# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JENNIFER S. FISCHMAN,

                 Plaintiff,

     v.

MITSUBISHI CHEMICAL HOLDINGS
AMERICA, INC.; MITSUBISHI CHEMICAL
CORPORATION; MITSUBISHI CHEMICAL
HOLDINGS CORPORATION; NICOLAS OLIVA,
in his individual and professional capacities;
DONNA COSTA, in her individual and professional
capacities; and JOHN DOES 1-10, in their individual
and professional capacities,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No. _:__-cv-____ (___)

**ECF Case**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jennifer S. Fischman ("**Ms. Fischman**"), by and through her attorneys Valli Kane & Vagnini LLP, hereby brings this Complaint against Mitsubishi Chemical Holdings America, Inc., Mitsubishi Chemical Holdings Corporation, and Mitsubishi Chemical Corporation (Collectively, "**Mitsubishi**" or the "**Company**"), Nicolas Oliva ("**Oliva**"), Donna Costa ("**Costa**"), and John Does 1-10 (individually, as "**Aider and Abettor Defendants**" and, together with the Company, "**Defendants**"), and hereby alleges as follows:

## INTRODUCTION

1.     Japan has a well-documented, long and deplorable history of discrimination against women in the work force.  Women in Japan earn on average 25-30% less than their male counterparts. Women are historically not elevated to positions of authority within Japanese companies and there are virtually no female role models in executive positions.

2.     Mitsubishi is no exception.  It employs tens of thousands of people worldwide and has virtually no women within the ranks of its executive management.  Although it has corporate

policies giving "lip service" to the ideals of diversity and equality, it is a culture devoid of any real diversity or equality for women.

3. Until 2016, there was not a *single* woman within the executive management ranks of Mitsubishi, including its subsidiaries or affiliates, anywhere in the world. Since then, only one woman has been promoted, to the position of president of a foreign affiliate not situated in Japan, and only one woman has been included on the Board of Directors in Japan. Unfortunately, for Ms. Fischman and for all of the other women who have dedicated years of exceptional work and talent to the Company, token representation at the executive level has been condoned by this multi-national Japanese conglomerate.

4. Ms. Fischman brings this action for failure to promote, demotion, and wrongful termination, as well as disparate treatment in compensation (all based upon gender discrimination), along with related claims of retaliation for her opposition to Defendants' unlawful employment practices, in violation of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("**Title VII**"); (2) the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.* (the "**EPA**"); (3) the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("**SARBOX**"); (4) the New York State Human Rights Law, N.Y. Exec. Law §296 *et seq.* (the "**NYSHRL**"); and (5) the Administrative Code of the City of New York § 8-107 *et seq.* (the "**NYCHRL**"). In addition, Ms. Fischman asserts tort claims based upon Defendant's wrongful conduct set forth herein.

5. Ms. Fischman seeks compensatory and punitive damages, injunctive and declaratory relief, and such other relief as is just and proper, including appropriate equitable relief.

**JURISDICTION AND VENUE**

6. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, pursuant to 29 U.S.C. § 206(d) under Title VII, 42 U.S.C. § 2000e *et seq.* under the EPA, 18 U.S.C. § 1514A under SARBOX and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief: (i) under any Act of Congress providing for the protection of civil rights; and (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201.

7. The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367 (a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of

operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 29 U.S.C. §§ 201-219, in as much as this judicial district lies in a State in which the unlawful employment practices occurred.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants maintain offices, conduct business and reside in this district.

## ADMINISTRATIVE PROCEDURES

9.      Pursuant to the administrative requirements of Title VII etc., a complaint was filed with the New York office of the Equal Employment Opportunity Commission ("**EEOC**"), and a Notice of a Right to Sue letter was issued on June 14, 2018.

## PARTIES

10.      Ms. Fischman is a resident of Westchester County, New York.  Defendant Mitsubishi Chemical Holdings America, Inc. employed Ms. Fischman in its legal department from March 3, 2008 to January 30, 2017.

11.      Defendant Mitsubishi Chemical Holdings America, Inc. f/k/a Mitsubishi Chemical USA, Inc. ("**MCHA**") is a Delaware corporation, with its principal place of business located at 633 Third Avenue, 15th Floor, New York, New York, in New York county.

12.      Defendant Mitsubishi Chemical Holdings Corporation ("**MCHC**") is a Japanese corporation, with its principal place of business in Tokyo, Japan.  MCHC is the 100% shareholder of MCHA and engaged, supervised and directed MCHA's legal department.

13.      Defendant Mitsubishi Chemical Corporation ("**MCC**") is a 100% subsidiary of MCHC, with its principal place of business in Tokyo, Japan.  MCC engaged, supervised and directed MCHA's legal department.

14.      Defendant Donna Costa is President of MCHA, Executive Officer of MCHC and is a resident of Kings County, New York.

15.      Defendant Nicolas Oliva is General Counsel and Chief Compliance Officer of MCHA and is a resident of New Jersey.

16.      Defendants John Does 1-10 are certain MCHA and MCHC directors, officers, and board members who participated in the actions alleged herein, whose identities are presently unknown as they are peculiarly within the possession of the corporate defendants named above.

## NON-PARTIES

17.     Non-Party Shoji Yoshisato is an Executive Officer of MCHC, a resident and citizen of Japan. Mr. Yoshisato was the President of MCHA in New York from 2010 to 2015.

18.     Non-Party Ken Fujiwara is an Executive Officer of MCHC, a resident and citizen of Japan. Mr. Fujiwara is the Administrative Director of the Legal Department of MCHC and is responsible for Legal matters around the world.

19.     Non-Party Masanori Sakaguchi is the General Manager of the MCHC Legal Department (aka the Mitsubishi Chemical Holdings Japan Legal Department), responsible for legal matters in the Americas and Europe.

20.     Non-Party Jouhei Takimoto is an Executive Officer of MCC, a resident and citizen of Japan and is responsible for the engagement of the MCHA legal department for certain MCC matters.

## FACTUAL BACKGROUND

21.     Ms. Fischman is a female attorney who was admitted to the State Bar of California in 1996 and is, was, and has at all relevant times been an attorney in good standing of the State Bar of California. At all times during the relevant time period she was properly registered as Defendants' in-house counsel pursuant to the laws of the State of New York.

22.     Ms. Fischman has practiced law for over twenty-one years, both as a law firm associate and as in-house counsel. She began her career as a federal law clerk to a United States District Court Judge in the Central District of California prior to becoming a litigation associate at a national law firm.

23.     Ms. Fischman was hired by Defendant MCHA in 2008, after serving for seven years as in-house corporate counsel for Raytheon Company, a publicly traded aerospace and defense company located in El Segundo, California.

24.     Ms. Fischman moved her family from California to New York to accept the position of Corporate Counsel in the legal department at MCHA, reporting to Defendant Costa, who was then the General Counsel of MCHA.

### Organization of Mitsubishi and its Legal Department

25.     The Mitsubishi Chemical Holding Corporation ("**MCHC**") is an international corporate conglomerate, based in Japan, and organized in accordance with the laws of that country. MCHC is the parent company of more than 700 (515 consolidated) subsidiaries or affiliate companies

worldwide, with over 69,000 employees and over ████████████ (FY 2017). MCHA and MCC are 100% owned, direct subsidiaries of MCHC (collectively, "Mitsubishi").

26.    The MCHA Board of Directors consists of the President of MCHA and Japanese board members from MCHC or other Japanese entities, including MCC. During the relevant time period, executive leadership at MCHA included some local leaders, such as the General Counsel and the Human Resources director, but the director of Finance and the President were, until 2016, always Japanese employees who rotated through the MCHA office for 3-5 year periods and reported directly to executives at MCHC or other Mitsubishi companies. Other members of the team including the Vice President of Tax and director of Internal Audit also reported directly to employees of Mitsubishi in Japan. All significant MCHA decision-making goes through Mitsubishi in Japan, and all significant actions taken by Mitsubishi's subsidiaries and affiliates in the United States require Mitsubishi's knowledge and consent.

27.    Almost all affiliates of Mitsubishi in the United States, as well as some in Japan, are signatories to a Legal Services Agreement ("**Signatory Entities**"), pursuant to which all of their legal matters throughout the United States are managed by the MCHA legal department. All told, during the relevant period, there were approximately 40 Signatory Entities that would seek legal advice and counsel from the MCHA legal department pursuant to the Legal Services Agreement. These Signatory Entities collectively had over 4000 employees throughout the United States and the rest of the world.

28.    The MCHA legal department is headed by a General Counsel who is also the Chief Compliance Officer and who, pursuant to the Legal Services Agreement, also holds the corporate title of "Secretary" for each of the Signatory Entities (including MCHA itself). Accordingly, the General Counsel/Chief Compliance Officer of MCHA holds a board level, director position in each of the Signatory Entities, as Secretary. Appointment to the title of Secretary generally requires the approval of the board of directors of each respective Signatory Entity, as well as the approval of the leadership of their respective Mitsubishi parent companies in Japan.

29.    The General Counsel/Chief Compliance Officer of MCHA holds one position but performs two roles at the company: first as General Counsel, and second as Chief Compliance Officer. As General Counsel, the incumbent serves as the first point of contact for providing legal support to any Signatory Entities which reach out to MCHA for assistance when a legal matter arises. Reporting to the General Counsel, during the relevant period, were a number of employees at the

Assistant General Counsel level, who in turn supervised a number of employees at the Corporate Counsel level, as well as the paralegal and Japanese legal interns.

30.     The General Counsel is charged with assigning and delegating work to each of the lawyers operating as an Assistant General Counsel, and to supervise the work performed by those legal personnel and their subordinates.  In addition, the General Counsel is responsible for managing the budget and other operations of the legal department, is required to function as an integral member of the management of MCHA, and is often involved in strategic decisions concerning the Signatory Entities.

31.     In addition to the duties described above, the General Counsel also has a second role as MCHA's Chief Compliance Officer, and in this role is responsible for legal and regulatory compliance for all of the Signatory Entities and their employees.  These personnel were required to receive compliance training, under the oversight of the General Counsel/Chief Compliance Officer of MCHA, as a result of their participation in the businesses of the Signatory Entities, which were affiliates of Mitsubishi.  That compliance training was offered via: (1) an online platform, and (2) live, in-person training.  Both of these training regimes were managed by the General Counsel/Chief Compliance Officer, who determined the programming content and courses offered each year for each region, coordinated with Japanese and European counterparts, and was responsible for making sure the training was effective.

32.     During the relevant period, the Assistant General Counsel position had 3 simultaneous incumbents.  They were responsible for managing the legal requirements of a number of Signatory Entities, as delegated to them, under the supervision of the General Counsel.  Once the Signatory Entities understood that one of the Assistant General Counsel had been assigned to be their lawyer, they would typically call that person directly to seek legal advice.

33.     The legal department also had a Corporate Counsel level position, which operated at a more junior level, providing support to the lawyers functioning in the Assistant General Counsel and General Counsel positions.

### Ms. Fischman's Performance as Corporate Counsel, Assistant General Counsel, Acting General Counsel and Chief Compliance Officer

34.     In her role as an attorney for the Company, Ms. Fischman's duties included providing legal advice and counsel for numerous affiliate companies located in the United States, Mexico, Brazil,

Argentina and Canada, as well as entities located in Japan, China and Europe that had transactions or legal matters in the United States.

35.     As Corporate Counsel, Ms. Fischman consistently received the highest accolades and a rating of "exceeds expectations" in each of her annual performance reviews, from 2009-2012.

36.     Ms. Fischman received the highest possible rating of "Exceeds Expectations" in her 2009 performance review, which contained a number of accolades including that Ms. Fischman:

- was "the go-to legal advisor for most non-IP legal matters"
- "demonstrated an ability to handle many complex matters at once.  She is hard working and often asks for additional responsibility, which she absorbs without hesitation or complaint.  In fact, the more work she is given the better she performs.... ██████████ ████████████████████████████████████████████."
- "contributed tremendously to a wide range of clients in the US and Japan and is greatly appreciated as a valuable member of the MCUS Legal Department.  It was a good year!"

37.     Each of Ms. Fischman's performance evaluations, continuing from 2010 onward, was similarly effusive.  Her 2010 evaluation included the highest possible "Exceeds Expectations" rating and noted that Ms. Fischman:

- "remains the go-to legal advisor for most non-IP legal matters"
- "Provided excellent compliance training in numerous areas this year"
- "has demonstrated an ability to handle many complex matters at once.  She is hard working and often asks for additional responsibility, which she absorbs without hesitation or complaint.  She is a true team player, willing to have a starring role or a supporting role as needed."
- "contributed tremendously to a wide range of clients in the US and Japan and is greatly appreciated as a valuable member of the MCUS Legal Department."

38.     In her 2011 evaluation, Ms. Fischman again received the highest possible "Exceeds Expectations" rating, and the evaluation noted that Ms. Fischman:

- Was entrusted with "a leading role in a number of complex transactional projects for ████, which she has handled extremely well."
- Has "good instincts and consistently demonstrates excellent judgment in providing advice."

39.     In her 2012 evaluation, Ms. Fischman again received the highest possible "Exceeds Expectations" rating, which included the following notations:

- "Jennifer did a great job in 2012."
- "Jennifer remains the go-to legal advisor"
- "She has good instincts and consistently demonstrates excellent judgment in providing advice."
- "Based on her demonstrated commitment, her strong work ethic, her assumption of greater responsibilities, and the level of trust and respect she has earned both inside and outside MCHA, Jennifer is being promoted in 2013 to Assistant General Counsel."

40.     In addition, during this time, Ms. Fischman was tasked to manage general counsel duties for Ms. Costa, while Ms. Costa was absent from the Office obtaining her Masters in Business Administration, attending an international business school (in London, New York, and China) during a two-year period from 2010 to 2012.

41.     In February 2013, the Company followed through on the statements contained within her 2012 performance evaluation, and promoted Ms. Fischman to the Assistant General Counsel position.

42.     As a result of her promotion, Ms. Fischman took on a number of additional responsibilities, which were cumulative to those she retained from her previous role as a Corporate Counsel.  In addition to ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Sometimes Ms. Fischman worked with outside counsel, but most of the time, the legal matters were successfully managed and concluded solely by Ms. Fischman.

43.     In addition to her legal duties, during her tenure, Ms. Fischman was also the primary developer and presenter of ethics and compliance training for MCHA and the Signatory Entities. She presented this training live, and in person, for Signatory Entities within the United States.

44.     As Assistant General Counsel, Ms. Fischman continued to perform at the highest professional level, efficiently and successfully handling many complex legal and compliance matters at once.

45.     In her 2013 performance evaluation, which measured her performance in her role as Assistant General Counsel, Ms. Fischman again earned the highest possible rating of "Exceeds Expectations."  The review contained a number of notable acknowledgments of her strong performance, including:

- "Jennifer excelled in her performance in 2013."
- "Jennifer is greatly appreciated as a valuable member of the MCHA Legal Department. Based on her demonstrated commitment, her strong work ethic, her assumption of greater responsibilities, and the level of trust and respect she has earned both inside and outside MCHA, Jennifer has earned the rating of 'Exceeds Expectations.'"

46.     In her 2014 performance evaluation, Ms. Fischman once again earned the highest possible rating of "Exceeds Expectations."  The review noted that:

- "Jennifer continued as lead counsel in support of several MCHC affiliates in North America…"
- "█████████████████████████████████████████████████"
- "As of April 1, 2015, Jennifer will be promoted to Acting General Counsel and Chief Compliance Officer of MCHA.  She began her transition to this new role during the 4th quarter of 2014."

47.     Ms. Fischman was promoted to the position of "Acting" General Counsel in the 4th Quarter of 2014.  In her capacity as Acting General Counsel and Chief Compliance Officer, Ms. Fischman became responsible for providing legal support and compliance programming to nearly 40 affiliate companies in the Americas and for managing a legal staff of five lawyers and one paralegal at MCHA.

48.     In her annual 2015 review (dated April 30, 2016), Ms. Fischman received another superlative performance review reflecting her tireless efforts over the course of the year and her continued excellent performance.  The review included glowing accolades, such as that Ms. Fischman's "continued success and ability to meet client demands is a testament to her skill, intelligence, capability and integrity,"

### The Company's Failure to Promote Ms. Fischman

49.     On December 3, 2014, Ms. Fischman met with Ms. Costa, who told her that she (Ms. Costa) was being promoted from the position of MCHA's General Counsel and Compliance Officer to the position of President, beginning April 2015.  Ms. Costa also informed Ms. Fischman that she

(Plaintiff), too, was being promoted to the position "Acting" General Counsel and Chief Compliance Officer. At the time, Ms. Costa explained that despite Ms. Fischman's outstanding performance in the position of Assistant General Counsel and numerous comments Ms. Costa made over the years that she viewed Ms. Fischman as her successor, it was unlikely Ms. Fischman would ever be promoted to the General Counsel and Chief Compliance Officer position on anything more than a temporary basis.

50.     Ms. Costa explained that the decision to not promote Ms. Fischman to full General Counsel and Chief Compliance Officer had been made in Japan. At no time did Ms. Costa state or suggest that the decision had been hers (Costa's). Ms. Costa explained that she was unable to "get you [Ms. Fischman] through Japanese management." Ms. Costa made other comments during this meeting that suggested Ms. Fischman was not going to successfully achieve any promotion to the permanent General Counsel position, including the statements:

- "I can't make any promises that it will ever happen [that you will be moved up to the full General Counsel role]."
- "It's probably never going to happen."

51.     On information and belief, the Company's decision to place Ms. Fischman in an "acting" role was unprecedented, and at no prior point had any male employee in the Company been placed into a job title on an "acting" basis (at MCHA or any other Company affiliate in the US or elsewhere).

52.     Ms. Fischman understood Ms. Costa's statement that she would be promoted to General Counsel on an "acting" basis to mean that that the Company would not tolerate another woman in its executive leadership. Women are not meaningfully represented within the senior levels of Mitsubishi, and during the relevant time only two (2) women had any significant role at the senior levels of the Company. First, at the time of Ms. Costa's promotion, she was the only woman in the entire company, worldwide, who occupied an officer-level position, including all of the Company's subsidiaries and affiliates worldwide. Additionally, at around the same time in Japan, MCHC appointed a female outside director to its board. Other than that, there were no female incumbents on the board of directors for the Company or any of its subsidiaries and affiliates, anywhere in the world. Promoting Ms. Costa, a woman, was a significant departure from Japanese corporate culture where women play a secondary role in the workplace compared to men. Moreover, Japanese culture and its associated politics was a continual point of emphasis at the

Company, and was even referenced and incorporated into year-end performance appraisals, including those of Ms. Fischman.

53.   ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████, which Ms. Fischman understood would safeguard her from retaliation and would always keep her in a position of authority.  Such conversations against the interest of the Company were common with Ms. Costa; ████████████████████████████████████████████████
████████████████████████████████████████.

54.   In April 2015, shortly after Ms. Fischman's promotion was announced, she visited ██████████████████ a Company affiliate located in South Carolina.  During two separate meetings, first with ██████████ (the affiliate's male president) and then with ██████████ (its male chief executive officer), ████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████-
███████████████████████████████████████████████████.
██████████, over dinner and drinks, stated: "I heard she [Ms. Costa] expended all of her political capital and ██████████████████████████████████████████."
██████████, over lunch, made similar comments to Ms. Fischman.

55.   Mitsubishi Polyester Film, like Mitsubishi's other affiliates, has no women in officer-level leadership and, ████████████████████████████████████████████████
█████████████████████████████████.

56.   During Ms. Costa's tenure as General Counsel and Chief Compliance Officer, she had direct access to the senior leadership of Mitsubishi in Japan.  Ms. Costa met regularly with all of them, went to Japan at least 2 times a year, and spoke or e-mailed with them on a regular basis about the direction of the Company's affiliates, merger and acquisition activity, and strategic initiatives.  Ms. Costa also met with Shoji Yoshisato, MCHA's local executive leader, on a nearly daily basis.

57.     In contrast, as "acting" General Counsel, Ms. Fischman was excluded from all meaningful interactions with the Company's Japanese leadership, including Ken Fujiwara and Masanori Sakaguchi. As "Acting" General Counsel, Ms. Fischman was invited to the monthly staff meetings for local MCHA leadership, which were chaired by Ms. Costa, but was not permitted to interact with any Mitsubishi personnel situated in Japan. As described in detail above, for Mitsubishi's North American subsidiaries, all decision-making goes through Mitsubishi in Japan. Moreover, no material decisions concerning MCHA were made without Mitsubishi (Japan)'s knowledge and consent. Accordingly, excluding Ms. Fischman from communicating with Mitsubishi personnel meant that she was being denied opportunities for promotion and advancement.

58.     Despite her excellent qualifications, eighteen years of legal practice (at the time the decision was made) (she practiced from 1996-2017) and seven years of documented outstanding performance at the Company, Ms. Fischman was passed over for promotion to the full (i.e. non-temporary) position of General Counsel and Chief Compliance Officer until the Company could hire a suitable *male* replacement, because the Company values male leadership and could not tolerate the notion of having more than one woman (Ms. Costa and Ms. Fischman) in executive positions.

59.     Indeed, other than one other woman who is an outside member of the board of directors in Japan, Ms. Costa remains the only woman in executive leadership worldwide – in a company with tens of thousands of employees and hundreds of affiliated companies.

### The Company's Disparate Treatment of Ms. Fischman

60.     As set forth below, Ms. Fischman was replaced with a younger, less qualified, and less experienced male attorney, Mr. Oliva, who took her place and became General Counsel and Chief Compliance Officer as of December 1, 2015.

61.     In contrast to Ms. Fischman's tenure as Acting General Counsel, Mr. Oliva received disparately favorable treatment when he occupied the General Counsel title because he was male.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████.

62.     Additionally, when Ms. Fischman was promoted to Acting General Counsel, she was prohibited, by Ms. Costa, from visiting or communicating directly with Mr. Fujiwara or Mr. Sakaguchi, her male supervisors at the Japanese headquarters of the Company. In contrast, Mr.

Oliva was permitted to communicate directly with Mr. Fujiwara and Mr. Sakaguchi immediately upon his receipt of the General Counsel title, and he visited them in Japan in January 2016, a mere six weeks after he was made General Counsel.,

63.     Similarly, on a trip to Japan with Ms. Costa in 2013, Mr. Sakaguchi was openly hostile to Ms. Costa in front of Ms. Fischman.  Later during the trip, ██████████████████████████ ████████.”  In contrast, when Mr. Oliva visited the Company's legal department in Japan, he was welcomed by, and invited to dine with, Mr. Sakaguchi and Mr. Fujiwara.  Indeed, on one occasion, he was invited to dinner and to attend a professional baseball game with them. Ms. Fischman, on the other hand, was not invited by either man to visit Japan, to dine with them or go to a baseball game or participate in any similar entertainment. Ms. Fischman did not visit Japan as Acting General Counsel until October 2015, more than eleven months after she had transitioned to the role.  Ms. Fischman was treated differently based on her gender.

64.     Ms. Fischman complained to Pat Saunders, MCHA's Human Resources representative on multiple occasions, about the disparate treatment that Mr. Oliva was receiving in contrast to how Ms. Fischman was treated as Acting General Counsel and Chief Compliance Officer.

### Ms. Fischman's Participation in Protected Activity

65.     During 2014, ████████████████████████████████ ███████████, had been the subject of a █████████████████████████    claim. Ms. Fischman was assigned to investigate the claim █████████████████████████. During the course of the investigation, ██████████ was required to interview ████████████ ████████████████████████████████████████████████ ███████████████, and which were, within the context of Japanese culture, particularly taboo given that she is an American female professional and he is a ███████████████████ ████████████████████████████.

66.     The investigation began after ██████████ and another employee were alleged ██████ ████████████████████████████████████████████████. Ms. Fischman hired an outside law firm to gather facts concerning the matter, ██████████████ ████████████████████████████████████████████████ ████████████████████████████████        █████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████



███████████████████████████████████████

███████████████████████████████████████

████████████████████████ Upon consultation with the law firm, Plaintiff, ██████

██████████████ investigation, advised ████████████████████████

███████████████████████████████████████

███████████████████████████████████."

67.   ████████████████████████████████ during the Fall of 2014, ████

████████ retaliated against Ms. Fischman for participating in protected activity (the investigation

████████████████████████) by refusing to promote her to the full role of General

Counsel and Chief Compliance Officer, despite her flawless record and exceptional performance,

and by beginning to search for someone to replace her. ██████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████.

68.   As an example of how the Company condones the improper behavior of men ██████

███████████████████████████████████████

████████, Ms. Fischman, who has never been accused of any wrong-doing, was passed over for

promotion, demoted, humiliated and wrongfully terminated (as described below) under false

pretenses. This is nothing less than disparate treatment based upon gender.

69.   In November 2015, despite her tireless efforts over the course of 2015 and her continued

excellent performance, the Company decided to hire a new, less qualified, less experienced, male

employee (Nicolas Oliva) to replace Ms. Fischman as General Counsel and Chief Compliance

Officer.

70.   On or about November 11, 2015, upon learning that the Company had hired Mr. Oliva, Ms.

Fischman complained to MCHA's Human Resources representative Pat Saunders that the hiring

of Mr. Oliva constituted discrimination based upon gender. Ms. Fischman told Ms. Saunders: "I

think this is crazy. I just got demoted so the company could hire a man. Didn't we all know this

was going to happen? This is discrimination."

71.     Mr. Oliva commenced employment at the Company on or about November 30, 2015. Simultaneously, the Company demoted Ms. Fischman from Acting General Counsel and Chief Compliance Officer to Assistant General Counsel. At the time he was hired, Mr. Oliva was not subject to any probationary period and was never temporarily titled as "Acting" General Counsel to the Company.

72.     Immediately upon his hire, Ms. Fischman was assigned to report to Mr. Oliva.

73.     Ms. Fischman proceeded to make additional complaints to Mitsubishi leadership about the discriminatory treatment of women. █████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Ms. Fischman told Mr. Oliva that ███████████████████████████████████ ████████████████, and I won't be a part of it." ███████████████████████ ██████████████████████. However, just a few weeks later in April 2016, Mr. Oliva retaliated against Ms. Fischman by "papering" her personnel file and including a "Needs Improvement" negative rating in the area of "Communication" in her otherwise stellar Annual Performance Review, for the first time in her tenure at the Company. At the time, Mr. Oliva had actual knowledge of the falsity of this comment.

74.     ████████████, Ms. Fischman was tasked by Mr. Oliva to investigate ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████" Fearing retaliation for disagreeing in writing with Mr. Oliva, Ms. Fischman did what she was told. ████████████████████████████████████████████████████████

75.     Ms. Fischman complained verbally to Mr. Oliva about his inherent gender bias in the investigation, the outcome of the investigation and conclusions he reached. █████████████ ██████████████████████████████████████████.

76. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████Mr. Oliva nodded in agreement with Ms. Fischman and shrugged, but failed to object to Mr. Takimoto or anyone else at the Company's headquarters in Japan.

77. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████

### Wrongful Termination

78.     The Company went out of its way to support its discrimination by laying a false foundation for its conduct, first in Ms. Fischman's demotion and then in her termination. It did this by using Ms. Costa to "paper" Ms. Fischman's personnel file by giving Ms. Fischman a pre-textual negative, mid-year review in November 2015, in order to demote Ms. Fischman and replace her with a male. It was not the Company's practice to issue mid-year reviews and Ms. Fischman had not received one at any other time during her tenure. At the time of the false negative review, Ms. Costa had actual knowledge of its falsity.

79.     The fact that the negative review was pretextual, as was the Company's demotion of Ms. Fischman to Assistant General Counsel, is further demonstrated by the fact that the Company compensated Ms. Fischman, at the end of 2015, as if she had performed exceptionally well in the Acting General Counsel Role. Although she was demoted on November 30, 2015, the Company paid Ms. Fischman the full value of her "Acting General Counsel" bonus (prorated from April 2015 through November 2015) as well as the prorated bonus for the remainder of the year at the

Assistant General Counsel level, when bonuses were paid out in June 2016. She also received a raise for 2016 over her 2015 salary for her exceptional performance (as articulated in the Annual Performance Review for 2015). Thus, the "papering" of Ms. Fischman's file with the first time ever mid-year review and the unwarranted negative component in her otherwise stellar Annual Review is evidence of their discriminatory and retaliatory motives.

80.      In retaliation for Ms. Fischman's complaints of gender discrimination and disparate treatment, described above, on January 30, 2017, upon her return to the office from a week-long trip with Mr. Oliva to California, Mr. Oliva terminated Ms. Fischman's employment. With Ms. Saunders present, Mr. Oliva read a one paragraph statement and then told Ms. Fischman that she had been fired *for cause and would receive no severance package.*

81.      Ms. Fischman was denied the opportunity to contact any of her colleagues and explain that she would be leaving the Company. She was denied the opportunity to wrap up any of her outstanding matters for clients who had trusted and worked with her for nearly nine years. Instead, Ms. Fischman was told to collect her coat and some personal effects and then was immediately "walked out" of the building by Ms. Saunders, leaving other employees with the impression that Ms. Fischman had committed a grievous crime.

82.      The cruelty with which Ms. Fischman was treated was an attempt by the Company to humiliate her, damage her personal and professional reputation and silence her from making a claim of discrimination and retaliation.

83.      At the time of her termination, Ms. Fischman was informed that the purported reason for termination was a supposed ethical breach of her professional ethics related to ███████████ case. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████.

84.      The Company's stated reason for termination was pretextual. ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████.

85.     Ironically, the week before the Company informed Ms. Fischman of her termination, the Company sent her to California to provide *ethics* training to the senior executive teams at four of its separate affiliate companies. During the visit and the training, which Mr. Oliva personally attended, he introduced Ms. Fischman to the executives of each of the affiliate companies as the Company's leading expert in business ethics.

86.     After Ms. Fischman's termination, the Company took further retaliatory action against her by contesting her application for unemployment insurance benefits. Ms. Fischman challenged the Company's denial of her unemployment benefits, and an administrative law judge found Mr. Oliva's testimony (that Ms. Fischman had been fired for ethical concerns), "lacked merit and strained credulity" since he, with full knowledge of the facts ███████████████, had still allowed her to hold herself out as the Company's expert on ethics a mere week before he terminated her.[1]

87.     As Assistant General Counsel and the primary attorney assigned to manage and advise on employment law matters for the Company, Ms. Fischman gained an intimate understanding of what constitutes grounds for dismissal within the Mitsubishi organization and also grounds for charges of discrimination and retaliation. The reason provided for Ms. Fischman's termination was pure fiction. But even if Ms. Fischman had made a settlement offer that was in some way improper, under the Company's system of progressive discipline, Ms. Fischman should not have been terminated. Indeed, no other employee of the Company had ever been summarily terminated without first receiving one or more written warnings.

88.     In contrast to the way Ms. Fischman was treated, Mr. Oliva consistently complained to her of the incompetence of ███████████████████; they even discussed how to terminate ████████████████████████████████████████████████████████████████.

89.     ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████.

---

[1] True and correct copy of the Opinion of the Honorable Catherine Agnello, Administrative Law Judge for the New York State Department of Labor, dated October 24, 2017 is attached as Exhibit 1.

90. .

## FIRST CAUSE OF ACTION

**(Discrimination in Violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17)**

*Against the Company Defendants*

91. Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

92. Defendants have discriminated against Plaintiff on the basis of her sex in violation of Title VII by passing her up for promotion, demoting her and terminating her on the basis of her sex including, but not limited to, subjecting her to disparate working conditions and compensation because of her gender, and denying her the opportunity to work in an employment environment free of unlawful discrimination.

93. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

94. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

95. Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SECOND CAUSE OF ACTION

### (Retaliation and Wrongful Termination in Violation of 42 U.S.C. § 2000e-3(a))

*Against the Company Defendants*

96.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

97.    Defendants retaliated against Plaintiff for her opposition to their discriminatory behavior toward Plaintiff and other women at the Company in violation of Title VII, by passing her up for promotion, demoting her and wrongfully terminating her.   Defendants also retaliated against Plaintiff for her participation in the investigation of the alleged sexual harassment and sexual misconduct by ███████████.

98.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

99.    As a direct and proximate result of Defendants' unlawful discriminatory and harassing conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

100.    Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous, malicious and cruel, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## THIRD CAUSE OF ACTION

### (Retaliation and Wrongful Termination in Violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A)

*Against the Company Defendants*

101.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

102.    Plaintiff was subjected to retaliation for her participation in the investigation of allegations asserted against ███████████ pursuant to the Sarbanes-Oxley Act.   In retaliation for her participation in the investigation, Ms. Fischman was subjected to adverse employment actions

including failure to promote her to the position of General Counsel and Chief Compliance Officer, demoting her to Assistant General Counsel, and ultimately terminating her employment.

103.    These actions are in direct violation of Sarbanes-Oxley Act.

104.    As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.  Plaintiff has also been damaged by having lost wages and benefits due to her retaliatory termination.

## FOURTH CAUSE OF ACTION
### (Equal Pay Act Violation, in Violation of 29 U.S.C. §§ 206(d) *et seq.*)
*Against the Company Defendants*

105.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

106.    Defendants discriminated against Plaintiff within the meaning of the Equal Pay Act by providing her with lower pay and other forms of compensation than similarly situated male colleagues on the basis of her gender even though Plaintiff performed equal work requiring equal skill, effort and responsibility as her similarly situated male colleagues.

107.    Plaintiff and similarly situated male employees all performed equal job duties and functions.

108.    Plaintiff and similarly situated male colleagues all performed equal work that required equal skill, effort, and responsibility, and that was performed under similar working conditions.

109.    Defendants discriminated against Plaintiff by subjecting her to discriminatory pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, and other forms of discrimination in compensation in violation of the Equal Pay Act.

110.    The differential in pay between Plaintiff and her male colleagues was not due to seniority, merit, quantity or quality of production, or a factor other than sex.  Rather, the differential in pay was due to Plaintiff's gender.

111.    · Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender in violation of the Equal Pay Act.

112.    Defendants' actions were not done in good faith nor did they have any reasonable grounds for believing that their acts or omissions were not a violation of the law.

113.   As a result, Plaintiff is entitled to liquidated damages in addition to lost wages and lost earning capacity.

114.   Defendants' foregoing conduct also constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

115.   As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages and lost earning capacity.

## FIFTH CAUSE OF ACTION

### (Discrimination in Violation of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297)

*Against the Company Defendants*

116.   Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

117.   Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by passing her up for promotion, demoting her and terminating her on the basis of her gender including, but not limited to, subjecting her to disparate working conditions and compensation because of her gender, and denying her the opportunity to work in an employment environment free of unlawful discrimination.

118.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

119.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

120.   Defendants' unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of the NYSHRL, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SIXTH CAUSE OF ACTION

### (Discrimination in Violation of the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131)

*Against All Defendants*

121.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

122.    Defendants have discriminated Plaintiff on the basis of her gender in violation of the NYCHRL by passing her up for promotion, demoting her and terminating her on the basis of her gender including, but not limited to, subjecting her to disparate working conditions and compensation because of her gender, and denying her the opportunity to work in an employment environment free of unlawful discrimination.

123.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

124.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

125.    Defendants' unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of the NYCHRL, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SEVENTH CAUSE OF ACTION

### (Pay Discrimination – New York State Equal Pay Act, New York Labor Law § 194)

*Against the Company Defendants*

126.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

127.    Plaintiff makes this claim under the New York State Equal Pay Act, NYLL §§ 194 *et seq*.

128.    Defendants subjected Plaintiff to a discriminatory lower rate of pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and/or titles, and other forms of discrimination relative to Plaintiff's similarly situated male colleagues.

129. Plaintiff and similarly situated male colleagues all performed equal work that required equal skill, effort, and responsibility, and that was performed under similar working conditions.

130. Defendants' actions were not done in good faith.

131. As a result, Plaintiff is entitled to liquidated damages in addition to lost wages and lost earning capacity.

132. As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages and lost earning capacity.

## SEVENTH CAUSE OF ACTION
### (Retaliation – New York Labor Law § 215)
*Against All Defendants*

133. Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

134. Plaintiff made complaints within the meaning and scope of Section 215 of the New York Labor Law when she complained to Defendants about her discriminatory treatment.

135. In response, Defendants retaliated against Plaintiff by refusing to promote her to General Counsel and Chief Compliance Officer, by demoting her to Assistant General Counsel, and by wrongfully terminating her.

136. As a result, Plaintiff has suffered and continues to suffer damages and harm, including but not limited to lost wages, lost earning capacity, and emotional distress.

## SEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
*Against All Defendants*

137. Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

138. Defendants acted intentionally and recklessly in taking their adverse employment actions against Plaintiff, including by immediately escorting her from the premises upon her termination, by denying her the opportunity to say goodbye to her co-workers and external contacts, and by refusing her the opportunity to even send a departure email, which is customary for an attorney to send when they leave their place of employment to pursue other employment opportunities. The

actions, taken by Defendants, were intended to, and did in fact, impress upon other employees that Ms. Fischman had committed criminal or otherwise despicable acts.

139.    The cruelty with which Ms. Fischman was treated was intended by the Company to humiliate her, damage her personal and professional reputation and silence her from making a claim of discrimination and retaliation.

140.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## EIGHTH CAUSE OF ACTION

### (Negligent Destruction of Plaintiffs' Employment Opportunities)

*Against All Defendants*

141.    Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

142.    Defendants acted intentionally and recklessly in taking their adverse employment actions against Plaintiff, including by immediately escorting her from the premises upon her termination, denying her the opportunity to say goodbye to her co-workers and external contacts, and by refusing her the opportunity to even send a departure email, which is customary for an attorney to send when they leave their place of employment to pursue other employment opportunities. The actions, taken by Defendants, were intended to, and did in fact, impress upon other employees that Ms. Fischman had committed criminal or otherwise despicable acts.

143.    In addition to the foregoing, Defendants willfully refused to provide Ms. Fischman with any positive employment references. In so doing, Defendants knew (or were recklessly indifferent to) the fact that because they had been Ms. Fischman's sole source of employment for many years, potential employers would be unable to verify her positive performance at the Company and would refuse to offer her employment opportunities, effectively destroying her legal career.

144.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been completely unable to find employment within the legal profession.

145.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## NINTH CAUSE OF ACTION

### (Aiding and Abetting Discrimination and Retaliation – NYSHRL)

*Against Defendants Costa and Oliva*

146.  Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

147.  Defendants Costa and Oliva aided and abetted Defendants in their discriminatory actions against Plaintiff based on Plaintiff's sex, and aided and abetted Defendants in their retaliatory actions against Plaintiff for her complaints about gender discrimination.

148.  These actions are in direct violation of the New York State Human Rights Law, Executive Law § 290 *et. seq.*

149.  As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.  Plaintiff has also been damaged by having lost wages and benefits due to her discriminatory and retaliatory termination.

## TENTH CAUSE OF ACTION

### (Aiding and Abetting Discrimination and Retaliation – NYCHRL)

*Against Defendants Costa and Oliva*

150.  Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

151.  Defendants Costa and Oliva aided and abetted Defendants in their discriminatory actions against Plaintiff based on Plaintiff's sex, and aided and abetted Defendants in their retaliatory actions against Plaintiff for her complaints about gender discrimination.

152.  These actions are in direct violation of the New York City Human Rights Law.

153.  As a result of these illegal actions, Plaintiff has been physically and emotionally damaged in an amount that is not presently calculable due to the ongoing and future effects.  Plaintiff has also been damaged by having lost wages and benefits due to her discriminatory and retaliatory termination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Ms. Fischman for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Ms. Fischman for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Ms. Fischman for harm to her professional and personal reputations and loss of career fulfillment;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by Ms. Fischman in an amount to be determined at trial, plus prejudgment interest;

G. An award of punitive damages;

H. An award of costs that Ms. Fischman has incurred in this action, as well as Ms. Fischman's reasonable attorneys' fees to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

Dated:     September 7, 2018
           Garden City, New York

                              Respectfully Submitted,
                              VALLI KANE & VAGNINI LLP


                              */s/ Sara Wyn Kane*

SARA WYN KANE
ROBERT J. VALLI, JR.
MATTHEW L. BERMAN
*Attorneys for Plaintiff*
600 Old Country Road, Suite 519
Garden City, New York 11530
516-203-7180