JENNIFER STONE FISCHMAN

Q. On page 830, do you recognize these notes?

A. I do.

Q. Page 830 and 831?

A. Yes.

Q. When were they created?

A. On March 1st, 2016.

Q. And what were the circumstances?

A. The circumstances were that I had met with Nick earlier in the day after returning from a vacation, and we had had a discussion that I was very worried about, and, so, for the first time in my life I documented this discussion because it was so far afield of the type of work that I'd been asked to do prior that I wanted to document it.

Q. What do you mean by far afield?

A. I felt that Nick was asking me to create a false narrative to support a company that was doing something wrong.

Q. What did you think the company was doing wrong?

1  JENNIFER STONE FISCHMAN
2       A.    They were terminating an
3  employee who had been with the company for
4  more than twenty years after she had
5  already given her resignation notice.
6  Remember when I talked to you earlier about
7  MKIC and them having a reduction in force?
8       Q.    Uh-hum.
9       A.    So, this is roughly a year
10 after those first notes were taken, right,
11 so, this is 2016 and those notes were taken
12 in early 2015.  So, there had been a couple
13 of waves of reduction in force, and my
14 understanding was that the employees were
15 told that if they would leave the company
16 voluntarily they would be provided with a
17 very good severance package based on your
18 years of service, and I helped prepare
19 those severance documents and those
20 agreements for the company, and Amber Todd
21 was an employee of MKIC, as was her
22 husband, Dan Todd, both of them long-term
23 employees who had moved to Glendale from
24 the Virginia manufacturing plant several
25 years earlier to help establish the

1  JENNIFER STONE FISCHMAN
2  California office.  Dan Todd left the
3  company in October of 2015 and received a
4  very nice -- well, he received the
5  severance package that had been offered at
6  that time for all employees.  Dan went to a
7  customer of MKIC, which helped create a
8  pipeline of product for MKIC, so, he was
9  actually now the customer, working for the
10 customer of the company, and he had been
11 working there for some time when Amber Todd
12 in, I believe, February, early February of
13 2016, Amber went to Yvonne Bienemi, the
14 H.R. manager at MKIC, and said that she was
15 interested in now taking her severance
16 package, staying as long as the company
17 needed her to stay to help train any
18 replacement or backfill, if necessary, but
19 that she was now ready to leave the
20 company, and Yvonne at the time contacted
21 me and told me that the company didn't want
22 to pay her a severance package as they had
23 done her husband and other employees, and I
24 said that you have to treat all employees
25 equally, and during the middle of this I

```
 1                JENNIFER STONE FISCHMAN
 2    had told Yvonne that, no, it would be
 3    inappropriate to treat her differently and
 4    that was how I left it with her.  Then I
 5    went away on vacation in February for
 6    President's week, I suppose it was
 7    President's week, and on or around March
 8    1st, for sure it was March 1st, I came back
 9    and Nick came into my office and told me
10    that while I was away he had had
11    discussions with Takayamasan and Donna and
12    that they had made a separate decision to
13    terminate Amber, and I was surprised, and I
14    said why would you -- why would they do
15    that when they have offered a severance
16    package, and they said, well, now there is
17    a conflict.  I said there is no conflict.
18    There's never been a conflict.  They're
19    manufacturing a reason to get rid of her
20    and treat her differently, and he said that
21    it was our job in the legal department to
22    help spin a narrative in order to protect
23    the company from any potential liability,
24    and I vehemently disagreed and told him
25    that that was discriminatory, and he
```

1            JENNIFER STONE FISCHMAN

2  immediately changed the subject and walked

3  -- sort of stormed out of my office and

4  refused to discuss it further.  So, I went

5  home and I wrote this letter to myself

6  because I had never been asked to do

7  something like that.  It was antithetical

8  to everything I believe.

9      Q.   And what did you intend to do

10  with these notes when you wrote them?

11          MR. BERMAN:  Object to form.

12       To the extent that it doesn't call

13       for the mental impressions of an

14       attorney representing herself, you

15       can answer.

16      A.   I took these notes.  I folded

17  them up and I stuffed them in the back of

18  my desk hoping to never see them again.  It

19  was a cleansing for me, and that's where

20  they laid for the next several years.

21      Q.   The reduction in force at MKIC

22  in 2015 included both men and women; right?

23      A.   It had to because we did it

24  according to, you know, the EEOC

25  guidelines.