**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
JENNIFER S. FISCHMAN,

                Plaintiff,              Index No. 18-cv-08188 (JMF)

      v.

MITSUBISHI CHEMICAL HOLDINGS
AMERICA, INC.; MITSUBISHI CHEMICAL
CORPORATION; MITSUBISHI CHEMICAL
HOLDINGS CORPORATION; NICHOLAS
OLIVA, in his individual and professional
capacities; DONNA COSTA, in her individual
and professional capacities; and JOHN DOES
1-10, in their individual and professional
Capacities,
                Defendants.
------------------------------------------------------------X

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS

**GORDON REES SCULLY MANSUKHANI, LLP**
ATTORNEYS FOR DEFENDANTS MCHA, COSTA, AND OLIVA
1 BATTERY PARK PLAZA, 28TH FLOOR
NEW YORK, NEW YORK 10004
PHONE: (212) 269-5500

**SHEARMAN & STERLING LLP**
ATTORNEYS FOR DEFENDANT MITSUBISHI CHEMICAL HOLDINGS CORPORATION
599 LEXINGTON AVE
NEW YORK, NEW YORK 10022
PHONE: (212) 848-4000

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ................................................................................................................. 1

    I.      PLAINTIFF'S FRAUDULENT CONDUCT WARRANTS DISMISSAL ........... 1

          A.      Defendants need only show clear and convincing evidence of a fraud on the court to warrant dismissal, and have done so ........................................ 1

          B.      Plaintiff violated Rule 37 by creating and producing a fraudulent document during the course of discovery, and falsely testifying to its legitimacy ................................................................................................ 4

          C.      Plaintiff violated Rule 11 by submitting pleadings with no basis in fact, and then submitting falsified evidence to further support those pleadings. 5

          D.      Rule 608 is irrelevant and does not render LaPorte's report inadmissible . 6

          E.      Plaintiff fails to contest bad faith ................................................................ 6

    II.     PLAINTIFF'S ATTACK ON LAPORTE'S METHODOLOGY IS BASELESS . 7

          A.      The GC/MS methodology is highly reliable and well accepted ................. 8

          B.      Plaintiff's speculation on conditions and contamination does not provide a basis to exclude LaPorte's findings ........................................................... 11

          C.      The Ceglia court's findings underscore LaPorte's expertise .................... 12

          D.      Plaintiff has failed to present any evidence to rebut LaPorte's expert conclusion ................................................................................................ 14

CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Adelphia Supply USA*,
  2020 WL 1429472 (E.D.N.Y. Mar. 24, 2020) ................................................................ 2

*AJ Energy LLC v. Woori Bank*,
  18 Civ. 3735 (JMF), 2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019),
  *aff'd*, 829 F. App'x 533 (2d Cir. 2020) ..................................................................... 2

*Amerisource Corp. v. Rx USA Int'l Inc.*,
  No. 02-CV-2514 (JMA), 2010 WL 2730748 (E.D.N.Y. July 6, 2010),
  *aff'd sub nom. Parson*, 432 F. App'x 25 (2d Cir. 2011) ............................................. 5

*Ceglia v. Zuckerberg*,
  2013 WL 1208558 (W.D.N.Y. Mar. 26, 2013) .................................................. 11, 12, 13, 14

*Cerruti 1881 S.A. v. Cerruti, Inc.*,
  169 F.R.D. 573 (S.D.N.Y. 1996) ................................................................................ 3

*ComLab, Corp. v. Kal Tire*,
  17 Civ. 1907 (KBF), 2018 WL 4333987 (S.D.N.Y. Sept. 11, 2018) ........................ 3

*DAG Jewish Directories, Inc. v. Y&R Media, LLC*,
  09 Civ. 7802 (RJH), 2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) ........................ 3

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................................... 7

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
  2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ............................................................... 14

*Gomez v. Madden*,
  2020 WL 4336094 (S.D. Cal. 2020) .................................................................... 4, 14

*Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*,
  248 F.R.D. 126 (S.D.N.Y. 2007) ............................................................................... 5

*LAOSD Asbestos Cases*,
  44 Cal. App. 5th 475, 257 Cal. Rptr. 3d 682 (2020) ................................................ 14

*McMunn v. Memorial Sloan-Kettering Cancer Ctr.*,
  191 F. Supp. 2d 440 (S.D.N.Y. 2002) ....................................................................... 2

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*,
  212 F.R.D. 178 (S.D.N.Y. 2003) ............................................................................... 4

*Miller v. Bridgeport Bd. of Educ.*,
    12 Civ. 1287 (JAM), 2014 WL 3738057 (D. Conn. July 30, 2014) ........................................... 6

*New York Credit & Fin. Mgt. Grp. v. Parson Ctr. Pharmacy, Inc.*,
    432 F. App'x 25 (2d Cir. Sept. 15, 2011) ................................................................................. 1

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017) ..................................................................................................... 8

*Rossbach v. Montefiore Med. Ctr.*,
    19 Civ. 5758 (DLC), 2021 WL 3421569 (S.D.N.Y. Aug. 5, 2021) .......................................... 2

*Shangold v. Walt Disney Co.*,
    03 Civ. 9522 (WHP), 2006 WL 71672 (S.D.N.Y. Jan. 12, 2006),
    *aff'd* 275 F. App'x 72 (2d Cir. 2008) ....................................................................................... 2

**Rules**

F.R.E. 11 ............................................................................................................................... 5, 6, 13

F.R.E. 37 ....................................................................................................................................... 4

F.R.E. 37 ....................................................................................................................................... 4

F.R.E. 608 ..................................................................................................................................... 6

F.R.E. 608(b) ................................................................................................................................. 6

# PRELIMINARY STATEMENT

Facing a motion for sanctions and expert evidence of document falsification, Plaintiff did not muster expert evidence to rebut the findings of Defendants' forensic ink chemist, Gerald LaPorte, nor even submit an affidavit attempting to explain away his conclusions. As a result, Mr. LaPorte's findings stand uncontested, and constitute clear and convincing evidence of fraud sufficient to warrant the sanction of dismissal. Plaintiff's arguments in opposition are no substitute for an expert rebuttal of Mr. LaPorte's findings and rely on mischaracterization or outdated sources in a vain attempt to shake the sturdy foundation on which Mr. LaPorte's opinions rest.

By continuing this action, Plaintiff is perpetrating a fraud on this Court. The Court has the inherent power to dismiss the action in its entirety, and it should do so.

# ARGUMENT

## I. PLAINTIFF'S FRAUDULENT CONDUCT WARRANTS DISMISSAL

### A. Defendants need only show clear and convincing evidence of a fraud on the court to warrant dismissal, and have done so

Plaintiff concedes that the Court has the inherent power to dismiss a matter where a plaintiff has committed fraud on the court by fabricating evidence. *See* Plaintiff's Opposition Brief ("Pl. Opp.") at 5.[1] Sanctions are warranted if a party establishes, "by clear and convincing evidence," that the offending party "set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action"; under this test, "Falsifying evidence is sanctionable conduct. Submitting falsified evidence is also properly sanctionable." *New York Credit & Fin. Mgt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25, 25 (2d Cir. Sept. 15, 2011) (citations omitted). The "clear and convincing" standard requires proof that is

---

[1] All exhibits referenced herein are attached to the Declaration of Mercedes Colwin, which accompanies Defendants' initial motion papers, with the exception of the Declaration of Gerald LaPorte annexed hereto.

"highly probable" and "leave[s] no substantial doubt." *Abbott Laboratories v. Adelphia Supply USA*, 2020 WL 1429472, at *5 (E.D.N.Y. Mar. 24, 2020) (citations omitted).

Plaintiff invents a nearly insurmountable hurdle: that "imposition of a dismissal sanction usually requires something akin to metaphysical certainty" of misconduct and bad faith. Pl. Opp. at 6, citing *Rossbach v. Montefiore Med. Ctr.*, 19 Civ. 5758 (DLC), 2021 WL 3421569 (S.D.N.Y. Aug. 5, 2021); *Shangold v. Walt Disney Co.*, 03 Civ. 9522 (WHP), 2006 WL 71672 (S.D.N.Y. Jan. 12, 2006), *aff'd* 275 F. App'x 72 (2d Cir. 2008); and *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440 (S.D.N.Y. 2002). There is no such standard. In *Rossbach*, the court dismissed the case, requiring "clear evidence of misconduct and a high degree of specificity in the factual findings," based on a combination of witness testimony and misrepresentations about evidence. 2021 WL 3421569, at * 6. The *McMunn* court expressly noted that, "in an effort to protect Ms. McMunn's procedural rights, we have applied a 'clear and convincing' standard to any findings of fact we have made." The court dismissed the case based on circumstantial evidence of fraud from credit card records and an audiotape expert. *See* 191 F. Supp. 2d at 445-60. *Shangold* similarly makes no mention of metaphysical certainty; it adhered to the "clear and convincing evidence" standard and dismissed the case based on evidence of document fabrication. 2006 WL 71672, at * 4. Plaintiff's argument is simply incorrect.

Plaintiff also conveniently ignores the numerous cases in this Circuit where courts, including this Court, have dismissed claims based upon strong circumstantial evidence of fabricated evidence, not metaphysical certainty, *See, e.g., AJ Energy LLC v. Woori Bank*, 18 Civ. 3735 (JMF), 2019 WL 4688629, at *12 (S.D.N.Y. Sept. 26, 2019), *aff'd*, 829 F. App'x 533 (2d Cir. 2020) ("One appropriate sanction is plainly dismissal of the FAC with prejudice, which, among other things, will help prevent future fraudulent lawsuits based on the factual allegations

pressed here."); *see also, ComLab, Corp. v. Kal Tire*, 17 Civ. 1907 (KBF), 2018 WL 4333987 at *8 (S.D.N.Y. Sept. 11, 2018) (relying on defendant's computer forensics expert's testimony, court found that evidence produced by plaintiff was likely fabricated, despite plaintiff's insistence to the contrary); *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 582 (S.D.N.Y. 1996) (dismissing defendants' counterclaims where court-appointed expert opined that records presented by defendants had been manually altered, "despite their insistence that they did not"); *DAG Jewish Directories, Inc. v. Y&R Media, LLC*, 09 Civ. 7802 (RJH), 2010 WL 3219292, at *4 (S.D.N.Y. Aug. 12, 2010) (dismissing plaintiff's claims where defendants presented substantial evidence that plaintiff's sales contract had been forged, despite plaintiff's insistence that there was no forgery). These cases present no "smoking gun" of impossibility—only strong and detailed evidence, often including expert testimony, demonstrating a fraud on the court.

Here, Defendants have established with clear and convincing evidence that Plaintiff created a false document to support her claims. Long after she had produced her documents to Defendants, and between the first and second days of her deposition, Plaintiff purportedly found and produced a "critically important" document, allegedly created in March 2016, that was "the basis for which [she] used for the complaint [sic]." Fischman June 28 Dep. at 285:17-24 (Exhibit "C"). The Falsified Note[2] -- Q8 (000830/000831) (Exhibit "A") -- was tested by Mr. LaPorte, a renowned forensic chemist and document dating specialist who found to a degree of "virtual[] certain[ty]" that Plaintiff's handwritten entries were not executed in March 2016, as claimed by Plaintiff in her deposition. Instead, he was "high[ly] confiden[t]" that "the written entries were executed within two (2) years before [Mr. LaPorte] performed [his] testing, which would have been sometime after July 31, 2019…[and] the results are consistent with the writing being executed as early as

---

[2] Capitalized terms have the same meanings assigned to them in the Memorandum of Law in Support of Defendants' Motion for Sanctions.

3

sometime in the past six (6) months." *See* LaPorte Report at 7. Mr. LaPorte also found additional edits and modifications to other documents that contradict Plaintiff's sworn testimony. *See* LaPorte Report at 20-24. Faced with that expert evidence, Plaintiff did not withdraw her claims, serve a rebuttal expert report, or otherwise account for the falsified evidence.

Plaintiff has proffered no expert to refute these findings. The evidence in the record unequivocally establishes that Plaintiff committed a fraud on the court and must be sanctioned. *See Gomez v. Madden*, 2020 WL 4336094, at *7 (S.D. Cal. 2020) ("Although the Court is obligated to examine the evidence in the light most favorable to Plaintiff, the nonmoving party, where, as here, there is a lack of evidence in opposition to Defendant's expert witness evidence, there simply is no weighing to be done"). Overwhelming objective evidence demonstrates that Plaintiff manufactured and produced a falsified document that she described as critical to her claims and then testified falsely under oath about it. Because clear and convincing evidence shows that Plaintiff acted willfully and in bad faith, the only reasonable sanction is dismissal of her lawsuit.

**B. Plaintiff violated Rule 37 by creating and producing a fraudulent document during the course of discovery, and falsely testifying to its legitimacy**

Plaintiff concedes that the Court has discretion under Rule 37 to impose sanctions based upon a party's conduct during discovery, *See* Pl. Opp. at 8, but Plaintiff interprets that sanctions power far too narrowly, arguing that Rule 37 does not apply because Defendants have not identified a specific disclosure or discovery order that Plaintiff breached. Rule 37 "addresses a variety of discovery failures that are without justification and not harmless." *Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003). The Second Circuit affirmed that "Rule 37 authorizes courts to sanction parties who fail to correct materially inaccurate discovery disclosures and responses." *Amerisource Corp. v. Rx USA Int'l*

4

*Inc.*, No. 02-CV-2514 (JMA), 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010), *aff'd sub nom. Parson*, 432 F. App'x 25 (2d Cir. 2011).

Here, Plaintiff's discovery abuses lie at the heart of her fraud on the court. During discovery, Plaintiff materially altered "critical" evidence, produced the improperly fabricated evidence, and, when confronted with evidence of her misconduct, refused to withdraw or correct it. This is an obvious abuse of the discovery process and therefore falls under the umbrella of Rule 37 sanctions. Because there is clear and convincing evidence that Plaintiff's discovery abuse is due to "willfulness, bad faith, or any fault," dismissal is appropriate. *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 143 (S.D.N.Y. 2007) (internal citations omitted).

**C. Plaintiff violated Rule 11 by submitting pleadings with no basis in fact, and then submitting falsified evidence to further support those pleadings**

As Plaintiff concedes, Rule 11 gives the Court authority to sanction a party that submits a pleading for an improper purpose. *See* Pl. Opp. at 9. In her Opposition Brief, Plaintiff misses the point by falsely claiming that: (i) Defendants have advanced no argument that Plaintiff's underlying pleading is frivolous, and (ii) the falsified evidence was submitted only to support Plaintiff's retaliation and wrongful termination claims. *Id.* at 10.

As to the first point above, in Plaintiff's own words, the Falsified Note was "critically important" to her case, and "[it] is the basis for which [she] used for the complaint [sic]." Fischman June 28 Dep. at 285:17-24 (Exhibit "C"). Thus, Plaintiff herself has inextricably linked the substance of her pleadings with the falsified evidence. Where a pleading is based on forgery that has no basis in fact, the pleading itself becomes void of any factual basis.[3]

---

[3] Plaintiff attempts to argue that not only is her pleading not frivolous, but that it is *supported* by testimony from Defendants and Defendants' employees. Pl. Opp. at 10. This argument will fool no one. To cite a few uncontested facts in a pleading is not to prove that the pleading is not frivolous. For example, Plaintiff alleges that testimony from Pat Saunders supports her claim. *Id.* (citing Dkt. Nos. 121-1, 121-2). This evidence shows, at most, that Pat Saunders knew that Amber Todd was at one point employed by a Mitsubishi Chemical Group company–there is no reference

5

Plaintiff's claim that the falsified evidence was submitted only to support Plaintiff's retaliation and wrongful termination claims is nonsensical. The Falsified Note contains Plaintiff's view that Defendants were engaging in sex discrimination. Plaintiff claims that this evidence, if credited, would corroborate her allegations of discriminatory treatment, her engaging in protected activity, and her fear of retaliation. It is unreasonable to contend that a note corroborating such evidence of discrimination would be submitted only in support of retaliation and wrongful termination claims, rather than all of Plaintiff's discrimination-based claims.

Plaintiff, herself a lawyer, violated Rule 11 by submitting pleadings containing claims that she knew had no basis in fact. Dismissal is the only appropriate sanction. *See, e.g., Miller v. Bridgeport Bd. of Educ.*, 12 Civ. 1287 (JAM), 2014 WL 3738057, at *8 (D. Conn. July 30, 2014).

### D. Rule 608 is irrelevant and does not render LaPorte's report inadmissible

Plaintiff unpersuasively argues that the LaPorte Report is inadmissible extrinsic character evidence. Pl. Opp. at 11. She either misunderstands Mr. LaPorte's findings or seeks to mischaracterize them. As Plaintiff notes, Rule 608(b) bars extrinsic evidence for the purpose of attacking "the witness's character for truthfulness." F.R.E. 608(b). But the LaPorte Report is not extrinsic, and it is not character evidence about truthfulness—it is expert factual evidence that a critical document that Plaintiff produced *in this case* was falsified. Rule 608 is simply irrelevant.

### E. Plaintiff fails to contest bad faith

Despite including a paragraph in the opposition brief contending that "LaPorte's testimony does not establish intent," Plaintiff does not do what she would need to do to actually contest bad

---

to any discussion of her termination, let alone evidence suggesting retaliation. The allegedly "supporting" testimony from Nicholas Oliva is nothing more than his failure to recall one in a series of recurring weekly meetings that occurred over five years ago. *See* Dkt. No. 121-3. And the email that Plaintiff alleges "provided . . . documentary evidence corroborating the discussion," Pl. Opp. at 10, references a conversation that took place two days after the meeting described in the Falsified Note allegedly took place, and does nothing to support her allegations. *See* Dkt. No. 121-4. This "evidence" hardly helps Plaintiff prove that her submissions based on the Falsified Note are not frivolous.

faith: namely, submit an affidavit setting forth any innocent explanation for the alterations described in the LaPorte Report (including not only the Falsified Note but also the alterations discussed on pages 20-24). Instead, Plaintiff stands back and lets her counsel pick out two isolated examples of handwritten notes and then argue that these handwritten notes were not "even slightly furtive" and not necessary to support her claims. Pl. Opp. at 25. But her silence on how any of the alterations discussed in the LaPorte Report came to be – her failure to offer any competing explanation for the evidence before the court – rings much louder than her counsel's defense of her good faith.

## II. PLAINTIFF'S ATTACK ON LAPORTE'S METHODOLOGY IS BASELESS

Plaintiff submits *nothing* to refute the scientific data gathered by Mr. LaPorte – she performed no testing of her own and, produced no expert witness to rebut Mr. LaPorte's findings, ink-dating techniques or the resulting data. Rather, Plaintiff relies entirely on the lay analysis of counsel – to contest some, but not all, of Mr. LaPorte's scientific determinations, attacking a well-established methodology for ink-dating analysis. This effort utterly fails to undercut Mr. LaPorte's methodology or conclusions.

Expert testimony is admissible as evidence where the court determines that it both "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Under *Daubert*, factors relevant to this inquiry include: (1) the theory's testability; (2) whether the expert's theory has been subjected to review; (3) the existence of standards concerning the expert's methodology, and reliance on those standards; (4) the known or potential rate of error in the expert's technique or theory; and (5) whether the technique or theory utilized by the expert has been generally accepted in the scientific community. *See Restivo v.*

*Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017). Mr. LaPorte's methods rest on a reliable foundation and are highly relevant to the task at hand.

Plaintiff does not dispute that the LaPorte Report is relevant to the issue at hand – whether Plaintiff's evidence of discrimination and retaliation is, in fact, a fabrication.[4] Rather, Plaintiff focuses on reliability, arguing that gas chromatography/mass spectrometry ("GC/MS") testing is not a scientifically valid method to establish whether an ink is less than two years old. *See* Pl. Opp. at 11-12.[5] Plaintiff's efforts to discredit GC/MS testing collapse under scrutiny.

### A. The GC/MS methodology is highly reliable and well accepted

First, the GC/MS method used by Mr. LaPorte is testable, repeatable, and well accepted in the scientific community, and in federal, state, county, municipal, and international courts. LaPorte Decl. ¶ 7. In GC/MS analysis, an examiner identifies and measures the concentration of the volatile organic compound in ink to determine the age of a writing. *See* LaPorte Decl. ¶¶ 11-16. Plaintiff does not contend otherwise. *See* Pl. Opp. *passim*. Nor does Plaintiff dispute that the data gathered by Mr. LaPorte are accurate. Indeed, Plaintiff is in no position to say otherwise because she chose not to test the document. Thus, the testability factor weighs heavily in favor of Defendants and admission of the LaPorte Report.

Second, as set forth in the LaPorte Report and the attached Declaration, GC/MS testing has been featured and analyzed in numerous publications.[6] GC/MS has been tested in studies subject

---

[4] Plaintiff briefly suggests that the LaPorte Report, is unduly prejudicial, because the revelation of her fraud would taint the fact-finder's opinion of her. Pl. Opp. at 11. This argument is absurd. The report is damaging to Plaintiff's case, and in that sense "prejudicial," because it proves that she lied and that she submitted fabricated evidence.

[5] However, GC/MS testing was only *part* of Mr. LaPorte's analysis of the Falsified Note, and Plaintiff apparently does not dispute his other techniques and conclusions. For example, she does not deny that the date "3/1/16" was not executed contemporaneously with the other handwritten notes on the Falsified Note, and was written in a different, yet visually indistinguishable, black ink. *See* LaPorte Report at 7.

[6] *See* LaPorte, GM. (2015) Chemical analysis for the scientific examination of questioned documents, in Forensic Chemistry: Fundamentals and Applications (ed J.A. Siegel), John Wiley & Sons, Ltd, Chichester, UK doi: 10.1002/9781118897768.ch8; *accord* LaPorte Decl. ¶¶ 12-18 (citing numerous studies analyzing GC/MS, Solvent Loss Ratio, and 2-PE in the context of document examination).

to peer review, and its use is widely accepted by, among others, the U.S. Department of Justice and the U.S. Secret Service. *See* LaPorte Decl. ¶ 28. This factor, too, weighs in favor of admission.

Third, the GC/MS standards used by Mr. LaPorte in his analysis of the Falsified Note – namely, that ballpoint inks cease to measurably age between 18 and 24 months, and that GC/MS testing can provide very strong evidence that an ink is less than two years old -- are widely accepted by experts in this field. *See* LaPorte Decl. ¶ 27. Indeed, experts cited by Plaintiff herself repeatedly cite this well-known standard.[7] Plaintiff's remaining efforts to discredit the benchmarks used by Mr. LaPorte similarly fail because they address entirely different theories concerning GC/MS testing. Specifically, Plaintiff challenges whether GC/MS testing can reliably establish ink-dating within an even shorter time frame, that is irrelevant to this case and does not affect whether a subject ink is less than two years old.[8] Plaintiff cites no evidence to suggest that Mr. LaPorte's findings could result from an ink that is more than two years old. Plaintiff cites Koenig and Weyermann (2018) for the proposition that the authors' examination found similar values in two 7-year old samples. *See* Pl. Opp. at 17. This proposition is false. The study only tested samples through a period of 304 days. In their study, Koenig and Weyermann suggest that another study had purportedly found two outlier results, yet their own testing revealed nothing to support that claim. Further, the study cited by Koenig and Weyermann deals with, again, a scenario not present here: whether "Ink aging testing [] preceding indentation examinations [can] affect ink aging parameters." *See id.* at n.12. In any event, these two alleged outliers do nothing to invalidate a

---

[7] *See*, *e.g.*, Koenig and Weyermann (2018), Berman Decl. at Exhibit "13" (proposing that if R%-values ≥ 50%, then the questioned ink entry is younger than 150 days; and if R%-values ≥ 25%, then the questioned ink entry is younger than 300 days); Giebink, Speckin, and Harner, Berman Decl. at Exhibit "14." ("Previous publications indicate that ball point ink samples can take between six months and two years for the concentration of PE to cease changing at a detectable rate. This lack of detectable changes is typically referred to as completely dry or aged.").

[8] *See*, *e.g.*, Koenig and Weyermann (2018), Berman Decl. at Exhibit "13," (testing "25 ink entries aged during 4 to 304 days"); Koenig, Magnolon, and Weyerman, (2015), Berman Decl. at Exhibit "12," (examining GC/MS results for samples tested aged between 1 to 450 days).

9

well-established scientific practice. Mr. LaPorte himself attests that, in the thousands of GC/MS tests he has performed, in his work with the Department of Justice, the U.S. Secret Service, and in the private sector, he has never seen any such results, ever**.** *See* LaPorte Decl. ¶ 44.

Fourth, the error rate of GC/MS testing is well studied by experts in this field and this factor strongly supports admissibility of the LaPorte Report. Again, Plaintiff emphasizes the disagreement among experts about whether GC/MS testing can accurately identify the age of an ink within the first two years of its origin – i.e. whether an ink is six months old rather than twelve months old.[9] This uncertainty, however, is irrelevant to Mr. LaPorte's testing and conclusions here, which sought to determine whether the Falsified Note was created at *any* point in the two years before testing. As noted by Mr. LaPorte, the 25% SLR threshold and two-year window provide a *conservative* baseline that greatly minimizes the potential for error. *See* LaPorte Decl. ¶¶ 19-24. As such, the GC/MS data and high R% establish to a "virtual certainty" that the Falsified Note was not created more than two years before testing. LaPorte Report at 7.

Finally, GC/MS testing has been used by ink-dating experts since the 1980's and has been the subject of extensive research by forensic laboratories around the world. *See* LaPorte Decl. ¶ 9. It is well accepted that a SLR of 25% or more makes it "highly probable" that the subject ink is less than two years old. LaPorte Decl. ¶ 4. Plaintiff has not presented any evidence to refute that claim or identify any error in Mr. LaPorte's testing. Rather, Plaintiff relies on outdated doctoral dissertations that used obsolete techniques,[10] studies performed using entirely different scientific

---

[9] *See*, *e.g.*, Koenig and Weyermann (2018), Berman Decl. at Exhibit "13"; Koenig, Magnolon, and Weyerman, (2015), Berman Decl. at Exhibit "12."

[10] Weyermann Dissertation (2005), Berman Decl. at Exhibit "11,"; LaPorte Decl. ¶ 33 (noting that in 2005, Weyermann "was not using the litany of optimized conditions that have been developed and used in this case such as using 'paired ink sampling', GC/MS with SIM mode, 0.5 mm micro punches, and placement of the hole punches facing upwards in a ceramic welled dish to facilitate efficient and effective evaporation of 2-PE.").

10

techniques and methodologies,[11] and studies that examine whether GC/MS testing can determine an even narrower window for the age of a subject ink. These studies do not undermine the basic point that, after two years, ballpoint inks have completely dried and do not produce a SLR value in excess of 25%.[12]

The plaintiff in *Ceglia v. Zuckerberg*, 2013 WL 1208558 (W.D.N.Y. Mar. 26, 2013) also questioned whether GC/MS testing is sufficiently accepted in the scientific community. The court rejected Ceglia's argument, noting that:

> Plaintiff's own expert, Aginsky, testified that he developed the PE test which has been subjected to peer-review in relevant scientific journals, "has never been criticized as junk science in scientific literature," and has been used by government agencies throughout the world in criminal cases and other court proceedings. Aginsky Dep. Tr. at 63–69.

*Ceglia*, 2013 WL 1208558, at *28. In sum, despite Plaintiff's mess of misrepresentations and blatantly false statements, it remains clear that GC/MS testing is well accepted in the scientific community and a reliable method to determine whether an ink is less than two years old. Plaintiff offers no plausible basis for the Court to exclude the LaPorte Report.

### B. Plaintiff's speculation on conditions and contamination does not provide a basis to exclude LaPorte's findings

Plaintiff raises further objections to Mr. LaPorte's methodology and suggests that other factors could have affected his results. These criticisms are baseless and ignore contrary information in the LaPorte Report. First, Plaintiff alleges that Mr. LaPorte failed to account for potential contaminants with 2-PE from other sources. *See* Pl. Opp. at 7. This assertion is

---

[11] Pl. Opp. at 18 (referencing *Determination of the Age of Ballpoint Pen Inc by Gas and Densitometric Thin-layer Chromatography*, but omitting that the paper dealt with "Gas and Densitometric Thin-layer Chromatography" and not GC/MS testing); Pl. Opp. at 18 (referencing Fortini, 2000; Lociciro et al., 2004; Andrasko, 2003, but omitting the different methodologies or conclusions reached in these studies); *accord* LaPorte Decl. ¶ 32.

[12] *See*, *e.g.*, Koenig and Weyermann (2018), Berman Decl. at Exhibit "13,") (testing "25 ink entries aged during 4 to 304 days"); Koenig, Magnolon, and Weyerman (2015), Berman Decl. at Exhibit "12," (examining GC/MS results for samples tested aged between 1 to 450 days).

11

demonstrably false. Mr. LaPorte testified at his deposition that he *had* accounted for the risk of contamination. To evaluate the possibility of contaminants, he performed GC/MS tests on 'paper blank' samples near the ink entries on the Falsified Note. *See* Laporte Decl. ¶ 26. These tests would reveal any foreign contaminants carrying 2-PE, and they came back negative, revealing no contamination that would affect GC/MS testing. *Id.* Plaintiff simply ignores this testimony.

Similarly, Plaintiff contends that Mr. LaPorte's analysis failed to account for environmental conditions that could have affected the GC/MS examination. Again, Plaintiff presents no evidence to suggest that the results are flawed – she produced no expert report of her own and did no testing herself. Rather, she suggests only that environmental conditions could, potentially, have affected the results. As Mr. LaPorte previously testified, certain conditions, such as "extreme cold," can slow the natural aging process of ink for the purpose of a GC/MS analysis. *See* LaPorte Decl. ¶ 25. But, "[s]torage in a desk drawer with other papers is not an extreme condition that would have slowed the aging process of a document purportedly written in March of 2016." *Id*. Again, Plaintiff presents nothing to refute this analysis.

### C. The *Ceglia* court's findings underscore LaPorte's expertise

Of all Plaintiff's misstatements concerning the reliability of GC/MS testing, perhaps the most egregious is her mischaracterization of the court's findings in *Ceglia v. Zuckerberg*, 2012 WL 12995636 (W.D.N.Y. June 28, 2012). *See* Pl. Opp. at 13. In *Ceglia*, the plaintiff moved to strike the testimony and expert report of Mr. LaPorte on the grounds that GC/MS testing was unreliable and that the defendants had failed to disclose prior testimony of Mr. LaPorte. In the motion to strike, the plaintiff claimed that testimony given by Mr. LaPorte in two criminal matters contradicted his testimony concerning 2-PE testing. This argument was *rejected* by the court. Indeed, despite the defendants' undisputed failure to disclose this prior testimony, the court found

the error "harmless" because Mr. LaPorte's testimony was not contradictory and the plaintiff's efforts to suggest otherwise were, "at best, strained, and, more correctly, a gross misrepresentation which would be detected by even the marginally literate." *Id.* at *6. In fact, in denying the *Ceglia* plaintiff's motion to strike, the court also ordered plaintiff to "show cause" why his conduct in bringing such a frivolous motion should not be sanctioned under Rule 11. *Id.* at *16. In her opposition brief, Plaintiff makes no mention of the actual ruling in *Ceglia. See* Pl. Opp. at 13. Plaintiff fails to disclose that the motion to strike Mr. LaPorte's expert report was denied in its entirety, and that the court ultimately adopted Mr. LaPorte's analysis and GC/MS testing results.

Further, Plaintiff fails to disclose the ultimate outcome in *Ceglia*, which, like this case, involved a motion for sanctions against the plaintiff for committing a fraud on the court by submitting fabricated evidence. In *Ceglia*, the Court rejected the same objections raised by Plaintiff here – that environmental conditions could have affected the analysis, that the 25% SLR benchmark was not appropriate, that the document could have been contaminated by other materials, and that GC/MS testing was not a reliable technique for ink-dating analysis. *See Ceglia v. Zuckerberg*, 2013 WL 1208558, at *26-28 (W.D.N.Y. Mar. 26, 2013), *adopted*, 2014 WL 1224574 (2014), *aff'd*, 600 F. App'x 34 (2d Cir. 2015). Indeed, in rejecting plaintiff's objections to Mr. LaPorte's testimony, the *Ceglia* court stated:

> [a] plain reading of the quoted statement, however, establishes only that no ink examination can precisely date the age of any ink, a fact that does not preclude LaPorte's use of the PE test, corroborated by Aginsky, to determine only whether the ink has, based on the solvent-loss ratio, ceased to age, indicating the ink is less than two years old.

*Ceglia*, 2013 WL 1208558, at *27. In other words, the *Ceglia* court explicitly adopted Mr. LaPorte's conclusion that 2-PE testing is a reliable method to determine whether a document is less than two years old. *See id.* at *24 (describing Mr. LaPorte's expert analysis that "[e]vaporation

13

or 'loss' of more than 25% of the pre-heating PE after heating indicates the ink is less than two years old or 'fresh.'"). In fact, it relied on Mr. LaPorte's analysis to conclude that the plaintiff had committed a fraud on the court and dismissed the suit. *See id.* at *29. The same result should follow here.

### D. Plaintiff has failed to present any evidence to rebut LaPorte's expert conclusion

Mr. LaPorte's methodology satisfies *Daubert* and his conclusions go to the heart of the pending motion for sanctions – whether Plaintiff committed a fraud on the court. His techniques are widely accepted in this highly technical field, courts have previously credited both his expert analysis and methodology, and Plaintiff has not submitted any expert evidence to challenge his findings. Nor does Plaintiff herself submit an affidavit to contest his findings or to explain away his conclusion that she created and backdated a document and then lied about it. It is therefore uncontested that, as Mr. LaPorte concludes, to a "highly probable" degree of scientific certainty, the Falsified Note could not have been written more than two years before it was tested in 2021. *See Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *19 (S.D.N.Y. Mar. 3, 2014) (plaintiff's reliance on a few emails, text messages, and anecdotal instances of consumer confusion were insufficient to overcome defendant's expert survey results); *accord Gomez v. Madden*, 2020 WL 4336094, at *7 (S.D. Cal. July 28, 2020) ("[W]here, as here, there is a lack of evidence in opposition to Defendant's expert witness evidence, there simply is no weighing [of evidence] to be done"); *accord LAOSD Asbestos Cases*, 44 Cal. App. 5th 475, 492–93, 257 Cal. Rptr. 3d 682, 697 (2020) ("attorney's conclusions concerning scientific and technical evidence" insufficient to create issue of material fact in context of talc product litigation).

Based on the only scientific evidence in the record, Defendants have produced clear, and uncontroverted scientific proof that the Falsified Note was not created on the date indicated and that Plaintiff lied at her deposition. This is more than sufficient to warrant dismissal.

## CONCLUSION

Defendants respectfully request that this Court dismiss the case in its entirety as a sanction for Plaintiff's misconduct, award all costs incurred by Defendants that are attributable to Plaintiff's fraud—including without limitation attorneys' fees and costs incurred in obtaining a document expert, preparing for and defending the expert's deposition, and preparing this motion (including this reply brief), as well as all expert fees—and grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**GORDON, REES, SCULLY & MANSUKHANI, LLP**

By: /s/ *Mercedes Colwin*
Mercedes Colwin
Brittany L. Primavera
1 Battery Park Plaza, 28th Floor
New York, New York 10004
(212) 269-5500

*Attorneys for Defendants Mitsubishi Chemical Holdings America, Donna Costa, and Nicholas Oliva*

**SHEARMAN & STERLING LLP**

By: /s/ *Jerome S. Fortinsky*
Jerome S. Fortinsky
Samuel J. Jolly
599 Lexington Avenue
New York, NY 10022-6069

Telephone: +1.212.848.4000
jfortinsky@shearman.com
sam.jolly@shearman.com

George Anhang
401 9th Street, N.W.
Suite 800
Washington, DC 20004
Telephone: +1.202.508.8000

*Attorneys for Defendant Mitsubishi Chemical Holdings Corporation*