**\*\*CONFIDENTIAL\*\***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
JENNIFER S. FISCHMAN,

Plaintiff,

-against-

Index No. 18-cv-08188

MITSUBISHI CHEMICAL HOLDINGS, AMERICA, INC.;
MITSUBISHI CHEMICAL CORPORATION; MITSUBISHI
CHEMICAL HOLDINGS CORPORATION; NICHOLAS OLIVA, in
his individual processional capacities; DONNA
COSTA, in her individual and professional
capacities; and JOHN DOES 1-10, in their
individual and professional capacities,

Defendants.

---------------------------------------------X

October 7, 2021
10:11 a.m.

DEPOSITION of GERALD LaPORTE, a
Non-Party witness herein, taken by the attorneys
for the respective parties, pursuant to Notice,
held via web conference at the above date and
time before Toni Musacchia, a Stenotype Reporter
and Notary Public within and for the State of New
York.

1

---

**\*\*CONFIDENTIAL\*\***

APPEARANCES:

VALLI KANE & VAGNINI LLP
Attorneys for Plaintiff
600 Old Country Road, Suite 519
Garden City, New York 11530

BY:  MATTHEW L. BERMAN, ESQ.

CLARICK GUERON REISBAUM LLP
Attorneys for Defendant, Donna Costa
220 Fifth Avenue, 14th Floor
New York, New York 10001

BY:  NICOLE GUERON, ESQ.

GORDON REES SCULLY MANSUKHANI, LLP
Attorneys for Defendants, Mitsubishis
Chemical Holdings America, Inc., Donna Costa and
Nicholas Oliva
One Battery Park Plaza, 28th Floor
New York, New York 10004
BY:  BRITTANY L. PRIMAVERA, ESQ.
     and
     MERCEDES COLWIN, ESQ.
SHEARMAN & STERLING, LLP
Attorneys for Defendant,
Mitsubishi Chemical Holdings Corporation
599 Lexington Avenue
New York, New York 10222
BY: SAM JOLLY, ESQ.

ALSO PRESENT:
Jennifer Fischman

2

---

**\*\*CONFIDENTIAL\*\***

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and
between the parties hereto, through their
respective Counsel, that the certification,
sealing and filing of the within examination will
be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, will be reserved to the time of the
trial;

IT IS FURTHER STIPULATED AND AGREED that
the within examination may be signed before any
Notary Public with the same force and effect as
if signed and sworn to before this Court.

3

---

**\*\*CONFIDENTIAL\*\***

THE REPORTER:  It is hereby stipulated
and agreed by and between counsel for all
parties present that pursuant to Federal
Rule of Civil Procedure 28 (a)(2), this
deposition is being conducted remotely and
that the court reporter shall be permitted
to administer the oath to the witness via
videoconference.  The witness and all
counsel are in separate remote locations and
participating via Zoom, telephone or any web
conference meeting platform under the
control of Bee Reporting Agency, Inc.

It is further stipulated that this
videoconference will not be recorded in any
manner and that any recording without the
express written consent of all parties shall
be considered unauthorized, in violation of
law and shall not be used for any purpose in
this litigation or otherwise.

Before I swear in the witness, I will
ask each counsel to stipulate on the record
that I, Toni Musacchia, the court reporter,
may swear in the witness even though I am
not physically in the presence of the

4

**CONFIDENTIAL**

1 **CONFIDENTIAL**
2 witness and that there is no objection to
3 that at this time, nor will there be an
4 objection at a future date.
5     MR. BERMAN:  So stipulated.
6     MS. PRIMAVERA:  So stipulated.
7     MS. GUERON:  So stipulated.
8     MR. JOLLY:  So stipulated.
9     THE REPORTER:  Ms. Primavera, can you
10 represent that to the best of you knowledge
11 and belief, that the witness appearing today
12 via web conference is, in fact, Gerald
13 LaPorte?
14     MS. PRIMAVERA:  Yes, I can.
15 G E R A L D  L A P O R T E,
16     the witness herein, having first been duly
17     sworn by Toni Musacchia, a Notary Public in and
18     for the State of New York, was examined and
19     testified as follows:
20 DIRECT EXAMINATION
21 BY MR. BERMAN:
22     Q.  Please state your name for the record.
23     A.  Gerald LaPorte.
24     Q.  Please state your address for the
25 record.

5

---

1     G. LaPorte - Confidential
2     A.  16106 Swan Mountain Drive, Broomfield,
3 Colorado 80023.
4     Q.  Mr. LaPorte, good morning, my name is
5 Mathew Berman, I'm counsel for Plaintiff,
6 Jennifer Fischman, in this action.
7     Today I will be asking you a series of
8 questions, which you'll be responding to having
9 sworn to tell the truth.
10     If you don't hear one of my questions, please
11 let me know.  I'm potentially able move closer to
12 the microphone or to make it louder in some other
13 way to make myself more audible.
14     If you don't understand one of my questions,
15 please let me know and I'll do my best to
16 rephrase it a different way to make it more
17 understandable.
18     If you do answer my question, I'll take that
19 to mean that you understood my question.
20     It's important today, as you know, to give
21 verbal responses because we have a court reporter
22 present and she cannot take down gestures.
23     I will do my best to let you finish your
24 answer completely before I move on to a new
25 question and I would request that you also do

6

---

1     G. LaPorte - Confidential
2 your best to let me get my entire question out
3 even if it's clear to you what I'm going to be
4 asking you because we want to have a clear
5 transcript.
6     From time to time we may have objections from
7 one of the attorneys.  Unless you're instructed
8 not to answer the question by one of the
9 attorneys, I will still expect you to provide a
10 response.
11     That being said, it's not my intention today
12 to ask you about any privileged communications
13 that you've had with counsel in connection with
14 matter.
15     Do you understand that you're under oath
16 today as if you're in a court of law even though
17 we're in an informal setting?
18     A.  Yes, sir.
19     Q.  Do you understand the other items that I
20 set forth already?
21     A.  Yes, sir.
22     Q.  Are you currently taking any medication
23 which could impact your ability to testify
24 truthfully or accurately today?
25     A.  I am not.

7

---

1     G. LaPorte - Confidential
2     Q.  Are you currently under any medical
3 condition which could affect your ability testify
4 truthfully and accurately today?
5     A.  I am not.
6     Q.  Do you suffer from my medical condition
7 which impairs your memory?
8     A.  I do not.
9     Q.  You've been deposed a number of times
10 before, correct?
11     A.  Yes, sir.
12     Q.  So I think you're used to the rules of
13 the road but if that's any questions that you
14 have about the procedure, please let me know and
15 I'll be happy to take a break.
16     From time to time you may wish to take a
17 break.  If you wish to take a break at any time,
18 that's totally fine.  I just request if there's a
19 question pending, you answer that question before
20 I move to take on any breaks.
21     I anticipate that we'll take breaks from time
22 to time apart from that and we'll just take it as
23 we go.
24     Did you conduct any preparation in connection
25 with today's testimony?

8

2 (Pages 5 to 8)

G. LaPorte - Confidential

1
2     A.   I did.
3     Q.   How much time did you spend preparing?
4     A.   I don't know exactly but maybe about
5   three -- three to four hours.
6     Q.   As part of your preparation, did you
7   have any interactions with counsel for the
8   Defendants in this matter?
9     A.   Yes.
10    Q.   Do you know how much time you spent
11  interacting with counsel for the Defendants in
12  order to prepare for today's deposition?
13    A.   Once again, not exactly.  I don't have
14  my records in front of me but maybe 30 minutes to
15  45 minutes.
16    Q.   Okay.  You spent other -- without
17  getting into the material that you discussed --
18  you have spent other time working with counsel in
19  connection with this matter, right?
20    A.   With respect to preparation or prior
21  to -- prior to the notification that there was
22  going to be a deposition?
23    Q.   Let me try to make my question more
24  clear.
25         What I'm trying to ascertain is how much of

9

G. LaPorte - Confidential

1
2   the time you have recorded for preparing for
3   today's deposition, just today's deposition, how
4   much of that time was spent working with other
5   counsel in this matter?
6     A.   About 30 to 45 minutes.  I'm trying to
7   think if there was -- if I spoke on the phone
8   previously.  But I would say probably not much
9   more than an hour total, if there was another
10  time that I spoke on the phone.
11    Q.   Setting aside your time with counsel --
12  I'm not asking about any of the subject matter
13  that you interacted with counsel -- but setting
14  that aside, what other preparation did you do in
15  connection with today's deposition?
16    A.   I reviewed -- I reviewed my report and
17  then I also reviewed my file and all of my notes.
18  Also, I took a number of -- I captured number of
19  images like photographs, digital scans.  So I
20  went overall of that a well, which I would
21  consider part of my file.
22    Q.   That material that you have just
23  identified, is that contained within your report?
24    A.   Some of it is in my report.  But I would
25  say, you know, a good part of like my written

10

G. LaPorte - Confidential

1
2   notes -- I would say that everything in my report
3   or what's in my report is a fairly good summary
4   of all of my notes.
5     Q.   You're testifying in this case as an
6   expert under the federal rules of civil
7   procedure, do you have a general understanding of
8   how that works?
9     A.   Yes.
10    Q.   So you're supposed to provide us in your
11  expert report with a number of items including
12  all of the facts upon which you relied to draw
13  your opinions and conclusions, do you understand
14  that?
15    A.   Yes.
16    Q.   So the material that you just described,
17  have you relied upon that in formulating your
18  opinions and conclusions in this matter?
19    A.   I would say that -- like I said, I think
20  most of my materials that I reviewed or that I
21  just mentioned are incorporated into my report
22  and then I have a section in my report where I
23  discuss all of the testing and examinations that
24  I preformed and the reasons and bases for those.
25  So I would say that a lot of that, you know, sums

11

G. LaPorte - Confidential

1
2   up what's in my notes.
3     Q.   So we're going to get to that
4   momentarily.
5         Do you have any opinions or conclusions with
6   respect to this matter that are not contained
7   within your report?
8     A.   No.
9         MR. BERMAN:  Toni, the first e-mail I
10  sent you, the large attachment, can we pull
11  it up on the screen, please.
12         Can everyone see this clearly on the
13  screen?
14    Q.   Do you need us to shrink it down a
15  little?
16    A.   I can see it just fine.
17    Q.   Okay.
18         MR. BERMAN:  Can we mark this please as
19  LaPorte Exhibit 1.
20         (LaPorte Exhibit 1, marked for
21  identification.)
22    Q.   Mr. LaPorte, is there a preferred title
23  that you use; is it Mr. or doctor, what do you
24  prefer?
25    A.   Whatever you prefer.  You can call me --

12

1      Q. What do you go by? What should I call
2 you today?
3      A. Jerry, Gerald, Mr. LaPorte.
4      Q. We'll go with Mr. LaPorte.
5      Mr. LaPorte, do you recognize this document
6 right?
7      A. I do, yes.
8      Q. This is the expert report you created in
9 this matter, correct?
10      A. It's the first page.
11      MR. BERMAN: Toni, can you please page
12 through the document to the witness'
13 satisfaction so he can satisfy himself this
14 is the report he prepared.
15      THE WITNESS: What would be best, I
16 think, if you can just go to the signature
17 page so I can see my signature at the end.
18      MR. BERMAN: Toni, can you please scroll
19 down to page 24.
20      THE WITNESS: Yes. To answer your
21 question, this is my report.
22      MR. BERMAN: Can we now turn to page
23 seven.
24      Q. Mr. LaPorte, this page at the top where

13

---

1 it says "Summary of opinions" and continuing
2 through the next page.
3      Does this itemize your opinions and
4 conclusions with respect to this matter?
5      A. I believe so. I mean, I would say that
6 I usually -- I mean, my full opinions are in my
7 conclusions are at the opinion section at the
8 end. But, yeah, I think this is a good summary
9 of my opinions.
10      Q. Are there any other opinions not
11 contained in your report which you intend to
12 present at trial if you're called upon?
13      A. I don't believe so. Can I just read --
14 I don't need to read everything -- can I just
15 browse the subsections, the 20 (a), (b), (c) and
16 what's on the back?
17      Q. Absolutely. Please direct the court
18 reporter and let me know when you're done.
19      THE WITNESS: Can we go to the next
20 page?
21      I believe we may be missing something
22 that would be in the final page, which had
23 to do with the indentations of the two
24 entries on Bates-stamped 788.

14

---

1      Q. Are you referring to something in your
2 conclusions that is not in the summary?
3      A. Yes, that's -- unless I missed it.
4      THE WITNESS: Can we go back up to (c)?
5 I apologize.
6      Yeah, if we go to the conclusion section
7 at the end I believe there's one point
8 missing.
9      MR. BERMAN: Toni, can you jump to page
10 23 or 24, please.
11      THE WITNESS: Yes, it would before
12 paragraph 46 and then (d) in here, the two
13 entries -- (d) beginning the two entries
14 reading "corp. (Plus Aldila Inc.) -- it's
15 number (d) in here, that's not in the
16 summary. So this is the idea that the two
17 entries from Q1 were executed over top of --
18 actually, I apologize but that Q8 is in
19 error, it should read Q12.
20      Q. So the Q8 bottom of page 23 should be
21 Q12?
22      A. Yes.
23      THE WITNESS: Can we go down to the
24 next -- can we split so we're looking at the

15

---

1 bottom of page 23 and the top of page 24.
2 There we go.
3      Yes, so I do apologize, it was
4 typographic error. So Q8 should actually
5 read Q12.
6      Q. With that in mind, are all of the
7 opinions and conclusions that you intend to offer
8 at trial contained within this document?
9      A. Yes.
10      Q. Let's go back to page seven of the
11 report. Let's start with conclusion in 20(a).
12      In conclusion 20(a) you state that, "It is
13 highly probable that the handwritten entries on
14 both sides of Q8 were not executed on the
15 purported date of March 1, 2016," correct?
16      A. Correct.
17      Q. Now you got a footnote there citing to
18 the Scientific Working Group For Forensic
19 Document Examiners: Standard Terminology for
20 Expressing Conclusions of Forensic Document
21 Examiners. Do you see that footnote?
22      MR. BERMAN: Can you scroll down a
23 little bit, Toni, so he can see the
24 footnote.

16

2   Q.   By the way, if you happen to have a
3   physical copy of the report handy or on your
4   computer, I don't object to you reviewing it if
5   that's more expeditious for you, okay?
6       A.   I do have a copy in front of me -- a
7   copy of my report in front of me so I can read
8   that.
9       Q.   That's fine.
10      A.   I'm trying not to sort of strain by
11   looking at the screen.
12      Q.   I understand and that's totally fine.
13   I'm fine with that.  But if you have any other
14   documents that you're referring to, I would need
15   to know that you' reviewing them.
16      A.   Of course, yes.  Of course.
17      Q.   Do you have any other documents in front
18   of you other than your expert report?
19      A.   I mean, I have my file but it's kind of
20   off to the side here.
21      Q.   You're not presently referring to any
22   documents other than your expert report?
23      A.   No, just my expert report is right in
24   front of me.
25      Q.   If you wish to review something then

17

2   please let me know and we can talk about that.
3   But otherwise if you're reading from a document
4   or reviewing a document, other than your expert
5   report, I need to know that.
6       A.   Absolutely, of course.
7       Q.   Thank you.  So the footnote at the
8   bottom here; do you see that footnote, footnote
9   one?
10      A.   Yes.
11      Q.   So this citation that you got to the
12   Scientific Working Group Standard Terminology For
13   Expressing Conclusions, that's a terminological
14   guideline, correct?
15      A.   It's a standard for terminology for
16   expressing conclusions.
17      Q.   So that's informing the language used to
18   articulate an opinion or conclusion, correct?
19      A.   As well as a definition of what those --
20   what that terminology means.
21      Q.   Okay.  But when you're using the phrase
22   "highly probable" here that's a terminology --
23   that's a use of terminology, it not an empirical
24   standard, correct?
25          MS. PRIMAVERA:  Objection.

18

2       A.   It's a standard that's used by the
3   forensic document examiner community.
4       Q.   But do you agree it's a standard for the
5   use of terminology?
6          MS. PRIMAVERA:  Objection.
7          MS. GUERON:  Objection.
8       A.   It's standard for terminology for
9   expressing conclusions.  There is another
10   standard that we have that's for other
11   terminology but this is terminology for
12   expressing conclusions.
13      Q.   Okay.  So when you use the term "highly
14   probable," you're using that as terminology to
15   express your view of evidence that is very
16   persuasive and where the examiner is virtually
17   certain but there is some factor that precludes
18   absolute certainty with respect to a conclusion,
19   right?
20          MS. COLWIN:  Objection.
21          MS. PRIMAVERA:  Objection.
22          MS. GUERON:  Objection.
23          MR. BERMAN:  Guys, if you want to
24   object, you can but maybe one of you can
25   give an objection rather than the three of

19

2   you.
3       THE WITNESS:  That's correct, that's the
4   definition in the footnote that I put in
5   there.
6       Q.   That definition comes from that
7   Scientific Working Group, Forensic Document
8   Examiners terminology document, correct?
9       A.   Just to be clear, the terminology for
10   expressing conclusions, yes.
11      Q.   Okay.  Now, you continue on in
12   subparagraph 20(a) and you state that you
13   performed a chemical analysis to measure the
14   amount of a volatile organic compound referred to
15   as T -- sorry, referred to as 2-phenoxyethanol
16   and in parenthesis you refer to that as 2-PE,
17   closed parenthesis.
18      A.   Can I correct your pronunciation.
19      Q.   Yes, please.
20      A.   It's phenoxyethanol.
21      Q.   Phenoxyethanol.
22      A.   I'm happy to call it 2-PE from this
23   point forward -- for the court reporter also.
24      Q.   Perfect.  So we'll have an understanding
25   that when you use the term 2-PE, we're referring

20

G. LaPorte - Confidential

1    to 2-phenoxyethanol, good?
2    A.    Yes.
3    Q.    Okay.  So it continues on here in your
4    summary of opinions to state "The level of 2-PE
5    stabilize over a period of approximately six to
6    eighteen months as an ink goes through a complex
7    drying process and is not significant much beyond
8    two years after the ink has been applied to
9    paper.  However, the levels of 2-PE were
10   extremely high, along with other test results,
11   which are consistent with an ink that is still in
12   a very fresh stage, e.g., less than six months
13   old," right?
14   A.    Correct.
15   Q.    So what makes this a complex drying
16   process?
17   A.    So the drawing process, which I
18   explained in my report in the reasons and bases
19   section, but to summarize that, when an ink is
20   placed on a piece of paper it goes through a
21   process where there is what we call crosslinking
22   in polymerization of the ink while the solvent
23   evaporates.  And that process of drying, if you
24   will, is multiple factors.  So as an analogy, you

21

G. LaPorte - Confidential

1    know, think about if you had a cut on your hand
2    and then a scar -- or then it starts to scab and
3    then potentially scars later.  So there's a lot
4    of different interactions that are going on that
5    causes that cut to scab at some point in time.
6    And the same thing goes with ink.
7        So the best way to describe it too is
8    that what happens is the ink starts to harden and
9    then it incapsulates and then what is left in
10   the -- sort of the core of it, specifically in
11   this 2-PE compound.
12   Q.    Did you use the term crosslinking of
13   polymerization?
14   A.    Crosslinking and polymerization.
15   Q.    When you use the term "crosslinking,"
16   what does that refer to?
17   A.    It's kind of the molecular description
18   of what's happening with the ink.
19   Q.    When you use the term "polymerization,"
20   what is that referring to?
21   A.    Hardening from a chemical perspective.
22   Q.    When you refer to the hardening of an
23   ink, are there different components in ink?
24   A.    Yes.

22

G. LaPorte - Confidential

1    Q.    And one of those components is the PE-2?
2    A.    So 2-PE is one of potentially other
3    solvents or volatile organic compounds but also
4    there are resins in ink too.  And so that process
5    with the resins in the volatile organic compounds
6    is what creates that drying process.
7    Q.    So if we use the term VOC for volatile
8    organic compounds, does that make sense?
9    A.    Yes.
10   Q.    So within the ink there are different
11   components.  You mentioned there could be VOCs
12   contained with the ink, there could be resins
13   contained with ink.
14       Are there any other types of components of
15   the ink?
16   A.    There are certainly -- there are dyes
17   and pigments in inks.  So to kind of summarize
18   that, the three main components of an ink are
19   colorants, which could be dyes and pigments,
20   solvents and then resins.  But also there's other
21   trace type materials that can be in the ink that
22   may interact with that drawing process.
23   Q.    Okay.  So in the process that you
24   described in the ink hardening, is that due to

23

G. LaPorte - Confidential

1    evaporation leaving a higher amount or a higher
2    proportion of resin in what's left?
3    A.    Not necessarily the resin but the
4    solvent.
5    Q.    So the solvent itself hardens?
6    A.    No, the solvent is part of -- it creates
7    -- is an activator for the hardening process.
8    The solvent is intended to -- I'll say help or
9    assist the liquid get applied to the paper when
10   it's wet and then once it's on the paper, the
11   idea is for that ink to dry so it stays on there
12   and doesn't come off.  What will happen in that
13   process is the solvents will begin to evaporate
14   and then and all of those other complex
15   interactions, like the polymerization that --
16   that hardens -- that will cause the ink to
17   harden.
18   Q.    Okay.  And you state here that the level
19   of 2-PE stabilizes over a period of approximately
20   six to eighteen months as the ink goes through
21   that complex drying process, right?
22   A.    Yes.
23   Q.    Okay.  So what determines whether it
24   takes six months or eighteen months or some other

24

6 (Pages 21 to 24)

G. LaPorte - Confidential

1    period of time to harden?
2    A.   It could depend on the formulation of
3    the ink.  So how the ink is formulated.  What I
4    mean by that is all of the -- all the mixture --
5    the mixture of all of the ingredients that are
6    used in the ink.  So not all ink formulations are
7    exactly the same.
8         There could be, you know, how the
9    document was stored.  If it was stored in a high
10   heat environment and then it would dry much
11   faster.
12        Sometime it can depend on even the type
13   of paper.  So very smooth surfaced paper --
14   technically we call it highly calendared paper so
15   it extremely smooth, thick, inks will dry -- you
16   know, they'll dry faster from those type of
17   materials because they don't absorb into the
18   paper.
19   Q.   Okay.  All right now you indicate here
20   that you performed a chemical analysis of the VOC
21   for document Q8; did I get that right?
22   A.   That's correct.
23   Q.   Did you perform any other analysis of
24   document Q8?

25

G. LaPorte - Confidential

1    A.   Yes.
2    Q.   How many other analyses did you perform
3    for document Q8?
4    A.   I performed what I would call a
5    visual -- I refer to as a visual examination and
6    that's generally to identify the color of the
7    ink, sometimes determine the type of ink and then
8    a microscopic examination, that's to confirm the
9    type of ink that's been used.
10        Then there's a series of what we call
11   optical examinations using an instrument referred
12   to as Video Spectral Comparator or a VSC.
13        Then I do what's called Thin Layer
14   Chromatography Analysis or TLC to compare all of
15   the inks from the different documents.
16        And then that leads to the Gas
17   Chromatography Mass Spectrometry or GC/MS testing
18   for the solvents.
19   Q.   So we got some new terms we introduced
20   into our discussion.  Let's just have an
21   agreement if we refer to "VSC," that's the device
22   you used for your optical exam, is that okay?
23   A.   Correct.
24   Q.   If we refer to "TLC" that's your Thin

26

G. LaPorte - Confidential

1    Layer Chromatography, did I get that right?
2    A.   Correct.
3    Q.   And if you refer to GC/MS, that's Gas
4    Chromatography Mass Spectrometry, did I get that
5    right?
6    A.   Yes.
7    Q.   Are gas chromatography and mass
8    spectrometry one thing or are they multiple
9    things?
10   A.   They're actually two different
11   technologies that work together in an integrated
12   way to provide different information about the
13   material being utilized.
14   Q.   Okay.  So we got for document Q8 a
15   visual examination, a microscopic examination, an
16   optical examination, a TLC examination and a
17   GC/MS examination; is that correct?
18   A.   That's correct.
19   Q.   Were there any other examinations
20   performed of document Q8?
21   A.   I believe we did the physical
22   examination on Q8, which is referred to as
23   indentation or impression analysis and the
24   instrument that was used for that is called an

27

G. LaPorte - Confidential

1    Electrostatic Detection Apparatus, which we can
2    refer to as an ESDA, E-S-D-A.
3    Q.   And then with respect to document Q12,
4    you summarize your opinions of that in paragraph
5    20(c); is that correct?
6    A.   That is correct.
7    Q.   What examinations did you perform on
8    document Q12?
9    A.   I would say all of the same examinations
10   that I did for Q8.
11   Q.   All right.  Now can you tell me where
12   you identify your physical indentation
13   examination of document Q8 in your report?
14   A.   Well, of course I describe it in
15   paragraphs 26 through 31.  With respect to my
16   results, paragraph 44 and 45.
17   Q.   Paragraph 44 doesn't seem to be
18   describing document Q8, am I misreading it?
19   A.   No.  So if I did -- if I did not observe
20   any impressions -- any significant impressions
21   then I don't report them up.
22   Q.   Okay.  Then there's no -- there's no
23   opinion or conclusion that you reached with
24   respect to document Q8 from your physical

28

| | | | |
|---|---|---|---|
| 1 | G. LaPorte - Confidential | 1 | G. LaPorte - Confidential |
| 2 | examination that's listed in your report? | 2 | Q. Okay. And is that the same answer for |
| 3 | A. With respect to the indented writing, | 3 | Ink 5 black? |
| 4 | no, there is nothing. | 4 | A. Correct. |
| 5 | Q. What about your visual examination of | 5 | Q. So is there any significance to the fact |
| 6 | document Q8, is that contained within your | 6 | that this is Ink 3 black other than that Q12 also |
| 7 | report? | 7 | contains Ink 3 black? |
| 8 | A. Yes. | 8 | A. Well, the significance is that I'm just |
| 9 | Q. Where can I find that? | 9 | identifying those ink formulations in terms of I |
| 10 | A. So that would be -- so the visual | 10 | could not differentiate them based on the testing |
| 11 | examination often gets combined with the | 11 | that I performed. |
| 12 | microscopic examination but that would all be | 12 | Q. Can you explain what you mean when you |
| 13 | summarized in table one, which falls under | 13 | say you couldn't differentiate them, what does |
| 14 | paragraph 39, when I identify the color and the | 14 | that mean? |
| 15 | type of ink. | 15 | A. That means I couldn't differentiate them |
| 16 | And then also in paragraph 40, the | 16 | base on all of the testing that I did. |
| 17 | microscopic examination -- so once again that | 17 | Q. Does that mean Ink 3 on document Q8 is |
| 18 | physical examination and that microscopic | 18 | the same as Ink 3 on Q12 or does it mean you |
| 19 | examination really gets combined to a certain | 19 | couldn't tell the difference or something |
| 20 | extent. I mean, I do it in that order | 20 | different? |
| 21 | specifically, I examine the document physically | 21 | A. Yeah, so we generally don't use the word |
| 22 | and then I look at it under the microscope more | 22 | "the same." The same as in chemistry means |
| 23 | to confirm what I've seen physically. | 23 | they're exactly the same in every aspect |
| 24 | Q. So with respect to document Q8 in | 24 | whatsoever. So we use the term "matching," so |
| 25 | paragraph 39 there doesn't seem to be any | 25 | those formulations match each other, they |
| | 29 | | 31 |

| | | | |
|---|---|---|---|
| 1 | G. LaPorte - Confidential | 1 | G. LaPorte - Confidential |
| 2 | conclusion that pertains particularly to Q8, | 2 | couldn't be differentiated based on the physical, |
| 3 | right, I would have to look in the table below | 3 | the optical, the chemical examinations and the |
| 4 | that? | 4 | chemical examinations included the TLC and GC/MS |
| 5 | A. Yes, the table, which Q8 would be that | 5 | testing. |
| 6 | black -- you know, black ballpoint ink was used | 6 | Q. Okay. So I'm not sure that I understood |
| 7 | for the text or written entries on both pages and | 7 | the distinction that you drew. |
| 8 | then a black non-ballpoint ink was used to write | 8 | I think what I understood you to say is that |
| 9 | in the date 3/1/16. | 9 | if we use the terminology that the inks are the |
| 10 | Q. In the right-hand column where it says | 10 | same, it means they have the same precise |
| 11 | "writing ink formulation"? | 11 | chemical composition; did I get that part right? |
| 12 | A. Yes. | 12 | A. Yes, can I just -- well, I'll provide an |
| 13 | Q. And you got two different formulations | 13 | example. I think that might clear this up. If |
| 14 | listed for document Q8, right? | 14 | you were to buy two chocolate chip cookies -- two |
| 15 | A. Correct. | 15 | different type of chocolate chip cookies, they'll |
| 16 | Q. So with respect to all entries except | 16 | have chocolate chips; flour, sugar, butter, |
| 17 | the date, you've identified the writing ink | 17 | right? So we can say that they're chocolate chip |
| 18 | formulation as Ink 3 black, correct? | 18 | cookies based on all those. But now one recipe |
| 19 | A. Correct. | 19 | might call for two tablespoons of flour and the |
| 20 | Q. What is Ink 3 black? | 20 | other one might call for three tablespoons of |
| 21 | A. So as I described I think in the | 21 | flour. So we can't feasibly look at the ratios |
| 22 | paragraph before, I do these -- I assign or | 22 | of all of the different chemicals that were used |
| 23 | designate the ink just -- a number to indicate | 23 | so that's why we avoid using the term "same" |
| 24 | that it is the same or different formulation from | 24 | because "same" means exactly the same in every |
| 25 | the other inks. | 25 | aspect whatsoever. So that's why we use the term |
| | 30 | | 32 |

8 (Pages 29 to 32)

G. LaPorte - Confidential

1      they're "matching" formulations.

2      Q. So what is it about them that matches?

3      A. The dye components, the solvents. All

4 of them based on the optical examinations using

5 the VSC. They have the same infrared

6 characteristics, they have the same ultraviolet

7 characteristics. They're, obviously, the same

8 color, they're the same type of ink. They have

9 the same dye components based on the TLC

10 examination.

11      Q. Okay. So with respect to the Ink 3

12 entry on document Q8, are you able to determine

13 what volatile organic compounds are contained

14 within that ink?

15      A. Based on my GC/MS analysis, they,

16 obviously, had the 2-phenoxyethol or the 2-PE

17 component.

18      Q. Are you able to tell whether there are

19 any other VOCs contained in the Ink 3 on document

20 Q8?

21      A. There -- so the GC/MS analysis that I

22 ran was very specific for 2-PE. And then there

23 are some -- potentially some other solvents that

24 will show within that range of analysis. But

33

---

G. LaPorte - Confidential

1      once again, I didn't find any differences between

2 those two inks.

3      Q. Did you identify which solvents were

4 present in Ink 3 on Q8?

5      A. No. I mean, my focus once I cannot

6 differentiate them, which is, by the way, we have

7 a standard for this, which is -- it's the

8 Scientific Working Group for Forensic Document

9 Examiners or SWGDOC, it's the standard for test

10 methods for forensic writing ink comparison,

11 which is included in my report.

12      So once we do a physical or visual

13 microscopic optical and TLC examination, if the

14 inks can't be differentiated at that point, the

15 standard allows us to say that they match each

16 other. But, obviously, to be clear, which is not

17 to use the word "the same".

18      Q. Okay. Do you know which resins were

19 contained in Ink 3 on Q8?

20      A. No, I didn't perform a resin analysis.

21      Q. Okay. Do you know which dyes or

22 pigments are contained within Ink 3 on document

23 Q8?

24      A. I can say that the same dyes in Ink 3 on

34

---

G. LaPorte - Confidential

1      Q8 and Q12 were the same based on the TLC.

2      Q. Do you know which trace materials were

3 present within Ink 3 on document Q8?

4      A. No, but once again when you add all of

5 those components together, when you take the

6 dyes, the solvents, the resins and the trace

7 materials, if there are differences, generally,

8 we would see that when we did the optical

9 examination in the infrared, so there might be

10 some different infrared characteristics if

11 something is different in those formulations.

12      So that examination the Video Spectral

13 Comparator or the VSC allows you to look at the

14 ink as a whole.

15      Q. Okay. Did you say that with respect to

16 document Q8 you combined your visual and

17 microscopic examinations?

18      A. Well, on Q8 and, you know, Q12 I did --

19 I performed the VSC examination and could not

20 differentiate the inks.

21      Q. I'm asking you something I think that's

22 a different. You identified five different

23 examinations, right.

24      A. Yes.

35

---

G. LaPorte - Confidential

1      Q. Physical, visual, microscopic, optical

2 and GC/MS, right?

3      A. Correct.

4      Q. So we've gone through so far your

5 physical indentation exam, your visual exam with

6 respect to document Q8.

7      Now I'm asking you paragraph 40 also contains

8 your microscopic exam, right?

9      A. Yes.

10      Q. And paragraph 40 contains your optical

11 exam?

12      A. Yes.

13      Q. And then your GC/MS exam and your TLC

14 exam for document Q8, are those listed in

15 paragraph 41 and 42?

16      A. So page -- paragraph 41 and 42, yes,

17 covers both Q8 and Q12. And also too we should

18 be clear that when we talk about the analysis of

19 Q8, the Q8 ink, we're just referring to the black

20 ballpoint Ink 3 and not the non-ballpoint ink

21 that was used for the date on Q8.

22      Q. You've identified that as Ink 5,

23 correct?

24      A. Correct.

36

G. LaPorte - Confidential

1       G. LaPorte - Confidential
2       Q.  So with respect to Ink 3, can you
3    identify what ink it is or is Ink 3 just a label
4    that you select, you know, so that you can
5    reference it in your report?
6       A.  It's an arbitrary designation to be able
7    to differentiate the inks that I've analyzed.  I
8    mean, I can tell you that the ink in all
9    likelihood is an ink that's been around for
10   several years that's manufactured by multiple
11   manufacturers including BIC and Paper Mate but I
12   didn't do a comparison to identify that ink
13   formulation.  But based on my experience with
14   inks, it's a pretty common black ballpoint ink.
15      Q.  When you say "in all likelihood," that's
16   conjecture?
17      A.  I wouldn't say it's conjecture.  It's
18   based on my knowledge, training and experience.
19   But I'm letting you know that I'm not -- I can't
20   confirm that because I didn't perform a direct
21   comparison with a BIC or Paper Mate ink.
22      Q.  Okay.  From your answer, can I take that
23   to mean that the document could have been written
24   by a BIC writing implement?
25          MS. GUERON:  Objection.

37

1       G. LaPorte - Confidential
2       A.  I wouldn't -- no, I would not
3    characterize this with a single manufacturer.  So
4    like I said, there's multiple manufacturers that
5    would that would have this type of ink.  It's
6    actually very simple from a formula perspective,
7    it always just a few dyes that are mixed
8    together.  So I wouldn't call it a BIC ink, no.
9       Q.  Have you completed your answer?
10      A.  Yes.
11      Q.  Let me clarify my question.  My question
12   was, is it possible that this Ink 3 black came
13   from a BIC pen?
14          MS. PRIMAVERA:  Objection.
15      A.  Is it possible.  But for reference
16   throughout, I would just call it Ink 3 without
17   a -- trying to identify it to a manufacturer.  I
18   can't do that.
19      Q.  I'm not asking you to identify the
20   manufacturer.  I'm asking you whether it's within
21   the possible solution sense that this could have
22   come from a BIC writing implement?
23      A.  It's possible.
24      Q.  And could have also come from a Paper
25   Mate writing implement, correct?

38

1       G. LaPorte - Confidential
2       A.  It's possible.
3       Q.  And it could have come from any other
4    number of brands, correct?
5       A.  Yes, that would be correct.  So other
6    brands -- it's a very complicated -- it's a very
7    complicated relationship with ink companies.
8    Some of them will sell their ink to other
9    companies or they'll use them in pens that you
10   pick up in hotels and that sort of thing.
11      Q.  Okay.  Have you completed your
12   responsibility?
13      A.  Yes, sir.
14      Q.  With respect to the Ink 3 black on
15   document Q12, could that also have come from a
16   BIC pen?
17      A.  Yes.
18      Q.  Could it have come from a Paper Mate?
19      A.  Yes.
20      Q.  You testified that you were unable to
21   differentiate between the Ink 3 black on document
22   Q8 and Ink 3 black on document Q12, correct?
23      A.  Correct.
24      Q.  Is it possible that they could have been
25   written with two different brands of writing

39

1    implements?
2           MS. PRIMAVERA:  Objection.
3       A.  It's possible.  I can't identify the
4    brands that were used.
5       Q.  To be clear, I'm not asking you to
6    identify the brands that are used.  I'm asking
7    you about the potential solution space.
8          In other words, could document Q8 have been
9    written in a BIC and document Q12 been written in
10   a Paper Mate?
11      A.  It's possible.  But there's no evidence
12   really to suggest that.  It's more likely that
13   they were written with a matching ink
14   formulation, that's all I can say at that point.
15      Q.  My understanding from your testimony,
16   and please correct me if I'm wrong, you can have
17   a matching formulation that's used in multiple
18   brands, right?
19      A.  It's possible, yes.
20      Q.  You can tell me if it's chocolate chip
21   cookies, you can't tell me if it's Chips Ahoy or
22   an Oreo -- Oreo is a bad example, they don't make
23   chocolate chips but you get my point?
24      A.  Yes.

40

10  (Pages 37 to 40)

1       G. LaPorte - Confidential
2    Q.  So you use the term formulation, what
3  does that term mean?
4    A.  It's the overall recipe.
5    Q.  Okay.  So your GC/MS examination of
6  document Q8 is contained in paragraphs 41 and 42,
7  right?
8    A.  That's correct.
9    Q.  I'm sorry, just to ask you one more
10  question about the formulation of ink.  If you
11  can tell that the recipes are the same, does that
12  mean that they're chemically the same?
13    A.  We don't use the word "the same."  Once
14  again, in order for something to be the same you
15  would have to know all of the ratios, the exact
16  amounts that were used.  So the best I can say is
17  that, you know, they generally have the same
18  ingredients.  I would -- so let me caveat that
19  though -- if there are differences in certain
20  ratios, there is the possibility that you would
21  see those differences when you examine those inks
22  under the VSC when you look at them in the
23  infrared.  So there's no evidence to indicate
24  that there are some major differences.  But once
25  again, the standard does not allow us to say two

41

1       G. LaPorte - Confidential
2  inks are the same.
3    Q.  I want to ask you a little bit more
4  about your chemical examination of document Q8.
5  I'm looking at paragraph 34 of your report and in
6  paragraph 34 you're describing the process of
7  chemical examination, correct?
8    A.  Yes.
9    Q.  So that's a general description of how
10  the examination works, right?
11    A.  Correct.
12    Q.  So in your discussion of the Thin Layer
13  Chromatography, TLC, you state that in order to
14  perform TLC on ink, the ink is extracted with a
15  solvent from the sample plugs removed from the
16  written entries; do you see where I'm reading?
17    A.  Yes.
18    Q.  Okay.  So what solvent do you use to
19  extract the ink from the sample plugs?
20    A.  So for TLC I use Pyridine,
21  P-Y-R-I-D-I-N-E.  That's specifically for
22  ballpoint ink.
23    Q.  When you when document here refers to
24  sample plugs, those are holes that you punch in
25  the document, correct?

42

1       G. LaPorte - Confidential
2    A.  Yes, from the ink of course, from the
3  writing.
4    Q.  From the portion of the document that
5  has writing on it, you extract a hole punched
6  sample?
7    A.  Yes.
8    Q.  With respect to document Q8, did you
9  follow this process?
10    A.  Yes.
11    Q.  So how many sample plugs did you remove
12  from document Q8?
13    A.  I don't remember exactly but can I -- I
14  may have something in my notes.  Can I refer to
15  that?
16    Q.  Yes, you may.
17    A.  So I don't -- I don't have it noted here
18  but I will tell you that it's typically three to
19  five hole punches.  Never more than five.  And
20  really never less than three unless I have a very
21  limited sample.
22    Q.  I'm not sure -- I'm not sure I caught
23  all that because I was jotting down some notes.
24  I think you said typically you would use three to
25  five?

43

1       G. LaPorte - Confidential
2    A.  Three to five.
3    Q.  Never more than five?
4    A.  Never more than five -- well, I hate to
5  use the word "never."  I don't recall really ever
6  using more than five from a ballpoint ink unless
7  I really needed to.  Sometimes there's other inks
8  that are a difficult to extract, which I may have
9  to do more than five but in this case that wasn't
10  -- that didn't apply here.  So I would say three
11  to five.
12    Q.  So with respect to document Q8, the ink
13  was not difficult to extract?
14    A.  Correct.
15    Q.  So that means you would have taken five
16  or fewer sample plugs?
17    A.  Yes, I usually take five when I do
18  onsite inspection, which I did in this particular
19  case or I might take seven to have an extra but I
20  won't analyze more than five.
21    Q.  Why do you prefer to use five?
22    A.  I don't necessary prefer to use five, it
23  depends.  I prefer to actually use three.  Five
24  sometimes the ink -- depending on the ink and how
25  think it is on the paper can be too -- it can be

44

11  (Pages 41 to 44)

1    too concentrated.
2    Q.   Why does that matter?
3    A.   Because when I -- when I perform the TLC
4    examination then the -- as you can see in figure
5    three that I have in my report sometimes those
6    spots will get too heavy and then it will be hard
7    to hard to compare the spots at each of the
8    different levels.  It all starts to run together.
9    Q.   So just for my understanding, the TLC
10   examination that you're describing in your report
11   involves a process that allows the ingredients of
12   the ink to separate so that you can look at them,
13   is that more or less correct?
14   A.   The colorants.
15   Q.   Colorants.  This examination only
16   concerns the colorants portion of the ink?
17   A.   Yes.  But in some cases when I --
18   because I'll visualize the TLC on the VSC and
19   when you visualize it in the infrared sometimes
20   you will see other components that are not
21   necessarily the dyes.
22   Q.   What did you do with respect to document
23   Q8 here?
24   A.   Can you be more clear.  What did I do?

1    What do you mean what did I do?
2    Q.   Well, I think you just testified that
3    sometimes you visualize and you can see other
4    components beyond the color, did I get that
5    right?
6    A.   Not sometimes.  I would say that almost
7    all the time I'm doing that.  Rarely do I not do
8    that.
9    Q.   Okay.  So what did you do here with Q8?
10   A.   Just like I said, which was I performed
11   the TLC examination, I took photographs of it and
12   then I examined it with the VSC.
13   Q.   Okay.  Were there colorants you were
14   able to discern for Q8?
15   A.   Yes.
16   Q.   Did you do the same analysis for Q12?
17   A.   Yes.
18   Q.   Did they match?
19   A.   Yes, they were all done on the same --
20   sort of the same TLC plate like you see on figure
21   three.
22   Q.   So in discussion of your inability to
23   differentiate the ink, you're incorporating in
24   that result your observations from the TLC

1    examination, is that right?
2    A.   Yes, it's everything combined.
3    Q.   You can't tell me how many sample plugs
4    you took from document Q8, can you?
5    A.   I said three to five.  I can't give you
6    the precise number on whether it was three or
7    four or five but it was three to five.
8    Q.   When you -- what's the next step --
9    after you take the sample plug, what's the next
10   step in the process of conducting your TLC
11   analysis?
12   A.   So once I take the samples -- in this
13   particular case, I extracted the samples in New
14   York and then I had to bring them back with me.
15   But once I brought them back to the laboratory, I
16   then transfer them into a glass vial and then I
17   add a solvent.
18   Q.   Did you complete your response?
19   A.   Yes, I'll sop stop there.
20   Q.   Okay.  So when you take the three to
21   five sample plugs, do they go into the same vial?
22   A.   I'm going to check my notes.  I may have
23   -- yes, so the samples that I remove -- yes, they
24   all go in the same vial.  Yes.

1    Q.   Okay.  So when you conduct your TLC
2    examination, is it one examination of the
3    three -- of the vial of combined sample plugs?
4    A.   Yes.
5    Q.   So what's the purpose of taking more
6    than one sample plug?
7    A.   Because it might not be concentrated
8    enough.  I need to be able to see those
9    components, like in figure three.  If I only take
10   one plug I may not be able to see all of those
11   components.  The idea is I want to get the right
12   concentration, if you will, where it's not too
13   concentrated and not under concentrated.
14   Q.   What determines the amount of
15   concentrate in a sample?
16   A.   It depends on how thick the ink is on
17   the paper.  It can also depend on the ink
18   formulation specifically.  Some inks will not
19   extract in a concentrated way or they'll
20   overly -- they'll be overly concentrated.
21   Q.   Is there some scientific standard that
22   you reference which tells you how many samples to
23   take?
24   MS. PRIMAVERA:  Objection.

12  (Pages 45 to 48)

1     A. Well, as I already said, there's the
2     SWGDOC standard for writing ink comparisons but
3     that standard doesn't specify exactly the number
4     for the reasons that I just mentioned. Sometimes
5     you don't know until you start extracting and
6     then -- but that -- but you can adjust that by
7     how much sample you take for the spot you're
8     going to put on the TLC plate. So if it comes
9     out really dark then I have to -- typically I'll
10    draw, you know, two microliters into a pipette
11    and then I can adjust that depending on how
12    concentrated the ink looks once it's in this
13    solution. So sometimes I'll just draw one
14    microliter, sometimes 1.5 or sometimes it will be
15    two.
16    Q. Have you completed your response?
17    A. Yes, sir.
18    Q. Is that process you just described part
19    of the standard for test methods for forensic
20    writing ink comparison that you referenced on
21    page 14 of your report?
22    A. I would actually say that goes back to
23    basic chemistry -- college chemistry when you do
24    TLC analysis.

49

1     Q. So is TLC analysis part of an
2     undergraduate or graduate chemistry curriculum?
3     A. Yes, absolutely.
4     Q. Is the use of Pyridine part of any
5     generally accepted scientific standard?
6     A. Pyridine is mentioned I believe in the
7     SWGDOC standard.
8     Q. Is SWGDOC separate from the standard for
9     test methods for forensic writing ink comparison?
10    A. SWGDOC stands for the Scientific Working
11    Group for Forensic Document Examiners, that's the
12    group published the standard.
13    Q. When you say "the standard," are you
14    referring to the standard for test methods for
15    forensic writing ink comparison?
16    A. Yes.
17    Q. So SWGDOC is the organization and
18    standard for test methods for forensic writing
19    inc comparison is a standard promulgated by that
20    group?
21    A. Well, you're going into a rabbit hole.
22    So I will say that the SWGDOC -- originally
23    SWGDOC was a group that was funded under the
24    department of just and the FBI. I was part of

50

1     that group, I was the technical representative
2     for the ink standards. But we then published the
3     standards through ASTM and we did that for many
4     year. And then ASTM turned over the rights to
5     those standards back to SWGDOC, which are
6     published on the website. So they are SWGDOC
7     endorsed standards but have been published
8     through ASTM. ASTM is a Standards Development
9     Organization or an SDO.
10    Q. Is ASTM an acronym?
11    A. Yes, it's the -- ASTM international, is
12    the Association For Standards, Testing and
13    Materials. But the ASTM actually just become
14    ASTM.
15    Q. So the name of the entity has changed?
16    A. Well, it's just ASTM now. Historically,
17    yes, it was it was an acronym. It's almost used
18    as a term now, ASTM, or the name of the
19    organization.
20    Q. Are all of the examinations that you
21    performed pursuant to the SWGDOC, slash, ASTM
22    standards?
23    A. Well, as I highlighted in my report.
24    Certainly for the -- you know, for the ink

51

1     comparisons, for the indentations, we do have
2     SWGDOC standards for those, yes.
3     Q. Do those standards also govern your
4     GC/MS testing?
5     A. It does not. There is not a standard
6     that was published through ASTM for the GC/MS
7     analysis.
8     Q. Is there a standard published through
9     any other entity for the GC/MS analysis?
10    A. There are multiple standards for GC/MS
11    analysis but not for inks.
12    Q. Is the GC/MS analysis used for analysis
13    of things other than inks?
14    A. Yes.
15    Q. Can you give me any examples?
16    A. Explosives, drugs, miscellaneous
17    materials, unknown materials, pharmaceuticals.
18    Q. Okay.
19    A. Probably I would say it's the most
20    utilized instrumental analytical procedure in the
21    world for chemical analysis.
22    Q. So did I correctly understand your
23    answer that SWGDOC and ASTM do not have a
24    promulgated standard for the use of GC/MS testing

52

1      for inks?
2          A.  Correct.
3          Q.  Okay.
4          A.  There's multiple publications but not a
5      standard for this.
6          Q.  There's multiple what?
7          A.  Publications -- peer reviewed
8      publications.
9          Q.  Is there any other -- well, you
10     described an SDO, Standards Development
11     Organization, is that what it stands for?
12         A.  Yes.
13         Q.  Is there any other SDO that promulgates
14     the standards for the use of GC/MS testing of
15     inks?
16         A.  No.
17         Q.  Is SWGDOC also considered an SDO?
18         A.  No.
19         Q.  What's the difference between those two
20     entity types?
21         A.  So an SDO is an organization that
22     promulgates standards through a process --
23     through a regulatory process, if you will.  And
24     SWGDOC was the group where we drafted the

1      standards and then we submitted them to the SDO.
2      So SWGDOC is really a composition of expert.
3          Q.  So if we use like a unit of measurement,
4      like a meter, right, there's some entity that
5      defines what a meter is, right?
6          A.  Correct.
7          Q.  And is that basically the same thing
8      that ASTM is doing?
9          MS. PRIMAVERA:  Objection.
10         A.  You're asking questions that sort of
11     require an immense amount of background that's
12     not that simple to answer.  But the meter -- what
13     happened is that there would probably -- there's
14     scientific research and ways to identify exactly
15     what a meter is and that goes through all
16     kinds -- all types of processes and then at some
17     point in time you would use an SDO to put forth
18     all of that information and write a standard of
19     what a meter is and then the SDO goes through a
20     long process of open public comments and then and
21     then people vote on that standard and if it's --
22     if it passes a certain majority then it becomes a
23     standard.  But an SDO does not necessarily write
24     its own standards, if that makes sense.

1          Q.  Okay.  So I'm understanding from your
2      answer that the SDO is the organization that
3      decides upon the standard but it can decide to
4      use the standard offered through some
5      third-party; is that correct?
6          A.  No, the SDO -- the SDO's purpose isn't
7      to decide whether to use the standard.  They --
8      based on a voting process, they decide whether
9      the standard should be published.  Once it's
10     published, you -- they're not mandatory -- in
11     most industries it's not mandatory that you have
12     to use the standard.
13         Q.  So the SDO publishes a standard but it
14     doesn't necessarily publish a standard that it
15     created.  It could be publishing a standard
16     created by some third-party, did I get that
17     right?
18         A.  Correct.
19         Q.  Using the same framework, SWGDOC drafted
20     the standard, provided it to ASTM and ASTM
21     through the process you described elected to
22     publish it, is that right?
23         A.  Correct.
24         Q.  Is there any such framework applicable

1      to the GC/MS examination of ink?
2          A.  No, not for -- not through an SDO.
3      There are standards for ink analysis that are in
4      the published literature but not that have gone
5      through an SDO.
6          Q.  So when you say there are standards,
7      you're referring to a body of peer reviewed work
8      that have been published in the various
9      publication, is that right?
10         A.  Correct.
11         Q.  All right.  So with respect to the GC/MS
12     analysis that you're describing in paragraph 35
13     and 36 and 37 and 38, you're looking at the rate
14     of evaporation of 2-PE, correct?
15         A.  That's over -- that's over simplified
16     but yes.
17         Q.  Are there any other examinations that
18     were performed using GC/MS of the document Q8
19     other than with respect to the 2-PE content?
20         A.  There are certainly quality control
21     samples that I analyzed using the GC/MS.
22         Q.  Okay.  So with respect to your TLC
23     examination, you described the process of taking
24     sample plugs, putting them in vials, developing

G. LaPorte - Confidential

them on a plate with a mixture of solvents and
then applying the SWGDOC standards.

Q.   Now with respect to the GC/MS, how can we how
can we identify the process that you used to
conduct the examination?

A.   I'm not sure what you mean by "identify
the process"?

Q.   Well, does your report describe the
process that you used to conduct your GC/MS
analysis?

A.   Yes.

Q.   So where can I find that in the report?

A.   That should be throughout -- I mean,
section D.

Q.   Section D you said?

A.   Yes.  Paragraphs 35, 36, 37, and 38.

Q.   So those are the paragraphs I just
referenced?

A.   Yes.

Q.   So starting with paragraph 36, you're
describing what the examination is looking at,
right?

A.   (No verbal response.)

Q.   Let me try it a different way.  Your

57

G. LaPorte - Confidential

paragraphs 36, 37 -- sorry, 35, 36, 37 and 38 are
generally describing what a GC/MS examination is
and does, correct?

A.   No, because there is a discussion about
how the solvent evaporates from the paper -- from
the ink when it's applied to the paper.  I talk
about the method that's used where you take plugs
at 70 degrees Celsius, you measure the difference
between the unheated and heated samples so
there's a methodology that's described in there.

Q.   So how can I tell from reviewing your
report what you did with document Q8 with respect
to the GC/MS analysis?

A.   Everything that's in those paragraphs is
what I did to Q8.

Q.   Well, for example, right, in order to
conduct your GC/MS examination do you take
samples of the document?

A.   Yes.

Q.   Is that described in here?

A.   That's described in -- I believe, in
paragraph 33.  So just to read the last sentence
of paragraph 33, "In order to conduct both TLC
and GC/MS, I removed paper and ink plugs from

58

G. LaPorte - Confidential

representative areas of the written entries with
a specialized hypodermic like device."

Q.   Okay.  Have you completed your response?

A.   Yes.

Q.   Okay.  So did you use -- did you remove
paper and ink plugs from document Q8 to conduct
the GC/MS examination?

A.   Yes.

Q.   Does your report describe you doing
that?

A.   The reasons and bases section talks
about how that's done and then later on I say in
my observations and results from testing section
that I performed a GC/MS analysis, which applies
to the GC/MS analysis that I described
previously.

Q.   Does your report tell me how many plugs
you the took from document Q8 to perform your
GC/MS analysis?

A.   No, that's all in my notes.

Q.   Does your report tell me whether your
plugs were half a millimeter or one millimeter or
something in between?

A.   They were 0.5 millimeters, that's in my

59

G. LaPorte - Confidential

notes.

Q.   But that's not in your report, right?

A.   That's in my notes.

Q.   Does your report tell me how many plugs
you took for the GC/MS analysis?

A.   It's in my notes, it's not in my report.

Q.   How many plugs did you take from
document Q8 to perform your GC/MS analysis?

A.   Four.

Q.   Why did you use the number four?

A.   I typically use three to five but
it's -- but I also performed duplicate testing.
So in order to minimize the amount of samples
that I take, sometimes depending on how much
write is present, then I'll change that from
three to five.  But at the end of the day it
doesn't really matter because as I described in
my report, I'm going to look at the relative
difference between the samples that have been
unheated or not treated and then the samples that
have been heated.  So the important part is just
I use the same amount of samples for both.

Q.   Well, what I'm trying to find out is if
I wanted to replicate your process from your

60

G. LaPorte - Confidential

1  report whether I can do that.
2       So you mentioned that you use typically three
3  to five plugs; is that correct?
4       A. Correct.
5       Q. What determines whether you use three,
6  four or five or some other number?
7       A. It depends on the amount of ink that's
8  present. If I'm going -- you know, how many
9  times -- I have to duplicate the testing so it's
10 four times two, which would be eight and then I
11 have to use that for the unheated and then I need
12 eight more for the heated so that's sixteen hole
13 punches that I'm taking.
14      Q. Can you walk me through that process
15 that you just described and explain to me, for
16 example, what's the difference between your
17 testing and your duplicate testing?
18      A. I'm doing the testing twice.
19      Q. Okay. So just walk me through step by
20 step what you do with taking plugs and using the
21 plugs, can you do that, please?
22      A. Yes.
23      Q. Okay.
24      A. So I remove the 0.5 millimeter hole

61

G. LaPorte - Confidential

1  punches for GC/MS testing. In this particular
2  case I removed four or really it's eight that I'm
3  taking but I divide those up between -- and put
4  those into two vials. So I take four hole
5  punches and place that into a vial. I take
6  another four hole punches that are in the very
7  near vicinity of where I took the first four hole
8  punches and I put that in a second vial. One of
9  those vials then I just -- I perform the testing
10 for the 2-PE, the GC/MS analysis, I get a value
11 for the quantity of 2-PE and then the other vial
12 I heat those hole punches at 70 degree Celsius
13 for 90 minutes and then I measure the amount of
14 2-phenoxyethanol in the heated samples. And the
15 idea based on lots of research -- years of
16 research is that if the ink is fresh then you
17 will drive off a lot of phenoxyethanol when you
18 heat it. If it's not fresh, if it's old, then
19 you're not going to drive off very much
20 phenoxyethanol because it will be completely dry.
21 The term that I use "a lot" is 25 percent, which
22 is the threshold that we use to say with a high
23 degree of probability that an ink is less than
24 two years old when those values exceed

62

G. LaPorte - Confidential

1  25 percent.
2       Q. Have you completed your response?
3       A. Yes.
4       Q. So with respect to the number of plugs
5  you took for your GC/MS analysis of document Q8,
6  did you take eight plugs or did you take four
7  plugs?
8       A. I did -- I actually did sixteen. So I
9  did four unheated, four heated and then I
10 repeated that again and did four unheated, four
11 heated.
12      Q. Let me just see if I'm keeping up with
13 the steps.
14      Step one you took sixteen plugs from document
15 Q8, did I get that right?
16      A. Correct.
17      Q. Then you took four of those plugs and
18 you put them in a vial; is that correct?
19      A. Correct.
20      Q. And you took four other plugs and put
21 them in a second vial?
22      A. Correct.
23      Q. You heated the first vial at 70 degrees
24 for 90 minutes; is that correct?

63

G. LaPorte - Confidential

1       A. Correct.
2       Q. You did not heat the second vial?
3       A. Correct.
4       Q. Do you somehow measure vial number one
5  after it's been heated?
6       A. I do a relative measurement of the --
7  when I compare the heated and the unheated and in
8  order to do that I use something called an
9  internal standard.
10      Q. You're going to compare two different
11 vials; a heated and unheated, correct?
12      A. Yes.
13      Q. Do you have to take measurements of each
14 of those two vials?
15      A. Not when I'm doing a relative
16 comparison. If I have two people standing next
17 to each other and one is 6'1 and the other is 5'8
18 and you can ask me who is taller, I can take a
19 ruler and measure a difference in their height.
20 I don't have to measure one and say, oh, he's 5'8
21 and measure the other and say he's 6'1. I can
22 just say there's a -- you know, a five inch
23 difference.
24      Q. Okay. Let's stick with your analogy

64

16  (Pages 61 to 64)

G. LaPorte - Confidential

1  that you just used.  In your analogy you used a
2  ruler as your measuring tool, right?
3  A.  Correct.
4  Q.  In taking your relative measurement of
5  the two vials, do you have a measurement tool?
6  A.  It's called the internal standard.
7  Q.  What is the internal standard that you
8  just referenced?
9  A.  The internal standard is another
10  chemical that's put in with the extraction
11  solvent and it's called o-cresol.  I put the
12  cresol in the extraction solvent or in a mixture,
13  if you will, and I use that to extract the ink
14  from both the samples.
15  And then there's -- then I do -- then
16  there's calculations where the cresol -- you get
17  more of -- I guess the best way to put it is a
18  corrected value because the cresol acts as a
19  measurement tool and a ruler in both of those
20  sets of samples.  So that allows you more
21  precision when you're doing the relative
22  comparison.
23  Q.  Okay.  I want to see if I understand
24  this conceptually.  Let -- I'll paraphrase back

---

G. LaPorte - Confidential

1  to you and let me know if I got it right or if
2  I'm off with something, okay.
3  You got the two vials; first vial is heated
4  the second vial is unheated; is that correct?
5  A.  Correct.
6  Q.  And then do you add this o-cresol to
7  each of those two vials?
8  A.  I add o-cresol and acetonitrile.
9  O-cresol is the internal standard, acetonitrile
10  is the solvent.  So it's a combination of
11  acetonitrile and o-cresol.  The acetonitrile acts
12  as the primary extractor, the one that pulls the
13  ink from the paper and puts the 2-PE into a
14  liquid solution.
15  Q.  Did I get the term right, acetonitrile?
16  A.  Correct.
17  Q.  And o-cresol?
18  A.  Yes.
19  Q.  So do I understand correctly that with
20  respect to the heated vial, you're adding
21  acetonitrile and o-cresol into that vial?
22  A.  Correct, for five minutes.
23  Q.  With respect to the unheated vial, do
24  you add acetonitrile and o-cresol?

---

G. LaPorte - Confidential

1  A.  I use the exact same solution so that
2  the ratio of acetonitrile an o-cresol is the same
3  in both, yes.
4  Q.  So then after you've added the
5  acetonitrile and o-cresol to vial number one and
6  the five minutes elapsed, what do you do with the
7  vial?
8  A.  Now I then remove the liquid ink, I
9  remove 10 microliters from that vial and I put
10  that into another vial.
11  Q.  So --
12  A.  And that's the vial that would be used
13  for the GC/MS analysis.
14  Q.  Let's keep breaking it up into, pieces.
15  Vial number one you add those two components to
16  it for five minutes, you wait.  Then you remove
17  10 microliters of the substance that's in the
18  heated vial, correct?
19  A.  Correct.
20  Q.  It's mixed together or is it separated
21  somehow within the liquid?
22  A.  Yes, so I think this is the issue we run
23  into when -- I'm not complaining here but you're
24  asking questions so out of order.  But if -- if I

---

G. LaPorte - Confidential

1  was explaining this to somebody from the
2  beginning I would use an analogy that think about
3  it if you got ink on your shirt and you tried
4  water and you tried to brush it off, it smudges
5  or nail polish remover.  Really what extraction
6  is it turns the ink -- the hard ink into a
7  liquid.  That's the whole idea of an extraction.
8  So, yes, when I put the acetonitrile and
9  the o-cresol together that is my -- the
10  acetonitrile is my extraction solvent.  The
11  o-cresol is the measurement tool or if you will
12  the ruler that's going to be used in there --
13  that we're going to correct for when everything
14  is done.
15  So, yes, ten microliters of the
16  acetonitrile plus the o-cresol is removed so that
17  I'm not taking the paper plugs because when I --
18  if I let the plugs sit in the solution, right,
19  then they're going to continue -- they can
20  potentially continue to extract.  So I remove
21  just the liquid out and put that into another
22  vial and then that goes into the GC/MS.
23  Q.  Have you completed your response?
24  A.  Yes.

---

G. LaPorte - Confidential

1      G. LaPorte - Confidential
2    Q. Okay. So let's rewind it a little bit.
3  You got vial number one with the four plugs in
4  it. You add the acetonitrile and the o-cresol,
5  you let it rest for five minutes; is that
6  correct?
7    A. I agitate it for five minutes too so
8  it's not just rest. I stir it up.
9    Q. Okay. It's agitated for five minutes,
10  do you have some kind of machine that shakes it
11  or something?
12    A. I don't agitate it for the whole five
13  minutes, I tap it probably -- I don't know, 30
14  seconds at least just to mix it up. And then,
15  yes, sometimes I -- what I do have is a vortex --
16  it's called a vortex and I put it on the vortex
17  and that actually shakes it. I do that for -- I
18  don't know, ten seconds or so and then I let it
19  sit. I continue to shake it up and then when I
20  remove the ink that's been extracted, I put it in
21  a syringe but I also mix it up with the syringe
22  too.
23    Q. Let's rewind that again. So you got the
24  vial with the four plugs in it, you add the
25  acetonitrile, you add the o-cresol. Some period

69

1      G. LaPorte - Confidential
2  of time elapses and then it gets agitated, is
3  that right?
4    A. It's being agitated in the interim, yes,
5  for over that course of five minutes.
6    Q. Well, is it being continuously agitated
7  for the entire five minutes?
8    A. Like I said, I'll tap it, I'll shake it,
9  I'll vortex it but then I'll also -- once the
10  five minutes starts -- I think -- I would say
11  typically when I'm about four minutes and
12  45 seconds then I'll start agitating it with the
13  syringe, sucking it up, pushing it out, just to
14  make sure it's all mixed completely.
15    Q. Are you describing to me a process that
16  you're engaging in manually?
17    A. That part is manual, yes. It's called
18  extraction. That's a manual process, yes.
19    Q. But the vortex piece of it, is that also
20  manual?
21    A. It's a sample prep. It's a little --
22  it's a little instrument that I have that
23  shakes -- it shakes when you push down on it so I
24  put the vial on there and it shakes it.
25    Q. Is it being continuously shaken by the

70

1      G. LaPorte - Confidential
2  vortex?
3    A. No, that's about ten seconds. I'm just
4  agitating it -- just trying to mix it up. I
5  don't have to -- it's not necessary to shake it
6  for five minutes.
7    Q. So when you put it on the vortex and you
8  depress the vortex, it shakes it for ten seconds?
9    A. Approximately, yes.
10    Q. How many times do you do that?
11    A. Once.
12    Q. So you do that for the heated sample.
13  You do the same process for the unheated sample,
14  correct?
15    A. Correct.
16    Q. So at the conclusion of this process of
17  five minutes with the agitation at intermittent
18  periods manually and through the vortex, what do
19  you end up with after the five minutes?
20    A. Then I end up with a liquid solution of
21  ink, acetonitrile and o-cresol.
22    Q. And is that solution uniform or does it
23  separate according to density in the vial?
24    A. No, it's uniform. That's the purpose of
25  using acetonitrile.

71

1      G. LaPorte - Confidential
2    Q. So it's a uniform solution?
3    A. Yes.
4    Q. You extract 10 microliters of that
5  uniform solution?
6    A. Correct.
7    Q. And you place that in a new vial?
8    A. Yes.
9    Q. What do you do with the new vial?
10    A. The new vial goes on to what's called
11  the GC portion of the GC/MS and it has what's
12  called an auto sampler. And the auto sampler has
13  a hypodermic needle in it that punches through
14  the vial and then draws one microliter of that
15  liquid solution and then it injects it into the
16  GC, which travels through that and then over to
17  the MS.
18    Q. Okay. So let me see if I understand
19  what happens with the new vial.
20    The new vial starts to ten microliters of the
21  uniform solution of the ink, the acetonitrile and
22  the o-cresol; is that correct?
23    A. Acetonitrile.
24    Q. Acetonitrile. Sorry. So that's where
25  we start out with, right?

72

G. LaPorte - Confidential
1
2     A.   Correct.
3     Q.   And then you use a device called an auto
4  sampler to punch through the vial and to pull out
5  one of those ten microliters?
6     A.   That's close.  But, yes, the auto
7  sampler has a hypodermic needle that's built into
8  a robotic arm and that hypodermic needle injects
9  into the new vial.  The vial is very specialized,
10  it has a top on it, almost like a rubberized
11  center so that the needle can go through it.  And
12  that needle goes through the vial, pics up one
13  microliter and then the one microliter is
14  injected into the GC/MS, and that's all robotic.
15     Q.   So you start with ten microliters and
16  the robotic device extracts one of those ten
17  microliters and puts it into the GC device?
18     A.   Once again, we're kind of going into a
19  rabbit hole.  So the way that I have my GC/MS
20  programmed is that it -- what it will do is it
21  will make the hypodermic needle go in there and
22  it will drop one microliter and then it will dump
23  one microliter into a waste vial and that does
24  that twice.  And it's more of sort of a cleaning
25  process to make sure everything is picked up

73

1            G. LaPorte - Confidential
2  the sample that's going to be analyzed, then
3  takes that one microliter and it injects it in
4  the GC/MS.  This is all preprogrammed and this
5  all based on the scientific literature and it
6  goes back to sort of a lot of basics about GC/MS.
7  I've been a GC/MS chemist for -- I've been using
8  GC/MS since 1993, a long time.  I was drug
9  chemist for many years and used GC/MS thousands
10  of times.  This is kind of a standardized method
11  that's used by GC/MS.
12     Q.   Have you complete your response?
13     A.   Yes.
14     Q.   So let me rewind and see if I'm
15  following you.  Your ten microliters gets
16  extracted by the auto samplers robotic arm, it
17  extracts one microliter.  It's programmed to
18  process that one microliter by adding more
19  acetonitrile to it and placing it into the first
20  of multiple empty clean vials, is that right?
21     A.   There's two -- no, so there's one dirty
22  vial, one waste vial and two cleans that have --
23  and the two cleans have clean acetonitrile in
24  them.
25     Q.   So when the uniform solution is

75

1            G. LaPorte - Confidential
2  correctly and then on the third time it draws
3  another microliter and it injects directly into
4  the GC/MS.
5     Q.   Let's back this up again.  You start
6  with a new vial with ten microliters of the
7  uniform solution of acetonitrile, o-cresol and
8  ink, right?
9     A.   Correct.
10     Q.   Then your auto sampler uses its robotic
11  arm to extract one of those ten microliters; is
12  that correct?
13     A.   Correct.
14     Q.   And then one drop of the one microliters
15  is placed into some other receptacle?
16     A.   The one microliter sample that the
17  plunger -- once the hypodermic needle plunges in,
18  pulls up one microliter, it then moves over
19  robotically to a waste vial and dumps that.  And
20  then it goes to another vial where it cleans
21  again with an acetonitrile solution that's in the
22  robotic arm and then it goes back into the vial,
23  does one microliter again, goes back to the waste
24  and then goes through the cleaning process and
25  then comes to what we call the ana-link sample,

74

1            G. LaPorte - Confidential
2  traveling through the GC robotic components, it's
3  placed first into a waste vial?
4     A.   There's a trey -- it's an auto sampler
5  trey -- it's a robotic trey, it all moves
6  automatically.  On one end of the trey is a waste
7  vial and then there's two clean vials.  When I
8  say "clean vials," those vials contain a clean
9  acetonitrile, just acetonitrile.  So what will
10  happen is now when I put the vial that's going to
11  be analyzed, it goes -- into goes into the trey,
12  the trey moves over under the robotic arm, the
13  syringe dips into that, takes one microliter,
14  then the arm moves back over and disburses the
15  one microliter into the dirty vial or the waste
16  vial.
17        Now, that -- the robotic arm goes to the
18  clean vial with the acetonitrile, it pumps and
19  then it then it dumps the clean acetonitrile back
20  into the waste vial, then goes back over to the
21  vial again and does that twice.  And then on the
22  third time it goes back to the vial, takes the
23  one microliter and then that's the one microliter
24  that gets into the injected into the GC/MS.
25     Q.   Let me rewind this and see if I'm

76

19  (Pages 73 to 76)

1   following. You have the heated vial, you add the
2   acetonitrile and o-cresol to the heated vial, it
3   agitates, goes through the five minute period you
4   described. After that concluded, the auto
5   sampler will withdraw ten microliters of the
6   uniform solution, it will --
7       A.  No, no. I have to stop you there.
8       Q.  Sure.
9       A.  The auto sampler doesn't withdraw ten
10  microliters, it's programmed to withdraw one
11  microliter. So the manual -- the -- as we call
12  it, the sample prep -- the sample extraction
13  procedure, I use a hypodermic needle that's
14  accurate to .005 microliters. So I withdraw ten
15  microliters and then I put that in the vial
16  that's then going to go on to the GC/MS.
17      Q.  That vial gets put onto the trey
18  underneath the GC/MS machine, is that right?
19      A.  Over top the GC/MS, not under.
20      Q.  So it goes on the top and underneath are
21  multiple vials; one waste vial and two clean
22  vials?
23      A.  Correct.
24      Q.  So the one microliter that's on the top

77

1   back; and then now it pulls up the third of the
2   ten microliters and then injects that into the
3   GC/MS.
4       Q.  What's the purpose of taking microliter
5   number one and running it through the GC/MS?
6       A.  It's to make sure that the hypodermic
7   needles doesn't have any air bubbles in it. If
8   you ever go for a shot and you see the doctor
9   flicking it, the idea is so you don't have any
10  air so you can get a more precise measurement.
11  Also too the reason it's doing that is because
12  once it pulls up it, it needs to rinse that to
13  make sure all of that ink material -- that ink
14  liquid that was removed, that's it's clean. The
15  needle every time wants to make sure it's clean
16  before it goes into the ana-like vial. That
17  cleaning process is actually pretty extensive too
18  because that happens a few times. It's all
19  automated once you get -- the whole idea is to
20  make sure that that arm -- because the arm is
21  pulling up the syringe and it wants to make sure
22  it's not -- it doesn't have any air in it.
23      Q.  So microliter number one is for the
24  purpose of cleaning the hypodermic and making

79

1   of the GC/MS is going to go through the GC/MS
2   machine, is that right?
3       A.  Well, yes, one microliter from the
4   analysis vial -- call it that -- because that's
5   the vial that contains the liquid ink that's
6   going to be analyzed. One microliter is going
7   into the machine.
8       Q.  Okay. I'm trying to keep track of the
9   microliters. You're starting with ten in a vial?
10      A.  Correct.
11      Q.  Only one of those ten microliters goes
12  onto the top of the GC/MS machine; is that
13  correct?
14      A.  Correct.
15      Q.  Okay. So that one microliter that's on
16  the top of the GC/MS machine is going to go
17  through three different processes through the
18  GC/MS machine; is that correct?
19      A.  No, no, no. So the ten microliters goes
20  through three different processes.
21      Q.  Okay.
22      A.  One is removed, then cleaned, it goes
23  back; another is removed -- call it -- we're at
24  microliter two now, it's cleaned, then it goes

78

1   sure there are no air bubbles in it?
2       A.  Correct.
3       Q.  Microliter number two, is that for the
4   same purpose?
5       A.  Correct, same thing.
6       Q.  Microliter three goes into the GC/MS and
7   that's the microliter that's analyzed?
8       A.  Correct.
9       Q.  So you do this for the heated sample --
10  for the heated vial and you do it for the
11  unheated vial, right?
12      A.  Correct.
13      Q.  Does the GC/MS give you some kind of
14  digital read out?
15      A.  Yes.
16      Q.  What format is the read out provided in?
17      A.  So the read out contains varying
18  information. The first is that as we described
19  earlier, GC/MS is really two different
20  instruments. So the GC gives you a read out that
21  look -- basically like a graph and then that
22  identifies -- will show you where the 2-PE is on
23  that graph. And that's based on -- we haven't
24  gotten into this but I've run lots of quality

80

1  control standards before. So I run blank
2  samples, I have to run a positive standard. I
3  run the acetonitrile cresol solution -- I run
4  that as a blank it also so there's nothing in it.
5  And then I have the standard so I know exactly
6  where the 2-PE is going to come out on this
7  graph. If you think about the Y axis of this
8  graph, it's in minutes -- it's in time. And so I
9  know that, you know, my sample will come out at
10 5.30 minutes for 2-PE, that's the GC output. The
11 mass spec or MS portion allows me to identify the
12 molecule of 2-PE. So that provides what we call
13 molecular information about that particular
14 molecule so that I can confirm that I'm analyzing
15 2-PE.
16     Q.  Have you completed your response?
17     A.  Yes.
18     Q.  So the machine is going to give you two
19 forms of output; one is the graph and two is
20 molecule identifying information?
21     A.  Yes.
22     Q.  So going back to this process that you
23 described --
24     A.  I'm sorry, can I just sort of -- just to

81

1  be clear so we understand what the GC is. The GC
2  is all about separating the different components
3  in the ink. I typically use this analogy of, you
4  know, if you were to analyze a Coke, you get
5  sugar and caffeine and colorants and all that.
6  So those come out at different times on the GC.
7  That's exactly what happening on the GC with ink
8  because you get different times of when the
9  different components come out. And I know the
10 time for 2-PE based on the standard. On my
11 GC/MS -- my program is 5.30 minutes or around
12 that time.
13     Q.  Have you completed your response?
14     A.  Yes.
15     Q.  This process that you described of using
16 the auto sampling, the agitation, that process is
17 not described anywhere in your report, is it?
18     A.  No, it's -- all of that is in my notes.
19     Q.  So I can't replicate this process using
20 your report, can I?
21     MS. PRIMAVERA: Objection.
22     MS. GUERON: Objection.
23     A.  I mean, I've been -- I've written
24 thousands of reports in Federal Court. But if

82

1  I'm an expert looking at another expert's report
2  there's no expectation that I can duplicate
3  everything based on just the report.
4     Q.  Okay. I didn't ask you that. I asked
5  you if I can replicate your results based upon
6  the contents of your report?
7     A.  Well, in theory, yes, you -- so I have a
8  reference in my report to a chapter that I
9  published that actually goes through the steps
10 like. It's published -- a published chapter that
11 goes through this. But I mean it's kind of --
12 the question you're asking me would be like,
13 well, if I watch Law and Order can I practice
14 law? I mean, you have to be an expert in the
15 area, you have to have basic chemistry knowledge.
16 When you refer to can you do this, unless you
17 have a chemistry background, I can't imagine you
18 can ever do this.
19     Q.  If I was a chemist, can I replicate your
20 process using your report?
21     A.  You should be able to because there's
22 references to it. I would say my notes would
23 provide that information that a chemist can
24 replicate this very easily.

83

1     MS. COLWIN: Objection.
2     Q.  So a chemist would need your notes to
3  replicate your work; is that correct?
4     A.  Yes, I know when I've been an opposing
5  expert I always want the notes. I can't just
6  simply rely on the report.
7     Q.  Is your use of o-cresol documented in
8  any of the professional standards you referenced?
9     A.  It's definitely -- I mean, I have my --
10 I have a written and standard operating procedure
11 and it's in there. But, yes, o-cresol is
12 definitely mentioned in a number of professional
13 or peer review publications.
14     Q.  Is it mentioned in any of the
15 publications cited in your report?
16     A.  I'm not sure exactly what's been cited
17 but it's definitely in the peer review
18 publications.
19     Q.  Is there anywhere in your report where I
20 can find the read out from the GC's graph?
21     A.  No, that's -- that's in my -- that will
22 definitely be in any notes.
23     Q.  Is there anywhere in your report where I
24 can identify the output of the identified

84

21 (Pages 81 to 84)

G. LaPorte - Confidential

molecule from the MS portion of the analysis?

A. No.

Q. What was the read out that you obtained
for the first heated sample that you --

MR. BERMAN: Let's back up. I'll ask
the question again because it cut out.

Q. My understanding is that, based on your
testimony, you get two sets of output from the
GC/MS machine; is that correct?

A. It's -- so it is a printout or a read
out, if you will, that has both of those types of
information.

Q. Did you record the output from the GC/MS
machine that you obtained when you ran the first
heated sample from Q8?

A. All of my data is automatically printed
out and it's in my file, yes.

Q. You also -- so you have the output from
the GC/MS from the heated sample of Q8 and the
nonheated sample of Q8?

A. Yes.

Q. And you ran that twice, correct?

A. I'm actually looking just to confirm
but, yes, I ran -- tested those -- which document

G. LaPorte - Confidential

are we taking about now?

Q. Q8 -- still Q8.

A. I'm sorry, Q8, what was last three of
the Bates.

Q. 827 and 828 -- hold on. Q8 was
Bates-stamped 830, slash, 831.

A. Okay. I'm sorry, I have -- because all
of my -- I use the last three of the Bates in all
my GC/MS. I didn't use the Q numbers.

I did the test on -- twice. I did it on
page 1 or 8 -- Bates-stamped -- last three of the
Bates-stamp, 830. And then I did it on the
backside, Bates-stamped 831.

Q. So you only did one heated sample and
one unheated sample of page one of Q8, is that
right?

A. Well, it's one page so I would say the
front and the back. So, yeah, one heated, one
unheated for the front and one unheated and one
heated for the back. I mean, that's two for the
page, if you will.

Q. Okay. Now, I'm a little confused by
something you said. If it's literally the same
page, 830 and 831 are written on the same piece

G. LaPorte - Confidential

of paper, front and back, correct?

A. Correct.

Q. So isn't the sample of page one
necessarily also a sample of page two because
they're on the same paper?

MS. PRIMAVERA: Objection.

A. They're different samples. I mean,
certainly when I punch the holes I'm not -- I
make sure there's nothing -- there's no ink on
the backside of where I'm punching.

Q. Okay. So that's part of your process is
to see which face of the document has ink and
which face does not have ink in each of the
plugs?

A. I'm making sure that when I punch the
hole that I'm not hitting ink on the opposite
side.

Q. Okay. Is that process described
somewhere in your report?

A. No, it's almost like common sense. I'm
not going to take samples, you know, where I get
ink -- where I would get ink on -- where I would
punch through and get ink from the other side.

Q. In selecting your samples are there any

G. LaPorte - Confidential

other procedural safeguards that you employ?

A. Oh, yes, lots.

Q. Okay. Can you give me some examples?

A. The first thing is that I make sure when
I'm taking samples -- well, I would say the first
step is to make sure I don't want to -- I'm not
going to hit a sample of ink on the other side
for my GC/MS testing.

The next is I then look at it under -- I
look at the ink or the letters words with a
magnifying device. And then I find specific
areas that are amenable to what I would say the
ink analysis part. And that is generally don't
like to get into the curve areas. Ballpoint inks
will also do what's called gooping so I stay away
from the goop. I try to get straight lines and
then when I find a nice area that looks
consistent with pressure, typically like the
middle of the stroke -- like if you're drawing a
line -- and I'm just thinking of the letter "G"
if I go up with the letter "G" in all likelihood
I'll put more pressure down on the bottom or the
top. So I find this ideal kind of the area in
the middle. And based on the microscopic

1 G. LaPorte - Confidential
2 analysis I make sure that the ink is not -- it's
3 more thick in one area than the other. And then
4 I take a hole punch that will go into the
5 unheated vial and then I take a hole punch
6 adjacent to that area and then that will go into
7 the heated vial so that I'm keeping is as
8 consistent as possible with the amount of ink I'm
9 removing.
10 Q. Have you completed your response?
11 A. Yes.
12 Q. So the gooping should be avoided
13 because, what, it could affect the amount of 2-PE
14 that's present on the document?
15 A. The idea is that I want to try to as
16 much as possible to have similar amounts of ink
17 in the unheated and the unheated when I do the
18 testing. Now, I'll correct for now with o-cresol
19 but for the most part I want to just make sure
20 I'm getting the same amount of ink.
21 Yeah, if I took from a goop area then I
22 might have more ink and also the goop might dry
23 differently because it's thick and it's heavy on
24 the paper.
25 Q. Similarly with respect to a curved

89

1 G. LaPorte - Confidential
2 versus a straight line portion of the sample,
3 that could result in different amounts of ink
4 being removed, is that right?
5 A. Yeah, depending on where it is in the
6 curve. Like, you know, it depends on the
7 writing. Some people may have a big curve. If
8 you're kind of getting into sort of the middle of
9 that, that can work. But, once again, it's all
10 about sort of identifying whether there is sort
11 of differences in the amount of pressure that was
12 applied, which you can see under the microscope
13 by the amount of ink that's deposited down.
14 Q. The amount of ink deposited can vary
15 based upon whether there's gooping of ink,
16 whether there's curvature of the pen stroke and
17 whether there is a different -- or a lighter or
18 heavier pressure applied to the pen stroke; is
19 that right?
20 A. Correct. And then also at sort of the
21 tail or starting point of writing -- if you write
22 with a ballpoint sometimes it's doesn't --
23 not all of the ink is flowing out equally in the
24 beginning or when you're tailing off you lift the
25 pen so that you're not leaving as much ink in

90

1 G. LaPorte - Confidential
2 there. I kind of stay away from the ends. I
3 like the centers. Straight is nice -- is ideal
4 but it's not always that easy.
5 MR. BERMAN: Let's take a five-minute
6 break. It's been a while so let's do that.
7 Come back at 12:15.
8 (Whereupon, a brief recess was taken.)
9 MR. BERMAN: I propose we make this into
10 a lunch. We will come back at 1:00.
11 (Whereupon, a luncheon was taken.)
12 Q. Mr. LaPorte, before our break you had
13 mentioned that you ran some quality control
14 tests, do you recall that?
15 A. Yes.
16 Q. Can I find information about what
17 quality control tests you ran in your report?
18 A. That's all in my notes.
19 Q. We were also talking about the output of
20 the GC/MS system and you had mentioned that the
21 GC portion results in graphical output, do you
22 recall that?
23 A. Yes.
24 Q. You explained to me that the output of
25 the graph shows time on a Y axis, is that right?

91

1 G. LaPorte - Confidential
2 A. Correct -- I'm sorry, did I say "Y"?
3 It's an "X." Sorry.
4 Q. So X axis is left to right, correct?
5 A. Correct, yes, the horizontal axis.
6 Q. So when you're getting a measurement in
7 time, what does that mean?
8 A. When a chemical or when a material goes
9 through the gas chromatograph, what happens is it
10 separates into it's different components and so
11 when it exits the gas chromatograph and enters
12 the mass spectrometer, that happens at a certain
13 time and based on the chemical makeup of all the
14 different molecules that be would be in
15 particular in the ink so all the different
16 components that come out -- they come out at
17 different times because they're --
18 Q. Okay.
19 A. Yeah, so 2-PE comes out at, you know, at
20 a retention time of approximately 5.30 minutes on
21 the program that I use. Now, I do run a standard
22 of 2-PE beforehand so that I know that, you know,
23 that that's the retention time it should come out
24 at.
25 Q. When you say you run a standard, does

92

1　that mean -- I'm paraphrasing -- you do a test
2　run of a sample of PE that you've known already?
3　　A. Yes.
4　　Q. So you're on that simple through your
5　system and you look and you see it comes out
6　about 5.3 minutes?
7　　A. Correct.
8　　Q. So these molecules are contained in the
9　GC system and then each kind of molecule will be
10　separated out at a specific point in time?
11　　A. Yes.
12　　Q. So the graphical read out that you get
13　will identify molecule one separates out at this
14　time, molecule two separates at that time?
15　　A. Correct.
16　　Q. And the MS portion is identifying the
17　molecule as it comes out?
18　　A. Yes.
19　　Q. So how do you compare the read out on
20　the GC/MS for the heated sample against the
21　unheated sample?
22　　A. So there's a software in the
23　instrument -- hold on, let me step back -- so the
24　Y axis is an approximation, if you will, or the

93

1　concentration of the 2-PE. So think of a curve,
2　right, that comes out at 5.30 minutes and it does
3　that -- I guess I shouldn't be saying doing that
4　on the record -- so it makes a curve and then
5　what will happen -- so depending on the height of
6　that curve, that's typically -- I mean, that
7　represents the concentration. So really the area
8　under the curve represents the entire
9　concentration of 2-PE. So there's a read out
10　that -- or some data that's printed out that has
11　that what that corresponding area under the curve
12　represents in terms of a quantity.
13　　Q. So there's a mathematical computation of
14　the area under the curve?
15　　A. Yes.
16　　Q. How does that -- how is that compared
17　from the heated to unheated sample?
18　　A. So now I take that area under the curve
19　for the unheated sample, which is now -- and once
20　again I'm correcting it with the o-cresol --
21　remember I have internal standards -- so I use
22　the o-cresol so it goes into a big formula and
23　what will happen -- essentially what we're doing
24　is we're comparing the quantity of 2-PE from the

94

1　from that -- from the calculations under the
2　curve when it's unheated minus the quantity of
3　the 2-PE in the heated sample and then that's the
4　divided by the unheated and then you get a
5　percentage of how much 2-PE was lost from the
6　heated.
7　　Q. Are you referring to something that's
8　typically denoted as R percentage point or
9　percentage symbol?
10　　A. Yes, it can be R percentage or solvent
11　loss ratio, SLR.
12　　Q. Okay. And the SLR or R percentage is
13　PEN minus PEH over PEN times 100 -- PE subscript
14　"N" minus PE subscript -- I'll call it an "H," it
15　might be a Greek symbol -- over PE subscript
16　"N" -- which, again, the "N" might be a Greek
17　symbol too?
18　　A. It's not. "N" is not heated and "H" is
19　heated. So it's pretty simple.
20　　Q. So it's the PE of the unheated sample
21　minus the PE of the heated sample over the PE of
22　the unheated sample times 100?
23　　A. Correct.
24　　Q. Okay. So the PE of the heated sample,

95

1　is that the area under the curve for the heated
2　sample?
3　　A. Yes.
4　　Q. Okay. So you're comparing the area
5　underneath the curve for each of these two
6　samples to come up with your solvent loss ratio?
7　　A. Let's not forget there's a -- the
8　o-cresol calculation is built in there too so
9　that everything is corrected to the o-cresol
10　level.
11　　Q. What does the o-cresol do to correct the
12　calculation?
13　　A. That's built into the calculation to --
14　so that if I have -- so, for example, if my
15　peak -- I call it my peak -- the curve for the
16　ACN in the cresol -- I'll use some real numbers
17　so we can -- so it's easier to explain. So let's
18　say that peaks at 100, right, and the
19　phenoxyethanol peak is at 200, now when I run the
20　next sample my ACN plus my cresol might be at 150
21　and then my PE will be at 100. So now I have to
22　correct because my standard is telling me that
23　there's going to be some variations so that the
24　internal standard is there to correct that value

96

24　(Pages 93 to 96)

G. LaPorte - Confidential

1    G. LaPorte - Confidential
2    so we're not -- it's almost you're comparing
3    apples to apples at that time.
4        Q.   Is this process you just described using
5    the o-cresol to correct, is that referenced in
6    your report somewhere?
7        A.   I'm not sure if it's referenced in this
8    report but it's definitely -- I mean, it's in
9    literature.  It's kind of basic chemistry.  Using
10   internal standards is kind of I would say
11   standard in the industry for when you're doing
12   quantitation.
13       Q.   When you use the term ACN were you
14   referring to acetonitrile?
15       A.   Acetonitrile.
16       Q.   Acetonitrile.  Now, the concept
17   underlying the analysis of the solvent loss
18   ratio -- and I'm paraphrasing so correct me if
19   I'm wrong -- is that ink starts out fresh and
20   when it's fresh, it would be expected to
21   evaporate more, right -- did I get that part
22   right?
23       A.   Well, you're missing a part on the end
24   of what you're asking.  So --
25       Q.   Okay.  Go ahead.

97

1    G. LaPorte - Confidential
2        A.   So the idea is if the ink the fresh that
3    more PE will be evaporated from the heated
4    sample.
5        Q.   Okay.  So if you have a fresh sample of
6    ink and you treat it with heat, you would expect
7    a large proportion of the PE-2 to cook off?
8        A.   Correct.
9        Q.   Okay.
10       A.   If I can from an analogy standpoint,
11   think about if you were to put fresh point on a
12   room in your house and it's really hot, right.
13   So the hotter it is, the more it will drive off
14   that solvent when it's fresh.  But once that
15   paint is dry and it's hot in the room, you're not
16   going to smell any solvents because it's dried
17   out.
18       Q.   Okay.  So in order to determine that a
19   lot of the PE-2 has cooked off, you would expect
20   to see a relatively high solvent loss ratio,
21   correct?
22       A.   Yes.
23       Q.   So is there a particular benchmark you
24   look for in your results to determine the age of
25   the ink sample?

98

1    G. LaPorte - Confidential
2        A.   If it's 25 percent -- if the solvent
3    loss ratio exceeds 25 percent then you can say
4    with a high degree of probability or a high
5    degree of certainty that the ink is less than two
6    years old.
7        Q.   Okay.  Why 25 percent?
8        A.   That's the -- essentially, that's the
9    established number that's been used in the field
10   based on research.  I can tell you that I've
11   been -- I probably run this type of testing, I
12   don't know, hundred times a year at least and
13   I've done validation type samples.  So I will see
14   inks that are less than two years old that will
15   have values in the -- you know, 15 percent plus.
16   But the idea though is that there's kind of an
17   error rate built into all of that so that when
18   you have when you hit 25 percent, you have this
19   very high degree of confidence.  It allows you
20   what we call measurement error, which is a very
21   natural part of any kind of chemical
22   measurements.  There's going to be variation so
23   the 25 percent is, if you will, I think the best
24   way to put it is it's a conservative type number
25   that allows somebody to say something with a high

99

1    G. LaPorte - Confidential
2    degree of probability.  I don't want to use the
3    word "probability" because I don't want to
4    connote there's some statistics involved but it's
5    highly probable -- it's very strong evidence.
6        Q.   We're going to delve into that a little
7    bit more.
8        Are these validations that you just discussed
9    published?
10       A.   I have -- I certainly presented it
11   publically and -- about my validations and also
12   there's been a lot of work done by other
13   researchers in this particular area too.
14       Q.   Can I find any of those validations you
15   just referenced in any of these published peer
16   reviewed publications?
17       A.   I believe that -- so I published a
18   chapter in a text book and I believe I referenced
19   those validations.  There are peer review
20   publications that do contain this information as
21   well too.
22       Q.   Can you sitting here today identify any
23   of them for me?
24       A.   Yes, there's one by Gaudreau and
25   Brazeau.

100

G. LaPorte - Confidential
1
2      Q.   Aren't there some published works that
3   relied upon a higher threshold than 25 percent?
4      A.   Not necessarily for a two year
5   threshold.  There's a published paper that relies
6   on 35 percent to say that an ink is less than
7   18 months old.
8      Q.   Are there any with respect to the two
9   year threshold?
10      A.   25 percent is -- there are some -- there
11   are some other experts out there that will try to
12   divvy this up a little bit more and say that
13   it's, you know, less than twelve months, it's
14   less than eighteen months, it's less than six
15   months, you know, with a high degree of
16   probability.  I don't agree with that.  I like to
17   just use the two year threshold.
18      But there are certainly times where the
19   solvent levels are extremely high, which I found,
20   you know, in this particular case and I talk
21   about this in my report.  The solvent levels are
22   very high, much higher than I would expect to see
23   in anything that's, you know, four, four and a
24   half years old.  And in a solvent loss ratio it
25   exceeds that 25 percent.

101

G. LaPorte - Confidential
1
2   samples that were known to be more than two years
3   old and I've never seen any level above
4   25 percent.
5      Q.   We'll turn to that a little bit more
6   later.
7      With respect to your general thesis, right,
8   which is that for a document, you would expect to
9   see a higher solvent loss ratio if it was a newer
10   document, right?
11      A.   Not necessarily.
12      Q.   Why or why not?
13      A.   So the way you're asking the question
14   now almost implies that we can compare solvent
15   loss ratios.  The issue with that though is that
16   if inks have different formulations, they may dry
17   at different rates.  So we kind of stay away from
18   the idea of comparing -- you know, especially if
19   inks are different formulations and then using
20   that for each.
21      The other thing is that there may be --
22   so we can have two documents.  And, once again,
23   depending on how the ink is aging a document can
24   be two weeks older than another document and then
25   maybe have a much lower level with the same ink

103

G. LaPorte - Confidential
1
2      Q.   Have you completed your response?
3      A.   Yes.
4      Q.   Did you just tell me that you disagreed
5   with some of the different standards that are
6   being used for different aging periods?
7      A.   No, I would say that I'm more
8   conservative.  I don't necessarily disagree with
9   the idea of it.  It's not something -- I don't
10   adhere to the idea of trying to identify with a
11   high degree of probability that an ink is less
12   than six months old, you know, based on a certain
13   solvent level.
14      Q.   Well, I'm not sure I understood that.
15   Wouldn't be more conservative imply that you
16   would have a higher percentage threshold for
17   solvent loss in order be more confident in your
18   results?
19      A.   No, the higher -- the more conservative
20   is using the two-year threshold.  Nobody that I
21   know of -- there's nothing in the literature that
22   would even suggest that a value above 25 percent
23   would indicate that an ink is more than two years
24   old.  And based on -- I've done presentations on
25   this data as well too where I've looked at known

102

G. LaPorte - Confidential
1
2   under the same circumstances depending on when
3   you do the analysis in determining -- what the
4   true age of the documents are.  So if they're
5   like less than six months, we can see a lot of
6   variation in values, you know, spanning over --
7   whether you did the test, I don't know, when it
8   was five months old versus six and a half months
9   old.
10      And then also depending how the document
11   was stored.  If they're stored a little
12   differently, then you might have some
13   different -- you might have some variation in the
14   solvent loss ratio too.
15      Q.   In your report you state that you had
16   seen values in the high teens in known age
17   samples that were less than two years old many
18   times over the course of performing ink dating
19   analysis hundreds of times.
20      You stand by that statement, right?
21      A.   Yes.
22      Q.   So isn't that statement, that you have
23   observed values in the high teens for known age
24   samples inconsistent with your overall thesis
25   that, you would expect to see a high solvent loss

104

G. LaPorte - Confidential

1              G. LaPorte - Confidential
2 ratio?
3        MS. PRIMAVERA: Objection.
4        A. No, not at all. So my statement in my
5 report says that when you exceed 25 percent you
6 can say with a high degree of probability that --
7 sorry, a high -- with a high degree of confidence
8 that the ink is less than two years old.
9        But when we start narrowing that down
10 and we try to peg off and say, oh, well, it's
11 highly probable it's less than 12 months or it's
12 highly probable that it's less than six months,
13 then you start deviating really from the
14 conservative part about just staying with the two
15 years.
16        Q. So let's stick with the two years for a
17 moment.
18        If I understand the underlying hypothesis
19 correctly, then wouldn't you expect less
20 certainty in the aging of the sample as the
21 percentage of solvent loss ratio decreases?
22        A. Not necessarily. I mean, so yes, we do
23 use that as kind of a benchmark. But you can
24 have an extremely high level of 2-PE but then
25 also have a lower solvent loss ratio in and it

105

1              G. LaPorte - Confidential
2 just depends where the ink is in its aging
3 process, the type of ink that was used. And as I
4 explained earlier I think we had discussed this
5 early on in the deposition, but what happens when
6 the ink dries is it's hardening. So if it
7 hardens fast, you might be able you might trap a
8 lot of 2-phenoxyethanol -- 2-PE in it. So you
9 trap the 2-PE in there as the ink hardens and
10 that can happen at stages. Like, if it's not
11 fully hardened, right, and now we heat it, then
12 we'll let all that 2-PE out.
13        Trying to interpret solvent loss ratio
14 levels outside of the fact that, you know, an ink
15 is less than two years old gets very complicated.
16        Q. Well, let's stick with the two year
17 measurement you're referring to, which you
18 mentioned was the most conservative approach,
19 correct?
20        A. Yes, from a highly probable -- from a
21 highly probable means that I'm virtually certain.
22 As a -- I've been a forensic scientist for 29
23 years. I would hope that I would never be wrong
24 about something so I want to be as conservative
25 as possible so I like to stick with the two years

106

1              G. LaPorte - Confidential
2 in that 25 percent threshold but there are times
3 when, you know, let's say I have a little less
4 confidence but I have a high level of 2-PE and
5 I'm close to 25 percent, you know, that's still
6 strong evidence that it's not two years old.
7        Q. I thought you said 25 percent is the
8 threshold and it has to be higher than
9 25 percent.
10        A. For a highly probable. We have
11 different degrees of conclusions.
12        Q. Okay. Then can I understand that to
13 mean that you have less certainty as the
14 percentage of solvent loss ratio decreases?
15        A. It will depend on the amount of 2-PE
16 present also, whether you -- so in this
17 particular case, I would say that the 2-PE levels
18 were -- I'm just looking at this real quickly --
19 I would say about three to four times higher than
20 what I would normally see in something that's,
21 you know -- what I would see in something that's
22 less than two years old.
23        So just to throw a number out, so one of
24 these levels came out to 1.2 million. What I
25 would expect to see sometimes or what I typically

107

1              G. LaPorte - Confidential
2 would see with 2-PE levels that, you know, are
3 showing less than two years old might be a
4 400,000.
5        Q. That 1.2 million data point you
6 mentioned, is that in your report?
7        A. It's all in my -- it's in my work file
8 in my notes.
9        Q. Aren't there cases where you have
10 testified that you cannot draw conclusions from
11 result that are below the 25 percent threshold?
12        A. Not a highly probable and solely based
13 on a threshold.
14        Q. Went you say the "threshold," are you
15 referring to that 1.2 million number that you
16 just referenced?
17        A. No. Sorry. So it's if there's -- if
18 there is an extremely high level of 2-PE and then
19 you have a sample of ink or that -- you know,
20 that's showing -- that doesn't get to 25 percent,
21 you're confidence level can decrease. But in
22 this particular case the ink from Q8 was the same
23 as the ink from Q12. So we can draw some
24 parallels with that same formulation of ink
25 that's being used.

108

1         G. LaPorte - Confidential
2      Q. Did you tell me earlier that you don't
3  like to say they're the same?
4      A. So they're matching formulations of ink.
5      Q. Didn't you testify in the Malek matter
6  that if the amount of the solvent decreases by
7  25 percent once it's heated then that tells you
8  that it's fresh because you're able to drive off
9  all the solvents?
10     A. In the Malek matter I believe I would
11 have testified to something like that. I don't
12 have my transcript. There's lot more that I had
13 before and after I think I made that statement.
14        MS. COLWIN: Objection.
15     Q. Was there a Grosvenor matter you were
16 testifying in?
17     A. Where did that take place?
18     Q. Give me a moment that was in the Matter
19 of Grosvenor Property Developers Limited (In
20 Liquidation) in the Matter of Insolvency Act
21 1986, which was in the high court of Chancery,
22 which I believe is London, England.
23        Does that sound familiar? It's referenced --
24     A. Yes.
25     Q. -- it's referenced in your report --

                            109

---

1         G. LaPorte - Confidential
2  both of these matters are referenced matters
3  where you were an expert.
4      A. Yes, I remember the Grosvenor matter.
5      Q. In this matter didn't you conclude that
6  an eight percent result -- that based on a
7  chemical analysis you performed using duplicate
8  sampling, the average amount of 2-PE lost in a
9  signature was eight percent, which did not exceed
10 the 25 percent value necessary to conclude that
11 an ink is less than two years old?
12     A. Yes, with a high degree of probability.
13        MS. PRIMAVERA: Objection.
14     A. Anything less than ten percent is
15 pretty -- I don't -- I can't say that it proves
16 that a document is more than two years old but
17 it's a level that you shouldn't make any
18 interpretations from other than really it's
19 inconclusive.
20     Q. Where does that ten percent number come
21 from?
22     A. No, I'm just saying that based on my
23 experience. When I get single digit numbers like
24 that, that to me that's inconclusive.
25     Q. So that's based upon your independent

                            110

---

1         G. LaPorte - Confidential
2  experience and judgment?
3      A. Based on performing this testing, you
4  know, for the past 18 years and hundreds of times
5  per year, yes.
6      Q. Okay. So is there any widely accepted
7  scientific standard that reflects that a ten
8  percent of the threshold?
9      A. No, I'm just saying that when I get a
10 single digit number based on doing known -- you
11 know, analyzing known samples, that's not a
12 number that you can draw a conclusion from.
13     Q. Okay. So somewhere between ten percent
14 and 25 percent that changes?
15     A. No, it all depends on the amount of
16 2-phenoxyethanol and that would depend on the
17 confidence or the type of conclusion that you're
18 going to draw.
19     Q. When you say it depends at least in part
20 on the amount of 2-PE, right, what's the standard
21 for how much 2-PE there should be?
22     A. So that would be based on experience and
23 that's difficult to put because the method that I
24 use may be more -- the way I extract the ink and
25 the method that I use, I'm accustomed to what I

                            111

---

1         G. LaPorte - Confidential
2  would consider to be a very high level.
3      Q. In the Grosvenor never matter you stated
4  that it is requisite that the established
5  threshold level of 25 percent be exceeded to
6  conclude with strong evidence that the signature
7  was executed within the past 24 months.
8      Do you still stand by that statement?
9      A. Yes. Keep in mind that in the UK we
10 generally don't use our same conclusion area
11 scale as we do here. But, yes, so that would be
12 very strong evidence to be able to say above
13 25 percent.
14        And if I remember correctly in the
15 Grosvenor matter, there was a very low level of
16 2-PE as well too.
17     Q. Well, again, the amount of 2-PE is not
18 referenced in your report in the Grosvenor matter
19 so I can't make that determination. I'll have to
20 take your statement as face value for that.
21     A. Yeah, it was a low level. I mean,
22 usually when getting at eight percent it will
23 be -- you know, anything with single digits
24 typically it would be in the low level of 2-PE.
25     Q. So let's talk about the sampling for a

                            112

---

G. LaPorte - Confidential

1  moment.  You took two samples of document eight
2  here, correct?
3
4      A.  (No verbal response.)
5      Q.  Remember we talked about the sixteen
6  plugs, you divided it into two trances of eight.
7  You did a heated sample of four, an unheated
8  sample of four and then you ran that test twice,
9  right?
10      A.  Correct.  Q8 was the 830, 821, right?
11      Q.  Correct.
12      A.  Yes.
13      Q.  So we agree on that, right?
14      A.  Yes.
15      Q.  And you came up with two different
16  measurements; one for each set of samples, right?
17      A.  Correct.
18      Q.  And there was some variance between the
19  results obtained between sample pairing one and
20  sample pairing two, correct?
21      A.  Correct.
22      Q.  Are you familiar with the concept of
23  standard deviation?
24      A.  Yes, I am.
25      Q.  Is there some reason that that concept

113

G. LaPorte - Confidential

1  is inapplicable to your sampling here?
2      A.  Because they're two levels that I got --
3  that I obtained, there were 33 percent and
4  28 percent.  Both were above 25 and it averages
5  to 31.  I can tell you that a five percent
6  difference isn't a lot of standard -- there's not
7  lot of standard deviation in there.
8      No, I don't need to use a standard
9  deviation because it will not go below
10  25 percent.
11      Q.  What do you base that on?
12      A.  Because the two numbers are 33 and 28.
13  So it would be -- how can that -- when you
14  average that, that's 31.  So how does that go
15  below 25 when you don't have a number below 25?
16      Q.  What I'm asking you is how does the mean
17  of the two measurements impact whether the
18  standard deviation is applicable to your
19  analysis?
20      A.  The standard deviation applies to the
21  mean.
22      Q.  Are you aware that with a sample size of
23  two the standard deviation for the sample
24  measurements is 6.25?

114

G. LaPorte - Confidential

1      A.  No --
2
3      MS. PRIMAVERA:  Objection.
4      MS. GUERON:  Objection.
5      A.  No, that's not -- when you do an average
6  of 33 and 28 both values are above 25 so the
7  average is 31 but it's not below -- neither of
8  those values are below 25.
9      Q.  The average is, in fact, 30.5, isn't it?
10      A.  I can tell you everything is rounded
11  because everything is plugged into an Excel
12  worksheet.  Everything is rounded to -- the other
13  thing is mathematically when you average 33 and
14  28, which have no decimals on them, its improper
15  to actually put a decimal on there.
16      Q.  Okay.  Regardless, would you agree with
17  me that the calculation of a mean and the
18  calculation of the standard deviation are going
19  to give you different results?
20      A.  Yes, of course.
21      Q.  Have you considered the confidence
22  interval that applies to your results as a result
23  of the standard deviation?
24      A.  It's not necessary because they're above
25  25 percent.

115

G. LaPorte - Confidential

1      Q.  But, again, this 25 percent is not a
2  standard number, it's just based upon your
3  experience, right?
4
5      MS. PRIMAVERA:  Objection.
6      MS. GUERON:  Objection.
7      A.  No, you're mischaracterizing what I
8  testified to here.  25 percent is something
9  that's been established in the literature and is
10  used by a number of other ink experts.
11  25 percent for two years is a -- is a
12  well-established figure.  I'm saying both of
13  these numbers are both 25.  So if I had 27 and a
14  23, then I would have to do the average of that
15  right and that would be different.  But both
16  these numbers are over 25.
17      Q.  Setting aside -- I agree both these
18  numbers are over 25 so we're on the same page
19  with that.
20      What I'm basically getting at here is how do
21  you know you don't have sampling error when you
22  only have two samples with a sample size of two
23  you would have a standard deviation of 6.25,
24  which leaves you a very wide range -- with a
25  sample size of two measurements, how can you be

116

G. LaPorte - Confidential

1   sure that you eliminated measurement error from
2   the possible solutions here? How do you know you
3   just haven't sampled two results that happen to
4   be above 25 percent where as if you took more
5   samples you might get numbers under 25 percent?
6   MS. PRIMAVERA: Objection.
7   A. So, first of all, I don't know where
8   you're getting your standard deviation and what
9   confidence interval you're using for that. I'm
10  not going to accept what you're telling me is the
11  standard deviation.
12  But to answer your question with respect
13  to measurement error that's why I run the samples
14  twice. Can we run three, four, five, six or ten
15  times, yes. To me, with a 33 and 28 we --
16  that's actually a very good level. And then
17  don't forget what I said earlier, is 25 percent
18  is really -- it has some error built -- it has
19  measurement error built into it already. So when
20  I'm above 25 percent with two measurements and
21  both of those are, you know, what I'm seeing in
22  terms of my data, there's consistency with my
23  internal standard, with the blank that -- sorry,
24  with two samples that I ran in terms of the way

117

G. LaPorte - Confidential

1   and the 28 if we go your way could be 40 and 37.
2   It can go in both directions. So when you say
3   I'm not sure -- well, it be 40 percent also if
4   we're taking measurement error in.
5   I have two values that are close in
6   proximity to each other and the data -- the data
7   is very strong and supports what I'm seeing in
8   these values to give you an extremely high degree
9   of confidence in the results. I have no doubt
10  about the result at all.
11  Q. That's not my question. I understand
12  that.
13  What I'm trying to just clarify here. Your
14  degree of certainty is not based upon statistical
15  analysis, it's not based upon a confidence
16  interval based upon the standard deviation, do we
17  agree on that?
18  MR. PRIMAVERA: Objection.
19  A. Not really because it's based on the
20  fact that these levels exceed 25 percent. I
21  mean, that's -- the 25 percent has been a value
22  that's been established really through a lot
23  of -- you know, a lot of research, a lot of
24  science that that is a very conservative level to

119

G. LaPorte - Confidential

1   they look on the GC/MS. So all of that is
2   consistent. There is no indication here
3   whatsoever that there would be a lot of
4   measurement error in these two. These are
5   actually pretty good values -- these are strong
6   values and they're both above 25 percent. I'm
7   100 percent confident in the data.
8   Q. Well, we can we can view that
9   differently. I understand you took two
10  measurements and they're both over 25 percent.
11  Sitting here today you can't tell me that if you
12  took more measurements you wouldn't get any
13  results under 25, can you?
14  MS. COLWIN: Objection.
15  A. Now, we can go for anything in the world
16  that's done when you're take measurements.
17  I can tell you I have a very high degree
18  of confidence in these values based on the data
19  that I have and based on the fact that there's
20  not a lot of deviation in these values either.
21  Q. Your confidence is not based upon any
22  inferential statistic work, is it?
23  MS. PRIMAVERA: Objection.
24  A. It's based on the average value. The 33

118

G. LaPorte - Confidential

1   be able to say that something --
2   Q. Have you completed your response?
3   A. No.
4   MS. PRIMAVERA: I'm sorry, I don't think
5   he finished. But go ahead.
6   A. So the 25 percent threshold level has
7   uncertainty built into it. I've never seen a
8   sample that was -- that was more than two years
9   old that even exceeded 20 percent.
10  Q. Have you completed your response?
11  A. Yes.
12  Q. I understand that you're telling me that
13  this is based upon your scientific experience.
14  I'm trying to clarify that whatever science
15  you're applying is not statistical science.
16  MS. PRIMAVERA: Objection.
17  Q. Do you have any degree in statistics or
18  any --
19  A. I have --
20  Q. Go ahead.
21  A. I have minor in statistics, yes.
22  Q. When I'm referring to "statistics," you
23  know what I'm referring to, right?
24  A. Yes.

120

G. LaPorte - Confidential

1       G. LaPorte - Confidential
2    Q. So you understand the concept of a
3 confidence interval?
4    A. Yes.
5    Q. So the confidence that you have here is
6 not based upon any particular confidence
7 interval, is it?
8       MS. PRIMAVERA: Objection.
9    A. No, because I did not do the full -- I
10 don't have to do a statistical analysis when I
11 have two levels that are above the 25 percent
12 threshold.
13    What that tells me is if you have a 28
14 and 33 is this -- you know, going with your
15 argument this could just as easily be 35 and 40,
16 right?
17    Q. It can be anything --
18    A. 28 and 33 it does not go below 25.
19 There's no indication here that these levels
20 are -- not to mention these are extremely high
21 levels of 2-PE in these samples.
22    Q. Let me give you an analogy, okay? We
23 can we can stipulate that it's an analogy. It's
24 not exactly pertinent to this particular fact
25 pattern.

121

1       G. LaPorte - Confidential
2 For example, if you wanted to determine the
3 temperature in a room, okay, you might take
4 samples of the temperature, right?
5    A. Yes.
6    Q. And your certainty as to the actual
7 temperature of the room is going to increase as
8 you take more samples, right?
9    A. Yes.
10    Q. And if in that room there's an air
11 conditioner on one side of room and a heater on
12 the other side of the room then it's going to
13 matter where you draw your samples from, correct?
14    A. That's a possibility.
15    Q. And if you take two samples and you
16 happen to take the two samples near that air
17 conditioning, you're going to get one set of
18 values, right?
19       MS. PRIMAVERA: Objection.
20    A. Yes.
21    Q. And if you take two samples on the other
22 end of the room next to the heater you'll get two
23 other results, right?
24    A. Yes.
25       MS. PRIMAVERA: Objection.

122

1       G. LaPorte - Confidential
2    Q. So can you have any degree of confidence
3 about the temperature in the room overall if your
4 two samples are near either of those two end
5 points?
6       MS. PRIMAVERA: Objection.
7    A. Your analogy is completely wrong. The
8 way your analogy should be presenting is if we
9 wanted to know if the temperature in room was
10 above 65 degrees and we took a measurement in one
11 area that was 69 and the other was 66 then we
12 can say that with a pretty high degree certainty
13 that it's not below 65. You're taking an
14 absolute value and trying to statistically
15 analyze this. This is based on a threshold value
16 of 25 percent and both numbers are above
17 25 percent.
18    Q. Let's look at -- in your methodology you
19 heated your samples to 70 degreed for 90 minutes,
20 right?
21    A. Correct.
22    Q. Aren't there other published works where
23 you heat the samples to 80 degrees?
24    A. So there's been research in this area if
25 I heated the samples to 80 degrees, there's a

123

1 chance I would actually get much higher levels.
2 The idea of using the 70 degree Celsius
3 temperature is that we don't want to heat it too
4 much. We just want to lightly agitate the ink
5 because once we start heating it at higher
6 temperatures then it could actually be drier but
7 the high temperature will break that apart. So
8 70 degrees has been sort of optimized I will say
9 that. And I did -- we did our own research when
10 I was at the Secret Service where we tested
11 100 degrees, 50 degrees, 80 degrees -- we did a
12 whole range of temperatures. We did find out
13 that, like, 100 was way too high. You'll elicit
14 2-PE -- high levels of 2-PE when you start
15 heating at 100 degree Celsius.
16    So 70 is an optimal temperature that's
17 really intended not to -- if you will, not to
18 disturb the ink too much but just to lightly
19 agitate it. And if it's fresh, then you'll still
20 elicit lots of 2-PE.
21    Q. Okay. But that's not what I asked you.
22 I asked you if there are other papers where the
23 samples are heated to 80 degree?
24    A. I'm note sure if those papers are

124

G. LaPorte - Confidential

1  research papers or if they're actually, you know,
2  papers where they use that methodology in case
3  work.
4      Q.   Are you familiar with the work of
5  Dr. Valery Aginsky?
6      A.   Yes.
7      Q.   Are you familiar with his paper,
8  Determination of the Age of Ballpoint Pen Inc by
9  gas and densitometric thin-layer chromatography?
10     A.   So I believe that was like a 1990
11 publication.  I know Dr. Aginsky uses 70
12 degrees -- now he does.
13     Q.   In that paper he used to 80 degrees,
14 didn't he?
15     A.   I think that was in the '90s, yeah.
16 That's when we started -- there was a process
17 that went on.  The Canada Border Services Agency
18 did research in this area as well.  They
19 optimized 70 and then when I was at Secret
20 Service we liked the idea of 70 as well.
21     Q.   Do we agree that standards change over
22 time?
23     A.   So that's more --
24     MS. PRIMAVERA:  Objection.

125

G. LaPorte - Confidential

1      A.   As a scientist I would say that our
2  knowledge should evolve over time, right, it gets
3  better.  So the idea that you know Dr. Akinsky
4  was using 80 degrees back in the 1990s -- you
5  know, we learned a lot since then.
6      Q.   In connection with your heating of the
7  samples, is it your position that this is a model
8  that's generalized to all inks stored in
9  different conditions and on different papers?
10     A.   So there's been a lot of research
11 looking a different papers in different
12 conditions.
13          But, generally speaking, this model
14 applies to the document that have been stored at
15 what I would call general room temperature,
16 indoor environment type things.  So it's not --
17 you know, it's not intended for documents that
18 have been, you know, stored in the extreme cold
19 or, you know, but if a document was exposed to
20 extreme heat then actually we probably wouldn't
21 get values like this because it would evaporate
22 the 2-PE.
23     Q.   Are you familiar with the work of a
24 Celine Weyermann?

126

G. LaPorte - Confidential

1      A.   Yes.
2      Q.   Are you familiar with the paper, the
3  Potential of Artificial Aging for Modeling of
4  Natural Aging Processes of Ballpoint Ink?
5      A.   Yes, and I believe that refers to dye
6  components.
7      Q.   There's statement in that paper that
8  says no model can be generalized to all inks
9  stored under different conditions and on
10 different papers.  Do you agree with that
11 statement?
12     A.   I would agree different conditions, yes.
13 Like -- and I just explained that; extreme cold,
14 extreme heat.
15     Q.   And you're familiar with the work of
16 Agnes Koenig?
17     A.   Yes.
18     Q.   Are you familiar with the paper
19 Comparative Study of Ballpoint Ink Aging
20 Parameters Using GC/MS?
21     A.   I believe so.
22     Q.   Okay.  And do we agree then -- I think
23 you mentioned this in your previous testimony --
24 that the shape of the curvature of an ink stroke

127

G. LaPorte - Confidential

1  can impact the amount of concentrate that's
2  lifted from the paper?
3      A.   Yes.  So the idea is that -- depending
4  how it's curved and whether somebody is actually
5  holding their pen on an angle when they go
6  through that and how much they angle, yes,
7  there's different amounts of ink that will be
8  deposited during that sequence of writing.
9      Q.   Okay.  And in research work, ink entries
10 are generally drawn as straight lines, correct?
11     A.   Not necessarily.  I believe there has
12 been some research -- actually Canada Border of
13 Services Agency where they actually had some
14 writing that they looked at well.  I know when I
15 was at the Secret Service -- and we did research
16 in area -- we did straight lines and then we did
17 writing too.  But it's more to help you sort of
18 understand -- you know, this is all part of the
19 research mechanism to control variables as much
20 as possible.
21     Q.   But in -- outside of a lab when writing
22 actually hits the page sometimes the lines are
23 not straight, correct?
24     A.   Oh, yes, I think I explained that

128

32  (Pages 125 to 128)

G. LaPorte - Confidential

1          G. LaPorte - Confidential
2 earlier there's -- yes.
3     Q.  If you have, for instance, the letter
4 "O," isn't the solvent going to defuse
5 differently than if you have just a straight
6 line?
7     A.  Not necessarily.  It depends on how the
8 "O" is -- you know how big the "O" is, where
9 you're testing from the "O."  And then once
10 again, this is based on a microscopic analysis in
11 making -- you know making a judgment of how much
12 ink -- if it looks -- if it appears to be heavily
13 inked in one area versus the other.
14     Q.  Okay.  Do you agree with the statement
15 that higher quantity of solvents may be found in
16 letter with dense lines compared to a straight
17 line of the same length?
18     A.  No, not necessarily because I think it
19 all depends on -- so the key that's missing from
20 all of this that -- the questions that you're
21 raising is that if you take unheated and heated
22 samples from the same place, right, then none of
23 that matters.  As long as you're taking adjacent
24 pairs of hole plugs where the holes are adjacent
25 to each other.  If you're in a heavily inked area

129

1          G. LaPorte - Confidential
2     Q.  I can't determine that based on her name
3 but I'll take your word for it.
4     A.  Not based on her name.  I didn't know if
5 the paper -- but, yeah, I know they've been doing
6 some work down in South America.
7     Q.  Okay.  Are you familiar with her
8 interaction plots for DR fitted means?
9     A.  I know -- I read that paper but, no, I'm
10 not -- I don't know off the top of my head.  I
11 would have to have that paper in front of me.
12     Q.  Do you disagree with her work in that
13 paper?
14     MS. PRIMAVERA:  Objection.  He didn't
15 read it.
16     A.  Yes, I would have to go back to this.  I
17 can say with a very high degree of confidence
18 that I've read every paper that has to do with
19 ink dating -- assuming that it's in English as
20 well too.  But that one -- it's been a while
21 since I reviewed that.  I would have to have the
22 paper in front of me.
23     Q.  Okay.  Do you agree that the paper can
24 impact the analysis -- the paper that the sample
25 was drawn from?

131

1          G. LaPorte - Confidential
2 versus a lightly inked area, that's fine.  The
3 part where you can create a lot of deviation
4 would be if you're taking an unheated punch from
5 one area and then a heated punch from a
6 completely different area.
7     Q.  I think we discussed earlier that the
8 pen flow rate matters in terms of the results,
9 correct?
10     A.  If you're making absolute measurements,
11 yes.  We're not making absolute measurements
12 because we're comparing unheated with heated all
13 the time and those hole punches are taking from
14 the same area.  This is -- I explained a lot of
15 this in the book chapter that I wrote on this
16 about sampling and it's definitely important.
17 But it's all about taking -- when you take those
18 paired samples, making sure they're from the same
19 area.
20     Q.  Are you familiar with the paper by
21 Magdalena Ezcurra, E-Z-C-U-R-R-A, Analytical
22 Methods For Dating Writing Instruments Inks on
23 Paper?
24     A.  Yeah, I believe she's from South
25 America.  Is it Brazil or --

130

1          G. LaPorte - Confidential
2     A.  In terms of what type of paper?  Like,
3 what do you mean by the paper?
4     Q.  For instance, does it make a difference
5 whether it's recycled or non-recycled paper?
6     A.  As I mentioned earlier -- and I've done
7 the same work my myself when we were at Secret
8 Service.  Yeah, paper can have an impact but
9 typically the type of paper that you use isn't
10 going to make the process slower, if you will.
11 So usually the paper -- depending on the paper --
12 like highly calendar paper, very smooth paper,
13 glossy type paper, the 2-PE will evaporate very
14 fast from it because it doesn't really absorb
15 into the paper as much.  But none of these
16 studies really talk about -- I mean, they don't
17 show that that certain type of paper will
18 actually cause the drawing to be extremely slow.
19 And that does go for when you're comparing -- you
20 know, obviously, when I compared Q80, I'm
21 comparing the samples from the same paper.  So
22 once again, this is a relative comparison.
23     If I was comparing these samples to
24 another page, then that's when you have to be
25 careful in interpreting the solvent loss ratios.

132

1    Q.   Are you familiar with the work of
2    Patricia Giebink, G-I-E-B-I-N-K, Erich Speckin,
3    Jason Harner, The Dating of Writing Inks Through
4    2-phenoxyethanol?
5        A.   That's a not a peer reviewed published
6    paper though.
7        Q.   Are you familiar with that work?
8        A.   I am familiar with the work.  They
9    presented it at a meeting but it was never peer
10   reviewed and published.
11       Q.   Have you critiqued that work?
12       A.   Probably, yes.
13       Q.   Do you -- are you familiar with
14   conclusions in that paper?
15       A.   I wouldn't trust the conclusions in that
16   paper, it's never been peer reviewed.  I believe
17   that's a paper from 2000 -- maybe mid 2000s --
18   2010, '11, something like that.  They never
19   produced any other data.
20       Q.   Do you agree with the statement that the
21   long-term behavior of solvent evaporation isn't
22   well-known or understood?
23       A.   It depends how you determine long-term.
24   I think -- I would say it's pretty well

133

1    foundational that the two year threshold is
2    something that everybody is comfortable with.  If
3    somebody found high levels of 2-PE in a document
4    that was greater known to be greater than two
5    years, they would publish that very fast, as
6    would I.
7        Q.   Are you familiar with the paper again by
8    Celine Weyermann, Joseph Almog, Jurgen Bugler and
9    Antonio Cantu?
10       A.   Yes.
11       Q.   Entitled Minimum Requirements For
12   Application of Ink Dating Methods Based on
13   Solvent Analysis in Case Work?
14       A.   Yes, I'm aware of all of those authors.
15   Specifically I trained under Dr. Cantu.
16       Q.   Dr. Cantu is a well-respected person in
17   this field of study, correct?
18       A.   He's well-respected, yes.  I trained
19   under him.
20       Q.   As is Dr. Aginsky, correct?
21       A.   Dr. Aginsky, we have some -- I will say
22   we have some differences.  But I would say that a
23   lot of the work he's done in this filed has been
24   instrumental.

134

1    Q.   Isn't he the inventor of this 2-PE
2    solvent loss ratio methodology?
3        A.   Not necessarily would I call him the
4    inventor.  He certainly had a big part in moving
5    this.  The way I would characterize this is
6    there's been a lot of research in this area that
7    added on to Dr. Aginsky's initial finding.  But
8    really where it all started was back in the 1980s
9    by a gentleman by the name of Larry Stewart and
10   sort of built from there.
11       Q.   Is Celine Weyermann respected in this
12   field of study?
13       A.   Celine Weyermann -- I know Celine very
14   well, she's a researcher.  She doesn't do case
15   work so she's used to working in a research
16   environment but I know who she is.
17       Q.   Okay.  Turning back to the paper I just
18   mentioned, Minimum Requirements For Application
19   of Ink Dating, there's a statement in that paper
20   that says, moreover, the time span that can be
21   considered to date inks through solvent analysis
22   using GC/MS is seriously questioned in the
23   forensic community.
24       Do you agree or disagree with that statement?

135

1    A.   I would have to -- I would have to see
2    what the statements are before and after what you
3    read me.  But what I would agree with is that the
4    timeframes of using three months, six months,
5    nine months, twelve months, eighteen months,
6    there's -- I would say there's a fair amount of
7    contention with that.  But the two year
8    timeframe, like I said, I'm not aware of anybody
9    that's ever said that when you look at -- you can
10   examine a document that's over two years old and
11   you'll have high levels of solvents in them.
12       Q.   The next very next line in that same
13   paper says, Brunelle and Crawford stated the that
14   ink dating dated technology which is based on
15   GC/MS analysis cannot be used to date inks over
16   six months old and Bugler et al recommended to
17   analyze ink with a maximum age of three to
18   four months.
19       Do you agree or disagree with that statement?
20       A.   I totally disagree.  Brunelle and
21   Crawford was a -- Brunelle was doing ink analysis
22   back in the 1960s and he's been retired for, I
23   don't know, 30 -- 25, 30 years.  So their
24   assessment of GC/MS is based on very old

136

34  (Pages 133 to 136)

G. LaPorte - Confidential

1          G. LaPorte - Confidential
2 technology.
3      In terms of Bugler, the method got a
4 little more perfected in terms of determining
5 that. I think a perfect example would be --
6 we've all had -- all of these people that you're
7 mentioning, if they worked in operational
8 laboratories you would see -- you do see
9 occasionally levels that are going to be very
10 hike, depending on the ink, that are going to
11 be -- you know, more than four or five or
12 six months old.
13     Q. Are you familiar with the paper entitled
14 The Dating of Writing Inks Through
15 2-Phenoxyethanol Using Gas Chromatography-Mass
16 Spectrometry by Patricia Giebink, Erich Speckin,
17 Jason Harner?
18     A. One again, that's not peer reviewed
19 so --
20     Q. Is that the same paper we were talking
21 about earlier?
22     A. I don't know if it's the same paper but
23 I know they never published anything so...
24     MR. BERMAN: Toni, can you pull up the
25 document in the third e-mail I sent you,

137

1          G. LaPorte - Confidential
2 it's entitled At Six Years.
3     Q. Mr. LaPorte, I'm showing you an excerpt
4 from that paper -- the citation is actually
5 listed below the table. The banner at the top
6 was applied not by the paper, we added it on
7 there, just to be clear.
8     A. Yes, to confirm -- and I assume you know
9 that this is not from a publication -- a journal
10 publication.
11     Q. This is from another form of paper
12 prepared by scientists in your field, correct?
13     A. I'm going to politely say these people
14 are not qualified. They have no -- they haven't
15 proper training in this particular area.
16     Q. In your field isn't it true there are
17 very limited number of testifying experts on the
18 subject of ink dating?
19     A. Yes.
20     Q. Isn't Erich Speckin one of those
21 testifying experts?
22     A. He's a testifying expert but his
23 opinions have been criticized by courts all over
24 the world so I don't -- I know Mr. Speckin. This
25 data -- like there's no -- first of all, these

138

1          G. LaPorte - Confidential
2 are absolute measurements so I just -- there's no
3 data here review other than some numbers, which I
4 can tell you just looking at the numbers for
5 their concentrations, these are low level
6 concentrations for these inks.
7     Q. Okay. So you draw different conclusions
8 than these particular individuals did in this
9 paper?
10     A. No, I think that would be incorrect to
11 say that I draw conclusions. What I'm saying --
12 I wouldn't draw conclusions from this. This
13 isn't data.
14     Q. Okay. Are you familiar with the work of
15 Carina Maria Bello De Carvalho? There's a
16 paper -- there's a paper entitled Figures of
17 Merit Evaluation of GC/MS Method for
18 Quantification of 2-PE From Ballpoint Pen Ink
19 Lines and Determination of the Influence of
20 Support Paper on Solvent Extraction?
21     A. I'm not aware of that publication. Do
22 you have -- can you pull that one up?
23     Q. I believe I can. Hold on a second here.
24 Actually, I don't think that's one of my slides.
25 There's a statement in the paper where they took

139

1          G. LaPorte - Confidential
2 about the detection limits obtained for their
3 study and they talk about the limits of reliable
4 measures of 2-PE.
5     Are you familiar with papers discussing those
6 points?
7     A. I would have to see that paper and what
8 their limited detections are.
9     Q. I think we can probably -- you know
10 what, let's skip that one for now.
11     We talked earlier about Bugler and some other
12 authors, right?
13     There's another paper that I've seen by
14 Bugler, Buchner and Dallmayer, are you familiar
15 with their works?
16     A. Yes.
17     Q. They make a statement in that paper --
18 I'll read the quote, it says, quote, these
19 authors maintain the methods applied until now in
20 which a ratio is made between the amounts of PE
21 found in two samples of the same ink, one without
22 treating and another heated, may have significant
23 error due to possible variations in the two
24 samples removed from the same ink."
25     A. Yes, so the key is "up until now." So I

140

G. LaPorte - Confidential

1  worked with Dr. Bugler when I was in the Secret
2  Service, we worked together on some samples and
3  we worked with the Canada of Border Service
4  Agency. This is when we were trying to optimize
5  the sampling. One of the things that came from
6  that is when you take samples to do adjacent
7  samples, when you take them in pairs.
8      Q.  Okay. There's a paper -- it's a paper
9  by Magdalena Ezcurra, we discussed previously,
10  Analytical Methods For Dating Modern Writing
11  Instrument Inks on Paper.
12     Are you familiar with that work?
13     A.  I know her work. I would have to see
14  that paper.
15     Q.  They're talking about the evaporation of
16  solvents in ink to achieve an approximation of
17  age of the ink. And there's a statement in there
18  that says, this method is based on publications
19  by Aginsky, 1996, and can be applied to determine
20  if an ink that contains PE as a solvent has been
21  entered on the paper in a period previous to a
22  year since the analysis is performed. Does that
23  sound familiar?
24     A.  Yes. So once again, I mean, they say a

141

G. LaPorte - Confidential

1  year and this is what I explained earlier in my
2  testimony that I use that two year limit to be
3  extremely conservative to minimize the potential
4  of a false positive. I mean, our goal -- at
5  least my goal -- I can speak for myself is I
6  never want to make an error. I never want to
7  have a false positive. I'm sure I can get it
8  wrong many times when I get a level that's below
9  25 -- I shouldn't say "get it wrong" but that's
10  an inconclusive level if you have, you know, of
11  course, like I explained like single digits but
12  that can never mean that it's generally -- that
13  the ink was generally done more than two years
14  ago. So we kind of -- you know, through all of
15  this research that you've been pointing out,
16  we -- to me the two year threshold or that two
17  year level just gives you a lot of security.
18     Q.  Do you know whether either of the two
19  samples --
20     MR. BERMAN: Withdrawn.
21     Q.  Do you know whether either of the two
22  documents that you reviewed, Q8 and Q12, do you
23  know whether either of them were on recycled
24  paper?

142

G. LaPorte - Confidential

1      A.  Q8 was on -- I believe it was on notepad
2  paper so I don't know if it's recycled or not.
3  And Q12 was a printout I think from a printer. I
4  don't know if that was recycled paper either.
5      Q.  Do you agree that recycled paper may
6  contain more PE-2?
7      A.  No -- I test paper samples before I do
8  my testing. My paper samples didn't show any
9  2-PE. That's during the quality control process.
10     Q.  So your blanks contained no PE at all?
11     A.  Correct.
12     Q.  Is that reflected in your report
13  somewhere?
14     A.  It's certainly in my notes.
15        MR. BERMAN: Toni, can we show him the
16  slide in the third e-mail that's titled
17  "Recycled Paper May Have More PE-2."
18        Whatever documents we showed Mr. LaPorte
19  today -- so far we showed him his expert
20  report, which we had marked as Plaintiff's
21  Exhibit 1.
22        Was the last document we showed him --
23  the second document that we put up today?
24  Mark that as LaPorte Exhibit 2 and let's

143

G. LaPorte - Confidential

1  mark this one as LaPorte Exhibit 3, please.
2        (LaPorte Exhibit 2 and LaPorte Exhibit
3  3, marked for identification.)
4      Q.  So are you familiar with this paper by
5  Carina Maria Bello De Carvalho?
6      A.  Yes, I saw -- I'm vaguely familiar with
7  this one.
8      Q.  And just to be clear, the green
9  highlighted material on the left, that's not part
10  of the paper. That was applied on our end.
11     A.  Yes.
12     Q.  So there's a highlighted line on the
13  right panel, do you see that where it says,
14  relating to the experiment's testing the
15  influence kind of paper on 2-PE concentrations,
16  it can be concluded that the kind of paper exerts
17  importance in the 2-PE quantification.
18        Do you see that statement?
19     A.  Yes.
20     Q.  Do you agree or disagree with that
21  statement?
22     A.  So I disagree with the idea that this
23  would be applicable in my case. First of all, I
24  ran paper solvent -- I ran paper blanks so I,

144

G. LaPorte - Confidential

1  obviously, didn't get any 2-phenoxyethanol that
2  would be significant enough for me to stop my
3  testing.
4
5  But secondly, this is comparative
6  method -- this is a relative comparison. So if
7  I'm taking samples and analyzing those in doing
8  the heated and unheated and the paper is by
9  chance contaminated, I'm getting the same
10  contaminations on both samples so it does have an
11  effect.
12  The other thing is I don't know where
13  they got their paper from. I believe -- I don't
14  know where she is from -- I'm not sure if she's
15  actually from Spain or from South America but I
16  don't know where they got their paper from that
17  would show, you know, contamination of 2-PE. I
18  don't know how old their paper was -- how old was
19  the paper? Was it fresh out of the package? And
20  I don't know where it was manufactured. If it's
21  manufactured in a place where they have print ink
22  also or if the printing ink is coming through
23  from the wrapping that's labeled. There's a lot
24  of variables. I'm a little speculative about
25  this statement.

145

G. LaPorte - Confidential

1  And then also too, I will say this has
2  to do with measuring absolute values of
3  2-phenoxyethanol. I haven't seen any of their
4  data that they ran in their laboratory. Did they
5  run blanks on the GC/MS? Is this contamination
6  from the GC/MS or is this really truly from the
7  paper. So I have a lot of questions about this.
8  Q. You seem to be inferring this paper is
9  about contamination, am I misunderstanding?
10  A. No, it's about what it seems to be about
11  is that if you test recycled paper you can get
12  2-PE. What I'm saying is it could be
13  contamination in the samples that they ran. I
14  don't know that.
15  Q. Okay. If you look at the last sentence
16  on the right panel it says, in part, recycled
17  paper will become a routine paper in offices and
18  the aging behavior of pen inks in this kind of
19  paper should be studied. Do you see that
20  sentence?
21  A. Yes, I see the sentence.
22  Q. So doesn't that indicate that they're
23  talking about the aging behavior of pen inks
24  rather than contamination?

146

G. LaPorte - Confidential

1  A. No, it sounds like they detected 2-PE in
2  the paper. All I'm say is I'm not privy to all
3  of their data and how they did their analysis and
4  whether that 2-PE is truly in the paper. You
5  would have to show me that the paper industry is
6  using 2-PE in their paper production. And these
7  don't seem like significant levels.
8  Q. I want to draw a distinction for you
9  between two different concepts.
10  The first concept being the one you've
11  identified, which is whether there is 2-PE in the
12  paper itself, right? Let's call that concept
13  one.
14  Concept two would be whether the tape of
15  paper that the ink is on affects the aging
16  behavior of that ink.
17  Do you understand the differentiation between
18  those two concepts?
19  A. Concept two depends on concept one.
20  Q. Well --
21  A. What they're suggesting, right, is that
22  the paper contaminated and we should do more
23  studies to understand the aging characteristics
24  of the ink. What I'm saying is I don't know if

147

G. LaPorte - Confidential

1  concept one is actually -- you know, if that's
2  feasible to begin with.
3  How many pieces of paper did they test?
4  Did they confirm with manufacturer this paper has
5  2-phenoxyethanol somewhere in the manufacturing
6  process. That's what I would want to know.
7  Q. I think I understand your response on
8  that point.
9  What I'm asking you is something a little bit
10  different, which is if you have recycled paper
11  that does not contain any 2-PE of its own, can
12  that fact that there's recycled paper affect the
13  aging behavior of pen ink applied to that paper?
14  A. If anything, I think I said this two or
15  three times already, but it wouldn't be expected
16  to make inks stay fresh for more than two years.
17  Are there differences in paper? Absolutely, I've
18  already -- you know, I've already testified to
19  that, that there are going to be differences in
20  paper and how inks dry on those papers. I'm not
21  debating that at all. But is there any evidence
22  that -- is there going to be any scientific study
23  that shows that a certain paper will cause an ink
24  not to dry, I'm not aware of that.

148

1        G. LaPorte - Confidential
2    Q.  Okay.  Do you agree that samples may be
3  contaminated through solvent migration?
4    A.  So solvent migration is where you have
5  writing and that can contaminate sort of the
6  paper around the writing.
7      Now, when I did my testing I removed
8  paper blank samples from around the writing to
9  determine whether there was any significant
10  contamination.  I didn't -- I certainly didn't
11  detect that.
12    Q.  Well, can samples be contaminated
13  through any other means?
14    A.  They could if you had other pieces of
15  paper, you know, put on top of them, sure.  But
16  once again, we're do a comparison of the unheated
17  and the heated.  So the idea of cross
18  contamination with an unheated and heated when
19  I've done -- when I've actually performed testing
20  on the paper that's adjacent to where I do the
21  sampling, then that -- that's not likely in this
22  particular case.  And I would say like almost
23  impossible in this particular case.
24    Q.  Do you agree or disagree that
25  contamination can occur from other sources of

149

1        G. LaPorte - Confidential
2  2-PE in the environment where the document is
3  stored?
4    A.  No, not the way you stated that.  No, I
5  don't agree.
6    Q.  And what is about the way I stated that
7  makes it more or less agreeable?
8    A.  You said "in the environment," what does
9  that mean?
10    Q.  So for example, don't other common
11  household products contain 2-PE?
12    MS. PRIMAVERA:  Objection.
13    A.  So that's possible.  I published a paper
14  on this and that -- you know, there are clones an
15  perfumes and things like that that can contain
16  2-PE.  But that's why we do paper blank samples
17  to determine whether that's possible -- the
18  possible case.
19    Q.  Okay.  Does solvent loss ratio decrease
20  uniformly with the age of a document?
21    A.  No, not -- so it depends on how you
22  define uniformly.  But the way I understand
23  uniformly, no.
24    Q.  Is it sometimes the case that solvent
25  loss ratio may increase over longer periods of

150

1        G. LaPorte - Confidential
2  time?
3    A.  I've never read that.  I've never heard
4  of that.
5    Q.  Are you familiar with the work Agnes
6  Koenig, Sophie Magnolone aging and Celine
7  Weyermann, Comparative Study of Ballpoint Ink
8  Aging Parameters Using GC/MS?
9    A.  I would have to see the reference.  I
10  mean, I'm familiar with those authors but I would
11  have to see this reference that you're -- that
12  you're referencing.
13    Q.  Well, if solvent loss ratio isn't
14  uniform over time, right, and you're taking a
15  ratio of a heated and unheated sample, then the
16  ratio of change for the heated sample versus the
17  unheated sample can change as the shape of the
18  curve changes, right?
19    MS. PRIMAVERA:  Objection.
20    A.  Not necessarily.  I mean, there can
21  certainly be -- you know, there can be what I
22  would call measurement error and variation.  But
23  it depends on how many measurements you're taking
24  and how often you're sampling or what the
25  difference is in the sampling.  But the idea that

151

1        G. LaPorte - Confidential
2  2-PE -- the solvent loss ratio would actually
3  rise or increase over time makes it -- it
4  logically, scientifically doesn't make any sense.
5    Q.  Well, it would be inconsistent with the
6  theory that you described with the fresh ink
7  showing a higher loss ratio, right?
8    MS. PRIMAVERA:  Objection.
9    A.  It depends if we're taking those samples
10  from exactly the same place, which would get very
11  difficult as you're doing this.  No, that just
12  doesn't make any sense to me.  And I haven't see
13  any research that would suggest that solvent loss
14  ratios increase over time as a function of the
15  ink.
16    Q.  But there this paper that I referenced
17  by Koenig, Magnolon and Weyermann; have you
18  reviewed that paper?
19    A.  No, I would have to see what you're
20  referencing.  I would have to review what
21  they're -- exactly what they're stating and how
22  they measured that.
23    Q.  Okay.  Are you familiar with a paper by
24  El-Sabbah, also by Gomaa and El-Hefny and
25  Al-Hawary, Dating the Ballpoint Pen Ink Using Gas

152

1          G. LaPorte - Confidential
2 Chromatography-Mass Spectrometry Technique?
3     A. I'm not sure I'm aware of that paper. I
4 would have to see it.
5     Q. Okay.
6     A. And maybe read the abstract on whether
7 -- I can't recall -- I can tell you right now I
8 can't recall that paper.
9     Q. All right.
10      MR. BERMAN: Just a moment please. I
11 might have a slide -- yeah.
12      Toni, can you show him the slide labeled
13 Inks Have Widely Varying -- and it continues
14 on from there. Let's label this please.
15      (LaPorte Exhibit 4, marked for
16 identification.)
17      THE WITNESS: Can we take a five-minute
18 break?
19      MR. BERMAN: Absolutely.
20      (Whereupon, a brief recess was taken.)
21     Q. Mr. LaPorte, I am showing you an exhibit
22 that's marked LaPorte Exhibit 4. Again, the
23 information on the left hand panel, we applied
24 that, that's not part of the underlying material,
25 okay, just to be clear.

153

1          G. LaPorte - Confidential
2     A. Yes.
3     Q. Okay. And that the black line
4 represents an unheated sample and the red line
5 represents a heated sample?
6     A. Yes.
7     Q. And then this appears to have on the X
8 axis time. Are you familiar with what the right
9 axis is showing us?
10     A. First of all, what is the -- the X axis
11 timing what?
12     Q. Let me see if I can discern that. In
13 months.
14     A. What are those numbers on the bottom?
15     Q. It appears to range from negative 5 to
16 40, depending upon the chart. So some of them go
17 from negative five to thirty. For example, panel
18 A goes from negative 5 to 35 months on the X axis
19 whereas panel -- I lost my place.
20     A. What is negative five in time?
21     Q. I think it's just -- there's no such
22 thing but you, obviously, can't have negative
23 months but I think it's just, you know, your
24 transposing the start points a little further to
25 the right on the chart?

155

1          G. LaPorte - Confidential
2      This is a slide that contains information
3 from that paper listed below the graphics, right,
4 where it says figure seven. This is from that
5 paper Dating Ballpoint Pain Ink Using Gas
6 Chromatography.
7      Have you seen graphs of nature before?
8     A. I have, yes.
9     Q. It's a little bit small but I'll
10 represent to you, for example, that on the top
11 left panel marked A there's an inset there says
12 the BIC pen at 24 degrees C and underneath that
13 it says BIC pen and 70 degrees C. Can you see
14 that?
15     A. I can't see that, no.
16      MR. BERMAN: Can you blow this up
17 larger, Toni, so that the graphs are more
18 visible?
19     Q. Are you familiar with the paper this is
20 excerpted from?
21     A. No. Once again, I think I would have to
22 see the front of the paper and then the abstract.
23     Q. Okay. My understanding is that in these
24 charts the top line is black and the bottom line
25 is red. Do you see that?

154

1          G. LaPorte - Confidential
2      MS. GUERON: I want to object to this
3 entire line of questioning because none of
4 us can even read this document. I just
5 don't think it's appropriate. I understand
6 technology makes things hard. I can't let
7 this questioning go un-objected because I
8 can't even see what we're talking about.
9      MR. BERMAN: Let's take a moment to
10 remedy that. Hold on a second.
11      (Whereupon, a brief recess was taken.)
12      MR. BERMAN: Let's mark this as LaPorte
13 Exhibit 5.
14      (LaPorte Exhibit 5, marked for
15 identification.)
16      MR. BERMAN: Please allow Mr. LaPorte to
17 guide you to the portions that he would like
18 to look at.
19     Q. The chart I would like to look at when
20 you're ready is on page 393.
21     A. Can I just sort of caveat this up in the
22 front. None of these people are forensic
23 chemists's. It's coming from the agriculture
24 department and these people are not experienced
25 in this methodology. So I am just going to put

156

G. LaPorte - Confidential

1       G. LaPorte - Confidential
2  that on the record right now.
3     I'm sorry, is the ball in my court right
4  now or --
5     Q.  Yes, Mr. LaPorte, you indicated you
6  wanted to review the abstract and other portions
7  of the paper.
8     A.  Yes, can we see the graphic now?
9     Q.  Yes, the graphic is on page 393.
10    MR. BERMAN:  Please feel free to guide
11  the court reporter to any portions you want
12  to review first and when you're ready for
13  the chart, we can have her flip to that
14  page.
15    THE WITNESS:  Can we just scroll down to
16  the next paragraph in this.  Can we go to
17  the methods section real quickly?
18    MR. BERMAN:  Where is that?  Can you
19  scroll down?
20    THE WITNESS:  Scroll down.  There we go.
21     A.  So I will just say that a lot of this
22  isn't going to be applicable because they removed
23  their samples with a scalpel.  As you can see in
24  the artificial aging part they say two one
25  centimeter samples of the examining inks on paper

157

1       G. LaPorte - Confidential
2  are removed using a sharp scalpel.  That's not a
3  generally accepted method for analyzing inks
4  because we do the hole punches.  So you'll create
5  a lot of variation in your data when you're
6  cutting and excising lines off the paper plus
7  you're removing too much paper at the same time
8  as well too.
9    THE WITNESS:  Can we go ahead and scroll
10  down I guess to the graphs.  That would
11  probably in the result section I assume,
12  which should be up next.
13    MR. BERMAN:  The graphs are on page 393.
14     A.  So now I can see the graphs.  Do you
15  have a question now?
16     Q.  So, again, just turning to panel A you
17  can see there's a black line, which they have in
18  the inset of the panel described as a BIC pen at
19  24 degrees C and underneath there's a red dash
20  line, BIC pen at 70 degrees C; do you see that?
21     A.  Yes.
22     Q.  Now you can see the X and Y where the X
23  is time in months and the Y axis is abundance in
24  it looks like N-G, does that make sense?
25     A.  Nanograms.

158

1       G. LaPorte - Confidential
2     Q.  In the different panels here we have
3  what appears to be different inks that are used.
4  So, for example, panel C is the Staedler pen at
5  24 degrees C and at 70 degrees C, right?
6     A.  Yes.
7     Q.  So, for example, in panel A, are you
8  able to tell me what the black curve -- the black
9  line curve represents?
10     A.  Well, I mean first of all we have some
11  data here with 24 degrees Celsius and that's
12  about 75 degrees Celsius.  That's typically above
13  what you expect room temperature.  The other
14  thing is I don't know how the -- well, I
15  mentioned this already, that they excise the
16  sample by removing these, you know, streps of
17  ink, which to me is just kind ruins the whole
18  experiment.  And then also to -- I mean, I --
19  so -- think about it this way, if you're removing
20  one centimeter of ink -- like the whole line, how
21  can that be consistent because you would be
22  taking one centimeter and then measuring that and
23  then taking another centimeter and then heating
24  that and measuring it.  The other thing is I
25  don't know how they heat their samples and that

159

1       G. LaPorte - Confidential
2  can be important in the process.  But you're not
3  going to have consistency between heated and
4  unheated if you're separating everything by a
5  full centimeter.  That's a lot of distance in an
6  ink.
7     Q.  Have you completed your response?
8     A.  Yes.
9     Q.  So with understanding that you have
10  certain critiques of their methodology, right, do
11  these panels generally reflect different
12  curvatures for the abundance of PE over time in
13  different ink types?
14    MS. GUERON:  Objection.
15     A.  I mean, I would say sort of generally
16  speaking, you know, these curves are -- they're
17  not a big surprise.  But, of course, if you're
18  not doing the methodology properly then you're
19  going to see some variances in those curves that
20  can really cause a lot of distortion in the
21  curve.
22    But, generally speaking, the idea of the
23  curve starting at high and coming down low is
24  what you would expect as an ink ages.
25     Q.  Have you completed your response?

160

G. LaPorte - Confidential

A. Yes, sir.

Q. I'll direct your attention to panel C, the red line which reflects a Staedler pen 70 degree; do you see that?

A. Yes.

Q. Do you see the curvature starts increasing after a certain point in time where the curve actually from 25 months onward goes up?

A. The ratio actually gets smaller as you see the red comes closer to the black so the difference is going to be smaller as it gets older, yes.

Q. Contrast that against panel F, right? In panel F we see the opposite, don't we, where the divergence between the two increases over time?

A. I can't see F.

MR. BERMAN: Can you scroll down, please, Toni. Panel F reflecting the Luxor pen at 24 degrees and 70 degrees.

A. Like I said, I wouldn't trust this data per se. I'm okay with the general curve but I don't trust the data. And then also we don't know if that variance is less than 25 percent or

161

G. LaPorte - Confidential

more than 25 percent.

Q. Okay. Are there other materials in the scientific field that show divergences of the heated and unheated samples increasing over time?

A. I'm not aware of that. If it's done using the same methodology that I'm using. You know, you're not excising one centimeter lines, you're using hole punches, you're taking adjacent samples, all that. I haven't seen anything like that.

Q. Okay. Prior to today have you seen this paper?

A. I don't -- you know, I don't recall this paper.

Q. So you're not sure but you're not familiar with it independently of me showing it to you now?

A. Once again, I don't -- I don't recall. I don't recall this paper. Can we go back up to front to see where it was published?

Q. Yes, you can. It was Egyptian Journal of Chemistry.

A. Yeah, that's not a journal that I typically read. But I do peer reviews and I want

162

G. LaPorte - Confidential

to be careful that I don't disclose anything I shouldn't be. But I do peer reviews for a lot of different journals on these types of articles. I haven't -- I don't recall seeing this.

Q. Okay. Did I understand you to be telling me the Egyptian Journal of Chemistry is not peer reviewed?

A. No, no. I'm saying I do peer reviews. I get called by a lot of journals to do peer reviews for them.

Q. Okay.

A. But this one, no, I'm not aware of this. I don't know if I just saw the article and I don't recall or -- I think it's easier for me to say I just don't remember seeing this.

Q. That's fine.

MR. BERMAN: You can put this one down, Toni.

Q. You mentioned that you do peer reviews. When was the last time that you were published in a peer review study?

A. I'm sorry, the last time I published?

Q. Yes, in a peer review study.

A. I would say the last time would be --

163

G. LaPorte - Confidential

well, I wrote a chapter in a textbook. I don't remember when that was published. I don't remember specifically. I would have to look it up.

Q. Okay. Is that the same chapter you referenced earlier?

A. Yes.

Q. Okay. Are you aware of any studies examining the uptake rate of PE-2 by ink as opposed to paper?

A. (No verbal response.)

Q. Is my question clear? I can rephrase it.

A. No, it's not clear.

Q. Okay. So before we were talking about potential sources of contamination from the environment that the document was stored in. Do you recall some questioning on that subject matter?

A. Yes.

Q. We had a discussion how you take hole punches from both the portion of the paper that has the ink on it as well as the portion of that is blank, right?

164

G. LaPorte - Confidential

A. Yes.

Q. And the rationale for doing that is, at least in part, to control for possible environmental contamination, right?

A. Yeah, to understand if there was some potential contamination that could affect your results?

Q. So just in taking an extreme example, if someone spilled some perfume with PE-2 on a document, you would expect it to be reflected on the blank if it had happened as well as on the ink portion, right?

A. Correct.

Q. So, obviously, moving away from that extreme example, in a case where -- in a situation where there was PE-2 in the environment but perhaps is it -- do you know whether PE-2 can be carried in the air?

A. So although it's a volatile organic compound that typically implies it volatiles pretty quickly once it hits the air. That's speculative I would say, that question. But I can't imagine that 2-PE is floating around in the area very much.

---

G. LaPorte - Confidential

Q. Okay. Obviously, in like a well-ventilated room or something like that it would never be expected to happen.

But what about like in a closed desk you draw?

MS. PRIMAVERA: Objection.

MS. GUERON: Objection.

A. I mean, that just wouldn't make sense to me. And then it like suddenly lands on the ink?

Q. Well, are you aware of any studies that have assessed whether there's any difference between the absorption of environmental contaminated PE-2 by ink versus that of paper?

A. No.

Q. Okay. Are you aware of any studies finding the solvent loss ratio becoming less stable in older documents?

A. What does "older" mean?

Q. Well, there's a document by Koenig, Magnolon and Weyermann entitled A Comparative Study of Ballpoint Ink Aging Parameters Using GC/MS, are you generally familiar with that?

A. Yes.

Q. And in that document's abstract they

---

G. LaPorte - Confidential

make a statement that for many -- excuse me -- for more than a decade scientists try to develop methods capable of dating ink by monitoring the loss of PE over time while many methods were proposed in the literature, few were really used to solve practical cases and they still raise much concern within the scientific community.

Do you agree or disagree with that statement?

A. I would say I partially disagree with that statement.

Q. Okay. Later on in the abstract -- would you like to clarify for me which portion you disagree with?

A. I would have to understand a little bit more about exactly what they're saying. What they don't come to a conclusion is that a solvent loss ratio above 25 percent will occur in a document that's greater than two years old. That I know is not said in there.

Q. There's a statement in the abstract says, surprisingly our results showed that our percentage was not the most reliable parameter, as it showed the highest standard deviation.

Do you agree or disagree with that statement?

---

G. LaPorte - Confidential

A. It depends on what they mean, do they mean over time as a predictor of age?

Q. Are you -- would you need to see the paper to know that or are you familiar with the work?

A. I'm fairly familiar with the work. It has nothing -- it does not imply that the solvent lost ratio increases above 25 percent when a document is over two years old. It may fluctuate in between but it's not going to have something to do with the measurements the way it's being taken. I'm not sure if they used hole punches or if they extracted with a scalpel.

Q. Well, are you familiar with Weyermann?

A. Yes.

Q. Isn't she a forensic criminologist?

A. No, she's a researcher.

Q. This particular article was published in -- University de Lausanne?

A. Lausanne.

Q. Isn't that a criminal forensic school?

A. They have criminal lists there but Dr. Weyermann does not -- as far as I know she doesn't engage in operational -- she doesn't work

---

1    in an operational laboratory, she's a researcher.
2    Q.   Are you familiar with Forensic Science
3    International?
4    A.   Yes.
5    Q.   Is that a well-regarded scientific
6    publication?
7         MS. PRIMAVERA:  Objection.
8    A.   I don't know if I call it well-regarded
9    in a sense -- it depends on what the article is.
10   Are there articles that are published in there
11   that I agree with, yes.  Are there articles that
12   published in there that I think that are not
13   great science, yes.
14   Q.   Do you know if works in that publication
15   are peer reviewed?
16   A.   I believe so, yes.
17   Q.   You're not contending that this article
18   is not peer reviewed, right?
19   A.   No, I'm not contending that.
20   Q.   All right.  Are you familiar -- never
21   mind -- we already asked about this paper.
22        Are you familiar with a 2017 work in Science
23   and Justice also by Agnes Koenig, Celine
24   Weyermann entitled Ink Dating Part II

169

1    Interpretation of Results in a Legal Perspective?
2    A.   I am familiar with that, yes.
3    Q.   Are you aware of that that article
4    discusses the use of a 50 percent threshold?
5    A.   Not for two years.
6    Q.   Okay.  Are you aware of studies
7    reporting false/positive results for the R
8    percentage parameter?
9    A.   So false/positive in what terms?  Did
10   they conclude that a document was less than two
11   years old when it was factually more than two
12   years old?  I'm not aware of that.
13   Q.   Let me give you a quote from the paper.
14   It says, thus, two values of 38 and 35 percent
15   were reported for two different seven year old
16   samples yielding false/positive results when
17   using the 35 percent threshold less than
18   18 months?
19   A.   I'm not aware of that.  Do you have that
20   study?  I would like to see how they did their
21   testing.
22   Q.   So you're not generally familiar with
23   that paper?
24        MS. PRIMAVERA:  Objection.

170

1    A.   I don't -- is it peer reviewed and
2    published?
3    Q.   It's published in Science and Justice
4    2017.  Do you know whether that is peer reviewed?
5    A.   I don't know but -- I'm not going to
6    contend that it is or isn't.  I would like to see
7    that article and understand exactly how they did
8    their testing.
9    Q.   Okay.  So without more information you
10   can't tell me whether you agree or disagree,
11   correct?
12   A.   Correct.
13   Q.   Is there any pear reviewed publication
14   that reports that after 24 months PE no longer
15   evaporates at a significant or measurable rate?
16   A.   There is a publication, yes, that
17   essentially says that.  Yes.
18   Q.   What publication is that?
19   A.   Gaudreau and Brazeau.
20   Q.   Do you know what date or what
21   approximate year that came out?
22   A.   I don't remember the year.  It would
23   have been sometime in the early to mid 2000s.
24   Q.   Do you know of any other papers that

171

1    come to that conclusion?
2    A.   I think there's a lot of papers that it
3    may be in there.  It may be in the paper
4    somewhere but it's not necessarily part of the
5    hypothesis of the testing, they'll use it as
6    foundational.
7    Q.   When you -- when you tell me they use it
8    as foundational, what does that mean?
9    A.   It means that's not what the testing is
10   all about.  I mean, that's not -- the test
11   that -- those are more -- that's more informative
12   information that's been developed over the years.
13        So when you say is there research to
14   show that, somebody probably wasn't doing that
15   research.  But I would say, generally, that's a
16   fairly accurate statement.
17   Q.   In your report you make the statement
18   after 24 months PE no longer evaporates at a
19   significant or measurable rate and you don't cite
20   any scientific work for that proposition?
21   A.   That's Gaudreau and Brazeau and I
22   believe I have a publication that states the same
23   thing too.
24   Q.   When you say you have a publication,

172

43  (Pages 169 to 172)

1  what do you mean by that?
2  
3      A.  I have a publication that states that
4  same thing that I cite Gaudreau and Brazeau from
5  it.
6      Q.  When you say you have a publication,
7  does that mean you have a copy of a publication
8  authored by some other author or you wrote one?
9      A.  No, I authored it.
10     Q.  You wrote a study where you came to this
11 conclusion?
12     A.  Like I said, it's general but, yes -- so
13 it's a general agreement that really after
14 24 months these inks are completely dried out
15 unless they were stored in some irregular
16 environment.
17     Q.  So the manifestation of that general
18 agreement would be the Gaudreau article you
19 referenced?
20     A.  That's where it starts.  And then
21 there's -- like I said, there's more articles
22 that when show -- when you seize the data that it
23 coincides with the data.  I'm not aware of any
24 publication that has debunked that idea.
25     Q.  In your report -- I think I asked you

1  about this -- excuse me, let me just go down.
2      In that in an article by Weyermann, Almog and
3  Bugler and Cantu in Forensic Science
4  International, 2011, they make the statement, to
5  present date no two laboratories that do ink
6  dating via solvent analysis use the same method.
7      Do you agree or disagreement with that
8  statement?
9      A.  That was 2011.  So I don't know -- I
10 can't comment on whether laboratories have come
11 together.  I do know that there are always
12 some -- you know, this is not uncommon in just
13 about any chemical analysis where there might be
14 some differences -- some variations in the
15 methodology.
16     Q.  Am I correct that you agree that there
17 are some variations in methodology from lab to
18 lab?
19     A.  I don't -- I can't say for sure.  I
20 don't know what every lab is doing.  I know what
21 I do and I know that I validated my own procedure
22 and I've used -- I know there are other ink
23 chemists that -- other test finding ink chemists
24 that use something similar.
25

1      Q.  Are there other ink chemists that are
2  testifying at experts that you can consider to be
3  at your level?
4      A.  I don't know what you mean by "at my
5  level."
6      Q.  I asked you earlier about, for example,
7  a paper written by Erich Speckin, remember that?
8      A.  Yes.
9      Q.  And effectively you told me you didn't
10 consider him qualified, correct?
11     A.  No, that's -- I mean, I wouldn't want to
12 characterize it as not qualified, that's not my
13 job as an expert when you say "not qualified."
14 The paper we were talking about was not peer
15 reviewed.  There's no data to sort of back it up.
16 It was a paper that was based on making absolute
17 measurements.
18     Q.  Let me try to frame it as a more
19 objective question to make it perhaps easier and
20 more clear.
21     Your testimony as a forensic ink dating
22 expert has been accepted in federal courts in the
23 US, correct?
24     A.  Yes.
25

1      Q.  How many other experts in the same
2  subject matter are you aware of whose testimony
3  has been accepted as expert testimony in federal
4  courts in the US?
5      A.  I don't think -- I mean, I can't -- I
6  can't comment on that because I don't know for
7  certain on whether or not their testimony has
8  been accepted in Federal Court.
9      Q.  Do you know whether Mr. Speckin's
10 testimony has been accepted in Federal Court?
11     A.  I actually don't know that for sure.
12     Q.  Do you know whether Dr. Aginsky's
13 testimony has been accepted in Federal Court?
14     A.  I don't know for sure.  I would -- my
15 guess is yes.
16     Q.  Are you familiar with a forensic ink
17 dating scientists named Lyter, L-Y-T-E-R?
18     A.  Yes.
19     Q.  Do you me know his first name?
20     A.  Albert.
21     Q.  Yes.  Do you know whether his testimony
22 has been accepted as expert testimony in the US?
23     A.  I can tell you I was involved on the
24 opposing side of that case in the Souther
25

1   G. LaPorte - Confidential
2   District of New York where -- if you read that --
3   if you read that ruling clearly, there were he
4   lacked quality control procedures and there were
5   other things that made the analysis unreliable
6   but the method itself -- I don't -- I don't
7   recall specifically if there was an issue with
8   just the method itself other than he forgot --
9   not forget -- he neglected to run quality control
10  samples and some other things. But -- so I'm
11  going to leave it at that.
12      Q.  Your referring to the case where his
13  testimony was discredited because he didn't take
14  the blank paper samples, right?
15      A.  Correct.
16      Q.  So other than yourself, are you aware of
17  any forensic ink dating experts whose testimony
18  has been credited as expert testimony in Federal
19  Courts in the US?
20      A.  Well, once again, I mean, I don't keep
21  track of other experts and their testimony and
22  whether it's been accepted or not.  Sometimes it
23  may not even involve ink dating.  So I don't
24  know.  He would probably be -- you can probably
25  get that information a lot easier than me.

177

1   G. LaPorte - Confidential
2       Q.  Thank you.  Is there a standard formula
3   for ballpoint pen manufacturing for the ink
4   that's used?
5       A.  I'm sorry, I don't understand the
6   question you're asking.
7       Q.  Let me phrase it differently.  Do the
8   solvents used in commonly available inks vary?
9       A.  Yes.
10      Q.  Do the dyes vary?
11      A.  Yes.
12      Q.  Do the resins vary?
13      A.  Yes, but not a lot.
14      Q.  Okay.  And they vary from brand to
15  brand?
16      A.  They can.
17      Q.  And they can vary from region to region?
18      A.  I don't know if I use a region to region
19  if it's the same manufacturer.  They may -- it
20  depends on -- let's say you sell -- BIC sells
21  pens in Arizona that's a dry climate versus a
22  highly humid climate, the company may sort of
23  alter their solvents in those but I don't know
24  that for sure.
25      Q.  Are you familiar with Brazilian Journal

178

1   G. LaPorte - Confidential
2   of Forensic Science Medical Law and Bioethics?
3       A.  I am not.
4       Q.  In the paper they published in January
5   of 2017 they stated that solvents, dyes and
6   resins may vary between different brands of pens
7   and may vary from region to region.
8       Do you agree or disagree with that?
9       A.  I don't have a basis to disagree with
10  that.
11      Q.  Okay.
12      A.  I would want to know where they got
13  their information from but.
14      Q.  In your analysis of the Q8 or Q12
15  document, for either document, were you able to
16  identify the formula for the inks used in those
17  documents?
18      A.  I did not identify the formula
19  specifically.
20      Q.  Are you familiar with an Excurra paper
21  written with coauthors entitled Analytical
22  Methods For Dating Modern Writing Instrument Inks
23  on Paper in 2010 in Forensic Science
24  International?
25      A.  I believe I have seen that article.

179

1   G. LaPorte - Confidential
2       Q.  In that article they're talking about a
3   Gaudreau, Brazeau article -- Gaudreau is
4   G-A-U-D-R-E-A-U and Brazeau is B-R-A-Z-E-A-U.
5       Are those the authors you referenced earlier
6   today?
7       A.  Yes.
8       Q.  There's a statement in that article that
9   says, "Nowhere throughout the cited article are
10  the volatile compounds corresponding to the
11  analyzed peaks A and B specified.  However, in
12  the bibliography below, so much LaPorte's,
13  L-A-P-O-R-T-E, as Gaudreau-Brazeau indicated
14  phenoxyethanol PE as one of the volatile
15  compounds to which Stewart refers,
16  S-T-E-W-A-R-T -- it continues on -- I'm not
17  breaking up the quote -- this method has two
18  clear limitations:  First, that the formula of
19  the problem ink needs to be identified and obtain
20  information on its volatile compounds through the
21  industry; second, the importance of storage
22  conditions of both inks.  Known and questioned
23  inks cannot differ if a comparison is intended."
24      Do you agree or disagree with the material in
25  that quotation?

180

45  (Pages 177 to 180)

G. LaPorte - Confidential

A. I disagree with that.

Q. Which part or parts do you disagree with?

A. I disagree with the idea you need to know the formula.

First of all, it sounds like you've done some reading on this but this method is called the dynamic method and the dynamic method has nothing to do with ink formulation, right, it's all about looking how an ink ages. Esthetic methods, as we commonly refer to it, that has more to do with ink formulation. This is ink formulation independent.

Now, in part, I do agree that certainly different inks are going to have different characteristics and they all age different. It will be really helpful to know a little bit more about when ink formulation in its solvent content levels originally but that's almost impossible. You would have to get all that information from the ink manufacturer and then they have to disclose all the ingredients that they used and that's just not going to happen.

Aside from that, it's -- this is why and

---

G. LaPorte - Confidential

this is the whole purpose and everything I think you've been talking about sort of drives my point home that I said in the beginning, which is this idea of using the two year threshold and there will be inks that are going to vary within those two years, there's no doubt. So when you use the two year threshold that's a lot more -- you have a lot more confidence in that because once we start, if you will, metaphorically splitting the hairs thinner and thinner here then there's a greater chance of making an inaccurate conclusion. So two years is always a nice -- nice to stay with.

So it's like if you were shooting at a target, right, and we use this analogy all the time in chemistry when you're talk about accuracy and precision, right, if you're shooting at a target, two years is a much bigger target so you have a better chance of hitting the target.

So I disagree, once again, with the idea that you have to know the ink formulation. But I don't disagree with the idea that knowing the ink formulation will be great but that will also help you in situations when you get levels that are

---

G. LaPorte - Confidential

below 25 percent to maybe make conclusions that way as opposed to an inconclusive.

Q. Okay. Have you completed your response?

A. Yes.

Q. Do I understand correctly you disagree with both of these conclusions; number one, the formula of the problem ink needs to be identified and number two, the importance of storage conditions of both inks?

A. No, I don't disagree with two. So storage condition, yes. There are what I would sort of qualify more as extreme storage conditions. Is there a difference between storage condition of, you know, in an office versus in a house, no. I would get, you know, 68 degrees versus 70 degrees or 71 degrees, no, that's not going to be a big difference. So it's as you get more drastic and the extreme.

Q. I asked you before about articles in Forensic Science International.

There's another one by Weyermann, Minimum Requirements For Application of Ink Dating Methods Based on Solvent Analysis in Case Work.

There's a statement in that article that

---

G. LaPorte - Confidential

says, "The influence of the initial ink composition on the aging rates of inks is very important. Two aspects must be considered: The compounds (dyes, resins, solvents and additives) and their relative amounts (initial solvent quantity in the ink formulation). Bugler et al actually suggested that the types of resins influenced the aging rates as they observed the presence of acetophenone-formaldehyde-resin in 'slowly aging inks'".

Did you follow me on that?

A. I know exactly what you're saying and I'm very familiar with that.

Q. Do you agree --

A. I'm very familiar with Bugler in that chart that he's referring to with the resins.

Q. So this article is pointing to work by Bugler but the article itself I'm asking about is a Weyermann article, are you with me on that?

A. Yes.

Q. Do you agree or disagree with in the statements in the Weyermann article that I just read?

A. I agree, generally, with what she's

---

G. LaPorte - Confidential

1 saying, that the resins are important. One of
2 the reasons is that Bugler showed that certain
3 resins will cause inks -- potentially cause inks
4 to be fast aging. So they will age out within
5 three, four months.
6    Q. Previously you worked in government
7 forensic labs, is that right?
8    A. Yes.
9    Q. Did any of those labs maintain a
10 database of inks?
11    A. Yes.
12    Q. How many of the organizations you've
13 worked for maintain databases of ink?
14    A. When I worked at the Secret Service.
15 It's the only US lab that actually maintains a
16 collection in collaboration with the Internal
17 Revenue Service lab.
18    Q. Approximately how many inks were in the
19 database at the time you last worked there?
20    A. 11, 12,000 maybe.
21    Q. Each of those inks will have different
22 aging characteristics, correct?
23    A. Through that two year period, yes. Once
24 you get to the two year period, they're all

185

G. LaPorte - Confidential

1 different samples were used. These results
2 actually showed that the aging parameter, R
3 percentage, did not minimize the variability of
4 measurements, but in contrary did yield increased
5 RSD values for older samples compared to PE
6 quantities. This was not expected from earlier
7 publications."
8    Are you familiar with that work?
9    A. I would have to read that more in depth
10 to understand exactly what that's saying. But
11 I -- when was that paper -- the date of that
12 paper?
13    Q. 2015.
14    A. So things have changed since 2015 as
15 well too. What I do know is that a lot of the
16 way some of the researches were making --
17 actually taking their samples in making their
18 measurements created a lot of uncertainty.
19    Q. We talked about resins a little bit. I
20 want to keep this moving. I understand you have
21 another engagement. Do we agree that the rule of
22 hardness in resins is important?
23    A. Yes.
24    Q. Do we agree that low amounts of solvents

187

G. LaPorte - Confidential

1 generally going to -- everything will come
2 together about the same.
3    Q. Are you familiar with the Koenig
4 paper -- Agnes Koenig, Ink Dating Part I,
5 Statistical Distribution of Selected Aging
6 Parameters in a Ballpoint Ink's Reference
7 Population?
8    A. Yes.
9    Q. There's a statement in that paper, "It
10 is generally known that ink composition has a
11 significant influence on ink aging. Thus,
12 analyzing representative ink referenced
13 populations is essential to ensure that the
14 selected aging parameter can be implemented in
15 those cases."
16    Do you agree or disagree with that statement?
17    A. I don't know -- I don't know what they
18 mean by "ink aging parameter."
19    Q. In the Koenig article we discussed
20 previously, A Comparative Study of Ballpoint Ink
21 Aging Parameters Using GC/MS. There is a
22 statement in that article that says, "The
23 calculation of R percent value may yield
24 propagation of the uncertainty because two

186

G. LaPorte - Confidential

1 may even stay trapped in the ink matrix for
2 years?
3    A. Absolutely.
4    Q. There's one more slide I want to show
5 you.
6    MR. BERMAN: Toni, can pull up the slide
7 that says at 304 days.
8    (LaPorte Exhibit 6, marked for
9 identification.)
10    Q. Mr. LaPorte, I'm directing your
11 attention to the exhibit labeled LaPorte
12 Exhibit 6. This is a graphic that was excerpted
13 from the Koenig and Weyermann paper. The
14 citation is under the graph. As you can see on
15 the X axis there's a label, sample age and days
16 and on the Y axis -- vertical axis, we have a
17 quantity indicated of R percentage.
18    Do you see that?
19    A. Yes.
20    Q. So the sample -- the age of the sample
21 in these goes out to 304 days in this chart,
22 right?
23    A. Yes.
24    Q. Do we agree that all of these samples

188

G. LaPorte - Confidential

1  indicated here are above the 25 percent threshold
2  for the window of time from zero days out through
3  304 days?
4      A.   I don't understand this data.  I mean,
5  are these -- are these different inks?  Are they
6  the same ink?  Is it just one ink?
7      Q.   Does that matter to answering the
8  question?
9      A.   Well, yeah, it does -- I mean, it does
10  -- I would like to understand sort of what I'm
11  looking at.  I mean, I will say the first thing
12  is that I would have -- I have serious doubts
13  about this data.  I can tell you very rarely do I
14  even see inks with a 40 percent solvent loss
15  ratio.  That doesn't happen very often.  So when
16  I'm seeing this -- I'm speculative -- not
17  speculative -- but I'm little concerned about the
18  data and how they did the testing.  I assume is
19  this ink lines?
20      Q.   This is a chart from the Agnes Koenig
21  anything article, Ink Dating Part I.  My question
22  to you is whether I'm reading the chart right
23  that it shows each of these samples -- taking
24  into account your raising the point of what are

189

G. LaPorte - Confidential

1  the samples, same ink or different ink -- but
2  they all appear to be above 25 percent and as you
3  pointed out, they go as high as about 70 percent
4  on the chart, don't they?  Am I reading it right?
5      MS. GUERON:  Objection.
6      A.   What's confusing is you keep saying
7  "samples" and that's why I asked is this multiple
8  samples?  I can't answer your question is this a
9  sample that's being tracked, you know, from day
10  four -- day three or four or is this multiple
11  samples?
12      Q.   Okay.  Whether -- either case of that is
13  true, right, they're all over 25 percent on the
14  chart; am I reading right?
15      A.   Yes, I'm seeing above 25 percent.  Yes.
16      Q.   That's the question is whether I'm
17  reading the chart right.
18      MR. BERMAN:  Let's take a very quick
19  break.  I suspect I'm finished with my
20  questioning.  I want to take a moment and
21  confirm, okay?
22      MS. PRIMAVERA:  Yes.
23      (Whereupon, a brief recess was taken.)
24      Q.   Mr. LaPorte, I have two other questions

190

G. LaPorte - Confidential

1  for you.  First of which, is are you aware of any
2  published study that shows solvent loss ratios
3  for inks that are aged to six years?
4      A.   No, I'm not.
5      Q.   And then with respect to the ratio
6  between heated and unheated samples, can that
7  ratio change as time goes on?
8      A.   It depends on when the time -- when
9  you're talking about the time, like, what, from
10  day five to day twenty or -- you know, I don't
11  understand sort of the time difference in when it
12  starts and when it stops.
13      Q.   For any given ink is it fair to say that
14  you can create a chart of the rate of evaporation
15  of the ink?
16      MS. PRIMAVERA:  Objection.
17      A.   So you could in theory do that.  So what
18  you're saying is like sampling at different
19  periods of time.  That's typically not practical,
20  I mean, in litigation but it can be done.
21      Q.   Setting aside the practical aspect.  I'm
22  really asking it as a theoretical question.  If
23  you took a compound of ink and you didn't have a
24  supply constraint in terms of you're going to run

191

G. LaPorte - Confidential

1  out of it, right, you can take that ink and you
2  can put all of it on different papers at the same
3  time and then at one day old you can measure a
4  paper and see how much of it evaporated and set
5  that one aside and then at two days old you can
6  look at your next sample and see how it
7  evaporated and you can plot that in a curve,
8  right?
9      A.   Well, you presented a lot of curves.
10  That's exactly what was done, yes.
11      Q.   You can do the same thing for heated
12  samples of the same ink, right?
13      A.   Yes, you can.  Sure.
14      Q.   So in theory if you did that for any
15  particular ink, are you going to find that the
16  curves have the same shape and therefore the
17  ratio between the two curves remains constant or
18  are you going to find something else?
19      A.   Those ratios should generally change.
20      Q.   Okay.  And will the change always be in
21  the same direction over time?
22      A.   It shouldn't -- if you're doing the
23  testing correctly, right -- and I'm not just
24  talking -- I don't want to downplay what happens

192

G. LaPorte - Confidential

in a research environment. So a lot of
researches they don't -- this idea of sampling
one centimeter lines and all this and I've spoken
publically about this many times and that doesn't
make any sense, right. There's things you can do
when you heat if's all coiled -- and I've seen
one researcher coil it up and so when you're
heating it, it all just spreads to each other --
it contaminates one side to the other side that's
coiled up. You have to understand the heating
process and how it's done.

In theory, I mean, over a longer period
of time the ratio should get -- should get
smaller -- the solvent loss ratio should
decrease. But, of course, there will be a little
measurement uncertainty in there but
statistically you would have to do that with
multiple samples and then monitor that. And then
it will all depend on how the ink is stored and
all that as well too.

Q. Okay. So if we measure the ink
according to your own methods and we plotted
those two curves, are we going to see the ratio
continuously decreasing as time elapses, is that

193

---

G. LaPorte - Confidential

going to be uniform?

A. Generally -- I don't know if I would
call it uniform but, generally, there should
be -- it depends what the time is because you
will have to measurement an uncertainty. But
from day -- say day 10 versus day 50, right, then
that ratio should get a little smaller.

MR. BERMAN: I have no further questions
at this time. Thank you for your time
today, Mr. LaPorte?

THE WITNESS: Thank you.

MS. PRIMAVERA: Thank you. I will need
this expedited before Wednesday.

(Whereupon, the examination of this
witness was concluded at 3:51 p.m.)

194

---

A C K N O W L E D G M E N T

STATE OF            )
                    : ss
COUNTY OF           )

I, GERALD LaPORTE, hereby certify that I
have read the transcript of my testimony taken
under oath in my deposition of October 7, 2021,
that the transcript is a true, complete and
correct record of my testimony, and that the
answers on the record as given by me are true and
correct.


_____

GERALD LAPORTE


Signed and subscribed to before
me, this          day
of              , 2021.


_____

Notary Public, State of

195

---

I N D E X

WITNESS          EXAMINATION BY    PAGE
Gerald LaPorte   Mr. Berman         5

E X H I B I T S

LAPORTE                    PAGE
1    Report                12
2    Slide                144
3    Slide                144
4    Slide                153
5    Slide                156
6    Slide                188

196

```
 1
 2              C E R T I F I C A T E
 3
 4        I, TONI MUSACCHIA, a Notary Public in and
 5   for the State of New York, do hereby certify:
 6        THAT the witness whose deposition is
 7   hereinbefore set forth, was duly sworn by me and
 8        THAT the within transcript is a true
 9   record of the testimony given by such witness.
10        I further certify that I am not related,
11   either by blood or marriage; to any of the
12   parties to this action; and
13        THAT I am in no way interested in the
14   outcome of this matter.
15        IN WITNESS WHEREOF, I have hereunto set
16   my hand this 11th day of October, 2021.
17
18        _____
19             TONI MUSACCHIA
20
21
22
23
24
25
                                    197
```

516-485-2222          BEE REPORTING AGENCY, INC.          212-327-3500