**IN THE UNITED STATES DISTRICT COURT FOR THE**

**SOUTHERN DISTRICT OF NEW YORK**



Jennifer Fischman,

   Plaintiff

   v.

Mitsubishi Chemical Holdings America, Inc. and Mitsubishi Chemical Holdings
Corporation; NICHOLAS OLIVA, in his individual and professional capacities; DONNA
COSTA, in her individual and professional capacities;
and JOHN DOES 1-10, in their individual and professional capacities

   Defendants

   Civil Action No: 18-cv-08188 (JMF)

**VOCATIONAL EVALUATION AND EARNING CAPACITY ANALYSIS**

**Of Plaintiff, Jennifer Fischman**

**January 28, 2021**

| | |
|---|---|
| **Referred by:** | **Gordon & Rees LLP** |
| **Prepared by:** | **Rona E. Wexler, M.A., ABVE/D** |

**Rona E. Wexler, M.A., ABVE/D**    **Vocational Evaluator**
*Diplomate, American Board of Vocational Experts*

**Vocational & Career Consulting, Employability Evaluation Services**

**15900 Riverside Dr. W., Suite 6C, New York, NY 10032-1041**
**rona@TheEmployabilityExpert.com (646) 335-5236**

**TABLE OF CONTENTS**

I. Introduction ....................................................................................................3
    A. Summary of Professional Qualifications .......................................3
    B. Purpose of Evaluation ......................................................................4
    C. Compensation....................................................................................4
    D. Appendices........................................................................................4

II. Summary of Opinions ....................................................................................5

III. Evaluation Methodology..............................................................................5

IV. Plaintiff's Background and Employment History .........................................6
    A. Family, Educational and Medical Background ...............................6
    B. Volunteer, Unpaid Work Experience, and Other Activity ..............7
    C. Employment History ........................................................................7

V. Analysis of Employability ...........................................................................11
    A. Vocational Assets, Proficiencies, and Transferable Skills............11
    B. Vocational Concerns ......................................................................13

VI. Analysis of Ms. Fischman's Job Search Efforts.........................................13
    A. Expectations and Accepted Standards of a Diligent Job Search....14
    B. Ms. Fischman's Job Search Efforts...............................................15
    C. Assessing Duration of Unemployment ..........................................16
    D. Minimal Applications Over Three Years........................................17

VII. Labor Market Research ............................................................................19
    A. Labor Market Research Process......................................................19
        1.  Job Categories..................................................................19
        2.  Employment Opportunities..............................................21
        3.  Labor Market Research:  Results......................................22
        4.  Assessment of Reemployment..........................................23

VIII. Summary .................................................................................................23

IX.   Conclusion ............................................................................................24

Appendix A – Rona Wexler:  Curriculum Vitae .............................................26

Rona Wexler:  Presentations & Publications ...................................................28

Rona Wexler:  Testimony as Vocational/Employability Expert at Trial or Deposition ............30

Appendix B – Standard Resources and References..........................................33

Appendix C – List of Documents Relied Upon in Preparing this Report.........36

Appendix D – Number of Advertised Jobs 2017-2019 Available for Application by
        Jennifer Fischman ...............................................................................37

Appendix E – Jennifer Fischman's Job Search Activities ...............................38

Appendix F – Jennifer Fischman's Job Applications Compared to Published
        Job Opportunities.................................................................................39

Appendix G – National Duration of Unemployment & Rates of Unemployment ....................40

## I. INTRODUCTION

### A. Summary of Professional Qualifications

I am the President and Founder of Wexler Vocational and Career Consulting LLC, New York, NY. I hold a B.A. from Emerson College in English and Education and a M.A. from New York University in Counseling Psychology and Guidance. I provide vocational evaluations and expert witness services nationwide and have previously been qualified as an employability/vocational expert witness in the Supreme Court of New York and various civil courts in New England, the New York tri-state region and Florida, as well as the U.S. District Court for the Southern District of New York. I have testified in trials, arbitrations and depositions about employability, compensation, earning capacity and job search diligence in employment and family law matters.

In addition to my two decades of experience as a Vocational Evaluator, Career Advisor and Employability Expert, I bring 12 years' experience in executive recruiting as a principal/managing partner and director in two firms. As a recruiter, I helped mid, senior and C-level professionals and executives find employment that best suited their skill sets and abilities and employers' needs. I also have extensive experience as a business consultant, sales manager, hiring and training manager and sales representative with different divisions in Xerox Corporation, as well as with clients in many different business sectors including pharmaceutical, healthcare, manufacturing, professional services and public sector entities, among others. Before entering the private sector, I was a college career services director and a principal in a career consulting practice for adults in career transition.

I am designated as a Diplomate by the American Board of Vocational Experts (ABVE/D), a not-for-profit organization and the only professional credentialing board in North America that establishes and evaluates competency of vocational experts.[1] I obtained my Diplomate certification in 2010. Since that time, I have met and generally exceeded the Continuing Education requirements by attending ABVE annual conferences and educational seminars on current topics in the field, attending relevant Continuing Legal Education seminars and by designing and presenting seminars at ABVE conferences and CLEs. Since 2015, I have served on the ABVE Board of Directors where I chair the committee that oversees the standards and process to earn ABVE credentials. I am also a long-term appointed member to the New York State Bar Association Family Law Section's Executive Committee as a Non-Lawyer Family Law Professional and its only employability expert.

I am frequently invited to present on matters about employment, executing a successful job search and career transitions. For example, I have been a featured CLE faculty panelist about

---

[1] ABVE's rigorous credentialing process requires the applicant earn a postgraduate degree in select disciplines with related training and experience and a minimum of seven years of recognized forensic experience for Diplomate designation. The applicant's knowledge and expertise are demonstrated by submitting forensic work product(s) and/or proof of forensic testimony, authored publications, and references attesting to the above. An applicant's materials undergo extensive peer review before the candidate may sit for a qualifying exam. If s/he passes the exam, s/he is designated as a Diplomate (highest level) and may maintain the designation by completing continuing education requirements in a triennial cycle.

forensic assessments of employability, job search diligence and earning capacity to state and county bar associations and national law firms. I have published on these topics in the *New York Law Journal*, various publications of American Legal Media and in annual editions of *Valuing Marital Assets*, a reference guide for family law attorneys published by <u>Wolters Kluwer Business and Law Division</u>.

### B.       Purpose of Evaluation

I have been retained to perform a vocational assessment of Jennifer Fischman's employment capabilities and to evaluate her efforts to search for employment in her chosen labor markets since her separation from Mitsubishi Chemical Holdings America, Inc. in January 2017.

This evaluation is based on (1) a review of information provided to me regarding Ms. Fischman including, but not limited to, information related to her education, past employment and earnings history, her current activities and other relevant experience and earnings; (2) an analysis of employment options and opportunities available to Ms. Fischman based on an assessment of her local labor market; and (3) information provided regarding Ms. Fischman's job search efforts since January 2017.

The vocational opinions expressed in this report are based on my experience as a Vocational Evaluator.[2] In forming my opinions and preparing my report, I have considered numerous documents, publications and other materials in addition to applying my experience and expertise. I reserve the right to amend or supplement this report based upon any new facts, expert reports or documents which may come to my attention.

### C.       Compensation

I am being compensated for my time at $450 per hour. My compensation is in no way tied to or dependent upon the outcome of this litigation or the content of my opinions or testimony.

### D.       Appendices

The following appendices are attached to my report and refer to my curriculum vitae, testimony and documents and resources I relied upon to form my opinion:

**Appendix A** is a copy of my current curriculum vitae which includes a list of all other cases in which I have testified as an expert at trial or by deposition during the previous four years.

**Appendix B** is a list of standard references in the vocational field and other resources that I rely on throughout the report.

**Appendix C** is a list of materials related to Ms. Fischman's education, past employment and earnings history, her current activities and other relevant experience and earnings and job search efforts.

---

[2] Vocational Experts are professionals educated and trained in and skilled in job placement knowledgeable about labor market conditions and employment opportunities based on a party's age, education, background, work experience and experience in or outside the workplace and medical condition. *Kerner v. Flemming*, 283 F.2d 916 (2nd Cir. 1960).

Appendix D is a summary of the labor market research analyzing appropriate employment options and opportunities available to Ms. Fischman, sourced from published job postings for Lawyer and Chief Executive positions in her local labor markets from 2017 to present.

Appendix E is a summary of Ms. Fischman's job search activities that she documented from January 2017 to September 30, 2018.

Appendix F Jennifer Fischman's job applications compared to published job opportunities.

Appendix G is a table reflecting national demographic unemployment duration as well as regional rates of unemployment during Ms. Fischman's period of unemployment obtained from the Bureau of Labor Statistics, U.S. Department of Labor.

## II.    SUMMARY OF OPINIONS

It is my opinion, to a reasonable degree of professional certainty, that Ms. Fischman failed to perform a reasonably diligent job search after she was terminated from Mitsubishi Chemical Holdings America on January 30, 2017. I base my opinion on my review of Ms. Fischman's education, experience, skills, knowledge and employment history; on local labor market research in the New York metropolitan labor markets; and on Ms. Fischman's documentation of her job search activity.

I base my opinion on my extensive experience in recruiting and evaluating candidate qualifications while considering the available data regarding potential job opportunities available in Ms. Fischman's field from 2017 to present. It is, therefore, my further opinion that, had Ms. Fischman performed a reasonably diligent search for comparable employment, I would have expected her to be hired into a Corporate Lawyer or Chief Executive position with significantly higher earnings than she would reasonably expect to make as a Real Estate Sales Agent.

## III.    EVALUATION METHODOLOGY

I used standardized, systematic vocational evaluation methodology[3] to produce valid and reliable data and findings. The steps followed included:

1.  Review records and documentation in connection with this litigation to form my opinion, all of which are listed in **Appendix C**.

2.  Identify Ms. Fischman's proficiencies and skills based on these records and documents and her LinkedIn profile.[4]

3.  Perform a transferable skills analysis of Ms. Fischman.[5]

---

[3] Vocational and Rehabilitation Assessment Model, Robinson & Pomeranz (2011), Robinson & Paquette, (2013).

[4] https://www.linkedin.com/in/jennifer-fischman-8a462341/ (last consulted September 30, 2020).

[5] Barros-Bailey and Heitzman, "Labor Market Survey," in Robinson, 2014, Foundations for Forensic Vocational Rehabilitation, Springer Publishing Company, New York; Havranek, Field, & Grimes, "Chapter 5: The

4. Perform an employability analysis[6] to include labor market research.

5. Analyze Ms. Fischman's job search efforts.

This methodology has been identified as "one of the most widely referenced vocational rehabilitation models of earning capacity assessment"[7] and has been "published in peer-reviewed literature and is generally accepted by the professional community."[8] It "appears to be the most comprehensive of all methods."[9] It has been used and accepted in the general vocational industry for over 30 years and is considered reliable as such. Standard vocational reference materials and other resources used are detailed in **Appendix B** of this report.

## IV.    PLAINTIFF'S BACKGROUND AND EMPLOYMENT HISTORY

### A.    Family, Educational and Medical Background

Before performing an objective assessment of a person's job search diligence, it is necessary to determine the person's employability (i.e., what he or she brings to an employer in the labor market). Vocational Evaluation methodology includes assessing the individual's education, skills and knowledge acquired in his or her work history, any physical or medical issues that might impact how he or she works or family issues that might play a role in this assessment.[10]

Jennifer Fischman, born November 7, 1967, was age 49 at the time of her separation from Mitsubishi Chemical Holdings America. She is currently age 52 and resides in Scarsdale, New York.

Ms. Fischman obtained her bachelor's degree in History of Art from the University of Michigan, Ann Arbor, MI in 1989. She studied in Florence, Italy in the Fall of 1987 and London, England in the Spring of 1988. She earned her Juris Doctorate from Boston University School of Law, Boston, MA, with a concentration in Environmental Law, in May 1996. She was a semi-finalist in the ABA Negotiation Competition and Moot Court Competition, and a Judge/Advisor for Esdaile Moot Court Competition. Ms. Fischman was admitted to the California Bar and the Central District of California in 1996. She earned her Master of Business Administration in Boston University's School of Management ACC Mini MBA Program in December 2009. She is a registered In-House Counsel pursuant to Part 522 of the Rules of Court of Appeals, New York, 2011 through present.

---

Transferability of Skills," in 2005, Vocational Assessment: Evaluating Employment Potential, 4th Edition, Elliott & Fitzpatrick: Athens, Georgia.

[6] Van de Bittner, EE, "Consultation in Employment Law," in Robinson, 2014, Foundations for Forensic Vocational Rehabilitation, Springer Publishing Company, New York.

[7] Robinson, R. (2014). *Foundations of Forensic Vocational Rehabilitation*. New York: Springer Publishing Company. Chapter 3, p. 39.

[8] Weed, R.O., & Field, T.F. (2012). *Rehabilitation Consultant's Handbook,* (4th Ed). Athens, GA: Elliot & Fitzpatrick. Chapter 11, p. 3.

[9] *Ibid.* Chapter 11, p. 207.

[10] Power, P., *A guide to Vocational Assessment*, 5th ed. Autin: Pro-Ed.

In 2005, Ms. Fischman was a contributor and speaker to Raytheon Program Management Best Practices Committee "Careful Communications." She held United States Security Clearance, US Department of Defense, Secret Level and Special Access Program from 2006 through 2008.

Ms. Fischman has completed four clerkships/internships:

1. U.S. District Court, Central District of California, Los Angeles, CA, August 1996 through February 1997 – Extern/Clerk to the Honorable Kim McLane Wardlaw

2. Massachusetts Office of the Attorney General, Boston, MA, Fall Semester 1995 – Legal Intern, Trial Division

3. US Congress, House of Representatives, Washington, DC, Summer 1995 – Legislative Intern to the Honorable Nita Lowery

4. US District Court, Southern District of New York, New York, NW, Summer 1994 – Legal Intern to the Honorable Miriam G. Cedarbaum

### B.  Volunteer, Unpaid Work Experience, and Other Activity

As part of a job search, it is recommended that one utilize volunteer opportunities, as well as involvement in professional or social organizations, to continue to use skills and further build a network of contacts to help identify job openings and make introductions.[11] Thus, it is relevant to consider Ms. Fischman's self-reported volunteer and other activities since January 2017 as part of my analysis.

Ms. Fischman's resume indicates volunteer experience in September 2006, when she was a Featured Speaker "Running the Career Marathon" for the North Texas Raytheon Women's Network and a Qualified Specialist through Raytheon's Six Sigma Program. From 2011 to the present, she has chaired multiple committees for the Junior League of Central Westchester, serving women and children in the local community.

Volunteering and assuming leadership positions is often recommended as an activity that may yield promising employment opportunities or would introduce her to other professionals who may assist in her networking or provide employment leads. Ms. Fischman might have added other volunteer opportunities to build her network within non-profit organizations related to the legal profession which could help her identify job opportunities.

### C.  Employment History

A careful review of Ms. Fischman's employment history is part of the evaluator's process to establish a profile of what potential abilities, skills and knowledge she can bring to another employer. Transferable skills are those learned in one job that can be used in other, different jobs. Understanding Ms. Fischman's skills helps identify and articulate strengths Ms. Fischman could emphasize in her job search and determines jobs for which she should have reasonably applied.[12]

---

[11] Vilori, D. (*2011*) Focused Job Seeking: A measured approach to looking for work. Bureau of Labor Statistics, Office of Occupational Statistics and Employment Projections.

[12] The generally accepted practice of conducting TSA's (the "classic" TSA), utilized in vocational rehabilitation for over 30 years and based on *CFR 404.1568(d)(4)* initially set forth in 1980, and current industry standard is, to

As noted above, for purposes of this report, I assumed that the information I reviewed about Ms. Fischman's past employment and experience was accurate. Unless otherwise stated, this employment history is sourced from Ms. Fischman's three-page resume,[13] her LinkedIn profile[14] or other documents found in Appendix C. In addition to considering Ms. Fischman's past achievements and skills applied throughout her career, I also considered relevant vocational factors of age, education and her local labor market.

In the 24 years since earning her juris doctorate degree, Ms. Fischman has had five employers. From February 1997 through December 1997, Ms. Fischman worked as a <u>Litigation Associate</u> in the Los Angeles, CA office of **Fried, Frank, Harris, Shriver & Jacobson**. Per her resume, she participated in all aspects of a commercial litigation practice. She represented six major oil companies in a five-month jury trial to invalidate a patent for the composition of gasoline in which she prepared witnesses, drafted and argued motions *in limine* and provided support to lead trial counsel.

She then was hired by **Paul, Hastings, Janofsky & Walker, LLP** in Los Angeles as <u>Litigation Associate</u> and <u>Corporate Associate</u>. Her resume indicates that she followed a partner from Fried Frank to Paul Hastings. She was employed there from December 1997 through November 1999, although, due to conflict of interest allegations between Fried Frank and Paul Hastings, she worked as a <u>litigator</u> at Tuttle & Taylor, LLP from February 1998 to December 1998 until the disqualification case was resolved by the California Court of Appeals. As a litigation associate she participated in all aspects of complex commercial litigation practice, including drafting of complaints, preparing witnesses for and taking depositions, responding to and drafting interrogatories and motion practice before the Los Angeles Superior Court and Federal District Court, Central District of California. As corporate associate, she drafted and negotiated agreements pertaining to patent and trademark licenses, franchise agreements, confidentiality and nondisclosure and distribution agreements.

In January 2000, she joined **Jeffer, Mangles, Butler & Marmaro** in Los Angeles as <u>Intellectual Property and Corporate Associate</u>. She drafted and negotiated agreements and licenses pertaining to software, web site development, entertainment, intellectual property transfer and non-disclosure agreements. She prepared settlement agreements pertaining to trademark infringements and prosecuted trademark and copyright applications before the U.S. Patent and Trademark and Copyright Offices. She conducted corporate and intellectual property due diligence for potential mergers and acquisitions. She participated in and drafted documents pertaining to mergers,

---

examine work fields (WF), specific vocational preparation (SVP), and materials, products, subject matter, and services (MPSMS). Weed & Field, 2012; Truthan, J.A. & Karman, S.E., 2003, Transferable Skills Analysis and Vocational Information During a Time of Transition, Jrnl of Forensic Vocational Analysis, June 2003, 6 (1) 17-25; and Field, T., 2002, Transitional Skills Analysis: A Common-Sense Approach, Jrnl of Forensic Voc Anal, 5(1),29-40; and Power, P., A guide to Vocational Assessment, 5th ed. Autin: Pro-Ed.

[13] DEF-000007-DEF-000009.

[14] https://www.linkedin.com/in/jennifer-fischman-8a462341/(last consulted September 6, 2020.

acquisitions, private offerings and stock purchases, including employment, retention and consulting agreements. She left the firm in March 2001.

From May 2001 through February 2008, Ms. Fischman worked as <u>Legal Counsel, General Law – Space and Airborne Systems</u> at **Raytheon Company,** El Segundo, CA. She was a member of their leadership team to multiple business units of $1.5 billion in revenue (Air Combat Avionics, Electronic Warfare Systems and GPS and Navigations Systems). She advised senior executive management on complex issues involving legal and financial risks to the Company. She demonstrated her skills in drafting, negotiating and reviewing all types of complex commercial contracts, such as: joint venture, intellectual property agreements, nondisclosure agreements, employment agreements and purchase and sale agreements under the Uniform Commercial Code. She drafted documents in support of multiple mergers, acquisitions and divestitures.

According to her documents, while employed at Raytheon, she provided transaction/due diligence support and legal advice and support to surviving/new entities in the transition of each business merger/acquisition. She managed, drafted and negotiated various business agreements, transaction documents and reports including the review of various SEC filings. She managed outside counsel for litigation, claims, disputes and transactions. She advised businesses on international contracting issues, such as International Trade in Arms Regulations, Commerce Department Regulations, the Foreign Corrupt Practices Act and the Anti-Kickback Act. Ms. Fischman provided legal support to multiple functional areas including Supply Chain Management, Environmental, Health and Safety, Facilities, Operations and Security. Overall, she demonstrated substantial experience in federal government and procurement contracts under Federal Acquisition Regulations.

Per her resume, Ms. Fischman represented Raytheon in negotiations and settlement discussions with opposing counsel, provided human resources support to business units and provided training of business personnel in areas such as ethics, human resource issues, offering of business courtesies, appropriate use of Independent Research and Development funds under federal regulations, dealing with distressed suppliers and avoiding bankruptcy, SEC issues (including Regulations FD and insider trading), strategic alliances and other agreements. Ms. Fischman also supervised, mentored and managed paralegal and support staff.

Ms. Fischman's resume states that, from October 2004 through February 2008, she was <u>Legal Counsel and Assistant Secretary</u> to the Board of Directors for **Photon Research Associates, Inc.**, a subsidiary of the Raytheon Company, San Diego, CA.

In March 2008, Ms. Fischman was hired by **Mitsubishi Chemical Holdings America, Inc.**, in New York, NY. During her 10-year tenure she held three positions:

1. Corporate Counsel (March 2008 through February 2013), $201,699 last annualized salary.

2. Assistant General Counsel (February 2013 through March 30, 2015), $222,162 last annualized salary.

3. Acting General Counsel, Chief Compliance Office (April 1, 2015 through December 4, 2015), $300,000 last annualized salary.

4. Assistant General Counsel (December 2015 through January 30, 2017), $230,826 last annualized salary.

Ms. Fischman's resume details her responsibilities at Mitsubishi. She was lead counsel to multiple subsidiaries in the Mitsubishi Chemical Holdings Company America. From 2008 through August 2014, she managed the conclusion of multiple litigation settlements on behalf of Alpha Therapeutics Corporation and was counsel and support for MP Healthcare Venture Management on multiple investment transactions, both domestic and international. She provided advice and counsel in all aspects of law including labor and employment, antitrust, predatory pricing, anti-bribery, corporate governance, commercial contracts, real estate, leasing, environmental and bankruptcy to all subsidiaries.

She also managed outside counsel in complex litigation, including the negotiation and settlement of class actions, claims, disputes, discovery (including e-discovery), mergers/acquisitions and other complex business transactions. She managed complex environmental issues, including compliance, litigation and remediation actions with the U.S. Environmental Protection Agency and state regulatory agencies.

As Corporate Counsel, she drafted and negotiated agreements pertaining to patent and trademark licenses, franchise agreements, confidentiality and nondisclosure and distribution agreements. She supervised, managed and conducted due diligence reviews for mergers and acquisitions. She developed, drafted, and revised company compliance policies, codes of conduct, international trade, antitrust, anti-bribery and use of company assets and document retention, as well as implemented the anti-bribery compliance company manual and program.

She provided board members with training on fiduciary duties and acted as corporate secretary for the companies' board of directors' meetings, drafting and managing resolutions and advising on corporate governance matters. She provided live training on company policies, business ethics and corporate governance, EPA and state regulatory agencies, supervised and managed Japanese trainees. In this role, she demonstrated substantial expertise in drafting, negotiating and reviewing commercial contracts including distribution, supply, sale and marketing, bailment, consignment, consulting, employment nondisclosure, intellectual property licensing, real estate, engineering and construction, mergers, acquisitions, investments (VC-like financing), partnerships and joint ventures both domestic and international. Ms. Fischman's employment was terminated by Mitsubishi effective January 30, 2017.

Note that, in her earliest work history, Ms. Fischman reports two jobs prior to embarking on her legal career. She was employed as a sales and marketing assistant for Putnam Publishing Group from 1991 through 1993 and as assistant retail buyer for Bergdorf Goodman from 1989 through 1991.

Once unemployed on January 30, 2017, Ms. Fischman's job search documentation shows that she sought employment in her profession as a lawyer, primarily as in-house counsel. Her job search documentation ended in May 2018. A September 13, 2018 email from Ms. Fishman referred

to a "new career" and selling a home.[15] Her current LinkedIn profile states that she began her career at the real estate firm, Houlihan Lawrence in October 2017, where she is "partnered with [her] mother, Shelia Stone, an icon in Scarsdale real estate," in our "family business." From these documents, we can assume that Ms. Fischman voluntarily left her extensive, 20-year law career and began a new occupation as a <u>Real Estate Sales Agent</u> as early as October 2017.

## V.     ANALYSIS OF EMPLOYABILITY

Employability is based on multiple factors, including efforts a person can make to be employed, the likelihood of finding such employment in the person's labor market and the likelihood an employer would hire that person into a relevant job. Employability is based on the individual's presentation, qualifications, specific demand for that job and industry, hiring practices and the applicant's age. This section evaluates Ms. Fischman's skills and the positions for which those skills would have qualified her in her job search.

### A.     Vocational Assets, Proficiencies and Transferable Skills

Transferable skills are skills learned in one job that can be utilized in another job.[16] Assessing skills helps identify and articulate the job seeker's strengths to emphasize in the job search. Based on her employment history, Ms. Fischman presents the following vocational assets, proficiencies and transferable skills as a competitive employment candidate:

1. Has 20 years' in-depth experience in corporate, business and commercial law starting with two marquee international law firms and two leading international technology manufacturing and research corporations with subsidiaries in multiple industries including healthcare.

2. Extensive domestic and international experience as counsel on investment transactions.

3. Two decades' experience in all aspects of complex litigation practice in domestic and international corporate legal matters.

4. Two decades' experience managing, supervising and conducting due diligence review.

5. Substantial expertise in drafting, negotiating and reviewing complex commercial contracts and other high-level complex legal documents, including:

   • Mergers and acquisitions

   • Distribution

   • Supply

   • Sales and marketing

   • Settlement

   • Bailment

---

[15] FISCHMAN 000306.

[16] (Power, P. 2013). A Guide to Vocational Assessment, 5th Ed. Austin: Pro-ed. Chapter 11, p. 287.

- Consignment

- Employment

- Nondisclosure

- Intellectual property licenses

- Investments

- Partnerships and joint ventures, domestic and international

- Real estate

- Engineering and Construction

- Employment

- Purchase and sales agreements under the Uniform Commercial Code

6. Demonstrated knowledge and skills evaluating new business partnerships, acquisitions and mergers, drawing up appropriate contracts.

7. Knowledge and skills to ensure companies' transactions comply with state, federal and international corporate laws and regulations, protecting companies against possible legal risks and violations.

8. Conceptual clarity and comprehensive technical knowledge in *all* aspects of corporate law, including:

- Commercial Contracts

- Labor and employment

- Antitrust

- Predatory pricing

- Anti-bribery

- Corporate governance

- Real estate

- Leasing

- Environmental

- Bankruptcy

- Intellectual Property and Patent Law

9. Leadership and training abilities with regard to fiduciary duties, business ethics and corporate governance to various constituencies including Boards of Directors.

10. Trademark and copyright prosecutorial experience before the U.S. Patient and Trademark Office and Copyright Office.

At the time she became unemployed on January 30, 2017, Ms. Fischman had demonstrated markedly significant transferrable skills that positioned her as a competitive candidate for positions as a Chief Legal Officer/Counsel, Lead Corporate or General Corporate Counsel. Ms. Fischman was age 49 at that time, considered a competitive mid-vocational age for a corporate professional. In my professional opinion and experience, considering her two decades of in-depth transferrable skills and knowledge in complex corporate transactions and her age, had she engaged in a reasonable and diligent job search, she was a competitive job applicant for numerous comparable level positions to those she held at Mitsubishi Chemical Holdings.

### B.     Vocational Concerns

After only 15 months in her job search, a search with minimal activity and which fails to meet the standards of reasonable or diligent job search efforts, Ms. Fischman chose to stop seeking employment in her legal profession where she had acquired in-depth knowledge and expertise practicing corporate law in different industries, domestic and international. At that time, she chose to start a "new career" as a real estate sales agent. When she stopped her search for employment as a lawyer, she was still considered a competitive job applicant; however, she forfeited many potential employment opportunities that fit her experience and earning capacity when she chose to pursue this new career. During her start-up years in real estate sales, she would likely earn significantly less income than as a mid-career senior level corporate lawyer with broad experience in multi-billion dollar international corporations.

Building a business as a new, self-employed real estate sales agent requires an intensive, highly disciplined and consistent effort every day. It is a highly competitive, crowded occupation subject to fluctuating economic conditions. Earnings are paid strictly on earned commissions; the sales agent is responsible for all of her expenses. With experience, real estate sales agents in her labor market have the potential to reach $100,000 in annual earnings which is the median earnings level for these agents. This is far below her earning capacity employed as an experienced and highly qualified corporate lawyer. Employment in real estate sales does not capitalize on Ms. Fischman's extensive, high-level legal skills and knowledge acquired in her decades of employment in corporate law with top-level law firms and well-known, major international businesses.

## VI.     ANALYSIS OF MS. FISCHMAN'S JOB SEARCH EFFORTS

As previously noted, our labor market research found ample jobs for which Ms. Fischman was qualified and that were available to her in this time frame (January 2017 to April 4, 2020). Hire-ability, or the ability to be reemployed, depends on many factors such as skills and experience, presentation and the individual's efforts to plan and follow a reasonably diligent job search plan. I have evaluated Ms. Fischman's job search efforts to determine, at least in part, why she failed to find reemployment commensurate with her experience and abilities.

### A.  Expectations and Accepted Standards of a Diligent Job Search

When unemployed, the minimum expectation for a diligent job search is two to six hours of active job search activities per day,[17] averaging 25 to 35 hours per week. Research repeatedly shows this time must be spent in aggressive and intensely focused job search activities on a consistent basis, pacing the activities rather than engaging in occasional spurts of activity, if an unemployed person wants to land a job.[18]

The elements of a reasonable job search have been a regular subject of numerous articles published in print and online publications, including those identified in **Appendix B**, such as *The Wall Street Journal*, *The New York Times*, *Forbes.com*, *Forbes* and *Money* and *U.S. News & World Report* as well as many other easily accessible job posting sites. According to these sources, an active versus passive job seeker typically crafts a strong resume, prepares introductory and networking statements, conducts company research to identify potential employers, to prepare customized correspondence, cover letters and resumes and submits these in direct job applications.

Face-to-face formal and informal meetings are held to expand the person's professional and personal network as well as active participation in online networking groups.[19] Engaging support services such as a professional job search coach or career advisor can improve the job search process and shortens the time to be hired. Merely looking at want ads (especially focusing on one job posting source) or primarily responding to inquiries that come directly to her does not constitute actively searching for a job. This guidance is comparable to my experience as a career advisor and executive recruiter.

The diligent job searcher should include multiple relevant activities and maintain well organized document(s) that track and detail these activities, such as:

1. An established daily schedule that tracks:

    a.  Employers contacted

    b.  Applications submitted

    c.  Where resumes were sent

    d.  Direct inquiries that s/he made

    e.  Potential employers researched

    f.  Interview responses and feedback

    g.  Follow-up activities

    h.  Networking activities to include correspondence, phone calls, in-person or video meetings, attendance at professional networking meetings and industry conferences or events

    i.  Notes about contacts or communiques that s/he

---

[17] Wanberg, Zhu, & van Hooft (2010).

[18] Brown, S.D. & Lent, R.W. (2013).

[19] Bolles (2010).

2. Documenting employer and professional contacts typically includes:[20]

    a. Day, month and year of each activity; total numbers and hours spent daily, weekly and monthly.

    b. Interviews and applications that were made, delineating between in-person and online applications and keeping a copy of the job posting. Completing online applications is easily accomplished via public and private job posting sites as well as employer websites.

    c. An organized system of retaining copies of all submitted applications (how and when), copies of letters and email communications and copies of customized resumes submitted.

    d. Log of phone calls made or received (naming the individual, company, date called, result and planned follow-up).

    e. Informational interview notes, useful in actively expanding one's network to "uncover" job openings that may not be publicly posted, obtain introductions that may lead to potential jobs and discovery of additional company or industry information.

3. Names and use of employment agencies (recruiters) to assist in locating job openings (private agencies/recruiters, career centers, state employment services, etc.).

4. Names and locations of professional meetings, conferences, workshops, job fairs or consortia attended.

**B.  Ms. Fischman's Job Search Efforts**

I understand that Ms. Fischman produced all documents regarding her job search activity and efforts since January 30, 2017 for this litigation. I was provided with PDF documents as evidence of the plaintiff's job search beginning January 30, 2017.[21] The last dated activity was on September 13, 2018[22] representing three years, eight and one-half months of documented job search activities. Her last two job applications were on May 25, 2018.[23]

Based on my review of these materials and my professional experience, I determined that Ms. Fischman failed to conduct diligent or reasonable job search efforts from January 30, 2017 through September 13, 2020. Among other things, Ms. Fischman did not engage in a sufficient volume and diversity of action in her job search efforts. A diligent and effective job search relies on a reasonably high volume of different job search activities. Ms. Fischman's job search activity was largely limited to online job applications she made using just one internet job posting source, LinkedIn. Throughout her unemployment, she made an extremely low number of applications on this one site. Labor market research, however, identified large numbers of job postings published

---

[20] Brown, S.D. & Lent, R.W. (2013).

[21] FISCHMAN 000001 to 000778

[22] FISCHMAN 000306

[23] FISCHMAN 000078 AND 000080

on multiple internet sites which she did not use. Furthermore, starting in the first quarter of 2018 and continuing through 2019, except for a handful of applications, her documented job applications dropped to zero. This may be due to her starting a new career in real estate sales as early as October 2017.

Ms. Fischman's volume of overall activities was also insufficient to be considered reasonably diligent or to succeed in obtaining reemployment. Referring to the documents Ms. Fischman provided, it appears that she failed to use many other available and effective job resources, such as proactively engaging recruiters, researching trade and other professional associations or active participation in bar associations.[24]

In addition, Ms. Fischman failed to expand and deepen her networking activity which is known to be a key strategy to potentially uncover more job opportunities. Consistent networking is recognized as an effective way to obtain introductions or referrals which increases the likelihood to obtain an interview and a job. Interviews are the first step to be considered for employment. It is also an opportunity to obtain new information about an industry or job market and sharpens one's presentation for future interviews. Job finding success is also closely associated with the quantity of interviews achieved during the job search.[25]

Each of these factors support my conclusion that Ms. Fischman's efforts were neither sufficiently reasonable nor diligent to find alternative employment comparable to her last position at Mitsubishi.

### C. Assessing Duration of Unemployment

Duration of unemployment is influenced by many factors. The United States Bureau of Labor Statistics publishes statistics about the duration of unemployment for several categories that can be used to opine on a reasonable time to find a job. In 2017, the median nationwide duration of unemployment for women job seekers aged 45 to 54 was 12.3 weeks and 9.3 for Professional and Related Occupations. Job seekers as a whole had a median duration of 10.0 weeks. No group's median duration of unemployment exceeded 12.3 weeks (about three months) from 2017 through 2019.

Referring to the above statistics for 2017, a reasonable estimate for Ms. Fischman to be hired into a position comparable to her most recent employment in corporate law, either in-house or with a firm, was less than 6 to 12 months starting from her first date of unemployment. I consider this to be a conservative estimate that considers her demographic, the strength of her regional labor market, her professional accomplishments and expertise, the number of relevant jobs with comparable responsibilities and compensation, as well as my professional experience and expertise. Note that subsequent years (2018 through 2019) showed shorter durations of unemployment and stronger labor markets, conditions that were even more favorable for job

---

[24] For example, Ms. Fischman could have sought contractor assignments from numerous legal recruiters and legal staffing agencies, such as Axiom, Assigned Counsel and many others. These short and longer term assignments would earn income and have the potential to become permanent positions.

[25] Saks and Ashforth (2000, Oxford Handbook of Job Loss and Jos Search, pg. 268.

seekers and would indicate a shorter duration to be hired. Unemployment data for 2017 through 2020 is in **Appendix G.**

### D.    Minimal Applications Over Three Years

As noted previously, when unemployed, the minimum expectation for a diligent job search is two to six hours of active job search activities per day,[26] averaging 25 to 35 hours per week. A reasonably diligent and motivated job seeker will approach obtaining new employment as their full-time job and will pursue multiple employment opportunities in parallel throughout their job search. A diligent job search effort to get hired is time consuming and time intensive.[27] Even if a well-qualified candidate is interviewed and invited to return for additional interviews, s/he may not be selected for it. Candidates should expect to pursue a variety of essential, regularly scheduled job search activities until they report to work with a signed employment agreement.

Ms. Fischman's documents, however, show that, throughout her three-year and eight-month period of unemployment in the law, she submitted only 100 actual job applications primarily using one job posting site and some applications directly on employer websites. She had nine meetings that appear to be networking connections with individuals who were in a position to hire or recruit. Her job search activities are illustrated in a chart found in **Appendix E**.

Thus, Ms. Fischman engaged in 1.18 applications per week from January 2017 through September 2018. She documents an additional 19 job search activities (phone calls, networking, job development and recruiter contact) averaging only 3.6 activities per month. This is less activity than a diligent job seeker would perform in one day. Her low quantity of efforts falls far short of the 25 to 35 hours per week of diligent job search activity. A sustained, full time job search, over a multi-year period, may be difficult to maintain during an extended period of unemployment. It is understood that job seekers often reduce their search intensity over time, but then they increase their search efforts again if they remain unemployed.[28] Even considering this, at no point did Ms. Fischman engage in job search activities with sufficient time and effort to obtain new employment.



---

[26] Wanberg, Zhu, & van Hooft (2010).

[27] Wanberg, Zhu, Kanfer & Zhand, Oxford Handbook, pg. 269.

[28] Wanberg, Zhu, Kanfer & Zhand, Oxford Handbook, pg. 269.

The chart above illustrates Ms. Fischman's very low and inconsistent job search efforts by quarter from January 2017 through April 2018. As previously stated, if an unemployed person wants to land a job, s/he must engage in diverse job search activities on a consistent basis, pacing the activities rather than engaging in occasional spurts of activity.[29] The majority of Ms. Fischman's job search was comprised of online job applications on LinkedIn. This is a more passive job search activity. The LinkedIn application process does not automatically upload a resume after the application is made. A stronger application that is more likely to engage the employer would include a customized cover letter and resume. Without these extra actions, employers or recruiters using LinkedIn see only the applicant's abbreviated summary profile and would need to take the extra step to click through the applicant's profile to learn more. It is unclear if Ms. Fischman searched for jobs using key words or if her primary method was to set alerts for potential matches to be emailed to her, a more passive action.

Overall, Ms. Fischman's use of online job applications was inadequate. First, she primarily confined her job search activity to focusing on one job posting site, LinkedIn, and a few applications were made directly on the employer website. Yet, throughout her unemployment, hundreds of lawyer and chief legal officer job postings that fit her qualifications and experience were consistently listed on different, commonly used job posting sites (i.e. Execunet, Andrew M. Mellon Foundation, RPN Executive Search and JDHUNTR). Although she appears to have relied on LinkedIn as her primary resource for job applications and networking, she has only 257 connections. In my professional experience, this is an unusually small number of relationships considering her many years in her profession, her industry and the nature of her work.

Growing an online network is fundamental to increasing one's chances of being found when someone does a LinkedIn search for what that person offers. Initiating activity to expand quality connections is a key strategy to find employment. If she is not visible in more connections in her network, Ms. Fischman wouldn't show up. When one starts using LinkedIn to reach out to potential [employment] prospects, one is limited to finding people who are in her network and who may lead to opportunities. People can only find the job seeker if she is in her contacts' 1st, 2nd or 3rd-degree networks. Her 1st-degree network is anyone she is directly connected to, her 2nd-degree network includes the contacts of her 1st-degree contacts and her 3rd-degree network includes the contacts of her 2nd-degree network. The number of connections one has on LinkedIn is a good lead generation strategy, but the quality of her connections counts, too.

Considering her experience and extensive 20-year career, Ms. Fischman would have access to a large number of quality connections to build such relationships. Her work required her to build trusted, vital relationships with many colleagues, coworkers, outside counsel, litigation support firms and different businesses with whom she would have worked in her capacity as corporate counsel. If she did not plan and initiate this effort and visibility, her current or future contacts would not know to help generate employment leads or make introductions which decreased her likelihood to find unpublished openings or be hired.

---

[29] Brown, S.D. & Lent, R.W. (2013).

It appears that LinkedIn was Ms. Fischman's primary focus for job applications. I would expect to see a far larger number of professional connections on her profile with more quantity and quality of communications. I believe she her the ability to build a strong list of contacts that she could access in and outside of LinkedIn. I would also expect that she would have executed greater efforts on actively leveraging this well-recognized professional networking site. Building and using LinkedIn and other professional sites would likely lead to more referrals and introductions. These in turn could lead to potential employment opportunities that would not be published on public sites. This activity is an ongoing process, just like any relationship - it requires a regular investment of time and upkeep.[30]

Online job applications, however, require far less time and effort than initiating more intensive effort on activities that are tied to a job seeker's success. A more comprehensive strategy requires well-planned, focused activities like researching employers or industries or new connections to identify potential openings or leads, maintaining relationships with recruiters, and creating customized cover letters and resumes. In order to be hired, the job seeker must build and use a professional network with consistent follow-up and engagement, seeking ways she can gain visibility on LinkedIn and in her professional associations, as well as other activities that are essential to find a job. If Ms. Fischman were exercising a full-time job, diligent search, the quantity of activities and job applications would be much higher and far more consistent over time.

I note that, soon after her departure from Mitsubishi Chemical Holdings, Ms. Fischman appeared to rely on Bliss Lawyer for networking, resume development and finding job opportunities. She later reached out to some personal contacts and one (Joshua Berman) made the effort to recommend her to others and help her find job opportunities. Other contacts appear less fruitful, although they indicate some networking attempts were made. At one point she did speak with someone from the New York Department of Labor and sent a professional follow-up email, though it is unclear if or how they helped her in her job search. Again, a diligent effort would yield a higher number of more customized communications, more frequent meetings, both individual and in professional groups with planned follow-up actions.

## VII. LABOR MARKET RESEARCH

This section summarizes our labor market research and outlines the available employment opportunities from February 1, 2017 through April 6, 2020 in areas that suit Ms. Fischman's skill set.

### A. Labor Market Research Process

**1. Job Categories.** In order to determine the particular categories of jobs for which Ms. Fischman may qualify, I compared Ms. Fischman's skills described above and her employment history to job titles and positions reflected in the U.S. Department of Labor's Occupational Outlook Handbook as well as those published by the Economic Research Institute ("ERI"). These resources collect data from a multitude of salary surveys, including those published by large survey firms and public sources. ERI's data are primarily derived from in-house (the

---

[30] Tombs, Rachel, How many connections do you need to have on LinkedIn to be successful, September 26, 2016.

employer) salary surveys. Analysis is conducted on wages by geographic area, size of company, years of experience and industry. When using data from third party sources, ERI uses multiple independent raters to go through job descriptions and match jobs in surveys to ERI's internal job descriptions before adding into their database, including salary information that they obtain from multiple sources.

Positions for which Ms. Fischman is best qualified and likely to be employed are Corporate Attorney positions. Attorney positions include General Counsel, Corporate Counsel, Associate General Counsel, Senior Associate General Counsel, Corporate Counsel Commercial, etc. Executive positions included Vice President Business Legal Affairs, Vice President Chief Privacy Counsel, Vice President Chief Legal Officer PGIM, etc. Job descriptions for these types of jobs follow. [31]

## General Counsel

- Provides legal counsel on general employment law, mergers and acquisitions and compliance.
- Evaluates legal documents and contracts to limit risk and maximize benefits.
- Represents the company in legal matters.
- Develops and reviews product warranties and license agreements.

## Corporate Attorney

- Advises, consults, litigates and performs trial work and carries out the legal processes necessary to affect the rights, privileges and obligations of the organization..
- Studies Constitution, statutes, decisions and ordinances of quasi-judicial bodies.
- Gathers evidence and information for management decision making.
- Prepares and reviews various legal instruments and documents, such as contracts, leases, licenses, purchases, sales, real estate, etc.
- Examines legal data to determine advisability of defending or prosecuting lawsuit.
- Examines material, such as advertisements, publications, etc. for legal implications, advising officials of proposed legislation that might affect the organization.
- Applies for copyrights or registration of the organization's products, processes, devices and trademarks, advising whether to initiate or defend lawsuits.
- Conducts pretrial preparations and defends the organization in lawsuits.
- Advises officials on tax matters, government regulations and/or legal rights.
- Represents the company before quasi-judicial or administrative agencies of the government.

---

[31] All job descriptions from Economic Research Institute, Survey Descriptions, May 19, 2020.

- Requires completion of law school with an LLB degree or JD degree and admission to the bar.

## Chief Legal Executive

- Directs, oversees and controls legal activities and functions to ensure the organization's legal posture is developed and maintained.

- Establishes legal services required by the organization and ensures that the organization is protected from any legal action.

- Provides officers and directors with advice and guidance in identifying the critical problems to which the application of legal principals yields the greatest opportunities for minimizing risks and maximizing profits.

## 2.    Employment Opportunities.

After referencing the Economic Research Institute database for which positions Ms. Fischman would be best qualified, research was performed to identify specific employment opportunities (i.e., published help wanted or job posting ads) that were available and for which Ms. Fischman could have applied following her departure from the Mitsubishi Chemical Holdings Company. Help-wanted advertisements have been used as an indicator of the labor market for more than 50 years.[32,33] In recent years, the vast majority of help-wanted advertisements became available almost solely online. Not all job openings are posted or included in this research. For example, new hires often are connected with job openings through employee referrals, recommendations and introductions through various forms of networking. The universe of job postings identified in this labor market research is, therefore, conservative because it includes only formal, published job opportunities.

Data researched starts on February 1, 2017 and extends through April 6, 2018. The help-wanted job postings were obtained from Gartner Talent Neuron, which is part of the highly regarded firm, Gartner Research. Gartner Talent Neuron has compiled a database of over 4,000,000,000 help-wanted advertisements going back to the year 2005 by collecting content from over 60,000 online global job research sources. These sources include large job boards such as Monster.com, CareerBuilder.com and LinkedIn, as well as corporate recruiting sites, university portals and aggregators such as Indeed.com. Approximately 120,000,000 companies are represented in the Gartner data. Ads in the database contain the original full text of the ad as well as the originating URL (Internet address). Any jobseekers with internet access would have access to the sites where the ads were posted.

To harness Gartner's unique database, we worked with the firm, Forensic Job Stats (FJS). FJS applies specialized labor market and advanced computer techniques to identify the most

---

[32] Graham, Katharine G. Brookings Institution Papers on Economic Activity, 1:1987, Help-Wanted Advertising, Job Vacancies and Unemployment Conclusion, pg. 241.

[33] The Conference Board, Help Wanted Online® (HWOL), July 15, 2020.

relevant employment ads for a particular jobseeker. Forensic experts such as vocational evaluators and economists frequently work with FJS in cases involving employment issues. To extract the most relevant job posts from the Gartner data, lists of key words targeting job titles in Ms. Fischman's industry were compiled (for example, "Chief Compliance Officer," General Counsel," "Corporate Counsel" and "Assistant General Counsel") in the New York metropolitan region. This process was extensive and required multiple quality checks to further refine the results and eliminate ads that met our criteria. This process was used to ensure a high confidence level that the identified job postings fit Ms. Fischman's qualifications and that she would be a competitive job applicant had she applied for these positions.

### 3.    Labor Market Research: Results

Our labor market research reflects nearly 700 Chief Legal Officer roles and Corporate Lawyer positions to which Ms. Fischman was qualified to apply between February 1, 2017 and April 6, 2020.

In 2017, companies posted **76** Lawyer positions and **12** Executive type role in the New York Metropolitan Area.

In 2018, companies posted **114** Lawyer positions and **41** Executive positions in the same metropolitan area.

In 2019, there were **269** Lawyer positions and **20** Executive positions advertised in this area.

In the first two quarters of 2020, there were **85** Lawyer and **8** Executive positions posted in this area.

Ms. Fischman's records and testimony reflect that she viewed and applied for a total of only **100** jobs between January 2017 and September 2018, as summarized in **Appendix D**. During this somewhat brief job search period, Ms. Fischman could have made **201** applications to potential jobs published during this time. Starting with the date of her separation from Mitsubishi through May 2020, she could have applied to approximately 683 published job openings for which she was highly qualified.

The charts in **Appendix F** illustrate the total job postings available to Ms. Fischman as compared to her total number of applications for the first two years of her job search (2017 through 2018). She documented almost no further job search activity in the third and fourth quarters of 2018. Her last two applications were made in May 2018.

The job postings available to Ms. Fischman during her unemployment occurred during a time when national unemployment rates had declined (2017 through 2019). Unemployment rates in her region also declined from a high of 4.5% in 2017 to 3.7% in 2019.[34] This is illustrated in the chart found in **Appendix G**. These unemployment rates indicate a robust labor market for the

---

[34] https://data.bls.gov/lausmap/showMap.

active job seeker.[35] A healthy and dynamic economy will still have some level of unemployment[36] ranging between 3.5% and 4.5%,[37] absent shocks to the economy; however, these are considered to be strong employment numbers.

4. **Assessment of Reemployment**

The labor market research data clearly indicates that there were hundreds of jobs for Lawyers and Executive Legal Officer jobs for which Ms. Fischman was highly qualified. These positions were published on multiple websites and available for her to make an application. Her documents show that she made almost no attempt to use these job posting sites averaging only a few job applications per month, primarily using one job posting site, LinkedIn. The large number of jobs in her industry, both as a Corporate Lawyer and Executive Legal Officer, indicate a solid job demand at a time when unemployment was at its lowest rate in years, a time which would be an advantage for job seekers in her local labor market.

In my professional opinion, had Ms. Fischman conducted a reasonably diligent, consistent job search and expanded her job search activities, she would have been employed in a job comparable to her last position at Mitsubishi Chemical Holdings America following her employment termination. The quantity of job openings for which Ms. Fischman's extensive skills and knowledge made her highly qualified, combined with a job market that favored the unemployed job seeker, support my opinion.

## VIII.  SUMMARY

Ms. Fischman has extensive experience and employment history as a lawyer with in-depth knowledge and skills as corporate counsel and corporate attorney. A reasonably diligent, full-time job search requires exercising a consistent job search plan with proactive and diverse activities that includes a high volume of committed networking and follow-up, especially for professionals at her level. Ms. Fischman's documentation and testimony fail to demonstrate she made such efforts.

In my professional opinion, for the reasons described throughout this report, Jennifer Fischman failed to meet the minimal standards of time, effort, record keeping or performing a variety of activities and decision making required for a diligent and effective job search. Data shows that in her first two years of unemployment (January 2017 through December 2018) when she was at her strongest competitive position as an employment candidate, she could have applied to over 243 advertised positions for which she was highly qualified. Ms. Fischman, however, made just 100 applications, forfeiting consideration for up to 143 such opportunities during her first two years after she left Mitsubishi. These first two years are considered to be the most significant years for her job search and as a competitive applicant. During this time, she chose to leave the law where she was able to earn compensation comparable to what she last earned when her

---

[35] U.S. Department of Labor Statistics, Local Area Unemployment Statistics, Chicago-Naperville-Elgin, IL-IN-WI Metropolitan Statistical Area, accessed July 10, 2020.

[36] U.S. Federal Reserve, What is the lowest level of unemployment that the U.S. economy can sustain? June 10, 2020, https://www.federalreserve.gov/faqs/economy_14424.htm

[37] Unemployment would be due to job changers; new workers enter and other workers leaving the labor force.

employment was terminated. Instead, she elected to pursue a sales career which would be unlikely to match her corporate compensation and benefits.

In her three years and eight months following her termination, Ms. Fischman documented just 106 job search activities. These activities started in late January 2018 and ended in mid-September 2018. She performed a decreasing number of job search actions from October 2017. and made her last two job applications in May 2018. Referring to her LinkedIn profile, however, it appears that she may have decided to make a career change as early as October 2017, less than nine months following her departure from Mitsubishi Chemical Holdings.

Her quantity of job search activities is an unreasonably low number of actions during this 19 month period, averaging just 1.1 job search activities per week. This fails to meet even minimal standards of a diligent job search, particularly when compared to the number of relevant published job opportunities for which she was well-qualified and could have applied. The quantity of available job openings we cite is a conservative estimate because this research counts only published job openings. Had Ms. Fischman made greater efforts with legal recruiters, it is highly likely that she would have been a candidate for more job openings that were unpublished. In addition, with committed, consistent and diligent networking activity, Ms. Fischman would have been introduced to more employment opportunities. As has been noted before, consistent and dedicated networking is the most highly recommended job search strategy, especially for experienced professionals.

## IX.    CONCLUSION

After approximately 15 months of efforts that fall far short of a diligent job search, Ms. Fischman voluntarily chose to leave her 20-year career as a highly qualified and well compensated corporate lawyer to enter a new occupation as a novice real estate sales agent, joining her mother, Shelia Stone, a longtime real estate broker in Westchester County. In this occupation, Ms. Fischman would earn income solely through her sales commissions. Salary surveys show that experienced sales agents in her region achieve median earnings of approximately $100,000 per year, far less than her last annual salary at Mitsubishi Chemical Holdings America and with fewer paid benefits.

I have considered the above, as well as Ms. Fischman's qualifications and the quantity of appropriate job openings in her local labor market since her departure from Mitsubishi Chemical Holdings America. In addition,  research shows that Ms. Fischman's job search began when unemployment was quite low in her labor market, an environment that favored job seekers.

In my professional opinion, with a reasonable degree of professional certainty, had Ms Fischman performed a reasonably committed, diligent job search, she would have been hired as a Corporate Attorney with competitive compensation similar to her last position at Mitsubishi Chemical Holdings America. If she was not hired as an in-house Corporate Attorney, General Counsel or in an Executive Legal leadership role, she was a competitive job applicant for hire by a law firm as a corporate attorney, a position for which she was highly qualified.

I reserve the right to amend this report if additional information becomes available.

Respectfully submitted:

Rona E. Wexler, M.A., ABVE/D,
Vocational Evaluator

## APPENDIX A

### Curriculum Vitae

### Rona E. Wexler, M.A., ABVE/D
*Diplomate, American Board of Vocational Experts*

**15900 Riverside Dr. W, Suite 6C, New York, NY 10032 T: (646) 335-5236**

## EXPERIENCE

### *Consulting & Vocational Evaluation*

**Wexler Vocational and Career Consulting, New York, NY**　　　　　　**2002 - Present**
**President & Founder, Vocational Evaluator**
Evaluate individuals to determine employability, job placement potential, and earning capacity working with plaintiff and defense counsel. Provide executive, career and job search coaching services. Qualified and testified as employability expert in following courts: New York Supreme, Superior Courts of Connecticut, New Jersey, Pennsylvania, and Florida; U.S. Southern District.

**Vocational Consulting Group, Springfield, NJ and New York, NY**　　　　**2002 - 2003**
**Vocational Evaluator**
Evaluate individuals to determine employability, job placement potential and earning capacity working with plaintiff and defense counsel.

**Institute for the Study of Adult Development, Philadelphia, PA**　　　　**1977 - 1980**
**Co-Director, Career Development Services**
Established Career Services program for corporate and adult clients, including Career and Life Planning, individual and group career counseling, resume writing, and job search marketing skills.

### *Recruiting and Business Employment*

**Stephen Bradford Search, New York, NY**　　　　　　　　　　　　**2004 - 2007**
**Director**
Retained executive recruiting firm placing senior talent in Marketing, Market Research, Sales, Business Development, Media, Advertising, Retail and Beauty & Luxury Goods. Managed and conducted research, candidate assessment, client and candidate coaching, structured and negotiated employment offers, reference checks and placement. Worked with C-level executives, senior managers and Human Resources executives. Developed new business and clients.

**Ariel Associates, New York, NY**　　　　　　　　　　　　　　　**1996 - 2004**
**Executive Vice President, Managing Partner**
Retained Executive Search firm specializing in business information services and media for senior and C-level managers and executives. Managed firm's recruiting and placement process. Assessed and placed candidates, coached clients and candidates, structured and negotiated employment offers, reference checks and follow up. Worked with C-level executives, senior managers and Human Resources executives. Hired, trained and managed staff. Managed operations and finances. Developed new business, brought in new clients.

**Search, Inc., New York, NY**　　　　　　　　　　　　　　　　　**2005**
**Director**
Executive recruiting firm placing senior, middle level and administrative talent with metropolitan staffing agencies. Assessed and placed candidates, coached clients and candidates, structured and negotiated employment offers, conducted reference checks, placement and follow-up.

**Xerox Corporation, New Jersey and New York, NY**                    1981 - 1996
**President's Club winner in various positions in sales management and in consultative sales**
across multiple business lines with customers in middle market through multi-billion-dollar global
entities in consumer, professional services, pharmaceutical, manufacturing, government, sports, and
entertainment sectors. Responsibilities included hiring, training, managing and developing sales
teams to meet and exceed revenue and business development goals.

*Career Services*

**Glassboro State College (now Rowan University), Glassboro, NJ**         1978 - 1980
**Director, Student Employment and Co-operative Education**
Directed student on-campus employment program, managed program budgets, assessed students for
employment, addressed performance issues.

**Philadelphia College of Art (now University of the Arts), Philadelphia, PA**    1976 - 1978
**Director of Career Services**
Established first full time Career Development and Placement Office in college's 100-year history.
Counseled students and alumni on career options, job search and interviewing skills, and job
placements. Expanded College's job bank and placement services.

*Teaching Experience*

**Glassboro State College (now Rowan University), Glassboro, NJ**         1979 - 1980
**Instructor**, *Introduction to Management*

**Ramapo College of New Jersey, Mahwah, NJ**                     1975 - 1976
**Instructor,** *Psychology of Communications*

**Johnston High School, Johnston, RI**                           1972
**English Teacher**, *Grades 10-12, including junior and senior honors classes*

**EDUCATION**

**New York University, New York, NY**                            1973
M.A., Counseling Psychology and Guidance

**Emerson College, Boston, MA**                                 1971
B.A., English Literature - Minors: Speech Communication and Education

**PROFESSIONAL AFFILIATIONS/APPOINTMENTS**

- Member, New York State Bar Association, Family Law Section Executive Committee, Subcommittee of Non-Lawyer Family Law Professionals

- American Board of Vocational Experts, Diplomate. Member, Board of Directors

- National Career Development Association

- International Association of Rehabilitation Professionals

- Advertising Women of New York, Member. Board of Directors, 2007-2010

- International Association of Corporate and Professional Recruiters, Member 2002-2005

**PRESENTATIONS & PUBLICATIONS**

- *Evaluating the Job Search: What a Litigator Needs to Know,* **USA500Clubs**, July 29, 2020. Presenter.

- *Imputation of Income in Matrimonial and Support Matters: Proof and Perspectives from the Court and the Expert*, **New York County Lawyers Association**, New York, NY, September 17, 2019. Invited CLE Presenter and Panelist.

- *Earning Capacity in Family Law: Understanding the Law, Litigating the Issue and Using Expert*, **Connecticut Bar Association Legal Conference**, Hartford, CT, June 10, 2019. Co-Presenter.

- *Assessing Employment Capability and Earning Capacity in Family Law Matters*. *Valuing Specific Assets in Divorce*, **Wolters Kluwer Law & Business**, 2012 - 2020 Editions. Author

- *How to Open a Law Practice*, **New York County Lawyers Association,** New York, NY, February 1, 2017. CLE Co-Presenter.

- *The New York Maintenance Law Unplugged: A Honed Analysis and Practical Implications*, **New York County Lawyers Association**, New York, NY, June 2, 2016. CLE Co-Presenter.

- *Imputing Income: Employability Expert Role to Determine Earning Capacity for Support and Advance Case to Settlement*, **Collaborative Divorce Association of North Jersey**, Woodcliff Lake, NJ, March 24, 2016. CLE Presenter.

- *Imputation of Income in Matrimonial and Support Matters: Proof and Perspectives from the Court, the Lawyers and the Expert*, **Nassau County Bar Association**, Mineola, NY, January 26, 2016. CLE Presenter and Panelist.

- *How Employability Assessments Can Be the Breakthrough to Settlement*, **New York County Lawyers Association**, New York, NY, October 13, 2015. Presenter.

- *How Expert Employability and Earning Capacity Assessments Help Settle Cases*, National Catalyst Conference, New York, NY, October 2, 2015. Presenter.

- *How to Determine a Diligent Job Search*, The Matrimonial Strategist, **American Legal Media**, August 2015. Author.

- *How an Employability Expert Helps Employment Litigators Determine the Scope of Damages*, CLE to national law firms, New York, NY, 2014. Presenter.

- *Vocational Evaluators: How They Can Breakthrough to Settlement*, **New York Collaborative Law Group**, New York, NY, February 4, 2014. Presenter.

- *Challenges in Imputing Earning and Employment Capacity in Continually Changing Economic Times,* **Connecticut Collaborative Law Group**, Darien, CT, June 12, 2013. Presenter.

- *Is Your Emotional Relationship to Money Undermining Your Career, Your Business and Confidence?*, **Gotham Networking**, September 10, 2012. Presenter.

- *Follow Your Passion, Reinvent Yourself and Your Identity: Career Paths, Finding Your Way Changing Your Course,* **Long Island University/C.W. Post Long Island Women's Institute**, Brookville, NY, February 15, 2012. Panelist and Presenter.

- *Successfully Handling Custody and Vocational Expert Witnesses*, **New York State Bar Association**, (NYSBA) Hauppauge, NY, October 28, 2011. CLE Presenter.

- *Using Experts in Matrimonial Cases: The Experts Speak*. **New York County Lawyers Association** (NYCLA) CLE, New York, NY, May 25, 2011. Presenter.

- *You've Got the Interview – Now to Win that Job Offer!*, **Bottomless Closet** (a non-profit organization for women transitioning to work), New York, NY, November 17, 2010. Presenter.

- *You're Hired, Now What? Successfully Starting Your New Job!*, **Bottomless Closet** (a non-profit organization for women transitioning to work), New York, NY, September 29, 2010. Presenter.

- *How to use Vocational Experts in Challenging & Changing Economic Times*, Presentation to **Fairfield County Bar Association**, May 19, 2010. Presenter.

- *Impact of Current Economy on Assessments of Vocational Opportunities and Earning Capacity*, **Westchester County Bar Association**, February 2, 2010. CLE Presenter & Panelist.

- *For Issues of Occupational Capacity and Imputed income, Bring in the Employability (or Vocational) Expert*, **New York State Bar Association Family Law Quarterly**, Spring, 2009. Author.

- *Vocational Experts: Do you really know how to use them –especially now?*, **New York County Lawyers Association**, Matrimonial Section, February 10, 2009. Presenter.

- *Reentering the Workforce after Divorce*, **New York Family Law**, American Legal Media, August 2008. Author.

- *Vocational Experts Help Decide Parties' Ability to Work*, **New York Law Journal**, February 14, 2008. Co-Author with Brett Kimmel, J.D.

- *Using Vocational Experts in Matrimonial Cases to Determine Earnings Capacity*, **Domestic Law Review, Family Law Section, Westchester Bar Association**, October 2004. Author.

- *The Use of Vocational Evaluation in Matrimonial Decisions*, **Westchester Women's Bar Association**, Matrimonial Committee, 2002. Co-Presenter with Charles Kincaid, Ph.D.

- *Learning to Market Yourself: Resume & Job Search Strategy Workshop*, **Advertising Women of New York Career Conference**, New York, NY, 2010, 2009, 2008, 2007, 2006. Presenter

**Rona E. Wexler, M.A., ABVE/D**

**Testimony as Vocational / Employability Expert at Trial or Deposition**

| <u>Year</u> | <u>State</u> | <u>County</u> | <u>Parties</u> | <u>Judge</u> | <u>Court</u> |
|---|---|---|---|---|---|
| 2020 | FL | Dade | Greenwood vs. Greenwood | Deposition | Eleventh Circuit Court Miami-Dade County, FL |
| 2020 | NY | New York | Fasanello vs. UNIS | Deposition | U.S. Southern District of New York |
| 2020 | NJ | Monmouth | Ball vs NJDEP | Deposition | Superior Court |
| 2020 | CT | Fairfield | Stackpole vs. Stackpole | Deposition | Superior Court Stamford/Norwalk |
| 2019 | NY | New York | Que vs. Tu | Hon. George Phelan | MA (Norfolk) Family Court |
| 2019 | NY | New York | Culman vs. Boesky | Hon. Marilyn Sugarman | NY Supreme |
| 2019 | NY | New York | Karam vs. Karam | Hon. Joe Burke | NY Supreme |
| 2019 | NY | New York | Mathieu vs. Michels | Hon Matthew Cooper | NY Supreme |
| 2019 | NY | New York | Patrick J. Thomas vs. G2 FMV, G2 Investment Group LLC | Deposition | NY Supreme |
| 2019 | NY | Rockland | Murphy vs. Murphy | Hon. Robert Berliner | NY Supreme |
| 2019 | NY | New York | P .D. vs. Google, Inc. | Hon. Helen Freedman | JAMS |
| 2019 | FL | Palm Beach | Brown vs. Varricchio | Hon. Scott Suskauer | Superior Court |

| Year | State | County | Parties | Judge | Court |
|---|---|---|---|---|---|
| 2018 | CT | Superior | Rossova. Charter Communications | Hon. Kenneth Provodator | Superior Court |
| 2018 | CT | Fairfield | Memel vs. Memel | Hon. Michael Shay | Superior Court |
| 2018 | NJ | Essex | Mayo vs. Mayo | Hon. David Katz | Superior Court |
| 2018 | NY | New York | Deoglu vs. Mallikarjan | Hon. Cheryl Weir-Reeves | Family Court |
| 2018 | NY | Nassau | Dix vs. Dix | Hon. Edmund M. Dane | NY Supreme |
| 2018 | CT | Hartford | Theriault & Manzione vs. Renbrook School | Deposition | Superior Court |
| 2017 | FL | Martin | Morrow vs. Morrow | Hon. Michael J. McNicholas | Superior Court |
| 2017 | CT | Fairfield | Wallace vs. Wallace | Deposition | Superior Court Stamford/Nor walk |
| 2017 | FL | Palm Beach | Kealy vs. Scherr | Hon. Howard K. Coates, Jr. | Palm Beach Superior |
| 2017 | CT | Fairfield | Schlegelmilch v. Schlegelmilch | Deposition | Superior Court Stamford/Nor walk |
| 2017 | FL | Palm Beach | Kealy vs. Scherr | Deposition | Palm Beach Superior |
| 2017 | NY | New York | Kaplan vs. Karambelas | Hon. Louis Crespo | NY Supreme |
| 2017 | NY | New York | Kaplan vs. Karambelas | Hon. Louis Crespo | NY Supreme |
| 2017 | NJ | Monmouth | D'Amore vs. D'Amore | John Paone, Esq, Arbitrator | NJ Superior |
| 2017 | NY | Nassau | Kalenka vs. Kalenka | Hon. Marie McCormick | NY Supreme |

| Year | State | County | Parties | Judge | Court |
|------|-------|--------|---------|-------|-------|
| 2016 | NY | Suffolk | Gullason vs. Gullason | Support Magistrate Darlene Jorif-Mangane | NY Family |
| 2016 | NY | New York | Kaplan vs. Karambelas | Hon. Tandra Dawson | NY Supreme |
| 2016 | NY | New York | Pankoff vs. Pankoff | Hon. Sue Ann Hoahng | NY Supreme |
| 2016 | FL | Martin | Riordan vs. Riordan | Hon. Laurie E. Buchanan | FL Circuit |
| 2016 | NY | New York | Lee vs. Westergaard | Hon. Marilyn T. Sugarman | NY Supreme |
| 2016 | NY | Westchester | Romano vs. Romano | Hon. Paul Marx | NY Supreme |
| 2016 | FL | Martin | Mumford vs. Mumford | Hon. Laurie Buchman | FL Circuit |

# APPENDIX B

## Standard Resources and References

1. **The 4 Things Older Job Seekers Are Doing Wrong**, Next Avenue, January 27, 2016.

2. **8 Microsoft Excel Tricks That'll Change Your Job Search Forever**, Glassdoor, November 8, 2017, posted by Julia Malacoff.

3. **The 10 Best and Worst Ways to Look For a Job**, by Richard N. Bolles, Next Avenue Contributor.

4. **15 Job Search Tips for Landing Your New Position**, Indeed.com, February 25, 2020.

5. **"Consultation in Employment Law,"** Van de Bittner, EE, in Robinson, 2014, Foundations for Forensic Vocational Rehabilitation, Springer Publishing Company, New York.

6. **Dictionary of Occupational Titles**, Revised 4th Edition, 1991, U.S. Department of Labor Employment and Training Administration, Government Printing Office, Washington, D.C.

7. **From Spreadsheets to Sticky Notes: 7 Strategies for Managing Your Job Search**, Glassdoor, January 4, 2018, posted by Sarah Greesonbach.

8. **Hiring a Coach to Spark the Job Hunt**, *The New York Times*, March 7, 2015, by Rob Walker (The Workologist).

9. **How To Get the Most Out Of LinkedIn's New Features**, April 18, 2016, by Nancy Collamer, Work and Purpose Blogger.

10. **How to Stand Out from the Competition**, *The Wall Street Journal*, May 13, 2009.

11. **How-to Guide – Careers**, *The Wall Street Journal*.

12. **Labor Market Survey**, Barros-Bailey and Heitzman, in Robinson, 2014, Foundations for Forensic Vocational Rehabilitation, Springer Publishing Company, New York.

13. **Job Hunting in the Digital Age**, by Tara Siegel Bernard, April 8, 2016.

14. **Job Search Resources for 50+**, AARP, July 2016.

15. **Older Job Seekers Find Ways to Avoid Age Bias**, *The New York Times*, by Kerry Hannon, January 16, 2015.

16. **The O*Net Dictionary of Occupational Titles**, https://occupationalinfo.org/dot_search.html

17. **O*NET Online**, 2020, https://www.onetonline.org/

18. **Occupational Outlook Handbook**, 2020 Edition, U.S. Department of Labor, Bureau of Labor Statistics, U.S. Government Printing Office, Washington, D.C.

19. **The Revised Handbook for Analyzing Jobs**, 1991, U.S. Department of Labor, Employment and Training Administration, Government Printing Office, Washington, D.C.

20. **To Get a Job in Your 50s, Maintain Friendships in Your 40s**, by Phyllis Korkki, September 26, 2015.

21. **Track Your Job Applications with Ease**, Glassdoor, posted by Jillian Kramer, August 15, 2018.

22. **Vocational Assessment: Evaluating Employment Potential**, Havranek, J., Grimes, J., Field, T. and Sink, J., 1994, Elliott & Fitzpatrick, Inc., Athens, GA.

23. **Why Your Job Search Is Not Working**, Forbes, April 28, 2019.

## Additional Resources and References

1. **Bureau of Labor Statistics**, U.S. Department of Labor, Metropolitan Statistical Areas: Chicago-Naperville-Elgin, Dallas-Fort Worth-Arlington, Houston- The Woodlands-Sugar Land.

2. **Bureau of Labor Statistics**, U.S. Department of Labor, Household Data Annual Averages, 31. Unemployed persons by age, sex, race, Hispanic or Latino ethnicity, marital status, and duration of unemployment, 2015 through 2020 for MSAs, Chicago, Dallas-Fort Worth and Houston.

3. **Bureau of Labor Statistics**, U.S. Department of Labor, Databases, Tables by Subject graph chart, Chicago-Naperville-Elgin, IL-IN-WI Metropolitan Statistical Area.

4. **Bureau of Labor Statistics**, U.S. Department of Labor, Databases, Tables by Subject, Labor Force Statistics from the Current Populations Survey, 2015 through 2019.

5. **Bureau of Labor Statistics**, U.S. Department of Labor Occupational Outlook Handbook, Sales Managers (visited May 5, 2020).

6. **Bureau of Labor Statistics**, U.S. Department of Labor, Occupational Outlook Handbook Wholesale and Manufacturing Sales Representatives, on the Internet at https://www.bls.gov/ooh/sales/wholesale-and-manufacturing-sales- representatives.htm (visited *May 5, 2020*).

7. **The United States Census Bureau Library**. https://www.census.gov/library/working-papers/2011/demo/SEHSD-WP2011-31.html Accessed on August 30, 2018.

8. **Salary Assessor**, June 2020, Economic Research Institute, Redmond WA.

9. **What Color Is Your Parachute a Practical Manual for Job Hunters and Career Changers**, Richard Nelson Bolles and Mary Emery Bolles, 2015, Ten Speed Press, Berkeley, CA.

10. **Indeed.com**, 15 Job Search Tips to Land Your New Position, February 2020.

11. **LinkedIn**, How to Get the Most Out of LinkedIn's New Features, Forbes.com and Next Avenue.com.

12. **Glassdoor.com**, Job Search Tracker (in Microsoft Excel and Word.

13. **New York Times**, Hiring a Coach to Spark Your Job Search, Rob Walker, March 7, 2015.

14. **New York Times**, Job Hunting in the Digital Age**, Tara Siegel Bernard, April 8, 2016.

15. **Wall Street Journal**, LinkedIn Finally Fixes its Website, January 19, 2017. https://www.youtube.com/watch?time_continue=49&v=UdmNAC-Rfr4&feature=emb_title

16. **Wall Street Journal**, Is LinkedIn a Waste of Time? Ashley Mateo, Updated January 15, 2020.

17. **Wall Street Journal**, How to Find Recruiters in Your Niche. https://guides.wsj.com/careers/how-to-work-with-executive-recruiters/how-to-find-recruiters-in-your-niche/

18. **Forbes.com**, How to Let Recruiters Know You're Open to a New Job Using LinkedIn, Robin Ryan, Careers, February 24, 2020.

19. **NPR.org**, A Successful Job Search: It's All About Networking, Wendy Kaufman, February 3, 2011. https://www.npr.org/2011/02/08/133474431/a-successful-job-search-its-all-about-networking

20. **Media Bistro**, Set Up a Schedule to Keep Your Job Search on Track: Establish a job search routine, John Lombard. https://www.mediabistro.com/get-hired/job-search/job-search-schedule/

21. **Indeed.com**, How to Develop a Strategic plan for your Job Search, December 12, 2019.

22. **Monster.com**, Create a Personal Networking Plan, Wendy S. Enelow.

23. **Monster.com**, 10 tips to improve the quality of your networking, John Rossheim, Senior Contributing Writer.

24. **Monster.com**, Networking letters 101, Kim Isaacs, Monster Resume Expert.

25. **Triangle Publishing**, Why Networking is so important in a job search, deBruyn, Jason, July 24, 2012.

26. **The Washington Post**, How to Land a Job by Networking, Paige Harden, May 23, 2016.

27. **Columbia University**, The New Rules of Networking, Kate Lawler, Spring/Summer 2015.

28. **Wall Street Journal**, Jumpstarting a Job Search, Sarah E. Needleman, October 20, 2009.

29. **Wall Street Journal**, Your Resume vs. Oblivion, Lauren Weber, January 21, 2012.

30. **Wall Street Journal**, For Job Seekers the Black Hole Persists, Wall Street Journal, Lauren Weber, June 22, 2015.

31. **The Rehabilitation Professional**, What is a reasonable job search? Developing a theoretical framework, Stewart, D.E. and Turner, D.T. 2014, 22(4): 223-230/p. 226.

32. **The Oxford Handbook of Job Loss and Job Search**, Oxford University Press, 2012.

33. **Wilhelm CL**, MD Consult Core Collection, *J Med Libr Assoc*., 2004; 92(1):110-111.

34. **World Economic Forum**, The longer you're unemployed, the less likely you are to find a job. Why?, Jarosch, Gregor & Philossoph, Laura, Federal Reserve Bank of New York.

**APPENDIX C**

| Document Name | Bates Stamp or Reference |
|---|---|
| First Amended Complaint Jury Trial Demanded | Amended Complaint, in Jennifer Fischman v Mitsubishi Chemical Holdings America, In; Mitsubishi Chemical Holdings Corporation; Nicolas Oliva, Donna Costs, and John Does 1-10, in the United States District Court, Southern District of New York. 001011. |
| Mitsubishi Defendants' Answer and Affirmative Defenses to First Amended Complaint | Answer and Affirmative Defenses to Amended Complaint, in Jennifer Fischman v Mitsubishi Chemical Holdings America, In; Mitsubishi Chemical Holdings Corporation; Nicolas Oliva, Donna Costs, and John Does 1-10, in the United States District Court, Southern District of New York. 001- 018. |
| Plaintiff's Responses and Objections to MCHA Defendants' First Interrogatories to Plaintiff | Plaintiff's Responses and Objections to MCHA Defendants' First Interrogatories to Plaintiff, In: Mitsubishi Chemical Holdings Corporation; Nicolas Oliva, Donna Costs, and John Does 1-10, in the United States District Court, Southern District of New York. |
| Response to Document Demand | FISCHMAN 000001 – FISCHMAN 000200 |
| Response to Document Demand | FISCHMAN 000201 – FISCHMAN 000400 |
| Response to Document Demand | FISCHMAN 000401 – FISCHMAN 000600 |
| Response to Document Demand | FISCHMAN 000602 – FISCHMAN 000778 |
| Email Correspondence | FISCHMAN 000306 |
| **Resume and Salary Documents** | |
| Fischman Resume | DEF-000007-DEF-000009 |
| Fischman LinkedIn | https://www.linkedin.com/in/jennifer-fischman-8a462341/ |
| Fischman Personnel File | 03/03/08 to 11/24/2015 |
| | |
| | |

**APPENDIX D**

**Number of Advertised Jobs Available for Jennifer Fischman's Application**

**Full Year 2017 through April 4, 2020**

These charts record the number of job postings by quarter between January 2017 and April 4, 2020 for different positions for Lawyer for which Ms. Fischman is qualified.

| Total Job Postings | | | | | |
|---|---|---|---|---|---|
| Year | Q1 | Q2 | Q3 | Q4 | Total |
| 2017 | 20 | 21 | 19 | 28 | 88 |
| 2018 | 34 | 44 | 35 | 42 | 155 |
| 2019 | 56 | 83 | 82 | 68 | 289 |
| 2020 | 85 | 66 | N/A | N/A | 151 |
| Talent Neuron, via Forensic Job Stats, 2020 | | | | Total | 683 |

**APPENDIX E**

**Jennifer Fischman's Job Search Activities**



| | Applications | Interviews/Phone Calls | Networking/Proactive Job Development | Recruiter Contact |
|---|---|---|---|---|
| Totals: | 100 | 9 | 8 | 2 |
| Q1 2017 | 24 | 8 | 6 | |
| Q2 2017 | 14 | | 1 | |
| Q3 2017 | 24 | | | |
| Q4 2017 | 18 | 1 | | 2 |
| Q1 2018 | 8 | | | |
| Q2 2018 | 12 | | | |
| Q32018 | 0 | | 1 | |

**APPENDIX F**

**Quantity of Jennifer Fischman's Job Applications**

**Compared to Published Job Opportunities Posted Online**



**APPENDIX G**

**UNEMPLOYMENT DURATION AND STATISTICS**

| National Median Duration of Unemployment (in weeks) | | | | |
|---|---|---|---|---|
| | All Job Seekers | Woman, age 45-54 | White Women, 16 Years and Over | Professional and Related Occupations |
| 2017 | 10.0 | 12.3 | 9.1 | 9.3 |
| 2018 | 9.3 | 10.7 | 8.3 | 8.8 |
| 2019 | 9.1 | 10.4 | 8.0 | 8.8 |
| 2020 - Aug | 16.2 | 16.9 | 16.0 | 15.5 |
| Labor Force Statistics, Current Population Survey, U.S. Bureau of Labor Statistics January 2015 – August 2020 | | | | |



Jennifer Fischman Vocational Evaluation Report       Prepared by Rona E. Wexler, M.A., ABVE/D