* * C O N F I D E N T I A L * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X

JENNIFER S. FISCHMAN,

                    Plaintiff,

          -against-

                         Index No. 18-cv-08188


MITSUBISHI CHEMICAL HOLDINGS, AMERICA, INC.;
MITSUBISHI CHEMICAL CORPORATION; MITSUBISHI
CHEMICAL HOLDINGS CORPORATION; NICHOLAS OLIVA, in
his individual processional capacities; DONNA
COSTA, in her individual and professional
capacities; and JOHN DOES 1-10, in their
individual and professional capacities,

                    Defendants.


-----------------------------------------------X

                         August 6, 2021
                         10:13 a.m.




               DEPOSITION of RONA WEXLER, a

Non-Party witness, taken by the attorneys for the

Plaintiff, pursuant to Stipulation, held via web

conference, at the above date and time before

Toni Musacchia, a Stenotype Reporter and Notary

Public within and for the State of New York.

1          * * C O N F I D E N T I A L   * *

2    A P P E A R A N C E S :

3    VALLI KANE & VAGNINI, LLP
     Attorneys for Plaintiff
4        600 Old Country Road, Suite 519
         Garden City, New York 11530
5
     BY:  MATTHEW L. BERMAN, ESQ.
6
     CLARICK GUERON REISBAUM, LLP
7    Attorneys for Defendant, Donna Costa
         220 Fifth Avenue, 14th Floor
8        New York, New York 10001

9    (NOT PRESENT)

10   GORDON REES SCULLY MANSUKHANI, LLP
     Attorneys for Defendants, Mitsubishi
11   Chemical Holdings America, Inc., Donna Costa and
     Nicholas Oliva
12       One Batter Park Plaza, 28th Floor
         New York, New York  10004
13
     BY:  BRITTANY L. PRIMAVERA, ESQ.
14

15   SHEARMAN & STERLING, LLP
     Attorneys for Defendant,
16   Mitsubishi Chemical Holdings Corporation
         599 Lexington Avenue
17       New York, New York  10222

18   BY:  Sam Jolly, Esq.

19

20   ALSO PRESENT:

21   Jennifer Fischman

22

23

24

25

1          * * C O N F I D E N T I A L  * *

2             FEDERAL STIPULATIONS

3

4          IT IS HEREBY STIPULATED AND AGREED by and

5    between the parties hereto, through their

6    respective Counsel, that the certification,

7    sealing and filing of the within examination will

8    be and the same are hereby waived;

9

10          IT IS FURTHER STIPULATED AND AGREED that

11   all objections, except as to the form of the

12   question, will be reserved to the time of the

13   trial;

14

15          IT IS FURTHER STIPULATED AND AGREED that

16   the within examination may be signed before any

17   Notary Public with the same force and effect as

18   if signed and sworn to before this Court.

19

20

21

22

23

24

25

1          * * C O N F I D E N T I A L * *

2          THE REPORTER:  It is hereby stipulated

3     and agreed by and between counsel for all

4     parties present that pursuant to Federal

5     Rule of Civil Procedure 28 (a)(2), this

6     deposition is being conducted remotely and

7     that the court reporter shall be permitted

8     to administer the oath to the witness via

9     videoconference.  The witness and all

10    counsel are in separate remote locations and

11    participating via Zoom platform under the

12    control of bee reporting agency, Inc.

13         It is further stipulated that this

14    videoconference will not be recorded in any

15    manner and that any recording without the

16    express written consent of all parties shall

17    be considered unauthorized, in violation of

18    law and shall not be used for any purpose in

19    this litigation or otherwise.

20         Before I swear in the witness, I will

21    ask each counsel to stipulate on the record

22    that I, Toni Musacchia, the court reporter,

23    may swear in the witness even though I am

24    not physically in the presence of the

25    witness and that there is no objection to

1              * * C O N F I D E N T I A L  * *

2        that at this time, nor will there be an

3        objection at a future date.

4              MR. BERMAN:  Agreed.

5              MS. PRIMAVERA:  Agreed.

6              MR. JOLLY:  Fine with me.  Stipulated.

7              THE REPORTER:  Ms. Primavera, can you

8        represent that to the best of your knowledge

9        and belief that the witness appearing today

10       via web conference is, in fact, Rona Wexler?

11             MS. PRIMAVERA:  Yes.

12             THE REPORTER:  Pursuant to?

13             MR. BERMAN:  Stipulation.

14             MS. PRIMAVERA:  Stipulation.

15  R O N A   W E X L E R,

16        The witness herein, having been first

17  duly sworn by Toni Musacchia, a Notary Public in

18  and for the State of New York, was examined and

19  testified as follows:

20  DIRECT EXAMINATION

21  BY MR. BERMAN:

22       Q.   Please state your name for the record.

23       A.   Rona Wexler.

24       Q.   Please state your address for the

25  record.

1            R. Wexler - Confidential

2       A.    15900 Riverside Dr. W, Suite 6C, New

3   York, New York 10032.

4       Q.    Good morning, Ms. Wexler -- is it okay

5   if I call you Ms. Wexler today?

6       A.    Absolutely.

7       Q.    Terrific.  Today I will be asking you a

8   series of questions, which you will be

9   responsible for answering, having sworn to tell

10  the truth.

11      If you do not hear one of my questions,

12  please let me know.  The microphones on these

13  video conferencing are sometimes unreliable,

14  sometimes blinking or cut out.  Please let me

15  know if it cuts off and if I need to repeat

16  anything, I'll be happy to do that.  If I'm not

17  loud enough, please let me know and I'll try to

18  restate my question more loudly to make it more

19  audible.

20      If you don't understand one of my questions,

21  please let me know that as well and I will do my

22  best to rephrase it in another way to make it

23  more understandable.

24      Today we have a court reporter with us, she

25  will be transcribing your testimony and my

1                    R. Wexler - Confidential

2     questions.  It's very difficult for her to take

3     down more than one person at a time.  So I am

4     going to do my best today to try to allow you to

5     finish all of your responses without interrupting

6     you.  Sometimes it's a little personally

7     challenging for me to do that because I am a New

8     Yorker and I will do my best.  If at any point

9     you give a response and you haven't had the

10    opportunity to complete it, please let me know

11    and I will give you the opportunity to finish

12    whatever you have to testify.

13        Similarly, please do your best -- even if you

14    anticipate what I am going to ask you -- to let

15    me get the entire question out so the court

16    reporter can get it down into the record.

17        It is also important today that, to the best

18    of your ability, to give verbal responses rather

19    than physical gestures because she can't take to

20    that down.

21        From time to time you may hear an objection

22    from one of the attorneys.  Pursuant to the

23    agreement of the parties in this action, the

24    objections today are to preserve objections to

25    the form of the question at trial.  So even if

1                    R. Wexler - Confidential

2     you hear an objection, I am going to still expect

3     you to answer the question unless you're

4     specifically instructed by your counsel not to

5     answer.

6         Do you understand that today you're under

7     oath as if you were in a court of law?

8         A.   I do.

9         Q.   If at any point today you wish to take a

10    break, please let me know and I will be happy to

11    accommodate break requests from you or any other

12    participates -- I intend to call a number of

13    breaks myself.  It's not intended to be any kind

14    of endurance competition today.  We want you to

15    be comfortable take, we want you to be able to

16    take care of whatever needs to be taken care of.

17        Do you understand all of those sort of ground

18    rules for how we're going to proceed today?

19        A.   I understand all of them, yes.

20        Q.   Terrific.  Are you currently taking or

21    refraining from taking any medication which could

22    affect your ability to testify truthfully and

23    accurately today?

24        A.   No, I am not.

25        Q.   Do you have any medical condition which

1                    R. Wexler - Confidential

2    may affect your ability to testify accurately?

3        A.    No.

4        Q.    Do you suffer from any medical condition

5    that impairs your memory?

6        A.    No.

7        Q.    Have you ever been deposed before?

8        A.    Yes.

9        Q.    How many times have you been deposed?

10       A.    Well over a dozen.

11       Q.    Are those in connection with lawsuits?

12       A.    Yes.

13       Q.    Approximately, how many lawsuits have

14   you testified in?

15       A.    In testimony bench trial and jury

16   trials, probably somewhere over 75.

17       Q.    Okay.

18       A.    It's also including arbitrations and --

19   yeah, mostly arbitration.

20       Q.    Did you do anything to prepare for

21   today's testimony?

22       A.    Yes.

23       Q.    Without revealing any privileged

24   communications that you may have had with any

25   attorneys, can you tell me, generally speaking,

1                R. Wexler - Confidential

2   what did you do to prepare for today's testimony?

3       A.   I reviewed the report that I submitted.

4   I also reviewed samples of some of the footnotes

5   are that are included in the report.  I reviewed

6   the documents that I had prepared to summarize

7   some of the findings in the report, particularly

8   numerically, things of that nature.

9       Q.   Okay.  Did you -- without telling me the

10  substance, did you meet with any attorneys in

11  connection with your testimony today?

12      A.   Did I meet with any attorneys, no.

13      Q.   Did you have any communications with any

14  attorneys concerning the substance of your today

15  testimony today?

16      A.   Not the substance, no.

17      Q.   In connection with your deposition

18  today, did you any communications with anyone

19  else other than attorneys?

20      A.   Yes.

21      Q.   What was the general nature of those

22  discussions?

23      A.   I connected with my -- communicated with

24  my lead evaluator and associate, who is in the

25  Midwest, and he had helped perform the analysis

1                    R. Wexler - Confidential

2    of the statistics of the labor market research,

3    et cetera, so I was conferring with him.

4        Q.    Are you aware that there are other

5    experts testifying in this case on behalf of the

6    defendants?

7        A.    I'm aware of one.

8        Q.    Who are you aware of?

9        A.    Chad Staller.

10       Q.    Did you have any communications with Mr.

11   Staller prior to testifying today?

12       A.    No, I did not.

13       Q.    Did you provide Mr. Staller a copy of

14   your expert report?

15       A.    I did not provide him a copy, no.

16       Q.    Did he provide you a copy of his expert

17   report?

18       A.    No, he did not provide me a copy of an

19   expert report.

20       Q.    Did he provide you with any --

21            MR. BERMAN:  Withdrawn.

22       Q.    Did Mr. Staller provide you with any

23   information concerning the opinions that he is

24   preparing to offer in this case?

25       A.    No, he did not provide me with anything

1                R. Wexler - Confidential

2     regarding his opinion.  The only thing he

3     provided was the documentation from Forensic

4     JobStats for the labor market research, since

5     it's an organization we partner with on a

6     frequent basis.  He happened to have engaged with

7     them first.

8         Q.   Do I understand correctly that to the

9     extent that you relied upon data from the

10    Forensic JobStats' database, that that data was

11    provided to you by Mr. Staller?

12           MS. PRIMAVERA:  Objection.  If you

13        understand you can respond.  Otherwise you

14        can ask him to break it up.

15        A.   He did provide the data.  We also

16    analyzed it on our own.

17        Q.   Setting aside the analysis, did you

18    obtain any Forensic JobStats data independently?

19        A.   No, I believe we consulted with FJS to

20    make sure he had it.  But other than that, it

21    came from -- I believe it came from Mr. Staller's

22    office.

23        Q.   So any data that you possess that you

24    used in your expert report, you obtained it from

25    Mr. Staller; did I get that right?

1              R. Wexler - Confidential

2         MS. PRIMAVERA:  Objection.

3    A.   Mr. Berman, I'm not really sure.  I

4    think we may have asked them to send us that data

5    as well.  I would have to double check on that.

6    Because I have all of it here and I'm not sure if

7    they provided it or Mr. Staller's office provided

8    it.  I think we got it from FJS once they got

9    permission from Mr. Staller's office.

10   Q.   When you refer to FJS, is that an

11   acronym for Forensic JobStats?

12   A.   Yes.

13   Q.   So the information that was provided to

14   you, did you query the database?

15   A.   We don't query the database, Forensic

16   JobStats queries the database.  It's rather

17   massive and we don't necessarily query it.  We do

18   look at parameters that we want to research.

19   Q.   And who determines the parameters that

20   are researched on Forensic JobStats?

21   A.   It would be -- well, Mr. Staller's

22   office ordered it and then we looked at those

23   parameters and I believe we also assessed them

24   and believed that they were appropriate.

25   Q.   Do you know whether your analysis of the

1                    R. Wexler - Confidential

2     Forensic JobStats data differs in any way from

3     Mr. Staller's analysis of that data?

4          A.   I would have to check but I think we

5     found -- we went through the numbers and we

6     thought we found a discrepancy, it turned out we

7     did not.  So I would say no.

8          Q.   When you say "we went through the

9     numbers," who are you referring to?

10         A.   My associate, Dr. Turner.

11         Q.   Dr. Turner and yourself went through

12    certain numbers, correct?

13         A.   Yes.

14         Q.   Which numbers did you go through with

15    Dr. Turner?

16         A.   The numbers -- with Forensic JobStats,

17    we went through the numbers of the different job

18    openings that were posted that were identified

19    through Forensic JobStats and did some sampling

20    of it as well.  That's a pretty much it.  And

21    then, although, we had some questions it turned

22    out we were pretty much on the same page.

23         Q.   You were pretty much on the same page as

24    what?

25         A.   As to the numbers of job openings that

1                    R. Wexler - Confidential

2   we found that were published and appropriate and

3   that weren't duplicates.

4       Q.   I just want to understand what you're

5   telling me a little bit more closely.

6       You were provided with numbers from Forensic

7   JobStats or from Mr. Staller; is that correct?

8       A.   Yes.  I'm pretty certain -- I will

9   double check -- it if came directly from Forensic

10  JobStats once we had permission to obtain that

11  information.

12      Q.   Okay.  Those numbers pertain to what?

13      A.   The published job postings that met

14  certain criteria that we believe Ms. Fischman was

15  qualified to make application to.

16      Q.   Okay.  So are you referring to the

17  quantity of the job postings that were

18  published -- the number of them?

19      A.   Yes, the quantity.

20      Q.   And you said that those met certain

21  criteria, correct?

22      A.   Yes.

23      Q.   Who determined what criteria were

24  applied to the query of the FJS database?

25      A.   Well, I believe it was Mr. Staller's

1                    R. Wexler - Confidential

2    office.

3        Q.   Did you use the same criteria for the

4    query that Mr. Staller's office used?

5        A.   Well, we didn't order a second run.  So

6    whatever was provided to us, that was it.  And it

7    appears that we used the same criteria at that

8    point.

9        Q.   I'm trying to understand a little more

10   closely.

11       Did you design your own criteria to query the

12   Forensic JobStats' database?

13       A.   No, we did not, Mr. Staller's office did

14   that.

15       Q.   To the extent that you're using a query

16   of the Forensic JobStats' database, are you

17   relying on the work of Mr. Staller to designate

18   that query.

19            MS. PRIMAVERA:  Objection.

20       A.   Yes.

21       Q.   Did you review the work of Mr. Staller

22   in designating that query at the Forensic

23   JobStats' database?

24       A.   We reviewed the criteria that he used to

25   source those jobs.  He did provide those.

1                R. Wexler - Confidential

2      Q.   Are those criteria listed somewhere on

3   your with expert report?

4      A.   I don't believe so.

5      Q.   Okay.  So can --

6           MR. BERMAN:  Withdrawn.

7           Toni, can you please pull up the expert

8      report.  It's one of the exhibits that was

9      sent to you.

10          Mark this exhibit as Wexler Exhibit 1.

11     And for identification, this is the report

12     that was prepared by Rona E. Wexler, M.A.,

13     ABVE/D and it's entitled Jennifer Fischman

14     Vocational Evaluation Report.

15          (Wexler Exhibit 1, marked for

16     identification.)

17          MR. BERMAN:  Toni, can you scroll back

18     up to the top of the document so we can see

19     the table of contents.

20          Can you, please, turn to page 36 of the

21     document.

22     Q.   Ms. Wexler, are you looking at Appendix

23   C?

24     A.   I am.

25     Q.   Is this a list of materials that your

1                R. Wexler - Confidential

2    report is relying on?

3        A.   Yes.

4        Q.   I don't see any indication concerning

5    your reliance upon the materials provided by

6    Mr. Staller.

7        A.   No, I do not -- and that is an

8    oversight.  Normally we attach the appendix, if

9    we wish, whatever was requested, so it becomes

10   clear and we also referenced it in the report.

11   However, it not listed in Appendix C.  I

12   understand that.

13       Q.   Was there any other material that was

14   provided to you by Mr. Staller besides the

15   Forensic JobStats information that you described

16   already?

17       A.   No, that was the only documentation that

18   we were interested in.

19       Q.   Are there any under other materials that

20   your report relies upon that are not listed in

21   Appendix C?

22       A.   Not that I can recall at this time.

23       Q.   Do you know why two different experts in

24   this case are looking at the same Forensic

25   JobStats information?

1                    R. Wexler - Confidential

2      A.    I can only tell you what I know about

3   why we use it.  So ordinarily in a case like

4   this, I would have requested the use -- I would

5   have requested the use of Forensic JobStats with

6   counsel.  They had already engaged Mr. Staller

7   and said that he had ordered it already.  There

8   were no point in --

9           MS. PRIMAVERA:  Objection.  Please don't

10      disclose any attorney/client conversations.

11          THE WITNESS:  Right.

12      Q.   Do you know what Mr. Staller was asked

13   to opine on in this case?

14          MS. PRIMAVERA:  Objection.

15      A.    I've worked with Mr. Staller before and

16   he does economical calculations on damages, I

17   guess, but that's all I know.

18      Q.   All right.  Do you know what scope of

19   work Mr. Staller was retained to provide in this

20   case?

21      A.    Not specifically.

22      Q.   What scope of work were you retained to

23   provide in this case?

24      A.    My scope of work was to evaluate Ms.

25   Fischman's employability -- employee capabilities

1                    R. Wexler - Confidential

2   as to how she can apply that to other employment

3   and to evaluate the diligence of her job search

4   to find such employment.

5       Q.   Okay.  Were you retained according -- or

6   pursuant to a contract?

7       A.   You mean, was I retained?  I'm not sure

8   I understand the question.

9       Q.   Is the work that you're providing in

10  this case pursuant to a written instrument?

11      A.   Yes, I have a retainer agreement with

12  counsel.

13      Q.   Does that retainer agreement set forth

14  the scope of work?

15      A.   It's a standard retainer agreement.  And

16  it pretty encompasses the one thing -- yes, it

17  pretty much covers the services.  It's all

18  inclusive.  Some services may not or may not be

19  utilized.

20      Q.   Does your standard retainer agreements

21  provide that your scope of work will include any

22  evaluation of employment capabilities to be

23  applied to other employment?

24      A.   Yes, it will include that type of

25  evaluation, yes, sir.

1                R. Wexler - Confidential

2        Q.    Does your standard agreement's scope of

3    work include evaluating the diligence of a

4    person's job search efforts?

5        A.    Yes.

6        Q.    Does your standard agreement's scope of

7    work include performing an analysis of duration

8    of unemployment?

9        A.    It will not state that specifically,

10   sir.

11       Q.    Do you know whether the scope of work in

12   your standard retainer agreement overlaps with

13   the scope of work that Mr. Staller was engaged to

14   perform.

15       A.    It may have overlapped.

16       Q.    Okay.

17       A.    I didn't communicate with Mr. Staller so

18   I don't know to, you know, if there was an

19   overlap.

20       Q.    Did you take any steps to ensure there

21   would be no duplication of work provided in this

22   case?

23       A.    I performed my own work according to the

24   practices that I generally employ.  So if there

25   is some duplication -- it could happen but it's

1                R. Wexler - Confidential

2    nothing that I checked.

3        Q.    Do you know whether Mr. Staller offered

4    any opinions on the same subject matter that your

5    offering opinions on?

6        A.    No, I do not.

7        Q.    Do you know whether Mr. Staller reached

8    any different opinions than the ones that you

9    reached in this matter?

10       A.    No, I have no knowledge of Mr. Staller's

11   opinion.

12       Q.    Did you make any changes to the scope of

13   work in your standard retainer agreements in

14   order to provide testimony in this case?

15       A.    I don't believe I did.  I believe it was

16   a standard -- rather all-encompassing standard

17   agreement.

18       Q.    Can you tell me what opinions you're

19   offering in this report?

20       A.    My opinions refer to a couple of

21   different areas.

22             One is evaluating Ms. Fischman's

23   employment history and the skills and knowledge

24   and capability she developed throughout heifer

25   career.  How those might apply to related

1              R. Wexler - Confidential

2    occupations for employment where she could be a

3    competitive candidate to find employment in those

4    areas -- those roles.

5              And then it was to evaluate what was a

6    reasonable expectation about the duration of her

7    unemployment.

8              And lastly what efforts she made to find

9    such employment that met the standards of a

10   reasonable diligent job search during her period

11   of unemployment.

12   Q.    Okay.  Feel free to reference or to

13   direct the court reporter to scroll you through

14   the document if that assists you in providing

15   answers, okay.

16   With that understanding that you're free to

17   instruct the reporter to change the display, how

18   many opinions are you offering in this expert

19   report?

20   A.    I think we should go to the summary so I

21   can take a look at that just to be sure.  The

22   summary will be probably be somewhere on page 25

23   or 23 -- something like that.

24             As you can see in the summary on page

25   23, I summarized a statement about Ms. Fischman's

1                   R. Wexler - Confidential

2    extensive experience and employment history as a

3    lawyer and some of the areas in which she had

4    practiced.

5              And then the other opinion -- opinions

6    that I offered was her failure to meet minimal

7    standards of time, effort, recordkeeping or

8    performing a variety of activities and

9    decisionmaking that would necessitate a diligent

10   and effective job search.

11             MR. BERMAN:  Toni, can you scroll down

12        slowly so the witness can see this summary

13        continues to the next page.

14        Q.   Ms. Wexler, let me know when you had

15   opportunity to look over the summary.

16        A.   Uh-huh.

17        Q.   Just referring to the portion of the

18   answer you just gave me, how many opinions does

19   that reflect; is that one opinion or multiple

20   opinions?

21        A.   Well, one opinion is about her

22   qualifications, obviously, and the -- what we

23   would call the employability assets that she

24   would bring to a future employer, so that is one

25   opinion.

1          R. Wexler - Confidential

2          The other one is the diligence of her

3     job search, how she planned it, carried it out,

4     and how it met the standards that's known in my

5     profession as the standards of a diligent job

6     search.  And inside of that opinion is that her

7     quantity of job search activities, in my

8     professional opinion, were at a reasonably low

9     number during the 19 month period following her

10    departure from Mitsubishi.

11    Q.    So is that three opinions?

12    A.    Well, I would say that the last portion

13    of my answer is embedded in the major opinion

14    about efforts to execute a diligent job search.

15    Q.    Okay.  Do we agree then you're offering

16    two opinions?

17    A.    It appears so.

18    Q.    Are you offering any other opinions in

19    this matter at trial -- if it goes to trial?

20    A.    Can we scroll down to the conclusion

21    please just so I can make sure I see that.

22    Q.    Sure.

23    A.    Further down -- just this page.

24          The other opinion I have proffered is

25    that within a certain period of time she had a

1          R. Wexler - Confidential

2    reasonable expectation to have found new

3    employment as a lawyer with compensation that

4    would be comparable to what she had last earned

5    at Mitsubishi.

6        Q.   Did you say within employment comparable

7    to what she had at Mitsubishi?

8        A.   With employment -- with employment or

9    compensation.

10           MR. BERMAN:  Toni, can you please pull

11       up -- it's going to be another exhibit

12       marked Wexler Exhibit 2 -- PDF labeled

13       2020.09 CV, underscore, Rona Wexler.

14           (Wexler Exhibit 2, marked for

15       identification.)

16           THE WITNESS:  Yes, that's my CV.

17           MR. BERMAN:  I've identified for the

18       record that Wexler Exhibit 2 is the CV that

19       we were provided for Rona Wexler.

20       Q.   Ms. Wexler, are you looking at the

21    document?

22       A.   Yes.  It's cut at the top -- yes, I am.

23       Q.   You've seen this document before,

24    correct?

25       A.   Yes, I've seen it many times.

1              R. Wexler - Confidential

2      Q.   Is it a current version of your CV?

3      A.   At the time, yes.  It's still pretty

4  current, yes.

5      Q.   Have there been any material changes to

6  your CV since you provided it in this matter?

7      A.   I would say no material changes, no.

8      Q.   Does this CV reflect your qualifications

9  to give testimony in this matter?

10     A.   I believe it does.

11     Q.   Do you have any other qualifications to

12  provide testimony in this matter that are not

13  listed in your CV?

14     A.   I don't believe so.

15     Q.   Do you have a degree in undergraduate

16  education?

17     A.   I do.  I have baccalaureate degree from

18  Emerson College with major in English literature

19  and two minors; one in education and the other is

20  in communications -- speech and communications.

21     Q.   Do you have any other postgraduate

22  degrees?

23     A.   I have a graduate degree and a Master of

24  Arts from New York University Steinhardt School

25  of Education in counseling, psychology and

1          R. Wexler - Confidential

2    guidance.

3        Q.    Do you have any other degrees?

4        A.    No, I do not.

5        Q.    Do you have any scientific training?

6        A.    No.

7        Q.    Do you have any statistical training?

8        A.    Other than what I encountered in my

9    graduate studies, no.

10       Q.    Did you have statistical training in

11   your graduate studies?

12       A.    Somewhat.

13       Q.    What was the extent of your statistical

14   training in your graduate studies?

15       A.    A basic course in statistics.

16       Q.    Are you an expert in statistics?

17       A.    Absolutely not.

18       Q.    Do you have any degrees in economics?

19       A.    No.

20       Q.    Do you have any certifications in

21   economics?

22       A.    No, I do not.

23       Q.    Do you have any degrees in labor market

24   analysis?

25       A.    I don't have a degree in labor market

1                    R. Wexler - Confidential

2    analysis.

3        Q.    Do you have a degree in economics?

4        A.    No, I do not.

5        Q.    Do you have any certifications in labor

6    market analysis?

7        A.    The only certification I have is as a

8    diplomate with American Board of Vocational

9    Experts, which requires us to have knowledge and

10   ability to assess labor market research.

11       Q.    What is the American Board of Vocational

12   Experts?

13       A.    It is a national organization that

14   provides certification credentials for forensic

15   vocational evaluations.

16       Q.    You mentioned that you are a diplomate

17   from that entity, correct?

18       A.    I did.

19       Q.    Is a diplomate a certification?

20       A.    It is.

21       Q.    What are the elements required to obtain

22   that certification?

23       A.    First, there is a minimum requirement of

24   a graduate degree in area that is considered

25   appropriate for this type of certification, that

1           R. Wexler - Confidential

2    could be counseling, vocational rehabilitation,

3    certain social service degrees, et cetera -- so

4    that's one.

5           The other one is a minimum before you

6    can even be asked to sit for an examination, you

7    must demonstrate a minimum of seven years of

8    forensic experience as a vocational evaluator and

9    then you are required to submit an application

10   with evidence of work product that you produced

11   during your forensic experience, which is then

12   reviewed by a minimum of three peers and if you

13   are approved -- if it meets the standards of

14   methodology and work product, et cetera, then you

15   are permitted to sit for an exam that is

16   approximately four hours.  And if --

17       Q.   What is a -- go ahead.

18       A.   And if you pass the exam and all the

19   other steps then you are certified with that

20   credential.  To maintain it, you must remain a

21   member of the organization and complete at least

22   42 continuing education units over a period of

23   three years.

24       Q.   Have you completed your response?

25       A.   Yes.

1                    R. Wexler - Confidential

2       Q.    What is a vocational evaluator?

3       A.    A vocational evaluator is another term

4    for evaluating a person's employment

5    capabilities; performing a transferable skills

6    analysis where appropriate; understanding what,

7    if any, limitations might be encompassed in that

8    evaluation, how it might be accommodated and/or

9    to the degree to which it may limit someone's

10   employment if any.  And then to -- the vocational

11   evaluation will usually -- not always -- conduct

12   labor market research to understand what the

13   employment opportunity will be for the occupation

14   or profession that someone would be qualified to

15   pursue and be an active candidate for.

16      Q.    Have you ever authored a peer reviewed

17   article?

18      A.    No.

19      Q.    Have you ever participated in the peer

20   review process?

21      A.    No.

22      Q.    You've provided us a list of

23   publications in your expert report, correct?

24      A.    I have.

25      Q.    Does the list of publications you

1                R. Wexler - Confidential

2    provided in your report encompass all of your

3    publications?

4        A.   You're talking about the report, not my

5    CV; is that correct?

6        Q.   Well, let's start with the report.

7        Does your report list all of your

8    publications?

9        A.   It lists the publications that I at

10   least referenced or referred to in some way,

11   shape or form.

12       Q.   And does your list of publications in

13   the report include all of the publications that

14   you utilized in preparing your report?

15       A.   I believe it does for this report.

16       Q.   Does your CV include all of the

17   publications that you have authored?

18       A.   Yes.

19           MR. BERMAN:  Can we pull up the expert

20       report again -- excuse me -- sorry.

21       Q.   Is your list of -- is the list of

22   publications you offered on your CV or in the

23   expert report?

24       A.   On my CV, sir.

25           MR. BERMAN:  Can we pull the CV back up.

1          R. Wexler - Confidential

2     Q.   Let's start with this list -- and then

3     it continues onto the next page, correct?

4     A.   Yes, it does.

5     Q.   Can you tell me, generally speaking --

6     does this include presentations that you

7     provided?

8     A.   Yes.

9     Q.   Is there a way to discern which of these

10    items on your CV are presentations versus which

11    ones are publications?

12    A.   Let's see.  Well, I can do that for you

13    if you wish.

14    Q.   What's the easiest way to glean that

15    information?

16    A.   If it doesn't say "presenter" or

17    "panelist" then I authored it.

18    Q.   So, for example, the first entry says

19    presenter, right?

20    A.   It does.

21    Q.   That's a presentation rather than

22    publication, correct?

23    A.   Yes.

24    Q.   And the second entry also says

25    presenter, right?

1                  R. Wexler - Confidential

2      A.   Yes.

3      Q.   And the third says presenter, right?

4      A.   Yes.

5      Q.   Fourth says what co-presenter, right?

6      A.   Yes.

7      Q.   And the fifth one says author, right?

8      A.   Yes.

9      Q.   That's a publication and not a

10   presentation, correct?

11     A.   Yes.

12     Q.   Can you continue on down the list and

13   let me know if there are any other items on this

14   list that reflect your authorship rather than

15   your presentation.

16     A.   Yes, I can.  If we move down to -- move

17   to down to "How to determine a diligent job

18   search, the matrimonial strategist, American

19   Legal Media, August 2015."

20          MR. BERMAN:  Can you scroll up, Toni.

21     Q.   Does that work for you, Ms. Wexler?

22     A.   Yes.  Do you see the matrimonial

23   strategist up there?

24     A.   Yes.  I guess we can go to the next

25   page, page four.  There's another one, "For

1              R. Wexler - Confidential

2    Issues of Occupational Capacity and Imputed

3    Income -- the sixth bullet that starts with "For

4    Issues of Occupational Capacity."

5        Q.   Any others?

6        A.   Yes, there's one more, "Reentering the

7    Workforce after Divorce, New York Family Law,

8    American Legal Media" a full bullets down.

9             And the last one is would really be

10   "Vocational Experts Help Decide Parties' Ability

11   to Work, New York Law Journal, in 2008."

12       Q.   What about the one below that?

13       A.   Yes, that too.  It's a smaller

14   publication but that as well.

15            MR. BERMAN:  Toni, if you can scroll

16       back up one page.

17       Q.   Turning to the first of those works of

18   authorship, Accessing Employment Capability and

19   Earning Capacity in Family Law Matters," can you

20   tell me what general subject matter of that work

21   is?

22       A.   Sure.  It's very similar to what I do in

23   any case; employment, personal injury or family

24   law.  And that is using our professional

25   methodology to understand how to assess the

1                    R. Wexler - Confidential

2    employment capability or employability of an

3    individual and their earning capacity in the

4    world of work primarily by having some

5    opportunity to meet with them where it's

6    possible, referencing other documents that might

7    be provided from that litigation -- it's

8    generally litigation and conducting labor market

9    research and, of course, the employment

10   capabilities would include a transferable skills

11   analysis.

12          Often times in family law, an individual

13   may have been out of work for substantial period

14   of time, perhaps as a primary caregiver for the

15   family, managing other kinds of matters that are

16   related to the family.

17       Q.   What about the second work of authorship

18   on the page, "How to Determine a Diligent Job

19   Search"?

20       A.   Can you tell me which one that is.

21       Q.   It's the second to last bullet point on

22   the page we're looking at.

23       A.   "How to Determine a Diligent Job

24   Search," yes, that was with matrimonial

25   strategist, which is -- it was a publication with

1          R. Wexler - Confidential

2     American Legal Media and that entailed what are

3     the steps that we would look for someone to

4     perform the activities, the range of activities,

5     the quantity and quality of their activity in

6     following a job search plan to execute a diligent

7     job search.

8          MR. BERMAN:  If you can scroll down,

9       Toni, to the next page.

10     Q.   Do you see the one that says, "For

11    Issues of Occupational Capacity and Imputed

12    income"?

13     A.   I forgot to mention that one.  Yes,

14    that's the one I authored, yes.  I was looking

15    for that.

16     Q.   What's the general subject matter of

17    that one?

18     A.   It's another way of saying the kind of

19    work that I generally do, which is assessing

20    employment capability and earning capacity, which

21    is also tied to labor market research,

22    understanding the transferable skills analysis

23    and how it applies in that particular matter, et

24    cetera.

25     Q.   Okay.  What about the next work of

1          R. Wexler - Confidential

2    authorship, "Reentering the Workforce after

3    Divorce"?

4      A.   Yes, with New York Family Law, American

5    Legal Media.  That has a somewhat slightly

6    different approach.  It was talking about how

7    individuals may have had a sustained absence from

8    the workforce, what steps they may need to take

9    to get back into it.

10          Generally speaking, I usually recommend

11   that anyone who has been out for any significant

12   period of time -- especially out of the workforce

13   and very underemployed -- seeking services of a

14   professional career advisor or job search coach

15   as things usually have changed about looking for

16   work during that time.

17          And it also is a discussion of some of

18   the abilities a person can utilize and some of

19   the challenges they may need to make to reenter

20   the workforce and achieve their earning capacity.

21     Q.   Is it correct to understand that people

22   who have been out of the workforce for an

23   extended period of time face additional

24   challenges seeking employment?

25          MS. PRIMAVERA:  Objection.

1                    R. Wexler - Confidential

2       A.   It depends on the amount of time.  The

3  longer, the more challenging.

4            In this case, I've often worked with

5  people who have been out for over 20 years,

6  15 years, et cetera and that presents a different

7  set of challenges.

8       Q.   Do I correctly understand that people

9  who have been out of work for 15 years or more

10  face additional challenges seeking employment?

11      A.   Seeking employment that can be

12  self-sustaining or meet their earning capacity or

13  how to achieve that.  Yes, there would be more

14  challenges involved.

15      Q.   What about the subject matter of the

16  next item on the list, "Vocational Experts Help

17  Decide Parties' Ability to Work"?

18      A.   That's pretty much the same thing.

19  Generally, I got my start in family law so many

20  of these articles were directed to that.  I added

21  employment litigation after six or seven -- six

22  years.

23           In any case, at this time there's always

24  a question, particularly in marital dissolution

25  about who is capable of earning what, when and

1           R. Wexler - Confidential

2    how and understanding what brings them to the

3    situation they're in today.

4        Q.   Okay.  So the title of that work where

5    it references, "the parties ability to work," is

6    that referencing the parties in matrimonial

7    matters?

8        A.   Generally -- generally speaking.  But

9    it's rather generic as well.  It just so happens

10   that it ties to matrimonial matter in that

11   article.

12       Q.   The next work on this list, "Using

13   Vocational Experts in Matrimonial Cases to

14   Determine Earnings Capacity."

15       What's the general subject matter of that

16   work?

17       A.   Pretty much what I've self-described,

18   use different titles as away to promote a topic

19   and to educate as much as possible.

20       Q.   Have you completed your answer?

21       A.   For the most part these articles are

22   also advisory in terms of how an expert may be

23   helpful to break through some of the obstacles

24   and help move a case to settlement.

25       Q.   Is it fair to say that the intended

1          R. Wexler - Confidential

2    audience of these works is attorneys?

3          MS. PRIMAVERA:  Objection.

4      A.   Yes.  Primarily attorneys, although I've

5    seen clients reference these as well -- their

6    clients.

7      Q.   Who are you saying you seen reference

8    these, clients of who?

9      A.   The attorney's clients who might be

10   using my services -- some of them have read these

11   articles as well.

12     Q.   Other than those works of authorship,

13   which we have just been through, the remainder of

14   these items are presentations, correct?

15     A.   Yes.

16     Q.   Are they primarily CLEs presentations?

17     A.   Yes.

18     Q.   What are CLEs?

19     A.   Continuing legal education.

20     Q.   Is that provided for the benefit of

21   attorneys?

22     A.   Yes.

23     Q.   Those CLE credits, are those the same

24   kind of CLE credits that attorneys require for

25   state licensing?

1                    R. Wexler - Confidential

2        A.    Yes.

3        Q.    Are there any presentations on here that

4    are not presented primarily for an audience of

5    attorneys?

6        A.    There are a few.

7        Q.    Which ones are those?

8        A.    Well, the bottom one, "Learning to

9    Market Yourself:  Resume and Job Search Strategy

10   Workshop."  That's a more generic audience and

11   primarily to sales and marketing professionals.

12   Let's see --

13            MR. BERMAN:  I would like the court

14        reporter to scroll if it will be helpful to

15        your answer.  I want to make sure --

16       A.    There was one about -- that said "You're

17   hired, you got the interview."  If you go to page

18   four, the second bullet.  "You've Got the

19   Interview - Now to Win that Job Offer."

20            I've done some pro bono presentations to

21   women frequently those who come from more

22   challenging backgrounds and are looking to get

23   back into the workforce and so I've conducted

24   some presentations with them over a period of

25   time.  These are two.

1                R. Wexler - Confidential

2      Q.   Are there any others?

3      A.   Let's go further up.  I think that's

4  pretty much it.  The rest of them are for a

5  professional audience.

6      Q.   When you say "professional audience,"

7  what do you mean?

8      A.   I mean primarily attorneys, business

9  valuation specialists, those who work in any

10  field where my work might overlap or we would

11  work as different experts on a particular matter.

12          MR. BERMAN:  You can put the CV away for

13      now, please, Toni.

14      Q.   Is this --

15          MR. BERMAN:  Withdrawn.

16      Q.   You testified earlier today you're

17  offering two opinions that have subcomponents,

18  correct?

19      A.   That have what?

20      Q.   Subcomponents.

21      A.   Yes.

22      Q.   Is that a fair characterization of your

23  testimony?

24      A.   I believe so.

25      Q.   Is one of those opinions that Ms.

1          R. Wexler - Confidential

2     Fischman failed to perform a reasonably diligent

3     job search after her termination on January 30,

4     2017?

5          MS. PRIMAVERA:  Objection.

6     A.   Yes.

7     Q.   Is that a fair characterization of your

8     opinion?

9     A.   Yes.

10    Q.   Is that opinion based upon a review of

11    Ms. Fischman's education?

12    A.   Yes.

13    Q.   Is it based on review of her experience?

14    A.   Yes.

15    Q.   Her skills?

16    A.   Yes, as described in her resume.

17    Q.   Her knowledge?

18    A.   Yes.

19    Q.   Her employment history?

20    A.   Yes.

21    Q.   Local labor market research?

22    A.   Yes.

23    Q.   Documents pertaining to her job search

24    activity?

25    A.   Yes.

1                R. Wexler - Confidential

2       Q.   And your experience recruiting and

3    evaluates candidate qualifications while

4    considering the available data regarding

5    potential job opportunities available in Ms.

6    Fischman's field from 2017 to present?

7       A.   Yes.

8       Q.   Is it based on anything beyond those

9    things I've identified?

10      A.   I believe that's everything I

11   considered.

12      Q.   Okay.  Was your review of Ms. Fischman's

13   education based upon her resume?

14      A.   Yes.

15      Q.   Was it based on anything else?

16      A.   No.

17      Q.   Was your review of Ms. Fischman's

18   experience based on her resume?

19      A.   Her resume, her LinkedIn profile, yes.

20      Q.   Was it based on anything else?

21      A.   No.

22      Q.   Was your review of Ms. Fischman's skills

23   based upon her resume?

24      A.   Yes.

25      Q.   Was it based on anything else?

1                    R. Wexler - Confidential

2        A.    Strictly the written documentation that

3    I had regarding her abilities and knowledge and

4    skills.

5        Q.    Was your review of her knowledge based

6    upon her resume?

7        A.    Yes.

8        Q.    Was it based on anything else?

9        A.    No.

10       Q.    Was your review for employment history

11   based on her resume?

12       A.    Yes.

13       Q.    Was it based on anything else?

14       A.    Not that I can recall.

15       Q.    Do you have any experience as a

16   recruiter?

17       A.    As a recruiter, yes.

18       Q.    Generally speaking, what's the nature of

19   your recruiter experience?

20       A.    I have experience as a managing partner

21   with a firm -- which is on my CV -- Ariel

22   Associates in Manhattan.  I was involved in that

23   for approximately eight years with my partner.

24   Our specialty was in media and publishing -- all

25   kinds of different publishing -- and with a

1          R. Wexler - Confidential

2   specialization in business-to-business

3   publishing.

4       Q.   Have you completed your response?

5       A.   And that we placed people at times at

6   midlevel up through the C suite -- chief

7   executive suite.

8       Q.   Do you have any experience recruiting

9   attorneys?

10      A.   Not directly.

11      Q.   When you say "not directly," what does

12  that mean?

13      A.   That the firm I was with -- the second

14  firm I was with, which was Steven Bradford and

15  Associates was also part of Howard Sloan and

16  Howard Sloan had a substantial practice in legal

17  recruiting.

18      Q.   Did you perform any work with respect to

19  the legal recruiting aspect of that business?

20      A.   No, I did not.

21      Q.   Have you got any experience placing

22  attorneys in jobs?

23      A.   No.

24      Q.   Have you got any experience working with

25  other recruiters who placed attorneys in jobs?

1                  R. Wexler - Confidential

2       A.   Yes.

3       Q.   Which ones?

4       A.   Which ones -- which -- I'm sorry, I

5    didn't quite understand the question.

6       Q.   Which recruiters who placed attorneys in

7    jobs have you worked with?

8       A.   Well, I didn't work with them directly.

9    But a number of those recruiters were with Howard

10   Sloan.  And on occasion I have spoken with them

11   as well when I'm doing labor market research.

12   But not directly working with them so that I was

13   placing -- making legal placements.

14      Q.   I want to be very clear here.

15      Do you have any experience facilitating the

16   placement of an attorney into a job?

17      A.   No, I not.

18           MS. PRIMAVERA:  Objection.

19      Q.   Do you have any legal experience of your

20   own?

21      A.   No.

22      Q.   Do you have any training in any legal

23   field of experience?

24      A.   I have no legal training.

25      Q.   In your expert report, page 13 -- so

1                    R. Wexler - Confidential

2       we're looking at a portion of the report that's

3       under Section V, which is your analysis of

4       employability.

5           A.   Yes.

6           Q.   The top of this page there's a statement

7       here that says the following, "At the time she

8       became unemployed on January 30, 2017, Ms.

9       Fischman had demonstrated markedly significant

10      transferable skills that positioned her as a

11      competitive candidate for positions as a chief

12      legal officer/counsel, lead corporate or general

13      corporate counsel."

14          Do you see that statement?

15          A.   I do.

16          Q.   What is the basis for the statement here

17      that Ms. Fischman had demonstrated markedly

18      significant transferable skills?

19          A.   I'm sorry, what is your question?

20          Q.   In your report you say Ms. Fischman had

21      demonstrated markedly significant transferable

22      skills, do you see that?

23          A.   I do.

24          Q.   What is the factual foundation

25      underlying the conclusion that she demonstrated

1                    R. Wexler - Confidential

2    markedly significant transferable skills?

3         A.    Well, she had extensive experience as

4    general counsel working with Raytheon for quite a

5    few years, as well as Mitsubishi, and prior to

6    that with at least two major law firms.  During

7    which time she had experience in all kinds of

8    legal functions -- you know, law matters,

9    everything from intellectual property, to mergers

10   and acquisitions and/or employment contracts and

11   many other types of matters that a corporate

12   lawyer would be involved in.  And these were

13   described before in my report as well.

14        Q.    Have you completed your response?

15        A.    Yes.

16        Q.    The statement that you just made are

17   based upon Ms. Fischman's resume?

18        A.    Correct.

19        Q.    Are they based upon anything else?

20        A.    Other than looking at her LinkedIn

21   profile as well as her resume and that's --

22   that's the primary basis for this.

23        Q.    Do you have to be an expert to review a

24   LinkedIn profile?

25             MS. PRIMAVERA:  Objection.

1                    R. Wexler - Confidential

2        A.    You don't have to be an expert but it's

3    useful to compare the to.

4        Q.    To compare the two what?

5        A.    Her resume and what she describes on her

6    LinkedIn profile.

7        Q.    Do you have to be an expert to review

8    her resume?

9             MS. PRIMAVERA:  Objection.

10       A.    You don't have to be an expert to review

11   the resume.

12       Q.    Do you have to be an expert to determine

13   that her resume demonstrated markedly significant

14   transferable skills?

15       A.    I believe that as an expert my job is to

16   evaluate what is on that resume and understand

17   what those transferable skills are and to the

18   degree to which demonstrate her ability to use

19   them.

20       Q.    When you use the word "transferable

21   skills" or the phrase "transferable skills," what

22   does that term mean to you?

23       A.    In our professional parlance,

24   transferable skills means these are skills that

25   are used in one job or a series of jobs or in

1                    R. Wexler - Confidential

2    employment history that gives you knowledge and

3    capability to execute similar tasks, executive

4    functioning and problem solving in the same,

5    somewhat different or very different roles.

6             In other words, can those skills be

7    transferred or applied to other job functions.

8        Q.   Do you have any qualifications that

9    allow you to evaluate job functions?

10       A.   Well, the certification I have as a

11   diplomate indicates that I understand how to do

12   that.  And I have training in that as well.

13       Q.   Do you have any training in the field of

14   industrial organizational psychology?

15       A.   No.

16       Q.   Are you familiar with the concept of a

17   job analysis?

18       A.   Yes.

19       Q.   Have you performed any job analyses in

20   connection with your work in this matter?

21       A.   In a formal job analysis, no.  I

22   understand how to parse out skills, you know,

23   that are before me and how to compare those.

24       Q.   Have you completed your response?

25       A.   And compare those to any published

1                    R. Wexler - Confidential

2    information about job descriptions, job analyses,

3    et cetera.

4        Q.    Have you completed your response?

5        A.    I have.

6        Q.    Are you familiar with concept of a

7    similarity index?

8        A.    I've heard of it.  I haven't necessarily

9    applied it.  It could be a term that is

10   comparable to what I do but I just don't use that

11   term.

12       Q.    Have you used any mathematical formulas

13   to compare the similarity of any of Ms.

14   Fischman's former jobs to any other jobs

15   available in the labor market?

16       A.    No, mathematical statistical analysis,

17   no.

18       Q.    Have you reviewed any published

19   information about the job analyses concerning

20   positions available to Ms. Fischman in the local

21   labor market?

22       A.    Have I reviewed any vocations or

23   research did you say?

24       Q.    No.  I said published -- have you

25   reviewed any published information about job

1                    R. Wexler - Confidential

2    analyses pertaining to jobs in the local labor

3    market to which Ms. Fischman could have

4    potentially have applied?

5        A.   I haven't looked at specific job

6    analyses per se.

7        Q.   In any where in your report have you

8    conducted an expert analysis comparing the

9    similarity of Ms. Fischman's prior jobs -- and

10   when I say "prior jobs" I mean prior to her

11   termination from Mitsubishi -- have you've done

12   any scientific or expert analysis comparing Ms.

13   Fischman's prior jobs to any of the available

14   jobs in the local labor market?

15           MS. PRIMAVERA:  Objection.  Several

16       questions in one.

17       Q.   Do you understand the question?

18       A.   Yes.

19       Q.   You can answer.

20       A.   The analyses I perform are methodical

21   and clearly stated.  However, I would not say

22   that they are a scientific analysis because I'm

23   not sure how you're using the term "scientific".

24       Q.   Thank you for your response.  Have you

25   completed it?

1                R. Wexler - Confidential

2      A.   Yes.

3      Q.   I'm actually asking you something

4  different.

5      A.   Okay.

6      Q.   What I'm asking you is whether you

7  conducted any methodological comparison of the

8  jobs that Ms. Fischman held at Mitsubishi to the

9  jobs that were in the local labor market?

10     A.   Yes, I looked at the jobs that were in

11 the local labor market that were available and

12 described from Forensic JobStats and compared

13 those -- at least a good sampling of them -- to

14 what was -- to her job history -- to her

15 employment history and the functions that she had

16 performed.

17     Q.   So then with respect to each job listing

18 from Forensic JobStats, did you compare the

19 similarity of Ms. Fischman's prior jobs at

20 Mitsubishi to that particular entry?

21     A.   I'm not sure I compared every single one

22 of those jobs but certainly a good representation

23 and I looked for keywords as well because

24 Forensic JobStats does issue a listing of

25 keywords that we can also reference in the job

1              R. Wexler - Confidential

2     description.

3         Q.    Okay.  You referred to the term "a

4     sample," what was the sample that you referred

5     to?

6         A.    Let's see.  I would say that I went

7     through a good portion of the jobs but some seem

8     to be very similar so I might not have spent as

9     much time with one job as I did with another,

10    particularly if I wasn't sure if it was a good

11    fit or good enough fit to at least get her to

12    apply and be invited for an interview.

13        Q.    Have you completed your response?

14        A.    I have.

15        Q.    How can we determine from reviewing your

16    report which jobs you included in your sample and

17    which jobs you did not include in your sample?

18        A.    There's no way to do that.

19        Q.    How can we determine from your report

20    how to replicate the work that you performed?

21        A.    I'm not sure how we would do that.  I

22    would have to review my -- you know, what I

23    looked through and how it did -- I'm not sure you

24    would replicate it.

25        Q.    Do you consider Mr. Staller and expert

1                R. Wexler - Confidential

2      in your field?

3              MS. PRIMAVERA:  Objection.

4         A.   Mr. Staller and I have some overlap in

5      our field but we also have some differences.

6         Q.   Is the use of the Forensic JobStats'

7      database an area of overlap between you and Mr.

8      Staller?

9         A.   Yes, I would say at this time it is.

10        Q.   If I provided a copy of your expert

11     report to Mr. Staller, would he be able to

12     replicate your analysis of the Forensic JobStats'

13     database?

14             MS. PRIMAVERA:  Objection.

15        A.   I don't know.  I do know our numbers are

16     very similar.  I know that we each went through

17     that process.  I can't say that he has -- he

18     would be able to say, oh, yes she reviewed that

19     job, that, that job, and job.

20        Q.   If I provided your expert to any other

21     expert with an understanding at an expert level

22     of the Forensic JobStats' database, would such an

23     expert be able to replicate your work?

24             MS. PRIMAVERA:  Objection.

25        A.   I believe that if they were to refer to

1                    R. Wexler - Confidential

2     the reports that Forensic JobStats produced, they

3     would be able to do so.

4         Q.   You haven't provided those reports to

5     us, have you?

6              MS. PRIMAVERA:  Objection.

7         A.   I did not provide them, no.

8         Q.   So based upon what you provided, is

9     there any way for me to double check your work?

10             MS. PRIMAVERA:  Objection.

11        A.   Only if you have the Forensic JobStats

12    for Mr. Staller.

13        Q.   Further down that paragraph you make

14    another statement says, quote, "In my

15    professional opinion and experience, considering

16    her two decades of in-depth transferable skills

17    and knowledge in complex corporate transactions

18    and her age, had she engaged in a reasonable and

19    diligent job search, she was a competitive job

20    applicant for numerous comparable level positions

21    to those she held at Mitsubishi Chemical

22    Holdings."

23             Do you see that statement?

24        A.   I do.

25        Q.   When you refer to comparable level

1                R. Wexler - Confidential

2     positions in that statement, to what are you

3     referring?

4          A.    I am referring to different levels of

5     general counsel, associate general counsel,

6     corporate counsel.  It could be internal counsel,

7     it could be counsel with a law firm -- another

8     law firm -- an outside firm.

9          Q.    Okay.  Do you have any independent

10     knowledge of knowing which candidates are

11     considered competitive for the positions you just

12     described?

13          A.    I rely on my knowledge of somebody's

14     capabilities and what they demonstrated in their

15     history and therefore how they would be

16     positioned to be a competitive candidate.

17          Q.    How are you situated to know who are

18     going to be competitive candidates for different

19     legal positions in the legal market?

20          A.    Well, part of it is my experience in

21     doing this for quite some time and evaluating

22     numerous attorneys and their roles, especially

23     when become unemployed or they're starting to

24     continue to look for employment.

25                I also will communicate with certain

1          R. Wexler - Confidential

2   recruiters that I know and ask their thoughts on

3   that as well.

4       Q.   Okay.  So you have no independent

5   knowledge of your own concerning which candidates

6   are competitive for particular legal positions,

7   do you?

8          MS. PRIMAVERA:  Objection.

9       Q.   You can answer.

10      A.   I think I do.

11      Q.   What is the basis for your independent

12  knowledge of who is considered a competitive

13  legal candidate for a particular legal job?

14      A.   Understanding what -- because of the

15  work I've done in consulting with other legal

16  recruiters and how having a good sense of what

17  positions somebody to be a good candidate.

18      Q.   So you're relying upon your own

19  experience, correct?

20      A.   My own experience and my consultation

21  with other legal professionals.

22      Q.   Are you relying upon anything else other

23  than your own experience and consultation with

24  other legal professionals?

25      A.   No, that is what I'm relying upon.

1                    R. Wexler - Confidential

2         Q.    What professional consultations did you

3    make with other legal professionals in the

4    preparation of this expert report?

5         A.    I consulted with a number of legal

6    recruiters -- about two or three -- about the

7    condition of the marketplace, how someone's

8    experience like this might position that

9    individual to seek work as inside counsel or

10   outside counsel.

11        Q.    Where are those consultations reflected

12   in your expert report?

13        A.    They're not reflected in my expert

14   report, they're just layers of experience that

15   I've acquired over the years.

16        Q.    I asked you whether this report --

17   earlier today I asked you whether this report

18   contains all the information you relied upon in

19   preparation of your testimony today --

20        A.    Yes.

21        Q.    -- do you remember that?

22        A.    Yes.

23        Q.    You didn't reference reliance upon

24   professional consultations previously, did you?

25             MS. PRIMAVERA:   Objection.

1                R. Wexler - Confidential

2        A.    No.

3        Q.    Is there anything that you relied upon

4    in providing your expert opinions in this matter

5    that is not contained in this expert report?

6        A.    No.

7        Q.    Which professionals did you consult,

8    that you just described, in preparation of

9    your -- or in formulation of your expert opinion

10   in this matter, who are they?

11       A.    Let's see.  One would be Michael Lord or

12   Andrew Berman.  Those would be two that I

13   referred to before.

14             It really is for me to get a lay of the

15   land, understand the competitive marketplace and

16   if these skills are in demand.

17       Q.    Who is Michael Lord?

18       A.    He's an executive recruiter -- executive

19   legal recruiter.

20       Q.    What entity is he affiliated with?

21       A.    It's his own form.

22       Q.    What does that firm do?

23       A.    They place partners and some GCs --

24   general counsel and associates -- it depends,

25   it's a range.

1                    R. Wexler - Confidential

2       Q.   When is the last time you spoke with

3    Michael Lord?

4       A.   I spoke with him on another matter about

5    four weeks ago perhaps.

6       Q.   Did you consult with Michael Lord in

7    connection with this matter?

8       A.   I don't believe so.

9       Q.   Who is Andrew Berman?

10      A.   He's his partner.

11      Q.   When is last time do you consulted with

12   Andrew Berman?

13      A.   About five weeks ago --

14      Q.   Did you consult --

15      A.   -- maybe six.  I did not consult with

16   him on this matter, no.

17      Q.   Did you consult with anyone else in

18   connection with this matter?

19      A.   No.

20      Q.   Are you relying upon any information

21   provided to you by anyone else in connection with

22   this matter?

23      A.   Other than the general knowledge I've

24   acquired about legal recruiting from other

25   matters, no, I have not consulted with anyone

1                    R. Wexler - Confidential

2    else.

3        Q.    Do you have any firsthand experience

4    with legal recruiting whatsoever?

5        A.    No, I don't.

6        Q.    Turning now to page 14 of your report,

7    I'll direct your attention to the second

8    paragraph on this page under heading A,

9    "Expectation and Accepted Standards of a Diligent

10   Job Search."

11       Do you see the second paragraph here?

12       A.    I do.

13       Q.    I'll direct your attention to the first

14   full sentence of this paragraph which reads as

15   follows, quote, "The elements of a reasonable job

16   search have been a regular subject of numerous

17   articles published in print and online

18   publications, including those identified in

19   Appendix B, such as The Wall Street Journal, The

20   New York Times, Forbes.com, Forbes and Money and

21   US News and World Report as well as many other

22   easily accessible job posting sites."

23       Do you see that sentence?

24       A.    I do.

25       Q.    Are any of the elements of a reasonable

1                    R. Wexler - Confidential

2   job search described and academic research cited

3   within your expert report?

4       A.   Yes, actually there are a number of

5   citations.

6       Q.   Where can I find those?

7       A.   It might be quicker -- I have a printed

8   copy.  If I have your permission to look at it,

9   it might be quicker to do that but I want to make

10  sure it's okay with you.

11      Q.   As long as you're referring to the same

12  expert report, the same version, then I'm fine.

13      A.   It is exactly same the version.

14           On page 17 of this report I also

15  reference what the standards are, and that would

16  be under D, "Minimal Applications Over Three

17  Years," the third paragraph down, "Thus, Ms.

18  Fischman engaged in 1.18 applications per week

19  from January 2017 through September 2018."

20           And then if we follow that down,

21  starting with the sentence "A sustained,

22  full-time job search, over a multiyear period,

23  may be difficult to maintain during an extended

24  period of unemployment.  It is understood that

25  job seekers often reduce their search intensity

1             R. Wexler - Confidential
2    over time, but then increase their search efforts
3    again if remain unemployed."  And you see a
4    reference to Wanberg, Zhu, Kanfer & Zhand, Oxford
5    Handbook, page 269, which is also referenced on
6    the prior page, on page 16, although the footnote
7    carried over.
8            In any case, this is a very
9    well-regarded handbook of heavily researched
10   articles examining job search, re-employment and
11   how the level of activity is tied to success.
12   Q.   Have you completed your response?
13   A.   I have.
14   Q.   Respectfully, I don't think you answered
15   the question I asked.
16           MR. BERMAN:  I'll ask the court reporter
17       to read it back.
18           (Whereupon, requested portion of
19       testimony read back.)
20   Q.   Where can I find a list of the sources
21   that identify, "The elements of a reasonable job
22   search"?
23   A.   Let me make sure I understand the
24   question.  The question is where you can find the
25   citations of a reasonable diligent job search?

1          R. Wexler - Confidential

2    On page 17 just below minimal applications over

3    three years, it starts with the sentence, "As

4    noted previously, when unemployed, the minimum

5    expectation for a diligent job search is two to

6    six hours of active job search activities per

7    day, cited footnote 26, Wanberg, Zhu and Van

8    Hooft."

9         Q.    Have you completed your response?

10        A.    I have.

11        Q.    Does Wanberg, Zhu and Van Hooft use the

12   quoted term, "diligent job search"?

13        A.    They -- I'm not sure if they use the

14   term "diligent" -- I would have to double check.

15   But, obviously, they -- the term "the minimum

16   expectation for a job search is."

17        Q.    Okay.  Does that citation Wanberg, Zhu

18   and Van Hooft use the phrase "reasonable job

19   search"?

20        A.    Yes, it does.  "A reasonably diligent

21   and motivated job seeker will approach obtaining

22   new employment as their full-time job and will

23   pursue multiple employment opportunities in

24   parallel throughout their job search.  A diligent

25   job search effort to get hired is time consuming

1                  R. Wexler - Confidential

2    and time intensive."  This is footnote 27 and

3    it's the same -- it's Wanberg, Zhu, Kanfer and

4    Zhand from the Oxford Handbook, page 269.

5        Q.   Are you replying upon any other source

6    for your opinion as to what constitutes a

7    reasonably diligent job search?

8            MS. PRIMAVERA:  Objection.

9        A.   Yes.

10       Q.   Where can I --

11       A.   I am also looking at on page 16, the

12   second full paragraph that states, "Job findings

13   success is also closely associated with the

14   quantity of interviews achieved during the job

15   search."  And that also that is an opinion stated

16   by Saks and Ashforth in the 2000 Oxford Handbook

17   of job loss and job search, page 268.

18       Q.   Are you familiar with the legal standard

19   applicable to a plaintiff in a wrongful

20   termination case who is charged with the duty to

21   mitigate their damages?

22           MS. PRIMAVERA:  Objection.

23       A.   I am familiar with it, yes.

24       Q.   Do you know whether that legal standard

25   is the same standard that you're looking to in

1              R. Wexler - Confidential

2    the academic sources that you cited in your

3    report?

4            MS. PRIMAVERA:  Objection.

5        A.   I believe it is somewhat less but I'm --

6    my job is to assess what I believe is a true

7    diligent job search.

8        Q.   Is it fair to say that your assessment

9    differs from the legal standard?

10           MS. PRIMAVERA:  Objection.

11       A.   It may.

12       Q.   It may differ?

13       A.   Yes.

14       Q.   Now, what methodology did you use to

15   reach your first opinion in your expert report?

16       A.   Which opinion are you referring, sir?

17       Q.   Which one do you consider your first

18   opinion?

19       A.   My first opinion in my summary of

20   opinions on page five is, "It is my opinion, to a

21   reasonable degree of professional certainty, that

22   Ms. Fischman failed to perform a reasonably

23   diligent job search after she was terminated from

24   Mitsubishi Chemical Holdings America on January

25   30, 2017."

1              R. Wexler - Confidential

2      Q.    What methodology did you use to reach

3  that opinion?

4      A.    The methodology I used was the analysis

5  of work history, the skills and analysis she

6  acquired -- which I already mentioned -- as well

7  as my extensive experience in recruiting

8  evaluated candidate's qualifications and advising

9  them on the steps acquired to be successful in

10  their job search.

11             I also considered the available data

12  about the labor market to compare to the efforts

13  to made by Ms. Fischman.

14      Q.    Do you see under subsection three on

15  page five of your report where it says,

16  "Evaluation Methodology"?

17      A.    Yes.

18      Q.    That's what I'm asking about.  What

19  methodology did you use?

20      A.    Well, obviously, as number one states, I

21  reviewed the records and documentation that was

22  provided to me in connection with the litigation.

23             Also, to identify Ms. Fischman's

24  proficiency and skills based on those documents,

25  which, as we discussed, were relied heavily on

1                R. Wexler - Confidential

2     her resume, to a more limited degree her LinkedIn

3     profile and how she described the work that she

4     did.  And, therefore, how she positions herself

5     in her resume as a potential applicant for a job.

6         Q.   Have you completed your response?

7         A.   Yes.  And after that analysis -- so I'm

8     not done -- after that analysis, that included,

9     as I mentioned before, the labor market research

10    and reviewing her documents and quantifying and

11    assessing her efforts in the job search.

12        Q.   Have you completed your response?

13        A.   I have, sir.

14        Q.   Okay.  Have the -- the methodology that

15    you just described to me, is that the same as

16    what's listed in the report under Section III?

17        A.   Yes.

18        Q.   Is that part of the vocational and

19    rehabilitation assessment model?

20        A.   Yes.

21        Q.   So are you listing for me the steps of

22    the vocational and rehabilitation assessment

23    model, which you incorporated into your analysis?

24        A.   Yes.

25        Q.   Are you familiar with the underlying

1                R. Wexler - Confidential

2    vocational and rehabilitation assessment model?

3        A.    I am, yes.

4        Q.    Can you tell me how many steps are

5    contained within that model?

6        A.    Oh, gosh, there are quite a few steps.

7    I summarized these.  But it's reviewing all the

8    documents, it's conducting -- it's assessing the

9    job skills required to perform different tasks in

10   a particular occupation and -- including

11   executive functioning; communication;

12   self-organization; leadership, where there is

13   necessary communication skills, able to analyze

14   information, assess it, utilize it to conduct

15   their work problem solving; advising others;

16   listening skills.  It's pretty detailed.  I

17   thought for the purposes of this report some of

18   this was, shall we say, more obvious and I didn't

19   need to list all of that in quite that amount of

20   detail.

21       Q.    Have you completed your response?

22       A.    Only to add that the summary of her

23   experience in each of her jobs also included the

24   skills that -- the task she performed and the

25   skills that she would need to perform those, were

1                R. Wexler - Confidential

2    also indicated later on.

3        Q.    Have you now completed your response?

4        A.    Yes.

5        Q.    Your expert report cites the vocational

6    and rehabilitation assessment model in footnote

7    three, doesn't it?

8        A.    It does.

9        Q.    In your cite to that model, your report

10   states, "I used standardized systemic vocational

11   evaluation methodology to produce valid and

12   reliable data and findings," correct?

13       A.    Yes.

14       Q.    So is the vocational and rehabilitation

15   assessment model standardized?

16            MS. PRIMAVERA:  Objection.

17       A.    There are different models.  However,

18   there are those that are standardize,

19   particularly vocational rehabilitation, that's

20   where the model began and some of the steps in

21   that model are not necessarily useful when

22   someone is not recovering from an injury or post

23   -- pre-post accident or illness that would have

24   impacted their ability to continue the work they

25   performed or to be reintroduced to the labor

1                    R. Wexler - Confidential

2    market.

3         Q.   Have you completed your response?

4         A.   Yes.

5         Q.   So I just want to clarify your answer.

6    Are you citing in footnote three multiple models

7    or one model?

8         A.   There's generally one basic model.

9              MS. PRIMAVERA:  I'm just going to

10             interject really quick.  If you need a

11             break, it's been over an hour and a half,

12             please feel free to take as long as you

13             need, five minutes, ten minute.  If you're

14             good though, we can continue.

15             MR. BERMAN:  Why don't we take a break

16             at 12:00 -- it's a few minutes away.

17             THE WITNESS:  Sure.

18             MR. BERMAN:  Just to repeat, any time

19             anyone wants a break, just say so, that's

20             not a problem.

21             THE WITNESS:  Okay.

22        Q.   Do you know how many steps there are in

23   the vocational and rehabilitation assessment

24   model?

25        A.   I'm not quite certain.  I think it could

1                R. Wexler - Confidential

2    be as much as 14 or 15 steps if it's really

3    detailed out.

4        Q.   Okay.  How many steps of that model did

5    you apply in your expert report?

6        A.   There's the job analysis, there's the

7    skills assessment and they're looking at her

8    skills and understanding what level of capability

9    she had and what was required in the various

10   jobs.  I would say it's probably somewhere close

11   to seven or eight.

12       Q.   Correct me if I'm mistaken but doesn't

13   your expert report list five steps?

14       A.   Yes, they're summarized.  You know, I

15   don't generally list every single small piece

16   that goes into it.

17       Q.   Well, of the 14 steps in the vocational

18   and rehabilitation assessment model, how many did

19   you use?

20       A.   I also want to add that I'm not sure if

21   it's 14 steps because they go through all these

22   different types of minor steps that are -- you

23   know, if use a computer program, for example,

24   it's going to give you more steps.  But I

25   estimate that I used a minimum of six to eight --

1                    R. Wexler - Confidential

2      at least eight.

3           Q.   Have completed your response?

4           A.   Yes.

5           Q.   So I see five items enumerated on here.

6      Do any of these five items incapsulate more than

7      one step?

8           A.   Of course, if I'm conducting an

9      employability analysis to include labor market

10     research, I could certainly break those down into

11     numerous steps, including where the jobs are,

12     what exactly the titles and responsibilities are,

13     are they able to be read and how to match them up

14     with her experience.

15          I could certainly break that down to

16     various steps but to me, with all of the years

17     I've been doing this, it's rather -- I know what

18     methodology I need to follow and the different

19     steps and I believe the summary was sufficient.

20          Q.   Have you completed your response?

21          A.   I have.

22          Q.   Respectfully, again, that's not the

23     question I asked you.

24          What I'm asking you is about a comparison

25     between the work that you performed and the work

1              R. Wexler - Confidential

2   you cite as the vocational and rehabilitation

3   assessment model.

4       So as you testified, the vocational and

5   rehabilitation assessment model contains multiple

6   steps; your evaluation methodology also contains

7   multiple steps but you identified five elements

8   of your methodology.

9       And my understanding of your testimony is

10  that the model you're citing has more than five

11  steps.

12      You indicated that although you got five

13  items here, that you may have conducted more than

14  five steps of the vocational and rehabilitation

15  assessment model.

16      So all of that is background to ask you

17  whether any of these items that you've enumerated

18  constitute multiple elements of the vocational

19  and rehabilitation assessment model, is that

20  clear?

21      A.   Yes.  I believe they do and some of the

22  elements in the vocational assessment model have

23  to do with additional steps about the -- how

24  should I put it -- the different physical and

25  mental capabilities for each of the tasks

1               R. Wexler - Confidential

2    performed.  When I'm working with someone on

3    professional level, such as an attorney, those

4    are much less helpful and not necessary because

5    this is not a rehabilitation employability

6    assessment.

7         Q.   Have you completed your response?

8         A.   I have.

9         Q.   My question was not how many steps are

10   necessary.

11        I'm just asking how many steps you performed.

12   You have five sentences listed here under "the

13   steps followed included," do you see that?

14        A.   I do.

15        Q.   And you indicated that the five elements

16   that you've enumerated may correspond to more

17   than five steps in the vocational and

18   rehabilitation assessment model; do I have that

19   correct?

20        A.   Yes, you do.

21        Q.   So which of the steps that you listed

22   here correspond to more than one step in the

23   vocational and rehabilitation assessment model?

24        A.   In performing an employability analysis

25   to include labor market research, that includes

1                 R. Wexler - Confidential

2      both the areas that I thought were strengths of

3      the individuals and areas that I thought might be

4      a concern.  That is that is inherent in number

5      four.

6           Q.    Okay.  So number four includes more than

7      one step from the vocational and rehabilitation

8      model; did I get that correct?

9           A.    Yes.

10          Q.    How many steps does that encompass?

11          A.    It at least two to three I would think.

12     I don't usually break it down to this degree,

13     Mr. Berman.

14          Q.    You did testify in your report -- or you

15     did state in your report you used a standardized

16     systematic vocational evaluation methodology,

17     correct?

18          A.    I did.

19          Q.    Doesn't that imply that other vocational

20     experts use the same methodology?

21               MS. PRIMAVERA:  Objection.

22          A.    We do refer to the same methodology but

23     certain steps are not necessary for every single

24     type of case.  That's my answer.

25          Q.    I'm not asking which steps are

```
 1              R. Wexler - Confidential

 2    necessary.  I'm just asking you if the model is

 3    the same model used by other vocational experts?

 4        A.   To the best of my knowledge it should

 5    be.  I can't speak to other experts.

 6        Q.   But the methodology is used in the same

 7    way that you used it here by other experts in

 8    your field?

 9            MS. PRIMAVERA:  Objection.  She

10        responded.

11            MR. BERMAN:  Her response was unclear so

12        I'm allowed to clarify.

13        Q.   Is it correct that you have not followed

14    all of the steps in that model?

15            MS. PRIMAVERA:  Objection.

16        A.   I applied all of the steps in that model

17    that I deemed appropriate and necessary.

18        Q.   So there are steps that you deemed not

19    appropriate and necessary, correct?

20        A.   Yes.

21        Q.   How many steps did you deem not

22    appropriate or not necessary?

23        A.   I can't count them.  Some of them just

24    don't apply.

25        Q.   Is the utilization of this vocational
```

1              R. Wexler - Confidential

2    and rehabilitation assessment model an exact

3    science?

4              MS. PRIMAVERA:  Objection.

5         A.   I don't know of anything that is an

6    exact science, sir.  However, it is one that is

7    relied upon and that has produced credible and

8    objective results and therefore has been accepted

9    for over 30 years or more in our profession.

10        Q.   Are you familiar with Downing

11   litigation?

12        A.   Yes, I am.

13        Q.   Did you testify in that matter?

14        A.   I did.

15        Q.   In that matter did you testify that it's

16   hard to call the analysis of the vocational and

17   rehabilitation assessment model an exact science?

18        A.   Yes.

19        Q.   Has your opinion changed since your

20   testimony in that matter?

21        A.   No, it has not.

22        Q.   You testified previously that you

23   consulted with Andrew Berman and Michael Lord,

24   correct?

25        A.   Yes, I consulted with them on numerous

1              R. Wexler - Confidential

2    occasions.

3        Q.    Do you know whether Ms. Fischman applied

4    for any jobs through Michael Lord?

5        A.    I believe she did not.

6        Q.    Do you know whether Ms. Fischman applied

7    for any jobs through Michael Berman?

8        A.    I don't believe she applied to any jobs

9    with -- other than legal recruiters -- except for

10   Bliss -- at least from the documentation that I

11   had available to me, sir.

12       Q.    So your understanding is confined to the

13   documents provided to you that are listed in your

14   expert report, correct?

15       A.    Yes, these are the documented provided

16   to me that I used.

17       Q.    So you don't know whether Ms. Fischman

18   conducted any job search efforts that are not

19   listed in the documents provided to you, do you?

20       A.    No, I have no way of knowing.

21       Q.    Were you provided with Ms. Fischman's

22   testimony in this matter?

23       A.    I don't believe so.

24       Q.    But it's not listed in your report as

25   anything you relied upon, correct?

1          R. Wexler - Confidential

2     A.   Right.

3     Q.   So does that refresh your recollection

4  as to whether you utilized her testimony in

5  preparing your report?

6     A.   No, I -- I honestly can't recall at this

7  time.  I have to reference.

8     Q.   If you relied upon it, wouldn't it be

9  listed in your report?

10     A.   Yes.  I don't believe I reviewed the

11  deposition of Ms. Fischman, just the complaint.

12     Q.   Do we agree that your report does not

13  encompass any information provided by Ms.

14  Fischman during her testimony?

15     A.   Only the information she provided to

16  defense counsel.  That's all I have.

17     Q.   So if you were not provided --

18          MR. BERMAN:  Withdrawn.

19     Q.   If you were provided with Ms. Fischman's

20  testimony, wouldn't it be listed in your expert

21  report?

22     A.   Yes, it would.

23     Q.   If it's not listed in your expert

24  report, does that tell you that you didn't rely

25  upon it?

1                  R. Wexler - Confidential

2         A.    Yes, it tells me that I did not rely

3    upon it.

4         Q.    My question is do you have any

5    independent knowledge other than through the

6    documentation provided to you whether Ms.

7    Fischman applied for jobs with either Andrew

8    Berman or Michael Lord?

9         A.    No, I don't.

10        Q.    Similarly, you wouldn't have any

11   personal knowledge of whether she was rejected

12   from any jobs from Michael Lord or Andrew Berman,

13   correct?

14        A.    Not from those individuals, that's

15   correct.

16        Q.    Thank you.  Did you ever consult with

17   anyone at BCG Legal Search?

18        A.    No, I don't believe so.

19        Q.    Do you know whether Andrew Berman has

20   any affiliation with BCG Legal Search?

21        A.    I'm not sure.  I usually refer to him

22   through the Michael Lord group.

23        Q.    With reference again to the vocational

24   and rehabilitation assessment model, would you

25   say that the use of this model is an art as much

1                    R. Wexler - Confidential

2     as a science?

3         A.    Yes.

4               MS. PRIMAVERA:  Objection.

5         Q.    And you so testified in the Downing

6     matter, correct?

7         A.    I did.

8         Q.    Has your opinion changed since then?

9         A.    No.

10        Q.    Isn't the use of the vocational and

11    rehabilitation assessment model generally based

12    upon determining whether injured or disabled

13    workers can find jobs in new fields?

14        A.    That's how it was originally developed.

15        Q.    Okay.  Isn't this methodology primarily

16    used in workman's compensation, Social Security

17    and disability cases?

18        A.    The model has been used in those --

19    particularly in personal injury, medical

20    malpractice.  That's how it was originally

21    developed.  It's, as I testified earlier, pre and

22    post injury or events.

23               However, the model itself in terms of

24    how to review someone's skills, understand how

25    they've been applied, if they're still intact and

1          R. Wexler - Confidential

2    can they be applied elsewhere in the local labor

3    market -- sometimes national, depending, will

4    still be appropriate because it's an accepted

5    step-by-step process.

6          MS. PRIMAVERA:  I will interject and

7       request we take a break at this point, it's

8       12:10.

9          MR. BERMAN:  That's fine.  How long

10      would you like to break for?

11          MS. PRIMAVERA:  It's up to you, Rona,

12      and Matthew.

13          MR. BERMAN:  How long would you like,

14      Ms. Wexler?

15          THE WITNESS:  I would say a good 10

16      minutes and --

17          MR. BERMAN:  We're going to take a lunch

18      break.

19          THE WITNESS:  Let's take five minutes

20      then.

21          MR. BERMAN:  You went in the wrong

22      direction.  I'm suggesting we take more than

23      10 minutes for lunch.

24          THE WITNESS:  20 minutes, 25 minutes.

25          MR. BERMAN:  Why don't we say 30 minutes

1          R. Wexler - Confidential

2     and we will reconvene at 12:40.

3          (Whereupon, a luncheon recess was

4     taken.)

5     Q.    Last we left off I think was continuing

6     the line of questioning on the vocational and

7     rehabilitation assessment model.

8     I believe you testified that there were

9     subsequent models that you thought were not

10    necessary.

11    Are you able to point to any literature in

12    your field of expertise supporting the claim that

13    the model that you used is valid when less than

14    all of the steps are used?

15    A.    I can't recall at the moment any

16    statement that is made per se.  I do recall the

17    model is used for people pre and post injury and

18    by the nature of that itself would indicate that

19    some of those steps could not be used.

20    Q.    Can you point to any literature in your

21    field of expertise that the model is valid at all

22    for use in litigation concerning this

23    reasonableness of a job search?

24    A.    I think the best one would be the

25    Robinson article or book, Foundation for Forensic

1          R. Wexler - Confidential

2     Vocational Rehabilitation, which also has a

3     separate chapter on employment matters and not

4     just rehabilitation.

5          Q.   Does that work address the

6     reasonableness of a person's job search?

7               MS. PRIMAVERA:  Objection.

8          A.   I don't know if the word "reasonable" is

9     used.  However, the steps are outlined.

10         Q.   Did you conduct any review of the

11    literature in your field prior to preparing this

12    report?

13         A.   Some of the literature I had reviewed

14    prior to this.  I reviewed it again as to its

15    applicability to this particular matter.

16         Q.   Okay.  Appendix D of your report --

17    excuse me, Appendix B, like boy, commencing on

18    page 33.

19         A.   Yes.

20         Q.   This is your list of standard resources

21    and references upon which your report relies,

22    correct?

23         A.   Yes.

24         Q.   Are any of these documents that are

25    cited here contained in the academic literature

1          R. Wexler - Confidential

2    in your field of knowledge?

3        A.   Any of these?  Well, the revised --

4    number 19, The Revised Handbook For Analyzing

5    Jobs, would be one.  Let's see.  We're talking

6    about research or literature?  Can you clarify,

7    please.

8        Q.   I'm talking about literature that you

9    relied upon in the preparation of your report and

10    the delivery of your opinions.

11        Which of these sources are in the body of

12    literature related to your field of study?

13            MS. PRIMAVERA:  Objection.

14        A.   Well, Richard Bolles has been someone

15    that I studied for quite sometime.

16        Q.   Are you --

17        A.   I'll get there in just a moment, sir.

18    That would be number three and also in his book

19    in number nine, under "additional resources and

20    references," "What Color is Your Parachute a

21    Practical Manual for Job Hunters and Career

22    Changers."

23            Let's see what else.  One of the other

24    articles that I referred to is number 25 in that

25    section, Triangle Publishing, "Why Networking is

1                    R. Wexler - Confidential

2    so important in a job search by deBruyn, Jason.

3            And number 32, the Oxford Handbook of

4    Job Loss and Job Search.

5       Q.   Have you completed your response?

6       A.   And the last one is a paper written for

7    the World Economic Forum, "The longer you're

8    unemployed, the less likely you are to find a

9    job.  Why?"

10           Those are the ones I can point to at the

11   moment.

12      Q.   Okay.

13      A.   And the others I incorporated from time

14   to time, you know.

15      Q.   Okay.  So pertaining to the first one of

16   those by Richard Bolles, you're referring to item

17   number three on Appendix B, correct?

18      A.   Yes.

19      Q.   Is that an article on Next Avenue?

20      A.   Yes, it's derived a lot from his books

21   that he published as well, which he's done pretty

22   much annually since 1975.

23      Q.   What is Next Avenue?

24      A.   Next Avenue is actually a publication

25   that's geared to those in the 50 age -- 50 plus

1                    R. Wexler - Confidential

2    category and they generally extract articles or

3    look to them, you know, for topics that would be

4    of interest to that population.

5         Q.    Is this entry, item number three, peer

6    reviewed?

7         A.    No, it is not.

8         Q.    Okay.

9         A.    Richard Bolles is not peer reviewed.

10        Q.    Turning to number 19, "The Revised

11   Handbook for Analyzing Jobs."  That's a

12   government handbook?

13        A.    Yes.  And that was last published in

14   '91.  The premise or the methodology used is

15   still used today and it's an underlying textbook

16   that is used in course work.

17        Q.    Did you rely upon any of the methodology

18   cited in that handbook?

19        A.    I've incorporated that methodology in my

20   day-to-day practice.  I haven't necessarily

21   referred to it in some time and the book is

22   packed away somewhere.

23        Q.    Is that methodology specifically

24   utilized in your expert report in this matter?

25        A.    Specifically?  It's an underlying

1          R. Wexler - Confidential

2   foundation, that's the best I can tell you.

3       Q.   It's a foundational work in your field

4   of study?

5       A.   Yes, it is.

6       Q.   Okay.  And it's not a peer reviewed

7   source, is it?

8       A.   I believe it was peer reviewed.  But

9   it's so long ago I really can't tell you.

10      Q.   What about number nine on the additional

11  resources, "What Color is Your Parachute," is

12  that a peer reviewed work?

13      A.   Well, that's Richard Bolles, again, and

14  wife, Mary, so it's not peer reviewed.

15      Q.   What about number 25, Triangle

16  Publishing, "Why networking is so important in a

17  job search"?

18      A.   I don't believe -- I'm not sure if

19  that's peer reviewed or not.  I know there was

20  some study that he conducted but I can't say for

21  sure.

22      Q.   What about the Oxford Handbook of "Job

23  Loss and Job Search"?

24      A.   Those articles -- well, this is a

25  handbook that contains a variety of different

1              R. Wexler - Confidential

2    chapters I should say.  Those chapters to the

3    best of my knowledge have been peer reviewed.

4        Q.   Continuing on, what about number 34, the

5    "World of Economic Forum" item, is that peer

6    reviewed?

7        A.   I believe it is peer reviewed but likely

8    by the author's peers -- because it was published

9    by the Federal Reserve Bank of New York.  But I

10   can't say exactly if it was peer reviewed or not

11   other than that it was used by the federal

12   Reserve Bank.

13       Q.   So with respect to these items that we

14   just discussed; number 3, number 19 on the

15   Standard Resources, number 10 -- I'm referring to

16   the two lists contained within Appendix B.  We

17   have under Standard Resources and References

18   items 3 and 19.

19       And Under Additional Resources and References

20   we have numbers 9, 25, 32 and 34.  Are you with

21   me?

22       A.   I am.

23       Q.   Are these six items foundational items

24   in your field of study?

25       A.   I would say for the most part they are,

1                    R. Wexler - Confidential

2    yes.  Although 34 may or may not be a

3    foundational item in our field of study, is it

4    through our own research we identify this article

5    and the research that was conducted.

6        Q.   Have you used any specific methodologies

7    from these six works within your expert report in

8    this matter?

9        A.   Specific methodologies?  Are we still

10   referring to Richard Bolles or are we not --

11   we're just referring to peer reviews?

12       Q.   Let me ask it a different way.  On page

13   five of your report you identify your evaluation

14   methodology, right?

15       A.   Yes.

16       Q.   Does that evaluation methodology on page

17   five to six of your report utilize any of the

18   specific methodologies in those six works you

19   just identified?

20       A.   I would say, as I mentioned before in my

21   prior statement and testimony, that the -- excuse

22   me -- that number -- what number was it -- number

23   19, the revised handbook, and number 22,

24   vocational assessment, evaluating employment

25   potential, they are foundational texts in my

1              R. Wexler - Confidential

2    field of expertise.

3              As far as the others are concerned,

4    Richard Bolles and Mary Emery Bolles, they have

5    been pioneers in this field for multiple decades

6    and they constantly update their recommendations,

7    it's in their manual, to reflect the changes in

8    the job world and the new tools that we have to

9    search for work.

10             Let's see.  "The Rehabilitation

11   Professional, What is a reasonable job search?

12   Developing a theoretical framework by Steward,

13   D.E. and Turner, D.T.," that's definitely one

14   that I have used and looked at.

15             And I already mentioned the forum --

16   "World Economic Forum" as something that we found

17   that seemed to have some implication in looking

18   for a job.

19   Q.   Have you completed your response?

20   A.   I'm just -- I also did refer to "Why

21   networking is so important in a job search."  But

22   honestly that -- "honestly" is a bad term -- that

23   article is simply reenforcing things that we have

24   known for sometime and that has been recommended

25   in other publications, peer reviewed and

1                R. Wexler - Confidential

2    otherwise, as to how for search for work.

3        Q.   Have you completed --

4        A.   I am completed, yes.

5        Q.   On page 5 to 6 of your expert report,

6    are you identifying more than one methodology

7    that you've employed?

8        A.   I can't say that there was more than one

9    methodology.

10       Q.   Okay.  So then the methodology that's

11   described here on pages 5 to 6 of your report is

12   the methodology you used, correct?

13       A.   Yes, it is.

14       Q.   Is that methodology the same as the

15   vocational and rehabilitation assessment model?

16       A.   It's very comparable -- it's very

17   similar, yes.

18       Q.   Is the vocational and rehabilitation

19   assessment model contained within any of the six

20   works that we identified in Wexler Exhibit B?

21            MS. PRIMAVERA:  Objection.

22       A.   I would say that the model would be

23   described in 31, "The Rehabilitation

24   Professional" as well as "The Oxford Handbook of

25   Job Loss and Job Search."  And to a certain

1                    R. Wexler - Confidential

2    degree those basic texts that I referenced before

3    and, of course, the books and publications by

4    Richard Bolles.

5        Q.   So of the six items that we discussed

6    that are listed in Wexler Exhibit B, it's not

7    clear to me whether those six contain the model

8    we've been discussing.

9        I believe you mentioned it is contained

10   within "The Oxford Handbook," did I get that

11   right?

12       A.   And "The Rehabilitation Professional."

13       Q.   But of those items, the only one that

14   has peer reviewed material in it is "The Oxford

15   Handbook," correct?

16       A.   And "The Rehabilitation Professional."

17       Q.   That one is peer reviewed as well?

18       A.   Oh, yes.

19       Q.   And the rest of items in Appendix B is

20   the "Standard Resources and References."  Aren't

21   those generally articles available online?

22       A.   Well, most of these things are available

23   online.  And, yes, the reason I include them, as

24   I stated in my report, is that their sound

25   advice, there's a consensus of opinion to be sure

1                    R. Wexler - Confidential

2    and they're readily accessible to anybody going

3    to these cites or just looking about suggestions

4    on how to conduct a good job search.

5        Q.   Is it fair to say these represent common

6    sense tips for job search seekers?

7        A.   Pretty much.

8        Q.   In your application of the vocational

9    model, does step one include the purpose of the

10   referral?

11       A.   Let me just take a look at that for a

12   moment, please.  The purpose of the rereferral

13   would be the overriding, you know, subject --

14   text -- context for all of these steps.

15       Q.   Is that one of the steps in the

16   vocational model we've been discussing?

17       A.   That can be one of the step, yes, to

18   know the purpose of what -- what purpose its

19   evaluation is supposed to serve, yes.

20       Q.   Is there a professional methodology for

21   applying that step of the model?

22       A.   Not that I can think of except to

23   understand what your role is, what you've been

24   asked to opine on.

25       Q.   Did you prepare this section of the

1           R. Wexler - Confidential

2    report yourself?

3        A.   Yes.

4        Q.   Were there any sections of this report

5    that you did not prepare yourself?

6        A.   No.  I mean, I prepared them, my

7    associate also gave me some input to a degree on

8    the research end.  This report is created solely

9    by me.

10       Q.   When you mention your associate, are you

11   referring to Dr. Turner?

12       A.   I am.

13       Q.   What area of study is Dr. Turner a

14   doctor in?

15       A.   He has doctorate in vocational

16   rehabilitation, counseling and evaluation.  He

17   has been doing this for a number of years in a

18   variety of settings.  He also has a very strong

19   background in statistical analysis and research.

20       Q.   Did he provide any statistical analysis

21   for you in connection with this report?

22       A.   He and I reviewed independently the data

23   from Forensic JobStats, which as I mentioned

24   before, I got directly from SJS and then he and I

25   reviewed that together.

1           R. Wexler - Confidential

2       Q.   Was there any part of the work done in

3   connection with this report that he performed

4   exclusively?

5       A.   No, we performed it together but he did

6   create the charts.

7       Q.   Did he rely upon any of his statistical

8   knowledge in the preparation of the charts?

9       A.   Well, what he relied upon was using his

10  statistical knowledge to go through the data and

11  be able to ascertain from some extensive sampling

12  the degree of the number of jobs, the percentage

13  of jobs that were really appropriate for Ms.

14  Fischman to make application.

15      Q.   Okay.  Did you review the sample

16  conducting by Dr. Turner?

17      A.   Yes, we reviewed it together.

18      Q.   Did you review the percentage of jobs

19  identified by Dr. Turner?

20      A.   We reviewed jobs that he had some

21  questions about whether or not we thought they

22  were appropriate or not.  One of the ones that we

23  chose to be more conservative about is we had

24  indicated that she could be a chief general

25  counsel and after looking at some of the

1                R. Wexler - Confidential

2    requirements of the jobs and her time out of the

3    field, you know, having been unemployed for a

4    certain period of time we eliminated those jobs.

5    To err on the side of caution.

6        Q.   And in connection with performing his

7    role in preparing the report, did Dr. Turner rely

8    upon his statistical background?

9        A.   I'm sure he did.

10       Q.   Did you review his work that relied upon

11   his statistical background?

12       A.   We -- I reviewed the work and then I

13   reviewed it with him.

14       Q.   Did you review the work performed by

15   Dr. Turner that relied upon his statistical

16   knowledge?

17       A.   Yes.

18       Q.   Are you qualified to review the

19   statistical work performed by a doctor?

20           MS. PRIMAVERA:  Objection.

21       A.   For the purposes of this project and

22   this assignment, yes.

23       Q.   What training and background in

24   statistics do you possess?

25       A.   My job was to help -- was to assess or

1                R. Wexler - Confidential

2     to supervise the quality check of the data that

3     we received.  From that Dr. Turner then conducted

4     an additional analysis to determine the number of

5     jobs that were appropriate that were not

6     duplicative in the report and then to a certain

7     degree use his statistical knowledge to determine

8     that.

9                For example, he determined that

10    approximately 12 percent of the jobs that we

11    reviewed were likely duplicates and we eliminated

12    them.

13        Q.    Have you completed your response?

14        A.    I have.

15        Q.    Are you qualified to determine whether

16    Dr. Turner properly assessed the percentage of

17    jobs reviewed as being duplicated?

18        A.    In this matter, yes.

19        Q.    What qualifications do you rely upon to

20    perform that review?

21        A.    Oh, my professional experience, 20 years

22    in this field, evaluating multiple individuals of

23    all different strifes and capabilities, primarily

24    white color and professionals, yes, I feel quite

25    qualified to do so.

1          R. Wexler - Confidential

2     Q.   I think you answered a more general

3 question than the one I asked you, which was what

4 qualifies you to determine whether Dr. Turner

5 accurately calculated the percentage of jobs

6 reviewed as being duplicates?

7          MS. PRIMAVERA:  Objection.

8     A.   Because we reviewed the duplicates

9 together and was therefore able to determine if

10 they were, in fact, duplicate or not.  And he and

11 I both reviewed the data in different stages and

12 I feel comfortable with his work.

13    Q.   That's not -- are you qualified to gauge

14 the quality of Dr. Turner's work when it comes to

15 mathematical or statistical knowledge?

16          MS. PRIMAVERA:  Objection.  This is

17     third time you asked the same question.

18          MR. BERMAN:  She hasn't answered it.

19          MS. PRIMAVERA:  She did.

20    A.   I said I'm qualified to understand and

21 evaluate the quality of his work in this matter.

22 The statistics in this matter are very

23 straightforward, sir.

24    Q.   Does that mean you don't need to be an

25 expert on statistics to understand the statistics

1          R. Wexler - Confidential

2    used in this matter?

3          MS. PRIMAVERA:  Objection.

4     A.   In this particular matter?

5     Q.   Yes.

6     A.   I would say yes.

7     Q.   Is it fair to say that you're not

8    relying on any expert level of knowledge in

9    statistics in connection with your work performed

10   here?

11         MS. PRIMAVERA:  Objection.  You can

12     answer.

13    A.   I am relying on my associate's knowledge

14   and my experience in doing this many times and

15   knowing what I need to do.

16    Q.   Okay.  Is your associate going to be

17   testifying in this matter?

18    A.   No, he is not.

19    Q.   So then how can I evaluate the

20   reliability of your associate's work?

21    A.   You'll have to rely on my reliability on

22   this work and that's it.

23    Q.   You referred to a quality check of the

24   data, do you recall making that statement?

25    A.   I do, yes.

1              R. Wexler - Confidential

2        Q.   Can you describe to me what your quality

3    check of the data was comprised of?

4        A.   Primarily going through the job

5    descriptions that were posted in the jobs online

6    that we found through Forensic JobStats.  We

7    would like -- I would like at the job duties,

8    responsibilities, knowledge and skills that was

9    required, including education and licensure.  And

10   comparing that to the skills, knowledge, and

11   experience that Ms. Fischman demonstrated

12   throughout her legal career, particularly in last

13   15 to 20 years.

14       Q.   Did you say comparing that to the skills

15   knowledge and experience of Ms. Fischman in the

16   last 20 years?

17       A.   15 to 20 years.

18       Q.   Now walk me through the process of your

19   quality check, please; what are the different

20   steps in that process -- what did you do first

21   and how did you proceed?

22       A.   First I look at the jobs that were

23   identified using keywords and job titles and then

24   I would look through the job description; first

25   of all, where it's located, what are the

1              R. Wexler - Confidential

2     requirements, what does this job entail, does it

3     require knowledge of certain aspects of the law,

4     does it require any supervisory roles, travel.

5     But primarily what exactly are the

6     responsibilities for the individual who is

7     applying for this position.  Generally the job

8     description can be somewhat detailed and the

9     requirements are usually pretty specific,

10    although some are preferred rather than required

11    and I look at that as well.

12        Q.   Have you completed your response?

13        A.   I'm thinking.  That's the first step in

14    reviewing the job, yes.

15        Q.   Okay.  Can you continue on and describe

16    additional steps that were consisting -- that

17    were within your quality check that you

18    described.

19        A.   So in looking through those different

20    items, I would then mentally check off the ones

21    that I thought were responsibilities or tasks

22    that Ms. Fischman can perform in that job and

23    that she could convey that with a degree of

24    credibility, knowledge and good presentation to

25    make her a competitive candidate.  Some jobs were

1              R. Wexler - Confidential

2    too entry level and we tended to eliminate those.

3    And as I mentioned before, if they were really

4    very senior jobs, it was my decision not to

5    include them.

6         Q.   Have you completed your response?

7         A.   Yes.

8         Q.   Were there any other steps in the

9    quality check you performed?

10        A.   For the most part, none of these jobs

11   have any -- I would say 95 percent of them do not

12   include any compensation.  At jobs at this level

13   they often don't.  So if they did, and it was

14   well below what someone might be earning -- and I

15   do mean very entry level or somewhat entry

16   level -- then I would not consider that as a

17   viable opportunity, that would help her mitigate

18   her damages or be a good selection for her.

19        Q.   Was there any other step in your quality

20   check that you haven't described to me so far?

21        A.   Other than geographic location or other

22   kinds of requirements such as language or

23   figuring out certain aspects of the law or an

24   industry, I would say not.

25        Q.   Have you now related to me all steps in

1                    R. Wexler - Confidential

2    your quality check or are there any other steps?

3        A.    Right now that's what I can recall.

4        Q.    Okay.  If you should recall any

5    additional steps, would you please inform me

6    immediately?

7        A.    Of course.

8        Q.    So with respect to the first part of the

9    quality check that you conducted.  Did you say

10   that that was consisting of going through the

11   postings on Forensic JobStats?

12       A.    Yes.

13       Q.    Did you personally review each of the

14   postings?

15       A.    Not every single one.

16       Q.    How many postings did you review?

17       A.    It's hard to say.  I did a number of

18   different postings -- a good sample of maybe 30,

19   40 per year -- depending on how many were

20   published.  In the first year of her job search

21   there was a lower number, it increased in 2018

22   and it increased dramatically in 2019.  So at

23   that point -- but her job search seemed to have

24   ended in 2018.

25            Nonetheless, I would say I reviewed a

1             R. Wexler - Confidential

2    significant number of these job.

3        Q.   In the first year of Ms. Fischman's

4    unemployment, how many jobs on Forensic JobStats

5    did you review?

6        A.   I would say -- especially that first

7    year, at least 45, 50 -- maybe 45.

8        Q.   You reviewed approximately 45 job

9    postings that were available to Ms. Fischman in

10   the first year?

11       A.   Yes.

12       Q.   That's 45 out of how many?

13       A.   76.

14       Q.   All right.  So the other 31 jobs you did

15   not review for that year, right?

16       A.   Not specifically, no.

17       Q.   Of the 45 jobs, you looked at the job

18   duties, the responsibilities, the knowledge, the

19   skills, the experience and the licensure; was

20   that your testimony?

21       A.   Yes.  And the type of industry that it

22   entailed, yes.

23       Q.   What types of industries did you

24   include?

25       A.   Anything to do with technology,

```
 1              R. Wexler - Confidential
 2    manufacturing, industrial.  Almost anything that
 3    was out there.  It wasn't necessarily important
 4    to stick to a particular industry because she had
 5    covered a lot of different types of functions and
 6    responsibilities as a lawyer working with
 7    Raytheon, working with one of the boards of
 8    directors, as well as her work with Mitsubishi.
 9    So she had a wide range of experience and skills
10    that could apply to multiple industries and
11    environments.
12        Q.   Is that based upon your personal
13    experience?
14             MS. PRIMAVERA:  Objection.
15        A.   It's based upon my experience as someone
16    who is looked at professionals and placed them in
17    different types of jobs and also just the
18    methodology, a job has skills that are
19    transferable to other positions.  If the
20    functions are very similar then that person can
21    be deemed as at least qualified enough to apply
22    to obtain an interview.  If there are more
23    specifics that arise during the interview -- and
24    that's sometimes happens -- then that person may
25    be eliminated, it doesn't mean she didn't have
```

1                    R. Wexler - Confidential

2      appropriate qualifications, it's more of a

3      question of fit, and in comparison with other

4      candidates.

5          Q.   But you base that off of your

6      experience, correct?

7              MS. PRIMAVERA:  Objection.

8          A.   I do --

9          Q.   You --

10         A.   -- and the methodology that I just

11     described.  We talked about transferable skills

12     analysis.  And in this case those are

13     transferable skills to a life position such as a

14     JC or associate counsel in different companies.

15     Obviously, she can go to a different type of

16     company internally or even externally and perform

17     similar work.

18         Q.   But in assessing what you described as a

19     like position or in assessing as you described it

20     similar work, you didn't use any industrial

21     psychology methodology to compare the jobs, did

22     you?

23             MS. PRIMAVERA:  Objection.

24         A.   No, and as I testified before, sir, I

25     don't use industrial psychology for this, it's

1           R. Wexler - Confidential

2     not necessary.

3           Q.   So that means that there was no job

4     analysis performed and no similarly index was

5     relied upon, correct?

6           MS. PRIMAVERA:  Objection.

7           A.   No, that's not correct.  Industrial

8     psychologists have their methodology and

9     employability experts and vocational experts have

10    theirs.  There are probably overlaps and there

11    are similarities.

12          Q.   Did you use any methodology to determine

13    or to assess the degree of overlap between Ms.

14    Fischman's jobs at Mitsubishi and the jobs in

15    Forensic JobStats' database?

16          A.   Yes, I did.

17          Q.   What was that methodology?

18          A.   Looking at the descriptions of the job

19    that she -- and the tasks that she performed in

20    her resume and comparing those to what I found in

21    the jobs that were advertised and how they

22    described the position opening.

23          Q.   So comparing the two job descriptions of

24    the job that she had and the job that was listed

25    in Forensic JobStats?

1                R. Wexler - Confidential

2       A.    Yes.

3       Q.    Okay.  Can anybody make that comparison?

4             MS. PRIMAVERA:  Objection.

5       A.    No -- actually, I found that a lot of

6   people don't make a good comparison with that if

7   they haven't had the proper training.

8       Q.    Do you need to be a vocational expert to

9   compare the jobs listed that Ms. Fischman had in

10  the jobs in Forensic JobStats?

11      A.    I think that that knowledge is

12  particularly important understanding the nuances

13  and how a description of a task may not be quite

14  appropriate for a job in another venue.  And

15  that's where I specialize in because I have a

16  great deal of business experience and I can tell

17  that.

18      Q.    Can a layperson compare the jobs just as

19  easily as you can?

20            MS. PRIMAVERA:  Objection.

21      A.    From my experience that has not been the

22  case.  I find that a layperson makes lots of

23  assumptions based on what they deem is important

24  to them and how they assess it.  I seen this many

25  times.  Attorneys sometimes do the same thing as

1                    R. Wexler - Confidential

2      a layperson.

3          Q.   I'm sorry, but didn't you just describe

4      to me that you made assumptions about the jobs

5      based on what you deem important based on your

6      experience?

7               MS. PRIMAVERA:  Objection.

8          A.   It's not just -- no, I did not state it

9      that quite that way.  I indicated that the job

10     description is one that I evaluate and analyze in

11     the context of the overall job and the company or

12     industry and then compare it to what I extract

13     from Ms. Fischman's experience, work history, et

14     cetera.  Certain terminology may appear almost

15     the same, sometimes it's not quite the same.  And

16     that is where my experience in doing this over

17     and over again has been helpful.

18         Q.   But you're relying upon your judgment to

19     do that, right?

20              MS. PRIMAVERA:  Objection.

21         A.   I am relying on my professional judgment

22     and experience.

23         Q.   You're sorting these jobs into buckets

24     but whether to include or eliminate them based on

25     that judgment, correct?

1                    R. Wexler - Confidential

2        A.    Pretty -- yes, I judge whether or not

3    they're appropriate and should be included in

4    these numbers or they're less appropriate and

5    might not be helpful in that.

6        Q.    And what label would you put on your

7    area of expertise, what would you call that?

8        A.    I would call that job analysis as well

9    as transferable skills analysis.

10        Q.    Is there an area of study that that's

11    considered, is that --

12        A.    Yes, it's in vocational evaluation and

13    vocational assessment, which I have training in.

14        Q.    Did you say vocational evaluation and

15    vocational assessment?

16        A.    Yes.

17        Q.    Let's presume that you're an expert in

18    each of those two topics.  If I found another

19    expert in each of those topics, would they make

20    that identical judgment calls that you made in

21    each instance as to whether to include or

22    eliminate the job?

23            MS. PRIMAVERA:  Objection.

24        A.    That is impossible to say.  As I

25    mentioned before, we each come with our own

1                    R. Wexler - Confidential

2    experiences with different types of positions or

3    occupations and so I would hope that the two

4    would be fairly comparable and not substantially

5    different but I can't say they will be identical.

6         Q.   As part of your assessment, did you take

7    into account the geographical location?

8         A.   Yes.

9         Q.   How did you factor that into your

10   assessment?

11        A.   Ms. Fischman, I believe lived in West

12   Chester County, highly commutable to Westchester

13   as well as New York City -- well, let me qualify

14   that -- I would say Manhattan.  I'm not so sure

15   other areas in the outer boroughs because the

16   commune might be too difficult.  So those were

17   primarily the areas we looked at unless a job --

18   and I can't recall what one did indicated that it

19   was more virtual in nature and then that would be

20   less relevant.

21        Q.   Did you factor in commuting distance in

22   your assessment?

23        A.   Yes.

24        Q.   Did you eliminate jobs based on

25   commuting distance?

1          R. Wexler - Confidential

2     A.   Not just distance, commutation.  I lived

3   in New Jersey, New York, outside D.C.,

4   Philadelphia and I know that commutation is not

5   only a radius or a distance it's also how

6   difficult that communicate can be if there's a

7   direct road to where you need to be.  Now,

8   commutation to New York is primarily by train so

9   access to the Metro North would probably be more

10  important.

11     Q.   How did you determine based on

12  commutation which jobs include and which jobs to

13  eliminate?

14     A.   If they had -- well, generally the job

15  postings indicated where they were located and

16  that was helpful.

17     Q.   So you know where the job was located.

18  How does that -- what criteria do you then

19  utilize to include or exclude the job based on

20  its location?

21     A.   Based on my knowledge of commutation

22  factors as well as distance, I would determine

23  whether or not that was feasible or not.  For

24  example, if it was near go Poughkeepsie or

25  Albany, that's a not commutable.

1                    R. Wexler - Confidential

2       Q.    What is your knowledge of what's

3    commutable based upon?

4       A.    Living in this area for 20 years, being

5    a sales rep and having to travel through New

6    York, Connecticut and Jersey, Westchester County,

7    Orange County.  I have a pretty good idea about

8    commutation.

9       Q.    That's based upon your residency,

10   correct?

11      A.    I lived in different places.  So, yes,

12   that is based upon residency.  I also worked with

13   many candidates who live all over the area and we

14   often discussed what is feasible for them and

15   what is not.

16      Q.    Are you claiming any expertise in

17   commutation?

18      A.    No, Mr. Berman, I'm not claiming

19   expertise in commutation.

20      Q.    Thank you.  Now, you said you also

21   considered licensure, right?

22      A.    Yes.

23      Q.    How did licensure factor into your

24   determinations?

25      A.    Well, in some ways -- you know, her

1                 R. Wexler - Confidential

2    licensure is in California.  We also factored

3    into and discussed that if she wanted to pursue

4    jobs that required a New York license, she could

5    sit for the bar.  She was unemployed, she could

6    study for it and do so.  That's how we determined

7    it.

8        Q.   Didn't you include in your analysis jobs

9    that were listed immediately after her

10   termination?

11       A.   Yes, we did.

12       Q.   Wouldn't it take some period of time for

13   her to get admission to the New York bar?

14       A.   Yes.

15       Q.   How long would that take?

16       A.   That depends.  It depends on her taking

17   the exam and it depends whether it's available,

18   it depends the time she puts in to study for it.

19   It could take a good six to nine months if the

20   job absolutely requires her to have that

21   licensure right now.

22       Q.   Do you know whether it's lawful to

23   practice law in the State of New York without a

24   license?

25       A.   It is not lawful to practice law in the

1              R. Wexler - Confidential

2      State of New York without a license.  You can

3      perform other tasks but you really can't perform

4      work as an attorney.

5          Q.   Did you include any jobs outside of the

6      State of New York in your analysis?

7          A.   I believe we did but I can't recall at

8      the moment.

9          Q.   Do you know what states those jobs are

10     in?

11         A.   As I said, I can't recall at the moment.

12     I would have to go back over the data.

13         Q.   Did you include California?

14         A.   Yes, but sometimes the California jobs

15     can also be located here but it might be housed

16     in California, such as the Mitsubishi job, for

17     example.

18         Q.   Well, the Mitsubishi job was pursuant to

19     a special type of listening, was it not?

20         A.   Yes.

21         Q.   Do you know whether Ms. Fischman's

22     licensing continued -- her special licensing, do

23     you know whether that licensing continued after

24     the termination of her employment with

25     Mitsubishi?

1          R. Wexler - Confidential

2     A.    I'm not certain.

3     Q.    Do you know whether Ms. Fischman's

4  license expired upon her termination?

5     A.    I don't know if her license expired in

6  California upon termination, the special

7  license -- are you talking about the special

8  license?

9     Q.    Yes.

10    A.    My guess would be that the license may

11 have expired after she was terminated because it

12 was a special license.

13    Q.    Did you conduct any assessment of what

14 the earliest point in time would have been after

15 Ms. Fischman's termination that she could have

16 obtained licensure within the State of New York?

17    A.    Not specifically, no.

18    Q.    No?

19    A.    No -- not that I can recall.  I never

20 looked into it so I'm not sure.

21    Q.    You're not sure.  But you do know that

22 you included jobs within the State of New York

23 that she couldn't possibly have obtained a

24 license in time to respond to those jobs,

25 correct?

1          R. Wexler - Confidential

2          MS. PRIMAVERA:  Objection.

3      A.    It's quite possible she could not but

4  she might have been invited for an interview and

5  that would have been a very positive thing.

6      Q.    That's an assumption, correct?

7          MS. PRIMAVERA:  Objection.

8      A.    Yes, it is assumption that she could

9  have been invited to an interview.

10     Q.    Does that also assume that Ms. Fischman

11  would pass the bar on her first attempt?

12          MS. PRIMAVERA:  Objection.

13     A.    Yes.

14     Q.    Did you consider the possibility that

15  she would be unable to pass the bar?

16     A.    I considered it.

17     Q.    How did you consider that possibility?

18     A.    I considered the possibility that it

19  does happen, number one.

20          But I was also considering the fact that

21  she had been practicing different forms,

22  different types of law for quite some time in

23  doing so, as it appeared successfully, in many

24  different roles, that she graduated from an

25  excellent law school and that with the right

1                    R. Wexler - Confidential

2      amount of time and diligence, I had confidence

3      that she would pass the first time.

4          Q.   In assessing the person's background, is

5      that one of the steps in the vocational model

6      that we described earlier?

7          A.   Can you define "background," please.

8          Q.   Sure.  Wasn't one of the steps of the

9      vocational model to assess a candidate's

10     background?

11              MS. PRIMAVERA:  Objection.

12         A.   I'm still not clear what you mean about

13     background.

14         Q.   I'm just asking you about the steps of

15     the vocational model.  My understand was that the

16     first step of the analysis was to look at purpose

17     of referral and then I was attempting to move

18     onto whatever the second step would be.

19         A.   The second step would be to consider her

20     background in terms of where she resided; her

21     family, does she have family responsibilities

22     perhaps; her involvement in non-work activities;

23     leadership roles, such as volunteer experience;

24     ways in which she might have been embedded in the

25     community for a certain period of time versus

1                    R. Wexler - Confidential

2    just newly relocated individual.  And I did

3    consider that Ms. Fischman had grown up and

4    resided in the greater Scarsdale area and that

5    she had many relationships there just by being in

6    the same place for the majority of her life --

7    and let's see -- and that includes her

8    educational background, of course, and her

9    qualification from that.  That would be, you

10   know, about the extent of the background for the

11   purposes of this report anyhow.

12       Q.   Have you completed your response?

13       A.   I believe so.

14       Q.   So your assessment of her connections to

15   the community were based upon assumptions that

16   you made about Ms. Fischman?

17            MS. PRIMAVERA:  Objection.

18       A.   She also indicated some things in her --

19   some activities in her documentation, such as

20   being involved in some community groups and that

21   indicates to me someone who has relationships in

22   the community.

23       Q.   But does that factor into whether the

24   jobs from Forensic JobStats are comparable to her

25   job at Mitsubishi?

1           R. Wexler - Confidential

2       A.   No, but it does tell me she has the

3    ability to promote her networking activities

4    within her community and within the legal

5    community in order to help find work.

6       Q.   So does that pertain to your second of

7    your two opinions and not to your first opinion?

8       A.   That's part of the background as well --

9    the background is a piece of that.

10      Q.   Is there a professional methodology

11   that's employed to assess a person's background

12   in the manner that you described?

13           MS. PRIMAVERA:  Objection.

14      A.   I'm not sure about that but it's part of

15   the profile that we generally complete for an

16   individual that we're evaluating.

17      Q.   Is it part of the literature with

18   respect to vocational evaluation?

19      A.   I'm sure there's a piece of that

20   incorporated somewhere.  I'm not sure.  It's just

21   a natural for thing for me to do and what I was

22   trained to do.

23      Q.   Is there any reference work that you can

24   cite me to for that methodology?

25      A.   I believe the references I've given you

1              R. Wexler - Confidential

2    before probably I would say have some component

3    of that, getting the person's background.

4        Q.   Then you mentioned another step of the

5    analysis being a transferability analysis, did I

6    get that correct?

7        A.   Transferable skills analysis, otherwise

8    known as a TSA.

9        Q.   Transferable skills analysis.  Does that

10   normally include behavorial observations?

11       A.   Where I can obtain it, yes.  Mostly in

12   terms of presentation and articulation.

13       Q.   You didn't obtain any behavorial

14   observations of Ms. Fischman, did you?

15       A.   No, I did not have that opportunity.

16       Q.   Doesn't a transferable skills analysis

17   normally include psychometric testing?

18       A.   Not necessarily.

19       Q.   When you say "not necessarily," what do

20   you mean?

21       A.   What I mean is psychometric testing is

22   applied on a case by case basis.  If an

23   individual has been well-educated and performs

24   successfully in so many different roles as Ms.

25   Fischman, I would say that psychometric testing

1          R. Wexler - Confidential

2     is not applicable here.

3          Q.   Is there any literature in your field of

4     study that you relied upon for that

5     determination?

6          A.   I think you'll find in all of this

7     literature there will be psychometric testing

8     involved where it is appropriate and necessary.

9     And, again, a lot of this methodology is about

10    pre and post events or injuries.  And in this

11    case, Ms. Fischman, to the best of my knowledge,

12    did not have that type of event.  She was -- her

13    event was that she was terminated from Mitsubishi

14    and then was positioned to look for new

15    employment.

16         Q.   When you say she didn't have that type

17    of event, what type of event are you referring

18    to?

19         A.   Injuries or some diminishment of

20    capability, cognitive, behavorial or physical,

21    which was not evident from the documentation or

22    reports that I received.  Therefore, I did not

23    see it as necessary to perform psychometric

24    testing.

25              And, again, I want to reiterate,

1                    R. Wexler - Confidential

2    psychometric testing has its place but not in

3    every case.

4         Q.    Isn't the determination as to

5    appropriateness and necessity of psychometric

6    testing a matter of judgment?

7         A.    Yes.

8         Q.    So if we got another vocational expert,

9    isn't it possible that they would make a

10   different determination than you made?

11        A.    Anything is possible but I highly doubt

12   it.

13        Q.    So then how can we replicate your

14   determination here with respect to the

15   methodology in your field of study?

16        A.    I guess by obtaining your own assessment

17   from another expert.

18        Q.    As you just conceded, the other expert

19   might come out on a different determination upon

20   that judgment call, correct?

21        A.    It's quite possible --

22              MS. PRIMAVERA:  Objection.

23        A.    -- but highly unlikely.

24        Q.    You said you made a determination that

25   Ms. Fischman did not experience the type of event

1                R. Wexler - Confidential

2    that involved injury, did I get that correct?

3        A.    Physical or -- you know, more of a

4    physical or illness injury of some kind, yes.

5        Q.    What about mental illness?

6        A.    Well, there was nothing in the records

7    that indicated that she suffered mental illness,

8    inability to perform her work.  There's always a

9    possibility that someone was depressed or unhappy

10   about the way they departed from a job but we

11   seen that many times -- I have at least -- and

12   those people are more than capable of starting to

13   plan and execute a job search.

14       Q.    When you say -- what's the basis for

15   your statement that people who have experienced

16   emotional distress or mental distress in

17   connection with the termination of their

18   employment are, quote, more than capable of

19   pursuing a job search?

20           MS. PRIMAVERA:  Objection.

21       A.    I didn't say all of them.  But unless

22   there are records or statements to the effect

23   that this had that type of effect and that there

24   is medical records or statements to support it,

25   then, yes, I would have to go on the assumption

1                R. Wexler - Confidential

2    that she was capable of doing so.

3         Q.    So that's an assumption, correct?

4         A.    It's a professional assumption based on

5    the information that I have, sir.

6         Q.    Well, the information that you had

7    included the amended complaint in this action,

8    correct?

9         A.    Yes, it did.

10             MS. PRIMAVERA:  Objection.

11        Q.    Did you review the amended complaint?

12        A.    I did.

13        Q.    If you reviewed the amended complaint,

14   do you know whether Ms. Fischman alleges

15   emotional distress in connection with her claims

16   against Mitsubishi?

17        A.    Yes, she did but it was not quantified

18   and neither did it talk about how it affected her

19   ability to transact different activities and/or

20   able to perform activities of daily living or

21   even to execute other types of plans.

22        Q.    Okay.  Do you have any medical expertise

23   in assessing emotional distress?

24        A.    I rely on medical practitioners to do

25   that when medical records and examinations are

1                   R. Wexler - Confidential

2    performed.

3         Q.    You did not rely on any medical records

4    in this case, did you?

5         A.    None was provided.

6         Q.    Did you request medical records?

7         A.    No, I did not.

8         Q.    Why did you not request medical records?

9         A.    Because Ms. Fischman had demonstrated

10   her ability to at least perform some activities

11   of a job search and, obviously, she was able to

12   do so -- some.  But no, I did not.  Neither

13   did -- was there any indication that medical

14   records were available that described the

15   limitations on her functional work capacity such

16   that she could not perform a job search.

17        Q.    But to the be clear you didn't request

18   any such records?

19        A.    No, I did not.

20        Q.    Sitting here today you don't know

21   whether any such records exist, do you?

22        A.    That is correct.

23        Q.    If you were provided with medical

24   records, can that change the outcome of your

25   determination?

1          R. Wexler - Confidential

2          MS. PRIMAVERA:  Objection.

3     A.    Depending on what the records describe

4  and how they're -- depending on the medical

5  records and statements from a treating

6  physicians.

7     Q.    If you were presented with statements

8  from treating physicians that indicated that Ms.

9  Fischman suffered from severe emotional distress,

10  severe depression, severe anxiety; would that

11  change your opinion?

12          MS. PRIMAVERA:  Objection.

13     A.    That depends.

14     Q.    What does it depend upon?

15     A.    It depends on the statements, the

16  descriptions on how it limited her day-to-day

17  activities, how it affected her longer term

18  learning.  It is not unusual that that kind of

19  stress may affect somebody more so in a short

20  term as they move forward into their other plans

21  and life plans.  But this is all speculative at

22  best, Mr. Berman, because I have no records.

23     Q.    Would the transferable skills analysis

24  normally include examination of work samples?

25     A.    It might it depends.  I don't need -- I

1                    R. Wexler - Confidential

2    mean, the work samples could be anything from

3    writing, to work samples.  In this case, in a

4    vocational evaluation setting, probably the work

5    samples have to do with samples of work task that

6    involve fine hand manipulation, ability to follow

7    instructions, things of that nature.  I do

8    believe Ms. Fischman was in a more sophisticated

9    role than that required.

10        Q.   You didn't rook at any work samples for

11   Ms. Fischman, did you?

12        A.   Well, she -- you know, she had been

13   performing very well as it appeared and her

14   resume was well-written.  So, no, I so no work

15   samples, no.

16        Q.   You didn't read any of her writing

17   samples, did you?

18        A.   No.

19        Q.   You didn't read any of her legal

20   research, did you?

21        A.   No.

22        Q.   You wouldn't be qualified to evaluate

23   her legal writing anyway, would you?

24        A.   Not entirely, no -- although I can

25   understand if it was well-written.

1           R. Wexler - Confidential

2      Q.   You wouldn't know if it was correct or

3 incorrect, right?

4      A.   No.  As we discussed, I'm not an

5 attorney.

6      Q.   The same with respect to her legal

7 research, right?

8      A.   Yes, that's correct.

9      Q.   And you don't have any information about

10 Ms. Fischman's interpersonal actions with

11 clients, do you?

12     A.   No, I do not have any firsthand

13 experience or documentation about that.

14     Q.   You concluded on page 13 of your

15 report -- which I think we looked at

16 previously -- that Ms. Fischman had markedly

17 significant transferable skills that positioned

18 her as a competitive candidate for positions as a

19 chief legal officer, counsel, lead corporate or

20 general corporate counsel, correct?

21     A.   Yes.

22     Q.   That doesn't include any executive

23 roles, does it?

24     A.   No.

25     Q.   Didn't you also opine that Ms. Fischman

1          R. Wexler - Confidential

2     could have sought employment as an executive?

3        A.    Well, she could.  I mean, that's always

4     an option open to an attorney but we decided

5     to -- I focussed on her legal employment more

6     than anything else.

7        Q.    In your view, should executive jobs be

8     eliminated for consideration for suitable

9     employment for Ms. Fischman?

10       A.    We did pretty -- depending on how the

11    job is worded, it may or may not be suitable.  We

12    did eliminate the chief legal officer counsel

13    job -- especially for companies for employers of

14    a significant size.  You know, you can have any

15    job title in a company with fewer than 15

16    employees or 10 or a many as 30,000, you know, it

17    just depends.  So your qualifications may be more

18    or less appropriate for those positions.

19       Q.    I'm asking you specifically about

20    executive positions right now.

21       Is it your view Ms. Fischman -- that Forensic

22    JobStats' positions for executives should be

23    eliminated as potential suitable employment for

24    Ms. Fischman?

25       A.    Not necessarily.  I depends on the

1                    R. Wexler - Confidential

2    nature of the job and how it's described.  There

3    are many individuals with legal experience who

4    undertake executive level jobs.

5        Q.    Would a chief executive officer

6    possession be suitable for Ms. Fischman in your

7    view?

8        A.    A CEO, no.

9        Q.    What about a chief technical officer?

10       A.    Likely not, no.

11       Q.    What about a chief investment officer?

12       A.    No.

13       Q.    So there's a panoply of executive level

14   skills that would not be considered suitable by

15   Ms. Fischman, correct?

16       A.    Right.  And I would not have included

17   those in the job postings that I had.

18       Q.    If Mr. Staller would have done that,

19   would that be appropriate?

20            MS. PRIMAVERA:  Objection.

21       A.    I can't comment whether or not

22   Mr. Staller used or did not use certain types of

23   criteria.  However, I would have not included

24   CIO, CTO, COO -- maybe a COO -- but not a CEO

25   either.

1          R. Wexler - Confidential

2     Q.   Is it fair to say --

3          MR. BERMAN:  Withdrawn.  I'll move on.

4     Q.   Did you rely upon any replicable

5  methodology in determining which of those

6  counsel, lead corporate counsel, or general

7  corporate counsel positions you considered

8  suitable for Ms. Fischman?

9     A.   I'm not sure I understand the question,

10  sir, can you rephrase perhaps.

11     Q.   Sure.  You used a methodology to include

12  or exclude positions that were characterized as

13  counsel or lead corporate or general corporate

14  counsel, correct?

15     A.   Yes.

16     Q.   Okay.  So was there any methodology that

17  you used that we can provide to another expert

18  such they can replicate your work in either

19  including or eliminating these jobs?

20     A.   The methodology I used was looking -- as

21  I described previously, was looking at the

22  various tasks and responsibilities in those jobs

23  and how they fit Ms. Fischman's qualifications,

24  knowledge, skills and experience.

25          To a certain degree, some of the job's

1                    R. Wexler - Confidential

2      titles may be less appropriate, as I mentioned

3      before, depending on the size of the company.  If

4      it's a chief legal officer that's global in

5      nature and had a lot of supervisory and

6      management responsibilities and legislative

7      responsibilities, that may not be as appropriate

8      for Ms. Fischman as a similar role with a smaller

9      company.

10         Q.    Have you completed your response?

11         A.    Pretty much.

12         Q.    The determination of whether job titles

13     are more or less appropriate, is that a matter of

14     judgment?

15         A.    It's not just a job title, it's a job

16     description, sir.

17         Q.    Are those two things a matter of

18     judgment?

19         A.    To a certain degree and also there in

20     black and white, there is her resume and there

21     are the job titles and there are the descriptors.

22         Q.    You didn't use something such as a

23     standardized occupational code in making your

24     determination, did you?

25         A.    No, that's not as useful for these

1          R. Wexler - Confidential

2     particular jobs.  No, it's not.

3          Q.   You didn't use a standard industrial

4     classification either, did you?

5          A.   A Standard industrial classification is

6     just for lawyers.  Lawyers is a very wide range

7     of position so no.  We did use the SOC codes to

8     identify these jobs and then it was our job to

9     sift though those and see which ones were a more

10    likely fit.

11         Q.   So how can I replicate your work in

12    using the SOC codes to identify the jobs that

13    were included?

14              MS. PRIMAVERA:  Objection.

15         A.   I think you would have to go through the

16    same process that I did.

17         Q.   Is there something that you can provide

18    to me so that I can replicate your work in

19    identifying those SOC codes and sorting the jobs

20    on the basis of those codes?

21         A.   As I said, the SOC codes for attorneys

22    generally tends to be fairly specific -- so these

23    are lawyers.  Then you have to go through the job

24    descriptions and use knowledge and experience to

25    understand how there is a good fit.

1              R. Wexler - Confidential

2      Q.    So do we agree that you used subjective

3  factors to make those determinations?

4           MS. PRIMAVERA:  Objection.

5      A.    No, I don't agree with that.

6      Q.    Well, were there objective factors that

7  you used that didn't --

8      A.    Yes.

9      Q.    -- that didn't require a exercise of

10  judgment?

11     A.    Everything requires some exercise of

12  judgment.  And, yes, if I were to look at a line

13  of text about a particular job, task,

14  responsibility, et cetera, and then I were to

15  compare that to what Ms. Fischman had described

16  in her resume about her job, which she described

17  in some detail in the different areas she had

18  experience in, I don't consider that to be

19  subjective.  Those are keywords that appear in

20  both.

21     Q.    I'm making a somewhat different point --

22  and perhaps I should clarify my question.

23          In the event that you had used specific

24  occupational codes or industrial classifications,

25  those were all contained on the lists, right?

1                R. Wexler - Confidential

2        A.   Yes, and they were used.  Forensic

3    JobStats -- that's only way we can pull the data

4    is using the SOC codes.

5        Q.   Right.  In order for me to have an

6    expert replicate your work, I would have to have

7    a list of the SOC codes or standard industrial

8    classification codes that you used or didn't use,

9    correct?

10       A.   Yes, more than likely or they could do

11   that themselves.  It's fairly common.

12       Q.   Well, if they did it themselves, they

13   might not exactly replicate your work, correct,

14   they might make different determinations as to

15   which codes to include or exclude, correct?

16       A.   That's true, they could include other

17   codes, et cetera.  They could broaden their

18   search and make it even wider.

19       Q.   So isn't it correct that the only way

20   that I can replicate your work or I can have one

21   of my experts replicate your work is if you

22   provided me with the codes?

23            MS. PRIMAVERA:  Objection.

24       A.   You can do that.

25       Q.   But you haven't provided us with the

1                R. Wexler - Confidential

2    codes used as part of your report, have you?

3        A.    No, I have not.

4        Q.    At the time of Ms. Fischman's

5    termination, how old was she?

6        A.    She was 49.

7        Q.    Did you factor her age into the

8    determination as to whether she was competitive

9    for a corporate professional position?

10       A.    Yes.

11       Q.    Is there a relationship between age and

12   competitiveness?

13       A.    Yes, there is.

14       Q.    What's the nature of that relationship?

15       A.    As one approaches their mid to late 50s,

16   their competitive position can diminish to a

17   certain degree depending on the role -- if

18   they're looking for work in a corporation, for

19   example, even at 55 they still have a good what

20   we would call "runway" i.e., future work years to

21   still make a positive contribution and be able to

22   use their knowledge and experience to both mentor

23   those on their team or consult internally and

24   externally, manage projects, et cetera.  But --

25       Q.    Is there -- sorry, go ahead.

1                R. Wexler - Confidential

2       A.    -- 49 is considered to be a mid

3   vocational age, even today, and competitive.

4       Q.    Is there any particular literature that

5   you're relying upon for the determination that 49

6   is mid vocational age?

7       A.    I would have to check that out.  I do

8   know that it is -- I believe, the Bureau of Labor

9   Statistics also incorporates those numbers

10  starting at 85 -- sorry -- 55 they will start

11  addressing that as a somewhat later vocational

12  age.

13      Q.    Under vocational concerns on page 13 of

14  your report -- it should be the same page, do you

15  see that?

16      A.    I do.

17      Q.    So what's the factual basis for your

18  determination that during Ms. Fischman's startup

19  years in real estate she would likely earn

20  significantly less income.  You don't cite any

21  work there.

22      A.    No, I don't.  This is basic -- well,

23  first of all, I looked at the two different

24  databases for what sales agents would earn in the

25  Westchester area or New York metropolitan region

1                R. Wexler - Confidential

2    and it would -- $1000,000 per year would be at

3    the very high end -- of course, she's in affluent

4    area, I would think sales commission would be

5    higher as well.  In my experience in evaluating

6    other people who have been brokers, agents in

7    real estate and conducting my own labor market

8    research, I've told time and time again that not

9    only does it require 100 percent of effort and

10   time but it takes time to build your client base

11   to get referrals, to seek referrals so that you

12   both get commissions for both, sales and

13   buyers -- the seller and the buyer and/or that

14   you can do it just by working with buyers.  I

15   mean, there are a lot of different ways to make

16   money in real estate but it takes time to get

17   there.  Especially if you had limited or no

18   experience before.

19        Q.   Have you completed your response?

20        A.   I have.

21        Q.   You don't reference any of these

22   databases that you just cited for your real

23   estate knowledge in your report, do you?

24        A.   No, I don't.

25        Q.   How can I replicate your understanding

1                    R. Wexler - Confidential

2    of the lengthy earning capacity for someone in

3    real estate?

4        A.   I can provide the databases I that

5    referenced.

6             MS. PRIMAVERA:  Objection.

7        Q.   With respect to the rest of it that you

8    said you consulted with others -- I'm

9    characterizing your testimony, so please correct

10   me if I'm mischaracterizing it -- but I believe

11   you told me that you were relying upon what had

12   been conveyed to you by others in the real estate

13   field; did I get that right?

14       A.   Yes.

15       Q.   So that determination is not based on

16   your own firsthand knowledge, is it?

17       A.   Well, I -- as a professional

18   employability evaluator, is it my role to conduct

19   labor market research, which often means going to

20   others in the field who own those companies, who

21   have been in it for a while so that they can

22   educate me or keep me up to date on what's going

23   on in the real estate -- residential real estate

24   industry and in a particular region.  It's my job

25   to stay up to date with that with every case.

1               R. Wexler - Confidential

2     Q.    Have you completed your answer?

3     A.    I have.

4     Q.    Ms. Wexler, I want to be very clear, I'm

5   not questioning your knowledge and ability as a

6   vocational professional, okay?

7     A.    Okay.

8     Q.    Do you understand that you're testifying

9   in this case as an expert under the Federal rules

10   of evidence?

11     A.    Yes.

12     Q.    Do you understand that the definition

13   under Federal rules of who is an expert that can

14   provide testimony may be different than the

15   definition of someone who is capable to provide

16   advise to other professionals in the vocational

17   area?

18          MS. PRIMAVERA:  Objection.

19     Q.    Do you understand the question?

20     A.    I do but it is also my understanding it

21   is my role as an expert to rely on that as well.

22   And in my role, that type of hearsay, if you

23   will, is admissible.

24     Q.    Okay.  So we might have different views

25   of the role of an expert in litigation in Federal

1                    R. Wexler - Confidential

2    court.  Pursuant to the Federal rules, there are

3    requirements as to what must be contained within

4    the report of a testifying expert, are you aware

5    of that?

6              MS. PRIMAVERA:  Objection.

7         A.   Yes.

8         Q.   So you understand that, for instance,

9    you have to provide a complete statement of all

10   opinions that you will express and the basis and

11   reasons for them?

12        A.   Yes.

13        Q.   Are you aware that you also have to

14   identify the facts or data considered in forming

15   your opinions?

16        A.   Yes.

17        Q.   So there are several items that I

18   already identified that you have expressed to me

19   that you've relied upon that are not contained

20   within your expert report --

21             MS. PRIMAVERA:  Objection.

22        Q.   -- so how can I obtain those things that

23   are not included?

24        A.   (No verbal response.)

25        Q.   So, for example, two data bases you just

1                    R. Wexler - Confidential

2    referenced under your vocational concerns, the

3    database that you claim to have relied upon or

4    the sources of secondhand information that you

5    claim to have relied upon in reaching the

6    determination that $100,000 in annual earnings is

7    at the high end of a potential realtor's earning

8    capacity.  How can I double check that?

9        A.   By my providing those databases.

10       Q.   But you haven't done so yet, correct?

11       A.   As of yet.

12       Q.   Now as part of your vocational analysis

13   of Ms. Fischman's potential earnings in the real

14   estate field, did you take into consideration

15   that she has immediate family that already

16   practitioner in that field?

17       A.   Yes.

18       Q.   How did you factor that in?

19       A.   That she could likely begin to start

20   faster than somebody else but it's speculative at

21   best while she has family members in there, I

22   don't know whether they're going to share

23   compensation with her, share commissions.  I

24   don't know whether or not they're going to

25   introduce her or show her how to get other types

1                R. Wexler - Confidential

2    of roles.  I'm not saying she can't accelerate

3    that process.  I think she made it quite clear

4    with her mother an icon in the real estate

5    business in the Scarsdale area is a good head

6    start -- but who knows.  And no compensation was

7    provided to me about what she has earned thus far

8    as an agent.

9        Q.   Did you ask for it?

10       A.   I relied on counsel to ask for it.  I

11   believe that it was their intention but I don't

12   know.

13       Q.   I asked you whether you asked for

14   compensation information about Ms. Fischman, did

15   you ask for that?

16       A.   I asked for compensation about the

17   Mitsubishi compensation but not for the real

18   estate because at the time that this was written

19   she was still fairly new in it.

20       Q.   So, if you were told that she earned in

21   excess is of $200,000 a year, would that change

22   your opinion?

23       A.   It might if she did.  And I don't know

24   if she earned that gross or net.

25       Q.   Are you familiar with the difference in

1                    R. Wexler - Confidential

2    real estate between gross and net income?

3        A.    Yes.

4        Q.    Are you an expert on that?

5        A.    No.

6        Q.    What's the basis of your knowledge?

7        A.    Because I would want to know -- because

8    I looked at it before and I worked with -- I

9    evaluated other brokers -- and she's an agent and

10   not broker from what I understand -- that in

11   terms of their expenses and how the commission

12   the divvied up and a whole bunch other things.

13   So it's hard to say.

14       Q.    And you also understand that there is a

15   variation in you how the commission splits are

16   determined, correct?

17       A.    Definitely.

18       Q.    It ranges between -- there's a broad

19   range of what possible splits are, correct?

20       A.    That's right.

21       Q.    And it's also possible that will have to

22   be split with other brokers, correct?

23       A.    Oh, sure.

24       Q.    For example, a commission may have to be

25   split between both a buyer's representative and a

1                R. Wexler - Confidential

2    seller's representative?

3        A.    Absolutely.

4        Q.    Does it also factor in the deductions

5    for the expenses of things such as advertising,

6    correct?

7        A.    That's what I meant about gross and net,

8    yes.

9        Q.    Also marketing, correct?

10       A.    That's right.

11       Q.    Is it fair to say those are material and

12   significant expenses for a realtor?

13       A.    It depends if you're also doing other

14   things; staging, that you might observing the

15   course for versus the seller.  There are many

16   different ways that splits can take place.

17       Q.    If I asked you this before, please let

18   me know and I'll move on.

19       Are you familiar with the legal standard

20   applicable to a plaintiff's duty to mitigate

21   damages?

22            MS. PRIMAVERA:  Objection.

23       A.    Yes, you did ask that before.

24       Q.    Can you relate to me your understanding

25   what duty a plaintiff has to seek a job?

1          R. Wexler - Confidential

2          MS. PRIMAVERA:  Objection.

3      A.    They have a duty to seek a job with --

4    and to demonstrate that they have done so.  The

5    demonstration can be vis-a-vis recollections but

6    more than likely in terms of documentation where

7    they -- it's my understanding that they're

8    required to produce.  The standard for that may,

9    as we have discussed before, be somewhat

10   different than what our field -- my professor --

11   regards as a diligent job search.  This is why I

12   give a range with the amount of effort that goes

13   into a job search.

14     Q.    Do you know whether a plaintiff has an

15   obligation to go into another line of work?

16     A.    They don't necessarily have that

17   obligation.  They can chose to and a line of work

18   may be somewhat different, it doesn't need to be

19   identical.

20     Q.    Okay.  Are they obligated to accept a

21   demotion?

22          MS. PRIMAVERA:  Objection.

23          MR. BERMAN:  I'll accept a standing

24     objection to this line of question, is that

25     okay?

1          R. Wexler - Confidential

2          MS. PRIMAVERA:  Okay.

3     Q.   Is a plaintiff whose -- is there a

4  requirement for a job searcher to accept a

5  demotion?

6     A.   They're not obligated to accept a lesser

7  job but, of course, the lesser is arbitrary.

8     Q.   Well, there might be an objective basis

9  for determining one job is lesser than another,

10  correct?

11    A.   That is true.

12    Q.   So, for instance, some jobs pay less

13  than other, correct?

14    A.   Yes.  But my understanding is that

15  individual in an effort to make some effort to

16  lessen -- well, mitigate damages can be held to

17  accept a job that might be somewhat less.  I'm

18  not talking about a great degree of less, which

19  is why we eliminated certain jobs that I've

20  identified because it was way too less.

21    Q.   They're not required to take a demeaning

22  job, correct?

23    A.   No, they're not required to take a

24  demeaning job.

25    Q.   Or to apply to jobs that they're

```
 1            R. Wexler - Confidential
 2    unqualified for, right?
 3            MS. PRIMAVERA:  I understand that this
 4        is a standing objection to this line of
 5        questioning.  I mean, she's not here
 6        testifying as an attorney and these are all
 7        calling for legal conclusions.
 8            MR. BERMAN:  I understand your
 9        objection.  I'm accepting your objection but
10        I'm going to apply it in a moment, okay?
11        That's my proffer to you.
12        Q.   Do we agree that they're not obligated
13    to apply for jobs they're unqualified for?
14        A.   They may not be fully qualified for.
15    They may have some degree of qualifications so
16    that, Mr. Berman, I think is a little bit
17    speculative.
18        Q.   Can we agree that the standard is one of
19    reasonableness at least in respect to the legal
20    standards that apply?
21        A.   I will accept that reasonableness should
22    be one of the criteria.
23        Q.   And you've opined on reasonableness,
24    correct?
25        A.   Yes.
```

1                R. Wexler - Confidential

2       Q.    Your version of reasonableness may not

3   be identical to the legal standard of

4   reasonableness, correct?

5       A.    That could be true.

6       Q.    So, for instance, in your determination

7   as to the reasonableness of plaintiff's job

8   search, did you factor there in that it might not

9   be suitable for Ms. Fischman to into another line

10  of work?

11            MS. PRIMAVERA:  Objection.

12      Q.    In other words, did you eliminate job

13  opportunities in other lines of work?

14      A.    We pretty much confined out search -- we

15  decided to look at the parameters in the legal

16  profession because that is where she would be

17  more or most competitive to find employment more

18  quickly and closer to her prior level of

19  compensation.

20      Q.    Okay.  Did you eliminate lesser jobs?

21      A.    We eliminated quite a few lesser jobs,

22  some may have come through but quite a few were

23  eliminated.

24      Q.    You continue eliminate lesser

25  compensating jobs because, as you testified

1                R. Wexler - Confidential

2    earlier, 95 percent of the listings didn't

3    include that, correct?

4        A.    Right.  And sometimes the compensation

5    may be something that an employer has in mind but

6    could be more flexible when they meet the right

7    person.

8        Q.    Do you know what Ms. Fischman's rate of

9    compensation was in her last job at Mitsubishi?

10       A.    $230,000 a year from what I understand.

11       Q.    Do you know what proportion of jobs

12   listed for attorneys in Forensic JobStats pay

13   less than that?

14       A.    I can't really tell you at this time.

15       Q.    You didn't factor that into your

16   analysis, did you?

17       A.    It would be very difficult to do so.

18       Q.    Thank you.  Doesn't it take longer for a

19   person over 40 to find a job?

20       A.    As compared to a 25 year old, yes.

21       Q.    Did you factor that into your analysis?

22       A.    No, because we also looked at -- well

23   yes and no, we also had a reasonable expectation

24   about what -- from statistics from the Bureau of

25   Labor Statistics, the US Department of Labor,

1                    R. Wexler - Confidential

2    what a reasonable amount of time would be for

3    someone to find a job particularly in a

4    management role, and a management role by and of

5    itself implies someone in their late 30s to 50s

6    and that was still approximately 15 to 18 weeks.

7    So age 40 is still considered to be a pretty

8    competitive employment age.

9         Q.   Ms. Fischman wasn't a manager, was she?

10        A.   No, she was a professional -- a high

11   ranking professional.

12        Q.   Does age bias impact the length of a job

13   search?

14             MS. PRIMAVERA:  Objection.

15        A.   It can -- I do want -- I do want to add

16   that management piece that I just mentioned from

17   Bureau Labor Statistics included professions, not

18   necessary only management.

19        Q.   Have you completed your answer?

20        A.   Yes.  And that last question was --

21        Q.   Does age bias the length of a job

22   search?

23        A.   Yes, it will.

24        Q.   Don't you factor that in?

25        A.   For Ms. Fischman to a limited degree,

1                    R. Wexler - Confidential

2    she still was a competitive applicant for someone

3    at her level of employment.

4        Q.    Does gender bias impact the length of a

5    job search?

6        A.    It can.

7        Q.    Did you factor that into your analysis

8    of the expected duration of Ms. Fischman's --

9        A.    Yes.

10       Q.    How did you factor that in?

11       A.    Assuming because I gave a range.  Like I

12   said, it would be between six to twelve months so

13   that would absolutely factor age, gender --

14       Q.    You said six to twelve months?

15       A.    Yes.

16       Q.    Are you familiar with applicant tracking

17   systems?

18       A.    Yes, I am.

19       Q.    Do those screen candidates out based

20   upon computerized determinations?

21       A.    Yes, I'm very familiar with that.

22       Q.    Don't some of them screen based upon

23   age?

24       A.    I'm sure they might but it doesn't

25   necessarily mean that age was indicated in the

1                    R. Wexler - Confidential

2      application.

3           Q.    But there are mother proxies for age

4      that might be indicated in the application,

5      correct?

6           A.    That could be.

7           Q.    Did you factor that into your analysis

8      of duration of unemployment?

9           A.    Yes.

10          Q.    How did you factor that in?

11          A.    Again, with six to twelve months.  I

12     also expected that Ms. Fischman would have

13     applied to jobs through networking that would not

14     have required going through an applicant tracking

15     system but more of personal referral.

16          Q.    That's an assumption, correct?

17                MS. PRIMAVERA:  Objection.

18          A.    That is something I would have expected

19     a job applicant to do.

20          Q.    It's an expectation, correct?

21          A.    It is a significant expectation because

22     that's the way people find jobs.  The higher

23     level of jobs, the more likely you are to find

24     them through networking introductions, referrals

25     and meetings versus an online application system.

1          R. Wexler - Confidential

2     Q.    In evaluating Ms. Fischman's job search

3     efforts, you relied exclusively upon the

4     documentation provided to you, correct?

5     A.    That is true.

6     Q.    Isn't it also true that an applicant can

7     fall into a black hole in one of these applicant

8     tracking systems such as they don't receive a

9     record of their employment application?

10          MS. PRIMAVERA:  Objection.

11     A.    Well, the black hole may be more tied to

12     if they didn't get a response that they made that

13     application.  But most of these job posting

14     systems applicant tracking systems have the

15     ability for someone to take a screen shot or get

16     some sort of confirmation that their application

17     has been made and sent.

18     Q.    Okay.  Are you aware that you testified

19     in Downing matter that there are instances where

20     an applicant may not get an acknowledgement of

21     the application or hear anything back from the

22     employer?

23     A.    That's a different than not having

24     record of making an application.  Yes, I am

25     familiar with that statement.

1              R. Wexler - Confidential

2      Q.   Your position hasn't change since then,

3  has it?

4      A.   No.  Let me clarify, sir, I'm talking

5  about having a record of an application that's

6  made through your own personal history is

7  different than expecting to receive a response

8  from an employer.

9      Q.   Again, you didn't factor in Ms.

10  Fischman's testimony -- her verbal testimony

11  concerning what job she applied to, correct?

12      A.   No.  At the time of my report no

13  testimony had been taken.

14      Q.   So would you opinion as to the adequacy

15  of Ms. Fischman's job search change based upon

16  her testimony?

17      A.   Depends upon her testimony.

18      Q.   Didn't you testify earlier today that

19  when an applicant has not conducted a job search

20  in a number of years it impacts the duration of

21  their unemployment?

22          MS. PRIMAVERA:  Objection.

23      Q.   Did I mischaracterize your testimony?

24      A.   You didn't include all of it, which is

25  it depends on the length of the duration of

1          R. Wexler - Confidential

2     unemployment.

3          Q.   Did you factor in that Ms. Fischman

4     hadn't done a job search in many years?

5          A.   Yes, 10 years or so, you know, because

6     she went from Raytheon to Mitsubishi.  Yes, I

7     factored that in.

8          Q.   Did you factor in that she did not have

9     a job reference?

10         A.   Yes, although interestingly enough on

11    LinkedIn she did have individuals who would, you

12    know, that stood up for her, so to speak, of

13    giving her a positive review.

14         Q.   Were any of those individuals employed

15    by Mitsubishi?

16         A.   I don't believe so but I can't recall.

17         Q.   Did you factor in she that didn't have a

18    job reference from anyone at Mitsubishi?

19         A.   No, I don't if she sought and made any

20    effort to get a job reference from someone who

21    was a colleague, maybe not a supervisor, or

22    someone to whom she directly reported at

23    Mitsubishi.  There are ways to work around it.

24    I, as a recruiter, I work with many individuals

25    who lost work -- their employment and needed to

1                    R. Wexler - Confidential

2    find ways to get references.

3            In addition, please note, many companies

4    do not give direct references anymore other than

5    to say, you know, what your period -- you know,

6    they're legally bound so they don't give them.

7        Q.   I'm an employment lawyer so I'm aware of

8    the subject matters that you're discussing.

9        But you don't know one way or the other

10   whether Ms. Fischman had any kind of reference

11   available to her from Mitsubishi, correct?

12       A.   Nor do I know if she sought them.

13       Q.   That's not factored into your analysis,

14   is it?

15       A.   It is factored into the analysis in

16   terms of the length of time I thought it would

17   take.  And I also would have expected her to, as

18   you mentioned, she had not looked for a job for a

19   while, so I would have expected her to consult

20   with recruiters or a career advisor to get that

21   back on track in today's world.

22       Q.   Okay.  As a recruiter wouldn't you see

23   it as a red flag if someone came to you with no

24   job references from the employer where they had

25   worked for the last 10 years?

1          R. Wexler - Confidential

2          MS. PRIMAVERA:  Objection.

3     A.    As a recruiter I would be considered

4  about that.  I also know those people are still

5  placeable.

6     Q.    Well, what percentage of candidates that

7  seek employment through a recruiter get placed by

8  the recruiter --

9          MS. PRIMAVERA:  Objection.

10    Q.    -- do you know anything about that?

11    A.    I can't possibly answer that question,

12  it is far too broad.

13    Q.    When you say they're still placeable,

14  you mean there is still a possibility of

15  placement, correct?

16    A.    Yes.

17    Q.    But you can't speak to the likelihood of

18  placement, correct?

19          MS. PRIMAVERA:  Objection.

20    Q.    Do you understand the distinction?

21    A.    I understand the distinction.  It is

22  possible.  How likely?  Fairly likely given her

23  experience.  I seen people rewound from negative

24  terms under which they lost their employment

25  before and find new employment.

1                R. Wexler - Confidential

2        Q.    Okay.  We agreed anything is possible.

3    What I'm asking you is whether there's any way to

4    quantify how possible it is, how likely it is,

5    how probable it is?

6        A.    I can't do that.  I'm not sure if a

7    legal recruiter can do it that well either.

8        Q.    Can a vocational expert do that?

9        A.    All we can do is the possibilities and

10    the and likelihoods and she was a very

11    experienced professional who had good skills to

12    take to another company.  Maybe not a major

13    corporation like she was employed with but --

14        Q.    You haven't identified the probability

15    that she can find suitable employment in your

16    report, have you?

17            MS. PRIMAVERA:  Objection.

18        A.    I did say it would take her about six to

19    twelve months, which encompasses all of these

20    negative factors that you have --

21        Q.    But that assessment that it would take

22    her between six and twelve months, that's not

23    based upon a statistical measure involving a

24    confidence interval, is it?

25        A.    No, it is not.

1          R. Wexler - Confidential

2     Q.   You can't tell me that I'm 95 percent

3   sure that she would have found a job within X

4   amount of time, can you?

5          MS. PRIMAVERA:  Objection.

6     A.   I don't have a statistical substance for

7   that.  But I feel within a 95 percent, 90 percent

8   certainty that she would have found a job within

9   that six to twelve months that would have been of

10  competitive compensation.

11    Q.   But that's based upon your feeling and

12  your judgment, not upon statistical science,

13  contribute?

14         MS. PRIMAVERA:  Objection.

15    A.   It's based upon my judgment, my

16  experience and it is not statistically based.

17    Q.   Thank you.  Doesn't it make more

18  difficult for someone who has filed a public

19  discrimination lawsuit to seek employment?

20    A.   Yes, the public statement on that does

21  make it more difficult.

22    Q.   Did you factor that into your analysis?

23    A.   Yes, I did.

24    Q.   How did you factor that in?

25    A.   That it was going to take that many more

1              R. Wexler - Confidential

2     relationships, that many more referrals,

3     introduction, networking.  I considered that the

4     networking was going to be even more important

5     for her to be able to get an introduction to a

6     potential opportunity because it would be a

7     personal introduction and could somewhat mitigate

8     that risk -- that employer perceived risk.

9          Q.   Doesn't mental health also impact the

10    ability of a person to find a job?

11         A.   Yes, depending on the degree.  And

12    that's why working with professionals can be very

13    useful if in this matter.

14         Q.   So with respect to all these questions,

15    don't these require an individualized inquiry of

16    the particular candidate and their prospects for

17    employment?

18              MS. PRIMAVERA:  Objection.

19         Q.   Each person will have been a different

20    degree of mental health, a different age, a

21    different set of knowledge, skills and abilities

22    and all these other factors that you looked at

23    such as references, et cetera, correct?

24         A.   Yes, that's true.

25         Q.   So when you're opining in your expert

1                R. Wexler - Confidential

2    report, aren't you opining about job prospects

3    for a candidate in general?

4          MS. PRIMAVERA:  Objection.

5       A.   Well, I'm -- not in general specific to

6    that person.

7       Q.   In your analysis of the duration of

8    unemployment in your expert report, did you rely

9    upon the BLS statistics, the Bureau of Labor

10   Statistics?

11      A.   I incorporated that.  It was a pretty

12   aggressive statistic, it indicated the

13   possibility of -- the median, I should say, was

14   18 weeks.

15      Q.   Are you familiar with the underlying BLS

16   data?

17      A.   Yes.  In what way are you referencing?

18      Q.   Do you know whether BLS statistics

19   consider compensation?

20      A.   They look at management levels, they

21   look at gender, they look at age, they combine it

22   together.  Some of it can be somewhat distorted

23   because they might be comparing it to someone who

24   is somewhat younger, who was in a much lower

25   paying position and that's why we tend to look at

1                    R. Wexler - Confidential

2    what I describe as the management of professional

3    level and to see what the median is for that.

4        Q.   I asked you a more specific question.  I

5    asked you whether the BLS statistics consider

6    compensation?

7        A.   No, I believe it's basically just on the

8    SOC codes and you know the position.

9        Q.   Thank you.  Do they consider the

10   applicant pool?

11       A.   That I'm not sure.  I know they look at

12   the number of people that are employed in those

13   professions or occupations and then take a look

14   at that as well.

15       Q.   Do they look at the demographics of the

16   population that you just described?

17       A.   The demographics -- they do have other

18   statistics that look at those demographics.

19   However, in this case, they would -- when we came

20   up to the management, again, more professional

21   level of positions, they did not -- well, they do

22   indicate it further down on the list as to

23   whether they're white, black, Hispanic, et

24   cetera.  But, of course, those latitudes do not

25   apply to Ms. Fischman.

1                    R. Wexler - Confidential

2          Q.    Ms. Wexler, do the BLS statistics for

3    duration of unemployment include the demographics

4    of the applicant pool?

5          A.    The demographics of the applicant pool,

6    no, not necessarily.

7          Q.    Do they include whether the jobs were

8    posted internally or externally?

9          A.    No, they do not.

10         Q.    Do they include whether the role was

11   filled or unfilled?

12         A.    No, they do not to the best of my

13   knowledge.

14         Q.    Do they include how the role was filled?

15   For example, internally, externally or via a

16   recruiter?

17         A.    No, they don't.

18         Q.    Do they include who filled the role,

19   including, for example, their age, sex or whether

20   they had filed a public claim of discrimination?

21         A.    No, they would include the later.  Age

22   and sex, yes.

23         Q.    Do they include mental health?

24         A.    No, they don't.

25         Q.    Are you aware that you testified

1                    R. Wexler - Confidential

2     previously that the BLS statistics do not include

3     age or sex?

4         A.   Well, certain -- some of the statistics

5     do.

6         Q.   I'm talking about the statistics

7     utilized in the duration of unemployment

8     analysis?

9         A.   Yes, they do.  I know that they -- we

10    looked at that before and the duration -- the

11    age -- there are different charts that you can

12    reference -- there are different databases and

13    one of them will consider age and sex.  But

14    they're broken down differently.

15             But when it comes to the higher level

16    role of professional employment, they generally

17    do not include those two components.  You have to

18    break them out.

19        Q.   Including or excluding the jobs from

20    Forensic JobStats, did you exclude jobs for which

21    Ms. Fischman was overqualified?

22        A.   We did our best to do that.

23        Q.   What does that mean, you did your best?

24        A.   We sampled many of the -- as many of the

25    jobs that we reasonably could and eliminated

1             R. Wexler - Confidential

2    those that we thought were too junior.

3         Q.   If there were only 76 jobs in the first

4    year why didn't you look at all 76?

5         A.   Well, I looked at some and my associate

6    looked at some.

7         Q.   But your associate is not here to

8    testify, correct?

9         A.   That is correct.

10        Q.   And he's not going to testify at trial,

11   correct?

12        A.   No, he is not.

13        Q.   All right.  You're familiar with the

14   Forensic JobStats' database job postings --

15        A.   I'm familiar with the Forensic JobStats'

16   posting and you said something else I didn't

17   catch.

18        Q.   I'm just asking -- you're generally

19   familiar with the jobs that are listed in that

20   database, correct?

21        A.   Generally, yes.

22        Q.   You don't know how they get the jobs in

23   that database, do you?

24        A.   Yes, I do.

25        Q.   How do you have personal firsthand

1                    R. Wexler - Confidential

2    knowledge of how to get those jobs?

3        A.   Well, firsthand, they explain the

4    process to me -- I asked them.  Do I actually sit

5    with them and go through the computer, no.  I

6    give them the SOC codes or in this case Mr. Chad

7    did and were in agreement with that and then we

8    got the report -- we asked for the report

9    directly, which we were granted and we went

10   through it on our own.  I didn't sit with them.

11   I mean, we -- you know, normally I've gone

12   through them enough so I know how they go into

13   the database and use those codes to sort through

14   hundreds of thousands of jobs and filter them.

15       Q.   I understand that but what I'm asking

16   you -- my intent is to ask you whether you

17   verified that the jobs that were provided to you

18   from Forensic JobStats were actually posted in

19   the real world?

20       A.   I would say that Gardener a consulting

21   group for Neuron would stand behind their data.

22   It's posted in the real world, these were posted

23   on job sites with employers as well as different

24   job postings job sites.  LinkedIn is not included

25   in it.  However, do I know for sure -- can I go

1          R. Wexler - Confidential

2    back in time and see if that actually occurred,

3    no.

4        Q.   Did you check whether the jobs that

5    surfaced in your results were actually posted in

6    the real world?

7        A.   I didn't go back -- I don't have the

8    capacity to go back to 2017, '18 and '19.  The

9    data just simply isn't available to us unless we

10   use tools like this.

11       Q.   Even if you had data, you wouldn't be

12   able to determine whether the jobs were posted

13   externally versus internally, correct?

14       A.   Yes, a lot of them were posted

15   externally.  They came from recruiters, they came

16   from on Indeed.  Could I absolutely break those

17   down into percentages about what were internal

18   and external, no.

19       Q.   But you also don't have any personal

20   information about how much market penetration any

21   of those job sites have, correct?  Like, you

22   don't know, for example, that each of the job

23   sites listed in there are job sites that are

24   routinely used by lawyers in the performance of a

25   job search, correct?

1                R. Wexler - Confidential

2        A.    No, I can't necessary -- you know, a

3    good job searcher who is looking online will go

4    to different sites and put in keywords and these

5    will pop up.

6        Q.    Are you familiar with the Pareto Rule,

7    80/20 rule?

8        A.    Yes.

9        Q.    So then is it fair to say, generally

10    speaking, that 80 percent of the jobs that are

11    posted are going to be in 20 percent of the job

12    sites?

13        A.    In this --

14            MS. PRIMAVERA:  Objection.

15        A.    -- in this case I would say that could

16    be the case.  I'm not but -- I'm not qualified to

17    say yes or no on that but it captures a lot of

18    them.

19        Q.    In fact, the job search market is

20    actually substantially more concentrated than

21    that, isn't it?

22        A.    It tends to be.

23        Q.    Do you know whether the Forensic

24    JobStats job postings are limited to job boards

25    that have a material portion of the market share?

1                 R. Wexler - Confidential

2      A.   Well, I think Indeed.com has a material

3   portion because aggregate on a variety of

4   different sites and people post on them directly

5   as well.

6      Q.   You don't know whether the references to

7   jobs posted on Indeed.com that are aggregated are

8   duplicative of other entries in the database, do

9   you?

10          MS. PRIMAVERA:  Objection.

11     A.   We went through the duplicate process.

12  It is possible that a job posted on Indeed.com

13  may be on another site but that was part of the

14  quality process that we were using as well.

15     Q.   It is also possible, is it not, it might

16  be that some of jobs that you're referencing in

17  Forensic JobStats' database are listed on job

18  boards that it might not be reasonable to expect

19  a candidate to access, correct?

20          MS. PRIMAVERA:  Objection.

21     A.   Not really, no.

22     Q.   Doesn't the Forensic JobStats' database

23  include a number of esoteric job boards?

24          MS. PRIMAVERA:  Objection.

25     A.   Just a very few.  A lot out them were

1                    R. Wexler - Confidential

2    with companies directly -- if Ms. Fischman had

3    been looking at jobs with keywords and job

4    titles, she would have come across.  She

5    primarily used, as I recall, LinkedIn, which is

6    one source but not a comprehensive one.

7        Q.   Doesn't LinkedIn aggregate other job

8    sources as well?

9        A.   No, not really.  You have to pay to be

10   on that and they tend not to do that.

11       Q.   Have you completed your response?

12       A.   So far.

13       Q.   Do you know whether Ms. Fischman

14   utilized Indeed.com?

15       A.   It does not appear that she did from

16   what I can tell from that data that was given to

17   us.  And if she did, it was very minimal.

18       Q.   Do you know whether any court has

19   considered whether Forensic JobStats is a

20   reliable database?

21       A.   No, I dot not.  I do know it's been used

22   frequently but I do not if has -- if there's been

23   a ruling of that or not.

24       Q.   So you don't know one way or the other?

25       A.   No.

1              R. Wexler - Confidential

2      Q.   Would knowledge of whether a court has

3   deemed the Forensic JobStats' board reliable

4   impact your decision to utilize that database?

5      A.   It depends on the type of decision, what

6   it applied to, what was context.  Many factors go

7   in there.  And one court may say no and another

8   may say yes.

9      Q.   Are you aware that there's a possibility

10  that your testimony could be challenged under the

11  Federal rules of evidence as being -- that it

12  could be challenged in terms of its admissibility

13  at trial?

14     A.   Under what grounds?

15     Q.   Are you familiar that a party in a

16  litigation can challenge the testimony of an

17  opposing party's expert?

18     A.   I think you need to explain that little

19  bit.

20     Q.   Okay.

21     A.   I'm not following you.

22     Q.   Let's try it a different way.  In any of

23  the litigations where you have testified, have

24  you testified at trial?

25     A.   Yes.

1              R. Wexler - Confidential

2      Q.   Do you know whether your testimony at

3   trial has ever been challenged?

4      A.   Of course -- well, under cross for sure.

5   Yes.

6      Q.   I don't mean under cross examination.  I

7   mean with respect to a motion to exclude your

8   testimony?

9      A.   I'm sure there have been some cases with

10   where that has occurred.

11      Q.   So you understand that there's a process

12   by which a party can seek to exclude the

13   testimony of a testifying expert witness,

14   correct?

15      A.   Of course.

16      Q.   And so my question to you is if you are

17   aware that a court had excluded the testimony of

18   a witness who relied upon Forensic JobStats for

19   the reason that the database was not considered

20   reliable, would that change your decision to rely

21   upon that data here in this case?

22          MS. PRIMAVERA:  Objection, hypothetical.

23      A.   Not only is it a hypothetical but it

24   excludes the other portion of my opinion, which

25   is the diligence of the job search.

1                R. Wexler - Confidential

2      Q.   Are you aware that courts in this

3  jurisdiction have excluded the opinions of the

4  type that you're providing here?

5      A.   I'm sure there have been cases where

6  that may have occurred.

7      Q.   Do you know whether Chad Staller's

8  opinions have ever been excluded?

9      A.   No, I have no idea.

10     Q.   Do you know whether his opinions relying

11  upon Forensic JobStats have ever been excluded?

12     A.   Again, I have no idea.

13     Q.   Wouldn't you want to know whether

14  Forensic JobStats have ever been determined to be

15  unreliable before you relied upon them in your

16  expert report?

17          MS. PRIMAVERA:  Objection, argumentive.

18     A.   Mr. Berman, I'm sure if there were cases

19  like that I would -- it would be helpful to know.

20  But as stated before, it really depends on the

21  context and the other factors that were involved

22  in that decision.

23          THE REPORTER:  Can we take a break?

24          MR. BERMAN:  Yes.  We're almost done.

25      Let's take a quick break and see if we can

1                R. Wexler - Confidential

2       wrap up.

3              (Whereupon, a brief recess was taken.)

4       Q.   On page 20 of your report, do you see in

5       the second paragraph there towards the end

6       there's a listing of executive positions included

7       and it goes vice president of business legal

8       affairs, vice president chief privacy counsel,

9       vice president chief legal officer, PGIM, et

10      cetera?

11      A.   Yes.

12      Q.   What's the basis for including these

13      executive positions as jobs that were suitable

14      for Ms. Fischman?

15      A.   Well, the vice president of business

16      legal affairs, depending on size of the company,

17      could be something that she would be applying

18      for.  You know, executive positions have a lot to

19      do with the size of the company.  She certainly

20      was working as an associate, GC, assistant GC and

21      temporarily as a GC.  So she can position herself

22      as someone who could be a reasonable candidate

23      for these positions.

24              I do want to make clear, however, that I

25      don't see these positions necessarily being the

1                    R. Wexler - Confidential

2     bulk of her applications or that she would be

3     qualified to be employed in those jobs in major

4     corporations -- really large corporations.

5          Q.    Turning to page 22 of the report under

6     "Labor Market Research Results."

7          A.    Yes.

8          Q.    The second full paragraph under that

9     section says, "Ms. Fischman's records and

10    testimony reflect that she viewed and applied for

11    a total of only 100 jobs between January 2017 and

12    September 2018 as summarized in Appendix D.

13    During this somewhat brief job search, Ms.

14    Fischman could have made 201 applications to

15    potential jobs published during this time.

16    Starting with the date of her separation from

17    Mitsubishi through May 2020, she could have

18    applied to approximately 683 published job

19    openings for which she was highly qualified."

20         Do you see that?

21         A.    Yes, I do.

22         Q.    Where is the list of 683 job postings?

23         A.    They're on a Forensic JobStats

24    spreadsheet that I have that we summarized in the

25    appendices of the report.

1                R. Wexler - Confidential

2      Q.    So those haven't been provide to us,

3   correct?

4      A.    Not as of yet, no.

5      Q.    When you say "summarized," you mean

6   quantified, correct?

7      A.    Quantified.

8      Q.    There is no material that we can review

9   that would allow us to verify your conclusion

10   that Ms. Fischman was highly qualified for those

11   particular jobs, right?

12      A.    Not at this time.

13      Q.    With respect to your use of the

14   vocational model we talked about for quite a bit

15   of time already today, is there any indication

16   that you can provide to us to substantiate that

17   your use of this model had been generally

18   accepted by anyone else other than yourself?

19           MS. PRIMAVERA:  Objection.

20      A.    I'm sure if we looked into case law we

21   can find some.

22      Q.    So sitting here today are you aware of

23   any reference material that would show that this

24   methodology has been generally accepted by your

25   community of vocational experts?

1                R. Wexler - Confidential

2        A.    I think that this does appear in one of

3    the chapters in the Rick Robinson publication --

4    let me get that out there.  Also the Oxford

5    Handbook of Job Loss and Job Search by Oxford

6    University Press, as well as the Rehabilitation

7    Professional.  And the other book, was the one I

8    mentioned before, which was edited by Rick

9    Robinson -- hold on just a moment and I'll get --

10   and he is a very highly respected and

11   well-published author about this process and has

12   done so for quite sometime and he published a

13   book as well that I regard as an excellent peer

14   reviewed fact-based model about this -- I wish I

15   can find the name of it.  Here it is, Vocational

16   and Rehabilitation Assessment Model, Robinson and

17   Pomeranz, 2011; Robinson and Paquette in 2013.

18       Q.    Have you completed your response?

19       A.    Yes.

20       Q.    In the literature that you just

21   described, what does the word "rehabilitation"

22   pertain to?

23       A.    Returning to work -- rehabilitating

24   somebody to be able to return to work.  As we

25   discussed previously during our time together,

1          R. Wexler - Confidential

2    the rehabilitation model still serves as at least

3    a model of the process that we go through.  Even

4    if rehabilitation is not necessarily the primary

5    focus of the opinion, it's the process that we

6    look at.

7        Q.   But there's nothing in the model that

8    compares jobs to other jobs, right?

9        A.   They compare the -- they will talk about

10   comparing what's required in those jobs -- the

11   specific elements of those jobs that can be

12   described in the Occupational Handbook, the

13   Bureau of Labor Statistics, the US Department of

14   Labor and then comparing them to the person's

15   qualifications, experience, knowledge and skills.

16   Is it a compare this job to this job type of

17   example, unlikely.  It's a process.

18       Q.   Have you completed your response?

19       A.   I have.

20       Q.   And you skipped the step of model that

21   considers impairment relate information, didn't

22   you?

23            MS. PRIMAVERA:  Objection.

24       A.   No, I did not skip it.  There was no --

25   I mean, other than the complaint, there was no

1                R. Wexler - Confidential

2    documentation to support the impairment piece.

3    And, in fact, Ms. Fischman did execute some steps

4    in the job search indicating she knew what to do

5    to a certain degree and did so.  It just was a

6    very limited period of time and effort.

7        Q.   But performing some steps of a process

8    doesn't necessarily mean you weren't impaired in

9    that process, right?  If someone has a walking

10   impairment, they still may be able to walk

11   several steps before their impairment manifests,

12   right?

13       A.   Correct.

14       Q.   Can we agree that step, the three

15   impairment related analysis, is not included in

16   your expert report?

17       A.   I would agree that we considered it and

18   did not consider -- and did not have enough

19   information to be able to say definitively how

20   impaired she was.

21       Q.   Okay.  So do we agree that that's not in

22   your report?

23       A.   It is not in my report.

24       Q.   Okay.  What about -- we already

25   discussed that one of the steps is behavioral

1              R. Wexler - Confidential

2     observations and that's not in your report,

3     correct?

4          A.   Correct.

5          Q.   And psychometric testing and work

6     samples, we've already gone through that, right?

7          A.   They don't apply.

8          Q.   What about assessment of activities, is

9     that in your report?

10         A.   Assessment of activities?  Do you mean

11    in terms of one's activity that one undertakes?

12    I'm not sure I understand what you mean.

13         Q.   I'm just referencing the steps in the

14    vocational model.  That's one of the steps --

15         A.   Right.  The steps of activities she --

16    you know, without having interviewed her, she

17    indicated she was conducting the activities for a

18    real estate agent, so she was performing

19    activities.  And she also had performed

20    activities in her job search.  And she appeared

21    to still be involved in some community

22    organization so that is unclear.  So, apparently,

23    I'm assuming, yes, she was involved in activity.

24         Q.   Is that contained in your report?

25         A.   It's not necessarily contained every

1              R. Wexler - Confidential

2     element of this in the report, sir.  But it is

3     not included in this report nor is it necessary.

4         Q.    Thank you.  What about recommendations

5     for vocational rehabilitation, is that contained

6     in your report?

7         A.    No.  I saw no reason to include

8     vocational rehabilitation.  She was -- she needed

9     to look for work and I had no documentation,

10    reports, medical reviews indicating that she

11    needed rehabilitation.

12        Q.    Flipping back to the issue of the

13    Forensic JobStats.  Is the big picture purpose

14    there to try to figure out what job openings may

15    have appeared in the labor market during the

16    period of Ms. Fischman's unemployment?

17             MS. PRIMAVERA:  Objection.

18        A.    When looking at the published

19    opportunities, that give us some references point

20    about demand for those jobs in that marketplace.

21    It does not -- I repeat -- it does not include

22    unpublished job, which would have been covered

23    with more networking, meetings and doing more

24    research and outside of just online postings.

25        Q.    So then do I understand correctly that

1          R. Wexler - Confidential

2    you're not taking the position that your Forensic

3    JobStats' database accurately reflects the full

4    extent of opportunities available to Ms.

5    Fischman?

6          MS. PRIMAVERA:  Objection.

7      A.    It is only an indication and does not

8    include the full extent because a lot of those

9    would be unpublished in her level.

10     Q.    So we can't use Forensic JobStats to

11   reconstruct the job market that existed during

12   the entire period of Ms. Fischman unemployment,

13   can?

14     A.    We can use it as an indicator about some

15   aspect of the job demand at that time.

16     Q.    It's an indicator of job demand, is that

17   right?

18     A.    Job demand and employment market, yes.

19     Q.    When you use the phrase "job demand," is

20   that, you know, a function of the economics

21   discipline?

22     A.    It indicates a function of the economics

23   discipline, it indicates what job were posted,

24   how that indicates some level of activity and

25   demand for particular occupations in particular

1              R. Wexler - Confidential

2     labor markets.

3          Q.   Do you know how long the jobs that were

4     contained within the database were posted for?

5          A.   I can't say for sure but they weren't

6     repeated over long periods of time.  I don't

7     think they were posted for years at a time.

8          Q.   But you also don't know whether they

9     were only posted for short periods of time,

10    correct?

11              MS. PRIMAVERA:  Objection.

12         A.   That is correct.  Generally speaking,

13    they were posted for at least six weeks to a

14    quarter.

15         Q.   How do you know that?

16         A.   Because we can see them repeated later

17    on and we knew they were duplicates but we can

18    tell they were posted for a while or they had

19    not -- they appeared at another time so the job

20    was not filled.

21         Q.   So that's an inference, correct?

22         A.   That's an inference, yes, sir.

23         Q.   You don't know whether the particular

24    jobs that were listed were ultimately filled or

25    unfilled, right?

1                R. Wexler - Confidential

2        A.    That is right.

3        Q.    You don't know whether if they were

4    filled, they were filled with internal or

5    external candidates?

6        A.    I believe I answered that question

7    previously.

8        Q.    Making sure.

9             MR. BERMAN:  Skip that.

10        Q.    The job postings that you examined, did

11    they contain information concerning the amount of

12    travel required?

13        A.    Some did.

14        Q.    And how many included that information?

15        A.    Not that many.  Travel was not necessary

16    a larger component in some of these jobs.

17        Q.    Did those job postings provide

18    information concerning the number of direct

19    reports that the applicant would have if they

20    were hired?

21        A.    I believe there were some that did.

22        Q.    How many had that information?

23        A.    I can't recall at this time.

24        Q.    Did any of the job postings indicate

25    whether they would provide promotional

1                    R. Wexler - Confidential

2    opportunities?

3        A.    I don't think so.

4        Q.    Did any of them indicate particular

5    geographic locations?

6        A.    Most did.

7        Q.    So my question to you is this:  You

8    testified -- also to not leave anything out --

9    that most of them don't have compensation

10   information, right?

11       A.    Yes, that's true.

12       Q.    So if a job posting doesn't have the

13   compensation information, the amount of travel

14   required, the number of direct reports, whether

15   it's going to provide a promotional opportunity,

16   how can one assess whether those positions are

17   suitable for Ms. Fischman?

18           MS. PRIMAVERA:  Objection.

19       A.    Well, I think you're mischaracterizing

20   my response, sir.  I said some did and some did

21   not just.  Just because it's not listed or not

22   listed as a requirement or -- then it doesn't

23   mean that -- let me rephrase that.

24           If the job listed travel, generally, it

25   would indicate about the amount of time it was

1             R. Wexler - Confidential

2    required.  If the job indicated there was some

3    promotional opportunity, that would have been

4    noted.  It doesn't mean, however, that just

5    because a job did not note that, that it did not

6    have that.

7        Q.   Okay.  But in your determination of

8    whether to include or exclude these jobs, we have

9    to take your word for it, right, we can't check?

10            MS. PRIMAVERA:  Objection.

11       A.   We have to go by what the published job

12   describes, where it is and some of the

13   requirements involved.  So I can't say that's

14   taking my word for it, the description themselves

15   are in the data and can be seen.

16       Q.   But you haven't provided that to me so I

17   have to take it under say so, don't I?

18       A.   Right now, yes.

19            MR. BERMAN:  I'll tender the witness at

20       this time.  Thank you for your help today.

21   I appreciate your testimony.

22            No further questions at this time.

23            MS. PRIMAVERA:  I don't have questions

24       for the witness.

25            MR. BERMAN:  Thank you all.  I

1              R. Wexler - Confidential

2        appreciate it.

3              Toni, we are going to order.

4              MS. PRIMAVERA:  Copy.

5              MR. JOLLY:  No order.

6              MS. PRIMAVERA:  I'll share with him.

7              (Whereupon, the examination of this

8        witness was concluded at 3:14 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK    )
                              : ss
5    COUNTY OF            )

6

7          I, RONA WEXLER, hereby certify that I

8    have read the transcript of my testimony taken

9    under oath in my deposition of August 6, 2021,

10   that the transcript is a true, complete and

11   correct record of my testimony, and that the

12   answers on the record as given by me are true and

13   correct.

14

15

16                    _____

17                         RONA WEXLER

18

19
     Signed and subscribed to before
20   me, this          day
     of                    , 2021.
21

22

23
     _____
24   Notary Public, State of New York

25

1

2                    I N D E X

3   WITNESS              EXAMINATION BY    PAGE

4   Rona Wexler         Mr. Berman          5

5

6                  E X H I B I T S

7   PLAINTIFF'S                         PAGE

8   Wexler Exhibit 1   Report              17

9   Wexler Exhibit 2   CV                  26

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2           C E R T I F I C A T E

3

4           I, TONI MUSACCHIA, a Notary Public in and

5     for the State of New York, do hereby certify:

6           THAT the witness whose deposition is

7     hereinbefore set forth, was duly sworn by me and

8           THAT the within transcript is a true

9     record of the testimony given by such witness.

10           I further certify that I am not related,

11     either by blood or marriage; to any of the

12     parties to this action; and

13           THAT I am in no way interested in the

14     outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto set

16     my hand this 30th day of August, 2021.

17

18                         _____

19                              TONI MUSACCHIA

20

21

22

23

24

25

## A

**a.m** 1:15
**abilities** 38:18 46:3 167:21
**ability** 7:18 8:22 9:2 29:10 35:10
  39:17 40:5 51:18 73:24 125:3
  130:19 131:10 133:6 146:5
  160:15 167:10
**able** 8:15 57:11,18,23 58:3 72:13
  76:13 87:11 100:11 103:9 130:20
  131:11 142:21 167:5 174:12
  184:24 186:10,19
**absence** 38:7
**absolutely** 6:6 28:17 119:20 151:3
  158:13 174:16
**ABVE/D** 17:13
**academic** 65:2 69:2 88:25
**accelerate** 149:2
**accept** 152:20,23 153:4,6,17 154:21
**accepted** 64:9 81:8 86:4 183:18,24
**accepting** 154:9
**access** 117:9 176:19
**accessible** 64:22 98:2
**Accessing** 35:18
**accident** 73:23
**accommodate** 8:11
**accommodated** 31:8
**account** 116:7
**accurately** 8:23 9:2 103:5 189:3
**achieve** 38:20 39:13
**achieved** 68:14
**acknowledgement** 160:20
**acquired** 61:15 63:24 70:6,9
**acquisitions** 50:10
**acronym** 13:11
**action** 7:23 130:7 197:12
**actions** 134:10
**active** 31:15 67:6
**activities** 24:8 25:7 37:4,4 67:6
  123:22 124:19 125:3 130:19,20
  131:10 132:17 187:8,10,15,17,19
  187:20
**activity** 37:5 44:24 66:11 187:11,23
  189:24
**add** 72:22 75:20 157:15
**added** 39:20
**addition** 163:3
**additional** 38:23 39:10 77:23 89:19
  92:10 93:19 102:4 106:16 108:5
**address** 5:24 88:5
**addressing** 143:11
**adequacy** 161:14
**administer** 4:8
**admissibility** 178:12
**admissible** 146:23
**admission** 119:13
**advertised** 112:21
**advertising** 151:5
**advice** 97:25

**advise** 146:16
**advising** 70:8 72:15
**advisor** 38:14 163:20
**advisory** 40:22
**affairs** 181:8,16
**affect** 8:22 9:2 132:19
**affiliated** 62:20
**affiliation** 84:20
**affluent** 144:3
**against-** 1:6
**age** 58:18 90:25 142:7,11 143:3,6
  143:12 157:7,8,12,21 158:13,23
  158:25 159:3 167:20 168:21
  170:19,21 171:3,11,13
**agency** 4:12
**agent** 149:8 150:9 187:18
**agents** 143:24 144:6
**aggregate** 176:3 177:7
**aggregated** 176:7
**aggressive** 168:12
**ago** 63:5,13 92:9
**agree** 25:15 83:12 140:2,5 154:12
  154:18 186:14,17,21
**agreed** 3:4,10,15 4:3 5:4,5 165:2
**agreement** 7:23 20:11,13,15 21:12
  22:17 173:7
**agreement's** 21:2,6
**agreements** 20:20 22:13
**ahead** 30:17 142:25
**Albany** 117:25
**all-encompassing** 22:16
**alleges** 130:14
**allow** 7:4 52:9 183:9
**allowed** 80:12
**amended** 130:7,11,13
**America** 1:8 2:11 69:24
**American** 29:8,11 34:18 35:8 37:2
  38:4
**amount** 39:2 72:19 123:2 152:12
  157:2 166:4 191:11 192:13,25
**analyses** 52:19 53:2,19 54:2,6,20
**analysis** 10:25 12:17 13:25 14:3
  21:7 28:24 29:2,6 31:6 36:11
  37:22 49:3 52:17,21 53:16 54:8
  54:12,22 57:12 70:4,5 71:7,8,23
  75:6 76:9 78:24 81:16 99:19,20
  102:4 111:12 112:4 115:8,9 119:8
  120:6 123:16 126:5,5,7,9,16
  132:23 148:12 156:16,21 158:7
  159:7 163:13,15 166:22 168:7
  171:8 186:15
**analyze** 72:13 114:10
**analyzed** 12:16
**Analyzing** 89:4 91:11
**and/or** 31:8 50:10 130:19 144:13
**Andrew** 62:12 63:9,12 81:23 84:7
  84:12,19
**annual** 148:6

**annually** 90:22
**answer** 8:3,5 24:18 25:13 40:20
  42:15 54:19 60:9 74:5 79:24
  104:12 146:2 157:19 164:11
**answered** 66:14 103:2,18 191:6
**answering** 6:9
**answers** 23:15 195:12
**anticipate** 7:14
**anxiety** 132:10
**anybody** 98:2 113:3
**anymore** 163:4
**anyway** 133:23
**apparently** 187:22
**appear** 114:14 140:19 177:15 184:2
**appeared** 122:23 133:13 187:20
  188:15 190:19
**appearing** 5:9
**appears** 16:7 25:17
**appendices** 182:25
**appendix** 17:22 18:8,11,21 64:19
  88:16,17 90:17 93:16 97:19
  182:12
**applicability** 88:15
**applicable** 68:19 127:2 151:20
**applicant** 58:20 71:5 158:2,16
  159:14,19 160:6,7,14,20 161:19
  169:10 170:4,5 191:19
**application** 15:15 30:9 98:8 100:14
  159:2,4,25 160:9,13,16,21,24
  161:5
**applications** 65:16,18 67:2 182:2
  182:14
**applied** 15:24 20:23 52:7 53:9 54:4
  80:16 82:3,6,8 84:7 85:25 86:2
  126:22 159:13 161:11 178:6
  182:10,18
**applies** 37:23
**apply** 20:2 22:25 56:12 75:5 80:24
  110:10,21 153:25 154:10,13,20
  169:25 187:7
**applying** 98:21 106:7 181:17
**appreciate** 193:21 194:2
**approach** 38:6 67:21
**approaches** 142:15
**appropriate** 13:24 15:2 29:25 31:6
  80:17,19,22 86:4 100:13,22 102:5
  111:2 113:14 115:3,4 127:8
  135:18 136:19 138:2,7,13
**appropriateness** 128:5
**approved** 30:13
**approximately** 9:13 30:16 46:23
  102:10 109:8 157:6 182:18
**arbitrary** 153:7
**arbitration** 9:19
**arbitrations** 9:18
**area** 29:24 57:7 99:13 115:7,10
  118:4,13 124:4 143:25 144:4
  146:17 149:5

**areas** 22:21 23:4 24:3 79:2,3 116:15 116:17 140:17
**argumentive** 180:17
**Ariel** 46:21
**art** 84:25
**article** 31:17 40:11 87:25 90:19 94:4 95:23
**articles** 39:20 40:21 41:11 64:17 66:10 89:24 91:2 92:24 97:21
**articulation** 126:12
**Arts** 27:24
**ascertain** 100:11
**Ashforth** 68:16
**aside** 12:17
**asked** 13:4 19:12 30:6 61:16,17 66:15 76:23 98:24 103:3,17 149:13,13,16 151:17 169:4,5 173:4,8
**asking** 6:7 55:3,6 70:18 76:24 78:11 79:25 80:2 123:14 135:19 165:3 172:18 173:15
**aspect** 47:19 189:15
**aspects** 106:3 107:23
**assess** 29:10 35:25 69:6 72:14 101:25 112:13 113:24 123:9 125:11 192:16
**assessed** 13:23 102:16
**assessing** 37:19 71:11 72:8 111:18 111:19 123:4 130:23
**assessment** 69:8 71:19,22 72:2 73:6 73:15 74:23 75:7,18 77:3,5,15,19 77:22 78:6,18,23 81:2,17 84:24 85:11 87:7 94:24 96:15,19 115:13 115:15 116:6,10,22 121:13 124:14 128:16 165:21 184:16 187:8,10
**assets** 24:23
**assignment** 101:22
**assistant** 181:20
**assists** 23:14
**associate** 10:24 14:10 59:5 99:7,10 104:16 111:14 172:5,7 181:20
**associate's** 104:13,20
**associated** 68:13
**associates** 46:22 47:15 62:24
**assume** 122:10
**assuming** 158:11 187:23
**assumption** 122:6,8 129:25 130:3,4 159:16
**assumptions** 113:23 114:4 124:15
**attach** 18:8
**attempt** 122:11
**attempting** 123:17
**attention** 64:7,13
**attorney** 48:16 78:3 120:4 134:5 135:4 154:6
**attorney's** 41:9
**attorney/client** 19:10

**attorneys** 1:20 2:3,7,10,15 7:22 9:25 10:10,12,14,19 41:2,4,21,24 42:5 43:8 47:9,22,25 48:6 59:22 113:25 139:21 156:12
**audible** 6:19
**audience** 41:2 42:4,10 43:5,6
**August** 1:15 34:19 195:9 197:16
**author** 34:7 184:11
**author's** 93:8
**authored** 31:16 32:17 33:17 37:14
**authorship** 34:14 35:18 36:17 38:2 41:12
**available** 45:4,5 53:15,20 54:13 55:11 70:11 82:11 97:21,22 109:9 119:17 131:14 163:11 174:9 189:4
**Avenue** 2:7,16 90:19,23,24
**aware** 11:4,7,8 147:4,13 160:18 163:7 170:25 178:9 179:17 180:2 183:22

**B**

**B** 64:19 88:17 90:17 93:16 96:20 97:6,19 196:6
**baccalaureate** 27:17
**back** 17:17 32:25 35:16 38:9 42:23 66:17,19 120:12 160:21 163:21 174:2,7,8 188:12
**background** 77:16 99:19 101:8,11 101:23 123:4,7,10,13,20 124:8,10 125:8,9,11 126:3
**backgrounds** 42:22
**bad** 95:22
**Bank** 93:9,12
**bar** 119:5,13 122:11,15
**base** 111:5 144:10
**based** 44:10,13 45:8,13,15,18,20,23 45:25 46:5,8,11,13 50:17,19 58:8 70:24 85:11 110:12,15 113:23 114:5,5,24 116:24 117:11,19,21 118:3,9,12 124:15 130:4 145:15 158:19,22 161:15 165:23 166:11 166:15,16
**bases** 147:25
**basic** 28:15 74:8 97:2 143:22
**basically** 169:7
**basis** 12:6 49:16 50:22 60:11 126:22 129:14 139:20 143:17 147:10 150:6 153:8 181:12
**Batter** 2:12
**BCG** 84:17,20
**bee** 4:12
**began** 73:20
**behalf** 11:5
**behavorial** 126:10,13 127:20 186:25
**belief** 5:9
**believe** 12:19,21 13:23 15:14,25

17:4 22:15,15 27:10,14 32:15 43:24 45:10 51:15 57:25 63:8 69:5,6 76:19 77:21 82:5,8,23 83:10 84:18 87:8 92:8,18 93:7 97:9 116:11 120:7 124:13 125:25 133:8 143:8 145:10 149:11 162:16 169:7 191:6,21
**believed** 13:24
**bench** 9:15
**benefit** 41:20
**Berman** 2:5 5:4,13,21 11:21 13:3 17:6,17 24:11 26:10,17 32:19,25 34:20 35:15 37:8 42:13 43:12,15 62:12 63:9,12 66:16 74:15,18 79:13 80:11 81:23 82:7 83:18 84:8,12,19 86:9,13,17,21,25 103:18 118:18 132:22 137:3 152:23 154:8,16 180:18,24 191:9 193:19,25 196:4
**best** 5:8 6:22 7:4,8,13,17 80:4 87:24 92:2 93:3 127:11 132:22 148:21 170:12 171:22,23
**beyond** 45:8
**bias** 157:12,21 158:4
**big** 188:13
**bit** 15:5 154:16 178:19 183:14
**black** 138:20 160:7,11 169:23
**blinking** 6:14
**Bliss** 82:10
**blood** 197:11
**BLS** 168:9,15,18 169:5 170:2 171:2
**board** 29:8,11 178:3
**boards** 110:7 175:24 176:18,23
**body** 89:11
**Bolles** 89:14 90:16 91:9 92:13 94:10 95:4,4 97:4
**bono** 42:20
**book** 87:25 89:18 91:21 184:7,13
**books** 90:20 97:3
**boroughs** 116:15
**bottom** 42:8
**bound** 163:6
**boy** 88:17
**Bradford** 47:14
**break** 8:10,11 12:14 40:23 74:11,15 74:19 76:10,15 79:12 86:7,10,18 171:18 174:16 180:23,25
**breaks** 8:13
**brief** 181:3 182:13
**bring** 24:24
**brings** 40:2
**BRITTANY** 2:13
**broad** 150:18 164:12
**broaden** 141:17
**broken** 171:14
**broker** 150:10
**brokers** 144:6 150:9,22
**buckets** 114:23

**build** 144:10
**bulk** 182:2
**bullet** 35:3 36:21 42:18
**bullets** 35:8
**bunch** 150:12
**Bureau** 143:8 156:24 157:17 168:9
185:13
**business** 43:8 47:19 113:16 149:5
181:7,15
**business-to-business** 47:2
**buyer** 144:13
**buyer's** 150:25
**buyers** 144:13,14

**C**

**C** 1:1 2:1,2 3:1 4:1 5:1 17:23 18:11
18:21 47:6 195:2 197:2,2
**calculated** 103:5
**calculations** 19:16
**California** 119:2 120:13,14,16
121:6
**call** 6:5 8:12 24:23 81:16 115:7,8
128:20 142:20
**calling** 154:7
**calls** 115:20
**candidate** 23:3 31:15 45:3 49:11
59:16 60:13,17 106:25 134:18
167:16 168:3 176:19 181:22
**candidate's** 70:8 123:9
**candidates** 59:10,18 60:5 111:4
118:13 158:19 164:6 191:5
**capabilities** 19:25 20:22 31:5 36:10
59:14 77:25 102:23
**capability** 22:24 35:18 36:2 37:20
52:3 75:8 127:20
**capable** 39:25 129:12,18 130:2
146:15
**capacities** 1:10,11,11
**capacity** 35:2,4,19 36:3 37:11,20
38:20 39:12 40:14 131:15 145:2
148:8 174:8
**captures** 175:17
**care** 8:16,16
**career** 22:25 38:14 89:21 105:12
163:20
**caregiver** 36:14
**carried** 25:3 66:7
**case** 11:5,24 18:24 19:3,13,20,23
20:10 21:22 22:14 35:23 39:4,23
40:24 66:8 68:20 79:24 111:12
113:22 126:22,22 127:11 128:3
131:4 133:3 145:25 146:9 169:19
173:6 175:15,16 179:21 183:20
**cases** 40:13 85:17 179:9 180:5,18
**catch** 172:17
**category** 91:2
**caution** 101:5
**CEO** 136:8,24

**certain** 14:12 15:8,14,20 25:25 30:3
59:25 74:25 79:23 96:25 101:4
102:6 106:3 107:23 114:14 121:2
123:25 136:22 137:25 138:19
142:17 153:19 171:4 186:5
**certainly** 55:22 76:10,15 181:19
**certainty** 69:21 166:8
**certification** 3:6 29:7,14,19,22,25
52:10
**certifications** 28:20 29:5
**certified** 30:19
**certify** 195:7 197:5,10
**cetera** 11:3 30:3,14 37:24 39:6 53:3
114:14 140:14 141:17 142:24
167:23 169:24 181:10
**Chad** 11:9 173:6 180:7
**challenge** 178:16
**challenged** 178:10,12 179:3
**challenges** 38:19,24 39:7,10,14
**challenging** 7:7 39:3 42:22
**change** 23:17 131:24 132:11 149:21
161:2,15 179:20
**changed** 38:15 81:19 85:8
**Changers** 89:22
**changes** 22:12 27:5,7 95:7
**chapter** 88:3
**chapters** 93:2,2 184:3
**characterization** 43:22 44:7
**characterized** 137:12
**characterizing** 145:9
**charged** 68:20
**charts** 100:6,8 171:11
**check** 13:5 14:4 15:9 58:9 67:14
102:2 104:23 105:3,19 106:17,20
107:9,20 108:2,9 143:7 148:8
174:4 193:9
**checked** 22:2
**Chemical** 1:8,9,9 2:11,16 58:21
69:24
**Chester** 116:12
**chief** 47:6 49:11 100:24 134:19
135:12 136:5,9,11 138:4 181:8,9
**chose** 100:23 152:17
**CIO** 136:24
**citation** 67:17
**citations** 65:5 66:25
**cite** 73:9 77:2 125:24 143:20
**cited** 65:2 67:7 69:2 88:25 91:18
144:22
**cites** 73:5 98:3
**citing** 74:6 77:10
**City** 2:4 116:13
**Civil** 4:5
**claim** 87:12 148:3,5 170:20
**claiming** 118:16,18
**claims** 130:15
**CLARICK** 2:6
**clarify** 74:5 80:12 89:6 140:22

161:4
**classification** 139:4,5 141:8
**classifications** 140:24
**CLE** 41:23,24
**clear** 18:10 48:14 77:20 97:7
123:12 131:17 146:4 149:3
181:24
**clearly** 54:21
**CLEs** 41:16,18
**client** 144:10
**clients** 41:5,6,8,9 134:11
**close** 75:10
**closely** 15:5 16:10 68:13
**closer** 155:18
**co-presenter** 34:5
**coach** 38:14
**code** 138:23
**codes** 139:7,12,19,20,21 140:24
141:4,7,8,15,17,22 142:2 169:8
173:6,13
**cognitive** 127:20
**colleague** 162:21
**College** 27:18
**color** 89:20 92:11 102:24
**combine** 168:21
**come** 42:21 115:25 128:19 155:22
177:4
**comes** 103:14 171:15
**comfortable** 8:15 103:12
**commencing** 88:17
**comment** 136:21
**commission** 144:4 150:11,15,24
**commissions** 144:12 148:23
**common** 98:5 141:11
**commune** 116:16
**communicate** 21:17 59:25 117:6
**communicated** 10:23
**communication** 72:11,13
**communications** 9:24 10:13,18
11:10 27:20,20
**community** 123:25 124:15,20,22
125:4,5 183:25 187:21
**commutable** 116:12 117:25 118:3
**commutation** 117:2,4,8,12,21 118:8
118:17,19
**commuting** 116:21,25
**companies** 111:14 135:13 145:20
163:3 177:2
**company** 111:16 114:11 135:15
138:3,9 165:12 181:16,19
**comparable** 26:4,6 53:10 58:20,25
96:16 116:4 124:24
**compare** 51:3,4 52:23,25 53:13
55:18 70:12 111:21 113:9,18
114:12 140:15 185:9,16
**compared** 55:12,21 156:20
**compares** 185:8
**comparing** 54:8,12 105:10,14

112:20,23 168:23 185:10,14
**comparison** 55:7 76:24 111:3 113:3
113:6
**compensating** 155:25
**compensation** 26:3,9 85:16 107:12
148:23 149:6,14,16,17 155:19
156:4,9 166:10 168:19 169:6
192:9,13
**competition** 8:14
**competitive** 23:3 49:11 58:19 59:11
59:16,18 60:6,12 62:15 106:25
134:18 142:8,16 143:3 155:17
157:8 158:2 166:10
**competitiveness** 142:12
**complaint** 83:11 130:7,11,13
185:25
**complete** 7:10 30:21 125:15 147:9
195:10
**completed** 30:24 40:20 47:4 50:14
52:24 53:4 54:25 56:13 66:12
67:9 71:6,12 72:21 73:3 74:3 76:3
76:20 78:7 90:5 95:19 96:3,4
102:13 106:12 107:6 124:12
138:10 144:19 146:2 157:19
177:11 184:18 185:18
**complex** 58:17
**component** 126:2 191:16
**components** 171:17
**comprehensive** 177:6
**comprised** 105:3
**computer** 75:23 173:5
**computerized** 158:20
**conceded** 128:18
**concentrated** 175:20
**concept** 52:16 53:6
**concern** 79:4
**concerned** 95:3
**concerning** 10:14 11:23 18:4 53:19
60:5 87:22 161:11 191:11,18
**concerns** 143:13 148:2
**concluded** 134:14 194:8
**conclusion** 25:20 49:25 183:9
**conclusions** 154:7
**condition** 8:25 9:4 61:7
**conduct** 31:11 72:14 88:10 98:4
121:13 145:18
**conducted** 4:6 42:23 54:8 55:7
77:13 82:18 92:20 94:5 102:3
108:9 161:19
**conducting** 36:8 72:8 76:8 100:16
144:7 187:17
**conference** 1:22 5:10
**conferencing** 6:13
**conferring** 11:3
**confidence** 123:2 165:24
**Confidential** 6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1 21:1 22:1

23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1 153:1 154:1 155:1
156:1 157:1 158:1 159:1 160:1
161:1 162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1
181:1 182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1 190:1
191:1 192:1 193:1 194:1
**confined** 82:12 155:14
**confirmation** 160:16
**connected** 10:23
**Connecticut** 118:6
**connection** 9:11 10:11,17 52:20
63:7,18,21 70:22 99:21 100:3
101:6 104:9 129:17 130:15
**connections** 124:14
**consensus** 97:25
**consent** 4:16
**conservative** 100:23
**consider** 56:25 69:17 107:16
122:14,17 123:19 124:3 140:18
168:19 169:5,9 171:13 186:18
**consideration** 135:8 148:14
**considered** 4:17 29:24 45:11 59:11
60:12 70:11 115:11 118:21
122:16,18 136:14 137:7 143:2
147:14 157:7 164:3 167:3 177:19
179:19 186:17
**considering** 45:4 58:15 122:20
**considers** 185:21
**consisting** 106:16 108:10
**constantly** 95:6
**constitute** 77:18
**constitutes** 68:6

**consult** 62:7 63:6,14,15,17 84:16
142:23 163:19
**consultation** 60:20,23
**consultations** 61:2,11,24
**consulted** 12:19 61:5 63:11,25
81:23,25 145:8
**consulting** 60:15 173:20
**consuming** 67:25
**contain** 97:7 191:11
**contained** 62:5 72:5 88:25 93:16
96:19 97:9 140:25 147:3,19
187:24,25 188:5 190:4
**contains** 61:18 77:5,6 92:25
**contents** 17:19
**context** 98:14 114:11 178:6 180:21
**continue** 34:12 59:24 73:24 74:14
106:15 155:24
**continued** 120:22,23
**continues** 24:13 33:3
**continuing** 30:22 41:19 87:5 93:4
**contract** 20:6
**contracts** 50:10
**contribute** 166:13
**contribution** 142:21
**control** 4:12
**conversations** 19:10
**convey** 106:23
**conveyed** 145:12
**COO** 136:24,24
**copy** 11:13,15,16,18 57:10 65:8
194:4
**corporate** 49:12,13 50:11 58:17
59:6 134:19,20 137:6,7,13,13
142:9
**corporation** 1:9,9 2:16 142:18
165:13
**corporations** 182:4,4
**correct** 14:12 15:7,21 26:24 29:17
31:23 32:5 33:3,22 34:10 38:21
41:14 43:18 50:18 60:19 73:12
75:12 78:19 79:8,17 80:13,19
81:24 82:14,25 84:13,15 85:6
88:22 90:17 96:12 97:15 111:6
112:5,7 114:25 118:10 121:25
122:6 126:6 128:20 129:2 130:3,8
131:22 134:2,8,20 136:15 137:14
141:9,13,15,19 145:9 148:10
150:16,19,22 151:6,9 153:10,13
153:22 154:24 155:4 156:3 159:5
159:16,20 160:4 161:11 163:11
164:15,18 167:23 172:8,9,11,20
174:13,21,25 176:19 179:14
183:3,6 186:13 187:3,4 190:10,12
190:21 195:11,13
**correctly** 12:8 39:8 188:25
**correspond** 78:16,22
**Costa** 1:10 2:7,11
**counsel** 3:6 4:3,10,21 8:4 19:6

20:12 49:13 50:4 59:5,5,6,6,7
61:9,10 62:24 83:16 100:25
111:14 134:19,20 135:12 137:6,6
137:7,13,14 149:10 181:8
**counseling** 27:25 30:2 99:16
**count** 80:23
**Country** 2:4
**County** 116:12 118:6,7 195:5
**couple** 22:20
**course** 28:15 36:9 76:8 91:16 97:3
108:7 124:8 144:3 151:15 153:7
169:24 179:4,15
**court** 1:2 3:18 4:7,22 6:24 7:15 8:7
23:13 42:13 66:16 147:2 177:18
178:2,7 179:17
**courts** 180:2
**covered** 110:5 188:22
**covers** 20:17
**create** 100:6
**created** 99:8
**credential** 30:20
**credentials** 29:14
**credibility** 106:24
**credible** 81:7
**credits** 41:23,24
**criteria** 15:14,21,23 16:3,7,11,24
17:2 117:18 136:23 154:22
**cross** 179:4,6
**CTO** 136:24
**current** 27:2,4
**currently** 8:20
**cut** 6:14 26:22
**cuts** 6:15
**CV** 26:13,16,18 27:2,6,8,13 32:5,16
32:22,24,25 33:10 43:12 46:21
196:9

**D**

**D** 1:1 2:1 3:1 4:1 5:1 65:16 88:16
182:12 195:2 196:2
**D.C** 117:3
**D.E** 95:13
**D.T** 95:13
**daily** 130:20
**damages** 19:16 68:21 107:18
151:21 153:16
**data** 12:9,10,15,18,23 13:4 14:2,3
45:4 70:11 73:12 99:22 100:10
102:2 103:11 104:24 105:3
120:12 141:3 147:14,25 168:16
173:21 174:9,11 177:16 179:21
193:15
**database** 12:10 13:14,15,16 15:24
16:12,16,23 57:7,13,22 112:15
148:3 172:14,20,23 173:13 176:8
176:17,22 177:20 178:4 179:19
189:3 190:4
**databases** 143:24 144:22 145:4

148:9 171:12
**date** 1:22 5:3 145:22,25 182:16
**day** 67:7 195:20 197:16
**day-to-day** 91:20 132:16
**deal** 113:16
**deBruyn** 90:2
**decades** 58:16 95:5
**Decide** 35:10 39:17
**decided** 135:4 155:15
**decision** 107:4 178:4,5 179:20
180:22
**decisionmaking** 24:9
**deductions** 151:4
**deem** 80:21 113:23 114:5
**deemed** 80:17,18 110:21 178:3
**Defendant** 2:7,15
**defendants** 1:12 2:10 11:6
**defense** 83:16
**define** 123:7
**definitely** 95:13 150:17
**definition** 146:12,15
**definitively** 186:19
**degree** 27:15,17,23 28:25 29:3,24
31:9 51:18 69:21 71:2 79:12 97:2
99:7 100:12 102:7 106:23 112:13
137:25 138:19 142:17 153:18
154:15 157:25 167:11,20 186:5
**degrees** 27:22 28:3,18,23 30:3
**delivery** 89:10
**demand** 62:16 188:20 189:15,16,18
189:19,25
**demeaning** 153:21,24
**demographics** 169:15,17,18 170:3
170:5
**demonstrate** 30:7 51:18 152:4
**demonstrated** 49:9,17,21,25 51:13
59:14 105:11 131:9
**demonstration** 152:5
**demotion** 152:21 153:5
**departed** 129:10
**Department** 156:25 185:13
**departure** 25:10
**depend** 132:14
**depending** 86:3 108:19 132:3,4
135:10 138:3 142:17 167:11
181:16
**depends** 39:2 62:24 119:16,16,17
119:18 132:13,15,25 135:17,25
151:13 161:17,25 178:5 180:20
**deposed** 9:7,9
**deposition** 1:19 4:6 10:17 83:11
195:9 197:6
**depressed** 129:9
**depression** 132:10
**derived** 90:20
**describe** 105:2 106:15 114:3 132:3
169:2
**described** 18:15 44:16 50:13 55:12

59:12 62:8 65:2 71:3,15 96:11,23
106:18 107:20 111:11,18,19
112:22 123:6 125:12 131:14
136:2 137:21 140:15,16 169:16
184:21 185:12
**describes** 51:5 193:12
**description** 56:2 105:24 106:8
113:13 114:10 138:16 193:14
**descriptions** 53:2 105:5 112:18,23
132:16 139:24
**descriptors** 138:21
**design** 16:11
**designate** 16:17
**designating** 16:22
**detail** 72:20 140:17
**detailed** 72:16 75:3 106:8
**determination** 127:5 128:4,10,14
128:19,24 131:25 138:12,24
142:8 143:5,18 145:15 148:6
155:6 193:7
**determinations** 118:24 140:3
141:14 158:20
**determine** 34:17 36:18,23 40:14
51:12 56:15,19 102:4,7,15 103:4
103:9 112:12 117:11,22 174:12
**determined** 15:23 102:9 119:6
150:16 180:14
**determines** 13:19
**determining** 85:12 137:5 153:9
**developed** 22:24 85:14,21
**Developing** 95:12
**differ** 69:12
**difference** 149:25
**differences** 57:5
**different** 14:17 18:23 22:8,21 38:6
39:6 40:18 43:11 46:25 52:5,5
55:4 59:4,18 72:9 73:17 75:22
76:18 77:24 92:25 94:12 102:23
103:11 105:19 106:19 108:18
110:5,17 111:14,15 116:2,5
118:11 122:21,22,24 126:24
128:10,19 130:19 140:17,21
141:14 143:23 144:15 146:14,24
151:16 152:10,18 160:23 161:7
167:19,20,21 171:11,12 173:23
175:4 176:4 178:22
**differently** 171:14
**differs** 14:2 69:9
**difficult** 7:2 65:23 116:16 117:6
156:17 166:18,21
**diligence** 20:3 21:3 25:2 123:2
179:25
**diligent** 23:10 24:9 25:5,14 34:17
36:18,23 37:6 44:2 58:19 64:9
66:25 67:5,12,14,20,24 68:7 69:7
69:23 152:11
**diminish** 142:16
**diminishment** 127:19

diplomate 29:8,16,19 52:11
direct 5:20 23:13 64:7,13 117:7
  163:4 191:18 192:14
directed 39:20
direction 86:22
directly 15:9 47:10,11 48:8,12
  99:24 162:22 173:9 176:4 177:2
directors 110:8
disability 85:17
disabled 85:12
discern 33:9
discipline 189:21,23
disclose 19:10
discrepancy 14:6
discrimination 166:19 170:20
discussed 70:25 93:14 97:5 118:14
  119:3 134:4 152:9 184:25 186:25
discussing 97:8 98:16 163:8
discussion 38:17
discussions 10:22
display 23:17
dissolution 39:24
distance 116:21,25 117:2,5,22
distinction 164:20,21
distorted 168:22
distress 129:16,16 130:15,23 132:9
DISTRICT 1:2,2
Divorce 35:7 38:3
divvied 150:12
doctor 99:14 101:19
doctorate 99:15
document 17:18,21 23:14 26:21,23
documentation 12:3 18:17 46:2
  70:21 82:10 84:6 124:19 127:21
  134:13 152:6 160:4 186:2 188:9
documented 82:15
documents 10:6 36:6 44:23 70:24
  71:10 72:8 82:13,19 88:24
doing 48:11 59:21 76:17 99:17
  104:14 114:16 122:23 130:2
  151:13 188:23
Donna 1:10 2:7,11
dot 177:21
double 13:5 15:9 58:9 67:14 148:8
doubt 128:11
Downing 81:10 85:5 160:19
dozen 9:10
Dr 6:2 14:10,11,15 99:11,13 100:16
  100:19 101:7,15 102:3,16 103:4
  103:14
dramatically 108:22
duly 5:17 197:7
duplicate 103:10 176:11
duplicated 102:17
duplicates 15:3 102:11 103:6,8
  190:17
duplication 21:21,25
duplicative 102:6 176:8

duration 21:7 23:6 158:8 159:8
  161:20,25 168:7 170:3 171:7,10
duties 105:7 109:18
duty 68:20 151:20,25 152:3

**E**

E 1:1 2:1,2,2 3:1 4:1 5:1,15,15
  17:12 195:2,2 196:2,6 197:2,2
earlier 43:16 61:17 85:21 123:6
  156:2 161:18
earliest 121:14
earn 143:19,24
earned 26:4 149:7,20,24
earning 35:19 36:3 37:20 38:20
  39:12,25 107:14 145:2 148:7
earnings 40:14 148:6,13
easiest 33:14
easily 64:22 113:19
Economic 90:7 93:5 95:16
economical 19:16
economics 28:18,21 29:3 189:20,22
edited 184:8
educate 40:19 145:22
education 27:16,19,25 30:22 41:19
  44:11 45:13 105:9
educational 124:8
effect 3:17 129:22,23
effective 24:10
effort 24:7 67:25 144:9 152:12
  153:15,15 162:20 186:6
efforts 21:4 23:8 25:14 66:2 70:12
  71:11 82:18 160:3
eight 46:23 75:11,25 76:2
either 84:7 136:25 137:18 139:4
  165:7 197:11
element 188:2
elements 29:21 64:15,25 66:21 77:7
  77:18,22 78:15 185:11
eliminate 107:2 114:24 115:22
  116:24 117:13 135:12 155:12,20
  155:24
eliminated 101:4 102:11 110:25
  135:8,23 153:19 155:21,23
  171:25
eliminating 137:19
embedded 25:13 123:24
Emerson 27:18
Emery 95:4
emotional 129:16 130:15,23 132:9
employ 21:24
employability 19:25 24:23 36:2
  49:4 76:9 78:5,24 112:9 145:18
employed 96:7 125:11 162:14
  165:13 169:12 182:3
employee 19:25
employees 135:16
employer 24:24 156:5 160:22 161:8
  163:24 167:8

employers 135:13 173:23
employment 20:2,4,22,23 22:23
  23:2,3,9 24:2 26:3,6,8,8 31:4,10
  31:13 35:18,23 36:2,9 37:20
  38:24 39:10,11,21 44:19 46:10
  50:10 52:2 55:15 59:24 67:22,23
  88:3 94:24 120:24 127:15 129:18
  135:2,5,9,23 155:17 157:8 158:3
  160:9 162:25 163:7 164:7,24,25
  165:15 166:19 167:17 171:16
  189:18
encompass 32:2 79:10 83:13
encompassed 31:7
encompasses 20:16 165:19
encountered 28:8
ended 108:24
endurance 8:14
engaged 12:6 19:6 21:13 58:18
  65:18
English 27:18
ensure 21:20
entail 106:2
entailed 37:2 109:22
entire 7:15 189:12
entirely 133:24
entitled 17:13
entity 29:17 62:20
entries 176:8
entry 33:18,24 55:20 91:5 107:2,15
  107:15
enumerated 76:5 77:17 78:16
environments 110:11
err 101:5
esoteric 176:23
especially 38:12 59:22 109:6
  135:13 144:17
Esq 2:5,13,18
estate 143:19 144:7,16,23 145:3,12
  145:23,23 148:14 149:4,18 150:2
  187:18
estimate 75:25
et 11:3 30:3,14 37:23 39:6 53:3
  114:13 140:14 141:17 142:24
  167:23 169:23 181:9
evaluate 19:24 20:3 23:5 51:16
  52:9 103:21 104:19 114:10
  133:22
evaluated 70:8 150:9
evaluates 45:3
evaluating 21:3 22:22 31:4 59:21
  94:24 102:22 125:16 144:5 160:2
evaluation 17:14 20:22,25 31:8,11
  70:16 73:11 77:6 79:16 94:13,16
  98:19 99:16 115:12,14 125:18
  133:4
evaluations 29:15
evaluator 10:24 30:8 31:2,3 145:18
event 127:12,13,17,17 128:25

140:23
events 85:22 127:10
evidence 30:10 146:10 178:11
evident 127:21
exact 81:2,6,17
exactly 65:13 76:12 93:10 106:5
  141:13
exam 30:15,18 119:17
examination 3:7,16 5:20 30:6
  132:24 179:6 194:7 196:3
examinations 130:25
examined 5:18 191:10
examining 66:10
example 33:18 75:23 102:9 117:24
  120:17 142:19 147:25 150:24
  170:15,19 174:22 185:17
excellent 122:25 184:13
excess 149:21
exclude 117:19 137:12 141:15
  171:20 179:7,12 193:8
excluded 179:17 180:3,8,11
excludes 179:24
excluding 171:19
exclusively 100:4 160:3
excuse 32:20 88:17 94:21
execute 25:14 37:6 52:3 129:13
  130:21 186:3
executive 47:7 52:3 62:18,18 72:11
  134:22 135:2,7,20 136:4,5,13
  181:6,13,18
executives 135:22
exercise 140:9,11
exhibit 17:10,10,15 26:11,12,14,18
  96:20 97:6 196:8,9
exhibits 17:8
exist 131:21
existed 189:11
expect 8:2 176:18
expectation 23:6 26:2 64:9 67:5,16
  156:23 159:20,21
expected 158:8 159:12,18 163:17
  163:19
expecting 161:7
expenses 150:11 151:5,12
experience 24:2 30:8,11 44:13 45:2
  45:18 46:15,19,20 47:8,21,24
  48:15,19,23 50:3,7 58:15 59:20
  60:19,20,23 61:8,14 64:3 70:7
  72:23 76:14 102:21 104:14
  105:11,15 109:19 110:9,13,15
  111:6 113:16,21 114:6,13,16,22
  123:23 128:25 134:13 136:3
  137:24 139:24 142:8 142:22
  144:5,18 164:23 166:16 185:15
experienced 129:15 165:11
experiences 116:2
expert 11:14,16,19 12:24 17:3,7
  23:18 28:16 31:23 32:19,23 40:22

48:25 50:23 51:2,7,10,12,15 54:8
  54:12 56:25 57:10,20,21,21,23
  61:4,12,13 62:4,5,9 65:3,12 69:15
  73:5 75:5,13 82:14 83:20,23
  91:24 94:7 96:5 103:25 104:8
  113:8 115:17,19 128:8,17,18
  137:17 141:6 146:9,13,21,25
  147:4,20 150:4 165:8 167:25
  168:8 178:17 179:13 180:16
  186:16
expertise 87:12,21 95:2 115:7
  118:16,19 130:22
experts 11:5 18:23 29:9,12 35:10
  39:16 40:13 43:11 79:20 80:3,5,7
  112:9,9 141:21 183:25
expired 121:4,5,11
explain 173:3 178:18
express 4:16 147:10
expressed 147:18
extended 38:23 65:23
extensive 24:2 50:3 70:7 100:11
extent 12:9 16:15 28:13 124:10
  189:4,8
external 174:18 191:5
externally 111:16 142:24 170:8,15
  174:13,15
extract 91:2 114:12

F

F 1:1 2:1 3:1 4:1 5:1 197:2
face 38:23 39:10
facilitating 48:15
fact 5:10 103:10 122:20 175:19
  186:3
fact-based 184:14
factor 116:9,21 118:23 124:23
  142:7 148:18 151:4 155:8 156:15
  156:21 157:24 158:7,10,13 159:7
  159:10 161:9 162:3,8,17 166:22
  166:24
factored 119:2 162:7 163:13,15
factors 117:22 140:3,6 165:20
  167:22 178:6 180:21
facts 147:14
factual 49:24 143:17
failed 44:2 69:22
failure 24:6
fair 40:25 43:22 44:7 69:8 98:5
  104:7 137:2 151:11 175:9
fairly 116:4 139:22 141:11 149:19
  164:22
fall 160:7
familiar 52:16 53:6 68:18,23 71:25
  81:10 149:25 151:19 158:16,21
  160:25 168:15 172:13,15,19
  175:6 178:15
family 35:7,19,23 36:12,15,16 38:4
  39:19 123:21,21 148:15,21

far 95:3 107:20 149:7 164:12
  177:12
faster 148:20
feasible 117:23 118:14
federal 3:2 4:4 93:9,11 146:9,13,25
  147:2 178:11
feel 23:12 74:12 102:24 103:12
  166:7
feeling 166:11
fewer 135:15
field 43:10 45:6 48:23 52:13 57:2,5
  80:8 87:12,21 88:11 89:2,12 92:3
  93:24 94:3 95:2,5 101:3 102:22
  127:3 128:15 145:13,20 148:14
  148:16 152:10
fields 85:13
fifth 2:7 34:7
figure 188:14
figuring 107:23
filed 166:18 170:20
filing 3:7
filled 170:11,14,18 190:20,24 191:4
  191:4
filter 173:14
find 20:4 23:3,8 65:6 66:20,24
  85:13 90:8 113:22 125:5 127:6
  155:17 156:19 157:3 159:22,23
  163:2 164:25 165:15 167:10
  183:21 184:15
findings 10:7 68:12 73:12
fine 5:6 65:12 86:9 133:6
finish 7:5,11
firm 46:21 47:13,14 59:7,8,8 62:22
firms 50:6
first 5:16 12:7 29:23 33:18 35:17
  64:13 69:15,17,19 90:15 105:20
  105:22,24 106:13 108:8,20 109:3
  109:6,10 122:11 123:3,16 125:7
  143:23 172:3
firsthand 64:3 134:12 145:16
  172:25 173:3
Fischman 1:4 2:21 15:14 17:13
  44:2 49:9,17,20 53:20 54:3 55:8
  65:18 69:22 70:13 82:3,6,17
  83:11,14 84:7 100:14 105:11,15
  106:22 109:9 113:9 116:11
  122:10 124:3,16 126:14,25
  127:11 128:25 130:14 131:9
  132:9 133:8,11 134:16,25 135:9
  135:21,24 136:6,15 137:8 138:8
  140:15 149:14 155:9 157:9,25
  159:12 162:3 163:10 169:25
  171:21 177:2,13 181:14 182:14
  183:10 186:3 189:5,12 192:17
Fischman's 19:25 22:22 23:25
  44:11 45:6,12,17,22 50:17 53:14
  54:9,13 55:19 70:23 82:21 83:19
  109:3 112:14 114:13 120:21

121:3,15 134:10 137:23 142:4
143:18 148:13 156:8 158:8 160:2
161:10,15 182:9 188:16
**fit** 56:11,11 111:3 137:23 139:10,25
**five** 63:13 69:20 70:15 74:13 75:13
76:5,6 77:7,10,12,14 78:12,15,17
86:19 94:13,17
**FJS** 12:19 13:8,10 15:24
**flag** 163:23
**flexible** 156:6
**Flipping** 188:12
**Floor** 2:7,12
**focus** 185:5
**focussed** 135:5
**follow** 65:20 76:18 133:6
**followed** 78:13 80:13
**following** 25:9 37:6 49:7 178:21
**follows** 5:19 64:15
**footnote** 66:6 67:7 68:2 73:6 74:6
**footnotes** 10:4
**Forbes** 64:20
**Forbes.com** 64:20
**force** 3:17
**forensic** 12:3,10,18 13:11,15,20
14:2,16,19 15:6,9 16:12,16,22
18:15,24 19:5 29:14 30:8,11
55:12,18,24 57:6,12,22 58:2,11
87:25 99:23 105:6 108:11 109:4
112:15,25 113:10 124:24 135:21
141:2 156:12 171:20 172:14,15
173:18 175:23 176:17,22 177:19
178:3 179:18 180:11,14 182:23
188:13 189:2,10
**forgot** 37:13
**form** 3:11 7:25 32:11 62:21
**formal** 52:21
**former** 53:14
**forming** 147:14
**forms** 122:21
**formulas** 53:12
**formulation** 62:9
**forth** 20:13 197:7
**forum** 90:7 93:5 95:15,16
**forward** 132:20
**found** 14:5,6 15:2 26:2 95:16 105:6
112:20 113:5 115:18 166:3,8
**foundation** 49:24 87:25 92:2
**foundational** 92:3 93:23 94:3,25
**four** 30:16 34:25 42:18 63:5 79:5,6
**Fourth** 34:5
**framework** 95:12
**free** 23:12,16 74:12
**frequent** 12:6
**frequently** 42:21 177:22
**full** 35:8 64:14 68:12 182:8 189:3,8
**full-time** 65:22 67:22
**fully** 154:14
**function** 189:20,22

**functional** 131:15
**functioning** 52:4 72:11
**functions** 50:8 52:7,9 55:15 110:5
110:20
**further** 3:10,15 4:13 25:23 43:3
58:13 169:22 193:22 197:10
**future** 5:3 24:24 142:20

_____

## G

**G** 195:2
**Garden** 2:4
**Gardener** 173:20
**gauge** 103:13
**GC** 181:20,20,21
**GCs** 62:23
**geared** 90:25
**gender** 158:4,13 168:21
**general** 10:21 35:20 37:16 40:15
49:12 50:4 59:5,5 62:24 63:23
100:24 103:2 134:20 137:6,13
168:3,5
**generally** 9:25 21:24 33:5 36:8
37:19 38:10 39:19 40:8,8 46:18
74:8 75:15 85:11 91:2 97:21
106:7 117:14 125:15 139:22
171:16 172:18,21 175:9 183:17
183:24 190:12 192:24
**generic** 40:9 42:10
**geographic** 107:21 192:5
**geographical** 116:7
**gestures** 7:19
**getting** 126:3
**give** 7:9,11,18 27:9 75:24 152:12
163:4,6 173:6 188:19
**given** 125:25 164:22 177:16 195:12
197:9
**gives** 52:2
**giving** 162:13
**glean** 33:14
**global** 138:4
**go** 14:14 23:20 30:17 34:24 42:17
43:3 75:21 100:10 111:15 117:24
120:12 129:25 139:15,23 142:25
152:15 173:5,12,25 174:7,8 175:3
178:6 185:3 193:11
**goes** 25:19 75:16 152:12 181:7
**going** 7:4,14 8:2,18 26:11 59:18
74:9 75:24 86:17 98:2 104:16
105:4 108:10 145:19,22 148:22
148:24 154:10 159:14 166:25
167:4 172:10 175:11 192:15
194:3
**good** 6:4 55:13,22 56:7,10,11 60:16
60:17 74:14 86:15 98:4 106:24
107:18 108:18 113:6 118:7
119:19 139:25 142:19 149:5
165:11 175:3
**GORDON** 2:10

**gosh** 72:6
**government** 91:12
**graduate** 27:23 28:9,11,14 29:24
**graduated** 122:24
**granted** 173:9
**great** 113:16 153:18
**greater** 124:4
**gross** 149:24 150:2 151:7
**ground** 8:17
**grounds** 178:14
**group** 84:22 173:21
**groups** 124:20
**grown** 124:3
**GUERON** 2:6
**guess** 19:17 34:24 121:10 128:16
**guidance** 28:2

_____

## H

**H** 196:6
**half** 74:11
**hand** 133:6 197:16
**handbook** 66:5,9 68:4,16 89:4 90:3
91:11,12,18 92:22,25 94:23 96:24
97:10,15 184:5 185:12
**happen** 21:25 122:19
**happened** 12:6
**happens** 40:9 110:24
**happy** 6:16 8:10
**hard** 81:10 108:17 150:13
**head** 149:5
**heading** 64:8
**health** 167:9,20 170:23
**hear** 6:11 7:21 8:2 160:21
**heard** 53:8
**hearsay** 146:22
**heavily** 66:9 70:25
**heifer** 22:24
**held** 1:21 55:8 58:21 153:16
**help** 35:10 39:16 40:24 101:25
107:17 125:5 193:20
**helped** 10:25
**helpful** 40:23 42:14 78:4 114:17
115:5 117:16 180:19
**hereinbefore** 197:7
**hereto** 3:5
**hereunto** 197:15
**high** 144:3 148:7 157:10
**higher** 144:5 159:22 171:15
**highly** 116:12 128:11,23 182:19
183:10 184:10
**hired** 42:17 67:25 191:20
**Hispanic** 169:23
**history** 22:23 24:2 44:19 46:10 52:2
55:14,15 59:15 70:5 114:13 161:6
**hold** 184:9
**Holdings** 1:8,9 2:11,16 58:22 69:24
**hole** 160:7,11
**honestly** 83:6 95:22,22

**Hooft** 67:8,11,18
**hope** 116:3
**hour** 74:11
**hours** 30:16 67:6
**housed** 120:15
**Howard** 47:15,16 48:9
**hundreds** 173:14
**Hunters** 89:21
**hypothetical** 179:22,23

**I**

**i.e** 142:20
**icon** 149:4
**idea** 118:7 180:9,12
**identical** 115:20 116:5 152:19
    155:3
**identification** 17:11,16 26:15
**identified** 14:18 26:17 45:9 64:18
    77:7 94:19 96:20 100:19 105:23
    147:18 153:20 165:14
**identify** 66:21 70:23 94:4,13 139:8
    139:12 147:14
**identifying** 96:6 139:19
**III** 71:16
**illness** 73:23 129:4,5,7
**immediate** 148:15
**immediately** 108:6 119:9
**impact** 157:12 158:4 167:9 178:4
**impacted** 73:24
**impacts** 161:20
**impaired** 186:8,20
**impairment** 185:21 186:2,10,11,15
**impairs** 9:5
**implication** 95:17
**implies** 157:5
**imply** 79:19
**important** 7:17 90:2 92:16 95:21
    110:3 113:12,23 114:5 117:10
    167:4
**impossible** 115:24
**Imputed** 35:2 37:11
**in-depth** 58:16
**inability** 129:8
**incapsulate** 76:6
**include** 20:21,24 21:3,7 32:13,16
    33:6 36:10 56:17 76:9 78:25
    97:23 98:9 107:5,12 109:24
    114:24 115:21 117:12,19 119:8
    120:5,13 126:10,17 132:24
    134:22 137:11 141:15,16 156:3
    161:24 170:3,7,10,14,18,21,23
    171:2,17 176:23 188:7,21 189:8
    193:8
**included** 10:5 56:16 71:8 72:23
    78:13 115:3 121:22 130:7 136:16
    136:23 139:13 147:23 157:17
    173:24 181:6 186:15 188:3
    191:14

**includes** 78:25 79:6 124:7
**including** 9:18 64:18 72:10 76:11
    105:9 137:19 170:19 171:19
    181:12
**inclusive** 20:18
**income** 35:3 37:12 143:20 150:2
**incorporated** 71:23 90:13 91:19
    125:20 168:11
**incorporates** 143:9
**incorrect** 134:3
**increase** 66:2
**increased** 108:21,22
**Indeed.com** 176:2,7,12 177:14
**independent** 59:9 60:4,11 84:5
**independently** 12:18 99:22
**index** 1:7 53:7 112:4
**indicate** 87:18 169:22 191:24 192:4
    192:25
**indicated** 73:2 77:12 78:15 100:24
    114:9 116:18 117:15 124:18
    129:7 132:8 158:25 159:4 168:12
    187:17 193:2
**indicates** 52:11 124:21 189:22,23
    189:24
**indicating** 186:4 188:10
**indication** 18:4 131:13 183:15
    189:7
**indicator** 189:14,16
**individual** 1:10,10,11 36:3,12 61:9
    106:6 124:2 125:16 126:23
    153:15
**individualized** 167:15
**individuals** 38:7 79:3 84:14 102:22
    136:3 162:11,14,24
**industrial** 52:14 110:2 111:20,25
    112:7 139:3,5 140:24 141:7
**industries** 109:23 110:10
**industry** 107:24 109:21 110:4
    114:12 145:24
**inference** 190:21,22
**inform** 108:5
**information** 11:23 13:13 15:11
    18:15,25 33:15 53:2,19,25 61:18
    63:20 72:14 83:13,15 130:5,6
    134:9 148:4 149:14 174:20
    185:21 186:19 191:11,14,18,22
    192:10,13
**inherent** 79:4
**injured** 85:12
**injuries** 127:10,19
**injury** 35:23 73:22 85:19,22 87:17
    129:2,4
**input** 99:7
**inquiry** 167:15
**inside** 25:6 61:9
**instance** 115:21 147:8 153:12 155:6
**instances** 160:19
**instruct** 23:17

**instructed** 8:4
**instructions** 133:7
**instrument** 20:10
**intact** 85:25
**intellectual** 10:9
**intend** 8:12
**intended** 8:13 40:25
**intensity** 65:25
**intensive** 68:2
**intent** 173:16
**intention** 149:11
**interest** 91:4
**interested** 18:18 197:13
**interestingly** 162:10
**interject** 74:10 86:6
**internal** 59:6 174:17 191:4
**internally** 111:16 142:23 170:8,15
    174:13
**interpersonal** 134:10
**interrupting** 7:5
**interval** 165:24
**interview** 42:17,19 56:12 110:22,23
    122:4,9
**interviewed** 187:16
**interviews** 68:14
**introduce** 148:25
**introduction** 167:3,5,7
**introductions** 159:24
**investment** 136:11
**invited** 56:12 122:4,9
**involve** 133:6
**involved** 39:14 46:22 50:12 124:20
    127:8 129:2 180:21 187:21,23
    193:13
**involvement** 123:22
**involving** 165:23
**issue** 55:24 188:12
**Issues** 35:2,4 37:11
**item** 39:16 90:16 91:5 93:5 94:3
**items** 33:10 34:13 41:14 76:5,6
    77:13,17 93:13,18,23,23 97:5,13
    97:19 106:20 147:17

**J**

**January** 44:3 49:8 65:19 69:24
    182:11
**Jason** 90:2
**JC** 111:14
**Jennifer** 1:4 2:21 17:13
**Jersey** 117:3 118:6
**job** 14:17,25 15:13,17 20:3 21:4
    23:10 24:10 25:3,5,7,14 34:17
    36:18,23 37:6,7 38:14 42:9,19
    44:3,23 45:5 48:16 51:15,25 52:7
    52:9,17,19,21 53:2,2,19,25 54:5
    55:14,17,25 56:9 57:19,19,19
    58:19,19 60:13 64:10,15,22 65:2
    65:22,25 66:10,21,25 67:5,6,12

67:16,18,21,22,24,25 68:7,12,14
68:17,17 69:6,7,23 70:10 71:5,11
72:9 75:6 82:18 87:23 88:6 89:21
90:2,4,4,9 92:17,22,23 95:8,11,18
95:21 96:25,25 98:4,6 101:25
105:4,7,23,24 106:2,7,14,22
108:20,23 109:2,8,17 110:18
112:3,18,23,24,24 113:14 114:9
114:11 115:8,22 116:17 117:14
117:17,19 119:20 120:16,18
124:25 129:10,13,19 131:11,16
135:11,13,15 136:2,17 138:12,15
138:15,21 139:8,23 140:13,16
145:24 151:25 152:3,11,13 153:4
153:7,9,17,22,24 155:7,12 156:9
156:19 157:3,12,21 158:5 159:19
160:2,13 161:11,15,19 162:4,9,18
162:20 163:18,24 166:3,8 167:10
168:2 172:14 173:23,24,24
174:21,22,23,25 175:3,11,19,24
175:24 176:12,17,23 177:3,7
179:25 182:13,18,22 184:5,5
185:16,16 186:4 187:20 188:14
188:22 189:11,15,16,18,19,23
190:19 191:10,17,24 192:12,24
193:2,5,11
**job's** 137:25
**jobs** 16:25 47:22,25 48:7 51:25
53:14,14 54:2,9,10,13,14 55:8,9
55:10,19,22 56:7,16,17 72:23
75:10 76:11 82:4,7,8 84:7,12
85:13 89:5 91:11 100:12,13,18,20
101:2,4 102:5,10,17 103:5 105:5
105:22 106:25 107:4,10,12 109:4
109:14,17 110:17 111:21 112:14
112:14,21 113:9,10,18 114:4,23
116:24 117:12,12 119:4,8 120:5,9
120:14 121:22,24 124:24 135:7
136:4 137:19,22 139:2,8,12,19
153:12,19,25 154:13 155:20,21
155:25 156:11 159:13,22,23
170:7 171:19,20,25 172:3,19,22
173:2,14,17 174:4,12 175:10
176:7,16 177:3 181:13 182:3,11
182:15 183:11 185:8,8,10,11
188:20 190:3,24 191:16 193:8
**JobStats** 12:4,18 13:11,16,20 14:2
14:16,19 15:7,10 18:15,25 19:5
55:12,18,24 58:2,11 99:23 105:6
108:11 109:4 112:25 113:10
124:24 141:3 156:12 171:20
173:18 175:24 177:19 179:18
180:11,14 182:23 188:13 189:10
**JobStats'** 12:10 16:12,16,23 57:6
57:12,22 112:15 135:22 172:14
172:15 176:17,22 178:3 189:3
**JOHN** 1:11
**Jolly** 2:18 5:6 194:5

**Journal** 35:11 64:19
**judge** 115:2
**judgment** 114:18,21,25 115:20
128:6,20 138:14,18 140:10,12
166:12,15
**junior** 172:2
**jurisdiction** 180:3
**jury** 9:15

### K

**K** 195:2
**KANE** 2:3
**Kanfer** 66:4 68:3
**keep** 145:22
**keywords** 55:23,25 105:23 140:19
175:4 177:3
**kind** 8:13 37:18 41:24 129:4 132:18
163:10
**kinds** 36:15 46:25 50:7 107:22
**knew** 186:4 190:17
**know** 6:12,15,17,21 7:10 8:10 13:25
18:23 19:2,12,17,18 21:11,18,18
22:3,7 24:14 34:13 50:8 52:22
56:22 57:15,15,16 59:17 60:2
68:24 74:22 75:14,23 76:17 81:5
82:3,6,17 84:19 88:8 90:14 91:3
92:19 98:13,18 101:3 117:4,17
118:25 119:22 120:9,21,23 121:3
121:5,21 124:10 129:3 130:14
131:20 133:12 134:2 135:14,16
143:8 148:22,24 149:12,23 150:7
151:18 152:14 156:8,11 162:5,12
163:5,5,9,12 164:4,10 168:18
169:8,11 171:9 172:22 173:11,12
173:25 174:22 175:2,23 176:6
177:13,18,21,24 179:2 180:7,10
180:13,19 181:18 187:16 189:20
190:3,8,15,23 191:3
**knowing** 59:10 82:20 104:15
**knowledge** 5:8 22:10,23 29:9 44:17
46:3,5 52:2 58:17 59:10,13 60:5
60:12 63:23 80:4 84:5,11 89:2
93:3 100:8,10 101:16 102:7
103:15 104:8,13 105:8,10,15
106:3,24 109:18 113:11 117:21
118:2 127:11 137:24 139:24
142:22 144:23 145:16 146:5
150:6 167:21 170:13 173:2 178:2
185:15
**known** 25:4 95:24 126:8
**knows** 149:6

### L

**L** 1:1 2:1,5,13 3:1 4:1 5:1,15 195:2
**label** 115:6
**labeled** 26:12
**labor** 11:2 12:4 28:23,25 29:5,10
31:12 36:8 37:21 44:21 48:11

53:15,21 54:2,14 55:9,11 70:12
71:9 73:25 76:9 78:25 86:2 143:8
144:7 145:19 156:25,25 157:17
168:9 182:6 185:13,14 188:15
190:2
**land** 62:15
**language** 107:22
**large** 182:4
**larger** 191:16
**lastly** 23:8
**late** 142:15 157:5
**latitudes** 169:24
**law** 4:18 8:7 35:7,11,19,24 36:12
38:4 39:19 50:6,8 59:7,8 106:3
107:23 119:23,25 122:22,25
183:20
**lawful** 119:22,25
**lawsuit** 166:19
**lawsuits** 9:11,13
**lawyer** 24:3 26:3 50:12 110:6 163:7
**lawyers** 139:6,6,23 174:24
**lay** 62:14
**layers** 61:14
**layperson** 113:18,22 114:2
**lead** 10:24 49:12 134:19 137:6,13
**leadership** 72:12 123:23
**learning** 42:8 132:18
**leave** 192:8
**left** 87:5
**legal** 34:19 35:8 37:2 38:5 41:19
47:16,19 48:13,19,22,24 49:12
50:8 59:19,19 60:6,13,13,15,21
60:24 61:3,5 62:19 63:24 64:4
68:18,24 69:9 82:9 84:17,20
105:12 125:4 133:19,23 134:6,19
135:5,12 136:3 138:4 151:19
154:7,19 155:3,15 165:7 181:7,9
181:16
**legally** 163:6
**legislative** 138:6
**length** 157:12,21 158:4 161:25
163:16
**lengthy** 145:2
**lessen** 153:16
**lesser** 153:6,7,9 155:20,21,24
**let's** 32:6 33:2,12 42:12 43:3 56:6
62:11 86:19 89:5,23 95:10 115:17
124:7 178:22 180:25
**level** 57:21 58:20,25 66:11 75:8
78:3 104:8 107:2,12,15,16 136:4
136:13 155:18 158:3 159:23
169:3,21 171:15 189:9,24
**levels** 59:4 168:20
**Lexington** 2:16
**license** 119:4,24 120:2 121:4,5,7,8
121:10,12,24
**licensing** 41:25 120:22,22,23
**licensure** 105:9 109:19 118:21,23

119:2,21 121:16
**life** 111:13 124:6 132:21
**likelihood** 164:17
**likelihoods** 165:10
**limit** 31:9
**limitations** 31:7 131:15
**limited** 71:2 132:16 144:17 157:25
175:24 186:6
**line** 87:6 140:12 152:15,17,24 154:4
155:9
**lines** 155:13
**LinkedIn** 45:19 50:20,24 51:6 71:2
162:11 173:24 177:5,7
**list** 17:25 31:22,25 32:7,12,21,21
33:2 34:12,14 39:16 40:12 66:20
72:19 75:13,15 88:20 141:7
169:22 182:22
**listed** 17:2 18:11,20 27:13 71:16
78:12,21 82:13,19,24 83:9,20,23
97:6 112:24 113:9 119:9 156:12
172:19 174:23 176:17 190:24
192:21,22,24
**listening** 72:16 120:19
**listing** 55:17,24 71:21 181:6
**listings** 156:2
**lists** 32:9 93:16 140:25
**literature** 27:18 87:11,20 88:11,13
88:25 89:6,8,12 125:17 127:3,7
143:4 184:20
**litigation** 4:19 36:7,8 39:21 70:22
81:11 87:22 146:25 178:16
**litigations** 178:23
**little** 7:6 15:5 16:9 154:16 178:18
**live** 118:13
**lived** 116:11 117:2 118:11
**living** 118:4 130:20
**LLP** 2:3,6,10,15
**local** 44:21 53:20 54:2,14 55:9,11
86:2
**located** 105:25 117:15,17 120:15
**location** 107:21 116:7 117:20
**locations** 4:10 192:5
**long** 65:11 74:12 86:9,13 92:9
119:15 190:3,6
**longer** 39:3 90:7 132:17 156:18
**look** 13:18 23:21 24:15 37:3 59:24
65:8 91:3 98:11 105:22,24 106:11
123:16 127:14 140:12 155:15
168:20,21,21,25 169:11,13,15,18
172:4 185:6 188:9
**looked** 13:22 54:5 55:10,23 56:23
95:14 109:17 110:16 116:17
121:20 134:15 143:23 150:8
156:22 163:18 167:22 171:10
172:5,6 183:20
**looking** 17:22 18:24 26:20 36:22
37:14 38:15 42:22 49:2 50:20
68:11,25 75:7 95:17 98:3 100:25

106:19 112:18 137:20,21 142:18
175:3 177:3 188:18
**Lord** 62:11,17 63:3,6 81:23 82:4
84:8,12,22
**loss** 68:17 90:4 92:23 96:25 184:5
**lost** 162:25 164:24
**lot** 90:20 110:5 113:5 127:9 138:5
144:15 174:14 175:17 176:25
181:18 189:8
**lots** 113:22
**loud** 6:17
**loudly** 6:18
**low** 25:8
**lower** 108:21 168:24
**lunch** 86:17,23
**luncheon** 87:3

# M

**M** 195:2
**M.A** 17:12
**maintain** 30:20 65:23
**major** 25:13 27:18 50:6 165:12
182:3
**majority** 124:6
**making** 48:13 104:24 138:23
140:21 160:24 191:8
**malpractice** 85:20
**manage** 142:24
**management** 138:6 157:4,4,16,18
168:20 169:2,20
**manager** 157:9
**managing** 36:15 46:20
**Manhattan** 46:22 116:14
**manifests** 186:11
**manipulation** 133:6
**manner** 4:15 125:12
**MANSUKHANI** 2:10
**manual** 89:21 95:7
**manufacturing** 110:2
**marital** 39:24
**Mark** 17:10
**marked** 17:15 26:12,14
**markedly** 49:9,17,21 50:2 51:13
134:16
**market** 11:2 12:4 28:23,25 29:6,10
31:12 36:8 37:21 42:9 44:21
48:11 53:15,21 54:3,14 55:9,11
59:19 70:12 71:9 74:2 76:9 78:25
86:3 144:7 145:19 174:20 175:19
175:25 182:6 188:15 189:11,18
**marketing** 42:11 151:9
**marketplace** 61:7 62:15 188:20
**markets** 190:2
**marriage** 197:11
**Mary** 92:14 95:4
**massive** 13:17
**Master** 27:23
**match** 76:13

**material** 18:13 27:5,7 97:14 151:11
175:25 176:2 183:8,23
**materials** 17:25 18:5,19
**mathematical** 53:12,16 103:15
**matrimonial** 34:18,22 36:24 40:6
40:10,13
**matter** 22:4,9 25:19 27:6,9,12
35:20 37:16,23 39:15 40:10,15
43:11 52:20 62:4,10 63:4,7,16,18
63:22 81:13,15,20 82:22 85:6
88:15 91:24 94:8 102:18 103:21
103:22 104:2,4,17 128:6 138:13
138:17 160:19 167:13 197:14
**matters** 35:19 36:15 40:7 50:8,11
63:25 88:3 163:8
**Matthew** 2:5 86:12
**mean** 20:7 43:7,8 47:12 51:22
54:10 99:6 103:24 107:15 110:25
123:12 126:20,21 133:2 135:3
144:15 154:5 158:25 164:14
171:23 173:11 179:6,7 183:5
185:25 186:8 187:10,12 192:23
193:4
**means** 51:24 112:3 145:19
**meant** 151:7
**measure** 165:23
**media** 34:19 35:8 37:2 38:5 46:24
**median** 168:13 169:3
**medical** 8:25 9:4 85:19 129:24
130:22,24,25 131:3,6,8,13,23
132:4 188:10
**medication** 8:21
**meet** 10:10,12 24:6 36:5 39:12
156:6
**meetings** 159:25 188:23
**meets** 30:13
**member** 30:21
**members** 148:21
**memory** 9:5
**mental** 77:25 129:5,7,16 167:9,20
170:23
**mentally** 106:20
**mention** 37:13 99:10
**mentioned** 29:16 70:6 71:9 94:20
95:15 97:9 99:23 107:3 115:25
126:4 138:2 157:16 163:18 184:8
**mentor** 142:22
**mergers** 50:9
**met** 15:13,20 23:9 25:4
**methodical** 54:20
**methodological** 55:7
**methodologies** 94:6,9,18
**methodology** 30:14 35:25 69:14
70:2,4,16,19 71:14 73:11 76:18
77:6,8 79:16,20,22 80:6 85:15
91:14,17,19,23 94:14,16 96:6,9
96:10,12,14 98:20 110:18 111:10
111:21 112:8,12,17 125:10,24

127:9 128:15 137:5,11,16,20 183:24
**Metro** 117:9
**metropolitan** 143:25
**Michael** 62:11,17 63:3,6 81:23 82:4 82:7 84:8,12,22
**microphones** 6:12
**mid** 142:15 143:2,6
**midlevel** 47:6
**Midwest** 10:25
**mind** 156:5
**minimal** 24:6 65:16 67:2 177:17
**minimum** 29:23 30:5,7,12 67:4,15 75:25
**minor** 75:22
**minors** 27:19
**minute** 74:13
**minutes** 74:13,16 86:16,19,23,24 86:24,25
**mischaracterize** 161:23
**mischaracterizing** 145:10 192:19
**mistaken** 75:12
**mitigate** 68:21 107:17 151:20 153:16 167:7
**Mitsubishi** 1:8,9,9 2:10,16 25:10 26:5,7 50:5 54:11 55:8,20 58:21 69:24 110:8 112:14 120:16,18,25 124:25 127:13 130:16 149:17 156:9 162:6,15,18,23 163:11 182:17
**model** 71:19,23 72:2,5 73:6,9,15,20 73:21 74:7,8,24 75:4,18 77:3,5,10 77:15,19,22 78:18,23 79:8 80:2,3 80:14,16 81:2,17 84:24,25 85:11 85:18,23 87:7,13,17,21 96:15,19 96:22 97:7 98:9,16,21 123:5,9,15 183:14,17 184:14,16 185:2,3,7,20 187:14
**models** 73:17 74:6 87:9
**moment** 87:15 89:17 90:11 98:12 120:8,11 154:10 184:9
**money** 64:20 144:16
**month** 25:9
**months** 119:19 158:12,14 159:11 165:19,22 166:9
**morning** 6:4
**mother** 149:4 159:3
**motion** 179:7
**motivated** 67:21
**move** 34:16,16 40:24 123:17 132:20 137:3 151:18
**multiple** 24:19 67:23 74:6 77:5,7,18 95:5 102:22 110:10
**multiyear** 65:22
**Musacchia** 1:23 4:22 5:17 197:4,19

**N**

**N** 1:1,1 2:1,1,2 3:1,1 4:1,1 5:1,1,15

195:2,2 196:2
**name** 5:22 184:15
**national** 29:13 86:3
**natural** 125:21
**nature** 10:8,21 46:18 87:18 116:19 133:7 136:2 138:5 142:14
**near** 117:24
**necessarily** 13:17 53:8 73:21 91:20 110:3 126:18,19 135:25 152:16 158:25 170:6 181:25 185:4 186:8 187:25
**necessary** 72:13 78:4,10 79:23 80:2 80:17,19,22 87:10 112:2 127:8,23 157:18 175:2 188:3 191:15
**necessitate** 24:9
**necessity** 128:5
**need** 6:15 38:8,19 72:19,25 74:10 74:13 76:18 103:24 104:15 113:8 117:7 132:25 152:18 178:18
**needed** 162:25 188:8,11
**needs** 8:16
**negative** 164:23 165:20
**neither** 130:18 131:12
**net** 149:24 150:2 151:7
**networking** 89:25 92:16 95:21 125:3 159:13,24 167:3,4 188:23
**Neuron** 173:21
**never** 121:19
**new** 1:2,24 2:4,8,8,12,12,17,17 5:18 6:2,3 7:7 26:2 27:24 35:7,11 38:4 64:20 67:22 85:13 93:9 95:8 116:13 117:3,3,8 118:5 119:4,13 119:23 120:2,6 121:16,22 127:14 143:25 149:19 164:25 195:4,24 197:5
**newly** 124:2
**News** 64:21
**Nicholas** 1:9 2:11
**nine** 89:19 92:10 119:19
**Non-Party** 1:20
**non-work** 123:22
**normally** 18:8 126:10,17 132:24 173:11
**North** 117:9
**Notary** 1:23 3:17 5:17 195:24 197:4
**note** 163:3 193:5
**noted** 67:4 193:4
**nuances** 113:12
**number** 8:12 15:18 25:9 48:9 61:5 65:4 70:20 79:4,6 89:4,18,19,24 90:3,17 91:5,10 92:10,15 93:4,14 93:14,15 94:22,22,22,23 99:17 100:12 102:4 108:17,21 109:2 122:19 161:20 169:12 176:23 191:18 192:14
**numbers** 14:5,9,12,14,16,17,25 15:6,12 57:15 93:20 115:4 143:9
**numerically** 10:8

**numerous** 58:20 59:22 64:16 76:11 81:25

**O**

**O** 1:1 2:1 3:1 4:1 5:1,15 195:2
**oath** 4:8 8:7 195:9
**objection** 4:25 5:3 7:21 8:2 12:12 13:2 16:19 19:9,14 38:25 41:3 44:5 48:18 50:25 51:9 54:15 57:3 57:14,24 58:6,10 60:8 61:25 68:8 68:22 69:4,10 73:16 79:21 80:9 80:15 81:4 85:4 88:7 89:13 96:21 101:20 103:7,16 104:3,11 110:14 111:7,23 112:6 113:4,20 114:7,20 115:23 122:2,7,12 123:11 124:17 125:13 128:22 129:20 130:10 132:2,12 136:20 139:14 140:4 141:23 145:6 146:18 147:6,21 151:22 152:2,22,24 154:4,9,9 155:11 157:14 159:17 160:10 161:22 164:2,9,19 165:17 166:5 166:14 167:18 168:4 175:14 176:10,20,24 179:22 180:17 183:19 185:23 188:17 189:6 190:11 192:18 193:10
**objections** 3:11 7:24,24
**objective** 81:8 140:6 153:8
**obligated** 152:20 153:6 154:12
**obligation** 152:15,17
**observations** 126:10,14 187:2
**observing** 151:14
**obstacles** 40:23
**obtain** 12:18 15:10 29:21 110:22 126:11,13 147:22
**obtained** 12:24 121:16,23
**obtaining** 67:21 128:16
**obvious** 72:18
**obviously** 24:22 67:15 70:20 111:15 131:11
**occasion** 48:10
**occasions** 82:2
**occupation** 31:13 72:10
**occupational** 35:2,4 37:11 138:23 140:24 185:12
**occupations** 23:2 116:3 169:13 189:25
**occurred** 174:2 179:10 180:6
**offer** 11:24 42:19
**offered** 22:3 24:6 32:22
**offering** 22:5,19 23:18 25:15,18 43:17
**office** 12:22 13:7,9,22 16:2,4,13
**officer** 134:19 135:12 136:5,9,11 138:4 181:9
**officer/counsel** 49:12
**oh** 57:18 72:6 97:18 102:21 150:23
**okay** 6:4 9:17 10:9 15:12,16 17:5 20:5 21:16 23:12,15 25:15 37:25

40:4 45:12 55:5 56:3 59:9 60:4
65:10 67:17 71:14 74:21 75:4
79:6 85:15 88:16 90:12,15 91:8
92:6 96:10 100:15 104:16 106:15
108:4 113:3 130:22 137:16 146:6
146:7,24 152:20,25 153:2 154:10
155:20 160:18 163:22 165:2
178:20 186:21,24 193:7
**old** 2:4 142:5 156:20
**Oliva** 1:9 2:11
**once** 13:8 15:10
**one's** 187:11
**ones** 22:8 33:11 42:7 48:3,4 90:10
100:22 106:20 139:9
**online** 64:17 97:21,23 105:5 159:25
175:3 188:24
**open** 135:4
**opening** 112:22
**openings** 14:18,25 182:19 188:14
**opine** 19:13 98:24 134:25
**opined** 154:23
**opining** 167:25 168:2
**opinion** 12:2 22:11 24:5,19,21,25
25:6,8,13,24 44:8,10 58:15 62:9
68:6,15 69:15,16,18,19,20 70:3
81:19 85:8 97:25 125:7 132:11
149:22 161:14 179:24 185:5
**opinions** 11:23 22:4,5,8,18,20 23:18
24:5,18,20 25:11,16,18 43:17,25
62:4 69:20 89:10 125:7 147:10,15
180:3,8,10
**opportunities** 45:5 67:23 155:13
188:19 189:4 192:2
**opportunity** 7:10,11 24:15 31:13
36:5 107:17 126:15 167:6 192:15
193:3
**opposing** 178:17
**option** 135:4
**Orange** 118:7
**order** 16:5 22:14 125:5 141:5 194:3
194:5
**ordered** 13:22 19:7
**ordinarily** 19:3
**organization** 12:5 29:13 30:21
187:22
**organizational** 52:14
**originally** 85:14,20
**outcome** 131:24 197:14
**outer** 116:15
**outlined** 88:9
**outside** 59:8 61:10 117:3 120:5
188:24
**overall** 114:11
**overlap** 21:19 43:10 57:4,7 112:13
**overlapped** 21:15
**overlaps** 21:12 112:10
**overqualified** 171:21
**overriding** 98:13

**oversight** 18:8
**Oxford** 66:4 68:4,16 90:3 92:22
96:24 97:10,14 184:4,5

**P**

**P** 2:2,2
**p.m** 194:8
**packed** 91:22
**page** 14:22,23 17:20 23:22,24 24:13
25:23 33:3 34:25,25 35:16 36:18
36:22 37:9 42:17 48:25 49:6 64:6
64:8 65:14 66:5,6,6 67:2 68:4,11
68:17 69:20 70:15 88:18 94:12,16
96:5 134:14 143:13,14 181:4
182:5 196:3,7
**pages** 96:11
**panelist** 33:17
**panoply** 136:13
**paper** 90:6
**Paquette** 184:17
**Parachute** 89:20 92:11
**paragraph** 58:13 64:8,11,14 65:17
68:12 181:5 182:8
**parallel** 67:24
**parameters** 13:18,19,23 155:15
**Pareto** 175:6
**Park** 2:12
**parlance** 51:23
**parse** 52:17
**part** 40:21 47:15 59:20 71:18 93:25
100:2 107:10 108:8 116:6 125:8
125:14,17 142:2 148:12 176:13
**participated** 31:19
**participates** 8:12
**participating** 4:11
**particular** 37:23 43:11 55:20 60:6
60:13 72:10 88:15 104:4 110:4
139:2 140:13 143:4 145:24
167:16 183:11 189:25,25 190:23
192:4
**particularly** 10:7 39:24 56:10
73:19 85:19 105:12 113:12 157:3
**parties** 3:5 4:4,16 7:23 40:5,6
197:12
**Parties'** 35:10 39:17
**partner** 12:5 46:20,23 63:10
**partners** 62:23
**party** 178:15 179:12
**party's** 178:17
**pass** 30:18 122:11,15 123:3
**pay** 153:12 156:12 177:9
**paying** 168:25
**PDF** 26:12
**peer** 31:16,19 91:5,9 92:6,8,12,14
92:19 93:3,5,7,10 94:11 95:25
97:14,17 184:13
**peers** 30:12 93:8
**penetration** 174:20

**people** 38:21 39:5,8 47:5 87:17
113:6 129:12,15 144:6 159:22
164:4,23 169:12 176:4
**perceived** 167:8
**percent** 102:10 107:11 144:9 156:2
166:2,7,7 175:10,11
**percentage** 100:12,18 102:16 103:5
164:6
**percentages** 174:17
**perform** 10:25 21:14 37:4 44:2
47:18 54:20 69:22 72:9,25 102:20
106:22 111:16 120:3,3 127:23
129:8 130:20 131:10,16
**performance** 174:24
**performed** 21:23 52:19 55:16 56:20
72:24 73:25 76:25 78:2,11 100:3
100:5 101:14,19 104:9 107:9
112:4,19 131:2 187:19
**performing** 21:7 24:8 31:5 78:24
101:6 133:13 186:7 187:18
**performs** 126:23
**period** 23:10 25:9,25 30:22 36:13
38:12,23 42:24 65:22,24 101:4
119:12 123:25 163:5 186:6
188:16 189:12
**periods** 190:6,9
**permission** 13:9 15:10 65:8
**permitted** 4:7 30:15
**person** 7:3 38:18 110:20,24 156:7
156:19 167:10,19 168:6
**person's** 21:4 31:4 88:6 123:4
125:11 126:3 185:14
**personal** 35:23 84:11 85:19 110:12
159:15 161:6 167:7 172:25
174:19
**personally** 7:6 108:13
**pertain** 15:12 125:6 184:22
**pertaining** 44:23 54:2 90:15
**PGIM** 181:9
**Philadelphia** 117:4
**phrase** 51:21 67:18 189:19
**physical** 7:19 77:24 127:20 129:3,4
**physically** 4:24
**physicians** 132:6,8
**picture** 188:13
**piece** 75:15 125:9,19 157:16 186:2
**pioneers** 95:5
**place** 62:23 124:6 128:2 151:16
**placeable** 164:5,13
**placed** 47:5,25 48:6 110:16 164:7
**placement** 48:16 164:15,18
**placements** 48:13
**places** 118:11
**placing** 47:21 48:13
**plaintiff** 1:5,21 2:3 68:19 151:25
152:14 153:3
**plaintiff's** 151:20 155:7 196:7
**plan** 37:6 129:13

planned 25:3
plans 130:21 132:20,21
platform 4:11
Plaza 2:12
please 5:22,24 6:12,14,17,21 7:10
    7:13 8:10 17:7,20 19:9 25:21
    26:10 43:13 74:12 89:7 98:12
    105:19 108:5 123:7 145:9 151:17
    163:3
plus 90:25
point 7:8 8:9 16:8 19:8 36:21 86:7
    87:11,20 90:10 108:23 121:14
    140:21 188:19
Pomeranz 184:17
pool 169:10 170:4,5
pop 175:5
population 91:4 169:16
portion 24:17 25:12 49:2 56:7
    66:18 175:25 176:3 179:24
position 61:8 106:7 111:13,19
    112:22 139:7 142:9,16 161:2
    168:25 169:8 181:21 189:2
positioned 49:10 59:16 127:14
    134:17
positions 49:11 53:20 58:20 59:2,11
    59:19 60:6,17 71:4 110:19 116:2
    134:18 135:18,20,22 137:7,12
    169:21 181:6,13,18,23,25 192:16
positive 122:5 142:21 162:13
possess 12:23 101:24
possession 136:6
possibilities 165:9
possibility 122:14,17,18 129:9
    164:14 168:13 178:9
possible 36:6 40:19 122:3 128:9,11
    128:21 150:19,21 164:22 165:2,4
    176:12,15
possibly 121:23 164:11
post 73:22 85:22 87:17 127:10
    176:4
posted 14:18 105:5 170:8 173:18,22
    173:22 174:5,12,14 175:11 176:7
    176:12 189:23 190:4,7,9,13,18
postgraduate 27:21
posting 64:22 160:13 172:16
    192:12
postings 15:13,17 108:11,14,16,18
    109:9 117:15 136:17 172:14
    173:24 175:24 182:22 188:24
    191:10,17,24
potential 45:5 71:5 94:25 135:23
    148:7,13 167:6 182:15
potentially 121:23 164:11
Poughkeepsie 117:24
Practical 89:21
practice 47:16 91:20 119:23,25
practiced 24:4
practices 21:24

practicing 122:21
practitioner 148:16
practitioners 130:24
pre 85:21 87:17 127:10
pre-post 73:23
preferred 106:10
premise 91:14
preparation 61:4,19 62:8 89:9
    100:8
prepare 9:20 10:2 98:25 99:5
prepared 10:6 17:12 99:6
preparing 11:24 32:14 83:5 88:11
    101:7
presence 4:24
present 2:9,20 4:4 45:6
presentation 33:21 34:10,15 106:24
    126:12
presentations 33:6,10 41:14,16
    42:3,20,24
presented 42:4 132:7
presenter 33:16,19,25 34:3
presents 39:6
preserve 7:24
president 181:7,8,9,15
Press 184:6
presume 115:17
pretty 14:20,22,23 15:8 20:16,17
    27:3 39:18 40:17 43:4 72:16
    90:21 98:7 106:9 115:2 118:7
    135:10 138:11 155:14 157:7
    168:11
previously 61:24 67:4 81:22 134:16
    137:21 171:2 184:25 191:7
primarily 36:4 41:4,16 42:4,11 43:8
    85:15 102:23 105:4 106:5 116:17
    117:8 177:5
primary 36:14 50:22 185:4
Primavera 2:13 5:5,7,11,14 12:12
    13:2 16:19 19:9,14 38:25 41:3
    44:5 48:18 50:25 51:9 54:15 57:3
    57:14,24 58:6,10 60:8 61:25 68:8
    68:22 69:4,10 73:16 74:9 79:21
    80:9,15 81:4 85:4 86:6,11 88:7
    89:13 96:21 101:20 103:7,16,19
    104:3,11 110:14 111:7,23 112:6
    113:4,20 114:7,20 115:23 122:2,7
    122:12 123:11 124:17 125:13
    128:22 129:20 130:10 132:2,12
    136:20 139:14 140:4 141:23
    145:6 146:18 147:6,21 151:22
    152:2,22 153:2 154:3 155:11
    157:14 159:17 160:10 161:22
    164:2,9,19 165:17 166:5,14
    167:18 168:4 175:14 176:10,20
    176:24 179:22 180:17 183:19
    185:23 188:17 189:6 190:11
    192:18 193:10,23 194:4,6
print 64:17

printed 65:7
prior 11:11 50:5 54:9,10,10,13
    55:19 66:6 88:11,14 94:21 155:18
privacy 181:8
privileged 9:23
pro 42:20
probability 165:14
probable 165:5
probably 9:16 23:22 75:10 112:10
    117:9 126:2 133:4
problem 52:4 72:15 74:20
Procedure 4:5
proceed 8:18 105:21
process 31:20 57:17 86:5 105:18,20
    139:16 149:3 173:4 176:11,14
    179:11 184:11 185:3,5,17 186:7,9
processional 1:10
produce 73:11 152:8
produced 30:10 58:2 81:7
product 30:10,14
profession 25:5 31:14 81:9 155:16
professional 1:10,11 25:8 35:24
    38:14 43:5,6 51:23 58:15 61:2,24
    69:21 78:3 95:11 96:24 97:12,16
    98:20 102:21 114:21 125:10
    130:4 142:9 145:17 146:6 157:10
    157:11 165:11 169:2,20 171:16
    184:7
professionals 42:11 60:21,24 61:3
    62:7 102:24 110:16 146:16
    167:12
professions 157:17 169:13
professor 152:10
proffer 154:11
proffered 25:24
proficiency 70:24
profile 45:19 50:21,24 51:6 71:3
    125:15
program 75:23
project 101:21
projects 142:24
promote 40:18 125:3
promotional 191:25 192:15 193:3
proper 113:7
properly 102:16
property 50:9
proportion 156:11
prospects 167:16 168:2
provide 11:13,15,16,18,20,22,25
    12:15 16:25 19:19,23 20:21 22:14
    27:12 58:7 99:20 137:17 139:17
    145:4 146:14,15 147:9 183:2,16
    191:17,25 192:15
provided 12:3,11 13:7,7,13 15:6
    16:6 18:5,14 21:21 26:19 27:6
    31:22 32:2 33:7 36:7 41:20 57:10
    57:20 58:4,8 63:21 70:22 82:13
    82:15,19,21 83:13,15,17,19 84:6

131:5,23 141:22,25 149:7 160:4
173:17 193:16
**provides** 29:14
**providing** 20:9 23:14 62:4 148:9
180:4
**proxies** 159:3
**psychologists** 112:8
**psychology** 27:25 52:14 111:21,25
**psychometric** 126:17,21,25 127:7
127:23 128:2,5 187:5
**public** 1:24 3:17 5:17 166:18,20
170:20 195:24 197:4
**publication** 33:22 34:9 35:14 36:25
90:24 184:3
**publications** 31:23,25 32:3,8,9,12
32:13,17,22 33:11 64:18 95:25
97:3
**published** 15:2,13,18 52:25 53:18
53:24,25 64:17 90:21 91:13 93:8
108:20 182:15,18 184:12 188:18
193:11
**publishing** 46:24,25 47:3 89:25
92:16
**pull** 17:7 26:10 32:19,25 141:3
**purpose** 4:18 98:9,12,18,18 123:16
188:13
**purposes** 72:17 101:21 124:11
**pursuant** 1:21 4:4 5:12 7:22 20:6
20:10 120:18 147:2
**pursue** 31:15 67:23 119:3
**pursuing** 129:19
**put** 43:12 77:24 115:6 175:4
**puts** 119:18

---

**Q**

**qualification** 124:9
**qualifications** 24:22 27:8,11 45:3
52:8 70:8 102:19 111:2 135:17
137:23 154:15 185:15
**qualified** 15:15 31:14 101:18
102:15,25 103:13,20 110:21
133:22 154:14 175:16 182:3,19
183:10
**qualifies** 103:4
**qualify** 116:13
**quality** 37:5 102:2 103:14,21
104:23 105:2,19 106:17 107:9,19
108:2,9 176:14
**quantified** 130:17 183:6,7
**quantify** 165:4
**quantifying** 71:10
**quantity** 15:17,19 25:7 37:5 68:14
**quarter** 190:14
**queries** 13:16
**query** 13:14,15,17 15:24 16:4,11,15
16:18,22
**question** 3:12 6:18 7:15,25 8:3 20:8
39:24 48:5 49:19 54:17 66:15,24

66:24 76:23 78:9 84:4 103:3,17
111:3 137:9 140:22 146:19
152:24 157:20 164:11 169:4
179:16 191:6 192:7
**questioning** 87:6 146:5 154:5
**questions** 6:8,11,20 7:2 14:21 54:16
100:21 167:14 193:22,23
**quick** 74:10 180:25
**quicker** 65:7,9
**quickly** 155:18
**quite** 48:5 50:4 59:21 72:6,19 74:25
89:15 102:24 113:13 114:9,15
122:3,22 128:21 149:3 155:21,22
183:14 184:12
**quote** 58:14 64:15 129:18
**quoted** 67:12

---

**R**

**R** 2:2 5:15,15 6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1 153:1 154:1 155:1
156:1 157:1 158:1 159:1 160:1
161:1 162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1
181:1 182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1 190:1
191:1 192:1 193:1 194:1 197:2
**radius** 117:5
**range** 37:4 62:25 110:9 139:6
150:19 152:12 158:11
**ranges** 150:18
**ranking** 157:11

**rate** 156:8
**Raytheon** 50:4 110:7 162:6
**re-employment** 66:10
**reach** 69:15 70:2
**reached** 22:7,9
**reaching** 148:5
**read** 41:10 66:17,19 76:13 133:16
133:19 195:8
**readily** 98:2
**reads** 64:14
**real** 143:19 144:7,16,22 145:3,12
145:23,23 148:13 149:4,17 150:2
173:19,22 174:6 187:18
**really** 13:3 35:9 62:14 74:10 75:2
92:9 100:13 107:3 120:3 156:14
176:21 177:9 180:20 182:4
**realtor** 151:12
**realtor's** 148:7
**reason** 97:23 179:19 188:7
**reasonable** 23:6,10 26:2 58:18
64:15,25 66:21,25 67:18 69:21
88:8 95:11 156:23 157:2 176:18
181:22
**reasonableness** 87:23 88:6 154:19
154:21,23 155:2,4,7
**reasonably** 25:8 44:2 67:20 68:7
69:22 171:25
**reasons** 147:11
**recall** 18:22 46:14 83:6 87:15,16
104:24 108:3,4 116:18 120:7,11
121:19 162:16 177:5 191:23
**receive** 160:8 161:7
**received** 102:3 127:22
**recess** 87:3 181:3
**recollection** 83:3
**recollections** 152:5
**recommend** 38:10
**recommendations** 95:6 188:4
**recommended** 95:24
**reconstruct** 189:11
**reconvene** 87:2
**record** 4:21 5:22,25 7:16 26:18
160:9,24 161:5 195:11,12 197:9
**recorded** 4:14
**recording** 4:15
**recordkeeping** 24:7
**records** 70:21 129:6,22,24 130:25
131:3,6,8,14,18,21,24 132:3,5,22
182:9
**recovering** 73:22
**recruiter** 46:16,17,19 62:18,19
162:24 163:22 164:3,7,8 165:7
170:16
**recruiters** 47:25 48:6,9 60:2,16
61:6 82:9 163:20 174:15
**recruiting** 45:2 47:8,17,19 63:24
64:4 70:7
**red** 163:23

reduce 65:25
reenforcing 95:23
reenter 38:19
Reentering 35:6 38:2
REES 2:10
refer 13:10 22:20 57:25 58:25
    79:22 84:21 95:20
reference 23:12 41:5,7 55:25 61:23
    65:15 66:4 83:7 84:23 125:23
    144:21 162:9,18,20 163:10
    171:12 183:23
referenced 18:10 32:10 66:5 97:2
    145:5 148:2
references 40:5 88:21 89:20 93:17
    93:19 97:20 125:25 163:2,4,24
    167:23 176:6 188:19
referencing 36:6 40:6 168:17
    176:16 187:13
referral 98:10 123:17 159:15
referrals 144:11,11 159:24 167:2
referred 32:10 56:3,4 62:13 89:24
    91:21 104:23
referring 14:9 15:16 24:17 59:3,4
    65:11 69:16 90:16 93:15 94:10,11
    99:11 127:17
reflect 24:19 27:8 34:14 95:7
    182:10
reflected 61:11,13
reflects 189:3
refraining 8:21
refresh 83:3
regard 184:13
regarding 12:2 45:4 46:3
regards 152:11
region 143:25 145:24
regular 64:16
rehabilitating 184:23
rehabilitation 30:2 71:19,22 72:2
    73:6,14,19 74:23 75:18 77:2,5,14
    77:19 78:5,18,23 79:7 81:2,17
    84:24 85:11 87:7 88:2,4 95:10
    96:15,18,23 97:12,16 99:16 184:6
    184:16,21 185:2,4 188:5,8,11
reintroduced 73:25
REISBAUM 2:6
reiterate 127:25
rejected 84:11
relate 151:24 185:21
related 22:25 36:16 89:12 107:25
    186:15 197:10
relationship 142:11,14
relationships 124:5,21 167:2
relevant 116:20
reliability 104:20,21
reliable 73:12 177:20 178:3 179:20
reliance 18:5 61:23
relied 12:9 61:18 62:3 70:25 81:7
    82:25 83:8 89:9 100:9 101:10,15

112:5 127:4 147:19 148:3,5
    149:10 160:3 179:18 180:15
relies 18:20 88:21
relocated 124:2
rely 59:13 83:24 84:2 91:17 100:7
    101:7 102:19 104:21 130:24
    131:3 137:4 146:21 168:8 179:20
relying 16:17 18:2 60:18,22,25
    63:20 104:8,13 114:18,21 143:5
    145:11 180:10
remain 30:20 66:3
remainder 41:13
remember 61:21
remote 4:10
remotely 4:6
rep 118:5
repeat 6:15 74:18 188:21
repeated 190:6,16
rephrase 6:22 137:10 192:23
replicable 137:4
replicate 56:20,24 57:12,23 128:13
    137:18 139:11,18 141:6,13,20,21
    144:25
replying 68:5
report 10:3,5,7 11:14,17,19 12:24
    17:3,8,11,14 18:2,10,20 22:19
    23:19 31:23 32:2,4,6,7,13,14,15
    32:20,23 48:25 49:2,20 50:13
    54:7 56:16,19 57:11 61:4,12,14
    61:16,17 62:5 64:6,21 65:3,12,14
    69:3,15 70:15 71:16 72:17 73:5,9
    75:5,13 79:14,15 82:14,24 83:5,9
    83:12,21,24 88:12,16,21 89:9
    91:24 94:7,13,17 96:5,11 97:24
    99:2,4,8,21 100:3 101:7 102:6
    124:11 134:15 142:2 143:14
    144:23 147:4,20 161:12 165:16
    168:2,8 173:8,8 180:16 181:4
    182:5,25 186:16,22,23 187:2,9,24
    188:2,3,6 196:8
reported 162:22
reporter 1:23 4:2,7,22 5:7,12 6:24
    7:16 23:13,17 42:14 66:16 180:23
reporting 4:12
reports 58:2,4 127:22 188:10
    191:19 192:14
represent 5:8 98:5
representation 55:22
representative 150:25 151:2
request 86:7 131:6,8,17
requested 18:9 19:4,5 66:18
requests 8:11
require 41:24 106:3,4 140:9 144:9
    167:15
required 29:21 30:9 72:9 75:9
    105:9 106:10 119:4 133:9 152:8
    153:21,23 159:14 185:10 191:12
    192:14 193:2

requirement 29:23 153:4 192:22
requirements 101:2 106:2,9 107:22
    147:3 193:13
requires 29:9 119:20 140:11
rereferral 98:12
research 11:2 12:4 13:18 29:10
    31:12 36:9 37:21 44:21 48:11
    53:23 65:2 71:9 76:10 78:25 89:6
    94:4,5 99:8,19 133:20 134:7
    144:8 145:19 182:6 188:24
researched 13:20 66:9
Reserve 93:9,12
reserved 3:12
resided 123:20 124:4
residency 118:9,12
residential 145:23
resources 88:20 89:19 92:11 93:15
    93:17,19 97:20
respect 47:18 55:17 93:13 108:8
    125:18 128:14 134:6 145:7
    154:19 167:14 179:7 183:13
respected 184:10
Respectfully 66:14 76:22
respective 3:6
respond 12:13 121:24
responded 80:10
response 7:9 30:24 47:4 50:14
    52:24 53:4 54:24 56:13 66:12
    67:9 71:6,12 72:21 73:3 74:3 76:3
    76:20 78:7 80:11 90:5 95:19
    102:13 106:12 107:6 124:12
    138:10 144:19 147:24 160:12
    161:7 177:11 184:18 185:18
    192:20
responses 7:5,18
responsibilities 76:12 105:8 106:6
    106:21 109:18 110:6 123:21
    137:22 138:6,7
responsibility 140:14
responsible 6:9
rest 43:4 97:19 145:7
restate 6:18
results 81:8 174:5 182:6
resume 42:9 44:16 45:13,18,19,23
    46:6,11 50:17,21 51:5,8,11,13,16
    71:2,5 112:20 133:14 138:20
    140:16
retained 19:19,22 20:5,7
retainer 20:11,13,15,20 21:12
    22:13
return 184:24
Returning 184:23
revealing 9:23
review 16:21 31:20 44:10,13 45:12
    45:17,22 46:5,10 50:23 51:7,10
    56:22 85:24 88:10 100:15,18
    101:10,14,18 102:20 108:13,16
    109:5,15 130:11 162:13 183:8

**reviewed** 10:3,4,5 16:24 30:12
31:16 53:18,22,25 57:18 70:21
83:10 88:13,14 91:6,9 92:6,8,12
92:14,19 93:3,6,7,10 95:25 97:14
97:17 99:22,25 100:17,20 101:12
101:13 102:11,17 103:6,8,11
108:25 109:8 130:13 184:14
**reviewing** 56:15 71:10 72:7 106:14
**reviews** 94:11 188:10
**revised** 89:3,4 91:10 94:23
**rewound** 164:23
**Richard** 89:14 90:16 91:9 92:13
94:10 95:4 97:4
**Rick** 184:3,8
**right** 12:25 19:11,18 33:19,25 34:3
34:5,7 83:2 94:14 97:11 108:3
109:14,15 114:19 118:21 119:21
122:25 134:3,7 135:20 136:16
140:25 141:5 145:13 150:20
151:10 154:2 156:4,6 172:13
183:11 185:8 186:9,12 187:6,15
189:17 190:25 191:2 192:10
193:9,18
**risk** 167:8,8
**Riverside** 6:2
**road** 2:4 117:7
**Robinson** 87:25 184:3,9,16,17
**role** 98:23 101:7 133:9 138:8
142:17 145:18 146:21,22,25
157:4,4 170:10,14,18 171:16
**roles** 23:4 52:5 59:22 106:4 122:24
123:23 126:24 134:23 149:2
**Rona** 1:19 5:10,23 17:12 26:13,19
86:11 195:7,17 196:4
**rook** 133:10
**routinely** 174:24
**rule** 4:5 175:6,7
**rules** 8:18 146:9,13 147:2 178:11
**ruling** 177:23
**run** 16:5
**runway** 142:20

**S**

**S** 1:4 2:2 196:6
**Saks** 68:16
**sales** 42:11 118:5 143:24 144:4,12
**Sam** 2:18
**sample** 56:4,4,16,17 100:15 108:18
**sampled** 171:24
**samples** 10:4 132:24 133:2,3,5,5,10
133:15,17 187:6
**sampling** 14:19 55:13 100:11
**saw** 188:7
**saying** 37:18 41:7 149:2
**says** 33:18,24 34:3,5,7 37:10 49:7
58:14 70:15 182:9
**Scarsdale** 124:4 149:5
**school** 27:24 122:25

**science** 81:3,6,17 85:2 166:12
**scientific** 28:5 54:12,22,23
**scope** 19:18,22,24 20:14,21 21:2,6
21:11,13 22:12
**screen** 158:19,22 160:15
**scroll** 17:17 23:13 24:11 25:20
34:20 35:15 37:8 42:14
**SCULLY** 2:10
**se** 54:6 87:16
**sealing** 3:7
**search** 20:3 21:4 23:10 24:10 25:3,6
25:7,14 34:18 36:19,24 37:6,7
38:14 42:9 44:3,23 58:19 64:10
64:16 65:2,22,25 66:2,10,22,25
67:5,6,12,16,19,24,25 68:7,15,17
69:7,23 70:10 71:11 82:18 84:17
84:20 87:23 88:6 90:2,4 92:17,23
95:9,11,21 96:2,25 98:4,6 108:20
108:23 129:13,19 131:11,16
141:18 152:11,13 155:8,14
157:13,22 158:5 160:2 161:15,19
162:4 174:25 175:19 179:25
182:13 184:5 186:4 187:20
**searcher** 153:4 175:3
**second** 16:5 33:24 36:17,21 42:18
47:13 64:7,11 68:12 123:18,19
125:6 181:5 182:8
**secondhand** 148:4
**section** 49:3 71:16 89:25 98:25
182:9
**sections** 99:4
**Security** 85:16
**see** 17:18 18:4 23:24 24:12 25:21
33:12 34:22 37:10 42:12 49:14,22
56:6 58:23 62:11 64:11,23 66:3
70:14 76:5 78:13 89:5,23 95:10
124:7 127:23 139:9 143:15
163:22 169:3 174:2 180:25 181:4
181:25 182:20 190:16
**seek** 61:9 144:11 151:25 152:3
164:7 166:19 179:12
**seeker** 67:21
**seekers** 65:25 98:6
**seeking** 38:13,24 39:10,11
**seen** 26:23,25 41:5,7 113:24 129:11
164:23 193:15
**selection** 107:18
**self-described** 40:17
**self-organization** 72:12
**self-sustaining** 39:12
**seller** 144:13 151:15
**seller's** 151:2
**send** 13:4
**senior** 107:4
**sense** 60:16 98:6
**sent** 17:9 160:17
**sentence** 64:14,23 65:21 67:3
**sentences** 78:12

**separate** 4:10 88:3
**separation** 182:16
**September** 65:19 182:12
**series** 6:8 51:25
**serve** 98:19
**serves** 185:2
**service** 30:3
**services** 20:17,18 38:13 41:10
**set** 20:13 39:7 167:21 197:7,15
**setting** 12:17 133:4
**settings** 99:18
**settlement** 40:24
**seven** 30:7 39:21 75:11
**severe** 132:9,10,10
**sex** 170:19,22 171:3,13
**shape** 32:11
**share** 148:22,23 175:25 194:6
**SHEARMAN** 2:15
**short** 132:19 190:9
**shot** 160:15
**show** 148:25 183:23
**side** 101:5
**sift** 139:9
**signed** 3:16,18 195:19
**significant** 38:11 49:9,18,21 50:2
51:13 109:2 134:17 135:14
151:12 159:21
**significantly** 143:20
**similar** 35:22 52:3 56:8 57:16 96:17
110:20 111:17,20 138:8
**similarities** 112:11
**similarity** 53:7,13 54:9 55:19
**similarly** 7:13 84:10 112:4
**simply** 95:23 174:9
**single** 55:21 75:15 79:23 108:15
**sir** 20:25 21:10 32:24 69:16 71:13
81:6 82:11 89:17 103:23 111:24
130:5 137:10 138:16 161:4 188:2
190:22 192:20
**sit** 30:6,15 119:5 173:4,10
**site** 176:13
**sites** 64:22 173:23,24 174:21,23,23
175:4,12 176:4
**sitting** 131:20 183:22
**situated** 59:17
**situation** 40:3
**six** 39:21,21 63:15 67:6 75:25 93:23
94:7,17,18 96:19 97:5,7 119:19
158:12,14 159:11 165:18,22
166:9 190:13
**sixth** 35:3
**size** 135:14 138:3 181:16,19
**SJS** 99:24
**skills** 22:23 31:5 36:10 37:22 44:15
45:22 46:4 49:10,18,22 50:2
51:14,17,21,21,24,24 52:6,22
58:16 62:16 70:5,24 72:9,13,16
72:24,25 75:7,8 85:24 105:8,10

105:14 109:19 110:9,18 111:11
111:13 115:9 126:7,9,16 132:23
134:17 136:14 137:24 165:11
167:21 185:15
**skip** 185:24 191:9
**skipped** 185:20
**slightly** 38:5
**Sloan** 47:15,16 48:10
**slowly** 24:12
**small** 75:15
**smaller** 35:13 138:8
**SOC** 139:7,12,19,21 141:4,7 169:8
173:6
**social** 30:3 85:16
**solely** 99:8
**solving** 52:4 72:15
**somebody** 60:17 132:19 148:20
184:24
**somebody's** 59:13
**someone's** 31:9 61:7 85:24
**somewhat** 28:12 38:5 52:5 69:5
106:8 107:15 140:21 143:11
152:9,18 153:17 167:7 168:22,24
182:13
**sophisticated** 133:8
**sorry** 32:20 48:4 49:19 114:3
142:25 143:10
**sort** 8:17 160:16 173:13
**sorting** 114:23 139:19
**sought** 135:2 162:19 163:12
**sound** 97:24
**source** 16:25 68:5 92:7 177:6
**sources** 66:20 69:2 89:11 148:4
177:8
**SOUTHERN** 1:2
**speak** 80:5 162:12 164:17
**speaking** 9:25 33:5 38:10 40:8
46:18 175:10 190:12
**special** 120:19,22 121:6,7,12
**specialists** 43:9
**specialization** 47:2
**specialize** 113:15
**specialty** 46:24
**specific** 54:5 94:6,9,18 106:9
139:22 140:23 168:5 169:4
185:11
**specifically** 8:4 19:21 21:9 91:23,25
109:16 121:17 135:19
**specifics** 110:23
**speculative** 132:21 148:20 154:17
**speech** 27:20
**spent** 56:8
**split** 150:22,25
**splits** 150:15,19 151:16
**spoke** 63:2,4
**spoken** 48:10
**spreadsheet** 182:24
**ss** 195:4

**stages** 103:11
**staging** 151:14
**Staller** 11:9,11,13,22 12:11,25 15:7
16:17,21 18:6,14 19:6,12,15,19
21:13,17 22:3,7 56:25 57:4,8,11
58:12 136:18,22
**Staller's** 12:21 13:7,9,21 14:3 15:25
16:4,13 22:10 180:7
**stand** 173:21
**standard** 20:15,20 21:2,6,12 22:13
22:16,16 68:18,24,25 69:9 88:20
93:15,17 97:20 139:3,5 141:7
151:19 152:8 154:18 155:3
**standardize** 73:18
**standardized** 73:10,15 79:15
138:23
**standards** 23:9 24:7 25:4,5 30:13
64:9 65:15 154:20
**standing** 152:23 154:4
**start** 32:6 33:2 39:19 143:10 148:19
149:6
**starting** 59:23 65:21 129:12 143:10
182:16
**starts** 35:3 67:3
**startup** 143:18
**state** 1:24 5:18,22,24 21:9 41:25
79:15 114:8 119:23 120:2,6
121:16,22 195:4,24 197:5
**stated** 54:21 68:15 97:24 180:20
**statement** 23:25 49:6,14,16 50:16
58:14,23 59:2 87:16 94:21 104:24
129:15 147:9 160:25 166:20
**statements** 129:22,24 132:5,7,15
**states** 1:2 68:12 70:20 73:10 120:9
**statistic** 168:12
**statistical** 28:7,10,13 53:16 99:19
99:20 100:7,10 101:8,11,15,19
102:7 103:15 165:23 166:6,12
**statistically** 166:16
**statistics** 11:2 28:15,16 101:24
103:22,25,25 104:9 143:9 156:24
156:25 157:17 168:9,10,18 169:5
169:18 170:2 171:2,4,6 185:13
**stay** 145:25
**Steinhardt** 27:24
**Stenotype** 1:23
**step** 76:7 78:22 79:7 98:9,17,21
106:13 107:19 123:16,18,19
126:4 185:20 186:14
**step-by-step** 86:5
**steps** 21:20 30:19 37:3 38:8 70:9
71:21 72:4,6 73:20 74:22 75:2,4
75:13,17,21,22,24 76:11,16,19
77:6,7,11,14,23 78:9,11,13,17,21
79:10,23,25 80:14,16,18,21 87:14
87:19 88:9 98:14,15 105:20
106:16 107:8,25 108:2,5 123:5,8
123:14 186:3,7,11,25 187:13,14

187:15
**STERLING** 2:15
**Steven** 47:14
**Steward** 95:12
**stick** 110:4
**stipulate** 4:21
**stipulated** 3:4,10,15 4:2,13 5:6
**Stipulation** 1:21 5:13,14
**STIPULATIONS** 3:2
**stood** 162:12
**straightforward** 103:23
**strategist** 34:18,23 36:25
**Strategy** 42:9
**Street** 64:19
**strengths** 79:2
**stress** 132:19
**Strictly** 46:2
**strifes** 102:23
**strong** 99:18
**studied** 89:15
**studies** 28:9,11,14
**study** 89:12 92:4,20 93:24 94:3
99:13 115:10 119:6,18 127:4
128:15
**subcomponents** 43:17,20
**subject** 22:4 35:20 37:16 39:15
40:15 64:16 98:13 163:8
**subjective** 140:2,19
**submit** 30:9
**submitted** 10:3
**subscribed** 195:19
**subsection** 70:14
**subsequent** 87:9
**substance** 10:10,14,16 166:6
**substantial** 36:13 47:16
**substantially** 116:4 175:20
**substantiate** 183:16
**success** 66:11 68:13
**successful** 70:9
**successfully** 122:23 126:24
**suffer** 9:4
**suffered** 129:7 132:9
**sufficient** 76:19
**suggesting** 86:22
**suggestions** 98:3
**suitable** 135:8,11,23 136:6,14 137:8
155:9 165:15 181:13 192:17
**suite** 2:4 6:2 47:6,7
**summarize** 10:6
**summarized** 23:25 72:7 75:14
182:12,24 183:5
**summary** 23:20,22,24 24:12,15
69:19 72:22 76:19
**supervise** 102:2
**supervisor** 162:21
**supervisory** 106:4 138:5
**support** 129:24 186:2
**supporting** 87:12

supposed 98:19
sure 12:20 13:3,6 20:7 23:21 25:21
  25:22 35:22 42:15 54:23 55:21
  56:10,21,23 65:10 66:23 67:13
  74:17 75:20 84:21 92:18,21 97:25
  101:9 116:14 121:20,21 123:8
  125:14,19,20 137:9,11 150:23
  158:24 165:6 166:3 169:11
  173:25 179:4,9 180:5,18 183:20
  187:12 190:5 191:8
surfaced 174:5
sustained 38:7 65:21
swear 4:20,23
sworn 3:18 5:17 6:9 197:7
system 159:15,25
systematic 79:16
systemic 73:10
systems 158:17 160:8,14,14

**T**

T 1:1 2:1 3:1 4:1 5:1 195:2 196:6
  197:2,2
table 17:19
take 7:2,19 8:9,15,16 21:20 23:21
  38:8 74:12,15 86:7,17,19,22
  98:11 116:6 119:12,15,19 148:14
  151:16 153:21,23 156:18 160:15
  163:17 165:12,18,21 166:25
  169:13 180:23,25 193:9,17
taken 1:20 8:16 87:4 161:13 181:3
  195:8
takes 144:10,16
talk 130:18 185:9
talked 111:11 183:14
talking 32:4 38:6 89:5,8 121:7
  153:18 161:4 171:6
task 72:24 113:13 133:5 140:13
tasks 52:3 72:9 77:25 106:21
  112:19 120:3 137:22
team 142:23
technical 136:9
technology 109:25
tell 6:9 9:25 19:2 22:18 33:5 35:20
  36:20 72:4 83:24 92:2,9 113:16
  125:2 156:14 166:2 177:16
  190:18
telling 10:9 15:5
tells 84:2
temporarily 181:21
ten 74:13
tend 168:25 177:10
tended 107:2
tender 193:19
tends 139:22 175:22
term 31:3 51:22 53:9,11 54:23 56:3
  67:12,14,15 95:22 132:17,20
terminated 69:23 121:11 127:13
termination 44:3 54:11 68:20

119:10 120:24 121:4,6,15 129:17
  142:5
terminology 114:14
terms 40:22 85:23 123:20 126:12
  150:11 152:6 163:16 164:24
  178:12 187:11
Terrific 6:7 8:20
testified 5:19 9:14 43:16 77:4 81:22
  85:5,21 87:8 111:24 155:25
  160:18 170:25 178:23,24 192:8
testify 7:12 8:22 9:2 79:14 81:13,15
  161:18 172:8,10
testifying 11:5,11 104:17 146:8
  147:4 154:6 179:13
testimony 6:25 9:15,21 10:2,11,15
  22:14 27:9,12 43:23 61:19 66:19
  77:9 81:20 82:22 83:4,14,20
  94:21 109:20 145:9 146:14
  161:10,10,13,16,17,23 178:10,16
  179:2,8,13,17 182:10 193:21
  195:8,11 197:9
testing 126:17,21,25 127:7,24
  128:2,6 187:5
text 98:14 140:13
textbook 91:15
texts 94:25 97:2
Thank 54:24 84:16 118:20 156:18
  166:17 169:9 188:4 193:20,25
theirs 112:10
theoretical 95:12
thing 12:2 20:16 39:18 113:25
  122:5 125:21
things 10:8 38:15 45:9 95:23 97:22
  124:18 133:7 138:17 147:22
  152:12 151:5,14
think 13:4,8 14:4 23:20 43:3 60:10
  66:14 74:25 79:11 87:5,24 98:22
  103:2 113:11 127:6 134:15
  139:15 144:4 149:3 154:16 176:2
  178:18 184:2 190:7 192:3,19
thinking 106:13
third 34:3 65:17 103:17
thought 14:6 72:17 79:2,3 87:9
  100:21 106:21 163:16 172:2
thoughts 60:2
thousands 173:14
three 25:11 30:12,23 61:6 65:16
  67:3 70:14 73:7 74:6 79:11 89:18
  90:17 91:5 186:14
tied 37:21 66:11 160:11
ties 40:10
time 1:22 3:12 5:2 7:3,21,21 18:22
  24:7 25:25 27:3 36:14 38:12,16
  38:23 39:2,23 42:25 49:7 50:7
  56:9 57:9 59:21 63:2,11 66:2
  67:25 68:2 74:18 83:7 90:13,14
  91:21 101:2,4 103:17 119:12,18
  121:14,24 122:22 123:2,3,25

142:4 144:8,8,10,10,16 149:18
  156:14 157:2 161:12 163:16
  166:4 174:2 182:15 183:12,15
  184:25 186:6 189:15 190:6,7,9,19
  191:23 192:25 193:20,22
times 9:9 26:25 36:12 47:5 64:20
  104:14 113:25 129:11
tips 98:6
title 40:4 135:15 138:15
titles 40:18 76:12 105:23 138:2,12
  138:21 177:4
today 5:9 6:5,7,24 7:4,17,24 8:6,9
  8:14,18,23 10:11,14,15,18 11:11
  40:3 43:16 61:17,19 91:15 131:20
  143:3 161:18 183:15,22 193:20
today's 9:21 10:2 163:21
told 144:8 145:11 149:20
Toni 1:23 4:22 5:17 17:7,17 24:11
  26:10 34:20 35:15 37:9 43:13
  194:3 197:4,19
tools 95:8 174:10
top 17:18 26:22 49:6
topic 40:18
topics 91:3 115:18,19
total 182:11
track 163:21
tracking 158:16 159:14 160:8,14
train 117:8
trained 125:22
training 28:5,7,10,14 48:22,24
  52:12,13 101:23 113:7 115:13
transact 130:19
transactions 58:17
transcribing 6:25
transcript 195:8,10 197:8
transferability 126:5
transferable 31:5 36:10 37:22
  49:10,18,21 50:2 51:14,17,20,21
  51:24 58:16 110:19 111:11,13
  115:9 126:7,9,16 132:23 134:17
transferred 52:7
travel 106:4 118:5 191:12,15
  192:13,24
treating 132:5,8
trial 3:13 7:25 9:15 25:19,19
  172:10 178:13,24 179:3
trials 9:16
Triangle 89:25 92:15
true 69:6 141:16 153:11 155:5
  160:5,6 167:24 192:11 195:10,12
  197:8
truth 6:10
truthfully 8:22
try 6:17 7:4 178:22 188:14
trying 16:9
TSA 126:8
turn 17:20
turned 14:6,21

**Turner** 14:10,11,15 95:13 99:11,13 100:16,19 101:7,15 102:3,16 103:4
**Turner's** 103:14
**Turning** 35:17 64:6 91:10 182:5
**twelve** 158:12,14 159:11 165:19,22 166:9
**two** 18:23 25:16 27:19 42:25 43:17 50:6 51:4 58:16 61:6 62:12 67:5 79:11 93:16 112:23 115:18 116:3 125:7 138:17 143:23 147:25 171:17
**type** 20:24 29:25 79:24 109:21 111:15 120:19 127:12,16,17 128:25 129:23 146:22 178:5 180:4 185:16
**types** 50:11 75:22 109:23 110:5,17 116:2 122:22 130:21 136:22 148:25

## U

**Uh-huh** 24:16
**ultimately** 190:24
**unable** 122:15
**unauthorized** 4:17
**unclear** 80:11 187:22
**underemployed** 38:13
**undergraduate** 27:15
**underlying** 49:25 71:25 91:15,25 168:15
**underscore** 26:13
**understand** 6:20 8:6,17,19 12:8,13 15:4 16:9 18:12 20:8 31:12 35:25 38:21 39:8 48:5 51:16 52:11,22 54:17 62:15 66:23 85:24 98:23 103:20,25 123:15 133:25 137:9 139:25 146:8,12,19 147:8 150:10 150:14 154:3,8 156:10 164:20,21 173:15 179:11 187:12 188:25
**understandable** 6:23
**understanding** 23:16 31:6 37:22 40:2 57:21 60:14 75:8 77:9 82:12 113:12 144:25 146:20 151:24 152:7 153:14
**understood** 65:24
**undertake** 136:4
**undertakes** 187:11
**unemployed** 49:8 59:23 66:3 67:4 90:8 101:3 119:5
**unemployment** 21:8 23:7,11 65:24 109:4 159:8 161:21 162:2 168:8 170:3 171:7 188:16 189:12
**unfilled** 170:11 190:25
**unhappy** 129:9
**UNITED** 1:2
**units** 30:22
**University** 27:24 184:6
**unpublished** 188:22 189:9

**unqualified** 154:2,13
**unreliable** 6:13 180:15
**unusual** 132:18
**update** 95:6
**use** 16:3 19:3,4,5 40:18 51:18,20 53:10 57:6 67:11,13,18 69:14 70:2,19 75:19,23 79:20 84:25 85:10 87:22 102:7 111:20,25 112:12 136:22 138:22 139:3,7,24 141:8 142:22 173:13 174:10 183:13,17 189:10,14,19
**useful** 51:3 73:21 138:25 167:13
**usually** 31:11 38:10,15 79:12 84:21 106:9
**utilization** 80:25
**utilize** 38:18 72:14 94:17 117:19 178:4
**utilized** 20:19 32:14 83:4 91:24 171:7 177:14

## V

**V** 49:3
**VAGNINI** 2:3
**valid** 73:11 87:13,21
**VALLI** 2:3
**valuation** 43:9
**Van** 67:7,11,18
**variation** 150:15
**variety** 24:8 92:25 99:18 176:3
**various** 75:9 76:16 137:22
**venue** 113:14
**verbal** 7:18 147:24 161:10
**verified** 173:17
**verify** 183:9
**version** 27:2 65:12,13 155:2
**versus** 33:10 123:25 151:15 159:25 174:13
**viable** 107:17
**vice** 181:7,8,9,15
**video** 6:13
**videoconference** 4:9,14
**view** 135:7,21 136:7
**viewed** 182:10
**views** 146:24
**violation** 4:17
**virtual** 116:19
**vis-a-vis** 152:5
**vocational** 17:14 29:8,11,15 30:2,8 31:2,3,10 35:10 39:16 40:13 71:18,22 72:2 73:5,10,14,19 74:23 75:17 77:2,4,14,18,22 78:17,23 79:7,16,19 80:3,25 81:16 84:23 85:10 87:6 88:2 94:24 96:15,18 98:8,16 99:15 112:9 113:8 115:12,13,14,15 123:5,9,15 125:18 128:8 133:4 143:3,6,11,13 146:6,16 148:2,12 165:8 183:14,25 184:15 187:14

188:5,8
**vocations** 53:22
**volunteer** 123:23

## W

**W** 5:15 6:2 195:2
**waived** 3:8
**walk** 105:18 186:10
**walking** 186:9
**Wall** 64:19
**Wanberg** 66:4 67:7,11,17 68:3
**want** 8:14,15 13:18 15:4 42:15 48:14 65:9 74:5 75:20 127:25 146:4 150:7 157:15,15 180:13 181:24
**wanted** 119:3
**wants** 74:19
**wasn't** 56:10 110:3 123:8 157:9
**way** 6:22 14:2 32:10 33:9,14 37:18 56:18 58:9 80:7 82:20 94:12 114:9 129:10 141:3,19 153:20 159:22 163:9 165:3 168:17 177:24 178:22 197:13
**ways** 118:25 123:24 144:15 151:16 162:23 163:2
**we're** 8:18 36:22 49:2 86:17 89:5 94:11 125:16 180:24
**we've** 97:8 98:16 187:6
**web** 1:21 5:10
**week** 65:18
**weeks** 63:5,13 157:6 168:14 190:13
**well-educated** 126:23
**well-published** 184:11
**well-regarded** 66:9
**well-written** 133:14,25
**went** 14:5,8,11,17 56:6 57:16 86:21 162:6 173:9 176:11
**weren't** 15:3 186:8 190:5
**West** 116:11
**Westchester** 116:12 118:6 143:25
**Wexler** 1:19 5:10,23 6:1,4,5 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1,10,12,15,22 18:1 19:1 20:1 21:1 22:1 23:1 24:1,14 25:1 26:1,12,13,14,18,19,20 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1,21 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1,14 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,20 97:1,6 98:1 99:1 100:1 101:1 102:1 103:1 104:1

105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,4 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1,2 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:7,17 196:4,8,9

**whatsoever** 64:4
**WHEREOF** 197:15
**white** 102:24 138:20 169:23
**wide** 110:9 139:6
**wider** 141:18
**wife** 92:14
**Win** 42:19
**wish** 8:9 18:9 33:13 184:14
**Withdrawn** 11:21 17:6 43:15 83:18 137:3
**witness** 1:20 4:8,9,20,23,25 5:9,16 19:11 24:12 26:16 74:17,21 86:15 86:19,24 179:13,18 193:19,24 194:8 196:3 197:6,9,15
**women** 42:21
**word** 51:20 88:8 184:21 193:9,14
**worded** 135:11
**words** 52:6 155:12
**work** 16:17,21 19:19,22,24 20:9,14 20:21 21:3,7,11,13,21,23 22:13 30:10,14 34:21 35:11,20 36:4,13 36:17 37:19,25 38:16 39:9,17 40:4,5,12,16 43:9,10,11 47:18 48:8 52:20 56:20 57:23 58:9 60:15 61:9 70:5 71:3 72:15 73:24 76:25,25 88:5 91:16 92:3,12 95:9 96:2 100:2 101:10,12,14,19 103:12,14,21 104:9,20,22 110:8 111:17,20 114:13 120:4 125:5,23 129:8 131:15 132:24 133:2,3,4,5 133:10,14 137:18 139:11,18 141:6,13,20,21 142:18,20 143:21 152:15,17 155:10,13 162:23,24 162:25 184:23,24 187:5 188:9
**worked** 19:15 39:4 48:7 118:12 150:8 163:25
**workers** 85:13
**workforce** 35:7 38:2,8,12,20,22 42:23

**working** 47:24 48:12 50:4 78:2 110:6,7 144:14 167:12 181:20
**workman's** 85:16
**works** 35:17 41:2,12 94:7,18 96:20
**Workshop** 42:10
**world** 36:4 64:21 90:7 93:5 95:8,16 163:21 173:19,22 174:6
**wouldn't** 83:8,20 84:10 119:12 133:22 134:2 163:22 174:11 180:13
**wrap** 181:2
**writing** 133:3,16,23
**written** 4:16 20:10 46:2 90:6 149:18
**wrong** 86:21
**wrongful** 68:19

### X

**X** 1:3,14 5:15 166:3 196:2,6

### Y

**yeah** 9:19
**year** 108:19,20 109:3,7,10,15 144:2 149:21 156:10,20 172:4
**years** 30:7,23 39:5,6,9,22 46:23 50:5 61:15 65:17 67:3 76:16 81:9 99:17 102:21 105:13,16,17 118:4 142:20 143:19 161:20 162:4,5 163:25 190:7
**York** 1:2,24 2:4,8,8,12,12,17,17 5:18 6:3,3 27:24 35:7,11 38:4 64:20 93:9 116:13 117:3,8 118:6 119:4,13,23 120:2,6 121:16,22 143:25 195:4,24 197:5
**Yorker** 7:8
**younger** 168:24

### Z

**Zhand** 66:4 68:4
**Zhu** 66:4 67:7,11,17 68:3
**Zoom** 4:11

### 0

### 1

**1** 17:10,15 196:8
**1-10** 1:11
**1.18** 65:18
**10** 86:15,23 93:15 135:16 162:5 163:25
**10:13** 1:15
**100** 144:9 182:11
**100,000** 148:6
**1000,000** 144:2
**10001** 2:8
**10004** 2:12
**10032** 6:3
**10222** 2:17

**11530** 2:4
**12** 102:10
**12:00** 74:16
**12:10** 86:8
**12:40** 87:2
**13** 48:25 134:14 143:13
**14** 64:6 75:2,17,21
**14th** 2:7
**15** 39:6,9 75:2 105:13,17 135:15 157:6
**15900** 6:2
**16** 66:6 68:11
**17** 65:14 67:2 196:8
**18** 157:6 168:14 174:8
**18-cv-08188** 1:7
**19** 25:9 89:4 91:10 93:14,18 94:23 174:8
**1975** 90:22

### 2

**2** 4:5 26:12,14,18 196:9
**20** 39:5 86:24 102:21 105:13,16,17 118:4 175:11 181:4
**200,000** 149:21
**2000** 68:16
**2008** 35:11
**201** 182:14
**2011** 184:17
**2013** 184:17
**2015** 34:19
**2017** 44:4 45:6 49:8 65:19 69:25 174:8 182:11
**2018** 65:19 108:21,24 182:12
**2019** 108:22
**2020** 182:17
**2020.09** 26:13
**2021** 1:15 195:9,20 197:16
**22** 94:23 182:5
**220** 2:7
**23** 23:23,25
**230,000** 156:10
**25** 23:22 86:24 89:24 92:15 93:20 156:20
**26** 67:7 196:9
**268** 68:17
**269** 66:5 68:4
**27** 68:2
**28** 4:5
**28th** 2:12

### 3

**3** 93:14,18
**3:14** 194:8
**30** 44:3 49:8 69:25 81:9 86:25 108:18
**30,000** 135:16
**30s** 157:5
**30th** 197:16

**31** 96:23 109:14
**32** 90:3 93:20
**33** 88:18
**34** 93:4,20 94:2
**36** 17:20

**4**

**40** 108:19 156:19 157:7
**42** 30:22
**45** 109:7,7,8,12,17
**49** 142:6 143:2,5

**5**

**5** 96:5,11 196:4
**50** 90:25,25 109:7
**50s** 142:15 157:5
**519** 2:4
**55** 142:19 143:10
**599** 2:16

**6**

**6** 1:15 96:5,11 195:9
**600** 2:4
**683** 182:18,22
**6C** 6:2

**7**

**75** 9:16
**76** 109:13 172:3,4

**8**

**80** 175:10
**80/20** 175:7
**85** 143:10

**9**

**9** 93:20
**90** 166:7
**91** 91:14
**95** 107:11 156:2 166:2,7