* * C O N F I D E N T I A L * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X

JENNIFER S. FISCHMAN,

               Plaintiff,

      -against-

                    Index No. 18-cv-08188


MITSUBISHI CHEMICAL HOLDINGS, AMERICA, INC.;
MITSUBISHI CHEMICAL CORPORATION; MITSUBISHI
CHEMICAL HOLDINGS CORPORATION; NICHOLAS OLIVA, in
his individual processional capacities; Donna
COSTA, in her individual and professional
capacities; and JOHN DOES 1-10, in their
individual and professional capacities,

               Defendants.


-----------------------------------------------X

                    July 30, 2021
                    11:05 a.m.




           DEPOSITION of CHAD STALLER, a

Non-Party witness, taken by the attorneys for the

respective parties, pursuant to Notice, held at

the above time and place before Toni Musacchia, a

Stenotype Reporter and Notary Public within and

for the State of New York.

1          * * C O N F I D E N T I A L * *

2   A P P E A R A N C E S:

3   VALLI KANE & VAGNINI LLP
    Attorneys for Plaintiff
4       600 Old Country Road
        Garden City, New York 11530
5
    BY:  MATTHEW L. BERMAN, ESQ.
6

7   CLARICK GUERON REISBAUM LLP
    Attorneys for Defendant, Donna Costa
8       220 Fifth Avenue, 14th Floor
        New York, New York 10001
9
    (NOT PRESENT)
10

    GORDON REES SCULLY MANSUKHANI, LLP
11  Attorneys for Defendants, Mitsubishis
    Chemical Holdings America, Inc., Donna Costa and
12  Nicholas Oliva
        One Battery Park Plaza, 28th Floor
13      New York, New York 10004

14  BY:  BRITTANY L. PRIMAVERA, ESQ.

15  SHEARMAN & STERLING, LLP
    Attorneys for Defendant,
16  Mitsubishi Chemical Holdings Corporation
        599 Lexington Avenue
17      New York, New York 10222

18  BY:  JEROME FORTINSKY, ESQ.

19

20  ALSO PRESENT:

21  Jennifer Fischman

22

23

24

25

1            * * C O N F I D E N T I A L * *

2                FEDERAL STIPULATIONS

3

4            IT IS HEREBY STIPULATED AND AGREED by and

5     between the parties hereto, through their

6     respective Counsel, that the certification,

7     sealing and filing of the within examination will

8     be and the same are hereby waived;

9

10           IT IS FURTHER STIPULATED AND AGREED that

11    all objections, except as to the form of the

12    question, will be reserved to the time of the

13    trial;

14

15           IT IS FURTHER STIPULATED AND AGREED that

16    the within examination may be signed before any

17    Notary Public with the same force and effect as

18    if signed and sworn to before this Court.

19

20

21

22

23

24

25

1          * * C O N F I D E N T I A L * *

2          THE REPORTER:  It is hereby stipulated

3     and agreed by and between counsel for all

4     parties present that pursuant to Federal

5     Rule of Civil Procedure 28 (a)(2), this

6     deposition is being conducted remotely and

7     that the court reporter shall be permitted

8     to administer the oath to the witness via

9     videoconference.  The witness and all

10    counsel are in separate remote locations and

11    participating via Zoom, telephone or any web

12    conference meeting platform under the

13    control of Bee Reporting Agency, Inc.

14         It is further stipulated that this

15    videoconference will not be recorded in any

16    manner and that any recording without the

17    express written consent of all parties shall

18    be considered unauthorized, in violation of

19    law and shall not be used for any purpose in

20    this litigation or otherwise.

21         Before I swear in the witness, I will

22    ask each counsel to stipulate on the record

23    that I, Toni Musacchia, the court reporter,

24    may swear in the witness even though I am

25    not physically in the presence of the

1            * * C O N F I D E N T I A L * *

2       witness and that there is no objection to

3       that at this time, nor will there be an

4       objection at a future date.

5            MR. BERMAN:  So stipulated.

6            MS. PRIMAVERA:  So stipulated.

7            MR. FORTINSKY:  So stipulated.

8            THE REPORTER:  Ms. Primavera, can you

9       represent that to the best of you knowledge

10      and belief, that the witness appearing today

11      via web conference is, in fact, Mr. Chad

12      Staller?

13           MS. PRIMAVERA:  Yes, I can represent

14      that.

15  C H A D   S T A L L E R,

16     the witness herein, having first been duly

17  sworn by Toni Musacchia, a Notary Public in and

18  for the State of New York, was examined and

19  testified as follows:

20  DIRECT EXAMINATION

21  BY MR. BERMAN:

22      Q.  Please state your name for the record.

23      A.  Chad Staller.

24      Q.  Please state your address for the

25  record.

1              C. Staller - Confidential

2      A.    1608 Walnut Street, Suite 801,

3    Philadelphia, Pennsylvania 19103.

4      Q.    Good morning, Mr. Staller, my name is

5    Matthew Berman, I am attorney representing

6    Jennifer Fischman in the lawsuit that you're

7    testifying on.

8          I would like to ask you a series of

9    questions, which you'll be answering having sworn

10   to tell the truth.

11         If you don't hear one of my questions, please

12   let me know and I will do my best to enunciate it

13   more loudly so that it is more understandable and

14   audible.

15         If you don't understand my question, please

16   let me know and I will do my best to rephrase the

17   question to make it more understandable.

18         If you do answer my question, I will take

19   that to mean that you understand the question.

20         As you know we have a court reporter here

21   today, she can only take down the testimony of

22   one of us at a time.  So I would ask you to

23   please do your best to wait until I finish my

24   complete question before you begin to answer,

25   even if you anticipate what I am going to say.

1              C. Staller - Confidential

2    In return, I will do my very best to make sure

3    that I wait until you have completed your

4    response before I move on to the next question.

5    It's very important that one of us speak at a

6    time.

7         Also, as you know the court reporter can only

8    take down verbal responses so please do your best

9    to answer with a "yes" or "no" or some other

10   verbal response so that she can get that

11   recorded.

12        From time to time you may hear an objection

13   from one of the attorneys.  In the case of such

14   an objection, I will still expect you to respond

15   to the question I pose unless you are

16   specifically instructed by counsel not to answer.

17        Do you understand that although we're not in

18   a formal courtroom setting today, you're still

19   under the same oath that you will be under in a

20   court of law?

21        A.   I do, yes.

22        Q.   Do you understand the rest of the

23   instruction I provided so far?

24        A.   I understand the collective

25   instructions, yes.

1                    C. Staller - Confidential

2        Q.    During the course of today's testimony,

3    if at any time you wish to take a break, please

4    let me know and I will be happy to accommodate

5    any request for a break by any participant.  I

6    just ask that you respond to the question before

7    we take that break.

8        In addition, the only instructions I have is,

9    to the extent possible, please do not respond to

10   any of my questions by providing privileged or

11   otherwise confidential information that you are

12   not supposed to be disclosing; is that okay?

13       A.    That is.

14       Q.    All right.  Are you currently taking or

15   refraining from taking any medication which could

16   affect your ability to testify truthfully and

17   accurately today?

18       A.    No.

19       Q.    Do you have any medical condition which

20   might affect your ability testify truthfully and

21   accurately today?

22       A.    No.

23       Q.    Do you suffer from any medical condition

24   which impairs your memory?

25       A.    I don't believe so.

1              C. Staller - Confidential

2       Q.   You've been deposed before, correct?

3       A.   Yes.

4       Q.   And you testified at trial?

5       A.   Yes.

6       Q.   So in preparation for your deposition

7    today did you --

8            MR. BERMAN:  Withdrawn.

9       Q.   What activities, if any, did you engage

10   in order to prepare for today's deposition?

11      A.   I got reacquainted with my file.

12   Reviewed my report in this matter and had a brief

13   conversation with Ms. Primavera yesterday.

14      Q.   Without revealing substance of any

15   conversations, have you had any other

16   conversations with Ms. Primavera or anyone else

17   in preparation for today's testimony?

18      A.   No.

19      Q.   So you have prepared a report in this

20   matter, correct?

21      A.   Yes.

22      Q.   I am going to -- have you also provide

23   was your CV?

24      A.   I believe so.  I provided that to Ms.

25   Primavera and she sent it to you.

1           C. Staller - Confidential

2           MR. BERMAN:  I'll ask the court reporter

3      to pull up an exhibit.  It should be mark as

4      CV, underscore, Staller, underscore, pic.

5           Can we mark this as Staller Exhibit 1.

6           (Staller Exhibit 1, marked for

7      identification.)

8           MR. BERMAN:  For identification, this is

9      a five-page PDF document.  Labeled at the

10     top, Center for Forensic Economic Studies.

11     Underneath that, Chad Staller, J.D., M.B.A,

12     M.A.C., C.V.A.

13          Toni, can you slowly scroll through the

14     document so the witness can see how many

15     pages it has.

16     Q.   Mr. Staller -- how should refer to you

17     today; is it correct to call you Mr. Staller or

18     should I be calling you something different?

19     A.   Mr. Staller works.

20     Q.   Mr. Staller, do you recognize this

21     document?

22     A.   Yes, I do.

23     Q.   Is this the CV that you provided in this

24     case?

25     A.   It is.

1                    C. Staller - Confidential

2        Q.    Does this document reflect your

3    qualifications to provide expert testimony in

4    this matter?

5        A.    Yes.

6        Q.    Are there any other qualifications that

7    you have that pertain to your qualification in

8    this matter that are not contained within this

9    document?

10        A.    No.

11        Q.    Did you prepare an expert report in this

12    matter, sir?

13        A.    Yes.

14        Q.    Did anyone besides you author the expert

15    report?

16        A.    My report is cosigned by my colleague,

17    fellow senior economist, Stephen Dripps.  Stephen

18    is spelled with a P-H and Dripps is spelled

19    D-R-I-P-P-S.

20        Q.    Do you know whether Mr. Dripps will be

21    presented as a testifying expert in this matter?

22        A.    I imagine, God willing, I will be the

23    testifying expert.

24        Q.    As far as you know, as of today,

25    Mr. Dripps has no intention to testify?

1                    C. Staller - Confidential

2         A.    True.

3         Q.    Was there a particular portion of the

4    expert report that was prepared by Mr. Dripps?

5         A.    Not a specific portion as a secondary

6    economist and co-signator.  His role was in the

7    reviewing process.  After the report was written,

8    review it for grammatical -- you know, typing

9    errors potentially.  And then review my summary

10   of the spreadsheets that I prepared with regard

11   to the available jobs for Ms. Fischman and then

12   if the conclusions are consistent with what

13   Mr. Dripps and I discussed throughout the

14   development of my report, he's happy to co-sign

15   the report.

16        Q.    Okay.  So the substance of the report is

17   all derived from you, correct?

18        A.    That's true, yes.

19        Q.    So turning to your accreditation section

20   of your CV on the left panel --

21        A.    Mr. Berman, the substance is coming from

22   various sources but the drafting -- the

23   preparation is coming from the --

24        Q.    You're the drafter of the report,

25   correct?

1          C. Staller - Confidential

2     A.   Yes.

3     Q.   And Mr. Dripps reviewed your drafts?

4     A.   Yes.

5     Q.   Mr. Dripps did not draft any portion of

6     the report, did he?

7     A.   Only in the editing capacity.

8     Q.   Thank you for clarifying.

9          With respect to your accreditations on the

10    left-hand panel, are you a certified valuation

11    analyst?

12    A.   Yes.

13    Q.   Did you use any skills as a certified

14    analyst in preparation of the report?

15    A.   No.

16    Q.   Are you a certified instructor for

17    National Institute of Trial Advocacy?

18    A.   Yes.

19    Q.   Did you use any of your skills and

20    training as a certified instructor for the

21    National Institute of Trial Advocacy in

22    preparation of this report?

23    A.   No.

24    Q.   Turning to your education beneath that.

25    Do you see that portion where it's labeled

1                    C. Staller - Confidential

2    education?

3        A.    Yes.

4        Q.    Are you a Master of Accountancy from

5    Villanova?

6        A.    I received a Master's of Accountancy

7    from Villanova, yes.

8        Q.    Did you use any of your Master of

9    Accountancy knowledge in preparation of the

10   report?

11       A.    Within my Masters's program, there was

12   Master's levels labor economic classes.  To the

13   extent that that background and training applied

14   to my specific examination in this case, my

15   training from that degree would have been used in

16   my drafting of the current report.

17       Q.    You have an MBA from Temple University?

18       A.    Yes.

19       Q.    Did you use any of your MBA skills in

20   preparation of this report?

21       A.    Yes.

22       Q.    Which ones?

23       A.    Throughout the course of my MBA program

24   which concentrated on economics, I took Master

25   level economic classes, including several labor

C. Staller - Confidential

2 economic classes.  Based upon my training in that

3 program in labor economics, the extent I was

4 providing economic conclusions in this report of

5 the labor market that existed for Ms. Fischman,

6 that would relate to my background and training

7 that derived from that program.

8 Q.  And you have a law degree from Temple

9 University's James E. Beasley School of Law?

10 A.  Yes.

11 Q.  Did you use any of that training in

12 preparation of this report?

13 A.  Yes.

14 Q.  Which training did you use from the

15 Beasley School of Law in the preparation of this

16 report?

17 A.  Through that training I had the

18 opportunity to sit for and pass three different

19 state bar examinations.  So I'm a member of three

20 bars in good standing.  As a licensed attorney,

21 my background and training explicitly from Temple

22 University would relate to employment law,

23 background and information, employment law,

24 formal training in law school, that would have

25 given me some context in understanding of the

1                    C. Staller - Confidential

2      claims being made by Ms. Fischman, the relevance

3      of my analysis and the scope of my analysis

4      that's presented in my report in this matter.

5          Q.    What states are you licensed in?

6          A.    New Jersey, the Commonwealth of

7      Pennsylvania and Maryland.

8          Q.    Do you have to be licensed in New Jersey

9      to practice law in that state?

10         A.    To my understanding, yes.

11         Q.    Do you have to the be licensed in

12     Pennsylvania to practice law in that state?

13         A.    I believe so, yes.

14         Q.    Do you have to be licensed to practice

15     law in Maryland in order to practice law in that

16     state?

17         A.    Yes, with the exception of a pro hac

18     vice admission to any of those states.

19         Q.    Turning to your awards and honor section

20     of your CV.  Do any of these awards and honors

21     have any bearing on the substance of the report

22     you prepared in this matter?

23             THE WITNESS:  Madam court reporter, can

24         you scroll down.  I can't see that part of

25         the CV.

1                  C. Staller - Confidential

2       A.    I would say, yes, to the extent that

3    those awards are provided based upon my work in

4    the field as a forensic economist, I'm providing

5    forensic economic analysis in this matter.  It

6    goes towards my experience in the industry and

7    the specific field.

8       Q.    Are you currently employed?

9       A.    Yes.

10      Q.    Where are you presently employed?

11      A.    I guess the where would be in

12   Philadelphia.  The whom would be the Center for

13   Forensic Economic Studies.

14      Q.    Can we refer to that today by the

15   acronym CFES?

16      A.    CFES would be fine.

17      Q.    What business is CFES in?

18      A.    Our primary practice is concentrated on

19   the evaluation of economic damages related to

20   various types of lawsuits primarily in the field

21   of employment discrimination, personal injury and

22   wrongful death and commercial disputes.

23      Q.    How many economists does CFES have?

24      A.    In addition to myself, we have six

25   additional economists.

1                    C. Staller - Confidential

2      Q.    So you mentioned yourself and

3   Mr. Dripps, right?

4      A.    Yes.

5      Q.    Who are the other four?

6      A.    That would be Brian Conley, Adam Gilham,

7   David Adams and Bernard Lex.

8      Q.    So in connection with this matter, what

9   area is your expertise lying in?

10     A.    Through the information I have to the

11  current date, labor economics.

12     Q.    Any other areas of expertise that are

13  being applied to this matter?

14     A.    I have not seen a report -- an economist

15  report prepared on behalf of Ms. Fischman.  To

16  the extent such a report is prepared that may

17  outline backpay and front pay damages, I may be

18  requested to opine on those damages.  But through

19  the information I have through the current date,

20  it would be limited to labor economics.

21     Q.    I think you mentioned earlier, correct

22  me if I'm wrong, that you're a forensic

23  economist?

24     A.    Yes.

25     Q.    Are you applying any forensic economics

1                 C. Staller - Confidential

2     to the report you prepared in this matter?

3         A.    As I explained many times in courtrooms,

4     the term "forensic" in economics can become

5     confusing or misleading.  The term "forensic"

6     simply means public forum.  It comes from the

7     Latin word "forensis," so simply forensic

8     economics just means the application of economic

9     theory, research and thought into the public

10    forum, which as we all know to be the courthouse.

11    So I guess the broad work I do is forensic

12    economics as my economics analysis is applied

13    into legal matters that may get into the public

14    forum at the courthouse.

15        Q.    For the purpose of the report that you

16    prepared, do you claim any expertise other than

17    in the field of labor economics?

18        A.    No.

19        Q.    How long have you been providing labor

20    economics expertise commercially?

21        A.    Sixteen plus years.

22        Q.    Do you know how many matters you have

23    been retained as an expert in over those past

24    sixteen years in connection with labor and

25    economics?

1          C. Staller - Confidential

2     A.   Was your question labor and economics or

3    labor economics?

4     Q.   Labor economics.  How many cases have

5    you been retained as an expert on labor economics

6    over the past 16 years, if you know?

7     A.   I can approximate -- as an

8    approximation, around thousand times.

9     Q.   In all of those cases, were you working

10   pursuant to a retainer agreement?

11    A.   I just couldn't -- in all those cases,

12   was I working under a retainer agreement?

13    Q.   Yes.

14    A.   I imagine so.  Our office's typical

15   practice is to be formally retained and we have a

16   retainer agreement or the client may provide a

17   retainer agreement.  So I would say in most of

18   those cases.

19    Q.   In the cases you just described, were

20   they all through CFES?

21    A.   Yes.

22    Q.   Were any of them provided on a pro bono

23   basis?

24    A.   Not to my recollection.

25    Q.   It your understanding that CFES was

1           C. Staller - Confidential

2    compensated or worked for compensation in each of

3    those matters?

4       A.    That's a compound question.  Can you

5    just split it up?

6       Q.    Is it your understanding that in the

7    matters that you testified in labor economics

8    over the past year, CFES was compensated for the

9    work?

10      A.    Over the past year, yes -- I imagine so.

11   I don't know about our collection process but I

12   imagine -- over the last year, I don't recall a

13   pro bono matter in a labor economic case.

14      Q.    So you don't perform this work for free,

15   correct?

16      A.    No, our firm is for a profit business.

17      Q.    In any of these labor economics cases

18   where you were initially hired as an expert, did

19   you ultimately decide you were unable to provide

20   testimony?

21      A.    If it got to drafting a report and I

22   felt comfortable to and willing to provide

23   testimony as needed -- so I imagine it got to a

24   point where I reviewed materials that I felt

25   comfortable drafting a report and with the

1                    C. Staller - Confidential

2    qualification the state or are jurisdiction

3    required a report, I felt comfortable doing that

4    and I felt comfortable providing testimony in

5    courthouse.

6        Q.   Were there any labor economic

7    engagements that you accepted that you ultimately

8    were uncomfortable providing a report in?

9        A.   No.

10       Q.   Are you being compensated for your work

11   in this matter?

12       A.   Yes.

13       Q.   Are you compensated on an hourly rate?

14       A.   The firm is, yes.

15       Q.   What is the hourly rate that the firm is

16   compensated at for your work?

17       A.   335 an hour for report writing and

18   analysis.  Testimony is billed at a half day rate

19   of 2,500 for deposition testimony or trial

20   testimony.

21       Q.   Do you know Mr. Dripps' rate?

22       A.   335 an hour.  Same trial or testimony

23   rates, 2,500 for a half day.

24       Q.   Do you know how many hours you put into

25   this matter so far?

1                    C. Staller - Confidential

2        A.    I do not.

3        Q.    You have prepared expert reports in a

4     number of cases, correct?

5        A.    Yes.

6        Q.    Approximately how many of those were

7     Federal cases?

8        A.    In my overall practice I, had over 1,000

9     since 2005.

10        Q.    Are you familiar with the Federal rules

11    of procedure covering disclosure of expert

12    testimony?

13        A.    I'm familiar with Rule 26.  I don't have

14    it committed to memory but generally familiar.

15        Q.    Are you aware that Rule 26 requires

16    statement of the compensation to be paid for the

17    study and testimony in the case by the expert?

18        A.    Yes.

19        Q.    Have you provided that here?

20        A.    As far as my hourly rate, yes.  As far

21    as a statement of compensation, at the time of

22    preparing my report it wasn't totaled so I

23    couldn't provide a total billing to date.

24        Q.    Did you provide any information

25    concerning the amount that you were being

1                 C. Staller - Confidential

2      compensate in your expert report?

3           A.   I believe so, yes.

4               MS. BERMAN:  Toni, you can put the

5          exhibit away for a moment.

6               Toni, can you pull up in the exhibits

7          that you've been provided there's a document

8          called CFES report Fischman 11-13-20.PDF.

9               Let's mark this as Staller Exhibit 2.

10              (Staller Exhibit 2, marked for

11         identification.)

12         Q.   Mr. Staller, do you see this document?

13         A.   Yes.

14         Q.   Do you see at bottom it says page 1 out

15     of 608?

16         A.   No, it only goes to the top -- the first

17     page right now on the screen.

18         Q.   On the screen --

19         A.   I'm sorry, I do see that.  Yes.

20         Q.   Did you prepare 608 page expert report

21     in this matter?

22         A.   With appendices, yes.  So yes.

23              MR. BERMAN:  Toni, can you allow the

24         witness to flip through the document to his

25         satisfaction and let me know when he's

1          C. Staller - Confidential

2     ready.

3     A.   Yes, this is my report with the relevant

4     attachment relevant to Ms. Fischman.

5     Q.   Can you please can you turn to page nine

6     of the document.  Mr. Staller, did I hear you say

7     you recognize this document?

8     A.   Yes.

9     Q.   And it's your expert report in this

10    matter, correct?

11    A.   Yes.

12    Q.   Do you see the last line on the summary

13    there where it says, All relevant documents as

14    required by F.R.C.P.26(a)(2)(B) are attached

15    hereto as Appendix A"?

16    A.   Yes.

17    Q.   Is there an Appendix A in this document?

18    A.   Scroll down.  Unfortunately, my

19    assistant didn't include it before the

20    attachment.  So that would be -- the CV we just

21    discussed -- the testimony list that I saw that

22    you do have and then the fee schedule that we

23    just discussed a couple moments ago, that's my

24    typical Appendix A.

25              MR. BERMAN:  I don't think we received a

1           C. Staller - Confidential

2      fee schedule.  I'll just call for production

3      of the fee schedule to the extent it hasn't

4      been previously provided.

5           We can set that issue aside.

6      Q.   Is it correct to characterize the first

7  nine pages of this report as the body of the

8  report; is that fair?

9      A.   Yes.

10      Q.   What I would like to do is just turn to

11  the front of the report, the very first page.

12      Do you see the section that says "documents

13  relied upon"?

14      A.   Yes.

15      Q.   Does this contain a complete and

16  accurate list of materials that you were provided

17  in this matter?

18      A.   So, I can't say provided.  These are the

19  documents I used to formulate my opinions and

20  conclusions.  Relied upon -- I'm sorry,

21  provided -- I believe that's additional documents

22  provided.

23      Q.   Okay.  But these are -- this is a

24  complete list of documents that you relied upon

25  in preparing this report, correct?

1                    C. Staller - Confidential

2          A.    Yes, that's true.

3          Q.    If it's not on this list you didn't rely

4     upon it?

5          A.    You'll see that there are some

6     additional documents used that are cited

7     throughout the report.  But as far as fact

8     specific documents related to this particular

9     matter, these would be the case specific material

10    and then throughout the report you'll see

11    references to the forensic job sets and some

12    other economic data that's cited within my

13    report.  But as far as case specific, it's in

14    Section I.

15         Q.    Is it fair to say that if it's

16    referenced expressly in your report, you may have

17    relied upon?

18         A.    Correct, either through Section I or

19    relevant footnotes.

20         Q.    In contrast, is it fair to say that if

21    it's not referenced in your report, you didn't

22    rely upon?

23              MS. PRIMAVERA:  Objection to form.  You

24         can answer.

25         A.    Correct, to form my opinions in this

1          C. Staller - Confidential

2    matter.  Yes.

3          Q.    Thank you.  Were you provided with any

4    additional documents that you determined -- you

5    decided not to rely upon?

6          A.    Let's see.  I'm taking a look to see

7    what else I have in my file.

8                The only documents that I received that

9    is not in Section I would be the expert report of

10   Rona Wexler, R-O-N-A W-E-X-L-E-R.

11         Q.    When did you receive the expert report

12   of Rona Wexler?

13         A.    The first part of your question got

14   muffled.

15         Q.    When did you receive the expert report

16   of Rona Wexler?

17         A.    October of 2020.

18         Q.    So it's your understanding that Ms.

19   Wexler had already drafted an expert report as of

20   October of 2020?

21               MS. PRIMAVERA:  Objection to form.

22         Q.    You were provided with -- you were

23   provided with Ms. Wexler's report in October of

24   2020, did I get that right?

25         A.    Yes.

1                    C. Staller - Confidential

2      Q.   Was that a draft report?

3      A.   (No verbal response.)

4      Q.   Can you hear me?

5      A.   Yes, I'm just looking.

6      Q.   Okay.

7      A.   Yes.

8      Q.   Did you subsequently receive any other

9   reports from Rona Wexler?

10     A.   I don't see a final version in my

11  system.

12     Q.   The report that you provided to us in

13  this matter is your final report, correct?

14     A.   Yes.

15     Q.   Was there any drafts?

16     A.   I don't have any, no.

17     Q.   Did you prepare any drafts of your

18  report before getting to the final version?

19     A.   The only version I have is my

20  November 13th report.  So as far as drafts, I

21  don't have any saved.  As far as the preparation

22  of it, I don't recall.

23     Q.   Did you provide any drafts of your

24  report to anyone prior to issuing your final

25  report in this matter?

1                    C. Staller - Confidential

2        A.   I don't know because the only version I

3    have is the current version and I don't have

4    anything that has a prior date stamp.

5        Q.   Can you tell me when you first began

6    drafting your expert report in this matter?

7        A.   No, I have to go back to look at the

8    billing records.

9        Q.   Do you know when you were retained in

10   this matter?

11       A.   When I was what?

12       Q.   Retained?

13       A.   There's a retention agreement.  I have

14   to go back look at retention agreement.

15       Q.   Do you know when you were assigned to

16   work on this matter?

17       A.   No.

18       Q.   Did you receive the draft of Ms.

19   Wexler's report before you began drafting your

20   report?

21       A.   I have to go back and look at my billing

22   records.

23       Q.   Did you provide Ms. Wexler with any

24   drafts of your report?

25       A.   I don't believe so -- no.

1              C. Staller - Confidential

2        Q.    Prior to providing your November 13,

3    2020 report, did you provide any drafts to your

4    counsel or your client's counsel?

5        A.    I don't recall.

6        Q.    Did you receive any feedback from the

7    attorneys that hired CFES concerning drafts of

8    your expert report?

9             MS. PRIMAVERA:  Objection.  You can

10       answer.

11       A.    I don't recall.

12       Q.    What were you asked to do in this case?

13            MS. PRIMAVERA:  Objection.

14       Q.    What was the scope of work you were

15   asked to perform in this case?

16       A.    Based upon Ms. Fischman's separation

17   from employment with the defendant, evaluate the

18   labor market that existed subsequent to her

19   separation and identify relevant and potential

20   employment opportunities that Ms. Fischman could

21   have pursued and compare that to the documented

22   and provided information of her efforts to find

23   subsequent employment post her separation.

24            MR. BERMAN:  Toni, can you read back the

25       last part of that response where he said

1          C. Staller - Confidential

2       "and compare that to."

3              (Whereupon, requested portion of

4       testimony read back.)

5       Q.    Were you asked to make any assumptions

6   in the preparation of your report?

7              MS. PRIMAVERA:  Objection.

8       A.    No.

9       Q.    Did you make any assumptions in the

10   preparation of your report?

11      A.    I don't think I did, no.

12      Q.    Is serving as an expert witness a

13   material part of your work for CFES?

14              MS. PRIMAVERA:  Objection.

15      Q.    You can answer.

16      A.    So I'm confused by the question of the

17   term "material" and I'm confused with how you're

18   using it as an expert witness.  So can you

19   restate the question, please.

20      Q.    Sure.  What portion of your work for

21   CFES involves serving as an expert?

22      A.    When you're using the term "serving as

23   an expert," is that testifying or just being

24   retained as an expert that would draft a report

25   and provide analysis?

1                    C. Staller - Confidential

2        Q.    The second of those two choices.

3        A.    Okay.  I would approximate 65 to

4    75 percent of my time would be serving as an

5    expert for my time with CFES, which would be

6    defined as working with clients and developing

7    economic models.

8        Q.    Is that is that work you just described

9    in connection with litigation?

10       A.    That approximation percentage would be,

11   yes.

12       Q.    So of the remaining portion of your

13   work, what is that comprised of?

14       A.    Non-litigation work and then some

15   administrative duties.  I serve as the firm's

16   president.

17       Q.    Okay.  So what proportion of your work

18   is spent doing administrative duties?

19       A.    That would vary whether we're in a

20   pandemic or not.  About 10 -- 10 to 15 percent of

21   the time.

22       Q.    Okay.  What proportion of your work

23   involves non-litigation duties?

24       A.    So if we take 20 percent -- if I take

25   the upper end of my approximation of litigation

1                    C. Staller - Confidential

2    time it was 70 percent and then I add 10 percent

3    for administrative duties, the balance would be

4    20 percent for non-litigation projects.

5         Q.    What types of work make up your

6    non-litigation projects?

7         A.    Business valuations, cost benefit

8    studies and union negotiations.

9         Q.    Do you charge different rates for these

10   different types of work you perform?

11        A.    Typically, most of those projects are

12   also billed at 335 an hour.

13        Q.    Is working for CFES your full-time

14   occupation?

15        A.    Yes.

16        Q.    Have you created billing records which

17   correspond to all of the work that you performed

18   in this matter to date?

19        A.    With the exception of preparing for

20   today's deposition and the deposition itself.

21   Other than that, yes.

22        Q.    All right.  So other than --

23            MS. BERMAN:  Withdrawn.

24        Q.    Do you recall earlier I asked you about

25   the scope of work for this assignment?

1                    C. Staller - Confidential

2        A.    Yes.

3        Q.    Okay.  So did I understand you correctly

4   that there were three components of the scope of

5   work -- and I'm just paraphrasing here --

6   evaluating the labor market after Ms. Fischman's

7   separation, that would be number one.

8        Number two, identifying relevant and

9   potential employment opportunities.

10       Number three, would be comparing those

11  potential employment opportunities to documented

12  and provided information concerning Ms.

13  Fischman's efforts to find post separation

14  employment; did I get that right?

15       A.    Generally, yes.

16       Q.    Were you asked to perform any other work

17  besides those three things that we just

18  identified?

19            MS. PRIMAVERA:  Objection.

20       Q.    You can answer the question.

21       A.    So, just for the record, I wasn't asked

22  to do those three sections.  I was asked to

23  provide an economic analysis of the labor market

24  and then develop my findings based upon the

25  review of the records I had provided in this

1              C. Staller - Confidential

2    case.  So I just don't want the record to suggest

3    I was told what to do or to reach certain

4    conclusions.  But here is the case, here is the

5    materials and can you provide an economic

6    analysis based upon that information.

7         Q.    What were you asked to provide an

8    economic analysis of?

9         A.    The labor market for lawyers, examine

10   her -- her being Ms. Fischman's job search

11   efforts subsequent to her separation -- compare

12   that to relevant economic labor and economic

13   information with regard to how the marketplace

14   looked for people similar to Ms. Fischman in

15   February of '17 and thereafter and see how her

16   efforts to find mitigating employment compared to

17   available jobs and the labor market.

18        Q.    Okay.  In connection with providing the

19   economic analysis you described, is that type of

20   economic analysis something that you have done

21   before?

22        A.    Yes.

23        Q.    How many times have you done that

24   before?

25        A.    Similar to the analysis that I provided

1              C. Staller - Confidential

2     in this matter?

3          Q.   Yes.

4          A.   I would approximate of the roughly 1,000

5     we already discussed in the labor economic arena,

6     maybe half of those are similar to the analysis

7     that I provided here.

8          Q.   Do I understand correctly you've done

9     approximately 500 analyses of this type?

10         A.   By approximation, yes.

11         Q.   Do each of those analyses look at the

12    same types of information that you just

13    described?

14              MS. PRIMAVERA:  Objection.

15         A.   No, that's a -- that's a generally

16    overbroad question.  Each case is going to be

17    specific on it's own.  I'm going to look at the

18    relevant materials in a specific case and then

19    pull relevant economic data to the task at hand.

20         Q.   How many of your previous assignments

21    have involved examining the job search efforts of

22    the plaintiff?

23         A.   Of those approximate 1,000 that we

24    already discussed, in that 500 ballpark -- again,

25    that's a loose approximation.  I never really

1                    C. Staller - Confidential

2      tallied it up.

3          Q.   I just want to make sure I understand.

4      Are you -- do I understand correctly that you

5      you've done approximately 500 analyses of job

6      search efforts of a plaintiff?

7          A.   If we're trying to go off of

8      approximations -- so earlier in our conversation

9      today we discussed that about roughly I've done

10     1,000 or so labor market or labor economic

11     studies -- those would be of various

12     examinations.  Within that 1,000 population --

13     which is still an approximation -- because now

14     your more refined question is going towards how

15     many are looking at the job search efforts of the

16     plaintiff?

17         Q.   Yes.

18         A.   I couldn't give you -- I mean, in that

19     500 ballpark -- I'm hesitant to put that on the

20     record because I don't want to be guessing.  I

21     don't know.  I don't really tally -- after each

22     report, I don't have a little check sheet.  I

23     don't know.

24         Q.   Is it fair to say you looked at the job

25     search efforts of a plaintiff hundreds of times.

1                    C. Staller - Confidential

2        A.    Sure.  North, greater than 100.  I can

3    definitely say that, yes.

4        Q.    Greater than 300?

5        A.    I just don't want to misstate the record

6    so I can't tell you.

7        Q.    Is there any way you would be able to

8    determine that information by resorting to your

9    records?

10       A.    No, my database isn't kept by that type

11   of granular information.  It's much broader

12   because my records I don't personally -- I don't

13   have a preference of what type of analysis I do.

14   I do what's requested in a specific case.

15       Q.    Okay.  Working with that same universe

16   of matters we just described -- you know, not

17   holding to you any specific number -- but you

18   said it's certainly more than 100.  It could be

19   significantly higher than that; is that fair?

20       A.    Right, it could be in the range of 100

21   to a 1,000.

22       Q.    Well, I thought you said the most it can

23   be 500ish, did I get that wrong?

24            MS. PRIMAVERA:  Objection.

25       A.    So the universe we're talking about now

1              C. Staller - Confidential

2    in labor economics matter that I can give an

3    approximation to of preparing an analysis on

4    would be 1,000.  I'm comfortable testifying on

5    the record that it be north of 100.  I got

6    hesitant and I wanted to clarify that I can't say

7    anywhere between 500 so I can say it's between

8    100 to 1,000 and that's what I can testify to

9    under other.

10        Q.    How many of those matters concern a job

11    search efforts of someone other than a plaintiff?

12        A.    Someone other than a plaintiff?

13        Q.    Yes.

14        A.    None.

15        Q.    How many of those analyses did you pair

16    that with labor economics information of the type

17    you described previously?

18        A.    I imagine a majority of them.

19        Q.    How many of those did you -- did your

20    pairing of job --

21            MS. BERMAN:  Withdrawn.

22        Q.    How many of those labor economics

23    studies did you consider the marketplace for

24    people similar to the plaintiff in your matter?

25        A.    I imagine a majority of them.  I don't

1          C. Staller - Confidential

2     have a firm statistic or percentage.

3          Q.    How many of those assignments did you

4     make an assessment of the reasonableness of the

5     person's job search efforts?

6          A.    I imagine a majority of them.  I don't

7     know.

8          Q.    How many of those matters did you make

9     an assessment of how long you would have expected

10    it to take for that person to find a comparable

11    position?

12         A.    I imagine a majority of those reports.

13         Q.    Okay.  This covers a 16 year period; is

14    that correct?

15         A.    I'm not sure what you're referring to

16    now.

17         Q.    Well, of those 1,000 or so labor

18    economic matters you just described, does that

19    cover a 16 year period?

20         A.    Yes.

21         Q.    Has your pace of working on these

22    assignments changed over time?

23         A.    Yes.

24         Q.    So within approximately the past year,

25    how many of these have you done?

1                C. Staller - Confidential

2      A.   Ballpark, 20 to 30.

3      Q.   Over the past year do you know how much

4  revenue your firm has derived from your labor

5  economics services?

6           MS. PRIMAVERA:  Objection.

7      A.   No, I don't.

8      Q.   Are you compensated on an hourly basis?

9      A.   No.

10     Q.   Are you salaried?

11     A.   Yes.

12     Q.   Do you receive any increase in your

13  compensation based upon the revenue that you

14  generate during the course of the year?

15     A.   No.

16     Q.   Turning to your report, can you please

17  identify for me any opinions that it contains?

18           MR. BERMAN:  By the way, it's 12:10.

19      Let me know if anyone wants a break.  I just

20      want to put that out there.

21           THE WITNESS:  Let me answer this

22      question and I'll do a quick bathroom break.

23     A.   Opinions that I have in this matter as

24  contained within my report would be that Ms.

25  Fischman's documented job search activities based

C. Staller - Confidential

upon the materials provided to me were
predominately consisted of online employment
applications.  Her job search activities tended
to be bunched together on a particular day and
then there would be gaps in between her next
search activity.

An additional opinion would be based
upon the New York Department of Labor with regard
to the efforts of a job seeker.  That a job
seeker under the New York Department of Labor
standards must perform three work search
activities per week.  That as of the time of my
report, that we would have expected to maintain
that minimum standard that Ms. Fischman would
have done 594 job search activities.  That based
upon the documents provided in discovery, I
totaled or tallied only 106 job search activities
for Ms. Fischman.  That an individual seeking
work after separation, the goal or the time
effort that should be set forth by that job
seeker should become a full-time job.  So the
information indicates that a job seeker should be
spending 25 to 40 hours per week looking for
re-employment.  That based upon her job search,

1                C. Staller - Confidential

2      that Ms. Fischman tended almost exclusively to

3      use Linked-In as a source of job contacts.  It

4      did not appear that she used online job

5      databases, headhunters, leveraging her prior

6      economic institutions, career placement

7      departments.

8           And based -- in totally based upon the

9      standards set forth by the State of New York,

10     based upon her demonstrative efforts that her job

11     search efforts fell far short of being reasonable

12     an diligent.

13          The next layer of my opinion then goes

14     towards a more specific search.  Other opinions

15     would relate to the average duration of

16     unemployment for lawyers and people similar to

17     Ms. Fischman based upon gender, age and general

18     occupation.  That based upon certain criteria we

19     would have expected Ms. Fischman to have found

20     re-employment within a period of rounding 10

21     weeks up to 37 weeks with an overwhelming

22     majority having found that within that time

23     period.

24          And then survey specific job

25     opportunities in my opinion relate to a number of

1          C. Staller - Confidential

2     opportunities that existed for Ms. Fischman based

3     upon a dataset acquired for lawyers from the

4     period of February 1st, 2017 through April 6,

5     2020, in the New York Metro area, which would

6     include Newark, New Jersey and Jersey City.  That

7     there were 6,409 job opportunities to be examined

8     by Ms. Fischman.  And then when we start to

9     control or remove for certain specific employment

10    types -- you see on page seven my opinion would

11    be that of the most relevant would be 551

12    employment opportunities.

13          When you compare, again, the specific

14    job employment opportunities per search effort,

15    combined with the standard set forth by the New

16    York Department of Labor, which is similar to

17    most states I've seen within the United States,

18    Ms. Fischman's efforts to find subsequent

19    employment were not reasonable, not sustained and

20    diligent when blended with broad economic data of

21    the marketplace and specific data to lawyers in

22    the New York Metro area.

23    Q.    Have you completed your response?

24    A.    Let me review my report to make sure I

25    captured all of my opinions.

C. Staller - Confidential

2          Also, at this time and as I discuss in

3    my report, so for a complete record here and

4    contained within the four corners of my report,

5    that should Ms. Fischman prevail on her claim of

6    wrongful termination based upon her human

7    capital, her experience, I would not see as an

8    economist -- or a labor economist standpoint any

9    permanent diminution or lifetime loss of earnings

10   for Ms. Fischman.

11       Q.   Have you completed your response?

12       A.   Just for the record, in sum, based upon

13   totally of information I had in this matter from

14   Ms. Fischman, as well as labor market statistics

15   an job opportunities acquired specific to Ms.

16   Fischman and her vocation, Ms. Fischman did not

17   conduct a reasonable or diligent job search and

18   did not perform a reasonable effort to mitigate

19   her efforts.

20          That would be the totality of my

21   opinions.

22       Q.   Is it fair to say the last one you just

23   described was a summary of the previous ones?

24       A.   Correct, yes, those were the dillying up

25   to the finale.

1              C. Staller - Confidential

2      Q.   I'm cognisant of your request to take a

3    break, I just want to -- I possibly missed a

4    portion of your area and I want to make sure I

5    got it.

6        You said that after removing and controlling

7    for certain jobs, 551 remained, correct?

8      A.   As you see on my table on page seven,

9    correct, the pole starts out at 6,409 and then as

10   you see -- depending again when you remove

11   certain titles or qualifications within the

12   dataset you're left with 551 after removal of all

13   those qualifications.

14          However, based upon Ms. Fischman's

15   resume, her training and experience, I don't

16   think she's limited to the 551.  I just wanted to

17   put on a filter of how we would examine the labor

18   market of specific opportunities that existed

19   from February 1, 2017 through April of 2020.

20     Q.   I got it.  And you mentioned two other

21   opinions plus your summary after that.  I just

22   want to make sure I got the gist of them at a

23   high level and then after the break we'll go

24   through them.

25        The opinion after that -- I'm not sure I got

1                    C. Staller - Confidential

2      it -- you said something about how her efforts

3      weren't reasonable, sustained and diligent; did I

4      get the gist of that one?

5          A.    Yes.

6          Q.    And there was one after that said no

7      loss of earnings, did I get the gist of that one?

8          A.    No, lifetime loss of earnings.

9          Q.    Lifetime, okay.  And the one after that

10     was the summary -- the totality of your findings,

11     right?

12         A.    I believe so, yes.

13             MR. BURMAN:  Let's take a break now.

14         What time is it?  It's 12:20.  We'll take a

15         break now and then we will take a break when

16         we get to lunchtime.

17             And if you have a preferred time to

18         break for lunch, please let me know.

19             MR. FORTINSKY:  How long, five minutes?

20             MS. BERMAN:  Five minutes.

21             (Whereupon, a brief recess was taken.)

22         Q.    Mr. Staller, turn to page three of the

23     report.  I will direct your attention to section

24     three of your report where it says, "Job search

25     activities" do you see where I'm referring you

1                    C. Staller - Confidential

2    to?

3         A.    Yes.

4         Q.    The first line of text here under the

5    section says, "Subsequent to her separation from

6    her employment with Mitsubishi, Ms. Fischman

7    sought employment in a similar capacity -- and

8    there's a footnote there.  Do you see that?

9         A.    Yes.

10        Q.    So your footnote is referencing

11   documents produced by Ms. Fischman in case

12   describing her job search, correct?

13        A.    I don't know if the documents are

14   describing it but I think it summarizes it.

15        Q.    Based on those documents did you

16   conclude Ms. Fischman sought employment in a

17   similar capacity?

18        A.    Through those documents for a period of

19   time, yes.

20        Q.    And then there's a table under that that

21   says "Table A:  Fischman documented job search

22   activities."  Do you see that table?

23        A.    Table A, yes.

24        Q.    Is that table similarly based upon the

25   documents referenced in footnote 12, Fischman

1          C. Staller - Confidential

2      000001 through 303?

3          A.    Yes.

4          Q.    Does this table breakdown documented job

5      search activities by Ms. Fischman in each month

6      of each year from 2017 through 2018?

7          A.    Through May of 2018, yes.

8          Q.    The first entry on that chart is for

9      February of 2017, right?

10         A.    The first entry is February of 2017.

11         Q.    We agree, right?

12         A.    I do.

13         Q.    And you identified 17 documented job

14     search activities for Ms. Fischman during that

15     period of time, correct?

16         A.    Yes, but I think one was on January

17     30th -- you'll see that footnote, 14.  But 16

18     were in the month of February, yes.

19         Q.    With respect to the footnote you just

20     identified, footnote 14, that footnote states it

21     includes -- the table includes one effort from

22     January 30, 2017; is that correct?

23         A.    Yes.

24         Q.    Now, is there any significance to the

25     date January 30, 2017?

C. Staller - Confidential

     1

     2     A.   I believe that's the date she separated

     3  with Mitsubishi.

     4     Q.   Do we agree that on the very day she was

     5  separated from Mitsubishi, she engaged in a job

     6  search effort?

     7     A.   True.

     8     Q.   Thank you.  Looking down below the

     9  table, do you see that paragraph says, "Based on

    10  the data above, Ms. Fischman made a total of 106

    11  job search activities between January 30th of

    12  2017 and May 6, 2018, approximately 1.61 job

    13  search efforts per week."  Do you see that

    14  section?

    15     A.   Yes.

    16     Q.   Is that just math?

    17     MS. PRIMAVERA:  Objection.

    18     A.   It is.

    19     Q.   That's how you got to number, right, you

    20  took the number of job search efforts and

    21  averaged it over the period of time, correct?

    22     A.   It's taking the total reported

    23  activities that are summarized in Fischman 1

    24  through 303, and then dividing that by the number

    25  of weeks, correct.  Then you arrive at 1.61

1          C. Staller - Confidential

2    activities per week.

3          Q.    So that's based on a monthly average for

4    each of those months identified from

5    February 2017 through May of 2018; is that

6    correct?

7          A.    So 1.61 represents a weekly average.

8          Q.    A weekly average, okay.

9          But it was taken over -- that's the average

10   per week over the period from February 2017

11   through May of 2018, right?

12         A.    Yes.

13         Q.    And then the next sentence there says,

14   "Assuming an ongoing search from January 30, 2017

15   to the current date, Ms. Fischman averaged 0.54

16   job search activities per week."  Do you see that

17   sentence?

18         A.    Yes.

19         Q.    Are how did you calculate -- what period

20   of time is that average calculated over?

21         A.    Through February of 2017 through

22   October 23rd of 2020.

23         Q.    So to arrive at this figure, did you

24   take the total of 106 jobs and average it over

25   the period you just described?

1                    C. Staller - Confidential

2       A.    Did I -- correct, so I received no

3   additional document after May of 2018.  So it's

4   taking the same 106 contacts and then dividing it

5   through more weeks, a longer period of time.

6       Q.    What's the significance of averaging it

7   out over a longer period of time when there were

8   no job search efforts in that period of time?

9       A.    My understanding of the law, Ms.

10  Fischman had a continuing duty to mitigate.  To

11  my understanding, she's -- at some point in time

12  became a real estate agent or working with her

13  mother's real estate firm doing real estate

14  transactions.

15          However, her duty to continue to find

16  comparable employment continues even after taking

17  the time to get into the real estate business so

18  that duty continues and persists through the

19  present date so that just demonstrates -- this

20  adequately represents the continued efforts or

21  lack thereof of Ms. Fischman to find comparable

22  legal positions.

23      Q.    So is your legal opinion a foundational

24  item for taking this average?

25          MS. PRIMAVERA:  Objection.

1                    C. Staller - Confidential

2        A.    So I'm not offering a legal opinion.

3   I'm sure the Court will instruct the jury on the

4   law.  I'm going based upon my background and

5   training and experience in the law as well as the

6   forensic economics.  As it relates to the

7   presentation of my analysis, my understanding of

8   the law in Federal courts in New York would be

9   that there's a continuing duty to mitigate and to

10  that extent I will explain to the jury where I

11  arrive at the 1.61 and the .55.

12       Q.    But you're not offering expert legal

13  testimony, correct?

14            MS. PRIMAVERA:  Objection.

15       A.    True, I am not.

16       Q.    So it's not your intention to testify as

17  to what the law is at trial, is it?

18       A.    My intention is not to testify to the

19  law at trial.  I can't predict all the cross

20  examination questions.  So I will answer those

21  questions as I deem fit and accurately and

22  appropriately.  But as far as why I got -- throw

23  in the .55, that's a the basis for throwing in

24  the .55.

25       Q.    Is your understanding of the law of

1              C. Staller - Confidential

2    mitigation current?

3              MR. FORTINSKY:  I'm sorry, I didn't hear

4        the last part.

5              MR. BERMAN:  Can you read it back,

6        please.

7              (Whereupon, last question read back.)

8        A.    I haven't done a recent -- when I say

9    "recent," I'm talking the last 30, 60 days case

10   law search.  But as far as current, we would go

11   back prior to that, that's as of the spring of

12   2021.  That's my understanding of the law.

13       Q.    During the course of your duties at CFES

14   do you perform legal research?

15       A.    I will from time to time as a forensic

16   economist.  As we discussed earlier, the context

17   of the word forensic and the word economics.  My

18   economic analysis is being applied into the

19   public forum of the courthouse.  To that extent

20   that my economic analysis must conform to the law

21   of this specific jurisdiction, my analysis -- my

22   research would be related to my analysis to make

23   sure it comports to the relevant laws of specific

24   jurisdiction.

25       Q.    Did you make take any steps to ensure

1              C. Staller - Confidential

2     that your expert analysis here conforms to the

3     law of the jurisdiction where this case is filed?

4         A.    When I was preparing my report in

5     November of '20, yes, based upon the Second

6     Circuit laws, yes.

7         Q.    Is it there a particular --

8               MR. BERMAN:  I'll rephrase.

9         Q.    Was there any particular subject matter

10    that you kept abreast of as of that November of

11    2020 timeframe you just identified?

12        A.    The subject matter would be through

13    mitigation efforts of a plaintiff and an

14    appointment matter pending in the Second Circuit.

15        Q.    What about subject matter related to the

16    permissible scope of expert testimony?

17        A.    I can't -- it seems too vague of a

18    question for me to answer.

19        Q.    Well, you're a trained attorney,

20    correct?

21        A.    Yes.

22        Q.    And I think you testified that you

23    perform legal research concerning the application

24    of your economic analysis so that it conforms to

25    the law of the specific jurisdiction, did I get

1                    C. Staller - Confidential

2    that right?

3        A.   Yes.

4        Q.   Okay.  So the legal research that you

5    perform include the permissible scope of your

6    ability to testify as an expert.

7        A.   You're asking me or telling me?

8        Q.   I'm asking you if it includes that

9    subject matter?

10       A.   I have done that research in general

11   terms, yes.

12       Q.   Did you do that research up through that

13   period that you just described, which was

14   November of 2020?

15       A.   Yes.

16       Q.   So is it fair to say that as of that

17   time in November of 2020, you were informed

18   concerning the permissible scope of your

19   testimony in this jurisdiction?

20       A.   So, again, I think "permissible" is not

21   a proper legal conclusion.  I think the Court

22   will indicate what's permissible.  I'm generally

23   familiar with what courts allow with regard to my

24   testimony in the field of labor economics and

25   employment discrimination matters.

1                C. Staller - Confidential

2       Q.    Thank you.   Have you ever been employed

3    as a professional recruiter?

4       A.    No.

5       Q.    Are you a vocational expert?

6       A.    No.

7       Q.    Are you industrial psychologist?

8       A.    No.

9       Q.    Are you organizational psychologist?

10      A.    No.

11      Q.    Are you an industrial organizational

12   psychologist?

13      A.    No.

14      Q.    Are you a professor?

15      A.    Yes.

16      Q.    What are you a professor of?

17      A.    Economics.

18      Q.    Where are you professor, sir?

19      A.    Temple University.

20      Q.    What kind of appointments do you have at

21   Temple University?

22      A.    Adjunct faculty member at the Beasley

23   School of Law.

24      Q.    How long have you been in that capacity?

25      A.    Thirteen years.

1              C. Staller - Confidential

2      Q.   Are you published?

3      A.   Yes.

4      Q.   What literature are you published in?

5      A.   Various journals as fully set forth

6  within my curriculum vitae.

7      Q.   All your publications are in your CV?

8      A.   Yes.

9      Q.   Are there any publications that you have

10  contributed to that are not listed in your CV?

11      A.   No.

12      Q.   Have you held any other professorships?

13      A.   I lectured at other institutions but not

14  sat on their faculty.

15      Q.   Where have you lectured?

16      A.   Villanova School of Law, Drexel School

17  of Law, the University of Baltimore School of Law

18  and the University of Pennsylvania.

19      Q.   Was that the University of Pennsylvania

20  or was it a particular school thereof?

21      A.   It was within their arts and science

22  department.

23      Q.   What was the subject matter of your

24  lectures at Villanova Law?

25      A.   Villanova Law was the civil litigation

1                C. Staller - Confidential

2    class that related to working with experts, what

3    experts -- the role of experts in civil

4    litigation, the different between liability and

5    damages experts and the roles of reach.

6        Q.   What was the nature of your lectures at

7    Drexel?

8        A.   Drexel would be on the same topic some

9    of the times.  Other times it dealt with

10   deposition practice, the students are within

11   their trial advocacy class and then they have a

12   deposition section and I would work with the

13   students on deposing experts and then we run

14   through a vignette and let them depose me for a

15   while.

16       Q.   What were the subject matter of your

17   lectures -- I believe you said it was the

18   University of Baltimore.

19       A.   Baltimore would be similar to that of

20   Villanova, working with experts and some

21   litigation, what civil litigation looks like

22   outside of your tort textbook.

23       Q.   Have you completed your response?

24       A.   Yes.

25       Q.   What was the subject at of your lectures

1                    C. Staller - Confidential

2    at the University of Pennsylvania School of Arts

3    and Sciences?

4        A.    That dealt with labor economics, survey

5    of what economists -- this is several years

6    ago -- I believe it was a survey of economic

7    issues in the labor market.  That also talked

8    about what economists may do as forensic

9    economists.

10       Q.    With respect to your lectures at

11   Villanova Law, did those concern economics?

12       A.    Yes.

13       Q.    What aspect of economics did the

14   Villanova lectures encompass?

15       A.    Present value, marginal loss analysis,

16   human capital models.

17       Q.    Did any of those lectures -- did any of

18   those lectures relate to the subject matter of

19   evaluating the labor market after the separation

20   of employment for an individual?

21       A.    My lectures would discuss that at my

22   employment at Temple.

23       Q.    So that's a not included in what you did

24   at Villanova, is it?

25       A.    I don't -- I don't recall that being

1          C. Staller - Confidential

2    discussed at Temple.

3        Q.    I'm asking you about Villanova.

4        A.    Sorry.  Villanova?

5        Q.    Yes.

6        A.    I don't recall that being discussed at

7    Villanova.

8        Q.    Did your Villanova lectures cover

9    potential employment opportunities and

10   identifying those relevant opportunities?

11       A.    At Villanova?

12       Q.    Yes.

13       A.    I don't recall.

14       Q.    Did your work at Villanova involve

15   pairing labor and economics data with job search

16   efforts?

17       A.    I don't recall.

18       Q.    What about at Drexel?

19       A.    At Drexel -- I believe I discussed that,

20   yes.

21       Q.    With what about at the University of

22   Baltimore?

23       A.    No, I don't believe so at the University

24   of Baltimore.

25       Q.    What about at the University of

1               C. Staller - Confidential

2     Pennsylvania?

3          A.    Labor economic issues I lectured on

4     there.  I don't know if pairing the two

5     together -- I don't recall that but I know it was

6     the topic of labor economics.

7          Q.    Are you familiar with the Journal of

8     Applied Psychology?

9          A.    No.

10         Q.    Are you familiar with the Journal of

11    Business in Psychology?

12         A.    No.

13         Q.    Do you use either of those two journals

14    in the course of your professional duties at

15    CFES?

16         A.    No, I'm not aware of them.

17         Q.    Have you won any awards for research?

18         A.    To the extent that the awards that I

19    received that are identified on my CV are related

20    to specific matters and my work in specific

21    matters, those matters all require research.  So

22    I would say, yes, to your question.

23         Q.    None of the awards were directly as a

24    result of research performed or on the basis of

25    research performed, correct?

1              C. Staller - Confidential

2       A.   Right.  So if your question is saying

3    was an award directly tied to one specific type

4    of research, true, my awards were not for one

5    micro or specific type of research.

6       Q.   And you don't have any award-winning

7    research, do you?

8       A.   Collectively I would say, yes.  But,

9    again, as far as one specific investigation or

10   one specific topic, no.

11      Q.   When you say "collectively," what are

12   you referring to?

13      A.   The awards that are identified on page

14   one of my curriculum vitae being recognized --

15   unfortunately several years ago as I get older --

16   for the "Top 40 under 40" for my work as a

17   forensic economist.  My work as a forensic

18   economist relates to doing research in a specific

19   case, developing economic loss models and then

20   either testifying to those conclusions or

21   drafting reports to those conclusions.

22           Likewise, having received the best of

23   award through The Legal Intelligencer for best

24   economist from the years 2010 through 2021 -- it

25   says 2018 on my CV -- I have to update that.

1                C. Staller - Confidential

2    Same answer, that's being derived and awarded for

3    my work and research on specific matter.

4        Q.   Do any of those awards relate to

5    comparing the job search efforts of a terminated

6    individual to available employment opportunities?

7        A.   Again, to the extent that my work as a

8    labor economist in my field of forensic

9    economics, yes.

10       Q.   What do you mean by that?  Do you

11   receive an award for comparing job search efforts

12   of a separated employee to their available

13   opportunities for employment?

14           MS. PRIMAVERA:  Objection.

15       A.   So it would be my same answer to your

16   same question.  It would be -- again, from a

17   collective process as a forensic economist, a

18   portion of my work -- we discussed now that

19   roughly 1,000 matters that I've worked on are

20   related to labor economic issues.  Some portion

21   between greater than 100 or up to 1,000 are

22   related to the application of a job search

23   efforts of a specific plaintiff compared to

24   relative labor market data.  To the extent that a

25   portion of my work there was recognized and I was

1                    C. Staller - Confidential

2    awarded for that work as either a Top 40 Under 40

3    through the organization, NACVA or recognized

4    through Legal Intelligencer's Best Of survey for

5    my work in my field as a forensic economist,

6    which again a good portion is labor economics, a

7    good portion is the application of the labor

8    market compared to a specific person's job search

9    efforts, I've been recognized for that work.

10            On an individual basis for one specific

11   research project, no.

12       Q.    Thank you.  Have you received any

13   specific awards connected to research in the

14   field of job searching?

15       A.    I'm not aware if search award exists.

16       Q.    Have you received any awards

17   specifically tied to efforts to compare the

18   similarity of jobs?

19       A.    I've never seen such award existing on

20   that topic.

21       Q.    Have you done work developing selection

22   procedure for jobs?

23       A.    I don't understand the question.

24       Q.    Have you done any work related to the

25   process for selecting candidates for employment?

1          C. Staller - Confidential

2     A.   To the extent as our firm's president

3     and I've hired and terminated individuals, the

4     answer would be yes.

5     Q.   Other than in your position as the

6     president of an organization that conducts its

7     own hiring, have you done any other work

8     developing selection procedures for selecting job

9     candidates?

10     A.   No.

11     Q.   Have you done any work concerning the

12     validation of selection procedures for hiring

13     candidates?

14     A.   It would be the same answer with regard

15     to operating and hiring and firing for CFES since

16     2008.

17     Q.   Have you received any training

18     concerning the comparison of one job to another

19     job?

20     A.   So I can't answer yes or no to that.

21     That's, obviously, a broad question.  Can you

22     refine the question.

23     Q.   Are you familiar with the field of

24     industrial organizational psychology?

25     A.   I'm aware of it as a field.

1          C. Staller - Confidential

2     Q.   Do you know what general subject matter

3   of that field pertains to?

4     A.   Psychological issues related to the

5   operation of the firm.

6     Q.   Do you know whether industrial

7   organizational psychologists regularly use the

8   science of job analysis?

9     A.   I don't know.

10     Q.   Are you familiar with the science of job

11   analysis?

12     A.   How are you defining the term?

13     Q.   I'm defining the term the way it's used

14   within the field of industrial organizational

15   psychology.

16     A.   I can't say yes or no because I don't

17   know how they're defining the term.

18     Q.   So you're not familiar with the science

19   of job analysis as it's performed by those in the

20   field of industrial organizational psychology,

21   correct?

22          MS. PRIMAVERA:  Objection to form.

23     Mischaracterizes the testimony.

24     Q.   You can answer the question.

25     A.   I don't know because I don't know how

1                 C. Staller - Confidential

2     they're defining it.  Unless you want to provide

3     me the definition, I can answer the question.

4         Q.   It's fair to say you're not familiar

5     with the definition of job analysis as practiced

6     by industrial organizational psychologists,

7     correct?

8         A.   Not off the top of my head, correct.

9         Q.   Okay.  Do you know whether the science

10    of industrial organizational psychology is used

11    for a wide array of activities, including

12    generating job descriptions?

13        A.   I don't know.

14        Q.   Do you know whether acute principle from

15    a scientific standpoint in building such systems

16    is that they accurately reflect the job?

17        A.   I'm not familiar with how you're using

18    the word "they" in your question.

19        Q.   I'm referring to industrial

20    organizational psychologists.

21        A.   Can you restate the question.

22             MR. BERMAN:  Can you please read back

23        the question, Toni.

24             (Whereupon, last question read back.)

25        A.   I don't understand your question.  Can

1                    C. Staller - Confidential

2    you rephrase it, please.

3               MR. BERMAN:  Toni, can you read it one

4        more time.

5               (Whereupon, last question read back.)

6        Q.   Do you know that there's a science used

7    in connection with generating job descriptions?

8        A.   I don't know.

9        Q.   Do you know anything about that science?

10       A.   To the extent there is a science being

11   applied in a specific job or every job, I don't

12   know.  But if there is science, I'm not aware of

13   that science.

14       Q.   Are you aware of any science concerning

15   the creation of hiring and promotion assessments?

16       A.   Is your question now the science of

17   hiring and promotion assessments?

18       Q.   Creating hiring and promotion

19   assessments, correct.

20       A.   So that's compound.  Can we break it

21   down?

22       Q.   Sure.  Are you aware of the science of

23   creating hiring assessments?

24       A.   I'm aware within hiring practices of

25   various assessments maybe employed to vet various

1          C. Staller - Confidential

2  candidates.  I don't know how you're using the

3  term "science" -- if it's used in a different

4  way.  But I can -- as far as the question is

5  worded, that's my answer.

6      Q.   Are you aware that there's a science

7  that is connected to the creation of those

8  assessments?

9      A.   I can't say on the record that every

10  employer uses science in creating assessments.

11  To the extend that some employers sometime may

12  use a scientific assessment, that's a possible.

13      Q.   Do you recognize that there is a science

14  that can be applied to the creation of hiring

15  assessments?

16      A.   I don't know.

17      Q.   Do you know anything about the science

18  of creating promotion assessments?

19      MR. FORTINSKY:  I am just going to

20      object to form to all these questions about

21      the sign of.  I don't really get what that

22      means.

23      MS. BERMAN:  This witness is presented

24      as an expert witness on topics involving the

25      comparison of jobs.  I'm asking him what he

1              C. Staller - Confidential

2       knows about that science.

3              MR. FORTINSKY:  Well, I don't

4       understand -- biology is a science, it's the

5       study of life; astronomy is a science, it's

6       the study of outer space; chemistry is a

7       science -- I don't understand what it means

8       when you say, you know, the science of job

9       whatever.

10             I mean, what's that the study?  I just

11      don't get this whole line of questions

12      about --

13             MS. BERMAN:  I noted your objection for

14      the record.  Let's move on without the

15      coaching of the witness, okay?

16             MR. FORTINSKY:  Sure.

17      Q.   Sir, do you know anything about any of

18      the subdisciplines contained within the field of

19      industrial organizational psychology?

20      A.    It depends on -- if you identify the

21      sub -- I can tell you whether I'm aware of

22      information.   I don't know about --

23      Q.    Those subfields would include generating

24      job descriptions, are you familiar with that

25      subfield of industrial organizational psychology?

1          C. Staller - Confidential

2     A.   Am I familiar with it?

3     Q.   Yes.

4     A.   Not as a labor economist.  When you use

5    the term "familiarity," I have familiarity.

6     Q.   So you're not an expert in any of the

7    subfields of industrial organizational

8    psychology, correct?

9          MS. PRIMAVERA:  Objection.

10     A.   True, I'm not an industrial

11    psychologist.  That's correct.

12     Q.   Do you have any specialized training

13    concerning establishing the similarity between

14    two jobs?

15     A.   So overly broad and vague, your

16    question.  As it relates to Ms. Fischman, the

17    answer would be, yes, based upon the fact that,

18    again, I've been a licensed attorney since 2001,

19    licensed in three states.  In this specific

20    matter, Ms. Fischman was a licensed attorney that

21    had a legal position within the defendant.  So as

22    job similarity would go, in this particular

23    matter, yes, I have training and experience.

24          So your overall question will depend on

25    the industry and the type of employment a person

1                C. Staller - Confidential

2    had and the nature of employment and the job

3    duties a person has.  But in this particular

4    case, yes.

5        Q.   Wouldn't the expertise you just

6    described the same as any other attorney would

7    have in identifying and comparing attorney jobs?

8             MS. PRIMAVERA:  Objection.  Can you

9        repeat that question back, please.

10            (Whereupon, the last question read

11        back.)

12            MS. PRIMAVERA:  Objection.

13       A.   So this whole line of questioning I'm

14   bit confused, Mr. Berman, because you spent some

15   time going into the concept of comparing and job

16   hiring practices with whatever science there may

17   be for promotion or science you may suggest with

18   request to hiring, promotions, job postings.

19            As explicitly stated in my report and

20   what I've testified to earlier, my role here was

21   to identify opportunities that existed for Ms.

22   Fischman to pursue within the legal field.  My

23   role is here is not to compare her job at

24   Mitsubishi to any of those 6,409 opportunities

25   identified --

C. Staller - Confidential

2    Q.    Was --

3    A.    -- I'm not done with my answer.   I

4  thought one of your rules was not to talk over

5  each other.

6    Q.    Sorry.  Have you completed your

7  response?

8    A.    No, I didn't.

9    Q.    Please continue.

10    A.    I'm happy to continue answering any

11  questions you have.

12           Just so the record is clear, and what

13  the scope of my testimony is today and at the

14  time of trial is, my goal was to look at the

15  opportunities that existed in the New York Metro

16  area for a licensed attorney, similar to Ms.

17  Fischman, based upon her years of experience in

18  the legal market, based upon her experience at

19  Mitsubishi and identify those opportunities she

20  could have pursued.

21           As far as obtainment of those positions,

22  we'll never know because she didn't apply.  We

23  know she made 106 contacts over roughly a two

24  year period.  So that's what I'm looking at, the

25  fruits of her efforts compared to the dynamic

1          C. Staller - Confidential

2    market that existed for an attorney similar to

3    Ms. Fischman.

4          Any questions you have with regards to

5    the receipt of a specific job or comparing one

6    job to the other, my goal here is not to compare

7    job "A" to job "B" but to identify opportunities

8    she could have applied to, interviewed and then

9    she could have determined whether she was a good

10   fit for that job or that employer will make that

11   determination.  Those events did not happen.

12       Q.   Have you complete your response?

13       A.   I have.

14       Q.   Wasn't it part of your job to determine

15   whether the opportunities identified were

16   suitable for Ms. Fischman?

17       A.   Correct.  Suitable in the sense based

18   upon her resume, described work, within her prior

19   job description within Mitsubishi and her work

20   experience and then what the market looked like

21   based upon what Ms. Fischman had done previously

22   as identified to the marketplace she's done

23   previously as identified on her resume.

24       Q.   Let me drill down on that.  Didn't you

25   say you looked at Department of Labor statistics

1          C. Staller - Confidential

2     concerning a specific MSA?

3          A.    Right.  The metropolitan area, yes.

4          Q.    Metropolitan statistical area, correct?

5          A.    Yes.

6          Q.    Doesn't that data derive from US Census?

7          A.    It does, yes.

8          Q.    Do you know how often that data is

9     updated?

10          A.    Which data?  US Census has a lot of

11     data.

12          Q.    Do you know how often the US Census

13     takes place?

14          A.    Well, a full census is every 10 years

15     and then they have more updates throughout that

16     10 year period.

17          Q.    Do you know how often those updates take

18     place?

19          A.    So they're going to ask different

20     questions over different time period.  Your

21     question has to be refined.

22          Q.    The metropolitan statistical area that

23     you included contained jobs from New Jersey,

24     correct?

25          A.    It does, yes.

1                  C. Staller - Confidential

2        Q.    Is Ms. Fischman licensed to practice law

3    in New Jersey?

4        A.    I have to go back to her resume.

5        Q.    We can do that right now if you would

6    like.  Do you have access to her resume?

7        A.    Yes, I'm looking at it now.

8        Q.    I will direct you to page three of her

9    resume.

10           MR. BERMAN:  Can you pull it up, Toni,

11       it was previously marked as plaintiff's

12       Exhibit 6.

13           THE WITNESS:  I think it's on page

14       three.

15           MR. BERMAN:  It should be on the bottom

16       of page three.

17           And let the record reflect the witness

18       is being shown an exhibit previously marked

19       as plaintiff's Exhibit 3 (sic) and

20       specifically his attention is being directed

21       to page marked Def000722.

22       A.   It appears -- to answer your question, I

23    believe the question pending is what bar

24    admissions Ms. Fischman had, correct?

25       Q.   Well, yes, you know what bar admissions

1           C. Staller - Confidential

2    she has, right?

3        A.   It appears, as she represented on her

4    resume, California State license and then the

5    Federal Court appears, Central District of

6    California.

7        Q.   Is Ms. Fischman licensed to practice law

8    in New Jersey?

9        A.   Not as of the time of this resume.

10       Q.   Right.  So would jobs in New Jersey for

11   an attorney be suitable for Ms. Fischman giving

12   her licensing?

13           MS. PRIMAVERA:  Objection.

14       A.   Yes.  For the same reason that her

15   Mitsubishi employment was in New York and she

16   didn't have a New York license or Federal

17   license.  To the extent that she would be using

18   her legal skills for a national -- international

19   company like Mitsubishi that they be a resident

20   or have an office in New Jersey, that would be

21   applicable.  To the extent that many attorneys

22   over years have applied for and received

23   additional bar licenses, such as myself, it's a

24   very feasible idea.  So the mere fact of a lack

25   of a state admission is not dispositive on any

1          C. Staller - Confidential

2     issue or any ability for her to apply or seek

3     again an opportunity in New Jersey.  These are

4     opportunities she could have pursued.

5          Q.    Sir, are you aware that the detail of

6     the job posting that you included in your expert

7     report specifically require licensing in certain

8     states?

9          A.    Some of the opportunities do.  And I'm

10    sure you're well aware, Mr. Berman, the whole

11    idea is creating opportunities that while some of

12    those opportunities may suggest a specific state

13    licensure, once they met Ms. Fischman and saw the

14    breath of her experience and training, then they

15    will be interested in purring suing conversations

16    with her.  So, again, these were opportunities

17    that could have been pursued.

18         Q.    Are you suggesting, sir, that an

19    employer who specifically requires in their job

20    posting a New Jersey license that that employment

21    is still suitable for Ms. Fischman who is not

22    licensed in New Jersey?

23         MS. PRIMAVERA:  Objection.

24    A.    What I'm suggesting is, one, you haven't

25    shown me a specific ad.  If you want to point one

1                  C. Staller - Confidential

2    out we can discuss it.  Some ads may require

3    certain state licensure or suggest certain state

4    licensure.  However, as we all know, what we call

5    in economics and hiring practices a thin down

6    market, these are opportunities that one would

7    explore to see if there's a fit.  Given Ms.

8    Fischman's over 20 years experience in the law,

9    if she was a good fit for the company.  Otherwise

10   state licensure, and that can be acquired through

11   a quick either application process or studying

12   for the bar, that would not be dispositive on the

13   issue not to apply for the jobs based upon her

14   credentials and potential job opportunity.

15       Q.   So it's your testimony that you know

16   better than the employer what qualifications are

17   required for the positions listed?

18            MS. PRIMAVERA:  Objection.  You don't

19       have to answer that question.

20       Q.   You can answer the question unless the

21   attorney instructs you not to answer the

22   question.

23            MS. PRIMAVERA:  Can you rephrase it.  It

24       didn't sound like an actual question.

25            Can you read that back.

1              C. Staller - Confidential

2         (Whereupon, last question read back.)

3         MS. PRIMAVERA:  Same objection and

4      request for Mr. Berman to restate that

5      question.

6         Q.   Is it your testimony, Mr. Staller, that

7      where an employer specifically lists in their job

8      posting the requirement for a New Jersey license,

9      that that position is still somehow suitable for

10     Ms. Fischman to apply to?

11        A.   Given the totality in my experience in

12     the law, which now goes over 20 years, and the

13     hiring practice of lawyers, yes, the mere -- I'm

14     not saying I know better -- I'm saying that's an

15     appropriate opportunity, all other criteria set

16     by Ms. Fischman for a potential opportunity is

17     worth her persuing in her continuing duty to

18     mitigate her damages following her separation

19     from Mitsubishi --

20        Q.   If --

21        A.   If you want to cut me off, we're going

22     to be here all day, Mr. Berman.

23        Q.   I thought you were finished.

24        A.   So with regard to her ongoing duty to

25     mitigate, these are opportunities that would

1          C. Staller - Confidential

2     exist for her to explore.  Would she get every

3     job, no, but would these be appropriate based

4     upon the criteria set forth in my search

5     parameter, her resume, these would be appropriate

6     search opportunities for her to explore.

7          Q.   If the employer lists the requirement,

8     then what scientific or expert basis are you

9     using to counter in the employer's description of

10    the job?

11              MS. PRIMAVERA:  Objection.

12         Q.   What facts are you relying upon to show

13    that an employer who requires or states a

14    requirement for a New Jersey license will

15    actually hire someone without that license?

16         A.   That's not a barrier to entry.  Licenses

17    are obtainable.  She can either -- based upon her

18    experience -- depending on the rules of

19    reciprocity with her California license, fill out

20    the relevant paperwork or she could sit for the

21    bar like many practicing attorneys do if all

22    other criteria of the job was a perfect match for

23    Ms. Fischman.

24         Q.   You listed jobs here --

25              MS. PRIMAVERA:  Mr. Berman -- Mr.

1          C. Staller - Confidential

2     Staller, are you finished with your

3     response?

4          THE WITNESS:  I wasn't, no.

5          MS. PRIMAVERA:  Let's do one at time,

6     please.

7          Mr. Staller, can you continue or do you

8     want the court reporter to read back what

9     you said so far.

10          THE WITNESS:  Can you read back the

11     question, I can finish my answer.

12          (Whereupon, last question read back.)

13     A.   To continue with my answer now on the

14     record, that would be an appropriate opportunity

15     for Ms. Fischman to have sought.

16     Q.   Have you completed your response?

17     A.   Yes, I have.

18     Q.   Can you please turn to page 512 of the

19     expert report.  So we are looking at a sample job

20     listing that you included in your analysis,

21     right?

22     A.   We're looking at one specific one right

23     now.  You said page 512?

24     Q.   Yes.  I just picked one out to look at

25     as an example.  There are hundreds of them,

1                    C. Staller - Confidential

2    right?

3         A.    Hundreds of postings.  I don't know --

4    there's hundreds of postings.

5         Q.    Okay.  So then, for example, this one

6    here says license requirement.  Do you see in the

7    fourth line of the content description?

8         A.    Yes.

9         Q.    It says, "Reviewers on this matter must

10   be licensed and in good standing with the State

11   of New York," right?

12        A.    This was does say that, yes.

13        Q.    Is Ms. Fischman licensed within the

14   State of New York?

15        A.    Not as of the date of -- the resume we

16   were looking at earlier.

17        Q.    In considering what opportunities were

18   suitable for Ms. Fischman, did you include

19   opportunities that she was not licensed to work

20   for?

21        A.    It includes certain opportunities that

22   do have state licensure that at the time Ms.

23   Fischman appears she might not have had.

24        Q.    And you mentioned that in your view it

25   was a possibility for her to get bar reciprocity,

1                    C. Staller - Confidential

2    correct?

3        A.    So I will -- this job was posted in

4    December of 2019.  I believe she separated in

5    January of 2017.  To the extent she wanted to

6    take the bar for the State of New York or any

7    other states to continue her obligation to

8    mitigate her damages, she could have done so.

9    But my opinion is also, yes, that this would be

10    an appropriate opportunity to have reached

11    contact out to.

12            MR. BERMAN:  I object to the

13        nonresponsive portion of your answer.

14        That's not what I asked you.

15            Toni, can you read back the question.

16            (Whereupon, last question read back.)

17        A.    In a general concept, yes.

18        Q.    Do you have any factual basis for

19    considering whether Ms. Fischman was eligible for

20    bar reciprocity with the State of New York?

21        A.    At what point in time?

22        Q.    Any point in time.

23        A.    Again, that's a super vague question.

24    You have to look at standard of a specific

25    clientele.

1          C. Staller - Confidential

2     Q.    Are you suggesting that the standard for

3  bar reciprocity between California and New York

4  has changed during the relevant period of time?

5     A.    I haven't looked into it so I can't say

6  yes or no.

7     Q.    The same question with respect to

8  reciprocity between California and New Jersey,

9  have you looked into that?

10    A.    Again, your question doesn't -- at a

11 certain point in time?

12    Q.    At any point in time, have you looked

13 into the looked into the requirements for

14 eligibility for reciprocity between the State of

15 California and the State of New Jersey?

16    A.    No.

17    Q.    Do you know how often the State of New

18 York offers the bar exam?

19    A.    As of 2021 -- again, you're not

20 referencing your question to any period of time.

21    Q.    At the time of Ms. Fischman's separate

22 from Mitsubishi, do you know how often the State

23 of New York offered the bar exam?

24    A.    As of 2017, I believe twice a year.

25    Q.    So do you know what the earliest point

1          C. Staller - Confidential

2    that Ms. Fischman could have satisfied the

3    requirement for a New York State bar licensing

4    was?

5        A.    February of '17 I imagine she could have

6    sat for the bar.  I don't know the lead time but

7    I believe there's a bar in February and a bar in

8    July.

9        Q.    Your licensed in three states as an

10   attorney, correct?

11       A.    That's true.

12       Q.    How many of those jurisdictions did you

13   sit for a bar examination?

14       A.    Three.

15       Q.    How long did -- which was the first of

16   those three?

17       A.    State of Maryland.

18       Q.    Did you study for the bar for the State

19   of Maryland?

20       A.    I did.

21       Q.    How long did you study for?

22       A.    I guess six weeks.  You finish law

23   school in June and you take it in July.

24       Q.    So can we agree there wasn't a six week

25   period of time between Ms. Fischman's termination

1                C. Staller - Confidential

2    from Mitsubishi and the February bar exam?

3        A.    True.

4        Q.    And do we agree there's an additional

5    period of time after the bar exam is administered

6    before an attorney is actually licensed by being

7    admitted to the bar?

8        A.    Generally, yes.

9        Q.    The second bar exam that you took, did

10   you study for that bar exam?

11       A.    It was the following days of the

12   Maryland bar so it would be the same answer.

13       Q.    So six weeks to study?

14       A.    More or less.  It was contemporaneous

15   with the State of Maryland.

16       Q.    With respect to the third bar exam you

17   took, did you study for that one?

18       A.    A little bit.

19       Q.    What's a little bit?

20       A.    I was a practicing attorney so at night

21   after working all day and taking care of any

22   other obligations, I cracked back open the MDR

23   book -- or whatever books they were -- I forget

24   the acronym -- but the state books.

25       Q.    Is it fair to say that sitting for the

1                C. Staller - Confidential

2     bar exam requires a significant degree of

3     studying?

4          A.     So I can't agree with your qualification

5     of significant.   It requires study.   And, again,

6     you know Ms. Fischman being a licensed attorney

7     has experience in the law, has a leg up on the

8     students who never practiced up.

9          Q.    Let's ask a different question.   I asked

10    you before what the earliest date that Ms.

11    Fischman's --

12               MS. BERMAN:   Withdrawn.

13         Q.    I asked you before whether you included

14    any --

15               MS. BERMAN:   Withdrawn.

16         Q.    When was the first date that Ms.

17    Fischman could have satisfied the requirements

18    for admission to the New York Bar and actually

19    been admitted?

20         A.    Any time since she started practicing

21    for Mitsubishi in New York.   From March of 2008

22    she could have -- at any point in time she could

23    have sat for the bar and taken the bar exam.

24         Q.    Let he me ask the question differently

25    then.

1          C. Staller - Confidential

2          When is the first point in time after Ms.

3     Fischman was terminated from Mitsubishi when she

4     could have been admitted to the New York Bar?

5          A.    Assuming no reciprocity and that it

6     would require the full sitting for the bar --

7     which I'm not sure it does.  But to answer your

8     question, if one sits for the bar, I imagine she

9     would have likely had to take the July of 2017

10    bar and would have been admitted in the fall of

11    '17.

12         Q.    Isn't it correct that you included job

13    opportunities requiring New York State licensing

14    from before that period of time when she could

15    have been admitted to the New York Bar after

16    being terminated from Mitsubishi?

17         A.    Yes.

18         Q.    And didn't you do the same with respect

19    to the State of New Jersey?

20         A.    Yes.  Because I do not view the

21    licensure requirement as a limitation to her

22    seeking opportunities that would otherwise -- her

23    ability and the needs of the employer.

24         Q.    Your view is based upon your opinion,

25    correct?

1          C. Staller - Confidential

2          MS. PRIMAVERA:  Objection.

3     A.    True.

4     Q.    That's based upon your opinion as a

5     labor economist, is that right?

6     A.    My opinion based upon my experience as a

7     labor economist, a lawyer for 20 years knowing

8     that the requirement of a bar licensure would not

9     prevent a candidate, otherwise more qualified,

10    from seeking employment from a specific employer.

11    That is if the employer finds the right match,

12    there are workarounds for the licensure issue,

13    such as we just discussed here, taking the bar.

14    Q.    You're not testifying as an expert

15    lawyer, correct?

16    A.    I'm not -- well, I'm not giving a legal

17    opinion -- I'm not being retained to offer a

18    legal opinion.  I'm being offered to offer my

19    opinions with regard to the labor market for a

20    lawyer, Ms. Fischman, and that's calling upon my

21    experience as a labor economist and a lawyer for

22    over 20 years.  I don't know if I can parse the

23    two out.  I'm not being called to talk about the

24    legal obligations but the problematic obligations

25    as a license attorney who has experience since

1          C. Staller - Confidential

2     1996.

3          Q.   You've been a licensed attorney for

4     20 years, right?

5          A.   Yes.

6          Q.   In your 20 years have you hired other

7     attorneys?

8          A.   I have, yes.

9          Q.   In your 20 years have you ever even once

10    hired an attorney who wasn't licensed in your

11    state?

12         A.   Yes.

13         Q.   What were circumstances surrounding that

14    decision?

15         A.   That the attorney that was hired for the

16    project that was going forward -- even in our

17    state didn't need to have the state license.

18         Q.   So that was in a state where that work

19    wasn't required to be work licensed?

20         A.   No, the projects that this person was

21    being hired for didn't require -- they're a

22    licensed attorney but they weren't filing papers

23    on behalf of third-parties in that specific state

24    so they weren't, I guess, representing or doing

25    legal pleadings in that state.

1                C. Staller - Confidential

2       Q.    So they weren't practicing law in that

3    state, correct?

4       A.    For that project, correct.

5       Q.    Have you ever hired a lawyer to practice

6    law in your state who wasn't licensed in your

7    state?

8       A.    One of the firms I worked at before

9    joining my current employer did, yes.  And then

10   those individuals sat for bar or seek

11   reciprocity.

12      Q.    Again, that wasn't what I asked you but

13   okay.

14           MR. BERMAN:  It's 1:37, would you like

15      to take a lunch break now?

16           MS. PRIMAVERA:  How much longer do you

17      have around?

18           MR. BERMAN:  I'm going to keep going.  I

19      don't know how long it will take.  We have

20      him for four hours is my understanding.

21           MS. PRIMAVERA:  It's up to you, Mr.

22      Staller.

23           THE WITNESS:  Let's take a 10 minute

24      break and then we'll continue.

25           MR. FORTINSKY:  Let's come back at 2:00

1          C. Staller - Confidential

2      to keep it even.

3          (Whereupon, a luncheon recess was

4      taken.)

5      Q.   Can you pull up the expert report and

6  turn to page four.

7      Mr. Staller, I am directing you to page four

8  of your expert report. Is it fair to say in this

9  section of the report you identify what you

10  consider to be the elements of a reasonable and

11  diligent job search?

12      A.   What I identify and the State of New

13  York identify.

14      Q.   Along those lines, in the second

15  sentence of the first paragraph you put in your

16  report the following statement, "To continue to

17  receive unemployment benefits in New York, the

18  unemployment recipient must, at a minimum,

19  perform three work search activities per week."

20      Do you see that statement?

21      A.   Yes.

22      Q.   Do you know whether Ms. Fischman applied

23  for unemployment benefits?

24      A.   I don't know if I ever saw her tax

25  returns.  I don't think I ever saw her tax

1                    C. Staller - Confidential

2    returns.

3        Q.   I didn't ask you about her tax returns.

4    I asked you whether you know if she applied for

5    unemployment benefits?

6        A.   The receipt of unemployment benefits if

7    she did receive them would be identified on her

8    tax returns so that would be a source for me as

9    an economist to verify receipt of such benefits.

10   The application without seeing her tax returns, I

11   don't know.

12       Q.   Aren't there other documents that would

13   reflect whether she received unemployment

14   benefits or applied for unemployment benefits

15   other than tax returns?

16       A.   You could have shared her bank

17   statements.  If she did get it, there would be

18   direct deposits.  There are other financial

19   sources from Ms. Fischman that you could have

20   provided that would allow me to verify that.

21       Q.   Sitting here today do you know whether

22   Ms. Fischman applied for unemployment benefits?

23       A.   I don't know.

24       Q.   Do you know whether she received

25   unemployment benefits?

1                 C. Staller - Confidential

2        A.    Based on your last question and my last

3     answer, obviously, I don't know.

4        Q.    Thank you.  And you've been an attorney

5     for 20 years you said, correct?

6        A.    True.

7        Q.    Did you litigate cases?

8        A.    Yes.

9        Q.    Did you conduct discovery?

10       A.    Yes.

11       Q.    In discovery did you call for production

12    of tax returns?

13       A.    Depending on the claim.

14       Q.    Do you know whether generally speaking

15    tax returns are discoverable?

16       A.    Generally -- well, again, it's

17    depending -- it's a very broad question because

18    from the employment cases that I worked on, yes,

19    they were discoverable.

20       Q.    Do you know what the rule is concerning

21    the discoverability of tax returns?

22       A.    What the rule is?

23       Q.    Yes.  Do you know what the rule is?

24       A.    I currently don't know what the rule in

25    the Second Circuit is on the production of tax

1          C. Staller - Confidential

2     returns.

3          Q.    Turning to third paragraph on this page.

4     Do you see where it says, "According to recent

5     articles for an individual who is not working a

6     reasonable target for the amount of time to spend

7     when searching for a full-time job is anywhere

8     from 25 to 40 hours per week."

9          Do you see that statement?

10         A.    Yes.

11         Q.    What forms the basis for that statement?

12         A.    Footnote 20.

13         Q.    So you're referring to the two citations

14    in footnote 20?

15         A.    Yes.

16         Q.    Is there any other basis for the

17    statement other than the sources cited in

18    footnote 20?

19         A.    I've had conversations -- not in this

20    particular matter with Ms. Wexler -- but over the

21    years I've spoken with Ms. Wexler in other

22    employment matters and she's reiterated that

23    concept that from an employability standpoint

24    similar to what's identified in those articles

25    that the work of the employee or separated

1          C. Staller - Confidential

2     individual is to find work.  So that's -- I've

3     had that conversation with Ms. Wexler.

4          On the US Department of Labor website

5     over the years there's been a discussion on

6     efforts of job seekers that's been identified

7     similar to those figures on the US Department of

8     Labor website.

9     Q.   Any other sources that support your

10    contention 25 to 40 hours a week is a reasonable

11    target for the amount of time for person who is

12    not working to search for a full-time job?

13    A.   It would be what we just discussed and

14    then I've had other conversations with other

15    employability professionals over the years that

16    offer the same findings.

17    Q.   Are you aware of any other articles that

18    support that contention?

19    A.   Articles would be then -- the only one

20    would be this US Department of Labor handbook

21    they have -- it actually used to be posted on the

22    New York Department of Labor website.  I don't

23    know if it currently is.

24    Q.   Are you relying upon those materials in

25    support of this contention?

1                    C. Staller - Confidential

2        A.    Not outside of footnote -- well, it just

3    corroborates -- you asked for all the information

4    I had supporting that statement.  So to answer

5    that question, the primary sources would be

6    footnote 20 as well as the additional information

7    I just provided.

8        Q.    As an expert, your understanding is

9    you're supposed to present the information that

10   you're relying upon within your written report,

11   correct?

12       A.    True.

13       Q.    So is there anything in this written

14   report other than information in footnote 20 that

15   you're relying upon in support of this opinion?

16       A.    No.  Again, your question was "any other

17   sources."  So additional sources, which we would

18   reiterate the same findings as properly cited on

19   footnote 20, would be my conversation with Ms.

20   Wexler and the US Department of Labor guide, as

21   well as speaking to other employability experts.

22            But as far as my opinions are contained

23   right here on page four, are fully cited.  To

24   answer your question to the full extent, that's

25   the answer.

1              C. Staller - Confidential

2       Q.    How did you identify these articles that

3    you selected for footnote 20?

4              MS. PRIMAVERA:  Objection.

5       A.    I don't understand that question.

6       Q.    Well, how did locate the first of these

7    two articles, the balancecareers.com article,

8    "How much time to spend on a job search"?

9       A.    Sitting here today I don't recall.

10      Q.    How did you come across or how did you

11   identify the second of those two; the

12   Iamdiversity.com article, "How much time should

13   you spend on your job search"?

14      A.    Sitting here today, I don't recall.

15      Q.    Generally speaking, if you wanted to

16   answer the question of how much time is

17   appropriate to spend when conducting a full-time

18   job search for a person who is not working, how

19   would you answer that question?

20      A.    (No verbal response.)

21      Q.    To clarify, how would you go about

22   answering that question?

23              MS. PRIMAVERA:  Objection.

24      Q.    Do you understand my question?

25      A.    Now that you rephrased it, can you ask

1                    C. Staller - Confidential

2      it in one coherent question and then I can answer

3      it.

4          Q.   If you wanted to answer the question of

5      how much time is appropriate for a person who is

6      unemployed to spend seeking a full-time job, how

7      would you go about learning the answer to that

8      question?

9              MS. PRIMAVERA:  Objection.

10         A.   Of the topic with employability experts,

11     other individuals, maybe such as headhunters;

12     independent research, such as the US Department

13     of Labor guide and then doing various searches to

14     see what type of information comes about on that

15     topic.

16         Q.   Where would you conduct the various

17     searches you just described?

18         A.   You can look at various state web sites.

19     Some states have more -- the information, such as

20     New York Department of Labor used to post the US

21     Department of Labor guide, which would talk about

22     this topic.  Other states give some specificity

23     to this so the various states' Departments of

24     Labor.  Employability web sites from various

25     practitioners, conversations with employability

C. Staller - Confidential

2  experts.  And then if you want you can always do

3  an initial Google search to see what topics or

4  articles come up from various publications.

5      Q.    Did you do a Google search to answer

6  this question?

7      A.    Did I?

8      Q.    Yes.

9      A.    You already asked that question and I

10  said I don't recall.

11      Q.    I didn't ask you that before.

12      A.    No.

13      Q.    Did you just answer the question?

14      A.    True, I don't recall.

15      Q.    So you the recall whether you did a

16  Google search?

17      A.    To find these articles or to do what?

18      Q.    Did you do a Google search to find these

19  articles?

20      A.    I don't recall.

21          MS. BERMAN:  Toni, let's pull up an

22      exhibit I e-mailed to you entitled "How much

23      time should you spend on your job search."

24          Let's mark this as an exhibit, Staller

25      Exhibit 3.

C. Staller - Confidential

2      (Staller Exhibit 3, marked for

3   identification.)

4     Q.  Mr. Staller, I will represent to you

5  this is a PDF of the Google results that I

6  obtained when I plugged into the search bar, "How

7  much time should you spend on your job search?"

8     Do you see the first result at very top of

9  the page?

10    A.  The first result being?

11    Q.  It says, "Plan around 20 to 25 hours a

12  week."

13    A.  I think the result would -- I don't know

14  if you would call it a result but okay.

15    Q.  Can we agree that's the same source

16  "Iamdiversity.com" that you got this article in

17  footnote 20 from?

18    A.  I can't say that's the same article but

19  that's the same source, I can agree with that --

20  that's the same web page.

21    Q.  Same source.

22    MR. BERMAN:  Toni, if you can scroll

23  down to the next result.

24    Q.  "How much time should you spend on a job

25  search?"  Do you see above that bar it says

1                    C. Staller - Confidential

2    www.thebalancecareers.com?

3        A.    Yes.

4        Q.    That's the same source as the other

5    article in footnote 20, correct?

6        A.    The same source, yes.

7        Q.    So did you just Google these two

8    articles?

9            MS. PRIMAVERA:   Objection.

10       A.    I still don't recall from five minutes

11   ago.

12       Q.    Do you know whether these are peer

13   reviewed sources?

14       A.    I don't know.

15       Q.    Do you know whether they are recognized

16   within the field of labor economists -- labor

17   economics?

18       A.    I don't know.

19       Q.    Do you know whether they're scholarly

20   researched?

21       A.    I don't know.

22       Q.    Do you have any basis from which you can

23   ascertain whether these sources are reliable?

24       A.    I have to look at the articles I pulled.

25   I don't know sitting here.

1              C. Staller - Confidential

2    Q.   Doesn't this article indicate that if I

3    wanted to know the answer to the question of how

4    long an individual who is not working should

5    spent speak seeking a full-time job, I can just

6    Google it?

7            MS. PRIMAVERA:  Objection.

8    A.   I don't understand -- your question is

9    confusing.  Can you restate it?

10           MR. BERMAN:  Can you read back the

11       question, Toni.

12           (Whereupon, last question read back.)

13   A.   It sounds to me the question is

14   mis-worded.  I can't answer that question.

15   Q.   The Google search results that you see

16   on the screen here, don't they reflect that I, as

17   a labor person, got the same answer you got just

18   by Googling the question?

19           MR. FORTINSKY:  Objection to form.

20   A.   I don't know you got the same results.

21   Right now you just showed the front page of a

22   Google search.  I don't know if those are the

23   same articles.

24   Q.   I'll represent to you they're the same

25   articles.

1

2     A.   Mr. Berman, when we started the

3   deposition at 11:00 you went through some rules

4   and those rules are pretty common in depositions,

5   especially on Zoom, it makes it a lot easier for

6   the court reporter and for me if we don't talk

7   over each other.  Multiple times today you

8   interrupted my answer and it messes up my train

9   of thought and it makes the record not clear.

10  I'm sure you're trying to get a clear record as

11  I'm trying to give clear testimony.

12          If you can be so kind just to let me

13  finish my answers and if you have follow-up

14  questions, you paid for four hours and I'm happy

15  to be here for four hours.  I'm not going to rush

16  you, just don't rush me and think we can get a

17  better transcript.

18     Q.   Thank you, Mr. Staller.  I will do my

19  best.  I'm a New Yorker and I do have a tendency

20  to interrupt.  I apologize and will try to limit

21  that.

22     A.   I don't want to guess that you're a New

23  Yorker.  It's a big population.

24     Q.   Thank you, sir.

25     A.   But I didn't get to answer my last

1          C. Staller - Confidential

2     question, you cut me off.  If we can read the

3     last question back, I would like to continue my

4     answer.

5          Q.   That's fine.

6          MR. BERMAN:  Toni, please read it back.

7          (Whereupon, requested portion of

8     testimony read back.)

9          A.   So what's presented here on exhibit --

10    the current exhibit -- I don't know what exhibit

11    it is.

12         Q.   Plaintiff's Exhibit 3?

13         A.   Exhibit 4?

14         Q.   Plaintiff's Exhibit 3.

15         A.   Thank you.  From plaintiff's Exhibit 3,

16    I can't say yes or no because this is just the

17    front page from what I appears to be a PDF

18    snapshot of a Google search.  I can't say yes or

19    no.

20         Q.   Do you know who authored the article you

21    referenced on the Balance Careers web page?

22         A.   Not off the top of my head, no.

23         Q.   Do you know whether that article was, in

24    fact, was authored by a human being?

25         A.   Not off -- I have to look at the

1          C. Staller - Confidential

2     article -- but not off the top of my head.

3          Q.    If that article --

4          MS. BERMAN:  Withdrawn.

5          Q.    Do you though with that article was

6     authored by AI?

7          A.    I have to look at the article.  I don't

8     know.

9          Q.    You understand when I use the term AI, I

10    mean artificial intelligence, correct?

11         A.    That's what I assumed when you were

12    using the acronym, AI.

13         Q.    What about with respect to the other

14    article on Iamdiversity.com, do you know whether

15    that article was authored by a human being?

16         A.    Without looking at the full article, off

17    the top of my head, I don't know.

18         Q.    Do you know whether it was authored by

19    artificial intelligence?

20         A.    Again, without looking at the full

21    article off top of my head, I don't know.

22         Q.    Do you have the full article in your

23    possession?

24         A.    Let me see if I do.  I can take a look.

25         Q.    Are you reviewing one of the articles?

1          C. Staller - Confidential

2     A.   I'm looking for it.

3     Q.   Okay.

4     A.   It appears that the article, how much

5     time should you spend on job a search was

6     written -- again, I've never met Allison Doyle

7     but identifies -- it appears that she's not a

8     computer or artificial intelligence.  It appears

9     Ms. Doyle is one of the industry's most highly

10    regarded job search and career experts.

11    Q.   When you say she's one of the industry's

12    most highly regarded job search experts, what do

13    you base that on?

14    A.   The overview of her looking at her

15    background and experience off of the Balance

16    Careers website.

17    Q.   So it's just based on upon what's on

18    this piece of paper?

19         MS. PRIMAVERA:  Objection.

20    A.   I don't know which piece of paper you're

21    referring to.

22    Q.   The article that you're looking at.

23    A.   So, no, off the article it says you can

24    click on her picture to get more information on

25    her.  So it's just not off the article itself,

1              C. Staller - Confidential

2    it's now coming off what it appears by her

3    biographical background.

4        Q.   You don't have any independent knowledge

5    about her level of expertise do you?

6        A.   I don't have independent knowledge of

7    Ms. Doyle's expertise, no.

8        Q.   You don't recognize her as an expert in

9    her field of study, do you?

10            MS. PRIMAVERA:  Objection.

11       A.   Do I recognize her as an expert?

12       Q.   Yes.

13       A.   In job search activities based upon her

14   article, yes.

15       Q.   So based upon her article you came to

16   that conclusion, correct?

17       A.   Her article and her biography as

18   available on the balancecareers.com.

19       Q.   Do you have any other independent basis

20   for making that assessment?

21       A.   No.

22       Q.   With respect to the article on

23   Iamdiversity.com, do you know was the author of

24   that article?

25       A.   Let me check.  It appears it was

1           C. Staller - Confidential

2     authored -- again, it appears to be an actual

3     human being -- Sean McGuigan, M-C-G-U-I-G-A-N.

4         Q.   Do you have any independent basis for

5     the statement that that person identified is, in

6     fact, a live human being?

7         A.   I mean, I've never taken the person's

8     temperature but based upon the representation on

9     the website that it's authored by a person with a

10    first name and last name, I've accepted it's

11    authored by a real person.

12        Q.   So you don't have an independent basis

13    for making that determination, do you?

14        A.   Outside of this article, I've never met

15    Mr. McGuigan.

16        Q.   Are you aware of Mr. McGuigan being an

17    expert in your field of study?

18        A.   In my field of study?

19        Q.   Yes.

20        A.   I have not seen Mr. McGuigan's

21    biography.

22        Q.   Do you have any other independent

23    awareness of this person, if it is, in fact, a

24    person, their level of expertise in any field?

25        A.   Not outside of this article.

1          C. Staller - Confidential

2     Q.    Thank you.  Turning back to Balance

3   Careers article for a moment -- do you have that

4   in your possession, correct?

5     A.    Yes.

6     Q.    That article is dated June 7, 2020,

7   correct?

8     A.    Yes.

9     Q.    Do you see the second paragraph of that

10   article from where it begins there is no right or

11   wrong answer for or set amount of time?

12     A.    Yes.

13     Q.    Do you factor that into your opinion as

14   to whether a full-time job search should be from

15   25 to 40 hours peer week?

16     A.    Yes.  Again, this article -- you have to

17   read the article in its totality.  Right, I do

18   see that one sentence.  In a broader context, I

19   do factor it in, yes.

20     Q.    Moving on.  Back to the expert report,

21   please.

22          MR. BERMAN:  Let the record reflect

23      we're looking at page five of the expert

24      report.

25     Q.    Sir, I would like to direct your

1                    C. Staller - Confidential

2     attention to the top portion of the page where it

3     says, Section V, "Relevant Employment and

4     Unemployment Statistics."

5          Do you see where I'm directing your

6     attention?

7          A.    Yes.

8          Q.    Okay.  So Table B, listed below the

9     first paragraph there, is entitled "Duration of

10    unemployment, January of 2017."

11         Do you see where I'm looking?

12         A.    Yes.

13         Q.    How did you use the data in this table

14    to formulate your opinion in this matter?

15         A.    As discussed earlier today, this labor

16    market data is the broader swoft (sic) of what

17    the marketplace looked like based upon various

18    demographic criteria similar to Ms. Fischman for

19    what we would have expected for Ms. Fischman to

20    get re-employed or to what would be a reasonable

21    period of time.

22              So, again, this data I take as part of

23    foundational information I used to form my

24    opinions about whether her search was reasonable

25    and diligent and this would be the economic labor

1                    C. Staller - Confidential

2    market statistics that indicate people that are

3    separated from employment based upon the criteria

4    in the category column were able to get

5    reemployed relatively quickly as compared to what

6    Ms. Fischman did.

7         Q.   Have you completed your answer?

8         A.   I have.

9         Q.   Is it fair to call what you just

10   described a methodology?

11        A.   I don't know if I would call it a

12   methodology or more as underlying relevant

13   economic data that's applied in my analysis.

14              I'm not sure what part would be

15   methodology.

16        Q.   Okay.  I think you just said that you

17   applied the data to the methodology, did I get

18   that right?

19        A.   This is one of the data piece that goes

20   into my analysis which forms my conclusions, yes.

21        Q.   If I refer to the phrase application of

22   the duration of unemployment data, can we agree

23   that that's the process that you just described

24   or is there something else we should call it?

25        A.   (No verbal response.)

1          C. Staller - Confidential

2     Q.   I'm just looking for a term that we can

3 use to refer back to the process you just

4 described.

5     A.   The term would be doing relevant

6 economic research and then to gather information

7 than can then be applied to the specifics of a

8 case, such as Ms. Fischman's, and the specifics

9 of Ms. Fischman's situation.  I don't know if

10 there's one simple term that covers all of that.

11     Q.   For the sake of this particular

12 conversation, can we just label this with the

13 term "a process," so we know what we're talking

14 about; is that fair?

15     A.   So just -- I don't mind simplifying it

16 but the process of doing research to come -- to

17 get data that can be applied later on.

18     Q.   Can we call that a research process

19 then?  What are you comfortable referring it to

20 so I don't have to say a full paragraph each time

21 I ask you about it?

22     A.   I would be comfortable calling this the

23 research process with regard to unemployment

24 statistics.

25     Q.   That's fine.  I'll try to remember that

1                C. Staller - Confidential

2    term.  The research process -- what was the rest

3    of it?

4        A.    Applied to unemployment statistics.

5        Q.    Did you use this research process

6    applied to unemployment statistics in previous

7    expert reports?

8        A.    Yes.

9        Q.    Has your use of that research process

10   applied to unemployability statistics ever

11   challenged on a motion to exclude?

12       A.    I don't know.

13       Q.    Do you know whether any Federal court

14   has excluded expert testimony on the basis of the

15   research process applied to unemployment

16   statistics that you just identified?

17       A.    Any Federal court in any case, is that

18   your question?

19       Q.    For now, yes.

20       A.    I don't know.

21       Q.    Do you practice law in the Federal

22   District of the Eastern District of Pennsylvania?

23       A.    Do I practice law there?

24       Q.    Yes, sir.

25       A.    I was licensed there.  I haven't

1          C. Staller - Confidential

2    practiced law since 2005.

3        Q.    Do you know whether any Federal court in

4    the Eastern District of Pennsylvania has excluded

5    expert testimony on the basis of a research

6    process applied to unemployment statistics of the

7    kind you just identified?

8        A.    I don't know.

9        Q.    Are you familiar with the case of

10   Speights, S-P-E-I-G-H-T-S versus Arsens,

11   A-R-S-E-N-S, Home Care, Inc.?

12       A.    Yes.

13       Q.    Does that refresh your recollection as

14   to whether any Federal court has excluded expert

15   testimony on the basis of the research process

16   applied to unemployment statistics?

17       A.    In the matter of Speights v Arsens?

18       Q.    Correct.

19       A.    I'm familiar with that case as I was the

20   defense economist in that case.  To my

21   recollection, the Eastern District Federal Court

22   permitted based upon a motion in limine or a

23   Daubert challenge the complete analysis,

24   including this process, with the one limitation

25   that I could not simply talk about the ultimate

1          C. Staller - Confidential

2     opinion of failure to mitigate.  But other than

3     that, all other opinions and analysis were deemed

4     permissible.

5          Q.   That's your understanding of the

6     decision in Speights versus Arsens Home Care,

7     Inc.?

8          A.   Yes.

9          Q.   Are you aware of whether the Court in

10    that matter considered the use of the forensic

11    job stats database?

12         A.   I know used it in that matter and I --

13    after speaking to that attorney, who I was

14    retained by, I knew I can -- would be able to

15    testify to it.  I don't know if -- the legal

16    opinion.

17         Q.   Do you know whether the use of the

18    forensic job stats database was permitted by the

19    Court in that matter?

20         A.   To the best of my understanding, it was.

21    But, again, my understanding had one limitation.

22    That's my understanding.

23         Q.   That's your understand in the decision

24    in Speights versus Arsens Home Care?

25         A.   Yes.

1              C. Staller - Confidential

2      Q.    Have you reviewed the case?

3      A.    No.

4      Q.    Have you reviewed any cases that allowed

5      the use of the forensic job stats database?

6      A.    I testified to it in other cases.  I

7      haven't done a search with regard -- a legal

8      search with regard to the use.

9      Q.    Are you aware of any Federal case

10     anywhere in United States at any time that

11     allowed the use of the forensic job stats

12     database when challenged on a motion to exclude?

13     A.    I don't know.

14     Q.    In that case was your expert report

15     prepared by you and Steven Dripps?

16     A.    Which case are you referring to now?

17     Q.    The Speights versus Arsens Home Care

18     case?

19     A.    I believe Mr. Dripps cosigned that

20     report, yes.

21     Q.    That was prepared by the Center For

22     Economic Studies, correct?

23     A.    Yes.

24     Q.    Do you know whether that case considered

25     the legal standard applicable to a Daubert

1          C. Staller - Confidential

2     motion?

3          MS. PRIMAVERA:  Objection.

4     A.    I didn't testify at a Daubert hearing.

5     It might have been a paper filing on a Daubert

6     challenge.

7     Q.    Are you familiar with the requirement of

8     Federal rule of evidence 702?

9     A.    I don't have it memorized, no.

10    Q.    Are you familiar with the case of

11    Patrulio versus Teleflex, Inc.?

12    A.    The case sounds familiar but I don't

13    have a memory of it sitting here.

14    Q.    What about the case of Roger versus

15    McCaul?

16    A.    I'm not familiar with that case.

17    Q.    What about the case Costullcio versus

18    International Business Machines, Corp.?

19    A.    I'm not familiar with that case.

20    Q.    Do you know whether any court has

21    excluded a testifying expert's testimony

22    concerning the reasonableness and diligence of a

23    plaintiff's job search efforts?

24    A.    Can I hear the question back.

25          MR. BERMAN:  Can you read it back, Toni.

C. Staller - Confidential

2          (Whereupon, last question read back.)

3     A.    So I have seen in cases and my

4  understanding from speaking to the attorney as

5  retained by the Speights matter, I've seen a

6  limitation of experts not being able to give an

7  ultimate opinion of the plaintiff has failed to

8  mitigate with that ultimate statement being

9  provided.  But otherwise, I have testified to and

10  been permitted to testify to the efforts of the

11  plaintiff without giving the ultimate opinion.

12     Q.    In your expert report that's presented

13  here, aren't you given the ultimate opinion as to

14  plaintiff's reasonableness and diligence of their

15  job search?

16          MS. PRIMAVERA:  Objection.

17     A.    I'm putting forth this statement that,

18  again, based upon Ms. Fischman's reported job

19  search efforts, relevant labor market data, data

20  specific to the MSA we've already discussed, that

21  when you put all that together that her efforts

22  were not reasonable and diligent.  I do not put

23  forth opinion that she failed to mitigate.  It's

24  my understanding that would be the ultimate

25  determination for the trier of fact.

1          C. Staller - Confidential

2          And I testified to these findings in

3     other matters without giving the ultimate

4     opinion.  And my understanding in that Speights

5     matter was as permitted to testify -- the case

6     settled, so it did not get into the courthouse --

7     but in Speights the limitation was I would not be

8     able to testify to ultimate opinion as failed to

9     mitigate but I can discuss the efforts and the

10    labor market for Ms. Speights similar to Ms.

11    Fischman.

12        Q.   Are you aware, sir, your expert report

13    was excluded in part in the matter of Speights

14    versus Arsens Home Care?

15        A.   Yes, I just discussed that with you.  In

16    that case my report did have the language "failed

17    to mitigate" and I was not permitted to testify

18    to that statement of a failure -- has failed to

19    mitigate.

20        Q.   Are you aware, sir, that your testimony

21    concerning the plaintiff's reasonable and

22    diligence was also excluded?

23        A.   I'm not aware of that, no.

24        Q.   Are you aware that your use of the

25    forensic job stats database was excluded?

1               C. Staller - Confidential

2       A.   I'm not aware of that.

3       Q.   Are you aware that the Court found your

4  report did not provide information regarding the

5  reliability of that database?

6       A.   I'm not aware of that.

7       Q.   Are you aware the Court found that there

8  is also no explanation of how the experts used

9  the information from forensic job stats in

10 reaching the conclusion that plaintiff should

11 have found a job in six months or how many jobs

12 must appear in the database to support the

13 conclusion that there were plentiful job

14 opportunities?

15      MS. PRIMAVERA:  Objection.

16      A.   I'm not aware of that.

17      Q.   Do you know whether within the Southern

18 District of New York a testifying expert may

19 opine as to whether a job candidate's search was

20 reasonable or diligent?

21      A.   Not off the top of my head.  I don't

22 know the legal stance.

23      Q.   Do you know whether within the Southern

24 District of New York a testifying expert may give

25 testimony concerning the amount of time a

1              C. Staller - Confidential

2     plaintiff can be expected to find a job within?

3              THE WITNESS:  Repeat the question, madam

4         court reporter -- can you read it back.

5              (Whereupon, last question read back.)

6         A.    That calls for a legal opinion in the

7     Southern District.  I don't know off the top of

8     my head.

9         Q.    So you don't know the answer, correct?

10             MS. PRIMAVERA:  Objection.

11        A.    True, not off the top of my head.

12        Q.    Do you know whether your own testimony

13    on those two questions has previously been

14    excluded in the Southern District of New York?

15        A.    I'm aware of one matter in the Southern

16    District of New York where I was permitted to

17    testify to the mitigation efforts and data with

18    one limitation, that there was one opinion of six

19    or seven within that report that I was not

20    permitted to testify to based upon a lack of -- I

21    believe, the opinion said proper citation for the

22    data source.

23        Q.    Have you completed your response?

24        A.    Now I have, yes.

25        Q.    What matter are you referring to?

1            C. Staller - Confidential

2      A.   Yang v. Navigators.

3      Q.   Okay.  And in Yang v. Navigators did you

4  give an opinion concerning how long it should

5  have taken for the plaintiff to find comparable

6  employment?

7      A.   I provided several opinions with regard

8  to the efforts of the plaintiff and the

9  mitigation efforts of the plaintiff.  I just

10 don't recall the opinions.

11     Q.   So sitting here today you don't know

12 whether one of your opinions concerned how long

13 it would be expected for it to take for the

14 plaintiff to find employment?

15          MS. PRIMAVERA:  Objection.

16     A.   That's a -- can you restate the

17 question.  I don't understand it as worded.

18     Q.   Didn't the Court exclude your opinion

19 concerning how long it would have taken the

20 plaintiff to find employment?

21     A.   In the Yang matter?

22     Q.   Yes, sir.

23     A.   I would have to read the Court's opinion

24 again.  I do not believe I was permitted to

25 testify as a labor economist to every opinion in

1                    C. Staller - Confidential

2     my report except the one.  And I believe the

3     opinion only precluded that based upon what I

4     perceived failure to provide a citation to a data

5     source.

6         Q.    Did you read the opinion?

7         A.    When it was issued six or seven years

8     ago.

9         Q.    If a court told you that your testimony

10    was excluded, would you offer again within the

11    same jurisdiction?

12            MS. PRIMAVERA:  Objection.

13        A.    Again, my exclusion on that one opinion,

14    I was permitted to testify in the Southern

15    District on all the issues of that plaintiff's

16    mitigation issues with the exception of one

17    opinion with regard to a data source that the

18    Court perceived was not properly footnoted.

19    However, it was however was properly cited in my

20    report -- it was fully cited in my report.  It

21    wasn't based upon the opinion itself.  The Court

22    in that matter found there was a lack of

23    citation -- which there was citation, for the

24    record.

25        Q.    In that matter didn't you compare the

1                C. Staller - Confidential

2    plaintiff there to any employee of the age of 25?

3              MS. PRIMAVERA:  Objection.

4        A.   I don't recall.  The matter was, I

5    think, six or seven years ago.

6        Q.   Didn't you compare the plaintiff's job

7    search to the New Jersey guidelines for

8    unemployment benefits?

9              MS. PRIMAVERA:  Objection.  The witness

10             testified that he doesn't recall the

11             opinion.

12       A.   I don't -- I still don't recall

13   specifics on that besides the one limitation and

14   all their opinions were permissible.

15       Q.   In the Speights matter where you used

16   the research process applied to unemployment

17   statistics, did you look at the category of all

18   workers?

19             MS. PRIMAVERA:  Objection.

20       A.   I don't recall.

21       Q.   Did you look at category of women age 45

22   to 54?

23       A.   I don't recall.

24       Q.   Your report here looks at those two

25   categories, correct?

1          C. Staller - Confidential

2          A.   In addition to two others, yes.

3          Q.   Those two others being the management

4     professional and related occupations category,

5     number one; and the manufacturing category,

6     number two, correct?

7          A.   Yes.

8          Q.   What's included within the management

9     professional and related occupations category?

10          A.   I have to go back and look at the DOL

11     footnote.  Sitting here I don't recall all the

12     subcategories or all the job codes within them.

13          Q.   Have you completed your answer?

14          A.   I have.

15          Q.   Do you know whether it includes doctors?

16          MS. PRIMAVERA:  Objection.

17          A.   As I just said, I would have to go back

18     and look at the subclassifications, which I

19     haven't memorized here.

20          Q.   Setting aside whether you memorized it,

21     do you know whether it includes doctors?

22          MS. PRIMAVERA:  Objection; asked and

23     answered.

24          Q.   That's a "no," right?

25          MS. PRIMAVERA:  Objection.  You can

1                    C. Staller - Confidential

2          answer if you understand the question.

3                  Can you read back the last question,

4          please.

5                  (Whereupon, last question read back.)

6          A.    I would have to look at the source.

7          Q.    What about dentists?

8          A.    I have to, again, look at the

9    subclassifications within the broad category.  I

10   don't know that I still have it memorized.

11         Q.    This category includes professionals,

12   correct?

13         A.    It does.

14         Q.    Doctors are professionals, correct?

15                MS. PRIMAVERA:  Objection.

16         A.    Deemed as a professional with a

17   professional degree, yes.

18         Q.    So are dentists, correct?

19         A.    That's my understanding, yes.

20         Q.    And so are dental hygienists, correct?

21                MS. PRIMAVERA:  Objection.

22         A.    I don't know if denial hygienists are

23   treated as professionals.  I would have to,

24   again -- I don't know what source you're using to

25   define that.

1              C. Staller - Confidential

2        Q.    What about engineers?

3              MS. PRIMAVERA:  Objection.

4        A.    Engineers -- engineers I think are

5    typically classified as professionals, yes.

6        Q.    What about teachers?

7              MS. PRIMAVERA:  Objection.

8        A.    From a traditional standpoint, teachers

9    are not defined as professionals.

10       Q.    What about real estate brokers?

11             MS. PRIMAVERA:  Objection.

12       A.    Typically -- again, it depends on which

13   classification.  Typically professionals are

14   limited to individuals who possess a professional

15   degree, which would be juris doctorate, an MD --

16   maybe a DO, and I believe engineers.

17       Q.    And management is also included in this

18   category, correct?

19             MS. PRIMAVERA:  Objection.

20       A.    Which category, professional?

21       Q.    No, this category you utilized;

22   management, professional and related

23   qualifications?

24       A.    Management is part of this category,

25   yes.

1              C. Staller - Confidential

2      Q.   And what is management comprised of?

3           MS. PRIMAVERA:  Objection.

4      A.   Without having memorized the specific

5  definition, typically the individuals that have

6  managerial capacity would be defined as oversight

7  of other employees.

8      Q.   In this matter you relied upon the

9  forensic job stats database, correct?

10     A.   In the last 15 minutes we discussed

11 multiple matters.  When you say "this matter,"

12 what matter are you referring to?

13     Q.   In your expert report, it's he relying

14 on the job stat database, correct?

15     A.   My expert report in Ms. Fischman's case?

16     Q.   Yes.

17     A.   Yes.

18     Q.   Do you know where forensic job stats

19 gets its data from?

20     A.   Yes.  It's --

21     Q.   Is your answer still in process?

22     A.   Yes.  It's -- I think it's like the

23 teletron database -- I'm pronouncing it

24 incorrectly -- but I do, yes.

25     Q.   Sir, are you referring to reference

1          C. Staller - Confidential

2    materials during your testimony now?

3        A.    I'm looking at my report.

4        Q.    Are you looking at any other reference

5    materials?

6        A.    No.

7        Q.    Have you taken any steps to consider the

8    reliability of the data within the forensic job

9    stats database?

10           MS. PRIMAVERA:  Objection.  You can

11       answer.

12       A.    Only to the extent it's -- I look at the

13   published job postings.  That will be the extent

14   of my investigation.

15       Q.    Do you have any other independent basis

16   to ascertain the reliability of the data within

17   forensic job stats database?

18           MS. PRIMAVERA:  Objection.

19       A.    As far as reliability in what regard?

20       Q.    In the Daubert context, do you

21   understand that reliability is the foundation for

22   the admissibility of expert testimony, correct?

23           MS. PRIMAVERA:  Objection.

24       A.    Yes.

25       Q.    So within that context, have you got any

1          C. Staller - Confidential

2    independent knowledge that you can use to

3    ascertain the reliability of the data within the

4    forensic job stats database?

5        A.   Within the definition of "reliability"

6    as used in the Federal Rules of Civil Procedure,

7    yes -- meaning do these jobs actually --

8          THE REPORTER:  I'm sorry, you went out.

9        A.   As the term "reliability" within the

10   Daubert context, that will mean different things

11   for different experts and different sources.

12          As I take it as applied to your line of

13   questioning with regard to the ads themselves

14   that are existing to be are they reliable in the

15   sense that they're presenting actual jobs, I have

16   tested the reliability in other matters, meaning

17   did these jobs exist at that time where certain

18   ads that were pulled from the database were then

19   also corroborated by clients that had those

20   postings that were then put on this third-party

21   source, such as Zip Recruiter.  As far as test

22   reliability and other matters, as to the

23   existence of those ads at that point in time,

24   yes.

25        Q.   Have you tested the existence of any of

1                   C. Staller - Confidential

2     the ads in this expert report that you cited?

3         A.    I haven't -- no, because I would have to

4     go back to the Mitsubishi ad to look -- but I

5     excluded -- and there were some that came up in

6     this matter -- but I haven't done so to date.

7         Q.    Is the forensic job stats database

8     specific to plaintiff's field?

9         A.    Ms. Fischman's field?

10        Q.    Correct.

11        A.    Ms. Fischman as a practicing attorney or

12    corporate counsel?

13        Q.    You tell me.

14        A.    It's specific based upon what she did

15    for Mitsubishi and based upon the work she

16    identified in her resume.

17        Q.    The forensic job stats database is

18    specific to plaintiff's field?

19            MS. PRIMAVERA:   Objection.

20        A.    So maybe you have a vague question.  I'm

21    a glad you're re-asking it because it's probably

22    a bad answer on a bad question.

23            Are you asking does forensic job stats

24    only do lawyers or does it have a database that

25    can query based upon job posts?  I need some

1              C. Staller - Confidential

2    clarification.

3         Q.    Let's do it this way.  What does the

4    forensic job stats database include with respect

5    to the fields or occupations of job hunters?

6         A.    Their database is going to be based upon

7    the SOC codes.

8         Q.    The SOC codes included within the

9    forensic job stats database include codes for

10   fields outside of Ms. Fischman's field, correct?

11            MS. PRIMAVERA:  Objection.

12        A.    In addition to the job codes identified

13   relevant to Ms. Fischman, their database has

14   other job codes, yes.

15        Q.    What job code did you select with

16   respect to the analysis of Ms. Fischman comparing

17   it to the forensic job stats database?

18            MS. PRIMAVERA:  Objection.

19        A.    Lawyers, chief executives -- and with

20   the key words general counsel, chief compliance

21   officer, assistant general counsel, corporate

22   counsel.

23        Q.    Any others?

24        A.    Not for Ms. Fischman, no.

25        Q.    Were there any other SOC codes that you

1                    C. Staller - Confidential

2     considered and rejected?

3          A.    Not for Ms. Fischman, no.

4          Q.    Do you know whether the construction of

5     the forensic job stats database is biased in

6     favor of defendants in litigation?

7               MS. PRIMAVERA:  Objection.

8          A.    I didn't create the database so I have

9     no knowledge of any biases for plaintiff or

10    defense.  I didn't create it.

11         Q.    Did you take any steps to ascertain

12    whether the database was free from bias?

13              MS. PRIMAVERA:  Objection.

14         A.    The database based upon the search

15    criteria in Ms. Fischman's case, based upon the

16    criteria you see on page five would be free from

17    bias.

18         Q.    Are you familiar with the concept of

19    garbage in, garbage out?

20         A.    In what context?

21         Q.    In any context.

22         A.    I'm familiar in the trash context, when

23    you put trash in a garbage.

24         Q.    What about in the context of querying a

25    database?

1           C. Staller - Confidential

2      A.   Well -- I'm not sure in the context of

3   querying a database of how you're using that

4   term.

5      Q.   Is it fair to say, sir, that the quality

6   of the data extracted from the database is based

7   upon the quality of the data put into the

8   database?

9           MS. PRIMAVERA:  Objection.

10     A.   Again, that's a really vague and broad

11  question.  I can say that the information from a

12  database is going to be driven by what's in the

13  database.

14     Q.   In your use of the management

15  professional and related occupations category,

16  did you consider whether any other category would

17  be more appropriate?

18     A.   Based upon the Department of Labor's

19  classification -- now we're referring to Table B,

20  correct?

21     Q.   Correct.

22     A.   So, with regard to the subcategories

23  available, based upon the Department of Labor

24  publication of unemployment data, my attempt with

25  the four presented categories was to provide the

1              C. Staller - Confidential

2    most relevant cuts of the data that existed or

3    that does exist for Ms. Fischman.  So that starts

4    with all workers, that's based upon broadly

5    gender and then within the two most refined

6    occupation categories available to Ms. Fischman.

7        Q.   Did you consider any other categories

8    and whether they would be more appropriate?

9            MS. PRIMAVERA:  Objection.

10       A.   No.

11       Q.   Do the occupational categories that you

12   just identified in Table B differentiate between

13   employees at different compensation rates?

14       A.   In categories -- well, the third row,

15   management, professionals and related

16   occupations, differentiates compared to isolating

17   certain population of the labor force based upon

18   job title, which is then associated with

19   compensation.

20       Q.   Have you completed your response?

21       A.   I have.

22       Q.   Does that category you just identified,

23   management, professional and related occupations

24   include CEOs, chief executive officers?

25       A.   I have to, again, look within the

1              C. Staller - Confidential

2    Department of Labor's definition of what's

3    contained in all those -- in a broad title.  I

4    don't recall sitting here today.

5        Q.   Is there some other management category

6    that chief executives would possibly fall into,

7    other than the management, professionals and

8    related occupations category?

9        A.   I would have to look at the Department

10   of Labor site.

11       Q.   So sitting here today you don't know

12   whether this category includes chief executive

13   officers, correct?

14       A.   True.

15       Q.   You don't know whether it includes

16   dental hygienists, correct?

17       A.   I don't know sitting here.  But again, I

18   don't think within the definition of professional

19   that a dental hygienist would meet that criteria

20   unless the dental hygienist happens to have a

21   doctorate degree.

22       Q.   The duration of unemployment information

23   in this table doesn't differentiate between a

24   chief executive and a dental hygienist, does it?

25       A.   I don't know because I would have to see

1              C. Staller - Confidential

2    where the hygienist is characterized.

3       Q.   What about between a chief executive

4    officer and an engineer?

5       A.   An engineer can be a CEO.

6       Q.   What about a CEO and a non-CEO engineer?

7       A.   Again, CEOs are included within

8    management.  As I already answered, I don't know

9    sitting here.  I have to look at Department of

10   Labor definition.  But if you're asking a

11   hypothetical that they are included, then those

12   would be put together.

13      Q.   Wouldn't one expect the compensation

14   rates for CEOs to be differentiated from that of

15   other professionals?

16          MS. PRIMAVERA:  Objection.

17      A.   So Table B is not measuring

18   compensation, it's measuring how long does it

19   take a person separated from employment to get

20   reemployed.

21      Q.   Sure.

22      A.   I'm not sure of the relevance of

23   compensation to Table B.

24      Q.   Are you aware of any relationship

25   empirically between duration of unemployment and

1                C. Staller - Confidential

2     compensation rates?

3         A.    Not off the top of my head, no.

4         Q.    Do you recall when I asked you if you

5     were familiar with the Costullcio case?

6         A.    Yes.

7         Q.    Are you aware that in that case the

8     trial court excluded the testimony as the

9     testifying witness who relied upon the management

10    professional and related occupations category?

11        A.    No, because I'm not familiar with that

12    case.

13        Q.    Is there a positive correlation between

14    age and duration of unemployment?

15            MS. PRIMAVERA:  Objection.

16        A.    Can you restate -- repeat the question.

17            MR. BERMAN:  Can you read it back,

18        please, Toni.

19            (Whereupon, last question read back.)

20        A.    A correlation statistic just means

21    there's a relationship between two variables.  So

22    there's a -- I don't know how your using the term

23    "positive" in front of correlation.

24        Q.    Is there a relationship between those

25    two variables, age and duration of unemployment?

C. Staller - Confidential

1  C. Staller - Confidential

2     A.   Yes.

3     Q.   What's the nature of that relationship?

4     A.   All other things being equal on average,

5  the older the individual the longer the average

6  duration of unemployment.

7     Q.   In assessing the duration of

8  unemployment, did you consider Ms. Fischman's

9  practice specialties?

10    A.   At Mitsubishi?

11    Q.   Yes.

12    A.   So -- again, the cuts of the data from

13 the Department of Labor do not cut it that

14 granular.  As granular as I can get was within

15 the four categories identified in Table B.

16    Q.   Did you take into consideration the type

17 of clients she had at Mitsubishi?

18    A.   In what regard?

19    Q.   Did you consider the effect of practice

20 specialty upon duration of unemployment?

21         MS. PRIMAVERA:  Objection.

22    A.   So, again, the data from the Department

23 of Labor, unfortunately, does not go into

24 lawyer's subspecialty practices and then cuts

25 duration of unemployment at that granular level.

1               C. Staller - Confidential

2     So that data does not exist.

3          Q.   Did you rely upon your experience as an

4     attorney in making assessments concerning Ms.

5     Fischman's duration of unemployment?

6          A.   My experience as an attorney would be

7     employed with the general conclusions I offered

8     in my report.

9          Q.   Does your report explain how your

10    experience as a lawyer leads to your conclusions?

11               MS. PRIMAVERA:   Objection.

12         A.   With regard to that last question, I

13    think that was explored today.   We just explored

14    that before the break.

15         Q.   Have you completed your response?

16         A.   Yes.

17         Q.   So your expert report doesn't

18    specifically identify how your legal experience

19    led to any of your conclusions, does it?

20         A.   As outlined in my summary on page nine,

21    obviously, those were my conclusions, my

22    findings -- and when I say "my," that's me, Chad

23    Staller, a licensed attorney in three states with

24    20 years experience.   So, obviously, when I'm

25    authoring that report, that has the inherent

1          C. Staller - Confidential

2     background that we covered in my resume and CV,

3     so those are findings that are associated with my

4     background, training and experience.

5          Q.   Sir, I agree with you that your report

6     discloses that you are an attorney and an

7     experienced one.

8          What I'm asking you is whether your report

9     discloses how that experience leads to your

10    conclusions?  That's not contained within your

11    report, is it?

12         A.   My conclusions are based upon my review

13    of Ms. Fischman's documented job search, the

14    broad economic data we just discussed in Table B,

15    and then the more specific data relevant to her

16    MSA from February of 2017 through April of 2020,

17    so it's the blend.  And then my interpretation of

18    that information as a trained lawyer and a

19    trained labor economist making those conclusions,

20    which are set forth on page nine.  And it sounds

21    as if you're suggesting I have to write in every

22    sentence of my report "I, as a lawyer since 2001,

23    finds that Ms. Fischman's job search was

24    insufficient," where I just don't write a report

25    like that.  That's why you have my CV.

1              C. Staller - Confidential

2      Q.    Under Federal Rule of Civil Procedure

3   26(a), aren't you required to explain how you

4   your experience leads to your particular

5   conclusions?

6              MS. PRIMAVERA:  Objection.

7      A.    I have to take a look at 26(a).

8      Q.    Haven't you just testified that you're

9   relying upon your legal experience and not just

10  your economic experience?

11             MS. PRIMAVERA:  Objection.

12     A.    Right.  You had multiple questions

13  throughout today that were specific to Ms.

14  Fischman and several ads with regard to her bar

15  licensure or the lack thereof, where we discussed

16  that at length of why I thought those

17  opportunities would still be specific and

18  relevant to Ms. Fischman to explore.

19             Obviously, in my report that -- I didn't

20  highlight every specific opportunity.  They were

21  attached as attachment one.  So to answer your

22  questions that came up in today's deposition, I

23  answered those.

24             But as far as my background, training

25  and experience that's fully set forth in my

1                C. Staller - Confidential

2   curriculum vita, my methodology to reach my

3   conclusions as fully set forth in my report and

4   the basis for my conclusions are fully set forth

5   in my report.

6        Q.   Let's turn to page eight of your report.

7        Mr. Staller, I direct your attention to the

8   second to last full paragraph.

9        Do you see "As shown in Table B, the median

10  duration of unemployment for categories

11  applicable to Ms. Fischman ranged from 9.6 to

12  17.0 weeks in January -- and it continues from

13  there, right; do you see that paragraph?

14       A.   Yes.

15       Q.   Can I please direct your attention to

16  the last full sentence, which reads:  "In our

17  opinion, had Ms. Fischman conducted a reasonable

18  job search subsequent to her separation from

19  Mitsubishi, she should have found full-time

20  employment within a period ranging from six to at

21  most nine months."  Do you see that sentence?

22       A.   Yes.

23       Q.   How did you come to the determination it

24  would take a period from six to at most nine

25  months?

1          C. Staller - Confidential

2     A.    Going back to Table B -- going back to

3    Table B, the lowest, quickest data point is all

4    workers, which was 9.6 weeks, where overall in

5    the US economy in 2017 it took 9.6 weeks for the

6    50 percent to have obtained re-employment.

7              On the long end looking at the mean of

8    Table B -- the longest mean -- was 36.6 weeks, so

9    that's nine months.

10             So what's included in that would be the

11   manufacturing industry, which Mitsubishi would be

12   part of and her work related to Mitsubishi as

13   corporate counsel would be in there.  And then

14   within management professional and related

15   occupations are also subsumed within that range.

16             So while the data points are from the

17   broader categories, they are providing the two

18   end points from which the more specific

19   categories relevant to Ms. Fischman's work

20   experience are contained.  So that's where that

21   time period is coming from.

22     Q.    How can you make an estimation on how

23   long it would take her to find employment based

24   only upon the mean or a median for a larger

25   group?

1          C. Staller - Confidential

2          MS. PRIMAVERA:  Objection.

3     A.    That's being the most generous, that

4  women or individuals within her more specific

5  occupation or trade have been 26.7 or 30.4 weeks.

6  By suggesting it would take up to nine months,

7  going based upon the broad age and gender

8  category is being conservative.

9     Q.    None of these categories comprise

10  individuals with Ms. Fischman's same

11  characteristics for employment purposes, right,

12  you're comparing her to a larger broader group of

13  individuals from various divers backgrounds,

14  correct?

15          MS. PRIMAVERA:  Objection.

16     A.    No.  So the manufacturing category would

17  contain professionals working in the

18  manufacturing industry, management professional

19  related occupations -- by definition,

20  professionals would be lawyers as defined in the

21  professional trades.  So Ms. Fischman is a lawyer

22  would fit into that category.  So those are the

23  most relevant categories --

24     Q.    Sir, I understand that she is within

25  each of those categories you identified.  But in

1              C. Staller - Confidential

2    addition, there are many other types of employees

3    within each of those categories, are there not?

4              MS. PRIMAVERA:  Objection.

5         A.    There will other occupations, sure.

6    Unfortunately, the Department of Labor doesn't

7    have the resources to only capture the

8    unemployment data for corporate counsel or acting

9    general counsel or acting -- or sorry -- chief

10   compliance officer from a Fortune 100 company.

11   That data just does not exist at that granular

12   level, which is why we -- that's why the

13   Department of Labor categorizes it based upon

14   broader classification of similar situated

15   individuals to provide benchmarks of what we

16   expect based upon the categories identified in

17   Table B.

18        Q.    Okay.  Without that data how can you

19   reliably determine how long it would take

20   somebody to find employment?

21             MS. PRIMAVERA:  Objection.

22        A.    If you look at the overall US economy,

23   all workers.  So, again, what we know as a labor

24   economist "all workers," that will capture highly

25   skilled and unskilled individuals.  So unskilled

1              C. Staller - Confidential

2    individuals as we know from labor economic theory

3    has greater demand of jobs, meaning, more volume.

4    Those individuals that are filing for the retail

5    jobs, the restaurant jobs, general manufacturing

6    jobs.  So there's more individuals that have less

7    academic training than Ms. Fischman in the entire

8    population.  That population took between nine to

9    twenty-three weeks.  Then we cut it based upon

10   age of all vocations -- but as we discussed, Ms.

11   Fischman, while in her forties, is not considered

12   older by general standards in the economy.  That

13   population between 45 and 54 put 17.36 weeks,

14   which is the longest duration you see in that

15   chart.  And as we discussed, there is a

16   correlation between age and average duration.

17   Regardless of vocation -- so people who are

18   unskilled that are older have the longest time to

19   find re-employment, that's what that category

20   represents.

21              Now we have the benefit of applying the

22   attributes to the vocation of Ms. Fischman,

23   management, professional related occupations.

24   Those individuals are now based upon higher

25   education, highly skilled jobs.  We know from

1          C. Staller - Confidential

2     that population that it's taking 13.7, as a

3     medium, to 30.4.  Then we refine the search -- if

4     you don't want to go off her trade or her

5     vocation as a trained lawyer practicing law, you

6     want to go off the industry in which she worked

7     since 2008 within the manufacturing world, we

8     know what that population looks like.  So the

9     data has been cut based upon the criteria for Ms.

10    Fischman.  So this has relevance to Ms. Fischman

11    either by her gender and age, based upon her

12    general participation in the US labor force or

13    more specifically based on her work experience as

14    a lawyer or as an individual working in the

15    manufacturing setting in a professional capacity.

16          So the last two categories may be more

17    specific but the other categories have relevance

18    to Ms. Fischman.  And these provide proxies,

19    which the Department of Labor uses all the time,

20    and we see discussed in the news all the time

21    especially during the COVID world that these

22    provide guide posts to what we expect individuals

23    similar to Ms. Fischman to have found

24    reemployment by.

25      Q.   Have you concluded your response?

1           C. Staller - Confidential

2      A.    I have, Mr. Berman.

3           MS. PRIMAVERA:  Sorry to interrupt.  How

4      much time have we gone today, Ms. Reporter?

5           (Whereupon, an off-the-record discussion

6      was held.)

7           MR. BERMAN:  I think we're getting to

8      the end of this.  I just want to ask a few

9      more questions.

10     Q.    Are you familiar with concept of a

11 confidence interval, Mr. Staller?

12     A.    Yes.

13     Q.    Have you identified any confidence

14 interval in connection with your estimate of how

15 long it should have taken Ms. Fischman to find

16 re-employment?

17     A.    Well, by a confidence interval and what

18 we know from Table Data B and the date captured

19 by the Department of Labor, if we look at the

20 lowest percentage but based upon vocation that

21 67.9 percent, so we know of the entire population

22 of individuals that are identified in management,

23 professional and related occupations, within a

24 half year, 26 weeks, 68 percent of those

25 individuals found re-employment.

1          C. Staller - Confidential

2          If we look with regard to her industry

3    training -- I shouldn't say "training" but

4    industry based experience -- again, not a

5    confidence interval -- I imagine how you're using

6    that term -- there's 74 percent of the population

7    that were unemployed were re-employed within a

8    half year.

9          So by statistical standards, a

10   majority -- an overwhelming majority within those

11   two criteria, found work within, at most, half

12   year.

13         There's nothing to suggest that in Ms.

14   Fischman's background, training or experience she

15   lacked any competency or ability in her skills

16   that would prevent her from being an outlier for

17   the minority of that population.

18   Q.   Have you completed your response?

19   A.   I have, Mr. Berman.

20   Q.   Have you made any calculation of the

21   predictive power of your estimate of how long it

22   should have taken Ms. Fischman to find

23   re-employment.

24   A.   I don't understand how you're using the

25   term "predictive power."

1          C. Staller - Confidential

2     Q.    Have you made any mathematical

3  determination concerning the degree to which your

4  estimate accurately predicts results?

5     A.    That's an impossible -- it's a question

6  with an impossible outcome.  Ms. Fischman --

7  obviously, she hasn't obtained employment except

8  for working with her mother in the real estate

9  field.  By all accounts from her supplied data,

10  she stopped seeking work and my opinion goes

11  towards the opportunities that existed for Ms.

12  Fischman in the New York Metro area for lawyer

13  positions -- legal positions and from all

14  accounts from the published data we have

15  available from the cusp that would be most

16  relevant to Ms. Fischman.  The empirical data

17  concludes that over three -- or just at three

18  quarters of that population obtained

19  re-employment at 27 weeks.  On the low end, two

20  thirds of the population of similar situated

21  co-force found re-employment within 27 weeks.  So

22  the predictive power, you can't test.  That's

23  based upon what has transacted and of a similar

24  situated co-force, we know what transacted and

25  how they found re-employment within a specific

1              C. Staller - Confidential

2    time period.

3         Q.    Have you completed your response?

4         A.    I have.

5         Q.    Do I understand correctly that when you

6    made an estimate of the time that it would take

7    for all workers to find re-employment, right --

8    first category here, correct?

9         A.    Yes.

10        Q.    Do I understanding correctly that when

11   you make that estimate, you cannot -- you can

12   look back later on your estimate and see whether

13   it had any predictive power?

14             MR. FORTINSKY:  Objection.

15        Q.    Do understand my question?

16        A.    (No verbal response.)

17        Q.    If you take a population -- the

18   population of this category, right -- and you

19   make an estimate that it will take between

20   23.7 -- it will take on average -- or I guess

21   you're using "mean" here, that's the average,

22   correct?

23        A.    There's both there, Mr. Berman.

24        Q.    You get the mean and the median, right?

25        A.    That's right.  There's both there.

1              C. Staller - Confidential

2      Q.    So is there any statistical analysis of

3  the predictive power of an estimate of this type

4  on predicting future outcome?

5          MR. FORTINSKY:  Objection.

6      A.    Rephrase the question.  You used

7  "predictive" three times one sentence.

8      Q.    When you use data of this type to make

9  an estimate, how long it would take a population

10  to find re-employment, in the real world can you

11  then later go and look at that population and

12  identify how many of them actually found

13  re-employment in the estimated time period?

14          MS. PRIMAVERA:  Objection.

15      A.    I'm just -- maybe I'm confused by your

16  question.  I probably can't answer it -- but

17  that's what the mean and median are showing.  In

18  the far column on the right-hand side, that's the

19  predictive power, of all individuals that had

20  separated from employment in January of 2017,

21  they found re-employment within 9.6 weeks in the

22  first row -- just to answer your question -- and

23  9.6 weeks or 23.7 weeks.  So I'm confused by when

24  you say "predictive power" because this is

25  recorded -- we're not estimating it -- this is

1                    C. Staller - Confidential

2    what transpired.  We're not going to estimate

3    what that population did, we're reporting what

4    that population did.

5         Q.   This is historical data, correct?

6              MS. PRIMAVERA:  Objection.

7         A.   Correct, this is reported data in that

8    time period.  So we're looking back now in the

9    period of January of 2017 what actually

10   transpired.  I don't see the relevance of

11   prediction.

12        Q.   Let me rephrase the question.

13        Has there been any statistical analysis of

14   whether the historical data predicts future

15   results?

16        A.   The duration of unemployment's dynamics,

17   it's changing months and every year.  So I don't

18   understand that question.

19        Q.   So does that mean that the duration --

20   the historical duration of unemployment does not

21   predict how long it would take someone to find

22   re-employment in the future?

23             MS. PRIMAVERA:  Objection.

24        A.   If I were to use this data as applied to

25   Ms. Fischman or to anybody as of July or August

1           C. Staller - Confidential

2    1st, 2021, I would not use the January dataset.

3    But fortunately for us, we know Ms. Fischman

4    separated from employment in January of 2017 --

5    February of 2017 and we had the benefit of

6    knowing what actually transpired from similarly

7    situated individuals based upon four cuts of

8    Department of Labor data that records -- not

9    predicts -- but records similar to Ms. Fischman

10   when they lost their jobs in that time period.

11   And to Ms. Fischman what do those individuals

12   actually experience in the period of unemployment

13   and what percent of that population got

14   re-employed -- and that's what that far right

15   hand column identifies.  So we don't need to

16   predict.

17          Ms. Fischman was part of that population

18   in February of 2017 and her could work

19   experienced this immediate and median.

20   Obviously, with Ms. Fischman not finding

21   employment, she would be outside the mean and

22   median periods.  But as that central point of

23   central tendency represents, half received

24   employment within those time periods.

25       Q.   Okay.  So this data for the duration of

1                    C. Staller - Confidential

2    unemployment in January of 2017, is that looking

3    at the results from 2017 onward or is that

4    looking for results up to 2017?

5         A.    (No verbal response.)

6         Q.    Does that make sense?

7         A.    Yes.  When did they separate?

8         Q.    Yes.  Like is this chart looking at how

9    long it took people to find employment taken at a

10   point in time in January of 2017 or is this

11   looking at unemployment that started in

12   January of 2017 and looking at it at some later

13   date?

14        A.    It's looking at people that separated in

15   January of 2017 and what it took those

16   individuals.

17        Q.    So when is it measured to -- if they

18   separated in January of 2017, when it is measured

19   to?  When does it stop tracking it?

20        A.    So with regard to the mean -- well,

21   27 weeks would be the second week of July -- or

22   actually it would be through January -- it would

23   be through January so it would be through the

24   first week of August of that respective year,

25   '17.

1          C. Staller - Confidential

2              They stopped tracking because the

3     mean -- the mean gets pulled out by the details,

4     quick hires and no hires.  After a certain time

5     point we stop tracking from the mean.  I forget,

6     it's like 100 weeks -- I forget the period.

7          Q.   100 weeks is a little less than two

8     years, right, that would be until December of

9     2019, is that correct?

10         A.   100 weeks with regard to the case

11    specific for Ms. Fischman, yes.

12         Q.   100 weeks from January of 2017 is

13    approximately December of 2019, do we agree?

14         A.   Approximately, yes.  As an

15    approximation, yes.

16         Q.   If you were looking at this table in

17    December of 2019, would there be any material

18    difference between what it says now and what it

19    says in December of 2019?

20         A.   Not for the January of 2017 data because

21    that's already established, no.

22         Q.   That's my question.  Thank you.  So if

23    you were looking at this table in December of

24    2019, would that enable to you to make a

25    prediction in December of 2019 about how long you

1             C. Staller - Confidential

2    expect it to take someone in the manufacturing

3    category to obtain re-employment if they were

4    separated in December of 2019?

5        A.    No.  You would use the December -- you

6    would have to -- the December -- if they were

7    separated in December of '19, you would not use

8    the January of 2017 data.  The data from the

9    January of 2017 dataset would be the stragglers

10   that are --

11       Q.   So if you were looking at the January of

12   2017 data in Table B -- if you were looking at

13   that information in December of 2019, is it

14   correct to say that you would not be able to use

15   that data to predict how long it would take

16   someone who was separated from employment in

17   December of 2019, you wouldn't be able to use

18   that to figure out an estimate of how long it

19   would take them to find reemployment; is that

20   correct?

21       A.    I'm confused by your question.

22       Q.   Okay.  If you have -- if it was -- if

23   you were looking at Table B in December of

24   2019 -- I think you told me the data would be

25   substantially the same as it is now, correct?

1          C. Staller - Confidential

2     A.    Right, it would be the exact same data

3  because this data been stagnant since January of

4  '17.

5     Q.    So it's stagnant data as of the point in

6  time of December of 2019, correct?

7     A.    2017.

8     Q.    The 2017 -- the January of 2017 data is

9  stagnant as of December of 2019, isn't it?

10    A.    Yes.  I understand your question now.

11  Correct.

12    Q.    We have a snapshot in time of

13  December of 2019 that has this data in it that is

14  presented in Table B, right?

15    A.    If I looked up the duration of

16  unemployment as of January of 2017, two years ago

17  in, January of 2019, you would get the status

18  set.

19    Q.    I want to stick with December of 2019,

20  if that's okay.  If you looked up this data in

21  December of 2019, it would say the same thing it

22  says now, right?

23    A.    The data published in Table B, yes.

24    Q.    If you had the data as published in

25  Table B, in December of 2019 would you be able to

1          C. Staller - Confidential

2    use that data to make any prediction about how

3    long you would expect it to take someone in the

4    manufacturing category who was severed from their

5    employment in December of 2019 to find

6    re-employment?

7          A.    You can use this dataset in your

8    hypothetical but there would be more updated

9    data -- more contemporaneous to that separation.

10   In your hypothetical, if this person separated in

11   the manufacturing industry in December of '19,

12   you would not use the data from Table B.

13         Q.    So you wouldn't be able to use the --

14         A.    I wasn't done, Mr. Berman.

15         Q.    Okay.

16         A.    You would be using -- I'm not sure how

17   you're using it or why you're using because your

18   hypothetical is not complete -- but if you're

19   just looking at the data itself, there would be

20   data contemporaneous to that person's separation

21   in December of '19 that you would not have to

22   rely upon the January of 2017 data published in

23   Table B if we were trying to explore how long

24   that newly separated person to have unemployment

25   for.  There would be data surrounding that

1              C. Staller - Confidential

2      separation in a time period context.

3          Q.    Have you completed your response?

4          A.    I have now, Mr. Berman.

5          Q.    In making your estimate of how long you

6      would have expected Ms. Fischman to take to find

7      re-employment, did you consider the impact of her

8      job references?

9          A.    Not specifically, no.

10         Q.    Do you know whether there's a

11     relationship between the duration of unemployment

12     and your job references as an applicant?

13         A.    I don't think one can draw a direct

14     correlation.  I think that will go into multiple

15     factors and attributes and the dynamics of the

16     job applicant, job posting, the presentation of

17     the person, their experience and the job they're

18     seeking.  I don't think it's as simple as saying

19     one to one.

20         Q.    That's fair.  Is it fair to say that one

21     of the factors to be considered within the

22     duration of unemployment would be the quality and

23     quantity of the person's references?

24             MS. PRIMAVERA:  Objection.

25         A.    I can't say that the references or lack

1                    C. Staller - Confidential

2    thereof draws a direct relationship to the

3    duration of unemployment, no.  It's much more

4    dynamic than what another person says about them.

5        Q.   You consider the number of references

6    Ms. Fischman had in estimating how long you would

7    expect her to find re-employment, correct?

8        A.   I did not consider the number of

9    references, no.

10       Q.   Did you consider whether she had a

11   reference available from Mitsubishi in connection

12   with your determination of her duration of

13   unemployment?

14            MS. PRIMAVERA:  Objection.

15       A.   I don't know about any references she

16   may or may not have had from Mitsubishi so it

17   wasn't considered.

18       Q.   In connection with the job listings we

19   saw in the forensic job stats database, do you

20   have any information about the market share of

21   the different job boards that are referenced in

22   that dataset?

23            MS. PRIMAVERA:  Objection.

24       A.   I'm not sure what market share you're

25   referring to.

1              C. Staller - Confidential

2       Q.   Well, there are different job boards

3    listed in the job postings within the dataset you

4    looked at, right?

5       A.   Yes.

6       Q.   There are many different job sites

7    listed in those job postings, correct?

8       A.   Yes.

9       Q.   Do you have any information concerning

10   the market share that those various job search

11   sites have in the marketplace?

12      A.   No, not off the top of my head.

13      Q.   Is there any field within the discipline

14   of forensic economics that considers the market

15   share of job search boards?

16      A.   Not that I'm aware of.

17      Q.   You testified earlier you have some

18   level of knowledge concerning a plaintiff's duty

19   to mitigate, correct?

20      A.   Yes.

21      Q.   Are you aware what the doctrine of

22   lowering your sites?

23      A.   Generally.

24      Q.   Did you complete your response?

25      A.   I did, yes.

1                C. Staller - Confidential

2      Q.   Did you consider that doctrine in your

3   assessment of the mitigation of plaintiff's

4   damages?

5           MR. FORTINSKY:  Objection to form.

6      A.   To the extent she just transitioned her

7   career into real estate.

8      Q.   Other than that, did you factor in the

9   doctrine of lowering your sites?

10     A.   Typically my experience of the doctrine

11  of lowering sites where it relates to the

12  residual earnings level of an individual that

13  they can't find the same level of pay, lower

14  their sites with regard to compensation.  I'm not

15  familiar with it with regard to job search

16  activity, with regard to the efforts.  But as far

17  my experience with it is with regard to the

18  residual earning ability of a person.

19     Q.   Are you familiar with O*NET?

20     A.   Yes.

21     Q.   Do you consult O*NET in connection with

22  this assignment?

23     A.   No.  Again, my experience with O*NET is

24  with regard to the specific level of earnings,

25  not so much of opportunities or employment

1                    C. Staller - Confidential

2      opportunities.

3          Q.    Okay.  Is it fair to describe O*NET as a

4      content model?

5              MS. PRIMAVERA:  Objection.

6          A.    I'm not sure how you're using content

7      model.  It's database.  I don't -- most of

8      databases are content.

9          Q.    Do you know whether the O*NET database

10     incorporates knowledge, skills and abilities?

11             MS. PRIMAVERA:  Objection.

12         A.    I didn't use it in this case so I didn't

13     look at it.

14         Q.    Did you conduct any analysis of the

15     knowledge, skills and abilities applicable to Ms.

16     Fischman's positions that she was separated from?

17             THE WITNESS:  Can you repeat the

18         question.

19             (Whereupon, last question read back.)

20         A.    Based upon her resume and answer to

21     interrogatories, I was aware of her work at

22     Mitsubishi.  I'm not sure how else you're using

23     it in that question.

24         Q.    Did make -- are you familiar with the

25     concept of transportability of skills?

C. Staller - Confidential

1

2      A.   Yes.

3      Q.   Did you make any analysis of the

4  transportability of the knowledge, skills and

5  abilities of Ms. Fischman's former jobs?

6      A.   Yes, as outlined in her CV and that's I

7  think exactly what shows in page seven of my

8  report.

9      Q.   That's what you would look for in an

10  analysis of knowledge, skills and abilities?

11      A.   Well, as earlier testified to, I'm not a

12  vocational expert.  But with regard to your

13  question, when you say transportability, I mean,

14  typically it's referred to as transferrable skill

15  set.  You see in her resume all of her background

16  and experience with regard to providing legal

17  counsel and advice on various legal matters at

18  either corporations or in private firms and

19  that's what the graph represents on page seven of

20  my report.  When you search, you control for some

21  of her experience -- I'm not suggesting Ms.

22  Fischman -- because that would outside my area of

23  expertise -- that she should become a financial

24  adviser or she should become a manufacturing

25  plant supervisor, I'm taking what she identified

1          C. Staller - Confidential

2     of her resume, key words, key terms that she

3     identified in her resume and using that through

4     the forensic job stats dataset to define relevant

5     and applicable job she could have sought based

6     upon what identified by Ms. Fischman.  I'm not

7     transferring her into a different industry or

8     occupation.

9          Q.   So you're not expressing any opinions

10    about the similarity of Ms. Fischman's job to any

11    other jobs, correct?

12          MS. PRIMAVERA:  Objection.

13          A.   Correct.  I think this was discussed

14    around your questioning of science and science

15    and more science.  But similarity, correct.

16          What I've identified here for Ms.

17    Fischman and what I've opined to is the number of

18    opportunities in the legal market that existed,

19    whether similar to Mitsubishi or Raytheon Company

20    or what she did in private practice, I'm not

21    trying to overlap those.  It's a key term

22    analysis based upon what she has identified in

23    her key bullet points on her three page resume

24    with regard to key words that are used to filter

25    out and identify the most relevant jobs in the

1                    C. Staller - Confidential

2     New York Metro area for lawyers from February 1,

3     2017 through April of 2020.

4         Q.   Okay.  So when you used the term

5     "similarly situated" before, you weren't

6     referring to assessing overlap between jobs,

7     right?

8         A.   Correct.  My role here as a labor

9     economist is identify the labor market that

10    existed and the job opportunities that existed.

11    I'm not here to say job on page 300 had nine of

12    the ten attributes that she had at Mitsubishi as

13    acting general counsel or chief compliance

14    officer.  My role here is to say there are other

15    jobs that could have been pursued and

16    investigated by Ms. Fischman after her date of

17    separation through the current date to show are

18    her 106 contacts reasonable or unreasonable based

19    upon what the marketplace -- it's a benchmark

20    study that indicates were her efforts based upon

21    her supplied documentation exhausted and complete

22    or was there more work and more of the labor

23    market she could have pursued as far as legal

24    opportunities.

25        Q.   In making those determinations, did you

1                C. Staller - Confidential

2    consider the length of time that any of these

3    jobs were posted?

4        A.    No.  My experience -- these jobs tend to

5    post per 90 days and they may be reposted and

6    that's why I identify them as opportunities.  To

7    the extent that an employer would repost it, it

8    was still an opportunity that if Ms. Fischman

9    didn't see it in February of '18, she could have

10   applied for it in March of '18.  So I identified

11   them as opportunities.

12       Q.    Did you take into account that a number

13   of these don't list the poster, they say poster

14   not listed, right?

15       A.    That's true.

16       Q.    Did you factor that into the analysis?

17       A.    No.  That would be an opportunity for

18   Ms. Fischman to explore.  Because it's not posted

19   doesn't mean it wouldn't be a relevant employer

20   for her to consider.

21       Q.    Did you factor in whether Ms. Fischman

22   had enough experience for each of the jobs

23   posted?

24           MR. BERMAN:  I hear somebody in the

25       background.

1                    C. Staller - Confidential

2        Q.   Did you take into account Ms. Fischman's

3    experience in connection with the jobs that were

4    posted, whether she had enough experience?

5            THE WITNESS:  I think that prior voice

6        was Mr. Berman's AI.

7            MR. BERMAN:  I've been accused AI

8        before, I won't deny that.

9        Q.   Did you hear my question?

10       A.   Just repeat it, please.

11       Q.   Did you take into account whether

12   plaintiff had enough experience to qualify for

13   the jobs that were posted?

14       A.   The criteria -- if you're using it to

15   say experience not based upon a threshold number

16   of years, obviously, Ms. Fischman has been a

17   licensed attorney since 1996.  So it's experience

18   or the relevance would be based upon the search

19   terms that's identified on page seven.

20       Q.   Did you take into account whether

21   plaintiff had too much experience for any of the

22   jobs listed?

23       A.   No.  Even if they wanted an entry level

24   attorney -- again, this is called the hidden job

25   market where it's worth meeting that employer --

1          C. Staller - Confidential

2   maybe this job wouldn't be right but they would

3   accept her resume or put it on hold for when the

4   right position comes up or they would place

5   knowing she's good a candidate that they don't

6   want to pass up.  So I do not exclude just if she

7   was over qualified.  Again, it's about contacts

8   with employers, getting out as many opportunities

9   as possible.  You have to swing the bat to get a

10  home run.  These are opportunities for her to

11  swing the bat.

12          THE WITNESS:  We're at 4:10.  We're well

13      over four hours now, the time I reserved for

14      the deposition.

15          If you have a couple more minutes, I'm

16      happy to do that but otherwise --

17          MR. BERMAN:  I'm just about finished

18      here.  I appreciate you indulging me.  I do

19      want to wrap this up and I think we're just

20      about there.

21      Q.   Just to clarify, you also considered

22  temporary assignment jobs, right?

23      A.   Yes, I did.  Again, get her foot in the

24  door if that was an appropriate opportunity to

25  explore.

1                    C. Staller - Confidential

2        Q.   And you also considered jobs that were

3    paying significantly less than what she was

4    making in her prior employment, correct?

5            MS. PRIMAVERA:  Objection.

6        A.   The posted -- most jobs don't have

7    dollars posted, there's some that do.  Right, I

8    believe, some of them may be lower than what her

9    annual learning were.  Again, I don't have her

10   tax returns.  But, yes, as far as -- some

11   opportunities may have had lower hourly rate than

12   what Ms. Fischman was making.  But, again, an

13   opportunity she should have explored.

14       Q.   You included, for example, document

15   review assignments, right?

16           MS. PRIMAVERA:  Objection.

17       A.   Yes.

18       Q.   Those are typically engagements that pay

19   lower hourly rates than anything that compares to

20   a general counsel rate, right?

21           MS. PRIMAVERA:  Objection.

22           MR. BERMAN:  I knocked the camera over.

23   Sorry.

24       A.   Generally, yes.  I can't say in every

25   matter, it's going to depend and that's the whole

1           C. Staller - Confidential

2    point of applying, to explore that opportunity

3    and see what it pays and what other opportunities

4    for that firm will be available for some of the

5    credentials for Ms. Fischman.

6        Q.   This analysis is within the context of

7    her duty to mitigate, correct?

8           MS. PRIMAVERA:  Objection.

9        A.   I don't under -- my report is a

10   mitigation report so I don't understand that

11   question as it may be something different.

12       Q.   I'll try to clarify it and I think we're

13   probably done.

14       You mentioned before that your generally

15   aware of the duty to mitigate, right?

16       A.   Yes.

17       Q.   Do you know whether a terminated

18   employee's duty to mitigate includes applying to

19   jobs that pay significantly less than the job

20   they have just been severed from?

21       A.   So that gets into that lower site

22   doctrine.  That after a period of time if you're

23   not successful in your exhaustive search for a

24   certain occupation or job at certain earnings

25   level, one should turn to a lower site.

1          C. Staller - Confidential

2          I don't think Ms. Fischman really got to

3     that level, to be honest, to the extent that what

4     I'm establishing here showing that there were

5     multiple opportunities to the extent that some

6     have lower jobs on a possible per hourly basis or

7     per annum basis.  Those are still contacts Ms.

8     Fischman would want to have pursued, to have

9     those meetings and discussions with the employer.

10     Q.   So just to make sure I understand, isn't

11     it correct that you included jobs or job postings

12     for positions that paid substantially less than

13     Ms. Fischman was earning with without removing

14     any based upon the time period of those posting,

15     right, so you included lower paying jobs from

16     January 30th onward, correct?

17          MS. PRIMAVERA:  Objection.

18     A.   So, again, I haven't seen Ms. Fischman's

19     tax returns.  And with regard to lower hourly

20     rates, some were per diem jobs that may pay than

21     what she made.  It doesn't mean it would have

22     been a relevant job or she would not demanded a

23     higher hourly rate.  What's listed there is not

24     the number that's necessarily settled upon in

25     reaching an employment agreement with that

1          C. Staller - Confidential

2     subsequent employer.  That's the whole reason of

3     meeting, showing your credentials and then

4     negotiating a fair salary.

5         Q.   Isn't that process entirely speculative?

6     For example, if there is a document review

7     position posted, the employer is not going to

8     negotiate to hire you as general counsel, are

9     they?

10             MS. PRIMAVERA:  Objection.

11        Q.   That's speculation, right?  It could

12    happen but it's probably not going to happen,

13    right?

14             MS. PRIMAVERA:  Objection.

15        A.   Right.  I'm not suggesting she become

16    general counsel for that organization.  Can she

17    become a senior associate or a senior team leader

18    on that project based upon wide breath of

19    experience and command more than the hourly rate

20    identified there, I think that's completely

21    possible and not speculation.

22             Ms. Fischman has a fantastic resume with

23    loads of experience and would help many employers

24    and many legal situations.  So the fact that you

25    might apply to a job that says temporary, I don't

1          C. Staller - Confidential

2   think that's prohibitive of anything.

3       Q.   Isn't that presuming that there's a

4   different job available than the one she applied

5   to?

6          MS. PRIMAVERA:  Objection.

7       Q.   I mean, it's not the job posted, right?

8   If the job posted is a document review attorney,

9   you're saying, I guess, it's within the realm of

10  possibility that she can negotiate for some other

11  job.  But doesn't that presume there's an

12  opening?

13      A.   No, it could mean that she takes the

14  document review job for the short term based upon

15  the conversation she could have had with that

16  employer but she did not with that employer but

17  could have pursued and got her foot in the door

18  and did the work on the specific ad she could be

19  qualified for it.  Again, we don't know if it's

20  exactly a lower rate -- you're suggesting it

21  is but we don't know -- and then she could have

22  gone to other opportunities after demonstrating

23  her highly trained skill set she's acquired since

24  1996.

25          MR. BERMAN:  I have no further questions

1                    C. Staller - Confidential

2          for you at this time, Mr. Staller.

3               I want to thank you for your time.  I

4          tender the witness.

5               MS. PRIMAVERA:  I have no questions for

6          the witness.

7               MR. FORTINSKY:  I have no questions for

8          the witness.

9               THE REPORTER:  Would anyone like to

10         order a copy of the transcript?

11              MS. PRIMAVERA:  Copy, please.

12              MR. FORTINSKY:  No copy.

13              (Whereupon, the examination of this

14         witness was concluded at 4:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2            A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK    )
                          : ss
5    COUNTY OF            )

6

7            I, CHAD STALLER, hereby certify that I

8    have read the transcript of my testimony taken

9    under oath in my deposition of July 30, 2021,

10   that the transcript is a true, complete and

11   correct record of my testimony, and that the

12   answers on the record as given by me are true and

13   correct.

14

15

16                    _____

17                         CHAD STALLER

18

19
     Signed and subscribed to before
20   me, this          day
     of                       , 2021.
21

22

23
     _____
24   Notary Public, State of New York

25

1

2                    I N D E X

3   WITNESS           EXAMINATION BY    PAGE

4   Chad Staller      Mr. Berman        5

5

6                    E X H I B I T S

7   PLAINTIFF'S                         PAGE

8   Staller Exhibit 1   Curriculum vitae   10

9   Staller Exhibit 2   Report             24

10  Staller Exhibit 3   Google search      104

11

12              REQUESTS/PRODUCTION

13  PAGE 25 - Fee schedule

14

15

16

17

18

19

20

21

22

23

24

25

1

2          C E R T I F I C A T E

3

4          I, TONI MUSACCHIA, a Notary Public in and

5     for the State of New York, do hereby certify:

6          THAT the witness whose deposition is

7     hereinbefore set forth, was duly sworn by me and

8          THAT the within transcript is a true

9     record of the testimony given by such witness.

10          I further certify that I am not related,

11     either by blood or marriage; to any of the

12     parties to this action; and

13          THAT I am in no way interested in the

14     outcome of this matter.

15          IN WITNESS WHEREOF, I have hereunto set

16     my hand this 30th day of August, 2021.

17

18                    _____

19                         TONI MUSACCHIA

20

21

22

23

24

25

## A

**A-R-S-E-N-S** 118:11
**a.m** 1:15
**abilities** 169:10,15 170:5,10
**ability** 8:16,20 57:6 80:2 91:23 154:15 168:18
**able** 39:7 115:4 119:14 122:6 123:8 162:14,17 163:25 164:13
**abreast** 56:10
**academic** 151:7
**accept** 175:3
**accepted** 22:7 112:10
**access** 78:6
**accommodate** 8:4
**account** 173:12 174:2,11,20
**Accountancy** 14:4,6,9
**accounts** 155:9,14
**accreditation** 12:19
**accreditations** 13:9
**accurate** 26:16
**accurately** 8:17,21 54:21 69:16 155:4
**accused** 174:7
**acquired** 45:3 46:15 81:10 180:23
**acronym** 17:15 89:24 109:12
**acting** 150:8,9 172:13
**action** 184:12
**activities** 9:9 42:25 43:4,13,16,18 48:25 49:22 50:5,14 51:11,23 52:2,16 69:11 95:19 111:13
**activity** 43:7 168:16
**actual** 81:24 112:2 134:15
**acute** 69:14
**ad** 80:25 135:4 180:18
**Adam** 18:6
**Adams** 18:7
**add** 34:2
**addition** 8:8 17:24 129:2 136:12 150:2
**additional** 17:25 26:21 27:6 28:4 43:8 53:3 79:23 89:4 100:6,17
**address** 5:24
**adequately** 53:20
**Adjunct** 58:22
**administer** 4:8
**administered** 89:5
**administrative** 33:15,18 34:3
**admissibility** 133:22
**admission** 16:18 79:25 90:18
**admissions** 78:24,25
**admitted** 89:7 90:19 91:4,10,15
**ads** 81:2 134:13,18,23 135:2 146:14
**advice** 170:17
**adviser** 170:24
**advocacy** 13:17,21 60:11
**affect** 8:16,20
**against-** 1:6
**age** 44:17 128:2,21 142:14,25 149:7

151:10,16 152:11
**Agency** 4:13
**agent** 53:12
**ago** 25:23 61:6 64:15 105:11 127:8 128:5 163:16
**agree** 50:11 51:4 88:24 89:4 90:4 104:15,19 115:22 145:5 161:13
**agreed** 3:4,10,15 4:3
**agreement** 20:10,12,16,17 30:13,14 178:25
**AI** 109:6,9,12 174:6,7
**Allison** 110:6
**allow** 24:23 57:23 96:20
**allowed** 120:4,11
**America** 1:8 2:11
**amount** 23:25 98:6 99:11 113:11 124:25
**analyses** 37:9,11 38:5 40:15
**analysis** 16:3,3 17:5 19:12 22:18 32:25 35:23 36:6,8,19,20,25 37:6 39:13 40:3 54:7 55:18,20,21,22 56:2,24 61:15 68:8,11,19 69:5 84:20 115:13,20 118:23 119:3 136:16 157:2 158:13 169:14 170:3,10 171:22 173:16 177:6
**analyst** 13:11,14
**annual** 176:9
**annum** 178:7
**answer** 6:18,24 7:9,16 27:24 31:10 32:15 35:20 42:21 54:20 56:18 65:2,15 67:4,14,20 68:24 69:3 71:5 73:17 75:3 78:22 81:19,20 81:21 84:11,13 86:13 89:12 91:7 97:3 100:4,24,25 101:16,19 102:2 102:4,7 103:5,13 106:3,14,17 107:8,25 108:4 113:11 115:7 125:9 129:13 130:2 132:21 133:11 135:22 146:21 157:16,22 169:20
**answered** 129:23 141:8 146:23
**answering** 6:9 75:10 101:22
**answers** 107:13 182:12
**anticipate** 6:25
**anybody** 158:25
**apologize** 107:20
**appear** 44:4 124:12
**appearing** 5:10
**appears** 78:22 79:3,5 85:23 108:17 110:4,7,8 111:2,25 112:2
**appendices** 24:22
**Appendix** 25:15,17,24
**applicable** 79:21 120:25 147:11 169:15 171:5
**applicant** 165:12,16
**application** 19:8 56:23 65:22 66:7 81:11 96:10 115:21
**applications** 43:4
**applied** 14:13 18:13 19:12 55:18

63:8 70:11 71:14 76:8 79:22 95:22 96:4,14,22 115:13,17 116:7 116:17 117:4,6,10,15 118:6,16 128:16 134:12 158:24 173:10 180:4
**apply** 75:22 80:2 81:13 82:10 179:25
**applying** 18:25 151:21 177:2,18
**appointment** 56:14
**appointments** 58:20
**appreciate** 175:18
**appropriate** 82:15 83:3,5 84:14 86:10 101:17 102:5 138:17 139:8 175:24
**appropriately** 54:22
**approximate** 20:7 33:3 37:4,23
**approximately** 23:6 37:9 38:5 41:24 51:12 161:13,14
**approximation** 20:8 33:10,25 37:10 37:25 38:13 40:3 161:15
**approximations** 38:8
**April** 45:4 47:19 145:16 172:3
**area** 18:9 45:5,22 47:4 75:16 77:3,4 77:22 155:12 170:22 172:2
**areas** 18:12
**arena** 37:5
**array** 69:11
**arrive** 51:25 52:23 54:11
**Arsens** 118:10,17 119:6,24 120:17 123:14
**article** 101:7,12 104:16,18 105:5 106:2 108:20,25 109:2,3,5,7,14 109:15,16,21,22 110:4,22,23,25 111:14,15,17,22,24 112:14,25 113:3,6,10,16,17
**articles** 98:5,24 99:17,19 101:2,7 103:4,17,19 105:8,24 106:23,25 109:25
**artificial** 109:10,19 110:8
**arts** 59:21 61:2
**ascertain** 105:23 133:16 134:3 137:11
**aside** 26:5 129:20
**asked** 31:12,15 32:5 34:24 35:16,21 35:22 36:7 86:14 90:9,13 94:12 96:4 100:3 103:9 129:22 142:4 141:10 145:8
**asking** 57:7,8 62:3 71:25 135:23
**aspect** 61:13
**assessing** 143:7 172:6
**assessment** 41:4,9 71:12 111:20 168:3
**assessments** 70:15,17,19,23,25 71:8 71:10,15,18 144:4
**assigned** 30:15
**assignment** 34:25 168:22 175:22
**assignments** 37:20 41:3,22 176:15
**assistant** 25:19 136:21

**associate** 179:17
**associated** 139:18 145:3
**assumed** 109:11
**Assuming** 52:14 91:5
**assumptions** 32:5,9
**astronomy** 72:5
**attached** 25:14 146:21
**attachment** 25:4,20 146:21
**attempt** 138:24
**attention** 48:23 78:20 114:2,6
 147:7,15
**attorney** 6:5 15:20 56:19 73:18,20
 74:6,7 75:16 76:2 79:11 81:21
 88:10 89:6,20 90:6 92:25 93:3,10
 93:15,22 97:4 119:13 122:4
 135:11 144:4,6,23 145:6 174:17
 174:24 180:8
**attorneys** 1:20 2:3,7,11,15 7:13
 31:7 79:21 83:21 93:7
**attributes** 151:22 165:15 172:12
**audible** 6:14
**August** 158:25 160:24 184:16
**author** 11:14 111:23
**authored** 108:20,24 109:6,15,18
 112:2,9,11
**authoring** 144:25
**available** 12:11 36:17 65:6,12
 111:18 138:23 139:6 155:15
 166:11 177:4 180:4
**Avenue** 2:8,16
**average** 44:15 52:3,7,8,9,20,24
 53:24 143:4,5 151:16 156:20,21
**averaged** 51:21 52:15
**averaging** 53:6
**award** 64:3,23 65:11 66:15,19
**award-winning** 64:6
**awarded** 65:2 66:2
**awards** 16:19,20 17:3 63:17,18,23
 64:4,13 65:4 66:13,16
**aware** 23:15 63:16 66:15 67:25
 70:12,14,22,24 71:6 72:21 80:5
 80:10 99:17 112:16 119:9 120:9
 123:12,20,23,24 124:2,3,6,7,16
 125:15 141:24 142:7 167:16,21
 169:21 177:15
**awareness** 112:23

**B**

**B** 76:7 114:8 138:19 139:12 141:17
 141:23 143:15 145:14 147:9
 148:2,3,8 150:17 153:18 162:12
 162:23 163:14,23,25 164:12,23
 183:6
**back** 30:7,14,21 31:24 32:4 55:5,7
 55:11 69:22,24 70:5 74:9,11 78:4
 81:25 82:2 84:8,10,12 86:15,16
 89:22 94:25 106:10,12 108:3,6,8
 113:2,20 116:3 121:24,25 122:2

125:4,5 129:10,17 130:3,5 135:4
 142:17,19 148:2,2 156:12 158:8
 169:19
**background** 14:13 15:6,21,23 54:4
 110:15 111:3 145:2,4 146:24
 154:14 170:15 173:25
**backgrounds** 149:13
**backpay** 18:17
**bad** 135:22,22
**balance** 34:3 108:21 110:15 113:2
**balancecareers.com** 101:7 111:18
**ballpark** 37:24 38:19 42:2
**Baltimore** 59:17 60:18,19 62:22,24
**bank** 96:16
**bar** 15:19 78:23,25 79:23 81:12
 83:21 85:25 86:6,20 87:3,18,23
 88:3,6,7,7,13,18 89:2,5,7,9,10,12
 89:16 90:2,18,23,23 91:4,6,8,10
 91:15 92:8,13 94:10 104:6,25
 146:14
**barrier** 83:16
**bars** 15:20
**base** 110:13
**based** 15:2 17:3 31:16 35:24 36:6
 42:13,25 43:8,16,25 44:8,8,10,17
 44:18 45:2 46:6,12 47:14 49:15
 49:24 51:9 52:3 54:4 56:5 73:17
 75:17,18 76:17,21 81:13 83:3,17
 91:24 92:4,6 97:2 110:17 111:13
 111:15 112:8 114:17 115:3
 118:22 122:18 125:20 127:3,21
 135:14,15,25 136:6 137:14,15
 138:6,18,23 139:4,17 145:12
 148:23 149:7 150:13,16 151:9,24
 152:9,11,13 153:20 154:4 155:23
 159:7 169:20 171:5,22 172:18,20
 174:15,18 178:14 179:18 180:14
**basis** 20:23 42:8 54:23 63:24 66:10
 83:8 86:18 98:11,16 105:22
 111:19 112:4,12 117:14 118:5,15
 133:15 147:4 178:6,7
**bat** 175:9,11
**bathroom** 42:22
**Battery** 2:12
**bearing** 16:21
**Beasley** 15:9,15 58:22
**Bee** 4:13
**began** 30:5,19
**begins** 113:10
**behalf** 18:15 93:23
**belief** 5:10
**believe** 8:25 9:24 16:13 24:3 26:21
 30:25 48:12 51:2 60:17 61:6
 62:19,23 78:23 86:4 87:24 88:7
 120:19 125:21 126:24 127:2
 131:16 176:8
**benchmark** 172:19
**benchmarks** 150:15

**beneath** 13:24
**benefit** 34:7 151:21 159:5
**benefits** 95:17,23 96:5,6,9,14,14,22
 96:25 128:8
**Berman** 2:5 5:5,21 6:5 9:8 10:2,8
 12:21 24:4,23 25:25 31:24 34:23
 40:21 42:18 48:20 55:5 56:8
 69:22 70:3 71:23 72:13 74:14
 78:10,15 80:10 82:4,22 83:25
 86:12 90:12,15 94:14,18 103:21
 104:22 106:10 107:2 108:6 109:4
 113:22 121:25 142:17 153:2,7
 154:19 156:23 164:14 165:4
 173:24 174:7 175:17 176:22
 180:25 183:4
**Berman's** 174:6
**Bernard** 18:7
**best** 5:9 6:12,16,23 7:2,8 64:22,23
 66:4 107:19 119:20
**better** 81:16 82:14 107:17
**bias** 137:12,17
**biased** 137:5
**biases** 137:9
**big** 107:23
**billed** 22:18 34:12
**billing** 23:23 30:8,21 34:16
**biographical** 111:3
**biography** 111:17 112:21
**biology** 72:4
**bit** 74:14 89:18,19
**blend** 145:17
**blended** 45:20
**blood** 184:11
**boards** 166:21 167:2,15
**body** 26:7
**bono** 20:22 21:13
**book** 89:23
**books** 89:23,24
**bottom** 24:14 78:15
**break** 8:3,5,7 42:19,22 47:3,23
 48:13,15,15,18 70:20 94:15,24
 144:14
**breakdown** 50:4
**breath** 80:14 179:18
**Brian** 18:6
**brief** 9:12 48:21
**BRITTANY** 2:14
**broad** 19:11 45:20 67:21 73:15
 97:17 130:9 138:10 140:3 145:14
 149:7
**broader** 39:11 113:18 114:16
 148:17 149:12 150:14
**broadly** 139:4
**brokers** 131:10
**building** 69:15
**bullet** 171:23
**bunched** 43:5
**BURMAN** 48:13

**business** 17:17 21:16 34:7 53:17
  63:11 121:18

## C

**C** 1:1 2:1,2 3:1 4:1 5:1,15 6:1 7:1
  8:1 9:1 10:1 11:1 12:1 13:1 14:1
  15:1 16:1 17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1 43:1 44:1
  45:1 46:1 47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1 55:1 56:1
  57:1 58:1 59:1 60:1 61:1 62:1
  63:1 64:1 65:1 66:1 67:1 68:1
  69:1 70:1 71:1 72:1 73:1 74:1
  75:1 76:1 77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1 97:1 98:1
  99:1 100:1 101:1 102:1 103:1
  104:1 105:1 106:1 107:1 108:1
  109:1 110:1 111:1 112:1 113:1
  114:1 115:1 116:1 117:1 118:1
  119:1 120:1 121:1 122:1 123:1
  124:1 125:1 126:1 127:1 128:1
  129:1 130:1 131:1 132:1 133:1
  134:1 135:1 136:1 137:1 138:1
  139:1 140:1 141:1 142:1 143:1
  144:1 145:1 146:1 147:1 148:1
  149:1 150:1 151:1 152:1 153:1
  154:1 155:1 156:1 157:1 158:1
  159:1 160:1 161:1 162:1 163:1
  164:1 165:1 166:1 167:1 168:1
  169:1 170:1 171:1 172:1 173:1
  174:1 175:1 176:1 177:1 178:1
  179:1 180:1 181:1 182:1 184:2,2
**C.V.A** 10:12
**calculate** 52:19
**calculated** 52:20
**calculation** 154:20
**California** 79:4,6 83:19 87:3,8,15
**call** 10:17 26:2 81:4 97:11 104:14
  115:9,11,24 116:18
**called** 24:8 92:23 174:24
**calling** 10:18 92:20 116:22
**calls** 125:6
**camera** 176:22
**candidate** 92:9 175:5
**candidate's** 124:19
**candidates** 66:25 67:9,13 71:2
**capacities** 1:10,11,11
**capacity** 13:7 49:7,17 58:24 132:6
  152:15
**capital** 46:7 61:16
**capture** 150:7,24
**captured** 45:25 153:18
**care** 89:21 118:11 119:6,24 120:17

123:14
**career** 44:6 110:10 168:7
**Careers** 108:21 110:16 113:3
**case** 7:13 10:24 14:14 21:13 23:17
  27:9,13 31:12,15 36:2,4 37:16,18
  39:14 49:11 55:9 56:3 64:19 74:4
  116:8 117:17 118:9,19,20 120:2,9
  120:14,16,18,24 121:10,12,14,16
  121:17,19 123:5,16 132:15
  137:15 142:5,7,12 161:10 169:12
**cases** 20:4,9,11,18,19 21:17 23:4,7
  97:7,18 120:4,6 122:3
**categories** 128:25 138:25 139:6,7
  139:11,14 143:15 147:10 148:17
  148:19 149:9,23,25 150:3,16
  152:16,17
**categorizes** 150:13
**category** 115:4 128:17,21 129:4,5,9
  130:9,11 131:18,20,21,24 138:15
  138:16 139:22 140:5,8,12 142:10
  149:8,16,22 151:19 156:8,18
  162:3 164:4
**census** 77:6,10,12,14
**Center** 10:10 17:12 120:21
**central** 79:5 159:22,23
**CEO** 141:5,6
**CEOs** 139:24 141:7,14
**certain** 36:3 44:18 45:9 47:7,11
  80:7 81:3,3 85:21 87:11 134:17
  139:17 161:4 177:24,24
**certainly** 39:18
**certification** 3:6
**certified** 13:10,13,16,20
**certify** 182:7 184:5,10
**CFES** 17:15,16,17,23 20:20,25 21:8
  24:8 31:7 32:13,21 33:5 34:13
  55:13 63:15 67:15
**Chad** 1:19 5:11,23 10:11 144:22
  182:7,17 183:4
**challenge** 118:23 121:6
**challenged** 117:11 120:12
**changed** 41:22 87:4
**changing** 158:17
**characteristics** 149:11
**characterize** 26:6
**characterized** 141:2
**charge** 34:9
**chart** 50:8 151:15 160:8
**check** 38:22 111:25
**Chemical** 1:8,9,9 2:11,16
**chemistry** 72:6
**chief** 136:19,20 139:24 140:6,12,24
  141:3 150:9 172:13
**choices** 33:2
**Circuit** 56:6,14 97:25
**circumstances** 93:13
**citation** 125:21 127:4,23,23
**citations** 98:13

**cited** 27:6,12 98:17 100:18,23
  127:19,20 135:2
**City** 2:4 45:6
**civil** 4:5 59:25 60:3,21 134:6 146:2
**claim** 19:16 46:5 97:13
**claims** 16:2
**CLARICK** 2:7
**clarification** 136:2
**clarify** 40:6 101:21 175:21 177:12
**clarifying** 13:8
**class** 60:2,11
**classes** 14:12,25 15:2
**classification** 131:13 138:19 150:14
**classified** 131:5
**clear** 75:12 107:9,10,11
**click** 110:24
**client** 20:16
**client's** 31:4
**clientele** 86:25
**clients** 33:6 134:19 143:17
**co-force** 155:21,24
**co-sign** 12:14
**co-signator** 12:6
**coaching** 72:15
**code** 136:15
**codes** 129:12 136:7,8,9,12,14,25
**cognisant** 47:2
**coherent** 102:2
**colleague** 11:16
**collection** 21:11
**collective** 7:24 65:17
**collectively** 64:8,11
**column** 115:4 157:18 159:15
**combined** 45:15
**come** 94:25 101:10 103:4 116:16
  147:23
**comes** 19:6 102:14 175:4
**comfortable** 21:22,25 22:3,4 40:4
  116:19,22
**coming** 12:21,23 111:2 148:21
**command** 179:19
**commercial** 17:22
**commercially** 19:20
**committed** 23:14
**common** 87:4
**Commonwealth** 16:6
**company** 79:19 81:9 150:10 171:19
**comparable** 41:10 53:16,21 126:5
**compare** 31:21 32:2 36:11 45:13
  66:17 74:23 76:6 127:25 128:6
**compared** 36:16 65:23 66:8 75:25
  115:5 139:16
**compares** 176:19
**comparing** 35:10 65:5,11 74:7,15
  76:5 136:16 149:12
**comparison** 67:18 71:25
**compensate** 24:2
**compensated** 21:2,8 22:10,13,16

42:8
**compensation** 21:2 23:16,21 42:13
139:13,19 141:13,18,23 142:2
168:14
**competency** 154:15
**complete** 6:24 26:15,24 46:3 76:12
118:23 164:18 167:24 172:21
182:10
**completed** 7:3 45:23 46:11 60:23
75:6 84:16 115:7 125:23 129:13
139:20 144:15 154:18 156:3
165:3
**completely** 179:20
**compliance** 136:20 150:10 172:13
**components** 35:4
**comports** 55:23
**compound** 21:4 70:20
**comprise** 149:9
**comprised** 33:13 132:2
**computer** 110:8
**concentrated** 14:24 17:18
**concept** 74:15 86:17 98:23 137:18
153:10 169:25
**concern** 40:10 61:11
**concerned** 126:12
**concerning** 23:25 31:7 35:12 56:23
57:18 67:11,18 70:14 73:13 77:2
97:20 121:22 123:21 124:25
126:4,19 144:4 155:3 167:9,18
**conclude** 49:16
**concluded** 152:25 181:14
**concludes** 155:17
**conclusion** 57:21 111:16 124:10,13
**conclusions** 12:12 15:4 26:20 36:4
64:20,21 115:20 144:7,10,19,21
145:10,12,19 146:5 147:3,4
**condition** 8:19,23
**conduct** 46:17 97:9 102:16 169:14
**conducted** 4:6 147:17
**conducting** 101:17
**conducts** 67:6
**conference** 4:12 5:11
**confidence** 153:11,13,17 154:5
**confidential** 6:1 7:1 8:1,11 9:1 10:1
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1 93:1 94:1

95:1 96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1 153:1 154:1 155:1
156:1 157:1 158:1 159:1 160:1
161:1 162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1
181:1
**conform** 55:20
**conforms** 56:2,24
**confused** 32:16,17 74:14 157:15,23
162:21
**confusing** 19:5 106:9
**Conley** 18:6
**connected** 66:13 71:7
**connection** 18:8 19:24 33:9 36:18
70:7 153:14 166:11,18 168:21
174:3
**consent** 4:17
**conservative** 149:8
**consider** 40:23 95:10 133:7 138:16
139:7 143:8,19 165:7 166:5,8,10
168:2 173:2,20
**consideration** 143:16
**considered** 4:18 119:10 120:24
137:2 151:11 165:21 166:17
175:21 176:2
**considering** 85:17 86:19
**considers** 167:14
**consisted** 43:3
**consistent** 12:12
**construction** 137:4
**consult** 168:21
**contact** 86:11
**contacts** 44:3 53:4 75:23 172:18
175:7 178:7
**contain** 26:15 149:17
**contained** 11:8 42:24 46:4 72:18
77:23 100:22 140:3 145:10
148:20
**contains** 42:17
**contemporaneous** 89:14 164:9,20
**content** 85:7 169:4,6,8
**contention** 99:10,18,25
**context** 15:25 55:16 113:18 133:20
133:25 134:10 137:20,21,22,24
138:2 165:2 177:6
**continue** 53:15 75:9,10 84:7,13

86:7 94:24 95:16 108:3
**continued** 53:20
**continues** 53:16,18 147:12
**continuing** 53:10 54:9 82:17
**contrast** 27:20
**contributed** 59:10
**control** 4:13 45:9 170:20
**controlling** 47:6
**conversation** 9:13 38:8 99:3 100:19
116:12 180:15
**conversations** 9:15,16 80:15 98:19
99:14 102:25
**copy** 181:10,11,12
**corners** 46:4
**Corp** 121:18
**corporate** 135:12 136:21 148:13
150:8
**Corporation** 1:9,9 2:16
**corporations** 170:18
**correct** 9:2,20 10:17 12:17,25 18:21
21:15 23:4 25:10 26:6,25 27:18
27:25 29:13 41:14 46:24 47:7,9
49:12 50:15,22 51:21,25 52:6
53:2 54:13 56:20 63:25 68:21
69:7,8 70:19 73:8,11 76:17 77:4
77:24 78:24 86:2 88:10 91:12,25
92:15 94:3,4 97:5 100:11 105:5
109:10 111:16 113:4,7 118:18
120:22 125:9 128:25 129:6
130:12,14,18,20 131:18 132:9,14
133:22 135:10 136:10 138:20,21
140:13,16 149:14 156:8,22 158:5
158:7 161:9 162:14,20,25 163:6
163:11 166:7 167:7,19 171:11,13
171:15 172:8 176:4 177:7 178:11
178:16 182:11,13
**correctly** 35:3 37:8 38:4 156:5,10
**correlation** 142:13,20,23 151:16
165:14
**correspond** 34:17
**corroborated** 134:19
**corroborates** 100:3
**cosigned** 11:16 120:19
**cost** 34:7
**Costa** 1:10 2:7,11
**Costullcio** 121:17 142:5
**counsel** 3:6 4:3,10,22 7:16 31:4,4
135:12 136:20,21,22 148:13
150:8,9 170:17 172:13 176:20
179:8,16
**counter** 83:9
**Country** 2:4
**COUNTY** 182:5
**couple** 25:23 175:15
**course** 8:2 14:23 42:14 55:13 63:14
**court** 1:2 3:18 4:7,23 6:20 7:7,20
10:2 16:23 54:3 57:21 79:5 84:9
107:6 117:13,17 118:3,14,21

119:9,19 121:20 124:3,7 125:4
126:18 127:9,18,21 142:8
**Court's** 126:23
**courthouse** 19:10,14 22:5 55:19
123:6
**courtroom** 7:18
**courtrooms** 19:3
**courts** 54:8 57:23
**cover** 41:19 62:8
**covered** 145:2
**covering** 23:11
**covers** 41:13 116:10
**COVID** 152:21
**cracked** 89:22
**create** 137:8,10
**created** 34:16
**creating** 70:18,23 71:10,18 80:11
**creation** 70:15 71:7,14
**credentials** 81:14 177:5 179:3
**criteria** 44:18 82:15 83:4,22 114:18
115:3 137:15,16 140:19 152:9
154:11 174:14
**cross** 54:19
**current** 14:16 18:11,19 30:3 52:15
55:2,10 94:9 108:10 172:17
**currently** 8:14 17:8 97:24 99:23
**curriculum** 59:6 64:14 147:2 183:8
**cusp** 155:15
**cut** 82:21 108:2 143:13 151:9 152:9
**cuts** 139:2 143:12,24 159:7
**CV** 9:23 10:4,23 12:20 16:20,25
25:20 59:7,10 63:19 64:25 145:2
145:25 170:6

---

**D**

**D** 1:1 2:1 3:1 4:1 5:1,15 182:2 183:2
**D-R-I-P-P-S** 11:19
**damages** 17:19 18:17,18 60:5 82:18
86:8 168:4
**data** 27:12 37:19 45:20,21 51:10
62:15 65:24 77:6,8,10,11 114:13
114:16,22 115:13,17,19,22
116:17 122:19,19 125:17,22
127:4,17 132:19 133:8,16 134:3
138:6,7,24 139:2 143:12,22 144:2
145:14,15 148:3,16 150:8,11,18
152:9 153:18 155:9,14,16 157:8
158:5,7,14,24 159:8,25 161:20
162:8,8,12,15,24 163:2,3,5,8,13
163:20,23,24 164:2,9,12,19,20,22
164:25
**database** 39:10 119:11,18 120:5,12
123:25 124:5,12 132:9,14,23
133:9,17 134:4,18 135:7,17,24
136:4,6,9,13,17 137:5,8,12,14,25
138:3,6,8,12,13 166:19 169:7,9
**databases** 44:5 169:8
**dataset** 45:3 47:12 159:2 162:9

---

164:7 166:22 167:3 171:4
**date** 5:4 18:11,19 23:23 30:4 34:18
50:25 51:2 52:15 53:19 85:15
90:10,16 135:6 153:18 160:13
172:16,17
**dated** 113:6
**Daubert** 118:23 120:25 121:4,5
133:20 134:10
**David** 18:7
**day** 22:18,23 43:5 51:4 82:22 89:21
182:20 184:16
**days** 55:9 89:11 173:5
**dealt** 60:9 61:4
**death** 17:22
**December** 86:4 161:8,13,17,19,23
161:25 162:4,5,6,7,13,17,23
163:6,9,13,19,21,25 164:5,11,21
**decide** 21:19
**decided** 28:5
**decision** 93:14 119:6,23
**deem** 54:21
**deemed** 119:3 130:16
**Def000722** 78:21
**defendant** 2:7,15 31:17 73:21
**defendants** 1:12 2:11 137:6
**defense** 118:20 137:10
**define** 130:25 171:4
**defined** 33:6 131:9 132:6 149:20
**defining** 68:12,13,17 69:2
**definitely** 39:3
**definition** 69:3,5 132:5 134:5 140:2
140:18 141:10 149:19
**degree** 14:15 15:8 90:2 130:17
131:15 140:21 155:3
**demand** 151:3
**demanded** 178:22
**demographic** 114:18
**demonstrates** 53:19
**demonstrating** 180:22
**demonstrative** 44:10
**denial** 130:22
**dental** 130:20 140:16,19,20,24
**dentists** 130:7,18
**deny** 174:8
**department** 43:9,11 45:16 59:22
76:25 99:4,7,20,22 100:20 102:12
102:20,21 138:18,23 140:2,9
141:9 143:13,22 150:6,13 152:19
153:19 159:8
**departments** 44:7 102:23
**depend** 73:24 176:25
**depending** 47:10 83:18 97:13,17
**depends** 72:20 131:12
**depose** 60:14
**deposed** 9:2
**deposing** 60:13
**deposition** 1:19 4:6 9:6,10 22:19
34:20,20 60:10,12 107:3 146:22

---

175:14 182:9 184:6
**depositions** 107:4
**deposits** 96:18
**derive** 77:6
**derived** 12:17 15:7 42:4 65:2
**describe** 169:3
**described** 20:19 33:8 36:19 37:13
39:16 40:17 41:18 46:23 52:25
57:13 74:6 76:18 102:17 115:10
115:23 116:4
**describing** 49:12,14
**description** 76:19 83:9 85:7
**descriptions** 69:12 70:7 72:24
**detail** 80:5
**details** 161:3
**determination** 76:11 112:13 122:25
147:23 155:3 166:12
**determinations** 172:25
**determine** 39:8 76:14 150:19
**determined** 28:4 76:9
**develop** 35:24
**developing** 33:6 64:19 66:21 67:8
**development** 12:14
**diem** 178:20
**difference** 161:18
**different** 10:18 15:18 34:9,10 60:4
71:3 77:19,20 90:9 134:10,11,11
139:13 166:21 167:2,6 171:7
177:11 180:4
**differentiate** 139:12 140:23
**differentiated** 141:14
**differentiates** 139:16
**differently** 90:24
**diligence** 121:22 122:14 123:22
**diligent** 44:12 45:20 46:17 48:3
95:11 114:25 122:22 124:20
**dillying** 46:24
**diminution** 46:9
**direct** 5:20 48:23 78:8 96:18 113:25
147:7,15 165:13 166:2
**directed** 78:20
**directing** 95:7 114:5
**directly** 63:23 64:3
**discipline** 167:13
**discloses** 145:6,9
**disclosing** 8:12
**disclosure** 23:11
**discoverability** 97:21
**discoverable** 97:15,19
**discovery** 43:17 97:9,11
**discrimination** 17:21 57:25
**discuss** 46:2 61:21 81:2 123:9
**discussed** 12:13 25:21,23 37:5,24
38:9 55:16 62:2,6,19 65:18 92:13
99:13 114:15 122:20 123:15
132:10 145:14 146:15 151:10,15
152:20 171:13
**discussion** 99:5 153:5

---

discussions 178:9
dispositive 79:25 81:12
disputes 17:22
District 1:2,2 79:5 117:22,22 118:4
    118:21 124:18,24 125:7,14,16
    127:15
divers 149:13
dividing 51:24 53:4
doctorate 131:15 140:21
doctors 129:15,21 130:14
doctrine 167:21 168:2,9,10 177:22
document 10:9,14,21 11:2,9 24:7
    24:12,24 25:6,7,17 53:3 176:14
    179:6 180:8,14
documentation 172:21
documented 31:21 35:11 42:25
    49:21 50:4,13 145:13
documents 25:13 26:12,19,21,24
    27:6,8 28:4,8 43:17 49:11,13,15
    49:18,25 96:12
doing 22:3 33:18 53:13 64:18 93:24
    102:13 116:5,16
DOL 129:10
dollars 176:7
Donna 1:10 2:7,11
door 175:24 180:17
Doyle 110:6,9
Doyle's 111:7
draft 13:5 29:2 30:18 32:24
drafted 28:19
drafter 12:24
drafting 12:22 14:16 21:21,25 30:6
    30:19 64:21
drafts 13:3 29:15,17,20,23 30:24
    31:3,7
draw 165:13
draws 166:2
Drexel 59:16 60:7,8 62:18,19
drill 76:24
Dripps 11:17,18,20,25 12:4,13 13:3
    13:5 18:3 120:15,19
Dripps' 22:21
driven 138:12
duly 5:16 184:7
duration 44:15 114:9 115:22
    140:22 141:25 142:14,25 143:6,7
    143:20,25 144:5 147:10 151:14
    151:16 158:16,19,20 159:25
    163:15 165:11,22 166:3,12
duties 33:15,18,23 34:3 55:13 63:14
    74:3
duty 53:10,15,18 54:9 82:17,24
    167:18 177:7,15,18
dynamic 75:25 166:4
dynamics 158:16 165:15

E

E 1:1 2:1,2,2 3:1 4:1 5:1,15 15:9

182:2,2 183:2,6 184:2,2
e-mailed 103:22
earlier 18:21 34:24 38:8 55:16
    74:20 85:16 114:15 167:17
    170:11
earliest 87:25 90:10
earning 168:18 178:13
earnings 46:9 48:7,8 168:12,24
    177:24
easier 107:5
Eastern 117:22 118:4,21
economic 10:10 14:12,25 15:2,4
    17:5,13,19 19:8 21:13 22:6 27:12
    33:7 35:23 36:5,8,12,12,19,20
    37:5,19 38:10 41:18 44:6 45:20
    55:18,20 56:24 61:6 63:3 64:19
    65:20 114:25 115:13 116:6
    120:22 145:14 146:10 151:2
economics 14:24 15:3 18:11,20,25
    19:4,8,12,12,17,20,25 20:2,3,4,5
    21:7,17 40:2,16,22 42:5 54:6
    55:17 57:24 58:17 61:4,11,13
    62:15 63:6 65:9 66:6 81:5 105:17
    167:14
economist 11:17 12:6 17:4 18:14,23
    46:8,8 55:16 64:17,18,24 65:8,17
    66:5 73:4 92:5,7,21 96:9 118:20
    126:25 145:19 150:24 172:9
economists 17:23,25 61:5,8,9
    105:16
economy 148:5 150:22 151:12
editing 13:7
education 13:24 14:2 151:25
effect 3:17 143:19
effort 43:21 45:14 46:18 50:21 51:6
efforts 31:22 35:13 36:11,16 37:21
    38:6,15,25 40:11 41:5 43:10
    44:10,11 45:18 46:19 48:2 51:13
    51:20 53:8,20 56:13 62:16 65:5
    65:11,23 66:9,17 75:25 99:6
    121:23 122:10,19,21 123:9
    125:17 126:8,9 168:16 172:20
eight 147:6
either 27:18 63:13 64:20 66:2 81:11
    83:17 152:11 170:18 184:11
elements 95:10
eligibility 87:14
eligible 86:19
empirical 155:16
empirically 141:25
employability 98:23 99:15 100:21
    102:10,24,25
employed 17:8,10 58:2 70:25 144:7
employee 65:12 98:25 128:2
employee's 177:18
employees 132:7 139:13 150:2
employer 71:10 76:10 80:19 81:16
    82:7 83:7,13 91:23 92:10,11 94:9

173:7,19 174:25 178:9 179:2,7
    180:16,16
employer's 83:9
employers 71:11 175:8 179:23
employment 15:22,23 17:21 31:17
    31:20,23 35:9,11,14 36:16 43:3
    45:9,12,14,19 49:6,7,16 53:16
    57:25 61:20,22 62:9 65:6,13
    66:25 73:25 74:2 79:15 80:20
    92:10 97:18 98:22 114:3 115:3
    126:6,14,20 141:19 147:20
    148:23 149:11 150:20 155:7
    157:20 159:4,21,24 160:9 162:16
    164:5 168:25 176:4 178:25
enable 161:24
encompass 61:14
engage 9:9
engaged 51:5
engagements 22:7 176:18
engineer 141:4,5,6
engineers 131:2,4,4,16
ensure 55:25
entire 151:7 153:21
entirely 179:5
entitled 103:22 114:9
entry 50:8,10 83:16 174:23
enunciate 6:12
equal 143:4
errors 12:9
especially 107:5 152:21
ESQ 2:5,14,18
established 161:21
establishing 73:13 178:4
estate 53:12,13,13,17 131:10 155:8
    168:7
estimate 153:14 154:21 155:4 156:6
    156:11,12,19 157:3,9 158:2
    162:18 165:5
estimated 157:13
estimating 157:25 166:6
estimation 148:22
evaluate 31:17
evaluating 35:6 61:19
evaluation 17:19
events 76:11
evidence 121:8
exact 163:2
exactly 170:7 180:20
exam 87:18,23 89:2,5,9,10,16 90:2
    90:23
examination 3:7,16 5:20 14:14
    54:20 88:13 181:13 183:3
examinations 15:19 38:12
examine 36:9 47:17
examined 5:18 45:7
examining 37:21
example 84:25 85:5 176:14 179:6
exception 16:17 34:19 127:16

**exclude** 117:11 120:12 126:18
  175:6
**excluded** 117:14 118:4,14 121:21
  123:13,22,25 125:14 127:10
  135:5 142:8
**exclusion** 127:13
**exclusively** 44:2
**executive** 139:24 140:12,24 141:3
**executives** 136:19 140:6
**exhausted** 172:21
**exhaustive** 177:23
**exhibit** 10:3,5,6 24:5,9,10 78:12,18
  78:19 103:22,24,25 104:2 108:9
  108:10,10,12,13,14,15 183:8,9,10
**exhibits** 24:6
**exist** 83:2 134:17 139:3 144:2
  150:11
**existed** 15:5 31:18 45:2 47:18 74:21
  75:15 76:2 139:2 155:11 171:18
  172:10,10
**existence** 134:23,25
**existing** 66:19 134:14
**exists** 66:15
**expect** 7:14 141:13 150:16 152:22
  162:2 164:3 166:7
**expected** 41:9 43:14 44:19 114:19
  125:2 126:13 165:6
**experience** 17:6 46:7 47:15 54:5
  73:23 75:17,18 76:20 80:14 81:8
  82:11 83:18 90:7 92:6,21,25
  110:15 144:3,6,10,18,24 145:4,9
  146:4,9,10,25 148:20 152:13
  154:4,14 159:12 165:17 168:10
  168:17,23 170:16,21 173:4,22
  174:3,4,12,15,17,21 179:19,23
**experienced** 145:7 159:19
**expert** 11:3,11,14,21,23 12:4 19:23
  20:5 21:18 23:3,11,17 24:2,20
  25:9 28:9,11,15,19 30:6 31:8
  32:12,18,21,23,24 33:5 54:12
  56:2,16 57:6 58:5 71:24 73:6 80:6
  83:8 84:19 92:14 95:5,8 100:8
  111:8,11 112:17 113:20,23 117:7
  117:14 118:5,14 120:14 122:12
  123:12 124:18,24 132:13,15
  133:22 135:2 144:17 170:12
**expert's** 121:21
**expertise** 18:9,12 19:16,20 74:5
  111:5,7 112:24 170:23
**experts** 60:2,3,3,5,13,20 100:21
  102:10 103:2 110:10,12 122:6
  124:8 134:11
**explain** 54:10 144:9 146:3
**explained** 19:3
**explanation** 124:8
**explicitly** 15:21 74:19
**explore** 81:7 83:2,6 146:18 164:23
  173:18 175:25 177:2

**explored** 144:13,13 176:13
**express** 4:17
**expressing** 171:9
**expressly** 27:16
**extend** 71:11
**extent** 8:9 14:13 15:3 17:2 18:16
  26:3 54:10 55:19 63:18 65:7,24
  67:2 70:10 79:17,21 86:5 100:24
  133:12,13 168:6 173:7 178:3,5
**extracted** 138:6

**F**

**F** 1:1 2:1 3:1 4:1 5:1 184:2
**F.R.C.P.26(a)(2)(B)** 25:14
**fact** 5:11 27:7 73:17 79:24 108:24
  112:6,23 122:25 179:24
**factor** 113:13,19 168:8 173:16,21
**factors** 165:15,21
**facts** 83:12
**factual** 86:18
**faculty** 58:22 59:14
**failed** 122:7,23 123:8,16,18
**failure** 119:2 123:18 127:4
**fair** 26:8 27:15,20 38:24 39:19
  46:22 57:16 69:4 89:25 95:8
  115:9 116:14 138:5 165:20,20
  169:3 179:4
**fall** 91:10 140:6
**familiar** 63:10,13,14 57:23 63:7,10
  67:23 68:10,18 69:4,17 72:24
  73:2 118:9,19 121:7,10,12,16,19
  137:18,22 142:5,11 153:10
  168:15,19 169:24
**familiarity** 73:5,5
**fantastic** 179:22
**far** 7:23 11:24 22:25 23:20,20 27:7
  27:13 29:20,21 44:11 54:22 55:10
  64:9 71:4 75:21 84:9 100:22
  133:19 134:21 146:24 157:18
  159:14 168:16 172:23 176:10
**favor** 137:6
**feasible** 79:24
**February** 36:15 45:4 47:19 50:9,10
  50:18 52:5,10,21 88:5,7 89:2
  145:16 159:5,18 172:2 173:9
**Federal** 3:2 4:4 23:7,10 54:8 79:5
  79:16 117:13,17,21 118:3,14,21
  120:9 121:8 134:6 146:2
**fee** 25:22 26:2,3 183:13
**feedback** 31:6
**fell** 44:11
**fellow** 11:17
**felt** 21:22,24 22:3,4
**field** 17:4,7,20 19:17 57:24 65:8
  66:5,14 67:23,25 68:3,14,20
  72:18 74:22 105:16 111:9 112:17
  112:18,24 135:8,9,18 136:10
  155:9 167:13

**fields** 136:5,10
**Fifth** 2:8
**figure** 52:23 162:18
**figures** 99:7
**file** 9:11 28:7
**filed** 56:3
**filing** 3:7 93:22 121:5 151:4
**fill** 83:19
**filter** 47:17 171:24
**final** 29:10,13,18,24
**finale** 46:25
**financial** 96:18 170:23
**find** 31:22 35:13 36:16 41:10 45:18
  53:15,21 99:2 103:17,18 125:2
  126:5,14,20 148:23 150:20
  151:19 153:15 154:22 156:7
  157:10 158:21 160:9 162:19
  164:5 165:6 166:7 168:13
**finding** 159:20
**findings** 35:24 48:10 99:16 100:18
  123:2 144:22 145:3
**finds** 92:11 145:23
**fine** 17:16 108:5 116:25
**finish** 6:23 84:11 88:22 107:13
**finished** 82:23 84:2 175:17
**firing** 67:15
**firm** 21:16 22:14,15 41:2 42:4
  53:13 68:5 177:4
**firm's** 33:15 67:2
**firms** 94:8 170:18
**first** 5:16 24:16 26:6,11 28:13 30:5
  49:4 50:8,10 88:15 90:16 91:2
  95:15 101:6 104:8,10 112:10
  114:9 156:8 157:22 160:24
**Fischman** 1:4 2:21 6:6 12:11 15:5
  16:2 18:15 24:8 25:4 31:20 36:14
  43:15,19 44:2,17,19 45:2,8 46:5
  46:10,14,16,16 49:6,11,16,21,25
  50:5,14 51:10,23 52:15 53:10,21
  73:16,20 74:22 75:17 76:3,16,21
  78:2,24 79:7,11 80:13,21 82:10
  82:16 83:23 84:15 85:13,18,23
  86:19 88:2 90:6,17 91:3 92:20
  95:22 96:19,22 114:18,19 115:6
  123:11 135:11 136:15,16,24
  137:3 139:3,6 146:14,18 147:11
  147:17 149:21 151:7,11,22
  152:10,10,18,23 153:15 154:22
  155:6,12,16 158:25 159:3,9,11,17
  159:20 161:11 165:6 166:6
  170:22 171:6,17 172:16 173:8,18
  173:21 174:16 176:12 177:5
  178:2,8,13 179:22
**Fischman's** 31:16 35:6,13 36:10
  42:25 45:18 47:14 81:8 87:21
  88:25 90:11 116:8,9 122:18
  132:15 135:9 136:10 137:15
  143:8 144:5 145:13,23 148:19

149:10 154:14 169:16 170:5
171:10 174:2 178:18
**fit** 54:21 76:10 81:7,9 149:22
**five** 48:19,20 105:10 113:23 137:16
**five-page** 10:9
**flip** 24:24
**Floor** 2:8,12
**follow-up** 107:13
**following** 82:18 89:11 95:16
**follows** 5:19
**foot** 175:23 180:17
**footnote** 49:8,10,25 50:17,19,20,20
98:12,14,18 100:2,6,14,19 101:3
104:17 105:5 129:11
**footnoted** 127:18
**footnotes** 27:19
**force** 3:17 139:17 152:12
**forensic** 10:10 17:4,5,13 18:22,25
19:4,5,7,11 27:11 54:6 55:15,17
61:8 64:17,17 65:8,17 66:5
119:10,18 120:5,11 123:25 124:9
132:9,18 133:8,17 134:4 135:7,17
135:23 136:4,9,17 137:5 166:19
167:14 171:4
**forensis** 19:7
**forget** 89:23 161:5,6
**form** 3:11 27:23,25 28:21 68:22
71:20 106:19 114:23 168:5
**formal** 7:18 15:24
**formally** 20:15
**former** 170:5
**forms** 98:11 115:20
**formulate** 26:19 114:14
**forth** 43:21 44:9 45:15 59:5 83:4
122:17,23 145:20 146:25 147:3,4
184:7
**forties** 151:11
**FORTINSKY** 2:18 5:7 48:19 55:3
71:19 72:3,16 94:25 106:19
156:14 157:5 168:5 181:7,12
**fortunately** 159:3
**Fortune** 150:10
**forum** 19:6,10,14 55:19
**forward** 93:16
**found** 44:19,22 124:3,7,11 127:22
147:19 152:23 153:25 154:11
155:21,25 157:12,21
**foundation** 133:21
**foundational** 53:23 114:23
**four** 18:5 46:4 94:20 95:6,7 100:23
107:14,15 138:25 143:15 159:7
175:13
**fourth** 85:7
**free** 21:14 137:12,16
**front** 18:17 26:11 106:21 108:17
142:23
**fruits** 75:25
**full** 77:14 91:6 100:24 109:16,20,22

116:20 147:8,16
**full-time** 34:13 43:22 98:7 99:12
101:17 102:6 106:5 113:14
147:19
**fully** 59:5 100:23 127:20 146:25
147:3,4
**further** 3:10,15 4:14 180:25 184:10
**future** 5:4 157:4 158:14,22

**G**

**G** 182:2
**gaps** 43:6
**garbage** 137:19,19,23
**Garden** 2:4
**gather** 116:6
**gender** 44:17 139:5 149:7 152:11
**general** 44:17 57:10 68:2 86:17
136:20,21 144:7 150:9 151:5,12
152:12 172:13 176:20 179:8,16
**generally** 23:14 35:15 37:15 57:22
89:8 97:14,16 101:15 167:23
176:24 177:14
**generate** 42:14
**generating** 69:12 70:7 72:23
**generous** 149:3
**getting** 29:18 153:7 175:8
**Gilham** 18:6
**gist** 47:22 48:4,7
**give** 38:18 40:2 102:22 107:11
122:6 124:24 126:4
**given** 15:25 81:7 82:11 122:13
182:12 184:9
**giving** 79:11 92:16 122:11 123:3
**glad** 135:21
**go** 30:7,14,21 38:7 47:23 55:10
73:22 78:4 101:21 102:7 129:10
129:17 135:4 143:23 152:4,6
157:11 165:14
**goal** 43:20 75:14 76:6
**God** 11:22
**goes** 17:6 24:16 44:13 82:12 115:19
155:10
**going** 6:25 9:22 37:16,17 38:14
54:4 71:19 74:15 77:19 82:21
93:16 94:18,18 107:15 136:6
138:12 148:2,2 149:7 158:2
176:25 179:7,12
**good** 6:4 15:20 66:6,7 76:9 81:9
85:10 175:5
**Google** 103:3,5,16,18 104:5 105:7
106:6,15,22 108:18 183:10
**Googling** 106:18
**GORDON** 2:10
**grammatical** 12:8
**granular** 39:11 143:14,14,25
150:11
**graph** 170:19
**greater** 39:2,4 65:21 151:3

**group** 148:25 149:12
**GUERON** 2:7
**guess** 17:11 19:11 88:22 93:24
107:22 156:20 180:9
**guessing** 38:20
**guide** 100:20 102:13,21 152:22
**guidelines** 128:7

**H**

**H** 5:15 183:6
**hac** 16:17
**half** 22:18,23 37:6 153:24 154:8,11
159:23
**hand** 37:19 159:15 184:16
**handbook** 99:20
**happen** 76:11 179:12,12
**happens** 140:20
**happy** 8:4 12:14 75:10 107:14
175:16
**head** 69:8 108:22 109:2,17,21
124:21 125:8,11 142:3 167:12
**headhunters** 44:5 102:11
**hear** 6:11 7:12 25:6 29:4 55:3
121:24 173:24 174:9
**hearing** 121:4
**held** 1:21 59:12 153:6
**help** 179:23
**hereinbefore** 184:7
**hereto** 3:5 25:15
**hereunto** 184:15
**hesitant** 38:19 40:6
**hidden** 174:24
**high** 47:23
**higher** 39:19 151:24 178:23
**highlight** 146:20
**highly** 110:9,12 150:24 151:25
180:23
**hire** 83:15 179:8
**hired** 21:18 31:7 67:3 93:6,10,15,21
94:5
**hires** 161:4,4
**hiring** 67:7,12,15 70:15,17,18,23,24
71:14 74:16,18 81:5 82:13
**historical** 158:5,14,20
**hold** 175:3
**holding** 39:17
**Holdings** 1:8,9 2:11,16
**home** 118:11 119:6,24 120:17
123:14 175:10
**honest** 178:3
**honor** 16:19
**honors** 16:20
**hour** 22:17,22 34:12
**hourly** 22:13,15 23:20 42:8 176:11
176:19 178:6,19,23 179:19
**hours** 22:24 43:24 94:20 98:8 99:10
104:11 107:14,15 113:15 175:13
**human** 46:6 61:16 108:24 109:15

112:3,6
**hundreds** 38:25 84:25 85:3,4
**hunters** 136:5
**hygienist** 140:19,20,24 141:2
**hygienists** 130:20,22 140:16
**hypothetical** 141:11 164:8,10,18

**I**

**Iamdiversity.com** 101:12 104:16
109:14 111:23
**idea** 79:24 80:11
**identification** 10:7,8 24:11 104:3
**identified** 35:18 50:13,20 52:4
56:11 63:19 64:13 74:25 76:15,22
76:23 96:7 98:24 99:6 112:5
117:16 118:7 135:16 136:12
139:12,22 143:15 149:25 150:16
153:13,22 170:25 171:3,6,16,22
173:10 174:19 179:20
**identifies** 110:7 159:15
**identify** 31:19 42:17 72:20 74:21
75:19 76:7 95:9,12,13 101:2,11
144:18 157:12 171:25 172:9
173:6
**identifying** 35:8 62:10 74:7
**imagine** 11:22 20:14 21:10,12,23
40:18,25 41:6,12 88:5 91:8 154:5
**immediate** 159:19
**impact** 165:7
**impairs** 8:24
**important** 7:5
**impossible** 155:5,6
**include** 25:19 45:6 57:5 72:23
85:18 136:4,9 139:24
**included** 61:23 77:23 80:6 84:20
90:13 91:12 129:8 131:17 136:8
141:7,11 148:10 176:14 178:11
178:15
**includes** 50:21,21 57:8 85:21
129:15,21 130:11 140:12,15
177:18
**including** 14:25 69:11 118:24
**incorporates** 169:10
**incorrectly** 132:24
**increase** 42:12
**independent** 102:12 111:4,6,19
112:4,12,22 133:15 134:2
**Index** 1:7
**indicate** 57:22 106:2 115:2
**indicates** 43:23 172:20
**individual** 1:10,10,11 43:19 61:20
65:6 66:10 98:5 99:2 106:4 143:5
152:14 168:12
**individuals** 67:3 94:10 102:11
131:14 132:5 149:4,10,13 150:15
150:25 151:2,4,6,24 152:22
153:22,25 157:19 159:7,11
160:16

**indulging** 175:18
**industrial** 58:7,11 67:24 68:6,14,20
69:6,10,19 72:19,25 73:7,10
**industry** 17:6 73:25 148:11 149:18
152:6 154:2,4 164:11 171:7
**industry's** 110:9,11
**information** 8:11 15:23 18:10,19
23:24 31:22 35:12 36:6,13 37:12
39:8,11 40:16 43:23 46:13 72:22
100:3,6,9,14 102:14,19 110:24
114:23 116:6 124:4,9 138:11
140:22 145:18 162:13 166:20
167:9
**informed** 57:17
**inherent** 144:25
**initial** 103:3
**initially** 21:18
**injury** 17:21
**Institute** 13:17,21
**institutions** 44:6 59:13
**instruct** 54:3
**instructed** 7:16
**instruction** 7:23
**instructions** 7:25 8:8
**instructor** 13:16,20
**instructs** 81:21
**insufficient** 145:24
**intelligence** 109:10,19 110:8
**Intelligencer** 64:23
**Intelligencer's** 66:4
**intention** 11:25 54:16,18
**interested** 80:15 184:13
**international** 79:18 121:18
**interpretation** 145:17
**interrogatories** 169:21
**interrupt** 107:20 153:3
**interrupted** 107:8
**interval** 153:11,14,17 154:5
**interviewed** 76:8
**investigated** 172:16
**investigation** 64:9 133:14
**involve** 62:14
**involved** 37:21
**involves** 32:21 33:23
**involving** 71:24
**isolating** 139:16
**issue** 26:5 80:2 81:13 92:12
**issued** 127:7
**issues** 61:7 63:3 65:20 68:4 127:15
127:16
**issuing** 29:24
**item** 53:24

**J**

**J.D** 10:11
**James** 15:9
**January** 50:16,22,25 51:11 52:14
86:5 114:10 147:12 157:20 158:9

159:2,4 160:2,10,12,15,18,22,23
161:12,20 162:8,9,11 163:3,8,16
163:17 164:22 178:16
**Jennifer** 1:4 2:21 6:6
**JEROME** 2:18
**Jersey** 16:6,8 45:6,6 77:23 78:3
79:8,10,20 80:3,20,22 82:8 83:14
87:8,15 91:19 128:7
**job** 27:11 36:10 37:21 38:5,15,24
40:10,20 41:5 42:25 43:4,10,10
43:16,18,21,22,23,25 44:3,4,10
44:24 45:7,14 46:15,17 48:24
49:12,21 50:4,13 51:5,11,12,20
52:16 53:8 62:15 65:5,11,22 66:8
66:14 67:8,18,19 68:8,10,19 69:5
69:12,16 70:7,11,11 72:8,24
73:22 74:2,15,18,23 76:5,6,7,7,10
76:14,19 80:6,19 81:14 82:7 83:3
83:10,22 84:19 86:3 91:12 95:11
98:7 99:6,12 101:8,13,18 102:6
103:23 104:7,24 106:5 110:5,10
110:12 111:13 113:14 119:11,18
120:5,11 121:23 122:15,18
123:25 124:9,11,13,19 125:2
128:6 129:12 132:9,14,18 133:8
133:13,17 134:4 135:7,17,23,25
136:4,5,9,12,14,15,17 137:5
139:18 145:13,23 147:18 165:8
165:12,16,16,17 166:18,19,21
167:2,3,6,7,10,15 168:15 171:4,5
171:10 172:10,11 174:24 175:2
177:19,24 178:11,22 179:25
180:4,7,8,11,14
**jobs** 12:11 36:17 47:7 52:24 66:18
66:22 71:25 73:14 74:7 77:23
79:10 81:13 83:24 124:11 134:7
134:15,17 151:3,5,5,6,25 159:10
170:5 171:11,25 172:6,15 173:3,4
173:22 174:3,13,22 175:22 176:2
176:6 177:19 178:6,11,15,20
**JOHN** 1:11
**joining** 94:9
**Journal** 63:7,10
**journals** 59:5 63:13
**July** 1:15 88:8,23 91:9 158:25
160:21 182:9
**June** 88:23 113:6
**juris** 131:15
**jurisdiction** 22:2 55:21,24 56:3,25
57:19 127:11
**jurisdictions** 88:12
**jury** 54:3,10

**K**

**K** 182:2
**KANE** 2:3
**keep** 94:18 95:2
**kept** 39:10 56:10

**key** 136:20 171:2,2,21,23,24
**kind** 58:20 107:12 118:7
**knew** 119:14
**knocked** 176:22
**know** 6:12,16,20 7:7 8:4 11:20,24
  12:8 19:10,22 20:6 21:11 22:21
  22:24 24:25 30:2,9,15 38:21,23
  39:16 41:7 42:3,19 48:18 49:13
  63:4,5 68:2,6,9,17,25,25 69:9,13
  69:14 70:6,8,9,12 71:2,16,17 72:8
  72:17,22 75:22,23 77:8,12,17
  78:25 81:4,15 82:14 85:3 87:17
  87:22,25 88:6 90:6 92:22 94:19
  95:22,24 96:4,11,21,23,24 97:3
  97:14,20,23,24 99:23 104:13
  105:12,14,15,18,19,21,25 106:3
  106:20,22 108:10,20,23 109:8,14
  109:17,18,21 110:20 111:23
  115:11 116:9,13 117:12,13,20
  118:3,8 119:12,15,17 120:13,24
  121:20 124:17,22,23 125:7,9,12
  126:11 129:15,21 130:10,22,24
  132:18 137:4 140:11,15,17,25
  141:8 142:22 150:23 151:2,25
  152:8 153:18,21 155:24 159:3
  165:10 166:15 169:9 177:17
  180:19,21
**knowing** 92:7 159:6 175:5
**knowledge** 5:9 14:9 111:4,6 134:2
  137:9 167:18 169:10,15 170:4,10
**knows** 72:2

———— **L** ————

**L** 1:1 2:1,5,14 3:1 4:1 5:1,15,15
  182:2
**label** 116:12
**labeled** 10:9 13:25
**labor** 14:12,25 15:3,5 18:11,20
  19:17,19,24 20:2,3,4,5 21:7,13,17
  22:6 31:18 35:6,23 36:9,12,17
  37:5 38:10,10 40:2,16,22 41:17
  42:4 43:9,11 45:16 46:8,14 47:17
  57:24 61:4,7,19 62:15 63:3,6 65:8
  65:20,24 66:6,7 73:4 76:25 92:5,7
  92:19,21 99:4,8,20,22 100:20
  102:13,20,21,24 105:16,16
  106:17 114:15,25 122:19 123:10
  126:25 138:23 139:17 140:10
  141:10 143:13,23 145:19 150:6
  150:13,23 151:2 152:12,19
  153:19 159:8 172:8,9,22
**Labor's** 138:18 140:2
**lack** 53:21 79:24 125:20 127:22
  146:15 165:25
**lacked** 154:15
**language** 123:16
**larger** 148:24 149:12
**Latin** 19:7

**law** 4:19 7:20 15:8,9,15,22,23,24
  16:9,12,15,15 53:9 54:4,5,8,17,19
  54:25 55:10,12,20 56:3,25 58:23
  59:16,17,17,24,25 61:11 78:2
  79:7 81:8 82:12 88:22 90:7 94:2,6
  117:21,23 118:2 152:5
**laws** 55:23 56:6
**lawsuit** 6:6
**lawsuits** 17:20
**lawyer** 92:7,15,20,21 94:5 144:10
  145:18,22 149:21 152:5,14
  155:12
**lawyer's** 143:24
**lawyers** 36:9 44:16 45:3,21 82:13
  135:24 136:19 149:20 172:2
**layer** 44:13
**lead** 88:6
**leader** 179:17
**leads** 144:10 145:9 146:4
**learning** 102:7 176:9
**lectured** 59:13,15 63:3
**lectures** 59:24 60:6,17,25 61:10,14
  61:17,18,21 62:8
**led** 144:19
**left** 12:20 47:12
**left-hand** 13:10
**leg** 90:7
**legal** 19:13 53:22,23 54:2,12 55:14
  56:23 57:4,21 64:23 66:4 73:21
  74:22 75:18 79:18 92:16,18,24
  93:25 119:15 120:7,25 124:22
  125:6 144:18 146:9 155:13
  170:16,17 171:18 172:23 179:24
**length** 146:16 173:2
**let's** 24:9 28:6 48:13 72:14 84:5
  90:9 94:23,25 103:21,24 136:3
  147:6
**level** 14:25 47:23 111:5 112:24
  143:25 150:12 167:18 168:12,13
  168:24 174:23 177:25 178:3
**levels** 14:12
**leveraging** 44:5
**Lex** 18:7
**Lexington** 2:16
**liability** 60:4
**license** 79:4,16,17 80:20 82:8 83:14
  83:15,19 85:6 92:25 93:17
**licensed** 15:20 16:5,8,11,14 73:18
  73:19,20 75:16 78:2 79:7 80:22
  85:10,13,19 88:9 89:6 90:6 93:3
  93:10,19,22 94:6 117:25 144:23
  174:17
**licenses** 79:23 83:16
**licensing** 79:12 80:7 88:3 91:13
**licensure** 80:13 81:3,4,10 85:22
  91:21 92:8,12 146:15
**life** 72:5
**lifetime** 46:9 48:8,9

**Likewise** 64:22
**limine** 118:22
**limit** 107:20
**limitation** 91:21 118:24 119:21
  122:6 123:7 125:18 128:13
**limited** 18:20 47:16 131:14
**line** 25:12 49:4 72:11 74:13 85:7
  134:12
**lines** 95:14
**Linked-In** 44:3
**list** 25:21 26:16,24 27:3 173:13
**listed** 59:10 81:17 83:24 114:8
  167:3,7 173:14 174:22 178:23
**listing** 84:20
**listings** 166:18
**lists** 82:7 83:7
**literature** 59:4
**litigate** 97:7
**litigation** 4:20 33:9,25 59:25 60:4
  60:21,21 137:6
**little** 38:22 89:18,19 161:7
**live** 112:6
**LLP** 2:3,7,10,15
**loads** 179:23
**locate** 101:6
**locations** 4:10
**long** 19:19 41:9 48:19 58:24 88:15
  88:21 94:19 106:4 126:4,12,19
  141:18 148:7,23 150:19 153:15
  154:21 157:9 158:21 160:9
  161:25 162:15,18 164:3,23 165:5
  166:6
**longer** 53:5,7 94:16 143:5
**longest** 148:8 151:14,18
**look** 28:6 30:7,14,21 37:11,17 75:14
  84:24 86:24 102:18 105:24
  108:25 109:7,24 128:17,21
  129:10,18 130:6,8 133:12 135:4
  139:25 140:9 141:9 146:7 150:22
  153:19 154:2 156:12 157:11
  169:13 170:9
**looked** 36:14 38:24 76:20,25 87:5,9
  87:12,13 114:17 163:15,20 167:4
**looking** 29:5 38:15 43:24 51:8
  75:24 78:7 84:19,22 85:16 109:16
  109:20 110:2,14,22 113:23
  114:11 116:2 133:3,4 148:7 158:8
  160:2,4,8,11,12,14 161:16,23
  162:11,12,23 164:19
**looks** 60:21 128:24 152:8
**loose** 37:25
**loss** 46:9 48:7,8 61:15 64:19
**lost** 159:10
**lot** 77:10 107:5
**loudly** 6:13
**low** 155:19
**lower** 168:13 176:8,11,19 177:21,25
  178:6,15,19 180:20

**lowering** 167:22 168:9,11
**lowest** 148:3 153:20
**lunch** 48:18 94:15
**luncheon** 95:3
**lunchtime** 48:16
**lying** 18:9

## M

**M** 182:2
**M-C-G-U-I-G-A-N** 112:3
**M.A.C** 10:12
**M.B.A** 10:11
**Machines** 121:18
**madam** 16:23 125:3
**maintain** 43:14
**majority** 40:18,25 41:6,12 44:22
 154:10,10
**making** 111:20 112:13 144:4
 145:19 165:5 172:25 176:4,12
**management** 129:3,8 131:17,22,24
 132:2 138:14 139:15,23 140:5,7
 141:8 142:9 148:14 149:18
 151:23 153:22
**managerial** 132:6
**manner** 4:16
**MANSUKHANI** 2:10
**manufacturing** 129:5 148:11
 149:16,18 151:5 152:7,15 162:2
 164:4,11 170:24
**March** 90:21 173:10
**marginal** 61:15
**mark** 10:3,5 24:9 103:24
**marked** 10:6 24:10 78:11,18,21
 104:2
**market** 15:5 31:18 35:6,23 36:9,17
 38:10 46:14 47:18 61:7,19 65:24
 66:8 75:18 76:2,20 81:6 92:19
 114:16 115:2 122:19 123:10
 166:20,24 167:10,14 171:18
 172:9,23 174:25
**marketplace** 36:13 40:23 45:21
 76:22 114:17 167:11 172:19
**marriage** 184:11
**Maryland** 16:7,15 88:17,19 89:12
 89:15
**Master** 14:4,8,24
**Master's** 14:6,12
**Masters's** 14:11
**match** 83:22 92:11
**material** 27:9 32:13,17 161:17
**materials** 21:24 26:16 36:5 37:18
 43:2 99:24 133:2,5
**math** 51:16
**mathematical** 155:2
**matter** 9:12,20 11:4,8,12,21 16:4
 16:22 17:5 18:8,13 19:2 21:13
 22:11,25 24:21 25:10 26:17 27:9
 28:2 29:13,25 30:6,10,16 34:18

37:2 40:2,24 42:23 46:13 56:9,12
 56:14,15 57:9 59:23 60:16 61:18
 65:3 68:2 73:20,23 85:9 98:20
 114:14 118:17 119:10,12,19
 122:5 123:5,13 125:15,25 126:21
 127:22,25 128:4,15 132:8,11,12
 135:6 176:25 184:14
**matters** 19:13,22 21:3,7 39:16
 40:10 41:8,18 57:25 63:20,21,21
 65:19 98:22 123:3 132:11 134:16
 134:22 170:17
**Matthew** 2:5 6:5
**MBA** 14:17,19,23
**McCaul** 121:15
**McGuigan** 112:3,15,16
**McGuigan's** 112:20
**MD** 131:15
**MDR** 89:22
**mean** 6:19 38:18 65:10 72:10
 109:10 112:7 134:10 148:7,8,24
 156:21,24 157:17 158:19 159:21
 160:20 161:3,3,5 170:13 173:19
 178:21 180:7,13
**meaning** 134:7,16 151:3
**means** 19:6,8 71:22 72:7 142:20
**measured** 160:17,18
**measuring** 141:17,18
**median** 147:9 148:24 156:24
 157:17 159:19,22
**medical** 8:19,23
**medication** 8:15
**medium** 152:3
**meet** 140:19
**meeting** 4:12 174:25 179:3
**meetings** 178:9
**member** 15:19 58:22
**memorized** 121:9 129:19,20 130:10
 132:4
**memory** 8:24 23:14 121:13
**mentioned** 18:2,21 47:20 85:24
 177:14
**mere** 79:24 82:13
**messes** 107:8
**met** 80:13 110:6 112:14
**methodology** 115:10,12,15,17
 147:2
**Metro** 45:5,22 75:15 155:12 172:2
**metropolitan** 77:3,4,22
**micro** 64:5
**mind** 116:15
**minimum** 43:15 95:18
**minority** 154:17
**minute** 94:23
**minutes** 48:19,20 105:10 132:10
 175:15
**mis-worded** 106:14
**Mischaracterizes** 68:23
**misleading** 19:5

**missed** 47:3
**misstate** 39:5
**mitigate** 46:18 53:10 54:9 82:18,25
 86:8 119:2 122:8,23 123:9,17,19
 167:19 177:7,15,18
**mitigating** 36:16
**mitigation** 55:2 56:13 125:17 126:9
 127:16 168:3 177:10
**Mitsubishi** 1:8,9,9,9 2:16 49:6 51:3,5
 74:24 75:19 76:19 79:15,19 82:19
 87:22 89:2 90:21 91:3,16 135:4
 135:15 143:10,17 147:19 148:11
 148:12 166:11,16 169:22 171:19
 172:12
**Mitsubishis** 2:11
**model** 169:4,7
**models** 33:7 61:16 64:19
**moment** 24:5 113:3
**moments** 25:23
**month** 50:5,18
**monthly** 52:3
**months** 52:4 124:11 147:21,25
 148:9 149:6 158:17
**morning** 6:4
**mother** 155:8
**mother's** 53:13
**motion** 117:11 118:22 120:12 121:2
**move** 7:4 72:14
**Moving** 113:20
**MSA** 77:2 122:20 145:16
**muffled** 28:14
**multiple** 107:7 132:11 146:12
 165:14 178:5
**Musacchia** 1:22 4:23 5:17 184:4,19

## N

**N** 1:1,1 2:1,1,2 3:1,1 4:1,1 5:1,1
 182:2,2 183:2
**NACVA** 66:3
**name** 5:22 6:4 112:10,10
**national** 13:17,21 79:18
**nature** 60:6 74:2 143:3
**Navigators** 126:2,3
**necessarily** 178:24
**need** 93:17 135:25 159:15
**needed** 21:23
**needs** 91:23
**negotiate** 179:8 180:10
**negotiating** 179:4
**negotiations** 34:8
**never** 37:25 66:19 75:22 90:8 110:6
 112:7,14
**New** 1:2,24 2:4,8,8,13,13,17,17,17 5:18
 16:6,8 43:9,11 44:9 45:5,6,15,22
 54:8 75:15 77:23 78:3 79:8,10,15
 79:16,20 80:3,20,22 82:8 83:14
 85:11,14 86:6,20 87:3,8,15,17,23
 88:3 90:18,21 91:4,13,15,19

95:12,17 99:22 102:20 107:19,22
124:18,24 125:14,16 128:7
155:12 172:2 182:4,24 184:5
**Newark** 45:6
**newly** 164:24
**news** 152:20
**Nicholas** 1:9 2:12
**night** 89:20
**nine** 25:5 26:7 144:20 145:20
147:21,24 148:9 149:6 151:8
172:11
**non-CEO** 141:6
**non-litigation** 33:14,23 34:4,6
**Non-Party** 1:20
**nonresponsive** 86:13
**north** 39:2 40:5
**Notary** 1:23 3:17 5:17 182:24 184:4
**noted** 72:13
**Notice** 1:21
**November** 29:20 31:2 56:5,10
57:14,17
**number** 23:4 35:7,8,10 39:17 44:25
51:19,20,24 129:5,6 166:5,8
171:17 173:12 174:15 178:24

**O**

**O** 1:1 2:1 3:1 4:1 5:1 182:2
**O*NET** 168:19,21,23 169:3,9
**oath** 4:8 7:19 182:9
**object** 71:20 86:12
**objection** 5:2,4 7:12,14 27:23 28:21
31:9,13 32:7,14 35:19 37:14
39:24 42:6 51:17 53:25 54:14
65:14 68:22 72:13 73:9 74:8,12
79:13 80:23 81:18 82:3 83:11
92:2 101:4,23 102:9 105:9 106:7
106:19 110:19 111:10 121:3
122:16 124:15 125:10 126:15
127:12 128:3,9,19 129:16,22,25
130:15,21 131:3,7,11,19 132:3
133:10,18,23 135:19 136:11,18
137:7,13 138:9 139:9 141:16
142:15 143:21 144:11 146:6,11
149:2,15 150:4,21 156:14 157:5
157:14 158:6,23 165:24 166:14
166:23 168:5 169:5,11 171:12
176:5,16,21 177:8 178:17 179:10
179:14 180:6
**objections** 3:11
**obligation** 86:7
**obligations** 89:22 92:24,24
**obtain** 162:3
**obtainable** 83:17
**obtained** 104:6 148:6 155:7,18
**obtainment** 75:21
**obviously** 67:21 97:3 144:21,24
146:19 155:7 159:20 174:16
**occupation** 34:14 44:18 139:6

149:5 171:8 177:24
**occupational** 139:11
**occupations** 129:4,9 136:5 138:15
139:16,23 140:8 142:10 148:15
149:19 150:5 151:23 153:23
**October** 28:17,20,23 52:22
**off-the-record** 153:5
**offer** 92:17,18 99:16 127:10
**offered** 87:23 92:18 144:7
**offering** 54:2,12
**offers** 87:18
**office** 79:20
**office's** 20:14
**officer** 136:21 141:4 150:10 172:14
**officers** 139:24 140:13
**okay** 8:12 12:16 26:23 29:6 33:3,17
33:22 35:3 36:18 39:15 41:13
48:9 52:8 57:4 69:9 72:15 85:5
94:13 104:14 110:3 114:8 115:16
126:3 150:18 159:25 162:22
163:20 164:15 169:3 172:4
**Old** 2:4
**older** 64:15 143:5 151:12,18
**Oliva** 1:9 2:12
**once** 80:13 93:9
**ones** 14:22 46:23
**ongoing** 52:14 82:24
**online** 43:3 44:4
**onward** 160:3 178:16
**open** 89:22
**opening** 180:12
**operating** 67:15
**operation** 68:5
**opine** 18:18 124:19
**opined** 171:17
**opinion** 43:8 44:13,25 45:10 47:25
53:23 54:2 86:9 91:24 92:4,6,17
92:18 100:15 113:13 114:14
119:2,16 122:7,11,13,23 123:4,8
125:6,18,21 126:4,18,23,25 127:3
127:6,13,17,21 128:11 147:17
155:10
**opinions** 26:19 27:25 42:17,23
44:14 45:25 46:21 47:21 92:19
100:22 114:24 119:3 126:7,10,12
128:14 171:9
**opportunities** 31:20 35:9,11 44:25
45:2,7,12,14 46:15 47:18 62:9,10
65:6,13 74:21,24 75:15,19 76:7
76:15 80:4,9,11,12,16 81:6 82:25
83:6 85:17,19,21 91:13,22 124:14
146:17 155:11 168:25 169:2
171:18 172:10,24 173:6,11 175:8
175:10 176:11 177:3 178:5
180:22
**opportunity** 15:18 80:3 81:14
82:15,16 84:14 86:10 146:20
173:8,17 175:24 176:13 177:2

**order** 9:10 16:15 181:10
**organization** 66:3 67:6 179:16
**organizational** 58:9,11 67:24 68:7
68:14,20 69:6,10,20 72:19,25
73:7
**outcome** 155:6 157:4 184:14
**outer** 72:6
**outlier** 154:16
**outline** 18:17
**outlined** 144:20 170:6
**outside** 60:22 100:2 112:14,25
136:10 159:21 170:22
**overall** 23:8 73:24 148:4 150:22
**overbroad** 37:16
**overlap** 171:21 172:6
**overly** 73:15
**oversight** 132:6
**overview** 110:14
**overwhelming** 44:21 154:10

**P**

**P** 2:2,2
**P-H** 11:18
**p.m** 181:14
**pace** 41:21
**page** 24:14,17,20 25:5 26:11 45:10
47:8 48:22 64:13 78:8,13,16,21
84:18,23 95:6,7 98:3 100:23
104:9,20 106:21 108:17,21
113:23 114:2 137:16 144:20
145:20 147:6 170:7,19 171:23
172:11 174:19 183:7,13
**pages** 10:15 26:7
**paid** 23:16 107:14 178:12
**pair** 40:15
**pairing** 40:20 62:15 63:4
**pandemic** 33:20
**panel** 12:20 13:10
**paper** 110:18,20 121:5
**papers** 83:20
**paperwork** 83:20
**paragraph** 51:9 95:15 98:3 113:9
114:9 116:20 147:8,13
**parameter** 83:5
**paraphrasing** 35:5
**Park** 2:12
**parse** 92:22
**part** 16:24 28:13 31:25 32:13 55:4
76:14 114:22 115:14 123:13
131:24 148:12 159:17
**participant** 8:5
**participating** 4:11
**participation** 152:12
**particular** 12:3 27:8 43:5 56:7,9
59:20 73:22 74:3 98:20 116:11
146:4
**parties** 1:21 3:5 4:4,17 184:12
**pass** 15:18 175:6

**Patrulio** 121:11
**pay** 18:17 168:13 176:18 177:19
   178:20
**paying** 176:3 178:15
**pays** 177:3
**PDF** 10:9 104:5 108:17
**peer** 105:12 113:15
**pending** 56:14 78:23
**Pennsylvania** 6:3 16:7,12 59:18,19
   61:2 63:2 117:22 118:4
**people** 36:14 40:24 44:16 115:2
   151:17 160:9,14
**perceived** 127:4,18
**percent** 33:4,20,24 34:2,2,4 148:6
   153:21,24 154:6 159:13
**percentage** 33:10 41:2 153:20
**perfect** 83:22
**perform** 21:14 31:15 34:10 35:16
   43:12 46:18 55:14 56:23 57:5
   95:19
**performed** 34:17 63:24,25 68:19
**period** 41:13,19 44:20,23 45:4
   49:18 50:15 51:21 52:10,19,25
   53:5,7,8 57:13 75:24 77:16,20
   87:4,20 88:25 89:5 91:14 114:21
   147:20,24 148:21 156:2 157:13
   158:8,9 159:10,12 161:6 165:2
   177:22 178:14
**periods** 159:22,24
**permanent** 46:9
**permissible** 56:16 57:5,18,20,22
   119:4 128:14
**permitted** 4:7 118:22 119:18
   122:10 123:5,17 125:16,20
   126:24 127:14
**persists** 53:18
**person** 41:10 73:25 74:3 93:20
   99:11 101:18 102:5 106:17 112:5
   112:9,11,23,24 141:19 164:10,24
   165:17 166:4 168:18
**person's** 41:5 66:8 112:7 164:20
   165:23
**personal** 17:21
**personally** 39:12
**persuing** 82:17
**pertain** 11:7
**pertains** 68:3
**Philadelphia** 6:3 17:12
**phrase** 115:21
**physically** 4:25
**pic** 10:4
**picked** 84:24
**picture** 110:24
**piece** 110:18,20 115:19
**place** 1:22 77:13,18 175:4
**placement** 44:6
**plaintiff** 1:5 2:3 37:22 38:6,16,25
   40:11,12,24 56:13 65:23 122:7,11

124:10 125:2 126:5,8,9,14,20
   128:2 137:9 174:12,21
**plaintiff's** 78:11,19 108:12,14,15
   121:23 122:14 123:21 127:15
   128:6 135:8,18 167:18 168:3
   183:7
**Plan** 104:11
**plant** 170:25
**platform** 4:12
**Plaza** 2:12
**pleadings** 93:25
**please** 5:22,24 6:11,15,23 7:8 8:3,9
   25:5 32:19 42:16 48:18 55:6
   69:22 70:2 74:9 75:9 84:6,18
   108:6 113:21 130:4 142:18
   147:15 174:10 181:11
**plentiful** 124:13
**plugged** 104:6
**plus** 19:21 47:21
**point** 21:24 53:11 80:25 86:21,22
   87:11,12,25 90:22 91:2 134:23
   148:3 159:22 160:10 161:5 163:5
   177:2
**points** 148:16,18 171:23
**pole** 47:9
**population** 38:12 107:23 139:17
   151:8,8,13 152:2,8 153:21 154:6
   154:17 155:18,20 156:17,18
   157:9,11 158:3,4 159:13,17
**portion** 12:3,5 13:5,25 32:3,20
   33:12 47:4 65:18,20,25 66:6,7
   86:13 108:7 114:2
**pose** 7:15
**position** 41:11 67:5 73:21 82:9
   175:4 179:7
**positions** 53:22 75:21 81:17 155:13
   155:13 169:16 178:12
**positive** 142:13,23
**possess** 131:14
**possession** 109:23 113:4
**possibility** 85:25 180:10
**possible** 8:9 71:12 175:9 178:6
   179:21
**possibly** 47:3 140:6
**post** 31:23 35:13 102:20 173:5
**posted** 86:3 99:21 173:3,18,23
   174:4,13 176:6,7 179:7 180:7,8
**poster** 173:13,13
**posting** 80:6,20 82:8 165:16 178:14
**postings** 74:18 85:3,4 133:13
   134:20 167:3,7 178:11
**posts** 135:25 152:22
**potential** 31:19 35:9,11 62:9 81:14
   82:16
**potentially** 12:9
**power** 154:21,25 155:22 156:13
   157:3,19,24
**practice** 16:9,12,14,15 17:18 20:15

23:8 60:10 78:2 79:7 82:13 94:5
   117:21,23 143:9,19 171:20
**practiced** 69:5 90:8 118:2
**practices** 70:24 74:16 81:5 143:24
**practicing** 83:21 89:20 90:20 94:2
   135:11 152:5
**practitioners** 102:25
**precluded** 127:3
**predict** 54:19 158:21 159:16 162:15
**predicting** 157:4
**prediction** 158:11 161:25 164:2
**predictive** 154:21,25 155:22 156:13
   157:3,7,19,24
**predicts** 155:4 158:14 159:9
**predominately** 43:3
**preference** 39:13
**preferred** 48:17
**preparation** 9:6,17 12:23 13:14,22
   14:9,20 15:12,15 29:21 32:6,10
**prepare** 9:10 11:11 24:20 29:17
**prepared** 9:19 12:4,10 16:22 18:15
   18:16 19:2,16 23:3 120:15,21
**preparing** 23:22 26:25 34:19 40:3
   56:4
**presence** 4:25
**present** 2:9,20 4:4 53:19 61:15
   100:9
**presentation** 54:7 165:16
**presented** 11:21 16:4 71:23 108:9
   122:12 138:25 163:14
**presenting** 134:15
**presently** 17:10
**president** 33:16 67:2,6
**presume** 180:11
**presuming** 180:3
**pretty** 107:4
**prevail** 46:5
**prevent** 92:9 154:16
**previous** 37:20 46:23 117:6
**previously** 26:4 40:17 76:21,23
   78:11,18 125:13
**primarily** 17:20
**primary** 17:18 100:5
**Primavera** 2:14 5:6,8,13 9:13,16,25
   27:23 28:21 31:9,13 32:7,14
   35:19 37:14 39:24 42:6 51:17
   53:25 54:14 65:14 68:22 73:9
   74:8,12 79:13 80:23 81:18,23
   82:3 83:11,25 84:5 92:2 94:16,21
   101:4,23 102:9 105:9 106:7
   110:19 111:10 121:3 122:16
   124:15 125:10 126:15 127:12
   128:3,9,19 129:16,22,25 130:15
   130:21 131:3,7,11,19 132:3
   133:10,18,23 135:19 136:11,18
   137:7,13 138:9 139:9 141:16
   142:15 143:21 144:11 146:6,11
   149:2,15 150:4,21 153:3 157:14

158:6,23 165:24 166:14,23 169:5
169:11 171:12 176:5,16,21 177:8
178:17 179:10,14 180:6 181:5,11
**principle** 69:14
**prior** 29:24 30:4 31:2 44:5 55:11
76:18 174:5 176:4
**private** 170:18 171:20
**privileged** 8:10
**pro** 16:17 20:22 21:13
**probably** 135:21 157:16 177:13
179:12
**problematic** 92:24
**procedure** 4:5 23:11 66:22 134:6
146:2
**procedures** 67:8,12
**process** 12:7 21:11 65:17 66:25
81:11 115:23 116:3,13,16,18,23
117:2,5,9,15 118:6,15,24 128:16
132:21 179:5
**processional** 1:10
**produced** 49:11
**production** 26:2 97:11,25
**professional** 1:10,11 58:3 63:14
129:4,9 130:16,17 131:14,20,22
138:15 139:23 140:18 142:10
148:14 149:18,21 151:23 152:15
153:23
**professionals** 99:15 130:11,14,23
131:5,9,13 139:15 140:7 141:15
149:17,20
**professor** 58:14,16,18
**professorships** 59:12
**profit** 21:16
**program** 14:11,23 15:3,7
**prohibitive** 180:2
**project** 66:11 93:16 94:4 179:18
**projects** 34:4,6,11 93:20
**promotion** 70:15,17,18 71:18 74:17
**promotions** 74:18
**pronouncing** 132:23
**proper** 57:21 125:21
**properly** 100:18 127:18,19
**proportion** 33:17,22
**provide** 9:22 11:3 20:16 21:19,22
23:23,24 29:23 30:23 31:3 32:25
35:23 36:5,7 69:2 124:4 127:4
138:25 150:15 152:18,22
**provided** 7:23 9:24 10:23 17:3
20:22 23:19 24:7 26:4,16,18,21
26:22 28:3,22,23 29:12 31:22
35:12,25 36:25 37:7 43:2,17
96:20 100:7 122:9 126:7
**providing** 8:10 15:4 17:4 19:19
22:4,8 31:2 36:18 148:17 170:16
**proxies** 152:18
**Psychological** 68:4
**psychologist** 58:7,9,12 73:11
**psychologists** 68:7 69:6,20

**psychology** 63:8,11 67:24 68:15,20
69:10 72:19,25 73:8
**public** 1:23 3:17 5:17 19:6,9,13
55:19 182:24 184:4
**publication** 138:24
**publications** 59:7,9 103:4
**published** 59:2,4 133:13 155:14
163:23,24 164:22
**pull** 10:3 24:6 37:19 78:10 95:5
103:21
**pulled** 105:24 134:18 161:3
**purpose** 4:19 19:15
**purposes** 149:11
**purring** 80:15
**pursuant** 1:21 4:4 20:10
**pursue** 74:22
**pursued** 31:21 75:20 80:4,17
172:15,23 178:8 180:17
**put** 22:24 24:4 38:19 42:20 47:17
95:15 122:21,22 134:20 137:23
138:7 141:12 151:13 175:3
**putting** 122:17

**Q**

**qualification** 11:7 22:2 90:4
**qualifications** 11:3,6 47:11,13
81:16 131:23
**qualified** 92:9 175:7 180:19
**qualify** 174:12
**quality** 138:5,7 165:22
**quantity** 165:23
**quarters** 155:18
**query** 135:25
**querying** 137:24 138:3
**question** 3:12 6:15,17,18,19,24 7:4
7:15 8:6 20:2 21:4 28:13 32:16,19
35:20 37:16 38:14 42:22 55:7
56:18 63:22 64:2 65:16 66:23
67:21,22 68:24 69:3,18,21,23,24
69:25 70:5,16 71:4 73:16,24 74:9
74:10 77:21 78:22,23 81:19,20,22
81:24 82:2,5 84:11,12 86:15,16
86:23 87:7,10,20 90:9,24 91:8
97:2,17 100:5,16,24 101:5,16,19
101:22,24 102:2,4,8 103:6,9,13
106:3,8,11,12,13,14,18 108:2,3
117:18 121:24 122:2 125:3,5
126:17 130:2,3,5 135:20,22
138:11 142:16,19 144:12 155:5
156:15 157:6,16,22 158:12,18
161:22 162:21 163:10 169:18,19
169:23 170:13 174:9 177:11
**questioning** 74:13 134:13 171:14
**questions** 6:9,11 8:10 54:20,21
71:20 72:11 75:11 76:4 77:20
107:14 125:13 146:12,22 153:9
180:25 181:5,7
**quick** 42:22 81:11 161:4

**quickest** 148:3
**quickly** 115:5

**R**

**R** 2:2 5:15 184:2
**R-O-N-A** 28:10
**range** 39:20 148:15
**ranged** 147:11
**ranging** 147:20
**rate** 22:13,15,18,21 23:20 176:11
176:20 178:23 179:19 180:20
**rates** 22:23 34:9 139:13 141:14
142:2 176:19 178:20
**Raytheon** 171:19
**re-asking** 135:21
**re-employed** 114:20 154:7 159:14
**re-employment** 43:25 44:20 148:6
151:19 153:16,25 154:23 155:19
155:21,25 156:7 157:10,13,21
158:22 162:3 164:6 165:7 166:7
**reach** 36:3 60:5 147:2
**reached** 86:10
**reaching** 124:10 178:25
**reacquainted** 9:11
**read** 31:24 32:4 55:5,7 69:22,24
70:3,5 74:10 81:25 82:2 84:8,10
84:12 86:15,16 106:10,12 108:2,6
108:8 113:17 121:25 122:2 125:4
125:5 126:23 127:6 130:3,5
142:17,19 169:19 182:8
**reads** 147:16
**ready** 25:2
**real** 53:12,13,13,17 112:11 131:10
155:8 157:10 168:7
**really** 37:25 38:21 71:21 138:10
178:2
**realm** 180:9
**reason** 79:14 179:2
**reasonable** 44:11 45:19 46:17,18
48:3 95:10 98:6 99:10 114:20,24
122:22 123:21 124:20 147:17
172:18
**reasonableness** 41:4 121:22 122:14
**recall** 21:12 29:22 31:5,11 34:24
61:25 62:6,13,17 63:5 101:9,14
103:10,14,15,20 105:10 126:10
128:4,10,12,20,23 129:11 140:4
142:4
**receipt** 76:5 96:6,9
**receive** 28:11,15 29:8 30:18 31:6
42:12 65:11 95:17 96:7
**received** 14:6 25:25 28:8 53:2 63:19
64:22 66:12,16 67:17 79:22 96:13
96:24 159:23
**recess** 48:21 95:3
**recipient** 95:18
**reciprocity** 83:19 85:25 86:20 87:3
87:8,14 91:5 94:11

**recognize** 10:20 25:7 71:13 111:8 111:11

**recognized** 64:14 65:25 66:3,9 105:15

**recollection** 20:24 118:13,21

**record** 4:22 5:22,25 35:21 36:2 38:20 39:5 40:5 46:3,12 71:9 72:14 75:12 78:17 84:14 107:9,10 113:22 127:24 182:11,12 184:9

**recorded** 4:15 7:11 157:25

**recording** 4:16

**records** 30:8,22 34:16 35:25 39:9 39:12 159:8,9

**recruiter** 58:3 134:21

**reemployed** 115:5 141:20

**reemployment** 152:24 162:19

**REES** 2:10

**refer** 10:16 17:14 115:21 116:3

**reference** 132:25 133:4 166:11

**referenced** 27:16,21 49:25 108:21 166:21

**references** 27:11 165:8,12,23,25 166:5,9,15

**referencing** 49:10 87:20

**referred** 170:14

**referring** 41:15 48:25 64:12 69:19 98:13 110:21 116:19 120:16 125:25 132:12,25 138:19 166:25 172:6

**refine** 67:22 152:3

**refined** 38:14 77:21 139:5

**reflect** 11:2 69:16 78:17 96:13 106:16 113:22

**refraining** 8:15

**refresh** 118:13

**regard** 12:10 36:13 43:9 57:23 67:14 82:24 92:19 116:23 120:7,8 126:7 127:17 133:19 134:13 138:22 143:18 144:12 146:14 154:2 160:20 161:10 168:14,15 168:16,17,24 170:12,16 171:24 178:19

**regarded** 110:10,12

**regarding** 124:4

**Regardless** 151:17

**regards** 76:4

**regularly** 68:7

**REISBAUM** 2:7

**reiterate** 100:18

**reiterated** 98:22

**rejected** 137:2

**relate** 15:6,22 44:15,25 61:18 65:4

**related** 17:19 27:8 55:22 56:15 60:2 63:19 65:20,22 66:24 68:4 129:4 129:9 131:22 138:15 139:15,23 140:8 142:10 148:12,14 149:19 151:23 153:23 184:10

**relates** 54:6 64:18 73:16 168:11

**relationship** 141:24 142:21,24 143:3 165:11 166:2

**relative** 65:24

**relatively** 115:5

**relevance** 16:2 141:22 152:10,17 158:10 174:18

**relevant** 25:3,4,13 27:19 31:19 35:8 36:12 37:18,19 45:11 55:23 62:10 83:20 87:4 114:3 115:12 116:5 122:19 136:13 139:2 145:15 146:18 148:19 149:23 155:16 171:4,25 173:19 178:22

**reliability** 124:5 133:8,16,19,21 134:3,5,9,16,22

**reliable** 105:23 134:14

**reliably** 150:19

**relied** 26:13,20,24 27:17 132:8 142:9

**rely** 27:3,22 28:5 144:3 164:22

**relying** 83:12 99:24 100:10,15 132:13 146:9

**remained** 47:7

**remaining** 33:12

**remember** 116:25

**remote** 4:10

**remotely** 4:6

**removal** 47:12

**remove** 45:9 47:10

**removing** 47:6 178:13

**repeat** 74:9 125:3 142:16 169:17 174:10

**rephrase** 6:16 56:8 70:2 81:23 157:6 158:12

**rephrased** 101:25

**report** 9:12,19 11:11,15,16 12:4,7 12:14,15,16,24 13:6,14,22 14:10 14:16,20 15:4,12,16 16:4,21 18:14,15,16 19:2,15 21:21,25 22:3,8,17 23:22 24:2,8,20 25:3,9 26:7,8,11,25 27:7,10,13,16,21 28:9,11,15,19,23 29:2,12,13,18 29:20,24,25 30:6,19,20,24 31:3,8 32:6,10,24 38:22 42:16,24 43:14 45:24 46:3,4 48:23,24 56:4 74:19 80:7 84:19 95:5,8,9,16 100:10,14 113:20,24 120:14,20 122:12 123:12,16 124:4 125:19 127:2,20 127:20 128:24 132:13,15 133:3 135:2 144:8,9,17,25 145:5,8,11 145:22,24 146:19 147:3,5,6 170:8 170:20 177:9,10 183:9

**reported** 51:22 122:18 158:7

**reporter** 1:23 4:2,7,23 5:8 6:20 7:7 10:2 16:23 84:8 107:6 125:4 134:8 153:4 181:9

**reporting** 4:13 158:3

**reports** 23:3 29:9 41:12 64:21 117:7

**repost** 173:7

**reposted** 173:5

**represent** 5:9,13 104:4 106:24

**representation** 112:8

**represented** 79:3

**representing** 6:5 93:24

**represents** 52:7 53:20 151:20 159:23 170:19

**request** 8:5 47:2 74:18 82:4

**requested** 18:18 32:3 39:14 108:7

**REQUESTS/PRODUCTION** 183:12

**require** 63:21 80:7 81:2 91:6 93:21

**required** 22:3 25:14 81:17 93:19 146:3

**requirement** 82:8 83:7,14 85:6 88:3 91:21 92:8 121:7

**requirements** 87:13 90:17

**requires** 23:15 80:19 83:13 90:2,5

**requiring** 91:13

**research** 19:9 55:14,22 56:23 57:4 57:10,12 63:17,21,24,25 64:4,5,7 64:18 65:3 66:11,13 102:12 116:6 116:16,18,23 117:2,5,9,15 118:5 118:15 128:16

**researched** 105:20

**reserved** 3:12 175:13

**resident** 79:19

**residual** 168:12,18

**resorting** 39:8

**resources** 150:7

**respect** 13:9 50:19 61:10 87:7 89:16 91:18 109:13 111:22 136:4,16

**respective** 1:21 3:6 160:24

**respond** 7:14 8:6,9

**response** 7:4,10 29:3 31:25 45:23 46:11 60:23 75:7 76:12 84:3,16 101:20 115:25 125:23 139:20 144:15 152:25 154:18 156:3,16 160:5 165:3 167:24

**responses** 7:8

**rest** 7:22 117:2

**restate** 32:19 69:21 82:4 106:9 126:16 142:16

**restaurant** 151:5

**result** 63:24 104:8,10,13,14,23

**results** 104:5 106:15,20 155:4 158:15 160:3,4

**resume** 47:15 76:18,23 78:4,6,9 79:4,9 83:5 85:15 135:16 145:2 169:20 170:15 171:2,3,23 175:3 179:22

**retail** 151:4

**retained** 19:23 20:5,15 30:9,12 32:24 92:17 119:14 122:5

**retainer** 20:10,12,16,17

**retention** 30:13,14

**return** 7:2

returns 95:25 96:2,3,8,10,15 97:12
    97:15,21 98:2 176:10 178:19
revealing 9:14
revenue 42:4,13
review 12:8,9 35:25 45:24 145:12
    176:15 179:6 180:8,14
reviewed 9:12 13:3 21:24 105:13
    120:2,4
Reviewers 85:9
reviewing 12:7 109:25
right 8:14 18:3 24:17 28:24 34:22
    35:14 39:20 48:11 50:9,11 51:19
    52:11 57:2 64:2 77:3 78:5 79:2,10
    84:21,22 85:2,11 92:5,11 93:4
    100:23 106:21 113:10,17 115:18
    129:24 146:12 147:13 149:11
    156:7,18,24,25 159:14 161:8
    163:2,14,22 167:4 172:7 173:14
    175:2,4,22 176:7,15,20 177:15
    178:15 179:11,13,15 180:7
right-hand 157:18
Road 2:4
Roger 121:14
role 12:6 60:3 74:20,23 172:8,14
roles 60:5
Rona 28:10,12,16 29:9
roughly 37:4 38:9 65:19 75:23
rounding 44:20
row 139:14 157:22
rule 4:5 23:13,15 97:20,22,23,24
    121:8 146:2
rules 23:10 75:4 83:18 107:3,4
    134:6
run 60:13 175:10
rush 107:15,16

S

S 1:4 2:2 5:15 183:6
S-P-E-I-G-H-T-S 118:10
sake 116:11
salaried 42:10
salary 179:4
sample 84:19
sat 59:14 88:6 90:23 94:10
satisfaction 24:25
satisfied 88:2 90:17
saved 29:21
saw 25:21 80:13 95:24,25 166:19
saying 64:2 82:14,14 165:18 180:9
says 24:14 25:13 26:12 48:24 49:5
    49:21 51:9 52:13 64:25 85:6,9
    98:4 104:11,25 110:23 114:3
    161:18,19 163:22 166:4 179:25
schedule 25:22 26:2,3 183:13
scholarly 105:19
school 15:9,15,24 58:23 59:16,16
    59:17,20 61:2 88:23
science 59:21 68:8,10,18 69:9 70:6

70:9,10,12,13,14,16,22 71:3,6,10
    71:13,17 72:2,4,5,7,8 74:16,17
    171:14,14,15
Sciences 61:3
scientific 69:15 71:12 83:8
scope 16:3 31:14 34:25 35:4 56:16
    57:5,18 75:13
screen 24:17,18 106:16
scroll 10:13 16:24 25:18 104:22
SCULLY 2:10
sealing 3:7
Sean 112:3
search 36:10 37:21 38:6,15,25
    40:11 41:5 42:25 43:4,7,12,16,18
    43:25 44:11,14 45:14 46:17 48:24
    49:12,21 50:5,14 51:6,11,13,20
    52:14,16 53:8 55:10 62:15 65:5
    65:11,22 66:8,15 83:4,6 95:11,19
    99:12 101:8,13,18 103:3,5,16,18
    103:23 104:6,7,25 106:15,22
    108:18 110:5,10,12 111:13
    113:14 114:24 120:7,8 121:23
    122:15,19 124:19 128:7 137:14
    145:13,23 147:18 152:3 167:10
    167:15 168:15 170:20 174:18
    177:23 183:10
searches 102:13,17
searching 66:14 98:7
second 33:22 56:5,14 89:9 95:14
    97:25 101:11 113:9 147:8 160:21
secondary 12:5
section 12:19 16:19 26:12 27:14,18
    28:9 48:23 49:5 51:14 60:12 95:9
    114:3
sections 35:22
see 10:14 13:25 16:24 24:12,14,19
    25:12 26:12 27:5,10 28:6,6 29:10
    36:15 45:10 46:7 47:8,10 48:25
    49:8,22 50:17 51:9,13 52:16 81:7
    85:6 95:20 98:4,9 102:14 103:3
    104:8,25 106:15 109:24 113:9,18
    114:5,11 137:16 140:25 147:9,13
    147:21 151:14 152:20 156:12
    158:10 170:15 173:9 177:3
seeing 96:10
seek 80:2 94:10
seeker 43:10,11,22,23
seekers 99:6
seeking 43:19 91:22 92:10 102:6
    106:5 155:10 165:18
seen 18:14 45:17 66:19 112:20
    122:3,5 178:18
select 136:15
selected 101:3
selecting 66:25 67:8
selection 66:21 67:8,12
senior 11:17 179:17,17
sense 76:17 134:15 160:6

sent 9:25
sentence 52:13,17 95:15 113:18
    145:22 147:16,21 157:7
separate 4:10 87:21 160:7
separated 51:2,5 65:12 86:4 98:25
    115:3 141:19 157:20 159:4
    160:14,18 162:4,7,16 164:10,24
    169:16
separation 31:16,19,23 35:7,13
    36:11 43:20 49:5 61:19 82:18
    147:18 164:9,20 165:2 172:17
series 6:8
serve 33:15
services 42:5
serving 32:12,21,22 33:4
set 26:5 43:21 44:9 45:15 59:5
    82:15 83:4 113:11 145:20 146:25
    147:3,4 163:18 170:15 180:23
    184:7,15
sets 27:11
setting 7:18 129:20 152:15
settled 123:6 178:24
seven 45:10 47:8 125:19 127:7
    128:5 170:7,19 174:19
severed 164:4 177:20
share 166:20,24 167:10,15
shared 96:16
SHEARMAN 2:15
sheet 38:22
short 44:11 180:14
show 83:12 172:17
showed 106:21
showing 157:17 178:4 179:3
shown 78:18 80:25 147:9
shows 170:7
sic 78:19 114:16
side 157:18
sign 71:21
signed 3:16,18 182:19
significance 50:24 53:6
significant 90:2,5
significantly 39:19 176:3 177:19
similar 36:14,25 37:6 40:24 44:16
    45:16 49:7,17 60:19 75:16 76:2
    98:24 99:7 114:18 123:10 150:14
    152:23 155:20,23 159:9 171:19
similarity 66:18 73:13,22 171:10,15
similarly 49:24 159:6 172:5
simple 116:10 165:18
simplifying 116:15
simply 19:6,7 118:25
sir 11:12 58:18 72:17 80:5,18
    107:24 113:25 117:24 123:12,20
    126:22 132:25 138:5 145:5
    149:24
sit 15:18 83:20 88:13
site 140:10 177:21,25
sites 102:18,24 167:6,11,22 168:9

168:11,14
sits 91:8
sitting 89:25 91:6 96:21 101:9,14
105:25 121:13 126:11 129:11
140:4,11,17 141:9
situated 150:14 155:20,24 159:7
172:5
situation 116:9
situations 179:24
six 17:24 88:22,24 89:13 124:11
125:18 127:7 128:5 147:20,24
sixteen 19:21,24
skill 170:14 180:23
skilled 150:25 151:25
skills 13:13,19 14:19 79:18 154:15
169:10,15,25 170:4,10
slowly 10:13
snapshot 108:18 163:12
SOC 136:7,8,25
somebody 150:20 173:24
sorry 24:19 26:20 55:3 62:4 75:6
134:8 150:9 153:3 176:23
sought 49:7,16 84:15 171:5
sound 81:24
sounds 106:13 121:12 145:20
source 44:3 96:8 104:15,19,21
105:4,6 125:22 127:5,17 130:6,24
134:21
sources 12:22 96:19 98:17 99:9
100:5,17,17 105:13,23 134:11
Southern 1:2 124:17,23 125:7,14
125:15 127:14
space 72:6
speak 7:5 106:5
speaking 97:14 100:21 101:15
119:13 122:4
specialized 73:12
specialties 143:9
specialty 143:20
specific 12:5 14:14 17:7 27:8,9,13
37:17,18 39:14,17 44:14,24 45:9
45:13,21 46:15 47:18 55:21,23
56:25 63:20,20 64:3,5,9,10,18
65:3,23 66:8,10,13 70:11 73:19
76:5 77:2 80:12,25 84:22 86:24
92:10 93:23 122:20 132:4 135:8
135:14,18 145:15 146:13,17,20
148:18 149:4 152:17 155:25
161:11 168:24 180:18
specifically 7:16 66:17 78:20 80:7
80:19 82:7 144:18 152:13 165:9
specificity 102:22
specifics 116:7,8 128:13
speculation 179:11,21
speculative 179:5
Speights 118:10,17 119:6,24
120:17 122:5 123:4,7,10,13
128:15

spelled 11:18,18
spend 98:6 101:8,13,17 102:6
103:23 104:7,24 110:5
spending 43:24
spent 33:18 74:14 106:5
split 21:5
spoken 98:21
spreadsheets 12:10
spring 55:11
ss 182:4
stagnant 163:3,5,9
Staller 1:19 5:12,23 6:1,4 7:1 8:1
9:1 10:1,4,5,6,11,16,17,19,20
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1 21:1 22:1
23:1 24:1,9,10,12 25:1,6 26:1
27:1 28:1 29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1,22 49:1 50:1
51:1 52:1 53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1 79:1 80:1
81:1 82:1,6 83:1 84:1,2,7 85:1
86:1 87:1 88:1 89:1 90:1 91:1
92:1 93:1 94:1,22 95:1,7 96:1
97:1 98:1 99:1 100:1 101:1 102:1
103:1,24 104:1,2,4 105:1 106:1
107:1,18 108:1 109:1 110:1 111:1
112:1 113:1 114:1 115:1 116:1
117:1 118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1 126:1
127:1 128:1 129:1 130:1 131:1
132:1 133:1 134:1 135:1 136:1
137:1 138:1 139:1 140:1 141:1
142:1 143:1 144:1,23 145:1 146:1
147:1,7 148:1 149:1 150:1 151:1
152:1 153:1,11 154:1 155:1 156:1
157:1 158:1 159:1 160:1 161:1
162:1 163:1 164:1 165:1 166:1
167:1 168:1 169:1 170:1 171:1
172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1 180:1 181:1,2
182:7,17 183:4,8,9,10
stamp 30:4
stance 124:22
standard 43:15 45:15 86:24 87:2
120:25
standards 43:12 44:9 151:12 154:9
standing 15:20 85:10
standpoint 46:8 69:15 98:23 131:8
start 45:8
started 90:20 107:2 160:11
starts 47:9 139:3
stat 132:14
state 1:24 5:18,22,24 15:19 16:9,12

16:16 22:2 44:9 79:4,25 80:12
81:3,3,10 85:10,14,22 86:6,20
87:14,15,17,22 88:3,17,18 89:15
89:24 91:13,19 93:11,17,17,18,23
93:25 94:3,6,7 95:12 102:18
182:4,24 184:5
stated 74:19
statement 23:16,21 95:16,20 98:9
98:11,17 100:4 112:5 122:8,17
123:18
statements 96:17
states 1:2 16:5,18 45:17,17 50:20
73:19 80:8 83:13 86:7 88:9
102:19,22 120:10 144:23
states' 102:23
statistic 41:2 142:20
statistical 77:4,22 154:9 157:2
158:13
statistics 46:14 76:25 114:4 115:2
116:24 117:4,6,10,16 118:6,16
128:17
stats 119:11,18 120:5,11 123:25
124:9 132:9,18 133:9,17 134:4
135:7,17,23 136:4,9,17 137:5
166:19 171:4
status 163:17
Stenotype 1:23
Stephen 11:17,17
steps 55:25 133:7 137:11
STERLING 2:15
Steven 120:15
stick 163:19
stipulate 4:22
stipulated 3:4,10,15 4:2,14 5:5,6,7
STIPULATIONS 3:2
stop 160:19 161:5
stopped 155:10 161:2
stragglers 162:9
Street 6:2
students 60:10,13 90:8
studies 10:10 17:13 34:8 38:11
40:23 120:22
study 23:17 72:5,6,10 88:18,21
89:10,13,17 90:5 111:9 112:17,18
172:20
studying 81:11 90:3
sub 72:21
subcategories 129:12 138:22
subclassifications 129:18 130:9
subdisciplines 72:18
subfield 72:25
subfields 72:23 73:7
subject 56:9,12,15 57:9 59:23 60:16
60:25 61:18 68:2
subscribed 182:19
subsequent 31:18,23 36:11 45:18
49:5 147:18 179:2
subsequently 29:8

subspecialty 143:24
substance 9:14 12:16,21 16:21
substantially 162:25 178:12
subsumed 148:15
successful 177:23
suffer 8:23
suggest 36:2 74:17 80:12 81:3
    154:13
suggesting 80:18,24 87:2 145:21
    149:6 170:21 179:15 180:20
suing 80:15
suitable 76:16,17 79:11 80:21 82:9
    85:18
Suite 6:2
sum 46:12
summarized 51:23
summarizes 49:14
summary 12:9 25:12 46:23 47:21
    48:10 144:20
super 86:23
supervisor 170:25
supplied 155:9 172:21
support 99:9,18,25 100:15 124:12
supporting 100:4
supposed 8:12 100:9
sure 7:2 32:20 38:3 39:2 41:15
    45:24 47:4,22,25 54:3 55:23
    70:22 72:16 80:10 91:7 107:10
    115:14 138:2 141:21,22 150:5
    164:16 166:24 169:6,22 178:10
surrounding 93:13 164:25
survey 44:24 61:4,6 66:4
sustained 45:19 48:3
swear 4:21,24
swing 175:9,11
swoft 114:16
sworn 3:18 5:17 6:9 184:7
system 29:11
systems 69:15

T

T 1:1 2:1 3:1 4:1 5:1,15 182:1 183:6
    184:2,2
table 47:8 49:20,21,22,23,24 50:4
    50:21 51:9 114:8,13 138:19
    139:12 140:23 141:17,23 143:15
    145:14 147:9 148:2,3,8 150:17
    153:18 161:16,23 162:12,23
    163:14,23,25 164:12,23
take 6:18,21 7:8 8:3,7 33:24,24
    41:10 47:2 48:13,14,15 52:24
    55:25 77:17 86:6 88:23 91:9
    94:15,19,23 109:24 114:22
    126:13 134:12 137:11 141:19
    143:16 146:7 147:24 148:23
    149:6 150:19 156:6,17,19,20
    157:9 158:21 162:2,15,19 164:3
    165:6 173:12 174:2,11,20

taken 1:20 48:21 52:9 90:23 95:4
    112:7 126:5,19 133:7 153:15
    154:22 160:9 182:8
takes 77:13 180:13
talk 75:4 92:23 102:21 107:6
    118:25
talked 61:7
talking 39:25 55:9 116:13
tallied 38:2 43:18
tally 38:21
target 98:6 99:11
task 37:19
tax 95:24,25 96:3,8,10,15 97:12,15
    97:21,25 176:10 178:19
teachers 131:6,8
team 179:17
Teleflex 121:11
telephone 4:11
teletron 132:23
tell 6:10 30:5 39:6 72:21 135:13
telling 57:7
temperature 112:8
Temple 14:17 15:8,21 58:19,21
    61:22 62:2
temporary 175:22 179:25
ten 172:12
tend 173:4
tended 43:4 44:2
tendency 107:19 159:23
tender 181:4
term 19:4,5 32:17,22 68:12,13,17
    71:3 73:5 109:9 116:2,5,10,13
    117:2 134:9 138:4 142:22 154:6
    154:25 171:21 172:4 180:14
terminated 65:5 67:3 91:3,16
    177:17
termination 46:6 88:25
terms 57:11 171:2 174:19
test 134:21 155:22
tested 134:16,25
testified 5:19 9:4 21:7 56:22 74:20
    120:6 122:9 123:2 128:10 146:8
    167:17 170:11
testify 8:16,20 11:25 40:8 54:16,18
    57:6 119:15 121:4 122:10 123:5,8
    123:17 125:17,20 126:25 127:14
testifying 6:7 11:21,23 32:23 40:4
    64:20 92:14 121:21 124:18,24
    142:9
testimony 6:21 8:2 9:17 11:3 21:20
    21:23 22:4,18,19,20,22 23:12,17
    25:21 32:4 54:13 56:16 57:19,24
    68:23 75:13 81:15 82:6 107:11
    108:8 117:14 118:5,15 121:21
    123:20 124:25 125:12 127:9
    133:2,22 142:8 182:8,11 184:9
text 49:4
textbook 60:22

thank 13:8 28:3 51:8 58:2 66:12
    97:4 107:18,24 108:15 113:2
    161:22 181:3
theory 19:9 151:2
thereof 53:21 59:20 146:15 166:2
thin 81:5
thing 163:21
things 35:11 134:10 143:4
think 18:21 25:25 32:11 47:16
    49:14 50:16 56:22 57:20,21 78:13
    95:25 104:13 107:16 115:16
    128:5 131:4 132:22 140:18
    144:13 153:7 162:24 165:13,14
    165:18 170:7 171:13 174:5
    175:19 177:12 178:2 179:20
    180:2
third 89:16 98:3 139:14
third-parties 93:23
third-party 134:20
thirds 155:20
Thirteen 58:25
thought 19:9 39:22 75:4 82:23
    107:9 146:16
thousand 20:8
three 15:18,19 35:4,10,17,22 43:12
    48:22,24 73:19 78:8,14,16 88:9
    88:14,16 95:19 144:23 155:17,17
    157:7 171:23
threshold 174:15
throw 54:22
throwing 54:23
tied 64:3 66:17
time 1:22 3:12 5:3 6:22 7:6,12,12
    8:3 23:21 33:4,5,21 34:2 41:22
    43:13,20 44:22 46:2 48:14,17
    49:19 50:15 51:21 52:20 53:5,7,8
    53:11,17 55:15,15 57:17 70:4
    74:15 75:14 77:20 79:9 84:5
    85:22 86:21,22 87:4,11,12,20,21
    88:6,25 89:5 90:20,22 91:2,14
    98:6 99:11 101:8,12,16 102:5
    103:23 104:7,24 110:5 113:11
    114:21 116:20 120:10 124:25
    134:17,23 148:21 151:18 152:19
    152:20 153:4 156:2,6 157:13
    158:8 159:10,24 160:10 161:4
    163:6,12 165:2 173:2 175:13
    177:22 178:14 181:2,3
timeframe 56:11
times 19:3 20:8 36:23 38:25 60:9,9
    107:7 157:7
title 139:18 140:3
titles 47:11
today 5:10 6:21 7:18 8:17,21 9:7
    10:17 11:24 17:14 38:9 75:13
    96:21 101:9,14 107:7 114:15
    126:11 140:4,11 144:13 146:13
    153:4

**today's** 8:2 9:10,17 34:20 146:22
**told** 36:3 127:9 162:24
**Toni** 1:22 4:23 5:17 10:13 24:4,6,23
    31:24 69:23 70:3 78:10 86:15
    103:21 104:22 106:11 108:6
    121:25 142:18 184:4,19
**top** 10:10 24:16 64:16 66:2 69:8
    104:8 108:22 109:2,17,21 114:2
    124:21 125:7,11 142:3 167:12
**topic** 60:8 63:6 64:10 66:20 102:10
    102:15,22
**topics** 71:24 103:3
**tort** 60:22
**total** 23:23 51:10,22 52:24
**totaled** 23:22 43:18
**totality** 46:20 48:10 82:11 113:17
**totally** 44:8 46:13
**tracking** 160:19 161:2,5
**trade** 149:5 152:4
**trades** 149:21
**traditional** 131:8
**train** 107:8
**trained** 56:19 145:18,19 152:5
    180:23
**training** 13:20 14:13,15 15:2,6,11
    15:14,17,21,24 47:15 54:5 67:17
    73:12,23 80:14 145:4 146:24
    151:7 154:3,3,14
**transacted** 155:23,24
**transactions** 53:14
**transcript** 107:17 181:10 182:8,10
    184:8
**transferrable** 170:14
**transferring** 171:7
**transitioned** 168:6
**transpired** 158:2,10 159:6
**transportability** 169:25 170:4,13
**trash** 137:22,23
**treated** 130:23
**trial** 3:13 9:4 13:17,21 22:19,22
    54:17,19 60:11 75:14 142:8
**trier** 122:25
**true** 12:2,18 27:2 51:7 54:15 64:4
    73:10 88:11 89:3 92:3 97:6
    100:12 103:14 125:11 140:14
    173:15 182:10,12 184:8
**truth** 6:10
**truthfully** 8:16,20
**try** 107:20 116:25 177:12
**trying** 38:7 107:10,11 164:23
    171:21
**turn** 25:5 26:10 48:22 84:18 95:6
    147:6 177:25
**turning** 12:19 13:24 16:19 42:16
    98:3 113:2
**twenty-three** 151:9
**twice** 87:24
**two** 33:2 35:8 47:20 63:4,13 73:14

75:23 92:23 98:13 101:7,11 105:7
    125:13 128:24 129:2,3,6 139:5
    142:21,25 148:17 152:16 154:11
    155:19 161:7 163:16
**type** 36:19 37:9 39:10,13 40:16
    64:3,5 73:25 102:14 143:16 157:3
    157:8
**types** 17:20 34:5,10 37:12 45:10
    150:2
**typical** 20:14 25:24
**typically** 34:11 131:5,12,13 132:5
    168:10 170:14 176:18
**typing** 12:8

**U**

**ultimate** 118:25 122:7,8,11,13,24
    123:3,8
**ultimately** 21:19 22:7
**unable** 21:19
**unauthorized** 4:18
**uncomfortable** 22:8
**underlying** 115:12
**Underneath** 10:11
**underscore** 10:4,4
**understand** 6:15,19 7:17,22,24
    35:3 37:8 38:3,4 66:23 69:25 72:4
    72:7 101:5,24 106:8 109:9 119:23
    126:17 130:2 133:21 149:24
    154:24 156:5,15 158:18 163:10
    177:10 178:10
**understandable** 6:13,17
**understanding** 15:25 16:10 20:25
    21:6 28:18 53:9,11 54:7,25 55:12
    94:20 100:8 119:5,20,21,22 122:4
    122:24 123:4 130:19 156:10
**unemployability** 117:10
**unemployed** 102:6 154:7
**unemployment** 44:16 95:17,18,23
    96:5,6,13,14,22,25 114:4,10
    115:22 116:23 117:4,6,15 118:6
    118:16 128:8,16 138:24 140:22
    141:25 142:14,25 143:6,8,20,25
    144:5 147:10 150:8 158:20
    159:12 160:2,11 163:16 164:24
    165:11,22 166:3,13
**unemployment's** 158:16
**unfortunately** 25:18 64:15 143:23
    150:6
**union** 34:8
**United** 1:2 45:17 120:10
**universe** 39:15,25
**University** 14:17 15:22 58:19,21
    59:17,18,19 60:18 61:2 62:21,23
    62:25
**University's** 15:9
**unreasonable** 172:18
**unskilled** 150:25,25 151:18
**update** 64:25

**updated** 77:9 164:8
**updates** 77:15,17
**upper** 33:25
**use** 13:13,19 14:8,19 15:11,14 44:3
    63:13 68:7 71:12 73:4 109:9
    114:13 116:3 117:5,9 119:10,17
    120:5,8,11 123:24 134:2 138:14
    157:8 158:24 159:2 162:5,7,14,17
    164:2,7,12,13 169:12
**uses** 71:10 152:19
**utilized** 131:21

**V**

**v** 114:3 118:17 126:2,3
**VAGNINI** 2:3
**vague** 56:17 73:15 86:23 135:20
    138:10
**validation** 67:12
**VALLI** 2:3
**valuation** 13:10
**valuations** 34:7
**value** 61:15
**variables** 142:21,25
**various** 12:22 17:20 38:11 59:5
    70:25,25 102:13,16,18,23,24
    103:4 114:17 149:13 167:10
    170:17
**vary** 33:19
**verbal** 7:8,10 29:3 101:20 115:25
    156:16 160:5
**verify** 96:9,20
**version** 29:10,18,19 30:2,3
**versus** 118:10 119:6,24 120:17
    121:11,14,17 123:14
**vet** 70:25
**vice** 16:18
**videoconference** 4:9,15
**view** 85:24 91:20,24
**vignette** 60:14
**Villanova** 14:5,7 59:16,24,25 60:20
    61:11,14,24 62:3,4,7,8,11,14
**violation** 4:18
**vita** 147:2
**vitae** 59:6 64:14 183:8
**vocation** 46:16 151:17,22 152:5
    153:20
**vocational** 58:5 170:12
**vocations** 151:10
**voice** 174:5
**volume** 151:3

**W**

**W** 182:2
**W-E-X-L-E-R** 28:10
**wait** 6:23 7:3
**waived** 3:8
**Walnut** 6:2
**want** 36:2 38:3,20 39:5 42:20 47:3

47:4,22 69:2 80:25 82:21 84:8
103:2 107:22 152:4,6 153:8
163:19 175:6,19 178:8 181:3
**wanted** 40:6 47:16 86:5 101:15
102:4 106:3 174:23
**wants** 42:19
**wasn't** 23:22 35:21 76:14 84:4
88:24 93:10,19 94:6,12 127:21
164:14 166:17
**way** 39:7 42:18 68:13 71:4 136:3
184:13
**we'll** 47:23 48:14 75:22 94:24
**we're** 7:17 33:19 38:7 39:25 82:21
84:22 113:23 116:13 138:19
153:7 157:25 158:2,3,8 175:12,12
175:19 177:12
**we've** 122:20
**web** 4:11 5:11 102:18,24 104:20
108:21
**website** 99:4,8,22 110:16 112:9
**week** 43:13,24 51:13 52:2,10,16
88:24 95:19 98:8 99:10 104:12
113:15 160:21,24
**weekly** 52:7,8
**weeks** 44:21,21 51:25 53:5 88:22
89:13 147:12 148:4,5,8 149:5
151:9,13 153:24 155:19,21
157:21,23,23 160:21 161:6,7,10
161:12
**went** 107:3 134:8
**weren't** 48:3 93:22,24 94:2 172:5
**Wexler** 28:10,12,16,19 29:9 30:23
98:20,21 99:3 100:20
**Wexler's** 28:23 30:19
**WHEREOF** 184:15
**wide** 69:11 179:18
**willing** 11:12 21:22
**wish** 8:3
**Withdrawn** 9:8 34:23 40:21 90:12
90:15 109:4
**witness** 1:20 4:8,9,21,24 5:2,10,16
10:14 16:23 24:24 32:12,18 42:21
71:23,24 72:15 78:13,17 84:4,10
94:23 125:3 128:9 142:9 169:17
174:5 175:12 181:4,6,8,14 183:3
184:6,9,15
**women** 128:21 149:4
**won** 63:17
**word** 19:7 55:17,17 69:18
**worded** 71:5 126:17
**words** 136:20 171:2,24
**work** 17:3 19:11 21:9,14 22:10,16
30:16 31:14 32:13,20 33:8,13,14
33:17,22 34:5,10,17,25 35:5,16
43:12,20 60:12 62:14 63:20 64:16
64:17 65:3,7,18,25 66:2,5,9,21,24
67:7,11 76:18,19 85:19 93:18,19
95:19 98:25 99:2 135:15 148:12

148:19 152:13 154:11 155:10
159:18 169:21 172:22 180:18
**workarounds** 92:12
**worked** 21:2 65:19 94:8 97:18
152:6
**workers** 128:18 139:4 148:4 150:23
150:24 156:7
**working** 20:9,12 33:6 34:13 39:15
41:21 53:12 60:2,20 89:21 98:5
99:12 101:18 106:4 149:17
152:14 155:8
**works** 10:19
**world** 152:7,21 157:10
**worth** 82:17 174:25
**wouldn't** 74:5 141:13 162:17
164:13 173:19 175:2
**wrap** 175:19
**write** 145:21,24
**writing** 22:17
**written** 4:17 12:7 100:10,13 110:6
**wrong** 18:22 39:23 113:11
**wrongful** 17:22 46:6
**www.thebalancecareers.com** 105:2

_____
**X**

**X** 1:3,14 183:2,6

_____
**Y**

**Yang** 126:2,3,21
**year** 21:8,10,12 41:13,19,24 42:3
42:14 50:6 75:24 77:16 87:24
153:24 154:8,12 158:17 160:24
**years** 19:21,24 20:6 58:25 61:5
64:15,24 75:17 77:14 79:22 81:8
82:12 92:7,22 93:4,6,9 97:5 98:21
99:5,15 127:7 128:5 144:24 161:8
163:16 174:16
**yesterday** 9:13
**York** 1:2,24 2:4,8,8,13,13,17,17
5:18 43:9,11 44:9 45:5,16,22 54:8
75:15 79:15,16 85:11,14 86:6,20
87:3,18,23 88:3 90:18,21 91:4,13
91:15 95:13,17 99:22 102:20
124:18,24 125:14,16 155:12
172:2 182:4,24 184:5
**Yorker** 107:19,23

_____
**Z**

**Zip** 134:21
**Zoom** 4:11 107:5

_____
**0**

**0.54** 52:15
**000001** 50:2

_____
**1**

**1** 10:5,6 24:14 47:19 51:23 172:2
183:8

**1-10** 1:11
**1,000** 23:8 37:4,23 38:10,12 39:21
40:4,8 41:17 65:19,21
**1.61** 51:12,25 52:7 54:11
**1:37** 94:14
**10** 33:20,20 34:2 44:20 77:14,16
94:23 183:8
**100** 39:2,18,20 40:5,8 65:21 150:10
161:6,7,10,12
**10001** 2:8
**10004** 2:13
**10222** 2:17
**104** 183:10
**106** 43:18 51:10 52:24 53:4 75:23
172:18
**11-13-20.PDF** 24:8
**11:00** 107:3
**11:05** 1:15
**11530** 2:4
**12** 49:25
**12:10** 42:18
**12:20** 48:14
**13** 31:2
**13.7** 152:2
**13th** 29:20
**14** 50:17,20
**14th** 2:8
**15** 33:20 132:10
**16** 20:6 41:13,19 50:17
**1608** 6:2
**17** 36:15 50:13 88:5 91:11 160:25
163:4
**17.0** 147:12
**17.36** 151:13
**18** 173:9,10
**18-cv-08188** 1:7
**19** 162:7 164:11,21
**19103** 6:3
**1996** 93:2 174:17 180:24
**1st** 45:4 159:2

_____
**2**

**2** 4:5 24:9,10 183:9
**2,500** 22:19,23
**2:00** 94:25
**20** 33:24 34:4 42:2 56:5 81:8 82:12
92:7,22 93:4,6,9 97:5 98:12,14,18
100:6,14,19 101:3 104:11,17
105:5 144:24
**2001** 73:18 145:22
**2005** 23:9 118:2
**2008** 67:16 90:21 152:7
**2010** 64:24
**2017** 45:4 47:19 50:6,9,10,22,25
51:12 52:5,10,14,21 86:5 87:24
91:9 114:10 145:16 148:5 157:20
158:9 159:4,5,18 160:2,3,4,10,12
160:15,18 161:12,20 162:8,9,12

163:7,8,8,16 164:22 172:3
**2018** 50:6,7 51:12 52:5,11 53:3
 64:25
**2019** 86:4 161:9,13,17,19,24,25
 162:4,13,17,24 163:6,9,13,17,19
 163:21,25 164:5
**2020** 28:17,20,24 31:3 45:5 47:19
 52:22 56:11 57:14,17 113:6
 145:16 172:3
**2021** 1:15 55:12 64:24 87:19 159:2
 182:9,20 184:16
**220** 2:8
**23.7** 156:20 157:23
**23rd** 52:22
**24** 183:9
**25** 43:24 98:8 99:10 104:11 113:15
 128:2 183:13
**26** 23:13,15 153:24
**26(a)** 146:3,7
**26.7** 149:5
**27** 155:19,21 160:21
**28** 4:5
**28th** 2:12

---
### 3

**3** 78:19 103:25 104:2 108:12,14,15
 183:10
**30** 1:15 42:2 50:22,25 52:14 55:9
 182:9
**30.4** 149:5 152:3
**300** 39:4 172:11
**303** 50:2 51:24
**30th** 50:17 51:11 178:16 184:16
**335** 22:17,22 34:12
**36.6** 148:8
**37** 44:21

---
### 4

**4** 108:13
**4:10** 175:12
**4:15** 181:14
**40** 43:24 64:16,16 66:2,2 98:8 99:10
 113:15
**45** 128:21 151:13

---
### 5

**5** 183:4
**50** 148:6
**500** 37:9,24 38:5,19 40:7
**500ish** 39:23
**512** 84:18,23
**54** 128:22 151:13
**55** 54:11,23,24
**551** 45:11 47:7,12,16
**594** 43:16
**599** 2:16

---
### 6

**6** 45:4 51:12 78:12
**6,409** 45:7 47:9 74:24
**60** 55:9
**600** 2:4
**608** 24:15,20
**65** 33:3
**67.9** 153:21
**68** 153:24

---
### 7

**7** 113:6
**70** 34:2
**702** 121:8
**74** 154:6
**75** 33:4

---
### 8

**801** 6:2

---
### 9

**9.6** 147:11 148:4,5 157:21,23
**90** 173:5