UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER S. FISCHMAN,

                Plaintiff,

     -against-

MITSUBISHI CHEMICAL HOLDINGS
AMERICA, INC.; MITSUBISHI CHEMICAL
CORPORATION; MITSUBISHI CHEMICAL
HOLDINGS CORPORATION; NICHOLAS
OLIVA, in his individual and professional
capacities; DONNA COSTA, in her individual
and professional capacities; and JOHN DOES
1-10, in their individual and professional
capacities,

                Defendants.

Index No. 18-cv-08188 (JMF)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF UNDISPUTED FACTS ..............................................................3

SUMMARY JUDGMENT STANDARD ..................................................................12

ARGUMENT .............................................................................................................13

    I.    The Undisputed Facts Disprove Plaintiff's Claims of Gender Discrimination Under Title VII, the NYSHRL, and NYCHRL as a Matter of Law (First, Fourth and Fifth Causes of Action) ...................................................13

        A.    Plaintiff Cannot Establish a *Prima Facie* Case of Gender Discrimination...............................................................................14

            1.    Costa's Role in the Employment Decisions Defeats Any Inference of Discrimination .......................................... 14

            2.    Plaintiff Fails to Present Any Evidence of Disparate Treatment.. 16

            3.    For Additional Reasons, Plaintiff Cannot Make a *Prima Facie* Case of Discriminatory Failure-to-Promote................................. 17

        B.    Defendants Had Legitimate, Non-Discriminatory Reasons for the Employment Decisions ...............................................................19

    II.    The Undisputed Facts Disprove Plaintiff's Retaliation Claim Under Title VII as a Matter of Law (Second Cause of Action)......................................22

    III.    The Undisputed Facts Disprove Plaintiff's Federal and State Equal Pay Act Claims (Third and Sixth Causes of Action) as a Matter of Law...........................24

    IV.    Plaintiff's Aiding and Abetting Claims Against Costa and Oliva Under the NYSHRL and NYCHRL Should Also Be Dismissed (Seventh and Eighth Causes of Action).....................................................................................25

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
   239 F.3d 456 (2d Cir. 2001) ................................................................................. 13

*Adler v. Penn Credit Corp.*,
   No. 19-cv-7084, 2022 WL 744031 (S.D.N.Y. Mar. 11, 2022) ................................. 12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 12

*Baptiste v. Cushman & Wakefield*,
   No. 03-cv-2102-RCC, 2007 WL 747796 (S.D.N.Y. Mar. 7, 2007) ......................... 12

*Campbell v. All. Nat'l Inc.*,
   107 F. Supp. 2d 234 (S.D.N.Y. 2000) ................................................................... 15

*Del Villar v. Hyatt Hotel Corp.*,
   No. 19 Civ. 10891, 2022 WL 2316205 (S.D.N.Y. June 28, 2022)........................... 13

*DeMuth v. United States Small Bus. Admin.*,
   819 F. App'x 23 (2d Cir. 2020) ............................................................................. 14

*Dickerson v. Health Mgmt. Corp. of Am.*,
   21 A.D.3d 326 (1st Dep't 2005) ............................................................................ 15

*Garcia v. Barclays Capital, Inc.*,
   281 F. Supp. 3d 365 (S.D.N.Y. 2017) ................................................................... 24

*Gilani v. Teneo, Inc.*,
   2021 WL 3501330 (S.D.N.Y. 2021) ...................................................................... 15

*Grady v. Affiliated Cent., Inc.*,
   130 F.3d 553 (2d Cir. 1997) ................................................................................. 15

*Halkitis v. New York City Department of Education*,
   19-cv-11753-JMF, 2022 WL 392911 (S.D.N.Y. Feb. 9, 2022)......................... 21, 22

*James v. New York Racing Ass'n*,
   233 F.3d 149 (2d Cir. 2000) ................................................................................. 15

*Jeune v. City of New York*,
   No. 11 Civ. 07424, 2014 WL 83851 (S.D.N.Y. Jan. 9, 2014)........................... 13, 14

*Mandell v. County of Suffolk*,
    316 F.3d 368 (2d Cir. 2003) ................................................................ 16

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) ................................................................ 13

*Moccio v. Cornell University*,
    889 F. Supp.2d 539 (S.D.N.Y. 2012) ................................................. 23

*Niagara Mohawk Power Corp. v. Jones Chem. Inc.*,
    315 F.3d 171 (2d Cir. 2003) ................................................................ 12

*Ochoa v. Fed. Express Corp.*,
    No. 16 Civ. 08729, 2018 WL 3996928 (S.D.N.Y. Aug. 21, 2018) ......... 16

*Petrosino v. Bell Atlantic*,
    385 F.3d 210 (2d Cir. 2004) ................................................................ 18

*Ricks v. Conde Nast Publications, Inc.*,
    6 Fed.Appx. 74 (2d Cir. 2001) ........................................................... 21

*Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*,
    575 F.3d 199 (2d Cir. 2009) ................................................................ 12

*White v. Pacifica Found.*,
    973 F. Supp. 2d 363 (S.D.N.Y. 2013) ................................................. 25

*Williams v. New York City Housing Auth.*,
    61 A.D.3d 62 (1st Dep't 2009) ........................................................... 13

*Wilson v. JPMorgan Chase Bank, N.A.*,
    No. 20 Civ. 04558, 2021 WL 918770 (S.D.N.Y. Mar. 10, 2021) ......... 25

*Zann Kwan v. Andalex Grp.*,
    737 F.3d 834 (2d Cir. 2013) ................................................................ 22

**Statutes**

29 U.S.C. § 206(d)(1) ................................................................................ 24

N.Y. Lab. Law § 194(1)(iv) ....................................................................... 24

N.Y.C. Admin. Code § 8-107(1)(a) ............................................................ 13

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................. 12

Defendants Mitsubishi Chemical Holdings America, Inc. ("MCHA"), now known as Mitsubishi Chemical America, Inc., Mitsubishi Chemical Holdings Corporation ("MCHC"), now known as Mitsubishi Chemical Group Corporation, Nicholas Oliva, and Donna Costa (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing this action in its entirety. Plaintiff Jennifer S. Fischman has failed to raise any genuine issue of material fact as to her claims.

## PRELIMINARY STATEMENT

Not one of Plaintiff's claims can survive summary judgment. Defendants are entitled to judgment as a matter of law because the undisputed evidence shows that the legitimate business-based decisions made about Plaintiff's employment—specifically, not to name her General Counsel, to terminate her, and about her pay scale—were not the result of gender discrimination or retaliation.[1]

The undisputed facts, supported by testimony and documentary evidence, disprove Plaintiff's claims of gender-based discrimination. Plaintiff alleged three adverse employment actions (the "Employment Decisions") against her: (1) passing her over for the role of MCHA's General Counsel, (2) returning her from the role of MCHA's Acting General Counsel to her former Assistant General Counsel position, and (3) terminating her employment. It is undisputed that Costa—the woman who served as MCHA's General Counsel and, later, President—made or approved all three Employment Decisions. It is also undisputed that Costa had previously: (i) hired

---

[1] Defendants maintain that MCHC never employed Plaintiff. (*See* MCHC's Jan. 17, 2020 Mot. to Dismiss Br., ECF No. 67.) MCHC does not seek summary judgment on that issue because it is abundantly clear for all the other reasons set forth here that Defendants are entitled to summary judgment on all of Plaintiff's remaining claims and this Court therefore need not reach the issue of whether MCHC employed Plaintiff in order to decide this motion. MCHC reserves all rights on this issue.

Plaintiff to join the MCHA legal department, which was built by Costa and was majority female throughout Costa's tenure as General Counsel; (ii) provided Plaintiff substantial pay increases annually; (iii) provided Plaintiff with countless training and advancement opportunities in order to support her advancement at MCHA; (iv) promoted Plaintiff to Assistant General Counsel; (v) promoted Plaintiff to Acting General Counsel over a man who also held the title of Assistant General Counsel; and (vi) later, as President of MCHA, appointed Plaintiff to serve on the newly formed MCHA Leadership Team, whose members, all appointed by Costa, were four women and four men. Plaintiff's claim that Defendants gave Oliva preferential treatment over her because of his gender is unsubstantiated—rather, it is undisputed that Costa did not initiate the hiring of Oliva as General Counsel until *after* she concluded that Plaintiff was incapable of doing the job. In sum, the undisputed facts negate any assertion that the Employment Decisions were based on *animus* related to Plaintiff's gender.

Even if Plaintiff could establish a *prima facie* case of gender discrimination (which she cannot), her claims still fail because of the undisputed evidence of Costa's legitimate, non-discriminatory reasons for making or approving the Employment Decisions. Plaintiff can point to no admissible evidence that Costa's stated reasons for the Employment Decisions were pretextual. Thus, the gender discrimination claims must be dismissed.

Likewise, there is no genuine issue of material fact with respect to Plaintiff's claim of retaliation. *First*, Plaintiff did not engage in protected activities. Indeed, other than her own testimony, Plaintiff's only evidence of any alleged protected activity is a forged document as to which the expert conclusion of forgery is unrefuted. *Second*, even if Plaintiff could establish that she engaged in protected activity, there is no causal connection between that alleged activity and the Employment Decisions. Thus, Plaintiff's retaliation claim fails.

Plaintiff's Equal Pay Act claims are equally unsuccessful because the undisputed evidence undercuts any argument that Plaintiff received less compensation than Oliva, the sole comparator she has identified. Plaintiff was the highest paid Assistant General Counsel at MCHA and her salary as Acting General Counsel was the same salary offered to Oliva when he was offered the General Counsel role. In any event, Plaintiff and Oliva did not receive different pay for the same position: Plaintiff was Acting General Counsel; Oliva was General Counsel. Further, it is undisputed that Plaintiff would have received a pay increase if she had been appointed General Counsel. Moreover, it is undisputed that, to persuade Oliva to accept the General Counsel position, MCHA had to offer him a one-time signing bonus, which he requested in order to pay back the signing bonus his previous employer had given him. Unlike Plaintiff, who faced no economic downside from a promotion, Oliva had to be incentivized to leave another employer to join MCHA. As such, the undisputed evidence disproves Plaintiff's Equal Pay Act claims.

Finally, Plaintiff's aiding and abetting claims against Costa and Oliva must fail because there was no underlying discrimination or retaliation. Therefore, summary judgment should be granted on these claims as well.

## STATEMENT OF UNDISPUTED FACTS[2]

In 2008, Donna Costa—then MCHA's Vice President and General Counsel—hired Plaintiff as a Corporate Counsel for MCHA. (Rule 56.1 Statement of Undisputed Material Facts ("SOF") ¶¶ 17, 19-22.) When Plaintiff was interviewing for the Corporate Counsel position, she

---

[2] For a complete statement of the material facts as to which there is no genuine issue to be tried, Defendants respectfully refer the Court to their Rule 56.1 Statement of Undisputed Material Facts and the evidence cited therein. Although Defendants are not contesting certain facts for purposes of this motion, they reserve the right to dispute Plaintiff's version of events, including statements set forth in their Rule 56.1 Statement and this memorandum.

met with Costa and other members of MCHA's legal department, but did not meet with anyone from MCHC, MCHA's parent company. (SOF ¶¶ 17-18.) Over the next five years, Costa provided Plaintiff with extensive training, development opportunities, and increasing responsibility. (SOF ¶ 33.) Further, Costa gave Plaintiff positive performance reviews and approved yearly salary increases for her. (SOF ¶ 34.) By 2012, Plaintiff was earning $201,699.16. (SOF ¶¶ 27-28.) In 2013, Costa promoted Plaintiff to become MCHA's Assistant General Counsel with a pay increase to $211,785.08. (SOF ¶¶ 30-32.) By 2014, Costa had raised Plaintiff's base salary to $222,161.94. (SOF ¶ 39.)

In late 2014, MCHC decided to promote Costa to President of MCHA, effective April 1, 2015, to replace Shoji Yoshisato, who planned to return to Japan. (SOF ¶ 42.) Costa preferred to hire someone from outside MCHA to fill the now vacant General Counsel position because she thought that none of MCHA's three Assistant General Counsels—one man and two women, including Plaintiff—were fit for the job. (SOF ¶ 43.) Yoshisato, however, told Costa that he preferred an internal promotion. (SOF ¶ 44.) Because of her concerns about Plaintiff's readiness to handle the General Counsel role, Costa decided to offer Plaintiff the position of Acting General Counsel, at a base salary of $300,000. (SOF ¶¶ 45, 54, 56.) In December 2014, Costa informed Ken Fujiwara, then head of MCHC's legal department, that MCHA would promote Plaintiff to Acting General Counsel on a probationary basis: "I received the message from Yoshisato-san that MCHA wants us to make Jennifer Acting-General Counsel for 12 months in the hope that she will grow into the job. I am working on a plan to communicate to her, which I will discuss with Yoshisato-san and later present to Jennifer." (SOF ¶ 46.) Plaintiff accepted the promotion, and Costa and Patricia Saunders, MCHA's Human Resources Director, immediately began preparing Plaintiff for the new role, which she assumed on April 1, 2015. (SOF ¶¶ 49-50, 61.)

Despite extensive, ongoing training by Costa and Saunders, Costa's performance reviews of Plaintiff soon reflected deficiencies in Plaintiff's communication skills, leadership, and development of colleagues. (SOF ¶ 59.) In June 2015, Costa told Saunders in a meeting that Plaintiff needed to "stop being defensive," learn to say "yes" or "I agree," "listen more" and "talk less," and be less "sloppy." (SOF ¶ 60.) Other MCHA employees also had difficulty working with Plaintiff. (SOF ¶¶ 60, 65-68.) In the summer of 2015, for example, Kelly Troccoli, a Legal Assistant and Compliance Coordinator at MCHA, submitted a formal complaint to Saunders alleging that Plaintiff had discriminated against her based on her disability. (SOF ¶ 75.) In August 2015, Ms. Troccoli complained to Costa about the difficulties she and others in MCHA's legal department had working with Plaintiff:

- "Potential for things to fall through the cracks because they are not being relayed . . . .";

- "She is completely micro managing to the point where it is detrimental . . . .";

- "Long delay in response time to questions that should take a minute to answer";

- "Her method of communication is often inappropriate (ie the words she chooses, the tone, etc.[)] and this also is with everyone not just our office";

- "She answers emails before reading the entire email in an effort to appear to respond quickly which then results in a multi email chain to correct the advice she's given";

- "She doesn't appear to fully grasp the job responsibilities (I think compliance is overwhelming her. . . .)";

- "legal dept meetings (there have been 2) have been very unorganized!";

- "She continues to try but ultimately struggle with her personality issues as it relates to dealing with others"; and

- "I've had people in our office and other companies make comments about her personality and ability to do the job."

(SOF ¶ 68.) Later that month, Troccoli also told Costa that Plaintiff was rude to her when Troccoli relayed a question from Costa to Plaintiff: "FYI she got defensive and nasty with me ..............it's hard to work with someone who loses her shit every time you mention Donna  :( ."  (SOF ¶ 69.) Plaintiff subsequently met with Saunders to complain about Troccoli's absences and threatened to quit if Troccoli was not fired, saying: "It's [Troccoli] or me."  (SOF ¶ 72.)

By August 2015, Costa sought to replace Plaintiff as Acting General Counsel because of persistent problems with her performance. (SOF ¶ 71.) In an August 7, 2015 email to Saunders, Costa wrote: "It has now been over eight months since she was told of her promotion, and more than seven months since it was announced.  I have no reason to believe that the barriers to her success will disappear. . . .  Her style results in a lack of trust, which is unacceptable for someone in her role. Personally, I am growing exhausted from our discussions, which often leave me drained and frustrated." (SOF ¶ 66.) On August 16, 2015, Costa informed MCHC that she was considering terminating Plaintiff: "I am writing to let you know that it is not going well with Jennifer and that there is a good chance that I will want to terminate her. . . .  I will keep you posted " (*Id.*) After she learned of Troccoli's disability discrimination complaint against Plaintiff, Costa advised MCHC that the complaint was a "clear example" of Plaintiff's deficiencies as Acting General Counsel and confirmed that she wanted to terminate Plaintiff. (SOF ¶¶ 75-76.)

Later that month, Costa had lunch with Oliva, a former member of the MCHA legal department who had left MCHA to work in the pharmaceutical industry, and with whom Costa had kept in touch with since 2007.  (SOF ¶¶ 83, 104-07.) At the lunch, Costa mentioned that there were some difficulties in the MCHA legal department. (SOF ¶ 83.) To Costa's surprise, Oliva expressed interest in returning to MCHA, but Costa did not offer him the General Counsel position at the lunch. (SOF ¶¶ 83-85.)

On September 1, 2015, Costa emailed Plaintiff to schedule an in-person meeting to discuss their relationship, as well as Plaintiff's relationship with Troccoli, noting: "I am at a loss as to how to work with you and communicate with you." (SOF ¶ 78.) That same day, Costa wrote to MCHC recommending that Plaintiff be replaced and suggesting that Oliva be hired as General Counsel: "I would like your thoughts on the following: would you truly prefer to keep Jennifer as GC knowing all the people who are miserable as a result, or would you prefer to have Nick Oliva as GC (or someone like him)?" (SOF ¶ 85.) Fujiwara replied that he welcomed the idea of hiring Oliva: "About Nick, I like him a lot more than Jennifer. To be frank, Jennifer has been sometimes difficult for us, while, based on my experience, Nick had tried to understand our culture and to be nice with people from Japan." (SOF ¶ 86.) In response, Costa wrote that Plaintiff's, "personality negatively impacts the quality of her work and her ability to manage, and creates risk for the businesses being supported by MCHA." (SOF ¶ 87.)

Oliva's qualifications included, among others, extensive experience in pharmaceuticals, particularly with launching new products, and experience managing a global team of lawyers—all experience that Plaintiff did not have. (SOF ¶¶ 108-09.) Costa preferred to terminate Plaintiff because of her performance issues, but Fujiwara suggested that MCHA instead offer Plaintiff her former Assistant General Counsel position. (SOF ¶ 88.) On September 25, 2015, Costa informed Fujiwara and Masanori Sakaguchi, then general manager of MCHC's legal department, that she "ha[d] concluded that [she was] willing to offer Jennifer to return to her prior position rather than terminating her." (SOF ¶¶ 89-90.)

Oliva's subsequent interviews were conducted by two female MCHA employees: Saunders and a female Assistant General Counsel. (SOF ¶ 110.) In 2015, Costa offered Oliva the position of General Counsel and Chief Compliance Officer with a base salary of $300,000 plus a

car allowance. (SOF ¶ 111.) Oliva said he would accept the offer if it were increased to $325,000, based upon his prior work experience. (SOF ¶ 112.) On October 19, 2015, Oliva received an offer letter for the General Counsel and Chief Compliance Officer role with MCHA; he commenced his duties on November 30, 2015. (SOF ¶ 114.)

In Plaintiff's November 2015 evaluation, Costa informed her that she would not be promoted to General Counsel, but rather, returned to her former position of Assistant General Counsel. (SOF ¶¶ 97, 101.) Costa explained that she had concluded, after considering the input of MCHA employees, MCHA clients, and her own work with Plaintiff, that additional time would not remedy Plaintiff's failure to satisfy the core competencies required of the General Counsel position. (SOF ¶ 97.) Costa explained that she could no longer trust Plaintiff's judgment in her current role, listing five critical examples:

1. the Comtrex litigation, in which Plaintiff failed to notify Costa of what was happening in the case throughout the litigation;

2. the Filtec matter, where Plaintiff disregarded Costa's instructions and made incorrect, premature conclusions;

3. a Section 4010 ERISA-related filing, with regard to which Plaintiff exhibited poor judgment and failed to consult Costa;

4. Plaintiff's dealings with Troccoli, which exposed MCHA to a potential lawsuit; and

5. the Project Genesis "go/ no-go" discussion, during which Plaintiff made "an emphatic soapbox statement" that was "entirely inappropriate."

(SOF ¶ 100.) Costa noted that she had "discussed [her] concerns" with Plaintiff "without results." (SOF ¶ 101.)

That same month, Sakaguchi wrote to Plaintiff that her clients were "very unhappy" with the way she was representing them. (SOF ¶ 120.) In response, Plaintiff accused him of being "unprofessional and nasty." (SOF ¶ 121.)

Throughout Oliva's initial months as General Counsel, Plaintiff frequently questioned his experience and capabilities, and refused to keep him informed about her assignments. (SOF ¶¶ 116-19.) In a February 2016 email to himself, for example, Oliva noted that he had coached Plaintiff on a trade secret issue but Plaintiff responded to him in a "condescending" tone, even though "her legal reasoning/identification of the core issue was wrong." (SOF ¶ 122.)

In March 2016, Mike Gragtmans, president of Mitsubishi Chemical Performance Polymers, Inc., wrote to Costa that Jouhei Takimoto, one of the general managers at Mitsubishi Chemical Corporation ("MCC"), did not want Plaintiff to lead the legal effort related to a company acquisition because he preferred "a more experienced person who can handle a multi-national acquisition." (SOF ¶ 128.) Gragtmans also wrote that he was "truly disappointed that [Plaintiff] seems to have lost a great deal of credibility with [the Performance Polymers Division]." (*Id.*)

On April 30, 2016, Plaintiff received her year-end performance evaluation for 2015, conducted by Oliva, which indicated poor performance in communicating and contributing to team success. (SOF ¶¶ 130-32.)

In June 2016, MCC filed a breach-of-contract suit against Genomatica, Inc. ("Genomatica") in the U.S. District Court for the Southern District of California. (SOF ¶ 135.) Plaintiff was the lead MCHA attorney responsible for the Genomatica matter, supervising the work of MCC's outside counsel, Joshua Berman. (SOF ¶ 136.) By the fall of 2016, however, MCC was growing dissatisfied with Plaintiff's work. (SOF ¶¶ 137-38.) In October of that year, Tomoji Minami, a manager in MCHC's legal department, wrote to Oliva that Takimoto and others at MCC thought that Plaintiff was not updating MCC on a timely basis about developments in the case. (SOF ¶ 139.) By late 2016, MCC and Genomatica began negotiating a potential settlement. On January 3, 2017, Minami instructed Plaintiff to make a $2.5 million demand. (SOF ¶¶ 142-43.) On

January 5, Plaintiff wrote back: "[W]e are not ready to respond with a counter proposal. We will send you our recommendation as soon as possible." (SOF ¶ 144.) The following day, however, Berman, authorized by Plaintiff, emailed Genomatica's counsel with a $2.3 million counterproposal—a demand that was not approved by MCC and was $200,000 less than the figure MCC had approved. (SOF ¶¶ 145-47.)

On January 19, 2017, Minami wrote to Oliva that he "was surprised to hear" on a call with Plaintiff and Berman earlier that day that Berman had made a $2.3 million settlement counterproposal to Genomatica on January 7 without first obtaining approval of the proposed figure from MCC. (SOF ¶ 148.) Minami noted that some at MCC were "upset by the fact that Josh [Berman] made it without advising us of the offer." (SOF ¶ 149.) Oliva wrote to Minami that he "did not know this occurred" and promised to investigate what had happened. (SOF ¶ 150.) Oliva then wrote to Plaintiff to ask whether Berman had indeed made a settlement counterproposal without prior client approval: "There may be confusion about whether a counter settlement was made prior to confirmation from MCC. Can you please tell me if Josh delivered information to Genomatica about the $2.3 [million counterproposal] prior to confirmation from MCC?" (SOF ¶ 151.) Plaintiff responded to Oliva that she had personally authorized Berman to make the counterproposal even though she had not obtained approval from MCC: "Yes. It was done that way by my authority because I was home sick and the date for a response came and you and [I] had discussed that offer and I believed it was consistent with MCC's fundamental position and authorized him to make that offer." (SOF ¶ 152.)

Later on January 19, Plaintiff emailed Minami to apologize for making a counterproposal without MCC's approval:

> I forgot to send MCC this proposal in advance of our responding to
> GI. When it was time to respond, I authorized Josh [Berman] to

> make the proposal because I believed it was consistent with MCC's
> position . . . .   In the future, as we progress toward settlement
> (hopefully), we will not make proposals or agreements of this nature
> without MCC's approval.

(SOF ¶ 154.)  After Minami thanked Plaintiff for her apology, she accused him of "back-stabbing" her: "I would appreciate it also if you simply ask me directly if you have a problem or if someone else has a problem, instead of going above me to Nick without copying me.  It is what we call in the US, 'back-stabbing.'" (SOF ¶ 155.)

Plaintiff forwarded her apology email to Oliva, describing it as a "mea culpa email"—thus conceding her culpability. (SOF ¶ 154.)  In light of Plaintiff's admission that she had authorized a settlement counterproposal without MCC's knowledge or consent, and her failure to inform him about the unauthorized counterproposal until MCC had raised its concerns with him, Oliva felt that he had no choice but to terminate Plaintiff's employment. (SOF ¶¶ 156-57.) That same day, Oliva met with Costa, who agreed that Plaintiff should be terminated if Oliva had lost trust in her, particularly in light of her two years of persistent performance problems. (SOF ¶ 160.) Costa approved Plaintiff's termination. (SOF ¶¶ 158, 160-61.)

On January 22, 2017, Oliva wrote to Fujiwara, copying Costa and Saunders, to inform him that MCHA was terminating Plaintiff: "I have lost the ability to trust Jennifer in her role and have determined to end her employment. . . .   I plan to deliver the news of termination on Monday, January 30." (SOF ¶ 159.) The next day, Fujiwara responded that he had "no objection" to Plaintiff's termination," noting:  "[T]here had been a very difficult situation with Jennifer before you returned to our team, when she was very close to be terminated. In my way of counting things, this seems the second misconduct on her part and now it should be appropriate to give her a red-card." (SOF ¶ 162.)

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat summary judgment, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*"; "[c]onclusory allegations, conjecture, and speculation . . . are insufficient," as is "[t]he mere existence of a scintilla of evidence supporting the non-movant's case." *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (*emphasis in original; internal quotation marks omitted*). Moreover, a non-moving party's subjective or self-serving statements, without the support of direct or circumstantial evidence in the record, cannot defeat a motion for summary judgment. *See Adler v. Penn Credit Corp.*, No. 19-cv-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022); *Baptiste v. Cushman & Wakefield*, No. 03-cv-2102, 2007 WL 747796, at *7 (S.D.N.Y. Mar. 7, 2007) ("Plaintiff's mere subjective belief she was discriminated against because of her race, oft-expressed in her deposition testimony on the subject . . . cannot sustain a charge of race discrimination . . . .").

Where, as here, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). To defeat summary judgment, the non-moving party must come forward with "evidence on which the jury could reasonably find for the plaintiff" based on the "evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When "faced with a properly supported summary judgment motion," an employment discrimination plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real

reason for the employment action." *Del Villar v. Hyatt Hotel Corp.*, No. 19-cv-10891, 2022 WL 2316205, at *4 (S.D.N.Y. June 28, 2022) (Furman, J.) (internal quotation marks omitted). It is "beyond cavil" that this rule applies, and summary judgment may be granted, "in the fact-intensive context of discrimination cases." *Id.* (*quoting Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).

## ARGUMENT

I. **The Undisputed Facts Disprove Plaintiff's Claims of Gender Discrimination Under Title VII, the NYSHRL, and NYCHRL as a Matter of Law (First, Fourth and Fifth Causes of Action)**

The NYCHRL[3] prohibits "an employer or an employee or agent thereof, because of the gender . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). The Second Circuit has cautioned that "district courts must be mindful that the NYCHRL is not a 'general civility code'" and that a plaintiff bringing a discrimination claim under the NYCHRL "bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

Courts in this Circuit "[t]ypically" analyze discrimination claims under the NYCHRL using the burden-shifting *McDonnell Douglas* framework applied to Title VII claims. *Jeune v. City of New York*, No. 11-cv-07424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (Furman, J.) To establish a *prima facie* case of discrimination under the NYCHRL, a plaintiff must show that:

---

[3] The federal and state counterparts to the NYCHRL "are viewed as a floor below which the [NYCHRL] cannot fall." *Williams v. New York City Housing Auth.*, 872 N.Y.S.2d 27, 31(App. Div., 1st Dep't 2009) (internal quotation marks omitted). Accordingly, for purposes of simplicity, Defendants analyze Plaintiff's claims of discrimination and retaliation under the NYCHRL only. In any event, for the same reasons that Plaintiff's claims fail as a matter of law under the more liberal NYCHRL, her claims under Title VII and the NYSHRL do as well.

(1) she "was a member of a protected class"; (2) she "was competent to perform the job in question, or was performing the job duties satisfactorily"; (3) her employer took an adverse action against her; and (4) "the action occurred under circumstances that give rise to an inference of discrimination." *Id.*[4] If a defendant can point to evidence of a legitimate, non-discriminatory reason for the challenged actions, "the plaintiff must then show that the reasons presented were a pretext for discrimination (or retaliation)." *DeMuth v. United States Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020) (internal quotation marks omitted).

Here, Defendants are entitled to summary judgment on Plaintiff's gender discrimination claims as to each of the Employment Decisions because: (1) Plaintiff cannot establish a *prima facie* case and, (2) Plaintiff cannot rebut Defendants' legitimate, non-discriminatory reasons for the Employment Decisions, nor show those reasons were pretextual or that her gender played *any* role in the Employment Decisions.

### A.      Plaintiff Cannot Establish a *Prima Facie* Case of Gender Discrimination

On the undisputed facts, Plaintiff cannot establish that Defendants discriminated against her on the basis of her gender. Even assuming *arguendo* that Defendants do not challenge Plaintiff's ability to establish the first three elements of her *prima facie* case, Plaintiff cannot establish the fourth—that any of the Employment Decisions were made under circumstances giving rise to an inference of discrimination.

#### 1.      Costa's Role in the Employment Decisions Defeats Any Inference of Discrimination

None of the Employment Decisions were made under circumstances giving rise to an inference of discrimination. Indeed, Costa's critical role in all three Employment Decisions defeats

---

[4] To make out a *prima facie* case of discrimination under Title VII, a plaintiff must not only show that she suffered an adverse employment action but also that the action was "material." *Id.*

any such inference. "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000) (noting that it is- "difficult to impute bias against plaintiff's protected class where the actor who made the adverse employment decision against plaintiff also made a recent favorable employment decision regarding plaintiff"). This principle, which is commonly referred to as the "same actor" inference, applies with equal force to discrimination claims brought under the NYCHRL. *See, e.g., Dickerson v. Health Mgmt. Corp. of Am.*, 800 N.Y.S.2d 391, 394 (App. Div., 1st Dep't 2005) (reversing decision denying employer's summary judgment motion to dismiss NYCHRL discrimination claim in part because "the same individuals who hired plaintiff . . . made the decision to terminate him").

Here, there is no dispute that Costa hired Plaintiff, promoted her repeatedly, and approved several salary increases for her. Nor is there any dispute that Costa made or approved all three Employment Decisions. (SOF ¶¶ 19, 21, 26, 97-102, 158, 160-61.) It strains credulity to believe that Costa—a woman—would have repeatedly promoted and increased the pay of Plaintiff—also a woman—only to make the subsequent Employment Decisions based upon *animus* towards Plaintiff's gender.

Although Oliva, who proposed Plaintiff's termination to Costa, was not involved in Plaintiff's hiring or subsequent promotions, "the decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions." *Gilani v. Teneo, Inc.*, No. 20-cv-1785, 2021 WL 3501330, at *13 (S.D.N.Y. 2021) (*quoting Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 250 (S.D.N.Y. 2000)). Here, it is

undisputed that Oliva reported to Costa and sought her input, and that Costa made or approved each Employment Decision.

Moreover, as General Counsel and, later, President of MCHA, Costa promoted women, including Plaintiff, to senior positions. (*See* SOF ¶¶ 46-47.) Furthermore, before and at the time of Plaintiff's promotion to Assistant General Counsel, MCHA's legal department consisted of four women and one man. (SOF ¶ 9.) These undisputed facts further dispel any notion that Costa (a woman herself) harbored any anti-woman animus toward Plaintiff, or otherwise.

### 2. Plaintiff Fails to Present Any Evidence of Disparate Treatment

A plaintiff may "rais[e] an inference of discrimination for purposes of making out a *prima facie* case" by a "showing of disparate treatment." *Ochoa v. Fed. Express Corp.*, No. 16-cv-8729, 2018 WL 3996928, at *3 (S.D.N.Y. Aug. 21, 2018) (Furman, J.). To demonstrate disparate treatment, a plaintiff must show that she was "*similarly situated in all material respects* to the individuals with whom" she seeks to compare herself. *Id.* (*emphasis in original*) (*quoting Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). Plaintiff cannot do so here.

In addition to Plaintiff's failure to offer any particulars in support of her gender discrimination claims, she cannot point to any similarly situated male employees who were treated better than she was. Here, the only employee to whom Plaintiff attempts to compare herself is Oliva (likely because she cannot dispute that she was treated as well as or better than the other Assistant General Counsels). However, this comparison is not valid. Whereas Oliva was hired to serve as General Counsel, MCHA promoted Plaintiff only to Acting General Counsel, and only for a probationary period, precisely because of Costa's concerns about Plaintiff's abilities. (*See* SOF ¶ 46.) Moreover, Oliva, unlike Plaintiff, was hired away from another employer. (SOF ¶ 113.) Oliva therefore had to be enticed to accept the General Counsel position and thus had more bargaining power than an internal candidate. In addition, Oliva was hired as General Counsel

partly because of his subject-matter experience and expertise in a number of areas that were crucial to MCHA—namely, his extensive experience in the pharmaceutical industry and managing a global legal team. (SOF ¶ 108.) It is undisputed that Plaintiff did not have this expertise or experience. (SOF ¶ 109.) Accordingly, Plaintiff and Oliva were not similarly situated.

The undisputed evidence disproves any claim by Plaintiff that she was deprived of some aspect of the General Counsel role that was later offered to Oliva, other than the formal title, which she had the opportunity to earn but, based on her performance, did not. Plaintiff has acknowledged that she was effectively functioning as General Counsel while serving in the "Acting" role: working with all legal department clients, managing the legal team, hiring and interacting with outside counsel, overseeing the compliance program and doing the work that had been previously done by Costa when she was General Counsel. (SOF ¶ 50.) Plaintiff was assigned all of the responsibilities and was provided every opportunity to succeed to be subsequently promoted to General Counsel. (SOF ¶¶ 46, 50.) In sum, Plaintiff has failed to present any evidence of any similarly situated employees outside of her protected class who were treated better than she was based on gender.

**3.    For Additional Reasons, Plaintiff Cannot Make a *Prima Facie* Case of Discriminatory Failure-to-Promote**

Plaintiff claims that MCHA and MCHC discriminated against her by failing to promote her to full General Counsel.[5] The Court should grant judgment in Defendants' favor on those claims, like her other claims, because Plaintiff cannot show that the decision not to promote her to General Counsel was made under circumstances giving rise to an inference of discrimination.

---

[5] Plaintiff brings claims against MCHA and MCHC under the NYSHRL and NYCHRL for "passing her up for promotion" (FAC ¶¶ 141 (NYSHRL), 146 (NYCHRL)) but makes no such allegation in her cause of action under Title VII (*see id.* ¶¶ 115-22).

Plaintiff's failure-to-promote claims should be dismissed for the additional reason that she cannot show that she was qualified for the role.[6]

Costa harbored doubts about Plaintiff's ability to serve as MCHA's General Counsel, and Plaintiff's tenure as Acting General Counsel confirmed that she was not fit for the General Counsel role. Before Plaintiff was promoted to Acting General Counsel, Costa shared with Saunders and MCHC her concerns that Plaintiff could not handle the responsibility of being MCHA's General Counsel. (SOF ¶ 45.) Urged by MCHA's then-President, Yoshisato, to promote someone to the position from within, Costa decided to promote Plaintiff to the Acting General Counsel role for a probationary period to determine whether she could handle the position. (SOF ¶ 46.) MCHA then promoted Plaintiff to the position over a male colleague. (SOF ¶ 47.) Within a few months, Costa determined that Plaintiff could not handle the role. (SOF ¶ 66.) Costa informed Saunders that Plaintiff needed to "stop being defensive," learn to say "yes" or "I agree," and needed to cease "sloppy" behavior, such as "respond[ing] to email [without] reading thoroughly." (SOF ¶ 60.) On July 26, 2015, Costa informed Plaintiff of shortcomings in her performance on a recent project that resulted in "some misses with respect to the process of identifying a financial advisor." (SOF ¶ 65.)

Plaintiff's colleagues within MCHA's legal department also found that Plaintiff was struggling with her new responsibilities. Troccoli, a female legal assistant, for example, wrote to Costa in August 2015 complaining that Plaintiff was "completely micro managing to the point where it [was] detrimental," "communic[ated]" in ways that were "often inappropriate," did not

---

[6] To establish a *prima facie* failure to promote case, a plaintiff must demonstrate that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004) (internal quotation marks omitted).

"appear to fully grasp the job responsibilities," "struggle[d] with her personality issues as it related to dealing with others," "answers emails before reading the entire email . . . which then results in a multi email chain to correct the advice she's given," had a "long delay in response time to questions that should take a minute to answer," and that there was the "potential for things to fall through the cracks because they [were] not being relayed." (SOF ¶ 68.) By then, Costa had grown so frustrated with Plaintiff's performance that she was considering terminating Plaintiff. (SOF ¶ 71.)

Plaintiff was not qualified to function as General Counsel. Thus, judgment on Plaintiff's failure-to-promote claims should be granted in MCHA's and MCHC's favor. Moreover, Plaintiff's failure-to-promote claim against MCHC should be dismissed for the additional reason that Plaintiff cannot point to any evidence that MCHC played a substantial role in MCHA's decision not to promote Plaintiff to the full General Counsel position. Rather, to the extent MCHC offered any input on that decision, it was to suggest that Plaintiff be returned to her former position instead of being terminated. (*See* SOF ¶¶ 88, 89.)

### B.   Defendants Had Legitimate, Non-Discriminatory Reasons for the Employment Decisions

Even assuming, without conceding, that Plaintiff could make out a *prima facie* case of gender discrimination, her gender discrimination claims nonetheless fail because Costa had legitimate, non-discriminatory reasons for each of the Employment Decisions, and Plaintiff can point to no basis to establish that those reasons were merely pretextual.

***Promotion to Assistant General Counsel Instead of Full General Counsel.***

MCHA promoted Plaintiff only to the <u>Acting</u> General Counsel role for a probationary period precisely because of Costa's concern that Plaintiff could not manage the responsibilities of

MCHA's General Counsel. (SOF ¶¶ 45-48.) In a December 2014 discussion with Saunders, for example, Costa expressed concerns about Plaintiff's ability to fill the role, including that she:

- "Still feels need to limit amount of her work because she can only deal with a limited amount at one time. . . . Things tend to fall through cracks";
- "[I]s selective in what she cares about . . . ."; and
- "[H]as preconceived judgments—has to learn to manage this emotional [reaction]. She complains to peers in department. Can't do that when you are the boss. Will need to learn to manage frustrations."

(SOF ¶ 45.)

### *Return to Assistant General Counsel Role.*

Plaintiff's tenure as Acting General Counsel demonstrated that Costa was right to be concerned about Plaintiff's ability to handle the job. Costa summarized her dissatisfaction with Plaintiff's performance in Plaintiff's mid-year evaluation for 2015. (SOF ¶¶ 96-101.) Costa wrote that Plaintiff "seem[ed] unable or unwilling to work with [Costa] as [Plaintiff's] supervisor" and "d[id] not proactively communicate with [Costa] on routine or substantive matters." (SOF ¶ 99.) Costa explained that "critical to [her] decision [wa]s the fact that [she] d[id] not trust [Plaintiff's] judgment in [Plaintiff's] current role" and provided five examples of Plaintiff's poor judgment. (SOF ¶ 100.)

Costa was not alone in concluding that Plaintiff was struggling as Acting General Counsel. Troccoli, a legal assistant in MCHA's legal department, wrote Costa an email summarizing many problems with Plaintiff's work and relationships with colleagues in the department. (SOF ¶ 68.) Troccoli also made a formal complaint to Saunders alleging that Plaintiff had discriminated against her on the basis of her disability. (SOF ¶ 75.)

Plaintiff can offer no evidence that the many performance problems identified by Costa as reasons for returning Plaintiff to the Assistant General Counsel position are mere pretext for gender

discrimination. Plaintiff's disagreement with others' assessment of her performance is insufficient to establish discriminatory intent, largely because "disagreements do not, as a matter of law or logic, mean that present performance reviews are unfounded." *Halkitis v. New York City Department of Education*, No. 19-cv-11753, 2022 WL 392911, at *5 (S.D.N.Y. Feb. 9, 2022) (Furman, J); *Ricks v. Conde Nast Publications, Inc.*, 6 Fed. App'x. 74, 78 (2d Cir. 2001). Moreover, to the extent MCHC played any role in the decision to return Plaintiff to her former role as Assistant General Counsel, it was to propose that course instead of termination. (SOF ¶¶ 88-89.) After receiving a request from Sakaguchi to return Plaintiff to her former role instead of firing her, Costa said that she was willing to offer Plaintiff her former position.  (*Id.*)

*Termination.*

Plaintiff's mishandling of the Genomatica litigation triggered MCHA's decision to terminate her. After making a settlement counterproposal without client approval, Plaintiff kept Oliva, MCHA's new General Counsel, in the dark for almost two weeks before Minami, a colleague in Japan, brought the issue to Oliva's attention. (SOF ¶¶ 143-150.) Once confronted, Plaintiff admitted to making a settlement counterproposal without prior client approval and accused Minami of "back-stabbing" her for telling Oliva what she had done.  (SOF ¶¶ 152-55.) Oliva determined that he had to terminate Plaintiff because he no longer trusted her (SOF ¶¶ 157, 159), and Costa approved and supported his decision (SOF ¶¶ 156, 158, 160-61.)  Oliva informed Fujiwara of the decision to terminate Plaintiff, and Costa confirmed to MCHC that she supported it.  (SOF ¶¶ 159-61.)  Fujiwara wrote that he had "no objection" to the decision, particularly because Plaintiff had already been "close to be[ing] terminated" before. (SOF ¶ 162.)

The undisputed evidence shows that Defendants had legitimate, non-discriminatory reasons for each of the Employment Decisions, and Plaintiff cannot point to any evidence that

those reasons were pretextual. Plaintiff's discrimination claims against MCHC should be dismissed for the additional reason that MCHC did not take any adverse employment actions against Plaintiff. Accordingly, Defendants are entitled to summary judgment on Plaintiff's gender discrimination claims under Title VII, NYCHRL, and NYSHRL.

## II.    The Undisputed Facts Disprove Plaintiff's Retaliation Claim Under Title VII as a Matter of Law (Second Cause of Action)

Retaliation claims under Title VII are analyzed under the same three-step *McDonnell Douglas* burden-shifting framework as discrimination claims under state and federal law. Only the elements of the *prima facie* case differ. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that "(1) [the plaintiff] engaged in a protected activity of which defendants were aware; (2) [the plaintiff] was subjected to an adverse employment action; and (3) a causal connection existed between the adverse employment action and [the plaintiff's] protected activity." *Halkitis*, 2022 WL 392911, at *6. If a plaintiff can show a *prima facie* case for retaliation and the defendant proffers an independent reason for the adverse employment action, the plaintiff "must then show that retaliation was a 'but-for' cause of the employer's adverse action." *Id.* But-for causation means that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (*quoting Zann Kwan v. Andalex Grp.*, 737 F.3d 834, 846 (2d Cir. 2013)).

Plaintiff alleges two incidents of retaliation against her. However, neither occurred, and Plaintiff cannot show that there is a genuine dispute that they did—let alone that any of the Employment Decisions would not have occurred absent retaliatory motive.

*First*, Plaintiff alleges that Yoshisato, MCHA's then-President, retaliated against her for her role in an investigation into sexual harassment claims against him by "refusing to promote her to the full role of General Counsel." (First Am. Compl. ("FAC") ¶ 70, ECF No. 89.) But the record

shows just the opposite. To the extent Yoshisato played any role, it was to encourage Costa to promote Plaintiff to the General Counsel position. Costa preferred that MCHA find an outside candidate to fill the General Counsel role (SOF ¶ 43) and was concerned that Plaintiff was unsuited for it (SOF ¶ 45.) Yoshisato, however, made clear to Costa that he preferred an internal candidate. (SOF ¶ 46.) In light of Costa's concerns, MCHA promoted Plaintiff to the Acting General Counsel role "in the hope that she w[ould] grow into the job." *Id.* Further, Yoshisato left MCHA by April 2015 and played no part in the other Employment Decisions.

*Second*, Plaintiff alleges that Oliva retaliated against her for complaining to him in March 2016 about an MCHA client company offering a severance package to a male employee but not a female employee. Oliva, however, testified that Plaintiff never made such a complaint. (SOF ¶ 126.) Aside from her own say-so, the only evidence of that conversation that Plaintiff can point to is a note—produced to Defendants after Plaintiff had already testified for a full day—that she alleges she wrote after speaking with Oliva in March 2016. (SOF ¶¶ 123-24.) Defendants' document dating expert, however, determined that the note could not have been written in 2016, but rather had to have been written sometime in or after 2019. (SOF ¶ 125.) Plaintiff has offered no evidence rebutting Defendants' expert's findings.

Even assuming that Plaintiff engaged in a protected conversation in March 2016, she cannot establish a causal connection between that protected activity and her termination on January 30, 2017, almost eleven months later. That gap is far too long for there to be any causal connection between the alleged protected activity and Plaintiff's termination. *See Moccio v. Cornell University*, 889 F. Supp.2d 539, 587-88 (S.D.N.Y. 2012) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." (citations omitted).).

Moreover, there is an intervening event—Plaintiff's misconduct in the Genomatica case—that prompted MCHA's decision to terminate Plaintiff.

Judgment should be granted in MCHA's and MCHC's favor on Plaintiff's retaliation claim because she cannot establish a *prima facie* case of retaliation and because MCHA had legitimate, non-discriminatory, and non-retaliatory reasons for the Employment Decisions. Plaintiff's retaliation claim against MCHC should be dismissed for the additional reason that she has offered no evidence that MCHC played any part in Yoshisato's or Oliva's alleged retaliatory conduct.

### III. The Undisputed Facts Disprove Plaintiff's Federal and State Equal Pay Act Claims (Third and Sixth Causes of Action) as a Matter of Law

To establish a claim under the federal Equal Pay Act, a plaintiff must make a *prima facie* showing that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *Garcia v. Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 385 (S.D.N.Y. 2017). If a plaintiff makes this *prima facie* showing, the defendant must demonstrate that the pay disparity is justified by one of the statutory affirmative defenses, including "a differential based on *any* factor other than sex." *Id.* at 386 (*emphasis added*) (*quoting* 29 U.S.C. § 206(d)(1)); *see* N.Y. Lab. Law 194(1)(iv). Once a defendant establishes one of the affirmative defenses, the "plaintiff may produce evidence demonstrating that the reasons the defendant seeks to advance are actually pretext." 281 F. Supp. 3d at 386. Claims for violations of the New York state Equal Pay Act are evaluated under the same standard. *Id.* at 386 n.27.

Even assuming Plaintiff can establish her *prima facie* case, any pay disparity between Plaintiff and Oliva is justified by differences between them that have nothing to do with gender. *First*, Oliva, unlike Plaintiff, had to be lured away from another employer. (SOF ¶ 113.) He

therefore had significant leverage that Plaintiff did not. When MCHA offered Oliva the General Counsel position, it offered him a salary of $300,000, which is exactly what Plaintiff earned as Acting General Counsel. (SOF ¶ 111.) *Second*, Oliva negotiated an additional $25,000 in salary due to his prior work experience in the pharmaceutical industry, experience that Plaintiff did not possess. (SOF ¶¶ 108-09, 112.) *Third*, MCHA determined that Oliva's salary was equivalent to what Plaintiff would have earned if she had been promoted to the full General Counsel position.

Because Plaintiff offers Oliva as the sole comparator, and Defendants have established that the modest pay differential was due to circumstances unique to Oliva rather than Plaintiff's gender, Plaintiff's federal and New York state Equal Pay Act claims must be dismissed.

IV.     **Plaintiff's Aiding and Abetting Claims Against Costa and Oliva Under the NYSHRL and NYCHRL Should Also Be Dismissed (Seventh and Eighth Causes of Action)**

Plaintiff has not established that MCHA or MCHC retaliated or discriminated against her. Her aiding and abetting claims against Costa and Oliva under the NYSHRL and NYCHRL must therefore be dismissed because she has not established that MCHA or MCHC retaliated or discriminated against her. "'[T]here can be no liability for aiding and abetting' under either the NYSHRL or NYCHRL absent 'a primary violation.'" *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-cv-4558, 2021 WL 918770, at *8 (S.D.N.Y. Mar. 10, 2021) (Furman, J.) (*quoting White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment in its entirety.

Dated: New York, New York
       November 1, 2022

                     Respectfully submitted,

                     GORDON REES SCULLY MANSUKHANI, LLP

                     /s/*Mercedes Colwin*
                     Mercedes Colwin
                     Brittany L. Primavera
                     1 Battery Park Plaza, 28th Floor
                     New York, New York  10004
                     Telephone: (212) 269-5500
                     mcolwin@grsm.com
                     bprimavera@grsm.com

                     *Attorneys for Defendants Mitsubishi*
                     *Chemical Holdings America, Inc., now*
                     *known as Mitsubishi Chemical America,*
                     *Inc., Donna Costa, and Nicholas Oliva*

                     SHEARMAN & STERLING LLP

                     /s/*Jerome S. Fortinsky*
                     Jerome S. Fortinsky
                     Nikolai Krylov
                     599 Lexington Avenue
                     New York, New York  10022
                     Telephone: (212) 848-4000
                     jfortinsky@shearman.com
                     nik.krylov@shearman.com

                     George Anhang
                     401 9th Street, N.W.
                     Suite 800
                     Washington, DC  20004
                     Telephone: (202) 508-8000
                     george.anhang@shearman.com

                     *Attorneys for Defendant Mitsubishi*
                     *Chemical Holdings Corporation, now*
                     *known as Mitsubishi Chemical Group*
                     *Corporation*

CLARICK GUERON REISBAUM LLP

/s/*Nicole L. Gueron*
Nicole L. Gueron
220 Fifth Avenue
New York, New York  10001
Telephone: (212) 633-4310
ngueron@cgr-law.com

*Attorneys for Defendant Donna Costa*