# EXHIBIT E

\* \* C O N F I D E N T I A L \* \*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

JENNIFER FISCHMAN,

                         Plaintiff,          Index No.

          -against-                   18-cv-08188

MITSUBISHI CHEMICAL HOLDINGS AMERICA, INC.,
MITSUBISHI CHEMICAL CORPORATION,
MITSUBISHI CHEMICAL HOLDINGS CORPORATION,
NICHOLAS OLIVA, in his individual and
professional capacities; DONNA COSTA,
in her individual and professional
capacities; and JOHN DOES 1-10, in
their individual and professional
capacities,

                         Defendants.

------------------------------------x

                         55 Maple Avenue
                         Rockville Centre, New York

                         July 12, 2021
                         10:20 a.m.


          DEPOSITION of DONNA COSTA, taken by

the attorneys for the Plaintiff, pursuant to

Notice, held before Bonnie Kreuzburg, a Notary

Public of the State of New York, at the

above-stated time and place.

```
 1        * * C O N F I D E N T I A L * *
   A P P E A R A N C E S:
 2
   VALLI KANE & VAGNINI LLP
 3 Attorneys for Plaintiff
         600 Old Country Road, Suite 519
 4       Garden City, New York  11530

 5 BY:   MATTHEW L. BERMAN, ESQ.
         ROBERT J. VALLI, JR., ESQ.
 6

 7
   CLARICK GUERON REISBAUM LLP
 8 Attorneys for Defendant, Donna Costa
         220 Fifth Avenue, 14th Floor
 9       New York, New York  10001

10 BY:   NICOLE GUERON, ESQ.

11
   GORDON REES SCULLY MANSUKHANI, LLP
12 Attorneys for Defendants, Mitsubishi
   Chemical Holdings America, Inc., Donna Costa and
13 Nicholas Oliva
         One Battery Park Plaza, 28th Floor
14       New York, New York  10004

15 BY:   MERCEDES COLWIN, ESQ.
         BRITTANY L. PRIMAVERA, ESQ.
16

17
   SHEARMAN & STERLING, LLP
18 Attorneys for Defendant
   Mitsubishi Chemical Holdings Corporation
19       599 Lexington Avenue
         New York, New York  10222
20
   BY:   JEROME FORTINSKY, ESQ.
21

22 ALSO PRESENT:

23         Jennifer Fischman

24         Matteo Traborelli, Intern

25         Skyler Stern, Intern
```

1              * * C O N F I D E N T I A L * *

2              MS. GUERON:  So the only stips we're

3         agreeing to on the record are that all

4         objections, other than objections to form,

5         are reserved and that you are waiving

6         signing of the transcript, if you want?

7              MR. VALLI:  No, we're not.

8              MS. GUERON:  No.  Okay.

9              MR. VALLI:  You want to read and sign.

10             MR. BERMAN:  Yes, please.

11   D O N N A   J O Y   C O S T A,

12        called as a witness, having been first duly

13        sworn by the Notary Public (Bonnie

14        Kreuzburg), was examined and testified

15        under oath as follows:

16             THE REPORTER:  Please state your full

17        legal name for the record.

18             THE WITNESS:  Donna, D-O-N-N-A, Joy,

19        J-O-Y, Costa, C-O-S-T-A.

20        Q.    Business address, please?

21             MS. GUERON:  Why don't you just give

22        it as care of the law firm.

23        A.    Care of Gueron Reisbaum.

24   EXAMINATION BY

25   MR. BERMAN:

1                D. Costa  - Confidential

2        Q.    Good morning, Ms. Costa.  My name is

3   Matthew Berman.  You've seen me before at the

4   deposition of plaintiff, Jennifer Fischman.  You

5   understand that today I'll be asking you some

6   questions which you'll be answering under oath,

7   having sworn to tell the truth?

8        A.    Yes.

9        Q.    If you don't hear one of my questions,

10  please let me know and I'll repeat it to make it a

11  little more loud; is that okay?

12       A.    Yes.

13       Q.    If you don't understand one of my

14  questions, please let me know and I'll do my best

15  to rephrase it.  If I ask a question that seems

16  foolish, it's because you know more than I do, and

17  part of my job is to find out what you know.  So

18  if you cannot answer a question because of the way

19  I've framed it, could you please tell me that?

20       A.    I'll try.

21       Q.    Okay.  Thank you.

22             So, we have a court reporter here

23  today who is taking down what everyone in the room

24  says, so it's important to give verbal responses

25  today.

1              D. Costa  - Confidential

2              Do you understand?

3         A.    Yes.

4         Q.    Okay.  I will do my best not to

5    interrupt you when you give a response to one of

6    my questions, and if you could please wait until

7    I've completed asking my question in full before

8    you begin to answer.  Because a lot of times

9    people anticipate what each other will say, but

10   since we have a transcript and we're trying to

11   keep it clean, let's just try to do our best not

12   to interrupt each other, okay?

13        A.    Yes.

14        Q.    From time to time, you may hear an

15   objection from one of the attorneys.  I'll still

16   expect a response from you to the question, unless

17   you're instructed not to answer, okay?

18        A.    Yes.

19        Q.    And you understand that, although

20   we're in an informal setting today in a conference

21   room, you're under oath just as if you were in a

22   court of law, correct?

23        A.    Yes.

24        Q.    From time to time, someone may wish to

25   take a break.  I'm happy to afford any breaks that

1                 D. Costa  - Confidential

2    anyone wants.  I'll probably take a number of them

3    myself, but I will ask that you answer any pending

4    question before we go on to a break.  But at any

5    time, please feel free to ask me, and we'll find

6    an appropriate time to take a break, okay?

7         A.    Yes.

8         Q.    During my questioning today, the time

9    period that I'm interested in is from 2014 to

10   present, unless otherwise specified.  So just can

11   we keep that in mind as we go forward today?

12        A.    Yes.

13        Q.    Do you understand everything that

14   we've just discussed, and do you have any

15   questions for me about any of that?

16        A.    I understand.

17        Q.    Okay.  Great.

18              So I have to ask some personal

19   questions, just to set the ground here.  Are you

20   taking or refraining from taking any medication

21   that could impact your ability to testify

22   truthfully and accurately today?

23        A.    No.

24        Q.    Do you suffer from any medical

25   condition which could affect your ability to

1          D. Costa  - Confidential

2    testify truthfully and accurately today?

3          A.    No.

4          Q.    Do you suffer from any medical

5    condition which impairs your memory?

6          A.    No.

7          Q.    Have you ever been deposed before,

8    Ms. Costa?

9          A.    No.

10          Q.    Did you do anything to prepare for

11    today's deposition?

12          A.    Yes.

13          Q.    At a high level, what did you do to

14    prepare?

15          A.    I met with my lawyers and I had phone

16    calls with my lawyer.

17          Q.    Okay.  In the course of my questioning

18    today, please keep in mind it's not my intention

19    to ask you about the substance of any

20    communications you've had with your attorneys,

21    okay?  So in responding to any question I pose to

22    you, if you can answer it without revealing any

23    substantive privileged communications with your

24    counsel, please do so.  If you're unable to do

25    that, please let me know, okay?

1                    D. Costa  - Confidential

2        A.    Yes.

3        Q.    So you said you met with your

4   attorneys?

5        A.    Yes.

6        Q.    How many times did you meet with your

7   attorneys?

8        A.    I had one meeting with Nicole,

9   Brittany, Jerry and Mercedes.  I had a separate

10  meeting with Nicole, and I had some phone

11  conversations with Nicole.

12       Q.    Okay.  When was your meeting with the

13  group of attorneys that you just mentioned?

14       A.    That was last Wednesday.

15       Q.    When was your meeting with your

16  counsel, Nicole?

17       A.    Last Tuesday.

18       Q.    And you said you had a number of phone

19  calls?

20       A.    I don't remember specifically when.

21       Q.    Okay.  Do you know approximately when

22  those took place?

23       A.    One prior to our first meeting last

24  Tuesday, and then subsequent to the meeting on

25  Wednesday.

1                D. Costa  - Confidential

2        Q.    In that first meeting that you

3    described with your panoply of counsel,

4    approximately how long did that meeting go for?

5        A.    It started at 10:00.  I believe we

6    finished at 4:00 or 5:00.

7        Q.    And your second meeting with your

8    counsel, Nicole, how long was that for?

9        A.    Less than three hours.

10        Q.    Okay.  Were you provided with any

11    documents to review as part of your preparation?

12        A.    No.

13        Q.    Have you, on your own, viewed any

14    documents in preparation for your deposition?

15        A.    No.

16        Q.    Have you ever been a witness in a

17    lawsuit before?

18        A.    Once, yes.

19        Q.    How long ago was that?

20        A.    At -- over ten years ago.

21        Q.    What was the general subject matter of

22    the suit?

23        A.    I was a witness in a hearing regarding

24    the disqualification of an attorney from

25    litigation that Mitsubishi was involved in.

1                  D. Costa  - Confidential

2          Q.    You attended the deposition of

3    Ms. Fischman, correct?

4          A.    Correct.

5          Q.    Have you reviewed the transcript from

6    that deposition?

7          A.    No, I have not.

8          Q.    Have you reviewed any of the exhibits

9    from that deposition?

10         A.    No, I have not.

11         Q.    Have you reviewed any e-mails or other

12   substantive materials in preparation for today's

13   testimony?

14         A.    No, I have not.

15         Q.    Did you communicate with any other

16   persons, besides your attorneys, in connection

17   with today's deposition?

18         A.    No, I have not.

19         Q.    You are aware that you're a defendant

20   in the litigation commenced by Ms. Fischman,

21   correct?

22         A.    Yes.

23         Q.    And you're aware that it concerns your

24   mutual tenure at Mitsubishi, correct?

25         A.    Yes.

1                    D. Costa  - Confidential

2        Q.    So, just to provide some additional

3   clarity, my intention -- and for efficiency, my

4   intention is to use a few acronyms today, and we

5   may come up with more as we go.  But, for now,

6   when I use the acronym MCHA, will you please

7   understand that I'm referring to Mitsubishi

8   Chemical Holdings America?

9        A.    Yes.

10       Q.    And when I use the acronym MCHC, will

11  you understand that I'm referring to Mitsubishi

12  Chemical Holdings Corp.?

13       A.    Yes.

14       Q.    So, were you, at any time, an employee

15  of Mitsubishi Chemical Holdings America --

16       A.    Yes.

17       Q.    -- MCHA?

18       A.    I'm sorry.

19       Q.    I'm sorry.  I'm just trying to use the

20  acronym the first time I use the full title.

21             Were you ever an employee of MCHA?

22       A.    Yes.

23       Q.    When did you first join the company?

24       A.    I joined a predecessor company in

25  February 1996.

1                    D. Costa  - Confidential

2          Q.     What was the name of the predecessor?

3          A.     Mitsubishi Chemical America, MCA.

4          Q.     At some point, did the name of that

5     entity change?

6          A.     It changed to Mitsubishi Chemical USA,

7     MCUS.

8          Q.     At some point, did the name of MCUS

9     change again?

10         A.     Yes.

11         Q.     What did it change to?

12         A.     MCHA.

13         Q.     And approximately when did that

14    happen?

15         A.     I don't recall exactly.

16         Q.     So when you first joined Mitsubishi

17    Chemical America, what was your position?

18         A.     General counsel.

19         Q.     How did you come to be employed as

20    general counsel?

21                MS. GUERON:  Objection.

22                You can answer.

23         A.     I worked at Cleary Gottlieb Steen &

24    Hamilton, which represented Mitsubishi Chemical

25    when Mitsubishi Chemical decided to hire their

1                    D. Costa  - Confidential

2    first general counsel and start a legal

3    department.  I was put forward by Cleary Gottlieb

4    as a candidate.

5         Q.    So, do I understand correctly that

6    Mitsubishi Chemical informed Cleary Gottlieb that

7    they had an opening?

8              MS. GUERON:  Objection.

9         A.    I don't know what was exactly

10   discussed.

11        Q.    But you heard about the opening, or

12   you learned of the opening through Cleary

13   Gottlieb?

14        A.    Correct.

15        Q.    Did you apply for a position?

16        A.    Technically, yes.

17        Q.    Okay.

18        A.    I was put forward by Cleary Gottlieb

19   and then went through a process.

20        Q.    What was the application process at

21   that time?

22        A.    I was interviewed by two people at

23   MCA, initially, two people from MCHC, and then sat

24   through a panel interview with many people from

25   MCA.

1              D. Costa  - Confidential

2          Q.    So, I want to make sure I understood

3      that.  Did you tell me you were interviewed by two

4      people at MCHA?

5          A.    That's correct.

6          Q.    And do you recall their roles?

7          A.    Mr. Fukatani (phonetic) was president

8      at the time, and Mr. Hirashima worked in human

9      resources at the time.

10         Q.    Did you say Hirashima?

11         A.    Hirashima, H-I-R-A-S-H-I-M-A.

12         Q.    Did you tell me that two other people

13     at MCHC interviewed you?

14         A.    Yes.

15         Q.    What were their roles?

16         A.    They were in the legal department

17     of -- let me correct myself.  There was no MCHC at

18     the time.  At the time, it was MCC, Mitsubishi

19     Chemical Corporation.

20         Q.    Okay.  So that seems like another

21     appropriate acronym to use.  If I use the term MCC

22     going forward, will you understand that I mean

23     Mitsubishi Chemical Corp.?

24         A.    Yes.

25         Q.    What were the roles of those two

```
 1              D. Costa  - Confidential
 2   people in the legal department?
 3        A.    They were the head of the legal
 4   department and the individual who was assigned to
 5   MCA legal in New York at the time.
 6        Q.    When you say assigned to MCA legal,
 7   what do you mean by that?
 8        A.    So, actually, now you're reminding
 9   that, actually, he was an employee of MCA at the
10   time.  When I -- he returned to MCC shortly
11   thereafter.
12        Q.    Okay.
13        A.    So what I mean is that he was an
14   ex-pat who was on foreign assignment to the United
15   States from Japan.
16        Q.    Are you thinking of a particular
17   individual?
18        A.    Yes.  So, the individual who was
19   working at MCA, who I mistakenly said was working
20   at MCC, was Ken Fujiwara.
21        Q.    Now, you mentioned a panel interview,
22   correct?
23        A.    Correct.
24        Q.    Can you recall who was on the panel?
25        A.    John Canfield, who was the head of HR
```

1              D. Costa  - Confidential

2    of MCA; Mr. Ushijima, who was an ex-pat, I

3    believe, with the title of executive

4    vice-president at the time of the MCA, and many

5    additional people who I can't specifically recall.

6         Q.    Did you remain in the general counsel

7    position --

8              MR. BERMAN:  Withdrawn.

9         Q.    At some point, was there a

10   reorganization where Mitsubishi Chemical Holdings

11   America was spun off somehow from Mitsubishi

12   Chemical USA?

13             MS. GUERON:  Objection.

14        A.    I cannot remember the exact corporate

15   change, but it was part of the reorganization when

16   Mitsubishi Chemical Holdings Corp. -- when MCHC

17   was formed.

18        Q.    When did you first learn of the

19   formation of MCHC?

20        A.    I don't recall the date, but it was

21   sometime prior to its formation.

22        Q.    Can you give me a year, maybe?

23        A.    Um, not at this moment.

24        Q.    Do you know when MCHC was formed?

25        A.    Not at this moment.  I don't recall.

1                  D. Costa  - Confidential

2        Q.     Okay.  Do you know the business

3    reasons behind the reorganization?

4                  MS. GUERON:  Objection.

5        A.     The corporation law changed in Japan

6    that allowed Japanese corporations, such at

7    Mitsubishi Chemical Corporation, to create a

8    holding company, and they did so for a variety of

9    strategic and legal reasons.

10       Q.     Do you know whether any other holding

11   companies were formed contemporaneously with the

12   formation of MCHC?

13       A.     Any other holding companies where?

14   I'm sorry.

15       Q.     Let's start with here in America.

16                 MR. FORTINSKY:  Objection to form.

17                 MS. GUERON:  Same objection.

18                 MR. VALLI:  Are you all going to

19       object?

20                 MR. BERMAN:  I'll withdraw the

21       objection.  Let's go about it in a different

22       way.

23       Q.     What business would you say that MCHA

24   was in during your tenure there?

25       A.     MCHA was a corporate service provider.

1                    D. Costa  - Confidential
2    It was the regional headquarters, regional
3    administrative headquarters for MCHC, and it was
4    in the business of providing corporate services.
5         Q.    Was there a particular geographical
6    region that MCHA was responsible for in connection
7    with its provision of corporate services?
8         A.    Generally, the Americas.
9         Q.    Were there any other corporate service
10   provider entities that were responsible for the
11   provision of corporate services in other regions?
12             MS. GUERON:  Objection.
13        A.    Yes.
14        Q.    Was one of those entities Mitsubishi
15   Chemical Holdings Japan?
16        A.    Yes.
17        Q.    And was one of them known by the
18   acronym MCHE?
19        A.    Yes.  That's an entity that I later
20   became president of as well.
21        Q.    What does that acronym stand for?
22        A.    Mitsubishi Chemical Holdings Europe.
23        Q.    Was there another administrative
24   services or corporate service provider responsible
25   for Beijing?

1              D. Costa  - Confidential

2       A.    Yes.

3       Q.    What was that one called?

4       A.    It was referred to as MCHB.

5       Q.    During your tenure at MCHA, did it

6  sell any products?

7       A.    No.

8       Q.    Did it sell any services?

9       A.    Yes.

10      Q.    What services did it sell?

11      A.    It sold its services to affiliated

12 companies.

13      Q.    What services would that include?

14            MS. GUERON:  Objection to form.

15      A.    It included IT, HR, tax, risk

16 management, finance, accounting, legal,

17 compliance, ex-pat support.  That's what comes to

18 mind.

19      Q.    Okay.

20      A.    Internal audit.  Sorry.

21      Q.    Did those service offerings change

22 over time during the course of your tenure?

23      A.    Yes.

24      Q.    Can you describe generally for me how

25 they changed?

1                    D. Costa  - Confidential

2          A.     They changed a number of times.  There

3      were services that existed -- were provided by

4      MCHA that were subsequently provided by MCA, and

5      there were services that were not originally

6      provided by MCHA that were added to MCHA.

7          Q.     I think I understood you to tell me

8      that some of those services moved to MCA.

9                 Did I get that right?

10         A.     Correct.

11         Q.     When you refer to MCA, what entity are

12     you referring to?

13         A.     It was not the same as the company I

14     joined originally, it was a new MCA entity that

15     was a subsidiary of MCC, whereas MCHA was a

16     subsidiary of MCHC.

17         Q.     So I just want to try to understand

18     this a little bit more closely.  When you were

19     first hired by Mitsubishi, you went to work at

20     Mitsubishi Chemical America, correct?

21         A.     Correct.

22         Q.     Okay.  But then you told me that, at

23     some point, the services offered by the successor

24     interest entity moved to MCC?

25         A.     Some services moved to MCA, which was

1                   D. Costa  - Confidential

2   a different entity, effectively, than the MCA that

3   I joined.

4        Q.    So were there two entities at the same

5   time that had the same initials or acronym?

6        A.    No, there were not.

7        Q.    Okay.  So how did it come to pass that

8   you went from Mitsubishi Chemical America to

9   another company that wasn't Mitsubishi Chemical

10  America?

11              MS. GUERON:  Objection.

12       A.    So, MCA, when I joined, was an

13  operating company.

14       Q.    Okay.

15       A.    It was not a service company.  It was

16  an operating company with plants, with all

17  functions that you would find in Mitsubishi

18  Chemical.  There were several business units,

19  there was R&D, etcetera.

20              Subsequently, MCHA became a services

21  only company, when MCHC was formed.

22       Q.    And at approximately that same time

23  that you just described when MCHA became a

24  services only company, did something similar

25  happen with respect to MCHA?

1          D. Costa  - Confidential

2          MS. GUERON:  Objection.

3   A.   No.

4   Q.   Okay.  Do you know if at approximately

5 the same time these other corporate service

6 providers became services only?

7          MS. GUERON:  Objection.

8   A.   I cannot say that.

9   Q.   Okay.  At the time when MCHA became a

10 services only company, how many entities did it

11 support?

12   A.   I believe in the range of 40.

13   Q.   Do you know how many of those were

14 operating companies?

15   A.   Almost all of them.

16   Q.   Do you know where the R&D and

17 production assets of Mitsubishi Chemical America

18 moved to when it transitioned to the service -- on

19 the course of its transitions to a service only

20 entity?

21   A.   Not to a single place.  There were a

22 number of entities that were established.

23   Q.   Was one of those entities Mitsubishi

24 Chemical Holdings Corp.?

25          MS. GUERON:  Objection.

1          D. Costa  - Confidential

2     A.    I don't understand that question.

3     Q.    When you first joined Mitsubishi

4  Chemical America, it had operating units, correct?

5     A.    Correct.

6     Q.    It had business units, correct?

7     A.    Correct.

8     Q.    At some point, it no longer possessed

9  those assets, correct?

10     A.    Correct.

11     Q.    Did any of those assets move to

12  Mitsubishi Chemical Holdings Corp.?

13     A.    No.  They moved into entities in the

14  United States.

15     Q.    The entities that those assets moved

16  into, were those subsidiaries of Mitsubishi

17  Chemical Holdings Corp.?

18          MS. GUERON:  Objection.

19     A.    Ultimately, they were subsidiaries,

20  but not directly owned by MCHC, no.

21     Q.    Okay.  During the course of your

22  tenure at MCHA, did you work with employees in any

23  of those other corporate service providers?

24     A.    All of them, yes.

25     Q.    So you worked at personnel at MCHJ?

1                D. Costa  - Confidential

2        A.    Yes.

3        Q.    And by MCHJ, I'm referring to

4    Mitsubishi Chemical Holdings Japan, okay?

5        A.    Yes.

6        Q.    Who was your primary point of contact

7    at Mitsubishi Chemical Holdings Japan?

8        A.    Ken Fujiwara.

9        Q.    Do you know who Masanori Sakaguchi is?

10       A.    Yes.

11       Q.    Do you know if Masanori Sakaguchi was

12   an employee of MCHJ at any point during your

13   tenure at MCHA?

14             MS. GUERON:  Objection.

15       A.    I'm not sure who his employer was.

16       Q.    Did you have any interactions with

17   Masanori Sakaguchi in connection with your

18   dealings with Mitsubishi Chemical Holdings Japan?

19       A.    Yes.

20       Q.    And what was the general nature of

21   those interactions?

22             MS. GUERON:  Objection.

23       A.    He had been general counsel of

24   Mitsubishi Rayon Corporation, and, as such, was a

25   client for some purposes, and that was my initial

1                D. Costa  - Confidential

2   contact with him.  Subsequently, Mitsubishi Rayon

3   Corporation was merged into MCC.  At that point,

4   he became a member of the legal group and

5   continued to be primarily responsible for the

6   legal work of the Mitsubishi Rayon businesses.

7        Q.    You mentioned Mitsubishi Rayon.  Did

8   you have an acronym for that entity?

9        A.    MRC.

10       Q.    Are you familiar with a Mitsubishi

11  entity named Lucite?

12       A.    Yes.

13       Q.    Was that part of MRC?

14       A.    Yes, it was.

15       Q.    At some point, did that change?

16       A.    When MRC was merged into MCC, Lucite

17  became a subsidiary of MCC.

18       Q.    Now, you mentioned that you viewed

19  Mr. Sakaguchi as a client, correct?

20       A.    Correct.

21       Q.    And when you refer to him as a client,

22  what do you mean by that?

23       A.    When MCHA managed legal matters for

24  the MRC entities, such as Lucite, he wanted to be

25  kept notified of what -- what we were working on.

1                 D. Costa  - Confidential

2          Q.    Did you say MCHA -- I'm sorry, did you

3     say MCHC entities?

4          A.    I believe I said MRC.  I may have

5     misspoken.  What I meant to say was, when we

6     worked on MRC matters.

7          Q.    Okay.  During the course of your

8     tenure as general counsel, did you have

9     interactions with personnel at MCC?

10         A.    Yes.

11         Q.    And did you have a primary point of

12    contact there?

13         A.    No.  At the time, there were 10

14    business units, and my contacts depended on the

15    business matter that was being worked on.

16         Q.    With respect to legal work, did you

17    have a particular point of contact at MCC that you

18    worked with?

19              MS. GUERON:  Objection.

20         A.    I don't believe so.

21         Q.    You mentioned 10 business units at

22    MCC.  Was one of those MCPP?

23         A.    No.  That was a subsidiary of MCC with

24    operations in Europe and the Americas and, I

25    believe, Japan.

```
 1              D. Costa  - Confidential
 2        Q.    And MCPP would stand for Mitsubishi
 3   Chemical Plastic Polymers?
 4        A.    Performance Polymers.
 5        Q.    Performance Polymers.  Okay.  Thank
 6   you.
 7              During your tenure, did you have
 8   business dealings with a man named Johei Takimoto?
 9        A.    Yes.
10        Q.    And at the beginning of your -- when
11   did you first interact with Mr. Takimoto?
12        A.    I met him in April 1996.  I believe I
13   worked for him via e-mail as early as February
14   1996.
15        Q.    Okay.  When you first began working
16   with Mr. Takimoto, what was his role?
17        A.    He was a member of the legal
18   department in Japan.
19        Q.    When you refer to the legal department
20   in Japan, are you referring to MCHJ or something
21   else?
22        A.    Something else.
23        Q.    What entity were you referring to?
24        A.    MCC.
25        Q.    So, at some point, was there a
```

1                D. Costa  - Confidential

2    restructuring where the legal department of MCC

3    was no longer performing legal work?

4                MS. GUERON:  Objection.

5         A.    What I can say is that when MCHC was

6    created, MCHJ was created.

7         Q.    Okay.  So upon the formation of MCHJ,

8    did MCHJ take on the function of the legal

9    department?

10               MS. GUERON:  Objection.

11        A.    At least in part.

12        Q.    When you say "in part," are you

13   referring to the existence of other corporate

14   services that were provided or something else?

15        A.    I do not know.

16        Q.    Okay.

17        A.    I just know that that was true, at

18   least in part.

19        Q.    At some point in time, did MCHJ become

20   responsible for legal work?

21               MS. GUERON:  Objection.

22        A.    For some legal work, yes.

23        Q.    Do you know when that occurred?

24        A.    No.

25        Q.    And at some point in time, did

1                    D. Costa  - Confidential

2   Mr. Takimoto work at MCHJ?

3        A.    No.  Mr. Takimoto left the legal

4   function in 1997.  Oh, 1996.  Excuse me.  1996.

5   Shortly after I joined.

6        Q.    What did Mr. Takimoto move on to when

7   he left the legal function?

8        A.    He was in the secretary's office,

9   which is the office that supported the chairman

10  and CEO of MCC.

11       Q.    Now, when you referred to the 10

12  business units earlier, did that include MTPC

13  Pharma?

14       A.    No.

15       Q.    What was MTPC Pharma?

16       A.    MTPC Pharma was the result of a series

17  of mergers of Japanese pharmaceutical companies.

18  It was a publicly listed company in Japan that was

19  owned in part by MCHC.

20       Q.    During your tenure at MCHA,

21  approximately how many employees did MTPC Pharma

22  have?

23            MS. GUERON:  Objection.

24       A.    I don't know.

25       Q.    Was it less than a hundred?

```
 1                D. Costa  - Confidential
 2        A.    At one point, it was less than a
 3   hundred.  At one point, it was more than a
 4   hundred.
 5        Q.    Okay.  Did the number of employees
 6   change substantially over time?
 7              MS. GUERON:  Objection.
 8        A.    The number of employees of that group
 9   grew gradually and, eventually, significantly.
10        Q.    Okay.  At the point when it had the
11   maximum head count during your tenure, do you know
12   approximately how many employees it had?
13        A.    I don't.  I'm sorry.  I apologize.
14   What entity are we talking about?  I've lost
15   track.
16        Q.    MTPC Pharma.
17        A.    Okay.  MTPC, I was -- I misunderstood
18   your question, so everything I said is not
19   accurate.
20        Q.    Okay.
21        A.    MTPC, of the publicly listed company
22   in Japan, had tens of thousands of employees at
23   all relevant times.
24        Q.    Did it have a pharma subsidiary?
25        A.    Yes.
```

1                    D. Costa  - Confidential

2          Q.    So when you're referring to the tens

3    of thousands of employees, you mean the entire

4    company, not just the pharma, right?

5          A.    No, that -- pharma.  Globally, MTPC

6    had tens of thousands of employees.

7          Q.    Okay.  Did MTPC Pharma have any U.S.

8    subsidiaries?

9          A.    Yes, it did.

10         Q.    Were those doing pharma work?

11         A.    Yes, they were.

12         Q.    Do you know how many pharma

13   subsidiaries in the US MTPC had during your

14   tenure?

15              MS. GUERON:  Objection.

16         A.    Approximately six.

17         Q.    Does one come to mind as being the

18   largest of those six?

19              MS. GUERON:  Objection.

20         Q.    In terms of employees?

21              MS. GUERON:  What time period are we

22         talking about now?

23              MR. BERMAN:  We can answer that next.

24         A.    I believe it was MTPA.

25         Q.    During the course of your tenure with

1                   D. Costa  - Confidential
2     MCHA, what was the largest size, in terms of
3     employee head count, that any of those six U.S.
4     subsidiaries reached?
5                   MS. GUERON:  Objection.
6         A.    I don't recall.
7         Q.    Could you tell me approximately?
8                   MS. GUERON:  Objection.
9         A.    Something over a hundred.
10        Q.    Okay.  Did any of those six American
11    subsidiaries have thousands of employees?
12        A.    No.
13        Q.    The employees at those U.S. entities,
14    were they primarily Japanese expatriates?
15                  MS. GUERON:  Objection.
16        A.    No.
17        Q.    Do you know approximately how much
18    revenue the U.S. subsidiaries were responsible for
19    during your tenure --
20                  MS. COLWIN:  Objection.
21                  MS. GUERON:  Objection.
22        Q.    -- on an annual basis?
23                  MS. GUERON:  Objection.
24        A.    How are you defining subsidiaries?
25    Subsidiaries of what entity?

1                    D. Costa  - Confidential

2          Q.    Those six.  Those six entities that

3    you just described for me that were U.S.

4    subsidiaries of MTPC Pharma.

5                    MS. GUERON:  Objection.

6          A.    Very limited.

7          Q.    Did any of those U.S. subsidiaries

8    manufacture drugs regulated by the U.S. FDA?

9                    MS. GUERON:  Objection.

10         A.    So, I want to go back to the time

11   period that you defined.  I believe you said 2014

12   to the present.  So, I am -- I have answered so

13   far for the period up until when I left in 2018 --

14   or, actually, I was answering for the period when

15   Jennifer was employed.  The pharma companies

16   launched a product during my tenure which resulted

17   in revenue.  They had product they were selling in

18   the United States.  I do not know what the revenue

19   was.

20         Q.    Do you know approximately when the

21   product was launched?

22         A.    2017, give or take a year.

23         Q.    Was that the first product that was

24   launched or were there others?

25         A.    That's the first that was commercially

1                    D. Costa  - Confidential

2      launched.

3           Q.    Do you know the name of it?

4           A.    Not at this moment.

5           Q.    Do you know the name of the entity

6      that launched that product?

7           A.    No.

8           Q.    Do you know what the purpose of the

9      product was?

10                MS. GUERON:  Objection.

11          A.    The drug was to treat patients who had

12     ALS.

13          Q.    So, I want to go back to MCHA for a

14     moment.

15                During your tenure, you had the

16     position of general counsel of MCHA, correct?

17                MS. GUERON:  Objection.

18          A.    Yes.

19          Q.    For some portion of your time there,

20     right?

21          A.    Yes.

22          Q.    At some point, your role changed,

23     correct?

24          A.    Yes.

25          Q.    Approximately when did your role

1                    D. Costa  - Confidential

2       change?

3              A.     April 1st, 2015.

4              Q.     At that time, what did your role

5       change from and to?

6              A.     It changed from general counsel

7       executive vice-president and chief compliance

8       officer, to president.  I was also a member of the

9       board of MCHA prior to my promotion, and the

10      corporate secretary.

11             Q.     When did you become a member of the

12      board of MCHA?

13             A.     I don't recall.

14             Q.     Was it approximately the time you were

15      hired as a general counsel?

16             A.     No.

17             Q.     So it was sometime later?

18             A.     Significantly later.

19             Q.     Okay.  Approximately when did you

20      become the corporate secretary of MCHA?

21             A.     I became assistant secretary within a

22      year or two of being hired, and became secretary

23      at some point within a few years after that.

24             Q.     Okay.  Did you serve as the corporate

25      secretary for any other Mitsubishi entities?

1                    D. Costa  - Confidential

2          A.    Yes.

3          Q.    Approximately how many?

4          A.    At least a couple of dozen.

5          Q.    Okay.  When did you first become the

6    corporate secretary of any entity other than MCHA?

7          A.    I do not recall.

8          Q.    Was it approximately the time you were

9    hired?

10         A.    No.

11         Q.    Was it sometime later than that?

12         A.    Sometime significantly later than

13   that.

14         Q.    Okay.  Who appointed the board of MCHA

15   when you were a member of the board?

16               MS. GUERON:  Objection.

17         A.    I don't know.

18         Q.    Well, at some point, you became the

19   corporate secretary of MCHA, correct?

20         A.    Correct.

21         Q.    At that time, did you know who was on

22   the Board of Directors?

23         A.    So, again, I need -- I want to

24   clarify.

25         Q.    Sure.

1                    D. Costa  - Confidential

2          A.    I was the corporate secretary of MCHA

3    from the time of its creation.  I thought you were

4    asking me to go back to when I first became

5    general counsel in 1996.  So, I just want to

6    clarify that the years aren't clear to me in some

7    of your questions.

8          Q.    Okay.

9          A.    So, some of my answers might not be

10   fully accurate.

11         Q.    Okay.  That's fine.  I appreciate you

12   clarifying.  Generally speaking, I'm interested in

13   the period from 2014 forward.

14         A.    Okay.

15         Q.    But let's go about it a slightly

16   different way.

17                You explained to me that you were

18   first hired into Mitsubishi Chemical America, and

19   then, at some point, you were employed by MCUSA,

20   correct?

21         A.    Correct.

22         Q.    And, at some point, you became

23   employed by MCHA, correct?

24         A.    Correct.

25         Q.    And I think you just told me that you

1                   D. Costa  - Confidential

2    were the corporate secretary of MCHA from the time

3    of its creation, correct?

4         A.    Correct.

5         Q.    At the time that MCHA was created and

6    you became the corporate secretary, did you know

7    who the Board of Directors was at that time?

8         A.    I'm not certain.

9         Q.    Okay.  At some point in time when you

10   were the corporate secretary of MCHA, did you come

11   to learn who the board members were?

12        A.    I always knew at the time who they

13   were.  I do not know, sitting here now, who they

14   were.

15        Q.    So, at the time, you knew the

16   identities of all the board members?

17        A.    Absolutely.

18        Q.    At the time when you were the

19   corporate secretary for MCHA, who was the head

20   executive of that entity?

21             MS. GUERON:  I'm sorry, can you read

22        that back.

23             (Whereupon, the requested question was

24        read back by the reporter.)

25             MS. GUERON:  Objection.

1                D. Costa  - Confidential

2        Q.    At the time you first became the

3  corporate secretary, who was the head executive of

4  the entity?

5        A.    I believe it was Hiroo Tanaka, who was

6  president at that time.

7        Q.    Do you know how Mr. Tanaka was

8  selected to be president of that entity?

9        A.    No.

10        Q.    At some point in time, did the

11  president change from Mr. Tanaka to someone else?

12        A.    Yes.

13        Q.    Who became president after Tanaka

14  left?

15        A.    Shoji Yoshisato.

16        Q.    Do you know how Shoji Yoshisato came

17  to be president?

18        A.    No, I do not.

19        Q.    You were the corporate secretary at

20  the time of the transition from Mr. Tanaka to

21  Mr. Yoshisato as president?

22        A.    Correct.

23        Q.    Was there a resolution that

24  effectuated that change?

25        A.    Yes.

1                    D. Costa  - Confidential

2          Q.    So, at the time, you knew how that

3     occurred, correct?

4               MS. GUERON:  Objection.

5          A.    If you've referring to how it legally

6     became effectuated, yes, I was aware.

7          Q.    So, how did it legally become

8     effectuated?

9          A.    The Board of Directors appointed

10    Mr. Yoshisato to succeed Mr. Tanaka as president

11    of MCHA.

12         Q.    What was the word you used, legally

13    speaking, how the Board of Directors of MCHA is

14    selected?

15         A.    Legally speaking, the shareholder

16    approves the Board of Directors and appoints -- I

17    should say appoints the Board of Directors.

18         Q.    During your tenure at MCHA, was MCHA a

19    public company?

20         A.    No.

21              MS. GUERON:  Objection.

22         Q.    Was it a private company?

23         A.    Yes.

24         Q.    So it was not listed on any securities

25    exchange, correct?

```
 1              D. Costa  - Confidential
 2      A.    Correct.
 3      Q.    Do you know who the shareholder or
 4  shareholders of MCHA were during your tenure at
 5  the company?
 6              MS. GUERON:  Objection.
 7              MS. COLWIN:  Objection.
 8              MR. BERMAN:  You can answer.
 9      A.    The shareholder of MCHA was at all
10  times MCHC.
11      Q.    So, by the transitive property, did
12  MCHC still appoint the members of the Board of
13  Directors of MCHA?
14              MS. GUERON:  Objection, but go ahead.
15      A.    Yes.
16      Q.    Did MCHA issue dividends?
17      A.    Yes -- oh, MCHA.  Give me a minute.
18            Yes.
19      Q.    Who determined whether dividends would
20  be issued by MCHA, legally speaking?
21      A.    A determination was made by MCHC and
22  MCHA.
23      Q.    During your tenure as the general
24  counsel of MCHA, did MCHA enter into legal
25  services agreements?
```

1                    D. Costa  - Confidential

2          A.    Yes.

3          Q.    And were those legal services

4    agreements between MCHA and some other affiliates

5    of MCHC?

6          A.    Yes.

7          Q.    Do you know approximately how many

8    MCHC affiliates entered into legal services

9    agreements?

10         A.    I believe it was about 40.

11         Q.    And as general counsel of MCHC, were

12   you the signatory of the legal services agreements

13   on behalf of MCHA?

14         A.    I was general --

15              MS. GUERON:  Objection.  You misspoke.

16         You said she was GC of MCHC.

17              MR. BERMAN:  MCHA.  Sorry.

18              MS. GUERON:  Thank you.

19              MR. BERMAN:  Let me just go back and

20         just make sure that's clear.

21         Q.    At the time when you were the general

22   counsel of MCHA, did the company enter -- did MCHA

23   enter into legal services agreements with other

24   Mitsubishi affiliates?

25         A.    Yes.

1                    D. Costa  - Confidential

2         Q.    Did those legal services agreements

3    provide for revenue to be paid to MCHA for

4    performing services?

5         A.    Yes.

6         Q.    Were those services of legal nature,

7    meaning they were legal services?

8         A.    Some of the services provided by MCHA

9    were legal services, and there were separate legal

10   services agreements which provided for fees for

11   legal services.

12        Q.    With respect to the other

13   administrative services that were provided by MCHA

14   that were of a non-legal services basis, was there

15   a separate agreement that covered those?

16        A.    Yes.

17        Q.    Was there a name for that agreement?

18        A.    I believe we called it the

19   administrative services agreement.

20        Q.    During the time when you were general

21   counsel for MCHA, did you have the discretion to

22   decline to enter into a legal service agreement

23   with a Mitsubishi affiliate?

24             MR. FORTINSKY:  Objection to form.

25        A.    Did we have the what?

```
 1              D. Costa  - Confidential
 2       Q.    The discretion to decline to enter
 3   into a legal services agreement?
 4       A.    I only once declined, in part, to
 5   enter into a legal services agreement.
 6       Q.    What was the general basis for
 7   declining?
 8            MS. COLWIN:  Objection.  I would say,
 9        if there was any privileged information,
10        then I would say not to disclose it.
11            MR. BERMAN:  Okay.  To the extent that
12        you can answer that question without
13        revealing any privileged communications with
14        counsel, please do so.
15            MS. GUERON:  Wait.  Hold on.  This is
16        not a privilege that -- my understanding --
17        I represent the witness.  Mercedes
18        represents the company.  I don't think she's
19        describing a privileged communication with
20        counsel.  I think she's describing a
21        privilege that belongs to MCHA.
22       Q.    To the extent that you can answer
23   without vitiating a privilege that is not yours to
24   waive, can you please do so?
25       A.    I cannot do so.
```

1                    D. Costa  - Confidential

2         Q.    Okay.  That is fine.

3              At the time when you declined to enter

4    into a legal services agreement, were you in

5    communication with any businesspeople concerning

6    that decision?

7         A.    All of my discussions regarding legal

8    services agreements were with the businesspeople

9    directly for the businesses that were contracting

10   for services.

11        Q.    Can you identify the entity that you

12   declined to enter into a legal services agreement

13   with?

14             MS. GUERON:  Hold on a second.

15             MS. COLWIN:  No.

16             MR. BERMAN:  I don't see how that

17        could be privileged, Counsel.

18             MS. COLWIN:  I'd like to confer -- why

19        don't you hold on to that question.  Let's

20        revisit it after the break.

21   RL        MR. BERMAN:  Okay.  We can mark that

22        question.  Thank you.

23        Q.    Without waiving any privilege, was the

24   decision not to enter into a legal services

25   agreement with whatever entity an exercise of your

1              D. Costa  - Confidential

2  discretion?

3       A.    Yes.

4       Q.    You said you only declined that

5  agreement in part, correct?

6       A.    That's correct.

7       Q.    So, to some extent, that agreement

8  ended up being executed?

9       A.    Correct.

10      Q.    Okay.  With respect to administrative

11  services agreements, was it within your discretion

12  to decline entering into those?

13      A.    To an extent.

14      MR. FORTINSKY:  Objection to form.

15      Q.    Can you clarify your response?

16      A.    There were some services where I had

17  discretion and some where I did not.

18      Q.    Which ones did you not have discretion

19  over?

20      A.    Internal audit and tax.

21      Q.    So, who made the determinations with

22  respect to the administrative service agreements

23  covering internal audit?

24      MS. GUERON:  Objection.

25      A.    The agreements themselves were drafted

```
 1              D. Costa  - Confidential
 2    by, governed by, entered into by MCHA, but the
 3    existence of a relationship was required by MCHC
 4    as shareholder, because they were ultimately
 5    responsible for complying with Japanese tax law
 6    and other public company requirements.
 7         Q.   Okay.  Does that also hold true for
 8    tax?
 9              MS. GUERON:  Objection.
10         A.   I believed I said internal audit and
11    tax.  If I did not, I misspoke.
12         Q.   Well, you identified those two
13    functions, and then you indicated that MCH -- that
14    the existence of the relationships was required by
15    MCHA as a shareholder because it had compliance
16    obligations in Japan, correct?
17              MS. GUERON:  Objection.  You
18         misspoke -- misrepresented her testimony,
19         just because the acronym is wrong.
20              MR. BERMAN:  Okay.
21         Q.   So, I believe you said that the
22    existence of the relationship was required by MCHC
23    as a shareholder.
24              Did I get that right?
25         A.   That's correct.
```

1          D. Costa  - Confidential

2     Q.    Okay.  And that was due to their

3   obligations in Japan?

4     A.    That's correct.

5     Q.    Okay.  And they had obligations in

6   Japan with respect to both internal audit and tax,

7   correct?

8          MS. GUERON:  Objection.

9     A.    Yes --

10          MS. GUERON:  Go ahead.

11     A.    That's correct.

12     Q.    During your tenure at MCHA as general

13   counsel, were you responsible for supervising the

14   legal department?

15     A.    I was responsible for the MCHA legal

16   department, yes.

17     Q.    What were your responsibilities in

18   connection with supervising the legal department?

19     A.    I managed all department members.  I

20   managed the relationships with all of our clients.

21   So, that included negotiating the legal services

22   agreements and overseeing all project matters.  I

23   worked with, to varying extents, the legal

24   departments in other countries.  I worked

25   directly, managed directly the largest projects

```
 1              D. Costa  - Confidential
 2    that came to us, the large M&A, for example, the
 3    more sensitive projects.  And I worked very
 4    closely across functions with other members of
 5    MCHA, people in all of our affiliates who had
 6    business in the United States, and anyone who
 7    requested my support in the group.
 8              MR. BERMAN:  Excuse me.  Please don't
 9         coach the witness during her response.
10              THE WITNESS:  She asked me if I needed
11         a break.
12              MS. GUERON:  I said to her, we've been
13         going for about an hour, would you like a
14         break.
15              MR. BERMAN:  Okay.  Please do that on
16         the record, and --
17              MS. GUERON:  I don't have any
18         obligation to do that on the record.
19              THE WITNESS:  So, I need to take
20         medication at 11:30.  I will ask for a break
21         in ten minutes.
22              MR. BERMAN:  Okay.  That's fine.  And
23         I'm happy to accommodate any break you want,
24         just let me know.  And I speak kind of
25         quickly, so, in the course of any of your
```

```
 1              D. Costa  - Confidential
 2         responses, feel free to work in that you
 3         would like a break, okay?
 4              THE WITNESS:  Yes.
 5              MR. BERMAN:  All right.  This is not
 6         an endurance contest.
 7              THE WITNESS:  Yes.
 8         Q.    All right.  So, did you complete your
 9    response?
10         A.    I don't remember what...
11         Q.    Okay.  I'll just clarify -- I'll
12    repeat my understanding and --
13              MS. GUERON:  Actually, maybe --
14              MR. BERMAN:  You want to read back the
15         response?
16              (Whereupon, the requested answer was
17         read back by the reporter.)
18         A.    I also headed up the compliance
19    function, ran the compliance function.  While I
20    was general counsel, during part of that period, I
21    also was responsible for internal audit.  It
22    reported to me directly for a period of time.  I
23    also had direct responsibility for HR during a
24    period.  I had involvement in risk management both
25    in terms of insurance and risk management in the
```

1                    D. Costa  - Confidential

2    enterprise sense.  I supported -- oh, the scope of

3    my work also included intellectual property.  And

4    I will mention, although it maybe is included in

5    my earlier discussion, Pharma, Life Science

6    Institute, Nippon Gohsei, and a number of clients

7    in Japan that I supported directly.  I think there

8    are others, but this is what comes to mind right

9    now.

10        Q.    Okay.  For now, have you completed

11   your response?

12        A.    For now.

13        Q.    If you have any other items that occur

14   to you as we go by, I'm going to add them to the

15   list, that's fine.  Just let me know, okay?

16        A.    Yes.

17        Q.    All right.  You mentioned that you

18   managed all department members, correct?

19        A.    Yes.

20        Q.    Did that include attorneys?

21        A.    Yes.

22        Q.    Okay.  What was the largest number of

23   attorneys that you had under your supervision

24   during your position as GC?

25        A.    I think five US attorneys.

```
 1                  D. Costa  - Confidential
 2          Q.    Okay.  And you mentioned relationships
 3     with clients, correct?
 4          A.    Oh, six.
 5          Q.    Six U.S. attorneys.  Okay.
 6                You mentioned that you were
 7     responsible for relationships with clients,
 8     correct?
 9          A.    Correct.
10          Q.    By clients, who did you mean?
11          A.    In that instance, I was referring to
12     those entities with whom we had legal services
13     agreements, where I worked with them to determine
14     what the scope of services would be that was
15     provided to them, and then I was also responsible
16     and accountable for all legal services provided
17     under those agreements by members of the
18     department.
19          Q.    Okay.  So were all of those clients
20     affiliates of Mitsubishi?
21                MS. GUERON:  Objection.
22          A.    It depends on how you define
23     affiliates, but they all could be called
24     affiliates of Mitsubishi, yes.
25          Q.    Okay.  Did you provide legal services
```

1                   D. Costa  - Confidential

2    in the marketplace, in general?

3         A.    No.

4         Q.    So other entities that wanted your

5    legal services could not obtain them, could they?

6         A.    No, they could not.

7         Q.    Okay.  So, you mentioned that you

8    worked with legal departments in other countries,

9    correct?

10        A.    Correct.

11        Q.    And by legal departments in other

12   countries, were you referring to MCHJ?

13        A.    That is included, yes.

14        Q.    Were you including MCHE?

15        A.    Yes.

16        Q.    Were you including MCHB, Beijing?

17        A.    Yes.

18        Q.    Any others that I missed?

19        A.    Lucite had a general counsel located

20   in England, and Quadrant had a general counsel

21   located in Switzerland.

22             MR. BERMAN:  Are we okay on time?

23             THE WITNESS:  My alarm will go off.

24   Thank you.

25        Q.    You mentioned M&A, correct?

1                D. Costa  - Confidential

2        A.    Yes.

3        Q.    Did you perform any M&A transactions

4    at Cleary?

5        A.    No.

6        Q.    So what was the first M&A transaction

7    you were working on?

8        A.    I don't recall what was first.  I

9    worked on 30 or so in my 19 years, but the first

10   one was definitely -- the first one or more was in

11   my first year.

12       Q.    Okay.  In your earliest transactions

13   that were related to M&A, was your work supervised

14   by any other lawyers?

15       A.    We worked with outside counsel.  In

16   the beginning, I worked with Cleary Gottlieb.

17       Q.    Okay.  So you were guided by outside

18   counsel on those transactions?

19            MS. GUERON:  Objection.

20       A.    I wouldn't say guided, but, yes, I

21   learned how to do M&A by working with Cleary

22   Gottlieb and other large law firms.

23       Q.    When you said you worked across

24   functions with other members of the MCHA team and

25   affiliates with business in the United States,

1                    D. Costa  - Confidential

2    what other functions were you referring to?

3          A.    It's very varied, but that included

4    working with tax, HR, internal audit, intellectual

5    property, IT, finance, and my reference to

6    business units was just there really was no area

7    of business that I did not, at one time, cover.

8          Q.    Okay.  You mentioned that you headed

9    up compliance, correct?

10         A.    Correct.

11         Q.    Did you perform any legal work for

12   compliance during your tenure at Cleary?

13              MS. GUERON:  Objection.

14         A.    It was not referred to as such, no.

15         Q.    Regardless -- without regard for what

16   they referred to it as, or what terminology, did

17   you perform legal services related to compliance

18   at Cleary?

19              MS. GUERON:  Objection.

20         A.    I would say no.

21         Q.    All right.  What was the general

22   nature of your work at Cleary?

23         A.    I was a litigator.

24         Q.    Was that primarily commercial

25   litigation?

```
 1              D. Costa  - Confidential
 2        A.    Yes.
 3        Q.    Any other major types of work that you
 4   performed at Cleary?
 5        A.    I did securities litigation, so I
 6   actually did M&A from the litigation side.  I did
 7   some employment litigation.  I did a lot of pro
 8   bono litigation.  I did a lot of international
 9   matters as well.
10        Q.    Did any of your employment litigation
11   at Cleary include gender discrimination claims?
12        A.    No, it did not.
13        Q.    Did any of it include any wrongful
14   termination claims?
15        A.    I don't believe so.
16        Q.    Did it include any retaliatory
17   discharge claims?
18        A.    I don't believe so.
19        Q.    Did you have any claims concerning --
20   or did you perform any legal work related to Equal
21   Pay Act?  The Equal Pay Act?
22        A.    No.
23        Q.    Did you conduct any pay equity
24   analyses at Cleary?
25        A.    No.
```

```
 1            D. Costa  - Confidential
 2      Q.    Did you do any investigative work at
 3 Cleary?
 4            MS. GUERON:  Objection.
 5      A.    In the employment context, no.
 6      Q.    Did you do any white collar
 7 investigations?
 8      A.    No.
 9      Q.    Did you do any criminal
10 investigations?
11      A.    No.
12      Q.    Did you do any accounting
13 investigations?
14      A.    No.
15      Q.    What about internal audit?
16      A.    No.
17      Q.    Did you do any intellectual property
18 work at Cleary?
19      A.    Some, yes.
20      Q.    Was that related to a particular
21 subject matter?
22      A.    What I can recall, related to
23 trademarks.
24      Q.    Any patent work?
25      A.    Not that I recall.
```

```
 1            D. Costa  - Confidential
 2       Q.   Did you do any pharmaceutical work at
 3  Cleary?
 4            Is that your alarm?
 5       A.   Yes, that is, but you can finish.
 6       Q.   If you can just answer that question,
 7  we can take a break.
 8            Did you do any pharma work at Cleary?
 9       A.   I don't believe so.
10            MR. BERMAN:  Okay.  Let's take a
11       break.  How long would you like?
12            THE WITNESS:  I need two minutes.
13            MR. BERMAN:  Okay.  Let's take a
14       break.
15            THE WITNESS:  Thank you.
16            (Whereupon, a recess was taken at this
17       time.)
18            MR. BERMAN:  Back on the record.
19            Could you just read back my last
20       question.)
21            (Whereupon, the requested question was
22       read back by the reporter.)
23       Q.   Did you do any life science work at
24  Cleary?
25       A.   I don't believe so.
```

1                D. Costa  - Confidential

2        Q.    You mentioned an entity named Nippon

3   Gohsei; is that correct?

4        A.    Yes.

5        Q.    How do you spell the second word?

6        A.    G-O-H-S-E-I.

7        Q.    What did they do, or what did they do

8   at the time that you were general counsel?

9              MS. GUERON:  Objection.

10       A.    They produced various chemicals.

11       Q.    So was that intended as an example of

12  pharma or life science work?

13       A.    No.

14       Q.    Okay.  So you viewed that as a

15  separate subject matter that you worked on?

16       A.    It was a publicly traded company.

17       Q.    And then you mentioned direct support

18  for clients in Japan.

19              What clients in Japan were you

20  referring to?

21       A.    Various business units of MCC, LSII,

22  MTPC.  Prior to the merger, MPI.  And Nippon

23  Gohsei.  And probably others.

24       Q.    You mentioned LSII, correct?

25       A.    Yes.

1              D. Costa  - Confidential

2       Q.    What is that?

3       A.    Life Science Institute.

4       Q.    Is there a second I in the acronym?

5       A.    I think it was Inc.

6       Q.    And you mentioned MTPC?

7       A.    That is Mitsubishi Tanabe Pharma

8   Corporation.

9       Q.    And you mentioned MPI.  What is that?

10      A.    Mitsubishi Plastics, Inc.

11      Q.    When you're referring to clients

12  generally, do you mean the term "client" in the

13  legal client sense or in a more broad sense?

14            MS. GUERON:  Objection.

15      A.    I believe in every -- let me restate

16  that.

17            The majority of the time, we had legal

18  services agreements with the entities I worked

19  with, and they were clients by contract.  There

20  were times when, prior to signing a legal services

21  agreement, or for some reason, I worked with

22  entities which were not under contract.

23      Q.    In those instances where you worked

24  with entities that were not under contract, were

25  you providing legal services to those entities?

1          D. Costa  - Confidential

2          MS. GUERON:  Objection.

3     A.    So, I'm thinking that there was always

4  a contract to establish attorney/client privilege,

5  but there was not necessarily a fee, and that's

6  what I was trying to distinguish earlier.

7     Q.    Okay.  Did the legal services

8  agreements generate substantial fees for MCHA?

9          MS. GUERON:  Objection.

10    A.    Yeah.

11         MS. GUERON:  Go ahead.

12    A.    The legal services fees covered,

13  dollar for dollar, the cost of the legal

14  department.

15    Q.    When you refer to a legal department,

16  what is it a department of?

17    A.    I believe your question was about

18  legal, so I'm referring to the legal department.

19    Q.    A department implies that there is

20  some larger organization that it slots into.  So

21  when you say "legal department," do you mean the

22  legal department of MCHA?

23    A.    Yes, that's what I mean.

24    Q.    And then with respect to -- I think

25  you mentioned there was a non-legal service -- oh,

1                    D. Costa  - Confidential

2     an administrative services agreements.  Did the

3     administrative services agreements generate

4     substantial fees?

5                    MS. GUERON:  Objection.

6          A.    The administrative services agreements

7     generated sufficient fees to cover all costs, plus

8     a margin for all services other than legal

9     services.

10         Q.    Okay.  So if everything went according

11    to plan, does that mean there would be profits for

12    MCHA?

13                   MS. GUERON:  Objection.

14         A.    Yes.  To the best of my recollection,

15    there were always profits in MCHA.

16         Q.    And then those profits would be

17    available for use for dividends, if the board

18    wanted them to, right?

19         A.    Correct.

20         Q.    During your time as general counsel

21    for MCHA, did you engage in business discussions

22    with businesspeople concerning the issuance of

23    dividends?

24                   MS. GUERON:  Why don't you just answer

25         that yes or no, just to make sure there is

1          D. Costa  - Confidential

2          no privilege problems, and we can go from

3          there.

4          A.    No.  My response was going to be, I'm

5     not sure I understand the question.

6          MS. GUERON:  Okay.

7          Q.    Okay.  In your role as general

8     counsel, did you provide non-legal advice

9     concerning dividends?

10          A.    No.

11          Q.    During your tenure as president of

12    MCHA, did you engage in business conversations

13    with businesspeople concerning the issuance of

14    dividends?

15          A.    Yes.

16          Q.    So that changed between the time that

17    you were general counsel and president, correct?

18          A.    Yes.

19          Q.    So, in your discussions concerning the

20    issuance of dividends, who did you have those

21    conversations with?

22          MS. GUERON:  Objection.  Go ahead.

23          A.    With the head of finance and

24    accounting at MCHA.

25          Q.    Was that a particular person?

1                    D. Costa  - Confidential
2         A.    It was Kohei Ichia during the
3    beginning of your time period, and it was Shin
4    Iguchi after that.
5         Q.    With respect to Shin Iguchi, was this
6    a male or a female?
7         A.    A man.
8         Q.    Was Shin Iguchi there during your
9    tenure as general counsel?
10        A.    No, he was not.
11        Q.    So only during your tenure as
12   president was Shin Iguchi there?
13        A.    Yes.
14        Q.    During your tenure as president, was
15   Shin Iguchi payrolled by MCHA?
16             MS. GUERON:  Objection.
17             THE WITNESS:  I'm sorry, I got
18        distracted.  Can you ask the question again?
19             MR. BERMAN:  Can you read it back.
20             (Whereupon, the requested question was
21        read back by the reporter.)
22        A.    Yes.
23        Q.    Who set the compensation for
24   Mr. Iguchi?
25        A.    I did.

1                    D. Costa  - Confidential

2         Q.    As part of setting Mr. Iguchi's

3    compensation, did you take into account budgeting

4    for MCHA?

5         A.    Yes.

6         Q.    How did you take into account

7    budgeting when setting compensation for

8    Mr. Iguchi?

9         A.    There was an amount allocated in the

10   budget, in the previous budget, when I became

11   president, and I used that as the starting point.

12        Q.    Did you have discussions with any

13   non-MCHA personnel concerning the setting of

14   compensation for Mr. Iguchi?

15        A.    No.

16        Q.    During your tenure as president, when

17   you first became president, there was already a

18   budget established?

19              MS. GUERON:  Objection.

20        A.    There was an existing budget.

21        Q.    Was that budget set annually?

22        A.    Yes.

23        Q.    So then, during your tenure as

24   president, did there come a time when you set the

25   budget?

```
 1                D. Costa  - Confidential

 2        A.    Yes.

 3        Q.    And did you consult with any non --

 4              MR. BERMAN:  Withdrawn.

 5        Q.    Did you communicate with any non-MCHA

 6   personnel in establishing that budget?

 7        A.    Not for creating the budget, no.

 8        Q.    During your tenure as president at

 9   MCHA, did you have discretion to increase the

10   budget unilaterally?

11        A.    It depended.

12        Q.    What did it depend on?

13        A.    Because the budget for MCHA -- because

14   the funds to cover the budget of MCHA were

15   determined by the fees that we charged our

16   clients, there were changes that occurred outside

17   our control that led to us having more funds or

18   lesser funds.  And the discretion I had, the

19   extent of the discretion depended on our funding

20   situation.

21        Q.    Did there ever come a time when

22   circumstances outside of MCHA's control led to

23   MCHA having less funds than expected?

24        A.    Yes.

25        Q.    How frequently did that take place?
```

1                    D. Costa  - Confidential

2         A.    It happened a number of times.  I

3    can't say how frequently.

4         Q.    And on the occasions where that

5    happened, how would that impact the budget, if at

6    all?

7                    MS. GUERON:  Objection.

8         A.    If we had less funds in the budget,

9    then we needed to figure out how to manage the

10   budget going forward, with that adjustment.

11        Q.    Were there any times where you

12   requested that MCHC provide funds to MCHA?

13        A.    MCHA paid a service fee under service

14   agreements, as did all the other clients, so I

15   negotiated with them once a year for that fee.

16        Q.    Did you mean to say MCHC paid a

17   service fee?

18        A.    I did.

19        Q.    And that fee was paid to MCHA?

20        A.    Correct.  As all other clients did.

21        Q.    During the course of your tenure at

22   MCHA as general counsel, you interacted with

23   personnel at MCHJ?

24        A.    Yes.

25        Q.    What was the purpose of interacting

1                    D. Costa  - Confidential

2    with personnel at MCHJ?

3                    MS. GUERON:  Objection.

4         A.    As stated, when we worked on matters

5    for which we had a common client, we would speak

6    to them to varying degrees.

7         Q.    When you refer to a common client, are

8    you referring to Mitsubishi affiliates?

9         A.    Correct.

10        Q.    And when you had a common client with

11   MCHJ, what circumstances would lead to that being

12   a common client of both MCHA and MCHJ?

13                   MS. GUERON:  Objection.

14        A.    If MCHA legal was handling a matter

15   for MCC, then MCC was our common client.

16        Q.    Okay.  Is that reference to MCC meant

17   to be an example or is that the only time that

18   would happen?

19        A.    Yes.  That's an example.

20        Q.    Would that also be true with respect

21   to the 40 or so other affiliates?

22                   MS. GUERON:  Objection.

23        A.    I'm not sure what you're asking.

24        Q.    Did you have other common clients

25   besides MCC?

```
 1                 D. Costa  - Confidential
 2         A.    Yes.
 3         Q.    Okay.  When you had a common client,
 4    what role was MCHA playing with respect to those
 5    representations?
 6               MS. GUERON:  Objection.
 7         A.    It was completely case by case.
 8         Q.    Okay.  Were those matters within a
 9    certain geographical jurisdiction?
10         A.    Not necessarily.
11         Q.    Did those matters have a certain
12    subject matter in common?
13         A.    I'm -- I'm sorry, I've lost your
14    question again.  What do you mean, that they had a
15    subject matter in common?
16         Q.    These common clients that MCHA and
17    MCHJ had, was that occasioned by the client having
18    particular legal needs that MCHA could satisfy?
19         A.    Yes.
20         Q.    Oh, okay.
21               And so would those needs all be
22    connected to the geographical area that you
23    described previously for MCHA?
24         A.    Not necessarily.
25         Q.    Okay.  So there were some -- do you
```

1                    D. Costa  - Confidential

2    want to explain your answer?

3         A.    I'm sorry.

4         Q.    That's okay.

5               Do you want to clarify your answer?

6         A.    If you were asking whether it was

7    limited to the Americas, the answer is no.  I did

8    a lot of work outside the Americas.

9         Q.    When you performed work outside of the

10   Americas, was it in connection with MCHJ?

11              MS. GUERON:  Objection.

12        A.    Not necessarily.

13        Q.    Was it in connection with one of the

14   other legal services providers that you mentioned

15   previously?

16        A.    Not necessarily.

17        Q.    Did MCHJ play any role in setting

18   MCHA's budget?

19        A.    No.

20        Q.    Did MCHC play any role in setting

21   MCHA's budget?

22        A.    They approved the budget as

23   shareholder.

24        Q.    Do you know what the legal process was

25   through which MCHC approved the budget as

1          D. Costa  - Confidential

2     shareholder?

3          A.     MCHA prepared the budget that was done

4     in the finance and accounting department, working

5     with all of the department heads.  That budget

6     then went to the Board of Directors of MCHA, and

7     then it went to the shareholder, MCHC, for final

8     approval.

9          Q.     Okay.  The final approval step that

10    you just mentioned, where you said that the budget

11    went to MCHC as the shareholder, was there a

12    particular individual that it was directed

13    towards?

14         A.     That person varied over time.  I

15    recall Mr. Date being responsible when I -- oh,

16    are you asking about when I was president or

17    general counsel?

18         Q.     You can start with the general counsel

19    position, please.

20              MS. GUERON:  The entire time period?

21         A.     Yeah, I don't know.  I don't know who

22    it was.

23         Q.     Okay.  So Mr. Date was one of the

24    individuals that was acting in a shareholder

25    approval role, correct?

```
 1                  D. Costa  - Confidential
 2         A.    He was on the board of MCHA, and
 3    represented the shareholder for budget purposes
 4    when I was president.
 5         Q.    What was Mr. Date's first name?
 6         A.    Hide -- I'm sorry.
 7         Q.    Can I help you?
 8         A.    Yes.
 9         Q.    Was it Hidefumi?
10         A.    Yes, it was.  Thank you.
11         Q.    Are there any other individuals that
12    you can recall performing that role that Mr. Date
13    performed?
14         A.    I believe that before it was Mr. Date,
15    it was Mr. Kosakai.
16         Q.    Do you know Mr. Kosakai's first name?
17         A.    I don't recall.
18         Q.    If at any point it comes to your
19    recollection, will you please let me know?
20         A.    Yes, I will.
21         Q.    Okay.  Thank you.
22               Was there an individual at MCHJ named
23    Ken Fujiwara?
24         A.    Yes.
25         Q.    What was his role?
```

```
 1                D. Costa  - Confidential
 2                MS. GUERON:  Objection.
 3         Q.    Do you know what his role was?
 4         A.    At what point in time?
 5         Q.    So, let's try to confine the responses
 6    to the period from 2014 forward, unless you can't
 7    do that, in which case, please explain.
 8         A.    I believe, in 2014, he was the head of
 9    the legal department in Tokyo.  I do not recall
10    his title at the time.
11         Q.    To your knowledge, was he employed by
12    MCHC?
13         A.    I do not know.
14         Q.    To your knowledge, was he employed by
15    MCHJ?
16         A.    I do not know.
17         Q.    During your tenure as president of
18    MCHA, are you aware of any employees at MCHA
19    being -- sorry, receiving compensation from any
20    other entity?
21         A.    All employees of MCHA were compensated
22    by MCHA.
23         Q.    I asked you something slightly
24    different, so let me clarify.
25         A.    Okay.
```

1                    D. Costa  - Confidential

2        Q.    What I'm asking you about is, in

3    addition to compensation that MCHA employees

4    received from MCHA, during your tenure as

5    president, were you aware of any of those

6    employees receiving compensation from some other

7    entity other than MCHA?

8        A.    How do you define compensation?

9        Q.    Something of financial value.

10       A.    So, when ex-pats were assigned from an

11   entity in Japan to work in the United States, they

12   had various arrangements with their -- their

13   transferring company, depending on their

14   circumstances.  Their salary was paid by MCHA.

15       Q.    Okay.  So for example, during your

16   time as president of MCHA, were there any Japanese

17   ex-pats assigned to MCHA?

18       A.    Yes.

19       Q.    Did that number change -- the number

20   of them, did that change over time during your

21   tenure as president?

22       A.    Not dramatically.

23       Q.    Approximately how many individuals are

24   we talking about?

25       A.    I want to say a half dozen.  It could

1                    D. Costa  - Confidential

2    have been more.

3        Q.    Are you able to identify any of those

4    individuals?

5        A.    Yes.  Shin Iguchi.

6              Remind me, are you asking when I was

7    president?

8        Q.    Yes.

9        A.    Shin Iguchi.  Prior to him, it was

10   Kohei Ichia.  Harry Fukasawa.  There were others

11   who supported IT in Virginia under Mr. Fukasawa,

12   whose names I don't recall.  And then we had

13   trainees, including Maikoo Usami.  And at least

14   one other in accounting.  I -- I don't recall

15   names right now.

16       Q.    Okay.  If it comes to mind, please let

17   me know.

18             When you refer to Shin Iguchi, is that

19   the same person as Shin?

20       A.    Yes.

21       Q.    And just for clarity, in Japan, is it

22   a common --

23             MR. BERMAN:  Withdrawn.

24       Q.    Are you generally familiar with

25   Japanese culture?

```
 1              D. Costa  - Confidential
 2        A.    Yes, I am.
 3              MS. GUERON:  Objection.
 4        Q.    In your experience working for MCHA,
 5   was it common practice to affix the word "san" to
 6   someone's surname?
 7        A.    If we -- yes, it was common.
 8        Q.    So in the case where somebody's name
 9   had the word "san" after it, is that effectively
10   the equivalent to "mister" here?
11        A.    Yes, it is.
12        Q.    Thank you.  I think earlier you
13   mentioned that you supervised internal audit; is
14   that correct?
15        A.    Yes.  For a time.
16        Q.    Did that time include when you were
17   president?
18        A.    No.
19        Q.    So it was just --
20        A.    Oh, I'm sorry.  Yes.  Yes.
21        Q.    So, as president, you supervised
22   internal audit?
23        A.    Yes.
24        Q.    Was there a particular person
25   responsible for that function under your
```

1                    D. Costa  - Confidential

2    supervision?

3         A.    Ryan Connors.

4         Q.    How do you spell the last name?

5         A.    C-O-N-N-O-R-S.

6         Q.    What was that person's role?

7         A.    He was responsible for the internal

8    audit function for the companies in the Americas,

9    and he had Katherine Todarello reporting to him,

10   and he supported internal audit outside the

11   Americas as well.

12        Q.    In connection with performing that

13   function, was Mr. Connors required to travel?

14        A.    Yes.

15        Q.    Where was he required to travel to?

16        A.    To all the affiliate companies that he

17   was auditing -- or I shouldn't say all.  To many

18   of the affiliate companies that he was auditing.

19        Q.    Were any of those in Japan?

20        A.    I don't specifically recall him

21   auditing an entity in Japan.

22        Q.    Okay.  Do you know the roles of the

23   people Mr. Connors was coordinating with outside

24   of MCHA?

25        A.    He worked with the internal audit

1                  D. Costa  - Confidential

2    function in Europe, he worked with the internal

3    audit function for Asia-Pacific, and he worked

4    with the internal audit function for Japan.

5         Q.    So do you know whether he traveled to

6    Japan in connection with the internal audit

7    function for entities in Japan?

8         A.    He traveled to Japan for meetings.  I

9    do not recall him traveling to Japan to engage in

10   audits.

11        Q.    Do you know whether Mr. Connors went

12   to Japan more than once during your tenure as

13   president?

14        A.    He did.

15        Q.    Do you know approximately how many

16   times?

17        A.    I do not.

18        Q.    On the occasions of Mr. Connors'

19   travel to Japan, how would you learn that he

20   intended to go there?

21        A.    I'm not sure what your question is.

22   He told me.

23        Q.    So he decided to go?

24        A.    It --

25              MR. VALLI:  Objection.

1                    D. Costa  - Confidential

2          A.    It -- it was -- I was going to say

3    assume.  I'm not going to assume.  I don't know.

4          Q.    So, during the time when you were

5    president and you were supervising Mr. Connors, he

6    would tell you that he intended to travel to

7    Japan; is that right?

8          A.    Sometimes I would tell him to travel

9    to Japan.  Sometimes he would tell me there was a

10   meeting he was going to attend in Japan.

11         Q.    Okay.  Did Mr. Connors require your

12   approval in order to travel to Japan?

13         A.    Yes.

14         Q.    Did he require anyone else's approval

15   in order to travel to Japan?

16              MS. GUERON:  Objection.

17         A.    No.

18         Q.    During your tenure as president of

19   MCHA, did you sit on any Boards of Directors?

20         A.    Yes.

21         Q.    Which ones?

22         A.    I was president of Qualicaps, Inc.,

23   which was a global company headquartered in Japan,

24   and I sat on the boards of a number of other

25   affiliate companies.

1                 D. Costa  - Confidential

2       Q.    And that was concurrent with your role

3    as president, right?

4       A.    Yes.

5       Q.    Did you receive separate compensation

6    for your participation in the Boards of Directors

7    of any of these entities?

8       A.    No.

9       Q.    How did it come to be that you were

10   appointed to the board of Qualicaps?

11              MS. GUERON:  Objection.

12      A.    A Mr. Siuki (phonetic) in Japan felt

13   like that company and board needed to be

14   professionalized, and he asked me to join the

15   board.

16      Q.    Was Mr. Siuki an executive at

17   Qualicaps?

18      A.    He was on the board of Qualicaps.

19      Q.    I'm sorry, did I get this correct that

20   he invited you?

21      A.    Yes.

22      Q.    And you were invited to join the board

23   of Qualicaps?  Were you required to inform anyone?

24      A.    I -- I -- no, I wasn't.

25      Q.    During your tenure as president of

1                D. Costa  - Confidential

2    MCHA, were you permitted to join Boards of

3    Directors of companies without obtaining any

4    approval from your own board?

5                MS. GUERON:  Objection.

6        A.    Just to be clear, the companies I was

7    referring to were all Mitsubishi affiliates.

8    These were not outside boards.  I did not need to

9    obtain permission.  I did sit on one outside

10   board, and I did need permission to do that.

11       Q.    What was the outside board you were

12   on?

13       A.    MicroSintesis, a biotech company based

14   in Canada.

15       Q.    Whose permission did you need?

16       A.    I needed -- I do not recall who I

17   spoke to.

18       Q.    Do you recall the role of the person

19   that would have been responsible for approving

20   that appointment?

21       A.    I'm thinking it was a board member of

22   MCHA, but I do not recall.

23       Q.    Did you require shareholder approval?

24       A.    I did not directly seek shareholder

25   approval.

1                    D. Costa  - Confidential

2         Q.     During your tenure as president of

3    MCHA, did you report to the Board of Directors of

4    any other affiliated entity?

5         A.     Can you give me that question again?

6              MR. BERMAN:  Can you read it back,

7         please.

8              (Whereupon, the requested question was

9         read back by the reporter.)

10        A.     No, I did not.

11        Q.     During your tenure as general counsel,

12    did you report to the Board of Directors of any

13    affiliated entity besides MCHA?

14        A.     Only in my capacity as general

15    counsel.  Not in a reporting sense, but I reported

16    to them on the work I did.

17              I think I answer to your question --

18    I'm sorry -- is no, I did not report to any Boards

19    of Directors.

20        Q.     So your interactions as a GC with

21    Boards of Directors outside of MCHA, if any, would

22    have been in your capacity as a legal advisor?

23        A.     Correct.

24        Q.     Okay.

25        A.     Unless I was on the board, and I'm now

1                    D. Costa  - Confidential

2      recalling I was on a board in Brazil for an entity

3      there MCPP Brazil, while I was general counsel.

4           Q.    Did you seek the approval of anyone

5      within MCHA in order to accept that appointment?

6           A.    My boss at the time, the president,

7      Mr. Yoshisato.

8           Q.    Do you know whether Mr. Yoshisato had

9      any communications with anyone outside of MCHA

10     concerning your appointments to the board of MCPP

11     Brazil?

12          A.    He spoke to someone at MCPP.  I do not

13     know if he spoke to anyone else.

14          Q.    Okay.  During your tenure as general

15     counsel at MCHA, were you familiar with the

16     incumbents on the Board of Directors of MCHJ?

17          A.    No.

18          Q.    Were you familiar with the incumbents

19     on the Board of Directors of MCHC?

20                MS. GUERON:  Objection.

21          A.    The Board of Directors of MCHC?  Yes.

22          Q.    Did you have any interactions in your

23     role as general counsel at MCHA with Board of

24     Directors members of MCHC, other than in your

25     capacity as a provider of legal services?

1          D. Costa  - Confidential

2          THE WITNESS:  Give me that question

3     again.

4          (Whereupon, the requested question was

5     read back by the reporter.)

6     A.    Yes.

7          I -- I don't know how to answer that

8     question, actually.  The question doesn't line up

9     perfectly for me.

10    Q.    Okay.  Is there something wrong with

11    the question that makes it unclear?

12    A.    I'm not saying the question -- well,

13    you used the word general counsel twice, in the

14    first clause and in the second clause, and I'm not

15    sure how to distinguish between the two.

16    Q.    Okay.  So, with respect to the

17    question, let me try it again.  I'm identifying

18    the time period as during your tenure in the

19    general counsel position.

20         During that time period, did you have

21    any interactions with the Board of Directors of

22    MCHJ that were outside of your provision of legal

23    services?

24    A.    I had no contact with the board of

25    MCHJ.

1                    D. Costa  - Confidential

2          Q.     During your tenure as general counsel

3    at MCHA, were you familiar with the job duties of

4    MCHJ's president?

5          A.     No.

6          Q.     Before you were hired at MCHA, or the

7    predecessor company, right, you told me earlier it

8    was predecessor when you first joined, correct?

9          A.     It was MCA.

10         Q.     Before you were hired at MCA, were you

11   provided with a job description of the job that

12   MCA was looking to fulfill?

13         A.     Yes.

14         Q.     Have you ever seen a job description

15   of the general counsel role at MCHA?

16         A.     I don't recall.

17         Q.     Do you know if there was a job

18   description of the general counsel position at

19   MCHA --

20                MS. GUERON:  Objection.

21         Q.     -- during your time at MCHA?

22                MS. GUERON:  Objection.

23         A.     There came a time when a job

24   description was created.

25         Q.     Can you identify for me when that time

1              D. Costa  - Confidential

2  was?

3      A.    I can't.

4      Q.    Can you give me a year?

5      A.    It was after I became president.

6      Q.    Are you familiar with that job

7  description?

8              MS. GUERON:  Objection.

9      A.    No.

10      Q.    Would you be able to recognize it if I

11  showed it to you?

12      A.    Maybe.

13      Q.    At the time that you became president

14  of MCHA, were you aware of any other females that

15  were incumbent in the rank of executive at any

16  Mitsubishi-related entities?

17              MS. GUERON:  Objection.

18              THE WITNESS:  So, read that back to

19        me, please.

20              (Whereupon, the requested question was

21        read back by the reporter.)

22              MS. GUERON:  Objection.

23      A.    There was a president of an entity in

24  Europe who was a woman.  I cannot think of anyone

25  else.

```
 1              D. Costa  - Confidential
 2        Q.    Do you know what entity it was?
 3        A.    I don't recall the name.  It was one
 4   of the MC -- Europe group companies.
 5        Q.    Do you recall the name of the
 6   president?
 7        A.    No.
 8        Q.    How long was your career at
 9   Mitsubishi?
10        A.    22 years.
11        Q.    During your 22 years, other than that
12   woman you just described, and other than yourself,
13   are you aware of any other female executives?
14        A.    There were a number of women named
15   into various executive positions in -- towards the
16   end of my tenure.  I do not recall prior to that.
17        Q.    When you refer to the end of your
18   tenure, do you have any particular period of time
19   in mind?
20        A.    I recall specifically the three years
21   that I was president.  Prior to that time, I
22   didn't have complete knowledge of all of the
23   400-plus Mitsubishi entities and who their
24   executives were.
25              MR. BERMAN:  Let's go off the record.
```

1                    D. Costa  - Confidential

2                    (Whereupon, a discussion was held off

3          the record.)

4                    MR. BERMAN:  Back on the record.

5          Q.    Ms. Costa, during the time period of

6    approximately January 1 of 2020, what was your

7    position at MCHA?  Were you still there?

8          A.    January 1, 2020?  No.

9          Q.    When did you depart the company?

10         A.    April 1 -- or March 31, 2018.

11         Q.    March 31, 2018?

12         A.    Yes.

13         Q.    Was your departure voluntary?

14         A.    Yes.

15         Q.    Where did you move on to?

16         A.    I am -- not to -- not to a company.

17    Not to another company.

18                    MR. BERMAN:  I'm going to have the

19          court reporter mark an exhibit for you to

20          review.

21                    (Plaintiff's Exhibit 1, document Bates

22          stamped DEF 000866, MCHA Organization, dated

23          January 1, 2020, confidential, one page,

24          marked for Identification, as of this date.)

25         Q.    Ms. Costa, are you looking at the

1                    D. Costa  - Confidential

2     document?

3          A.    Yes.

4          Q.    So, I'm going to identify the document

5     for the record.  This is a document produced by

6     defendants Bates stamped DEF 000866.  It's a

7     one-page document bearing the header MCHA

8     Organization.

9               Ms. Costa, I direct your attention to

10    the top right corner where it has a date of

11    January 1, 2020.

12              MR. BERMAN:  And please mark this

13         portion of the transcript confidential.

14         Q.    Does this document accurately reflect

15    the organizational structure of MCHA during your

16    tenure as president?

17              MS. GUERON:  Objection.

18              Do you mean the people or the

19         structure?

20              MR. BERMAN:  Let's start with the

21         structure.

22         A.    In part.

23         Q.    Are there any material differences

24    between this structure and the structure that was

25    in place when you were president?

1                    D. Costa  - Confidential

2          A.    It looks similar.

3          Q.    During your tenure as president, was

4    there an org chart of this nature?

5          A.    There were org charts, yes.

6          Q.    So you possessed org charts, as

7    president, for example?

8          A.    Yes.

9          Q.    Were there any material differences

10   between the most recent org chart at the end of

11   your tenure and this one?

12                MS. GUERON:  Objection.

13         A.    I don't recall specifically.  If you

14   ask me a specific question, I'm happy to answer.

15         Q.    Okay.

16         A.    But I've never seen this before, and I

17   don't know how many differences there might be.

18         Q.    During your tenure as president, there

19   was a tax department?

20         A.    Correct.

21         Q.    And there was an internal audit and

22   control department?

23         A.    Correct.

24         Q.    And there was a legal and compliance

25   department?

1                    D. Costa  - Confidential

2          A.     Correct.

3          Q.     And there was a finance and accounting

4    department?

5          A.     Correct.

6          Q.     And there was an IT department?

7          A.     Correct.

8          Q.     During your tenure as president, was

9    there also a CEO?

10         A.     There was not a CEO, no.

11         Q.     Was there ever a CEO during any time

12   with your tenure at MCHA?

13         A.     No, there was not.

14         Q.     Okay.

15         A.     Not that I recall.

16         Q.     Are you aware of any business

17   discussions, in other words, non-legal discussions

18   concerning whether MCHA should have a CEO?

19         A.     No.

20         Q.     During your tenure as president, was

21   there an office manager?

22         A.     Yuka Matsugu was there, yes.

23         Q.     Was there an administrative assistant

24   to the office manager?

25         A.     No, there was not.

1          D. Costa  - Confidential

2          Q.    All right.  Looking at the personnel

3     on this org chart, are there any names on here

4     that you don't recognize?

5          A.    Um...

6          Q.    To make it easier, maybe you could

7     just go from left to right or right to left.

8          A.    Yeah.  I started on the right.

9                IT looks effectively the same,

10    although I think there were some individuals that

11    are different.  Finance and accounting is

12    different, it's different individuals.  Legal and

13    compliance has some of the same and some

14    different.  Internal audit, same thing, some same,

15    some different.  Tax is mostly the same, one

16    different.

17         Q.    Okay.  Let's start with tax.

18               Who's different?

19         A.    I don't know Paul Fury.

20         Q.    Do you know if there was a different

21    senior manager of tax during your tenure as

22    president?

23         A.    There was a woman who was in the tax

24    group at some point.  I do not know if it was that

25    role.

1                    D. Costa  - Confidential

2        Q.    With respect to internal audit, are

3    there any individuals that are different?

4        A.    Yes.  During my time, it was Brian and

5    Katherine and there was an ex-pat trainee whose

6    name I don't recall.  Lee Denton and Stephen

7    Nallen are new.

8        Q.    Do you know whether there were

9    different internal control manager and specialist

10   during your tenure?

11       A.    There was not.  That's a new role that

12   was discussed prior to my leaving, but was not yet

13   filled.

14       Q.    Okay.  With respect to legal and

15   compliance, do you see at the top there you've got

16   Nicholas Oliva, correct?

17       A.    Yes.

18       Q.    And he was still the GC and CCO when

19   you departed, correct?

20       A.    Correct.

21       Q.    And CCO stands for what?

22       A.    Chief compliance officer.

23       Q.    During your tenure as president, was

24   Kathryn Roche there?

25       A.    Yes, she was.

```
 1              D. Costa  - Confidential
 2        Q.    Was she an assistant GC?
 3        A.    Yes.
 4        Q.    Did she practice intellectual property
 5   law?
 6        A.    Among other things, yes.
 7        Q.    So that was the same?
 8        A.    Yes.
 9        Q.    Was Joseph Sherinsky there?
10        A.    Yes.
11        Q.    Was he in the same role?
12        A.    I do not remember if he was senior
13   counsel at the time, and I believe his designation
14   was IP, and that litigation was later added, which
15   may or may not have been before I left.
16        Q.    What about legal affairs?
17        A.    That's generally the title given to a
18   trainee from Mitsubishi.  It was not Takahisa Oda
19   at the time.
20        Q.    When you say a trainee from
21   Mitsubishi, when you say Mitsubishi, what are you
22   referring to?
23        A.    The entity that sends the person
24   changes.  It varies.  It could be someone from
25   Pharma, it could be someone from NCC, it could be
```

1                    D. Costa  - Confidential

2    someone from MCHJ.  I have no idea about Oda-san.

3         Q.   So would those be considered

4    expatriates?

5         A.   Yes.

6         Q.   And I'm spelling it differently.  It's

7    not patriot, P-A-T-R-I-O-T.  It's P-A-T-R-I-A-T-E.

8              When expatriates from the affiliates

9    were appointed to do a tour of duty in America, do

10   you know whether they retained their

11   non-compensatory benefits in their country of

12   origin?

13             MS. GUERON:  Objection.

14        Q.   By that, I'll just clarify further.

15        A.   Yes, please.

16        Q.   I'm referring to pension benefits,

17   health insurance, anything of that nature.

18             MS. GUERON:  Objection.

19        A.   There were some benefits that may have

20   been retained.

21        Q.   In those instances, was MCHA charged

22   any fee in connection with supporting those

23   benefits?

24             MS. GUERON:  Objection.

25        A.   My recollection is MCHA paid for

```
 1                D. Costa  - Confidential
 2   salary, bonuses and benefits in the United States.
 3        Q.    Okay.  So as far as you know, there
 4   was no contribution for benefits that weren't
 5   derived from the U.S.?
 6        A.    I do not recall.
 7        Q.    During your tenure as president, was
 8   Stephen Rose there?
 9        A.    Yes.
10        Q.    Same role?
11        A.    I don't recall what his title was when
12   I left.
13        Q.    Was Sheri Pardo there?
14        A.    Yes.
15        Q.    Same role?
16        A.    Again, I don't recall what her title
17   was.
18        Q.    Was Kelli Troccoli there?
19        A.    Yes.
20        Q.    Same role?
21        A.    It looks like it.
22        Q.    Did you tell me Yuen Kobayashi, did
23   you mention him before?
24        A.    No.  I think Yuen is a woman, but Yuen
25   was not there.
```

1                    D. Costa  - Confidential

2          Q.     Do you know if that's a new position?

3          A.     It -- I don't recall.

4          Q.     In connection with this litigation,

5     have you reviewed any of the discovery demands

6     issued by the plaintiff?

7          A.     I have reviewed -- I think at the very

8     beginning, I reviewed them, yes.  I haven't

9     reviewed them recently.

10         Q.     Did you have in your personal

11    possession custody or control of any documents

12    that plaintiff demanded production of?

13         A.     I had very, very little.  What I had,

14    I turned over to counsel.

15         Q.     Okay.  And when you say you turned

16    them over to counsel, you mean counsel sitting

17    next to you here today?

18         A.     I mean Gordon Rees.  Mercedes Colwin.

19         Q.     So you turned them over to counsel for

20    MCHA?

21         A.     And me.  They represent me as well.

22         Q.     Okay.  That's fine.

23                Did you have any org charts in your

24    possession at that time?

25         A.     I don't recall, but it's unlikely.

1              D. Costa  - Confidential

2        Q.    Did you assist in the preparation of

3    MCHA's responses to our discovery demands?

4        A.    I --

5              MS. GUERON:  Just yes or no, because

6         of privilege issues.

7        A.    Did I assist?  Yes.

8        Q.    Did you assist counsel for MCHA in

9    identifying the locations where responsive

10   documents could be found?

11             MS. GUERON:  Hold on a second.

12             MR. BERMAN:  Could you read that back,

13        please.

14             (Whereupon, the requested question was

15        read back by the reporter.)

16             MS. COLWIN:  I'm going to table that.

17   RL        MR. BERMAN:  Okay.  Please mark that

18        question.

19             MS. COLWIN:  So we have two questions.

20             MR. BERMAN:  Thank you.

21   RQ        I'm going to call for the production

22        of any org charts that were in the care,

23        custody and control of Ms. Costa during her

24        tenure as general counsel or president,

25        because we only have this one which is after

```
 1              D. Costa  - Confidential
 2        she left the company.
 3              MS. COLWIN:  Taken under advisement.
 4              MR. BERMAN:  Thank you.
 5              MS. COLWIN:  Matt, you're going to
 6        send a letter afterwards?
 7              MR. BERMAN:  We can send a document to
 8        memorialize it, but we've already demanded
 9        these documents in our discovery demands.
10        Q.    With respect to finance accounting, do
11   any of these positions look new to you?
12        A.    I believe Yuko Shaw might have been
13   there, and Sakaya Matsuyama was there.  The other
14   individuals, I believe are new, but in previously
15   existing positions.  Margaret might have been
16   there, actually.
17        Q.    During your tenure as president, was
18   there any turnover in the tax group?
19        A.    Um...
20        Q.    I'm only asking about your time as
21   president.
22        A.    Yeah, I know.
23              Konstantin was new.  Jeff and Esther
24   had been there for years.
25        Q.    With respect to Konstantin, were you
```

```
1                D. Costa  - Confidential
2    responsible for setting his compensation?
3         A.    Jeff Kuropatkin proposed the
4    compensation, and I approved it.
5         Q.    Did you require any other approvals?
6         A.    No.
7         Q.    Were there any new personnel in
8    internal audit and control?
9         A.    Not during that time, no.
10        Q.    During your tenure as president, did
11   the staffing of the legal and compliance
12   department change?
13        A.    Sheri Pardo was hired.
14        Q.    Did you play any role in hiring
15   Ms. Pardo?
16        A.    I don't recall if I interviewed her or
17   not.
18        Q.    Was that a new position?
19        A.    That was a new position, yes.
20        Q.    Were you involved in the decision to
21   create that new position?
22        A.    Yes.
23        Q.    What was your role in that process?
24        A.    Nick Oliva proposed to me that the
25   company bring on an employment counsel position,
```

1              D. Costa  - Confidential

2    and I approved it.

3         Q.    Was there a business need that you

4    recognized for an employment law counsel at that

5    time?

6         A.    Yes, there was.

7         Q.    Are you able to articulate that

8    without divulging any privileged information?

9         A.    I do not recall specifically what may

10   have led to that hiring.

11        Q.    Do you know what this employee was

12   tasked with upon hire?

13        A.    She was responsible for employment law

14   matters throughout the group, including pharma.

15        Q.    Do you know how Ms. Pardo was selected

16   for this position?

17        A.    I don't recall.

18        Q.    Do you know whether MCHA looked for

19   any internal candidates for that position?

20        A.    Within the legal department?

21        Q.    Yes.

22        A.    The need was recognized to increase

23   the size of the legal department.

24        Q.    So, obviously, if you're increasing

25   the size, you can't look for within, you're just

1                    D. Costa  - Confidential

2    going to move the opening from one spot to

3    another, right?

4                    MS. COLWIN.  Objection to form.

5                    MR. BERMAN:  Withdrawn.  Let's move

6         on.

7         Q.    Did you consider any candidates from

8    other Mitsubishi entities to fill the slot?

9         A.    No.  There were no U.S. lawyers

10   located outside of the MCHA legal department who

11   would have been qualified.

12        Q.    Okay.  What qualifications were needed

13   to fill this position?

14        A.    I don't recall what the job

15   description looked like.

16        Q.    Other than whatever was in the job

17   description, would there be any other

18   qualifications?

19        A.    Nick oversaw that hiring.  I don't

20   know the details.

21        Q.    Do you know whether a job description

22   was, in fact, prepared for that role?

23        A.    I don't recall.

24        Q.    During your tenure as president, did

25   you hire any other legal positions other than this

1          D. Costa  - Confidential

2    one?

3         A.    There were hirings in New Jersey at

4    Pharma but not in New York.

5         Q.    So when you refer to Pharma, is that a

6    different Mitsubishi affiliate?

7         A.    It is a different affiliate, but at

8    one legal department.

9         Q.    So that person was under your

10   supervision in your role as general counsel?

11        A.    So, all legal services to the Pharma

12   entities that we discussed earlier were provided

13   by members of the MCHA legal department.

14        Q.    But some of them were not seated in

15   the same office that you were in, correct?

16        A.    Correct.  And this chart accurately

17   reflects that we had people located in New York,

18   Virginia and New Jersey.

19        Q.    And that's what the colors reflect on

20   this chart, right?

21        A.    That's correct.

22        Q.    That looks accurate to you?

23        A.    I don't know about these individuals,

24   but, in general, yes.

25             MS. COLWIN:  Which individuals,

1          D. Costa  - Confidential

2     Ms. Costa?  Just identify which ones.

3          THE WITNESS:  The four people colored

4     in green under legal and compliance.

5          MS. COLWIN:  Thank you.

6     Q.    During your tenure as general counsel,

7  was there any standard procedure that was used to

8  select candidates for open attorney positions?

9     A.    It was something that I addressed on a

10 case-by-case basis.  We did not have that much

11 hiring, so it was done case by case.  And the same

12 was true for the hirings done by Nick Oliva while

13 I was the president.

14    Q.    Did you post any of the open positions

15 that you were seeking to fill for external

16 candidates?

17    A.    What are you referring to?

18         MS. GUERON:  Objection.

19    Q.    Well, you said that you had more than

20 one legal position that you had to fill while you

21 were general counsel, correct?

22    A.    Yes.  Between 1996 and 2015, yes.

23 Correct.

24    Q.    Were any of those openings posted?

25         MS. GUERON:  Objection.

1              D. Costa  - Confidential

2         A.    By posted, you mean posted where?

3         Q.    Were any of those positions publicized

4    in any way that would draw the attention of

5    qualified candidates to the fact that there was an

6    open position?

7         A.    Yes.

8         Q.    And how was that done?

9              MS. GUERON:  Objection.

10        A.    It varied case to case.

11        Q.    Well, what are some of the methods

12   that you can think of that were utilized?

13        A.    I used legal recruiters for most of

14   the positions.  In the case of at least one, I

15   used Axiom.

16        Q.    Have you completed your response or

17   are you still thinking?

18        A.    I -- that's it for now.

19        Q.    Is Axiom a placement agency?

20        A.    No.  Axiom -- I'm going to get their

21   branding wrong, but they are an organization that

22   contracts out in-house legal services to

23   corporations.

24        Q.    Those in-house legal services, are

25   those provided by interim personnel?

1           D. Costa  - Confidential

2           MS. GUERON:  Objection.

3      A.    I -- yes, except in the case where I

4  hired one permanently.  I used Axiom on a number

5  of occasions.

6      Q.    Who was hired permanently?

7      A.    Gregory Peterson.

8      Q.    Can you identify which legal

9  recruiters you used?

10      A.    When I hired Jennifer, I used Sandy

11  Friedman at PeterSan.  I think that's the only

12  time I used that firm.  I do not remember who I

13  used previously.  I later used Major, Lindsey &

14  Africa.

15      Q.    Do you recall why you selected Major,

16  Lindsey & Africa?

17      A.    I thought they were really good.

18      Q.    On the occasions where you used legal

19  recruiters, how did you identify for them, or did

20  you identify for them what criteria you were

21  looking for?

22      A.    I always created a job description.

23      Q.    Other than the job description, did

24  you identify any other criteria?

25      A.    I always spoke to them one on one, and

1          D. Costa  - Confidential

2    explained what I wanted, yes.

3          Q.    Okay.  Did you identify any criteria

4    in terms of the particular backgrounds of the

5    individuals that you were looking to hire?

6          A.    Yes.

7          Q.    What types of things did you identify

8    that you were looking for?

9               MS. COLWIN:  Objection.

10              MS. GUERON:  Objection.

11         Q.    What criteria did you identify?

12              MS. GUERON:  Objection.

13         A.    It depended on the role.  I identified

14   criteria that was specific to the needs we had and

15   the role I was hiring for.

16              THE WITNESS:  I do need to stop within

17         ten minutes.  I'm sorry.  I have a small

18         window.  So --

19              MR. BERMAN:  You just let me know

20         when, and we'll stop immediately.

21              THE WITNESS:  We can stop now, or

22         within ten minutes.

23              MR. BERMAN:  All right.  Let's go for

24         ten more minutes, but let me know when we're

25         like getting towards the end of that.  Okay?

1          D. Costa  - Confidential

2          MS. GUERON:  Okay.

3          MR. BERMAN:  I'm going to show you

4     what we'll mark as Exhibit 2.

5          (Plaintiff's Exhibit 2, a two-page

6     document bearing Bates stamp DEF 001592 to

7     001593, confidential, marked for

8     Identification, as of this date.)

9          MR. BERMAN:  I'll identify for the

10    record that Exhibit 2 is a two-page document

11    bearing Bates stamp DEF 001592 to 93.

12    Q.    Ms. Costa, are you looking at the

13 document?

14    A.    Yes.

15    Q.    Have you seen this before?

16    A.    Yes.

17    Q.    Have you --

18    A.    I can't be certain that I've seen this

19 document before.

20    Q.    Have you seen a position profile

21 comparable to this one previously?

22    A.    Generally, yes.

23    Q.    So when you described providing a job

24 description to recruiters, were you referring to

25 something along the lines of this?

1                    D. Costa  - Confidential

2          A.    I know this document was created

3     later.  Whenever I did a search, I created a job

4     description, together with the recruiter I was

5     working with.

6          Q.    Okay.  For the positions that you were

7     looking to fill, did you create a file for that

8     opening?

9                 MS. GUERON:  Objection.

10         A.    I don't recall.

11         Q.    Do you recall recruiting for the

12    position that you ultimately filled with

13    plaintiff's hire?

14         A.    Yes.

15         Q.    Did you use a recruiter for that

16    position?

17         A.    No.

18         Q.    How did you go about recruiting for

19    that position?

20         A.    We didn't recruit for that position.

21    We made a decision to promote Jennifer.

22         Q.    I'm sorry.  Maybe my questioning

23    wasn't clear.  I was referring to when

24    Ms. Fischman was initially hired by the company.

25         A.    Oh.  I used PeterSan.

1              D. Costa  - Confidential

2        Q.    When you used PeterSan, did you open

3   any kind of file in your office for that selection

4   process?

5              MS. GUERON:  Objection.

6        A.    I probably had one at the time, and

7   probably got rid of it at some point after the

8   hire was complete.

9        Q.    So it wasn't your practice to retain

10   the selection files for positions that you filled

11   during your tenure as general counsel?

12              MS. GUERON:  Objection.

13        A.    It wasn't.

14        Q.    During your tenure as general counsel,

15   did you have any kind of document retention

16   policy?

17              MS. GUERON:  Objection.

18        A.    The company had a document retention

19   policy.

20        Q.    Are you familiar with its terms?

21        A.    Not as I sit here, no.

22        Q.    Do you know what period of time the

23   company's retention policy called for documents to

24   be retained for?

25        A.    What I recall is the document was two

```
 1              D. Costa  - Confidential

 2    or more pages long, and it set different time

 3    limits for different types of documents, and I

 4    cannot tell you what it was for any category of

 5    documents.

 6         Q.    So do you know if there's any written

 7    record of other candidates who were considered for

 8    the selection that ultimately Ms. Fischman was

 9    staffed in?

10              MS. COLWIN:  Objection.

11         A.    Can you give me that one again?

12              MR. BERMAN:  Can you read it back,

13         please.

14              (Whereupon, the requested question was

15         read back by the reporter.)

16         A.    In 2008?

17         Q.    At her original point of hire, yes,

18    her first point of hire.

19         A.    I'm not aware that there was any file.

20         Q.    Okay.  What position was Ms. Fischman

21    initially hired into?

22         A.    Corporate counsel.

23         Q.    So if you look at this job description

24    -- I'll direct your attention to the top -- do you

25    see where it says corporate counsel?
```

1            D. Costa  - Confidential

2       A.    Yes.

3       Q.    Is that the same job?

4       A.    Um, as it evolved over time.

5       Q.    And I know you said that this

6  particular instance of this document, you believe

7  it was created sometime after 2008, correct?

8       A.    Based on the heading, yes, that's what

9  I believe.

10       Q.    Okay.  What about the heading

11  indicates that to you?

12       A.    The cutoff of the top of that top

13  diamond was -- actually, was sort of a mistake

14  that got carried over into documents from that

15  time period.

16       Q.    So you're referring to the image at

17  the top that corresponds to Mitsubishi's corporate

18  logo; is that correct?

19       A.    The logo was cut off, correct.

20       Q.    Is that same logo used for multiple

21  Mitsubishi entities?

22       A.    If you mean non-Mitsubishi Chemical

23  entities?  Are you asking me for non-Mitsubishi

24  Chemical entities?

25       Q.    Do you know any other entities besides

1              D. Costa  - Confidential

2    Mitsubishi Chemical Holdings Association that uses

3    that logo?

4         A.    The triple diamonds, yes.

5         Q.    And, generally speaking, which

6    entities used that logo?

7         A.    There are a range of entities that

8    derived from the original Mitsubishi corporation,

9    pre-World War II, that continue to use the three

10   diamond mark.

11             MS. GUERON:  You've got a couple of

12        minutes left before lunch.

13             THE WITNESS:  And that story would

14        take four hours.

15             MR. BERMAN:  We don't need it.  It's

16        okay.

17             (Whereupon, a discussion was held off

18        the record.)

19        Q.    So, you would have provided the

20   position profile document that existed at the time

21   to whatever recruiter you were using for your

22   search, right?

23        A.    I do not know how this was used with

24   recruiters.  There was created as an internal

25   document.

1              D. Costa  - Confidential

2        Q.    When you were seeking to fill

3   positions, did you use a position profile similar

4   to this?

5        A.    Again, I can't say similar.  I created

6   one for each position that I hired for.

7        Q.    Did it have the same headings in it,

8   "key responsibilities, experience and

9   qualifications"?

10       A.    It may --

11       Q.    Did it have that information?

12       A.    It may have.

13       Q.    Did you use a template to create it?

14       A.    No.

15       Q.    Did you use any kind of form to create

16  it?

17       A.    No.

18       Q.    Did you seek to fill open positions in

19  the legal department through any other channel,

20  other than legal recruiters?

21            MS. GUERON:  Objection.

22       A.    Nathan Gallup, I hired strictly

23  through to a search I managed on, I believe it was

24  LinkedIn.

25       Q.    Did you post any of the open legal

```
 1              D. Costa  - Confidential
 2  positions during your tenure as general counsel on
 3  any job boards?
 4       A.    I believe one could say that the
 5  Nathan Gallup search was done through a job board.
 6       Q.    You're referring to LinkedIn?
 7       A.    Yes.
 8       Q.    Did you use any other job boards?
 9       A.    I don't recall.
10       Q.    Are you generally familiar with
11  different job boards?
12              MS. GUERON:  Objection.
13       A.    I don't know what that means.
14       Q.    Okay.  You've heard of Monster.com?
15       A.    I have not used Monster.com.
16       Q.    I just asked if you heard of them.
17       A.    Yes, I've heard of them.
18       Q.    So you're familiar with the function
19  that that business uses, correct?
20       A.    Yes.
21              MS. GUERON:  Objection.
22       Q.    So when I say "job board," I'm
23  referring to something like Monster.com or
24  Indeed.com or any of the other various companies
25  that post open positions that applicants can apply
```

1              D. Costa  - Confidential

2   to.

3              Did you ever use any of those types of

4   job boards to fill open positions in the legal

5   department?

6              MS. GUERON:  Objection.

7       A.    LinkedIn is the only one I recall

8   using as an external job board.

9              MR. BERMAN:  Thank you.  I think this

10         is a good time to take that break.

11             THE WITNESS:  Okay.  Thank you.

12             (Luncheon recess taken 12:58 p.m. to

13         1:40 p.m.)

14             MR. BERMAN:  End of confidential

15         portion.

16             We're back on the record.

17      Q.    Ms. Costa, I want to just circle back

18  real quick to a couple of things I asked you about

19  earlier.

20             Do you recall earlier I asked you some

21  questions about Mr. Connors and internal audit?

22      A.    Yes.

23      Q.    And you indicated that you supervised

24  Mr. Connors, correct?

25      A.    Correct.

1          D. Costa  - Confidential

2     Q.    How closely did you direct his work?

3     A.    His day-to-day work, I did not direct.

4 His schedule, his approach, his policies, I was

5 involved in.

6     Q.    Was he responsible for conducting

7 internal audit of companies outside of MCHA?

8     A.    Yes.

9     Q.    And that would include various

10 Mitsubishi affiliates?

11    A.    Yes.

12    Q.    Would those affiliates contact MCHA at

13 the audit department and request internal audits?

14    A.    Audits came about through a variety of

15 means.

16    Q.    Did any of these entities request that

17 they be audited?

18    A.    They -- I'm not aware that anyone

19 requested a self-audit -- an audit of themselves.

20    Q.    Can you tell me how entities were

21 selected to receive an internal audit?

22    A.    There was a schedule, which I think

23 supposed that companies got audited every three

24 years.  So, by looking at when the past audit had

25 occurred, that was one way.

1              D. Costa  - Confidential

2              Another way was, after we purchased a

3    company, we tried to do an audit within six

4    months.  Another way was, if issues came up in an

5    audit that suggested a revisit in less than three

6    years was appropriate, that would tried to be

7    scheduled.

8              And sometimes it came from any one of

9    a number of areas.  So, for example, when I was

10   general counsel, quite a few audits were done at

11   my request, because I learned of something in my

12   role as general counsel that I thought warranted

13   an audit, and I would speak to Brian about, again,

14   trying to fit it into the schedule.

15        Q.   Can you give me an example of a

16   circumstance that took place where you requested

17   an internal audit that Brian conducted?

18              MS. GUERON:  Objection.

19              MR. FORTINSKY:  Objection.  That may

20        be privileged.

21              MS. GUERON:  Exactly.

22        Q.   On any of the occasions where you

23   described that the request for an audit originated

24   with you, was your request for the execution of an

25   internal audit on behalf of MCHA?

1              D. Costa  - Confidential

2              MS. COLWIN:  Can you read that back.

3              (Whereupon, the requested question was

4         read back by the reporter.)

5         A.    Yes.

6         Q.    Was it on behalf of one of MCHA's

7    clients?

8         A.    Yes.

9         Q.    So, when you requested an audit of one

10   of MCHA's clients, were you acting in your

11   capacity as an attorney?

12        A.    Yes.

13        Q.    Did you make any such requests while

14   you were president?

15        A.    I don't recall, because my role as

16   president did not leave me to be aware of the same

17   type of information that compelled me to request

18   the audits as general counsel.

19              I would say I -- there may have been

20   times, if we did a recent acquisition, where I

21   would have -- the request would have come from me,

22   but I have no specific recollection.

23        Q.    With respect to your testimony that

24   you wouldn't be privy to the same types of

25   information in the role of president, when you

1                    D. Costa  - Confidential

2    were appointed the president, didn't you at all

3    times have a general counsel that reported to you?

4         A.    Yes.

5         Q.    And wouldn't that general counsel be

6    responsible for apprising you of the information

7    necessary to conduct the affairs of the internal

8    audit department?

9         A.    Yes.

10        Q.    So, did you actually have the

11   information necessary to request internal audits,

12   if they were needed?

13             MS. GUERON:  Objection.

14             MS. COLWIN:  Objection.

15        A.    At times, yes.

16        Q.    You mentioned that, after purchases, I

17   think you used the words, we tried to audit -- I

18   think you said in six months after a purchase.

19             Did I get that right?

20        A.    If it was possible, we -- that was our

21   aim.

22        Q.    When you used the pronoun "we," who

23   were you referring to?

24        A.    MCHA and whichever entity made the

25   acquisition.

1                D. Costa  - Confidential

2        Q.    Did I understand correctly that you

3    practiced securities litigation at Cleary?

4        A.    It was one of the areas of litigation

5    that I worked in, yes.

6        Q.    For how long did you practice

7    securities litigation at Cleary?

8        A.    It was the '80s and early '90s.  It

9    was peppered throughout.

10       Q.    So it was intermittent?

11       A.    Yes.

12       Q.    As part of your securities litigation

13   practice of law, were you familiar with quarterly

14   reports?

15            MR. FORTINSKY:  Objection to form.

16       A.    I am familiar that public companies

17   file quarterly reports.

18       Q.    And same question with respect to

19   annual reports.

20            MR. FORTINSKY:  Objection to form.

21       A.    Yes, I am familiar that public

22   companies file annual reports.

23       Q.    Are you generally familiar with the

24   contents of each of those reporting types?

25            MS. GUERON:  Objection.

1                    D. Costa  - Confidential

2          A.    No.

3          Q.    Do you know what goes into a quarterly

4    report for a public company?

5          A.    At this point, no.

6          Q.    At the time when you were practicing

7    law in the '80s and '90s, did you know?

8                MS. GUERON:  Objection.

9          A.    To an extent.

10         Q.    And the same with respect to annual

11   reports?

12               MS. GUERON:  Objection.

13         A.    To an extent.

14         Q.    Did that include domestic companies?

15               MS. GUERON:  Objection.

16         A.    By that, do you mean companies listed

17   on the New York Stock Exchange?

18         Q.    Sure.

19         A.    I believe so, yes.

20         Q.    Did it include foreign companies?

21         A.    Yes.

22         Q.    Did it include Japanese companies?

23         A.    No.

24         Q.    Are you familiar with the general

25   types of financial reports that are presented in

```
 1              D. Costa  - Confidential
 2    the security filings of public companies during
 3    the time when you were practicing law at Cleary?
 4              MS. GUERON:  Objection.
 5         A.    I didn't understand that question.
 6              MR. BERMAN:  It was a little fast.
 7         Could you read it back, please.
 8              (Whereupon, the requested question was
 9         read back by the reporter.)
10         A.    Only in the most general way.
11         Q.    Are you familiar in a general way with
12    the financial reports that are in 10-Qs?
13         A.    Yes.
14         Q.    And in 10-Ks?
15         A.    Yes.
16         Q.    Are you generally familiar with
17    consolidated financial statements?
18         A.    Generally.
19         Q.    Do you recall earlier today when I
20    asked you whether MCHA had any profits during your
21    tenure?
22         A.    Yes.
23         Q.    Do you know if any of those profits
24    were included in the consolidated financial
25    statements of any other Mitsubishi entity?
```

1                 D. Costa  - Confidential

2        A.    No.

3        Q.    You don't know?

4        A.    I don't know.

5        Q.    Have you had the opportunity to review

6   the complaint in this action?

7        A.    Yes.

8              MR. BERMAN:  Mark this, please.

9              (Plaintiff's Exhibit 3, copy of first

10        amended complaint, marked for

11        identification, as of this date.)

12        Q.    Plaintiff's Exhibit 3 is a copy of the

13   first amended complaint filed in this action as

14   ECF Docket 86.

15             I want to direct your attention to

16   page 21 of the document.  Let me know when you're

17   there.

18        A.    I'm here.

19        Q.    Have you reviewed this portion of the

20   complaint previously --

21        A.    I --

22        Q.    -- that concerns joint employment

23   allegations?

24        A.    Yes.

25        Q.    Do you recognize this chart?

1              D. Costa  - Confidential

2         A.    Generally, yes.

3         Q.    Do you see that there's a reference in

4    paragraph 95 to a corporate governance report

5    dated May 31, 2016?

6         A.    Yes.

7         Q.    During your tenure as MCHA's general

8    counsel, did you ever review any corporate

9    governance reports from MCHC?

10        A.    No.

11        Q.    Do you know whether MCHC requested any

12   information from you in order to complete its own

13   corporate governance reports?

14        A.    MCHC requested various information

15   from us from time to time.  I do not know what

16   made it into this report or any other report.

17        Q.    Are you aware of any instances where

18   MCHC specifically noted that it was for the

19   purpose of inclusion in a corporate governance

20   report?

21        A.    I have no recollection of that.

22        Q.    After reading this complaint, did you

23   review the corporate governance report referenced

24   in here at paragraph 95?

25        A.    No, I did not.

1           D. Costa  - Confidential

2      Q.    Then do you know, in paragraph --

3  well, I'll direct your attention to paragraph 96.

4           Do you know whether the paragraph --

5           MR. BERMAN:  Withdrawn.

6      Q.    Do you know whether MCHC's nominating

7  committee approves the selection and dismissal of

8  operating company presidents, excluding listed

9  subsidiaries?

10     A.    I do not.

11     Q.    Do you know whether MCHC's management

12 administration of its subsidiaries includes

13 setting compensation?

14     A.    As to entities other than MCHA, I do

15 not.

16     Q.    With respect to MCHA, what do you know

17 about this allegation?

18     A.    That the MCHC compensation committee,

19 to my knowledge, was not involved in setting the

20 compensation for MCHA company presidents.

21     Q.    Does that include indirectly?

22     A.    I cannot speak to indirectly.

23     Q.    Well, for example, earlier today, do

24 you recall testifying concerning the existence of

25 legal services agreements?

1                    D. Costa  - Confidential

2        A.    Yes.

3        Q.    Do you know whether any of those legal

4   service agreements had their fee provisions

5   adjusted based upon the need to compensate

6   employees that were designated by MCHC?

7             MS. GUERON:  Objection.  I'm sorry,

8        can you read that back.

9             (Whereupon, the requested question was

10       read back by the reporter.)

11            MS. COLWIN:  Objection.

12            MR. BERMAN:  Let me clarify the

13       question.

14            Can you just read it back slowly.

15            (Whereupon, the requested question was

16       read back by the reporter.)

17            MR. BERMAN:  I'm going to restate the

18       question.

19       Q.    Do you know whether any of the fee

20   provisions in the legal services agreements were

21   adjusted in order to provide for the compensation

22   of operating company presidents, excluding listed

23   subsidiaries?

24            MS. COLWIN:  Objection.

25            MR. FORTINSKY:  Objection.

1              D. Costa  - Confidential

2              MS. GUERON:  Objection.

3        A.    There was no relationship between the

4    legal service fees charged to clients of MCHA and

5    compensation paid to operating company presidents.

6        Q.    Same question, but with respect to

7    administrative service agreements.

8        A.    Same answer.

9        Q.    During your tenure as general counsel,

10   did MCHC had a legal services agreement with MCHA?

11       A.    Yes.

12       Q.    Did MCHC have the discretion to

13   decline to pay the fees identified in the legal

14   services agreement?

15       A.    Yes.

16       Q.    Did they ever exercise that

17   discretion?

18       A.    I don't believe so.

19             MS. GUERON:  Time frame?  Ever?

20             MR. BERMAN:  I identified a time frame

21        already.

22             MS. GUERON:  You said "ever."

23       Q.    During your tenure as general counsel,

24   did they ever exercise that discretion?

25       A.    Not to my knowledge.

1          D. Costa  - Confidential

2      Q.    What about during your tenure as

3   president?

4      A.    No.

5      Q.    Did they have the discretion to

6   partially pay the fees listed in the legal

7   services agreement?

8      A.    Every entity, including MCHC, that

9   entered into an agreement with MCHA was --

10  negotiated that amount up front, agreed to pay,

11  and, in fact, did pay.

12     Q.    Are you familiar with the composition

13  of MC -- with respect to your tenure at MCHA, were

14  you familiar with the composition of MCHC's

15  management committee?

16     A.    Um, I'm not sure what the management

17  committee refers to.

18     Q.    Okay.  During your tenure as president

19  of MCHA, did you have any board level positions at

20  MCHC?

21     A.    I was an executive officer of MCHC,

22  and, as such, I was on what I believe they

23  referred to as the executive committee.  I'm not

24  sure what the management committee might be.

25     Q.    When you refer to the executive

1                    D. Costa  - Confidential

2     committee, is that a subcommittee of the Board of

3     Directors of MCHC?

4          A.    No.

5          Q.    What is the executive committee?

6          A.    It was a subset of the executive

7     officers of MCHC that met once a month to discuss

8     various matters relevant to the MCHC group.

9          Q.    While you were president at MCHA, you

10    had these executive committee duties?

11         A.    No.  Um, being appointed -- oh, yes.

12    But not because I was president.  That was a later

13    appointment.

14         Q.    What was a later appointment?

15         A.    As an executive officer of MCHC.

16         Q.    So did you concurrently hold the role

17    of president of MCHA and executive officer of

18    MCHC?

19         A.    During my last year as president of

20    MCHA.

21         Q.    Do you know if any of your

22    predecessors, as president of MCHA, similarly held

23    positions at MCHC concurrently?

24         A.    Not to my knowledge.

25         Q.    Do you know if Mr. Yoshiato was an

1          D. Costa  - Confidential

2    executive officer of MCHC during his tenure as

3    president as MCHA?

4          A.    I believe he was not.

5          Q.    Do you know the reason why you were

6    selected as an executive officer of MCHC?

7          MS. GUERON:  Objection.

8          A.    They communicated to me that they

9    valued my contribution and wanted to give me that

10   promotion.

11         Q.    So could you just clarify, what did

12   you do as the promotion?

13         A.    Executive officer of MCHC is not a

14   promotion within MCHA, but is one of the highest

15   positions you can hold in the group globally.  It

16   is beneath the Board of Directors.  The other

17   members were the CEO of MCHC, the CFO of MCHC, the

18   CEO of the -- of Pharma, the CEO of LSII.  There

19   were 10 to 12 of us, total.  Oh, the CTO of MCHC.

20   There were 10 to 12 of us, total, in that group.

21         Q.    Are you familiar with the term C

22   suite?

23         A.    Yes.

24         Q.    So is it to fair to say that all the

25   members of the executive committee were the C

                    D. Costa  - Confidential

 1    suite level of one of the affiliates?

 2                    MR. FORTINSKY:  Objection to form.

 3                    MS. GUERON:  Objection.

 4         Q.    Do you understand the question?

 5         A.    Yes.

 6                    They were not C suite of MCHC, but

 7    they were C suite of an MCHC group company, yes.

 8         Q.    Do you know if any of them had

 9    concurrent roles at multiple entities?

10         A.    This was not like a full-time job.

11    They all had jobs with their entity, and then were

12    an executive officer of MCHC.

13         Q.    So do I understand you correctly that

14    they concurrently held both roles?

15                    MR. FORTINSKY:  Objection to form.

16         A.    Yes.

17         Q.    During the time period where you

18    concurrently held the executive officer position

19    and the presidency of MCHA, did you receive an

20    increase in compensation associated with your

21    executive officer position?

22         A.    I had a contract with MCHC.  There was

23    compensation connected to that role.  I do not

24    remember how it worked in terms of -- I don't

                    D. Costa  - Confidential

 1    suite level of one of the affiliates?

 2                    MR. FORTINSKY:  Objection to form.

 3                    MS. GUERON:  Objection.

 4         Q.    Do you understand the question?

 5         A.    Yes.

 6                    They were not C suite of MCHC, but

 7    they were C suite of an MCHC group company, yes.

 8         Q.    Do you know if any of them had

 9    concurrent roles at multiple entities?

10         A.    This was not like a full-time job.

11    They all had jobs with their entity, and then were

12    an executive officer of MCHC.

13         Q.    So do I understand you correctly that

14    they concurrently held both roles?

15                    MR. FORTINSKY:  Objection to form.

16         A.    Yes.

17         Q.    During the time period where you

18    concurrently held the executive officer position

19    and the presidency of MCHA, did you receive an

20    increase in compensation associated with your

21    executive officer position?

22         A.    I had a contract with MCHC.  There was

23    compensation connected to that role.  I do not

24    remember how it worked in terms of -- I don't

1                   D. Costa  - Confidential

2    remember how it worked.

3         Q.    When you were initially promoted to

4    the role of president of MCHA, did you request an

5    employment contract?

6         A.    I had an employment contract as

7    executive vice-president, and, yes, I negotiated a

8    new contract when I became president.

9         Q.    Who was the counterparty to your

10   contract?

11        A.    It was -- it was Shoji Yoshiasato.

12        Q.    Was your counterparty an individual or

13   an entity?

14        A.    I believe he signed on behalf of MCHA.

15   No, not as an individual.  I believe he was a

16   signatory.  I don't recall.  It was with MCHA.

17        Q.    Thank you.

18              And then, when you received the

19   appointment to the executive officer position, was

20   that pursuant to an additional contract?

21        A.    Yes.

22        Q.    Who was your counterparty in that

23   contract?

24        A.    I don't recall.

25        Q.    Do you recall the entity?

1                D. Costa  - Confidential

2          A.    Oh, MCHC.

3          Q.    Okay.

4          A.    I'm sorry.

5          Q.    Was your contract for a fixed term

6     with respect to the executive committee

7     appointment?

8          A.    Yes.  I believe it was year to year.

9          Q.    Do I understand you correctly that

10    that means it was for a one-year term and could be

11    renewed?

12         A.    I don't remember the terms.

13         Q.    Okay.  Were you in that position for

14    more than a year?

15         A.    No.  Because I left MCHA at the end of

16    one year.

17         Q.    How was your compensation structured

18    under the executive committee contract?

19               MS. GUERON:  Objection.

20               MS. COLWIN:  Objection.

21               MS. GUERON:  Asked and answered.

22         Q.    Do you understand what I'm asking you?

23         A.    Yeah, I believe I answered it.  There

24    was an amount of money that was designated in

25    connection with that role, and I do not recall

```
 1                D. Costa  - Confidential
 2    how -- any of the details beyond that.
 3         Q.    Do you recall the amounts?
 4         A.    I don't.
 5         Q.    Was it a material portion of your
 6    annual compensation for that year?
 7         A.    No, it was not.
 8         Q.    I want to direct your attention to
 9    paragraph 107.
10                Do you see there are six individuals
11    that are named in paragraph 107?
12         A.    Yes.
13                MS. GUERON:  Take your time to read
14         the whole paragraph, okay?
15         Q.    You can read the entire paragraph.
16    That's fine.  Let me know when you're ready.
17         A.    Yes.
18         Q.    Do you recognize the names that are
19    listed here?
20         A.    Yes.
21         Q.    So, we've already mentioned Ken
22    Fujiwara, correct?
23         A.    Yes.
24         Q.    At any point during your tenure at
25    MCHA, do you know whether he had a dual role?
```

1                    D. Costa  - Confidential

2          A.    Dual role --

3                MS. GUERON:  Objection.

4          Q.    Meaning, did he have a role at more

5     than one Mitsubishi entity at the same time?

6          A.    I believe he did.

7          Q.    Do you know what those roles were?

8          A.    I believe he had appointments at each

9     of MCHC and MCC at some point in time, and MCHJ &

10    MCHC.  I'm not certain about the second one.

11         Q.    With respect to Hidefumi Date, we

12    mentioned him earlier today, correct?

13         A.    Correct.

14         Q.    Can you tell me what his role was?

15         A.    When I --

16               MS. GUERON:  Objection.

17         A.    When I left the company, he was CFO.

18         Q.    Did he have a different role at some

19    other point in time during your tenure?

20         A.    He -- again, tenure, what period are

21    we discussing?

22         Q.    Your tenure at the company, MCHA.

23         A.    As MCHA.  He was -- prior to his --

24               MS. GUERON:  Wait.  That's actually --

25         do you mean 25 years?

1                    D. Costa  - Confidential

2          Q.     You can explain if the answer changes.

3    I assume he didn't have very many different

4    positions, but if you need to clarify, just let me

5    know.

6                    What other positions are you aware of

7    him having during the course of your employment

8    with MCHA or its predecessor entities?

9                    Is that a fair question?

10         A.     Yes.

11                   So, Mr. Date was in finance and

12   accounting the entire time I knew him.  I first

13   came to know him when he had an ex-pat assignment

14   in New York, and we worked closely together.  He

15   subsequently went back to Japan.  I don't know

16   what his roles were specifically, although he

17   remained in finance and accounting.  He eventually

18   became what was effectively number 2 under the CFO

19   at the time, and eventually became CFO of MCHC.

20         Q.     Okay.  Thank you.

21                   When he was an ex-pat in New York, was

22   he assigned to MCHA?

23         A.     It might have been a different entity

24   at the time.  Actually, in fact, it was a

25   different entity at the time; but, yes, that was

1                D. Costa  - Confidential

2    his assignment.

3        Q.    Do you know which predecessor entity

4    it was?

5        A.    Either MCA or MCUS.

6        Q.    And then you said there came a time

7    when he returned to Japan?

8        A.    Yes.

9        Q.    Do you know the circumstances

10   surrounding his return to Japan?

11       A.    At the expiration of his visa and the

12   end of his ex-pat assignment and rotation.

13       Q.    Do you know who assigned him to

14   America?

15       A.    I have no idea.

16       Q.    When you mentioned that he became the

17   number 2 under the CFO, was that also at MCHC?

18       A.    Yes.

19       Q.    And then he became CFO at MCHC?

20       A.    Yes.

21       Q.    And he retained that position until

22   you left the company?

23       A.    Yes.

24       Q.    Mr. Kosakai, do you know his first

25   name?

1                  D. Costa  - Confidential

2        A.    Mr. Kosakai, no, I don't remember his

3   first name.

4        Q.    Can you tell me Mr. Kosakai's role?

5        A.    My memory is that he was the CFO prior

6   to Mr. Date.

7        Q.    At MCHC?

8        A.    At MCHC.

9        Q.    Can you tell me who Noriyoshi Ohira

10  is?

11       A.    Yes.  Ohira was responsible for human

12  resources at MCHC.

13       Q.    And Masanori Sakaguchi, I think we

14  discussed him earlier, correct?

15       A.    Yes.

16       Q.    Was he the GC at Rayon?

17       A.    Yes.

18       Q.    Are you aware of any other positions

19  he had?

20       A.    That he, when Rayon was merged into

21  MCC, became a member of the legal function, and

22  when Ken was promoted, Mr. Sakaguchi became the

23  head of the legal department at MCHJ.

24       Q.    All right.  So I just want to unpack

25  that a little bit for clarity.

```
 1                D. Costa  - Confidential

 2                So Mr. Sakaguchi was, at one point,

 3      the GC at Rayon, correct?

 4        A.    Yes.

 5        Q.    And then Rayon merged into MCC?

 6        A.    Yes.

 7        Q.    And then when Rayon merged into MCC,

 8      who was handling MCC's legal work with respect to

 9      Japanese legal needs?

10        A.    Well, there were many people, but Ken

11      Fujiwara was heading the department at that time.

12        Q.    Okay.  When you say "department at

13      that time, are you referring to MCHJ?

14        A.    There have been so many retitlings and

15      shiftings, that it is impossible for me to answer

16      with total accuracy at any given point in time

17      whether someone worked at MCHJ or a different

18      entity.

19        Q.    Okay.  Well, let's see if we can

20      clarify with respect to Mr. Fujiwara, okay?

21                Did you tell me that, at one point, he

22      was at MCHJ?

23        A.    I believe so.

24        Q.    And did you tell me that, at one

25      point, he was at MCHC?
```

1          D. Costa  - Confidential

2     A.    Yes.

3     Q.    Do you remember whether he shifted

4  from one to the other?

5     A.    I'm not sure what you mean by shifted.

6     Q.    Did he switch entities that he worked

7  for?

8     A.    I have no idea who his employer was at

9  any given time.

10     Q.    Was there any given point in time

11  where you associated him with concurrent

12  representation of both MCHJ and MCHC?

13          MS. GUERON:  Objection.

14          MR. FORTINSKY:  Objection to form.

15          MS. COLWIN:  Objection.

16     A.    I don't think I ever thought about

17  that.  I -- I don't know.

18          MR. BERMAN:  Okay.  We'll come back to

19      this later.

20          Plaintiff's 4, please.

21          (Plaintiff's Exhibit 4, two-page

22      document Bates stamped DEF 001590,

23      confidential, marked for Identification, as

24      of this date.)

25          MR. BERMAN:  Again, I will remind you,

1                     D. Costa  - Confidential

2            any time you want a break, just let me know.

3                     THE WITNESS:  I'm good.

4                     MR. BERMAN:  I'm going to give you

5            another exhibit as Plaintiff's 5.

6                     (Plaintiff's Exhibit 5, two-page

7            document Bates stamped DEF 000821 and DEF

8            000822, confidential, marked for

9            Identification, as of this date.)

10                    MR. BERMAN:  So I'll identify for the

11           record, Exhibit 4 it's a two-page document

12           Bates stamped DEF 001590, and Exhibit 5 is a

13           two-page document Bates stamped DEF 000821

14           to 822.

15           Q.    Ms. Costa, do you recall earlier when

16    I showed you Exhibit 2, which was a position

17    profile?

18           A.    Yes.

19           Q.    Okay.  Now I'm showing you Exhibit 4,

20    which is a position profile that purports to be

21    for the assistant general counsel, corporate

22    position.

23                 Do you see that?

24           A.    Yes.

25           Q.    Do you see that Exhibit 5 purports to

1                    D. Costa  - Confidential

2    be a position profile for the general counsel and

3    chief compliance officer position?

4          A.    Yes.

5          Q.    So with respect to Exhibits 2, 4 and

6    5, did you have any role in creating these

7    documents?

8                 MS. GUERON:  Objection.  These

9          documents have no date.

10         A.    I had a role in creating documents

11   similar, but I have no idea if these documents are

12   the same as the ones I created.

13         Q.    Okay.  That's fair.

14                Did there come a point in time where

15   you worked with MCHA's human resource's department

16   to craft position profile documents?

17         A.    Yes.

18         Q.    And was there a particular point in

19   time where that took place?

20         A.    Shortly after I became president, we

21   created position profiles for all positions in the

22   company, not just the legal department.

23         Q.    Was there anything in particular that

24   prompted you to do that?

25         A.    There were positions for which there

1                    D. Costa  - Confidential

2    was no profile, and I didn't think that was a good

3    practice.

4          Q.    When did you become aware that there

5    were positions for which there was no profile?

6          A.    I don't recall.

7          Q.    Were you aware that there were

8    positions with no profile during your tenure as

9    general counsel?

10         A.    I was aware only about legal

11   department internal audit and human resource

12   positions at that time.

13         Q.    So with respect to those categories

14   that you just enumerated, were you aware that

15   there were positions with no profile?

16         A.    Either no profile or -- or old

17   profiles, you know, that I thought needed to be

18   updated.  I have no specific recollection with

19   respect to each position.

20         Q.    So did you institute some kind of

21   process pursuant to which the profiles were

22   updated?

23         A.    Yes.

24         Q.    What was that process?

25         A.    I asked Pat Saunders, the head of HR,

1                D. Costa  - Confidential

2    to do so.

3        Q.    Did you give Pat any instructions as

4    to which positions to start with?

5        A.    I said all positions.

6        Q.    So, did Pat consult with you on

7    preparing profiles?

8        A.    Yes.

9        Q.    So, how did that work?  Did she draft

10   them first and present them to you?

11       A.    I don't recall.

12       Q.    Okay.  So let's limit it to the legal

13   positions.  Does that make it easier?

14            MS. GUERON:  Objection.

15       A.    With the legal positions, I gave her

16   whatever I had at the time, asked her to work with

17   those, and then I reviewed.

18       Q.    Do you know whether this was a project

19   that took a substantial amount of Ms. Saunders'

20   time?

21            MS. GUERON:  Objection.

22            MS. COLWIN:  Objection.

23       A.    I have no idea.

24       Q.    You supervised Ms. Saunders at that

25   time, didn't you?

1                    D. Costa  - Confidential

2          A.     Yes.  And they got -- they were

3    completed pretty quickly.  I have no idea how much

4    time she spent on them.

5          Q.     Did she consult with you concerning

6    the different subject matter areas of these

7    documents?

8          A.     Yes.

9          Q.     So, she provided you with drafts that

10   included these same subject matters?

11         A.     I don't recall.

12         Q.     Well, do you recall instructing Pat to

13   change the format of the position profile?

14         A.     Change the format?

15         Q.     Yes.

16         A.     I don't recall.

17         Q.     Would you agree with me that Exhibits

18   2, 4 and 5 are all in substantially the same

19   format?

20         A.     Oh, yes.  I mean, one of the

21   directions was that every position in the company

22   should have a position profile in a consistent

23   format, following a certain format, and should be

24   either updated or created if it doesn't exist.

25         Q.     Did you have any particular purpose in

1                    D. Costa  - Confidential

2      mind that these position profiles were to serve?

3                    MS. GUERON:  Objection.

4            A.    Multiple purposes.

5            Q.    Can you explain to me what the purpose

6      is of having a position profile?

7            A.    It -- one is it assists with searches

8      and recruiting.  It means we didn't have to create

9      a new profile every time we hired.  I thought that

10     was inefficient.

11           Q.    Okay.

12           A.    2, I thought it was important that

13     every employee receive their own position profile

14     and the corresponding competency bands, so that

15     they understood what their responsibilities were,

16     what the expectations were, to make it easier to

17     hold people accountable.

18           Q.    Okay.  Any other material purposes

19     that you envisioned to use the position profiles

20     for?

21           A.    None that come to mind.

22           Q.    If any do, would you please let me

23     know?

24           A.    Yes.

25           Q.    So, with respect to the attorney

1                D. Costa  - Confidential

2    positions, right?  We're looking here at corporate

3    counsel, assistant general counsel, and general

4    counsel, and chief compliance officer.

5                Do you recall reviewing position

6    profiles for those positions with Ms. Saunders?

7         A.    Not specifically, no.

8         Q.    Do you know whether Ms. Saunders ever

9    provided you with a position profile for the

10   corporate counsel position?

11        A.    I have no specific memory.

12        Q.    During your tenure as -- let me frame

13   this temporally, okay?  I'm interested only right

14   now in your tenure as general counsel and as

15   president.  Put those two together mentally for a

16   moment, okay?

17        A.    Okay.

18        Q.    Does this position profile for the

19   corporate counsel position accurately describe the

20   nature of the corporate counsel position during

21   that temporal period?

22        A.    I don't know if this was the document

23   we created, and my memory isn't specific enough to

24   be able to tell you whether -- what differences

25   there might be between what we created and this

1                    D. Costa  - Confidential

2     document.  I gave her the job descriptions

3     prepared for the corporate counsel searches I had

4     done recently.  That served as the basis.

5          Q.    Sitting here today, looking at the key

6     responsibilities and the experience and

7     qualifications that are contained in this

8     corporate counsel position profile, do those items

9     listed here accurately reflect the nature of the

10    position during your tenure in that temporal

11    period we just described?

12                MS. GUERON:  So we're talking about

13          Exhibit 2?

14                MR. BERMAN:  Yes.

15                MS. GUERON:  So take your time.

16          A.    So you're asking if, even before this

17    document was created, this document accurately

18    reflects what the position was?

19          Q.    No, ma'am.  Let me rephrase the

20    question.

21          A.    Okay.

22          Q.    So you had a corporate counsel

23    position while you were general counsel, correct?

24          A.    Yes.

25          Q.    And you also had a corporate counsel

1     D. Costa  - Confidential

2 position while you were president, correct?

3    A. Yes.

4    Q. So that position existed potentially

5 before this document was created, right?

6    A. The corporate counsel, while I was

7 general counsel, potentially existed before this

8 was created.  Stephen Rose was the first corporate

9 counsel hired after I became president.  I do not

10 recall that this document existed at that time.

11    Q. Okay.  So, what I want to clarify is,

12 I'm not asking you whether this document existed

13 at the time.  What I'm asking is, this document

14 that exists now, does the content of it accurately

15 describe the position as it existed back in that

16 time?

17    Does that make sense?

18    A. It makes sense.  But I -- I don't know

19 that I can accurately answer that question.  If

20 you want, I will review the document.

21    Q. That would be helpful, thank you.

22    MR. BERMAN:  Can we go off the record

23    for a moment while the witness reviews the

24    document.

25    MS. GUERON:  No, we --

1          D. Costa  - Confidential

2          THE WITNESS:  This is going to take me

3  less that a minute.

4          MR. BERMAN:  Oh, okay.

5          MR. COLWIN:  We're going to stay on

6  the record while she reviews documents.

7          MR. BERMAN:  Well, Counsel, I don't

8  agree to that.

9          MS. GUERON:  I don't -- I don't think

10  that is debatable.  That is how it --

11         MR. BERMAN:  If you want to stay on

12  the record, that's fine.  I'm not being held

13  accountable for the time that the witness

14  could be taking off the record.

15         MS. GUERON:  That's not right.  Your

16  seven hours encompasses her testimony and --

17  I'm not done -- her review of any documents

18  you want to show her.  She is not reviewing

19  documents off the record on her clock.

20         MR. BERMAN:  I don't agree, Counsel.

21         MS. GUERON:  I don't care.  That is

22  encompassed in the seven hours.

23         MR. BERMAN:  Well, we'll take it to

24  the judge, if we need to.

25         MR. VALLI:  So are we off the record

1            D. Costa  - Confidential

2       or not?

3            MS. GUERON:  We are on the record.

4            THE WITNESS:  I'm finished, so we're

5       on the record one way or the other.

6            MS. GUERON:  Take your time reading

7       it, okay?

8            THE WITNESS:  Yeah.

9       Q.    Okay.  So, now are you able to answer

10   my question?

11      A.    This, more or less, generally

12   generically describes what this position might

13   have been.

14      Q.    Okay.  Now let me make it more

15   concrete, okay?

16      A.    Okay.

17      Q.    At some point during your tenure,

18   Ms. Fischman occupied the position of corporate

19   counsel, correct?

20      A.    Yes.

21      Q.    Are there any material differences

22   between the key responsibilities, the experience

23   and the qualifications reflected in this document

24   and the key responsibilities, experience and

25   qualifications needed for the corporate counsel

1                    D. Costa  - Confidential

2      position while Ms. Fischman was the incumbent?

3           A.    I would say that Ms. Fischman did some

4      or all of the responsibilities that are described

5      in here.

6           Q.    And under experience and

7      qualifications, do you see where it says,

8      "corporate counsel must be a competent and

9      business savvy legal professional with a minimum

10     of five years of legal experience in-house and/or

11     in an international law firm, dealing with a broad

12     range of issues."

13                Do you see that text?

14          A.    Yes.

15          Q.    And in your view, is five years'

16     minimum experience necessary to perform this role?

17                MS. GUERON:  Objection.

18          A.    This was the aim.  Again, this was --

19     you know, this was the generic template.  But I

20     guess at the -- I don't know if I'm the one who

21     wrote five years, by the way, so let's just

22     clarify that.  I don't know what it said when I

23     worked on the document.  But, sitting here today,

24     I think that five years is useful.

25          Q.    Okay.  Sitting here today, do you have

                    D. Costa  - Confidential

 1

 2    any reason to think that, at any point, the

 3    position profile for this position required less

 4    than five years of experience?

 5                    MS. GUERON:  Objection.

 6         A.    I would have considered hiring someone

 7    with less than five years.

 8         Q.    How much less?

 9         A.    It would be case specific.

10         Q.    Depending on what?

11         A.    Depending on the person and depending

12    on the role.  As I said, this is the general

13    generic explanation, but, in fact, Joe Sherinsky

14    was hired to focus on IP.  He had the corporate

15    counsel title, but he did IP.

16                    There are people with that title who

17    were responsible for pharma.  There were people

18    with that title who were responsible more broadly.

19    So, it would depend on where their focus was.  We

20    were not strictly compartmentalized.  People

21    didn't have just a narrow role, but we had needs

22    we tried to meet.

23         Q.    So, I think you mentioned -- who is it

24    that you mentioned that was the corporate counsel

25    that was doing the intellectual property?

1          D. Costa  - Confidential

2     A.    Joe Sherinsky, who reported to Kathryn

3 Roche.

4     Q.    And we saw him on the org chart here

5 earlier, right?

6     A.    Yes.

7     Q.    So, when you recruited for that

8 position, would you have tailored the position

9 profile to reflect the need for intellectual

10 property?

11     A.    The position --

12          MS. GUERON:  Objection.

13     A.    -- didn't exist at the time.

14     Q.    Did you have a version of it?

15     A.    I don't recall --

16     Q.    Okay.

17     A.    -- that there was a version.

18     Q.    Didn't you tell me that when you were

19 recruiting, you would prepare a document?

20     A.    Oh, not a version of this, but, yes,

21 what I gave to the recruiter; the recruiter and I

22 would generate the job description.

23     Q.    So when you referred to the job

24 description provided to the recruiter, it was

25 materially different than this kind of document?

1          D. Costa  - Confidential

2          MS. GUERON:  Objection to form.

3     Identifying Exhibit 2.

4          MR. BERMAN:  Yes.  Exhibit 2.

5     A.     That was the point I tried to make

6  earlier.  So, to clarify, up until the time this

7  document was created, a job description was

8  created for each role on a case-by-case basis.

9     Q.     Okay.

10    A.     When these documents were created,

11 they were intended to serve as templates.

12    Q.     So, when you actually recruited for an

13 open position using a recruiter, did you provide a

14 job description?

15    A.     Yes.

16    Q.     Was it tailored to that particular

17 opening?

18    A.     Yes.

19    Q.     Did it include key responsibilities?

20    A.     Yes.

21    Q.     Did it include experience and

22 qualifications?

23    A.     Yes.

24    Q.     Did you provide any other objective

25 criteria to the recruiter other than key

```
 1              D. Costa  - Confidential
 2   responsibilities, experience and qualifications?
 3              MS. GUERON:  Objection.
 4        A.    This -- this was the -- the bulk of
 5   what I provided.
 6        Q.    Now, let me draw your attention to
 7   Exhibit 4.  All right?
 8              Now, you can take a moment to review,
 9   but if you compare the key responsibilities of
10   each of these positions in these documents,
11   they're the same, right?
12              MS. COLWIN:  Objection.
13        A.    They're very close, yes.
14        Q.    What's different?
15        A.    The number of years, the proficiency
16   level, the -- there are statements that are the
17   same, but the expectations were different, as can
18   be understood from the fact that one says five
19   years and the other says 15 years.
20        Q.    Okay.  But you'll agree with me,
21   right, that each of the bullet points under key
22   responsibilities, under Exhibit 2 and Exhibit 4,
23   they're identical, word for word, right?
24        A.    They are not --
25              MS. COLWIN:  Objection.
```

                    D. Costa  - Confidential

1

2        A.    -- identical.

3              MS. GUERON:  Take your time.

4        A.    So, if you're asking me simply to read

5   both documents and tell you if they're identical,

6   I can do that, but I cannot tell you what these

7   documents said when I was in the role.

8        Q.    Okay.

9        A.    I cannot tell you why they're

10  identical are not.  I cannot answer any

11  substantive question.  But if you want me to

12  compare them, I will.

13       Q.    Let me ask you this:  Did you

14  participate in the production of documents

15  responsive to plaintiff's discovery demands in

16  this case?

17             MS. GUERON:  Objection.

18       A.    Yes.

19       Q.    And did you participate on behalf of

20  MCHA?

21             MS. COLWIN:  Objection.

22             MS. GUERON:  Objection.

23       A.    I'm not an employee of MCHA, but I

24  shared my experience as a former employee of MCHA.

25       Q.    Do you know why we don't have any

```
 1                D. Costa  - Confidential
 2    position profiles that predate these?
 3                MS. GUERON:  Let me just caution you,
 4           to the extent that your answer would reveal
 5           any privileged communications, please do not
 6           do so.
 7                MS. COLWIN:  I join.
 8      A.    I do not know.
 9      Q.    Do you know if any exist?
10      A.    I do not know.
11  RQ          MR. BERMAN:  We call for production of
12           any position profiles for the corporate
13           counsel position, the assistant general
14           counsel corporate position, and the general
15           counsel and chief compliance officer
16           position, because these are the only ones
17           that have been produced.
18                MS. COLWIN:  Taken under advisement.
19                MR. BERMAN:  Okay.
20      Q.    One other question about these
21    documents.  Each of them under key
22    responsibilities in the second to last bullet
23    point, says, "interacts with other functions at
24    MCHC" --
25                MS. GUERON:  So you're just comparing
```

1          D. Costa  - Confidential

2      2 and 4?

3          MR. BERMAN:  They all say the same

4      language.  I'm just -- I'm --

5      Q.    With respect to Exhibit 2, Exhibit 4

6  and Exhibit 5, the second to last bullet point

7  under key responsibilities, for each of those says

8  interacts with other functions at MCHC," correct?

9          MS. GUERON:  Objection.

10     Q.    With respect to any of these position

11 profiles, can you tell me what that means?

12     A.    I think MCHC was intended to be read

13 as MCHC group.  And this was meant to refer to the

14 fact that, as a member of the legal department, we

15 were all required to work with different functions

16 across different affiliated entities, from time to

17 time, in order to effectively serve our clients.

18     Q.    Okay.  Did you participate in the

19 initial hiring of plaintiff, Jennifer Fischman?

20     A.    Yes.

21     Q.    As part of hiring Jennifer Fischman,

22 did you request a copy of the applicant's resumé?

23     A.    Yes.

24     Q.    Were there any other applicants for

25 the position?

1                    D. Costa  - Confidential

2          A.    Yes.

3          Q.    Did you request copies of their

4     resumés?

5          A.    I got everything that was provided to

6     me by Sandy Friedman and PeterSan Group.

7          Q.    For each candidate that was presented

8     to you by Sandy at PeterSan Group, did each one of

9     them have a resumé?

10         A.    I believe so.

11         Q.    It would be pretty unusual if they

12    didn't, right?

13         A.    Yeah.

14         Q.    Why did you want a copy of the resumé?

15         A.    Because I was evaluating specifically

16    what their experience was, not simply whether they

17    met the check-the-box key response -- or

18    check-the-box experience and qualifications that

19    you usually find in a job description.

20         Q.    Couldn't you get that information

21    verbally from a candidate?

22         A.    The point was for me to not meet with

23    20 candidates or 40 candidates, but to narrow it

24    down in advance using my best judgment to who was

25    most likely to be qualified.

1                    D. Costa  - Confidential

2        Q.    So, in your view, the resumés provided

3    you with the information necessary to determine

4    whether you would want to take the next step with

5    an applicant?

6              MS. GUERON:  Objection.

7        A.    Correct.

8        Q.    Were there any other materials that

9    you requested be provided to you by Sandy at

10   PeterSan concerning applicants?

11       A.    I don't recall.

12       Q.    Did you ask for writing samples?

13       A.    I don't recall.

14       Q.    Did you review Ms. Fischman's resumé?

15       A.    Yes.

16       Q.    I'm going to provide you with a

17   document --

18             MR. BERMAN:  Let's just mark this.

19             (Plaintiff's Exhibit 6, a three-page

20        document Bates stamped DEF 000720 to 722,

21        confidential, marked for Identification, as

22        of this date.)

23       Q.    Take a minute to look at it.

24       A.    This was not the resumé I saw.  The

25   resumé --

1            D. Costa  - Confidential

2            MS. GUERON:  There's no question

3        pending.

4            THE WITNESS:  Sorry.

5            MR. BERMAN:  It's okay.

6            I'm going to identify for the record

7        that this document is a three-page exhibit

8        Bates stamped DEF 000720 to 722.

9        Q.    Ms. Costa, I'll represent to you that

10    this document was produced to us by the defendants

11    in this litigation, so we understand it to have

12    come from Defendant MCHA's files.

13            Do you have any reason to believe that

14    it didn't come from MCHA'S files?

15        A.    No.

16        Q.    So was there some other version of a

17    resumé for Ms. Fischman that you've seen

18    previously?

19        A.    The resumé for Ms. Fischman that I

20    reviewed was the one I saw in 2008 when I

21    interviewed her for the role.

22        Q.    So that would have included her time

23    up through her employment at Raytheon Co., right?

24        A.    That's correct.

25        Q.    And that's reflected on this document

1              D. Costa  - Confidential

2    on the lower position of the first page, correct?

3         A.    Yes.

4         Q.    So, substantively, was the information

5    on this document, commencing from where it

6    mentions Raytheon and onward, right; so, from the

7    bottom half of the first page through the final

8    page, substantively, is this what you would have

9    considered when Ms. Fischman applied for her first

10   position at MCHA?

11             MS. GUERON:  Objection.

12        A.    Yes.  In -- in sub -- general

13   substance, yes.

14        Q.    In a general sense, is this the type

15   of information that would have allowed you to

16   determine whether she was qualified for the

17   position?

18        A.    Yes.

19        Q.    And is there anything in particular in

20   this document that allows you to make that

21   determination?

22        A.    I liked that she had both law firm

23   experience and in-house counsel experience.

24        Q.    What was it that you liked about her

25   having law firm experience?

1                D. Costa  - Confidential

2         A.    I think there's a certain rigor of

3    training that you get from law firm experience.

4    But I also learned from previous hires that hiring

5    fresh out of law firms sometimes did not

6    sufficiently prepare people, that, in fact, the

7    in-house experience was more valuable to

8    Mitsubishi than the law firm experience.

9         Q.    Okay.  So you were able to determine

10   from this that Ms. Fischman had both law firm

11   experience and in-house counsel experience,

12   correct?

13        A.    Correct.

14        Q.    Is there any other substantive

15   information that would have helped you make that

16   determination in this document?

17              MS. GUERON:  Objection.

18        A.    That was, um -- that, and the

19   descriptions of what she did in each of her roles,

20   of course.

21        Q.    Are you familiar with the law firm of

22   Fried, Frank, Harris, Shriver & Jacobson?

23        A.    I've heard of them, yes.

24        Q.    They're a nationally-known law firm,

25   right?

1                D. Costa  - Confidential

2          A.    Yes.

3          Q.    And same question with respect to

4    Paul, Hastings, Janofsky & Walker, correct?

5          A.    Yes.

6          Q.    And the law firm that you worked for,

7    Cleary, is also a well-known national law firm,

8    correct?

9          A.    Yes.

10         Q.    Are you familiar with the term Am Law

11   100?

12         A.    Yes.

13         Q.    Can you tell me what that term means

14   to you?

15         A.    American Lawyer is a magazine that

16   publishes a list that ranks law firms based on

17   various criteria, that I have not followed.

18         Q.    Do you know how many firms are ranked

19   in the Am Law 100?

20         A.    Well, it says Am Law 100, so I would

21   guess 100, but I actually have no knowledge.

22         Q.    Is Cleary one of the firms in Am Law

23   100?

24               MS. GUERON:  Objection.

25         A.    It was when I was there.

1                D. Costa  - Confidential

2        Q.    Do you know whether Paul, Hastings has

3    ever been a firm in the Am Law 100?

4                MS. GUERON:  Objection.

5        A.    I have no idea.  This is not something

6    that I look at.

7        Q.    Same with Fried, Frank, do you know?

8                MS. GUERON:  Objection.

9        A.    Yeah, I don't know.  It wasn't one of

10   my criteria.

11       Q.    Okay.

12       A.    Criterion.

13       Q.    Now, there came a time when

14   Ms. Fischman was in the acting general counsel

15   role at MCHA, correct?

16       A.    Yes.

17       Q.    And there came a time when you

18   determined that you wanted to hire someone new for

19   the general counsel role, correct?

20       A.    Yes.

21       Q.    Did you see applicants for that

22   position?

23                MS. GUERON:  Objection.

24       A.    I met with Lee Udelsman at Major,

25   Lindsey & Africa, and discussed the fact that I

1                    D. Costa  - Confidential

2    was being promoted and that I would be asking them

3    to do a search for general counsel, but we did not

4    proceed with that search.

5         Q.    Did you get to the point in the search

6    where you provided criterion to Major, Hagen (sic)

7    & Lindsey?

8              MS. GUERON:  Objection.

9         A.    Major, Lindsey & Africa, no.

10        Q.    So how far did you get in that

11   process?

12        A.    A lunch discussion.

13        Q.    Can you recall when that took place?

14        A.    It would have been the fall of 2014.

15        Q.    And, at some point, did you decide

16   that you were interested in Nick Oliva for the

17   position?

18        A.    I first considered Nick for that

19   position in the late August, early September time

20   frame, 2015.

21        Q.    So this is a year after you spoke with

22   Major, Lindsey & Africa?

23        A.    That's correct.

24        Q.    Okay.

25        A.    Not quite a year, but, yes.

1          D. Costa  - Confidential

2          Q.    Because I thought you told me you met

3     with Lee in the fall of 2014; is that right?

4          A.    Yes.  Yes.  A year later.

5          Q.    And then you first considered

6     Mr. Oliva in late August of 2015.

7                Did I get that right?

8                MS. GUERON:  Objection.

9          A.    Either late August, early September,

10    yes.

11         Q.    So, did you ultimately consider any

12    other candidates for the position besides

13    Mr. Oliva?

14         A.    So, your question suggests that it

15    unfolded in a way that it did not exactly unfold,

16    but the answer is, there was no one whom I

17    seriously considered for the role.

18         Q.    You mean no one other than Mr. Oliva?

19         A.    What time frame were you asking about?

20         Q.    Well, I asked you whether you

21    considered any other candidates and you said --

22         A.    At any time.

23         Q.    Yes.  And you said that you couldn't

24    answer that question because it unfolded in a

25    different way.  And then you responded that there

1                    D. Costa  - Confidential
2    was no one whom I seriously considered, but you
3    ultimately hired Mr. Oliva, correct?
4         A.    Yes.  So at the time --
5              MS. GUERON:  What is the question?
6              THE WITNESS:  Yes.  Yeah, I'm a little
7         confused.
8         Q.    So you said you first considered
9    Mr. Oliva in late August of 2015 or early
10   September of 2015, right?
11        A.    Yes.
12        Q.    And you were considering him for the
13   role of general counsel, correct?
14        A.    Yes.
15        Q.    At that time, did you also contemplate
16   that position being responsible for compliance?
17        A.    Yes.
18        Q.    So it's one position or two positions?
19        A.    I was treating it as one position.
20   That was what I thought it should be.
21        Q.    And so, what I'm asking you is, with
22   respect to that position, general counsel and
23   chief compliance officer, you said you considered
24   Mr. Oliva.
25              Did you consider anyone else?

 1                D. Costa  - Confidential

 2                MS. GUERON:  In 2015?

 3                MR. BERMAN:  Ever.

 4                MS. GUERON:  What do you mean, ever?

 5           There's two different hiring time periods,

 6           so help her out here.  What date are we

 7           talking about, 2015 or 2014?

 8                MR. BERMAN:  We're talking about the

 9           general counsel position, okay?

10                MS. GUERON:  Right.

11                MR. BERMAN:  So let's break it up into

12           pieces, okay?

13           Q.    In or around August of 2015 and

14      September of 2015, right, at that time, around

15      that time, fall of 2015, you considered Mr. Oliva

16      for hiring into the general counsel, chief

17      compliance officer position, correct?

18           A.    Yes.  But I want to go back to the

19      earlier time period --

20                MS. GUERON:  That is not a question

21           pending.  You answered his question.  Wait

22           for the next question.

23           Q.    I'm going to give you a chance, okay?

24      We're going to do it how you can get all your

25      information out.  As I explained, part of my job

1                  D. Costa  - Confidential

2    is to learn what you know.

3         A.    Yes.

4         Q.    So, focusing on this August to

5    September 2015 period.

6         A.    Yes.

7         Q.    Did you consider any other candidates

8    for the general counsel and chief compliance

9    officer position?

10        A.    No.

11        Q.    Why not?

12        A.    Because MCHA had a preference for

13   having an internal promotion, and I had previously

14   reviewed, in my mind, the assistant general

15   counsels, of which there were three, and

16   considered Jennifer to be the only qualified of

17   those three.  And when it came time for me to make

18   plans to replace Jennifer, my first thought was to

19   the only other person who was, um, a -- an

20   internal hire, although there had been a break in

21   time.

22        Q.    So, just for clarify, when you say

23   your first thought was an internal hire and there

24   had been a break in time, you're referring to

25   Mr. Oliva right?

                    D. Costa  - Confidential

1

2         A.    Yes.  He had left.  But people come

3    and go sometimes at Mitsubishi.

4         Q.    Sure.  Okay.

5               Then, with respect to the internal

6    candidates that you did not consider to be

7    qualified, which individuals are you referring to?

8         A.    Kathryn Roche and Andy Csaszar.

9         Q.    Is there a particular reason that

10   comes to mind why Ms. Roche would not be qualified

11   for the position?

12        A.    She was not willing to come back full

13   time and to work in the office on a regular basis.

14        Q.    Have you completed your response?

15        A.    Yes.

16        Q.    Okay.  Same question with respect to

17   Mr. Csaszar -- can you spell the last name for me,

18   please?

19        A.    C-S-A-C-Z-A-R.

20              REPORTER CORRECTION:  C-S-A-S-Z-A-R.

21        Q.    Was there a particular reason why, in

22   your view, Mr. Csaszar was not qualified for the

23   general counsel position?

24        A.    I didn't think he had the depth of

25   experience that was required.

1             D. Costa  - Confidential

2        Q.    All right.  So then, at -- first of

3    all, you had mentioned that MCHA preferred an

4    internal promotion.

5             Did I get that right, or did you say

6    MCHC?

7        A.    I said MCHA.

8        Q.    So, when you say that MCHA preferred

9    an internal promotion, who is that?

10        A.    Well, at the --

11             MR. FORTINSKY:  Objection to form.

12        Q.    That's you, right?

13             MS. GUERON:  Objection.

14        A.    At the time that Jennifer was hired,

15    it was Mr. Yoshisato.

16        Q.    So you're referring to the president

17    at the time, right?

18        A.    The president at the time the decision

19    was made to appoint my successor.

20        Q.    Okay.  Now, Mr. Yoshisato transitioned

21    out of MCHA, which created the vacancy for you to

22    become president, correct?

23        A.    Correct.

24        Q.    Do you know where he transitioned to?

25        A.    He moved to the internal audit

1            D. Costa  - Confidential

2    department or group of an entity in Japan, that I

3    think was MCHC, but I'm not certain.

4            Q.    So, did you have any discussions with

5    Mr. Yoshisato about why he preferred an internal

6    candidate?

7            A.    Yeah.   There were two reasons.   One,

8    frankly, was budgetary.   I told them what

9    Mr. Udelsman told me it would cost to hire a

10   general counsel, and they were concerned that,

11   between my salary and the new general counsel's

12   salary, that we would be significantly over

13   budget.

14           And then the other reason was more

15   cultural, that there was a preference for

16   promoting from within and giving opportunities to

17   internal candidates.

18           Q.    So then, I think you mentioned that

19   when you first considered Mr. Oliva in August of

20   2015 and early September 2015, he was not hired at

21   that time, correct?

22           A.    Oh, no, that was the very first time

23   I consider -- your question was considered.

24           Q.    Yes.  So you first considered hiring

25   Mr. Oliva in August of 2015 or September of 2015,

1              D. Costa  - Confidential

2    correct?

3         A.    And began a process at that point.

4         Q.    What is the process that you are

5    mentioning; is that what you just described to me

6    or something different?

7         A.    The process -- I don't think I

8    described it.

9              The process was that I learned from

10   him, inadvertently, that he was available.  I did

11   not -- I'm not the person who -- I didn't -- I

12   didn't ask him.  I didn't offer him a job.  I

13   learned, inadvertently, that he considered himself

14   available.  I had a series of discussions with him

15   about the role, and then he interviewed with

16   people at MCHA.

17        Q.    So, when was Mr. Oliva's first

18   interview with MCHA?

19        A.    Other than with me, I believe it was

20   in October.

21        Q.    When did he interview with you, or are

22   those what you just described to me?

23        A.    It started out as a discussion that

24   was in a casual context, and I do not recall when

25   we began talking formally.

1               D. Costa  - Confidential

2         Q.    Do you recall having a meeting with

3    Mr. Oliva around your birthday?

4         A.    He took me to lunch -- the answer is,

5    after my birthday, yes.

6         Q.    What month was that?

7         A.    August.

8         Q.    You're a Leo?

9         A.    Yes.

10        Q.    Me, too.  Okay.

11              So you had a discussion with Mr. Oliva

12   in August of 2015, correct?

13        A.    Yes.

14        Q.    And is that when you first considered

15   him for employment?

16        A.    That's when I first considered him,

17   yes.

18        Q.    From that time forward, from August

19   2015, up until the time where Mr. Oliva was hired

20   and commenced employment -- he commenced

21   employment on November 30, correct?

22        A.    Correct.

23        Q.    So, between August 2015 and November

24   30, 2015, were any other candidates considered for

25   the position?

1                    D. Costa  - Confidential

2          A.    No.

3          Q.    You were present for the first day of

4     depositions of plaintiff, Jennifer Fischman,

5     correct?

6          A.    Yes.

7          Q.    Do you recall your counsel making a

8     statement on the record that other candidates were

9     considered for this opening?

10               MS. COLWIN:  Objection.

11               MS. GUERON:  Objection.

12         A.    I -- I don't think she said that.  I

13    haven't read the transcript.  I think what she

14    said was that there were other qualified can --

15    there were other candidates who could be

16    considered, and I did consider Kathryn and Andy

17    and Jennifer back in the fall of 2014.  I didn't

18    consider -- oh, and I -- Nick was theoretically a

19    potential, but I didn't know he was available.

20         Q.    Okay.  So, remember, in response to

21    one of my questions, you said that's not the way

22    it unfolded, and I told you, you would have an

23    opportunity to explain.  Have you now fully

24    explained to me, or is there a piece that's

25    missing?

1          D. Costa  - Confidential

2     A.    I don't know.

3          MS. GUERON:  Objection.  I don't

4     understand that question.

5     Q.    I thought there was something you

6     wanted to explain to me, so I want to make sure

7     I've given you the opportunity.

8          MS. GUERON:  Objection.

9     A.    I think I'm comfortable with my

10    answers.

11    Q.    If that changes, please let me know.

12    A.    Yes.

13    Q.    I just want to clarify one of your

14    recent responses.

15         You said you considered Kathryn --

16    A.    Roche.

17    Q.    -- Roche for the position, right?  And

18    you didn't view her as qualified, correct?

19    A.    She wasn't prepared to come full time.

20    Q.    And coming full time was a

21    requirement, right?

22    A.    Yes.

23    Q.    And then, with respect to Mr. Csaszar,

24    you didn't consider him qualified because of his

25    depth of experience, I think you said?

1                    D. Costa  - Confidential

2          A.    Not --

3                    MS. GUERON:  Objection.

4          A.    Not as qualified as Jennifer.

5                    MS. GUERON:  Objection.

6          Q.    Was he qualified for the general

7    counsel position, if Jennifer wasn't in contention

8    for it?

9                    MS. GUERON:  Objection.

10         A.    In my opinion, no.

11         Q.    Was it because of the depth of

12   experience issue?

13         A.    Yes.

14         Q.    Were there any other candidates who

15   were substantively qualified for the position that

16   were considered, other than Mr. Oliva?

17         A.    There were no other internal

18   candidates, no.

19         Q.    Were there any other external

20   candidates?

21         A.    I did not consider any.

22         Q.    Okay.  So, in your view, was Mr. Oliva

23   an internal candidate?

24         A.    Yes.

25         Q.    All right.  I'm just going to show you

1                    D. Costa  - Confidential
2    some things real quick here.  These are all
3    performance review for Ms. Fischman, so I'm sure
4    you won't be surprised by any of these.
5                    MR. BERMAN:  Are we at 7?
6                    (Plaintiff's Exhibit 7, multipage
7          document Bates stamped DEF 000619 through
8          631, confidential, marked for
9          Identification, as of this date.)
10                   MR. BERMAN:  For identification,
11         Exhibit 7 is a multipage document Bates
12         stamped DEF 000619 through 631.
13         Q.    Have you seen this document before?
14         A.    Yes, I have.
15         Q.    Can you tell me what it is?
16         A.    This is the performance evaluation of
17   Jennifer Fischman for year 2011, which was
18   provided to her on March 8, 2012.
19                   MS. GUERON:  Take your time to look
20         through it, please.
21         Q.    Was MCHA on a fiscal year or a
22   calendar year?
23         A.    At this point in time, we were on a
24   calendar year.
25         Q.    At some point, that changed?

1                D. Costa  - Confidential

2        A.    Yes.

3        Q.    Do you recall approximately when?

4        A.    No.

5        Q.    Okay.  If anything jogs your memory,

6   please let me know at that time.

7              I'll refer you to the last page of the

8   document.

9              Is that your signature?

10       A.    You gave me multiple documents, yes?

11       Q.    No.  I think it should all be the

12   same.

13             I'll refer you to page 631.  It's the

14   final page of the packet.  It should be.  And by

15   page numbers, I'm referring to the number stamped

16   in the bottom right?

17       A.    Okay.  So, I want to note this is more

18   than one performance evaluation, so my description

19   of the document was not accurate.  This is more

20   than one --

21       Q.    Okay.

22       A.    -- evaluation.

23       Q.    So, just to clarify then, from page

24   619 to 623, that's one document, correct?

25       A.    Correct.

1                D. Costa  - Confidential

2         Q.    Okay.  Can you tell me what that is?

3         A.    619 to 623 is what I described

4    previously.

5         Q.    Okay.  And is that your signature on

6    page 623?

7         A.    Yes.

8         Q.    With the date 3/8/12?

9         A.    Yes.

10        Q.    And as far as you're concerned, does

11   this accurately correspond to the performance

12   appraisal delivered to Ms. Fischman for this time

13   period?

14        A.    Yes.

15        Q.    And then with respect to pages marked

16   624 to 631?

17        A.    It's actually -- again, you've still

18   lumped together two documents.

19        Q.    So, can you tell me where one ends and

20   one begins?

21        A.    624 through 627 is the performance

22   evaluation provided to her on February 14, 2011.

23   628 to 631 is the performance evaluation provided

24   to Jennifer February 16, 2010.

25        Q.    Okay.  On page 627, is that your

1           D. Costa  - Confidential

2   signature?

3           A.    Yes, it is.

4           Q.    On page 631, is that your signature?

5           A.    Yes, it is.

6           Q.    To the best of your knowledge, do

7   these documents accurately reflect the performance

8   reviews delivered to Ms. Fischman?

9           A.    Yes, they do.

10          Q.    Is it fair to say that she got

11  positive reviews in each of these documents?

12          MS. GUERON:  Objection.

13          A.    She -- I gave her positive reviews,

14  yes.

15          MR. BERMAN:  The next one is going to

16      be 8.

17          (Plaintiff's Exhibit 8, multipage

18      document Bates stamped DEF 1479 through

19      1483, confidential, marked for

20      Identification, as of this date.)

21          MR. BERMAN:  For identification,

22      Plaintiff's 8 is a multipage document Bates

23      stamped DEF 1479 through 83.

24          Q.    Ms. Costa, can you tell me what this

25  document is?

1                    D. Costa  - Confidential

2          A.    This is the performance review for

3    year 2012 that I gave to Ms. Fischman on February

4    15, 2013.

5          Q.    Did you sign the last page of this

6    document?

7          A.    Yes.

8          Q.    Page 1483?

9          A.    I did.

10         Q.    To the best of your knowledge, does

11   this accurately reflect the performance review

12   delivered to Ms. Fischman during the time period

13   reflected in the report?

14         A.    Yes, it does.

15              MR. BERMAN:  Next one is 9.

16              (Plaintiff's Exhibit 9, multipage

17         document Bates stamped DEF 001383 to 1389,

18         confidential, marked for Identification, as

19         of this date.)

20              MR. BERMAN:  For identification,

21         Plaintiff's 9 is a multipage document Bates

22         stamped DEF 001383 to 1389.

23         Q.    Ms. Costa, have you seen this document

24   before?

25         A.    I believe so.

1                    D. Costa  - Confidential

2          Q.     Can you tell me what it is?

3          A.     This is not the performance evaluation

4    I gave Ms. Fischman, but this is a review on the

5    form for performance reviews.

6          Q.     So is this a draft?

7          A.     So -- give me a moment.

8          Q.     Sure.

9          A.     I believe this is the job that was

10   created by Ms. Fischman.

11         Q.     Did you ultimately review the draft?

12         A.     I reviewed the draft, and it resulted

13   in a final evaluation.

14         Q.     Do you know whether that final

15   evaluation resulted in an overall level of

16   performance of exceeds expectations?

17                MS. GUERON:  Objection.

18         A.     I would need to look at it to tell you

19   that.

20         Q.     Do you have any reason to believe that

21   in the year 2013, Ms. Fischman did not exceed

22   expectations?

23         A.     I would need to refer to her review

24   from that year.  But she was promoted.

25         Q.     And you would have considered her

reviews in the process of determining whether she should be promoted, correct?

A. The information that went into these reviews was considered in my decision to promote her.

Q. That works for me.

MR. BERMAN: Number 10.

(Plaintiff's Exhibit 10, multipage document Bates stamped DEF 000064 through 000076, and also pages marked DEF 001004 through 001012, confidential, marked for Identification, as of this date.)

MR. BERMAN: Plaintiff's 10 is a multipage exhibit bearing Bates stamps -- actually, it's got a break -- so, it's bearing Bates stamps DEF 000064 through 76. And then there's also pages marked DEF 001004 through 001012.

Let me know when you're ready Ms. Costa.

THE WITNESS: Yes.

Q. So, I believe I've handed you two separate documents which are appended to each other.

1                    D. Costa  - Confidential

2          A.    Yes.

3          Q.    The first document marked DEF 000064

4    through 76, let's start with that one first, okay?

5                Do you recognize this document?

6          A.    Wait.  Let me check the pages.  You

7    said through 76?  Yes, I recognize this document.

8          Q.    Can you tell me what it is?

9          A.    This was the performance evaluation

10   covering the year 2014 that I delivered to

11   Jennifer April 29, 2015.

12         Q.    Does this accurately reflect the

13   performance evaluation delivered to Ms. Fischman?

14         A.    Yes, it does.

15         Q.    Can I direct your attention to page

16   68?

17         A.    Yes.

18         Q.    That's your signature, right?

19         A.    Yes.

20         Q.    And then if you look up on the same

21   page, you see under specific goal or objective?

22         A.    Yes.

23         Q.    Do you see where it says "see

24   attached"?

25         A.    Yes.

1                    D. Costa  - Confidential

2          Q.    So if you flip forward now to page 70

3    and onward, can you tell me what pages 70 through

4    76 are?

5          A.    Yeah.  This is the list of goals and

6    the action plan that Jennifer created for the

7    coming year.

8          Q.    So, this review date is dated April

9    29, 2015 on the front cover.

10                Do you see that?

11         A.    Yes.

12         Q.    So, this document reflects

13   Ms. Fischman's performance for the calendar year

14   2014, correct?

15         A.    Correct.

16         Q.    Now, we hadn't switched from calendar

17   year to fiscal year at this stage, had we?

18         A.    It doesn't appear so.

19         Q.    So then, at the time that this review

20   was delivered, had there been a discussion with

21   Ms. Fischman about what her role would be after

22   April 15?

23         A.    So, let me -- I said it doesn't appear

24   so.  I can't tell.  I do not know if we switched

25   fiscal year at that point.

1          D. Costa  - Confidential

2      Q.    Okay.

3      A.    So, please ask your question again.

4      Q.    Sure.  So, the pages here that are

5  marked pages 70 through 76 --

6      A.    Yes.

7      Q.    -- would you agree that that's forward

8  looking in nature?

9      A.    Yes.  That's what goals and action

10  plans always are.

11      Q.    Did you have any discussions with

12  Ms. Fischman that led to the preparation of these

13  goals?

14      A.    Yes.

15      Q.    When did those discussions take place?

16      A.    They started in January 2015, which is

17  when I started working with her to prepare her for

18  the role.  I have no memory as to when this

19  document might have first been created.

20      Q.    When you say prepared for the role,

21  are you referring to the acting general counsel

22  and chief compliance officer position?

23      A.    Yes.

24      Q.    And that's one position, correct?

25      A.    Yes.

1              D. Costa  - Confidential

2      Q.     Then with respect to the pages marked

3 DEF 1004 through 1012, have you seen this before?

4      A.     Yes.

5      Q.     Can you tell me what this is?

6      A.     There was Jennifer's draft of her

7 midyear review.

8      Q.     Now, you mentioned that you had some

9 conversations with Jennifer that commenced in

10 January of 2015 in connection with preparing her

11 for the new role, correct?

12     A.     Yes.

13     Q.     Did you take any notes of those

14 meetings?

15     A.     No.

16     Q.     Do you know if Jennifer took any notes

17 of those meetings?

18     A.     She took notes.

19     Q.     How do you know she took notes?

20     A.     Because she sat in my office and I

21 watched her take notes.

22     Q.     Okay.

23     A.     She did not always.  There were times

24 when I said, you don't need to write this down, no

25 need for notes, let's just talk; but there were

1          D. Costa  - Confidential

2    many times when she came into my office and I

3    watched her take notes.

4          Q.    Okay.  She had a little notebook of

5    some kind?

6          A.    I think it was a legal pad.  But I

7    don't recall.

8          Q.    Have you been provided copies of the

9    notes produced by Ms. Fischman?

10         A.    The ones produced a couple of weeks

11   ago?  No.

12         Q.    What about recently?

13         A.    No.

14         Q.    Okay.  So I'm going to show you --

15               MR. BERMAN:  Are we on 11?

16               THE REPORTER:  We are on 11, yes.

17               (Plaintiff's Exhibit 11,

18         Ms. Fischman's notes, 43 pages, marked for

19         Identification, as of this date.)

20         Q.    I'm going to be super brief with this,

21   because I'm just going to ask if you've seen it

22   before.

23               So, Ms. Costa, have you ever seen

24   Exhibit 11 before?

25         A.    When I was sitting in the second day

1                    D. Costa  - Confidential

2      of Jennifer's deposition, I saw it in this form.

3      I kind of quickly looked at the first two or three

4      pages.  I did not have the time, because I was

5      listening to Jennifer's testimony, to review it,

6      but I did see it briefly.

7           Q.    I'm going to represent to you that we

8      produced this document after that date.

9           A.    The second -- the second deposition?

10          Q.    Oh, was that the second date of

11     deposition?

12          A.    That's what I intended to say.

13          Q.    Okay.  Fair enough.  Okay.

14                Does that refresh your recollection as

15     to whether Ms. Fischman had a spiral notebook that

16     she took notes in?

17                MS. GUERON:  Objection.

18          A.    No, it doesn't.

19          Q.    Okay.  Let's move on.

20                The last review I showed you, was that

21     Exhibit 10, the performance review?

22          A.    Yes.

23          Q.    And then the back of that was a draft

24     for 2015 that Ms. Fischman provided to you, right?

25          A.    Yes.

1                D. Costa  - Confidential

2          Q.    Now, later in 2015, did there come a

3     time where you gave Ms. Fischman a review in

4     November?

5          A.    Yes.

6          Q.    Did you make substantive edits to the

7     draft that Ms. Fischman provided to you?

8          A.    I don't think it bears much

9     resemblance to the draft she provided to me.

10               MR. BERMAN:  I'm going to show you --

11               I guess this will be Exhibit 12.

12               (Plaintiff's Exhibit 12, multipage

13               document Bates stamped DEF-747 through 752,

14               confidential, marked for Identification, as

15               of this date.)

16               MR. BERMAN:  Exhibit Plaintiff's 12 is

17               a multipage document Bates stamped DEF-747

18               through 752.

19          Q.    Ms. Costa, have you seen this document

20     before?

21          A.    Yes.

22          Q.    Can you tell me what it is?

23          A.    This -- this isn't signed, so I can't

24     be certain, but it appears to be a copy, an

25     unsigned copy of the evaluation I gave to Jennifer

1          D. Costa  - Confidential

2     November 11, 2015.

3          Q.    I'll direct your attention to page

4     marked DEF-749.

5          A.    Yes.

6          Q.    And you'll see there is a narrative

7     there under "manager comments."

8                Do you see that?

9          A.    Yes.

10          Q.    It continues on to the next page,

11     correct?

12          A.    Yes.

13          Q.    Did you write these manager comments?

14          A.    Assuming this is the same version,

15     this is my final version, yes, I did.

16          Q.    Do you know when the manager portion

17     of the November 11, 2015 review was first drafted?

18          A.    It would have been drafted by me

19     shortly before I delivered that.

20          Q.    So then, any comments made would have

21     reflected Ms. Fischman's performance up to shortly

22     before November of 2015, correct?

23          A.    Shortly before, yes.

24          Q.    Looking at these manager comments, do

25     these accurately describe your performance

1              D. Costa  - Confidential

2    appraisal of Ms. Fischman from that time?

3         A.    Yes.

4         Q.    Will you agree with me that you

5    identify a number of what we can call performance

6    deficiencies?

7         A.    I gave five examples of performance

8    deficiencies, as well as some general comments

9    that reflected other deficiencies, yes.

10        Q.    Did there come a time in 2015 where

11   you desired to terminate Ms. Fischman?

12        A.    Yes.

13        Q.    When did you first have the desire to

14   terminate Ms. Fischman?

15        A.    Early August was the first time I

16   communicated it to others.

17        Q.    At that time in August of 2015, you

18   were in the role of president of MCHA, correct?

19        A.    Correct.

20        Q.    Did you have the discretion to fire

21   Ms. Fischman at that time?

22        A.    I had the discretion to fire

23   Ms. Fischman, yes.

24        Q.    Why didn't you?

25        A.    Because I was persuaded that it was in

```
 1                D. Costa  - Confidential

 2   the best interest of MCHA to keep her on as

 3   assistant general counsel, if she were willing to

 4   return to the role.

 5          Q.    Who persuaded you that?

 6          A.    A combination of people, including Pat

 7   Saunders.  I believe I discussed it with Dennis

 8   Trice.  I discussed it with Ken Fujiwara.

 9          Q.    What position did Dennis Trice hold at

10   the time?

11          A.    He was the president of MCA.

12          Q.    What's MCA?

13          A.    MCA is that entity that was the

14   regional headquarters of MCC in the Americas that

15   was created not long before that.

16          Q.    Was that an operating business?

17          A.    No.

18          Q.    So what was its role?

19          A.    Its role was to provide other types of

20   support and services to MCC affiliates only.  Not

21   MCHC affiliates, but MCC affiliates.

22          Q.    Were those services overlapping with

23   the services performed by MCHA?

24                MS. GUERON:  Objection.

25          A.    We made efforts -- Dennis and I made
```

1               D. Costa  - Confidential

2     efforts to ensure they didn't overlap.

3          Q.    Okay.  Did you say it was MCA?

4          A.    MCA.

5          Q.    Did MCA provide legal services?

6          A.    No.

7          Q.    Did MCA provide internal audit

8     services?

9          A.    No.

10          Q.    Did MCA provide tax services?

11          A.    No.

12          Q.    Did MCA provide finance and

13     accounting?

14          A.    No.

15          Q.    Did MCA provide IT?

16          A.    Some IT.

17          Q.    So other than IT, were there any other

18     areas of potential overlap?

19          A.    HR.

20          Q.    Okay.

21          A.    Which is off -- out of MCHA by 2020.

22          Q.    Would you agree with me that the

23     decision to terminate an employee is a

24     confidential matter for a company?

25               MS. COLWIN:  Objection.

1          D. Costa  - Confidential

2          MS. GUERON:  Objection.

3     A.    I don't understand the question.

4     Q.    Why were you discussing the potential

5  termination of an employee with someone outside of

6  your company?

7     A.    Dennis Trice and I were colleagues who

8  worked extremely closely together because there

9  was a lot of overlap.  Dennis attended leadership

10  meetings, and I used him as an advisor in dealing

11  with Jennifer.

12     Q.    Okay.  So with respect to the Comtrex

13  litigation, when did the Comtrex litigation take

14  place?

15     A.    I do not know when it began.  Comtrex

16  is a company that was acquired around 2013.  This

17  litigation arose subsequent to the acquisition,

18  and the specific instance I refer to was in the

19  summer of 2015.

20     Q.    Can you be more specific of when in

21  the summer?

22     A.    I do believe there are documents that

23  were produced in the case that evidence this, but

24  I do not recall off the top of my head.

25     Q.    And then the second item you have here

```
 1              D. Costa  - Confidential
 2    concerns the Filtech matter, correct?
 3         A.    Yes.
 4         Q.    Did that involve an investigation of a
 5    Foreign Corrupt Practices Act matter?
 6         A.    Yes.  In Mexico.
 7         Q.    When did that investigation take
 8    place?
 9         A.    Sometime after Stephen Rose was hired
10    and before I wrote this evaluation.
11         Q.    When was Stephen Rose hired?
12         A.    Sometime after Jennifer took the
13    position.  So it was late spring, early summer,
14    maybe early fall.  All of these things are within
15    a pretty small window.
16         Q.    The Comtrex matter, did that involve
17    Mike Gragtmans?
18         A.    Yes, it did.  Gragtmans.
19         Q.    Is it G-R-A-G-T?
20         A.    M-A-N-S.
21         Q.    Was Mr. Gragtmans associated with a
22    company called MCPP?
23         A.    Yes.
24         Q.    So, was Mr. Gragtmans a client of
25    MCHA?
```

1                D. Costa  - Confidential

2          A.    Yes.

3          Q.    And, by extension, he was a client of

4    Ms. Fischman, correct?

5          A.    Yes.  I should say, he was not the

6    client.  The company that he was heading was the

7    client.

8          Q.    So what was his position at the

9    company?

10               MS. GUERON:  Objection.

11         A.    I believe he was the president of MCPP

12   at this time.

13         Q.    Did you come to an understanding

14   concerning a manner of interaction between

15   Ms. Fischman and Mr. Gragtmans?

16               MR. BERMAN:  Withdrawn.

17         Q.    Were you familiar with Ms. Fischman's

18   interactions with Mr. Gragtmans?

19               MS. GUERON:  Objection.

20               MS. COLWIN:  Objection.

21         A.    I was aware of interactions between

22   them over the course of a number of years, yes.

23         Q.    Was there anything unusual, in your

24   view, about the nature of those interactions?

25               MS. COLWIN:  Objection.

1                D. Costa  - Confidential

2        A.    You would have to be more specific.

3        Q.    Well, you supervised Ms. Fischman's

4    work, correct?

5        A.    Yes.

6        Q.    So you became aware of her

7    interactions with numerous clients, right?

8        A.    Yes.

9        Q.    So, was there anything about this

10   interaction that was different in tone or content

11   or nature than her other interactions with other

12   clients?

13              MS. COLWIN:  Objection.

14              MS. GUERON:  Objection.

15       A.    During the Contracts acquisition and

16   during the A. Schulman acquisition, I believe it

17   was an asset acquisition, Jennifer was often heard

18   to be screaming at Mike Gragtmans.  That was

19   unusual.

20       Q.    Are you aware that Mr. Gragtmans made

21   favorable comments about Jennifer's performance in

22   representing MCPP?

23              MS. COLWIN:  Objection.

24              MS. GUERON:  Objection.

25       A.    Yes.  Mike Gragtmans came around to

1                    D. Costa  - Confidential

2    respecting her and appreciating the services she

3    provided, yes.

4          Q.    Okay.  Thank you.

5                And MCHA similarly received favorable

6    feedback from other clients concerning

7    Ms. Fischman's performance, correct?

8                MS. COLWIN:  Objection.

9                MS. GUERON:  Objection.

10         A.    At various points in time, I received

11   positive feedback from clients of MCHA about

12   Jennifer's performance, yes.

13         Q.    One of them was Noltex, right?

14         A.    I have no specific memory with respect

15   to Noltex.  I think her contact was Philip Wiles,

16   but I do not recall specific feedback.

17         Q.    Do you know a Mr. Slaton that was

18   affiliated with Noltex?

19         A.    Yes.

20         Q.    Do you know whether he provided

21   positive --

22         A.    I don't.

23         Q.    -- performance feedback for

24   Ms. Fischman?

25                MS. GUERON:  Wait until he finishes

```
 1              D. Costa  - Confidential
 2         the question.
 3              THE WITNESS:  Yes.  I'm sorry.  He
 4         said Slaton, and it just reminded me of
 5         someone I haven't thought of in a long time.
 6         A.    So, no, I have no memory of receiving
 7    positive feedback from Slaton Fry, I think was.
 8         Q.    Yeah.  Thank you.
 9              So, with respect to Ms. Fischman's
10    representations of client matters, right, as an
11    attorney, she owed her clients a duty, correct?
12              MS. GUERON:  Objection.
13         A.    Yes.
14         Q.    Did she owe, as an attorney, anyone
15    else besides the client a duty?
16              MS. COLWIN:  Objection.
17              MS. GUERON:  Objection.
18         A.    She had many clients, so she owed many
19    duties to many different clients.
20         Q.    Can we agree that her duties as an
21    attorney ran exclusively to her clients?
22              MS. COLWIN:  Objection.
23         A.    And to --
24              MS. GUERON:  Objection.
25         A.    -- her employer.
```

1                    D. Costa  - Confidential

2        Q.    With respect to the Filtech matter, do

3   you know whether Ms. Fischman retained outside

4   counsel?

5        A.    I do not recall.

6        Q.    Do you know whether Arnold & Porter

7   was involved in that matter?

8        A.    I do not recall.

9        Q.    Do you know whether Arnold & Porter

10   issued a report in connection with that matter?

11        A.    I do not recall.

12        Q.    Do you know whether Arnold & Porter

13   issued any recommendations with respect to Filtech

14   FCPA practices?

15        A.    I do not recall.

16        Q.    Would you agree that the description

17   of the Filtech matter in this performance review

18   constitutes a reflection of Ms. Fischman's

19   purported performance?

20        A.    Yes.

21   RQ          MR. BERMAN:  We call for production of

22          any Arnold & Porter recommendations

23          concerning the Filtech matter.

24              MS. COLWIN:  Taken under advisement.

25              MS. GUERON:  Matt, we're coming up on

1          D. Costa  - Confidential

2     two hours straight.  No rush, but when you

3     have a moment.

4          MR. BERMAN:  Whenever you want to take

5     a break, let me know.

6          MS. GUERON:  I don't want to interrupt

7     your line of questioning, so.

8          MR. BERMAN:  We're good.  Any time you

9     want to take a break, just tell me.

10          THE WITNESS:  I can't take my

11     medication until 4:30, so I'm happy to go to

12     4:30.

13          MS. GUERON:  Fine.

14          MR. BERMAN:  Just to be clear, any

15     time anyone wants a break, that's fine.

16          MS. GUERON:  Understood.

17          THE WITNESS:  That's fine.

18     Q.    Can I point you to the third comment.

19  It's the paragraph beginning "third, you exhibited

20  poor judgment with respect to the 4010 filing."

21          Do you see that?

22     A.    Yes.

23     Q.    Is that a reference to a pension

24  matter?

25     A.    It's -- this refers to an ERISA issue,

1          D. Costa  - Confidential

2    yes, a pension matter.

3          Q.    So --

4          A.    4010 refers to ERISA.  It's a pension

5    matter.

6          Q.    Were you involved in creation of the

7    pension referenced in this third paragraph?

8          A.    There were three pensions involved in

9    this issue.  I was not involved in creating any of

10   the three.

11         Q.    Did you ever consult with Pat Saunders

12   with respect to any of these pensions?

13         A.    Yes.

14         Q.    When did you first start working on

15   these pension matters?

16         A.    This is referring to one specific

17   issue.

18               Are you asking me a broader question?

19         Q.    Let me broaden the question.

20               Were you responsible for pension

21   matters at MCHA?

22               MS. GUERON:  Objection.

23         A.    I was on the pension committee of one

24   of the three companies.

25         Q.    Was that during your tenure as GC --

1                   D. Costa  - Confidential

2          A.    Yes.

3          Q.    -- general counsel?

4                Did you retain that responsibility

5     when you were promoted to president?

6          A.    No.

7          Q.    Was Pat Saunders involved with the

8     pension program during your tenure as GC?

9                MS. GUERON:  Objection.

10         A.    I don't recall what her involvement

11    might have been with these pensions.

12         Q.    Was outside counsel retained in

13    connection with the 4010 matter?

14         A.    Yes.

15         Q.    Was that Winston & Strawn?

16         A.    I don't recall.

17         Q.    Are you familiar with the work that

18    Winston & Strawn performed in connection with that

19    matter?

20         A.    I am familiar with where we ended up.

21    I am not familiar with the work that they did.

22         Q.    Where did you end up, without

23    revealing any privileged communications?

24                MS. GUERON:  Can you?  Can you answer

25         that question without revealing privileged

1                D. Costa  - Confidential

2        information?

3                Do you want to hear the question

4        again?

5        A.    I think I need to consult on that.

6        Q.    Is it fair to say that the conclusion

7    of that matter did not require the pension to pay

8    any monies to the IRS?

9                MS. COLWIN:  Objection.  Don't answer.

10                MS. GUERON:  I'll direct you not to

11        answer, in deference to co-counsel.

12                MR. BERMAN:  On what basis are you

13        directing --

14                MS. COLWIN:  Attorney-client

15        privilege.

16                MR. BERMAN:  Whether the IRS was paid

17        money is attorney-client privilege?

18                MS. COLWIN:  There is a lot of

19        communication that went --

20                MR. BERMAN:  I'm not asking about the

21        communications, Counselor.

22                MS. COLWIN:  You're asking for -- what

23        are you asking for exactly?

24                MR. BERMAN:  I'm asking whether the

25        conclusion of that matter resulted in a

1              D. Costa  - Confidential

2        payment to the IRS.

3              MS. GUERON:  I think we have to table

4        it.

5              MR. BERMAN:  When you say table it,

6        Counselor, what do you mean by that?

7              MS. COLWIN:  I need to consult with

8        the client to make sure that that can be

9        divulged.

10             MR. BERMAN:  Okay.  Will you get me an

11       answer to that --

12             MS. COLWIN:  Yes.

13             MR. BERMAN:  -- before we conclude

14       today?

15             MS. COLWIN:  Yes.

16             MR. BERMAN:  Okay.  Thank you.

17       Q.    Did somebody at MCHA develop the

18  pension plans?

19             MS. GUERON:  Objection.

20       A.    No.  The pension plans preceded the

21  creation of MCHA.

22       Q.    All right.  Turning your attention to

23  the fourth point in this narrative concerning the

24  interaction between Ms. Fischman and Kelli,

25  K-E-L-L-I.

1          D. Costa  - Confidential

2          Does that refer to Kelli Troccoli?

3     A.    Yes.

4     Q.    Is it fair to say that there was a

5  considerable amount of friction between

6  Ms. Fischman and Ms. Troccoli during their mutual

7  employment at MCHA?

8          MS. GUERON:  Objection.

9     A.    At times, yes.

10     Q.    Are you aware of what led to that

11  friction?

12     A.    I don't quite understand the question.

13     Q.    So, during your tenure as general

14  counsel, you supervised Ms. Fischman, correct?

15     A.    Yes.

16     Q.    You also supervised Ms. Troccoli,

17  correct?

18     A.    Yes.

19     Q.    It came to your attention that, as you

20  put it, at times they were not getting along,

21  correct?

22     A.    Yes.

23     Q.    Did you take any steps to remediate

24  that friction between these two individuals?

25     A.    I spoke to each of them from time to

1              D. Costa  - Confidential

2    time, and I requested that Pat Saunders speak to

3    each of them.

4         Q.    Did you form any conclusions about the

5    source of the friction between them?

6         A.    I never identified one source, no.

7         Q.    Do you know why they didn't get along?

8              MS. GUERON:  Objection.

9         A.    Sometimes people don't get along.

10        Q.    Do you know whether Ms. Fischman

11   viewed Ms. Troccoli as attempting to undermine

12   her?

13        A.    There came a time when Jennifer told

14   me that she believed that Kelli was trying to

15   undermine her.

16        Q.    Once you were informed of

17   Ms. Fischman's view, did you take any steps to

18   investigate the situation?

19        A.    I referred it to Pat Saunders.

20        Q.    When you say referred it to Pat

21   Saunders, did you direct Pat Saunders to take any

22   actions?

23        A.    I don't recall exactly what the

24   discussions were.  Yeah, I don't recall.

25        Q.    Did you review any of the

1                D. Costa  - Confidential

2    communications between Ms. Fischman and

3    Ms. Troccoli?

4         A.    In what time period, with what -- on

5    what topic?

6         Q.    On the topic of their interpersonal

7    relationships, did you review any of their

8    communications in order to try to understand what

9    the difficulty was that they were having with each

10   other?

11               MS. GUERON:  Again, time period?

12        Q.    You just said you became aware that

13   they were not getting along at times, correct?

14        A.    Yes.

15        Q.    Okay.

16        A.    When I was president, I reviewed

17   documents that -- I reviewed communications

18   between Ms. Troccoli and Ms. Fischman and related

19   documents.

20        Q.    Did you form any conclusions about the

21   bases for their not getting along?

22        A.    I concluded that each had a very short

23   fuse with the other, and that there were a number

24   of factors that contributed to Ms. Fischman being

25   unhappy with Kelli, and vice versa.

```
1                    D. Costa  - Confidential
2          Q.    Did there come a time when
3     Ms. Troccoli informed you that Ms. Fischman had
4     altered one of her presentations?
5          A.    I don't specifically remember that.
6          Q.    During your tenure as general counsel,
7     did you alter the work product of the personnel
8     that you supervised?
9          A.    Yes.
10              MS. GUERON:  Objection.
11         Q.    And that was within your purview as
12    general counsel, correct?
13         A.    Yes.
14         Q.    So, to the extent that Ms. Fischman,
15    in fact, did modify any of Ms. Troccoli's
16    presentations, it would have been within the scope
17    of her duties to do so, correct?
18              MS. GUERON:  Objection.
19         A.    I'm not in a position to say.
20         Q.    All right.  Turning your attention to
21    the next paragraph, referencing Project Genesis.
22              Is Project Genesis an acquisition that
23    took place?
24         A.    Yes.
25         Q.    What geographical area did it take
```

```
 1                    D. Costa  - Confidential
 2    place in?
 3          A.    Brazil.
 4          Q.    Who was the primary point of contact
 5    between MCHA on that project?
 6          A.    The client contact?
 7          Q.    Yes.  Who was your primary contact?
 8          A.    The client contact was Ciro Ahumada,
 9    the CEO, and me.  I was a member of the board at
10    the time.
11          Q.    Now, in this document, are you
12    referencing a particular event that took place in
13    connection with Project Genesis?
14          A.    Yes.
15          Q.    Was there a no go -- sorry a go/no go
16    discussion?
17          A.    There was a one and-a-half-day board
18    meeting that culminated in a go/no go discussion.
19          Q.    When did that discussion take place?
20          A.    Again, I believe it was summer 2015.
21          Q.    Can you be any more specific?
22          A.    No.
23          Q.    Was it after August?
24          A.    I don't recall.
25          Q.    Was that during your tenure as
```

```
 1              D. Costa  - Confidential
 2   president?
 3        A.   Yes.
 4        Q.   So that's in 2015, the summertime?
 5        A.   Correct.
 6        Q.   Now, generally speaking, what were
 7   Ms. Fischman's duties in connection with that
 8   transaction?
 9        A.   So, her job was to run that M&A
10   transaction, working closely with me as a client
11   and as her boss, and working with Ciro Ahumada as
12   client and CEO of Qualicaps.
13        Q.   When you say working with me as her
14   client, in what capacity were you the client?
15        A.   A lot of the requests passed through
16   me.  A lot of requests that would normally be made
17   by a client went through me.
18        Q.   So are the requests that you're
19   referencing from Qualicaps?
20        A.   Related to the -- to Project Genesis.
21        Q.   The requests that were made related to
22   project Genesis, did any of them originate from a
23   point other than Qualicaps?
24        A.   No.
25        Q.   Okay.
```

```
 1                  D. Costa  - Confidential
 2         A.    No.
 3         Q.    So when you're referring to yourself
 4   as a client, do you mean the agent of the client?
 5                MS. GUERON:  Objection.
 6                MS. COLWIN:  Objection.
 7         A.    No.
 8         Q.    Are you acting as a principal?
 9         A.    No.
10         Q.    Okay.
11         A.    I can't speak to whether agent is the
12   appropriate word.
13         Q.    You're acting in the capacity of an
14   attorney or a non-attorney?
15         A.    A non-attorney.
16         Q.    And in that capacity, you're not the
17   principal, right?
18                MS. GUERON:  Objection.
19         A.    We didn't use the word principal, so
20   I'm not sure what the -- I didn't own the company,
21   no.
22         Q.    Okay.  In a transaction, right, there
23   are counterparties, correct?
24         A.    Yes.
25         Q.    You weren't one of the counterparties?
```

1                    D. Costa  - Confidential

2         A.    I was on the Board of Directors and I

3    was brought on the board, in part, to oversee M&A.

4         Q.    Which Board of Directors were you

5    referring to?

6         A.    Qualicaps, Inc.

7         Q.    So at the time of this transaction,

8    you were on the Board of Directors of Qualicaps?

9         A.    Correct.

10        Q.    And you were also the president of

11   MCHA?

12        A.    Correct.

13        Q.    So you were acting in a dual role?

14              MS. COLWIN:  Objection.

15        A.    Yes.

16        Q.    Were you compensated for being part of

17   the board at Qualicaps?

18        A.    I had a contract with Qualicaps, and

19   there was a dollar amount that was designated to

20   cover my service, and I do not recall how that was

21   paid.

22        Q.    Was it a material por -- partial

23   portion of your compensation?

24              MS. COLWIN:  Objection.

25        A.    No, it was not.

```
 1              D. Costa  - Confidential
 2        Q.    Was any portion of Project Genesis
 3    involving a legal risk analysis?
 4        A.    Yes.
 5        Q.    Who was responsible for that?
 6        A.    Jennifer.
 7        Q.    What is a legal risk analysis?
 8        A.    It can mean a lot of different things,
 9    but her responsibility was to identify the legal
10    risks that existed within Genex, the company that
11    was being acquired, with the support of Penyar
12    Netta (phonetic), the outside law firm that was
13    being used, and to deliver that information to the
14    board and to Mr. Ahumada to help with the decision
15    whether to go through with the acquisition.
16        Q.    So, the scope of her job duties in
17    connection with this transaction was to identify
18    and communicate legal risks, correct?
19        A.    That was one of her responsibilities,
20    yes.
21        Q.    Did she identify legal risks?
22        A.    Yes, she did.
23        Q.    Did she communicate legal risks?
24        A.    Yes, she did.
25        Q.    Were there any legal risks that she
```

1                D. Costa  - Confidential

2    failed to identify?

3         A.    Not that I'm aware of.

4         Q.    Were there any legal risks that she

5    failed to communicate?

6         A.    Not that I'm aware of.

7         Q.    Did she have any other job duties

8    related to this transaction?

9         A.    Oh, yes.

10        Q.    Could you generally let me know what

11   they are?

12        A.    Identifying -- at the beginning,

13   identifying financial advisors, working with the

14   financial advisors, working with the outside

15   counsel, supporting due diligence.  Yeah.  Just

16   the full range of M&A transaction-related

17   responsibilities.

18        Q.    Did she faithfully execute those

19   duties?

20             MS. COLWIN:  Objection.

21        A.    She executed those duties, not without

22   problems.

23             MR. BERMAN:  Objection to the

24        nonresponsive portion of that answer.

25        Q.    Are there any problems related to

1              D. Costa  - Confidential

2    Project Genesis that are not reflected in this

3    document?

4         A.    Yes, there are.

5         Q.    What types of problems?

6         A.    There was her unwillingness to

7    communicate with me as a client in a way that made

8    the process run as smoothly as possible.  We

9    argued about the selection of financial advisors.

10   We argued about the payment of financial advisors.

11   There were various issues that arose earlier in

12   the transaction, prior to this meeting.  And there

13   was also a time when I asked Jennifer if she

14   needed help, that she appeared to be overwhelmed,

15   that I was concerned about the quality of the

16   work, and her -- part of her reaction -- response

17   to me was to say, okay, then you run this deal,

18   I'm off it.  She then retracted that.  But I would

19   say that was a problem with this transaction.

20        Q.    Any other problems that you didn't

21   relate to me just now?

22             MS. COLWIN:  Objection.

23        A.    I -- there might be.  Those are the

24   things that come to mind right away.

25        Q.    If you think of any others, will you

1                    D. Costa  - Confidential

2     let me know?

3          A.    Yes.

4          Q.    In your view, was Ms. Fischman's

5     performance on the Project Genesis matter, would

6     that merit a demotion, on its own?

7          A.    No.

8          Q.    Would it merit termination?

9          A.    No.

10          Q.    What about with respect to the

11    interactions with Ms. Troccoli?

12               MR. FOR:  You mean independently or

13          cumulatively?

14               MR. BERMAN:  Independently.

15          A.    If it were truly in a vacuum, no, it

16    would not.

17          Q.    Does that apply to both termination

18    and demotion?

19          A.    Yes.

20          Q.    What about with respect to the 4010

21    issue?

22               MS. GUERON:  Same question?  In a

23          vacuum?

24               MR. BERMAN:  Same question.

25          A.    Same question -- same answer.  No.

```
 1                D. Costa  - Confidential
 2         Q.    What about Filtech, same answer?
 3         A.    Same answer.
 4         Q.    What about Comtrex, same answer?
 5         A.    Same answer.
 6         Q.    During your tenure as general counsel,
 7    did you ever discipline Ms. Fischman?
 8         A.    As general counsel?
 9         Q.    Yes.
10         A.    I would not say I ever disciplined
11    her, no.
12         Q.    What about as president?
13         A.    No, I never disciplined her.
14         Q.    Did you ever issue her a written
15    warning?
16         A.    No.
17         Q.    Did you ever inform her that she
18    violated any company policy?
19         A.    No.
20         Q.    Any company procedure?
21         A.    I notified her that I thought certain
22    things she did were not in compliance with good
23    practice and procedures, but no technical
24    violation of any procedure, no.
25         Q.    Okay.  Ms. Fischman received a
```

1                    D. Costa  - Confidential

2    performance review after the November 2015 review.

3    Correct?

4         A.    I believe so.

5         Q.    Did you have any role in preparing

6    that performance review?

7         A.    No, I did not.

8         Q.    Did you see a draft of that

9    performance review before it was presented to

10   Ms. Fischman?

11        A.    I don't recall.

12        Q.    Did you have any discussions with

13   Ms. Saunders concerning delivery of Ms. Fischman's

14   2016 performance review?

15        A.    I don't recall.

16        Q.    At the time when you were having

17   discussions with Mr. Oliva about taking the

18   general counsel position, did you inform him that

19   there was an incumbent in the role in an acting

20   capacity?

21        A.    Yes.

22        Q.    Did you have any conversations with

23   Mr. Oliva concerning how the transition would be

24   managed from an acting general counsel role under

25   Ms. Fischman to a general counsel role under

```
 1              D. Costa  - Confidential
 2   Mr. Oliva?
 3              MS. GUERON:  What time period are we
 4        talking about?
 5              MR. BERMAN:  I'm talking about the
 6        period leading up to his hiring.
 7        A.    I had various discussions with him
 8   about taking on the role.
 9        Q.    Did any of those discussions include
10   transitioning Ms. Fischman out of the role?
11        A.    Yes.
12        Q.    Were any of these discussions after
13   August of 2015?
14        A.    They were all after August 2015.  We
15   had no discussions specifically about the role at
16   that time.
17        Q.    So, this is after you had first
18   expressed a desire to terminate Ms. Fischman,
19   correct?
20              MS. COLWIN:  Objection.
21        A.    My first meeting with Nick Oliva, my
22   first discussion ever about the role, was after I
23   had already had discussions internally at MCHA and
24   with MCHC about terminating or demoting
25   Ms. Fischman.
```

1                    D. Costa  - Confidential

2          Q.    Did you at any point instruct

3      Mr. Oliva to document his interactions with

4      Ms. Fischman?

5          A.    You mean after he began his role as

6      general counsel?

7          Q.    Yes.

8          A.    No.

9          Q.    Were you aware that he was documenting

10     his interactions with Ms. Fischman?

11         A.    I'm generally aware that, unlike me,

12     Nick is a note taker.

13         Q.    Do you know whether he takes notes of

14     his interactions with any other personnel?

15         A.    The answer is the same.  I'm aware

16     he's, in general, a note taker.  That's all I

17     know.

18               MR. BERMAN:  Let's take a quick break.

19               (Whereupon, a recess was taken at this

20          time.)

21               MR. BERMAN:  We're back on the record.

22         Q.    Ms. Costa, I asked you previously

23     whether you had any discussions with Mr. Oliva

24     about documenting Ms. Fischman's performance, and

25     you asked me to clarify whether that was before or

1          D. Costa  - Confidential

2    after he joined the company on November 30, 2015,

3    correct?

4          A.    Yes.

5          Q.    Does your answer change if I change

6    the time period to before he was brought on?

7          A.    No, it doesn't.

8          Q.    Okay.  Thank you for clarifying that.

9                Did you have any discussions with

10   Mr. Oliva before November 30th about your concern

11   or potential desire to terminate Ms. Fischman?

12         A.    Yes.

13         Q.    What was the nature of those

14   discussions?

15         A.    When I saw Nick, after my birthday in

16   August of 2015, he complained to me about his job

17   and I complained to him about the person in the

18   role of acting general counsel.  And I said, too

19   bad you won't -- you wouldn't consider the role of

20   GC.  And that was what I communicated to him.

21         Q.    Did you communicate to Mr. Oliva that

22   you had considered terminating Ms. Fischman?

23         A.    I don't remember if I specifically

24   said that.

25         Q.    Wouldn't that be something that an

1              D. Costa  - Confidential

2    oncoming general counsel ought to know?

3        A.    Oh, eventually.  I'm sorry.  I was

4    answering the question about that first

5    interaction.

6        Q.    Okay.

7        A.    Subsequently, subsequent to that

8    discussion, prior to him taking the role in

9    November 30, I communicated to Mr. Oliva that I

10   had considered terminating Ms. Fischman, but that

11   I concluded that it was in the best interests of

12   MCHA not to do so.

13       Q.    Did you convey to Mr. Oliva the

14   reasoning that underlaid your consideration of

15   terminating Ms. Fischman?

16       A.    Yes.

17       Q.    What bases did you communicate to

18   Mr. Oliva?

19       A.    I do not remember if I shared the

20   November 2015 document initially, but at some

21   point I did, and at some point I elaborated on all

22   of the points in that document, as well as the

23   other issues that I did not include in that

24   document.

25       Q.    So when you say elaborated, you mean

1          D. Costa  - Confidential

2    to?

3          A.    To Mr. Oliva.

4          Q.    Okay.  Was that verbal?

5          A.    Yes.

6          Q.    Was it in writing?

7          A.    No, it wasn't in writing.

8          Q.    With respect to -- you just mentioned

9    that there were issues that were not referenced in

10   the performance review.

11               Have you told me about those yet?

12         A.    No.  Not unless it was responsive to a

13   question you asked me, no.

14         Q.    What other issues were there that were

15   underlying your consideration of terminating

16   Ms. Fischman that were not reflected in the

17   November performance review?

18         A.    There were underlying factors related

19   to Comtrex, related to the 4010 issue, related to

20   Genesis, although I told you what I could remember

21   of those, related to Filtech; and then I talked

22   about other things that had occurred and other

23   information I had received during my tenure as

24   acting general counsel.

25         Q.    Okay.  Maybe I'm not understanding,

1                    D. Costa  - Confidential

2      but didn't the November performance review cover

3      Comtrex?

4           A.    It touched on it in a couple of

5      sentences.

6           Q.    Okay.

7           A.    It was --

8           Q.    So there was more detail than that?

9           A.    There was more detail than that, and I

10     shared it with him.

11          Q.    But is the high-level substance of the

12     critique encapsulated within that review?

13          A.    The most immediate issue was

14     encapsulated in that review, yes.

15          Q.    Okay.  Same question with regard to

16     the 4010?

17          A.    That specific issue, the most

18     immediate factors were encapsulated -- were

19     summarized in that review.

20          Q.    And the Filtech issues, were they also

21     summarized in there?

22          A.    Yes.  Again, I don't want to give you

23     the impression that I listed everything.  I did

24     not.  I put enough information in there that I

25     thought could communicate for purposes of that

1           D. Costa  - Confidential

2     document.  I didn't want it to be 20 pages long.

3           Q.     Are you suggesting that it would be 20

4     pages long if you provided more detail, or is that

5     hyperbole?

6           A.     That was hyperbole, but I could have

7     filled 20 pages.

8           Q.     You mentioned Comtrex, 4010, Genesis,

9     which I think you went into more detail, correct?

10          A.     Yes.

11          Q.     Filtech?

12          A.     Yes.

13          Q.     And then you said other?

14          A.     Yes.

15          Q.     What was other?

16          A.     The other was feedback I got from

17    employees at MCHA and from clients.  Other was my

18    personal interactions with her.  Other was

19    concerns I had with her about her cultural

20    insensitivity.  Other was my sense that she was

21    overwhelmed in the role, and additional points

22    along those lines.

23          Q.     Okay.  Let's go through those.

24                 Feedback from MCHA clients.  Which

25    ones?

1                 D. Costa  - Confidential

2        A.    There were quite a few.  I routinely

3    solicited input for everyone who reported to me,

4    not just Jennifer.  I got negative feedback from

5    Johei Takimoto.  I got negative feedback from Bill

6    Radlein.  I got negative feedback from a number of

7    business heads.  At this moment, I can't remember

8    specifically.

9        Q.    If you recall any names other than

10   Takimoto and Radlein, will you let me know?

11       A.    Yes.

12       Q.    We can leave a blank in the transcript

13   if you want to fill it in.

14             Would you like to do that?

15       A.    If I think of any, I will let you

16   know.

17             MR. BERMAN:  Please leave a gap in the

18        transcript where she can fill in the names,

19        if she wishes.

20   (INSERT)_____

21       Q.    You said feedback from MCHA clients.

22             Did you say also feedback from MCHA

23   employees?

24       A.    Yes.

25       Q.    Which ones?

1                  D. Costa  - Confidential

2         A.    Kathryn Roche, Andy Csaszar, Jordan

3    Elbaum, Kelli Troccoli.  To a lesser extent, Brian

4    Connors.  Those are the names that come to mind.

5         Q.    Other than Ms. Troccoli, who we've

6    discussed in part already, are there any documents

7    reflecting the feedback that you just related to

8    me from Mr. Takimoto, Mr. Radlein, any of the

9    business heads, or any of the other individuals

10   you just named?

11        A.    The only thing I can recall, I know

12   that there are documents that reference

13   Mr. Takimoto's concerns about her, but that's only

14   in relation to the Comtrex litigation.  It started

15   long before then.  There is no documentation.  No.

16   In general, I would -- I don't recall.

17        Q.    During the lead-up to Ms. Fischman

18   transitioning to the acting general counsel role,

19   did you have any discussions with her concerning

20   reporting to Japan?

21             MS. GUERON:  Objection.

22        A.    Can you ask that question?  I'm not

23   sure exactly what you're getting it.

24        Q.    Let me be more specific.

25             During your communications with

1                D. Costa  - Confidential

2   Ms. Fischman from approximately December 2014

3   until approximately mid-April 2015, you were

4   helping her to prepare to transition for the new

5   role of acting general counsel and CCO, correct?

6        A.    Correct.

7        Q.    Did any of your discussions include

8   communications to Masanori Sakaguchi?

9        A.    Yes.

10        Q.    What was the general nature of that

11   piece of discussion?

12        A.    I generally recall she asked me, with

13   reference to specific items, should I report this

14   to Mr. Sakaguchi?  Should I report this to

15   Mr. Sakaguchi?  I do not remember what topics

16   those were.  And I either said yes or no,

17   depending on what the subject matter was.

18        Q.    Was Mr. Sakaguchi one of

19   Ms. Fischman's clients?

20        A.    He was a client in the respect that

21   they had co-clients, as I had explained earlier.

22        Q.    I'm confused by your response, so

23   could you clarify, because Mr. Sakaguchi is an

24   attorney, correct?

25        A.    Yes.

1              D. Costa  - Confidential

2      Q.    So when you refer to them having

3  co-clients, that can mean different things.  That

4  could mean, for example, they're in a relationship

5  as attorneys representing the same client, or it

6  could mean something different.

7              How do you mean it?

8      A.    So, I gave examples earlier.  I

9  explained earlier that there are times when we

10  were both supporting the same business unit,

11  sometimes on the same project.  There are also

12  instances where the client maybe did not

13  communicate well in English, so we used MCHJ as a

14  go-between.  There were times when, because the

15  client was located in Japan, we worked with MCHJ.

16  They're -- I don't think I would describe MCHJ as

17  a client.

18      Q.    So then, just to make it more literal,

19  do you literally mean to imply that Mr. Sakaguchi

20  is a legal client of Ms. Fischman in the course of

21  her conduct as an attorney?

22      A.    I thought I just said -- maybe I

23  misspoke.  I thought I just said that I wouldn't

24  characterize MCHJ as a client.

25      Q.    You said MCHJ, and I'm referring to

```
 1              D. Costa  - Confidential
 2    Mr. Sakaguchi individually.
 3         A.    Oh, I'm sorry.
 4               Same answer.  No.
 5         Q.    Thank you for clarifying.  Okay.
 6               In your own tenure as GCC -- general
 7    corp -- general counsel, excuse me, for MCHA, did
 8    you have difficulties communicating with
 9    Mr. Sakaguchi?
10         A.    I did have some difficulty, yes, which
11    is why sometimes I recommended that Jennifer not
12    communicate with him.
13         Q.    Okay.  What was, in your view, the
14    basis for the difficulty in communicating with
15    Mr. Sakaguchi?
16         A.    I found him to be a difficult person
17    in general.
18         Q.    Was he unusual in that respect,
19    compared to other individuals you've interacted
20    with in performing the course of your duties?
21         A.    Yes, he was.
22         Q.    During the time when Ms. Fischman was
23    in the acting general counsel role, did she
24    maintain an office?
25         A.    An office in the offices of MCHA?
```

```
 1                D. Costa  - Confidential

 2        Q.     Yes.

 3        A.     Yes.

 4        Q.     Where was it in comparison to your

 5    office?

 6        A.     When she was acting general counsel,

 7    she sat in the office that had previously been

 8    mine as general counsel, which made us down the

 9    hall from each other.

10        Q.     Okay.  Thank you.

11               So if you wanted to meet with her

12    during that time, you had the ability to do so,

13    correct?

14        A.     And vice versa, yes.

15        Q.     The goals and plans that we saw in one

16    of the performance reviews, do you recall we

17    looked at those?

18        A.     In general.  I believe they're in

19    every performance evaluation.

20        Q.     Weren't there specific goals and plans

21    that Ms. Fischman provided to you in connection

22    with her assuming the role of acting general

23    counsel?

24        A.     They were more extensive than goals

25    and plans that were included in any other review,
```

1              D. Costa  - Confidential

2    yes.

3         Q.    Is there a term we can use to relate

4    to those, so that we'll know we're talking about a

5    specific set of them?

6         A.    The 2015 --

7         Q.    Okay.  So --

8         A.    -- goals.

9         Q.    The 2015 goals and plans?

10        A.    Yes.

11        Q.    The substance of the subject matter in

12   those goals and plans, were those the same issues

13   that you had been discussing during the December

14   2014 to April 2015 period with Ms. Fischman?

15        A.    At least in part, yes.

16        Q.    Okay.  So then, was it your

17   understanding that she developed those 2015 goals

18   and plans on the basis of your dialogue during

19   that window of time from December of 2014 to April

20   2015?

21        A.    I expected her to do that, yes.

22        Q.    Did those goals and plans comport with

23   your expectation of the duties and

24   responsibilities of the acting general counsel

25   position?

1                D. Costa  - Confidential

2                MS. GUERON:  Objection.

3        A.    I don't specifically recall what I

4   thought at the time, but, sitting here, what I

5   remember is I thought that those were good goals

6   for her first year in that role.

7        Q.    During your conversations with

8   Ms. Fischman between December 2014 and April 2015,

9   did there come a time when you instructed

10  Ms. Fischman that she had to own the compliance

11  function?

12       A.    Yes.

13       Q.    What does it mean to own the

14  compliance function?

15       A.    So, up until that point in time, she

16  had been an individual contributor to the

17  compliance function.  She had led many compliance

18  trainings, she had advised individual clients on

19  compliance matters.  What she had not done is

20  viewed compliance as a whole, thinking about what

21  are the issues that are important for compliance

22  in our company that reflected what's happening in

23  the industry, what the best in class compliance

24  programs looked like, and what the specific issues

25  that arose throughout the company suggested were

1          D. Costa  - Confidential

2     important to us.

3          Q.    Okay.  So, with respect to those

4     high-level compliance subjects -- I'll just use

5     that term; is that okay?

6          A.    That's fine.

7          Q.    With respect to those subjects, did

8     you perform those duties at any time prior to

9     joining MCHA or its predecessor entities?

10          A.    No.

11          Q.    So, you learned how to do those after

12     you first started in the position as general

13     counsel, correct?

14          A.    Yes.  I created the compliance program

15     from scratch.  It was the first compliance program

16     globally in Mitsubishi Chemical, and it started

17     small and developed over time.

18          Q.    Prior to becoming the acting general

19     counsel, did Ms. Fischman deliver compliance

20     training to any affiliates?

21          A.    Yes.

22          Q.    Did she deliver compliance training to

23     any of the expatriate employees?

24          A.    Yes.

25          Q.    Was Ms. Fischman responsible for

```
 1              D. Costa  - Confidential
 2    delivering expatriate training in New Jersey in
 3    2015?
 4         A.   Yes.
 5         Q.   What about in Virginia?
 6         A.   I don't -- I wasn't there, I don't
 7    specifically recall, but probably.
 8         Q.   Did you attend the compliance training
 9    Ms. Fischman attended in New Jersey?
10         A.   I attended one training in New Jersey.
11         Q.   Was Ms. Fischman in attendance as
12    well?
13         A.   Yes.
14         Q.   Did you have seats at the function?
15         A.   Yes.
16         Q.   Were your seats adjacent?
17         A.   Probably.
18         Q.   Did you know she was there when you
19    were there?
20         A.   Yes.
21         Q.   You saw her?
22         A.   Yes.
23         Q.   Did you direct her to not be present
24    at that location?
25         A.   No.
```

1                    D. Costa  - Confidential

2          Q.      Did you direct her to leave the

3    location when you saw her there?

4          A.      No.  She delivered a talk.

5          Q.      Approximately how many people were in

6    attendance?

7          A.      I think it was well-attended.  I think

8    it was large.  I don't recall.  Dozens.

9          Q.      Did you view it as important for

10   Ms. Fischman to be there in the New Jersey

11   presentation?

12         A.      Yes.

13         Q.      With respect to those conversations

14   you had with Ms. Fischman between December 2014

15   and April 2015, did those conversations -- or did

16   conversations of that same type continue with

17   Ms. Fischman after April of 2015?

18         A.      Yes.

19         Q.      And for approximately how long did

20   those conversations continue, in terms of calendar

21   time elapsing?

22         A.      I was still giving her opportunities

23   and developing her into October of 2015.

24         Q.      So, from that period, between April of

25   2015 and October of 2015, was Ms. Fischman

```
 1                D. Costa  - Confidential
 2    responsible for the Brazilian acquisition?
 3         A.    Except when she briefly ceded it to
 4    me, yes.
 5         Q.    That's Project Genesis?
 6         A.    Yes.
 7         Q.    Was she responsible for compliance?
 8         A.    Yes.
 9         Q.    Was she responsible for supporting the
10    affiliates?
11         A.    Yes.
12         Q.    And providing them with legal
13    services?
14         A.    Yes.
15         Q.    And with respect to the position that
16    Ms. Fischman had vacated, right, that was an
17    assistant general counsel position?
18         A.    Uh-huh.
19               THE REPORTER:  Is that a yes?
20               THE WITNESS:  I'm sorry.  I'll wait.
21         Q.    With respect to that position, was it
22    an assistant general counsel position?
23         A.    She vacated an assistant general
24    counsel position.
25         Q.    So, after she vacated that position
```

1              D. Costa  - Confidential

2     and transitioned into the acting general counsel

3     position, was the position she vacated backfilled?

4          A.    We hired a corporate counsel.  We

5     didn't backfill assistant general counsel.

6          Q.    All right.  So, the corporate counsel

7     position, was that Mr. Rose?

8          A.    Yes.

9          Q.    Is his first name Stephen?

10         A.    Yes.  With a P-H.

11         Q.    And the corporate counsel position is

12    one level below the assistant general counsel

13    position, correct?

14         A.    Correct.

15         Q.    So, did Mr. Rose take on all the

16    duties of the position that Ms. Fischman had

17    vacated?

18         A.    No.

19         Q.    Did he take on any portion of those

20    duties?

21         A.    I believe so.

22         Q.    Whatever portion that he did not take

23    on, did that remain the duty and responsibility of

24    Ms. Fischman?

25         A.    She had the authority to delegate to

1                    D. Costa  - Confidential

2    the other lawyers in the department, and I believe

3    I authorized a temp lawyer, but I don't have a

4    specific recollection about a temp.  But she had

5    the authority to delegate how she chose.

6         Q.    Irrespective of whether she could

7    delegate the work or not, was she still ultimately

8    responsible for performing that work?

9         A.    Of course.

10        Q.    Did you express concerns at any time

11   with Ms. Fischman that you felt she had too much

12   work on her plate?

13        A.    Yes.

14        Q.    Did you ever express concern to

15   Ms. Fischman that you were worried she might have

16   a mental breakdown?

17        A.    No.  That was a term she used when I

18   communicated that I was concerned about her.

19        Q.    Okay.  Did you take any specific steps

20   to address your concern that she had too much on

21   her plate?

22        A.    I -- yes, I did.

23        Q.    What did you do?

24        A.    I went to her.  I told her I had

25   concerns.  I told her that there were a lot of

1                    D. Costa  - Confidential

2     people who could help her with workload, that I

3     was happy to help her figure out how to delegate

4     work.  And, yeah, that's my response.

5          Q.    Did there come a time where you

6     decided to pursue a master's in business

7     administration?

8          A.    Yes.

9          Q.    Approximately when was that?

10         A.    I first proposed it in February 2011

11    and then again in June 2011.

12         Q.    When you say "proposed," who did you

13    mean to propose it to?

14         A.    To the president of MCHA, who was

15    Mr. Tanaka at the time.

16         Q.    Do you know whether he had any

17    discussions concerning your request with anyone

18    outside of MCHA?

19         A.    To my knowledge, the only person he

20    discussed it with was Ms. Yoshisato, who was the

21    incoming president, and would be the one who was

22    working with me while I did the program.

23         Q.    While you were in that program, did

24    that require travel out of the office?

25         A.    Yes, it did.

1              D. Costa  - Confidential

2        Q.    Did it require international travel?

3        A.    Yes, it did.

4        Q.    Were you frequently called upon to be

5    out of the office for this travel?

6        A.    There were four modules, two weeks

7    each, two of ten days, where I was outside the

8    office.  That was over a 16-month period.  I was

9    also out of the office for two modules at NYU

10   Stern, so I didn't have to travel.

11       Q.    During that time when you were out of

12   the office pursuing the MBA, were you still

13   concurrently performing your duties and

14   responsibilities in your role at MCHA?

15       A.    Yes.  I was still general counsel,

16   chief compliance officer.

17       Q.    So you were working and studying at

18   the same time?

19       A.    Yes.

20       Q.    Did you keep a calendar with your

21   schedule from the time when you pursued the MBA?

22       A.    Only whatever type of calendar I might

23   have kept at the time in general.

24       Q.    Would that calendar reflect your time

25   out of office?

1                D. Costa  - Confidential

2        A.    I don't have that calendar.  But, in

3   the moment, it would have, yes.

4        Q.    Is there any other document that still

5   exists that would reflect your time out of the

6   office while you were pursuing the MBA?

7                MS. GUERON:  Objection.

8        A.    I could figure out when I was out of

9   the office by looking at the Web site of the

10  program, but, no, there is no document.

11       Q.    Okay.  Does MCHA retain any

12  attendance-related document for attorneys working

13  there?

14                MS. GUERON:  Objection.

15       A.    We, during a period of time, filled

16  out an attendance chart, which consisted of

17  checking the box whether we were in or out with a

18  key at the bottom which said, if we were out,

19  where we were.

20       Q.    Do you know whether those charts were

21  utilized any time after 2010?

22       A.    I believe they were, yes.

23       Q.    Did there come a time when the company

24  stopped using those charts?

25       A.    Yes.

1                D. Costa  - Confidential

2          Q.     Approximately when did that take

3     place?

4          A.     I don't recall.

5          Q.     Do you recall the year?

6          A.     I don't recall.

7          Q.     Do you know if they still have those

8     charts in 2015?

9          A.     I don't specifically recall.

10         Q.     When those charts were no longer being

11    used, was there any other type of document that

12    took the place of the chart?

13         A.     Not that I'm aware of.

14         Q.     So, you were using these charts for

15    some period of time, and then that practice

16    ceased.  Did any other process or procedure get

17    implemented that would allow you to determine

18    whether the lawyers working for the company were

19    attending the office or not?

20         A.     No.

21         Q.     Were the employees at MCHA, during

22    your tenure as president, issued any kind of

23    electronic key fobs?

24         A.     To get in and out of the office?

25    There was an electronic key fob for all employees

1                    D. Costa  - Confidential

2    of MCHA.

3         Q.    Do you know whether those key fobs

4    record data on whether an attorney was present in

5    the office or not?

6         A.    I have no idea.

7         Q.    Do you know who would know?

8         A.    No.

9         Q.    Do you know if Mr. Fukasawa would

10   know?

11        A.    I don't think he had anything to do

12   with the New York office key fobs, but I don't

13   know.

14        Q.    Okay.  You mentioned an IT person

15   named Harry?

16        A.    Yes.  That's Mr. Fukasawa.

17        Q.    That's the same person?

18        A.    Yes.

19        Q.    Okay.  It says Hideo --

20        A.    Hideo.  Harry was his chosen nickname.

21        Q.    If we wanted to determine whether any

22   of those key fobs recorded the location of

23   attorneys during the year 2015, who would we talk

24   to, to find that out?

25                    MS. GUERON:  Objection.

                    D. Costa  - Confidential

1

2       A.    I think someone who works there now.

3       Q.    If you were the president -- well, you

4   were the president.  If during 2015, during your

5   tenure as president, you wanted to know that

6   information, how would you go about determining

7   the answer?

8       A.    I would have asked Pat Saunders, who's

9   no longer with the company.  I would have asked

10  Yuka Matsugu, who was the administrative assistant

11  at the top of the chart.

12      Q.    Okay.  So, that would be a good place

13  to start looking for the answer.

14            MS. GUERON:  Objection.

15      A.    I asked Yuka most things I didn't know

16  the answer to in the first instance.

17      Q.    Okay.

18            Did there come a time when

19  Ms. Fischman was accused of engaging in unethical

20  behavior?

21            MS. COLWIN:  Objection.

22      A.    Can you be more specific?

23      Q.    During your tenure as president, was

24  Ms. Fischman ever accused of engaging in unethical

25  behavior as an attorney?

1              D. Costa  - Confidential

2              MS. GUERON:  Objection.

3         A.    Nick came to me and said he had

4    concerns that she was engaging in unethical,

5    unprofessional behavior.

6         Q.    Was this with respect to the

7    Genomatica matter?

8         A.    Yes.

9         Q.    Was there any other instance that

10   you're aware of, at any time during Jennifer's

11   tenure, where she was being scrutinized on the

12   basis of her ethical performance of her attorney's

13   duties?

14             MS. GUERON:  Objection.

15             MS. COLWIN:  Objection.

16        A.    No.

17        Q.    Thank you.

18             The issue that you just mentioned in

19   Genomatica, did that arise on or about January 19

20   of 2016?

21        A.    It was in January.

22        Q.    It was in connection --

23        A.    Oh, was it 2017?  It was 2017.

24        Q.    So January 19, 2017, right?

25        A.    2017.

1          D. Costa  - Confidential

2     Q.    Did you take any steps of your own to

3   investigate those claims or concerns?

4          MS. GUERON:  Objection.

5     A.    I did not conduct an investigation.  I

6   reviewed the information provided to me by Nick

7   Oliva.

8     Q.    Did you direct anyone to perform an

9   investigation?

10     A.    Nick was engaged in an investigation.

11   I did not need to ask him to.

12     Q.    During your tenure as general counsel

13   at the company, did you perform any

14   investigations?

15     A.    Many.

16     Q.    Did they have a standard protocol for

17   how you performed them?

18     A.    We did not have a written protocol.

19     Q.    Okay.  Regardless of whether a

20   protocol was written or unwritten, did you have a

21   protocol that you used in performing

22   investigations?

23     A.    They varied by circumstance, but there

24   were many, and there were some general practices I

25   followed in the majority of cases.

1           D. Costa  - Confidential

2      Q.    So, did you take any independent steps

3  to investigate those claims yourself?

4           MS. GUERON:  Objection.

5      A.    As general counsel, it was my

6  responsibility, it was part of my role, to conduct

7  investigations.  I never asked the president to

8  conduct an investigation.

9      Q.    Okay.  In connection with the

10  investigation that Mr. Oliva performed, was that

11  reduced to writing?

12     A.    I don't recall what might have been

13  reduced to writing.

14     Q.    Did you ever receive an investigative

15  report?

16     A.    I don't recall seeing an investigative

17  report.  And I believe it would be responsive to

18  one of your prior questions to say that Pat

19  Saunders was also involved.

20     Q.    I thought you had testified that you

21  reviewed information provided to you by Mr. Oliva?

22     A.    Yeah.  Primarily, yes.  But now I'm

23  saying, I now realize that Pat Saunders was also

24  involved.

25     Q.    Okay.

1             D. Costa  - Confidential

2      A.    I do not recall if she ever presented

3  me with information.

4      Q.    Do you recall whether Mr. Oliva

5  presented you with information?

6             MS. GUERON:  Objection.  Asked and

7       answered.

8      A.    He did.

9      Q.    Was any of that information presented

10 in writing?

11     A.    He shared e-mails, which were in

12 writing.

13     Q.    Who were those e-mails between?

14     A.    They were between and among Josh

15 Berman, Jennifer Fischman, Nick Oliva, Tomoji

16 Minami.  I believe that's all.  That's all I

17 recall.

18     Q.    Did you review any of the e-mails

19 between Mr. Oliva and Mr. Minami concerning the

20 amount of his settlement authority?

21     A.    I was not involved in the settlement

22 with discussion -- I'm sorry, ask the question

23 again.

24            MR. BERMAN:  Could you read it back,

25       please?

1          D. Costa  - Confidential

2          (Whereupon, the requested question was

3     read back by the reporter.)

4     A.    There were e-mail that referred to

5  settlement authority and settlement amounts, yes.

6     Q.    Do you know whether Mr. Oliva's

7  investigation was complete?

8          MS. GUERON:  Objection.

9          MS. COLWIN:  Objection.

10    A.    I don't know the details of his

11 investigation.

12    Q.    Did he provide you with the underlying

13 materials that formed the basis of his

14 investigation?

15    A.    He provided me with underlying

16 materials and with his conclusion.

17    Q.    Did you request any other materials

18 from him other than those that he provided to you?

19    A.    I don't recall if I asked for anything

20 specifically.

21    Q.    In the course of your tenure as

22 president, were there any other investigations

23 that were performed by Mr. Oliva?

24    A.    Relating to MCHA, no, I don't believe

25 so.  I don't recall.

1                D. Costa  - Confidential

2        Q.    Okay.  During your tenure as either

3    president or general counsel, did you supervise

4    any other attorney staff who were performing

5    investigations?

6        A.    Yes.

7        Q.    And with respect to those

8    investigations, did you ever ask the attorneys who

9    were performing the investigations for their

10   underlying materials?

11       A.    Yes.

12       Q.    In any of those investigations, did

13   you ask the attorneys to seek out additional

14   information beyond what they had originally

15   provided to you?

16       A.    I may have.

17       Q.    Did you do that with Mr. Oliva in

18   connection with the investigation of Ms. Fischman?

19       A.    I don't recall asking for anything

20   specifically.

21       Q.    So you don't know then whether there

22   were other pertinent communications or documents

23   that would have had a bearing on Mrs. Fischman's

24   ethical discharge of her attorney's duties, do

25   you?

1              D. Costa  - Confidential

2         A.    What I know is, at the time, I was

3    satisfied with what I received.

4         Q.    At the time, did you have any concern

5    that Mr. Oliva's conduct might itself have

6    violated ethical duties?

7              MS. GUERON:  Objection.

8         A.    I don't recall anything that suggested

9    that to me.

10        Q.    Well, you knew Mr. Oliva was involved

11   in the Genomatica matter, correct?

12        A.    Generally, yes.

13             MR. FORTINSKY:  Objection to form.

14             MR. BERMAN:  What's the objection to

15        form?

16             MR. FORTINSKY:  What does involved in

17        the Genomatica matter mean?

18        Q.    Was Mr. Oliva responsible, as general

19   counsel, for the Genomatica litigation matter?

20        A.    As general counsel, he was responsible

21   for all litigation matters.

22        Q.    Was he specifically and individually

23   involved in the discussions with Mr. Berman

24   concerning settlement of the Genomatica

25   litigation?

1            D. Costa  - Confidential

2            MS. GUERON:  Objection.

3       A.    I don't know.

4       Q.    Did you ask him that?

5       A.    We discussed it, not at the time, but

6   we discussed it in the context of his

7   investigation of the matter that led to Jennifer's

8   termination.

9       Q.    Did you speak to Mr. Berman about that

10   matter?

11       A.    I never spoke to Mr. Berman -- or I

12   don't recall speaking to Mr. Berman directly.

13       Q.    Did there come a time when you came to

14   learn that Ms. Fischman claimed that Mr. Oliva had

15   authorized for a settlement agreement?

16       A.    In this litigation.

17       Q.    In the Genomatica matter.

18       A.    No.  In this litigation, I came to

19   learn that, yes.

20       Q.    Oh, okay.

21            So prior to the commencement of this

22   litigation, you were not aware that Ms. Fischman

23   was making that allegation, correct?

24            MS. COLWIN:  Objection.

25       A.    I did not hear that allegation, no.

1                     D. Costa  - Confidential

2          Q.    Did you take any steps at the time

3     that these ethical allegations arose in January of

4     2017 to see whether there were any other

5     potentially culpable actors in connection with the

6     settlement of the Genomatica matter?

7          A.    Again, I was not investigating the

8     matter.  I relied on what I learned from Pat

9     Saunders and Nick Oliva and what I read in the

10    documents that were presented to me.

11         Q.    Did you consider the possibility that

12    Nick Oliva could have had a conflict of interest

13    in investigating that issue?

14              MS. COLWIN:  Objection.

15              MS. GUERON:  Objection.

16         A.    No, I didn't.

17         Q.    During your tenure as general counsel,

18    were there investigations that you were

19    responsible for where outside counsel was called

20    in?

21         A.    Yes.

22         Q.    Were any of those instances where

23    outside counsel was retained for the

24    investigation, for the purpose of avoiding any

25    potential conflicts?

```
1                    D. Costa  - Confidential

2         A.    At times, yes.

3         Q.    Was considering the possibility of

4    potential conflicts part of your protocol for

5    conducting investigations?

6         A.    Yes.

7         Q.    So, is there some reason why that

8    element of your protocol wasn't considered in this

9    investigation of Ms. Fischman?

10                   MS. GUERON:  Objection.

11                   MS. COLWIN:  Objection.

12        A.    Because the basis for the decision to

13   terminate Jennifer was not limited to what

14   occurred in the communications with Genomatica.

15   It was also how she responded after the issue was

16   discovered, and it boiled down to a trust issue.

17        Q.    So, Ms. Fischman was terminated

18   because there was a trust issue?

19                   MS. GUERON:  Objection --

20                   MS. COLWIN:  Objection --

21                   MS. GUERON:  -- mischaracterizes her

22        testimony.

23        Q.    Did I get that wrong?

24        A.    The fact that Nick Oliva felt that he

25   could no longer trust her was important in my
```

1                    D. Costa  - Confidential

2     approving her termination.  I cannot speak to what

3     were the grounds for him choosing to terminate

4     her.

5         Q.    Were there any other grounds that

6     formed the basis of your approving his decision to

7     terminate Ms. Fischman?

8         A.    I would say it was my concern about

9     her failure to communicate about the Genomatica

10    settlement.  It was her failure to communicate in

11    a way I thought was responsible after Nick learned

12    about the offer to Genomatica, and it was Nick's

13    feeling that it was going to be very difficult for

14    him to continue to work with someone who he didn't

15    feel like he could trust.

16              MR. BERMAN:  Pause there a second.

17         Could you just repeat the response back to

18         me?

19              (Whereupon, the requested answer was

20         read back by the reporter.)

21         A.    So, I'd like to clarify.  It was not

22    his feeling.  It was what he told me in response

23    to the situation.  I was not assuming his feeling.

24    It was based on what he said to me.

25         Q.    That is with respect to the third

1                    D. Costa  - Confidential

2    basis, that it was hard to work with someone that

3    there was no trust with?

4         A.    Correct.

5         Q.    I just wanted to make sure about that.

6    So, with respect to the first of those three

7    bases, the failure to communicate regarding the

8    Genomatica settlement, how do you know that

9    Ms. Fischman failed to communicate regarding the

10   Genomatica settlement without looking at all the

11   communications related to that matter and its

12   settlement?

13              MS. COLWIN:  Objection.

14        A.    No, I looked at them all.

15        Q.    You looked at all of the e-mails

16   concerning the Genomatica settlement?

17        A.    I looked at what I was presented with,

18   yes.

19        Q.    But you don't know if you were

20   presented with all of those communications, do

21   you?

22        A.    No, I don't.

23        Q.    Would it surprise you to learn that

24   there were additional communications about the

25   settlement of the Genomatica matter?

1                    D. Costa  - Confidential

2                    MS. COLWIN:  Objection.

3          A.    Whether I was surprised would depend

4     on the documents.

5          Q.    Okay.  Do you have any understanding

6     of what the scope of --

7                    MR. BERMAN:  Withdrawn.

8          Q.    Are you familiar with the history of

9     the settlement demands in the Genomatica matter?

10         A.    I was not, no.

11         Q.    So you weren't provided with that

12    information at the time of the investigation?

13                   MS. COLWIN:  Objection.

14         A.    That's not what I meant to say.  I

15    thought you asked me a different question.  I was

16    not in the course of the litigation.  Okay?  Let

17    me separate in time between prior to Tomoji Minami

18    saying, I just learned that an offer was made

19    almost two weeks ago, what's going on?  What

20    happened before that and what happened from that

21    moment forward.  I thought your question referred

22    to what happened before that moment.  I was not

23    involved, other than maybe general periodic

24    reports from Nick in the course of his routine

25    reporting to me.

1              D. Costa  - Confidential

2       Q.    Okay.  Thank you for clarifying your

3  response.

4              What I'm asking you about, temporally,

5  is information after January 19 of 2017.  So my

6  question is --

7       A.    January 19th?

8       Q.    After Minami informed Nick there had

9  been a settlement offer, we didn't know about it,

10  I'm paraphrasing, but we're on the same page here,

11  right, January 19th --

12      A.    Okay.

13      Q.    -- there's some kind of communication,

14  and that's the gist of it, right?

15      A.    If that's the date, yes, sometime in

16  January, there was an e-mail received by Nick from

17  Tomoji Minami.

18      Q.    And Nick presented you with that

19  e-mail, correct?

20      A.    Yes.

21      Q.    And he presented you with other

22  e-mails about that same settlement, correct?

23      A.    Yes.

24      Q.    Did Nick present you with information,

25  after January 19, that conveyed the history of the

1          D. Costa  - Confidential

2    settlement demands made in that matter?

3             MS. COLWIN:  Objection.

4          A.    Yes.

5          Q.    How was that presented to you?

6          A.    What I saw was a combination of --

7    what I saw were e-mails, and I also heard a

8    narrative from Nick.

9          Q.    Okay.  Were you provided information

10   about a six-figure settlement demand made by the

11   adverse party in that matter?

12         A.    I don't know.

13         Q.    Were you provided with information

14   about a 1.5 million-dollar settlement demand made

15   by the adverse party in that matter?

16         A.    I don't recall.

17         Q.    Were you provided information about

18   the dollar amount of settlement authority provided

19   by MCHA's client in connection with the Genomatica

20   matter?

21             THE WITNESS:  I need that question

22        again.

23             (Whereupon, the requested question was

24        read back by the reporter.)

25         A.    I have no specific memory of that.

1                    D. Costa  - Confidential

2          Q.    Do you know what an ENE is?

3          A.    I believe it's a form for settlement

4    or mediation.

5          Q.    Okay.  Are you aware that there was an

6    ENE connection with the Genomatica matter?

7          A.    I was generally aware at the time,

8    yes.

9          Q.    Were you provided with information

10   about the scope of an authority that MCHA had to

11   settle the Genomatica matter at the ENE?

12              MS. GUERON:  Objection.

13         A.    I remember there were discussions.  I

14   have no specific recall.

15         Q.    Do you know the dollar amount of the

16   settlement authority that MCHA had in connection

17   with that ENE?

18         A.    Sitting here, I don't recall.

19         Q.    Was it provided to you by Nick?

20              MS. GUERON:  Objection.

21              MS. COLWIN:  Objection.

22         A.    I believe so.

23         Q.    Would it surprise you to learn that

24   there was a written document that was provided to

25   MCHA with unlimited discretion to settle the

1              D. Costa  - Confidential

2    Genomatica matter at the ENE?

3              MS. GUERON:  Objection.

4         A.   If you're suggesting that the client

5    gave MCHE unlimited discretion?

6         Q.   MCHE?

7         A.   I'm sorry.  MCHA unlimited discretion

8    without providing a range?  That would surprise

9    me.

10        Q.   Did Nick ever present you a document

11   reflecting the extent of the settlement authority

12   actually possessed by MCHA at the ENE?

13        A.   I don't recall.

14             (Plaintiff's Exhibit 13, one-page

15        document Bates stamped DEF-001762,

16        confidential, marked for Identification, as

17        of this date.)

18        Q.   For identification, Plaintiff's 13 is

19   a one-page document Bates stamped DEF-001762.

20        A.   Yes.

21        Q.   Ms. Costa, are you looking at the

22   document?

23        A.   Yes, I am.

24        Q.   Have you seen it before?

25        A.   I don't recall.

1                    D. Costa  - Confidential

2          Q.     Can you please read the full text of

3    the document to yourself and let me know when

4    you're done?

5          A.     I have.

6          Q.     Okay.  What is this document?

7          A.     This is a document which is consistent

8    with what was sometimes required when going into

9    settlement discussions that indicates that the

10   person attending on behalf of the company has

11   authority to settle that day, without needing to

12   go back to the client to get their approval.

13         Q.     Okay.  Do you see the reference in the

14   second sentence to "early neutral evaluation"?

15         A.     Yes.

16         Q.     Does that comport with your

17   understanding of what an ENE is?

18         A.     Generally, yes.

19         Q.     So, is that a form of settlement

20   conference?

21         A.     I believe it was.

22         Q.     During your time at Cleary, you were a

23   litigator, correct?

24         A.     Yes.

25         Q.     Did you attend settlement conferences?

1                    D. Costa  - Confidential

2        A.     I attended far more at Mitsubishi

3    Chemical, but, yes.

4        Q.     In the course of your litigation

5    experience attending settlement conference, is it

6    unusual for a judge to require the parties to be

7    present with full settlement authority?

8        A.     No.  That's standard.

9        Q.     So does it surprise you that there was

10    a letter of authorization indicating what the

11    settlement authority was --

12               MS. GUERON:  Objection.

13        A.     -- for the ENE?

14               MS. GUERON:  Objection.

15               MS. COLWIN:  Objection.

16        A.     Yeah, I think you're mischaracterizing

17    the meaning of this letter.  So, this letter

18    doesn't surprise me.  It was required.  It's

19    standard.  I've seen letters like this before.

20    This does not say he had authority to settle for

21    any amount.  He said he had authority to conclude

22    a settlement for -- in the context of that ENE

23    conference.

24        Q.     I'll direct your attention to the last

25    sentence of the document.  Do you see that

1                    D. Costa  - Confidential

2   sentence, it says, "there are no limitations or

3   reservations on your authority to explore

4   settlement options fully, change the settlement

5   position of the company at any time, or agree to

6   settlement terms that are satisfactory and

7   acceptable, in the exercise of your full and

8   plenary discretion."

9            Do you see that sentence?

10      A.   I see that sentence.

11      Q.   Are you familiar with the word

12   plenary?

13      A.   Yes.

14      Q.   Do you know what that means?

15      A.   Well, why don't you tell me what you

16   think it means, so I can confirm if I --

17      Q.   What's --

18      A.   -- share your understanding.

19      Q.   What's your understanding of the

20   meaning of that term?

21            MS. GUERON:  Objection.

22            MS. COLWIN:  Objection.

23      A.   I don't want to define terms.

24      Q.   Okay.  I'll represent to you that

25   plenary means absolutely.

1          D. Costa  - Confidential

2          MS. GUERON:  There's no question

3     pending.

4          Q.   So, does that change your

5     interpretation of what that last sentence means?

6          A.   No, it doesn't.  I read it differently

7     than you do, and I also know what Mitsubishi's

8     policies and practices were, and I interpret this

9     letter in light of what their policies and

10    practices were.

11         Q.   Was this letter presented to you at

12    part of Nick's investigation?

13         A.   I don't specifically recall, but it

14    wouldn't have surprised me one way or the other.

15              MR. BERMAN:  This will be 14.

16              (Plaintiff's Exhibit 14, a multipage

17         document Bates stamped DEF-001828 to 001830,

18         confidential, marked for Identification, as

19         of this date.

20              MR. BERMAN:  For identification,

21         Plaintiff's 14 is a multipage document Bates

22         stamped DEF-001828 to 1830.

23              THE WITNESS:  Yes.

24         Q.   Ms. Costa, have you seen this document

25    before?

                    D. Costa  - Confidential

1

2       A.    Yes.

3       Q.    Can you tell me what it is?

4       A.    It is a redacted version of

5  communications between Nick Oliva and Tomoji

6  Minami relating to settlement of the Genomatica

7  case in November 2016.

8       Q.    Okay.  When did you see this document

9  first?

10      A.    I don't recall.

11      Q.    Was this document presented to you by

12 Nick in the course of his investigation?

13      A.    I don't recall.

14      Q.    Okay.  Can you explain to me --

15           MR. BERMAN:  Withdrawn.

16      Q.    Do you have an understanding of what

17 the first page means, where its text looks like

18 from Tomoji to Nick?

19           MS. GUERON:  Objection.  I don't

20           understand the question.

21      Q.    Do you understand what's happening in

22 this e-mail, what's being communicated between

23 Tomoji and Nick?

24           MS. COLWIN:  Objection.

25           MS. GUERON:  Objection.

 1              D. Costa  - Confidential

 2      A.    What I understand this to mean is

 3  communications between them relevant to whatever

 4  their discussions were as of November 2016.

 5      Q.    So you don't know whether this

 6  pertains to the Genomatica litigation?

 7      A.    Oh, I'm sorry.  Relating to the

 8  Genomatica litigation.

 9      Q.    Okay.  Does this pertain to settlement

10  authority with respect to Genomatica?

11              MS. GUERON:  Objection.  Foundation.

12      A.    It is a communication where they refer

13  to settlement authority.

14      Q.    So, would it surprise you to learn

15  that there was consideration of settlement

16  authority in the amount of $1 million in

17  connection with that matter?

18      A.    No.

19      Q.    Do you know what this matter

20  ultimately settled for?

21      A.    I don't recall.

22      Q.    Do you see on the second page of the

23  document, towards the top center, where there's a

24  communication from Nick to Tomoji, and it looks

25  like there's some quoted language below that?  Do

1                  D. Costa  - Confidential

2    those carat symbols indicate quoted language,

3    usually?

4                  MS. GUERON:  I'm sorry, where is that?

5                  MR. BERMAN:  This text, first page,

6            DEF-1829 at the top.

7            A.    Yeah.  I think that just means it's

8    forwarded.

9            Q.    Forwarded, okay.

10                 Does that indicate that there was some

11   consideration of a settlement authority in the

12   amount of 500,000 or above?

13                 MS. GUERON:  Objection.

14                 MS. COLWIN:  Objection.

15           A.    The document speaks for itself.  I

16   don't know actually what was discussed.

17                 MR. BERMAN:  Mark this one as 15.

18                 (Plaintiff's Exhibit 15, a multipage

19           document Bates stamped DEF-001858 through

20           001862, confidential, marked for

21           Identification, as of this date.)

22                 MR. BERMAN:  For identification,

23           Plaintiff's 15 is multipage document bearing

24           Bates stamp DEF-001858 through 1862.  Let me

25           know when you're ready, Ms. Costa.

1           D. Costa  - Confidential

2           THE WITNESS:  Yes.

3      Q.    Have you seen this document before?

4      A.    Yes.

5      Q.    Can you tell me what it is?

6      A.    It is further communication between

7  Nick and Tomoji in November -- early November 2016

8  relating to the possible settlement of the

9  Genomatica case.

10     Q.    When is the first time you saw this

11  document?

12     A.    I don't recall.

13     Q.    Was this document presented to you by

14  Nick in the course of his investigation?

15     A.    I don't recall.

16          MR. BERMAN:  Mark this 16, please.

17          (Plaintiff's Exhibit 16, a two-page

18          document Bates stamped DEF-000869 to 000870,

19          marked for Identification, as of this date.)

20          MR. BERMAN:  For identification,

21          Plaintiff's 16 is a two-page document Bates

22          stamped DEF-000869 to 70.

23     Q.    Are you looking at the document?

24     A.    Yes.

25     Q.    Have you seen it before?

1                    D. Costa  - Confidential

2          A.    I don't recall seeing this before.

3          Q.    Okay.  Do you know whether this

4    document was presented to you by Nick during the

5    course of his investigation?

6          A.    I don't recall seeing it.

7          Q.    Do you recall any conversations with

8    Nick about the consideration of $1 million of

9    settlement authority?

10         A.    I don't recall.

11               MR. BERMAN:  Mark this one 17.

12               (Plaintiff's Exhibit 17, a multipage

13         document Bates stamped DEF-001746 to 1748,

14         confidential, marked for Identification, as

15         of this date.)

16               MR. BERMAN:  For identification, 17 is

17         a multipage document Bates stamped

18         DEF-001746 to 1748.

19         Q.    Are you looking at the document?

20         A.    Yes.

21         Q.    Have you seen it before?

22         A.    I don't recall.

23         Q.    Can you tell me what it is?

24         A.    It is an e-mail communication among

25    Nick, Jennifer, Tomoji, Josh, and Takimoto

1              D. Costa  - Confidential

2      relating to the Genomatica case and settlement,

3      potential settlement.

4          Q.    And so, the first page of this

5      document, do you agree that it's an e-mail from

6      Nick Oliva to Jennifer Fischman, Tomoji Minami,

7      and cc'ing Joshua Berman and Johei Takimoto?

8          A.    That's what it appears to be.

9              MS. GUERON:  Objection.  She's not an

10             author nor a recipient.  So, I have a

11             continuing objection to asking her about

12             something she's not e-mailed on.

13             MR. BERMAN:  Okay.

14         Q.    Do you see the reference to

15     Takimoto-san at the bottom?

16         A.    Yes.

17         Q.    Is that how Mr. Takimoto was referred

18     to, typically?

19         A.    In some contexts.  He was referred to

20     generally by me as Johei.

21         Q.    Did Nick provide you with a copy of

22     this document in connection with his

23     investigation?

24         A.    I don't remember.

25         Q.    Do you see on the second page of the

1          D. Costa  - Confidential

2     document, Bates stamped 1747, the first full

3     paragraph underneath the redaction?

4          A.    Yes.

5          Q.    Do you see the sentence midway through

6     the paragraph that says, "we finally offered

7     2.0" -- with a dollar sign in front of the 2.0 --

8     "with deferred payments over time and interest"?

9          A.    Yes.

10          Q.    Do you have any comprehension of what

11     that is referring to?

12          A.    No.

13          Q.    Do you know whether MCHA ever made a

14     settlement offer in the Genomatica matter to

15     settle the matter for $2 million?

16               MS. COLWIN:  Objection.

17          A.    I have no knowledge.  I do not know.

18          Q.    So you don't know one way or the

19     other?

20          A.    I don't know one way or the other.

21          Q.    Do you recall earlier when I asked you

22     whether Nick provided you with the history of the

23     settlement demands --

24          A.    Yes.

25          Q.    -- in the litigation?

1                    D. Costa  - Confidential

2                    If there was a 2.0 million-dollar

3    offer, would you have expected it to be included

4    in that information?

5                    MS. GUERON:  Objection.

6                    MS. COLWIN:  Objection.

7         A.    All I know is that this was two months

8    previously, and I don't, sitting here, remember

9    what might have happened between November 2016 and

10   January 2017 that could impact the client's

11   attitude about settlement.  I don't know.

12        Q.    I mean, this allegation that was

13   leveled at Ms. Fischman is very serious, would you

14   agree?

15        A.    I would agree.

16                   MS. COLWIN:  Objection.

17        Q.    An attorney could get disbarred if, in

18   fact, an ethical violation of the type alleged had

19   transpired, correct?

20        A.    I don't have an opinion on that.

21                   MS. GUERON:  Objection.

22                   MS. COLWIN:  Objection.

23        Q.    Okay.  But did you take the matter

24   seriously?

25        A.    I took the matter seriously, yes.

1                 D. Costa  - Confidential

2        Q.    And, in your view, was it, therefore,

3   appropriate and required for a full investigation

4   to take place?

5                 MS. GUERON:  Objection.

6                 MS. COLWIN:  Objection.

7        A.    I believe a full investigation took

8   place.

9        Q.    Okay.  And if a full investigation

10  took place, then you should have been presented

11  with the full results, correct?

12                MS. GUERON:  Objection.

13                MS. COLWIN:  Objection.

14       A.    I have no memory of what I was

15  presented with.

16       Q.    I'm not asking you what has actually

17  happened, I'm asking you what should have happened

18  if it was done properly.

19                MS. GUERON:  That's a hypothetical.

20            She's a fact witness.

21                MR. BERMAN:  She's allowed to answer

22            hypothetical questions.

23                MS. GUERON:  She's a fact witness --

24                MR. BERMAN:  Are you instructing the

25            witness not to answer the question?

1                    D. Costa  - Confidential

2                    MS. GUERON:  No.

3          A.    I would expect that I would be

4    presented with all of the relevant information.

5          Q.    And that would include a comprehensive

6    list of the settlement offers and demands made in

7    the matter?

8                    MS. GUERON:  Objection.

9          A.    I can't say, sitting here, what would

10   have been relevant.

11         Q.    Don't you think the settlement history

12   of the matter would be relevant to the

13   determination of whether Ms. Fischman made an

14   authorized or unauthorized settlement demand?

15                   MS. COLWIN:  Objection.

16                   MS. GUERON:  Objection.

17         A.    I think all information about her

18   authority would be relevant.

19                   MR. BERMAN:  Thank you.

20                   Mark this, please.

21                   (Plaintiff's Exhibit 18, multipage

22            document Bates stamped DEF-1809 to 1812,

23            confidential, marked for Identification, as

24            of this date.)

25                   MR. BERMAN:  For identification,

1          D. Costa  - Confidential

2          Plaintiff's 18 is a multipage document

3          bearing Bates stamp DEF-1809 to 1812.

4     Q.   Are we ready to proceed?

5          Ms. Costa, are you ready to continue?

6     A.   Yes.

7     Q.   Are you looking at the document?

8     A.   I've looked at the document.

9     Q.   Have you seen it before?

10    A.   Yes.

11    Q.   Can you tell me what it is?

12    A.   It is an e-mail communication between

13   Jennifer and Nick dated December 29, 2016, with

14   the last portion redacted and with a different

15   date.

16    Q.   Can you tell me when the first time

17   you saw this document was?

18    A.   I don't recall.

19    Q.   Did Nick provide this to you during

20   the course of his investigation?

21    A.   I don't recall.

22    Q.   During the course of Nick's

23   investigation, did you ever hear Jennifer's side

24   of the story?

25    A.   Jennifer never came to speak to me

1                D. Costa  - Confidential

2    about it, and I was not conducting the

3    investigation, so I did not speak to her directly.

4        Q.    Were you ever presented with her side

5    of the story?

6              MS. GUERON:  Objection.

7        A.    I -- only through Nick and Pat.

8        Q.    When you say only through Nick and

9    Pat, what were you presented with?

10             MS. GUERON:  Objection.

11             MS. COLWIN:  Objection.

12       A.    I was presented with e-mails from

13   Jennifer to Nick and others, where she made

14   various comments as a follow-up to that original

15   e-mail that triggered the investigation.

16       Q.    So you're referring to e-mail

17   communications between Ms. Fischman and

18   Mr. Tomoji, correct?

19       A.    Ms. Fischman and Mr. Tomoji.  Possibly

20   others.  I don't recall.

21       Q.    Other than the e-mail communications,

22   did you ever provide Ms. Fischman with an

23   opportunity to tell you in her own words what

24   happened?

25             MS. GUERON:  Objection.

1                    D. Costa  - Confidential

2        A.    Again, she did not report to me, and I

3    was not conducting the investigation, so, no, I

4    did not ask her.

5        Q.    Did anyone get her own explanation of

6    what happened and present it to you?

7                    MS. GUERON:  Objection.

8                    MS. COLWIN:  Objection.

9        A.    I heard a number of accounts from Nick

10    and from Pat that they said were Jennifer's

11    statements on the matter.  So, we're talking

12    third, fourth-hand information.  Third-hand.

13        Q.    Okay.  Thank you for clarifying.

14                    Were you provided with any written

15    statement written by Jennifer concerning this

16    matter?

17        A.    Other than her e-mail, I don't believe

18    so.

19        Q.    Okay.  So you didn't receive any

20    written statement from Jennifer as part of the

21    investigation?

22                    MS. GUERON:  Objection.

23        A.    I do not recall seeing a written

24    statement from Jennifer.

25        Q.    Okay.  And you didn't request a verbal

```
 1              D. Costa  - Confidential

 2     statement from Jennifer, did you?

 3          A.    I did not conduct interviews, no.

 4          Q.    Did you request a meeting with

 5     Jennifer and Nick?

 6              MS. GUERON:  Objection.

 7          A.    No.

 8          Q.    Did you request a meeting with

 9     Jennifer and Pat Saunders?

10          A.    No.

11              MS. GUERON:  Objection.

12          Q.    Didn't you want to know from her what

13     her side of the story was?

14              MS. GUERON:  Objection.

15              MS. COLWIN:  Objection.

16          A.    By this time, Jennifer had

17     communicated that she didn't want to work in the

18     New York office because I was there.  She turned

19     around and walked the other way when she saw me.

20     I did not believe that my direct involvement

21     speaking to Jennifer would be a contributor to an

22     effective investigation, and my door was open; if

23     she had ever indicated an interest in speaking to

24     me, I would have spoken to her.  But I want to

25     state again, I did not conduct the investigation,
```

1              D. Costa  - Confidential

2    and no president of MCHA, in my memory, was ever

3    directly involved in an investigation.

4         Q.    Did there come a time when you learned

5    that Ms. Fischman's position was that Mr. Oliva

6    had authorized her settlement communication?

7         A.    In this litigation, yes.

8         Q.    And was there a particular occasion

9    upon which Ms. Fischman alleged that Mr. Oliva

10   authorized her communication?

11             MS. GUERON:  Objection.

12        A.    I don't understand your question.

13             MR. BERMAN:  I'll rephrase the

14        question.

15        Q.    Are you aware that there's an

16   allegation in this litigation that on January 5,

17   Ms. Fischman and Mr. Oliva met, discussing the

18   settlement authority?

19        A.    I heard about that in Ms. Fischman's

20   deposition.

21        Q.    Okay.  Was any of that information

22   included in Nick's report concerning the

23   investigation?

24             MS. GUERON:  Objection.

25             MS. COLWIN:  Objection.

1              D. Costa  - Confidential

2      A.    To my knowledge, there was no meeting.

3      Q.    That's not what I asked you.  I asked

4  you if there was any information about a meeting

5  that was included in the information that Nick

6  relayed to you.

7          MS. GUERON:  Objection.

8          MS. COLWIN:  Objection.

9      A.    Nick did not communicate the existence

10  of such a meeting.

11      Q.    Did he say anything to the effect of,

12  no meetings took place?

13          MS. GUERON:  Objection.

14      A.    I don't recall.

15      Q.    Did you ask Mr. Oliva whether, at any

16  time, he had authorized any conveyance of a

17  settlement demand by Ms. Fischman?

18      A.    Yes, I did.

19      Q.    And what was his response?

20      A.    His response was, there had been

21  various discussions leading up to that time about

22  possible levels of authority, but that,

23  immediately preceding that offer, there was no

24  authority given.

25          MR. BERMAN:  Okay.  Mark this, please.

```
 1              D. Costa  - Confidential

 2              (Plaintiff's Exhibit 19, a one-page

 3         document Bates stamped DEF-002257,

 4         confidential, marked for Identification, as

 5         of this date.)

 6              MR. BERMAN:  For identification,

 7         Plaintiff's 19 is a one-page document Bates

 8         stamped DEF-002257.

 9         Q.    Ms. Costa, are you looking at the

10    document?

11         A.    Yes.

12         Q.    Have you seen it before?

13         A.    I don't specifically recall, but it

14    appears to be addressed to me.

15         Q.    Can you tell me what it is?

16         A.    It is an e-mail from Brian Connors to

17    me and Katherine Todarello dated September 6,

18    2016, which has, at the bottom of the thread, an

19    e-mail dated August 30, 2016.

20         Q.    Okay.  You see the top of this

21    document concerning auditing of MCHA in early

22    2017?

23         A.    Yes.

24         Q.    Do you know whether there was an audit

25    of MCHA in early 2017?
```

1                    D. Costa  - Confidential

2         A.    I recall there was some sort of audit.

3         Q.    Okay.  That was during your tenure as

4    president still?

5         A.    Yes.

6         Q.    So if there was an audit of MCHA

7    during that time, you would have known about it,

8    right?

9         A.    Yes.

10        Q.    And that audit was performed by who?

11        A.    Individuals from the internal audit

12   office of MCHC.

13        Q.    Okay.  Is Hideo Inatomi --

14             MR. BERMAN:  Withdrawn.

15        Q.    During your tenure as general counsel

16   at Mitsubishi, did there come a time when Jennifer

17   Fischman was sent to you in Japan?

18        A.    I'm sorry, give me the time frame

19   again?

20        Q.    During your time as general counsel,

21   in the general counsel position --

22        A.    Yes.  Yes.

23             MS. GUERON:  Wait for his question.

24        Q.    So, just to repeat it.  During that

25   period of time, when you were still general

1                D. Costa  - Confidential

2     counsel --

3          A.     Yes.

4          Q.     -- did Ms. Fischman travel to Japan?

5          A.     She did.

6          Q.     Do you know how long, approximately,

7     she had been at the company when that trip took

8     place?

9          A.     No, I don't.

10         Q.     Do you recall whether it was in her

11    first year working at the company?

12         A.     Probably would not have been.

13         Q.     Okay.  And when Mr. Oliva was hired,

14    did he travel to Japan in his first year at the

15    company?

16         A.     Do you mean as general counsel, when

17    he was hired as general counsel?

18         Q.     Yes.

19         A.     Okay.  I'm sorry.  I need the previous

20    question again.  I'm a little confused about time

21    frames.

22              (Whereupon, the requested question was

23         read back by the reporter.)

24         Q.     In Mr. Oliva's first year in his

25    tenure as general counsel, did he travel to Japan?

1                  D. Costa  - Confidential

2          A.    Yes, he did.

3          Q.    And, in fact, before he even rejoined

4    the company as general counsel, were plans already

5    in motion to have him travel to Japan?

6          A.    I don't recall that.

7          Q.    Do you recall any discussions prior to

8    November 30, 2015 concerning him traveling to

9    Japan?

10         A.    I don't recall.

11               MR. BERMAN:  Mark this, please.

12               (Plaintiff's Exhibit 20, a multipage

13         document Bates stamped DEF-2062 to 2065,

14         confidential, marked for Identification, as

15         of this date.)

16               MR. BERMAN:  For identification,

17         Plaintiff's 20 is a multipage document Bates

18         stamped DEF-2062 to 2065.

19               THE WITNESS:  Yes, I read it.

20         Q.    Have you seen this document before?

21         A.    Yes.

22         Q.    Can you tell me what it is?

23         A.    It is an e-mail thread among Nick

24    Oliva, Ken Fujiwara and me, November the 30th,

25    2015.

1                    D. Costa  - Confidential

2        Q.    I'll direct your attention to the very

3    bottom of the second page, continuing on to the

4    third page.  So page 2063 to 2064.

5        A.    Yes.

6        Q.    And on the top of 2064, do you see the

7    first full paragraph there?

8        A.    Yes.

9        Q.    Does that refresh your recollection as

10   to whether Nick went to Japan in his first year as

11   general counsel?

12       A.    I think I told you he did go to Japan

13   his first year as general counsel.

14       Q.    Does it refresh your recollection as

15   to whether there were any discussions before him

16   coming in November 30?

17       A.    This looks like, in the week or two

18   before he started, Ken Fujiwara requested that

19   Nick go to Tokyo.

20            MR. BERMAN:  Mark this, please.

21            (Plaintiff's Exhibit 21, three-page

22       document Bates stamped DEF-000010 to 000012,

23       confidential, marked for Identification, as

24       of this date.)

25            MR. BERMAN:  So, I'll I.D. this one as

1                    D. Costa  - Confidential

2          a three-page document Bates stamped

3          Defendant's 000010 to 12.

4          Q.    Are you looking at the document?

5          A.    Yes.

6          Q.    Have you seen it before?

7          A.    Yes.

8          Q.    Can you tell me what it is?

9          A.    It is an e-mail exchange between me

10   and Jennifer Fischman dated February 26, 2015,

11   regarding a request from the Pharma Group --

12   February 25 and 26, from the -- relating to a

13   request from the Pharma Group for information

14   about her, including her C.V.

15         Q.    Okay.  And on the bottom of the page

16   marked 11, there is a sentence there where it

17   says, "I will also be serving as corporate

18   secretary for several boards of directors for the

19   U.S. subsidiaries."

20                Do you see that text?

21         A.    Yes.

22         Q.    So, first of all, during your tenure

23   at MCHA, was it the practice to have the general

24   counsel serve as the corporate secretary for the

25   affiliates?

1                  D. Costa  - Confidential

2         A.    That was many things that evolved

3    through the course of my tenure.

4         Q.    So that was consistent with your

5    experience?

6              MS. GUERON:  Objection.

7              MS. COLWIN:  Objection.

8         A.    This was true as of that date.

9         Q.    Okay.

10        A.    Many.  I don't know if it was most,

11   but many.

12        Q.    And then, do you see up above that,

13   you responded to Jennifer's e-mail and you stated

14   in your message, "to get you in the right habits:

15   We do not have subsidiaries, we have affiliates,

16   particularly when speaking to anyone other than

17   MCC."

18        A.    Yes.

19        Q.    Do you see that text?

20              Was MCC one of MCHA's clients?

21        A.    Yes.

22        Q.    Was it a significant client?

23        A.    Yes.

24        Q.    Was it the most significant client at

25   the time?

1              D. Costa  - Confidential

2        A.    I don't remember what percentage it

3    was.

4        Q.    So is it fair to say that this e-mail

5    was informing Jennifer that there was different

6    terminology that should be used with respect to

7    the subsidiaries?

8        A.    And -- and informing her, in

9    particular, that using the term subsidiary did not

10   apply to Pharma.  It was not explicit, but this

11   was in the context of a request from Pharma, which

12   was not a subsidiary.  It was an affiliate.  It

13   was a publicly traded company.

14       Q.    Okay.  And in response to your

15   communication, she responded at the top of the

16   first page, correct?

17       A.    Yes.

18       Q.    Did you view that as a professional

19   response?

20       A.    Yes.

21            MR. BERMAN:  Okay.  22.

22            (Plaintiff's Exhibit 22, a four-page

23        document, Bates stamped DEF-000162 to

24        000165, confidential, marked for

25        Identification, as of this date.)

```
 1              D. Costa  - Confidential
 2              MR. BERMAN:  For identification,
 3         Plaintiff's 22 is a three-page document --
 4         excuse me -- a four-page document Bates
 5         stamped DEF-000162 to 165.
 6              THE WITNESS:  Yes.
 7         Q.    Have you seen this document before?
 8         A.    Yes.
 9         Q.    Can you tell me what it is?
10         A.    This is an e-mail exchange between me
11    and Jennifer Fischman, July 26 and 27, containing
12    some feedback about the Genesis project.
13         Q.    Is it fair to say that your feedback
14    included some constructive criticism?
15         A.    I believe so, yes.
16         Q.    Did Jennifer respond to your critique?
17         A.    Yes.
18         Q.    Is her response reflected on the first
19    page of the document?
20         A.    Yes.
21              MR. FORTINSKY:  Objection.
22         Q.    Did Ms. Fischman thank you for the
23    feedback?
24         A.    Yes.
25         Q.    And, in your view, is this a
```

1          D. Costa  - Confidential

2    professional response?

3          A.    Yes.

4          MR. BERMAN:  Next up?

5          (Plaintiff's Exhibit 23, two-page

6          document Bates stamped DEF-000458 to 000459,

7          confidential, marked for Identification, as

8          of this date.)

9          MR. BERMAN:  For identification,

10         Plaintiff's 23 is a two-page document Bates

11         stamped DEF-000458 to 459.

12         Q.    Are you looking at the document?

13         A.    I've looked at it.

14         Q.    Have you seen it before?

15         A.    Yes, I have.

16         Q.    Can you tell me what it is?

17         A.    It is a communication from Mike

18   Gragtmans to me dated November 15, 2015, in

19   response to an e-mail I sent November 11, 2015 to

20   Mike, Dennis Trice, Bill Radlein and Glen Steady.

21         Q.    In that communication you sent on

22   November 11, what was the purpose of that

23   communication?

24         A.    I communicated to many stakeholders of

25   the change of -- the changeover from Jennifer to

1                D. Costa  - Confidential
2   Nick, and this is the communication I sent to four
3   clients.
4        Q.    And then you see on the top of the
5   first page, Mr. Gragtmans' response to you?
6        A.    Yes.
7        Q.    Do you see the last sentence of the
8   paragraph there, or second to last sentence, "I
9   fear she may have been blamed for more issues than
10  is fair.  I just want to make sure the record is
11  set straight in how she conducted herself with my
12  business affairs.  Let me know when we can
13  talk.....I am available Monday to Wednesday before
14  Thanksgiving."
15            Do you see that text?
16       A.    Yes.
17       Q.    Did you ever have a conversation with
18  Mr. Gragtmans about the subject matter of his
19  e-mail?
20       A.    Yes, I did.
21       Q.    What did you say and what did he say
22  during that conversation?
23       A.    He basically repeated his statement
24  that he has in this e-mail, that he wanted to make
25  sure that problems that may have occurred or

```
1              D. Costa  - Confidential

2    complaints that may have been lodged by his

3    business unit were not the primary reason for the

4    employment action taken, and she had a -- he had a

5    fear that she may be blamed for more than was

6    fair.

7         Q.    So, I want to make sure I under -- I

8    don't want to mischaracterize what you're saying,

9    so correct me if I got this wrong.

10             Did he convey to you, in sum or

11   substance, that when he got your e-mail, he was

12   concerned that something related to his business

13   caused you to make the decision to have Mr. Oliva

14   join MCHA as general counsel?

15        A.    He communicated that he was aware

16   that, over the years, there had been complaints

17   about Jennifer relating to his business, and he

18   wanted to make sure that that was not why she --

19   the decision was made.

20        Q.    Okay.  So did he set the record

21   straight?

22        A.    Well, what I told him was that there

23   were many reasons, and that he didn't need to

24   worry that anything he had said in the past was

25   being held against her.
```

```
 1              D. Costa  - Confidential
 2              MR. BERMAN:  Okay.  24.
 3              (Plaintiff's Exhibit 24, a two-page
 4         document Bates stamped DEF-000168 to 000169,
 5         confidential, marked for Identification, as
 6         of this date.)
 7              MR. BERMAN:  For identification,
 8         Plaintiff's 24 is a two-page document Bates
 9         stamped DEF-000168 to 169.
10         Q.    Are you looking at the document?
11         A.    Yes.
12         Q.    Have you seen it before?
13         A.    I don't recall this document.
14         Q.    Okay.  Can you tell me what this is?
15         A.    It is a communication between me and
16    Jennifer Fischman dated August 15, 2015 regarding
17    two words or one line in the engagement letter
18    with Rothschild.
19         Q.    Who is Rothschild?
20         A.    Rothschild was the financial advisor
21    retained for Project Genesis.
22         Q.    So is this taking place during your
23    tenure as general counsel?
24         A.    This is taken -- taking place --
25    sorry.  I'm starting to slur.
```

1          D. Costa  - Confidential

2          This is when I was president and

3    Jennifer was acting general counsel.

4      Q.    Okay.  So is Jennifer asking you a

5    question about legal agreements?

6      A.    She is asking me about the engagement

7    letter with Rothschild.

8      Q.    Is that a contract?

9      A.    That's my understanding, is that

10    that's what she's doing.  That's what I believe

11    this is.

12     Q.    And you responded to her and you gave

13    her the information she was seeking, correct?

14     A.    Correct.

15          MR. BERMAN:  Mark this, please.

16          (Plaintiff's Exhibit 25, a one-page

17          document Bates stamp DEF-209, confidential,

18          marked for Identification, as of this date.)

19          THE WITNESS:  To clarify.  Can you

20          read back what my response was to our

21          exchange about this document.  I want to

22          make sure I spoke accurately, because I kind

23          of went into a blur there for a moment.

24          (Whereupon, the requested answer was

25          read back by the reporter.)

1          D. Costa - Confidential

2          THE WITNESS:  I believe I gave her the

3      information she was seeking.

4          MR. BERMAN:  25 is a one-page document

5      Bates stamped Defendant's 209.

6      Q.    You're looking at the document?

7      A.    I've read it.

8      Q.    Have you seen it before?

9      A.    I don't recall.

10     Q.    Can you tell me what this is?

11     A.    This is an e-mail from Jennifer to me

12     dated August 18, 2018, where she is telling me

13     that the schedule that we had discussed for her

14     visit to Japan would be impacted by a board

15     meeting.

16         MS. GUERON:  I'm sorry.  Just to

17     correct the record, you said 2018.  It's

18     2015.

19         THE WITNESS:  Okay.  August 18, 2015.

20         Thank you.

21     A.    -- about a board meeting that was

22     going to impact her travel plans.

23     Q.    And she sought a recommendation from

24     you?

25     A.    Yes.

1              D. Costa  - Confidential

2        Q.    Do you know if you responded to it?

3        A.    I know I did.

4        Q.    But it could have been verbal?

5        A.    It could have been verbal.

6        Q.    Okay.

7        A.    I remember the discussion.  It was

8   verbal.

9              (Plaintiff's Exhibit 26, a one-page

10        document Bates stamped DEF-000273,

11        confidential, marked for Identification, as

12        of this date.)

13             MR. BERMAN:  For identification,

14        Plaintiff's 26 is a one-page document Bates

15        stamped DEF-000273.

16        Q.    Are you looking at the document?

17        A.    I've read it.

18        Q.    Have you seen it before?

19        A.    Yes.

20        Q.    Can you tell me what it is?

21        A.    It's e-mail from me to Jennifer dated

22   September 1, 2015.

23        Q.    Have you completed your response?

24        A.    I propose that we have a sit-down.

25        Q.    Okay.  Why did you send Ms. Fischman

1                  D. Costa  - Confidential

2      this e-mail?

3          A.    I don't specifically recall.

4          Q.    Do you see the second full sentence,

5      "I am at a loss as to how to work with you and

6      communicate with you"?

7          A.    Yes.

8          Q.    Does that refresh your recollection as

9      to why you sent this e-mail?

10         A.    I don't recall what specifically

11     prompted me to communicate my frustration.

12         Q.    Do you see the first sentence about

13     constant change of direction in recent e-mails?

14         A.    Yes.

15         Q.    Do you know what that relates to?

16         A.    I don't.

17              MR. BERMAN:  Okay.

18              (Plaintiff's Exhibit 27, a three-page

19         document Bates stamped DEF-000334 to 000336,

20         confidential, marked for Identification, as

21         of this date.)

22              MR. BERMAN:  For identification,

23         Plaintiff's 27 is a three-page document

24         Bates stamped DEF-000334 to 36.

25         Q.    Are you looking at the document?

1                  D. Costa  - Confidential

2        A.    Yes, I have read it.

3        Q.    Have you seen it before?

4        A.    I don't recall.

5        Q.    Can you tell me what this is?

6        A.    This is a thread that includes

7    communication among me, Jennifer and Jordan dated

8    September 18, 2015, and then is followed by

9    communication from Jennifer directly to me.

10       Q.    Do you see at the top where it says,

11   "Jennifer, there's no" --

12       A.    I'm sorry.  Dated September 18, 2015.

13       Q.    Okay.  I don't object to you reading

14   dates into the record if you wish, but the

15   document does have dates on it, correct?

16       A.    Yes.  But it also has who it's to and

17   who it's from, and you're asking me to describe

18   the document.  I'm just trying to be accurate.

19       Q.    That's fine.

20             Do you see at the top where it says,

21   "Jennifer, there is no need for me to weigh in"?

22       A.    Yes.

23       Q.    Do you know why you said that to her?

24       A.    I think I was saying that she could go

25   ahead and make the call.

```
 1              D. Costa  - Confidential
 2         Q.    Okay.
 3         A.    On the question that had been raised
 4    by Jordan.
 5         Q.    Okay.  So, these communications that
 6    I've just shown you in these last few exhibits,
 7    24, 25, 26 and 27, they're all around -- they
 8    begin August 5 -- well, just respectively, they're
 9    August 5, August 18, September 1 and September 18.
10              Are you with me so far?
11         A.    Yes.
12         Q.    So then, two months later, you have a
13    review with Ms. Fischman, correct, and you deliver
14    the November 2015 performance review for her,
15    correct?
16         A.    Correct.
17         Q.    So, do you recall, and you can
18    reference it if you wish, that one of your
19    critiques of Ms. Fischman was that she didn't
20    proactively seek you out to communicate?
21         A.    Yes.
22         Q.    So, we've just seen here several
23    examples of her reaching out to you.  So, what's
24    the basis for including in the review that she
25    wasn't reaching out to you proactively?
```

1                    D. Costa  - Confidential

2          A.    Okay.  So, first, I want to clarify

3     Plaintiff's 27.  There was an issue that was

4     brought to my attention by Jordan, not by

5     Jennifer.

6          Q.    Okay.

7          A.    Plaintiff's 26, I don't remember what

8     specifically preceded this, but I'm -- this does

9     not evidence that she brought issues to my

10    attention.  Plaintiff's 25, she's talking about

11    scheduling her trip to Japan.  Not a substantive

12    matter.  Plaintiff's 24, she was asking me about

13    an interpretation of a few words in an engagement

14    letter.  I -- you know, this was not of huge

15    import.  I think those are the ones that you're

16    referring to.

17         Q.    Okay.  So, these communications that

18    we've just looked at, did you view them as a

19    nuisance?

20         A.    No.  Not at all.

21         Q.    At that time, did you have any concern

22    about any of the reports over-communicating to

23    you?

24         A.    I don't recall ever being concerned

25    about my direct reports over-reporting to me.

1              D. Costa  - Confidential

2      Q.      During your tenure as general counsel,

3 did you ever have any concerns about

4 over-reporting to those who were supervising your

5 work?

6      A.      I did not.  As Jennifer testified, and

7 alleged, I communicated with my boss,

8 Mr. Yoshisato, on a regular basis, very

9 frequently.  I kept him apprised of what I was

10 working on.  I understood that to be my job and

11 responsibility as general counsel, to keep the

12 president aware of all things that I considered

13 material to the company and its clients.

14      Q.      So, when you say keeping the president

15 informed of all things, the caveat is that that's

16 with respect to critical pieces of information,

17 correct?

18      A.      That I considered material.  It is a

19 matter of judgment as to what's material to the

20 company's interest and its clients' interests.

21      Q.      Okay.  But you wouldn't communicate to

22 clients every detail of every matter you're

23 working on, right?

24      A.      Well, right now, I'm talking about my

25 communications with Mr. Yoshisato, not my clients.

1              D. Costa  - Confidential

2      Q.    Would the answer change with respect

3   to clients?

4      A.    It's a completely different

5   relationship in your question.  I'm not sure I

6   understand.

7      Q.    In your representation of clients in

8   your role as general counsel at MCHA, would you

9   communicate every detail of every matter to them

10  or would you --

11            MS. GUERON:  Objection.

12     Q.    -- do it some other way?

13            MS. GUERON:  Objection.

14     A.    It was a case-by-case judgment call on

15  my part to determine what would be material to a

16  given client in a given circumstance, and I did my

17  best to communicate what I believed to be material

18  to their interests.

19     Q.    Okay.  So I think you're agreeing with

20  me when you're saying you would communicate

21  everything that you deemed to be material,

22  correct?

23     A.    Yes.

24     Q.    And you wouldn't over-communicate by

25  sharing with clients information that was

1                    D. Costa  - Confidential

2      immaterial, correct?

3                    MS. GUERON:  Objection.

4           A.    Um, I can't say I never communicated

5      information that was not material.

6           Q.    Okay.  I didn't ask it in the form of

7      an absolute question.

8                    Do you recall, with respect to project

9      Genesis, MCHA performing a due diligence role?

10          A.    Yes.

11          Q.    Do you recall being asked by Ciro

12     Ahumada whether you would be communicating with

13     MCHJ in connection with the matter?

14          A.    I don't specifically recall that, no.

15                   MR. BERMAN:  I'm going to show you

16          Exhibit 28.

17                   (Plaintiff's Exhibit 28, two-page

18          document Bates stamped DEF 000910 and 00091,

19          confidential, marked for Identification, as

20          of this date.)

21                   THE WITNESS:  Yes.

22          Q.    Does that refresh your recollection

23     concerning communication of critical information

24     to clients?

25          A.    This is a very specific situation,

1                   D. Costa  - Confidential

2     and, as I said, every situation, I looked at on a

3     case-by-case basis.

4          Q.    Okay.

5          A.    I don't know if you're asking me a

6     question.

7                   MR. BERMAN:  All right.  That's number

8          28.  So, we'll do 29.

9                   (Plaintiff's Exhibit 29, one-page

10         document Bates stamped DEF-000194,

11         confidential, marked for Identification, as

12         of this date.)

13                  MR. BERMAN:  For identification, this

14         is DEF-000194.  It's a one-page document.

15                  THE WITNESS:  Yes.

16         Q.    Have you seen this document before?

17         A.    Yes.

18         Q.    Can you tell me what it is?

19         A.    It's an e-mail from Kelli Troccoli to

20    me dated August 12, 2015.

21         Q.    Do you see the first line there where

22    it says, here is the information you requested?

23         A.    Yes.

24         Q.    Did you request information from Kelli

25    Troccoli?

1              D. Costa  - Confidential

2       A.    I asked Kelli to put in writing a

3   series of complaints she had made to me verbally.

4       Q.    Why did you ask her to do that?

5       A.    I don't specifically recall.

6       Q.    Was this after you expressed an

7   interest in terminating Ms. Fischman?

8       A.    I don't remember the exact date of

9   that, but this was certainly after I decided that

10  I thought she should be terminated.

11      Q.    Was your request for information from

12  Mr. Troccoli motivated by a desire to terminate

13  Ms. Fischman?

14             MS. GUERON:  Objection.

15      A.    No.

16             MR. BERMAN:  Mark this, please.

17             (Plaintiff's Exhibit 30, a four-page

18         document Bates stamped DEF-000001 through

19         000004, confidential, marked for

20         Identification, as of this date.)

21             MR. BERMAN:  For identification, this

22         is a four-page document Bates stamped

23         DEF-000001 through 000004.

24             THE WITNESS:  Yes.

25      Q.    Are you looking at the document?

1                    D. Costa  - Confidential

2         A.    Yes.

3         Q.    Have you seen it before?

4         A.    Yes.

5         Q.    Can you tell me what this is?

6         A.    This is a thread that includes a

7   series of communications, one between me and Pat

8   Saunders, one between me and Ken Fujiwara.  The

9   rest is between me and Ken Fujiwara.

10        Q.    On the first page, do you see where it

11  says, "Pat, I got the okay to speak with Jennifer

12  with full disclosure"?

13        A.    Yes.

14        Q.    What does full disclosure refer to?

15        A.    That meant I could tell her that she

16  was being offered the position of acting general

17  counsel.

18        Q.    And when it says, "I got the okay to

19  speak with Jennifer," who did you get the okay

20  from?

21        A.    Mr. Yoshisato.

22        Q.    Then on the second page, in the second

23  paragraph, it says here, "Yoshisato-san said that

24  I can notify other legal department members on

25  February 2, two days before the February 4 board

```
 1              D. Costa  - Confidential

 2  meeting."

 3              Is Yoshisato-san Mr. Yoshisato?

 4      A.    Yes.

 5      Q.    And it says here, "this will allow us

 6  to begin interviewing attorney candidates on

 7  February 5," correct?

 8      A.    Yes.

 9      Q.    Did you, in fact, interview attorney

10  candidates on February 5?

11      A.    This was for the position that Stephen

12  Rose eventually filled.  I don't remember when we

13  started that search.

14      Q.    Okay.  Did you testify earlier

15  concerning how you filled that position?

16      A.    Jennifer ran that process.  I was

17  involved, but I don't recall who she used in terms

18  of a recruiter or any other details.

19      Q.    On the final page here, in the very

20  center of the communication between you and Ken,

21  do you see this --

22      A.    Yes.

23      Q.    -- bottom communication?

24            This is a communication between you

25  and Mr. Fujiwara, correct?
```

1                D. Costa  - Confidential

2       A.   Yes.

3       Q.   And after Mr. Fujiwara's name, it says

4  MCC in the e-mail header.

5            Do you see that?

6       A.   Yes.

7       Q.   Is that information provided from the

8  Japan end of this transaction?

9       A.   That is a legacy system.

10      Q.   So it may not be accurate?

11      A.   It has nothing to do with where

12  someone works.  It means they're a part of that

13  system.

14      Q.   Okay.  Thank you.

15           Do we get to continue?

16      A.   Let me just make sure I turned it off,

17  and I didn't snooze it, so we don't have to hear

18  it again.  Yeah, we're good.

19      Q.   Did you have a conversation with

20  Mr. Yoshisato concerning making Jennifer acting

21  general counsel for 12 months?

22      A.   Yes.

23      Q.   Is there a document that would

24  memorialize that?

25      A.   I'm not sure what you're asking.

1                   D. Costa - Confidential

2        Q.     Is there some communication from

3    Mr. Yoshisato concerning a 12-month period for

4    considering Jennifer acting general counsel?

5        A.     You know, as I sit here, I don't

6    recall any document other than this one that

7    refers to it.  It is what I told Jennifer.  It is

8    what I told everyone.  It was -- it was the plan.

9        Q.     Okay.  But you're not aware of any

10   contemporaneous memorialization of that plan,

11   correct?

12              MS. GUERON:  Objection.

13       A.     Well, this is contemporaneous.

14   Because this is, you know, before I spoke to

15   Jennifer.  But, other than this, I don't recall.

16       Q.     Okay.  Did Mr. Yoshisato work in your

17   offices?

18       A.     He was the president of MCHA.

19       Q.     Was he located physically on the same

20   premises where you worked?

21       A.     Yes.

22       Q.     And was he down the hall from you?

23       A.     He was in the office that I then took

24   when Jennifer took my old office.

25       Q.     So, you worked proximate to each

1          D. Costa  - Confidential

2      other?

3          A.     Yes, very proximate.

4               MR. BERMAN:  Okay.  31.

5               (Plaintiff's Exhibit 31, multipage

6          document Bates stamped DEF-000693 to 000695,

7          confidential, marked for Identification, as

8          of this date.)

9               MR. BERMAN:  It's a multipage document

10         Bates stamped DEF-000693 to 000695.

11         Q.     Are you looking at the document?

12         A.     Yes.

13         Q.     Have you seen it before?

14         A.     Yes.

15         Q.     Can you tell me what it is?

16         A.     This is a response I got to Pat on

17     August 9 when I requested her advice on August 7

18     about an e-mail I wanted to send to Ken Fujiwara.

19         Q.     Why did you ask Pat Saunders to review

20     your e-mail to Ken Fujiwara?

21         A.     I asked for Pat's input on many, many

22     things, and asked for her input on almost

23     everything concerning Jennifer, because I wanted

24     to make sure I had input.

25         Q.     Okay.  And why were you communicating

```
 1              D. Costa  - Confidential
 2    with Ken on this topic?  Mr. Fujiwara.  Excuse me.
 3         A.    Yes.  So, he -- he was very interested
 4    in who sat in the office of general counsel of
 5    MCHA, and I wanted him to know what the status
 6    was.
 7              And also, I think it's reflected in
 8    another communication; I had been giving him
 9    positive reports about Jennifer up until this
10    point, some cursory positive optimistic reports,
11    and I wanted to tell him where I was at.
12         Q.    So this is August 9, 2015, right?
13         A.    Correct.
14         Q.    So up until this point,
15    Mr. Fujiwara --
16         A.    Oh, August 7 -- oh, well, the draft
17    was August 7.
18         Q.    Okay.  But it hadn't been sent yet on
19    August 9, correct?
20         A.    Yes.  Correct.
21         Q.    So, up until that point, as far as
22    Mr. Fujiwara is aware, he's only heard positive
23    things about Jennifer's performance?
24         A.    Yeah.  We didn't discuss her much.
25    There wasn't much discussed, but what we discussed
```

1                    D. Costa  - Confidential

2    was positive.

3         Q.    Do you see in the middle of the first

4    full paragraph there, there's a line that

5    commences, "nevertheless, after discussions

6    regarding the cost of hiring a general counsel,

7    MCHC directed MCHA to promote Jennifer, and I was

8    asked to do my best to make it work"?

9         A.    So, I'm sorry, I don't see what

10   you're --

11        Q.    Let's count down, 1, 2, 3, 4, 5 lines

12   at the very end on the right, "nevertheless"?

13        A.    Yes.

14        Q.    And it continues from there?  Okay.

15              Did you have discussions regarding the

16   cost of hiring a general counsel?

17        A.    Yes.  As I referred to earlier.

18        Q.    Who were those conversations with?

19        A.    Primarily, with Mr. Yoshisato, but I

20   had at least one conversation with Ken Fujiwara.

21        Q.    Was Ken Fujiwara at MCHC?

22        A.    He was at some entity in Japan.

23        Q.    So when it says here, "MCHC directed

24   MCHA to promote Jennifer," is that a reference to

25   Mr. Fujiwara?

                    D. Costa  - Confidential

1

2       A.    Yes, it is.

3       Q.    Then at the very last paragraph of

4   that draft communication, the first line of that

5   last paragraph says, "how would you like me to

6   proceed?"

7             Do you see that?

8       A.    Yes.

9       Q.    Why are you asking Mr. Fujiwara how he

10  wants you to proceed with handling Jennifer?

11      A.    As I said, this was an issue of great

12  importance to him personally, and I knew he cared

13  about who sat in that role, and I also routinely

14  sought his advice on things.

15            MR. BERMAN:  Okay.  Let's mark this as

16        the next one.

17            (Plaintiff's Exhibit 32, a one-page

18        document Bates stamped DEF-000696,

19        confidential, marked for Identification, as

20        of this date.)

21            MR. BERMAN:  For identification, this

22        is a one-page document Bates stamped

23        DEF-000696.

24      Q.    Are you looking at the document?

25      A.    Yes.

1                    D. Costa  - Confidential

2          Q.    Have you seen it before?

3          A.    Yes.

4          Q.    Can you tell me what it is?

5          A.    This is an e-mail that I sent to Ken

6     Fujiwara on August 16, 2015.

7          Q.    So, does looking at this document

8     refresh your recollection as to when you first

9     desired to terminate Ms. Fischman?

10               MS. GUERON:  Objection.

11         A.    No, this does not relate to when I

12    first desired to.  This is the e-mail I ultimately

13    elected to send to Ken Fujiwara instead of the

14    draft of August 7 that we looked at in Plaintiff's

15    31.

16         Q.    Okay.  So as of August 7, did you

17    desire to terminate Ms. Fischman?

18         A.    Yes.

19         Q.    Was there some point prior to August 7

20    when you desired to terminate Ms. Fischman?

21         A.    I -- I don't remember when I first

22    did.

23         Q.    Was that August 7 e-mail the first

24    time that you wanted to terminate Ms. Fischman?

25               MS. GUERON:  Objection.

1                    D. Costa  - Confidential

2          A.    It's the first time I put in writing

3     that I wanted to terminate her.

4          Q.    Do you know at that time approximately

5     how long you had been considering terminating

6     Ms. Fischman?

7          A.    I don't recall.

8                MR. BERMAN:  Okay.  You can set that

9          aside.

10               Mark the next one, please.

11               (Plaintiff's Exhibit 33, a four-page

12          document Bates stamped DEF-000219 to 000222,

13          confidential, marked for Identification, as

14          of this date.)

15               MR. BERMAN:  For identification,

16          Plaintiff's 33 is a four-page document Bates

17          stamped DEF-000219 to 222.

18          Q.    Are you looking at the document?

19          A.    Yes, I have looked at it.

20          Q.    Have you seen it before?

21          A.    Yes.

22          Q.    Can you tell me what it is?

23          A.    It is an e-mail exchange between me --

24          Q.    Continue, please.  I'm sorry.

25          A.    No problem.

1           D. Costa  - Confidential

2           -- between me and Ken Fujiwara dated

3    August 18th and 19th.

4       Q.    Do you see the reference there to

5    Sakaguchi-san?

6       A.    Yes.

7       Q.    Who is Mr. Sakaguchi?

8       A.    This is the person who we discussed

9    earlier, Masanori Sakaguchi.

10      Q.    Do you know why he's referenced as a

11   participant in the call?

12      A.    Ken chose to include him.

13      Q.    Now, you had mentioned previously, in

14   discussing Mr. Fujiwara, that prior to the time

15   when you had prepared that draft e-mail on August

16   7, he was only aware of positive reports

17   concerning Ms. Fischman, correct?

18      A.    As far as I can recall.

19      Q.    Do you know whether those positive

20   reports were reduced to writing?

21      A.    I do not believe they were.

22      Q.    At the time when Ms. Fischman was

23   promoted to acting general counsel, did

24   Mr. Fujiwara express any interest in having her

25   visit Japan?

1                    D. Costa  - Confidential

2         A.    I don't recall.

3         Q.    Okay.  Is that something that would

4    have stood out to you?

5         A.    Um, no.

6              MS. COLWIN:  Objection.

7         A.    I had discussions with Jennifer about

8    when she should visit Japan.  I do not -- I gave

9    her my opinions.  I do not specifically recall any

10   discussion with Ken on that topic.

11        Q.    And she actually did travel to Japan,

12   correct?

13        A.    In October, correct.

14        Q.    Okay.  We agree.

15             MR. BERMAN:  34.

16             (Plaintiff's Exhibit 34, one-page

17        document Bates stamped DEF-001024,

18        confidential, marked for Identification, as

19        of this date.

20             MR. BERMAN:  For identification, this

21        is a one-page document Bates stamped

22        DEF-001024.

23             THE WITNESS:  Yes.

24        Q.    Are you looking at the document?

25        A.    Yes.

1            D. Costa  - Confidential

2      Q.    Have you seen it before?

3      A.    Yes.

4      Q.    Can you tell me what it is?

5      A.    This is an e-mail from me to Ken

6  Fujiwara.

7      Q.    Why did you send this communication to

8  Mr. Fujiwara?

9      A.    There was a communication of some sort

10  before this where he proposed that we speak in

11  November, and I said I thought that was too long

12  to wait.

13      Q.    Why was that too long to wait?

14      A.    Because I had made my decision, and my

15  frustration was running high.

16            MR. BERMAN:  Let's set that aside.

17            (Plaintiff's Exhibit 35, a one-page

18      document, Bates stamped DEF 025,

19      confidential, marked for Identification, as

20      of this date.)

21      Q.    No, I think this -- I'm sorry.  I

22  apologize.  I think this is a continuation of the

23  last exhibit, that I placed out as two exhibits.

24            Just to put it into context for you,

25  Ms. Costa, this looks like it's the second page of

1                D. Costa  - Confidential
2    the e-mail thread we just looked at.  Does that
3    change any of your answers?
4         A.   No.
5              MS. GUERON:  I just want to say, these
6         are all part of 33, also.
7              MR. BERMAN:  Well, if they're
8         incorporated into multiple exhibits, that
9         may be.  I'm just asking about specific
10        parts, and I want to make sure the witness
11        has the full information.
12             MS. GUERON:  Right.  But 33 is the
13        full thread, is all I'm saying.
14             MR. BERMAN:  Okay.  That's fine.
15        Q.   I'm looking at the page marked
16   DEF-001025.
17             Are you looking at that?
18        A.   Yes.
19        Q.   Have you seen it before?
20        A.   Yes.
21        Q.   Can you tell me what that is?
22        A.   Yes.  I do recall reading this in an
23   earlier exhibit.
24             This is part of an e-mail thread
25   between me and Ken Fujiwara.

1                D. Costa  - Confidential

2        Q.    He says in this message, "I'm a bit

3    surprised to hear that you would be thinking a

4    termination," right?

5        A.    Yes.

6        Q.    So had he received your August 7 draft

7    letter at this time?

8        A.    No.  As I stated, the e-mail I

9    ultimately sent him was that August 16th e-mail

10   that we just reviewed.

11       Q.    Okay.  So, that draft e-mail that Pat

12   reviewed never actually got transmitted?

13       A.    Not at that time.

14       Q.    Did it ultimately get transmitted into

15   some form?

16       A.    I don't recall.

17       Q.    Do you see the line at the bottom of

18   that paragraph where he says, "I know there is

19   some claim or allegation to her, but it is too

20   sudden for me to agree or disagree, because not a

21   small number of people in Japan like her and have

22   been appreciative for her contribution."

23             Do you see that?

24       A.    Yes.

25       Q.    Do you know what the remark about some

1              D. Costa  - Confidential

2     claim or allegations relates to?

3        A.    I think it -- I believe it refers

4     generally to the complaints various people have

5     made about her.

6        Q.    Well, was there one particular

7     complaint made by Mr. Kohei?

8              MS. GUERON:  Objection.

9        A.    No, that's not what this is referring

10    to.

11       Q.    Was Mr. Fujiwara aware on or about

12    August 19, 2015 about a compliance complaint made

13    by Mr. Kohei concerning Ms. Fischman?

14             MS. GUERON:  Objection, foundation.

15       A.    I don't recall the timing of that.  I

16    would have to look at a document to remind me of

17    the timing.

18       Q.    Okay.  Because you seem certain that

19    this reference to a claim or allegation is related

20    to something else; is that right?

21             MS. GUERON:  Objection.

22       A.    My memory is that this was intended to

23    be general, not specific to a given claim.

24       Q.    Do you know what claims or allegations

25    would be included in this then?

1           D. Costa  - Confidential

2           MS. GUERON:  Objection.

3      A.    I've already answered that question.

4      Q.    So are we talking about --

5           MR. BERMAN:  Withdrawn.

6      Q.    Were you surprised to learn that

7   Mr. Fujiwara's view was that there was not a small

8   number of people in Japan who liked Ms. Fischman?

9      A.    That didn't surprise me.

10     Q.    Were you surprised to learn that his

11  view was that there were not a small number of

12  people in Japan that had been appreciative of her

13  contribution?

14     A.    That didn't surprise me.

15     Q.    See at the bottom where it says,

16  "thus, I will not think of termination until you

17  and us had a chance to talk this matter in

18  November"?

19     A.    Yes.

20     Q.    Did you ultimately have a conversation

21  with Mr. Fujiwara concerning the termination of

22  Ms. Fischman?

23     A.    Yes.  But it did not wait until

24  November.

25     Q.    Okay.  Did it take place in September?

1           D. Costa  - Confidential

2       A.    My memory is that this was before the

3   Kelli allegation, and the Kelli allegation

4   accelerated our decision to have a discussion, but

5   I would need to look at a document to confirm

6   whether my memory is accurate or not.

7       Q.    Okay.  If that changes as we look

8   through the remainder of the exhibits, please let

9   me know.

10          MR. BERMAN:  And we're on 36.

11          (Plaintiff's Exhibit 36, a two-page

12          document Bates stamped DEF-000848 to 000849,

13          confidential, marked for Identification, as

14          of this date.)

15          MR. BERMAN:  For identification, this

16          is a two-page document Bates stamped

17          DEF-000848 to 849.

18          THE WITNESS:  This confirms what I

19          told you was my memory of the order in which

20          things occurred.

21          MR. BERMAN:  Okay.

22          THE WITNESS:  So, this was clearly not

23          referring in any way to the Kelli Troccoli

24          claim.

25       Q.    So, just to be clear, have you seen

1                    D. Costa  - Confidential

2    this document before?

3          A.    Yes.

4          Q.    And this is a communication between

5    you and Mr. Fujiwara, correct?

6          A.    Yes.  And Mr. Sakaguchi is copied as

7    well.

8          Q.    Why is Mr. Sakaguchi copied on this

9    message?

10         A.    I do not recall whether Mr. Fujiwara

11   brought him into this matter or if he's here for

12   another reason.

13         Q.    Okay.  And at this point in time,

14   Mr. Sakaguchi is an attorney, and he's no longer

15   working for Rayon, correct?

16         A.    Correct.  He is running the legal

17   department in Tokyo and, therefore, had an

18   interest in legal department matters.

19         Q.    When you refer to legal department, is

20   that a reference to MCHJ?

21         A.    I think it was MCHJ.  Again, I can't

22   speak to which legal entity it was.

23         Q.    Okay.  But it was one of the

24   Mitsubishi affiliated entities?

25         A.    Yes.

```
 1                D. Costa  - Confidential

 2                MR. BERMAN:  This should be 37.

 3                (Plaintiff's Exhibit 37, a four-page

 4         document Bates stamped DEF-000953 to 000956,

 5         confidential, marked for Identification, as

 6         of this date.)

 7                MR. BERMAN:  For identification,

 8         Exhibit 37 is Bates stamped DEF-000953 to

 9         956.

10                THE WITNESS:  Yes.

11         Q.    Have you seen this document before?

12         A.    Yes.

13         Q.    Can you tell me what it is?

14         A.    This is communication between me and

15    Pat Saunders.

16         Q.    See at the bottom of the first page

17    where it says, "this is my battle.  I will remove

18    you from future e-mail with MCHJ"?

19         A.    Yes.

20         Q.    Why did you plan, or why did you

21    mention that you were going to remove Ms. Saunders

22    from e-mail with MCHJ?

23         A.    Because Jennifer had claimed she had a

24    conflict of interest and couldn't conduct the

25    investigation.
```

1              D. Costa  - Confidential

2        Q.    Any other reason?

3        A.    It's possible that Pat was busy and

4   overwhelmed at the time.  But, honestly, I don't

5   remember.

6        Q.    If you could direct your attention to

7   the second page there, DEF-954.

8              Do you see in the center there's a

9   communication that says, "Dear Sakaguchi-san,

10  contrary to my personal and professional judgment,

11  I will proceed as you request"?

12       A.    Yes.

13       Q.    When this is referring to a request,

14  is it your understanding that that's referring to

15  the message below that?

16       A.    It was the request that we not hire

17  outside counsel at that point in time.

18       Q.    Why is it that you're adhering to the

19  request from Mr. Sakaguchi, rather than following

20  your personal and professional judgment?

21       A.    In part, because, as I stated, I

22  arguably also had a conflict, and I was also a

23  witness, and Jennifer was very sensitive to the

24  fact that this couldn't be conducted internally,

25  so it was hard to ignore outside input.

1          D. Costa  - Confidential

2     Q.    Did you ever ultimately retain outside

3   counsel for this?

4     A.    I don't believe so.

5          MR. BERMAN:  Okay.  38.

6          (Plaintiff's Exhibit 38, a three-page

7       document Bates stamped DEF-000702 through

8       000704, confidential, marked for

9       Identification, as of this date.)

10          MR. BERMAN:  For identification

11       purposes, Plaintiff's 38 is a three-page

12       document Bates stamped DEF-000702 through

13       704.

14          THE WITNESS:  Yes.

15     Q.    Have you seen this document before?

16     A.    Yes.  Including a minute ago, as part

17   of the earlier exhibit.

18     Q.    Okay.  If you turn your attention to

19   the bottom of the first page there, do you see a

20   reference to Kosakai-san?

21     A.    Kosakai.

22     Q.    Kosakai-san and/or Date-san?

23          Did you identify previously an

24   individual named Kosakai?

25     A.    I mentioned Kosakai and Date both

1              D. Costa  - Confidential

2    earlier.

3         Q.    So, these are those same individuals?

4         A.    That was the CFO and the number 2.

5         Q.    Okay.  Why is it that you were

6    considering whether the issue described in this

7    communication should be raised with Kosakai and/or

8    Date?

9         A.    Date-san was on the board of MCHA at

10   that time.  I don't think I was thinking I needed

11   to raise it with Kosakai-san, but I was meeting

12   with the two of them, and Date-san was on the

13   board.

14        Q.    Okay.  And Kosakai -- I'm not going to

15   pronounce his name properly, I'm sorry.  It's hard

16   for me.

17        A.    That's good.

18        Q.    Was that a finance person?

19        A.    Yes, he was a finance person.

20        Q.    So, why would this decision be

21   pertinent to a finance person in Japan?

22             MS. GUERON:  Objection.

23        A.    As I said, Date-san was on the board

24   of MCHA.  I don't re -- I'm surprised to see that

25   I mentioned Kosakai-san.  I know I met with the

 1                D. Costa  - Confidential

 2  two of them together.  That might have been what I

 3  was referring to.  I can't think of any reason why

 4  I would have raised it with Kosakai-san.

 5        Q.    At the time that Date-san was on the

 6  board of MCHA, was he physically located in

 7  America?

 8        A.    He was physically located in Tokyo.

 9        Q.    Do you know whether he was performing

10  a dual role in connection with another Mitsubishi

11  affiliate?

12        A.    He didn't have a dual role.  He had a

13  role in Japan, and he was a member of the Board of

14  Directors of MCHA.

15        Q.    So, his duties and responsibilities in

16  connection with the board of MCHA were part of his

17  position in Japan?

18              MR. FORTINSKY:  Objection to form.

19              MS. GUERON:  Objection.

20              MS. COLWIN:  Objection.

21        Q.    Did I get that right?

22        A.    No, you didn't.

23        Q.    Okay.  Can you please explain?

24        A.    I guess, there is a way in which to

25  define terms to state that he had a dual role.  It

1                    D. Costa  - Confidential

2    was common for people who sat on the MCHA board --

3    or it wasn't common.  In every instance that I can

4    recall, members of the MCHA board had a day job.

5    So, I didn't think of that as a dual role.

6         Q.    Okay.  So you considered their duties

7    and responsibilities on the MCHA board to be part

8    of their day job in Japan?

9         A.    No, I said --

10              MR. FORTINSKY:  Objection to form.

11        A.    -- the opposite.

12        Q.    The opposite of that?

13        A.    I said, they had a day job and then

14   they had an appointment which took a small

15   fraction of their time and attention.  I don't

16   consider it a job, is what I was trying to say.

17        Q.    So then, let me see if I have this

18   correct.  At this time that this communication was

19   transmitted, Mr. Date was an employee of a

20   Mitsubishi affiliate in Japan?

21        A.    Yes.

22        Q.    And simultaneous, he also sat on the

23   Board of Directors of MCHA?

24        A.    He represented the shareholder on the

25   board of MCHA, yes.

1                    D. Costa  - Confidential

2        Q.    When you refer to the shareholder,

3    there's only one shareholder, correct?

4        A.    Correct.

5        Q.    And that shareholder was MCHC,

6    correct?

7        A.    Correct.

8              MR. BERMAN:  Okay.  Thank you for

9        clarifying that.

10              All right.  Exhibit 39.

11              (Plaintiff's Exhibit 39, a four-page

12        document Bates stamped DEF-000961 through

13        000964, confidential, marked for

14        Identification, as of this date.)

15              MR. BERMAN:  For identification,

16        DEF-000961 through 64.

17        Q.    Are you looking at the document?

18        A.    Yes.

19        Q.    Have you seen it before?

20        A.    Yes.

21        Q.    Can you tell me what it is?

22        A.    This is e-mail -- an e-mail thread we

23    saw previously, with the addition of my

24    communication to Ken Fujiwara on September 1,

25    2015.

1          D. Costa  - Confidential

2      Q.    Does this e-mail, at the top of the

3  first page, accurately reflect your state of mind

4  on or about September 1st?

5          MS. GUERON:  Objection.

6      A.    Yes.

7      Q.    Why did you communicate that sentiment

8  to Mr. Fujiwara?

9      A.    Because I was frustrated, and he's a

10  friend.

11      Q.    Now, in reference to the first line

12  that says, in part, "I am not trusted to run an

13  internal investigation."  What is the internal

14  investigation referring to?

15      A.    It was my -- my opinion that we should

16  hire outside counsel to investigate Kelli's claim

17  against Jennifer.

18      Q.    Did you have the discretion to decide

19  anyway to hire an outside counsel?

20      A.    I did.

21      Q.    You had that discretion?

22      A.    Yes, I did.

23      Q.    But you declined to exercise it?

24          MS. COLWIN:  Objection.

25      A.    That's correct.

```
1                    D. Costa  - Confidential
2                    MR. BERMAN:  40.
3                    (Plaintiff's Exhibit 40, a three-page
4          document Bates stamped DEF-000705 through
5          000707, confidential, marked for
6          Identification, as of this date.)
7                    MR. BERMAN:  This is defendant's
8          000705 through 707.
9          Q.    Did you look at the document?
10         A.    I have read it.
11         Q.    Have you seen it before?
12         A.    Yes.
13         Q.    Can you tell me what it is?
14         A.    This is an e-mail from me to Ken
15   Fujiwara.
16         Q.    And then, if I direct your attention
17   to the top of the second page, do you see the
18   first line where it says, "I'm going to speak to
19   Nick and see if he's interested"?
20         A.    Yes.
21         Q.    "It would be great to have Nick back
22   again"?
23         A.    Yes.
24         Q.    Did you speak to Nick?
25         A.    At some point after this date, yes.
```

1          D. Costa  - Confidential

2     Q.    Okay.  Do you know when that took

3  place?

4     A.    I don't.

5     Q.    Was that the lunch you referred to?

6     A.    What I referred to was my birthday

7  lunch, or dinner, I don't remember.  I don't

8  remember when I next spoke to Nick.

9     Q.    Without divulging your year of birth,

10  what's your birthday?

11     A.    August 15.

12     Q.    Okay.  So that would have transpired

13  before this communication took place?

14     A.    Yes, it did, which is what made me

15  think that maybe Nick would be available.

16     Q.    So, as of the date of this

17  communication, you'd already had some kind of

18  conversation with Nick, and in this communication

19  you reference that you're going to speak with him

20  again, and at some point, you subsequently did

21  that?

22     A.    At some point, I did.

23     Q.    Do you see in the next communication

24  below that from Fujiwara, where he states in part,

25  "we may even want to listen to Jennifer's version

1          D. Costa  - Confidential

2   of this story"?

3          Do you see that text?

4     A.    Yes.

5     Q.    Did you ever listen to Jennifer's

6   version of the story?

7          MS. COLWIN:  Objection.

8     A.    Absolutely.  Jennifer and I had a

9   number of conversations about the situation with

10  Kelli.

11    Q.    Okay.  And did you feel that Jennifer

12  was acting unreasonably in connection with her

13  relationship with Kelli?

14    A.    With respect to Kelli's potential ADA

15  claim?  Yes.

16    Q.    What about with respect to their

17  personal interactions in the workplace?

18    A.    I can't speak to that.

19          MR. BERMAN:  Let's do 41.

20          (Plaintiff's Exhibit 41, a three-page

21          document Bates stamped DEF-000439 through

22          000441, confidential, marked for

23          Identification, as of this date.)

24          MR. BERMAN:  For identification, this

25          is a three-page exhibit Bates stamped

```
 1                    D. Costa  - Confidential
 2          DEF-000439 through 441.
 3          Q.    Are you looking at the document?
 4          A.    Yes.
 5          Q.    Have you seen it before?
 6          A.    Yes.
 7          Q.    Can you tell me what it is?
 8          A.    This is communication with -- between
 9     me and Ken Fujiwara.
10          Q.    Okay.
11          A.    And Mr. Sakaguchi is cc'd.
12          Q.    So in the top of the first page, in
13     the communication from Ken to you, he says to
14     you -- or the e-mail communication reads, "what
15     you need to do is to draw a clear picture to
16     explain the increase of MCHA running cost and
17     justifiable allocation of that to affiliates or
18     parents."
19                Did you see that sentence?
20          A.    Yes.
21          Q.    Do you have an understanding of why
22     he's telling you that?
23                MS. GUERON:  Objection.
24                MS. COLWIN:  Objection.
25          A.    He was telling me that I was
```

1          D. Costa  - Confidential

2    responsible for the increase in MCHA's budget as a

3    result of retaining Jennifer and hiring Nick.

4          Q.    What is the reference to "justifiable

5    allocation of that to affiliates or parents"?

6          A.    I don't know specifically what he was

7    referring to.

8          Q.    Well, were the costs of MCHA allocated

9    to affiliates or parents?

10         A.    As I told you, 100 percent of the

11    costs of the legal department were allocated to

12    its clients.  So, that could be described as

13    affiliates or parents.  It's not a term I would

14    use, but, yes, 100 percent was allocated to

15    clients.

16         Q.    In the next line, you see the

17    reference of Iguchi-san?

18         A.    Yes.

19         Q.    Who is that?

20         A.    That is Shin Iguchi, who was finance

21    and accounting at MCHA, and, therefore, needed to

22    make changes to the budget.

23              MR. BERMAN:  Next exhibit.  42.

24              (Plaintiff's Exhibit 42, a five-page

25         document Bates stamped DEF-000346 through

1            D. Costa  - Confidential

2       350, confidential, marked for

3       Identification, as of this date.)

4            THE WITNESS:  Okay.

5            MR. BERMAN:  For identification, this

6       is Bates stamped DEF-000346 through 350.

7            THE WITNESS:  Yes.

8       Q.    I'll direct your attention to the

9  paragraph that begins "if Jennifer accepts."

10           Do you see that paragraph?

11      A.    Yes.

12      Q.    And the last two sentences there, do

13  you see the reference to a request for additional

14  money from MCHC?

15      A.    "I believe we will not have to request

16  additional money from MCHC."

17      Q.    Why was this being discussed?

18      A.    I was assuring Ken that MCHC's legal

19  services fee wouldn't increase.

20      Q.    So did legal services paid by

21  affiliates increase in proportion with the costs

22  incurred by MCHA?

23      A.    Again, it was covered dollar for

24  dollar, but it did not always change

25  proportionally.  Things were constantly changing

1                D. Costa  - Confidential
2   that had an impact on the allocation.  This was
3   just a sort of, don't worry, MCHC's fee won't
4   increase.
5        Q.    Understood.  But without regard to the
6   allocation, if MCHA's costs increased or expenses
7   increased, that cost would be allocated to one of
8   the affiliates, correct?
9        A.    It would be an -- allocated among the
10  affiliates, unless we had a reserve for some
11  reason.
12       Q.    Okay.  Thank you.
13             Do you see in the paragraph two
14  paragraph down, a reference to BHQS, or BHQs?
15       A.    Yeah.  Why am I not seeing it?  I'm
16  sorry, where are you.
17       Q.    It's on the fifth paragraph.
18  "Regardless of what happens with the legal
19  department in 2015 and 2016, MCHC/BHQ" --
20       A.    Oh, BHQs, yes.
21       Q.    What is that?
22       A.    Business headquarters.
23       Q.    Ah, okay.  Okay.
24             So where it says, "they will have to
25  pay my costs in 2016," what costs are those?

1                    D. Costa  - Confidential

2        A.    I don't recall.

3        Q.    Then in the next paragraph, at the

4    conclusion of which it says, "in the end, MCHC

5    will have to pay for a new GC and for Jennifer to

6    say or go regardless."

7              Do you see that line?

8        A.    Yes.

9        Q.    What do you mean when you say, "MCHC

10   will have to pay for a new GC"?

11       A.    I was referring to the group.  It was

12   not MCHC.

13       Q.    Okay.  So that cost would be

14   apportioned amongst the affiliates?

15       A.    Yes, certainly.  And specifically not

16   to MCHC.

17              MR. BERMAN:  43.

18              (Plaintiff's Exhibit 43, a seven-page

19         document Bates stamped DEF-000351 to 000357,

20         confidential, marked for Identification, as

21         of this date.)

22              MR. BERMAN:  This is will be Bates

23         stamped DEF-000351 through 357.

24       Q.    Have you seen this document before?

25       A.    Yes.

1                    D. Costa  - Confidential

2        Q.    Can you tell me what it is?

3        A.    It's an e-mail communication from me

4    to Ken Fujiwara.

5        Q.    I direct your attention to the top of

6    the second page.  And in the second full sentence

7    it says, "as you mentioned, this is my (and

8    Sakaguchi-san's issue), not Date-san nor

9    Kosakai-san's, but the management issue including

10   its budget of MCHA as a subsidiary of MCHC is

11   under the responsibility of Date-san's department

12   as you are well aware of."

13                 Do you see that sentence?

14       A.    Yes.

15       Q.    Were you aware of this arrangement

16   that is specified here by Mr. Fujiwara?

17       A.    What arrangement are you referring to?

18       Q.    Whatever is referenced in that second

19   full sentence.

20       A.    Honestly, this is not a very

21   well-worded or drafted e-mail.  It's a little bit

22   confusing.  I know what I think he meant, yes.

23       Q.    Okay.  So was the budget of MCHA a

24   responsibility of Mr. Date?

25       A.    He was the member of the board of MCHA

1          D. Costa  - Confidential

2     appointed as a representative of MCHC, the

3     shareholder, and he was in the finance and

4     accounting department, so this fell within --

5     the review of the budget fell within his domain.

6          MR. BERMAN:  I see that it's now seven

7          o'clock, and I wish to honor your request to

8          break here.  I'm going to say that we're

9          going to adjourn this deposition for now.

10         We'll reserve the right to recall the

11         witness if it's appropriate to do so.

12         MS. GUERON:  So, that's not our

13         position.  It's been seven hours.  You've

14         had seven hours.  It's our position that the

15         deposition is closed.  If it's your view

16         that you have five more minutes, go ahead

17         and do it, but, other than that, this

18         deposition is closed.

19         MR. BERMAN:  Okay.  Your position is

20         noted.

21         Does anyone else need to say anything

22         on the record before we close?

23              (Continued on next page.)

24                   o0o

25

1           D. Costa  - Confidential

2           MS. COLWIN:  I join in the objection.

3           MR. BERMAN:  All right.  Thank you

4      everybody.

5           (Whereupon, the examination of this

6  witness was concluded at 7:02 p.m.)

7           *         *         *         *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    A C K N O W L E D G M E N T

3    STATE OF NEW YORK)

4         ) ss.:

5    COUNTY OF            )

6              I, DONNA COSTA, hereby certify that I

7    have read the transcript of my testimony taken

8    under oath in my deposition of July 12, 2021; that

9    the transcript is a true, complete and correct

10   record of what was asked, answered and said during

11   this deposition, and that the answers on the

12   record as given by me are true and correct.

13

14

15                           _____

16                                DONNA COSTA

17   Subscribed and sworn to

18   before me this _____ day

19   of _____, 2021.

20

21   _____

22      NOTARY PUBLIC

23

24

25

1

2                    I N D E X

3  EXAMINATION OF        BY                    PAGE

4  Donna Costa         Mr. Berman              3

5

6                  E X H I B I T S

7

8  PLAINTIFF'S        DESCRIPTION            PAGE

9  1, Document Bates stamped DEF 000866, MCHA

10     Organization, dated January 1, 2020,

11     confidential, one page                 88

12  2, Two-page document bearing Bates stamp

13     DEF 001592 to 001593, confidential     108

14  3, Copy of first amended complaint        124

15  4, Two-page document Bates stamped

16     DEF 001590, confidential               141

17  5, Two-page document Bates stamped

18     DEF 000821 and DEF 000822, confidential  142

19  6, Three-page document Bates stamped

20     DEF 000720 to 722, confidential        162

21  7, Multipage document Bates stamped

22     DEF 000619 through 631, confidential   181

23  8, Multipage document Bates stamped

24     DEF 1479 through 1483, confidential    184

25  (Cont'd)

E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 9, | Multipage document Bates stamped DEF 001383 to 1389, confidential | 185 |
| 10, | Multipage document Bates stamped DEF 000064 through 000076, and also pages marked DEF 001004 through 001012, confidential | 187 |
| 11, | Ms. Fischman's notes, 43 pages | 192 |
| 12, | Multipage document Bates stamped DEF-747 through 752, confidential | 194 |
| 13, | One-page document Bates stamped DEF-001762, confidential | 168 |
| 14, | Multipage document Bates stamped DEF-001828 to 001830, confidential | 272 |
| 15, | Multipage document Bates stamped DEF-001858 through 001862, confidential | 275 |
| 16, | Two-page document Bates stamped DEF-000869 to 000870 | 276 |
| 17, | Multipage document Bates stamped DEF-001746 to 1748, confidential | 277 |
| 18, | Multipage document Bates stamped DEF-1809 to 1812, confidential | 282 |

1

2                    E X H I B I T S (Cont'd)

3

4     PLAINTIFF'S          DESCRIPTION              PAGE

5     26, One-page document Bates stamped

6         DEF-000273, confidential              304

7     27, Three-page document Bates stamped

8         DEF-000334 to 000336, confidential    305

9     28, Two-page document Bates stamped

10        DEF 000910 and 00091, confidential     311

11    29, One-page document Bates stamped

12        DEF-000194, confidential              312

13    30, Four-page document Bates stamped

14        DEF-000001 through 000004, confidential  313

15    31, Multipage document Bates stamped

16        DEF-000693 to 000695, confidential     318

17    32, One-page document Bates stamped

18        DEF-000696, confidential              321

19    33, Four-page document Bates stamped

20        DEF-000219 to 000222, confidential     321

21    34, One-page document Bates stamped

22        DEF-001024, confidential              325

23    35, One-page document, Bates stamped

24        DEF 025, confidential                 326

25    (Cont'd)

1

2                    E X H I B I T S (Cont'd)

3

4    PLAINTIFF'S         DESCRIPTION              PAGE

5    36, Two-page document Bates stamped

6        DEF-000848 to 000849, confidential      331

7    37, Four-page document Bates stamped

8        DEF-000953 to 000956, confidential      333

9    38, Three-page document Bates stamped

10       DEF-000702 through 000704, confidential  335

11   39, Four-page document Bates stamped

12       DEF-000961 through 000964, confidential  339

13   40, Three-page document Bates stamped

14       DEF-000705 through 000707, confidential  341

15   41, Three-page document Bates stamped

16       DEF-000439 through 000441, confidential  343

17   42, Five-page document Bates stamped

18       DEF-000346 through 350, confidential     345

19   43, Seven-page document Bates stamped

20       DEF-000351 to 000357, confidential       348

21

22

23

24

25

```
 1
 2              REQUESTS FOR PRODUCTION
 3    DESCRIPTION                         PAGE
 4    Any org charts that were in the care,
 5    custody and control of Ms. Costa during
 6    her tenure as general counsel or
 7    President                             98
 8    Any position profiles for the corporate
 9    counsel position, the assistant general
10    counsel corporate position, and the
11    general counsel and chief compliance
12    officer position                      159
13    Any Arnold & Porter recommendations
14    concerning the Filtech matter        205
15
16                    INSERT
17              PAGE    LINE
18              232      20
19
20
21                    RULINGS
22              PAGE    LINE
23               45      21
24               98      17
25
```

1

2                   C E R T I F I C A T I O N

3              I, BONNIE KREUZBURG, a Notary Public

4    of the State of New York do hereby certify:

5              That the testimony in the within

6    proceeding was held before me at the aforesaid

7    time and place.

8              That said witness was duly sworn

9    before the commencement of the testimony, and that

10   the  testimony was taken stenographically by me,

11   then transcribed under my supervisor, and that the

12         within transcript is a true record of the

13         testimony of said witness.

14              I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage, that I am not interested

17   directly or indirectly in the matter in

18   controversy, nor am I in the employ of any of the

19   counsel.

20              IN WITNESS WHEREOF, I have hereunto

21   set my hand this 22nd day of July, 2021.

22

23

24         _____
           *Bonnie Kreuzburg*

25              BONNIE KREUZBURG

## A

**a.m** 1:13
**ability** 6:21,25 237:12
**able** 75:3 86:10 101:7 148:24 152:9
  165:9
**above-stated** 1:20
**absolute** 311:7
**absolutely** 38:17 271:25 343:8
**accelerated** 331:4
**accept** 83:5
**acceptable** 271:7
**accepts** 346:9
**accommodate** 49:23
**account** 65:3,6
**accountable** 52:16 147:17 151:13
**accounting** 19:16 57:12 63:24 71:4
  75:14 91:3 92:11 99:10 137:12,17
  198:13 345:21 350:4
**accounts** 285:9
**accuracy** 140:16
**accurate** 30:19 37:10 103:22
  182:19 306:18 316:10 331:6
**accurately** 6:22 7:2 89:14 103:16
  148:19 149:9,17 150:14,19
  183:11 184:7 185:11 188:12
  195:25 302:22 340:3
**accused** 251:19,24
**acquired** 199:16 219:11
**acquisition** 119:20 120:25 199:17
  202:15,16,17 214:22 219:15
  243:2
**acronym** 11:6,10,20 14:21 18:18,21
  21:5 25:8 47:19 60:4
**acronyms** 11:4
**Act** 56:21,21 200:5
**acting** 71:24 119:10 167:14 190:21
  217:8,13 218:13 224:19,24
  227:18 229:24 233:18 234:5
  236:23 237:6,22 238:24 240:18
  244:2 302:3 314:16 316:20 317:4
  324:23 343:12
**action** 124:6,13 189:6 190:9 300:4
  358:15
**actions** 212:22
**actors** 260:5
**ADA** 343:14
**add** 51:14
**added** 20:6 94:14
**addition** 74:3 339:23
**additional** 11:2 16:5 133:20 231:21
  257:13 263:24 346:13,16
**address** 3:20 245:20
**addressed** 104:9 289:14
**adhering** 334:18
**adjacent** 241:16
**adjourn** 350:9
**adjusted** 127:5,21
**adjustment** 67:10

**administration** 126:12 246:7
**administrative** 18:3,23 43:13,19
  46:10,22 62:2,3,6 91:23 128:7
  251:10
**advance** 161:24
**adverse** 266:11,15
**advice** 63:8 318:17 321:14
**advised** 239:18
**advisement** 99:3 159:18 205:24
**advisor** 82:22 199:10 301:20
**advisors** 220:13,14 221:9,10
**affairs** 94:16 120:7 299:12
**affect** 6:25
**affiliate** 43:23 77:16,18 79:25 103:6
  103:7 296:12 337:11 338:20
**affiliated** 19:11 82:4,13 160:16
  203:18 332:24
**affiliates** 42:4,8,24 49:5 52:20,23
  52:24 54:25 68:8,21 81:7 95:8
  117:10,12 132:2 197:20,21,21
  240:20 243:10 294:25 295:15
  344:17 345:5,9,13 346:21 347:8
  347:10 348:14
**affix** 76:5
**afford** 5:25
**aforesaid** 358:6
**Africa** 106:14,16 167:25 168:9,22
**against-** 1:4
**agency** 105:19
**agent** 217:4,11
**ago** 9:19,20 192:11 264:19 335:16
**agree** 146:17 151:8,20 157:20
  190:7 196:4 198:22 204:20
  205:16 271:5 278:5 280:14,15
  325:14 328:20
**agreed** 129:10
**agreeing** 3:3 310:19
**agreement** 43:15,17,19,22 44:3,5
  45:4,12,25 46:5,7 60:21 128:10
  128:14 129:7,9 259:15
**agreements** 41:25 42:4,9,12,23
  43:2,10 45:8 46:11,22,25 48:22
  52:13,17 60:18 61:8 62:2,3,6
  67:14 126:25 127:4,20 128:7
  302:5
**Ah** 347:23
**ahead** 41:14 48:10 61:11 63:22
  306:25 350:16
**Ahumada** 215:8 216:11 219:14
  311:12
**aim** 120:21 153:18
**alarm** 53:23 58:4
**allegation** 126:17 259:23,25 280:12
  287:16 328:19 329:19 331:3,3
**allegations** 124:23 260:3 329:2,24
**alleged** 280:18 287:9 309:7
**allocated** 65:9 345:8,11,14 347:7,9
**allocation** 344:17 345:5 347:2,6

**allow** 249:17 315:5
**allowed** 17:6 164:15 281:21
**allows** 164:20
**ALS** 34:12
**alter** 214:7
**altered** 214:4
**amended** 124:10,13 353:14
**America** 1:5 2:12 11:8,15 12:3,17
  16:11 17:15 20:20 21:8,10 22:17
  23:4 37:18 95:9 138:14 337:7
**American** 32:10 166:15
**Americas** 18:8 26:24 70:7,8,10 77:8
  77:11 197:14
**amount** 65:9 129:10 134:24 145:19
  211:5 218:19 255:20 266:18
  267:15 270:21 274:16 275:12
**amounts** 135:3 256:5
**analyses** 56:24
**analysis** 219:3,7
**and-a-half-day** 215:17
**and/or** 153:10 335:22 336:7
**Andy** 173:8 178:16 233:2
**annual** 32:22 121:19,22 122:10
  135:6
**annually** 65:21
**answer** 4:18 5:8,17 6:3 7:22 12:22
  31:23 41:8 44:12,22 50:16 58:6
  62:24 70:2,5,7 82:17 84:7 90:14
  128:8 137:2 140:15 150:19 152:9
  158:10 159:4 169:16,24 177:4
  208:24 209:9,11 210:11 220:24
  222:25 223:2,3,4,5 226:15 227:5
  236:4 251:7,13,16 262:19 281:21
  281:25 302:24 310:2
**answered** 33:12 134:21,23 171:21
  255:7 330:3 352:10
**answering** 4:6 33:14 228:4
**answers** 37:9 179:10 327:3 352:11
**anticipate** 5:9
**anyway** 340:19
**apologize** 30:13 326:22
**appear** 189:18,23
**appeared** 221:14
**appears** 194:24 278:8 289:14
**appended** 187:24
**applicant** 162:5
**applicant's** 160:22
**applicants** 115:25 160:24 162:10
  167:21
**application** 13:20
**applied** 164:9
**apply** 13:15 115:25 222:17 296:10
**appoint** 41:12 174:19
**appointed** 36:14 40:9 80:10 95:9
  120:2 130:11 350:2
**appointment** 81:20 83:5 130:13,14
  133:19 134:7 338:14
**appointments** 83:10 136:8

**appoints** 40:16,17
**apportioned** 348:14
**appraisal** 183:12 196:2
**appreciate** 37:11
**appreciating** 203:2
**appreciative** 328:22 330:12
**apprised** 309:9
**apprising** 120:6
**approach** 117:4
**appropriate** 6:6 14:21 118:6
  217:12 281:3 350:11
**approval** 71:8,9,25 79:12,14 81:4
  81:23,25 83:4 269:12
**approvals** 100:5
**approved** 70:22,25 100:4 101:2
**approves** 40:16 126:7
**approving** 81:19 262:2,6
**approximately** 8:21 9:4 12:13
  21:22 22:4 29:21 30:12 31:16
  32:7,17 33:20 34:25 35:14,19
  36:3,8 42:7 74:23 78:15 88:6
  182:3 234:2,3 242:5,19 246:9
  249:2 291:6 323:4
**April** 27:12 35:3 88:10 188:11
  189:8,22 238:14,19 239:8 242:15
  242:17,24
**area** 55:6 69:22 214:25
**areas** 118:9 121:4 146:6 198:18
**arguably** 334:22
**argued** 221:9,10
**Arnold** 205:6,9,12,22 357:13
**arose** 199:17 221:11 239:25 260:3
**arrangement** 349:15,17
**arrangements** 74:12
**articulate** 101:7
**Asia-Pacific** 78:3
**aside** 323:9 326:16
**asked** 49:10 73:23 80:14 115:16
  116:18,20 123:20 134:21 144:25
  145:16 169:20 221:13 226:22,25
  229:13 234:12 251:8,9,15 254:7
  255:6 256:19 264:15 279:21
  288:3,3 311:11 313:2 318:21,22
  320:8 352:10
**asking** 4:5 5:7 37:4 68:23 70:6
  71:16 74:2 75:6 99:20 112:23
  134:22 149:16 150:12,13 158:4
  168:2 169:19 170:21 207:18
  209:20,22,23,24 257:19 265:4
  278:11 281:16,17 302:4,6 306:17
  308:12 312:5 316:25 321:9 327:9
**asset** 202:17
**assets** 22:17 23:9,11,15
**assigned** 15:4,6 74:10,17 137:22
  138:13
**assignment** 15:14 137:13 138:2,12
**assist** 98:2,7,8
**assistant** 35:21 91:23 94:2 142:21

  148:3 159:13 172:14 197:3
  243:17,22,23 244:5,12 251:10
  357:9
**assists** 147:7
**associated** 132:21 141:11 200:21
**Association** 113:2
**assume** 79:3,3 137:3
**assuming** 195:14 237:22 262:23
**assuring** 346:18
**attached** 188:24
**attempting** 212:11
**attend** 79:10 241:8 269:25
**attendance** 241:11 242:6 248:16
**attendance-related** 248:12
**attended** 10:2 199:9 241:9,10 270:2
**attending** 249:19 269:10 270:5
**attention** 89:9 105:4 111:24 124:15
  126:3 135:8 157:6 188:15 195:3
  210:22 211:19 214:20 270:24
  293:2 308:4,10 334:6 335:18
  338:15 341:16 346:8 349:5
**attitude** 280:11
**attorney** 9:24 104:8 119:11 147:25
  204:11,14,21 217:14 234:24
  235:21 250:4 251:25 257:4
  280:17 315:6,9 332:14
**attorney's** 252:12 257:24
**attorney-client** 209:14,17
**attorney/client** 61:4
**attorneys** 1:17 2:3,8,12,18 5:15
  7:20 8:4,7,13 10:16 51:20,23,25
  52:5 235:5 248:12 250:23 257:8
  257:13
**audit** 19:20 46:20,23 47:10 48:6
  50:21 55:4 57:15 76:13,22 77:8
  77:10,25 78:3,4,6 90:21 92:14
  93:2 100:8 116:21 117:7,13,19,21
  117:24 118:3,5,13,17,23,25 119:9
  120:8,17 144:11 174:25 198:7
  289:24 290:2,6,10,11
**audited** 117:17,23
**auditing** 77:17,18,21 289:21
**audits** 78:10 117:13,14 118:10
  119:18 120:11
**August** 168:19 169:6,9 170:9
  171:13 172:4 175:19,25 177:7,12
  177:18,23 196:15,17 215:23
  225:13,14 227:16 289:19 301:16
  303:12,19 307:8,9,9 312:20
  318:17,17 319:12,16,17,19 322:6
  322:14,16,19,23 324:3,15 328:6,9
  329:12 342:11
**author** 278:10
**authority** 244:25 245:5 255:20
  256:5 266:18 267:10,16 268:11
  269:11 270:7,11,20,21 271:3
  274:10,13,16 275:11 277:9
  282:18 287:18 288:22,24

**authorization** 270:10
**authorized** 245:3 259:15 282:14
  287:6,10 288:16
**available** 62:17 176:10,14 178:19
  299:13 342:15
**Avenue** 1:11 2:8,19
**avoiding** 260:24
**aware** 10:19,23 40:6 73:18 74:5
  86:14 87:13 91:16 111:19 117:18
  119:16 125:17 137:6 139:18
  144:4,7,10,14 201:21 202:6,20
  211:10 213:12 220:3,6 226:9,11
  226:15 249:13 252:10 259:22
  267:5,7 287:15 300:15 309:12
  317:9 319:22 324:16 329:11
**Axiom** 105:15,19,20 106:4

**B**

**B** 353:6 354:2 355:2 356:2
**back** 33:10 34:13 37:4 38:22,24
  42:19 50:14,17 58:18,19,22 64:19
  64:21 82:6,9 84:5 86:18,21 88:4
  98:12,15 111:12,15 116:16,17
  119:2,4 123:7,9 127:8,10,14,16
  137:15 141:18 150:15 171:18
  173:12 178:17 193:23 226:21
  255:24 256:3 262:17,20 266:24
  269:12 291:23 302:20,25 341:21
**backfill** 244:5
**backfilled** 244:3
**backgrounds** 107:4
**bad** 227:19
**bands** 147:14
**based** 81:13 112:8 127:5 166:16
  262:24
**bases** 213:21 228:17 263:7
**basically** 299:23
**basis** 32:22 43:14 44:6 104:10
  149:4 156:8 173:13 209:12
  236:14 238:18 252:12 256:13
  261:12 262:6 263:2 307:24 309:8
  312:3
**Bates** 88:21 89:6 108:6,11 141:22
  142:7,12,13 162:20 163:8 181:7
  181:11 184:18,22 185:17,21
  187:10,15,17 194:13,17 268:15
  268:19 272:17,21 275:19,24
  276:18,21 277:13,17 279:2
  282:22 283:3 289:3,7 292:13,17
  293:22 294:2 296:23 297:4 298:6
  298:10 301:4,8 302:17 303:5
  304:10,14 305:19,24 311:18
  312:10 313:18,22 318:6,10
  321:18,22 323:12,16 325:17,21
  326:18 331:12,16 333:4,8 335:7
  335:12 339:12 341:4 343:21,25
  345:25 346:6 348:19,22 353:9,12

353:15,17,19,21,23 354:5,7,12,14
354:16,18,20,22,24 355:5,7,9,11
355:13,15,17,19,21,23 356:5,7,9
356:11,13,15,17,19
**Battery** 2:13
**battle** 333:17
**bearing** 89:7 108:6,11 187:15,17
257:23 275:23 283:3 353:12
**bears** 194:8
**becoming** 240:18
**began** 27:15 176:3,25 199:15 226:5
**beginning** 27:10 54:16 64:3 97:8
206:19 220:12
**begins** 183:20 346:9
**behalf** 42:13 118:25 119:6 133:14
158:19 269:10
**behavior** 251:20,25 252:5
**Beijing** 18:25 53:16
**believe** 9:5 16:3 22:12 26:4,20,25
27:12 31:24 33:11 39:5 42:10
43:18 47:21 56:15,18 58:9,25
60:15 61:17 72:14 73:8 94:13
99:12,14 112:6,9 114:23 115:4
122:19 128:18 129:22 131:4
133:14,15 134:8,23 136:6,8
140:23 161:10 163:13 176:19
185:25 186:9,20 187:23 197:7
199:22 201:11 202:16 215:20
224:4 237:18 244:21 245:2
248:22 254:17 255:16 256:24
267:3,22 269:21 281:7 285:17
286:20 297:15 302:10 303:2
324:21 329:3 335:4 346:15
**believed** 47:10 212:14 310:17
**belongs** 44:21
**beneath** 131:16
**benefits** 95:11,16,19,23 96:2,4
**Berman** 2:5 3:10,25 4:3 16:8 17:20
31:23 41:8 42:17,19 44:11 45:16
45:21 47:20 49:8,15,22 50:5,14
53:22 58:10,13,18 64:19 66:4
75:23 82:6 87:25 88:4,18 89:12
89:20 98:12,17,20 99:4,7 102:5
107:19,23 108:3,9 111:12 113:15
116:9,14 123:6 124:8 126:5
127:12,17 128:20 141:18,25
142:4,10 149:14 150:22 151:4,7
151:11,20,23 156:4 159:11,19
160:3 162:18 163:5 171:3,8,11
181:5,10 184:15,21 185:15,20
187:8,14 192:15 194:10,16
201:16 205:21 206:4,8,14 209:12
209:16,20,24 210:5,10,13,16
220:23 222:14,24 225:5 226:18
226:21 232:17 255:15,24 258:14
258:23 259:9,11,12 262:16 264:7
272:15,20 273:15 275:5,17,22
276:16,20 277:11,16 278:7,13

281:21,24 282:19,25 287:13
288:25 289:6 290:14 292:11,16
293:20,25 296:21 297:2 298:4,9
301:2,7 302:15 303:4 304:13
305:17,22 311:15 312:7,13
313:16,21 318:4,9 321:15,21
323:8,15 325:15,20 326:16 327:7
327:14 330:5 331:10,15,21 333:2
333:7 335:5,10 339:8,15 341:2,7
343:19,24 345:23 346:5 348:17
348:22 350:6,19 351:3 353:4
**best** 4:14 5:4,11 62:14 161:24 184:6
185:10 197:2 228:11 239:23
310:17 320:8
**beyond** 135:2 257:14
**BHQs** 347:14,14,20
**Bill** 232:5 298:20
**biotech** 81:13
**birth** 342:9
**birthday** 177:3,5 227:15 342:6,10
**bit** 20:18 139:25 328:2 349:21
**blamed** 299:9 300:5
**blank** 232:12
**blood** 358:16
**blur** 302:23
**board** 35:9,12 36:14,15,22 38:7,11
38:16 40:9,13,16,17 41:12 62:17
71:6 72:2 80:10,13,15,18,22 81:4
81:10,11,21 82:3,12,25 83:2,10
83:16,19,21,23 84:21,24 115:5,22
116:8 129:19 130:2 131:16 215:9
215:17 218:2,3,4,8,17 219:14
303:14,21 314:25 336:9,13,23
337:6,13,16 338:2,4,7,23,25
349:25
**boards** 79:19,24 80:6 81:2,8 82:18
82:21 115:3,8,11 116:4 294:18
**boiled** 261:16
**Bonnie** 1:18 3:13 358:3,25
**bono** 56:8
**bonuses** 96:2
**boss** 83:6 216:11 309:7
**bottom** 164:7 182:16 248:18 278:15
289:18 293:3 294:15 315:23
328:17 330:15 333:16 335:19
**box** 248:17
**branding** 105:21
**Brazil** 83:2,3,11 215:3
**Brazilian** 243:2
**break** 5:25 6:4,6 45:20 49:11,14,20
49:23 50:3 58:7,11,14 116:10
142:2 171:11 172:20,24 187:16
206:5,9,15 226:18 350:8
**breakdown** 245:16
**breaks** 5:25
**Brian** 93:4 118:13,17 233:3 289:16
**brief** 192:20
**briefly** 193:6 243:3

**bring** 100:25
**Brittany** 2:15 8:9
**broad** 60:13 153:11
**broaden** 207:19
**broader** 207:18
**broadly** 154:18
**brought** 218:3 227:6 308:4,9
332:11
**budget** 65:10,10,18,20,21,25 66:6,7
66:10,13,14 67:5,8,10 70:18,21
70:22,25 71:3,5,10 72:3 175:13
345:2,22 349:10,23 350:5
**budgetary** 175:8
**budgeting** 65:3,7
**bulk** 157:4
**bullet** 157:21 159:22 160:6
**business** 3:20 17:2,23 18:4 21:18
23:6 26:14,15,21 27:8 29:12 49:6
54:25 55:6,7 59:21 62:21 63:12
91:16 101:3 115:19 153:9 197:16
232:7 233:9 235:10 246:6 299:12
300:3,12,17 347:22
**businesses** 25:6 45:9
**businesspeople** 45:5,8 62:22 63:13
**busy** 334:3

---

**C**

**C** 1:1 2:1,1 3:1,11 131:21,25 132:7
132:8 352:2 358:2,2
**C-O-N-N-O-R-S** 77:5
**C-O-S-T-A** 3:19
**C-S-A-C-Z-A-R** 173:19
**C-S-A-S-Z-A-R** 173:20
**C.V** 294:14
**calendar** 181:22,24 189:13,16
242:20 247:20,22,24 248:2
**call** 98:21 159:11 196:5 205:21
306:25 310:14 324:11
**called** 3:12 19:3 43:18 52:23 110:23
200:22 247:4 260:19
**calls** 7:16 8:19
**Canada** 81:14
**candidate** 13:4 161:7,21 175:6
180:23
**candidates** 101:19 102:7 104:8,16
105:5 111:7 161:23,23 169:12,21
172:7 173:6 175:17 177:24 178:8
178:15 180:14,18,20 315:6,10
**Canfield** 15:25
**capacities** 1:7,8,9
**capacity** 82:14,22 83:25 119:11
216:14 217:13,16 224:20
**carat** 275:2
**care** 3:22,23 98:22 151:21 357:4
**cared** 321:12
**career** 87:8
**carried** 112:14
**case** 69:7,7 73:7 76:8 104:11,11

105:10,10,14 106:3 154:9 158:16
199:23 273:7 276:9 278:2
**case-by-case** 104:10 156:8 310:14
312:3
**cases** 253:25
**casual** 176:24
**categories** 144:13
**category** 111:4
**caused** 300:13
**caution** 159:3
**caveat** 309:15
**cc'd** 344:11
**cc'ing** 278:7
**CCO** 93:18,21 234:5
**ceased** 249:16
**ceded** 243:3
**center** 274:23 315:20 334:8
**Centre** 1:12
**CEO** 29:10 91:9,10,11,18 131:17
131:18,18 215:9 216:12
**certain** 38:8 69:9,11 108:18 136:10
146:23 165:2 175:3 194:24
223:21 329:18
**certainly** 313:9 348:15
**certify** 352:6 358:4,14
**CFO** 131:17 136:17 137:18,19
138:17,19 139:5 336:4
**chairman** 29:9
**chance** 171:23 330:17
**change** 12:5,9,11 16:15 19:21 25:15
30:6 35:2,5 39:11,24 74:19,20
100:12 146:13,14 227:5,5 271:4
272:4 298:25 305:13 310:2 327:3
346:24
**changed** 12:6 17:5 19:25 20:2
34:22 35:6 63:16 181:25
**changeover** 298:25
**changes** 66:16 94:24 137:2 179:11
331:7 345:22
**changing** 346:25
**channel** 114:19
**characterize** 235:24
**charged** 66:15 95:21 128:4
**chart** 90:4,10 92:3 103:16,20
124:25 155:4 248:16 249:12
251:11
**charts** 90:5,6 97:23 98:22 248:20
248:24 249:8,10,14 357:4
**check** 188:6
**check-the-box** 161:17,18
**checking** 248:17
**Chemical** 1:5,6,6 2:12,18 11:8,12
11:15 12:3,6,17,24,25 13:6 14:19
14:23 16:10,12,16 17:7 18:15,22
20:20 21:8,9,18 22:17,24 23:4,12
23:17 24:4,7,18 27:3 37:18
112:22,24 113:2 240:16 270:3
**chemicals** 59:10

**chief** 35:7 93:22 143:3 148:4 159:15
170:23 171:16 172:8 190:22
247:16 357:11
**choosing** 262:3
**chose** 245:5 324:12
**chosen** 250:20
**circle** 116:17
**circumstance** 118:16 253:23
310:16
**circumstances** 66:22 68:11 74:14
138:9
**Ciro** 215:8 216:11 311:11
**City** 2:4
**claim** 328:19 329:2,19,23 331:24
340:16 343:15
**claimed** 259:14 333:23
**claims** 56:11,14,17,19 253:3 254:3
329:24
**CLARICK** 2:7
**clarify** 36:24 37:6 46:15 50:11 70:5
73:24 95:14 127:12 131:11 137:4
140:20 150:11 153:22 156:6
172:22 179:13 182:23 226:25
234:23 262:21 302:19 308:2
**clarifying** 37:12 227:8 236:5 265:2
285:13 339:9
**clarity** 11:3 75:21 139:25
**class** 239:23
**clause** 84:14,14
**clean** 5:11
**clear** 37:6 42:20 81:6 109:23
206:14 331:25 344:15
**clearly** 331:22
**Cleary** 12:23 13:3,6,12,18 54:4,16
54:21 55:12,18,22 56:4,11,24
57:3,18 58:3,8,24 121:3,7 123:3
166:7,22 269:22
**client** 24:25 25:19,21 60:12,13 68:5
68:7,10,12,15 69:3,17 200:24
201:3,6,7 204:10,15 210:8 215:6
215:8 216:10,12,14,14,17 217:4,4
221:7 234:20 235:5,12,15,17,20
235:24 266:19 268:4 269:12
295:22,24 310:16
**client's** 280:10
**clients** 48:20 51:6 52:3,7,10,19
59:18,19 60:11,19 66:16 67:14,20
68:24 69:16 119:7,10 128:4
160:17 202:7,12 203:6,11 204:11
204:18,19,21 231:17,24 232:21
234:19 239:18 295:20 299:3
309:13,22,25 310:3,7,25 311:24
345:12,15
**clients'** 309:20
**clock** 151:19
**close** 157:13 350:22
**closed** 350:15,18
**closely** 20:18 49:4 117:2 137:14

199:8 216:10
**co-clients** 234:21 235:3
**co-counsel** 209:11
**coach** 49:9
**collar** 57:6
**colleagues** 199:7
**colored** 104:3
**colors** 103:19
**Colwin** 2:15 32:20 41:7 44:8 45:15
45:18 97:18 98:16,19 99:3,5
102:4 103:25 104:5 107:9 111:10
119:2 120:14 127:11,24 134:20
141:15 145:22 151:5 157:12,25
158:21 159:7,18 178:10 198:25
201:20,25 202:13,23 203:8
204:16,22 205:24 209:9,14,18,22
210:7,12,15 217:6 218:14,24
220:20 221:22 225:20 251:21
252:15 256:9 259:24 260:14
261:11,20 263:13 264:2,13 266:3
267:21 270:15 271:22 273:24
275:14 279:16 280:6,16,22 281:6
281:13 282:15 284:11 285:8
286:15 287:25 288:8 295:7 325:6
337:20 340:24 343:7 344:24
351:2
**combination** 197:6 266:6
**come** 11:5 12:19 21:7 31:17 38:10
65:24 66:21 80:9 119:21 141:18
143:14 147:21 163:12,14 173:2
173:12 179:19 194:2 196:10
201:13 214:2 221:24 233:4 239:9
246:5 248:23 251:18 259:13
287:4 290:16
**comes** 19:17 51:8 72:18 75:16
173:10
**comfortable** 179:9
**coming** 179:20 189:7 205:25
293:16
**commenced** 10:20 177:20,20 191:9
**commencement** 259:21 358:9
**commences** 320:5
**commencing** 164:5
**comment** 206:18
**comments** 195:7,13,20,24 196:8
202:21 284:14
**commercial** 55:24
**commercially** 33:25
**committee** 126:7,18 129:15,17,23
129:24 130:2,5,10 131:25 134:6
134:18 207:23
**common** 68:5,7,10,12,15,24 69:3,12
69:15,16 75:22 76:5,7 338:2,3
**communicate** 10:15 66:5 219:18,23
220:5 221:7 227:21 228:17
230:25 235:13 236:12 262:9,10
263:7,9 288:9 305:6,11 307:20
309:21 310:9,17,20 340:7

**communicated** 131:8 196:16 227:20 228:9 245:18 273:22 286:17 298:24 300:15 309:7 311:4

**communicating** 236:8,14 311:12 318:25

**communication** 44:19 45:5 209:19 265:13 274:12,24 276:6 277:24 283:12 287:6,10 296:15 298:17 298:21,23 299:2 301:15 306:7,9 311:23 315:20,23,24 317:2 319:8 321:4 326:7,9 332:4 333:14 334:9 336:7 338:18 339:24 342:13,17 342:18,23 344:8,13,14 349:3

**communications** 7:20,23 44:13 83:9 159:5 208:23 209:21 213:2,8 213:17 233:25 234:8 257:22 261:14 263:11,20,24 273:5 274:3 284:17,21 307:5 308:17 309:25 314:7

**companies** 17:11,13 19:12 22:14 29:17 33:15 77:8,16,18 79:25 81:3,6 87:4 115:24 117:7,23 121:16,22 122:14,16,20,22 123:2 207:24

**company** 11:23,24 17:8 20:13 21:9 21:13,15,16,21,24 22:10 29:18 30:21 31:4 40:19,22 41:5 42:22 44:18 47:6 59:16 74:13 79:23 80:13 81:13 85:7 88:9,16,17 99:2 100:25 109:24 110:18 118:3 122:4 126:8,20 127:22 128:5 132:8 136:17,22 138:22 143:22 146:21 198:24 199:6,16 200:22 201:6,9 217:20 219:10 223:18,20 227:2 239:22,25 248:23 249:18 251:9 253:13 269:10 271:5 291:7 291:11,15 292:4 296:13 309:13

**company's** 110:23 309:20

**comparable** 108:21

**compare** 157:9 158:12

**compared** 236:19

**comparing** 159:25

**comparison** 237:4

**compartmentalized** 154:20

**compelled** 119:17

**compensate** 127:5

**compensated** 73:21 218:16

**compensation** 64:23 65:3,7,14 73:19 74:3,6,8 80:5 100:2,4 126:13,18,20 127:21 128:5 132:21,24 134:17 135:6 218:23

**competency** 147:14

**competent** 153:8

**complained** 227:16,17

**complaint** 124:6,10,13,20 125:22 329:7,12 353:14

**complaints** 300:2,16 313:3 329:4

**complete** 50:8 87:22 110:8 125:12 256:7 352:9

**completed** 5:7 51:10 105:16 146:3 173:14 304:23

**completely** 69:7 310:4

**compliance** 19:17 35:7 47:15 50:18 50:19 55:9,12,17 90:24 92:13 93:15,22 100:11 104:4 143:3 148:4 159:15 170:16,23 171:17 172:8 190:22 223:22 239:10,14 239:17,17,19,20,21,23 240:4,14 240:15,19,22 241:8 243:7 247:16 329:12 357:11

**complying** 47:5

**comport** 238:22 269:16

**composition** 129:12,14

**comprehension** 279:10

**comprehensive** 282:5

**Comtrex** 199:12,13,15 200:16 223:4 229:19 230:3 231:8 233:14

**concern** 227:10 245:14,20 258:4 262:8 308:21

**concerned** 175:10 183:10 221:15 245:18 300:12 308:24

**concerning** 45:5 56:19 62:22 63:9 63:13,19 65:13 83:10 91:18 126:24 146:5 162:10 201:14 203:6 205:23 210:23 224:13,23 233:19 246:17 255:19 258:24 263:16 285:15 287:22 289:21 292:8 311:23 315:15 316:20 317:3 318:23 324:17 329:13 330:21 357:14

**concerns** 10:23 124:22 200:2 231:19 233:13 245:10,25 252:4 253:3 309:3

**conclude** 210:13 270:21

**concluded** 213:22 228:11 351:6

**conclusion** 209:6,25 256:16 348:4

**conclusions** 212:4 213:20

**concrete** 152:15

**concurrent** 80:2 132:10 141:11

**concurrently** 130:16,23 132:15,19 247:13

**condition** 6:25 7:5

**conduct** 56:23 120:7 235:21 253:5 254:6,8 258:5 286:3,25 333:24

**conducted** 118:17 299:11 334:24

**conducting** 117:6 261:5 284:2 285:3

**confer** 45:18

**conference** 5:20 269:20 270:5,23

**conferences** 269:25

**confidential** 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1

34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,23 89:1,13 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1,7 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1,14 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1,23 142:1,8 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1,21 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1,8 182:1 183:1 184:1,19 185:1,18 186:1 187:1,12 188:1 189:1 190:1 191:1 192:1 193:1 194:1,14 195:1 196:1 197:1 198:1,24 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1,16 269:1 270:1 271:1 272:1,18 273:1 274:1 275:1,20 276:1 277:1,14 278:1 279:1 280:1 281:1 282:1,23 283:1 284:1 285:1 286:1 287:1 288:1 289:1,4 290:1 291:1 292:1,14 293:1,23 294:1 295:1 296:1,24 297:1 298:1,7 299:1 300:1 301:1,5 302:1,17 303:1 304:1,11 305:1,20 306:1 307:1 308:1 309:1 310:1 311:1,19 312:1,11 313:1,19 314:1 315:1 316:1 317:1 318:1,7 319:1 320:1 321:1,19 322:1 323:1,13 324:1

325:1,18 326:1,19 327:1 328:1
329:1 330:1 331:1,13 332:1 333:1
333:5 334:1 335:1,8 336:1 337:1
338:1 339:1,13 340:1 341:1,5
342:1 343:1,22 344:1 345:1 346:1
346:2 347:1 348:1,20 349:1 350:1
351:1 353:11,13,16,18,20,22,24
354:6,10,13,15,17,19,23,25 355:6
355:8,10,12,14,16,18,20,22,24
356:6,8,10,12,14,16,18,20
**confine** 73:5
**confirm** 271:16 331:5
**confirms** 331:18
**conflict** 260:12 333:24 334:22
**conflicts** 260:25 261:4
**confused** 170:7 234:22 291:20
**confusing** 349:22
**connected** 69:22 132:24
**connection** 10:16 18:6 24:17 48:18
70:10,13 77:12 78:6 95:22 97:4
134:25 191:10 205:10 208:13,18
215:13 216:7 219:17 237:21
252:22 254:9 257:18 260:5
266:19 267:6,16 274:17 278:22
311:13 337:10,16 343:12
**Connors** 77:3,13,23 78:11 79:5,11
116:21,24 233:4 289:16
**Connors'** 78:18
**consider** 102:7 169:11 170:25
172:7 173:6 175:23 178:16,18
179:24 180:21 227:19 260:11
338:16
**considerable** 211:5
**consideration** 228:14 229:15
274:15 275:11 277:8
**considered** 95:3 111:7 154:6 164:9
168:18 169:5,17,21 170:2,8,23
171:15 172:16 175:19,23,24
176:13 177:14,16,24 178:9,16
179:15 180:16 186:25 187:5
227:22 228:10 261:8 309:12,18
338:6
**considering** 170:12 261:3 317:4
323:5 336:6
**consisted** 248:16
**consistent** 146:22 269:7 295:4
**consolidated** 123:17,24
**constant** 305:13
**constantly** 346:25
**constitutes** 205:18
**constructive** 297:14
**consult** 66:3 145:6 146:5 207:11
209:5 210:7
**Cont'd** 353:25 355:2,25 356:2
**contact** 24:6 25:2 26:12,17 84:24
117:12 203:15 215:4,6,7,8
**contacts** 26:14
**contained** 149:7

**containing** 297:11
**contemplate** 170:15
**contemporaneous** 317:10,13
**contemporaneously** 17:11
**content** 150:14 202:10
**contention** 180:7
**contents** 121:24
**contest** 50:6
**context** 57:5 176:24 259:6 270:22
296:11 326:24
**contexts** 278:19
**continuation** 326:22
**continue** 113:9 242:16,20 262:14
283:5 316:15 323:24
**continued** 25:5 350:23
**continues** 195:10 320:14
**continuing** 278:11 293:3
**contract** 60:19,22,24 61:4 132:23
133:5,6,8,10,20,23 134:5,18
218:18 302:8
**contracting** 45:9
**contracts** 105:22 202:15
**contrary** 334:10
**contributed** 213:24
**contribution** 96:4 131:9 328:22
330:13
**contributor** 239:16 286:21
**control** 66:17,22 90:22 93:9 97:11
98:23 100:8 357:5
**controversy** 358:18
**conversation** 299:17,22 316:19
320:20 330:20 342:18
**conversations** 8:11 63:12,21 191:9
224:22 239:7 242:13,15,16,20
277:7 320:18 343:9
**convey** 228:13 300:10
**conveyance** 288:16
**conveyed** 265:25
**coordinating** 77:23
**copied** 332:6,8
**copies** 161:3 192:8
**copy** 124:9,12 160:22 161:14
194:24,25 278:21 353:14
**corner** 89:10
**corp** 11:12 14:23 16:16 22:24 23:12
23:17 236:7
**corporate** 16:14 17:25 18:4,7,9,11
18:24 22:5 23:23 28:13 35:10,20
35:24 36:6,19 37:2 38:2,6,10,19
39:3,19 111:22,25 112:17 125:4,8
125:13,19,23 142:21 148:2,10,19
148:20 149:3,8,22,25 150:6,8
152:18,25 153:8 154:14,24
159:12,14 244:4,6,11 294:17,24
357:8,10
**corporation** 1:6,6 2:18 14:19 17:5,7
24:24 25:3 60:8 113:8
**corporations** 17:6 105:23

**correct** 5:22 10:3,4,21,24 13:14
14:5,17 15:22,23 20:10,20,21
23:4,5,6,7,9,10 25:19,20 34:16,23
36:19,20 37:20,21,23,24 38:3,4
39:22 40:3,25 41:2 46:5,6,9 47:16
47:25 48:4,7,11 51:18 52:3,8,9
53:9,10,25 55:9,10 59:3,24 62:19
63:17 67:20 68:9 71:25 76:14
80:19 82:23 85:8 90:20,23 91:2,5
91:7 93:16,19,20 103:15,16,21
104:21,23 112:7,18,19 115:19
116:24,25 135:22 136:12,13
139:14 140:3 149:23 150:2
152:19 160:8 162:7 163:24 164:2
165:12,13 166:4,8 167:15,19
168:23 170:3,13 171:17 174:22
174:23 175:21 176:2 177:12,21
177:22 178:5 179:18 182:24,25
187:3 189:14,15 190:24 191:11
195:11,22 196:18,19 200:2 201:4
202:4 203:7 204:11 211:14,17,21
213:13 214:12,17 216:5 217:23
218:9,12 219:18 224:3 225:19
227:3 231:9 234:5,6,24 237:13
240:13 244:13,14 258:11 259:23
263:4 265:19,22 269:23 280:19
281:11 284:18 296:16 300:9
302:13,14 303:17 306:15 307:13
307:15,16 309:17 310:22 311:2
315:7,25 317:11 319:13,19,20
324:17 325:12,13 332:5,15,16
338:18 339:3,4,6,7 340:25 347:8
352:9,12
**CORRECTION** 173:20
**correctly** 13:5 121:2 132:14 134:9
**correspond** 183:11
**corresponding** 147:14
**corresponds** 112:17
**Corrupt** 200:5
**cost** 61:13 175:9 320:6,16 344:16
347:7 348:13
**Costa** 1:7,16 2:8,12 3:19 4:1,2 5:1
6:1 7:1,8 8:1 9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1,5,25 89:1,9
90:1 91:1 92:1 93:1 94:1 95:1
96:1 97:1 98:1,23 99:1 100:1

101:1 102:1 103:1 104:1,2 105:1
106:1 107:1 108:1,12 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1,17 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1,15 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1 153:1 154:1 155:1
156:1 157:1 158:1 159:1 160:1
161:1 162:1 163:1,9 164:1 165:1
166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1
181:1 182:1 183:1 184:1,24 185:1
185:23 186:1 187:1,21 188:1
189:1 190:1 191:1 192:1,23 193:1
194:1,19 195:1 196:1 197:1 198:1
199:1 200:1 201:1 202:1 203:1
204:1 205:1 206:1 207:1 208:1
209:1 210:1 211:1 212:1 213:1
214:1 215:1 216:1 217:1 218:1
219:1 220:1 221:1 222:1 223:1
224:1 225:1 226:1,22 227:1 228:1
229:1 230:1 231:1 232:1 233:1
234:1 235:1 236:1 237:1 238:1
239:1 240:1 241:1 242:1 243:1
244:1 245:1 246:1 247:1 248:1
249:1 250:1 251:1 252:1 253:1
254:1 255:1 256:1 257:1 258:1
259:1 260:1 261:1 262:1 263:1
264:1 265:1 266:1 267:1 268:1,21
269:1 270:1 271:1 272:1,24 273:1
274:1 275:1,25 276:1 277:1 278:1
279:1 280:1 281:1 282:1 283:1,5
284:1 285:1 286:1 287:1 288:1
289:1,9 290:1 291:1 292:1 293:1
294:1 295:1 296:1 297:1 298:1
299:1 300:1 301:1 302:1 303:1
304:1 305:1 306:1 307:1 308:1
309:1 310:1 311:1 312:1 313:1
314:1 315:1 316:1 317:1 318:1
319:1 320:1 321:1 322:1 323:1
324:1 325:1 326:1,25 327:1 328:1
329:1 330:1 331:1 332:1 333:1
334:1 335:1 336:1 337:1 338:1
339:1 340:1 341:1 342:1 343:1
344:1 345:1 346:1 347:1 348:1
349:1 350:1 351:1 352:6,16 353:4
357:5
**costs** 62:7 345:8,11 346:21 347:6,25
347:25
**counsel** 7:24 8:16 9:3,8 12:18,20
13:2 16:6 24:23 26:8 34:16 35:6
35:15 37:5 41:24 42:11,22 43:21
44:14,20 45:17 48:13 50:20 53:19

53:20 54:15,18 59:8 62:20 63:8
63:17 64:9 67:22 71:17,18 82:11
82:15 83:3,15,23 84:13,19 85:2
85:15,18 94:13 97:14,16,16,19
98:8,24 100:25 101:4 103:10
104:6,21 110:11,14 111:22,25
115:2 118:10,12 119:18 120:3,5
125:8 128:9,23 142:21 143:2
144:9 148:3,3,4,10,14,19,20
149:3,8,22,23,25 150:6,7,9 151:7
151:20 152:19,25 153:8 154:15
154:24 159:13,14,15 164:23
165:11 167:14,19 168:3 170:13
170:22 171:9,16 172:8 173:23
175:10 178:7 180:7 190:21 197:3
205:4 208:3,12 211:14 214:6,12
220:15 223:6,8 224:18,24,25
226:6 227:18 228:2 229:24
233:18 234:5 236:7,23 237:6,8,23
238:24 240:13,19 243:17,22,24
244:2,4,5,6,11,12 247:15 253:12
254:5 257:3 258:19,20 260:17,19
260:23 290:15,20,21 291:2,16,17
291:25 292:4 293:11,13 294:24
300:14 301:23 302:3 309:2,11
310:8 314:17 316:21 317:4 319:4
320:6,16 324:23 334:17 335:3
340:16,19 357:6,9,10,11 358:19
**counsel's** 175:11
**Counselor** 209:21 210:6
**counsels** 172:15
**count** 30:11 32:3 320:11
**counterparties** 217:23,25
**counterparty** 133:9,12,22
**countries** 48:24 53:8,12
**country** 2:3 95:11
**COUNTY** 352:5
**couple** 36:4 113:11 116:18 192:10
230:4
**course** 7:17 19:22 22:19 23:21 26:7
31:25 49:25 67:21 137:7 165:20
201:22 235:20 236:20 245:9
256:21 264:16,24 270:4 273:12
276:14 277:5 283:20,22 295:3
**court** 1:1 4:22 5:22 88:19
**cover** 55:7 62:7 66:14 189:9 218:20
230:2
**covered** 43:15 61:12 346:23
**covering** 46:23 188:10
**craft** 143:16
**create** 17:7 100:21 109:7 114:13,15
147:8
**created** 28:6,6 38:5 85:24 106:22
109:2,3 112:7 113:24 114:5
143:12,21 146:24 148:23,25
149:17 150:5,8 156:7,8,10 174:21
186:10 189:6 190:19 197:15
240:14

**creating** 66:7 143:6,10 207:9
**creation** 37:3 38:3 207:6 210:21
**criminal** 57:9
**criteria** 106:20,24 107:3,11,14
156:25 166:17 167:10
**criterion** 167:12 168:6
**critical** 309:16 311:23
**criticism** 297:14
**critique** 230:12 297:16
**critiques** 307:19
**Csaszar** 173:8,17,22 179:23 233:2
**CTO** 131:19
**culminated** 215:18
**culpable** 260:5
**cultural** 175:15 231:19
**culture** 75:25
**cumulatively** 222:13
**cursory** 319:10
**custody** 97:11 98:23 357:5
**cut** 112:19
**cutoff** 112:12

---

**D**

**D** 1:1 2:1 3:1,11 4:1 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1 102:1 103:1 104:1
105:1 106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1 114:1
115:1 116:1 117:1 118:1 119:1
120:1 121:1 122:1 123:1 124:1
125:1 126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1 134:1
135:1 136:1 137:1 138:1 139:1
140:1 141:1 142:1 143:1 144:1
145:1 146:1 147:1 148:1 149:1
150:1 151:1 152:1 153:1 154:1
155:1 156:1 157:1 158:1 159:1
160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1 169:1
170:1 171:1 172:1 173:1 174:1
175:1 176:1 177:1 178:1 179:1
180:1 181:1 182:1 183:1 184:1
185:1 186:1 187:1 188:1 189:1
190:1 191:1 192:1 193:1 194:1

195:1 196:1 197:1 198:1 199:1
200:1 201:1 202:1 203:1 204:1
205:1 206:1 207:1 208:1 209:1
210:1 211:1 212:1 213:1 214:1
215:1 216:1 217:1 218:1 219:1
220:1 221:1 222:1 223:1 224:1
225:1 226:1 227:1 228:1 229:1
230:1 231:1 232:1 233:1 234:1
235:1 236:1 237:1 238:1 239:1
240:1 241:1 242:1 243:1 244:1
245:1 246:1 247:1 248:1 249:1
250:1 251:1 252:1 253:1 254:1
255:1 256:1 257:1 258:1 259:1
260:1 261:1 262:1 263:1 264:1
265:1 266:1 267:1 268:1 269:1
270:1 271:1 272:1 273:1 274:1
275:1 276:1 277:1 278:1 279:1
280:1 281:1 282:1 283:1 284:1
285:1 286:1 287:1 288:1 289:1
290:1 291:1 292:1 293:1 294:1
295:1 296:1 297:1 298:1 299:1
300:1 301:1 302:1 303:1 304:1
305:1 306:1 307:1 308:1 309:1
310:1 311:1 312:1 313:1 314:1
315:1 316:1 317:1 318:1 319:1
320:1 321:1 322:1 323:1 324:1
325:1 326:1 327:1 328:1 329:1
330:1 331:1 332:1 333:1 334:1
335:1 336:1 337:1 338:1 339:1
340:1 341:1 342:1 343:1 344:1
345:1 346:1 347:1 348:1 349:1
350:1 351:1 352:2 353:2
**D-O-N-N-A** 3:18
**data** 250:4
**date** 16:20 71:15,23 72:12,14 88:24
89:10 108:8 124:11 136:11
137:11 139:6 141:24 142:9 143:9
162:22 171:6 181:9 183:8 184:20
185:19 187:13 189:8 192:19
193:8,10 194:15 265:15 268:17
272:19 275:21 276:19 277:15
282:24 283:15 289:5 292:15
293:24 295:8 296:25 298:8 301:6
302:18 304:12 305:21 311:20
312:12 313:8,20 318:8 321:20
323:14 325:19 326:20 331:14
333:6 335:9,25 336:8 338:19
339:14 341:6,25 342:16 343:23
346:3 348:21 349:24
**Date's** 72:5
**Date-san** 335:22 336:9,12,23 337:5
349:8
**Date-san's** 349:11
**dated** 88:22 125:5 189:8 283:13
289:17,19 294:10 298:18 301:16
303:12 304:21 306:7,12 312:20
324:2 353:10
**dates** 306:14,15

**day** 178:3 192:25 269:11 338:4,8
338:13 352:18 358:21
**day-to-day** 117:3
**days** 247:7 314:25
**deal** 221:17
**dealing** 153:11 199:10
**dealings** 24:18 27:8
**Dear** 334:9
**debatable** 151:10
**December** 234:2 238:13,19 239:8
242:14 283:13
**decide** 168:15 340:18
**decided** 12:25 78:23 246:6 313:9
**decision** 45:6,24 100:20 109:21
174:18 187:5 198:23 219:14
261:12 262:6 300:13,19 326:14
331:4 336:20
**decline** 43:22 44:2 46:12 128:13
**declined** 44:4 45:3,12 46:4 340:23
**declining** 44:7
**deemed** 310:21
**DEF** 88:22 89:6 108:6,11 141:22
142:7,7,12,13 162:20 163:8 181:7
181:12 184:18,23 185:17,22
187:10,11,17,18 188:3 191:3
311:18 326:18 353:9,13,16,18,18
353:20,22,24 354:6,8,9 355:10,24
**DEF-000001** 313:18,23 355:14
**DEF-000010** 293:22
**DEF-000162** 296:23 297:5
**DEF-000168** 301:4,9
**DEF-000194** 312:10,14 355:12
**DEF-000219** 323:12,17 355:20
**DEF-000273** 304:10,15 355:6
**DEF-000334** 305:19,24 355:8
**DEF-000346** 345:25 346:6 356:18
**DEF-000351** 348:19,23 356:20
**DEF-000439** 343:21 344:2 356:16
**DEF-000458** 298:6,11
**DEF-000693** 318:6,10 355:16
**DEF-000696** 321:18,23 355:18
**DEF-000702** 335:7,12 356:10
**DEF-000705** 341:4 356:14
**DEF-000848** 331:12,17 356:6
**DEF-000869** 276:18,22 354:21
**DEF-000953** 333:4,8 356:8
**DEF-000961** 339:12,16 356:12
**DEF-001024** 325:17,22 355:22
**DEF-001025** 327:16
**DEF-001746** 277:13,18 354:23
**DEF-001762** 268:15,19 354:15
**DEF-001828** 272:17,22 354:17
**DEF-001858** 275:19,24 354:19
**DEF-002257** 289:3,8
**DEF-1809** 282:22 283:3 354:25
**DEF-1829** 275:6
**DEF-2062** 292:13,18
**DEF-209** 302:17

**DEF-747** 194:13,17 354:13
**DEF-749** 195:4
**DEF-954** 334:7
**defendant** 2:8,18 10:19 163:12
**defendant's** 294:3 303:5 341:7
**defendants** 1:10 2:12 89:6 163:10
**deference** 209:11
**deferred** 279:8
**deficiencies** 196:6,8,9
**define** 52:22 74:8 271:23 337:25
**defined** 33:11
**defining** 32:24
**definitely** 54:10
**degrees** 68:6
**delegate** 244:25 245:5,7 246:3
**deliver** 219:13 240:19,22 307:13
**delivered** 183:12 184:8 185:12
188:10,13 189:20 195:19 242:4
**delivering** 241:2
**delivery** 224:13
**demand** 266:10,14 282:14 288:17
**demanded** 97:12 99:8
**demands** 97:5 98:3 99:9 158:15
264:9 266:2 279:23 282:6
**demoting** 225:24
**demotion** 222:6,18
**Dennis** 197:7,9,25 199:7,9 298:20
**Denton** 93:6
**depart** 88:9
**departed** 93:19
**department** 13:3 14:16 15:2,4
27:18,19 28:2,9 48:14,16,18,19
51:18 52:18 61:14,15,16,18,19,21
61:22 71:4,5 73:9 90:19,22,25
91:4,6 100:12 101:20,23 102:10
103:8,13 114:19 116:5 117:13
120:8 139:23 140:11,12 143:15
143:22 144:11 160:14 175:2
245:2 314:24 332:17,18,19
345:11 347:19 349:11 350:4
**departments** 48:24 53:8,11
**departure** 88:13
**depend** 66:12 154:19 264:3
**depended** 26:14 66:11,19 107:13
**depending** 74:13 154:10,11,11
234:17
**depends** 52:22
**deposed** 7:7
**deposition** 1:16 4:4 7:11 9:14 10:2
10:6,9,17 193:2,9,11 287:20
350:9,15,18 352:8,11
**depositions** 178:4
**depth** 173:24 179:25 180:11
**derived** 96:5 113:8
**describe** 19:24 148:19 150:15
195:25 235:16 306:17
**described** 9:3 21:23 33:3 69:23
87:12 108:23 118:23 149:11

153:4 176:5,8,22 183:3 336:6
345:12
**describes** 152:12
**describing** 44:19,20
**description** 85:11,14,18,24 86:7
102:15,17,21 106:22,23 108:24
109:4 111:23 155:22,24 156:7,14
161:19 182:18 205:16 353:8
354:4 355:4 356:4 357:3
**descriptions** 149:2 165:19
**designated** 127:6 134:24 218:19
**designation** 94:13
**desire** 196:13 225:18 227:11 313:12
322:17
**desired** 196:11 322:9,12,20
**detail** 230:8,9 231:4,9 309:22 310:9
**details** 102:20 135:2 256:10 315:18
**determination** 41:21 164:21 165:16
282:13
**determinations** 46:21
**determine** 52:13 162:3 164:16
165:9 249:17 250:21 310:15
**determined** 41:19 66:15 167:18
**determining** 187:2 251:6
**develop** 210:17
**developed** 238:17 240:17
**developing** 242:23
**dialogue** 238:18
**diamond** 112:13 113:10
**diamonds** 113:4
**differences** 89:23 90:9,17 148:24
152:21
**different** 17:21 21:2 37:16 73:24
92:11,12,14,15,16,18,20 93:3
93:9 103:6,7 111:2,3 115:11
136:18 137:3,23,25 140:17 146:6
155:25 157:14,17 160:15,16
169:25 171:5 176:6 202:10
204:19 219:8 235:3,6 264:15
283:14 296:5 310:4
**differently** 95:6 272:6
**difficult** 236:16 262:13
**difficulties** 236:8
**difficulty** 213:9 236:10,14
**diligence** 220:15 311:9
**dinner** 342:7
**direct** 50:23 59:17 89:9 111:24
117:2,3 124:15 126:3 135:8
188:15 195:3 209:10 212:21
241:23 242:2 253:8 270:24
286:20 293:2 308:25 334:6
341:16 346:8 349:5
**directed** 71:12 320:7,23
**directing** 209:13
**direction** 305:13
**directions** 146:21
**directly** 23:20 45:9 48:25,25 50:22
51:7 81:24 259:12 284:3 287:3

306:9 358:17
**directors** 36:22 38:7 40:9,13,16,17
41:13 71:6 79:19 80:6 81:3 82:3
82:12,19,21 83:16,19,21,24 84:21
130:3 131:16 218:2,4,8 294:18
337:14 338:23
**disagree** 328:20
**disbarred** 280:17
**discharge** 56:17 257:24
**discipline** 223:7
**disciplined** 223:10,13
**disclose** 44:10
**disclosure** 314:12,14
**discovered** 261:16
**discovery** 97:5 98:3 99:9 158:15
**discretion** 42:13 44:2 46:2,11,17,18
66:9,18,19 128:12,17,24 129:5
196:20,22 267:25 268:5,7 271:8
340:18,21
**discrimination** 56:11
**discuss** 130:7 319:24
**discussed** 6:14 13:10 93:12 103:12
139:14 167:25 197:7,8 233:6
246:20 259:5,6 275:16 303:13
319:25,25 324:8 346:17
**discussing** 136:21 199:4 238:13
287:17 324:14
**discussion** 51:5 88:2 113:17 168:12
176:23 177:11 189:20 215:16,18
215:19 225:22 228:8 234:11
255:22 304:7 325:10 331:4
**discussions** 45:7 62:21 63:19 65:12
91:17,17 175:4 176:14 190:11,15
212:24 224:12,17 225:7,9,12,15
225:23 226:23 227:9,14 233:19
234:7 246:17 258:23 267:13
269:9 274:4 288:21 292:7 293:15
320:5,15 325:7
**dismissal** 126:7
**disqualification** 9:24
**distinguish** 61:6 84:15
**distracted** 64:18
**DISTRICT** 1:1,2
**dividends** 41:16,19 62:17,23 63:9
63:14,20
**divulged** 210:9
**divulging** 101:8 342:9
**Docket** 124:14
**document** 88:21 89:2,4,5,7,14 99:7
108:6,10,13,19 109:2 110:15,18
110:25 112:6 113:20,25 124:16
141:22 142:7,11,13 148:22 149:2
149:17,17 150:5,10,12,13,20,24
152:23 153:23 155:19,25 156:7
162:17,20 163:7,10,25 164:5,20
165:16 181:7,11,13 182:8,19,24
184:18,22,25 185:6,17,21,23
187:10 188:3,5,7 189:12 190:19

193:8 194:13,17,19 215:11 221:3
226:3 228:20,22,24 231:2 248:4
248:10,12 249:11 267:24 268:10
268:15,19,22 269:3,6,7 270:25
272:17,21,24 273:8,11 274:23
275:15,19,23 276:3,11,13,18,21
276:23 277:4,13,17,19 278:5,22
279:2 282:22 283:2,7,8,17 289:3
289:7,10,21 292:13,17,20 293:22
294:2,4 296:23 297:3,4,7,19
298:6,10,12 301:4,8,10,13 302:17
302:21 303:4,6 304:10,14,16
305:19,23,25 306:15,18 311:18
312:10,14,16 313:18,22,25
316:23 317:6 318:6,9,11 321:18
321:22,24 322:7 323:12,16,18
325:17,21,24 326:18 329:16
331:5,12,16 332:2 333:4,11 335:7
335:12,15 339:12,17 341:4,9
343:21 344:3 345:25 348:19,24
353:9,12,15,17,19,21,23 354:5,7
354:12,14,16,18,20,22,24 355:5,7
355:9,11,13,15,17,19,21,23 356:5
356:7,9,11,13,15,17,19
**documentation** 233:15
**documenting** 226:9,24
**documents** 9:11,14 97:11 98:10
99:9 110:23 111:3,5 112:14 143:7
143:9,10,11,16 146:7 151:6,17,19
156:10 157:10 158:5,7,14 159:21
182:10 183:18 184:7,11 187:24
199:22 213:17,19 233:6,12
257:22 260:10 264:4
**doing** 31:10 154:25 302:10
**dollar** 61:13,13 218:19 266:18
267:15 279:7 346:23,24
**domain** 350:5
**domestic** 122:14
**Donna** 1:7,16 2:8,12 3:18 352:6,16
353:4
**door** 286:22
**dozen** 36:4 74:25
**Dozens** 242:8
**draft** 145:9 186:6,11,12 191:6
193:23 194:7,9 224:8 319:16
321:4 322:14 324:15 328:6,11
**drafted** 46:25 195:17,18 349:21
**drafts** 146:9
**dramatically** 74:22
**draw** 105:4 157:6 344:15
**drug** 34:11
**drugs** 33:8
**dual** 135:25 136:2 218:13 337:10
337:12,25 338:5
**due** 48:2 220:15 311:9
**duly** 3:12 358:8
**duties** 85:3 130:10 204:19,20
214:17 216:7 219:16 220:7,19,21

236:20 238:23 240:8 244:16,20
247:13 252:13 257:24 258:6
337:15 338:6
**duty** 95:9 204:11,15 244:23

———————————————
**E**
———————————————

**E** 1:1 2:1,1,1 3:1 352:2,2 353:2,6
354:2 355:2 356:2 358:2
**e-mail** 27:13 256:4 265:16,19
273:22 277:24 278:5 283:12
284:15,16,21 285:17 289:16,19
292:23 294:9 295:13 296:4
297:10 298:19 299:19,24 300:11
303:11 304:21 305:2,9 312:19
316:4 318:18,20 322:5,12,23
323:23 324:15 326:5 327:2,24
328:8,9,11 333:18,22 339:22,22
340:2 341:14 344:14 349:3,21
**e-mailed** 278:12
**e-mails** 10:11 255:11,13,18 263:15
265:22 266:7 284:12 305:13
**earlier** 29:12 51:5 61:6 76:12 85:7
103:12 116:19,20 123:19 126:23
136:12 139:14 142:15 155:5
156:6 171:19 221:11 234:21
235:8,9 279:21 315:14 320:17
324:9 327:23 335:17 336:2
**earliest** 54:12
**early** 27:13 121:8 168:19 169:9
170:9 175:20 196:15 200:13,14
269:14 276:7 289:21,25
**easier** 92:6 145:13 147:16
**ECF** 124:14
**edits** 194:6
**effect** 288:11
**effective** 286:22
**effectively** 21:2 76:9 92:9 137:18
160:17
**effectuated** 39:24 40:6,8
**efficiency** 11:3
**efforts** 197:25 198:2
**either** 138:5 144:16 146:24 169:9
234:16 257:2
**elaborated** 228:21,25
**elapsing** 242:21
**Elbaum** 233:3
**elected** 322:13
**electronic** 249:23,25
**element** 261:8
**else's** 79:14
**employ** 358:18
**employed** 12:19 33:15 37:19,23
73:11,14
**employee** 11:14,21 15:9 24:12 32:3
101:11 147:13 158:23,24 198:23
199:5 338:19
**employees** 23:22 29:21 30:5,8,12,22
31:3,6,20 32:11,13 73:18,21 74:3

**employer** 24:15 141:8 204:25
**employment** 56:7,10 57:5 100:25
101:4,13 124:22 133:5,6 137:7
163:23 177:15,20,21 211:7 300:4
**encapsulated** 230:12,14,18
**encompassed** 151:22
**encompasses** 151:16
**ended** 46:8 208:20
**ends** 183:19
**endurance** 50:6
**ENE** 267:2,6,11,17 268:2,12 269:17
270:13,22
**engage** 62:21 63:12 78:9
**engaged** 253:10
**engagement** 301:17 302:6 308:13
**engaging** 251:19,24 252:4
**England** 53:20
**English** 235:13
**ensure** 198:2
**enter** 41:24 42:22,23 43:22 44:2,5
45:3,12,24
**entered** 42:8 47:2 129:9
**entering** 46:12
**enterprise** 51:2
**entire** 31:3 71:20 135:15 137:12
**entities** 18:10,14 21:4 22:10,22,23
23:13,15 25:24 26:3 32:13 33:2
35:25 52:12 53:4 60:18,22,24,25
78:7 80:7 86:16 87:23 102:8
103:12 112:21,23,24,25 113:6,7
117:16,20 126:14 132:10 137:8
141:6 160:16 240:9 332:24
**entity** 12:5 18:19 20:11,14,24 21:2
22:20 25:8,11 27:23 30:14 32:25
34:5 36:6 38:20 39:4,8 45:11,25
59:2 73:20 74:7,11 77:21 82:4,13
83:2 86:23 87:2 94:23 120:24
123:25 129:8 132:12 133:13,25
136:5 137:23,25 138:3 140:18
175:2 197:13 320:22 332:22
**enumerated** 144:14
**envisioned** 147:19
**Equal** 56:20,21
**equity** 56:23
**equivalent** 76:10
**ERISA** 206:25 207:4
**ESQ** 2:5,5,10,15,15,20
**establish** 61:4
**established** 22:22 65:18
**establishing** 66:6
**Esther** 99:23
**etcetera** 21:19
**ethical** 252:12 257:24 258:6 260:3
280:18
**Europe** 18:22 26:24 78:2 86:24
87:4

**evaluating** 161:15
**evaluation** 181:16 182:18,22
183:22,23 186:3,13,15 188:9,13
194:25 200:10 237:19 269:14
**event** 215:12
**eventually** 30:9 137:17,19 228:3
315:12
**everybody** 351:4
**evidence** 199:23 308:9
**evolved** 112:4 295:2
**ex-pat** 15:14 16:2 19:17 93:5
137:13,21 138:12
**ex-pats** 74:10,17
**exact** 16:14 313:8
**exactly** 12:15 13:9 118:21 169:15
209:23 212:23 233:23
**examination** 3:24 351:5 353:3
**examined** 3:14
**example** 49:2 59:11 68:17,19 74:15
90:7 118:9,15 126:23 235:4
**examples** 196:7 235:8 307:23
**exceed** 186:21
**exceeds** 186:16
**exchange** 40:25 122:17 294:9
297:10 302:21 323:23
**excluding** 126:8 127:22
**exclusively** 204:21
**excuse** 29:4 49:8 236:7 297:4 319:2
**execute** 220:18
**executed** 46:8 220:21
**execution** 118:24
**executive** 16:3 35:7 38:20 39:3
80:16 86:15 87:15 129:21,23,25
130:5,6,10,15,17 131:2,6,13,25
132:13,19,22 133:7,19 134:6,18
**executives** 87:13,24
**exercise** 45:25 128:16,24 271:7
340:23
**exhibit** 88:19,21 108:4,5,10 124:9
124:12 141:21 142:5,6,11,12,16
142:19,25 149:13 156:3,4 157:7
157:22,22 160:5,5,6 162:19 163:7
181:6,11 184:17 185:16 187:9,15
192:17,24 193:21 194:11,12,16
268:14 272:16 275:18 276:17
277:12 282:21 289:2 292:12
293:21 296:22 298:5 301:3
302:16 304:9 305:18 311:16,17
312:9 313:17 318:5 321:17
323:11 325:16 326:17,23 327:23
331:11 333:3,8 335:6,17 339:10
339:11 341:3 343:20,25 345:23
345:24 348:18
**exhibited** 206:19
**exhibits** 10:8 143:5 146:17 307:6
326:23 327:8 331:8
**exist** 146:24 155:13 159:9
**existed** 20:3 113:20 150:4,7,10,12

150:15 219:10
**existence** 28:13 47:3,14,22 126:24
288:9
**existing** 65:20 99:15
**exists** 150:14 248:5
**expatriate** 240:23 241:2
**expatriates** 32:14 95:4,8
**expect** 5:16 282:3
**expectation** 238:23
**expectations** 147:16 157:17 186:16
186:22
**expected** 66:23 238:21 280:3
**expenses** 347:6
**experience** 76:4 114:8 149:6 152:22
152:24 153:6,10,16 154:4 156:21
157:2 158:24 161:16,18 164:23
164:23,25 165:3,7,8,11,11 173:25
179:25 180:12 270:5 295:5
**expiration** 138:11
**explain** 70:2 73:7 137:2 147:5
178:23 179:6 273:14 337:23
344:16
**explained** 37:17 107:2 171:25
178:24 234:21 235:9
**explanation** 154:13 285:5
**explicit** 296:10
**explore** 271:3
**express** 245:10,14 324:24
**expressed** 225:18 313:6
**extension** 201:3
**extensive** 237:24
**extent** 44:11,22 46:7,13 66:19
122:9,13 159:4 214:14 233:3
268:11
**extents** 48:23
**external** 104:15 116:8 180:19
**extremely** 199:8

**F**

**F** 1:1 2:1 3:1 358:2
**fact** 102:22 105:5 129:11 137:24
154:13 157:18 160:14 165:6
167:25 214:15 261:24 280:18
281:20,23 292:3 315:9 334:24
**factors** 213:24 229:18 230:18
**failed** 220:2,5 263:9
**failure** 262:9,10 263:7
**fair** 131:24 137:9 143:13 184:10
193:13 209:6 211:4 296:4 297:13
299:10 300:6
**faithfully** 220:18
**fall** 168:14 169:3 171:15 178:17
200:14
**familiar** 25:10 75:24 83:15,18 85:3
86:6 110:20 115:10,18 121:13,16
121:21,23 122:24 123:11,16
129:12,14 131:21 165:21 166:10
201:17 208:17,20,21 264:8

271:11
**far** 33:13 96:3 168:10 183:10 270:2
307:10 319:21 324:18
**fast** 123:6
**favorable** 202:21 203:5
**FCPA** 205:14
**FDA** 33:8
**fear** 299:9 300:5
**February** 11:25 27:13 183:22,24
185:3 246:10 294:10,12 314:25
314:25 315:7,10
**fee** 61:5 67:13,15,17,19 95:22 127:4
127:19 346:19 347:3
**feedback** 203:6,11,16,23 204:7
231:16,24 232:4,5,6,21,22 233:7
297:12,13,23
**feel** 6:5 50:2 262:15 343:11
**feeling** 262:13,22,23
**fees** 43:10 61:8,12 62:4,7 66:15
128:4,13 129:6
**fell** 350:4,5
**felt** 80:12 245:11 261:24
**female** 64:6 87:13
**females** 86:14
**fifth** 2:8 347:17
**figure** 67:9 246:3 248:8
**file** 109:7 110:3 111:19 121:17,22
**filed** 124:13
**files** 110:3 163:12,14
**filing** 206:20
**filings** 123:2
**fill** 102:8,13 104:15,20 109:7 114:2
114:18 116:4 232:13,18
**filled** 93:13 109:12 110:10 231:7
248:15 315:12,15
**Filtech** 200:2 205:2,13,17,23 223:2
229:21 230:20 231:11 357:14
**final** 71:7,9 164:7 182:14 186:13,14
195:15 315:19
**finally** 279:6
**finance** 19:16 55:5 63:23 71:4 91:3
92:11 99:10 137:11,17 198:12
336:18,19,21 345:20 350:3
**financial** 74:9 122:25 123:12,17,24
220:13,14 221:9,10 301:20
**find** 4:17 6:5 21:17 161:19 250:24
**fine** 37:11 45:2 49:22 51:15 97:2
135:16 151:12 206:13,15,17
240:6 306:19 327:14
**finish** 58:5
**finished** 9:6 152:4
**finishes** 203:25
**fire** 196:20,22
**firm** 3:22 106:12 153:11 164:22,25
165:3,8,10,21,24 166:6,7 167:3
219:12
**firms** 54:22 165:5 166:16,18,22
**first** 3:12 8:23 9:2 11:20,23 12:16

13:2 16:18 20:19 23:3 27:11,15
33:23,25 36:5 37:4,18 39:2 54:6,8
54:9,10,11 65:17 72:5,16 84:14
85:8 111:18 124:9,13 137:12
138:24 139:3 145:10 150:8 164:2
164:7,9 168:18 169:5 170:8
172:18,23 174:2 175:19,22,24
176:17 177:14,16 178:3 188:3,4
190:19 193:3 195:17 196:13,15
207:14 225:17,21,22 228:4 239:6
240:12,15 244:9 246:10 251:16
263:6 273:9,17 275:5 276:10
278:4 279:2 283:16 291:11,14,24
293:7,10,13 294:22 296:16
297:18 299:5 305:12 308:2
312:21 314:10 320:3 321:4 322:8
322:12,21,23 323:2 333:16
335:19 340:3,11 341:18 344:12
353:14
**fiscal** 181:21 189:17,25
**Fischman** 1:3 2:23 4:4 10:3,20
109:24 111:8,20 152:18 153:2,3
160:19,21 163:17,19 164:9
165:10 167:14 178:4 181:3,17
183:12 184:8 185:3,12 186:4,10
186:21 188:13 189:21 190:12
192:9 193:15,24 194:3,7 196:2,11
196:14,21,23 201:4,15 203:24
205:3 210:24 211:6,14 212:10
213:2,18,24 214:3,14 223:7,25
224:10,25 225:10,18,25 226:4,10
227:11,22 228:10,15 229:16
233:17 234:2 235:20 236:22
237:21 238:14 239:8,10 240:19
240:25 241:9,11 242:10,14,17,25
243:16 244:16,24 245:11,15
251:19,24 255:15 257:18 259:14
259:22 261:9,17 262:7 263:9
278:6 280:13 282:13 284:17,19
284:22 287:9,17 288:17 290:17
291:4 294:10 297:11,22 301:16
304:25 307:13,19 313:7,13 322:9
322:17,20,24 323:6 324:17,22
329:13 330:8,22
**Fischman's** 162:14 189:13 192:18
195:21 201:17 202:3 203:7 204:9
205:18 212:17 216:7 222:4
224:13 226:24 234:19 257:23
287:5,19 354:11
**fit** 118:14
**five** 5:17 153:10,15,21,24 154:4,7
157:18 196:7 350:16
**five-page** 345:24 356:17
**fixed** 134:5
**flip** 189:2
**Floor** 2:8,13
**fob** 249:25
**fobs** 249:23 250:3,12,22

**focus** 154:14,19
**focusing** 172:4
**follow-up** 284:14
**followed** 166:17 253:25 306:8
**following** 146:23 334:19
**follows** 3:15
**foolish** 4:16
**foreign** 15:14 122:20 200:5
**form** 3:4 17:16 19:14 43:24 46:14
  102:4 114:15 121:15,20 132:3,16
  141:14 156:2 174:11 186:5 193:2
  212:4 213:20 258:13,15 267:3
  269:19 311:6 328:15 337:18
  338:10
**formally** 176:25
**format** 146:13,14,19,23,23
**formation** 16:19,21 17:12 28:7
**formed** 16:17,24 17:11 21:21
  256:13 262:6
**former** 158:24
**FORTINSKY** 2:20 17:16 43:24
  46:14 118:19 121:15,20 127:25
  132:3,16 141:14 174:11 258:13
  258:16 297:21 337:18 338:10
**forward** 6:11 13:3,18 14:22 37:13
  67:10 73:6 177:18 189:2 190:7
  264:21
**forwarded** 275:8,9
**found** 98:10 236:16
**foundation** 274:11 329:14
**four** 104:3 113:14 247:6 299:2
**four-page** 296:22 297:4 313:17,22
  323:11,16 333:3 339:11 355:13
  355:19 356:7,11
**fourth** 210:23
**fourth-hand** 285:12
**fraction** 338:15
**frame** 128:19,20 148:12 168:20
  169:19 290:18
**framed** 4:19
**frames** 291:21
**Frank** 165:22 167:7
**frankly** 175:8
**free** 6:5 50:2
**frequently** 66:25 67:3 247:4 309:9
**fresh** 165:5
**friction** 211:5,11,24 212:5
**Fried** 165:22 167:7
**Friedman** 106:11 161:6
**friend** 340:10
**front** 129:10 189:9 279:7
**frustrated** 340:9
**frustration** 305:11 326:15
**Fry** 204:7
**Fujiwara** 15:20 24:8 72:23 135:22
  140:11,20 197:8 292:24 293:18
  314:8,9 315:25 318:18,20 319:2
  319:15,22 320:20,21,25 321:9

322:6,13 324:2,14,24 326:6,8
  327:25 329:11 330:21 332:5,10
  339:24 340:8 341:15 342:24
  344:9 349:4,16
**Fujiwara's** 316:3 330:7
**Fukasawa** 75:10,11 250:9,16
**Fukatani** 14:7
**fulfill** 85:12
**full** 3:16 5:7 11:20 173:12 179:19
  179:20 220:16 269:2 270:7 271:7
  279:2 281:3,7,9,11 293:7 305:4
  314:12,14 320:4 327:11,13 349:6
  349:19
**full-time** 132:11
**fully** 37:10 178:23 271:4
**function** 28:8 29:4,7 50:19,19 76:25
  77:8,13 78:2,3,4,7 115:18 139:21
  239:11,14,17 241:14
**functions** 21:17 47:13 49:4 54:24
  55:2 159:23 160:8,15
**funding** 66:19
**funds** 66:14,17,18,23 67:8,12
**further** 95:14 276:6 358:14
**Fury** 92:19
**fuse** 213:23
**future** 333:18

---

### G

**G** 352:2
**G-O-H-S-E-I** 59:6
**G-R-A-G-T** 200:19
**Gallup** 114:22 115:5
**gap** 232:17
**Garden** 2:4
**GC** 42:16 51:24 82:20 93:18 94:2
  139:16 140:3 207:25 208:8
  227:20 348:5,10
**GCC** 236:6
**gender** 56:11
**general** 9:21 12:18,20 13:2 16:6
  24:20,23 26:8 34:16 35:6,15 37:5
  41:23 42:11,14,21 43:20 44:6
  48:12 50:20 53:2,19,20 55:21
  59:8 62:20 63:7,17 64:9 67:22
  71:17,18 82:11,14 83:3,14,23
  84:13,19 85:2,15,18 98:24 103:10
  103:24 104:6,21 110:11,14 115:2
  118:10,12 119:18 120:3,5 122:24
  123:10,11 125:7 128:9,23 142:21
  143:2 144:9 148:3,3,14 149:23
  150:7 154:12 159:13,14 164:12
  164:14 167:14,19 168:3 170:13
  170:22 171:9,16 172:8,14 173:23
  175:10,11 180:6 190:21 196:8
  197:3 208:3 211:13 214:6,12
  223:6,8 224:18,24,25 226:6,16
  227:18 228:2 229:24 233:16,18
  234:5,10 236:6,7,17,23 237:6,8

237:18,22 238:24 240:12,18
  243:17,22,23 244:2,5,12 247:15
  247:23 253:12,24 254:5 257:3
  258:18,20 260:17 264:23 290:15
  290:20,21,25 291:16,17,25 292:4
  293:11,13 294:23 300:14 301:23
  302:3 309:2,11 310:8 314:16
  316:21 317:4 319:4 320:6,16
  324:23 329:23 357:6,9,11
**generally** 18:8 19:24 37:12 60:12
  75:24 94:17 108:22 113:5 115:10
  121:23 123:16,18 125:2 152:11
  216:6 220:10 226:11 234:12
  258:12 267:7 269:18 278:20
  329:4
**generate** 61:8 62:3 155:22
**generated** 62:7
**generic** 153:19 154:13
**generically** 152:12
**Genesis** 214:21,22 215:13 216:20
  216:22 219:2 221:2 222:5 229:20
  231:8 243:5 297:12 301:21 311:9
**Genex** 219:10
**Genomatica** 252:7,19 258:11,17,19
  258:24 259:17 260:6 261:14
  262:9,12 263:8,10,16,25 264:9
  266:19 267:6,11 268:2 273:6
  274:6,8,10 276:9 278:2 279:14
**geographical** 18:5 69:9,22 214:25
**getting** 107:25 211:20 213:13,21
  233:23
**gist** 265:14
**give** 3:21 4:24 5:5 16:22 33:22
  41:17 82:5 84:2 86:4 111:11
  118:15 131:9 142:4 145:3 171:23
  186:7 230:22 290:18
**given** 94:17 140:16 141:9,10 179:7
  288:24 310:16,16 329:23 352:12
**giving** 175:16 242:22 319:8
**Glen** 298:20
**global** 79:23
**globally** 31:5 131:15 240:16
**go** 6:4,11 9:4 11:5 17:21 33:10
  34:13 37:4,15 41:14 42:19 48:10
  51:14 53:23 61:11 63:2,22 78:20
  78:23 87:25 92:7 107:23 109:18
  150:22 171:18 173:3 206:11
  215:15,15,18 219:15 231:23
  251:6 269:12 293:12,19 306:24
  348:6 350:16
**go-between** 235:14
**go/no** 215:15,18
**goal** 188:21
**goals** 189:5 190:9,13 237:15,20,24
  238:8,9,12,17,22 239:5
**goes** 122:3
**Gohsei** 51:6 59:3,23
**going** 14:22 17:18 49:13 51:14 63:4

67:10 79:2,3,10 88:18 89:4 98:16
98:21 99:5 102:2 105:20 108:3
127:17 142:4 151:2,5 162:16
163:6 171:23,24 180:25 184:15
192:14,20,21 193:7 194:10
262:13 264:19 269:8 303:22
311:15 333:21 336:14 341:18
342:19 350:8,9
**good** 4:2 106:17 116:10 142:3
144:2 206:8 223:22 239:5 251:12
316:18 336:17
**Gordon** 2:11 97:18
**Gottlieb** 12:23 13:3,6,13,18 54:16
54:22
**governance** 125:4,9,13,19,23
**governed** 47:2
**gradually** 30:9
**Gragtmans** 200:17,18,21,24 201:15
201:18 202:18,20,25 298:18
299:18
**Gragtmans'** 299:5
**great** 6:17 321:11 341:21
**green** 104:4
**Gregory** 106:7
**grew** 30:9
**ground** 6:19
**grounds** 262:3,5
**group** 8:13 25:4 30:8 49:7 87:4
92:24 99:18 101:14 130:8 131:15
131:20 132:8 160:13 161:6,8
175:2 294:11,13 348:11
**Gueron** 2:7,10 3:2,8,21,23 12:21
13:8 16:13 17:4,17 18:12 19:14
21:11 22:2,7,25 23:18 24:14,22
26:19 28:4,10,21 29:23 30:7
31:15,19,21 32:5,8,15,21,23 33:5
33:9 34:10,17 36:16 38:21,25
40:4,21 41:6,14 42:15,18 44:15
45:14 46:24 47:9,17 48:8,10
49:12,17 50:13 52:21 54:19 55:13
55:19 57:4 59:9 60:14 61:2,9,11
62:5,13,24 63:6,22 64:16 65:19
67:7 68:3,13,22 69:6 70:11 71:20
73:2 76:3 79:16 80:11 81:5 83:20
85:20,22 86:8,17,22 89:17 90:12
95:13,18,24 98:5,11 104:18,25
105:9 106:2 107:10,12 108:2
109:9 110:5,12,17 113:11 114:21
115:12,21 116:6 118:18,21
120:13 121:25 122:8,12,15 123:4
127:7 128:2,19,22 131:7 132:4
134:19,21 135:13 136:3,16,24
141:13 143:8 145:14,21 147:3
149:12,15 150:25 151:9,15,21
152:3,6 153:17 154:5 155:12
156:2 157:3 158:3,17,22 159:3,25
160:9 162:6 163:2 164:11 165:17
166:24 167:4,8,23 168:8 169:8

170:5 171:2,4,10,20 174:13
178:11 179:3,8 180:3,5,9 181:19
184:12 186:17 193:17 197:24
199:2 201:10,19 202:14,24 203:9
203:25 204:12,17,24 205:25
206:6,13,16 207:22 208:9,24
209:10 210:3,19 211:8 212:8
213:11 214:10,18 217:5,18
222:22 225:3 233:21 239:2 248:7
248:14 250:25 251:14 252:2,14
253:4 254:4 255:6 256:8 258:7
259:2 260:15 261:10,19,21
267:12,20 268:3 270:12,14
271:21 272:2 273:19,25 274:11
275:4,13 278:9 280:5,21 281:5,12
281:19,23 282:2,8,16 284:6,10,25
285:7,22 286:6,11,14 287:11,24
288:7,13 290:23 295:6 303:16
310:11,13 311:3 313:14 317:12
322:10,25 327:5,12 329:8,14,21
330:2 336:22 337:19 340:5
344:23 350:12
**guess** 153:20 166:21 194:11 337:24
**guided** 54:17,20

**H**
**H** 353:6 354:2 355:2 356:2
**H-I-R-A-S-H-I-M-A** 14:11
**habits** 295:14
**Hagen** 168:6
**half** 74:25 164:7
**hall** 237:9 317:22
**Hamilton** 12:24
**hand** 358:21
**handed** 187:23
**handling** 68:14 140:8 321:10
**happen** 12:14 21:25 68:18
**happened** 67:2,5 264:20,20,22
280:9 281:17,17 284:24 285:6
**happening** 239:22 273:21
**happens** 347:18
**happy** 5:25 49:23 90:14 206:11
246:3
**hard** 263:2 334:25 336:15
**Harris** 165:22
**Harry** 75:10 250:15,20
**Hastings** 166:4 167:2
**head** 15:3,25 30:11 32:3 38:19 39:3
63:23 73:8 139:23 144:25 199:24
**headed** 50:18 55:8
**header** 89:7 316:4
**heading** 112:8,10 140:11 201:6
**headings** 114:7
**headquartered** 79:23
**headquarters** 18:2,3 197:14 347:22
**heads** 71:5 232:7 233:9
**health** 95:17
**hear** 4:9 5:14 209:3 259:25 283:23

316:17 328:3
**heard** 13:11 115:14,16,17 165:23
202:17 266:7 285:9 287:19
319:22
**hearing** 9:23
**held** 1:18 88:2 113:17 130:22
132:15,19 151:12 300:25 358:6
**help** 72:7 171:6 219:14 221:14
246:2,3
**helped** 165:15
**helpful** 150:21
**helping** 234:4
**hereunto** 358:20
**Hide** 72:6
**Hidefumi** 72:9 136:11
**Hideo** 250:19,20 290:13
**high** 7:13 326:15
**high-level** 230:11 240:4
**highest** 131:14
**Hirashima** 14:8,10,11
**hire** 12:25 101:12 102:25 107:5
109:13 110:8 111:17,18 167:18
172:20,23 175:9 334:16 340:16
340:19
**hired** 20:19 35:15,22 36:9 37:18
85:6,10 100:13 106:4,6,10 109:24
111:21 114:6,22 147:9 150:9
154:14 170:3 174:14 175:20
177:19 200:9,11 244:4 291:13,17
**hires** 165:4
**hiring** 100:14 101:10 102:19
104:11 107:15 154:6 160:19,21
165:4 171:5,16 175:24 225:6
320:6,16 345:3
**hirings** 103:3 104:12
**Hiroo** 39:5
**history** 264:8 265:25 279:22 282:11
**hold** 44:15 45:14,19 47:7 98:11
130:16 131:15 147:17 197:9
**holding** 17:8,10,13
**Holdings** 1:5,6 2:12,18 11:8,12,15
16:10,16 18:15,22 22:24 23:12,17
24:4,7,18 113:2
**honestly** 334:4 349:20
**honor** 350:7
**hour** 49:13
**hours** 9:9 113:14 151:16,22 206:2
350:13,14
**HR** 15:25 19:15 50:23 55:4 144:25
198:19
**huge** 308:14
**human** 14:8 139:11 143:15 144:11
**hundred** 29:25 30:3,4 32:9
**hyperbole** 231:5,6
**hypothetical** 281:19,22

**I**
**I.D** 293:25

**Ichia** 64:2 75:10
**idea** 95:2 138:15 141:8 143:11 145:23 146:3 167:5 250:6
**identical** 157:23 158:2,5,10
**identification** 88:24 108:8 124:11 141:23 142:9 162:21 181:9,10 184:20,21 185:18,20 187:13 192:19 194:14 268:16,18 272:18 272:20 275:21,22 276:19,20 277:14,16 282:23,25 289:4,6 292:14,16 293:23 296:25 297:2 298:7,9 301:5,7 302:18 304:11,13 305:20,22 311:19 312:11,13 313:20,21 318:7 321:19,21 323:13,15 325:18,20 326:19 331:13,15 333:5,7 335:9,10 339:14,15 341:6 343:23,24 346:3 346:5 348:20
**identified** 47:12 107:13 128:13,20 212:6
**identify** 45:11 75:3 85:25 89:4 104:2 106:8,19,20,24 107:3,7,11 108:9 142:10 163:6 196:5 219:9 219:17,21 220:2 335:23
**identifying** 84:17 98:9 156:3 220:12,13
**identities** 38:16
**ignore** 334:25
**Iguchi** 64:4,5,8,12,15,24 65:8,14 75:5,9,18 345:20
**Iguchi's** 65:2
**Iguchi-san** 345:17
**II** 113:9
**image** 112:16
**immaterial** 311:2
**immediate** 230:13,18
**immediately** 107:20 288:23
**impact** 6:21 67:5 280:10 303:22 347:2
**impacted** 303:14
**impairs** 7:5
**implemented** 249:17
**implies** 61:19
**imply** 235:19
**import** 308:15
**importance** 321:12
**important** 4:24 147:12 239:21 240:2 242:9 261:25
**impossible** 140:15
**impression** 230:23
**in-house** 105:22,24 153:10 164:23 165:7,11
**inadvertently** 176:10,13
**Inatomi** 290:13
**include** 19:13 29:12 51:20 56:11,13 56:16 76:16 117:9 122:14,20,22 126:21 156:19,21 225:9 228:23 234:7 282:5 324:12

**included** 19:15 48:21 51:3,4 53:13 55:3 123:24 146:10 163:22 237:25 280:3 287:22 288:5 297:14 329:25
**includes** 126:12 306:6 314:6
**including** 53:14,16 75:13 101:14 129:8 197:6 294:14 307:24 335:16 349:9
**inclusion** 125:19
**incoming** 246:21
**incorporated** 327:8
**increase** 66:9 101:22 132:21 344:16 345:2 346:19,21 347:4
**increased** 347:6,7
**increasing** 101:24
**incumbent** 86:15 153:2 224:19
**incumbents** 83:16,18
**incurred** 346:22
**Indeed.com** 115:24
**independent** 254:2
**independently** 222:12,14
**Index** 1:3
**indicate** 275:2,10
**indicated** 47:13 116:23 286:23
**indicates** 112:11 269:9
**indicating** 270:10
**indirectly** 126:21,22 358:17
**individual** 1:7,8,9 15:4,17,18 71:12 72:22 133:12,15 239:16,18 335:24
**individually** 236:2 258:22
**individuals** 71:24 72:11 74:23 75:4 92:10,12 93:3 99:14 103:23,25 107:5 135:10 173:7 211:24 233:9 236:19 290:11 336:3
**industry** 239:23
**inefficient** 147:10
**inform** 80:23 223:17 224:18
**informal** 5:20
**information** 44:9 101:8 114:11 119:17,25 120:6,11 125:12,14 161:20 162:3 164:4,15 165:15 171:25 187:4 209:2 219:13 229:23 230:24 251:6 253:6 254:21 255:3,5,9 257:14 264:12 265:5,24 266:9,13,17 267:9 280:4 282:4,17 285:12 287:21 288:4,5 294:13 302:13 303:3 309:16 310:25 311:5,23 312:22,24 313:11 316:7 327:11
**informed** 13:6 212:16 214:3 265:8 309:15
**informing** 296:5,8
**initial** 24:25 160:19
**initially** 13:23 109:24 111:21 133:3 228:20
**initials** 21:5
**input** 232:3 318:21,22,24 334:25

**insensitivity** 231:20
**INSERT** 232:20 357:16
**instance** 52:11 112:6 199:18 251:16 252:9 338:3
**instances** 60:23 95:21 125:17 235:12 260:22
**institute** 51:6 60:3 144:20
**instruct** 226:2
**instructed** 5:17 239:9
**instructing** 146:12 281:24
**instructions** 145:3
**insurance** 50:25 95:17
**intellectual** 51:3 55:4 57:17 94:4 154:25 155:9
**intended** 59:11 78:20 79:6 156:11 160:12 193:12 329:22
**intention** 7:18 11:3,4
**interact** 27:11
**interacted** 67:22 236:19
**interacting** 67:25
**interaction** 201:14 202:10 210:24 228:5
**interactions** 24:16,21 26:9 82:20 83:22 84:21 201:18,21,24 202:7 202:11 222:11 226:3,10,14 231:18 343:17
**interacts** 159:23 160:8
**interest** 20:24 197:2 260:12 279:8 286:23 309:20 313:7 324:24 332:18 333:24
**interested** 6:9 37:12 148:13 168:16 319:3 341:19 358:16
**interests** 228:11 309:20 310:18
**interim** 105:25
**intermittent** 121:10
**Intern** 2:24,25
**internal** 19:20 46:20,23 47:10 48:6 50:21 55:4 57:15 76:13,22 77:7 77:10,25 78:2,4,6 90:21 92:14 93:2,9 100:8 101:19 113:24 116:21 117:7,13,21 118:17,25 120:7,11 144:11 172:13,20,23 173:5 174:4,9,25 175:5,17 180:17 180:23 198:7 290:11 340:13,13
**internally** 225:23 334:24
**international** 56:8 153:11 247:2
**interpersonal** 213:6
**interpret** 272:8
**interpretation** 272:5 308:13
**interrupt** 5:5,12 206:6
**interview** 13:24 15:21 176:18,21 315:9
**interviewed** 13:22 14:3,13 100:16 163:21 176:15
**interviewing** 315:6
**interviews** 286:3
**investigate** 212:18 253:3 254:3 340:16

**investigating** 260:7,13

**investigation** 200:4,7 253:5,9,10 254:8,10 256:7,11,14 257:18 259:7 260:24 261:9 264:12 272:12 273:12 276:14 277:5 278:23 281:3,7,9 283:20,23 284:3 284:15 285:3,21 286:22,25 287:3 287:23 333:25 340:13,14

**investigations** 57:7,10,13 253:14,22 254:7 256:22 257:5,8,9,12 260:18 261:5

**investigative** 57:2 254:14,16

**invited** 80:20,22

**involve** 200:4,16

**involved** 9:25 100:20 117:5 126:19 205:7 207:6,8,9 208:7 254:19,24 255:21 258:10,16,23 264:23 287:3 315:17

**involvement** 50:24 208:10 286:20

**involving** 219:3

**IP** 94:14 154:14,15

**Irrespective** 245:6

**IRS** 209:8,16 210:2

**issuance** 62:22 63:13,20

**issue** 41:16 180:12 206:25 207:9,17 222:21 223:14 229:19 230:13,17 252:18 260:13 261:15,16,18 308:3 321:11 336:6 349:8,9

**issued** 41:20 97:6 205:10,13 249:22

**issues** 98:6 118:4 153:12 221:11 228:23 229:9,14 230:20 238:12 239:21,24 299:9 308:9

**item** 199:25

**items** 51:13 149:8 234:13

---

**J**

**J** 2:5 3:11

**J-O-Y** 3:19

**Jacobson** 165:22

**Janofsky** 166:4

**January** 88:6,8,23 89:11 190:16 191:10 252:19,21,24 260:3 265:5 265:7,11,16,25 280:10 287:16 353:10

**Japan** 15:15 17:5 18:15 24:4,7,18 26:25 27:18,20 29:18 30:22 47:16 48:3,6 51:7 59:18,19 74:11 75:21 77:19,21 78:4,6,7,8,9,12,19 79:7 79:9,10,12,15,23 80:12 137:15 138:7,10 175:2 233:20 235:15 290:17 291:4,14,25 292:5,9 293:10,12 303:14 308:11 316:8 320:22 324:25 325:8,11 328:21 330:8,12 336:21 337:13,17 338:8 338:20

**Japanese** 17:6 29:17 32:14 47:5 74:16 75:25 122:22 140:9

**Jeff** 99:23 100:3

**Jennifer** 1:3 2:23 4:4 33:15 106:10 109:21 160:19,21 172:16,18 174:14 178:4,17 180:4,7 181:17 183:24 188:11 189:6 191:9,16 194:25 199:11 200:12 202:17 212:13 219:6 221:13 232:4 236:11 255:15 261:13 277:25 278:6 283:13,25 284:13 285:15 285:20,24 286:2,5,9,16,21 290:16 294:10 296:5 297:11,16 298:25 300:17 301:16 302:3,4 303:11 304:21 306:7,9,11,21 308:5 309:6 314:11,19 315:16 316:20 317:4,7 317:15,24 318:23 319:9 320:7,24 321:10 325:7 333:23 334:23 340:17 343:8,11 345:3 346:9 348:5

**Jennifer's** 191:6 193:2,5 202:21 203:12 252:10 259:7 283:23 285:10 295:13 319:23 342:25 343:5

**JEROME** 2:20

**Jerry** 8:9

**Jersey** 103:3,18 241:2,9,10 242:10

**job** 4:17 85:3,11,11,14,17,23 86:6 102:14,16,21 106:22,23 108:23 109:3 111:23 112:3 115:3,5,8,11 115:22 116:4,8 132:11 149:2 155:22,23 156:7,14 161:19 171:25 176:12 186:9 216:9 219:16 220:7 227:16 309:10 338:4,8,13,16

**jobs** 132:12

**Joe** 154:13 155:2

**jogs** 182:5

**Johei** 27:8 232:5 278:7,20

**John** 1:8 15:25

**join** 11:23 80:14,22 81:2 159:7 300:14 351:2

**joined** 11:24 12:16 20:14 21:3,12 23:3 29:5 85:8 227:2

**joining** 240:9

**joint** 124:22

**Jordan** 233:2 306:7 307:4 308:4

**Joseph** 94:9

**Josh** 255:14 277:25

**Joshua** 278:7

**Joy** 3:18

**JR** 2:5

**judge** 151:24 270:6

**judgment** 161:24 206:20 309:19 310:14 334:10,20

**July** 1:13 297:11 352:8 358:21

**June** 246:11

**jurisdiction** 69:9

**justifiable** 344:17 345:4

---

**K**

**K** 352:2

**K-E-L-L-I** 210:25

**KANE** 2:2

**Katherine** 77:9 93:5 289:17

**Kathryn** 93:24 155:2 173:8 178:16 179:15 233:2

**keep** 5:11 6:11 7:18 197:2 247:20 309:11

**keeping** 309:14

**Kelli** 96:18 210:24 211:2 212:14 213:25 233:3 312:19,24 313:2 331:3,3,23 343:10,13

**Kelli's** 340:16 343:14

**Ken** 15:20 24:8 72:23 135:21 139:22 140:10 197:8 292:24 293:18 314:8,9 315:20 318:18,20 319:2 320:20,21 322:5,13 324:2 324:12 325:10 326:5 327:25 339:24 341:14 344:9,13 346:18 349:4

**kept** 25:25 247:23 309:9

**key** 114:8 149:5 152:22,24 156:19 156:25 157:9,21 159:21 160:7 161:17 248:18 249:23,25 250:3 250:12,22

**kind** 49:24 103:3,15 114:15 144:20 155:25 192:5 193:3 249:22 265:13 302:22 342:17

**knew** 38:12,15 40:2 137:12 258:10 321:12

**know** 4:10,14,16,17 7:25 8:21 13:9 16:24 17:2,10 22:4,13,16 24:9,11 28:15,17,23 29:24 30:11 31:12 32:17 33:18,20 34:3,5,8 36:17,21 38:6,13 39:7,16 41:3 42:7 49:24 51:15 70:24 71:21,21 72:16,19 73:3,13,16 75:17 77:22 78:5,11 78:15 79:3 83:8,13 84:7 85:17 87:2 90:17 92:19,20,24 93:8 95:10 96:3 97:2 99:22 101:11,15 101:18 102:20,21 103:23 107:19 107:24 109:2 110:22 111:6 112:5 112:25 113:23 115:13 122:3,7 123:23 124:3,4,16 125:11,15 126:2,4,6,11,16 127:3,19 130:21 130:25 131:5 132:9 135:16,25 136:7 137:5,13,15 138:3,9,13,24 141:17 142:2 144:17 145:18 147:23 148:8,22 150:18 153:19 153:20,22 158:25 159:8,9,10 166:18 167:2,7,9 172:2 174:24 178:19 179:2,11 182:6 186:14 187:20 189:24 191:16,19 195:16 199:15 203:17,20 205:3,6,9,12 206:5 212:7,10 220:10 222:2 226:13,17 228:2 232:10,16 233:11 238:4 241:18 246:16 248:20 249:7 250:3,7,7,9,10,13

251:5,15 256:6,10 257:21 258:2
259:3 263:8,19 265:9 266:12
267:2,15 269:3 271:14 272:7
274:5,19 275:16,25 277:3 279:13
279:17,18,20 280:7,11 286:12
289:24 291:6 295:10 299:12
304:2,3 305:15 306:23 308:14
312:5 317:5,14 319:5 323:4
324:10,19 328:18,25 329:24
331:9 336:25 337:9 342:2 345:6
349:22
**knowledge** 73:11,14 87:22 126:19
128:25 130:24 166:21 184:6
185:10 246:19 279:17 288:2
**known** 18:17 290:7
**Kobayashi** 96:22
**Kohei** 64:2 75:10 329:7,13
**Konstantin** 99:23,25
**Kosakai** 72:15 138:24 139:2 335:21
335:24,25 336:7,14
**Kosakai's** 72:16 139:4
**Kosakai-san** 335:20,22 336:11,25
337:4
**Kosakai-san's** 349:9
**Kreuzburg** 1:18 3:14 358:3,25
**Kuropatkin** 100:3

---

**L**

**L** 1:1 2:1,5,15 3:1 352:2
**language** 160:4 274:25 275:2
**large** 49:2 54:22 242:8
**larger** 61:20
**largest** 31:18 32:2 48:25 51:22
**late** 168:19 169:6,9 170:9 200:13
**launched** 33:16,21,24 34:2,6
**law** 3:22 5:22 17:5 47:5 54:22 94:5
101:4,13 121:13 122:7 123:3
153:11 164:22,25 165:3,5,8,10,21
165:24 166:6,7,10,16,19,20,22
167:3 219:12
**lawsuit** 9:17
**lawyer** 7:16 166:15 245:3
**lawyers** 7:15 54:14 102:9 245:2
249:18
**lead** 68:11
**lead-up** 233:17
**leadership** 199:9
**leading** 225:6 288:21
**learn** 16:18 38:11 78:19 172:2
259:14,19 263:23 267:23 274:14
330:6,10
**learned** 13:12 54:21 118:11 165:4
176:9,13 240:11 260:8 262:11
264:18 287:4
**leave** 119:16 232:12,17 242:2
**leaving** 93:12
**led** 66:17,22 101:10 190:12 211:10
239:17 259:7

**Lee** 93:6 167:24 169:3
**left** 29:3,7 33:13 39:14 92:7,7 94:15
96:12 99:2 113:12 134:15 136:17
138:22 173:2
**legacy** 316:9
**legal** 3:17 13:2 14:16 15:2,3,5,6
17:9 19:16 25:4,6,23 26:16 27:17
27:19 28:2,3,8,20,22 29:3,7 41:24
42:3,8,12,23 43:2,6,7,9,9,11,22
44:3,5 45:4,7,12,24 48:14,15,18
48:21,23 52:12,16,25 53:5,8,11
55:11,17 56:20 60:13,17,20,25
61:7,12,13,15,18,18,21,22 62:8
68:14 69:18 70:14,24 73:9 82:22
83:25 84:22 90:24 92:12 93:14
94:16 100:11 101:20,23 102:10
102:25 103:8,11,13 104:4,20
105:13,22,24 106:8,18 114:19,20
114:25 116:4 126:25 127:3,20
128:4,10,13 129:6 139:21,23
140:8,9 143:22 144:10 145:12,15
153:9,10 160:14 192:6 198:5
219:3,7,9,18,21,23,25 220:4
235:20 243:12 302:5 314:24
332:16,18,19,22 345:11 346:18
346:20 347:18
**legally** 40:5,7,12,15 41:20
**Leo** 177:8
**lesser** 66:18 233:3
**let's** 5:11 17:15,21 37:15 45:19
58:10,13 73:5 87:25 89:20 92:17
102:5 107:23 140:19 145:12
153:21 162:18 171:11 188:4
191:25 193:19 226:18 231:23
320:11 321:15 326:16 343:19
**letter** 99:6 270:10,17,17 272:9,11
301:17 302:7 308:14 328:7
**letters** 270:19
**level** 7:13 129:19 132:2 157:16
186:15 244:12
**leveled** 280:13
**levels** 288:22
**Lexington** 2:19
**life** 51:5 58:23 59:12 60:3
**light** 272:9
**liked** 164:22,24 330:8
**limit** 145:12
**limitations** 271:2
**limited** 33:6 70:7 261:13
**limits** 111:3
**Lindsey** 106:13,16 167:25 168:7,9
168:22
**line** 84:8 206:7 301:17 312:21
320:4 321:4 328:17 340:11
341:18 345:16 348:7 357:17,22
**lines** 108:25 231:22 320:11
**LinkedIn** 114:24 115:6 116:7
**list** 51:15 166:16 189:5 282:6

**listed** 29:18 30:21 40:24 122:16
126:8 127:22 129:6 135:19 149:9
230:23
**listen** 342:25 343:5
**listening** 193:5
**literal** 235:18
**literally** 235:19
**litigation** 9:25 10:20 55:25 56:5,6,7
56:8,10 94:14 97:4 121:3,4,7,12
163:11 199:13,13,17 233:14
258:19,21,25 259:16,18,22
264:16 270:4 274:6,8 279:25
287:7,16
**litigator** 55:23 269:23
**little** 4:11 20:18 97:13 123:6 139:25
170:6 192:4 291:20 349:21
**LLP** 2:2,7,11,17
**located** 53:19,21 102:10 103:17
235:15 317:19 337:6,8
**location** 241:24 242:3 250:22
**locations** 98:9
**lodged** 300:2
**logo** 112:18,19,20 113:3,6
**long** 9:4,8,19 58:11 87:8 111:2
121:6 197:15 204:5 231:2,4
233:15 242:19 291:6 323:5
326:11,13
**longer** 23:8 28:3 249:10 251:9
261:25 332:14
**look** 99:11 101:25 111:23 162:23
167:6 181:19 186:18 188:20
329:16 331:5,7 341:9
**looked** 101:18 102:15 193:3 237:17
239:24 263:14,15,17 283:8
298:13 308:18 312:2 322:14
323:19 327:2
**looking** 85:12 88:25 92:2 106:21
107:5,8 108:12 109:7 117:24
148:2 149:5 190:8 195:24 248:9
251:13 263:10 268:21 276:23
277:19 283:7 289:9 294:4 298:12
301:10 303:6 304:16 305:25
313:25 318:11 321:24 322:7
323:18 325:24 327:15,17 339:17
344:3
**looks** 90:2 92:9 96:21 103:22
273:17 274:24 293:17 326:25
**loss** 305:5
**lost** 30:14 69:13
**lot** 5:8 56:7,8 70:8 199:9 209:18
216:15,16 219:8 245:25
**loud** 4:11
**lower** 164:2
**LSII** 59:21,24 131:18
**Lucite** 25:11,16,24 53:19
**lumped** 183:18
**lunch** 113:12 168:12 177:4 342:5,7
**Luncheon** 116:12

## M

**M** 352:2
**M-A-N-S** 200:20
**M&A** 49:2 53:25 54:3,6,13,21 56:6
  216:9 218:3 220:16
**ma'am** 149:19
**magazine** 166:15
**Maikoo** 75:13
**maintain** 236:24
**major** 56:3 106:13,15 167:24 168:6
  168:9,22
**majority** 60:17 253:25
**making** 178:7 259:23 316:20
**male** 64:6
**man** 27:8 64:7
**manage** 67:9
**managed** 25:23 48:19,20,25 51:18
  114:23 224:24
**management** 19:16 50:24,25
  126:11 129:15,16,24 349:9
**manager** 91:21,24 92:21 93:9 195:7
  195:13,16,24
**manner** 201:14
**MANSUKHANI** 2:11
**manufacture** 33:8
**Maple** 1:11
**March** 88:10,11 181:18
**Margaret** 99:15
**margin** 62:8
**mark** 45:21 88:19 89:12 98:17
  108:4 113:10 124:8 162:18
  275:17 276:16 277:11 282:20
  288:25 292:11 293:20 302:15
  313:16 321:15 323:10
**marked** 88:24 108:7 124:10 141:23
  142:8 162:21 181:8 183:15
  184:19 185:18 187:11,12,18
  188:3 190:5 191:2 192:18 194:14
  195:4 268:16 272:18 275:20
  276:19 277:14 282:23 289:4
  292:14 293:23 294:16 296:24
  298:7 301:5 302:18 304:11
  305:20 311:19 312:11 313:19
  318:7 321:19 323:13 325:18
  326:19 327:15 331:13 333:5
  335:8 339:13 341:5 343:22 346:2
  348:20 354:9
**marketplace** 53:2
**marriage** 358:16
**Masanori** 24:9,11,17 139:13 234:8
  324:9
**master's** 246:6
**material** 89:23 90:9 135:5 147:18
  152:21 218:22 309:13,18,19
  310:15,17,21 311:5
**materially** 155:25
**materials** 10:12 162:8 256:13,16,17
  257:10

**Matsugu** 91:22 251:10
**Matsuyama** 99:13
**Matt** 99:5 205:25
**Matteo** 2:24
**matter** 9:21 26:15 57:21 59:15
  68:14 69:12,15 146:6 198:24
  200:2,5,16 205:2,7,10,17,23
  206:24 207:2,5 208:13,19 209:7
  209:25 222:5 234:17 238:11
  252:7 258:11,17,19 259:7,10,17
  260:6,8 263:11,25 264:9 266:2,11
  266:15,20 267:6,11 268:2 274:17
  274:19 279:14,15 280:23,25
  282:7,12 285:11,16 299:18
  308:12 309:19,22 310:9 311:13
  330:17 332:11 357:14 358:17
**matters** 25:23 26:6 48:22 56:9 68:4
  69:8,11 101:14 130:8 146:10
  204:10 207:15,21 239:19 258:21
  332:18
**Matthew** 2:5 4:3
**maximum** 30:11
**MBA** 247:12,21 248:6
**MC** 87:4 129:13
**MCA** 12:3 13:23,25 15:5,6,9,19
  16:2,4 20:4,8,11,14,25 21:2,12
  85:9,10,12 138:5 197:11,12,13
  198:3,4,5,7,10,12,15
**MCC** 14:18,21 15:10,20 20:15,24
  25:3,16,17 26:9,17,22,23 27:24
  28:2 29:10 59:21 68:15,15,16,25
  136:9 139:21 140:5,7 197:14,20
  197:21 295:17,20 316:4
**MCC's** 140:8
**MCH** 47:13
**MCHA** 11:6,17,21 12:12 14:4
  17:23,25 18:6 19:5 20:4,6,6,15
  21:20,23,25 22:9 23:22 24:13
  25:23 26:2 29:20 32:2 34:13,16
  35:9,12,20 36:6,14,19 37:2,23
  38:2,5,10,19 40:11,13,18,18 41:4
  41:9,13,16,17,20,22,24,24 42:4
  42:13,17,22,22 43:3,8,13,21
  44:21 47:2,15 48:12,15 49:5
  54:24 61:8,22 62:12,15,21 63:12
  63:24 64:15 65:4 66:9,13,14,23
  67:12,13,19,22 68:12,14 69:4,16
  69:18,23 71:3,6 72:2 73:18,18,21
  73:22 74:3,4,7,14,16,17 76:4
  77:24 79:19 81:2,22 82:3,13,21
  83:5,9,15,23 85:3,6,15,19,21
  86:14 88:7,22 89:7,15 91:12,18
  95:21,25 97:20 98:8 101:18
  102:10 103:13 117:7,12 118:25
  120:24 123:20 126:14,16,20
  128:4,10 129:9,13,19 130:9,17,20
  130:22 131:3,14 132:20 133:4,14
  133:16 134:15 135:25 136:22,23

  137:8,22 158:20,23,24 164:10
  167:15 172:12 174:3,7,8,21
  176:16,18 181:21 196:18 197:2
  197:23 198:21 200:25 203:5,11
  207:21 210:17,21 211:7 215:5
  218:11 225:23 228:12 231:17,24
  232:21,22 236:7,25 240:9 246:14
  246:18 247:14 248:11 249:21
  250:2 256:24 267:10,16,25 268:7
  268:12 279:13 287:2 289:21,25
  290:6 294:23 300:14 310:8 311:9
  317:18 319:5 320:7,24 336:9,24
  337:6,14,16 338:2,4,7,23,25
  344:16 345:8,21 346:22 349:10
  349:23,25 353:9
**MCHA's** 66:22 70:18,21 98:3
  119:6,10 125:7 143:15 163:12,14
  266:19 295:20 345:2 347:6
**MCHB** 19:4 53:16
**MCHC** 11:10 13:23 14:13,17 16:16
  16:19,24 17:12 18:3 20:16 21:21
  23:20 26:3 28:5 29:19 41:10,12
  41:21 42:5,8,11,16 47:3,22 67:12
  67:16 70:20,25 71:7,11 73:12
  83:19,21,24 125:9,11,14,18
  126:18 127:6 128:10,12 129:8,20
  129:21 130:3,7,8,15,18,23 131:2
  131:6,13,17,17,19 132:7,8,13,23
  134:2 136:9,10 137:19 138:17,19
  139:7,8,12 140:25 141:12 159:24
  160:8,12,13 174:6 175:3 197:21
  225:24 290:12 320:7,21,23 339:5
  346:14,16 348:4,9,12,16 349:10
  350:2
**MCHC's** 126:6,11 129:14 346:18
  347:3
**MCHC/BHQ** 347:19
**MCHE** 18:18 53:14 268:5,6
**MCHJ** 23:25 24:3,12 27:20 28:6,7
  28:8,19 29:2 53:12 67:23 68:2,11
  68:12 69:17 70:10,17 72:22 73:15
  83:16 84:22,25 95:2 136:9 139:23
  140:13,17,22 141:12 235:13,15
  235:16,24,25 311:13 332:20,21
  333:18,22
**MCHJ's** 85:4
**MCPP** 26:22 27:2 83:3,10,12
  200:22 201:11 202:22
**MCUS** 12:7,8 138:5
**MCUSA** 37:19
**mean** 14:22 15:7,13 25:22 31:3
  52:10 60:12 61:21,23 62:11 67:16
  69:14 89:18 97:16,18 105:2
  112:22 122:16 136:25 141:5
  146:20 169:18 171:4 210:6 217:4
  219:8 222:12 226:5 228:25 235:3
  235:4,6,7,19 239:13 246:13
  258:17 274:2 280:12 291:16

348:9
meaning 43:7 136:4 270:17 271:20
means 115:13 117:15 134:10 147:8
160:11 166:13 271:14,16,25
272:5 273:17 275:7 316:12
meant 26:5 68:16 160:13 264:14
314:15 349:22
mediation 267:4
medical 6:24 7:4
medication 6:20 49:20 206:11
meet 8:6 154:22 161:22 237:11
meeting 8:8,10,12,15,23,24 9:2,4,7
79:10 177:2 215:18 221:12
225:21 286:4,8 288:2,4,10 303:15
303:21 315:2 336:11
meetings 78:8 191:14,17 199:10
288:12
member 25:4 27:17 35:8,11 36:15
81:21 139:21 160:14 215:9
337:13 349:25
members 38:11,16 41:12 48:19
49:4 51:18 52:17 54:24 83:24
103:13 131:17,25 314:24 338:4
memorialization 317:10
memorialize 99:8 316:24
memory 7:5 139:5 148:11,23 182:5
190:18 203:14 204:6 266:25
281:14 287:2 329:22 331:2,6,19
mental 245:16
mentally 148:15
mention 51:4 96:23 333:21
mentioned 8:13 15:21 25:7,18
26:21 51:17 52:2,6 53:7,25 55:8
59:2,17,24 60:6,9 61:25 70:14
71:10 76:13 120:16 135:21
136:12 138:16 154:23,24 174:3
175:18 191:8 229:8 231:8 250:14
252:18 324:13 335:25 336:25
349:7
mentioning 176:5
mentions 164:6
Mercedes 2:15 8:9 44:17 97:18
merged 25:3,16 139:20 140:5,7
merger 59:22
mergers 29:17
merit 222:6,8
message 295:14 328:2 332:9 334:15
met 7:15 8:3 27:12 130:7 161:17
167:24 169:2 287:17 336:25
methods 105:11
Mexico 200:6
MicroSintesis 81:13
mid-April 234:3
middle 320:3
midway 279:5
midyear 191:7
Mike 200:17 202:18,25 298:17,20
million 274:16 277:8 279:15

million-dollar 266:14 280:2
Minami 255:16,19 264:17 265:8,17
273:6 278:6
mind 6:11 7:18 19:18 31:17 51:8
75:16 87:19 147:2,21 172:14
173:10 221:24 233:4 340:3
mine 237:8
minimum 153:9,16
minute 41:17 151:3 162:23 335:16
minutes 49:21 58:12 107:17,22,24
113:12 350:16
mischaracterize 300:8
mischaracterizes 261:21
mischaracterizing 270:16
misrepresented 47:18
missed 53:18
missing 178:25
misspoke 42:15 47:11,18 235:23
misspoken 26:5
mistake 112:13
mistakenly 15:19
mister 76:10
misunderstood 30:17
Mitsubishi 1:5,6,6 2:12,18 9:25
10:24 11:7,11,15 12:3,6,16,24,25
13:6 14:18,23 16:10,11,16 17:7
18:14,22 20:19,20 21:8,9,17
22:17,23 23:3,12,16 24:4,7,18,24
25:2,6,7,10 27:2 35:25 37:18
42:24 43:23 52:20,24 60:7,10
68:8 81:7 87:9,23 94:18,21,21
102:8 103:6 112:21 113:2,8
117:10 123:25 136:5 165:8 173:3
240:16 270:2 290:16 332:24
337:10 338:20
Mitsubishi's 112:17 272:7
Mitsubishi-related 86:16
modify 214:15
modules 247:6,9
moment 16:23,25 34:4,14 148:16
150:23 157:8 186:7 206:3 232:7
248:3 264:21,22 302:23
Monday 299:13
money 134:24 209:17 346:14,16
monies 209:8
Monster.com 115:14,15,23
month 130:7 177:6
months 118:4 120:18 280:7 307:12
316:21
morning 4:2
motion 292:5
motivated 313:12
move 23:11 29:6 88:15 102:2,5
193:19
moved 20:8,24,25 22:18 23:13,15
174:25
MPI 59:22 60:9
MRC 25:9,13,16,24 26:4,6

MTPA 31:24
MTPC 29:12,15,16,21 30:16,17,21
31:5,7,13 33:4 59:22 60:6
multipage 181:6,11 184:17,22
185:16,21 187:9,15 194:12,17
272:16,21 275:18,23 277:12,17
282:21 283:2 292:12,17 318:5,9
353:21,23 354:5,7,12,16,18,22,24
355:15
multiple 112:20 132:10 147:4
182:10 327:8
mutual 10:24 211:6

N

N 1:1,1 2:1,1,1 3:1,1,11,11 352:2,2
353:2 358:2
Nallen 93:7
name 3:17 4:2 12:2,4,8 34:3,5
43:17 72:5,16 76:8 77:4 87:3,5
93:6 138:25 139:3 173:17 244:9
316:3 336:15
named 25:11 27:8 59:2 72:22 87:14
135:11 233:10 250:15 335:24
names 75:12,15 92:3 135:18 232:9
232:18 233:4
narrative 195:6 210:23 266:8
narrow 154:21 161:23
Nathan 114:22 115:5
national 166:7
nationally-known 165:24
nature 24:20 43:6 55:22 90:4 95:17
148:20 149:9 190:8 201:24
202:11 227:13 234:10
NCC 94:25
necessarily 61:5 69:10,24 70:12,16
necessary 120:7,11 153:16 162:3
need 36:23 49:19 58:12 81:8,10,15
101:3,22 107:16 113:15 127:5
137:4 151:24 155:9 186:18,23
191:24,25 209:5 210:7 253:11
266:21 291:19 300:23 306:21
331:5 344:15 350:21
needed 49:10 67:9 80:13 81:16
102:12 120:12 144:17 152:25
221:14 336:10 345:21
needing 269:11
needs 69:18,21 107:14 140:9
154:21
negative 232:4,5,6
negotiated 67:15 129:10 133:7
negotiating 48:21
Netta 219:12
neutral 269:14
never 90:16 212:6 223:13 254:7
259:11 283:25 311:4 328:12
nevertheless 320:5,12
new 1:2,12,19 2:4,9,9,14,14,19,19
15:5 20:14 93:7,11 97:2 99:11,14

99:23 100:7,18,19,21 103:3,4,17
103:18 122:17 133:8 137:14,21
147:9 167:18 175:11 191:11
234:4 241:2,9,10 242:10 250:12
286:18 348:5,10 352:3 358:4
**Nicholas** 1:7 2:13 93:16
**Nick** 100:24 102:19 104:12 168:16
168:18 178:18 225:21 226:12
227:15 252:3 253:6,10 255:15
260:9,12 261:24 262:11 264:24
265:8,16,18,24 266:8 267:19
268:10 273:5,12,18,23 274:24
276:7,14 277:4,8,25 278:6,21
279:22 283:13,19 284:7,8,13
285:9 286:5 288:5,9 292:23
293:10,19 299:2 341:19,21,24
342:8,15,18 345:3
**Nick's** 262:12 272:12 283:22
287:22
**nickname** 250:20
**Nicole** 2:10 8:8,10,11,16 9:8
**Nippon** 51:6 59:2,22
**Noltex** 203:13,15,18
**nominating** 126:6
**non** 66:3
**non-attorney** 217:14,15
**non-compensatory** 95:11
**non-legal** 43:14 61:25 63:8 91:17
**non-MCHA** 65:13 66:5
**non-Mitsubishi** 112:22,23
**nonresponsive** 220:24
**Noriyoshi** 139:9
**normally** 216:16
**Notary** 1:18 3:13 352:22 358:3
**note** 182:17 226:12,16
**notebook** 192:4 193:15
**noted** 125:18 350:20
**notes** 191:13,16,18,19,21,25 192:3
192:9,18 193:16 226:13 354:11
**Notice** 1:18
**notified** 25:25 223:21
**notify** 314:24
**November** 177:21,23 194:4 195:2
195:17,22 224:2 227:2,10 228:9
228:20 229:17 230:2 273:7 274:4
276:7,7 280:9 292:8,24 293:16
298:18,19,22 307:14 326:11
330:18,24
**nuisance** 308:19
**number** 6:2 8:18 20:2 22:22 30:5,8
51:6,22 67:2 74:19,19 79:24
87:14 106:4 118:9 137:18 138:17
157:15 182:15 187:8 196:5
201:22 213:23 232:6 285:9 312:7
328:21 330:8,11 336:4 343:9
**numbers** 182:15
**numerous** 202:7
**NYU** 247:9

**O**

**O** 1:1 2:1 3:1,11,11,11,11 352:2 358:2
**o'clock** 350:7
**o0o** 350:24
**oath** 3:15 4:6 5:21 352:8
**object** 17:19 306:13
**objection** 5:15 12:21 13:8 16:13
17:4,16,17,21 18:12 19:14 21:11
22:2,7,25 23:18 24:14,22 26:19
28:4,10,21 29:23 30:7 31:15,19
32:5,8,15,20,21,23 33:5,9 34:10
34:17 36:16 38:25 40:4,21 41:6,7
41:14 42:15 43:24 44:8 46:14,24
47:9,17 48:8 52:21 54:19 55:13
55:19 57:4 59:9 60:14 61:2,9 62:5
62:13 63:22 64:16 65:19 67:7
68:3,13,22 69:6 70:11 73:2 76:3
78:25 79:16 80:11 81:5 83:20
85:20,22 86:8,17,22 89:17 90:12
95:13,18,24 102:4 104:18,25
105:9 106:2 107:9,10,12 109:9
110:5,12,17 111:10 114:21
115:12,21 116:6 118:18,19
120:13,14 121:15,20,25 122:8,12
122:15 123:4 127:7,11,24,25
128:2 131:7 132:3,4,16 134:19,20
136:3,16 141:13,14,15 143:8
145:14,21,22 147:3 153:17 154:5
155:12 156:2 157:3,12,25 158:17
158:21,22 160:9 162:6 164:11
165:17 166:24 167:4,8,23 168:8
169:8 174:11,13 178:10,11 179:3
179:8 180:3,5,9 184:12 186:17
193:17 197:24 198:25 199:2
201:10,19,20,25 202:13,14,23,24
203:8,9 204:12,16,17,22,24
207:22 208:9 209:9 210:19 211:8
212:8 214:10,18 217:5,6,18
218:14,24 220:20,23 221:22
225:20 233:21 239:2 248:7,14
250:25 251:14,21 252:2,14,15
253:4 254:4 255:6 256:8,9 258:7
258:13,14 259:2,24 260:14,15
261:10,11,19,20 263:13 264:2,13
266:3 267:12,20,21 268:3 270:12
270:14,15 271:21,22 273:19,24
273:25 274:11 275:13,14 278:9
278:11 279:16 280:5,6,16,21,22
281:5,6,12,13 282:8,15,16 284:6
284:10,11,25 285:7,8,22 286:6,11
286:14,15 287:11,14,24,25 288:7,8
288:13 295:6,7 297:21 310:11,13
311:3 313:14 317:12 322:10,25
325:6 329:8,14,21 330:2 336:22
337:18,19,20 338:10 340:5,24
343:7 344:23,24 351:2
**objections** 3:4,4
**objective** 156:24 188:21

**obligation** 49:18
**obligations** 47:16 48:3,5
**obtain** 53:5 81:9
**obtaining** 81:3
**obviously** 101:24
**occasion** 287:8
**occasioned** 69:17
**occasions** 67:4 78:18 106:5,18
118:22
**occupied** 152:18
**occur** 51:13
**occurred** 28:23 40:3 66:16 117:25
229:22 261:14 299:25 331:20
**October** 176:20 242:23,25 325:13
**Oda** 94:18
**Oda-san** 95:2
**offer** 176:12 262:12 264:18 265:9
279:14 280:3 288:23
**offered** 20:23 279:6 314:16
**offerings** 19:21
**offers** 282:6
**office** 29:8,9 91:21,24 103:15 110:3
173:13 191:20 192:2 236:24,25
237:5,7 246:24 247:5,8,9,12,25
248:6,9 249:19,24 250:5,12
286:18 290:12 317:23,24 319:4
**officer** 35:8 93:22 129:21 130:15,17
131:2,6,13 132:13,19,22 133:19
143:3 148:4 159:15 170:23
171:17 172:9 190:22 247:16
357:12
**officers** 130:7
**offices** 236:25 317:17
**oh** 29:4 41:17 51:2 52:4 61:25
69:20 71:15 76:20 109:25 130:11
131:19 134:2 146:20 151:4
155:20 175:22 178:18 193:10
220:9 228:3 236:3 252:23 259:20
274:7 319:16,16 347:20
**Ohira** 139:9,11
**okay** 3:8 4:11,21 5:4,12,17 6:6,17
7:17,21,25 8:12,21 9:10 13:17
14:20 15:12 17:2 19:19 20:22
21:7,14 22:4,9 23:21 24:4 26:7
27:5,15 28:7,16 30:5,10,17,20
31:7 32:10 35:19,24 36:5,14 37:8
37:11,14 38:9 44:11 45:2,21
46:10 47:7,20 48:2,5 49:15,22
50:3,11 51:10,15,22 52:2,5,19,25
53:7,22 54:12,17 55:8 58:10,13
59:14 61:7 62:10 63:6,7 68:16
69:3,8,20,25 70:4 71:9,23 72:21
73:25 74:15 75:16 77:22 79:11
82:24 83:14 84:10,16 90:15 91:14
92:17 93:14 96:3 97:15,22 98:17
102:12 107:3,25 108:2 109:6
111:20 112:10 113:16 115:14
116:11 129:18 134:3,13 135:14

137:20 140:12,19,20 141:18
142:19 143:13 145:12 147:11,18
148:13,16,17 149:21 150:11
151:4 152:7,9,14,15,16 153:25
155:16 156:9 157:20 158:8
159:19 160:18 163:5 165:9
167:11 168:24 171:9,12,23 173:4
173:16 174:20 177:10 178:20
180:22 182:5,17,21 183:2,5,25
188:4 190:2 191:22 192:4,14
193:13,13,19 198:3,20 199:12
203:4 210:10,16 213:15 216:25
217:10,22 221:17 223:25 227:8
228:6 229:4,25 230:6,15 231:23
236:5,13 237:10 238:7,16 240:3,5
245:19 248:11 250:14,19 251:12
251:17 253:19 254:9,25 257:2
259:20 264:5,16 265:2,12 266:9
267:5 269:6,13 271:24 273:8,14
274:9 275:9 277:3 278:13 280:23
281:9 285:13,19,25 287:21
288:25 289:20 290:3,13 291:13
291:19 294:15 295:9 296:14,21
300:20 301:2,14 302:4 303:19
304:6,25 305:17 306:13 307:2,5
308:2,6,17 309:21 310:19 311:6
312:4 314:11,18,19 315:14
316:14 317:9,16 318:4,25 319:18
320:14 321:15 322:16 323:8
325:3,14 327:14 328:11 329:18
330:25 331:7,21 332:13,23 335:5
335:18 336:5,14 337:23 338:6
339:8 342:2,12 343:11 344:10
346:4 347:12,23,23 348:13
349:23 350:19
**old** 2:3 144:16 317:24
**Oliva** 1:7 2:13 93:16 100:24 104:12
168:16 169:6,13,18 170:3,9,24
171:15 172:25 175:19,25 177:3
177:11,19 180:16,22 224:17,23
225:2,21 226:3,23 227:10,21
228:9,13,18 229:3 253:7 254:10
254:21 255:4,15,19 256:23
257:17 258:10,18 259:14 260:9
260:12 261:24 273:5 278:6 287:5
287:9,17 288:15 291:13 292:24
300:13
**Oliva's** 176:17 256:6 258:5 291:24
**once** 9:18 44:4 67:15 78:12 130:7
212:16
**oncoming** 228:2
**one-page** 89:7 268:14,19 289:2,7
302:16 303:4 304:9,14 312:9,14
321:17,22 325:16,21 326:17
354:14 355:5,11,17,21,23
**one-year** 134:10
**ones** 46:18 79:21 104:2 143:12
159:16 192:10 231:25 232:25

308:15
**onward** 164:6 189:3
**open** 104:8,14 105:6 110:2 114:18
114:25 115:25 116:4 156:13
286:22
**opening** 13:7,11,12 102:2 109:8
156:17 178:9
**openings** 104:24
**operating** 21:13,16 22:14 23:4
126:8 127:22 128:5 197:16
**operations** 26:24
**opinion** 180:10 280:20 340:15
**opinions** 325:9
**opportunities** 175:16 242:22
**opportunity** 124:5 178:23 179:7
284:23
**opposite** 338:11,12
**optimistic** 319:10
**options** 271:4
**order** 79:12,15 83:5 125:12 127:21
160:17 213:8 331:19
**org** 90:4,5,6,10 92:3 97:23 98:22
155:4 357:4
**organization** 61:20 88:22 89:8
105:21 353:10
**organizational** 89:15
**origin** 95:12
**original** 111:17 113:8 284:14
**originally** 20:5,14 257:14
**originate** 216:22
**originated** 118:23
**ought** 228:2
**outside** 54:15,17 66:16,22 70:8,9
77:10,23 81:8,9,11 82:21 83:9
84:22 102:10 117:7 199:5 205:3
208:12 219:12 220:14 246:18
247:7 260:19,23 334:17,25 335:2
340:16,19
**over-communicate** 310:24
**over-communicating** 308:22
**over-reporting** 308:25 309:4
**overall** 186:15
**overlap** 198:2,18 199:9
**overlapping** 197:22
**oversaw** 102:19
**oversee** 218:3
**overseeing** 48:22
**overwhelmed** 221:14 231:21 334:4
**owe** 204:14
**owed** 204:11,18
**owned** 23:20 29:19

**P**

**P** 2:1,1
**P-A-T-R-I-A-T-E** 95:7
**P-A-T-R-I-O-T** 95:7
**P-H** 244:10
**p.m** 116:12,13 351:6

**packet** 182:14
**pad** 192:6
**page** 88:23 124:16 164:2,7,8 182:7
182:13,14,15,23 183:6,25 184:4
185:5,8 188:15,21 189:2 195:3,10
265:10 273:17 274:22 275:5
278:4,25 293:3,4,4 294:15 296:16
297:19 299:5 314:10,22 315:19
326:25 327:15 333:16 334:7
335:19 340:3 341:17 344:12
349:6 350:23 353:3,8,11 354:4
355:4 356:4 357:3,17,22
**pages** 111:2 183:15 187:11,18
188:6 189:3 190:4,5 191:2 192:18
193:4 231:2,4,7 354:9,11
**paid** 43:3 67:13,16,19 74:14 95:25
128:5 209:16 218:21 346:20
**panel** 13:24 15:21,24
**panoply** 9:3
**paragraph** 125:4,24 126:2,3,4
135:9,11,14,15 206:19 207:7
214:21 279:3,6 293:7 299:8
314:23 320:4 321:3,5 328:18
346:9,10 347:13,14,17 348:3
**paraphrasing** 265:10
**Pardo** 96:13 100:13,15 101:15
**parents** 344:18 345:5,9,13
**Park** 2:13
**part** 4:17 9:11 16:15 25:13 28:11
28:12,18 29:19 44:4 46:5 50:20
65:2 89:22 121:12 160:21 171:25
218:3,16 221:16 233:6 238:15
254:6 261:4 272:12 285:20
310:15 316:12 327:6,24 334:21
335:16 337:16 338:7 340:12
342:24
**partial** 218:22
**partially** 129:6
**participant** 324:11
**participate** 158:14,19 160:18
**participation** 80:6
**particular** 15:16 18:5 26:17 57:20
63:25 69:18 71:12 76:24 87:18
107:4 112:6 143:18,23 146:25
156:16 164:19 173:9,21 215:12
287:8 296:9 329:6
**particularly** 295:16
**parties** 270:6 358:15
**parts** 327:10
**party** 266:11,15
**pass** 21:7
**passed** 216:15
**Pat** 144:25 145:3,6 146:12 197:6
207:11 208:7 212:2,19,20,21
251:8 254:18,23 260:8 284:7,9
285:10 286:9 314:7,11 318:16,19
328:11 333:15 334:3
**Pat's** 318:21

patent 57:24
patients 34:11
patriot 95:7
Paul 92:19 166:4 167:2
Pause 262:16
pay 56:21,21,23 128:13 129:6,10
129:11 209:7 347:25 348:5,10
payment 210:2 221:10
payments 279:8
payrolled 64:15
pending 6:3 163:3 171:21 272:3
pension 95:16 206:23 207:2,4,7,15
207:20,23 208:8 209:7 210:18,20
pensions 207:8,12 208:11
Penyar 219:11
people 5:9 13:22,23,24 14:4,12 15:2
16:5 49:5 77:23 89:18 103:17
104:3 140:10 147:17 154:16,17
154:20 165:6 173:2 176:16 197:6
212:9 242:5 246:2 328:21 329:4
330:8,12 338:2
peppered 121:9
percent 345:10,14
percentage 296:2
perfectly 84:9
perform 54:3 55:11,17 56:20
153:16 240:8 253:8,13
performance 27:4,5 181:3,16
182:18 183:11,21,23 184:7 185:2
185:11 186:3,5,16 188:9,13
189:13 193:21 195:21,25 196:5,7
202:21 203:7,12,23 205:17,19
222:5 224:2,6,9,14 226:24 229:10
229:17 230:2 237:16,19 252:12
307:14 319:23
performed 56:4 70:9 72:13 197:23
208:18 253:17 254:10 256:23
290:10
performing 28:3 43:4 72:12 77:12
236:20 245:8 247:13 253:21
257:4,9 311:9 337:9
period 6:9 31:21 33:11,13,14 37:13
50:20,22,24 64:3 71:20 73:6
84:18,20 87:18 88:5 110:22
112:15 132:18 136:20 148:21
149:11 171:19 172:5 183:13
185:12 213:4,11 225:3,6 227:6
238:14 242:24 247:8 248:15
249:15 290:25 317:3
periodic 264:23
periods 171:5
permanently 106:4,6
permission 81:9,10,15
permitted 81:2
person 63:25 71:14 75:19 76:24
81:18 94:23 103:9 154:11 172:19
176:11 227:17 236:16 246:19
250:14,17 269:10 324:8 336:18

person's 77:6
personal 6:18 97:10 231:18 334:10
334:20 343:17
personally 321:12
personnel 23:25 26:9 65:13 66:6
67:23 68:2 92:2 100:7 105:25
214:7 226:14
persons 10:16
persuaded 196:25 197:5
pertain 274:9
pertains 274:6
pertinent 257:22 336:21
PeterSan 106:11 109:25 110:2
161:6,8 162:10
Peterson 106:7
pharma 29:13,15,16,21 30:16,24
31:4,5,7,10,12 33:4,15 51:5 58:8
59:12 60:7 94:25 101:14 103:4,5
103:11 131:18 154:17 294:11,13
296:10,11
pharmaceutical 29:17 58:2
Philip 203:15
phone 7:15 8:10,18
phonetic 14:7 80:12 219:12
physically 317:19 337:6,8
picture 344:15
piece 178:24 234:11
pieces 171:12 309:16
place 1:20 8:22 22:21 66:25 89:25
118:16 143:19 168:13 190:15
199:14 200:8 214:23 215:2,12,19
249:3,12 251:12 281:4,8,10
288:12 291:8 301:22,24 330:25
342:3,13 358:7
placed 326:23
placement 105:19
plaintiff 1:3,17 2:3 4:4 97:6,12
160:19 178:4
plaintiff's 88:21 108:5 109:13 124:9
124:12 141:20,21 142:5,6 158:15
162:19 181:6 184:17,22 185:16
185:21 187:9,14 192:17 194:12
194:16 268:14,18 272:16,21
275:18,23 276:17,21 277:12
282:21 283:2 289:2,7 292:12,17
293:21 296:22 297:3 298:5,10
301:3,8 302:16 304:9,14 305:18
305:23 308:3,7,10,12 311:17
312:9 313:17 318:5 321:17
322:14 323:11,16 325:16 326:17
331:11 333:3 335:6,11 339:11
341:3 343:20 345:24 348:18
353:8 354:4 355:4 356:4
plan 62:11 189:6 317:8,10 333:20
plans 172:18 190:10 210:18,20
237:15,20,25 238:9,12,18,22
292:4 303:22

plants 21:16
Plastic 27:3
Plastics 60:10
plate 245:12,21
play 70:17,20 100:14
playing 69:4
Plaza 2:13
please 3:10,16,20 4:10,14,19 5:6
6:5 7:18,24,25 11:6 44:14,24 49:8
49:15 71:19 72:19 73:7 75:16
82:7 86:19 89:12 95:15 98:13,17
111:13 123:7 124:8 141:20
147:22 159:5 173:18 179:11
181:20 182:6 190:3 232:17
255:25 269:2 276:16 282:20
288:25 292:11 293:20 302:15
313:16 323:10,24 331:8 337:23
plenary 271:8,12,25
plus 62:7
point 12:4,8 16:9 20:23 23:8 24:6
24:12 25:3,15 26:11,17 27:25
28:19,25 30:2,3,10 34:22 35:23
36:18 37:19,22 38:9 39:10 65:11
72:18 73:4 92:24 110:7 111:17,18
122:5 135:24 136:9,19 140:2,16
140:21,25 141:10 143:14,18
152:17 154:2 156:5 159:23 160:6
161:12 168:5,15 176:3 181:23,25
189:25 206:18 210:23 215:4
216:23 226:2 228:21,21 239:15
319:10,14,21 322:19 332:13
334:17 341:25 342:20,22
points 157:21 203:10 228:22
231:21
policies 117:4 272:8,9
policy 110:16,19,23 223:18
Polymers 27:3,4,5
poor 206:20
por 218:22
Porter 205:6,9,12,22 357:13
portion 34:19 89:13 116:15 124:19
135:5 195:16 218:23 219:2
220:24 244:19,22 283:14
pose 7:21
position 12:17 13:15 16:7 34:16
51:24 71:19 84:19 85:18 88:7
97:2 100:18,19,21,25 101:16,19
102:13 104:20 105:6 108:20
109:12,16,19,20 111:20 113:20
114:3,6 132:19,22 133:19 134:13
138:21 142:16,20,22 143:2,3,16
143:21 144:19 146:13,21,22
147:2,6,13,19 148:5,9,10,18,19
148:20 149:8,10,18,23 150:2,4,15
152:12,18 153:2 154:3,3 155:8,8
155:11 156:13 159:2,12,13,14,16
160:10,25 164:2,10,17 167:22
168:17,19 169:12 170:16,18,19

170:22 171:9,17 172:9 173:11,23
177:25 179:17 180:7,15 190:22
190:24 197:9 200:13 201:8
214:19 224:18 238:25 240:12
243:15,17,21,22,24,25 244:3,3,7
244:11,13,16 271:5 287:5 290:21
314:16 315:11,15 337:17 350:13
350:14,19 357:8,9,10,12
**positions** 87:15 99:11,15 102:25
104:8,14 105:3,14 109:6 110:10
114:3,18 115:2,25 116:4 129:19
130:23 131:15 137:4,6 139:18
143:21,25 144:5,8,12,15 145:4,5
145:13,15 148:2,6 157:10 170:18
**positive** 184:11,13 203:11,21 204:7
319:9,10,22 320:2 324:16,19
**possessed** 23:8 90:6 268:12
**possession** 97:11,24
**possibility** 260:11 261:3
**possible** 120:20 221:8 276:8 288:22
334:3
**Possibly** 284:19
**post** 104:14 114:25 115:25
**posted** 104:24 105:2,2
**potential** 178:19 198:18 199:4
227:11 260:25 261:4 278:3
343:14
**potentially** 150:4,7 260:5
**practice** 76:5 94:4 110:9 121:6,13
144:3 223:23 249:15 294:23
**practiced** 121:3
**practices** 200:5 205:14 253:24
272:8,10
**practicing** 122:6 123:3
**pre-World** 113:9
**preceded** 210:20 308:8
**preceding** 288:23
**predate** 159:2
**predecessor** 11:24 12:2 85:7,8
137:8 138:3 240:9
**predecessors** 130:22
**preference** 172:12 175:15
**preferred** 174:3,8 175:5
**premises** 317:20
**preparation** 9:11,14 10:12 98:2
190:12
**prepare** 7:10,14 155:19 165:6
190:17 234:4
**prepared** 71:3 102:22 149:3 179:19
190:20 324:15
**preparing** 145:7 191:10 224:5
**present** 2:22 6:10 33:12 145:10
178:3 241:23 250:4 265:24
268:10 270:7 285:6
**presentation** 242:11
**presentations** 214:4,16
**presented** 122:25 161:7 224:9
255:2,5,9 260:10 263:17,20

265:18,21 266:5 272:11 273:11
276:13 277:4 281:10,15 282:4
284:4,9,12
**presidency** 132:20
**president** 14:7 18:20 35:8 39:6,8,11
39:13,17,21 40:10 63:11,17 64:12
64:14 65:11,16,17,24 66:8 71:16
72:4 73:17 74:5,16,21 75:7 76:17
76:21 78:13 79:5,18,22 80:3,25
82:2 83:6 85:4 86:5,13,23 87:6,21
89:16,25 90:3,7,18 91:8,20 92:22
93:23 96:7 98:24 99:17,21 100:10
102:24 104:13 119:14,16,25
120:2 129:3,18 130:9,12,17,19,22
131:3 133:4,8 143:20 148:15
150:2,9 174:16,18,22 196:18
197:11 201:11 208:5 213:16
216:2 218:10 223:12 246:14,21
249:22 251:3,4,5,23 254:7 256:22
257:3 287:2 290:4 302:2 309:12
309:14 317:18 357:7
**presidents** 126:8,20 127:22 128:5
**pretty** 146:3 161:11 200:15
**previous** 65:10 165:4 291:19
**previously** 69:23 70:15 99:14
106:13 108:21 124:20 163:18
172:13 183:4 226:22 237:7 280:8
324:13 335:23 339:23
**primarily** 25:5 32:14 55:24 254:22
320:19
**primary** 24:6 26:11 215:4,7 300:3
**PRIMAVERA** 2:15
**principal** 217:8,17,19
**prior** 8:23 16:21 35:9 59:22 60:20
75:9 87:16,21 93:12 136:23 139:5
221:12 228:8 240:8,18 254:18
259:21 264:17 292:7 322:19
324:14
**private** 40:22
**privilege** 44:16,21,23 45:23 61:4
63:2 98:6 209:15,17
**privileged** 7:23 44:9,13,19 45:17
101:8 118:20 159:5 208:23,25
**privy** 119:24
**pro** 56:7
**proactively** 307:20,25
**probably** 6:2 59:23 110:6,7 241:7
241:17 291:12
**problem** 221:19 323:25
**problems** 63:2 220:22,25 221:5,20
299:25
**procedure** 104:7 223:20,24 249:16
**procedures** 223:23
**proceed** 168:4 283:4 321:6,10
334:11
**proceeding** 358:6
**process** 13:19,20 70:24 100:23
110:4 144:21,24 168:11 176:3,4,7

176:9 187:2 221:8 249:16 315:16
**produced** 59:10 89:5 159:17 163:10
192:9,10 193:8 199:23
**product** 33:16,17,21,23 34:6,9
214:7
**production** 22:17 97:12 98:21
158:14 159:11 205:21 357:2
**products** 19:6
**professional** 1:7,8,9 153:9 296:18
298:2 334:10,20
**professionalized** 80:14
**proficiency** 157:15
**profile** 108:20 113:20 114:3 142:17
142:20 143:2,16 144:2,5,8,15,16
146:13,22 147:6,9,13 148:9,18
149:8 154:3 155:9
**profiles** 143:21 144:17,21 145:7
147:2,19 148:6 159:2,12 160:11
357:8
**profits** 62:11,15,16 123:20,23
**program** 208:8 240:14,15 246:22
246:23 248:10
**programs** 239:24
**project** 48:22 145:18 214:21,22
215:5,13 216:20,22 219:2 221:2
222:5 235:11 243:5 297:12
301:21 311:8
**projects** 48:25 49:3
**promote** 109:21 187:5 320:7,24
**promoted** 133:3 139:22 168:2
186:24 187:3 208:5 324:23
**promoting** 175:16
**promotion** 35:9 131:10,12,14
172:13 174:4,9
**prompted** 143:24 305:11
**pronoun** 120:22
**pronounce** 336:15
**properly** 281:18 336:15
**property** 41:11 51:3 55:5 57:17
94:4 154:25 155:10
**proportion** 346:21
**proportionally** 346:25
**propose** 246:13 304:24
**proposed** 100:3,24 246:10,12
326:10
**protocol** 253:16,18,20,21 261:4,8
**provide** 11:2 43:3 52:25 63:8 67:12
127:21 156:13,24 162:16 197:19
198:5,7,10,12,15 256:12 278:21
283:19 284:22
**provided** 9:10 20:3,4,6 28:14 43:8
43:10,13 52:15,16 85:11 103:12
105:25 113:19 146:9 148:9
155:24 157:5 161:5 162:2,9 168:6
181:18 183:22,23 192:8 193:24
194:7,9 203:3,20 231:4 237:21
253:6 254:21 256:15,18 257:15
264:11 266:9,13,17,18 267:9,19

267:24 279:22 285:14 316:7
**provider** 17:25 18:10,24 83:25
**providers** 22:6 23:23 70:14
**providing** 18:4 60:25 108:23
  243:12 268:8
**provision** 18:7,11 84:22
**provisions** 127:4,20
**proximate** 317:25 318:3
**public** 1:19 3:13 40:19 47:6 121:16
  121:21 122:4 123:2 352:22 358:3
**publicized** 105:3
**publicly** 29:18 30:21 59:16 296:13
**publishes** 166:16
**purchase** 120:18
**purchased** 118:2
**purchases** 120:16
**purported** 205:19
**purports** 142:20,25
**purpose** 34:8 67:25 125:19 146:25
  147:5 260:24 298:22
**purposes** 24:25 72:3 147:4,18
  230:25 335:11
**pursuant** 1:17 133:20 144:21
**pursue** 246:6
**pursued** 247:21
**pursuing** 247:12 248:6
**purview** 214:11
**put** 13:3,18 148:15 211:20 230:24
  313:2 323:2 326:24

**Q**

**Quadrant** 53:20
**Qualicaps** 79:22 80:10,17,18,23
  216:12,19,23 218:6,8,17,18
**qualifications** 102:12,18 114:9
  149:7 152:23,25 153:7 156:22
  157:2 161:18
**qualified** 102:11 105:5 161:25
  164:16 172:16 173:7,10,22
  178:14 179:18,24 180:4,6,15
**quality** 221:15
**quarterly** 121:13,17 122:3
**question** 4:15,18 5:7,16 6:4 7:21
  23:2 30:18 38:23 44:12 45:19,22
  58:6,20,21 61:17 63:5 64:18,20
  69:14 78:21 82:5,8,17 84:2,4,8,8
  84:11,12,17 86:20 90:14 98:14,18
  111:14 119:3 121:18 123:5,8
  127:9,13,15,18 128:6 132:5 137:9
  149:20 150:19 152:10 158:11
  159:20 163:2 166:3 169:14,24
  170:5 171:20,21,22 173:16
  175:23 179:4 190:3 199:3 204:2
  207:18,19 208:25 209:3 211:12
  222:22,24,25 228:4 229:13
  230:15 233:22 255:22 256:2
  264:15,21 265:6 266:21,23 272:2
  273:20 281:25 287:12,14 290:23

291:20,22 302:5 307:3 310:5
  311:7 312:6 330:3
**questioning** 6:8 7:17 109:22 206:7
**questions** 4:6,9,14 5:6 6:15,19 37:7
  98:19 116:21 178:21 254:18
  281:22
**quick** 116:18 181:2 226:18
**quickly** 49:25 146:3 193:3
**quite** 118:10 168:25 211:12 232:2
**quoted** 274:25 275:2

**R**

**R** 2:1 358:2
**R&D** 21:19 22:16
**Radlein** 232:6,10 233:8 298:20
**raise** 336:11
**raised** 307:3 336:7 337:4
**ran** 50:19 204:21 315:16
**range** 22:12 113:7 153:12 220:16
  268:8
**rank** 86:15
**ranked** 166:18
**ranks** 166:16
**Rayon** 24:24 25:2,6,7 139:16,20
  140:3,5,7 332:15
**Raytheon** 163:23 164:6
**reached** 32:4
**reaching** 307:23,25
**reaction** 221:16
**read** 3:9 38:21,24 50:14,17 58:19
  58:22 64:19,21 82:6,9 84:5 86:18
  86:21 98:12,15 111:12,15 119:2,4
  123:7,9 127:8,10,14,16 135:13,15
  158:4 160:12 178:13 255:24
  256:3 260:9 262:20 266:24 269:2
  272:6 291:23 292:19 302:20,25
  303:7 304:17 306:2 341:10 352:7
**reading** 125:22 152:6 306:13
  327:22
**reads** 344:14
**ready** 135:16 187:20 275:25 283:4
  283:5
**real** 116:18 181:2
**realize** 254:23
**really** 55:6 106:17
**reason** 60:21 131:5 154:2 163:13
  173:9,21 175:14 186:20 261:7
  300:3 332:12 334:2 337:3 347:11
**reasoning** 228:14
**reasons** 17:3,9 175:7 300:23
**recall** 12:15 14:6 15:24 16:5,20,25
  32:6 35:13 36:7 54:8 57:22,25
  71:15 72:12,17 73:9 75:12,14
  77:20 78:9 81:16,18,22 85:16
  87:3,5,16,20 90:13 91:15 93:6
  96:6,11,16 97:3,25 100:16 101:9
  101:17 102:14,23 106:15 109:10
  109:11 110:25 115:9 116:7,20

119:15 123:19 126:24 133:16,24
  133:25 134:25 135:3 142:15
  144:6 145:11 146:11,12,16 148:5
  150:10 155:15 162:11,13 168:13
  176:24 177:2 178:7 182:3 192:7
  199:24 203:16 205:5,8,11,15
  208:10,16 212:23,24 215:24
  218:20 224:11,15 232:9 233:11
  233:16 234:12 237:16 239:3
  241:7 242:8 249:4,5,6,9 254:12
  254:16 255:2,4,17 256:19,25
  257:19 258:8 259:12 266:16
  267:14,18 268:13,25 272:13
  273:10,13 274:21 276:12,15
  277:2,6,7,10,22 279:21 283:18,21
  284:20 285:23 288:14 289:13
  290:2 291:10 292:6,7,10 301:13
  303:9 305:3,10 306:4 307:17
  308:24 311:8,11,14 313:5 315:17
  317:6,15 323:7 324:18 325:2,9
  327:22 328:16 329:15 332:10
  338:4 348:2 350:10
**recalling** 83:2
**receive** 80:5 117:21 132:20 147:13
  254:14 285:19
**received** 74:4 133:18 203:5,10
  223:25 229:23 258:3 265:16
  328:6
**receiving** 73:19 74:6 204:6
**recess** 58:16 116:12 226:19
**recipient** 278:10
**recognize** 86:10 92:4 124:25 135:18
  188:5,7
**recognized** 101:4,22
**recollection** 62:14 72:19 95:25
  119:22 125:21 144:18 193:14
  245:4 293:9,14 305:8 311:22
  322:8
**recommendation** 303:23
**recommendations** 205:13,22
  357:13
**recommended** 236:11
**record** 3:3,17 49:16,18 58:18 87:25
  88:3,4 89:5 108:10 111:7 113:18
  116:16 142:11 150:22 151:6,12
  151:14,19,25 152:3,5 163:6 178:8
  226:21 250:4 299:10 300:20
  303:17 306:14 350:22 352:10,12
  358:12
**recorded** 250:22
**recruit** 109:20
**recruited** 155:7 156:12
**recruiter** 109:4,15 113:21 155:21
  155:21,24 156:13,25 315:18
**recruiters** 105:13 106:9,19 108:24
  113:24 114:20
**recruiting** 109:11,18 147:8 155:19
**redacted** 273:4 283:14

**redaction** 279:3
**reduced** 254:11,13 324:20
**Rees** 2:11 97:18
**refer** 20:11 25:21 27:19 61:15 68:7
 75:18 87:17 103:5 129:25 160:13
 182:7,13 186:23 199:18 211:2
 235:2 274:12 314:14 332:19
 339:2
**reference** 55:5 68:16 125:3 206:23
 233:12 234:13 269:13 278:14
 307:18 320:24 324:4 329:19
 332:20 335:20 340:11 342:19
 345:4,17 346:13 347:14
**referenced** 125:23 207:7 229:9
 324:10 349:18
**referencing** 214:21 215:12 216:19
**referred** 19:4 29:11 55:14,16
 129:23 155:23 212:19,20 256:4
 264:21 278:17,19 320:17 342:5,6
**referring** 11:7,11 20:12 24:3 27:20
 27:23 28:13 31:2 40:5 52:11
 53:12 55:2 59:20 60:11 61:18
 68:8 81:7 94:22 95:16 104:17
 108:24 109:23 112:16 115:6,23
 120:23 140:13 172:24 173:7
 174:16 182:15 190:21 207:16
 217:3 218:5 235:25 279:11
 284:16 308:16 329:9 331:23
 334:13,14 337:3 340:14 345:7
 348:11 349:17
**refers** 129:17 206:25 207:4 317:7
 329:3
**reflect** 89:14 103:19 149:9 155:9
 184:7 185:11 188:12 247:24
 248:5 340:3
**reflected** 152:23 163:25 185:13
 195:21 196:9 221:2 229:16
 239:22 297:18 319:7
**reflecting** 233:7 268:11
**reflection** 205:18
**reflects** 103:17 149:18 189:12
**refraining** 6:20
**refresh** 193:14 293:9,14 305:8
 311:22 322:8
**regard** 55:15 230:15 347:5
**regarding** 9:23 45:7 263:7,9 294:11
 301:16 320:6,15
**regardless** 55:15 253:19 347:18
 348:6
**region** 18:6
**regional** 18:2,2 197:14
**regions** 18:11
**regular** 173:13 309:8
**regulated** 33:8
**Reisbaum** 2:7 3:23
**rejoined** 292:3
**relate** 221:21 238:3 322:11
**related** 54:13 55:17 56:20 57:20,22

 213:18 216:20,21 220:8,25
 229:18,19,21 233:7 263:11
 300:12 329:19 358:15
**relates** 305:15 329:2
**relating** 256:24 273:6 274:7 276:8
 278:2 294:12 300:17
**relation** 233:14
**relationship** 47:3,22 128:3 235:4
 310:5 343:13
**relationships** 47:14 48:20 52:2,7
 213:7
**relayed** 288:6
**relevant** 30:23 130:8 274:3 282:4
 282:10,12,18
**relied** 260:8
**remain** 16:6 244:23
**remainder** 331:8
**remained** 137:17
**remark** 328:25
**remediate** 211:23
**remember** 8:20 16:14 50:10 94:12
 106:12 132:25 133:2 134:12
 139:2 141:3 178:20 214:5 227:23
 228:19 229:20 232:7 234:15
 239:5 267:13 278:24 280:8 296:2
 304:7 308:7 313:8 315:12 322:21
 334:5 342:7,8
**remind** 75:6 141:25 329:16
**reminded** 204:4
**reminding** 15:8
**remove** 333:17,21
**renewed** 144:11
**reorganization** 16:10,15 17:3
**repeat** 4:10 50:12 262:17 290:24
**repeated** 299:23
**rephrase** 4:15 149:19 287:13
**replace** 172:18
**report** 82:3,12,18 122:4 125:4,16
 125:16,20,23 185:13 205:10
 234:13,14 254:15,17 285:2
 287:22
**reported** 50:22 82:15 120:3 155:2
 232:3
**reporter** 3:16 4:22 38:24 50:17
 58:22 64:21 82:9 84:5 86:21
 88:19 98:15 111:15 119:4 123:9
 127:10,16 173:20 192:16 243:19
 256:3 262:20 266:24 291:23
 302:25
**reporting** 77:9 82:15 121:24 233:20
 264:25
**reports** 121:14,17,19,22 122:11,25
 123:12 125:9,13 264:24 308:22
 308:25 319:9,10 324:16,20
**represent** 44:17 97:21 163:9 193:7
 271:24
**representation** 141:12 310:7
**representations** 69:5 204:10

**representative** 350:2
**represented** 12:24 72:3 338:24
**representing** 202:22 235:5
**represents** 44:18
**request** 117:13,16 118:11,23,24
 119:17,21 120:11 133:4 160:22
 161:3 246:17 256:17 285:25
 286:4,8 294:11,13 296:11 312:24
 313:11 334:11,13,16,19 346:13
 346:15 350:7
**requested** 38:23 49:7 50:16 58:21
 64:20 67:12 82:8 84:4 86:20
 98:14 111:14 117:19 118:16
 119:3,9 123:8 125:11,14 127:9,15
 162:9 212:2 256:2 262:19 266:23
 291:22 293:18 302:24 312:22
 318:17
**requests** 119:13 216:15,16,18,21
 357:2
**require** 79:11,14 81:23 100:5 209:7
 246:24 247:2 270:6
**required** 47:3,14,22 77:13,15 80:23
 154:3 160:15 173:25 269:8
 270:18 281:3
**requirement** 179:21
**requirements** 47:6
**resemblance** 194:9
**reservations** 271:3
**reserve** 347:10 350:10
**reserved** 3:5
**resolution** 39:23
**resource** 144:11
**resource's** 143:15
**resources** 14:9 139:12
**respect** 21:25 26:16 43:12 46:10,22
 48:6 61:24 64:5 68:20 69:4 84:16
 93:2,14 99:10,25 119:23 121:18
 122:10 126:16 128:6 129:13
 134:6 136:11 140:8,20 143:5
 144:13,19 147:25 160:5,10 166:3
 170:22 173:5,16 179:23 183:15
 191:2 199:12 203:14 204:9 205:2
 205:13 206:20 207:12 222:10,20
 229:8 234:20 236:18 240:3,7
 242:13 243:15,21 252:6 257:7
 262:25 263:6 274:10 296:6
 309:16 310:2 311:8 343:14,16
**respecting** 203:2
**respectively** 307:8
**respond** 297:16
**responded** 169:25 261:15 295:13
 296:15 302:12 304:2
**responding** 7:21
**response** 5:5,16 46:15 49:9 50:9,15
 51:11 63:4 105:16 161:17 173:14
 178:20 221:16 234:22 246:4
 262:17,22 265:3 288:19,20
 296:14,19 297:18 298:2,19 299:5

302:20 304:23 318:16
**responses** 4:24 50:2 73:5 98:3
179:14
**responsibilities** 48:17 114:8 147:15
149:6 152:22,24 153:4 156:19
157:2,9,22 159:22 160:7 219:19
220:17 238:24 247:14 337:15
338:7
**responsibility** 50:23 208:4 219:9
244:23 254:6 309:11 349:11,24
**responsible** 18:6,10,24 25:5 28:20
32:18 47:5 48:13,15 50:21 52:7
52:15 71:15 76:25 77:7 81:19
100:2 101:13 117:6 120:6 139:11
154:17,18 170:16 207:20 219:5
240:25 243:2,7,9 245:8 258:18,20
260:19 262:11 345:2
**responsive** 98:9 158:15 229:12
254:17
**rest** 314:9
**restate** 60:15 127:17
**restructuring** 28:2
**result** 29:16 345:3
**resulted** 33:16 186:12,15 209:25
**results** 281:11
**resumé** 160:22 161:9,14 162:14,24
162:25 163:17,19
**resumés** 161:4 162:2
**retain** 110:9 208:4 248:11 335:2
**retained** 95:10,20 110:24 138:21
205:3 208:12 260:23 301:21
**retaining** 345:3
**retaliatory** 56:16
**retention** 110:15,18,23
**retitlings** 140:14
**retracted** 221:18
**return** 138:10 197:4
**returned** 15:10 138:7
**reveal** 159:4
**revealing** 7:22 44:13 208:23,25
**revenue** 32:18 33:17,18 43:3
**review** 9:11 88:20 124:5 125:8,23
150:20 151:17 157:8 162:14
181:3 185:2,11 186:4,11,23 189:8
189:19 191:7 193:5,20,21 194:3
195:17 205:17 212:25 213:7
224:2,2,6,9,14 229:10,17 230:2
230:12,14,19 237:25 255:18
307:13,14,24 318:19 350:5
**reviewed** 10:5,8,11 97:5,7,8,9
124:19 145:17 163:20 172:14
186:12 213:16,17 253:6 254:21
328:10,12
**reviewing** 148:5 151:18
**reviews** 150:23 151:6 184:8,11,13
186:5 187:2,5 237:16
**revisit** 45:20 118:5
**rid** 110:7

**right** 20:9 31:4 34:20 47:24 50:5,8
51:8,17 55:21 62:18 75:15 79:7
80:3 85:7 89:10 92:2,7,7,8 102:3
103:20 107:23 113:22 120:19
139:24 148:2,13 150:5 151:15
155:5 157:7,11,21,23 161:12
163:23 164:6 165:25 169:3,7
170:10 171:10,14 172:25 174:2,5
174:12,17 179:17,21 180:25
182:16 188:18 193:24 202:7
203:13 204:10 210:22 214:20
217:17,22 221:24 243:16 244:6
252:24 265:11,14 290:8 295:14
309:23,24 312:7 319:12 320:12
327:12 328:4 329:20 337:21
339:10 350:10 351:3
**rigor** 165:2
**risk** 19:15 50:24,25 219:3,7
**risks** 219:10,18,21,23,25 220:4
**RL** 45:21 98:17
**Road** 2:3
**ROBERT** 2:5
**Roche** 93:24 155:3 173:8,10 179:16
179:17 233:2
**Rockville** 1:12
**role** 27:16 34:22,25 35:4 63:7 69:4
70:17,20 71:25 72:12,25 73:3
77:6 80:2 81:18 83:23 85:15
92:25 93:11 94:11 96:10,15,20
100:14,23 102:22 103:10 107:13
107:15 118:12 119:15,25 130:16
132:24 133:4 134:25 135:25
136:2,4,14,18 139:4 143:6,10
153:16 154:12,21 156:8 158:7
163:21 167:15,19 169:17 170:13
176:15 189:21 190:18,20 191:11
196:18 197:4,18,19 218:13 224:5
224:19,24,25 225:8,10,15,22
226:5 227:18,19 228:8 231:21
233:18 234:5 236:23 237:22
239:6 247:14 254:6 310:8 311:9
321:13 337:10,12,13,25 338:5
**roles** 14:6,15,25 77:22 132:10,15
136:7 137:16 165:19
**room** 4:23 5:21
**Rose** 96:8 150:8 200:9,11 244:7,15
315:12
**rotation** 138:12
**Rothschild** 301:18,19,20 302:7
**routine** 264:24
**routinely** 232:2 321:13
**RQ** 98:21 159:11 205:21
**RULINGS** 357:21
**run** 216:9 221:8,17 340:12
**running** 326:15 332:16 344:16
**rush** 206:2
**Ryan** 77:3

**S**
**S** 2:1 3:11 353:6 354:2 355:2 356:2
**Sakaguchi** 24:9,11,17 25:19 139:13
139:22 140:2 234:8,14,15,18,23
235:19 236:2,9,15 324:7,9 332:6
332:8,14 334:19 344:11
**Sakaguchi-san** 324:5 334:9
**Sakaguchi-san's** 349:8
**Sakaya** 99:13
**salary** 74:14 96:2 175:11,12
**samples** 162:12
**san** 76:5,9
**Sandy** 106:10 161:6,8 162:9
**sat** 13:23 79:24 191:20 237:7 319:4
321:13 338:2,22
**satisfactory** 271:6
**satisfied** 258:3
**satisfy** 69:18
**Saunders** 144:25 145:24 148:6,8
197:7 207:11 208:7 212:2,19,21
212:21 224:13 251:8 254:19,23
260:9 286:9 314:8 318:19 333:15
333:21
**Saunders'** 145:19
**savvy** 153:9
**saw** 155:4 162:24 163:20 193:2
227:15 237:15 241:21 242:3
266:6,7 276:10 283:17 286:19
339:23
**saying** 84:12 254:23 264:18 300:8
306:24 310:20 327:13
**says** 4:24 111:25 153:7 157:18,19
159:23 160:7 166:20 188:23
250:19 271:2 279:6 294:17
306:10,20 312:22 314:11,18,23
315:5 316:3 320:23 321:5 328:2
328:18 330:15 333:17 334:9
340:12 341:18 344:13 347:24
348:4 349:7
**schedule** 117:4,22 118:14 247:21
303:13
**scheduled** 118:7
**scheduling** 308:11
**Schulman** 202:16
**science** 51:5 58:23 59:12 60:3
**scope** 51:2 52:14 214:16 219:16
264:6 267:10
**scratch** 240:15
**screaming** 202:18
**scrutinized** 252:11
**SCULLY** 2:11
**search** 109:3 113:22 114:23 115:5
168:3,4,5 315:13
**searches** 147:7 149:3
**seated** 103:14
**seats** 241:14,16
**second** 9:7 45:14 59:5 60:4 84:14
98:11 136:10 159:22 160:6

192:25 193:9,9,10 199:25 262:16
269:14 274:22 278:25 293:3
299:8 305:4 314:22,22 326:25
334:7 341:17 349:6,6,18
**secretary** 35:10,20,21,22,25 36:6
36:19 37:2 38:2,6,10,19 39:3,19
294:18,24
**secretary's** 29:8
**securities** 40:24 56:5 121:3,7,12
**security** 123:2
**see** 45:16 93:15 111:25 125:3
135:10 140:19 142:23,25 153:7
153:13 167:21 188:21,23,23
189:10 193:6 195:6,8 206:21
224:8 260:4 269:13 270:25 271:9
271:10 273:8 274:22 278:14,25
279:5 289:20 293:6 294:20
295:12,19 299:4,7,15 305:4,12
306:10,20 312:21 314:10 315:21
316:5 320:3,9 321:7 324:4 328:17
328:23 330:15 333:16 334:8
335:19 336:24 338:17 341:17,19
342:23 343:3 344:19 345:16
346:10,13 347:13 348:7 349:13
350:6
**seeing** 254:16 277:2,6 285:23
347:15
**seek** 81:24 83:4 114:18 257:13
307:20
**seeking** 104:15 114:2 302:13 303:3
**seen** 4:3 85:14 90:16 108:15,18,20
163:17 181:13 185:23 191:3
192:21,23 194:19 268:24 270:19
272:24 276:3,25 277:21 283:9
289:12 292:20 294:6 297:7
298:14 301:12 303:8 304:18
306:3 307:22 312:16 314:3
318:13 322:2 323:20 326:2
327:19 331:25 333:11 335:15
339:19 341:11 344:5 348:24
**select** 104:8
**selected** 39:8 40:14 101:15 106:15
117:21 131:6
**selection** 110:3,10 111:8 126:7
221:9
**self-audit** 117:19
**sell** 19:6,8,10
**selling** 33:17
**send** 99:6,7 304:25 318:18 322:13
326:7
**sends** 94:23
**senior** 92:21 94:12
**sense** 51:2 60:13,13 82:15 150:17
150:18 164:14 231:20
**sensitive** 49:3 334:23
**sent** 290:17 298:19,21 299:2 305:9
319:18 322:5 328:9
**sentence** 269:14 270:25 271:2,9,10

272:5 279:5 294:16 299:7,8 305:4
305:12 344:19 349:6,13,19
**sentences** 230:5 346:12
**sentiment** 340:7
**separate** 8:9 43:9,15 59:15 80:5
187:24 264:17
**September** 168:19 169:9 170:10
171:14 172:5 175:20,25 289:17
304:22 306:8,12 307:9,9 330:25
339:24 340:4
**series** 29:16 176:14 313:3 314:7
**serious** 280:13
**seriously** 169:17 170:2 280:24,25
**serve** 35:24 147:2 156:11 160:17
294:24
**served** 149:4
**service** 17:25 18:9,24 19:21 21:15
22:5,18,19 23:23 43:22 46:22
61:25 67:13,13,17 127:4 128:4,7
218:20
**services** 18:4,7,11,24 19:8,10,11,13
20:3,5,8,23,25 21:20,24 22:6,10
28:14 41:25 42:3,8,12,23 43:2,4,6
43:7,8,9,10,11,13,14,19 44:3,5
45:4,8,10,12,24 46:11,16 48:21
52:12,14,16,25 53:5 55:17 60:18
60:20,25 61:7,12 62:2,3,6,8,9
70:14 83:25 84:23 103:11 105:22
105:24 126:25 127:20 128:10,14
129:7 197:20,22,23 198:5,8,10
203:2 243:13 346:19,20
**serving** 294:17
**set** 6:19 64:23 65:21,24 111:2 238:5
299:11 300:20 323:8 326:16
358:21
**setting** 5:20 65:2,7,13 70:17,20
100:2 126:13,19
**settle** 267:11,25 269:11 270:20
279:15
**settled** 274:20
**settlement** 255:20,21 256:5,5
258:24 259:15 260:6 262:10
263:8,10,12,16,25 264:9 265:9,22
266:2,10,14,18 267:3,16 268:11
269:19,19,25 270:5,7,11,22 271:4
271:4,6 273:6 274:9,13,15 275:11
276:8 277:9 278:2,3 279:14,23
280:11 282:6,11,14 287:6,18
288:17
**seven** 151:16,22 350:6,13,14
**seven-page** 348:18 356:19
**share** 271:18
**shared** 158:24 228:19 230:10
255:11
**shareholder** 40:15 41:3,9 47:4,15
47:23 70:23 71:2,7,11,24 72:3
81:23,24 338:24 339:2,3,5 350:3
**shareholders** 41:4

**sharing** 310:25
**Shaw** 99:12
**SHEARMAN** 2:17
**Sheri** 96:13 100:13
**Sherinsky** 94:9 154:13 155:2
**shifted** 141:3,5
**shiftings** 140:15
**Shin** 64:3,5,8,12,15 75:5,9,18,19
345:20
**Shoji** 39:15,16 133:11
**short** 213:22
**shortly** 15:10 29:5 143:20 195:19
195:21,23
**show** 108:3 151:18 180:25 192:14
194:10 311:15
**showed** 86:11 142:16 193:20
**showing** 142:19
**shown** 307:6
**Shriver** 165:22
**sic** 168:6
**side** 56:6 283:23 284:4 286:13
**sign** 3:9 185:5 279:7
**signatory** 42:12 133:16
**signature** 182:9 183:5 184:2,4
188:18
**signed** 133:14 194:23
**significant** 295:22,24
**significantly** 30:9 35:18 36:12
175:12
**signing** 3:6 60:20
**similar** 21:24 90:2 114:3,5 143:11
**similarly** 130:22 203:5
**simply** 158:4 161:16
**simultaneous** 338:22
**single** 22:21
**sit** 79:19 81:9 110:21 317:5
**sit-down** 304:24
**site** 248:9
**sitting** 38:13 97:16 149:5 153:23,25
192:25 239:4 267:18 280:8 282:9
**situation** 66:20 212:18 262:23
311:25 312:2 343:9
**Siuki** 80:12,16
**six** 31:16,18 32:3,10 33:2,2 52:4,5
118:3 120:18 135:10
**six-figure** 266:10
**size** 32:2 101:23,25
**Skyler** 2:25
**Slaton** 203:17 204:4,7
**slightly** 37:15 73:23
**slot** 102:8
**slots** 61:20
**slowly** 127:14
**slur** 301:25
**small** 107:17 200:15 240:17 328:21
330:7,11 338:14
**smoothly** 221:8
**snooze** 316:17

**sold** 19:11
**solicited** 232:3
**somebody** 210:17
**somebody's** 76:8
**someone's** 76:6
**sorry** 11:18,19 17:14 19:20 26:2
30:13 38:21 42:17 64:17 69:13
70:3 72:6 73:19 76:20 80:19
82:18 107:17 109:22 127:7 134:4
163:4 204:3 215:15 228:3 236:3
243:20 255:22 268:7 274:7 275:4
290:18 291:19 301:25 303:16
306:12 320:9 323:24 326:21
336:15 347:16
**sort** 112:13 290:2 326:9 347:3
**sought** 303:23 321:14
**source** 212:5,6
**SOUTHERN** 1:2
**speak** 49:24 68:5 118:13 126:22
212:2 217:11 259:9 262:2 283:25
284:3 314:11,19 326:10 332:22
341:18,24 342:19 343:18
**speaking** 37:12 40:13,15 41:20
113:5 216:6 259:12 286:21,23
295:16
**speaks** 275:15
**specialist** 93:9
**specific** 90:14 107:14 119:22
144:18 148:11,23 154:9 188:21
199:18,20 202:2 203:14,16
207:16 215:21 230:17 233:24
234:13 237:20 238:5 239:24
245:4,19 251:22 266:25 267:14
311:25 327:9 329:23
**specifically** 8:20 16:5 77:20 87:20
90:13 101:9 125:18 137:16 148:7
161:15 214:5 225:15 227:23
232:8 239:3 241:7 249:9 256:20
257:20 258:22 272:13 289:13
305:3,10 308:8 311:14 313:5
325:9 345:6 348:15
**specified** 6:10 349:16
**spell** 59:5 77:4 173:17
**spelling** 95:6
**spent** 146:4
**spiral** 193:15
**spoke** 81:17 83:12,13 106:25
168:21 211:25 259:11 302:22
317:14 342:8
**spoken** 286:24
**spot** 102:2
**spring** 200:13
**spun** 16:11
**ss** 352:4
**staff** 257:4
**staffed** 111:9
**staffing** 100:11
**stage** 189:17

**stakeholders** 298:24
**stamp** 108:6,11 275:24 283:3
302:17 353:12
**stamped** 88:22 89:6 141:22 142:7
142:12,13 162:20 163:8 181:7,12
182:15 184:18,23 185:17,22
187:10 194:13,17 268:15,19
272:17,22 275:19 276:18,22
277:13,17 279:2 282:22 289:3,8
292:13,18 293:22 294:2 296:23
297:5 298:6,11 301:4,9 303:5
304:10,15 305:19,24 311:18
312:10 313:18,22 318:6,10
321:18,22 323:12,17 325:17,21
326:18 331:12,16 333:4,8 335:7
335:12 339:12 341:4 343:21,25
345:25 346:6 348:19,23 353:9,15
353:17,19,21,23 354:5,7,12,14,16
354:18,20,22,24 355:5,7,9,11,13
355:15,17,19,21,23 356:5,7,9,11
356:13,15,17,19
**stamps** 187:15,17
**stand** 18:21 27:2
**standard** 104:7 253:16 270:8,19
**stands** 93:21
**start** 13:2 17:15 71:18 89:20 92:17
145:4 188:4 207:14 251:13
**started** 9:5 92:8 176:23 190:16,17
233:14 240:12,16 293:18 315:13
**starting** 65:11 301:25
**state** 1:19 3:16 286:25 337:25 340:3
352:3 358:4
**stated** 68:4 295:13 328:8 334:21
**statement** 178:8 285:15,20,24
286:2 299:23
**statements** 123:17,25 157:16
285:11
**states** 1:1 15:15 23:14 33:18 49:6
54:25 74:11 96:2 342:24
**status** 319:5
**stay** 151:5,11
**Steady** 298:20
**Steen** 12:23
**stenographically** 358:10
**step** 71:9 162:4
**Stephen** 93:6 96:8 150:8 200:9,11
244:9 315:11
**steps** 211:23 212:17 245:19 253:2
254:2 260:2
**STERLING** 2:17
**Stern** 2:25 247:10
**stips** 3:2
**Stock** 122:17
**stood** 325:4
**stop** 107:16,20,21
**stopped** 248:24
**story** 113:13 283:24 284:5 286:13
343:2,6

**straight** 206:2 299:11 300:21
**strategic** 17:9
**Strawn** 208:15,18
**strictly** 114:22 154:20
**structure** 89:15,19,21,24,24
**structured** 134:17
**studying** 247:17
**sub** 164:12
**subcommittee** 130:2
**subject** 9:21 57:21 59:15 69:12,15
146:6,10 234:17 238:11 299:18
**subjects** 240:4,7
**Subscribed** 352:17
**subsequent** 8:24 199:17 228:7
**subsequently** 20:4 21:20 25:2
137:15 228:7 342:20
**subset** 130:6
**subsidiaries** 23:16,19 31:8,13 32:4
32:11,18,24,25 33:4,7 126:9,12
127:23 294:19 295:15 296:7
**subsidiary** 20:15,16 25:17 26:23
30:24 296:9,12 349:10
**substance** 7:19 164:13 230:11
238:11 300:11
**substantial** 61:8 62:4 145:19
**substantially** 30:6 146:18
**substantive** 7:23 10:12 158:11
165:14 194:6 308:11
**substantively** 164:4,8 180:15
**succeed** 40:10
**successor** 20:23 174:19
**sudden** 328:20
**suffer** 6:24 7:4
**sufficient** 62:7
**sufficiently** 165:6
**suggested** 118:5 239:25 258:8
**suggesting** 231:3 268:4
**suggests** 169:14
**suit** 9:22
**suite** 2:3 131:22 132:2,7,8
**sum** 300:10
**summarized** 230:19,21
**summer** 199:19,21 200:13 215:20
**summertime** 216:4
**super** 192:20
**supervise** 257:3
**supervised** 54:13 76:13,21 116:23
145:24 202:3 211:14,16 214:8
**supervising** 48:13,18 79:5 309:4
**supervision** 51:23 77:2 103:10
**supervisor** 358:11
**support** 19:17 22:11 49:7 59:17
197:20 219:11
**supported** 29:9 51:2,7 75:11 77:10
**supporting** 95:22 220:15 235:10
243:9
**supposed** 117:23
**sure** 14:2 24:15 36:25 42:20 62:25

63:5 68:23 78:21 84:15 122:18
129:16,24 141:5 173:4 179:6
181:3 186:8 190:4 210:8 217:20
233:23 263:5 299:10,25 300:7,18
302:22 310:5 316:16,25 318:24
327:10
**surname** 76:6
**surprise** 263:23 267:23 268:8 270:9
270:18 274:14 330:9,14
**surprised** 181:4 264:3 272:14 328:3
330:6,10 336:24
**surrounding** 138:10
**switch** 141:6
**switched** 189:16,24
**Switzerland** 53:21
**sworn** 3:13 4:7 352:17 358:8
**symbols** 275:2
**system** 316:9,13

**T**

**T** 1:1 2:1 3:1,11 352:2 353:6 354:2
355:2 356:2 358:2,2
**table** 98:16 210:3,5
**tailored** 155:8 156:16
**Takahisa** 94:18
**take** 5:25 6:2,6 28:8 33:22 49:19
58:7,10,13 65:3,6 66:25 113:14
116:10 135:13 149:15 151:2,23
152:6 157:8 158:3 162:4,23
181:19 190:15 191:13,21 192:3
199:13 200:7 206:4,9,10 211:23
212:17,21 214:25 215:19 226:18
244:15,19,22 245:19 249:2 253:2
254:2 260:2 280:23 281:4 330:25
**taken** 1:16 58:16 99:3 116:12
159:18 205:24 226:19 300:4
301:24 352:7 358:10
**taker** 226:12,16
**takes** 226:13
**Takimoto** 27:8,11,16 29:2,3,6
232:5,10 233:8 277:25 278:7,17
**Takimoto's** 233:13
**Takimoto-san** 278:15
**talk** 191:25 242:4 250:23 299:13
330:17
**talked** 229:21
**talking** 30:14 31:22 74:24 149:12
171:7,8 176:25 225:4,5 238:4
285:11 308:10 309:24 330:4
**Tanabe** 60:7
**Tanaka** 39:5,7,11,13,20 40:10
246:15
**tasked** 101:12
**tax** 19:15 46:20 47:5,8,11 48:6 55:4
90:19 92:15,17,21,23 99:18
198:10
**team** 54:24
**technical** 223:23

**Technically** 13:16
**tell** 4:7,19 14:3,12 20:7 32:7 79:6,8
79:9 96:22 111:4 117:20 136:14
139:4,9 140:21,24 148:24 155:18
158:5,6,9 160:11 166:13 181:15
183:2,19 184:24 186:2,18 188:8
189:3,24 191:5 194:22 206:9
271:15 273:3 276:5 277:23
283:11,16 284:23 289:15 292:22
294:8 297:9 298:16 301:14
303:10 304:20 306:5 312:18
314:5,15 318:15 319:11 322:4
323:22 326:4 327:21 333:13
339:21 341:13 344:7 349:2
**telling** 303:12 344:22,25
**temp** 245:3,4
**template** 114:13 153:19
**templates** 156:11
**temporal** 148:21 149:10
**temporally** 148:13 265:4
**ten** 9:20 49:21 107:17,22,24 247:7
**tens** 30:22 31:2,6
**tenure** 10:24 17:24 19:5,22 23:22
24:13 26:8 27:7 29:20 30:11
31:14,25 32:19 33:16 34:15 40:18
41:4,23 48:12 55:12 63:11 64:9
64:11,14 65:16,23 66:8 67:21
73:17 74:4,21 78:12 79:18 80:25
82:2,11 83:14 84:18 85:2 87:16
87:18 89:16 90:3,11,18 91:8,12
91:20 92:21 93:10,23 96:7 98:24
99:17 100:10 102:24 104:6
110:11,14 115:2 123:21 125:7
128:9,23 129:2,13,18 131:2
135:24 136:19,20,22 144:8
148:12,14 149:10 152:17 207:25
208:8 211:13 214:6 215:25 223:6
229:23 236:6 249:22 251:5,23
252:11 253:12 256:21 257:2
260:17 290:3,15 291:25 294:22
295:3 301:23 309:2 357:6
**term** 14:21 60:12 131:21 134:5,10
166:10,13 238:3 240:5 245:17
271:20 296:9 345:13
**terminate** 196:11,14 198:23 225:18
227:11 261:13 262:3,7 313:12
322:9,17,20,24 323:3
**terminated** 261:17 313:10
**terminating** 225:24 227:22 228:10
228:15 229:15 313:7 323:5
**termination** 56:14 199:5 222:8,17
259:8 262:2 328:4 330:16,21
**terminology** 55:16 296:6
**terms** 31:20 32:2 50:25 107:4
110:20 132:25 134:12 242:20
271:6,23 315:17 337:25
**testified** 3:14 254:20 309:6
**testify** 6:21 7:2 315:14

**testifying** 126:24
**testimony** 10:13 47:18 119:23
151:16 193:5 261:22 352:7 358:5
358:9,10,13
**text** 153:13 269:2 273:17 275:5
294:20 295:19 299:15 343:3
**thank** 4:21 27:5 42:18 45:22 53:24
58:15 72:10,21 76:12 98:20 99:4
104:5 116:9,11 133:17 137:20
150:21 203:4 204:8 210:16 227:8
236:5 237:10 252:17 265:2
282:19 285:13 297:22 303:20
316:14 339:8 347:12 351:3
**Thanksgiving** 299:14
**theoretically** 178:18
**thing** 92:14 233:11
**things** 94:6 107:7 116:18 181:2
200:14 219:8 221:24 223:22
229:22 235:3 251:15 295:2
309:12,15 318:22 319:23 321:14
331:20 346:25
**think** 20:7 37:25 44:18,20 51:7,25
60:5 61:24 76:12 82:17 86:24
92:10 96:24 97:7 105:12 106:11
116:9 117:22 120:17,18 139:13
141:16 144:2 151:9 153:24 154:2
154:23 160:12 165:2 173:24
175:3,18 176:7 178:12,13 179:9
179:25 182:11 192:6 194:8
203:15 204:7 209:5 210:3 221:25
231:9 232:15 235:16 242:7,7
250:11 251:2 270:16 271:16
275:7 282:11,17 293:12 306:24
308:15 310:19 319:7 326:21,22
329:3 330:16 332:21 336:10
337:3 338:5 342:15 349:22
**thinking** 15:16 61:3 81:21 105:17
239:20 328:3 336:10
**third** 206:18,19 207:7 262:25
285:12 293:4
**Third-hand** 285:12
**thought** 37:3 106:17 118:12 141:16
144:17 147:9,12 169:2 170:20
172:18,23 179:5 204:5 223:21
230:25 235:22,23 239:4,5 254:20
262:11 264:15,21 313:10 326:11
**thousands** 30:22 31:3,6 32:11
**thread** 289:18 292:23 306:6 314:6
327:2,13,24 339:22
**three** 9:9 87:20 113:9 117:23 118:5
172:15,17 193:3 207:8,10,24
263:6
**three-page** 162:19 163:7 293:21
294:2 297:3 305:18,23 335:6,11
341:3 343:20,25 353:19 355:7
356:9,13,15
**time** 1:20 5:14,14,24,24 6:5,6,8
11:14,20 13:21 14:8,9,18,18 15:5

15:10 16:4 19:22 21:5,22 22:5,9
26:13 28:19,25 30:6 31:21 33:10
34:19 35:4,14 36:8,21 37:3 38:2,5
38:7,9,12,15,18 39:2,6,10,20 40:2
42:21 43:20 45:3 50:22 53:22
55:7 58:17 59:8 60:17 62:20
63:16 64:3 65:24 66:21 68:17
71:14,20 73:4,10 74:16,20 76:15
76:16 79:4 83:6 84:18,20 85:21
85:23,25 86:13 87:18,21 88:5
91:11 93:4 94:13,19 97:24 99:20
100:9 101:5 106:12 110:6,22
111:2 112:4,15 113:20 116:10
122:6 123:3 125:15,15 128:19,20
132:18 135:13 136:5,9,19 137:12
137:19,24,25 138:6 140:11,13,16
141:9,10 142:2 143:14,19 144:12
145:16,20,25 146:4 147:9 149:15
150:10,13,16 151:13 152:6
155:13 156:6 158:3 160:16,17
163:22 167:13,17 168:19 169:19
169:22 170:4,15 171:5,14,15,19
172:17,21,24 173:13 174:14,17
174:18 175:21,22 177:18,19
179:19,20 181:19,23 182:6
183:12 185:12 189:19 193:4
194:3 196:2,10,15,17,21 197:10
201:12 203:10 204:5 206:8,15
211:25 212:2,13 213:4,11 214:2
215:10 218:7 221:13 224:16
225:3,16 226:20 227:6 236:22
237:12 238:19 239:4,9,15 240:8
240:17 242:21 245:10 246:5,15
247:11,18,21,23,24 248:5,15,21
248:23 249:15 251:18 252:10
258:2,4 259:5,13 260:2 264:12,17
267:7 269:22 271:5 276:10 279:8
283:16 286:16 287:4 288:16,21
290:7,16,18,20,25 291:20 295:25
308:21 322:24 323:2,4 324:14,22
328:7,13 332:13 334:4,17 336:10
337:5 338:15,18 358:7
**times** 5:8 8:6 20:2 30:23 41:10
60:20 67:2,11 78:16 119:20 120:3
120:15 191:23 192:2 211:9,20
213:13 235:9,14 261:2
**timing** 329:15,17
**title** 11:20 16:3 73:10 94:17 96:11
96:16 154:15,16,18
**Todarello** 77:9 289:17
**today** 4:5,23,25 5:20 6:8,11,22 7:2
7:18 11:4 97:17 123:19 126:23
136:12 149:5 153:23,25 210:14
**today's** 7:11 10:12,17
**Tokyo** 73:9 293:19 332:17 337:8
**told** 20:22 37:25 78:22 85:7 169:2
175:8,9 178:22 212:13 229:11,20
245:24,25 262:22 293:12 300:22

317:7,8 331:19 345:10
**Tomoji** 255:15 264:17 265:17
273:5,18,23 274:24 276:7 277:25
278:6 284:18,19
**tone** 202:10
**top** 89:10 93:15 111:24 112:12,12
112:17 199:24 251:11 274:23
275:6 289:20 293:6 296:15 299:4
306:10,20 340:2 341:17 344:12
349:5
**topic** 213:5,6 319:2 325:10
**topics** 234:15
**total** 131:19,20 140:16
**touched** 230:4
**tour** 95:9
**Traborelli** 2:24
**track** 30:15
**traded** 59:16 296:13
**trademarks** 57:23
**trainee** 93:5 94:18,20
**trainees** 75:13
**training** 165:3 240:20,22 241:2,8
241:10
**trainings** 239:18
**transaction** 54:6 216:8,10 217:22
218:7 219:17 220:8 221:12,19
316:8
**transaction-related** 220:16
**transactions** 54:3,12,18
**transcribed** 358:11
**transcript** 3:6 5:10 10:5 89:13
178:13 232:12,18 352:7,9 358:12
**transferring** 74:13
**transition** 39:20 224:23 234:4
**transitioned** 22:18 174:20,24 244:2
**transitioning** 225:10 233:18
**transitions** 22:19
**transitive** 41:11
**transmitted** 328:12,14 338:19
**transpired** 280:19 342:12
**travel** 77:13,15 78:19 79:6,8,12,15
246:24 247:2,5,10 291:4,14,25
292:5 303:22 325:11
**traveled** 78:5,8
**traveling** 78:9 292:8
**treat** 34:11
**treating** 170:19
**Trice** 197:8,9 199:7 298:20
**tried** 118:3,6 120:17 154:22 156:5
**triggered** 284:15
**trip** 291:7 308:11
**triple** 113:4
**Troccoli** 96:18 211:2,6,16 212:11
213:3,18 214:3 222:11 233:3,5
312:19,25 313:12 331:23
**Troccoli's** 214:15
**true** 28:17 47:7 68:20 104:12 295:8
352:9,12 358:12

**truly** 222:15
**trust** 261:16,18,25 262:15 263:3
**trusted** 340:12
**truth** 4:7
**truthfully** 6:22 7:2
**try** 4:20 5:11 20:17 73:5 84:17
213:8
**trying** 5:10 11:19 61:6 118:14
212:14 306:18 338:16
**Tuesday** 8:17,24
**turn** 335:18
**turned** 97:14,15,19 286:18 316:16
**Turning** 210:22 214:20
**turnover** 99:18
**twice** 84:13
**two** 13:22,23 14:3,12,25 21:4 35:22
47:12 58:12 84:15 98:19 110:25
148:15 170:18 171:5 175:7
183:18 187:23 193:3 206:2
211:24 247:6,7,9 264:19 280:7
293:17 301:17 307:12 314:25
326:23 336:12 337:2 346:12
347:13
**two-page** 108:5,10 141:21 142:6,11
142:13 276:17,21 298:5,10 301:3
301:8 311:17 331:11,16 353:12
353:15,17 354:20 355:9 356:5
**type** 119:17 164:14 242:16 247:22
249:11 280:18
**types** 56:3 107:7 111:3 116:3
119:24 121:24 122:25 197:19
221:5
**typically** 278:18

### U

**U.S** 31:7 32:3,13,18 33:3,7,8 52:5
96:5 102:9 294:19
**Udelsman** 167:24 175:9
**Uh-huh** 243:18
**ultimately** 23:19 47:4 109:12 111:8
169:11 170:3 186:11 245:7
274:20 322:12 328:9,14 330:20
335:2
**um** 16:23 92:5 99:19 112:4 129:16
130:11 165:18 172:19 311:4
325:5
**unable** 7:24
**unauthorized** 282:14
**unclear** 84:11
**underlaid** 228:14
**underlying** 229:15,18 256:12,15
257:10
**undermine** 212:11,15
**underneath** 279:3
**understand** 4:5,13 5:2,19 6:13,16
11:7,11 13:5 14:22 20:17 23:2
63:5 121:2 123:5 132:5,14 134:9
134:22 163:11 179:4 199:3

211:12 213:8 273:20,21 274:2
287:12 310:6
**understanding** 44:16 50:12 201:13
229:25 238:17 264:5 269:17
271:18,19 273:16 302:9 334:14
344:21
**understood** 14:2 20:7 147:15
157:18 206:16 309:10 347:5
**unethical** 251:19,24 252:4
**unfold** 169:15
**unfolded** 169:15,24 178:22
**unhappy** 213:25
**unilaterally** 66:10
**unit** 235:10 300:3
**United** 1:1 15:14 23:14 33:18 49:6
54:25 74:11 96:2
**units** 21:18 23:4,6 26:14,21 29:12
55:6 59:21
**unlimited** 267:25 268:5,7
**unpack** 139:24
**unprofessional** 252:5
**unreasonably** 343:12
**unsigned** 194:25
**unusual** 161:11 201:23 202:19
236:18 270:6
**unwillingness** 221:6
**unwritten** 253:20
**updated** 144:18,22 146:24
**USA** 12:6 16:12
**Usami** 75:13
**use** 11:4,6,10,19,20 14:21,21 62:17
109:15 113:9 114:3,13,15 115:8
116:3 147:19 217:19 238:3 240:4
345:14
**useful** 153:24
**uses** 113:2 115:19
**Ushijima** 16:2
**usually** 161:19 275:3
**utilized** 105:12 248:21

_____ V _____

**vacancy** 174:21
**vacated** 243:16,23,25 244:3,17
**vacuum** 222:15,23
**VAGNINI** 2:2
**VALLI** 2:2,5 3:7,9 17:18 78:25
151:25
**valuable** 165:7
**value** 74:9
**valued** 131:9
**varied** 55:3 71:14 105:10 253:23
**varies** 94:24
**variety** 17:8 117:14
**various** 59:10,21 74:12 87:15
115:24 117:9 125:14 130:8
166:17 203:10 221:11 225:7
284:14 288:21 329:4
**varying** 48:23 68:6

**verbal** 4:24 229:4 285:25 304:4,5,8
**verbally** 161:21 313:3
**versa** 213:25 237:14
**version** 155:14,17,20 163:16
195:14,15 273:4 342:25 343:6
**vice** 213:25 237:14
**vice-president** 16:4 35:7 133:7
**view** 153:15 162:2 173:22 179:18
180:22 201:24 212:17 222:4
236:13 242:9 281:2 296:18
297:25 308:18 330:7,11 350:15
**viewed** 9:13 25:18 59:14 212:11
239:20
**violated** 223:18 258:6
**violation** 223:24 280:18
**Virginia** 75:11 103:18 241:5
**visa** 138:11
**visit** 303:14 324:25 325:8
**vitiating** 44:23
**voluntary** 88:13

_____ W _____

**W** 352:2
**wait** 5:6 44:15 136:24 171:21 188:6
203:25 243:20 290:23 326:12,13
330:23
**waive** 44:24
**waiving** 3:5 45:23
**walked** 286:19
**Walker** 166:4
**want** 3:6,9 14:2 20:17 33:10 34:13
36:23 37:5 49:23 50:14 70:2,5
74:25 116:17 124:15 135:8
139:24 142:2 150:11,20 151:11
151:18 158:11 161:14 162:4
171:18 179:6,13 182:17 206:4,6,9
209:3 230:22 231:2 232:13
271:23 286:12,17,24 299:10
300:7,8 302:21 308:2 327:5,10
342:25
**wanted** 25:24 53:4 62:18 107:2
131:9 167:18 179:6 237:11
250:21 251:5 263:5 299:24
300:18 318:18,23 319:5,11
322:24 323:3
**wants** 6:2 206:15 321:10
**War** 113:9
**warning** 223:15
**warranted** 118:12
**wasn't** 21:9 80:24 109:23 110:9,13
167:9 179:19 180:7 229:7 241:6
261:8 307:25 319:25 338:3
**watched** 191:21 192:3
**way** 4:18 17:22 37:16 105:4 117:25
118:2,4 123:10,11 152:5 153:21
169:15,25 178:21 221:7 262:11
272:14 279:18,20 286:19 310:12
331:23 337:24

**we'll** 6:5 107:20 108:4 141:18
151:23 238:4 312:8 350:10
**we're** 3:2,7 5:10,20 107:24 116:16
148:2 149:12 151:5 152:4 171:8
171:24 205:25 206:8 226:21
238:4 265:10 285:11 316:18
331:10 350:8
**we've** 6:14 49:12 99:8 135:21 233:5
307:22 308:18
**Web** 248:9
**Wednesday** 8:14,25 299:13
**week** 293:17
**weeks** 192:10 247:6 264:19
**weigh** 306:21
**well-attended** 242:7
**well-known** 166:7
**well-worded** 349:21
**went** 13:19 20:19 21:8 62:10 71:6,7
71:11 78:11 137:15 187:4 209:19
216:17 231:9 245:24 293:10
302:23
**weren't** 96:4 217:25 237:20 264:11
**WHEREOF** 358:20
**whichever** 120:24
**white** 57:6
**Wiles** 203:15
**willing** 173:12 197:3
**window** 107:18 200:15 238:19
**Winston** 208:15,18
**wish** 5:24 306:14 307:18 350:7
**wishes** 232:19
**withdraw** 17:20
**Withdrawn** 16:8 66:4 75:23 102:5
126:5 201:16 264:7 273:15
290:14 330:5
**witness** 3:12,18 9:16,23 44:17 49:9
49:10,19 50:4,7 53:23 58:12,15
64:17 84:2 86:18 104:3 107:16,21
113:13 116:11 142:3 150:23
151:2,13 152:4,8 163:4 170:6
187:22 204:3 206:10,17 243:20
266:21 272:23 276:2 281:20,23
281:25 292:19 297:6 302:19
303:2,19 311:21 312:15 313:24
325:23 327:10 331:18,22 333:10
334:23 335:14 346:4,7 350:11
351:6 358:8,13,20
**woman** 86:24 87:12 92:23 96:24
**women** 87:14
**word** 40:12 59:5 76:5,9 84:13
157:23,23 217:12,19 271:11
**words** 91:17 120:17 284:23 301:17
308:13
**work** 20:19 23:22 25:6 26:16 28:3
28:20,22 29:2 31:10 50:2 51:3
54:13 55:11,22 56:3,20 57:2,18
57:24 58:2,8,23 59:12 70:8,9
74:11 82:16 117:2,3 140:8 145:9

145:16 160:15 173:13 202:4
208:17,21 214:7 221:16 245:7,8
245:12 246:4 262:14 263:2
286:17 305:5 309:5 317:16 320:8
**worked** 12:23 14:8 23:25 26:6,15
26:18 27:13 48:23,24 49:3 52:13
53:8 54:9,15,16,23 59:15 60:18
60:21,23 68:4 77:25 78:2,3 121:5
132:25 133:2 137:14 140:17
141:6 143:15 153:23 166:6 199:8
235:15 317:20,25
**working** 15:19,19 25:25 27:15 54:7
54:21 55:4 71:4 76:4 109:5
190:17 207:14 216:10,11,13
220:13,14 246:22 247:17 248:12
249:18 291:11 309:10,23 332:15
**workload** 246:2
**workplace** 343:17
**works** 187:7 251:2 316:12
**worried** 245:15
**worry** 300:24 347:3
**wouldn't** 54:20 119:24 120:5
227:19,25 235:23 272:14 309:21
310:24 346:19
**write** 191:24 195:13
**writing** 162:12 229:6,7 254:11,13
255:10,12 313:2 323:2 324:20
**written** 111:6 223:14 253:18,20
267:24 285:14,15,20,23
**wrong** 47:19 84:10 105:21 261:23
300:9
**wrongful** 56:13
**wrote** 153:21 200:10

---
### X
**x** 1:2,10 353:2,6 354:2 355:2 356:2

---
### Y
**Y** 3:11
**yeah** 61:10 71:21 92:8 99:22 134:23
152:8 161:13 167:9 170:6 175:7
189:5 204:8 212:24 220:15 246:4
254:22 270:16 275:7 316:18
319:24 347:15
**year** 16:22 33:22 35:22 54:11 67:15
86:4 130:19 134:8,8,14,16 135:6
168:21,25 169:4 181:17,21,22,24
185:3 186:21,24 188:10 189:7,13
189:17,17,25 239:6 249:5 250:23
291:11,14,24 293:10,13 342:9
**years** 9:20 35:23 37:6 54:9 87:10,11
87:20 99:24 117:24 118:6 136:25
153:10,21,24 154:4,7 157:15,19
157:19 201:22 300:16
**years'** 153:15
**York** 1:2,12,19 2:4,9,9,14,14,19,19
15:5 103:4,17 122:17 137:14,21
250:12 286:18 352:3 358:4

**Yoshiasato** 133:11
**Yoshiato** 130:25
**Yoshisato** 39:15,16,21 40:10 83:7,8
174:15,20 175:5 246:20 309:8,25
314:21 315:3 316:20 317:3,16
320:19
**Yoshisato-san** 314:23 315:3
**Yuen** 96:22,24,24
**Yuka** 91:22 251:10,15
**Yuko** 99:12

---
### Z

---
### 0
**000004** 313:19,23 355:14
**000010** 294:3
**000012** 293:22
**000064** 187:10,17 188:3 354:8
**000076** 187:11 354:8
**000165** 296:24
**000169** 301:4
**000222** 323:12 355:20
**000336** 305:19 355:8
**000357** 348:19 356:20
**000441** 343:22 356:16
**000459** 298:6
**000619** 181:7,12 353:22
**000695** 318:6,10 355:16
**000704** 335:8 356:10
**000705** 341:8
**000707** 341:5 356:14
**000720** 162:20 163:8 353:20
**000821** 142:7,13 353:18
**000822** 142:8 353:18
**000849** 331:12 356:6
**000866** 88:22 89:6 353:9
**000870** 276:18 354:21
**000091** 311:18 355:10
**000910** 311:18 355:10
**000956** 333:4 356:8
**000964** 339:13 356:12
**001004** 187:11,19 354:9
**001012** 187:12,19 354:15
**001383** 185:17,22 354:6
**001590** 141:22 142:12 353:16
**001592** 108:6,11 353:13
**001593** 108:7 353:13
**001830** 272:17 354:17
**001862** 275:20 354:19
**025** 326:18 355:24

---
### 1
**1** 88:6,8,10,21,23 89:11 274:16
277:8 304:22 307:9 320:11
339:24 353:9,10
**1-10** 1:8
**1.5** 266:14
**1:40** 116:13

**10** 26:13,21 29:11 131:19,20 187:8
187:9,14 193:21 354:7
**10-Ks** 123:14
**10-Qs** 123:12
**10:00** 9:5
**10:20** 1:13
**100** 166:11,19,20,21,23 167:3
345:10,14
**10001** 2:9
**10004** 2:14
**1004** 191:3
**1012** 191:3
**10222** 2:19
**107** 135:9,11
**108** 353:13
**11** 192:15,16,17,24 195:2,17 294:16
298:19,22 354:11
**11:30** 49:20
**11530** 2:4
**12** 1:13 131:19,20 194:11,12,16
294:3 312:20 316:21 352:8
354:12
**12-month** 317:3
**12:58** 116:12
**124** 353:14
**13** 268:14,18 354:14
**1389** 185:17,22 354:6
**14** 183:22 272:15,16,21 354:16
**141** 353:16
**142** 353:18
**1479** 184:18,23 353:24
**1483** 184:19 185:8 353:24
**14th** 2:8
**15** 157:19 185:4 189:22 275:17,18
275:23 298:18 301:16 342:11
354:18
**159** 357:12
**16** 183:24 276:16,17,21 322:6
354:20
**16-month** 247:8
**162** 353:20
**165** 297:5
**168** 354:15
**169** 301:9
**16th** 328:9
**17** 277:11,12,16 354:22 357:24
**1747** 279:2
**1748** 277:13,18 354:23
**18** 282:21 283:2 303:12,19 306:8,12
307:9,9 354:24
**18-cv-08188** 1:4
**181** 353:22
**1812** 282:22 283:3 354:25
**1830** 272:22
**184** 353:24
**185** 354:6
**1862** 275:24
**187** 354:10

---

**18th** 324:3
**19** 54:9 252:19,24 265:5,25 289:2,7 329:12
**192** 354:11
**194** 354:13
**1996** 11:25 27:12,14 29:4,4 37:5 104:22
**1997** 29:4
**19th** 265:7,11 324:3
**1st** 35:3 340:4

**2**

**2** 108:4,5,10 137:18 138:17 142:16 143:5 146:18 147:12 149:13 156:3,4 157:22 160:2,5 279:15 314:25 320:11 336:4 353:12
**2.0** 279:7,7 280:2
**20** 161:23 231:2,3,7 292:12,17 357:18
**2008** 111:16 112:7 163:20
**2010** 183:24 248:21
**2011** 181:17 183:22 246:10,11
**2012** 181:18 185:3
**2013** 185:4 186:21 199:16
**2014** 6:9 33:11 37:13 73:6,8 168:14 169:3 171:7 178:17 188:10 189:14 234:2 238:14,19 239:8 242:14
**2015** 35:3 104:22 168:20 169:6 170:9,10 171:2,7,13,14,15 172:5 175:20,20,25,25 177:12,19,23,24 188:11 189:9 190:16 191:10 193:24 194:2 195:2,17,22 196:10 196:17 199:19 215:20 216:4 224:2 225:13,14 227:2,16 228:20 234:3 238:6,9,14,17,20 239:8 241:3 242:15,17,23,25,25 249:8 250:23 251:4 292:8,25 294:10 298:18,19 301:16 303:18,19 304:22 306:8,12 307:14 312:20 319:12 322:6 329:12 339:25 347:19
**2016** 125:5 224:14 252:20 273:7 274:4 276:7 280:9 283:13 289:18 289:19 347:19,25
**2017** 33:22 252:23,23,24,25 260:4 265:5 280:10 289:22,25
**2018** 33:13 88:10,11 303:12,17
**2020** 88:6,8,23 89:11 198:21 353:10
**2021** 1:13 352:8,19 358:21
**205** 357:14
**2063** 293:4
**2064** 293:4,6
**2065** 292:13,18
**209** 303:5
**21** 124:16 293:21 357:23
**22** 87:10,11 296:21,22 297:3
**220** 2:8

**222** 323:17
**22nd** 358:21
**23** 298:5,10
**232** 357:18
**24** 301:2,3,8 307:7 308:12
**25** 136:25 294:12 302:16 303:4 307:7 308:10
**26** 294:10,12 297:11 304:9,14 307:7 308:7 355:5
**27** 297:11 305:18,23 307:7 308:3 355:7
**272** 354:17
**275** 354:19
**276** 354:21
**277** 354:23
**28** 311:16,17 312:8 355:9
**282** 354:25
**28th** 2:13
**29** 188:11 189:9 283:13 312:8,9 355:11

**3**

**3** 124:9,12 320:11 353:4,14
**3/8/12** 183:8
**30** 54:9 177:21,24 227:2 228:9 289:19 292:8 293:16 313:17 355:13
**304** 355:6
**305** 355:8
**30th** 227:10 292:24
**31** 88:10,11 125:5 318:4,5 322:15 355:15
**311** 355:10
**312** 355:12
**313** 355:14
**318** 355:16
**32** 321:17 355:17
**321** 355:18,20
**325** 355:22
**326** 355:24
**33** 323:11,16 327:6,12 355:19
**331** 356:6
**333** 356:8
**335** 356:10
**339** 356:12
**34** 325:15,16 355:21
**341** 356:14
**343** 356:16
**345** 356:18
**348** 356:20
**35** 326:17 355:23
**350** 346:2,6 356:18
**357** 348:23
**36** 305:24 331:10,11 356:5
**37** 333:2,3,8 356:7
**38** 335:5,6,11 356:9
**39** 339:10,11 356:11

**4**

**4** 141:20,21 142:11,19 143:5 146:18 157:7,22 160:2,5 314:25 320:11 353:15
**4:00** 9:6
**4:30** 206:11,12
**40** 22:12 42:10 68:21 161:23 341:2 341:3 356:13
**400-plus** 87:23
**4010** 206:20 207:4 208:13 222:20 229:19 230:16 231:8
**41** 343:19,20 356:15
**42** 345:23,24 356:17
**43** 192:18 348:17,18 354:11 356:19
**441** 344:2
**45** 357:23
**459** 298:11

**5**

**5** 142:5,6,12,25 143:6 146:18 160:6 287:16 307:8,9 315:7,10 320:11 353:17
**5:00** 9:6
**500,000** 275:12
**519** 2:3
**55** 1:11
**599** 2:19

**6**

**6** 162:19 289:17 353:19
**600** 2:3
**619** 182:24 183:3
**623** 182:24 183:3,6
**624** 183:16,21
**627** 183:21,25
**628** 183:23
**631** 181:8,12 182:13 183:16,23 184:4 353:22
**64** 339:16
**68** 188:16

**7**

**7** 181:5,6,11 318:17 319:16,17 322:14,16,19,23 324:16 328:6 353:21
**7:02** 351:6
**70** 189:2,3 190:5 276:22
**704** 335:13
**707** 341:8
**722** 162:20 163:8 353:20
**752** 194:13,18 354:13
**76** 187:17 188:4,7 189:4 190:5

**8**

**8** 181:18 184:16,17,22 353:23
**80s** 121:8 122:7
**822** 142:14
**83** 184:23

**849** 331:17
**86** 124:14
**88** 353:11

---

**9**

**9** 185:15,16,21 318:17 319:12,19
 354:5
**90s** 121:8 122:7
**93** 108:11
**95** 125:4,24
**956** 333:9
**96** 126:3
**98** 357:7,24