# EXHIBIT F


* * C O N F I D E N T I A L * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

JENNIFER FISCHMAN,

                Plaintiff,

                                   Index No.
      -against-               18-cv-08188

MITSUBISHI CHEMICAL HOLDINGS AMERICA, INC.,
MITSUBISHI CHEMICAL CORPORATION,
MITSUBISHI CHEMICAL HOLDINGS CORPORATION,
NICHOLAS OLIVA, in his individual and
professional capacities; DONNA COSTA,
in her individual and professional
capacities; and JOHN DOES 1-10, in
their individual and professional
capacities,

                Defendants.

------------------------------------x

                55 Maple Avenue
                Rockville Centre, New York

                July 15, 2021
                10:06 a.m.

       DEPOSITION of NICHOLAS OLIVA, taken by

the attorneys for the Plaintiff, pursuant to

Notice, held before Bonnie Kreuzburg, a Notary

Public of the State of New York, at the

above-stated time and place.

1    A P P E A R A N C E S :

2

3         VALLI KANE & VAGNINI LLP
          Attorneys for Plaintiff
4              600 Old Country Road, Suite 519
               Garden City, New York  11530
5
          BY:   MATTHEW L. BERMAN, ESQ.
6               ROBERT J. VALLI, JR., ESQ.

7

8         GORDON REES SCULLY MANSUKHANI, LLP
          Attorneys for Defendants, Mitsubishi
9         Chemical Holdings America, Inc., Donna Costa
          and Nicholas Oliva
10             One Battery Park Plaza, 28th Floor
               New York, New York  10004
11
          BY:   MERCEDES COLWIN, ESQ.
12              BRITTANY L. PRIMAVERA, ESQ.

13

14        SHEARMAN & STERLING, LLP
          Attorneys for Defendant
15        Mitsubishi Chemical Holdings Corporation
               599 Lexington Avenue
16             New York, New York  10222

17        BY:   JEROME FORTINSKY, ESQ.

18

19

20

21

22

23

24

25

1                    FEDERAL STIPULATIONS

2              IT IS HEREBY STIPULATED AND AGREED by

3    and between the parties hereto, through their

4    respective Counsel, that the certification,

5    sealing and filing of the within examination will

6    be and the same are hereby waived;

7

8              IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form of the

10   question, will be reserved to the time of the

11   trial;

12

13             IT IS FURTHER STIPULATED AND AGREED

14   that the within examination may be signed before

15   any Notary Public with the same force and effect

16   as if signed and sworn to before this Court.

17

18

19

20

21

22

23

24

25

1          N. J. Oliva - CONFIDENTIAL

2     N I C H O L A S   J U D E   O L I V A,

3          called as a witness, having been first duly

4          sworn by the Notary Public (Bonnie

5          Kreuzburg), was examined and testified as

6          follows:

7     EXAMINATION BY

8     MR. BERMAN:

9          THE REPORTER:  Please state your full

10         legal name.

11         THE WITNESS:  Nicholas Jude Oliva.

12         THE REPORTER:  What is your business

13         address?

14         THE WITNESS:  65 Third Avenue, 12th

15         Floor, New York, New York.

16         Q.   Good morning, Mr. Oliva.  My name is

17    Matthew Berman.  You've seen me before at

18    plaintiff's deposition.  I represent plaintiff,

19    Jennifer Fischman, in this matter.  Today I'll be

20    asking you a series of questions which you'll be

21    answering having sworn to tell the truth.

22         Do you understand?

23         A.   I do.

24         Q.   Today, I'll do my best to annunciate

25    my words, but if you do not hear my question,

1       N. J. Oliva - CONFIDENTIAL

2  please let me know and I'll repeat it, okay?

3       A.   Okay.

4       Q.   If you answer my question, I'm going

5  to assume that you've understood it.  If I ask you

6  a question that you do not understand, please let

7  me know I will do my best to rephrase it, okay?

8       A.   Okay.

9       Q.   As you can see, we have a court

10 reporter here today.  She's taking down the

11 questions and the responses.  Please, let's try to

12 do our best to only have one of us speaking at a

13 time.  I will do my best not to interrupt you

14 during your responses, and if you have a lengthy

15 response, I may even ask you if you have completed

16 it, just to be sure you've had an opportunity to

17 fully explain your answer.  In return, I would ask

18 that you try not to interrupt my questions, even

19 if you anticipate what I'm going to ask you, as

20 it's something we commonly do here, right?

21           Do you understand?

22      A.   I do.

23      Q.   Okay.  From time to time, you may hear

24 objections from your counsel.  Absent an

25 instruction from your counsel not to answer a

1          N. J. Oliva - CONFIDENTIAL

2   question, I will anticipate receiving your

3   response, okay?

4          A.    Okay.

5          Q.    It's not my intention to ask you about

6   any privileged or confidential communications

7   you've had with your counsel.  So, to the extent

8   that any response would call for that information,

9   please do not volunteer any information that is

10  privileged or confidential between you and your

11  counsel; and, similarly, with respect to any other

12  privileges you may have on behalf of any other

13  party, please don't waive those, okay?

14         A.    Okay.

15         Q.    With respect to time period, to the

16  extent that I'm asking you questions which could

17  be ambiguous as to the time period, my intention

18  is generally to be asking questions confined to

19  the time period of 2014 through the beginning of

20  2017.  But, some of the questions I ask you may be

21  about background or other issues that go back

22  further in time than that.

23         To the extent any question I ask you

24  is unclear with the respect to the time period at

25  issue, feel free to clarify or to ask me to

1          N. J. Oliva - CONFIDENTIAL

2    specify.  I'm happy to do that, okay?

3          A.    Okay.

4          Q.    At any point today, if you want a

5    break at any time, please speak up.  I'm happy to

6    accommodate any breaks.  It is my intention to

7    take regular breaks, but if you should need one

8    sooner or later, just let me know, or if there are

9    any specific times that you would request a break,

10   please let me know.  I will do my best to

11   accommodate that; however, I would ask that if

12   there's a question pending, you complete your

13   response to that question before we move on to a

14   break, okay?

15         A.    Okay.

16         Q.    So, with that in mind, let's move on.

17               I have three background questions I

18   ask of every witness, and you are no exception,

19   but they're somewhat personal, so please forgive

20   me.  But, are you taking or refraining from taking

21   any medication which could affect your ability to

22   testify truthfully and accurately today?

23         A.    I am not.

24         Q.    Do you have any medical condition

25   which might affect your ability to testify

1          N. J. Oliva - CONFIDENTIAL

2    accurately and truthfully?

3         A.    I do not.

4         Q.    Do you have any medical condition that

5    impairs your memory?

6         A.    No.

7         Q.    Okay.  Thank you, sir.

8               Have you ever been deposed before?

9         A.    No.

10        Q.    Have you ever given testimony at trial

11   before?

12        A.    Yes.

13        Q.    How many times?

14        A.    Once.

15        Q.    How long ago?

16        A.    A few years ago.  I'm not sure of the

17   time.

18        Q.    What was the general subject matter of

19   that matter?

20        A.    I was the plaintiff in a contract case

21   against a contractor for my kitchen, for my stove.

22   Small Claims Court.

23        Q.    So that's not relevant to any of the

24   issues here.

25               Just for the sake of clarity, did you

1           N. J. Oliva - CONFIDENTIAL

2   give testimony at an unemployment insurance

3   hearing involving plaintiff?

4           A.    Yes.

5           Q.    So did that slip your mind

6   momentarily?

7           A.    Yes.

8           Q.    Okay.  Thank you.  All right.

9                 Did you do anything to prepare for

10  today's deposition?

11          A.    I met with my counsel.

12          Q.    When did you meet with your counsel?

13          A.    Last Thursday.

14          Q.    Without revealing the substance of any

15  communications, for how long did you meet with

16  your counsel?

17          A.    Most of the day.

18          Q.    Did that include Ms. Colwin?

19          A.    Yes.

20          Q.    Anyone else present?

21          A.    Brittany, Jerry.

22          Q.    Okay.  Are you aware of whether there

23  is a joint representation agreement between your

24  counsel and Mr. Fortinsky?

25                MS. COLWIN:  Objection.

1          N. J. Oliva - CONFIDENTIAL

2          MR. BERMAN:  You can answer the

3     question, unless you're instructed not to.

4     A.    Yes, there is a joint defense

5  agreement.

6          Q.    Okay.  Thank you.

7                Were there any non-attorneys present?

8          A.    No.

9          Q.    Were you provided with any documents

10  to review in preparation for today's deposition?

11         A.    No.

12         Q.    Independent of anything provided to

13  you, did you seek out any documents to review?

14         A.    No.

15         Q.    You were present at the deposition of

16  Jennifer Fischman, correct?

17         A.    Yes.

18         Q.    Both days, correct?

19         A.    Yes.

20         Q.    Did you review the transcript for

21  either day?

22         A.    No.

23         Q.    Did you review any of the exhibits

24  from that deposition?

25         A.    During the deposition.

1          N. J. Oliva - CONFIDENTIAL

2     Q.     After the deposition?

3     A.     No.

4     Q.     Have you discussed this case with

5  anyone else besides your attorneys?

6     A.     Yes.

7     Q.     Were those discussions non-privileged

8  in nature?

9     A.     No.

10    Q.     They were privileged communications?

11    A.     Yes.

12    Q.     Are you presently employed?

13    A.     Yes.

14    Q.     Where?

15    A.     Mitsubishi Chemical Holdings America,

16 Inc.

17    Q.     What is your job title?

18    A.     General counsel and chief compliance

19 officer.

20    Q.     When did your employment commence?

21    A.     November 30, 2015.

22    Q.     Mr. Oliva, do you have a resumé or a

23 curriculum vitae?

24    A.      I have one that is probably not up to

25 date.

1           N. J. Oliva - CONFIDENTIAL

2           Q.    When was it last updated?

3           A.    I touched it up lightly for the chief

4    legal officer at MCHC, so that he could

5    communicate to the new CEO of MCHC who is on the

6    legal staff globally, but it's not fully updated.

7           Q.    Approximately when did that take

8    place?

9           A.    Within the last six months.

10   RQ          MR. BERMAN:  We call for the

11               production of Mr. Oliva's resumé that he

12               just specified.

13               MS. COLWIN:  Taken under advisement.

14               MR. BERMAN:  Sure.

15          Q.    Prior to the light touching up you

16   described of your resumé, when was the last time

17   that you had an updated resumé?

18          A.    Likely, for the Mitsubishi Chemical

19   Holdings America general counsel position in 2015.

20          Q.    So, could you clarify your answer for

21   me?  I'm not exactly certain what that means.

22               Did you update the resumé before

23   taking the job at Mitsubishi --

24          A.    Yes.

25          Q.    -- Chemical -- I'm sorry, sir.  Could

1          N. J. Oliva - CONFIDENTIAL

2    you please just allow me to finish it, so that she

3    can get the full sentence down.  I was going to

4    ask you about the job at Mitsubishi Chemical

5    Holdings America.

6          A.    Can you repeat the question?

7                MR. BERMAN:  Can you read it back.

8                (Whereupon, the requested question was

9          read back by the reporter.)

10         Q.    Did you update your resumé prior to

11   taking the job at Mitsubishi Chemical Holdings

12   America?

13         A.    Yes.

14         Q.    Thank you.

15               Just to make it a little bit easier

16   for us as we go today, I'd like to have your

17   agreement upon the meaning of certain acronyms

18   that I intend to use.  So, just so we're clear, if

19   I say the acronym MCHA, I'm referring to

20   Mitsubishi Chemical Holdings America.

21               Does that work for you?

22         A.    Yes.

23         Q.    Similarly, if I use the acronym MCHC,

24   I'm referring to Mitsubishi Chemical Holdings

25   Corp.

1           N. J. Oliva - CONFIDENTIAL

2           Does that work for you?

3      A.   Yes.

4      Q.   And, likewise, if I use the acronym

5  MCHJ, I'm referring to Mitsubishi Chemical

6  Holdings Japan.

7           Does that work?

8      A.   Yes.

9  RQ        MR. BERMAN:  We call for production of

10          whatever resumé was just specified by you in

11          connection with the acceptance of the 2015

12          position at MCHA.

13          MS. COLWIN:  Objection.  Taken under

14          advisement.

15          MR. BERMAN:  Thank you.

16     Q.   Mr. Oliva, do you maintain an account

17  on LinkedIn?

18     A.   Yes.

19     Q.   Does it maintain substantive

20  information about your professional background?

21     A.   Yes.

22          MS. COLWIN:  Objection to form.

23     Q.   To the best of your knowledge, is that

24  information accurate?

25     A.   I haven't updated that in a while, but

1              N. J. Oliva - CONFIDENTIAL

2    probably.

3         Q.    Can you recollect the last time you

4    updated the information?

5         A.    No.

6         Q.    Is it fair to say, at least up to the

7    time that you provided your last update, that the

8    information listed there was accurate?

9              MS. COLWIN:  Objection.

10        A.    I would repeat my answer.  Generally,

11   I think it's generally accurate, but...

12             MR. BERMAN:  Okay.  I'm going to have

13             the court reporter mark a document.  Just so

14             that you know, procedurally, the way that it

15             works is, if I want to show you a document

16             that hasn't already been marked with an

17             exhibit sticker, the court reporter will

18             apply one on the document and hand it to

19             you; that way, it's clear from the record

20             what documents we're referring to as we go

21             today, okay?

22             THE WITNESS:  Uh-huh.

23             MS. COLWIN:  What are you going to

24             mark it?

25             MR. BERMAN:  It's going to be 44,

1           N. J. Oliva - CONFIDENTIAL

2     Plaintiff's 44.  So I'm just going to

3     continue with the numbering --

4           MS. COLWIN:  Okay.  I just wanted to

5     make sure.

6           (Plaintiff's Exhibit 44, ten-page

7     printout from LinkedIn, referring to

8     Nicholas Oliva, marked for Identification,

9     as of this date.)

10    Q.    For identification, Plaintiff's 44 is

11 a ten-page printout.  It says LinkedIn on it, and

12 Nicholas Oliva.

13          Mr. Oliva, I'll represent to you that

14 this is a printout I made of a profile on

15 LinkedIn.  Are you looking at the document?

16    A.    Yes.

17    Q.    Have you seen this before?

18    A.    The profile or the document?

19    Q.    Have you seen the substantive

20 information contained within this document?

21    A.    Yes.

22    Q.    Does it correspond to your LinkedIn

23 profile?

24    A.    Yes.

25    Q.    Could you take a moment to just glance

1          N. J. Oliva - CONFIDENTIAL

2   at the profile and let me know if it's accurate

3   with respect to your professional background?

4        A.    Yes.

5        Q.    You mentioned that there may have been

6   an issue concerning the last time that this

7   information was updated.  I'll direct your

8   attention to the bottom of the first page where it

9   says "experience."

10       A.    Uh-huh.

11       Q.    Do you see where it says "general

12  counsel and chief compliance officer"?

13       A.    Yes.

14       Q.    So that information is still correct

15  as we sit here today, correct?

16       A.    Yes.

17       Q.    All right.

18             Does the information listed under

19  there generally describe the job duties and

20  responsibilities you have while serving as general

21  counsel and chief compliance officer?

22       A.    I should add MCHC's companies.  They

23  now have a subsidiary directly in the U.S.,

24  besides MCHA.  There's a lot of reorganization

25  since this was updated, but, generally speaking,

1          N. J. Oliva - CONFIDENTIAL

2    it does.

3         Q.    With respect to the subsidiary that's

4    directly in the U.S., can you identify the name of

5    that entity?

6         A.    Diamond Edge Ventures.

7         Q.    So then, just scrolling through, if

8    you see on page 4 at the bottom, there's a section

9    that's marked "education"?

10         A.    Yes.

11         Q.    If you could just take a moment to

12    review the education section.

13               Does that look accurate to you?

14         A.    Yes.

15         Q.    So, you attended Pace University

16    School of Law?

17         A.    I did.

18         Q.    Did you attend the day program?

19         A.    No.

20         Q.    Did you attend the night program?

21         A.    I did.  I worked full time when I went

22    to law school.

23         Q.    So is that why it reflects a four-year

24    period of time?

25         A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    And law school would normally be three

3     years in that day program, correct?

4               MS, COLWIN:  Objection.

5          A.    It's four-year evening program.

6          Q.    Three-year day, four-year evening, and

7     it's for the equivalent program, correct?

8          A.    Yes.

9          Q.    So where did you work during law

10    school?

11         A.    I worked at Pace University for the

12    first two years, and I worked at Mitsubishi

13    Chemical USA for the next two years.

14         Q.    You just referred to an entity named

15    Mitsubishi Chemical USA, correct?

16         A.    Yes.

17         Q.    Is that a predecessor entity to MCHA?

18         A.    Yes.

19         Q.    And you were there for two years?

20         A.    I was there for longer than two years.

21    During law school, I worked there for two years.

22         Q.    So you began working there in law

23    school?

24         A.    That's correct.

25         Q.    And you continued on working there

1          N. J. Oliva - CONFIDENTIAL

2     after you graduated?

3          A.     That's correct.

4          Q.     What was your position when you first

5     started working at MCUSA?

6          A.     Paralegal.

7          Q.     And, generally speaking, what were

8     your job duties as a paralegal?

9          A.     I supported Kathryn Roche, who's a

10    current member of our team as the assistant

11    general counsel, in her patent portfolio as,

12    primarily, a patent paralegal, but it was a very

13    small department, so many other things.  I

14    assisted Donna on M&A.  I assisted Isao Yano, who

15    is now a chief legal officer, who was a trainee

16    from Japan at the time, in the office on his deals

17    and activities.  I was essentially the only

18    paralegal.  Primarily, IP.

19          Q.     And then after you graduated law

20    school, did you take the bar?

21          A.     I did.

22          Q.     And you passed the bar?

23          A.     I did.

24          Q.     And then, did your job duties change

25    after passing the bar?

1                    N. J. Oliva - CONFIDENTIAL

2          A.     They did.

3          Q.     What did they change to?

4          A.     I became -- my title became counsel,

5     and I became primarily responsible for the

6     divestiture and post-closing obligations of Alpha

7     Therapeutic Corporation, while maintaining my

8     obligations as paralegal for IP and other deals.

9     I didn't lose anything.  I gained.

10         Q.     Understood.  So your job duties

11    increased?

12         A.     Yes.

13         Q.     Now, you mentioned that your job title

14    was counsel.  Is that the same as corporate

15    counsel or is it different?

16         A.     I think it's the same.

17         Q.     Okay.

18         A.     I recall it being counsel.

19         Q.     Is it possible the job titles changed

20    over the years?

21                MS. COLWIN:  Objection.

22         A.     That the job title that I had at the

23    time has changed over years?

24         Q.     Is it possible that the nomenclature

25    for whatever that position is has changed over

1          N. J. Oliva - CONFIDENTIAL

2     time?

3          A.     It's possible.  It's also possible

4     that my title was corporate counsel.  It was a

5     long time ago.

6          Q.     Got it.  Thank you.  All right.

7               How many years did you remain in that

8     position?

9          A.     I stayed there until April of 2007,

10    and I had joined originally in July of 2001.

11         Q.     So, did your job duties change from

12    the point in time where you were named counsel or

13    corporate counsel until the time you departed in

14    April of 2007?

15         A.     Yes.

16         Q.     And, generally speaking, how did your

17    duties change?

18         A.     I became primarily responsible for the

19    pharmaceutical-related businesses of Mitsubishi

20    Chemical group.

21         Q.     Were those pharmaceutical businesses

22    located within the U.S.?

23         A.     Yes.

24         Q.     Were any of them outside the U.S.?

25         A.     They owned entities outside, Alpha

1            N. J. Oliva - CONFIDENTIAL

2    did.  But Mitsubishi Pharma America was the local

3    subsidiary.  It did not own entities outside the

4    U.S.

5            Q.    Okay.

6            A.    Its parent did.

7            Q.    Upon your departure from Mitsubishi, I

8    think you said it was Chemical US?

9            A.    Correct.

10           Q.    Where did you move to?

11           A.    Bristol-Myers Squibb.

12           Q.    How did you find that position?

13           A.    I think it was what was called ACCA at

14   the time, an ACC, Association of Corporate Counsel

15   posting.

16           Q.    Is that a Web page?

17           A.    It's an association for in-house

18   counsel, and they have a Web page listing.

19           Q.    And the Web page has job listings on

20   it?

21           A.    It did then, yes.

22           Q.    Did you find this Bristol-Myers Squibb

23   job on that Web page?

24           A.    I think so.

25           Q.    Did you use any recruiters --

1          N. J. Oliva - CONFIDENTIAL

2     A.    No.

3     Q.    -- while you were looking for jobs?

4           Just a reminder --

5     A.    Sorry.

6     Q.    -- only one of us can speak at a time.

7  We'll get used to it as we go throughout the day.

8  It's not a problem, but let's just try to keep in

9  mind we have a court reporter here.

10          So I think I just asked you if you

11 used any recruiter.

12          MR. BERMAN:  Is that what the last

13      question was?  Can you just read that back?

14      (Whereupon, the requested question was

15      read back by the reporter.)

16     Q.    So other than using the ACCA Web page

17 that you just described, did you use any other

18 methods to look for jobs when you were seeking to

19 transition?

20     A.    I don't remember.

21     Q.    Okay.  And then, how long were you in

22 that position?

23     A.    I moved positions at Bristol, so if

24 you mean how long I was with Bristol; the original

25 position?

1          N. J. Oliva - CONFIDENTIAL

2     Q.    Let me clarify, because it seems like

3 my question wasn't clear enough.

4          So, when you first moved to

5 Bristol-Myers Squibb, what job title did you have?

6     A.    I don't recall the official title, but

7 we referred to ourselves as brand lawyers.

8     Q.    Okay.  If you refer to the bottom of

9 page 3 on this document, there is an entry there

10 that says brand hyphen -- or brand/regulatory

11 counsel.

12          Is that comparable to what you just

13 described?

14     A.    Yes.

15     Q.    Is it the same position?

16     A.    Yes.

17     Q.    Does this information accurately

18 describe your duties as brand and regulatory

19 counsel in the first position you had at

20 Bristol-Myers Squibb?

21     A.    Yes.

22     Q.    There's a "see more" here, by the way,

23 so there's more to it.  If you look on --

24     A.    Okay.  There we go.

25     Q.    I did my best to print this out in the

1          N. J. Oliva - CONFIDENTIAL

2    expanded mode, but to the extent there's any

3    information, we can reference your LinkedIn,

4    correct?

5          A.    Yes, and this is missing.

6          Q.    Okay.  So that's understood.  Okay.

7          Then could you just generally describe

8    your job duties and responsibilities in that role?

9          A.    Sure.  So I was hired to join a team

10   of regulatory brand -- what we call brand lawyers

11   in the pharmaceutical industry for the primary

12   purpose, originally, of helping launch two brand

13   new immuno-oncology products.  The job is giving

14   regulatory counsel to marketing medical clinical

15   teams' leadership, about what they can do from a

16   sales perspective, from a marketing perspective,

17   regulatory perspective; and it includes training

18   physicians who speak for the company, contracts

19   for everything related to the brand, from

20   advertising and promotion, to consulting and media

21   and procurement.

22         At that time, also, it was a very

23   expansive role, because it was prior to a

24   reorganization of how the work would get done from

25   a demand management perspective.  So, it was

1          N. J. Oliva - CONFIDENTIAL

2     everything related to those products.  The

3     immuno-oncology products became delayed as a

4     result of clinical data, and I took on a virology

5     product for HIV called Ria-daz, (phonetic), and

6     that I supported until the immuno-oncology

7     products came back and were ready for review and

8     filing.

9          Q.     Did you have an opportunity to

10    complete your response?

11         A.     I think that's a general summary of

12    that position.

13         Q.     I'm just making sure.  I don't want to

14    interrupt you.

15               Now, you said training physicians,

16    correct?

17         A.     Yes.

18         Q.     I just want to make sure I got that

19    right.

20               And then, at some point, did your job

21    title change there?

22         A.     Yes.

23         Q.     What did it change to?

24         A.     Corporate counsel, and then senior

25    corporate counsel, I think.

1              N. J. Oliva - CONFIDENTIAL

2         Q.    I'll direct your attention to page 2

3    of the document in front of us.

4              Do you see a position there that's

5    listed as senior corporate legal counsel --

6         A.    Yes.

7         Q.    -- worldwide commercial?

8              Does that encapsulate the two job

9    titles you just mentioned?

10        A.    Yes.

11        Q.    So on the LinkedIn entry, does the

12   senior corporate legal counsel --

13             MR. BERMAN:  Withdrawn.

14        Q.    Is it one job title or two that we're

15   talking about?

16        A.    Two.

17        Q.    Okay.

18        A.    I was promoted.

19        Q.    So, the listing here only lists one

20   title, correct?

21        A.    That's right.

22        Q.    So, does this listing basically

23   encapsulate all the duties of both roles?

24        A.    Yes.

25        Q.    Okay.  So then, the description under

1          N. J. Oliva - CONFIDENTIAL

2    senior corporate legal counsel describes the job

3    duties that you had in each of those two

4    positions, correct?

5         A.    Correct.

6         Q.    So, could you just give me a

7    high-level view of what your role was in the first

8    of those two titles, the corporate counsel role?

9         A.    So, the corporate counsel role was

10   part of a brand new organization called Contract

11   Center of Excellence, a portion of the

12   transactional practice group.  After they created

13   the practice group model, the transactional

14   practice group was formed, and a division called

15   the Contract Center of Excellence was created, and

16   I reported to the assistant general counsel as

17   corporate counsel to help create that function.

18             So, some of what you see in here, like

19   created contract law 101, series of training

20   modules delivered in person for procurement to

21   increase the knowledge of value-based contracting,

22   that's something I did in the first role.

23             The attorney and residents program in

24   Shanghai is something I did in the second role.

25        Q.    Okay.  How long were you in the first

1          N. J. Oliva - CONFIDENTIAL

2     role for?

3          A.    I don't recall when I got promoted.

4          Q.    Well, under the senior corporate legal

5     counsel, it includes an eight-year and three-month

6     period from April 2007 to June 2015.

7                Does that seem right for the amount of

8     time that you were in both of those roles

9     combined?

10         A.    No.

11               MS. COLWIN:  Objection.

12         A.    It doesn't seem right.  It seems like

13    the first role shows the entire time at

14    Bristol-Myers Squibb, and the second role shows

15    just the period of the first position.  So...

16         Q.    So, how long were you at Bristol-Myers

17    Squibb, in total?

18         A.    From April 2007 to June 2015.

19         Q.    Do you recall how long you were in the

20    corporate counsel role?

21         A.    I do not.

22         Q.    Do you recall how long you were in the

23    senior corporate counsel role?

24         A.    I do not.

25         Q.    All right.  At some point, did you

1          N. J. Oliva - CONFIDENTIAL

2    transition from Bristol-Myers Squibb to another

3    entity?

4          A.    Yes.

5          Q.    What was that other entity?

6          A.    Catalent, C-A-T-A-L-E-N-T.

7          Q.    Is Catalent affiliated in any way with

8    Bristol-Myers Squibb?

9          A.    No.

10         Q.    Was it at the time?

11         A.    No.

12         Q.    So, how did it come to pass that you

13   transitioned from Bristol-Myers Squibb to

14   Catalent?

15         A.    I was looking for an advancement

16   position at Bristol, within Bristol, and outside

17   Bristol, also.  And I had interviewed at several

18   places, I had used a recruiter, and I found,

19   interviewed for, and was provided an offer and

20   accepted at Catalent.  That process was some time.

21         Q.    With respect to your decision to seek

22   advancement, how did you go about seeking

23   advancement within Bristol-Myers Squibb?

24         A.    I spoke to my supervisors, I spoke to

25   members of other practice group areas, and I used

1          N. J. Oliva - CONFIDENTIAL

2    a relationship network.

3          Q.    What is a relationship network?

4          A.    It's where you keep good relationships

5    with the people that you used to work with, or key

6    people who have some connection, who might be able

7    to make that happen for you.

8          Q.    So, is this some kind of external

9    organization or are you referring to your own

10   connections with people?

11         A.    My own internal with -- within

12   Bristol-Myers Squibb.

13         Q.    After engaging in the activities you

14   just described, did you form some conclusion as to

15   whether you were going to be able to advance

16   within Bristol-Myers Squibb?

17              MS. COLWIN:  Objection.

18         A.    I was not going to get the position

19   that I wanted to get.

20         Q.    Which position did you want?

21         A.    There was a position in Tokyo.

22         Q.    What is your understanding of why you

23   were not going to get that position?

24              MS. COLWIN:  Objection.

25         A.    I understand that they went to hire a

1          N. J. Oliva - CONFIDENTIAL

2     local bengoshi.

3          Q.     What is a bengoshi?

4          A.     In Japan, bengoshi is a certified

5     lawyer, one who is very rare.  It's very difficult

6     to pass the bengoshi exam in Japan.  If you think

7     the New York and California bars are hard, at that

8     time, I recall it being a miniscule percentage of

9     people who pass.

10         Q.     Are you licensed in New York?

11         A.     Yes.

12         Q.     Are you licensed in California?

13         A.     No.

14         Q.     So you're just mentioning that to draw

15    a comparison?

16         A.     Correct.

17              MS. COLWIN:  Objection.

18         Q.     Thank you.

19              So, after learning that Bristol-Myers

20    Squibb was seeking to hire a bengoshi, did you

21    decide to look for new positions externally?

22         A.     I think I had already begun.

23         Q.     And you mentioned that you used

24    recruiters, correct?

25         A.     Yes.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    Which recruiters did you use?

3     A.    Princeton Legal.

4     Q.    Any others?

5     A.    No.

6     Q.    Had you used Princeton Legal

7   previously?

8     A.    Previously to what?

9     Q.    Previously to when you began searching

10   externally, after being at Bristol-Myers Squibb?

11     A.    No.

12     Q.    I think you testified earlier that you

13   consulted with recruiters in seeking the brand

14   regulatory counsel at Bristol-Myers Squibb; did I

15   get that correct?

16     A.    You did not.

17          MS. COLWIN:  Objection.

18     Q.    Did you ever use recruiters after law

19   school, before joining Bristol-Myers Squibb?

20     A.    No.

21     Q.    So, was this interaction with

22   Princeton the first time you had worked with

23   recruiters?

24          MS. COLWIN:  Objection.

25     A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    Okay.  Thank you.

3          So, other than consulting with

4   Princeton Legal Group, what other steps did you

5   take in your job process, your job search process?

6     A.    I don't recall.

7     Q.    Did you look for jobs on LinkedIn?

8     A.    I don't think so.

9     Q.    Did you look for jobs on ACCA?

10    A.    I don't remember, but probably.

11  That's how I found the Bristol job.

12    Q.    Did you consult any other job boards?

13    A.    I don't remember.

14    Q.    Okay.  That's fine.

15          All right.  Could you describe

16  generally for me the position you had at Catalent?

17    A.    So, I was the associate general

18  counsel, which at Catalent is one step above

19  assistant general counsel.  I reported directly to

20  the general counsel, and I supported one of three

21  main businesses as being the primary lawyer for

22  the president of the -- essentially, the R&D

23  function of Catalent.

24    Q.    Listed on page 2 of the document, does

25  this describe that position correctly?

1          N. J. Oliva - CONFIDENTIAL

2     A.    Yes.

3     Q.    Does it omit anything material?

4     A.    It's a very small summary, so,

5 possibly.

6     Q.    Well, looking at it now, is there

7 anything important that you would add to that?

8          MS. COLWIN:  Objection.

9     A.    I can't recall anything.  I can't

10 think of anything right now that I would add.

11     Q.    If your recollection should change as

12 we're having a discussion today, would you please

13 let me know?

14     A.    Yes.

15     Q.    Thank you.

16          So then, at some point in time --

17          MR. BERMAN:  Withdrawn.

18     Q.    In the time between you joined

19 Catalent and the time that you first departed from

20 Mitsubishi Chemical Corporation, did you maintain

21 contact with any personnel from Mitsubishi?

22          MS. COLWIN:  Can I just have that read

23     back?

24          (Whereupon, the requested question was

25     read back by the reporter.)

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  I missed the "first

3     departed."  That's the word I missed.  Okay.

4     Q.    Is that question clear?

5     A.    No.

6     Q.    Okay.  What I'm interested in learning

7  is whether you had contact with any personnel from

8  MCHA, after the time that you departed from MCHA

9  up until the time that you joined Catalent?

10         Does that make sense?

11    A.    Yes.

12    Q.    Okay.

13    A.    Can I ask, only MCHA or any Mitsubishi

14 Chemical group?

15    Q.    My intention is to start with MCHA and

16 then expand from there, but if it helps you to

17 clarify, then that's fine.

18    A.    Yes.  I have -- I maintained contact

19 with Donna Costa, who was at MCHA, and others who

20 were at other companies.

21    Q.    So, can you describe for me how you

22 maintained contact with Ms. Costa during that time

23 period?

24    A.    Yeah.  We talked once in a while, we

25 sought to meet once in a while and catch up, and

N. J. Oliva - CONFIDENTIAL

1

2  she was a reference for me in job searches.

3       Q.    Did Ms. Costa provide you with a

4  written reference?

5       A.    Yes.

6       Q.    Did she provide you with more than one

7  written reference?

8       A.    I don't remember.  In fact, I'm not --

9  I'm not sure I can picture a written ref -- she

10  provided me with references.  Whether the

11  reference calls for documents, I don't recall.

12  But more than one time she served as a reference

13  for me for sure.

14            MR. BERMAN:  There's a disturbance.

15  Can you just give me one second.

16            (Pause in proceedings.)

17       Q.    How did it come to pass that you were

18  provided with a reference from Ms. Costa?

19       A.    I asked.

20       Q.    At what point in time did you ask for

21  the reference?

22       A.    I asked -- I think the first time I

23  asked was for a company called Savient, also a

24  pharmaceutical company in New Jersey.  I think the

25  second time I asked was for a company called

N. J. Oliva - CONFIDENTIAL

1    Valiant, also a pharmaceutical company in New

2    Jersey, and for the Catalent position.  I don't

3    recall if I asked for anything else.  I did not

4    ask for one for the Bristol-Myers Squibb job.  I

5    don't recall.  I don't recall asking for one.

6    

7         Q.    Okay.  When you transitioned out from

8    Mitsubishi Chemical Holdings Association to

9    Bristol-Myers Squibb, was that a voluntary

10   departure?

11        A.    Yes.

12        Q.    Did they know you were looking for

13   another position?

14             MS. COLWIN:  Objection.

15        A.    Not to my knowledge.

16        Q.    Did you explore whether you had an

17   opportunity for further advancement within MCHA

18   before you departed?

19             MS. COLWIN:  Objection.

20        A.    I recall talking to Donna about the

21   department and my focus on pharma, and what the

22   likelihood of Mitsubishi Tanabe -- well, at that

23   time it wasn't Tanabe -- Mitsubishi Pharma

24   Corporation bringing pharmaceutical product to the

25   U.S. was.  I think it's on that basis that I made

1          N. J. Oliva - CONFIDENTIAL

2     the decision for the career I wanted.

3          Donna was clear that her opinion was

4     that I should -- my skill set and my focus should

5     be on being a generalist, and plenty of those

6     opportunities existed for me at Mitsubishi.

7          Q.    So, did you think it was in your

8     interest to become a generalist and to focus on

9     that?

10          MS. COLWIN:   Objection.

11          A.    Looking back, I think she was right.

12     At that time, I wanted to focus on being a pharma

13     lawyer.

14          Q.    So at that time, was it your

15     understanding that it was unlikely in the near

16     term for Mitsubishi to bring a pharma product on

17     line?

18          A.    In the U.S.

19          MS. COLWIN:   Objection.

20          Q.    All right.  So, did you ask Ms. Costa

21     for a job reference before departing MCHA?

22          A.    I don't recall doing that.

23          Q.    So you mentioned asking her for a

24     reference in connection with a position at

25     Savient, correct?

1          N. J. Oliva - CONFIDENTIAL

2      A.    Savient.  And Valiant and Catalent.

3      Q.    So, was the position at Savient one

4  that you were applying to before you joined

5  Bristol-Myers Squibb?

6      A.    No.

7      Q.    Was it a position you were interested

8  in after already being at Bristol-Myers Squibb?

9      A.    Yes.

10     Q.    Was that a written reference?

11           MS. COLWIN:  Objection.

12     A.    I don't recall.

13     Q.    Do you know whether Ms. Costa provided

14  you with a written reference that you could use

15  for multiple job applications during the course of

16  your career?

17     A.    I don't think so.

18     Q.    So whenever you asked her for a

19  reference, it was for a particular application?

20     A.    That's correct.

21     Q.    Okay.  Thank you.

22           So then, you discussed that you had

23  been in contact and maintained contact with

24  Ms. Costa.  I believe you testified that you spoke

25  with her once in a while; is that correct?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3     Q.    Did I get that right?

4     A.    I think that's what I said.

5     Q.    Approximately how often did you speak

6  with Ms. Costa after you first departed MCHA?

7     A.    I would say several times a year.

8     Q.    Did you have meetings with her during

9  that time?

10    A.    Sometimes, dinner or lunch.

11    Q.    Okay.  And from the time that you

12  joined --

13         MR. BERMAN:  Withdrawn.

14    Q.    Did there come a time when you learned

15  that there might be a new opportunity for you at

16  Mitsubishi Chemical Holdings America?

17    A.    Sorry, could you repeat the question?

18         MR. BERMAN:  Can you read it back,

19     please.

20         (Whereupon, the requested question was

21     read back by the reporter.)

22    A.    Yes.

23    Q.    Approximately when was that?

24    A.    Um, I think that was in August of

25  2015.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    So prior to August of 2015, did you

3     maintain contact with anyone else in any

4     Mitsubishi entity other than Ms. Costa?

5               MS. COLWIN:    Objection.

6          A.    Yes.

7          Q.    Can you identify those people?

8          A.    Riu Eato (phonetic) from Mitsubishi

9     Pharma in Japan.  Hiroo Uemura, U-E-M-U-R-A,

10    from -- currently at Japan Blood Products, but

11    formerly of Mitsubishi Pharma Corporation in

12    Japan.

13              That's all I can recall right now.

14    Those were the two main contacts in Japan for me

15    that I visited.

16         Q.    You just mentioned that you visited

17    Japan?

18         A.    Yes.

19         Q.    In the time period after you first

20    departed MCHA, when did you visit Japan?

21         A.    It was as part of working for

22    Bristol-Myers Squibb.  I was responsible for Asia,

23    Shanghai was our headquarters, and I had a

24    bengoshi reporting to me in Tokyo.  So I visited

25    maybe -- I don't recall the dates.

1          N. J. Oliva - CONFIDENTIAL

2     Q.   Do you recall the year?

3     A.   No.

4     Q.   Did you make more than one trip to

5 Japan while you were at Bristol-Myers Squibb?

6     A.   I think one trip to Japan, and

7 multiple to China.

8     Q.   Had you planned to visit Japan in

9 2014?

10    A.   In 2014?

11    Q.   Yes.

12    A.   I don't recall.

13         MR. BERMAN:  I'm going to have the

14         reporter mark a document, so this should be

15         45.

16         (Plaintiff's Exhibit 45, one-page

17         document Bates stamped MCHC-0001321,

18         confidential, marked for Identification, as

19         of this date.)

20         MR. BERMAN:  I'll identify the

21         document.  It's MCHC-0001321.  It's one

22         page.

23    Q.   Let me know when you're ready, please.

24    A.   Okay.

25    Q.   Mr. Oliva, are you looking at the

```
1               N. J. Oliva - CONFIDENTIAL

2    document?

3        A.    Yes.

4        Q.    Have you seen it before?

5        A.    I must have.

6        Q.    Can you tell me what it is?

7        A.    It's an e-mail from Hiroo Uemura, who

8    I just communicated about, to me, about possibly

9    meeting in Japan, and then an e-mail back saying,

10   I'm sorry, but I can't make it.

11       Q.    Does this refresh your recollection as

12   to whether you had planned to visit Japan in 2014?

13       A.    Yes.

14       Q.    Was this in connection with your work

15   for Bristol-Myers Squibb?

16       A.    Yes.

17       Q.    Do you recall whether you actually

18   went to Japan?

19            MS. COLWIN:  Objection.  At what point

20       in time?

21            MR. BERMAN:  In connection with this

22       e-mail.

23       Q.    Did you cancel your trip?

24       A.    Yes.

25       Q.    But, subsequently, was there another
```

1          N. J. Oliva - CONFIDENTIAL

2    occasion where you visited Japan?

3          A.    I did visit Japan and met with Ray

4    Morozon (phonetic.)

5          Q.    And, approximately, when did that take

6    place?

7          A.    It must have been after this, because

8    this says, "after seeing you after all these

9    years."  So it must have happened after this.

10          Q.    Okay.  Did your subsequent visit to

11    Japan take place before you rejoined MCHA?

12          A.    Yes.

13          Q.    Was that in connection with your work

14    at Bristol-Myers Squibb?

15          A.    Yes.

16          Q.    Prior to originally departing MCHA,

17    had you ever traveled to Japan?

18          A.    I'm sorry, say it again?

19          Q.    Had you ever traveled to Japan prior

20    to your first departure from MCHA?

21          MS. COLWIN:  Objection.

22          A.    Yes.

23          Q.    Approximately when did you travel to

24    Japan?

25          A.    I think it was November of 2006.

1          N. J. Oliva - CONFIDENTIAL

2     Shortly before I left.

3          Q.     Was that in connection with your work

4     for MCHA?

5          A.     Yes.

6          Q.     Who made the determination to send you

7     to Japan?

8               MS. COLWIN:  Objection.

9          A.     I don't know the answer.

10         Q.     What were the circumstances

11    surrounding your visit?

12         A.     I had traveled with Ken Fujiwara and

13    Hiroo Uemura significantly many trips, mostly with

14    Hiroo Uemura, to L.A., Europe, related to Alpha

15    Therapeutical Corporation post-closing, and I went

16    to visit, after all that time, the headquarters in

17    Osaka and, of course, in Tokyo.  So it was a -- it

18    was business travel.  I had not been there before,

19    and I had supported these businesses for a long

20    time.

21         Q.     Did you meet any executives on your

22    trip?

23               MS. COLWIN:  Objection.

24         Q.     Mitsubishi executives.

25         A.     I'm sure I did.

N. J. Oliva - CONFIDENTIAL

1

2      Q.    Okay.  Sitting here today, can you

3  recall whether anyone was at the president level

4  or above?

5      A.    I'm sure I did not meet the president

6  of Mitsubishi Chemical Holdings at that time.

7      Q.    Did you meet any Board of Directors

8  level personnel?

9      A.    I don't recall.

10     Q.    Okay.  Thank you.

11     A.    I think it would be unlikely.

12     Q.    Okay.  Thank you.

13           So, going back to that time around

14  August 2015, when you first learned of an

15  opportunity at MCHA.  How did you come to learn of

16  that opportunity?

17     A.    How did I come to learn about the

18  opportunity of the general counsel position?

19     Q.    Let's try asking it a different way.

20     A.    Okay.

21     Q.    You had discussed that you had

22  maintained contact with Donna Costa over the

23  years.  Did there come a time in approximately

24  August 2015 when you met with Ms. Costa?

25     A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    Was that surrounding her birthday?

3          A.    Yes, it was around the time of her

4    birthday, and she -- and I had been at Catalent,

5    for which she served as a reference.

6          Q.    So, had you spoken to Donna about any

7    opportunities at MCHA prior to August 2015, but

8    after you had joined Catalent?

9          MS. COLWIN:   Objection.

10         A.    No.

11         Q.    So, on or around Ms. Costa's birthday

12   in August of 2015, what did you discuss concerning

13   opportunities at MCHA?

14         A.    Um, I recall Donna saying something

15   like, I'm having some trouble, or, you know,

16   there's some problems in the department, it's too

17   bad that you would not be interested in a position

18   in New York.  Something like that.

19         Q.    Did she indicate what the nature of

20   the trouble was?

21         A.    No.

22         Q.    Did she get into any more depth about

23   the problems?

24         A.    No.  Not to my recollection.

25         Q.    Was there any discussion of

1           N. J. Oliva - CONFIDENTIAL

2    Ms. Fischman at that meeting?

3         A.    I'm not sure if she was even

4    identified by name.  I think Donna was telling me

5    that things were not going all that well, and I

6    recall it being sort of something of an offhanded

7    comment like, you know, it's too bad that you

8    didn't live anywhere near, or you wouldn't be

9    interested, or you wouldn't be able to commute, or

10   something like that.  And I said, for a general

11   counsel position, maybe I would.  That kind of

12   response.

13        Q.    Was there any discussion about the

14   nature of the general counsel position at that

15   time?

16        A.    I don't think so.

17        Q.    So, was your understanding of the

18   nature of the general -- first of all, did you

19   have any understanding of what that general

20   counsel position at MCHA involved?

21        A.    Yes.

22        Q.    Was that predicated upon your past

23   experience in the legal department there?

24        A.    Yes.

25        Q.    Did you have any discussion about

N. J. Oliva - CONFIDENTIAL

1

2    whether the role had changed over time since you

3    left?

4        A.    Very unlikely at that meeting, but,

5    yes.

6        Q.    Was there anything else that you

7    recall discussing with Ms. Costa during that

8    August meeting?

9        A.    I probably talked to her about my

10    Catalent position.

11        Q.    What did you tell her about your

12    Catalent position at the time?

13        A.    I don't remember exactly, but I had

14    been -- I had settled into role -- I had just

15    started in June, but I had settled into role and

16    found it -- people were great and the company is

17    great, I don't have anything bad to say about it,

18    but the role was relatively small.

19        Q.    When you say the role was relatively

20    small, what do you mean by that?

21        A.    I think I had more responsibility in

22    my -- more breadth of responsibility in my global

23    role as Bristol, but this was -- it was a good

24    opportunity.

25        Q.    Was the Catalent position more closely

N. J. Oliva - CONFIDENTIAL

1          N. J. Oliva - CONFIDENTIAL

2     aligned with your previously-stated goal of

3     becoming a pharma lawyer?

4               MS. COLWIN:  Objection.

5          A.    Well, the Catalent position was very

6     much aligned and strategic for me and my goal to

7     become a general counsel.

8          Q.    So it was more broadly focused?

9          A.    It was different, it filled a little

10    bit of a gap, and the title was certainly a step

11    in the right direction.

12         Q.    So, can you give me any examples of

13    types of work that you performed at Catalent that

14    would be aligned more closely with your goal of

15    becoming a general counsel?

16         A.    Yes.  So, at that time, I expected

17    that, at some point, I would be the general

18    counsel of the pharmaceutical-related business,

19    and so I wanted to have the manufacturing and

20    small batch operations experience that Catalent

21    had, that Bristol does, but I didn't have exposure

22    to.

23         Q.    Did you have any discussions with

24    Ms. Costa around August 2015 about the prospects

25    of any Mitsubishi-related entities bringing a

N. J. Oliva - CONFIDENTIAL

1

2     pharma product to market?

3           A.     No.

4           Q.     Okay.

5           A.     Not that I recall.

6           Q.     At the time that you had the meeting

7     with Ms. Costa in August of 2015, were you still

8     interested in knowing whether Mitsubishi planned

9     to bring pharmaceutical products to market?

10          A.     Probably not.  We might have even been

11    competitors.  I don't know what their area of

12    expertise was, so I probably would have avoided

13    having that conversation.

14          Q.     Okay.  So, after August '15, when was

15    the next time that you had any interaction with

16    folks at MCHA concerning a potential opportunity

17    for you to become general counsel?

18          A.     Well, that meeting sort of lit a

19    candle, so we started to meet regularly and speak

20    regularly after that.  Probably -- I think I had a

21    vacation right after that, a preexisting vacation.

22    And it's probably when I got back from that.  So,

23    again, maybe the end of August or beginning of

24    September where we picked up the conversation,

25    which, as I recall, was something like, if we're

1                    N. J. Oliva - CONFIDENTIAL

2    serious about this, we need to start -- we need to

3    talk about it.

4          Q.    So, approximately how many meetings

5    are we talking about?

6                MS. COLWIN:   Objection.

7          Q.    Do you understand the question?

8          A.    How many meetings?

9          Q.    Yes.   Approximately how many meetings

10   did you have with Ms. Costa after that August 2015

11   conversation, but before November 30, 2015?

12         A.    Yeah.   I would say in person, two or

13   three times, and by phone more than that.

14         Q.    Did you have any discussions about the

15   nature of the GC position that MCHA was seeking to

16   fill?

17         A.    Yes.

18         Q.    What did Ms. Costa tell you about the

19   nature of the GC position she was looking to fill?

20         A.    She told me about -- at that point,

21   she started to tell me about the issues she was

22   having, and questioned me mostly about my

23   experience and if there were gaps, and if there

24   were gaps, how we would fill those gaps and those

25   kinds of things.   The nature of the position, I

1           N. J. Oliva - CONFIDENTIAL

2     had generally known, and the response to that

3     question is really about the difference between

4     what Mitsubishi Chemical Holdings group looked

5     like when I left and what it looked like in 2015.

6           Q.    Did you complete your response?

7           A.    Yes.

8           Q.    So, I want to just unpack that a

9     little bit.  I'm going to start with the questions

10    about the gaps in your experience.

11          Were the two of you able to identify

12    any gaps?

13          MS. COLWIN:  Objection.

14          A.    We talked about Donna's concern about

15    the gaps, and, if there were gaps, what they would

16    be and how we would manage those.

17          Donna was rigorous in the conversation

18    with me about my experience, because although we

19    spent time communicating and kept our

20    relationship, I didn't tell her on a day-to-day

21    basis, nor could I, what the kinds of things that

22    I really worked on, so she didn't really have a

23    great depth of understanding of what I had done

24    for the eight, nine years or however long it had

25    been since I left.

1                N. J. Oliva - CONFIDENTIAL

2          Q.    The nature of your duties at Catalent

3     were to provide legal advice and counsel, among

4     other things?

5                MS. COLWIN:  Objection.

6          Q.    Is that correct?

7          A.    At Catalent?

8          Q.    Yes.

9          A.    Yes.

10         Q.    So you couldn't reveal those in a

11    discussion with a prospective employer, correct?

12               MS. COLWIN:  Objection.

13         A.    Correct.

14         Q.    So, what concerns about potential gaps

15    in your experience did Ms. Costa identify?

16               MS. COLWIN:  Objection.

17         A.    Donna identified a question as to what

18    experience I had in the antitrust and in M&A.  I

19    think those were the two major areas of concern

20    for Donna.

21         Q.    Did she ask you anything about

22    compliance experience?

23         A.    No.  Well, yes, but she knew.  She

24    didn't identify that as a gap or a concern.

25         Q.    So, at that point, did you have

1          N. J. Oliva - CONFIDENTIAL

2   substantive compliance experience?

3          A.    Yes.

4          MS. COLWIN:  Objection.

5          Q.    In your career, up until that point in

6   time, had you had any antitrust exposure?

7          A.    Yes.

8          Q.    What was the general nature of that?

9          A.    Well, there's a lot.  So, antitrust

10   exposure in the pharmaceutical industry is very

11   complicated.  Most of the products that we worked

12   on and most of the products that I worked on as

13   the commercial lead for the transaction group were

14   joint venture products.  And as a brand lawyer, I

15   worked on joint venture products.

16          So, from an antitrust perspective, I

17   drafted provisions to ensure protection of

18   collaborations and to avoid any problem related to

19   collaborations or inappropriate disclosures.

20          As a brand lawyer, we had joint calls

21   with collaboration partners.  There's a lot of

22   antitrust-related concern in a highly-regulated

23   industry that is so often partnered.  We had

24   collaborations with multiple companies on multiple

25   products that I supported.

1              N. J. Oliva - CONFIDENTIAL

2        Q.    Up until that same point in time, did

3   you have mergers and acquisitions exposure?

4        A.    Yes.

5        Q.    What was the general nature of that

6   exposure?

7        A.    Well, the first exposure was Alpha

8   Therapeutic Corporation.  Actually, I take that

9   back.  The first exposure was Western Lithotech,

10  which is a divestiture by Mitsubishi Chemical

11  group.  When I was here the first time as a

12  paralegal, and I worked on that supporting

13  Yano-san and Donna.

14             Then Alpha Thera -- others, I think,

15  also that I can't recall, small, small

16  divestiture.  Then Alpha Therapeutic, which is a

17  major divestiture, where we retained the entity

18  and the liabilities and sold all the assets to

19  entities, and all of those post-closing

20  obligations.

21             And then at Bristol, the Medarex deal,

22  which was a -- over a 2 billion-dollar deal that

23  brought those immuno-oncology-related products to

24  Bristol.  And then the diabetes franchise

25  divestiture of over $6 billion to AstraZeneca that

1          N. J. Oliva - CONFIDENTIAL

2    I worked on as part of the commercial group.  And

3    then the closeout of the Otsuka franchise for

4    Abilify, which I worked on.  So, many.

5        Q.    Did you relate all of those

6    experiences in M&A to Ms. Costa?

7        MS. COLWIN:  Objection.

8        A.    I don't recall.

9        Q.    Did you describe then generally to

10   her?

11       A.    I would think that I would explain to

12   someone who's concerned about whether I had M&A

13   experience, that I did have M&A experience.

14       Q.    Likewise, you did the same with the

15   antitrust?

16       A.    Yes.

17       Q.    After providing Ms. Costa with that

18   information, were there any other potential gaps

19   in experience that she expressed concern over?

20       MS. COLWIN:  Objection.

21       A.    I think the answer to that is no.

22       Q.    Okay.  So, in the course of your

23   discussions with Ms. Costa, can you recall any

24   other subject matter relating to the opportunity

25   of general counsel?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3     Q.     Can you recall what you said to her or

4     what she said to you, other than what you've just

5     described in these conversations?

6     A.     About the subject matter of the

7     position?

8     Q.     Yes.

9     A.     I do recall Donna communicating that

10    it's a big role, that the company has changed,

11    that it's undergoing change.  I don't remember if

12    there was -- I'm sure we talked about a lot of

13    things when we met, but I can't recall any

14    specifics.

15    Q.     Did you have any discussions with

16    Ms. Costa about the chief compliance officer

17    aspect of the position?

18    A.     Yes.

19    Q.     What was the general nature of those

20    discussions?

21    A.     It was about the role of chief

22    compliance officer and my experience that would

23    very easily fit and match that.

24    Q.     So, during the course of these

25    discussions, did Ms. Fischman's name come up?

1          N. J. Oliva - CONFIDENTIAL

2     A.     Yes.

3     Q.     What discussions did you have

4 concerning Ms. Fischman?

5          MS. COLWIN:  At what time?

6          MR. BERMAN:  At any of these times

7     during --

8     Q.     You mentioned that you had

9 approximately two or three conversations, so

10 that's what I'm focusing on.

11    A.     Plus by phone.  Sorry to interrupt.

12    Q.     Sure.  Let's agree that we're

13 including those conversations.  I'm interested in

14 any conversation you had with Ms. Costa in the

15 period leading up to November 30, 2015 that

16 concerned Ms. Fischman.

17         Maybe just to try to parse it and make

18 it a little easier.  When is the first time that

19 Ms. Fischman's name arose or she was identified in

20 a conversation by her position?

21    A.     I don't remember the first time that

22 her name arose.  I think it started as a pretty

23 rigorous interview process about me and whether

24 this position and my experience was a match and

25 whether I was interested and whether this was

1           N. J. Oliva - CONFIDENTIAL

2    something that we were really going to be able to

3    pursue.

4           Later on, as it became clear that we

5    both seemed interested, Donna did discuss with me

6    that she had some trouble with Jennifer and that

7    it was likely that Jennifer would leave the

8    company, or it was possible that Jennifer would

9    leave the company upon being returned to her

10   position.  But, if she didn't, it was in my best

11   interest, because Jennifer had years of experience

12   that could help me in my transition into the role.

13   And that if I was comfortable, you know, making

14   that work, that could be a really good benefit.

15   Not necessarily if I was comfortable, I didn't

16   have a say in that, but, really, if I could make

17   that work, it would be better for the department

18   and probably better for my success, if -- if we

19   could make that work.

20       Q.    So, I think you generally described

21   for me the process of determining whether this was

22   a match, right?

23           Did you leave anything out of that,

24   that was important?

25       A.    It was pretty rigorous, but I think I

1          N. J. Oliva - CONFIDENTIAL

2     said that.

3          Q.    And then you mentioned part of the

4     discussions were to determine your level of

5     interest.

6               How did that come about?

7          A.    Well, as I mentioned, the first thing

8     Donna said is that offhanded comment was, it's too

9     bad that you wouldn't be interested, or it's too

10    bad it's too far away, or something like that.

11    And that's how this whole thing started.  Because

12    I said, well, you know, my goal is to get -- is to

13    be general counsel.  People at Bristol knew that.

14    That's what I wanted to do.  And so, if I had the

15    opportunity to become a general counsel, then I

16    would consider either moving or communicating or

17    making it work, if the position's right.

18         Q.    Where were you living at the time?

19         A.    Where I live currently, in

20    Robinsville, New Jersey.

21         Q.    Was there any discussion about the

22    compensation attendant to the position?

23              MS. COLWIN:  Objection.

24         A.    Yes.

25         Q.    What was that discussion?

1           N. J. Oliva - CONFIDENTIAL

2      A.    Well, I don't think there was only one

3  discussion.  When we got to the point of the

4  offer, Donna made an offer to me and I began

5  negotiating with her, having just gone through the

6  process not that long ago, not long previous to

7  this with Catalent.

8      Q.    Prior to the point in time where Ms.

9  Costa -- well, prior to the point in time where

10  MCHA offered you the general counsel and chief

11  compliance officer position, had there been any

12  discussion about the compensation tied to that

13  role?

14      A.    I don't think so.

15      Q.    Did Ms. Costa mention to you that

16  there was a budget for the position?

17      A.    I don't think so.

18      Q.    Now, just backing up to the discussion

19  concerning Ms. Fischman.  Had you worked with Ms.

20  Fischman at MCHA in your first time at that

21  company?

22      A.    No.

23      Q.    That was before she was there,

24  correct?

25      A.    Correct.

N. J. Oliva - CONFIDENTIAL

1

2    Q.    So, did you know anything about

3 Ms. Fischman prior to joining MCHA as a general

4 counsel and chief compliance officer?

5         MS. COLWIN:  Objection.

6    A.    Nothing except what we talked about

7 immediately prior to my acceptance.

8    Q.    Okay.  I think you just described --

9         MR. BERMAN:  Withdrawn.

10    Q.    So, did Ms. Costa relate to you

11 information about Ms. Fischman's skills and

12 experience?

13         MS. COLWIN:  Objection.

14    A.    I think generally she had been there

15 ten years, she supported multiple clients, those

16 kinds of things.  I don't recall anything

17 specific.  Mostly the conversation was around the

18 volume of work and the big challenge this would

19 be, and that having help is good.  And Jennifer

20 could be that.

21    Q.    So, I understood you to be telling me

22 that there was a high volume of work.

23         Did I get that correct?

24         MS. COLWIN:  Objection.

25    A.    In the general counsel position?

N. J. Oliva - CONFIDENTIAL

1

2      Q.    Yes.

3      A.    Yes.

4      Q.    You were supporting many affiliates of

5   Mitsubishi, correct?

6              MS. COLWIN:  Objection.

7              MR. BERMAN:  You can answer.

8      A.    Yes.

9      Q.    So, did Ms. Costa relate to you

10   anything about her level of confidence in

11   Ms. Fischman being able to support you in your

12   role as general counsel?

13      A.    I recall that she did not necessarily

14   expect Jennifer would stay, when being returned to

15   her position, and that it might be very difficult.

16   And I recall saying that I think I can make it

17   work.  I don't know Jennifer, and we can start

18   with a clean slate, and I'm pretty good at

19   relationships with people and building teams, so I

20   think we can -- we'll work it out.  I think it'll

21   be fine.  I came into that pretty confident that

22   there wasn't going to be much of an issue.

23      Q.    Okay.  And you made a comment earlier

24   that you didn't have a say in whether she would

25   stay or leave.

1          N. J. Oliva - CONFIDENTIAL

2          Who did have that say?

3     A.    Jennifer.

4     Q.    Well, who at the company would be able

5  to make the determination whether she would stay

6  on after you had joined?

7     A.    Who -- can you repeat the question?

8          MR. BERMAN:  Would you read it back,

9     please.

10         (Whereupon, the requested question was

11    read back by the reporter.)

12         MS. COLWIN:  Objection.

13    Q.    Do you understand the question?

14    A.    I think so, but I don't know that I

15 know the answer.  I wasn't there.

16    Q.    Then let me rephrase the question.

17         After you joined the company as

18 general counsel and chief compliance officer on

19 November 30, 2015, you became Ms. Fischman's

20 supervisor, correct?

21    A.    Yes.

22    Q.    In that capacity, did you have the

23 authority to determine whether she would stay on

24 at the company?

25    A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2          MR. BERMAN:  Let's take a two-minute

3     break or a five-minute break.

4          (Recess taken:  11:16 to 11:26 a.m.)

5     Q.    Mr. Oliva, you mentioned that at some

6  point in time, MCHA made you an offer for the

7  position.  How much compensation did they offer

8  you?

9     A.    I believe --

10         MS. COLWIN:  I'm going to object to

11    form, but allow him to answer.

12    A.    I believe the original offer was

13  300,000.

14    Q.    Okay.  And did you negotiate the

15  offer?

16    A.    I did.

17    Q.    And --

18    A.    And all of the --

19    Q.    I'm sorry.  I didn't mean to interrupt

20  you.

21    A.    I thought I interrupted you.

22         Yes, I negotiated the offer and all of

23  the surrounding comp model.

24    Q.    What ended up being the compensation

25  package applicable to your position when you

1          N. J. Oliva - CONFIDENTIAL

2     joined?

3          MS. COLWIN:  Objection.

4     Q.    Do you understand the question?

5     A.    I think I understand it.

6     Q.    I can rephrase it.

7          How were you compensated when you

8     joined MCHA as general counsel and chief

9     compliance officer, when you first joined?

10          MS. COLWIN:  Objection.

11     A.    I don't recall exactly, but I think it

12     was 325K base and 29 percent bonus.  I had

13     negotiated out a car that was part of policy

14     applicable to the position.  I had negotiated in a

15     signing bonus for the purposes of paying back my

16     Catalent signing bonus, and I had negotiated up

17     the base on the basis of my prior experience and

18     whether this was worth it for me to come to the

19     city and take this bigger job and all of those --

20     all of those things.  Yeah.

21     Q.    What was your base at the Catalent

22     position that you were departing from?

23     RL          NS. COLWIN:  Objection.  Don't answer.

24          Mark it for a ruling.

25          MR. BERMAN:  Okay.  Please mark that

1          N. J. Oliva - CONFIDENTIAL

2      testimony for a ruling.

3          MS. COLWIN:  I'll revisit it, Matt,

4      but let me think about it.  I'll revisit

5      that question.

6          MR. BERMAN:  I don't see any basis

7      for --

8          MS. COLWIN:  We don't have to con --

9      table it.  We'll talk later.

10          MR. BERMAN:  Okay.  Yesterday, we

11      raised a number of issues to be tabled, and

12      I requested a response from you by the end

13      of the day.  I would make the same request

14      today.

15          MS. COLWIN:  Okay.  I had no control

16      over the other dep, but, okay.

17      Q.    Who did you have these negotiations

18  with?

19      A.    Donna, primarily, and Pat Saunders,

20  who's the HR for MCHA, with whom I interviewed.

21      Q.    What was the interview process in

22  order to obtain the job?

23      A.    The multiple meetings and

24  conversations with Donna and in-person interviews

25  with Kathryn Roche and Pat Saunders.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    Were you asked to submit a resumé in

3    connection with your consideration for the

4    position?

5          A.    I think so.

6          Q.    Do you still have a copy of that

7    resumé?

8          A.    I don't know.

9          Q.    Did you search for it as part of this

10   litigation?

11         A.    Did I search for it specifically?  I

12   don't know if it was part of the requests.  We had

13   many requests for searching, so I can't recall.

14         Q.    In connection with the discovery

15   demands that plaintiff propounded upon you during

16   this case, did you exercise your best efforts to

17   try to locate responsive documents?

18         A.    I did.

19         Q.    Did you provide them to your counsel?

20         A.    I did.

21         Q.    Do you know if that included a copy of

22   your resumé?

23         A.    I don't recall.

24   RQ          MR. BERMAN:  We'll call for production

25         of any resumé that was submitted in

1          N. J. Oliva - CONFIDENTIAL

2          connection with Mr. Oliva's consideration

3          for the general counsel, chief compliance

4          officer position.

5               MS. COLWIN:  Taken under advisement.

6               MR. BERMAN:  Thank you.

7          Q.    Other than the compensation that

8     you've described, the base, the bonus, the car and

9     the retainment of the Catalent sign-on bonus, did

10    you receive any other perquisites in connection

11    with that position when you first joined on

12    November 30, 2015?

13               MS. COLWIN:  Objection.

14          A.    I can clarify, it's the lack of car.

15    I was entitled to a car, but I negotiated a

16    different package in lieu of a car, because I had

17    just purchased a car for another position.  So I

18    declined to take the company car.  Sorry, that's

19    just to clarify, because it sounded like that

20    was -- I don't recall anything else.  I mean,

21    medical, right?  Standard HR benefit, but I don't

22    recall anything else.  I think the major issues

23    were base and bonus, which was negotiated as a

24    result -- and signing bonus.  But, again, that,

25    you know, was for the purpose of paying back the

1              N. J. Oliva - CONFIDENTIAL

2    Catalent signing bonus that I had to return, and

3    did return.

4         Q.    Understood.

5              Was there a discrete portion of this

6    compensation package that was in lieu of the car?

7         A.    I think the bonus -- well, I don't

8    know how they calculated it.  I remember just

9    negotiating numbers.

10        Q.    Did you receive any other benefits

11   that had a material financial value, such as, for

12   instance, an insurance policy, like a life

13   insurance policy?

14             MS. COLWIN:  Objection.

15        A.    I think all employees have a group

16   company life insurance policy.

17        Q.    Did you receive any personal non-group

18   coverage?

19        A.    No.  Not that I know of.

20        Q.    Did you receive any equity awards or

21   restricted stock units or anything of that nature?

22        A.    No.

23        Q.    Okay.  Thank you.

24             Were you provided with an offer letter

25   at some point?

1          N. J. Oliva - CONFIDENTIAL

2     A.    Yes.

3          (Plaintiff's Exhibit 46, one-page

4     document Bates stamped DEF 011530,

5     confidential, marked for Identification, as

6     of this date.)

7     Q.    I'm going to provide you with a

8     document that was previously marked as Plaintiff's

9     46.  And I'll represent to you that this was a

10    document produced to us in litigation; hence, it

11    has a Bates number in the bottom right corner of

12    DEF 001530.

13         Have you seen this document before?

14    A.    I don't recall seeing this document.

15    Q.    Did you receive an offer letter in

16    substantially the same format as the document

17    we're looking at now, Plaintiff's 46?

18    A.     I received -- I received an offer

19    letter.  I think Pat Saunders would be the

20    signatory.

21    RQ         MR. BERMAN:  We call for production of

22         any offer letter issued to Mr. Oliva in

23         connection with his reemployment with the

24         company on November 30, 2015.

25         MS. COLWIN:  Taken under advisement.

1            N. J. Oliva - CONFIDENTIAL

2    RQ          MR. BERMAN:  We also call for the

3         production of any documents reflecting the

4         negotiation process Mr. Oliva just

5         described.

6         Q.    Mr. Oliva, as part of your

7    interviewing process, you mentioned interviewing

8    with Ms. Kathryn Roche, I think you said, and with

9    Ms. Saunders.

10            Did you interview with any other MCHA

11   personnel as part of the consideration of

12   reemployment with the company?

13        A.    No.

14        Q.    Did you interview with any other

15   personnel at any other Mitsubishi company in

16   connection with your reemployment in this role?

17        A.    No.

18        Q.    After you joined the company, or

19   rejoined the company on November 30, 2015, were

20   you appointed to any corporate board positions on

21   any affiliates?

22        A.    No.

23        Q.    So you didn't sit on the board of any

24   Mitsubishi entities?

25            MS. COLWIN:  Objection.

N. J. Oliva - CONFIDENTIAL

2      A.    No.

3      Q.    I'm going to show you an exhibit

4    previously marked as Plaintiff's Exhibit 5.

5      A.    Okay.

6      Q.    Have you seen this document before?

7      A.    It's familiar.

8      Q.    Can you tell me what it is?

9      A.    It's a job description of the general

10    counsel and chief compliance officer.

11      Q.    Please take a moment to review it and

12    let me know if this position profile accurately

13    describes the position you were rehired into on or

14    about November 30, 2015?

15      A.    Yes.

16      Q.    Okay.  Thank you.

17            Prior to your rehire in November of

18    2015, had you had any experience monitoring

19    corporate governance?

20            MS. COLWIN:  Objection.

21      A.    I can't recall for sure.

22      Q.    Okay.  What about --

23      A.    I had experience in corporate

24    governance, but monitoring corporate governance,

25    that's what I'm struggling with.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    Is there a distinction between those

3  two things?

4     A.    There is.

5     Q.    What's the nature of the distinction?

6     A.    So, experience in corporate governance

7  is being able to advise about the role of Boards

8  of Directors, about what happens serving, even as

9  an acting secretary at board meetings.  There's

10  lots of corporate governance activities.

11  Monitoring corporate governance is the person who

12  is responsible for the corporate governance

13  program.  And I don't think I was responsible

14  prior to this position for corporate governance.

15  I did have corporate governance experience.

16     Q.    Forgive me, but I know a lot less than

17  you when it comes to corporate law, so if I ask a

18  question that's foolish or it can't be answered

19  the way it's posed, please let me know and I'll do

20  my best to rephrase it.

21          But can you explain to me, what does

22  it mean to be responsible for a corporate

23  governance program?  What does that entail?

24     A.    For a company like Mitsubishi Chemical

25  Holdings group, that has many hundreds of

1                    N. J. Oliva - CONFIDENTIAL

2   affiliates, each of those separate legal entities

3   has their own Board of Directors and officers.

4   And to serve as secretary to one of those boards

5   requires a level of knowledge of how a board runs

6   and what those bylaws are.

7            But to monitor a program as a holdings

8   group means that you are able to manage all of

9   their corporate filings, what service you use for

10  their state registrations, when the group will

11  have their annual meetings.  It's very different

12  to manage a number of affiliated companies and

13  control, have a level of control over making sure

14  they comport with their corporate formalities,

15  than to serve as a board member or as secretary to

16  a board, or acting secretary to a board, which

17  those experiences I had.

18       Q.    Okay.  Thank you for explaining that.

19       A.    Sure.

20       Q.    Prior to your rehire in November 2015,

21  had you participated in review and negotiation of

22  any acquisitions?

23       A.    I did participate in the Medarex

24  acquisition for Bristol-Myers Squibb, and if

25  that's read more broadly, as would normally be

1           N. J. Oliva - CONFIDENTIAL

2    read, divestitures also.  Then at Mitsubishi

3    Chemical, the Western Lithotech divestiture, the

4    two asset sale divestitures related to Alpha

5    Therapeutic, and multiple schedules and activity

6    related to the AstraZeneca diabetes franchise

7    divestitures.

8           Q.    Wouldn't those be described as

9    strategic transactions?

10          A.    Strategic transactions also includes

11   other things, but those are strategic

12   transactions.

13          Q.    So, which of those divestitures that

14   you mentioned was the largest transaction, in

15   terms of dollars?

16          A.    AstraZeneca divestiture.

17          Q.    How large was that transaction?

18          A.    Six billion-dollar.

19          Q.    What was your level of responsibility

20   in that transaction?

21          A.    So, my level of responsibility was

22   with regard to the commercial-related

23   transactional matters and how we would get those

24   transitioned.

25          Q.    So, who was responsible for the -- who

1          N. J. Oliva - CONFIDENTIAL

2    was the head lawyer with responsibility for your

3    side of the transaction?

4          Does that question make sense?

5          MS. COLWIN:  Objection.

6    A.    My one over manager.  The -- I think

7    he was the deputy general counsel at the time.

8    Q.    So, was that person vested with

9    overall responsibility for the transaction?

10         MS. COLWIN:  Objection.

11   A.    They had a deal team, so from a legal

12   perspective, the answer is yes.

13   Q.    Okay.  And you reported to that

14   person?

15         MS. COLWIN:  Objection.  Which person?

16         MR. BERMAN:  The person that he's

17         describing was the person with overall

18         responsibility for the deal.

19   Q.    Perhaps, it would be easier if you

20   want to just name the individual?

21   A.    That's okay.  But, yes, my one over

22   manager, the head of the transactional practice

23   group, was responsible from a legal perspective

24   for the deal, and I reported in through that

25   person.

N. J. Oliva - CONFIDENTIAL

1

2      Q.    Was there a particular aspect of that

3  transaction that you had the overall

4  responsibility for?

5      A.    Yes.

6      Q.    Which portion of the transaction was

7  that?

8      A.    The transfer of the commercial side

9  transactional work, transactions.

10      Q.    Do you know whether there was any

11  dollar value attributed to that aspect of the

12  transaction?

13           MS. COLWIN:   Objection.

14      A.    I don't know.

15      Q.    That was the AstraZeneca?

16      A.    Yes.

17      Q.    What was the next largest transaction

18  you participated in after AstraZeneca?

19      A.    Medarex.

20      Q.    Approximately how large was the

21  Medarex transaction?

22      A.    Two billion.

23      Q.    On your side of the transaction, who

24  was the head lawyer with overall responsibility

25  for the deal?

1            N. J. Oliva - CONFIDENTIAL

2        A.    I think it was the same person, my one

3   over manager.  At that time, there was no practice

4   group model, so the organization was structured

5   differently.  I reported directly to the assistant

6   general counsel.

7            As I mentioned before, at that time,

8   brand lawyers did everything related to a brand.

9   So, I don't recall there being a transactional

10  practice person.  My one -- my -- I'm sorry.  My

11  immediate manager was the person with -- who I

12  supported on that deal.

13       Q.    With respect to the -- is it Medarex?

14       A.    Medarex.

15       Q.    M-E-T-A-R-E-X?

16       A.    M-E-D-A-R-E-X.  Medarex.

17       Q.    Was there a particular aspect of that

18  transaction that you had responsibility for?

19       A.    Yes.

20       Q.    Which portion?

21       A.    Due diligence.

22       Q.    What was the nature of your

23  responsibility on the due diligence end of that

24  transaction?

25       A.    Visiting, interviewing, reviewing and

1                   N. J. Oliva - CONFIDENTIAL

2    being prepared to integrate.

3         Q.    Were there any financial advisors on

4    that transaction?

5         A.    I don't recall.  I'm sure there were.

6         Q.    Did you have any role in selecting

7    them?

8         A.    No.

9         Q.    What country did that transaction take

10   place in?

11        A.    The U.S.

12        Q.    Were there any outside lawyers hired

13   for any part of that transaction?

14        A.    Probably.

15        Q.    Were you responsible for selecting

16   them or identifying them?

17        A.    No.

18        Q.    You mentioned integration.

19              What does that entail?

20        A.    Integration is, after you purchase a

21   company, lining up the assets, the people, the

22   resources with your company, so that you have a

23   successful purchase.  And integrating, or being

24   responsible for due diligence with an eye towards

25   integration, means advising the business how they

1         N. J. Oliva - CONFIDENTIAL

2    will be able to do that successfully, efficiently,

3    quickly.

4         Q.    Prior to rejoining MCHA, did you have

5    any experience selecting outside counsel?

6         A.    Did I select outside counsel prior

7    to -- yes.

8         Q.    Can you describe that process for me?

9         A.    Well, I can recall at Catalent

10   selecting lawyers for -- outside counsel for

11   export control programming.

12        Q.    Other than with respect to export

13   control programming, did you select any outside

14   counsel?

15        A.    Yes.

16        Q.    For what type of work?

17        A.    Transactional work in Brazil,

18   Argentina, Australia.  Probably others.

19        Q.    Did you select any financial advisors?

20        A.    No.

21        Q.    Did you manage any outside counsel

22   prior to rejoining MCHA?

23        A.    Yes.

24        Q.    What aspects, or could you just give

25   me the general nature of that work?

1              N. J. Oliva - CONFIDENTIAL

2         A.    Transactional work, export control

3    work.  Yeah, transactional is pretty broad, so

4    small transactions, big transactions, export

5    control.  I think that's probably it.

6         Q.    Did you, prior to rejoining MCHA, have

7    any responsibility for selecting outside counsel

8    with respect to employment law matters?

9         A.    No.  Both places I worked had internal

10   employment lawyers.

11        Q.    Did you manage those lawyers?

12        A.    No.

13             MS. COLWIN:  Objection.

14        Q.    Did you evaluate those lawyers?

15        A.    No.

16        Q.    With respect to the outside counsel

17   that you've just described, were you responsible

18   for evaluating those outside counsel?

19        A.    Yes.

20        Q.    Which outside counsel did you

21   evaluate?

22             MS. COLWIN:  Objection.

23        A.    It was Drinker Biddle at the time.  It

24   was Trench Rossi Watanabe at the time.  It was a

25   firm in Australia that I -- in Melbourne that I

1      N. J. Oliva - CONFIDENTIAL

2  don't recall the name of, that had a joint venture

3  in China at the time.  And Baker McKenzie in

4  multiple jurisdictions around signatory

5  authorities.  Yeah, I don't -- I -- others

6  probably.  I don't recall.

7      Q.    Could you describe for me what

8  evaluating -- excuse me -- what evaluating outside

9  counsel entails?

10     A.    Yeah.  If you hire someone to do a

11  job, then you make sure that you get the benefit

12  of what you're paying for, in quality, in speed,

13  in efficiency, in relationship.

14     Q.    Prior to being rehired at MCHA, did

15  you have any experience concerning internal audit?

16     A.    Yes.

17     Q.    What was the general nature of that

18  experience?

19     A.    I had significant experience reviewing

20  internal audit reports, in draft form, for

21  purposes of corrective action and CAPA.

22     Q.    What about with respect to human

23  resources?

24     A.    What's the question?

25     Q.    The same question as internal audit.

1          N. J. Oliva - CONFIDENTIAL

2          MR. BERMAN:  Could you please read

3      back the internal audit question.

4          (Whereupon, the requested question was

5      read back by the reporter.)

6      Q.    Prior to being rehired at MCHA, did

7  you have any experience interacting with the human

8  resources function at any of your previous

9  positions?

10     A.    Yes.

11     Q.    What is the general nature of that

12 work?

13     A.    There were multiple different issues

14 that I worked on with the employment lawyers, from

15 classification to entity, the impact of corporate

16 restructuring and entities, to independent

17 contractor, independent contractor vetting,

18 employment-related behavior issues, vendor

19 behavior related issues.

20     Q.    Have you completed your response?

21     A.    I think so.

22     Q.    If anything else comes to mind, just

23 let me know.

24          Starting with the first of those that

25 you identified.  When you use the phrase

1           N. J. Oliva - CONFIDENTIAL

2     classification, what are you referring to?

3           A.    So, employee classification, which is

4     how an employee is identified for purposes of

5     taxation, exempt, nonexempt, and otherwise.  So,

6     it's a high -- can be a high risk area for a

7     company that has consultants and independent

8     contractors, so it's important to be aligned with

9     the employment law group to make sure that we hire

10    consultants and things appropriately.

11          Q.    The second portion of your response, I

12    think you said it -- I might get the wording

13    wrong.  You mentioned something about structuring

14    entities?

15          A.    Yes.  So, the impact on employees if

16    you restructure an organization.  So, for example,

17    if you dissolve an entity and there were people

18    who were W-2 employees of that entity, what do you

19    do?  How do you transition?  Or in the case of

20    integration of an M&A.

21          Q.    So, is it basically what happens to

22    the people in either a divestiture or an

23    acquisition?

24          A.    Yes.

25          Q.    You mentioned vetting independent

1        N. J. Oliva - CONFIDENTIAL

2    contractors.

3            What did that entail?

4        A.    So, that's similar to the

5    classification issue.  Implementing systems,

6    including third-party systems, on the advice of

7    employment lawyers and working through the

8    transactional team to make sure that we had the

9    ability to -- if we were going to hire someone who

10   we identified as an independent contractor, that

11   they would actually meet the test for being

12   independent and being an independent contractor.

13   Reducing our risk.

14       Q.    And then after that, did you say

15   something about vendor balance issues?  What was

16   the last --

17       A.    Behavior.  Ven -- behavior.  Both

18   internal employee and vendor employee behavior

19   issues.

20       Q.    So, what type of employee behavior

21   issues would that cover?

22           MS. COLWIN:  Objection.

23       Q.    Do you understand my question, or

24   should I rephrase it?

25       A.    I think so.  Just inappropriate

1          N. J. Oliva - CONFIDENTIAL

2    workplace behaviors.

3        Q.    With respect to inappropriate

4    workplace behaviors, what was your role in that

5    process?

6        A.    As a lawyer and a person responsible

7    for compliance, it was related to reporting and

8    advising and communicating with the employment

9    lawyers and the HR team.

10        Q.    So, reporting, advising,

11    communicating?

12        A.    Yeah, and encouraging people to --

13    about their resources.  Those kinds of things.

14        Q.    Did you have the same role with

15    respect to vendor behavior issues?

16        A.    It's slightly different, because

17    sometimes I had to take a more active role in

18    communicating to the vendor, if I was the

19    transactional lawyer, or the brand lawyer,

20    contacting their compliance or their lawyer to

21    manage those issues directly.

22        Q.    Have you supervised any employment law

23    litigations prior to being rehired at MCHA?

24        A.    No.

25        Q.    Have you been personally responsible

1          N. J. Oliva - CONFIDENTIAL

2     for any employment law matters that were being

3     litigated?

4          A.    Prior to rejoining MCHA?

5          Q.    Yes.

6          A.    No.

7          Q.    Other than what you've described to me

8     so far today, did you have any other experience

9     dealing with issues pertaining to employment law

10    before being rehired at MCHA?

11              MS. COLWIN:  Objection.

12         A.    International experience.

13         Q.    What did that entail?

14         A.    Particularly understanding the

15    difference in Brazil, where I had two people who

16    reported to me.  It's a very different model of

17    employment.  And -- was there employment issues

18    in -- probably in other places, but that's the one

19    that sticks out the most.

20         Q.    Prior to rejoining MCHA, did you have

21    any experiencing interacting with the information

22    technology function at any of your prior

23    employees?

24         A.    Yes.  Significant.

25         Q.    What was the general nature of that

1          N. J. Oliva - CONFIDENTIAL

2   work?

3          A.    I was the lead transactional lawyer

4   for IT and software licensing for a period of

5   time, and I supported the chief technology officer

6   or chief information officer, I think it was CTO

7   of Bristol-Myers Squibb in two major disputes over

8   two different years.

9          Q.    Did any of those disputes go to

10  litigation?

11         A.    They did not.

12         Q.    Prior to being rehired at MCHA, did

13  you have any experience with cost control?

14         A.    Yes.

15         Q.    What did that entail?

16         A.    So, I had survived two reductions in

17  force at Bristol-Myers Squibb during some, I

18  guess, relatively leaner times, and I think,

19  actually, you can see from my -- from the e-mail

20  that you provided, having travel canceled and

21  those kind of things.

22         Q.    Prior to being rehired at MCHA, did

23  you have any interaction with -- any direct

24  interaction with governmental agencies?

25         A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    What about regulatory agencies?

3     A.    Yes.

4     Q.    What was the general nature of your

5 interactions with governmental agencies?

6     A.    The first interaction I had was

7 actually at Mitsubishi Chemical USA, and that was

8 with regard to an FDA audit of Mitsubishi Pharma

9 America, and coordinating that response.

10          I also engaged counsel -- this relates

11 to your other question -- and supervised counsel

12 at Mitsubishi Chemical USA on environmental

13 matters and the closing of a site, and working

14 with the New Jersey Department of Environmental

15 Protection.

16          And, from a regulatory perspective,

17 when I joined Bristol-Myers Squibb, they had just

18 entered a corporate integrity agreement for five

19 years.  We had an on-site monitor in Judge Lacey.

20 We provided reporting.  I personally provided

21 reporting on activities.  So, some pretty

22 significant communications.

23          MR. BERMAN:  I'm going to show you an

24     exhibit marked as Plaintiff's 47.  Let me

25     know when you're done looking at the

1          N. J. Oliva - CONFIDENTIAL

2     document.

3          (Plaintiff's Exhibit 47, a two-page

4     document Bates stamped MCHC-00001361 to

5     00001362, confidential, marked for

6     Identification, as of this date.)

7          MR. BERMAN:  Plaintiff's 47 is a

8     two-page exhibit Bates stamped MCHC-00001361

9     to 1362.

10         Q.    Have you seen this document before?

11         A.    I must have.  I'm a participant, at

12    least in part of it.

13         Q.    Can you tell me what it is?

14         A.    Yes.  So this is a welcome back e-mail

15    from Ken Fujiwara saying, welcome back to

16    Mitsubishi Chemical, and I would like to make sure

17    you understand, you know, what's happening here

18    and how we've changed since you -- since you've

19    been gone.

20         Q.    So, did you ultimately learn what had

21    changed during the period while you were gone from

22    the company?

23         A.    Yes.

24         Q.    And what had changed?

25         A.    Many things.

N. J. Oliva - CONFIDENTIAL

2    Q.    What were the most important of those

3  changes?

4          MS. COLWIN:  Objection.

5    Q.    In your view.

6    A.    The company, when I was there the

7  first time -- well, I would say probably the most

8  important thing was the focus on becoming what

9  they called a global company.  I heard from both

10  very early after I rejoined.  I saw information

11  and was presented about how the economy and future

12  of Japan was -- was not certain, and that they had

13  determined that they were essentially moving the

14  ship, and that they needed to really focus on

15  becoming a truly global company, both the pharma

16  side business and the chemical side business.

17          That was probably the most significant

18  change.  There were multiple other changes; the

19  number of companies, the scope of work companies

20  that were inside the mix that weren't there when I

21  was there the first time.  But the most

22  significant was both Tokyo, meaning chemical side

23  and Osaka meaning pharma side, communicating that

24  it was time that they had to become truly

25  globally-focused companies as opposed to, you

1           N. J. Oliva - CONFIDENTIAL

2    know, focused on Japan with multiple businesses

3    around the world.

4           Q.    The very top portion of the first page

5    of this document appears to be in Japanese; is

6    that correct?

7           A.    It looks that way to me, but I don't

8    read Japanese.

9           Q.    That was going to be my question.

10   Okay.  Thank you.

11           When you first rejoined Mitsubishi at

12   the end of November 2015, and you arrived at the

13   legal department, how was the department

14   structured generally?  How many employees did it

15   have?

16           A.    The legal department, when I rejoined,

17   was three assistant general counsels, Kathryn

18   Roche, Jennifer Fischman and Andy Csaszar.

19   Reporting to Kathryn was Joe Sherinsky.  Jennifer

20   Fischman had recently hired Stephen Rose and

21   Jordan Elbaum, plus Kelly Troccoli and Maikoo

22   Usami.  I think that that's what the entire

23   department looked like at the time of rejoining,

24   from my memory.  I might -- may have missed one.

25           Q.    If you remember anything differently

1          N. J. Oliva - CONFIDENTIAL

2    as we go, just please let me know.  Okay?

3          So, how was the legal work of the --

4    should I call it the department, the legal

5    department?

6          A.    Yeah, that's fine.

7          Q.    How was the work of the legal

8    department allocated among the attorneys within

9    the department?

10         A.    Primarily, it was on what I call a

11   client-centered base.  The lawyers were

12   generalists, and they focused on their clients.

13   There was some overlap.  I don't mean it to be so

14   strict.  But mostly, there was a client group that

15   Kathryn supported and a client group that Jennifer

16   supported and a client group that Andy supported.

17         Q.    Did Kathryn Roche support Verbatim?

18         A.    Yes.

19         Q.    Did she support Yupo?

20         A.    I don't recall.

21         Q.    Y-U-P-O?

22         A.    That's the name of it, but I don't

23   recall.

24         Q.    Did she support MFA?

25         A.    Yes.

1              N. J. Oliva - CONFIDENTIAL

2        Q.    Did she support Verbatim Argentina?

3        A.    Probably.  I don't recall.

4        Q.    Did Andy support MTPA?

5        A.    Yeah.  That stands for Mitsubishi

6   Tanabe Pharma America, yes.

7        Q.    What about MTDA?

8        A.    Mitsubishi Pharma Tanabe Development

9   America, yes.

10       Q.    What about MPHVM?

11       A.    MP -- oh.  Yes.

12       Q.    What does that stand for?

13       A.    MPH is the venture capital arm of the

14  pharma business in Boston.  MP Ventures -- MP

15  Healthcare Ventures, I think, is the formal name,

16  but we refer to it as MPH.

17       Q.    And Andy's last name is Csaszar?

18       A.    Csaszar.

19       Q.    Did he support Alpha?

20       A.    I don't know if Andy supported Alpha.

21  I don't recall.

22       Q.    At that time when you first rejoined

23  the company in November 2015, did you have a

24  client Genix Brazil, G-E-N-I-X?

25       A.    They weren't a client yet, because we

1          N. J. Oliva - CONFIDENTIAL

2     hadn't closed on the deal.

3          Q.     Did they subsequently become a client?

4          A.     Yes.

5          Q.     Who was responsible for that client?

6          A.     Me.

7          MR. BERMAN:  I'm going to show you a

8          document marked as Plaintiff's 48.

9          (Plaintiff's Exhibit 48, a one-page

10         document Bates stamped Fischman 000788,

11         marked for Identification, as of this date.)

12         MR. BERMAN:  For identification,

13         Plaintiff's 48 is a one-page document Bates

14         stamped Fischman, F-I-S-C-H-M-A-N, 000788.

15         Q.     Let me know when you're ready.

16         A.     I'm ready.

17         Q.     I'm showing you a one-page document

18    produced by plaintiff in this litigation, and if

19    you look on the left-hand side of the page,

20    there's a list of names there.

21         Do you recognize those names?

22         A.     I do.

23         Q.     Are there any that you do not

24    recognize?

25         A.     No.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    Are these clients that, at the time

3    you rejoined MCHA, were supported by Jennifer

4    Fischman?

5          MS. COLWIN:   Objection.

6          A.    So, this -- if I can give a little

7    explanation.  This is, with due respect, sort of

8    the world according to Jennifer.  This was part of

9    a conversation where I had asked Jennifer to give

10   me a list of what she perceived to be her primary

11   clients and groups, because I had, in my mind, at

12   the time to switch what we were doing from the

13   client focus to a practice group model, which is a

14   change that I had undergone, actually, at

15   Bristol-Myers Squibb, and I thought it was much

16   more efficient and effective.

17          I can say by looking at these, I think

18   other members of our legal department would take

19   objection to saying that these were Jennifer's

20   client, primary client.

21          Q.    Could you explain to me the

22   distinction between a client focus model and a

23   practice group model?

24          A.    Of course.  So, in a client-focused

25   model, I would say Verbatim is my client and I am

N. J. Oliva - CONFIDENTIAL

their generalist, and I handle their contract work

and I handle their employment work, and I hire

outside counsel for them, and I advise them on

their real estate matters and their litigation.

In a practice group model, we switch

our focus to subject matter and we become subject

matter experts, if we're not already. And that's

more efficient, because all employment-related

matters, whether they're for Verbatim or for Yupo,

go to the subject matter expert in employment law,

similar to what I think you're familiar with in a

law firm. You give the experts of that area that

work, whether it's one client or another.

And that's more efficient not only

because they become -- they can develop their

skill and truly become experts in that area if

they're not already, but the advice is better,

faster, and it operates more like a team. So, one

client doesn't have one person. And we would

consistently get that question. Who may I call?

Who should I call for this? And my answer

routinely over and over was, you should be able to

call anyone on our team. Anyone on our team will

provide you with triage and help immediately, but

N. J. Oliva - CONFIDENTIAL

1  then get it to the right person, get it to the

2  practice group.  And that was the experience I had

3  at -- in another place, too.  So, transitioning

4  from this is -- MCPP is my client, to MCPP is our

5  client, employment law goes here and litigation

6  goes here and patent goes here.

7  Q.    So then, in your view, under the

8  practice group model, would individual attorneys

9  no longer be generalists?

10  A.    No.  Because we're such a small group,

11  we have to maintain that generalist position.  But

12  also, what I had mentioned in communicating to the

13  clients, in order to provide triage service, our

14  department is -- is very experienced people,

15  because it's very small, and whatever issue comes

16  up today, I need there to be a certain level of

17  understanding, so that if a person calls any one

18  of us, we can help them immediately and then get

19  them to the right person.  So, yeah, there still

20  remains a level of being a generalist.

21  Q.    So, was there a reallocation of work

22  as part of a shift from a client-focused model to

23  a practice group model?

24  A.    Yes.

N. J. Oliva - CONFIDENTIAL

1

2    Q.    So, how did the responsibilities of

3    the lawyers in the department change as a result

4    of that?

5    A.    Okay.  So, what I tried to do when I

6    first rejoined was meet with every single person

7    in one-on-one meetings every week.  It was

8    burdensome, because, although it's a small group,

9    that's still a lot of one-on-one meetings.

10         But what I wanted to understand was,

11    what is the skill set of Joe Sherinsky or Stephen

12    Rose?  So that, as we moved to the practice group

13    model, I not only understand where they are, but

14    what room there is for development, and then ask

15    them what's their interest.  And one, I think,

16    really good example of that is with Joe, who's a

17    patent lawyer, who's doing transactional work, who

18    then ultimately, based on his skill and

19    experience, because a -- you know, a litigate --

20    the lead of the litigation group, lead of the

21    litigation practice and managing trademarks.  And,

22    yes, he has to review contracts sometimes as a

23    generalist.  But, primarily, his focus is

24    elsewhere, that matches his skill set there.

25    Q.    Okay.  So, as part of this process,

1          N. J. Oliva - CONFIDENTIAL

2    did you come to understand or have an

3    understanding of the skill set of each attorney?

4          MS. COLWIN:   Objection.

5          A.    I think reasonably, reasonably enough,

6    yeah.  That was my goal.  I tried to understand

7    what they had worked on, what they had done, and

8    what they wanted to do.  For me, that was probably

9    even more important, because they weren't hired

10   into the practice group model, they were hired

11   into a generalist model.  And if I was going to

12   change it, I wanted to be respectful that this

13   would be something that would be good for their

14   career, that I could help lead them to where they

15   would want to go.

16         Q.    So, as part of that process, did you

17   have one-on-ones with Ms. Fischman?

18         A.    Yes.

19         Q.    Did they occur roughly every week?

20         A.    Yes.

21         Q.    Did you come to some understanding as

22   to what her skill set was comprised of?

23         A.    Generally speaking.

24         Q.    What understanding did you come to

25   about her skill set?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3          MR. BERMAN:  You can answer.

4     A.    That she was heavy on transactional

5  work and was probably the one who handled the most

6  employment-related matters.  Those were the two

7  primary areas.

8     Q.    Did you come to any conclusion as to

9  the existence or lack thereof of any gaps in her

10  skill set?

11          MS. COLWIN:  Objection.

12     A.    My conversations with Jennifer about

13  her development were really encouraging her to

14  figure out what the right role and fit would be

15  for her.  And I tried -- this is actually a

16  document that's related to that.  So, who are the

17  companies that you support?  What kind of matters?

18          And I went through demand management

19  process.  I'm trying to really understand how to

20  restructure, and I invited Jennifer to have those

21  conversations with me many, many times, and she

22  didn't.  She did not communicate with me the areas

23  of focus or what the future position could or

24  should look like, in her opinion.

25          So, it's hard for me to answer that

1           N. J. Oliva - CONFIDENTIAL

2    because I think I understood that she had a lot of

3    experience in transactional work, probably a

4    significant amount of experience in employment

5    work, but I was missing a key piece, which was

6    where does she want to go?  What does she want to

7    work on?  How does she want to develop herself?

8    What does her next -- you know, the next few

9    months, years look like for her as she develops

10   and stay -- you know, stays in or grows in either

11   her role or the next role?

12        Q.    So, when you're having these

13   conversations with Ms. Fischman, you were aware

14   that she had previously been demoted, correct?

15        MS. COLWIN:  Objection.

16        A.    I know that she was returned to her

17   previous position after the acting function.

18        Q.    Okay.  So, we don't have to put a

19   label on that, right?  We can just -- we can use

20   your word return, that's fine.

21        A.    Okay.

22        Q.    You knew that she had previously been

23   in the acting general counsel and chief compliance

24   officer of MCHA, correct?

25        A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    Did you have any discussions with

3     Ms. Costa about returning Ms. Fischman to her

4     prior role of assistant general counsel?

5          A.    Well, just as I mentioned, that during

6     the interview process, Donna had kind of expected,

7     or maybe wasn't so sure that Jennifer would stay

8     after being returned, but that, if she did, that

9     could be good for me.

10         Q.    Okay.  Understood.

11               So then, after you had rejoined the

12    company, did you have any discussions with

13    Ms. Fischman about the fact that she had been

14    returned to her role at AGC from the prior role --

15    sorry, AGC is maybe ambiguous in this context.

16               Did you have any --

17               MR. BERMAN:  Withdrawn.

18         Q.    Did you have any discussions with

19    Ms. Fischman after you rejoined MCHA in November

20    2015 concerning the fact that she had been

21    returned from the position of acting general

22    counsel and chief compliance officer to the

23    position of assistant general counsel?

24               MS. COLWIN:  Objection.

25         A.    Yes.

N. J. Oliva - CONFIDENTIAL

1

2      Q.    Can you describe hose conversations to

3  me?

4         When did they first take place?

5      A.    I can tell you that the first

6  conversation I had with Jennifer was on my first

7  day.  I made it a point, on purpose, to go into

8  her office, not call her into my office, but to go

9  into her office and to communicate with her in an

10  open way to say, I know this can't be easy for

11  you, but we're on the same team, and I want you to

12  be successful here, and I don't really care about

13  what happened before.  We start today together.

14  We have something to do.  I have a lot of work.  I

15  understand that you can help me with that, and I'm

16  looking forward to that.

17        I don't remember if those were exactly

18  the words, but that's the sentiment at the time.

19  And we had several conversations after that, when

20  she told me about how difficult it was to have had

21  that job and not have that job anymore.  There

22  were conversations we had later where she confided

23  in me that she was unhappy at the company, that

24  she was unhappy with her role.

25      Q.    Let's just break that up.

1          N. J. Oliva - CONFIDENTIAL

2          When you first approached her on your

3     first day, what was the nature of her response to

4     your overture?

5          A.     It was --

6          MS. COLWIN:   Objection.

7          Q.     What did she say?

8          A.     It was inappropriate and aggressive.

9          Q.     What did she say or do that led you to

10    that conclusion?

11         A.     She was -- she offered me -- I think

12    you probably have some document related to that, a

13    note about it.  She offered me a blister pack of

14    gum, where some of the blisters were open, and in

15    one of them was her already chewed gum.  Now,

16    meeting with my new boss, I would never in a

17    million years think that that would be an

18    appropriate way to meet for the first day and say,

19    would you like some gum, in an aggressive and kind

20    of disgusting way.  It's inappropriate and it set

21    the tone.  But I was patient with her.  I didn't

22    call her out on it.  I just said, no, thank you,

23    and we returned to our conversation.  That's the

24    nature of the first meeting.  It was aggressive.

25         Q.     Did she use any aggressive words with

1            N. J. Oliva - CONFIDENTIAL

2    you during that conversation?

3         A.    I don't think so.

4         Q.    Did she say anything to you that was,

5    in your view, unprofessional during that

6    conversation?

7         A.    I don't recall.

8         Q.    So, setting aside your interpretation

9    of her proffer of the gum to you, was there

10   anything other than that that you thought was

11   aggressive in that meeting?

12            MS. COLWIN:  Objection.

13        A.    I might have made a note if there was,

14   but I don't recall.

15        Q.    Do you know whether Ms. Fischman made

16   a habit of chewing gum?

17            MS. COLWIN:  Objection.

18        A.    I don't know her habits of gum

19   chewing.

20        Q.    Other than the one time that she

21   offered the gum to you, did you ever see her with

22   gum at any subsequent point?

23        A.    Yes, I think so.

24        Q.    Did you ever see her with a blister

25   pack that had been opened at any point?

N. J. Oliva - CONFIDENTIAL

1

2      A.    No.

3      Q.    So, do you know whether she, as a

4  routine course, put the used gum back into the

5  blister pack?

6           MS. COLWIN:  Objection.

7      A.    I don't know, but that's not really

8  all that important for when you're meeting for the

9  first day with your new boss.

10          MR. BERMAN:  Okay.  I object to the

11         portion of your response that was

12         nonresponsive to my question, but we can

13         move on.

14          THE WITNESS:  Okay.

15     Q.    Now, you mentioned that, later on, you

16  had additional conversations with Ms. Fischman and

17  that she indicated she was unhappy.

18          When did she indicate that?

19     A.    I don't remember the time.  I may have

20  notes about it in one-on-ones or notes to myself,

21  but...

22     Q.    Okay.  This is, I think, the second or

23  more time that you mentioned having notes that you

24  took.

25     A.    Uh-huh.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    Was it your regular practice to take

3     notes in your meetings?

4     A.    Yes.

5     Q.    Did you take notes during all

6     significant meetings you had with personnel under

7     your supervision?

8          MS. COLWIN:  Objection.

9     A.    Yes.

10     Q.    Did you take notes at all meetings you

11     had with clients?

12     A.    No.

13          MS. COLWIN:  Objection.

14     Q.    So, what would determine whether you

15     took notes with clients or not?

16     A.    I don't have an answer to that.  I

17     don't know.  I took notes or I didn't.  The model

18     for notes of the people who I supervised were, we

19     had one-on-one meetings, and I used e-mail as the

20     tool to keep those notes, because I'm essentially

21     paperless.  It's not possible to be entirely

22     paperless, but I'm essentially paperless, and I

23     would write an e-mail to myself, usually titled

24     one on one, or Jennifer one on one, or Joe one on

25     one, and document for myself, and so that I could

N. J. Oliva - CONFIDENTIAL

communicate with them the next week about

follow-up, the items we talked about.  But I also

wrote notes -- I write notes to myself that are

for, you know, my eyes or for my recollection,

those kinds of things.

Q.   So, with respect to your meetings with

Ms. Fischman, did you write notes to yourself for

each of those meetings?

MS. COLWIN:  Objection.

A.   Very likely, yes.

RQ        MR. BERMAN:  We call for the

production of any notes not previously

produced pertaining to Mr. Oliva's

conversations with Ms. Fischman.

MS. COLWIN:  Taken under advisement.

MR. BERMAN:  Thank you.

Q.   With respect to client meetings, did

you also use e-mail as a tool on the occasions

where you took notes?

A.   I think you asked me that before, and

I think probably.  I think I do have some, but

it's a different format.  Usually, if I'm meeting

with a client, I'm somewhere else.  I'm not

sitting in my office for these one-on-ones or --

1           N. J. Oliva - CONFIDENTIAL

2    where I might be able to go back and write.  So,

3    probably, but it might not be convenient to do

4    that.

5           Q.    So, on the occasions where you were

6    somewhere else outside the office and you had

7    meetings that you wanted to be able to revisit at

8    a future point, did you have some procedure you

9    would follow in order to do that?

10          MS. COLWIN:  Objection.

11          A.    No, no procedure.

12          Q.    Okay.  With respect to client meetings

13   that you had in the office, did you have some

14   procedure you followed in order to memorialize

15   your conversations?

16          A.    If we met in the New York office, I

17   would likely, after the meeting, go back to my

18   office and write either to myself or to them,

19   often to them, as we just discussed, that kind of

20   thing.

21          Q.    So you're referring to an e-mail?

22          A.    Right.

23          Q.    And if you were writing to yourself,

24   would that also be an e-mail?

25          A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    So you didn't maintain legal pads or

3  something like that, that you wrote on?

4     A.    No.

5     Q.    Did other attorneys in the office

6  maintain those?

7     A.    I don't know.

8     Q.    Did you ever see Jennifer Fischman

9  maintain legal pads in your interactions with her?

10         MS. COLWIN:   Objection.

11    A.    Yes.

12    Q.    Ultimately, when Ms. Fischman departed

13 the company, do you know if the company retained

14 any of her legal pads?

15    A.    I think so.

16 RQ        MR. BERMAN:  We call for the

17         production of any legal pads that were

18         utilized by Ms. Fischman during her

19         employment with the company, to the extent

20         they haven't been produced yet.

21         MS. COLWIN:   Taken under advisement.

22         MR. BERMAN:   Thank you.

23    Q.    After you rejoined the company in

24 November of 2015, did you rebalance the

25 assignments that Ms. Fischman was responsible for?

1          N. J. Oliva - CONFIDENTIAL

2          A.     Yeah, that was certainly my intention.

3    I wanted Jennifer to be a part of that process,

4    and that was a struggle, but I think we did make

5    some progress before she left.

6          Q.     Okay.  So was her workload changed as

7    a result of you rejoining the company?

8          A.     Yes.

9          Q.     How was it changed?

10         A.     Well, some things I -- she was the

11   acting general counsel and chief compliance

12   officer before I joined, so there was a host of

13   things that she had no more responsibility for at

14   all.  And then, with regard to certain clients,

15   things were either moved or I took, but I don't --

16   yeah.

17         Q.     So I understand there's a couple of

18   things happening at the same time in November,

19   right?  You're rejoining the company and she is

20   transitioning from one position to another,

21   correct?

22         A.     Yes.

23         Q.     So with respect to Ms. Fischman's

24   duties and responsibilities changing, what I'm

25   interested in are any changes that you made to her

1           N. J. Oliva - CONFIDENTIAL

2    duties and responsibilities.

3           Did you make any changes to

4    Ms. Fischman's duties and responsibilities when

5    you rejoined the company on or around November 30,

6    2015?

7           MS. COLWIN:  Objection.

8        A.    I don't recall.

9        Q.    Did you direct Ms. Fischman to

10   transition any of her projects to you?

11       A.    I don't recall.  Likely, corporate

12   governance matters, secretary activity, the

13   compliance-related program.  It was probably

14   understood, as opposed to me directing her to do

15   it, but we probably had conversation.  But, again,

16   at the very instant I rejoined, I didn't have in

17   my mind to change the model.  I was there to

18   observe and see what was working and make the

19   right -- implement the right model, so it's a

20   little hard for me to say at that point.

21          But I don't recall specific direction

22   to move this from here to there.

23       Q.    Okay.  So when you rejoined the

24   company in your position as GC/CCO, can you

25   describe for me the balance in your duties between

1           N. J. Oliva - CONFIDENTIAL

2     performing legal work of your own and supervising

3     the work performed with others -- by others?

4           MS. COLWIN:  Objection.

5     A.     I would say, in the first instance,

6     the majority of the work was understanding where

7     the work was coming from, what kind of work, and

8     who was doing it, because the department was not

9     at a loss.  There was no gap.  Someone didn't

10    leave and that work needed to be reshuffled.

11          So it was mostly about learning the

12    team and the dynamic and the skill set, and then

13    trying to figure out where people wanted to go,

14    like I said, that was really important to me on

15    the development side, and then implementing a

16    structure.

17          So I think in the first instance, the

18    majority of the work for me was supervisory,

19    strategic, definitely strategic, and, probably

20    more than those two, was relationship with

21    clients.  That was very critical from -- that was

22    a direction I received from Donna, was it was

23    critical for me to make sure that the, you know,

24    affiliates in the U.S. knew who I was, especially

25    if they didn't remember me from the last time, I

1          N. J. Oliva - CONFIDENTIAL

2     was different people, and understood what was --

3     you know, what was happening.

4          Q.     How much time does that process take,

5     the relationship-building portion of it?

6          MS. COLWIN:  Objection.

7          A.     I think I spent the majority of my

8     first six months on these issues.  That process

9     never ends.  Relationship is absolutely key to the

10    role of general counsel.  It is critical to the

11    role of general counsel.

12         Q.     Why is it critical to the role of

13    general counsel?

14         A.     I communicate to my team often that,

15    when someone calls their lawyer, they want their

16    lawyer to tell them that they're going to be okay.

17    They may not even understand what their lawyer is

18    talking about.  They may not be able to judge

19    whether the legal advice is good.  What they want

20    is to make sure that they can trust their lawyer,

21    that their lawyer understands what they're saying,

22    that their lawyer says, I got your back, that I'm

23    on your team, that you're going to be okay, and

24    that's what I want to engender in my team.

25              So keeping and developing and

1           N. J. Oliva - CONFIDENTIAL

2    maintaining those relationships is absolutely

3    critical for the success of the department, every

4    lawyer, but definitely the general counsel.

5         Q.    Okay.  And is it fair to say that it

6    takes a substantial length of a relationship in

7    order to build that level of trust that you

8    described?

9           MS. COLWIN:  Objection.

10        A.    It depends.  I think it's logical to

11   say that trust doesn't develop immediately.

12   That's a certain.  But there are things you can do

13   to make sure that clients understand and trust

14   you; like coming through on your -- on your

15   promises, right?  You can set a goal and you can

16   meet a goal.  You can communicate that you will

17   get back to them, and you do.  You can stay in

18   contact.  You can approach them proactively.

19   There are a lot of things that you can do to make

20   that process shorter.

21        Q.    So when you rejoined the department,

22   you described various attorneys to me.  I just

23   want to ask you if you recall now.  Do you know

24   what position Ms. Roche was in at the time?

25        A.    Assistant general counsel.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    And Ms. Fischman was also an assistant

3 general counsel?

4     A.    Yes.

5     Q.    Is it the same position?

6     A.    Yes.

7     Q.    Were their functions and

8 responsibilities the same or different?

9     A.    Well, they were both generalists, but

10 Kathryn is also a patent lawyer.

11     Q.    And then with respect to Mr. Csaszar,

12 what was his role?

13     A.    He was primarily focused on the

14 pharmaceutical business.

15     Q.    Was he also an assistant general

16 counsel?

17     A.    Yes.

18     Q.    So there were three assistant general

19 counsels at the time?

20          MS. COLWIN:   Objection.

21     A.    Yes.

22     Q.    And then you had Mr. Sherinsky?

23     A.    Yes.

24     Q.    What was his role?

25     A.    Joe, at the time I rejoined, was a

1           N. J. Oliva - CONFIDENTIAL

2    patent lawyer, who was also a generalist.  He

3    supported, primarily, one of the list -- one of

4    the deals on the companias on Jen's list here,

5    MKIC.  I think he was originally hired for the

6    patent portfolio related to MKIC, but I don't

7    recall because I wasn't there.

8          Q.    Have you completed your response?

9          A.    Yes.

10         Q.    At the time you rejoined, was he also

11   an assistant general counsel?

12         A.    No.

13         Q.    What was his title?  Was he a

14   corporate counsel?

15         A.    Corporate counsel, I think.

16         Q.    And Mr. Rose, what was his title?

17         A.    Counsel or corporate counsel.

18         Q.    And Jordan Elbaum, what was his title?

19         A.    Same.  Corporate counsel, I think.

20         Q.    When you first rejoined the company,

21   how was Ms. Fischman's performance?

22               Did she perform up to your

23   expectations at the time that you rejoined the

24   company?

25               MS. COLWIN:  Objection.

N. J. Oliva - CONFIDENTIAL

1
2     A.     Well, not with regard to the -- the
3     tone and the behavior.  But I didn't have any
4     significant concerns around the content of her
5     legal advice.
6               MR. BERMAN:  As it's 12:26 now, I'm
7          going to suggest we take our lunch break.
8          How much time would you like?
9               MS. COLWIN:  We can take 45 minutes,
10         like the last time.
11              (Luncheon recess taken 12:26 p.m. to
12         1:23 p.m.)
13              MR. BERMAN:  Back on the record.
14    Q.     Mr. Oliva, I asked you some questions
15    earlier today about your discussions with
16    Ms. Costa prior to being rehired in November 2015.
17              As part of those discussions with
18    Ms. Costa, was there any contemplation by either
19    of you of acting in a provisional basis for some
20    period of time when you rejoined the company?
21              MS. COLWIN:  Objection to form.
22    A.     No.
23    Q.     So there was no discussion about any
24    acting role when you had rejoined the company,
25    correct?

1           N. J. Oliva - CONFIDENTIAL

2           MS. COLWIN:  Objection.

3     A.    No.

4     Q.    No, there was no discussion?

5     A.    There was no discussion.

6     Q.    Okay.  Thank you for clarifying that.

7           Earlier today, do you recall

8    mentioning that there was some issue with

9    Ms. Fischman's tone and behavior?

10    A.    Yes.

11    Q.    Other than the incident with the

12   chewing gum that you described, are there other

13   incidents that fall within that category?

14          MS. COLWIN:  Objection.

15    A.    What's the time frame?

16    Q.    The time frame would be from the time

17   that you rejoined the company in November of 2015,

18   up until January 30, 2017.

19    A.    Yes.

20    Q.    When was the first of those incidents?

21    A.    I don't recall.

22    Q.    Do you recall the nature of it?

23    A.    The first -- apart from the -- you

24   said apart from the first day?

25    Q.    Correct.

1          N. J. Oliva - CONFIDENTIAL

2     A.    No, I don't recall.  But I...

3     Q.    So there were more than one incident?

4     A.    Yes.

5     Q.    Do you recall the general nature of

6     any of those incidents?

7     A.    Yes.

8     Q.    How many can you recall?

9     A.    I can recall -- I can recall several.

10    I recall Jennifer being very inappropriately loud

11    in the office.  I recall Jennifer not

12    understanding the cultural dynamic in a meeting.

13    I recall a confrontation with Jennifer.  I recall

14    Jennifer being -- having an inappropriate and

15    curious reaction to not being invited to

16    something.  I can expound on all of these, but you

17    asked for the number.  I don't know the number,

18    but there are many.

19    Q.    Okay.  So you just listed four.

20          Are there more?

21    A.    Probably.

22    Q.    Do you recall more than those four at

23    this time?

24    A.    I may have written notes about them,

25    but I don't recall.

1            N. J. Oliva - CONFIDENTIAL

2        Q.    Sitting here today, if you should

3    recall any additional ones, will you please let me

4    know?

5        A.    Sure.

6        Q.    So with respect to the first of those,

7    you described an incident where Ms. Fischman was

8    inappropriately loud?

9        A.    Yes.

10       Q.    Can you provide any additional detail?

11       A.    Yes.  So there was a potential

12   antitrust-related issue at a client group, and I

13   called certain members, including Jennifer, to my

14   office to discuss it and to manage how we would

15   handle it.  And, upon hearing the issue, Jennifer

16   yelled, literally yelled, oh, my God, they're

17   going to jail.  Although the door was closed,

18   that's an incredibly inappropriate response.  That

19   was the first one.

20       Q.    Okay.  Are there any more details that

21   you can recollect about that meeting, as you sit

22   here?

23       A.    Not without divulging any

24   privileged-related information.

25       Q.    To be clear, I have no interest in any

1          N. J. Oliva - CONFIDENTIAL

2    privileged communication that you have either on

3    your own with your counsel or on behalf of any

4    other entity or person you represent, or that you

5    have a potential privilege.

6              The antitrust matter that you just

7    referenced, was that a civil matter?

8       A.    I decline to answer that question on

9    privilege.

10      Q.    Okay.  With respect to -- not with

11   respect to that matter in particular, but with

12   respect to antitrust matters in general, are any

13   antitrust matters civil and not criminal?  Are

14   there some that fall into the civil category?

15      A.    Yes.

16      Q.    Are there some that fall into the

17   criminal category?

18      A.    Yes.

19      Q.    And of those antitrust matters that

20   fall into the criminal category, do any of them

21   have sentences which could include jail time

22   connected to them?

23      A.    Yes.

24      Q.    All right.  With respect to the second

25   incident that you described as, I'm paraphrasing,

N. J. Oliva - CONFIDENTIAL

not understanding cultural dynamics in a meeting,

can you provide me with any additional detail on

that incident?

A.    Yes.  I was actually pretty surprised

that, when we met with executives visiting from

Japan, that Jennifer either did not know, nor did

not respect the culture of the organization at the

table, who sits where, and the kind of ceremony

that precedes it.  She took her spot, and

seemingly did not care.  And when I communicated

to her about that afterwards, her response was,

we're in America, not Japan.  Something like that.

I'm not quoting.

Q.    And just to be clear, because I'm not

familiar with Japanese culture, could you please

describe to me the general nature of the cultural

ceremony you described?

A.    Of course.  So, when you have business

guests from Japan, you start, typically, with a

business card ceremony and appropriately handing

your business cards to each other, and there is

some -- there are some kind of rules or guidance

around how to do that.  And then, what I'm

particularly talking about in this case was where

1          N. J. Oliva - CONFIDENTIAL

2    people sit.  So, the position of power, so to

3    speak, or the honorary position, in a U.S. company

4    it's usually the head of the table, we think of it

5    as the head, but that's not the case in Japan.

6    It's usually the center of the table.  The two

7    centers are the heads on opposing sides, with the

8    highest ranking people near them.  And that's the

9    position of honor or power.

10          And so usually what happens,

11    especially for people who are culturally sensitive

12    to working with the Japanese, you go into the room

13    and you wait for there to be kind of an

14    arrangement of where people should sit, and

15    usually one person, and it may not be the most

16    high ranking, it may be a more junior person who

17    knows the rules, will kind of invite people to sit

18    in certain spots.

19          And I would have expected, after so

20    many years, that Jennifer knew.  So my only

21    assumption would be that she didn't care, which is

22    why I asked her, why, what was that?  And she

23    said, we're not in Japan.

24    Q.    Can you describe for me where within

25    the time period that incident took place,

1          N. J. Oliva - CONFIDENTIAL

2    approximately?  Was it closer to when you first

3    arrived or was it closer to the end of

4    Ms. Fischman's employment?

5          A.    It was closer to when I first arrived.

6          Q.    During your first period of employment

7    at MCHA, in connection with your law school and

8    post-law school experience, when you were part of

9    the MCHA or the predecessor company's legal

10   department, during that period of time, were these

11   ceremonies that you just described observed within

12   office?

13         A.    Yes.

14         Q.    Was the business card ceremony

15   observed within the office at that time?

16         A.    Yes.  It's not a Mitsubishi principle.

17   It's Japanese business culture.

18         Q.    Okay.  Thank you for clarifying.

19               But that aspect of the Japanese

20   culture was observed within MCHA during the first

21   period of employment you had with the company?

22         A.    Yes.

23         Q.    And its predecessor, I guess?  Okay.

24               And what about this ceremony of who

25   sits where, was that similarly observed at that

1          N. J. Oliva - CONFIDENTIAL

2     time?

3          A.     Yes.

4          Q.     Did you issue Ms. Fischman any kind of

5     disciplinary notice in connection with that

6     instance?

7          MS. COLWIN:  Objection.

8          A.     I just spoke to her about it and asked

9     her what it was.

10         Q.     You spoke --

11         A.     I didn't provide her with a warning

12    or...

13         Q.     Did you consider that conversation to

14    be disciplinary in nature?

15         MS. COLWIN:  Objection.

16         A.     I don't consider it to be disciplinary

17    in a formal way, but it's certainly a coaching

18    opportunity.

19         Q.     Okay.

20         A.     Or at least clarifying, trying to

21    understand what she was thinking.

22         Q.     Okay.  Thank you.

23         With respect to the third tone and

24    behavior incident you described as a

25    confrontation, can you provide me with any

1       N. J. Oliva - CONFIDENTIAL

2    additional details on that?

3        A.    Yeah.   So there was a case for a

4    client which Jennifer described as a trade secret

5    case, but also had a more substantial

6    antitrust-related, and when I had communicated

7    that my major concern in that case was the

8    antitrust concern, although the trade secret is

9    important, Jennifer yelled at me, you need to get

10   off of that.  And I was pretty shocked that that

11   was her reaction.  And then I coached her back

12   that, no, I don't need to get off that, she needs

13   to attend to it, because that's really serious,

14   that's the kind of issue that she should be paying

15   attention to.

16           And when I explained it carefully to

17   her, it was clear that she was wrong on the

18   subject matter and inappropriate in her -- in her

19   mannerism, in her communication, her tone.

20       Q.    Have you told me everything you

21   recollect about that incident now?

22       A.    Same, without disclosing any -- and I

23   know you're going to say you don't intend me to,

24   but, without disclosing any privileged

25   information, yeah, that's everything.

N. J. Oliva - CONFIDENTIAL

Q.   Okay.  And then the fourth incident
you described is an inappropriate reaction to not
being invited.

Can you tell me about that incident?

A.   Yes.  We -- Mitsubishi Chemical group
owned a company called Lucite International, which
you may have heard of.  Lucite operated
independently, although it was owned, and they had
their own general counsel.  They did not use MCHA
for their services.  I was trying to bridge the
gap with that company, and offer our services, and
have them pull into the fold a little bit more,
because I also understood and had heard that we
had a strategy that we were going to start to
integrate companies, and, like I mentioned, become
one in a more global company, as opposed to the
holdings model.

And so I had a meeting in New York
with the general counsel of Lucite.  Her name is
Pauletta Brown.  And when I came back and met with
Jennifer, she expressed to me in a kind of a -- I
don't know -- I can only describe it as bizarre or
hurt way that she was very upset that she wasn't
invited to that meeting.  But Jennifer had no

N. J. Oliva - CONFIDENTIAL

1

2    business being at that meeting.  She had no

3    business with Lucite or Pauletta Brown.  She

4    didn't even really know why I was meeting with

5    them.  And I tried to communicate to her that she

6    didn't miss anything, she wasn't being left out of

7    anything.  It doesn't make any sense that she

8    would be at that meeting.  But her reaction to not

9    being in that meeting was curious, at best.  Odd.

10   More like odd.

11        Q.    Okay.  Have you told me everything

12   that you can recall about that incident, apart

13   from any privileged information?

14        A.    Yes.

15        Q.    With respect to the incident about

16   Ms. Fischman allegedly being inappropriately loud,

17   did you make any notes contemporaneous with that

18   event?

19             MS. COLWIN:  Objection.

20        A.    I don't think I made any notes on that

21   issue because of my concern around underlying

22   privilege.

23        Q.    With respect to the second incident

24   about the cultural dynamics in a meeting, did you

25   make any notes concerning that incident?

1          N. J. Oliva - CONFIDENTIAL

2     A.    I think I did.

3     Q.    And, to the best of your knowledge,

4  those have been provided to your counsel?

5     A.    Yes.

6     Q.    And then, with respect to incident

7  three, which you described as the confrontation,

8  did you make any notes pertaining to that

9  incident?

10    A.    I think I did.

11    Q.    To the best of your knowledge, have

12 those been provided to your counsel?

13    A.    Yes.

14    Q.    With respect to the fourth incident,

15 involving Lucite International, did you make any

16 notes of that incident?

17    A.    I think I did.

18    Q.    To the best of your knowledge, have

19 those been provided to your counsel?

20    A.    Yes.

21 RQ        MR. BERMAN:  To the extent not

22         previously produced, we call on defendants

23         to produce those notes.

24         MS. COLWIN:  Taken under advisement.

25         MR. BERMAN:  Thank you.

1          N. J. Oliva - CONFIDENTIAL

2          Let the record reflect that I'm

3     providing the witness with a copy of a

4     document previously marked as Exhibit 3.

5     And I have copies.

6          Q.    Mr. Oliva, have you seen this document

7     before?

8          A.    Yes.

9          Q.    Are you generally familiar with its

10    contents?

11         A.    Yes.

12         Q.    Are you aware that Ms. Fischman is

13    making claims alleging that she was treated

14    disparately by defendants because of her gender?

15         A.    Yes.

16         Q.    So I'd like to turn your attention to

17    page 13 of her complaint, and I'd like to ask you

18    some questions about Ms. Fischman's allegations in

19    this portion of the document.  So I'm commencing

20    with paragraph 64.  Actually, let's skip 64 and

21    move on to 65.  Pardon me.

22         In paragraph 65, this is the First

23    Amended Complaint.  The First Amended Complaint

24    alleges that you were permitted to communicate

25    directly with Mr. Fujiwara and Mr. Sakaguchi

1          N. J. Oliva - CONFIDENTIAL

2    immediately upon being rehired into the general

3    counsel position.

4          So my first question for you is, upon

5    your rehire in November of 2015, were you

6    permitted to communicate directly with

7    Mr. Fujiwara?

8          MS. COLWIN:  Objection.

9    A.    Yes.  And I had known Ken probably

10   since 2003.

11   Q.    Okay.  And did you, in fact,

12   communicate with him directly?

13   A.    Yeah.  You provided an e-mail before

14   that said welcome.

15   Q.    But, in general, did you communicate

16   with him directly?

17         MR. FORTINSKY:  Objection.

18   A.    Yes.

19   Q.    I can ask it a different way.

20         Were there other instances where you

21   communicated with Mr. Fujiwara directly after

22   being rehired?

23         MS. COLWIN:  Objection.

24   A.    Yes.

25   Q.    After you were rehired in November of

1          N. J. Oliva - CONFIDENTIAL

2     2015, did you communicate directly with

3     Mr. Sakaguchi?

4          A.     Yes.

5          Q.     Turning now to paragraph 68 on the

6     next page.  Page 14.

7          Do you know whether Mr. Yoshisato was

8     the subject of an employment law investigation by

9     employees of MCHA?

10          MS. COLWIN:  Objection.

11          A.     It's before my time at the company or

12     after my time, depending how you look at it, but I

13     know of the issue.

14          Q.     When you say you know of the issue,

15     what does that mean, again without getting into

16     any privileged communications?

17          A.     I know that there was an

18     investigation.  I know that Yoshisato-san was the

19     president.  I know there was another member of the

20     depart -- of the company, Joe Morano, with -- who

21     I never met.  I don't know the details or the case

22     report or anything like that.

23          Q.     Do you know whether Mr. Yoshisato was

24     one of the subjects of the investigation?

25          A.     I believe so.

N. J. Oliva - CONFIDENTIAL

1

2      Q.    All right.  Prior to -- let me think

3  of a better way to ask this question.

4            During the period after you left

5  Mitsubishi, during your first time working for the

6  company, and you rejoining the company later,

7  right?  So I'm talking about the intervening

8  period between your two employments at Mitsubishi.

9            During that intervening period, were

10  you ever responsible for conducting internal

11  investigations at any of your other jobs?

12            MS. COLWIN:  Objection.

13      A.    Yes.

14      Q.    Without revealing any privileged

15  communications, what was the nature of your role

16  in connection with any such investigations?

17      A.    Both participating in and leading and

18  assisting someone, a whistleblower-style person,

19  in communicating around potential violations of

20  law and policy, including anticorruption, those

21  kinds of things.

22      Q.    Approximately how many investigations

23  did you participate in?

24            MS. COLWIN:  Objection.

25      A.    I recall four independently.  There

1          N. J. Oliva - CONFIDENTIAL

2     may be more.

3          Q.    Was there any particular way in which

4     you learned how to conduct investigations?

5          A.    We -- I was very close with the

6     compliance department, and also the government and

7     litigation -- government investigation litigation

8     person, so by their modeling at Bristol-Myers

9     Squibb.

10         Q.    So did you receive training at

11    Bristol-Myers Squibb concerning how to conduct an

12    investigation?

13         A.    Not formal training.

14         Q.    But informally, you were trained?

15         A.    Informally, I observed.

16         Q.    So you learned by observing?

17         A.    Yes.

18               MS. COLWIN:  Objection.

19         Q.    And then, as a result of your learning

20    through observation, did you formulate any

21    particular protocol for how an investigation

22    should be conducted?

23               MS. COLWIN:  Objection.

24         A.    Yes.

25         Q.    In your role as general counsel after

N. J. Oliva - CONFIDENTIAL

you were rehired, was that protocol in effect?

    A.    Yes.

    Q.    Was that protocol ever reduced to
writing?

    A.    No.  But I can say I think the -- no.

    Q.    After you were rehired by the company,
was Mr. Yoshisato still affiliated with the
company or with any of the affiliates of the
company?

    A.    Yes.

    Q.    Okay.  Which one?

    A.    I think he was at MCHC.

    Q.    Do you know what his capacity at MCHC
was at that time?

    A.    I'm not sure.  I think he might have
worked in the audit function, internal audit
function.

    Q.    Do you know whether he was the
executive officer of the company?

    A.    I don't know.

    Q.    Do you know if he was promoted after
that investigation for which he was a subject of?

    A.    I have no idea.

    Q.    After you were rehired into MCHA, did

1          N. J. Oliva - CONFIDENTIAL

2     you --

3          MR. BERMAN:  Withdrawn.

4          Q.    After you were rehired into MCHA, did

5     you have access to the personnel files of the

6     attorneys you supervised?

7          A.    Did I have access to the personnel

8     files?  I probably could have requested them from

9     the HR person.

10         Q.    After you had been rehired by MCHA,

11    did you ever have any discussions with Ms. Costa

12    about the reasons why Ms. Fischman was reassigned

13    from acting general counsel to her previous

14    position of assistant general counsel?

15         MS. COLWIN:  Objection.

16         A.    Not in detail.  We talked about tone

17    and behavior.  We talked generally speaking, but

18    not very specifically about a particular issue --

19    well, maybe there were a couple of particular

20    issues.  I do recall Donna telling me about the

21    meeting -- there was a meet about Ciro about a

22    go/no go decision.  Yeah, so there were some

23    instances that she told me about.

24         Q.    Do you know whether any other

25    individuals besides Ms. Costa were involved in

1          N. J. Oliva - CONFIDENTIAL

2     that decision?

3          MS. COLWIN:  Objection.

4     A.     In what decision?

5     Q.     In the decision to reassign

6     Ms. Fischman.

7          MS. COLWIN:  Objection.

8     A.     I don't know.

9     Q.     I'm sorry?

10     A.     I don't know.

11     Q.     You don't know.  Okay.  I didn't hear

12     your response.  I'm sorry.  Okay.  Moving on.

13          Is it correct that, immediately upon

14     your being rehired by the company, Ms. Fischman

15     was assigned to report to you as a supervisor?

16          MS. COLWIN:  Objection.

17     A.     Ms. Fischman reported to me on my

18     arrival, yes.

19     Q.     And you were her supervisor, correct?

20     A.     Yes.

21     Q.     I'm referring now to paragraph 76 of

22     the First Amended Complaint, if you could just

23     turn to that.

24          Do you see on the second sentence of

25     paragraph 16, there's an allegation that on March

N. J. Oliva - CONFIDENTIAL

1st, 2016, Ms. Fischman complained to Mr. Oliva

that one of the company's female employees was

denied a severance package while her male

colleague had been offered a severance package

under very similar circumstances.

        Do you see that allegation?

    A.    I do.

    Q.    Did you have an interaction with

Ms. Fischman on March 1, 2016?

    A.    I do not remember.

    Q.    Did Ms. Fischman ever complain to you

about a female employee being denied a severance

package?

    A.    Not that I recall.  I recall Jennifer

being upset that an affiliate was overpaying in

their severance packages.

    Q.    Can you help me place that in time,

temporally?

    A.    I don't recall.

    Q.    Do you know who they were overpaying,

according to Ms. Fischman?

    A.    Basically, everyone.

    So that company had a series of

reductions.  They went from having a plant that

1              N. J. Oliva - CONFIDENTIAL

2    was demolished and many employees, to very few, to

3    a handful; at this time, there's barely any.  And,

4    over time, we assisted them with multiple

5    reductions.  And I do recall Jennifer being upset

6    that they were overpaying or, you know, not -- not

7    being savvy in their reduction.

8              And I also recall advising Jennifer

9    that, when it comes to the economics of it, this

10   is their decision, that's what the president does.

11   We can advise, we can tell them what we think is

12   standard, but, ultimately, it's their call.

13        Q.    Did Ms. Fischman ever complain to you

14   about Amber Todd being separated from the company?

15        A.    No.

16        Q.    Did she ever complain that Amber Todd

17   was being provided with a less generous severance

18   package than her husband, Dan Todd?

19        A.    No.

20              MR. BERMAN:  Can we mark this as the

21         next exhibit, please.

22              (Plaintiff's Exhibit 49, multipage

23         document Bates stamped DEF-000590 through

24         000599, confidential, marked for

25         Identification, as of this date.)

1          N. J. Oliva - CONFIDENTIAL

2              MR. BERMAN:  For identification,

3          Plaintiff's 49 is Bates stamped DEF-000590

4          through 599.

5          Q.   Mr. Oliva, are you looking at the

6     document?

7          A.   Yes.

8          Q.   Have you seen it before?

9          A.   Yes.

10         Q.   Can you tell me what it is?

11         A.   Well, I haven't looked at all the

12    pages, but on top --

13             MS. COLWIN:  You have the wrong one.

14         This is the one you handed me.  Hold on a

15         second.

16         Q.   Have you seen this document before?

17         A.   Yes.

18         Q.   Can you tell me what it is?

19         A.   This is the annual performance review

20    for Jennifer that's for the fiscal year 2015.

21         Q.   Can I direct your attention to the

22    third page of the document, which is Bates stamped

23    DEF-000592?

24         A.   Yes.

25         Q.   Do you see the section that says

1                  N. J. Oliva - CONFIDENTIAL

2    manager comments?

3         A.    I do.

4         Q.    Do you see the note there that says,

5    "it is important to note that this performance

6    review and the related comments and suggestions

7    are based on the fourth quarter of the fiscal year

8    2015 only"?

9         A.    I do.  I wrote it.

10        Q.    Is that correct?

11        A.    Yes.

12        Q.    As far as you know, is this document a

13   correct and accurate representation of a

14   performance review delivered to Ms. Fischman on or

15   about April 30, 2016?

16        A.    I think the meeting is later.  Yes,

17   it's correct, but as far as the date goes, I think

18   the meeting -- or at least it's signed in May.

19        Q.    So the date on the front cover does

20   not control, correct?

21        A.    Right.

22        Q.    And that's your signature on page --

23        A.    Yes.

24        Q.    -- 596?

25        A.    595.

1           N. J. Oliva - CONFIDENTIAL

2      Q.    595.  And what about 596?

3      A.    And 596, yes.

4      Q.    Okay.  Thank you.

5           Looking at the panel in the center of

6  page 592, did Ms. Fischman receive a "needs

7  improvement rating" on the communication category

8  performance?

9      A.    She did.  The lowest rating possible.

10     Q.    Can you tell me why she received that

11 rating?

12     A.    Yes.  Because, in the short term that

13 I had dealt with her from November 30, 2015 to the

14 point of this review, Jennifer needed to work on

15 her tone, she needed to improve her tone and

16 demeanor the way that she went about her business,

17 and communication style.

18     Q.    Turning now to the next sentence of

19 that same section where it says, "Jennifer has had

20 a challenging year and her continued success and

21 ability to meet client demands is a testament to

22 her skill, intelligence, capability and

23 integrity."

24          Do you see that section?

25     A.    I do.

N. J. Oliva - CONFIDENTIAL

1

2     Q.     Was this section of the performance

3  appraisal provided by you?

4     A.     Yes.

5     Q.     What about the remainder of this

6  section under management comments?

7     A.     Yes.

8     Q.     And are the comments contained in the

9  manager comments section accurate, to the best of

10  your knowledge?

11     A.     At that time, yes.

12     Q.     So at the time that you wrote this

13  performance appraisal for Ms. Fischman, did you

14  have any question about her integrity?

15     A.     No.

16     MS. COLWIN:  Objection.

17     Q.     At the time that you wrote this

18  report, did you have any question about Jennifer

19  maintaining a high ethical standard?

20     MS. COLWIN:  Objection.

21     A.     No.

22     Q.     Did you have any question about her

23  communicating directly with regard to any

24  potential ethical concern?

25     MS. COLWIN:  Objection.

N. J. Oliva - CONFIDENTIAL

2    A.    No.

3    Q.    And with regard to Ms. Fischman's

4    competencies, did she, in fact, exceed

5    expectations in most areas?

6          MS. COLWIN:  Objection.

7    Q.    I'll direct your attention, if it

8    helps, to the bottom portion of the management

9    comments.

10   A.    Yes.

11   Q.    Now, with respect to the final line on

12   this page, the bottom of 592, do you see the

13   comment there that says, "I believe there is room

14   for improvement in communication" comma -- I think

15   that's a comma -- "specifically communicating in a

16   respectful tone and manner and being aware of and

17   responsive to verbal and nonverbal communication

18   styles."

19         Do you see that sentence?

20   A.    I do.

21   Q.    So with respect to the first portion

22   of that sentence concerning tone and manner, have

23   you described for me already your concerns about

24   Ms. Fischman's tone and manner?

25         MS. COLWIN:  Objection.

1                N. J. Oliva - CONFIDENTIAL

2        A.    Essentially.

3        Q.    At the time that this document was

4   created, did you have any other concerns about

5   Ms. Fischman's tone and manner, other than those

6   that you described to me already?

7                MS. COLWIN:  Objection.

8        A.    Not that I recall.

9        Q.    With respect to Ms. Fischman's verbal

10  and nonverbal communication styles, in your view,

11  what room for improvement was there for

12  Ms. Fischman with respect to those?

13       A.    Jennifer reacts first and thinks

14  second.  Jennifer could have tried a more measured

15  approach and a more culturally sensitive approach

16  to dealing with clients, and Japanese in

17  particular.  Like I had identified where I

18  identify an issue, and she yells.  It's an

19  inappropriate response.  There's a lot of room for

20  improvement there.  For someone who's supposed to

21  be so senior, a measured and appropriate

22  communication style is critical, and so there's a

23  lot of room for improvement that way.

24                And nonverbally, I do recall -- now

25  you invited me to recall other items.  I do recall

N. J. Oliva - CONFIDENTIAL

people complaining about Jennifer eating in

meetings, bringing food into meetings.  We have a

kind of formal meeting culture, and it's not

really all that acceptable, and there was room for

improvement in being sensitive.

Reading the room.  You know, there's a

saying, like reading the room or reading the air,

and Jennifer was not good at that.  There was a

lot of room for improvement there.

Q.    On any occasions where those

activities you just described took place, did you

prepare any notes reflecting those

contemporaneously?

A.    I think so.

Q.    To the best of your knowledge, have

those been provided to your counsel?

A.    Yes.

RQ        MR. BERMAN:  To the extent not already

produced, we call for the production of

those notes.

MS. COLWIN:  Taken under advisement.

MR. BERMAN:  Thank you.

MS. COLWIN:  Matt, I will -- Nick will

testify about Catalent.  He can testify

1          N. J. Oliva - CONFIDENTIAL

2     about Catalent.  You asked a question --

3          MR. BERMAN:  Can you please refer back

4     to the portion of the testimony marked

5     previously?  Was there more one spot or just

6     one spot?

7          THE REPORTER:  I believe there was one

8     spot.

9          (Record read as follows:

10          "Question:  Okay.  What was your base

11     at the Catalent position that you were

12     departing from?")

13     A.    I don't remember.

14     Q.    Were you previously compensated at a

15     lower level than the level you were compensated

16     with when you returned to MCHA as general counsel?

17          MS. COLWIN:  Objection.

18          MR. FORTINSKY:  Objection.

19     A.    Yes.

20     Q.    Was that question clear or unclear?

21     A.    Clear.

22     Q.    Okay.  We can set aside Exhibit 49.

23     We're done with that.

24          Turning back to Exhibit 3, which is

25     the First Amended Complaint.  I'd like to direct

1          N. J. Oliva - CONFIDENTIAL

2   your attention to page 16, paragraph 78.

3          A.    Okay.

4          Q.    In approximately August of 2016, was

5   Ms. Fischman tasked to investigate a claim of

6   sexual harassment?

7          A.    Yes.

8          Q.    Was that claim involving a female

9   colleague in the legal department?

10         A.    As a witness, not as a complainant.

11  There's a lot wrong in this paragraph 78.

12         Q.    Okay.  So as we go through the

13  paragraph, will you please let me know if any of

14  these allegations are disputed and which

15  allegations they are, and what the correct facts

16  are.

17         MS. COLWIN:  Objection.

18         Q.    Let's start with the first sentence.

19         "In August 2016, Ms. Fischman was

20  tasked by Mr. Oliva to investigate a claim of

21  sexual harassment made by a female colleague in

22  the legal department."  And I think you've just

23  described for me that the colleague in the legal

24  department in question was a witness; is that

25  correct?

1           N. J. Oliva - CONFIDENTIAL

2      A.    Yes.

3      Q.    Do you know who the complainant was?

4      A.    Yes.

5      Q.    Was there more than one complainant?

6      A.    Yes.

7      Q.    And where were those complainants

8  located?

9      A.    The Jersey City office.

10     Q.    All right.  So was Ms. Fischman

11 responsible for investigation of the complainants'

12 claims?

13           MS. COLWIN:  Objection.

14     A.    She was responsible for investigating

15 what had come to us from the Human Resources

16 department as several complaints, none of those

17 through the HR function from the member of the

18 legal department.

19     Q.    Okay.  Just so we're clear.  Is the

20 member of the legal department as a witness Ann

21 Reilly?

22     A.    That's correct.

23     Q.    And who are the complainants?

24     A.    Other members of the Jersey City

25 pharmaceutical business.  They were both men and

1                N. J. Oliva - CONFIDENTIAL

2      women.  Jennifer Kohler, Armand Famiglietti, a

3      Japanese expat, I think it was Hiroo, I don't

4      recall for sure, and Ann was the witness.  But I

5      think about six names were given to us.

6                Ann Reilly became a witness because I

7      had originally asked her, when I had determined

8      not to have Andy Csaszar investigate the matter, I

9      had originally gone to Ann Reilly and asked her,

10     because although it wasn't my first choice, she

11     was a member of the legal department, and that's

12     when she confided in me that she had a similar

13     experience, and at that point, I could not ask her

14     to also investigate.

15          Q.   Why not?

16          A.   Because --

17               MS. COLWIN:  Objection.

18               MR. BERMAN:  You can answer, unless

19          instructed otherwise.

20               MS. COLWIN:  No, you can answer.

21          A.   Because if she experienced the

22     behavior, she can't be completely unbiassed in

23     investigating the behavior.

24          Q.   Okay.  Was there ultimately an

25     investigation of the complainants' claims?

N. J. Oliva - CONFIDENTIAL

1

2    A.    Yes.

3    Q.    Who conducted the investigation?

4    A.    Jennifer.

5    Q.    Did anyone supervise Jennifer's

6  conducting of the investigation?

7    A.    I gave Jennifer guidance.

8    Q.    Other than the guidance that you

9  provided to her, was she reporting to anyone else

10  in connection with performing the investigative

11  duties?

12    A.    No.

13    Q.    Did Ms. Fischman recommend hiring

14  outside counsel to do the investigation?

15    A.    She did.

16    Q.    And did you decline her invitation?

17    A.    I did.  I thought Jennifer was

18  entirely capable of handling this investigation.

19    Q.    Did it turn out that she properly

20  investigated the claims, in your view?

21    MS. COLWIN:  Objection.

22    A.    I think her investigation yielded

23  enough information for us to take appropriate

24  action.

25    Q.    So it met your requirements?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3      A.    Yes.  The investigation was fine.

4      Q.    When you say -- I think you said you

5  provided guidance to Jennifer in how to conduct

6  the investigation.  Did you provide her with your

7  protocol for investigating that you discussed

8  previously?

9          MS. COLWIN:  Objection.

10     A.    Yeah, in a manner of speaking, yes.  I

11  encouraged Jennifer to speak with all of the

12  witnesses, and to specifically ask every witness,

13  as I do in every investigation, to ask them who

14  else might have experienced or witnessed the same

15  behavior, and then to go ask them, go interview

16  them.

17     Q.    Is that a standard step of your

18  investigative protocol?

19     A.    Yes.

20     Q.    Do you expect your subordinate

21  attorneys who are investigating claims to apply

22  that protocol?

23          MS. COLWIN:  Objection.

24     A.    And I remind them, like I did in

25  Jennifer's case.

N. J. Oliva - CONFIDENTIAL

1

2      Q.     Did you mention that you considered

3    having Mr. Csaszar investigate the claims?

4      A.     I did.

5      Q.     What was the reason why you ultimately

6    had Ms. Fischman investigate the claims rather

7    than Mr. Csaszar?

8      A.     There were several reasons.  The first

9    was, Andy had just opened an investigation and, as

10   a result of the way he handled it, we had a very

11   sort of belligerent witness.  I didn't think it

12   was handled great, and so I didn't want to give

13   him another one immediately.

14         Second, Andy was in the Jersey City

15   office and responsible for daily communications

16   with the witnesses and the accused, and I thought

17   it would probably not be the best opportunity for

18   him, combined with the first instance where he

19   maybe didn't handle things so perfectly.  So I

20   went to Ann to ask her if she was comfortable or

21   if she might be a suitable person, because she was

22   in the same location, Jersey City.

23         When she told me that she was -- that

24   she had experienced the behavior herself, I was

25   disappointed that she hadn't told me that already,

N. J. Oliva - CONFIDENTIAL

1          but, of course, I determined that she couldn't

2          conduct the investigation, that she was a witness,

3          and then I asked Jennifer if she would do it.

4               Q.    Did you instruct Ms. Fischman how to

5          conduct the investigation?

6               MS. COLWIN:  Objection.

7               A.    In a manner of speaking.  I told her

8          to -- here's the witness list, talk to Deborah

9          Moorer, the HR person, interview every witness,

10         find out what happened, and ask every witness who

11         else might have experienced or witnessed the same

12         thing, and go talk to them.

13              Q.    Did Ms. Fischman interview the subject

14         of the investigation?

15              A.    No one interviewed the subject of the

16         investigation.

17                    The accused you mean?

18              Q.    Yes.

19              A.    No one interviewed the accused.

20              Q.    Why not?

21              A.    We had enough info --

22              MS. COLWIN:  Objection.

23              A.    We had enough information on the basis

24         of multiple witness statements to take appropriate

1          N. J. Oliva - CONFIDENTIAL

2     action.

3          Q.     Did you instruct Ms. Fischman not to

4     interview the accused?

5               MS. COLWIN:   Objection.

6          A.     I don't recall instructing her not to.

7          Q.     Did she ask you if she could interview

8     the accused?

9          A.     I don't recall her asking me if she

10    could.

11         Q.     You indicated that this paragraph was

12    not factually correct.  Is there anything that you

13    haven't told me about that's incorrect about this

14    paragraph and the allegations contained therein?

15              MS. COLWIN:   Paragraph 78?

16              MR. BERMAN:   Yes.  I just want to give

17         the witness the opportunity to provide any

18         other information he has on this topic.

19         A.     So this says that I communicated to

20    her what I, in italics, expected her to find.

21    Based on the information I had been provided by

22    Deborah Moorer, the HR person who initially

23    reported this to me from multiple sources, both

24    men and women, and my conversation with Ann

25    Reilly, I understood at that time that none of the

1          N. J. Oliva - CONFIDENTIAL

2   complainants, who had all experienced what they

3   called nonsexual but unwanted touching, had never

4   communicated to the accused that they didn't like

5   it or didn't want it or wanted it to stop, that no

6   communication from anyone, neither HR, nor any of

7   the complainants had been made to that person.

8          So I do recall telling Jennifer that I

9   would not be surprised if you interviewed

10  everyone, including everyone else who they

11  identified, and no one has said to this person not

12  to do this.  Again, all of them identified this as

13  non-sexual unwanted or odd touching, like of a

14  sleeve or something like that, or dusting

15  something off, both men and women.

16         So I take issue with that, because

17  this suggests that I told her what the conclusion

18  of the investigation is.  She had autonomy to

19  conduct the investigation.  I wasn't in the

20  meeting.  I did not direct what it should find.  I

21  said, I wouldn't be surprised if we find out that

22  no one has said anything.  That's one thing I take

23  issue with here.

24         And it says that she was allowed only

25  to interview the female claimant.  In fact, I

1          N. J. Oliva - CONFIDENTIAL

2    believe she interviewed two male people.  Not the

3    accused, two male witnesses who either experienced

4    or witnessed the behavior.  I did not interview

5    them, Jennifer did.

6              I did not communicate about what I

7    expect all the witnesses to say, except as I just

8    identified, and I certainly did not say what to

9    write in her report.  No one interviewed the

10   alleged accused because I communicated on the

11   basis of the information that we had received on

12   the number of confirmed reports that -- after

13   discussing with the president of the company, that

14   I would communicate directly as the chief

15   compliance officer that the behavior needs to stop

16   immediately, and that this what is perceived and

17   this is why it needs to stop.  And that's what I

18   did.

19             It wasn't an interview.  It was a

20   communication.  And, as of that date, no further

21   activity had ever occurred.  We actually went back

22   about six weeks later and asked for all of the

23   witnesses to communicate back whether or not the

24   behavior continued, and they all confirmed it had

25   not.

1          N. J. Oliva - CONFIDENTIAL

2          So from the point at which I met out

3     the result, no further action occurred, no further

4     offensive behavior.  So that's what I take issue

5     with in here.  This is twisted.

6          Q.     Have you had an opportunity to

7     complete your response?

8          A.     Yes.

9          Q.     Turning your attention to paragraph

10    79.  Did Ms. Fischman complain to you about her

11    perception that you were gender biased in the

12    conduct of the investigation?

13         A.     No.

14         MS. COLWIN:  Objection.

15         Q.     Turning your attention to the next

16    sentence in that paragraph, did Ms. Fischman have

17    a conversation with you during October 2016

18    wherein she complained about women being treated

19    differently than men?

20         MS. COLWIN:  Objection.

21         A.     I don't recall that conversation, but

22    I can tell you that, as the co-chair of the

23    diversity committee at Bristol and as the general

24    counsel and chief compliance officer at Mitsubishi

25    Chemical, that would have been something that I

1          N. J. Oliva - CONFIDENTIAL

2     would have taken very seriously, and I don't

3     recall that happening at all.

4          Q.    Did Ms. Fischman ever make any

5     complaints to you about disparate treatment on the

6     basis of gender at MCHA?

7          MS. COLWIN:  Objection.

8          A.    Can you repeat that?

9          MR. BERMAN:  Could you read it back,

10          please.

11          (Record read.)

12          MS. COLWIN:  Objection.

13          A.    No.

14          Q.    Did she have any other conversations

15     with you wherein she raised the issue of disparate

16     treatment on the basis of gender?

17          A.    No.  I think that's the same question.

18          Q.    Did Ms. Fischman ever make a comment

19     to you concerning her reassignment from acting

20     general counsel to assistant general counsel being

21     gender discrimination?

22          MS. COLWIN:  Objection.

23          A.    No.

24          Q.    Turning your attention to the next

25     paragraph, paragraph 80.  If you could just take a

1          N. J. Oliva - CONFIDENTIAL

2    look at that for a moment, and let me know when

3    you're done.

4          A.    I'm done.

5          Q.    Are you familiar with the subject

6    matter of the Genomatica matter?

7          A.    Yes.

8          Q.    Was that a litigation that MCHA was

9    responsible for?

10         A.    Yes.

11         Q.    On or about November of 2016, was

12   there a judicial settlement conference in

13   connection with that matter?

14         A.    One was scheduled.

15         Q.    Do you know if it ultimately took

16   place?

17         A.    Two ENE settlement conferences

18   ultimately took place, but I don't recall the

19   dates particularly.  I remember one was scheduled

20   and postponed.

21         Q.    Up until that point, who had been the

22   attorney with primary responsibility for the

23   Genomatica litigation?

24         A.    Josh Berman as outside counsel,

25   Jennifer Fischman leading and supervising outside

1          N. J. Oliva - CONFIDENTIAL

2    counsel, with my direction.

3          Q.    When it came time to attend the first

4    of the judicial settlement conferences, did

5    someone make a decision as to who would attend on

6    behalf of the client of MCHA in the Genomatica

7    matter?

8               That might be a little imprecise, so I

9    just want to clarify.  Maybe it's easier to break

10   it up into pieces.

11              Who was the client on the Genomatica

12   matter?

13         A.    MCC.

14         Q.    And in connection with serving the

15   needs of the client, was MCHA acting in a

16   representative role?

17         A.    They were our client, and we engaged

18   outside counsel to litigate.

19         Q.    So is it fair to describe it as MCHA

20   was representing the client in a legal

21   representation through outside counsel?

22         A.    Using --

23              MS. COLWIN:  Objection.

24         A.    -- outside counsel.

25         Q.    Using outside counsel.

N. J. Oliva - CONFIDENTIAL

2      And that would be Mr. Berman, correct?

3   A.   Yes.

4   Q.   So did there come a time when there

5   had to be a determination as to who would attend

6   the judicial settlement conference on behalf of

7   MCC?

8   A.   Yes.  So for the ENE, you are required

9   to present someone who has authority to settle,

10  and so we asked who will it be.

11  Q.   I'm sorry for the imprecision of my

12  questioning.  What I intended to ask was about the

13  selection of the attorneys who would attend the

14  conference on behalf of MCC.

15      Did there come a time where a

16  determination had to be made concerning which

17  attorneys would represent MCC's interest at the

18  conference?

19  A.   No.  It was always Josh Berman.

20  Q.   Did any MCHA attorneys accompany

21  Mr. Berman to the conference?

22      MR. BERMAN:  No relation, by the way.

23  A.   No, not in that capacity.  I mean, I

24  attended the conference in the only capacity as --

25  I didn't appear as counsel.

1                N. J. Oliva - CONFIDENTIAL

2         Q.    So how would you describe the capacity

3    in which you were appearing?

4         A.    As a business representative of MCC.

5         Q.    So did there come a time where

6    somebody had to make the determination as to which

7    MCHA personnel would appear at the conference as

8    business representatives of MCC?

9         A.    Well, it wasn't --

10              MS. COLWIN:  Objection.

11        A.    It wasn't with regard to which MCHA

12   person would attend.  The question was, will MCC

13   attend?  And their response was, no, MCHA will

14   attend.  This -- remember, MCC is a multi

15   billion-dollar business, multi billion-dollar

16   company.  This matter was 3 million or less, at

17   max.  Right?  So to send a very high-ranking

18   person for this maybe didn't make sense.

19              So we asked, you need to send someone

20   who has authority to settle.  Who will it be?  And

21   they said, we'll get back to you as -- I recall

22   them saying or writing, we'll get back to you as

23   to whether it's MCC or MCHA.  And then they came

24   back to us and said, it's MCHA, we'd like you,

25   Nick, to go.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    Let's break that up into pieces.

3          Who made the decision as to whether

4     MCC or MCHA would attend?

5     A.    I don't know.  It's internal to MCC.

6     Q.    Okay.  Who made the decision, once it

7     was determined that MCHA would go, concerning your

8     attendance?

9          MS. COLWIN:  Objection.

10    A.    I don't know, but I think I recall

11    that the e-mail said, we have decided MCHA.  Nick,

12    please attend, or something like that.  Or Nick

13    will -- you can attend for us.

14    Q.    At that time, when that decision was

15    made, were you fully informed concerning the

16    Genomatica matter?

17    A.    Yes.

18    Q.    So, up until that time, did you play

19    an active role in the litigation?

20         MS. COLWIN:  Objection.

21    A.    Yes.

22    Q.    What was your role in connection with

23    the litigation up until that time, of being

24    informed that you would attend the settlement

25    conference?

1            N. J. Oliva - CONFIDENTIAL

2            MS. COLWIN:  Objection.

3       Q.      Without revealing any communication.

4       A.      So starting from the very beginning,

5   it was my role to set the strategy.  I had

6   communicated around what we could use litigation

7   for.  I think it's really important to understand

8   that this case was really important to MCHA, more

9   so than -- maybe than to MCC.

10           MCC had determined that they wanted to

11  be a global business, as we already talked about,

12  and this was an opportunity for us at MCHA to

13  communicate to MCHC that they could rely on us in

14  a legal function in the Americas, and they could

15  use tools that may be uncomfortable for them, like

16  litigation, that we could use these tools to help

17  drive their global business, and that actually

18  filing litigation against someone is a tool that

19  you can use, that I have, you know, waited for or

20  used previously, that you can use for people to

21  bring them to the table to get a good business

22  result.

23           And so from -- to answer your

24  question.  From the very beginning, the

25  conversation from my side, my role, was around

1          N. J. Oliva - CONFIDENTIAL

2    strategy.  How do we use litigation?  How do we

3    make this filing in a way that brings Genomatica

4    to the table, right, and that we can get a good

5    business result and engenders trust with our

6    client, so that the next one comes along, they

7    realize they can call us, they can trust, they can

8    use us for their matters as they grow.

9          Further, more detailed than that, I

10   reviewed filings for tone, especially for tone.

11   Yes, for subject matter, but mostly for tone.  And

12   the reason why that's important is because this is

13   reflective of our client.  Our client is going to

14   go in a public way and make statements, and

15   they're Mitsubishi Chemical Corporation, and they

16   have a way about them that's professional and

17   appropriate.  It's culturally sensitive.  And I

18   needed to review those filings to make sure they

19   comported with who we are as a company.  And so I

20   was very active in reviewing the documents.

21         I was also very active in

22   communicating to Jennifer and Josh what our

23   expectations should be.  What does good look like?

24   How do we comport ourselves?  So the day-to-day

25   affairs were Josh Berman, the supervision of that

N. J. Oliva - CONFIDENTIAL

was Jennifer, the client was MCC, but I was very

active, including in reviewing documentation, to

make sure that we were doing this in a way that

would engender trust with our client and get the

right result.

    Q.    Have you completed your response?

    A.    Yes.

    Q.    Okay.  Did Ms. Fischman ever complain

that she should have been permitted to attend that

conference, or the first of those two conferences?

    A.    No.

    Q.    Did she ever complain that she should

have been permitted to attend the second of those

two conferences?

    A.    She was not working at Mitsubishi at

the time of the second one.

    Q.    Okay.  Did you, in fact, attend the

first of the two settlement conferences?

    A.    I did.

    Q.    Did you, in fact, attend the second of

the two settlement conferences?

    A.    I did.

    Q.    In connection with the first of those

two settlement conferences, were you provided with

1          N. J. Oliva - CONFIDENTIAL

2     settlement authority by MCC?

3          A.    So I had specific -- well, the court

4     rule, as I mentioned before, is that you have to

5     bring someone representative of the client, of the

6     plaintiff, MCC, with settlement authority.  That's

7     essentially unlimited, right?  You have to show up

8     with someone who can make decisions for the

9     company.

10          So I was very clear in communicating

11    to Jennifer and Josh and MCC that I wanted that

12    document to bring with me, to show that I had

13    settlement authority for the purposes of that ENE

14    that met those requirements, and I asked

15    specifically can I get a board resolution from MCC

16    giving me that authorization, and, in the absence

17    of that, a signatory for Takimoto-san, who's the

18    executive, granting me authority for the purposes

19    of that ENE with a document.

20          I also think I asked Jennifer or Josh,

21    I may have asked Jennifer to ask Josh, to draft it

22    for them, so that it would comport exactly with

23    the requirements of the ENE.

24          Q.    Have you completed your response?

25          A.    Yes.

1           N. J. Oliva - CONFIDENTIAL

2           Q.    So with respect to the first of the

3    two settlement conferences, or ENEs -- by the way,

4    just to clarify, when you use the term

5    Takimoto-san, is that equivalent to Mr. Takimoto?

6           A.    It's a manner of respect.  It's

7    Japanese culture to refer to someone either as

8    Mr. Takimoto or Takimoto-san.  We -- I use San.

9           Q.    Okay.  That's fine.  I'm just making

10   sure we understand who we're talking about.  Thank

11   you.

12          And then, with respect to the first of

13   the two settlement conferences, are those also

14   known as ENEs?  E like Edward, N like nighttime, E

15   like Edward?

16          A.    Yes.

17          Q.    Can you tell me what that stands for?

18          A.    I don't recall.

19          Q.    Is it Early Neutral Evaluation?

20          A.    That may be it.

21          Q.    So can we use those terms

22   interchangeably, settlement conference and ENE for

23   this --

24          A.    Yes.

25          Q.    -- the purpose of discussing the

1          N. J. Oliva - CONFIDENTIAL

2    Genomatica litigation?

3         A.    Yes.    There's a federal magistrate

4    overseeing those.

5         Q.    Okay.    I just want to make sure we're

6    talking about the same thing.

7              When you attended the first of the two

8    ENEs, or settlement conferences, did you have an

9    understanding of what the client was looking to

10   settle the matter for?

11        A.    The first of the two was mostly around

12   posturing.  I don't think any of us really thought

13   we might settle at that first one.  No, I don't --

14   I don't recall going in there with a -- with an

15   ID, you know, with a -- with a number or a minimum

16   or a maximum.  Again, I had to go there on the

17   authority of that document with the ability to

18   settle.  That doesn't mean I was required to

19   settle.  But with the ability to settle.  And I

20   think it was mostly -- that first one was mostly

21   about posturing.  I don't think any of us really

22   thought we were going to walk out of there and be

23   completely done that day.

24        Q.    Okay.  But does one normally attend a

25   settlement conference without some idea of what

1          N. J. Oliva - CONFIDENTIAL

2     they could actually settle the matter for?

3          A.    I don't know what one normally does --

4                MS. COLWIN:  Objection.

5          A.    -- but I can -- I can say that, in

6     that case, I knew what the parameters of this case

7     were from an earlier ridiculously low offer of

8     something like 100,000 to our entire claim of

9     roughly 3 million, so I knew what the value of the

10    case was.

11         Q.    So had there been any discussion as to

12    your ability to actually effectuate a settlement

13    at the first settlement conference?  And when I

14    say discussion, I mean between MCHA and MCC.

15         A.    There was --

16                MS. COLWIN:  Objection.

17         Q.    Without divulging any privileged

18    communications, are you able to answer the

19    question?

20         A.    Well, as I mentioned, there was

21    specifically a document that I had asked for in

22    writing from the Board of Directors that was

23    ultimately signed by Takimoto that gave me

24    authority to do it at the ENE.

25         Q.    I understand that you had actual

1          N. J. Oliva - CONFIDENTIAL

2    authority to settle the matter in the form of a

3    written communication that granted you that

4    authority expressly, right?  And we're going to

5    get to that document, and I'll show it to you, and

6    you'll have an opportunity to provide me with more

7    information on that document.

8          But what I'm asking you is something a

9    little bit different, and maybe it's a little bit

10   more nuanced.

11         What I'm asking you is, although you

12   had authority to settle the matter, did you have

13   any actual understanding of what, from the

14   client's perspective, a successful settlement

15   would look like.

16         MS. COLWIN:  Objection.

17   A.    I don't recall a conversation like

18   that.  We had been discussing this case for a good

19   period of time, and, as I mentioned, from very low

20   to our entire amount.  So I don't have an answer

21   to that.  I don't know.  I don't recall.

22   Q.    When you say there had been

23   discussions about very low, what do you mean was

24   very low?

25         MS. COLWIN:  Objection.

1           N. J. Oliva - CONFIDENTIAL

2      Q.    Do you mean a financial amount?

3           MS. COLWIN:  I'm just going to caution

4      you, Mr. Oliva, that this may be privileged

5      communication, and you may not be able to

6      answer.  It's not your right to.  You

7      understand.

8      Q.    Are you able to answer the question?

9      A.    Say your question again.

10          MR. BERMAN:  Could you repeat it back,

11     please?

12          (Whereupon, the requested question was

13     read back by the reporter.)

14          MS. COLWIN:  Are you seeking the

15     financial amount, Matt?

16     Q.    No, I'm not asking you what the

17     financial amount was.  I'm just asking you to

18     clarify, when you referenced something that was

19     very low about the settlement, did you mean that

20     the settlement amount would be very low or the

21     settlement amount being discussed was very low?

22     A.    What was offered to us was very low.

23     Q.    Okay.  At some point, was MCC offered

24     $130,000?

25     A.    Something like that.

1          N. J. Oliva - CONFIDENTIAL

2     Q.    So when you said very low, were you

3   referring to that?

4     A.    Yes.

5     Q.    Okay.  Got it.

6          MS. COLWIN:  Okay.  Can we take a

7     quick break?

8          MR. BERMAN:  We can take a quick break

9     whenever you want.

10         Let's go off the record.

11         (Discussion held off the record.)

12         (Recess taken:  2:28 to 2:36 p.m.)

13         MR. BERMAN:  Back on the record.

14         (Plaintiff's Exhibit 50, a two-page

15    document Bates stamped DEF-001654 through

16    001655, confidential, marked for

17    Identification, as of this date.)

18         MR. BERMAN:  So, for identification,

19    Exhibit Plaintiff's 50 is a two-page

20    document Bates stamped DEF-001654 through

21    55.

22    Q.    Mr. Oliva, are you looking at the

23   document?

24    A.    Yes.

25    Q.    Have you seen it before?

1                    N. J. Oliva - CONFIDENTIAL

2          A.     I'm not sure.

3          Q.     Okay.  Is this an e-mail communication

4     from Donna Costa --

5          A.     Oh, I see --

6          Q.     -- to you on or about December 7,

7     2015?

8          A.     Yes.

9          Q.     Does it include an attachment?

10         A.     Yes.

11         Q.     Do you know what that attachment is?

12         A.     It looks like Jennifer's performance

13    review from Donna previously.

14         Q.     So at the time of this message, you're

15    back at the company in your general counsel

16    position, correct?

17         A.     For one week, yes.

18         Q.     So the review in question had already

19    been delivered to Ms. Fischman at that point,

20    correct?

21         A.     Yes.

22         Q.     Do you know why Ms. Costa was sending

23    you a copy of the evaluation?

24              MS. COLWIN:  Objection.

25         A.     I do not know.

N. J. Oliva - CONFIDENTIAL

1

2     Q.     Was there any discussion with

3 Ms. Costa concerning her sending you a copy of

4 Ms. Fischman's evaluation?

5     A.     I don't recall.

6     Q.     Were you sent any of Ms. Fischman's

7 prior evaluations, besides this one?

8     MS. COLWIN: Objection.

9     A.     I don't recall. As I mentioned, I can

10 say that I went into Jennifer's office on my first

11 day with the concept that we could probably make

12 this work, and I communicated that to Donna. So I

13 don't know why Donna sent them, but I don't recall

14 having conversations about them. I certainly

15 didn't ask for them.

16     Q.     So on or around this time, a week into

17 your reemployment at the company, did you have any

18 discussions with Ms. Costa about Ms. Fischman's

19 performance during the first week?

20     MS. COLWIN: Objection.

21     A.     I don't remember.

22     Q.     Okay.

23     A.     It's possible.

24     Q.     Okay.

25     MR. BERMAN: Mark this, please.

1        N. J. Oliva - CONFIDENTIAL

2        (Plaintiff's Exhibit 51, a two-page

3        document Bates stamped DEF-000864 through

4        0008865, confidential, marked for

5        Identification, as of this date.)

6        MR. BERMAN:  For identification,

7        Plaintiff's 51 is a two-page document Bates

8        stamped DEF-000864 through 865.

9        THE WITNESS:  Okay.

10       Q.    Have you seen this document before?

11       A.    Yes.

12       Q.    Can you tell me what it is?

13       A.    It's a note to myself about a meeting

14  I had with Jennifer.

15       Q.    When did the meeting take place?

16       A.    It says "notes from Jennifer meeting

17  today," so I expect March 3rd of 2016.

18       Q.    Can you tell me what transpired during

19  that meeting?

20       A.    Well, I think it's reflected here.  I

21  had alluded to before the Pauletta, that's

22  Pauletta Brown, the Lucite general counsel.  I

23  don't recall what direct confrontation about

24  one-on-one is.  Direct confrontation on MKIC

25  employment issue I don't recall what that is.

1          N. J. Oliva - CONFIDENTIAL

2     But, as I mentioned before, Jennifer was upset

3     that they were overpaying -- Stephen to Donna on

4     corporate governance.  This one was a

5     confrontation.  This may be -- well, they are

6     listed as separate things.

7               Stephen to Donna on corporate

8     governance was, Jennifer did not want to talk to

9     Kelli.  Kelli is the person who was responsible

10    for corporate governance, getting board

11    resolutions drafted.  And Stephen required a

12    ruling on whether or not we needed a board

13    resolution.  The right person to ask whether or

14    not we need -- we, meaning a client, right,

15    whether or not one of our clients needs a board

16    resolution to take action, is the general counsel.

17              Kelli knows the answer to that

18    question very well.  She's been doing this a

19    really long time.  But Jennifer didn't want to ask

20    Kelli, and Stephen wasn't sure to whom he should

21    go, because I think he felt like he reported to

22    Jennifer because she hired him, although, you

23    know, direct line reporting, that wasn't -- that

24    wasn't the HR system way.

25              Jennifer directed Stephen to talk to

1          N. J. Oliva - CONFIDENTIAL

2  Donna and ask Donna what the answer was.  And I

3  confronted her on that for a number of reasons.

4  That's not the way our department should work.

5  Number 1, Kelli can answer that question.  She

6  does it for clients all the time.  She has a list

7  of what requires board approval and what doesn't.

8  She can answer the question based on her

9  experience and these training documents, these

10  internal documents.  And, if not, if there's a

11  question because it's curious or maybe it's a

12  special circumstance, the right person to ask in

13  that case is me, the general counsel.  Donna

14  certainly could answer the question, she was the

15  general counsel for 20 years, but she's moved on

16  to the president role.

17          Why would Jennifer direct Stephen to

18  Donna, instead of to Kelli or to me?  That's not

19  an efficient and well-oiled legal function.  So I

20  had confronted her on that.

21          When I asked her -- you know, I told

22  her, these are all these things that I'm seeing

23  today, what's up with you?  This is where you can

24  see my notes.  She replied, miserable here, and

25  the document speaks for itself.

1      N. J. Oliva - CONFIDENTIAL

2      Q.   I understand the document says what it

3  says, but you have firsthand knowledge of -- of

4  your interactions with Ms. Fischman, so I'm just

5  trying to get your perspective --

6      A.   Sure.

7      Q.   -- on the context that this document

8  was created in.

9           So when it says, I'm miserable, I'm at

10  the point where I have to make a decision, and

11  there's a parentheses, alluding to quitting, but

12  seemed to refuse to say the word, what forms the

13  basis for the conclusion that Ms. Fischman was

14  alluding to quitting?

15      A.   Because when I would ask her that,

16  when I would say, because you feel like you want

17  to leave?  Or you're -- and she would do like this

18  (indicating), you know.  She wouldn't answer the

19  question.

20      Q.   Okay.  So she never said she wanted to

21  leave, did she?

22      A.   She didn't --

23           MS. COLWIN:  Objection.

24      A.   In that meeting, she did not tell me

25  she wanted to leave.  That's why I wrote this

N. J. Oliva - CONFIDENTIAL

note.

Q.    All right.

A.    I specifically asked.  It sounded to me, when someone says I'm miserable and I'm at the point at which I have to make a decision, that she's contemplating leaving.  And when I ask her, I didn't get an answer at that point.

Q.    Okay.  At or around the time of this conversation on March 3rd, 2016, did you have any understanding of Mrs. Fischman's personal circumstances?

MS. COLWIN:  Objection.

A.    In what way?

Q.    Do you know if she was married?

A.    Yes.

Q.    Do you know if her husband was working?

A.    I don't know.

Q.    Did she ever have any conversation with you about her personal finances?

A.    No.

MS. COLWIN:  Objection.

Q.    Okay.  So that's fine.  Let's move on.

All right.  There's a note here that

N. J. Oliva - CONFIDENTIAL

says, "wants me to reconsider two days per week

from home - standing rule."

Can you tell me what that refers to?

A.    Yes.  So if you go back in this

document, it reflects that I had asked her

specifically, what can I do for you?  If you're

miserable, what is it that I can do for you?  And

she identified that she's miserable because of

Donna and Katherine Todarello and Esther, right?

And she's miserable for Kelli because of her

relationships with lots of people in the office.

And I ask her, what can I do for you?

And she says, I want to work from home three days

a week.  And I said to her -- on several

occasions, I think I said to her before this --

let me see (perusing).

I'm not sure if this was the first

meeting or not.  But I had said to her, I don't

want a standing rule.  I am of the opinion that,

you know, time off and those kinds of things

should be -- should be more flexible, and that I

don't have a problem.  In fact, I encourage one

day a week from home, if it means that you can

focus on special projects without the distractions

1          N. J. Oliva - CONFIDENTIAL

2   of the office or the phone ringing or a client

3   coming by.  If that helps you create a new

4   template or a new guidance or create a training

5   deck, or do something meaningful and deliverable,

6   I encourage that.

7          I think that's good for all of us to

8   spend -- I used to say about 20 percent of your

9   time doing those things.  I don't say that

10  percentage anymore, as it's different for

11  everybody.  I've learned over time, not everybody

12  operates the same way in that regard.

13         But what I said to Jennifer was, I'm

14  not willing to just say we have a standing rule in

15  the department that it's three days per week.

16  What I said was, if you work from home, which she

17  had been doing, and it averages about a day a

18  week, I don't have a problem.  And the words that

19  I used with her and others was, I don't have a

20  problem unless I have a problem, right?

21         If I have clients who are in the

22  office and you're not here and they expected to

23  meet with you, I have a problem, right?  You have

24  to make arrangements for that; you have to be

25  willing to be in the office when it's appropriate.

1          N. J. Oliva - CONFIDENTIAL

2    Use your judgment.  Use good judgment.

3          But she was adamant.  She wanted a

4    standing three day a week rule, and there was no

5    basis for it, and I wasn't willing to create that

6    rule for the department, because it wouldn't have

7    been a -- it certainly wouldn't have been a

8    Jennifer rule.

9          Q.    Okay.  Have you completed your

10   response?

11         A.    I think so.

12         Q.    Did you mention an individual named

13   Katherine Todarello?

14         A.    Yes.

15         Q.    Who is that?

16         A.    Katherine Todarello is a member of the

17   internal audit function.  That's who I reference

18   here by Katherine T.  This is not a reference to

19   Kathryn Roche here.  This is a reference to

20   another woman in the MCHA office, Katherine

21   Todarello.

22         Q.    In Ms. Fischman's capacity as

23   assistant general counsel, did she interact with

24   the internal audit function?

25         A.     It's a small office, and, yes, we'd

1          N. J. Oliva - CONFIDENTIAL

2    see each other.  It's a very small office.  We see

3    each other.  And partially, internal audit and

4    legal work together.

5          Q.    So was there some friction between

6    Ms. Fischman and Mrs. Todarello -- Ms. Todarello?

7          A.    Um...

8          MS. COLWIN:  Can I have that question

9          read back.

10         (Whereupon, the requested question was

11         read back by the reporter.)

12         MS. COLWIN:  Objection.

13         A.    I don't remember, but I wrote here

14   that these are the people that Jennifer described

15   as having a problem with; Kelli, Donna, Katherine

16   Todarello, not Kathryn Roche, Esther, who is a

17   member of the tax department, and then I

18   specifically said, what about me?  I'm inviting

19   the -- like, do you have a problem with me?

20   Because if that's the case, we should -- we should

21   talk about this and figure it out.  So only after

22   I said, and what about me?  She said, yeah, you

23   too.  So I wrote down "and Nick too."

24         Q.    Did she indicate the nature of the

25   problem with you?

N. J. Oliva - CONFIDENTIAL

1

2    A.    Yes.    She said that it's very hard to

3    go from acting general counsel to reporting to

4    someone, and that, although, you know, our

5    relationship was fine and she didn't have a

6    problem with me personally, that it's just a very

7    difficult situation for her to be in.    And I

8    understood that.

9    Q.    Okay.    All right.

10          You mentioned Kelli now.    Are you

11    aware that, previously, Ms. Fischman had some

12    negative interactions with Kelli Troccoli?

13          MS. COLWIN:    Objection.

14    A.    I think they had negative interactions

15    with each other.

16    Q.    Had you been informed about that prior

17    to being rehired at the company?

18    A.    I don't think I was informed prior,

19    but I was certainly informed upon my arrival at

20    least.

21    Q.    Prior to your reemployment at the

22    company, did Ms. Costa ever indicate to you that

23    she desired to terminate Ms. Fischman?

24          MS. COLWIN:    Objection.

25          THE WITNESS:    Can you repeat that?

N. J. Oliva - CONFIDENTIAL

1

2      Q.      Can you tell me what that means?

3      A.      Those are her words.  I don't know

4  what they -- I wrote them down as what I heard her

5  say.

6      Q.      Okay.  Did you ask her what that

7  meant?

8      A.      Yes.

9      Q.      Is that how you got to the next

10  comment here, "she primarily" --

11      A.      Yes.

12      Q.      Did she describe to you the nature of

13  her difficulty with Kelli?

14      A.      I don't think she described the nature

15  of any of those.  I think she was listing them for

16  me.

17      Q.      Did you get into detail on any of

18  those individuals?

19      A.      At that meeting, no, I don't think so.

20      Q.      At some subsequent point, did you have

21  conversations about any of these relationships?

22      A.      Prior and subsequent, I think I had

23  conversations with Jennifer about these.  I don't

24  recall any conversation about Esther.

25      Q.      Okay.

N. J. Oliva - CONFIDENTIAL

1

2      A.     I think that was a little confusing to

3   me, why she would have a problem with Esther in

4   the office.  It doesn't make any sense, but that's

5   what she said.

6      Q.     Were you aware of any facts around the

7   time of this meeting, March 2016, that would cause

8   you to think that the relationship between

9   Ms. Fischman and Ms. Troccoli was strained?

10          MS. COLWIN:  Objection.

11      A.     Can you repeat that?

12          MR. BERMAN:  Can you read it back,

13          please.

14          (Whereupon, the requested question was

15          read back by the reporter.)

16      A.     Yes.

17      Q.     Can you relate those facts to me as

18   best you can?

19      A.     Yes.  Part of, or maybe all of Kelli's

20   complaint was that Jennifer didn't respect her

21   time out of office for medical reasons.  And, as I

22   understood it, again, that all occurred before I

23   got there.  But as I understood the record of

24   that, Jennifer had put the company at risk, and

25   the way that they handled that wasn't so good, and

1          N. J. Oliva - CONFIDENTIAL

2   there was a very strained relationship between

3   those two.  You can see, I think in some of the

4   e-mails that we produced that I recall,

5   communications that show they -- they were at odds

6   there.

7          Q.    As of the time of this meeting on

8   March 3, 2016, what was your understanding of the

9   relationship between Ms. Fischman and Ms.

10  Troccoli?

11         A.    Jennifer did not want to work with or

12  talk to -- I'm laughing, sorry.  Jennifer did not

13  want to work with or talk to Kelli nor Donna, who

14  was the president.  Neither of those were

15  acceptable.

16         Q.    Did Ms. Fischman relate to you her

17  reasons for not wanting to work with Kelli?

18         MS. COLWIN:  Objection.

19         A.    Probably she did, but I don't recall

20  what she said.  Maybe I have a note.

21         Q.    Did Ms. Fischman ever -- Mrs. Fischman

22  ever complain to you that --

23         A.    Can I go back?

24         Q.    Yes, sure.

25         A.    Some of the answer is actually in this

1          N. J. Oliva - CONFIDENTIAL

2    note, now that I look at it.  She had hurt

3    feelings.  Jennifer had hurt feelings that she

4    wasn't invited to a party at Kelli's house, those

5    kinds of things.  It's part -- partly here.

6    Sorry.

7         Q.    Did Ms. Fischman ever complain to you

8    that she felt Ms. Troccoli was trying to undermine

9    her?

10        A.    No.  Not that I remember.

11              MR. BERMAN:  Let's move on.  52.

12              (Plaintiff's Exhibit 52, two-page

13        document Bates stamped DEF-001831 through

14        001832, confidential, marked for

15        Identification, as of this date.)

16        Q.    Do you wish to say something,

17   Mr. Oliva?

18        A.    Yes, please.  You asked me about

19   whether she had communicated anything about the

20   nature of that relationship with Kelli, and it's

21   here, it's the second to last bullet.  I asked

22   several times what the underlying reason is, and

23   she says Kelli, and says the environment.  I dig

24   deeper.  She says, it's Kelli.  And she says I

25   don't need -- I, Nick, don't need to know why.

1        N. J. Oliva - CONFIDENTIAL

2   And I said to her, I do if I'm going to address

3   team issues, workplace issues, systematic issues,

4   and she agreed.  So here I am imploring her to

5   tell me what we can do about this situation.

6        Q.    How was that ultimately resolved?

7        A.    What ultimately happened, and I think

8   you see it in the note above, is that I requested

9   that she come into the office and that she do the

10  best to work as a team member, which is also

11  reflected in her performance review that year.

12  But she told me she'll do it and she'll do it for

13  me, but when she comes in, she's going to keep her

14  door closed and not talk to anybody.

15        So it wasn't a great resolution, but

16  considering where we were from when I walked in

17  the door, it was a step in the right direction.

18        Q.    Were there any subsequent steps in the

19  right direction after that?

20        A.    Um, things never got great with

21  Jennifer and others.  Certainly not with Donna or

22  Kelli, but things seemed to improve more

23  significantly with me.  Seemed to is the -- it's

24  the -- that's the key word.

25        MR. BERMAN:  Okay.  Let's move on to

1          N. J. Oliva - CONFIDENTIAL

2     Exhibit 52, which the reporter will hand you

3     momentarily.  And for identification, this

4     is a two-page document Bates stamped

5     DEF-001831 through 32.

6     Q.    Mr. Oliva, are you looking at the

7  document?

8     A.    Yes.

9     Q.    Have you seen it before?

10     A.    I must have.  It's an e-mail to me in

11  2016.

12     Q.    Okay.  So can I direct your attention

13  to the fourth bullet point?

14     A.    Yes.

15     Q.    Do you see where it says, Jennifer

16  received 25 percent bonus based on her acting GC

17  salary prorated for an eight-month period (per our

18  agreement with her), and it continues on from

19  there?

20     A.    Yes.

21     Q.    Do you know whether Ms. Fischman

22  received a 25 percent bonus?

23          MS. COLWIN:  Objection.

24     A.    I don't know.

25     Q.    Who would know?

1               N. J. Oliva - CONFIDENTIAL

2       A.      Jennifer.

3       Q.      Who else?

4       A.      Maybe the HR function.  Payroll.

5       Q.      Would Ms. Saunders know?

6       A.      If she recalls.  It's been a while.

7    She hasn't worked for the company in a while.

8       Q.      At the time, was she in the HR

9    function?

10      A.      Yes.

11      Q.      So at the time she wrote this e-mail

12   to you --

13      A.      But your question to me is -- is at

14   the -- I'm sorry to interrupt.  Your question to

15   me was at the time, would I have known if she

16   received this?

17           MR. BERMAN:  Let's withdraw that

18        question.  I'll try to break it up into

19        pieces.

20      Q.      At the time that this communication

21   was provided to you by Ms. Saunders, was Ms.

22   Saunders in a position to know Ms. Fischman's

23   bonus?

24      A.      Yes.

25      Q.      Okay.  So do you have any reason to

1                    N. J. Oliva - CONFIDENTIAL

2      believe that this bullet point is not correct?

3           A.    No reason.

4           Q.    And then as far as -- to the best of

5      your knowledge, does the compensation information

6      contained in this document appear to be correct?

7           A.    I have no reason to doubt it.

8           Q.    Did there come a time where there were

9      communication difficulties or communication issues

10     between Mr. Joshua Berman, Mrs. Jennifer Fischman

11     and Mr. Takimoto?

12          A.    That's a way of describing what

13     happened.

14               MR. BERMAN:   Let me rephrase the

15          question then.

16               THE WITNESS:   Okay.

17               MR. BERMAN:   All right?   I'll give you

18          a different -- I'll give you a temporal

19          period to try to bring this into context.

20          Q.    On or about October of 2016, were you

21     aware of any communication issues between those

22     three individuals?

23          A.    I think around that time I received a

24     complaint through Tomoji Minami by e-mail.

25               MR. BERMAN:   Let's mark this one,

1          N. J. Oliva - CONFIDENTIAL

2      please, 53.

3          (Plaintiff's Exhibit 53, a two-page

4      document Bates stamped DEF-876 through 877,

5      marked for Identification, as of this date.)

6          THE WITNESS:  I remember this e-mail.

7          MR. BERMAN:  Pause just one second,

8      Mr. Oliva.

9          For identification, this is a

10     two-pages, Plaintiff's 53.  It's Bates

11     stamped DEF-000876 through 000877.

12     Q.    Does this refresh your recollection as

13 to whether there were any communications issues

14 between Mr. Takimoto, Mr. Joshua Berman and

15 Ms. Jennifer Fischman -- Mrs. Jennifer Fischman?

16     A.    I would add that it's not just

17 Takimoto-san.  It's the MCC team clearly,

18 including Tomoji, and Utsunomiya-san, also,

19 probably.

20     Q.    Did you take any steps to resolve

21 these communication issues?

22          MS. COLWIN:  Objection.

23     A.    Yes.

24     Q.    What steps did you take to resolve it?

25     A.    I spoke to Jennifer.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    What did you say to her?

3          A.    I said -- I reminded her again of the

4     strategy and the importance of communicating, and

5     that we should have -- we need to keep them close.

6     I did not tell her that I received a complaint.

7               MR. BERMAN:  Okay.  The next exhibit

8          is 54.

9               (Plaintiff's Exhibit 54, multipage

10         document Bates stamped DEF-1419 to 1421,

11         marked for Identification, as of this date.)

12              MR. BERMAN:  This is a multipage

13         document Bates stamped DEF-1419 to 1421.

14         Q.    Mr. Oliva, are you looking at the

15    document?

16         A.    Yes.

17         Q.    Have you seen it before?

18         A.    Yes.

19         Q.    Can you tell me what it is?

20         A.    Let me just read it for a second.

21              Okay.

22         Q.    Have you seen this document before?

23         A.    Yes.

24         Q.    Can you tell me what it is?

25         A.    Yes.  It's Tomoji complaining about

1          N. J. Oliva - CONFIDENTIAL

2     the handling of the matter, and questioning Josh's

3     capability and whether he's the right litigator,

4     and whether this is going according to plan, and

5     whether we should consider changing outside

6     counsel firms.

7          Q.    Okay.   In response to these

8     communications, did you take any steps to

9     remediate Mr. Minami's concerns?

10         A.    I think this happened before the other

11    one.   I think I did have several conversations --

12    again, from the very beginning, I was very clear

13    with Jennifer and Josh when I spoke to him

14    directly about the strategy of this case.   And you

15    can see, essentially, what I communicated to them

16    multiple times is here.   We should remain calm.

17    We should not be combative.   We should not make

18    this case into something bigger than it is.   It's

19    a breach of contract case.   Bring them to the

20    table, let's negotiate, let's understand what

21    success looks like, let's maintain our composure.

22              And you can see in here that I also

23    say, I toned down the language of that filing

24    myself to make sure that the tone was serious, but

25    did not want us to appear combative, right?   This

1          N. J. Oliva - CONFIDENTIAL

2    is very simple; just remain calm and appropriate

3    in your communication.

4          So this is me responding that,

5    essentially, look, outside coun -- Josh is a

6    litigator, right?  This is what he does.  He

7    fights.  Right?  And that's fine.  That's his job.

8    I don't have any problem with the way he's doing

9    it.  We're managing it.  I'll manage it.  I'll

10   tone it down myself.  So I don't think we need a

11   different outside counsel.  I think we're in good

12   hands.

13         And, to your question, I had been

14   communicating about that strategy and that tone

15   from the beginning.  I'm confident that after I

16   received this, because now the client is upset and

17   he says specifically, Takimoto-san is skeptical

18   about Josh, right?  Takimoto-san is asking

19   questions, do we have the right outside counsel

20   here?  That's pretty serious, if my job is to make

21   sure that my client trusts us to handle litigation

22   in the U.S.

23         So, I say, don't worry, I'm involved

24   myself, it's okay, and, yes, I'm confident that

25   after this and after the other, and all the way

1          N. J. Oliva - CONFIDENTIAL

2     through, I reminded Josh and Jen -- Jennifer, and

3     Josh when I spoke to him directly, remember who we

4     are, remember how we comport ourselves.

5          Q.    After this communication and the one

6     that we just looked at in the prior Exhibit 53,

7     did you provide Mr. Takimoto with any reassurances

8     directly?

9          MS. COLWIN:   Objection.

10         Q.    Meaning other than through Mr. Tomoji,

11    because you indicated this was a serious concern,

12    right?

13         A.    I did not communicate directly to

14    Takimoto-san about this.

15         Q.    Okay.   Thank you.

16         A.    And if you want the spelling for

17    Utsunomiya-San, it's here.   I got it wrong when I

18    tried to do it by memory.   It's

19    U-T-S-U-N-O-M-I-Y-A.

20              MR. BERMAN:   I've got a series of

21         documents here.   What's the next one, 55?

22              THE REPORTER:   55.

23              MR. BERMAN:   Wait.   This one is

24         previously marked as 14.   Let's go with the

25         original.

1          N. J. Oliva - CONFIDENTIAL

2          THE WITNESS:  Okay.

3     Q.    Have you seen this document before?

4     A.    Yes.

5     Q.    Can you tell me what it is?

6     A.    Yes.  This is me very specifically

7  requiring written authorization to attend the ENE

8  in that capacity as the business representative

9  with authority to settle.

10     Q.    Is this a communication concerning

11  consideration of potential settlement amounts?

12     A.    This is specific to the ENE document

13  that I would hold, right?  And bring on behalf of

14  the business.  So this is me saying I want -- I

15  need a document that says I have unlimited

16  authority.  Right?  That's what the court

17  requires.  I need to be able to speak for the

18  company.

19          I asked Josh.  He says a board

20  resolution makes sense.  I know how it works in

21  Japan.  It's not like here.  It takes a while to

22  get on the agenda.  I don't know if we'll be able

23  to do that.  That's why I say, is it possible?

24  But I want written confirmation.  I want it to be

25  very, very clear.  For the purpose of going to

1          N. J. Oliva - CONFIDENTIAL

2     this, right, I need -- I need this.

3          So, Tomoji says, can you write it for

4     us?  And I say, you know, essentially, I'll --

5     basically, I asked Jennifer, or Jennifer to Josh

6     to write it.  And he -- and I say here, I might

7     propose an amount and higher, right?  If we have

8     to have an amount in there, what I'm supposed to

9     go with is unlimited, right?  So I would like

10    unlimited.

11         Q.    Okay.  So this was in the context of

12    your requesting a board resolution?

13         A.    This is in my -- this is in the

14    context of me requesting the document that I can

15    bring to the ENE that shows I have unlimited

16    authority.

17         Q.    And to get that, you contemplated a

18    board resolution?

19         A.    Yes.

20         Q.    Okay.

21         A.    Of MCC.

22         Q.    Understood.  Thank you.

23         This is prior to the first settlement

24    conference or the second settlement conference?

25    It's dated November 4, 2016 on the top of the

1          N. J. Oliva - CONFIDENTIAL

2    first page.

3          A.    It's got to be the first.

4          Q.    I'm going to show you Exhibit 15.  It

5    should be --

6          A.    This seems to be a continuation of

7    that, because I have the originals here, and then

8    some more.

9          MR. BERMAN:  Let the record reflect

10         that the witness is reviewing an exhibit

11         previously marked as Plaintiff's 15.

12         Have you seen this document before?

13         A.    Yes.

14         Q.    Can you tell me what it is?

15         A.    It's a continuation of the e-mail

16    chain that we just talked about.

17         Q.    Okay.  And directing your attention to

18    the second page marked DEF-1859.

19         Do you see a reference to 1.5 MM to

20    2.0 MM?

21         A.    Yes.

22         Q.    Are those numbers representative of

23    millions of dollars, where it says MM?

24         A.    Yes.

25         Q.    So is this a discussion of settlement

1          N. J. Oliva - CONFIDENTIAL

2    authority on the Genomatica matter?

3          MS. COLWIN:   Objection.

4          A.    Let me see if that's what it is.

5          Q.    Okay.

6          A.    I say, I will try to negotiate as much

7    as possible, but I need the authorization granted.

8    I have to have it in writing.  I have to know what

9    it is.  I'm not doing it without it.  I'm not

10   going there.  I'm not getting on a plane without

11   it.  And he says, it depends on Takimoto, based on

12   what we hear from Josh and Jennifer, and what we

13   start at the beginning, our position is very

14   strong.  So if we go to trial -- this is what he

15   says -- it means that we are likely to win and get

16   one and a half to 2 million if we go to trial.

17   Deducting legal fees of, you know, roughly half a

18   million.  That's why I think we're probably not

19   going to ask.  Takimoto will not ask for less than

20   1 million at this point.

21         Q.    Okay.  I don't see the word trial in

22   here, so is that your interpretation of the

23   meaning?

24         A.    We are likely to win.

25         Q.    So it's based on the word win?

1          N. J. Oliva - CONFIDENTIAL

2     A.    Yes.

3          MR. BERMAN:  Okay.  You can set this

4     one aside.  Now we'll look at 16.  Handing

5     the witness what has been previously marked

6     as Plaintiff's Exhibit 16.

7          The witness has been handed an exhibit

8     previously marked as Plaintiff's 16.

9          THE WITNESS:  Yes.  I know what this

10    is.

11    Q.    Can you tell me what this document is?

12    A.    Yes.  This is me taking great care to

13    be appropriate and compliant and make sure I have

14    what I need before I make any action on behalf of

15    MCC.

16         I heard from MCC that they want, you

17    know, not less than a million, or that's what

18    they're thinking, they might be entitled to, you

19    know, a win.  They might think they're going to

20    win, and that might be 2 million minus 500K.

21         And I write to Josh and say, I need a

22    little help here, because I'm going to go there

23    and tell the ENE that I have full and complete

24    settlement authority, what is my authority?  Can

25    you please draft it so that I have what I need for

1                N. J. Oliva - CONFIDENTIAL

2    that ENE.  That's why I say, but note the

3    financial limitation language in the text.  My

4    reading is, I need to go there with full

5    authority.

6         Q.    Did this language ultimately make it

7    into the document that you received to authorize

8    you to participate in the ENE?

9         A.    Josh drafted appropriate language.

10            MR. BERMAN:  I'm going to show you

11        Plaintiff's Exhibit 13.  The witness has

12        been handed an exhibit previously marked as

13        Plaintiff's Exhibit 13.

14         Q.    Mr. Oliva, have you seen this document

15    before?

16         A.    Yes.

17         Q.    Can you tell me what it is?

18         A.    This is the authorization letter that

19    I specifically requested giving me full authority

20    for the purposes of the ENE on that date.

21         Q.    So this was for the first of the two

22    settlement conferences?

23         A.    Yes.

24         Q.    Was a copy of this letter provided to

25    Ms. Fischman at any point?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3     A.    I don't know the answer to that.

4     Q.    Do you know if this would have been in

5  to the file for the matter?

6     A.    I think she was probably copied on the

7  receipt of these documents from MCC.

8     Q.    Okay.  Thank you.

9     A.    But I don't know for sure.

10         MR. BERMAN:  Thank you.  I think we're

11         going to move on to Exhibit 17.

12         The witness has been handed a copy of

13         an exhibit previously marked as Exhibit

14         Plaintiff's 17.

15    Q.    Are you looking at the document?

16    A.    I am.

17    Q.    Have you seen it before?

18    A.    Yes.

19    Q.    Can you tell me what it is?

20    A.    This is Jennifer communicating to the

21  client that we need this letter that I have

22  requested drafted by Josh Berman, presumably.

23    Q.    If you turn to the very first page of

24  the document, do you see at the top where it says,

25  from Nicholas, and then it has U.S.A. 7375, and

1           N. J. Oliva - CONFIDENTIAL

2    then it says Oliva?

3           Does this reflect an e-mail that you

4    sent to Jennifer and Tomoji and copied Mr. Berman

5    and Mr. Jouhei on?  I'm looking at the very first

6    page of the document marked Plaintiff's 17.

7           Are we on the same --

8    A.    Yes.

9    Q.    Okay.

10   A.    But you're asking me if this e-mail is

11   reflected in the body of the e-mails on the second

12   page, so.

13   Q.    Okay.  The bottom of the very first

14   page, where it says, Dear Takimoto-san and Tomoji,

15   is that a communication from you?

16   A.    I'm not sure, because my e-mail is to

17   Jennifer up here, copying Josh.  But, yes,

18   clearly, when you turn the page, this says, best

19   regards, Nick.  Josh and I spent over four hours

20   in a settlement conference with the judge today.

21   Q.    So I see that Tomoji Minami is one of

22   the recipients on the "to" line on the first page?

23   A.    Correct.

24   Q.    So did you perhaps intend to have

25   Mr. Minami pass this on for you?

1          N. J. Oliva - CONFIDENTIAL

2     A.    Takimoto-san's copied.

3     Q.    Are we looking at the same thing?  I'm

4  looking --

5     A.    Yes.

6     Q.    -- at Plaintiff's Exhibit 17 and I'm

7  looking --

8     A.    Takimoto-san's copied under c.c.,

9  under Josh Berman.

10     Q.    Oh, that Mr. Johei Takimoto, okay,

11  that's what you're referencing as c.c.  I see.

12  Okay.

13     A.    No problem.

14     Q.    No, I just -- because I was looking at

15  the "to" line.  Okay.

16     A.    I probably should have put

17  Takimoto-san in the "to" line and Jennifer in the

18  copy line.

19     Q.    Okay.  Thank you for clarifying.

20          MR. FORTINSKY:  And I believe you had

21          pronounced Jo-Hay (phonetic) the other day.

22          THE WITNESS:  Yes.

23     Q.    Is this communication an accurate

24  reflection of the status of the matter at the time

25  this communication was sent?

1          N. J. Oliva - CONFIDENTIAL

2     A.    I would expect it was.

3     Q.    Do you see the sentence in the middle

4  of the first full body, beneath the redaction?  It

5  states, "we finally offered 2.0, with deferred

6  payments over time and interest)."

7          Do you see that statement?

8     A.    Uh-huh.

9     Q.    Was there a settlement offer of 2.0

10 million dollars made in connection with this

11 matter?

12         MS. COLWIN:  Objection.

13    A.    It says what it says.  I don't recall.

14    Q.    What I'm asking is, does the 2.0 refer

15 to $2 million?

16    A.    That would be million.

17    Q.    All right.  That's my question.  Okay.

18         MR. VALLI:  And just to clarify,

19         Matthew, it wasn't offered, it was demanded.

20         And I hate when they do this all the time.

21         MR. BERMAN:  Okay.  Understood.  The

22         text says offered, that's why.

23         Let's move on.

24         (Plaintiff's Exhibit 55, a three-page

25         document Bates stamped DEF-002307 through

1          N. J. Oliva - CONFIDENTIAL

2     002309, confidential, marked for

3     Identification, as of this date.)

4          MR. BERMAN:  For identification, this

5     is a three-page document Bates stamped

6     DEF-002307 through 2309.

7          THE WITNESS:  Okay.

8     Q.    Are you looking at the document?

9     A.    Yes.

10    Q.    Have you seen it before?

11    A.    Yes.

12    Q.    Can you tell me what it is?

13    A.    This is Josh reporting to us that we

14    have the opportunity to make our demand, right?

15    That the case is going well for us.  He says, they

16    are scared.  So he proposes a counter.

17    Q.    Do you see the line there that says,

18    "shall we discuss," from Mr. Berman to

19    Ms. Fischman, and copying you?

20    A.    Yes.

21    Q.    Was there ultimately a discussion

22    resulting from this communication?

23    A.    I don't recall.

24    Q.    Okay.

25    A.    I say, "let's talk tomorrow," so

1          N. J. Oliva - CONFIDENTIAL

2    presumably -- I don't know.

3          Q.    Now, turning to the top of the first

4    page, there's a comment from Ms. Fischman to Josh.

5    It says, "this is a meaningful start.  It's still

6    worse than where we were before litigation."

7               Do you know what that means?

8          A.    Yes.  This is Jennifer's reaction.

9    She goes very aggressively.  So in the face of

10   good news, I say "excellent," basically saying it

11   looks like we're going to be able to resolve this

12   and maybe even have a meaningful business

13   relationship with Genomatica going forward.  And

14   Jennifer's reaction is, you know, this is

15   nothing -- you know, this is meaningful, but it's

16   still worse.  And I think she's probably intending

17   to ask for more, be more aggressive.  So that's

18   what I expect she meant by this.

19         Q.    Do you have any understanding of why

20   there would be a comment that this was worse than

21   before litigation?  Do you know what that means?

22              MS. COLWIN:  Objection.

23         A.    I think that if you add everything up,

24   it may have been closer to 3 million total that

25   was owed.  But, of course, we have attorneys' fees

1        N. J. Oliva - CONFIDENTIAL

2   and other costs and things, of course, so.

3        Q.    Okay.  Thank you.

4        A.    She may have not been considering the

5   entire picture.

6        Q.    I'm going to hand you an exhibit

7   that's previously marked Exhibit 18.  Plaintiff's

8   18.

9        A.    This answers your question before

10  about whether there was a meeting.  I wasn't

11  included.  Jennifer said specifically she spoke to

12  Josh.

13       Q.    I'm sorry, what are you looking at

14  right now?  Are you looking at page 18 --

15       A.    1810.  Yeah.

16             I spoke to Josh briefly.  So Josh

17  says, "shall we discuss?"  What's missing is me

18  saying, sure, tomorrow.  That's intervening.

19  Jennifer writes to me, "I spoke to Josh."

20             So your question before was, was there

21  a meeting.  There was a meeting, but I wasn't

22  included.

23       Q.    Okay.  And that's the communication

24  dated 12/29/2016 that you're referring to at the

25  bottom of the second page?

N. J. Oliva - CONFIDENTIAL

1

2     A.     Yes.

3     Q.     And then up above that, there's a

4  communication from you to Jennifer saying,

5  "Thanks.  Isn't that asking for everything and not

6  settlement?"

7     A.     Exactly.

8     Q.     What does that communication mean?

9     A.     This is me challenging Jennifer that

10 if -- you know, let's get back to the strategy of,

11 yet again, what's the point of this litigation?

12 What are we trying to do here?  What are we trying

13 to accomplish?

14        Now that Josh has said, "looks like

15 they're scared," Jennifer is going all in, you

16 know, let's get as much as we can, that kind of

17 very aggressive tone, which was not the strategy

18 from the beginning.  This was a simple case.

19        And what she says here is, I don't

20 want to counter with anything less than 2.5 and a

21 royalty license.  And that's why I write back,

22 well, wait a minute.  If the entire -- I didn't

23 write all of the principals here, but if the

24 entire case is roughly worth, you know, 3 million,

25 and we have to pay attorneys' fees and everything,

1          N. J. Oliva - CONFIDENTIAL

2    are you actually moving towards settlement?  Are

3    you actually moving this case along in a

4    meaningful way for the client that we have?

5          I understand that strategy.  I

6    understand going for more, but that's not what we

7    talked about this entire time.  So aren't you

8    asking for everything and not reasonably, you

9    know, providing a settlement conversation?

10        Q.    Okay.  Then directing your attention

11   to the bottom of the first page.  Does this

12   reflect an e-mail from Jennifer to you dated

13   December 29, 2016?

14        A.    Yes.

15        Q.    Where she says in the body of the

16   message -- she's responding to your query, right,

17   and she says, "well, not really, because we are

18   giving up interest (500K) and the patents and the

19   lawsuits.  $1.5 over 4 years doesn't get it done

20   either, right?  But we can discuss how to approach

21   on Tuesday."

22        Do you have an understanding of what

23   was meant by this communication?

24        MS. COLWIN:  Objection.

25        A.    I don't know what Jennifer meant, but

1          N. J. Oliva - CONFIDENTIAL

2     she's responding to me saying, aren't you asking

3     for everything?  And she comes back and says, no,

4     I don't think I'm asking for everything.  But, in

5     my opinion, going at them with 2.5 was maybe a

6     lot.

7          Q.    Okay.

8          A.    But again, I'm questioning, right?

9     This is not me demanding.  I'm saying, aren't you

10    asking for a lot?  Is that really settlement?

11         Q.    Okay.  And the bottom line there where

12    it says, "but we can discuss how to approach on

13    Tuesday."  Did you have a subsequent discussion on

14    Tuesday?

15         A.    I don't remember.

16         Q.    So the Tuesday after December 9th

17    would have been January 3rd.  Do you know if you

18    had a discussion with Ms. Fischman on January 3rd?

19         A.    I don't remember.

20         Q.    Do you know if you had a discussion

21    with Ms. Fischman in connection with that

22    communication she sent any time that week?

23         A.    I don't think so.  I don't remember.

24         Q.    Do you know if you had a discussion

25    with Ms. Fischman concerning the Genomatica matter

1           N. J. Oliva - CONFIDENTIAL

2    on January 5th?

3           A.    I don't think so.

4           Q.    What do you mean you don't think so;

5    is that a yes or a no?  I don't understand what

6    you're --

7           A.    Well, I said I don't think so many

8    times before.  This is the first time you're

9    asking what I mean by it.  It means I don't think

10   I had that meeting, but I don't recall.

11          Q.    Okay.  Do you recall being present at

12   an unemployment insurance hearing in connection

13   with Ms. Fischman's application for employment

14   insurance benefits?

15          A.    Yes.

16          Q.    Do you recall telling the

17   administrative law judge that there was a meeting

18   on January 5th?

19          MS. COLWIN:  Objection.

20          A.    No.

21          MR. BERMAN:  Mark this as 56.

22          MS. COLWIN:  Do you have the whole

23       transcript?

24          MR. BERMAN:  I mean, I could produce

25       the entire transcript.  I've provided an

1        N. J. Oliva - CONFIDENTIAL

2    excerpt which contains the material before

3    and after.  I think that's --

4        MS. COLWIN:  All right.  Let me see --

5        MR. BERMAN:  -- sufficient.  We can

6    pull out the entire transcript, if you want.

7    I don't think it's really necessary.

8        (Plaintiff's Exhibit 56, a multipage

9    document, first page being the cover page of

10   a hearing transcript dated September 7,

11   2017, followed by excerpts, marked for

12   Identification, as of this date.)

13       MR. BERMAN:  For identification,

14   Plaintiff's 56 is a multipage document.  The

15   first page is the cover of a transcript of a

16   hearing dated September 7, 2017 in the

17   matter of Jennifer Fischman and Mitsubishi

18   Chemical Holdings, case number 17-13333.

19   And the second page, and thereafter, are the

20   portions of the transcript that are

21   excerpted from page 60 consecutively through

22   page 65, and the witness is looking over the

23   exhibit.

24   Q.    Let me know when you're ready.

25   A.    Okay.

N. J. Oliva - CONFIDENTIAL

1

2      Q.    Mr. Oliva, do you recall giving

3  testimony at an unemployment insurance hearing on

4  September 7, 2017?

5      A.    Yes.

6      Q.    Do you have any reason to believe that

7  the transcript excerpt that you're looking at is

8  inaccurate in any way?

9            MS. COLWIN:  Objection.

10     A.    No.

11     Q.    So are you aware that Ms. Fischman

12  claims that she had a meeting with you on or about

13  January 5th of 2017 concerning the Genomatica

14  matter?

15           MS. COLWIN:  Objection.

16     A.    Yes.

17     Q.    Do you know whether such a meeting

18  took place?

19     A.    I don't recall.

20     Q.    Okay.  Did you have a discussion with

21  Ms. Fischman at any point in January of 2017

22  concerning a $2.3 million settlement demand in

23  connection with the Genomatica matter?

24     A.    I think by e-mail.  I think there's an

25  e-mail conversation around 2.3.  But, again, all

1          N. J. Oliva - CONFIDENTIAL

2     subject to --

3          Q.    Is that one --

4          A.    -- MCC --

5          Q.    -- of the e-mails we looked at today?

6               MS. COLWIN:  Don't interrupt him,

7          Matt.

8               MR. BERMAN:  I'm sorry.

9               MS. COLWIN:  Leave him finish his

10         answer.

11         Q.    Did you finish your --

12              MS. COLWIN:  "All subject to MCC" is

13         what I heard.  I don't know if Bonnie got

14         it.

15              THE REPORTER:  Yes.

16         Q.    Did you have an opportunity to

17    complete your response?

18         A.    I think so.

19              MS. COLWIN:  Would you read back his

20         response, just to make sure.

21              (Whereupon, the requested answer was

22         read back by the reporter.)

23         Q.    Is that based upon the e-mail or based

24    upon a verbal conversation that you had?

25         A.    Is what based upon an e-mail or what

1          N. J. Oliva - CONFIDENTIAL

2    based upon a verbal?

3          Q.    Your last response indicated that

4    there was an e-mail communication concerning a

5    settlement demand of $2.3 million, correct?

6          MS. COLWIN:  Objection.

7          A.    I said there may be an e-mail that

8    talks about the number 2.3.

9          Q.    Okay.  That's not one of the documents

10   we've looked at today, is it?

11         A.    I don't recall.

12   RQ        MR. BERMAN:  I don't think so.

13            To the extent it hasn't already been

14         produced, we call for the production of any

15         communication representing a $2.3 million

16         offer.

17            MS. PRIMAVERA:  It's in there.

18         Q.    And then with respect to the portion

19   of your response that said subject to -- how did

20   you phrase it?  Subject to what?

21         A.    MCC's approval.  They're the client.

22         Q.    Okay.

23         A.    We can talk all we want about what

24   might be acceptable or what might be appropriate,

25   but, ultimately, MCC is the client.  You saw the

1          N. J. Oliva - CONFIDENTIAL

2    lengths to which I went to make sure I had very

3    clear authority to go to that ENE for a very

4    specific day.

5          Q.    Okay.    The portion of your response

6    focussed on the approval of MCC, is that in a

7    written communication somewhere?

8          MS. COLWIN:    Objection.

9          A.    I don't know.

10         Q.    Do you have any written material

11   reflecting your admonishment to Ms. Fischman to

12   obtain the client's approval in connection with a

13   $2.3 million settlement demand?

14         MS. COLWIN:    Objection.

15         A.    Number one, I would say I don't need

16   that, because she's a lawyer, and lawyers have to

17   get the authority of settlement from their

18   clients, and that's really clear.    That's not

19   something you have to talk about every day.    But

20   it is something that I communicated with Jennifer

21   about very carefully on multiple occasions, that,

22   given this client, given this situation, given the

23   level of trust, we have to make sure they're

24   aware.

25               And you do see two complaints that

1          N. J. Oliva - CONFIDENTIAL

2     they're saying, what's going on?  We don't even

3     know what's happening.  So, yes, I am confident I

4     communicated to Jennifer that they should know all

5     relevant details and material.

6          MR. BERMAN:  I object to the portion

7          of your response that's not responsive to my

8          question, which is whether you have any

9          writings contemporaneous with that

10         instruction to Ms. Fischman.

11         MS. COLWIN:  I'm just going to object

12         to that.

13         MR. BERMAN:  You can object.

14         You can answer.

15    Q.    Do you have any writings that reflect

16    that?

17    A.    I don't know.

18    Q.    In your capacity as an attorney,

19    either at MCC -- excuse me -- either at MCHA or at

20    Bristol-Myers Squibb or at your subsequent

21    position at -- how do you pronounce it?

22         MS. COLWIN:  Catalent.

23    Q.    Catalent?  In any of those positions,

24    were you primarily responsible for litigating

25    matters?

1          N. J. Oliva - CONFIDENTIAL

2               MS. COLWIN:  Objection.

3      A.    No.

4      Q.    Okay.

5      A.    We had litigation groups, very big

6  departments, like 200 lawyers, as opposed to MCHA

7  that had, as you know, less than ten.

8      Q.    So have you ever personally litigated

9  a matter where you obtained settlement authority

10  on behalf of a client?

11          Have you ever personally litigated a

12  matter where you have received settlement

13  authority from a client?

14               MS. COLWIN:  Objection.

15      A.    Not that I recall.

16      Q.    But you have an understanding about

17  how settlement authority works, correct?

18      A.    Indeed.

19               MS. COLWIN:  Objection.

20      Q.    Okay.  So in the face of an express

21  authorization to make a settlement demand, doesn't

22  an attorney have discretion to make any settlement

23  offer or demand within that expressed grant of

24  authority?

25               MS. COLWIN:  Objection.

1          N. J. Oliva - CONFIDENTIAL

2     A.    That's not what happened here.

3     Q.    That wasn't my question, sir.

4     A.    It depends on the circumstance.

5     Q.    Well, we looked earlier at a grant of

6    authority in connection with an ENE, right?  And I

7    understand that your position is that that grant,

8    although it's couched in terms that are express,

9    was more limited; is that a fair characterize?

10          MS. COLWIN:  Objection.

11    A.    It's specific to the ENE.

12    Q.    Okay.  We -- I think we agree on that.

13   I don't think that's in dispute, that your

14   position is that it's confined to the ENE, right?

15   Is that a fair representation?

16          MS. COLWIN:  Objection.

17    A.    That it's not just my position.  It

18   says so in the document.

19    Q.    Well, would you care to look at the

20   document again?  What number was that, 13?

21    A.    The document speaks for itself.

22    Q.    All right.  Then, that's fine.

23          So, if you had a document with an

24   express grant of authority to settle the matter

25   for 2.0 million or higher, can we agree that you

1          N. J. Oliva - CONFIDENTIAL

2    have authority to make a demand of 2.1 million?

3          MS. COLWIN:  Objection.  Don't answer

4        hypotheticals.  You can mark it for a

5        ruling.

6          MR. BERMAN:  You can answer, unless

7        you're instructed not to by counsel.

8          MS. COLWIN:  Don't answer any

9        hypotheticals.  We'll get a ruling.

10         MR. BERMAN:  Is that an instruction

11       not to answer?

12         MS. COLWIN:  Yes.

13   RL     MR. BERMAN:  Okay.  Please mark it for

14       a ruling.

15     Q.    Do you know whether you were in the

16   office on January 5th of 2017?

17     A.    I don't recall.

18     Q.    Would there be any written record that

19   would reflect whether you were in the office on

20   that day?

21     A.    I don't know.

22     Q.    Do you know whether Ms. Fischman was

23   in the office on January 5th, 2017?

24     A.    I don't recall.

25     Q.    Do you know whether there would be any

1          N. J. Oliva - CONFIDENTIAL

2    written record that would reflect whether she was

3    in the office that day?

4          A.    Same answer.

5          Q.    Do you know whether you were in the

6    office on January 10th of 2017?

7          A.    I don't recall.

8          Q.    Would there be any written record that

9    would reflect your presence in the office that

10   day?

11         A.    Same answer.

12         Q.    Do you know if Ms. Fischman was in the

13   office on January 10th of 2017?

14         A.    Same answer.

15         Q.    Would there be any written record that

16   would answer that question?

17         A.    Same answer.

18         Q.    Do you know whether Mr. Takimoto came

19   to visit MCHA on January 10th of 2017?

20         A.    I know Takimoto-san came to visit.  I

21   don't know if it was January 10th.

22         Q.    On the occasion Mr. Takimoto's visit,

23   did you greet him?

24               MS. COLWIN:  Objection.

25         A.    I'm sure I was not the first person to

1          N. J. Oliva - CONFIDENTIAL

2     meet with Takimoto-san.

3          Q.   Okay.  Setting apart who met with him

4     first, did you meet him that day?

5          A.   I did.

6          Q.   Can you place in time for me

7     approximately when that visit took place?

8          A.   What time during the day?

9          Q.   No.  What time of the year did that

10    take place?

11         A.   Oh.  I don't recall exactly.

12         Q.   Did Mr. Takimoto visit --

13         A.   I think it was January.  Sorry.

14         Q.   So, to the best of your recollection,

15    Mr. Takimoto visited approximately in January of

16    2017?

17         A.   That sounds right.

18         Q.   Do you know whether it was before

19    January 19, 2021?

20         A.   I don't recall.

21         MR. VALLI:  January 19, 2017.

22         MR. BERMAN:  Sorry.  Thank you.

23         Q.   Do you know whether Mr. Takimoto

24    visited MCHA before January 19 of 2017?

25         MS. COLWIN:  Objection.

N. J. Oliva - CONFIDENTIAL

1

2      A.    I think the answer is yes.

3      Q.    Okay.  Was there --

4      A.    Because I'm starting to recall that --

5  the events of January 19.  So I think it was yes.

6      Q.    Okay.  So on the occasion of

7  Mr. Takimoto's visit, did you have a meeting with

8  him?

9      A.    Yes.

10      Q.    Who was present at the meeting?

11      A.    Jennifer.

12      Q.    Was anyone else present?

13      A.    No.

14      Q.    Was the Genomatica matter discussed at

15  that meeting?

16      A.    Yes.

17      Q.    Was there any discussion of the amount

18  of any settlement demand in the Genomatica matter

19  at that meeting?

20      A.    No.

21      Q.    Without revealing any privileged

22  communications, are you able to convey to me what

23  was discussed during that matter -- during that

24  meeting?  Excuse me.

25      A.    Yes.  As is typical when an executive

1              N. J. Oliva - CONFIDENTIAL

2    from Japan travels, they meet with the teams that

3    are supporting them, and they use the New York

4    office for that purpose.  And Jennifer and I were

5    working on matters for Takimoto-san and MCC,

6    including Genomatica.

7              So, I do recall meeting with him for a

8    short period of time and talking at a high level

9    about the matters and the strategy and the status

10   and those kinds of things.  It was a -- kind of a

11   typical meet-and-greet conversation about status

12   and potential -- potential outcome, and maybe next

13   steps, those kinds of things.

14        Q.    Did you take any notes in connection

15   with that meeting?

16        A.    I don't think so.  It's possible.

17        Q.    If you took those notes, where would

18   they be?

19        A.    Produced.

20        Q.    I mean, would they be in your files at

21   work?

22        A.    No.  It would be by e-mail, or I would

23   have written -- as I mentioned before, if I took

24   notes about that meeting, I would have either

25   written to Takimoto-san, saying it's nice to meet

1          N. J. Oliva - CONFIDENTIAL

2  you, as we discussed, ABC, or I would have written

3  a note to myself by e-mail.

4  RQ          MR. BERMAN:  To the extent they

5          haven't been produced already, we call for

6          the production of any notes of the meeting

7          just described by the witness.

8              Next exhibit, please.

9              (Plaintiff's Exhibit 57, a two-page

10         document Bates stamped DEF-002315 through

11         002316, confidential, marked for

12         Identification, as of this date.)

13             MR. BERMAN:  For identification,

14         Plaintiff's 57 is a two-page exhibit Bates

15         stamped DEF-002315 through 16.

16     Q.    Are you looking at the document?

17     A.    Yes.

18     Q.    Have you seen it before?

19     A.    Yes.

20     Q.    Can you tell me what it is?

21     A.    This is Genomatica making an offer and

22  Josh countering with a settlement offer on behalf

23  of MCC.

24     Q.    Okay.  Do you see in the reference to

25  the body, there's a mention of a 2.3 million

1                    N. J. Oliva - CONFIDENTIAL

2       figure?

3          A.    Yes.

4          Q.    Is that the $2.3 million e-mail that

5       you were referring to previously?

6                MS. COLWIN:   Objection.

7          A.    No.

8          Q.    There's a separate communication?

9                MS. COLWIN:   Objection.   That's not

10               his testimony.

11         Q.    Were you referring to something else?

12         A.    I think there's a document or an

13      e-mail concerning the possibility of 2.3 that's

14      not this document.

15         Q.    Okay.  If we should come across that

16      document during the remainder --

17         A.    Uh-huh.

18         Q.    -- of your testimony, will you please

19      let me know?

20         A.    Yes.

21               MR. BERMAN:   That's it.  Let's move on

22               to the next one.

23               (Plaintiff's Exhibit 58, a three-page

24               document Bates stamped DEF-000884 through

25               000886, marked for Identification, as of

1          N. J. Oliva - CONFIDENTIAL

2      this date.)

3          MR. BERMAN:  For identification,

4      Plaintiff's 58 is a three-page document

5      Bates stamped DEF-000884 through 886.

6          THE WITNESS:  Okay.

7      Q.    Are you looking at the document?

8      A.    Yes.

9      Q.    Have you seen it before?

10     A.    Yes.

11     Q.    Can you tell me what it is?

12     A.    This is Tomoji complaining that they

13 were surprised at the meeting the night before

14 that Josh had made a settlement offer without

15 their approval.

16     Q.    Okay.  Is there a time difference

17 between the U.S. and Japan?

18     A.    Yes.

19     Q.    Do you know what it is?

20     A.    It's approximately 12 or 13 hours.

21     Q.    Depending on where in Japan you are?

22     A.    Depending on time -- depending on

23 daylight savings.

24     Q.    With respect to the time difference

25 between New York and Tokyo, do you know what it

1          N. J. Oliva - CONFIDENTIAL

2    is?

3          A.    Depends on whether it's daylight

4    savings or not.

5          Q.    And if it's daylight savings, what is

6    it?

7          A.    I think it's 13 hours, so, right now,

8    I think it's plus one.  I think it's a 13-hour

9    difference.

10         Q.    When it's daylight savings, what is

11   it?

12         A.    I'm not sure.

13         Q.    Okay.

14         A.    I looked it up on an app to make sure

15   I have the right time.

16         MR. BERMAN:  Thank you.  You can set

17         this aside.

18         Q.    This is not the $2.3 million e-mail

19   you referenced earlier, right?

20         MS. COLWIN:  Objection.

21         A.    Correct.

22         MR. BERMAN:  New exhibit.

23         (Plaintiff's Exhibit 59, a two-page

24         document Bates stamped DEF-844 through 845,

25         confidential, marked for Identification, as

1           N. J. Oliva - CONFIDENTIAL

2      of this date.)

3           MR. BERMAN:  For identification,

4      Plaintiff's 59 is a two-page document Bates

5      stamped DEF-844 through 845.

6      Q.   Are you looking at the document?

7      A.   Yes.

8      Q.   Have you seen it before?

9      A.   I have.

10     Q.   Can you tell me what it is?

11     A.   This is me having seen Tomoji's

12  complaint, communicating to Jennifer while I was

13  in Donna Costa's office that Josh may have made an

14  offer without approval, and I giving Jennifer the

15  benefit of the doubt, saying, Jennifer, I don't

16  know what's happened here, but did Josh send out

17  information about a 2.3 offer without approval

18  from MCC.

19           And Jennifer's response.  Yes, I,

20  Jennifer authorized it, because I was home sick,

21  because the day for a response came, because you

22  and I had discussed, I thought it was consistent

23  with MCC, so I authorized him to make it.

24     Q.   Okay.

25     A.   I, Jennifer.

1           N. J. Oliva - CONFIDENTIAL

2      Q.   Did you respond to this message?

3      A.   Did I respond to this message?  I --

4   did I respond to this message?  I'm not sure.  We

5   could look.  I'm sure that's it.

6      Q.   Okay.  There's a comment here that you

7   just read that included you -- it says on the

8   document "you and had discussed."  You read it a

9   little differently, right?

10      A.   Uh-huh.

11      Q.   So do you have any -- what was your

12   understanding of what she meant by that?

13           MS. COLWIN:  Objection.

14      A.   Yeah, I don't know what my

15   understanding was at the time.  Probably that she

16   thought we had discussed, which is not the same

17   thing as getting authority of the client.

18      Q.   Did you and Jennifer discuss the

19   issue?

20      A.   Well, you can see from the --

21           MS. COLWIN:  Objection.

22      A.   -- from the e-mail before, there's a

23   discussion where I say, aren't you asking for

24   everything?

25           MR. BERMAN:  Okay.  Let's go to the

1        N. J. Oliva - CONFIDENTIAL

2        next exhibit.

3            (Plaintiff's Exhibit 60, a two-page

4        document Bates stamped 842 to 843,

5        confidential, marked for Identification, as

6        of this date.)

7            MR. BERMAN:  For identification,

8        Plaintiff's 60 is a two-page document Bates

9        stamped 842 to 843.  DEF-842 to 843.

10            THE WITNESS:  Okay.

11        Q.    Are you looking at the document?

12        A.    Yes.

13        Q.    Have you seen it before?

14        A.    Yes.

15        Q.    Can you tell me what it is?

16        A.    Yes.  This is Jennifer, without

17    talking to me about how to handle this matter,

18    shooting off an e-mail to Tomoji saying that this

19    is her -- her mea culpa e-mail.  This is her

20    saying that she was home sick and she thought it

21    was fine, and I believe there's no harm.

22            But this is, again, not with my input.

23    In fact, she didn't even copy me.  And then

24    afterwards she said, oh, yeah, sorry, I didn't

25    copy you, but I sent a mea culpa e-mail to

1           N. J. Oliva - CONFIDENTIAL

2   describe.  This is Jennifer's admission that she,

3   by her authority, she sent a -- she directed Josh

4   to make a settlement offer without authority.

5           Q.   This communication on the first page

6   is sent two minutes after the initial

7   communication, correct?

8                MS. COLWIN:  Objection.

9           A.   Yes.  But you can imagine that any

10  reply to Jennifer here would not include me.

11               MR. BERMAN:  Okay.  Understood.

12               Let's go to the next exhibit here.

13               (Plaintiff's Exhibit 61, a two-page

14          document Bates stamped DEF-000485 through

15          486, confidential, marked for

16          Identification, as of this date.)

17               MR. BERMAN:  For identification,

18          Exhibit 61 is a two-page document Bates

19          stamped DEF-000485 through 486.

20          Q.   Are you looking at the document?

21          A.   Yes.

22          Q.   Have you seen it before?

23          A.   Yes.

24          Q.   Can you tell me what it is?

25          A.   This is me communicating to Ken

1          N. J. Oliva - CONFIDENTIAL

2   Fujiwara that I have to terminate Jennifer and the

3   reasons why.

4          Q.    Do you see the part on the document at

5   the end of the second to last full paragraph, "I

6   plan to deliver the news of termination on Monday,

7   January 30th"?

8          A.    Yes.

9          Q.    So you wrote this on Sunday, January

10  22, correct?

11         A.    Yes.

12         Q.    What was the reason for delivering the

13  news eight days later?

14         MS. COLWIN:   Objection.

15         A.    It says so here.   We had a preexisting

16  business trip to California, and I considered

17  whether I could call Jennifer in and terminate her

18  immediately, but it was -- that's not -- it wasn't

19  a feasible option, too disruptive to the business,

20  and not really possible, given everything we had

21  to do to prepare for that.   So we determined to go

22  ahead with the business meeting and terminate her

23  on the return.

24         Q.    What was the purpose of the trip?

25         A.    So the primary purpose of the trip was

1          N. J. Oliva - CONFIDENTIAL

2    to visit a company called Aldila, which is in the

3    carbon fiber business, and for me to communicate

4    to the president of that company that we were

5    going to not only essentially reduce their entire

6    workforce of approximately 40 people, but that we

7    hoped, and I was there to implore him, that

8    although he was also being terminated, that he

9    would deliver the news to people.

10        Q.    Was there a secondary purpose of the

11   trip?

12        A.    While we were in California, we -- of

13   course, you don't take a business trip, especially

14   on budgets like we have, internal legal

15   departments, without trying to make the most of

16   it.  So we decided to visit as many of the carbon

17   fiber businesses as possible.  And the reason --

18   the primary reason for that -- the primary reason

19   for the visit was the Aldila reduction and that

20   very sensitive conversation.

21            The primary reason to visit those

22   other companies was that, at this time, early

23   January '17, we were preparing for a significant

24   merger that would bring the Rayon group companies,

25   of which carbon fiber businesses were a apart,

1          N. J. Oliva - CONFIDENTIAL

2     into the Mitsubishi Chemical Corporation group.

3          And so we had historically not had

4     very close relationships with them.  They were

5     served by Mitsubishi Rayon Corporation.  And as of

6     April 1, 2017, they were going to, and, in fact,

7     were merged in -- both in Japan and the U.S., a

8     merger that I handled from our office; and

9     visiting these clients was really important

10    because they were going to be part of the

11    consolidated group as of April 1.  And only a

12    select few people at those companies actually knew

13    it.

14         And then the additional purpose, the

15    third purpose, would be, while we're there, to

16    deliver compliance training, to give us an

17    opportunity to meet people from, you know, factory

18    line folks to executives, and talk to people about

19    legal and compliance subjects.  It also helps,

20    because when you're there, that's when people

21    sometimes open up and communicate to you.

22    Q.     So with respect to the compliance

23    training portion that you just -- first of all,

24    did you have an opportunity to complete your

25    answer?

1          N. J. Oliva - CONFIDENTIAL

2     A.    Yes.

3     Q.    With respect to the compliance

4  training portion of your response, was

5  Ms. Fischman responsible for delivering that

6  training?

7          MS. COLWIN:  Objection.

8     A.    She was primarily responsible for

9  delivering content.  Typically, I offered a tone

10  from the top style message, which is an element of

11  an effective compliance program.  So the chief

12  compliance officer greeting and giving an

13  introduction, and then turning over the content

14  delivery of the prepared slides to Jennifer.

15     Q.    So did she deliver the content?

16     A.    Yes.

17     Q.    Did she author the content?

18     A.    I don't know who authored the content

19  originally.  It was probably Donna that authored

20  that content originally, and it was modified over

21  the years.  I'm sure Jennifer modified the content

22  over time.

23     Q.    Did that content include ethics?

24          MS. COLWIN:  Objection.

25     A.    That content included a range of

1              N. J. Oliva - CONFIDENTIAL

2    compliance and legal subjects for business side

3    folks.  The code of conduct style training.

4    Discrimination and harassment.  Anti-corruption.

5    The basics of antitrust or competition law.  And

6    doing business with integrity, yes.  Certainly not

7    attorney ethics or settlement communications.

8         Q.    Well, no one in MCHA would be

9    delivering attorney ethics training to an

10   affiliate, would they?

11        A.    No.

12             MS. COLWIN:  Objection.

13             MR. BERMAN:  Next exhibit.

14             THE REPORTER:  61.

15             (Plaintiff's Exhibit 61A, a one-page

16        document Bates stamped DEF-000487,

17        confidential, marked for Identification, as

18        of this date.)

19             Please mark this portion of the

20        transcript confidential, and obviously

21        Counsel can make any additional designations

22        confidential pursuant to the --

23             MS. COLWIN:  I believe all of the

24        documents just about -- yes, they're all

25        Bates stamped confidential, so.

1          N. J. Oliva - CONFIDENTIAL

2          MR. BERMAN:  We have a confidentiality

3      agreement in this case, so all these will be

4      handled in accordance with that agreement.

5      Q.   Are you looking at the document?

6      A.   Yes.

7          MR. BERMAN:  For identification, this

8      is a one-page document Bates stamped

9      DEF-000487.

10     Q.   Can you tell me what this document is?

11     A.   This is Ken's reply to my e-mail to

12  him saying that I had determined to terminate

13  Jennifer's employment, and his response.

14     Q.   At this point in time, Ms. Fischman

15  was your subordinate, correct?

16     A.   Yes.

17     Q.   Okay.  So why were you informing

18  Mr. Fujiwara of your determination?

19          MS. COLWIN:  Objection.

20          MR. FORTINSKY:  Objection.

21     A.   Because Ken Fujiwara is the head of

22  the -- at that time, was the head of the

23  administration department, a very high-ranking

24  official, that oversaw human resources and legal

25  and other functions, and it would be appropriate

N. J. Oliva - CONFIDENTIAL

1    for me to let him know that this was happening.

2    Also, you probably already know that

3    terminations at a Japanese company are really

4    serious issues, and they're very carefully

5    considered.  So, it would be important for me to

6    notify Ken.

7    Q.    Okay.  You mentioned an administrative

8    department.  Were you referring to a specific

9    entity?

10    A.    MCHC.

11    Q.    Did you confer with Ms. Costa prior to

12    making your termination decision?

13    MS. COLWIN:  Objection.

14    A.    In fact, that happened real time.  I

15    was in Donna's office when I got the original note

16    from Tomoji, and I recall saying to Donna, I think

17    I have to fire Josh, and sending the e-mail to

18    Jennifer and saying, did Josh do this?  And

19    Jennifer saying, no, I, Jennifer, did it.

20    And I turned to Donna and said, I

21    think I have to fire Jennifer.  And then she sent

22    a mea culpa e-mail, without consulting with me, on

23    how we would mitigate the damage that she caused,

24    and that's when I said, I have to fire.  Yeah, so

N. J. Oliva - CONFIDENTIAL

1    for me to let him know that this was happening.

2    Also, you probably already know that

3    terminations at a Japanese company are really

4    serious issues, and they're very carefully

5    considered.  So, it would be important for me to

6    notify Ken.

7    Q.    Okay.  You mentioned an administrative

8    department.  Were you referring to a specific

9    entity?

10    A.    MCHC.

11    Q.    Did you confer with Ms. Costa prior to

12    making your termination decision?

13    MS. COLWIN:  Objection.

14    A.    In fact, that happened real time.  I

15    was in Donna's office when I got the original note

16    from Tomoji, and I recall saying to Donna, I think

17    I have to fire Josh, and sending the e-mail to

18    Jennifer and saying, did Josh do this?  And

19    Jennifer saying, no, I, Jennifer, did it.

20    And I turned to Donna and said, I

21    think I have to fire Jennifer.  And then she sent

22    a mea culpa e-mail, without consulting with me, on

23    how we would mitigate the damage that she caused,

24    and that's when I said, I have to fire.  Yeah, so

1          N. J. Oliva - CONFIDENTIAL

2     I consulted with Donna real time.

3          Q.    And she supported your decision,

4     correct?

5          A.    Yes.

6          MR. VALLI:  The one that is 487, will

7     be 61A.

8          MS. PRIMAVERA:  Did you mean Defendant

9     487?

10         MR. VALLI:  Yes.  So, Defendant Bates

11    stamped 000487 is now remarked as

12    Plaintiff's Exhibit 61A.  That is an e-mail

13    dated January 22, 2017, from Ken Fujiwara to

14    Nicholas Oliva.

15         MR. BERMAN:  So, because we had an

16    issue with the mis-marking of an exhibit, we

17    had duplicate Exhibits 61, and the original

18    Exhibit -- the first Exhibit 61 was Bates

19    stamped DEF-485 through 486.

20         The witness was then presented with

21    the next exhibit, which was Bates stamped

22    DEF-487.  The court reporter inadvertently

23    marked it with a duplicative label as

24    Plaintiff's 61, and so we've now renumbered

25    it 61A.

1          N. J. Oliva - CONFIDENTIAL

2          So the record will reflect that the

3    witness's testimony with respect to document

4    Bates stamp DEF-487 is now relabeled and

5    remarked as Plaintiff's 61A.

6          Mark this, please.

7          (Plaintiff's Exhibit 62, one-page

8    document bates stamped Def 806 through 807,

9    confidential, marked for Identification, as

10   of this date.)

11         So the witness has now been handed a

12   document that's been marked Exhibit 62.  It

13   is bates stamped Def 806 through 807.

14         Q.    Mr. Oliva, are you looking at the

15   document?

16         A.    Yes.

17         Q.    Can you tell me what it is?

18         A.    Yes.  This is the record of what I

19   read to Jennifer on January 30th as part of her

20   termination, and then the notice -- the notes from

21   that day based on the conversation that ensued,

22   with Pat Saunders present.

23         Q.    So the information on the first page,

24   did you deliver that to Ms. Fischman on January

25   30, 2017?

N. J. Oliva - CONFIDENTIAL

1

2      A.    Yes.

3      Q.    Was there any subsequent discussion

4  after you read this information to her?

5      A.    Yes.

6      Q.    What was said after you delivered the

7  typed portion of this document?

8      A.    As reflected in my notes at the time

9  and witnessed by Pat, Jennifer responded, you

10  authorized.  I said, I told you to go to the

11  client, as is your obligation.  And Jennifer

12  replied, I forgot.

13      Q.    I'm not sure I understood.  When you

14  used the language "you authorized," who said that?

15      A.    Jennifer.

16      Q.    So Jennifer said the words "you

17  authorized"?

18      A.    Yes.  And I replied, no, I told you to

19  go to the client, as is your obligation.  And she

20  replied, I forgot.  Which is consistent with her

21  e-mail to MCC saying she forgot.

22            Then she said, what, no package?  Or

23  no package?  Meaning severance package.  And I

24  said, if you have any questions, you can put them

25  in writing.

N. J. Oliva - CONFIDENTIAL

1
2          And then Jennifer spoke, and stated
3   the following, which -- to which I did not reply:
4   "There was no harm caused by the ethics violation
5   because they ultimately went along with it.  Why
6   did you let me drive around California if you
7   knew?  If you wanted me gone, you could have
8   talked to me and offered me something.  If you
9   told me, I could have brought my laptop in.  You
10  handled this poorly, because I have a lot of work
11  that you don't even know about and meetings today,
12  and I expected more from you."
13         Also witnessed as -- by myself and Pat
14  Saunders, who was present.
15      Q.   Was there any subsequent discussion
16  after those remarks?
17      A.   No.
18      Q.   Had you offered her any kind of
19  severance package in connection with her
20  termination?
21      A.   No.
22      Q.   Why or why not?
23      A.   She was terminated --
24           MS. COLWIN:  Objection.
25      A.   -- for -- she was terminated for

1            N. J. Oliva - CONFIDENTIAL

2    cause.

3        Q.    What does the term for cause mean,

4    when you use it that way?

5        A.    I terminate --

6        MS. COLWIN:  Objection.

7        Q.    What's your meaning -- what's your

8    meaning when you use the phrase, for cause?

9        A.    She did something --

10       MS. COLWIN:  Objection.

11       Go ahead, you can answer.

12       A.    She did something or some things

13   wrong.  She was terminated because we desired for

14   her to not have employment with us anymore.  And

15   you can see in my e-mail it's -- it's for a

16   variety of reasons, including a breach of trust,

17   for cause termination, as opposed to we eliminated

18   the position or we mutually think it's not working

19   out.  For cause termination is, in this case,

20   because of Jennifer's behaviors and what I wrote

21   here.

22       Q.    Did you reach the conclusion that

23   Ms. Fischman intended to make an unauthorized

24   demand for settlement in connection with the

25   Genomatica matter?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3     A.    Jennifer admitted it to me and MCC in

4     writing in the e-mail.

5     Q.    Would she have any motivation to do

6     that?

7          MS. COLWIN:  Objection.

8     A.    I have no idea what her motivation

9     would be.

10    Q.    Did you ask her?

11    A.    I asked her, did Josh make an

12    unauthorized settlement?  Giving Jennifer the

13    benefit of the doubt.  And she said, no, I did.

14    And then she gave a list of reasons.  She was

15    sick, there was a deadline, etcetera.

16    Q.    Why would any attorney ever make an

17    unauthorized settlement demand?

18         MS. COLWIN:  Objection.

19    A.    That seems to be one of the

20    hypotheticals that I --

21    Q.    Well, you can --

22    A.    -- am being advised not to answer.

23    Q.    -- answer the -- okay.  You can answer

24    the question or not answer the question.

25               You've been an attorney for more than

1          N. J. Oliva - CONFIDENTIAL

2    20 years, right?

3          A.    I have been an attorney since I was

4    admitted in early 2004.

5          Q.    So, ever in your life, have you known

6    of an attorney to make an unauthorized settlement

7    demand, other than in this purported instance?

8          MS. COLWIN:  Objection.

9          A.    Do I personally know any attorneys

10   that have made?

11         Q.    Sure.

12         A.    I don't think so.

13         Q.    Are you aware of any benefit that

14   would immure to Ms. Fischman in making an

15   unauthorized settlement offer or settlement

16   demand?

17         MS. COLWIN:  Objection.

18         A.    No.

19         Q.    Okay.  So, did you come to a

20   conclusion that Ms. Fischman made a willful

21   departure from your instructions?

22         MS. COLWIN:  Objection.

23         A.    I'll tell you, the conclusion I

24   reached was that she broke trust.  I had

25   communicated to her about the MCC case many times,

1          N. J. Oliva - CONFIDENTIAL

2    as we've talked about today, and how critical it

3    was for MCHA to handle this appropriately, and to

4    keep the client close, and to make sure they knew

5    what was going on, right?  And, yes, to get

6    approval.  And you see the great lengths I go to,

7    to make sure that I have the right approval,

8    right?

9          After two written complaints from the

10   client, and then this third issue, which results

11   in a written admission that she did it without

12   authorization, I could not trust her, and she was

13   not going to be successful in this role.  She

14   didn't have the capability.  So I reached the

15   conclusion that she couldn't stay here anymore,

16   that she was terminated for cause; not for any one

17   particular issue, for that all combined, mostly

18   around trust.

19        Q.    Did you become aware that there was a

20   potential for Ms. Fischman to assert a legal claim

21   against the company after you had terminated her?

22            MS. COLWIN:  Objection.

23        A.    Did I become aware that there was a

24   possibility she could?

25        Q.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2          A.    Well, everyone has the possibility to

3     assert a legal claim.

4          Q.    Did you actively consider the

5     possibility that she might present a claim?

6                MS. COLWIN:  Objection.

7          A.    I considered that she might present a

8     claim.

9          Q.    When did you first consider that?

10         A.    Prior to her termination.

11         Q.    Okay.  Are you familiar with the

12    concept of a litigation hold?

13         A.    Yes.

14         Q.    In connection with your termination of

15    Ms. Fischman, did you initiate a legal hold or a

16    litigation hold?

17         A.    As soon as we were reasonably on

18    notice of the likelihood of litigation, yes.

19         Q.    How did you effectuate the litigation

20    hold?

21                MS. COLWIN:  Objection.

22         A.    I think either I drafted and sent, or

23    asked outside counsel to draft and send, and we

24    communicated that through the appropriate people

25    internally.

1          N. J. Oliva - CONFIDENTIAL

2      Q.    When was that effectuated?

3      A.    I don't recall.  We could look at the

4   dates.

5      Q.    Do you know what happened to

6   Jennifer's cell phone, Ms. Fischman cell phone?

7      A.    No.

8      Q.    Do you know what happened to her legal

9   pads?

10     A.    No.

11     Q.    Are you able to identify anyone who

12  would know?

13     A.    The cell phone, if it was returned,

14  because some people had their own cell phones, and

15  I don't know Jennifer's situation, would go back

16  through the IT department.  The notepads would

17  likely be in the New York office, if we have them.

18  And Yuka Matsugu is probably the right person, but

19  I think that she's worked with counsel on

20  production.

21     Q.    On or about January 19th, you became

22  aware from Tomoji Minami that there was

23  potentially an unauthorized settlement offer,

24  right, or settlement demand?

25          MS. COLWIN:  Objection.

1          N. J. Oliva - CONFIDENTIAL

2          Q.   What steps did you take after becoming

3     aware of that communication to investigate the

4     underlying facts?

5               MS. COLWIN:  Can I just have that read

6          back.

7               (Whereupon, the requested question was

8          read back by the reporter.)

9               MS. COLWIN:  Objection.  You can

10         answer.

11         A.   I specifically asked Jennifer, did

12    Josh do what they claim he did?  Again, giving

13    Jennifer the benefit of the doubt.  And Jennifer

14    wrote back, no, she did.  Subsequent to that, I

15    spoke directly with Josh Berman and asked his

16    recollection of that -- I believe it was a

17    Wednesday night meeting, and the offer situation.

18         Q.   Did you take any other steps to

19    investigate the issue, the underlying facts?

20         A.   I don't think so.  I don't know.

21         Q.   Did you prepare any report of your

22    investigative findings?

23         A.   No.  This is unlike a -- may I?

24         Q.   Yes, please continue your response.

25         A.   There is unlike a whistleblower

N. J. Oliva - CONFIDENTIAL

1   hotline complaint or an HR report to the legal

2   department asking for an investigation.

3

4        Q.    Okay.  Did you inform Ms. Costa of

5   your finding of fact?

6            MS. COLWIN:  Objection.

7        A.    As I mentioned, Donna was with me real

8   time as those e-mails came in from Tomoji, to

9   Jennifer, from Jennifer, and from Jennifer to

10  Tomoji.

11       Q.    Did you inform Ms. Costa of your

12  discussions with Mr. Berman?

13       A.    I think so.  I'm pretty confident that

14  I told both Donna and Pat that I wanted to hear

15  from Josh before I took final action.

16       Q.    Did you inform Ms. Costa of your

17  conversation with Ms. Fischman?

18       A.    What conversation with Ms. Fischman?

19       Q.    Didn't you say you spoke to

20  Ms. Fischman as part of your investigation?

21           MS. COLWIN:  Objection.

22       A.    No.  I said I e-mailed her.

23       Q.    E-mail.  Okay.  Forgive me.

24       A.    No problem.

25       Q.    Did you inform Ms. Costa of your

N. J. Oliva - CONFIDENTIAL

2  e-mail communications with Ms. Fischman?

3      A.      As I mentioned, I was sitting with

4  Donna in her office real time as all of those

5  communications happened, and I talked to her about

6  them as they occurred.

7      Q.      When did you first reach the

8  conclusion that your intent was to terminate

9  Ms. Fischman?

10      A.      That Thursday morning when I got that

11  final mea culpa e-mail, where Jennifer, who had

12  the opportunity to tell me about this issue from

13  the moment that offer went out, to January 20th in

14  the morning, and determined not to tell me any of

15  it, for it to be a surprise to Tomoji, for it to

16  be a surprise to me in the morning, and for her to

17  react and communicate to Japan without asking me,

18  how should we handle this?  They're upset.  For

19  all the things you've told me about how to handle

20  this -- this litigation, these matters and this

21  trust and this relationship, what should we do?

22  She fires off a mea culpa, it doesn't matter,

23  don't worry, big deal.  That was the moment.

24      Q.      Okay.  And the fact of the existence

25  of the offer that was conveyed on January 7th was

1          N. J. Oliva - CONFIDENTIAL

2     not a topic of discussion with Mr. Takimoto during

3     his visit; is that correct?

4          MS. COLWIN:  Objection.

5     A.     Can you say it again?

6          MR. BERMAN:  Can you repeat that back,

7          please.

8          (Whereupon, the requested question was

9          read back by the reporter.)

10    A.     It was not a topic of the

11    conversation.

12    Q.     When was the first time that you

13    conveyed your intention to terminate Ms. Fischman

14    to anyone else?

15    A.     Pat Saunders would have been the next

16    person, and very likely that Thursday or Friday

17    following.  I don't recall.

18    Q.     At the time you made your decision to

19    terminate Ms. Fischman, did you have any other

20    reason to terminate her?

21    A.     Things had been going relatively well

22    for a period of time, which is why I was surprised

23    that I found myself in that situation.  I had been

24    communicating with Jennifer about her tone and

25    about her culture, right?  There's a lot of -- you

1           N. J. Oliva - CONFIDENTIAL

2    see, it wasn't that long of a period, right?

3    We're talking about November 2015 to January 2017.

4               So, she was making progress in those

5    areas, but certainly was not complete and

6    proficient in those areas.  But that's -- what

7    really occurred, you know, the reason why I made

8    the determination on that Thursday was what you

9    see here.  It's everything that's outlined here,

10   but really primarily it was, I can't -- I can't

11   trust her.  I can't trust her to be a member of

12   this legal department.  She doesn't communicate

13   with me, she doesn't communicate with the client.

14              Yes, she may have also violated the

15   ethics rule in making this settlement authority;

16   and that's bad enough, but I can't trust her to do

17   this job or to advance this department.  So, yes,

18   there are other reasons, but the primary reason

19   was -- those primary reasons were what occurred

20   that Thursday.

21        Q.    Other than what you've just described,

22   is there any other basis that you had to terminate

23   Ms. Fischman at the time that you did so?

24              MS. COLWIN:  Objection.

25        A.    Basis to terminate for cause?  I mean,

1              N. J. Oliva - CONFIDENTIAL

2     at will, right, I can just -- we can just go our

3     separate ways, but I did not have an intention to

4     terminate Jennifer on the basis of other things

5     before that Thursday, the 19th.

6          Q.    What about on January 30th, that was

7     when you actually notified her of the termination,

8     correct?

9          A.    Yes.

10         Q.    Did you have any other bases to

11    terminate her on January 30th that you haven't

12    already related to me?

13              MS. COLWIN:   Objection.

14         A.    As between the 19th and the 30th?

15         Q.    Yes.

16         A.    Well, continued failure to tell me.   I

17    will tell you, I was pretty surprised that we

18    spent that week in California and that the entire

19    time, whether it was in the car or at business

20    meetings, that she never confided in me what

21    happened.  She never expressed any sort of remorse

22    or mis -- or understanding that this was a

23    problem.  This was a major problem.  We have a

24    client, a really critical client, who's very upset

25    with you, and all you did was shoot off an e-mail

1          N. J. Oliva - CONFIDENTIAL

2  and say, my fault, no big deal.  I was kind of

3  surprised by that.  So that would be a continuing

4  or additional concern.

5          Q.    After January 30th, so after

6  Ms. Fischman had already been terminated --

7          A.    Yes.

8          Q.    -- did you become aware at any point

9  of any additional reasons which would justify

10  Ms. Fischman's termination?

11          A.    Yes.

12          Q.    What were they?

13          A.    So, a very similar issue to the

14  Genomatica case occurred, and it occurred with

15  regard to a company called Technophar,

16  T-E-C-H-N-O-P-H-A-R, and two related executives,

17  the Kalin, Victor Kalin (phonetic) and Diane, I

18  think, maybe I'm wrong about her name, who were

19  being terminated from their positions.  And the

20  Technophar business reports up, or is owned by the

21  Qualicaps business.  And the global CEO of the

22  Qualicaps business was named Ciro Ahumada,

23  A-H-U-M-A-D-A. I think.

24          And Jennifer was working with Ciro on

25  reducing the risk in the termination of Victor and

1          N. J. Oliva - CONFIDENTIAL

2   Diane.  She was using outside counsel, because

3   this was in Canada, and employment law, as you may

4   know, is not the same in the U.S. and Canada, so

5   we had outside counsel.  Jennifer was leading that

6   and giving advice to Ciro, who was the decision

7   maker; Qualicaps -- really Ciro being the CEO of

8   the group.

9          And what I learned, having taken on

10  that matter after Jennifer departed, was that

11  Jennifer authorized a settlement offer, confirmed

12  by outside counsel, saying, you know, outside

13  counsel communicates to me, Jennifer said, yes,

14  it's all approved, this, this, this and this,

15  whatever it was, and Ciro saying, that's not what

16  I said to Jennifer.  That's not what I approved.

17  And me communicating back to him, well, okay, what

18  do we do now?  We're in this situation and we

19  have -- I think it was a -- without, you know,

20  disclosing all the details, it was an or/and

21  situation, where I think Ciro had suggested, I'm

22  comfortable providing either A or B, as part of

23  this reduction.  And Jennifer provided and.

24          And I'm pretty confident outside

25  counsel said, and?  And Jennifer said, yes.  And

1          N. J. Oliva - CONFIDENTIAL

2  Ciro said, I never said and, I said or.  And I

3  said, you know, I'm sorry that that's where we

4  are, and what do we do?  And I helped him through

5  that resolution.

6          But, yes, that -- it's very similar to

7  what happened in Genomatica, by Jennifer's

8  authority, and I had no knowledge of this

9  situation, she didn't confide in me, she didn't

10  tell me.  You know.

11          Q.    Other than what you have just related

12  to me with respect to the Kalin family situation,

13  after January 30, 2017, did you have any other

14  additional bases for termination of Ms. Fischman

15  that you have not already related to me?

16          A.    Yes.

17          Q.    What are those?

18          A.    Jennifer accused Tomoji Minami in

19  e-mail, and I think we've produced it, of

20  backstabbing.  And, as a compliance person, it's

21  really critical, one of the effective

22  element -- one of the elements of an effective

23  compliance program is open lines of

24  communications.  We want reports.  More reports

25  are better.  Open lines of communication about any

1          N. J. Oliva - CONFIDENTIAL

2     potential violation of law or compliance are

3     critical.  That's one of the essential elements of

4     an effective program.  And Jennifer should know

5     that, as a lawyer and as the former chief

6     compliance officer.

7          And when Tomoji said, Nick, did Josh

8     make this offer?  Jennifer writes to him, that's

9     what we call backstabbing.  That's very aggressive

10    and completely inappropriate for a member of the

11    compliance department, legal department, to

12    communicate to someone that they should feel

13    uncomfortable or they shouldn't communicate in an

14    open way about a matter that they think is

15    important, or maybe sensitive, or maybe a

16    violation.  That was -- that was pretty bad.  I

17    learned that after the fact, also.

18        Q.    Are there any other reasons that you

19    became aware of that would justify Ms. Fischman's

20    termination, in your view, after January 30th of

21    2017?

22        A.    I don't recall anything else.  Those

23    are the two major ones.

24        Q.    Are there any other bases that MCHA

25    had or learned of after Ms. Fischman's departure

1          N. J. Oliva - CONFIDENTIAL

2    which would justify her termination, in your view?

3          MS. COLWIN:  Objection.

4     A.    Not to my knowledge.

5     Q.    Did the Genomatica matter ultimately

6    settle?

7     A.    Yes.

8     Q.    What was the dollar value of that

9    settlement?

10         MS. COLWIN:  Objection.

11    A.    I think that's confidential as to

12   Genomatica and MCC.

13    Q.    Well, I'm not sure what that means in

14   this context, but did it end up being compromised

15   for less than the amount that Ms. Fischman

16   purportedly told Josh to ask for?

17         MS. COLWIN:  Objection.

18    A.    I'm not sure I understand that

19   question.

20    Q.    Well, the settlement demand made on

21   January 7th was in the amount of $2.3 million,

22   correct?

23    A.    I think that's right.

24    Q.    Did the matter ultimately get settled

25   for less than that?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.  Again,

3     attorney/client privileged information.

4          MR. BERMAN:  I don't think that is --

5          MS. COLWIN:  Sure it is.

6          MR. BERMAN:  Hold on.  We can mark the

7     amount of settlement for a ruling as to

8     whether it's privileged.  I'll agree with

9     you that it's confidential and it would be

10    handled according to the confidentiality

11    agreement in this case, but I don't think a

12    settlement amount is privileged.

13         MS. COLWIN:  I'm going to direct you

14    not to answer.  Mark it for a ruling.

15  RL     MR. BERMAN:  Okay.  Please mark that

16    for now, and we'll set that issue aside.

17         THE WITNESS:  Okay.

18         MR. BERMAN:  Let's take a short break.

19         MR. COLWIN:  Sure.

20         (Recess taken:  4:26 to 4:41 p.m.)

21         MR. BERMAN:  Back on the record.

22    Q.    Mr. Oliva, do you recall earlier I

23    asked you about the steps you took to execute a

24    litigation hold?

25    A.    Yes.

1          N. J. Oliva - CONFIDENTIAL

2          Q.    Did it take you some amount of time to

3     pull together the language to craft that

4     litigation hold?

5          MS. COLWIN:  Objection.

6          A.    I don't remember.

7          Q.    During the process of coming up with

8     the language, before you determined what language

9     you were going to use, did you take any steps to

10    effectuate preservation of any relevant materials

11    or documents or communications?

12         MS. COLWIN:  Objection.

13         A.    I'm sure that we were very careful

14    about ensuring that the documents were preserved

15    in this case, as we do for all litigation.

16         Q.    During the course of your tenure in

17    the GC position, did you communicate with

18    Ms. Fischman via text message?

19         A.    Maybe.

20         Q.    For work purposes?

21         A.    Yeah.  Maybe.

22         Q.    Did you communicate with Ms. Costa via

23    text messages for work purposes?

24         MS. COLWIN:  Objection.

25         A.    I think so.

N. J. Oliva - CONFIDENTIAL

1

2      Q.      Did you communicate with any of your

3   clients through text messaging, rather than

4   e-mail?

5      A.      I recall getting what I would consider

6   to be a compliance report by text message because

7   I was on-site and someone knew I was on-site and

8   they wanted to speak with me confidential, and so

9   they got my phone number and texted me.  But it

10   was not my practice to text clients, but I can't

11   say no for sure.  You know, it's possible that

12   clients texted me.

13      Q.      To the best of your knowledge, have

14   any relevant text message communications between

15   you and Ms. Fischman been preserved?

16      A.      I would -- if there were text messages

17   to preserve, then I'm sure we would have preserved

18   them.

19      Q.      Would those have been turned over to

20   your counsel?

21      A.      Yes.

22      Q.      Same question with respect to text

23   communications with Ms. Costa.  To the best of

24   your knowledge, have those been preserved?

25      A.      Well, I'm sure that -- I'm confident

1          N. J. Oliva - CONFIDENTIAL

2    that the preservation notice was clear, that it

3    didn't matter what media.

4          Q.    Okay.  So to the best of your

5    knowledge, all relevant materials have been

6    provided to your counsel?

7          A.    Yes.

8          Q.    With respect to the communication on

9    January 19 of 2017 with Tomoji, what entity is

10   Tomoji affiliated with?

11         A.    Currently, or you're talking January

12   19th?

13         Q.    At that time, on January 19th.

14         A.    He was at MCHJ.

15         Q.    With respect to the Genomatica

16   litigation, who was the client?

17         A.    MCC.

18         Q.    What role did MCHJ have in MCHA's

19   representation of MCC in the Genomatica

20   litigation?

21         A.    At that time, the legal function for

22   the MCC group was housed in MCHJ.

23         Q.    So was this like a co-counsel

24   agreement or situation between MCHA and MCHJ with

25   respect to the representation of MCC?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3     A.    I don't think that you can identify it

4     that way, because the legal systems are very

5     different.  As I mentioned, there's a bengoshi.

6     But most of the people who serve in the legal

7     function in MCHA group and in other Japanese

8     companies are not practicing attorneys.  They're

9     college graduates, and they go to work at a

10    company, and they may do rotation through the

11    legal function.

12          So MCHJ is where they house the legal

13    function, but remember, Japan is a very different

14    style country, it's statutory civil law country,

15    so it's not comparing the same thing.  So it's

16    really hard to answer that question.  To do my

17    best to answer that question, MCHJ would

18    typically -- I think, typically advise MCC about

19    legal matters for Japan or other Asia.

20    Q.    Would you call that an administrative

21    entity, MCHJ?

22          MS. COLWIN:  Objection.

23    A.    I don't know what else they did, but

24    the legal function of MCHJ would have reported up

25    at that time through the overall MCHC

1           N. J. Oliva - CONFIDENTIAL

2     administrative function, ultimately.

3           Q.    Thank you.

4                 From your perspective as an attorney,

5     settlement authorization on the Genomatica matter

6     could have been conveyed to MCHA through MCHJ?

7                 MS. COLWIN:   Objection.

8           Q.    Does that make sense?

9           A.    It makes sense.

10                I think if we got an e-mail from

11    Tomoji saying Takimoto-san has communicated, or

12    MCC's position is, that we would have relied on

13    that.   But it would be incredibly unusual, in fact

14    unthinkable, that MCC people wouldn't also be on

15    that communication.

16                So they may have relied on Tomoji to

17    effectively communicate with us, whether it's for

18    English or because it's kind of legal

19    conversation.   But I think -- I think we would

20    have relied on an e-mail from Tomoji with the

21    others copied, yes.

22          Q.    In the event of a direct communication

23    from Mr. Takimoto to MCHA conveying someone with

24    authority, that would have been sufficient for

25    MCHA's purposes, correct?

1          N. J. Oliva - CONFIDENTIAL

2          MS. COLWIN:  Objection.

3     A.    Can you say it again?

4          MR. BERMAN:  Can you read it back,

5     please.

6          (Whereupon, the requested question was

7     read back by the reporter.)

8          MR. BERMAN:  So let's try that again.

9     Let me actually strike that question and ask

10    a different question.

11    Q.    Would a direct communication from

12 Mr. Takimoto suffice for the purposes of conveying

13 settlement authority to MCHA for the purposes of

14 the Genomatica matter?

15         MS. COLWIN:  Objection.

16    A.    If Takimoto-san wrote an e-mail

17 saying, I authorized this, then the answer would

18 be yes.  He was an officer of MCC, he could speak

19 for them.  But, again, I repeat, I think it would

20 be very unusual for him to do that without a whole

21 bunch of other people copied.

22    Q.    Okay.

23    A.    And I think it's also generally un --

24 it would be generally unusual for Takimoto-san to

25 be -- to write that kind of e-mail to us.

1      N. J. Oliva - CONFIDENTIAL

2      Q.    Actually, I don't think we have to

3  look at it necessarily, but do you recall earlier

4  today looking at Exhibit 13, which was the ENE

5  authorization document that you requested?

6      A.    Yes.

7      Q.    So, once you had that document in your

8  possession, did you feel like you had what you

9  needed to attend the first ENE?

10         MS. COLWIN:  Objection.

11     A.    Yes.

12     Q.    Did you feel any need to reconfirm

13  that you had what you need in order to attend the

14  ENE?

15     A.    So, be reminded that I had

16  specifically asked, and asked Josh to draft, and

17  ultimately received the document that I asked for.

18  So there were multiple conversations making sure

19  very clear that I had what I needed.

20         So the answer is yes, with that in

21  hand, I felt confident that I could go to the ENE.

22     Q.    And you didn't feel any need to

23  reconfirm that you had the authority conveyed to

24  you through that ENE document, correct?

25         MS. COLWIN:  Objection.

N. J. Oliva - CONFIDENTIAL

1

2      A.    For purposes of attending the first

3  ENE?

4      Q.    Correct.

5      A.    Correct.

6      Q.    What about with respect to attending

7  the second ENE, did you feel like you could rely

8  upon the instrument conveyed to you to attend the

9  first ENE?

10          MS. COLWIN:  Objection.

11      A.    No.  Actually, I asked Josh do we need

12  another document?  Should we get another document?

13  That kind of thing.

14      Q.    Were you ultimately provided with some

15  other instrument?

16      A.    No.  His response was -- I don't

17  remember exactly what his response was.  But we

18  didn't need another doc -- we didn't need another

19  document for purposes of the second ENE.  It was

20  considered either a continuation or, essentially,

21  it's the same proceeding in front of a federal

22  magistrate.  We didn't need another document.

23      Q.    There have been a number of redactions

24  in the documents presented to us in this case.

25  Did you play any role in redacting the documents

1          N. J. Oliva - CONFIDENTIAL

2    that were produced in the litigation?

3               MS. COLWIN:  Objection.

4          A.    I communicated with our counsel what I

5    felt was attorney/client privileged communications

6    of our clients.

7          Q.    Did you play any role in the creation

8    of the privilege log produced in this litigation?

9               MS. COLWIN:  Objection.

10         A.    No, I did not create the privilege

11   log.  Did I play any role?  I communicated with

12   counsel.

13         Q.    Okay.  I'm not going to ask you about

14   those communications.

15              Were you ultimately provided with

16   settlement authority in the Genomatica matter in

17   the amount of $2 million?

18              MS. COLWIN:  Objection.

19         A.    No, I don't think so.  When we went to

20   the second ENE, I attended with Tomoji and

21   Utsunomiya-san and Josh Berman, and we -- they

22   were essentially the decision-makers that day.  I

23   think Utsunomiya-San was the decision maker that

24   day.  I did a lot of the conversing and worked

25   with Josh, but we had representatives -- we had a

1          N. J. Oliva - CONFIDENTIAL

2    representative of MCC at the site.

3      Q.    At any point in the Genomatica matter,

4    are you aware of the conveyance of a settlement

5    demand in the amount of $2 million?

6          MS. COLWIN:  Objection.

7      A.    At any point -- can you repeat the

8    question?

9          MR. BERMAN:  Can you read it back,

10         please.

11         (Whereupon, the requested question was

12         read back by the reporter.)

13         MS. COLWIN:  Settlement demand.  So,

14         Matt, just clarify the demand part, are you

15         asking if Genomatica was offering 2 million?

16         MR. BERMAN:  No.  That MCC was

17         demanding $2 million from Genomatica, or

18         Genomatica would be paying the money to MCC.

19         MS. COLWIN:  And this is the time

20         frame after Ms. Fischman was terminated,

21         correct?

22         MR. BERMAN:  No.  I'm asking at any

23         point in that matter.

24         MS. COLWIN:  Okay.

25     A.    I don't recall making a $2 million

1          N. J. Oliva - CONFIDENTIAL

2    demand of Genomatica, but it doesn't mean that

3    it's absolutely that it didn't happen.  I don't

4    recall that.

5          Q.    Provided that such an offer was made

6    during Ms. Fischman's employment, would she have

7    been aware of it?

8          MS. COLWIN:  Objection.

9          A.    I would imagine so, considering her

10   role in the litigation.

11         Q.    Did you consider the possibility that

12   investigating Ms. Fischman's role in the

13   conveyance of the January 7, 2017 settlement

14   offer, that you could have a conflict of interest

15   in that investigation?

16         MS. COLWIN:  Objection.

17         A.    No.  It was not an investigation.  I

18   asked what happened, she admitted that she did it,

19   and that was all I did.

20         Q.    Didn't she take the position that you

21   had authorized her activity?

22         A.    No.  She said she did it because she

23   was home sick, a deadline came, she thought it was

24   consistent, she thought it wasn't a big deal.

25   She, in fact, did not say, Nick, you told me to do

1          N. J. Oliva - CONFIDENTIAL

2     this or, Nick, Takimoto-san told me to do -- she

3     did not say that because that's not what happened.

4               She said, almost instantly, oh, it

5     was -- I said, did Josh do this?  And she said,

6     no, I did it.  Why?  She lists the reasons.

7     Because I was home sick, because a deadline came

8     and went.

9          Q.    At any point in Ms. Fischman's

10    employment, did you give her a formal verbal

11    warning?

12               MS. COLWIN:  Objection.

13         A.    No.

14         Q.    At any point in Ms. Fischman's

15    employment, did you give her a formal written

16    warning?

17         A.    No.

18               MS. COLWIN:  Objection.

19         Q.    At any point in Ms. Fischman's

20    employment, did you give her a final warning?

21               MS. COLWIN:  Objection.

22         A.    No.

23         Q.    During the tenure of your employment

24    as GCC, general counsel and corporate compliance

25    officer for MCHA, did the company have a

1          N. J. Oliva - CONFIDENTIAL

2    progressive disciplinary policy?

3          MS. COLWIN:  Objection.

4    A.    No.  Not to my knowledge.

5          MR. BERMAN:  I do not have any further

6    questions for the witness at this time.

7    However, I reserve the right to re-question

8    the witness on the basis of any further

9    questions posed to him today or on the basis

10   of any additional documents that are

11   produced in the litigation.

12          We also reserve the right to pose

13   additional questions to the witness,

14   dependent upon the result of any rulings

15   issued in connection with today's testimony

16   regarding the witness being instructed not

17   to answer my questions.

18          Thank you.

19          (Whereupon, the examination of this

20    witness was concluded at 4:57 p.m.)

21          *          *          *          *

22

23

24

25

1
2                A C K N O W L E D G M E N T
3   STATE OF NEW YORK)
4        ) ss.:
5   COUNTY OF        )
6                I, NICHOLAS JUDE OLIVA, hereby certify
7   that I have read the transcript of my testimony
8   taken under oath in my deposition of July 15,
9   2021; that the transcript is a true, complete and
10  correct record of what was asked, answered and
11  said during this deposition, and that the answers
12  on the record as given by me are true and correct.
13
14
15
16                      _____
17                      NICHOLAS JUDE OLIVA
18  Subscribed and sworn to
19  before me this _____ day
20  of _____, 2021.
21
22  _____
23      NOTARY PUBLIC
24
25

1

2                          I N D E X

3

4    EXAMINATION OF        BY                      PAGE

5    Nicholas Jude Oliva   Mr. Berman               4

6

7                      E X H I B I T S

8    PLAINTIFF'S          DESCRIPTION            PAGE

9    44, Ten-page printout from LinkedIn,

10        referring to Nicholas Oliva             16

11   45, One-page document Bates stamped

12       MCHC-0001321, confidential               44

13   46, one-page document Bates stamped

14       DEF 011530, confidential                 74

15   47, Two-page document Bates stamped

16       MCHC-00001361 to 00001362,               94

17   confidential

18   48, One-page document Bates stamped

19       Fischman 000788                          99

20   49, Multipage document Bates stamped

21       DEF-000590 through 000599,

22       confidential                            145

23   50, Two-page document Bates stamped

24       DEF-001654 through 001655, confidential  180

25

1

2          E X H I B I T S (Cont'd)

3    PLAINTIFF'S        DESCRIPTION            PAGE

4    51, Two-page document Bates stamped

5         DEF-000864 through 0008865, confidential 183

6    52, Two-page document Bates stamped      197

7         DEF-001831 through 001832, confidential  202

8    53, Two-page document Bates stamped DEF-876

9         through 877                        202

10   54, Multipage document Bates stamped

11        DEF-1419 to 1421                   203

12   55, Three-page document Bates stamped

13        DEF-002307 through 002309, confidential  216

14   56, Multipage document, first page being the

15        cover page of a hearing transcript dated

16        September 7, 2017, followed by excerpts  224

17   57, Two-page document Bates stamped

18        DEF-002315 through 002316, confidential  237

19   58, Three-page document Bates stamped

20        DEF-000884 through 000886          238

21   59, Two-page document Bates stamped

22        DEF-844 through 845, confidential  240

23   60, Two-page document Bates stamped

24        842 to 843, confidential           243

25

1

2              E X H I B I T S (Cont'd)

3    PLAINTIFF'S        DESCRIPTION              PAGE

4    61, Two-page document Bates stamped

5        DEF-000485 through 486, confidential    244

6    61A, One-page document Bates stamped

7        DEF-000487, confidential 24962, One-page

8        document bates stamped Def 806 through

9        807, confidential                        249

10

11                REQUESTS FOR PRODUCTION

12   DESCRIPTION                           PAGE

13   Mr. Oliva's recent touched up resumé     12

14   Whatever resumé was just specified by

15   The witness in connection with the

16   Acceptance of the 2015 position at MCHA   14

17   Any resumé that was submitted in

18   connection with Mr. Oliva's consideration

19   For the general counsel, chief compliance

20   officer position                          71

21   Any offer letter issued to Mr. Oliva in

22   Connection with his reemployment with

23   the company on November 30, 2015          74

24   Any documents reflecting the negotiation

25   process Mr. Oliva just described          75

1

2                    REQUESTS FOR PRODUCTION

3    DESCRIPTION                                    PAGE

4    Any notes not previously produced

5    pertaining to Mr. Oliva's conversations

6    with Ms. Fischman                              113

7    Any legal pads that were utilized by

8    Ms. Fischman during her employment with

9    the company, to the extent they haven't

10   been produced yet                             115

11   To the extent not previously produced,

12   notes involving Lucite International          135

13   Any occasions where those activities

14   described took place, produce those

15   contemporaneously notes                       152

16   Any communication representing a

17   $2.3 million offer                            227

18   To the extent they haven't been produced,

19   any notes of the meeting just described by

20   the witness                                   237

21                         RULINGS

22                    PAGE   LINE

23                     69     23

24                    232     12

25                    273     13

1

2            C E R T I F I C A T I O N

3

4            I, BONNIE KREUZBURG, a Notary Public

5    of the State of New York do hereby certify:

6            That the testimony in the within

7    proceeding was held before me at the aforesaid

8    time and place.

9            That said witness was duly sworn

10   before the commencement of the testimony, and that

11   the   testimony was taken stenographically by me,

12   then transcribed under my supervisor, and that the

13         within transcript is a true record of the

14         testimony of said witness.

15           I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage, that I am not interested

18   directly or indirectly in the matter in

19   controversy, nor am I in the employ of any of the

20   counsel.

21           IN WITNESS WHEREOF, I have hereunto

22   set my 27th day of July, 2021.

23                          *Bonnie Kreuzburg*

24   _____

25               BONNIE KREUZBURG

# LAWYER'S NOTES

| PAGE | LINE | NOTES... |
|------|------|----------|
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |
|      |      |          |

## A

A-H-U-M-A-D-A 268:23
a.m 1:14 68:4
ABC 237:2
Abilify 59:4
ability 7:21,25 89:9 148:21 176:17
    176:19 177:12
able 32:6,15 50:9 55:11 62:2 66:11
    67:4 77:7 78:8 84:2 101:23 114:2
    114:7 119:18 177:18 179:5,8
    207:17,22 218:11 235:22 261:11
above-stated 1:21
absence 174:16
Absent 5:24
absolutely 119:9 120:2 284:3
ACC 23:14
ACCA 23:13 24:16 35:9
acceptable 152:5 196:15 227:24
acceptance 14:11 65:7 290:16
accepted 31:20
access 142:5,7
accommodate 7:6,11
accompany 168:20
accomplish 220:13
account 14:16
accurate 14:24 15:8,11 17:2 18:13
    147:13 149:9 215:23
accurately 7:22 8:25 17:7 76:12
accused 159:16 160:18,20 161:4,8
    162:4 163:3,10 270:18
acquisition 78:24 88:23
acquisitions 58:3 78:22
acronym 13:19,23 14:4
acronyms 13:17
acting 77:9 78:16 106:17,23 107:21
    116:11 123:19,24 142:13 165:19
    167:15 192:3 199:16
action 86:21 157:24 161:2 164:3
    184:16 211:14 263:15 292:16
active 90:17 170:19 172:20,21
    173:2
actively 260:4
activities 20:17 32:13 77:10 93:21
    152:12 291:13
activity 79:5 117:12 163:21 284:21
actual 177:25 178:13
adamant 190:3
add 17:22 36:7,10 202:16 218:23
additional 111:16 126:3,10 128:3
    132:2 247:14 249:21 268:4,9
    270:14 286:10,13
address 4:13 198:2
administration 250:23
administrative 223:17 251:8
    277:20 278:2
admission 244:2 259:11
admitted 257:3 258:4 284:18
admonishment 228:11

advance 32:15 266:17
advancement 31:15,22,23 39:17
advertising 26:20
advice 56:3 89:6 101:18 119:19
    123:5 269:6
advise 77:7 101:4 145:11 277:18
advised 257:22
advisement 12:13 14:14 72:5 74:25
    113:16 115:21 135:24 152:22
advising 83:25 90:8,10 145:8
advisors 83:3 84:19
affairs 172:25
affect 7:21,25
affiliated 144:16 249:10
affiliated 31:7 78:12 141:8 276:10
affiliates 66:4 75:21 78:2 118:24
    141:9
aforesaid 292:7
against- 1:4
AGC 107:14,15
agencies 92:24 93:2,5
agenda 207:22
aggressive 109:8,19,24,25 110:11
    218:17 220:17 271:9
aggressively 218:9
ago 8:15,16 22:5 64:6
agree 61:12 231:12,25 273:8
agreed 3:2,8,13 198:4
agreement 9:23 10:5 13:17 93:18
    199:18 250:3,4 273:11 276:24
ahead 245:22 256:11
Ahumada 268:22
air 152:8
Aldila 246:2,19
aligned 52:2,6,14 88:8
allegation 143:25 144:7
allegations 136:18 154:14,15
    161:14
alleged 163:10
allegedly 134:16
alleges 136:24
alleging 136:13
allocated 97:8
allow 13:2 68:11
allowed 162:24
alluded 183:21
alluding 186:11,14
Alpha 21:6 22:25 47:14 58:7,14,16
    79:4 98:19,20
Amber 145:14,16
ambiguous 6:17 107:15
Amended 136:23,23 143:22 153:25
America 1:5 2:9 11:15 12:19 13:5
    13:12,20 23:2 42:16 93:9 98:6,9
    128:13
Americas 171:14
amount 30:7 106:4 178:20 179:2
    179:15,17,20,21 208:7,8 235:17

272:15,21 273:7,12 274:2 282:17
    283:5
amounts 207:11
Andy 96:18 97:16 98:4,20 156:8
    159:9,14
Andy's 98:17
Ann 155:20 156:4,6,9 159:20
    161:24
annual 78:11 146:19
annunciate 4:24
answer 5:4,17,25 10:2 12:20 15:10
    47:9 59:21 66:7 67:15 68:11
    69:23 80:12 101:22 105:3,25
    112:16 127:8 156:18,20 171:23
    177:18 178:20 179:6,8 184:17
    185:2,5,8,14 186:18 187:8
    196:25 213:3 226:10,21 229:14
    232:3,6,8,11 233:4,11,14,16,17
    235:2 247:25 256:11 257:22,23
    257:23,24 262:10 273:14 277:16
    277:17 279:17 280:20 286:17
answered 77:18 287:10
answering 4:21
answers 219:9 287:11
Anti-corruption 249:4
anticipate 5:19 6:2
anticorruption 139:20
antitrust 56:18 57:6,9,16 59:15
    127:6,12,13,19 132:8 249:5
antitrust-related 57:22 126:12
    132:6
anybody 198:14
anymore 108:21 189:10 256:14
    259:15
apart 124:23,24 134:12 234:3
    246:25
app 240:14
appear 168:25 169:7 201:6 204:25
appearing 169:3
appears 96:5
applicable 68:25 69:14
application 41:19 223:13
applications 41:15
apply 15:18 158:21
applying 41:4
appointed 75:20
appraisal 149:3,13
approach 120:18 151:15,15 221:20
    222:12
approached 109:2
appropriate 109:18 151:21 157:23
    160:25 172:17 189:25 205:2
    211:13 212:9 227:24 250:25
    260:24
appropriately 88:10 128:21 259:3
approval 185:7 227:21 228:6,12
    239:15 241:14,17 259:6,7
approved 269:14,16

belligerent 159:11
beneath 216:4
benefit 62:14 72:21 86:11 241:15
  257:13 258:13 262:13
benefits 73:10 223:14
bengoshi 33:2,3,4,6,20 43:24 277:5
Berman 2:5 4:8,17 10:2 12:10,14
  13:7 14:9,15 15:12,25 24:12
  28:13 36:17 38:14 42:13,18
  44:13,20 45:21 61:6 65:9 66:7
  67:8 68:2 69:25 70:6,10 71:24
  72:6 74:21 75:2 80:16 87:2 93:23
  94:7 99:7,12 105:3 107:17
  111:10 113:12,17 115:16,22
  123:6,13 135:21,25 142:3 145:20
  146:2 152:19,23 153:3 156:18
  161:16 165:9 166:24 168:2,19,21
  168:22 172:25 179:10 180:8,13
  180:18 182:25 183:6 193:21
  195:12 197:11 198:25 200:17
  201:10,14,17,25 202:7,14 203:7
  203:12 206:20,23 209:9 211:3
  212:10 213:10,22 214:4 215:9
  216:21 217:4,18 223:21,24 224:5
  224:13 226:8 227:12 229:6,13
  232:6,10,13 234:22 237:4,13
  238:21 239:3 240:16,22 241:3
  242:25 243:7 244:11,17 249:13
  250:2,7 252:15 262:15 263:12
  265:6 273:4,6,15,18,21 279:4,8
  282:21 283:9,16,22 286:5 288:5
best 4:24 5:7,12,13 7:10 14:23
  25:25 62:10 71:16 77:20 134:9
  135:3,11,18 149:9 152:16 159:17
  195:18 198:10 201:4 214:18
  234:14 275:13,23 276:4 277:17
better 62:17,18 101:18 139:3
  270:25
biased 164:11
Biddle 85:23
big 60:10 65:18 85:4 230:5 264:23
  268:2 284:24
bigger 69:19 204:18
billion 58:25 81:22
billion-dollar 58:22 79:18 169:15
  169:15
birthday 49:2,4,11
bit 13:15 52:10 55:9 133:13 178:9
  178:9
bizarre 133:23
blister 109:13 110:24 111:5
blisters 109:14
blood 43:10 292:17
board 48:7 75:20,23 77:9 78:3,5,15
  78:16,16 174:15 177:22 184:10
  184:12,15 185:7 207:19 208:12
  208:18
boards 35:12 77:7 78:4

body 214:11 216:4 221:15 237:25
Bonnie 1:19 4:4 226:13 292:4,25
bonus 69:12,15,16 72:8,9,23,24
  73:2,7 199:16,22 200:23
boss 109:16 111:9
Boston 98:14
bottom 17:8 18:8 25:8 74:11 150:8
  150:12 214:13 219:25 221:11
  222:11
brand 25:7,10,18 26:10,10,12,19
  29:10 34:13 57:14,20 82:8,8
  90:19
brand/regulatory 25:10
Brazil 84:17 91:15 98:24
breach 204:19 256:16
breadth 51:22
break 7:5,9,14 68:3,3 108:25 123:7
  167:9 170:2 180:7,8 200:18
  273:18
breaks 7:6,7
bridge 133:11
briefly 219:16
bring 40:16 53:9 171:21 174:5,12
  201:19 204:19 207:13 208:15
  246:24
bringing 39:24 52:25 152:3
brings 172:3
Bristol 24:23,24 31:16,16,17 35:11
  51:23 52:21 58:21,24 63:13
  164:23
Bristol-Myers 23:11,22 25:5,20
  30:14,16 31:2,8,13,23 32:12,16
  33:19 34:10,14,19 39:5,9 41:5,8
  43:22 44:5 45:15 46:14 78:24
  92:7,17 93:17 100:15 140:8,11
  229:20
Brittany 2:12 9:21
broad 85:3
broadly 52:8 78:25
broke 258:24
brought 58:23 255:9
Brown 133:21 134:3 183:22
budget 64:16
budgets 246:14
build 120:7
building 66:19
bullet 197:21 199:13 201:2
bunch 279:21
burdensome 103:8
business 4:12 47:18 52:18 83:25
  95:16,16 98:14 121:14 128:19,21
  128:22 130:14,17 134:2,3 148:16
  155:25 169:4,8,15 171:11,17,21
  172:5 207:8,14 218:12 245:16,19
  245:22 246:3,13 249:2,6 267:19
  268:20,21,22
businesses 22:19,21 35:21 47:19
  96:2 246:17,25

bylaws 78:6

_____

### C

C 1:1 2:1 4:2 287:2 292:2,2
C-A-T-A-L-E-N-T 31:6
c.c 215:8,11
calculated 73:8
California 33:7,12 245:16 246:12
  255:6 267:18
call 6:8 12:10 14:9 26:10 71:24
  74:21 75:2 97:4,10 101:21,22,24
  108:8 109:22 113:12 115:16
  135:22 145:12 152:20 172:7
  227:14 237:5 245:17 271:9
  277:20
called 4:3 23:13 27:5 29:10,14
  38:23,25 95:9 126:13 133:7
  162:3 246:2 268:15
calls 38:11 57:20 102:18 119:15
calm 204:16 205:2
Canada 269:3,4
cancel 45:23
canceled 92:20
candle 53:19
CAPA 86:21
capability 148:22 204:3 259:14
capable 157:18
capacities 1:7,8,9
capacity 67:22 141:14 168:23,24
  169:2 190:22 207:8 229:18
capital 98:13
car 69:13 72:8,14,15,16,17,18 73:6
  267:19
carbon 246:3,16,25
card 128:21 130:14
cards 128:22
care 108:12 128:11 129:21 211:12
  231:19
career 40:2 41:16 57:5 104:14
careful 274:13
carefully 132:16 228:21 251:5
case 8:20 11:4 71:16 88:19 128:25
  129:5 132:3,5,7 138:21 158:25
  171:8 177:6,6,10 178:18 185:13
  191:20 204:14,18,19 217:15
  220:18,24 221:3 224:18 250:3
  256:19 258:25 268:14 273:11
  274:15 281:24
Catalent 31:6,7,14,20 35:16,18,23
  36:19 37:9 39:3 41:2 49:4,8
  51:10,12,25 52:5,13,20 56:2,7
  64:7 69:16,21 72:9 73:2 84:9
  152:25 153:2,11 229:22,23
catch 37:25
category 124:13 127:14,17,20
  148:7
cause 195:7 256:2,3,8,17,19 259:16
  266:25

271:13 274:17,22 275:2 278:17
communicated 45:8 128:11 132:6
137:21 161:19 162:4 163:10
171:6 182:12 197:19 204:15
228:20 229:4 258:25 260:24
278:11 282:4,11
communicates 269:13
communicating 55:19 60:9 63:16
90:8,11,18 95:23 102:13 139:19
149:23 150:15 172:22 174:10
203:4 205:14 213:20 241:12
244:25 265:24 269:17
communication 127:2 132:19
148:7,17 150:14,17 151:10,22
162:6 163:20 171:3 178:3 179:5
181:3 200:20 201:9,9,21 202:21
205:3 206:5 207:10 214:15
215:23,25 217:22 219:23 220:4,8
221:23 222:22 227:4,15 228:7
238:8 244:5,7 262:3 270:25
276:8 278:15,22 279:11 291:16
communications 6:6 9:15 11:10
93:22 138:16 139:15 159:15
177:18 196:5 202:13 204:8
235:22 249:7 264:2,5 270:24
274:11 275:14,23 282:5,14
commute 50:9
comp 68:23
companies 17:22 37:20 57:24
78:12 95:19,19,25 105:17 122:4
133:16 246:22,24 247:12 277:8
company 26:18 38:23,24,25 39:2
51:16 60:10 62:8,9 64:21 67:4,17
67:24 72:18 73:16 74:24 75:12
75:15,18,19 77:24 83:21,22 88:7
94:22 95:6,9,15 98:23 107:12
108:23 115:13,13,19,23 116:7,19
117:5,24 122:20,24 123:20,24
124:17 129:3 130:21 133:7,12,17
138:11,20 139:6,6 141:7,9,10,20
143:14 144:24 145:14 163:13
169:16 172:19 174:9 181:15
182:17 192:17,22 193:13,16
195:24 200:7 207:18 246:2,4
251:4 259:21 268:15 277:10
285:25 290:23 291:9
company's 130:9 144:3
comparable 25:12
comparing 277:15
comparison 33:15
compensated 69:7 153:14,15
compensation 63:22 64:12 68:7,24
72:7 73:6 201:5
competencies 150:4
competition 249:5
competitors 53:11
complain 144:12 145:13,16 164:10
173:9,13 196:22 197:7

complainant 154:10 155:3,5
complainants 155:7,23 162:2,7
complainants' 155:11 156:25
complained 144:2 164:18
complaining 152:2 203:25 239:12
complaint 136:17,23,23 143:22
153:25 195:20 201:24 203:6
241:12 263:2
complaints 155:16 165:5 193:7
228:25 259:9
complete 7:12 27:10 55:6 164:7
211:23 226:17 247:24 266:5
287:9
completed 5:15 87:20 122:8 173:7
174:24 190:9
completely 156:22 176:23 271:10
compliance 11:18 17:12,21 56:22
57:2 60:16,22 64:11 65:4 67:18
69:9 72:3 76:10 90:7,20 106:23
107:22 116:11 140:6 163:15
164:24 247:16,19,22 248:3,11,12
249:2 270:20,23 271:2,6,11
275:6 285:24 290:19
compliance-related 117:13
compliant 211:13
complicated 57:11
comport 78:14 172:24 174:22
206:4
comported 172:19
composure 204:21
comprised 104:22
compromised 272:14
con 70:8
concept 182:11 260:12
concern 55:14 56:19,24 57:22
59:19 132:7,8 134:21 149:24
206:11 268:4
concerned 59:12 61:16
concerning 17:6 49:12 53:16 61:4
64:19 86:15 107:20 134:25
140:11 150:22 165:19 168:16
170:7,15 182:3 193:17 207:10
222:25 225:13,22 227:4 238:13
concerns 56:14 123:4 150:23 151:4
204:9
concluded 286:20
conclusion 32:14 105:8 109:10
162:17 186:13 256:22 258:20,23
259:15 264:8
condition 7:24 8:4
conduct 140:4,11 158:5 160:3,6
162:19 164:12 249:3
conducted 140:22 157:3
conducting 139:10 157:6
confer 251:12
conference 166:12 168:6,14,18,21
168:24 169:7 170:25 173:11
175:22 176:25 177:13 208:24,24

214:20
conferences 166:17 167:4 173:11
173:15,19,22,25 175:3,13 176:8
212:22
confide 270:9
confided 108:22 156:12 267:20
confidence 66:10
confident 66:21 205:15,24 229:3
263:13 269:24 275:25 280:21
confidential 4:1 5:1 6:1,6,10 7:1
8:1 9:1 10:1 11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1 43:1 44:1,18
45:1 46:1 47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1 73:1 74:1,5
75:1 76:1 77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1 91:1 92:1
93:1 94:1,5 95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1 103:1
104:1 105:1 106:1 107:1 108:1
109:1 110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1 118:1
119:1 120:1 121:1 122:1 123:1
124:1 125:1 126:1 127:1 128:1
129:1 130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1 138:1
139:1 140:1 141:1 142:1 143:1
144:1 145:1,24 146:1 147:1
148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1 162:1
163:1 164:1 165:1 166:1 167:1
168:1 169:1 170:1 171:1 172:1
173:1 174:1 175:1 176:1 177:1
178:1 179:1 180:1,16 181:1
182:1 183:1,4 184:1 185:1 186:1
187:1 188:1 189:1 190:1 191:1
192:1 193:1 194:1 195:1 196:1
197:1,14 198:1 199:1 200:1
201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1
211:1 212:1 213:1 214:1 215:1
216:1 217:1,2 218:1 219:1 220:1
221:1 222:1 223:1 224:1 225:1
226:1 227:1 228:1 229:1 230:1
231:1 232:1 233:1 234:1 235:1
236:1 237:1,11 238:1 239:1
240:1,25 241:1 242:1 243:1,5
244:1,15 245:1 246:1 247:1
248:1 249:1,17,20,22,25 250:1
251:1 252:1 253:1,9 254:1 255:1

court 1:1 3:16 5:9 8:22 15:13,17
  24:9 174:3 207:16 252:22
cover 89:21 147:19 224:9,15
  289:15
coverage 73:18
craft 274:3
create 29:17 189:3,4 190:5 282:10
created 29:12,15,19 151:4 186:8
creation 282:7
criminal 127:13,17,20
critical 118:21,23 119:10,12 120:3
  151:22 259:2 267:24 270:21
  271:3
Csaszar 96:18 98:17,18 121:11
  156:8 159:3,7
CTO 92:6
culpa 243:19,25 251:23 264:11,22
cultural 125:12 128:2,17 134:24
culturally 129:11 151:15 172:17
culture 128:8,16 130:17,20 152:4
  175:7 265:25
curious 125:15 134:9 185:11
current 20:10
currently 43:10 63:19 276:11
curriculum 11:23

**D**

D 1:1 4:2 287:2 288:2
daily 159:15
damage 251:24
Dan 145:18
data 27:4
date 11:25 16:9 44:19 74:6 94:6
  99:11 145:25 147:17,19 163:20
  180:17 183:5 197:15 202:5
  203:11 212:20 217:3 224:12
  237:12 239:2 241:2 243:6 244:16
  249:18 253:10
dated 208:25 219:24 221:12 224:10
  224:16 252:13 289:15
dates 43:25 166:19 261:4
day 9:17 10:21 18:18 19:3,6 24:7
  70:13 108:7 109:3,18 111:9
  124:24 176:23 182:11 188:24
  189:17 190:4 215:21 228:4,19
  232:20 233:3,10 234:4,8 241:21
  253:21 282:22,24 287:19 292:22
day-to-day 55:20 172:24
daylight 239:23 240:3,5,10
days 10:18 188:2,14 189:15 245:13
deadline 257:15 284:23 285:7
deal 58:21,22 80:11,18,24 81:25
  82:12 99:2 264:23 268:2 284:24
dealing 91:9 151:16
deals 20:16 21:8 122:4
dealt 148:13
Dear 214:14
Deborah 160:9 161:22

December 181:6 221:13 222:16
decide 33:21
decided 170:11 246:16
decision 31:21 40:2 142:22 143:2,4
  143:5 145:10 167:5 170:3,6,14
  186:10 187:6 251:13 252:3
  265:18 269:6 282:23
decision-makers 282:22
decisions 174:8
deck 189:5
decline 127:8 157:16
declined 72:18
Deducting 210:17
deeper 197:24
Def 74:4,12 253:8,13 288:14 290:8
DEF-000485 244:14,19 290:5
DEF-000487 249:16 250:9 290:7
DEF-000590 145:23 146:3 288:21
DEF-000592 146:23
DEF-000864 183:3,8 289:5
DEF-000876 202:11
DEF-000884 238:24 239:5 289:20
DEF-001654 180:15,20 288:24
DEF-001831 197:13 199:5 289:7
DEF-002307 216:25 217:6 289:13
DEF-002315 237:10,15 289:18
DEF-1419 203:10,13 289:11
DEF-1859 209:18
DEF-485 252:19
DEF-487 252:22 253:4
DEF-842 243:9
DEF-844 240:24 241:5 289:22
DEF-876 202:4 289:8
Defendant 2:14 252:8,10
defendants 1:10 2:8 135:22 136:14
defense 10:4
deferred 216:5
definitely 118:19 120:4
delayed 37:3
deliver 245:6 246:9 247:16 248:15
  253:24
deliverable 189:5
delivered 29:20 147:14 181:19
  254:6
delivering 245:12 248:5,9 249:9
delivery 248:14
demand 26:25 105:18 217:14
  225:22 227:5 228:13 230:21,23
  232:2 235:18 256:24 257:17
  258:7,16 261:24 272:20 283:5,13
  283:14 284:2
demanded 216:19
demanding 222:9 283:17
demands 71:15 148:21
demeanor 148:16
demolished 145:2
demoted 106:14
denied 144:4,13

dep 70:16
depart 138:20
departed 22:13 36:19 37:3,8 39:18
  42:6 43:20 115:12 269:10
departing 40:21 46:16 69:22
  153:12
department 20:13 39:21 49:16
  50:23 62:17 93:14 96:13,13,16
  96:23 97:4,5,8,9 100:18 102:15
  103:3 118:8 120:3,21 130:10
  140:6 154:9,22,24 155:16,18,20
  156:11 185:4 189:15 190:6
  191:17 250:23 251:9 261:16
  263:3 266:12,17 271:11,11
departments 230:6 246:15
departure 23:7 39:10 46:20 258:21
  271:25
dependent 286:14
depending 138:12 239:21,22,22
depends 120:10 210:11 231:4
  240:3
deposed 8:8
deposition 1:17 4:18 9:10 10:10,15
  10:24,25 11:2 287:8,11
depth 49:22 55:23
deputy 80:7
describe 17:19 25:18 26:7 35:15,25
  37:21 59:9 84:8 86:7 108:2
  117:25 128:17 129:24 133:23
  167:19 169:2 194:12 244:2
described 12:16 24:17 25:13 32:14
  60:5 62:20 65:8 72:8 75:5 79:8
  85:17 91:7 120:8,22 124:12
  126:7 127:25 128:18 130:11
  131:24 132:4 133:3 135:7 150:23
  151:6 152:12 154:23 191:14
  194:14 237:7 266:21 290:25
  291:14,19
describes 29:2 76:13
describing 80:17 201:12
description 28:25 76:9 193:23
  288:8 289:3 290:3,12 291:3
designations 249:21
desire 193:17
desired 192:23 256:13
detail 126:10 128:3 142:16 194:17
detailed 172:9
details 126:20 132:2 138:21 229:5
  269:20
determination 47:6 67:5 168:5,16
  169:6 250:18 266:8
determine 63:4 67:23 112:14
determined 95:13 156:7 160:2
  170:7 171:10 245:21 250:12
  264:14 274:8
determining 62:21
develop 101:16 106:7 120:11
developing 119:25

effectuate 177:12 260:19 274:10
effectuated 261:2
efficiency 86:13
efficient 100:16 101:9,15 185:19
efficiently 84:2
efforts 71:16
eight 55:24 245:13
eight-month 199:17
eight-year 30:5
either 10:21 63:16 88:22 106:10
    114:18 116:15 123:18 127:2
    128:7 163:3 175:7 221:20 229:19
    229:19 236:24 260:22 269:22
    281:20
Elbaum 96:21 122:18
element 248:10 270:22
elements 270:22 271:3
eliminated 256:17
employ 292:19
employed 11:12
employee 88:3,4 89:18,18,20
    144:13
employees 73:15 88:15,18 91:23
    96:14 138:9 144:3 145:2
employer 56:11
employment 11:20 85:8,10 87:14
    88:9 89:7 90:8,22 91:2,9,17,17
    101:3,11 102:6 106:4 115:19
    130:4,6,21 138:8 183:25 223:13
    250:13 256:14 269:3 284:6
    285:10,15,20,23 291:8
employment-related 87:18 101:9
    105:6
employments 139:8
encapsulate 28:8,23
encourage 188:23 189:6
encouraged 158:11
encouraging 90:12 105:13
ended 68:24
ends 119:9
ENE 166:17 168:8 174:13,19,23
    175:22 177:24 207:7,12 208:15
    211:23 212:2,8,20 228:3 231:6
    231:11,14 280:4,9,14,21,24
    281:3,7,9,19 282:20
ENEs 175:3,14 176:8
engaged 93:10 167:17
engaging 32:13
engender 119:24 173:5
engenders 172:5
English 278:18
ensued 253:21
ensure 57:17
ensuring 274:14
entail 77:23 83:19 89:3 91:13
    92:15
entails 86:9
entered 93:18

entire 30:13 96:22 177:8 178:20
    219:5 220:22,24 221:7 223:25
    224:6 246:5 267:18
entirely 112:21 157:18
entities 22:25 23:3 52:25 58:19
    75:24 78:2 87:16 88:14
entitled 72:15 211:18
entity 18:5 19:14,17 31:3,5 43:4
    58:17 87:15 88:17,18 127:4
    251:10 276:9 277:21
entry 25:9 28:11
environment 193:23 197:23
environmental 93:12,14
equity 73:20
equivalent 19:7 175:5
especially 118:24 129:11 172:10
    246:13
ESQ 2:5,6,11,12,17
essential 271:3
essentially 20:17 35:22 95:13
    112:20,22 151:2 174:7 204:15
    205:5 208:4 246:5 281:20 282:22
estate 101:5
Esther 188:10 191:16 194:24 195:3
etcetera 257:15
ethical 149:19,24
ethics 248:23 249:7,9 255:4 266:15
Europe 47:14
evaluate 85:14,21
evaluating 85:18 86:8,8
evaluation 175:19 181:23 182:4
evaluations 182:7
evening 19:5,6
event 134:18 278:22
events 235:5
everybody 189:11,11
exactly 12:21 51:13 69:11 108:17
    174:22 220:7 234:11 281:17
exam 33:6
examination 3:5,14 4:7 286:19
    288:4
examined 4:5
example 88:16 103:16
examples 52:12
exceed 150:4
Excellence 29:11,15
excellent 218:10
exception 7:18
excerpt 224:2 225:7
excerpted 224:21
excerpts 224:11 289:16
excuse 86:8 229:19 235:24
execute 273:23
executive 141:20 174:18 235:25
executives 47:21,24 128:6 247:18
    268:16
exempt 88:5
exercise 71:16

exhibit 15:17 16:6 44:16 74:3 76:3
    76:4 93:24 94:3,8 99:9 136:4
    145:21,22 153:22,24 180:14,19
    183:2 197:12 199:2 202:3 203:7
    203:9 206:6 209:4,10 211:6,7
    212:11,12,13 213:11,13,13 215:6
    216:24 219:6,7 224:8,23 237:8,9
    237:14 238:23 240:22,23 243:2,3
    244:12,13,18 249:13,15 252:12
    252:16,18,18,21 253:7,12 280:4
exhibits 10:23 252:17
existed 40:6
existence 105:9 264:24
expand 37:16
expanded 26:2
expansive 26:23
expat 156:3
expect 66:14 158:20 163:7 183:17
    216:2 218:18
expectations 122:23 150:5 172:23
expected 52:16 107:6 129:19
    161:20 189:22 255:12
experience 17:9 50:23 52:20 54:23
    55:10,18 56:15,18,22 57:2 59:13
    59:13,19 60:22 61:24 62:11
    65:12 69:17 76:18,23 77:6,15
    84:5 86:15,18,19 87:7 91:8,12
    92:13 102:3 103:19 106:3,4
    130:8 156:13 185:9
experienced 102:15 156:21 158:14
    159:24 160:12 162:2 163:3
experiences 59:6 78:17
experiencing 91:21
expert 101:11
expertise 53:12
experts 101:8,13,17
explain 5:17 59:11 77:21 100:21
explained 132:16
explaining 78:18
explanation 100:7
explore 39:16
export 84:11,12 85:2,4
exposure 52:21 57:6,10 58:3,6,7,9
expound 125:16
express 230:20 231:8,24
expressed 59:19 133:22 230:23
    267:21
expressly 178:4
extent 6:7,16,23 26:2 115:19
    135:21 152:19 227:13 237:4
    291:9,11,18
external 32:8
externally 33:21 34:10
eye 83:24
eyes 113:5

**F**

F 1:1 292:2

Garden 2:4
GC 54:15,19 199:16 274:17
GC/CCO 117:24
GCC 285:24
gender 136:14 164:11 165:6,16,21
general 8:18 11:18 12:19 17:11,20
  20:11 27:11 29:16 35:17,19,20
  48:18 50:10,14,18,19 52:7,15,17
  53:17 57:8 58:5 59:25 60:19
  63:13,15 64:10 65:3,25 66:12
  67:18 69:8 72:3 76:9 80:7 82:6
  84:25 86:17 87:11 91:25 93:4
  96:17 106:23 107:4,21,23 116:11
  119:10,11,13 120:4,25 121:3,15
  121:18 122:11 125:5 127:12
  128:17 133:10,20 137:2,15
  140:25 142:13,14 153:16 164:23
  165:20,20 181:15 183:22 184:16
  185:13,15 190:23 192:3 285:24
  290:19
generalist 40:5,8 101:2 102:12,21
  103:23 104:11 122:2
generalists 97:12 102:10 121:9
generally 6:18 15:10,11 17:19,25
  20:7 22:16 26:7 35:16 55:2 59:9
  62:20 65:14 96:14 104:23 136:9
  142:17 279:23,24
generous 145:17
Genix 98:24
Genomatica 166:6,23 167:6,11
  170:16 172:3 176:2 210:2 218:13
  222:25 225:13,23 235:14,18
  236:6 237:21 256:25 268:14
  270:7 272:5,12 276:15,19 278:5
  279:14 282:16 283:3,15,17,18
  284:2
getting 138:15 184:10 210:10
  242:17 275:5
give 9:2 29:6 38:15 52:12 84:24
  100:6,9 101:13 159:12 161:16
  201:17,18 247:16 285:10,15,20
given 8:10 156:5 228:22,22,22
  245:20 287:12
giving 26:13 174:16 212:19 221:18
  225:2 241:14 248:12 257:12
  262:12 269:6
glance 16:25
global 51:22 95:9,15 133:17 171:11
  171:17 268:21
globally 12:6
globally-focused 95:25
go 6:21 13:16 15:20 24:7 25:24
  31:22 92:9 97:2 101:11 104:15
  106:6 108:7,8 114:2,17 118:13
  129:12 142:22 154:12 158:15,15
  160:13 169:25 170:7 172:14
  176:16 180:10 184:21 188:5
  192:3 196:23 206:24 208:9

210:14,16 211:22 212:4 228:3
  242:25 244:12 245:21 254:10,19
  256:11 259:6 261:15 267:2 277:9
  280:21
go/no 142:22
goal 52:2,6,14 63:12 104:6 120:15
  120:16
God 126:16
goes 102:6,7,7 147:17 218:9
going 5:4,19 13:3 15:12,23,25 16:2
  32:15,18,23 44:13 48:13 50:5
  55:9 62:2 66:22 68:10 74:7 76:3
  89:9 93:23 96:9 99:7 104:11
  119:16,23 123:7 126:17 132:23
  133:15 172:13 176:14,22 178:4
  179:3 198:2,13 204:4 207:25
  209:4 210:10,19 211:19,22
  212:10 213:11 217:15 218:11,13
  219:6 220:15 221:6 222:5 229:2
  229:11 246:5 247:6,10 259:5,13
  265:21 273:13 274:9 282:13
good 4:16 32:4 51:23 62:14 65:19
  66:18 103:16 104:13 107:9
  119:19 152:9 171:21 172:4,23
  178:18 189:7 190:2 195:25
  205:11 218:10
GORDON 2:8
governance 76:19,24,24 77:6,10,11
  77:12,14,15,23 117:12 184:4,8
  184:10
government 140:6,7
governmental 92:24 93:5
graduated 20:2,19
graduates 277:9
grant 230:23 231:5,7,24
granted 178:3 210:7
granting 174:18
great 51:16,17 55:23 159:12
  198:15,20 211:12 259:6
greet 233:23
greeting 248:12
group 22:20 29:12,13,14 31:25
  35:4 37:14 55:4 57:13 58:11 59:2
  73:15 77:25 78:8,10 80:23 82:4
  88:9 97:14,15,16 100:13,23
  101:6 102:3,9,11,24 103:8,12,20
  104:10 126:12 133:6 246:24
  247:2,11 269:8 276:22 277:7
groups 100:11 230:5
grow 172:8
grows 106:10
guess 92:18 130:23
guests 128:20
guidance 128:23 157:7,8 158:5
  189:4
gum 109:14,15,19 110:9,16,18,21
  110:22 111:4 124:12

H
H 4:2 288:7 289:2 290:2
habit 110:16
habits 110:18
half 210:16,17
hand 15:18 199:2 219:6 280:21
handed 146:14 211:7 212:12
  213:12 253:11
handful 145:3
handing 128:21 211:4
handle 101:2,3 126:15 159:19
  205:21 243:17 259:3 264:18,19
handled 105:5 159:10,12 195:25
  247:8 250:4 255:10 273:10
handling 157:18 204:2
hands 205:12
happen 32:7 284:3
happened 46:9 108:13 160:11
  198:7 201:13 204:10 231:2
  241:16 251:15 261:5,8 264:5
  267:21 270:7 284:18 285:3
happening 94:17 116:18 119:3
  165:3 229:3 251:2
happens 77:8 88:21 129:10
happy 7:2,5
harassment 154:6,21 249:4
hard 33:7 105:25 117:20 192:2
  277:16
harm 243:21 255:4
hate 216:20
head 80:2,22 81:24 129:4,5 250:21
  250:22
headquarters 43:23 47:16
heads 129:7
Healthcare 98:15
hear 4:25 5:23 143:11 210:12
  263:14
heard 95:9 133:8,14 194:4 211:16
  226:13
hearing 9:3 126:15 223:12 224:10
  224:16 225:3 289:15
heavy 105:4
held 1:19 180:11 292:7
help 29:17 62:12 65:19 101:25
  102:19 104:14 108:15 144:18
  171:16 211:22
helped 270:4
helping 26:12
helps 37:16 150:8 189:3 247:19
hereto 3:3
hereunto 292:21
high 65:22 88:6,6 129:16 149:19
  236:8
high-level 29:7
high-ranking 169:17 250:23
higher 208:7 231:25
highest 129:8
highly-regulated 57:22

internally 260:25
International 91:12 133:7 135:15
291:12
interpretation 110:8 210:22
interrupt 5:13,18 27:14 61:11
68:19 200:14 226:6
interrupted 68:21
intervening 139:7,9 219:18
interview 61:23 70:21 75:10,14
107:6 158:15 160:10,14 161:4,7
162:25 163:4,19
interviewed 31:17,19 70:20 160:16
160:20 162:9 163:2,9
interviewing 75:7,7 82:25
interviews 70:24
introduction 248:13
investigate 154:5,20 156:8,14
159:3,6 262:3,19
investigated 157:20
investigating 155:14 156:23 158:7
158:21 284:12
investigation 138:8,18,24 140:7,12
140:21 141:23 155:11 156:25
157:3,6,14,18,22 158:3,6,13
159:9 160:3,6,15,17 162:18,19
164:12 263:3,20 284:15,17
investigations 139:11,16,22 140:4
investigative 157:10 158:18 262:22
invitation 157:16
invite 129:17
invited 105:20 125:15 133:4,25
151:25 197:4
inviting 191:18
involved 50:20 142:25 205:23
involving 9:3 135:15 154:8 291:12
IP 20:18 21:8
Isao 20:14
issue 6:25 17:6 66:22 89:5 102:16
124:8 126:12,15 131:4 132:14
134:21 138:13,14 142:18 151:18
162:16,23 164:4 165:15 183:25
242:19 252:16 259:10,17 262:19
264:12 268:13 273:16
issued 74:22 286:15 290:21
issues 6:21 8:24 54:21 70:11 72:22
87:13,18,19 89:15,19,21 90:15
90:21 91:9,17 119:8 142:20
198:3,3,3 201:9,21 202:13,21
251:5
it'll 66:20
italics 161:20
items 113:3 151:25

J

J 2:6 4:1,2 5:1 6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1 28:1

29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1 153:1 154:1 155:1
156:1 157:1 158:1 159:1 160:1
161:1 162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1
181:1 182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1 190:1
191:1 192:1 193:1 194:1 195:1
196:1 197:1 198:1 199:1 200:1
201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1
211:1 212:1 213:1 214:1 215:1
216:1 217:1 218:1 219:1 220:1
221:1 222:1 223:1 224:1 225:1
226:1 227:1 228:1 229:1 230:1
231:1 232:1 233:1 234:1 235:1
236:1 237:1 238:1 239:1 240:1
241:1 242:1 243:1 244:1 245:1
246:1 247:1 248:1 249:1 250:1
251:1 252:1 253:1 254:1 255:1
256:1 257:1 258:1 259:1 260:1
261:1 262:1 263:1 264:1 265:1
266:1 267:1 268:1 269:1 270:1
271:1 272:1 273:1 274:1 275:1
276:1 277:1 278:1 279:1 280:1
281:1 282:1 283:1 284:1 285:1
286:1
jail 126:17 127:21
January 124:18 222:17,18 223:2
223:18 225:13,21 232:16,23
233:6,13,19,21 234:13,15,19,21
234:24 235:5 245:7,9 246:23
252:13 253:19,24 261:21 264:13
264:25 266:3 267:6,11 268:5
270:13 271:20 272:21 276:9,11

276:13 284:13
Japan 14:6 20:16 33:4,6 43:9,10,12
43:14,17,20 44:5,6,8 45:9,12,18
46:2,3,11,17,19,24 47:7 95:12
96:2 128:7,13,20 129:5,23
207:21 226:2 239:17,21 247:7
264:17 277:13,19
Japanese 96:5,8 128:16 129:12
130:17,19 151:16 156:3 175:7
251:4 277:7
Jen 206:2
Jen's 122:4
Jennifer 1:3 4:19 10:16 62:6,7,8,11
65:19 66:14,17 67:3 96:18,19
97:15 100:3,8,9 105:12,20 107:7
108:6 112:24 115:8 116:3 125:10
125:11,13,14 126:13,15 128:7
129:20 132:4,9 133:22,25 144:15
145:5,8 146:20 148:14,19 149:18
151:13,14 152:2,9 156:2 157:4,7
157:17 158:5,11 160:4 162:8
163:5 166:25 172:22 173:2
174:11,20,21 183:14,16 184:2,8
184:19,22,25 185:17 189:13
190:8 191:14 194:23 195:20,24
196:11,12 197:3 198:21 199:15
200:2 201:10 202:15,15,25
204:13 206:2 208:5,5 210:12
213:20 214:4,17 215:17 219:11
219:19 220:4,9,15 221:12,25
224:17 228:20 229:4 235:11
236:4 241:12,14,15,20,25 242:18
243:16 244:10 245:2,17 248:14
248:21 251:19,20,20,22 253:19
254:9,11,15,16 255:2 257:3,12
262:11,13,13 263:9,9,9 264:11
265:24 267:4 268:24 269:5,10,11
269:13,16,23,25 270:18 271:4,8
Jennifer's 100:19 157:5 158:25
181:12 182:10 218:8,14 241:19
244:2 250:13 256:20 261:6,15
270:7
JEROME 2:17
Jerry 9:21
Jersey 38:24 39:3 63:20 93:14
155:9,24 159:14,22
Jo-Hay 215:21
job 11:17 12:23 13:4,11 17:19 20:8
20:24 21:10,13,19,22 22:11
23:19,23 25:5 26:8,13 27:20 28:8
28:14 29:2 35:5,5,11,12 38:2
39:5 40:21 41:15 69:19 70:22
76:9 86:11 108:21,21 205:7,20
266:17
jobs 24:3,18 35:7,9 139:11
Joe 96:19 103:11,16 112:24 121:25
138:20
Johei 215:10

**level** 48:3,8 63:4 66:10 78:5,13
  79:19,21 102:17,21 120:7 153:15
  153:15 228:23 236:8
**Lexington** 2:15
**liabilities** 58:18
**license** 220:21
**licensed** 33:10,12
**licensing** 92:4
**lieu** 72:16 73:6
**life** 73:12,16 258:5
**light** 12:15
**lightly** 12:3
**likelihood** 39:22 260:18
**likewise** 14:4 59:14
**limitation** 212:3
**limited** 231:9
**line** 40:17 150:11 184:23 214:22
  215:15,17,18 217:17 222:11
  247:18 291:22
**lines** 270:23,25
**lining** 83:21
**LinkedIn** 14:17 16:7,11,15,22 26:3
  28:11 35:7 288:9
**list** 99:20 100:10 122:3,4 160:9
  185:6 257:14
**listed** 15:8 17:18 28:5 35:24 125:19
  184:6
**listing** 23:18 28:19,22 194:15
**listings** 23:19
**lists** 28:19 285:6
**lit** 53:18
**literally** 126:16
**Lithotech** 58:9 79:3
**litigate** 103:19 167:18
**litigated** 91:3 230:8,11
**litigating** 229:24
**litigation** 71:10 74:10 92:10 99:18
  101:5 102:6 103:20,21 104:7,7
  166:8,23 170:19,23 171:6,16,18
  172:2 176:2 205:21 218:6,21
  220:11 230:5 260:12,16,18,19
  264:20 273:24 274:4,15 276:16
  276:20 282:2,8 284:10 286:11
**litigations** 90:23
**litigator** 204:3 205:6
**little** 13:15 52:9 55:9 61:18 100:6
  117:20 133:13 167:8 178:9,9
  195:2 211:22 242:9
**live** 50:8 63:19
**living** 63:18
**LLP** 2:3,8,14
**local** 23:2 33:2
**locate** 71:17
**located** 22:22 155:8
**location** 159:22
**log** 282:8,11
**logical** 120:10
**long** 8:15 9:15 22:5 24:21,24 29:25

30:16,19,22 47:19 55:24 64:6,6
  184:19 266:2
**longer** 19:20 102:10
**look** 18:13 24:18 25:23 33:21 35:7
  35:9 99:19 105:24 106:9 138:12
  166:2 172:23 178:15 197:2 205:5
  211:4 231:19 242:5 261:3 280:3
**looked** 55:4,5 96:23 146:11 206:6
  226:5 227:10 231:5 240:14
**looking** 16:15 24:3 31:15 36:6
  39:12 40:11 44:25 54:19 74:17
  93:25 100:17 108:16 146:5 148:5
  176:9 180:22 199:6 203:14
  213:15 214:5 215:3,4,7,14 217:8
  219:13,14 224:22 225:7 237:16
  239:7 241:6 243:11 244:20 250:5
  253:14 280:4
**looks** 96:7 181:12 204:21 218:11
  220:14
**lose** 21:9
**loss** 118:9
**lot** 17:24 57:9,21 60:12 77:16
  103:9 106:2 108:14 120:19
  151:19,23 152:10 154:11 222:6
  222:10 255:10 265:25 282:24
**lots** 77:10 188:12
**loud** 125:10 126:8 134:16
**low** 177:7 178:19,23,24 179:19,20
  179:21,22 180:2
**lower** 153:15
**lowest** 148:9
**Lucite** 133:7,8,20 134:3 135:15
  183:22 291:12
**lunch** 42:10 123:7
**Luncheon** 123:11

---

**M**

**M** 287:2
**M-E-D-A-R-E-X** 82:16
**M-E-T-A-R-E-X** 82:15
**M&A** 20:14 56:18 59:6,12,13
  88:20
**magistrate** 176:3 281:22
**Maikoo** 96:21
**main** 35:21 43:14
**maintain** 14:16,19 36:20 43:3
  102:12 115:2,6,9 204:21
**maintained** 37:18,22 41:23 48:22
**maintaining** 21:7 120:2 149:19
**major** 56:19 58:17 72:22 92:7
  132:7 267:23 271:23
**majority** 118:6,18 119:7
**maker** 269:7 282:23
**making** 27:13 62:13 63:17 78:13
  136:13 175:9 237:21 251:13
  258:14 266:4,15 280:18 283:25
**male** 144:4 163:2,3
**manage** 55:16 78:8,12 84:21 85:11

90:21 126:14 205:9
**management** 26:25 105:18 149:6
  150:8
**manager** 80:6,22 82:3,11 147:2
  149:9
**managing** 103:21 205:9
**manner** 150:16,22,24 151:5 158:10
  160:8 175:6
**mannerism** 132:19
**MANSUKHANI** 2:8
**manufacturing** 52:19
**Maple** 1:12
**March** 143:25 144:10 183:17
  187:10 195:7 196:8
**mark** 15:13,24 44:14 69:24,25
  145:20 182:25 201:25 223:21
  232:4,13 249:19 253:6 273:6,14
  273:15
**marked** 15:16 16:8 18:9 44:18 74:5
  74:8 76:4 93:24 94:5 99:8,11
  136:4 145:24 153:4 180:16 183:4
  197:14 202:5 203:11 206:24
  209:11,18 211:5,8 212:12 213:13
  214:6 217:2 219:7 224:11 237:11
  238:25 240:25 243:5 244:15
  249:17 252:23 253:9,12
**market** 53:2,9
**marketing** 26:14,16
**marriage** 292:17
**married** 187:15
**match** 60:23 61:24 62:22
**matches** 103:24
**material** 36:3 73:11 224:2 228:10
  229:5
**materials** 274:10 276:5
**Matsugu** 261:18
**Matt** 70:3 152:24 179:15 226:7
  283:14
**matter** 4:19 8:18,19 59:24 60:6
  101:7,8,11 127:6,7,11 132:18
  156:8 166:6,6,13 167:7,12
  169:16 170:16 172:11 176:10
  177:2 178:2,12 204:2 210:2
  213:5 215:24 216:11 222:25
  224:17 225:14,23 230:9,12
  231:24 235:14,18,23 243:17
  256:25 264:22 269:10 271:14
  272:5,24 276:3 278:5 279:14
  282:16 283:3,23 292:18
**matters** 79:23 85:8 91:2 93:13
  101:5,10 105:6,17 117:12 127:12
  127:13,19 172:8 229:25 236:5,9
  264:20 277:19
**Matthew** 2:5 4:17 216:19
**max** 169:17
**maximum** 176:16
**MCC** 167:13 168:7,14 169:4,8,12
  169:14,23 170:4,5 171:9,10

MPHVM 98:10
MTDA 98:7
MTPA 98:4
multi 169:14,15
multipage 145:22 203:9,12 224:8
  224:14 288:20 289:10,14
multiple 41:15 44:7 57:24,24 65:15
  70:23 79:5 86:4 87:13 95:18 96:2
  145:4 160:25 161:23 204:16
  228:21 280:18
mutually 256:18

**N**

N 1:1,1 2:1 4:1,2 5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1 68:1 69:1
  70:1 71:1 72:1 73:1 74:1 75:1
  76:1 77:1 78:1 79:1 80:1 81:1
  82:1 83:1 84:1 85:1 86:1 87:1
  88:1 89:1 90:1 91:1 92:1 93:1
  94:1 95:1 96:1 97:1 98:1 99:1
  100:1 101:1 102:1 103:1 104:1
  105:1 106:1 107:1 108:1 109:1
  110:1 111:1 112:1 113:1 114:1
  115:1 116:1 117:1 118:1 119:1
  120:1 121:1 122:1 123:1 124:1
  125:1 126:1 127:1 128:1 129:1
  130:1 131:1 132:1 133:1 134:1
  135:1 136:1 137:1 138:1 139:1
  140:1 141:1 142:1 143:1 144:1
  145:1 146:1 147:1 148:1 149:1
  150:1 151:1 152:1 153:1 154:1
  155:1 156:1 157:1 158:1 159:1
  160:1 161:1 162:1 163:1 164:1
  165:1 166:1 167:1 168:1 169:1
  170:1 171:1 172:1 173:1 174:1
  175:1,14 176:1 177:1 178:1
  179:1 180:1 181:1 182:1 183:1
  184:1 185:1 186:1 187:1 188:1
  189:1 190:1 191:1 192:1 193:1
  194:1 195:1 196:1 197:1 198:1
  199:1 200:1 201:1 202:1 203:1
  204:1 205:1 206:1 207:1 208:1
  209:1 210:1 211:1 212:1 213:1
  214:1 215:1 216:1 217:1 218:1
  219:1 220:1 221:1 222:1 223:1
  224:1 225:1 226:1 227:1 228:1
  229:1 230:1 231:1 232:1 233:1
  234:1 235:1 236:1 237:1 238:1
  239:1 240:1 241:1 242:1 243:1

244:1 245:1 246:1 247:1 248:1
  249:1 250:1 251:1 252:1 253:1
  254:1 255:1 256:1 257:1 258:1
  259:1 260:1 261:1 262:1 263:1
  264:1 265:1 266:1 267:1 268:1
  269:1 270:1 271:1 272:1 273:1
  274:1 275:1 276:1 277:1 278:1
  279:1 280:1 281:1 282:1 283:1
  284:1 285:1 286:1 287:2,2 288:2
  292:2
name 4:10,16 18:4 50:4 60:25
  61:19,22 80:20 86:2 97:22 98:15
  98:17 133:20 268:18
named 19:14 22:12 190:12 268:22
names 99:20,21 156:5
nature 11:8 49:19 50:14,18 54:15
  54:19,25 56:2 57:8 58:5 60:19
  73:21 77:5 82:22 84:25 86:17
  87:11 91:25 93:4 109:3,24
  124:22 125:5 128:17 131:14
  139:15 191:24 194:12,14 197:20
near 40:15 50:8 129:8
necessarily 62:15 66:13 280:3
necessary 224:7
need 7:7 54:2,2 102:17 132:9,12
  169:19 184:14 197:25,25 203:5
  205:10 207:15,17 208:2,2 210:7
  211:14,21,25 212:4 213:21
  228:15 280:12,13,22 281:11,18
  281:18,22
needed 95:14 118:10 148:14,15
  172:18 184:12 280:9,19
needs 132:12 148:6 163:15,17
  167:15 184:15
negative 192:12,14
negotiate 68:14 204:20 210:6
negotiated 68:22 69:13,14,16
  72:15,23
negotiating 64:5 73:9
negotiation 75:4 78:21 290:24
negotiations 70:17
neither 162:6 196:14
network 32:2,3
Neutral 175:19
never 109:16 119:9 138:21 162:3
  186:20 198:20 267:20,21 270:2
new 1:2,12,20 2:4,10,10,16,16 4:15
  4:15 12:5 26:13 29:10 33:7,10,21
  38:24 39:2 42:15 49:18 63:20
  93:14 109:16 111:9 114:16
  133:19 189:3,4 236:3 239:25
  240:22 261:17 287:3 292:5
news 218:10 245:6,13 246:9
nice 236:25
Nicholas 1:7,17 2:9 4:11 16:8,12
  213:25 252:14 287:6,17 288:5,10
Nick 152:24 169:25 170:11,12
  191:23 197:25 214:19 271:7

284:25 285:2
night 18:20 239:13 262:17
nighttime 175:14
nine 55:24
nomenclature 21:24
non-attorneys 10:7
non-group 73:17
non-privileged 11:7
non-sexual 162:13
nonexempt 88:5
nonresponsive 111:12
nonsexual 162:3
nonverbal 150:17 151:10
nonverbally 151:24
normally 19:2 78:25 176:24 177:3
Notary 1:19 3:15 4:4 287:23 292:4
note 109:13 110:13 147:4,5 183:13
  187:2,25 196:20 197:2 198:8
  212:2 237:3 251:16
notepads 261:16
notes 111:20,20,23 112:3,5,10,15
  112:17,18,20 113:4,4,8,13,20
  125:24 134:17,20,25 135:8,16,23
  152:13,21 183:16 185:24 236:14
  236:17,24 237:6 253:20 254:8
  291:4,12,15,19
notice 1:19 131:5 253:20 260:18
  276:2
notified 267:7
notify 251:7
November 11:21 46:25 54:11
  61:15 67:19 72:12 74:24 75:19
  76:14,17 78:20 96:12 98:23
  107:19 115:24 116:18 117:5
  123:16 124:17 137:5,25 148:13
  166:11 208:25 266:3 290:23
NS 69:23
nuanced 178:10
number 70:11 74:11 78:12 95:19
  125:17,17 163:12 176:15 185:3,5
  224:18 227:8 228:15 231:20
  275:9 281:23
numbering 16:3
numbers 73:9 209:22

**O**

O 1:1 4:2,2 287:2 292:2
oath 287:8
object 68:10 111:10 229:6,11,13
objection 9:25 14:13,22 15:9 19:4
  21:21 30:11 32:17,24 33:17
  34:17,24 36:8 39:14,19 40:10,19
  41:11 42:2 43:5 45:19 46:21 47:8
  47:23 49:9 52:4 54:6 55:13 56:5
  56:12,16 57:4 59:7,20 60:2 63:23
  65:5,13,24 66:6 67:12 69:3,10,23
  72:13 73:14 75:25 76:20 80:5,10
  80:15 81:13 85:13,22 89:22

290:18 291:5
omit 36:3
on-site 93:19 275:7,7
once 8:14 37:24,25 41:25 170:6
  280:7
one-on-one 103:7,9 112:19 183:24
one-on-ones 104:17 111:20 113:25
one-page 44:16 74:3 99:9,13,17
  249:15 250:8 253:7 288:11,13,18
  290:6,7
ones 126:3 271:23
open 108:10 109:14 247:21 270:23
  270:25 271:14
opened 110:25 159:9
operated 133:8
operates 101:19 189:12
operations 52:20
opinion 40:3 105:24 188:20 222:5
opportunities 40:6 49:7,13
opportunity 5:16 27:9 39:17 42:15
  48:15,16,18 51:24 53:16 59:24
  63:15 131:18 159:17 161:17
  164:6 171:12 178:6 217:14
  226:16 247:17,24 264:12
opposed 95:25 117:14 133:17
  230:6 256:17
opposing 129:7
option 245:19
or/and 269:20
order 70:22 102:14 114:9,14 120:7
  280:13
organization 29:10 32:9 82:4 88:16
  128:8
original 24:24 68:12 206:25 251:16
  252:17
originally 22:10 26:12 46:16 122:5
  156:7,9 248:19,20
originals 209:7
Osaka 47:17 95:23
Otsuka 59:3
outcome 236:12
outlined 266:9
outside 22:24,25 23:3 31:16 83:12
  84:5,6,10,13,21 85:7,16,18,20
  86:8 101:4 114:6 157:14 166:24
  166:25 167:18,21,24,25 204:5
  205:5,11,19 260:23 269:2,5,12
  269:12,24
overall 80:9,17 81:3,24 277:25
overlap 97:13
overpaying 144:16,21 145:6 184:3
oversaw 250:24
overseeing 176:4
overture 109:4
owed 218:25
owned 22:25 133:7,9 268:20

P

P 2:1,1
p.m 123:11,12 180:12 273:20
  286:20
Pace 18:15 19:11
pack 109:13 110:25 111:5
package 68:25 72:16 73:6 144:4,5
  144:14 145:18 254:22,23,23
  255:19
packages 144:17
pads 115:2,9,14,17 261:9 291:7
page 17:8 18:8 23:16,18,19,23
  24:16 25:9 28:2 35:24 44:22 96:4
  99:19 136:17 138:6,6 146:22
  147:22 148:6 150:12 154:2
  193:23 209:2,18 213:23 214:6,12
  214:14,18,22 218:4 219:14,25
  221:11 224:9,9,15,19,21,22
  244:5 253:23 288:4,8 289:3,14
  289:15 290:3,12 291:3,22
pages 146:12
panel 148:5
paperless 112:21,22,22
paragraph 136:20,22 138:5 143:21
  143:25 154:2,11,13 161:11,14,15
  164:9,16 165:25,25 245:5
paralegal 20:6,8,12,18 21:8 58:12
parameters 177:6
paraphrasing 127:25
Pardon 136:21
parent 23:6
parentheses 186:11
Park 2:10
parse 61:17
part 29:10 43:21 59:2 63:3 69:13
  71:9,12 75:6,11 83:13 94:12
  100:8 102:23 103:25 104:16
  116:3 123:17 130:8 193:17
  195:19 197:5 245:4 247:10
  253:19 263:20 269:22 283:14
partially 191:3
participant 94:11
participate 78:23 139:23 212:8
participated 78:21 81:18
participating 139:17
particular 41:19 81:2 82:17 127:11
  140:3,21 142:18,19 151:17
  259:17
particularly 91:14 128:25 166:19
parties 3:3 292:16
partly 197:5
partnered 57:23
partners 57:21
party 6:13 197:4
pass 31:12 33:6,9 38:17 214:25
passed 20:22
passing 20:25
Pat 70:19,25 74:19 253:22 254:9
  255:13 263:14 265:15

patent 20:11,12 102:7 103:17
  121:10 122:2,6
patents 221:18
patient 109:21
Pauletta 133:21 134:3 183:21,22
Pause 38:16 202:7
pay 220:25
paying 69:15 72:25 86:12 132:14
  283:18
payments 216:6
Payroll 200:4
pending 7:12
people 32:5,6,10 33:9 43:7 51:16
  63:13 66:19 83:21 88:17,22
  90:12 91:15 102:15 112:18
  118:13 119:2 129:2,8,11,14,17
  152:2 163:2 171:20 188:12
  191:14 246:6,9 247:12,17,18,20
  260:24 261:14 277:6 278:14
  279:21
perceived 100:10 163:16
percent 69:12 189:8 199:16,22
percentage 33:8 189:10
perception 164:11
perfectly 159:19
perform 122:22
performance 122:21 146:19 147:5
  147:14 148:8 149:2,13 181:12
  182:19 198:11
performed 52:13 118:3
performing 118:2 157:10
period 6:15,17,19,24 18:24 30:6,15
  37:23 43:19 61:15 92:4 94:21
  123:20 129:25 130:6,10,21 139:4
  139:8,9 178:19 199:17 201:19
  236:8 265:22 266:2
permitted 136:24 137:6 173:10,14
perquisites 72:10
person 29:20 54:12 77:11 80:8,14
  80:15,16,17,25 82:2,10,11 90:6
  101:20 102:2,18,20 103:6 127:4
  129:15,16 139:18 140:8 142:9
  159:21 160:10 161:22 162:7,11
  169:12,18 184:9,13 185:12
  233:25 261:18 265:16 270:20
personal 7:19 73:17 187:11,21
personally 90:25 93:20 192:6
  230:8,11 258:9
personnel 36:21 37:7 48:8 75:11,15
  112:6 142:5,7 169:7
perspective 26:16,16,17,25 57:16
  80:12,23 93:16 178:14 186:5
  278:4
pertaining 91:9 113:14 135:8
  291:5
perusing 188:17
pharma 23:2 39:21,23 40:12,16
  43:9,11 52:3 53:2 93:8 95:15,23

53:10,12,20,22 62:18 83:14
84:18 85:5 86:6 91:18 95:7,17
98:3 104:8 105:5 106:3 109:12
113:22 114:3 117:13,15 118:19
125:21 137:9 142:8 159:17
182:11 196:19 202:19 210:18
213:6 215:16 218:16 242:15
248:19 251:3 261:18
**problem** 24:8 57:18 188:23 189:18
189:20,20,23 191:15,19,25 192:6
195:3 205:8 215:13 263:24
267:23,23
**problems** 49:16,23
**procedurally** 15:14
**procedure** 114:8,11,14
**proceeding** 281:21 292:7
**proceedings** 38:16
**process** 31:20 35:5,5 61:23 62:21
64:6 70:21 75:4,7 84:8 90:5
103:25 104:16 105:19 107:6
116:3 119:4,8 120:20 274:7
290:25
**procurement** 26:21 29:20
**produce** 135:23 223:24 291:14
**produced** 74:10 99:18 113:14
115:20 135:22 152:20 196:4
227:14 236:19 237:5 270:19
282:2,8 286:11 291:4,10,11,18
**product** 27:5 39:24 40:16 53:2
**production** 12:11 14:9 71:24 74:21
75:3 113:13 115:17 152:20
227:14 237:6 261:20 290:11
291:2
**products** 26:13 27:2,3,7 43:10 53:9
57:11,12,14,15,25 58:23
**professional** 1:7,8,9 14:20 17:3
172:16
**proffer** 110:9
**proficient** 266:6
**profile** 16:14,18,23 17:2 76:12
**program** 18:18,20 19:3,5,7 29:23
77:13,23 78:7 117:13 248:11
270:23 271:4
**programming** 84:11,13
**progress** 116:5 266:4
**progressive** 286:2
**projects** 117:10 188:25
**promises** 120:15
**promoted** 28:18 30:3 141:22
**promotion** 26:20
**pronounce** 229:21
**pronounced** 215:21
**properly** 157:19
**propose** 208:7
**proposes** 217:16
**propounded** 71:15
**prorated** 199:17
**prospective** 56:11

**prospects** 52:24
**protection** 57:17 93:15
**protocol** 140:21 141:2,4 158:7,18
158:22
**provide** 38:3,6 56:3 71:19 74:7
101:25 102:14 126:10 128:3
131:11,25 158:6 161:17 178:6
206:7
**provided** 10:9,12 15:7 31:19 38:10
38:18 41:13 73:24 92:20 93:20
93:20 135:4,12,19 137:13 145:17
149:3 152:17 157:9 158:5 161:21
173:25 200:21 212:24 223:25
269:23 276:6 281:14 282:15
284:5
**providing** 59:17 136:3 221:9
269:22
**provisional** 123:19
**provisions** 57:17
**public** 1:20 3:15 4:4 172:14 287:23
292:4
**pull** 133:13 224:6 274:3
**purchase** 83:20,23
**purchased** 72:17
**purported** 258:7
**purportedly** 272:16
**purpose** 26:12 72:25 108:7 175:25
207:25 236:4 245:24,25 246:10
247:14,15
**purposes** 69:15 86:21 88:4 174:13
174:18 212:20 274:20,23 278:25
279:12,13 281:2,19
**pursuant** 1:18 249:22
**pursue** 62:3
**put** 106:18 111:4 195:24 215:16
254:24

**Q**
**Qualicaps** 268:21,22 269:7
**quality** 86:12
**quarter** 147:7
**query** 221:16
**question** 3:10 4:25 5:4,6 6:2,23
7:12,13 10:3 13:6,8 24:13,14
25:3 36:24 37:4 42:17,20 54:7
55:3 56:17 67:7,10,13,16 69:4
70:5 77:18 80:4 86:24,25 87:3,4
89:23 93:11 96:9 101:21 111:12
127:8 137:4 139:3 149:14,18,22
153:2,10,20 154:24 165:17
169:12 171:24 177:19 179:8,9,12
181:18 184:18 185:5,8,11,14
186:19 191:8,10 193:3 195:14
200:13,14,18 201:15 205:13
216:17 219:9,20 229:8 231:3
233:16 257:24,24 262:7 265:8
272:19 275:22 277:16,17 279:6,9
279:10 283:8,11

**questioned** 54:22
**questioning** 168:12 204:2 222:8
**questions** 4:20 5:11,18 6:16,18,20
7:17 55:9 123:14 136:18 205:19
254:24 286:6,9,13,17
**quick** 180:7,8
**quickly** 84:3
**quitting** 186:11,14
**quoting** 128:14

**R**
**R** 2:1 292:2
**R&D** 35:22
**raised** 70:11 165:15
**range** 248:25
**ranking** 129:8,16
**rare** 33:5
**rating** 148:7,9,11
**Ray** 46:3
**Rayon** 246:24 247:5
**re-question** 286:7
**reach** 256:22 264:7
**reached** 258:24 259:14
**react** 264:17
**reaction** 125:15 132:11 133:3
134:8 218:8,14
**reacts** 151:13
**read** 13:7,9 24:13,15 36:22,25
42:18,21 67:8,11 78:25 79:2 87:2
87:5 96:8 153:9 165:9,11 179:13
191:9,11 193:2,4 195:12,15
203:20 226:19,22 242:7,8 253:19
254:4 262:5,8 265:9 279:4,7
283:9,12 287:7
**reading** 152:7,8,8 212:4
**ready** 27:7 44:23 99:15,16 224:24
**real** 101:5 251:15 252:2 263:7
264:4
**realize** 172:7
**reallocation** 102:22
**really** 55:3,22,22 62:2,14,16 95:14
103:16 105:13,19 108:12 111:7
118:14 132:13 134:4 152:5 171:7
171:8 176:12,21 184:19 221:17
222:10 224:7 228:18 245:20
247:9 251:4 266:7,10 267:24
269:7 270:21 277:16
**reason** 159:5 172:12 197:22 200:25
201:3,7 225:6 245:12 246:17,18
246:18,21 265:20 266:7,18
**reasonably** 104:5,5 221:8 260:17
**reasons** 142:12 159:8 185:3 195:21
196:17 245:3 256:16 257:14
266:18,19 268:9 271:18 285:6
**reassign** 143:5
**reassigned** 142:12
**reassignment** 165:19
**reassurances** 206:7

231:15 276:19,25
**representative** 167:16 169:4 174:5
  207:8 209:22 283:2
**representatives** 169:8 282:25
**representing** 167:20 227:15 291:16
**request** 7:9 70:13
**requested** 13:8 24:14 36:24 42:20
  67:10 70:12 87:4 142:8 179:12
  191:10 193:3 195:14 198:8
  212:19 213:22 226:21 262:7
  265:8 279:6 280:5 283:11
**requesting** 208:12,14
**requests** 71:12,13 290:11 291:2
**required** 168:8 176:18 184:11
**requirements** 157:25 174:14,23
**requires** 78:5 185:7 207:17
**requiring** 207:7
**reserve** 286:7,12
**reserved** 3:10
**reshuffled** 118:10
**residents** 29:23
**resolution** 174:15 184:13,16
  198:15 207:20 208:12,18 270:5
**resolutions** 184:11
**resolve** 202:20,24 218:11
**resolved** 198:6
**resources** 83:22 86:23 87:8 90:13
  155:15 250:24
**respect** 6:11,15,24 17:3 18:3 31:21
  82:13 84:12 85:8,16 86:22 90:3
  90:15 100:7 113:7,18 114:12
  116:23 121:11 126:6 127:10,11
  127:12,24 128:8 131:23 134:15
  134:23 135:6,14 150:11,21 151:9
  151:12 175:2,6,12 195:20 227:18
  239:24 247:22 248:3 253:3
  270:12 275:22 276:8,15,25 281:6
**respectful** 104:12 150:16
**respective** 3:4
**respond** 242:2,3,4
**responded** 254:9
**responding** 205:4 221:16 222:2
**response** 5:15 6:3,8 7:13 27:10
  50:12 55:2,6 70:12 87:20 88:11
  93:9 109:3 111:11 122:8 126:18
  128:12 143:12 151:19 164:7
  169:13 173:7 174:24 190:10
  204:7 226:17,20 227:3,19 228:5
  229:7 241:19,21 248:4 250:13
  262:24 281:16,17
**responses** 5:11,14
**responsibilities** 17:20 26:8 103:2
  116:24 117:2,4 121:8
**responsibility** 51:21,22 79:19,21
  80:2,9,18 81:4,24 82:18,23 85:7
  116:13 166:22
**responsible** 21:5 22:18 43:22 77:12
  77:13,22 79:25 80:23 83:15,24

85:17 90:6,25 99:5 115:25
  139:10 155:11,14 159:15 166:9
  184:9 229:24 248:5,8
**responsive** 71:17 150:17 229:7
**restricted** 73:21
**restructure** 88:16 105:20
**restructuring** 87:16
**result** 27:4 72:24 103:3 116:7
  140:19 159:10 164:3 171:22
  172:5 173:6 286:14
**resulting** 217:22
**results** 259:10
**resumé** 11:22 12:11,16,17,22 13:10
  14:10 71:2,7,22,25 290:13,14,17
**retained** 58:17 115:13
**retainment** 72:9
**return** 5:17 73:2,3 106:20 245:23
**returned** 62:9 66:14 106:16 107:8
  107:14,21 109:23 153:16 261:13
**returning** 107:3
**reveal** 56:10
**revealing** 9:14 139:14 171:3
  235:21
**review** 10:10,13,20,23 18:12 27:7
  76:11 78:21 103:22 146:19 147:6
  147:14 148:14 172:18 181:13,18
  198:11
**reviewed** 172:10
**reviewing** 82:25 86:19 172:20
  173:3 209:10
**revisit** 70:3,4 114:7
**Ria-daz** 27:5
**ridiculously** 177:7
**right** 5:20 9:8 17:17 22:6 27:19
  28:21 30:7,12,25 35:15 36:10
  40:11,20 42:3 43:13 52:11 53:21
  62:22 63:17 72:21 74:11 102:2
  102:20 105:14 106:19 114:22
  116:19 117:19,19 120:15 127:24
  139:2,7 147:21 155:10 169:17
  172:4 173:6 174:7 178:4 179:6
  184:13,14 185:12 187:3,25
  188:10 189:20,23 192:9 198:17
  198:19 201:17 204:3,25 205:6,7
  205:18,19 206:12 207:13,16
  208:2,7,9 216:17 217:14 219:14
  221:16,20 222:8 224:4 231:6,14
  231:22 234:17 240:7,15,19 242:9
  258:2 259:5,7,8 261:18,24
  265:25 266:2 267:2 272:23 286:7
  286:12
**rigorous** 55:17 61:23 62:25
**ringing** 189:2
**risk** 88:6 89:13 195:24 268:25
**Riu** 43:8
**RL** 69:23 232:13 273:15
**Road** 2:4
**ROBERT** 2:6

**Robinsville** 63:20
**Roche** 20:9 70:25 75:8 96:18 97:17
  120:24 190:19 191:16
**Rockville** 1:12
**role** 26:8,23 29:7,8,9,22,24 30:2,13
  30:14,20,23 51:2,14,15,18,19,23
  60:10,21 62:12 64:13 66:12
  75:16 77:7 83:6 90:4,14,17
  105:14 106:11,11 107:4,14,14
  108:24 119:10,11,12 121:12,24
  123:24 139:15 140:25 167:16
  170:19,22 171:5,25 185:16
  259:13 276:18 281:25 282:7,11
  284:10,12
**roles** 28:23 30:8
**room** 103:14 129:12 150:13 151:11
  151:19,23 152:5,7,8,10
**Rose** 96:20 103:12 122:16
**Rossi** 85:24
**rotation** 277:10
**roughly** 104:19 177:9 210:17
  220:24
**routine** 111:4
**routinely** 101:23
**royalty** 220:21
**RQ** 12:10 14:9 71:24 74:21 75:2
  113:12 115:16 135:21 152:19
  227:12 237:4
**rule** 174:4 188:3,20 189:14 190:4,6
  190:8 266:15
**rules** 128:23 129:17
**ruling** 69:24 70:2 184:12 232:5,9
  232:14 273:7,14
**rulings** 286:14 291:21
**runs** 78:5

**S**

**S** 2:1 4:2 288:7 289:2 290:2
**Sakaguchi** 136:25 138:3
**sake** 8:25
**salary** 199:17
**sale** 79:4
**sales** 26:16
**San** 175:8
**Saunders** 70:19,25 74:19 75:9
  200:5,21,22 253:22 255:14
  265:15
**Savient** 38:23 40:25 41:2,3
**savings** 239:23 240:4,5,10
**savvy** 145:7
**saw** 95:10 227:25
**saying** 45:9 49:14 66:16 94:15
  100:19 119:21 152:8 169:22
  207:14 218:10 219:18 220:4
  222:2,9 229:2 236:25 241:15
  243:18,20 250:12 251:17,19,20
  254:21 269:12,15 278:11 279:17
**says** 16:11 17:9,11 25:10 46:8

143:9,12 168:11 196:12 197:6
200:14 219:13 226:8 234:13,22
243:24 270:3
sort 50:6 53:18 100:7 159:11
267:21
sought 37:25
sounded 72:19 187:4
sounds 234:17
sources 161:23
SOUTHERN 1:2
speak 7:5 24:6 26:18 42:5 53:19
129:3 158:11 207:17 275:8
279:18
speaking 5:12 17:25 20:7 22:16
104:23 142:17 158:10 160:8
speaks 185:25 231:21
special 185:12 188:25
specific 7:9 65:17 117:21 174:3
207:12 228:4 231:11 251:9
specifically 71:11 142:18 150:15
158:12 174:15 177:21 187:4
188:7 191:18 205:17 207:6
212:19 219:11 262:11 280:16
specifics 60:14
specified 12:12 14:10 290:14
specify 7:2
speed 86:12
spelling 206:16
spend 189:8
spent 55:19 119:7 214:19 267:18
spoke 31:24,24 41:24 131:8,10
202:25 204:13 206:3 219:11,16
219:19 255:2 262:15 263:19
spoken 49:6
spot 128:10 153:5,6,8
spots 129:18
Squibb 23:11,22 25:5,20 30:14,17
31:2,8,13,23 32:12,16 33:20
34:10,14,19 39:5,9 41:5,8 43:22
44:5 45:15 46:14 78:24 92:7,17
93:17 100:15 140:9,11 229:20
ss 287:4
staff 12:6
stamp 253:4
stamped 44:17 74:4 94:4,8 99:10
99:14 145:23 146:3,22 180:15,20
183:3,8 197:13 199:4 202:4,11
203:10,13 216:25 217:5 237:10
237:15 238:24 239:5 240:24
241:5 243:4,9 244:14,19 249:16
249:25 250:8 252:11,19,21 253:8
253:13 288:11,13,15,18,20,23
289:4,6,8,10,12,17,19,21,23
290:4,6,8
stand 98:12
standard 72:21 145:12 149:19
158:17
standing 188:3,20 189:14 190:4

stands 98:5 175:17
start 37:15 54:2 55:9 66:17 108:13
128:20 133:15 154:18 210:13
218:5
started 20:5 51:15 53:19 54:21
61:22 63:11
starting 87:24 171:4 235:4
state 1:20 4:9 78:10 287:3 292:5
stated 255:2
statement 216:7
statements 160:25 172:14
states 1:1 216:5
status 215:24 236:9,11
statutory 277:14
stay 66:14,25 67:5,23 106:10 107:7
120:17 259:15
stayed 22:9
stays 106:10
stenographically 292:11
step 35:18 52:10 158:17 198:17
Stephen 96:20 103:11 184:3,7,11
184:20,25 185:17
steps 35:4 198:18 202:20,24 204:8
236:13 262:2,18 273:23 274:9
STERLING 2:14
sticker 15:17
sticks 91:19
STIPULATED 3:2,8,13
STIPULATIONS 3:1
stock 73:21
stop 162:5 163:15,17
stove 8:21
strained 195:9 196:2
strategic 52:6 79:9,10,11 118:19,19
strategy 133:15 171:5 172:2 203:4
204:14 205:14 220:10,17 221:5
236:9
strict 97:14
strike 279:9
strong 210:14
structure 118:16
structured 82:4 96:14
structuring 88:13
struggle 116:4
struggling 76:25
style 148:17 151:22 248:10 249:3
277:14
styles 150:18 151:10
subject 8:18 59:24 60:6 101:7,7,11
132:18 138:8 141:23 160:14,16
166:5 172:11 226:2,12 227:19,20
subjects 138:24 247:19 249:2
submit 71:2
submitted 71:25 290:17
subordinate 158:20 250:15
Subscribed 287:18
subsequent 46:10 110:22 194:20
194:22 198:18 222:13 229:20

254:3 255:15 262:14
subsequently 45:25 99:3
subsidiary 17:23 18:3 23:3
substance 9:14
substantial 120:6 132:5
substantially 74:16
substantive 14:19 16:19 57:2
success 62:18 120:3 148:20 204:21
successful 83:23 108:12 178:14
259:13
successfully 84:2
suffice 279:12
sufficient 224:5 278:24
suggest 123:7
suggested 269:21
suggestions 147:6
suggests 162:17
suitable 159:21
Suite 2:4
summary 27:11 36:4
Sunday 245:9
supervise 157:5
supervised 90:22 93:11 112:18
142:6
supervising 118:2 166:25
supervision 112:7 172:25
supervisor 67:20 143:15,19 292:12
supervisors 31:24
supervisory 118:18
support 66:11 97:17,19,24 98:2,4
98:19 105:17
supported 20:9 27:6 35:20 47:19
57:25 65:15 82:12 92:5 97:15,16
97:16 98:20 100:3 122:3 252:3
supporting 58:12 66:4 236:3
supposed 151:20 208:8
sure 5:16 8:16 12:14 16:5 26:9
27:13,18 38:9,13 47:25 48:5 50:3
60:12 61:12 76:21 78:13,19 83:5
86:11 88:9 89:8 94:16 107:7
118:23 119:20 120:13 126:5
141:16 156:4 172:18 173:4
175:10 176:5 181:2 184:20 186:6
188:18 196:24 204:24 205:21
211:13 213:9 214:16 219:18
226:20 228:2,23 233:25 240:12
240:14 242:4,5 248:21 254:13
258:11 259:4,7 272:13,18 273:5
273:19 274:13 275:11,17,25
280:18
surprise 264:15,16
surprised 128:5 162:9,21 239:13
265:22 267:17 268:3
surrounding 47:11 49:2 68:23
survived 92:16
switch 100:12 101:6
sworn 3:16 4:4,21 287:18 292:9
system 184:24

17:6 18:21,24 20:16 21:23 22:2,5
22:12,13 23:14 24:6 26:22 30:8
30:13 31:10,20 33:8 34:22 36:16
36:18,19 37:8,9,22 38:12,20,22
38:25 39:23 40:12,14 42:9,11,14
43:19 45:20 47:16,20 48:6,13,23
49:3 50:15 51:2,12 52:16 53:6,15
55:19 57:6 58:2,11 61:5,18,21
63:18 64:8,9,20 68:6 80:7 82:3,7
85:23,24 86:3 92:5 95:7,21,24
96:23 98:22 100:2,12 108:18
110:20 111:19,23 116:18 118:25
119:4 120:24 121:19,25 122:10
122:23 123:8,10,20 124:15,16,16
125:23 127:21 129:25 130:10,15
131:2 138:11,12 139:5 141:15
144:18 145:3,4 149:11,12,17
151:3 161:25 167:3 168:4,15
169:5 170:14,18,23 173:17
178:19 181:14 182:16 184:19
185:6 187:9 188:21 189:9,11
195:7,21 196:7 200:8,11,15,20
201:8,23 215:24 216:6,20 221:7
222:22 223:8 234:6,8,9 236:8
239:16,22,24 240:15 242:15
246:22 248:22 250:14,22 251:15
252:2 254:8 263:8 264:4 265:12
265:18,22 266:23 267:19 274:2
276:13,21 277:25 283:19 286:6
292:8
**times** 7:9 8:13 42:7 54:13 61:6
92:18 105:21 197:22 204:16
223:8 258:25
**title** 11:17 21:4,13,22 22:4 25:5,6
27:21 28:14,20 52:10 122:13,16
122:18
**titled** 112:23
**titles** 21:19 28:9 29:8
**Todarello** 188:10 190:13,16,21
191:6,6,16
**today** 4:19,24 5:10 7:4,22 13:16
15:21 17:15 36:12 48:2 70:14
91:8 102:17 108:13 123:15 124:7
126:2 183:17 185:23 214:20
226:5 227:10 255:11 259:2 280:4
286:9
**today's** 9:10 10:10 286:15
**Todd** 145:14,16,18
**Tokyo** 32:21 43:24 47:17 95:22
239:25
**told** 54:20 108:20 132:20 134:11
142:23 159:23,25 160:8 161:13
162:17 185:21 198:12 254:10,18
255:9 263:14 264:19 272:16
284:25 285:2
**Tomoji** 201:24 202:18 203:25
206:10 208:3 214:4,14,21 239:12
243:18 251:17 261:22 263:8,10

264:15 270:18 271:7 276:9,10
278:11,16,20 282:20
**Tomoji's** 241:11
**tomorrow** 217:25 219:18
**tone** 109:21 123:3 124:9 131:23
132:19 142:16 148:15,15 150:16
150:22,24 151:5 172:10,10,11
204:24 205:10,14 220:17 248:9
265:24
**toned** 204:23
**tool** 112:20 113:19 171:18
**tools** 171:15,16
**top** 96:4 146:12 208:25 213:24
218:3 248:10
**topic** 161:18 265:2,10
**total** 30:17 218:24
**touched** 12:3 290:13
**touching** 12:15 162:3,13
**toxic** 193:24
**trade** 132:4,8
**trademarks** 103:21
**trained** 140:14
**trainee** 20:15
**training** 26:17 27:15 29:19 140:10
140:13 185:9 189:4 247:16,23
248:4,6 249:3,9
**transaction** 57:13 79:14,17,20 80:3
80:9 81:3,6,12,17,21,23 82:18,24
83:4,9,13
**transactional** 29:12,13 79:23 80:22
81:9 82:9 84:17 85:2,3 89:8
90:19 92:3 103:17 105:4 106:3
**transactions** 79:9,10,12 81:9 85:4
85:4
**transcribed** 292:12
**transcript** 10:20 223:23,25 224:6
224:10,15,20 225:7 249:20 287:7
287:9 289:15 292:13
**transfer** 81:8
**transition** 24:19 31:2 62:12 88:19
117:10
**transitioned** 31:13 39:7 79:24
**transitioning** 102:4 116:20
**transpired** 183:18
**travel** 46:23 47:18 92:20
**traveled** 46:17,19 47:12
**travels** 236:2
**treated** 136:13 164:18
**treatment** 165:5,16
**Trench** 85:24
**triage** 101:25 102:14
**trial** 3:11 8:10 210:14,16,21
**tried** 103:5 104:6 105:15 134:5
151:14 206:18
**trip** 44:4,6 45:23 47:22 245:16,24
245:25 246:11,13
**trips** 47:13
**Troccoli** 96:21 192:12 195:9

196:10 197:8
**trouble** 49:15,20 62:6
**true** 287:9,12 292:13
**truly** 95:15,24 101:17
**trust** 119:20 120:7,11,13 172:5,7
173:5 228:23 256:16 258:24
259:12,18 264:21 266:11,11,16
**trusts** 205:21
**truth** 4:21
**truthfully** 7:22 8:2
**try** 5:11,18 24:8 48:19 61:17 71:17
200:18 201:19 210:6 279:8
**trying** 105:19 118:13 131:20
133:11 186:5 197:8 220:12,12
246:15
**Tuesday** 221:21 222:13,14,16
**turn** 136:16 143:23 157:19 213:23
214:18
**turned** 251:21 275:19
**turning** 138:5 148:18 153:24 164:9
164:15 165:24 218:3 248:13
**twisted** 164:5
**two** 19:12,13,19,20,21 26:12 28:8
28:14,16 29:3,8 43:14 54:12
55:11 56:19 61:9 77:3 79:4 81:22
91:15 92:7,8,16 105:6 118:20
129:6 139:8 163:2,3 166:17
173:11,15,19,22,25 175:3,13
176:7,11 188:2 196:3 212:21
228:25 244:6 259:9 268:16
271:23
**two-minute** 68:2
**two-page** 94:3,8 180:14,19 183:2,7
197:12 199:4 202:3 237:9,14
240:23 241:4 243:3,8 244:13,18
288:15,23 289:4,6,8,17,21,23
290:4
**two-pages** 202:10
**type** 84:16 89:20
**typed** 254:7
**types** 52:13
**typical** 235:25 236:11
**typically** 128:20 248:9 277:18,18

_____

U

**U** 4:2
**U-E-M-U-R-A** 43:9
**U-T-S-U-N-O-M-I-Y-A** 206:19
**U.S** 17:23 18:4 22:22,24 23:4 39:25
40:18 83:11 118:24 129:3 205:22
239:17 247:7 269:4
**U.S.A** 213:25
**Uemura** 43:9 45:7 47:13,14
**Uh-huh** 15:22 17:10 111:25 216:8
238:17 242:10
**ultimately** 94:20 103:18 115:12
145:12 156:24 159:5 166:15,18
177:23 198:6,7 212:6 217:21

65:9 107:17 142:3 193:21
**witness** 4:3,11,14 7:18 15:22
　111:14 136:3 154:10,24 155:20
　156:4,6 158:12 159:11 160:3,9
　160:10,11,25 161:17 183:9
　192:25 201:16 202:6 207:2
　209:10 211:5,7,9 212:11 213:12
　215:22 217:7 224:22 237:7 239:6
　243:10 252:20 253:11 273:17
　286:6,8,13,16,20 290:15 291:20
　292:9,14,21
**witness's** 253:3
**witnessed** 158:14 160:12 163:4
　254:9 255:13
**witnesses** 158:12 159:16 163:3,7
　163:23
**woman** 190:20
**women** 156:2 161:24 162:15
　164:18
**word** 37:3 106:20 186:12 198:24
　210:21,25
**wording** 88:12
**words** 4:25 108:18 109:25 189:18
　194:3 254:16
**work** 13:21 14:2,7 19:9 26:24 32:5
　45:14 46:13 47:3 52:13 62:14,17
　62:19 63:17 65:18,22 66:17,20
　81:9 84:16,17,25 85:2,3 87:12
　92:2 95:19 97:3,7 101:2,3,14
　102:22 103:17 105:5 106:3,5,7
　108:14 118:2,3,6,7,7,10,18
　148:14 182:12 185:4 188:14
　189:16 191:4 196:11,13,17
　198:10 236:21 255:10 274:20,23
　277:9
**worked** 18:21 19:11,12,21 34:22
　55:22 57:11,12,15 58:12 59:2,4
　64:19 85:9 87:14 104:7 141:17
　200:7 261:19 282:24
**workforce** 246:6
**working** 19:22,25 20:5 43:21 89:7
　93:13 117:18 129:12 139:5
　173:16 187:18 236:5 256:18
　268:24
**workload** 116:6
**workplace** 90:2,4 198:3
**works** 15:15 207:20 230:17
**world** 96:3 100:8
**worldwide** 28:7
**worry** 205:23 264:23
**worse** 218:6,16,20
**worth** 69:18 220:24
**wouldn't** 50:8,9 63:9 79:8 162:21
　186:18 190:6,7 278:14
**write** 112:23 113:4,8 114:2,18
　163:9 208:3,6 211:21 220:21,23
　279:25
**writes** 219:19 271:8

**writing** 114:23 141:5 169:22
　177:22 210:8 254:25 257:4
**writings** 229:9,15
**written** 38:4,7,9 41:10,14 125:24
　178:3 207:7,24 228:7,10 232:18
　233:2,8,15 236:23,25 237:2
　259:9,11 285:15
**wrong** 88:13 132:17 146:13 154:11
　206:17 256:13 268:18
**wrote** 113:4 115:3 147:9 149:12,17
　186:25 191:13,23 194:4 200:11
　245:9 256:20 262:14 279:16

**X**

**x** 1:2,11 288:2,7 289:2 290:2

**Y**

**Y-U-P-O** 97:21
**Yano** 20:14
**Yano-san** 58:13
**yeah** 37:24 54:12 69:20 85:3 86:5
　86:10 90:12 97:6 98:5 102:20
　104:6 116:2,16 132:3,25 137:13
　142:22 158:10 191:22 219:15
　242:14 243:24 251:25 274:21
**year** 42:7 44:2 146:20 147:7
　148:20 198:11 234:9
**years** 8:16 19:3,12,13,19,20,21
　21:20,23 22:7 46:9 48:23 55:24
　62:11 65:15 92:8 93:19 106:9
　109:17 129:20 185:15 221:19
　248:21 258:2
**yelled** 126:16,16 132:9
**yells** 151:18
**Yesterday** 70:10
**yielded** 157:22
**York** 1:2,12,20 2:4,10,10,16,16
　4:15,15 33:7,10 49:18 114:16
　133:19 236:3 239:25 261:17
　287:3 292:5
**Yoshisato** 138:7,23 141:8
**Yoshisato-san** 138:18
**Yuka** 261:18
**Yupo** 97:19 101:10

**Z**

**0**

**00001362** 94:5 288:16
**000487** 252:11
**000599** 145:24 288:21
**000788** 99:10,14 288:19
**000877** 202:11
**000886** 238:25 289:20
**0008865** 183:4 289:5
**001530** 74:12
**001655** 180:16 288:24
**001832** 197:14 289:7

**002309** 217:2 289:13
**002316** 237:11 289:18
**011530** 74:4 288:14

**1**

**1** 144:10 185:5 210:20 247:6,11
**1-10** 1:8
**1.5** 209:19 221:19
**1:23** 123:12
**10:06** 1:14
**100,000** 177:8
**10004** 2:10
**101** 29:19
**10222** 2:16
**10th** 233:6,13,19,21
**11:16** 68:4
**11:26** 68:4
**113** 291:6
**115** 291:10
**11530** 2:4
**12** 239:20 290:13 291:24
**12/29/2016** 219:24
**12:26** 123:6,11
**12th** 4:14
**13** 16:17 212:11,13 231:20 239:20
　240:7 280:4 291:25
**13-hour** 240:8
**130,000** 179:24
**135** 291:12
**1362** 94:9
**14** 138:6 206:24 290:16
**1421** 203:10,13 289:11
**145** 288:22
**15** 1:13 53:14 209:4,11 287:8
**152** 291:15
**16** 143:25 154:2 211:4,6,8 237:15
　288:10
**17** 213:11,14 214:6 215:6 246:23
**17-13333** 224:18
**18** 219:7,8,14
**18-cv-08188** 1:4
**180** 288:24
**1810** 219:15
**183** 289:5
**19** 234:19,21,24 235:5 276:9
**197** 289:6
**19th** 261:21 267:5,14 276:12,13
**1st** 144:2

**2**

**2** 28:2 35:24 58:22 210:16 211:20
　216:15 282:17 283:5,15,17,25
**2.0** 209:20 216:5,9,14 231:25
**2.1** 232:2
**2.3** 225:22,25 227:5,8,15 228:13
　237:25 238:4,13 240:18 241:17
　272:21 291:17
**2.5** 220:20 222:5

**A**

**A-H-U-M-A-D-A** 268:23
**a.m** 1:14 68:4
**ABC** 237:2
**Abilify** 59:4
**ability** 7:21,25 89:9 148:21 176:17
    176:19 177:12
**able** 32:6,15 50:9 55:11 62:2 66:11
    67:4 77:7 78:8 84:2 101:23 114:2
    114:7 119:18 177:18 179:5,8
    207:17,22 218:11 235:22 261:11
**above-stated** 1:21
**absence** 174:16
**Absent** 5:24
**absolutely** 119:9 120:2 284:3
**ACC** 23:14
**ACCA** 23:13 24:16 35:9
**acceptable** 152:5 196:15 227:24
**acceptance** 14:11 65:7 290:16
**accepted** 31:20
**access** 142:5,7
**accommodate** 7:6,11
**accompany** 168:20
**accomplish** 220:13
**account** 14:16
**accurate** 14:24 15:8,11 17:2 18:13
    147:13 149:9 215:23
**accurately** 7:22 8:2 25:17 76:12
**accused** 159:16 160:18,20 161:4,8
    162:4 163:3,10 270:18
**acquisition** 78:24 88:23
**acquisitions** 58:3 78:22
**acronym** 13:19,23 14:4
**acronyms** 13:17
**acting** 77:9 78:16 106:17,23 107:21
    116:11 123:19,24 142:13 165:19
    167:15 192:3 199:16
**action** 86:21 157:24 161:2 164:3
    184:16 211:14 263:15 292:16
**active** 90:17 170:19 172:20,21
    173:3
**actively** 260:4
**activities** 20:17 32:13 77:10 93:21
    152:12 291:13
**activity** 79:5 117:12 163:21 284:21
**actual** 177:25 178:13
**adamant** 190:3
**add** 17:22 36:7,10 202:16 218:23
**additional** 111:16 126:3,10 128:3
    132:2 247:14 249:21 268:4,9
    270:14 286:10,13
**address** 4:13 198:2
**administration** 250:23
**administrative** 223:17 251:8
    277:20 278:2
**admission** 244:2 259:11
**admitted** 257:3 258:4 284:18
**admonishment** 228:11

**advance** 32:15 266:17
**advancement** 31:15,22,23 39:17
**advertising** 26:20
**advice** 56:3 89:6 101:18 119:19
    123:5 269:6
**advise** 77:7 101:4 145:11 277:18
**advised** 257:22
**advisement** 12:13 14:14 72:5 74:25
    113:16 115:21 135:24 152:22
**advising** 83:25 90:8,10 145:8
**advisors** 83:3 84:19
**affairs** 172:25
**affect** 7:21,25
**affiliate** 144:16 249:10
**affiliated** 31:7 78:12 141:8 276:10
**affiliates** 66:4 75:21 78:2 118:24
    141:9
**aforesaid** 292:7
**against-** 1:4
**AGC** 107:14,15
**agencies** 92:24 93:2,5
**agenda** 207:22
**aggressive** 109:8,19,24,25 110:11
    218:17 220:17 271:9
**aggressively** 218:9
**ago** 8:15,16 22:5 64:6
**agree** 61:12 231:12,25 273:8
**agreed** 3:2,8,13 198:4
**agreement** 9:23 10:5 13:17 93:18
    199:18 250:3,4 273:11 276:24
**ahead** 245:22 256:11
**Ahumada** 268:22
**air** 152:8
**Aldila** 246:2,19
**aligned** 52:2,6,14 88:8
**allegation** 143:25 144:7
**allegations** 136:18 154:14,15
    161:14
**alleged** 163:10
**allegedly** 134:16
**alleges** 136:24
**alleging** 136:13
**allocated** 97:8
**allow** 13:2 68:11
**allowed** 162:24
**alluded** 183:21
**alluding** 186:11,14
**Alpha** 21:6 22:25 47:14 58:7,14,16
    79:4 98:19,20
**Amber** 145:14,16
**ambiguous** 6:17 107:15
**Amended** 136:23,23 143:22 153:25
**America** 1:5 2:9 11:15 12:19 13:5
    13:12,20 23:2 42:16 93:9 98:6,9
    128:13
**Americas** 171:14
**amount** 30:7 106:4 178:20 179:2
    179:15,17,20,21 208:7,8 235:17

    272:15,21 273:7,12 274:2 282:17
    283:5
**amounts** 207:11
**Andy** 96:18 97:16 98:4,20 156:8
    159:9,14
**Andy's** 98:17
**Ann** 155:20 156:4,6,9 159:20
    161:24
**annual** 78:11 146:19
**annunciate** 4:24
**answer** 5:4,17,25 10:2 12:20 15:10
    47:9 59:21 66:7 67:15 68:11
    69:23 80:12 101:22 105:3,25
    112:16 127:8 156:18,20 171:23
    177:18 178:20 179:6,8 184:17
    185:2,5,8,14 186:18 187:8
    196:25 213:3 226:10,21 229:14
    232:3,6,8,11 233:4,11,14,16,17
    235:2 247:25 256:11 257:22,23
    257:23,24 262:10 273:14 277:16
    277:17 279:17 280:20 286:17
**answered** 77:18 287:10
**answering** 4:21
**answers** 219:9 287:11
**Anti-corruption** 249:4
**anticipate** 5:19 6:2
**anticorruption** 139:20
**antitrust** 56:18 57:6,9,16 59:15
    127:6,12,13,19 132:8 249:5
**antitrust-related** 57:22 126:12
    132:6
**anybody** 198:14
**anymore** 108:21 189:10 256:14
    259:15
**apart** 124:23,24 134:12 234:3
    246:25
**app** 240:14
**appear** 168:25 169:7 201:6 204:25
**appearing** 169:3
**appears** 96:5
**applicable** 68:25 69:14
**application** 41:19 223:13
**applications** 41:15
**apply** 15:18 158:21
**applying** 41:4
**appointed** 75:20
**appraisal** 149:3,13
**approach** 120:18 151:15,15 221:20
    222:12
**approached** 109:2
**appropriate** 109:18 151:21 157:23
    160:25 172:17 189:25 205:2
    211:13 212:9 227:24 250:25
    260:24
**appropriately** 88:10 128:21 259:3
**approval** 185:7 227:21 228:6,12
    239:15 241:14,17 259:6,7
**approved** 269:14,16

approximately 12:7 42:5,23 46:5
46:23 48:23 54:4,9 61:9 81:20
130:2 139:22 154:4 234:7,15
239:20 246:6
April 22:9,14 30:6,18 147:15 247:6
247:11
area 53:11 88:6 101:13,17
areas 31:25 56:19 105:7,22 150:5
266:5,6
Argentina 84:18 98:2
arm 98:13
Armand 156:2
arose 61:19,22
arrangement 129:14
arrangements 189:24
arrival 143:18 192:19
arrived 96:12 130:3,5
Asia 43:22 277:19
aside 110:8 153:22 211:4 240:17
273:16
asked 24:10 38:19,22,23,25 39:4
41:18 71:2 100:9 113:21 123:14
125:17 129:22 131:8 153:2 156:7
156:9 160:4 163:22 168:10
169:19 174:14,20,21 177:21
185:21 187:4 188:6 197:18,21
207:19 208:5 257:11 260:23
262:11,15 273:23 280:16,16,17
281:11 284:18 287:10
asking 4:20 6:16,18 39:6 40:23
48:19 161:9 178:8,11 179:16,17
205:18 214:10 216:14 220:5
221:8 222:2,4,10 223:9 242:23
263:3 264:17 283:15,22
aspect 60:17 81:2,11 82:17 130:19
aspects 84:24
assert 259:20 260:3
asset 79:4
assets 58:18 83:21
assigned 143:15
assignments 115:25
assistant 20:10 29:16 35:19 82:5
96:17 107:4,23 120:25 121:2,15
121:18 122:11 142:14 165:20
190:23
assisted 20:14,14 145:4
assisting 139:18
associate 35:17
association 23:14,17 39:8
assume 5:5
assumption 129:21
AstraZeneca 58:25 79:6,16 81:15
81:18
attachment 181:9,11
attend 18:18,20 132:13 167:3,5
168:5,13 169:12,13,14 170:4,12
170:13,24 173:10,14,18,21
176:24 207:7 280:9,13 281:8

attendance 170:8
attendant 63:22
attended 18:15 168:24 176:7
282:20
attending 281:2,6
attention 17:8 28:2 132:15 136:16
146:21 150:7 154:2 164:9,15
165:24 199:12 209:17 221:10
attorney 29:23 104:3 166:22
229:18 230:22 249:7,9 257:16,25
258:3,6 278:4
attorney/client 273:3 282:5
attorneys 1:18 2:3,8,14 11:5 97:8
102:9 115:5 120:22 142:6 158:21
168:13,17,20 258:9 277:8
attorneys' 218:25 220:25
attributed 81:11
audit 86:15,20,25 87:3 93:8 141:17
141:17 190:17,24 191:3
August 42:24 43:2 48:14,24 49:7
49:12 51:8 52:24 53:7,14,23
54:10 154:4,19
Australia 84:18 85:25
author 248:17
authored 248:18,19
authorities 86:5
authority 67:23 168:9 169:20
174:2,6,13,18 176:17 177:24
178:2,4,12 207:9,16 208:16
210:2 211:24,24 212:5,19 228:3
228:17 230:9,13,17,24 231:6,24
232:2 242:17 244:3,4 266:15
270:8 278:24 279:13 280:23
282:16
authorization 174:16 207:7 210:7
212:18 230:21 259:12 278:5
280:5
authorize 212:7
authorized 241:20,23 254:10,14,17
269:11 279:17 284:21
autonomy 162:18
Avenue 1:12 2:15 4:14
averages 189:17
avoid 57:18
avoided 53:12
awards 73:20
aware 9:22 106:13 136:12 150:16
192:11 195:6 201:21 225:11
228:24 258:13 259:19,23 261:22
262:3 268:8 271:19 283:4 284:7

_____

**B**

B 269:22 288:7 289:2 290:2
back 6:21 13:7,9 24:13,15 27:7
36:23,25 40:11 42:18,21 45:9
48:13 53:22 58:9 67:8,11 69:15
72:25 87:3,5 94:14,15 111:4
114:2,17 119:22 120:17 123:13

132:11 133:21 153:3,24 163:21
163:23 165:9 169:21,22,24
179:10,13 180:13 181:15 188:5
191:9,11 193:2,4 195:12,15
196:23 220:10,21 222:3 226:19
226:22 261:15 262:6,8,14 265:6
265:9 269:17 273:21 279:4,7
283:9,12
background 6:21 7:17 14:20 17:3
backing 64:18
backstabbing 270:20 271:9
bad 49:17 50:7 51:17 63:9,10
266:16 271:16
Baker 86:3
balance 89:15 117:25
bar 20:20,22,25
barely 145:3
bars 33:7
base 69:12,17,21 72:8,23 97:11
153:10
based 103:18 147:7 161:21 185:8
199:16 210:11,25 226:23,23,25
227:2 253:21
bases 267:10 270:14 271:24
basically 28:22 88:21 144:23 208:5
218:10
basics 249:5
basis 39:25 55:21 69:17 70:6
123:19 160:24 163:11 165:6,16
186:13 190:5 266:22,25 267:4
286:8,9
batch 52:20
bates 44:17 74:4,11 94:4,8 99:10
99:13 145:23 146:3,22 180:15,20
183:3,7 197:13 199:4 202:4,10
203:10,13 216:25 217:5 237:10
237:14 238:24 239:5 240:24
241:4 243:4,8 244:14,18 249:16
249:25 250:8 252:10,18,21 253:4
253:8,13 288:11,13,15,18,20,23
289:4,6,8,10,12,17,19,21,23
290:4,6,8
Battery 2:10
becoming 52:3,15 95:8,15 262:2
began 19:22 34:9 64:4
beginning 6:19 53:23 171:4,24
204:12 205:15 210:13 220:18
begun 33:22
behalf 6:12 127:3 167:6 168:6,14
207:13 211:14 230:10 237:22
behavior 87:18,19 89:17,17,18,20
90:15 123:3 124:9 131:24 142:17
156:22,23 158:15 159:24 163:4
163:15,24 164:4
behaviors 90:2,4 256:20
believe 41:24 68:9,12 138:25
150:13 153:7 163:2 201:2 215:20
225:6 243:21 249:23 262:16

belligerent 159:11
beneath 216:4
benefit 62:14 72:21 86:11 241:15
  257:13 258:13 262:13
benefits 73:10 223:14
bengoshi 33:2,3,4,6,20 43:24 277:5
Berman 2:5 4:8,17 10:2 12:10,14
  13:7 14:9,15 15:12,25 24:12
  28:13 36:17 38:14 42:13,18
  44:13,20 45:21 61:6 65:9 66:7
  67:8 68:2 69:25 70:6,10 71:24
  72:6 74:21 75:2 80:16 87:2 93:23
  94:7 99:7,12 105:3 107:17
  111:10 113:12,17 115:16,22
  123:6,13 135:21,25 142:3 145:20
  146:2 152:19,23 153:3 156:18
  161:16 165:9 166:24 168:2,19,21
  168:22 172:25 179:10 180:8,13
  180:18 182:25 183:6 193:21
  195:12 197:11 198:25 200:17
  201:10,14,17,25 202:7,14 203:7
  203:12 206:20,23 209:9 211:3
  212:10 213:10,22 214:4 215:9
  216:21 217:4,18 223:21,24 224:5
  224:13 226:8 227:12 229:6,13
  232:6,10,13 234:22 237:4,13
  238:21 239:3 240:16,22 241:3
  242:25 243:7 244:11,17 249:13
  250:2,7 252:15 262:15 263:12
  265:6 273:4,6,15,18,21 279:4,8
  282:21 283:9,16,22 286:5 288:5
best 4:24 5:7,12,13 7:10 14:23
  25:25 62:10 71:16 77:20 134:9
  135:3,11,18 149:9 152:16 159:17
  195:18 198:10 201:4 214:18
  234:14 275:13,23 276:4 277:17
better 62:17,18 101:18 139:3
  270:25
biased 164:11
Biddle 85:23
big 60:10 65:18 85:4 230:5 264:23
  268:2 284:24
bigger 69:19 204:18
billion 58:25 81:22
billion-dollar 58:22 79:18 169:15
  169:15
birthday 49:2,4,11
bit 13:15 52:10 55:9 133:13 178:9
  178:9
bizarre 133:23
blister 109:13 110:24 111:5
blisters 109:14
blood 43:10 292:17
board 48:7 75:20,23 77:9 78:3,5,15
  78:16,16 174:15 177:22 184:10
  184:12,15 185:7 207:19 208:12
  208:18
boards 35:12 77:7 78:4

body 214:11 216:4 221:15 237:25
Bonnie 1:19 4:4 226:13 292:4,25
bonus 69:12,15,16 72:8,9,23,24
  73:2,7 199:16,22 200:23
boss 109:16 111:9
Boston 98:14
bottom 17:8 18:8 25:8 74:11 150:8
  150:12 214:13 219:25 221:11
  222:11
brand 25:7,10,18 26:10,10,12,19
  29:10 34:13 57:14,20 82:8,8
  90:19
brand/regulatory 25:10
Brazil 84:17 91:15 98:24
breach 204:19 256:16
breadth 51:22
break 7:5,9,14 68:3,3 108:25 123:7
  167:9 170:2 180:7,8 200:18
  273:18
breaks 7:6,7
briefly 219:16
bring 40:16 53:9 171:21 174:5,12
  201:19 204:19 207:13 208:15
  246:24
bringing 39:24 52:25 152:3
brings 172:3
Bristol 24:23,24 31:16,16,17 35:11
  51:23 52:21 58:21,24 63:13
  164:23
Bristol-Myers 23:11,22 25:5,20
  30:14,16 31:2,8,13,23 32:12,16
  33:19 34:10,14,19 39:5,9 41:5,8
  43:22 44:5 45:15 46:14 78:24
  92:7,17 93:17 100:15 140:8,11
  229:20
Brittany 2:12 9:21
broad 85:3
broadly 52:8 78:25
broke 258:24
brought 58:23 255:9
Brown 133:21 134:3 183:22
budget 64:16
budgets 246:14
build 120:7
building 66:19
bullet 197:21 199:13 201:2
bunch 279:21
burdensome 103:8
business 4:12 47:18 52:18 83:25
  95:16,16 98:14 121:14 128:19,21
  128:22 130:14,17 134:2,3 148:16
  155:25 169:4,8,15 171:11,17,21
  172:5 207:8,14 218:12 245:16,19
  245:22 246:3,13 249:2,6 267:19
  268:20,21,22
businesses 22:19,21 35:21 47:19
  96:2 246:17,25

bylaws 78:6

**C**

C 1:1 2:1 4:2 287:2 292:2,2
C-A-T-A-L-E-N-T 31:6
c.c 215:8,11
calculated 73:8
California 33:7,12 245:16 246:12
  255:6 267:18
call 6:8 12:10 14:9 26:10 71:24
  74:21 75:2 97:4,10 101:21,22,24
  108:8 109:22 113:12 115:16
  135:22 145:12 152:20 172:7
  227:14 237:5 245:17 271:9
  277:20
called 4:3 23:13 27:5 29:10,14
  38:23,25 95:9 126:13 133:7
  162:3 246:2 268:15
calls 38:11 57:20 102:18 119:15
calm 204:16 205:2
Canada 269:3,4
cancel 45:23
canceled 92:20
candle 53:19
CAPA 86:21
capability 148:22 204:3 259:14
capable 157:18
capacities 1:7,8,9
capacity 67:22 141:14 168:23,24
  169:2 190:22 207:8 229:18
capital 98:13
car 69:13 72:8,14,15,16,17,18 73:6
  267:19
carbon 246:3,16,25
card 128:21 130:14
cards 128:22
care 108:12 128:11 129:21 211:12
  231:19
career 40:2 41:16 57:5 104:14
careful 274:13
carefully 132:16 228:21 251:5
case 8:20 11:4 71:16 88:19 128:25
  129:5 132:3,5,7 138:21 158:25
  171:8 177:6,6,10 178:18 185:13
  191:20 204:14,18,19 217:15
  220:18,24 221:3 224:18 250:3
  256:19 258:25 268:14 273:11
  274:15 281:24
Catalent 31:6,7,14,20 35:16,18,23
  36:19 37:9 39:3 41:2 49:4,8
  51:10,12,25 52:5,13,20 56:2,7
  64:7 69:16,21 72:9 73:2 84:9
  152:25 153:2,11 229:22,23
catch 37:25
category 124:13 127:14,17,20
  148:7
cause 195:7 256:2,3,8,17,19 259:16
  266:25

caused 251:24 255:4
caution 179:3
cell 261:6,6,13,14
center 29:11,15 129:6 148:5
centers 129:7
Centre 1:12
CEO 12:5 268:21 269:7
ceremonies 130:11
ceremony 128:9,18,21 130:14,24
certain 12:21 13:17 95:12 102:17
    116:14 120:12 126:13 129:18
certainly 52:10 116:2 131:17 163:8
    182:14 185:14 190:7 192:19
    198:21 249:6 266:5
certification 3:4
certified 33:4
certify 287:6 292:5,15
chain 209:16
challenge 65:18
challenging 148:20 220:9
change 20:24 21:3 22:11,17 27:21
    27:23 36:11 60:11 95:18 100:14
    103:3 104:12 117:17
changed 21:19,23,25 51:2 60:10
    94:18,21,24 116:6,9
changes 95:3,18 116:25 117:3
changing 116:24 204:5
characterize 231:9
chemical 1:5,6,6 2:9,15 11:15
    12:18,25 13:4,11,20,24 14:5
    19:13,15 22:20 23:8 36:20 37:14
    39:8 42:16 48:6 55:4 58:10 77:24
    79:3 93:7,12 94:16 95:16,22
    133:6 164:25 172:15 224:18
    247:2
chewed 109:15
chewing 110:16,19 124:12
chief 11:18 12:3 17:12,21 20:15
    60:16,21 64:10 65:4 67:18 69:8
    72:3 76:10 92:5,6 106:23 107:22
    116:11 163:14 164:24 248:11
    271:5 290:19
China 44:7 86:3
choice 156:10
circumstance 185:12 231:4
circumstances 47:10 144:6 187:12
Ciro 142:21 268:22,24 269:6,7,15
    269:21 270:2
city 2:4 69:19 155:9,24 159:14,22
civil 127:7,13,14 277:14
claim 154:5,8,20 177:8 259:20
    260:3,5,8 262:12
claimant 162:25
claims 8:22 136:13 155:12 156:25
    157:20 158:21 159:3,6 225:12
clarify 6:25 12:20 25:2 37:17 72:14
    72:19 167:9 175:4 179:18 216:18
    283:14

clarifying 124:6 130:18 131:20
    215:19
clarity 8:25
classification 87:15 88:2,3 89:5
clean 66:18
clear 13:18 15:19 25:3 37:4 40:3
    62:4 126:25 128:15 132:17
    153:20,21 155:19 174:10 204:12
    207:25 228:3,18 276:2 280:19
clearly 202:17 214:18
client 97:14,15,16 98:24,25 99:3,5
    100:13,20,20,22,25 101:14,20
    102:5,6 113:18,24 114:12 126:12
    132:4 148:21 167:6,11,15,17,20
    172:6,13,13 173:2,5 174:5 176:9
    184:14 189:2 205:16,21 213:21
    221:4 227:21,25 228:22 230:10
    230:13 242:17 254:11,19 259:4
    259:10 266:13 267:24,24 276:16
client's 178:14 228:12
client-centered 77:11
client-focused 100:24 102:23
clients 65:15 97:12 100:2,11
    102:14 112:11,15 116:14 118:21
    120:13 151:16 184:15 185:6
    189:21 228:18 247:9 275:3,10,12
    282:6
clinical 26:14 27:4
close 140:5 203:5 247:4 259:4
closed 99:2 126:17 198:14
closely 51:25 52:14
closeout 59:3
closer 130:2,3,5 218:24
closing 93:13
co-chair 164:22
co-counsel 276:23
coached 132:11
coaching 131:17
code 249:3
collaboration 57:21
collaborations 57:18,19,24
colleague 144:5 154:9,21,23
college 277:9
Colwin 2:11 9:18,25 12:13 14:13
    14:22 15:9,23 16:4 19:4 21:21
    30:11 32:17,24 33:17 34:17,24
    36:8,22 37:2 39:14,19 40:10,19
    41:11 42:2 43:5 45:19 46:21 47:8
    47:23 49:9 52:4 54:6 55:13 56:5
    56:12,16 57:4 59:7,20 60:2 61:5
    63:23 65:5,13,24 66:6 67:12
    68:10 69:3,10,23 70:3,8,15 72:5
    72:13 73:14 74:25 75:25 76:20
    80:5,10,15 81:13 85:13,22 89:22
    91:11 95:4 100:5 104:4 105:2,11
    106:15 107:24 109:6 110:12,17
    111:6 112:8,13 113:10,16 114:10
    115:10,21 117:7 118:4 119:6

    120:9 121:20 122:25 123:9,21
    124:2,14 131:7,15 134:19 135:24
    137:8,23 138:10 139:12,24
    140:18,23 142:15 143:3,7,16
    146:13 149:16,20,25 150:6,25
    151:7 152:22,24 153:17 154:17
    155:13 156:17,20 157:21 158:2,9
    158:23 160:7,23 161:5,15 164:14
    164:20 165:7,12,22 167:23
    169:10 170:9,20 171:2 177:4,16
    178:16,25 179:3,14 180:6 181:24
    182:8,20 186:23 187:13,23 191:8
    191:12 192:13,24 193:9,25
    195:10 196:18 199:23 202:22
    206:9 210:3 213:2 216:12 218:22
    221:24 223:19,22 224:4 225:9,15
    226:6,9,12,19 227:6 228:8,14
    229:11,22 230:2,14,19,25 231:10
    231:16 232:3,8,12 233:24 234:25
    238:6,9 240:20 242:13,21 244:8
    245:14 248:7,24 249:12,23
    250:19 251:14 255:24 256:6,10
    257:2,7,18 258:8,17,22 259:22
    260:6,21 261:25 262:5,9 263:6
    263:21 265:4 266:24 267:13
    272:3,10,17 273:2,5,13,19 274:5
    274:12,24 277:2,22 278:7 279:2
    279:15 280:10,25 281:10 282:3,9
    282:18 283:6,13,19,24 284:8,16
    285:12,18,21 286:3
combative 204:17,25
combined 30:9 159:18 259:17
come 31:12 38:17 42:14 48:15,17
    48:23 60:25 63:6 69:18 104:2,21
    104:24 105:8 155:15 168:4,15
    169:5 198:9 201:8 238:15 258:19
comes 77:17 87:22 102:16 145:9
    172:6 198:13 222:3
comfortable 62:13,15 159:20
    269:22
coming 118:7 120:14 189:3 274:7
comma 150:14,15
commence 11:20
commencement 292:10
commencing 136:19
comment 50:7 63:8 66:23 150:13
    165:18 193:16,22 194:10 218:4
    218:20 242:6
comments 147:2,6 149:6,8,9 150:9
commercial 28:7 57:13 59:2 81:8
commercial-related 79:22
committee 164:23
commonly 5:20
communicate 12:5 105:22 108:9
    113:2 119:14 120:16 134:5
    136:24 137:6,12,15 138:2 163:6
    163:14,23 171:13 206:13 246:3
    247:21 264:17 266:12,13 271:12

271:13 274:17,22 275:2 278:17
communicated 45:8 128:11 132:6
137:21 161:19 162:4 163:10
171:6 182:12 197:19 204:15
228:20 229:4 258:25 260:24
278:11 282:4,11
communicates 269:13
communicating 55:19 60:9 63:16
90:8,11,18 95:23 102:13 139:19
149:23 150:15 172:22 174:10
203:4 205:14 213:20 241:12
244:25 265:24 269:17
communication 127:2 132:19
148:7,17 150:14,17 151:10,22
162:6 163:20 171:3 178:3 179:5
181:3 200:20 201:9,9,21 202:21
205:3 206:5 207:10 214:15
215:23,25 217:22 219:23 220:4,8
221:23 222:22 227:4,15 228:7
238:8 244:5,7 262:3 270:25
276:8 278:15,22 279:11 291:16
communications 6:6 9:15 11:10
93:22 138:16 139:15 159:15
177:18 196:5 202:13 204:8
235:22 249:7 264:2,5 270:24
274:11 275:14,23 282:5,14
commute 50:9
comp 68:23
companies 17:22 37:20 57:24
78:12 95:19,19,25 105:17 122:4
133:16 246:22,24 247:12 277:8
company 26:18 38:23,24,25 39:2
51:16 60:10 62:8,9 64:21 67:4,17
67:24 72:18 73:16 74:24 75:12
75:15,18,19 77:24 83:21,22 88:7
94:22 95:6,9,15 98:23 107:12
108:23 115:13,13,19,23 116:7,19
117:5,24 122:20,24 123:20,24
124:17 129:3 130:21 133:7,12,17
138:11,20 139:6,6 141:7,9,10,20
143:14 144:24 145:14 163:13
169:16 172:19 174:9 181:15
182:17 192:17,22 193:13,16
195:24 200:7 207:18 246:2,4
251:4 259:21 268:15 277:10
285:25 290:23 291:9
company's 130:9 144:3
comparable 25:12
comparing 277:15
comparison 33:15
compensated 69:7 153:14,15
compensation 63:22 64:12 68:7,24
72:7 73:6 201:5
competencies 150:4
competition 249:5
competitors 53:11
complain 144:12 145:13,16 164:10
173:9,13 196:22 197:7

complainant 154:10 155:3,5
complainants 155:7,23 162:2,7
complainants' 155:11 156:25
complained 144:2 164:18
complaining 152:2 203:25 239:12
complaint 136:17,23,23 143:22
153:25 195:20 201:24 203:6
241:12 263:2
complaints 155:16 165:5 193:7
228:25 259:9
complete 7:12 27:10 55:6 164:7
211:23 226:17 247:24 266:5
287:9
completed 5:15 87:20 122:8 173:7
174:24 190:9
completely 156:22 176:23 271:10
compliance 11:18 17:12,21 56:22
57:2 60:16,22 64:11 65:4 67:18
69:9 72:3 76:10 90:7,20 106:23
107:22 116:11 140:6 163:15
164:24 247:16,19,22 248:3,11,12
249:2 270:20,23 271:2,6,11
275:6 285:24 290:19
compliance-related 117:13
compliant 211:13
complicated 57:11
comport 78:14 172:24 174:22
206:4
comported 172:19
composure 204:21
comprised 104:22
compromised 272:14
con 70:8
concept 182:11 260:12
concern 55:14 56:19,24 57:22
59:19 132:7,8 134:21 149:24
206:11 268:4
concerned 59:12 61:16
concerning 17:6 49:12 53:16 61:4
64:19 86:15 107:20 134:25
140:11 150:22 165:19 168:16
170:7,15 182:3 193:17 207:10
222:25 225:13,22 227:4 238:13
concerns 56:14 123:4 150:23 151:4
204:9
concluded 286:20
conclusion 32:14 105:8 109:10
162:17 186:13 256:22 258:20,23
259:15 264:8
condition 7:24 8:4
conduct 140:4,11 158:5 160:3,6
162:19 164:12 249:3
conducted 140:22 157:3
conducting 139:10 157:6
confer 251:12
conference 166:12 168:6,14,18,21
168:24 169:7 170:25 173:11
175:22 176:25 177:13 208:24,24

214:20
conferences 166:17 167:4 173:11
173:15,19,22,25 175:3,13 176:8
212:22
confide 270:9
confided 108:22 156:12 267:20
confidence 66:10
confident 66:21 205:15,24 229:3
263:13 269:24 275:25 280:21
confidential 4:1 5:1 6:1,6,10 7:1
8:1 9:1 10:1 11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1 43:1 44:1,18
45:1 46:1 47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1 73:1 74:1,5
75:1 76:1 77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1 91:1 92:1
93:1 94:1,5 95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1 103:1
104:1 105:1 106:1 107:1 108:1
109:1 110:1 111:1 112:1 113:1
114:1 115:1 116:1 117:1 118:1
119:1 120:1 121:1 122:1 123:1
124:1 125:1 126:1 127:1 128:1
129:1 130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1 138:1
139:1 140:1 141:1 142:1 143:1
144:1 145:1,24 146:1 147:1
148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1 162:1
163:1 164:1 165:1 166:1 167:1
168:1 169:1 170:1 171:1 172:1
173:1 174:1 175:1 176:1 177:1
178:1 179:1 180:1,16 181:1
182:1 183:1,4 184:1 185:1 186:1
187:1 188:1 189:1 190:1 191:1
192:1 193:1 194:1 195:1 196:1
197:1,14 198:1 199:1 200:1
201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1
211:1 212:1 213:1 214:1 215:1
216:1 217:1,2 218:1 219:1 220:1
221:1 222:1 223:1 224:1 225:1
226:1 227:1 228:1 229:1 230:1
231:1 232:1 233:1 234:1 235:1
236:1 237:1,11 238:1 239:1
240:1,25 241:1 242:1 243:1,5
244:1,15 245:1 246:1 247:1
248:1 249:1,17,20,22,25 250:1
251:1 252:1 253:1,9 254:1 255:1

256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1,11 273:1,9 274:1 275:1,8 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 288:12,14,17,22,24 289:5,7,13,18,22,24 290:5,7,9
**confidentiality** 250:2 273:10
**confined** 6:18 231:14
**confirmation** 207:24
**confirmed** 163:12,24 269:11
**conflict** 284:14
**confrontation** 125:13 131:25 135:7 183:23,24 184:5
**confronted** 185:3,20
**confusing** 195:2
**connected** 127:22
**connection** 14:11 32:6 40:24 45:14 45:21 46:13 47:3 71:3,14 72:2,10 74:23 75:16 130:7 131:5 139:16 157:10 166:13 167:14 170:22 173:24 216:10 222:21 223:12 225:23 228:12 231:6 236:14 255:19 256:24 260:14 286:15 290:15,18,22
**connections** 32:10
**consecutively** 224:21
**consider** 63:16 131:13,16 204:5 260:4,9 275:5 284:11
**consideration** 71:3 72:2 75:11 207:11 290:18
**considered** 159:2 245:16 251:6 260:7 281:20
**considering** 198:16 219:4 284:9
**consistent** 241:22 254:20 284:24
**consistently** 101:21
**consolidated** 247:11
**consult** 35:12
**consultants** 88:7,10
**consulted** 34:13 252:2
**consulting** 26:20 35:3 251:23
**Cont'd** 289:2 290:2
**contact** 36:21 37:7,18,22 41:23,23 43:3 48:22 120:18
**contacting** 90:20
**contacts** 43:14
**contained** 16:20 149:8 161:14 201:6
**contains** 224:2
**contemplated** 208:17
**contemplating** 187:7
**contemplation** 123:18
**contemporaneous** 134:17 229:9
**contemporaneously** 152:14 291:15
**content** 123:4 248:9,13,15,17,18,20 248:21,23,25
**contents** 136:10

**context** 107:15 186:7 201:19 208:11,14 272:14
**continuation** 209:6,15 281:20
**continue** 16:3 262:24
**continued** 19:25 148:20 163:24 267:16
**continues** 199:18
**continuing** 268:3
**contract** 8:20 29:10,15,19 101:2 204:19
**contracting** 29:21
**contractor** 8:21 87:17,17 89:10,12
**contractors** 88:8 89:2
**contracts** 26:18 103:22
**control** 70:15 78:13,13 84:11,13 85:2,5 92:13 147:20
**controversy** 292:19
**convenient** 114:3
**conversation** 53:13,24 54:11 55:17 61:14,20 65:17 100:9 108:6 109:23 110:2,6 117:15 131:13 161:24 164:17,21 171:25 178:17 187:10,20 194:24 221:9 225:25 226:24 236:11 246:20 253:21 263:17,18 265:11 278:19
**conversations** 60:5 61:9,13 70:24 105:12,21 106:13 108:2,19,22 111:16 113:15 114:15 165:14 182:14 194:21,23 204:11 280:18 291:5
**conversing** 282:24
**convey** 235:22
**conveyance** 283:4 284:13
**conveyed** 264:25 265:13 278:6 280:23 281:8
**conveying** 278:23 279:12
**coordinating** 93:9
**copied** 213:6 214:4 215:2,8 278:21 279:21
**copies** 136:5
**copy** 71:6,21 136:3 181:23 182:3 212:24 213:12 215:18 243:23,25
**copying** 214:17 217:19
**corner** 74:11
**Corp** 13:25
**corporate** 21:14 22:4,13 23:14 27:24,25 28:5,12 29:2,8,9,17 30:4,20,23 75:20 76:19,23,24 77:6,10,11,12,14,15,17,22 78:9 78:14 87:15 93:18 117:11 122:14 122:15,17,19 184:4,7,10 285:24
**Corporation** 1:6,6 2:15 21:7 36:20 39:24 43:11 47:15 58:8 172:15 247:2,5
**correct** 10:16,18 17:14,15 19:3,7 19:15,24 20:3 23:9 26:4 27:16 28:20 29:4,5 33:16,24 34:15 40:25 41:20,25 56:6,11,13 64:24

64:25 65:23 66:5 67:20 96:6 106:14,24 116:21 123:25 124:25 143:13,19 147:10,13,17,20 154:15,25 155:22 161:12 168:2 181:16,20 201:2,6 214:23 227:5 230:17 240:21 244:7 245:10 250:15 252:4 265:3 267:8 272:22 278:25 280:24 281:4,5 283:21 287:10,12
**corrective** 86:21
**correctly** 35:25
**correspond** 16:22
**cost** 92:13
**Costa** 1:7 2:9 37:19,22 38:3,18 40:20 41:13,24 42:6 43:4 48:22 48:24 51:7 52:24 53:7 54:10,18 56:15 59:6,17,23 60:16 61:14 64:9,15 65:10 66:9 107:3 123:16 123:18 142:11,25 181:4,22 182:3 182:18 192:22 193:12,16 251:12 263:4,11,16,25 274:22 275:23
**Costa's** 49:11 241:13
**costs** 219:2
**couched** 231:8
**coun** 205:5
**counsel** 3:4 5:24,25 6:7,11 9:11,12 9:16,24 11:18 12:19 17:12,21 20:11 21:4,14,15,18 22:4,12,13 23:14,18 25:11,19 26:14 27:24 27:25 28:5,12 29:2,8,9,16,17 30:5,20,23 34:14 35:18,19,20 48:18 50:11,14,20 52:7,15,18 53:17 56:3 59:25 63:13,15 64:10 65:4,25 66:12 67:18 69:8 71:19 72:3 76:10 80:7 82:6 84:5,6,10 84:14,21 85:7,16,18,20 86:9 93:10,11 101:4 106:23 107:4,22 107:23 116:11 119:10,11,13 120:4,25 121:3,16 122:11,14,15 122:17,17,19 127:3 133:10,20 135:4,12,19 137:3 140:25 142:13 142:14 152:17 153:16 157:14 164:24 165:20,20 166:24 167:2 167:18,21,24,25 168:25 181:15 183:22 184:16 185:13,15 190:23 192:3 204:6 205:11,19 232:7 249:21 260:23 261:19 269:2,5,12 269:13,25 275:20 276:6 282:4,12 285:24 290:19 292:20
**counsels** 96:17 121:19
**counter** 217:16 220:20
**countering** 237:22
**country** 2:4 83:9 277:14,14
**COUNTY** 287:5
**couple** 116:17 142:19
**course** 41:15 47:17 59:22 60:24 100:24 111:4 128:19 160:2 218:25 219:2 246:13 274:16

**court** 1:1 3:16 5:9 8:22 15:13,17 24:9 174:3 207:16 252:22
**cover** 89:21 147:19 224:9,15 289:15
**coverage** 73:18
**craft** 274:3
**create** 29:17 189:3,4 190:5 282:10
**created** 29:12,15,19 151:4 186:8
**creation** 282:7
**criminal** 127:13,17,20
**critical** 118:21,23 119:10,12 120:3 151:22 259:2 267:24 270:21 271:3
**Csaszar** 96:18 98:17,18 121:11 156:8 159:3,7
**CTO** 92:6
**culpa** 243:19,25 251:23 264:11,22
**cultural** 125:12 128:2,17 134:24
**culturally** 129:11 151:15 172:17
**culture** 128:8,16 130:17,20 152:4 175:7 265:25
**curious** 125:15 134:9 185:11
**current** 20:10
**currently** 43:10 63:19 276:11
**curriculum** 11:23

**D**

**D** 1:1 4:2 287:2 288:2
**daily** 159:15
**damage** 251:24
**Dan** 145:18
**data** 27:4
**date** 11:25 16:9 44:19 74:6 94:6 99:11 145:25 147:17,19 163:20 180:17 183:5 197:15 202:5 203:11 212:20 217:3 224:12 237:12 239:2 241:2 243:6 244:16 249:18 253:10
**dated** 208:25 219:24 221:12 224:10 224:16 252:13 289:15
**dates** 43:25 166:19 261:4
**day** 9:17 10:21 18:18 19:3,6 24:7 70:13 108:7 109:3,18 111:9 124:24 176:23 182:11 188:24 189:17 190:4 215:21 228:4,19 232:20 233:3,10 234:4,8 241:21 253:21 282:22,24 287:19 292:22
**day-to-day** 55:20 172:24
**daylight** 239:23 240:3,5,10
**days** 10:18 188:2,14 189:15 245:13
**deadline** 257:15 284:23 285:7
**deal** 58:21,22 80:11,18,24 81:25 82:12 99:2 244:23 268:2 284:24
**dealing** 91:9 151:16
**deals** 20:16 21:8 122:4
**dealt** 148:13
**Dear** 214:14
**Deborah** 160:9 161:22

**December** 181:6 221:13 222:16
**decide** 33:21
**decided** 170:11 246:16
**decision** 31:21 40:2 142:22 143:2,4 143:5 145:10 167:5 170:3,6,14 186:10 187:6 251:13 252:3 265:18 269:6 282:23
**decision-makers** 282:22
**decisions** 174:8
**deck** 189:5
**decline** 127:8 157:16
**declined** 72:18
**Deducting** 10:17
**deeper** 197:24
**Def** 74:4,12 253:8,13 288:14 290:8
**DEF-000485** 244:14,19 290:5
**DEF-000487** 249:16 250:9 290:7
**DEF-000590** 145:23 146:3 288:21
**DEF-000592** 146:23
**DEF-000864** 183:3,8 289:5
**DEF-000876** 202:11
**DEF-000884** 238:24 239:5 289:20
**DEF-001654** 180:15,20 288:24
**DEF-001831** 197:13 199:5 289:7
**DEF-002307** 216:25 217:6 289:13
**DEF-002315** 237:10,15 289:18
**DEF-1419** 203:10,13 289:11
**DEF-1859** 209:18
**DEF-485** 252:19
**DEF-487** 252:22 253:4
**DEF-842** 243:9
**DEF-844** 240:24 241:5 289:22
**DEF-876** 202:4 289:8
**Defendant** 2:14 252:8,10
**defendants** 1:10 2:8 135:22 136:14
**defense** 10:4
**deferred** 216:5
**definitely** 118:19 120:4
**delayed** 27:3
**deliver** 245:6 246:9 247:16 248:15 253:24
**deliverable** 189:5
**delivered** 29:20 147:14 181:19 254:6
**delivering** 245:12 248:5,9 249:9
**delivery** 248:14
**demand** 26:25 105:18 217:14 225:22 227:5 228:13 230:21,23 232:2 235:18 256:24 257:17 258:7,16 261:24 272:20 283:5,13 283:14 284:2
**demanded** 216:19
**demanding** 222:9 283:17
**demands** 71:15 148:21
**demeanor** 148:16
**demolished** 145:2
**demoted** 106:14
**denied** 144:4,13

**dep** 70:16
**depart** 138:20
**departed** 22:13 36:19 37:3,8 39:18 42:6 43:20 115:12 269:10
**departing** 40:21 46:16 69:22 153:12
**department** 20:13 39:21 49:16 50:23 62:17 93:14 96:13,13,16 96:23 97:4,5,8,9 100:18 102:15 103:3 118:8 120:3,21 130:10 140:6 154:9,22,24 155:16,18,20 156:11 185:4 189:15 190:6 191:17 250:23 251:9 261:16 263:3 266:12,17 271:11,11
**departments** 230:6 246:15
**departure** 23:7 39:10 46:20 258:21 271:25
**dependent** 286:14
**depending** 138:12 239:21,22,22
**depends** 120:10 210:11 231:4 240:3
**deposed** 8:8
**deposition** 1:17 4:18 9:10 10:10,15 10:24,25 11:2 287:8,11
**depth** 49:22 55:23
**deputy** 80:7
**describe** 17:19 25:18 26:7 35:15,25 37:21 59:9 84:8 86:7 108:2 117:25 128:17 129:24 133:23 167:19 169:2 194:12 244:2
**described** 12:16 24:17 25:13 32:14 60:5 62:20 65:8 72:8 75:5 79:8 85:17 91:7 120:8,22 124:12 126:7 127:25 128:18 130:11 131:24 132:4 133:3 135:7 150:23 151:6 152:12 154:23 191:14 194:14 237:7 266:21 290:25 291:14,19
**describes** 29:2 76:13
**describing** 80:17 201:12
**description** 28:25 76:9 193:23 288:8 289:3 290:3,12 291:3
**designations** 249:21
**desire** 193:17
**desired** 192:23 256:13
**detail** 126:10 128:3 142:16 194:17
**detailed** 172:9
**details** 126:20 132:2 138:21 229:5 269:20
**determination** 47:6 67:5 168:5,16 169:6 250:18 266:8
**determine** 63:4 67:23 112:14
**determined** 95:13 156:7 160:2 170:7 171:10 245:21 250:12 264:14 274:8
**determining** 62:21
**develop** 101:16 106:7 120:11
**developing** 119:25

development 98:8 103:14 105:13
  118:15
develops 106:9
diabetes 58:24 79:6
Diamond 18:6
Diane 268:17 269:2
difference 55:3 91:15 239:16,24
  240:9
different 21:15 48:19 52:9 72:16
  78:11 87:13 90:16 91:16 92:8
  113:23 119:2 121:8 137:19 178:9
  189:10 201:18 205:11 277:5,13
  279:10
differently 82:5 96:25 164:19
  242:9
difficult 33:5 66:15 108:20 192:7
difficulties 201:9
difficulty 194:13
dig 197:23
diligence 82:21,23 83:24
dinner 42:10
direct 17:7 28:2 92:23 117:9
  146:21 150:7 153:25 162:20
  183:23,24 184:23 185:17 199:12
  273:13 278:22 279:11
directed 184:25 244:3
directing 117:14 209:17 221:10
direction 52:11 117:21 118:22
  167:2 198:17,19
directly 17:23 18:4 35:19 82:5
  90:21 136:25 137:6,12,16,21
  138:2 149:23 163:14 204:14
  206:3,8,13 262:15 292:18
Directors 48:7 77:8 78:3 177:22
disappointed 159:25
disciplinary 131:5,14,16 286:2
disclosing 132:22,24 269:20
disclosures 57:19
discovery 71:14
discrete 73:5
discretion 230:22
discrimination 165:21 249:4
discuss 49:12 62:5 126:14 217:18
  219:17 221:20 222:12 242:18
discussed 11:4 41:22 48:21 114:19
  158:7 179:21 235:14,23 237:2
  241:22 242:8,16
discussing 51:7 163:13 175:25
  178:18
discussion 36:12 49:25 50:13,25
  56:11 63:21,25 64:3,12,18
  123:23 124:4,5 177:11,14 180:11
  182:2 193:11 209:25 217:21
  222:13,18,20,24 225:20 235:17
  242:23 254:3 255:15 265:2
discussions 11:7 52:23 54:14 59:23
  60:15,20,25 61:3 63:4 107:2,12
  107:18 123:15,17 142:11 178:23

182:18 263:12
disgusting 109:20
disparate 165:5,15
disparately 136:14
dispute 231:13
disputed 154:14
disputes 92:7,9
disruptive 245:19
dissolve 88:17
distinction 77:2,5 100:22
distractions 188:25
diversity 164:23
divestiture 21:6 58:10,16,17,25
  79:3,16 88:22
divestitures 79:2,4,7,13
division 29:14
divulging 126:23 177:17
doc 281:18
document 15:13,15,18 16:15,18,20
  25:9 28:3 35:24 44:14,17,21 45:2
  74:4,8,10,13,14,16 76:6 94:2,4
  94:10 96:5 99:8,10,13,17 105:16
  109:12 112:25 136:4,6,19 145:23
  146:6,16,22 147:12 151:3 174:12
  174:19 176:17 177:21 178:5,7
  180:15,20,23 183:3,7,10 185:25
  186:2,7 188:6 197:13 199:4,7
  201:6 202:4 203:10,13,15,22
  207:3,12,15 208:14 209:12
  211:11 212:7,14 213:15,24 214:6
  216:25 217:5,8 224:9,14 231:18
  231:20,21,23 237:10,16 238:12
  238:14,16,24 239:4,7 240:24
  241:4,6 242:8 243:4,8,11 244:14
  244:18,20 245:4 249:16 250:5,8
  250:10 253:3,8,12,15 254:7
  280:5,7,17,24 281:12,12,19,22
  288:11,13,15,18,20,23 289:4,6,8
  289:10,12,14,17,19,21,23 290:4
  290:6,8
documentation 173:3
documents 10:9,13 15:20 38:11
  71:17 75:3 172:20 185:9,10
  206:21 213:7 227:9 249:24
  274:11,14 281:24,25 286:10
  290:24
doing 40:22 100:12 103:17 118:8
  173:4 184:18 189:9,17 205:8
  210:9 249:6
dollar 81:11 272:8
dollars 79:15 209:23 216:10
Donna 1:7 2:9 20:14 37:19 39:20
  40:3 48:22 49:6,14 50:4 55:17
  56:17,20 58:13 60:9 62:5 63:8
  64:4 70:19,24 107:6 118:22
  142:20 181:4,13 182:12,13 184:3

184:7 185:2,2,13,18 188:10
  191:15 196:13 198:21 241:13
  248:19 251:17,21 252:2 263:7,14
  264:4
Donna's 55:14 251:16
door 126:17 198:14,17
doubt 201:7 241:15 257:13 262:13
draft 86:20 174:21 211:25 260:23
  280:16
drafted 57:17 184:11 212:9 213:22
  260:22
draw 33:14
Drinker 85:23
drive 171:17 255:6
due 82:21,23 83:24 100:7
duly 4:3 292:9
duplicate 252:17
duplicative 252:23
dusting 162:14
duties 17:19 20:8,24 21:10 22:11
  22:17 25:18 26:8 28:23 29:3 56:2
  116:24 117:2,4,25 157:11
dynamic 118:12 125:12
dynamics 128:2 134:24

E
E 1:1 2:1,1 4:2 175:14,14 287:2,2
  288:2,7 289:2 290:2 292:2
e-mail 45:7,9,22 92:19 94:14
  112:19,23 113:19 114:21,24
  137:13 170:11 181:3 199:10
  200:11 201:24 202:6 209:15
  214:3,10,16 221:12 225:24,25
  226:23,25 227:4,7 236:22 237:3
  238:4,13 240:18 242:22 243:18
  243:19,25 250:11 251:18,23
  252:12 254:21 256:15 257:4
  263:23 264:2,11 267:25 270:19
  275:4 278:10,20 279:16,25
e-mailed 263:22
e-mails 196:4 214:11 226:5 263:8
earlier 34:12 66:23 123:15 124:7
  177:7 231:5 240:19 273:22 280:3
early 95:10 175:19 246:22 258:4
easier 13:15 61:18 80:19 167:9
easily 60:23
easy 108:10
eating 152:2
Eato 43:8
economics 145:9
economy 95:11
Edge 18:6
education 18:9,12
Edward 175:14,15
effect 3:15 141:2
effective 100:16 248:11 270:21,22
  271:4
effectively 278:17

effectuate 177:12 260:19 274:10
effectuated 261:2
efficiency 86:13
efficient 100:16 101:9,15 185:19
efficiently 84:2
efforts 71:16
eight 55:24 245:13
eight-month 199:17
eight-year 30:5
either 10:21 63:16 88:22 106:10
    114:18 116:15 123:18 127:2
    128:7 163:3 175:7 221:20 229:19
    229:19 236:24 260:22 269:22
    281:20
Elbaum 96:21 122:18
element 248:10 270:22
elements 270:22 271:3
eliminated 256:17
employ 292:19
employed 11:12
employee 88:3,4 89:18,18,20
    144:13
employees 73:15 88:15,18 91:23
    96:14 138:9 144:3 145:2
employer 56:11
employment 11:20 85:8,10 87:14
    88:9 89:7 90:8,22 91:2,9,17,17
    101:3,11 102:6 106:4 115:19
    130:4,6,21 138:8 183:25 223:13
    250:13 256:14 269:3 284:6
    285:10,15,20,23 291:8
employment-related 87:18 101:9
    105:6
employments 139:8
encapsulate 28:8,23
encourage 188:23 189:6
encouraged 158:11
encouraging 90:12 105:13
ended 68:24
ends 119:9
ENE 166:17 168:8 174:13,19,23
    175:22 177:24 207:7,12 208:15
    211:23 212:2,8,20 228:3 231:6
    231:11,14 280:4,9,14,21,24
    281:3,7,9,19 282:20
ENEs 175:3,14 176:8
engaged 93:10 167:17
engaging 32:13
engender 119:24 173:5
engenders 172:5
English 278:18
ensued 253:21
ensure 57:17
ensuring 274:14
entail 77:23 83:19 89:3 91:13
    92:15
entails 86:9
entered 93:18

entire 30:13 96:22 177:8 178:20
    219:5 220:22,24 221:7 223:25
    224:6 246:5 267:18
entirely 112:21 157:18
entities 22:25 23:3 52:25 58:19
    75:24 78:2 87:16 88:14
entitled 72:15 211:18
entity 18:5 19:14,17 31:3,5 43:4
    58:17 87:15 88:17,18 127:4
    251:10 276:9 277:21
entry 25:9 28:11
environment 193:23 197:23
environmental 93:12,14
equity 73:20
equivalent 19:7 175:5
especially 118:24 129:11 172:10
    246:13
ESQ 2:5,6,11,12,17
essential 271:3
essentially 20:17 35:22 95:13
    112:20,22 151:2 174:7 204:15
    205:5 208:4 246:5 281:20 282:22
estate 101:5
Esther 188:10 191:16 194:24 195:3
etcetera 257:15
ethical 149:19,24
ethics 248:23 249:7,9 255:4 266:15
Europe 47:14
evaluate 85:14,21
evaluating 85:18 86:8,8
evaluation 175:19 181:23 182:4
evaluations 182:7
evening 19:5,6
event 134:18 278:22
events 235:5
everybody 189:11,11
exactly 12:21 51:13 69:11 108:17
    174:22 220:7 234:11 281:17
exam 33:6
examination 3:5,14 4:7 286:19
    288:4
examined 4:5
example 88:16 103:16
examples 52:12
exceed 150:4
Excellence 29:11,15
excellent 218:10
exception 7:18
excerpt 224:2 225:7
excerpted 224:21
excerpts 224:11 289:16
excuse 86:8 229:19 235:24
execute 273:23
executive 141:20 174:18 235:25
executives 47:21,24 128:6 247:18
    268:16
exempt 88:5
exercise 71:16

exhibit 15:17 16:6 44:16 74:3 76:3
    76:4 93:24 94:3,8 99:9 136:4
    145:21,22 153:22,24 180:14,19
    183:2 197:12 199:2 202:3 203:7
    203:9 206:6 209:4,10 211:6,7
    212:11,12,13 213:11,13,13 215:6
    216:24 219:6,7 224:8,23 237:8,9
    237:14 238:23 240:22,23 243:2,3
    244:12,13,18 249:13,15 252:12
    252:16,18,18,21 253:7,12 280:4
exhibits 10:23 252:17
existed 40:6
existence 105:9 264:24
expand 37:16
expanded 26:2
expansive 26:23
expat 156:3
expect 66:14 158:20 163:7 183:17
    216:2 218:18
expectations 122:23 150:5 172:23
expected 52:16 107:6 129:19
    161:20 189:22 255:12
experience 17:9 50:23 52:20 54:23
    55:10,18 56:15,18,22 57:2 59:13
    59:13,19 60:22 61:24 62:11
    65:12 69:17 76:18,23 77:6,15
    84:5 86:15,18,19 87:7 91:8,12
    92:13 102:3 103:19 106:3,4
    130:8 156:13 185:9
experienced 102:15 156:21 158:14
    159:24 160:12 162:2 163:3
experiences 59:6 78:17
experiencing 91:21
expert 101:11
expertise 53:12
experts 101:8,13,17
explain 5:17 59:11 77:21 100:21
explained 132:16
explaining 78:18
explanation 100:7
explore 39:16
export 84:11,12 85:2,4
exposure 52:21 57:6,10 58:3,6,7,9
expound 125:16
express 230:20 231:8,24
expressed 59:19 133:22 230:23
    267:21
expressly 178:4
extent 6:7,16,23 26:2 115:19
    135:21 152:19 227:13 237:4
    291:9,11,18
external 32:8
externally 33:21 34:10
eye 83:24
eyes 113:5

**F**

F 1:1 292:2

**F-I-S-C-H-M-A-N** 99:14
**face** 218:9 230:20
**fact** 38:8 107:13,20 137:11 150:4
162:25 173:18,21 188:23 243:23
247:6 251:15 263:5 264:24
271:17 278:13 284:25
**factory** 247:17
**facts** 154:15 195:6,17 262:4,19
**factually** 161:12
**failure** 267:16
**fair** 15:6 120:5 167:19 231:9,15
**fall** 124:13 127:14,16,20
**Famiglietti** 156:2
**familiar** 76:7 101:12 128:16 136:9
166:5 260:11
**family** 270:12
**far** 63:10 91:8 147:12,17 201:4
**faster** 101:19
**fault** 268:2
**FDA** 93:8
**feasible** 245:19
**federal** 3:1 176:3 281:21
**feel** 6:25 186:16 271:12 280:8,12
280:22 281:7
**feelings** 197:3,3
**fees** 210:17 218:25 220:25
**felt** 184:21 197:8 280:21 282:5
**female** 144:3,13 154:8,21 162:25
**fiber** 246:3,17,25
**fights** 205:7
**figure** 105:14 118:13 191:21 238:2
**file** 213:5
**filed** 193:6
**files** 142:5,8 236:20
**filing** 3:5 27:8 171:18 172:3 204:23
**filings** 78:9 172:10,18
**fill** 54:16,19,24
**filled** 52:9
**final** 150:11 263:15 264:11 285:20
**finally** 216:5
**finances** 187:21
**financial** 73:11 83:3 84:19 179:2
179:15,17 212:3
**find** 23:12,22 160:11 161:20
162:20,21
**finding** 263:5
**findings** 262:22
**fine** 35:14 37:17 66:21 97:6 106:20
158:3 175:9 187:24 192:5 205:7
231:22 243:21
**finish** 13:2 226:9,11
**fire** 251:18,22,25
**fires** 264:22
**firm** 85:25 101:13
**firms** 204:6
**first** 4:3 17:8 19:12 20:4 25:4,19
29:7,22,25 30:13,15 34:22 36:19
37:2 38:22 42:6 43:19 46:20

48:14 50:18 58:7,9,11 61:18,21
63:7 64:20 69:9 72:11 87:24 93:6
95:7,21 96:4,11 98:22 103:6
108:4,5,6 109:2,3,18,24 111:9
118:5,17 119:8 122:20 124:20,23
124:24 126:6,19 130:2,5,6,20
136:22,23 137:4 139:5 143:22
150:21 151:13 153:25 154:18
156:10 159:8,18 167:3 173:11,19
173:24 175:2,12 176:7,11,13,20
177:13 182:10,19 188:18 193:22
208:23 209:2,3 212:21 213:23
214:5,13,22,24 216:4 218:3 221:11
223:8 224:9,15 233:25 234:4
244:5 247:23 252:18 253:23
260:9 264:7 265:12 280:9 281:2
281:9 289:14
**firsthand** 186:3
**fiscal** 146:20 147:7
**Fischman** 1:3 4:19 10:16 50:2 61:4
61:16 64:19,20 65:3 66:11 96:18
96:20 99:10,14 100:4 104:17
106:13 107:3,13,19 110:15
111:16 113:8,15 115:8,12,18,25
117:9 121:2 126:7 131:4 134:16
136:12 142:12 143:6,14,17 144:2
144:10,12,22 145:13 147:14
148:6 149:13 151:12 154:5,19
155:10 157:13 159:6 160:5,14
161:3 164:10,16 165:4,18 166:25
173:9 181:19 186:4,13 191:6
192:11,23 193:8,18,20 195:9
196:9,16,21,21 197:7 199:21
201:10 202:15,15 212:25 217:19
218:4 222:18,21,25 224:17
225:11,21 228:11 229:10 232:22
233:12 248:5 250:14 253:24
256:23 258:14,20 259:20 260:15
261:6 263:17,18,20 264:2,9
265:13,19 266:23 268:6 270:14
272:15 274:18 275:15 283:20
288:19 291:6,8
**Fischman's** 60:25 61:19 65:11
67:19 116:23 117:4 122:21 124:9
130:4 136:18 150:3,24 151:5,9
182:4,6,18 187:11 190:22 200:22
223:13 268:10 271:19,25 284:6
284:12 285:9,14,19
**fit** 60:23 105:14
**five** 93:18
**five-minute** 68:3
**flexible** 188:22
**Floor** 2:10 4:15
**focus** 39:21 40:4,8,12 95:8,14
100:13,22 101:7 103:23 105:23
188:25
**focused** 52:8 96:2 97:12 121:13
**focusing** 61:10

**focussed** 228:6
**fold** 133:13
**folks** 53:16 247:18 249:3
**follow** 114:9
**follow-up** 113:3
**followed** 114:14 224:11 289:16
**following** 255:3 265:17
**follows** 4:6 153:9
**food** 152:3
**foolish** 77:18
**force** 3:15 92:17
**forgive** 7:19 77:16 263:23
**forgot** 254:12,20,21
**form** 3:9 14:22 32:14 68:11 86:20
123:21 178:2
**formal** 98:15 131:17 140:13 152:4
193:7 285:10,15
**formalities** 78:14
**format** 74:16 113:23
**formed** 29:14
**former** 271:5
**formerly** 43:11
**forms** 186:12
**formulate** 140:20
**Fortinsky** 2:17 9:24 137:17 153:18
215:20 250:20
**forward** 108:16 218:13
**found** 31:18 35:11 51:16 265:23
**four** 125:19,22 139:25 214:19
**four-year** 18:23 19:5,6
**fourth** 133:2 135:14 147:7 199:13
**frame** 124:15,16 283:20
**franchise** 58:24 59:3 79:6
**free** 6:25
**friction** 191:5
**Friday** 265:16
**front** 28:3 147:19 281:21
**Fujiwara** 47:12 94:15 136:25
137:7,21 245:2 250:18,21 252:13
**full** 4:9 13:3 18:21 211:23 212:4,19
216:4 245:5
**fully** 5:17 12:6 170:15
**function** 29:17 35:23 87:8 91:22
106:17 141:17,18 155:17 171:14
185:19 190:17,24 200:4,9 276:21
277:7,11,13,24 278:2
**functions** 121:7 250:25
**further** 3:8,13 6:22 39:17 163:20
164:3,3 172:9 286:5,8 292:15
**future** 95:11 105:23 114:8

---

**G**

**G** 287:2
**G-E-N-I-X** 98:24
**gained** 21:9
**gap** 52:10 56:24 118:9 133:12
**gaps** 54:23,24,24 55:10,12,15,15
56:14 59:18 105:9

Garden 2:4
GC 54:15,19 199:16 274:17
GC/CCO 117:24
GCC 285:24
gender 136:14 164:11 165:6,16,21
general 8:18 11:18 12:19 17:11,20
  20:11 27:11 29:16 35:17,19,20
  48:18 50:10,14,18,19 52:7,15,17
  53:17 57:8 58:5 59:25 60:19
  63:13,15 64:10 65:3,25 66:12
  67:18 69:8 72:3 76:9 80:7 82:6
  84:25 86:17 87:11 91:25 93:4
  96:17 106:23 107:4,21,23 116:11
  119:10,11,13 120:4,25 121:3,15
  121:18 122:11 125:5 127:12
  128:17 133:10,20 137:2,15
  140:25 142:13,14 153:16 164:23
  165:20,20 181:15 183:22 184:16
  185:13,15 190:23 192:3 285:24
  290:19
generalist 40:5,8 101:2 102:12,21
  103:23 104:11 122:2
generalists 97:12 102:10 121:9
generally 6:18 15:10,11 17:19,25
  20:7 22:16 26:7 35:16 55:2 59:9
  62:20 65:14 96:14 104:23 136:9
  142:17 279:23,24
generous 145:17
Genix 98:24
Genomatica 166:6,23 167:6,11
  170:16 172:3 176:2 210:2 218:13
  222:25 225:13,23 235:14,18
  236:6 237:21 256:25 268:14
  270:7 272:5,12 276:15,19 278:5
  279:14 282:16 283:3,15,17,18
  284:2
getting 138:15 184:10 210:10
  242:17 275:5
give 9:2 29:6 38:15 52:12 84:24
  100:6,9 101:13 159:12 161:16
  201:17,18 247:16 285:10,15,20
given 8:10 156:5 228:22,22,22
  245:20 287:12
giving 26:13 174:16 212:19 221:18
  225:2 241:14 248:12 257:12
  262:12 269:6
glance 16:25
global 51:22 95:9,15 133:17 171:11
  171:17 268:21
globally 12:6
globally-focused 95:25
go 6:21 13:16 15:20 24:7 25:24
  31:22 92:9 97:2 101:11 104:15
  106:6 108:7,8 114:2,17 118:13
  129:12 142:22 154:12 158:15,15
  160:13 169:25 170:7 172:14
  176:16 180:10 184:21 188:5
  192:3 196:23 206:24 208:9

210:14,16 211:22 212:4 228:3
  242:25 244:12 245:21 254:10,19
  256:11 259:6 261:15 267:2 277:9
  280:21
go/no 142:22
goal 52:2,6,14 63:12 104:6 120:15
  120:16
God 126:16
goes 102:6,7,7 147:17 218:9
going 5:4,19 13:3 15:12,23,25 16:2
  32:15,18,23 44:13 48:13 50:5
  55:9 62:2 66:22 68:10 74:7 76:3
  89:9 93:23 96:9 99:7 104:11
  119:16,23 123:7 126:17 132:23
  133:15 172:13 176:14,22 178:4
  179:3 198:2,13 204:4 207:25
  209:4 210:10,19 211:19,22
  212:10 213:11 217:15 218:11,13
  219:6 220:15 221:6 222:5 229:2
  229:11 246:5 247:6,10 259:5,13
  265:21 273:13 274:9 282:13
good 4:16 32:4 51:23 62:14 65:19
  66:18 103:16 104:13 107:9
  119:19 152:9 171:21 172:4,23
  178:18 189:7 190:2 195:25
  205:11 218:10
GORDON 2:8
governance 76:19,24,24 77:6,10,11
  77:12,14,15,23 117:12 184:4,8
  184:10
government 140:6,7
governmental 92:24 93:5
graduated 20:2,19
graduates 277:9
grant 230:23 231:5,7,24
granted 178:3 210:7
granting 174:18
great 51:16,17 55:23 159:12
  198:15,20 211:12 259:6
greet 233:23
greeting 248:12
group 22:20 29:12,13,14 31:25
  35:4 37:14 55:4 57:13 58:11 59:2
  73:15 77:25 78:8,10 80:23 82:4
  88:9 97:14,15,16 100:13,23
  101:6 102:3,9,11,24 103:8,12,20
  104:10 126:12 133:6 246:24
  247:2,11 269:8 276:22 277:7
groups 100:11 230:5
grow 172:8
grows 106:10
guess 92:18 130:23
guests 128:20
guidance 128:23 157:7,8 158:5
  189:4
gum 109:14,15,19 110:9,16,18,21
  110:22 111:4 124:12

## H

H 4:2 288:7 289:2 290:2
habit 110:16
habits 110:18
half 210:16,17
hand 15:18 199:2 219:6 280:21
handed 146:14 211:7 212:12
  213:12 253:11
handful 145:3
handing 128:21 211:4
handle 101:2,3 126:15 159:19
  205:21 243:17 259:3 264:18,19
handled 105:5 159:10,12 195:25
  247:8 250:4 255:10 273:10
handling 157:18 204:2
hands 205:12
happen 32:7 284:3
happened 46:9 108:13 160:11
  198:7 201:13 204:10 231:2
  241:16 251:15 261:5,8 264:5
  267:21 270:7 284:18 285:3
happening 94:17 116:18 119:3
  165:3 229:3 251:2
happens 77:8 88:21 129:10
happy 7:2,5
harassment 154:6,21 249:4
hard 33:7 105:25 117:20 192:2
  277:16
harm 243:21 255:4
hate 216:20
head 80:2,22 81:24 129:4,5 250:21
  250:22
headquarters 43:23 47:16
heads 129:7
Healthcare 98:15
hear 4:25 5:23 143:11 210:12
  263:14
heard 95:9 133:8,14 194:4 211:16
  226:13
hearing 9:3 126:15 223:12 224:10
  224:16 225:3 289:15
heavy 105:4
held 1:19 180:11 292:7
help 29:17 62:12 65:19 101:25
  102:19 104:14 108:15 144:18
  171:16 211:22
helped 270:4
helping 26:12
helps 37:16 150:8 189:3 247:19
hereto 3:3
hereunto 292:21
high 65:22 88:6,6 129:16 149:19
  236:8
high-level 29:7
high-ranking 169:17 250:23
higher 208:7 231:25
highest 129:8
highly-regulated 57:22

hire 32:25 33:20 86:10 88:9 89:9
  101:3
hired 26:9 83:12 96:20 104:9,10
  122:5 184:22
hiring 157:13
Hiroo 43:9 45:7 47:13,14 156:3
historically 247:3
HIV 27:5
hold 146:14 207:13 260:12,15,16
  260:20 273:6,24 274:4
holdings 1:5,6 2:9,15 11:15 12:19
  13:5,11,20,24 14:6 39:8 42:16
  48:6 55:4 77:25 78:7 133:18
  224:18
home 188:3,14,24 189:16 241:20
  243:20 284:23 285:7
honor 129:9
honorary 129:3
hoped 246:7
hose 108:2
host 116:12
hotline 263:2
hours 214:19 239:20 240:7
house 197:4 277:12
housed 276:22
HR 70:20 72:21 90:9 142:9 155:17
  160:10 161:22 162:6 184:24
  200:4,8 263:2
human 86:22 87:7 155:15 250:24
hundreds 77:25
hurt 133:24 197:2,3
husband 145:18 187:17
hyphen 25:10
hypotheticals 232:4,9 257:20

I

ID 176:15
idea 141:24 176:25 257:8
identification 16:8,10 44:18 74:5
  94:6 99:11,12 145:25 146:2
  180:17,18 183:5,6 197:15 199:3
  202:5,9 203:11 217:3,4 224:12
  224:13 237:12,13 238:25 239:3
  240:25 241:3 243:5,7 244:16,17
  249:17 250:7 253:9
identified 50:4 56:17 61:19 87:25
  88:4 89:10 151:17 162:11,12
  163:8 188:9
identify 18:4 43:7 44:20 55:11
  56:15,24 151:18 261:11 277:3
identifying 83:16
imagine 244:9 284:9
immediate 82:11
immediately 65:7 101:25 102:19
  120:11 137:2 143:13 159:13
  163:16 245:18
immuno-oncology 26:13 27:3,6
immuno-oncology-related 58:23

immure 258:14
impact 87:15 88:15
impairs 8:5
implement 117:19
implementing 89:5 118:15
implore 246:7
imploring 198:4
importance 203:4
important 36:7 62:24 88:8 95:2,8
  104:9 111:8 118:14 132:9 147:5
  171:7,8 172:12 247:9 251:6
  271:15
imprecise 167:8
imprecision 168:11
improve 148:15 198:22
improvement 150:14 151:17
  151:20,23 152:6,10
in-house 23:17
in-person 70:24
inaccurate 225:8
inadvertently 252:22
inappropriate 57:19 89:25 90:3
  109:8,20 125:14 126:18 132:18
  133:3 151:19 271:10
inappropriately 125:10 126:8
  134:16
incident 124:11 125:3 126:7
  127:25 128:4 129:25 131:24
  132:21 133:2,5 134:12,15,23,25
  135:6,9,14,16
incidents 124:13,20 125:6
include 9:18 127:21 181:9 244:10
  248:23
included 71:21 219:11,22 242:7
  248:25
includes 26:17 30:5 79:10
including 61:13 89:6 126:13
  139:20 162:10 173:3 202:18
  236:6 256:16
incorrect 161:13
increase 29:21
increased 21:11
incredibly 126:18 278:13
independent 10:12 87:16,17 88:7
  88:25 89:10,12,12
independently 133:9 139:25
Index 1:4
indicate 49:19 111:18 191:24
  192:22
indicated 111:17 161:11 206:11
  227:3
indicating 186:18
indirectly 292:18
individual 1:7,8,9 80:20 102:9
  190:12
individuals 142:25 194:18 201:22
industry 26:11 57:10,23
info 160:22

inform 263:4,11,16,25
informally 140:14,15
information 6:8,9 14:20,24 15:4,8
  16:20 17:7,14,18 25:17 26:3
  59:18 65:11 91:21 92:6 95:10
  126:24 132:25 134:13 157:23
  160:24 161:18,21 163:11 178:7
  201:5 241:17 253:23 254:4 273:3
informed 170:15,24 192:16,18,19
informing 250:17
initial 244:6
initially 161:22
initiate 260:15
input 243:22
inside 95:20
instance 73:12 118:5,17 131:6
  159:18 258:7
instances 137:20 142:23
instant 117:16
instantly 285:4
instruct 160:5 161:3
instructed 10:3 156:19 232:7
  286:16
instructing 161:6
instruction 5:25 229:10 232:10
instructions 258:21
instrument 281:8,15
insurance 9:2 73:12,13,16 223:12
  223:14 225:3
integrate 83:2 133:16
integrating 83:23
integration 83:18,20,25 88:20
integrity 93:18 148:23 149:14
  249:6
intelligence 148:22
intend 13:18 132:23 214:24
intended 168:12 256:23
intending 218:16
intent 264:8
intention 6:5,17 7:6 37:15 116:2
  265:13 267:3
interact 190:23
interacting 87:7 91:21
interaction 34:21 53:15 92:23,24
  93:6 144:9
interactions 93:5 115:9 186:4
  192:12,14
interchangeably 175:22
interest 40:8 62:11 63:5 103:15
  126:25 168:17 216:6 221:18
  284:14
interested 37:6 41:7 49:17 50:9
  53:8 61:13,25 62:5 63:9 116:25
  292:17
internal 32:11 85:9 86:15,20,25
  87:3 89:18 139:10 141:17 170:5
  185:10 190:17,24 191:3 193:7
  246:14

internally 260:25
International 91:12 133:7 135:15
    291:12
interpretation 110:8 210:22
interrupt 5:13,18 27:14 61:11
    68:19 200:14 226:6
interrupted 68:21
intervening 139:7,9 219:18
interview 61:23 70:21 75:10,14
    107:6 158:15 160:10,14 161:4,7
    162:25 163:4,19
interviewed 31:17,19 70:20 160:16
    160:20 162:9 163:2,9
interviewing 75:7,7 82:25
interviews 70:24
introduction 248:13
investigate 154:5,20 156:8,14
    159:3,6 262:3,19
investigated 157:20
investigating 155:14 156:23 158:7
    158:21 284:12
investigation 138:8,18,24 140:7,12
    140:21 141:23 155:11 156:25
    157:3,6,14,18,22 158:3,6,13
    159:9 160:3,6,15,17 162:18,19
    164:12 263:3,20 284:15,17
investigations 139:11,16,22 140:4
investigative 157:10 158:18 262:22
invitation 157:16
invite 129:17
invited 105:20 125:15 133:4,25
    151:25 197:4
inviting 191:18
involved 50:20 142:25 205:23
involving 9:3 135:15 154:8 291:12
IP 20:18 21:8
Isao 20:14
issue 6:25 17:6 66:22 89:5 102:16
    124:8 126:12,15 131:4 132:14
    134:21 138:13,14 142:18 151:18
    162:16,23 164:4 165:15 183:25
    242:19 252:16 259:10,17 262:19
    264:12 268:13 273:16
issued 74:22 286:15 290:21
issues 6:21 8:24 54:21 70:11 72:22
    87:13,18,19 89:15,19,21 90:15
    90:21 91:9,17 119:8 142:20
    198:3,3,3 201:9,21 202:13,21
    251:5
it'll 66:20
italics 161:20
items 113:3 151:25

J

J 2:6 4:1,2 5:1 6:1 7:1 8:1 9:1 10:1
    11:1 12:1 13:1 14:1 15:1 16:1
    17:1 18:1 19:1 20:1 21:1 22:1
    23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1
    35:1 36:1 37:1 38:1 39:1 40:1
    41:1 42:1 43:1 44:1 45:1 46:1
    47:1 48:1 49:1 50:1 51:1 52:1
    53:1 54:1 55:1 56:1 57:1 58:1
    59:1 60:1 61:1 62:1 63:1 64:1
    65:1 66:1 67:1 68:1 69:1 70:1
    71:1 72:1 73:1 74:1 75:1 76:1
    77:1 78:1 79:1 80:1 81:1 82:1
    83:1 84:1 85:1 86:1 87:1 88:1
    89:1 90:1 91:1 92:1 93:1 94:1
    95:1 96:1 97:1 98:1 99:1 100:1
    101:1 102:1 103:1 104:1 105:1
    106:1 107:1 108:1 109:1 110:1
    111:1 112:1 113:1 114:1 115:1
    116:1 117:1 118:1 119:1 120:1
    121:1 122:1 123:1 124:1 125:1
    126:1 127:1 128:1 129:1 130:1
    131:1 132:1 133:1 134:1 135:1
    136:1 137:1 138:1 139:1 140:1
    141:1 142:1 143:1 144:1 145:1
    146:1 147:1 148:1 149:1 150:1
    151:1 152:1 153:1 154:1 155:1
    156:1 157:1 158:1 159:1 160:1
    161:1 162:1 163:1 164:1 165:1
    166:1 167:1 168:1 169:1 170:1
    171:1 172:1 173:1 174:1 175:1
    176:1 177:1 178:1 179:1 180:1
    181:1 182:1 183:1 184:1 185:1
    186:1 187:1 188:1 189:1 190:1
    191:1 192:1 193:1 194:1 195:1
    196:1 197:1 198:1 199:1 200:1
    201:1 202:1 203:1 204:1 205:1
    206:1 207:1 208:1 209:1 210:1
    211:1 212:1 213:1 214:1 215:1
    216:1 217:1 218:1 219:1 220:1
    221:1 222:1 223:1 224:1 225:1
    226:1 227:1 228:1 229:1 230:1
    231:1 232:1 233:1 234:1 235:1
    236:1 237:1 238:1 239:1 240:1
    241:1 242:1 243:1 244:1 245:1
    246:1 247:1 248:1 249:1 250:1
    251:1 252:1 253:1 254:1 255:1
    256:1 257:1 258:1 259:1 260:1
    261:1 262:1 263:1 264:1 265:1
    266:1 267:1 268:1 269:1 270:1
    271:1 272:1 273:1 274:1 275:1
    276:1 277:1 278:1 279:1 280:1
    281:1 282:1 283:1 284:1 285:1
    286:1
jail 126:17 127:21
January 124:18 222:17,18 223:2
    223:18 225:13,21 232:16,23
    233:6,13,19,21 234:13,15,19,21
    234:24 235:5 245:7,9 246:23
    252:13 253:19,24 261:21 264:13
    264:25 266:3 267:6,11 268:5
    270:13 271:20 272:21 276:9,11
276:13 284:13
Japan 14:6 20:16 33:4,6 43:9,10,12
    43:14,17,20 44:5,6,8 45:9,12,18
    46:2,3,11,17,19,24 47:7 95:12
    96:2 128:7,13,20 129:5,23
    207:21 236:2 239:17,21 247:7
    264:17 277:13,19
Japanese 96:5,8 128:16 129:12
    130:17,19 151:16 156:3 175:7
    251:4 277:7
Jen 206:2
Jen's 122:4
Jennifer 1:3 4:19 10:16 62:6,7,8,11
    65:19 66:14,17 67:3 96:18,19
    97:15 100:3,8,9 105:12,20 107:7
    108:6 112:24 115:8 116:3 125:10
    125:11,13,14 126:13,15 128:7
    129:20 132:4,9 133:22,25 144:15
    145:5,8 146:20 148:14,19 149:18
    151:13,14 152:2,9 156:2 157:4,7
    157:17 158:5,11 160:4 162:8
    163:5 166:25 172:22 173:2
    174:11,20,21 183:14,16 184:2,8
    184:19,22,25 185:17 189:13
    190:8 191:14 194:23 195:20,24
    196:11,12 197:3 198:21 199:15
    200:2 201:10 202:15,15,25
    204:13 206:2 208:5,5 210:12
    213:20 214:4,17 215:17 219:11
    219:19 220:4,9,15 221:12,25
    224:17 228:20 229:4 235:11
    236:4 241:12,14,15,20,25 242:18
    243:16 244:10 245:2,17 248:14
    248:21 251:19,20,20,22 253:19
    254:9,11,15,16 255:2 257:3,12
    262:11,13,13 263:9,9,9 264:11
    265:24 267:4 268:24 269:5,10,11
    269:13,16,23,25 270:18 271:4,8
Jennifer's 100:19 157:5 158:25
    181:12 182:10 218:8,14 241:19
    244:2 250:13 256:20 261:6,15
    270:7
JEROME 2:17
Jerry 9:21
Jersey 38:24 39:3 63:20 93:14
    155:9,24 159:14,22
Jo-Hay 215:21
job 11:17 12:23 13:4,11 17:19 20:8
    20:24 21:10,13,19,22 22:11
    23:19,23 25:5 26:8,13 27:20 28:8
    28:14 29:2 35:5,5,11,12 38:2
    39:5 40:21 41:15 69:19 70:22
    76:9 86:11 108:21,21 205:7,20
    266:17
jobs 24:3,18 35:7,9 139:11
Joe 96:19 103:11,16 112:24 121:25
    138:20
Johei 215:10

**JOHN** 1:8
**join** 26:9
**joined** 22:10 36:18 37:9 41:4 42:12 49:8 67:6,17 69:2,8,9 72:11 75:18 93:17 116:12
**joining** 34:19 65:3
**joint** 9:23 10:4 57:14,15,20 86:2
**Jordan** 96:21 122:18
**Josh** 166:24 168:19 172:22,25 174:11,20,21 204:13 205:5,18 206:2,3 207:19 208:5 210:12 211:21 212:9 213:22 214:17,19 215:9 217:13 218:4 219:12,16,16 219:19 220:14 237:22 239:14 241:13,16 244:3 251:18,19 257:11 262:12,15 263:15 271:7 272:16 280:16 281:11 282:21,25 285:5
**Josh's** 204:2
**Joshua** 201:10 202:14
**Jouhei** 214:5
**JR** 2:6
**Jude** 4:11 287:6,17 288:5
**judge** 93:19 119:18 214:20 223:17
**judgment** 190:2,2
**judicial** 166:12 167:4 168:6
**July** 1:13 22:10 287:8 292:22
**June** 30:6,18 51:15
**junior** 129:16
**jurisdictions** 86:4
**justify** 268:9 271:19 272:2

---

**K**

**K** 287:2
**Kalin** 268:17,17 270:12
**KANE** 2:3
**Katherine** 188:10 190:13,16,18,20 191:15
**Kathryn** 20:9 70:25 75:8 96:17,19 97:15,17 121:10 190:19 191:16
**keep** 24:8 32:4 112:20 198:13 203:5 259:4
**keeping** 119:25
**Kelli** 184:9,9,17,20 185:5,18 188:11 191:15 192:10,12 193:10 194:13 196:13,17 197:20,23,24 198:22
**Kelli's** 195:19 197:4
**Kelly** 96:21
**Ken** 47:12 94:15 137:9 244:25 250:21 251:7 252:13
**Ken's** 250:11
**kept** 55:19
**key** 32:5 106:5 119:9 198:24
**kind** 32:8 50:11 92:21 105:17 107:6 109:19 114:19 118:7 128:9 128:23 129:13,17 131:4 132:14 133:22 152:4 220:16 236:10

---

255:18 268:2 278:18 279:25 281:13
**kinds** 54:25 55:21 65:16 90:13 113:6 139:21 188:21 197:5 236:10,13
**kitchen** 8:21
**knew** 56:23 63:13 106:22 118:24 129:20 177:6,9 247:12 255:7 259:4 275:7
**know** 5:2,7 7:8,10 15:14 17:2 36:13 39:12 41:13 44:23 47:9 49:15 50:7 53:11 62:13 63:12 65:2 66:17 67:14,15 71:8,12,21 72:25 73:8,19 76:12 77:16,19 81:10,14 87:23 93:25 94:17 96:2 97:2 98:20 99:15 103:19 106:8,10,16 108:10 110:15,18 111:3,7 112:17 113:5 115:7,13 118:23 119:3 120:23 125:17 126:4 128:7 132:23 133:23 134:4 138:7,13,14 138:17,18,19,21,23 141:14,19,21 141:22 142:24 143:8,10,11 144:21 145:6 147:12 152:7 154:13 155:3 166:2,15 170:5,10 171:19 176:15 177:3 178:21 181:11,22,25 182:13 184:23 185:21 186:18 187:15,17,19 188:21 192:4 193:6 194:3 197:25 199:21,24,25 200:5,22 207:20,22 208:4 210:8,17 211:9,17,19 213:3,4,9 218:2,7,14,15,21 220:10,16,24 222:7 222:17,20 222:24 224:24 225:17 226:13 228:9 229:3,4,17 230:7 232:15 232:21,22,25 233:5,12,18,20,21 234:18,23 238:19 239:19,25 241:16 242:14 247:17 248:18 251:2,3 255:11 258:9 261:5,8,12 261:15 262:20 266:7 269:4,12,19 270:3,10 271:4 275:11 277:23
**knowing** 53:8
**knowledge** 14:23 29:21 39:15 78:5 135:3,11,18 149:10 152:16 186:3 201:5 270:8 272:4 275:13,24 276:5 286:4
**known** 55:2 137:9 175:14 200:15 258:5
**knows** 129:17 184:17
**Kohler** 156:2
**Kreuzburg** 1:19 4:5 292:4,25

---

**L**

**L** 1:1 2:5,12 4:2,2 287:2
**L.A** 47:14
**label** 106:19 252:23
**Lacey** 93:19
**lack** 72:14 105:9
**language** 204:23 212:3,6,9 254:14

---

274:3,8,8
**laptop** 255:9
**large** 79:17 81:20
**largest** 79:14 81:17
**laughing** 196:12
**launch** 26:12
**law** 18:16,22 19:2,9,21,22 20:19 29:19 34:18 77:17 85:8 88:9 90:22 91:2,9 101:11,13 102:6 130:7 138:8 139:20 223:17 249:5 269:3 271:2 277:14
**lawsuits** 221:19
**lawyer** 33:5 35:21 40:13 52:3 57:14,20 80:2 81:24 90:6,19,19 90:20 92:3 103:17 119:15,16,17 119:20,21,22 120:4 121:10 122:2 228:16 271:5
**lawyers** 25:7 26:10 82:8 83:12 84:10 85:10,11,14 87:14 89:7 90:9 97:11 103:3 228:16 230:6
**lead** 57:13 92:3 103:20,20 104:14
**leadership** 26:15
**leading** 61:15 139:17 166:25 269:5
**leaner** 92:18
**learn** 48:15,17 94:20
**learned** 42:14 48:14 140:4,16 189:11 269:9 271:17,25
**learning** 33:19 37:6 118:11 140:19
**leave** 62:7,9,23 66:25 118:10 186:17,21,25 226:9
**leaving** 187:7
**led** 109:9
**left** 47:2 51:3 55:5,25 116:5 134:6 139:4
**left-hand** 99:19
**legal** 4:10 12:4,6 20:15 28:5,12 29:2 30:4 34:3,6 35:4 50:23 56:3 78:2 80:11,23 96:13,16 97:3,4,7 100:18 115:2,9,14,17 118:2 119:19 123:5 130:9 154:9,22,23 155:18,20 156:11 167:20 171:14 185:19 191:4 210:17 246:14 247:19 249:2 250:24 259:20 260:3,15 261:8 263:2 266:12 271:11 276:21 277:4,6,11,12,19 277:24 278:18 291:7
**length** 120:6
**lengths** 228:2 259:6
**lengthy** 5:14
**let's** 5:11 7:16 24:8 48:19 61:12 68:2 108:25 136:20 154:18 170:2 180:10 187:24 197:11 198:25 200:17 201:25 204:20,20,21 206:24 216:23 217:25 220:10,16 238:21 242:25 244:12 273:18 279:8
**letter** 73:24 74:15,19,22 212:18,24 213:21 290:21

level 48:3,8 63:4 66:10 78:5,13
    79:19,21 102:17,21 120:7 153:15
    153:15 228:23 236:8
Lexington 2:15
liabilities 58:18
license 220:21
licensed 33:10,12
licensing 92:4
lieu 72:16 73:6
life 73:12,16 258:5
light 12:15
lightly 12:3
likelihood 39:22 260:18
likewise 14:4 59:14
limitation 212:3
limited 231:9
line 40:17 150:11 184:23 214:22
    215:15,17,18 217:17 222:11
    247:18 291:22
lines 270:23,25
lining 83:21
LinkedIn 14:17 16:7,11,15,22 26:3
    28:11 35:7 288:9
list 99:20 100:10 122:3,4 160:9
    185:6 257:14
listed 15:8 17:18 28:5 35:24 125:19
    184:6
listing 23:18 28:19,22 194:15
listings 23:19
lists 28:19 285:6
lit 53:18
literally 126:16
Lithotech 58:9 79:3
litigate 103:19 167:18
litigated 91:3 230:8,11
litigating 229:24
litigation 71:10 74:10 92:10 99:18
    101:5 102:6 103:20,21 140:7,7
    166:8,23 170:19,23 171:6,16,18
    172:2 176:2 205:21 218:6,21
    220:11 230:5 260:12,16,18,19
    264:20 273:24 274:4,15 276:16
    276:20 282:2,8 284:10 286:11
litigations 90:23
litigator 204:3 205:6
little 13:15 52:9 55:9 61:18 100:6
    117:20 133:13 167:8 178:9,9
    195:2 211:22 242:9
live 50:8 63:19
living 63:18
LLP 2:3,8,14
local 23:2 33:2
locate 71:17
located 22:22 155:8
location 159:22
log 282:8,11
logical 120:10
long 8:15 9:15 22:5 24:21,24 29:25

30:16,19,22 47:19 55:24 64:6,6
    184:19 266:2
longer 19:20 102:10
look 18:13 24:18 25:23 33:21 35:7
    35:9 99:19 105:24 106:9 138:12
    166:2 172:23 178:15 197:2 205:5
    211:4 231:19 242:5 261:3 280:3
looked 55:4,5 96:23 146:11 206:6
    226:5 227:10 231:5 240:14
looking 16:15 24:3 31:15 36:6
    39:12 40:11 44:25 54:19 74:17
    93:25 100:17 108:16 146:5 148:5
    176:9 180:22 199:6 203:14
    213:15 214:5 215:3,4,7,14 217:8
    219:13,14 224:22 225:7 237:16
    239:7 241:6 243:11 244:20 250:5
    253:14 280:4
looks 96:7 181:12 204:21 218:11
    220:14
lose 21:9
loss 118:9
lot 17:24 57:9,21 60:12 77:16
    103:9 106:2 108:14 120:19
    151:19,23 152:10 154:11 222:6
    222:10 255:10 265:25 282:24
lots 77:10 188:12
loud 125:10 126:8 134:16
low 177:7 178:19,23,24 179:19,20
    179:21,22 180:2
lower 153:15
lowest 148:9
Lucite 133:7,8,20 134:3 135:15
    183:22 291:12
lunch 42:10 123:7
Luncheon 123:11

**M**

M 287:2
M-E-D-A-R-E-X 82:16
M-E-T-A-R-E-X 82:15
M&A 20:14 56:18 59:6,12,13
    88:20
magistrate 176:3 281:22
Maikoo 96:21
main 35:21 43:14
maintain 14:16,19 36:20 43:3
    102:12 115:2,6,9 204:21
maintained 37:18,22 41:23 48:22
maintaining 21:7 120:2 149:19
major 56:19 58:17 72:22 92:7
    132:7 267:23 271:23
majority 118:6,18 119:7
maker 269:7 282:23
making 27:13 62:13 63:17 78:13
    136:13 175:9 237:21 251:13
    258:14 266:4,15 280:18 283:25
male 144:4 163:2,3
manage 55:16 78:8,12 84:21 85:11

90:21 126:14 205:9
management 26:25 105:18 149:6
    150:8
manager 80:6,22 82:3,11 147:2
    149:9
managing 103:21 205:9
manner 150:16,22,24 151:5 158:10
    160:8 175:6
mannerism 132:19
MANSUKHANI 2:8
manufacturing 52:19
Maple 1:12
March 143:25 144:10 183:17
    187:10 195:7 196:8
mark 15:13,24 44:14 69:24,25
    145:20 182:25 201:25 223:21
    232:4,13 249:19 253:6 273:6,14
    273:15
marked 15:16 16:8 18:9 44:18 74:5
    74:8 76:4 93:24 94:5 99:8,11
    136:4 145:24 153:4 180:16 183:4
    197:14 202:5 203:11 206:24
    209:11,18 211:5,8 212:12 213:13
    214:6 217:2 219:7 224:11 237:11
    238:25 240:25 243:5 244:15
    249:17 252:23 253:9,12
market 53:2,9
marketing 26:14,16
marriage 292:17
married 187:15
match 60:23 61:24 62:22
matches 103:24
material 36:3 73:11 224:2 228:10
    229:5
materials 274:10 276:5
Matsugu 261:18
Matt 70:3 152:24 179:15 226:7
    283:14
matter 4:19 8:18,19 59:24 60:6
    101:7,8,11 127:6,7,11 132:18
    156:8 166:6,6,13 167:7,12
    169:16 170:16 172:11 176:10
    177:2 178:2,12 204:2 210:2
    213:5 215:24 216:11 222:25
    224:17 225:14,23 230:9,12
    231:24 235:14,18,23 243:17
    256:25 264:22 269:10 271:14
    272:5,24 276:3 278:5 279:14
    282:16 283:3,23 292:18
matters 79:23 85:8 91:2 93:13
    101:5,10 105:6,17 117:12 127:12
    127:13,19 172:8 229:25 236:5,9
    264:20 277:19
Matthew 2:5 4:17 216:19
max 169:17
maximum 176:16
MCC 167:13 168:7,14 169:4,8,12
    169:14,23 170:4,5 171:9,10

173:2 174:2,6,11,15 177:14
179:23 202:17 208:21 211:15,16
213:7 226:4,12 227:25 228:6
229:19 236:5 237:23 241:18,23
254:21 257:3 258:25 272:12
276:17,19,22,25 277:18 278:14
279:18 283:2,16,18
**MCC's** 168:17 227:21 278:12
**MCHA** 13:19 14:12 17:24 19:17
37:8,8,13,15,19 39:17 40:21 42:6
43:20 46:11,16,20 47:4 48:15
49:7,13 50:20 53:16 54:15 64:10
64:20 65:3 68:6 69:8 70:20 75:10
84:4,22 85:6 86:14 87:6 90:23
91:4,10,20 92:12,22 100:3
106:24 107:19 130:7,9,20 133:10
138:9 141:25 142:4,10 153:16
165:6 166:8 167:6,15,19 168:20
169:7,11,13,23,24 170:4,7,11
171:8,12 177:14 190:20 229:19
230:6 233:19 234:24 249:8 259:3
271:24 276:24 277:7 278:6,23
279:13 285:25 290:16
**MCHA's** 276:18 278:25
**MCHC** 12:4,5 13:23 141:13,14
171:13 251:11 277:25
**MCHC's** 17:22
**MCHC-00001361** 94:4,8 288:16
**MCHC-0001321** 44:17,21 288:12
**MCHJ** 14:5 276:14,18,22,24
277:12,17,21,24 278:6
**McKenzie** 86:3
**MCPP** 102:5,5
**MCUSA** 20:5
**mea** 243:19,25 251:23 264:11,22
**mean** 24:24 51:20 68:19 72:20
77:22 97:13 138:15 160:18
168:23 176:18 177:14 178:23
179:2,19 220:8 223:4,9,24
236:20 252:8 256:3 266:25 284:2
**meaning** 13:17 95:22,23 184:14
206:10 210:23 254:23 256:7,8
**meaningful** 189:5 218:5,12,15
221:4
**means** 12:21 78:8 83:25 188:24
194:2 210:15 218:7,21 223:9
272:13
**meant** 194:7 218:18 221:23,25
242:12
**measured** 151:14,21
**Medarex** 58:21 78:23 81:19,21
82:13,14,16
**media** 26:20 276:3
**medical** 7:24 8:4 26:14 72:21
195:21
**medication** 7:21
**meet** 9:12,15 37:25 47:21 48:5,7
53:19 89:11 103:6 109:18 120:16

142:21 148:21 189:23 234:2,4
236:2,25 247:17
**meet-and-greet** 236:11
**meeting** 45:9 50:2 51:4,8 53:6,18
109:16,24 110:11 111:8 113:23
114:17 125:12 126:21 128:2
133:19,25 134:2,4,8,9,24 142:21
147:16,18 152:4 162:20 183:13
183:15,16,19 186:24 188:19
194:19 195:7 196:7 219:10,21,21
223:10,17 225:12,17 235:7,10,15
235:19,24 236:7,15,24 237:6
239:13 245:22 262:17 291:19
**meetings** 42:8 54:4,8,9 70:23 77:9
78:11 103:7,9 112:3,6,10,19
113:7,9,18 114:7,12 152:3,3
255:11 267:20
**Melbourne** 85:25
**member** 20:10 78:15 138:19
155:17,20 156:11 190:16 191:17
198:10 266:11 271:10
**members** 31:25 100:18 126:13
155:24
**memorialize** 114:14
**memory** 8:5 96:24 206:18
**men** 155:25 161:24 162:15 164:19
**mention** 64:15 159:2 190:12
237:25
**mentioned** 17:5 21:13 28:9 33:23
40:23 43:16 61:8 63:3,7 68:5
75:7 79:14 82:7 83:18 88:13,25
102:13 107:5 111:15,23 133:16
174:4 177:20 178:19 182:9 184:2
192:10 236:23 251:8 263:7 264:3
277:5
**mentioning** 33:14 124:8
**MERCEDES** 2:11
**merged** 247:7
**merger** 246:24 247:8
**mergers** 58:3
**message** 181:14 221:16 242:2,3,4
248:10 274:18 275:6,14
**messages** 274:23 275:16
**messaging** 275:3
**met** 9:11 46:3 48:24 60:13 114:16
128:6 133:21 138:21 157:25
164:2 174:14 234:3
**methods** 24:18
**MFA** 97:24
**middle** 216:3
**million** 109:17 169:16 177:9
210:16,18,20 211:17,20 216:10
216:15,16 218:24 220:24 225:22
227:5,15 228:13 231:25 232:2
237:25 238:4 240:18 272:21
282:17 283:5,15,17,25 291:17
**millions** 209:23
**Minami** 201:24 214:21,25 261:22

270:18
**Minami's** 204:9
**mind** 7:16 9:5 24:9 87:22 100:11
117:17
**minimum** 176:15
**miniscule** 33:8
**minus** 211:20
**minute** 220:22
**minutes** 123:9 244:6
**mis** 267:22
**mis-marking** 252:16
**miserable** 185:24 186:9 187:5
188:8,9,11
**missed** 37:2,3 96:24
**missing** 26:5 106:5 219:17
**mitigate** 251:24
**Mitsubishi** 1:5,6,6 2:8,15 11:15
12:18,23 13:4,11,20,24 14:5
19:12,15 22:19 23:2,7 36:20,21
37:13 39:8,22,23 40:6,16 42:16
43:4,8,11 47:24 48:6 53:8 55:4
58:10 66:5 75:15,24 77:24 79:2
93:7,8,12 94:16 96:11 98:5,8
130:16 133:6 139:5,8 164:24
172:15 173:16 224:17 247:2,5
**Mitsubishi-related** 52:25
**mix** 95:20
**MKIC** 122:5,6 183:24
**MM** 209:19,20,23
**mode** 26:2
**model** 29:13 68:23 82:4 91:16
100:13,22,23,25 101:6 102:9,23
102:24 103:13 104:10,11 112:17
117:17,19 133:18
**modeling** 140:8
**modified** 248:20,21
**modules** 29:20
**moment** 16:25 18:11 76:11 166:2
264:13,23
**momentarily** 9:6 199:3
**Monday** 245:6
**money** 283:18
**monitor** 78:7 93:19
**monitoring** 76:18,24 77:11
**months** 12:9 106:9 119:8
**Moorer** 160:10 161:22
**Morano** 138:20
**morning** 4:16 264:10,14,16
**Morozon** 46:4
**motivation** 257:5,8
**move** 7:13,16 23:10 111:13 117:22
136:21 187:24 197:11 198:25
213:11 216:23 238:21
**moved** 24:23 25:4 103:12 116:15
185:15
**moving** 63:16 95:13 143:12 221:2,3
**MP** 98:11,14,14
**MPH** 98:13,16

**MPHVM** 98:10
**MTDA** 98:7
**MTPA** 98:4
**multi** 169:14,15
**multipage** 145:22 203:9,12 224:8
224:14 288:20 289:10,14
**multiple** 41:15 44:7 57:24,24 65:15
70:23 79:5 86:4 87:13 95:18 96:2
145:4 160:25 161:23 204:16
228:21 280:18
**mutually** 256:18

_____

**N**

**N** 1:1,1 2:1 4:1,2 5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1 102:1 103:1 104:1
105:1 106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1 114:1
115:1 116:1 117:1 118:1 119:1
120:1 121:1 122:1 123:1 124:1
125:1 126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1 134:1
135:1 136:1 137:1 138:1 139:1
140:1 141:1 142:1 143:1 144:1
145:1 146:1 147:1 148:1 149:1
150:1 151:1 152:1 153:1 154:1
155:1 156:1 157:1 158:1 159:1
160:1 161:1 162:1 163:1 164:1
165:1 166:1 167:1 168:1 169:1
170:1 171:1 172:1 173:1 174:1
175:1,14 176:1 177:1 178:1
179:1 180:1 181:1 182:1 183:1
184:1 185:1 186:1 187:1 188:1
189:1 190:1 191:1 192:1 193:1
194:1 195:1 196:1 197:1 198:1
199:1 200:1 201:1 202:1 203:1
204:1 205:1 206:1 207:1 208:1
209:1 210:1 211:1 212:1 213:1
214:1 215:1 216:1 217:1 218:1
219:1 220:1 221:1 222:1 223:1
224:1 225:1 226:1 227:1 228:1
229:1 230:1 231:1 232:1 233:1
234:1 235:1 236:1 237:1 238:1
239:1 240:1 241:1 242:1 243:1
244:1 245:1 246:1 247:1 248:1
249:1 250:1 251:1 252:1 253:1
254:1 255:1 256:1 257:1 258:1
259:1 260:1 261:1 262:1 263:1
264:1 265:1 266:1 267:1 268:1
269:1 270:1 271:1 272:1 273:1
274:1 275:1 276:1 277:1 278:1
279:1 280:1 281:1 282:1 283:1
284:1 285:1 286:1 287:2,2 288:2
292:2
**name** 4:10,16 18:4 50:4 60:25
61:19,22 80:20 86:2 97:22 98:15
98:17 133:20 268:18
**named** 19:14 22:12 190:12 268:22
**names** 99:20,21 156:5
**nature** 11:8 49:19 50:14,18 54:15
54:19,25 56:2 57:8 58:5 60:19
73:21 77:5 82:22 84:25 86:17
87:11 91:25 93:4 109:3,24
124:22 125:5 128:17 131:14
139:15 191:24 194:12,14 197:20
**near** 40:15 50:8 129:8
**necessarily** 62:15 66:13 280:3
**necessary** 224:7
**need** 7:7 54:2,2 102:17 132:9,12
169:19 184:14 197:25,25 203:5
205:10 207:15,17 208:2,2 210:7
211:14,21,25 212:4 213:21
228:15 280:12,13,22 281:11,18
281:18,22
**needed** 95:14 118:10 148:14,15
172:18 184:12 280:9,19
**needs** 132:12 148:6 163:15,17
167:15 184:15
**negative** 192:12,14
**negotiate** 68:14 204:20 210:6
**negotiated** 68:22 69:13,14,16
72:15,23
**negotiating** 64:5 73:9
**negotiation** 75:4 78:21 290:24
**negotiations** 70:17
**neither** 162:6 196:14
**network** 32:2,3
**Neutral** 175:19
**never** 109:16 119:9 138:21 162:3
186:20 198:20 267:20,21 270:2
**new** 1:2,12,20 2:4,10,10,16,16 4:15
4:15 12:5 26:13 29:10 33:7,10,21
38:24 39:2 42:15 49:18 63:20
93:14 109:16 111:9 114:16
133:19 189:3,4 236:3 239:25
240:22 261:17 287:3 292:5
**news** 218:10 245:6,13 246:9
**nice** 236:25
**Nicholas** 1:7,17 2:9 4:11 16:8,12
213:25 252:14 287:6,17 288:5,10
**Nick** 152:24 169:25 170:11,12
191:23 197:25 214:19 271:7
**284**:25 285:2
**night** 18:20 239:13 262:17
**nighttime** 175:14
**nine** 55:24
**nomenclature** 21:24
**non-attorneys** 10:7
**non-group** 73:17
**non-privileged** 11:7
**non-sexual** 162:13
**nonexempt** 88:5
**nonresponsive** 111:12
**nonsexual** 162:3
**nonverbal** 150:17 151:10
**nonverbally** 151:24
**normally** 19:2 78:25 176:24 177:3
**Notary** 1:19 3:15 4:4 287:23 292:4
**note** 109:13 110:13 147:4,5 183:13
187:2,25 196:20 197:2 198:8
212:2 237:3 251:16
**notepads** 261:16
**notes** 111:20,20,23 112:3,5,10,15
112:17,18,20 113:4,8,13,20
125:24 134:17,20,25 135:8,16,23
152:13,21 183:16 185:24 236:14
236:17,24 237:6 253:20 254:8
291:4,12,15,19
**notice** 1:19 131:5 253:20 260:18
276:2
**notified** 267:7
**notify** 251:7
**November** 11:21 46:25 54:11
61:15 67:19 72:12 74:24 75:19
76:14,17 78:20 96:12 98:23
107:19 115:24 116:18 117:5
123:16 124:17 137:5,25 148:13
166:11 208:25 266:3 290:23
**NS** 69:23
**nuanced** 178:10
**number** 70:11 74:11 78:12 95:19
125:17,17 163:12 176:15 185:3,5
224:18 227:8 228:15 231:20
275:9 281:23
**numbering** 16:3
**numbers** 73:9 209:22

_____

**O**

**O** 1:1 4:2,2 287:2 292:2
**oath** 287:8
**object** 68:10 111:10 229:6,11,13
**objection** 9:25 14:13,22 15:9 19:4
21:21 30:11 32:17,24 33:17
34:17,24 36:8 39:14,19 40:10,19
41:11 42:2 43:5 45:19 46:21 47:8
47:23 49:9 52:4 54:6 55:13 56:5
56:12,16 57:4 59:7,20 60:2 63:23
65:5,13,24 66:6 67:12 69:3,10,23
72:13 73:14 75:25 76:20 80:5,10
80:15 81:13 85:13,22 89:22

91:11 95:4 100:5,19 104:4 105:2
105:11 106:15 107:24 109:6
110:12,17 111:6 112:8,13 113:10
114:10 115:10 117:7 118:4 119:6
120:9 121:20 122:25 123:21
124:2,14 131:7,15 134:19 137:8
137:17,23 138:10 139:12,24
140:18,23 142:15 143:3,7,16
149:16,20,25 150:6,25 151:7
153:17,18 154:17 155:13 156:17
157:21 158:2,9,23 160:7,23
161:5 164:14,20 165:7,12,22
167:23 169:10 170:9,20 171:2
177:4,16 178:16,25 181:24 182:8
182:20 186:23 187:13,23 191:12
192:13,24 193:9,25 195:10
196:18 199:23 202:22 206:9
210:3 213:2 216:12 218:22
221:24 223:19 225:9,15 227:6
228:8,14 230:2,14,19,25 231:10
231:16 232:3 233:24 234:25
238:6,9 240:20 242:13,21 244:8
245:14 248:7,24 249:12 250:19
250:20 251:14 255:24 256:6,10
257:2,7,18 258:8,17,22 259:22
260:6,21 261:25 262:9 263:6,21
265:4 266:24 267:13 272:3,10,17
273:2 274:5,12,24 277:2,22
278:7 279:2,15 280:10,25 281:10
282:3,9,18 283:6 284:8,16
285:12,18,21 286:3
**objections** 3:9 5:24
**obligation** 254:11,19
**obligations** 21:6,8 58:20
**observation** 140:20
**observe** 117:18
**observed** 130:11,15,20,25 140:15
**observing** 140:16
**obtain** 70:22 228:12
**obtained** 230:9
**obviously** 249:20
**occasion** 46:2 233:22 235:6
**occasions** 113:19 114:5 152:11
188:16 228:21 291:13
**occur** 104:19
**occurred** 163:21 164:3 195:22
264:6 266:7,19 268:14,14
**October** 164:17 201:20
**odd** 134:9,10 162:13
**odds** 196:5
**offensive** 164:4
**offer** 31:19 64:4,4 68:6,7,12,15,22
73:24 74:15,18,22 133:12 177:7
216:9 227:16 230:23 237:21,22
239:14 241:14,17 244:4 258:15
261:23 262:17 264:13,25 269:11
271:8 284:5,14 290:21 291:17
**offered** 64:10 109:11,13 110:21

144:5 179:22,23 216:5,19,22
248:9 255:8,18
**offering** 283:15
**offhanded** 50:6 63:8
**office** 20:16 108:8,8,9 113:25 114:6
114:13,16,18 115:5 125:11
126:14 130:12,15 155:9 159:15
182:10 188:12 189:2,22,25
190:20,25 191:2 195:4,21 198:9
232:16,19,23 233:3,6,9,13 236:4
241:13 247:8 251:16 261:17
264:4
**officer** 11:19 12:4 17:12,21 20:15
60:16,22 64:11 65:4 67:18 69:9
72:4 76:10 92:5,6 106:24 107:22
116:12 141:20 163:15 164:24
248:12 271:6 279:18 285:25
290:20
**officers** 78:3
**official** 25:6 250:24
**oh** 98:11 126:16 181:5 215:10
234:11 243:24 285:4
**okay** 5:2,3,7,8,23 6:3,4,13,14 7:2,3
7:14,15 8:7 9:8,22 10:6 15:12,21
16:4 21:17 23:5 24:21 25:8,24
26:6,6 28:17,25 29:25 35:2,14
37:3,6,12 39:7 41:21 42:11 44:24
46:10 48:2,10,12,20 53:4,14
59:22 65:8 66:23 68:14 69:25
70:10,15,16 73:23 76:5,16,22
78:18 80:13,21 96:10 97:2 103:5
103:25 106:18,21 107:10 111:10
111:14,22 114:12 116:6 117:23
119:16,23 120:5 124:6 125:19
126:20 127:10 130:18,23 131:19
131:22 133:2 134:11 137:11
141:12 143:11,12 148:4 153:10
153:22 154:3,12 155:19 156:24
170:6 173:9,18 175:9 176:5,24
179:23 180:5,6 181:3 182:22,24
183:9 186:20 187:9,24 190:9
192:9 194:6,25 198:25 199:12
200:25 201:16 203:7,21 204:7
205:24 206:15 207:2 208:11,20
209:17 210:5,21 211:3 213:8
214:9,13 215:10,12,15,19 216:17
216:21 217:7,24 219:3,23 221:10
222:7,11 223:11 224:25 225:20
227:9,22 228:5 230:4,20 231:12
232:13 234:3 235:3,6 237:24
238:15 239:6,16 240:13 241:24
242:6,25 243:10 244:11 250:17
251:8 257:23 259:18 260:11
263:4,23 264:24 269:17 273:15
273:17 276:4 279:22 282:13
283:24
**Old** 2:4
**Oliva** 1:7,17 2:9 4:1,11,16 5:1 6:1

7:1 8:1 9:1 10:1 11:1,22 12:1
13:1 14:1,16 15:1 16:1,8,12,13
17:1 18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1,25 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1,5 69:1 70:1
71:1 72:1 73:1 74:1,22 75:1,4,6
76:1 77:1 78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1 102:1 103:1 104:1
105:1 106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1 114:1
115:1 116:1 117:1 118:1 119:1
120:1 121:1 122:1 123:1,14
124:1 125:1 126:1 127:1 128:1
129:1 130:1 131:1 132:1 133:1
134:1 135:1 136:1,6 137:1 138:1
139:1 140:1 141:1 142:1 143:1
144:1,2 145:1 146:1,5 147:1
148:1 149:1 150:1 151:1 152:1
153:1 154:1,20 155:1 156:1
157:1 158:1 159:1 160:1 161:1
162:1 163:1 164:1 165:1 166:1
167:1 168:1 169:1 170:1 171:1
172:1 173:1 174:1 175:1 176:1
177:1 178:1 179:1,4 180:1,22
181:1 182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1 190:1
191:1 192:1 193:1 194:1 195:1
196:1 197:1,17 198:1 199:1,6
200:1 201:1 202:1,8 203:1,14
204:1 205:1 206:1 207:1 208:1
209:1 210:1 211:1 212:1,14
213:1 214:1,2 215:1 216:1 217:1
218:1 219:1 220:1 221:1 222:1
223:1 224:1 225:1,2 226:1 227:1
228:1 229:1 230:1 231:1 232:1
233:1 234:1 235:1 236:1 237:1
238:1 239:1 240:1 241:1 242:1
243:1 244:1 245:1 246:1 247:1
248:1 249:1 250:1 251:1 252:1
252:14 253:1,14 254:1 255:1
256:1 257:1 258:1 259:1 260:1
261:1 262:1 263:1 264:1 265:1
266:1 267:1 268:1 269:1 270:1
271:1 272:1 273:1,22 274:1
275:1 276:1 277:1 278:1 279:1
280:1 281:1 282:1 283:1 284:1
285:1 286:1 287:6,17 288:5,10
290:21,25
**Oliva's** 12:11 72:2 113:14 290:13

290:18 291:5
omit 36:3
on-site 93:19 275:7,7
once 8:14 37:24,25 41:25 170:6
　280:7
one-on-one 103:7,9 112:19 183:24
one-on-ones 104:17 111:20 113:25
one-page 44:16 74:3 99:9,13,17
　249:15 250:8 253:7 288:11,13,18
　290:6,7
ones 126:3 271:23
open 108:10 109:14 247:21 270:23
　270:25 271:14
opened 110:25 159:9
operated 133:8
operates 101:19 189:12
operations 52:20
opinion 40:3 105:24 188:20 222:5
opportunities 40:6 49:7,13
opportunity 5:16 27:9 39:17 42:15
　48:15,16,18 51:24 53:16 59:24
　63:15 131:18 159:17 161:17
　164:6 171:12 178:6 217:14
　226:16 247:17,24 264:12
opposed 95:25 117:14 133:17
　230:6 256:17
opposing 129:7
option 245:19
or/and 269:20
order 70:22 102:14 114:9,14 120:7
　280:13
organization 29:10 32:9 82:4 88:16
　128:8
original 24:24 68:12 206:25 251:16
　252:17
originally 22:10 26:12 46:16 122:5
　156:7,9 248:19,20
originals 209:7
Osaka 47:17 95:23
Otsuka 59:3
outcome 236:12
outlined 266:9
outside 22:24,25 23:3 31:16 83:12
　84:5,6,10,13,21 85:7,16,18,20
　86:8 101:4 114:6 157:14 166:24
　166:25 167:18,21,24,25 204:5
　205:5,11,19 260:23 269:2,5,12
　269:12,24
overall 80:9,17 81:3,24 277:25
overlap 97:13
overpaying 144:16,21 145:6 184:3
oversaw 250:24
overseeing 176:4
overture 109:4
owed 218:25
owned 22:25 133:7,9 268:20

_____
　　　　P

P 2:1,1
p.m 123:11,12 180:12 273:20
　286:20
Pace 18:15 19:11
pack 109:13 110:25 111:5
package 68:25 72:16 73:6 144:4,5
　144:14 145:18 254:22,23,23
　255:19
packages 144:17
pads 115:2,9,14,17 261:9 291:7
page 17:8 18:8 23:16,18,19,23
　24:16 25:9 28:2 35:24 44:22 96:4
　99:19 136:17 138:6,6 146:22
　147:22 148:6 150:12 154:2
　193:23 209:2,18 213:23 214:6,12
　214:14,18,22 218:4 219:14,25
　221:11 224:9,9,15,19,21,22
　244:5 253:23 288:4,8 289:3,14
　289:15 290:3,12 291:3,22
pages 146:12
panel 148:5
paperless 112:21,22,22
paragraph 136:20,22 138:5 143:21
　143:25 154:2,11,13 161:11,14,15
　164:9,16 165:25,25 245:5
paralegal 20:6,8,12,18 21:8 58:12
parameters 177:6
paraphrasing 127:25
Pardon 136:21
parent 23:6
parentheses 186:11
Park 2:10
parse 61:17
part 29:10 43:21 59:2 63:3 69:13
　71:9,12 75:6,11 83:13 94:12
　100:8 102:23 103:25 104:16
　116:3 123:17 130:8 193:17
　195:19 197:5 245:4 247:10
　253:19 263:20 269:22 283:14
partially 191:3
participant 94:11
participate 78:23 139:23 212:8
participated 78:21 81:18
participating 139:17
particular 41:19 81:2 82:17 127:11
　140:3,21 142:18,19 151:17
　259:17
particularly 91:14 128:25 166:19
parties 3:3 292:16
partly 197:5
partnered 57:23
partners 57:21
party 6:13 197:4
pass 31:12 33:6,9 38:17 214:25
passed 20:22
passing 20:25
Pat 70:19,25 74:19 253:22 254:9
　255:13 263:14 265:15

patent 20:11,12 102:7 103:17
　121:10 122:2,6
patents 221:18
patient 109:21
Pauletta 133:21 134:3 183:21,22
Pause 38:16 202:7
pay 220:25
paying 69:15 72:25 86:12 132:14
　283:18
payments 216:6
Payroll 200:4
pending 7:12
people 32:5,6,10 33:9 43:7 51:16
　63:13 66:19 83:21 88:17,22
　90:12 91:15 102:15 112:18
　118:13 119:2 129:2,8,11,14,17
　152:2 163:2 171:20 188:12
　191:14 246:6,9 247:12,17,18,20
　260:24 261:14 277:6 278:14
　279:21
perceived 100:10 163:16
percent 69:12 189:8 199:16,22
percentage 33:8 189:10
perception 164:11
perfectly 159:19
perform 122:22
performance 122:21 146:19 147:5
　147:14 148:8 149:2,13 181:12
　182:19 198:11
performed 52:13 118:3
performing 118:2 157:10
period 6:15,17,19,24 18:24 30:6,15
　37:23 43:19 61:15 92:4 94:21
　123:20 129:25 130:6,10,21 139:4
　139:8,9 178:19 199:17 201:19
　236:8 265:22 266:2
permitted 136:24 137:6 173:10,14
perquisites 72:10
person 29:20 54:12 77:11 80:8,14
　80:15,16,17,25 82:2,10,11 90:6
　101:20 102:2,18,20 103:6 127:4
　129:15,16 139:18 140:8 142:9
　159:21 160:10 161:22 162:7,11
　169:12,18 184:9,13 185:12
　233:25 261:18 265:16 270:20
personal 7:19 73:17 187:11,21
personally 90:25 93:20 192:6
　230:8,11 258:9
personnel 36:21 37:7 48:8 75:11,15
　112:6 142:5,7 169:7
perspective 26:16,16,17,25 57:16
　80:12,23 93:16 178:14 186:5
　278:4
pertaining 91:9 113:14 135:8
　291:5
perusing 188:17
pharma 23:2 39:21,23 40:12,16
　43:9,11 52:3 53:2 93:8 95:15,23

98:6,8,14
pharmaceutical 22:21 26:11 38:24
  39:2,24 53:9 57:10 121:14
  155:25
pharmaceutical-related 22:19
  52:18
phone 54:13 61:11 189:2 261:6,6
  261:13 275:9
phones 261:14
phonetic 27:5 43:8 46:4 215:21
  268:17
phrase 87:25 227:20 256:8
physicians 26:18 27:15
picked 53:24
picture 38:9 219:5
piece 106:5
pieces 167:10 170:2 200:19
place 1:21 12:8 46:6,11 83:10
  102:4 108:4 129:25 144:18
  152:12 166:16,18 183:15 225:18
  234:6,7,10 291:14 292:8
places 31:18 85:9 91:18
plaintiff 1:3,18 2:3 4:18 8:20 9:3
  71:15 99:18 174:6
plaintiff's 4:18 16:2,6,10 44:16
  74:3,8,17 76:4 93:24 94:3,7 99:8
  99:9,13 145:22 146:3 180:14,19
  183:2,7 197:12 202:3,10 203:9
  209:11 211:6,8 212:11,13 213:14
  214:6 215:6 216:24 219:7 224:8
  224:14 237:9,14 238:23 239:4
  240:23 241:4 243:3,8 244:13
  249:15 252:12,24 253:5,7 288:8
  289:3 290:3
plan 204:4 245:6
plane 210:10
planned 44:8 45:12 53:8
plant 148:25
play 170:18 281:25 282:7,11
Plaza 2:10
please 4:9 5:2,6,11 6:9,13 7:5,10,19
  13:2 36:12 42:19 44:23 67:9
  69:25 76:11 77:19 87:2 97:2
  126:3 128:16 145:21 153:3
  154:13 165:10 170:12 179:11
  182:25 193:2 195:13 197:18
  202:2 211:25 232:13 237:8
  238:18 249:19 253:6 262:24
  265:7 273:15 279:5 283:10
plenty 40:5
plus 61:11 96:21 240:8
point 7:4 22:12 27:20 30:25 36:16
  38:20 45:19 52:17 54:20 56:25
  57:5 58:2 64:3,8,9 68:6 73:25
  108:7 110:22,25 114:8 117:20
  148:14 156:13 164:2 166:21
  179:23 181:19 186:10 187:6,8
  193:15 194:20 199:13 201:2

210:20 212:25 220:11 225:21
  250:14 268:8 283:3,7,23 285:9
  285:14,19
policy 69:13 73:12,13,16 139:20
  286:2
poorly 255:10
portfolio 20:11 122:6
portion 29:11 73:5 81:6 82:20
  88:11 96:4 111:11 119:5 136:19
  150:8,21 153:4 227:18 228:5
  229:6 247:23 248:4 249:19 254:7
portions 224:20
pose 286:12
posed 77:19 286:9
position 12:19 14:12 20:4 21:25
  22:8 23:12 24:22,25 25:15,19
  27:12 28:4 30:15 31:16 32:18,20
  32:21,23 35:16,25 39:3,13 40:24
  41:3,7 48:18 49:17 50:11,14,20
  51:10,12,25 52:5 54:15,19,25
  60:7,17 61:20,24 62:10 63:22
  64:11,16 65:25 66:15 68:7,25
  69:14,22 71:4 72:4,11,17 76:12
  76:13 77:14 102:12 105:23
  106:17 107:21,23 116:20 117:24
  120:24 121:5 129:2,3,9 137:3
  142:14 153:11 181:16 200:22
  210:13 229:21 231:7,14,17
  256:18 274:17 278:12 284:20
  290:16,20
position's 63:17
positions 24:23 29:4 33:21 75:20
  87:9 229:23 268:19
possession 280:8
possibility 238:13 259:24 260:2,5
  284:11
possible 21:19,24 22:3,3 62:8
  112:21 148:9 182:23 207:23
  210:7 236:16 245:20 246:17
  275:11
possibly 36:5 45:8
post-closing 21:6 47:15 58:19
post-law 130:8
posting 23:15
postponed 166:20
posturing 176:12,21
potential 53:16 56:14 59:18 126:11
  127:5 139:19 149:24 207:11
  236:12,12 259:20 271:2
potentially 261:23
power 129:2,9
practice 29:12,13,14 31:25 80:22
  82:3,10 100:13,23 101:6 102:3,9
  102:24 103:12,21 104:10 112:2
  275:10
practicing 277:8
precedes 128:10
predecessor 19:17 130:9,23

predicated 50:22
preexisting 53:21 245:15
preparation 10:10
prepare 9:9 152:13 245:21 262:21
prepared 83:2 248:14
preparing 246:23
presence 233:9
present 9:20 10:7,15 168:9 223:11
  235:10,12 253:22 255:14 260:5,7
presented 95:11 252:20 281:24
presently 11:12
preservation 274:10 276:2
preserve 275:17
preserved 274:14 275:15,17,24
president 35:22 48:3,5 138:19
  145:10 163:13 185:16 196:14
  246:4
presumably 213:22 218:2
pretty 61:22 62:25 66:18,21 85:3
  93:21 128:5 132:10 205:20
  263:13 267:17 269:24 271:16
previous 64:6 87:8 106:17 142:13
previously 34:7,8,9 74:8 76:4
  106:14,22 113:13 135:22 136:4
  153:5,14 158:8 171:20 181:13
  192:11 206:24 209:11 211:5,8
  212:12 213:13 219:7 238:5 291:4
  291:11
previously-stated 52:2
primarily 20:12,18 21:5 22:18
  70:19 97:10 103:23 121:13 122:3
  194:10 229:24 248:8 266:10
primary 26:11 35:21 100:10,20
  105:7 166:22 245:25 246:18,18
  246:21 266:18,19
PRIMAVERA 2:12 227:17 252:8
Princeton 34:3,6,22 35:4
principals 220:23
principle 130:16
print 25:25
printout 16:7,11,14 288:9
prior 12:15 13:10 26:23 43:2 46:16
  46:19 49:7 64:8,9 65:3,7 69:17
  76:17 77:14 78:20 84:4,6,22 85:6
  86:14 87:6 90:23 91:4,20,22
  92:12,22 107:4,14 123:16 139:2
  182:7 192:16,18,21 193:12,14
  194:22 206:6 208:23 251:12
  260:10
privilege 127:5,9 134:22 282:8,10
privileged 6:6,10 11:10 127:2
  132:24 134:13 138:16 139:14
  177:17 179:4 235:21 273:3,8,12
  282:5
privileged-related 126:24
privileges 6:12
proactively 120:18
probably 11:24 15:2 35:10 51:9

53:10,12,20,22 62:18 83:14
84:18 85:5 86:6 91:18 95:7,17
98:3 104:8 105:5 106:3 109:12
113:22 114:3 117:13,15 118:19
125:21 137:9 142:8 159:17
182:11 196:19 202:19 210:18
213:6 215:16 218:16 242:15
248:19 251:3 261:18
**problem** 24:8 57:18 188:23 189:18
189:20,20,23 191:15,19,25 192:6
195:3 205:8 215:13 263:24
267:23,23
**problems** 49:16,23
**procedurally** 15:14
**procedure** 114:8,11,14
**proceeding** 281:21 292:7
**proceedings** 38:16
**process** 31:20 35:5,5 61:23 62:21
64:6 70:21 75:4,7 84:8 90:5
103:25 104:16 105:19 107:6
116:3 119:4,8 120:20 274:7
290:25
**procurement** 26:21 29:20
**produce** 135:23 223:24 291:14
**produced** 74:10 99:18 113:14
115:20 135:22 152:20 196:4
227:14 236:19 237:5 270:19
282:2,8 286:11 291:4,10,11,18
**product** 27:5 39:24 40:16 53:2
**production** 12:11 14:9 71:24 74:21
75:3 113:13 115:17 152:20
227:14 237:6 261:20 290:11
291:2
**products** 26:13 27:2,3,7 43:10 53:9
57:11,12,14,15,25 58:23
**professional** 1:7,8,9 14:20 17:3
172:16
**proffer** 110:9
**proficient** 266:6
**profile** 16:14,18,23 17:2 76:12
**program** 18:18,20 19:3,5,7 29:23
77:13,23 78:7 117:13 248:11
270:23 271:4
**programming** 84:11,13
**progress** 116:5 266:4
**progressive** 286:2
**projects** 117:10 188:25
**promises** 120:15
**promoted** 28:18 30:3 141:22
**promotion** 26:20
**pronounce** 229:21
**pronounced** 215:21
**properly** 157:19
**propose** 208:7
**proposes** 217:16
**propounded** 71:15
**prorated** 199:17
**prospective** 56:11

**prospects** 52:24
**protection** 57:17 93:15
**protocol** 140:21 141:2,4 158:7,18
158:22
**provide** 38:3,6 56:3 71:19 74:7
101:25 102:14 126:10 128:3
131:11,25 158:6 161:17 178:6
206:7
**provided** 10:9,12 15:7 31:19 38:10
38:18 41:13 73:24 92:20 93:20
93:20 135:4,12,19 137:13 145:17
149:3 152:17 157:9 158:5 161:21
173:25 200:21 212:24 223:25
269:23 276:6 281:14 282:15
284:5
**providing** 59:17 136:3 221:9
269:22
**provisional** 123:19
**provisions** 57:17
**public** 1:20 3:15 4:4 172:14 287:23
292:4
**pull** 133:13 224:6 274:3
**purchase** 83:20,23
**purchased** 72:17
**purported** 258:7
**purportedly** 272:16
**purpose** 26:12 72:25 108:7 175:25
207:25 236:4 245:24,25 246:10
247:14,15
**purposes** 69:15 86:21 88:4 174:13
174:18 212:20 274:20,23 278:25
279:12,13 281:2,19
**pursuant** 1:18 249:22
**pursue** 62:3
**put** 106:18 111:4 195:24 215:16
254:24

**Q**

**Qualicaps** 268:21,22 269:7
**quality** 86:12
**quarter** 147:7
**query** 221:16
**question** 3:10 4:25 5:4,6 6:2,23
7:12,13 10:3 13:6,8 24:13,14
25:3 36:24 37:4 42:17,20 54:7
55:3 56:17 67:7,10,13,16 69:4
70:5 77:18 80:4 86:24,25 87:3,4
89:23 93:11 96:9 101:21 111:12
127:8 137:4 139:3 149:14,18,22
153:2,10,20 154:24 165:17
169:12 171:24 177:19 179:8,9,12
181:18 184:18 185:5,8,11,14
186:19 191:8,10 193:3 195:14
200:13,14,18 201:15 205:13
216:17 219:9,20 229:8 231:3
233:16 257:24,24 262:7 265:8
272:19 275:22 277:16,17 279:6,9
279:10 283:8,11

**questioned** 54:22
**questioning** 168:12 204:2 222:8
**questions** 4:20 5:11,18 6:16,18,20
7:17 55:9 123:14 136:18 205:19
254:24 286:6,9,13,17
**quick** 180:7,8
**quickly** 84:3
**quitting** 186:11,14
**quoting** 128:14

**R**

**R** 2:1 292:2
**R&D** 35:22
**raised** 70:11 165:15
**range** 248:25
**ranking** 129:8,16
**rare** 33:5
**rating** 148:7,9,11
**Ray** 46:3
**Rayon** 246:24 247:5
**re-question** 286:7
**reach** 256:22 264:7
**reached** 258:24 259:14
**react** 264:17
**reaction** 125:15 132:11 133:3
134:8 218:8,14
**reacts** 151:13
**read** 13:7,9 24:13,15 36:22,25
42:18,21 67:8,11 78:25 79:2 87:2
87:5 96:8 153:9 165:9,11 179:13
191:9,11 193:2,4 195:12,15
203:20 226:19,22 242:7,8 253:19
254:4 262:5,8 265:9 279:4,7
283:9,12 287:7
**reading** 152:7,8,8 212:4
**ready** 27:7 44:23 99:15,16 224:24
**real** 101:5 251:15 252:2 263:7
264:4
**realize** 172:7
**reallocation** 102:22
**really** 55:3,22,22 62:2,14,16 95:14
103:16 105:13,19 108:12 111:7
118:14 132:13 134:4 152:5 171:7
171:8 176:12,21 184:19 221:17
222:10 224:7 228:18 245:20
247:9 251:4 266:7,10 267:24
269:7 270:21 277:16
**reason** 159:5 172:12 197:22 200:25
201:3,7 225:6 245:12 246:17,18
246:18,21 265:20 266:7,18
**reasonably** 104:5,5 221:8 260:17
**reasons** 142:12 159:8 185:3 195:21
196:17 245:3 256:16 257:14
266:18,19 268:9 271:18 285:6
**reassign** 143:5
**reassigned** 142:12
**reassignment** 165:19
**reassurances** 206:7

rebalance 115:24
recall 21:18 25:6 30:3,19,22 33:8
    35:6 36:9 38:11 39:4,6,6,20
    40:22 41:12 43:13,25 44:2,12
    45:17 48:3,9 49:14 50:6 51:7
    53:5,25 58:15 59:8,23 60:3,9,13
    65:16 66:13,16 69:11 71:13,23
    72:20,22 74:14 76:21 82:9 83:5
    84:9 86:2,6 97:20,23 98:3,21
    110:7,14 117:8,11,21 120:23
    122:7 124:7,21,22 125:2,5,8,9,9
    125:10,11,13,13,22,25 126:3
    134:12 139:25 142:20 144:15,15
    144:20 145:5,8 151:8,24,25,25
    156:4 161:6,9 162:8 164:21
    165:3 166:18 169:21 170:10
    175:18 176:14 178:17,21 182:5,9
    182:13 183:23,25 194:24 196:4
    196:19 216:13 217:23 223:10,11
    223:16 225:2,19 227:11 230:15
    232:17,24 233:7 234:11,20 235:4
    236:7 251:17 261:3 265:17
    271:22 273:22 275:5 280:3
    283:25 284:4
recalls 200:6
receipt 213:7
receive 72:10 73:10,17,20 74:15
    140:10 148:6
received 74:18,18 118:22 148:10
    163:11 199:16,22 200:16 201:23
    203:6 205:16 212:7 230:12
    280:17
receiving 6:2
recess 68:4 123:11 180:12 273:20
recipients 214:22
recognize 99:21,24
recollect 15:3 126:21 132:21
recollection 36:11 45:11 49:24
    113:5 202:12 234:14 262:16
recommend 157:13
reconfirm 280:12,23
reconsider 188:2
record 15:19 123:13 136:2 153:9
    165:11 180:10,11,13 195:23
    209:9 232:18 233:2,8,15 253:2
    253:18 273:21 287:10,12 292:13
recruiter 24:11 31:18
recruiters 23:25 33:24 34:2,13,18
    34:23
redacting 281:25
redaction 216:4
redactions 281:23
reduce 246:5
reduced 141:4
reducing 89:13 268:25
reduction 145:7 246:19 269:23
reductions 92:16 144:25 145:5
reemployment 74:23 75:12,16

    182:17 192:21 290:22
REES 2:8
ref 38:9
refer 25:8 98:16 153:3 175:7
    216:14
reference 26:3 38:2,4,7,11,12,18
    38:21 40:21,24 41:10,14,19 49:5
    190:17,18,19 209:19 237:24
referenced 127:7 179:18 240:19
references 38:10
referencing 215:11
referred 19:14 25:7
referring 13:19,24 14:5 15:20 16:7
    32:9 88:2 114:21 143:21 180:3
    219:24 238:5,11 251:9 288:10
refers 188:4
reflect 136:2 209:9 214:3 221:12
    229:15 232:19 233:2,9 253:2
reflected 183:20 198:11 214:11
    254:8
reflecting 75:3 152:13 228:11
    290:24
reflection 215:24
reflective 172:13
reflects 18:23 188:6
refraining 7:20
refresh 45:11 202:12
refuse 186:12
regard 79:22 93:8 116:14 123:2
    149:23 150:3 169:11 189:12
    268:15
regarding 286:16
regards 214:19
registrations 78:10
regular 7:7 112:2
regularly 53:19,20
regulatory 25:18 26:10,14,17
    34:14 93:2,16
rehire 76:17 78:20 137:5
rehired 76:13 86:14 87:6 90:23
    91:10 92:12,22 123:16 137:2,22
    137:25 141:2,7,25 142:4,10
    143:14 192:17 193:12,14,15
Reilly 155:21 156:6,9 161:25
rejoined 46:11 75:19 95:10 96:11
    96:16 98:22 100:3 103:6 107:11
    107:19 115:23 117:5,16,23
    120:21 121:25 122:10,20,23
    123:20,24 124:17
rejoining 84:4,22 85:6 91:4,20
    96:23 116:7,19 139:6
relabeled 253:4
relate 59:5 65:10 66:9 195:17
    196:16
related 26:19 27:2 47:14 57:18
    79:4,6 82:8 87:19 90:7 105:16
    109:12 122:6 147:6 267:12
    268:16 270:11,15 292:16

relates 93:10
relating 59:24
relation 168:22
relationship 32:2,3 55:20 86:13
    118:20 119:9 120:6 192:5 195:8
    196:2,9 197:20 218:13 264:21
relationship-building 119:5
relationships 32:4 66:19 120:2
    188:12 194:21 247:4
relatively 51:18,19 92:18 265:21
relevant 8:23 229:5 274:10 275:14
    276:5
relied 278:12,16,20
rely 171:13 281:7
remain 22:7 204:16 205:2
remainder 149:5 238:16
remains 102:21
remarked 252:11 253:5
remarks 255:16
remediate 204:9
remember 24:20 35:10,13 38:8
    51:13 60:11 61:21 73:8 96:25
    108:17 111:19 118:25 144:11
    153:13 166:19 169:14 182:21
    191:13 197:10 202:6 206:3,4
    222:15,19,23 274:6 277:13
    281:17
remind 158:24
reminded 203:3 206:2 280:15
reminder 24:4
remorse 267:21
renumbered 252:24
reorganization 17:24 26:24
repeat 5:2 13:6 15:10 42:17 67:7
    165:8 179:10 192:25 195:11
    265:6 279:19 283:7
rephrase 5:7 67:16 69:6 77:20
    89:24 201:14
replied 185:24 254:12,18,20
reply 244:10 250:11 255:3
report 138:22 143:15 149:18 163:9
    262:21 263:2 275:6
reported 29:16 35:19 80:13,24
    82:5 91:16 143:17 161:23 184:21
    277:24
reporter 4:9,12 5:10 13:9 15:13,17
    24:9,15 36:25 42:21 44:14 67:11
    87:5 153:7 179:13 191:11 193:4
    195:15 199:2 206:22 226:15,22
    249:14 252:22 262:8 265:9 279:7
    283:12
reporting 43:24 90:7,10 93:20,21
    96:19 157:9 184:23 192:3 217:13
reports 86:20 163:12 268:20
    270:24,24
represent 4:18 16:13 74:9 127:4
    168:17
representation 9:23 147:13 167:21

231:15 276:19,25
**representative** 167:16 169:4 174:5
  207:8 209:22 283:2
**representatives** 169:8 282:25
**representing** 167:20 227:15 291:16
**request** 7:9 70:13
**requested** 13:8 24:14 36:24 42:20
  67:10 70:12 87:4 142:8 179:12
  191:10 193:3 195:14 198:8
  212:19 213:22 226:21 262:7
  265:8 279:6 280:5 283:11
**requesting** 208:12,14
**requests** 71:12,13 290:11 291:2
**required** 168:8 176:18 184:11
**requirements** 157:25 174:14,23
**requires** 78:5 185:7 207:17
**requiring** 207:7
**reserve** 286:7,12
**reserved** 3:10
**reshuffled** 118:10
**residents** 29:23
**resolution** 174:15 184:13,16
  198:15 207:20 208:12,18 270:5
**resolutions** 184:11
**resolve** 202:20,24 218:11
**resolved** 198:6
**resources** 83:22 86:23 87:8 90:13
  155:15 250:24
**respect** 6:11,15,24 17:3 18:3 31:21
  82:13 84:12 85:8,16 86:22 90:3
  90:15 100:7 113:7,18 114:12
  116:23 121:11 126:6 127:10,11
  127:12,24 128:8 131:23 134:15
  134:23 135:6,14 150:11,21 151:9
  151:12 175:2,6,12 195:20 227:18
  239:24 247:22 248:3 253:3
  270:12 275:22 276:8,15,25 281:6
**respectful** 104:12 150:16
**respective** 3:4
**respond** 242:2,3,4
**responded** 254:9
**responding** 205:4 221:16 222:2
**response** 5:15 6:3,8 7:13 27:10
  50:12 55:2,6 70:12 87:20 88:11
  93:9 109:3 111:11 122:8 126:18
  128:12 143:12 151:19 164:7
  169:13 173:7 174:24 190:10
  204:7 226:17,20 227:3,19 228:5
  229:7 241:19,21 248:4 250:13
  262:24 281:16,17
**responses** 5:11,14
**responsibilities** 17:20 26:8 103:2
  116:24 117:2,4 121:8
**responsibility** 51:21,22 79:19,21
  80:2,9,18 81:4,24 82:18,23 85:7
  116:13 166:22
**responsible** 21:5 22:18 43:22 77:12
  77:13,22 79:25 80:23 83:15,24

85:17 90:6,25 99:5 115:25
  139:10 155:11,14 159:15 166:9
  184:9 229:24 248:5,8
**responsive** 71:17 150:17 229:7
**restricted** 73:21
**restructure** 88:16 105:20
**restructuring** 87:16
**result** 27:4 72:24 103:3 116:7
  140:19 159:10 164:3 171:22
  172:5 173:6 286:14
**resulting** 217:22
**results** 259:10
**resumé** 11:22 12:11,16,17,22 13:10
  14:10 71:2,7,22,25 290:13,14,17
**retained** 58:17 115:13
**retainment** 72:9
**return** 5:17 73:2,3 106:20 245:23
**returned** 62:9 66:14 106:16 107:8
  107:14,21 109:23 153:16 261:13
**returning** 107:3
**reveal** 56:10
**revealing** 9:14 139:14 171:3
  235:21
**review** 10:10,13,20,23 18:12 27:7
  76:11 78:21 103:22 146:19 147:6
  147:14 148:14 172:18 181:13,18
  198:11
**reviewed** 172:10
**reviewing** 82:25 86:19 172:20
  173:3 209:10
**revisit** 70:3,4 114:7
**Ria-daz** 27:5
**ridiculously** 177:7
**right** 5:20 9:8 17:17 22:6 27:19
  28:21 30:7,12,25 35:15 36:10
  40:11,20 42:3 43:13 52:11 53:21
  62:22 63:17 72:21 74:11 102:2
  102:20 105:14 106:19 114:22
  116:19 117:19,19 120:15 127:24
  139:2,7 147:21 155:10 169:17
  172:4 173:6 174:7 178:4 179:6
  184:13,14 185:12 187:3,25
  188:10 189:20,23 192:9 198:17
  198:19 201:17 204:3,25 205:6,7
  205:18,19 206:12 207:13,16
  208:2,7,9 216:17 217:14 219:14
  221:16,20 222:8 224:4 231:6,14
  231:22 234:17 240:7,15,19 242:9
  258:2 259:5,7,8 261:18,24
  265:25 266:2 267:2 272:23 286:7
  286:12
**rigorous** 55:17 61:23 62:25
**ringing** 189:2
**risk** 88:6 89:13 195:24 268:25
**Riu** 43:8
**RL** 69:23 232:13 273:15
**Road** 2:4
**ROBERT** 2:6

**Robinsville** 63:20
**Roche** 20:9 70:25 75:8 96:18 97:17
  120:24 190:19 191:16
**Rockville** 1:12
**role** 26:8,23 29:7,8,9,22,24 30:2,13
  30:14,20,23 51:2,14,15,18,19,23
  60:10,21 62:12 64:13 66:12
  75:16 77:7 83:6 90:4,14,17
  105:14 106:11,11 107:4,14,14
  108:24 119:10,11,12 121:12,24
  123:24 139:15 140:25 167:16
  170:19,22 171:5,25 185:16
  259:13 276:18 281:25 282:7,11
  284:10,12
**roles** 28:23 30:8
**room** 103:14 129:12 150:13 151:11
  151:19,23 152:5,7,8,10
**Rose** 96:20 103:12 122:16
**Rossi** 85:24
**rotation** 277:10
**roughly** 104:19 177:9 210:17
  220:24
**routine** 111:4
**routinely** 101:23
**royalty** 220:21
**RQ** 12:10 14:9 71:24 74:21 75:2
  113:12 115:16 135:21 152:19
  227:12 237:4
**rule** 174:4 188:3,20 189:14 190:4,6
  190:8 266:15
**rules** 128:23 129:17
**ruling** 69:24 70:2 184:12 232:5,9
  232:14 273:7,14
**rulings** 286:14 291:21
**runs** 78:5

**S**
**S** 2:1 4:2 288:7 289:2 290:2
**Sakaguchi** 136:25 138:3
**sake** 8:25
**salary** 199:17
**sale** 79:4
**sales** 26:16
**San** 175:8
**Saunders** 70:19,25 74:19 75:9
  200:5,21,22 253:22 255:14
  265:15
**Savient** 38:23 40:25 41:2,3
**savings** 239:23 240:4,5,10
**savvy** 145:7
**saw** 95:10 227:25
**saying** 45:9 49:14 66:16 94:15
  100:19 119:21 152:8 169:22
  207:14 218:10 219:18 220:4
  222:2,9 229:2 236:25 241:15
  243:18,20 250:12 251:17,19,20
  254:21 269:12,15 278:11 279:17
**says** 16:11 17:9,11 25:10 46:8

119:22 146:25 147:4 148:19
150:13 161:19 162:24 183:16
186:2,3,9 187:5 188:2,14 197:23
197:23,24,24 199:15 205:17
207:15,19 208:3 209:23 210:11
210:15 213:24 214:2,14,18
216:13,13,22 217:15,17 218:5
219:17 220:19 221:15,17 222:3
222:12 231:18 242:7 245:15
**scared** 217:16 220:15
**scheduled** 166:14,19
**schedules** 79:5
**school** 18:16,22 19:2,10,21,23
20:20 34:19 130:7,8
**scope** 95:19
**scrolling** 18:7
**SCULLY** 2:8
**sealing** 3:5
**search** 35:5 71:9,11
**searches** 38:2
**searching** 34:9 71:13
**second** 29:24 30:14 38:15,25 88:11
111:22 127:24 134:23 143:24
146:15 151:14 159:14 173:14,17
173:21 197:21 202:7 203:20
208:24 209:18 214:11 219:25
224:19 245:5 281:7,19 282:20
**secondary** 246:10
**secret** 132:4,8
**secretary** 77:9 78:4,15,16 117:12
**section** 18:8,12 146:25 148:19,24
149:2,6,9
**see** 5:9 17:11 18:8 25:22 28:4 29:18
70:6 92:19 110:21,24 115:8
117:18 143:24 144:7 146:25
147:4 148:24 150:12,19 181:5
185:24 188:17 191:2,2 196:3
198:8 199:15 204:15,22 209:19
210:4,21 213:24 214:21 215:11
216:3,7 217:17 224:4 228:25
237:24 242:20 245:4 256:15
259:6 266:2,9
**seeing** 46:8 74:14 185:22
**seek** 10:13 31:21
**seeking** 24:18 31:22 33:20 34:13
54:15 179:14
**seemingly** 128:11
**seen** 4:17 16:17,19 45:4 74:13 76:6
94:10 136:6 146:8,16 180:25
183:10 199:9 203:17,22 207:3
209:12 212:14 213:17 217:10
237:18 239:9 241:8,11 243:13
244:22
**select** 84:6,13,19 247:12
**selecting** 83:6,15 84:5,10 85:7
**selection** 168:13
**send** 47:6 169:17,19 241:16 260:23
**sending** 181:22 182:3 251:18

**senior** 27:24 28:5,12 29:2 30:4,23
151:21
**sense** 37:10 80:4 134:7 169:18
195:4 207:20 278:8,9
**sensitive** 129:11 151:15 152:6
172:17 246:20 271:15
**sent** 182:6,13 214:4 215:25 222:22
243:25 244:3,6 251:22 260:22
**sentence** 13:3 143:24 148:18
150:19,22 154:18 164:16 216:3
**sentences** 127:21
**sentiment** 108:18
**separate** 78:2 184:6 238:8 267:3
**separated** 145:14
**September** 53:24 224:10,16 225:4
289:16
**series** 4:20 29:19 144:24 206:20
**serious** 54:2 132:13 204:24 205:20
206:11 251:5
**seriously** 165:2
**serve** 78:4,15 277:6
**served** 38:12 49:5 247:5
**service** 78:9 102:14
**services** 133:11,12
**serving** 17:20 77:8 167:14
**set** 40:4 103:11,24 104:3,22,25
105:10 109:20 118:12 120:15
153:22 171:5 211:3 240:16
273:16 292:22
**setting** 110:8 234:3
**settle** 168:9 169:20 176:10,13,18
176:19,19 177:2 178:2,12 207:9
231:24 272:6
**settled** 51:14,15 272:24
**settlement** 166:12,17 167:4 168:6
170:24 173:19,22,25 174:2,6,13
175:3,13,22 176:8,25 177:12,13
178:14 179:19,20,21 207:11
208:23,24 209:25 211:24 212:22
214:20 216:9 220:6 221:2,9
222:10 225:22 227:5 228:13,17
230:9,12,17,21,22 235:18 237:22
239:14 244:4 249:7 256:24
257:12,17 258:6,15,15 261:23,24
266:15 269:11 272:9,20 273:7,12
278:5 279:13 282:16 283:4,13
284:13
**severance** 144:4,5,13,17 145:17
254:23 255:19
**sexual** 154:6,21
**Shanghai** 29:24 43:23
**she'll** 198:12,12
**SHEARMAN** 2:14
**Sherinsky** 96:19 103:11 121:22
**shift** 102:23
**ship** 95:14
**shocked** 132:10
**shoot** 267:25

**shooting** 243:18
**short** 148:12 236:8 273:18
**shorter** 120:20
**Shortly** 47:2
**show** 15:15 76:3 93:23 99:7 174:7
174:12 178:5 196:5 209:4 212:10
**showing** 99:17
**shows** 30:13,14 208:15
**sick** 241:20 243:20 257:15 284:23
285:7
**side** 80:3 81:8,23 95:16,16,22,23
99:19 118:15 171:25 249:2
**sides** 129:7
**sign-on** 72:9
**signatory** 74:20 86:4 174:17
**signature** 147:22
**signed** 3:14,16 147:18 177:23
**significant** 86:19 91:24 93:22
95:17,22 106:4 112:6 123:4
246:23
**significantly** 47:13 198:23
**signing** 69:15,16 72:24 73:2
**similar** 89:4 101:12 144:6 156:12
268:13 270:6
**similarly** 6:11 13:23 130:25
**simple** 205:2 220:18
**single** 103:6
**sir** 8:7 12:25 231:3
**sit** 17:15 75:23 126:21 129:2,14,17
**site** 93:13 283:2
**sits** 128:9 130:25
**sitting** 48:2 113:25 126:2 264:3
**situation** 192:7 198:5 228:22
261:15 262:17 265:23 269:18,21
270:9,12 276:24
**six** 12:9 79:18 119:8 156:5 163:22
**skeptical** 205:17
**skill** 40:4 101:17 103:11,18,24
104:3,22,25 105:10 118:12
148:22
**skills** 65:11
**skip** 136:20
**slate** 66:18
**sleeve** 162:14
**slides** 248:14
**slightly** 90:16
**slip** 9:5
**small** 8:22 20:13 36:4 51:18,20
52:20 58:15,15 85:4 102:11,16
103:8 190:25 191:2
**software** 92:4
**sold** 58:18
**somebody** 169:6
**somewhat** 7:19
**soon** 260:17
**sooner** 7:8
**sorry** 12:25 24:5 42:17 45:10 46:18
61:11 68:19 72:18 82:10 107:15

143:9,12 168:11 196:12 197:6
200:14 219:13 226:8 234:13,22
243:24 270:3
**sort** 50:6 53:18 100:7 159:11
267:21
**sought** 37:25
**sounded** 72:19 187:4
**sounds** 234:17
**sources** 161:23
**SOUTHERN** 1:2
**speak** 7:5 24:6 26:18 42:5 53:19
129:3 158:11 207:17 275:8
279:18
**speaking** 5:12 17:25 20:7 22:16
104:23 142:17 158:10 160:8
**speaks** 185:25 231:21
**special** 185:12 188:25
**specific** 7:9 65:17 117:21 174:3
207:12 228:4 231:11 251:9
**specifically** 71:11 142:18 150:15
158:12 174:15 177:21 187:4
188:7 191:18 205:17 207:6
212:19 219:11 262:11 280:16
**specifics** 60:14
**specified** 12:12 14:10 290:14
**specify** 7:2
**speed** 86:12
**spelling** 206:16
**spend** 189:8
**spent** 55:19 119:7 214:19 267:18
**spoke** 31:24,24 41:24 131:8,10
202:25 204:13 206:3 219:11,16
219:19 255:2 262:15 263:19
**spoken** 49:6
**spot** 128:10 153:5,6,8
**spots** 129:18
**Squibb** 23:11,22 25:5,20 30:14,17
31:2,8,13,23 32:12,16 33:20
34:10,14,19 39:5,9 41:5,8 43:22
44:5 45:15 46:14 78:24 92:7,17
93:17 100:15 140:9,11 229:20
**ss** 287:4
**staff** 12:6
**stamp** 253:4
**stamped** 44:17 74:4 94:4,8 99:10
99:14 145:23 146:3,22 180:15,20
183:3,8 197:13 199:4 202:4,11
203:10,13 216:25 217:5 237:10
237:15 238:24 239:5 240:24
241:5 243:4,9 244:14,19 249:16
249:25 250:8 252:11,19,21 253:8
253:13 288:11,13,15,18,20,23
289:4,6,8,10,12,17,19,21,23
290:4,6,8
**stand** 98:12
**standard** 72:21 145:12 149:19
158:17
**standing** 188:3,20 189:14 190:4

**stands** 98:5 175:17
**start** 37:15 54:2 55:9 66:17 108:13
128:20 133:15 154:18 210:13
218:5
**started** 20:5 51:15 53:19 54:21
61:22 63:11
**starting** 87:24 171:4 235:4
**state** 1:20 4:9 78:10 287:3 292:5
**stated** 255:2
**statement** 216:7
**statements** 160:25 172:14
**states** 1:1 216:5
**status** 215:24 236:9,11
**statutory** 277:14
**stay** 66:14,25 67:5,23 106:10 107:7
120:17 259:15
**stayed** 22:9
**stays** 106:10
**stenographically** 292:11
**step** 35:18 52:10 158:17 198:17
**Stephen** 96:20 103:11 184:3,7,11
184:20,25 185:17
**steps** 35:4 198:18 202:20,24 204:8
236:13 262:2,18 273:23 274:9
**STERLING** 2:14
**sticker** 15:17
**sticks** 91:19
**STIPULATED** 3:2,8,13
**STIPULATIONS** 3:1
**stock** 73:21
**stop** 162:5 163:15,17
**stove** 8:21
**strained** 195:9 196:2
**strategic** 52:6 79:9,10,11 118:19,19
**strategy** 133:15 171:5 172:2 203:4
204:14 205:14 220:10,17 221:5
236:9
**strict** 97:14
**strike** 279:9
**strong** 210:14
**structure** 118:16
**structured** 82:4 96:14
**structuring** 88:13
**struggle** 116:4
**struggling** 76:25
**style** 148:17 151:22 248:10 249:3
277:14
**styles** 150:18 151:10
**subject** 8:18 59:24 60:6 101:7,7,11
132:18 138:8 141:23 160:14,16
166:5 172:11 226:2,12 227:19,20
**subjects** 138:24 247:19 249:2
**submit** 71:2
**submitted** 71:25 290:17
**subordinate** 158:20 250:15
**Subscribed** 287:18
**subsequent** 46:10 110:22 194:20
194:22 198:18 222:13 229:20

254:3 255:15 262:14
**subsequently** 45:25 99:3
**subsidiary** 17:23 18:3 23:3
**substance** 9:14
**substantial** 120:6 132:5
**substantially** 74:16
**substantive** 14:19 16:19 57:2
**success** 62:18 120:3 148:20 204:21
**successful** 83:23 108:12 178:14
259:13
**successfully** 84:2
**suffice** 279:12
**sufficient** 224:5 278:24
**suggest** 123:7
**suggested** 269:21
**suggestions** 147:6
**suggests** 162:17
**suitable** 159:21
**Suite** 2:4
**summary** 27:11 36:4
**Sunday** 245:9
**supervise** 157:5
**supervised** 90:22 93:11 112:18
142:6
**supervising** 118:2 166:25
**supervision** 112:7 172:25
**supervisor** 67:20 143:15,19 292:12
**supervisors** 31:24
**supervisory** 118:18
**support** 66:11 97:17,19,24 98:2,4
98:19 105:17
**supported** 20:9 27:6 35:20 47:19
57:25 65:15 82:12 92:5 97:15,16
97:16 98:20 100:3 122:3 252:3
**supporting** 58:12 66:4 236:3
**supposed** 151:20 208:8
**sure** 5:16 8:16 12:14 16:5 26:9
27:13,18 38:9,13 47:25 48:5 50:3
60:12 61:12 76:21 78:13,19 83:5
86:11 88:9 89:8 94:16 107:7
118:23 119:20 120:13 126:5
141:16 156:4 172:18 173:4
175:10 176:5 181:2 184:20 186:6
188:18 196:24 204:24 205:21
211:13 213:9 214:16 219:18
226:20 228:2,23 233:25 240:12
240:14 242:4,5 248:21 254:13
258:11 259:4,7 272:13,18 273:5
273:19 274:13 275:11,17,25
280:18
**surprise** 264:15,16
**surprised** 128:5 162:9,21 239:13
265:22 267:17 268:3
**surrounding** 47:11 49:2 68:23
**survived** 92:16
**switch** 100:12 101:6
**sworn** 3:16 4:4,21 287:18 292:9
**system** 184:24

systematic 198:3
systems 89:5,6 277:4

---
**T**
---

T 1:1 190:18 287:2 288:7 289:2
  290:2 292:2,2
T-E-C-H-N-O-P-H-A-R 268:16
table 70:9 128:9 129:4,6 171:21
  172:4 204:20
tabled 70:11
take 7:7 12:7 16:25 18:11 20:20
  35:5 46:5,11 58:8 68:2 69:19
  72:18 76:11 83:9 90:17 100:18
  108:4 112:2,5,10 119:4 123:7,9
  157:23 160:25 162:16,22 164:4
  165:25 180:6,8 183:15 184:16
  202:20,24 204:8 234:10 236:14
  246:13 262:2,18 273:18 274:2,9
  284:20
taken 1:17 12:13 14:13 68:4 72:5
  74:25 113:16 115:21 123:11
  135:24 152:22 165:2 180:12
  269:9 273:20 287:8 292:11
takes 120:6 207:21
Takimoto 175:5,8 177:23 201:11
  202:14 206:7 210:11,19 215:10
  233:18 234:12,15,23 265:2
  278:23 279:12
Takimoto's 233:22 235:7
Takimoto-san 174:17 175:5,8
  202:17 205:17,18 206:14 214:14
  215:17 233:20 234:2 236:5,25
  278:11 279:16,24 285:2
Takimoto-san's 215:2,8
talk 54:3 70:9 160:9,13 184:8,25
  191:21 196:12,13 198:14 217:25
  227:23 228:19 247:18
talked 37:24 51:9 55:14 60:12 65:6
  113:3 142:16,17 171:11 209:16
  221:7 255:8 259:2 264:5
talking 28:15 39:20 54:5 119:18
  128:25 139:7 175:10 176:6 236:8
  243:17 266:3 276:11
talks 227:8
Tanabe 39:22,23 98:6,8
tasked 154:5,20
tax 191:17
taxation 88:5
team 20:10 26:9 80:11 89:8 90:9
  101:19,24,24 108:11 118:12
  119:14,23,24 198:3,10 202:17
teams 66:19 236:2
teams' 26:15
technology 91:22 92:5
Technophar 268:15,20
tell 4:21 45:6 51:11 54:18,21 55:20
  76:8 94:13 108:5 119:16 133:5
  145:11 146:10,18 148:10 164:22

175:17 183:12,18 186:24 188:4
  194:2 198:5 203:6,19,24 207:5
  209:14 211:11,23 212:17 213:19
  217:12 237:20 239:11 241:10
  243:15 244:24 250:10 253:17
  258:23 264:12,14 267:16,17
  270:10
telling 50:4 65:21 142:20 162:8
  223:16
template 189:4
temporal 201:18
temporally 144:19
ten 65:15 230:7
ten-page 16:6,11 288:9
tenure 274:16 285:23
term 40:16 148:12 175:4 256:3
terminate 192:23 193:17 245:2,17
  245:22 250:12 256:5 264:8
  265:13,19,20 266:22,25 267:4,11
terminated 246:8 255:23,25
  256:13 259:16,21 268:6,19
  283:20
termination 245:6 251:13 253:20
  255:20 256:17,19 260:10,14
  267:7 268:10,25 270:14 271:20
  272:2
terminations 251:4
terms 79:15 175:21 231:8
test 89:11
testament 148:21
testified 4:5 34:12 41:24
testify 7:22,25 152:25,25
testimony 8:10 9:2 70:2 153:4
  225:3 238:10,18 253:3 286:15
  287:7 292:6,10,11,14
text 212:3 216:22 274:18,23 275:3
  275:6,10,14,16,22
texted 275:9,12
thank 8:7 9:8 10:6 13:14 14:15
  22:6 33:18 35:2 36:15 41:21
  48:10,12 72:6 73:23 76:16 78:18
  96:10 109:22 113:17 115:22
  124:6 130:18 131:22 135:25
  148:4 152:23 175:10 206:15
  208:22 213:8,10 215:19 219:3
  234:22 240:16 278:3 286:18
Thanks 220:5
Thera 58:14
Therapeutic 21:7 58:8,16 79:5
Therapeutical 47:15
thereof 105:9
thing 63:7,11 95:8 114:20 160:13
  162:22 176:6 215:3 242:17
  277:15 281:13
things 20:13 50:5 54:25 55:21 56:4
  60:13 65:16 69:20 77:3 79:11
  88:10 90:13 92:21 94:25 113:6
  116:10,13,15,18 120:12,19

139:21 159:19 184:6 185:22
  188:21 189:9 197:5 198:20,22
  219:2 236:10,13 256:12 264:19
  265:21 267:4
think 15:11 21:16 23:8,13,24 24:10
  27:11,25 33:6,22 34:12 35:8
  36:10 38:22,24 39:25 40:7,11
  41:17 42:4,24 44:6 46:25 48:11
  50:4,16 51:21 53:20 56:19 58:14
  59:11,21 61:22 62:20,25 64:2,14
  64:17 65:8,14 66:16,20,20 67:14
  69:5,11 70:4 71:5 72:22 73:7,15
  74:19 75:8 77:13 80:6 82:2 85:5
  87:21 88:12 89:25 92:6,18 96:22
  98:15 100:17 101:12 103:15
  104:5 106:2 109:11,17 110:3,23
  111:22 113:21,22,22 115:15
  116:4 118:17 119:7 120:10 122:5
  122:15,19 129:4 134:20 135:2,10
  135:17 139:2 141:6,13,16 145:11
  147:16,17 150:14 152:15 154:22
  156:3,5 157:22 158:4 159:11
  165:17 170:10 171:7 174:20
  176:12,20,21 183:20 184:21
  188:16 189:7 190:11 192:14,18
  193:10,14 194:14,15,19,22 195:2
  195:8 196:3 198:7 201:23 204:10
  204:11 205:10,11 210:18 211:19
  213:6,10 218:16,23 222:4,23
  223:3,4,7,9 224:3,7 225:24,24
  226:18 227:12 231:12,13 234:13
  235:2,5 236:16 238:12 240:7,8,8
  251:17,22 256:18 258:12 260:22
  261:19 262:20 263:13 268:18,23
  269:19,21 270:19 271:14 272:11
  272:23 273:4,11 274:25 277:3,18
  278:10,19,19 279:19,23 280:2
  282:19,23
thinking 131:21 211:18
thinks 151:13
third 4:14 131:23 146:22 247:15
  259:10
third-party 89:6
thought 68:21 100:15 110:10
  157:17 159:16 176:12,22 241:22
  242:16 243:20 284:23,24
three 7:17 19:2 35:20 54:13 61:9
  96:17 121:18 135:7 188:14
  189:15 190:4 201:22
three-month 30:5
three-page 216:24 217:5 238:23
  239:4 289:12,19
Three-year 19:6
Thursday 9:13 264:10 265:16
  266:8,20 267:5
tied 64:12
time 1:21 3:10 5:13,23,23 6:15,17
  6:19,22,24 7:5 8:17 12:16 15:3,7

17:6 18:21,24 20:16 21:23 22:2,5
22:12,13 23:14 24:6 26:22 30:8
30:13 31:10,20 33:8 34:22 36:16
36:18,19 37:8,9,22 38:12,20,22
38:25 39:23 40:12,14 42:9,11,14
43:19 45:20 47:16,20 48:6,13,23
49:3 50:15 51:2,12 52:16 53:6,15
55:19 57:6 58:2,11 61:5,18,21
63:18 64:8,9,20 68:6 80:7 82:3,7
85:23,24 86:3 92:5 95:7,21,24
96:23 98:22 100:2,12 108:18
110:20 111:19,23 116:18 118:25
119:4 120:24 121:19,25 122:10
122:23 123:8,10,20 124:15,16,16
125:23 127:21 129:25 130:10,15
131:2 138:11,12 139:5 141:15
144:18 145:3,4 149:11,12,17
151:3 161:25 167:3 168:4,15
169:5 170:14,18,23 173:17
178:19 181:14 182:16 184:19
185:6 187:9 188:21 189:9,11
195:7,21 196:7 200:8,11,15,20
201:8,23 215:24 216:6,20 221:7
222:22 223:8 234:6,8,9 236:8
239:16,22,24 240:15 242:15
246:22 248:22 250:14,22 251:15
252:2 254:8 263:8 264:4 265:12
265:18,22 266:23 267:19 274:2
276:13,21 277:25 283:19 286:6
292:8
**times** 7:9 8:13 42:7 54:13 61:6
92:18 105:21 197:22 204:16
223:8 258:25
**title** 11:17 21:4,13,22 22:4 25:5,6
27:21 28:14,20 52:10 122:13,16
122:18
**titled** 112:23
**titles** 21:19 28:9 29:8
**Todarello** 188:10 190:13,16,21
191:6,6,16
**today** 4:19,24 5:10 7:4,22 13:16
15:21 17:15 36:12 48:2 70:14
91:8 102:17 108:13 123:15 124:7
126:2 183:17 185:23 214:20
226:5 227:10 255:11 259:2 280:4
286:9
**today's** 9:10 10:10 286:15
**Todd** 145:14,16,18
**Tokyo** 32:21 43:24 47:17 95:22
239:25
**told** 54:20 108:20 132:20 134:11
142:23 159:23,25 160:8 161:13
162:17 185:21 198:12 254:10,18
255:9 263:14 264:19 272:16
284:25 285:2
**Tomoji** 201:24 202:18 203:25
206:10 208:3 214:4,14,21 239:12
243:18 251:17 261:22 263:8,10

264:15 270:18 271:7 276:9,10
278:11,16,20 282:20
**Tomoji's** 241:11
**tomorrow** 217:25 219:18
**tone** 109:21 123:3 124:9 131:23
132:19 142:16 148:15,15 150:16
150:22,24 151:5 172:10,10,11
204:24 205:10,14 220:17 248:9
265:24
**toned** 204:23
**tool** 112:20 113:19 171:18
**tools** 171:15,16
**top** 96:4 146:12 208:25 213:24
218:3 248:10
**topic** 161:18 265:2,10
**total** 30:17 218:24
**touched** 12:3 290:13
**touching** 12:15 162:3,13
**toxic** 193:24
**trade** 132:4,8
**trademarks** 103:21
**trained** 140:14
**trainee** 20:15
**training** 26:17 27:15 29:19 140:10
140:13 185:9 189:4 247:16,23
248:4,6 249:3,9
**transaction** 57:13 79:14,17,20 80:3
80:9 81:3,6,12,17,21,23 82:18,24
83:4,9,13
**transactional** 29:12,13 79:23 80:22
81:9 82:9 84:17 85:2,3 89:8
90:19 92:3 103:17 105:4 106:3
**transactions** 79:9,10,12 81:9 85:4
85:4
**transcribed** 292:12
**transcript** 10:20 223:23,25 224:6
224:10,15,20 225:7 249:20 287:7
287:9 289:15 292:13
**transfer** 81:8
**transition** 24:19 31:2 62:12 88:19
117:10
**transitioned** 31:13 39:7 79:24
**transitioning** 102:4 116:20
**transpired** 183:18
**travel** 46:23 47:18 92:20
**traveled** 46:17,19 47:12
**travels** 236:2
**treated** 136:13 164:18
**treatment** 165:5,16
**Trench** 85:24
**triage** 101:25 102:14
**trial** 3:11 8:10 210:14,16,21
**tried** 103:5 104:6 105:15 134:5
151:14 206:18
**trip** 44:4,6 45:23 47:22 245:16,24
245:25 246:11,13
**trips** 47:13
**Troccoli** 96:21 192:12 195:9

196:10 197:8
**trouble** 49:15,20 62:6
**true** 287:9,12 292:13
**truly** 95:15,24 101:17
**trust** 119:20 120:7,11,13 172:5,7
173:5 228:23 256:16 258:24
259:12,18 264:21 266:11,11,16
**trusts** 205:21
**truth** 4:21
**truthfully** 7:22 8:2
**try** 5:11,18 24:8 48:19 61:17 71:17
200:18 201:19 210:6 279:8
**trying** 105:19 118:13 131:20
133:11 186:5 197:8 220:12,12
246:15
**Tuesday** 221:21 222:13,14,16
**turn** 136:16 143:23 157:19 213:23
214:18
**turned** 251:21 275:19
**turning** 138:5 148:18 153:24 164:9
164:15 165:24 218:3 248:13
**twisted** 164:5
**two** 19:12,13,19,20,21 26:12 28:8
28:14,16 29:3,8 43:14 54:12
55:11 56:19 61:9 77:3 79:4 81:22
91:15 92:7,8,16 105:6 118:20
129:6 139:8 163:2,3 166:17
173:11,15,19,22,25 175:3,13
176:7,11 188:2 196:3 212:21
228:25 244:6 259:9 268:16
271:23
**two-minute** 68:2
**two-page** 94:3,8 180:14,19 183:2,7
197:12 199:4 202:3 237:9,14
240:23 241:4 243:3,8 244:13,18
288:15,23 289:4,6,8,17,21,23
290:4
**two-pages** 202:10
**type** 84:16 89:20
**typed** 254:7
**types** 52:13
**typical** 235:25 236:11
**typically** 128:20 248:9 277:18,18

**U**

**U** 4:2
**U-E-M-U-R-A** 43:9
**U-T-S-U-N-O-M-I-Y-A** 206:19
**U.S** 17:23 18:4 22:22,24 23:4 39:25
40:18 83:11 118:24 129:3 205:22
239:17 247:7 269:4
**U.S.A** 213:25
**Uemura** 43:9 45:7 47:13,14
**Uh-huh** 15:22 17:10 111:25 216:8
238:17 242:10
**ultimately** 94:20 103:18 115:12
145:12 156:24 159:5 166:15,18
177:23 198:6,7 212:6 217:21

227:25 255:5 272:5,24 278:2
280:17 281:14 282:15
**Um** 42:24 49:14 191:7 198:20
**un** 279:23
**unauthorized** 256:23 257:12,17
258:6,15 261:23
**unbiassed** 156:22
**unclear** 6:24 153:20
**uncomfortable** 171:15 271:13
**undergoing** 60:11
**undergone** 100:14
**underlying** 134:21 197:22 262:4,19
**undermine** 197:8
**understand** 4:22 5:6,21 32:25 54:7
67:13 69:4,5 89:23 94:17 103:10
103:13 104:2,6 105:19 108:15
116:17 119:17 120:13 131:21
171:7 175:10 177:25 179:7 186:2
204:20 221:5,6 223:5 231:7
272:18
**understanding** 32:22 40:15 50:17
50:19 55:23 91:14 102:18 104:3
104:21,24 118:6 125:12 128:2
176:9 178:13 187:11 196:8
218:19 221:22 230:16 242:12,15
267:22
**understands** 119:21
**understood** 5:5 21:10 26:6 65:21
73:4 106:2 107:10 117:14 119:2
133:14 161:25 192:8 195:22,23
208:22 216:21 244:11 254:13
**unemployment** 9:2 223:12 225:3
**unhappy** 108:23,24 111:17
**UNITED** 1:1
**units** 73:21
**University** 18:15 19:11
**unlimited** 174:7 207:15 208:9,10
208:15
**unpack** 55:8
**unprofessional** 110:5
**unthinkable** 278:14
**unusual** 278:13 279:20,24
**unwanted** 162:3,13
**update** 12:22 13:10 15:7
**updated** 12:2,6,17 14:25 15:4 17:7
17:25
**upset** 133:24 144:16 145:5 184:2
205:16 264:18 267:24
**USA** 19:13,15 93:7,12
**Usami** 96:22
**use** 13:18,23 14:4 23:25 24:17 34:2
34:18 41:14 78:9 87:25 106:19
109:25 113:19 133:10 171:6,15
171:16,19,20 172:2,8 175:4,8,21
190:2,2 236:3 256:4,8 274:9
**usually** 112:23 113:23 129:4,6,10
129:15
**utilized** 115:18 291:7

**Utsunomiya-san** 202:18 206:17
282:21,23

---
**V**
---

**V** 4:2
**vacation** 53:21,21
**VAGNINI** 2:3
**Valiant** 39:2 41:2
**VALLI** 2:3,6 216:18 234:21 252:6
252:10
**value** 73:11 81:11 177:9 272:8
**value-based** 29:21
**variety** 256:16
**various** 120:22
**Ven** 89:17
**vendor** 87:18 89:15,18 90:15,18
**venture** 57:14,15 86:2 98:13
**Ventures** 18:6 98:14,15
**verbal** 150:17 151:9 226:24 227:2
285:10
**Verbatim** 97:17 98:2 100:25
101:10
**vested** 80:8
**vetting** 87:17 88:25
**Victor** 268:17,25
**view** 29:7 95:5 102:8 110:5 151:10
157:20 271:20 272:2
**violated** 266:14
**violation** 255:4 271:2,16
**violations** 139:19
**virology** 27:4
**visit** 43:20 44:8 45:12 46:3,10
47:11,16 233:19,20,22 234:7,12
235:7 246:2,16,19,21 265:3
**visited** 43:15,16,24 46:2 234:15,24
**visiting** 82:25 128:6 247:9
**vitae** 11:23
**volume** 65:18,22
**voluntary** 39:9
**volunteer** 6:9

---
**W**
---

**W** 287:2
**W-2** 88:18
**wait** 129:13 206:23 220:22
**waited** 171:19
**waive** 6:13
**waived** 3:6
**walk** 176:22
**walked** 198:16
**want** 7:4 15:15 27:13,18 32:20
55:8 80:20 104:15 106:6,6,7
108:11 119:15,19,24 120:23
159:12 161:16 162:5 167:9 176:5
180:9 184:8,19 186:16 188:14,20
196:11,13 204:25 206:16 207:14
207:24,24 211:16 220:20 224:6
227:23 270:24

**wanted** 16:4 32:19 40:2,12 52:19
63:14 103:10 104:8,12 114:7
116:3 118:13 162:5 171:10
174:11 186:20,25 190:3 255:7
263:14 275:8
**wanting** 196:17
**wants** 188:2
**warning** 131:11 285:11,16,20
**wasn't** 25:3 39:23 66:22 67:15
107:7 122:7 133:24 134:6 156:10
162:19 163:19 169:9,11 184:20
184:23,24 190:5 195:25 197:4
198:15 216:19 219:10,21 231:3
245:18 266:2 284:24
**Watanabe** 85:24
**way** 12:4,19 25:22 31:7 48:19
77:19 96:7 108:10 109:18,20
131:17 133:24 137:19 139:3
140:3 148:16 151:23 159:10
168:22 172:3,14,16 173:4 175:3
184:24 185:4 187:14 189:12
195:25 201:12 205:8,25 221:4
225:8 256:4 271:14 277:4
**ways** 267:3
**we'll** 24:7 66:20 70:9 71:24 169:21
169:22 207:22 211:4 232:9
273:16
**we're** 13:18 15:20 28:14 36:12
53:25 61:12 74:17 101:8 102:11
108:11 128:13 129:23 153:23
155:19 175:10 176:5 178:4 205:9
205:11 210:18 213:10 218:11
247:15 266:3 269:18
**we've** 94:18 227:10 252:24 259:2
270:19
**Web** 23:16,18,19,23 24:16
**Wednesday** 262:17
**week** 103:7 104:19 113:2 181:17
182:16,19 188:2,15,24 189:15,18
190:4 222:22 267:18
**weeks** 163:22
**welcome** 94:14,15 137:14
**well-oiled** 185:19
**went** 18:21 32:25 45:18 47:15
105:18 144:25 148:16 159:20
163:21 182:10 228:2 255:5
264:13 282:19 285:8
**weren't** 95:20 98:25 104:9
**Western** 58:9 79:3
**WHEREOF** 292:21
**whistleblower** 262:25
**whistleblower-style** 139:18
**willful** 258:20
**willing** 189:14,25 190:5
**win** 210:15,24,25 211:19,20
**wish** 197:16
**withdraw** 200:17
**Withdrawn** 28:13 36:17 42:13

65:9 107:17 142:3 193:21
**witness** 4:3,11,14 7:18 15:22
  111:14 136:3 154:10,24 155:20
  156:4,6 158:12 159:11 160:3,9
  160:10,11,25 161:17 183:9
  192:25 201:16 202:6 207:2
  209:10 211:5,7,9 212:11 213:12
  215:22 217:7 224:22 237:7 239:6
  243:10 252:20 253:11 273:17
  286:6,8,13,16,20 290:15 291:20
  292:9,14,21
**witness's** 253:3
**witnessed** 158:14 160:12 163:4
  254:9 255:13
**witnesses** 158:12 159:16 163:3,7
  163:23
**woman** 190:20
**women** 156:2 161:24 162:15
  164:18
**word** 37:3 106:20 186:12 198:24
  210:21,25
**wording** 88:12
**words** 4:25 108:18 109:25 189:18
  194:3 254:16
**work** 13:21 14:2,7 19:9 26:24 32:5
  45:14 46:13 47:3 52:13 62:14,17
  62:19 63:17 65:18,22 66:17,20
  81:9 84:16,17,25 85:2,3 87:12
  92:2 95:19 97:3,7 101:2,3,14
  102:22 103:17 105:5 106:3,5,7
  108:14 118:2,3,6,7,7,10,18
  148:14 182:12 185:4 188:14
  189:16 191:4 196:11,13,17
  198:10 236:21 255:10 274:20,23
  277:9
**worked** 18:21 19:11,12,21 34:22
  55:22 57:11,12,15 58:12 59:2,4
  64:19 85:9 87:14 104:7 141:17
  200:7 261:19 282:24
**workforce** 246:6
**working** 19:22,25 20:5 43:21 89:7
  93:13 117:18 129:12 139:5
  173:16 187:18 236:5 256:18
  268:24
**workload** 116:6
**workplace** 90:2,4 198:3
**works** 15:15 207:20 230:17
**world** 96:3 100:8
**worldwide** 28:7
**worry** 205:23 264:23
**worse** 218:6,16,20
**worth** 69:18 220:24
**wouldn't** 50:8,9 63:9 79:8 162:21
  186:18 190:6,7 278:14
**write** 112:23 113:4,8 114:2,18
  163:9 208:3,6 211:21 220:21,23
  279:25
**writes** 219:19 271:8

**writing** 114:23 141:5 169:22
  177:22 210:8 254:25 257:4
**writings** 229:9,15
**written** 38:4,7,9 41:10,14 125:24
  178:3 207:7,24 228:7,10 232:18
  233:2,8,15 236:23,25 237:2
  259:9,11 285:15
**wrong** 88:13 132:17 146:13 154:11
  206:17 256:13 268:18
**wrote** 113:4 115:3 147:9 149:12,17
  186:25 191:13,23 194:4 200:11
  245:9 256:20 262:14 279:16

---

**X**

**x** 1:2,11 288:2,7 289:2 290:2

---

**Y**

**Y-U-P-O** 97:21
**Yano** 20:14
**Yano-san** 58:13
**yeah** 37:24 54:12 69:20 85:3 86:5
  86:10 90:12 97:6 98:5 102:20
  104:6 116:2,16 132:3,25 137:13
  142:22 158:10 191:22 219:15
  242:14 243:24 251:25 274:21
**year** 42:7 44:2 146:20 147:7
  148:20 198:11 234:9
**years** 8:16 19:3,12,13,19,20,21
  21:20,23 22:7 46:9 48:23 55:24
  62:11 65:15 92:8 93:19 106:9
  109:17 129:20 185:15 221:19
  248:21 258:2
**yelled** 126:16,16 132:9
**yells** 151:18
**Yesterday** 70:10
**yielded** 157:22
**York** 1:2,12,20 2:4,10,10,16,16
  4:15,15 33:7,10 49:18 114:16
  133:19 236:3 239:25 261:17
  287:3 292:5
**Yoshisato** 138:7,23 141:8
**Yoshisato-san** 138:18
**Yuka** 261:18
**Yupo** 97:19 101:10

---

**Z**

---

**0**

**00001362** 94:5 288:16
**000487** 252:11
**000599** 145:24 288:21
**000788** 99:10,14 288:19
**000877** 202:11
**000886** 238:25 289:20
**0008865** 183:4 289:5
**001530** 74:12
**001655** 180:16 288:24
**001832** 197:14 289:7

**002309** 217:2 289:13
**002316** 237:11 289:18
**011530** 74:4 288:14

---

**1**

**1** 144:10 185:5 210:20 247:6,11
**1-10** 1:8
**1.5** 209:19 221:19
**1:23** 123:12
**10:06** 1:14
**100,000** 177:8
**10004** 2:10
**101** 29:19
**10222** 2:16
**10th** 233:6,13,19,21
**11:16** 68:4
**11:26** 68:4
**113** 291:6
**115** 291:10
**11530** 2:4
**12** 239:20 290:13 291:24
**12/29/2016** 219:24
**12:26** 123:6,11
**12th** 4:14
**13** 136:17 212:11,13 231:20 239:20
  240:7 280:4 291:25
**13-hour** 240:8
**130,000** 179:24
**135** 291:12
**1362** 94:9
**14** 138:6 206:24 290:16
**1421** 203:10,13 289:11
**145** 288:22
**15** 1:13 53:14 209:4,11 287:8
**152** 291:15
**16** 143:25 154:2 211:4,6,8 237:15
  288:10
**17** 213:11,14 214:6 215:6 246:23
**17-13333** 224:18
**18** 219:7,8,14
**18-cv-08188** 1:4
**180** 288:24
**1810** 219:15
**183** 289:5
**19** 234:19,21,24 235:5 276:9
**197** 289:6
**19th** 261:21 267:5,14 276:12,13
**1st** 144:2

---

**2**

**2** 28:2 35:24 58:22 210:16 211:20
  216:15 282:17 283:5,15,17,25
**2.0** 209:20 216:5,9,14 231:25
**2.1** 232:2
**2.3** 225:22,25 227:5,8,15 228:13
  237:25 238:4,13 240:18 241:17
  272:21 291:17
**2.5** 220:20 222:5

**2:28** 180:12
**2:36** 180:12
**20** 185:15 189:8 258:2
**200** 230:6
**2001** 22:10
**2003** 137:10
**2004** 258:4
**2006** 46:25
**2007** 22:9,14 30:6,18
**2014** 6:19 44:9,10 45:12
**2015** 11:21 12:19 14:11 30:6,18
  42:25 43:2 48:14,24 49:7,12
  52:24 53:7 54:10,11 55:5 61:15
  67:19 72:12 74:24 75:19 76:14
  76:18 78:20 96:12 98:23 107:20
  115:24 117:6 123:16 124:17
  137:5 138:2 146:20 147:8 148:13
  181:7 266:3 290:16,23
**2016** 144:2,10 147:15 154:4,19
  164:17 166:11 183:17 187:10
  195:7 196:8 199:11 201:20
  208:25 221:13
**2017** 6:20 124:18 224:11,16 225:4
  225:13,21 232:16,23 233:6,13,19
  234:16,21,24 247:6 252:13
  253:25 266:3 270:13 271:21
  276:9 284:13 289:16
**202** 289:7,9
**2021** 1:13 234:19 287:9,20 292:22
**203** 289:11
**20th** 264:13
**216** 289:13
**22** 245:10 252:13
**224** 289:16
**227** 291:17
**23** 291:23
**2309** 217:6
**232** 291:24
**237** 289:18 291:20
**238** 289:20
**240** 289:22
**243** 289:24
**244** 290:5
**249** 290:9
**24962** 290:7
**25** 199:16,22
**273** 291:25
**27th** 292:22
**28th** 2:10
**29** 69:12 221:13

---
**3**
---
**3** 25:9 136:4 153:24 169:16 177:9
  196:8 218:24 220:24
**30** 11:21 54:11 61:15 67:19 72:12
  74:24 75:19 76:14 117:5 124:18
  147:15 148:13 253:25 270:13
  290:23

**300,000** 68:13
**30th** 245:7 253:19 267:6,11,14
  268:5 271:20
**32** 199:5
**325K** 69:12
**3rd** 183:17 187:10 222:17,18

---
**4**
---
**4** 18:8 208:25 221:19 288:5
**4:26** 273:20
**4:41** 273:20
**4:57** 286:20
**40** 246:6
**44** 15:25 16:2,6,10 288:9,12
**45** 44:15,16 123:9 288:11
**46** 74:3,9,17 288:13
**47** 93:24 94:3,7 288:15
**48** 99:8,9,13 288:18
**486** 244:15,19 252:19 290:5
**487** 252:6,9
**49** 145:22 146:3 153:22 288:20

---
**5**
---
**5** 76:4
**50** 180:14,19 288:23
**500K** 211:20 221:18
**51** 183:2,7 289:4
**519** 2:4
**52** 197:11,12 199:2 289:6
**53** 202:2,3,10 206:6 289:8
**54** 203:8,9 289:10
**55** 1:12 180:21 206:21,22 216:24
  289:12
**56** 223:21 224:8,14 289:14
**57** 237:9,14 289:17
**58** 238:23 239:4 289:19
**59** 240:23 241:4 289:21
**592** 148:6 150:12
**595** 147:25 148:2
**596** 147:24 148:2,3
**599** 2:15 146:4
**5th** 223:2,18 225:13 232:16,23

---
**6**
---
**6** 58:25
**60** 224:21 243:3,8 289:23
**600** 2:4
**61** 244:13,18 249:14 252:17,18,24
  290:4
**61A** 249:15 252:7,12,25 253:5
  290:6
**62** 253:7,12
**64** 136:20,20
**65** 4:14 136:21,22 224:22
**68** 138:5
**69** 291:23

---
**7**
---
**7** 181:6 224:10,16 225:4 284:13
  289:16
**71** 290:20
**7375** 213:25
**74** 288:14 290:23
**75** 290:25
**76** 143:21
**78** 154:2,11 161:15
**79** 164:10
**7th** 264:25 272:21

---
**8**
---
**80** 165:25
**806** 253:8,13 290:8
**807** 253:8,13 290:9
**842** 243:4,9 289:24
**843** 243:4,9,9 289:24
**845** 240:24 241:5 289:22
**865** 183:8
**877** 202:4 289:9
**886** 239:5

---
**9**
---
**94** 288:16
**99** 288:19
**9th** 222:16