# EXHIBIT G

* * C O N F I D E N T I A L * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X

JENNIFER S. FISCHMAN,

               Plaintiff,

      -against-

                  Index No. 18-cv-08188

MITSUBISHI CHEMICAL HOLDINGS, AMERICA, INC.;
MITSUBISHI CHEMICAL CORPORATION; MITSUBISHI
CHEMICAL HOLDINGS CORPORATION; NICHOLAS OLIVA, in
his individual processional capacities; DONNA
COSTA, in her individual and professional
capacities; and JOHN DOES 1-10, in their
individual and professional capacities,

               Defendants.

-----------------------------------------------X

               September 30, 2021
               10:09 a.m.

          DEPOSITION of PAT SAUNDERS, a

Non-Party witness herein, taken by the attorneys

for the respective parties, pursuant to Notice,

held via web conference at the above date and

time before Toni Musacchia, a Stenotype Reporter

and Notary Public within and for the State of New

York.

1              * * C O N F I D E N T I A L * *

2    A P P E A R A N C E S :

3    VALLI KANE & VAGNINI LLP
     Attorneys for Plaintiff
4       600 Old Country Road
        Garden City, New York 11530
5
     BY:  MATTHEW L. BERMAN, ESQ.
6

7    CLARICK GUERON REISBAUM LLP
     Attorneys for Defendant, Donna Costa
8       220 Fifth Avenue, 14th Floor
        New York, New York 10001
9
     BY:  NICOLE GUERON, ESQ.
10

     GORDON REES SCULLY MANSUKHANI, LLP
11   Attorneys for Defendants, Mitsubishis
     Chemical Holdings America, Inc., Donna Costa and
12   Nicholas Oliva
        One Battery Park Plaza, 28th Floor
13      New York, New York 10004

14   BY:  BRITTANY L. PRIMAVERA, ESQ.
                 and
15        MERCEDES COLWIN, ESQ.

16   SHEARMAN & STERLING, LLP
     Attorneys for Defendant,
17   Mitsubishi Chemical Holdings Corporation
        599 Lexington Avenue
18      New York, New York 10222

19   BY:  SAM JOLLY, ESQ.

20

21   ALSO PRESENT:

22   Jennifer Fischman

23

24

25

1          * * C O N F I D E N T I A L * *

2              FEDERAL STIPULATIONS

3

4          IT IS HEREBY STIPULATED AND AGREED by and

5     between the parties hereto, through their

6     respective Counsel, that the certification,

7     sealing and filing of the within examination will

8     be and the same are hereby waived;

9

10          IT IS FURTHER STIPULATED AND AGREED that

11    all objections, except as to the form of the

12    question, will be reserved to the time of the

13    trial;

14

15          IT IS FURTHER STIPULATED AND AGREED that

16    the within examination may be signed before any

17    Notary Public with the same force and effect as

18    if signed and sworn to before this Court.

19

20

21

22

23

24

25

1          * * C O N F I D E N T I A L * *

2          THE REPORTER:  It is hereby stipulated

3     and agreed by and between counsel for all

4     parties present that pursuant to Federal

5     Rule of Civil Procedure 28 (a)(2), this

6     deposition is being conducted remotely and

7     that the court reporter shall be permitted

8     to administer the oath to the witness via

9     videoconference.  The witness and all

10    counsel are in separate remote locations and

11    participating via Zoom, telephone or any web

12    conference meeting platform under the

13    control of Bee Reporting Agency, Inc.

14         It is further stipulated that this

15    videoconference will not be recorded in any

16    manner and that any recording without the

17    express written consent of all parties shall

18    be considered unauthorized, in violation of

19    law and shall not be used for any purpose in

20    this litigation or otherwise.

21         Before I swear in the witness, I will

22    ask each counsel to stipulate on the record

23    that I, Toni Musacchia, the court reporter,

24    may swear in the witness even though I am

25    not physically in the presence of the

1           * * C O N F I D E N T I A L * *

2      witness and that there is no objection to

3      that at this time, nor will there be an

4      objection at a future date.

5           MR. BERMAN:  So stipulated.

6           MS. PRIMAVERA:  So stipulated.

7           MS. GUERON:  So stipulated.

8           MR. JOLLY:  So stipulated.

9           THE REPORTER:  Ms. Primavera, can you

10      represent that to the best of you knowledge

11      and belief, that the witness appearing today

12      via web conference is, in fact, Pat

13      Saunders?

14           MS. PRIMAVERA:  Yes, I can.

15   P A T   S A U N D E R S,

16      the witness herein, having first been duly

17   sworn by Toni Musacchia, a Notary Public in and

18   for the State of New York, was examined and

19   testified as follows:

20   DIRECT EXAMINATION

21   BY MR. BERMAN:

22      Q.   Please state your name for the record.

23      A.   Pat Saunders.

24      Q.   Please state your address for the

25   record.

1                    P. Saunders - Confidential

2        A.    4425 Downing Place Way, Mount Pleasant,

3    South Carolina 29466.

4        Q.    Good morning, Ms. Saunders, my name is

5    Mathew Berman, I'm one of the attorneys for the

6    Plaintiff in this case, Jennifer Fischman.

7            Today I will be asking you a series of

8    questions, which you will be answering having

9    sworn to tell the truth.

10           If you don't hear one of my questions, please

11   let me know and I'll repeat it more loudly so

12   it's more audible.

13           If you don't understand one of my questions,

14   please let me know and I'll do my best to

15   rephrase it.  It doesn't do me any good to get an

16   answer from you on a question you haven't

17   understood.

18           If you do understand my question, feel free

19   to answer it, of course.  And if you do answer my

20   question, I'll take that to mean that you have

21   understood it.

22           Today, as you can see, we have a court

23   reporter here who is taking down the testimony

24   for a transcript.  It's very challenging for a

25   court reporter to take down testimony for more

1          P. Saunders - Confidential

2     than one speaking at a time.  I will do my best

3     today to wait until you completed your responses

4     to a question before I move on to my next

5     question.  And I would ask you, if possible,

6     please wait until I completed my entire question

7     before you begin to respond even if you know what

8     I am going to say.

9         It's important today that responses be verbal

10    because the court reporter cannot take down

11    gestures.

12        From time to time you may hear an objection

13    from counsel to the form of a question.  Unless

14    you're instructed not to answer by your attorney,

15    I'll still expect you to provide a response.

16        I do have one caveat with respect to that,

17    it's not my intention today to ask you about any

18    requests for legal advice that you made or any

19    legal advice that you've been provided by your

20    counsel.  So to the extent that you can answer

21    without revealing that information, please do so.

22    Please do not reveal any attorney/client

23    privileged information to me during your

24    responses.  If that makes it challenging for you

25    to provide a response, then just tell me you

1          P. Saunders - Confidential

2     can't respond to it and tell me why.

3          From time to time you may wish to take a

4     break, that's perfectly fine and I'm happy to

5     accommodate any breaks that anyone who is

6     participating today wishes to take.  I'm sure

7     I'll wish to take some from time to time as well.

8     If you do wish to take a break, please let me

9     know.  I would expect that if there's a question

10    pending you answer that one and then we can, of

11    course, take a break.

12         With respect to the time period that I'm

13    inquiring about today.  Unless otherwise noted,

14    I'm interested in the period of time from the

15    year 2014 to the present.  I understand that you

16    may have knowledge of events predating that.  If

17    it's necessary to provide that information in

18    response to a question, by all means please let

19    me know.  But generally speaking, just for

20    clarity, when I ask you about events, I'm looking

21    for information concerning the period from 2014

22    onward.  Do you understand those things?

23         A.   Yes.

24         Q.   Do you have any questions about anything

25    I just explained?

1              P. Saunders - Confidential

2      A.   No, I do not.

3      Q.   With that in mind, let's move on.

4      I also ask witnesses the same three questions

5  to start.  It's nothing personal to you or to any

6  other witness.

7      Are you currently taking any medication which

8  could impact your ability to testify truthfully

9  and accurately today?

10     A.   No.

11     Q.   Are you suffering from any medical

12  conditions which could impact your ability to

13  testify truthfully and accurately today?

14     A.   No.

15     Q.   Do you suffer from any medical condition

16  which impairs your memory to the extent that it

17  might impact your testimony today?

18     A.   No.

19     Q.   Have you done anything to prepare for

20  today's deposition?

21     A.   I have had conversations with counsel.

22     Q.   Without revealing the contents of any

23  communications that are privileged, how many

24  conversations have you had with your counsel?

25     A.   We have had two to three conversations.

1                    P. Saunders - Confidential

2        Q.    Were you provided with any documents to

3    review by your counsel?

4        A.    Yes, I was.

5        Q.    Do you know whether all the documents

6    you reviewed were produced to us during the

7    course of this litigation?

8        A.    Yes, they were.

9        Q.    Have you ever been a witness in a

10   lawsuit before?

11       A.    I have not.

12       Q.    Do you understand that you are not named

13   as a Defendant in the case?

14       A.    I do.

15       Q.    You're here only as a witness; you

16   understand that, correct?

17       A.    Yes.

18       Q.    How much time did you spend with your

19   attorneys -- without revealing any

20   communications -- in order to prepare for today's

21   deposition?

22       A.    Probably about three -- between three

23   and four hours in total.

24       Q.    Did you review any of the deposition

25   transcripts in this case?

1                    P. Saunders - Confidential

2        A.    No.

3        Q.    Are you currently employed?

4        A.    No.

5        Q.    Are you retired?

6        A.    I am.

7        Q.    When did you retire?

8        A.    I retired on April 1st of 2018 from

9    MCHA.

10       Q.    So that raises an interesting point

11   today.  For the sake of today's deposition, just

12   as a shorthand, we can use acronyms to refer to

13   some of the corporate names in this case.

14       You just mentioned MCHA, is that Mitsubishi

15   Chemical Holdings America?

16       A.    Yes, it is.

17       Q.    So can we awe degree when ever the term

18   "MCHA" is used today, it refers to Mitsubishi

19   Chemical Holdings America?

20       A.    Yes.

21       Q.    We may also refer to MCHC, are you

22   familiar with that entity?

23       A.    Mitsubishi Chemical Holdings

24   Corporation.

25       Q.    So if we use the term "MCHC," will you

1                   P. Saunders - Confidential

2    understand me to be referring to Mitsubishi

3    Chemical Holdings Company?

4         A.   Yes.

5         Q.   Great.  When you retired in April of

6    2018, did you receive a pension?

7         A.   No.

8         Q.   So since the date of your retirement,

9    have you received any compensation in any form

10   from Mitsubishi Chemical Holdings America?

11        A.   No.

12        Q.   When you were working for MCHA, what was

13   your job title?

14        A.   I was director of human resources.

15        Q.   When did you first become the director

16   of human resources?

17        A.   I was hired by MCHA in September of

18   2009.

19        Q.   September of 2009?

20        A.   2009, yes.

21        Q.   Did you hold the title of director for

22   the entire duration of your employment?

23        A.   Yes.

24        Q.   Who hired you?

25        A.   I was hired by the president of the

1          P. Saunders - Confidential

2    company was Hiroo Tanaka, T-A-N-A-K-A, and Donna

3    Costa was the general counsel -- executive vice

4    president and general counsel and she primarily

5    in the interview -- primarily led the interview

6    process when I was hired.

7        Q.   Was Ms. Fischman working for MCHA when

8    you joined the company?

9        A.   Yes, she was.

10       Q.   When you came into the company there was

11   a legal department at the company, correct?

12       A.   Correct.

13       Q.   Were you primarily responsible for the

14   HR function within MCHA?

15           MS. PRIMAVERA:  Objection to the form.

16       You can answer.

17       A.   Yes.

18       Q.   Okay.  And that included the legal

19   department, correct?

20       A.   No.  No.  The HR function was separate

21   from the legal department.

22       Q.   Thank you.  My question perhaps was

23   ambiguous.

24       What I'm asking you is whether in the

25   performance of your HR duties, your HR duties

1                    P. Saunders - Confidential

2    were also inclusive of HR duties concerning legal

3    department.

4         Did you provide HR for the legal department?

5              MS. PRIMAVERA:  Objection to form.  You

6         can answer.

7         A.    In my role as HR, I was the HR person,

8    if you will, to all of the employees in MCHA;

9    tax, legal, accounting, finance.  If I'm

10   understanding your question correctly.

11        Q.    Yes.  Thank you.

12        So you provided you provided human resources

13   services for the entirety of MCHA, correct?

14        A.    Correct.

15        Q.    That included the legal department,

16   correct?

17        A.    Correct.

18        Q.    Okay.  So were you involved in hiring?

19        A.    Yes.

20        Q.    Were you involved in firing?

21        A.    Yes.

22        Q.    Were you involved in promotion?

23        A.    Yes.

24        Q.    Were you involved in setting

25   compensation?

1           P. Saunders - Confidential

2      A.    Yes.

3      Q.    Were you involved in the performance

4   review process?

5      A.    Yes.

6      Q.    Okay.  So with respect to the legal

7   department, was there -- what was the review

8   process, generally speaking?

9      A.    The review process in the legal

10  department was the same process that we use

11  throughout the MCHA organization.  The direct

12  supervisor of the employee would conduct the

13  performance evaluation for the employee, have a

14  dialogue with the employee about the performance

15  evaluation, complete a written performance

16  evaluation form, assign a rating.  And that was

17  basically the process.

18     Q.    How often were you these reviews

19  conducted within the legal department?

20     A.    They were conducted annually.

21     Q.    All right.  Within the legal department

22  with respect to the attorney positions, can you

23  tell me how many different attorney positions

24  there were during your tenure?

25     A.    (No verbal response.)

1                 P. Saunders - Confidential

2      Q.    Meaning the type -- the job types.

3            MS. GUERON:  Objection.

4      A.    There were approximately four as best as

5   I can recall.

6      Q.    I'm only --

7      A.    I believe --

8      Q.    Have you completed your response?

9      A.    I believe there were about four

10  positions within the legal department.

11     Q.    I'm only referring to the attorney

12  positions, just for clarification; does that

13  help?

14     A.    Then there would be three as I recall.

15     Q.    Okay.  So the most junior of those

16  positions would be called what?

17           MS. PRIMAVERA:  Objection.

18     Q.    Do you understand my question?

19     A.    Yes.

20     Q.    Okay.

21     A.    I believe the title was associate

22  counsel.

23     Q.    Did MCHA have a corporation counsel

24  position?

25     A.    No.

1                    P. Saunders - Confidential

2          Q.   Okay.

3               MR. BERMAN:  Let the record reflect

4          we're showing the witness an exhibit

5          previously marked as Plaintiff's Exhibit 2.

6               Can you scroll through it or reduce it

7          so the witness can review the document in

8          its entirety.

9               Take a look and let the court reporter

10         know how to move the document so you can

11         look it over to your satisfaction.

12              THE WITNESS:  Is there more to the

13         document?

14              MR. BERMAN:  Yes.  Let me know when

15         you're ready.

16              THE WITNESS:  I'm ready.

17              MR. BERMAN:  If you scroll up, Toni, to

18         the very top of the document.

19         Q.   I'll represent to you this is a document

20    that was produced to us during this litigation.

21         It purports to be a position profile for the

22    job title corporate counsel.

23         Does that refresh your recollection

24    concerning any of the legal positions at MCHA?

25         A.   Yes, I believe I called it the associate

1                P. Saunders - Confidential

2    counsel.  Looking at this document, as best as I

3    can recall, I believe the title is correct,

4    corporate counsel.

5        Q.   Wasn't there also an a GC assistant

6    general counsel or associate general counsel

7    position?

8        A.   There was an assistant general counsel

9    position, yes.

10       Q.   Okay.  And was that a more senior

11   position than the corporate counsel position?

12       A.   Yes.

13       Q.   Was there a position more senior than

14   the associate general counsel position?

15       A.   Than the assistant general counsel

16   position?

17       Q.   Yes.

18       A.   The general counsel position.

19       Q.   Were you responsible --

20            MR. BERMAN:  Withdrawn.

21       Q.   This document we're looking at,

22   Plaintiff's Exhibit 2, do you know who created

23   this document?

24       A.   I believe this was created by Donna

25   Costa.  I'm not 100 percent sure.

1                    P. Saunders - Confidential

2        Q.    Did you have any involvement in the

3    creation of this document?

4        A.    I -- I don't recall.  I don't -- I don't

5    believe so.

6        Q.    Do you --

7        A.    Generally, the kind of key

8    responsibilities, qualifications -- the key

9    responsibilities in particular would be

10   determined by the business.  And other than

11   perhaps reviewing and maybe providing some, you

12   know, formatting and -- consistency and

13   formatting among the various positions with --

14   descriptions for the organization, the -- again,

15   key responsibilities would generally -- would be

16   provided by the business.

17       Q.    Do you know when this document was

18   created approximately?

19       A.    I don't know.

20       Q.    Okay.

21       A.    I don't know.

22       Q.    Did you discuss the content of this

23   document with Ms. Costa?

24       A.    It's -- again, it's been a while.  I

25   don't recall if we had specific discussions about

1          P. Saunders - Confidential

2    the content.

3        Q.    Do you know why this document was

4    created.

5        A.    This particular document I can't -- I

6    can't -- again, I can't say specifically when it

7    was created.  You know, when I came into the

8    organization, obviously, positions existed.

9    There could have been prior documentation.  I do

10   recall that at one point MCHA was undergoing an

11   audit from MCHC and as part of, you know, a

12   complete review and audit of the business, we

13   were pulling various documents together and we

14   wanted to have -- ensure that we had position

15   descriptions for everyone in the organization.

16   So at that time position descriptions were

17   updated.  It was -- yes, it was an audit, as I

18   recall, we went through.  So there could have

19   been variations on this position profile but I do

20   recall at one particular time we, you know, made

21   sure we had a position description for everyone

22   in the organization.

23       Q.    Okay.  So with respect to the content of

24   this document, does this align with your

25   understanding of the duties and responsibilities

1                P. Saunders - Confidential

2      of the corporate counsel position?

3            MS. PRIMAVERA:  Objection.

4      Q.    Do you understand the question?

5      A.    I'm not sure I do understand the

6      question.

7      Q.    Okay.  With respect to the time period

8      from 2014 until you left the company, does the

9      content of this document match up to the job

10     duties and responsibilities of the corporate

11     counsel position?

12           MS. PRIMAVERA:  Objection.  You can

13           answer.

14     Q.    In other words, does this document

15     accurately reflect what the corporate counsel job

16     was?

17           MS. PRIMAVERA:  Objection.  To the

18           extent you understand and can answer, go

19           ahead, you can answer that.

20           MR. BERMAN:  Please let's avoid any

21           speaking objections.

22     Q.    Go ahead.

23     A.    I -- I'm sorry, can you repeat the

24     question because I do want to make sure I'm

25     answering accurately.

1           P. Saunders - Confidential

2           MR. BERMAN:  Toni, can you read it back,

3      please.

4           (Whereupon, the last question read

5      back.)

6           THE WITNESS:  I have to -- you know --

7      I'm not the -- I'm not -- in my HR function,

8      I know generally the duties and

9      responsibilities.  I can't say as the HR

10     person not being a legal expert and

11     understanding nuances of legal skills and

12     what they might do, that this is 100 percent

13     completely accurate to the duties of the

14     corporate counsel position.

15     Q.    Okay.  With that caveat in mind, does

16 this generally reflect the duties and

17 responsibilities of the corporate counsel as that

18 position was actually performed at the company?

19          MS. GUERON:  Objection.

20     Q.    Do you understand the question?

21     A.    Again, it wouldn't -- with that caveat,

22 to the best of my knowledge, without the --

23 again, without the intimate understanding of what

24 is performed in that in the role, such as

25 corporate counsel, I believe it would, yes.

1                P. Saunders - Confidential

2      Q.   And with respect to the experience and

3   qualifications --

4           MR. BERMAN:  Toni, if you can scroll

5      down so those are fully visible.

6      Q.   -- do these experience and

7   qualifications generally match up with your

8   understanding of what's required for the role?

9           MS. PRIMAVERA:  Objection.

10          MS. GUERON:  Objection.

11     A.   Again, based on my role as HR, I'm not

12  the one who would determine these types of

13  qualifications.

14     Q.   I didn't ask you who determined them.  I

15  asked you if they're generally matching up with

16  your understanding of what was required.

17          MS. PRIMAVERA:  Objection.

18          MS. GUERON:  Objection.

19     A.   When you say are they generally matching

20  up with what is required, I'm not sure I

21  understand what you're asking me.

22     Q.   What is the general purpose of a

23  position profile in HR?

24     A.   To establish a baseline of criteria for

25  which you are evaluating a -- to establish the

1              P. Saunders - Confidential

2    baseline criteria for the position, the general

3    qualifications, the general duties of that

4    position.

5         Q.   Okay.  Have you completed your response?

6         A.   Yes.

7         Q.   Okay.  Does this document do those

8    things for the corporate counsel position?

9              MS. GUERON:  Objection.

10        A.   Yes.

11        Q.   Okay.  Thank you.

12             MR. BERMAN:  Toni, can you pull up

13        Plaintiff's Exhibit 4.

14             Let the record reflect this is an

15        exhibit that's been previously marked as

16        Plaintiff's Exhibit 4.

17        Q.   I'll direct your attention to the top

18   portion of the document.

19        Do you see where it says job title, assistant

20   general counsel, corporate?

21        A.   Uh-huh.

22        Q.   Is this a position profile for the

23   assistant general counsel position?

24        A.   For corporate, yes.

25        Q.   Okay.  And so does this document serve

1          P. Saunders - Confidential

2     the purpose that you identified previously, which

3     I'll paraphrase as serving as a baseline for the

4     duties and responsibilities of the position and

5     the requirements?

6          MS. PRIMAVERA:  Objection.

7     Q.   Was that a fair paraphrasing of your

8     description of the purpose of the position

9     profile document?

10    A.   Yes.

11    Q.   Does this document serve that purpose

12    for the assistant general counsel position?

13    A.   Yes.

14    Q.   Were you involved in the preparation of

15    this document?

16    A.   Again, no, not in a substantive way.

17    Q.   Did you confer with anyone in the

18    preparation of this document?

19    A.   It would have been -- sorry, did you say

20    did I confer with anyone?

21    Q.   Yes.

22    A.   The content would have been prepared

23    most likely by Donna.

24    Q.   Did you discuss the creation of this

25    document with Ms. Costa?

1              P. Saunders - Confidential

2       A.    Not that I recall, no.

3             MR. BERMAN:  We can set this one aside

4       for a moment.

5             Toni, let's look at Plaintiff's

6       Exhibit 5.

7             Please scroll through and allow the

8       witness to look over the document to her

9       satisfaction.

10            THE WITNESS:  You can move down.

11            MR. BERMAN:  Let the record reflect

12      we're showing the witness an exhibit

13      previously marked as Plaintiff's Exhibit 5.

14      Q.    Ms. Saunders, I'll direct your attention

15      to the job title at the top of document where it

16      says general counsel and chief compliance

17      officer, do you see that?

18      A.    Uh-huh.

19      Q.    Again, the same question I asked you

20      with respect to the two other documents.

21      Does this position profile serve the function

22      that you described previously, which I'll

23      paraphrase, as establishing a baseline of duties

24      and responsibilities and criteria for the

25      position?

1          P. Saunders - Confidential

2          MS. PRIMAVERA:  Objection.

3      A.   Yes.  The only thing I would add is --

4   and I would add this on all of the profiles that

5   I've been presented with -- is at a point -- they

6   were they were created at a point in time and

7   position profiles, again, are created at a

8   particular point in time and may become outdated

9   for -- because of changes in the business needs.

10     Q.   Okay.  Have you --

11     A.   I'm sorry?

12     Q.   Have you completed your response?

13     A.   Yes.

14     Q.   Okay.  Now, you said you joined MCHA in

15  2009, correct?

16     A.   Yes.

17     Q.   Were these position profiles created

18  after you joined the company?

19     A.   These -- the format of these particular

20  profiles look like they were created after I

21  joined the company.  What I'm suggesting is the

22  content in the profiles could have been in

23  existence prior to joining the company.

24     Q.   Understood.  Have you completed your

25  response?

1                    P. Saunders - Confidential

2        A.    Yes.

3        Q.    When you first joined Mitsubishi, was

4    the entity that you worked for called something

5    different than MCHA?

6        A.    Yes.

7        Q.    Was it MCUSA when you joined?

8        A.    Yes.

9        Q.    And at some point did the name of the

10   entity that employed you change to MCHA?

11       A.    Yes.

12       Q.    Do you know if that was approximately in

13   2011?

14       A.    Approximately.

15       Q.    Okay.  So in 2011 you --

16             MR. BERMAN:  Withdrawn.

17       Q.    Did you see the content that was in

18   these three position profiles before it was

19   formalized?

20       A.    I don't recall.  I may not have.

21       Q.    Do you know whether you made any edits

22   to the content in these position profiles, you

23   personally?

24       A.    Again, I would not have made the

25   substantive bullet points in these profiles.

1                    P. Saunders - Confidential

2       Q.    Did you explain to me or did I get this

3   right that the substantive content was provided

4   by Ms. Costa?

5            MS. PRIMAVERA:  Objection.

6       A.    Yes, that is what I said.

7       Q.    Okay.  During your tenure at MCHA did

8   you hire anyone into --

9            MR. BERMAN:  Withdrawn.

10      Q.    Did you use these position profiles for

11  hiring during your tenure at MCHA?

12      A.    Yes.

13      Q.    How were they used in connection with

14  hiring?

15      A.    As a -- again, as a guideline to

16  evaluating candidates.

17      Q.    When you -- was there a time during your

18  tenure at MCHA when you had vacant positions you

19  wanted to fill?

20      A.    Are you referring to the legal

21  department still?

22      Q.    Yes.  Unless I specify otherwise, my

23  intention is to ask you about the workings of the

24  legal department.

25      A.    Yes -- yes, but vacancy in the sense

1                    P. Saunders - Confidential

2    that -- as best as I can recall, from hiring in

3    the legal department, they were additional

4    positions, not someone left and we replaced.

5        Q.   Okay.  So in what you just described, in

6    these additional positions, was there a process

7    by which additional positions were created?

8        A.   A formal process?

9        Q.   Well, formal or informal.  How did you

10   come to learn that there was an additional

11   position to fill?

12       A.   I would learn -- generally, Donna was in

13   the general counsel position at the time and

14   wanted -- had approval for -- to hire a new

15   position -- a counsel position and generally

16   described to me what that position would be --

17   what level of position she was looking for.

18   Likewise, when Nick was in the role same thing --

19   likewise, Nick was in the role there was a hire

20   and Jennifer also.

21       Q.   Okay.  So during your tenure at MCHA,

22   did there ever come a time when you had an

23   additional position that became available for a

24   corporate counsel level attorney?

25       A.   Yes.

1              P. Saunders - Confidential

2      Q.   Okay.  So when approximately is the

3   first time that that happens?

4      A.   Approximately -- oh, jeez.

5      Q.   Is there a particular individual you're

6   recollecting?

7      A.   I believe one of the first in that level

8   position would have been Joe Sharinski.

9      Q.   With respect to Joe Sharinski, did he

10  come into the company as a corporate counsel?

11     A.   I believe so, yes.

12     Q.   Okay.  So can you explain to me --

13          MR. BERMAN:  Withdrawn.

14     Q.   Was there -- are you familiar with the

15  term "requisition" for a job opening?

16     A.   Yes.

17     Q.   Did MCHA have a process by which it

18  would requisition job openings?

19     A.   No.

20     Q.   So what was the process for identifying

21  a job opening?

22     A.   Again, MCHA was an organization of 35 to

23  40 employees.  We were small.  It was

24  conversations between myself and in this case it

25  would have been head of the legal department

1                   P. Saunders - Confidential

2      going to add to staff, level position --

3      generally the level of the position and from

4      there worked with an outside recruiting firm.

5          Q.   Okay.  Have you complete your response?

6          A.   No.  Just generally for these positions

7      would work with an outside recruiting firm.

8          Q.   To circle back a little bit, I think I

9      heard you tell me you were informed by the lead

10     attorney that there was a position open; did I

11     get that right?

12         A.   Yes -- yes.

13         Q.   So at the time that you joined the

14     company that would have been Donna Costa, right?

15         A.   Yes.

16         Q.   And so -- and that -- and Donna Costa

17     was still the lead attorney at the time Mr.

18     Sharinski was hired, correct?

19         A.   Yes.

20         Q.   So at the time of that position opening

21     up, did you get informed of the opening by Ms.

22     Costa?

23         A.   Yes.

24         Q.   Okay.  And then did you work with an

25     outside recruiter to fill that position?

1                    P. Saunders - Confidential

2       A.    Generally with the legal positions Donna

3    would work directly with the outside firm.

4    Again, the substantive discussions of what we

5    were -- you know, what the organization was

6    looking for, I might interact on more of an

7    administrative level, although -- you know,

8    again, I'm thinking back because it's been a

9    number of years -- but for the most part the

10   legal positions when they were filled and the

11   conversations with the recruiters were had by

12   either Donna or Jennifer or Nick.

13      Q.    With respect to the opening itself of

14   the position for corporate counsel, do you know

15   whether any approvals were required above the

16   level of the head attorney?  When I say "head

17   attorney," we're talking about the general

18   counsel position, right?

19      A.    Right.

20      Q.    Do you know whether any approval above

21   the level of general counsel were required to

22   fill the corporate counsel position?

23      A.    Other than budgetary with the president,

24   that would be it.

25      Q.    Okay.  With respect to budgetary

1                    P. Saunders - Confidential

2    approval from the president, you're referring to

3    the president of MCHA?

4         A.   Yes.

5         Q.   Did MCHA have a legal budget?

6         A.   Yes.

7         Q.   In the case of an increase in the number

8    of positions, that would require an increase in

9    the budget for the legal department, correct?

10        A.   Certainly on the -- yes, on the salary

11   lines, yes -- salary and fridge line, yes.

12        Q.   Because when you add an employee, you

13   add to your payroll, right?

14        A.   Yes.

15        Q.   Do you know who was responsible for that

16   level of approval?

17        A.   Ultimately the budget for MCHA was the

18   president.

19        Q.   Did you finish your response?

20        A.   Yes.

21        Q.   Did you participate in the budgeting

22   process?

23        A.   Yes.

24        Q.   What was your degree of participation in

25   that process?

1              P. Saunders - Confidential

2      A.   I would complete the budget for the HR

3   function.

4      Q.   When you say "complete the budget,"

5   generally, what does that mean?

6      A.   I would receive, you know, a worksheet

7   from the prior year that had all of the different

8   budgeting type of categories and any changes and

9   expenses within those categories; additions,

10  deletions, I would make those changes.

11     Q.   Did you have any conversations with the

12  president of MCHA concerning -- establishing the

13  amount of the budget for any of its departments

14  within MCHA?

15     A.   Not direct -- I don't believe -- I may

16  have had conversations directly with the

17  president or it would have been the director of

18  accounting and finance.

19     Q.   Okay.  Would that have been Chin?

20     A.   Yes.

21          MR. BERMAN:  And just for the record --

22     A.   And a prior individual whose name was

23  Kohei.

24     Q.   Can you tell us Kohei's full name?

25     A.   You're challenging my memory.  I'm

1          P. Saunders - Confidential

2    sorry.  Kohei San --

3         Q.   If you don't know, you can just tell

4    me --

5         A.   Oh my gosh, I'm sorry.

6         Q.   Would it be Kohei Iguchi --

7         A.   No, Chin was Iguchi -- Chin Iguchi.

8    Kohei Ichiya, I-C-H-I-Y-A.

9         Q.   And when we use the term "San" that's

10   S-A-N, correct?

11        A.   Yes.  And that's -- yes.

12        Q.   And that's a connotation of respect in

13   Japanese culture, correct?

14        A.   Yes.  They very often went by single

15   names.  And as I just said, Kohei San.

16        Q.   So it's comparable to the western title

17   "Mr.," right?

18        A.   I don't know that I would call it

19   comparable as it was different culturally.  It

20   was a sign of respect.  Yes, in respect that

21   addressing someone as Mr. so and so may be viewed

22   as more respectful, yes.

23        Q.   So in connection with establishing the

24   budget for new positions, do you know whether --

25   do you know who made the decision to open the

```
 1              P. Saunders - Confidential
 2   position?
 3              MS. PRIMAVERA:  Objection.
 4       Q.   Well, for example, I think you said you
 5   were talking about Mr. Steven -- what was his
 6   name?  The first name you said was hired into
 7   this position?
 8       A.   Joe Sharinski --
 9       Q.   Sharinski.  I'm sorry, I'm talking over
10   you a little I don't mean to.  I'll slow down.
11       A.   It's okay.
12       Q.   With respect to the position that
13   Mr. Sharinski was hired into, do you know who
14   made the determination to open that position up?
15       A.   Donna.
16       Q.   Do you know whether Donna required any
17   approvals from higher up within the organization
18   in order to open that position?
19              MS. PRIMAVERA:  Objection.
20       A.   I think, as I said before, the -- you
21   know, the president was in the position of being
22   the ultimate person responsible for budget for
23   MCHA.
24       Q.   Okay.  Do you know the source of MCHA'S
25   funds for payrolling employees?
```

1          P. Saunders - Confidential

2          MS. PRIMAVERA:  Objection.

3     Q.   Do you know whether --

4          MR. BERMAN:  I'll rephrase the question.

5     Q.   Do you know whether MCHA had any

6     revenue?

7     A.   MCHA was a services organization that

8     charged fees back to the affiliates for the

9     services provided.  MCHA was not a profit

10    company.

11    Q.   Have you complete your response?

12    A.   Yes.

13    Q.   Was any part of your responsibility

14    determining the amount of charges that MCHA

15    required the affiliates to pay?

16    A.   For the HR function, yes.

17    Q.   So with respect to the HR function, was

18    there an independent amount that was decided upon

19    to charge an affiliate?

20         MR. BERMAN:  Let me rephrase the

21         question.

22    Q.   How was it determined how much to charge

23    for the HR function to the affiliates?

24    A.   It -- there's -- I'm not sure I can

25    clearly answer your question.  There was a charge

1              P. Saunders - Confidential

2    back amount in place when I joined the

3    organization.  And just to explain, for example,

4    part of my function was -- and the shared

5    services function was we provided payroll

6    services to certain smaller companies, we

7    provided a health and welfare benefit program

8    that certain companies can participate in as well

9    as an operated 401(k) plan.  There was a charge

10   back for those types of services in place when I

11   joined the company.

12             And, generally, in terms of what would

13   be charged back was there was not a scientific

14   approach to determining that it really kind of

15   was on that baseline that I inherited, so to

16   speak, if we brought in additional business to --

17   into one of the programs, we would assign a

18   charge back that was similar to like a business

19   of a similar size.

20        Q.   Have you completed your response?

21        A.   Yes.

22        Q.   Is it fair to say that MCHA incurred

23   certain costs in order to provide these shared

24   services to the affiliates?

25        A.   Yes.

1          P. Saunders - Confidential

2     Q.   Is it fair to say that those costs were

3 a portioned amongst the affiliates?

4     A.   They -- yes, the costs were apportioned.

5 I don't believe the cost were apportioned

6 100 percent.

7     Q.   But you gave the example of a new

8 business coming in and getting shared services,

9 right?

10    A.   Right.

11    Q.   So if a new business came in to have

12 shared services provided to it by MCHA, would

13 that -- would that, generally speaking, increase

14 MCHA'S cost of providing shared services overall?

15         MS. PRIMAVERA:  Objection.

16    Q.   Do you understand the question?

17    A.   (No verbal response.)

18    Q.   Like if you get a new company coming in,

19 you're now providing services to an additional

20 client, does that increase the cost that you

21 have?

22         MS. PRIMAVERA:  Objection.

23    A.   It could potentially increase the cost

24 but minimally -- could be minimally also.

25    Q.   Okay.  So then assuming --

1                    P. Saunders - Confidential

2              MR. BERMAN:  Withdrawn.

3         Q.    In a scenario where the costs were

4    expected to only increase minimally, like you

5    just described, if a new client joined the share

6    services, would that have the overall effect of

7    reducing all the other affiliates costs?

8              MS. PRIMAVERA:  Objection.

9         A.    Theoretically.

10        Q.    Okay.  Do you know whether in practice

11   that's how it worked?

12             MS. PRIMAVERA:  Objection.

13        A.    Again, I can only speak for the HR

14   function on that.  In certain instances it may

15   have but it was -- you know, it was not a total

16   cause and effect type of budgeting.

17        Q.    Okay.  Was there some kind of process by

18   which MCHA would endeavor to charge the

19   affiliates a fair price for their portion of the

20   services that were used?

21        A.    I don't -- I don't think I understand

22   what you're asking me was.

23             MR. BERMAN:  Toni, can you read it back,

24        please.

25             (Whereupon, the last question was read

1           P. Saunders - Confidential

2      back.)

3           MS. PRIMAVERA:  I'll place an objection

4      to that question, please.

5      Q.   Ms. Saunders?

6      A.   Can you read it back again, please.

7           (Whereupon, the last question was read

8      back.)

9      A.   I just -- I feel -- the budgeting

10     process at MCHA, again, was not my function.  All

11     of the -- you know, the technical process behind

12     it, I'm not familiar with.  So I'm -- I don't

13     know how -- I'm struggling to try to respond to

14     your question.  I'm sorry.

15     Q.   Let me try to make it easier, Ms.

16     Saunders.  If you don't know something, just tell

17     me you don't know.

18     A.   Okay.

19     Q.   I'm only here to find out what you know.

20     I can't ask you to predict the future.  I can't

21     ask you for things you don't know.

22     A.   Okay.

23     Q.   If there's subject matter that I'm

24     asking you about, just tell me "I'm sorry, I

25     don't know that" and I'll move on to the next

1          P. Saunders - Confidential

2    question, okay.

3         A.   Okay.

4         MS. PRIMAVERA:  Matthew, I'm sorry,

5    unless there's a question you want to

6    complete, I need a five-minute break.

7         MR. BERMAN:  That's fine.  Let's take a

8    break.

9         MS. PRIMAVERA:  Thank you.

10        (Whereupon, a brief recess was taken.)

11        Q.   Ms. Saunders, before when I asked you

12   about hiring for positions, I asked you if there

13   were ever any open positions and you responded --

14   I'm paraphrasing, again, that you were mainly

15   concerned with filling additional positions; do

16   you remember that?

17        A.   Yes.

18        Q.   But there were occasions where you had

19   turnover in attorney positions, right?

20        A.   Yes.  Yes.

21        Q.   Can so, for example, there was an

22   attorney at MCHA named Nathan Gallop, do you

23   remember him?

24        A.   Yes.

25        Q.   So he was in an attorney position and he

1                  P. Saunders - Confidential

2    to parted from the company, correct?

3        A.   Yes.

4        Q.   And that created an opening, correct?

5        A.   Yes, it did.  Yes.

6        Q.   And that opening was subsequently

7    filled, correct?

8        A.   Yes.

9        Q.   Was there any difference between the

10   process that you had for filling a position that

11   was vacant compared to filling a new

12   incrementally added position?

13           MS. PRIMAVERA:  Objection.

14       Q.   Do you understand my question?

15       A.   Yes.  No.

16       Q.   There was no difference, is that what

17   you just told me?

18       A.   Substantively, no.

19       Q.   Okay.  So open positions and new

20   positions were filled in essentially the same

21   method, right?

22           MS. PRIMAVERA:  Objection.

23       Q.   Ms. Saunders?

24       A.   Sorry, I'm -- yes, again, the process

25   would be substantively the same.

1                    P. Saunders - Confidential

2        Q.    Okay.  With respect to Mr. Gallop's

3    departure from the company, do you know whether

4    he received a severance package?

5        A.    He did.

6        Q.    Did the company have a policy pursuant

7    to which it would offer severance?

8        A.    No, we did not have a formal policy.

9        Q.    What about an informal practice, how was

10   severance managed at the company?

11       A.    Severance was managed generally on a

12   case by case basis.

13       Q.    What were the factors that would play

14   into whether severance was provided and the

15   amounts?

16            MS. PRIMAVERA:  Objection.

17            MS. GUERON:  Objection.

18       A.    The factors -- some of the factors that

19   might come into play would be the reason the

20   individual was leaving the company, being

21   terminated, years of service.

22       Q.    Have you completed your response?

23       A.    Yes.

24       Q.    Were there any attorneys that we haven't

25   mentioned yet other than Ms. Fischman who

1                    P. Saunders - Confidential

2      involuntarily departed from the company during

3      your tenure there?

4           MS. PRIMAVERA:  Objection.

5      A.    Yes.

6      Q.    How many?

7      A.    There was one other, other than Nathan.

8      Q.    Who was the other one?

9      A.    Andrew Caezar?

10     Q.    Did Mr. Caezar receive a severance?

11     A.    Yes.

12     Q.    Were there any other --

13          MR. BERMAN:  Withdrawn.

14     Q.    Were there any other non-employees in

15     the legal department who involuntarily departed

16     from the company during your tenure?

17     A.    Not that I recall.

18     Q.    Were there any other positions outside

19     the legal depart but within MCHA where there were

20     involuntary departures during your tenure?

21     A.    Yes.

22     Q.    For any of those departures, did the

23     people not receive a severance?

24     A.    As best as I can recall they received a

25     severance.

1                    P. Saunders - Confidential

2       Q.    During your tenure with MCHA, did the

3   company have a progressive discipline policy?

4       A.    No.

5       Q.    Were employees generally counseled on

6   their performance if they failed to meet

7   expectations during your tenure at the company?

8             MS. PRIMAVERA:  Objection.

9       A.    That would depend on what the

10  performance issue was.

11      Q.    What do you mean by that?

12      A.    If the performance issue was quality of

13  work related, then the employee could potentially

14  be counseled to improve the quality of work.

15            If the issue with the individual was

16  determined to be an egregious act, then they

17  would not be counseled.

18      Q.    With respect to the employees in the

19  legal department, you referenced two involuntary

20  departures so far, right?

21      A.    Uh-huh.

22      Q.    With respect to each of those, were they

23  -- were they both --

24            MR. BERMAN:  Withdrawn.

25      Q.    With respect to the involuntary

1                 P. Saunders - Confidential

2    departures in the legal department of attorney

3    positions that we talked about, were any of those

4    departures that were involuntary not related to

5    performance?

6              MS. PRIMAVERA:  Objection.

7       Q.    Do you understand my question?

8       A.    Would you please repeat the question.

9              MR. BERMAN:  Toni, can you read it back.

10             (Whereupon, last question read back.)

11      A.    No.

12      Q.    So were each of those employees

13   counseled about their performance prior to their

14   involuntary terminations?

15      A.    Yes.

16      Q.    Would that be reflected in their annual

17   performance reviews?

18      A.    Performance issues, yes.

19      Q.    So is it safe to say that if an employee

20   was not meeting performance expectations then

21   that would be reflected in their performance

22   review?

23             MS. PRIMAVERA:  Objection.

24             MS. GUERON:  Objection.

25      A.    There would be an indication in the

1                P. Saunders - Confidential

2     performance review of an issue, yes.

3          Q.    For the legal department, during your

4     tenure at the company, did you participate in the

5     year end review process?

6          A.    It -- can you be more specific about

7     your question.  Participate in what?

8          Q.    What was your involvement in the

9     performance review process for the legal

10    department during your time with MCHA?

11         A.    Generally to set the schedule, have

12    the -- advise the managers to complete the

13    performance reviews for their people, get the

14    ratings from the managers and have some, you

15    know, basic discussion about the individual and

16    rating and -- you know, I would compile that for

17    the organization.

18         Q.    Okay.  And the reviews were reduced to

19    writing, correct?

20              MS. PRIMAVERA:  Objection.

21         Q.    You can answer.

22         A.    There was a document that was the

23    written document.  I'm not sure what you mean by

24    reduced to writing.

25         Q.    Well, the review of the employee was

```
 1              P. Saunders - Confidential
 2    documented in a writing, correct?
 3        A.    That's correct.
 4        Q.    That writing was delivered to the
 5    employee, correct?
 6        A.    Yes.
 7        Q.    Was there also a face to face meeting to
 8    discuss the review?
 9        A.    Most managers would have face to face
10    meetings, yes.
11        Q.    With respect to Ms. Costa during her
12    tenure as general counsel, did she have face to
13    face meetings with her subordinates to discuss
14    their reviews?
15              MS. PRIMAVERA:  Objection.
16              MS. GUERON:  Objection.
17        Q.    Do you understand my question?
18        A.    I understand your question, yes.  I
19    believe she did, yes.
20        Q.    Okay.  Did Ms. Costa discuss the reviews
21    with you prior to her discussions with the
22    employee?
23              MS. PRIMAVERA:  Objection.
24              MS. GUERON:  Objection.
25        A.    Not necessarily.
```

1                    P. Saunders - Confidential

2       Q.    Were you present during Ms. Costa's

3    discussions with her subordinates as part of the

4    review process?

5            MS. PRIMAVERA:  Objection.

6       Q.    Do you understand my question?

7       A.    Yes.  No.  Yes, I understand your

8    question.  My answer is no.

9       Q.    So you were not present during Ms.

10   Costa's review meetings with her subordinates,

11   correct?

12      A.    Correct.

13      Q.    Did you receive copies of the written

14   performance reviews for each of the employees

15   that were attorneys in the legal department

16   during your time there?

17      A.    Yes.

18      Q.    Did you discuss those written reviews

19   with Ms. Costa concerning her subordinates?

20      A.    No, not necessarily.  No.

21      Q.    So she --

22           MR. BERMAN:  Withdrawn.

23      Q.    Would she prepare the written reviews

24   for her subordinates?

25      A.    Yes.

1                    P. Saunders - Confidential

2      Q.   She would provide a copy of that to you?

3      A.   Yes.

4      Q.   Did you make any changes to her

5    documents?

6      A.   No.

7      Q.   So once it was provided to you, what did

8    you do with it?

9      A.   We put it in the employee personnel

10   file.

11     Q.   To your knowledge were all of the

12   year-end reviews for employees true and correct

13   with respect to the legal department?

14          MS. PRIMAVERA:   Objection.

15     A.   To the best of my knowledge.

16     Q.   Are you familiar with Ms. Fischman's

17   performance reviews?

18     A.   Not in detail.

19     Q.   Have you seen Ms. Fischman's reviews

20   from 2011 through the last year of her

21   employment?

22     A.   Not -- not in the documents I was

23   provided.

24     Q.   Were you provided with copies of Ms.

25   Fischman's reviews in connection with this case?

1               P. Saunders - Confidential

2      A.    I don't -- no.  Not "I don't know."  The

3  answer is no.

4      Q.    Okay.  When you first joined MCHA, do

5  you know what position Ms. Fischman had?

6      A.    I believe she was corporate counsel.

7            (Whereupon, Ms. Colwin dropped off the

8            web conference.)

9            MS. PRIMAVERA:  I'll send her a text.

10           We can continue.

11           MR. BERMAN:  Toni, if you can pull up

12           Plaintiff's Exhibit 7.  If you can just

13           maybe shrink it a little bit so we can see

14           more of the page.

15           If you allow the witness to direct you

16           through the document so she can familiarize

17           herself.

18           THE WITNESS:  Scroll down.

19           MR. BERMAN:  Let me know when you're

20           ready.

21           THE WITNESS:  Can you scroll down

22           please.

23           MR. BERMAN:  So let the record reflect

24           that Ms. Saunders is being shown an exhibit

25           previously marked as Plaintiff's Exhibit 7.

1                    P. Saunders - Confidential

2        Q.    Ms. Saunders, does this refresh your

3    recollection as to the job title that Ms.

4    Fischman had in 2011, 2012?

5        A.    Yes.

6        Q.    What was her job title on or about March

7    of 2012?

8        A.    Corporate counsel.

9        Q.    Does this document reflect her job

10   performance as corporate counsel for the year

11   2011?

12       A.    Yes.

13       Q.    So it's an annual review, right?

14       A.    Yes.

15       Q.    During your tenure were all of the

16   annual reviews for attorneys in substantially the

17   same format?

18            MS. PRIMAVERA:   Objection.

19       A.    Yes.

20       Q.    So this is a year end review, right?

21       A.    Yes.

22       Q.    So reviews were delivered in --

23            MR. BERMAN:   Withdrawn.

24       Q.    This says on it that it was the

25   performance manager program for the year 2011 but

1          P. Saunders - Confidential

2     the review date says March of 2012, do you see

3     that?

4          A.   Yes.

5          Q.   So is that typical, you have, you know,

6     a review in let's say the first quarter of the

7     new year to review the performance over the prior

8     12 months?

9          A.   Yes.

10         Q.   So this review would cover calendar year

11    2011 but would be delivered in the first quarter

12    of 2012, right?

13         A.   Yes.

14         Q.   So you looked through her performance

15    review for the year.  Is it fair to say she had

16    positive performance for the year?

17              MS. PRIMAVERA:  Objection.

18         Q.   You can answer.

19         A.   The document reflects Donna's evaluation

20    of her with a rating that was positive, yes.

21         Q.   What portion of the document do you look

22    at to determine the rating?

23         A.   There's a page that you check box as to

24    the performance rating.

25         Q.   Is that Section II, knowledge and skills

1                    P. Saunders - Confidential

2      application, which is in this document is on

3      page -- it's Bates-stamped DEF0000624 on the

4      bottom left -- on the bottom right corner.

5                    MR. BERMAN:  Can you scroll down, Toni,

6             to page 64 -- actually, I'm looking at the

7             wrong page -- 65.  Keep going.  Stop.  This

8             is page 621.  Can you scroll up a little

9             bit.

10          Q.   We're looking at the page marked 621 and

11     there's a box there that says skill and knowledge

12     area, do you see that?

13          A.   Yes.

14          Q.   Is this portion of the document that we

15     would look at to determine the rating?

16          A.   No, I believe I'm -- no, I'm referring

17     to what I believe is the next page.

18                    MR. BERMAN:  Can you scroll down, Toni,

19             to the next page.

20                    (Whereupon, Ms. Colwin re-entered web

21             conference.)

22          Q.   Is this the box that you're referring to

23     where it says Section IV, overall level of

24     performance?

25          A.   Yes.

1              P. Saunders - Confidential

2      Q.   So Ms. Fischman received a rating of

3  exceeds expectations for the 2011 period, right?

4      A.   Yes.

5      Q.   Okay.  And then if you scroll down to

6  page 622, there's a spot on the document for

7  signature of the manager or supervisor, right?

8      A.   Yes.

9      Q.   Ms. Costa was Ms. Fischman's supervisor

10  during that period of time, right?

11      A.   Yes.

12      Q.   Okay.  So the narrative that's on the

13  prior page, 621, under Section III, comments,

14  that's provided by the supervisor, correct?

15      A.   Yes.

16      Q.   And that's uniformed throughout the

17  performance reviews as far as you're aware of,

18  right?

19      A.   Yes.

20      Q.   Okay.

21      A.   The format you're taking about?

22      Q.   Yes.  Are you personally familiar with

23  Ms. Fischman's performance historically?

24           MS. GUERON:  Objection.

25      A.   In a general sense.  In a general sense.

```
 1              P. Saunders - Confidential
 2      Q.   All right.  So did there come a time
 3  when Ms. Fischman was promoted from corporate
 4  counsel to assistant general counsel?
 5      A.   Yes.
 6      Q.   Were you involved in any way in Ms.
 7  Fischman's promotion?
 8      A.   No.
 9      Q.   Who was involved in Ms. Fischman's
10  promotion?
11      A.   Donna.
12      Q.   Was anyone else involved in Ms.
13  Fischman's promotion?
14      A.   The president would approve or
15  disapprove.
16      Q.   Generally speaking, can you describe for
17  me your duties and responsibilities as director
18  of HR during your tenure at MCHA?
19      A.   Yes, I was responsible -- I really had a
20  two-fold role because MCHA was a services
21  organization.  My one role was the HR individual
22  for MCHA as a company and in that role I was
23  responsible for the overall HR strategy as well
24  as the day-to-day tactical HR function since it
25  was a small organization.
```

1                    P. Saunders - Confidential

2              In the role that I performed for MCHA

3        services, that too was really kind of a dual

4        role.  There was very much a role that was

5        focussed on the shared services that we provided,

6        that I spoke about previously; payroll, health

7        and welfare benefits and operating the 401(k)

8        plan.

9              And I have another role that was kind of

10       more broad-based and somewhat eclectic where I

11       was an HR -- excuse me, HR resource -- HR expert,

12       if you will -- HR expert resource to the

13       affiliated businesses in the US on any of the

14       issues that fell within the HR arena, be it

15       compensation, benefits, employee, relations,

16       reorgs and things of that nature.  And in that

17       role also I would act as counselor and advisor to

18       the president of the businesses.  And these

19       weren't all of the affiliated businesses in the

20       US, there was a select few that I work with in my

21       HR role as compared to some of the other

22       functions, they tended to be the smaller

23       businesses.

24              And so I worked with, you know, company

25       presidents, I worked with senior leaders in some

1                P. Saunders - Confidential

2     of the organizations in regard to policy

3     interpretation, perhaps performance management

4     type of issues.  In some cases I actually had to

5     fulfill an HR role in some of the smaller

6     organizations.  For some of those organizations,

7     we actually went on to develop an HR function

8     within those business units.

9              But, generally, that was a broad brush

10    on the types of activities that I was involved in

11    and the counseling, the consulting, the advising

12    that I would provide to the business leaders, the

13    managers as well as employees.

14    Q.    Have you completed your response?

15    A.    Yes.

16    Q.    Is it fair to say then that you were HR

17    generalist?

18             MS. PRIMAVERA:  Objection.

19    A.    Yes.

20             MR. BERMAN:  Toni, if you can put this

21          exhibit away and pull up Plaintiff's

22          Exhibit 8, please.

23             I'll try to get through these relatively

24          quickly.

25             Let the record show that the witness is

1           P. Saunders - Confidential

2      being shown an exhibit previously marked as

3      Plaintiff's Exhibit 8.

4      Q.   Ms. Saunders, I'll give you the full

5  opportunity if you want to review the document.

6  I just want to really direct your attention to

7  the title information on the front page so that

8  you can see the period in question, the review

9  date and the job title at issue.  And then to the

10  box that you indicated reflects the performance.

11  But if you want to look at any portion of this to

12  familiarize yourself, by all means.  Is that

13  fair?

14      A.   Sure.

15           MR. BERMAN:  If you can scroll down a

16      little, Toni, so she can see the bottom

17      portion of the front page.  And then when

18      Ms. Saunders is ready, we'll move to that

19      box showing the performance.

20           THE WITNESS:  Ready.

21      Q.   Ms. Saunders, obviously, if you want to

22  review any other portion of the document, you're

23  welcome to do so.  But I would like to direct

24  your attention to the front of the document.

25           Is it correct this is Ms. Fischman's annual

1                    P. Saunders - Confidential

2     performance review covering the period calendar

3     year 2012 when she was employed as corporate

4     counsel?

5          A.   Yes.

6          Q.   Does this review reflect she exceeded

7     performance expectations?

8          A.   Yes.

9               MR. BERMAN:  We can set this exhibit

10          aside -- let's unless the witness needs to

11          look at any other portion for now.

12          Q.   Is that okay, Ms. Saunders -- you're

13     comfortable?

14          A.   Yes.

15               MR. BERMAN:  Can you set this aside,

16          please, and pull up exhibit Plaintiff's

17          Exhibit 9.

18               Same process, if you can just, please,

19          scroll through so the witness can see the

20          documents and we'll come pack to the first

21          page and to the chart.

22          Q.   Again, Ms. Saunders, you're welcome to

23     review any other portion of this document, if it

24     will help you respond.

25               MR. BERMAN:  Let the record reflect that

1          P. Saunders - Confidential

2          Ms. Saunders is being shown an exhibit

3          previously marked as Plaintiff's Exhibit 9.

4          Q.    Ms. Saunders, is this Ms. Fischman's

5     performance appraisal covering calendar year

6     2013?

7          A.    Yes.

8          Q.    This reflects her performance in the

9     role of assistant general counsel, correct?

10         A.    Yes.

11         Q.    Is it fair to say that her review

12    indicates that she exceeded performance

13    expectations from this annual review?

14              MS. PRIMAVERA:   Objection?

15         Q.    You can answer.

16         A.    Yes, on the document that's what it

17    says.

18         Q.    And this is the first review that she

19    would have received in her role as assistant

20    general counsel after being promoted, correct?

21         A.    Yes.

22              MS. PRIMAVERA:   Objection.

23              MR. BERMAN:   We can set this one aside.

24         Now I would like to pull up Plaintiff's

25         Exhibit 10.  Same process, scroll through so

1          P. Saunders - Confidential

2     the witness can see the contents of the

3     documents.

4          THE WITNESS:  Just hold here.  I just

5     want to look at this.  Okay.

6     Q.    So scrolling to the front of the

7     document, does this comport with your

8     understanding that Ms. Fischman received a review

9     covering the period calendar year 2014 for her

10    work in connection with position of assistant

11    general counsel?

12    A.    Yes.

13    Q.    Does this review reflect that she

14    received and exceeds expectation score?

15    A.    Yes, I believe I saw that as I was

16    scrolling through.  Yes.

17    Q.    Okay.  If you can turn to the portion --

18    it's on the bottom of page stamped DEF000069.

19    On this page here you see the very last

20    sentence there, I am excited for my new role

21    leading the legal department and assuming the

22    lead of the compliance program this year.  These

23    are huge responsibilities and I'm ready to take

24    them on, et cetera.

25    A.    Yes.

1                    P. Saunders - Confidential

2        Q.    Did you have any discussions with Ms.

3    Fischman about her taking on the role of

4    compliance?

5        A.    Not that I recall.  Again, I just want

6    to be clear, this was for performance for 2014?

7        Q.    Right.  And the review date is April 29,

8    2015?

9        A.    Right.

10       Q.    This is backward looking -- they are all

11   backward looking, right?

12       A.    Yes.

13            MR. BERMAN:  Let's set this aside.  This

14        was Plaintiff's Exhibit 10.  Let's pull up

15        plaintiff's 12?

16       Q.    Let me know when you're ready?

17       A.    Okay.

18            MR. BERMAN:  Can you scroll to the top

19        please, Toni.

20            Let the record reflect the witness is

21        being shown a document that has previously

22        been marked as Plaintiff's Exhibit 12.

23       Q.    Ms. Saunders, I'll direct your attention

24   to the employee title on the front page.

25            MR. BERMAN:  Toni, can you scroll down a

1                  P. Saunders - Confidential

2          little so she can see that.

3          Q.   Is this the review for Ms. Fischman

4    concerning her work in the role of acting general

5    counsel and chief compliance officer?

6          A.   Yes.

7          Q.   Okay.  Now, at some point was Ms.

8    Fischman promoted to that role from the role of

9    assistant general counsel?

10         A.   Yes.

11         Q.   Were you part of that process of

12   having --

13              MR. BERMAN:  Withdrawn.

14         Q.   Were you part of the process to promote

15   Ms. Fischman?

16         A.   I was involved in that, yes.

17         Q.   What was your role in connection with

18   Ms. Fischman's promotion to acting general

19   counsel and chief compliance officer?

20         A.   My role was the discussions with Donna

21   as she made a determination and decision in

22   regard to who she felt was a qualified candidate

23   for the role at the time.  She knew it was likely

24   she would be promoted to the position of

25   president of MCHA and therefore her position

1                   P. Saunders - Confidential

2    would need to be filled.

3        Q.   Let's turn to the time period of the

4    calendar year 2014.  We're rewinding a little at

5    this point.

6        Is it fair to say that in 2014 MCHA was

7    undergoing some organizational changes?

8             MS. PRIMAVERA:  Objection.

9        Q.   Do you understand my question?

10       A.   Yes, I understand the question.  If MCHA

11   was potentially -- yes, they were undergoing some

12   organizational changes.

13       Q.   Okay.  So in 2014 who was the president

14   prior to Donna Costa becoming the president?

15       A.   Shoji Yoshisato.

16       Q.   Right.  Did there come a time when MCHA

17   determined that Mr. Yoshisato was going to leave

18   the role of president?

19       A.   Yes, at some point there was.

20       Q.   How did you become aware of that?

21       A.   I don't recall how I specifically became

22   aware of it.

23       Q.   At some point MCHA placed Ms. Costa into

24   the role, correct, the role of president?

25       A.   Ms. Costa was placed into the role but

1                P. Saunders - Confidential

2     when you say MCHA placed her into that role, from

3     a decisionmaking standpoint, I'm not sure that's

4     entirely correct.

5          Q.    Okay.  Have you finished your response?

6          A.    Yes.

7          Q.    What do you know about how the decision

8     was made to have Ms. Costa take on the role of

9     president?

10         A.    I know very little about that decision.

11         Q.    Do you know who made the decision?

12         A.    I do not.

13         Q.    Do you know whether MCHC was involved in

14    the decision to select the president of MCHA?

15         A.    Yes, I -- yes, I would assume MCHC was

16    involved in that decision.

17         Q.    What is that assumption based on?

18         A.    That the president's role reported back

19    to MCHC.

20         Q.    Do you know whether Mr. Yoshisato was at

21    any point subject to an investigation concerning

22    allegations of sexual harassment?

23         A.    I am aware he -- yes, I am aware of

24    that.

25         Q.    Okay.  And at a general level, what do

1                    P. Saunders - Confidential

2    you know about those allegations?

3        A.    I don't know -- on a general level, just

4    that there were allegations made.  And on a

5    general level they involved a former employee of

6    MCHA.

7        Q.    Do you know whether those allegations

8    were investigated?

9        A.    It's my understanding they were

10   investigated, yes.

11       Q.    Do you know whether the allegations were

12   corroborated?

13       A.    I don't have that knowledge.

14       Q.    Do you know whether that transpired

15   prior to Mr. Yoshisato vacating the position of

16   president of MCHA?

17       A.    As best as I can recall I think it did.

18       Q.    Okay.  Do you know when Mr. Yoshisato

19   vacated the position of president of MCHA,

20   whether he moved on to another role?

21       A.    He returned to Japan.

22       Q.    Do you know which entity he returned to

23   in Japan?

24       A.    I don't recall.

25       Q.    Do you know whether he went to work for

1          P. Saunders - Confidential

2    MCHC?

3        A.    I don't recall.

4        Q.    Do you know whether he was a member of

5    the board of directors of MCHC?

6            MS. GUERON:   Objection.

7        A.    I don't recall.  I don't know -- I

8    shouldn't say -- I don't know -- not that I don't

9    recall.  I know he returned to Japan but I don't

10   know.

11       Q.    When you first learned that Ms. Costa

12   was going to become the president of MCHA, did

13   you have any discussions with Ms. Costa

14   concerning succession planning?

15       A.    Yes.

16       Q.    What was the nature of those

17   discussions?

18       A.    She sought my input and she often used

19   me as a sounding board for her thought process

20   during decisionmaking, including this.

21       Q.    Did you have any opinion as to what

22   would be appropriate with respect to succession

23   planning in the wake of Ms. Costa's promotion?

24       A.    I did not have an opinion, no.

25       Q.    Did you have an opinion on the position

1                    P. Saunders - Confidential

2      of general counsel and chief compliance officer

3      should be filled?

4          A.    Meaning what?  Meaning internally,

5      externally?

6          Q.    Well -- upon Ms. Costa's promotion from

7      general counsel and chief compliance officer to

8      president, that would leave a vacancy in the role

9      she vacated, correct?

10         A.    Correct.

11         Q.    Did you have any sense of what made

12     sense in terms of filling the position that was

13     being vacated?

14             MS. PRIMAVERA:  Objection.

15             THE WITNESS:  I'm sorry, can you repeat

16         the question.  Did you ask me did I have any

17         opinion?

18             MR. BERMAN:  Can you read it back,

19         please, Toni.

20             (Whereupon, the last question was read

21         back.)

22         A.    Nothing in particular, no.

23         Q.    Did you have a candidate in mind to take

24     on the role that was vacated by Ms. Costa?

25         A.    A candidate in mind, no.

1                    P. Saunders - Confidential

2        Q.    Did you speak with Ms. Costa about how

3    to fill that vacancy?

4        A.    Yes.

5        Q.    What did you say to her and what did she

6    say to you?

7        A.    We talked about the candidate -- the

8    legal staff at the assistant GC level and who

9    might be potential -- you know, potential

10   candidates and discussed them and at the -- I

11   can't say at the same time -- during the course

12   of discussion, because we had a number of

13   discussions, we also discussed going externally

14   for candidates.

15       Q.    Okay.  Prior to Ms. Costa's promotion to

16   president have you previously discussed

17   succession planning within the legal department

18   with Ms. Costa?

19       A.    Yes.  Well, not in a formal sense but in

20   informal conversations.

21       Q.    As part of those conversations, did she

22   express to you that she was interested in

23   becoming president?

24       A.    I don't -- I don't recall a direct

25   expression of that.

1                    P. Saunders - Confidential

2        Q.    In your discussions with Ms. Costa

3    concerning filling the vacancy that she was

4    leaving in that GC, general counsel, and chief

5    compliance officer role, how did you determine

6    whether to select an internal or external

7    candidate?

8            MS. PRIMAVERA:   Objection.

9        A.    From a budgetary standpoint, my

10   understanding is to is Japan from a budgetary

11   standpoint -- let me back up.  The potential

12   recruiting costs to hire an external candidate

13   was an amount that Japan was not willing to pay

14   for.

15       Q.    When you say "recruiting cost," are you

16   referring to like outside agencies that would

17   recruit for you or something different?

18       A.    I believe -- yes.  Not only the

19   recruiters costs but potentially the higher --

20   much higher and we didn't necessarily know but

21   potentially the overall cost, not only recruiter

22   cost but finding a candidate in the New York

23   marketplace, what that cost might be.

24       Q.    So was Japan involved in the

25   determination of whether to seek an internal

```
 1              P. Saunders - Confidential
 2   versus external candidate?
 3              MS. PRIMAVERA:  Objection.
 4        A.   Was Japan involved -- were they -- was
 5   Japan involved in the decision whether to seek an
 6   internal or external candidate?  I would answer
 7   indirectly, yes.
 8        Q.   With respect to the costs associated
 9   with external recruitment, how would those be
10   paid?
11              MS. GUERON:  Objection.
12        A.   So I would like to back -- I'm sorry, I
13   would like to go back to prior question.
14              You asked me was Japan involved in the
15   decision to -- involved in whether we went
16   internally or externally?
17        Q.   Correct.
18        A.   My understanding is -- again, I'm not --
19   this is based on my discussions with Donna.  I
20   don't have -- I didn't have direct conversations
21   with Japan.  My understanding is Japan was
22   focussed on appointing Jennifer to the position,
23   not looking externally.
24        Q.   Okay.  Have you completed your response?
25        A.   Yes.
```

1                    P. Saunders - Confidential

2         Q.    Okay.  At what point -- how did it come

3    about that Japan identified Ms. Fischman as their

4    preferred candidate?

5              MS. GUERON:  Objection.

6         A.    I don't know the answer to that.

7         Q.    Do you know how the determination to

8    select Ms. Fischman for the general counsel --

9    the acting general counsel and chief compliance

10   officer role took place?

11        A.    Yes.

12        Q.    How was Ms. Fischman selected for the

13   role?

14             MS. GUERON:  Objection.

15        A.    Donna was instructed or MCHA was

16   instructed to appoint Jennifer to that role.

17        Q.    Do you know how the decision was made to

18   select Jennifer?

19        A.    The internal legal staff of the

20   assistant general counsel early on were reviewed

21   and Donna and I had some discussions.  Jennifer

22   was the most likely candidate for the replacement

23   of Donna in the general counsel role and Donna

24   and, obviously, the president Yoshisato San had

25   several conversations about that and

1                   P. Saunders - Confidential

2      recommendation to Japan was not that Jennifer was

3      not qualified for the position of general counsel

4      and the recommendation was -- that was my

5      understanding of the recommendation made to

6      Japan.

7          Q.    Have you completed your response?

8          A.    Yes.

9          Q.    Okay.  So you had discussions with Donna

10     concerning the encumbrance in the assistant

11     general counsel position with respect to whether

12     it made sense to promote them to the general

13     counsel and chief compliance role; is that

14     correct?

15         A.    Yes.

16               MS. PRIMAVERA:  Objection.

17         Q.    During your tenure with the company you

18     took notes in notebooks, right?

19         A.    Yes.

20         Q.    And your notes were extensive, correct?

21               MS. PRIMAVERA:  Objection.

22         A.    I did my best to take notes -- detailed

23     notes.

24         Q.    Was it your general practice to take

25     notes concerning important conversations that you

1                    P. Saunders - Confidential

2    had concerning MCHA?

3         A.    That was my general practice, yes.

4         Q.    Did you take any notes concerning the

5    identification of candidates to succeed Ms. Costa

6    in the general counsel and chief compliance

7    officer role?

8         A.    As best as I can recall, I believe my

9    notes reflect more of the conversations that

10   Donna and I had with regard to Jennifer because

11   at that point -- again, she was the selected

12   individual out of the three -- there were three

13   assistant GC's at the time.

14        Q.    Okay.  So did you and Ms. Costa discuss

15   the criteria for a successful candidate into the

16   general counsel and chief compliance officer

17   position?

18        A.    Not in those terms, no.

19        Q.    What did you discuss with regard to how

20   to select a candidate?

21        A.    Again, we discussed the individuals and

22   focussing again in on Jennifer what were the pros

23   as well as the cons related to Jennifer as

24   applied to the role.

25        Q.    Okay.  Have you completed your response?

1                    P. Saunders - Confidential

2          A.    Yes.

3          Q.    So correct me if I'm wrong, you

4    mentioned that there were three candidates at the

5    AGC, assistant general counsel, level, correct?

6          A.    Yes.

7          Q.    That would be Jennifer Fischman?

8          A.    Yes.

9          Q.    That would be Andy Caezar?

10         A.    Yes.

11         Q.    And who was the third one?

12         A.    Kathryn Roche.

13         Q.    So let's just go through them in order,

14   is that okay?

15         A.    Uh-huh.

16         Q.    Starting with Andy Caezar, what were the

17   pros and cons with of selecting Mr. Caezar?

18         A.    I believe at the time it was -- he was

19   not viewed as a -- he was viewed more of a

20   specialized in pharmacy, so not as broad of a

21   background and not as strong of a -- he was more

22   of an individual contributor type and did not

23   necessarily have a more broad based skills for

24   the role.

25         Q.    Have you complete your response?

1              P. Saunders - Confidential

2       A.   Yes.

3       Q.   What about Ms. Roche?

4       A.   Ms. Roche actually for her own choice,

5    on work family reasons, she was an 80 percent

6    position and was not interested in the next level

7    up role.

8       Q.   When you say 80 percent position, is

9    that part-time; what does that mean?

10      A.   Yes, essentially.

11      Q.   What were the pros and cons of Ms.

12   Fischman?

13      A.   The pros on Jennifer were that she knew

14   the organization.  Donna felt she was -- had

15   legally technically competent skills and what

16   wasn't, would be developed.

17           In terms of the cons, it focussed on the

18   fact that Jennifer was an individual who was

19   difficult to work with at times.  Jennifer had a

20   style and characteristic -- excuse me, a style

21   and personality type of characteristics that both

22   peers or business affiliates felt at times were

23   difficult to deal with.  Donna felt that, again,

24   Jennifer had issues in communicating -- the

25   communication between Donna and Jennifer was

1                    P. Saunders - Confidential

2       difficult at times.  Jennifer tended to be

3       difficult to coach and mentor because she had a

4       tendency to feel that she needed to have ready

5       answers or had all the ready answers.  So

6       sometimes she would become defensive in dialogue

7       and that made it difficult for Donna to coach her

8       and lead to better decisionmaking, whatever it

9       was they were talking about.

10                   There are also concerns on Donna's part

11      about Jennifer stylistically.  She -- in the

12      general counsel role, you would be working with a

13      much higher level of Japanese executive level.

14      Jennifer did work, of course, with Japanese in

15      US.  But at a more executive level, Jennifer's,

16      again, style, personality, tended to be very

17      loud, unfiltered at times.  The Japanese tend to

18      be very reserved -- from a cultural standpoint

19      reserved, hierarchical.  You would differ to the

20      senior Japanese person in a position.  Jennifer's

21      style was the opposite of that.  So that would

22      have required definitely some coaching for

23      Jennifer but that presented concern to Donna in

24      that regard.  And Donna was concerned, again, of

25      the role of general counsel for MCHA, MCHA being

1                    P. Saunders - Confidential

2    an organization overall that provided the

3    services to the business affiliates.  Jennifer

4    had some difficult relationships, had some -- a

5    representation among the business affiliates that

6    was of concern to Donna if she were appointed to

7    the role.

8                    And then I think the last thing I would

9    say is Jennifer didn't have direct managerial

10   skills for managing people and the peers --

11   Jennifer's peers within the legal department also

12   had difficulty with Jennifer and there was the

13   concern that if we appointed her to the general

14   counsel role would people leave from the legal

15   department.

16       Q.   Have you completed your response?

17       A.   Yes.

18       Q.   With respect to the last thing you

19   mentioned, the concern about whether people would

20   leave the legal department.  Are you referring to

21   anyone specifically?

22       A.   No -- no.

23       Q.   So would you include Kelli Troccoli

24   within that category?

25       A.   Of people who might leave?

1          P. Saunders - Confidential

2     Q.   Yes.

3     A.   Potentially, yes.

4     Q.   Well, at that point in time would you

5  characterize Jennifer and Kelli Troccoli --

6  Jennifer Fischman and Kelli Troccoli as having a

7  positive workplace relationship?

8     A.   No.

9     Q.   So wasn't she someone that you would

10 consider in that category then?

11         MS. PRIMAVERA:  Objection.

12    Q.   Or if not, why not?

13    A.   If Jennifer were appointed to general

14 counsel, might Kelli leave?  That's the question,

15 correct?

16    Q.   Well, let me preface this by saying

17 in asking what the pros and cons were of each of

18 the candidates, we went one by one and you

19 started telling me the pros and cons with respect

20 to Ms. Fischman in concerning her for the general

21 counsel and chief compliance role.

22         And one of the potential cons that you've

23 identified was her relationships with her peers

24 and the consideration that if she was approved

25 for the role some members of the legal department

1            P. Saunders - Confidential

2    could potentially leave.  Do you recall telling

3    me that?

4        A.   Uh-huh.

5        Q.   So I'm asking you whether the people who

6    might leave included Ms. Troccoli?

7        A.   Potentially, yes.

8        Q.   Who else would it include?

9        A.   There was an attorney, Jordan Elbaum,

10   who had been hired -- I don't recall exactly when

11   and he was a high performer, young, he was, I

12   believe, corporate counsel.  And there was a

13   concern that potentially Jordan might leave too.

14       Q.   Have you completed your response?

15       A.   Yes.

16       Q.   Anyone else besides Ms. Troccoli and

17   Mr. Elbaum that you were concerned might leave?

18       A.   In the general sense, again, I think

19   there was a concern for everyone in the legal

20   department.  The concern I would describe as

21   grayer with perhaps the newer attorneys in the

22   department such as Jordan, Joe.  There was also a

23   sense that Andy might have difficulty with

24   Jennifer in the general counsel role.

25       Q.   Andy was --

1          P. Saunders - Confidential

2          MR. BERMAN:  Withdrawn.

3     Q.   Did you complete your response?

4     A.   Yes.  Yes.  That there might be, you

5     know, a concern for Andy.

6     Q.   Have you completed your response?

7     A.   Yes.

8     Q.   Well, Andy wanted the position for

9     himself, didn't he?

10          MS. PRIMAVERA:  Objection?

11          MS. GUERON:  Objection.

12     A.   Yes.

13     Q.   And you had discussions with him where

14     he expressed that desire to do you, correct?

15          MS. PRIMAVERA:  Objection.

16     A.   I don't recall discussions with Andy on

17     -- no -- no.  I don't recall, no.

18     Q.   We'll get into that in a little more

19     detail later.

20     A.   Okay.

21     Q.   So with respect to these candidates you

22     now expressed to me the pros and cons of each of

23     their respective individuals.

24          Is there anything else that you haven't

25     mentioned about considering their pros and cons?

1          P. Saunders - Confidential

2     A.   No.

3     Q.   Okay.  So you mentioned a recommendation

4  made to Japan that Jennifer be selected, did I

5  get that right?

6          MS. PRIMAVERA:  Objection.

7          MS. GUERON:  Objection.

8     A.   There was not a recommendation made to

9  Japan that Jennifer be selected -- Jennifer be

10  appointed general counsel, no.

11     Q.   Okay.  Where is the disconnect here?  I

12  toll you thought me told me Ms. Costa and Mr.

13  Yoshisato discussed a recommendation to Japan in

14  terms of identifying a candidate for the

15  position.  Did I get that right?

16     A.   They had discussions about the

17  candidates.  The recommendation was to go outside

18  to look for a candidate because there was not an

19  internal candidate that was qualified for the

20  position -- that they would recommend as

21  qualified for the position.

22     Q.   Have you complete your response?

23     A.   Yes.

24     Q.   Okay.  The recommendation to seek an

25  external candidate was declined, correct?

1               P. Saunders - Confidential

2        A.   Yes.

3        Q.   Okay.  So taking external candidates off

4    the table, you're left with three internal

5    candidates, right?

6        A.   Yes.

7        Q.   So with respect to those three internal

8    candidates, what was the resulting

9    recommendation?

10            MS. GUERON:  Objection.

11       A.   I guess -- there was not a

12   recommendation of Jennifer in the sense that we

13   -- the -- Donna and Yoshisato San were not

14   recommending an internal candidate.  And at some

15   point Japan came back and said, you know, we're

16   not approved going externally and Jennifer of the

17   three was the only identified candidate and so

18   they -- so Japan instructed MCHA to appoint

19   Jennifer.

20       Q.   Okay.  Have you completed your response?

21       A.   Yes.

22       Q.   When you say "Japan," are you referring

23   to MCHC?

24       A.   Yes.

25       Q.   So when Jennifer was selected, was there

1                    P. Saunders - Confidential

2      a discussion of what the title would be?

3          A.    A discussion by who?

4          Q.    Let's go about it a different way, okay?

5      When Jennifer was ultimately selected for the

6      promotion, she was promoted to the position of

7      acting general counsel and chief compliance

8      officer, correct?

9          A.    Correct.

10         Q.    So there's a distinction between the

11     acting title and the full title, correct?

12         A.    Correct.

13         Q.    Okay.  In your view, what's the

14     distinction?

15         A.    The distinction was that in the absence

16     of feeling Jennifer was qualified

17     and recommended -- you know, was qualified for

18     the position but we were being instructed to

19     appoint Jennifer to the position to -- I'm not

20     expressing myself well.  I'm sorry.

21              The conversation about that title

22     focussed on the fact that developmentally Donna

23     did not feel Jennifer was qualified for the

24     position.  So it was to address the fact that she

25     was being instructed to appoint her to the

1                    P. Saunders - Confidential

2    position but that there was still concerns and

3    developmental needs that were there in order for

4    her to be able to be considered fully qualified

5    in the general counsel role.

6        Q.   Have you finished your response?

7        A.   Yes.

8        Q.   Okay.  What were the qualifications for

9    the full position of general counsel and chief

10   compliance officer?

11       A.   Someone who could handle broad-based --

12   the number of broad-based duties without falling

13   through the cracks.

14            Someone who can interact successfully

15   with management in Japan.

16            Someone who can technically handle the

17   legal matters for the department.

18            Someone who had the trust of the

19   business affiliates they were supporting.

20       Q.   Have you completed your response?

21       A.   Yes.

22       Q.   Okay.  Any other qualifications than

23   those four that you just identified?

24       A.   I'm -- when you're asking me the

25   qualifications, I'm not -- as HR I cannot

1              P. Saunders - Confidential

2    determine the legal, technical qualifications of

3    the individual overall.  The types of things that

4    I've been explaining to you are more of the soft

5    type of qualifications that I know go into a

6    leadership role that I know were discussed

7    between Donna and I as we assessed and that are

8    important to the success of an individual in that

9    role.

10       Q.   Have you completed your response?

11       A.   Yes.

12       Q.   I want to draw a distinction because you

13   used the term "individual."

14       I'm talking about the role of general counsel

15   and chief compliance officer.

16       So within an HR framework, right, isn't it

17   fair to say that whether or not you're a lawyer,

18   you can articulate what the requirements are for

19   the position, right?

20           MS. PRIMAVERA:  Objection.

21           MS. GUERON:  Objection also.

22           MS. PRIMAVERA:  Can you read that back.

23           (Whereupon, last question was read

24       back.)

25           MS. PRIMAVERA:  I want to make sure has

1              P. Saunders - Confidential

2       my objection.

3              MR. BERMAN:  I'm withdrawing the

4       question.

5              MS. PRIMAVERA:  I'm sorry, there's a

6       delay.

7              MR. BERMAN:  I'll rephrase the question

8       and I'll give you an opportunity to object

9       again.

10      Q.   Ms. Saunders --

11      A.   Yes.

12      Q.   -- I want to draw a distinction with you

13      between the position itself and its

14      characteristics and the characteristics of the

15      individuals that you just discussed you

16      considered.

17         So with that distinction in mind, I'm asking

18      you about the role, right?

19         What are the characteristics of the role,

20      what are the requirements of the role, what are

21      duties app responsibility of the role?

22         These are things that as an HR instructor are

23      within your scope, correct?

24              MS. PRIMAVERA:  Objection.

25              MS. GUERON:  Objection.

1                    P. Saunders - Confidential

2        A.    I don't determine what makes a qualified

3    GC.

4        Q.    Have you completed your answer?

5        A.    Yes.

6        Q.    I'm not asking you who chooses the

7    qualifications.  I'm asking what the

8    qualifications are for the position.

9        Do you understand the difference?

10            MS. PRIMAVERA:  Objection.

11       Q.    Would it help if I give you an example?

12       A.    I think the examples are written on the

13   job description.

14       Q.    Okay.  So does that help you -- if you

15   refer to the job description, does that help you

16   tell me what the qualifications for the position

17   are?

18            MS. GUERON:  Objection.

19       A.    They would be the qualifications that

20   are written on the page.

21       Q.    Thank you.  So that job description

22   would tell me what the qualifications are for the

23   full general counsel and chief compliance officer

24   position, correct?

25            MS. PRIMAVERA:  Objection.

1                    P. Saunders - Confidential

2          A.    I don't know that saying it's the full

3    qualifications is accurate.

4          Q.    Can we agree that the job description is

5    a starting point for the qualifications for the

6    position?

7          A.    Yes.

8                MS. GUERON:   Objection.

9          Q.    Can we agree that the job description is

10   a starting point for the qualifications of the

11   position?

12               MS. PRIMAVERA:   Objection.

13         Q.    You can answer.

14         A.    Yes.

15         Q.    Okay.  So what else beyond the job

16   description would one need to know to determine

17   the qualifications for the position?

18               MS. PRIMAVERA:   Objection.

19               MS. GUERON:   Objection.

20         Q.    You can answer the question unless

21   instructed not to.

22         A.    As we said, it's a starting point but

23   it's not all of the factors that go into

24   determining if someone is qualified for the

25   position.

1              P. Saunders - Confidential

2      Q.   Okay.  So what else would you need to

3  make that determination?

4           MS. PRIMAVERA:  Objection.

5           MS. GUERON:  Objection.

6      A.   Any knowledge that you may have of a

7  candidate that makes you question is the person

8  the right fit in the job.  Again, based on the

9  fundamental qualifications but is it a right fit

10  in the organization also.

11      Q.   When you use the phrase fundamental

12  qualifications, are you referring to the position

13  profile or something different?

14      A.   No, it would be the position profile.

15      Q.   Okay.  When you were considering

16  candidates for the general counsel and chief

17  compliance officer position, you had discussions

18  with Ms. Costa, right?

19      A.   Yes.

20           MS. GUERON:  Objection.

21      Q.   As part of those conversations, did you

22  discuss Ms. Costa's own qualifications when she

23  first assumed that role?

24      A.   Not that I recall.

25      Q.   Do you know what Ms. Costa's own

1                    P. Saunders - Confidential

2    qualifications for the position were when she

3    first inherited it or joined that title --

4    whatever you want to call it?

5        A.    No.

6        Q.    Okay.  Do you know Ms. Costa's

7    professional background?

8        A.    In general terms.

9        Q.    Do you know how much legal experience

10   she had before she became general counsel of

11   MCHA?

12       A.    I do not.

13       Q.    Do you know whether Ms. Fischman had

14   more or less legal experience than Ms. Costa had

15   at the time Ms. Costa first assumed the role of

16   general counsel and chief compliance officer?

17            MS. PRIMAVERA:  Objection.

18       A.    I do not.

19       Q.    Now, you mentioned that Ms. Costa and

20   Mr. Yoshisato had conversations about the

21   selection of candidates, correct?

22       A.    Yes.

23       Q.    How do you know they had those

24   conversations?

25       A.    Just through casual knowledge, either

1                    P. Saunders - Confidential

2    Donna would have said to me she was having a

3    meeting with Yoshisato San.

4        Q.   Ms. Fischman is ultimately selected as

5    acting general counsel.  Who made the decision

6    that she would be acting general counsel rather

7    than general counsel and chief compliance

8    officer?

9             MS. PRIMAVERA:  Objection.

10       A.   I don't know who made that decision.

11       Q.   Did you make the decision?

12       A.   Did I?

13       Q.   Yes.

14       A.   I didn't make that decision, no.

15       Q.   When was the first time that you heard

16   the role being referred to as an acting position

17   rather than a full position?

18       A.   I don't recall when.

19       Q.   Was it your idea?

20       A.   Was it my idea that -- was it my idea --

21   was what my idea?

22       Q.   Was it your idea to select Jennifer for

23   the -- Ms. Fischman -- for the acting general

24   counsel and chief compliance officer rather than

25   for the full position of general counsel and

1            P. Saunders - Confidential

2    chief compliance officer?

3            MS. GUERON:  Objection.

4        A.   I was not a decisionmaker in selecting

5    Jennifer.

6        Q.   Who came up with the concept of having

7    an acting general counsel and chief compliance

8    officer role rather than a full general counsel

9    and chief compliance role?

10           MS. PRIMAVERA:  Objection.

11           MS. GUERON:  Objection.

12       A.   I recall having a discussion with Donna

13   and -- I don't recall who came up with the

14   concept but I do recall titles other than full

15   general counsel having what might be a title

16   other than general counsel -- other than the

17   general counsel.

18       Q.   What other titles were discussed?

19       A.   Acting general counsel -- I don't recall

20   beyond acting general counsel.

21       Q.   So there were other titles but you can't

22   recall what they were?

23           MS. PRIMAVERA:  Objection.

24       Q.   Did I get that right?

25       A.   Were there other titles?  Meaning -- no,

1                    P. Saunders - Confidential

2    I don't recall what other titles.

3        Q.    But you recall that there were other

4    titles that were considered?

5            MS. PRIMAVERA:   Objection.

6        Q.    Isn't that what you just told me or did

7    I get that wrong?

8        A.    Well, no, I mean -- would there be

9    another, you know -- yes, there was some

10   discussion or thought given to another title but

11   what other options -- specific options, I don't

12   recall what other specific options that may

13   have -- we may have discussed or I may have

14   suggested, you know, Donna asked me for, you

15   know, input on that.  I don't recall.

16       Q.    Okay.  So was there any discussion of

17   how long Ms. Fischman would be in the role of

18   acting general counsel and chief compliance

19   officer?

20           MS. GUERON:   Objection.

21       A.    Yes.

22       Q.    What was the discussion?  What did you

23   say and what did Ms. Costa say?

24       A.    I don't recall the details but the

25   general -- my general understanding is that it

1                    P. Saunders - Confidential

2      would be for a one year period.

3           Q.    And in -- as part of that discussion,

4      what was to happen at the end of the year?

5           A.    That she would be promoted to the full

6      GC position.

7           Q.    Okay.  And how would the decision to

8      promote her to the full GC position be

9      determined?

10          A.    Based on her performance during the

11     year.

12          Q.    Okay.  When did you have this discussion

13     with Ms. Costa?

14          A.    Prior to Jennifer's appointment.

15          Q.    Can you be anymore specific than that?

16          A.    I don't -- I don't remember

17     specifically.

18          Q.    Do you know when Ms. Fischman was

19     promoted?

20          A.    She was notified in December of 2014.

21          Q.    When did the decision take effect?

22          A.    April 1st of 2015.

23          Q.    So if Ms. Fischman was notified in

24     December then presumably your discussion with Ms.

25     Costa was sometime prior to December of 2014,

1                 P. Saunders - Confidential

2    correct?

3         A.    Yes.

4         Q.    Do you know how much time elapsed from

5    your discussions to the time when Ms. Fischman

6    was notified?

7         A.    I don't know exactly, no.

8         Q.    Well, these organizational changes that

9    were taken place, you became aware of them at the

10   beginning of 2014, right?

11              MS. PRIMAVERA:  Objection.

12        A.    I don't recall that it was as early as

13   the beginning of 2014.

14              MR. BERMAN:  Why don't we take a break

15        here and we can turn to that in more detail

16        after lunch, okay?

17              THE WITNESS:  Okay.

18              MR. BERMAN:  Thank you, all.

19              THE WITNESS:  What's the period of time?

20              MR. BERMAN:  We're going to break for

21        30 minutes.  If you want more time, just let

22        me know.

23              THE WITNESS:  No, I'm fine with that.

24              MR. BERMAN:  Let's take 30 minutes.

25              (Whereupon, a luncheon recess was

1                    P. Saunders - Confidential

2          taken.)

3          Q.    Ms. Saunders, we're back on the record.

4          You, of course, understand you're still under

5     oath.

6          Before we took our break we were talking

7     about the pros and cons of different candidates

8     that were considered for the acting general

9     counsel and regular full general counsel

10    position.

11         We talked about the pros and cons of Ms.

12    Fischman, you mentioning in connection with that

13    discussion that there were certain individuals

14    that you felt had difficulty with Ms. Fischman;

15    did I get that right?

16         A.    Yes.

17         Q.    You mentioned Jordan Elbaum as one of

18    the individuals that you were considered

19    concerned might leave the company if Ms. Fischman

20    was promoted; is that correct?

21         A.    Yes.

22         Q.    What was the factual basis for your

23    concern that Mr. Elbaum might leave the company

24    if Ms. Fischman was promoted?

25         A.    It was just a general knowledge of

                    P. Saunders - Confidential

1    working in an office with individuals and hearing

2    remarks or comments some, which would have been

3    third-hand in regard to what people felt or

4    thought of Jennifer.

5        Q.    Were there any comments of that nature

6    made directly to you?

7        A.    Yes.

8        Q.    Who made those comments?

9        A.    I would receive comments from Kelli

10   Troccoli and I would receive -- are you asking me

11   about direct comments?

12       Q.    Are there -- yes, firsthand comments

13   that you --

14       A.    Oh, firsthand comments.  From Kelli

15   Troccoli and -- I don't recall any specific

16   firsthand comment from anyone else.

17       Q.    So the only firsthand comments you

18   receive was from Ms. Troccoli; is that correct?

19             MS. PRIMAVERA:  Objection.

20       A.    That I can recall.

21       Q.    Sitting here today, can you recall any

22   other individuals who made comments directly to

23   you concerning Ms. Fischman?

24             MS. GUERON:  Objection.

1                   P. Saunders - Confidential

2          A.    I would -- oh, from the legal

3     department?  I can't recall the specific

4     comments, no.

5          Q.    Okay.  So did Mr. Elbaum ever come to

6     you with comments about Ms. Fischman and having

7     difficulty with her?

8          A.    No.

9          Q.    We looked at Ms. Fischman's performance

10    reviews for the period leading up to and through

11    her promotion, none of them have reference to any

12    comments about her being difficult to work with,

13    are you aware of that?

14              MS. PRIMAVERA:  Objection?

15         A.    From reviewing performance reviews, yes.

16         Q.    And are you aware of any instances

17    outside of these performance reviews prior to Ms.

18    Fischman's promotion she was counseled about any

19    communication issues or difficulties with

20    personal interactions?

21         A.    Yes.

22         Q.    What can you tell me about those?

23         A.    About her difficulties?

24         Q.    About her being counseled.

25         A.    Oh, about her being counseled --

1           P. Saunders - Confidential

2      Q.   Yes.

3      A.   -- from difficulties?

4      Q.   And, again, we're talking about the

5  period prior to her becoming promoted to acting

6  general counsel?

7      A.   I am -- I'm sorry, just please repeat

8  the question.

9      Q.   I'll try it a different way.

10      A.   Okay.

11      Q.   Prior to April 1st of 2015, right, which

12  is the date when Ms. Fischman's promotion became

13  effective, right?

14      A.   Right, yes.

15      Q.   Prior to that point have you ever

16  counseled Ms. Fischman concerning her

17  performance?

18      A.   I don't recall specific times that I

19  counseled Jennifer, no.

20      Q.   Did you ever counsel Ms. Fischman

21  concerning her performance as a member of the

22  legal department?

23      A.   Again, it may have been more on an

24  informal basis where knowing of a certain issue

25  in conversation, trying to suggest a way to be

1           P. Saunders - Confidential

2   softer, not as -- to be softer, less

3   intimidating.

4           For example, sometimes when we would

5   deal with employee issues, and they could be

6   outside of MCHA, and I would consult with

7   Jennifer she, at times, would react kind of --

8   she would react more shoot from the hip or

9   more -- react more emotionally to the situation.

10  And I would say to her, you know, let's just step

11  back and calm down and, you know, review what the

12  facts were.

13          So, you know, did I ever counsel and try

14  to assist her in those type of things, yes.

15      Q.   Have you completed your response?

16      A.   Yes.

17      Q.   Those interactions you just described to

18  me, are those pertaining to her relationship with

19  Ms. Troccoli?

20      A.   No.

21      Q.   What are they pertaining to?

22      A.   Not that particular -- no, I was talking

23  more about, you know, when I would go to her with

24  a particular -- like, employment -- employment

25  relations or an performance issue that was occur

1           P. Saunders - Confidential

2    in the field and explaining the situation and

3    getting more of a -- more of an emotional or

4    expressive result from Jennifer and -- or if we

5    were discussing a remedy or what might be an

6    appropriate action, I would counsel her at times

7    to think more -- less emotionally, react less

8    emotionally, let's think about this more

9    objectively.

10       Q.   Are you describing interactions other

11   people are having in field that you're reporting

12   to her in connection with her legal duties?

13           MS. PRIMAVERA:  Objection.

14       A.   Jennifer -- I would be aware, HR

15   managers or the people that I dealt with in the

16   businesses in my function, I would work with them

17   on employee situations, whether they be

18   performance issues or things like that and I

19   would work in tandem with Jennifer as in the

20   legal department to -- you know, on the situation

21   to make sure we were handling things

22   appropriately or what the facts were and what

23   might be the appropriate course of action to

24   advice the business.

25       Q.   Have you completed your response?

1                    P. Saunders - Confidential

2        A.    Yes.

3        Q.    Let me try this a different way okay.  I

4    am asking you about conveying to Ms. Fischman

5    that her performance was negative in a verbal

6    manner; have you ever done that?

7             MS. PRIMAVERA:  Objection.

8             MS. GUERON:  Objection.

9        Q.    Do you understand my question?

10       A.    Did I ever -- when you say in a "verbal

11   manner" --

12       Q.    As an HR professional, right --

13       A.    Right.

14       Q.    -- part of your job duties is to

15   interact with employees concerning their

16   performance, correct?

17       A.    Correct.

18       Q.    And there are different methods through

19   which you can achieve that, correct?

20       A.    Correct.

21       Q.    So, for example, you can issue them a

22   document, which informs them of their

23   performance, correct?

24       A.    Correct.

25       Q.    And you can also import that information

1                    P. Saunders - Confidential

2    to them verbally, correct?

3         A.   Yes.

4         Q.   Did you ever import to Ms. Fischman

5    prior to her promotion that she had negative

6    performance in connection with inter-peer

7    communication?

8              MS. PRIMAVERA:  Objection.

9         Q.   Do you understand my question?

10        A.   I do.  No, not that I recall.

11        Q.   Do you have any notes or memorandum

12   reflecting conveying to Ms. Fischman any form of

13   negative performance, other than what might be

14   contained within a written performance appraisal?

15             MS. PRIMAVERA:  Objection.

16        A.   I mean, that's very -- that's a very

17   broad question.  So, you know, if the bottom line

18   of the question that you're asking me is

19   counseling her on her performance, the answer

20   would be no.

21        Q.   Okay.  Is there any written document

22   that you're aware of that reflects that any other

23   employee in the legal department, other than

24   Kelli Troccoli, had any interpersonal

25   difficulties with Ms. Fischman prior to her

1                   P. Saunders - Confidential

2     promotion?

3          A.    No, no that I -- no.  No.

4          Q.    Did Mr. Elbaum ever make a complaint

5     about Ms. Fischman?

6          A.    No, not to me.

7          Q.    Are you aware of any complaint

8     Mr. Elbaum made to anyone about Ms. Fischman?

9          A.    What do you mean by complaint?

10         Q.    Well, you had discussed in the

11    consideration of Ms. Fischman's pros and cons

12    that one of the cons identified was that peers

13    purportedly had difficulty working with her,

14    correct?

15         A.    Uh-huh.

16         Q.    What I'm asking now is you had

17    mentioned Mr. Elbaum in connection with that

18    conversation.  I'm asking if he made any

19    complaints, right, and you said not directly to

20    me.

21         A.    Uh-huh.

22         Q.    Now I'm asking are you aware of any

23    other complaint he made about Ms. Fischman?

24         A.    Again, just what I would have heard

25    third sense that's -- other than hearing

1              P. Saunders - Confidential

2    something third-party in that regard, no.

3        Q.   Okay.  Have you complete your response?

4        A.   Yes.

5        Q.   Okay.  If you heard a second or third

6    hand complaint about one of the attorneys in the

7    legal department, wouldn't you have investigated

8    it?

9              MS. PRIMAVERA:  Objection.

10             MS. GUERON:  Objection.

11       A.   About someone being difficult to work

12   with?

13       Q.   Yes.

14       A.   That depends on what I heard or how

15   frequently I heard.

16       Q.   Would you have memorialized such a

17   complaint?

18       A.   No, not necessarily something like that.

19       Q.   Okay.

20             MR. BERMAN:  Let's pull up Plaintiff's

21        Exhibit 5 again, please.

22       Q.   Ms. Saunders, I would like you to take a

23   moment or however long you need to review this

24   position profile for general counsel and chief

25   compliance officer with the following question

1               P. Saunders - Confidential

2    question in mind, are there any qualifications

3    for this position that you contend that Ms.

4    Fischman did not have at the time of her

5    promotion?

6               MS. PRIMAVERA:  Objection.

7               MS. GUERON:  Objection.

8               MR. BERMAN:  You can direct the court

9        reporter as needed.

10              THE WITNESS:  Okay.  I see a couple of

11       things, yes.

12       Q.    Are you ready to provide your response?

13       A.    Yes.

14       Q.    Go ahead.

15       A.    Strong interpersonal skills and

16   emotional intelligence.

17       Q.    Any others?

18       A.    Leadership skills.

19       Q.    Any others?

20       A.    Ability to collaborate effectively with

21   business people and outside counsel.

22       Q.    Any others?

23       A.    No.

24       Q.    Prior to Ms. Fischman's promotion did

25   you have any complaints from -- what was it --

1          P. Saunders - Confidential

2   what did you call it, outside business people --

3   business people and outside counsel, did you have

4   any complaints about Ms. Fischman from them?

5       A.   From my interactions with some of the

6   affiliates they felt that there were, at times,

7   feelings of when they had to deal with Jennifer

8   that they were intimidated by her style, the way

9   she went to speak to them, the -- yes.

10      Q.   Have you completed your response?

11      A.   (No verbal response.)

12      Q.   I asked you if there were any complaints

13  from business people and outside counsel.

14      A.   So you're asking for complaints?  I'm

15  referring more to feedback that I would receive

16  in my daily interactions working with another --

17  either HR manager or a Japanese expat president,

18  where the -- what was conveyed to me is that they

19  weren't comfortable working with Jennifer because

20  of her stylistic attributes I've just been

21  referring to.

22      Q.   Have you completed your response?

23      A.   Yes.

24      Q.   Which HR managers you are you referring

25  to that provided you with the feedback concerning

1              P. Saunders - Confidential

2   Ms. Fischman?

3       A.   There was an HR manager from an

4   affiliate -- one of the business affiliates.

5            THE WITNESS:  Am I required to give the

6       name here, Brittany?

7            MS. PRIMAVERA:  You can answer the

8       question -- Pat, unless instructed not to

9       answer, you should respond to the question.

10           THE WITNESS:  Okay.  Thank you.

11           MS. PRIMAVERA:  If you want to take a

12      very brief one minute break, you can.  But

13      unless instructed, you should respond.

14           MR. BERMAN:  Just to be clear, I don't

15      -- if you want a break between questions,

16      you can take a break between questions.  You

17      can't take a break to consult with your

18      attorney concerning a question that's

19      pending.

20           Just to be clear about the instructions,

21      you're here to testify under oath as a fact

22      witness.  I'm not asking you about any

23      privileged communications you had with your

24      attorney.  So other than confessing to a

25      crime or something like that, I expect you

1              P. Saunders - Confidential

2       to respond to the questions.

3            MS. PRIMAVERA:  I appreciate that.  I

4       meant more so if she needs a break for

5       herself to assess -- I don't know what her

6       concern is in regard to your question but

7       before she -- if she has a concern about

8       consulting with her attorneys, we understand

9       the rule of the day.

10           MR. BERMAN:  And just for the witness'

11      benefit, if there's anything that you're

12      concerned is confidential, just tell us and

13      we can mark the transcript confidential if

14      it's pertaining to personal information of

15      somebody.  We have a confidentiality order

16      in the case.

17           THE WITNESS:  Okay.

18      A.   So the company was Mytex and the HR

19 individual there is Chris -- I'm sorry, again,

20 I've very been retired a few years -- Chris.  I

21 recall a situation -- there's a company in

22 Virginia, MPCA -- I'm sorry, under the reorg that

23 occurred about a year before I left, it's

24 probably MCCA right now -- Mitsubishi Chemical

25 Composites America -- and it was a Japanese expat

1                    P. Saunders - Confidential

2     president there at the time.  There was a

3     situation where they wanted some sensitivity

4     training among their employees.  I suggested

5     Jennifer can do the training and I received a

6     negative reaction in that regard.

7          Q.    Have you completed your response?

8          A.    Yes.

9          Q.    With respect to this situation with

10    Mytex with Chris, what did that pertain to?

11              MS. PRIMAVERA:  Pat, before you

12         answer -- Matt, can we mark this whole line

13         of questioning confidential in the

14         transcript?

15              MR. BERMAN:  Yes, we can.

16              MS. PRIMAVERA:  I think we're getting

17         into specifics with clients and I'm

18         concerned about various privilege issues.

19              MR. BERMAN:  Well, we're not discussing

20         the substance of any client matters, we're

21         just discussing any complaints about Ms.

22         Fischman's demeanor.  We can mark it

23         confidential.

24              MS. PRIMAVERA:  In turn, it's

25         implicating specific matters that were being

1          P. Saunders - Confidential

2     dealt with to get there -- to why there were

3     complaints about Jennifer.

4          MR. BERMAN:  Why don't we mark the

5     portion of the transcript confidential and

6     we can admonish the witness not to reveal

7     the substantive nature of the client matter

8     but just the substance of whatever complaint

9     was made about Ms. Fischman; does that work

10    for you?

11         MS. PRIMAVERA:  That would be great.

12    Thank you.

13    Q.   With that understanding, Ms. Saunders,

14 can you provide any additional detail about the

15 complaints made from Chris at Mytex?

16    A.   I dealt with Chris and Jennifer dealt

17 with Mytex over a number year period and, you

18 know, a specific -- a specific situation I don't

19 necessarily recall.  I just know that in the

20 multiple various employee type of issues that

21 would arise that we would discuss, he, you know,

22 I can receive a call from Chris and discuss it

23 and I would say, you know, you really should

24 discuss that with Jennifer and I would get a

25 response I was afraid you were going to say that.

1              P. Saunders - Confidential

2    And just knowing, you know, from having a

3    relationship with Chris that dealing with

4    Jennifer at times can have certain challenges to

5    it.

6         Q.    Have you completed your response?

7         A.    I know also from Chris that the expat

8    president of Mytex -- excuse me, Arai, A-R-A-I,

9    hearing third-hand through Chris that at times

10   they were not comfortable -- necessarily

11   comfortable work being Jennifer.

12        Q.    Have you completed your response?

13        A.    Yes.

14        Q.    Do you know who Deborah Westerholt was?

15        A.    Yes.

16        Q.    Wasn't Deborah Westerholt the HR

17   director at Mytex?

18        A.    She was the for a period of time, yes.

19        Q.    So does that refresh your recollection

20   as to the last name of Chris?

21        A.    Greeley.

22        Q.    Were either of these reports of

23   interpersonal issues conveyed to Ms. Fischman at

24   any time during her tenure?

25        A.    Not to my knowledge.

1                    P. Saunders - Confidential

2      Q.    Is if you deemed them to be significant,

3   would that have made their way into her

4   performance reviews?

5           MS. PRIMAVERA:  Objection.

6      A.    Again, performance reviews are done by

7   the business, not by HR.

8      Q.    Okay.  So HR doesn't have a role in

9   documenting performance?

10          MS. PRIMAVERA:  Objection.

11          MS. GUERON:  Objection.

12     Q.    You can respond.

13     A.    HR does not have a role -- HR does not

14  complete a performance evaluations.  HR -- yeah,

15  HR does not complete the performance evaluations.

16     Q.    Are you aware that Mr. Arai had a sexual

17  harassment allegation lodged against him?

18     A.    No, I am not.

19     Q.    Let's move on here.

20          MR. BERMAN:  You can put this exhibit

21      away, please.

22     Q.    Ms. Saunders this exhibit, DEF002520, is

23  a selection of pages that were produced to us

24  from MCHA from notebooks.  So I don't want to

25  represent to you that this is one particular

1                    P. Saunders - Confidential

2    document, rather this is excerpts from various

3    notebooks that were provided to us.  Are you with

4    me so far?

5         A.    Yes.

6         Q.    So there's 130 pages in the exhibit --

7    I'm not going to ask you to read the whole thing,

8    obviously, right now.

9              MR. BERMAN:  If you could, just direct

10        the court reporter to scroll through the

11        document to your satisfaction, such that you

12        can tell me what these documents are or

13        identify them for me somehow, if possible.

14             THE WITNESS:  Okay.

15             MR. BERMAN:  Or, alternatively, can you

16        confirm for me that these are excerpts from

17        notebooks that you created.

18             THE WITNESS:  Yes, I can confirm that.

19             MR. BERMAN:  Take a moment with the

20        court reporter just to scroll through so you

21        can see these are all the spiral notebook

22        and you're familiar with the contents.

23             THE WITNESS:  Okay.  Go ahead and

24        scroll, please.  This appears to be a

25        similar document that was provided to me by

1          P. Saunders - Confidential

2     counsel.

3          MR. BERMAN:  Please just take your time

4     and scroll through to the end so you can

5     confirm --

6          THE WITNESS:  Yes, absolutely.  Go

7     ahead.  Can you go back a page?

8          I want to point out that this page is

9     not from the spiral notebook.  It may have

10    been -- it may have been clipped into that

11    or sometimes I would write on a pad and

12    maybe clip into the spiral notebook but I

13    recognize this.

14         MR. BERMAN:  Okay.  Thank you.

15         Let the record reflect that the witness

16    has just been shown documents Bates-stamped

17    DEF002520 through 2649.

18    Q.   Ms. Saunders, have you seen these pages

19   before?

20    A.   Yes.

21    Q.   Can you tell me what they are?

22    A.   They are pages from spiral notebooks I

23   kept during my tenure at MCHA.

24    Q.   Thank you.  And you kept a number of

25   notebooks, correct?

1                    P. Saunders - Confidential

2        A.    Correct.

3        Q.    Okay.  Turning to the very first page in

4    the middle portion of the page --

5             MR. BERMAN:  Toni, if you can zoom up to

6        the top.

7        Q.    -- there's a date at the top left corner

8    of the page it says February 25th, 2014?

9             MR. BERMAN:  Zoom up higher.

10       Q.    Do you see the date now?

11       A.    Yes.

12       Q.    And the subject in the box where it says

13   legal department?

14       A.    Yes.

15       Q.    If you scroll down towards the middle of

16   the page, it says legal, underlined, in the

17   middle, do you see that?

18       A.    Yes.

19       Q.    Do you see these notes under there where

20   it says meets, Jordan, Kaz.  Exceeds, Andy, Kath,

21   Kell?

22       A.    Yes.

23       Q.    Are these performance ratings?

24       A.    Yes.

25       Q.    There's a comment there that says

1          P. Saunders - Confidential

2    3.9 percent next to the word Jenn, do you see

3    that?

4        A.   Yes.

5        Q.   What does that mean?

6        A.   That would be the percent increase on

7    the base salary, that's what that means to me.

8        Q.   Next to the word Jenn, it says, exceeds,

9    has grown a lot.  Are those comment about Ms.

10   Fischman?

11       A.   Yes.

12       Q.   Okay.  Do you see next to that where it

13   says, new intern will report to her?

14       A.   Yes -- no, actually it -- I can't see

15   that because on my screen the participants --

16            THE REPORTER:  I will move it.

17       A.   New intern will report to her, yes.

18       Q.   Was there a new intern that was being

19   hired at that time?

20       A.   No, I believe that referred to an intern

21   from Japan.  Japan would send over what they're

22   called interns to work in the legal department.

23       Q.   Was that Mako?

24       A.   I don't recall -- Mako was an intern.  I

25   don't recall who it was at the time.

1          P. Saunders - Confidential

2     Q.   Okay.  Do you see next line where it

3  says, expectation to continue to grow, slash,

4  expand?

5     A.   Yes.

6     Q.   What does that mean?

7     A.   I'm sorry, I didn't hear your question.

8     Q.   What does that mean?

9     A.   My interpretation of that is that it

10  means that was Donna's comment about Jennifer.

11     Q.   So are these notes about your comments

12  with Donna concerning personnel in the legal

13  department?

14     A.   Yes.

15     Q.   Okay.  And there's comment to the right

16  that says, keep pushing to be a GC here or

17  elsewhere, do you see that?

18     A.   Yes.

19     Q.   What does that mean?

20     A.   That -- to me that means from a career

21  goal standpoint -- that was her career or goal to

22  be -- eventually become a GC.

23     Q.   And your understanding is that this is a

24  result of your conversation with Ms. Costa?

25          MS. PRIMAVERA:  Objection.

1          P. Saunders - Confidential

2     Q.   In other words, that comment is based

3  upon -- these notes are based upon your

4  conversation with Ms. Costa, right?

5     A.   Yes.

6     Q.   So when it says, keep pushing to be a GC

7  here or elsewhere, is that comment from Donna?

8  And is it conveyed as Donna's sentiment or is it

9  conveyed as Ms. Fischman's sentiment or something

10  entirely different, can you provide a little

11  context for that?

12     A.   No, I can't.

13     Q.   As of February --

14     A.   I mean, my interpretation of reading

15  that right now is that based upon Jennifer and

16  Donna's conversation, that's Jennifer's career

17  aspiration and Donna's commitment to development

18  of Jennifer toward that career goal.

19     Q.   Okay.  Turning to the next page, right

20  there at the top --

21          MR. BERMAN:  Toni, can you scroll a

22     little higher so we can see the date,

23     please.

24     Q.   So this appears to say 7/14/2014; is

25  that correct?

1                 P. Saunders - Confidential

2        A.    Yes.

3        Q.    Okay.  And you see where it says,

4   Hasebe, top center?

5        A.    Yes.

6        Q.    Was there a gentleman named Harry Hasebe

7   at MCHA during approximately this time?

8        A.    Yes.

9        Q.    Was he a Japanese citizen?

10        A.    I don't know.  He was -- I don't know if

11   he was a Japanese.  I don't know his citizenship.

12        Q.    You used the term previously today

13   expatriate right?

14        A.    Right.  He's not an expatriate.

15        Q.    He's not, okay.  Do you know whether he

16   was employed by MCHA?

17        A.    Yes, I believe he was employed by MCHA.

18        Q.    Okay.  Who made the decision to employ

19   him at MCHA?

20        A.    I don't have a clear recollection of

21   Harry Hasebe but at times MCHA, as a services

22   company, would -- what's the best way to explain

23   it?  We would have on MCHA payroll individuals

24   who were working not in the businesses of MCHA,

25   meaning the MCHA share businesses but maybe

1                P. Saunders - Confidential

2    smaller what they would call incubator businesses

3    from Japan.  I don't recall Harry Hasebe's exact

4    position but he was an MCHA payrolled individual

5    as I believe.  But, again, not an employee of

6    MCHA like myself, like Donna, like Jennifer and

7    others.

8        Q.    Have you completed your response?

9        A.    Yes.

10       Q.    All right.  Did MCHA during your tenure

11   have on its payroll Japanese expatriates?

12       A.    Yes.

13       Q.    Were any of them from MCHC?

14       A.    Likely, yes.  But the technical business

15   unit they came from Japan, you know, could vary?

16       Q.    Was there a woman at MCHA named Yoko?

17       A.    Are you referring to what appears to be

18   the first name up on this page, Yoko.

19       Q.    Yoko?

20       A.    Yes.

21       Q.    Was she in charge of Japanese expats at

22   MCHA?

23       A.    Yes.

24       Q.    Generally speaking, what were her duties

25   with regard to that?

1          P. Saunders - Confidential

2     A.   Yoko oversaw the Japanese expat program

3 so -- and the administration of the Japanese

4 expat program.

5     Q.   Was it the practice during your tenure

6 at MCHA for Japanese employee of MCHC to come to

7 the United States for some period of time?

8     A.   As expats, yes.

9     Q.   During that time did they provide any

10 services to MCHA?

11     A.   Well, they functioned in roles such as

12 the director of accounting and finance as an

13 expat.

14     Q.   Have you complete your response?

15     A.   As president.

16     Q.   Do you know whether any of the Japanese

17 expatriates on the MCHA payroll during your

18 tenure were also on the payroll of MCHC?

19     A.   At the same time?

20     Q.   Yes.

21     A.   I don't know.

22     Q.   Do you know whether any of them were

23 receiving benefits from MCHC while they were

24 employed at MCHA?

25     A.   I don't know for certain the very

1              P. Saunders - Confidential

2    technical details of the benefits.

3        Q.    Okay.

4              MR. BERMAN:  Can we please flip down a

5        couple pages to 2523, Toni.

6        Q.    Do you see at the top of this page it

7    says 2/18/2015?

8        A.    Yes.

9        Q.    So you see in the center it say says

10   legal department salary and then there's some

11   kind of symbol or something to the right of

12   salary?

13       A.    Yes.

14       Q.    What does that say?

15       A.    Legal department salary changes.

16       Q.    So is that a triangle?

17       A.    Yes.

18       Q.    So the triangle is the Greek symbol

19   delta?

20       A.    Yes.

21       Q.    And the Greek symbol delta means change?

22       A.    To me it did.  I can't say -- that's

23   what I use for change.

24       Q.    That's what I'm asking.  That was your

25   symbol for change?

1                    P. Saunders - Confidential

2         A.    Yes.

3         Q.    So underneath there it says DC, JF, JE;

4    are those initials?

5         A.    Yes.

6         Q.    Is that Donna Costa, Jennifer Fischman

7    Jordan Elbaum?

8         A.    Yes.

9         Q.    And to the right of that there are

10   annotations; does that indicate changes to pay?

11        A.    Yes.

12        Q.    So am I interpreting this correctly that

13   this indicates an increase in Donna Costa's total

14   compensation by $50,000?

15        A.    Yes.

16        Q.    And to the right of that it says, base

17   sal; is that her basal 462,000?

18        A.    Yes.

19        Q.    Plus a 77,000 bonus?

20        A.    Yes.

21        Q.    For a total of $539,000?

22        A.    Yes.

23        Q.    And the annotation below that for

24   Jennifer Fischman reflects a rate of pay of

25   $300,000 per year?

1                    P. Saunders - Confidential

2         A.   Yes.

3         Q.   Okay.  And if you scroll down below that

4    where it says, bonus; and it says, counsel,

5    15 percent; assistant GC, 17 percent.  Is that

6    assistant general counsel?

7         A.   Yes.

8         Q.   And below that it says, GC; is that

9    25 percent?

10        A.   Yes.

11        Q.   So as of this -- as of about this time

12   in February of 2015, do these numbers look right

13   to you?

14        A.   Yes.

15        Q.   Now, those bonus numbers, are those

16   targets or are those fixed; how did it work?

17        A.   Those were fixed and depending upon

18   performance we would award potentially more in

19   bonus.

20        Q.   Okay.  So these were -- I don't know for

21   lack -- were these guidelines?

22        A.   No, these were pretty much the -- for

23   the positions, the positions had, you know, a

24   fixed bonus amount -- again, not a guaranteed

25   bonus amount but a fixed.  And depending upon

1              P. Saunders - Confidential

2    performance, we would potentially pay higher than

3    that amount, depending upon the individual

4    performance.

5         Q.    Okay.  So, for example, where it says

6    down below that, counsel 15 percent; was

7    Mr. Elbaum a counsel at that time?

8         A.    Yes.

9         Q.    So he could have made $175,000 base plus

10   potentially a 15 percent bonus?

11        A.    Yes.

12        Q.    And MCHA can exercise its discretion

13   potentially to give him additional; is that

14   correct?

15        A.    Based on performance, yes.

16        Q.    And same with respect to Ms. Fischman,

17   it say there $3000,000 base; is that right?

18        A.    Yes.

19        Q.    So this is in contemplation of her

20   promotion, which was to take effect in April; is

21   that right?

22        A.    Yes.

23        Q.    Because as of this date she wasn't

24   actually assistant general counsel, right?

25        A.    As of --

1           P. Saunders - Confidential

2      Q.   Excuse me, I misspoke.

3      A.   Yes.

4      Q.   As of this date in February she was not

5 yet promoted to the acting general counsel

6 position, correct?

7      A.   Correct.

8      Q.   Are these numbers forward looking

9 numbers?

10     A.   Yes.  Meaning at the current assistant

11 general counsel, it would be 17 percent but at

12 the acting GC level 25 percent.

13     Q.   Okay.  So does this document reflect Ms.

14 Fischman's anticipated rate of pay would be

15 $300,000 plus a percentage?

16     A.   Plus a 25 percent bonus, yes.

17     Q.   Had she completed a full year in the

18 position the company expected to pay her $300,000

19 base plus a $25,000 bonus; did I get that right?

20     A.   Plus 25 percent of 300,000 if --

21 whatever that number is.

22     Q.   75,000.

23     A.   Thank you.

24     Q.   Okay.  And then below that where it

25 says, DC Supp, seven percent, no delta.  Was what

1          P. Saunders - Confidential

2  does that mean?

3      A.   Donna contractually had a

4  supplemental -- it was -- oh, actually -- I'm

5  sorry, give me a minute to think, it's been a few

6  years.

7          Donna had a supplemental contribution

8  that was made annually to a nonqualified deferred

9  compensation top hat plan and it was at seven

10 percent of her salary and there was no change to

11 that contribution amount based on her promotion

12 to president.

13     Q.   Okay.  That benefit that you just

14 described, was that tied to her position as

15 president?

16     A.   No, that was tied to her position as

17 executive vice president and general counsel.

18     Q.   So, Ms. Costa was both --

19         MR. BERMAN:  Withdrawn.

20     Q.   Ms. Costa filled the general counsel

21 role and in addition to that she had executive

22 vice president duties, is that correct?

23     A.   And chief compliance officer.

24     Q.   Okay.  When it reflects Ms. Costa's

25 compensation on the top line of this page, is

1                    P. Saunders - Confidential

2    that with respect go her position as president or

3    something different?

4        A.   Her position as president.

5        Q.   Okay.  So that's her role going forward

6    what compensation she would expect to receive for

7    the year, is that right?

8        A.   Yes.

9        Q.   All right.  Turning to the next page of

10   the document, 2524.  This document has a

11   different date at top, it says, 12/10/2014.

12       Do you recall earlier today telling me about

13   the pros and cons of Ms. Fischman that were under

14   consideration prior to her being promoted?

15       A.   Yes.

16       Q.   Okay.  Does this document reflect that

17   same series of conversations?

18            THE WITNESS:  Can you scroll up, please.

19            MR. BERMAN:  This is the top, we can

20       scroll down a little bit.

21            THE WITNESS:  Scroll down.

22       So your question was, does this reflect

23       the, you know, pros and cons that we talked

24       about earlier?

25            MR. BERMAN:  Let me rephrase the

1                    P. Saunders - Confidential

2        question to make it more clear.

3        Q.    Earlier today you told me that you had

4    discussions with Donna Costa concerning the pros

5    and cons of each of the potential candidates for

6    promotion, including Ms. Fischman; do you

7    remember telling me about that?

8        A.    Yes.

9        Q.    So this document is dated December 10th,

10   2014 and it has on the top of it pluses and it

11   says JF on the top, right?

12       A.    Right.

13       Q.    Does this document concern Jennifer

14   Fischman?

15       A.    Yes.

16       Q.    Okay.  So can you tell me what this

17   document is?

18       A.    Again, this would just be notes from one

19   of the conversations that Donna and I had about

20   Jennifer -- pros and cons to her.

21       Q.    Sure.  Do you see at the top where it

22   says pluses?

23            THE WITNESS:  Can you move it back to

24       the -- so I can see the top.

25            MR. BERMAN:  Scroll up, please, Toni.

1                    P. Saunders - Confidential

2        A.    Yes.

3        Q.    Now am I reading this correctly that it

4   says, okay with her knowledge.  She can learn.

5   Smart, can learn?

6        A.    Yes.

7        Q.    Does that accurately describe one of Ms.

8   Fischman's positive attributes?

9              MS. PRIMAVERA:  Objection.

10       A.    That was one of the attributes that

11  Donna described, yes.

12       Q.    So this information is memorializing

13  information from -- this document is

14  memorializing information provided to you by Ms.

15  Costa?

16       A.    In conversation with Ms. -- with, Donna

17  yes.

18       Q.    Item number two, knows our orgs; am I

19  reading that right -- is that organizations?

20       A.    Yes.

21       Q.    I can't make out what's after that, can

22  you?

23       A.    Idiosyncrasies.

24       Q.    Culture, our business and our people; is

25  that what it says?

1                    P. Saunders - Confidential

2        A.    Yes.

3        Q.    And number three says, has changed,

4    learned and grown; is that correct?

5        A.    Yes.

6        Q.    And then do you see little lower it

7    says, cons to the numbers above?

8        A.    Uh-huh.

9        Q.    There's like some markings right above

10   that, is that -- is that any written words or is

11   that like impressions from something else?  I'm

12   not missing any --

13       A.    No, I don't think you're missing any.

14       Q.    Where it says, cons to numbers above,

15   number one, it looks like it says, something feel

16   need to limit -- can you make that out and tell

17   me what it say.  She'll feel need to --

18       A.    Still feel need to limit amount of her

19   work because she can only deal with a limited

20   amount at one time.

21             She will not be EVP so will not have

22   those responsibilities.  Things tend to fall

23   through cracks.

24       Q.    Okay.  What does it say below that?

25       A.    She is selective in what she cares

1                    P. Saunders - Confidential

2    about.  Wants to deal only with high profile

3    stuff.  Doesn't like shit work.  She has

4    capability to change this.

5         Q.   And then below that, what does it say?

6         A.   Has preconceived judgements - has to

7    learn to manage this emotional reaction.  RX is

8    reaction -- short for reaction.  She complains to

9    peers in department.  Can't do that when you are

10   the boss.  Will need to learn to manage her

11   frustrations.

12        Q.   So are all of these comments -- are

13   these -- is the source of all this commentary

14   from Donna or are any of these your independent

15   thoughts?

16        A.   This would be from Donna.

17        Q.   Can you tell me why you were discussing

18   this on December 10th of 2014 after it was

19   already decided to promote Ms. Fischman?

20        A.   I'm not certain of the date the final

21   decision came to promote Jennifer.

22        Q.   Well, Ms. Fischman was notified of the

23   decision prior to this date, right?

24        A.   It was -- it was in December.

25        Q.   Would it help to look at another exhibit

1          P. Saunders - Confidential

2     to clarify that timing?  I can pull another

3     exhibit up for you.

4          A.   The date on this is the 14th --

5     December 14th.

6          MR. BERMAN:  Let's set this aside but

7     we'll come back to it, Toni.

8          For the moment can we just pull up

9     Plaintiff's Exhibit 30.

10          MS. GUERON:  I'm sorry, Matthew, did you

11     put an exhibit number on these notes?

12          MR. BERMAN:  Why don't we do it now.

13          The notes we were just looking at, we'll

14     have them marked -- I'm just checking to see

15     what the highest exhibit number we have so

16     far is.

17          I believe this will be Plaintiff's

18     Exhibit 63.

19          (Plaintiff's Exhibit 63, marked for

20     identification.)

21          Q.   Ms. Saunders, I'm showing you an exhibit

22     that's been previously marked as Plaintiff's

23     Exhibit 30.  Does this refresh your recollection

24     as to when Ms. Fischman was informed of her

25     promotion?

1                   P. Saunders - Confidential

2        A.    Yes.

3        Q.    So this document is dated December 11th

4    and this is an e-mail from Donna to you saying

5    she got okay the okay speak to Jennifer, right?

6        A.    Yes.

7        Q.    Do you know who provided Donna with that

8    okay -- Ms. Costa?

9        A.    I do not.

10        Q.    Okay.  The notes we were just looking at

11    were from December 10th, the day before this

12    e-mail, right?

13        A.    (No verbal response.)

14            MR. BERMAN:  If this -- we have to go to

15        page 2524.

16        Q.    If this conversation is being noted as

17    occurring on December 10th of 2014, can you infer

18    for me or are you able to tell me when the

19    decision was made to promote Jennifer?

20        A.    When the decision was made, no.  I mean,

21    obviously, the final, you know, would have been

22    according to that e-mail the next day.  So, no,

23    I -- again, I don't know when the final decision

24    was.

25        Q.    Okay.  As of this time it was your

1                    P. Saunders - Confidential

2    understanding that Donna Costa's intention was to

3    see Jennifer Fischman moving forward on her

4    career goal path towards a potential GC position

5    in the future?

6            MS. PRIMAVERA:  Objection.

7        Q.   Did I get that right?

8            MS. GUERON:  Objection.

9        Q.   You want to look at it again?  So we

10   have the pros and cons, right?

11       A.   Right.

12       Q.   And we have in here that the plus were

13   that she was okay with her knowledge, she's

14   learning and growing, she knows the organization,

15   its idiosyncrasies and its culture and, again,

16   she's changed, learned and grown.

17           And under the cons it says, she feels the

18   need to limit the amount of her work; she won't

19   be EDP so she will not have those

20   responsibilities.

21           One of the cons that's listed is things tend

22   to fall through the crack, that's Donna's comment

23   to you, right?

24       A.   Uh-huh.

25       Q.   She's selective about what kind of work

1                    P. Saunders - Confidential

2     she wants to do; and she has preconceived

3     judgments and has to learn how to manage them.

4     She has emotional reactions; she complaints to

5     peers, you can't do that when you're the boss.

6     Will need to learn to manage her frustrations,

7     right?

8          A.    Uh-huh.

9          Q.    If we scroll down a few more pages to

10    page 2526, do you see the top portion of the page

11    here, this is dated August 7, 2015, right?

12         A.    Yes.

13         Q.    And where it says DC re:  JF --

14         A.    Uh-huh.

15         Q.    -- does this reflect a conversation you

16    had with Donna Costa about Ms. Fischman?

17         A.    Yes.

18         Q.    So can you describe for me in the big

19    picture what's happening to your understanding

20    between Ms. Fischman and Ms. Costa on or about

21    August 7, 2015?

22         A.    This reflects a level of frustration

23    that Donna had reached in working with Jennifer

24    in the role as president and Jennifer as acting

25    general counsel.

1              P. Saunders - Confidential

2              THE WITNESS:  Can it be made it bigger

3      so I can actually see some of the content?

4      Q.   We can go through it, if it will help.

5   Do you want to do that?

6      A.   Yes, please.

7      Q.   So this document has number of comments

8   on it, right?  I'll read what I think it says and

9   tell me if I get any of it wrong because I'm

10  reading your handwriting -- or do want to read it

11  and tell us what it says -- maybe that's better.

12     A.   Incapable of not reacting, she baits me,

13  she broke me, I'm admitting failure.

14             MR. BERMAN:  Slow down a little so Toni

15      can keep up.

16     A.   Incapable of not reacting, she baits me,

17  she broke me.  I'm admitting failure.  I'm

18  getting more passive/aggressive.  I've failed.

19  Not capable of interacting with her without

20  reacting.  Am I a good enough manager to get her

21  to a place where I'm comfortable getting her

22  to --

23     Q.   Manager level?

24             THE WITNESS:  I'm sorry, can you make it

25      slightly bigger?

P. Saunders - Confidential

1

2      A.    Getting to a manager level, yes.

3    Figuring out how to talk to her, using energy to

4    do it.  I tried, I can't do it anymore.  I was a

5    child.  I couldn't react appropriately.  She

6    baits me.  It's just Jennifer, it's who she is.

7    I want to talk to you, take 30 to 40 minutes to

8    think about everything happening.  Did someone

9    complain?  Did Kelli?  What are you seeing me not

10   do that suggests I'm not capable?  I have many

11   balls in the air, what.  Expat training example,

12   time consuming.  Well, I'm not responsible for

13   it.  How important she was there.  Is something

14   wrong, have I screwed up.  No, you're working

15   hard but I don't want something falling through

16   the cracks.

17       Q.    We're going to the next page.  Can we

18   pause here for a moment?

19       A.    Yes.

20       Q.    On this page there are a couple of spots

21   in the left margin where you got initials there.

22           MR. BERMAN:  If Toni scrolls down a

23       little more I think you'll see those.  Toni,

24       can you scroll down just a little bit.

25       Q.    Do you see those notes on the side, JF,

1          P. Saunders - Confidential

2     DC; JF, DC?

3          A.    Yes.

4          Q.    Is this document memorializing a

5     conversation between you and Donna, where you're

6     using initials to indicate what Donna is saying

7     she, Donna, told you and what Donna is saying

8     what Jennifer told Donna?  How does this work?

9     Can you explain what these initials are?

10         A.    Yes, the initials I would have --

11    probably reading back through later for my own

12    understanding.  The initials mean this is what

13    Jennifer said and then this is what Donna said.

14         Q.    Okay.  Am I interpreting this correctly

15    to begin with a discussion between you and Donna

16    where she's questioning whether she's -- whether

17    she's failed as a manager and getting

18    passive/aggressive and relating that to

19    Jennifer's performance.  And then at some point

20    the conversation transitions to Donna relaying to

21    you the substance of a conversation that Donna

22    Costa had with Jennifer Fischman?  Did I get a

23    that right?

24         A.    Yes.

25         Q.    It's sort of like a conversation within

1                P. Saunders - Confidential

2    a conversation?

3        A.   Yes.

4        Q.   In this conversation within a

5    conversation, Donna, I'm interpreting this, so

6    tell me where I'm getting this incorrect, if I

7    am.

8        I'm just trying to understand your notes.  Is

9    this basically saying that Donna is relaying a

10   conversation where she, Ms. Costa, went to Ms.

11   Fischman, I want to talk to you.  Fischman

12   responds, did someone complainant about me, why

13   are we talking?  She's asking whether Kelli

14   complained about her.  Are you -- what are you

15   seeing about me that suggests I'm not capable,

16   Fischman is asking Costa.  Did I get that part

17   right so far?

18       A.   Yes.

19       Q.   Okay.  And then Costa is relating her

20   response to Fischman an example concerning the

21   expatriate training, right?

22       A.   Uh-huh.

23       Q.   What does it say after expatriate's

24   training example on that line?

25       A.   Time -- I think time consuming.  I

1                P. Saunders - Confidential

2     think.

3          Q.    Okay.  So is Costa critiquing Fischman

4     for spending too much time on patriate train --

5     or expatriate training?  Do you know what the

6     substance of the critique was there?

7          A.    I'm rereading it.  Just give me a

8     second.

9          Q.    Sure.

10         A.    And your question again?

11         Q.    So did Ms. Costa relate to you that she

12    provided a critique of Ms. Fischman's performance

13    with respect to expatriate training?

14         A.    I really -- other than what's written

15    here on the page, I'm not really -- I'm not

16    certain what she's saying here.

17         Q.    At the time that this notation was made,

18    did you know what she was talking about at the

19    time?

20              MS. GUERON:  Objection.

21         A.    I don't know.

22         Q.    Okay.  Did Donna relate to you that she

23    told Ms. Fischman you're working hard but I don't

24    want something to fall through the cracks?

25         A.    (No verbal response.)

1               P. Saunders - Confidential

2      Q.   I'm looking at very bottom of the page

3   here?

4           THE WITNESS:  Please scroll up a little.

5      You're working hard but I don't -- I see it

6      never mind.

7      A.   That's my note as to what Donna was

8   saying to me at the time.

9      Q.   And then if you go to the next page of

10  this notebook, 2527, is this part of the same

11  conversation between you and Ms. Costa?

12     A.   Yes.

13     Q.   Okay.  So she's continuing to relate to

14  you the substance of her communication with Ms.

15  Fischman, right?

16     A.   Yes.

17     Q.   Is Donna relating to you that there was

18  some understanding on Ms. Fischman's part that

19  Ms. Costa wanted responsibility for a transaction

20  in Brazil?

21          THE WITNESS:  Can you scroll down or

22     scroll down.

23          Again, your question about Brazil.  You

24     asked me --

25          MR. BERMAN:  Can you please read it

1          P. Saunders - Confidential

2      back, Toni.

3          (Whereupon, the last question was read

4      back.)

5      A.    Again, other than what my notes say on

6      the page, I don't -- I don't have any clearer

7      interpretation today.

8      Q.    Okay.  Let's flip to the next page,

9      2528.  Start at the top of the page.  This is

10     still August 7, 2015 and the document appears to

11     say, she comes in my office, how about this how

12     bout this, how bout I don't work on Brazil.  Am I

13     reading it correctly?

14     A.    Yes.

15     Q.    And then it says DC, which is Ms. Costa,

16     are you saying this because you recognize you're

17     too busy or because we're stepping on each

18     other's toes and it's inefficient.  Did I read

19     that right?

20     A.    Yes.

21     Q.    Then it says JF, Ms. Fischman's

22     response, was it's inefficient.  Did I get that

23     right?

24     A.    Yes.

25     Q.    Then it says below that, she left me

1          P. Saunders - Confidential

2    thinking this is not a sustainable situation.

3    Our relationship sucks.  I can't do it.  Am I

4    reading that correctly?

5        A.   Yes.

6        Q.   And that's Ms. Costa explaining to you

7    how she felt after speaking with Ms. Fischman,

8    right?

9             MS. PRIMAVERA:  Objection.

10       Q.   You can answer.  Am I reading this

11   correctly?

12       A.   Yes.

13       Q.   Okay.  So then below that, you see where

14   it says steps?

15       A.   Uh-huh.

16       Q.   What does it say under steps, can you

17   read that to me please.

18       A.   Lay ground work with Japan.  I tried but

19   can't make her GC.  I will give her a six-month

20   review on paper.

21       Q.   What does it state below that?

22       A.   What's not working?

23       Q.   Can you read remainder of that bottom

24   portion of the page.

25       A.   I always told her she was competent

1              P. Saunders - Confidential

2     substantively.  She has improved but has gotten

3     better but people still have reservations.  My

4     reservation is long term.

5          Q.   What does it say below that?

6              THE WITNESS:  Can you scroll down,

7          please.

8          A.   I am considering letting her go sooner

9     than March 31 but definitely March 31.  How will

10    I interact with her.  Should --

11         Q.   Can I pause you here for a second.

12             MR. BERMAN:  I this will make it easier

13         for all of us.  Toni, if you can just leave

14         this over here but then also pull up exhibit

15         I sent you labeled notebook 10.

16             Turn to the fourth page of this

17         document -- let's mark this as Plaintiff's

18         Exhibit 64.

19             (Plaintiff's Exhibit 64, marked for

20         identification.)

21             MS. PRIMAVERA:  Matt, are these

22         Bates-stamped documents or are just photos

23         that you took in the office?

24             MR. BERMAN:  Yes, this is just a photo

25         of the same document that you copied.

1           P. Saunders - Confidential

2           MS. PRIMAVERA:  These are photographs

3      you took?

4           MR. BERMAN:  Yes, an iPhone photo so

5      it's a little more crisp of a copy than what

6      was produced.

7           Ms. Saunders, you're welcome to compare

8      this to the other document.  I thought this

9      might assist you in telling us what it says.

10          MS. COLWIN:  Matthew, I need a

11     representation from you --

12          MS. PRIMAVERA:  Mercedes, we can't hear

13     you.  I think you might have lost service.

14          MR. BERMAN:  I'll try to anticipate what

15     her request is.  I'll represent that this is

16     a true and correct photograph taken of the

17     same page of notebook 10 that we've just

18     been reviewing.

19          (Whereupon, Ms. Colwin dropped off and

20     re-entered.)

21          MS. COLWIN:  Matthew, I need a

22     specific -- number one, I need confirmation

23     on the record that there are no other

24     photographs that exist of documents that

25     were provided to you and to Ms. Fischman for

1          P. Saunders - Confidential

2     discovery inspection other than ones that

3     were photographed -- photocopies and

4     Bates-stamped and provided to you.

5          I have to tell you -- and I said this --

6     obviously, you didn't hear any of this but

7     this is shocking behavior.  I've been

8     practicing a long time and I have never seen

9     opposing counsel take photographs of

10    documents and provide them at the

11    deposition, that is not what's done.  I'm

12    presuming it wasn't used who took the

13    photographs.

14         It is completely inappropriate to

15    conduct a discovery and inspection in this

16    way -- completely inappropriate.

17         MR. BERMAN:  Have you --

18         MS. COLWIN:  I'm not -- I'm not

19    finished.  I need a representation to you

20    that there are no other photographs that

21    exist of documents provided to you and Ms.

22    Fischman for that discovery inspection other

23    than what's already been provided and a

24    photocopy and Bates-stamped.

25         MR. BERMAN:  Are you done now?

1          P. Saunders - Confidential

2          MS. COLWIN:  Yes.

3          MR. BERMAN:  Okay.  Let's take a few

4     minutes off the record.

5          (Whereupon, a brief recess was taken.)

6          MR. BERMAN:  Is everyone here?

7          MS. PRIMAVERA:  Yes.

8          MR. BERMAN:  I'm a going to keep posing

9     questions to the witness.

10    Q.   Ms. Saunders, can you tell me what

11    remainder of the bottom portion of the document

12    says?

13         MS. COLWIN:  Matt, I want a

14         representation on the record about what I

15         just stated.  Are you not going to make a

16         representation?  Tell me now.

17         MR. BERMAN:  Your request --

18         MS. COLWIN:  No -- excuse me, I'm not

19         done.  I want a representation right now --

20         and if you're not willing to give a

21         representation, I need to -- we need to call

22         the judge.  I will review the rules and we

23         need to call the judge.  I want a

24         representation right now.

25         MR. BERMAN:  I'm not making any

1                    P. Saunders - Confidential

2        representation on the record.

3            MS. COLWIN:  Fine.  We're going to take

4        a break.  I'll review the rules that govern

5        the procedure and see if Judge Furman will

6        take our call.

7            MR. BERMAN:  That's fine.

8            MS. COLWIN:  Brittany, please call me.

9            MS. PRIMAVERA:  Sure.

10           (Whereupon, a brief recess was taken.)

11           MS. PRIMAVERA:  Matt, instead of, you

12       know, involving the Court and you know

13       filing a follow-up motion to address the

14       issue, can we just call for the production

15       of any and all photographs that were taken

16       in our offices on the date of the D&I in

17       addition to this one -- to extent there are

18       additional photographs taken from that day?

19           MR. BERMAN:  Are we on the record or are

20       we off the record?

21           THE REPORTER:  We are on the record.

22           MR. BERMAN:  Your request is noted.

23           Let's go off the record for a moment.

24           MS. PRIMAVERA:  Okay.

25           (Whereupon, a brief off-the-record

1               P. Saunders - Confidential

2      discussion was held.)

3           MS. PRIMAVERA:  So off-the-record myself

4      and Mr. Berman stipulated that he and his

5      client would turn over any documents,

6      including the photographs that relate to the

7      D&I that took place here, including the

8      document that was used today, which is not

9      yet Bates-stamped.

10          Is that accurate, Mr. Berman?

11          MR. BERMAN:  Yes.

12          MS. PRIMAVERA:  Mercedes or Nicole, do

13     you want to add anything before I move on?

14          MS. COLWIN:  That's fine.  Thank you.

15          MS. GUERON:  That's fine.

16          MS. PRIMAVERA:  Thank you.

17          MR. BERMAN:  Toni, can you please read

18     back my last question.

19          (Whereupon, the last question was read

20     back.)

21     A.   I am considering letting her go sooner

22     than March 31st but definitely March 31st.  How

23     will I interact with her when she comes.  Should

24     we document.  Yes.  Do you think it's dangerous

25     to be writing down what others say.  No.

1                    P. Saunders - Confidential

2        Q.   Okay.  Did you have a concern about how

3   to act with Ms. Fischman after your discussion

4   with Ms. Costa on August 7th of 2015?

5        A.   Did I have a concern, was that your

6   question?  I don't I think understood your

7   question.

8        Q.   Yes.  When you were making this

9   notation, was that your thought, "How will I

10  interact with her," or was that Donna's thought?

11       A.   I believe that was Donna's thought.

12       Q.   Okay.  So did Donna Costa identify a

13  concern with interacting with Ms. Fischman going

14  forward?

15       A.   The note is incomplete there.  How will

16  I -- it says how will I interact with her when

17  she comes -- and I don't know what the rest of

18  the statement was.

19       Q.   Do you see that comment, should we

20  document.  In parenthesis, yes?

21       A.   Yes, I see that.

22       Q.   What does that mean?

23       A.   I don't know what that's specifically

24  referred to.

25       Q.   Okay.  Let me direct your attention to

1                P. Saunders - Confidential

2    the top left corner of this same page.

3              MR. BERMAN:  Toni, please scroll up.

4        Q.    Are there are notes in the marginalia on

5    the left-hand side.  Can you read that to me?

6              MR. BERMAN:  Toni, can you scroll down

7         as she does so she can see what it says.

8        A.    Will my listening to JF knowing what I

9    know about DC's intentions.  I need to have

10   heightened awareness to her complaints and what I

11   say to her.

12             MR. BERMAN:  Can you scroll down a

13        little, please.

14       Q.    What does this note say?

15       A.    We're not documenting for cause, we're

16   documenting -- let me start that over.  We're not

17   documenting for cause - document to have the

18   story.

19       Q.    When it says we're not documenting, does

20   it say termination to the right of that?

21       A.    We're not documenting cuz, C-U-Z,

22   termination, which is crossed out, for cause -

23   document to have the story.

24       Q.    What do these notes mean?

25       A.    (No verbal response.)

1           P. Saunders - Confidential

2     Q.    That's your initials at the top of the

3     marginalia, right?

4     A.    Yes.

5     Q.    What do these notes mean?

6     A.    These notes in the margin?

7     Q.    Yes.

8           THE WITNESS:  Can you go back up.

9           MR. BERMAN:  Can you make it larger.

10    A.    To me, this was -- the way I interpret

11    this is Donna saying, I need to have a heightened

12    awareness to Jennifer's complaints and what I

13    what I say to her and we're documenting to have

14    the story.

15    Q.    What are you documenting to have, what

16    story?

17    A.    The ongoing -- the same as has been

18    documented all along, what the interactions are,

19    the exchanges between Donna and Jennifer, the

20    issues that are documented in the notes.

21    Q.    Okay.  Did these notes reflect the

22    intention to terminate Ms. Fischman definitely

23    before March 31 of 2016?

24          MS. PRIMAVERA:  Objection.

25          THE WITNESS:  Can you scroll down so I

1              P. Saunders - Confidential

2      can read that again.

3      A.   I don't --

4      Q.   Do you see where it says there, I'm

5  considering --

6      A.   I'm considering letting her go -- I'm

7  just reading the note to myself.

8           This documents a conversation between

9  Donna and I where she was, as best as I can

10  recall, very frustrated with what was occurring

11  between her and Jennifer and this documents what

12  she said to me on the phone.

13      Q.   Okay.  And that included her expression

14  to you of her intention to let Jennifer go,

15  correct?

16      A.   That's what the -- the words that are

17  written there.

18      Q.   Okay.  And there's some discussion as to

19  the timing, whether it's sooner than March 31st

20  or by March 31, correct?

21      A.   But she's also saying I'm considering

22  letting her go.

23      Q.   It says I'm considering letting her go

24  sooner than March 31st, right?

25      A.   Yes.

1              P. Saunders - Confidential

2      Q.    Turning to the next page also dated

3 August 7th.  At the top there it says second

4 call.

5              MR. BERMAN:  Toni, can you scroll down a

6        little, please.

7              THE WITNESS:  Toni, you will need to

8        please move it to my left.

9      Q.    Can you please tell me what this says

10 from the top on down to the remainder of the

11 page.

12     A.    I've been lying to her from day one.

13 For three months I gave no feedback because she

14 said she couldn't handle it.  Now in July I give

15 it to her straight.  I cannot work with someone

16 where my entire relationship is based on a lie.

17 I told Japan she wasn't qualified.  I gave her a

18 negative review because was going to hire a GC.

19 Japan said no.  My responsibility to train her.

20 They not worried about legal because I would be

21 there still.  I need to tell her this.  Can I

22 tell her this.  What does it get you.

23              Do you want me to read to the middle or

24 the page or the whole page?

25     Q.    If you can just read down to the

1          P. Saunders - Confidential

2   remainder of the page because you're most of the

3   way there.

4      A.   I've done everything I can.  This is the

5   last thing I have to try.  Removes all barriers.

6   Issues to resolve as move forward term.  Get

7   Japan approval, money.  DC, quote, that's the

8   easy part.  Andy issue - he think he should be

9   GC.  All the reasons I gave him why her over him.

10  Now, why not him?  Pharma Company acquisition -

11  he could be GC.  GC hiring issue.  Confidential

12  search not good.  Gap when she's gone.

13  Disruption to department.  Search.

14     Q.   Thank you.  Do you see on line 17 of the

15  document on the left-hand side, it says PS?

16     A.   Uh-huh.

17     Q.   Is this document reflecting a call you

18  had with Ms. Costa on August 7, 2015?

19     A.   Yes.

20     Q.   It says at the top, 2nd call?

21     A.   Yes.

22     Q.   Is the first portion of the document --

23  the first 16 lines her commentary to you?

24          THE WITNESS:  Please scroll up so I can

25          see those lines.

1                    P. Saunders - Confidential

2        A.    Yes.

3        Q.    Okay.  And on line 17 where it says, PS,

4    what does it get you, is that your reply to her,

5    Donna, what does that get you?

6        A.    Yes.

7        Q.    And lines 18, 19 and 20, is that then

8    Ms. Costa's response to you again?

9             THE WITNESS:  Please scroll down.

10       A.    Yes.

11       Q.    Okay.  Do you have an understanding what

12   she meant by the term, removes all barriers?

13       A.    I think that that meant the barriers to

14   their relationship going forward.

15       Q.    Okay.  So Ms. Fischman was promoted and

16   took office as acting general office and chief

17   compliance officer in April of 2015, right?

18       A.    That was the official start date.  The

19   transition and the work that she and Donna did to

20   transition Jennifer and ensure she was as

21   successful as possible in role began basically

22   January 1st.

23       Q.    Okay.  So from January through April

24   there was a period during which Ms. Fischman was

25   being transitioned or prepared to take on the

1          P. Saunders - Confidential

2    role, right?

3          MS. PRIMAVERA:  Objection.

4     A.    It was a -- yes, a transition period, a

5    transfer of information and grooming, yes.

6     Q.    What do you know about the process of

7    transferring the information?

8     A.    That Donna had meetings with Jennifer

9    and a -- number of meetings and discussions to

10   educate her about the position.  There a number

11   of -- well, that's basically it, a number of

12   meetings and discussions to help transfer the

13   information.

14    Q.    So then she actually took -- she

15   actually commenced the new role in April of 2015,

16   right?

17    A.    Jennifer, yes.

18    Q.    So from April through the time of this

19   notation, was there any feedback given to Ms.

20   Fischman concerning her performance in the new

21   role?

22    A.    There were ongoing -- ongoing

23   conversations, as best as I can recall, January,

24   February, March.  There was concern on Donna's

25   part during that time that Jennifer -- the

1           P. Saunders - Confidential

2     download of information while Jennifer was

3     actively taking notes and things like that, it

4     appeared to be one way; that Jennifer was not

5     coming proactively to Donna with questions and --

6     with questions and concerns or anything along

7     those lines.  Donna, my understanding from my

8     conversations with Donna, would frequently,

9     again, meet with Jennifer.

10          So, Jennifer assumed the position in the

11     beginning of April.  Part of what I was hearing

12     from Jennifer was Donna would want, you know, a

13     lot of dialogue or ask questions of Jennifer and

14     Jennifer was wanting space to do her thing and

15     one of the things I had advised Donna was as

16     she -- as we approached April 1st to give

17     Jennifer space so that she can, you know,

18     establish herself in the role, do her thing and

19     Donna took my advice and backed off, if you will,

20     in trying to dialogue and establish more

21     communication between the two of them.  And so in

22     response to was there feedback being given, I

23     can't say specifically because I was not in all

24     of their conversations and every time they had

25     conversations back and forth I was not

1              P. Saunders - Confidential

2    necessarily made aware.  But there was a

3    conscious effort on Donna's part during time to

4    give Jennifer some space to operate in the role

5    in the way Jennifer was comfortable.

6        Q.    Okay.  Have you completed your response?

7        A.    Yes.

8        Q.    Okay.  With respect to the portion of

9    your response about Donna Costa making a

10   conscious effort to give Jennifer space, what's

11   the basis for that statement?

12       A.    (No verbal response.)

13       Q.    What's that based on?  How do you know

14   that?

15       A.    Well, I knew that from my daily -- not

16   daily interactions but my frequent interactions

17   working with Donna.

18       Q.    Okay.

19       A.    And excuse me -- not to interrupt but I

20   think that speaks to somewhere in the note where

21   it says -- it references that I not had spoken

22   with her in a while.  Anyway -- I thought there

23   was a notation that sort of -- without me going

24   back through and reading, I think some of this

25   notation is -- indicates that kind of time period

1              P. Saunders - Confidential

2     where Donna was consciously backing off and

3     allowing Jennifer some space.

4          Q.    Well lines three through five or two

5     through 5 of this note says I've been lying to

6     her from day one.  For three months I gave no

7     feedback because she said she couldn't handle it.

8     Now in July I give it to her straight, right,

9     that's what the note says?

10         A.    Right.

11         Q.    So you wrote cone down what she told

12    you, right?

13         A.    Yes.

14         Q.    So she told you this comment, for three

15    months I gave her no feedback because she said

16    she couldn't handle it.  Now in July I give it to

17    her straight, right?

18         A.    Uh-huh.

19         Q.    Does that mean from April through July

20    Ms. Fischman had no feedback from her supervisor?

21              MS. PRIMAVERA:  Objection.

22         Q.    How did you understand this?

23         A.    The word -- the note says for three

24    months I gave no feedback because she said she

25    couldn't handle it.  "She" being Jennifer.  That

1                    P. Saunders - Confidential

2     in combination with my advice to her to give

3     Jennifer space.  I believe there were -- no, that

4     in addition to my advice to give her space and

5     Jennifer's request not to have feedback.

6          Q.    I think you didn't answer exactly what I

7     asked you.

8               MR. BERMAN:  Toni, can you please read

9          back the question.

10         A.    For three months --

11              MR. BERMAN:  I asked the court reporter

12         to read back the question.

13              (Whereupon, the requested portion of

14         testimony was read back.)

15         A.    My response to that is generally, yes,

16    because Jennifer specifically asked for no need

17    back.

18         Q.    Okay.  So up until July Ms. Fischman had

19    no candid feedback from her supervisor on her

20    performance in the role, right?

21              MS. PRIMAVERA:  Objection.

22         A.    Up until July from what time period?  I

23    would say she had feedback.  She definitely had

24    conversations with Donna.  There was, you know,

25    feedback and discussions that were occurring.

1          P. Saunders - Confidential

2     There was a period of time starting with April,

3     May, June where there was a conscious effort and

4     at Jennifer's request to just try -- just move

5     forward, give everybody their space is how I

6     would describe it.

7          Q.   So up through July this is what's

8     happening and then August 7th the decision is

9     made to the terminate her, right?

10         Let's look at the next page, August 7th also,

11    right?  The note here at the top says, JF re: KT

12    absences.

13         A.   Yes.

14         Q.   Is this the issue of Ms. Fischman and

15    Mr. Troccoli's conflict sort of comes to a head

16    over the fact that for various -- a mix of

17    reasons Ms. Troccoli is out of the office?

18         A.   I would say that this is not the point

19    at which it came to a head.  I would say this is

20    the point at which it started to really bubble

21    up.

22         Q.   Okay.  Ms. Troccoli and Ms. Fischman had

23    had a tenuous relationship for years up to this

24    point, correct?

25         A.   That's generally accurate, yes.

1          P. Saunders - Confidential

2     Q.    There was some incident where a notary

3  came to visit the office and Jennifer complained

4  about how many Troccoli handled it, right?

5     A.    Yes.

6     Q.    And there were other points of tension

7  between Ms. Fischman and Ms. Troccoli from this

8  point onward, right?

9     A.    What do you mean by points of tension?

10  Can you --

11     Q.    Well --

12     A.    -- be more specific?

13     Q.    Ms. Troccoli filed a formal complaint

14  against Ms. Fischman, correct?

15     A.    Correct.

16     Q.    And Ms. Fischman filed a formal

17  complaint against Ms. Troccoli, correct?

18          MS. PRIMAVERA:   Objection.

19     A.    The formal complaint filed against Ms.

20  Troccoli was actually later in the year.

21     Q.    But each of them filed a complaint

22  against the other, right?

23     A.    Yes.

24     Q.    And Ms. Fischman complained to you that

25  she felt Ms. Troccoli was undermining her

1                    P. Saunders - Confidential

2    authority, right?

3                    MS. PRIMAVERA:  Objection.

4        A.    Is that -- is there a note that says

5    undermining my authority?

6        Q.    I'm generalizing but you can respond

7    however you wish.

8        A.    I -- other than -- I'm not sure

9    undermining my authority would characterize it, I

10    have no further response.

11        Q.    Let's be more specific.  On note -- on

12    this note line 23, Ms. Fischman is indicating to

13    you, correct me if I'm misinterpreting this, Ms.

14    Troccoli is not there to help Ms. Fischman do her

15    job right and below that is the comment, I need

16    to start documenting, right?

17        A.    Yes.

18        Q.    Do you have an understanding of what

19    this term means, documenting?

20                    THE WITNESS:  Can you scroll down so I

21        can see the rest of the note.  I don't know

22        the reference to documenting in this

23        context.

24        A.    I need to start documenting -- I don't

25    recall or I don't know in this, I need to start

1          P. Saunders - Confidential

2    documenting, what the documenting refers to.

3       Q.   Okay.  Well, was Ms. Troccoli

4    responsible for providing administrative support

5    to Ms. Fischman?

6       A.   Ms. Troccoli's role -- Kelli's role was

7    role was not as an administrative assistant.  She

8    did certain administrative matters for the legal

9    department.

10      Q.   Did Ms. Fischman complain to you that

11   she felt Ms. Troccoli was bullying her?

12      A.   Jennifer expressed to me in comments and

13   in the notes that, yes, she felt that was

14   bullying or she felt she was being bullied.

15      Q.   And did Ms. Fischman complain that Ms.

16   Troccoli wasn't supporting her?

17      A.   Yes, she complained to me that she felt

18   she wasn't getting support from Kelli.

19      Q.   Okay.  All right if you flip forward to

20   page 2532, this is note dated August 11th.  At

21   top it says, DC re: JF.  Do you see that?

22      A.   Yes.

23      Q.   All right.  So does this reflect a

24   conversation you had on or about August 11th of

25   2015 with Ms. Costa about Ms. Fischman?

                    P. Saunders - Confidential

1

2       A.   Yes.

3       Q.   Can you interpret this note for me -- I

4  can't read the top.  What does that say from line

5  1 through 3?

6       A.   Unfortunately, I'm not sure about the

7  first line myself.  How much I am pre to be -- I

8  don't know what the next word is --

9  because doesn't get along with -- I think DC --

10  the yellow thing is blocking -- and then hyphen,

11  not good, GC.

12      Q.   Do you know what that note means?

13      A.   I don't.

14      Q.   If you continue looking down on this

15  page it continues on and it has a notation, DC,

16  if I step back in way I think I need to -- and

17  there's an arrow to right -- if I do, what I'm

18  giving up on is -- what does it say after that?

19      A.   What I'm giving up on is having a GC who

20  I trust -- trust to seek advice from me or

21  others.  I am --

22      Q.   By definition --

23      A.   By def -- definition accepting less than

24  what --

25      Q.   I expect --

1                    P. Saunders - Confidential

2         A.    -- I am by definition accepting less

3    than what expect.

4         Q.    What does it say in the next few lines

5    below that, numbers 13 through 17?

6         A.    Why do I expect her to be me.  I have

7    super high expectations.  Lower my expectation

8    for quality of work, role of GC, accept a lesser

9    definition of GC.

10        Q.    What does that mean?

11              MS. PRIMAVERA:  Objection.

12        A.    This is Donna struggling with her own

13   thoughts -- struggling with herself to

14   objectively evaluate whether Jennifer's

15   performance -- she can accept a level of

16   performance versus what Donna feels her level of

17   expectations of performance of the GC should be

18   and questioning -- she acknowledges she has high

19   expectations but questioning can that be okay,

20   can I -- can I accept that and can I work -- can

21   I accept that.  And so she's really soul

22   searching her -- to see if she can accept what

23   she feel is not a level of expectation or has

24   been receiving a level that she would expect from

25   Jennifer.

1              P. Saunders - Confidential

2      Q.   Do you see that note on line 13 that

3  says, why do I expect her to be me.  What does

4  that mean?

5           MS. PRIMAVERA:  Objection.

6      A.   I don't know that I can interpret that.

7      Q.   Okay.  Is Ms. Costa holding Ms. Fischman

8  to the standard of Ms. Costa's own performance at

9  the point of time when she already been the

10  incumbent of the role for many years?

11          MS. PRIMAVERA:  Objection.

12          MS. GUERON:  Objection.

13     Q.   You can answer.

14     A.   I don't agree that this -- I don't

15  agree -- I don't think there's -- I don't think

16  you can draw that direct conclusion, no.

17     Q.   Can you see the marginalia on the

18  left-hand side, is that visitable to you?

19     A.   Not all of it.

20          MR. BERMAN:  Toni, can you scroll over

21          so she can see the marginalia on the left,

22          please.

23     Q.   Do you see that one on the bottom that

24  says DC next to it?

25     A.   Uh-huh.

1                    P. Saunders - Confidential

2        Q.    What does is that say?

3        A.    If I back off will things get better.

4    Will she ever learn to come to me with questions.

5    Hasn't asked me anything in four months never.

6    Knows it all, not willing to listen.

7        Q.    And then under line 18 --

8        MR. BERMAN:  On the right again, if you

9        scroll down a little please.

10        Q.    So line 18 that says, pro gen example,

11    is that project Genesis?

12        A.    I believe so, yes.

13        Q.    What does it say below that?

14        A.    New project --

15        THE WITNESS:  Can you please shift it to

16        my left a little bit.

17        A.    New project - go into her office - ask

18    if she'd like to have financial advisement -- ask

19    if she'd like to have financial advisement.

20    Leaves for vacation without talking to me.  She

21    was willing to talk while away but schedules

22    didn't work.  I met with Jordan.  She came up

23    with her list of firms.  Didn't meet the

24    criteria.  In process of asking questions.  She

25    digs in.  She's arguing in support of firms she

1                    P. Saunders - Confidential

2    doesn't know.

3        Q.    Next page.  This is --

4            MR. BERMAN:  Can you scroll up a little

5        bit, please.

6        Q.    This is August 17th and the notation

7    says JF re: KT.  This is a conversation where

8    Jennifer is speaking with you about Ms. Troccoli,

9    right?

10       A.    Yes.

11       Q.    So there's an issue with some e-mails

12   that were exchanged.  Did Ms. Fischman complain

13   to you from looking at line four that she was

14   upset that Ms. Troccoli's response was hostile

15   and disrespectful?

16       A.    Yes.

17       Q.    So this is a continuing strife between

18   Ms. Troccoli and Ms. Fischman, right?

19       A.    Yes.

20       Q.    Towards the bottom on line 26, it

21   says -- so line 22, did Ms. Fischman relate to

22   you she hadn't spoken to Kelli about the e-mails?

23       A.    Yes.

24       Q.    So was she coming to you for advice on

25   how to handle it?

1          P. Saunders - Confidential

2      A.   I don't know that she was coming to me

3   for advice on how to handle it.  I -- the

4   conversation led to that.

5      Q.   So on line 26 it says, separate issue,

6   medical condition.  Is there a need for

7   accommodation, right?

8      A.   Yes.

9      Q.   There was a medical mention to Ms.

10  Troccoli's absences, right?

11     A.   Yes, there was.

12     Q.   So there was a discussion between you

13  and Ms. Fischman about keeping the medical issue

14  separate, correct?

15     A.   There were a number of discussions and

16  the matter of -- the matter of Kelli's absences

17  from the office were a source of frustration for

18  Jennifer.  And in that mix was the fact that

19  many -- not all, but many of Kelli's absences

20  from the office were due to medical reasons.  And

21  so as Jennifer expressed frustration with Kelli,

22  at the same time we a have difficult situation

23  with Kelli being absent for medical reasons and

24  managing that aspect or me helping Jennifer

25  appropriately manage that aspect of -- in her

1                  P. Saunders - Confidential

2     interactions with Kelli so that we wouldn't run

3     into issues of ADA discrimination or things of

4     that nature.

5          Q.   And Ms. Fischman was well informed about

6     the nature of the disability discrimination

7     claims, right?

8               MS. PRIMAVERA:  Objection.

9          A.   I can't say she was well informed.

10         Q.   Well, she had an outside attorney,

11    Steven Moss, who was advising her on it, didn't

12    she?

13              MS. PRIMAVERA:  Objection.

14              MS. GUERON:  Objection.

15         A.   There was a communication that he

16    provided to her regarding disability leave and

17    accommodation.

18         Q.   Okay.  At the time of -- well, at the

19    time of Ms. Costa's promotion from general

20    counsel to president, as she was -- at the time

21    she was exiting the general counsel role, how

22    many assistant general counsels did she have

23    supporting her?

24         A.   There were three when she was in general

25    counsel role.

1                    P. Saunders - Confidential

2        Q.    Okay.  And when she transitioned to the

3    president role and when Ms. Fischman became the

4    acting general counsel, how many assistant

5    general counsels did Ms. Fischman have supporting

6    her?

7        A.    She had two.

8        Q.    So when Ms. Costa ascended from GC to

9    president she left the GC role vacant; Ms.

10   Fischman was bumped up into the acting general

11   counsel position and Ms. Fischman's vacated

12   assistant general counsel position was not

13   filled, was it?

14       A.    There was an addition to the two staff

15   not at the assistant GC level.

16       Q.    Do you know when that addition took

17   place?

18       A.    I don't know the exact hire date of the

19   individual but it was -- Jennifer recruited and

20   hired the individual into the position and --

21   again, I don't recall the exact date but it was

22   something that she started on fairly soon into

23   the role.

24       Q.    Do you have a particular person in mind?

25       A.    Steven Rose.

1                P. Saunders - Confidential

2        Q.    Okay.  Was Mr. Rose relatively junior?

3        A.    He was hired in at a corporate counsel

4    position as I recall.

5        Q.    Okay.  And that's the most junior

6    attorney position in the legal department, isn't

7    it?

8        A.    Yes.

9        Q.    So if we can turn now to page 2537 of

10   the notes.  So this note is from August 19, 2015.

11   At the top it says DC.  So does this reflect a

12   conversation you had with Donna Costa?

13       A.    It appears to, yes.

14       Q.    So do you see on line six it says DC

15   wrote to Ken v brief, is that very briefly?

16       A.    Yes.

17       Q.    Can you tell me, generally speaking,

18   what this is describing?

19       A.    Yes.  As best I can recall this was the

20   point in time at which Donna started -- reached

21   out to Japan to let them know that she did not

22   feel Jennifer was going to be successful in the

23   position and wished to replace.

24       Q.    Okay.  On or about August 7th when you

25   were having those conversations that we looked at

1                 P. Saunders - Confidential

2    that were memorialized in your notes; do you

3    remember those conversations?

4         A.    With Donna?

5         Q.    Yes, the August 7th conversation that we

6    discussed.  Do you remember those?

7         A.    Yes.

8         Q.    On or about that time, did Donna provide

9    you with a draft e-mail that she was anticipating

10   sending to Mr. Fujiwara?

11        A.    There was a draft e-mail, yes, that she

12   provided to him.  But from a timeframe

13   standpoint, I think that came later -- a little

14   bit later.

15        Q.    Okay.

16             MR. BERMAN:  Toni, can we pull up

17        Exhibit 31 real quick.

18        Q.    Ms. Saunders, you're being shown a copy

19   of what was previously marked as Plaintiff's

20   Exhibit 31.

21        Ms. Saunders, does this exhibit refresh your

22   recollection as to the timing of the draft e-mail

23   to Mr. Fujiwara?

24        A.    Yes, it does.

25        Q.    So what was your understanding of why

1           P. Saunders - Confidential

2    Ms. Costa was providing you with this draft

3    e-mail to Mr. Fujiwara?

4        A.   Similarly for a -- because she had --

5    she and I had several discussions about the

6    issues and she was drafting an e-mail simply to

7    have my input that -- to have my input because I

8    was familiar with the situation for my input on

9    what she was relaying to Japan.

10       Q.   Do you know if she ultimately contacted

11   with Mr. Fujiwara?

12       A.   Yes, I believe she did.  Yes.

13       Q.   And do your notes that we were just

14   looking at reflect the results of that?

15            MR. BERMAN:  Can we flip back.  You can

16       close Exhibit 31.

17            THE WITNESS:  What was your question

18       again?

19       Q.   Do these notes reflect the outcome of

20   Ms. Costa's e-mail to Ken?

21       A.   (No verbal response.)

22       Q.   I'm looking at line six and seven --

23            MR. BERMAN:  If you scroll up a little,

24       Toni, it will make it easier for her.  There

25       we go, line six and line seven.

1                    P. Saunders - Confidential

2      A.    I'm sorry, the question once more.

3      Q.    Sure.

4      A.    Do these notes reflect --

5      Q.    Do these notes reflect the outcome of

6  Ms. Costa's e-mail to Mr. Fujiwara?

7      A.    Yes.

8      Q.    What was the outcome?

9      A.    As stated here in the notes --

10          THE WITNESS:  Can you move the note to

11      the left, please.

12      A.    The outcome was as stated in the notes.

13  He wrote back, disappointed.  You need to talk to

14  us when you're here in November.

15      Q.    Does it continue on from there that Ms.

16  Costa said that was too late or something to that

17  effect.  What does it say?

18      A.    Yes.  DC said too late.  Asked for phone

19  call.  Ken agreed to call later in September 23rd

20  25th between Ken and Sakaguchi San.

21      Q.    Why were Ken Fujiwara and Sakaguchi San

22  involved in this discussion?

23      A.    Because Japan -- because the action that

24  Donna was looking to take -- potentially take on

25  Jennifer would need to be discussed with these

1                    P. Saunders - Confidential

2      individuals back in Japan.

3           Q.    Okay.  So when you say "the action to be

4      taken," you mean Jennifer Fischman's termination,

5      right?

6                MS. PRIMAVERA:  Objection.

7           A.    Potential termination, yes.

8           Q.    At this time Ms. Costa was seeking to

9      terminate Ms. Fischman, right?

10               MS. PRIMAVERA:  Objection.

11          A.    Yes.

12          Q.    Now, earlier on in your notes -- when we

13     were looking at the August 7th notes, remember we

14     looked at that comment on the second call, I've

15     been lying to her from day one?

16          A.    Uh-huh.

17          Q.    What does that comment mean?

18               MS. PRIMAVERA:  Objection.

19          A.    Donna --

20               MS. GUERON:  Objection.

21          A.    Donna from the very beginning did not

22     believe Jennifer was qualified for the general

23     counsel position.  She was instructed by Japan to

24     appoint Jennifer to the position.  When Donna

25     informed Jennifer of her promotion, she did not

1              P. Saunders - Confidential

2    tell Jennifer those facts because, again, once

3    the decision was made, Donna was completely

4    invested in Jennifer succeeding in the role.

5              So the "I've been lying," that was a

6    false narrative upon which their relationship

7    went forward and that's what I interpreted the

8    comment "I've been lying" to mean.

9         Q.   Okay.  So here on this page that we're

10   looking at on August 19th, do you see below those

11   lines that you just read it says, I said I would

12   give it four weeks --

13            MR. BERMAN:  If you scroll down to line

14       15 -- scroll down to the bottom half of the

15       page.

16        Q.   -- where it says, I said I would give it

17   four weeks, who is that comment attributed to?

18        A.   (No verbal response.)

19        Q.   Who is giving it four weeks?

20            THE WITNESS:  Can you scroll back up a

21       second.

22        A.   That comment is attributed -- I would

23   interpret that as attributed to Donna.

24        Q.   Okay.  So that's Donna telling you that

25   she said she would give it four weeks?

1              P. Saunders - Confidential

2      A.   Yes.

3      Q.   Who did she say that to?  Is that about

4  Ken or someone else?

5      A.   I believe the individuals in Japan.

6      Q.   The next line there, 18, what does that

7  say?

8      A.   Line 18 says, if you want to continue

9  this job you need to figure out your relationship

10  with DC.  Talk, keep appraised, seek input, ask

11  questions when appropriate.  DC has discussed

12  this in a general sense related to clients.  You

13  have to ask questions.  JF worried people

14  wouldn't trust her if she didn't have an answer

15  to everything.

16      Q.   So what does that mean, that bottom

17  portion of the page?

18          MS. PRIMAVERA:  Objection.

19      Q.   What did you mean when you wrote this

20  down?

21      A.   Again, this is just the notes from my --

22  from my a conversation with Donna.

23      Q.   Okay.  So when it says there either Pat

24  or DC need to have an honest conversation with

25  her, the "her" is Ms. Fischman, right?

1                    P. Saunders - Confidential

2         A.    Yes.

3         Q.    In what you described as this false

4    narrative, up to this point it still hadn't been

5    contributed, right, Ms. Fischman was never fully

6    informed of the facts?

7              MS. PRIMAVERA:   Objection?

8         Q.    Do I have that right?

9         A.    Of the facts, yes, that I described,

10   yes.

11        Q.    That comment on the bottom where it

12   says, JF worried people wouldn't trust her if she

13   didn't have an answer to everything.  Am I

14   reading that right?

15        A.    Uh-huh.

16        Q.    Is that Donna relating a comment to

17   Jennifer or what is that?

18        A.    That's -- let me see.  That relates to

19   the fact that Jennifer had a tendency to feel she

20   needed to have an answer to everything and that

21   created difficulties at times in trying to have a

22   discussions on legal or technical points or --

23   yeah, just her -- the way in which she would, you

24   know, sometimes converse and just circuitously

25   debate a point because she had difficulty

1                P. Saunders - Confidential

2     admitting she didn't know something and felt she

3     had to know everything or have an answer to

4     everything.

5          Q.   Your notes continue on to the next page,

6     which says page two at the top left corner.

7              MR. BERMAN:   Scroll down there.

8          Q.   On line three there it has a comment,

9     she has it in her head she can do this job

10    without help.  Nobody can do that.  She's going

11    so far counter to good sense.  Did I read that

12    correctly?

13         A.   Yes.

14         Q.   That's referring to Ms. Fischman, right?

15         A.   Uh-huh.

16         Q.   Okay.  And then continuing on down to

17    line eight, the first three months I stayed out

18    of her hair.  Am I reading that right?

19         A.   Yes.

20         Q.   She never came to me, am I reading that

21    right?

22         A.   Yes.

23         Q.   On line 19, I recognize I've been

24    judgmental?

25         A.   Yes.

1          P. Saunders - Confidential

2     Q.   What does the rest of that sentence say?

3     A.   I recognize I've been judgmental but the

4 less she comes, the more I become judgmental.

5 But I could definitely -- I could def -- I don't

6 know -- better if I'd been involved in decisions

7 up front.  Up to her to communicate with me.

8     Q.   And then turning to the next page, line

9 nine, what does that say?

10     A.   I haven't been directly honest.

11     Q.   Is that the same issue you described as

12 the false narrative?

13     A.   I would add that this also includes the

14 fact that in trying to give Jennifer space and at

15 one point Donna wanted to have a more open

16 conversation with her -- I believe it was

17 referred to as why the acting GC title versus GC,

18 Jennifer said not now.

19          And so this comment to me isn't -- I

20 interpret it as Donna did want to provide

21 feedback to Jennifer, respected Jennifer needing

22 space to grow in her job, and is now saying, I

23 haven't been directly honest because she hasn't

24 had the opportunity to be -- one of the reasons

25 being she hasn't had the opportunity to be

1                    P. Saunders - Confidential

2    directly honest.

3         Q.    Turning to the next page, 2540.  This is

4    a note from August 25th regarding Kelli Troccoli;

5    is that correct?

6         A.    Yes.

7         Q.    And you got a call from Donna Costa and

8    this memorializes that?

9         A.    Yes.

10        Q.    Is your discussion with Ms. Troccoli or

11   Ms. Costa in these notes?

12        A.    In these notes it is a call from Donna

13   relaying the situation about Kelli.

14        Q.    Okay.  And line 25, does it say nobody

15   respects her, terrible manager?

16        A.    Yes.

17        Q.    Okay.  So Donna is relating to you that

18   Ms. Troccoli commented that nobody respects Ms.

19   Fischman and Ms. Fischman is a terrible manager;

20   is that correct?

21        A.    Yes.

22        Q.    All right.  Flipping forward to next

23   page 2541.  This is conversation or these are

24   notes from August 27th, correct?

25             MR. BERMAN:  Scroll up a little, please.

1              P. Saunders - Confidential

2       Q.    Does this reflect a direct conversation

3    between you and Ms. Troccoli?

4       A.    Yes.

5       Q.    It continues on to the next page right.

6             MR. BERMAN:  So please flip down to the

7       next page.

8       Q.    Go to line 16, this is the same

9    conversation, right, with you and Ms. Troccoli?

10      A.    Yes, as best as I can tell from the way

11   it's scrolled, yes.

12      Q.    Ms. Troccoli commenting to you that Ms.

13   Fischman doesn't have the ability to do the job

14   because she's drowning and she is attacking us.

15   I'm looking at lines 16 through 18.  Am I reading

16   that correctly?

17      A.    Uh-huh.

18      Q.    Okay.  So you heard it from Donna and

19   now you're hearing it directly from Kelli, right?

20      A.    (No verbal response.)

21      Q.    Right, these negative --

22      A.    Hearing what?

23      Q.    Negative comments from Ms. Troccoli

24   about Ms. Fischman?

25      A.    When you say "I heard it from Donna and

1              P. Saunders - Confidential

2     now I'm hearing it from Kelli."  I heard Donna's

3     report of the conversation she had with Kelli.

4          Q.   Okay.  Turning to the next page.  It

5     says page three according to your notes.  If you

6     look at the top left corner it says P3, that's

7     page three, right?

8          A.   Yes.

9               MR. BERMAN:  Scroll down a little more,

10          please, and we'll look at the margin on the

11          left.

12         Q.   What does this note say?

13         A.   KT told DC I wish DC would say to us I'm

14    doing an evaluation of Jennifer and want your

15    honest feedback.

16         Q.   So what does that note reflect?

17         A.   Just Kelli's comment to me.

18         Q.   So she's informing you that she conveyed

19    to Ms. Costa that Ms. Troccoli wanted an

20    opportunity to provide information to go into an

21    evaluation for Ms. Fischman, is that right?

22              MS. PRIMAVERA:  Objection.

23         A.   It was kind of long -- can it be read

24    back?

25              MR. BERMAN:  I'll rephrase the question.

P. Saunders - Confidential

1

2      Q.   Does this reflect a comment that Ms.

3  Troccoli made to you concerning Ms. Fischman?

4      A.   Yes.  Indirectly, yes.

5      Q.   Let's flip to pages 2546 and 47.  This

6  is an August 28th note and it says at the top DC

7  meeting with JF.

8      A.   Uh-huh.

9      Q.   Is this -- what are these notes?  Are

10  these notes reflecting a meeting between three

11  people and you're participating or something

12  different?

13      A.   No, this reflects Donna's report to me

14  of her meeting with Jennifer.

15      Q.   Okay.  So Donna had a meeting with Ms.

16  Fischman and she's telling you about it?

17      A.   Yes.

18      Q.   And the top line there says, I

19  understand --

20          THE WITNESS:  Excuse me for

21      interrupting.  Can it be moved to the left

22      so I can see.

23      Q.   Can you see it now?

24      A.   Yes.

25      Q.   Does this say, I understand you went to

1                P. Saunders - Confidential

2    PS office, that's you?

3        A.    Yes.

4        Q.    You're PS?

5        A.    Yes.

6        Q.    And said X, Y, Z?

7        A.    Yes.

8        Q.    That was overheard.  Who told KT.  KT

9    made a formal complaint.  Am I reading that

10   correctly?

11       A.    Yes.

12       Q.    What does that mean?

13       A.    Donna was telling Jennifer that she

14   understands she went to my office and said

15   certain things.  Those things were overheard.

16   And I believe Jennifer asked who told Kelli -- in

17   other words, who was the person who overheard and

18   told Kelli and then Kelli made a formal

19   complaint.

20       Q.    Okay.  Turning to the next page, page

21   two of the same conversation it looks like.

22            THE WITNESS:  Can we take a quick break?

23            MR. BERMAN:  Of course.

24            (Whereupon, a brief recess was taken.)

25       Q.    Does this reflect page two of the same

1          P. Saunders - Confidential

2     conversation?

3       A.   Yes.

4       Q.   If you look at line five, what does that

5     say?

6       A.   We need chart of her absences she

7     created.

8       Q.   Okay.  Who is saying that to whom?

9       A.   Donna is saying that to me.

10       Q.   Okay.  And what does that mean?

11       A.   Jennifer created a chart of Kelli's

12     absences that included both absences for the

13     medical reasons as well as other absences out of

14     the times when she was out of the office.

15       Q.   Did you have an understanding why Donna

16     expressed the need for the chart?

17            MS. PRIMAVERA:  Objection.

18       A.   Yes, because we were -- we were going to

19     conduct an investigation into Kelli's claim that

20     Jennifer was retaliating against her for being

21     out for medical reasons.

22            MR. BERMAN:  If you flip to the next

23       page.

24       Q.   This is a note from August 31, 2015.

25       A.   Uh-huh.

1                    P. Saunders - Confidential

2       Q.   At the top where it says line two, is KT

3    notifying JF properly?

4       A.   Yes.

5       Q.   What is this note about, is this

6    reflecting a conversation with someone?  It looks

7    like there's a phone number on the top left

8    corner.

9       A.   Yes, that was a phone conversation

10   between myself and Donna.

11      Q.   What does it mean on line two, is KT

12   notifying JF properly?

13      A.   As best as I can recall I believe she

14   was questioning is Kelli notifying Jennifer

15   properly whenever she's out of the office.

16      Q.   Okay.  And then line 18, do you see --

17           MR. BERMAN:  Can you scroll down.

18           THE WITNESS:  I can't see the whole

19      thing.

20      Q.   Can you see line 18?

21      A.   Line 18, chart -- as much as I can see

22   it says chart should only have personal, not

23   medical.  There may be a word cut off -- personal

24   absences -- chart should only have personal

25   absences, not medical.

1                    P. Saunders - Confidential

2      Q.   Did you discuss -- did you discuss --

3           MR. BERMAN:  Withdrawn.

4      Q.   When it says, chart should only have

5  personal absences, not medical, does that mean

6  the chart going forward should have that

7  information in it or retrospective or something

8  else, what are we talking about here?

9      A.   No, we're talking about looking at the

10  chart that Jennifer created and did it have both

11  personal as well as medical and that it should

12  have only personal.

13      Q.   So at this point in time you're already

14  investigating or are you considering doing an

15  investigation?

16      A.   No, we're planning to do an

17  investigation.

18      Q.   Weren't you a witness to the underlying

19  facts being investigated?

20           MS. PRIMAVERA:  Objection.

21           MS. GUERON:  Objection.

22      A.   I was involved, yes, in discussions

23  between -- with Jennifer and with Kelli.

24      Q.   So was there a discussion about having

25  an outside third-party investigate?

1                    P. Saunders - Confidential

2        A.    Not at this time, no.

3        Q.    Okay.  Didn't Ms. Fischman come to you

4    for advice on how to handle her interactions with

5    Kelli and Kelli's absences?

6        A.    Yes.

7             MR. BERMAN:  Let's flip to page 2566,

8        please.

9        Q.    So this note indicates a date of

10   4/29/2015 on the top left corner and the top

11   section says -- it looks like Pru actuaries re:

12   DB plans, am I reading that correctly?

13       A.    Yes.

14       Q.    Was there an issue regarding the

15   recording of defined benefit, plans?

16       A.    Yes.

17       Q.    And were you working with outside

18   counsel with respect to issues of plan recording

19   to the Pension Benefit Guarantee Corp.?

20       A.    We were working -- yes, we had outside

21   couple on this matter.

22       Q.    Was that matter ultimately resolved

23   without any liability to MCHA?

24             MS. GUERON:  Objection.

25       A.    Yes, but MCHA did not have ADB plan so

1              P. Saunders - Confidential

2     it would not have any liabilities.

3         Q.   So one of -- one -- was MCHA'S client

4     the one with the defined benefit issue -- was it

5     a client?

6         A.   I'm sorry, I was thinking back.  I just

7     want to -- the previous issue we were just

8     talking about was MCHA, right, you didn't ask me

9     MCHC?

10        Q.   No, MCHA.

11        A.   MCHA, okay.

12        Q.   So I don't want -- I'm trying to be

13    delicate about handling client matters and

14    questioning over them.

15        Is it fair to say MCHA had a client that had

16    a defined benefit plans and there were a couple

17    of issues about reporting for the plans to the

18    Pension Benefit Guarantee Corp.?

19        A.   Well, MCHA doesn't have clients, they

20    were business affiliates within the control group

21    of companies in the US who had defined plan

22    benefit plans.  And there was an issue that arose

23    in regard to reporting that because we're so

24    disjointed was not done on a controlled group

25    basis.

1                    P. Saunders - Confidential

2         Q.    Was this matter resolved without any

3    liability to any affiliate companies?

4         A.    Yes.

5         Q.    Were you a participant in handling this

6    project with outside counsel?

7         A.    Yes.

8         Q.    Was the point of contact Joan?

9         A.    Yes.

10        Q.    Do you recall her last name?

11        A.    I'll spell it,

12   P-E-I-F-F-E-R-B-R-A-N-D-T.

13             MR. BERMAN:  Let's scroll down to page

14        2587.

15        Q.    So this note is dated 11/11/2015 and at

16   the top it says DC, JF notice; do you see that?

17        A.    Yes.

18        Q.    Okay.  So does this reflect informing

19   Ms. Fischman about her demotion?

20        A.    Yes.

21        Q.    Do you see the top line there on line

22   one?

23        A.    Yes.

24        Q.    What does that say?

25        A.    Delete e-mails.

1          P. Saunders - Confidential

2     Q.   What is that in reference to?

3     A.   I believe that was in reference to

4  notifying IT to preserve -- well, let me back up.

5  No, I don't know what that refers to.  I do not.

6  And I'm sorry, I started to think what it might

7  and that would be -- I don't know for sure what

8  that meant.

9     Q.   Okay.  Did you have e-mail

10 communications with Ms. Costa concerning Ms.

11 Fischman's demotion?

12    A.   I had several e-mail communications.

13 That's a very broad question regarding her

14 demotion.  I mean, can you be more specific.

15    Q.   Sure.  Did you have any e-mail

16 communications with Ms. Costa concerning the

17 decision or the decisionmaking process that led

18 to Ms. Fischman's demotion?

19    A.   Well, for example, there was the one

20 e-mail where she asked me to review the e-mail

21 she was going to send to Japan.  So there could

22 have been any number of those types of e-mails

23 that were all related to the demotion.

24    Q.   Okay.  During your time at MCHA did you

25 have a policy about how long you should retain

1          P. Saunders - Confidential

2    e-mails for?

3         A.   To my knowledge you didn't delete

4    e-mails.

5         Q.   Okay.  Do you know whether Ms. Costa

6    deleted any e-mail concerning Ms. Fischman?

7              MS. PRIMAVERA:   Objection.

8         A.   I don't know.

9         Q.   Okay.  Do you know whether upon Ms.

10   Costa's promotion from general counsel to

11   president, she deleted any of her e-mails?

12             MS. PRIMAVERA:   Objection.

13        A.   I don't know that.

14        Q.   Do you have any e-mail communications

15   with Ms. Costa concerning the identification of a

16   candidate for general counsel other than Ms.

17   Fischman?

18        A.   No, I don't believe so.  I don't recall.

19        Q.   Did there come a time when it was

20   decided that Ms. Fischman should be replaced with

21   a different person in the role of general

22   counsel?

23        A.   Yes.

24        Q.   Okay.  How did that decision come to

25   pass?

1                    P. Saunders - Confidential

2        A.   How did the decision that she would be

3    replaced?

4        Q.   Yes.

5        A.   Through --

6        Q.   How was that -- how did that -- go

7    ahead.

8        A.   Through Donna's communication with Japan

9    and -- yeah, through communications with Japan

10   and the decisionmaking process.

11       Q.   Did anyone seek to attract outside

12   applicants for the position?

13       A.   At what point?

14       Q.   At any point in that process did outside

15   candidates get recruited?

16            MS. GUERON:   Objection.

17       A.   We're talking at the time Jennifer was

18   replaced?

19       Q.   Yes.  So Ms. Fischman was ultimately

20   replaced with Mr. Oliva, correct?

21       A.   Right.

22       Q.   And Mr. Oliva had previously worked at

23   Mitsubishi earlier in his career, correct?

24       A.   Correct.

25       Q.   And at some point in time MCHA

1              P. Saunders - Confidential

2    determined that it wasn't going to continue

3    maintaining Ms. Fischman in the acting general

4    counsel and chief compliance officer role,

5    correct?

6              MS. PRIMAVERA:  Objection.

7         A.   Yes.

8         Q.   Okay.  So once that determination had

9    been made, did the company look for external

10   candidates?

11             MS. GUERON:  Objection.

12        A.   I didn't personally look for external

13   candidates.  And, again, we knew Japan would not

14   -- we knew previously Japan did not want to spend

15   money for recruiting.  But as I recall, I believe

16   some calls were made maybe to recruiters.  I

17   don't -- I don't know.  I don't recall.  I don't

18   recall that.

19        Q.   Okay.  Setting aside recruiters who were

20   paid commissions for finding candidates, do you

21   know whether any job postings were placed for the

22   opening?

23        A.   No.

24        Q.   On or about October of 2015 was Mr.

25   Oliva invited in for interviews?

1                    P. Saunders - Confidential

2        A.   Yes.

3        Q.   Were any other candidates invited in for

4   interviews other than Mr. Oliva?

5        A.   No.

6        Q.   Were you included in the decision to

7   hire Mr. Oliva?

8        A.   I did interview him.  I was one of

9   others in the office.

10       Q.   Okay.  So you provided your feedback

11  based upon your evaluation of Mr. Oliva during

12  your interview with him?

13       A.   Yes.

14       Q.   Okay.  Setting aside your feedback as a

15  result of that interview or interviews, did you

16  have any other involvement in the process of

17  selecting Mr. Oliva for the position?

18       A.   No.

19       Q.   Do you know whether any other candidates

20  other than Mr. Oliva were considered for the

21  position?

22       A.   Yes -- from what I recall of discussions

23  with Donna, she considered others.

24       Q.   So you from your conversations with Ms.

25  Costa you understood that she had considered

1                    P. Saunders - Confidential

2     other candidates?

3         A.    Yes.

4         Q.    Did you see any of their resumes?

5         A.    No.

6         Q.    Did you see Mr. Oliva's resume?

7         A.    Yes.

8         Q.    Did you interview any other candidate

9     other than Mr. Oliva?

10        A.    No.

11        Q.    Mr. Oliva interviewed with other

12    employees of MCHA, right?

13              MS. PRIMAVERA:   Objection.

14        A.    A very limited number.

15        Q.    Did you schedule those interviews?

16        A.    I don't recall who scheduled them.

17        Q.    Well, would scheduling the interviews be

18    an administrative function?

19        A.    Yes.

20        Q.    Who would be responsible for handling

21    that function normally?

22        A.    Most likely Yuka Matsugu, Y-U-K-A

23    M-A-T-S-U-G-U.  I honestly don't recall

24    specifically how the scheduling occurred for

25    mixed interviews.

1          P. Saunders - Confidential

2     Q.   Is it fair to say you were interested in

3     keeping apprised of the progress in hiring a new

4     general counsel?

5     A.   Yes.

6     Q.   So did you come to learn of any other

7     candidates being considered for the position

8     other than Mr. Oliva?

9     A.   No.

10     Q.   Who made the decision to hire Mr. Oliva?

11     A.   Donna.

12     Q.   Was Donna required to obtain any

13     approvals in hiring Mr. Oliva?

14     A.   I believe the approval process -- yes,

15     it would have had to go back to Japan.

16          I do want to clarify that, you know,

17     what I understand about what Japan approves and

18     disapproves on, you know, something like that,

19     the clear authority line wouldn't be something

20     that I have an intimate knowledge of.

21     Q.   Okay.  But it's your understanding that

22     MCHC was consulted on the decision?

23     A.   Yes.

24     Q.   Okay.  We've already seen that MCHC was

25     consulted on the decision to demote Ms. Fischman,

1              P. Saunders - Confidential

2    right?

3              MS. PRIMAVERA:   Objection.

4         A.   Yes.

5         Q.   Okay.  Who made the determination as to

6    which title would be applied to Mr. Oliva when he

7    joined the company?

8         A.   I believe it was Donna.

9         Q.   Okay.  So did Ms. Costa make the

10   decision to hire him as a general counsel and

11   chief compliance officer as opposed to an acting

12   general counsel and chief compliance officer?

13        A.   Yes.

14        Q.   Are you aware of any discussion or

15   consideration of hiring him in on an acting

16   basis?

17        A.   Not that I recall.

18        Q.   Okay.  When Ms. Fischman was considered

19   for the position that she was ultimately promoted

20   into, didn't you describe for me that there was

21   going to be a one year review period applicable

22   to her?

23        A.   Yes, a one year period to assist her in

24   developmentally getting to the level of GC, yes.

25        Q.   Was any such review period applicable to

1           P. Saunders - Confidential

2    Mr. Oliva?

3           MS. PRIMAVERA:  Objection.

4       A.   No.

5       Q.   Do you know why not?

6       A.   No.

7       Q.   Do you know whether after she was

8    transitioned back into the assistant general

9    counsel role, Ms. Fischman received an exceeds

10   expectations performance review?

11      A.   I'm sorry, when she transitioned back

12   to?

13      Q.   In 2016 --

14      A.   Right.

15      Q.   -- Ms. Fischman was in the assistant

16   general counsel role again, right?

17      A.   Yes.

18      Q.   In that position, did she receive an

19   exceeds expectations rating for her performance

20   in 2016?

21      A.   I believe she did, yes.

22      Q.   Earlier in 2016, are you aware of an

23   issue concerning the termination of Amber Todd?

24      A.   No.

25      Q.   Are you familiar with one of the

1                    P. Saunders - Confidential

2    companies affiliates MKIC?

3        A.    Yes.

4        Q.    You have some notes concerning

5    discussions with Yvonne concerning MKIC.

6            MR. BERMAN:  You can flip to those, page

7        2612 towards the end.

8            (Whereupon, a brief recess was taken.)

9        Q.    Take a look at this and let me know if

10   this refreshes your recollection about Amber

11   Todd.

12           THE WITNESS:  Can you scroll up -- down.

13       A.    I read it, yes.

14       Q.    Does this refresh your recollection as

15   to whether there was any issue concerning Amber

16   Todd's departure from the company?

17       A.    When you say "any issue," other than

18   what's written on the page, I don't have any -- I

19   -- other than what's written on the page, no.

20       Q.    Okay.  Do you know whether Ms. Todd

21   requested a severance package for her departure?

22       A.    I do not know.

23       Q.    Do you know whether her husband had

24   previously worked for the company, Dan Todd?

25       A.    Yes, he did work for the company.

1                    P. Saunders - Confidential

2        Q.    Do you know whether he got a severance

3    package?

4        A.    I don't know.

5        Q.    Do you know whether --

6              MR. BERMAN:   Withdrawn.

7        Q.    Did Ms. Fischman come to you about the

8    issue of whether Amber Todd should get a

9    severance package?

10       A.    No.  No.

11       Q.    So she didn't complain to you that Amber

12   Todd was being unfairly treated because she

13   wasn't getting severance?

14       A.    Not that I recall.

15       Q.    Okay.  Did you have I in other

16   discussions about providing Amber Todd with

17   severance?

18       A.    No.  No.

19       Q.    For 2016 did Ms. Fischman receive a

20   bonus?

21       A.    2016.

22       Q.    Let me provide you with some additional

23   context that may help.

24       A.    Thank you.

25       Q.    For the year 2016 Ms. Fischman occupied

1                  P. Saunders - Confidential

2     two different titles, right, she was --

3          A.    Yes.

4          Q.    -- she was in one title for four months

5     and the other title for eight months, right?

6          A.    Right.  Right.

7          Q.    Does that refresh your recollection as

8     to whether she received a bonus for the year?

9          A.    So that's the bonus that would have been

10    paid.  I'm sorry, I'm trying to do the dates in

11    my head.  Are you -- because there's -- the

12    performance is based on a calendar year and then

13    the bonus doesn't get paid out until the

14    following May.

15              So the May, 2016 bonus, is that what

16    you're referring -- a bonus paid in May of 2016

17    but for 2015 performance, she received a bonus,

18    yes.

19         Q.    And she got the full amount of her

20    bonus, right?

21         A.    She got the full amount of her bonus for

22    her period that she was the acting general

23    counsel and then the assistant general counsel.

24         Q.    And each of those bonuses were prorated

25    for the portion of time in those respected

1                 P. Saunders - Confidential

2    positions, correct?

3        A.    Correct.

4        Q.    So if she was in the GC position or the

5    acting GC position for four months, she got a

6    prorated 25 percent bonus covering 25 percent of

7    the year, right?

8        A.    Covering a full rated -- 25 percent

9    bonus covering her salary as GC at the time and

10   the same as assistant GC.

11       Q.    So she got --

12       A.    The same -- meaning the same approach.

13       Q.    Right.  So 17 percent for the assistant

14   general counsel, 25 percent for the acting

15   general counsel role, right?

16       A.    That's correct.

17       Q.    Was there any discussion about giving

18   her a reduced amount of bonus?

19       A.    No --

20       Q.    Okay.

21       A.    -- not that I recall.

22       Q.    Who determined the amount of bonus that

23   would be paid to Ms. Fischman after she had been

24   in two different positions during the same

25   calendar year?

1                P. Saunders - Confidential

2        A.    What do you mean by "who determined"?

3    Because it she -- was in the position -- this was

4    the agreed upon structure and so it was paid out

5    to her.  So --

6        Q.    Okay.

7        A.    -- does that answer your question?

8        Q.    Yes.  So I think earlier today we talked

9    through a chart in your document where it showed

10   a $300,000 rate of base compensation and a 25

11   percent bonus applicable to the general counsel

12   level and a 17 percent for the level below that,

13   right?

14       A.    Right.

15       Q.    And I think I misspoke before about the

16   time allocation because Ms. Fischman was in the

17   acting general counsel role for eight months and

18   she was in the assistant general counsel role for

19   four months of the year 2015, right?

20       A.    She would have been considered in the

21   acting general counsel role from April until,

22   approximately, the November timeframe.  And then

23   the assistant general counsel for the remainder

24   -- from January, February, March and the

25   remainder of the year.

1          P. Saunders - Confidential

2     Q.   Okay.  So based upon what you just

3  described, these weren't discretionary bonuses,

4  they were set at the beginning of the year and

5  they were applied at the end of the year; is that

6  correct?

7     A.   Correct.

8     Q.   Did you meet with Ms. Fischman after she

9  was notified about her demotion?

10    A.   Yes, we did -- we did have a meeting as

11 I recall shortly after that, yes.

12    Q.   What did she say to you and what did you

13 say to her?

14    A.   In regard to?

15    Q.   In regard to her demotion.

16    A.   I don't know what you're asking me as

17 far as -- we discussed some transition issues --

18    Q.   Okay.

19    A.   -- the office -- she was going to be

20 returning to her office.

21    Q.   Okay.  Did she express to your her

22 unhappiness with the fact she was being demoted?

23    A.   I don't recall that she expressed

24 unhappiness, no.

25    Q.   Did she comment to you about her being

```
 1              P. Saunders - Confidential
 2   replaced by a male?
 3       A.   She -- yes, she did make a remark that
 4   the company hired a male.
 5       Q.   Hired a male to replace her?
 6       A.   I don't recall the specific words she
 7   used.
 8       Q.   What was your sense of the substance of
 9   the remark?
10       A.   It was a remark made to me in a passing.
11       Q.   Did you understand her to be complaining
12   of unfair treatment?
13       A.   It was not a complaint.
14       Q.   It was not a complaint.  Based on what?
15            MS. PRIMAVERA:  Objection.
16            MS. GUERON:  Objection.
17       A.   As best as I can recall the
18   conversation, it was not a complaint.
19       Q.   All right.  Did there come a time when
20   the decision was made to terminate Ms. Fischman?
21       A.   Yes.
22       Q.   Were you involved in that decision?
23       A.   Yes.
24       Q.   Okay.  And what was your involvement in
25   the decision to terminate Ms. Fischman?
```

1                    P. Saunders - Confidential

2        A.    I was in a meeting with Nick and Donna

3    -- I was called to Donna's office, Nick was there

4    and there was discussions surrounding the actions

5    that had occurred with Jennifer.

6        Q.    Are you referring to the Genomatica

7    matter?

8        A.    Yes.

9        Q.    Do you know whether there was an

10   investigation conducted into Jennifer's handling

11   of the Genomatica matter?

12       A.    There was no investigation to my

13   knowledge.

14       Q.    Okay.  Did you have any discussions with

15   Donna only concerning the Genomatica matter and

16   Ms. Fischman's handling of it?

17       A.    Not that I recall with Donna only, no.

18       Q.    Did you have any conversations with Mr.

19   Oliva only about Ms. Fischman's handling of the

20   Genomatica matter?

21       A.    No, not that I recall.

22       Q.    Okay.  How many conversations did -- but

23   you did have conversations where the three of you

24   discussed Ms. Fischman's termination?

25       A.    Yes.

1               P. Saunders - Confidential

2       Q.   When was the first of those

3    conversations?

4       A.   The first of the conversations was --

5    are you asking me for the date?

6       Q.   If you know, sure.

7       A.   I believe it was the 19th of January,

8    2017.

9       Q.   Okay.  Do you recall the substance of

10   the conversation?

11      A.   I -- I mean, in general -- I recall, in

12   general, we discussed there was discussion back

13   and forth about the e-mail that Nick had received

14   from Japan, expressing the surprise of the

15   settlement offer that had been made and there

16   was, you know, some discussions surrounding that

17   and.

18           MR. BERMAN:  Can we turn to page 2640,

19       Toni.

20      Q.   Are you able to see the top left corner

21   with the date?

22      A.   Uh-huh.

23      Q.   Are these your notes from January 19,

24   2016 conversation with Mr. Oliva and Ms. Costa

25   concerning Ms. Fischman?

1           P. Saunders - Confidential

2      A.   Yes.

3      Q.   So the first line there, does that say

4    you need to earn my trust again?

5      A.   Yes.

6      Q.   Why did you write that on this page,

7    what does that mean?

8      A.   What this means to me is a thought

9    process from Nick in deciding -- you know, a

10   thought process from Nick as to the decision he

11   would make regarding Jennifer's termination.

12     Q.   Okay.  What was that thought process?

13     A.   In regard to what the appropriate

14   disciplinary action should be.

15     Q.   Okay.  Did he solicit your input as to

16   the appropriate disciplinary action?

17     A.   I was part of the overall discussion.

18     Q.   Okay.  Did you make a recommendation as

19   to the appropriate disciplinary action?

20     A.   No, that's not my role.

21     Q.   Did Ms. Costa make a recommendation?

22     A.   A recommendation?

23     Q.   As to the appropriate --

24     A.   I don't recall specifically but she was

25   part of the conversation.

1                    P. Saunders - Confidential

2        Q.    So you don't recall her recommending any

3    specific form of discipline?

4        A.    Correct.  I believe -- I believe --

5    well, again, I don't want to guess.  You know,

6    just -- the conversation in total came down to

7    Nick's decision as to the disciplinary action.

8        Q.    Okay.  Did he inform you as of the 19th

9    what form of discipline he had decided upon?

10       A.    He had decided upon termination.

11       Q.    Did he inform you of that during this

12   meeting on the 19th?

13       A.    Yes, my understanding was he would --

14   that was his decision, yes.

15            MR. BERMAN:  Can you scroll down,

16        please, Toni.

17       Q.    Do these comments reflect the actions

18   taken as a result of this meeting?

19       A.    Yes.

20       Q.    Okay.  When it says write to Japan, who

21   was responsible for that?

22       A.    Nick.

23       Q.    Did you have any other meetings between

24   the 19th and the time when Ms. Fischman was

25   terminated?

1                    P. Saunders - Confidential

2        A.    Yes, I believe there was a meeting with

3    Donna the following week.

4        Q.    Was that January 23rd?

5        A.    I don't recall the exact date.

6        Q.    Do you know why we don't have any

7    meetings or meeting notes from that date?

8        We have meeting notes from your meeting from

9    the 19th and we have them from the 30th when Ms.

10   Fischman was terminated.

11       Do you know why we don't have the meeting

12   notes from the meeting between the 19th and the

13   30th?

14            MS. GUERON:   Objection.

15       A.    No, I don't know why.

16       Q.    Can you tell me what transpired during

17   that meeting, meeting number two?

18       A.    I believe it was just was to confirm the

19   severance issue.

20            MR. BERMAN:   I take it back.   We do

21       have -- we do have meeting notes from

22       meeting on the 26th.   Let's look at those.

23       I apologize.   It's page 2625.

24       Q.    All right.   So it looks like this is a

25   note from a meeting on the 26th of January 2017;

1                 P. Saunders - Confidential

2    is that correct?

3        A.   Yes.

4        Q.   It says on the top, DC, arrow, JF.  What

5    does that reflect?

6        A.   Donna Costa -- just my way of Donna and

7    Jennifer being a subject -- one of the subjects

8    of this meeting.

9        Q.   Okay.  So if you can scroll down to line

10   11.  Can you read to me, please, lines 11 through

11   17.

12       A.   We can lose our ability to collect from

13   insurance if we offer severance.  Options.  We

14   offer severance and on hook for all money or term

15   for cause and offer nothing.  Decision from DC,

16   no severance.  Read script as approved by

17   Mercedes, PS, NO.

18            THE WITNESS:  Can you scroll down,

19       please.

20       Q.   PS are your initials and Mr. Oliva's

21   initials?

22       A.   Yes.

23       Q.   What does the next comment say?

24       A.   Not giving me dollar.  Why don't you

25   take your time to think about this and if there's

1          P. Saunders - Confidential

2    something you want to discussion with us then.

3    Benefits of no severance.  Insurance.  She will

4    hire counsel and we then get to turn it over to

5    Mercedes.

6         Q.   What's the last line?

7         A.   Immediate walk out, no access to

8    anything.

9         Q.   Do you know whether the company, MCHA,

10   had insurance to cover employment law claims?

11             MS. GUERON:  Objection.

12        A.   Yes.

13        Q.   And pursuant to that insurance, was

14   there some financial benefit to the company of

15   not providing severance to someone who might make

16   an employment law claim?

17             MS. PRIMAVERA:  Objection.

18             MS. GUERON:  Objection.

19        A.   Can you repeat that.

20             MR. BERMAN:  Can you please read back

21        the question, Toni.

22             (Whereupon, last question read back.)

23             MS. PRIMAVERA:  Objection.

24             MS. GUERON:  Objection.

25             THE WITNESS:  There's -- I'm sorry, but

1                    P. Saunders - Confidential

2          I know this is important.  Can you, please,

3          read it again.

4                (Whereupon, the last question read

5          back.)

6          A.   I don't -- I don't know the answer to

7     that.

8          Q.   Well, there's a note here on line 11, we

9     can lose our ability to collect from insurance if

10    we offer severance.  It says that on your note,

11    right?

12         A.   Yes.

13         Q.   Okay.  So in your view, was the decision

14    not to provide Ms. Fischman severance partially

15    motivated by the insurance coverage that was

16    available?

17              MS. GUERON:  Objection.

18         A.   No.

19         Q.   Then why did you write this?

20              MS. PRIMAVERA:  Objection.

21              MS. GUERON:  Objection.

22         A.   Jennifer was terminated for cause and

23    she was terminated for actions that were

24    egregious and for that reason we determined that

25    she would not receive severance.  And that

1                    P. Saunders - Confidential

2    determination was made in the meeting -- the

3    prior meeting Nick, Donna and myself.

4         Q.   The meeting on the 19th?

5         A.   Yes.

6         Q.   Okay.

7         A.   These notes reflect the fact that with

8    any termination there's risks and you take in

9    when you're -- you take into consideration from a

10   business decision standpoint all of the risk

11   factors and the company had the insurance and it

12   was a fact in the facts and circumstances of the

13   situation that we were evaluating regarding

14   Jennifer's termination.

15        Q.   Have you completed your response?

16        A.   The only thing I will add that I recall

17   about these notes on this day, I was not familiar

18   with EPL insurance and how it works and so this

19   discussion -- particularly the way the notes are

20   written was more of an academic discussion that I

21   was having with Donna at the time on EPL.  But

22   the decision regarding her termination and

23   severance were made in a prior meeting.

24        Q.   Your notes from the prior meeting don't

25   discuss severance, do they?

1                    P. Saunders - Confidential

2          A.    They do not.

3          Q.    They only discuss termination, right?

4          A.    Correct.

5          Q.    The note from this meeting discuss

6     severance?

7          A.    Yes.

8          Q.    And there are two separate decisions to

9     be made; number one, are we going to terminate

10    Ms. Fischman; and number two, what are terms of

11    the termination going to be, correct?

12              MS. PRIMAVERA:  Objection.

13         A.    Yes.

14         Q.    Okay.  So I am going to recast my

15    question.

16         Was the decision to not provide Ms. Fischman

17    with severance motivated in part by the insurance

18    coverage available?

19              MS. PRIMAVERA:  Objection.

20         A.    No.

21         Q.    Let's turn to page 2627, which I believe

22    is the second to last document.

23              MR. BERMAN:  Can we see the top left

24         portion of the page, please.

25         Q.    In appears to be dated March 15, 2017;

1               P. Saunders - Confidential

2   do you see that?

3       A.   Yes.  It's very faint but I do.

4       Q.   Are these note reflecting a meeting or

5   conversation you had with Ms. Costa?

6          THE WITNESS:  Can you scroll -- can you

7       make it slightly bigger it's faint and I'm

8       having a hard time reading it.

9          Move it to the left a little.  Scroll

10      down, please.

11         MR. BERMAN:  There's more material on

12      the lower page.

13         THE WITNESS:  I've read it.

14      Q.   So what do these notes reflect; is there

15  one conversation here or more than one

16  conversation, what are we looking at?

17      A.   One conversation.

18      Q.   Okay.  Is this a conversation between

19  you and Ms. Costa?

20      A.   Yes.

21      Q.   What's the nature of your conversation?

22      A.   Well, the nature of the conversation is

23  as the notes reflect.

24      Q.   For example, if you look at line eight

25  it says, DC told Dennis and Steve --

1             P. Saunders - Confidential

2             MR. BERMAN:  Can you scroll up so she

3        can see.

4        Q.    DC told Dennis and Steve positioned it

5        in casual way.  Am I reading it right?

6        A.    Right.

7        Q.    Is this Dennis Trice that's being

8        referred to here?

9        A.    Yes.

10       Q.    And Steve who?

11       A.    Yurich, Y-U-R-I-C-H.

12       Q.    What is Ms. Costa informing you that she

13       told to Dennis and Steve?

14       A.    Donna had an employment contract and at

15       this point her contract was due to renew a few

16       months down the road and she was in negotiating

17       with Japan regarding her contract and in and

18       informing -- you know, informing Dennis and Steve

19       that they may not -- she may not be able to reach

20       an agreement on her contract and, therefore, I

21       believe, could potentially be leaving the

22       company.

23       Q.    Do you know what ultimately was the

24       result of the contract negotiations between Ms.

25       Costa and MCHA?

1                    P. Saunders - Confidential

2        A.    Her contract was she did not continue

3    employment after contract ended.

4        Q.    Okay.  Did she move to another position

5    at an affiliate?

6        A.    No.

7        Q.    Do you know if she had any other

8    concurrent appointments at any other affiliates?

9        A.    No.

10        Q.    So, for example, do you know whether she

11    served on any of the boards of directors or

12    executive committees with any of the other

13    Mitsubishi affiliates?

14        A.    Not after the time she left the company

15    -- at the time she left the company, no.

16        Q.    Okay.

17        A.    Not to my knowledge.

18        Q.    Okay.  If I can direct your attention

19    down to line 18.  Can you tell me what it says

20    from there through the remainder of the page.

21            MR. BERMAN:  Scroll down, Toni, so she

22        can see lines 18 through 24.

23        A.    I see that.

24        Q.    Can you read that to me so I can learn

25    what it says.

1                    P. Saunders - Confidential

2        A.    Opportunity for Japan to not give me --

3              THE WITNESS:  It's cut off.  Just shift

4        left.

5        A.    -- exec role since won't be here year

6    from now.  That's what I can view.

7        Q.    And then it continues on a few lines

8    more, doesn't it?

9        A.    With Japan this is not what I --

10             THE WITNESS:  Shift left for me, please.

11       A.    -- this is not what I signed up for.

12   I've seen my role -- MCHA role whittled away.

13             MR. BERMAN:  There are a couple more

14       lines, Toni.  Can you scroll down so she can

15       see those, please.

16       A.    What she would consider.  Be on board of

17   Medicago and Matheson I think that is.

18       Q.    Was Medicago an affiliate?

19       A.    Yes.

20       Q.    Was Matheson an affiliate?

21       A.    Yes.

22       Q.    So what does this notation reflect when

23   it says, opportunity for Japan to not give me

24   executive role since won't the hear a year from

25   now?

1                    P. Saunders - Confidential

2        A.    I don't know what that refers to.

3        Q.    Ms. Costa made that remark to you?

4        A.    Yes.

5        Q.    And you just wrote it down?

6        A.    In reading that now, I don't know

7    exactly what she meant when she said that.

8        Q.    Okay.  What about the comment with

9    Japan, this is not what I signed up for I seen my

10   MCHA role whittled away, did she relate that

11   comment to you?

12       A.    Yes, that's there in note.

13       Q.    Do you have an understanding what she

14   meant by that comment?

15       A.    Yes.

16       Q.    What did she mean?

17       A.    At this time MCHC was undertaking a

18   restructuring of the chemical companies and

19   combining them into one and under MCC and

20   creating a regional structure where there would

21   be within each of -- I can't recall -- I think it

22   was five, maybe six regions, certain functions.

23   And those functions included services; for

24   example, a marketing type function, environmental

25   health and safety, HR function that would serve

1          P. Saunders - Confidential

2    all of the business affiliates in the regions.

3       Q.   Did you complete your response?

4       A.   No.

5       Q.   Okay.

6       A.   That particular structure -- that new

7    structure that would be in place going forward

8    would take on some of the roles that were being

9    performed by MCHA and therefore the role of MCHA

10   was diminished and Donna's role was diminished.

11      Q.   Have you now complete your response?

12      A.   Yes.

13      Q.   Was Ms. Costa ever appointed to the

14   board of Medicago?

15      A.   Not to my knowledge.

16      Q.   Was she appointed to the board of

17   Matheson?

18      A.   Not to my knowledge.

19      Q.   When Ms. Costa's contract ended, do you

20   know who took over the role that she had been

21   occupying?

22      A.   They replaced the president of MCHA with

23   another expat.

24      Q.   Who is the expat that took over the

25   position?

                    P. Saunders - Confidential

1

2      A.    I'm sorry, I don't remember his name

3    because I had left at the same time.  It may come

4    to me before we stop so...

5      Q.    Okay.  Let's add a blank here because

6    you'll be provided an opportunity to review and

7    sign the transcript.  If you should happen to

8    recall the name, if you can just fill in the

9    plank as part of the errata process, that will be

10   helpful.

11   INSERT:  _____

12   _____

13     Q.    Can you firm for me that the person who

14   was placed into the position after Ms. Costa left

15   was male?

16     A.    He was a Japanese male expat.

17     Q.    Okay.  Do you know whether he was in a

18   dual role, meaning he was both at MCHA and

19   working for MCHC?

20     A.    Again, that's somewhat of a technical

21   statement to me.  I don't know when they -- when

22   they have Japanese expats come, they're working

23   in the company, payrolled by us, paid in US

24   dollars.  Technically are they still working for

25   MCHC, I don't know that technicality.  But

1              P. Saunders - Confidential

2    they're, again, fulfilling the role, for example,

3    of president of MCHA.

4        Q.   Okay.  With respect to the role of

5    president of MCHA, that role has certain duties

6    app responsibilities, right?

7        A.   Yes.

8        Q.   And it has compensation attended to

9    those duties an responsibilities, correct?

10       A.   Yes.

11       Q.   Who determines what the duties and

12   responsibilities of the president of MCHA are?

13            MS. GUERON:  Objection.

14       A.   I believe that's MCHC.

15       Q.   Who sets compensation for that position?

16            MS. GUERON:  Objection.

17       A.   We have set that in -- we have set that

18   in the US.

19       Q.   Whose "we"?

20       A.   MCHA.

21       Q.   Who at MCHA sets the compensation for

22   the president of MCHA?

23       A.   The president of MCHA up until Donna

24   have been Japanese expats and the compensation

25   was generally set by -- I'm sorry, how can I

```
 1              P. Saunders - Confidential

 2    explain this?  It ties into these -- you know,

 3    what's required through Visa immigration to

 4    ensure we're paying a reasonable fair

 5    compensation for tax purposes, you know, between

 6    Japan and the US so the individual who

 7    administered the expat program generally would

 8    make the recommendation on, again, with all the

 9    expats that were being dealt with, what a

10    reasonable salary would be for a president as

11    well as the other positions.

12         Q.   Okay.

13         A.   They're taking into consideration that

14    that's within reason as to what we would pay here

15    in the US in that type of position.

16         Q.   Okay.  So is that information -- is that

17    determined by one particular person at MCHA?

18         A.   By Yoko Katihama (phonetic).

19         Q.   Is that male or female?

20         A.   Female.

21         Q.   Okay.  And who does Yoko Katiama report

22    to?

23         A.   Me, she reported to me.

24         Q.   She was one of your directs reports?

25         A.   Yes.
```

1                    P. Saunders - Confidential

2        Q.    So when she made the recommendation as

3    to compensation for the president, did she make

4    the recommendation to you?

5        A.    Yes, we would -- we would, generally,

6    discuss, yes, the comp.  Yes.

7        Q.    With respect to the increase in Ms.

8    Costa's salary that she received, who made that

9    determination when she was president?

10        A.    I don't know.  I don't know who made

11    that determination.

12              MS. PRIMAVERA:  Objection.

13        Q.    Do you know whether MCHC had to approve

14    the compensation of MCHA'S president?

15        A.    I don't know.

16        Q.    Okay.  During your tenure at MCHA, other

17    than Ms. Costa, was there ever at any point in

18    your tenure another female president?

19        A.    At MCHA?

20        Q.    Yes.

21        A.    No.

22        Q.    Was there ever a female board member at

23    MCHA --

24              MS. GUERON:  Objection.

25        Q.    -- during your time there?

1                  P. Saunders - Confidential

2        A.    Jennifer would have been on the board.

3        Q.    Jennifer was on the board of directors

4    of MCHA?

5        A.    I think in the board structure.  I'm not

6    clear on this -- I'm not clear.  I'm sorry.

7        Q.    Okay, that's fine.

8        Do you know who the counter party on Ms.

9    Costa's contract was?

10       A.    The counter party, as in the company?

11       Q.    Yes.

12       A.    I believe it was MCHC.

13       Q.    Okay.

14       A.    Again, I'm not -- I'm not entirely sure

15   thinking back.

16       Q.    Okay.  Do you know who signed her

17   contract from MCHC?

18       A.    No.

19       Q.    Do you know who Ms. Costa reported to in

20   her role as president?

21             MS. PRIMAVERA:  Objection.

22       A.    I don't recall who she reported to.

23       Q.    During your tenure at MCHA, were you

24   aware of any other females who were acting in the

25   capacity of president at any of the affiliates?

1                    P. Saunders - Confidential

2         A.    No --

3         Q.    Okay.

4         A.    -- I don't know of others.

5         Q.    Do you know of any female board member

6    of any affiliates during your time at the

7    company?

8         A.    I don't know of others.

9         Q.    Okay.  Do you know whether MCHC has ever

10   had a female president?

11        A.    I don't know the MCHC structure.

12        Q.    Do you know so -- this is a similar

13   question.  Do you know whether any of MCHC's

14   board members have ever been female?

15        A.    I don't know.

16             MR. BERMAN:  Okay.  Let's take a quick

17        break.  I believe I may be done with my

18        questions.  I just want to check my notes

19        and we will wrap up -- unless your counsel

20        wants to ask you anything.

21             (Whereupon, a brief recess was taken.)

22        Q.    Ms. Saunders, so we've reviewed a number

23   of your notes here today.  Was it your regular

24   practice to take notes of your business

25   conversations at MCHA?

1                  P. Saunders - Confidential

2        A.   Yes.

3        Q.   And any notes that you had concerning

4    Ms. Fischman's promotion to acting general

5    counsel would it have been reflected in your

6    notebooks; is that correct?

7        A.   Yes.

8             MS. PRIMAVERA:   Objection.

9        Q.   Okay.  Any note use took concerning Ms.

10   Fischman's demotion would also be reflected in

11   your notebooks, correct?

12       A.   Yes.

13       Q.   And any notes you took concerning Ms.

14   Fischman's termination would be reflect in your

15   notebooks, correct?

16       A.   Yes.

17       Q.   Is there any other place where we could

18   potentially locate documents concerning any of

19   those three events?

20       A.   No.

21       Q.   Okay.  You have no additional documents

22   in your person covering that subject matter, do

23   you?

24       A.   No.

25       Q.   With respect to the general counsel

1           P. Saunders - Confidential

2    position and the criteria, right, sitting here

3    today are you aware of any objective criteria

4    that Nick had for that position -- Mr. Oliva, had

5    for that position that Ms. Fischman did not

6    possess?

7           MS. PRIMAVERA:  Objection.

8           MS. GUERON:  Objection.

9      Q.   Do you understand my question?

10     A.   I understand your question.  But, again,

11   I am not -- in my role as HR, I am not the person

12   who -- the expert to determine the qualifications

13   and the criteria and for the position.

14     Q.   Okay.  So then are you -- is it correct

15   you are not taking a position one way or the

16   other on Ms. Fischman's qualifications for the

17   position?

18          MS. PRIMAVERA:  Objection.

19     A.   On Ms. Fischman's qualifications for the

20   position, I'm not taking a position on it.

21     Q.   Same question with respect to Mr.

22   Oliva's qualifications.

23     A.   Correct.

24     Q.   Okay.

25          MR. BERMAN:  I have no further questions

1          P. Saunders - Confidential

2     for you at this time.  I want to thank you

3     very much for your cooperation today, Ms.

4     Saunders.

5          MS. PRIMAVERA:  I just have one

6     follow-up question.  Thank you so much, Pat,

7     it was a long day.  I just want to clarify

8     one thing.

9  CROSS EXAMINATION

10 BY MS. PRIMAVERA:

11     Q.   In your role as the director of human

12 resources, it was outside the scope of your

13 duties and responsibilities to assess an

14 attorney's qualifications as it relates to how

15 they would qualify for a particular position,

16 correct?

17     A.   Correct.

18     Q.   Thank you.

19          MS. PRIMAVERA:  I have nothing further.

20          MR. BERMAN:  Thank you all.

21          MS. GUERON:  No questions.

22          THE REPORTER:  Would anyone like to

23     order a copy of the transcript?

24          MS. PRIMAVERA:  I will order and I will

25     provide Sam and Nicole a copy.

1          (Whereupon, the examination of this

2      witness was concluded at 6:26 p.m.)

3              A C K N O W L E D G M E N T

4    STATE OF                )
                              : ss
5    COUNTY OF               )

6

7          I, PAT SAUNDERS, hereby certify that I

8    have read the transcript of my testimony taken

9    under oath in my deposition of September 30,

10   2021, that the transcript is a true, complete and

11   correct record of my testimony, and that the

12   answers on the record as given by me are true and

13   correct.

14

15

16                    _____

17                         PAT SAUNDERS

18

19
     Signed and subscribed to before
20   me, this          day
     of                      , 2021.
21

22   _____

23   Notary Public, State of

24

25

1

2                    I N D E X

3    WITNESS              EXAMINATION BY     PAGE

4    Pat Saunders    Mr. Berman         5
                     Ms. Primavera      241
5

6                    E X H I B I T S

7    PLAINTIFF'S                        PAGE

8    63        Notes                    138

9    64        Notes                    150

10

11                   REQUEST/PRODUCTION

12   PAGE 233 -  Name of individual who replaced
                 Ms. Costa
13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                  C E R T I F I C A T E

3

4          I, TONI MUSACCHIA, a Notary Public in and

5    for the State of New York, do hereby certify:

6          THAT the witness whose deposition is

7    hereinbefore set forth, was duly sworn by me and

8          THAT the within transcript is a true

9    record of the testimony given by such witness.

10          I further certify that I am not related,

11   either by blood or marriage; to any of the

12   parties to this action; and

13          THAT I am in no way interested in the

14   outcome of this matter.

15          IN WITNESS WHEREOF, I have hereunto set

16   my hand this 12th day of October, 2021.

17

18                    _____

19                         TONI MUSACCHIA

20

21

22

23

24

25

**A**

**A-R-A-I** 116:8
**a.m** 1:15
**ability** 9:8,12 110:20 191:13 222:12
  224:9
**able** 88:4 139:18 218:20 228:19
**absence** 87:15
**absences** 168:12 177:10,16,19
  195:6,12,12,13 196:24,25 197:5
  198:5
**absent** 177:23
**absolutely** 119:6
**academic** 225:20
**accept** 173:8,15,20,21,22
**accepting** 172:23 173:2
**access** 223:7
**accommodate** 8:5
**accommodation** 177:7 178:17
**accounting** 14:9 35:18 126:12
**accurate** 22:13 92:3 155:10 168:25
**accurately** 9:9,13 21:15,25 135:7
**achieve** 106:19
**acknowledges** 173:18
**acquisition** 161:10
**acronyms** 11:12
**act** 47:16 59:17 156:3
**acting** 66:4,18 75:9 87:7,11 95:5,6
  95:16,23 96:7,19,20 97:18 100:8
  103:5 131:5,12 141:24 162:16
  179:4,10 189:17 204:3 208:11,15
  212:22 213:5,14 214:17,21
  237:24 239:4
**action** 105:6,23 183:23 184:3
  219:14,16,19 220:7 244:12
**actions** 217:4 220:17 224:23
**actively** 164:3
**activities** 60:10
**actuaries** 198:11
**ADA** 178:3
**ADB** 198:25
**add** 27:3,4 32:2 34:12,13 155:13
  189:13 225:16 233:5
**added** 44:12
**addition** 132:21 154:17 167:4
  179:14,16
**additional** 30:3,6,7,10,23 39:16
  40:19 43:15 115:14 130:13
  154:18 211:22 239:21
**additions** 35:9
**address** 5:24 87:24 154:13
**addressing** 36:21
**administer** 4:8
**administered** 235:7
**administration** 126:3
**administrative** 33:7 171:4,7,8
  206:18
**admitting** 142:13,17 188:2
**admonish** 115:6

**advice** 7:18,19 105:24 164:19 167:2
  167:4 172:20 176:24 177:3 198:4
**advise** 49:12
**advised** 164:15
**advisement** 175:18,19
**advising** 60:11 178:11
**advisor** 59:17
**affiliate** 38:19 112:4 200:3 229:5
  230:18,20
**affiliated** 59:13,19
**affiliates** 38:8,15,23 39:24 40:3
  41:7,19 79:22 81:3,5 88:19 111:6
  112:4 199:20 210:2 229:8,13
  232:2 237:25 238:6
**afraid** 115:25
**against-** 1:6
**AGC** 78:5
**agencies** 73:16
**Agency** 4:13
**agree** 92:4,9 174:14,15
**agreed** 3:4,10,15 4:3 183:19 214:4
**agreement** 228:20
**ahead** 21:19,22 110:14 118:23
  119:7 203:7
**air** 143:11
**align** 20:24
**allegation** 117:17
**allegations** 68:22 69:2,4,7,11
**allocation** 214:16
**allow** 26:7 53:15
**allowing** 166:3
**alternatively** 118:15
**Amber** 209:23 210:10,15 211:8,11
  211:16
**ambiguous** 13:23
**America** 1:8 2:11 11:15,19 12:10
  113:25
**amount** 35:13 38:14,18 39:2 73:13
  129:24,25 130:3 132:11 136:18
  136:20 140:18 212:19,21 213:18
  213:22
**amounts** 45:15
**Andrew** 46:9
**Andy** 78:9,16 83:23,25 84:5,8,16
  120:20 161:8
**annotation** 128:23
**annotations** 128:10
**annual** 48:16 54:13,16 61:25 63:13
**annually** 15:20 132:8
**answer** 6:16,19,19 7:14,20 8:10
  13:16 14:6 21:13,18,19 38:25
  49:21 51:8 53:3 55:18 63:15 74:6
  75:6 91:4 92:13,20 107:19 112:7
  112:9 114:12 149:10 167:6
  174:13 186:14 187:13,20 188:3
  214:7 224:6
**answering** 6:8 21:25
**answers** 80:5,5 242:12

**anticipate** 151:14
**anticipated** 131:14
**anticipating** 181:9
**anymore** 98:15 143:4
**Anyway** 165:22
**apologize** 221:23
**app** 90:21 234:6
**appeared** 164:4
**appearing** 5:11
**appears** 118:24 123:24 125:17
  148:10 180:13 226:25
**applicable** 208:21,25 214:11
**applicants** 203:12
**application** 56:2
**applied** 77:24 208:6 215:5
**appoint** 75:16 86:18 87:19,25
  184:24
**appointed** 81:6,13 82:13 85:10
  232:13,16
**appointing** 74:22
**appointment** 98:14
**appointments** 229:8
**apportioned** 40:4,5
**appraisal** 63:5 107:14
**appraised** 186:10
**appreciate** 113:3
**apprised** 207:3
**approach** 39:14 213:12
**approached** 164:16
**appropriate** 70:22 105:6,23 186:11
  219:13,16,19,23
**appropriately** 105:22 143:5 177:25
**approval** 30:14 33:20 34:2,16
  161:7 207:14
**approvals** 33:15 37:17 207:13
**approve** 58:14 236:13
**approved** 82:24 86:16 222:16
**approves** 207:17
**approximately** 16:4 19:18 28:12,14
  31:2,4 124:7 214:22
**April** 11:8 12:5 65:7 98:22 103:11
  130:20 162:17,23 163:15,18
  164:11,16 166:19 168:2 214:21
**Arai** 116:8 117:16
**area** 56:12
**arena** 59:14
**arguing** 175:25
**arose** 199:22
**arrow** 172:17 222:4
**articulate** 89:18
**ascended** 179:8
**aside** 26:3 62:10,15 63:23 65:13
  138:6 204:19 205:14
**asked** 23:15 26:19 43:11,12 74:14
  97:14 111:12 147:24 167:7,11,16
  175:5 183:18 194:16 201:20
**asking** 6:7 13:24 23:21 41:22 42:24
  82:17 83:5 88:24 90:17 91:6,7

101:11 106:4 107:18 108:16,18
108:22 111:14 112:22 127:24
145:13,16 175:24 215:16 218:5
**aspect** 177:24,25
**aspiration** 123:17
**assess** 113:5 241:13
**assessed** 89:7
**assign** 15:16 39:17
**assist** 104:14 151:9 208:23
**assistant** 18:5,8,15 24:19,23 25:12
58:4 63:9,19 64:10 66:9 72:8
75:20 76:10 77:13 78:5 129:5,6
130:24 131:10 171:7 178:22
179:4,12,15 209:8,15 212:23
213:10,13 214:18,23
**associate** 16:21 17:25 18:6,14
**associated** 74:8
**assume** 68:15
**assumed** 93:23 94:15 164:10
**assuming** 40:25 64:21
**assumption** 68:17
**attacking** 191:14
**attended** 234:8
**attention** 24:17 26:14 61:6,24
65:23 156:25 229:18
**attorney** 7:14 15:22,23 16:11 30:24
32:10,17 33:16,17 43:19,22,25
48:2 83:9 112:18,24 178:10 180:6
**attorney's** 241:14
**attorney/client** 7:22
**attorneys** 1:20 2:3,7,11,16 6:5
10:19 45:24 51:15 54:16 83:21
109:6 113:8
**attract** 203:11
**attributed** 185:17,22,23
**attributes** 111:20 135:8,10
**audible** 6:12
**audit** 20:11,12,17
**August** 141:11,21 148:10 156:4
160:3 161:18 168:8,10 171:20,24
176:6 180:10,24 181:5 184:13
185:10 190:4,24 193:6 195:24
**authority** 170:2,5,9 207:19
**available** 30:23 224:16 226:18
**Avenue** 2:8,17
**avoid** 21:20
**award** 129:18
**aware** 57:17 67:20,22 68:23,23
99:9 102:13,16 105:14 107:22
108:7,22 117:16 165:2 208:14
209:22 237:24 240:3
**awareness** 157:10 158:12
**awe** 11:17

**B**

**B** 243:6
**back** 22:2,5 32:8 33:8 38:8 39:2,10
39:13,18 41:23 42:2,6,8 48:9,10

68:18 71:18,21 73:11 74:12,13
86:15 89:22,24 100:3 104:11
119:7 134:23 138:7 144:11 148:2
148:4 155:18,20 158:8 164:25
165:24 167:9,12,14,17 172:16
175:3 182:15 183:13 184:2
185:20 192:24 199:6 201:4
207:15 209:8,11 218:12 221:20
223:20,22 224:5 237:15
**backed** 164:19
**background** 78:21 94:7
**backing** 166:2
**backward** 65:10,11
**baits** 142:12,16 143:6
**balls** 143:11
**barriers** 161:5 162:12,13
**basal** 128:17
**base** 121:7 128:16 130:9,17 131:19
214:10
**based** 23:11 68:17 74:19 78:23 93:8
98:10 123:2,3,15 130:15 132:11
160:16 165:13 205:11 212:12
215:2 216:14
**baseline** 23:24 24:2 25:3 26:23
39:15
**basic** 49:15
**basically** 15:17 145:9 162:21
163:11
**basis** 45:12 100:22 103:24 165:11
199:25 208:16
**Bates-stamped** 56:3 119:16 150:22
152:4,24 155:9
**Battery** 2:12
**becoming** 67:14 72:23 103:5
**Bee** 4:13
**began** 162:21
**beginning** 99:10,13 164:11 184:21
215:4
**behavior** 152:7
**belief** 5:11
**believe** 16:7,9,21 17:25 18:3,24
19:5 22:25 31:7,11 35:15 40:5
50:19 53:6 56:16,17 64:15 73:18
77:8 78:18 83:12 121:20 124:17
125:5 138:17 156:11 167:3
175:12 182:12 184:22 186:5
189:16 194:16 196:13 201:3
202:18 204:15 207:14 208:8
209:21 218:7 220:4,4 221:2,18
226:21 228:21 234:14 237:12
238:17
**benefit** 39:7 113:11 132:13 198:15
198:19 199:4,16,18,22 223:14
**benefits** 59:7,15 126:23 127:2 223:3
**Berman** 2:5 5:5,21 6:5 17:3,14,17
18:20 21:20 22:2 23:4 24:12 26:3
26:11 28:16 29:9 31:13 35:21
38:4,20 41:2,23 43:7 46:13 47:24

48:9 51:22 53:11,19,23 54:23
56:5,18 60:20 61:15 62:9,15,25
63:23 65:13,18,25 66:13 71:18
84:2 90:3,7 99:14,18,20,24
109:20 110:8 112:14 113:10
114:15,19 115:4 117:20 118:9,15
118:19 119:3,14 120:5,9 123:21
127:4 132:19 133:19,25 134:25
138:6,12 139:14 142:14 143:22
147:25 150:12,24 151:4,14
152:17,25 153:3,6,8,17,25 154:7
154:19,22 155:4,10,11,17 157:3,6
157:12 158:9 160:5 167:8,11
174:20 175:8 176:4 181:16
182:15,23 185:13 188:7 190:25
191:6 192:9,25 194:23 195:22
196:17 197:3 198:7 200:13 210:6
211:6 218:18 220:15 221:20
223:20 226:23 227:11 228:2
229:21 230:13 238:16 240:25
241:20 243:4
**best** 5:10 6:14 7:2 16:4 18:2 22:22
30:2 46:24 52:15 69:17 76:22
77:8 124:22 159:9 163:23 180:19
191:10 196:13 216:17
**better** 80:8 142:11 150:3 175:3
189:6
**beyond** 92:15 96:20
**big** 141:18
**bigger** 142:2,25 227:7
**bit** 32:8 53:13 56:9 133:20 143:24
175:16 176:5 181:14
**blank** 233:5
**blocking** 172:10
**blood** 244:11
**board** 70:5,19 230:16 232:14,16
236:22 237:2,3,5 238:5,14
**boards** 229:11
**bonus** 128:19 129:4,15,19,24,25
130:10 131:16,19 171:20 212:8,9
212:13,15,16,17,20,21 213:6,9,18
213:22 214:11
**bonuses** 212:24 215:3
**boss** 137:10 141:5
**bottom** 56:4,4 61:16 64:18 107:17
147:2 149:23 153:11 174:23
176:20 185:14 186:16 187:11
**bout** 148:12,12
**box** 55:23 56:11,22 61:10,19 120:12
**Brazil** 147:20,23 148:12
**break** 8:4,8,11 43:6,8 99:14,20
100:6 112:12,15,16,17 113:4
154:4 194:22 238:17
**breaks** 8:5
**brief** 43:10 112:12 153:5 154:10,25
180:15 194:24 210:8 238:21
**briefly** 180:15
**Brittany** 2:14 112:6 154:8

**broad** 60:9 78:20,23 107:17 201:13
**broad-based** 59:10 88:11,12
**broke** 142:13,17
**brought** 39:16
**brush** 60:9
**bubble** 168:20
**budget** 34:5,9,17 35:2,4,13 36:24
　37:22
**budgetary** 33:23,25 73:9,10
**budgeting** 34:21 35:8 41:16 42:9
**bullet** 28:25
**bullied** 171:14
**bullying** 171:11,14
**bumped** 179:10
**business** 19:10,16 20:12 27:9 39:16
　39:18 40:8,11 60:8,12 79:22 81:3
　81:5 88:19 105:24 110:21 111:2,3
　111:13 112:4 117:7 125:14
　135:24 199:20 225:10 232:2
　238:24
**businesses** 59:13,18,19,23 105:16
　124:24,25 125:2
**busy** 148:17

**C**

**C** 1:1 2:1,2 3:1 4:1 5:1 242:3 244:2
　244:2
**C-U-Z** 157:21
**Caezar** 46:9,10 78:9,16,17
**calendar** 55:10 62:2 63:5 64:9 67:4
　212:12 213:25
**call** 36:18 94:4 111:2 115:22 125:2
　153:21,23 154:6,8,14 160:4
　161:17,20 183:19,19 184:14
　190:7,12
**called** 16:16 17:25 28:4 121:22
　217:3
**calls** 204:16
**calm** 104:11
**candid** 167:19
**candidate** 66:22 71:23,25 72:7 73:7
　73:12,22 74:2,6 75:4,22 77:15,20
　85:14,18,19,25 86:14,17 93:7
　202:16 206:8
**candidates** 29:16 72:10,14 77:5
　78:4 82:18 84:21 85:17 86:3,5,8
　93:16 94:21 100:7 134:5 203:15
　204:10,13,20 205:3,19 206:2
　207:7
**capability** 137:4
**capable** 142:19 143:10 145:15
**capacities** 1:10,11,11
**capacity** 237:25
**career** 122:20,21 123:16,18 140:4
　203:23
**cares** 136:25
**Carolina** 6:3
**case** 6:6 10:13,25 11:13 31:24 34:7

　45:12,12 52:25 113:16
**cases** 60:4
**casual** 94:25 228:5
**categories** 35:8,9
**category** 81:24 82:10
**cause** 41:16 157:15,17,22 222:15
　224:22
**caveat** 7:16 22:15,21
**center** 124:4 127:9
**certain** 39:6,8,23 41:14 100:13
　103:24 116:4 126:25 137:20
　146:16 171:8 194:15 231:22
　234:5
**Certainly** 34:10
**certification** 3:6
**certify** 242:7 244:5,10
**cetera** 64:24
**challenges** 116:4
**challenging** 6:24 7:24 35:25
**change** 28:10 127:21,23,25 132:10
　137:4
**changed** 136:3 140:16
**changes** 27:9 35:8,10 52:4 67:7,12
　99:8 127:15 128:10
**characteristic** 79:20
**characteristics** 79:21 90:14,14,19
**characterize** 82:5 170:9
**charge** 38:19,22,25 39:9,18 41:18
　125:21
**charged** 38:8 39:13
**charges** 38:14
**chart** 62:21 195:6,11,16 196:21,22
　196:24 197:4,6,10 214:9
**check** 55:23 238:18
**checking** 138:14
**chemical** 1:8,9,9 2:11,17 11:15,19
　11:23 12:3,10 113:24 231:18
**chief** 26:16 66:5,19 71:2,7 73:4 75:9
　76:13 77:6,16 82:21 87:7 88:9
　89:15 91:23 93:16 94:16 95:7,24
　96:2,7,9 97:18 109:24 132:23
　162:16 204:4 208:11,12
**child** 143:5
**Chin** 35:19 36:7,7
**choice** 79:4
**chooses** 91:6
**Chris** 113:19,20 114:10 115:15,16
　115:22 116:3,7,9,20
**circle** 32:8
**circuitously** 187:24
**circumstances** 225:12
**citizen** 124:9
**citizenship** 124:11
**City** 2:4
**Civil** 4:5
**claim** 195:19 223:16
**claims** 178:7 223:10
**CLARICK** 2:7

**clarification** 16:12
**clarify** 138:2 207:16 241:7
**clarity** 8:20
**clear** 65:6 112:14,20 124:20 134:2
　207:19 237:6,6
**clearer** 148:6
**clearly** 38:25
**client** 40:20 41:5 114:20 115:7
　155:5 199:3,5,13,15
**clients** 114:17 186:12 199:19
**clip** 119:12
**clipped** 119:10
**close** 182:16
**coach** 80:3,7
**coaching** 80:22
**collaborate** 110:20
**collect** 222:12 224:9
**Colwin** 2:15 53:7 56:20 151:10,19
　151:21 152:18 153:2,13,18 154:3
　154:8 155:14
**combination** 167:2
**combining** 231:19
**come** 30:10,22 31:10 45:19 58:2
　62:20 67:16 75:2 102:5 126:6
　138:7 175:4 198:3 202:19,24
　207:6 211:7 216:19 233:3,22
**comes** 148:11 155:23 156:17
　168:15 189:4
**comfortable** 62:13 111:19 116:10
　116:11 142:21 165:5
**coming** 40:8,18 164:5 176:24 177:2
**commenced** 163:15
**comment** 101:17 120:25 121:9
　122:10,15 123:2,7 140:22 156:19
　166:14 170:15 184:14,17 185:8
　185:17,22 187:11,16 188:8
　189:19 192:17 193:2 215:25
　222:23 231:8,11,14
**commentary** 137:13 161:23
**commented** 190:18
**commenting** 191:12
**comments** 57:13 101:3,6,9,10,12,13
　101:15,18,23 102:4,6,12 122:11
　137:12 142:7 171:12 191:23
　220:17
**commissions** 204:20
**commitment** 123:17
**committees** 229:12
**communicate** 189:7
**communicating** 79:24
**communication** 79:25 102:19 107:7
　147:14 164:21 178:15 203:8
**communications** 9:23 10:20 112:23
　201:10,12,16 202:14 203:9
**comp** 236:6
**companies** 39:6,8 199:21 200:3
　210:2 231:18
**company** 12:3 13:2,8,10,11 21:8

22:18 27:18,21,23 31:10 32:14 38:10 39:11 40:18 44:2 45:3,6,10 45:20 46:2,16 47:3,7 49:4 58:22 59:24 76:17 100:19,23 113:18,21 124:22 131:18 161:10 204:9 208:7 210:16,24,25 216:4 223:9 223:14 225:11 228:22 229:14,15 233:23 237:10 238:7
**comparable** 36:16,19
**compare** 151:7
**compared** 44:11 59:21
**compensation** 12:9 14:25 59:15 128:14 132:9,25 133:6 214:10 234:8,15,21,24 235:5 236:3,14
**competent** 79:15 149:25
**compile** 49:16
**complain** 143:9 171:10,15 176:12 211:11
**complainant** 145:12
**complained** 145:14 169:3,24 171:17
**complaining** 216:11
**complains** 137:8
**complaint** 108:4,7,9,23 109:6,17 115:8 169:13,17,19,21 194:9,19 216:13,14,18
**complaints** 108:19 110:25 111:4,12 111:14 114:21 115:3,15 141:4 157:10 158:12
**complete** 15:15 20:12 32:5 35:2,4 38:11 43:6 49:12 78:25 84:3 85:22 109:3 117:14,15 126:14 232:3,11 242:10
**completed** 7:3,6 16:8 24:5 27:12,24 39:20 45:22 60:14 74:24 76:7 77:25 81:16 83:14 84:6 86:20 88:20 89:10 91:4 104:15 105:25 111:10,22 114:7 116:6,12 125:8 131:17 165:6 225:15
**completely** 22:13 152:14,16 185:3
**compliance** 26:16 64:22 65:4 66:5 66:19 71:2,7 73:5 75:9 76:13 77:6 77:16 82:21 87:7 88:10 89:15 91:23 93:17 94:16 95:7,24 96:2,7 96:9 97:18 109:25 132:23 162:17 204:4 208:11,12
**comport** 64:7
**Composites** 113:25
**concept** 96:6,14
**concern** 80:23 81:6,13,19 83:13,19 83:20 84:5 100:23 113:6,7 134:13 156:2,5,13 163:24
**concerned** 43:15 80:24 83:17 100:19 113:12 114:18
**concerning** 8:21 14:2 17:24 35:12 51:19 66:4 68:21 70:14 73:3 76:10,25 77:2,4 82:20 101:24 103:16,21 106:15 111:25 112:18

122:12 134:4 145:20 163:20 193:3 201:10,16 202:6,15 209:23 210:4,5,15 217:15 218:25 239:3,9 239:13,18
**concerns** 80:10 88:2 164:6
**concluded** 242:2
**conclusion** 174:16
**concurrent** 229:8
**condition** 9:15 177:6
**conditions** 9:12
**conduct** 15:12 152:15 195:19
**conducted** 4:6 15:19,20 217:10
**cone** 166:11
**confer** 25:17,20
**conference** 1:22 4:12 5:12 53:8 56:21
**confessing** 112:24
**confidential** 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1,12,13 114:1,13 114:23 115:1,5 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1,11 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1

224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1
**confidentiality** 113:15
**confirm** 118:16,18 119:5 221:18
**confirmation** 151:22
**conflict** 168:15
**connection** 29:13 36:23 52:25 64:10 66:17 100:12 105:12 107:6 108:17
**connotation** 36:12
**cons** 77:23 78:17 79:11,17 82:17,19 82:22 84:22,25 100:7,11 108:11 108:12 133:13,23 134:5,20 136:7 136:14 140:10,17,21
**conscious** 165:3,10 168:3
**consciously** 166:2
**consent** 4:17
**consider** 82:10 230:16
**consideration** 82:24 108:11 133:14 208:15 225:9 235:13
**considered** 4:18 88:4 90:16 97:4 100:8,18 205:20,23,25 207:7 208:18 214:20
**considering** 84:25 93:15 150:8 155:21 159:5,6,21,23 197:14
**consistency** 19:12
**consult** 104:6 112:17
**consulted** 207:22,25
**consulting** 60:11 113:8
**consuming** 143:12 145:25
**contact** 200:8
**contacted** 182:10
**contained** 107:14
**contemplation** 130:19
**contend** 110:3
**content** 19:22 20:2,23 21:9 25:22 27:22 28:17,22 29:3 142:3
**contents** 9:22 64:2 118:22
**context** 123:11 170:23 211:23
**continue** 53:10 122:3 172:14 183:15 186:8 188:5 204:2 229:2
**continues** 172:15 191:5 230:7
**continuing** 147:13 176:17 188:16
**contract** 228:14,15,17,20,24 229:2 229:3 232:19 237:9,17
**contractually** 132:3
**contributed** 187:5
**contribution** 132:7,11
**contributor** 78:22
**control** 4:13 199:20
**controlled** 199:24
**conversation** 87:21 103:25 108:18 122:24 123:4,16 135:16 139:16 141:15 144:5,20,21,25 145:2,4,5 145:10 147:11 159:8 171:24 176:7 177:4 180:12 181:5 186:22

186:24 189:16 190:23 191:2,9
192:3 194:21 195:2 196:6,9
216:18 218:10,24 219:25 220:6
227:5,15,16,17,18,21,22
**conversations** 9:21,24,25 31:24
33:11 35:11,16 72:20,21 74:20
75:25 76:25 77:9 93:21 94:20,24
133:17 134:19 163:23 164:8,24
164:25 167:24 180:25 181:3
205:24 217:18,22,23 218:3,4
238:25
**converse** 187:24
**conveyed** 111:18 116:23 123:8,9
192:18
**conveying** 106:4 107:12
**cooperation** 241:3
**copied** 150:25
**copies** 51:13 52:24
**copy** 52:2 151:5 181:18 241:23,25
**corner** 56:4 120:7 157:2 188:6
192:6 196:8 198:10 218:20
**Corp** 198:19 199:18
**corporate** 11:13 17:22 18:4,11 21:2
21:10,15 22:14,17,25 24:8,20,24
30:24 31:10 33:14,22 53:6 54:8
54:10 58:3 62:3 83:12 180:3
**corporation** 1:9,9 2:17 11:24 16:23
**correct** 10:16 13:11,12,19 14:13,14
14:16,17 18:3 27:15 32:18 34:9
36:10,13 44:2,4,7 49:19 50:2,3,5
51:11,12 52:12 57:14 61:25 63:9
63:20 67:24 68:4 71:9,10 74:17
76:14,20 78:3,5 82:15 84:14
85:25 87:8,9,11,12 90:23 91:24
94:21 99:2 100:20 101:19 106:16
106:17,19,20,23,24 107:2 108:14
119:25 120:2 123:25 130:14
131:6,7 132:22 136:4 151:16
159:15,20 168:24 169:14,15,17
170:13 177:14 190:5,20,24
203:20,23,24 204:5 213:2,3,16
215:6,7 220:4 222:2 226:4,11
234:9 239:6,11,15 240:14,23
241:16,17 242:11,13
**correctly** 14:10 128:12 135:3
144:14 148:13 149:4,11 188:12
191:16 194:10 198:12
**corroborated** 69:12
**cost** 40:5,14,20,23 73:15,21,22,23
**Costa** 1:10 2:7,11 13:3 18:25 19:23
25:25 29:4 32:14,16,22 50:11,20
51:19 57:9 67:14,23,25 68:8
70:11,13 71:24 72:2,18 73:2 77:5
77:14 85:12 93:18 94:14,15,19
97:23 98:13,25 122:24 123:4
128:6 132:18,20 134:4 135:15
139:8 141:16,20 144:22 145:10
145:16,19 146:3,11 147:11,19

148:15 149:6 156:4,12 161:18
165:9 171:25 174:7 179:8 180:12
182:2 183:16 184:8 190:7,11
192:19 201:10,16 202:5,15
205:25 208:9 218:24 219:21
222:6 227:5,19 228:12,25 231:3
232:13 233:14 236:17 237:19
243:12
**Costa's** 51:2,10 70:23 71:6 72:15
93:22,25 94:6 128:13 132:24
140:2 162:8 174:8 178:19 182:20
183:6 202:10 232:19 236:8 237:9
**costs** 39:23 40:2,4 41:3,7 73:12,19
74:8
**counsel** 3:6 4:3,10,22 7:13,20 9:21
9:24 10:3 13:3,4 16:22,23 17:22
18:2,4,6,6,8,11,14,15,18 21:2,11
21:15 22:14,17,25 24:8,20,23
25:12 26:16 30:13,15,24 31:10
33:14,18,21,22 50:12 53:6 54:8
54:10 58:4,4 62:4 63:9,20 64:11
66:5,9,19 71:2,7 73:4 75:8,9,20
75:23 76:3,11,13 77:6,16 78:5
80:12,25 81:14 82:14,21 83:12,24
85:10 87:7 88:5,9 89:14 91:23
93:16 94:10,16 95:5,6,7,24,25
96:7,8,15,16,17,19,20 97:18
100:9,9 103:6,20 104:13 105:6
109:24 110:21 111:3,13 119:2
129:4,6 130:6,7,24 131:5,11
132:17,20 141:25 152:9 178:20
178:21,25 179:4,11,12 180:3
184:23 198:18 200:6 202:10,16
202:22 204:4 207:4 208:10,12
209:9,16 212:23,23 213:14,15
214:11,17,18,21,23 223:4 238:19
239:5,25
**counseled** 47:5,14,17 48:13 102:18
102:24,25 103:16,19
**counseling** 60:11 107:19
**counselor** 59:17
**counsels** 178:22 179:5
**counter** 188:11 237:8,10
**Country** 2:4
**COUNTY** 242:5
**couple** 110:10 127:5 143:20 198:21
199:16 230:13
**course** 6:19 8:11 10:7 72:11 80:14
100:4 105:23 194:23
**court** 1:2 3:18 4:7,23 6:22,25 7:10
17:9 110:8 118:10,20 154:12
167:11
**cover** 55:10 223:10
**coverage** 224:15 226:18
**covering** 62:2 63:5 64:9 213:6,8,9
239:22
**crack** 140:22
**cracks** 88:13 136:23 143:16 146:24

**created** 18:22,24 19:18 20:4,7 27:6
27:7,17,20 30:7 44:4 118:17
187:21 195:7,11 197:10
**creating** 231:20
**creation** 19:3 25:24
**crime** 112:25
**crisp** 151:5
**criteria** 23:24 24:2 26:24 77:15
175:24 240:2,3,13
**critique** 146:6,12
**critiquing** 146:3
**CROSS** 241:9
**crossed** 157:22
**cultural** 80:18
**culturally** 36:19
**culture** 36:13 135:24 140:15
**current** 131:10
**currently** 9:7 11:3
**cut** 196:23 230:3
**cuz** 157:21

### D

**D** 1:1 2:1 3:1 4:1 5:1,15 242:3 243:2
**D&I** 154:16 155:7
**daily** 111:16 165:15,16
**Dan** 210:24
**dangerous** 155:24
**date** 1:22 5:4 12:8 55:2 61:9 65:7
103:12 120:7 123:22 130:23
131:4 133:11 137:20,23 138:4
154:16 162:18 179:18,21 198:9
218:5,21 221:5,7
**dated** 134:9 139:3 141:11 160:2
171:20 200:15 226:25
**dates** 212:10
**day** 113:9 139:11,22 154:18 160:12
166:6 184:15 225:17 241:7
242:20 244:16
**day-to-day** 58:24
**DB** 198:12
**DC** 128:3 131:25 141:13 144:2,2
148:15 161:7 171:21 172:9,15
174:24 180:11,14 183:18 186:10
186:11,24 192:13,13 193:6
200:16 242:4,15 227:25 228:4
**DC's** 157:9
**deal** 79:23 104:5 111:7 136:19
137:2
**dealing** 116:3
**dealt** 105:15 115:2,16,16 235:9
**debate** 187:25
**Deborah** 116:14,16
**December** 98:20,24,25 134:9
137:18,24 138:5 139:3,11,17
**decided** 38:18 137:19 202:20 220:9
220:10
**deciding** 219:9
**decision** 36:25 66:21 68:7,10,11,14

68:16 74:5,15 75:17 95:5,10,11
95:14 98:7,21 124:18 137:21,23
139:19,20,23 168:8 185:3 201:17
202:24 203:2 205:6 207:10,22,25
208:10 216:20,22,25 219:10
220:7,14 222:15 224:13 225:10
225:22 226:16
**decisionmaker** 96:4
**decisionmaking** 68:3 70:20 80:8
201:17 203:10
**decisions** 189:6 226:8
**declined** 85:25
**deemed** 117:2
**def** 172:23 189:5
**DEF0000624** 56:3
**DEF0000069** 64:18
**DEF002520** 117:22 119:17
**Defendant** 2:7,16 10:13
**Defendants** 1:12 2:11
**defensive** 80:6
**deferred** 132:8
**defined** 198:15 199:4,16,21
**definitely** 80:22 150:9 155:22
158:22 167:23 189:5
**definition** 172:22,23 173:2,9
**degree** 11:17 34:24
**delay** 90:6
**delete** 200:25 202:3
**deleted** 202:6,11
**deletions** 35:10
**delicate** 199:13
**delivered** 50:4 54:22 55:11
**delta** 127:19,21 131:25
**demeanor** 114:22
**demote** 207:25
**demoted** 215:22
**demotion** 200:19 201:11,14,18,23
215:9,15 239:10
**Dennis** 227:25 228:4,7,13,18
**depart** 46:19
**departed** 46:2,15
**department** 13:11,19,21 14:3,4,15
15:7,10,19,21 16:10 29:21,24
30:3 31:25 34:9 46:15 47:19 48:2
49:3,10 51:15 52:13 64:21 72:17
81:11,15,20 82:25 83:20,22 88:17
102:3 103:22 105:20 107:23
109:7 120:13 121:22 122:13
127:10,15 137:9 161:13 171:9
180:6
**departments** 35:13
**departure** 45:3 210:16,21
**departures** 46:20,22 47:20 48:2,4
**depend** 47:9
**depending** 129:17,25 130:3
**depends** 109:14
**deposition** 1:19 4:6 9:20 10:21,24
11:11 152:11 242:9 244:6

**describe** 58:16 83:20 135:7 141:18
168:6 208:20
**described** 26:22 30:5,16 41:5
104:17 132:14 135:11 187:3,9
189:11 215:3
**describing** 105:10 180:18
**description** 20:21 25:8 91:13,15,21
92:4,9,16
**descriptions** 19:14 20:15,16
**desire** 84:14
**detail** 52:18 84:19 99:15 115:14
**detailed** 76:22
**details** 97:24 127:2
**determination** 37:14 66:21 73:25
75:7 93:3 204:8 208:5 225:2
236:9,11
**determine** 23:12 55:22 56:15 73:5
89:2 91:2 92:16 240:12
**determined** 19:10 23:14 38:22
47:16 67:17 98:9 204:2 213:22
214:2 224:24 235:17
**determines** 234:11
**determining** 38:14 39:14 92:24
**develop** 60:7
**developed** 79:16
**development** 123:17
**developmental** 88:3
**developmentally** 87:22 208:24
**dialogue** 15:14 80:6 164:13,20
**differ** 80:19
**difference** 44:9,16 91:9
**different** 15:23 28:5 35:7 36:19
73:17 87:4 93:13 100:7 103:9
106:3,18 123:10 133:3,11 193:12
202:21 212:2 213:24
**difficult** 79:19,23 80:2,3,7 81:4
102:12 109:11 177:22
**difficulties** 102:19,23 103:3 107:25
187:21
**difficulty** 81:12 83:23 100:14 102:7
108:13 187:25
**digs** 175:25
**diminished** 232:10,10
**direct** 5:20 15:11 24:17 26:14 35:15
53:15 61:6,23 65:23 72:24 74:20
81:9 101:12 110:8 118:9 156:25
174:16 191:2 229:18
**directly** 33:3 35:16 101:7,23 108:19
189:10,23 190:2 191:19
**director** 12:14,15,21 35:17 58:17
116:17 126:12 241:11
**directors** 70:5 229:11 237:3
**directs** 235:24
**disability** 178:6,16
**disappointed** 183:13
**disapprove** 58:15
**disapproves** 207:18
**disciplinary** 219:14,16,19 220:7

**discipline** 47:3 220:3,9
**disconnect** 85:11
**discovery** 152:2,15,22
**discretion** 130:12
**discretionary** 215:3
**discrimination** 178:3,6
**discuss** 19:22 25:24 50:8,13,20
51:18 77:14,19 93:22 115:21,22
115:24 197:2,2 225:25 226:3,5
236:6
**discussed** 72:10,13,16 77:21 85:13
89:6 90:15 96:18 97:13 108:10
181:6 183:25 186:11 215:17
217:24 218:12
**discussing** 105:5 114:19,21 137:17
**discussion** 49:15 72:12 87:2,3 96:12
97:10,16,22 98:3,12,24 100:13
144:15 155:2 156:3 159:18
177:12 183:22 190:10 197:24
208:14 213:17 218:12 219:17
223:2 225:19,20
**discussions** 19:25 33:4 50:21 51:3
65:2 66:20 70:13,17 72:13 73:2
74:19 75:21 76:9 84:13,16 85:16
93:17 99:5 134:4 163:9,12 167:25
177:15 182:5 187:22 197:22
205:22 210:5 211:16 217:4,14
218:16
**disjointed** 199:24
**disrespectful** 176:15
**Disruption** 161:13
**distinction** 87:10,14,15 89:12 90:12
90:17
**DISTRICT** 1:2,2
**document** 17:7,10,13,18,19 18:2,21
18:23 19:3,17,23 20:3,5,24 21:9
21:14 24:7,18,25 25:9,11,15,18
25:25 26:8,15 49:22,23 53:16
54:9 55:19,21 56:2,14 57:6 61:5
61:22,24 62:23 63:16 64:7 65:21
106:22 107:21 118:2,11,25
131:13 133:10,10,16 134:9,13,17
135:13 139:3 142:7 144:4 148:10
150:17,25 151:8 153:11 155:8,24
156:20 157:17,23 161:15,17,22
214:9 226:22
**documentation** 20:9
**documented** 50:2 158:18,20
**documenting** 117:9 157:15,16,17
157:19,21 158:13,15 170:16,19
170:22,24 171:2,2
**documents** 10:2,5 20:13 26:20 52:5
52:22 62:20 64:3 118:12 119:16
150:22 151:24 152:10,21 155:5
159:8,11 239:18,21
**doing** 192:14 197:14
**dollar** 222:24
**dollars** 233:24

**Donna** 1:10 2:7,11 13:2 18:24
25:23 30:12 32:14,16 33:2,12
37:15,16 58:11 66:20 67:14 74:19
75:15,21,23,23 76:9 77:10 79:14
79:23,25 80:7,23,24 81:6 86:13
87:22 89:7 95:2 96:12 97:14
122:12 123:7 125:6 128:6,13
132:3,7 134:4,19 135:11,16
137:14,16 139:4,7 140:2 141:16
141:23 144:5,6,7,7,8,13,15,20,21
145:5,9 146:22 147:7,17 156:12
158:11,19 159:9 162:5,19 163:8
164:5,7,8,12,15,19 165:9,17
166:2 167:24 173:12,16 180:12
180:20 181:4,8 183:24 184:19,21
184:24 185:3,23,24 186:22
187:16 189:15,20 190:7,12,17
191:18,25 193:15 194:13 195:9
195:15 196:10 205:23 207:11,12
208:8 217:2,15,17 221:3 222:6,6
225:3,21 228:14 234:23
**Donna's** 55:19 80:10 122:10 123:8
123:16,17 140:22 156:10,11
163:24 165:3 192:2 193:13 203:8
217:3 232:10
**Downing** 6:2
**download** 164:2
**draft** 181:9,11,22 182:2
**drafting** 182:6
**draw** 89:12 90:12 174:16
**dropped** 53:7 151:19
**drowning** 191:14
**dual** 59:3 233:18
**due** 177:20 228:15
**duly** 5:16 244:7
**duration** 12:22
**duties** 13:25,25 14:2 20:25 21:10
22:8,13,16 24:3 25:4 26:23 58:17
88:12 90:21 105:12 106:14
125:24 132:22 234:5,9,11 241:13

**E**

**E** 1:1 2:1,2,2 3:1 4:1 5:1,15 242:3,3
243:2,6 244:2,2
**e-mail** 139:4,12,22 181:9,11,22
182:3,6,20 183:6 201:9,12,15,20
201:20 202:6,14 218:13
**e-mails** 176:11,22 200:25 201:22
202:2,4,11
**earlier** 133:12,24 134:3 184:12
203:23 209:22 214:8
**early** 75:20 99:12
**earn** 219:4
**easier** 42:15 150:12 182:24
**easy** 161:8
**eclectic** 59:10
**edits** 28:21
**EDP** 140:19

**educate** 163:10
**effect** 3:17 41:6,16 98:21 130:20
183:17
**effective** 103:13
**effectively** 110:20
**effort** 165:3,10 168:3
**egregious** 47:16 224:24
**eight** 188:17 212:5 214:17 227:24
**either** 33:12 94:25 111:17 116:22
186:23 244:11
**elapsed** 99:4
**Elbaum** 83:9,17 100:17,23 102:5
108:4,8,17 128:7 130:7
**emotional** 105:3 110:16 137:7
141:4
**emotionally** 104:9 105:7,8
**employ** 124:18
**employed** 11:3 28:10 62:3 124:16
124:17 126:24
**employee** 15:12,13,14 34:12 47:13
48:19 49:25 50:5,22 52:9 59:15
65:24 69:5 104:5 105:17 107:23
115:20 125:5 126:6
**employees** 14:8 31:23 37:25 47:5
47:18 48:12 51:14 52:12 60:13
106:15 114:4 206:12
**employment** 12:22 52:21 104:24,24
223:10,16 228:14 229:3
**encumbrance** 76:10
**endeavor** 41:18
**ended** 229:3 232:19
**energy** 143:3
**ensure** 20:14 162:20 235:4
**entire** 7:6 12:22 160:16
**entirely** 68:4 123:10 237:14
**entirety** 14:13 17:8
**entity** 11:22 28:4,10 69:22
**environmental** 231:24
**EPL** 225:18,21
**errata** 233:9
**ESQ** 2:5,9,14,15,19
**essentially** 44:20 79:10
**establish** 23:24,25 164:18,20
**establishing** 26:23 35:12 36:23
et 64:24
**evaluate** 173:14
**evaluating** 23:25 29:16 225:13
**evaluation** 15:13,15,16 55:19
192:14,21 205:11
**evaluations** 117:14,15
**events** 8:16,20 239:19
**eventually** 122:22
**everybody** 168:5
**EVP** 136:21
**exact** 125:3 179:18,21 221:5
**exactly** 83:10 99:7 167:6 231:7
**examination** 3:7,16 5:20 241:9
242:1 243:3

**examined** 5:18
**example** 37:4 39:3 40:7 43:21 91:11
104:4 106:21 130:5 143:11
145:20,24 175:10 201:19 227:24
229:10 231:24 234:2
**examples** 91:12
**exceeded** 62:6 63:12
**exceeds** 57:3 64:14 120:20 121:8
209:9,19
**excerpts** 118:2,16
**exchanged** 176:12
**exchanges** 158:19
**excited** 64:20
**excuse** 59:11 79:20 116:8 131:2
153:18 165:19 193:20
**exec** 230:5
**executive** 13:3 80:13,15 132:17,21
229:12 230:24
**exercise** 130:12
**exhibit** 17:4,5 18:22 24:13,15,16
26:6,12,13 53:12,24,25 60:21,22
61:2,3 62:9,16,17 63:2,3,25 65:14
65:22 109:21 117:20,22 118:6
137:25 138:3,9,11,15,18,19,21,23
150:14,18,19 181:17,20,21
182:16
**exist** 151:24 152:21
**existed** 20:8
**existence** 27:23
**exiting** 178:21
**expand** 122:4
**expat** 111:17 113:25 116:7 126:2,4
126:13 143:11 232:23,24 233:16
235:7
**expatriate** 124:13,14 145:21 146:5
146:13
**expatriate's** 145:23
**expatriates** 125:11 126:17
**expats** 125:21 126:8 233:22 234:24
235:9
**expect** 7:15 8:9 112:25 133:6
172:25 173:3,6,24 174:3
**expectation** 64:14 122:3 173:7,23
**expectations** 47:7 48:20 57:3 62:7
63:13 173:7,17,19 209:10,19
**expected** 41:4 131:18
**expenses** 35:9
**experience** 23:2,6 94:9,14
**expert** 22:10 59:11,12 240:12
**explain** 29:2 31:12 39:3 124:22
144:9 235:2
**explained** 8:25
**explaining** 89:4 105:2 149:6
**express** 4:17 72:22 215:21
**expressed** 84:14,22 171:12 177:21
195:16 215:23
**expressing** 87:20 218:14
**expression** 72:25 159:13

expressive 105:4
extensive 76:20
extent 7:20 9:16 21:18 154:17
external 73:6,12 74:2,6,9 85:25 86:3 204:9,12
externally 71:5 72:13 74:16,23 86:16

## F

F 1:1 2:1 3:1 4:1 5:1 244:2
face 50:7,7,9,9,12,13
fact 5:12 79:18 87:22,24 112:21 168:16 177:18 187:19 189:14 215:22 225:7,12
factors 45:13,18,18 92:23 225:11
facts 104:12 105:22 185:2 187:6,9 197:19 225:12
factual 100:22
failed 47:6 142:18 144:17
failure 142:13,17
faint 227:3,7
fair 25:7 39:22 40:2 41:19 55:15 60:16 61:13 63:11 67:6 89:17 199:15 207:2 235:4
fairly 179:22
fall 136:22 140:22 146:24
falling 88:12 143:15
false 185:6 187:3 189:12
familiar 11:22 31:14 42:12 52:16 57:22 118:22 182:8 209:25 225:17
familiarize 53:16 61:12
family 79:5
far 47:20 57:17 118:4 138:16 145:17 188:11 215:17
February 120:8 123:13 129:12 131:4 163:24 214:24
Federal 3:2 4:4
feedback 111:15,25 160:13 163:19 164:22 166:7,15,20,24 167:5,19 167:23,25 189:21 192:15 205:10 205:14
feel 6:18 42:9 80:4 87:23 136:15,17 136:18 173:23 180:22 187:19
feeling 87:16
feelings 111:7
feels 140:17 173:16
fees 38:8
fell 59:14
felt 66:22 79:14,22,23 100:14 101:4 111:6 149:7 169:25 171:11,13,14 171:17 188:2
female 235:19,20 236:18,22 238:5 238:10,14
females 237:24
field 105:2,11
Fifth 2:8
figure 186:9

Figuring 143:3
file 52:10
filed 169:13,16,19,21
filing 3:7 154:13
fill 29:19 30:11 32:25 33:22 72:3 233:8
filled 33:10 44:7,20 67:2 71:3 132:20 179:13
filling 43:15 44:10,11 71:12 73:3
final 137:20 139:21,23
finance 14:9 35:18 126:12
financial 175:18,19 223:14
find 42:19
finding 73:22 204:20
fine 8:4 43:7 99:23 154:3,7 155:14 155:15 237:7
finish 34:19
finished 68:5 88:6 152:19
firing 14:20
firm 32:4,7 33:3 233:13
firms 175:23,25
first 5:16 12:15 28:3 31:3,7 37:6 53:4 55:6,11 62:20 63:18 70:11 93:23 94:3,15 95:15 120:3 125:18 161:22,23 172:7 188:17 218:2,4 219:3
firsthand 101:13,15,17,18
Fischman 1:4 2:22 6:6 13:7 45:25 53:5 54:4 57:2 58:3 64:8 65:3 66:3,8,15 75:3,8,12 78:7 79:12 82:6,20 94:13 95:4,23 97:17 98:18,23 99:5 100:12,14,19,24 101:24 102:6 103:16,20 106:4 107:4,12,25 108:5,8,23 110:4 111:4 112:2 115:9 116:23 121:10 128:6,24 130:16 133:13 134:6,14 137:19,22 138:24 140:3 141:16 141:20 144:22 145:11,11,16,20 146:3,23 147:15 149:7 151:25 152:22 156:3,13 158:22 162:15 162:24 163:20 166:20 167:18 168:14,22 169:7,14,16,24 170:12 170:14 171:5,10,15,25 174:7 176:12,18,21 177:13 178:5 179:3 179:5,10 184:9 186:25 187:5 188:14 190:19,19 191:13,24 192:21 193:3,16 198:3 200:19 202:6,17,20 203:19 204:3 207:25 208:18 209:9,15 211:7,19,25 213:23 214:16 215:8 216:20,25 218:25 220:24 221:10 224:14 226:10,16 240:5
Fischman's 52:16,19,25 57:9,23 58:7,9,13 61:25 63:4 66:18 102:9 102:18 103:12 108:11 110:24 114:22 123:9 131:14 135:8 146:12 147:18 148:21 179:11 184:4 201:11,18 217:16,19,24

239:4,10,14 240:16,19
fit 93:8,9
five 166:4 195:4 231:22
five-minute 43:6
fixed 129:16,17,24,25
flip 127:4 148:8 171:19 182:15 191:6 193:5 195:22 198:7 210:6
Flipping 190:22
Floor 2:8,12
focussed 59:5 74:22 79:17 87:22
focussing 77:22
follow-up 154:13 241:6
following 109:25 212:14 221:3
follows 5:19
force 3:17
form 3:11 7:13 12:9 13:15 14:5 15:16 107:12 220:3,9
formal 30:8,9 45:8 72:19 169:13,16 169:19 194:9,18
formalized 28:19
format 27:19 54:17 57:21
formatting 19:12,13
former 69:5
forth 164:25 218:13 244:7
forward 131:8 133:5 140:3 156:14 161:6 162:14 168:5 171:19 185:7 190:22 197:6 232:7
four 10:23 16:4,9 88:23 175:5 176:13 185:12,17,19,25 212:4 213:5 214:19
fourth 150:16
framework 89:16
free 6:18
frequent 165:16
frequently 109:15 164:8
fridge 34:11
front 61:7,17,24 64:6 65:24 189:7
frustrated 159:10
frustration 141:22 177:17,21
frustrations 137:11 141:6
Fujiwara 181:10,23 182:3,11 183:6 183:21
fulfill 60:5
fulfilling 234:2
full 35:24 61:4 87:11 88:9 91:23 92:2 95:17,25 96:8,14 98:5,8 100:9 131:17 212:19,21 213:8
fully 23:5 88:4 187:5
function 13:14,20 22:7 26:21 35:3 38:16,17,23 39:4,5 41:14 42:10 58:24 60:7 105:16 206:18,21 231:24,25
functioned 126:11
functions 59:22 231:22,23
fundamental 93:9,11
funds 37:25
Furman 154:5
further 3:10,15 4:14 170:10 240:25

241:19 244:10
**future** 5:4 42:20 140:5

_____

## G

**G** 242:3
**Gallop** 43:22
**Gallop's** 45:2
**Gap** 161:12
**Garden** 2:4
**GC** 18:5 72:8 73:4 91:3 98:6,8
122:16,22 123:6 129:5,8 131:12
140:4 149:19 160:18 161:9,11,11
172:11,19 173:8,9,17 179:8,9,15
189:17,17 208:24 213:4,5,9,10
**GC's** 77:13
**gen** 175:10
**general** 13:3,4 18:6,6,8,14,15,18
23:22 24:2,3,20,23 25:12 26:16
30:13 33:17,21 50:12 57:25,25
58:4 63:9,20 64:11 66:4,9,18
68:25 69:3,5 71:2,7 73:4 75:8,9
75:20,23 76:3,11,12,24 77:3,6,16
78:5 80:12,25 81:13 82:13,20
83:18,24 85:10 87:7 88:5,9 89:14
91:23 93:16 94:8,10,16 95:5,6,7
95:23,25 96:7,8,15,16,17,19,20
97:18,25,25 100:8,9,25 103:6
109:24 129:6 130:24 131:5,11
132:17,20 141:25 162:16 178:19
178:21,22,24 179:4,5,10,12
184:22 186:12 202:10,16,21
204:3 207:4 208:10,12 209:8,16
212:22,23 213:14,15 214:11,17
214:18,21,23 218:11,12 239:4,25
**generalist** 60:17
**generalizing** 170:6
**generally** 8:19 15:8 19:7,15 22:8,16
23:7,15,19 30:12,15 32:3,6 33:2
35:5 39:12 40:13 45:11 47:5
49:11 58:16 60:9 125:24 167:15
168:25 180:17 234:25 235:7
236:5
**Genesis** 175:11
**Genomatica** 217:6,11,15,20
**gentleman** 124:6
**gestures** 7:11
**getting** 40:8 105:3 114:16 142:18
142:21 143:2 144:17 145:6
171:18 208:24 211:13
**give** 61:4 90:8 91:11 112:5 130:13
132:5 146:7 149:19 153:20
160:14 164:16 165:4,10 166:8,16
167:2,4 168:5 185:12,16,25
189:14 230:2,23
**given** 97:10 163:19 164:22 242:12
244:9
**giving** 172:18,19 185:19 213:17
222:24

**go** 21:18,22 74:13 78:13 85:17 87:4
89:5 92:23 104:23 110:14 118:23
119:6,7 133:2 139:14 142:4 147:9
150:8 154:23 155:21 158:8 159:6
159:14,22,23 175:17 182:25
191:8 192:20 203:6 207:15
**goal** 122:21,21 123:18 140:4
**going** 7:8 32:2 56:7 67:17 70:12
72:13 86:16 99:20 115:25 118:7
133:5 143:17 153:8,15 154:3
156:13 160:18 162:14 165:23
180:22 188:10 195:18 197:6
201:21 204:2 208:21 215:19
226:9,11,14 232:7
**good** 6:4,15 142:20 161:12 172:11
188:11
**GORDON** 2:10
**gosh** 36:5
**gotten** 150:2
**govern** 154:4
**grayer** 83:21
**great** 12:5 115:11
**Greek** 127:18,21
**Greeley** 116:21
**grooming** 163:5
**ground** 149:18
**group** 199:20,24
**grow** 122:3 189:22
**growing** 140:14
**grown** 121:9 136:4 140:16
**Guarantee** 198:19 199:18
**guaranteed** 129:24
**GUERON** 2:7,9 5:7 16:3 22:19
23:10,18 24:9 45:17 48:24 50:16
50:24 57:24 70:6 74:11 75:5,14
84:11 85:7 86:10 89:21 90:25
91:18 92:8,19 93:5,20 96:3,11
97:20 101:25 106:8 109:10 110:7
117:11 138:10 140:8 146:20
155:15 174:12 178:14 184:20
197:21 198:24 203:16 204:11
216:16 221:14 223:11,18,24
224:17,21 234:13,16 236:24
240:8 241:21
**guess** 86:11 220:5
**guideline** 29:15
**guidelines** 129:21

_____

## H

**H** 243:6
**hair** 188:18
**half** 185:14
**hand** 109:6 244:16
**handle** 88:11,16 160:14 166:7,16
166:25 176:25 177:3 198:4
**handled** 169:4
**handling** 105:21 199:13 200:5
206:20 217:10,16,19

**handwriting** 142:10
**happen** 98:4 233:7
**happening** 141:19 143:8 168:8
**happens** 31:3
**happy** 8:4
**harassment** 68:22 117:17
**hard** 143:15 146:23 147:5 227:8
**Harry** 124:6,21 125:3
**Hasebe** 124:4,6,21
**Hasebe's** 125:3
**hat** 132:9
**head** 31:25 33:16,16 168:15,19
188:9 212:11
**health** 39:7 59:6 231:25
**hear** 6:10 7:12 122:7 151:12 152:6
230:24
**heard** 32:9 95:15 108:24 109:5,14
109:15 191:18,25 192:2
**hearing** 101:2 108:25 116:9 164:11
191:19,22 192:2
**heightened** 157:10 158:11
**held** 1:22 155:2
**help** 16:13 62:24 91:11,14,15
137:25 142:4 163:12 170:14
188:10 211:23
**helpful** 233:10
**helping** 177:24
**hereinbefore** 244:7
**hereto** 3:5
**hereunto** 244:15
**hierarchical** 80:19
**high** 83:11 137:2 173:7,18
**higher** 37:17 73:19,20 80:13 120:9
123:22 130:2
**highest** 138:15
**hip** 104:8
**hire** 29:8 30:14,19 73:12 160:18
179:18 205:7 207:10 208:10
223:4
**hired** 12:17,24,25 13:6 32:18 37:6
37:13 83:10 121:19 179:20 180:3
216:4,5
**hiring** 14:18 29:11,14 30:2 43:12
161:11 207:3,13 208:15
**Hiroo** 13:2
**historically** 57:23
**hold** 12:21 64:4
**holding** 174:7
**Holdings** 1:8,9 2:11,17 11:15,19,23
12:3,10
**honest** 186:24 189:10,23 190:2
192:15
**honestly** 206:23
**hook** 222:14
**hostile** 176:14
**hours** 10:23
**HR** 13:14,20,25,25 14:2,4,7,7 22:7
22:9 23:11,23 35:2 38:16,17,23

41:13 58:18,21,23,24 59:11,11,11
59:12,14,21 60:5,7,16 88:25
89:16 90:22 105:14 106:12
111:17,24 112:3 113:18 116:16
117:7,8,13,13,14,15 231:25
240:11
**huge** 64:23
**human** 12:14,16 14:12 241:11
**husband** 210:23
**hyphen** 172:10

**I**

**I-C-H-I-Y-A** 36:8
**Ichiya** 36:8
**idea** 95:19,20,20,21,22
**identification** 77:5 138:20 150:20
202:15
**identified** 25:2 75:3 82:23 86:17
88:23 108:12
**identify** 118:13 156:12
**identifying** 31:20 85:14
**idiosyncrasies** 135:23 140:15
**Iguchi** 36:6,7,7
**II** 55:25
**III** 57:13
**Immediate** 223:7
**immigration** 235:3
**impact** 9:8,12,17
**impairs** 9:16
**implicating** 114:25
**import** 106:25 107:4
**important** 7:9 76:25 89:8 143:13
224:2
**impressions** 136:11
**improve** 47:14
**improved** 150:2
**inappropriate** 152:14,16
**Incapable** 142:12,16
**incident** 169:2
**include** 81:23 83:8
**included** 13:18 14:15 83:6 159:13
195:12 205:6 231:23
**includes** 189:13
**including** 70:20 134:6 155:6,7
**inclusive** 14:2
**incomplete** 156:15
**incorrect** 145:6
**increase** 34:7,8 40:13,20,23 41:4
121:6 128:13 236:7
**incrementally** 44:12
**incubator** 125:2
**incumbent** 174:10
**incurred** 39:22
**independent** 38:18 137:14
**Index** 1:7
**indicate** 128:10 144:6
**indicated** 61:10
**indicates** 63:12 128:13 165:25

198:9
**indicating** 170:12
**indication** 48:25
**indirectly** 74:7 193:4
**individual** 1:10,10,11 31:5 35:22
45:20 47:15 49:15 58:21 77:12
78:22 79:18 89:3,8,13 113:19
125:4 130:3 179:19,20 235:6
243:12
**individuals** 77:21 84:23 90:15
100:13,18 101:2,23 124:23 184:2
186:5
**inefficient** 148:18,22
**infer** 139:17
**inform** 220:8,11
**informal** 30:9 45:9 72:20 103:24
**information** 7:21,23 8:17,21 61:7
106:25 113:14 135:12,13,14
163:5,7,13 164:2 192:20 197:7
235:16
**informed** 32:9,21 138:24 178:5,9
184:25 187:6
**informing** 192:18 200:18 228:12,18
228:18
**informs** 106:22
**inherited** 39:15 94:3
**initials** 128:4 143:21 144:6,9,10,12
158:2 222:20,21
**input** 70:18 97:15 182:7,7,8 186:10
219:15
**inquiring** 8:13
**INSERT** 233:11
**inspection** 152:2,15,22
**instances** 41:14 102:16
**instructed** 7:14 75:15,16 86:18
87:18,25 92:21 112:8,13 184:23
**instructions** 112:20
**instructor** 90:22
**insurance** 222:13 223:3,10,13
224:9,15 225:11,18 226:17
**intelligence** 110:16
**intention** 7:17 29:23 140:2 158:22
159:14
**intentions** 157:9
**inter-peer** 107:6
**interact** 33:6 88:14 106:15 150:10
155:23 156:10,16
**interacting** 142:19 156:13
**interactions** 102:20 104:17 105:10
111:5,16 158:18 165:16,16 178:2
198:4
**interested** 8:14 72:22 79:6 207:2
244:13
**interesting** 11:10
**intern** 121:13,17,18,20,24
**internal** 73:6,25 74:6 75:19 85:19
86:4,7,14
**internally** 71:4 74:16

**interns** 121:22
**interpersonal** 107:24 110:15
116:23
**interpret** 158:10 172:3 174:6
185:23 189:20
**interpretation** 60:3 122:9 123:14
148:7
**interpreted** 185:7
**interpreting** 128:12 144:14 145:5
**interrupt** 165:19
**interrupting** 193:21
**interview** 13:5,5 205:8,12,15 206:8
**interviewed** 206:11
**interviews** 204:25 205:4,15 206:15
206:17,25
**intimate** 22:23 207:20
**intimidated** 111:8
**intimidating** 104:3
**invested** 185:4
**investigate** 197:25
**investigated** 69:8,10 109:7 197:19
**investigating** 197:14
**investigation** 68:21 195:19 197:15
197:17 217:10,12
**invited** 204:25 205:3
**involuntarily** 46:2,15
**involuntary** 46:20 47:19,25 48:4,14
**involved** 14:18,20,22,24 15:3 25:14
58:6,9,12 60:10 66:16 68:13,16
69:5 73:24 74:4,5,14,15 183:22
189:6 197:22 216:22
**involvement** 19:2 49:8 205:16
216:24
**involving** 154:12
**iPhone** 151:4
**issue** 47:10,12,15 49:2 61:9 103:24
104:25 106:21 154:14 161:8,11
168:14 176:11 177:5,13 189:11
198:14 199:4,7,22 209:23 210:15
210:17 211:8 221:19
**issues** 48:18 59:14 60:4 79:24
102:19 104:5 105:18 114:18
115:20 116:23 158:20 161:6
178:3 182:6 198:18 199:17
215:17
**Item** 135:18
**IV** 56:23

**J**

**January** 162:22,23 163:23 214:24
218:7,23 221:4,25
**Japan** 69:21,23 70:9 73:10,13,24
74:4,5,14,21,21 75:3 76:2,6 85:4
85:9,13 86:15,18,22 88:15 121:21
121:21 125:3,15 149:18 160:17
160:19 161:7 180:21 182:9
183:23 184:2,23 186:5 201:21
203:8,9 204:13,14 207:15,17

218:14 220:20 228:17 230:2,9,23
231:9 235:6
**Japanese** 36:13 80:13,14,17,20
111:17 113:25 124:9,11 125:11
125:21 126:2,3,6,16 233:16,22
234:24
**JE** 128:3
**jeez** 31:4
**Jenn** 121:2,8
**Jennifer** 1:4 2:22 6:6 30:20 33:12
74:22 75:16,18,21 76:2 77:10,22
77:23 78:7 79:13,18,19,24,25
80:2,11,14,23 81:3,9,12 82:5,6,13
83:24 85:4,9,9 86:12,16,19,25
87:5,16,19,23 95:22 96:5 101:5
103:19 104:7 105:4,14,19 111:7
111:19 114:5 115:3,16,24 116:4
116:11 122:10 123:15,18 125:6
128:6,24 134:13,20 137:21 139:5
139:19 140:3 141:23,24 143:6
144:8,13,22 158:19 159:11,14
162:20 163:8,17,25 164:2,4,9,10
164:12,13,14,17 165:4,5,10 166:3
166:25 167:3,16 169:3 171:12
173:25 176:8 177:18,21,24
179:19 180:22 183:25 184:4,22
184:24,25 185:2,4 187:17,19
189:14,18,21,21 192:14 193:14
194:13,16 195:11,20 196:14
197:10,23 203:17 217:5 222:7
224:22 237:2,3
**Jennifer's** 80:15,20 81:11 98:14
123:16 144:19 158:12 167:5
168:4 173:14 217:10 219:11
225:14
**JF** 128:3 134:11 141:13 143:25
144:2 148:21 157:8 168:11
171:21 176:7 186:13 187:12
193:7 196:3,12 200:16 222:4
**Joan** 200:8
**job** 12:13 16:2 17:22 21:9,15 24:19
26:15 31:15,18,21 54:3,6,9 61:9
91:13,15,21 92:4,9,15 93:8
106:14 170:15 186:9 188:9
189:22 191:13 204:21
**Joe** 31:8,9 37:8 83:22
**JOHN** 1:11
**joined** 13:8 27:14,18,21 28:3,7
32:13 39:2,11 41:5 53:4 94:3
208:7
**joining** 27:23
**JOLLY** 2:19 5:8
**Jordan** 83:9,13,22 100:17 120:20
128:7 175:22
**judge** 153:22,23 154:5
**judgements** 137:6
**judgmental** 188:24 189:3,4
**judgments** 141:3

**July** 160:14 166:8,16,19 167:18,22
168:7
**June** 168:3
**junior** 16:15 180:2,5

### K

**K** 242:3
**KANE** 2:3
**Kath** 120:20
**Kathryn** 78:12
**Katiama** 235:21
**Katihama** 235:18
**Kaz** 120:20
**keep** 56:7 122:16 123:6 142:15
153:8 186:10
**keeping** 177:13 207:3
**Kell** 120:21
**Kelli** 81:23 82:5,6,14 101:10,15
107:24 143:9 145:13 171:18
176:22 177:21,23 178:2 190:4,13
191:19 192:2,3 194:16,18,18
196:14 197:23 198:5
**Kelli's** 171:6 177:16,19 192:17
195:11,19 198:5
**Ken** 180:15 182:20 183:19,20,21
186:4
**kept** 119:23,24
**key** 19:7,8,15
**kind** 19:7 39:14 41:17 59:3,9 104:7
127:11 140:25 165:25 192:23
**knew** 66:23 79:13 165:15 204:13,14
**know** 6:11,14 7:7 8:9,19 10:5 17:10
17:14 18:22 19:12,17,19,21 20:3
20:7,11,20 22:6,8 28:12,21 33:5,7
33:14,20 34:15 35:6 36:3,18,24
36:25 37:13,16,21,24 38:3,5
41:10,15 42:11,13,16,17,19,21,25
45:3 49:15,16 53:2,5,19 55:5
59:24 65:16 68:7,10,11,13,20
69:2,3,7,11,14,18,22,25 70:4,7,8
70:9,10 72:9 73:20 75:6,7,17 84:5
86:15 87:17 89:5,6 92:2,16 93:25
94:6,9,13,23 95:10 97:9,14,15
98:18 99:4,7,22 104:10,11,13,23
105:20 107:17 113:5 115:18,19
115:21,23 116:2,7,14 124:10,10
124:11,15 125:15 126:16,21,22
126:25 129:20,23 133:23 139:7
139:21,23 146:5,18,21 154:12,12
156:17,23 157:9 163:6 164:12,17
165:13 167:24 170:21,25 172:8
172:12 174:6 176:2 177:2 179:16
179:18 180:21 182:10 187:24
188:2,3 189:6 201:5,7 202:5,8,9
202:13 204:17,21 205:19 207:16
207:18 209:5,7 210:9,20,22,23
211:2,4,5 215:16 217:9 218:6,16
219:9 220:5 221:6,11,15 223:9

224:2,6 228:18,23 229:7,10 231:2
231:6 232:20 233:17,21,25 235:2
235:5 236:10,10,13,15 237:8,16
237:19 238:4,5,8,9,11,12,13,15
**knowing** 103:24 116:2 157:8
**knowledge** 5:10 8:16 22:22 52:11
52:15 55:25 56:11 69:13 93:6
94:25 100:25 116:25 135:4
140:13 202:3 207:20 217:13
229:17 232:15,18
**knows** 135:18 140:14 175:6
**Kohei** 35:23 36:2,6,8,15
**Kohei's** 35:24
**KT** 168:11 176:7 192:13 194:8,8
196:2,11

### L

**L** 1:1 2:1,5,14 3:1 4:1 5:1 242:3
**labeled** 150:15
**lack** 129:21
**larger** 158:9
**late** 183:16,18
**law** 4:19 223:10,16
**lawsuit** 10:10
**lawyer** 89:17
**Lay** 149:18
**lead** 32:9,17 64:22 80:8
**leaders** 59:25 60:12
**leadership** 89:6 110:18
**leading** 64:21 102:10
**learn** 30:10,12 135:4,5 137:7,10
141:3,6 175:4 207:6 229:24
**learned** 70:11 136:4 140:16
**learning** 140:14
**leave** 67:17 71:8 81:14,20,25 82:14
83:2,6,13,17 100:19,23 150:13
178:16
**Leaves** 175:20
**leaving** 45:20 73:4 228:21
**led** 13:5 177:4 201:17
**left** 21:8 30:4 56:4 86:4 113:23
120:7 143:21 148:25 157:2 160:8
174:21 175:16 179:9 183:11
188:6 192:6,11 193:21 196:7
198:10 218:20 226:23 227:9
229:14,15 230:4,10 233:3,14
**left-hand** 157:5 161:15 174:18
**legal** 7:18,19 13:11,18,21 14:2,4,9
14:15 15:6,9,19,21 16:10 17:24
22:10,11 29:20,24 30:3 31:25
33:2,10 34:5,9 46:15,19 47:19
48:2 49:3,9 51:15 52:13 64:21
72:8,17 75:19 81:11,14,20 82:25
83:19 88:17 89:2 94:9,14 102:2
103:22 105:12,20 107:23 109:7
120:13,16 121:22 122:12 127:10
127:15 160:20 171:8 180:6
187:22

**legally** 79:15
**lesser** 173:8
**let's** 9:3 21:20 26:5 43:7 55:6 62:10
65:13,14 67:3 78:13 87:4 99:24
104:10 105:8 109:20 117:19
138:6 148:8 150:17 153:3 154:23
168:10 170:11 193:5 198:7
200:13 221:22 226:21 233:5
238:16
**letting** 150:8 155:21 159:6,22,23
**level** 30:17,24 31:7 32:2,3 33:7,16
33:21 34:16 56:23 68:25 69:3,5
72:8 78:5 79:6 80:13,13,15
131:12 141:22 142:23 143:2
173:15,16,23,24 179:15 208:24
214:12,12
**Lexington** 2:17
**liabilities** 199:2
**liability** 198:23 200:3
**lie** 160:16
**likewise** 30:18,19
**limit** 136:16,18 140:18
**limited** 136:19 206:14
**line** 34:11 107:17 114:12 122:2
132:25 145:24 161:14 162:3
170:12 172:4,7 174:2 175:7,10
176:13,20,21 177:5 180:14
182:22,25,25 185:13 186:6,8
188:8,17,23 189:8 190:14 191:8
193:18 195:4 196:2,11,16,20,21
200:21,21 207:19 219:3 222:9
223:6 224:8 227:24 229:19
**lines** 34:11 161:23,25 162:7 164:7
166:4 173:4 185:11 191:15
222:10 229:22 230:7,14
**list** 175:23
**listed** 140:21
**listen** 175:6
**listening** 157:8
**litigation** 4:20 10:7 17:20
**little** 32:8 37:10 53:13 56:8 61:16
66:2 67:4 68:10 84:18 123:10,22
133:20 136:6 142:14 143:23,24
147:4 151:5 157:13 160:6 175:9
175:16 176:4 181:13 182:23
190:25 192:9 227:9
**LLP** 2:3,7,10,16
**locate** 239:18
**locations** 4:10
**lodged** 117:17
**long** 97:17 109:23 150:4 152:8
192:23 201:25 241:7
**look** 17:9,11 26:5,8 27:20 55:21
56:15 61:11 62:11 64:5 85:18
129:12 137:25 140:9 168:10
192:6,10 195:4 204:9,12 210:9
221:22 227:24
**looked** 55:14 102:9 180:25 184:14

**looking** 8:20 18:2,21 30:17 33:6
56:6,10 65:10,11 74:23 131:8
138:13 139:10 147:2 172:14
176:13 182:14,22 183:24 184:13
185:10 191:15 197:9 227:16
**looks** 136:15 194:21 196:6 198:11
221:24
**lose** 222:12 224:9
**lost** 151:13
**lot** 121:9 164:13
**loud** 80:17
**loudly** 6:11
**lower** 136:6 173:7 227:12
**lunch** 99:16
**luncheon** 99:25
**lying** 160:12 166:5 184:15 185:5,8

## M

**M** 242:3
**M-A-T-S-U-G-U** 206:23
**maintaining** 204:3
**making** 153:25 156:8 165:9
**Mako** 121:23,24
**male** 216:2,4,5 233:15,16 235:19
**manage** 137:7,10 141:3,6 177:25
**managed** 45:10,11
**management** 40:3 88:15
**manager** 54:25 57:7 111:17 112:3
142:20,23 143:2 144:17 190:15
190:19
**managerial** 81:9
**managers** 49:12,14 50:9 60:13
105:15 111:24
**managing** 81:10 177:24
**manner** 4:16 106:6,11
**MANSUKHANI** 2:10
**March** 54:6 55:2 150:9,9 155:22,22
158:23 159:19,20,24 163:24
214:24 226:25
**margin** 143:21 158:6 192:10
**marginalia** 157:4 158:3 174:17,21
**mark** 113:13 114:12,22 115:4
150:17
**marked** 17:5 24:15 26:13 53:25
56:10 61:2 63:3 65:22 138:14,19
138:22 150:19 181:19
**marketing** 231:24
**marketplace** 73:23
**markings** 136:9
**marriage** 244:11
**match** 21:9 23:7
**matching** 23:15,19
**material** 227:11
**Matheson** 230:17,20 232:17
**Mathew** 6:5
**Matsugu** 206:22
**Matt** 114:12 150:21 153:13 154:11
**matter** 42:23 115:7 177:16,16

198:21,22 200:2 217:7,11,15,20
239:22 244:14
**matters** 88:17 114:20,25 171:8
199:13
**Matthew** 2:5 43:4 138:10 151:10
151:21
**MCC** 231:19
**MCCA** 113:24
**MCHA** 11:9,14,18 12:12,17 13:7
13:14 14:8,13 15:11 16:23 17:24
20:10 27:14 28:5,10 29:7,11,18
30:21 31:17,22 34:3,5,17 35:12
35:14 37:23 38:5,7,9,14 39:22
40:12 41:18 42:10 43:22 46:19
47:2 49:10 53:4 58:18,20,22 59:2
66:25 67:6,10,16,23 68:2,14 69:6
69:16,19 70:12 75:15 77:2 80:25
80:25 86:18 94:11 104:6 117:24
119:23 124:7,16,17,19,21,23,24
124:25 125:4,6,10,16,22 126:6,10
126:17,24 130:12 198:23,25
199:8,10,11,15,19 201:24 203:25
206:12 223:9 228:25 230:12
231:10 232:9,9,22 233:18 234:3,5
234:12,20,21,22,23 235:17
236:16,19,23 237:4,23 238:25
**MCHA'S** 37:24 40:14 199:3 236:14
**MCHC** 11:21,25 20:11 68:13,15,19
70:2,5 86:23 125:13 126:6,18,23
199:9 207:22,24 231:17 233:19
233:25 234:14 236:13 237:12,17
238:9,11
**MCHC's** 238:13
**MCUSA** 28:7
**mean** 6:20 35:5 37:10 47:11 49:23
79:9 97:8 107:16 108:9 121:5
122:6,8,19 123:14 132:2 139:20
144:12 156:22 157:24 158:5
166:19 169:9 173:10 174:4 184:4
184:17 185:8 186:16,19 194:12
195:10 196:11 197:5 201:14
214:2 218:11 219:7 231:16
**meaning** 16:2 71:4,4 96:25 124:25
131:10 213:12 233:18
**means** 8:18 61:12 121:7 122:10,20
127:21 170:19 172:12 219:8
**meant** 113:4 162:12,13 201:8 231:7
231:14
**Medicago** 230:17,18 232:14
**medical** 9:11,15 177:6,9,13,20,23
195:13,21 196:23,25 197:5,11
**medication** 9:7
**meet** 47:6 164:9 175:23 215:8
**meeting** 4:12 48:20 50:7 95:3 193:7
193:10,14,15 215:10 217:2
220:12,18 221:2,7,8,8,11,12,17
221:17,21,22,25 222:8 225:2,3,4
225:23,24 226:5 227:4

meetings 50:10,13 51:10 163:8,9,12 220:23 221:7
meets 120:20
member 70:4 103:21 236:22 238:5
members 82:25 238:14
memorandum 107:11
memorialized 109:16 181:2
memorializes 190:8
memorializing 135:12,14 144:4
memory 9:16 35:25
mention 177:9
mentioned 11:14 45:25 78:4 81:19 84:25 85:3 94:19 100:17 108:17
mentioning 100:12
mentor 80:3
Mercedes 2:15 151:12 155:12 222:17 223:5
met 175:22
method 44:21
methods 106:18
middle 120:4,15,17 160:23
mind 9:3 22:15 71:23,25 90:17 110:2 147:6 179:24
minimally 40:24,24 41:4
minute 112:12 132:5
minutes 99:21,24 143:7 153:4
misinterpreting 170:13
missing 136:12,13
misspoke 131:2 214:15
Mitsubishi 1:8,9,9 2:17 11:14,18,23 12:2,10 28:3 113:24 203:23 229:13
Mitsubishis 2:11
mix 168:16 177:18
mixed 206:25
MKIC 210:2,5
moment 26:4 109:23 118:19 138:8 143:18 154:23
money 161:7 204:15 222:14
months 55:8 160:13 166:6,15,24 167:10 175:5 188:17 212:4,5 213:5 214:17,19 228:16
morning 6:4
Moss 178:11
motion 154:13
motivated 224:15 226:17
Mount 6:2
move 7:4 9:3 17:10 26:10 42:25 61:18 117:19 121:16 134:23 155:13 160:8 161:6 168:4 183:10 227:9 229:4
moved 69:20 193:21
moving 140:3
MPCA 113:22
multiple 115:20
Musacchia 1:23 4:23 5:17 244:4,19
Mytex 113:18 114:10 115:15,17 116:8,17

**N**

N 1:1,1 2:1,1,2 3:1,1 4:1,1 5:1,1,15 242:3,3 243:2
name 5:22 6:4 28:9 35:22,24 37:6,6 112:6 116:20 125:18 200:10 233:2,8 243:12
named 10:12 43:22 124:6 125:16
names 11:13 36:15
narrative 57:12 185:6 187:4 189:12
Nathan 43:22 46:7
nature 59:16 70:16 101:6 115:7 178:4,6 227:21,22
necessarily 50:25 51:20 73:20 78:23 109:18 115:19 116:10 165:2
necessary 8:17
need 43:6 67:2 92:16 93:2 109:23 136:16,17,18 137:10 140:18 141:6 151:10,21,22 152:19 153:21,21,23 157:9 158:11 160:7 160:21 167:16 170:15,24,25 172:16 177:6 183:13,25 186:9,24 195:6,16 219:4
needed 80:4 110:9 187:20
needing 189:21
needs 27:9 62:10 88:3 113:4
negative 106:5 107:5,13 114:6 160:18 191:21,23
negotiating 228:16
negotiations 228:24
never 147:6 152:8 175:5 187:5 188:20
new 1:2,24 2:4,8,8,13,13,18,18 5:18 30:14 36:24 40:7,11,18 41:5 44:11,19 55:7 64:20 73:22 121:13 121:17,18 163:15,20 175:14,17 207:3 232:6 244:5
newer 83:21
Nicholas 1:9 2:11
Nick 30:18,19 33:12 217:2,3 218:13 219:9,10 220:22 225:3 240:4
Nick's 220:7
Nicole 2:9 155:12 241:25
nine 189:9
non-employees 46:14
Non-Party 1:20
nonqualified 132:8
normally 206:21
notary 1:24 3:17 5:17 169:2 242:23 244:4
notation 146:17 156:9 163:19 165:23,25 172:15 176:6 230:22
note 147:7 156:15 157:14 159:7 165:20 166:5,9,23 168:11 170:4 170:11,12,21 171:20 172:3,12 174:2 180:10 183:10 190:4 192:12,16 193:6 195:24 196:5 198:9 200:15 221:25 224:8,10

**O**

notebook 118:21 119:9,12 147:10 150:15 151:17
notebooks 76:18 117:24 118:3,17 119:22,25 239:6,11,15
noted 8:13 139:16 154:22
notes 76:18,20,22,23,25 77:4,9 107:11 120:19 122:11 123:3 134:18 138:11,13 139:10 143:25 145:8 148:5 157:4,24 158:5,6,20 158:21 164:3 171:13 180:10 181:2 182:13,19 183:4,5,9,12 184:12,13 186:21 188:5 190:11 190:12,24 192:5 193:9,10 210:4 218:23 221:7,8,12,21 225:7,17,19 225:24 227:14,23 238:18,23,24 239:3,13 243:8,9
notice 1:21 200:16
notified 98:20,23 99:6 137:22 215:9
notifying 196:3,12,14 201:4
November 183:14 214:22
nuances 22:11
number 33:9 34:7 72:12 88:12 115:17 119:24 131:21 135:18 136:3,15 138:11,15 142:7 151:22 163:9,10,11 177:15 196:7 201:22 206:14 221:17 226:9,10 238:22
numbers 129:12,15 131:8,9 136:7 136:14 173:5

**O**

O 1:1 2:1 3:1 4:1 5:1 242:3
oath 4:8 100:5 112:21 242:9
object 90:8
objection 5:2,4 7:12 13:15 14:5 16:3,17 21:3,12,17 22:19 23:9,10 23:17,18 24:9 25:6 27:2 29:5 37:3 37:19 38:2 40:15,22 41:8,12 42:3 44:13,22 45:16,17 46:4 47:8 48:6 48:23,24 49:20 50:15,16,23,24 51:5 52:14 54:18 55:17 57:24 60:18 63:14,22 67:8 70:6 71:14 73:8 74:3,11 75:5,14 76:16,21 82:11 84:10,11,15 85:6,7 86:10 89:20,21 90:2,24,25 91:10,18,25 92:8,12,18,19 93:4,5,20 94:17 95:9 96:3,10,11,23 97:5,20 99:11 101:20,25 102:14 105:13 106:7,8 107:8,15 109:9,10 110:6,7 117:5 117:10,11 122:25 135:9 140:6,8 146:20 149:9 158:24 163:3 166:21 167:21 169:18 170:3 173:11 174:5,11,12 178:8,13,14 184:6,10,18,20 186:18 187:7 192:22 195:17 197:20,21 198:24 202:7,12 203:16 204:6,11 206:13 208:3 209:3 216:15,16 221:14 223:11,17,18,23,24 224:17,20,21

226:5 227:4 231:12 239:9

226:12,19 234:13,16 236:12,24
237:21 239:8 240:7,8,18
**objections** 3:11 21:21
**objective** 240:3
**objectively** 105:9 173:14
**obtain** 207:12
**obviously** 20:8 61:21 75:24 118:8
139:21 152:6
**occasions** 43:18
**occupied** 211:25
**occupying** 232:21
**occur** 104:25
**occurred** 113:23 206:24 217:5
**occurring** 139:17 159:10 167:25
**October** 204:24 244:16
**off-the-record** 154:25 155:3
**offer** 45:7 218:15 222:13,14,15
224:10
**office** 101:2 148:11 150:23 162:16
162:16 168:17 169:3 175:17
177:17,20 194:2,14 195:14
196:15 205:9 215:19,20 217:3
**officer** 26:17 66:5,19 71:2,7 73:5
75:10 77:7,16 87:8 88:10 89:15
91:23 93:17 94:16 95:8,24 96:2,8
97:19 109:25 132:23 162:17
204:4 208:11,12
**offices** 154:16
**official** 162:18
**oh** 31:4 36:5 101:15 102:2,25 132:4
**okay** 13:18 14:18 15:6 16:15,20
17:2 18:10 19:20 20:23 21:7
22:15 24:5,7,11,25 27:10,14
28:15 29:7 30:5,21 31:2,12 32:5
32:24 33:25 35:19 37:11,24 40:25
41:10,17 42:18,22 43:2,3 44:19
45:2 49:18 50:20 53:4 57:5,12,20
62:12 64:5,17 65:17 66:7 67:13
68:5,25 69:18 72:15 74:24 75:2
76:9 77:14,25 78:14 84:20 85:3
85:11,24 86:3,20 87:4,13 88:8,22
91:14 92:15 93:2,15 94:6 97:16
98:7,12 99:16,17 102:5 103:10
106:3 107:21 109:3,5,19 110:10
112:10 113:17 117:8 118:14,23
119:14 120:3 121:12 122:2,15
123:19 124:3,15,18 127:3 129:3
129:20 130:5 131:13,24 132:13
132:24 133:5,16 134:16 135:4
136:24 139:5,5,8,10,25 140:13
144:14 145:19 146:3,22 147:13
148:8 149:13 153:3 154:24 156:2
156:12,25 158:21 159:13,18
162:3,11,15,23 165:6,8,18 167:18
168:22 171:3,19 173:19 174:7
178:18 179:2 180:2,5,24 181:15
184:3 185:9,24 186:23 188:16
190:14,17 191:18 192:4 193:15

194:20 195:8,10 196:16 198:3
199:11 200:18 201:9,24 202:5,9
202:24 204:8,19 205:10,14
207:21,24 208:5,9,18 210:20
211:15 213:20 214:6 215:2,18,21
216:24 217:14,22 218:9 219:12
219:15,18 220:8,20 222:9 224:13
225:6 226:14 227:18 229:4,16,18
231:8 232:5 233:5,17 234:4
235:12,16,21 236:16 237:7,13,16
238:3,9,16 239:9,21 240:14,24
**Old** 2:4
**Oliva** 1:9 2:12 203:20,22 204:25
205:4,7,11,17,20 206:9,11 207:8
207:10,13 208:6 209:2 217:19
218:24 240:4
**Oliva's** 206:6 222:20 240:22
**once** 52:7 183:2 185:2 204:8
**ones** 152:2
**ongoing** 158:17 163:22,22
**onward** 8:22 169:8
**open** 32:10 36:25 37:14,18 43:13
44:19 189:15
**opening** 31:15,21 32:20,21 33:13
44:4,6 204:22
**openings** 31:18
**operate** 165:4
**operated** 39:9
**operating** 59:7
**opinion** 70:21,24,25 71:17
**opportunity** 61:5 90:8 189:24,25
192:20 230:2,23 233:6
**opposed** 208:11
**opposing** 152:9
**opposite** 80:21
**options** 97:11,11,12 222:13
**order** 10:20 37:18 39:23 78:13 88:3
113:15 241:23,24
**organization** 15:11 19:14 20:8,15
20:22 31:22 33:5 37:17 38:7 39:3
49:17 58:21,25 79:14 81:2 93:10
140:14
**organizational** 67:7,12 99:8
**organizations** 60:2,6,6 135:19
**orgs** 135:18
**other's** 148:18
**outcome** 182:19 183:5,8,12 244:14
**outdated** 27:8
**outside** 32:4,7,25 33:3 46:18 73:16
85:17 102:17 104:6 110:21 111:2
111:3,13 178:10 197:25 198:17
198:20 200:6 203:11,14 241:12
**overall** 40:14 41:6 56:23 58:23
73:21 81:2 89:3 219:17
**overheard** 194:8,15,17
**oversaw** 126:2

**P**

**P** 2:2,2 5:15 6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1 153:1 154:1 155:1
156:1 157:1 158:1 159:1 160:1
161:1 162:1 163:1 164:1 165:1
166:1 167:1 168:1 169:1 170:1
171:1 172:1 173:1 174:1 175:1
176:1 177:1 178:1 179:1 180:1
181:1 182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1 190:1
191:1 192:1 193:1 194:1 195:1
196:1 197:1 198:1 199:1 200:1
201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1
211:1 212:1 213:1 214:1 215:1
216:1 217:1 218:1 219:1 220:1
221:1 222:1 223:1 224:1 225:1
226:1 227:1 228:1 229:1 230:1
231:1 232:1 233:1 234:1 235:1
236:1 237:1 238:1 239:1 240:1
241:1
**P-E-I-F-F-E-R-B-R-A-N-D-T**
200:12
**p.m** 242:2
**P3** 192:6
**pack** 62:20
**package** 45:4 210:21 211:3,9
**pad** 119:11
**page** 53:14 55:23 56:3,6,7,8,10,17
56:19 57:6,13 61:7,17 62:21
64:18,19 65:24 91:20 119:7,8
120:3,4,8,16 123:19 125:18 127:6
132:25 133:9 139:15 141:10,10
143:17,20 146:15 147:2,9 148:6,8

148:9 149:24 150:16 151:17 157:2 160:2,11,24,24 161:2 168:10 171:20 172:15 176:3 180:9 185:9,15 186:17 188:5,6 189:8 190:3,23 191:5,7 192:4,5,7 194:20,20,25 195:23 198:7 200:13 210:6,18,19 218:18 219:6 221:23 226:21,24 227:12 229:20 243:3,7,12

**pages** 117:23 118:6 119:18,22 127:5 141:9 193:5

**paid** 74:10 204:20 212:10,13,16 213:23 214:4 233:23

**paper** 149:20

**paraphrase** 25:3 26:23

**paraphrasing** 25:7 43:14

**parenthesis** 156:20

**Park** 2:12

**part** 20:11 33:9 38:13 39:4 51:3 66:11,14 72:21 80:10 93:21 98:3 106:14 145:16 147:10,18 161:8 163:25 164:11 165:3 219:17,25 226:17 233:9

**part-time** 79:9

**parted** 44:2

**partially** 224:14

**participant** 200:5

**participants** 121:15

**participate** 34:21 39:8 49:4,7

**participating** 4:11 8:6 193:11

**participation** 34:24

**particular** 19:9 20:5,20 27:8,19 31:5 71:22 104:22,24 117:25 179:24 232:6 235:17 241:15

**particularly** 225:19

**parties** 1:21 3:5 4:4,17 244:12

**party** 237:8,10

**pass** 202:25

**passing** 216:10

**passive/aggressive** 142:18 144:18

**Pat** 1:19 5:12,23 112:8 114:11 186:23 241:6 242:7,17 243:4

**path** 140:4

**patriate** 146:4

**pause** 143:18 150:11

**pay** 38:15 73:13 128:10,24 130:2 131:14,18 235:14

**paying** 235:4

**payroll** 34:13 39:5 59:6 124:23 125:11 126:17,18

**payrolled** 125:4 233:23

**payrolling** 37:25

**peers** 79:22 81:10,11 82:23 108:12 137:9 141:5

**pending** 8:10 112:19

**pension** 12:6 198:19 199:18

**people** 46:23 49:13 81:10,14,19,25 83:5 101:4 105:11,15 110:21

111:2,3,13 135:24 150:3 186:13 187:12 193:11

**percent** 18:25 22:12 40:6 79:5,8 121:2,6 129:5,5,9 130:6,10 131:11,12,16,20,25 132:10 213:6 213:6,8,13,14 214:11,12

**percentage** 131:15

**perfectly** 8:4

**performance** 13:25 15:3,13,14,15 47:6,10,12 48:5,13,17,18,20,21 49:2,9,13 51:14 52:17 54:10,25 55:7,14,16,24 56:24 57:17,23 60:3 61:10,19 62:2,7 63:5,8,12 65:6 98:10 102:9,15,17 103:17,21 104:25 105:18 106:5,16,23 107:6 107:13,14,19 117:4,6,9,14,15 120:23 129:18 130:2,4,15 144:19 146:12 163:20 167:20 173:15,16 173:17 174:8 209:10,19 212:12 212:17

**performed** 22:18,24 59:2 232:9

**performer** 83:11

**period** 8:12,14,21 21:7 57:3,10 61:8 62:2 64:9 67:3 98:2 99:19 102:10 103:5 115:17 116:18 126:7 162:24 163:4 165:25 167:22 168:2 208:21,23,25 212:22

**permitted** 4:7

**person** 14:7 22:10 37:22 80:20 93:7 179:24 194:17 202:21 233:13 235:17 239:22 240:11

**personal** 9:5 102:20 113:14 196:22 196:23,24 197:5,11,12

**personality** 79:21 80:16

**personally** 28:23 57:22 204:12

**personnel** 52:9 122:12

**pertain** 114:10

**pertaining** 104:18,21 113:14

**Pharma** 161:10

**pharmacy** 78:20

**phone** 159:12 183:18 196:7,9

**phonetic** 235:18

**photo** 150:24 151:4

**photocopies** 152:3

**photocopy** 152:24

**photograph** 151:16

**photographed** 152:3

**photographs** 151:2,24 152:9,13,20 154:15,18 155:6

**photos** 150:22

**phrase** 93:11

**physically** 4:25

**picture** 141:19

**place** 6:2 39:2,10 42:3 75:10 99:9 142:21 155:7 179:17 232:7 239:17

**placed** 67:23,25 68:2 204:21 233:14

**Plaintiff** 1:5 2:3 6:6

**plaintiff's** 17:5 18:22 24:13,16 26:5 26:13 53:12,25 60:21 61:3 62:16 63:3,24 65:14,15,22 109:20 138:9 138:17,19,22 150:17,19 181:19 243:7

**plan** 39:9 59:8 132:9 198:18,25 199:21

**plank** 233:9

**planning** 70:14,23 72:17 197:16

**plans** 198:12,15 199:16,17,22

**platform** 4:12

**play** 45:13,19

**Plaza** 2:12

**Pleasant** 6:2

**please** 5:22,24 6:10,14 7:6,21,22 8:8,18 21:20 22:3 26:7 41:24 42:4 42:6 48:8 53:22 60:22 62:16,18 65:19 71:19 103:7 109:21 117:21 118:24 119:3 123:23 127:4 133:18 134:25 142:6 147:4,25 149:17 150:7 154:8 155:17 157:3 157:13 160:6,8,9 161:24 162:9 167:8 174:22 175:9,15 176:5 183:11 190:25 191:6 192:10 198:8 220:16 222:10,19 223:20 224:2 226:24 227:10 230:10,15

**plus** 128:19 130:9 131:15,16,19,20 140:12

**pluses** 134:10,22

**point** 11:10 20:10 27:5,6,8 28:9 66:7 67:5,19,23 68:21 75:2 77:11 82:4 86:15 92:5,10,22 103:15 119:8 144:19 168:18,20,24 169:8 174:9 180:20 187:4,25 189:15 197:13 200:8 203:13,14,25 228:15 236:17

**points** 28:25 169:6,9 187:22

**policy** 45:6,8 47:3 60:2 201:25

**portion** 24:18 41:19 55:21 56:14 61:11,17,22 62:11,23 64:17 115:5 120:4 141:10 149:24 153:11 161:22 165:8 167:13 186:17 212:25 226:24

**portioned** 40:3

**posing** 153:8

**position** 16:24 17:21 18:7,9,11,11 18:13,14,16,18 20:14,16,19,21 21:2,11 22:14,18 23:23 24:2,4,8 24:22,23 25:4,8,12 26:21,25 27:7 27:17 28:18,22 29:10 30:11,13,15 30:15,16,17,23 31:8 32:2,3,10,20 32:25 33:14,18,22 37:2,7,12,14 37:18,21 43:25 44:10,12 53:5 64:10 66:24,25 69:15,19 70:25 71:12 74:22 76:3,11 77:17 79:6,8 80:20 84:8 85:15,20,21 87:6,18 87:19,24 88:2,9 89:19 90:13 91:8 91:16,24 92:6,11,17,25 93:12,14

93:17 94:2 95:16,17,25 98:6,8
100:10 109:24 110:3 125:4 131:6
131:18 132:14,16 133:2,4 140:4
163:10 164:10 179:11,12,20
180:4,6,23 184:23,24 203:12
205:17,21 207:7 208:19 209:18
213:4,5 214:3 229:4 232:25
233:14 234:15 235:15 240:2,4,5
240:13,15,17,20,20 241:15
**positioned** 228:4
**positions** 15:22,23 16:10,12,16
17:24 19:13 20:8 29:18 30:4,6,7
32:6 33:2,10 34:8 36:24 43:12,13
43:15,19 44:19,20 46:18 48:3
129:23,23 213:2,24 235:11
**positive** 55:16,20 82:7 135:8
**possess** 240:6
**possible** 7:5 118:13 162:21
**postings** 204:21
**potential** 72:9,9 73:11 82:22 134:5
140:4 184:7
**potentially** 40:23 47:13 67:11 73:19
73:21 82:3 83:2,7,13 129:18
130:2,10,13 183:24 228:21
239:18
**practice** 41:10 45:9 76:24 77:3
126:5 238:24
**practicing** 152:8
**pre** 172:7
**preconceived** 137:6 141:2
**predating** 8:16
**predict** 42:20
**preface** 82:16
**preferred** 75:4
**preparation** 25:14,18
**prepare** 9:19 10:20 51:23
**prepared** 25:22 162:25
**presence** 4:25
**present** 2:21 4:4 8:15 51:2,9
**presented** 27:5 80:23
**preserve** 201:4
**president** 12:25 13:4 33:23 34:2,3
34:18 35:12,17 37:21 58:14 59:18
66:25 67:13,14,18,24 68:9,14
69:16,19 70:12 71:8 72:16,23
75:24 111:17 114:2 116:8 126:15
132:12,15,17,22 133:2,4 141:24
178:20 179:3,9 202:11 232:22
234:3,5,12,22,23 235:10 236:3,9
236:14,18 237:20,25 238:10
**president's** 68:18
**presidents** 59:25
**presumably** 98:24
**presuming** 152:12
**pretty** 129:22
**previous** 199:7
**previously** 17:5 24:15 25:2 26:13
26:22 53:25 59:6 61:2 63:3 65:21

72:16 124:12 138:22 181:19
203:22 204:14 210:24
**price** 41:19
**primarily** 13:4,5,13
**Primavera** 2:14 5:6,9,14 13:15 14:5
16:17 21:3,12,17 23:9,17 25:6
27:2 29:5 37:3,19 38:2 40:15,22
41:8,12 42:3 43:4,9 44:13,22
45:16 46:4 47:8 48:6,23 49:20
50:15,23 51:5 52:14 53:9 54:18
55:17 60:18 63:14,22 67:8 71:14
73:8 74:3 76:16,21 82:11 84:10
84:15 85:6 89:20,22,25 90:5,24
91:10,25 92:12,18 93:4 94:17
95:9 96:10,23 97:5 99:11 101:20
102:14 105:13 106:7 107:8,15
109:9 110:6 112:7,11 113:3
114:11,16,24 115:11 117:5,10
122:25 135:9 140:6 149:9 150:21
151:2,12 153:7 154:9,11,24 155:3
155:12,16 158:24 163:3 166:21
167:21 169:18 170:3 173:11
174:5,11 178:8,13 184:6,10,18
186:18 187:7 192:22 195:17
197:20 202:7,12 204:6 206:13
208:3 209:3 216:15 223:17,23
224:20 226:12,19 236:12 237:21
239:8 240:7,18 241:5,10,19,24
243:4
**prior** 20:9 27:23 35:7,22 48:13
50:21 55:7 57:13 67:14 69:15
72:15 74:13 98:14,25 102:17
103:5,11,15 107:5,25 110:24
133:14 137:23 225:3,23,24
**privilege** 114:18
**privileged** 7:23 9:23 112:23
**pro** 175:10
**proactively** 164:5
**probably** 10:22 113:24 144:11
**procedure** 4:5 154:5
**process** 13:6 15:4,8,9,10,17 30:6,8
31:17,20 34:22,25 41:17 42:10,11
44:10,24 49:5,9 51:4 62:18 63:25
66:11,14 70:19 163:6 175:24
201:17 203:10,14 205:16 207:14
219:9,10,12 233:9
**processional** 1:10
**produced** 10:6 17:20 117:23 151:6
**production** 154:14
**professional** 1:10,11 94:7 106:12
**profile** 17:21 20:19 23:23 24:22
25:9 26:21 93:13,14 109:24 137:2
**profiles** 27:4,7,17,20,22 28:18,22
28:25 29:10
**profit** 38:9
**program** 39:7 54:25 64:22 126:2,4
235:7
**programs** 39:17

**progress** 207:3
**progressive** 47:3
**project** 175:11,14,17 200:6
**promote** 66:14 76:12 98:8 137:19
137:21 139:19
**promoted** 58:3 63:20 66:8,24 87:6
98:5,19 100:20,24 103:5 131:5
133:14 162:15 208:19
**promotion** 14:22 58:7,10,13 66:18
70:23 71:6 72:15 87:6 102:11,18
103:12 107:5 108:2 110:5,24
130:20 132:11 134:6 138:25
178:19 184:25 202:10 239:4
**properly** 196:3,12,15
**prorated** 212:24 213:6
**pros** 77:22 78:17 79:11,13 82:17,19
84:22,25 100:7,11 108:11 133:13
133:23 134:4,20 140:10
**provide** 7:15,25 8:17 14:4 39:23
52:2 60:12 110:12 115:14 123:10
126:9 152:10 181:8 189:20
192:20 211:22 224:14 226:16
241:25
**provided** 7:19 10:2 14:12,12 19:16
29:3 38:9 39:5,7 40:12 45:14 52:7
52:23,24 57:14 59:5 81:2 111:25
118:3,25 135:14 139:7 146:12
151:25 152:4,21,23 178:16
181:12 205:10 233:6
**providing** 19:11 40:14,19 171:4
182:2 211:16 223:15
**Pru** 198:11
**PS** 161:15 162:3 194:2,4 222:17,20
**Public** 1:24 3:17 5:17 242:23 244:4
**pull** 24:12 53:11 60:21 62:16 63:24
65:14 109:20 138:2,8 150:14
181:16
**pulling** 20:13
**purportedly** 108:13
**purports** 17:21
**purpose** 4:19 23:22 25:2,8,11
**purposes** 235:5
**pursuant** 1:21 4:4 45:6 223:13
**pushing** 122:16 123:6
**put** 52:9 60:20 117:20 138:11

---

## Q

**qualifications** 19:8 23:3,7,13 24:3
88:8,22,25 89:2,5 91:7,8,16,19,22
92:3,5,10,17 93:9,12,22 94:2
110:2 240:12,16,19,22 241:14
**qualified** 66:22 76:3 85:19,21 87:16
87:17,23 88:4 91:2 92:24 160:17
184:22
**qualify** 241:15
**quality** 47:12,14 173:8
**quarter** 55:6,11
**question** 3:12 6:16,18,20 7:4,5,6,13

8:9,18 13:22 14:10 16:18 21:4,6
21:24 22:4,20 26:19 38:4,21,25
40:16 41:25 42:4,7,14 43:2,5
44:14 48:7,8,10 49:7 50:17,18
51:6,8 61:8 67:9,10 71:16,20
74:13 82:14 89:23 90:4,7 92:20
93:7 103:8 106:9 107:9,17,18
109:25 110:2 112:8,9,18 113:6
122:7 133:22 134:2 146:10
147:23 148:3 155:18,19 156:6,7
167:9,12 182:17 183:2 192:25
201:13 214:7 223:21,22 224:4
226:15 238:13 240:9,10,21 241:6
**questioning** 114:13 144:16 173:18
173:19 196:14 199:14
**questions** 6:8,10,13 8:24 9:4 112:15
112:16 113:2 153:9 164:5,6,13
175:4,24 186:11,13 238:18
240:25 241:21
**quick** 181:17 194:22 238:16
**quickly** 60:24
**quote** 161:7

**R**

**R** 2:2 5:15 244:2
**raises** 11:10
**rate** 128:24 131:14 214:10
**rated** 213:8
**rating** 15:16 49:16 55:20,22,24
56:15 57:2 209:19
**ratings** 49:14 120:23
**re-entered** 56:20 151:20
**reach** 228:19
**reached** 141:23 180:20
**react** 104:7,8,9 105:7 143:5
**reacting** 142:12,16,20
**reaction** 114:6 137:7,8,8
**reactions** 141:4
**read** 22:2,4 41:23,25 42:6,7 48:9,10
71:18,20 89:22,23 118:7 142:8,10
147:25 148:3,18 149:17,23
155:17,19 157:5 159:2 160:23,25
167:8,12,14 172:4 185:11 188:11
192:23 210:13 222:10,16 223:20
223:22 224:3,4 227:13 229:24
242:8
**reading** 123:14 135:3,19 142:10
144:11 148:13 149:4,10 159:7
165:24 187:14 188:18,20 191:15
194:9 198:12 227:8 228:5 231:6
**ready** 17:15,16 53:20 61:18,20
64:23 65:16 80:4,5 110:12
**real** 181:17
**really** 39:14 58:19 59:3 61:6 115:23
146:14,15 168:20 173:21
**reason** 45:19 224:24 235:14
**reasonable** 235:4,10
**reasons** 79:5 161:9 168:17 177:20

177:23 189:24 195:13,21
**recall** 16:5,14 18:3 19:4,25 20:10
20:18,20 26:2 28:20 30:2 46:17
46:24 65:5 67:21 69:17,24 70:3,7
70:9 72:24 77:8 83:2,10 84:16,17
93:24 95:18 96:12,13,14,19,22
97:2,3,12,15,24 99:12 101:16,21
101:22 102:3 103:18 107:10
113:21 115:19 121:24,25 125:3
133:12 159:10 163:23 170:25
179:21 180:4,19 196:13 200:10
202:18 204:15,17,18 205:22
206:16,23 208:17 211:14 213:21
215:11,23 216:6,17 217:17,21
218:9,11 219:24 220:2 221:5
225:16 231:21 233:8 237:22
**recast** 226:14
**receive** 12:6 35:6 46:10,23 51:13
101:10,11,19 111:15 115:22
133:6 209:18 211:19 224:25
**received** 12:9 45:4 46:24 57:2 63:19
64:8,14 114:5 209:9 212:8,17
218:13 236:8
**receiving** 126:23 173:24
**recess** 43:10 99:25 153:5 154:10
194:24 210:8 238:21
**recognize** 119:13 148:16 188:23
189:3
**recollecting** 31:6
**recollection** 17:23 54:3 116:19
124:20 138:23 181:22 210:10,14
212:7
**recommend** 85:20
**recommendation** 76:2,4,5 85:3,8,13
85:17,24 86:9,12 219:18,21,22
235:8 236:2,4
**recommended** 87:17
**recommending** 86:14 220:2
**record** 4:22 5:22,25 17:3 24:14
26:11 35:21 53:23 60:25 62:25
65:20 100:3 119:15 151:23 153:4
153:14 154:2,19,20,21,23 242:11
242:12 244:9
**recorded** 4:15
**recording** 4:16 198:15,18
**recruit** 73:17
**recruited** 179:19 203:15
**recruiter** 32:25 73:21
**recruiters** 33:11 73:19 204:16,19
**recruiting** 32:4,7 73:12,15 204:15
**recruitment** 74:9
**reduce** 17:6
**reduced** 49:18,24 213:18
**reducing** 41:7
**REES** 2:10
**refer** 11:12,21 91:15
**reference** 102:11 170:22 201:2,3
**referenced** 47:19

**references** 165:21
**referred** 95:16 121:20 156:24
189:17 228:8
**referring** 12:2 16:11 29:20 34:2
56:16,22 73:16 81:20 86:22 93:12
111:15,21,24 125:17 188:14
212:16 217:6
**refers** 11:18 171:2 201:5 231:2
**reflect** 17:3 21:15 22:16 24:14
26:11 53:23 54:9 62:6,25 64:13
65:20 77:9 119:15 131:13 133:16
133:22 141:15 158:21 171:23
180:11 182:14,19 183:4,5 191:2
192:16 193:2 194:25 200:18
220:17 222:5 225:7 227:14,23
230:22 239:14
**reflected** 48:16,21 239:5,10
**reflecting** 107:12 161:17 193:10
196:6 227:4
**reflects** 55:19 61:10 63:8 107:22
128:24 132:24 141:22 193:13
**refresh** 17:23 54:2 116:19 138:23
181:21 210:14 212:7
**refreshes** 210:10
**regard** 60:2 66:22 77:10,19 80:24
101:4 109:2 113:6 114:6 125:25
199:23 215:14,15 219:13
**regarding** 178:16 190:4 198:14
201:13 219:11 225:13,22 228:17
**regional** 231:20
**regions** 231:22 232:2
**regular** 100:9 238:23
**REISBAUM** 2:7
**relate** 146:11,22 147:13 155:6
176:21 231:10
**related** 47:13 48:4 77:23 186:12
201:23 244:10
**relates** 187:18 241:14
**relating** 144:18 145:19 147:17
187:16 190:17
**relations** 59:15 104:25
**relationship** 82:7 104:18 116:3
149:3 160:16 162:14 168:23
185:6 186:9
**relationships** 81:4 82:23
**relatively** 60:23 180:2
**relaying** 144:20 145:9 182:9 190:13
**remainder** 149:23 153:11 160:10
161:2 214:23,25 229:20
**remark** 216:3,9,10 231:3
**remarks** 101:3
**remedy** 105:5
**remember** 43:16,23 98:16 134:7
181:3,6 184:13 233:2
**remote** 4:10
**remotely** 4:6
**removes** 161:5 162:12
**renew** 228:15

**reorg** 113:22
**reorgs** 59:16
**repeat** 6:11 21:23 48:8 71:15 103:7
223:19
**rephrase** 6:15 38:4,20 90:7 133:25
192:25
**replace** 180:23 216:5
**replaced** 30:4 202:20 203:3,18,20
216:2 232:22 243:12
**replacement** 75:22
**reply** 162:4
**report** 121:13,17 192:3 193:13
235:21
**reported** 68:18 235:23 237:19,22
**reporter** 1:23 4:2,7,23 5:9 6:23,25
7:10 17:9 110:9 118:10,20 121:16
154:21 167:11 241:22
**reporting** 4:13 105:11 199:17,23
**reports** 116:22 235:24
**represent** 5:10 17:19 117:25 151:15
**representation** 81:5 151:11 152:19
153:14,16,19,21,24 154:2
**request** 151:15 153:17 154:22
167:5 168:4
**REQUEST/PRODUCTION**
243:11
**requested** 167:13 210:21
**requests** 7:18
**require** 34:8
**required** 23:8,16,20 33:15,21 37:16
38:15 80:22 112:5 207:12 235:3
**requirements** 25:5 89:18 90:20
**requisition** 31:15,18
**rereading** 146:7
**reservation** 150:4
**reservations** 150:3
**reserved** 3:12 80:18,19
**resolve** 161:6
**resolved** 198:22 200:2
**resource** 59:11,12
**resources** 12:14,16 14:12 241:12
**respect** 7:16 8:12 15:6,22 20:23
21:7 23:2 26:20 31:9 33:13,25
36:12,20,20 37:12 38:17 45:2
47:18,22,25 50:11 52:13 70:22
74:8 76:11 81:18 82:19 84:21
86:7 114:9 130:16 133:2 146:13
165:8 198:18 234:4 236:7 239:25
240:21
**respected** 189:21 212:25
**respectful** 36:22
**respective** 1:21 3:6 84:23
**respects** 190:15,18
**respond** 7:7 8:2 42:13 62:24 112:9
112:13 113:2 117:12 170:6
**responded** 43:13
**responds** 145:12
**response** 7:15,25 8:18 15:25 16:8

24:5 27:12,25 32:5 34:19 38:11
39:20 40:17 45:22 60:14 68:5
74:24 76:7 77:25 78:25 81:16
83:14 84:3,6 85:22 86:20 88:6,20
89:10 104:15 105:25 109:3
110:12 111:10,11,22 114:7
115:25 116:6,12 125:8 126:14
139:13 145:20 146:25 148:22
157:25 162:8 164:22 165:6,9,12
167:15 170:10 176:14 182:21
185:18 191:20 225:15 232:3,11
**responses** 7:3,9,24
**responsibilities** 19:8,9,15 20:25
21:10 22:9,17 25:4 26:24 58:17
64:23 136:22 140:20 234:6,9,12
241:13
**responsibility** 38:13 90:21 147:19
160:19
**responsible** 13:13 18:19 34:15
37:22 58:19,23 143:12 171:4
206:20 220:21
**rest** 156:17 170:21 189:2
**restructuring** 231:18
**result** 105:4 122:24 205:15 220:18
228:24
**resulting** 86:8
**results** 182:14
**resume** 206:6
**resumes** 206:4
**retain** 201:25
**retaliating** 195:20
**retire** 11:7
**retired** 11:5,8 12:5 113:20
**retirement** 12:8
**retrospective** 197:7
**returned** 69:21,22 70:9
**returning** 215:20
**reveal** 7:22 115:6
**revealing** 7:21 9:22 10:19
**revenue** 38:6
**review** 10:3,24 15:4,7,9 17:7 20:12
48:22 49:2,5,9,25 50:8 51:4,10
54:13,20 55:2,6,7,10,15 61:5,8,22
62:2,6,23 63:11,13,18 64:8,13
65:7 66:3 104:11 109:23 149:20
153:22 154:4 160:18 201:20
208:21,25 209:10 233:6
**reviewed** 10:6 75:20 238:22
**reviewing** 19:11 102:15 151:18
**reviews** 15:18 48:17 49:13,18 50:14
50:20 51:14,18,23 52:12,17,19,25
54:16,22 57:17 102:10,15,17
117:4,6
**rewinding** 67:4
**right** 15:21 29:3 32:11,14 33:18,19
34:13 36:17 40:9,10 43:19 44:21
47:20 54:13,20 55:12 56:4 57:3,7
57:10,18 58:2 65:7,9,11 67:16

76:18 85:5,15 86:5 89:16,19
90:18 93:8,9,18 96:24 99:10
100:15 103:11,13,14 106:12,13
108:19 113:24 118:8 122:15
123:4,15,19 124:13,14 125:10
127:11 128:9,16 129:12 130:17
130:21,24 131:19 133:7,9 134:11
134:12 135:19 136:9 137:23
139:5,12 140:7,10,11,23 141:7,11
142:8 144:23 145:17,21 147:15
148:19,23 149:8 153:19,24
157:20 158:3 159:24 162:17
163:2,16 166:8,10,12,17 167:20
168:9,11 169:4,8,22 170:2,15,16
171:19,23 172:17 175:8 176:9,18
177:7,10 178:7 184:5,9 186:25
187:5,8,14 188:14,18,21 190:22
191:5,9,19,21 192:7,21 199:8
203:21 206:12 208:2 209:14,16
212:2,5,6,6,20 213:7,13,15
214:13,14,19 216:19 221:24
224:11 226:3 228:5,6 234:6 240:2
**risk** 225:10
**risks** 225:8
**road** 2:4 228:16
**Roche** 78:12 79:3,4
**role** 14:7 22:24 23:8,11 30:18,19
58:20,21,22 59:2,4,4,9,17,21 60:5
63:9,19 64:20 65:3 66:4,8,8,17,20
66:23 67:18,24,24,25 68:2,8,18
69:20 71:8,24 73:5 75:10,13,16
75:23 76:13 77:7,24 78:24 79:7
80:12,25 81:7,14 82:21,25 83:24
88:5 89:6,9,14 90:18,19,20,21
93:23 94:15 95:16 96:8,9 97:17
117:8,13 132:21 133:5 141:24
162:21 163:2,15,21 164:18 165:4
167:20 171:6,6,7 173:8 174:10
178:21,25 179:3,9,23 185:4
202:21 204:4 209:9,16 213:15
214:17,18,21 219:20 230:5,12,12
230:24 231:10 232:9,10,20
233:18 234:2,4,5 237:20 240:11
241:11
**roles** 126:11 232:8
**Rose** 179:25 180:2
**rule** 4:5 113:9
**rules** 153:22 154:4
**run** 178:2
**RX** 137:7

**S**

**S** 1:4 2:2 5:15,15 243:6
**S-A-N** 36:10
**safe** 48:19
**safety** 231:25
**Sakaguchi** 183:20,21
**sake** 11:11

**sal** 128:17

**salary** 34:10,11 121:7 127:10,12,15
    132:10 213:9 235:10 236:8

**Sam** 2:19 241:25

**San** 36:2,9,15 75:24 86:13 95:3
    183:20,21

**satisfaction** 17:11 26:9 118:11

**Saunders** 1:19 5:13,23 6:1,4 7:1 8:1
    9:1 10:1 11:1 12:1 13:1 14:1 15:1
    16:1 17:1 18:1 19:1 20:1 21:1
    22:1 23:1 24:1 25:1 26:1,14 27:1
    28:1 29:1 30:1 31:1 32:1 33:1
    34:1 35:1 36:1 37:1 38:1 39:1
    40:1 41:1 42:1,5,16 43:1,11 44:1
    44:23 45:1 46:1 47:1 48:1 49:1
    50:1 51:1 52:1 53:1,24 54:1,2
    55:1 56:1 57:1 58:1 59:1 60:1
    61:1,4,18,21 62:1,12,22 63:1,2,4
    64:1 65:1,23 66:1 67:1 68:1 69:1
    70:1 71:1 72:1 73:1 74:1 75:1
    76:1 77:1 78:1 79:1 80:1 81:1
    82:1 83:1 84:1 85:1 86:1 87:1
    88:1 89:1 90:1,10 91:1 92:1 93:1
    94:1 95:1 96:1 97:1 98:1 99:1
    100:1,3 101:1 102:1 103:1 104:1
    105:1 106:1 107:1 108:1 109:1,22
    110:1 111:1 112:1 113:1 114:1
    115:1,13 116:1 117:1,22 118:1
    119:1,18 120:1 121:1 122:1 123:1
    124:1 125:1 126:1 127:1 128:1
    129:1 130:1 131:1 132:1 133:1
    134:1 135:1 136:1 137:1 138:1,21
    139:1 140:1 141:1 142:1 143:1
    144:1 145:1 146:1 147:1 148:1
    149:1 150:1 151:1,7 152:1 153:1
    153:10 154:1 155:1 156:1 157:1
    158:1 159:1 160:1 161:1 162:1
    163:1 164:1 165:1 166:1 167:1
    168:1 169:1 170:1 171:1 172:1
    173:1 174:1 175:1 176:1 177:1
    178:1 179:1 180:1 181:1,18,21
    182:1 183:1 184:1 185:1 186:1
    187:1 188:1 189:1 190:1 191:1
    192:1 193:1 194:1 195:1 196:1
    197:1 198:1 199:1 200:1 201:1
    202:1 203:1 204:1 205:1 206:1
    207:1 208:1 209:1 210:1 211:1
    212:1 213:1 214:1 215:1 216:1
    217:1 218:1 219:1 220:1 221:1
    222:1 223:1 224:1 225:1 226:1
    227:1 228:1 229:1 230:1 231:1
    232:1 233:1 234:1 235:1 236:1
    237:1 238:1,22 239:1 240:1 241:1
    241:4 242:7,17 243:4

**saw** 64:15

**saying** 82:16 92:2 139:4 144:6,7
    145:9 146:16 147:8 148:16
    158:11 159:21 189:22 195:8,9

**says** 24:19 26:16 54:24 55:2 56:11
    56:23 63:17 120:8,12,16,20,25
    121:8,13 122:3,16 123:6 124:3
    127:7,9 128:3,16 129:4,4,8 130:5
    131:25 133:11 134:11,22 135:4
    135:25 136:3,7,14,15 140:17
    141:13 142:8,11 148:15,21,25
    149:14 151:9 153:12 156:16
    157:7,19 159:4,23 160:3,9 161:15
    161:20 162:3 165:21 166:5,9,23
    168:11 170:4 171:21 174:3,24
    175:10 176:7,21 177:5 180:11,14
    185:11,16 186:8,23 187:12 188:6
    192:5,6 193:6,18 196:2,22 197:4
    198:11 200:16 220:20 222:4
    224:10 227:25 229:19,25 230:23

**scenario** 41:3

**schedule** 49:11 206:15

**scheduled** 206:16

**schedules** 175:21

**scheduling** 206:17,24

**scientific** 39:13

**scope** 90:23 241:12

**score** 64:14

**screen** 121:15

**screwed** 143:14

**script** 222:16

**scroll** 17:6,17 23:4 26:7 53:18,21
    56:5,8,18 57:5 61:15 62:19 63:25
    65:18,25 118:10,20,24 119:4
    120:15 123:21 129:3 133:18,20
    133:21 134:25 141:9 143:24
    147:4,21,22 150:6 157:3,6,12
    158:25 160:5 161:24 162:9
    170:20 174:20 175:4 176:4
    182:23 185:13,14,20 188:7
    190:25 192:9 196:17 200:13
    210:12 220:15 222:9,18 227:6,9
    228:2 229:21 230:14

**scrolled** 191:11

**scrolling** 64:6,16

**scrolls** 143:22

**SCULLY** 2:10

**sealing** 3:7

**search** 161:12,13

**searching** 173:22

**second** 109:5 146:8 150:11 160:3
    184:14 185:21 226:22

**section** 55:25 56:23 57:13 198:11

**see** 6:22 24:19 26:17 28:17 53:13
    55:2 56:12 61:8,16 62:19 64:2,19
    66:2 110:10 118:21 120:10,17,19
    121:2,12,14 122:2,17 123:22
    124:3 127:6,9 134:21,24 136:6
    138:14 140:3 141:10 142:3
    143:23,25 147:5 149:13 154:5
    156:19,21 157:7 159:4 161:14,25
    170:21 171:21 173:22 174:2,17

    174:21,23 180:14 185:10 187:18
    193:22,23 196:16,18,20,21
    200:16,21 206:4,6 218:20 226:23
    227:2 228:3 229:22,23 230:15

**seeing** 143:9 145:15

**seek** 73:25 74:5 85:24 172:20
    186:10 203:11

**seeking** 184:8

**seen** 52:19 119:18 152:8 207:24
    230:12 231:9

**select** 59:20 68:14 73:6 75:8,18
    77:20 95:22

**selected** 75:12 77:11 85:4,9 86:25
    87:5 95:4

**selecting** 78:17 96:4 205:17

**selection** 94:21 117:23

**selective** 136:25 140:25

**send** 53:9 121:21 201:21

**sending** 181:10

**senior** 18:10,13 59:25 80:20

**sense** 29:25 57:25,25 71:11,12
    72:19 76:12 83:18,23 86:12
    108:25 186:12 188:11 216:8

**sensitivity** 114:3

**sent** 150:15

**sentence** 64:20 189:2

**sentiment** 123:8,9

**separate** 4:10 13:20 177:5,14 226:8

**September** 1:15 12:17,19 183:19
    242:9

**series** 6:7 133:17

**serve** 24:25 25:11 26:21 231:25

**served** 229:11

**service** 45:21 151:13

**services** 14:13 38:7,9 39:5,6,10,24
    40:8,12,14,19 41:6,20 58:20 59:3
    59:5 81:3 124:21 126:10 231:23

**serving** 25:3

**set** 26:3 49:11 62:9,15 63:23 65:13
    138:6 215:4 234:17,17,25 244:7
    244:15

**sets** 234:15,21

**setting** 14:24 204:19 205:14

**settlement** 218:15

**seven** 131:25 132:9 182:22,25

**severance** 45:4,7,10,11,14 46:10,23
    46:25 210:21 211:2,9,13,17
    221:19 222:13,14,16 223:3,15
    224:10,14,25 225:23,25 226:6,17

**sexual** 68:22 117:16

**share** 41:5 124:25

**shared** 39:4,23 40:8,12,14 59:5

**Sharinski** 31:8,9 32:18 37:8,9,13

**she'd** 175:18,19

**She'll** 136:17

**SHEARMAN** 2:16

**shift** 175:15 230:3,10

**shit** 137:3

shocking 152:7
Shoji 67:15
shoot 104:8
short 137:8
shorthand 11:12
shortly 215:11
show 60:25
showed 214:9
showing 17:4 26:12 61:19 138:21
shown 53:24 61:2 63:2 65:21
 119:16 181:18
shrink 53:13
side 143:25 157:5 161:15 174:18
sign 36:20 233:7
signature 57:7
signed 3:16,18 230:11 231:9 237:16
 242:19
significant 117:2
similar 39:18,19 118:25 238:12
Similarly 182:4
simply 182:6
single 36:14
sitting 101:22 240:2
situation 104:9 105:2,20 113:21
 114:3,9 115:18 149:2 177:22
 182:8 190:13 225:13
situations 105:17
six 180:14 182:22,25 231:22
six-month 149:19
size 39:19
skill 56:11
skills 22:11 55:25 78:23 79:15
 81:10 110:15,18
slash 122:3
slightly 142:25 227:7
slow 37:10 142:14
small 31:23 58:25
smaller 39:6 59:22 60:5 125:2
Smart 135:5
soft 89:4
softer 104:2,2
solicit 219:15
somebody 113:15
somewhat 59:10 233:20
soon 179:22
sooner 150:8 155:21 159:19,24
sorry 21:23 25:19 27:11 36:2,5 37:9
 42:14,24 43:4 44:24 71:15 74:12
 87:20 90:5 103:7 113:19,22 122:7
 132:5 138:10 142:24 183:2 199:6
 201:6 209:11 212:10 223:25
 233:2 234:25 237:6
sort 144:25 165:23 168:15
sought 70:18
soul 173:21
sounding 70:19
source 37:24 137:13 177:17
South 6:3

SOUTHERN 1:2
space 164:14,17 165:4,10 166:3
 167:3,4 168:5 189:14,22
speak 39:16 41:13 72:2 111:9 139:5
speaking 7:2 8:19 15:8 21:21 40:13
 58:16 125:24 149:7 176:8 180:17
speaks 165:20
specialized 78:20
specific 19:25 49:6 97:11,12 98:15
 101:16 102:3 103:18 114:25
 115:18,18 151:22 169:12 170:11
 201:14 216:6 220:3
specifically 20:6 67:21 81:21 98:17
 156:23 164:23 167:16 206:24
 219:24
specifics 114:17
specify 29:22
spell 200:11
spend 10:18 204:14
spending 146:4
spiral 118:21 119:9,12,22
spoke 59:6
spoken 165:21 176:22
spot 57:6
spots 143:20
ss 242:4
staff 32:2 72:8 75:19 179:14
stamped 64:18
standard 174:8
standpoint 68:3 73:9,11 80:18
 122:21 181:13 225:10
start 9:5 148:9 157:16 162:18
 170:16,24,25
started 82:19 168:20 179:22 180:20
 201:6
starting 78:16 92:5,10,22 168:2
state 1:24 5:18,22,24 149:21 242:4
 242:23 244:5
stated 153:15 183:9,12
statement 156:18 165:11 233:21
States 1:2 126:7
stayed 188:17
Stenotype 1:23
step 104:10 172:16
stepping 148:17
steps 149:14,16
STERLING 2:16
Steve 227:25 228:4,10,13,18
Steven 37:5 178:11 179:25
stipulate 4:22
stipulated 3:4,10,15 4:2,14 5:5,6,7
 5:8 155:4
STIPULATIONS 3:2
stop 56:7 233:4
story 157:18,23 158:14,16
straight 160:15 166:8,17
strategy 58:23
strife 176:17

strong 78:21 110:15
structure 214:4 231:20 232:6,7
 237:5 238:11
struggling 42:13 173:12,13
stuff 137:3
style 79:20,20 80:16,21 111:8
stylistic 111:20
stylistically 80:11
subject 42:23 68:21 120:12 222:7
 239:22
subjects 222:7
subordinates 50:13 51:3,10,19,24
subscribed 242:19
subsequently 44:6
substance 114:20 115:8 144:21
 146:6 147:14 216:8 218:9
substantially 54:16
substantive 25:16 28:25 29:3 33:4
 115:7
substantively 44:18,25 150:2
succeed 77:5
succeeding 185:4
success 89:8
successful 77:15 162:21 180:22
successfully 88:14
succession 70:14,22 72:17
sucks 149:3
suffer 9:15
suffering 9:11
suggest 103:25
suggested 97:14 114:4
suggesting 27:21
suggests 143:10 145:15
super 173:7
supervisor 15:12 57:7,9,14 166:20
 167:19
Supp 131:25
supplemental 132:4,7
support 171:4,18 175:25
supporting 88:19 171:16 178:23
 179:5
sure 8:6 18:25 20:21 21:5,24 23:20
 38:24 49:23 61:14 68:3 89:25
 105:21 134:21 146:9 154:9 170:8
 172:6 183:3 201:7,15 218:6
 237:14
surprise 218:14
surrounding 217:4 218:16
sustainable 149:2
swear 4:21,24
sworn 3:18 5:17 6:9 244:7
symbol 127:11,18,21,25

T

T 1:1 2:1 3:1 4:1 5:1,15 242:3 243:6
 244:2,2
T-A-N-A-K-A 13:2
table 86:4

**tactical** 58:24
**take** 6:20,25 7:10 8:3,6,7,8,11 17:9
    43:7 64:23 68:8 71:23 76:22,24
    77:4 98:21 99:14,24 109:22
    112:11,16,17 118:19 119:3
    130:20 143:7 152:9 153:3 154:3,6
    162:25 183:24,24 194:22 210:9
    221:20 222:25 225:8,9 232:8
    238:16,24
**taken** 1:20 43:10 99:9 100:2 151:16
    153:5 154:10,15,18 184:4 194:24
    210:8 220:18 238:21 242:8
**talk** 143:3,7 145:11 175:21 183:13
    186:10
**talked** 48:3 72:7 100:11 133:23
    214:8
**talking** 33:17 37:5,9 80:9 89:14
    100:6 103:4 104:22 145:13
    146:18 175:20 197:8,9 199:8
    203:17
**Tanaka** 13:2
**tandem** 105:19
**targets** 129:16
**tax** 14:9 235:5
**technical** 42:11 89:2 125:14 127:2
    187:22 233:20
**technicality** 233:25
**technically** 79:15 88:16 233:24
**telephone** 4:11
**tell** 6:9 7:25 8:2 15:23 32:9 35:24
    36:3 42:16,24 91:16,22 102:22
    113:12 118:12 119:21 134:16
    136:16 137:17 139:18 142:9,11
    145:6 152:5 153:10,16 160:9,21
    160:22 180:17 185:2 191:10
    221:16 229:19
**telling** 82:19 83:2 133:12 134:7
    151:9 185:24 193:16 194:13
**tend** 80:17 136:22 140:21
**tended** 59:22 80:2,16
**tendency** 80:4 187:19
**tension** 169:6,9
**tenuous** 168:23
**tenure** 15:24 29:7,11,18 30:21 46:3
    46:16,20 47:2,7 49:4 50:12 54:15
    58:18 76:17 116:24 119:23
    125:10 126:5,18 236:16,18
    237:23
**term** 11:17,25 31:15 36:9 89:13
    124:12 150:4 161:6 162:12
    170:19 222:14
**terminate** 158:22 168:9 184:9
    216:20,25 226:9
**terminated** 45:21 220:25 221:10
    224:22,23
**termination** 157:20,22 184:4,7
    209:23 217:24 219:11 220:10
    225:8,14,22 226:3,11 239:14

**terminations** 48:14
**terms** 39:12 71:12 77:18 79:17
    85:14 94:8 226:10
**terrible** 190:15,19
**testified** 5:19
**testify** 9:8,13 112:21
**testimony** 6:23,25 9:17 167:14
    242:8,11 244:9
**text** 53:9
**thank** 13:22 14:11 24:11 43:9 91:21
    99:18 112:10 115:12 119:14,24
    131:23 155:14,16 161:14 211:24
    241:2,6,18,20
**Theoretically** 41:9
**thing** 27:3 30:18 81:8,18 118:7
    161:5 164:14,18 172:10 196:19
    225:16 241:8
**things** 8:22 24:8 42:21 59:16 89:3
    90:22 104:14 105:18,21 110:11
    136:22 140:21 164:3,15 175:3
    178:3 194:15,15
**think** 32:8 37:4,20 41:21 69:17 81:8
    83:18 91:12 105:7,8 114:16 132:5
    136:13 142:8 143:8,23 145:25
    146:2 151:13 155:24 156:6 161:8
    162:13 165:20,24 167:6 172:9,16
    174:15,15 181:13 201:6 214:8,15
    222:25 230:17 231:21 237:5
**thinking** 33:8 149:2 199:6 237:15
**third** 78:11 108:25 109:5
**third-hand** 101:4 116:9
**third-party** 109:2 197:25
**thought** 70:19 85:12 97:10 101:5
    151:8 156:9,10,11 165:22 219:8
    219:10,12
**thoughts** 137:15 173:13
**three** 9:4,25 10:22,22 16:14 28:18
    77:12,12 78:4 86:4,7,17 136:3
    160:13 166:4,6,14,23 167:10
    178:24 188:8,17 192:5,7 193:10
    217:23 239:19
**tied** 132:14,16
**ties** 235:2
**time** 1:23 3:12 5:3 7:2,12,12 8:3,3,7
    8:7,12,14 10:18 20:16,20 21:7
    27:6,8 29:17 30:13,22 31:3 32:13
    32:17,20 49:10 51:16 57:10 58:2
    66:23 67:3,16 72:11 77:13 78:18
    82:4 94:15 95:15 99:4,5,19,21
    110:4 114:2 116:18,24 119:3
    121:19,25 124:7 126:7,9,19
    129:11 130:7 136:20 139:25
    143:12 145:25,25 146:4,17,19
    147:8 152:8 163:18,25 164:24
    165:3,25 167:22 168:2 174:9
    177:22 178:18,19,20 180:20
    181:8 184:8 197:13 198:2 201:24
    202:19 203:17,25 212:25 213:9

    214:16 216:19 220:24 222:25
    225:21 227:8 229:14,15 231:17
    233:3 236:25 238:6 241:2
**timeframe** 181:12 214:22
**times** 79:19,22 80:2,17 103:18
    104:7 105:6 111:6 116:4,9 124:21
    187:21 195:14
**timing** 138:2 159:19 181:22
**title** 12:13,21 16:21 17:22 18:3
    24:19 26:15 36:16 54:3,6 61:7,9
    65:24 87:2,11,11,21 94:3 96:15
    97:10 189:17 208:6 212:4,5
**titles** 96:14,18,21,25 97:2,4 212:2
**today** 5:11 6:7,22 7:3,9,17 8:6,13
    9:9,13,17 11:11,18 101:22 124:12
    133:12 134:3 148:7 155:8 214:8
    238:23 240:3 241:3
**today's** 9:20 10:20 11:11
**Todd** 209:23 210:11,20,24 211:8,12
    211:16
**Todd's** 210:16
**toes** 148:18
**told** 44:17 85:12 97:6 134:3 144:7,8
    146:23 149:25 160:17 166:11,14
    192:13 194:8,16,18 227:25 228:4
    228:13
**toll** 85:12
**Toni** 1:23 4:23 5:17 17:17 22:2 23:4
    24:12 26:5 41:23 48:9 53:11 56:5
    56:18 60:20 61:16 65:19,25 71:19
    120:5 123:21 127:5 134:25 138:7
    142:14 143:22,23 148:2 150:13
    155:17 157:3,6 160:5,7 167:8
    174:20 181:16 182:24 218:19
    220:16 223:21 229:21 230:14
    244:4,19
**top** 17:18 24:17 26:15 65:18 120:6
    120:7 123:20 124:4 127:6 132:9
    132:25 133:11,19 134:10,11,21
    134:24 141:10 148:9 157:2 158:2
    160:3,10 161:20 168:11 171:21
    172:4 180:11 188:6 192:6 193:6
    193:18 196:2,7 198:10,10 200:16
    200:21 218:20 222:4 226:23
**total** 20:13 41:15 128:13,21 220:6
**train** 146:4 160:19
**training** 114:4,5 143:11 145:21,24
    146:5,13
**transaction** 147:19
**transcript** 6:24 113:13 114:14
    115:5 233:7 241:23 242:8,10
    244:8
**transcripts** 10:25
**transfer** 163:5,12
**transferring** 163:7
**transition** 162:19,20 163:4 215:17
**transitioned** 162:25 179:2 209:8,11
**transitions** 144:20

**transpired** 69:14 221:16
**treated** 211:12
**treatment** 216:12
**trial** 3:13
**triangle** 127:16,18
**Trice** 228:7
**tried** 143:4 149:18
**Troccoli** 81:23 82:5,6 83:6,16
101:11,16,19 104:19 107:24
168:17,22 169:4,7,13,17,20,25
170:14 171:3,11,16 176:8,18
190:4,10,18 191:3,9,12,23 192:19
193:3
**Troccoli's** 168:15 171:6 176:14
177:10
**true** 52:12 151:16 242:10,12 244:8
**trust** 88:18 172:20,20 186:14
187:12 219:4
**truth** 6:9
**truthfully** 9:8,13
**try** 42:13,15 60:23 103:9 104:13
106:3 151:14 161:5 168:4
**trying** 103:25 145:8 164:20 187:21
189:14 199:12 212:10
**turn** 64:17 67:3 99:15 114:24
150:16 155:5 180:9 218:18 223:4
226:21
**turning** 120:3 123:19 133:9 160:2
189:8 190:3 192:4 194:20
**turnover** 43:19
**two** 9:25 26:20 47:19 135:18 164:21
166:4 179:7,14 188:6 194:21,25
196:2,11 212:2 213:24 221:17
226:8,10
**two-fold** 58:20
**type** 16:2 35:8 41:16 60:4 78:22
79:21 89:5 104:14 115:20 231:24
235:15
**types** 16:2 23:12 39:10 60:10 89:3
201:22
**typical** 55:5

**U**

**U** 5:15
**Uh-huh** 24:21 26:18 47:21 78:15
83:4 108:15,21 136:8 140:24
141:8,14 145:22 149:15 161:16
166:18 174:25 184:16 187:15
188:15 191:17 193:8 195:25
218:22
**ultimate** 37:22
**ultimately** 34:17 87:5 95:4 182:10
198:22 203:19 208:19 228:23
**unauthorized** 4:18
**undergoing** 20:10 67:7,11
**underlined** 120:16
**underlying** 197:18
**undermining** 169:25 170:5,9

**underneath** 128:3
**understand** 6:13,18 8:15,22 10:12
10:16 12:2 16:18 21:4,5,18 22:20
23:21 40:16 41:21 44:14 48:7
50:17,18 51:6,7 67:9,10 91:9
100:4 106:9 107:9 113:8 145:8
166:22 193:19,25 207:17 216:11
240:9,10
**understanding** 14:10 20:25 22:11
22:23 23:8,16 64:8 69:9 73:10
74:18,21 76:5 97:25 115:13
122:23 140:2 141:19 144:12
147:18 162:11 164:7 170:18
181:25 195:15 207:21 220:13
231:13
**understands** 194:14
**understood** 6:17,21 27:24 156:6
205:25
**undertaking** 231:17
**unfair** 216:12
**unfairly** 211:12
**unfiltered** 80:17
**Unfortunately** 172:6
**unhappiness** 215:22,24
**uniformed** 57:16
**unit** 125:15
**United** 1:2 126:7
**units** 60:8
**updated** 20:17
**upset** 176:14
**use** 11:12,25 15:10 29:10 36:9
93:11 127:23 239:9

**V**

**v** 180:15
**vacancy** 29:25 71:8 72:3 73:3
**vacant** 29:18 44:11 179:9
**vacated** 69:19 71:9,13,24 179:11
**vacating** 69:15
**vacation** 175:20
**VAGNINI** 2:3
**VALLI** 2:3
**variations** 20:19
**various** 19:13 20:13 114:18 115:20
118:2 168:16
**vary** 125:15
**verbal** 7:9 15:25 40:17 106:5,10
111:11 139:13 146:25 157:25
165:12 182:21 185:18 191:20
**verbally** 107:2
**versus** 74:2 173:16 189:17
**vice** 13:3 132:17,22
**videoconference** 4:9,15
**view** 87:13 224:13 230:6
**viewed** 36:21 78:19,19
**violation** 4:18
**Virginia** 113:22
**Visa** 235:3

**visible** 23:5
**visit** 169:3
**visitable** 174:18

**W**

**W** 242:3
**wait** 7:3,6
**waived** 3:8
**wake** 70:23
**walk** 223:7
**want** 21:24 43:5 61:5,6,11,21 64:5
65:5 89:12,25 90:12 94:4 99:21
112:11,15 117:24 119:8 140:9
142:5,10 143:7,15 145:11 146:24
153:13,19,23 155:13 160:23
164:12 186:8 189:20 192:14
199:7,12 204:14 207:16 220:5
223:2 238:18 241:2,7
**wanted** 20:14 29:19 30:14 84:8
114:3 147:19 189:15 192:19
**wanting** 164:14
**wants** 137:2 141:2 238:20
**wasn't** 18:5 79:16 82:9 116:16
130:23 152:12 160:17 171:16,18
204:2 211:13
**way** 6:2 25:16 58:6 87:4 103:9,25
106:3 111:8 117:3 124:22 152:16
158:10 161:3 164:4 165:5 172:16
187:23 191:10 222:6 225:19
228:5 240:15 244:13
**we'll** 61:18 62:20 84:18 138:7,13
192:10
**we're** 17:4 18:21 26:12 33:17 56:10
67:4 86:15 99:20 100:3 103:4
114:16,19,20 143:17 148:17
154:3 157:15,15,16,19,21 158:13
185:9 197:9,16 199:23 203:17
235:4
**we've** 151:17 207:24 238:22
**web** 1:22 4:11 5:12 53:8 56:20
**week** 221:3
**weeks** 185:12,17,19,25
**welcome** 61:23 62:22 151:7
**welfare** 39:7 59:7
**went** 20:18 36:14 60:7 69:25 74:15
82:18 111:9 145:10 185:7 193:25
194:14
**weren't** 59:19 111:19 197:18 215:3
**Westerholt** 116:14,16
**western** 36:16
**WHEREOF** 244:15
**whittled** 230:12 231:10
**willing** 73:13 153:20 175:6,21
**wish** 8:3,7,8 170:7 192:13
**wished** 180:23
**wishes** 8:6
**withdrawing** 90:3
**Withdrawn** 18:20 28:16 29:9 31:13

41:2 46:13 47:24 51:22 54:23
66:13 84:2 132:19 197:3 211:6
**witness** 1:20 4:8,9,21,24 5:2,11,16
9:6 10:9,15 17:4,7,12,16 22:6
26:8,10,12 53:15,18,21 60:25
61:20 62:10,19 64:2,4 65:20
71:15 99:17,19,23 110:10 112:5
112:10,22 113:17 115:6 118:14
118:18,23 119:6,15 133:18,21
134:23 142:2,24 147:4,21 150:6
153:9 158:8,25 160:7 161:24
162:9 170:20 175:15 182:17
183:10 185:20 193:20 194:22
196:18 197:18 210:12 222:18
223:25 227:6,13 230:3,10 242:2
243:3 244:6,9,15
**witness'** 113:10
**witnesses** 9:4
**woman** 125:16
**word** 121:2,8 166:23 172:8 196:23
**words** 21:14 123:2 136:10 159:16
194:17 216:6
**work** 32:7,24 33:3 47:13,14 59:20
64:10 66:4 69:25 79:5,19 80:14
102:12 105:16,19 109:11 115:9
116:11 121:22 129:16 136:19
137:3 140:18,25 144:8 148:12
149:18 160:15 162:19 173:8,20
175:22 210:25
**worked** 28:4 32:4 41:11 59:24,25
203:24 210:24
**working** 12:12 13:7 80:12 101:2
108:13 111:16,19 124:24 141:23
143:14 146:23 147:5 149:22
165:17 198:17,20 233:19,22,24
**workings** 29:23
**workplace** 82:7
**works** 225:18
**worksheet** 35:6
**worried** 160:20 186:13 187:12
**wouldn't** 22:21 109:7 178:2 186:14
187:12 207:19
**wrap** 238:19
**write** 119:11 219:6 220:20 224:19
**writing** 49:19,24 50:2,4 155:25
**written** 4:17 15:15 49:23 51:13,18
51:23 91:12,20 107:14,21 136:10
146:14 159:17 210:18,19 225:20
**wrong** 56:7 78:3 97:7 142:9 143:14
**wrote** 166:11 180:15 183:13 186:19
231:5

**X**

**X** 1:3,14 194:6 243:2,6

**Y**

**Y** 194:6
**Y-U-K-A** 206:22

**Y-U-R-I-C-H** 228:11
**yeah** 117:14 187:23 203:9
**year** 8:15 35:7 49:5 52:20 54:10,20
54:25 55:7,10,15,16 62:3 63:5
64:9,22 67:4 98:2,4,11 113:23
115:17 128:25 131:17 133:7
169:20 208:21,23 211:25 212:8
212:12 213:7,25 214:19,25 215:4
215:5 230:5,24
**year-end** 52:12
**years** 33:9 45:21 113:20 132:6
168:23 174:10
**yellow** 172:10
**Yoko** 125:16,18,19 126:2 235:18,21
**York** 1:2,25 2:4,8,8,13,13,18,18
5:18 73:22 244:5
**Yoshisato** 67:15,17 68:20 69:15,18
75:24 85:13 86:13 94:20 95:3
**young** 83:11
**Yuka** 206:22
**Yurich** 228:11
**Yvonne** 210:5

**Z**

**Z** 194:6
**zoom** 4:11 120:5,9

**0**

**1**

**1** 172:5
**1-10** 1:11
**10** 63:25 65:14 150:15 151:17
**10:09** 1:15
**100** 18:25 22:12 40:6
**10001** 2:8
**10004** 2:13
**10222** 2:18
**10th** 134:9 137:18 139:11,17
**11** 222:10,10 224:8
**11/11/2015** 200:15
**11530** 2:4
**11th** 139:3 171:20,24
**12** 55:8 65:15,22
**12/10/2014** 133:11
**12th** 244:16
**13** 173:5 174:2
**130** 118:6
**138** 243:8
**14th** 2:8 138:4,5
**15** 129:5 130:6,10 185:14 226:25
**150** 243:9
**16** 161:23 191:8,15
**17** 129:5 131:11 161:14 162:3
173:5 213:13 214:12 222:11
**175,000** 130:9
**17th** 176:6
**18** 162:7 175:7,10 186:6,8 191:15

196:16,20,21 229:19,22
**18-cv-08188** 1:7
**19** 162:7 180:10 188:23 218:23
**19th** 185:10 218:7 220:8,12,24
221:9,12 225:4
**1st** 11:8 98:22 103:11 162:22
164:16

**2**

**2** 4:5 17:5 18:22
**2/18/2015** 127:7
**20** 162:7
**2009** 12:18,19,20 27:15
**2011** 28:13,15 52:20 54:4,11,25
55:11 57:3
**2012** 54:4,7 55:2,12 62:3
**2013** 63:6
**2014** 8:15,21 21:8 64:9 65:6 67:4,6
67:13 98:20,25 99:10,13 120:8
134:10 137:18 139:17
**2015** 65:8 98:22 103:11 129:12
141:11,21 148:10 156:4 161:18
162:17 163:15 171:25 180:10
195:24 204:24 212:17 214:19
**2016** 158:23 209:13,20,22 211:19
211:21,25 212:15,16 218:24
**2017** 218:8 221:25 226:25
**2018** 11:8 12:6
**2021** 1:15 242:10,20 244:16
**22** 176:21
**220** 2:8
**23** 170:12
**233** 243:12
**23rd** 183:19 221:4
**24** 229:22
**241** 243:4
**25** 129:9 131:12,16,20 190:14 213:6
213:6,8,14 214:10
**25,000** 131:19
**2523** 127:5
**2524** 133:10 139:15
**2526** 141:10
**2527** 147:10
**2528** 148:9
**2532** 171:20
**2537** 180:9
**2540** 190:3
**2541** 190:23
**2546** 193:5
**2566** 198:7
**2587** 200:14
**25th** 120:8 183:20 190:4
**26** 176:20 177:5
**2612** 210:7
**2625** 221:23
**2627** 226:21
**2640** 218:18
**2649** 119:17

**26th** 221:22,25
**27th** 190:24
**28** 4:5
**28th** 2:12 193:6
**29** 65:7
**29466** 6:3
**2nd** 161:20

---

### 3

**3** 172:5
**3.9** 121:2
**30** 1:15 99:21,24 138:9,23 143:7
  242:9
**300,000** 128:25 131:15,18,20
  214:10
**3000,000** 130:17
**30th** 221:9,13
**31** 150:9,9 158:23 159:20 181:17,20
  182:16 195:24
**31st** 155:22,22 159:19,24
**35** 31:22

---

### 4

**4** 24:13,16
**4/29/2015** 198:10
**40** 31:23 143:7
**401(k)** 39:9 59:7
**4425** 6:2
**462,000** 128:17
**47** 193:5

---

### 5

**5** 26:6,13 109:21 166:5 243:4
**50,000** 128:14
**539,000** 128:21
**599** 2:17

---

### 6

**6:26** 242:2
**600** 2:4
**621** 56:8,10 57:13
**622** 57:6
**63** 138:18,19 243:8
**64** 56:6 150:18,19 243:9
**65** 56:7

---

### 7

**7** 53:12,25 141:11,21 148:10 161:18
**7/14/2014** 123:24
**75,000** 131:22
**77,000** 128:19
**7th** 156:4 160:3 168:8,10 180:24
  181:5 184:13

---

### 8

**8** 60:22 61:3
**80** 79:5,8

---

### 9

**9** 62:17 63:3