# EXHIBIT J

1

2 UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3 -----------------------------------------X

JENNIFER S. FISCHMAN,

4

PLAINTIFF,

5

6 -against- Case No.:

18-cv-08188

7

8 MITSUBISHI CHEMICAL HOLDINGS AMERICA, INC.;

MITSUBISHI CHEMICAL HOLDINGS CORPORATION;

9 NICOLAS OLIVA, in his individual and

professional capacities; DONNA COSTA, in

10 her individual and professional capacities;

and JOHN DOES 1-10, in their individual and

11 professional capacities,

12 DEFENDANTS.

-----------------------------------------X

13

14 DATE: June 15, 2021

15 TIME: 10:27 A.M.

16

17 DEPOSITION of the Plaintiff,

18 JENNIFER S. FISCHMAN, taken by the

19 Defendants, pursuant to a Court Order and

20 to the Federal Rules of Civil Procedure,

21 held at the offices of Gordon Rees Scully

22 Mansukhani LLP, One Battery Park Plaza,

23 28th Floor, New York, New York 10004,

24 before Enrique Alvarado, a Notary Public of

25 the State of New York.

```
 1
 2   A P P E A R A N C E S:
 3
 4   VALLI KANE & VAGNINI
        Attorneys for the Plaintiff
 5      JENNIFER S. FISCHMAN
        600 Old Country Road, Ste. 519
 6      Garden City, New York 11530
        BY: MATTHEW L. BERMAN, ESQ.
 7              and
          SARA WYN KANE, ESQ.
 8
 9
      GORDON REES SCULLY MANSUKHANI LLP
10      Attorneys for the Defendants
        MITSUBISHI CHEMICAL HOLDINGS AMERICA,
11      INC, NICOLAS OLIVA and DONNA COSTA
        One Battery Park Plaza, 28th Floor
12      New York, New York 10004
        BY: MERCEDES COLWIN, ESQ.
13      File #: MCHEM-1135398
14
15   SHEARMAN & STERLING
        Attorneys for the Defendant
16      MITSUBISHI CHEMICAL HOLDINGS CORPORATION
        599 Lexington Avenue
17      New York, New York 10022
        BY: JERRY FORTINSKY, ESQ.
18
19
20   CLARICK GUERON REISBAUM
        Attorneys for the Defendant
21      DONNA COSTA
        220 Fifth Avenue
22      New York, New York 10001
        BY: NICOLE GUERON, ESQ.
23
24
25
```

1
2   ALSO PRESENT:
3           Sam Jolly, Esq.
            Shearman & Sterling
4
5           Brittany L. Primavera, Esq.
            Gordon Rees Scully Mansukhani LLP
6
7           Nicholas Oliva
8           Donna Costa
9
            Deverell Write,
10          Videographer
            Veritext Legal Solutions
11
                    *           *           *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *    *    *    *

25

1                    J. FISCHMAN

2   J E N N I F E R   S.   F I S C H M A N,

3   called as a witness, having been first duly

4   sworn by a Notary Public of the State of

5   New York, was examined and testified as

6   follows:

7   EXAMINATION BY

8   MS. COLWIN:

9        Q.    Please state your name for the

10  record.

11       A.    Jennifer S. Fischman.

12       Q.    What is your address?

13       A.    600 Old Country Road, Ste. 519,

14  Garden City, New York 11530.

15            THE VIDEOGRAPHER:  We are on

16        the record at 10:27 a.m., on June 15,

17        2021.  This is the beginning of video

18        1 recorded deposition of Jennifer S.

19        Fischman taken by counsel for the

20        defendants in the matter of Jennifer

21        S. Fischman versus Mitsubishi

22        Chemical Holdings America

23        Incorporated et al.

24            This is part of the US District

25        Court for the Southern District of

```
 1              J. FISCHMAN
 2         New York.  My name is Deverell Write
 3         representing Veritext Legal
 4         Solutions.  The court reporter is
 5         Enrique Alvarado from Veritext Legal
 6         Solutions.  At this time the court
 7         reporter will swear in the witness.
 8    Q.    Good morning, Ms. Fischman.
 9    A.    Good morning.
10    Q.    As you know, my name is
11  Mercedes Colwin and I represent Donna
12  Costa, Nick Oliva, and Mitsubishi Chemical
13  Holdings America.  I'm here to ask you
14  questions based on your complaint that you
15  filed against multiple defendants.  We have
16  already stated for the record who is
17  present so we don't have to go through that
18  formality, so thank you Enrique for doing
19  that.
20         MS. COLWIN:  And I just want to
21         say on the record, counsel have
22         agreed to the following acronyms so
23         that we can get through this fairly
24         quickly.  For Mitsubishi Chemical
25         Holdings America, the acronym will be
```

1              J. FISCHMAN

2        MCHA.  For Mitsubishi Chemical

3        Holdings Corporation, the acronym

4        will be for MCHC.  For Mitsubishi

5        Chemical Corporation, the acronym

6        will be MCC and for Mitsubishi

7        Chemical Holdings Japan, it will be

8        MCHJ.  Agreed, Counsel?

9             MR. BERMAN:  Yes.

10      Q.    Ms. Fischman, you've been an

11  attorney for a long time, so I'm not going

12  to go through all the formalities of a

13  deposition.  You're familiar with the

14  deposition rules, correct?

15      A.    You can go through the

16  formalities if you like.

17      Q.    Okay.  So we're here, as you

18  know, we have a stenographer, you've been

19  sworn to tell the truth so you understand

20  that your testimony has to be truthful,

21  correct?

22      A.    Of course.

23      Q.    And you understand that

24  nonverbal cues can't be captured by a

25  stenographer so we ask that all your

1                    J. FISCHMAN
2    answers to my questions are verbal.
3    Understood?
4         A.    100 percent.
5         Q.    And if you need a break, you
6    can certainly signal that you need a break.
7    You have your great counsel here, let us
8    know, but all I ask is that you not
9    interrupt my questioning; finish the answer
10   and then you can certainly take a break.
11   Understood?
12        A.    Yes.
13        Q.    You understand that if you
14   don't answer truthfully there are criminal
15   penalties that can attach, correct?
16        A.    Yes.
17        Q.    Those criminal penalties are
18   the penalties of perjury, correct?
19        A.    Correct.
20        Q.    And you understand.  Let's have
21   an agreement.  If I ask you a question, you
22   respond, you've answered truthfully,
23   correct?
24        A.    Yes.
25        Q.    You've understood the question

```
 1                    J. FISCHMAN
 2   I've posed to you, correct?
 3        A.    Yes.
 4        Q.    You have answered to the best
 5   of your recollection, correct?
 6        A.    Sure.
 7        Q.    Is there any reason why you
 8   can't testify truthfully today?
 9        A.    No.
10        Q.    Have you taken any medication
11   in the last 24 hours?
12        A.    Just Synthroid.
13        Q.    Is that for --
14        A.    Thyroid.
15        Q.    Thyroid condition.  What is the
16   milligram?
17        A.    125 micro milligrams.
18        Q.    Any other medication?
19        A.    No.
20        Q.    Anything over the counter?
21        A.    No.
22        Q.    Have you consumed alcohol in
23   the last 24 hours?
24        A.    Yes.
25        Q.    How much alcohol have you
```

1              J. FISCHMAN
2  consumed?
3       A.    I had a glass of chardonnay
4  last night with dinner.
5       Q.    Does consuming the alcohol have
6  any effect on your ability to recall
7  events?
8       A.    No.
9       Q.    Does it affect your ability to
10  testify truthfully?
11       A.    No.
12       Q.    Have you taken any controlled
13  substances, or any substance other than
14  what you've already testified, which is
15  Synthroid --
16       A.    No.
17       Q.    -- milligrams --
18       A.    No.
19       Q.    And the glass of chardonnay,
20  correct?
21       A.    That's correct.
22       Q.    And all I ask Ms. Fischman, you
23  might anticipate the question I'm going to
24  ask you but I just ask that you allow me to
25  complete it before you answer.  Is that

```
 1                    J. FISCHMAN
 2    understood?
 3         A.    Of course.
 4         Q.    Thank you.  When did you first
 5    retain your attorneys, these current
 6    counsel that are present today?
 7         A.    I don't recall.
 8         Q.    Do you recall the year?
 9         A.    I don't remember.
10         Q.    Why don't I leave a space so
11    that can be filled in.
12         A.    Yeah, I have no idea.
13               THE WITNESS:  Do you?
14               MR. BERMAN:  We can't provide
15          the answer.  You have to answer based
16           upon the best of your knowledge.
17         A.    I didn't look at the engagement
18    agreements.  I can't remember.  Sometime in
19    -- let me just -- give me a minute and let
20    me -- we can provide that.
21         Q.    This is your second set of
22    counsel, correct, you had prior counsel?
23         A.    Yes.
24         Q.    When did you retain, the name
25    and the year about that you retained your
```

```
 1                  J. FISCHMAN
 2  former counsel?
 3       A.    I would say -- the name?
 4       Q.    Yes.
 5       A.    Richard Reeser (phonetic)
 6  sometime in early 2017.  I want to say in
 7  the end of March, April, May.  I don't
 8  recall exactly.
 9       Q.    You retained them though after
10  you became separated from MCHA, correct?
11       A.    Yes.
12       Q.    Was this the first time that
13  you've been a party to an action?
14       A.    Yes.
15       Q.    Did you ever bring any sort of
16  charge in an enforcement agency?
17       A.    Never.
18       Q.    Have you ever been sued?
19       A.    No.
20             (Whereupon, First Amended
21         Complaint was marked as Defendant's
22         Exhibit for identification as of this
23         date.)
24       Q.    Now you filed a complaint.  I'm
25  just going to have that just marked, the
```

1                    J. FISCHMAN
2  first exhibit.  It's the first amended
3  complaint, the one that's controlling here.
4  I'm not going to put in the former, the
5  initial complaint.  Ms. Fischman, so I'm
6  showing you the first amended complaint
7  that your counsel submitted on your behalf.
8          A.    Yes.
9          Q.    And you reviewed this complaint
10 prior to its admission in court and filing,
11 correct?
12         A.    Yes.
13         Q.    You understood that it was
14 critically important to ensure that
15 everything that was put in there in terms
16 of factual requirements were accurate,
17 correct?
18         A.    Yes.
19         Q.    And everything that you put in
20 this complaint is accurate?
21         A.    To the best of my knowledge.
22         Q.    Did you have input in the
23 drafting of this complaint, did you
24 actually write portions of the complaint?
25         A.    I don't recall.

1              J. FISCHMAN
2        Q.    Is there anything that exists
3    that would refresh your recollection as to
4    whether or not you drafted portions of this
5    complaint?
6        A.    I'm sure I looked at the
7    complaint and I probably gave comments on
8    it.
9        Q.    But you don't have a specific
10   recollection that there is a document that
11   may refresh your recollection as to whether
12   or not you wrote portions of the complaint,
13   correct?
14       A.    I don't.
15       Q.    Now you were hired by MCHA in
16   March of 2008, correct?
17       A.    I was hired by Mitsubishi
18   Chemical USA to be more specific.  That is
19   the former company.
20       Q.    And the successor to the
21   company that you've identified is MCHA,
22   correct?
23       A.    Yes.
24       Q.    And MCHA is the payor on every
25   check that you received during the time

```
 1                    J. FISCHMAN
 2    that you worked at MCHA, correct?
 3         A.    Yes.
 4         Q.    And the position that you held
 5    at MCHA, for purposes we know that there
 6    was a successor company.
 7              MS. COLWIN:  Let's just all
 8         agree that it was MCHA, that was the
 9         successor company, is that in
10         agreement Counsel so there is no
11         confusion on the record?
12              MR. BERMAN:  When you're
13         referring to the successor company
14         you're referring to MCHA.
15              MS. COLWIN:  Yes.
16              MR. BERMAN:  That's fine.
17              MS. COLWIN:  And that is, it's
18         already on the record, let's
19         stipulate that is Ms. Fischman's
20         employer.  So stipulated?
21              MR. BERMAN:  We're not
22         stipulating to any legal conclusions.
23         We can stipulate that you're using
24         that term for MCHA.
25              MS. COLWIN:  Let's continue.
```

1           J. FISCHMAN

2      Q.    And your position, your initial

3 position with MCHA, was corporate counsel,

4 correct?

5      A.    Correct.

6      Q.    And at some point later on you

7 were promoted; is that right?

8      A.    Yes.

9      Q.    And you reported, at the time

10 of your promotion to assistant general

11 counsel, you reported to Donna Costa; is

12 that right?

13      A.    Correct.

14      Q.    And Donna Costa was the general

15 counsel and chief compliance officer at the

16 time; is that right?

17      A.    Correct.

18      Q.    Please take a moment to take a

19 look at the document that is Bates stamped

20 41 to 57.  Now at this time Ms. Costa began

21 a practice of having these mid-year

22 reviews; isn't that right?

23      A.    I'm sorry.  What are you asking

24 me and what am I suppose to be looking at?

25      Q.    You're looking at an evaluation

1              J. FISCHMAN
2    for year end for '14.  These are the
3    mid-year evaluations that the legal
4    department, subject to Ms. Costa, had begun
5    for mid-year review, correct?
6              MR. BERMAN:  Objection to form.
7              MS. COLWIN:  Let me rephrase.
8         Q.   Ms. Fischman, I'm showing you a
9    document.  Let's start with do you
10   recognize the document that's before you?
11   It's Bates stamped 41 to 57.
12        A.   Yes.  This is an e-mail that I
13   sent to Donna with a draft of my year-end
14   evaluation when I was promoted to acting
15   general counsel, as far as I can tell.
16        Q.   I'm going to direct your focus
17   to Bates stamp 42.  Do you see that on the
18   bottom.  So it's 000042.  And the title
19   that you had at the time was assistant
20   general counsel, correct?
21        A.   Yes.
22        Q.   So this would have captured
23   your time as assistant general counsel; is
24   that right?
25        A.   Yes.  It's a backward-looking

1          J.  FISCHMAN

2    document and a forward-looking document.

3          Q.    Okay.  So this is, as you can

4    see, beginning in page 44 there's the blue

5    line throughout this document, correct?

6          A.    Mmhmm.

7          Q.    Is that a yes?

8          A.    Yes.

9          Q.    And that's Ms. Costa, her input

10   on all of this, correct?

11         A.    Yes.

12         Q.    So just so we understand fully

13   the process of the evaluation process, at

14   the time you were at MCHA, the process

15   begin with you drafting your initial

16   review.

17         A.    Yes.

18         Q.    Sending it to Ms. Costa, Ms.

19   Costa then reviewing it and then giving her

20   input; is that right?

21         A.    Yes, that was the process.

22         Q.    And looking at this document,

23   just so the record is clear, all of the

24   black ink that's on this document would be

25   your original comments; is that right?

1                    J. FISCHMAN

2         A.    Actually not necessarily,

3    because what we did was from year to year

4    we would just kind of use the same document

5    and we would kind of just update it, so

6    there might be language in here and writing

7    in here that had accrued since an earlier

8    year.  So it might have been Donna's

9    language in some of it as well.

10        Q.    Was there anything in this

11   document that you believe is inaccurate?

12   We can go off the record for a few minutes

13   and you can let us know, identify, any part

14   of this document that you believe to be

15   inaccurate.

16             THE VIDEOGRAPHER:  The time on

17        the video monitor is 10:42 a.m.  We

18        are off the record.

19             (Whereupon, an off-the-record

20        discussion was held.)

21             THE VIDEOGRAPHER:  We are back

22        on the record.  The time on the video

23        monitor is 10:46 a.m.

24             MS. COLWIN:  Do you want to

25        read back, Enrique, the last two

1              J. FISCHMAN

2        questions and answers.

3              (Whereupon, the referred to

4        questions and answers were read back

5        by the Reporter.)

6              MS. COLWIN:  That's the pending

7        question.

8              THE WITNESS:  No, there's

9        nothing inaccurate.

10       Q.    I'm going to direct your

11  attention to 47, to Bates stamp 47 at the

12  end.  The blue part that's on this

13  document, that's your statement at the very

14  end, correct?  Where it says "I'm excited

15  for my new role, leading the legal

16  department, assuming the lead of the

17  compliance program this year.  These are

18  huge, huge responsibilities.  I'm ready to

19  take them on and devote all my energy to

20  them," exclamation point.

21       A.    Yes.

22       Q.    That was your statement?

23       A.    A-ha.

24       Q.    I had asked earlier, Ms.

25  Fischman, and I don't believe I got an

1          J. FISCHMAN
2    affirmative on this, there are mid-year
3    reviews that the legal department went
4    through in 2014.  Do you recall that?
5          A.    I don't recall there being a
6    standard practice for mid-year reviews.
7          Q.    I'm going to show you a
8    document that's Bates stamp 1359 to 1373.
9    Do you recognize this document?
10         A.    I'm sorry, can you be more
11   specific, please?
12         Q.    Do you recognize the document
13   I've handed to you.  It's the e-mail
14   exchanges between yourself and Ms. Costa in
15   the beginning pages and then I focus your
16   attention on Bates stamp 1362.
17         A.    Yes.
18         Q.    And this would be your mid-year
19   review, correct?
20         A.    Yes.
21         Q.    And that was dated November 20,
22   2014?
23         A.    Yes.
24         Q.    If you can take a look at this
25   document and let us know if there are any

```
 1                    J. FISCHMAN
 2   inaccuracies.
 3        A.    No.
 4        Q.    So the answer is there are no
 5   inaccuracies, correct?
 6        A.    There are no inaccuracies.
 7              (Whereupon, Copy of mid-year
 8          review was marked as Defendant's
 9          Exhibit 61 to 76 for identification
10          as of this date.)
11        Q.    I ask that Exhibit 61 to 76.
12   Ms. Fischman, I'm showing you what's been
13   marked as 61 to 76.  This is your executed
14   copy of your mid-year review, correct?
15        A.    No.
16        Q.    What is it?
17        A.    This is my year-end review for
18   2014.
19              MR. BERMAN:  Counsel, please
20          note that the Bates numbers are
21          identical.  Excuse me, never mind,
22          it's 1361.  Never mind.
23        Q.    Take at look at your signature
24   at 68.  That is your signature, correct?
25        A.    Yes.
```

1          J. FISCHMAN

2      Q.     What portion of this document

3  did you provide, did you write?

4      A.     Everything with the exception

5  of -- honestly I can't recall every single

6  letter that I wrote, but it would be

7  whatever changes that you see between

8  Defendant's 42 and Defendant's 64, you can

9  run a red line and see what the changes are

10  that a supervisor would make.

11      Q.     There are no inaccuracies in

12  this year-end evaluation, correct, that one

13  that's Bates stamped 64 to 76, correct?

14      A.     Not that I know of after -- not

15  that I know, no.

16      Q.     And you have no reason to

17  believe that there are any inaccuracies in

18  this document, correct?

19      A.     I have no reason to believe

20  that there inaccuracies.  Can you give me

21  an idea of what you mean inaccuracies?

22      Q.     There's nothing in here that

23  you disagree with, correct?

24      A.     That I disagree with?  I'm not

25  sure what you mean by disagree.

1                    J. FISCHMAN

2          Q.     Is there anything in this

3    document that is not accurate with respect

4    to your performance, as detailed by Ms.

5    Costa, who is the individual who was the

6    reviewer?

7          A.     Do I disagree with any of the

8    comments about my performance, is that --

9          Q.     Well, let's approach it this

10   way.  You signed the document, did you not?

11   That's on 69.

12         A.     I did.

13         Q.     You would not sign a document

14   that you didn't number one, understand and

15   agree with, correct?

16         A.     First of all, I'm not going to

17   agree to your comment that I would not sign

18   a document that I disagreed with or have a

19   problem with.  I think that we signed lots

20   of documents that we disagreed with, but I

21   will tell you that I do not see

22   inaccuracies in this April 1, 2015, sorry

23   April 29, 2015 performance year-end review.

24         Q.     And your reviewer was Ms.

25   Costa, correct?

1                    J. FISCHMAN

2        A.     Yes.

3        Q.     And Ms. Costa is the one who

4   provided the commentary throughout

5   regarding your performance; isn't that

6   right?

7        A.     She and I wrote it together as

8   is evident from the other documents that

9   you've shown me this morning that show that

10  I wrote the document.

11       Q.     If you had any disputes, and

12  this is true of all your evaluations at

13  MCHA, correct, if you had any disputes with

14  anything that was presented to you in your

15  evaluation, whether it was mid-year or end

16  of year, you had the opportunity to

17  actually write in your comments within the

18  evaluation itself?

19       A.     No, actually, no, that's not

20  true.

21       Q.     What is --

22       A.     That wasn't the process.  So

23  the process, if you don't mind me

24  explaining it, so the process was that

25  somewhere around the beginning of the year,

1                    J. FISCHMAN

2    and the fiscal year for the Japanese

3    companies ends March 31st, so we were on a

4    fiscal year April 1 to March 31, so

5    somewhere around February or early January,

6    that timeframe, we would be instructed to

7    begin the process of filling out our

8    evaluation.

9              So we would do a draft, as you

10   see, of our own evaluation and we would

11   write the entire thing from head to toe.

12   We would fill in performance during

13   previous period, major areas of

14   responsibility, and then we fill in our

15   performance, then on the next page we would

16   go over our knowledge and skills and we

17   would fill in, and frequently even I would

18   fill in my level of proficiency.

19              And then I would write the

20   comments.  Jennifer worked on a number of

21   ongoing projects, she took over the

22   management of HIV HCD litigations.  Those

23   are comments that I would write, all of

24   them, and I would go through every --

25              Basically my process was that I

```
 1              J. FISCHMAN
 2   would go back and I would look at all the
 3   major, all the major projects that I worked
 4   during the course of the year for all of
 5   the affiliated companies.  And so the major
 6   ones that I worked on I would identify and
 7   I would say this is the project that I
 8   worked on, this was the conclusion.  We
 9   successfully concluded this litigation, or
10   I successfully concluded employment
11   investigations; I successfully concluded
12   MNA deals.
13              So I would go through and I
14   would write this all out and then, you
15   know, some of it, you know, over the years
16   we would leave some sentences in from the
17   year before.  So, for example, the third
18   paragraph begins Jennifer has demonstrated
19   an ability to handle many complex matters
20   at once.  So I think that sentence may be
21   found in earlier performance reviews.
22              So if you go back to 2009,
23   2010, 2011, you may find that exact same
24   sentence because like I said, we started
25   from the year earlier, you know, the year
```

1              J. FISCHMAN

2    before, and I would just update it with the

3    substantive work and then Donna would go in

4    and she would red line it or just take out

5    whatever fluff, whatever she wanted to, and

6    then she would add her own comments here

7    and there so that was the process --

8          Q.    But I want to make sure the

9    record is clear, Ms. Fischman, is that you

10   had an avenue, if you did not agree with

11   what was said in this evaluation, to speak

12   up and to say something, whether it's a

13   collaboration with Ms. Costa or actually

14   writing something differently within the

15   review?

16         A.    So in every year, I wrote the

17   document.

18         Q.    Right, we understand that.

19         A.    And in every year the comments

20   were all positive, so I had no reason to

21   object to anything that Ms. Costa put in.

22   If there was room for growth and she wrote

23   there was room for growth, I'm good with

24   that.  We're all here to grow and to learn

25   from what we do, okay, so I did not have

1             J. FISCHMAN
2  any reason to object to any of my annual
3  reviews.
4      Q.    So when you say you had no
5  reason to object to your annual reviews,
6  that's up to and including this one dated
7  April 29, 2015, correct?
8      A.    Up to this one, 2015.
9      Q.    Is that right?  We spoke over
10 each other and I just want to make sure
11 that we are accurate.  You had no reason to
12 dispute anything that's written in any of
13 your evaluations up to and including this
14 last one, April 29, 2015?
15     A.    This is true up to and
16 including this last one.
17     Q.    And there's no evidence of
18 discrimination in this performance
19 evaluation, correct?
20            MR. BERMAN:  Object to form.
21      Calls for legal conclusion.
22     Q.    Did you feel targeted in any
23 way and treated unfairly in this
24 evaluation?
25     A.    So in this evaluation, I did

1                    J. FISCHMAN
2   not feel discriminated in the language of
3   this evaluation.  What I did feel
4   discriminated against was that I was not
5   promoted to the full general counsel as I
6   should have been back in December of 2014
7   when I was made acting general counsel,
8   which no one in the company had ever been
9   acting anything, but at that time, I was
10  made acting, so yes, I did object to that
11  and I made that objection well known.
12       Q.    So I think this is a great way
13  to segue into that area but before we do,
14  it's your testimony then that up until
15  December of 2014, you had not been
16  subjected to anything that you perceived to
17  be unfair or inappropriate, correct?
18            MR. BERMAN:  Object to form.
19        Mischaracterizes testimony.
20       A.    I disagree with your
21  characterization.
22       Q.    Is it your testimony that there
23  were acts of discrimination that took place
24  prior to December 2014?
25       A.    I'm not going to discuss

```
 1                    J. FISCHMAN
 2    anything outside --
 3              THE WITNESS:  Do I have to
 4         answer --
 5              MR. BERMAN:  You can answer the
 6         question.
 7              MS. COLWIN:  Do not coach.
 8              MR. BERMAN:  I said to answer
 9         the question.
10              MS. COLWIN:  We're going to
11         keep this in conformance with what's
12         required under the Federal Rules of
13         Civil --
14         A.    Okay, I will go back into
15    earlier years.  There were definitely times
16    where as a woman, in a company full of only
17    men, with only one other woman, at the
18    head, in the leadership, I definitely felt
19    discriminated against.  I definitely felt
20    that I was among this misogynistic culture;
21    that I was always the only woman in the
22    room in office meetings and business
23    meetings.  I definitely felt that there
24    were times when, for example, when we were
25    in Japan, and I saw other women being
```

1                   J. FISCHMAN
2    dressed down, yes, I definitely felt that
3    there were other times that I observed or
4    felt discriminated against in the company.
5         Q.    So Ms. Fischman, I just want to
6    make sure that the record is clear.  You've
7    already stated on the record that MCHA was
8    your employer, correct?
9                   MR. BERMAN:  Object to form.
10        A.    I received a paycheck from
11   MCHA, yes.
12        Q.    And you directly reported to
13   the Donna Costa, correct?
14        A.    Yes.
15        Q.    And the individuals in that
16   legal department, under Donna Costa, for
17   the most part, 50 percent or greater, were
18   women, were they not?
19        A.    Well, why don't you identify
20   who the people in the legal department are
21   and I'll tell you if I believe they're
22   women.  I'm not sure who --
23        Q.    Let's go through it.  Katherine
24   Roach you worked with, correct?
25        A.    Katherine Roach is an assistant

1                    J. FISCHMAN
2      general counsel who worked for the most
3      part, the entire time that I worked at
4      Mitsubishi, part-time and from home.
5           Q.    She's still an assistant
6      general counsel, correct?
7           A.    Yes.
8           Q.    She still was the primary
9      intellectual property counsel, correct, in
10     the department?
11          A.    She is and she is a very
12     bright, terrific person.
13          Q.    The legal department is
14     comprised, in 2008, of the following
15     individuals, Ms. Costa as the general
16     counsel, correct?
17          A.    Yes.
18          Q.    Katherine Roach as the
19     assistant general counsel, correct?
20          A.    I don't know that her title in
21     2008 was assistant general counsel.
22          Q.    She was there at the time --
23          A.    She was home working from 9 to
24     12 was my recollection at that time.  9 to
25     1, working part-time.

```
 1                    J. FISCHMAN
 2        Q.    So there will be testimony, and
 3   I'm sure you'll be present for it, that she
 4   worked three days a week, those three full
 5   days a week, and the testimony will come
 6   from senior management within the legal
 7   department.  They would be lying?
 8        A.    I'm was not in charge of
 9   Katherine Roach's schedule.  My
10   recollection from 2008, until at least 2011
11   or 2012, was that she worked a limited
12   hourly schedule from her home.  She came
13   into the office, I think, once a month for
14   our legal department meeting.
15        Q.    But when you stated on the
16   record that her hours were 9 to 12, that is
17   not accurate, correct?
18        A.    My recollection was that there
19   were hours of the day that she worked but
20   it was not a full workday.  Like I said,
21   I'm not her supervisor, but I do recall
22   that there were times when businesses tried
23   to to reach her and she was offline.
24        Q.    Ms. Fischman, you would agree
25   with me that individuals that are
```

```
 1              J. FISCHMAN
 2   management in the legal department would
 3   know what her hours were, correct, since
 4   they were the ones responsible for her, for
 5   Ms. Roach, isn't that right?
 6        A.   I mean you can pull some
 7   documentation that can contradict that.  I
 8   don't think we're here to discuss
 9   Katherine's schedule, but she was a
10   part-time employee.
11        Q.   So let me finish the legal
12   department.  When you started in 2008,
13   Kelli Troccoli was there as the legal
14   assistant, correct?
15        A.   Yes.
16        Q.   Nathan Gallup as corporate
17   counsel?
18        A.   Yes.
19        Q.   And Kanako Murata (phonetic),
20   who was a female Mitsubishi Chemical
21   trainee from Japan; is that right?
22        A.   I don't recall the years that
23   Kanako worked in our department and I don't
24   think she worked in the White Plains
25   office.  I thought we had somebody else
```

1                    J. FISCHMAN
2    there at that time.  Daisuke Kansawa.  Was
3    it Daisuke?  Not Daisuke.  It was another
4    legal trainee.  You'll have to refresh my
5    memory as to Kanako's years.  I don't know.
6    I don't recall her in the White Plains
7    office though.
8         Q.    You received two promotions
9    working at MCHA, correct?
10        A.    Yes.
11        Q.    Those two promotions came from
12   Donna Costa, isn't that right?
13        A.    Donna Costa, yes.
14        Q.    So she promoted you from
15   corporate counsel to assistant general
16   counsel, correct?
17        A.    Yes.
18        Q.    And then she promoted you from
19   assistant general counsel to acting general
20   counsel; is that right?
21        A.    She delivered the information
22   to me that I would be promoted.
23        Q.    Is it your testimony that she
24   didn't have input in your promotion to
25   acting general counsel?

1               J. FISCHMAN

2       A.    It's my belief that she had

3   input but not final authority, and it's

4   also my belief that even her authority was

5   subject to Japan's approval as all material

6   decisions that were made at MCHA were

7   subject to authorization from Japan.

8       Q.    When you keep referring to

9   Japan, what are you referring to?  Japan is

10   a country, what are you referring to?

11       A.    Management in Japan.

12   Management at MCHC; management at MCC;

13   management at -- well, MCHJ is just the

14   legal arm of MCHC.

15       Q.    So let me break this down.  At

16   MCHC, who do you believe had input in your

17   promotions?

18       A.    Ken Fujiwara, Yoshisato-san,

19   Sakaguchi, Takimoto, Date-san.  The

20   officer, sorry, the board members of MCHA,

21   who were unknown to me but were Japanese --

22   sorry, were MCHC employees.

23       Q.    At MCC, who do you believe had

24   input in your promotions?

25       A.    Takimoto.  I can't remember

```
 1                    J. FISCHMAN
 2  people's names.
 3        Q.    MCHJ?
 4        A.    I've given you names of people.
 5        Q.    At MCHJ, the same ones from
 6  MCHC?
 7        A.    Well, Sakaguchi is MCHJ,
 8  Manomi-san is MCHJ.  I mean there may be
 9  others.
10        Q.    But those are the ones you
11  recall as you sit here today?
12        A.    Mmhmm.
13        Q.    Is that a yes?
14        A.    Yes.
15        Q.    Is there a document that you
16  have in your possession and control that
17  you believe may refresh your recollection?
18        A.    No.
19        Q.    When I asked you to identify
20  acts of discrimination that you felt, you
21  identified meetings outside of MCHA, so I
22  want to focus your attention at MCHA.
23  There were no acts of discrimination that
24  you were subjected to by MCHA, according to
25  your testimony, prior to December of 2014.
```

1                    J. FISCHMAN

2    Do you agree?

3        A.    I think that there were times

4    of feeling slighted, there were times where

5    I did not feel comfortable with Yoshisato.

6    That I felt that he looked down upon me as

7    a woman.  There were certainly

8    uncomfortable conversations with him, but

9    for the most part, most of my interactions

10   were not with MCHA.

11              For example, in our legal

12   department we support a variety of

13   businesses, so my interactions were with

14   business people at all the other businesses

15   that I supported.

16       Q.    At MCHA, and I'm talking about

17   your colleagues, and your supervisor, Donna

18   Costa, at MCHA, you were never subjected,

19   prior to December of 2014 --

20       A.    Actually --

21       Q.    I want to make sure that this

22   record is clear.  Prior to December of

23   2014, you had no allegations of

24   discrimination against any of your

25   colleagues prior to December of 2014,

```
 1                  J. FISCHMAN
 2   correct?
 3        A.    No, actually that's not the
 4   case.  There was an instance where I felt
 5   discriminated against and humiliated by
 6   Donna Costa.  There were a number of
 7   occasions actually where in front of other
 8   people, she --
 9             When I was preparing to leave
10   for Japan, she said you're going to Japan,
11   you need to leave your personality at home
12   as if my personality, which of course,
13   being a woman, my personality is tied up in
14   my emotions, the way I hold myself, the way
15   I dress, the way I look, and the way that I
16   interact with people, and that felt very
17   discriminatory at the time.
18             I don't think she would ever
19   have said that to a man; in fact, I'm
20   certain of it.  There were times where she
21   addressed me or dressed me down after a
22   meeting with Japanese businessmen for
23   making small talk prior to the meeting to
24   put everyone at ease.  She told me that
25   they don't want to hear from you, which
```

1                    J. FISCHMAN
2    again, felt very discriminatory.
3           I can't imagine her saying such
4    a thing to a man who mentioned did you
5    happen to see that we have Starbucks in the
6    building?  This is not a controversial
7    comment and I felt I should be seen, not
8    heard, and I felt that those were
9    discriminatory comments.
10         Q.    Let me make sure that the
11   record is clear what you believe Ms. Costa
12   subjected you to.  You believe that when
13   she made comments to you about leaving your
14   personality when you are off to a trip to
15   Japan, leave your personality here in the
16   US, you believe that was gender, correct?
17         A.    Yes.
18         Q.    What evidence is there that
19   that's gender?  Is that just your
20   assumption?
21         A.    The evidence that I feel that
22   that's gender is that I am woman and all of
23   management in Japan are men, a hundred
24   percent.
25         Q.    Ms. Fischman, we're not talking

1                    J. FISCHMAN

2    about Japan and when you say Japan we've

3    already establish it's not the country.  I

4    need to know what entity that you're

5    targeting when you say that.  I'm talking

6    about Ms. Costa and I want to keep it to

7    Ms. Costa so my question again is --

8              MS. COLWIN:  Enrique, can you

9         please ask that question again so

10        that we can get the response.

11             (Whereupon, the referred to

12        question was read back by the

13        Reporter.)

14        A.    Yes, I felt that that was

15   gender based and that was my interpretation

16   of her smart way of saying it without me,

17   without actually discriminating, so let me

18   finish my statement.  Ms. Costa is an

19   incredibly intelligent lawyer person and

20   when she says things, she is very careful

21   to not appear discriminatory.

22             However, that was not a casual

23   comment.  It was very clear to me that I

24   had to be more manly there, not to be as

25   personable, and as friendly, and as womanly

```
 1              J. FISCHMAN
 2  as I am, and that I should be seen, not
 3  heard, and that the men at MCC and MCHC,
 4  who I would be visiting, would be not
 5  appreciate a vocal woman, a vocal New York
 6  woman, and that was my perception and my
 7  belief.
 8       Q.    So it is your perception, Ms.
 9  Fischman, but I want to make sure the
10  record is clear.  Ms. Costa never stopped
11  you from being promoted, correct?
12       A.    Yes, she did.  In
13  December 2014, she stopped me from being
14  promoted to the general counsel.
15       Q.    You didn't let me finish.  Ms.
16  Costa did not stop you from being promoted
17  to assistant general counsel, correct?
18       A.    No.
19       Q.    And Ms. Costa had reservations
20  about you assuming the role of general
21  counsel, did she not?
22       A.    I can't speak to that.
23       Q.    You seen a lot of documentation
24  in this litigation.  It's been a long
25  litigation process.  You've seen
```

1          J. FISCHMAN
2    documentation where Ms. Costa has raised
3    concerns because she felt you were about
4    two or three years away from being able to
5    take on the role of general counsel; isn't
6    that right?
7          A.    I can't speak to what Ms.
8    Costa thought.
9          Q.    She expressed that to you, did
10   she not?
11         A.    No.
12         Q.    She never said to you that you
13   were about two or three years away from
14   assuming the role of general counsel?
15         A.    She may have said that during
16   her meeting, though I had been practicing
17   law for 17 years and I had been working --
18   let me finish -- I had been working at the
19   company at that time for seven years.
20         Q.    Ms. Fischman, Donna Costa had
21   that role of general counsel and chief
22   compliance officer, correct?
23         A.    Yes.
24         Q.    And she had it for a number for
25   years, so she knew full well what was

1                    J. FISCHMAN
2    needed to have that role, do it and execute
3    it successfully, correct?
4         A.    Yes.
5         Q.    When she had reservations about
6    you assuming that role, she didn't say she
7    wouldn't give you the opportunity.  What
8    she said was you were two or three years
9    away.  Correct?
10        A.    I don't recall that.
11        Q.    And she would help you and if
12   everything worked out, you would get that
13   position?
14        A.    No, she specifically said that
15   she was not going to do that.  She was
16   going to help me from December through
17   April 1st, we would have multiple meetings
18   where she would do a data dump and she
19   specifically said to me, in that meeting, I
20   can't make any promises to you and it's
21   probably not going to happen.  Those were
22   actually the words that she used and I said
23   to her I'm going to get this, I'm going to
24   prove it, I can do this.
25        Q.    So we're going to go through

1                    J. FISCHMAN

2    the particulars of that conversation

3    because that's obviously very critical and

4    important.  I want to finish up on some of

5    items that you've raised.  You had said

6    that Ms. Costa would not make those

7    comments to men, meaning the comments to

8    leave your personality at home here in the

9    US, correct, that was your testimony?

10        A.    Yes, that was my testimony.

11        Q.    You have not been in the

12   presence of every single conversation that

13   Ms. Costa had with men, correct?

14        A.    I've been in the presence of

15   her --

16        Q.    You're not answering my

17   question, Ms. Fischman .  My question is

18   you have not been in the presence of every

19   conversation she's had with men?

20        A.    Certainly not.

21        Q.    So we're in agreement with

22   that.  So there is a possibility and, in

23   fact, it probably it is, that she did coach

24   men on how to comport themselves in Japan,

25   correct?

```
1                    J. FISCHMAN
2              MR. BERMAN:  Object to form.
3         A.    I have no idea whether she has
4    or has not.
5         Q.    So when you stated that she
6    wouldn't speak to a man in that way, that's
7    not accurate, is it?
8         A.    In my experience, I had never
9    witnessed her speaking to her another man,
10   or anyone else in our department, in that
11   way.
12             MS. COLWIN:  Move to strike.
13        Can you ask the question again
14        please.  I'd like an answer to that.
15             (Whereupon, the referred to
16        question was read back by the
17        Reporter.)
18        A.    In my experience, I have never
19   witnessed her saying such things to a man
20   in our legal department.
21             MS. COLWIN:  I'm going to move
22        to strike again.
23        Q.    You were not present for every
24   conversation that Ms. Costa had with men at
25   MRHA, correct?
```

```
 1                    J. FISCHMAN
 2       A.    That is correct.
 3       Q.    So when you made the statement
 4  under oath that she would wouldn't speak to
 5  a man that way, that is not accurate is it?
 6            MR. BERMAN:  Object to form.
 7       A.    In my experience, I had never
 8  witnessed her speaking to another man or
 9  coach, or did I ever hear that she had
10  coached another man in that way.
11            MS. COLWIN:  I'm just going to
12        move to strike.  I'll just move to
13        compel the answer.
14       Q.    Isn't the coaching that you
15  received from Ms. Costa is to be more
16  respectful and to listen more?
17       A.    I can't recall that I ever
18  heard her say be more respectful; listen
19  more, for sure.
20       Q.    When Ms. Costa takes the stand
21  and testifies that she coached you and said
22  be more respectful and listen more, is it
23  your testimony that she is lying?
24            MR. BERMAN:  Object to form.
25       A.    I think I just answered that.
```

1          J. FISCHMAN
2   She certainly told me to listen more;
3   listening is very important --
4        Q.    The second part of my question
5   was be more respectful.  Do you recall
6   being told that?
7        A.    I don't recall be more
8   respectful.  I'm a pretty respectful person
9   so I don't recall that.
10       Q.    Is there anything in your
11  possession and control that would refresh
12  your recollection as to whether you were
13  instructed to be more respectful?
14       A.    Not that I know of but maybe if
15  you have a document you can show me
16  something.
17       Q.    As we go through I'm sure there
18  will be more for us to discuss on that
19  matter.  You have said on the record that
20  you believe the MCHC, MCC and MCHJ had
21  exhibited misogynistic tendencies, correct?
22       A.    Correct.
23       Q.    Now you do know that when
24  Mr. Yoshisato was elevated within the
25  company, he recommended Ms. Costa as his

1                    J. FISCHMAN
2    successor, correct?
3         A.    No, I don't know anything about
4    that.
5         Q.    You have no reason to dispute
6    that, correct?
7         A.    I have no knowledge of it.
8         Q.    And you're aware from the
9    documents that have been produced here now
10   that it was Mr. Yoshisato who recommended
11   that you be elevated to general counsel and
12   then elevated to acting general counsel,
13   correct?
14        A.    Actually, no, I don't have that
15   document.
16        Q.    Bates stamp 1104 to 1106.  Do
17   you see the document?  I'm directing you to
18   1106.  It is an e-mail communication
19   between Ms. Costa and Mr. Fujiwara dated
20   December 10, 2014.  In the middle of
21   document it says "I received a message from
22   Yoshisato-san that MCHA wants us to make
23   Jennifer acting general counsel for
24   12 months and I hope that she will grow
25   into the job.  I'm working on a plan to

1                    J. FISCHMAN

2    communicate to her, which I will discuss

3    with Yoshisato-san and later present to

4    Jennifer."

5        A.    Sorry, what's your question?

6        Q.    You have no reason, now that

7    you see this document before you, you have

8    no reason to dispute the question I asked

9    before, that it was Mr. Yoshisato who had

10   recommended you for the acting general

11   counsel position?

12       A.    Well, actually what I see is an

13   e-mail between Donna and Ken Fujiwara.  I

14   don't see any message from Yoshisato-san,

15   so I actually couldn't say what he said to

16   her and so I actually think that there were

17   -- that there may have been outside

18   discussions where they made this decision

19   and then Donna interpreted or spun it to

20   make it seem like it's Yoshisato wanted

21   this or didn't want this.  I actually don't

22   trust this e-mail.

23       Q.    What's the basis for you're not

24   trusting the e-mail and believing it's

25   inaccurate?

1                    J. FISCHMAN

2        A.    Because later, throughout the

3    year, after all of this, I've seen other

4    documents that are complete fabrications

5    between Donna and Ken of things I have

6    actual knowledge about and so when I look

7    at this and I see something that a message

8    received from Yoshisato, I would rather see

9    the message from Yoshisato than rely on

10   Donna's interpretation of that message or

11   communication about that message.

12       Q.    So your testimony is that

13   there's some documents, somewhere that's

14   been produced, that would establish that

15   this document in front of you, 1106, is

16   inaccurate.  Is that what you're saying?

17            MR. BERMAN:  Object to form.

18       A.    I don't think that's what I was

19   saying.  What I'm saying is that --

20       Q.    Let me rephrase that.  What

21   evidence, not supposition, not opinion,

22   what evidence do you have to establish that

23   this document in front you, 1106, is

24   inaccurate?

25       A.    The evidence that I have, and

1                 J. FISCHMAN

2    that I base my opinion on, is that there

3    were a number of e-mails that Ms. Costa

4    wrote to Ken Fujiwara, throughout the year

5    of 2015, where she created fabrications

6    about me to him that are completely

7    inaccurate and because of that, I don't

8    believe that what Yoshisato says here, or

9    what she says Yoshisato says here, is a

10   complete picture of what occurred.  So I'd

11   rather rely on Yoshisato's actual message

12   than Donna's explanation of a message.

13         Q.    We're going to go through a

14   number of documents, Ms. Fischman.  Now

15   that you've placed this context on the

16   record, I will continue to ask you the same

17   question.  Are there inaccuracies in this

18   document, and when we get through if we

19   arrive at the document that you believe

20   disputes 1106, I'm going to ask you to flag

21   it for us so that we can go back to that

22   discussion.  Understood?

23         A.    Sure.  I'm not sure that we're

24   going to find -- since you haven't produced

25   any e-mails or documents from Yoshisato

1                J. FISCHMAN

2  that I've seen, or that I recall seeing, I

3  don't think we're going to find a direct

4  contradiction to this statement.  What I'm

5  merely saying is that I don't trust these

6  e-mails where there's no underlying message

7  that's being repeated.

8       Q.    So let me make sure that I

9  understand and the record is clear.  You

10 believe that Donna Costa is a liar, is that

11 what you're saying?

12      A.    Yes.

13      Q.    And when she testifies under

14 oath, she will do it under the penalties of

15 perjury, she would be lying?

16           MR. BERMAN:  Object to form.

17      A.    Yes.

18      Q.    From the time, from 2008 to

19 2014, you've already established on the

20 record that you reported to Ms. Costa at

21 MCHA, correct?

22      A.    Yes.

23      Q.    You didn't report to anyone at

24 MCHC, correct?

25      A.    No.  Well, yes.  Yoshisato-san

1           J. FISCHMAN

2  and before him, I don't even remember who

3  the president was, but the presidents of

4  the company were always Japanese employees

5  of MCHC.

6      Q.    But Mr. Yoshisato was at MCHA,

7  at the time; he was the president of MCHA,

8  was he not?

9      A.    Yes, but also co-employed by

10  MCHC.

11     Q.    What evidence do you have that

12  Mr. Yoshisato was a co-employee of MCHA and

13  MCHC?

14     A.    Over the years, I've worked

15  with many Japanese presidents of many of

16  our affiliates and over many years, I

17  learned to, or I was told information that

18  led me to believe that they still retained

19  their positions at the parent company

20  during their tenure as, during their three

21  to five years, at the rotation through the

22  American affiliate so that their pensions

23  stayed in place, that they didn't cut --

24  their employment was not severed.  It was

25  my understanding their employment was not

1                    J. FISCHMAN

2    severed from the parent company when they

3    moved to the affiliate company.

4        Q.    So let me make sure that the

5    record is clear because number one, this is

6    what you believe to be the case based on

7    conversations, correct, this is what you've

8    testified based on conversations?

9        A.    Yes.  That's because we haven't

10   gotten discovery yet.

11       Q.    Who are the individuals, and

12   you know that I represent MCHA.  MCHC's

13   counsel is here, Jerry Fortinsky and Sam

14   Jolly, they represent MCHC.  So when you're

15   asking about discovery pertaining to MCHC,

16   that is not my purview but let me make sure

17   that the record is clear.  You know that

18   Mr. Yoshisato was the president of MCHA

19   appointed by the MCHA board, correct?

20       A.    And who were the board members

21   who appointed him?

22       Q.    I'm asking you the board for

23   MCHA appointed Mr. Yoshisato president,

24   correct?

25       A.    Yes.

1                      J. FISCHMAN
2          Q.     And that was president of MCHA,
3    not any other --
4          A.     Yes.
5          Q.     -- business entity, or any
6    other business affiliate, correct, and that
7    was in the US, correct?
8          A.     Actually I don't know the
9    answer to that because I was not privy to
10   those board documents and that board
11   meeting could have taken place in the US.
12   But it could have also taken place in
13   Japan, because I believe two board members
14   of MCHA are members, are employees of MCHC
15   or MCC.
16         Q.     Mr. Yoshisato, when he was
17   president of MCHA, was physically in the
18   United States; isn't that right?
19         A.     Mmhmm.
20         Q.     Is that a yes?
21         A.     Yes.
22         Q.     And Ms. Costa was a member of
23   the MCHA board, correct?
24         A.     If you can list the members for
25   me, it would be easier for me to answer

1                    J. FISCHMAN

2   that question.

3        Q.    Do you have any reason to

4   dispute that Ms. Costa was a member of the

5   MCHA board?

6        A.    I have no reason to dispute it.

7   I believe she was the secretary of numerous

8   boards during her tenure.

9        Q.    In the evaluations you've seen,

10  there was never input in these evaluations,

11  during the time you were at MCHA that were

12  -- any input from MCHC, correct?

13       A.    I don't know who Donna spoke

14  with before she completed her annual

15  reviews.  She often told me that she spoke

16  to multiple businesses to get their

17  feedback on her attorneys.

18       Q.    Is it your testimony that you

19  believe that MCHC had input on your

20  evaluations?

21       A.    I think I thought I just

22  answered that, that she spoke with numerous

23  business leaders that I had provided input

24  or support to in a given year I was doing

25  work for MCHC or MCC, yes, she would have

1                    J. FISCHMAN
2    spoken to them.  I don't actually know who
3    she spoke with.
4         Q.    So you don't know who she spoke
5    with.  So you're assuming that she may have
6    gotten feedback from individuals at MCHC,
7    correct?
8         A.    Yes.
9         Q.    And if there were to be any
10   input from MCHC, that was because they were
11   clients of MCHA, correct?
12        A.    Not necessarily.  So the way
13   that things worked at MCHA was that nearly
14   our entire budget came from two sources of
15   income, if you will.  Since MCHA was not a
16   profit center of any kind and had no sales,
17   it simply was a department arm of MCHC.
18              So it was a legal department in
19   the United States, the tax department in
20   the United States, the internal audit
21   department in the United States, and I know
22   that MCHC provided funding for our entire
23   budget, also supported by each of the
24   businesses that we provided support to.
25              So the budget would be made up

1                    J. FISCHMAN

2     of input from MCHC and also all of the

3     American affiliate companies that we have

4     legal service agreements with would also

5     pay a portion of our budget.

6              So I would imagine that every

7     year that budget is reviewed and it is

8     reviewed with the understanding of how many

9     attorneys, what their salaries are going to

10    be, what their bonuses are going to be, and

11    what their new salaries for the coming year

12    are.  So it's my understanding that during

13    those budgetary discussions, I believe that

14    all of the attorneys would be evaluated

15    because our compensation was partially

16    coming from MCHC.

17              MS. COLWIN:  Enrique, I want

18         that testimony marked.

19         Q.    From 2008 to 2014, we've

20    already established that you reported to

21    Ms. Costa and you had responsibility for

22    important clients and sensitive matters; is

23    that right?

24         A.    Yes.

25         Q.    And during 2008 to 2014, Ms.

1                    J. FISCHMAN
2    Costa encouraged you to broaden your
3    expertise with particular emphasis on
4    employment laws; isn't that right?
5         A.    Yes.
6         Q.    So you would be the go-to
7    employment lawyer for MCHA inhouse?
8         A.    I was, yes.
9         Q.    You were encouraged to attend
10   seminars; isn't that right?
11        A.    Sure.
12        Q.    And in a lot of your
13   evaluations there were particular seminars
14   that Ms. Costa would recommend for you to
15   go and attend, correct?
16        A.    I guess I can't remember
17   whether or not those were written into the
18   documents, but if you want to point me to a
19   page I'd be happy to say that it says that.
20   But I definitely did continuing ed,
21   throughout obviously we all have continuing
22   ed requirements for our bar admissions.
23        Q.    And it has been for a long
24   time?
25        A.    Yes.

1                    J. FISCHMAN

2        Q.    And there's no reason for you

3   to believe that when you were elevated to

4   assistant general counsel that you were

5   subject to discrimination, correct?

6              MR. BERMAN:  Object to form.

7        A.    No.  I earned that.

8        Q.    At the time that you were

9   elevated to assistant general counsel, Ms.

10  Costa was also promoted.  She became the

11  executive VP making her the second highest

12  ranking executive at MCHA, correct?

13       A.    Yes.

14       Q.    Because Mr. Yoshisato was

15  president of MCHA at the time?

16       A.    I don't remember when that was.

17  I actually didn't know that that was at the

18  same time to be honest.

19       Q.    So at the time that you were

20  elevated to assistant general counsel, you

21  had Ms. Costa as the EVP and you had Ms.

22  Roach as the most senior members of the

23  legal department, correct?

24       A.    I'm sorry, what year was that?

25       Q.    When you were elevated to

```
 1                    J. FISCHMAN
 2   assistant general counsel.
 3       A.    Again what year was that?
 4       Q.    2013.
 5       A.    So what's your question?
 6       Q.    At the time that you were
 7   appointed to assistant general counsel, the
 8   two highest ranking individuals at MCHA's
 9   legal department were Ms. Costa and
10   Ms. Roach, correct?
11       A.    Yes.  So I -- yes, I was.
12       Q.    And as an assistant general
13   counsel, you did not have any direct
14   reports, correct?
15       A.    I believe I supervised the
16   legal -- can you remind me of who the
17   members of the department were at that
18   time?
19       Q.    We said it earlier in the
20   record but we'll just have to go --
21       A.    In 2013, if you don't mind.
22       Q.    It would be Ms. Roach,
23   Ms. Costa, Mr. Yoshisato.
24       A.    No, he's not in the legal
25   department.
```

```
 1              J. FISCHMAN
 2      Q.    As president of the MCHA.
 3  Strictly in the legal dept?
 4      A.    Yes.
 5      Q.    While we're getting that I'm
 6  going to move on.  Did Ms. Costa ever say
 7  to you that she wanted you to take on a
 8  more management leadership role now that
 9  you had been promoted to assistant general
10  counsel?
11      A.    I going to hold off answering
12  that question until you tell me how many
13  people are in the legal department.
14      Q.    We're going to continue.  This
15  is our deposition, Ms. Fischman.
16      A.    The thing is that I want you to
17  understand that there are like four people
18  in the legal department.  So when you say
19  take on a more leadership role, who am I
20  leading?  It's a very small department,
21  Mercedes, so I just don't know.  I want to
22  answer you but I want to answer you
23  accurately in the context in which we were
24  all operating.
25      Q.    So you're saying that you don't
```

1                    J. FISCHMAN
2    have any independent recollection of 2013?
3         A.    Well, I'll wait for you to give
4    me -- you want me to answer a question, you
5    got to give me the context.
6         Q.    Well, then we're taking a
7    break.
8         A.    Okay.
9              THE VIDEOGRAPHER:  The time on
10         the video monitor is 11:44 a.m.  We
11         are off the record.  This ends Media
12         1.
13              (Whereupon, a short recess was
14         taken.)
15              THE VIDEOGRAPHER:  We are back
16         on the record.  The time on the video
17         monitor is 12:15 p.m.  This starts
18         Media 2.
19         Q.    Ms. Fischman, we took a break.
20    You had asked that we locate the
21    individuals that worked with your
22    colleagues when you were promoted to
23    assistant general counsel, correct?
24         A.    Yes.
25         Q.    And that was in 2013; is that

1                    J. FISCHMAN

2    right?

3         A.    Yes.

4         Q.    When you were promoted,

5    correct?  And it's your testimony that you

6    couldn't recall the individuals that worked

7    with you at that time; is that right?

8         A.    That wasn't my testimony.  I

9    just asked if you could give me a list of

10   who they were in 2013.

11        Q.    So when I asked you to identify

12   the individuals what worked with you in

13   2013, you had the intellectual capital to

14   provide those names to us on the record, is

15   that your testimony?

16             MR. BERMAN:  Object to form.

17        A.    I simply asked you to identify

18   them because I worked at Mitsubishi from

19   2008 to --

20        Q.    Ms. Fischman, I just want an

21   answer to my question.

22             MS. COLWIN:  Can I ask the

23        question again.  Move to strike.

24             (Whereupon, the referred to

25        question was read back by the

1                    J. FISCHMAN

2          Reporter.)

3          A.    I couldn't remember exactly who

4    was there at that particular time so I

5    asked you to provide them.

6          Q.    So before I give you the list,

7    why don't you the identify the individuals

8    you recall?

9          A.    In the legal department?

10         Q.    Yes.

11         A.    2013, Donna Costa, Jennifer

12   Fischman, Katherine Roach, maybe Andrew

13   Sezar (phonetic), maybe Joe Sherinsky, and

14   Kelli Troccoli.

15         Q.    You had -- go ahead.

16         A.    I'm sorry and I think there was

17   a legal intern, sorry, someone from Japan

18   who interns in the office from MCHC.

19         Q.    Was that Kaz Kashima

20   (phonetic)?

21         A.    Kaz, yes, that's his name, Kaz,

22   thank you.

23         Q.    There was also a Mikosami

24   (phonetic), correct?

25         A.    Miko, yes.  I think Miko was

1                    J. FISCHMAN

2    later.  I don't recall the exact dates that

3    Kaz was there and I don't recall the exact

4    dates that Mika (phonetic) and I can't

5    remember who was first.

6         Q.    Okay.  So we have the complete

7    list when you were promoted.  It was indeed

8    Ms. Costa, as you already testified,

9    yourself, Ms. Roach, Mr. Sezar, Ms.

10   Troccoli, and Kaz Kashima and Miko Yusami

11   (phonetic), correct?

12        A.    Kaz and Miko wouldn't have been

13   there at the same time.

14        Q.    Do you believe it was Kaz in

15   2013?

16        A.    Can you give me a specific date

17   of 2013?

18        Q.    We don't have the date.  It is

19   your best recollection as to what you

20   remember.

21        A.    I'm sorry, Mercedes, I simply

22   don't remember when Kaz was there and when

23   he left and when Mika -- now I do recall

24   that Mika, I think, replaced Kaz so if they

25   overlapped, it would have been for maybe

1          J. FISCHMAN

2   two, three weeks because she's a -- they

3   would have been trainees.  That's what we

4   referred to them as, trainees, so we have

5   -- why don't you ask your next question.

6          Q.    So I've given you who was in

7   the legal department.  You had testified

8   under oath that you believe that you had

9   one of the legal interns as a direct report

10  when you were an assistant general counsel,

11  correct?

12         A.    If you just give a minute.

13  I'll be honest I don't totally recall if I

14  was responsible to oversee Kaz in 2013.  I

15  may have been.

16         Q.    We discussed the document,

17  1106, in your earlier testimony and this is

18  a document that you have in front of you,

19  it's Bates stamped 1106.  I'm just calling

20  your attention to 1106.  You testified

21  under oath that you did not believe the

22  content of this exchange between Ms. Costa

23  and Mr. Fujiwara, correct?

24         A.    Just to be specific, I would

25  rather if you read back what I testified

1                    J. FISCHMAN
2    because I don't want to contradict what I
3    said.
4         Q.    To the extent that I asked a
5    question that's inaccurate, correct me.  In
6    your earlier testimony you said that you do
7    not believe that Mr. Yoshisato was the
8    individual who had this exchange with this
9    Ms. Costa that you should be elevated to
10   acting general counsel, correct?
11        A.    I think my testimony was, and
12   of course we can read it back later, was
13   that I would rather rely on the message
14   that Yoshisato sent than Donna Costa's
15   interpretation of that message or her
16   relaying of a message because she may have
17   interpreted it differently.
18        Q.    Do you have a single
19   contemporaneous written document that
20   states that Mr. Yoshisato did not have this
21   communication with Ms. Costa pertaining to
22   your elevation to acting general counsel?
23        A.    The documents --
24        Q.    That's a yes or no, Ms.
25   Fischman.  Yes or no, you either have it or

```
 1                    J. FISCHMAN
 2   you don't.
 3        A.    I don't have any documents of
 4   Mr. Yoshisato.
 5        Q.    Okay.  You testified that there
 6   were communications that you had with Ms.
 7   Costa where she said to you before you were
 8   going to trips to Japan, to leave your
 9   personality here.  Do you recall that
10   testimony?
11        A.    Yes, I do.
12        Q.    Do you have a single
13   contemporaneous writing that where you, in
14   fact, put that in writing and made an
15   allegation of discrimination pertaining to
16   that particular exchange that you had with
17   Ms. Costa?
18             MR. BERMAN:  Object to form.
19        A.    I don't have a writing of where
20   I complained of that discrimination because
21   I think it was hard to complain when your
22   general counsel is the one discriminating
23   against you and who -- I think I was
24   intimidated to complain, but I certainly
25   told my family about that and it shook me.
```

1          J. FISCHMAN
2     Q.    But my question is very clear.
3  Do you have something in writing which you
4  state that when Ms. Costa said to you to
5  leave your personality, you believe that
6  you were being targeted and treated
7  unfairly, yes or no?
8     A.    I already answered that.
9     Q.    So the answer is no?
10    A.    I believe the answer was that I
11 don't have a writing, but it hurt me
12 deeply.
13    Q.    Okay.  And you said that you
14 disclosed it to family members.  Who in
15 particular did you speak to?
16    A.    My husband.
17    Q.    Anyone else?
18    A.    My mother and my father.
19    Q.    And these conversations that
20 you had with your husband were
21 contemporaneous to the discussions you had
22 with Ms. Costa about your personality?
23    A.    Yes.
24    Q.    And the conversations you had
25 with your mother were contemporaneous to

```
 1              J. FISCHMAN
 2    the time that you had this discussion
 3    regarding your personality with Ms. Costa?
 4         A.    Yes.
 5         Q.    And the discussions you had
 6    with your father, was that also
 7    contemporaneous to the time you had
 8    discussions with Ms. Costa about your
 9    personality?
10         A.    I believe it would've been at
11    the same time, yes.
12         Q.    You made a broad sweeping
13    statement on the record, under oath, that
14    there were a lot fabrications.  Do you
15    recall that?
16         A.    Yes.
17         Q.    What written documents can you
18    identify on the record that establish those
19    fabrications that you've alleged occurred?
20              MR. BERMAN:  Object to form.
21         A.    I would say every document that
22    talks about me that you have produced in
23    2015.
24         Q.    Identify which documents you're
25    referring to in particular?
```

1                    J. FISCHMAN

2        A.    I didn't come here with a list

3   of documents.

4        Q.    Which are the ones that you

5   recall to the best of your recollection?

6        A.    A draft e-mail to Ken Fujiwara

7   which she wrote in August of 2015.

8   Comments that she made to Pat Saunders

9   during meetings, during August, again of

10  2015, and the mid-year review of

11  November 2015.

12       Q.    You made a broad sweeping

13  statement on the record, under oath, that

14  Ms. Costa lies.  What lies in particular,

15  as you sit here today, to the best of your

16  recollection, do you recall?

17       A.    Yes.  The statements that she

18  made in those documents that I just told

19  you about.

20       Q.    And so that the record is

21  clear, the documents you've identified you

22  believe that Ms. Costa lied?

23       A.    Yes.

24       Q.    The draft e-mail to

25  Mr. Fujiwara, the meetings that she had in

1                    J. FISCHMAN
2    which she disclosed certain information to
3    Pat Saunders in August of 2015 and the
4    mid-year review in 2015; is that accurate?
5         A.    Yes.
6         Q.    You've identified what you
7    believe to be unfair criticisms of your
8    performance, correct, on the record?  Let
9    me retract.
10        A.    I haven't, no.
11        Q.    You have identified, on the
12   record, that you believe that some of the
13   commentary that you have received from Ms.
14   Costa was unfair, correct?
15        A.    I didn't testify to that and
16   you'd have to point to a document which I
17   just actually told you about where I
18   believe they're not just unfair but
19   complete fabrications.
20        Q.    You'd agree with me that you
21   were not present when Ms. Costa had
22   coaching sessions with other employees at
23   MCHA legal department, correct?
24             MR. BERMAN:  Object to form.
25        A.    Can you reask that?  It's very

1           J. FISCHMAN

2  confusing the way you're --

3      Q.    When Ms. Costa was providing

4  feedback to other members of the legal

5  department, you were not present for each

6  and every conversation she had with them,

7  correct?

8      A.    Correct.

9      Q.    I'm going to call your

10 attention to December of 2014 when Ms.

11 Costa informed you that you were going to

12 be elevated to acting general counsel

13 effective April 1, 2015 where Ms. Costa had

14 a conversation with you one on one.  Is

15 that right?

16     A.    That's correct.

17     Q.    And that's when, in this

18 conversation she had in December of 2014,

19 is when she had informed you that you were

20 going to be elevated effective April 1st,

21 2015, correct?

22     A.    Yes.

23     Q.    Now by then Ms. Costa had had

24 multiple elevations in her own career at

25 MCHA; isn't that right?

1                    J. FISCHMAN

2        A.    I don't actually know what all

3   of the elevations that Ms. Costa had

4   personally.  I don't know.

5        Q.    Were you aware, are you not,

6   that she was hired as general counsel much

7   before you were hired in 2008, she was

8   there beginning of 1996; isn't that right?

9        A.    You'd have to ask her.  Yes.  I

10   mean I wasn't there.

11        Q.    You don't have any reason to

12   dispute that she was hired as general

13   counsel at MCHA in 1996; is that right?

14        A.    MCHA as the successor company.

15        Q.    Yes.

16        A.    I did -- so in 1996 I'm not

17   really sure what company she worked at.  I

18   think it was MCA back then and then, yeah,

19   and then --

20        Q.    So we are in agreement, she was

21   general counsel and she was then elevated

22   and received the designation as chief

23   compliance officer, correct?

24        A.    So I'm not sure if she was

25   elevated to become chief compliance

1          J. FISCHMAN

2     officer.  I'm not sure that there was a

3     compliance program at the company, so I

4     don't have information on that, so I don't

5     know that she was elevated into a position

6     as a -- I guess I wouldn't see that as an

7     elevation.  I would see that as an

8     additional job duty.

9          Q.     As you sit here today, what was

10    your understanding of the number of

11    positions that Ms. Costa had at MCHA?

12         A.     She was general counsel and

13    chief compliance officer.  What are you

14    looking for?

15         Q.     I'm asking you a question.

16    Tell me what were the positions that she

17    held?

18         A.     Those two positions and I'm

19    sorry, and she was also secretary of, I

20    believe, many of the affiliate companies.

21         Q.     She was also an officer, was

22    she not?

23         A.     Yes, she was an officer at

24    MCHA.

25         Q.     What were the positions as

```
 1                    J. FISCHMAN
 2   officer that you recall?
 3        A.    I don't --
 4        Q.    She was vice president,
 5   correct?
 6        A.    I believe so.
 7        Q.    Executive vice president,
 8   correct?
 9        A.    I guess so.
10        Q.    No guessing.  You have no
11   reason to dispute the fact that she had
12   been EVP at some point before being
13   elevated to president at MCHA, correct?
14             MR. BERMAN:  Object to form.
15        A.    I have no reason to dispute
16   what you're telling me, of course not.
17        Q.    Now the reason that Ms. Costa
18   was talking to you about this general
19   counsel position is that she had been
20   elevated to president of MCHA; isn't that
21   right?
22        A.    Yes.
23        Q.    And in your reaction, when
24   Ms. Costa had this conversation in
25   December 2014, is one of surprise, were you
```

                    J. FISCHMAN

1

2   not?

3        A.    I don't remember if I was

4   surprised, but we had talked about her

5   taking that position or moving into the

6   that position over the years and she had

7   always said that she would never have

8   wanted that position, so yeah, I think that

9   surprise is probably an accurate

10  description.

11       Q.    Weren't you surprised when she

12  said to you that you were going to be

13  promoted to acting general counsel?

14       A.    Why would I be surprised?

15       Q.    I'm asking you a question.

16       A.    No, I was the next in line.  I

17  was the most senior attorney in the

18  department.  I was not surprised at all.

19       Q.    Didn't you say to Ms. Costa in

20  this exchange, in December of 2014, that

21  you thought you were being called into her

22  office because she was going to fire you?

23       A.    As a joke.

24       Q.    So you did say that to her?

25       A.    Yeah, I did.  It was a joke,

```
 1              J. FISCHMAN
 2   but why would I have been fired?  Did you
 3   see my 2014 performance review?  Why would
 4   I say that with any seriousness?
 5         Q.    So you're saying that when you
 6   disclosed that to Ms. Costa, you were just
 7   kidding; is that right?
 8         A.    Yes.
 9         Q.    Now in that meeting Ms. Costa
10   was very direct with you about the fact
11   that you were about two to three years away
12   from being able to take on the
13   responsibility of general counselor and
14   chief compliance officer; isn't that right?
15              MR. BERMAN:  Object to form.
16         A.    I don't recall her being very
17   direct about that, no.
18         Q.    Then let me rephrase.  In that
19   meeting Ms. Costa said to you you were
20   about two to three years away from being
21   able to take on the responsibility of
22   general counsel and chief compliance
23   officer; isn't that right?
24              MR. BERMAN:  Object to form.
25         A.    I don't recall.
```

```
 1                    J. FISCHMAN
 2        Q.    Do you have any reason to
 3   dispute Ms. Costa's recollection of that
 4   conversation --
 5              MR. BERMAN:  Object to form.
 6        Q.    -- pertaining to the fact that
 7   you were two to three years away from being
 8   elevated to general counsel --
 9              MR. BERMAN:  Object to form.
10              MS. COLWIN:  You can say it
11         once.  Don't interrupt me, please.
12              MR. BERMAN:  I'm not
13         interrupting.  I'm insuring that I
14         get it in before the witness answers.
15              MS. COLWIN:  Okay.  I'm sure
16         you had a conversation with your
17         client and she's an experienced
18         lawyer.  She knows to pause after a
19         question is being asked so you can
20         object.
21        Q.    You have no reason to dispute
22   Ms. Costa's recollection having told you,
23   in December of 2014, that you were two to
24   three years away from being able to take on
25   the responsibilities of general counsel and
```

```
 1              J. FISCHMAN
 2   chief compliance officer, correct?
 3              MR. BERMAN:  Object to form.
 4        A.    So I have a recollection of her
 5   saying that she would have liked another
 6   two to three years but that here we were
 7   and, you know, two to three years, why?  I
 8   think I remember challenging that and
 9   saying why?  I've been here for seven years
10   and what, 16 years of 17 years of legal
11   practice.  How many years did she have when
12   she took on the general counsel?  I was
13   experienced as you have noted multiple
14   times today.  I was an extremely
15   experienced lawyer.  I had, in my
16   background, worked for a federal judge.  I
17   have worked at two national law firms.  I
18   have worked at a Fortune 500 company in a
19   senior position for seven years, and now I
20   had worked at Mitsubishi Chemical, in a
21   small law department, for seven years.  So
22   yeah, I thought that was a -- I think she
23   said that, but it was part of a larger
24   discussion about the role.
25        Q.    You would agree with me that
```

J. FISCHMAN

1
2    the role of -- well, let me just step back
3    for a moment.  You said that you worked for
4    a federal judge.  That was your --
5            A.    Post --
6            Q.    But wasn't that an internship
7    program that you had worked with?
8            A.    So if you'd like me to explain
9    that --
10           Q.    No, I'm asking you that was an
11   internship program, correct?
12           A.    It was not an internship
13   program.  So when I graduated from Boston
14   University Law School, which is a top 25
15   top tier law school in the United States.
16           Q.    My son has (inaudible).  I'm
17   aware.
18           A.    I moved to Los Angeles and had
19   the got fortune of meeting Kim McLane
20   Wardlaw, who was at that time, before she
21   was elevated to the Ninth Circuit, a
22   federal judge and we met through a variety
23   of acquaintances and she had just hired her
24   two clerks.  She was a new federal judge
25   and she had just hired her two clerks, one

1          J. FISCHMAN
2    of whom had worked with her in her law
3    firm, but she told me that she could use
4    another set of hands and that I would be
5    treated just as the other two law clerks,
6    which meant reviewing legal pleadings,
7    doing research writing opinions, but that I
8    was going to be unpaid so that I -- would I
9    be interested in doing that?  So yes, I
10   said yes, and I worked with her from the
11   time I took the bar at the end of July, so
12   the beginning of August until I got a job
13   in February 6th months later at Fried
14   Frank.
15              (Whereupon, Ms. Fischman's CV
16         was marked as Defendant's Exhibit 7 -
17         9 for identification as of this
18         date.)
19       Q.    I'm showing you what's been
20   marked as Defendant's Exhibit 7 to 9.  That
21   is your CV, is it not?
22       A.    It's a version of it, yeah.
23       Q.    And I'm going to direct you to
24   the second page which is Bates stamped
25   000008 and it says US District Court

```
 1                    J.  FISCHMAN
 2  Central District of California.
 3        A.    Yeah.
 4        Q.    Honorable Kim McLane Wardlaw,
 5  extern clerk, August 1996 to February 1997,
 6  correct?
 7        A.    That's what I just described to
 8  you in a longer narrative, yes.
 9        Q.    And everything that you set
10  forth in this CV is accurate, is that
11  right?
12        A.    Yes.
13        Q.    You would agree with me that
14  the general counsel and chief compliance
15  officer position is a very significant
16  position, correct?
17        A.    What do you mean by
18  significant?  Yes, it's a big deal.
19        Q.    Okay.  Now in this conversation
20  that Ms. Costa with you in December of
21  2014, she said to you that she thought you
22  were on the right track but you were not
23  ready for the tremendous increase of
24  responsibility that came with being general
25  counsel and CCO.  Do you recall her saying
```

1                    J. FISCHMAN

2   that?

3        A.    I don't recall that

4   specifically.

5        Q.    And do you recall her saying

6   think about it, don't give an answer at

7   that very point in December of 2014, think

8   about this, go off -- I believe you had a

9   vacation planned, did you not?

10        A.    Yes.

11        Q.    And to think about it during

12   vacation and to come and speak to her about

13   whether you would accept it.  Do you recall

14   --

15        A.    No, I believe I accepted it

16   right then and there or the following day.

17   I did not think about it.  She did not tell

18   me to go off and think about it over that

19   vacation, because by that vacation I had

20   told my family that I had accepted this

21   position.

22        Q.    So tell us, to the best of your

23   recollection, as you sit here today, what

24   you said to Ms. Costa and what she said to

25   you during that exchange in December of

1          J. FISCHMAN

2    2015.

3          A.     That's six years ago.  I can't

4    recall.

5          Q.     I'm only asking for your best

6    recollection.

7          A.     Of the entire -- we were in her

8    office for hours.  I can't recall any of

9    that.  I mean I can recall specific

10   details.  She offered me this job, she said

11   it was a big job.  She said you're going to

12   have to own the compliance program.  I said

13   no problem, I will get up to speed, I will

14   own it, I will spend an enormous amount of

15   time on it.  I asked her who was going to

16   backfill.  We talked about the fact that I

17   would need to hire someone to replace me

18   but it wasn't going to be someone senior,

19   it was going to be a very junior person

20   because that's all we had the budget for,

21   and that person ultimately became Steven

22   Rose, who was hired sometime during the

23   spring, but that I was going to continue to

24   maintain being responsible for a multitude

25   of companies while taking on this

1                    J. FISCHMAN

2  additional responsibility.  Yeah, it was

3  going -- it's a general counsel position,

4  so as you would expect it had a great deal

5  of responsibility.

6          Q.    You are familiar with the job

7  description for general counsel, correct?

8          A.    I've never seen a job

9  description for the general counsel

10 position, no.

11         Q.    In the exchange of documents in

12 this litigation, you were made aware that

13 there were job descriptions provided, were

14 you not?

15         A.    For the general counsel

16 position, no, I'm sorry, I've never seen

17 it.

18         Q.    I'm going to show you --

19         A.    I can't say I have actually

20 reviewed every document that was produced

21 yet.

22         Q.    But it wasn't flagged by your

23 counsel to review; is that right?

24              MR. BERMAN:  Object to form.

25         Privileged communications should not

1          J. FISCHMAN

2       be revealed.

3       Q.    I'm going to show you a

4  document.  It's Bates stamped 817, 822, and

5  I'm going to direct your attention to 819

6  to 820.  Look at 821.  So Ms. Fischman, I

7  understand your testimony earlier, this is

8  the first time you're seeing this

9  particular job description, correct?

10      A.    This is the first time I have

11 ever seen this job description.  I don't

12 believe that there was such a document in

13 2014 when I had a conversation with Donna

14 Costa.

15      Q.    Do you have something in

16 writing that corroborates the assumption

17 you have that this document didn't exist in

18 2014?

19      A.    I have never seen this document

20 before.  It was not presented to me in

21 December 2014 or any time thereafter.

22      Q.    So that's the basis of your

23 belief?

24      A.    That is the basis of my belief.

25      Q.    But you have nothing in writing

```
1                    J. FISCHMAN
2    that establishes that fact, correct?
3         A.    I have nothing in writing that
4    establishes that a document didn't exist?
5    No.
6         Q.    You never asked for a job
7    description in writing, correct?
8         A.    I never asked for a job
9    description in writing, correct.
10        Q.    Did you ever ask for a job
11   description in verbal communication?
12        A.    I never asked for job
13   description ever.
14        Q.    Take a look at what is set
15   forth --
16        A.    I'll also note that I never
17   asked for job description of assistant
18   general counsel, which is on Defendant's
19   Exhibit 817, but I probably at some point
20   or another saw a job description for
21   corporate counsel as part of the interview
22   back in 2008 but I don't know that it was
23   this job description, and I've got to guess
24   that it wasn't since this says MCHA on it
25   and I was hired at MCUSA.
```

```
 1                    J. FISCHMAN
 2        Q.    Take look at 821 to 822.  Is
 3   this an accurate description of what the
 4   job duties and responsibilities were for
 5   general counsel and CCO at MCHA?
 6        A.    I'm going to take a few minutes
 7   to take a look at this.
 8        Q.    Sure.  Why don't we go off the
 9   record.
10             THE VIDEOGRAPHER:  The time on
11         the video monitor is 12:47 p.m.  We
12         are off the record.
13             (Whereupon, an off-the-record
14         discussion was held)
15             (Whereupon, a lunch break was
16         taken.)
17             THE VIDEOGRAPHER:  We are back
18         on the record.  The time on the video
19         monitor is 1:40 p.m.
20        Q.    Ms. Fischman, before the break
21   we were talking about the document that is
22   identified as Bates stamp 821 to 822.  Have
23   you had a chance to review this document?
24        A.    I have.
25        Q.    And is it an accurate depiction
```

1                    J. FISCHMAN
2   of what the duties and responsibility were,
3   as general counsel and CCO at MCHA?
4        A.    Yes.
5        Q.    And is there anything that
6   needs to be added to what's identify in
7   this document?
8        A.    I'll be honest, as I quickly
9   read through it, I didn't read it for
10  comprehension, like for comprehensiveness
11  but rather just to identify that these were
12  the key responsibilities, so at this time I
13  can't say that there's anything missing.
14       Q.    Is there any document that
15  would refresh your recollection as whether
16  or not there were additional duties and
17  responsibilities that you had as general
18  counsel and CCO?
19       A.    Can you repeat the question?
20       Q.    Is there a document that exists
21  that would refresh your recollection as to
22  whether or not there were additional duties
23  and responsibilities that you executed as
24  acting general counsel and CCO?
25       A.    Not that I can think of at this

```
 1                    J. FISCHMAN
 2    time.
 3         Q.    Do you believe that the
 4    promotion itself that was offered to you in
 5    December 2014 is an act of discrimination?
 6         A.    I believe that the promotion to
 7    acting rather than full general counsel was
 8    an act of discrimination, yes.
 9         Q.    What is the factual basis for
10    your belief that your elevation to acting
11    general counsel as opposed to general
12    counsel was discriminatory?
13         A.    The basis is that no other
14    person that I was aware of, at the time or
15    since, was, in our company, promoted to an
16    acting position and also because there were
17    effectively no other women, other than
18    Donna Costa, in an officer position at that
19    time worldwide.
20              So I concluded, based on that
21    fact, and belief, also because during the
22    course of our meeting, Donna said a few
23    things to me that made me believe that it
24    was not her decision fully.  One was I
25    couldn't get you through Japan; two, it may
```

1                    J. FISCHMAN
2    never happen, and at no time did she say if
3    you execute X, Y and Z, you will become the
4    GC.  In fact, she did just the opposite and
5    said I can't make any promises this is ever
6    going to happen, even though I repeatedly
7    asked for the full promotion.
8              I also believe at the time that
9    Yoshisato-san may not have supported it
10   because I had just completed his -- the
11   allegation and investigation into
12   complaints of sexual harassment against him
13   and during the course of that
14   investigation, I had to sit with him and
15   ask him extremely personal questions one on
16   one, and so I felt that he may have been
17   discriminating against me for putting him
18   in that position and asking him those
19   questions.
20        Q.    Any other factual basis other
21   than what you've just identified?
22        A.    During the course of that
23   meeting, I have no other -- those were the
24   main bases.
25        Q.    Ms. Fischman, you understand

1           J. FISCHMAN

2  that in the fall of 2014, Ms. Costa had the

3  opportunity to actually elevate your male

4  colleague, Andy Sezar, who was also seeking

5  a position of promotion within the company.

6  Are you aware of that?

7        A.    No.

8        Q.    Are you aware that in the fall

9  of 2014 Mr. Oliva was in conversation with

10 Ms. Costa about wanting to make a change

11 from Bristol Squibb to another company and

12 was seeking references from her?

13       A.    No.

14       Q.    Do you have any reason to

15 dispute the fact that when Ms. Costa

16 testifies she will set forth that she had

17 opportunities to actually elevate both

18 Mr. Sezar and Mr. Oliva -- well not elevate

19 Mr. Oliva, he was in a different company,

20 but bring in Mr. Oliva, in the fall of

21 2014, as general counsel, but she did not?

22            MR. BERMAN:  Object to form.

23       A.    Can you restate that in a more

24 simple form because I'm not sure --

25       Q.    Do you dispute that Ms. Costa

1           J. FISCHMAN

2    had the opportunity to elevate Mr. Sezar,

3    who was your colleague at MCHA, to acting

4    general counsel but she chose not to,

5    correct?

6         A.    I have no idea whether or not

7    she considered Andy in that position.  I do

8    know that during the course of the data

9    dump that we went through, between December

10   and April 2014 to 2015, that she disclosed

11   that she had little confidence in his legal

12   abilities and his competence as a lawyer.

13        Q.    But my question is do you have

14   reason to doubt her testimony that's going

15   to come in and say that she could have

16   elevated Andy Sezar or hired Nick Oliva in

17   the fall of 2014 rather than you --

18             MR. BERMAN:  Object to form.

19        Q.    -- in the promotional position

20   of acting general counsel?

21        A.    Yes, I have reason to dispute

22   that.

23        Q.    Give us the factual basis for

24   the reasons you dispute that?

25        A.    I believe I gave you the

1                    J. FISCHMAN

2   factual basis in my prior response to your

3   question.

4        Q.    Only to Mr. Sezar.  Now Mr.

5   Oliva.  Why is it that you have reason to

6   doubt Ms. Costa's testimony that will come

7   in that she could have brought Mr. Oliva in

8   the fall of 2014 and not given you the

9   opportunity to be promoted to acting

10  general counsel?

11       A.    I'm sorry, Mercedes, I don't

12  have any understanding of what you're

13  asking me.  It sounds like a hypothetical

14  like I have no personal knowledge of the

15  interactions between Donna and Nick in

16  2014, so I really can't answer that

17  question from personal knowledge and I

18  can't really opine on the hypothetical that

19  she could have, might have, done something.

20       Q.    Ms. Fischman, it's not a

21  hypothetical.  I'm directly stating to you

22  when you hear the testimony from Ms. Costa,

23  that in the fall of 2014 she could have

24  brought Mr. Oliva in at that point because

25  he was not -- he wanted to make a change to

```
 1                    J. FISCHMAN
 2   another company.  He was available to come
 3   back to MCHA and she didn't give him that
 4   opportunity in the fall of 2014.  That's
 5   her testimony that will come in.  Do you
 6   have any reason to dispute it?
 7             MR. BERMAN:  Object to form.
 8        A.    Yes, I dispute because I have
 9   no personal knowledge of it and we have to
10   wait and see what she testifies to.  I
11   can't say that she is going to say -- this
12   isn't a real question, Mercedes.  With all
13   due respect, you're asking me to testify on
14   which she's going to testify about when I
15   don't have any idea.
16        Q.    I'm asking you, it's not a
17   hypothetical.  I'm going to ask it again.
18   In the fall of 2014, Ms. Costa was in
19   communication with Mr. Oliva.  She could
20   have brought Mr. Oliva back in the fall of
21   2014 and she did not.  My question to you
22   is do you have a factual basis for
23   disputing the truth of that statement when
24   it comes in as testimony?
25             MR. BERMAN:  Object to form.
```

1                    J. FISCHMAN
2         A.    Yes.  My factual basis is that
3    you have not presented me with any
4    documentary evidence that that
5    communication occurred so therefore I
6    cannot say that what testimony Ms. Costa
7    would provide will be truthful so that is
8    my basis for saying no, I can't agree.
9         Q.    Do you have a document that
10   disputes that testimony in your possession?
11        A.    Do I have a document that in
12   2014 Donna was in contact with a former
13   employee that I had never met?  No, I don't
14   have a document like that.
15        Q.    And you have no document that
16   actually disputes that fact, correct?
17        A.    What are you referring to when
18   you say that?  When you say "that," what
19   are you referring to?
20        Q.    You have nothing that will
21   controvert the testimony that will come in
22   that Mr. Oliva and Ms. Costa were in
23   communication in the fall of 2014; isn't
24   that right?
25        A.    I have no documentation that I

1                    J. FISCHMAN

2    have --

3        Q.    It's a yes or no, Ms. Fischman,

4    so we can get through this.  I have a long

5    outline, I'd like to get through it.

6        A.    I know.  I would like to answer

7    the question.

8        Q.    It's a simple yes or no.  Do

9    you have a document that disputes it, yes

10   or no?  And we can move on.

11       A.    I have no document that

12   disputes that Donna Costa was in contact

13   with Nick Oliva over I'm sure many years,

14   since he left Mitsubishi Chemical prior to

15   my employment there.  I have no knowledge

16   or documents of their interaction,

17   friendship, or otherwise.

18       Q.    In the meeting that we've been

19   talking about, Ms. Fischman, didn't Ms.

20   Costa say to you that you would have the

21   opportunity to be promoted to general

22   counsel and it would basically be a

23   12-month period for that time period to

24   prove yourself, didn't she say that to you?

25       A.    She absolutely categorically

1          J. FISCHMAN

2    did not say that to me.  She never said

3    that and she never said that there was a

4    path to get there.  In fact, she made it

5    feel very doubtful, to which I responded

6    that I was going to work as hard as I

7    possibly could and do everything that

8    possibly could to prove that I was capable

9    of this position.

10        Q.    She's president of MCHA,

11   correct?

12        A.    At that moment she had not

13   become president yet.

14        Q.    She was becoming president

15   April 1, 2015, when you were becoming

16   acting general counsel and CCO for MCHA,

17   correct?

18        A.    Correct.

19        Q.    Her success as president of

20   MCHA, part of it, is how successful you are

21   in the position of acting general counsel

22   and CCO; isn't that right?

23        A.    I don't know the answer to that

24   question.

25        Q.    So is it your testimony that

```
1                    J. FISCHMAN
2    Ms. Costa, as president of MCHA, would not
3    have any repercussions if you failed
4    miserably?  Do you understand that there is
5    a correlation between her wanting you to be
6    successful in this new position and her
7    elevation as president of MCHA?
8         A.    Of course there's a
9    correlation, yes.
10        Q.    Didn't Ms. Costa say to you
11   that this acting title would give you the
12   time she thought you needed to prove
13   yourself and go into the role of general
14   counsel?
15        A.    As it is occurs to me and
16   you've now told me and revealed she'd been
17   in contact with Nick Oliva during the fall
18   of 2014 and that he was unavailable to make
19   the move at that time, I now recall that
20   no, I think she probably never anticipated
21   I would stay in that role and she was
22   holding me as a placeholder until he was
23   more available later that year.
24             Now that I remember hearing a
25   year later that he just started a role at a
```

1                    J. FISCHMAN

2   spin-off company of the major -- some

3   pharma company that he had been at and he

4   wasn't ready to leave.  So actually now I

5   do dispute that there was a possibility

6   that he could've taken that.

7        Q.    You have just identified on the

8   record that you were a placeholder for Mr.

9   Oliva.  What document do you have to

10  establish that?

11       A.    I suppose we'll rely on

12  documents that you produced that Mr. Nick

13  and Donna were in contact in the fall of

14  2014.

15       Q.    That is not the answer to my

16  question.  You have identified yourself as

17  a placeholder to Mr. Oliva.  Identify the

18  document that supports that.

19       A.    I don't have a document,

20  Mercedes.

21       Q.    You state on the record that

22  Mr. Oliva was not available in the fall of

23  2014.  That's not an accurate statement

24  considering that he was moving from one

25  company to the other, correct?

J. FISCHMAN

1

2      A.      So just to clarify, what I said

3  stated was that a year later when he

4  replaced me, I remembered hearing that he

5  was starting a new position the year

6  earlier and that it was that position that

7  he was unhappy in.  This was the story that

8  I was told.  I don't know who told me so

9  honestly I can't really speak to Nick's

10  specifics because I was not -- I never met

11  him before November 30, 2015.

12      Q.      So Ms. Fischman, testimony will

13  come in that Mr. Oliva was, in fact,

14  available to make the move to MCHA in the

15  fall of 2014.  Do you have a factual basis

16  to contradict that?

17      A.      The factual basis is that he

18  didn't make the move.

19      Q.      Do you have a document?  The

20  reason why Mr. Oliva didn't make the move,

21  and there will be testimony to that, is

22  that he wasn't offered the position.  So my

23  question to you is do you have a basis to

24  dispute the testimony that will come in

25  that Mr. Oliva was available to make the

```
 1              J. FISCHMAN
 2   move to MCHA in the fall of 2014 but was
 3   not given that opportunity?
 4       A.    I have no such document.  But I
 5   would love to see Mitsubishi's
 6   documentation that hasn't been produced
 7   that supports that testimony just as my
 8   testimony you keep asking me for my
 9   documents, I would similarly like to see
10   the same documents that Nick was considered
11   for the position in 2014 or anybody else
12   who was considered for the position in 2014
13   or 2015.
14       Q.    In this elevated promotional
15   opportunity you had, in acting general
16   counsel and CCO, you were also given a
17   significant raise, were you not?
18       A.    I was.
19       Q.    You were increased to $300,000,
20   plus your bonus was increased to 25 percent
21   of your base, isn't that right?
22       A.    That is.
23       Q.    You never negotiated for more
24   money, did you?
25       A.    I did not.  In fact, because of
```

1              J. FISCHMAN
2    the way the budgeting work from the money
3    --
4         Q.    You've answered my question.
5         A.    It was disclosed to me so.
6         Q.    Ms. Fischman, you answered the
7    question and I appreciate it.  Paragraph 51
8    of the complaint -- you need a copy?  In
9    that paragraph, you allege that Ms. Costa
10   said that it's -- the GC role -- is
11   probably never going to happen.  Now when
12   Ms. Costa testifies, she will state that
13   that was never stated during that
14   conversation.  Is it your testimony that
15   she would be lying?
16        A.    It is my testimony that she
17   said the things that I say in this
18   complaint, a hundred percent.
19        Q.    So when she contradicts the
20   particular statement that you make in
21   paragraph 51, is it your testimony that
22   Ms. Costa is lying?
23        A.    Yes.
24        Q.    The position of acting general
25   counsel, Ms. Fischman, you understood that

1                    J. FISCHMAN
2    that was a temporary role, did you not?
3        A.    Yeah.
4        Q.    In your complaint in paragraph
5    112, you make a statement that your
6    promotion, and all the decisions concerning
7    your promotion, were made jointly by MCHA
8    and MCHC with MCHC having final approval.
9        A.    That's right.  It says that.
10       Q.    Who are you referring to at
11   MCHC that you believe had that level --
12       A.    Ken Fujiwara.
13       Q.    And what document --
14       A.    And perhaps others.  I believed
15   that the MCHC board members of MCHA would
16   also have had approval over that as that
17   position was an officer position in the
18   company.  I also believed that there were
19   other members in Japan, other people in
20   Japan, at high levels that were involved in
21   decision making for high level executive
22   positions at all affiliates not just MCHA.
23       Q.    So as you sit here today, to
24   the best of your best recollection, you
25   identified Mr. Fujiwara.  Who, as you sit

```
 1                    J. FISCHMAN
 2   here today, do you believe also had an
 3   input on your promotion?  Identity, not
 4   just broad sweeping statements about who it
 5   night be, names of individuals who you
 6   believe had input.
 7        A.    Sakaguchi-san.  I believe that
 8   there were other employees in MCHC.
 9        Q.    I'm asking for names, Ms.
10   Fischman.  What names do you remember?
11        A.    Date-san, Date.  At this
12   moment, I cannot recall any others for the
13   names.  And let me also mention that I did
14   not have direct contact with those
15   individuals, so I may never have known
16   their names.
17        Q.    Do you have a document in your
18   possession that supports your assumption
19   that these individuals that you've
20   identified, on the record, Mr. Fujiwara
21   Mr. Sakaguchi and Mr. Date, had influence
22   in your elevation to acting general
23   counsel?
24        A.    I do not have documents in my
25   possession of such things; however, I
```

```
 1              J. FISCHMAN
 2   believe that Donna took a trip to Japan in
 3   the fall of 2014, and it was typical for
 4   her to have high level discussions with
 5   such MCHC employees who had responsibility
 6   of overseeing the day-to-day operations at
 7   MCHA, and that's when she would have had
 8   these conversations and discussions about
 9   the future management of this business
10   unit.
11        Q.    You have no document that
12   exists that supports your statement you
13   just made that Ms. Costa went to Japan and
14   may or may not have conversations about the
15   future management of HCHA, correct?
16        A.    Correct.
17        Q.    You just stated on the record
18   that you didn't have contact with
19   individuals in Japan an MCHC; is that
20   right?
21        A.    Let me rephrase the way I
22   answered that question.  I did not have
23   contact with respect to management issues
24   with individuals in Japan.  I was in
25   contact with individuals located at MCHC,
```

```
 1                    J. FISCHMAN
 2   MCHJ, MCC, Mitsubishi Tanabe Pharma and
 3   other businesses for which I provided legal
 4   counsel.
 5        Q.    Take a look at Exhibit Bates
 6   stamped 1209.  Ms. Fischman, do you
 7   recognize this document before you?
 8        A.    A-ha.
 9        Q.    And this is an e-mail
10   communication that you sent to Ken
11   Fujiwara, correct?
12        A.    Sure.
13        Q.    You what is this document?
14   Describe what this is.
15        A.    This is an e-mail
16   congratulating Ken Fujiwara on his
17   promotion to executive officer of MCHC.
18        Q.    It was also, in your
19   communication, did you not thank him for
20   his support in your promotion?
21        A.    Yes.
22        Q.    And in it it said "which I am
23   sure could not have happened without you."
24   What did you mean by that?
25        A.    That Mr. Fujiwara was
```

```
 1                J. FISCHMAN
 2   instrumental in approving my promotion, or
 3   rather that he was instrumental in the
 4   decision regarding my promotion.
 5       Q.    So is it your testimony that
 6   Mr. Fujiwara had the most influence in your
 7   promotion?
 8       A.    I couldn't say if it was the
 9   most but he certainly had authority to
10   approve my promotion.
11       Q.    How do you explain what you
12   wrote?  "I also wanted to thank you for all
13   your support in my promotion which I'm sure
14   could not have happened without you."
15   Doesn't that mean that you felt that Mr.
16   Fujiwara had the utmost support in getting
17   you elevated?
18       A.    This is a congratulatory
19   greeting where I was respectably trying to
20   engage with an executive at MCHC where I
21   was flattering him and where I was trying
22   to garner his support.  So the fact that I
23   wrote "I want to thank you for your
24   support" is flattery.
25       Q.    I'm not focusing on the first
```

1                    J. FISCHMAN

2    part, I'm focusing on the second part,

3    "which could not have happened without

4    you," and by flattery do you mean that what

5    you stated there was not true?

6          A.     No.   Why would you say that?   I

7    don't know what you mean, it's not true.   I

8    wrote to him "I want to thank you for all

9    your support in my promotion which I am

10   sure could not have happened without you,"

11   and the reason I wrote I am sure could not

12   have happened without you is because it was

13   my firm belief, based on eight years of

14   working at the company, that nothing we did

15   at a high level in terms of the management

16   of MCHJ -- sorry, MCHA, occurred without

17   the full knowledge and support of MCHC

18   individuals, especially and including

19   Mr. Ken Fujiwara.

20         Q.     What did you do, between

21   December of 2014 and April 2015, to prepare

22   for your new role as acting general

23   counsel?

24         A.     I did many things.   I had

25   multiple, probably weekly, several hour

1                J. FISCHMAN

2  conversations with Donna where she provided

3  me with data dump.  Basically these are the

4  areas that you may not be aware of that I

5  do in this job.  I tried to read some books

6  on leadership.  I started subscribing to

7  Japanese websites, additional leadership

8  websites.  Some of that is included in my

9  2015 goals.  If you want to pull that out,

10  you'll see a long list of things that I

11  started working on.

12      Q.    Did you read any books?

13      A.    I'm sure I did.

14      Q.    Do you recall, as you sit here

15  today, what books you read?

16      A.    No, I don't recall any of the

17  names.  I'm sure I read a book on

18  leadership and I also had a book in my

19  office at the time on Japanese business

20  that I had either gotten from Donna early

21  on in my tenure at Mitsubishi, and I think

22  I reread that at the time.

23      Q.    Do you still have copies of the

24  books that you read?

25      A.    No, and I didn't take any of

1                    J. FISCHMAN
2    the books from my office when I left.  I
3    didn't take anything from my office when I
4    left.
5         Q.    The websites that you
6    subscribed to, what websites were they?
7         A.    Certainly Harvard Business
8    Review.  If you don't mind, I'd like to go
9    back and look at this document to refresh
10   my memory.
11        Q.    Sure, not a problem.
12        A.    So I think one of the things
13   that I started doing, and again this is
14   many, many years ago, 2015, and it's now of
15   six years ago, but one of the things I was
16   definitely engaging in more, I was going to
17   be engaging in more in the overview of the
18   compliance program, so I was looking at
19   different compliance programs, I probably
20   looked at different compliance websites,
21   not just the one that we used.
22             I definitely was reviewing and
23   reading different articles on going from
24   being a peer to a leader; that was one of
25   my transitions and I was very interested in

1                    J. FISCHMAN
2    how to manage the relationships so I read
3    several articles about that.
4              I met multiple times with our
5    HR person, Pat Saunders.  In fact, Pat was
6    the only one I met with about my goals.
7    These goals were never reviewed together
8    with Donna.  I only reviewed these with
9    Pat.  I did eventually leave them for Donna
10   to look at but she never -- she and I never
11   sat down and went through them.
12        Q.    And just so the record is
13   clear, you're looking at the document
14   that's Bates stamped 64 to 76; is that
15   right?
16        A.    Yes, and I'm specifically
17   looking at Bates stamps 70, 71, 72, 73, 74,
18   75, 76 to refresh my memory.
19        Q.    And we've already identified on
20   the record that this is an accurate
21   depiction; all the contents in this
22   document itself are accurate, so we've
23   established this, correct?
24        A.    Yes.
25        Q.    Isn't the fact that Ms. Costa,

```
1                J. FISCHMAN
2   during this time, met with you at least
3   three times a week to talk about evolving
4   into the general counsel role?
5        A.    I couldn't say that it was
6   three times a week.  It was certainly once
7   a week and it was certainly for several
8   hours at a time, sure.
9        Q.    And I understand that you were
10  taking notes during that time.
11       A.    Yes.
12       Q.    Extensive notes, in fact,
13  because these were hours that you were
14  spending with Ms. Costa; isn't that right?
15       A.    I would say I see some of them
16  on your table there, if I'm not correct.
17  Is that --
18       Q.    These are not your notes, those
19  are Ms. Saunders' notes.  Do you have
20  copies of the notes?
21       A.    So I do have some notes that I
22  took and we thought that we produced them,
23  but we can't find them in our production
24  last night so we'll be providing those.
25       Q.    Please do.
```

```
 1                    J. FISCHMAN
 2              MS. COLWIN:  I call for
 3         production.  That's responsive to our
 4         discovery demands so we appreciate
 5         that.
 6              MR. BERMAN:  We'll produce
 7         them.
 8         A.    We just realized that they
 9   weren't there, but also I took extensive
10   notes for eight years in my role as
11   corporate counsel, assistant general
12   counsel, and acting general counsel on
13   notepads like the one that you're writing
14   on, legal pads, that I left in my office
15   when I was escorted out after my
16   termination, and I'm sure that there's
17   responsive information on those notepads
18   that have not yet been produced so we'd
19   appreciate it if you guys would --
20         Q.    When you say responsive
21   information, you mean responsive to your
22   discovery demands of us; is that what
23   you're saying?
24         A.    Yes.
25         Q.    What did you do about becoming
```

```
 1                    J. FISCHMAN
 2   more familiar with Pharma?  Did you do any
 3   due diligence in that regard with respect
 4   to Pharma?
 5        A.    I'm sure I did.
 6        Q.    Do you recall, as you sit here
 7   today, what you did?
 8        A.    Can you refresh my memory as to
 9   what time period you're speaking of?
10        Q.    We're still in that
11   December 2014 to April 2015.  This is in
12   preparation for you assuming the role of
13   acting general counsel.
14        A.    Yeah, I'm sure I tried to learn
15   more about our Pharma business.  I probably
16   -- let me just say I can't recall.  I
17   actually can't recall.
18        Q.    Do you have any documents that
19   may refresh your recollection?
20        A.    I don't.  Do you?
21        Q.    Did you do any due diligence
22   with respect to intellectual property?  Did
23   you do reading?
24        A.    I have been an intellectual
25   property lawyer when I was in private
```

```
 1              J. FISCHMAN
 2   practice.  I had pretty good familiarity
 3   with our intellectual property issues and
 4   from time to time, I frequently had IP
 5   issues come up that I worked with Katherine
 6   on or Joe on.  So I didn't really need to
 7   do additional due diligence during that
 8   three-month timeframe.
 9        Q.    The last time you were at a
10   private firm was in March of 2001, correct?
11        A.    Yes.
12        Q.    You were an associate, an IP
13   and corporate associate, at Jeffer Mangels
14   Butler & Marmaro, correct?
15        A.    Yes.
16        Q.    We're talking now about 2014.
17   Did you do anything to familiarize yourself
18   with the development of IP?  Presumably it
19   developed quite a bit in those 14 years.
20        A.    I would say that through my
21   generalist practice at Mitsubishi, I
22   frequently had opportunity to work on
23   intellectual property matters and when I --
24   and I had a pretty good sense of our IP
25   issues from working with Katherine or with
```

```
 1              J. FISCHMAN
 2  Joe, and but if there were specific IP
 3  litigation issues or complex IP issues,
 4  Katherine was an expert in IP and I would
 5  have deferred to her counsel.
 6       Q.    What businesses did you
 7  support?  By December of 2014, what
 8  businesses -- affiliates I'm talking about
 9  -- what affiliates did you support, had you
10  already worked with while working at MCHA?
11       A.    We have provided the list, I
12  believe in our answers to your
13  interrogatories.  There were about 21
14  businesses that I supported and I'll be
15  happy to identify them if you give me a
16  list of all the affiliates that existed in
17  2014.  I'd be happy to check them off for
18  you but I don't think it would be useful
19  for you for me to try to think of 21
20  businesses off the top of my head.
21       Q.    We're going to assume that the
22  interrogatories, because you certified
23  them, are accurate, correct?
24       A.    Yes.
25       Q.    And that was the information
```

```
 1              J. FISCHMAN
 2   you provided to your counsel, which then
 3   was sent to us, so we're assuming that what
 4   you set forth in the interrogatories was
 5   completely truthful.
 6        A.    To the best of my knowledge.
 7        Q.    With the affiliates that you
 8   haven't worked with, do you have an
 9   independent recollection as to the
10   affiliates that you had not worked with by
11   December of 2014?
12        A.    Again, if you could give me a
13   list of all the affiliates that existed in
14   2014, in the United States, I would be
15   happy to talk about each and every one of
16   them who I helped and didn't help at that
17   time and what my knowledge was about them.
18        Q.    So we're going to give you a
19   document that's going to refresh your
20   recollection.  We can go off the record and
21   then you can identify the affiliates that
22   you had not worked with.
23        A.    Okay.  And this is not Bates
24   stamped?
25        Q.    It's a document to refresh your
```

1                    J. FISCHMAN

2  recollection.

3            MS. COLWIN:  Off the record.

4            (Whereupon, an off-the-record

5        discussion was held.)

6            THE VIDEOGRAPHER:  The time on

7        the video monitor is 2:25 p.m.  we're

8        off the record.  This ends Media 2.

9            (Whereupon, an off-the-record

10       discussion was held.)

11           THE VIDEOGRAPHER:  We are back

12       on the record.  The time on the video

13       monitor is 2:28 p.m.  This starts

14       Media 3.

15       Q.    So Ms. Fischman, I've asked

16  which businesses had you not worked with

17  and we provided you with a document that

18  lists the affiliates that were in existence

19  in 2015.

20       A.    So without answering this, I

21  don't want to be difficult in any way

22  possible, I'm just going to tell you that

23  some of the businesses listed on this

24  document did not have legal services

25  agreements with MCHA so nobody in our

1          J. FISCHMAN

2    business provided legal support to them.

3    So first I can identify those, I think, to

4    the best of my recollection, going back six

5    years.

6          Q.    Tell us which ones.

7          A.    Nippon Gohsei, and again,

8    obviously, you know, someone else may know

9    better.  Taiyo Nippon Sanso Corporation,

10   which was Matheson Tri-Gas.  Medicago Inc.

11   and Medicago USA under the Mitsubishi

12   Tanabe Pharma Corporation.

13         Q.    Anything else?

14         A.    Those were the two that I

15   identified.  Soarus, S-O-A-R-U-S.  Okay.

16         Q.    Are there affiliates where MCHA

17   was providing legal services in that

18   timeframe?  We're talking about 2014 and

19   2015 that you were unfamiliar with on this

20   list.

21         A.    Going the through list, I can't

22   remember who MC Ionic solutions was, so

23   I'll say that one.  I'd also like to point

24   out that some of these were paper

25   companies, in that they were not operating

1              J. FISCHMAN
2    companies.  I believe Japan Poly Chem
3    America was one such paper company as was
4    Japan Polypropylene Corp. was one such
5    paper company.  Under Verbatim was one
6    company that I did not support at this
7    time, and was completely unfamiliar with
8    them, at this point in time, 2014, 2015,
9    and I believe some of the companies listed
10   under Verbatim Corporation are also paper
11   companies.
12        Q.    So are you talking about Data
13   Life?
14        A.    Data Life, Kasei Memory and
15   Verbatim Limited but they also may be
16   foreign companies that are wholly owned by
17   Verbatim Corp as they indicate in the
18   document.  So to answer your question, as I
19   look at this list, in my tenure at
20   Mitsubishi Chemical Holdings, I worked at
21   nearly every -- I worked for or had
22   familiarity with nearly every single
23   company on this list with the exception of
24   the Verbatim companies and the Tanabe
25   Pharma companies.

                      J. FISCHMAN

1

2      Q.    Of the affiliates that you had

3  not worked, what did you do to become

4  familiar with the companies?

5      A.    During that period of time, I

6  think I met with Donna and she gave me

7  their background and I'm sure that I looked

8  them up on the web.  I'm sure that I tried

9  to understand what was their product, but

10  at time, for example, especially with

11  Mitsubishi Tanabe Pharma America, they

12  didn't have a product that had been

13  approved by the FDA.

14          So they were more about forming

15  the company at that time is my

16  recollection, putting in the appropriate

17  people in place because they were going to

18  be bringing a new drug to treat Lou

19  Gehrig's Disease.  They were going to be

20  bring a new drug to the US around 2015, the

21  middle of 2015, and beyond.

22      Q.    Okay.  You had described the

23  coaching and the meetings that you had with

24  Ms. Costa as a data dump, so describe for

25  us the meetings.  You've already said that

1                    J. FISCHMAN
2     you met at least once a week and it was an
3     extensive meeting with Ms. Costa where you
4     took a lot of notes.  Describe those
5     meetings.
6          A.    We would sit down and she
7     explained maybe what she was working on for
8     one of those companies, for one of these
9     companies.  She may have been privy to, for
10    example, with Mitsubishi Kagaku Imaging
11    Corp, it was about this time period that
12    they started talking about doing a major
13    reduction in force, so we probably had a
14    long conversation about MKIC and that what
15    the timeframe was that they were going to
16    be reducing in force.
17              We probably talked about the
18    land lease in Virginia where they occupied
19    space.  We probably talked about the lease
20    in California where they occupied space.
21    We probably talked about their management
22    team, how they were going reduce it, or
23    what their plans for the future were just
24    as an example of the kind of things and the
25    kind of business things that we would talk

1          J. FISCHMAN
2    about, because Donna, being on the board of
3    so many of these businesses, would know
4    information about the businesses that
5    employees may not know.  So this was an
6    example of one of the things we talked
7    about.
8               I think we would have gone
9    through each and every business and talked
10   about each and every business, and so there
11   would be meetings where we would talk about
12   management and budget.  So she presented me
13   with the budget for the legal department
14   but explained how the budgetary, how
15   everything worked and where the money came
16   from.  She explained, she would explain all
17   of that, and I don't know if you want to
18   get into that right now.
19               We, yeah, I mean we talked
20   about every single affiliate business.  We
21   talked about staffing in the department,
22   which was a little bit disappointing to me
23   because, although I was excited to be
24   hiring someone new, the person who was
25   going to replace me was, because of

1              J. FISCHMAN

2    budgetary constraints, going to have be a

3    new junior attorney who had never, you

4    know, a very junior attorney.

5              And that meant that I would

6    continue to have responsibility for all the

7    businesses that I had, with the exception

8    of a few, and that I would be training

9    Steven on, or the candidate on, but that I

10   would still maintain primary business

11   responsibility for so many companies in

12   addition to taking on this role of the

13   leader of the department.

14       Q.    And when you mention Steve,

15   that's Steven Rose, correct?

16       A.    Yes, Steven Rose.

17       Q.    And that was the individual

18   that you hired as acting general counsel,

19   correct?

20       A.    Yes, I don't know what his date

21   of hire was.

22       Q.    Date of hire is May 13, 2015,

23   does that refresh your recollection?

24       A.    Yes.

25       Q.    Anything else, in terms of

1               J. FISCHMAN
2    training and coaching, that Donna provided
3    you other than what you've testified?
4         A.     We talked about the interaction
5    with Japan.  She said that Japan didn't
6    want to deal with me.  That the only thing
7    that I would be interacting with them would
8    be on a quarterly basis and that I could
9    work out with Sakaguchi-san how he wanted
10   me to report on important matters, whether
11   it was going to be monthly or whether it
12   was going to be quarterly, but that I would
13   not have direct contact with the leadership
14   in Japan as she, Donna, had and then we
15   also talked about the fact that I would not
16   be going to Japan until much later in the
17   year.
18        Q.     When you say the interaction
19   with Japan, I know we've made this
20   distinction in the past.  I just want to
21   make sure that the record is clear.
22        A.     I'm sorry.  When we talk in the
23   office, our lexicon is to identify -- we
24   would say have you spoken to Japan?  We're
25   talking about employees at the Japanese

```
 1              J. FISCHMAN
 2   parent company, MCHC, or the strongest
 3   affiliate company, MCC, which is the
 4   primary revenue for the company.  It's the
 5   largest of all of the product companies,
 6   which was Mitsubishi Chemical Corp and
 7   Mitsubishi Chemical Holdings Corp is a
 8   small office of administrative people who
 9   are in a holding company but the primary
10   work is done at the business level,
11   Mitsubishi Chemical Corp.
12        Q.    Ms. Fischman, I want to focus
13   on testimony you just gave moments ago
14   where you had testified that Ms. Costa had
15   said to you that Japan didn't want to deal
16   with you.
17        A.    Yes.
18        Q.    And so describe when that
19   conversation took place, what you said to
20   her and what she said to you to the best of
21   your recollection.
22        A.    That took place very early on
23   in one of our first meetings I think.
24        Q.    First meetings in
25   December 2014, or you're talking about
```

1              J. FISCHMAN
2  after you became acting general counsel in
3  April 2015?
4       A.    No, during the transition,
5  absolutely during the transition.
6       Q.    When do you believe that
7  conversation took place?
8       A.    In either December 2014 or
9  January 2015.
10      Q.    Who was present?
11      A.    No one was ever present in any
12 of our meetings other than Donna and I,
13 Donna and me.
14      Q.    So what is it that you said to
15 her and Ms. Costa said to you to the best
16 of your recollection?
17      A.    This was in the context of a
18 conversation of the reporting structure and
19 who I would be in contact with in Japan and
20 whether or not I would be reporting
21 directly as she had and meeting with and
22 traveling to Japan twice a year, as she
23 had, and meeting with high level executives
24 at Mitsubishi Chemical Holdings Corp and as
25 well as MCC and in that context, she said

```
 1                    J. FISCHMAN
 2   no, you will not be.  You will not be
 3   meeting with them.  I will continue to be
 4   their primary contact; you will not.  They
 5   don't want to deal with you.
 6        Q.    When she said they don't want
 7   to deal with you, according to your
 8   testimony, did Ms. Costa ever identify who
 9   they were were?
10        A.    No.
11        Q.    Did you ever press her for more
12   information?
13        A.    No, I didn't.
14        Q.    Did you ever ask who these
15   individuals were?
16        A.    No, I assumed it was Ken
17   Fujiwara, Sakaguchi, to some extent
18   Takimoto, because he and she were very
19   close, they had a close relationship, and
20   that wasn't going to change by me being in
21   this role even though he was a primary
22   client and important businessperson to our
23   business.
24        Q.    But as you said these were your
25   assumptions, correct, you never got the
```

```
 1                J. FISCHMAN
 2   identities of the individuals, as you've
 3   testified, that Ms. Costa made this
 4   comments to you, correct?
 5        A.    No.
 6        Q.    We've already established on
 7   the record that Ms. Costa made this comment
 8   to you.  Was there ever an explanation?
 9        A.    No.
10        Q.    Now towards the end of
11   transition period, that would be in March
12   of 2015, Ms. Costa had wanted to talk to
13   you about other areas that she wanted to
14   focus on, she wanted you to focus on, in
15   order for the full transition to acting
16   general counsel to take place.  Do you
17   remember a conversation you had with her in
18   March of 2015 when the two of you were
19   speaking about taking on the role formally,
20   beginning April 1, 2015, in which she said
21   she wanted you to concentrate on other
22   areas?
23        A.    No, I have no recollection of
24   that as you've describe it.
25        Q.    Do you recall that when she had
```

J. FISCHMAN

this conversation with you about you taking

on this acting role in April 1st, 2015, and

wanting to give you more feedback as to

what she wanted you to focus on, you had

asked her not to talk anymore about the

transition but to give you some space so

that you could grow into the role?

A.    Never.

Q.    You never said that?

A.    Not like that certainly.

Q.    What do you recall?

A.    I don't recall ever telling

Donna anything like that.  I remember

always being receptive to feedback because

I wanted this job, so I recall asking for

guidance on the goals that I put in my 2015

performance review, the goals for 2015.  I

remember asking for guidance on that and

being told to seek it from Pat Saunders.  I

remember providing that list of goals to

Donna and her having no time to talk to me

about it and so never really having any

interest in whether I met those goals or

not.  We never talked about them again so

```
 1                    J. FISCHMAN
 2  no, I don't recall ever saying I don't want
 3  feedback.
 4       Q.    I just want to make sure that
 5  the record is clear.  The goals that you
 6  are referring to are the ones that are
 7  Bates stamped 64 to 76, correct?
 8       A.    No.  The goals are --
 9       Q.    But it's within this document?
10       A.    The goals are 69 through 76
11  Bates stamped.
12       Q.    Is it your testimony that
13  Ms. Costa had not provided you with any
14  training or coaching on any of the goals
15  that you set forth in this document, 70 to
16  76?
17       A.    No, that's not my testimony.
18       Q.    You said that was not your
19  testimony?
20       A.    No, that's not my testimony.
21       Q.    So the record stands for itself
22  but I will give you the opportunity to --
23  I've asked you a question.  What is it
24  about the question that I posed to you that
25  is inaccurate?
```

                    J. FISCHMAN
1
2        A.     I'm sorry, I don't remember the
3   question.
4        Q.     Is it your testimony that Ms.
5   Costa did not provide any training or
6   guidance with respect to the goals that you
7   provided to her as set forth in the
8   documents 70 to 76 Bates stamped?
9        A.     It is my recollection that she
10  and I never talked about Bates stamped 69
11  to 76 ever, and, I'm sorry, let me be
12  clear, Bates stamped 70 to 76, that she and
13  I never reviewed these together, that she
14  asked me to develop these with Pat
15  Saunders, which I did.  I provided them to
16  Donna and she did not do anything but sign
17  them and return them to me as indicated in
18  some e-mail, I put it on your desk or
19  something.
20       Q.     I just want to make sure that
21  it's clear.  In sum and substance, the
22  areas that you've identified in that
23  document, and we're all in 70 to 76, we
24  haven't moved from this document.  Is it
25  your testimony that Donna did not provide

```
 1              J. FISCHMAN
 2   training and coaching in those areas?
 3        A.    I think you need to be more
 4   specific please.
 5        Q.    It's probably easier to tell us
 6   affirmatively what areas, the substantive
 7   areas that are defined in the goals that
 8   set forth in 70 to 76 which Ms. Costa
 9   provided training and guidance on.
10        A.    I think as I previously
11   mentioned, I never discussed any of these
12   goals with Donna at any time so to the
13   extent she provided me any guidance or did
14   you call it coaching, I'm sure she did.  I
15   certainly, over my tenure at eight years at
16   Mitsubishi, she did but I will say that
17   during this period of what you're asking,
18   from the time that this was submitted, I
19   don't recall any particular coaching as to
20   these goals.
21            Having said that, she wrote an
22   e-mail in July to me about a transaction we
23   were working where I was for the first time
24   helping the team choose a financial advisor
25   for a Brazilian deal and she wrote me very
```

1             J. FISCHMAN

2   constructive feedback that I thought was

3   very useful and that was, I would say, my

4   recollection during this period the only

5   time that she provided any feedback that I

6   can recall.

7          Q.    Is there any document that

8   would refresh your recollection as to other

9   substantive areas that Ms. Costa gave

10  constructive criticism training or

11  coaching?

12         A.    If you have a document of such,

13  it would certainly help, but I can't think

14  of anything off the top of my head.

15         Q.    I just have a document Bates

16  stamped DEF 13 to 15.  I'm going to ask you

17  to begin with 15 and then go up to 14.  So

18  Ms. Fischman, taking a look, this is an

19  e-mail exchange between Ms. Costa and

20  Ms. Saunders, and Ms. Saunders you've

21  identified; she was the head of HR at MCHA,

22  correct?

23         A.    Yes, thank you, yes, she was.

24         Q.    So do you see in the second

25  paragraph in 15 it says "just want to let

1              J. FISCHMAN
2    you know that when I was catching up with
3    Jennifer she made another reference to
4    being acting, so I took the opening to say
5    on that point now that our transition
6    period is over, I would like to speak to
7    you about what was behind that decision.
8    She immediately got teary and said I would
9    like to wait until the end of April to have
10   that discussion.  I told her that was
11   absolutely fine with me and we moved on to
12   other topics."  Do you recall that?
13        A.    I don't recall the teary eyed
14   part but I recall asking again to be
15   elevated to the full role because it was
16   undermining my credibility with clients,
17   and I also recall being made fun of at a
18   meeting with the president of Taiyo Nippon
19   Matheson Tri-Gas, where he made fun of me
20   being an acting general counsel and said
21   "are we all acting here" or something to
22   that effect and it was very embarrassing
23   and humiliating, so I think I did ask her
24   about that.
25        Q.    When did that exchange take

1                    J. FISCHMAN
2    place?
3        A.    It might have been a little
4    later but I frequently asked to be elevated
5    to get rid of the "acting" word.
6        Q.    Do you recall this exchange in
7    which Ms. Costa had offered to explain why
8    you were in acting role and the response
9    was that you didn't want to speak about it
10   at that time?
11       A.    I don't recall the specific
12   conversation but I note that Pat is already
13   preparing for any action that might need to
14   take down the road when it doesn't work
15   out.  So it seems like the two of them had
16   been talking about my failure or my
17   perceived failure before I even took the
18   job.
19       Q.    Ms. Fischman, I want to correct
20   you right now.  That's not what -- let me
21   make sure that the record is clear.  That's
22   not what Ms. Saunders says.  She says this
23   is important if this doesn't work out.  Not
24   that it was not going to work out.
25       A.    Well, also supports any action

1                    J. FISCHMAN
2  you may need to take down the road if this
3  doesn't work out so --
4       Q.    That doesn't presuppose that
5  it's going to be that you're going to fail,
6  correct?
7            MR. BERMAN:  Object to form.
8       A.    I read it differently than you
9  do.
10      Q.    The document stands for itself,
11 does it not?
12           MR. BERMAN:  Object to form.
13      A.    No, I don't think the document
14 stands for itself.  I think that there was
15 an intention behind the document and what
16 she said.
17      Q.    But the verbiage is what is set
18 forth in this document, the words itself,
19 whether there is an intent or meaning
20 that's different story.  The document
21 stands for itself means, as you know, that
22 the words that are on the page are what
23 they are, correct?
24      A.    Correct.
25      Q.    Do you have any reason to

1           J. FISCHMAN
2  dispute the statements that Ms. Costa put
3  forth in page 15 that you had rejected
4  being told the underlying reasons for not
5  receiving the general counsel position?
6       A.    I have no recollection of this
7  conversation so I can't opine on whether or
8  not this really took place and, in fact, I
9  can't say.  When Ms. Costa, she can
10 authenticate this, but I can't.
11      Q.    Do you have any document in
12 your possession and control that would
13 refresh your recollection as whether or not
14 this exchange between you Ms. Costa took
15 place?
16      A.    I do not.
17      Q.    What were the differences?  Now
18 you've held three positions, or held three
19 positions at MCHA, Corporate counsel,
20 acting general counsel, and assistant
21 general counsel.  What were the differences
22 between acting general counsel and
23 assistant general counsel?
24      A.    Well, you've provided me a
25 description of the profiles of these roles,

```
 1                  J. FISCHMAN
 2   so I'd be happy to read off what the
 3   differences are.
 4        Q.    Let me just, I can short
 5   circuit that.
 6        A.    Okay.
 7        Q.    Were the duties and
 8   responsibilities set forth in that
 9   document, in the document that you're
10   reading, or the description for the duties
11   and responsibilities for all three
12   positions, Bates stamps 817 to 822,
13   accurate?  We've already established that
14   the general counsel one is, what about the
15   other two?
16        A.    I actually, in looking at this,
17   would like to know what the origin of this
18   document is and the date that it was
19   created because as I mentioned, I don't
20   recall ever seeing this document, certainly
21   not for the general counsel position or the
22   assistant general counsel position.  So if
23   you have something that can authenticate
24   when that was actually created, that would
25   be helpful to me.
```

1              J. FISCHMAN

2        Q.    Looking at the substance of the

3    documents, we're just going to look at the

4    substance.

5        A.    Okay.

6        Q.    Are the duties and

7    responsibilities set forth in those

8    documents, that I've already said were 817

9    to 822, are they accurate?  We've already

10   established that the general counsel

11   position and CCO position, as described in

12   the document you have in your hand, is

13   accurate.  I'm now asking about the other

14   two positions.  Is that an accurate

15   depiction of the duties and

16   responsibilities of those positions as you

17   held them?

18       A.    I think that they are a good

19   overview of the duties and responsibilities

20   of the roles.

21       Q.    In paragraph 30 of your

22   complaint, if you could just take a look at

23   that.  You state that the GC is in charge

24   with assigning and delegating to each of

25   the lawyers, operating as an assistant

```
 1              J. FISCHMAN
 2  general counsel, and to supervise the work
 3  performed by those legal personnel and
 4  their subordinates.  Do you see that?
 5        A.    Aha.
 6        Q.    It's important, then, the
 7  lawyers that are below and report to the
 8  general counsel at MCHA tell them, tell the
 9  general counsel, the work that they're
10  working on; isn't that right?
11        A.    Yes, sometimes.
12        Q.    How is that possible?  Why the
13  qualifier?  If you as the general counsel
14  are responsible for the attorneys that
15  report to you, would you be comfortable
16  having lawyers that report to you not tell
17  you the work they're working on?
18        A.    Sure.
19        Q.    Under what circumstances?
20        A.    Well first of all, I would
21  trust that my assistant general counsel has
22  attained significant knowledge and
23  experience dealing with all of the
24  affiliated companies and that if you look
25  at how many affiliates there are, it's not
```

1          J. FISCHMAN

2    like there's just one business that you

3    support.

4              You support, or at least in my

5    experience, I supported more than 20 of

6    these businesses and that I, or any

7    assistant general counsel, or corporate

8    counsel, would have a variety of work that

9    they work on that they may not have had an

10   opportunity to pass it by the general

11   counsel because there are actually only so

12   many hours in the day, and the access to

13   the general counsel isn't always

14   uninterrupted and available.

15             I know that when I was

16   assistant general counsel, reporting

17   directly to the general counsel Donna or

18   even later to Nick, there was many times

19   where they were out of the office meeting

20   other businesses, travelling.  We

21   communicated a great deal, but there is

22   simply too many matters that each person is

23   responsible for you to have a handle on

24   every single matter that they work on.

25   Having said that, I would think that most

                    J. FISCHMAN
of the major matters you would expect some
basic knowledge of what was going on.

     Q.    And you would expect, too, that
those attorneys who were reporting to the
general counsel, that they would make the
general counsel aware of those matters,
correct?

     A.    Like I said, on the major
matters, especially litigation, you would
make sure that the general is kept informed
certainly on IP, and certainly on the
environmental litigation that I managed for
many years, on the HIV litigation I managed
for many years; I certainly had multiple
conversations with Donna.

     Q.    I'm going to refer to your
complaint for a moment.  In your complaint,
paragraph 60, you allege that you were
excluded from all meaningful interactions
with the company's Japanese leadership
including Ken Fujiwara, Masanori Sakaguchi,
and not permitted to interact with any
senior level Mitsubishi personnel situated
in Japan including MCHC executives Ken

```
1                    J. FISCHMAN
2    Fujiwara and Hidefumi Date.  Correct?
3         A.    Which paragraph?
4         Q.    That's paragraph 60.
5         A.    Yeah.
6         Q.    I'm going to ask you to take a
7    look at paragraph 60, 65; which we
8    discussed moments ago in substance.
9         A.    Yes.
10        Q.    But isn't it true that you
11   actually did communicate directly with Mr.
12   Fujiwara and Mr. Sakaguchi despite what you
13   have alleged, Ms. Costa allegedly
14   prohibited you from doing so?
15        A.    No, not in a meaningful way.
16        Q.    Let's take a look at
17   Defendant's 1217.  This is Bates stamped
18   1217.  This is an e-mail communication
19   between Mr. Sakaguchi and yourself in March
20   of 2018; is that right?
21        A.    Yes.
22        Q.    And in the top of that
23   document, Mr. Sakaguchi states that he's
24   very anxious in my new assignment, I'm
25   anxious to work and collaborate with you
```

```
1                    J. FISCHMAN
2    and your colleagues so as to be in the best
3    interest of MCHA's group company.  Do you
4    see that?
5         A.    I do.
6         Q.    That's a truthful statement by
7    Mr. Sakaguchi, correct?
8         A.    I really can't answer whether
9    that's a truthful statement.  Their words
10   are on the page.
11        Q.       Do you have any actual
12   factual reason to dispute the statement
13   that Mr. Sakaguchi states in this document?
14            MR. BERMAN:  Object to form.
15        A.    Other than the conversation I
16   had with Donna Costa in December of 2014
17   that I was not going to be interacting with
18   the Japanese colleagues at MCHC or
19   otherwise, this seems like a kind and warm
20   fluff statement just in response to my kind
21   and warm, you know, congratulations.  It's
22   just like a nice response.
23        Q.    He ends the paragraph by saying
24   I'm planing to travel to New York in the
25   week of April 20 and I hope to see you
```

```
 1                J. FISCHMAN
 2   then.  He saw you then, didn't he?
 3        A.    I think -- I don't actually
 4   know when I saw him.
 5        Q.    But you saw him on one of the
 6   trips to the United States; isn't that
 7   right?
 8        A.    I really couldn't say when that
 9   was.  I don't know.
10        Q.    But your answer affirmatively
11   states that you actually did meet Mr.
12   Sakaguchi when he was in the United States,
13   correct?
14        A.    Do you have documentation that
15   shows that I met with him on --
16             MS. COLWIN:  Can you read back
17         her statement please?
18             (Whereupon, the referred to
19         answer was read back by the
20         Reporter.)
21        Q.    So the answer to my question is
22   that there was an occasion when you saw
23   Mr. Sakaguchi.
24        A.    Yes, but I don't know when that
25   was and whether I was in this role or not.
```

```
 1              J. FISCHMAN
 2   I don't have any recollection of the dates
 3   of Mr. Sakaguchi coming to the United
 4   States and I actually feel like I read
 5   someplace that this trip was canceled, so I
 6   don't recall, but I'm open to hearing
 7   differently if you have evidence that I
 8   can't recall.
 9        Q.    Take a look at Exhibit 2018.
10   This is another direct communication you
11   had with Mr. Sakaguchi, correct?
12        A.    This is -- okay.  This is a
13   communication I had with Sakaguchi-san as
14   assistant general counsel, not as acting
15   general counsel, and I was already demoted
16   at that time and Nick was in charge.
17        Q.    That's not my question.  I see
18   the date.
19        A.    But you asked earlier.  Go
20   ahead, Mercedes, I'm sorry.  Go ahead.
21        Q.    So Mr. Sakaguchi tried to
22   cultivate a professional relationship with
23   you, did he not?
24        A.    No, he did not.
25        Q.    What's your factual basis for
```

1                    J. FISCHMAN
2      that statement that he did want to
3      cultivate a professional relationship with
4      you?
5          A.    I didn't have a professional
6      working relationship with him other than
7      sending him a report maybe once a month and
8      if I did, again, I have no recollection of
9      it.  If you have some support for my good
10     relationship with him, I'm absolutely open
11     to hear about it.
12         Q.    You felt comfortable enough, in
13     this direct communication with Mr.
14     Sakaguchi, to call attention to the way you
15     perceived his communication to you,
16     correct?  In this statement, you write
17     "this is what I gave you.  Please do not
18     continue to condemn my legal advice in such
19     a public manner.  It is unprofessional and
20     nasty."
21         A.    I can't really -- you don't
22     have the e-mail interaction that this is
23     responding to, so if you want to give me
24     that I'd be happy to then talk about it.
25         Q.    Sure, we'll get it for you.

1                          J. FISCHMAN
2      Then we'll return to this document.
3          A.    Okay.  Are we ready for a bio
4      break?
5          Q.    Sure.  No problem.
6                THE VIDEOGRAPHER:  The time on
7           the video monitor is 3:14 p.m.  We
8           are off the record.
9                (Whereupon, a short recess was
10          taken.)
11               THE VIDEOGRAPHER:  We are back
12          on the record.  The time on the video
13          monitor is 3:33 p.m., this starts
14          Media 4.
15         Q.    Ms. Fischman, we are showing
16     you what's been Bates stamped 1218 and
17     1219.  That is the complete exchange
18     between yourself and Mr. Sakaguchi.  Does
19     that help you put into context the exchange
20     between yourself and Mr. Sakaguchi?
21         A.    No, because it doesn't have the
22     e-mail that I sent to him originally, so if
23     you have that e-mail, that would be even
24     more helpful to put this in context.
25         Q.    Look at the last line of 1218.

                    J.  FISCHMAN
1
2   Where you say "please do not continue to
3   condemn my legal advice in such a public
4   manner.  It is unprofessional and nasty."
5   You would agree with me that that is a
6   pretty aggressive way of communicating,
7   would you not?
8       A.    Yes.
9       Q.    When you had been elevated to
10  acting general counsel, you were a member
11  of MCHA's leadership team, were you not?
12      A.    Yes.
13      Q.    And that leadership team was
14  led by Ms. Costa, correct?
15      A.    Yes.
16      Q.    And at the time that you were
17  elevated, you had Ms. Costa as president,
18  yourself as assistant general counsel,
19  Ms. Patricia Saunders, who we've already
20  identified as director of HR, Ms. Yoko
21  Katayama, who is the head of expat
22  services; Mr. Jeff Kuropatkin, who is the
23  VP of tax; Mr. Brian Conners, director of
24  internal audit; Mr. Harry Fukasawa who is
25  the director of IT and Mr. Shin Iguchi, who

```
 1                    J. FISCHMAN
 2   is the director of finance and accounting.
 3   Correct?
 4        A.    As far as I can recall, yes.
 5        Q.    So that would be, looking at
 6   the breakdown, that there were four women
 7   and four men; is that right?
 8        A.    You have it in front of you.
 9        Q.    So 50 percent of the MCHA
10   leadership team were women, were they not?
11        A.    50 percent of the people who
12   attended Donna's monthly or bimonthly
13   meetings appear to be women.
14             MS. COLWIN:  I'm going to
15          strike that as unresponsive.
16        Q.    My question is 50 percent of
17   the MCHA leadership team were women, were
18   they not?
19        A.    I think that the leaders were
20   people of director and above.  So I'm going
21   to say that three of the women were
22   leaders, yes.
23        Q.    Who did you believe was not a
24   leader amongst the list that I just gave
25   you?
```

1                    J. FISCHMAN

2          A.     Yoko.  She was a low level

3     person in the human resources department

4     responsible for making sure that all the

5     Japanese expats that come to the United

6     States -- you know, she handled their

7     visas, she made sure that they had, you

8     know, handled those kinds of things.  She

9     was an administrative person as far as I

10    understood.

11         Q.     Is there any evidence of gender

12    discrimination on the MCHA leadership team?

13         A.     No.

14         Q.     We have already established

15    that you reviewed documents that were

16    exchanged in this litigation.  Were you

17    aware that Ms. Costa had informed, after

18    she was informed of her promotion to

19    president of MCHA, she had discussed her

20    plans to hire and recruit a general counsel

21    from outside MCHA?

22         A.     No.

23         Q.     Were you aware of that?

24         A.     No.

25         Q.     Were you aware that in those

1                    J. FISCHMAN

2    conversations, she believed that the most

3    qualified candidate in the legal department

4    -- were you aware that Ms. Costa informed

5    the president of MCHA that you were the

6    most qualified candidate in the legal

7    department but she preferred that MCHA hire

8    a general counsel from outside MCHA due to

9    your lack of experience at the time?

10        A.    What's the question?

11        Q.    Were you aware that Ms. Costa

12   informed the president of MCHA that you

13   were the most qualified candidate in the

14   legal department but she preferred to hire

15   a general counsel from outside MCHA due to

16   your lack of experience at the time?

17        A.    I am unaware of that.

18        Q.    Were you aware that MCHC, which

19   is MCHA's parent company, as we've already

20   identified on the record, preferred that

21   MCHA promote you rather than hire someone

22   from outside the company due to cost and a

23   cultural preference to promote from within?

24        A.    I'm unaware of that.

25        Q.    I'm showing you what's been

1                    J. FISCHMAN
2    marked as 347 to 350.  I'm going to call
3    your attention to page Bates stamped 347.
4    Do you see the beginning of the second
5    paragraph, it says the reason those of us
6    in Japan have not agreed to the idea of
7    hiring new GC after your taking the
8    president's position was because of the
9    anticipated increase in the cost at the
10   legal department or MCHA.
11        A.    Yes.
12        Q.    You have no reason to doubt
13   that statement as anything other than
14   accurate, correct?
15        A.    This is a statement made nearly
16   a year after the decision was made, so
17   there may have been other influences that
18   are not included in this sentence that may
19   have influenced the decision.  So I will
20   say that the sentence is there and I have
21   no reason to doubt that this sentence is
22   true, but I also think that it's not the
23   full story.
24        Q.    What evidence do you have, what
25   documentary evidence do you have, to

1              J. FISCHMAN
2   dispute that being anything other than
3   accurate?
4         A.    Well, I didn't dispute that it
5   was accurate.  All I said was that it
6   wasn't the full story of what was going in
7   Japan in 2014 for which there's no
8   documentary evidence of any discussion of
9   who the GC would be.
10        Q.    What's your factual basis for
11  your belief that something was going on at
12  that time?  What's the basis of your
13  belief?
14        A.    The basis for my belief is that
15  I was well qualified for the position.  I
16  had been in the company for eight years.  I
17  was supporting three quarters of the
18  business units at the time.  I had ample
19  experience and I was not promoted to the
20  general counsel position.  That's the
21  factual basis for my position.
22        Q.    I just want to make sure that
23  the record is clear.  This statement which
24  is set forth in this document, 347, is very
25  simple.  Ms. Costa wanted to hire outside

1                    J. FISCHMAN

2    of MCHA.  She did want to promote within

3    MCHA.  Management in Japan states that

4    here, like Ken Fujiwara, said the reason

5    for that is because of expense and having

6    said that, you have no documentary evidence

7    of anything that disputes that as being

8    untrue.

9         A.    I don't have any documentary

10   evidence but I do note that Ken Fujiwara

11   was in charge of the decision, as was

12   Date-san, as indicated in this document,

13   that his department was primarily

14   responsible for the management of MCHA.  It

15   also states in this document that I don't

16   think --

17              MS. COLWIN:  Ms. Fischman,

18         there's no question pending.  Move to

19         strike.

20         A.    Okay, but it's hard to, you

21   know, keep the context of the document.

22         Q.    The document speaks for itself.

23   We've established that a few times on the

24   record so you'll be able to use the

25   document.

```
 1              J. FISCHMAN
 2      A.    Okay.  Sorry, Mercedes.
 3      Q.    No worries.  You've already
 4  described the training that you received
 5  from Donna and I just want to ask a few
 6  other questions.  Didn't Donna speak to you
 7  about pertinent laws?
 8      A.    I'm sorry?
 9      Q.    Didn't Donna talk to you about
10  pertinent laws that you may be facing as
11  acting general counsel?  During her
12  training and coaching, didn't she talk to
13  you about certain laws?
14      A.    Can you be more specific
15  please?  What laws?
16      Q.    What laws do you recall that
17  she talked to you about, if any?  If you
18  don't recall then we'll move on.
19      A.    I'm sorry, I don't recall.
20      Q.    Is there a document that would
21  refresh your recollection as to what laws
22  she may have spoken to you about during
23  your training and coaching?
24      A.    If you have an outline or a
25  record of what she talked about that would
```

```
 1                J. FISCHMAN
 2   certainly help.
 3        Q.   Do you have a recollection of
 4   the programs that Ms. Costa talked to you
 5   about?
 6        A.   What kind of programs?  I don't
 7   understand your question.
 8        Q.   I'm going to rephrase that.
 9   Didn't Ms. Costa also speak to you about
10   working on your emotional intelligence?
11        A.   I recall that in the timeframe
12   of 2015, emotional intelligence was a topic
13   in a lot of business magazines and maybe
14   even on like the cover of Time Magazine and
15   it was one of those sort of trendier topics
16   to talk about in management, so yeah, I'm
17   sure we talked about emotional intelligence
18   at some point in time.
19        Q.   Didn't she also talk to you
20   about cultural awareness?
21        A.   Yes, we had talked about
22   cultural awareness in 2008, 2009, 2010,
23   sure.  One of the things I think she said
24   earlier in one of my performance reviews
25   was that I had good culture awareness.
```

1           J. FISCHMAN
2  That's why I was invited to go, pretty
3  early on, with her on a trip to Japan, so
4  yeah.
5       Q.    Didn't she ask you to work on
6  your tone in communications?
7       A.    Not that I recall.
8       Q.    Didn't she ask you to focus on
9  how you communicate and have the cultural
10 awareness when you are providing
11 communication to individuals outside of
12 MCHA?
13      A.    Not that I recall.
14      Q.    Didn't she say to you, on
15 various occasions, in your training and
16 coaching, that she wanted you to develop
17 relationships to do business within the
18 affiliates of MCHC and to focus on how to
19 use your tone and take care of the unsaid,
20 "reading the air" quote on quote?
21      A.    No, never.
22      Q.    She never said that to you?
23      A.    Never.
24      Q.    In your role as acting general
25 counsel, Ms. Costa provided quite a bit of

```
 1                J. FISCHMAN
 2   feedback to improve your performance; isn't
 3   that right?
 4        A.    No.
 5        Q.    She never gave you feedback on
 6   how to improve your performance?
 7        A.    I can't recall anytime that she
 8   actually did between April 1st and that one
 9   e-mail that I told you about in July.  I
10   actually don't recall any other time.
11        Q.    Okay.  In the training and
12   coaching that Ms. Costa provided to you,
13   which we have ample testimony from you on
14   the record, there is no evidence of
15   discrimination by her?
16             MR. BERMAN:  Object to form.
17        A.    I think the whole choice of me
18   becoming acting was, in and of itself, a
19   discriminatory action, so yes.
20        Q.    So do you believe that the
21   training and coaching and investment that
22   Ms. Costa gave to you, to make sure that
23   you were successful as the acting general
24   counsel, leading up to being promoted to
25   general counsel, was pretext for
```

```
 1                  J. FISCHMAN
 2   discrimination?
 3              MR. BERMAN:  Object to form.
 4        A.    I don't understand your
 5   question.
 6        Q.    What is it that you don't
 7   understand and I'll rephrase it for you?
 8        A.    Can you just rephrase it?  It's
 9   a lot of compound questions.
10        Q.    It wasn't compound.  Is it your
11   testimony that the time and energy and
12   commitment that Ms. Costa devoted to you,
13   during your due diligence period leading up
14   to being promoted to acting general
15   counsel, and after you were promoted to
16   acting general counsel, in her training and
17   coaching, was somehow discriminatory?
18        A.    First of all, we haven't
19   established -- you've made it seem like
20   this extensive, I mean, training and
21   coaching.  I explained it as a data dump
22   where she told me everything she was
23   working on.  I do not have a specific
24   recollection of quote "training and
25   coaching" that you've referred to so I
```

```
1                    J. FISCHMAN
2    really -- that's my answer, sorry.
3         Q.    Okay.  I'll let the record
4    speak for itself.  We don't have to go back
5    there.  I'd ask that you take a look at
6    1179 and 1180.  1179 and 1180, do you have
7    document in front of you?
8         A.    I do.  I have the e-mail in
9    front of me.  I don't have the document
10   that it refers to in front of me.
11        Q.    Well, I'm referring to the
12   Bates stamped two-page document that I've
13   had Brittany just hand to you.  So it's an
14   e-mail exchange between yourself and
15   Ms. Costa, correct?
16        A.    Yes.
17        Q.    And in it you're asking Ms.
18   Costa to give you feedback on a report
19   titled MCHA Compliance Report, correct?
20        A.    Yes.
21        Q.    And you ask Ms. Costa to review
22   the attached before you send it to out to a
23   larger group; isn't that right?
24        A.    That is correct.
25        Q.    Why were you seeking her input?
```

1            J. FISCHMAN
2       A.    I believe this was the first
3   compliance report that I would be sending
4   in my role as acting general counsel, and
5   so I wanted to make sure that the format
6   was what she had used or thought was a good
7   format.  Again it was the first time I was
8   sending out a compliance report, Q1, so I
9   was seeking her input because she had been
10  the one responsible for sending it out
11  beforehand.  It was probably because it was
12  also the first nonlegal report that I would
13  be providing.
14      Q.    And you trusted that Ms. Costa
15  would give you the appropriate counsel on
16  how to modify the report if necessary,
17  correct?
18      A.    I asked her to take a look at
19  it.
20      Q.    That's not the question.  You
21  trusted that Ms. Costa would give you the
22  appropriate advice when looking at this
23  document, correct?
24      A.    I'm not sure what you mean by
25  appropriate advice.  I trusted that if she

```
 1              J. FISCHMAN
 2   reviewed it first it would comport with her
 3   expectations.
 4        Q.    And you trusted that if any
 5   modifications were necessary, that she
 6   would give you the right advice on how to
 7   modify it, correct?
 8        A.    Yes, so that it would comport
 9   with her expectations.
10        Q.    1182.  This is during the
11   period of the training, coaching and
12   counsel that we have on the record prior to
13   you ascending into the acting general
14   counsel role.  It's an e-mail exchange
15   between yourself and Ms. Costa, correct?
16        A.    Mmhmm.
17        Q.    Is that a yes?
18        A.    I'm so sorry.  Yes.
19        Q.    And in it, you were providing
20   your CV; isn't that right?
21        A.    Yes.
22        Q.    And you were also providing
23   language for it to be used in the document
24   that shows that you were being elevated to
25   acting general counsel, that's reflected in
```

1                    J. FISCHMAN
2   page 1183; isn't that right?
3        A.    Okay.  Can you ask your
4   question again?
5        Q.    So this document exchange,
6   you're providing your CV to Ms. Costa;
7   isn't that right?
8        A.    That is correct.
9        Q.    And you're also providing
10  language to be used in the notification
11  about your elevation to acting general
12  counsel, correct?
13       A.    No, that is not correct.
14       Q.    What is the top of 1183.  What
15  information were you providing to her?
16       A.    To give you the context of what
17  this request, MTPC which is Mitsubishi
18  Tanabe Pharma Corp, which is a Japanese
19  company, requested my CV in order to make a
20  decision as to whether or not they would
21  allow me to be secretary of their American
22  subsidiaries.
23            So Donna asked me to provide
24  her with my CV but also she said, in
25  addition to a CV, to introduce who she is

1                    J.  FISCHMAN

2   officially, MTPC would like information

3   about her planned position in coming April.

4   I actually have no idea how MTPC introduced

5   me.  All I know is that they had to approve

6   me in order for me to be on their boards in

7   the United States.

8          Q.     Look at 1182.

9          A.     Yes.

10         Q.     And Ms. Costa provided

11  constructive criticism on how to approach

12  this exchange, correct?  In the middle of

13  that page.

14         A.     She corrected some typos that I

15  had in my CV probably and where I wrote --

16  actually on 1183, I will be responsible for

17  all legal matters in the Americas for all

18  subsidiaries that MCHA supports and --

19         Q.     They're not subsidiaries,

20  right?

21         A.     She corrected me that they are

22  not subsidiaries but rather we call them

23  affiliates because they are affiliates of

24  MCHA but they are, in fact, subsidiaries of

25  MCC, MCHC, and other companies like

```
 1                    J. FISCHMAN
 2   Mitsubishi -- at the time there was another
 3   Mitsubishi Plastics Inc. so I misused the
 4   term but it wasn't incorrect but from that
 5   point forward I never made that mistake
 6   again.  I was happy to change it.
 7        Q.    And it said on the very top you
 8   said "noted, Donna noted, wasn't being as
 9   careful as I should have been.  Must still
10   be a bit groggy."  You weren't feeling well
11   at the time; isn't that right?
12        A.    I must have, whether I'd been
13   out sick or just home from a trip.
14        Q.    In the first part of the
15   exchange Ms. Costa wrote "I hope you are
16   feeling better!"  Did she not?
17        A.    I didn't see that, I'm sorry.
18   Do I have that?
19        Q.    You do.
20        A.    I hope you're feeling better,
21   yeah.
22        Q.    Exclamation point.
23        A.    So I tried to do this when I
24   was home sick, which I frequently tried to
25   do, which was work even when I was home
```

1                    J. FISCHMAN

2    sick.

3         Q.    1026 to 1028.  These are e-mail

4    exchanges between yourself and Ms. Costa,

5    correct?

6         A.    Mmhmm.

7         Q.    And in these e-mail exchanges,

8    Ms. Costa is providing you with counsel, is

9    she not?

10        A.    Yes.  This was the e-mail that

11   I was referring to earlier in my testimony

12   today where I said that this was probably

13   the only real constructive feedback that I

14   received during the course of my being

15   acting general counsel, and it was the

16   first time and, in fact, I think if you'll

17   look through the record, this is the first

18   time she'd ever written me a constructive

19   feedback in my tenure at Mitsubishi.  I

20   don't recall ever receiving such feedback,

21   such extensive feedback.

22        Q.    Ms. Fischman, we've gone

23   through some your evaluations.  There's

24   quite a bit of constructive feedback that

25   Ms. Costa gave to you, did she not?

1          J. FISCHMAN

2      A.     Like what?

3      Q.     We've already gone through your

4  2015 -- I don't have the document in front

5  of me, but we've gone through evaluations

6  which were in front of you where Ms. Costa

7  was very clear in giving you feedback,

8  constructive feedback, correct?

9      A.     If you could give me the

10  example that you're thinking of that would

11  be helpful.  I thought it was -- which one

12  are you speaking of?

13      Q.     I'm going to ask you to take a

14  look at 41 to 57, 1359 to --

15      A.     Hold on, one a time, please.

16      Q.     41 to 57.

17      A.     Which on is that?

18      Q.     It's the one that's red lined.

19  There's your year-end evaluation.  There's

20  your mid-year evaluation.

21      A.     Stop for a second, please.  The

22  red line is mine.  I red lined, so what is

23  it that you're specifically pointing to?

24      Q.     I'm going to let the record

25  state what's already on the record but

```
 1              J. FISCHMAN
 2   you've already described the back and forth
 3   communication that you had with Ms. Costa
 4   pertaining to training, coaching and
 5   constructive criticism, and constructive
 6   feedback that you received during the time
 7   that you worked for her?
 8              MR. BERMAN:  She's referring to
 9         the performance appraisals we've
10         reviewed.
11        Q.    I'll move on.
12        A.    I don't know what you're
13   referring to.  Sorry.  If you would like to
14   bring up a sentence, or a page, or
15   something, you can tell me what you mean.
16        Q.    I think the record will stand
17   for itself what you received from Ms. Costa
18   under her supervision.  1234 to 1238.
19              MS. COLWIN:  We are going to go
20         off the record because this is fairly
21         lengthy.  I'm going to ask you to
22         take a look at it.
23              THE VIDEOGRAPHER:  The time on
24         the video monitor is 4:06 p.m.  We're
25         off the record.
```

1              J. FISCHMAN

2              (Whereupon, an off-the-record

3          discussion was held.)

4              THE VIDEOGRAPHER:  We are back

5          on the record.  The time on the video

6          monitor is 4:10 p.m.

7      Q.    Ms. Fischman, you've had an

8  opportunity to look at Defendant's

9  Exhibit 1234 to 1238, correct?

10     A.    I have.

11     Q.    I'm going to ask you to take a

12  look at what's Bates stamped 1235 and it's

13  an e-mail exchange between Mr. Fujiwara to

14  you with a copy to various individuals

15  including Ms. Costa, correct?

16     A.    Yes.

17     Q.    And in this e-mail, Mr.

18  Fujiwara is criticizing you for the

19  exchange between yourself and Robert

20  Dunkley at Lucite, isn't that right?

21     A.    I don't characterize this as a

22  criticism, because he is simply suggesting

23  that we need to be more soft with this

24  attorney in the UK, and I don't see any

25  criticism of my language that I use.

1              J. FISCHMAN

2      Q.    It says very specifically in

3  the beginning of his e-mail, I'm so sorry

4  to see this sort of e-mail fighting that is

5  totally counterproductive and only worsens

6  the relationship between an MCHA and

7  Lucite.  He's characterizing your exchanges

8  with Mr. Dunkley as e-mail fighting.  That

9  is a criticism, is it not?

10     A.    I think he's reacting to the

11 emotional response that Robert gave to my

12 very businesslike e-mail, which does not

13 seem to indicate any attack or personal

14 attack whatsoever, and Mr. Fujiwara

15 definitely saw that there was something in

16 Robert Dunkley's e-mail that he was upset.

17 But the context of this, the context of

18 this situation, was that there was a lot of

19 pressure on the US and the UK Lucite

20 businesses, for which I was helping to

21 support, and Robert was very difficult from

22 everybody's perspective, and we were just

23 all working to find a way to satisfy him.

24 And as you can see in the following e-mail,

25 I had a very amicable conversation with him

1          J. FISCHMAN

2    where I believe that the incident was

3    behind us and that the issues that Lucite

4    had with the entire project did not

5    originate with me or MCHA.

6          Q.    Looking at your e-mail response

7    in 1234, you understood that you had a

8    fractured relationship with Mr. Dunkley

9    that had to be repaired, correct?

10         A.    I believe that there was a

11   misunderstanding --

12         Q.    You're not answering the

13   question.  Didn't you, by expressing "I

14   think our relationship can improve," meant

15   that you had a fractured relationship with

16   Mr. Dunkley that needed to be fixed,

17   correct?

18         A.    No, I disagree.

19         Q.    And you give assurances, do you

20   not, that the relationship you had with

21   Mr. Dunkley will improve in time, correct?

22         A.    Yes.

23         Q.    Take a look at 186 to 187.  Ms.

24   Fischman, if you can take a look at this

25   Document, 186, 187, you have seen this

```
 1                    J. FISCHMAN
 2  document before, have you not?
 3       A.    I've seen this in discovery.
 4       Q.    So you reviewed it before
 5  today, isn't that right?
 6       A.    I have read it recently when
 7  you disclosed it, or produced it, rather.
 8       Q.    So let's begin when you're
 9  ready in the third sentence, the second
10  sentence -- third sentence and second
11  paragraph and before we begin, tell me what
12  this document is?
13       A.    What do you mean?
14       Q.    Do you know what this document
15  is?
16       A.    No.
17       Q.    This is an e-mail exchange
18  between Ms. Costa and Ms. Saunders.  This
19  is a draft e-mail that she intends to send
20  to Mr. Fujiwara, correct?
21       A.    That's what she writes here.
22       Q.    And she's asking for
23  Ms. Saunders to give her feedback; isn't
24  that right?
25       A.    That's what she says in the
```

1              J. FISCHMAN

2    e-mail.

3         Q.     In the third sentence in the

4    second paragraph, Ms. Costa writes

5    "although Jennifer is smart, the breadth

6    and depth of her legal expertise were

7    limited.  She had no management experience

8    and she often behaved in a way that was

9    incompatible with the position.  I've

10   received many complaints about her style

11   and attitude that impacted both her

12   credibility and effectiveness."  At the

13   time that this was written, so this is

14   2015, prior to your elevation to acting

15   general counsel, you had no management

16   experience, correct?

17        A.     I had some limited management

18   experience in my capacity at Raytheon where

19   I was on the leadership team there and

20   responsible for legal matters there and

21   supervising a paralegal and an assistant,

22   legal assistant, and then in my promotion

23   to acting -- I mean assistant general

24   counsel, I was responsible for managing

25   Mika.  We had very small department, so I

1                    J. FISCHMAN
2   would say there weren't many people to
3   manage; however, I was responsible for
4   managing the legal matters across multiple
5   businesses and over multiple years, so I'm
6   going to disagree with that statement.
7             MS. COLWIN:  I'm going to move
8         to strike as unresponsive.
9        Q.    This statement say that you had
10  no management experience.  You would agree
11  with me that you had no management
12  experience with respect to attorneys?  You
13  never managed attorneys prior to your
14  elevation to acting general counsel,
15  correct?
16       A.    I had no experience with
17  managing attorneys who worked directly for
18  me within the legal department.  However, I
19  managed outside counsel for years and the
20  management of outside counsel is very
21  important type of management.
22       Q.    You'd agree with me, would you
23  not, that managing outside counsel in
24  litigation matters is very different than
25  managing attorneys that report in to the

```
 1                J. FISCHMAN
 2   general counsel, wouldn't you agree?
 3        A.    I don't agree entirely.
 4        Q.    What's the basis for your
 5   disagreement on that statement?
 6        A.    I've managed both and I believe
 7   that management of individual performance
 8   and productiveness is universal.
 9        Q.    You understood that Ms. Costa
10   was providing this feedback based on her
11   experiences with you in this new role as
12   acting general counsel, correct?
13        A.    What feedback are you --
14        Q.    She is providing her perception
15   of how you were doing in this new position
16   as acting general counsel; isn't that
17   right?
18        A.    That is not my takeaway from
19   this document.  My takeaway from this
20   document is --
21        Q.    This is not her opinion?  This
22   is not her perception of how your --
23        A.    No, this is paper in the record
24   so that she has a basis to demote me.
25             MR. BERMAN:  Objection to form
```

```
1                    J. FISCHMAN
2         because the witness has not been
3         allowed to complete her responses.
4              MS. COLWIN:  You can read it
5         back, Enrique.  Just read back her
6         response and I'll pick it up from
7         there.
8              (Whereupon, the referred to
9         answer was read back by the
10        Reporter.)
11        Q.    So is it your testimony that
12   this sentence that I read into the record,
13   that's in this document, 186, 187,
14   specifically 186 is false?
15        A.    I believe that this entire
16   document is false.  I think it's
17   manufactured and fabrication in order to
18   support a decision.
19        Q.    What factual basis do you have
20   to set forth that this is a false document?
21        A.    She never sent this document
22   and where is her status report on how I was
23   doing from April to June?  This document is
24   a fabrication.
25        Q.    If we were to --
```

1                    J. FISCHMAN

2        A.    The things in it are not true

3    Mercedes.

4        Q.    But you are saying that her

5    perceptions are false.  What I'm asking you

6    is what written documentation do you have

7    to support that?

8        A.    The written documents that I

9    have contradict these.  I have eight years

10   of performance reviews where not a single

11   one of these things are mentioned.  I have

12   accolades from client who said that I was

13   an excellent lawyer.  This, it's nonsense.

14       Q.    But Ms. Fischman, this

15   criticism that's in this document, you'd

16   agree with me, is about your performance as

17   an acting general counsel, not as a

18   corporate counsel and not as an assistant

19   general counsel, it is your performance as

20   an acting general counsel, correct?

21       A.    Tell me what you -- you know I

22   kind of lost track of what your question is

23   so why don't you start with what your exact

24   question is --

25       Q.    My question was very clear, Ms.

1                    J. FISCHMAN

2    Fischman.

3         A.    But I've forgotten it.

4              MS. COLWIN:   Can we have that

5         repeated please.

6              (Whereupon, the referred to

7         question was read back by the

8         Reporter.)

9         A.    This is a document that was

10   never provided to me and --

11        Q.    You're not answering the

12   question, Ms. Fischman.  Just answer the

13   question.  This is about your position as

14   an acting general counsel, not about your

15   prior positions within MCHA; that's all I'm

16   asking.

17        A.    It does appear to be written

18   during the time that I was acting general

19   counsel, yes.

20        Q.    And in the document itself

21   Ms. Costa writes "she often behaved in a

22   way that was incompatible with the

23   position."  In the subheading it says

24   general counsel, correct?

25              THE WITNESS:  Can you read back

1                    J. FISCHMAN
2          that question.
3                    (Whereupon, the referred to
4          question was read back by the
5          Reporter.)
6          A.    Can you point me to the
7    paragraph where you're reading from,
8    please?
9          Q.    Second paragraph, same sentence
10   that we on have on the record.
11         A.    Second paragraph.
12         Q.    Third sentence.
13         A.    I don't know what she's
14   referring to in that sentence.
15         Q.    Do you have any reason to
16   believe that the position that she's
17   writing in that statement is anything other
18   than general counsel?
19         A.    I have no idea.  It's a bit
20   vague, especially with the parenthetical
21   afterwards.  It's definitely vague.
22         Q.    Above that it says I'm writing
23   to provide you with a status report on
24   Jennifer to explain why I would like to
25   replace her as general counsel.  So

```
 1                J. FISCHMAN
 2   presumably this entire document is about
 3   your performance as a general counsel;
 4   isn't that right?
 5        A.    This first paragraph is about
 6   before I was general counsel, so it's not,
 7   right; it's past tense, so no.
 8        Q.    Now this communication about
 9   replacing you as general counsel is dated
10   on August 7, 2015, correct?
11        A.    Yes.
12        Q.    Look at the top of the
13   document, and you've seen from documents
14   that are produced in this litigation, that
15   the first date that Mr. Oliva and Ms. Costa
16   met was on August 9th.  That was before the
17   first time --
18        A.    Sorry, I don't know.  I don't
19   know anything about her meetings with Nick
20   Oliva.
21        Q.    If you could take a look at
22   Bates stamp 35.
23             MS. COLWIN:  I just want to
24        note for the record, and it will be
25        established through testimony, that
```

```
 1                J. FISCHMAN
 2        August 24th is first time that Ms.
 3        Costa and Mr. Oliva met in 2015.
 4             MR. BERMAN:  Objection.  That's
 5        not a question.
 6             MS. COLWIN:  It's on the
 7        record.
 8             MR. BERMAN:  Are you
 9        testifying?
10        Q.    Do you have any reason to
11   dispute the fact that Ms. Costa and Mr.
12   Oliva met on August 24th, 15 days after
13   this communication was written to
14   Ms. Saunders?
15        A.    Yes, because I've been provided
16   no evidence of their meeting or lack of
17   meetings.
18        Q.    Do you have any evidence to
19   establish that they met -- no, I'm asking
20   you, Ms. Fischman.  Do you have any
21   evidence that --
22        A.    I have no evidence that they've
23   ever met because I am not Nick or Donna and
24   I cannot testify as to when they met.  I
25   mean come on.  I'm not trying to be cute.
```

```
1                    J. FISCHMAN
2    I'm just you're asking me like, you know.
3         Q.    Okay.  The records speaks for
4    itself.  Exhibit Bates stamped 35.  You've
5    seen this document before, have you not?
6         A.    Yes.
7         Q.    And this is a document that was
8    addressed to you from Kelli Troccoli,
9    correct?
10        A.    Yes.
11        Q.    She worked at MCHA, we've
12   already established that; isn't that right?
13        A.    Yes.
14        Q.    And in it Ms. Troccoli is
15   advising both you and Ms. Costa that she
16   has a serious illness; isn't that right?
17        A.    That's what it says.
18        Q.    Did you believe her?
19        A.    I never received a doctor's
20   note or even what the serious illness was,
21   so I had to take it at face value.
22        Q.    That would be managed through
23   HR and Ms. Saunders, is that right, any
24   doctor notes?
25        A.    I would expect so.
```

```
 1                    J. FISCHMAN
 2        Q.    Now, by the way, you were
 3   promoted to acting general counsel, you had
 4   been working with Ms. Troccoli for nearly
 5   seven years; isn't that right?
 6        A.    Yes.
 7        Q.    And during that time
 8   Ms. Troccoli had reported directly to Ms.
 9   Costa?
10        A.    Correct.
11        Q.    And then when you were elevated
12   to acting general counsel, she began to
13   report to you; isn't that right?
14        A.    Yes.
15        Q.    Bates stamp 1040 to 1044.  Do
16   you recognize this document?
17        A.    Yes, I do.
18        Q.    And you recognize this document
19   as an e-mail exchange between yourself,
20   Ms. Saunders, with a copy to Donna Costa,
21   correct?
22        A.    Yes.
23        Q.    And in that first page of 1040,
24   you ask Ms. Saunders to help you guide your
25   relationship with Ms. Kelli, correct?
```

1                    J. FISCHMAN
2           A.    Can you repeat that, Mercedes?
3    I'm sorry, I was reviewing the document
4    while you were talking.  I apologize.
5           Q.    No worries.  You were seeking
6    guidance from Ms. Saunders on how to manage
7    Kelli Troccoli in this e-mail exchange,
8    correct?
9           A.    Yes.
10          Q.    What were the underlying
11   reasons that you were seeking guidance from
12   Ms. Saunders pertaining to your
13   relationship with Ms. Troccoli?
14          A.    Ms. Troccoli was Donna's
15   assistant for many years, even before I
16   began at the company, and she made it very
17   clear that she was very unhappy when I was
18   elevated to acting general counsel by
19   spending a lot of time in Donna's office
20   crying.  And she was disrespectful to me on
21   a number of occasions, and I knew that
22   Donna and I had talked about the fact that
23   Donna was not going to be taking Kelli as
24   her assistant when she became president.
25   And back in December, and during those

```
 1                J.  FISCHMAN
 2   December meetings, Kelli was one of the
 3   topics.
 4               Kelli did not want to work for
 5   me and I wanted to figure out a way to
 6   improve that relationship.  I often sought
 7   guidance from Donna, but she asked me to
 8   speak with Pat.  So Pat, being the HR
 9   manager, I felt it was constructive to work
10   with Pat on learning to get the best
11   productivity out of Kelli.
12        Q.   Didn't you seek counsel from
13   both Ms. Costa and Ms. Saunders regularly
14   in order to manage the relationship with
15   Ms. Troccoli and others in the department?
16        A.   I don't think it would be
17   unusual for me to say that I -- that part
18   of the transition was discussing the best
19   way to, as I said in one of our earlier
20   exchanges, to go from peer to leader is
21   often a difficult transition and so, yeah I
22   definitely sat with both Donna and Pat in
23   discussions on the best way to move forward
24   in that way.
25               MS. COLWIN:  Can I take a look
```

```
 1                    J. FISCHMAN
 2        at 892.
 3              THE WITNESS:  I need a break.
 4              THE VIDEOGRAPHER:  The time on
 5        the video monitor is 4:38 p.m.  We
 6        are off the record.
 7              (Whereupon, a short recess was
 8        taken.)
 9              THE VIDEOGRAPHER:  We are back
10        on the record.  The time on the video
11        monitor is 4:58 p.m.  This starts
12        media 5.
13              (Whereupon, Document was marked
14        as Defendant's Exhibit 892 for
15        identification as of this date.)
16        Q.    Ms. Fischman, I'm showing you
17   what's been marked as 892.  You have seen
18   this document before today, correct?
19        A.    It was in your document
20   production and I did see it.
21        Q.    Do you recognize this document
22   other than when it was produced?
23        A.    No.
24        Q.    Do you have an understanding of
25   what this document is?
```

```
 1                J. FISCHMAN
 2        A.     No.
 3        Q.     In June of 2015, didn't Ms.
 4   Costa describe you as being defensive in
 5   your communication with her?
 6        A.     Not that I have any
 7   recollection of.
 8        Q.     In June of 2015, didn't Ms.
 9   Costa say that she felt you always needed
10   to have the last word when communicating
11   with her?
12        A.     I've never heard her say that
13   to me before.
14        Q.     Didn't Ms. Costa say to you
15   learn to say yes, okay, I agree?
16        A.     I don't recall her ever saying
17   those words to me.
18        Q.     Didn't she say to you, in June
19   of 2015, you have to listen more and talk
20   less?
21        A.     I don't have any recollection
22   of that.
23        Q.     Didn't she also give you
24   constructive feedback that you need to read
25   e-mails thoroughly and not just respond to
```

```
 1                    J.  FISCHMAN
 2   it?
 3        A.    I have no recollection of that.
 4        Q.    Take a look at Exhibit 1206.
 5   Taking a look at 1206, that is your e-mail
 6   communication between you and Ms. Saunders,
 7   correct?
 8        A.    Yes, it is.
 9        Q.    And this is in July of 2015; is
10   that right?
11        A.    Yes, it is.
12        Q.    You were commending Ms.
13   Saunders for the advice that she had given
14   you regarding an interaction you had with
15   Ms. Troccoli; isn't that right?
16        A.    Yes, I believe this is in
17   response to Exhibit 1040 where I requested
18   her assistance.
19        Q.    Who did you, in the legal
20   department at MCHA, did you admire?
21             MR. BERMAN:  Object to form.
22        A.    In what way?
23        Q.    Who did you admire in the legal
24   department at MCHA?
25        A.    At what time?
```

1                    J. FISCHMAN

2          Q.    I'm talking about 2015, the

3     time you were acting general counsel, who

4     did you admire?

5          A.    In the legal department.

6          Q.    Strictly legal department.

7          A.    Certainly, I liked everybody.

8     I always admired Katherine Roach.  Steven

9     Rose was terrific; I hired him.  Joe

10    Sherinsky, great people, and Mikosami, I

11    admired her actually a great deal.

12         Q.    This is in 2015.  Now from 2008

13    to 2015, who did you admire?

14         A.    Well, of course, I admired my

15    boss, Donna Costa, and Katherine Roach and

16    who else was in the legal department?

17    Nathan Gallup.  Admired is a very

18    subjective word.  I admired all of them.

19         Q.    Who's all of them?

20         A.    Those people that I just named.

21         Q.    Between 2008 and 2015, who did

22    you respect in the legal department?

23         A.    Same people.

24         Q.    And 2015?

25         A.    Same people.

```
 1                    J. FISCHMAN
 2        Q.    And in 2015?
 3        A.    Same people.
 4        Q.    In 2015 to 2017, who did you
 5   respect within the legal department at
 6   MCHA?
 7        A.    Well, let's see.  I respect --
 8   I respected every member of the legal
 9   department.  And I'd like to go back and
10   revise my answer from the earlier response
11   to from 2008 to 2015, I respected every
12   employee of MCHA and every member of the
13   legal department.
14        Q.    How about with respect to the
15   legal acumen, the individuals exhibited in
16   MCHA legal between 2008 and 2015?
17        A.    Yeah, can you repeat the
18   question, Mercedes, just a little bit
19   clearer?
20        Q.    Sure.  Who did you respect with
21   respect to legal skills, legal acumen, who
22   did you respect in the MCHA legal
23   department between 2008 and 2015?
24        A.    I respected all of the lawyers
25   in the legal department.
```

1                    J. FISCHMAN
2        Q.     And what is your answer for
3    2015?  Who did you respect with respect --
4        A.     Same answer.
5        Q.     -- legal competency, their
6    legal skills?
7        A.     Same answer.  I respected all
8    of the members of the legal department up
9    until my termination in 2017.
10       Q.     In 2015 to 2017, who did you
11   admire within the MCHA legal department?
12              MR. BERMAN:  Object to form.
13       A.     I have answered that already.
14       Q.     That's a different timeframe.
15       A.     Who did I admire in the legal
16   department?  My admiration didn't wane.  I
17   still admired Katherine Roach and -- seems
18   a little silly but I'd like to know what
19   the actual definition is of the word
20   "admired" and what you're looking for.
21       Q.     I'm not looking for anything
22   other than your testimony and your truthful
23   statements, Ms. Fischman.
24       A.     Obviously, but I guess admire
25   is kind of a broad term to use and --

                    J. FISCHMAN

1

2      Q.    And you've answered about 15

3   questions concerning who you admired so I'm

4   assuming --

5      A.    15?

6      Q.    15, you're keeping count, I

7   appreciate that.

8      A.    No, not at all.  I think it was

9   like two questions.  You asked me who I

10  admired in the legal department from 2008

11  to 2015.

12     Q.    But let me rephrase and ask you

13  2015 to 2017, who did you admire within the

14  legal department?

15     A.    Admire in the legal department.

16  Anne Riley, Katherine Roach, Steven Rose,

17  Joe Sherinsky.  I admired all of them and

18  respected them.

19     Q.    You've described yourself as a

20  primary employment lawyer in your

21  complaint, correct?

22     A.    No.

23     Q.    You've described yourself as

24  the primary employment lawyer in the

25  complaint.

```
 1                    J. FISCHMAN
 2        A.    If you could just point to the
 3   language of the complaint, I think that
 4   would be helpful.  I think the complaint
 5   speaks for itself.
 6        Q.    You would agree with me that
 7   you had, by 2015, pretty extensive
 8   knowledge on employment law, correct?
 9        A.    I think that by -- what date
10   did you use?
11        Q.    2015.
12        A.    By 2015, I was responsible for
13   -- I was the primary attorney responsible
14   for employment matters in our MCHA legal
15   department.
16        Q.    Take a look at 236 to 238.
17   These are e-mail exchanges between
18   yourself, Kelli Troccoli and other
19   exchanges between yourself and
20   Ms. Saunders, correct?
21        A.    Yes.
22        Q.    On the first page, 236, you say
23   there is presumably a meeting that you had
24   with Ms. Saunders following this exchange;
25   isn't that right?
```

1                    J. FISCHMAN
2          A.    No.
3          Q.    Did you ever discuss with Ms.
4    Saunders what took place in the e-mail
5    exchanges between yourself and
6    Ms. Troccoli?
7          A.    Yes, at a later date.
8          Q.    Do you recall the date that you
9    met her?
10         A.    I don't recall the date that I
11   met with her.
12         Q.    Did you believe that the
13   exchange that you had with Ms. Troccoli was
14   appropriate?
15         A.    I believe that the e-mail that
16   I sent to Ms. Troccoli was appropriate,
17   yes.
18         Q.    And did you think that the
19   response was appropriate from Ms. Troccoli?
20         A.    No, I did not.
21         Q.    Why is that?
22         A.    Because it was extremely
23   defensive, argumentative.  She
24   misunderstood what I said and clearly was
25   very angry about something, but I had never

Page 202

header reads "Page 202"

1          J. FISCHMAN

2  intended any anger, as you can see by my

3  e-mail, which is completely professional

4  and friendly.

5          Q.    At the time that you met with

6  Ms. Saunders about this e-mail exchange

7  that we're discussing, which you stated on

8  the record at a later day, tell us what you

9  said to Ms. Saunders and what she said to

10 you in response, to the best of your

11 recollection.

12         A.    I met with Pat to discuss the

13 best way to talk about this with Kelli and

14 she suggested that I set up a meeting when

15 I return from vacation.  Kelli was going to

16 be on vacation one week and then I was

17 going on the vacation the following week, I

18 believe, or it was when she gets back from

19 vacation or something like that.

20              I can't remember exactly and

21 Pat suggested that I bring with me a copy

22 of the e-mail exchange and take it out and

23 try calmly explain that I was simply asking

24 her to do documents that she did all the

25 time and that had -- that there was nothing

```
 1                J.  FISCHMAN
 2   behind this and that just to kindly and
 3   softly speak with her.
 4        Q.    On August -- I'm going to
 5   direct your attention to 194 at the very
 6   end.  You've seen this communication
 7   before, correct?
 8        A.    No.
 9        Q.    This is the first time you're
10   seeing this document?
11        A.    No.  I may have seen it in your
12   --
13        Q.    Production?
14        A.    Production.
15        Q.    This is an e-mail communication
16   between Ms. Troccoli and Ms. Costa, subject
17   line info requested, and there are bullet
18   points there.  This is pertaining to Ms.
19   Troccoli's assessment as to your
20   performance as acting general counsel.  Any
21   of the bullet points accurate?
22        A.    No, of course not.
23        Q.    What purpose do you believe
24   exists for Ms. Troccoli to lie about her
25   perceptions of your performance as acting
```

```
 1              J. FISCHMAN
 2   general counsel?
 3        A.    Ms. Troccoli was a legal
 4   secretary in our department who was very
 5   upset that I was given this position.  She
 6   did absolutely nothing to support me
 7   throughout and she could have no basis for
 8   most of the -- most of her bullet points.
 9   She could have absolutely no basis as her
10   role, as being an assistant, to know any of
11   this information, so I think it's all
12   nonsense.
13        Q.    I asked for the purpose.  What
14   is your belief as to why she would have
15   done that Ms. Troccoli?
16             MR. BERMAN:  Object to form.
17        A.    I have no idea.
18        Q.    Do you have any belief as to
19   why she did that?
20        A.    She didn't like me, so why --
21   she didn't have any interest in supporting
22   me.
23        Q.    Take a look at 1169 and 1170.
24   You've seen this document before today, Ms.
25   Fischman?
```

1                    J. FISCHMAN

2        A.    Yes, through your document

3    production.

4        Q.    And this is an e-mail

5    communication between Ms. Troccoli and Ms.

6    Costa, correct?

7        A.    That's what it appears to be.

8        Q.    This is Ms. Troccoli's

9    perception of your behavior as an acting

10   general counsel, in which she states that

11   you get defensive and nasty with her when

12   she raises Ms. Costa's name; is that true?

13       A.    No, that was not true.

14       Q.    What is your belief -- you're

15   saying that it's untrue?

16       A.    Absolutely 100 percent untrue.

17       Q.    What do you believe is the

18   purpose behind Ms. Troccoli making false

19   statements about you?

20       A.    Because if you look at the

21   corresponding timeframe of the two

22   documents you've presented to me today, one

23   is Defendant's 238 and the other is

24   Defendant's 1169, you can see that these

25   documents were written at exactly the same

1                    J. FISCHMAN
2   time within ten minutes of each other and
3   you can see that my response to her was
4   yes, thanks Kelli, as I mentioned when I
5   told you about it, I said that Mike asked
6   us to do this on short notice and that I
7   would be checking with resilient counsel,
8   but since it is next week and you're out
9   again, I wanted to get the documents from
10  you.  I will take care of it from here.
11  Thanks, enjoy your vacation.  So my basis
12  for saying that I was defensive and nasty
13  with her is the fact that I was completely
14  professional in my communication with her
15  on this exact same date on this exact same
16  issue.
17       Q.    By then you were already
18  notified by Ms. Troccoli, in April, this is
19  after you became acting general counsel on
20  April 1st, April of 2015, she had already
21  identified, for both you and Ms. Costa,
22  that she had a very serious illness,
23  correct?
24       A.    Are we moving on to a new
25  topic?

1                    J. FISCHMAN

2        Q.    No.   Subject to connection.

3    She had already told you by this time, back

4    in April of 2015, after you were acting

5    general counsel, that she suffered from a

6    very serious illness, correct?

7        A.    On April 17, 2015, she sent a

8    text or an e-mail to both Donna and I.

9        Q.    So the answer is yes?

10       A.    Defendant's 35, yeah.

11       Q.    So you knew, as of this

12   communication, that she suffered from a

13   serious illness; isn't that right?

14            MR. BERMAN:  Object to form.

15       A.    On this particular day, she was

16   in the office doing work.

17       Q.    The subject line --

18       A.    So my answer to you is there's

19   no relevance in looking at this document as

20   to her illness because it doesn't come up

21   in this document.

22       Q.    Well, her illness doesn't come

23   up in the document but the subject line is

24   "are you there" and that's what you wrote,

25   correct?

```
 1                J. FISCHMAN
 2      A.    Yeah.
 3      Q.    And then in the e-mail itself
 4  you wrote "out again."
 5      A.    Yeah, but she was going on
 6  vacation the following week and she
 7  probably had been out during the course of
 8  this week as well.
 9      Q.    And Ms. Troccoli responded to
10  that, on page 237, when she writes with
11  exclamation points "out again, really
12  Jenn," correct?
13      A.    What are you asking me?
14      Q.    I'm not asking anything.  She
15  basically responded to you by saying -- she
16  reacted to you saying that she was out
17  again and she reacted by giving you that
18  response, did she not, as reflected in 237?
19      A.    Yes.
20      Q.    199 to 200.  Taking a look at
21  Document 199 to 200.  You've seen this
22  document before, have you not?
23      A.    No, I have not.
24      Q.    You didn't see it in the
25  production?
```

1                    J. FISCHMAN

2        A.     No, I did not.

3        Q.     So I'm going to direct you to

4   page 200.  This is an e-mail communication

5   between Ms. Saunders and Ms. Costa, dated

6   August 14th, 2015, and in this e-mail

7   communication to Ms. Saunders Ms. Costa

8   writes "be good to Jennifer while I'm

9   away!"  You were not copied on this e-mail,

10  correct?

11       A.     No, I was not.

12       Q.     Do you believe that Ms. Costa

13  was sincere when she had written that about

14  you?

15       A.     I have no idea what she's

16  referring to at all.  You haven't provided

17  anything below, which I assume this is in

18  response to, which probably should've been

19  provided to us, to give us the context of

20  this, because I'm sure there was a context

21  so --

22       Q.     Is that an assumption, Ms.

23  Fischman, because that is the complete

24  exchange between Ms. Saunders and Ms.

25  Costa.

```
 1                    J. FISCHMAN
 2         A.    I have no idea.  I have no idea
 3    what that is about.
 4         Q.    1014 to 1015.  You've seen this
 5    document before today, correct?
 6         A.    I've seen it discovery.
 7         Q.    This document is an exchange
 8    between Ms. Costa and Ms. Saunders about an
 9    exchange that you had had with Ms. Saunders
10    at that time in which you went into Ms.
11    Saunders' office and basically threatened
12    that you would quit if Ms. Troccoli was not
13    fired; isn't that right?
14              MR. BERMAN:  Object to form.
15         A.    No, that's actually not
16    correct.
17         Q.    Let me ask you this next
18    question.  Did you demand that Ms. Troccoli
19    be terminated?
20         A.    Oh my God, no.
21         Q.    Did you say that you would quit
22    if she wasn't terminated?
23         A.    No, never.
24         Q.    You had a conversation with Ms.
25    Saunders at or around this time.  What was
```

1                    J. FISCHMAN
2    said in that conversation, at or about
3    August 25, 2015, between yourself and Ms.
4    Saunders, to the best of your recollection?
5         A.    To best of my recollection we
6    talked about this e-mail from Defendant's
7    237 as well as my general frustration that
8    I needed additional support because Kelli
9    was out of the office quite a bit for her
10   illness, and also for many personal
11   reasons, and then also for vacation days.
12             And so the number of days that
13   she was in the office supporting me was
14   very little, and then on top of that, she
15   was not nice to me.  So as expressed in
16   earlier exhibit, where I was asking for
17   help on a small matter, so it was very
18   difficult to work under those
19   circumstances.
20             So yes, I went to Pat and
21   expressed my frustration, based on this
22   July 12th interaction as well as asking her
23   to do the board documents for MCP Brazil.
24   During that exchange with Pat, with her
25   door closed, Pat said well, she's just a

1                    J. FISCHMAN

2     bully, and we agreed that that was how she

3     operates so you have to work around that.

4     And you know what I did say to her, which

5     is what Donna said to me, in December 2014,

6     is I know that working with Kelli is going

7     to be challenging but once she's working

8     for you that will be up to you how you

9     handle it.

10                    And what I took from that was

11    if it doesn't work out with you and Kelli,

12    then you would have the ability to

13    terminate her.  However, I never suggested,

14    at any time, that we would terminate Kelli,

15    because that would create great deal of

16    risk for the company and I never ever would

17    put the company risk.

18                    Did I say God, I wish I could

19    get rid of her?  Probably, because she was

20    unhelpful and I was running this department

21    at a deficit, so yeah, in my frustration I

22    probably said that.  But if there were, you

23    know, but Pat was there, Pat can speak to

24    it.

25        Q.    Ms. Fischman, you testified

```
 1                J.  FISCHMAN
 2   that terminating Ms. Troccoli would've
 3   created a great risk for MCHA, correct?
 4        A.    Yes, 100 percent.
 5        Q.    She has a medical condition,
 6   we've already established that on the
 7   record, and you knew that to be so,
 8   correct?
 9             MR. BERMAN:  Object to form.
10        Q.    When Ms. Saunders testifies,
11   she will testify that you did, in fact,
12   threaten to quit if Ms. Troccoli was not
13   terminated.  Is it your testimony that Ms.
14   Saunders is lying?
15             MR. BERMAN:  Object to form.
16        A.    I have no idea what Ms.
17   Saunders will say in her testimony.  She
18   and I were in the room together and, as I
19   expressed to you just now, I may have, in
20   my deep frustration, said it's got to be
21   either her or me, but there was no chance
22   that we were ever going to terminate Kelli
23   Troccoli under any circumstances and that
24   was never even a serious conversation at
25   all.
```

1                    J. FISCHMAN

2       Q.    The date that you met Ms.

3  Saunders is -- I'm going to show you

4  document, it's page 896.  Have you seen 896

5  before?

6       A.    No.

7       Q.    We went to the liberty of

8  having it typewritten.  You've never seen

9  this document before?

10      A.    No.

11      Q.    I will represent to you that

12  these are Pat Saunders' notes that she

13  took during her conversation with you on

14  August 17, 2015.  Do you have any reason to

15  dispute that?

16      A.    I have no reason to dispute

17  that I said sat in her office on August 17,

18  2015.

19      Q.    Do you have any reason to

20  dispute the authenticity of these notes?

21      A.    I don't have any reason to

22  dispute the authenticity of these notes but

23  don't know if they're a full accounting of

24  the fairly long conversation that we had

25  when there's only one page of notes

```
 1              J. FISCHMAN
 2  provided here.
 3       Q.   Is there anything, and you can
 4  read the full page on page 896 and then the
 5  typewritten portion.  Is there anything
 6  that's reflected in this document that is
 7  not accurate?
 8       A.   No.  I'm sorry, what was your
 9  question?  Is any of it inaccurate?
10       Q.   Yes.
11       A.   There's nothing inaccurate
12  here.
13       Q.   Did you ever make a chart on
14  Ms. Troccoli's absences?
15       A.   Yes.
16       Q.   Did you believe that all the
17  absences that Ms. Troccoli had were related
18  to her illness?
19       A.   No, I did not believe that.
20       Q.   What's the basis for your
21  belief that --
22       A.   Because she used to text me all
23  the time and say I'm not going to be in
24  today.  I'm working from home today because
25  my so and so -- my boyfriend's nanny didn't
```

```
 1                    J. FISCHMAN
 2   show up and I'm going to babysit.  She
 3   texted me and told me where she was going
 4   to be.  In addition, she had personal days
 5   and vacation days as well.
 6          Q.    Take a look at 253 to 254.
 7   Before you answer any questions about this
 8   document, did you believe that the chart
 9   that you created pertaining to Ms.
10   Troccoli's absences were accurate?
11          A.    I believe that I had a fairly
12   accurate picture, but again, if she had
13   submitted things to HR about her absences,
14   I think I had given it to Pat and she could
15   have corrected any inaccuracies.
16          Q.    You've seen this document
17   before?
18          A.    No, actually.
19          Q.    So this is -- just take a
20   minute to read.  If you could take look at
21   the second part which is 254, this is an
22   e-mail exchange between Ms. Costa and Ms.
23   Saunders, where Ms. Costa discovered some
24   inaccuracies in your chart, correct?
25          A.    That's what she writes here.
```

1             J. FISCHMAN

2        Q.    Is that a true statement?

3        A.    I have no idea.

4        Q.    Take a look 244 to 246.  You've

5   seen this document before, correct?  Ms.

6   Fischman, what was your motivation behind

7   retaining Mr. Moss?

8        A.    I was concerned that Ms.

9   Troccoli, or Kelli, was out of the office a

10  great deal between April 1st and the date

11  of that e-mail, or exchange, was about

12  August 12th or something, August 10th, and

13  that we weren't really tracking what was

14  personal, what was medical, what was

15  vacation days.

16            It just felt like she was out

17  all the time and I needed help and I just

18  didn't feel like she was around, and as had

19  been explained earlier with Ms. Saunders,

20  with Pat, which is that it's really hard to

21  e-mail and text with her; that things got

22  miscommunicated easily --

23        Q.    But what was the --

24        A.    Let me finish my sentence,

25  please.

1                    J. FISCHMAN

2       Q.     But you're not answering the

3    question.  What possessed you to retain Mr.

4    Moss?

5       A.     I wanted to make sure that

6    Kelli was not -- that her excessive

7    absences were all for medical and those

8    that weren't had to be counted so --

9    because her performance for me was

10   unacceptable.  And so therefore, I wanted

11   to record and know how to proceed and also

12   know how to interact with her in light of

13   her illness so that anything that I did or

14   said could not be misconstrued as

15   retaliatory for her illness.  That's why I

16   sought counsel.  I wanted to make sure that

17   I didn't do anything to hurt the company.

18       Q.     Understood.  And that was a

19   labor and employment counsel that you

20   sought at the --

21       A.     Yes.

22       Q.     Did you ever speak to anyone at

23   MCHA that you were seeking counsel on this

24   particular issue?

25       A.     I was the acting general

```
 1                 J. FISCHMAN
 2   counsel at the time, so no.
 3        Q.    Did you tell Ms. Costa?
 4        A.    I felt I had the authority.  I
 5   don't recall if I told her or not.  It was
 6   summer, a lot people were on vacation.
 7        Q.    Do you think that it was
 8   important for Ms. Costa to know that you
 9   had retained counsel regarding the Kelli
10   Troccoli concerns you had?
11        A.    Actually, I had not retained
12   counsel.  I had worked with Steve Moss on
13   multiple other matters over the course of
14   my employment at MCHA and so I called him.
15   He never billed us for this time, as far as
16   I recall, and I called him for some free
17   advice on the best way to handle this
18   situation.
19        Q.    Why didn't you tell Ms. Costa
20   that you were seeking this free advice from
21   Mr. Moss?
22        A.    I don't recall.  I wasn't
23   trying to hide it.  I honestly just was
24   trying to do my job.
25        Q.    Take a look at 900.  Have you
```

```
 1                    J. FISCHMAN
 2   seen this document before?
 3        A.    No.
 4        Q.    This is the first time you're
 5   seeing it?
 6        A.    Yes.
 7        Q.    At or around this time, which
 8   would have been August 28th, didn't
 9   Ms. Costa meet with you regarding a
10   complaint, a formal complaint, that Ms.
11   Troccoli had lodged against you?
12        A.    You're showing me something
13   marked 827, but you're asking me about
14   something that happened on 828.
15        Q.    Take a look at Document 900.
16   It says 828 on the very top.  That is the
17   page that I have directed you to look at.
18        A.    Okay.
19        Q.    And it says 828, DC, meaning
20   Donna Costa, were in meeting with JF,
21   meaning you, correct?
22              THE WITNESS:  Could you read
23         back the question for me please.
24              (Whereupon, the referred to
25         answer was read back by the
```

```
 1                    J.  FISCHMAN
 2         Reporter.)
 3         A.    Yes.   After I returned from
 4  vacation, I had a meeting with Kelli,
 5  actually, that I had scheduled pursuant to
 6  Pat Saunders' recommendation of how to
 7  speak to her and also how to talk about
 8  that e-mail, about the Brazil documents,
 9  and I sat down with her and I took out the
10  e-mail and she refused to speak to me and
11  she said you should go talk to Donna.  So I
12  went to talk to Donna and she wasn't
13  available until 3:00 that afternoon, and at
14  that time she explained to me that Kelli
15  had made a formal complaint based on
16  overhearing a conversation that, a
17  confidential conversation that I had with
18  Pat Saunders in her office.
19         Q.    So that meeting took place
20  between the two of you, correct?
21         A.    Yes.
22         Q.    And it was during that meeting
23  that Ms. Costa had said to you that there
24  would be an investigation surrounding Ms.
25  Troccoli's allegations against you,
```

```
 1                    J. FISCHMAN
 2   correct?
 3        A.    She may have said that, yes.
 4        Q.    And in that conversation with
 5   Ms. Costa you had said that you were not
 6   going to cooperate with an investigation,
 7   did you not?
 8        A.    I don't recall that I said that
 9   I would not cooperate with that
10   investigation, actually, at all.  No,
11   that's not true.
12        Q.    Isn't it true that when you met
13   with Ms. Saunders you were extremely
14   defensive and uncooperative when she was
15   asking you questions about Ms. Troccoli?
16        A.    Yes.  I met with Pat Saunders,
17   who was supposed to be investigating a
18   conversation that she was participating in,
19   and I thought that that was a farce and I
20   told her if you want to do an investigation
21   of the acting general counsel, we should
22   hire outside counsel.  It should not be
23   conducted by the person who was the primary
24   witness to the conversation since she was
25   the one engaged in the conversation, so
```

```
 1                    J. FISCHMAN
 2   yes.
 3        Q.    281 to 282.  You've seen this
 4   document before, have you not?
 5        A.    Through your production.
 6        Q.    Let me just identify it.  It is
 7   an e-mail communication between Ms.
 8   Costa and Mr. Fujiwara, Mr. Sakaguchi with
 9   a copy to Ms. Saunders, correct?
10        A.    That's what it appears to be.
11        Q.    And this is the notification to
12   Mr. Fujiwara and Mr. Sakaguchi that there
13   had been a complaint against you lodged by
14   Ms. Troccoli; isn't that right?
15        A.    That's what it appears to.
16        Q.    The second paragraph, it says
17   Jennifer has been complaining to Pat for
18   some time about Kelli, including the amount
19   of time Kelli spends out of the office.
20   That's true is it not?
21        A.    That is true, as we established
22   earlier.
23        Q.    In some cases the time is due
24   to personal matters, in some instances it
25   involves significant medical issues Kelli
```

```
1                    J. FISCHMAN
2    has been having.  That's also accurate,
3    correct?
4         A.    Yes.
5         Q.    It goes on to say that Pat
6    informed Jennifer that she needs to be very
7    careful about complaining about or
8    challenging Kelli's absences because
9    failure to accommodate Kelli's medical
10   needs could be seen as a violation of the
11   Americans with Disabilities Act.  That is
12   also true, is it not?
13        A.    That is a complete fallacy.
14   Why would Pat Saunders, the human resources
15   person, be advising the acting general
16   counsel on legal advice.  I was the one who
17   was telling her that we needed to be very
18   careful because we don't want to violate
19   the Americans with Disabilities Act or any
20   other law.  I was the lawyer.
21        Q.    So Jennifer told Pat that she
22   consulted with outside counsel about how to
23   avoid a claim with Kelli in connection with
24   the ADA, that is also true, is it not?
25        A.    That is true.
```

```
 1                    J. FISCHMAN
 2        Q.     1120 and 1121.  You have seen
 3   this document before, have you not?
 4        A.     No.
 5        Q.     This is an e-mail communication
 6   between Ms. Troccoli and Ms. Saunders dated
 7   October 12, 2015.  1121, are you on that
 8   page?  It says, this is from Ms. Troccoli,
 9   "Miko was just out for a week.  I doubt she
10   notified you.  In fact, every member of the
11   legal department has been out sick recently
12   and I'm sure I'm the only one she notified
13   you of."  Is that true?
14        A.     You've redacted most of the
15   e-mail, which is hard to understand the
16   context of the e-mail, because I'm having a
17   hard time understanding why that's redacted
18   when it's not anybody giving legal advice,
19   but I don't know what the context of this
20   is.  I do recall Miko getting sick at some
21   point during the time that she worked at
22   Mitsubishi for one week and she ended up in
23   the hospital and everybody did know,
24   actually, so but I don't know what this is
25   supposed to say.
```

```
 1                    J. FISCHMAN
 2        Q.    Now with your employment law
 3   background you understood, Ms. Fischman,
 4   that investigations of a complaint are very
 5   necessary, correct?
 6             MR. BERMAN:  Object to form.
 7        A.    Yes.
 8        Q.    And in fact you have conducted
 9   investigations yourself, have you not?
10        A.    I have.
11        Q.    942 to 945.  Take a look at
12   943.  Now this is an e-mail communication
13   between Ms. Costa and Mr. Fujiwara, Mr.
14   Sakaguchi, with a copy to Ms. Saunders.  It
15   is dated September 1, 2015.  I'm going to
16   direct your attention to 943.  It says,
17   bottom part of the page, "Pat met with
18   Kelli this morning and Jennifer this
19   afternoon in attempt to gather more
20   information.  According to Pat, Jennifer
21   interrupted Pat repeatedly and expressed a
22   lot of outrage about being questioned."  Is
23   that accurate?
24        A.    As I stated earlier, I could
25   not understand how a legitimate
```

```
 1                    J. FISCHMAN
 2   investigation could be done by the very
 3   person who participated --
 4        Q.    We have that on the record.
 5              MS. COLWIN:  Move to strike.
 6        Q.    Ms. Fischman, I'm just asking a
 7   question.  Is that accurate?  According to
 8   Pat, Jennifer interrupted Pat repeatedly
 9   and expressed a lot of outrage about being
10   questioned, yes or no?
11        A.    No.
12        Q.    She was defensive and
13   argumentative?
14        A.    No.
15        Q.    She blamed everyone but herself
16   for the situation?
17        A.    No.
18        Q.    It was Ms. Costa's assessment,
19   after receiving Ms. Saunders' feedback on
20   her meeting with you, that an independent
21   investigation had to be done by outside
22   counsel, and you see that identified at the
23   top of the page at 944, correct?
24        A.    I see that she states that.
25        Q.    And you would agree that
```

```
 1              J. FISCHMAN
 2   bringing an outside independent
 3   investigator was necessary given the
 4   circumstances?  You've testified to that.
 5         A.    I had requested it.
 6         Q.    Now take a look at 943.
 7   Mr. Sakaguchi had denied the request for an
 8   independent investigator you brought in,
 9   correct?
10         A.    It does look like that, yeah.
11         Q.    And it was, basically the
12   message was to work things out, correct?
13         A.    It says here that our
14   conclusion is that it's too early for MCHA
15   to hire an outside counsel for this matter.
16         Q.    You have alleged that Mr.
17   Sakaguchi said "you girls you should work
18   it out" but there is no mention "you girls"
19   in this exchange; isn't that right?
20         A.    Well, this isn't the e-mail
21   that I received from Sakaguchi.  Do you
22   have that one?
23         Q.    Showing you what's been marked
24   Bates stamp 972 to 974.  This is the e-mail
25   exchange between yourself and Mr.
```

                        J. FISCHMAN
1
2    Sakaguchi, correct?
3         A.    Yes, this appears to be -- it's
4    a little hard to understand because there
5    seems to be some part of this missing and
6    the typeface is completely different, so I
7    actually don't -- I don't know if this is
8    the real document.
9         Q.    The very first back page of
10   this document, I'm sure you're familiar
11   with metadata, this first page confirms
12   that this is a standalone authentic
13   business record kept at MCHA.  So there is
14   no possibility, given this metadata, that
15   this is a document that was modified in any
16   way.
17              MR. BERMAN:  There's no
18         question pending.
19        Q.    There is in 974, 973 to 974, is
20   Mr. Sakaguchi's e-mail to you, dated
21   9/1/2015, in which he says I was informed
22   there is a problem arising in MCHA among
23   you, Kelli and Donna and the problem is
24   escalating in the wrong direction.  I would
25   appreciate it if you would calm down and

```
1              J. FISCHMAN
2    try to resolve the problem internally by
3    the discussing the issues in good faith
4    with Donna and HR manager.  I am neutral.
5    And then it goes on to say -- you've made
6    the accusation that Mr. Sakaguchi said to
7    you in this exchange that he said "you
8    girls work it out" but there's no mention
9    of "you girls" in any of these exchanges
10   between yourself and Mr. Sakaguchi,
11   correct?
12        A.    In this document there is not.
13   There is however a suggestion that we
14   should calm down, which seems to indicate
15   that we have gotten too emotional, I guess.
16        Q.    So Mr. Fischman, it doesn't say
17   "you girls," correct?
18        A.    I don't see that it says it in
19   this e-mail.
20        Q.    What document do you have in
21   your possession, that you've produced in
22   this litigation, where Mr. Sakaguchi says
23   "you girls"?
24        A.    As you know, I don't have any
25   documents in my possession, Mercedes.  I
```

1                    J. FISCHMAN

2    returned all the documents to Mitsubishi

3    with the exception of the few kind notes I

4    received over my tenure.  So this document

5    appears to be what I was referring to, but

6    my recollection was that he said "you

7    girls."  Perhaps there was another e-mail

8    exchange.

9         Q.    That's your guesswork on your

10   part, isn't it?

11        A.    My recollection is what it is.

12        Q.    You have no evidence that there

13   is another exchange between yourself and

14   Mr. Sakaguchi in which he writes "you

15   girls," correct?

16        A.    Not in this e-mail, it does not

17   say that.

18        Q.    And you have no evidence, any

19   documentary evidence of any exchange, where

20   Mr. Sakaguchi refers to you and the other

21   female members of MCHA legal as "you

22   girls," correct?

23        A.    I believe at the time that

24   there was another one, because I believed

25   at the time I complained to Donna that he

```
 1                    J. FISCHMAN
 2   made -- that he sent an e-mail that spoke
 3   to that.
 4        Q.    Is it your testimony there's an
 5   e-mail where Mr. Sakaguchi writes "you
 6   girls."  Is that your testimony?
 7        A.    Yeah, that's my recollection.
 8        Q.    And what is the basis of that
 9   recollection?
10             MR. BERMAN:  Object to form.
11        A.    The basis for that
12   recollection is that I don't know that this
13   is the only e-mail that Sakaguchi ever sent
14   me on this matter and I again, would like
15   to note for the record, that the typeface
16   is completely different and on a different
17   page than all the other e-mails that are
18   concluded in this file, in this defense, so
19   I'm kind of at a loss.  I don't believe
20   this document to be --
21        Q.    It stands for what it is, Ms.
22   Fischman.  Those are metadata.  If you
23   want to challenge it, get an expert to
24   challenge it, but the metadata is there.
25   Take a look at 375 to 383.  You've seen
```

1                    J. FISCHMAN

2    this document before?

3         A.    Yes.

4         Q.    In fact, you created this

5    document.  This is your self assessment for

6    your mid-year review as assistant general

7    counsel, correct?

8         A.    As acting general counsel, yes,

9    correct.

10        Q.    It's dated October 1, 2015.

11   You believe that all the statements that

12   you set forth in this document are

13   accurate, correct?

14        A.    Yes.

15        Q.    Now Ms. Costa did not accept

16   this, your self assessment; isn't that

17   right?

18        A.    No, she did not.  Well, I

19   actually don't know if she even reviewed

20   it.

21        Q.    Before we go to the next

22   document, take a look at 377.  You drafted

23   this part where it says manager comments,

24   correct?

25        A.    Yes, as I had always done in

```
 1                    J.  FISCHMAN
 2   previous years.
 3        Q.    So this is your estimation of
 4   how you comported yourself as acting
 5   general counsel.  "Jennifer has stepped up
 6   and has exceeded my expectations in
 7   numerous ways since assuming the role of
 8   acting general counsel and chief compliance
 9   officer."  That was your estimation and
10   that was your statement, correct?
11        A.    Yes.
12        Q.    1714 to 1716.
13              MS. COLWIN:  Can we just go off
14         the record.
15              THE VIDEOGRAPHER:  The time on
16         the video monitor is 6:05 p.m.  This
17         ends Media 5.
18              (Whereupon, an off-the-record
19         discussion was held.)
20              THE VIDEOGRAPHER:  We are back
21         on the record.  The time on the video
22         monitor is 6:08 p.m.  This starts
23         Media 6.
24        Q.    You're looking at the
25   Document 1714 to 1716.  You have seen this
```

```
 1                   J.  FISCHMAN
 2   document before today, have you not?
 3         A.    Yes.
 4         Q.    And this review, you would
 5   agree with me, is vastly different than the
 6   self-assessment that you provided to Ms.
 7   Costa, correct?
 8         A.    That's right.
 9         Q.    And in this review, Ms. Costa
10   detailed the reasons, at least five of the
11   critical reasons why you were going to be
12   relieved of your responsibilities as acting
13   general counsel, correct?
14         A.    Yes.
15         Q.    Do you disagree with the
16   reasons that Ms. Costa provided in this
17   document?
18         A.    Yes, emphatically.
19         Q.    Detail for us the reasons why
20   you disagree with them.
21         A.    Each and every reason that she
22   lists here is a fabrication of the true
23   events that took place, and that's why.
24         Q.    And what's the basis for your
25   belief that this is all a fabrication?
```

                    J. FISCHMAN

1

2       A.      Because they're all -- because

3   I was involved in each and every one of

4   them and what she states here is nothing to

5   do with what actually happened on any of

6   these matters.

7       Q.      In this document, I'm moving

8   away from the examples, Ms. Costa says that

9   you did not proactively communicate with

10  Ms. Costa on a regular basis.  That is

11  accurate, correct?

12      A.      No, that's not correct.

13      Q.      There are occasions where you

14  spoke to Ms. Costa where you were combative

15  and defensive, were you not?

16      A.      I would say no, that was not

17  true except on one occasion in August

18  of 2015.  But prior to that date, I've

19  never been combative, defensive,

20  argumentative or anything less than

21  completely deferential to Ms. Costa during

22  my entire tenure at Mitsubishi.

23      Q.      So when Ms. Costa takes the

24  stand and testifies differently and states

25  on the record, under penalties of perjury,

```
 1                J. FISCHMAN
 2   that you were defensive and combative, she
 3   would be lying?
 4            MR. BERMAN:  Object to form.
 5        A.    Yes.
 6        Q.    In the 19 years that Ms. Costa
 7   was at MCHA, this is now 19 years at MCHA,
 8   you're aware that she had only terminated
 9   two individuals in the legal department --
10            MR. BERMAN:  Object to form.
11        Q.    -- as general counsel, Gregory
12   Peterson and Mr. Nathan Gallup; isn't that
13   right?
14        A.    I don't have any basis to
15   disagree with that comment.  I don't know
16   what she did before 2008.  I only know
17   Nathan Gallup was terminated during the
18   time I was there.
19        Q.    Nathan Gallup was terminated in
20   2012 and you were at MCHA in 2012, were you
21   not?
22        A.    Yes.
23        Q.    Does that refresh your
24   recollection now that Nathan Gallup was
25   terminated by Ms. Costa?
```

```
 1                    J. FISCHMAN
 2        A.     I think I already agreed that
 3   Nathan Gallup was terminated during my
 4   tenure in Mitsubishi but that I could not
 5   speak to anything that happened before 2008
 6   because I was not there.
 7        Q.     Taking a look at 1024, 1025,
 8   specifically 1025, it's an e-mail exchange
 9   between -- you've seen this document
10   before, have you not, Ms. Fischman?
11        A.     No.
12        Q.     And in this e-mail exchange,
13   Mr. Fujiwara says "as for Jennifer, I'm a
14   bit surprised to hear that you'll be
15   thinking of termination as I thought you
16   had been feeling well with her as she's
17   been trying her best to assume her new
18   position or assignment" and that's as of
19   August 19, 2015, correct?
20        A.     Well, the document speaks for
21   itself but it's odd because there's no
22   e-mail that connected with this that
23   suggests termination, so I don't know what
24   he's referring to.
25        Q.     Take a look at 1052.  Do you
```

1                    J. FISCHMAN

2    see the e-mail communication now.  This is

3    dated August 16, 2015 between Ms. Costa and

4    Mr. Fujiwara in which she states "I'm

5    writing to let you know that it is not

6    going well with Jennifer and there's a

7    chance that I will want to terminate her."

8    Do you see that?

9         A.    I do.

10        Q.    951.  You've seen this document

11   before, 951 to 952, have you not?

12        A.    I think you gave it to us a few

13   minutes ago, did you not?

14        Q.    I'm asking you to take a look

15   at it, Ms. Fischman.  You've seen it

16   before, correct?

17        A.    I'm sorry, I'm a bit confused

18   because I thought you gave this document

19   before but the top part looks different.

20        Q.    The top part is a response,

21   another communication from Ms. Costa to

22   Mr. Fujiwara and Mr. Sakaguchi, with a copy

23   to Ms. Saunders.  You've seen the bottom

24   part, now it's the top part.

25        A.    Why would Donna be responding

```
 1                    J. FISCHMAN
 2  to herself?  The bottom part is an e-mail
 3  from Donna to the same people and then
 4  she's writing --
 5       Q.    So is this testimony, that
 6  you're questioning the authenticity of this
 7  document?
 8            MR. BERMAN:  Object to form.
 9       A.    I'm just confused because some
10  of the documents you produced with the
11  metadata on it and some of them you just
12  hand to me without any metadata, and they
13  don't always follow congruously, so it's
14  hard for me to --
15       Q.    Look at the Bates stamp.  One
16  is 8282015, correct?
17       A.    Yes.
18       Q.    It's the same date of 8282015.
19  Is it your testimony that you have never
20  supplemented an earlier communication to
21  the same people and used it on an e-mail
22  chain?
23       A.    What is the question that you
24  have for me?
25       Q.    On that day, Ms. Costa
```

1          J. FISCHMAN

2   reiterates why this particular issue

3   involving Ms. Troccoli is another clear

4   example of what prompted her to write, on

5   August 16th of 2015, that she wanted to

6   terminate you.  Correct?

7          A.    That's what it says.

8          Q.    Take a look at 147 to 148.

9   It's an e-mail exchange between you and

10  Ms. Costa.  1047, 1048.

11         A.    I draw your attention to 1048.

12  Ms. Costa writes to you I'm at a loss on

13  how to work with you and communicate with

14  you.  We need sit down after a long weekend

15  to discuss your relationship and

16  communication as well as your relationship

17  with Kelli.  What was your understanding as

18  to why Ms. Costa wrote this to you?

19         A.    I really don't know.  We

20  actually had just been together in a

21  conference in California for the presidents

22  that she had hosted, and I really didn't

23  know what she was talking about.  I knew,

24  obviously, about the Kelli situation, and I

25  looked forward to talking to her about

1                    J. FISCHMAN

2   that.  But as she says, she had a change of

3   direction in recent e-mails, so I really

4   didn't know want to make of this.  That's

5   why I said I'll see you Thursday and we can

6   speak next week.

7        Q.    Did you think you had a good

8   relationship with Ms. Costa at that time,

9   at the time that she wrote this to you?

10       A.    I think that our relationship

11  had recently been strained in the month of

12  August and I looked forward to working on

13  it together.

14       Q.    Is there any evidence of

15  discrimination?  We've talked about the

16  perception and the constructive feedback

17  that you received from Ms. Costa at or

18  around this time which should have been

19  August of 2015.  Is there any evidence of

20  discrimination on her part towards you?

21       A.    Yes.  The constant

22  discrimination of her not giving me the

23  general counsel position and twisting

24  things that were going on; all the positive

25  things that I was doing in the department

```
 1              J. FISCHMAN
 2   and not acknowledging all the things that I
 3   wrote in my mid-year review, which all were
 4   true.  No one ever disputed any of those
 5   things, they were all true, they were all
 6   positive.
 7              So yes, I did have trouble with
 8   Kelli Troccoli, which she knew since about
 9   2008 or '9, and so having her support me
10   was a difficult hill to climb for all of
11   us, but the basis for her decision was
12   still that she preferred to have a man in
13   that position and always was that.  That
14   was why she didn't give me the full
15   position.  I was more than qualified.
16      Q.    We already have on the record
17   that there were two individuals that
18   could've gotten that position, two men, Mr.
19   Oliva and Mr. Sezar.
20              MR. BERMAN:  Object to form.
21      Q.    Correct?
22              MR. BERMAN:  Object to form.
23              MS. COLWIN:  You can object.
24      A.    Incorrect.  There's been no
25   evidence on the record of either of those
```

```
 1                    J. FISCHMAN
 2   two people being considered for the
 3   position that I've heard today.
 4        Q.   Well, it's your testimony that
 5   we're focusing.
 6        A.   And I can tell you that I have
 7   no knowledge of either of those two
 8   individuals ever being considered for that
 9   position except that possibly Nick had been
10   considered in 2014.  I have no idea.
11        Q.   What is the basis for the sex
12   discrimination claim you have, that you
13   just identified, that your not getting the
14   promotion to general counsel and just
15   having the acting position?  Is it your
16   assumption that Ms. Costa wanted to have a
17   man in that position?  Is that your
18   assumption?
19        A.   Yes.  My assumption was that it
20   would have been easier for her, in dealings
21   with Japan, with the individual employees
22   of MCHC, MCC, MTPC, that it is easier for
23   them to deal with men.  On top of that, I
24   had the discussion with her in December
25   where she told me the Japanese didn't want
```

1                    J. FISCHMAN

2    to deal with me.  I had understood from her

3    comments to me in that early meeting that

4    she did not have the political capital to

5    get me through Japan in her words.

6              Then I met with Bill Radlien,

7    of Mitsubishi Polyester Film, in April,

8    late April 2015, where we had dinner and

9    cocktails, and he basically said those

10   exact same words to me.  I heard that Donna

11   Costa expended all of her political capital

12   getting that job herself as president and

13   there was no way they were going to let two

14   women run that business.

15        Q.    Now there was an e-mail that

16   you sent about that meeting with Mr.

17   Radlien, correct?

18        A.    I have no recollection.

19        Q.    And you had no mention

20   whatsoever of the comments that he had made

21   to you during that meeting, that you have

22   just alleged on the record today?

23        A.    That would be a very insulting

24   thing for me to say to Donna, that she had

25   expended all of her political capital.  No,

1                    J. FISCHMAN
2    of course I wasn't going to say that to
3    her.  I would -- I'm trying to prove that
4    I'm capable of doing this job, so I'm
5    putting that to the side.  I'm putting all
6    that discrimination to the side and using
7    my legal talents to do the job that I have
8    been doing and that I have earned.
9              Mercedes, I was the primary
10   breadwinner in my family.  It was super
11   important for me to keep my job.  It has
12   always been super important for me to keep
13   my job.  I have been working my entire
14   life, as I know you have, and it is
15   important that I kept this job.  So even
16   after I was demoted, I stayed because I
17   needed to work to support my family.
18        Q.    Ms. Fischman, this is a
19   document that's been Bates stamped 38 to
20   39.  That first part is about the meeting
21   that you just mentioned on the record.
22   With Mr. Radlien, the individuals that you
23   met up --
24        A.    Yes.  What's the question?
25        Q.    In this exchange with Ms. Costa

```
1              J. FISCHMAN
2    you were talking about the meeting that you
3    were just testifying about in which you
4    were allegedly told that Ms. Costa had
5    expended all her political capital to
6    become president of MCHA and she didn't
7    have any to elevate you to general counsel,
8    correct?
9         A.    I state here that I will give
10   you a report on the 27th.  I also said that
11   I had good meetings with Bill and Dennis.
12        Q.    It's in paragraph 56 of the
13   complaint.  You allege that during the
14   meeting with Dennis Trice and Bill Radlien,
15   in April of 2015, they stated that MCHA
16   would not elevate you to general counsel
17   because you're a female and Ms. Costa had
18   expended all of her political capital in
19   achieving her own promotion.  You just
20   testified that before on the record and
21   that's what's stated in your complaint as
22   well?
23        A.    So I had two separate meetings.
24   One was with Bill Radlien at night on my
25   first -- when I arrived in Greer, South
```

1          J. FISCHMAN
2    Carolina, where he picked me up at the
3    hotel and we had a couple of drinks in the
4    bar and then we went to dinner where we had
5    several more drinks, or he did, because he
6    drinks scotch.  I just had -- I probably
7    had a glass a wine.  He stated this to me
8    over the dinner.
9          Dennis, the second day of my
10   being in Greer, took me to lunch at his
11   golf club, where he similarly inferred that
12   Donna had basically kind of moved him out
13   to get the job as president.  It was the
14   first time in the history of Mitsubishi
15   Chemical that any woman had held the job of
16   president of any affiliate, again
17   worldwide, and it was a massive thing for
18   her to do.  And so they both said it in
19   different ways but they both said it.
20         Q.    The document stands for itself.
21   It says "things are good this week!"
22   Exclamation point, correct?
23         A.    Yes, because we had other
24   meetings there that went really well
25   because we were talking about their new

1                    J. FISCHMAN
2   line expansion, which I was going to work
3   with them on, so yes.
4        Q.    Now there came a point that Mr.
5   Oliva was appointed general counsel,
6   correct?
7        A.    Yes.
8        Q.    Prior to his appointment, you
9   were demoted to -- you were relieved of
10  your service as an acting general counsel
11  and returned to your former position as
12  assistant general counsel, correct?
13       A.    On the same day.
14       Q.    That was on November 11th?
15       A.    November 30th.
16       Q.    November 11th is the date of
17  your review, your six-month review, that
18  Ms. Costa reviewed with you, which we've
19  gone through?
20       A.    November 11th is the date of
21  the review but Nick came to the -- came on
22  the 30th of November.
23       Q.    Now after Ms. Costa had met
24  with you to tell you of this change, she
25  had written and said that you were not

```
 1              J. FISCHMAN
 2   happy about the change but that you acted
 3   maturely and would continue to do your job;
 4   isn't that right?
 5        A.     Absolutely.  That's exactly how
 6   I acted and that's always how I acted.  I
 7   don't know why she would be surprised.
 8        Q.    I'm going to show you a
 9   document, 448 to 450.  This is an e-mail
10   exchange, on the second page, between you
11   and Ms. Costa, reflected in 449 to 450,
12   correct?
13        A.    It is e-mail exchange between
14   -- yes.
15        Q.    And in it you write that you
16   will be taking some time to reflect on the
17   change and how I can work to improve our
18   relationship and restore trust, correct?
19        A.    Yes.
20        Q.    And you meant that, did you
21   not?
22        A.    No, not really.  I meant that I
23   wanted to keep my job, so I said things
24   that would be kind.
25        Q.    So you're saying that those
```

```
 1                J. FISCHMAN
 2   were untrue, that statement?
 3              MR. BERMAN:  Object to form.
 4        A.    Can you repeat what you're
 5   asking me, please?
 6        Q.    Let the record stand for
 7   what --
 8        A.    Okay.
 9        Q.    So on November 30th, we've
10   established on the record that Mr. Oliva
11   joined as general counsel and chief
12   compliance officer at MCHA, correct?
13        A.    He arrived on the 30th of
14   December -- November, yeah.
15        Q.    On December 9, 2015, you had a
16   conversation with Mr. Oliva where you
17   talked about his capabilities as a general
18   counsel, did you not?
19        A.    I may have asked him about his
20   background and capabilities, yes.
21        Q.    Is there anything in this page,
22   on 854, that is inaccurate?
23        A.    Yeah.
24        Q.    What is inaccurate?
25        A.    His opinions about offering
```

1          J. FISCHMAN
2  someone gum as aggressive and symbolic.  I
3  think an offering of gum is how you hand
4  someone a blister pack -- I did have a
5  tendency to put the gum, if I didn't have a
6  piece of paper to put it in, but I didn't
7  mean to gross him out.  It certainly wasn't
8  meant to be aggressive and symbolic in any
9  way.  I have no recollection of meeting
10  with Steven about a power seat.  I don't
11  know where we met.  I don't even know what
12  the power seat is, so I disagree with his
13  characterization of that.
14       Q.    Do you know what the power seat
15  is in Japanese culture?
16       A.    Probably the head of the table,
17  yeah, and never facing the -- also back to
18  the door.
19       Q.    So you're familiar with the
20  power seat?
21       A.    And also let the most important
22  person come before anybody else sits down,
23  but we weren't in a Japanese place; we were
24  in a small office with three Americans.
25       Q.    It was Japanese visitors, was

```
 1                    J.  FISCHMAN
 2   it not, at that meeting?
 3        A.    I have no recollection of who
 4   was at that meeting.  If you have
 5   information that can shed some light on who
 6   was there, that'd be fine.
 7        Q.    Mytex, these were visitors on
 8   Mytex matter, correct?
 9        A.    No, I have no recollection of
10   that.
11        Q.    So you have nothing in writing
12   that disputes what's written here by Mr.
13   Oliva, correct?
14        A.    It says met in my office
15   about --
16        Q.    That's not the the question.
17        A.    It's on the same day.
18        Q.    You have nothing in writing
19   that disputes this document created by Mr.
20   Oliva on that day?
21        A.    There's nothing in this
22   document that states that we had Japanese
23   visitors from --
24        Q.    Let me ask the question again.
25   There's nothing in writing that you have
```

1                    J. FISCHMAN

2    that contradicts the statements made in

3    this document by Mr. Oliva, correct?

4         A.    I have nothing in writing that

5    contradicts this note to file.

6         Q.    And 856.  Before you get into

7    that document, you knew that Mr. Oliva had

8    previously worked at MCHA prior to coming

9    to the company, correct?

10        A.    I knew that Nick had been a

11   paralegal at the company during law school

12   and that he had worked just after law

13   school.

14        Q.    And you were made aware that

15   Mr. Oliva had extensive experience in both

16   chemical and pharma industries, were you

17   not?

18        A.    No, I was not aware of any such

19   thing.

20        Q.    You were made aware that he had

21   managed a team of lawyers in other

22   companies, correct?

23        A.    I don't know that I was aware

24   of that.  I think that's why I asked him

25   about his experience.

```
1                J. FISCHMAN
2        Q.    You were made aware that he had
3  extensive international experience also,
4  did you not?
5        A.    I knew that he had flown to
6  China at some point to do some work there.
7        Q.    Do you think that Mr. Oliva was
8  qualified for the position of general
9  counsel?
10       A.    No.
11       Q.    Why not?
12       A.    I don't think that he had the
13  depth of experience that I had.  I don't
14  think that he had as many years out of law
15  school that I had.  I don't think he went
16  to -- I don't think he had the same
17  pedigree that I had.  I don't think in
18  terms of the category of law school that he
19  went to.  I had never seen his writings so
20  I really couldn't opine on that.  I had
21  seen Donna's writing many times over the
22  course of my work with her and found her to
23  be an excellent writer.  I never once saw
24  Nick write anything.
25       Q.    So you have no basis to
```

```
 1                J. FISCHMAN
 2  criticize the way he communicates in
 3  writing, correct?
 4            MR. BERMAN:  Object to form.
 5       A.    Well, not on December 16th only
 6  16 days after he began working at the
 7  company.  I didn't know anything about him.
 8       Q.    During the time that you worked
 9  together, did your opinion of Mr. Oliva
10  change?
11       A.    No, not really.  I mean I liked
12  him as a person.  I mean we had a nice time
13  the week that we were in California when I
14  was doing ethics training and he was really
15  quite lovely at dinner.
16       Q.    That's not responsive to my
17  question, so just move to strike.
18       A.    You asked an open-ended
19  question, so I gave you a fuller answer.
20       Q.    You allege that Mr. Oliva was
21  paid more than you, correct?
22       A.    I believe he was.
23       Q.    What is the basis for that
24  allegation?
25       A.    I know that he had a company
```

```
 1              J. FISCHMAN
 2   car paid for and I believe that he was also
 3   paid more than I was.  That was just my
 4   belief.  I asked for evidence of that.
 5        Q.    Do you think it's appropriate
 6   for an acting general counsel to make as
 7   much as a general counsel?
 8        A.    Yes.
 9        Q.    What is the basis for your
10   belief on that?
11        A.    It's the same job.
12        Q.    Isn't there a grooming period,
13   when you're acting general counsel, to
14   become general counsel, which is the reason
15   why you were given the acting general
16   counsel position, to be groomed into that
17   position, correct?
18              MR. BERMAN:  Object to form.
19        A.    Only when you're discriminating
20   against the woman and putting her in the
21   place of acting general counsel and you
22   don't put a man through the same grooming
23   period.
24        Q.    You didn't manage a team of
25   lawyers in other countries, correct?
```

1                   J. FISCHMAN

2        A.     No.

3        Q.     You didn't have pharma

4   experience either, did you?

5        A.     The pharmaceutical business was

6   a very small part of our business in North

7   America.  In fact, they had no products,

8   but I did recognize the importance of

9   pharma on a go forward basis and we were

10  endeavoring to staff up there.

11       Q.     You were present during Josh

12  Berman's deposition, were you not?

13       A.     Actually I wasn't for most of

14  it.  I had a conflict and I didn't join

15  until very late in the deposition.

16       Q.     You were made aware, were you

17  not, that Mr. Berman disclosed, during his

18  deposition under oath, under the penalties

19  of perjury, that in conversations with you,

20  you had stated that Mr. Oliva's abilities

21  were ones that were very high as an

22  attorney?  Let me rephrase.

23       A.     You'll have to show me the

24  transcript.  I didn't hear that.

25       Q.     I just want to ask about your

```
 1               J. FISCHMAN
 2   recollection.  You were present.  We saw
 3   you on the screen and then it turned off
 4   and then you came back.  You were present
 5   during the deposition and during that
 6   deposition Mr. Berman disclosed that you
 7   had regarded Mr. Oliva's abilities as
 8   significant, correct?
 9               MR. BERMAN:  Object to form.
10        A.    I have no recollection of
11   saying that to Josh Berman ever.
12        Q.    Were you given copies of
13   Mr. Berman's deposition?
14        A.    No.
15        Q.    Did you review the deposition
16   in some other form, digital?
17        A.    No.  No, I didn't.
18        Q.    Do you have any basis to
19   believe that Mr. Berman testified
20   dishonestly?
21        A.    Yes.
22        Q.    What?  What's the basis for
23   your belief that he lied under oath?
24        A.    I think he could have -- first
25   of all, you haven't given me his exact
```

```
 1              J. FISCHMAN
 2   language, so if you provide that to me,
 3   that's fine.
 4        Q.    I'm not asking about exact
 5   language.  Ms. Fischman, let me be very
 6   clear of my question.  Do you have a basis
 7   to believe that Mr. Berman lied under oath
 8   during his deposition?
 9        A.    No.
10        Q.    Did you have a meeting with Ms.
11   Saunders on December 17, 2015, do you
12   recall?
13        A.    No, I have no recollection of
14   that.
15        Q.    Do you recall saying to Ms.
16   Saunders, during a meeting in December of
17   2015, that you did not intend to keep Mr.
18   Oliva apprised of the work that you were
19   working on?
20        A.    No, I have no absolutely
21   recollection of that.  That is -- I have no
22   idea what you're talking about.
23        Q.    And you have no documents that
24   would refresh your recollection as to this
25   meeting, correct?
```

1                    J. FISCHMAN

2         A.    I don't know that the meeting

3    even took place.

4         Q.    You have no independent

5    recollection that the meeting took place,

6    period?

7         A.    I don't.

8         Q.    Now during the time that Mr.

9    Oliva started as general counsel, you had

10   requested time to work from home, isn't

11   that right?

12        A.    I did.

13        Q.    And at the time, no one in the

14   legal department with a full-time schedule

15   was actually working from home on a regular

16   scheduled basis, correct?

17        A.    Katherine Roach had always been

18   working from home on a regular basis since

19   the time I began working at the company.

20        Q.    But you've testified under oath

21   and it's pretty well established that Ms.

22   Roach did not work a full-time schedule;

23   isn't that right?

24        A.    That's right.

25        Q.    Now nevertheless, although

1                    J. FISCHMAN

2    there was no set policy in the legal

3    department in MCHA to work from home,

4    Mr. Oliva had agreed to work with you to

5    meet your needs, did he not?

6         A.    He did because I was having

7    some very serious emotional distress that

8    was compounded by coming to the office

9    every single day and the humiliation that I

10   was feeling by having gone through this

11   situation.  So I requested, of my direct

12   report, that I be accommodated for my

13   mental and emotional state.

14            MS. COLWIN:  Can we just go off

15        the record for a minute.

16            THE VIDEOGRAPHER:  The time on

17        the video monitor is 6:52 p.m.  we

18        are off the record.

19            (Whereupon, an off-the-record

20        discussion was held.)

21            (Whereupon, at 7:00 P.M., the

22        Examination of this witness was

23        adjourned.)

24

25            °        °        °        °

1                    J. FISCHMAN

2                 D E C L A R A T I O N

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

                   _____

15                      JENNIFER S. FISCHMAN

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

    _____

22      NOTARY PUBLIC

23

24

25

J. FISCHMAN

E X H I B I T S

DEFENDANT EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| N/A | First amended complaint | 12 |
| 61 to 76 | Copy of mid-year review | 22 |
| 7 to 9 | Ms. Fischman's CV | 84 |
| 2018 | Sakaguchi E-mail exchange | 152 |
| 1026-1028 | Costa/Fischman E-mail | 172 |
| 1234 | | 175 |
| 186-187 | Saunders/Fischman E-mail | 178 |
| 892 | Document | 193 |
| 1206 | Saunders/Fischman Email | 194 |
| 236-238 | Triccoli/Fischman/ Saunders E-mails | 200 |
| 1169-1170 | Troccoli/Costa E-mail | 204 |
| 199-200 | 8/14/15 Saunders E-mail | 208 |
| 1014-1015 | Costa/Saunders E-mail | 209 |
| 896 | Saunders Notes | 213 |
| 253-254 | Costa/Saunders E-mail | 215 |
| 900 | 8/28 Memo | 219 |

(Continued on the following page.)

1                    J. FISCHMAN
2   EXHIBIT    EXHIBIT                    PAGE
3   NUMBER     DESCRIPTION
4   281-282    E-mail notification of    222
               Troccoli complaint
5
    1121       10/12/15 Troccoli/        224
6              Saunders E-mail
7   942-945    9/1/15 Costa/Fujiwara     225
               E-mail
8
    375-383    Fischman Self Assessment  232
9
    1714-1716  Ms. Costa's Review of     234
10             Ms. Fischman
11  1025       8/19/15 Fujiwara E-mail   237
12  1052       8/16/15 Costa/Fujiwara    238
               E-mail
13
    951-952    Costa/Fujiwara E-mail     238
14
    1047-1048  Costa/Fischman E-mail     240
15
    448-450    Fischman/Costa E-mail     249
16             Exchange
17  BATES STAMPED EXHIBITS
18  NUMBER     DESCRIPTION               PAGE
19  41-57      Mid-year Evaluation/      16
               E-mail
20
    47         Ms. Fischman Statement    20
21
    1359-1373 E-mail exchanges           21
22
    1104-1106 2014 E-mail exchange       50
23
24        (Continued on the following page.)
25

1                    J. FISCHMAN
2    BATES STAMPED EXHIBITS
3    NUMBER      DESCRIPTION                PAGE
4    819-820    Job Description            89
     821

5    1209       Ken Fujiwara E-mail        111

6    70-76      Record of Goals            136

7    DEF        Saunders/Costa E-mail      139
8    13 to 15
9    1217       3/18 Sakaguchi E-mail      149
10   1218/1219  Complete Sakaguchi         153
                Exchange
11
     347-350    Statement                  158
12
     1179/1180  Costa/Fischman E-mail      166
13
     35         Kelli Troccoli Document    188
14
     1040-1044  Saunders/Fischman E-mail   189
15
     972-974    Sakaguchi/Fischman         228
16              E-mails
17
18       (Exhibits retained by Counsel.)
19
20              I N D E X
21
22   EXAMINATION BY                        PAGE
23   MS. COLWIN                            6
24
25

1                    J. FISCHMAN

2      INFORMATION AND/OR DOCUMENTS REQUESTED

3   INFORMATION AND/OR DOCUMENTS         PAGE

4   Date when Plaintiff retained         11

5   Current counsel

6   Notes taken by Plaintiff in          118

7   meetings with Ms. Costa

8

9

10

11        QUESTIONS MARKED FOR RULINGS

12  PAGE LINE QUESTION

13  (None)

14

15  TESTIMONY REQUESTED MARKED BY MS. COLWIN

16

17  PAGE LINE

18  Ms. Fischman's testimony from Page 59, Line

19  12, to Page 60, Line 16

20

21

22

23

24

25

1          J. FISCHMAN
2        C E R T I F I C A T E
3

4  STATE OF NEW YORK        )
                            :  SS.:
5  COUNTY OF NEW YORK       )
6

7

8          I, ENRIQUE ALVARADO, a Notary Public
9  for and within the State of New York, do
10  hereby certify:
11          That the witness whose examination is
12  hereinbefore set forth was duly sworn and
13  that such examination is a true record of
14  the testimony given by that witness.
15          I further certify that I am not
16  related to any of the parties to this
17  action by blood or by marriage and that I
18  am in no way interested in the outcome of
19  this matter.
20          IN WITNESS WHEREOF, I have hereunto
21  set my hand this 22nd day of June 2021.
22

23          *Enrique Alvarado*

24  _____
          ENRIQUE ALVARADO
25

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Fischman, Jennifer S. v. Mitsubishi Chemical Holdings
America, Inc.
DATE OF DEPOSITION: 6/15/2021
WITNESSES' NAME: Jennifer S. Fischman

PAGE     LINE (S)          CHANGE                    REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                              _____
                                              Jennifer S. Fischman
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                MY COMMISSION EXPIRES:

**&**

**&** 2:4,15 3:3 4:17
120:14

**0**

**000008** 85:25
**000042** 17:18
**08188** 1:6

**1**

**1** 4:17 5:18 24:22
26:4 33:25 65:12
76:13 102:15
134:20 226:15
233:10
**1-10** 1:10
**10** 50:20
**10/12/15** 265:5
**100** 8:4 205:16
213:4
**10001** 2:22
**10004** 1:23 2:12
**10022** 2:17
**1014** 210:4
**1014-1015** 264:20
**1015** 210:4
**1024** 238:7
**1025** 238:7,8
265:11
**1026** 173:3
**1026-1028** 264:12
**1028** 173:3
**1040** 190:15,23
195:17
**1040-1044** 266:14
**1044** 190:15
**1047** 241:10
**1047-1048** 265:14
**1048** 241:10,11
**1052** 238:25
265:12

**10:27** 1:15 5:16
**10:42** 19:17
**10:46** 19:23
**10th** 217:12
**11** 267:4
**1104** 50:16
**1104-1106** 265:22
**1106** 50:16,18
52:15,23 53:20
69:17,19,20
**111** 266:5
**112** 108:5
**1120** 225:2
**1121** 225:2,7 265:5
**1135398** 2:13
**11530** 2:6 5:14
**1169** 204:23
205:24
**1169-1170** 264:18
**1170** 204:23
**1179** 167:6,6
**1179/1180** 266:12
**118** 267:6
**1180** 167:6,6
**1182** 169:10 171:8
**1183** 170:2,14
171:16
**11:44** 65:10
**11th** 249:14,16,20
**12** 33:24 34:16
50:24 101:23
225:7 264:8
267:19
**1206** 195:4,5
264:16
**1209** 111:6 266:5
**1217** 149:17,18
266:9
**1218** 154:16,25
**1218/1219** 266:10

**1219** 154:17
**1234** 175:18 176:9
178:7 264:13
**1235** 176:12
**1238** 175:18 176:9
**125** 9:17
**12:15** 65:17
**12:47** 92:11
**12th** 211:22
217:12
**13** 129:22 139:16
266:8
**1359** 21:8 174:14
**1359-1373** 265:21
**136** 266:6
**1361** 22:22
**1362** 21:16
**1373** 21:8
**139** 266:7
**14** 17:2 120:19
139:17
**147** 241:8
**148** 241:8
**149** 266:9
**14th** 209:6
**15** 1:14 5:16
139:16,17,25
143:3 188:12
199:2,5,6 266:8
**152** 264:11
**153** 266:10
**158** 266:11
**16** 83:10 239:3
256:6 265:19
267:19
**166** 266:12
**16th** 241:5 256:5
**17** 44:17 83:10
207:7 214:14,17
260:11

**1714** 234:12,25
**1714-1716** 265:9
**1716** 234:12,25
**172** 264:12
**175** 264:13
**178** 264:14
**18** 1:6
**186** 178:23,25
183:13,14
**186-187** 264:14
**187** 178:23,25
183:13
**188** 266:13
**189** 266:14
**19** 237:6,7 238:19
**193** 264:15
**194** 203:5 264:16
**199** 208:20,21
**199-200** 264:19
**1996** 77:8,13,16
86:5
**1997** 86:5
**1:40** 92:19
**1st** 45:17 76:20
135:3 165:8
206:20 217:10

**2**

**2** 65:18 123:8
**20** 21:21 147:5
150:25 263:19
265:20 269:22
**200** 208:20,21
209:4 264:17
**2001** 120:10
**2008** 14:16 33:14
33:21 34:10 35:12
54:18 60:19,25
66:19 77:7 91:22
163:22 196:12,21
197:11,16,23
199:10 237:16

238:5 243:9
**2009** 27:22 163:22
**2010** 27:23 163:22
**2011** 27:23 34:10
**2012** 34:11 237:20
237:20
**2013** 63:4,21 65:2
65:25 66:10,13
67:11 68:15,17
69:14
**2014** 21:4,22 22:18
30:6,15,24 38:25
39:19,23,25 43:13
50:20 54:19 60:19
60:25 76:10,18
79:25 80:20 81:3
82:23 86:21 87:7
90:13,18,21 94:5
96:2,9,21 97:10,17
98:8,16,23 99:4,18
99:21 100:12,23
103:18 104:14,23
105:15 106:2,11
106:12 110:3
113:21 119:11
120:16 121:7,17
122:11,14 124:18
125:8 131:25
132:8 150:16
160:7 212:5
244:10 265:22
**2015** 24:22,23 29:7
29:8,14 53:5
73:23 74:7,10,11
75:3,4 76:13,21
88:2 97:10 102:15
105:11 106:13
113:21 114:9
115:14 119:11
123:19 124:19
125:8 126:20,21

129:22 132:3,9
134:12,18,20
135:3,17,18
163:12 174:4
180:14 187:10
188:3 194:3,8,19
195:9 196:2,12,13
196:21,24 197:2,4
197:11,16,23
198:3,10 199:11
199:13 200:7,11
200:12 206:20
207:4,7 209:6
211:3 214:14,18
225:7 226:15
233:10 236:18
238:19 239:3
241:5 242:19
245:8 247:15
251:15 260:11,17
**2017** 12:6 197:4
198:9,10 199:13
**2018** 149:20 152:9
264:11
**2021** 1:14 5:17
268:21
**204** 264:18
**208** 264:19
**209** 264:20
**21** 121:13,19
265:21
**213** 264:21
**215** 264:22
**219** 264:23
**22** 264:9
**220** 2:21
**222** 265:4
**224** 265:5
**225** 265:7
**228** 266:15

**22nd** 268:21
**232** 265:8
**234** 265:9
**236** 200:16,22
**236-238** 264:17
**237** 208:10,18
211:7 265:11
**238** 200:16 205:23
265:12,13
**24** 9:11,23
**240** 265:14
**244** 217:4
**24556** 268:23
**246** 217:4
**249** 265:15
**24th** 188:2,12
**25** 84:14 106:20
211:3
**253** 216:6
**253-254** 264:22
**254** 216:6,21
**27th** 247:10
**281** 223:3
**281-282** 265:4
**282** 223:3
**28th** 1:23 2:11
220:8
**29** 24:23 29:7,14
**2:25** 123:7
**2:28** 123:13

### 3

**3** 123:14
**3/18** 266:9
**30** 4:16 105:11
145:21
**300,000** 106:19
**30th** 249:15,22
251:9,13
**31** 26:4
**31st** 26:3

**347** 159:2,3 160:24
**347-350** 266:11
**35** 187:22 189:4
207:10 266:13
**350** 159:2
**375** 232:25
**375-383** 265:8
**377** 233:22
**38** 246:19
**383** 232:25
**39** 246:20
**3:00** 221:13
**3:14** 154:7
**3:33** 154:13

### 4

**4** 154:14
**41** 16:20 17:11
174:14,16
**41-57** 265:19
**42** 17:17 23:8
**44** 18:4
**448** 250:9
**448-450** 265:15
**449** 250:11
**450** 250:9,11
**47** 20:11,11 265:20
**4:06** 175:24
**4:10** 176:6
**4:38** 193:5
**4:58** 193:11

### 5

**5** 193:12 234:17
**50** 32:17 156:9,11
156:16 265:22
**500** 83:18
**51** 107:7,21
**519** 2:5 5:13
**56** 247:12
**57** 16:20 17:11
174:14,16

**59** 267:18
**599** 2:16

**6**

**6** 234:23 266:23
**6/15/2021** 269:3
**60** 148:19 149:4,7
266:23 267:19
**600** 2:5 5:13
**61** 22:9,11,13
264:9
**64** 23:8,13 116:14
136:7
**65** 149:7
**68** 22:24
**69** 24:11 136:10
137:10
**6:05** 234:16
**6:08** 234:22
**6:52** 262:17
**6th** 85:13

**7**

**7** 85:16,20 187:10
264:10
**70** 116:17 136:15
137:8,12,23 138:8
**70-76** 266:6
**71** 116:17
**72** 116:17
**73** 116:17
**74** 116:17
**75** 116:18
**76** 22:9,11,13
23:13 116:14,18
136:7,10,16 137:8
137:11,12,23
138:8 264:9
**7:00** 262:21

**8**

**8/14/15** 264:19
**8/16/15** 265:12
**8/19/15** 265:11
**8/28** 264:23
**817** 90:4 91:19
144:12 145:8
**819** 90:5
**819-820** 266:4
**820** 90:6
**821** 90:6 92:2,22
266:4
**822** 90:4 92:2,22
144:12 145:9
**827** 220:13
**828** 220:14,16,19
**8282015** 240:16,18
**84** 264:10
**854** 251:22
**856** 254:6
**89** 266:4
**892** 193:2,14,17
264:15
**896** 214:4,4 215:4
264:21

**9**

**9** 33:23,24 34:16
85:17,20 243:9
251:15 264:10
**9/1/15** 265:7
**9/1/2015** 229:21
**900** 219:25 220:15
264:23
**942** 226:11
**942-945** 265:7
**943** 226:12,16
228:6
**944** 227:23
**945** 226:11

**951** 239:10,11
**951-952** 265:13
**952** 239:11
**972** 228:24
**972-974** 266:15
**973** 229:19
**974** 228:24 229:19
229:19
**9th** 187:16

**a**

**a.m.** 1:15 5:16
19:17,23 65:10
**abilities** 97:12
258:20 259:7
**ability** 10:6,9
27:19 212:12
**able** 44:4 81:12,21
82:24 161:24
**absences** 215:14
215:17 216:10,13
218:7 224:8
**absolutely** 101:25
132:5 140:11
153:10 204:6,9
205:16 250:5
260:20
**accept** 87:13
233:15
**accepted** 87:15,20
**access** 147:12
**accolades** 184:12
**accommodate**
224:9
**accommodated**
262:12
**accounting** 156:2
214:23
**accrued** 19:7
**accurate** 13:16,20
24:3 29:11 34:17
47:7 48:5 75:4

80:9 86:10 92:3
92:25 104:23
116:20,22 121:23
144:13 145:9,13
145:14 159:14
160:3,5 203:21
215:7 216:10,12
224:2 226:23
227:7 233:13
236:11
**accurately** 64:23
**accusation** 230:6
**achieving** 247:19
**acknowledging**
243:2
**acquaintances**
84:23
**acronym** 6:25 7:3
7:5
**acronyms** 6:22
**act** 94:5,8 224:11
224:19
**acted** 250:2,6,6
**acting** 17:14 30:7
30:9,10 36:19,25
50:12,23 51:10
70:10,22 76:12
80:13 93:24 94:7
94:10,16 97:3,20
98:9 102:16,21
103:11 106:15
107:24 109:22
113:22 118:12
119:13 129:18
132:2 134:15
135:3 140:4,20,21
141:5,8 143:20,22
152:14 155:10
162:11 164:24
165:18,23 166:14
166:16 168:4

169:13,25 170:11
173:15 180:14,23
181:14 182:12,16
184:17,20 185:14
185:18 190:3,12
191:18 196:3
203:20,25 205:9
206:19 207:4
218:25 222:21
224:15 233:8
234:4,8 235:12
244:15 249:10
257:6,13,15,21
**action** 12:13
141:13,25 165:19
268:17
**acts** 30:23 38:20
38:23
**actual** 52:6 53:11
150:11 198:19
**acumen** 197:15,21
**ada** 224:24
**add** 28:6
**added** 93:6
**addition** 129:12
170:25 216:4
**additional** 78:8
89:2 93:16,22
114:7 120:7 211:8
**address** 5:12
**addressed** 40:21
189:8
**adjourned** 262:23
**administer** 4:11
**administrative**
131:8 157:9
**admiration** 198:16
**admire** 195:20,23
196:4,13 198:11
198:15,24 199:13
199:15

**admired** 196:8,11
196:14,17,18
198:17,20 199:3
199:10,17
**admission** 13:10
**admissions** 61:22
**advice** 153:18
155:3 168:22,25
169:6 195:13
219:17,20 224:16
225:18
**advising** 189:15
224:15
**advisor** 138:24
**affect** 10:9
**affiliate** 55:22
56:3 57:6 60:3
78:20 128:20
131:3 248:16
**affiliated** 27:5
146:24
**affiliates** 55:16
108:22 121:8,9,16
122:7,10,13,21
123:18 124:16
126:2 146:25
164:18 171:23,23
**affirmative** 21:2
**affirmatively**
138:6 151:10
**afternoon** 221:13
226:19
**agency** 12:16
**aggressive** 155:6
252:2,8
**ago** 88:3 115:14,15
131:13 149:8
239:13
**agree** 15:8 24:15
24:17 28:10 34:24
39:2 75:20 83:25

86:13 100:8 155:5
181:10,22 182:2,3
184:16 194:15
200:6 227:25
235:5
**agreed** 4:5,20 6:22
7:8 159:6 212:2
238:2 262:4
**agreement** 8:21
15:10 46:21 77:20
**agreements** 11:18
60:4 123:25
**aha** 146:5
**ahead** 67:15
152:20,20
**air** 164:20
**al** 5:23
**alcohol** 9:22,25
10:5
**allegation** 71:15
95:11 256:24
**allegations** 39:23
221:25
**allege** 107:9
148:19 247:13
256:20
**alleged** 73:19
149:13 228:16
245:22
**allegedly** 149:13
247:4
**allow** 10:24
170:21
**allowed** 183:3
**alvarado** 1:24 6:5
268:8,24
**amended** 12:20
13:2,6 264:8
**america** 1:8 2:10
5:22 6:13,25
125:3 126:11

258:7 269:2
**american** 55:22
60:3 170:21
**americans** 224:11
224:19 252:24
**americas** 171:17
**amicable** 177:25
**amount** 88:14
223:18
**ample** 160:18
165:13
**andrew** 67:12
**andy** 96:4 97:7,16
**angeles** 84:18
**anger** 202:2
**angry** 201:25
**anne** 199:16
**annual** 29:2,5
58:14
**answer** 8:9,14
10:25 11:15,15
22:4 31:4,5,8
47:14 48:13 57:9
57:25 64:22,22
65:4 66:21 72:9
72:10 87:6 98:16
101:6 102:23
104:15 125:18
150:8 151:10,19
151:21 167:2
183:9 185:12
197:10 198:2,4,7
207:9,18 216:7
220:25 256:19
**answered** 8:22 9:4
48:25 58:22 72:8
107:4,6 110:22
198:13 199:2
**answering** 46:16
64:11 123:20
178:12 185:11

218:2
**answers** 8:2 20:2,4
  82:14 121:12
**anticipate** 10:23
**anticipated** 103:20
  159:9
**anxious** 149:24,25
**anybody** 106:11
  225:18 252:22
**anymore** 135:6
**anytime** 165:7
**apologize** 191:4
**appear** 42:21
  156:13 185:17
**appears** 205:7
  223:10,15 229:3
  231:5
**appointed** 56:19
  56:21,23 63:7
  249:5
**appointment**
  249:8
**appraisals** 175:9
**appreciate** 43:5
  107:7 118:4,19
  199:7 229:25
**apprised** 260:18
**approach** 24:9
  171:11
**appropriate**
  126:16 168:15,22
  168:25 201:14,16
  201:19 257:5
**approval** 37:5
  108:8,16
**approve** 112:10
  171:5
**approved** 126:13
**approving** 112:2
**april** 12:7 24:22
  24:23 26:4 29:7

29:14 45:17 76:13
  76:20 97:10
  102:15 113:21
  119:11 132:3
  134:20 135:3
  140:9 150:25
  165:8 171:3
  183:23 206:18,20
  206:20 207:4,7
  217:10 245:7,8
  247:15
**area** 30:13
**areas** 26:13 114:4
  134:13,22 137:22
  138:2,6,7 139:9
**argumentative**
  201:23 227:13
  236:20
**arising** 229:22
**arm** 37:14 59:17
**arrive** 53:19
**arrived** 247:25
  251:13
**articles** 115:23
  116:3
**ascending** 169:13
**asked** 20:24 38:19
  51:8 65:20 66:9
  66:11,17 67:5
  70:4 82:19 88:15
  91:6,8,12,17 95:7
  123:15 135:6
  136:23 137:14
  141:4 152:19
  168:18 170:23
  192:7 199:9
  204:13 206:5
  251:19 254:24
  256:18 257:4
**asking** 16:23
  56:15,22 78:15

80:15 84:10 88:5
  95:18 98:13 99:13
  99:16 106:8 109:9
  135:16,19 138:17
  140:14 145:13
  167:17 179:22
  184:5 185:16
  188:19 189:2
  202:23 208:13,14
  211:16,22 220:13
  222:15 227:6
  239:14 251:5
  260:4
**assessment** 203:19
  227:18 233:5,16
  235:6 265:8
**assigning** 145:24
**assignment** 149:24
  238:18
**assistance** 195:18
**assistant** 16:10
  17:19,23 32:25
  33:5,19,21 35:14
  36:15,19 43:17
  62:4,9,20 63:2,7
  63:12 64:9 65:23
  69:10 91:17
  118:11 143:20,23
  144:22 145:25
  146:21 147:7,16
  152:14 155:18
  180:21,22,23
  184:18 191:15,24
  204:10 233:6
  249:12
**associate** 120:12
  120:13
**assume** 121:21
  209:17 238:17
**assumed** 133:16

**assuming** 20:16
  43:20 44:14 45:6
  59:5 119:12 122:3
  199:4 234:7
**assumption** 41:20
  90:16 109:18
  209:22 244:16,18
  244:19
**assumptions**
  133:25
**assurances** 178:19
**attach** 8:15
**attached** 167:22
**attack** 177:13,14
**attained** 146:22
**attempt** 226:19
**attend** 61:9,15
**attended** 156:12
**attention** 20:11
  21:16 38:22 69:20
  76:10 90:5 153:14
  159:3 203:5
  226:16 241:11
**attitude** 180:11
**attorney** 7:11
  80:17 129:3,4
  176:24 200:13
  258:22
**attorneys** 2:4,10
  2:15,20 11:5
  58:17 60:9,14
  146:14 148:5
  181:12,13,17,25
**audit** 59:20 155:24
**august** 74:7,9 75:3
  85:12 86:5 187:10
  187:16 188:2,12
  203:4 209:6 211:3
  214:14,17 217:12
  217:12 220:8
  236:17 238:19

239:3 241:5
242:12,19
**authentic** 229:12
**authenticate**
143:10 144:23
**authenticity**
214:20,22 240:6
**authority** 37:3,4
112:9 219:4
**authorization** 37:7
**authorized** 4:11
**available** 99:2
103:23 104:22
105:14,25 147:14
221:13
**avenue** 2:16,21
28:10
**avoid** 224:23
**aware** 50:8 77:5
84:17 89:12 94:14
96:6,8 114:4
148:7 157:17,23
157:25 158:4,11
158:18 237:8
254:14,18,20,23
255:2 258:16
**awareness** 163:20
163:22,25 164:10

**b**

**b** 264:2
**babysit** 216:2
**back** 19:21,25
20:4 27:2,22 30:6
31:14 42:12 47:16
53:21 65:15 66:25
69:25 70:12 77:18
84:2 91:22 92:17
99:3,20 115:9
123:11 124:4
151:16,19 154:11
167:4 175:2 176:4

183:5,5,9 185:7,25
186:4 191:25
193:9 197:9
202:18 207:3
220:23,25 229:9
234:20 252:17
259:4
**backfill** 88:16
**background** 83:16
126:7 226:3
251:20
**backward** 17:25
**bar** 61:22 85:11
248:4
**base** 53:2 106:21
**based** 6:14 11:15
42:15 56:6,8
94:20 113:13
182:10 211:21
221:15
**bases** 95:24
**basic** 148:3
**basically** 26:25
101:22 114:3
208:15 210:11
228:11 245:9
248:12
**basis** 51:23 90:22
90:24 94:9,13
95:20 97:23 98:2
99:22 100:2,8
105:15,17,23
130:8 152:25
160:10,12,14,21
182:4,24 183:19
204:7,9 206:11
215:20 232:8,11
235:24 236:10
237:14 243:11
244:11 255:25
256:23 257:9

258:9 259:18,22
260:6 261:16,18
**bates** 16:19 17:11
17:17 20:11 21:8
21:16 22:20 23:13
50:16 69:19 85:24
90:4 92:22 111:5
116:14,17 122:23
136:7,11 137:8,10
137:12 139:15
144:12 149:17
154:16 159:3
167:12 176:12
187:22 189:4
190:15 228:24
240:15 246:19
265:17 266:2
**battery** 1:22 2:11
**becoming** 102:14
102:15 118:25
165:18
**began** 16:20
190:12 191:16
256:6 261:19
**beginning** 5:17
18:4 21:15 25:25
77:8 85:12 134:20
159:4 177:3
**begins** 27:18
**begun** 17:4
**behalf** 13:7
**behaved** 180:8
185:21
**behavior** 205:9
**belief** 37:2,4 43:7
90:23,24 94:10,21
113:13 160:11,13
160:14 204:14,18
205:14 215:21
235:25 257:4,10
259:23

**believe** 19:11,14
20:25 23:17,19
32:21 37:16,23
38:17 41:11,12,16
49:20 53:8,19
54:10 55:18 56:6
57:13 58:7,19
60:13 62:3 63:15
68:14 69:8,21
70:7 72:5,10
73:10 74:22 75:7
75:12,18 78:20
79:6 87:8,15
90:12 94:3,6,23
95:8 97:25 108:11
109:2,6,7 110:2
121:12 125:2,9
132:6 156:23
165:20 168:2
178:2,10 182:6
183:15 186:16
189:18 195:16
201:12,15 202:18
203:23 205:17
209:12 215:16,19
216:8,11 231:23
232:19 233:11
256:22 257:2
259:19 260:7
**believed** 108:14,18
158:2 231:24
**believing** 51:24
**berman** 2:6 7:9
11:14 15:12,16,21
17:6 22:19 29:20
30:18 31:5,8 32:9
47:2 48:6,24
52:17 54:16 62:6
66:16 71:18 73:20
75:24 79:14 81:15
81:24 82:5,9,12

83:3 89:24 96:22
97:18 99:7,25
118:6 142:7,12
150:14 165:16
166:3 175:8
182:25 188:4,8
195:21 198:12
204:16 207:14
210:14 213:9,15
226:6 229:17
232:10 237:4,10
240:8 243:20,22
251:3 256:4
257:18 258:17
259:6,9,11,19
260:7
**berman's** 258:12
259:13
**best** 9:4 11:16
13:21 68:19 74:5
74:15 87:22 88:5
108:24,24 122:6
124:4 131:20
132:15 150:2
192:10,18,23
202:10,13 211:4,5
219:17 238:17
**better** 124:9
172:16,20
**beyond** 126:21
**big** 86:18 88:11
**bill** 245:6 247:11
247:14,24
**billed** 219:15
**bimonthly** 156:12
**bio** 154:3
**bit** 120:19 128:22
164:25 172:10
173:24 186:19
197:18 211:9
238:14 239:17

**black** 18:24
**blamed** 227:15
**blister** 252:4
**blood** 268:17
**blue** 18:4 20:12
**board** 37:20 56:19
56:20,22 57:10,10
57:13,23 58:5
108:15 128:2
211:23
**boards** 58:8 171:6
**bonus** 106:20
**bonuses** 60:10
**book** 114:17,18
**books** 114:5,12,15
114:24 115:2
**boss** 196:15
**boston** 84:13
**bottom** 17:18
226:17 239:23
240:2
**boyfriend's**
215:25
**brazil** 211:23
221:8
**brazilian** 138:25
**breadth** 180:5
**breadwinner**
246:10
**break** 8:5,6,10
37:15 65:7,19
92:15,20 154:4
193:3
**breakdown** 156:6
**brian** 155:23
**bright** 33:12
**bring** 12:15 96:20
126:20 175:14
202:21
**bringing** 126:18
228:2

**bristol** 96:11
**brittany** 3:5
167:13
**broad** 73:12 74:12
109:4 198:25
**broaden** 61:2
**brought** 98:7,24
99:20 228:8
**budget** 59:14,23
59:25 60:5,7
88:20 128:12,13
**budgetary** 60:13
128:14 129:2
**budgeting** 107:2
**building** 41:6
**bullet** 203:17,21
204:8
**bully** 212:2
**business** 31:22
39:14 57:5,6
58:23 110:9
114:19 115:7
119:15 124:2
127:25 128:9,10
128:20 129:10
131:10 133:23
147:2 160:18
163:13 164:17
229:13 245:14
258:5,6
**businesses** 34:22
39:13,14 58:16
59:24 111:3 121:6
121:8,14,20
123:16,23 128:3,4
129:7 147:6,20
177:20 181:5
**businesslike**
177:12
**businessmen**
40:22

**businessperson**
133:22
**butler** 120:14

|     c     |
| :-------: |

**c** 2:2 5:2 263:2
268:2,2
**california** 86:2
127:20 241:21
256:13
**call** 76:9 118:2
138:14 153:14
159:2 171:22
**called** 5:3 80:21
219:14,16
**calling** 69:19
**calls** 29:21
**calm** 229:25
230:14
**calmly** 202:23
**canceled** 152:5
**candidate** 129:9
158:3,6,13
**capabilities**
251:17,20
**capable** 102:8
246:4
**capacities** 1:9,10
1:11
**capacity** 180:18
**capital** 66:13
245:4,11,25 247:5
247:18
**captured** 7:24
17:22
**car** 257:2
**care** 164:19
206:10
**career** 76:24
**careful** 42:20
172:9 224:7,18

carolina 248:2
case 1:6 40:4 56:6
  269:2
cases 223:23
casual 42:22
catching 140:2
categorically
  101:25
category 255:18
cco 86:25 92:5
  93:3,18,24 102:16
  102:22 106:16
  145:11
center 59:16
central 86:2
certain 40:20 75:2
  162:13
certainly 8:6,10
  39:7 46:20 49:2
  71:24 112:9 115:7
  117:6,7 135:11
  138:15 139:13
  144:20 148:12,12
  148:15 163:2
  196:7 252:7
certification 4:8
certified 121:22
certify 263:4,8
  268:10,15
chain 240:22
challenge 232:23
  232:24
challenging 83:8
  212:7 224:8
chance 92:23
  213:21 239:7
change 96:10
  98:25 133:20
  172:6 242:2
  249:24 250:2,17
  256:10 269:5

changes 23:7,9
characterization
  30:21 252:13
characterize
  176:21
characterizing
  177:7
chardonnay 10:3
  10:19
charge 12:16 34:8
  145:23 152:16
  161:11
chart 215:13
  216:8,24
check 14:25
  121:17
checking 206:7
chem 125:2
chemical 1:8,8
  2:10,16 5:22 6:12
  6:24 7:2,5,7 14:18
  35:20 83:20
  101:14 125:20
  131:6,7,11 132:24
  248:15 254:16
  269:2
chief 16:15 44:21
  77:22,25 78:13
  81:14,22 83:2
  86:14 234:8
  251:11
china 255:6
choice 165:17
choose 138:24
chose 97:4
circuit 84:21
  144:5
circumstances
  146:19 211:19
  213:23 228:4

city 2:6 5:14
civil 1:20 31:13
claim 224:23
  244:12
clarick 2:20
clarify 105:2
clear 18:23 28:9
  32:6 39:22 41:11
  42:23 43:10 54:9
  56:5,17 72:2
  74:21 116:13
  130:21 136:5
  137:12,21 141:21
  160:23 174:7
  184:25 191:17
  241:3 260:6
clearer 197:19
clearly 201:24
clerk 86:5
clerks 84:24,25
  85:5
client 82:17
  133:22 184:12
clients 59:11 60:22
  140:16
climb 243:10
close 133:19,19
closed 211:25
club 248:11
coach 31:7 46:23
  48:9
coached 48:10,21
coaching 48:14
  75:22 126:23
  130:2 136:14
  138:2,14,19
  139:11 162:12,23
  164:16 165:12,21
  166:17,21,25
  169:11 175:4

cocktails 245:9
collaborate 149:25
collaboration
  28:13
colleague 96:4
  97:3
colleagues 39:17
  39:25 65:22 150:2
  150:18
colwin 2:12 5:8
  6:11,20 15:7,15,17
  15:25 17:7 19:24
  20:6 31:7,10 42:8
  47:12,21 48:11
  60:17 66:22 82:10
  82:15 118:2 123:3
  151:16 156:14
  161:17 175:19
  181:7 183:4 185:4
  187:23 188:6
  192:25 227:5
  234:13 243:23
  262:14 266:23
  267:15
combative 236:14
  236:19 237:2
come 34:5 74:2
  87:12 97:15 98:6
  99:2,5 100:21
  105:13,24 120:5
  157:5 188:25
  207:20,22 252:22
comes 99:24
comfortable 39:5
  146:15 153:12
coming 60:11,16
  152:3 171:3 254:8
  262:8
commending
  195:12

comment 24:17 41:7 42:23 134:7 237:15
commentary 25:4 75:13
comments 14:7 18:25 24:8 25:17 26:20,23 28:6,19 41:9,13 46:7,7 74:8 134:4 233:23 245:3,20
commission 269:25
commitment 166:12
communicate 51:2 149:11 164:9 236:9 241:13
communicated 147:21
communicates 256:2
communicating 155:6 194:10
communication 50:18 52:11 70:21 91:11 99:19 100:5 100:23 111:10,19 149:18 152:10,13 153:13,15 164:11 175:3 187:8 188:13 194:5 195:6 203:6,15 205:5 206:14 207:12 209:4,7 223:7 225:5 226:12 239:2,21 240:20 241:16
communications 71:6 89:25 164:6

companies 26:3 27:5 60:3 78:20 88:25 124:25 125:2,9,11,16,24 125:25 126:4 127:8,9 129:11 131:5 146:24 171:25 254:22
company 14:19,21 15:6,9,13 30:8 31:16 32:4 44:19 49:25 55:4,19 56:2,3 77:14,17 78:3 83:18 94:15 96:5,11,19 99:2 104:2,3,25 108:18 113:14 125:3,5,6 125:23 126:15 131:2,3,4,9 150:3 158:19,22 160:16 170:19 191:16 212:16,17 218:17 254:9,11 256:7,25 261:19
company's 148:21
compel 48:13
compensation 60:15
competence 97:12
competency 198:5
complain 71:21,24
complained 71:20 231:25
complaining 223:17 224:7
complaint 6:14 12:21,24 13:3,5,6 13:9,20,23,24 14:5 14:7,12 107:8,18 108:4 145:22 148:18,18 199:21

199:25 200:3,4 220:10,10 221:15 223:13 226:4 247:13,21 264:8 265:4
complaints 95:12 180:10
complete 10:25 52:4 53:10 68:6 75:19 154:17 183:3 209:23 224:13 266:10
completed 58:14 95:10
completely 53:6 122:5 125:7 202:3 206:13 229:6 232:16 236:21
complex 27:19 121:3
compliance 16:15 20:17 44:22 77:23 77:25 78:3,13 81:14,22 83:2 86:14 88:12 115:18,19,20 167:19 168:3,8 234:8 251:12
comport 46:24 169:2,8
comported 234:4
compound 166:9 166:10
compounded 262:8
comprehension 93:10
comprehensiven... 93:10
comprised 33:14

concentrate 134:21
concerned 217:8
concerning 108:6 199:3
concerns 44:3 219:10
concluded 27:9,10 27:11 94:20 232:18
conclusion 27:8 29:21 228:14
conclusions 15:22
condemn 153:18 155:3
condition 9:15 213:5
conducted 222:23 226:8
conference 241:21
confidence 97:11
confidential 221:17
confirms 229:11
conflict 258:14
conformance 31:11
confused 239:17 240:9
confusing 76:2
confusion 15:11
congratulating 111:16
congratulations 150:21
congratulatory 112:18
congruously 240:13
connected 238:22

connection 207:2
224:23
conners 155:23
considered 97:7
106:10,12 244:2,8
244:10
considering
104:24
constant 242:21
constraints 129:2
constructive 139:2
139:10 171:11
173:13,18,24
174:8 175:5,5
192:9 194:24
242:16
consulted 224:22
consumed 9:22
10:2
consuming 10:5
contact 100:12
101:12 103:17
104:13 109:14
110:18,23,25
130:13 132:19
133:4
contemporaneous
70:19 71:13 72:21
72:25 73:7
content 69:22
contents 116:21
context 53:15
64:23 65:5 132:17
132:25 154:19,24
161:21 170:16
177:17,17 209:19
209:20 225:16,19
continue 15:25
53:16 64:14 88:23
129:6 133:3
153:18 155:2

250:3
continued 264:24
265:24
continuing 61:20
61:21
contradict 35:7
70:2 105:16 184:9
contradiction 54:4
contradicts 107:19
254:2,5
control 38:16
49:11 143:12
controlled 10:12
controlling 13:3
controversial 41:6
controvert 100:21
conversation 46:2
46:12,19 47:24
76:6,14,18 79:24
82:4,16 86:19
90:13 96:9 107:14
127:14 131:19
132:7,18 134:17
135:2 141:12
143:7 150:15
177:25 210:24
211:2 213:24
214:13,24 221:16
221:17 222:4,18
222:24,25 251:16
conversations
39:8 56:7,8 72:19
72:24 110:8,14
114:2 148:16
158:2 258:19
cooperate 222:6,9
copied 209:9
copies 114:23
117:20 259:12
copy 4:14,17 22:7
22:14 107:8

176:14 190:20
202:21 223:9
226:14 239:22
264:9
corp 125:4,17
127:11 131:6,7,11
132:24 170:18
corporate 16:3
35:16 36:15 91:21
118:11 120:13
143:19 147:7
184:18
corporation 1:8
2:16 7:3,5 124:9
124:12 125:10
correct 7:14,21
8:15,18,19,23 9:2
9:5 10:20,21
11:22 12:10 13:11
13:17 14:13,16,22
15:2 16:4,5,13,17
17:5,20 18:5,10
20:14 21:19 22:5
22:14,24 23:12,13
23:18,23 24:15,25
25:13 29:7,19
30:17 32:8,13,24
33:6,9,16,19 34:17
35:3,14 36:9,16
40:2 41:16 43:11
43:17 44:22 45:3
45:9 46:9,13,25
47:25 48:2 49:21
49:22 50:2,6,13
54:21,24 56:7,19
56:24 57:6,7,23
58:12 59:7,11
61:15 62:5,12,23
63:10,14 65:23
66:5 67:24 68:11
69:11,23 70:5,10

75:8,14,23 76:7,8
76:16,21 77:23
79:5,8,13 83:2
84:11 86:6,16
89:7 90:9 91:2,7,9
97:5 100:16
102:11,17,18
104:25 110:15,16
111:11 116:23
117:16 120:10,14
121:23 129:15,19
133:25 134:4
136:7 139:22
141:19 142:6,23
142:24 148:8
149:2 150:7
151:13 152:11
153:16 155:14
156:3 159:14
167:15,19,24
168:17,23 169:7
169:15 170:8,12
170:13 171:12
173:5 174:8 176:9
176:15 178:9,17
178:21 179:20
180:16 181:15
182:12 184:20
185:24 187:10
189:9 190:10,21
190:25 191:8
193:18 195:7
199:21 200:8,20
203:7 205:6
206:23 207:6,25
208:12 209:10
210:5,16 213:3,8
216:24 217:5
220:21 221:20
222:2 223:9 224:3
226:5 227:23

228:9,12 229:2
230:11,17 231:15
231:22 233:7,9,13
233:24 234:10
235:7,13 236:11
236:12 238:19
239:16 240:16
241:6 243:21
245:17 247:8
248:22 249:6,12
250:12,18 251:12
253:8,13 254:3,9
254:22 256:3,21
257:17,25 259:8
260:25 261:16
263:9
**corrected** 171:14
171:21 216:15
**correlation** 103:5
103:9
**corresponding**
205:21
**corroborates**
90:16
**cost** 158:22 159:9
**costa** 1:9 2:11,21
3:8 6:12 16:11,14
16:20 17:4 18:9
18:18,19 21:14
24:5,25 25:3
28:13,21 32:13,16
33:15 36:12,13
39:18 40:6 41:11
42:6,7,18 43:10,16
43:19 44:2,8,20
46:6,13 47:24
48:15,20 49:25
50:19 53:3 54:10
54:20 57:22 58:4
60:21 61:2,14
62:10,21 63:9,23

64:6 67:11 68:8
69:22 70:9,21
71:7,17 72:4,22
73:3,8 74:14,22
75:14,21 76:3,11
76:13,23 77:3
78:11 79:17,24
80:19 81:6,9,19
86:20 87:24 90:14
94:18 96:2,10,15
96:25 98:22 99:18
100:6,22 101:12
101:20 103:2,10
107:9,12,22
110:13 116:25
117:14 126:24
127:3 131:14
132:15 133:8
134:3,7,12 136:13
137:5 138:8 139:9
139:19 141:7
143:2,9,14 149:13
150:16 155:14,17
157:17 158:4,11
160:25 163:4,9
164:25 165:12,22
166:12 167:15,18
167:21 168:14,21
169:15 170:6
171:10 172:15
173:4,8,25 174:6
175:3,17 176:15
179:18 180:4
182:9 185:21
187:15 188:3,11
189:15 190:9,20
192:13 194:4,9,14
196:15 203:16
205:6 206:21
209:5,7,12,25
210:8 216:22,23

219:3,8,19 220:9
220:20 221:23
222:5 223:8
226:13 233:15
235:7,9,16 236:8
236:10,14,21,23
237:6,25 239:3,21
240:25 241:10,12
241:18 242:8,17
244:16 245:11
246:25 247:4,17
249:18,23 250:11
264:12,18,20,22
265:7,12,13,14,15
266:7,12 267:7
**costa's** 70:14 82:3
82:22 98:6 205:12
227:18 265:9
**could've** 104:6
243:18
**counsel** 4:6,17
5:19 6:21 7:8 8:7
11:6,22,22 12:2
13:7 15:10 16:3
16:11,15 17:15,20
17:23 22:19 30:5
30:7 33:2,6,9,16
33:19,21 35:17
36:15,16,19,20,25
43:14,17,21 44:5
44:14,21 50:11,12
50:23 51:11 56:13
62:4,9,20 63:2,7
63:13 64:10 65:23
69:10 70:10,22
71:22 76:12 77:6
77:13,21 78:12
79:19 80:13 81:22
82:8,25 83:12
86:14,25 89:3,7,9
89:15,23 91:18,21

92:5 93:3,18,24
94:7,11,12 96:21
97:4,20 98:10
101:22 102:16,21
103:14 106:16
107:25 109:23
111:4 113:23
117:4 118:11,12
118:12 119:13
121:5 122:2
129:18 132:2
134:16 140:20
143:5,19,20,21,22
143:23 144:14,21
144:22 145:10
146:2,8,9,13,21
147:7,8,11,13,16
147:17 148:6,7
152:14,15 155:10
155:18 157:20
158:8,15 160:20
162:11 164:25
165:24,25 166:15
166:16 168:4,15
169:12,14,25
170:12 173:8,15
180:15,24 181:14
181:19,20,23
182:2,12,16
184:17,18,19,20
185:14,19,24
186:18,25 187:3,6
187:9 190:3,12
191:18 192:12
196:3 203:20
204:2 205:10
206:7,19 207:5
218:16,19,23
219:2,9,12 222:21
222:22 224:16,22
227:22 228:15

233:7,8 234:5,8
235:13 237:11
242:23 244:14
247:7,16 249:5,10
249:12 251:11,18
255:9 257:6,7,13
257:14,16,21
261:9 266:18
267:5
**counselor** 81:13
**count** 199:6
**counted** 218:8
**counter** 9:20
**counterproductive**
177:5
**countries** 257:25
**country** 2:5 5:13
37:10 42:3
**county** 268:5
**couple** 248:3
**course** 7:22 11:3
27:4 40:12 70:12
79:16 94:22 95:13
95:22 97:8 103:8
173:14 196:14
203:22 208:7
219:13 246:2
255:22
**court** 1:2,19 4:13
5:25 6:4,6 13:10
85:25
**cover** 163:14
**create** 212:15
**created** 53:5
144:19,24 213:3
216:9 233:4
253:19
**credibility** 140:16
180:12
**criminal** 8:14,17

**critical** 46:3
235:11
**critically** 13:14
**criticism** 139:10
171:11 175:5
176:22,25 177:9
184:15
**criticisms** 75:7
**criticize** 256:2
**criticizing** 176:18
**crying** 191:20
**cues** 7:24
**cultivate** 152:22
153:3
**cultural** 158:23
163:20,22 164:9
**culture** 31:20
163:25 252:15
**current** 11:5 267:5
**cut** 55:23
**cute** 188:25
**cv** 1:6 85:15,21
86:10 169:20
170:6,19,24,25
171:15 264:10

---

**d**

**d** 4:2 263:2 266:20
**daisuke** 36:2,3,3
**data** 45:18 97:8
114:3 125:12,14
126:24 166:21
**date** 1:14 12:23
22:10 37:19 68:16
68:18 85:18
109:11,11,21
129:20,22 144:18
149:2 152:18
161:12 187:15
193:15 200:9
201:7,8,10 206:15
214:2 217:10

236:18 240:18
249:16,20 267:4
269:3
**dated** 21:21 29:6
50:19 187:9 209:5
225:6 226:15
229:20 233:10
239:3
**dates** 68:2,4 152:2
**day** 34:19 87:16
110:6,6 147:12
202:8 207:15
240:25 248:9
249:13 253:17,20
262:9 263:19
268:21 269:22
**days** 4:16 34:4,5
188:12 211:11,12
216:4,5 217:15
256:6
**dc** 220:19
**deal** 86:18 89:4
130:6 131:15
133:5,7 138:25
147:21 196:11
212:15 217:10
244:23 245:2
**dealing** 146:23
**dealings** 244:20
**deals** 27:12
**december** 30:6,15
30:24 38:25 39:19
39:22,25 43:13
45:16 50:20 76:10
76:18 79:25 80:20
82:23 86:20 87:7
87:25 90:21 94:5
97:9 113:21
119:11 121:7
122:11 131:25
132:8 150:16

191:25 192:2
212:5 244:24
251:14,15 256:5
260:11,16
**decision** 51:18
94:24 108:21
112:4 140:7
159:16,19 161:11
170:20 183:18
243:11
**decisions** 37:6
108:6
**deep** 213:20
**deeply** 72:12
**def** 139:16 266:7
**defendant** 2:15,20
264:4
**defendant's** 12:21
22:8 23:8,8 85:16
85:20 91:18
149:17 176:8
193:14 205:23,24
207:10 211:6
**defendants** 1:12
1:19 2:10 5:20
6:15
**defense** 232:18
**defensive** 194:4
201:23 205:11
206:12 222:14
227:12 236:15,19
237:2
**deferential** 236:21
**deferred** 121:5
**deficit** 212:21
**defined** 138:7
**definitely** 31:15,18
31:19,23 32:2
61:20 115:16,22
177:15 186:21
192:22

definition 198:19
delegating 145:24
delivered 36:21
demand 210:18
demands 118:4,22
demonstrated 27:18
demote 182:24
demoted 152:15 246:16 249:9
denied 228:7
dennis 247:11,14 248:9
department 17:4 20:16 21:3 32:16 32:20 33:10,13 34:7,14 35:2,12,23 39:12 47:10,20 59:17,18,19,21 62:23 63:9,17,25 64:13,18,20 67:9 69:7 75:23 76:5 80:18 83:21 128:13,21 129:13 157:3 158:3,7,14 159:10 161:13 180:25 181:18 192:15 195:20,24 196:5,6,16,22 197:5,9,13,23,25 198:8,11,16 199:10,14,15 200:15 204:4 212:20 225:11 237:9 242:25 261:14 262:3
depiction 92:25 116:21 145:15
deposition 1:17 4:8,9,14 5:18 7:13 7:14 64:15 258:12

258:15,18 259:5,6 259:13,15 260:8 269:3
dept 64:3
depth 180:6 255:13
describe 111:14 126:24 127:4 131:18 134:24 194:4
described 86:7 126:22 145:11 162:4 175:2 199:19,23
description 80:10 89:7,9 90:9,11 91:7,9,11,13,17,20 91:23 92:3 143:25 144:10 264:7 265:3,18 266:3,4
descriptions 89:13
designation 77:22
desk 137:18
despite 149:12
detail 235:19
detailed 24:4 235:10
details 88:10
develop 137:14 164:16
developed 120:19
development 120:18
deverell 3:9 6:2
devote 20:19
devoted 166:12
differences 143:17 143:21 144:3
different 96:19 115:19,20,23 142:20 181:24

198:14 229:6 232:16,16 235:5 239:19 248:19
differently 28:14 70:17 142:8 152:7 236:24
difficult 123:21 177:21 192:21 211:18 243:10
digital 259:16
diligence 119:3,21 120:7 166:13
dinner 10:4 245:8 248:4,8 256:15
direct 17:16 20:10 54:3 63:13 69:9 81:10,17 85:23 90:5 109:14 130:13 152:10 153:13 203:5 209:3 226:16 262:11
directed 220:17
directing 50:17
direction 229:24 242:3
directly 32:12 98:21 132:21 147:17 149:11 181:17 190:8
director 155:20,23 155:25 156:2,20
disabilities 224:11 224:19
disagree 23:23,24 23:25 24:7 30:20 178:18 181:6 235:15,20 237:15 252:12
disagreed 24:18 24:20

disagreement 182:5
disappointing 128:22
disclosed 72:14 75:2 81:6 97:10 107:5 179:7 258:17 259:6
discovered 216:23
discovery 56:10 56:15 118:4,22 179:3 210:6
discriminated 30:2,4 31:19 32:4 40:5
discriminating 42:17 71:22 95:17 257:19
discrimination 29:18 30:23 38:20 38:23 39:24 62:5 71:15,20 94:5,8 157:12 165:15 166:2 242:15,20 242:22 244:12 246:6
discriminatory 40:17 41:2,9 42:21 94:12 165:19 166:17
discuss 30:25 35:8 49:18 51:2 201:3 202:12 241:15
discussed 69:16 138:11 149:8 157:19
discussing 192:18 202:7 230:3
discussion 19:20 53:22 73:2 83:24 92:14 123:5,10

140:10 160:8
176:3 234:19
244:24 262:20
**discussions** 51:18
60:13 72:21 73:5
73:8 110:4,8
192:23
**disease** 126:19
**dishonestly**
259:20
**dispute** 29:12 50:5
51:8 58:4,6 77:12
79:11,15 82:3,21
96:15,25 97:21,24
99:6,8 104:5
105:24 143:2
150:12 160:2,4
188:11 214:15,16
214:20,22
**disputed** 243:4
**disputes** 25:11,13
53:20 100:10,16
101:9,12 161:7
253:12,19
**disputing** 99:23
**disrespectful**
191:20
**distinction** 130:20
**distress** 262:7
**district** 1:2,2 5:24
5:25 85:25 86:2
**doctor** 189:24
**doctor's** 189:19
**document** 14:10
16:19 17:9,10
18:2,2,5,22,24
19:4,11,14 20:13
21:8,9,12,25 23:2
23:18 24:3,10,13
24:18 25:10 28:17
38:15 49:15 50:15

50:17,21 51:7
52:15,23 53:18,19
69:16,18 70:19
73:21 75:16 89:20
90:4,12,17,19 91:4
92:21,23 93:7,14
93:20 100:9,11,14
100:15 101:9,11
104:9,18,19
105:19 106:4
108:13 109:17
110:11 111:7,13
115:9 116:13,22
122:19,25 123:17
123:24 125:18
136:9,15 137:23
137:24 139:7,12
139:15 142:10,13
142:15,18,20
143:11 144:9,9,18
144:20 145:12
149:23 150:13
154:2 160:24
161:12,15,21,22
161:25 162:20
167:7,9,12 168:23
169:23 170:5
174:4 178:25
179:2,12,14
182:19,20 183:13
183:16,20,21,23
184:15 185:9,20
187:2,13 189:5,7
190:16,18 191:3
193:13,18,19,21
193:25 203:10
204:24 205:2
207:19,21,23
208:21,22 210:5,7
214:4,9 215:6
216:8,16 217:5

220:2,15 223:4
225:3 229:8,10,15
230:12,20 231:4
232:20 233:2,5,12
233:22 234:25
235:2,17 236:7
238:9,20 239:10
239:18 240:7
246:19 248:20
250:9 253:19,22
254:3,7 264:15
266:13
**documentary**
100:4 159:25
160:8 161:6,9
231:19
**documentation**
35:7 43:23 44:2
100:25 106:6
151:14 184:6
**documents** 24:20
25:8 50:9 52:4,13
53:14,25 57:10
61:18 70:23 71:3
73:17,24 74:3,18
74:21 89:11
101:16 104:12
106:9,10 109:24
119:18 137:8
145:3,8 157:15
184:8 187:13
202:24 205:22,25
206:9 211:23
221:8 230:25
231:2 240:10
260:23 267:2,3
**doing** 6:18 58:24
85:7,9 115:13
127:12 149:14
182:15 183:23
207:16 242:25

246:4,8 256:14
**donna** 1:9 2:11,21
3:8 6:11 16:11,14
17:13 28:3 32:13
32:16 36:12,13
39:17 40:6 44:20
51:13,19 52:5
54:10 58:13 67:11
70:14 90:13 94:18
94:22 98:15
100:12 101:12
104:13 110:2
114:2,20 116:8,9
126:6 128:2 130:2
130:14 132:12,13
135:14,22 137:16
137:25 138:12
147:17 148:16
150:16 162:5,6,9
170:23 172:8
188:23 190:20
191:22,23 192:7
192:22 196:15
207:8 212:5
220:20 221:11,12
229:23 230:4
231:25 239:25
240:3 245:10,24
248:12
**donna's** 19:8
52:10 53:12
156:12 191:14,19
255:21
**door** 211:25
252:18
**doubt** 97:14 98:6
159:12,21 225:9
**doubtful** 102:5
**draft** 17:13 26:9
74:6,24 179:19

**drafted** 14:4
233:22
**drafting** 13:23
18:15
**draw** 241:11
**dress** 40:15
**dressed** 32:2 40:21
**drinks** 248:3,5,6
**drug** 126:18,20
**due** 99:13 119:3
119:21 120:7
158:8,15,22
166:13 223:23
**duly** 5:3 263:5
268:12
**dump** 45:18 97:9
114:3 126:24
166:21
**dunkley** 176:20
177:8 178:8,16,21
**dunkley's** 177:16
**duties** 92:4 93:2
93:16,22 144:7,10
145:6,15,19
**duty** 78:8

**e**

**e** 2:2,2 4:2,2 5:2,2
17:12 21:13 50:18
51:13,22,24 53:3
53:25 54:6 74:6
74:24 111:9,15
137:18 138:22
139:19 149:18
153:22 154:22,23
165:9 167:8,14
169:14 173:3,7,10
176:13,17 177:3,4
177:8,12,16,24
178:6 179:17,19
180:2 190:19
191:7 194:25

195:5 200:17
201:4,15 202:3,6
202:22 203:15
205:4 207:8 208:3
209:4,6,9 211:6
216:22 217:11,21
221:8,10 223:7
225:5,15,16
226:12 228:20,24
229:20 230:19
231:7,16 232:2,5
232:13,17 238:8
238:12,22 239:2
240:2,21 241:9
242:3 245:15
250:9,13 263:2
264:2,11,12,14,17
264:18,19,20,22
265:4,6,7,11,12,13
265:14,15,19,21
265:22 266:5,7,9
266:12,14,16,20
268:2,2
**earlier** 19:7 20:24
27:21,25 31:15
63:19 69:17 70:6
90:7 105:6 152:19
163:24 173:11
192:19 197:10
211:16 217:19
223:22 226:24
240:20
**early** 12:6 26:5
114:20 131:22
164:3 228:14
245:3
**earned** 62:7 246:8
**ease** 40:24
**easier** 57:25 138:5
244:20,22

**easily** 217:22
**ed** 61:20,22
**effect** 4:12,15 10:6
140:22
**effective** 76:13,20
**effectively** 94:17
**effectiveness**
180:12
**eight** 113:13
118:10 138:15
160:16 184:9
**either** 70:25
114:20 132:8
213:21 243:25
244:7 258:4
**elevate** 96:3,17,18
97:2 247:7,16
**elevated** 49:24
50:11,12 62:3,9,20
62:25 70:9 76:12
76:20 77:21,25
78:5 79:13,20
82:8 84:21 97:16
106:14 112:17
140:15 141:4
155:9,17 169:24
190:11 191:18
**elevation** 70:22
78:7 94:10 103:7
109:22 170:11
180:14 181:14
**elevations** 76:24
77:3
**email** 264:16
**embarrassing**
140:22
**emotional** 163:10
163:12,17 177:11
230:15 262:7,13
**emotions** 40:14

**emphasis** 61:3
**emphatically**
235:18
**employed** 55:9
**employee** 35:10
55:12 100:13
197:12
**employees** 37:22
55:4 57:14 75:22
109:8 110:5 128:5
130:25 244:21
**employer** 15:20
32:8
**employment** 27:10
55:24,25 61:4,7
101:15 199:20,24
200:8,14 218:19
219:14 226:2
**encouraged** 61:2,9
**endeavoring**
258:10
**ended** 225:22
256:18
**ends** 26:3 65:11
123:8 150:23
234:17
**energy** 20:19
166:11
**enforcement**
12:16
**engage** 112:20
**engaged** 222:25
**engagement** 11:17
**engaging** 115:16
115:17
**enjoy** 206:11
**enormous** 88:14
**enrique** 1:24 6:5
6:18 19:25 42:8
60:17 183:5 268:8
268:24

ensure 13:14
entire 26:11 33:3
  59:14,22 88:7
  178:4 183:15
  187:2 236:22
  246:13
entirely 182:3
entity 42:4 57:5
environmental
  148:13
errata 269:1
escalating 229:24
escorted 118:15
especially 113:18
  126:10 148:10
  186:20
esq 2:6,7,12,17,22
  3:3,5
establish 42:3
  52:14,22 73:18
  104:10 188:19
established 54:19
  60:20 116:23
  134:6 144:13
  145:10 157:14
  161:23 166:19
  187:25 189:12
  213:6 223:21
  251:10 261:21
establishes 91:2,4
estimation 234:3,9
et 5:23
ethics 256:14
evaluated 60:14
evaluation 16:25
  17:14 18:13 23:12
  25:15,18 26:8,10
  28:11 29:19,24,25
  30:3 174:19,20
  265:19

evaluations 17:3
  25:12 29:13 58:9
  58:10,20 61:13
  173:23 174:5
events 10:7 235:23
eventually 116:9
everybody 196:7
  225:23
everybody's
  177:22
evidence 29:17
  41:18,21 52:21,22
  52:25 55:11 100:4
  152:7 157:11
  159:24,25 160:8
  161:6,10 165:14
  188:16,18,21,22
  231:12,18,19
  242:14,19 243:25
  257:4
evident 25:8
evolving 117:3
evp 62:21 79:12
exact 27:23 68:2,3
  184:23 206:15,15
  245:10 259:25
  260:4
exactly 12:8 67:3
  202:20 205:25
  250:5
examination 5:7
  262:22 266:22
  268:11,13
examined 5:5
example 27:17
  31:24 39:11
  126:10 127:10,24
  128:6 174:10
  241:4
examples 236:8

exceeded 234:6
excellent 184:13
  255:23
exception 23:4
  125:23 129:7
  231:3
excessive 218:6
exchange 69:22
  70:8 71:16 80:20
  87:25 89:11
  139:19 140:25
  141:6 143:14
  154:17,19 167:14
  169:14 170:5
  171:12 172:15
  176:13,19 179:17
  190:19 191:7
  200:24 201:13
  202:6,22 209:24
  210:7,9 211:24
  216:22 217:11
  228:19,25 230:7
  231:8,13,19 238:8
  238:12 241:9
  246:25 250:10,13
  264:11 265:16,22
  266:10
exchanged 157:16
exchanges 21:14
  173:4,7 177:7
  192:20 200:17,19
  201:5 230:9
  265:21
excited 20:14
  128:23
exclamation 20:20
  172:22 208:11
  248:22
excluded 148:20
excuse 22:21

execute 45:2 95:3
executed 22:13
  93:23
executive 62:11,12
  79:7 108:21
  111:17 112:20
executives 132:23
  148:25
exhibit 12:22 13:2
  22:9,11 85:16,20
  91:19 111:5 152:9
  176:9 189:4
  193:14 195:4,17
  211:16 264:6,6
  265:2,2
exhibited 49:21
  197:15
exhibits 264:4
  265:17 266:2,18
exist 90:17 91:4
existed 121:16
  122:13
existence 123:18
exists 14:2 93:20
  110:12 203:24
expansion 249:2
expat 155:21
expats 157:5
expect 89:4 148:2
  148:4 189:25
expectations
  169:3,9 234:6
expended 245:11
  245:25 247:5,18
expense 161:5
experience 47:8
  47:18 48:7 146:23
  147:5 158:9,16
  160:19 180:7,16
  180:18 181:10,12
  181:16 254:15,25

255:3,13 258:4
**experienced** 82:17
83:13,15
**experiences**
182:11
**expert** 121:4
232:23
**expertise** 61:3
180:6
**expires** 269:25
**explain** 84:8
112:11 128:16
141:7 186:24
202:23
**explained** 127:7
128:14,16 166:21
217:19 221:14
**explaining** 25:24
**explanation** 53:12
134:8
**expressed** 44:9
211:15,21 213:19
226:21 227:9
**expressing** 178:13
**extensive** 117:12
118:9 127:3
166:20 173:21
200:7 254:15
255:3
**extent** 70:4 133:17
138:13
**extern** 86:5
**extremely** 83:14
95:15 201:22
222:13
**eyed** 140:13

**f**

**f** 4:2 5:2,2 268:2
**fabrication** 183:17
183:24 235:22,25

**fabrications** 52:4
53:5 73:14,19
75:19
**face** 189:21
**facing** 162:10
252:17
**fact** 40:19 46:23
71:14 79:11 81:10
82:6 88:16 91:2
94:21 95:4 96:15
100:16 102:4
105:13 106:25
112:22 116:5,25
117:12 130:15
143:8 171:24
173:16 188:11
191:22 206:13
213:11 225:10
226:8 233:4 258:7
**factual** 13:16 94:9
95:20 97:23 98:2
99:22 100:2
105:15,17 150:12
152:25 160:10,21
183:19
**fail** 142:5
**failed** 103:3
**failure** 141:16,17
224:9
**fairly** 6:23 175:20
214:24 216:11
**faith** 230:3
**fall** 96:2,8,20
97:17 98:8,23
99:4,18,20 100:23
103:17 104:13,22
105:15 106:2
110:3
**fallacy** 224:13
**false** 183:14,16,20
184:5 205:18

**familiar** 7:13 89:6
119:2 126:4
229:10 252:19
**familiarity** 120:2
125:22
**familiarize** 120:17
**family** 71:25 72:14
87:20 246:10,17
**far** 17:15 156:4
157:9 219:15
**farce** 222:19
**father** 72:18 73:6
**fda** 126:13
**february** 26:5
85:13 86:5
**federal** 1:20 31:12
83:16 84:4,22,24
**feedback** 58:17
59:6 76:4 135:4
135:15 136:3
139:2,5 165:2,5
167:18 173:13,19
173:20,21,24
174:7,8 175:6
179:23 182:10,13
194:24 227:19
242:16
**feel** 29:22 30:2,3
39:5 41:21 102:5
152:4 217:18
**feeling** 39:4
172:10,16,20
238:16 262:10
**felt** 31:18,19,23
32:2,4 38:20 39:6
40:4,16 41:2,7,8
42:14 44:3 95:16
112:15 153:12
192:9 194:9
217:16 219:4

**female** 35:20
231:21 247:17
**fifth** 2:21
**fighting** 177:4,8
**figure** 192:5
**file** 2:13 232:18
254:5
**filed** 6:15 12:24
**filing** 4:7 13:10
**fill** 26:12,14,17,18
**filled** 11:11
**filling** 26:7
**film** 245:7
**final** 37:3 108:8
**finance** 156:2
**financial** 138:24
**find** 27:23 53:24
54:3 117:23
177:23
**fine** 15:16 140:11
253:6 260:3
**finish** 8:9 35:11
42:18 43:15 44:18
46:4 217:24
**fire** 80:22
**fired** 81:2 210:13
**firm** 85:3 113:13
120:10
**firms** 83:17
**first** 5:3 11:4
12:12,20 13:2,2,6
24:16 68:5 90:8
90:10 112:25
124:3 131:23,24
138:23 146:20
166:18 168:2,7,12
169:2 172:14
173:16,17 187:5
187:15,17 188:2
190:23 200:22
203:9 220:4 229:9

229:11 246:20
247:25 248:14
259:24 263:5
264:8
**fiscal** 26:2,4
**fischman** 1:3,18
2:5 5:1,11,19,21
6:1,8 7:1,10 8:1
9:1 10:1,22 11:1
12:1 13:1,5 14:1
15:1 16:1 17:1,8
18:1 19:1 20:1,25
21:1 22:1,12 23:1
24:1 25:1 26:1
27:1 28:1,9 29:1
30:1 31:1 32:1,5
33:1 34:1,24 35:1
36:1 37:1 38:1
39:1 40:1 41:1,25
42:1 43:1,9 44:1
44:20 45:1 46:1
46:17 47:1 48:1
49:1 50:1 51:1
52:1 53:1,14 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1,15 65:1,19
66:1,20 67:1,12
68:1 69:1 70:1,25
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1,6 91:1
92:1,20 93:1 94:1
95:1,25 96:1 97:1
98:1,20 99:1
100:1 101:1,3,19

102:1 103:1 104:1
105:1,12 106:1
107:1,6,25 108:1
109:1,10 110:1
111:1,6 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1,15
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1,12
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1,18
140:1 141:1,19
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1,15 155:1
156:1 157:1 158:1
159:1 160:1 161:1
161:17 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1,22
174:1 175:1 176:1
176:7 177:1 178:1
178:24 179:1
180:1 181:1 182:1
183:1 184:1,14
185:1,2,12 186:1
187:1 188:1,20
189:1 190:1 191:1
192:1 193:1,16
194:1 195:1 196:1
197:1 198:1,23
199:1 200:1 201:1
202:1 203:1 204:1

204:25 205:1
206:1 207:1 208:1
209:1,23 210:1
211:1 212:1,25
213:1 214:1 215:1
216:1 217:1,6
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
226:3 227:1,6
228:1 229:1 230:1
230:16 231:1
232:1,22 233:1
234:1 235:1 236:1
237:1 238:1,10
239:1,15 240:1
241:1 242:1 243:1
244:1 245:1 246:1
246:18 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1,5 261:1
262:1 263:1,15
264:1,12,14,16,17
265:1,8,10,14,15
265:20 266:1,12
266:14,15 267:1
268:1 269:2,3,21
**fischman's** 15:19
85:15 264:10
267:18
**five** 55:21 235:10
**fixed** 178:16
**flag** 53:20
**flagged** 89:22
**flattering** 112:21
**flattery** 112:24
113:4

**floor** 1:23 2:11
**flown** 255:5
**fluff** 28:5 150:20
**focus** 17:16 21:15
38:22 131:12
134:14,14 135:5
164:8,18
**focusing** 112:25
113:2 244:5
**follow** 240:13
**following** 6:22
33:14 87:16
177:24 200:24
202:17 208:6
264:24 265:24
**follows** 5:6
**force** 4:15 127:13
127:16
**foregoing** 263:8
**foreign** 125:16
**forgotten** 185:3
**form** 4:21 17:6
29:20 30:18 32:9
47:2 48:6,24
52:17 54:16 62:6
66:16 71:18 73:20
75:24 79:14 81:15
81:24 82:5,9 83:3
89:24 96:22,24
97:18 99:7,25
142:7,12 150:14
165:16 166:3
182:25 195:21
198:12 204:16
207:14 210:14
213:9,15 226:6
232:10 237:4,10
240:8 243:20,22
251:3 256:4
257:18 259:9,16

**formal** 220:10
221:15
**formalities** 7:12
7:16
**formality** 6:18
**formally** 134:19
**format** 168:5,7
**former** 12:2 13:4
14:19 100:12
249:11
**forming** 126:14
**forth** 86:10 91:15
96:16 122:4
136:15 137:7
138:8 142:18
143:3 144:8 145:7
160:24 175:2
183:20 233:12
268:12
**fortinsky** 2:17
56:13
**fortune** 83:18
84:19
**forward** 18:2
172:5 192:23
241:25 242:12
258:9
**found** 27:21
255:22
**four** 64:17 156:6,7
**fractured** 178:8
178:15
**frank** 85:14
**free** 219:16,20
**frequently** 26:17
120:4,22 141:4
172:24
**fried** 85:13
**friendly** 42:25
202:4

**friendship** 101:17
**front** 40:7 52:15
52:23 69:18 156:8
167:7,9,10 174:4,6
**frustration** 211:7
211:21 212:21
213:20
**fujiwara** 37:18
50:19 51:13 53:4
69:23 74:6,25
108:12,25 109:20
111:11,16,25
112:6,16 113:19
133:17 148:22
149:2,12 161:4,10
176:13,18 177:14
179:20 223:8,12
226:13 238:13
239:4,22 265:7,11
265:12,13 266:5
**fukasawa** 155:24
**full** 30:5 31:16
34:4,20 44:25
94:7 95:7 113:17
134:15 140:15
159:23 160:6
214:23 215:4
243:14 261:14,22
**fuller** 256:19
**fully** 18:12 94:24
**fun** 140:17,19
**funding** 59:22
**further** 4:20 263:8
268:15
**future** 110:9,15
127:23

**g**

**gallup** 35:16
196:17 237:12,17
237:19,24 238:3

**garden** 2:6 5:14
**garner** 112:22
**gas** 124:10 140:19
**gather** 226:19
**gc** 95:4 107:10
145:23 159:7
160:9
**gehrig's** 126:19
**gender** 41:16,19
41:22 42:15
157:11
**general** 16:10,14
17:15,20,23 30:5,7
33:2,6,15,19,21
36:15,19,19,25
43:14,17,20 44:5
44:14,21 50:11,12
50:23 51:10 62:4
62:9,20 63:2,7,12
64:9 65:23 69:10
70:10,22 71:22
76:12 77:6,12,21
78:12 79:18 80:13
81:13,22 82:8,25
83:12 86:14,24
89:3,7,9,15 91:18
92:5 93:3,17,24
94:7,11,11 96:21
97:4,20 98:10
101:21 102:16,21
103:13 106:15
107:24 109:22
113:22 117:4
118:11,12 119:13
129:18 132:2
134:16 140:20
143:5,20,21,22,23
144:14,21,22
145:10 146:2,8,9
146:13,21 147:7
147:10,13,16,17

148:6,7,11 152:14
152:15 155:10,18
157:20 158:8,15
160:20 162:11
164:24 165:23,25
166:14,16 168:4
169:13,25 170:11
173:15 180:15,23
181:14 182:2,12
182:16 184:17,19
184:20 185:14,18
185:24 186:18,25
187:3,6,9 190:3,12
191:18 196:3
203:20 204:2
205:10 206:19
207:5 211:7
218:25 222:21
224:15 233:6,8
234:5,8 235:13
237:11 242:23
244:14 247:7,16
249:5,10,12
251:11,17 255:8
257:6,7,13,14,15
257:21 261:9
**generalist** 120:21
**getting** 64:5
112:16 225:20
244:13 245:12
**girls** 228:17,18
230:8,9,17,23
231:7,15,22 232:6
**give** 11:19 23:20
45:7 65:3,5 66:9
67:6 68:16 69:12
87:6 97:23 99:3
103:11 121:15
122:12,18 135:4,7
136:22 153:23
167:18 168:15,21

169:6 170:16
174:9 178:19
179:23 194:23
209:19 243:14
247:9
**given** 38:4 58:24
69:6 98:8 106:3
106:16 195:13
204:5 216:14
228:3 229:14
257:15 259:12,25
263:10 268:14
**giving** 18:19 174:7
208:17 225:18
242:22
**glass** 10:3,19
248:7
**go** 6:17 7:12,15
19:12 26:16,24
27:2,13,22 28:3
31:14 32:23 45:25
49:17 53:13,21
61:6,15 63:20
67:15 87:8,18
92:8 103:13 115:8
122:20 139:17
152:19,20 164:2
167:4 175:19
192:20 197:9
221:11 233:21
234:13 258:9
262:14
**goals** 114:9 116:6
116:7 135:17,18
135:21,24 136:5,8
136:10,14 137:6
138:7,12,20 266:6
**god** 210:20 212:18
**goes** 224:5 230:5
**gohsei** 124:7

**going** 7:11 10:23
12:25 13:4 17:16
20:10 21:7 24:16
30:25 31:10 40:10
45:15,16,21,23,23
45:25 47:21 48:11
53:13,20,24 54:3
60:9,10 64:6,11,14
71:8 76:9,11,20
80:12,22 85:8,23
88:11,15,18,19,23
89:3,18 90:3,5
92:6 95:6 97:14
99:11,14,17 102:6
107:11 115:16,23
121:21 122:18,19
123:22 124:4,21
126:17,19 127:15
127:22 128:25
129:2 130:11,12
130:16 133:20
139:16 141:24
142:5,5 145:3
148:3,17 149:6
150:17 156:14,20
159:2 160:6,11
163:8 174:13,24
175:19,21 176:11
181:6,7 191:23
202:15,17 203:4
208:5 209:3 212:6
213:22 214:3
215:23 216:2,3
222:6 226:15
235:11 239:6
242:24 245:13
246:2 249:2 250:8
**golf** 248:11
**good** 6:8,9 28:23
120:2,24 145:18
153:9 163:25

168:6 209:8 230:3
242:7 247:11
248:21
**gordon** 1:21 2:9
3:5
**gotten** 56:10 59:6
114:20 230:15
243:18
**graduated** 84:13
**great** 8:7 30:12
89:4 147:21
196:10,11 212:15
213:3 217:10
**greater** 32:17
**greer** 247:25
248:10
**greeting** 112:19
**gregory** 237:11
**groggy** 172:10
**groomed** 257:16
**grooming** 257:12
257:22
**gross** 252:7
**group** 150:3
167:23
**grow** 28:24 50:24
135:8
**growth** 28:22,23
**gueron** 2:20,22
**guess** 61:16 78:6
79:9 91:23 198:24
230:15
**guessing** 79:10
**guesswork** 231:9
**guidance** 135:17
135:19 137:6
138:9,13 191:6,11
192:7
**guide** 190:24
**gum** 252:2,3,5

**guys** 118:19

**h**

**h** 5:2 264:2
**ha** 20:23 111:8
**hand** 145:12
167:13 240:12
252:3 268:21
**handed** 21:13
**handle** 27:19
147:23 212:9
219:17
**handled** 157:6,8
**hands** 85:4
**happen** 41:5 45:21
95:2,6 107:11
**happened** 111:23
112:14 113:3,10
113:12 220:14
236:5 238:5
**happy** 61:19
121:15,17 122:15
144:2 153:24
172:6 250:2
**harassment** 95:12
**hard** 71:21 102:6
161:20 217:20
225:15,17 229:4
240:14
**harry** 155:24
**harvard** 115:7
**hcd** 26:22
**hcha** 110:15
**head** 26:11 31:18
121:20 139:14,21
155:21 252:16
**hear** 40:25 48:9
98:22 153:11
238:14 258:24
**heard** 41:8 43:3
48:18 194:12
244:3 245:10

**hearing** 103:24 105:4 152:6
**held** 1:21 15:4 19:20 78:17 92:14 123:5,10 143:18 143:18 145:17 176:3 234:19 248:15 262:20
**help** 45:11,16 122:16 139:13 154:19 163:2 190:24 211:17 217:17
**helped** 122:16
**helpful** 144:25 154:24 174:11 200:4
**helping** 138:24 177:20
**hereinbefore** 263:11 268:12
**hereunto** 268:20
**hide** 219:23
**hidefumi** 149:2
**high** 108:20,21 110:4 113:15 132:23 258:21
**highest** 62:11 63:8
**hill** 243:10
**hire** 88:17 129:21 129:22 157:20 158:7,14,21 160:25 222:22 228:15
**hired** 14:15,17 77:6,7,12 84:23,25 88:22 91:25 97:16 129:18 196:9
**hiring** 128:24 159:7

**history** 248:14
**hiv** 26:22 148:14
**hold** 40:14 64:11 174:15
**holding** 103:22 131:9
**holdings** 1:8,8 2:10,16 5:22 6:13 6:25 7:3,7 125:20 131:7 132:24 269:2
**home** 33:4,23 34:12 40:11 46:8 172:13,24,25 215:24 261:10,15 261:18 262:3
**honest** 62:18 69:13 93:8
**honestly** 23:5 105:9 219:23
**honorable** 86:4
**hope** 50:24 150:25 172:15,20
**hospital** 225:23
**hosted** 241:22
**hotel** 248:3
**hour** 113:25
**hourly** 34:12
**hours** 9:11,23 34:16,19 35:3 88:8 117:8,13 147:12
**hr** 116:5 139:21 155:20 189:23 192:8 216:13 230:4
**huge** 20:18,18
**human** 157:3 224:14
**humiliated** 40:5

**humiliating** 140:23
**humiliation** 262:9
**hundred** 41:23 107:18
**hurt** 72:11 218:17
**husband** 72:16,20
**hypothetical** 98:13,18,21 99:17

**i**

**idea** 11:12 23:21 47:3 97:6 99:15 159:6 171:4 186:19 204:17 209:15 210:2,2 213:16 217:3 244:10 260:22
**identical** 22:21
**identification** 12:22 22:9 85:17 193:15
**identified** 14:21 38:21 74:21 75:6 75:11 92:22 95:21 104:7,16 108:25 109:20 116:19 124:15 137:22 139:21 155:20 158:20 206:21 227:22 244:13
**identify** 19:13 27:6 32:19 38:19 66:11,17 67:7 73:18,24 93:6,11 104:17 121:15 122:21 124:3 130:23 133:8 223:6
**identities** 134:2
**identity** 109:3

**iguchi** 155:25
**illness** 189:16,20 206:22 207:6,13 207:20,22 211:10 215:18 218:13,15
**imagine** 41:3 60:6
**imaging** 127:10
**immediately** 140:8
**impacted** 180:11
**importance** 258:8
**important** 13:14 46:4 49:3 60:22 130:10 133:22 141:23 146:6 181:21 219:8 246:11,12,15 252:21
**improve** 165:2,6 178:14,21 192:6 250:17
**inaccuracies** 22:2 22:5,6 23:11,17,20 23:21 24:22 53:17 216:15,24
**inaccurate** 19:11 19:15 20:9 51:25 52:16,24 53:7 70:5 136:25 215:9 215:11 251:22,24
**inappropriate** 30:17
**inaudible** 84:16
**incident** 178:2
**included** 114:8 159:18
**including** 29:6,13 29:16 113:18 148:22,25 176:15 223:18
**income** 59:15

**incompatible** 180:9 185:22
**incorporated** 5:23
**incorrect** 172:4 243:24
**increase** 86:23 159:9
**increased** 106:19 106:20
**incredibly** 42:19
**independent** 65:2 122:9 227:20 228:2,8 261:4
**indicate** 125:17 177:13 230:14
**indicated** 137:17 161:12
**individual** 1:9,10 1:10 24:5 70:8 129:17 182:7 244:21
**individuals** 32:15 33:15 34:25 56:11 59:6 63:8 65:21 66:6,12 67:7 109:5,15,19 110:19,24,25 113:18 133:15 134:2 164:11 176:14 197:15 237:9 243:17 244:8 246:22
**industries** 254:16
**inferred** 248:11
**influence** 109:21 112:6
**influenced** 159:19
**influences** 159:17
**info** 203:17
**information** 36:21 55:17 75:2 78:4

118:17,21 121:25 128:4 133:12 170:15 171:2 204:11 226:20 253:5 267:2,3
**informed** 76:11,19 148:11 157:17,18 158:4,12 224:6 229:21
**inhouse** 61:7
**initial** 13:5 16:2 18:15
**ink** 18:24
**input** 13:22 18:9 18:20 36:24 37:3 37:16,24 58:10,12 58:19,23 59:10 60:2 109:3,6 167:25 168:9
**instance** 40:4
**instances** 223:24
**instructed** 26:6 49:13
**instrumental** 112:2,3
**insulting** 245:23
**insuring** 82:13
**intellectual** 33:9 66:13 119:22,24 120:3,23
**intelligence** 163:10,12,17
**intelligent** 42:19
**intend** 260:17
**intended** 202:2
**intends** 179:19
**intent** 142:19
**intention** 142:15
**interact** 40:16 148:23 218:12

**interacting** 130:7 150:17
**interaction** 101:16 130:4,18 153:22 195:14 211:22
**interactions** 39:9 39:13 98:15 148:20
**interest** 135:24 150:3 204:21
**interested** 85:9 115:25 268:18
**intern** 67:17
**internal** 59:20 155:24
**internally** 230:2
**international** 255:3
**interns** 67:18 69:9
**internship** 84:6,11 84:12
**interpretation** 42:15 52:10 70:15
**interpreted** 51:19 70:17
**interrogatories** 121:13,22 122:4
**interrupt** 8:9 82:11
**interrupted** 226:21 227:8
**interrupting** 82:13
**interview** 91:21
**intimidated** 71:24
**introduce** 170:25
**introduced** 171:4
**investigating** 222:17
**investigation** 95:11,14 221:24 222:6,10,20 227:2

227:21
**investigations** 27:11 226:4,9
**investigator** 228:3 228:8
**investment** 165:21
**invited** 164:2
**involved** 108:20 236:3
**involves** 223:25
**involving** 241:3
**ionic** 124:22
**ip** 120:4,12,18,24 121:2,3,4 148:12
**issue** 206:16 218:24 241:2
**issues** 110:23 120:3,5,25 121:3,3 178:3 223:25 230:3
**items** 46:5

**j**

**j** 5:1,2 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1

64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1

187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1
**january** 26:5
132:9
**japan** 7:7 31:25
35:21 37:7,9,9,11
40:10,10 41:15,23
42:2,2 46:24
57:13 67:17 71:8
94:25 108:19,20
110:2,13,19,24
125:2,4 130:5,5,14
130:16,19,24
131:15 132:19,22
148:25 159:6

160:7 161:3 164:3
244:21 245:5
**japan's** 37:5
**japanese** 26:2
37:21 40:22 55:4
55:15 114:7,19
130:25 148:21
150:18 157:5
170:18 244:25
252:15,23,25
253:22
**jeff** 155:22
**jeffer** 120:13
**jenn** 208:12
**jennifer** 1:3,18 2:5
5:11,18,20 26:20
27:18 50:23 51:4
67:11 140:3 180:5
186:24 209:8
223:17 224:6,21
226:18,20 227:8
234:5 238:13
239:6 263:15
269:2,3,21
**jerry** 2:17 56:13
**jf** 220:20
**job** 50:25 78:8
85:12 88:10,11
89:6,8,13 90:9,11
91:6,8,10,12,17,20
91:23 92:4 114:5
135:16 141:18
219:24 245:12
246:4,7,11,13,15
248:13,15 250:3
250:23 257:11
266:4
**joe** 67:13 120:6
121:2 196:9
199:17

**john** 1:10
**join** 258:14
**joined** 251:11
**jointly** 108:7
**joke** 80:23,25
**jolly** 3:3 56:14
**josh** 258:11
259:11
**judge** 4:13 83:16
84:4,22,24
**july** 85:11 138:22
165:9 195:9
211:22
**june** 1:14 5:16
183:23 194:3,8,18
268:21
**junior** 88:19 129:3
129:4

**k**

**kagaku** 127:10
**kanako** 35:19,23
**kanako's** 36:5
**kane** 2:4,7
**kansawa** 36:2
**kasei** 125:14
**kashima** 67:19
68:10
**katayama** 155:21
**katherine** 32:23
32:25 33:18 34:9
67:12 120:5,25
121:4 196:8,15
198:17 199:16
261:17
**katherine's** 35:9
**kaz** 67:19,21,21
68:3,10,12,14,22
68:24 69:14
**keep** 31:11 37:8
42:6 106:8 161:21
246:11,12 250:23

260:17
**keeping** 199:6
**kelli** 35:13 67:14
  189:8 190:25
  191:7,23 192:2,4
  192:11 200:18
  202:13,15 206:4
  211:8 212:6,11,14
  213:22 217:9
  218:6 219:9 221:4
  221:14 223:18,19
  223:25 224:23
  226:18 229:23
  241:17,24 243:8
  266:13
**kelli's** 224:8,9
**ken** 37:18 51:13
  52:5 53:4 74:6
  108:12 111:10,16
  113:19 133:16
  148:22,25 161:4
  161:10 266:5
**kept** 148:11
  229:13 246:15
**key** 93:12
**kidding** 81:7
**kim** 84:19 86:4
**kind** 19:4,5 59:16
  127:24,25 150:19
  150:20 163:6
  184:22 198:25
  231:3 232:19
  248:12 250:24
**kindly** 203:2
**kinds** 157:8
**knew** 44:25
  191:21 207:11
  213:7 241:23
  243:8 254:7,10
  255:5

**know** 6:10 7:18
  8:8 15:5 19:13
  21:25 23:14,15
  27:15,15,25 33:20
  35:3 36:5 42:4
  49:14,23 50:3
  56:12,17 57:8
  58:13 59:2,4,21
  62:17 64:21 77:2
  77:4 78:5 83:7
  91:22 97:8 101:6
  102:23 105:8
  113:7 124:8,8
  128:3,5,17 129:4
  129:20 130:19
  140:2 142:21
  144:17 147:15
  150:21 151:4,9,24
  157:6,8 161:21
  171:5 175:12
  179:14 184:21
  186:13 187:18,19
  189:2 198:18
  204:10 212:4,6,23
  214:23 218:11,12
  219:8 225:19,23
  225:24 229:7
  230:24 232:12
  233:19 237:15,16
  238:23 239:5
  241:19,23 242:4
  246:14 250:7
  252:11,11,14
  254:23 256:7,25
  261:2
**knowledge** 11:16
  13:21 26:16 50:7
  52:6 98:14,17
  99:9 101:15
  113:17 122:6,17
  146:22 148:3

200:8 244:7
**known** 30:11
  109:15
**knows** 82:18
**kuropatkin**
  155:22

**l**

**l** 2:6 3:5 4:2,2
  263:2
**labor** 218:19
**lack** 158:9,16
  188:16
**land** 127:18
**language** 19:6,9
  30:2 169:23
  170:10 176:25
  200:3 260:2,5
**larger** 83:23
  167:23
**largest** 131:5
**late** 245:8 258:15
**law** 44:17 83:17
  83:21 84:14,15
  85:2,5 200:8
  224:20 226:2
  254:11,12 255:14
  255:18
**laws** 61:4 162:7,10
  162:13,15,16,21
**lawyer** 42:19 61:7
  82:18 83:15 97:12
  119:25 184:13
  199:20,24 224:20
**lawyers** 145:25
  146:7,16 197:24
  254:21 257:25
**lead** 20:16
**leader** 115:24
  129:13 156:24
  192:20

**leaders** 58:23
  156:19,22
**leadership** 31:18
  64:8,19 114:6,7,18
  130:13 148:21
  155:11,13 156:10
  156:17 157:12
  180:19
**leading** 20:15
  64:20 165:24
  166:13
**learn** 28:24 119:14
  194:15
**learned** 55:17
**learning** 192:10
**lease** 127:18,19
**leave** 11:10 27:16
  40:9,11 41:15
  46:8 71:8 72:5
  104:4 116:9
**leaving** 41:13
**led** 55:18 155:14
**left** 68:23 101:14
  115:2,4 118:14
**legal** 3:10 6:3,5
  15:22 17:3 20:15
  21:3 29:21 32:16
  32:20 33:13 34:6
  34:14 35:2,11,13
  36:4 37:14 39:11
  47:20 59:18 60:4
  62:23 63:9,16,24
  64:3,13,18 67:9,17
  69:7,9 75:23 76:4
  83:10 85:6 97:11
  111:3 118:14
  123:24 124:2,17
  128:13 146:3
  153:18 155:3
  158:3,6,14 159:10
  171:17 180:6,20

180:22 181:4,18
195:19,23 196:5,6
196:16,22 197:5,8
197:13,15,16,21
197:21,22,25
198:5,6,8,11,15
199:10,14,15
200:14 204:3
224:16 225:11,18
231:21 237:9
246:7 261:14
262:2
**legitimate** 226:25
**lengthy** 175:21
**letter** 23:6
**level** 26:18 108:11
108:21 110:4
113:15 131:10
132:23 148:24
157:2
**levels** 108:20
**lexicon** 130:23
**lexington** 2:16
**liar** 54:10
**liberty** 214:7
**lie** 203:24
**lied** 74:22 259:23
260:7
**lies** 74:14,14
**life** 125:13,14
246:14
**light** 218:12 253:5
**liked** 83:5 196:7
256:11
**limited** 34:11
125:15 180:7,17
**line** 18:5 23:9 28:4
80:16 154:25
174:22 203:17
207:17,23 249:2
267:12,17,18,19

269:5
**lined** 174:18,22
**list** 57:24 66:9
67:6 68:7 74:2
114:10 121:11,16
122:13 124:20,21
125:19,23 135:21
156:24
**listed** 123:23
125:9
**listen** 48:16,18,22
49:2 194:19
**listening** 49:3
**lists** 123:18 235:22
**litigation** 27:9
43:24,25 89:12
121:3 148:10,13
148:14 157:16
181:24 187:14
230:22
**litigations** 26:22
**little** 97:11 128:22
141:3 197:18
198:18 211:14
229:4
**llc** 269:1
**llp** 1:22 2:9 3:5
**locate** 65:20
**located** 110:25
**lodged** 220:11
223:13
**long** 7:11 43:24
61:23 101:4
114:10 127:14
214:24 241:14
**longer** 86:8
**look** 11:17 16:19
21:24 22:23 27:2
40:15 52:6 90:6
91:14 92:2,7
111:5 115:9

116:10 125:19
139:18 145:3,22
146:24 149:7,16
152:9 154:25
167:5 168:18
171:8 173:17
174:14 175:22
176:8,12 178:23
178:24 187:12,21
192:25 195:4,5
200:16 204:23
205:20 208:20
216:6,20 217:4
219:25 220:15,17
226:11 228:6,10
232:25 233:22
238:7,25 239:14
240:15 241:8
**looked** 14:6 39:6
115:20 126:7
241:25 242:12
**looking** 16:24,25
17:25 18:2,21
78:14 115:18
116:13,17 144:16
145:2 156:5
168:22 178:6
198:20,21 207:19
234:24
**looks** 239:19
**los** 84:18
**loss** 232:19 241:12
**lost** 184:22
**lot** 43:23 61:12
73:14 127:4
163:13 166:9
177:18 191:19
219:6 226:22
227:9
**lots** 24:19

**lou** 126:18
**love** 106:5
**lovely** 256:15
**low** 157:2
**lucite** 176:20
177:7,19 178:3
**lunch** 92:15
248:10
**lying** 34:7 48:23
54:15 107:15,22
213:14 237:3

**m**

**m** 5:2
**magazine** 163:14
**magazines** 163:13
**mail** 17:12 21:13
50:18 51:13,22,24
74:6,24 111:9,15
137:18 138:22
139:19 149:18
153:22 154:22,23
165:9 167:8,14
169:14 173:3,7,10
176:13,17 177:3,4
177:8,12,16,24
178:6 179:17,19
180:2 190:19
191:7 195:5
200:17 201:4,15
202:3,6,22 203:15
205:4 207:8 208:3
209:4,6,9 211:6
216:22 217:11,21
221:8,10 223:7
225:5,15,16
226:12 228:20,24
229:20 230:19
231:7,16 232:2,5
232:13 238:8,12
238:22 239:2
240:2,21 241:9

245:15 250:9,13
264:11,12,14,18
264:19,20,22
265:4,6,7,11,12,13
265:14,15,19,21
265:22 266:5,7,9
266:12,14
**mails** 53:3,25 54:6
194:25 232:17
242:3 264:17
266:16
**main** 95:24
**maintain** 88:24
129:10
**major** 26:13 27:3
27:3,5 104:2
127:12 148:2,9
**making** 40:23
62:11 108:21
157:4 205:18
**male** 96:3
**man** 40:19 41:4
47:6,9,19 48:5,8
48:10 243:12
244:17 257:22
**manage** 116:2
181:3 191:6
192:14 257:24
**managed** 148:13
148:14 181:13,19
182:6 189:22
254:21
**management**
26:22 34:6 35:2
37:11,12,12,13
41:23 64:8 110:9
110:15,23 113:15
127:21 128:12
161:3,14 163:16
180:7,15,17
181:10,11,20,21

182:7
**manager** 192:9
230:4 233:23
**managing** 180:24
181:4,17,23,25
**mangels** 120:13
**manly** 42:24
**manner** 153:19
155:4
**manomi** 38:8
**mansukhani** 1:22
2:9 3:5
**manufactured**
183:17
**march** 12:7 14:16
26:3,4 120:10
134:11,18 149:19
**marked** 12:21,25
22:8,13 60:18
85:16,20 159:2
193:13,17 220:13
228:23 267:11,15
**marmaro** 120:14
**marriage** 268:17
**masanori** 148:22
**massive** 248:17
**material** 37:5
**matheson** 124:10
140:19
**matter** 5:20 49:19
147:24 211:17
228:15 232:14
253:8 268:19
**matters** 27:19
60:22 120:23
130:10 147:22
148:2,7,10 171:17
180:20 181:4,24
200:14 219:13
223:24 236:6

**matthew** 2:6
**maturely** 250:3
**mc** 124:22
**mca** 77:18
**mcc** 7:6 37:12,23
43:3 49:20 57:15
58:25 111:2 131:3
132:25 171:25
244:22
**mcha** 7:2 12:10
14:15,21,24 15:2,5
15:8,14,24 16:3
18:14 25:13 32:7
32:11 36:9 37:6
37:20 38:21,22,24
39:10,16,18 50:22
54:21 55:6,7,12
56:12,18,19,23
57:2,14,17,23 58:5
58:11 59:11,13,15
61:7 62:12,15
64:2 75:23 76:2
77:13,14 78:11,24
79:13,20 91:24
92:5 93:3 97:3
99:3 102:10,16,20
103:2,7 105:14
106:2 108:7,15,22
110:7 113:16
121:10 123:25
124:16 139:21
143:19 146:8
156:9,17 157:12
157:19,21 158:5,7
158:8,12,15,21
159:10 161:2,3,14
164:12 167:19
171:18,24 177:6
178:5 185:15
189:11 195:20,24
197:6,12,16,22

198:11 200:14
213:3 218:23
219:14 228:14
229:13,22 231:21
237:7,7,20 247:6
247:15 251:12
254:8 262:3
**mcha's** 63:8 150:3
155:11 158:19
**mchc** 7:4 37:12,14
37:16,22 38:6
43:3 49:20 54:24
55:5,10,13 56:14
56:15 57:14 58:12
58:19,25 59:6,10
59:17,22 60:2,16
67:18 108:8,8,11
108:15 109:8
110:5,19,25
111:17 112:20
113:17 131:2
148:25 150:18
158:18 164:18
171:25 244:22
**mchc's** 56:12
**mchem** 2:13
**mchj** 7:8 37:13
38:3,5,7,8 49:20
111:2 113:16
**mclane** 84:19 86:4
**mcp** 211:23
**mcusa** 91:25
**mean** 23:21,25
35:6 38:8 77:10
86:17 88:9 111:24
112:15 113:4,7
118:21 128:19
166:20 168:24
175:15 179:13
180:23 188:25
252:7 256:11,12

**meaning** 46:7
142:19 220:19,21
**meaningful**
148:20 149:15
**means** 142:21
**meant** 85:6 129:5
178:14 250:20,22
252:8
**media** 65:11,18
123:8,14 154:14
193:12 234:17,23
**medicago** 124:10
124:11
**medical** 213:5
217:14 218:7
223:25 224:9
**medication** 9:10
9:18
**meet** 151:11 220:9
262:5
**meeting** 34:14
40:22,23 44:16
45:19 57:11 81:9
81:19 84:19 94:22
95:23 101:18
127:3 132:21,23
133:3 140:18
147:19 188:16
200:23 202:14
220:20 221:4,19
221:22 227:20
245:3,16,21
246:20 247:2,14
252:9 253:2,4
260:10,16,25
261:2,5
**meetings** 31:22,23
38:21 45:17 74:9
74:25 126:23,25
127:5 128:11
131:23,24 132:12

156:13 187:19
188:17 192:2
247:11,23 248:24
267:7
**member** 57:22
58:4 155:10 197:8
197:12 225:10
**members** 37:20
56:20 57:13,14,24
62:22 63:17 72:14
76:4 108:15,19
198:8 231:21
**memo** 264:23
**memory** 36:5
115:10 116:18
119:8 125:14
**men** 31:17 41:23
43:3 46:7,13,19,24
47:24 156:7
243:18 244:23
**mental** 262:13
**mention** 109:13
129:14 228:18
230:8 245:19
**mentioned** 41:4
138:11 144:19
184:11 206:4
246:21
**mercedes** 2:12
6:11 64:21 68:21
98:11 99:12
104:20 152:20
162:2 184:3 191:2
197:18 230:25
246:9
**merely** 54:5
**message** 50:21
51:14 52:7,9,10,11
53:11,12 54:6
70:13,15,16
228:12

**met** 84:22 100:13
105:10 116:4,6
117:2 126:6 127:2
135:24 151:15
187:16 188:3,12
188:19,23,24
201:9,11 202:5,12
214:2 222:12,16
226:17 245:6
246:23 249:23
252:11 253:14
**metadata** 229:11
229:14 232:22,24
240:11,12
**micro** 9:17
**mid** 16:21 17:3,5
21:2,6,18 22:7,14
25:15 74:10 75:4
174:20 233:6
243:3 264:9
265:19
**middle** 50:20
126:21 171:12
**mika** 68:4,23,24
180:25
**mike** 206:5
**miko** 67:25,25
68:10,12 225:9,20
**mikosami** 67:23
196:10
**milligram** 9:16
**milligrams** 9:17
10:17
**mind** 22:21,22
25:23 63:21 115:8
**mine** 174:22
**minute** 11:19
69:12 216:20
262:15
**minutes** 19:12
92:6 206:2 239:13

**mischaracterizes**
30:19
**miscommunicated**
217:22
**misconstrued**
218:14
**miserably** 103:4
**misogynistic** 31:20
49:21
**missing** 93:13
229:5
**mistake** 172:5
**misunderstanding**
178:11
**misunderstood**
201:24
**misused** 172:3
**mitsubishi** 1:8,8
2:10,16 5:21 6:12
6:24 7:2,4,6 14:17
33:4 35:20 66:18
83:20 101:14
111:2 114:21
120:21 124:11
125:20 126:11
127:10 131:6,7,11
132:24 138:16
148:24 170:17
172:2,3 173:19
225:22 231:2
236:22 238:4
245:7 248:14
269:2
**mitsubishi's** 106:5
**mkic** 127:14
**mmhmm** 18:6
38:12 57:19
169:16 173:6
**mna** 27:12
**modifications**
169:5

**modified** 229:15

**modify** 168:16
169:7

**moment** 16:18
84:3 102:12
109:12 148:18

**moments** 131:13
149:8

**money** 106:24
107:2 128:15

**monitor** 19:17,23
65:10,17 92:11,19
123:7,13 154:7,13
175:24 176:6
193:5,11 234:16
234:22 262:17

**month** 34:13
101:23 120:8
153:7 242:11
249:17

**monthly** 130:11
156:12

**months** 50:24
85:13

**morning** 6:8,9
25:9 226:18

**moss** 217:7 218:4
219:12,21

**mother** 72:18,25

**motivation** 217:6

**move** 47:12,21
48:12,12 64:6
66:23 101:10
103:19 105:14,18
105:20 106:2
161:18 162:18
175:11 181:7
192:23 227:5
256:17

**moved** 56:3 84:18
137:24 140:11

248:12

**moving** 80:5
104:24 206:24
236:7

**mrha** 47:25

**mtpc** 170:17 171:2
171:4 244:22

**multiple** 6:15
45:17 58:16 76:24
83:13 113:25
116:4 148:15
181:4,5 219:13

**multitude** 88:24

**murata** 35:19

**mytex** 253:7,8

**n**

**n** 2:2 4:2 5:2,2,2
263:2 264:8
266:20

**name** 5:9 6:2,10
11:24 12:3 67:21
205:12 269:2,3

**named** 196:20

**names** 38:2,4
66:14 109:5,9,10
109:13,16 114:17

**nanny** 215:25

**narrative** 86:8

**nasty** 153:20
155:4 205:11
206:12

**nathan** 35:16
196:17 237:12,17
237:19,24 238:3

**national** 83:17

**nearly** 59:13
125:21,22 159:15
190:4

**necessarily** 19:2
59:12

**necessary** 168:16
169:5 226:5 228:3

**need** 8:5,6 40:11
42:4 88:17 107:8
120:6 138:3
141:13 142:2
176:23 193:3
194:24 241:14

**needed** 45:2
103:12 178:16
194:9 211:8
217:17 224:17
246:17

**needs** 93:6 224:6
224:10 262:5

**negotiated** 106:23

**neutral** 230:4

**never** 12:17 22:21
22:22 39:18 43:10
44:12 47:8,18
48:7 58:10 80:7
89:8,16 90:19
91:6,8,12,16 95:2
100:13 102:2,3
103:20 105:10
106:23 107:11,13
109:15 116:7,10
116:10 129:3
133:25 135:9,10
135:23,25 137:10
137:13 138:11
164:21,22,23
165:5 172:5
181:13 183:21
185:10 189:19
194:12 201:25
210:23 212:13,16
213:24 214:8
219:15 236:19
240:19 252:17
255:19,23

**nevertheless**
261:25

**new** 1:2,23,23,25
2:6,12,12,17,17,22
2:22 5:5,14 6:2
20:15 43:5 60:11
84:24 103:6 105:5
113:22 126:18,20
128:24 129:3
149:24 150:24
159:7 182:11,15
206:24 238:17
248:25 268:4,5,9
269:1

**nice** 150:22 211:15
256:12

**nicholas** 3:7

**nick** 6:12 97:16
98:15 101:13
103:17 104:12
106:10 147:18
152:16 187:19
188:23 244:9
249:21 254:10
255:24

**nick's** 105:9

**nicolas** 1:9 2:11

**nicole** 2:22

**night** 10:4 109:5
117:24 247:24

**ninth** 84:21

**nippon** 124:7,9
140:18

**nonlegal** 168:12

**nonsense** 184:13
204:12

**nonverbal** 7:24

**north** 258:6

**notary** 1:24 5:4
263:22 268:8
269:25

**note** 22:20 91:16
141:12 161:10
187:24 189:20
232:15 254:5
**noted** 83:13 172:8
172:8
**notepads** 118:13
118:17
**notes** 117:10,12,18
117:19,20,21
118:10 127:4
189:24 214:12,20
214:22,25 231:3
264:21 267:6
**notice** 206:6
**notification**
170:10 223:11
265:4
**notified** 206:18
225:10,12
**november** 21:21
74:11 105:11
249:14,15,16,20
249:22 251:9,14
**number** 24:14
26:20 40:6 44:24
53:3,14 56:5
78:10 191:21
211:12 264:7
265:3,18 266:3
**numbers** 22:20
**numerous** 58:7,22
234:7

**o**

**o** 4:2 124:15 263:2
**oath** 4:12 48:4
54:14 69:8,21
73:13 74:13
258:18 259:23
260:7 261:20

**object** 28:21 29:2
29:5,20 30:10,18
32:9 47:2 48:6,24
52:17 54:16 62:6
66:16 71:18 73:20
75:24 79:14 81:15
81:24 82:5,9,20
83:3 89:24 96:22
97:18 99:7,25
142:7,12 150:14
165:16 166:3
195:21 198:12
204:16 207:14
210:14 213:9,15
226:6 232:10
237:4,10 240:8
243:20,22,23
251:3 256:4
257:18 259:9
**objection** 17:6
30:11 182:25
188:4
**objections** 4:21
**observed** 32:3
**obviously** 46:3
61:21 124:8
198:24 241:24
**occasion** 151:22
236:17
**occasions** 40:7
164:15 191:21
236:13
**occupied** 127:18
127:20
**occurred** 53:10
73:19 100:5
113:16
**occurs** 103:15
**october** 225:7
233:10

**odd** 238:21
**offered** 88:10 94:4
105:22 141:7
**offering** 251:25
252:3
**office** 31:22 34:13
35:25 36:7 67:18
80:22 88:8 114:19
115:2,3 118:14
130:23 131:8
147:19 191:19
207:16 210:11
211:9,13 214:17
217:9 221:18
223:19 252:24
253:14 262:8
**officer** 16:15
37:20 44:22 77:23
78:2,13,21,23 79:2
81:14,23 83:2
86:15 94:18
108:17 111:17
234:9 251:12
**offices** 1:21
**officially** 171:2
**offline** 34:23
**oh** 210:20
**okay** 7:17 18:3
28:25 31:14 65:8
68:6 71:5 72:13
82:15 86:19
122:23 124:15
126:22 144:6
145:5 152:12
154:3 161:20
162:2 165:11
167:3 170:3 189:3
194:15 220:18
251:8
**old** 2:5 5:13

**oliva** 1:9 2:11 3:7
6:12 96:9,18,19,20
97:16 98:5,7,24
99:19,20 100:22
101:13 103:17
104:9,17,22
105:13,20,25
187:15,20 188:3
188:12 243:19
249:5 251:10,16
253:13,20 254:3,7
254:15 255:7
256:9,20 260:18
261:9 262:4
**oliva's** 258:20
259:7
**once** 27:20 34:13
82:11 117:6 127:2
153:7 212:7
255:23
**ones** 27:6 35:4
38:5,10 74:4
124:6 136:6
258:21
**ongoing** 26:21
**open** 152:6 153:10
256:18
**opening** 140:4
**operates** 212:3
**operating** 64:24
124:25 145:25
**operations** 110:6
**opine** 98:18 143:7
255:20
**opinion** 52:21 53:2
182:21 256:9
**opinions** 85:7
251:25
**opportunities**
96:17

**opportunity** 25:16
45:7 96:3 97:2
98:9 99:4 101:21
106:3,15 120:22
136:22 147:10
176:8
**opposed** 94:11
**opposite** 95:4
**order** 1:19 134:15
170:19 171:6
183:17 192:14
**origin** 144:17
**original** 4:9,17
18:25
**originally** 154:22
**originate** 178:5
**outcome** 268:18
**outline** 101:5
162:24
**outrage** 226:22
227:9
**outside** 31:2 38:21
51:17 157:21
158:8,15,22
160:25 164:11
181:19,20,23
222:22 224:22
227:21 228:2,15
**overhearing**
221:16
**overlapped** 68:25
**oversee** 69:14
**overseeing** 110:6
**overview** 115:17
145:19
**owned** 125:16

**p**

**p** 2:2,2 4:2
**p.m.** 65:17 92:11
92:19 123:7,13
154:7,13 175:24

176:6 193:5,11
234:16,22 262:17
262:21
**pack** 252:4
**pads** 118:14
**page** 18:4 26:15
61:19 85:24
142:22 143:3
150:10 159:3
167:12 170:2
171:13 175:14
190:23 200:22
208:10 209:4
214:4,25 215:4,4
220:17 225:8
226:17 227:23
229:9,11 232:17
250:10 251:21
264:6,24 265:2,18
265:24 266:3,22
267:3,12,17,18,19
269:5
**pages** 21:15
**paid** 256:21 257:2
257:3
**paper** 124:24
125:3,5,10 182:23
252:6
**paragraph** 27:18
107:7,9,21 108:4
139:25 145:21
148:19 149:3,4,7
150:23 159:5
179:11 180:4
186:7,9,11 187:5
223:16 247:12
**paralegal** 180:21
254:11
**parent** 55:19 56:2
131:2 158:19

**parenthetical**
186:20
**park** 1:22 2:11
**part** 5:24 19:13
20:12 32:17 33:3
33:4,25 35:10
39:9 49:4 83:23
91:21 102:20
113:2,2 140:14
172:14 192:17
216:21 226:17
229:5 231:10
233:23 239:19,20
239:24,24 240:2
242:20 246:20
258:6
**partially** 60:15
**participated** 227:3
**participating**
222:18
**particular** 61:3,13
67:4 71:16 72:15
73:25 74:14 90:9
107:20 138:19
207:15 218:24
241:2
**particulars** 46:2
**parties** 4:7 268:16
**party** 12:13
**pass** 147:10
**pat** 74:8 75:3
116:5,5,9 135:20
137:14 141:12
192:8,8,10,22
202:12,21 211:20
211:24,25 212:23
212:23 214:12
216:14 217:20
221:6,18 222:16
223:17 224:5,14
224:21 226:17,20

226:21 227:8,8
**path** 102:4
**patricia** 155:19
**pause** 82:18
**pay** 60:5
**paycheck** 32:10
**payor** 14:24
**pedigree** 255:17
**peer** 115:24
192:20
**penalties** 8:15,17
8:18 54:14 236:25
258:18
**pending** 20:6
161:18 229:18
**pensions** 55:22
**people** 32:20 38:4
39:14 40:8,16
64:13,17 108:19
126:17 131:8
156:11,20 181:2
196:10,20,23,25
197:3 219:6 240:3
240:21 244:2
**people's** 38:2
**perceived** 30:16
141:17 153:15
**percent** 8:4 32:17
41:24 106:20
107:18 156:9,11
156:16 205:16
213:4
**perception** 43:6,8
182:14,22 205:9
242:16
**perceptions** 184:5
203:25
**performance** 24:4
24:8,23 25:5
26:12,15 27:21
29:18 75:8 81:3

135:18 163:24
165:2,6 175:9
182:7 184:10,16
184:19 187:3
203:20,25 218:9
**performed** 146:3
**period** 26:13
101:23,23 119:9
126:5 127:11
134:11 138:17
139:4 140:6
166:13 169:11
257:12,23 261:6
**perjury** 8:18
54:15 236:25
258:19
**permitted** 148:23
**person** 33:12
42:19 49:8 88:19
88:21 94:14 116:5
128:24 147:22
157:3,9 222:23
224:15 227:3
252:22 256:12
**personable** 42:25
**personal** 95:15
98:14,17 99:9
177:13 211:10
216:4 217:14
223:24
**personality** 40:11
40:12,13 41:14,15
46:8 71:9 72:5,22
73:3,9
**personally** 77:4
**personnel** 146:3
148:24
**perspective**
177:22
**pertaining** 56:15
70:21 71:15 82:6

175:4 191:12
203:18 216:9
**pertinent** 162:7,10
**peterson** 237:12
**pharma** 104:3
111:2 119:2,4,15
124:12 125:25
126:11 170:18
254:16 258:3,9
**pharmaceutical**
258:5
**phonetic** 12:5
35:19 67:13,20,24
68:4,11
**physically** 57:17
**pick** 183:6
**picked** 248:2
**picture** 53:10
216:12
**piece** 252:6
**place** 30:23 55:23
57:11,12 126:17
131:19,22 132:7
134:16 141:2
143:8,15 201:4
221:19 235:23
252:23 257:21
261:3,5 263:11
**placed** 53:15
**placeholder**
103:22 104:8,17
**plains** 35:24 36:6
**plaintiff** 1:4,17 2:4
267:4,6
**plan** 50:25
**planing** 150:24
**planned** 87:9
171:3
**plans** 127:23
157:20

**plastics** 172:3
**plaza** 1:22 2:11
**pleadings** 85:6
**please** 5:9 16:18
21:11 22:19 42:9
47:14 82:11
117:25 138:4
151:17 153:17
155:2 162:15
174:15,21 185:5
186:8 217:25
220:23 251:5
**plus** 106:20
**point** 16:6 20:20
61:18 75:16 79:12
87:7 91:19 98:24
124:23 125:8
140:5 163:18
172:5,22 186:6
200:2 225:21
248:22 249:4
255:6
**pointing** 174:23
**points** 203:18,21
204:8 208:11
**policy** 262:2
**political** 245:4,11
245:25 247:5,18
**poly** 125:2
**polyester** 245:7
**polypropylene**
125:4
**portion** 23:2 60:5
215:5
**portions** 13:24
14:4,12
**posed** 9:2 136:24
**position** 15:4 16:2
16:3 45:13 51:11
78:5 79:19 80:5,6
80:8 83:19 86:15

86:16 87:21 89:3
89:10,16 94:16,18
95:18 96:5 97:7
97:19 102:9,21
103:6 105:5,6,22
106:11,12 107:24
108:17,17 143:5
144:21,22 145:11
145:11 159:8
160:15,20,21
171:3 180:9
182:15 185:13,23
186:16 204:5
238:18 242:23
243:13,15,18
244:3,9,15,17
249:11 255:8
257:16,17
**positions** 55:19
78:11,16,18,25
108:22 143:18,19
144:12 145:14,16
185:15
**positive** 28:20
242:24 243:6
**possessed** 218:3
**possession** 38:16
49:11 100:10
109:18,25 143:12
230:21,25
**possibility** 46:22
104:5 229:14
**possible** 123:22
146:12
**possibly** 102:7,8
244:9
**post** 84:5
**power** 252:10,12
252:14,20
**practice** 16:21
21:6 83:11 120:2

120:21
**practicing** 44:16
**preference** 158:23
**preferred** 158:7
158:14,20 243:12
**preparation**
119:12
**prepare** 113:21
**preparing** 40:9
141:13
**presence** 46:12,14
46:18
**present** 3:2 6:17
11:6 34:3 47:23
51:3 75:21 76:5
132:10,11 258:11
259:2,4
**presented** 25:14
90:20 100:3
128:12 205:22
**president** 55:3,7
56:18,23 57:2,17
62:15 64:2 79:4,7
79:13,20 102:10
102:13,14,19
103:2,7 140:18
155:17 157:19
158:5,12 191:24
245:12 247:6
248:13,16
**president's** 159:8
**presidents** 55:3,15
241:21
**press** 133:11
**pressure** 177:19
**presumably**
120:18 187:2
200:23
**presuppose** 142:4
**pretext** 165:25

**pretty** 49:8 120:2
120:24 155:6
164:2 200:7
261:21
**previous** 26:13
234:2
**previously** 138:10
254:8
**primarily** 161:13
**primary** 33:8
129:10 131:4,9
133:4,21 199:20
199:24 200:13
222:23 246:9
**primavera** 3:5
**prior** 11:22 13:10
30:24 38:25 39:19
39:22,25 40:23
98:2 101:14
169:12 180:14
181:13 185:15
236:18 249:8
254:8
**private** 119:25
120:10
**privileged** 89:25
**privy** 57:9 127:9
**proactively** 236:9
**probably** 14:7
45:21 46:23 80:9
91:19 103:20
107:11 113:25
115:19 119:15
127:13,17,19,21
138:5 168:11
171:15 173:12
208:7 209:18
212:19,22 248:6
252:16
**problem** 24:19
88:13 115:11

154:5 229:22,23
230:2
**procedure** 1:20
**proceed** 218:11
**process** 18:13,13
18:14,21 25:22,23
25:24 26:7,25
28:7 43:25
**produce** 118:6
**produced** 50:9
52:14 53:24 73:22
89:20 104:12
106:6 117:22
118:18 179:7
187:14 193:22
230:21 240:10
**product** 126:9,12
131:5
**production** 117:23
118:3 193:20
203:13,14 205:3
208:25 223:5
**productiveness**
182:8
**productivity**
192:11
**products** 258:7
**professional** 1:9
1:10,11 152:22
153:3,5 202:3
206:14
**proficiency** 26:18
**profiles** 143:25
**profit** 59:16
**program** 20:17
78:3 84:7,11,13
88:12 115:18
**programs** 115:19
163:4,6
**prohibited** 149:14

**project** 27:7 178:4
**projects** 26:21
27:3
**promises** 45:20
95:5
**promote** 158:21
158:23 161:2
**promoted** 16:7
17:14 30:5 36:14
36:18,22 43:11,14
43:16 62:10 64:9
65:22 66:4 68:7
80:13 94:15 98:9
101:21 160:19
165:24 166:14,15
190:3
**promotion** 16:10
36:24 94:4,6 95:7
96:5 108:6,7
109:3 111:17,20
112:2,4,7,10,13
113:9 157:18
180:22 244:14
247:19
**promotional** 97:19
106:14
**promotions** 36:8
36:11 37:17,24
**prompted** 241:4
**property** 33:9
119:22,25 120:3
120:23
**prove** 45:24
101:24 102:8
103:12 246:3
**provide** 11:14,20
23:3 66:14 67:5
100:7 137:5,25
170:23 186:23
260:2

**provided** 25:4
58:23 59:22,24
89:13 111:3 114:2
121:11 122:2
123:17 124:2
130:2 136:13
137:7,15 138:9,13
139:5 143:24
164:25 165:12
171:10 185:10
188:15 209:16,19
215:2 235:6,16
**providing** 76:3
117:24 124:17
135:21 164:10
168:13 169:19,22
170:6,9,15 173:8
182:10,14
**public** 1:24 5:4
153:19 155:3
263:22 268:8
269:25
**pull** 35:6 114:9
**purpose** 203:23
204:13 205:18
**purposes** 15:5
**pursuant** 1:19
221:5
**purview** 56:16
**put** 13:4,15,19
28:21 40:24 71:14
135:17 137:18
143:2 154:19,24
212:17 252:5,6
257:22
**putting** 95:17
126:16 246:5,5
257:20

**q**

**q1** 168:8
**qualified** 158:3,6
158:13 160:15
243:15 255:8
**qualifier** 146:13
**quarterly** 130:8
130:12
**quarters** 160:17
**question** 8:21,25
10:23 20:7 31:6,9
42:7,9,12 46:17,17
47:13,16 49:4
51:5,8 53:17 58:2
63:5 64:12 65:4
66:21,23,25 69:5
70:5 72:2 78:15
80:15 82:19 93:19
97:13 98:3,17
99:12,21 101:7
102:24 104:16
105:23 107:4,7
110:22 125:18
136:23,24 137:3
151:21 152:17
156:16 158:10
161:18 163:7
166:5 168:20
170:4 178:13
184:22,24,25
185:7,12,13 186:2
186:4 188:5
197:18 210:18
215:9 218:3
220:23 227:7
229:18 240:23
246:24 253:16,24
256:17,19 260:6
267:12
**questioned** 226:22
227:10

**questioning** 8:9
240:6
**questions** 6:14 8:2
20:2,4 95:15,19
162:6 166:9 199:3
199:9 216:7
222:15 267:11
**quickly** 6:24 93:8
**quit** 210:12,21
213:12
**quite** 120:19
164:25 173:24
211:9 256:15
**quote** 164:20,20
166:24

**r**

**r** 2:2 4:2 5:2
124:15 263:2
268:2
**radlien** 245:6,17
246:22 247:14,24
**raise** 106:17
**raised** 44:2 46:5
**raises** 205:12
**ranking** 62:12
63:8
**raytheon** 180:18
**reach** 34:23
**reacted** 208:16,17
**reacting** 177:10
**reaction** 79:23
**read** 19:25 20:4
42:12 47:16 66:25
69:25 70:12 93:9
93:9 114:5,12,15
114:17,24 116:2
142:8 144:2
151:16,19 152:4
179:6 183:4,5,9,12
185:7,25 186:4
194:24 215:4

216:20 220:22,25
**reading** 115:23
119:23 144:10
164:20 186:7
**ready** 20:18 86:23
104:4 154:3 179:9
**real** 99:12 173:13
229:8
**realized** 118:8
**really** 77:17 98:16
98:18 105:9 120:6
135:23 143:8
150:8 151:8
153:21 167:2
208:11 217:13,20
241:19,22 242:3
248:24 250:22
255:20 256:11,14
**reask** 75:25
**reason** 9:7 23:16
23:19 28:20 29:2
29:5,11 50:5 51:6
51:8 58:3,6 62:2
77:11 79:11,15,17
82:2,21 96:14
97:14,21 98:5
99:6 105:20
113:11 142:25
150:12 159:5,12
159:21 161:4
186:15 188:10
214:14,16,19,21
235:21 257:14
269:5
**reasons** 97:24
143:4 191:11
211:11 235:10,11
235:16,19
**recall** 10:6 11:7,8
12:8 13:25 21:4,5
23:5 34:21 35:22

36:6 38:11 45:10
48:17 49:5,7,9
54:2 66:6 67:8
68:2,3,23 69:13
71:9 73:15 74:5
74:16 79:2 81:16
81:25 86:25 87:3
87:5,13 88:4,8,9
103:19 109:12
114:14,16 119:6
119:16,17 134:25
135:12,13,16
136:2 138:19
139:6 140:12,13
140:14,17 141:6
141:11 144:20
152:6,8 156:4
162:16,18,19
163:11 164:7,13
165:7,10 173:20
194:16 201:8,10
219:5,16,22 222:8
225:20 260:12,15
**received** 14:25
32:10 36:8 48:15
50:21 52:8 75:13
77:22 162:4
173:14 175:6,17
180:10 189:19
228:21 231:4
242:17
**receiving** 143:5
173:20 227:19
**receptive** 135:15
**recess** 65:13 154:9
193:7
**recognize** 17:10
21:9,12 111:7
190:16,18 193:21
258:8

**recollection** 9:5
14:3,10,11 33:24
34:10,18 38:17
49:12 65:2 68:19
74:5,16 82:3,22
83:4 87:23 88:6
93:15,21 108:24
119:19 122:9,20
123:2 124:4
126:16 129:23
131:21 132:16
134:23 137:9
139:4,8 143:6,13
152:2 153:8
162:21 163:3
166:24 194:7,21
195:3 202:11
211:4,5 231:6,11
232:7,9,12 237:24
245:18 252:9
253:3,9 259:2,10
260:13,21,24
261:5
**recommend** 61:14
**recommendation**
221:6
**recommended**
49:25 50:10 51:10
**record** 5:10,16
6:16,21 15:11,18
18:23 19:12,18,19
19:22 28:9 32:6,7
34:16 39:22 41:11
43:10 49:19 53:16
54:9,20 56:5,17
63:20 65:11,16
66:14 73:13,18
74:13,20 75:8,12
92:9,12,13,18
104:8,21 109:20
110:17 116:12,20

122:20 123:3,4,8,9
123:12 130:21
134:7 136:5,21
141:21 154:8,12
158:20 160:23
161:24 162:25
165:14 167:3
169:12 173:17
174:24,25 175:16
175:20,25 176:2,5
182:23 183:12
186:10 187:24
188:7 193:6,10
202:8 213:7
218:11 227:4
229:13 232:15
234:14,18,21
236:25 243:16,25
245:22 246:21
247:20 251:6,10
262:15,18,19
266:6 268:13
**recorded** 5:18
**records** 189:3
**recruit** 157:20
**red** 23:9 28:4
174:18,22,22
**redacted** 225:14
225:17
**reduce** 127:22
**reducing** 127:16
**reduction** 127:13
**rees** 1:21 2:9 3:5
**reeser** 12:5
**refer** 148:17
**reference** 140:3
**references** 96:12
**referred** 20:3
42:11 47:15 66:24
69:4 151:18
166:25 183:8

185:6 186:3
220:24
**referring** 15:13,14
37:8,9,10 73:25
100:17,19 108:10
136:6 167:11
173:11 175:8,13
186:14 209:16
231:5 238:24
**refers** 167:10
231:20
**reflect** 250:16
**reflected** 169:25
208:18 215:6
250:11
**refresh** 14:3,11
36:4 38:17 49:11
93:15,21 115:9
116:18 119:8,19
122:19,25 129:23
139:8 143:13
162:21 237:23
260:24
**refused** 221:10
**regard** 119:3
**regarded** 259:7
**regarding** 25:5
73:3 112:4 195:14
219:9 220:9
**regular** 236:10
261:15,18
**regularly** 192:13
**reisbaum** 2:20
**reiterate** 241:2
**rejected** 143:3
**related** 215:17
268:16
**relationship**
133:19 152:22
153:3,6,10 177:6
178:8,14,15,20

190:25 191:13
192:6,14 241:15
241:16 242:8,10
250:18
**relationships**
116:2 164:17
**relaying** 70:16
**relevance** 207:19
**relieved** 235:12
249:9
**rely** 52:9 53:11
70:13 104:11
**remember** 11:9,18
37:25 55:2 61:16
62:16 67:3 68:5
68:20,22 80:3
83:8 103:24
109:10 124:22
134:17 135:14,19
135:21 137:2
202:20
**remembered**
105:4
**remind** 63:16
**repaired** 178:9
**repeat** 93:19 191:2
197:17 251:4
**repeated** 54:7
185:5
**repeatedly** 95:6
226:21 227:8
**repercussions**
103:3
**rephrase** 17:7
52:20 81:18
110:21 163:8
166:7,8 199:12
258:22
**replace** 88:17
128:25 186:25

**replaced** 68:24
105:4
**replacing** 187:9
**report** 54:23 69:9
130:10 146:7,15
146:16 153:7
167:18,19 168:3,8
168:12,16 181:25
183:22 186:23
190:13 247:10
262:12
**reported** 16:9,11
32:12 54:20 60:20
190:8
**reporter** 6:4,7
20:5 42:13 47:17
67:2 151:20
183:10 185:8
186:5 221:2
**reporting** 132:18
132:20 147:16
148:5 269:1
**reports** 63:14
**represent** 6:11
56:12,14 214:11
**representing** 6:3
**request** 170:17
228:7
**requested** 170:19
195:17 203:17
228:5 261:10
262:11 267:2,15
**required** 31:12
**requirements**
13:16 61:22
**reread** 114:22
**research** 85:7
**reservations** 43:19
45:5
**reserved** 4:22

**resilient** 206:7
**resolve** 230:2
**resources** 157:3
224:14
**respect** 24:3 99:13
110:23 119:3,22
137:6 181:12
196:22 197:5,7,14
197:20,21,22
198:3,3
**respectably**
112:19
**respected** 197:8
197:11,24 198:7
199:18
**respectful** 48:16
48:18,22 49:5,8,8
49:13
**respective** 4:6
**respond** 8:22
194:25
**responded** 102:5
208:9,15
**responding** 153:23
239:25
**response** 42:10
98:2 141:8 150:20
150:22 177:11
178:6 183:6
195:17 197:10
201:19 202:10
206:3 208:18
209:18 239:20
**responses** 183:3
**responsibilities**
20:18 82:25 92:4
93:12,17,23 144:8
144:11 145:7,16
145:19 235:12
**responsibility**
26:14 60:21 81:13

81:21 86:24 89:2
89:5 93:2 110:5
129:6,11
**responsible** 35:4
69:14 88:24
146:14 147:23
157:4 161:14
168:10 171:16
180:20,24 181:3
200:12,13
**responsive** 118:3
118:17,20,21
256:16
**restate** 96:23
**restore** 250:18
**retain** 11:5,24
218:3
**retained** 11:25
12:9 55:18 219:9
219:11 266:18
267:4
**retaining** 217:7
**retaliatory** 218:15
**retract** 75:9
**return** 137:17
154:2 202:15
**returned** 221:3
231:2 249:11
**revealed** 90:2
103:16
**revenue** 131:4
**review** 17:5 18:16
21:19 22:8,14,17
24:23 28:15 74:10
75:4 81:3 89:23
92:23 115:8
135:18 167:21
233:6 235:4,9
243:3 249:17,17
249:21 259:15
264:9 265:9

**reviewed** 13:9
60:7,8 89:20
116:7,8 137:13
157:15 169:2
175:10 179:4
233:19 249:18
**reviewer** 24:6,24
**reviewing** 18:19
85:6 115:22 191:3
**reviews** 16:22 21:3
21:6 27:21 29:3,5
58:15 163:24
184:10
**revise** 197:10
**richard** 12:5
**rid** 141:5 212:19
**right** 16:7,12,16
16:22 17:24 18:20
18:25 25:6 28:18
29:9 35:5,21
36:12,20 44:6
57:18 60:23 61:4
61:10 66:2,7
76:15,25 77:8,13
79:21 81:7,14,23
86:11,22 87:16
89:23 100:24
102:22 106:21
108:9 110:20
116:15 117:14
128:18 141:20
146:10 149:20
151:7 156:7 165:3
167:23 169:6,20
170:2,7 171:20
172:11 176:20
179:5,24 182:17
187:4,7 189:12,16
189:23 190:5,13
195:10,15 200:25
207:13 210:13

223:14 228:19
233:17 235:8
237:13 250:4
261:11,23,24
**riley** 199:16
**risk** 212:16,17
213:3
**roach** 32:24,25
33:18 35:5 62:22
63:10,22 67:12
68:9 196:8,15
198:17 199:16
261:17,22
**roach's** 34:9
**road** 2:5 5:13
141:14 142:2
**robert** 176:19
177:11,16,21
**role** 20:15 43:20
44:5,14,21 45:2,6
64:8,19 83:24
84:2 103:13,21,25
107:10 108:2
113:22 117:4
118:10 119:12
129:12 133:21
134:19 135:3,8
140:15 141:8
151:25 164:24
168:4 169:14
182:11 204:10
234:7
**roles** 143:25
145:20
**room** 28:22,23
31:22 213:18
**rose** 88:22 129:15
129:16 196:9
199:16
**rotation** 55:21

**rules** 1:20 7:14
31:12
**rulings** 267:11
**run** 23:9 245:14
**running** 212:20

**s**

**s** 1:3,18 2:2,5 4:2,2
5:2,2,11,18,21
124:15,15 263:15
264:2 269:2,3,5,21
**sakaguchi** 37:19
38:7 109:7,21
130:9 133:17
148:22 149:12,19
149:23 150:7,13
151:12,23 152:3
152:11,13,21
153:14 154:18,20
223:8,12 226:14
228:7,17,21 229:2
230:6,10,22
231:14,20 232:5
232:13 239:22
264:11 266:9,10
266:15
**sakaguchi's**
229:20
**salaries** 60:9,11
**sales** 59:16
**sam** 3:3 56:13
**san** 37:18,19 38:8
50:22 51:3,14
54:25 95:9 109:7
109:11 130:9
152:13 161:12
**sanso** 124:9
**sara** 2:7
**sat** 116:11 192:22
214:17 221:9
**satisfy** 177:23

**saunders** 74:8
75:3 116:5 117:19
135:20 137:15
139:20,20 141:22
155:19 179:18,23
188:14 189:23
190:20,24 191:6
191:12 192:13
195:6,13 200:20
200:24 201:4
202:6,9 209:5,7,24
210:8,9,11,25
211:4 213:10,14
213:17 214:3,12
216:23 217:19
221:6,18 222:13
222:16 223:9
224:14 225:6
226:14 227:19
239:23 260:11,16
264:14,16,17,19
264:20,21,22
265:6 266:7,14
**saw** 31:25 91:20
151:2,4,5,22
177:15 255:23
259:2
**saying** 41:3 42:16
47:19 52:16,19,19
54:5,11 64:25
81:5 83:5,9 86:25
87:5 100:8 118:23
136:2 150:23
184:4 194:16
205:15 206:12
208:15,16 250:25
259:11 260:15
**says** 20:14 42:20
50:21 53:8,9,9
61:19 85:25 91:24
108:9 139:25

141:22,22 159:5
177:2 179:25
185:23 186:22
189:17 220:16,19
223:16 225:8
226:16 228:13
229:21 230:18,22
233:23 236:8
238:13 241:7
242:2 248:21
253:14
**schedule** 34:9,12
35:9 261:14,22
**scheduled** 221:5
261:16
**school** 84:14,15
254:11,13 255:15
255:18
**scotch** 248:6
**screen** 259:3
**scully** 1:21 2:9 3:5
**sealing** 4:7
**seat** 252:10,12,14
252:20
**second** 11:21 49:4
62:11 85:24 113:2
139:24 159:4
174:21 179:9,10
180:4 186:9,11
216:21 223:16
248:9 250:10
**secretary** 58:7
78:19 170:21
204:4
**see** 17:17 18:4
23:7,9 24:21
26:10 41:5 50:17
51:7,12,14 52:7,8
78:6,7 81:3 99:10
106:5,9 114:10
117:15 139:24

146:4 150:4,25
152:17 159:4
172:17 176:24
177:4,24 193:20
197:7 202:2
205:24 206:3
208:24 227:22,24
230:18 239:2,8
242:5
**seeing** 54:2 90:8
144:20 203:10
220:5
**seek** 135:20
192:12
**seeking** 96:4,12
167:25 168:9
191:5,11 218:23
219:20
**seen** 41:7 43:2,23
43:25 52:3 54:2
58:9 89:8,16
90:11,19 178:25
179:3 187:13
189:5 193:17
203:6,11 204:24
208:21 210:4,6
214:4,8 216:16
217:5 220:2 223:3
224:10 225:2
232:25 234:25
238:9 239:10,15
239:23 255:19,21
**segue** 30:13
**self** 233:5,16 235:6
265:8
**seminars** 61:10,13
**send** 167:22
179:19
**sending** 18:18
153:7 168:3,8,10

**senior** 34:6 62:22
80:17 83:19 88:18
148:24
**sense** 120:24
**sensitive** 60:22
**sent** 17:13 70:14
111:10 122:3
154:22 183:21
201:16 207:7
232:2,13 245:16
**sentence** 27:20,24
159:18,20,21
175:14 179:9,10
179:10 180:3
183:12 186:9,12
186:14 217:24
**sentences** 27:16
**separate** 247:23
**separated** 12:10
**september** 226:15
**serious** 189:16,20
206:22 207:6,13
213:24 262:7
**seriousness** 81:4
**service** 4:16 60:4
249:10
**services** 123:24
124:17 155:22
**sessions** 75:22
**set** 11:21 85:4 86:9
91:14 96:16 122:4
136:15 137:7
138:8 142:17
144:8 145:7
160:24 183:20
202:14 233:12
262:2 268:12,21
**seven** 44:19 83:9
83:19,21 190:5
**severed** 55:24 56:2

**sex** 244:11
**sexual** 95:12
**sezar** 67:13 68:9
96:4,18 97:2,16
98:4 243:19
**she'd** 103:16
173:18
**shearman** 2:15 3:3
**shed** 253:5
**sheet** 269:1
**sherinsky** 67:13
196:10 199:17
**shin** 155:25
**shook** 71:25
**short** 65:13 144:4
154:9 193:7 206:6
**should've** 209:18
**show** 21:7 25:9
49:15 89:18 90:3
214:3 216:2 250:8
258:23
**showing** 13:6 17:8
22:12 85:19
154:15 158:25
193:16 220:12
228:23
**shown** 25:9
**shows** 151:15
169:24
**sick** 172:13,24
173:2 225:11,20
**side** 246:5,6
**sign** 24:13,17
137:16
**signal** 8:6
**signature** 22:23,24
268:23
**signed** 4:10,12,15
24:10,19
**significant** 86:15
86:18 106:17

146:22 223:25
259:8
**silly** 198:18
**similarly** 106:9
248:11
**simple** 96:24
101:8 160:25
**simply** 59:17
66:17 68:21
147:22 176:22
202:23
**sincere** 209:13
**single** 23:5 46:12
70:18 71:12
125:22 128:20
147:24 184:10
262:9
**sit** 38:11 74:15
78:9 87:23 95:14
108:23,25 114:14
119:6 127:6
241:14
**sits** 252:22
**situated** 148:24
**situation** 177:18
219:18 227:16
241:24 262:11
**six** 88:3 115:15
124:4 249:17
**skills** 26:16 197:21
198:6
**slighted** 39:4
**small** 40:23 64:20
83:21 131:8
180:25 211:17
252:24 258:6
**smart** 42:16 180:5
**soarus** 124:15
**soft** 176:23
**softly** 203:3

**solutions** 3:10 6:4
6:6 124:22
**somebody** 35:25
**someplace** 152:5
**son** 84:16
**sorry** 16:23 21:10
24:22 37:20,22
51:5 62:24 67:16
67:17 68:21 78:19
89:16 98:11
113:16 130:22
137:2,11 152:20
162:2,8,19 167:2
169:18 172:17
175:13 177:3
187:18 191:3
215:8 239:17
**sort** 12:15 163:15
177:4
**sought** 192:6
218:16,20
**sounds** 98:13
**sources** 59:14
**south** 247:25
**southern** 1:2 5:25
**space** 11:10
127:19,20 135:7
**speak** 28:11 43:22
44:7 47:6 48:4
72:15 87:12 105:9
140:6 141:9 162:6
163:9 167:4 192:8
203:3 212:23
218:22 221:7,10
238:5 242:6
**speaking** 47:9
48:8 119:9 134:19
174:12
**speaks** 161:22
189:3 200:5
238:20

**specific** 14:9,18
21:11 68:16 69:24
88:9 121:2 138:4
141:11 162:14
166:23
**specifically** 45:14
45:19 87:4 116:16
174:23 177:2
183:14 238:8
**specifics** 105:10
**specified** 263:11
**speed** 88:13
**spend** 88:14
**spending** 117:14
191:19
**spends** 223:19
**spin** 104:2
**spoke** 29:9 58:13
58:15,22 59:3,4
232:2 236:14
**spoken** 59:2
130:24 162:22
**spring** 88:23
**spun** 51:19
**squibb** 96:11
**ss** 268:4
**staff** 258:10
**staffing** 128:21
**stamp** 17:17 20:11
21:8,16 50:16
92:22 187:22
190:15 228:24
240:15
**stamped** 16:19
17:11 23:13 69:19
85:24 90:4 111:6
116:14 122:24
136:7,11 137:8,10
137:12 139:16
149:17 154:16
159:3 167:12

176:12 189:4
246:19 265:17
266:2
**stamps** 116:17
144:12
**stand** 48:20
175:16 236:24
251:6
**standalone** 229:12
**standard** 21:6
**stands** 136:21
142:10,14,21
232:21 248:20
**starbucks** 41:5
**start** 17:9 184:23
**started** 27:24
35:12 103:25
114:6,11 115:13
127:12 261:9
**starting** 105:5
**starts** 65:17
123:13 154:13
193:11 234:22
**state** 1:25 5:4,9
72:4 104:21
107:12 145:23
174:25 247:9
262:13 268:4,9
**stated** 6:16 32:7
34:15 47:5 105:3
107:13 110:17
113:5 202:7
226:24 247:15,21
248:7 258:20
**statement** 20:13
20:22 42:18 48:3
54:4 73:13 74:13
99:23 104:23
107:20 108:5
110:12 150:6,9,12
150:20 151:17

153:2,16 159:13
159:15 160:23
181:6,9 182:5
186:17 217:2
234:10 251:2
265:20 266:11
**statements** 74:17
109:4 143:2
198:23 205:19
233:11 254:2
**states** 1:2 57:18
59:19,20,21 70:20
84:15 122:14
149:23 150:13
151:6,11,12 152:4
157:6 161:3,15
171:7 205:10
227:24 236:4,24
239:4 253:22
**stating** 98:21
**status** 183:22
186:23
**stay** 103:21
**stayed** 55:23
246:16
**ste** 2:5 5:13
**stenographer** 7:18
7:25
**step** 84:2
**stepped** 234:5
**sterling** 2:15 3:3
**steve** 129:14
219:12
**steven** 88:21 129:9
129:15,16 196:8
199:16 252:10
**stipulate** 15:19,23
**stipulated** 4:5,20
15:20
**stipulating** 15:22

**stop** 43:16 174:21
**stopped** 43:10,13
**story** 105:7 142:20
159:23 160:6
**strained** 242:11
**strictly** 64:3 196:6
**strike** 47:12,22
48:12 66:23
156:15 161:19
181:8 227:5
256:17
**strongest** 131:2
**structure** 132:18
**style** 180:10
**subheading**
185:23
**subject** 17:4 37:5
37:7 62:5 203:16
207:2,17,23
**subjected** 30:16
38:24 39:18 41:12
**subjective** 196:18
**submitted** 13:7
138:18 216:13
**subordinates**
146:4
**subscribed** 115:6
263:18 269:22
**subscribing** 114:6
**subsidiaries**
170:22 171:18,19
171:22,24
**substance** 10:13
137:21 145:2,4
149:8
**substances** 10:13
**substantive** 28:3
138:6 139:9
**success** 102:19
**successful** 102:20
103:6 165:23

**successfully** 27:9
27:10,11 45:3
**successor** 14:20
15:6,9,13 50:2
77:14
**sued** 12:18
**suffered** 207:5,12
**suggested** 202:14
202:21 212:13
**suggesting** 176:22
**suggestion** 230:13
**suggests** 238:23
**sum** 137:21
**summer** 219:6
**super** 246:10,12
**supervise** 146:2
**supervised** 63:15
**supervising**
180:21
**supervision**
175:18
**supervisor** 23:10
34:21 39:17
**supplemented**
240:20
**support** 39:12
58:24 59:24
111:20 112:13,16
112:22,24 113:9
113:17 121:7,9
124:2 125:6 147:3
147:4 153:9
177:21 183:18
184:7 204:6 211:8
243:9 246:17
**supported** 39:15
59:23 95:9 121:14
147:5
**supporting** 160:17
204:21 211:13

**supports** 104:18
106:7 109:18
110:12 141:25
171:18
**suppose** 16:24
104:11
**supposed** 222:17
225:25
**supposition** 52:21
**sure** 9:6 14:6
23:25 28:8 29:10
32:6,22 34:3
39:21 41:10 43:9
48:19 49:17 53:23
53:23 54:8 56:4
56:16 61:11 77:17
77:24 78:2 82:15
92:8 96:24 101:13
111:12,23 112:13
113:10,11 114:13
114:17 115:11
117:8 118:16
119:5,14 126:7,8
130:21 136:4
137:20 138:14
141:21 146:18
148:11 153:25
154:5 157:4,7
160:22 163:17,23
165:22 168:5,24
197:20 209:20
218:5,16 225:12
229:10
**surprise** 79:25
80:9
**surprised** 80:4,11
80:14,18 238:14
250:7
**surrounding**
221:24

**swear** 6:7
**sweeping** 73:12
74:12 109:4
**sworn** 4:10 5:4
7:19 263:5,18
268:12 269:22
**symbolic** 252:2,8
**synthroid** 9:12
10:15

**t**

**t** 4:2,2 263:2 264:2
268:2,2
**table** 117:16
252:16
**taiyo** 124:9 140:18
**take** 8:10 16:18,18
20:19 21:24 22:23
28:4 44:5 64:7,19
81:12,21 82:24
91:14 92:2,6,7
111:5 114:25
115:3 134:16
140:25 141:14
142:2 145:22
149:6,16 152:9
164:19 167:5
168:18 174:13
175:22 176:11
178:23,24 187:21
189:21 192:25
195:4 200:16
202:22 204:23
206:10 216:6,19
216:20 217:4
219:25 220:15
226:11 228:6
232:25 233:22
238:25 239:14
241:8
**takeaway** 182:18
182:19

**taken** 1:18 5:19
9:10 10:12 57:11
57:12 65:14 92:16
104:6 154:10
193:8 267:6
**takes** 48:20 236:23
**takimoto** 37:19,25
133:18
**talents** 246:7
**talk** 40:23 117:3
122:15 127:25
128:11 130:22
134:12 135:6,22
153:24 162:9,12
163:16,19 194:19
202:13 221:7,11
221:12
**talked** 80:4 88:16
127:17,19,21
128:6,9,19,21
130:4,15 135:25
137:10 162:17,25
163:4,17,21
191:22 211:6
242:15 251:17
**talking** 39:16
41:25 42:5 79:18
92:21 101:19
120:16 121:8
124:18 125:12
127:12 130:25
131:25 141:16
191:4 196:2
241:23,25 247:2
248:25 260:22
**talks** 73:22
**tanabe** 111:2
124:12 125:24
126:11 170:18
**targeted** 29:22
72:6

**targeting** 42:5
**tax** 59:19 155:23
**team** 127:22
138:24 155:11,13
156:10,17 157:12
180:19 254:21
257:24
**teary** 140:8,13
**tell** 7:19 17:15
24:21 32:21 64:12
78:16 87:17,22
123:22 124:6
138:5 146:8,8,16
175:15 179:11
184:21 202:8
219:3,19 244:6
249:24
**telling** 79:16
135:13 224:17
**temporary** 108:2
**ten** 206:2
**tendencies** 49:21
**tendency** 252:5
**tense** 187:7
**tenure** 55:20 58:8
114:21 125:19
138:15 173:19
231:4 236:22
238:4
**term** 15:24 172:4
198:25
**terminate** 212:13
212:14 213:22
239:7 241:6
**terminated** 210:19
210:22 213:13
237:8,17,19,25
238:3
**terminating** 213:2
**termination**
118:16 198:9

238:15,23
**terms** 13:15
113:15 129:25
255:18
**terrific** 33:12
196:9
**testified** 5:5 10:14
56:8 68:8 69:7,20
69:25 71:5 130:3
131:14 134:3
212:25 228:4
247:20 259:19
261:20
**testifies** 48:21
54:13 96:16 99:10
107:12 213:10
236:24
**testify** 9:8 10:10
75:15 99:13,14
188:24 213:11
263:5
**testifying** 188:9
247:3
**testimony** 7:20
30:14,19,22 34:2,5
36:23 38:25 46:9
46:10 48:23 52:12
58:18 60:18 66:5
66:8,15 69:17
70:6,11 71:10
90:7 97:14 98:6
98:22 99:5,24
100:6,10,21
102:25 105:12,21
105:24 106:7,8
107:14,16,21
112:5 131:13
133:8 136:12,17
136:19,20 137:4
137:25 165:13
166:11 173:11

183:11 187:25
198:22 213:13,17
232:4,6 240:5,19
244:4 263:6,10
267:15,18 268:14
**text** 207:8 215:22
217:21
**texted** 216:3
**thank** 6:18 11:4
67:22 111:19
112:12,23 113:8
139:23
**thanks** 206:4,11
**that'd** 253:6
**thing** 26:11 41:4
64:16 130:6
245:24 248:17
254:19
**things** 42:20 47:19
52:5 59:13 94:23
107:17 109:25
113:24 114:10
115:12,15 127:24
127:25 128:6
157:8 163:23
184:2,11 216:13
217:21 228:12
242:24,25 243:2,5
248:21 250:23
**think** 24:19 27:20
30:12 34:13 35:8
35:24 39:3 40:18
48:25 51:16 52:18
54:3 58:21 67:16
67:25 68:24 70:11
71:21,23 77:18
80:8 83:8,22 87:6
87:7,11,17,18
93:25 103:20
114:21 115:12
121:18,19 124:3

126:6 128:8
131:23 138:3,10
139:13 140:23
142:13,14 145:18
147:25 151:3
156:19 159:22
161:16 163:23
165:17 173:16
175:16 177:10
178:14 183:16
192:16 199:8
200:3,4,9 201:18
204:11 216:14
219:7 238:2
239:12 242:7,10
252:3 254:24
255:7,12,14,15,16
255:17 257:5
259:24
**thinking** 174:10
238:15
**third** 27:17 179:9
179:10 180:3
186:12
**thoroughly** 194:25
**thought** 35:25
44:8 58:21 80:21
83:22 86:21
103:12 117:22
139:2 168:6
174:11 222:19
238:15 239:18
**threaten** 213:12
**threatened** 210:11
**three** 34:4,4 44:4
44:13 45:8 55:20
69:2 81:11,20
82:7,24 83:6,7
117:3,6 120:8
143:18,18 144:11
156:21 160:17

252:24
**thursday** 242:5
**thyroid** 9:14,15
**tied** 40:13
**tier** 84:15
**time** 1:15 4:22 6:6
7:11 12:12 14:25
16:9,16,20 17:19
17:23 18:14 19:16
19:22 30:9 33:3,4
33:22,24,25 35:10
36:2 40:17 44:19
54:18 55:7 58:11
61:24 62:8,15,18
62:19 63:6,18
65:9,16 66:7 67:4
68:13 73:2,7,11
84:20 85:11 88:15
90:8,10,21 92:10
92:18 93:12 94:2
94:14,19 95:2,8
101:23 103:12,19
114:19,22 117:2,8
117:10 119:9
120:4,4,9 122:17
123:6,12 125:7,8
126:5,10,15
127:11 135:22
138:12,18,23
139:5 141:10
152:16 154:6,12
155:16 158:9,16
160:12,18 163:14
163:18 165:10
166:11 168:7
172:2,11 173:16
173:18 174:15
175:6,23 176:5
178:21 180:13
185:18 187:17
188:2 190:7

191:19 193:4,10
195:25 196:3
202:5,25 203:9
206:2 207:3
210:10,25 212:14
215:23 217:17
219:2,15 220:4,7
221:14 223:18,19
223:23 225:17,21
231:23,25 234:15
234:21 237:18
242:8,9,18 248:14
250:16 256:8,12
261:8,10,13,14,19
261:22 262:16
263:10
**timeframe** 26:6
120:8 124:18
127:15 163:11
198:14 205:21
**times** 31:15,24
32:3 34:22 39:3,4
40:20 83:14 116:4
117:3,6 147:18
161:23 255:21
**title** 17:18 33:20
103:11
**titled** 167:19
**today** 9:8 11:6
38:11 74:15 78:9
83:14 87:23
108:23 109:2
114:15 119:7
173:12 179:5
193:18 204:24
205:22 210:5
215:24,24 235:2
244:3 245:22
**toe** 26:11
**told** 40:24 49:2,6
55:17 58:15 71:25

74:18 75:17 82:22
85:3 87:20 103:16
105:8,8 135:20
140:10 143:4
165:9 166:22
206:5 207:3 216:3
219:5 222:20
224:21 244:25
247:4
**tone** 164:6,19
**top** 84:14,15
121:20 139:14
149:22 170:14
172:7 187:12
211:14 220:16
227:23 239:19,20
239:24 244:23
**topic** 163:12
206:25
**topics** 140:12
163:15 192:3
**totally** 69:13 177:5
**track** 86:22
184:22
**tracking** 217:13
**trainee** 35:21 36:4
**trainees** 69:3,4
**training** 129:8
130:2 136:14
137:5 138:2,9
139:10 162:4,12
162:23 164:15
165:11,21 166:16
166:20,24 169:11
175:4 256:14
**transaction**
138:22
**transcript** 258:24
263:9,9
**transition** 132:4,5
134:11,15 135:7

140:5 192:18,21
**transitions** 115:25
**travel** 150:24
**traveling** 132:22
**travelling** 147:20
**treat** 126:18
**treated** 29:23 72:6
85:5
**tremendous** 86:23
**trendier** 163:15
**tri** 124:10 140:19
**trial** 4:22
**triccoli** 264:17
**trice** 247:14
**tried** 34:22 114:5
119:14 126:8
152:21 172:23,24
**trip** 41:14 110:2
152:5 164:3
172:13
**trips** 71:8 151:6
**troccoli** 35:13
67:14 68:10 189:8
189:14 190:4,8
191:7,13,14
192:15 195:15
200:18 201:6,13
201:16,19 203:16
203:24 204:3,15
205:5,18 206:18
208:9 210:12,18
213:2,12,23
215:17 217:9
219:10 220:11
222:15 223:14
225:6,8 241:3
243:8 264:18
265:4,5 266:13
**troccoli's** 203:19
205:8 215:14
216:10 221:25

**trouble** 243:7
**true** 25:12,20
29:15 113:5,7
149:10 159:22
184:2 205:12,13
217:2 222:11,12
223:20,21 224:12
224:24,25 225:13
235:22 236:17
243:4,5 263:9
268:13
**trust** 51:22 54:5
146:21 250:18
**trusted** 168:14,21
168:25 169:4
**trusting** 51:24
**truth** 7:19 99:23
263:5
**truthful** 7:20
100:7 122:5 150:6
150:9 198:22
**truthfully** 8:14,22
9:8 10:10
**try** 121:19 202:23
230:2
**trying** 112:19,21
188:25 219:23,24
238:17 246:3
**turned** 259:3
**twice** 132:22
**twisting** 242:23
**two** 19:25 36:8,11
44:4,13 45:8
57:13 59:14 63:8
69:2 78:18 81:11
81:20 82:7,23
83:6,7,17 84:24,25
85:5 94:25 124:14
134:18 141:15
144:15 145:14
167:12 199:9

205:21 221:20
237:9 243:17,18
244:2,7 245:13
247:23
**type** 181:21
**typeface** 229:6
232:15
**typewritten** 214:8
215:5
**typical** 110:3
**typos** 171:14

**u**

**u** 4:2 124:15
**uk** 176:24 177:19
**ultimately** 88:21
**unacceptable**
218:10
**unavailable**
103:18
**unaware** 158:17
158:24
**uncomfortable**
39:8
**uncooperative**
222:14
**underlying** 54:6
143:4 191:10
**undermining**
140:16
**understand** 7:19
7:23 8:13,20
18:12 24:14 28:18
54:9 64:17 90:7
95:25 103:4 117:9
126:9 163:7 166:4
166:7 225:15
226:25 229:4
**understanding**
55:25 60:8,12
78:10 98:12
193:24 225:17

241:17
**understood** 8:3,11
8:25 11:2 13:13
53:22 107:25
157:10 178:7
182:9 218:18
226:3 245:2
**unfair** 30:17 75:7
75:14,18
**unfairly** 29:23
72:7
**unfamiliar** 124:19
125:7
**unhappy** 105:7
191:17
**unhelpful** 212:20
**uninterrupted**
147:14
**unit** 110:10
**united** 1:2 57:18
59:19,20,21 84:15
122:14 151:6,12
152:3 157:5 171:7
**units** 160:18
**universal** 182:8
**university** 84:14
**unknown** 37:21
**unpaid** 85:8
**unprofessional**
153:19 155:4
**unresponsive**
156:15 181:8
**unsaid** 164:19
**unsigned** 4:14
**untrue** 161:8
205:15,16 251:2
**unusual** 192:17
**update** 19:5 28:2
**upset** 177:16
204:5

**usa** 14:18 124:11
**use** 19:4 85:3
161:24 164:19
176:25 198:25
200:10
**useful** 121:18
139:3
**utmost** 112:16

**v**

**v** 269:2
**vacation** 87:9,12
87:19,19 202:15
202:16,17,19
206:11 208:6
211:11 216:5
217:15 219:6
221:4
**vagnini** 2:4
**vague** 186:20,21
**valli** 2:4
**value** 189:21
**variety** 39:12
84:22 147:8
**various** 164:15
176:14
**vastly** 235:5
**verbal** 8:2 91:11
**verbatim** 125:5,10
125:15,17,24
**verbiage** 142:17
**veritext** 3:10 6:3,5
269:1
**version** 85:22
**versus** 5:21
**vice** 79:4,7
**video** 5:17 19:17
19:22 65:10,16
92:11,18 123:7,12
154:7,12 175:24
176:5 193:5,10
234:16,21 262:17

**videographer** 3:10
5:15 19:16,21
65:9,15 92:10,17
123:6,11 154:6,11
175:23 176:4
193:4,9 234:15,20
262:16
**violate** 224:18
**violation** 224:10
**virginia** 127:18
**visas** 157:7
**visiting** 43:4
**visitors** 252:25
253:7,23
**vocal** 43:5,5
**vp** 62:11 155:23

**w**

**wait** 65:3 99:1
140:9
**waived** 4:9
**wane** 198:16
**want** 6:20 12:6
19:24 28:8 29:10
32:5 38:22 39:21
40:25 42:6 43:9
46:4 51:21 60:17
61:18 64:16,21,22
65:4 66:20 70:2
112:23 113:8
114:9 123:21
128:17 130:6,20
131:12,15 133:5,6
136:2,4 137:20
139:25 141:9,19
153:2,23 160:22
161:2 162:5
187:23 192:4
222:20 224:18
232:23 239:7
242:4 244:25
258:25

**wanted** 28:5 51:20
64:7 80:8 98:25
112:12 130:9
134:12,13,14,21
135:5,16 160:25
164:16 168:5
192:5 206:9 218:5
218:10,16 241:5
244:16 250:23
**wanting** 96:10
103:5 135:4
**wants** 50:22
**wardlaw** 84:20
86:4
**warm** 150:19,21
**way** 24:10 29:23
30:12 40:14,14,15
40:15 42:16 47:6
47:11 48:5,10
59:12 76:2 107:2
110:21 123:21
149:15 153:14
155:6 177:23
180:8 185:22
190:2 192:5,19,23
192:24 195:22
202:13 219:17
229:16 245:13
252:9 256:2
268:18
**ways** 234:7 248:19
**we've** 42:2 60:19
101:18 116:19,22
130:19 134:6
144:13 145:9
155:19 158:19
161:23 173:22
174:3,5 175:9
189:11 213:6
242:15 249:18
251:9

**web** 126:8
**websites** 114:7,8
  115:5,6,20
**week** 34:4,5 117:3
  117:6,7 127:2
  150:25 202:16,17
  206:8 208:6,8
  225:9,22 242:6
  248:21 256:13
**weekend** 241:14
**weekly** 113:25
**weeks** 69:2
**went** 21:3 97:9
  110:13 116:11
  210:10 211:20
  214:7 221:12
  248:4,24 255:15
  255:19
**whatsoever**
  177:14 245:20
**whereof** 268:20
**white** 35:24 36:6
**wholly** 125:16
**wine** 248:7
**wish** 212:18
**witness** 4:10,16,18
  5:3 6:7 11:13 20:8
  31:3 82:14 183:2
  185:25 193:3
  220:22 222:24
  262:22 268:11,14
  268:20
**witnessed** 47:9,19
  48:8
**witnesses'** 269:3
**woman** 31:16,17
  31:21 39:7 40:13
  41:22 43:5,6
  248:15 257:20
**womanly** 42:25

**women** 31:25
  32:18,22 94:17
  156:6,10,13,17,21
  245:14
**word** 141:5 194:10
  196:18 198:19
**words** 45:22
  142:18,22 150:9
  194:17 245:5,10
**work** 28:3 58:25
  102:6 107:2
  120:22 130:9
  131:10 141:14,23
  141:24 142:3
  146:2,9,17 147:8,9
  147:24 149:25
  164:5 172:25
  192:4,9 207:16
  211:18 212:3,11
  228:12,17 230:8
  241:13 246:17
  249:2 250:17
  255:6,22 260:18
  261:10,22 262:3,4
**workday** 34:20
**worked** 15:2 26:20
  27:3,6,8 32:24
  33:2,3 34:4,11,19
  35:23,24 45:12
  55:14 59:13 65:21
  66:6,12,18 77:17
  83:16,17,18,20
  84:3,7 85:2,10
  120:5 121:10
  122:8,10,22
  123:16 125:20,21
  126:3 128:15
  175:7 181:17
  189:11 219:12
  225:21 254:8,12
  256:8

**working** 33:23,25
  36:9 44:17,18
  50:25 113:14
  114:11 120:25
  121:10 127:7
  138:23 146:10,17
  153:6 163:10
  166:23 177:23
  190:4 212:6,7
  215:24 242:12
  246:13 256:6
  260:19 261:15,18
  261:19
**worldwide** 94:19
  248:17
**worries** 162:3
  191:5
**worsens** 177:5
**would've** 73:10
  213:2
**write** 3:9 6:2
  13:24 23:3 25:17
  26:11,19,23 27:14
  153:16 241:4
  250:15 255:24
**writer** 255:23
**writes** 179:21
  180:4 185:21
  208:10 209:8
  216:25 231:14
  232:5 241:12
**writing** 19:6 28:14
  71:13,14,19 72:3
  72:11 85:7 90:16
  90:25 91:3,7,9
  118:13 186:17,22
  239:5 240:4
  253:11,18,25
  254:4 255:21
  256:3

**writings** 255:19
**written** 29:12
  61:17 70:19 73:17
  173:18 180:13
  184:6,8 185:17
  188:13 205:25
  209:13 249:25
  253:12
**wrong** 229:24
**wrote** 14:12 23:6
  25:7,10 28:16,22
  53:4 74:7 112:12
  112:23 113:8,11
  138:21,25 171:15
  172:15 207:24
  208:4 241:18
  242:9 243:3
**wyn** 2:7

|       x       |
|---------------|

**x** 1:3,12 95:3
  264:2 266:20

|       y       |
|---------------|

**y** 95:3
**yeah** 11:12 77:18
  80:8,25 83:22
  85:22 86:3 89:2
  108:3 119:14
  128:19 149:5
  163:16 164:4
  172:21 192:21
  197:17 207:10
  208:2,5 212:21
  228:10 232:7
  251:14,23 252:17
**year** 11:8,25 16:21
  17:2,3,5,13 19:3,3
  19:8 20:17 21:2,6
  21:18 22:7,14,17
  23:12 24:23 25:15
  25:16,25 26:2,4

27:4,17,25,25
28:16,19 52:3
53:4 58:24 60:7
60:11 62:24 63:3
74:10 75:4 103:23
103:25 105:3,5
130:17 132:22
159:16 174:19,20
233:6 243:3 264:9
265:19
**years** 27:15 31:15
35:22 36:5 44:4
44:13,17,19,25
45:8 55:14,16,21
80:6 81:11,20
82:7,24 83:6,7,9
83:10,10,11,19,21
88:3 101:13
113:13 115:14,15
118:10 120:19
124:5 138:15
148:14,15 160:16
181:5,19 184:9
190:5 191:15
234:2 237:6,7
255:14
**yoko** 155:20 157:2
**york** 1:2,23,23,25
2:6,12,12,17,17,22
2:22 5:5,14 6:2
43:5 150:24 268:4
268:5,9 269:1
**yoshisato** 37:18
39:5 49:24 50:10
50:22 51:3,9,14,20
52:8,9 53:8,9,25
54:25 55:6,12
56:18,23 57:16
62:14 63:23 70:7
70:14,20 71:4
95:9

**yoshisato's** 53:11
**yusami** 68:10

**z**

**z** 95:3

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   -------------------------------------x

5   JENNIFER S. FISCHMAN,

6                         Plaintiff,        Index No.

7              -against-                    18-CV-08188

8   MITSUBISHI CHEMICAL HOLDINGS AMERICA,

9   INC.; MITSUBISHI CHEMICAL HOLDINGS

10  CORPORATION; NICOLAS OLIVA, in his

11  individual and professional capacities;

12  DONNA COSTA, in her individual and

13  professional capacities; and JOHN DOES

14  1-10, in their individual and

15  professional capacities,

16                         Defendants.

17  -------------------------------------x

18

19                         June 28, 2021

20                         10:09 a.m.

21

22

23

24

25

1

2                    June 28, 2021

3                    10:09 a.m.

4

5           Continued videotaped deposition of

6    JENNIFER FISCHMAN, held at the offices of Gordon

7    Rees Scully Mansukhani LLP, One Battery Park

8    Plaza, New York, New York, pursuant to Notice,

9    before Lynne D. Metz, a Shorthand Reporter and

10   Notary Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2   A P P E A R A N C E S:
3
4       VALLI KANE & VAGNINI
5       Attorneys for the Plaintiff
6           600 Old Country Road
7           Suite 519
8           Garden City, New York 11530
9       BY:   MATTHEW L. BERMAN, ESQ.
10          ROBERT VALLI, ESQ.
11          SARA WYN KANE, ESQ.
12
13
14      GORDON REES SCULLY MANSUKHANI LLP
15      Attorneys for Defendants MITSUBISHI CHEMICAL
16      HOLDINGS AMERICA, INC., NICOLAS OLIVA AND
17      DONNA COSTA
18          One Battery Park Plaza
19          28th Floor
20          New York, New York 10004
21      BY:   MERCEDES COLWIN, ESQ.
22          BRITTANY L. PRIMAVERA, ESQ.
23          File # MCHEM-1135398
24
25

1

2          SHEARMAN & STERLING

3          Attorneys for Defendant MITSUBISHI CHEMICAL

4          HOLDINGS CORPORATION

5                  599 Lexington Avenue

6                  New York, New York 10022

7          BY:   JEROME S. FORTINSKY, ESQ.

8                  SAM JOLLY, ESQ.

9

10

11          CLARICK GUERON REISBAUM

12          Attorneys for Defendant DONNA COSTA

13                  220 Fifth Avenue

14                  New York, New York 10001

15          BY:  NICOLE GUERON, ESQ.

16

17

18          ALSO PRESENT:

19                  Rocco Mercurio - videographer

20                  Nicolas Oliva

21                  Donna Costa

22                  Skyler Stern - intern

23                  Adriana Acosta - intern

24

25

1

2          THE VIDEOGRAPHER:  We are now going on

3     the record.  Today is June 28, 2021 at

4     approximately 10:09.  This is the video

5     deposition of Jennifer S. Fischman volume

6     two in the matter of Fischman versus

7     Mitsubishi Chemical Holdings America, Inc.

8     filed in the Southern District Court of New

9     York case number 18-CV-08188.

10          My name is Rocco Mercurio and the

11     court reporter is Lynne Metz.

12          Will counsel please introduce

13     yourselves and who you represent.

14          MR. BERMAN:  For plaintiff Matthew L.

15     Berman and I am joined today by my

16     colleagues Sara Wyn Kane and Robert Valli,

17     Jr.

18          MS. COLWIN:  Mercedes Colwin for MCHA,

19     Donna Costa and Nicolas Oliva and with me is

20     my colleagues Brittany Primavera, Skyler

21     Stern and Adriana Acosta.

22          MR. FORTINSKY:  Jerry Fortinsky with

23     Shearman and Sterling for defendant

24     Mitsubishi Chemical Holdings Corporation and

25     with me is my colleague Sam Jolly.

```
 1                    J. Fischman
 2              MS. GUERON:  Nicole Gueron with
 3         Clarick Gueron Reisbaum and I represent
 4         Donna Costa.
 5
 6    J E N N I F E R   F I S C H M A N,
 7         having been previously sworn, resumed the
 8         stand and testified further as follows:
 9    EXAMINATION (Cont'd)
10    BY MS. COLWIN:
11         Q.    Good morning Ms. Fischman.
12         A.    Good morning Mercedes.
13               How are you?
14         Q.    I am good thank you.
15               So we are going to continue your
16    deposition.  I just have some questions.  I will
17    begin with my first question.  I am going to
18    direct your attention to March 3, 2016.  Mr. Oliva
19    had met with you on that date to see how you were
20    doing.
21               Do you recall that date and that
22    meeting?
23               MR. BERMAN:  Object to form.
24         A.    I think I could use some refresher
25    about what you are talking about.
```

                    J. Fischman

1

2        Q.      Sure.

3                MS. COLWIN:  I ask that Bates 864 to

4        865 be shown to the witness please.  Let's

5        mark this as Fischman Exhibit 1.

6                (Fischman Exhibit 1, a document

7        Bates stamped 864 to 865, marked for

8        identification, as of this date.)

9        Q.    Ms. Fischman, if you could just take a

10   look briefly at the two-page document Bates

11   stamped 864 to 865.

12       A.    Yes.

13       Q.    Does that refresh your recollection as

14   to the meeting that you had with Mr. Oliva?

15       A.    It refreshes a meeting that I had.  I

16   can't state as to when that occurred but

17   definitely remember the meeting.

18       Q.    There are statements made in this

19   document.

20                Could you take a look at this and

21   review it to see if there is any inaccuracies?

22       A.    So these are Nick's notes based on a

23   conversation that he and I had on that date.  I

24   remember generally having this conversation with

25   him and I do remember parts of the conversation,

```
 1                    J. Fischman
 2   but...
 3        Q.    But my question Ms. Fischman, were
 4   there any inaccuracies?
 5        A.    I would say that there is some.  Yes.
 6   I would say that there are inaccuracies.
 7        Q.    Point out where they are?
 8        A.    I am at the point -- his conclusions
 9   about --
10        Q.    No, just --
11        A.    -- what I am saying.
12              So on page 864 his parenthetical
13   alluding to my quitting but refusing to say the
14   word, I don't recall ever feeling that I was going
15   to quit.
16        Q.    Okay, go on.
17        A.    I recall definitely saying that the
18   environment was a toxic one.  The office felt
19   toxic to me.
20        Q.    Ms. Fischman, if you could do me a
21   favor, just point out the inaccuracies and I am
22   going to go back on this first point that you made
23   in a moment.
24        A.    Okay.  I do recall saying that on page
25   865 I do recall saying that for my mental health I
```

```
 1                    J. Fischman
 2    was requesting two days a week to work from home.
 3          Q.    That's not what it says.  I am asking
 4    for --
 5          A.    So it says -- so while he says in his
 6    parenthetical on line two quote, not mental health
 7    in parenthetical.  So that's incorrect.  It was
 8    for my mental health.
 9          Q.    Anything else?
10          A.    Again, line one, two, three, four,
11    five he said "I asked if she meant leaving the
12    company.  She implied so, no.  I never implied
13    so."  So that's incorrect.
14                I don't know what a Yuka issue is.  So
15    that line 6 I don't know what that is.
16                I think that in general the last --
17    where he says I asked what the underlying reason
18    is several times, she says Kelli.  Then says and
19    the environment.  I dig deeper.  She says Kelli.
20    She says that I don't need to know why.  I don't
21    recall saying all of that.
22                He then says in parenthetical on the
23    last two lines what Jennifer seems to
24    misunderstand.  He again, is trying to read my
25    mind.  So I don't know where that comes from.  So
```

1                     J. Fischman
2    that would be incorrect.  And that's it.
3         Q.    Do you recall working on project Haru
4    in 2016?
5         A.    Sometimes the project names are,
6    escape me.  So if you could hand me a document
7    that might refresh my memory.
8         Q.    1102 to 1103.
9              MS. COLWIN:  Please mark this as
10         Fischman Exhibit 2 a document Bates stamped
11         1102 through 1103.
12              (Fischman Exhibit 2, a document
13         Bates stamped 1102 through 1103, marked for
14         identification, as of this date.)
15         Q.    Have you had a chance to review that
16    document?  Does that refresh your recollection
17    about project Haru?
18         A.    Briefly, yes.
19         Q.    Did it surprise you to hear that they
20    were concerned about your involvement in the
21    project?
22         A.    Yes.
23              MS. COLWIN:  I would like to mark as
24         Fischman Exhibit 3 a document Bates stamped
25         590 to 599.

```
 1                    J. Fischman
 2                (Fischman Exhibit 3, a document
 3         Bates stamped 590 to 599, marked for
 4         identification, as of this date.)
 5         Q.    Can you take a look at 590 to 599?
 6         A.    I know this document.
 7         Q.    I am sorry?
 8         A.    I know this document.
 9         Q.    So this is the review that you
10    received from Mr. Oliva; is that right?
11         A.    Yes.
12         Q.    And that captures the time you were
13    the acting general counsel; is that right?
14               Assistant general counsel, do you see
15    that on the very top in the front?
16         A.    Mm-hmm.
17         Q.    April 30, 2016 take a look at page
18    595.
19               That is your signature, is it not?
20         A.    Yes.
21         Q.    And that is signed and dated May 24,
22    2016; correct?
23         A.    Mm-hmm.
24         Q.    Right above that there is a
25    typewritten portion which is section five Employee
```

```
 1                    J. Fischman
 2   Comments; correct?  It starts at 594 at the very
 3   bottom and these are your comments above that
 4   typewritten; correct, in terms of it starts "The
 5   2015 fiscal year was a good and challenging year."
 6              Is that right?
 7        A.    Yes.
 8        Q.    Is there any evidence of
 9   discrimination related to the criticisms that are
10   set forth in your work --
11              MR. BERMAN:  Object to form.
12        Q.    -- in this document?
13        A.    Could you repeat the question?
14              (Record read.)
15              MR. BERMAN:  Object to form.
16        A.    Yes.
17        Q.    Where is that in the document?
18        A.    Well, it is not something that I would
19   have written in the document because this document
20   is submitted to my boss for his review and --
21        Q.    Ms. Fischman that's not the question.
22        A.    Actually, that's the answer.  You
23   asked me to answer the question.
24        Q.    Where is it in writing?  I am not
25   asking for the reason.
```

```
 1                   J. Fischman
 2              Where is it in writing in this
 3    document that you felt evidence of discrimination?
 4         A.    Well actually, there is evidence of
 5    retaliation, if you must know.  It's in the Needs
 6    Improvement on the level of proficiency on page
 7    592 which I had never received before and that was
 8    in retaliation for comments that I had made to
 9    Nick Oliva on or about March 1st when we had a
10    discussion about the dismissal of Amber Todd.
11         Q.    So it is your statement under oath
12    that the fact that you received a needs
13    improvement in communication was for retaliatory
14    motive by Mr. Oliva; is that your testimony?
15         A.    Yes.
16         Q.    And that stems from a conversation
17    that was had regarding Miss Amber Todd?
18         A.    Yes.
19         Q.    If you could, to the best of your
20    recollection, state for the record under oath what
21    the conversation you had with Mr. Oliva regarding
22    Miss Amber Todd in March of 2016?
23         A.    Two things Mercedes.  I am a lawyer.
24    You don't need to remind me that I am under oath.
25    So please don't do that.
```

1                        J. Fischman

2              Secondly --

3         Q.      It is my deposition Ms. Fischman and I

4    am being very respectful.

5         A.      But I find that very disrespectful.  I

6    know I am under oath.  She just reminded me of it,

7    okay.  Under oath I state that when I returned

8    from vacation in early March, I believe it was

9    March 1st, we had a conversation about the

10   termination of Amber Todd, a woman who worked at

11   one of our affiliates for who we supported with

12   legal advice.  Dan Todd had previously worked at

13   the company back in the Fall of 2015.  Dan Todd

14   left the company and he received a very generous

15   year long severance package.  When Amber -- the

16   company was closing down or winding down its

17   operations and when Amber Todd identified that she

18   was ready to leave the company the company said

19   they would not give her a severance package.  All

20   of this occurred in early February of 2016.

21              I went on vacation with my family in

22   mid to late February and when I returned Mr. Oliva

23   told me that the company was not going to give

24   Amber a severance package but instead was going to

25   fire her for cause because there was a conflict

1                    J. Fischman
2   now that her husband worked for a customer of the
3   company.  So I said to Nick that that was
4   inappropriate and that I was not going to paper
5   any record as he had suggested and we got into
6   quite a -- we got into a strongly worded
7   conversation where he was angry with my response
8   and I did not want to do anything that I thought
9   was inappropriate and I told him that I thought it
10  was discrimination against Amber and that they had
11  treated her male husband quite differently and
12  that it was absolutely wrong and I wouldn't
13  support it.  He immediately changed the subject,
14  walked out of my office and I was very shaken from
15  that experience.
16       Q.    What, if anything, exists in writing
17  that details this conversation that you had with
18  Mr. Oliva?
19       A.    On that night I went home and I wrote
20  myself a note on a legal pad and I stuffed it in a
21  draw and hoped to forget about it.
22       Q.    Have you produced that?
23       A.    Yeah.  That was, remember last week
24  when I said there were a bunch of handwritten
25  documents that I thought had been produced.  We

```
 1                    J. Fischman
 2   have now produced everything.
 3              MR. BERMAN:  I will represent to
 4        counsel those were produced.
 5        Q.   Ms. Fischman, we have been in this
 6   controversy for quite a number of years.
 7              Why is it that you just produced this
 8   document to your counsel and then in turn
 9   allegedly produced to us?
10              MR. BERMAN:  Object to form.
11        A.   I thought I had produced everything
12   and I went back and when I was preparing for this
13   deposition I went back and searched another part
14   of my bedroom office and found a couple of more
15   documents.  Not just this, but I also found a
16   notebook that I had kept.
17        Q.   You perceive this document as a
18   critically important document to your claim;
19   correct?
20              MR. BERMAN:  Object to form.
21        A.   Of course.
22        Q.   How is it that --
23        A.   It is the basis for which I used for
24   the complaint.
25        Q.   Ms. Fischman, let me finish.
```

1                    J. Fischman

2                    How is it that we are in 2021 and now

3        for the first time you have given this document to

4        your counsel who then gave it to us?

5                    MR. BERMAN:  Object to form.

6            A.    I don't know how to answer that.  I

7        found a couple of extra documents that I thought I

8        already produced it a year ago actually.

9            Q.    The circumstances regarding Mr. Todd

10        and Miss Todd are very different.

11                    Mr. Todd was subject to a reduction in

12        force, was he not?

13                    MR. BERMAN:  Object to form.

14                    MS. COLWIN:  What's the objection to

15            the form counsel?

16                    MR. BERMAN:  You provided a prequel to

17            the question.  So that was two questions or

18            one was a statement and one was a question.

19        BY MS. COLWIN:

20            Q.    Mr. Todd was subjected to a reduction

21        in force, was he not?

22            A.    I think the whole company was subject

23        to --

24            Q.    I am not asking you that question.  I

25        am asking you a question Ms. Fischman.

```
 1                    J. Fischman
 2              Mr. Todd was subject to reduction in
 3    force, was he not?
 4         A.    No.
 5         Q.    Do you have something in writing to
 6    state that he wasn't subject to reduction in
 7    force?
 8         A.    All of the documents that I have are
 9    in the possession of your client.
10         Q.    Miss Todd was not subject to a
11    reduction of force, was she?
12              MR. BERMAN:  Object to form.
13         A.    I don't believe either one of them
14    were subject to a reduction in force.
15         Q.    Did you make any -- withdrawn.
16              There is no evidence that you had this
17    discussion about this conversation with anyone
18    within MCHA, did you?
19              MR. BERMAN:  Object to form.
20         A.    Yes.  I had this discussion with Nick
21    Oliva.
22         Q.    I am talking about the discussion you
23    had with Mr. Oliva.
24              You spoke to no one else at MCHA
25    regarding this discussion; correct?
```

```
 1                    J. Fischman
 2        A.    I can't recall.  I may have had a
 3   discussion with Steven Rose.
 4        Q.    Do you have anything in writing about
 5   subsequent discussion you had with someone at MCHA
 6   regarding this discussion you had with Mr. Oliva?
 7        A.    There may be e-mails between me and
 8   Yvonne Bienami.  There might be e-mails between
 9   she and I about this.
10        Q.    Shifting gears to Genomatica.
11              You were general counsel to
12   Genomatica, were you not?
13        A.    Yes.
14        Q.    Josh Berman worked with you as your
15   outside counsel; correct?
16        A.    He did.
17        Q.    Your client was MCC, was it not?
18        A.    Yes.
19        Q.    And your contact at MCHJ was Tomoji
20   Minami; correct?
21        A.    Yes.
22        Q.    And Mr. Takimoto was the business unit
23   leader for MCC; correct?
24        A.    Yes.
25        Q.    You were given instructions about this
```

1                    J. Fischman

2    litigation from Mr. Oliva, were you not?

3          A.    Mr. Oliva and I discussed this

4    litigation many times.  You would have to be more

5    specific.

6          Q.    Well, he gave you instructions on how

7    to handle the litigation overall, did he not?

8          A.    Well, I was in the litigation for two

9    and a half years before Mr. Oliva joined the

10   company.

11         Q.    He gave you -- so didn't he say to you

12   that this litigation for MCC was very important?

13         A.    We had always discussed the importance

14   of this litigation, yes.

15         Q.    So the answer is yes; correct Ms.

16   Fischman?

17         A.    I am not sure that he instructed me.

18   I had been running the case for many years before

19   he arrived on the scene.  So I was well aware of

20   its importance.  I don't believe --

21         Q.    I am talking about -- Ms. Fischman,

22   listen.  We have a short period of time.  Let's

23   get through this and you know let's go through

24   this and let's go through this.  I am not going to

25   speak over each other.  Don't interrupt my

```
 1                    J. Fischman
 2    questioning.  Let's just move on.
 3              Mr. Oliva told you it was very
 4    important litigation because MCHA's legal
 5    department, and you in particular, could shine
 6    with this client and be a resource for MCC in the
 7    future.
 8              Did he not say that to you?
 9              MR. BERMAN:  Object to form.
10        Q.    Yes or no?
11        A.    I don't believe he said those words to
12    me, no.
13        Q.    Did he not say to you that it was
14    going to be a great opportunity for you to shine
15    with this particular client so that you could be a
16    resource for MCC that was going to be global at
17    some point?
18        A.    I would say I was well aware of the
19    importance of the lawsuit because I had been
20    working for this company for eight years by this
21    point and I always treated them with great respect
22    and reverence.  So I knew of the importance of MCC
23    and I also knew of Mr. Takimoto's importance.
24        Q.    And you understood that Genomatic --
25    with respect to this particular litigation you
```

1                    J. Fischman

2    understood that Genomatica basically ignored MCC

3    for about two years; is that correct?

4                    MR. BERMAN:  Object to form.

5         A.    What was the question?

6         Q.    You knew that Genomatica had --

7    Genomatica and MCC had a difficult situation where

8    MCC was basically ignored by Genomatica which

9    resulted in this breach of contract?

10                   MR. BERMAN:  Object to form.

11        A.    Are we going back to the basis for the

12   lawsuit?

13        Q.    I am talking about the instructions

14   that you understood na there was a difficult

15   strained relationship between Genomatica and MCC.

16                   Genomatica had essentially ignored MCC

17   for about two years; correct?

18                   MR. BERMAN:  Object to form.

19        A.    Genomatica had taken a great deal of

20   money from Mitsubishi Chemical.

21        Q.    The answer is yes or no.  If you don't

22   know I am going to move on.

23                   MR. BERMAN:  Object to form.

24        A.    I believe the question ignores the

25   fact we were in litigation.  So yes, of course

```
 1                    J. Fischman
 2   there were a strained relationship between these
 3   former contracted companies, yes.
 4        Q.    Weren't you instructed by Mr. Oliva
 5   that it was essential that MCC be kept updated
 6   with any developments within the litigation?
 7             MR. BERMAN:  Object to form.
 8        A.    I spoke with MCHJ and MCC on an
 9   absolute regular basis.  Sometimes more than three
10   or four times a week.  It was a very active case.
11        Q.    And you understood how important it
12   was as lead counsel to keep your client MCC
13   updated; correct?
14        A.    Yes.
15        Q.    Who did you seek approval from at MCC,
16   was that Mr. Minami and Mr. Takimoto?
17        A.    Approval for what?
18        Q.    Any strategic measure that you were
19   going to take in litigation.
20        A.    There were different levels of people
21   that we would speak to.
22             So am I allowed to give a fuller
23   explanation or do you just want a yes or no
24   answer?
25        Q.    I am just asking who are the
```

```
 1                    J. Fischman
 2  individuals or your point people?  If there was a
 3  strategic decision to be made, who were your point
 4  individuals at MCC?
 5          A.    So I would say there were a few
 6  different people that we spoke to on a regular
 7  basis.  There was first Takibondo.  Then there was
 8  Utsin Myama (phonetically).  I can't remember
 9  exactly how to pronounce his name, but it starts
10  with a U-T-S.  Then there was Tomoji Minami and
11  then ultimate control over everything was Takimoto
12  San.  You can leave the San off.  Takimoto.
13          Q.    Mr. Takimoto was the same individual
14  that had raised concerns about your involvement in
15  project Haru; correct?  That was the document that
16  you just --
17          A.    I was unaware of that.  It was never
18  shared with me.
19          Q.    But you saw that document in front of
20  you that's Bates stamped 1102 and 1103; correct?
21          A.    I have seen the document so I assume
22  it is correct but I can't speak to its
23  authenticity nor can I speak to -- I never saw it.
24              MS. COLWIN:  1419 through 1421 please
25          mark as Fischman Exhibit 4.
```

1                          J. Fischman
2                   (Fischman Exhibit 4, a document
3          Bates stamped 1419 through 1421, marked for
4          identification, as of this date.)
5          Q.    Were you aware that Mr. Minami raised
6    concerns about the way you were handling the case?
7          A.    No.  I was not aware at all.
8                   MS. COLWIN:  Let's mark 876 and 877 as
9          Fischman Exhibit 5.
10                  (Fischman Exhibit 5, a document
11         Bates stamped 876 and 877, marked for
12         identification, as of this date.)
13         Q.    Were you aware that Mr. Minami
14   expressed discomfort regarding your handling of
15   the Genomatica litigation on 10/23/2016 as
16   reflected in the document 876, 877?
17         A.    I was aware about this particular
18   small incident.  And what I would like to explain
19   is that it was only a matter of a few days between
20   my e-mail to Tomoji letting him know that the
21   judge had retired.  So it was the judge had
22   retired in mid-October 2016 and by, within a week
23   we barely had learned that he had retired and that
24   the ENE was cancelled and within the same week
25   they said that they had passed it to a new judge

```
 1                     J. Fischman
 2  and an ENE had been scheduled.  So it was not --
 3  there was a very short period of time between the
 4  two incidents and that was the explanation for not
 5  letting Tomoji know that the judge had retired.
 6  In fact, I am not sure how aware I was of it.  It
 7  was something that Josh knew about and we were
 8  sort of scrambling to figure out that implications
 9  of it before speaking to Japan.
10                 MS. COLWIN:  Take a look at 1842 to
11           1847 which we will mark as Fischman Exhibit
12           6.
13                 (Fischman Exhibit 6, a document
14           Bates stamped 1842 to 1847, marked for
15           identification, as of this date.)
16           A.    Okay.
17           Q.    This pertains to the settlement
18  conference; correct?
19           A.    This is pertaining to the yes, we will
20  call it the settlement conference between -- in
21  front of the judge called an ENE.
22           Q.    And you understood the settlement
23  conference needed a certain level of authority to
24  settle; correct?
25           A.    Yes.
```

```
1                    J. Fischman
2      Q.    And you understood that it wasn't from
3  that document you can see it was not whether who
4  was going, it was whether MCC would attend or
5  someone from MCHJ would attend; is that correct?
6            MR. BERMAN:  Object to form.
7      Q.    You are aware from that document that
8  it was a decision between whether someone from MCC
9  would attend versus someone from MCHJ; correct?
10     A.    Correct.  It was --
11     Q.    Let me point your attention at 1844.
12 It says Dear Jennifer.  This is from Mr. Minami
13 "Regarding the person who has the authority to
14 settle the case, I believe Takimoto San should be
15 the person, but he is now on a business trip to
16 abroad.  We will discuss internally next week
17 whether Takimoto San will be able to attend the
18 conference or MCC appoints MCHA as its
19 representative with authority, in addition to the
20 settlement terms we can accept/compromise."
21            Do you understand that?
22     A.    Yes.
23     Q.    So it is clear from this particular
24 communication from Mr. Minami to you that it is
25 either someone from MCC in particular Mr. Takimoto
```

```
 1                     J. Fischman
 2   or someone from MCHJ who they would select;
 3   correct?
 4        A.    Yes.
 5        Q.    Is there any evidence of
 6   discrimination that, according to you, that with
 7   respect to the who they selected for the
 8   conference?
 9             MR. BERMAN:  Object to form.
10        A.    Yes.
11        Q.    What is the evidence of
12   discrimination?
13        A.    That they chose Nick for this to
14   attend the settlement conference when I was the
15   lead attorney on the case and had been so for two
16   and a half years before he arrived on the scene
17   and when I turned to Nick, when he stood in my
18   office and we discussed it, I said it's evidence
19   of the misogynistic culture of this company that
20   they chose you and not me.
21        Q.    Ms. Fischman, I've already shown you
22   two separate documents from MCC they had concerns
23   about the way that you were handling the case.
24             You saw this.  They are in front of
25   you.  They are in that pile; correct?
```

1                    J. Fischman

2                MR. BERMAN:  Object to form.

3        Q.    Yes or no?

4        A.    No.  I mean you keep asking me yes or

5    no questions.

6        Q.    Because it is a yes or no.

7        A.    I can't answer everything in a yes or

8    no question.  I think it requires an explanation.

9        Q.    Ms. Fischman, if there is an

10   explanation to be had, you have three counsel

11   across from me.  They can certainly ask you but I

12   am asking you a very direct question.

13               You have in front of you documents

14   that clearly showed there were concerns about the

15   way you were handling Genomatica; correct?

16               MR. BERMAN:  Object to form.

17       A.    I have documents in front of me that I

18   was not aware of and nobody had ever told me about

19   these concerns.

20       Q.    So we are clear right now, Mr. Oliva

21   was the one who covered that settlement conference

22   after there were concerns raised about the way you

23   were handling Genomatica; correct?

24               MR. BERMAN:  Object to form.

25       A.    Mr. Oliva was chosen to go to the ENE

```
 1                   J. Fischman
 2   because he was a man and --
 3   MO          MS. COLWIN:  Move to strike.
 4        A.     -- and they didn't want a woman to
 5   meet with the male judge, the male opposing
 6   counsel and our male outside counsel.
 7        Q.    Ms. Fischman, I am going to move to
 8   strike.  You didn't answer my question.
 9             The question is:  Mr. Oliva was
10   selected for this settlement conference after
11   there had been concerns raised about the way you
12   were handling Genomatica; yes or no?
13             MR. BERMAN:  Object to form.
14        A.    No.  Because I don't know the answer
15   as to why they chose him except that --
16        Q.    You already answered my question.  We
17   are moving on.
18             MS. COLWIN:  Take a look at 1907 to
19        1908 which we will mark as Fischman Exhibit
20        7.
21             (Fischman Exhibit 7, a document
22        Bates stamped 1907 to 1908, marked for
23        identification, as of this date.)
24             MS. COLWIN:  Please mark as Fischman
25        Exhibit 8 a document Bates stamped 2301
```

```
 1                    J. Fischman
 2        through 2302.
 3                    (Fischman Exhibit 8, a document
 4        Bates stamped 2301 through 2302, marked for
 5        identification, as of this date.)
 6        Q.    I am showing you what has been marked
 7   as 1907 to 1908 and 2301 and 2302.
 8                    This is an e-mail communication
 9   between you and Mr. Oliva?
10        A.    Mm-hmm.
11        Q.    Pertaining to a document that you or a
12   communication that you were going to send to
13   opposing general at Genomatica; correct?
14        A.    Yes.
15        Q.    And you were seeking Mr. Oliva's
16   feedback on this communication that you were
17   proposing to send to opposing counsel; correct?
18        A.    Yes.
19        Q.    You wanted to make sure that the tone
20   and the content was consistent with the strategy
21   that you had spoken to with Mr. Oliva?
22        A.    Yes.
23        Q.    You wanted to make sure that the
24   hostility was kept in check?
25        A.    Yes.  That's what the e-mail says.
```

```
 1                    J. Fischman
 2              MS. COLWIN:  Mark this as Fischman
 3         Exhibit 9 a document Bates stamped 882 to
 4         883.
 5              (Fischman Exhibit 9, a document
 6         Bates stamped 882 to 883, marked for
 7         identification, as of this date.)
 8         Q.    Ms. Fischman, I am showing you 882 to
 9    883.  It starts on the second page communication
10    regarding the settlement offer of 2.5 written to
11    you by your outside counsel Mr. Berman.  And in
12    the very top that's Mr. Oliva's response to you.
13    He writes "Isn't that asking for everything and
14    not settlement."
15              You see that; correct?
16         A.    Yes.  On December 29th we had e-mail
17    correspondence because I was home sick with the
18    flu and we decided we would discuss it in the
19    office.
20    MO         MS. COLWIN:  I am not even asking that
21         so I will move to strike.
22         Q.    At the very top of 882 it says
23    "Thanks.  Isn't that asking for everything and not
24    settlement?"
25              Do you see that from Mr. Oliva?
```

```
 1                    J. Fischman
 2        A.    I do see that, yes.
 3        Q.    And you understood that to be his
 4   feedback pertaining to the offer that was, you
 5   were communicating to him?
 6        A.    That was his feedback on December 29th
 7   at 2:12 p.m.
 8              MS. COLWIN:  Please mark as Fischman
 9         Exhibit 10 a document Bates stamped 884
10         through 886.
11              (Fischman Exhibit 10, a document
12         Bates stamped 884 through 886, marked for
13         identification, as of this date.)
14        Q.    Are you familiar with this e-mail, you
15   see that; correct?
16        A.    I learned of this e-mail during the
17   course of this litigation; correct.
18        Q.    I am going to page 85.  I am not going
19   to 884 just yet.  In that e-mail this is your
20   e-mail to Mr. Minami in response to his e-mail
21   below.
22              Do you see that?
23        A.    Yes.
24        Q.    In that e-mail, this is January 5,
25   2017, you write to Mr. Minami, "Thank you for your
```

```
 1                    J. Fischman
 2   e-mail.  We are still discussing the offer among
 3   Josh, Nick and myself and we are not ready to
 4   respond with a counter proposal."
 5        A.    Yes.
 6        Q.    "We will send you our recommendation
 7   as soon as possible."
 8              Correct?
 9        A.    Yes.  That's what I wrote at 7:14 in
10   the morning or --
11        Q.    I am not asking that.
12        A.    -- or 7:14 at night depending on
13   whether it is Japan time or US time.
14        Q.    Ms. Fischman, as of January 5, 2017
15   you specifically told your client representative
16   at MCHJ that you were not ready at that point with
17   a counterproposal to opposing counsel; correct?
18        A.    Because of the time difference between
19   Japan and US.
20        Q.    Are you answering my question Ms.
21   Fischman or are you going to answer a question
22   that's not --
23        A.    I am answering your question.
24   Mercedes --
25        Q.    My question was very clear.
```

1                    J. Fischman

2                    As of January 5, 2017 you specifically

3      wrote to your client representative Mr. Minami

4      that you were not ready with a counterproposal

5      because it was still being discussed internally;

6      correct?

7                    MR. BERMAN:  Object as to form,

8           ambiguous as to time and whether it is Japan

9           or US.

10                   MS. COLWIN:  Are you testifying Mr.

11          Berman?  Then we will get your --

12                   MR. BERMAN:  You mean US or Japan?

13                   MS. COLWIN:  Objection to form.  You

14          don't need to coach your witness.

15                   MR. BERMAN:  She's already provided a

16          response.  You repeated your question in an

17          ambiguous form.  So please clarify your

18          question.

19                   MS. COLWIN:  Object to question and

20          move on Mr. Berman.

21     BY MS. COLWIN:

22          Q.    Ms. Fischman, I am asking a very

23     simple question.

24                   As of January 5, 2017 you were not

25     ready to send a counterproposal to Genomatica as

```
 1                    J. Fischman
 2   reflected in this e-mail; yes or no?
 3        A.    I am unable to answer that question as
 4   posed because it requires an explanation as to the
 5   time.
 6        Q.    What is your best recollection as the
 7   time of this e-mail to Mr. Minami on January 5,
 8   2017?
 9        A.    My best recollection of the time of
10   this e-mail was that it was either the night
11   before January 5th which would be January 4th or
12   very early in the morning on January 5th before I
13   had spoken with Nick Oliva.
14        Q.    So it is your best recollection that
15   you may have had a discussion with Mr. Oliva?
16        A.    It is more than the best recollection.
17        Q.    Let me finish.  I didn't finish my
18   question.
19             Is it your best recollection Ms.
20   Fischman, you had a conversation with Mr. Oliva
21   before you sent this e-mail to Mr. Minami?
22        A.    No.  It is my best recollection that I
23   had a discussion with Nick Oliva after I sent this
24   e-mail to Tomoji.
25        Q.    There is no communication that exists
```

1                    J. Fischman

2    after this January 5, 2017 e-mail to your clients

3    at MCC pertaining to the offer that was actually

4    made to Genomatica; correct?

5         A.    Incorrect.

6         Q.    What written document do you have that

7    sets forth an e-mail from you to your client that

8    you were going -- that an offer was being made?

9         A.    To be very clear --

10        Q.    It is a very clear question.

11              What document do you have?

12        A.    So the document -- there is no

13   document until later in the month, but may I

14   please answer the question because you are asking

15   for -- you only want part of the story and the

16   fact of the matter is is that on January 5th Nick

17   Oliva and I had a conversation in his office at

18   approximately 11:15 a.m. where she and I discussed

19   the offer.  She suggested we come down to 2.2

20   million.  I said I don't think we need to go down

21   to 2.2.  I think 2.3 is the right number.  He

22   agreed.  I then went back to my office.  I called

23   Josh or Josh called me.  I can't recall who called

24   whom.  I told him that was the number.  I then

25   went home sick.  Over the weekend I received a

1                      J. Fischman

2     text or an e-mail from Donna Costa saying that Mr.

3     Takimoto was going to be in the office on Tuesday

4     where upon Nick Oliva and I met with the client,

5     the head of the company, the person responsible

6     for this and we discussed the offer and the

7     strategy for this case.

8               MS. COLWIN:  Take a look at 2322 and

9           we will mark that as Fischman Exhibit 11.

10              (Fischman Exhibit 11, a document

11          Bates stamped 2322, marked for

12          identification, as of this date.)

13          Q.    This is Mr. Berman your outside

14     counsel writing to you on January 5, 2017 where he

15     says/sets forth "Let's also decide firmly how we

16     want to respond to Mr. Stiegler's settlement

17     e-mail to the extent we don't have sufficiently

18     concrete answers from Japan yet.  Could be with an

19     e-mail thanking him for the overture and letting

20     him know that MCC is considering the issue and

21     will be responding shortly."

22               There was no deadline to make a finite

23     offer to Genomatica; correct?

24          A.    Yes, there was.

25          Q.    There was no deadline.  You're --

```
1                    J. Fischman
2        A.    Yes, there was.
3        Q.    -- communication is telling you Ms.
4   Fischman, that you can simply say to opposing
5   counsel thank you for your offer.  We will discuss
6   it internally; correct?
7        A.    There was a deadline and that's why we
8   responded.
9        Q.    Ms. Fischman, this communication says
10  that there is and it also states there is nothing
11  in here that suggests that there is some formal
12  deadline.  In fact, your outside counsel is saying
13  the opposite.
14              It could simply be a thank you to the
15  overture to settle; correct?
16              MR. BERMAN:  Object to form.
17       A.    Do you have the response to this
18  e-mail?
19       Q.    Before we get to another document, it
20  is clear as of January 5, 2017 at 6:29 p.m., you
21  are not disputing the time on this because --
22       A.    No.  I am not disputing the time on
23  this.
24       Q.    It is clear as of 6:30 just about
25  there was no concrete answer on how MCC wanted to
```

1                    J. Fischman

2    do with respect to making a finite offer to

3    Genomatica?

4              MR. BERMAN:  Object to form.

5         A.    I had a discussion with Josh Berman

6    after --

7         Q.    You are not answering the question Ms.

8    Fischman.

9         A.    -- after I went home sick.  I don't

10   know if it was that afternoon.  I have always

11   believed it was, but I am telling you that I was

12   very sick.

13        Q.    Ms. Fischman you said that under oath

14   and I understand, but as of 6:30 on January 5,

15   2017 it is clear from your outside counsel that

16   MCC had not given the go ahead to make that offer

17   to Genomatica?

18             MR. BERMAN:  Object to form.

19        A.    No, no, no.  It's clear that we hadn't

20   made a decision how to respond according to that

21   e-mail.

22        Q.    Doesn't it simply state that you don't

23   have approval from the client to make an offer?

24             MR. BERMAN:  Object to form.

25        Q.    It says it clearly in this document,

1                        J. Fischman
2    does it not?
3         A.    I think he is asking a question.  I
4    don't know that he is saying we need -- look, the
5    document speaks for itself.  I can't interpret it
6    what he is saying.
7              MS. COLWIN:  Please mark as Fischman
8         Exhibit 12 a document Bates stamped 2315
9         through 2316.
10             (Fischman Exhibit 12, a document
11         Bates stamped 2315 through 2316, marked for
12         identification, as of this date.)
13        Q.    That is the e-mail communication from
14   Mr. Berman to opposing counsel.
15        A.    Mm-hmm.
16        Q.    And in this communication which is
17   dated January 6, 2017 at 10:50 p.m. it says "MCC
18   is prepared to settle in exchange for a payment of
19   $2.3 million to be paid within 30 days."
20             Correct?
21        A.    Yes.
22        Q.    Where -- there is no communication
23   that you wrote to anyone at MCC establishing that
24   you had the authorization to make this offer;
25   correct?

```
 1                    J. Fischman
 2             MR. BERMAN:  Object to form.
 3       Q.    Yes or no?
 4       A.    It is not a yes or no answer.
 5       Q.    Then we are going to move on.
 6       A.    Okay.
 7       Q.    You have the document in front of you
 8  it is Bates stamped 884.
 9             MR. BERMAN:  Exhibit 10.
10       Q.    That's the communication to Mr. Minami
11  to Mr. Oliva that an offer had been made without
12  MCC's approval; correct?
13       A.    Actually, it says that an offer had
14  been made on -- let's see what it actually says.
15       Q.    This is an e-mail dated January 19,
16  2017?
17       A.    Yes.  It is an e-mail dated January
18  19th, yes.
19       Q.    Now from the time that you made, that
20  offer was made to Genomatica on January 6th to the
21  time of January 19th, there is no communication to
22  MCC that offer had been made; correct?
23             MR. BERMAN:  Object to form.
24       A.    No, incorrect.  A hundred percent
25  incorrect.  We met with Takimoto San in our New
```

1                    J. Fischman

2    York office on January 10th at 1 p.m.

3         Q.    Who was at this meeting?

4         A.    Nick Oliva and Takimoto and myself in

5    the small conference room at MCHA.

6         Q.    Take a look at 844 and 845.

7              MS. COLWIN:  Please mark that as

8         Fischman Exhibit 13.

9              (Fischman Exhibit 13, a document

10        Bates stamped 844 and 845, marked for

11        identification, as of this date.)

12        Q.    On 845 Mr. Oliva writes to you on

13   January 19th after receiving Mr. Minami's e-mail

14   communication he writes to you "There may be some

15   confusion about whether a counter settlement offer

16   was made prior to confirmation from MCC.  Can you

17   please tell me if Josh delivered information to

18   Genomatica about the 2.3 prior to confirmation

19   from MCC."

20              Do you see that?

21        A.    I do.

22        Q.    And Mr. Oliva actually felt that it

23   was your outside counsel who made the mistake in

24   making an offer of settlement without prior

25   authorization; correct?

```
 1                    J. Fischman
 2            MR. BERMAN:  Object to form.
 3       A.    I can't say what was in his head.
 4       Q.    I am not asking you to contemplate
 5  what was in his head.  It is in the document.
 6       A.    You just read it.  So it's in the
 7  document.
 8       Q.    He doesn't say that you made the
 9  offer.
10            He thought it was your outside counsel
11  that made the mistake of making the offer;
12  correct?
13            MR. BERMAN:  Object to form.
14       A.    He writes "Can you please tell me if
15  Josh delivered information to Genomatica about the
16  2.3 prior to confirmation from MCC."
17       Q.    Ms. Fischman, he doesn't accuse you of
18  wrongful conduct in this e-mail, does he?
19       A.    No.  There was no wrongful conduct to
20  accuse me of.
21       Q.    He believed it was your outside
22  counsel that had made that offer to Genomatica;
23  correct?
24       A.    Again, this document has already been
25  stated.
```

1                    J. Fischman

2        Q.    So let's look at 844.

3              This is your response to them?

4        A.    Yes.

5        Q.    Yes, it was done that way by my

6    authority?

7        A.    Yes.

8        Q.    You didn't say by MCC's authority;

9    correct?

10       A.    You can keep reading.

11       Q.    Does it say by MCC's authority or does

12   it say my authority?

13       A.    I took full responsibility for making

14   the offer because Nick and I had discussed it and

15   he had approved it and he had delegated authority

16   from MCC.

17       Q.    Did it say --

18       A.    Yes, I --

19       Q.    Does it say in this document based on

20   our conversations Mr. Oliva I made this offer?

21       A.    Yes.  It does exactly say that.

22       Q.    It says --

23       A.    You and I had discussed that offer.

24       Q.    Because I was home sick and the date

25   for response came.  There was no due date for

```
1                    J. Fischman
2   response to opposing counsel; correct?  There was
3   no deadline?
4        A.    The deadline was January 7th to
5   respond.  That was what was in the original offer.
6        Q.    We have already gone through and we
7   are not going back.
8              Mr. Berman said, and by the way, the
9   deadline that you are saying is in an arbitrary
10  deadline imposed by your opposing counsel in
11  Genomatica; correct?
12             MR. BERMAN:  Object to form.
13       A.    The request was to respond.
14       Q.    I'm not -- it's an arbitrary deadline
15  that was set forth by opposing counsel in
16  Genomatica to respond to an offer by January 7th;
17  correct?
18             MR. BERMAN:  Object to form.
19       A.    Correct, but I object to the use of
20  the word arbitrary.  Nothing is arbitrary.
21       Q.    Was it a court deadline?
22       A.    It was not a court deadline.
23       Q.    Did the judge impose this deadline?
24       A.    It was not a court deadline.
25       Q.    What did you mean by this, I believed
```

```
 1                    J. Fischman
 2   it was consistent with MCC's fundamental position?
 3        A.    I was referring to the delegated
 4   authority that Nick had to go down to 2 million
 5   dollars and which he had made that offer at the
 6   ENE.
 7        Q.    It doesn't say that it was based on
 8   the authorization you received from MCC, does it?
 9             MR. BERMAN:  Object to form.
10        A.    Just because I didn't write that in
11   this text does not mean that he and I did not both
12   know that he had authority down to 2 million
13   dollars.  He himself had made an offer of 2
14   million dollars and that this was well within
15   that.
16        Q.    Ms. Fischman, I am not asking.  I am
17   asking this particular statement says.
18             It doesn't say that based on MCC's
19   authorization to proceed with 2.3, does it?
20             MR. BERMAN:  Object to form.
21        A.    The words speak for themselves
22   Mercedes.
23        Q.    Between January 6th and January 19th
24   you never put anything in writing to Mr. Oliva
25   that the offer to Genomatica had been made of 2.3;
```

```
 1                    J. Fischman
 2   correct?
 3              MR. BERMAN:  Object to form.
 4        A.    I didn't need to put anything in
 5   writing.  His office was next door to mine.  We
 6   talked about it and then we also met with Takimoto
 7   San on January 10th where we had a full and robust
 8   discussion about the offer of settlement and the
 9   strategy going forward and also that they wouldn't
10   respond to the offer of settlement which they did
11   not.  So there was really no harm whatsoever by
12   this.
13        Q.    Ms. Fischman, where is any of this in
14   writing?  Where is there a writing to your client
15   saying we are about to make this offer of 2.3
16   million.  Am I authorized to do so?  Where is that
17   in writing?
18        A.    Mercedes --
19        Q.    Where is it in writing I am asking?
20   Does it exist?  Do you have it at home?  Where is
21   it?
22              MR. BERMAN:  Object to form.
23        Q.    I am asking.
24        A.    And I would like to make a full
25   explanation.
```

```
 1                     J. Fischman
 2        Q.    And you can do so if your counsel --
 3   they can call you as a witness.
 4              MR. VALLI:  Let's take a break.
 5              THE VIDEOGRAPHER:  We are now going
 6        off the record --
 7              MS. COLWIN:  Let's finish the line of
 8        questioning.
 9              MR. VALLI:  I believe we've finished.
10              MS. COLWIN:  No.
11              MR. VALLI:  I heard you talking to --
12              MS. COLWIN:  No.
13              Please mark this as Fischman Exhibit
14        14 a document Bates stamped 842 to 843.
15              (Fischman Exhibit 14, a document
16        Bates stamped 842 to 843, marked for
17        identification, as of this date.)
18        Q.    This is an e-mail communication from
19   you Ms. Fischman to Mr. Minami?
20        A.    Mm-hmm.
21        Q.    Mr. Oliva is not copied on this
22   e-mail, is he?
23        A.    You know we went back and forth --
24        Q.    He is not copied on this e-mail;
25   correct?
```

1                     J. Fischman

2          A.    He is mistakenly not copied on this

3    e-mail which was sent to him within one minute of

4    hitting send to the rest of the team.

5          Q.    Mr. Berman was not copied on this

6    either; correct?

7          A.    No.  Mr. Berman was not copied.  He

8    was not always copied on internal e-mails.

9          Q.    And by the way, the communication

10   there had never been -- withdrawn.

11               In Genomatica the process that you had

12   with respect to communications with MCC involving

13   Mr. Berman always included you if there were

14   communications with MCC and Mr. Berman had to

15   participate you were always included; correct?

16               MR. BERMAN:  Object to form.

17          A.    I am not even sure what you are

18   asking.

19          Q.    In communications with MCC involving

20   Mr. Berman none of those communications ever

21   occurred without your presence; correct?

22          A.    Between MCC and Mr. Berman?

23          Q.    Yes.  Your outside counsel.

24          A.    No.  He would not communicate directly

25   with MCC or MCHJ without copying made to my

 1                    J. Fischman

 2    knowledge.

 3          Q.    Now you go on to say "After further

 4    consideration between Josh, Nick and I we thought

 5    it would not show good faith negotiation because

 6    it is essentially what we are seeking in the

 7    litigation."

 8                That was 2.5 over six months that Mr.

 9    Minami had asked you to offer to Genomatica in

10    terms to settle the case; correct?

11          A.    Yes.

12          Q.    And it was -- so you go on to say that

13    it was instead 2.3 in 30 days?

14          A.    Mm-hmm.

15          Q.    Nowhere in here in your communication

16    with Mr. Minami do you say we made the 2.3 because

17    you authorized the 2.3; correct?

18          A.    Well, actually I do say it, but I

19    don't say it exactly the way you want it to be

20    said.

21          Q.    It is not the way I want it to be said

22    Ms. Fischman.  It is stated here this way by your

23    communication drafted four years ago.

24          A.    First of all, I do state throughout

25    this that it was a joint decision between Nick,

1                    J. Fischman

2    myself and Josh and then I did you state in here

3    that it was within the position of the authorized

4    amount of 2 million dollars.

5           Q.    Wait, but you are moving ahead because

6    in between this you write, hang on, I forgot to

7    send MCC this proposal in advance of our

8    responding to Genomatica.  So you admit in this

9    communication that you had not received formal

10   authorization or any authorization from MCC.  Let

11   me strike that.

12              In this communication you state very

13   clearly that you had not sent this 2.3 million

14   dollar proposal to MCC prior to making that

15   communication to Genomatica; correct?

16          A.    Actually, what I said is unfortunately

17   I was home sick the entire week before the

18   response was due and in my illness --

19   MO          MS. COLWIN:  Move to strike.

20          Q.    You are not answering my question.  It

21   says clearly in this paragraph that you did not

22   send this proposal of 2.3 million dollars to MCC

23   prior to making that communication to Genomatica;

24   yes or no?

25          A.    You can lower your tone a little bit

```
 1                    J. Fischman
 2   first of all.
 3        Q.    Maybe if you answered the question
 4   rather than not answer the question and being
 5   evasive I wouldn't have to raise my voice.
 6        A.    I am not trying to be evasive.
 7        Q.    I have asked you very clear questions.
 8   Yes or no.  It says it.
 9              There is no authorization to MCC to
10   make the offer of 2.3 million prior to that offer
11   being made to Genomatica; correct?
12              MR. BERMAN:  Object to form.
13        A.    MCC had delegated its authority to
14   Nick to settle this litigation up to, down to 2
15   million dollars.  I was well aware of that and I
16   did not send the proposal in advance of responding
17   to Genomatica.
18        Q.    Why didn't you write that that it was
19   Nick's -- why didn't you say that?
20        A.    I said that we discussed it.
21        Q.    Where is this statement I believed it
22   was consistent with MCC's position to obtain 2
23   million in settlement?
24              Where did you get that conclusion
25   from?
```

```
 1                    J. Fischman
 2        A.    I got that conclusion from the fact
 3   that Nick was authorized to settle the case down
 4   to 2 million dollars at the settlement negotiation
 5   in November.
 6        Q.    How is that communicated to you?
 7        A.    Nick communicated that to me when he
 8   received the letter from Takimoto San giving him
 9   unbridled authority to settle the case.
10        Q.    You go on to write "We knew that both
11   proposals would be rejected so there would be no
12   harm to MCC by offering this amount."
13        A.    Right.  I was well aware that there
14   was no way they were going to settle at this time
15   anyway, but we certainly could have pulled it back
16   at any time if people were upset about the
17   proposal since no response had ever been made.
18        Q.    But Ms. Fischman, what if your
19   assumption was wrong and you made that offer
20   without the authorization?
21             MR. BERMAN:  Object to form.
22        Q.    You would have assumed it was going to
23   be rejected, but there was a possibility that it
24   wasn't; correct?
25        A.    Well.
```

```
 1                    J. Fischman
 2        Q.    Yes or no?
 3        A.    Nick had already offered 2 million
 4   dollars in settlement and this was three hundred
 5   thousand dollars more.
 6        Q.    Ms. Fischman.
 7        A.    It was well within the settlement
 8   authorization.
 9   MO        MS. COLWIN:  Move to strike.
10             Lynne, please ask the question again.
11             (Record read.)
12             MS. COLWIN:  I moved to strike that
13        part.  Let's move on.
14   BY MS. COLWIN:
15        Q.    Prior to writing this communication to
16   Mr. Minami, you never went to Mr. Oliva and said
17   we have an issue let's strategize on how to handle
18   the situation; correct?
19        A.    No.  I was I believe either traveling
20   or I was home that day.  We were not -- neither of
21   us were in the same physical space.
22        Q.    So even though you weren't in the same
23   physical space, somehow you believed that would
24   stop you from making a phone call?
25             MR. BERMAN:  Object to form.
```

```
 1                    J. Fischman
 2        A.    How do you know that I didn't make a
 3   phone call?
 4        Q.    I am not under oath Ms. Fischman.
 5        A.    No, I am just saying you are saying
 6   that I didn't make a phone call.  Perhaps I did.
 7        Q.    You did not consult with Mr. Oliva
 8   before writing this; correct?
 9        A.    No, I did not consult with him before
10   apologizing to Tomoji.
11             MS. COLWIN:  Please mark as Fischman
12        Exhibit 15 a document Bates stamped 838
13        through 841.
14             (Fischman Exhibit 15, a document
15        Bates stamped 838 through 841, marked for
16        identification, as of this date.)
17        Q.    Do you see 839 it starts?  You write
18   to Mr. Minami in response to his January 19, 2017
19   e-mail "I would appreciate it also if you simply
20   ask me directly if you have a problem or if
21   someone else has a problem instead of going above
22   me to Nick without copying me.  It is what we call
23   in the US back-stabbing."
24        A.    Yes.
25        Q.    You wrote that, did you not?
```

```
 1                   J. Fischman
 2        A.    I did.
 3        Q.    Do you believe that it was
 4   discriminatory for Mr. Minami to look into how the
 5   origin of this offer to Genomatica of 2.3 million?
 6        A.    No.  I don't believe so.
 7        Q.    Do you think it was discriminatory of
 8   Mr. Oliva to look into the origins of the 2.3
 9   million dollar offer to Genomatica?
10        A.    Mr. Oliva knew the origins of the 2.3
11   million dollar offer to Genomatica because he was
12   in the conversation who decided the 2.3 million
13   dollar offer to Genomatica.  So anything that he
14   did with regard to that would have been a
15   pretextual reason for terminating.
16        Q.    So Ms. Fischman, when he wrote to you
17   how did this happen and you saw this communication
18   in front of you, did Josh make that offer with
19   this line?
20             MR. BERMAN:  Object to form.
21        Q.    You have the document right in front
22   of you.  When Mr. Oliva gave you the benefit of
23   the doubt when he discovered from his
24   communication with Mr. Minami that a 2.3 million
25   dollar offer had been made to settle the case at
```

1                    J. Fischman

2    Genomatica?

3         A.    I think that Mr. Oliva forgot the

4    whole transaction of what happened those two weeks

5    prior because he was in the conversation with me

6    on January 5th.  He was in the conversation with

7    me and Takimoto San on January 10th and then nine

8    days later when he received an e-mail that he

9    couldn't recall what had happened specifically and

10   maybe that I didn't notify Tomoji, he was

11   confused.  He did expect me to have notified

12   Tomoji and I've already admitted on the record and

13   in the e-mails that I failed to notify Tomoji.

14   The low level window person at MCHJ but Takimoto

15   San, the business leader and person most important

16   to this litigation understood what we had done,

17   what I had done in authorizing Josh to make that

18   offer.  He also understood that it was within

19   Nick's authority.  He didn't question that.  He

20   agreed one hundred percent with our strategy and

21   was ready to move forward.  The confusion was that

22   two separate businesses in Japan.  Tomoji, who

23   works in the legal department of MCHJ, didn't know

24   what Mr. Takimoto San knew and so that's what

25   created the confusion and the miscommunication but

```
 1                    J. Fischman
 2   no one was against the 2.3 offer.  In fact, Tomoji
 3   states in his e-mails we don't think the offer is
 4   so bad.  It is the miscommunication that is a
 5   problem.
 6         Q.    Where in any of this, we have gone
 7   through the documents pertaining to this offer,
 8   you have them all.  Where do you --
 9         A.    I don't know that I have them all.
10         Q.    Where does it state Mr. Takimoto
11   authorizes the 2.3 million dollar offer to
12   Genomatica?  Where does that say -- where does it
13   say in the document we just reviewed that --
14         A.    Well, Mr. Takimoto --
15         Q.    No, I am asking you a question.  We
16   just reviewed a document where you are offering an
17   explanation to your contact at MCHJ, Mr. Minami,
18   this is 843.  Where do you say Mr. Takimoto knew
19   of this 2.3 million dollar offer?  I am not sure
20   why you are so upset.  Where does it say that?  It
21   doesn't say that, does it Ms. Fischman?  It
22   doesn't and when you confronted Mr. Minami with
23   this communication to Mr. Oliva, you call him a
24   back-stabber?
25         A.    I felt betrayed that he didn't just
```

1                    J. Fischman
2  ask me what happened and then within one minute
3  after that I apologized immediately.  It was very
4  late at night.  Never send an e-mail late at
5  night.  "Sorry about my prior e-mail.  Of course
6  you must feel free to speak exclusively with Nick
7  anytime.  I should not have suggested otherwise.
8  I am always happy to help you and the others and I
9  am working diligently to bring success to MCC.  I
10 will do my best to provide you all the necessary
11 information in the future about this case in a
12 timely fashion."
13              MS. COLWIN:  Let me take a quick
14         break.
15              THE VIDEOGRAPHER:  We are now going
16         off the record.  The time is 11:29.
17              (Recess taken.)
18              THE VIDEOGRAPHER:  We are now back on
19         the record at 11:44.
20 BY MS. COLWIN:
21         Q.    Ms. Fischman, in August of 2016 you
22 were involved in the sexual harassment
23 investigation of Mr. Tom Larson; correct?
24         A.    Yes.  This was a complaint by Anne
25 Riley, another lawyer in our department.

```
 1                    J. Fischman
 2        Q.    So who assigned you to this matter?
 3    That was Mr. Oliva, was it not?
 4        A.    Yes.
 5        Q.    And isn't it true that you wanted MCHJ
 6    to retain private counsel to do the investigation?
 7        A.    Yes.  I suggested we hire outside
 8    counsel to conduct an investigation of the sexual
 9    harassment claim.
10        Q.    Now you had said that it was an
11    investigation pertaining to a harassment claim by
12    Ms. Riley; correct?
13        A.    Yes.
14        Q.    Isn't it true Ms. Riley never made the
15    complaint, she was never the one who made the
16    complaint; correct?
17              MR. BERMAN:  Object to form.
18        A.    I believe that Ms. Riley did make a
19    complaint.
20        Q.    You were chosen to do this
21    investigation by Mr. Oliva over Mr. Sezar;
22    correct?
23        A.    I was asked to do the investigation.
24    I was not told why or whether or not other people
25    were considered.
```

1                     J. Fischman
2          Q.    In the past you have conducted various
3    investigations, have you not?
4          A.    Yes.
5          Q.    You identified yourself as a lead
6    employment lawyer within MCHA; correct?
7          A.    I was responsible for most employment
8    issues, yes.
9          Q.    Now MCHC wasn't involved in this
10   investigation; correct?
11         A.    No.  This was in the Pharma companies.
12         Q.    They weren't made aware of it either;
13   correct, as far as you know?
14         A.    It is a different business.
15         Q.    So as far as you know they were not
16   made aware of it; correct?
17         A.    No.
18               MCC or MCHC?
19         Q.    No, I am talking about MCHC?
20         A.    You said MCC.
21         Q.    No, I said MCHC.
22               As far as you know MCHC was not made
23   aware of this issue pertaining to Mr. Larsen;
24   isn't that right?
25         A.    I have no idea.

1              J. Fischman
2      Q.    Debra Mora was the HR individual at
3  Pharma; correct?
4      A.    Correct.
5      Q.    Isn't it a fact --
6      A.    Or I believe so, yes.
7      Q.    Isn't it a fact that several people
8  went to Ms. Mora regarding Mr. Larsen but Anne
9  Riley did not?
10              MR. BERMAN:  Object to form.
11      A.    I would have to look back at notes
12  from that time period.  My understanding was that
13  Anne Riley brought this complaint and that there
14  were other women in the Pharma company that also
15  complained at the same time.
16      Q.    There are men and women that
17  complained about Mr. Larsen's behavior; correct?
18      A.    To my knowledge, there were three
19  women.
20      Q.    But there were also men that
21  complained about Mr. Larsen's behavior; correct?
22      A.    I don't recall.
23      Q.    Weren't the witnesses that you
24  interviewed pertaining to Mr. Larsen included men
25  and women?

```
1                   J. Fischman
2        A.    I don't recall.
3        Q.    After at the conclusion of the
4   investigation Mr. Oliva did follow up with you to
5   see what your findings were; correct?
6        A.    That requires a further explanation.
7   I can't answer that with a yes or a no answer.
8        Q.    Didn't --
9        A.    Would you like me to give the full
10  explanation?
11       Q.    Let me follow up with a subsequent
12  question.
13             Didn't Mr. Oliva speak to you about
14  the outcome of the investigation after he had
15  spoken to Mr. Larsen?
16       A.    Probably.
17       Q.    What is the basis of your belief that
18  you were retaliated against because of your
19  involvement in this investigation?
20       A.    I believe I was retaliated against
21  because I strongly suggested that we should hire
22  outside counsel because the investigation included
23  a woman in the legal department and that there was
24  a high likelihood of a subjective response when
25  you are investigating one of your own and that I
```

```
 1                    J. Fischman
 2   thought that we should have an objective
 3   investigation by an outside third-party and it
 4   would also raise the seriousness of the claims to
 5   an appropriate level.
 6        Q.    So just to make sure that the time
 7   frame is clear on the record.
 8             This is August of 2016; correct?
 9        A.    I thought it was October of 2016, so.
10        Q.    In January of 2017 you had gone to
11   California with Mr. Oliva, did you not?  It was a
12   business trip; correct?
13        A.    In January shortly after the Tomoji
14   situation on January 19th.  So on January 21st I
15   believe --
16        Q.    Withdrawn.
17        A.    May I finish the answer?
18        Q.    Just yes or no.
19             In January of 2017, it is foundation.
20   Otherwise, your counsel is going to object to
21   form.  It is strictly foundation.
22             You were on a business trip to
23   California with Mr. Oliva January 2017; correct?
24        A.    Correct.
25        Q.    The primary purpose of that trip was
```

```
 1                    J. Fischman
 2   to advise Aldila of a major reduction in force;
 3   isn't that right?
 4        A.    No.  That is not correct.
 5        Q.    It is your testimony that you were not
 6   there to have a conversation with the president of
 7   Aldila regarding the reduction in force?
 8        A.    Are you going to allow me to make a
 9   full explanation?  The primary purpose of that
10   business trip over four days in -- we visited four
11   different companies the primary purpose of which
12   was to provide ethics training to four companies
13   leadership and I provided that expert ethics
14   training to those four leadership teams.
15             In addition to that primary purpose, I
16   also did have a meeting at the Aldila company
17   about their plans for potential reduction in
18   force.
19        Q.    Wasn't the initial -- withdrawn.
20             Wasn't the primary purpose of the trip
21   as explained to you by Mr. Oliva that there had to
22   be a conversation with Aldila regarding the
23   significant reduction in force and while you were
24   there there was an intention to also visit with
25   other companies, specifically the carbon fiber
```

```
 1                  J. Fischman
 2   businesses in that location as well; correct?
 3        A.    I just explained the primary purpose
 4   of the trip was to provide ethical training,
 5   training on ethics and compliance to the four
 6   major businesses in California as where we drove
 7   from San Diego and --
 8        Q.    So the answer is no?
 9   MO         MS. COLWIN:  Move to strike.
10        Q.    The answer is no, that part --
11        A.    So you are cutting me off.
12              Can I finish the --
13        Q.    Ms. Fischman, I only have a very short
14   period of time.  So let's move on.
15        A.    Okay.
16        Q.    The answer is no, that was not your
17   purpose?
18        A.    That was not the primary purpose, no.
19        Q.    The training that you describe, that's
20   not a training for lawyers of professional
21   responsibility; correct?
22        A.    No.  It was for business people on the
23   ethical business practices.
24        Q.    And it was not a training on
25   litigation management either; isn't that right?
```

1                    J. Fischman

2        A.    That's correct.

3        Q.    And it was a stock code of conduct

4    training that you had delivered fairly frequently

5    as a counsel at MCHJ; isn't that right?

6        A.    Over the eight years I worked at MCHJ

7    I was the primary person who delivered the ethics

8    trainings to over probably 30 businesses.

9        Q.    And the training was a stock code of

10   conduct policy training, basic training for all

11   levels of employees, from factory line employees

12   to sales to managers of manufacturing plants;

13   isn't that right?

14       A.    No.  This particular training was to

15   more high level managers, supervisors and

16   executive management.

17       Q.    There had been a similar training that

18   you had done just before this January 2017 trip in

19   Canada, did you not?

20       A.    You would have to refresh my memory on

21   the date.

22       Q.    That is the training at Technophar in

23   Canada shortly before this January 2017 training?

24       A.    Again, you would have to -- I am not

25   sure when I was at Technophar.  You would have to

1                    J. Fischman

2   refresh my memory with some documentation.

3        Q.    And that is a prepared deck that you

4   gave when you gave that training; isn't that

5   right?

6        A.    That's right.  I prepared the deck and

7   when you talking about a deck you mean a

8   PowerPoint presentation that I had developed over

9   the eight years that I've worked at Mitsubishi.

10       Q.    On January 30, 2017 you were called in

11  a meeting with Mr. Oliva and Ms. Saunders, were

12  you not?

13       A.    Yes.

14            MS. COLWIN:  Please mark as Fischman

15       Exhibit 16 a document Bates stamped 806 to

16       807.

17            (Fischman Exhibit 16, a document

18       Bates stamped 806 to 807, marked for

19       identification, as of this date.)

20       Q.    Ms. Fischman, you are familiar with

21  this document, are you not?

22       A.    Yes.

23       Q.    On January 30, 2017 you were informed

24  by Mr. Oliva in the presence of Ms. Saunders that

25  you were to be separated from MCHA; correct?

```
 1                    J. Fischman
 2        A.    I am sorry.  I wasn't listening.  I
 3   was reading.
 4              What did you say?
 5        Q.    I said on this day Mr. Oliva informed
 6   you that your services were no longer needed at
 7   MCHA in the presence of Ms. Saunders; correct?
 8        A.    Yes.
 9        Q.    I want you to take a look at the
10   written portions, not the typewritten portion.
11              With respect to the typewritten
12   portion, this was told to you on that day by Mr.
13   Oliva; correct?
14        A.    That's right.
15        Q.    Looking at --
16        A.    I am sorry.  The typewritten portion
17   he told to me, yes.
18        Q.    So I am asking you to just focus on
19   the written portion.  It says witnessed by P.
20   Saunders.  That's her signature.
21              You are familiar with her signature;
22   correct?
23        A.    Yes.
24        Q.    And it says delivered 1/30/17 10:01
25   a.m.
```

```
 1                    J. Fischman
 2            That's Mr. Oliva's signature; correct?
 3       A.    It appears to be so.
 4       Q.    It says "You authorizing" which means
 5  you authorizing the settlement to Genomatica.  Mr.
 6  Oliva said to you "I told you to go to the client
 7  as is your obligation."  And your response was "I
 8  forgot."
 9            MR. BERMAN:  Object to form.
10       Q.    You expressed that during that
11  meeting, did you not?
12       A.    I think this is a very condensed note
13  on what was a fuller conversation and obviously
14  self serving for Mr. Oliva.
15  MO        MS. COLWIN:  Ms. Fischman, I am going
16            to move to strike that part of your
17            testimony.
18       Q.    In the conversation with Mr. Oliva
19  when he said to you with respect to the 2.3
20  million dollar offer made to Genomatica, he had
21  said as is your obligation, you did not get the
22  authorization to make that offer to Genomatica and
23  when asked about it you replied, do you see
24  quotations here I forgot.
25            You express that, did you not?
```

```
 1                    J. Fischman
 2        A.    No, I did not.  I wouldn't have just
 3   said ooh, I forgot.  I would never have said it
 4   just like that.  We would have had a longer
 5   conversation.
 6        Q.    Is anything in sum and substance did
 7   you say to Mr. Oliva during that conversation in
 8   that particular moment when this was discussed
 9   regarding the 2.3 million dollar offer to
10   Genomatica, did you say in sum and substance I
11   forgot?
12        A.    No.
13        Q.    Go below.
14              You asked about a package; correct?
15   Meaning a severance package; isn't that right?
16        A.    I asked if they were going to provide
17   a severance package for my eight years of service
18   or nine years of service.
19        Q.    Didn't you say to Mr. Oliva no
20   package?
21        A.    No, I did not.
22        Q.    Go to the second page.  I want you to
23   go through each one.
24              Didn't you say to Mr. Oliva in the
25   presence of Ms. Saunders "There is no harm caused
```

```
1                    J. Fischman
2    by the ethics violation because they ultimately
3    went along with it"?
4         A.    No.  Why would I say it like that?
5    First of all --
6         Q.    Your answer is no.
7               In sum or substance did you not say to
8    Mr. Oliva there was no harm caused by the ethics
9    violation because they ultimately went along with
10   it?
11        A.    No, because we had never discussed any
12   kind of ethical violation until this document.  So
13   I would not have turned around and said anything
14   like this.  I may have said there was no harm
15   caused.
16        Q.    So let me rephrase.
17              In sum and substance did you not say
18   to Mr. Oliva that there was no harm caused by the
19   2.3 million dollar offer that was unauthorized by
20   MCC because ultimately they went along with that
21   offer?
22              MR. BERMAN:  Object to form.
23        A.    I could not have said all of that.  So
24   I will say no, because your question goes on so
25   long and it assumes that they went along with the
```

```
 1                    J. Fischman
 2   2.3 million dollar offer.  They hadn't settled by
 3   January 30th.  Ultimately they settled later after
 4   I was gone.  So I couldn't have said that.
 5        Q.    Second, didn't you say to Mr. Oliva in
 6   sum or substance why did you let me drive around
 7   California if you knew?
 8        A.    Yes.  I definitely said why would you
 9   make me drive you all over California if you knew
10   you were going to fire me the day we returned.
11        Q.    Next, in sum or substance did you not
12   say to Mr. Oliva if you wanted me gone you could
13   have talked to me and offered me something?
14        A.    Yes.
15        Q.    Next, in sum or substance did you not
16   say to Mr. Oliva if you told me I could have
17   brought my laptop in?
18        A.    Yes.
19        Q.    In sum or substance did you not say
20   you handled this to Mr. Oliva, you handled this
21   poorly because I have a lot of work that you don't
22   even know about and meetings today?
23        A.    I would have said something to the
24   effect of I have a lot of information on the 22
25   companies that I supported of which he could not
```

```
1                    J. Fischman
2  have been aware of every single detail of even who
3  I was having telephone calls with that morning.
4  So yeah, I was pretty upset I would not be able to
5  give them a download of data and different matters
6  and different contracts that I was working on.
7              So yes, I did say that or something
8  like that.
9       Q.    In sum or substance didn't you say to
10 Mr. Oliva I expected more from you?
11      A.    I don't recall saying that.
12            MS. COLWIN:  I reserve some time of
13       the time that I asked Mr. Valli with respect
14       to the documents that were served last week.
15       I will review them and to the event that we
16       need to review it and ask any questions we
17       will speak again, but other than that Ms.
18       Fischman thank you for your time.
19      A.    Okay, thank you.
20            MS. COLWIN:  We are going to go off
21       the record.
22            THE VIDEOGRAPHER:  We are going off
23       the record and the time is 12:02.
24            (Recess taken.)
25            THE VIDEOGRAPHER:  We are going on the
```

```
 1                    J. Fischman
 2         record at 12:06.
 3   EXAMINATION BY
 4   MR. FORTINSKY:
 5         Q.    Good afternoon Ms. Fischman.  My name
 6   is Jerry Fortinsky.  I represent MCHC and I am a
 7   partner in the firm of Shearman and Sterling.
 8         A.    Hi Jerry.  Nice to meet you.
 9         Q.    Nice to meet you too.
10               Did you read the transcript of the
11   first day of your testimony?
12         A.    I did not.
13         Q.    Did you speak to your counsel since
14   the first day of your testimony?
15         A.    Yes.
16         Q.    How many times?
17         A.    Two times.
18         Q.    When?
19         A.    Friday and we had dinner last night.
20         Q.    Did you discuss your testimony at
21   either meeting?
22         A.    Well, I think that my discussions with
23   counsel are attorney/client privilege.  So let's
24   just leave it there.
25         Q.    I am not asking you about the
```

```
 1                    J. Fischman
 2   substance of your testimony.  I am just asking
 3   whether you discussed the deposition at those two
 4   occasions?
 5        A.    Yes.
 6        Q.    How long did you meet with your
 7   attorneys, how long did you speak to your
 8   attorneys on Friday?
 9        A.    A couple of hours.
10        Q.    And who did you meet with?
11        A.    Mr. Berman and Rob Valli.
12        Q.    And you said you had dinner with them
13   last night?
14        A.    I had dinner with Sara and Rob.
15        Q.    Have you discussed your deposition
16   either first day or today with anyone other than
17   your attorneys?
18        A.    Just generally with my family.
19        Q.    Who interviewed you for your first
20   position with MCHA or any predecessor?
21        A.    Donna Costa and other members of the
22   legal department at MCHA in 2007 and '8.  End of
23   '7 beginning of '8.
24        Q.    And Donna Costa was at MCHJ were
25   predecessors; correct?
```

```
 1                    J. Fischman
 2        A.    It was MCUSA at the time and it was
 3   Donna and yes, as general counsel at the time of
 4   MCUSA.
 5        Q.    You didn't interview with anyone from
 6   MCHC; correct?
 7        A.    No, not at that time.
 8        Q.    Where did the interviews -- when you
 9   say not at that time, was there some other time
10   when you interviewed with MCHC?
11        A.    No.  Let's just stick to 2008 for now
12   and then we will move on if you don't mind, so I
13   can be more very specific with my answers.
14        Q.    I appreciate your clarification with
15   the answer, but I still want to ask whether there
16   was some other time when you had an interview not
17   a meeting or discussion but an interview with
18   MCHC?
19        A.    No.  I did not have an interview with
20   MCHC.
21        Q.    Where did the interviews in 2007 and
22   2008 take place?
23        A.    In New York.  One was in New York City
24   at a restaurant with Donna and the others were at
25   the MCUSA offices which were located in White
```

```
 1                    J. Fischman
 2   Plains.
 3        Q.    You reported to Ms. Costa for most of
 4   your time at MCHA; correct or its predecessors;
 5   correct?
 6        A.    Yes, correct.
 7        Q.    Do you ever report directly to anyone
 8   else?
 9        A.    Directly, no.
10        Q.    Did you ever report to Nick Oliva?
11        A.    Yes, I am sorry.  Yes, from November
12   30, 2015 to January 30, 2017 I reported to Nick
13   Oliva.
14        Q.    What was his position at the time?
15        A.    General counsel.
16        Q.    Of?
17        A.    MCHA.
18        Q.    When you were hired you received your
19   offer of employment from Ms. Costa; correct?
20        A.    Yes.
21        Q.    Who made the decision to hire you in
22   2008?
23        A.    I couldn't say other than receiving
24   the letter.
25        Q.    Do you have any evidence that MCHC
```

```
 1                    J. Fischman
 2   played a role in the decision?
 3        A.    No.  Not at that time.
 4        Q.    When you worked before you were
 5   terminated, did you have an ID of some kind,
 6   employee ID?
 7        A.    I think we had, it was post 9/11.  So
 8   I think we had card readers to get into the office
 9   building.  I can't recall if we had those at MCUSA
10   in White Plains but we had them once we moved in
11   2011 to New York City.
12        Q.    Did the card reader identify on its
13   face the name of the company that employed you?
14        A.    I assume it did.
15        Q.    And what company is that?
16        A.    You would have to look at the card
17   reader.  I am sure it was -- I can't say.  You
18   would have to go back and look at the card reader.
19   I don't have it in my possession.  You guys have
20   it.
21        Q.    I understand.
22              Did you ever discuss your job with any
23   of your friends?
24        A.    I am sure I have.
25        Q.    Did you ever tell them where you
```

1                    J. Fischman

2    worked?

3         A.    I am sure I would have.

4         Q.    Do you recall where you told them you

5    worked?

6         A.    I am sure I called it Mitsubishi,

7    Mitsubishi Chemical.

8         Q.    Did you ever tell them you worked at

9    MCHA?

10        A.    Probably didn't use that acronym.  I

11   typically refer to it as Mitsubishi Chemical or I

12   usually would say Mitsubishi and then I would

13   identify it as Chemical because people know the

14   Mitsubishi companies they think of the car or in

15   my prior career at Raytheon we were more familiar

16   with Mitsubishi Heavy Industries.

17        Q.    When someone asked you where you

18   worked, did you ever tell anyone that you had more

19   than one employer?

20        A.    I typically would explain the

21   integration of the companies possibly.

22   MO            MR. FORTINSKY:  Move to strike as not

23        responsive.

24        Q.    Did you ever tell anyone that you

25   worked for more than one employer?

1                    J. Fischman

2         A.    I don't think that I would have ever

3    gotten into that.  I mean I don't know.

4         Q.    Did you ever tell anyone that you had

5    joint employers?

6         A.    I don't think I would ever have had

7    that conversation with someone.

8         Q.    You don't think you ever did have that

9    conversation with anyone?

10        A.    Not until we started talking about

11   joint employment for the basis of this litigation.

12        Q.    Until the litigation had you ever

13   heard of the joint employer doctrine?

14        A.    I am sure yeah, I am sure I have.

15        Q.    In what context?

16        A.    I have been a lawyer for 20 years.

17        Q.    Can you think of any case where you

18   dealt with it prior to your filing this lawsuit?

19        A.    So I am generally aware of the

20   possibility of joint employment between a parent

21   company and its wholly owned subsidiary.  In fact,

22   we were concerned about that as a legal department

23   because the way that Mitsubishi Chemical Holdings

24   Corp. and its three major companies Mitsubishi

25   Chemical Corp., Mitsubishi Tanabe Pharma,

1                    J. Fischman

2    Mitsubishi Plastics, the way they operated is to

3    be completely in control of everything that goes

4    on in their subsidiaries.  So we would often tell

5    them to be more careful so that they are not

6    considered joint employers, but they didn't listen

7    and they really were completely integrated and

8    completely in control of the operations of their

9    subsidiaries.

10         Q.    What was it that you told them to do

11   or not to do?

12         A.    Probably we would tell them to observe

13   more formalities.  We would -- more corporate

14   formalities.  We would probably suggest that they

15   allow a US person be their management, make the

16   management decisions.  Give them more autonomy.

17         Q.    Is there any recommendation that you

18   recall making that was not followed?

19         A.    That wasn't followed in most of the

20   companies, no.

21         Q.    More specifically, what

22   recommendations were not followed?

23         A.    I just said, they had Japanese ex pats

24   who were in control of usually the money and the

25   direction of the company.  The president, director

1                    J. Fischman
2    of finance almost always.  The board members were
3    almost always partially from the parent company,
4    which means that all the major decisions were
5    typically made in Japan at the parent company.
6          Q.    Did you ever express concern about
7    what you are testifying as a failure to adopt what
8    you recommended?
9          A.    I am sure that over the course of my
10   time at the company we had discussions about it,
11   sure.
12         Q.    Do you remember any specific
13   discussions?
14         A.    Not at this time.
15         Q.    Did you ever refer to yourself as an
16   employee of MCHC?
17         A.    Again, I wasn't using that
18   terminology, so.
19         Q.    We talked before about what
20   terminology you would use with your friends.
21         A.    Mitsubishi.
22         Q.    But now I am asking a broader question
23   not limited to people externally who might not be
24   alert to the distinctions within Mitsubishi
25   Chemical.

1                    J. Fischman
2              I am saying anywhere even within the
3    company, did you identify yourself as an employee
4    of MCHC at any time?
5         A.    I always felt like I was or that the
6    company was beholden to this parent company.  I
7    don't think I referred to myself that way but the
8    inverse of that is true as well.  I don't think I
9    ever referred to my -- it is not like I walked
10   around and said I am MCHJ or I'm MCHA or I'm MCC.
11   I didn't do either.
12        Q.    You got reviewed.  We have looked at
13   some of those reviews already.
14        A.    Yes.
15        Q.    Who provided those reviews?  Who
16   reviewed you?
17        A.    Well, I typically wrote most of the
18   review and then Donna Costa, who was my direct
19   report, would give me the final review in her
20   office and then when Mr. Oliva was my direct
21   supervisor he gave me one such review.
22        Q.    No one from MCHC ever gave you a
23   review; correct?
24        A.    No one from MCHC was ever in the room.
25   Only my direct report, only my direct supervisor.

```
 1                    J. Fischman
 2        Q.    But no one from MCHC ever wrote a
 3   written review for you either; correct?
 4        A.    No, but I don't know that they didn't
 5   provide input and in fact, I would assume they did
 6   provide input if I was doing work for them as
 7   well.
 8        Q.    Do you have any concrete information
 9   to suggest that they did?
10        A.    No.
11        Q.    Did you ever represent MCHC as a
12   client -- withdrawn.
13              Did you in your role with MCHA
14   consider yourself to have clients, internal
15   clients?
16        A.    Yes.
17        Q.    Who were they?
18        A.    We did this in the first round of my
19   testimony.  Mercedes gave us a list and I
20   identified about 25 different entities.
21        Q.    I recall that.
22              Was MCHC one of the clients that you
23   represented?
24        A.    No.  No, they were not.
25        Q.    You never represented MCHC?
```

```
 1                    J. Fischman
 2        A.    No.
 3        Q.    How about MCC?
 4        A.    Yes.
 5        Q.    What interactions did you have with
 6   MCHC in your role within MCHA?
 7        A.    Our legal department reported directly
 8   to the MCHJ which is the legal department for MCHC
 9   and many of the people that I did do work for were
10   also executive officers of MCHC.
11        Q.    Tell me what you mean by the people
12   that you did work for?
13        A.    Takimoto San I believe was an
14   executive officer.
15              Yoshisato San, who was our president
16   and then went back to Japan and became an
17   executive officer and I believe still had input in
18   the work that was going on in our office.
19              Ken Fujiwara who was the
20   administrative officer for MCHJ was also an
21   executive officer at MCHC and these were the
22   people that I had direct -- Sakaguchi San was at
23   MCHJ but again that was the legal arm of MCHC.  So
24   it was kind of like that.
25        Q.    And the people, the gentlemen you just
```

```
 1                    J. Fischman
 2   mentioned, you had interactions with them
 3   throughout your period in the counsel of office?
 4        A.    Ken Fujiwara from day one.  I didn't
 5   have interaction with him, but I knew of him.
 6   Donna had direct contact with him from the
 7   earliest of my employment.
 8        Q.    And the others that you mentioned, you
 9   had direct interactions with them throughout your
10   period in the counsel's office?
11        A.    Actually kind of in a mixed way and
12   very infrequently.  More so towards the end of my
13   tenure.  Three interactions.  I know that they --
14   I had interactions.  I didn't have a great deal of
15   interactions, but I had interactions and I knew
16   they knew what was going on in our you business.
17        Q.    And you had direct interactions with
18   them during your period as acting general counsel;
19   correct?
20        A.    Very, very, very limited.
21        Q.    What do you mean by very, very, very
22   limited?
23        A.    I mean that when I was given the
24   position I was told to have limited contact with
25   Japan.  That they did not really want to deal with
```

```
 1                    J. Fischman
 2   me and that I could provide Sakaguchi with a
 3   quarterly report, but other than that I did not
 4   no, I did not have any interaction with Ken
 5   Fujiwara who was the main lead and I had limited
 6   interaction with Takimoto, but only as it related
 7   -- well, he is at MCC and only as it related to
 8   the Genomatica and contracts, litigations.
 9        Q.    We will come back to that.
10              Did you have an employment contract?
11        A.    No.
12        Q.    Where were the terms and conditions of
13   your employment set forth?
14        A.    I guess in that offer letter back in
15   2008 and then each year I got a salary increase.
16        Q.    And the terms of your employment set
17   forth in your offer letter, the offer letter --
18   sorry.  Withdrawn.
19              The offer letter that set forth your
20   terms and conditions of your employment was signed
21   by MCHA or its predecessor; correct?
22        A.    So the terms and conditions of my
23   lower level corporate counsel position.  Which is
24   the only letter I ever received, was I believe
25   signed by Donna Costa or Carolyn, I can't remember
```

```
 1                   J. Fischman
 2   Carolyn's last name right now, Warner I think who
 3   was the director of HR in Virginia at the time.
 4        Q.    In your complaint you say and we can
 5   look at it, but I don't know if it is necessary.
 6   In your complaint you say that the key terms of
 7   your employment were controlled, dictated and
 8   approved by MCHC.
 9              Do you recall that from your
10   complaint?
11        A.    It would be helpful if I had it in
12   front of me so I can see the context and where it
13   was.
14              MR. FORTINSKY:  Sure.  I am going to
15          ask the reporter to mark as Fischman Exhibit
16          17 the first amended complaint which is that
17          is docket 89.
18              (Fischman Exhibit 17, the first
19          amended complaint, marked for
20          identification, as of this date.)
21        Q.    I will direct your attention to
22   paragraph 108.
23        A.    Okay.
24        Q.    The first line, that's the one I read.
25        A.    Do me one favor and give me one
```

 1                    J. Fischman
 2    second.  I want to see where we are in the
 3    complaint because we are pretty deep into it.
 4         Q.    Take your time.
 5         A.    Okay.
 6         Q.    What is your basis for saying -- do
 7    you still believe that it's true that the key
 8    terms of your employment were controlled, dictated
 9    and approved by MCHC?
10         A.    Yes.
11         Q.    What's your basis for saying so?
12         A.    Because by the time as I grew in the
13    position I realized that MCHC really controlled
14    everything at MCHA and that because they
15    controlled the budget, because MCHA was not a
16    profit center.  We didn't make anything.  We
17    didn't sell anything.  That all the money came
18    from MCHC and then also through its subsidiaries
19    to pay for legal services, that they controlled
20    everything.  They controlled our entire budget for
21    the office.  Whether or not we could afford to
22    have Diet Cokes in the kitchen.
23              So yeah, my benefits, my salary,
24    everything was controlled by MCHC.
25         Q.    How do you know they controlled

```
 1                    J. Fischman
 2  whether there were Diet Cokes in the kitchen?
 3         A.    Maybe I was exaggerating a tiny bit,
 4  but because they controlled the budget for the
 5  office everything had to have been determined by
 6  that budget and that budget was completely passed
 7  through MCHC by the director of finance every
 8  year.
 9         Q.    What is the basis for the
10  extrapolation that because MCHA's budget reflected
11  input from MCHC that MCHC determined the terms and
12  conditions of your employment?
13         A.    Because Donna had to ask for
14  permission and authority on all of those matters.
15         Q.    How do you know that?
16         A.    She discussed it and we discussed it
17  at length when she gave me the information about
18  the acting general counsel position.
19         Q.    Do you remember what she said to you?
20         A.    When she handed me the budget she
21  explained to me how it worked and she also
22  explained to me how everything had to be approved
23  and that if we were going to hire replacement for
24  me this was the amount we had because they had to
25  take money from the legal budget to pay for her as
```

 1                    J. Fischman
 2    the president because the president that had been
 3    formerly in the position was an ex pat and since
 4    he still had his position at MCHC in Japan, they
 5    didn't pay him as much as they were going to be
 6    paying her.  So part of the budget had to then
 7    adjust and all of this budget had to be approved
 8    by Japan.
 9          Q.    Is there anything else that you would
10    add from those conversations referred to with
11    Donna Costa?
12          A.    I believe also the insurance and all
13    the benefits would have been approved by Japan.
14          Q.    What do you mean by the insurance and
15    the benefits?
16          A.    The cost of our insurance plans was
17    all run past Japan, everything.
18          Q.    Did you discuss that with Donna Costa
19    at that meeting?
20          A.    I most certainly did and I also
21    discussed that at earlier points because we looked
22    at -- we were doing an ongoing insurance review.
23    I wasn't responsible for the review, but it was a
24    general understanding that she had worked on
25    pension materials prior to this time period.  So I

```
 1                    J. Fischman
 2    knew that she worked with people in Japan on that
 3    and then I know that, I knew that both Iguchi San
 4    and Shin.  Kohei and Shin.  Let's just leave it at
 5    those two names.  Kohei, K-O-H-E-I and Shin,
 6    S-H-I-N who were both finance directors, ex pats
 7    from Japan.  I knew that they worked directly with
 8    MCHC counterparts for all of our financial
 9    matters.
10         Q.    So what you have described so far is
11    about the organization's budget and finances.
12              My question is what is the basis for
13    extrapolating those discussions about the
14    organization's budget and finances to infer that
15    the terms and conditions of your personal
16    employment were actually dictated by MCHC?
17         A.    Because early on I believe as I was a
18    lower level employee that they may not have been
19    completely involved in those decisions.  They were
20    not involved in my decision or mine and Donna's
21    decision to hire Steven Rose.
22              However, at the higher level of the
23    company I was well aware that approval needed,
24    approval was needed from MCHC to be appointed
25    general counsel and also to demote me and we know
```

1                    J. Fischman

2    that from the documents that you've produced.

3         Q.    I ask the question again though.

4              What is the basis for inferring that

5    that was for extrapolating that the alleged

6    control by MCHC over budget and even position

7    selection meant that they controlled the terms and

8    conditions of your individual employment; the

9    terms of your contract, in other words?

10        A.    I didn't have a contract.  I asked for

11   a contract and that was denied.

12        Q.    We can debate -- we don't have to get

13   into legalities whether it was or it was not a

14   contract notwithstanding the absence of an

15   agreement.

16        A.    Okay.

17        Q.    But my question still stands as to

18   what the basis was for, what support that provides

19   for the statement that they controlled the terms

20   of your personal employment?

21        A.    It was my belief or rather I knew that

22   my boss at the time Donna Costa was in constant

23   communication with Ken Fujiwara at MCHC and about

24   the way that the legal department was run and I

25   knew that she spoke with MCHC about my promotion

```
 1                    J. Fischman
 2   or demotion and was led to believe in our meeting
 3   that that decision was made in Japan.
 4         Q.    Did MCHC maintain any employment
 5   records for you personally?
 6         A.    I don't know.
 7         Q.    Do you have any basis to think so?
 8         A.    I have no basis to know that they
 9   don't.
10         Q.    Do you have any basis to believe that
11   MCHC determined the amount that you were paid?
12         A.    Yes.  I believe that they probably did
13   have input into that.
14         Q.    What's the basis for that?
15         A.    Because they developed the budget I
16   believe and they provided the funding for both the
17   budget and our salaries and our bonuses that I
18   believe they did have input.
19         Q.    We will come back to that.
20               Do you have any basis to believe that
21   MCHC supervised or controlled the conditions of
22   your employment?
23         A.    Could you be more specific when you
24   talk about the conditions of my employment that
25   you are asking about?
```

1                    J. Fischman

2          Q.    Your complaint says in part in

3     paragraph 104 which is in front of you, that

4     defendants MCHA and MCHC, you can read paragraph

5     104 to yourself.

6          A.    Which number?  I am sorry.

7          Q.    Paragraph 104.  You see number 2

8     within paragraph 104 refers to supervise and

9     control plaintiff's conditions of employment?

10          A.    Mm-hmm.

11          Q.    Do you have any basis to support the

12     statement that MCHC supervised and controlled the

13     conditions of employment?

14          A.    As I explained, I believe that Ken

15     Fujiwara as an employee of MCHC definitely had

16     some control over the conditions of my employment.

17          Q.    What about number one, hire and fire

18     plaintiff, do you have any basis to believe that?

19          A.    Yes.  I believe Ken Fujiwara

20     specifically had the ability to hire and fire me.

21          Q.    Is there anything else that you can

22     add that supports the allegations in paragraph

23     104?

24          A.    I generally knew that these

25     discussions were happening in Japan when Donna met

```
 1                    J. Fischman
 2   with members of MCHC about me and we have seen
 3   evidence in this lawsuit produced by defendants
 4   that confirm that Mr. Fujiwara was in fact and Mr.
 5   Guchisato (phonetically) was in fact involved in
 6   those decisions and possibly others.
 7        Q.    Did you ever ask for a raise while
 8   working for MCHA?
 9        A.    No.
10        Q.    Do you ever raise questions about your
11   employment with Pat Saunders?
12        A.    That's too broad a question.  I am
13   certain that I may have.
14        Q.    If you had any questions about the
15   circumstances or conditions of your own
16   employment, who would you turn to?
17        A.    Probably Donna.
18        Q.    Anyone else?
19        A.    I am sure at times Pat Saunders.  She
20   was HR.
21        Q.    For?
22        A.    For Mitsubishi.
23        Q.    For MCHA?
24        A.    Yeah.  She was resident in our office.
25              MR. FORTINSKY:  Let's mark as Fischman
```

```
 1                    J. Fischman
 2         Exhibit 18 a document with the Bates number
 3         465 and 466.
 4                    (Fischman Exhibit 18, a document
 5            Bates stamped 465 and 466, marked for
 6            identification, as of this date.)
 7         Q.    Do you recognize this document?
 8         A.    Yes.
 9         Q.    What is it?
10         A.    This is a request to Pat Saunders
11    after my demotion in 2015 where I asked what my
12    salary, what the details of my salary were going
13    to be because we didn't really get into those
14    details during the meeting with Donna Costa where
15    I was demoted.
16         Q.    So when you had a question as for
17    example on 466, about the terms and the pay that
18    you would have as counsel, you asked MCHA's HR
19    person; correct?
20         A.    Correct.  That doesn't mean however
21    that it wasn't approved by someone in Japan
22    because I think we have learned through the
23    documents that Mr. Fujiwara was in fact aware and
24    approved of this scheme (sic).
25         Q.    What is the basis for you saying that?
```

```
 1                    J. Fischman
 2        A.    That's the e-mails that have been
 3   produced during the course of this litigation.
 4        Q.    Okay.  Well, they speak for
 5   themselves.
 6        A.    Okay.
 7        Q.    We talked before about the clients
 8   that you served as inhouse counsel.
 9             Did they pay for your time or service?
10        A.    No.
11        Q.    Was there a legal services agreement?
12        A.    Yes.
13        Q.    And what were the terms of the legal
14   services agreement with respect as between one of
15   your clients -- withdrawn.
16             Who were the parties to the legal
17   services agreement?
18        A.    You know what, mostly it was between
19   the particular affiliate company and maybe MCHA or
20   MCUSA.
21        Q.    And pursuant to the legal services
22   agreement MCHA or MCUSA would provide legal
23   services to these various affiliates; correct?
24        A.    Yes.
25        Q.    And in that sense the MCHA legal
```

1                    J. Fischman

2   department had these affiliates as its clients as

3   we discussed before; right?

4        A.    Yes.

5        Q.    And was there any financial component

6   to the legal services agreement?

7        A.    I can't recall.  I am sure there is

8   because -- I am sure there is.

9        Q.    And does the funding provided pursuant

10  to those legal services agreement support the

11  budget of the legal department?

12       A.    Part of it.

13       Q.    Where does the other part come from?

14       A.    MCHC.

15       Q.    Were you ever required to obtain

16  MCHC's consent for any decision, you personally?

17       A.    I can't recall.

18       Q.    You can't recall any instance of that?

19       A.    I can't recall because you are asking

20  me to go back over nine years.

21             When you say any decision, can be more

22  specific?

23       Q.    Let me put the question this way, can

24  you recall any instance in which you were asked to

25  obtain the consent of MCHC for any decision that

```
 1                    J. Fischman
 2   you were involved in in your role as counsel?
 3        A.    I didn't necessarily have direct
 4   contact with MCHC.  I had direct contact with my
 5   two supervisors.  They had contact with MCHC.
 6        Q.    But --
 7        A.    So I wouldn't have been in a position
 8   to ask.
 9        Q.    So the answer to my question if I
10   understand correctly is no, you can't recall any
11   instance in which you asked, in which you were
12   asked to obtain MCHC's consent to a decision; is
13   that correct?
14        A.    Most of the time I was too low level
15   to have had interaction with MCHC.  However, as I
16   grew in my positions I had a lot of interaction
17   with people at all of the companies including
18   MCHC.  So I would have from time to time have
19   interacted with people both at MCHC, MCC, MPI.
20   All the Japanese parent companies including MCHC.
21        Q.    Still my question is:  Can you recall
22   a single instance as you sit here today where you
23   were asked to obtain MCHC's consent to any
24   decision?
25        A.    No.
```

1                    J. Fischman
2        Q.    Can you recall any specific instance
3    in which Donna Costa was required to obtain MCHC's
4    consent to any decision?
5        A.    I think that Donna Costa was
6    frequently in contact with multiple high level
7    members up to and including the CEO Mr. Kobeoshi
8    (phonetic) and she would have been in a position
9    to ask for consent on any number of matters
10   including the role of the legal department in its
11   entirety including the way that the legal
12   department was set up initially when MCA broke up
13   and MCUSA was formed.  I believe that they had a
14   great deal of input in that over the years she and
15   I had discussed those types of instances.  She
16   went to Japan at least two to three times a year.
17   I know that she had to have approval to go to
18   business school.
19               So yeah, I would say that she
20   definitely asked for approval on a great many
21   matters.
22   MO        MR. FORTINSKY:  Move to strike as not
23        responsive.
24       Q.    You had extensive discussions over
25   eight years or so with Donna Costa over all kinds

```
 1                    J. Fischman
 2  of things?
 3         A.    Yes.
 4         Q.    Do you recall any specific instance
 5  where she told you that she had to obtain the
 6  consent of MCHC for any decision that she made?
 7         A.    I just gave you one very specific when
 8  she went to business school she had to obtain
 9  approval for that.  When she became the president,
10  when she was appointed the presses of the company
11  that would have been a decision made at MCHC.
12         Q.    How do you know?
13         A.    Because that's part of their bylaws.
14         Q.    Did she ever tell you that she had to
15  get MCHC's approval?
16         A.    It was widely known, yes.
17         Q.    She told you that?
18         A.    She told me other presidents of other
19  companies told me.  I know that she went to Japan.
20  It doesn't just happen.
21         Q.    Did she ever tell you that she had to
22  get MCHC's consent in order to go to business
23  school?
24         A.    Yes.
25         Q.    When?
```

1                    J. Fischman

2        A.    Before she went to business school.

3        Q.    Can you think of any other instances

4    besides the business school example where she told

5    you specifically she had to get MCHC's consent?

6        A.    I am sure that over the years we had

7    many, many conversations about multiple things

8    that went on at MCHA that had to be approved and

9    I've mentioned them.  When the pension program was

10   restructured.  When we were looking at different

11   insurances.  When the company was formed and she

12   had to ask and they wanted us to be effectively

13   the legal arm of the company in the United States,

14   the legal department for the company in the United

15   States, how that was structured because originally

16   the company was set up as a profit center.  We

17   were part of a larger organization and then the

18   company was -- each of those organizations were

19   broken off and what was left was solely an

20   administrative department.

21       Q.    Were you happy when you learned that

22   you were going to be promoted to acting general

23   counsel?

24       A.    I had mixed feelings.

25       Q.    On balance were you happy?

```
 1                    J. Fischman
 2        A.    Acting general counsel, you said.
 3        Q.    Acting general counsel?
 4        A.    On balance I had very mixed feelings.
 5   I was both happy and unhappy.
 6        Q.    But when I say on balance --
 7        A.    I was proud that -- I am sorry.  I was
 8   proud that I had achieved this which had been a
 9   goal of mine over my 18 year career, but I was
10   extremely unhappy that after all my years of
11   experience, knowledge, familiarity with the
12   businesses had been given an acting role.
13        Q.    I understand.  You said you had mixed
14   feelings.  I am asking you to in a way balance out
15   those mixed feelings.
16              On balance, were you more happy or
17   unhappy?
18        A.    I was both happy and unhappy.  I would
19   say that I was -- it was a good split.  51 percent
20   if you want.
21        Q.    51 percent more happy than unhappy?
22        A.    Hard to say.
23        Q.    If you were more unhappy than happy,
24   you would have said no to the position; correct?
25        A.    No.
```

```
 1                    J. Fischman
 2        Q.    You took the position even though you
 3   were more unhappy about it?
 4        A.    I didn't say I was more unhappy.  I
 5   just said it was difficult.  It is difficult to
 6   say.
 7        Q.    But you took the position?
 8        A.    I took the position because I saw it
 9   as a great opportunity.
10        Q.    And you wanted that great opportunity?
11        A.    Absolutely.
12        Q.    And you received an increase in
13   salary?
14        A.    Absolutely.
15        Q.    Were you grateful to the people that
16   advocated for your promotion?
17        A.    I don't know who advocated for my
18   promotion.  I had to guess and also I had to
19   pretend that certain people who I figured did not
20   advocate for my promotion I had to pretend and
21   thank them for it anyway.  I was working to get
22   the full promotion.  So from that moment forward I
23   was doing everything I could to get rid of the
24   acting part, right.
25        Q.    You said you had mixed feelings when
```

```
 1                    J. Fischman
 2   you took the job?
 3        A.    Yes.
 4        Q.    Have you ever hired anybody to work
 5   under you in an organization?
 6        A.    Yes.
 7        Q.    Did you when you hired them want them
 8   to be enthusiastic about their position?
 9        A.    Yes.
10        Q.    If you knew the person had mixed
11   feelings about taking the position, would you have
12   hired them?
13        A.    If they had told me that they had
14   mixed feelings about the position I would have
15   been concerned.
16        Q.    Why?
17        A.    If I am offering a position I am
18   offering it at a hundred percent.  This position
19   is yours.  You have earned it or we have chosen
20   you because we believe in you, but that wasn't
21   what was offered to me, was it.
22        Q.    When you hire people to work under
23   you, are you concerned that if they are not
24   enthusiastic and they have mixed feelings that
25   their performance may not be a hundred percent as
```

```
 1                    J. Fischman
 2   a result?
 3        A.    No.
 4        Q.    Why not?
 5        A.    Because you are asking me a question
 6   that you are trying to lead me into something and
 7   I am not going to fall for your lead in.
 8        Q.    I am not playing games.  I am just
 9   asking you for your honest views.  What you are
10   telling me actually is that you know that the
11   right answer is that you would not want to hire
12   somebody who had mixed feelings and you don't want
13   to give me the answer because you are afraid of
14   the consequences, isn't that what you are telling
15   me?
16             MR. BERMAN:  Object to form.
17        A.    That's not what I am telling you.
18        Q.    What are you telling me?
19        A.    Ask me a real question and I will
20   answer with a real answer.  Don't ask me
21   hypotheticals.  With due respect you can ask me
22   hypotheticals and we will see how it goes.  I am
23   sorry about that Jerry.
24        Q.    Is it unreasonable for an employer to
25   have second thoughts about an employee that has
```

```
 1                    J. Fischman
 2   mixed feelings about her job?
 3        A.    Your hypothetical is too broad for me
 4   to answer.
 5        Q.    It is not a hypothetical.  I am not
 6   asking you to imagine a set of circumstances.  I
 7   am asking you to tell me your view as to whether
 8   it is unreasonable or reasonable.
 9        A.    Unreasonable.
10        Q.    Why?
11        A.    I don't have an answer for you because
12   I don't think you are giving me the benefit of a
13   complete question and it's too broad and too
14   hypothetical for me to answer.
15              MR. FORTINSKY:  I would propose we
16         take a lunch break if that's okay with
17         everybody.
18              THE VIDEOGRAPHER:  We are off the
19         record at 12:55.
20              (Luncheon recess:  12:55 p.m.)
21
22
23
24
25
```

```
 1                    J. Fischman
 2             A F T E R N O O N    S E S S I O N
 3                    (1:50 p.m.)
 4  J E N N I F E R   F I S C H M A N,
 5       having been previously sworn, resumed the
 6       stand and testified further as follows:
 7  EXAMINATION (Cont'd)
 8  BY MR. FORTINSKY:
 9             THE VIDEOGRAPHER:  We are back on the
10       record at 1:51.
11       Q.    So I would like to continue our
12  discussion Ms. Fischman.
13             I meant to ask you before, you were
14  promoted to assistant general counsel in 2013;
15  right?
16       A.    Yes.
17       Q.    Who made the decision to promote you?
18       A.    I am not aware of who was consulted
19  for that decision.
20       Q.    What did you understand the term
21  acting to mean when you took the position of
22  acting general counsel?
23       A.    That it was a plate holder.
24       Q.    What does that mean?
25       A.    That it was temporary.
```

```
 1                    J. Fischman
 2         Q.    And if it was temporary that meant
 3    that it could at some point come to an end; right?
 4         A.    Yes.
 5         Q.    And if it came to an end, you would be
 6    reassigned to your previous position?
 7         A.    I didn't make any assumptions about
 8    it.
 9         Q.    Eventually you were reassigned to your
10    previous position; right?
11         A.    Yes.
12         Q.    And you said that the nature of the
13    acting general counsel position was that it was
14    temporary; correct?
15         A.    The term acting conveys that meaning.
16         Q.    So when you were reassigned to be an
17    assistant counsel, that was consistent with the
18    terms of your position as acting general counsel
19    which you said was temporary as you understood it;
20    correct?
21         A.    I don't think that I ever foresaw
22    being returned to the assistant general counsel
23    position because I assumed that I would be made
24    the full general counsel.
25         Q.    I understand that you had confidence
```

1                    J. Fischman
2    in your ability to attain the full general counsel
3    position, but my question is whether or not the
4    reassignment to the assistant counsel position was
5    consistent with the temporary status that you said
6    the acting terminology conveyed in your acting
7    general counsel title?
8         A.    I am sorry.
9              Could you rephrase the question?  I am
10   having trouble understanding where the question is
11   in there.
12        Q.    When you were reassigned to be
13   assistant counsel, was that consist with the terms
14   on which you took the acting general counsel
15   position?
16        A.    I don't know that it was consistent
17   because I don't know what the terms -- I don't
18   know that.  I don't know what the -- I mean
19   originally in the first meeting I had with Donna
20   and I was kind of told it's probably never going
21   to happen.  I couldn't get you through to Japan
22   and said it is acting.  I had two reactions.  One
23   was disappointment as I mentioned, and the other
24   was I am going to do whatever I can to prove to
25   everyone that I have earned this position and I

1           J. Fischman

2   belong in this position and that I can do a great

3   job in this position.

4           So I am not sure that I can answer

5   your former question as to whether it was

6   consistent with the terms because I never

7   anticipated being back in that position.

8       Q.   When you were told that you were named

9   acting general counsel, did you understand that

10  that meant you could be reassigned to be assistant

11  counsel?

12      A.   I can't say that I contemplated it at

13  the time.

14      Q.   You didn't think about what the terms

15  of your appointment to become acting general

16  counsel included?

17      A.   That wasn't part of the conversation,

18  no.

19      Q.   I am asking what you perceived.

20          Did you perceive, based on your

21  conversation with Donna Costa, that by virtue of

22  being an acting general counsel you could be

23  reassigned to the assistant counsel?

24      A.   Maybe, yes.

25      Q.   On the first day of your testimony you

```
 1                    J. Fischman
 2   said that no one in the history of MCHC or any of
 3   its affiliates had ever been given an acting role
 4   in anything.
 5             Do you recall that testimony?
 6        A.    I probably said something like that.
 7        Q.    What was the basis for that statement?
 8        A.    The basis for that statement was that
 9   I had been in the company for at the time eight
10   years and I had never heard of or met anyone in a
11   senior position as a president of the many, many
12   companies and the many roles of people at officer
13   level, senior level, VP level.  I never met
14   anybody who had been in an acting position.
15        Q.    So it was limited to your personal
16   knowledge and experience; right?
17        A.    Yes.
18        Q.    You said that the decision not to
19   promote you to full general counsel was made in
20   Japan; is that right?
21        A.    Yes.
22        Q.    What evidence supports that?
23        A.    Well, I knew that the decision at this
24   senior level which would have been the second
25   highest level position in the company would have
```

1          J. Fischman
2   been made by the people that were responsible for
3   the legal department such as Ken Fujiwara, the
4   former president Yoshisato and probably the board
5   members who were in Japan and others because for
6   example, I knew that the decision to promote Donna
7   Costa to president was made by many of these same
8   people and that her replacement would then
9   ultimately also had been an essential element of
10  that discussion.
11       Q.    So you are extrapolating from your
12  other experiences in the company to speculate
13  about the role that Japan played?
14            MR. BERMAN:  Object to form.
15       A.    Yes, because further on, first in that
16  meeting where she said that I can't get you
17  through Japan.
18            Then when I went to Greer, South
19  Carolina and met with two other senior executives
20  at one of our affiliates and they confirmed that
21  scenario to me as I knew that.  Throughout my many
22  years at the company I knew that decisions were
23  generally made on all high level situations.  Such
24  as the directors of each company were made by
25  parent companies and approved by parent companies.

```
 1                    J. Fischman
 2    So it was not a surprise to me and I was able to
 3    extrapolate that based on my experience, yeah.
 4         Q.    You said on the first day of your
 5    testimony that you made your objection to the
 6    acting position well known.
 7              What did you mean by well known?
 8         A.    To Donna Costa I objected to that on a
 9    number of occasions.
10         Q.    Anyone else?  Did you object to anyone
11    else, in other words?
12         A.    Yeah, I am sure I did.  I am sure I
13    spoke with other colleagues in the company.
14    Probably someone who I felt I had a friendship
15    with and maybe I would have mentioned it.  I am
16    certain I mentioned it to Pat Saunders and
17    probably Brian O'Connors.
18         Q.    When you say you mentioned it, were
19    these in the nature of objections or complaints?
20         A.    Well, there is no really -- yes.
21         Q.    Would it surprise you to learn that
22    other executives in the company were taken aback
23    by somebody making complaints and objections after
24    having just been promoted?
25         A.    Well, I wasn't really promoted, right.
```

```
 1                    J. Fischman
 2   So I was promoted, but in an undermined way,
 3   right.  I wasn't given the full confidence of the
 4   company.  I was given a trial.
 5             So it would surprise me to learn that
 6   other people would be surprised when of course
 7   someone who worked so hard would be disappointed
 8   and would object to an acting position when that
 9   person was so qualified, knew the company so well
10   and had worked so hard for the position.
11        Q.   You felt you were not really being
12   promoted?
13        A.   I felt that I was being promoted in
14   an -- but at the same time undermined because my
15   authority was not full and everybody knew it was
16   sort of temporary and I was made fun of by
17   actually one president, visiting affiliate that
18   was humiliating, yeah.
19        Q.   Who was the president?
20        A.   The president of Nippon.  Not Nippon.
21   TSMC.  I have to go back and look, but there was a
22   meeting in our conference room around the end of
23   April with a new company, a new affiliate company
24   and the president came and spoke to us and he made
25   a joke about me being an acting and then one other
```

```
 1                  J. Fischman
 2    time that I interacted with him he made a joke
 3    still acting, still pretending.
 4         Q.    What was the joke?  You described the
 5    second but not the first.
 6         A.    It was the same thing.  You know oh,
 7    it was a joke about, that made me, that humiliated
 8    me because it made it look like I wasn't good
 9    enough and it undermined my position.
10         Q.    Did any of the -- did you register any
11    complaints or objections to the acting position
12    with anyone at MCHC?
13         A.    I was told not to speak with the
14    people at MCHC when I was provided this -- during
15    that first meeting with Donna.
16         Q.    So the answer is no?
17         A.    No.
18         Q.    It is correct that the answer is no;
19    correct?
20         A.    The answer is no, correct.
21         Q.    You said in your complaint and I think
22    also in some respects in your testimony, that you
23    were excluded from all meaningful interactions
24    with the company's Japanese leadership including
25    Ken Fujiwara and Masanori Sakaguchi.
```

1                        J. Fischman

2                What did you mean by excluded from all

3    meaningful interactions?

4         A.    I had not been to Japan I think for at

5    least a year when I was made acting GC and it was

6    surprising to me that I was not going to have an

7    opportunity to go abroad early on even during the

8    transition period or even when I first was

9    officially in the role in April to interact on a

10   more meaningful way to talk about the department,

11   to talk about the direction of the businesses, to

12   have strategic conversations which I was aware

13   that on many, many occasions my predecessor had

14   had that opportunity.  So I did not -- that's the

15   answer.

16        Q.    And whose decision was it that you

17   would not have contact with those people in Japan?

18        A.    Well, I assumed it was from both of

19   them as well as Ms. Costa.

20        Q.    And who would have those conversations

21   instead of you?

22        A.    Donna Costa.

23        Q.    Another woman; right?

24        A.    The only other woman in management

25   worldwide, yes.

```
 1                    J. Fischman
 2        Q.    You said in the complaint too that you
 3   were not permitted to interact with any senior
 4   level personnel situated in Japan.
 5              Did anyone ever prohibit you?
 6        A.    Yes.  I was told specifically by Ms.
 7   Costa during that initial meeting not to engage
 8   with them except for on a quarterly report basis.
 9        Q.    And did you ask why?
10        A.    No.
11        Q.    Did she explain why?
12        A.    No.
13        Q.    Did Mr. Sakaguchi ever criticize your
14   legal advice?
15        A.    Ever?
16        Q.    Yes.
17        A.    I didn't provide legal advice to Mr.
18   Sakaguchi.  He was a lawyer.  He was not a client.
19        Q.    Did he ever criticize the advice you
20   had given anyone else?
21        A.    Not that I know of or can recall.
22              MR. FORTINSKY:  Can you mark as
23        Fischman Exhibit 19 a document identified
24        with Bates numbers 1218 through 1229.
25              (Fischman Exhibit 19, a document
```

1              J. Fischman

2      identified with Bates numbers 1218 through

3      1229, marked for identification, as of this

4      date.)

5          Q.    I will direct your attention to page

6  1219 and to the to's and from's indicated above

7  that e-mail which actually begins on 1218.

8              Do you recognize this e-mail?

9          A.    Without knowing the defendants' 1219

10  through 1223 which are all redacted, I can't

11  really respond to what Sakaguchi San is responding

12  to me.  So let's let this if you don't mind speak

13  for itself.

14          Q.    On page 1219, do you see where

15  Sakaguchi San in this e-mail says "MKM is very

16  unhappy with the ways in which you or MCHA and

17  your Brazilian lawyers are handling this matters."

18              Do you see that?

19          A.    I see that Sakaguchi San wrote that

20  but what I explained in my response to him is that

21  in fact, I had not had any responsibility for

22  managing this matter which was over a decade old

23  and as far as I can recall, not very many things

24  occurred during my tenure as general counsel.  So

25  it was no longer in my responsibility, set of

```
 1                    J. Fischman
 2   responsibilities.  This is already after my
 3   demotion.
 4        Q.    Did you feel as though Mr. Sakaguchi
 5   was condemning your legal advice?
 6        A.    I believe that he was retaliating
 7   against me at this time.
 8   MO          MR. FORTINSKY:  Move to strike as
 9          nonresponsive.
10        Q.    Do you see the line that says "Please
11   do not continue to condemn my legal advice in such
12   a public matter" on page 1218?
13        A.    Yes.
14        Q.    Did you believe at the time Mr.
15   Sakaguchi was condemning your legal advice?
16        A.    I can only say that when he said MKM
17   is very unhappy with way you and your Brazil
18   lawyers are handling these matters he was
19   condemning my legal advice, but I hadn't really
20   provided any legal advice on this matter.  It was
21   the Brazilian lawyers.  I was merely forwarding a
22   document.
23               MR. FORTINSKY:  I would now ask the
24          reporter to mark as Fischman Exhibit 20 a
25          document previously identified in this case
```

1                    J. Fischman

2          by Bates numbers Defendant 1208.

3                    (Fischman Exhibit 20, a document

4          previously identified in this case by Bates

5          numbers Defendant 1208, marked for

6          identification, as of this date.)

7          Q.    Do you recognize this e-mail?

8          A.    I do.

9          Q.    What is it?

10         A.    This is an e-mail that Sakaguchi San

11   sent me on 11/5/2014.  This was a misunderstanding

12   that he understood that I had violated some

13   confidentiality that he had provided information

14   to me about something, but there was another

15   witness in the room at the time.  Mika Usame,

16   U-S-A-M-E and she explained to Yoshisato San, the

17   president of the company at the time, and to Donna

18   that I had not violated any confidentiality and I

19   had never disclosed any confidential information

20   that he had provided.

21               So while this e-mail may exist in the

22   records, there were events that occurred after

23   this e-mail that then did not go back and respond

24   to it.  There was no reason to.  It was taken care

25   of by Miko, our Japanese legal intern, who had

```
 1              J. Fischman
 2  been present at the meeting and knew that I had
 3  not violated any confidentiality.
 4       Q.    Did you perceive this as being an
 5  unfair criticism of your performance as a lawyer?
 6       A.    Yes.  Not a lawyer.  I felt that he
 7  had jumped to a conclusion and instead of asking
 8  for something to be kept confidential first of
 9  all, and then he jumped to a conclusion that I
10  would violate his trust which I had no intention
11  of doing.  That was important to me.
12       Q.    But you perceive this to be an unfair
13  criticism of your work?
14       A.    I think this was an unfair criticism
15  of my trust.
16       Q.    But it was a criticism; right?
17       A.    Yes.
18       Q.    Have you reviewed the documents
19  produced in this litigation?
20       A.    Some of them.
21       Q.    Not all of them?
22       A.    No.
23       Q.    Are you aware that Mr. Sakaguchi and
24  Mr. Fujiwara persuaded Donna Costa to demote you
25  rather than terminate you?
```

```
 1                    J. Fischman
 2        A.    I have seen there are documents where
 3   there are discussions about that which shows how
 4   influential they were on the hiring and firing and
 5   demoting of me completely and completely and
 6   utterly in control of it.
 7             MR. FORTINSKY:  Let's mark as Fischman
 8        Exhibit 21 a document produced with Bates
 9        number Defense 1067 and 1068.
10             (Fischman Exhibit 21, a document
11        produced with Bates numbers Defendant 1066
12        through 1068, marked for identification, as
13        of this date.)
14        Q.    Let me direct your attention to page
15   1068 and ask you whether you have seen this
16   document before?
17        A.    Yes.
18        Q.    In what context?
19        A.    In the context of this litigation.
20        Q.    Do you see the line that reads "I
21   would like your thoughts on the following:  Would
22   you truly prefer to keep Jennifer as GC knowing
23   all the people that are miserable as a result."
24             Do you see that line?
25        A.    Yeah, I do see that line.
```

```
 1                    J. Fischman
 2         Q.    And this is an e-mail from Donna
 3    Costa; correct?
 4         A.    It is.  It appears to be.
 5         Q.    She was your boss --
 6         A.    She was the president of the company
 7    at the time.
 8         Q.    And she was your boss at the time?
 9         A.    Yes.
10         Q.    Do you think this e-mail reflected how
11    she honestly felt?
12         A.    I can't say how she honestly felt.
13         Q.    Why do you think Donna Costa sent this
14    to Ken Fujiwara?
15         A.    I don't know.
16         Q.    Is there any reason you can think of
17    why she would say this other than this reflects
18    her true feelings?
19         A.    I can't answer for how her true
20    feelings whether they were reflected in this
21    document or whether this document is a pretext for
22    my demotion.
23         Q.    Do you think it was a pretext?
24         A.    Yes.
25         Q.    Why?
```

1                    J. Fischman

2        A.    Because Donna made a concerted effort

3    starting in July of 2015 to paper the record with

4    negative comments about me as a pretext to demote

5    me.

6        Q.    For what purpose?

7        A.    Because I was doing a very good job

8    and Japan did not want me in the role and they

9    needed to find a way to get rid of me.

10       Q.    Why would Donna want to paper the

11   record to your disadvantage?

12       A.    To avoid litigation like this.

13       Q.    So you think that Donna, the fix was

14   in between Donna and the people in Japan?

15       A.    A hundred percent.

16       Q.    You think they had candid discussions

17   in which they were plotting to get rid of you,

18   that's what you think?

19       A.    I think that they had candid

20   discussions always and in fact, the record

21   reflects almost no documentation from prior to my

22   promotion in 2014 because Donna almost never wrote

23   things down unless she wanted to have a record.

24   She had many conversations with Japan.

25       Q.    Have you in your role ever done

```
 1                    J. Fischman
 2   business with people in Japan?
 3        A.    Yes.
 4        Q.    Of course you have; right?
 5        A.    Of course.
 6        Q.    And Japan is -- is there ever a time
 7   when the Japanese business day coincides with the
 8   US business day?
 9        A.    No.  That's why we worked very late at
10   night and very early in the morning.
11        Q.    And that's why people communicating
12   with Japan from the United States and vice versa
13   typically put things in e-mails; right?
14        A.    Not sensitive things.  We would
15   typically set up phone calls.
16             Donna had been working with Ken
17   Fujiwara for over 20 years and with other high
18   level executives in Japan for 20 years and had
19   very long standing relationships with many people
20   who had come and worked in New York for a time
21   period and then returned to Japan.  So I know that
22   she did have multiple conversations by phone
23   frequently and by the way, she wasn't always in
24   New York.  She may have been in Japan.  She may
25   have been in Europe.  Time differences are
```

```
 1                    J. Fischman
 2   sometimes less.
 3        Q.    If Donna's objective was to put you
 4   back in the assistant counsel role, wouldn't it
 5   have been easier for her not to elevate you to
 6   acting general counsel in the first place?
 7        A.    I can't answer that.  I can't say what
 8   would have been easier or harder for Donna.
 9        Q.    Let's turn to the next e-mail on
10   Defendant' Exhibit 1067.  You see the line where
11   it says in the third paragraph "Jennifer has been
12   sometimes difficult for us."
13             Do you see that?
14        A.    I do.
15        Q.    Do you think that reflected how Mr.
16   Fujiwara honestly felt?
17        A.    I don't know what that is based on.  I
18   never heard any concerns that Ken Fujiwara had
19   ever raised about me.
20        Q.    Is there any reason he would say
21   something that didn't reflect his true beliefs?
22        A.    I can't say whether this is true
23   beliefs or not.
24             MR. FORTINSKY:  Let me ask the
25        reporter to now mark as Exhibit 22 what's
```

```
1                    J. Fischman
2        been produced as Defense 1109 and 1110.
3               (Fischman Exhibit 22, a document
4        Bates stamped 1109 and 1110, marked for
5        identification, as of this date.)
6        Q.    Directing your attention to the third
7   paragraph in the e-mail that begins Dear Yoshisato
8   San on page 1110.  Let me direct your attention to
9   the line that says "The bad news is that things
10  are not going well with Jennifer.  She has
11  improved in many ways, but our fundamental
12  concerns remain and I need to decide next steps."
13              Do you see that?
14       A.    Yeah.
15       Q.    The third paragraph.
16              Is there any reason to believe that
17  Donna Costa did not believe what she wrote to
18  Yoshisato San in that e-mail?
19       A.    No.  I think she did believe that,
20  mm-hmm.
21       Q.    And why do you think -- what do you
22  think was the basis for her belief?
23       A.    I think that she created a set of
24  circumstances and then made things very difficult
25  and then she never, they never wanted me to be in
```

```
 1                     J. Fischman
 2   this position as I was in the position effectively
 3   from the beginning of the year to mid July doing a
 4   fine job and then suddenly she realizes we are
 5   getting closer to the end of the year.  I am going
 6   to have to create a situation where she is not
 7   going to be in this position.  People don't want
 8   her there.  So she starts telling everybody that I
 9   am terrible, but I haven't done anything terrible
10   at all except she is telling everybody how
11   terrible I am and yet there is no instance of me
12   at all to this point.  So she is like starting
13   this whole path to get rid of me because I was
14   never supposed to have the position to begin with
15   so she has to do this.
16          Q.    What is your view as to why she
17   elevated you to the acting general counsel
18   position only to take it away a few months later
19   if it is not based on your performance?
20          A.    I was a place holder until she could
21   hire someone like Nick to replace me.
22          Q.    Do you have any evidence to suggest
23   that -- withdrawn.
24                When you say someone like Nick, what
25   do you mean?
```

```
1                    J. Fischman
2         A.    A man.
3         Q.    Do you have any evidence to support
4    the idea that Donna Costa was unable to find a man
5    to serve as general counsel in early 2015?
6         A.    Yes.
7         Q.    What evidence is that?
8         A.    The evidence that you produced is that
9    she was not permitted to look for another person
10   at that time while she was moving into her role as
11   president and she asked me to be the acting
12   general counsel.
13        Q.    So your inference is that the true
14   decision was made in Japan; is that what you are
15   saying that Donna's hands were tied?
16        A.    Yes.
17        Q.    So why would people in Japan not want
18   somebody, not want Donna to go out and hire a man
19   if that's what they really wanted?
20        A.    Let me give you the context in which
21   we are working here.  We are in a company with
22   69,000 employees with one woman in an executive
23   position.  In December of 2015 I am only, after
24   eight years of stellar reviews and high
25   performance and knowledge of the companies and
```

1                    J. Fischman

2    maybe nary an e-mail that was negative about my

3    performance, no one is perfect as you well know,

4    but I had grown.  I had performed.  I handled more

5    than two thirds of the affiliate companies and

6    provided all of the legal work okay, until this

7    point, but I was given an acting role and then a

8    year later a man was given, a man with less

9    qualifications who hasn't been involved in the

10   business for eight years, who has eight years less

11   experience than me is given the full general

12   counsel position.  Why, because he is a guy.  He

13   can go to baseball games with them.  He can hang

14   out and have a beer.  They don't feel comfortable

15   around women.

16   MO             MR. FORTINSKY:  Move to strike as not

17         responsive.

18         Q.    When you were appointed acting general

19   counsel, is it your testimony that the people

20   making the decision, whoever that was, could not

21   find a man to serve in that role?

22         A.    I believe that they could not find a

23   man at that moment because they were not looking.

24   They wanted a temporary person until Nick was

25   available later that year.

```
 1                    J. Fischman
 2        Q.     Andrew Sezar was working in that
 3   department at the time; wasn't he?
 4        A.     Andrew Sezar was a Pharma lawyer
 5   working in the New Jersey office not in the main
 6   office responsible for one business unit with less
 7   experience than me and performance issues.
 8        Q.     You were more qualified than he was,
 9   in other words?
10        A.     He had performance issues.
11        Q.     So if I understand your testimony
12   right, they had a choice between a woman who is
13   qualified and a man who is less qualified and they
14   chose a woman; is that right?
15        A.     No.  I don't believe they considered
16   Andy Sezar at all for the position.  I don't
17   believe he was in their sight line.  I don't
18   believe that anybody considered him until two
19   years or four years later when it was convenient
20   to say we considered Andy Sezar for the role.
21        Q.     He was working in the general
22   counsel's office at the time; wasn't he?
23        A.     He was working in our New Jersey
24   Pharma company at the time, but he was a member of
25   the legal department, yes.
```

1                    J. Fischman
2         Q.    And he a member of the legal
3    department and he was a man; right?
4         A.    And he was a man.
5         Q.    And he was less qualified than you;
6    correct?
7         A.    You will have to speak to him about
8    his qualifications.  My understanding is that he
9    was less qualified, yes.
10        Q.    You perceived him to be less
11   qualified?
12        A.    I didn't perceive him because nobody
13   ever asked me to compare myself against him.
14        Q.    As you sit here today, do you think
15   you were more qualified for that position or he
16   was?
17        A.    I was but I was also more qualified
18   than every single person in this room except for
19   Ms. Costa.
20        Q.    And the company chose you over a less
21   qualified man; correct?  The company chose you;
22   correct?
23        A.    I don't know that the company
24   considered anyone at that time other than me as a
25   place holder, but I certainly wasn't considered

```
 1                    J. Fischman
 2   the general counsel.
 3        Q.    In the e-mail we just discussed on
 4   page 1110 Donna says, Ms. Costa says speaking of
 5   you "She has improved in many ways."
 6              Do you see that?
 7        A.    Mm-hmm.
 8        Q.    Do you think she would say that if she
 9   were trying to create a record that -- if she was
10   doing this solely to create a record that your
11   performance was poor?
12              MR. BERMAN:  Object to form.
13        A.    Sure.
14              Why not?
15        Q.    Do you recall saying that Mr. Oliva
16   was paid more than you were?
17        A.    Yes.
18        Q.    What's the basis of that allegation?
19        A.    I knew that he received a car stipend
20   and parking stipend that was more than me and I
21   believe that he also made more as a general
22   counsel.
23        Q.    What's the basis of that belief?
24        A.    Of course I am not privy to his
25   salary.  We have asked for it, but I believe he
```

```
 1                    J. Fischman
 2    was.
 3         Q.    You said before that you had sometimes
 4    hired people to work under you?
 5         A.    Yeah.
 6         Q.    Have you ever hired somebody to work
 7    under you who had previously been working at
 8    another company?
 9         A.    Yes.
10         Q.    Would you agree that when you hire
11    somebody you have to negotiate the person's
12    compensation to make sure the compensation package
13    is attractive enough?
14              MR. BERMAN:  Object to form.
15         A.    I did not typically have that
16    authority to do that negotiation.  So no, I would
17    say no.
18         Q.    Meaning you don't have any experience
19    enough to give me the answer?
20              MR. BERMAN:  Object to form.
21         A.    I would say I never had the experience
22    where I needed to negotiate to make an offer more
23    attractive to attract a candidate.  The salary was
24    the salary, but that's what it was.
25         Q.    Would it surprise you to find out that
```

1                     J. Fischman

2   companies sometimes have to negotiate to recruit

3   attractive candidates by changing the compensation

4   package?

5                 MR. BERMAN:  Object to form.

6        A.    I imagine that in some companies that

7   would be the case.

8        Q.    Do you think it's unfair for a company

9   to pay an acting general counsel who is perceived

10  not yet ready to serve as full general counsel

11  less than a general counsel who is perceived to be

12  ready for the job?

13                MR. BERMAN:  Object to form.

14       A.    Can you read back the question please?

15               (Record read.)

16       A.    Of course I do, a hundred percent.

17       Q.    Do you believe that's unfair?

18       A.    I believe that's discrimination

19  because the only reason I was paid less and was

20  told I was not ready to take on the job is because

21  I was a woman.

22       Q.    I am not talking about you.  Nothing

23  personal.  I am not talking about you.  My

24  question is in general terms.

25               Were you answering my question based

1                    J. Fischman

2    on yourself?

3         A.    I was basing it on my experience.  I

4    am the one being deposed.  Sorry.

5         Q.    I am going to ask the same question

6    again and I want you to answer the question in

7    general terms without regard to you personally.

8    Just as a general proposition.

9              Do you think it is unfair for a

10   company to pay an acting general counsel who is

11   perceived to be not yet ready to serve as full

12   general counsel less than a general counsel who is

13   perceived to be ready for the job?

14             MR. BERMAN:  Object to form.

15        A.    I guess I would have to say I believe

16   that would be unfair unless there were

17   circumstances that justified it.  So I would say

18   that would be unfair.

19        Q.    The circumstances I am asking you to

20   consider is whether or not, the circumstances I am

21   asking you to consider is that the acting general

22   counsel is not yet ready for the role.  Is

23   somebody they hope can grow into the role.

24             Under those circumstances, would it be

25   reasonable for a company to pay the acting general

```
 1                    J. Fischman
 2    counsel perceived to be less than ready to pay
 3    that -- withdrawn.
 4              MR. BERMAN:  Object to form.
 5         Q.    Under those circumstances, would it be
 6    reasonable for a company to pay the acting general
 7    counsel perceived to be not yet ready for the full
 8    general counsel role less than the full general
 9    counsel would otherwise get?
10              MR. BERMAN:  Object to form.
11         A.    I believe because I cannot answer a
12    hypothetical, sorry, other than my own experience,
13    I am going to say it would be blatantly unfair.
14         Q.    It is blatantly unfair.
15              Why is it blatantly unfair?
16         A.    Because presumably the acting general
17    counsel is qualified and the only reason she is
18    not qualified is because of her gender and
19    therefore --
20         Q.    I didn't say anything about gender.
21    Let's assume these are both men.  It has nothing
22    to do with gender.
23         A.    I don't have enough facts to answer
24    the question.
25         Q.    Here are the facts.  The two
```

1                    J. Fischman
2   candidates are in every respect the same except
3   that the one person is an acting general counsel
4   who is perceived to be not yet ready for the role
5   and the other person is a full general counsel who
6   is perceived to be ready for the role.
7              MR. BERMAN:  Object to form.
8        Q.    You can assume for argument's sake
9   that they are being hired at the same time in two
10  different affiliates of the same organization and
11  everything else is the same.  One of them is hired
12  to be an acting general counsel because he, he is
13  not yet perceived to be ready for the full role
14  and the other one is hired to be a full general
15  counsel because he is perceived to be ready for
16  the full role.
17             MR. BERMAN:  Object to form.
18       Q.    Is it your testimony that it would be
19  unfair for the company to pay the first one, the
20  acting general counsel less?
21             MR. BERMAN:  Object to form.  Please
22       note my continuing objection for this line
23       of questioning.
24       A.    Without knowing what the perception on
25  readiness entails, I would have to say that they

```
 1                    J. Fischman
 2   should be paid the equivalent if the job duties
 3   are equivalent.
 4        Q.    So maybe the reason you have objected
 5   in this complaint has nothing to do with gender at
 6   all?
 7             MR. BERMAN:  Object to form.
 8        Q.    You filed a complaint that alleged
 9   there was gender discrimination, but you've just
10   told us that you think it is always, even where
11   everything is otherwise the same, it is always
12   unfair to pay the acting general counsel less than
13   the general counsel?
14             MR. BERMAN:  Object to form.  This is
15        palpably improper.  What's fairness?  There
16        is no element of fairness.
17             MR. FORTINSKY:  You can't testify.
18             MR. BERMAN:  I am not testifying.  You
19        are badgering the witness --
20             MR. FORTINSKY:  I am not badgering the
21        witness.
22             MR. BERMAN:  -- and asking the same
23        question five times.  Please move on.
24             MR. FORTINSKY:  Could you read back
25        the last question?
```

```
 1                    J. Fischman
 2      A.    Is there a question?  I thought he was
 3  testifying.
 4            (Record read.)
 5      Q.    Do you think it is unfair to pay an
 6  employee less, one employee less than another
 7  because he has lesser qualifications?
 8            MR. BERMAN:  Object to form.
 9      A.    I think that salary is very
10  subjective.  However, I think that usually we base
11  our salary on roles and responsibilities plus
12  qualifications and level of experience.
13      Q.    So is that a yes or no?
14      A.    Honestly, I don't even know what your
15  question is.  I am sorry.  You keep going into
16  these hypotheticals and I don't have answers to
17  hypotheticals.  I have answers to my personal
18  experience.
19            MR. FORTINSKY:  Could you read the
20      question back please?
21            (Record read.)
22      A.    I think that there are many occasions
23  when an employee is paid less based on their
24  qualifications or their lesser qualifications than
25  another employee.
```

1                    J. Fischman
2         Q.    Is there ever a time when it is
3    unreasonable to pay one employee less than the
4    other when that employee has lesser
5    qualifications?
6         A.    I am sorry Lynne, would you read that
7    back please?
8              (Record read.)
9         A.    I think that's what I just said, that
10   there is a time when employees are paid different
11   amounts based on their experience and
12   qualifications.
13        Q.    In 2015 you received a full year's
14   bonus; right?
15        A.    I did.
16        Q.    Who made the decision to pay you the
17   full bonus?
18        A.    I don't know.
19        Q.    You got a raise for 2016; right?
20        A.    Yes, I did.
21        Q.    Do you know who made the decision to
22   pay you that raise?
23        A.    I believe -- let me state no, I don't
24   know who made that decision.
25        Q.    Do you know who made the decision to

```
1                    J. Fischman
2   terminate your employment with MCHA?
3        A.    No.  I don't know who made that full
4   decision.
5        Q.    Do you know whether anyone from MCHC
6   played a role?
7        A.    I believe that they must have played a
8   role, yes.
9        Q.    Based on the considerations we
10  discussed earlier?
11       A.    Yes.
12       Q.    Anything beyond that?
13       A.    No.
14             MR. FORTINSKY:  I now ask the reporter
15        to mark as Fischman Exhibit 23 what was
16        marked as 490, produced as Defendants' 490.
17             (Fischman Exhibit 23, a document
18        Bates stamped 489 and 490, marked for
19        identification, as of this date.)
20       Q.    Ms. Fischman, take your time to read
21  that but the document I am just asking you about
22  490.
23             And then my question is going to be
24  whether you have seen this before?
25       A.    Yes.
```

1                    J. Fischman

2        Q.    In the context of this litigation?

3        A.    In the context of this litigation.

4        Q.    Do you see the line where Mr. Oliva

5   writes "I have lost the ability to trust Jennifer

6   in her role and I have determined to end her

7   employment."

8              Do you see that?

9        A.    Yeah.

10       Q.    Do you have any reason to believe that

11  that line does not reflect how Mr. Oliva honestly

12  felt at that time?

13       A.    I have reason to believe that this was

14  the end of a long year of him papering the record

15  to get rid of me and creating a false narrative of

16  the situation that occurred.

17       Q.    So he was, in your view, working for

18  the full year before that to paper the record; is

19  that your view?

20       A.    I think as we have seen here through

21  this litigation that he made several notes to the

22  file from day one from our very first meeting that

23  is not a normal way to interact with your

24  subordinates where he literally was creating

25  negative comments about me down to like my offer

```
 1                    J. Fischman
 2   of gum to him as aggressive behavior.
 3             So yeah, I think that he was told
 4   before he arrived that it was up to him to get rid
 5   of me and that he had a year to do it and that he
 6   probably believed the statue of limitations on my
 7   demotion ran a year and that was it.  He found
 8   some miscommunications to terminate me and that
 9   everybody was just waiting for this to occur.  So
10   the approvals were already in hand.
11        Q.    So in your view there were other
12   instances before this in which Mr. Oliva had found
13   grounds, true or untrue, to criticize you and to
14   paper the record accordingly?
15        A.    We have seen them in this litigation.
16        Q.    But there were a number of them;
17   right, in your view?
18        A.    No.  There were three or four over the
19   course of a year of his negative impression of my
20   behavior which was never shared with me, but now I
21   can see that he took comments or interactions,
22   wrote them down in a negative way so he would have
23   a basis to terminate me when in fact they are
24   complete spins of what actually occurred in the
25   meetings and I don't have the opportunity to
```

```
 1                    J. Fischman
 2    respond to them.
 3         Q.    Why do you think he didn't terminate
 4    you sooner than he did if there were these three
 5    or four other instances?
 6         A.    I think because I was demoted on
 7    November 11, 2015 and I think there was a great
 8    concern of the company that I was going to bring a
 9    lawsuit for discrimination, for gender
10    discrimination because I had complained about
11    feeling discriminated when I was demoted and I
12    believe that they wanted to hold on to me a year
13    so that it would seem less associated with those
14    actions.  Everything they did was leading to this.
15         Q.    To the extent there were concerns
16    about being perceived as acting for discriminatory
17    reasons, wouldn't those reasons and wouldn't those
18    concerns have been equally true at the point where
19    you were actually terminated?
20         A.    Yes, and they remain true today.
21         Q.    So then my question goes back to why
22    do you think they didn't terminate you if it was
23    just because they were trying to get rid of you?
24    Why do you think they didn't terminate you six
25    months earlier?
```

1                    J. Fischman

2          A.    Because the claim would have been

3    stronger, much closer to the November demotion.

4          Q.    Why?

5          A.    It is closer in time.

6          Q.    You think your claim now is weaker

7    relatively speaking?

8          A.    No.  It is just as strong.

9          Q.    It is just as strong, exactly.

10                Why did they terminate you when they

11   did?

12         A.    I can't say.  I don't know what was in

13   their head.

14         Q.    Did it have anything to do with the

15   Genomatica episode that you were asked about

16   earlier today?

17         A.    I couldn't answer that.

18         Q.    You've offered us a theory as to why

19   the company terminated you and so I am just trying

20   to understand better in the context of this

21   deposition what you think the reasons?

22         A.    I can't say what the reasons were of

23   why they did not take action sooner except for

24   that I was doing my job and I was doing it well

25   and I also believe that Nick needed to be in the

1                    J. Fischman

2    job for a full year with me supporting him and

3    providing legal advice to 22 or 23 different

4    companies while he could settle into the position

5    and get a full understanding of the scope of the

6    position before terminating me because terminating

7    me would leave a huge void in the department if he

8    had done it earlier.

9         Q.    And you think those factors that you

10   just described changed over the last six months,

11   let's say, of your work at MCHA?

12        A.    Yeah.  He was in the position longer.

13        Q.    And you said that you were performing

14   well earlier; right?

15        A.    Yes.

16        Q.    And throughout the period after you

17   were moved into the assistant general counsel

18   position after having been the acting general

19   counsel position, in your view, your performance

20   was good; correct?

21        A.    Yes.

22        Q.    And then came the Genomatica episode

23   where Mr. Oliva thought your performance was not

24   good; correct?

25                  MR. BERMAN:  Object to form.

1                    J. Fischman

2         A.    I had no idea that he felt my

3    performance was not good.

4         Q.    Do you think he perceived that you

5    made a mistake in connection with the Genomatica

6    episode?

7         A.    I think he understands that I made a

8    miscommunication and I did make a mistake and I

9    fully admitted to that mistake of not

10   communicating with a lower level window person at

11   MCHJ but that I had the full authority from Nick

12   to make the offer of settlement.  So what I think

13   is he used a miscommunication as a basis for

14   termination but not an ethical breach.

15        Q.    So you think, let me ask you, do you

16   think that Mr. Oliva misperceived what really

17   happened in the Genomatica settlement

18   negotiations?

19        A.    No.  I don't think he misperceived

20   anything.  I think he knows exactly what happens

21   because he was part of all of it.

22        Q.    You said you had made a

23   miscommunication; right?

24        A.    Yes.

25        Q.    Do you think that he didn't understand

```
 1              J. Fischman
 2  what you had communicated?  Do you think he
 3  unfairly perceived what you did with respect to
 4  this miscommunication?
 5       A.    I don't think he unfairly perceived
 6  anything.  I think he was trying to use what was
 7  effectively a misunderstanding and a
 8  miscommunication as something bigger than it was.
 9  So that he could use it as a basis for termination
10  because what we really had at its base was just a
11  failure to communicate with a low level person in
12  the legal department at MCHJ, not a failure of
13  authority of which we had plenary to settle a
14  litigation.
15       Q.    There was a failure to communicate.
16            Did you think that Mr. Oliva blamed
17  you for that?
18       A.    We know that he did ultimately yeah,
19  because I apologized for it I and took full
20  responsibility for it.
21       Q.    Did you perceive that -- withdrawn.
22            Could I hear back the last question
23  and answer?
24            (Record read.)
25       Q.    Do you think it was wrong to fire you
```

```
 1                    J. Fischman
 2   on that basis?
 3        A.    Yes, a hundred percent, mm-hmm.
 4        Q.    Do you think you were fired on that
 5   basis?
 6        A.    No.
 7        Q.    Why not?
 8        A.    I think that I was fired because I was
 9   retaliated against for all the things I had
10   complained about that year starting with going all
11   the way back to complaining about not being given
12   the acting general counsel.  Then complaining that
13   they weren't removing the acting back again in
14   August of 2015.  Then complaining when I was
15   demoted that they put a man who had less
16   experience and less qualifications in the position
17   and complaining that a man had replaced me.
18              Then complaining about Amber Todd and
19   Dan Todd and the mistreatment and discrimination
20   against her.
21              Then complaining about the
22   discrimination against Anne Riley and the way that
23   investigation was handled.
24              So I believe that I was terminated for
25   retaliatory reasons based on my gender that was a
```

```
 1                    J. Fischman
 2  long line of discrimination.
 3      Q.    So you were retaliated against for
 4  making a lot of complaints against the company; is
 5  that right?
 6      A.    Yes.  I was retaliated and
 7  discriminated against for making complaints about
 8  discrimination at our company.
 9      Q.    Who did you talk to about being
10  terminated?
11            MR. BERMAN:  Object to form.
12      A.    What does that mean?
13      Q.    Other than counsel.
14            In the immediate wake of your
15  termination, who did you talk to about those
16  events other than counsel?
17      A.    Family and friends I am sure and
18  obviously Department of State because I had to
19  file unemployment.
20      Q.    What did you say to your friends about
21  the termination?
22      A.    I told them that I was terminated.
23      Q.    Did you tell them what the basis of
24  the termination was?
25      A.    Yes.
```

```
 1                    J. Fischman
 2       Q.    What did you say?
 3       A.    I said that Mitsubishi terminated me
 4  because I am a woman in retaliation for my
 5  complaints about discrimination in the company and
 6  that they came up with a pretextual reason based
 7  on miscommunication between me and Japanese legal
 8  department.
 9       Q.    And then you filed a complaint with
10  the EEOC?
11       A.    In May of 2017.
12            MR. FORTINSKY:  Can we mark as Exhibit
13       24 a copy of that EEOC complaint which was
14       previously identified as 326.
15            (Fischman Exhibit 24, a copy of the
16       EEOC complaint Bates stamped Fischman 326
17       through 328, marked for identification, as
18       of this date.)
19       Q.    Is this document Exhibit 24 the EEOC
20  complaint that you filed?
21       A.    Yes.
22       Q.    More formally labeled Charge of
23  Discrimination; is that right?
24       A.    It is.
25       Q.    What employer did you name in this
```

1                      J. Fischman

2    complaint?  Who did you identify as your employer

3    in this complaint?

4         A.    In this complaint I named MCHA.

5         Q.    Do you see that there is room beneath

6    where you put the name and address of MCHA for

7    another employer to be listed, another name and

8    address that you listed?

9         A.    Looks like that's for labor

10   organization employment agency or apprenticeship

11   committee.

12        Q.    It allows you to name whatever agency

13   you are complaining against, but my question is

14   you see there is a second blank beneath the part

15   where it asks you for the name of the employer; is

16   that right?

17        A.    Yes, but I didn't fill this.  You know

18   I didn't fill this form out with my typewriter,

19   right.

20        Q.    Who filled it out?

21        A.    My counsel at the time which is a

22   different counsel than is sitting here.

23        Q.    And that was at your direction; right?

24              MR. BERMAN:  Object to form.

25        A.    I never filled out a charge of

```
 1                   J. Fischman
 2    discrimination.  So he asked me questions over the
 3    phone and yeah, and he filled it out.
 4         Q.    Turning your attention to the third
 5    page of this exhibit, do you see your signature on
 6    this page?
 7         A.    I do.
 8         Q.    Did you read the document before you
 9    signed it?
10         A.    I did.
11         Q.    And you didn't object that the counsel
12    had failed to put in MCHC as one of your
13    employers; did you?
14              MR. BERMAN:  Object to form and I will
15         counsel the witness not to reveal any
16         privileged communications with her counsel.
17         A.    You will have to read back the
18    question please.
19              (Record read.)
20              MR. BERMAN:  Object to form.
21         A.    We put down MCHA because I knew that
22    MCHC would learn about this complaint as they knew
23    about every major claim against the company.
24         Q.    Did you mention MCHC anywhere in the
25    body of the complaint?
```

```
 1                    J. Fischman

 2         A.    I do talk about Japan throughout the

 3   complaint.

 4         Q.    But you don't mention MCHC, do you?

 5         A.    I mention Japanese executives and

 6   throughout the complaint.

 7         Q.    You don't mention MCHC, do you?

 8         A.    Not in this two-page document I do

 9   not.

10         Q.    Did you at this time at the time that

11   this charge of discrimination was filed, did you

12   perceive that MCHC was your employer?

13         A.    I believe that both MCHC and MCHA were

14   a unified unit where most of the direction and

15   control had been by the parent company of this a

16   hundred percent wholly owned subsidiary.  While my

17   paycheck in the State of New York came from MCHA

18   who was writing the paycheck, I knew that MCHC

19   controlled the operations.

20   MO            MR. FORTINSKY:  Move to strike as not

21         responsive.

22         Q.    At the time that you signed this

23   complaint, did you perceive that MCHC was your

24   employer?

25         A.    I think I said yes, I did.  I believed
```

1                         J. Fischman

2      it all my years.

3           Q.      Then why if you perceived that did you

4      not insist that MCHC be listed in the second blank

5      where the employer's name is supposed to appear?

6                 MR. BERMAN:   Object to form.

7           A.      As I said, I never filled one of these

8      out so I just didn't write it in.

9           Q.      Had you ever seen an EEOC complaint of

10     any type before signing this one?

11          A.      I think I received copies of them over

12     the years.   No.

13                 An actual complaint yeah, maybe a few

14     times over the years.

15          Q.      And you were functioning as an

16     employment lawyer with MCHA; correct?

17          A.      I wasn't functioning as an employment

18     lawyer.   I never held myself out as an employment

19     lawyer.   I was a generalist.   So I was as much an

20     employment lawyer as any trust lawyer, as a

21     contracts lawyer, as an environmental lawyer, as

22     an IP lawyer.   I had experience in it and I had

23     more experience than other people in the

24     department.   So as employee matters came up I was

25     primarily responsible for them especially for the

```
 1                    J. Fischman
 2    businesses I supported.
 3          Q.    Did you read this EEOC complaint
 4    carefully before you signed it?
 5          A.    I am sure I did.
 6          Q.    You signed it under penalty of
 7    perjury; right?
 8          A.    I am sure I did.
 9          Q.    And you signed it before a notary;
10    right?
11          A.    Yes, I did.
12          Q.    Was there ever a time -- withdrawn.
13                When employees brought EEOC complaints
14    against MCHA or even its affiliates, did you have
15    any role in handling those complaints?
16          A.    Once we were at the point where
17    someone had filed a claim of discrimination with
18    the EEOC we frequently would hire outside
19    employment counsel.
20          Q.    And would you be involved in hiring
21    that outside counsel?
22          A.    Occasionally.
23          Q.    So you have had experience in dealing
24    with EEOC complaints at least to the extent of
25    reviewing and reaching out to hire counsel to
```

```
 1                    J. Fischman
 2  assist you; is that right?
 3       A.    I would say over my tenure at
 4  Mitsubishi I maybe saw one or two EEOC complaints.
 5  I wouldn't say that I saw even a handful.  I
 6  wouldn't say I was very familiar with them, no.
 7       Q.    What did you do with respect to those
 8  one or two complaints?
 9       A.    I would say that I probably hired
10  outside counsel to manage the case.
11       Q.    Anything else?
12       A.    No.
13       Q.    Moving to another subject.
14       A.    Okay.
15       Q.    What actions by the defendants did you
16  regard as discriminatory?
17       A.    I think I just enumerated them.
18       Q.    I know it's come up in different
19  context, but I am asking you for kind of an
20  overview of what actions did you regard as
21  discriminatory?
22       A.    I think I put all those actions
23  enumerated in great detail in my complaint.
24            Would you like me to go back and read
25  my complaint into the record?
```

```
 1                    J. Fischman
 2        Q.    No.
 3              Just from your own knowledge and your
 4   own belief, in what ways do you believe you were
 5   discriminated against?
 6        A.    Okay.  I believe I was discriminated
 7   against, as we have established, at the time when
 8   I was not made the full general counsel.
 9              I believe I was discriminated against
10   when I was asked, when I asked again to be
11   promoted to the full general counsel and I was
12   not.
13              I believe I was discriminated against
14   when I was demoted for pretextual nonsensical
15   reasons.
16              I believe I was discriminated against
17   when the company, when MCHC approved the hiring of
18   Nick Oliva who had less experience, less current
19   business knowledge of the Mitsubishi company
20   businesses, had gone to a lesser law school.  Had
21   not worked in the national law firm.  Had ten
22   years less or eight years less experience than I
23   had and was given the full general counsel
24   position without any trial or acting role.
25              I believe I was discriminated against
```

1                    J. Fischman

2    and retaliated against after raising the issue

3    about Amber Todd's discrimination and then being

4    told in my review within just a month later that I

5    needed improvement in my communication.

6             I believe I was discriminated against

7    and retaliated against when I complained about

8    discrimination in the investigation of Anne

9    Riley's and some other women's complaints about

10   vice-president in the Pharma company and I

11   suggested that we handle it a different way and

12   that what we were doing was discriminatory and

13   that Nick only wanted me to interview the women

14   and then he was going to handle the man.  I felt

15   that entire investigation was a farce and I

16   complained to him about it and I was retaliated

17   against.

18            I believe I was discriminated against

19   on November, early November when a decision in

20   Japan was made that I as lead counsel would not be

21   attending the settlement conference that consisted

22   of a male judge, a male opposing counsel, a male

23   client and a male outside counsel at the ENE on

24   November 16, 2016.  I complained to Nick Oliva

25   that moment as he stood in my office and said this

```
 1                    J. Fischman
 2   culture is so misogynistic.  Of course they chose
 3   you over me and I believe I was retaliated against
 4   and terminated under a pretextual context.
 5        Q.    We have talked about a lot of those
 6   issues already in the course of today and the last
 7   time too.
 8             Are there any facts that you have that
 9   support those statements that you have not already
10   put on the record?
11        A.    I think we put them all on the record
12   or we've disclosed them to defendants and they can
13   chose to put them on the record or not.  Perhaps
14   they'll come on to the record when the defendants
15   are deposed.
16        Q.    What do you mean when you say disclose
17   them to defendants?
18        A.    We did a supplemental document
19   production on Friday and there are some
20   documentation in there that support my testimony.
21        Q.    And you said something about the last
22   part something about what other witnesses deposed.
23             What did you mean by that?
24        A.    Perhaps other documents will be
25   brought up.  I have no idea what is going to come
```

1                    J. Fischman

2   up in these depositions.

3        Q.    But I am asking about any facts that

4   you have not facts that other lawyers have that I

5   ask you about or ask other people about.

6             I am asking you about other facts that

7   you have that support your allegations of

8   discrimination.

9        A.    Those are the facts that I have.

10       Q.    And you mentioned retaliation in the

11  course of your answer.

12            I assume, but please correct me, that

13  those answers include the facts that support any

14  claim of retaliation as well as discrimination; is

15  that right?

16            MR. BERMAN:  Object to form.

17       A.    Yes.  The facts that we have are in

18  evidence, produced or came out during the course

19  of today's testimony or the first day of

20  testimony.

21       Q.    When did you first consider filing a

22  lawsuit against MCHA or any of its affiliates?

23       A.    As Pat was watching me pack my purse

24  on January 30, 2017.

25       Q.    The day of your termination?

```
 1                    J. Fischman
 2        A.    Oh, yeah.
 3        Q.    Why not sooner?
 4        A.    Because I was the primary bread winner
 5   for my family and I needed the job and the income.
 6        Q.    Do you think good judgment is an
 7   important qualification to serve as general
 8   counsel of a major corporation?
 9        A.    I do.
10        Q.    If you were hiring somebody in that
11   role and you were faced with two candidates, one
12   that you thought had good judgment and the other
13   one didn't, which one would you hire, other things
14   being equal?
15        A.    It would depend on what my basis of
16   that conclusion was.
17        Q.    I don't understand.
18              Other things be equal, the only
19   difference is one candidate has good judgment and
20   the other one doesn't, which one would you hire?
21        A.    I want to hire the one who has good
22   judgment.
23        Q.    What if one candidate had good
24   judgment and the other didn't but the one who
25   didn't went to a better law school, which one
```

1                    J. Fischman

2    would you hire?

3         A.    Maybe I would question what my basis

4    of my decision is.

5         Q.    What do you mean?

6         A.    Maybe I would question what is my

7    basis for one having good judgment and one having

8    not good judgment.

9         Q.    I am taking it as a given that you

10   know these candidates and one of them you

11   concluded has good judgment and the other you

12   concluded does not and you said quite sensibly

13   that of course you would hire, you didn't say of

14   course, but you said you would hire the candidate

15   that has good judgment.

16              And I am asking you would that still

17   be true even though the candidate that didn't have

18   good judgment went to a better law school?

19         A.    It is entirely possible that I would

20   hire the person with good judgment over the person

21   who went to a better law school but I would also

22   question.  It is not such a simple answer.  It is

23   not such a simple yes or no question.  There is

24   more involved.  Judgment is -- there is many

25   factors not just good judgment, bad judgment and

```
 1                    J. Fischman
 2    what is my basis for my good judgment, bad
 3    judgment.
 4         Q.    You told me without qualification that
 5    you would, other things being equal, choose the
 6    candidate with good judgment over the candidate
 7    with not so good judgment.  You were not able to
 8    give me a clear answer that you would do the same
 9    if the other candidate went to a better law
10    school.
11              Did I understand that right?
12         A.    No.  I guess you hire the person with
13    good judgment.
14         Q.    What if the candidate with good
15    judgment, what if there were two candidates, one
16    had good judgment and the other one didn't have
17    good judgment but had a couple years more
18    experience plus went to a better law school, which
19    one would you hire?
20         A.    These hypotheticals are so interesting
21    because you are trying to lead me down a path of
22    saying oh, law school, experience.  None of that
23    matters because you are always going to hire the
24    person with good judgment and I can't answer these
25    hypotheticals in the way that you are posing them
```

```
 1                    J. Fischman
 2   because they are being posed in a vacuum.  Ask me
 3   about what my experience is but I am sorry, I
 4   can't answer those questions.  They are too --
 5   they are too -- they are in a vacuum.
 6         Q.    You have asserted certain claims
 7   against my client.
 8         A.    Yes.
 9         Q.    And those claims include certain
10   theories of liability and responsibility as
11   complaints do.  You are a lawyer and you
12   understand that.  In a deposition I naturally on
13   behalf of my client want to understand what your
14   position is.  Sure, part of it we try to
15   understand the facts, but we are also trying to
16   understand what your position is.  What your
17   theory is.  What your view of the world is to see
18   if it supports the allegations you are making.  So
19   that's why I am asking.  I am not trying to trap
20   you.  These are not really hypotheticals although
21   we can debate what the word means.  I am trying to
22   understand what your position is and that's why I
23   am asking the question.
24         A.    I think my position is is that if I am
25   a Japanese executive sitting in MCHC with all my
```

```
 1                    J. Fischman
 2    other male Japanese executives, it does seem like
 3    the woman doesn't have as good judgment as the guy
 4    that we like to have a beer with and go to a
 5    baseball game with and it does seem like the women
 6    as stated in Sakaguchi's e-mail are just too
 7    emotional.  Calm down women as we have seen with
 8    the Japanese olympic committee head doesn't like
 9    to have women on the olympic committee because
10    they talk too much in meetings.
11              You got to understand the context in
12    which we are all sitting here is that you can't
13    objectively say one person has good judgment and
14    one person has bad judgment because it depends on
15    who is asking the question; right.  And so I had
16    good judgment in every one of my years of working
17    at Mitsubishi.  Every single one of them.  I had
18    performance review after performance review.  I
19    was -- why was I responsible for 23 companies
20    because I had good judgment.  Because I gave good
21    advice.  Because I was able to manage multiple
22    different kinds of matters from antitrust to
23    environmental, to IP, to contracts, to litigation,
24    to multi-million dollar contracts all juggling
25    that at the same time with my good judgment.
```

```
 1                    J. Fischman
 2              So now you are saying in a
 3     hypothetical that should we hire someone who
 4     doesn't have good judgment who has more
 5     experience.  How did that person get all of that
 6     experience without their good judgment?  I say to
 7     you that person who had all that great experience,
 8     business knowledge, time invested probably had
 9     pretty good judgment and maybe was picked apart
10     because of her gender because she didn't fit into
11     the mold of the executives that they had seen
12     before.  So that's the basis for my claim.
13         Q.    I understand your position.  I want to
14     go back and ask about retaliation a little
15     further.
16              What is the basis for saying you were
17     retaliated against as opposed to the events that
18     happened taking place for sort of good and
19     legitimate reason on their own?
20              MR. BERMAN:  Object to form.
21         A.    Specifically, for one example the
22     whole Amber Todd claim of early March 2016 where I
23     had discussed that I felt that the company MCHC
24     was discriminating begins Ms. Todd on the basis of
25     her gender because they had treated her husband
```

```
 1                    J. Fischman
 2   completely differently than they had treated her
 3   and when I raised this to my boss and supervisor
 4   he got very angry with me, very angry and that I
 5   felt at that moment I am going to be retaliated
 6   against this because I spoke up, okay.  Within the
 7   month I suddenly have a negative needs improvement
 8   on my communication on my performance review which
 9   if you know the fiscal year ends March 30th, March
10   31st.  So specifically with that I felt I was
11   going to be retaliated against and then for the
12   whole Anne Riley situation again, I questioned the
13   way it was being handled.  It was a sexual
14   harassment claim.  I questioned the way it was
15   being handled and I felt that I was going to be
16   retaliated against for questioning how this man
17   was going to handle this claim against another man
18   and sure enough just a few months later not even,
19   a few weeks later.  No, it was a few months
20   because you corrected that it was the end of
21   August or something.  I thought it was October.
22        Q.    I want to ask now about the equal pay
23   claim you have made.
24              What's the basis for saying that,
25   what's the basis for the equal pay violation?
```

1                    J. Fischman

2          A.    I heard he was making more than me.

3          Q.    If it turns out he was not making more

4     than you, than you would not have a claim;

5     correct?

6                MR. BERMAN:  Object to form.

7          A.    I think that he was treated in a way

8     that -- I can't make a legal conclusion about that

9     at this time.  We have asked for the documentation

10    from defense on his salary, his benefits and all

11    of the information on his personal file and we

12    received none of that, to my knowledge.  When you

13    produce that I guess that's when the companies or

14    the parties will get together and have a

15    discussion about that.

16         Q.    But sitting here today, you don't have

17    any facts to support that claim, do you?

18                MR. BERMAN:  Object to form.

19         A.    I just said that I have heard that he

20    was making more than me and I know also that he

21    had the car and that they had the parking and that

22    he had other perks and benefits.

23         Q.    Is there any other basis for your

24    equal pay claim -- in other words -- withdrawn.

25                Other than the comparison between you

```
 1                    J. Fischman
 2    and Mr. Oliva, is there any other basis for your
 3    equal pay claim?
 4          A.    I can't say for sure.
 5          Q.    You are not saying, for example, that
 6    you made less than other assistant general
 7    counsels, are you?
 8          A.    Than other assistant general counsels
 9    no, I am not saying that.
10                MR. FORTINSKY:  Could we take a five
11          minute break.
12                THE VIDEOGRAPHER:  We are now going
13          off the record.  The time is 3:29.
14                (Recess taken.)
15                THE VIDEOGRAPHER:  We are back on the
16          record at 3:47.
17    BY MR. FORTINSKY:
18          Q.    I want to clarify something we talked
19    about before the break Ms. Fischman.  We were
20    talking about your retaliation claim and I want to
21    make sure that I have distinct from the
22    discrimination discussion we had, a clear account
23    of what adverse job actions you allege were taken
24    by any of the defendants that constitute
25    retaliation.
```

```
 1                    J. Fischman
 2              Could you tell me that?
 3         A.    Yes, and let me clarify that I believe
 4    also that there are other facts and other
 5    explanations of incidents that occurred that I was
 6    asked about by Ms. Colwin that I didn't fully
 7    explain.  So maybe not every single detail has
 8    been enumerated during the course of this
 9    testimony, but it is actually in the complaint and
10    in documentation that we provided.  So going back
11    to --
12         Q.    And I am sorry, just pausing on that.
13              You are referring to the allegations
14    of discrimination when you said that just now?
15         A.    Yes, allegations of discrimination,
16    yes.
17         Q.    Just in the interest of clarity, are
18    there facts that support the discrimination that
19    we did not cover and that you think you did not
20    get the chance to cover that would also constitute
21    acts of discrimination?
22         A.    Yes.  I mean I believe that there were
23    other incidents.  For example, my demotion which
24    was based on pretextual and completely fabricated
25    mid-year review in 2015 and I believe that there
```

```
 1                    J. Fischman
 2    were other incidents that we have discussed at
 3    some different points during the course of today
 4    and our first meeting where I tried to explain the
 5    situation and may have been cut off in my
 6    explanation.
 7         Q.    But are there facts that you felt you
 8    didn't get to put on the record because you got
 9    cut off that we have not already covered that you
10    think constitute evidence of discrimination?
11         A.    There very well may be but I can't be
12    responsible to remember ever single thing that was
13    or was not said in the last ten hours of my
14    testimony.
15         Q.    I am not asking you to recall what you
16    intended to say at some particular time.  I am
17    just asking whether there are things that are not
18    on the record of the deposition last time or this
19    time, that are evidence in your mind of
20    discrimination that you haven't put on the record
21    yet?
22         A.    We haven't -- there are a few things
23    that we haven't discussed that were in the
24    complaint.
25         Q.    Like what constitutes acts of
```

1                     J. Fischman

2    discrimination?  I realize there are other things

3    in the complaint.  Not every paragraph constitutes

4    an allegation that there was discrimination, but

5    what other acts of discrimination did you believe

6    you have not yet put on the record?

7         A.    I would have to go through the

8    complaint and make sure that we touched upon every

9    allegation of discrimination that I made in the

10   complaint and see if one of you have asked me

11   about it yet.

12        Q.    Please go ahead.

13        A.    Do you want to go off the record while

14   I review the complaint?

15        Q.    That's fine.

16             Before we go off the record I began to

17   ask you too whether there were adverse employment

18   actions that constitute evidence of retaliation.

19   Remember I said when we started I wanted to get a

20   clear statement of what those were.  So if you are

21   reviewing the complaint you can have that in mind

22   too because that's the next question I am going to

23   ask you.

24             THE VIDEOGRAPHER:  Going off the

25        record.  The time is 3:54.

1                    J. Fischman

2              (Recess taken.)

3              THE VIDEOGRAPHER:  We are back on the

4        record at 4:clock.

5   BY MR. FORTINSKY:

6        Q.    We have just taken a few minute pause

7   to allow you Ms. Fischman to look at the complaint

8   to identify additional facts in response to the

9   question I put on the record.

10             So let me ask you again with the

11   benefit of that, what additional facts that we

12   haven't discussed in the course of your testimony

13   today and the first deposition do you believe

14   support your claims of discrimination?

15        A.    Well, I think the easiest way for me

16   to go through that would be to go through the

17   paragraphs of the complaint where I enumerate the

18   claims of discrimination.  So I can read the

19   complaint into the record if you would like or I

20   can just give you the paragraphs that I believe

21   are relevant.

22        Q.    I don't think it is necessary to read

23   it into the record.  You can make reference to

24   paragraphs, that's fine.

25        A.    On paragraph 51 of the first amended

```
 1                    J. Fischman
 2    complaint.
 3         Q.    This is the document we marked earlier
 4    as Exhibit 17?
 5         A.    17.
 6         Q.    Okay.
 7         A.    On paragraph -- and the subsequent
 8    paragraphs 52 through 54 are my facts about
 9    discrimination.
10                Evidence of the facts of
11    discrimination in 56.
12                Evidence of discrimination in 58.
13                Evidence of discrimination in 59, 60,
14    61, 62, 63, 64, 66.
15                Evidence of retaliation 68, 69, 70.
16         Q.    This is retaliation you are referring
17    to 69 and 70?
18         A.    Evidence of discrimination.
19         Q.    I'm sorry.  It has to be verbal.
20                So your answer is yes?
21         A.    Did you ask a question?
22         Q.    My question is referring to 69 and 70
23    you are enumerating additional examples of
24    retaliation?
25         A.    Yes.  71 is evidence of
```

```
 1                    J. Fischman
 2   discrimination.
 3              72 evidence of discrimination.
 4              Evidence of retaliation 76, 77.
 5              78 is evidence of discrimination.
 6              Evidence of discrimination in 79.
 7              Evidence of retaliation in 80.
 8              And evidence of discrimination and a
 9   pretextual basis of discrimination in 83.
10              Evidence of retaliation 84, 85 and 86.
11        Q.    Also retaliation?
12        A.    Yeah.
13              88 retaliation.
14              89, 90, 91, 92 retaliation.
15              I am sorry.  Let me correct that.
16              92 is evidence of discrimination.
17              94 discrimination.
18        Q.    Anything else?
19        A.    Well, and any of the facts that are
20   related to any of those paragraphs that we've
21   discussed or may discuss or could discuss.
22        Q.    What is it that we may discuss or
23   could discuss that we haven't already discussed
24   that would relate to those paragraphs?
25        A.    Neither you nor Ms. Colwin have asked
```

1                    J. Fischman
2    me detailed information about many of those
3    claims.  So they are taken as facts right here.
4         Q.    We will get to some of those.
5    Switching topics.
6         A.    That wasn't really meant to be an
7    invitation for more questions frankly.  It has
8    been a long day already.
9         Q.    Switching topics.
10                Do you know what the Qualicaps Group
11   is?
12        A.    Yes.
13        Q.    What is it?
14        A.    It is a group of companies that makes
15   pharmaceutical capsules.
16        Q.    And Technophar?
17        A.    A Canadian company that was part of
18   that group.
19        Q.    What is its relationship to the MCHA
20   legal department?
21        A.    Provide legal services.
22        Q.    Are they affiliates of MCHA?
23        A.    I suppose so, yeah.
24        Q.    Do you recognize the names Victor and
25   Corrina Calin, C-A-L-I-N?

```
 1                    J. Fischman
 2        A.    Yeah.
 3        Q.    Who are they?
 4        A.    My recollection is that they are the
 5   president or owner.  Victor was I think the
 6   president of Qualicaps.
 7              No.  I mean Technophar.
 8        Q.    And Corinna Calin?
 9        A.    I can't recall what her role was.
10        Q.    Do you know who Ciro Ahumada is?
11        A.    Yes.
12        Q.    Who is he?
13        A.    He was an executive at the Spanish
14   affiliate of Qualicaps.
15        Q.    He was the CEO if I am not mistaken;
16   is that right?
17        A.    If you have him as the CEO, then he
18   was the CEO.
19        Q.    Was he -- did you provide legal advice
20   in connection with the severance negotiations of
21   Victor and Corinna Calin?
22        A.    I probably did.
23        Q.    And who was your client contact with
24   respect to those discussions?
25        A.    Why don't you tell me who the client
```

```
 1                    J. Fischman
 2   contact was?
 3         Q.    Was it Mr. Ahumada?
 4         A.    Perhaps it was.
 5         Q.    Is that your recollection?  Is that
 6   your best recollection?
 7         A.    Yes.
 8         Q.    Did you work with outside counsel on
 9   those negotiations?
10         A.    Yes.
11         Q.    What firm was that?
12         A.    Would have been a Canadian lawyer, law
13   firm.
14         Q.    At one point did you provide a
15   proposal concerning the severance package for
16   outside counsel to give to Mr. Calin's counsel?
17         A.    I may have.
18         Q.    Do you remember that?
19         A.    I remember working on Victor's
20   termination because Victor was very, was a very
21   hostile and difficult manager and there were many
22   complaints about his hostility towards employees
23   and his inappropriate behavior and conduct and I
24   believe we worked with Canadian counsel on how to
25   sever the relationship.  He also had been I think
```

```
 1                    J. Fischman
 2   the founder of Technophar.  So they had been
 3   purchased by Qualicaps at some point in time and I
 4   worked with Canadian counsel to make sure that we
 5   did not run afoul of Canadian law with respect to
 6   terminations and severance and obligations under
 7   Canadian law which would be very different than
 8   under US law.
 9        Q.    What do you remember about the
10   severance negotiations?
11        A.    I believe my memory could be best
12   refreshed with some documentation about the
13   severance negotiation.
14        Q.    But sitting here right now based on
15   what is in your head, what do you remember?
16        A.    I remember he got a severance package.
17        Q.    Do you remember that you gave a
18   proposal, a severance proposal to outside counsel
19   to transmit that was, consisted of a lump sum plus
20   a continuance of salary?
21        A.    Possibly.
22        Q.    That's what happened; right?
23        A.    I can't recall.
24              MR. BERMAN:  Object to form.
25        Q.    That severance proposal, was that
```

```
 1                    J. Fischman
 2   authorized by anybody?
 3        A.    I am certain it would have been since
 4   I would have not had authority to offer that
 5   severance package.
 6        Q.    Who would you have gotten authority
 7   from?
 8        A.    I would have gotten authority from
 9   whoever was in charge of paying that.
10        Q.    You would have gotten authority from
11   essentially your client contact at the client;
12   right?
13        A.    Yes and/or at the time Donna was
14   working very closely with Qualicaps and Ciro was
15   very, very was working on that and perhaps I spoke
16   with her.  I don't recall.  I would have to go
17   through all the documentation and the e-mails
18   between me and everybody else involved in that.
19        Q.    Do you remember Mr. Ahumada ever
20   authorizing you to make the severance proposal
21   that I just described?
22        A.    I have no recollection that he did not
23   authorize me for that severance package.
24        Q.    You have no recollection one way or
25   the other?
```

```
 1                    J. Fischman
 2        A.    That's right.
 3        Q.    And if he were to testify that he
 4   authorized you to provide a severance proposal
 5   with either two lump sums or a continuance of
 6   salary, would you have a basis to say that was not
 7   so?
 8        A.    I don't have a basis because I don't
 9   have the documentation in front of me to refresh
10   my recollection.
11        Q.    So sitting here right now you have no
12   recollection one way or the other?
13        A.    No.
14        Q.    Do you believe you have been injured
15   at all by the defendant's conduct alleged in the
16   complaint?
17              MR. BERMAN:  Object to form.
18        A.    Yes.
19        Q.    How so?
20        A.    I have lost my 20 years career in law.
21   I was unable after a year of searching for a job
22   to get another comparable position.
23              I was damaged emotionally.
24        Q.    Anything else?
25        A.    I was damaged emotionally and
```

```
 1                    J. Fischman
 2    mentally, physically.  I was destroyed by their
 3    conduct.
 4         Q.    What's the difference between damaged
 5    emotionally and damaged mentally?
 6         A.    I don't know.
 7         Q.    The same idea; right?
 8         A.    The same idea.  Just being over
 9    inclusive because it was very painful and it
10    continues to be extremely painful.
11         Q.    Putting aside for the moment the
12    emotional and mental that you just referred to,
13    you said you were damaged physically.
14              How were you damaged physically?
15         A.    Physically I lost interest in the
16    enjoyment of life and was like couldn't get out of
17    bed every day.  Had to fight to get out of bed.
18    Physically had stopped eating.  Physically just
19    really hurt.  So it is wrapped into the emotional
20    and mental distress.
21         Q.    For my purposes today I will divide
22    between the economic side and then group together
23    the emotional, mental, physical all --
24         A.    Sure.
25              Oh, I did have one physical ailment
```

1                    J. Fischman

2    that lasted for about four years.

3         Q.    What was that?

4         A.    The stress of all of this brought on

5    this really weird like itching that started right

6    around this time of 2015 I think and it lasted for

7    about four and a half years and it was like this

8    horrible itching from the stress.  That was a

9    physical.

10        Q.    And that's gone now?

11        A.    Yes.  Through a lot of stress

12   reduction and different doctors and medicines,

13   yeah.

14        Q.    I am glad it's gone.  You have --

15   sorry.  Let's focus on the damages that you say

16   you've experienced because you were unable to get

17   a job.

18             Can you explain and quantify what

19   those damages or injuries were?

20        A.    I think it is not, it wasn't just the

21   first injury of being terminated.  It was also the

22   injury of being terminated in such a, like an

23   incredibly nasty, vicious manner after I had

24   devoted so many years of good work to a company

25   and to people that I believed were colleagues and

```
 1                    J. Fischman
 2    friends and it was very vicious which made it even
 3    harder, but not only did they terminate me and not
 4    provide any severance or notice.  As I mentioned,
 5    I was the primary bread winner in my family and
 6    had been.
 7              They denied my unemployment insurance
 8    forcing me to hire counsel to fight that.  That
 9    was 20 grand to get 11.  Doesn't sound like a
10    great idea and in fact, most lawyers wouldn't take
11    it for free as is really the law in New York.  So
12    my employment counsel previous to these agreed to
13    help me with that.
14              I'd worked for nine years at a company
15    or eight years, whatever it was, since 2008 at a
16    company with increasing levels of responsibility
17    and yet when I was fired I had no one that I could
18    ask for a letter of reference from because I knew
19    that the company was because they had fired me for
20    cause pretextually that I knew from my prior
21    experience as a lawyer in the company that anybody
22    I had asked would ask permission from Nick or from
23    Donna for whether or not it would be okay if they
24    gave a reference.
25              So let me give an example of that, if
```

1              J. Fischman

2    you don't mind.  Mike Grapmans (phonetic), that I

3    had worked with him since my, for my entire time

4    that I had been at the company I worked with him.

5    When his company was very small, only a handful of

6    people to many years of supporting his business as

7    it grew and I supported him through two

8    acquisitions and I did almost all of his legal

9    work.  I had a very good relationship with him but

10   I knew from another experience when somebody else

11   was terminated in the company Larry Smith, at

12   another affiliate company that Mike was friendly

13   with, that Mike had asked Donna if it would be all

14   right for Mike to give Larry a letter of reference

15   and my recollection at that time, because I was

16   involved in the discussions, was that it was not a

17   good idea.  You can confirm that you knew him.

18   You can confirm that you worked with him.  You can

19   confirm that he worked here a certain amount of

20   dates, but it would be better if you didn't give

21   him an open-ended letter or act as a reference for

22   him which I recall Larry complaining to me that

23   that was very hard on him.  He had left and had a

24   severance package and was given outsourcing

25   support when he was terminated.

1                        J. Fischman

2                  So I knew that there was no one I

3       could go to at the company after this very vicious

4       termination and in fact, within a few months that

5       was confirmed when my unemployment insurance was

6       denied that I knew that there was no one I could

7       have spoken to at that company nor -- because they

8       were gearing up for litigation and as we know they

9       expected this, right.  We know that on February 1,

10      2017 Donna wrote to Ken Fujiwara Jennifer is going

11      to hire counsel.  We are ready.  We know.  The

12      company knew.  Not a surprise.  Not that I wanted

13      to.  That's why I asked for a package when I left.

14      Been there long time.

15                  So it is very hard to go and ask for a

16      job.  It is hard to interview for a job without

17      anybody being able to speak to anyone at your

18      prior employment where you worked for the last

19      nine years.  I had the general counsel of space

20      and airborne systems from Raytheon as a reference.

21      I had several of my outside counsel that had

22      worked with me over the years at Mitsubishi who

23      acted as references, but no one from the company.

24      And it came up again and again in all of my

25      interviews.  Who can we call at Mitsubishi?  No

1                    J. Fischman
2   one.  No one.  So it became very difficult
3   although I tried.
4            On top of that the company knew that I
5   was registered inhouse counsel.  That I wasn't a
6   member of the New York Bar and that in order to
7   continue to practice law in the State of New York
8   I had to be registered as inhouse counsel in a
9   corporation.  So while for other attorneys maybe
10  they can do low level contract work for Axiom
11  (phonetic) or one of the other contractors that
12  wasn't an option for me.  I needed to be hired by
13  another company.  So I tried.  I looked and I
14  looked and I looked and I applied to no avail for
15  a year and a half.
16           In the meantime, my children need to
17  be fed.  Our house mortgage needs to be paid.  Our
18  insurance, I had no health insurance.  It was cut
19  off on my last day of employment.  So we took a
20  different health insurance from my husband's
21  company.  So I don't claim that as an issue, but
22  it was certainly scary.
23           I didn't get a single offer of
24  employment.  After about three, four months I
25  didn't get a single request for an interview.  I

1                    J. Fischman
2    watched my 18 year, 20-year career that I had
3    struggled for, that I had worked for, that I went
4    to law school at 25.  I moved across the country.
5    I worked as a law clerk to a federal judge who is
6    now on the 9th Circuit.  I worked at Fried Frank,
7    a national law firm.  Tough place.  I worked at
8    Paul Hastings, a national law firm.  Another tough
9    place.  Great lawyers, great training, hard hours.
10   You know how you work your associates at Shearman
11   and Sterling.  You know how it is to be a first
12   and second year and third year and fourth year
13   associate there?  How many hours do they bill?
14   Three thousand?  It's not a question.
15        Q.    I took that as --
16        A.    But you know how it is.  You work and
17   you work and you work and I had worked and they
18   know how hard I worked and in an instant they took
19   it all away.  There was no harm for anybody.  In
20   an instant they took it all away and I looked and
21   I looked and nobody was interested.  And I am 50
22   years old and a I'm a woman who is 20 years out of
23   law school looking for an inhouse position and
24   everyone I interviewed was younger than me and
25   everyone I interviewed had less experience than I

1                    J. Fischman

2   did and they didn't want me.  So in an instant --

3   maybe with a glowing review, maybe with a glowing

4   reference, maybe with -- maybe had I had a job and

5   they said to me Jennifer, things are not really

6   working out here.  We want to take the department

7   in a different direction like they had said to

8   Nathan Gallup in 2011 when Donna terminated him.

9   I am going to give you six months notice.  Find

10  another job with our support.  They didn't give

11  that to me.

12              What did they give Andy Sezar when he

13  was terminated.  We have asked for that

14  information.  Did Andy get notice?  Did he get a

15  severance agreement?  Does he have a reference

16  from the company?  We have asked for that

17  information and they haven't provided us.

18       Q.   I have some questions for you about

19  what you just said.  You started out by saying

20  that the termination was vicious.

21              Why do you say that?

22       A.   Because it was pretextual.  It was

23  made up of, it was made of a small truth, right

24  that I had made a mistake and not sent a

25  communication to a department, a law department in

```
 1                    J. Fischman
 2   Japan but it wasn't the full truth.  The full
 3   truth was that I made an authorized offer of
 4   settlement authorized by the client of MCC.  That
 5   was the full truth, but they took a
 6   miscommunication and grew it into an enormous
 7   issue that it wasn't so that they could terminate
 8   me.  It was vicious.  I worked there for nine
 9   years.  We had just come back from a five day
10   business trip in California where we sat across
11   the table from each other every night, every
12   breakfast, every lunch and he knew he was going to
13   fire me when we returned.  Making pleasantries.
14   Asking me about my family.  It was a lie.  It was
15   vicious.
16        Q.    Did you ever ask anybody for a letter
17   of reference?  Withdrawn.
18             Did you ever ask anybody at MCHA or
19   any of its affiliates for a reference?
20        A.    I did not because I knew based on my
21   experience it would not be done well.  It would
22   not be done.
23        Q.    That was pure speculation on your
24   part; right?
25             MR. BERMAN:  Object to form.
```

1              J. Fischman

2         Q.    Correct?

3         A.    Based on my experience at Mitsubishi

4    that was how it was handled.

5         Q.    But you never asked; right?

6         A.    Who was I going to ask, Nick.  Was I

7    going to ask Donna?  She demoted me based on a

8    completely pretextual and made up fabricated

9    thing.  I should ask these two?

10        Q.    You said you worked for about 20

11   difference clients within, among MCHA chain and

12   affiliates; correct?

13        A.    Yes, and I did not believe that they

14   would have -- I believe they would have known that

15   I was terminated and there was no way they were

16   going to give me a reference.

17        Q.    Was there any negative consequence in

18   asking?

19        A.    There was great humiliation in what I

20   had been going through and I believe that nobody

21   was going to give me a reference.  Believe me I

22   worked so hard, but I knew how the internal

23   spinning goes and there was no way they were going

24   to let anybody give me a letter of reference and

25   really it is not a letter of reference.  You need

```
 1                    J. Fischman
 2   someone who can be called as a recommendation.
 3   Who can talk in depth about my work and that was
 4   these two.
 5        Q.    And you had someone from Raytheon who
 6   was willing to do that for you?
 7        A.    Yes.
 8        Q.    How many people from Raytheon?
 9        A.    Two.
10        Q.    Who were they?
11        A.    Barbara Pollack, who was my, who was
12   the vice-president and general counsel of Space
13   and Airborne Systems and I had Bruce Greenspan who
14   was a director of contracts.  I had -- probably
15   could have asked Irv Grough (phonetic) who I still
16   keep in touch with who is the vice-president of
17   air combat and probably could have asked -- and
18   this was all -- yeah.  I had them on my list of
19   references, but they hadn't worked with me in nine
20   years.
21        Q.    Do you know whether they gave you --
22   do you know whether anybody ever called them?
23        A.    I don't know if anybody ever called
24   them.
25        Q.    Did you provide their names to --
```

```
 1                    J. Fischman
 2        A.    Yes.
 3        Q.    -- to the places you applied?
 4        A.    Yes, I did.
 5        Q.    Do you know whether they actually
 6   would have given you good references?
 7        A.    Yes, I do.
 8        Q.    How do you know?
 9        A.    Because I was still in contact with
10   them.  I still had friendships with them.
11        Q.    How many companies did you apply to?
12        A.    I think over a hundred.
13        Q.    How did you go about looking for a
14   job?
15        A.    I looked when I first was terminated I
16   met with several recruiters.  People I had known
17   in the industry.  People that were friends,
18   family.  People that had placed me in this job.  I
19   had spoken with many of them.  I reached out to
20   Bliss who is a legal seconder.  I spoke with
21   people at Axiom and I did online research for
22   companies for which I had an appropriate
23   background for having come from manufacturing and
24   industrial corporations.
25        Q.    What is Axiom?
```

```
 1                    J. Fischman
 2        A.    They are a temporary lawyer provider,
 3   contract lawyer.  After multiple conversations
 4   with Axiom and Bliss it became clear that I could
 5   not take a temporary position from them because I
 6   needed to be hired by a corporation in order to
 7   practice law in the State of New York.
 8        Q.    Did you ever take the New York Bar?
 9        A.    I did not.
10        Q.    Why not?
11        A.    I had taken the California Bar in 1996
12   and it took three months of extraordinary time,
13   energy and effort and emotional strength to sit
14   for the bar exam and I did not feel that at this
15   time in my life that I had the emotional strength
16   to sit for that bar exam that many people do fail
17   and John F. Kennedy failed it three times.  It was
18   intimidating at that time in my life and I didn't
19   feel that was necessary.
20        Q.    Where were you looking to be hired?
21        A.    I looked in kind of -- I am sorry.  It
22   is very distracting when everybody is asking
23   questions.
24              MS. COLWIN:  I am sorry.
25        A.    That's okay.
```

1                    J. Fischman

2               I looked all up and down the eastern

3    seaboard.  I wanted to stay in the New York

4    Metropolitan area of course because my children

5    are in school here.  My family is here.  I have

6    elderly parents who are here.  I looked New York.

7    I looked in places where I could probably waive in

8    like Florida, Maryland, D.C.  I looked at

9    government contractors in D.C.  Maryland, New

10   Jersey and New York, Connecticut.

11        Q.    Can you waive that in New York?

12        A.    No.  They don't have reciprocity with

13   California.

14        Q.    Were there other companies besides

15   Axiom and Bliss where you couldn't go further in

16   the process because you were not a member of the

17   bar?

18        A.    No.

19        Q.    It was just those two?

20        A.    Because of their business model they

21   are a contract employer.  They loan out attorneys

22   to do contract work like document review and et

23   cetera.  So those weren't full time positions.

24   Those were sort of continue with some income.

25        Q.    So you are a member of the bar in

```
 1                    J. Fischman
 2    California?
 3         A.    Yes.
 4         Q.    You are not a member of the bar in New
 5    York?
 6         A.    Yes, we have established that.
 7         Q.    And your claim is that you --
 8    withdrawn.
 9               You said taking the bar was an
10    emotional investment of time and emotional
11    resources.  I am paraphrasing.
12               But you took the bar in California and
13    I take it you thought it was worth it to do that;
14    right?
15         A.    I had taken the bar in California 20
16    years earlier when I had just graduated law school
17    and didn't have the responsibilities of raising a
18    family or taking care of a family and yes, it was
19    to practice law in California.  I took the
20    California Bar.
21         Q.    Was it worth it?
22         A.    Yes.
23         Q.    Why not do the same in New York?
24         A.    Because the jobs that I wanted in New
25    York would have been to work in a corporation as
```

1                    J. Fischman
2   inhouse counsel which I had been doing for the
3   last 15 years and I did not need the New York Bar
4   to do that.  I needed the New York Bar only to do
5   the temp work that would have kind of supplemented
6   my income until I got a full time position.
7        Q.    You said you had to leave the practice
8   of law because of the separation with MCHA; right?
9        A.    Yes.
10       Q.    So if you had taken the bar in New
11  York that would have opened up a whole range of
12  additional opportunities to practice in New York;
13  correct?
14            MR. BERMAN:  Object to form.
15       A.    Like what?
16       Q.    As you know I am asking the questions.
17       A.    You are doing as good a job as anybody
18  in testifying.
19            So tell me do you think there were
20  other opportunities that I missed.  I think that I
21  applied to the opportunities for which I was
22  qualified for.
23       Q.    My question is:  Do you agree or
24  disagree that taking the New York Bar would have
25  opened up a range of opportunities for a lawyer

```
 1                    J. Fischman
 2    that would otherwise not be available?
 3              MR. BERMAN:  Object to form.
 4         A.    I disagree because I don't believe
 5    that taking the New York Bar would have opened any
 6    additional opportunities for me for which I wasn't
 7    already qualified for.
 8    MO        MR. FORTINSKY:  Move to strike as not
 9         responsive.
10         Q.    I am not asking about you personally.
11    I am asking about the general principle.
12              Do you agree that applying for the New
13    York -- sorry.
14              Would you agree that being a member of
15    the New York Bar opens up a range of possible job
16    opportunities that are otherwise unavailable to a
17    lawyer?
18              MR. BERMAN:  Object to form.
19         A.    What kind of lawyer?
20         Q.    A lawyer generally.
21         A.    I think it depends on what kind of
22    lawyer you are talking about and what kind of
23    practice that person is interested in doing.
24         Q.    Can you practice law in New York State
25    without being admitted to the bar in New York?
```

1                    J. Fischman

2        A.    No.   Except if you are a registered

3    inhouse counsel at a corporation, then you can

4    practice law in the State of New York without

5    being a member of the New York Bar.

6        Q.    And you were registered?

7        A.    Yes.

8        Q.    Who did you register with?

9        A.    The State Bar of New York.

10       Q.    And when did you first register?

11       A.    When I first moved to New York in

12   2008.

13       Q.    Has your registration lapsed since

14   then?

15       A.    You are required by law to send a

16   notice of termination within a certain time period

17   of your termination from the corporation from

18   which you were registered.  So yes.  It is not

19   lapsed.  I had to terminate it.

20       Q.    When did that happen?  When did you

21   terminate it?

22       A.    Sometime after my termination from

23   Mitsubishi.

24       Q.    You said you applied for more than a

25   hundred jobs I think you said; right.

```
 1                    J. Fischman
 2              How many of them did you have
 3    interviews with?
 4        A.    Very few.
 5        Q.    Approximately?
 6        A.    A dozen.
 7        Q.    What companies?
 8        A.    I would have to look at the list to
 9    recall.  I was supposed to have an interview at
10    Amex.
11              I had an interview with CBRE.  I had
12    multiple interviews there.  Maybe had a couple of
13    other phone interviews, but I really didn't get
14    very many interviews.
15        Q.    How far did you get in the process?
16        A.    I may have had an interview at
17    MasterCard.
18        Q.    And then did you advance in the
19    process beyond that, beyond the first interview
20    stage?
21        A.    I would have to go back and see the
22    list of companies to recall.
23        Q.    Were there any companies where you got
24    into a negotiation about salary?
25        A.    No.
```

1                    J. Fischman

2        Q.    Were there any companies where they

3    said they wanted to call your references?

4        A.    Yes.

5        Q.    Which ones?

6        A.    Certainly when I was speaking with

7    Bliss the recruiter and RPN, the recruiters and

8    Elise Abraham, another recruiter.  All of them

9    asked for my list of references because they

10   wanted to preposition me I suppose.

11       Q.    Of the dozen companies that you

12   interviewed with, did any of them ask for your

13   references?

14       A.    Possibly.  I would have to look at the

15   list.  I am not even sure I got interviews with a

16   dozen.

17       Q.    But do you remember any instance in

18   which you were asked to provide an employer after

19   your interview with a list of references to call?

20       A.    I believe that I was asked on a few

21   occasions do you have references.  Who can we call

22   at Mitsubishi?

23       Q.    Who asked you that?

24       A.    I would have to look at the list again

25   to see who they are.

```
 1                    J. Fischman
 2        Q.    Do you have that list?
 3        A.    We have produced the list of all the
 4   places I applied to.
 5        Q.    What about the places you interviewed,
 6   did you produce that?
 7        A.    I am not sure if we had a separate
 8   list.  I don't think it was segregated.
 9   RQ           MR. FORTINSKY:  We would call for the
10           production of that list if it hasn't been --
11        A.    I don't think we have a separate list.
12        Q.    You mentioned just now that you would
13   have to look at the list.  That was the list --
14        A.    No.  The list I am referring to is the
15   list of all the applications that might jog my
16   memory as to where I had interviews.
17        Q.    But --
18        A.    Because there were so few.
19        Q.    As you sit here today, you can't think
20   of any instance, any specific name of a company
21   that asked you for your references?
22        A.    I think MasterCard.
23        Q.    And did you provide the references?
24        A.    I would have, yes.
25        Q.    And did you hear anything further from
```

```
1                    J. Fischman
2    MasterCard after that?
3         A.    Yes.  They were not hiring me.
4         Q.    And I take it that for the others that
5    you interviewed with the result was the same, they
6    didn't hire you, they didn't make you an offer of
7    employment?
8         A.    Correct.
9         Q.    When you went through those
10   interviews, what did you say about your separation
11   from MCHA?
12        A.    I would say things to the effect of
13   there was a new general counsel that came in after
14   I was demoted and that he wanted to take the
15   department in a different direction and that we
16   just -- he just wanted to take it into a different
17   direction so I just left.
18        Q.    Did you think that was, that
19   explanation was an impediment in any way to your
20   getting a job?
21        A.    Yes, I do.
22        Q.    Why?
23        A.    I am a very truthful person and I felt
24   that that was the kind of thing that was a spin on
25   what had happened and I think it is a pretty
```

```
 1                   J. Fischman
 2  obvious spin and I typically I am an overtalker as
 3  you have noticed.  I like to talk to people.  I
 4  like to engage.  I like to have fruitful
 5  conversations, by when you have a one liner on
 6  something it stands out as probably not the full
 7  story.
 8       Q.    Did anybody ask you followup questions
 9  about the story in those interviews?
10       A.    Yes.
11       Q.    What were the questions?
12       A.    Tell me more about that.  Why did you
13  not get along with people or did you, what am I
14  going to say.  Of course I got along with
15  everybody and I did except him.
16       Q.    What else did you say in response to
17  those questions?
18       A.    I tried to keep it always very
19  positive because I wanted to get a job badly.
20       Q.    I now want to show you the amended
21  initial disclosures that you provided in this
22  litigation which I would ask the reporter to mark
23  as Exhibit 25.
24            (Fischman Exhibit 25, the amended
25       initial disclosures, marked for
```

```
 1                    J. Fischman
 2        identification, as of this date.)
 3        Q.    Let me direct your attention to, this
 4   document doesn't have page numbers but the next to
 5   last substantive page has a section C Computation
 6   of Damages on it.
 7                Do you see that?
 8        A.    Yes.
 9        Q.    Then you see it goes on to, it starts
10   with the next page.
11                Do you see that?
12        A.    Yes.
13        Q.    Did you review this document before it
14   was filed?
15                MR. BERMAN:  Object to form.  It
16           wasn't filed.
17        Q.    Did you review this form before it was
18   signed?
19        A.    Yes.
20        Q.    Is there anything in here that -- what
21   was your role in putting together the set of
22   economic damages shown on this page?
23        A.    Which page?
24        Q.    The page that starts, it has on it C
25   Computation of Damages and it says Economic
```

```
 1                    J. Fischman
 2   Damages underneath it?
 3        A.    My contribution would have been
 4   providing all of my -- this is like attorney
 5   client; isn't it?
 6              MR. BERMAN:  Depends on your answer.
 7        You are cautioned not to reveal attorney
 8        client privileges.  Otherwise, you can
 9        answer the question.
10        A.    Can you restate the question please?
11        Q.    What was your role in preparing the
12   damages outlined under economic damages?
13        A.    I don't think I can answer that
14   without revealing attorney-client privileged
15   communications.
16        Q.    If you look at the four bullets that
17   make up the economic damages calculations, do you
18   believe all that to be true?
19        A.    I believed it to be true as of the
20   date of December 2019.
21        Q.    Is there anything that is no longer
22   true now?
23        A.    Well, it's been a longer amount of
24   time.  So the numbers may be different if we start
25   calculating them to today.
```

```
 1                    J. Fischman
 2        Q.    Does this document fairly state the
 3   damages you are claiming in this litigation?
 4              MR. BERMAN:  Object to form.
 5        A.    I think that section C of this
 6   document that you are referring to accurately
 7   states the types of damages that we are seeking in
 8   this lawsuit, if that's what your question is.
 9        Q.    Is there any part of it that is no
10   longer correct?
11        A.    As I said, it was all correct when it
12   was filed on December 24th or was provided to
13   defense counsel on December 24, 2019, but the time
14   frame has shifted forward a year and a half, two
15   years.
16        Q.    But your claims have not changed in
17   litigation; right?
18        A.    That's right.  So I would still being
19   seeking back pay, front pay, benefits which would
20   be offset by mitigation factors.
21        Q.    What do you understand the word
22   mitigation to mean?
23        A.    Mitigation is my obligation to do what
24   I can to lower defendants damages and my efforts
25   in that respect have been great.
```

1                    J. Fischman

2        Q.     What have you done to mitigate

3    damages?

4        A.     I have started a new career after I

5    was unsuccessful at finding work.  Instead of

6    staying home and being unemployed, I realized that

7    there was an opportunity in the real estate

8    business with a lot of connections that I had and

9    crossover strengths from being a lawyer.  As you

10   know, if you are admitted to practice law in New

11   York State you don't even have to take a real

12   estate course to sell real estate in this state.

13   So though I not having been a member of the bar, I

14   did take a course, but found that I had a lot of

15   overlapping skills in this area and connections

16   and tried to make a go of it here.

17       Q.     When did you first start looking for a

18   job as a -- withdrawn.

19              When did you first start pursuing a

20   career in real estate?

21       A.     Towards -- I started working on it in

22   the early, I would say, early summer of 2017.

23   After being unemployed for about five or six

24   months I got scared.  I got really scared that I

25   was never going to practice law again and that I

1                    J. Fischman

2    was so terrified that I wasn't getting any

3    response to any of my applications that I decided

4    to take this real estate course to try and find

5    another way of finding income in the interim.

6          Q.    When did you send out the applications

7    to be hired as a lawyer?

8          A.    All throughout 2017 into early 2018.

9          Q.    So the last time you did that was in

10   what, first quarter of 2018?

11         A.    Yeah.  Probably the end of the first

12   quarter.  Maybe May 2018.  So it had been 16, 17

13   months.

14         Q.    And that was the point where you would

15   said you stopped looking for a job as an attorney

16   and devoted yourself more fully to real estate?

17         A.    It became apparent to me that I was

18   unable to find a job in law after so many months

19   and the further you get away from working we know

20   statistically the harder it is to find a position.

21   So I started hopefully to find a new career, yeah.

22         Q.    So what was the point in time when you

23   decided you were going to pursue a new career?

24         A.    They were concurrent so.

25         Q.    Still what was the point in time you

```
 1                    J. Fischman
 2   decided to pursue a career in real estate?
 3        A.    So I decided to pursue a career or at
 4   least supplement the career in the meantime during
 5   the course of 2017 but I was still looking for a
 6   job in earnest in law throughout 2017 and probably
 7   throughout much of the first quarter, maybe the
 8   first half of 2018.  That was a long time to go
 9   without any income.
10        Q.    What was the month and year of your
11   termination of your registration with the New York
12   State Bar?
13        A.    Sometime in 2017.  I would have to
14   find that record.  I don't know.
15        Q.    So do you have a job, you have a job
16   in the real estate business; is that right?
17        A.    I am an independent contractor.  I
18   don't have a job.
19        Q.    Who do you work for as an independent
20   contractor?
21        A.    I am an independent contractor with
22   Houlihan Lawrence.
23        Q.    You are a real estate agent?
24        A.    Yes.
25        Q.    And is it common for real estate
```

1                    J. Fischman

2    agents to work as independent contractors?

3        A.    Yes.  It is a hundred percent.

4        Q.    The norm?

5        A.    All.  Not the norm.  It is.

6        Q.    When did you first begin to have that

7    relationship with Houlihan Lawrence as an

8    independent contractor?

9        A.    Probably the summer of 2017, but I had

10   no income in 2017 from that.  I was just trying.

11       Q.    And you went about learning the real

12   estate business?

13       A.    Yes.

14       Q.    How did you do that?

15       A.    My mother has sold real estate in -- I

16   live in Scarsdale.  She sold real estate in

17   Scarsdale for 45 years.  So I learned from her and

18   others in my family.

19       Q.    45 years until when?

20       A.    It hasn't stopped.

21       Q.    She still does.  I see.

22             Are you in some sort of partnership or

23   other business relationship with your mother in

24   connection with the sale of real estate?

25       A.    Yes.

1                    J. Fischman

2        Q.    Can you tell us what that is?

3        A.    I call her my partner.

4        Q.    So what is the nature of the

5  partnership?

6        A.    I talk to her about -- she mentors me.

7        Q.    Do you work jointly on particular

8  house sales or prospective house sales?

9        A.    She is 83 years old.  She has a vast

10  knowledge of probably every house in our area, but

11  she doesn't engage in the day-to-day showing of

12  houses.  She accompanies me on listing

13  presentations for sellers.  She covers inspections

14  and other things.  Sometimes if I need her

15  assistance, but by and large she is a mentor.

16        Q.    And has that relationship been the

17  same since you began doing this independent

18  contractor work with Houlihan Lawrence in 2017?

19        A.    Yes.  My mother is a very well known

20  professional in Westchester and I thought that if

21  I partnered with her that I would have more

22  credibility early on.

23        Q.    Has that been true?

24        A.    I believe so.

25        Q.    What is your mother's name?

```
 1                    J. Fischman
 2        A.     Sheila stone.
 3               Do you live in Scarsdale?
 4        Q.     Nearby.
 5        A.     Talk to me later.
 6        Q.     She is a pro?
 7        A.     Thank you.
 8        Q.     So you said you didn't earn any income
 9   from your real estate business or real estate
10   practice in 2017; did I understand that right?
11        A.     Correct.
12        Q.     What was your income from the real
13   estate business or real estate practice in 2018?
14        A.     Let's just say that it was 170,000 at
15   the time that we provided this statement at the
16   end of December 2019.
17        Q.     And by that you mean the accumulated
18   income from 2018 and 2019?
19        A.     Yes.
20        Q.     And do you recall approximately what
21   the split was between 2018 and 2019?
22        A.     I don't recall.
23        Q.     Are you compensated in any way other
24   than getting a percentage on the sale of houses
25   that you work on?
```

1                    J. Fischman

2          A.    No.  I am not compensated by any other

3    means and this is also offset by all of the

4    expenses that I have to incur to make those sales.

5          Q.    What expenses are those?

6          A.    Including advertising and marketing

7    and advertising on Zillow which is exceptionally

8    expensive.  I pay for the photography for all the

9    houses that I list.  I pay for my business cards.

10   I pay for my gas.  There is a lot of expenses as

11   an independent contractor that is all on me.

12         Q.    Is the $170,000 that you included in

13   this document net of those expenses?

14         A.    I am going to say at the time that we

15   wrote this that was a gross number because in

16   recent conversations I had -- no.  Let me take

17   that back.

18               I believe this might be a gross number

19   based on 1099 statements.

20         Q.    You said might be.

21         A.    I think.  I don't know.  I don't

22   recall what this number is based on at this moment

23   in time.

24   RQ          MR. FORTINSKY:  We would call for the

25         production of the documents that establish,

```
 1              J. Fischman
 2         if we don't have them already, call for
 3         production of documents that establish the
 4         basis of the 170,000 and also whether it's
 5         inclusive or not of the expenses you
 6         described.
 7         Q.    What was your income from real estate
 8    in 2020?
 9         A.    It was better than this.
10         Q.    Can you tell us what it was?
11         A.    Maybe two hundred.
12    RQ          MR. FORTINSKY:  And we would call for
13         the production of documents establishing the
14         two hundred thousand dollars also as well as
15         the question of where the expenses are for
16         that.
17         A.    I believe we have provided the 1099s,
18    but I think what we haven't provided which is all
19    the expenses related to that get deducted from
20    that, like when I file the taxes.  So I think we
21    can agree to provide that information, right.
22              MS. KANE:  We can agree to disagree.
23         Q.    What about 2021?
24         A.    It's good.  Doing my very best.
25         Q.    Everybody says the real estate market
```

```
1                    J. Fischman
2    is booming.
3         A.    It is a tough market.
4         Q.    Is that true?
5         A.    The market is very, very competitive.
6         Q.    But it is booming; right?
7         A.    It is booming with limited inventory.
8    So if you are lucky enough to have a client that
9    wins the bidding war, then it is booming, but if
10   you have clients that are not lucky enough to win
11   bidding wars, then you have some disappointed
12   folks.
13        Q.    You represent sellers or buyers?
14        A.    Both.
15        Q.    You get paid a percentage of the sale
16   either way?
17        A.    If I am representing the buyer I get a
18   percentage of the sale.  If I am representing the
19   seller I get a percentage of the sale.
20        Q.    How many houses did you sell in 2021
21   so far?
22        A.    Probably six that have closed.  I can
23   tell you in the last 12 months it's been 14.
24        Q.    How about 2020, how many houses were
25   there?
```

1                          J. Fischman
2          A.    I don't have that number in front of
3     me, but I know that it's been a running 12 months,
4     about 12 to 12 months.  12 in 12 months and I had
5     two closings last week.  So it became 14 in 12
6     months.
7          Q.    Are you on a June 30th fiscal year is
8     that why the last 12 months are significant for
9     you?
10         A.    No.  It's that I don't keep a running
11    list on my own, but the multiple listing service
12    on my home page flashes sales.  So that's if I
13    look at that home page I go oh, that's great 12
14    and 12.
15         Q.    You have a Jennifer Fischman home page
16    within the Houlihan Lawrence website?
17               MR. BERMAN:  Object to form.
18         A.    Yes.
19         Q.    What was your mother's income from
20    real estate in 2020?
21               MR. BERMAN:  Object to form.
22         A.    Zero.
23         Q.    How about 2019?
24         A.    She may have had some income then.  I
25    don't know what it was though from deals that may

```
 1                    J. Fischman
 2   have been without me.
 3        Q.    You didn't do any work on the deals
 4   that she had income from?
 5        A.    I couldn't say in 2019.  She may have
 6   had no income.  It may have been 2018 or she had
 7   income from deals that came to fruition before I
 8   started working with her.
 9        Q.    So was there ever a time when you were
10   in partnership and she had her own income as well
11   as you having income?
12        A.    No.
13        Q.    No?
14        A.    No.
15        Q.    Looking at the third bullet on the
16   last page we looked at.
17              One thing I meant to ask also, what
18   have you earned so far for 2021?
19        A.    Gross about $90,000, gross.
20   RQ             MR. FORTINSKY:  So again, we will ask
21        for the documentation for that as well.
22        Q.    Going to the benefits, the third
23   bullet on the page we were last looking at, what's
24   the basis for saying that the amount of 401(k)
25   matching was 89,200?  I see the next line it says
```

1                    J. Fischman

2    the calculation but what is the rationale for

3    that?

4        A.    That was the match that the company

5    provided, four percent or .04 percent.  I would

6    have to go back and look at my documents, but I

7    received matching.  The company provided a match.

8        Q.    What is the 2.23 million represent?

9        A.    I think it's the combination of the

10   first and the second bullets.

11       Q.    I see.  I am sorry.

12       A.    Okay.

13       Q.    What is your basis for seeking damages

14   in the combined total of three years backpay plus

15   five years of front pay?

16       A.    I believe that if I had had a proper

17   opportunity to have left the company with an

18   appropriate reference and also with some notice as

19   other people had been provided, that I would have

20   been able to find another position and that I

21   would have worked for at least another five years

22   in the legal profession.  Probably a lot longer

23   because -- but 55 I mean I think was a reasonable

24   age.  I could have asked for 60 but I think we

25   were asking for something reasonable not to be

1                    J. Fischman

2    unreasonable.

3         Q.    You wrote or the document says

4    anticipated mitigation of $120,000 per year for

5    front pay.

6              Judging from what you told us about

7    your income this year and last year, that

8    mitigation appears to be an underestimate; is that

9    right?  Did you agree with that?

10             MR. BERMAN:  Object to form.

11        A.    Yeah.  I think at the time this was

12   written I wasn't making $120,000 yet, so.  Or

13   maybe that was 120 after I pay $50,000 in legal

14   fees and associated with trying to get my

15   unemployment insurance and other expenses that I

16   had.  So maybe that was an estimate based on that

17   and then you know, we didn't expect me to be

18   making more than 170 would be a great amount for a

19   realtor to make and probably close to what I made

20   in that year and probably close to what I made

21   last year too.  Not much more certainly.

22        Q.    What's the price of the average home

23   in the Scarsdale area?

24        A.    About a million five.

25        Q.    About a million five.

```
 1                    J. Fischman
 2             And what percentage do you get when
 3   you close a deal?
 4        A.    Well, it is more complicated than what
 5   percentage I get and it is also propriety.  I am
 6   not sure I can reveal how that all is calculating.
 7        Q.    My impression is that real estate
 8   agents get five percent of the closing
 9   transaction.
10        A.    I don't get five percent.
11        Q.    With rough math you said you closed 12
12   deals.  You said up to 14 deals over the past year
13   or so?
14        A.    Yes.
15        Q.    So if the average closing, average
16   price is about a million and a half and you closed
17   14, then the sale price in the aggregate is 21
18   million dollars and five percent of 21 million
19   dollars and ten percent would be 2.1 million and
20   five percent would be 1.05 million based on my
21   rough math.  That seems like a lot more than what
22   you told us.
23             So my question to you is:  Do you have
24   any basis, without invading anything that's
25   propriety, do you have any basis to quarrel with
```

```
 1                    J. Fischman
 2   the calculation that says, that does the
 3   arithmetic I just did and concludes that your
 4   income over the past year was over a million
 5   dollars?
 6              MR. BERMAN:  Object to form.
 7        Q.    You can still answer.
 8              MR. BERMAN:  You can answer.
 9        A.    Wow.  Would I have loved to have made
10   a million dollars last year.  However, it doesn't
11   work like that.
12        Q.    Why not?
13        A.    Because I am not the only broker on
14   the deal.  There are two agents, the seller's
15   agent and the buyer's agent.  The buyer's agent
16   doesn't always get what the seller's agent gets
17   first of all.  You got to figure at least a 50/50
18   split.  Sometimes it is 30 percent versus 70
19   percent for the seller.  30 percent for the
20   buyer's agent.  Then that money is paid to the
21   brokerage.  The brokerage then gives me a cut of
22   that money.  So at the end of the day I am
23   certainly not making a million dollars or anything
24   close to it.  I mean we have given you the 1099s.
25   So you can go back and look at that and try and
```

1                        J. Fischman

2      figure out, but it's not as lucrative after all is

3      said and done for each individual agent as you

4      have just expressed.

5              Q.    Let's go off the record.

6                    THE VIDEOGRAPHER:  We are going off

7              the record.  The time is 5:19.

8                    (Recess taken.)

9                    THE VIDEOGRAPHER:  We are back on the

10             record at 5:32.

11     BY MR. FORTINSKY:

12             Q.    We are back on the record and I have

13     just a couple of questions on the topic we were

14     discussing before we broke.  We talked about the

15     records reflecting your income and your counsel

16     pointed out that we actually do have some

17     documents.  Basically the 1099s reflect your

18     income.

19                    So I want to ask whether the income

20     reflected on the 1099s is net of the expenses you

21     described?

22             A.    No.

23             Q.    It is not?

24             A.    No.

25             Q.    We are in the middle of the year.

1                  J. Fischman

2                  Presumably there is no 1099 generated

3    until the end of the calendar year; correct?

4         A.    Correct.

5         Q.    What documents, document or documents

6    would show us your 2021 income?

7         A.    I receive an electronic notice of

8    payment when a property closes.

9         Q.    And that would be net of expenses or

10   not?

11        A.    No.  That would be a gross on each

12   particular property sale.

13   RQ            MR. FORTINSKY:  Those are the

14            documents that we would ask for production

15            of.

16        A.    For?

17        Q.    2021.

18        A.    2021, sure.

19        Q.    And the expenses, I take it your

20   expenses that you are talking about are all

21   connected with generating income and therefore

22   appropriately tax deductible I would assume; is

23   that fair?

24        A.    Yes.  We are still getting our feet

25   wet, if you will, on whether or not we properly

1                    J. Fischman

2    documented, for example, mileage in 2019 or most

3    of 2020.  The IRS has certain rules about how you

4    have to write down every house that you went to

5    and every business excursion and I was just new at

6    being an independent contractor and didn't

7    document it to the satisfaction of the government.

8    So we are now doing a better job of documenting

9    it, but I just don't have the car expenses and the

10   gas expenses from -- let's just say I can document

11   for your purposes all of my expenses.  Whether or

12   not the IRS accepts the same documentation like my

13   entire Amex bill versus the individual gas

14   receipts that you get at the gas station.

15                I don't even think I answered the

16   question.  I have documentation.  If you want it I

17   am happy to provide it.

18   RQ           MR. FORTINSKY:  We would request the

19        tax documentation reflecting your business

20        expenses for, I guess that would be 2017

21        through 2020.

22                And you mentioned that something about

23        the government not accepting it.

24        Q.   Was there some sort of audit of your

25   taxes?

```
 1                    J. Fischman
 2        A.    I am under audit for 20 -- yeah,
 3   insult to injury I am being audited for, we, my
 4   husband and I are being audited for 2018 or 2019.
 5   RQ            MR. FORTINSKY:  We would request that
 6          documentation too to the extent it relates
 7          to any business expenses that you claimed on
 8          the tax returns.
 9        Q.    Did you have any other source of
10   income other than the real estate business since
11   leaving MCHA?
12        A.    Just the unemployment insurance that I
13   received $11,000 I think in 2017.  That was my
14   total income for 2017.  Maybe it was a little more
15   because I did have one month of income at
16   Mitsubishi.
17             I have no other income other than my
18   dividend and interest on bank accounts, investment
19   accounts.
20        Q.    You mentioned earlier that you
21   experienced what you described as emotional,
22   mentality and physical injuries as well.
23             Are you asserting any compensation in
24   this case apart from the injuries we just talked
25   about connected with you losing your job and
```

```
 1                    J. Fischman
 2   having to pursue a different career, are you
 3   pursuing any damages, any dollar amounts from the
 4   defendants associated separately with the
 5   emotional, mental and physical injuries that you
 6   referred to?
 7        A.    I believe that we did put that in this
 8   document.
 9        Q.    When you say this document, what are
10   you referring to?
11        A.    I am referring to the document you
12   gave me which is plaintiff's first amended Rule 26
13   A-1 disclosures.
14        Q.    Are you still asserting those damages?
15        A.    Absolutely.
16        Q.    The reason I ask partly is that I am
17   going to have to ask you some personal questions
18   if you are still asserting them.
19        A.    Yeah.
20        Q.    If you are not, then I am happy to
21   skip that?
22        A.    No.  I am expecting you to ask me some
23   personal questions and I am happy to answer them
24   to the best of my ability.
25        Q.    Thank you.
```

```
 1                    J. Fischman
 2              What's the basis for estimating the
 3     emotional distress damages at five hundred
 4     thousand dollars according to the disclosures?
 5                    MR. BERMAN:  Object to form.
 6                    You can answer the question.
 7         A.    I had such significant depression.
 8     Such significant anxiety.  I was at the verge of
 9     contemplating suicide.  I had to start taking
10     medication to sleep.  I still take medication to
11     sleep.  I still have anxiety, all of which was
12     caused by Mitsubishi and this is a low estimate of
13     that type of damage.
14         Q.    How did you come up with the number?
15                    MR. BERMAN:  Counsel the witness not
16              to reveal any attorney-client privileges but
17              other than that you can answer.
18         A.    I feel I can't answer that without
19     revealing attorney-client privileged
20     communications.
21         Q.    You said you are still experiencing
22     anxiety and still need sleep medication.  You also
23     mentioned as symptoms depression and the idea of
24     suicide.
25                    Are you no longer experiencing the
```

```
 1                    J. Fischman
 2   depression and suicidal ideas?
 3        A.    I still have some depression.  I am
 4   not considering suicide unless we go a lot more
 5   hours in this day.  Sorry.  Move to strike that
 6   from the record.  Just kidding.
 7        Q.    Are there other symptoms that you have
 8   experienced besides the four that you mentioned?
 9        A.    Yeah.  Lack of consortium with my
10   husband.  You really don't want to do much of
11   anything when you are depressed and have anxiety
12   and frankly, when my children.  There has been a
13   lot of anger.  There was an incredible amount of
14   anger.
15        Q.    On your part?
16        A.    I think in my whole family was very
17   angry.
18        Q.    At whom?
19        A.    At Mitsubishi.
20        Q.    Based on what you told them?
21        A.    Based on what they watched me
22   experience, but in my immediate family my children
23   definitely were the recipients of a lot of mood
24   swings and depression of their mommy.  They were
25   young when this occurred.  They know I am involved
```

1                    J. Fischman

2    in a lawsuit because I was unfairly treated.  A

3    lot of sadness.  A lot of sadness.

4         Q.    And you have seen doctors for those

5    conditions?

6         A.    I see my primary care physician Dr.

7    Croen with a C.  He referred me to a doctor in his

8    group who has left his group but in his group

9    called Dr. Isaacs because he first put me on an

10   antidepressant and it made me -- it didn't make me

11   undepressed.  It made me very tired and it didn't

12   help.  So he recommended that I meet with Dr.

13   Isaacs and pursue treatment under her guidance of

14   meditation and learn medication and when we lost

15   two thirds of our income I didn't feel like I

16   could spend money on therapy because I had to pay

17   for other things for my children.

18        Q.    Do you want to pause and go off the

19   record?

20        A.    No.  That's okay.  I knew this was --

21   we knew you were going to ask questions that would

22   bring up a lot of emotions.  This is the emotional

23   situation I am dealing with.  It is still at the

24   surface, right.  It still four and a half years

25   later I am still in pain.  I am still in pain from

```
 1                    J. Fischman
 2    this.  It is right here, right at the surface.  So
 3    you start digging and asking and yeah, I am going
 4    to have an emotional response because it was very
 5    painful and it continues to this day to be very
 6    painful to think about this.  To sit in a room
 7    with these people.
 8         Q.    If you had been terminated on grounds
 9    that you thought were grossly unfair, but had
10    nothing to do with your gender, how would you have
11    reacted?
12              MR. BERMAN:  Object to form.
13              You can answer.
14         A.    I was an employee at will.  As the
15    judge wrote in her decision, the administrative
16    law judge who made the decision to grant me my
17    unemployment benefits, Mitsubishi could have
18    chosen any reason at all to fire this person, but
19    the reason they chose is not credible.  It may
20    have been unfair and I may have been upset, but it
21    is much different when the reason is
22    discrimination.
23         Q.    Do you think you reacted worse because
24    the reason was discrimination?
25         A.    Yes.
```

```
 1                    J. Fischman
 2        Q.    I have never been in a situation that
 3   you are in and my sympathies, but I do want to
 4   ask.
 5              If it were me and I understood that I
 6   was fired because of poor performance, I think
 7   that would have been for me a lot more damaging
 8   emotionally than if I understood that I was fired
 9   because of my gender, race or religion.
10              Would you agree that being fired for
11   reasons of performance is more emotionally
12   damaging than being fired for, because of your
13   gender?
14              MR. BERMAN:  Object to form.
15        A.    I can't answer that question.  I can
16   only speak from what my experience was here.  I am
17   sorry.  I think that when you are a man and you
18   wouldn't be fired for your gender it is hard for
19   you to really stand in the shoes of someone who
20   was not overtly -- nobody said oh, let's get rid
21   of Jennifer.  She is a woman.  So much more nuance
22   than that as you have seen in this case.
23              So it's painful and it is difficult.
24        Q.    I am not trying to say I can put
25   myself into your shoes.  I am just asking you
```

```
 1                    J. Fischman
 2   let's for argument's sake suppose there was --
 3   withdrawn.
 4              How do we know that all of the
 5   symptoms that you are experiencing don't simply
 6   flow from the fact that you were terminated for
 7   what was perceived to be poor performance?
 8              MR. BERMAN:  Object to form.
 9        A.    What we know that all of the reasons
10   stated were pretextual.  So they were not for poor
11   performance.  So I was fired.  I was terminated.
12   I was retaliated against.  I saw the writing on
13   the wall.  It was happening and then the final
14   straw I was terminated wrongfully and that's what
15   caused the damages emotional and otherwise.
16              MR. FORTINSKY:  Let's look together at
17         an exhibit that we will mark as Exhibit 26
18         which is a set of medical records produced
19         in this case.  I don't see Bates numbers on
20         them.  They are not Bates numbered.
21              (Fischman Exhibit 26, a set of
22         medical records produced in this case,
23         marked for identification, as of this date.)
24        Q.    I am not going to ask you about every
25   page, just a handful.  You can flip through it to
```

1                    J. Fischman
2    see what's in there, but you don't have to read
3    every single page.
4             Do you generally recognize this set of
5    records?
6         A.    Generally, yeah.
7         Q.    What are they?
8         A.    They appear to be documents that were
9    produced by my primary physician at Scarsdale
10   Medical Group.
11        Q.    Let me ask you to turn to what I think
12   is the eighth or so page.  And at the top of the
13   page it says Scarsdale Medical Group and then
14   below your name and date of birth it has a date of
15   4/13/2014.
16        A.    Yes.
17        Q.    You took -- what does this document
18   reflect?
19        A.    Are you talking about the document
20   dated 4/13/2014?
21        Q.    Right.
22        A.    It looks like I met with someone named
23   Dr. Diego Escobar who says that I presented with
24   left ear pain.
25        Q.    Do you see lower down on the page it

1                    J. Fischman
2  says you are taking medication of Synthroid?
3          A.    Yes.
4          Q.    What was that for?
5          A.    I take Synthroid as a thyroid
6  replacement because I had thyroid cancer in 2007.
7          Q.    And then looking further ahead to
8  page, about five pages more November 19, 2014
9  asking about the third page of that document.
10                Do you see that there is a list of
11 medications?
12         A.    Yes.
13         Q.    Beginning with Zithromax and then by
14 concluding Zolpidem?
15         A.    Okay.
16         Q.    What was -- what did you take the
17 Zolpidem for?
18         A.    I don't know why I was taking
19 Zithromax.
20         Q.    Zolpidem I am asking about.
21         A.    I am not sure I am on the right page.
22         Q.    The page -- so that page is eight
23 pages past the one we just looked at before.  And
24 at the bottom there is a signature from what looks
25 to be Kenneth Croen.

1                    J. Fischman

2          A.    Okay.  So this was for, I had asked I

3    guess we were going to Tanzania on vacation and I

4    think at that time I asked Ken Croen for Ambien to

5    take on the flight.  This is the first time I ever

6    asked him for that and I think that Zolpidem is

7    the generic form of that.

8          Q.    Zolpidem is a sedative; isn't it?

9          A.    Yes.

10         Q.    And it relieves anxiety?

11         A.    No.  Honestly, I don't know.  I think

12   I was asking for it at this time.  It says

13   traveling to Tanzania.  So I think that was I went

14   in to ask if he had something I could take on the

15   plane so we would fall asleep on that overnight

16   plane.

17         Q.    Did you experience anxiety prior to

18   2017?

19         A.    Prior to 2017, yes.  In, during 2015

20   yes.

21         Q.    Did you ever see a doctor for anxiety?

22         A.    Yes.  I saw Dr. Isaacs and Dr. Croen

23   for that anxiety starting in 2015.

24         Q.    In what month in 2015?

25         A.    Let's go and look shall we.

1                    J. Fischman
2    11/13/2015 is the first time I was given anything
3    for panic attacks and stress.  So that was after I
4    was demoted as you can see.
5         Q.    Had you had panic attacks before then?
6         A.    No.
7         Q.    Had you had any depression before
8    then?
9         A.    No.
10        Q.    Had you ever seen a psychiatrist
11   before November 2015?
12        A.    Probably when I was 28 or 29 I saw a
13   psychiatrist in Los Angeles because I was having
14   trouble meeting boys.  There was that 30-year old
15   threshold was coming up and I am like I am not
16   married and that was depressing.  So that was a
17   short period of time.
18        Q.    How long did you see -- was it a
19   psychiatrist or psychologist or therapist or what?
20        A.    Psychologist I think and it wasn't for
21   sleeplessness.  It wasn't for anxiety.  It was for
22   loneliness.  Just having someone to talk to.
23        Q.    How long did you see the psychologist
24   for?
25        A.    Probably a year because I was a young

```
 1                    J. Fischman
 2   associate at a law firm and it was also very hard
 3   to get away to do that.  So I took up golf.
 4         Q.    Did you see a therapist or
 5   psychiatrist or psychologist of any kind after
 6   that point?
 7         A.    No.
 8         Q.    Had you seen a therapist or
 9   psychiatrist or psychologist prior to that point?
10         A.    I saw a psychiatrist again in my early
11   twenties when I was trying to figure out what I
12   wanted to do with my life.
13         Q.    And that was the kind of psychiatrist,
14   meaning someone who writes drug prescriptions?
15         A.    Yeah, but I never prescription from
16   him.  He was really more of a family friend
17   actually.
18         Q.    Did you in connection with either of
19   those conditions that you saw somebody for, did
20   you experience depression?
21         A.    No.  Not in the same -- not
22   depression.  I think it was more, like I said,
23   loneliness in Los Angeles because it is an
24   isolating city in a way and when I was in my early
25   twenties I think it was more about the existential
```

```
 1                    J. Fischman
 2   meaning of life.  Now that you are done with --
 3   where everybody expects you to go to college and
 4   it was sort of finding myself in a way.  Finding
 5   myself led me right to law school at 25.
 6         Q.    Did you ever experience anxiety prior
 7   to 2015?
 8         A.    No.
 9         Q.    Did you ever experience suicidal ideas
10   prior to 2015?
11         A.    No.
12         Q.    Did you ever experience -- did you
13   ever have a need for -- sorry.
14               Did you ever experience insomnia or
15   sleep problems prior to 2015?
16         A.    No.
17         Q.    When did you first experience anxiety
18   in connection with -- when did you first
19   experience symptoms of anxiety?
20         A.    It all began around the end of 2015
21   around the time that I was demoted.
22         Q.    And when you say it all began, you
23   mean the other symptoms as well that you
24   mentioned?
25         A.    Yeah.
```

1                    J. Fischman

2        Q.    When did you first have suicidal

3    ideation?

4        A.    That was probably in the early 2016

5    and then again in just -- and then again in 2017,

6    February 2017.

7        Q.    Was there something in particular that

8    brought those on?

9        A.    In 2016 it was brought on by my

10   replacement of me as the general, acting general,

11   or general counsel by Nick Oliva and in 2017 it

12   was the termination by the company that brought it

13   on.

14       Q.    The reason I ask is that you had first

15   said that it was in late 2015, November 2015

16   around the time of the job issues we talked about.

17   And then you said in 2016 which is presumably

18   later than that that you said you first had these

19   ideas of suicide.

20            So my question therefore was:  Was

21   there something past that initial November 2015

22   issue?

23       A.    No.  It was just learning to deal with

24   the reality of, with just the continuation of this

25   reality.

1                    J. Fischman

2          Q.    I take it you never actually sought to

3    carry those ideas, those suicidal ideas out?

4          A.    No.

5          Q.    You said you saw Dr. Croen and Dr.

6    Isaacs.

7                What kind of doctor was Dr. Isaacs?

8          A.    She was an internal medicine doctor

9    but also mind, body, alternative medicine doctor

10   in the practice group who Dr. Croen, who is also

11   an internal medicine but a very highly regarded

12   doctor, recommended that if I wasn't going to seek

13   -- he said that meditation and -- that meditation

14   had been very, very useful for other executives

15   that he knew who had encountered great stress and

16   he suggested that perhaps I try meditation,

17   learning meditation with Dr. Isaacs instead of

18   medicating if the medication wasn't working.

19        Q.    So did you see Dr. Croen in connection

20   with your treatment for any of the symptoms you

21   attributed to your termination?

22        A.    I continued to see Dr. Croen and I

23   continue to see him frequently because he is my

24   general doctor.  So yes, he has continued to

25   provide me with antianxiety Xanax medication and

```
 1                    J. Fischman
 2   the Ambien medication that I take from time to
 3   time so that I can get a good night's sleep or get
 4   through the day.
 5          Q.    You experienced this itchiness?
 6          A.    Yes.
 7          Q.    In your feet?
 8          A.    Yes.
 9          Q.    You experienced that before you were
10   terminated; right?
11          A.    Yes.
12          Q.    And in fact you experienced that
13   before you were demoted as well; correct?
14          A.    Actually, it was during the Fall of
15   2014 that coincides with the sort of negative
16   interactions that I am beginning to have at the
17   office.  So I would say that it started as I was
18   starting to feel this increased negative pressure
19   from my supervisor at the time.
20          Q.    This symptom about the itchiness
21   started in 2014 before you were being elevated to
22   acting general counsel; right?
23          A.    I guess it did.
24          Q.    And you said it has to do with the
25   pressure you felt at work?
```

                              J. Fischman

         A.    I believed it was.  I guess it did
start before that.

         Q.    So you think the pressure you felt at
work even in 2014 had affects on you physically
and emotionally?

         A.    Well, now I can't say that.  I had
always believed it was 2015 that it began, but
here this says 2014.  So it certainly wasn't
helped by the stress I felt at work as it
continued for a number of years.

         Q.    Did you think that the symptoms were
stress induced?

         A.    They may have been.

         Q.    When I say the symptoms, I mean the
problem with your itchy feet.  Correct me if there
is a better way to characterize it.

         A.    It's possible that they were brought
on by some epidemiological means like some
infection, but then they never -- it never went
away.  So it's possible that it started from some
other outside third source and then became worse
over the course of the great stress that I was
under.

         Q.    Is it possible that it was initially

1                    J. Fischman

2     because of the stress of a demanding job?

3          A.    I mean I don't know.  You would have

4     to go back and ask this doctor whether that was

5     the case.

6          Q.    Let's look at the medical record dated

7     11/13/2015.  So on this page you see where it says

8     "Very stressed by work.  Can't deal with her boss.

9     She was made head of compliance, but very stressed

10    by interactions with boss."

11         A.    Those are the notes that briefly

12    written down by the doctor based on a much longer

13    conversation or a very short conversation.  I

14    really couldn't say, but I did go in there and say

15    I can't sleep.  I am very stressed by my work

16    situation.  I probably told him about the demotion

17    but he didn't write it down since it was just a

18    few days earlier.

19         Q.    Did you also tell him that these

20    problems had gone on since July?  Let me direct

21    you to the last line of that first set of notes.

22              You see where this has been a problem

23    since July?

24         A.    Yeah, because that's when all the

25    negativity began.  Yeah.

```
 1                    J. Fischman
 2        Q.    That was before you were demoted;
 3   right?
 4        A.    But that was after the negative
 5   interactions began with Donna.
 6        Q.    But it was before you were demoted;
 7   right?
 8        A.    It was before I was demoted, but after
 9   I was not given the general counsel position.  So
10   it is after that and now it becomes clearer that
11   there is no intention, no intention.  So they are
12   going to demote me.  They are going to get rid of
13   me.  So yeah, it was before the actual demotion
14   but it was after the failure to promote a few
15   months earlier.
16        Q.    It was after your promotion to acting
17   general counsel; right?
18        A.    It was after their failure to promote
19   me to full general counsel.
20        Q.    Would you have been better off if you
21   were never promoted to acting general counsel?
22              MR. BERMAN:  Object to form.
23        A.    I think I would have been better off
24   if I had been fully supported to be promoted as
25   general counsel.
```

1                        J. Fischman

2        Q.      That's not my question.

3                My question is:  Would you have been

4   better off if you were never promoted to acting

5   general counsel?

6        A.      I can't say.

7        Q.      So is it fair to say that these

8   symptoms as described in this medical record from

9   November of 2015 and as you have testified about

10  today began in July 2015?

11       A.      It may have been so since July

12  probably, but I didn't seek assistance because it

13  was manageable.

14       Q.      On that same page there is a notation.

15  Let's see if I can find it.  There is a notation

16  at the top of the third page of that particular

17  record, that medical visit record, that says "Look

18  at situational work related.  Looking to change

19  jobs."

20                Were you looking to change jobs at

21  that point?

22       A.      He probably said to me because he has

23  said it, you know one way to avoid stress is to

24  change jobs.  So I had just been demoted.  I am

25  certain that I said to him yeah, I probably ought

```
 1                    J. Fischman
 2  to change jobs, but I felt very strongly and
 3  comitted to Mitsubishi.  So there I stayed.
 4        Q.    You said that you could see the
 5  writing on the wall, I am paraphrasing, but you
 6  said that you began to see, experience pressures
 7  at work in July.
 8              When did you first begin, as it says
 9  here, looking to change jobs?
10        A.    I don't think I looked to change jobs.
11        Q.    When did you first start thinking
12  about changing jobs?
13        A.    January 31, 2017.
14        Q.    On the page that begins, the office
15  visit, on the record reflecting the office visit
16  of 3/7/2016.  Tell me when you have it.
17        A.    Yes.
18        Q.    You see where it says "Reading the
19  book I shared, Real Happiness.  More aware she is
20  overreacting to things.  Feeling bored with
21  meditation."
22              Can you explain what that refers to or
23  at least what you said that prompted that note?
24        A.    Well, I was just starting meditation.
25  This is in the early days of learning meditation
```

```
 1                    J. Fischman
 2    and so I was just learning how to meditate and
 3    sometimes sitting quietly for 20 minutes or ten
 4    minutes or five minutes is hard to do until you
 5    kind of train yourself to do it and this is very
 6    early on in that training.  So I said well, it is
 7    boring right when you are used to moving all the
 8    time.
 9         Q.    And what was it you said that prompted
10    the notation "more aware she is overreacting to
11    things"?
12         A.    I don't know what she is referring to
13    on that.  I did enjoy the book Real Happiness.  It
14    was an interesting read on how people learn to
15    adopt meditation in their busy lives and how that
16    brings them more peace and I don't know why she
17    would write that I was overreacting to things, so
18    I couldn't say.
19         Q.    Was it true you overreacted to things
20    in or about March of 2016?
21         A.    It's possible that at home in my home
22    life that I overreact to the children or life's
23    various stresses because I was feeling unhappy at
24    this time.
25         Q.    And the note says you were more aware.
```

1                    J. Fischman

2              Were you more aware of this tendency

3    to overreact than you had been previously?

4         A.    No.  I don't know what she means by

5    that.

6         Q.    Do you think that your career was ever

7    affected by a tendency to overreact?

8              MR. BERMAN:  Object to form.

9         A.    No, I don't.  I had a great career.  I

10   had increasing levels of responsibility in every

11   job that I'd ever had.  I was an amazing listener,

12   counsel, counselor, legal advisor.  I was an

13   expert in multiple fields.  Not an expert might be

14   too strong.  I knew where to find the answers.  So

15   if I reacted quickly we know that in two or three

16   of the e-mails I reacted too quickly.  Did that

17   affect my legal career?  I think that you and I

18   both know many lawyers who are very highly

19   reactive.  In fact, I worked with a number of them

20   during my career at Fried Frank and Paul Hastings

21   and even at Raytheon who were reactive.  In fact,

22   Donna Costa herself has admitted to being too

23   reactive sometimes.

24              Does that affect our ability to

25   provide legal advice, no.  Does that affect our

```
 1                    J. Fischman
 2   ability to be a good counsel, no.
 3        Q.    Do you think being overreactive
 4   affects lawyers ability to interact successfully
 5   with their clients?
 6        A.    Occasionally it can.
 7        Q.    Do you think that was --
 8        A.    I think that 99 percent of the time it
 9   did not, I did not overreact and I had no problem
10   communicating effectively with the vast number of
11   my clients.
12        Q.    Have you consulted with any physicians
13   for purposes of this lawsuit?
14        A.    No.
15        Q.    Have you ever filed any other lawsuit
16   or complaint of any kind?
17        A.    No.
18        Q.    As inhouse counsel you had clients in
19   litigation from time to time; correct?
20        A.    Yes.
21        Q.    Genomatica was one example we talked
22   about.
23              How many others were there
24   approximately?
25        A.    Just a handful over the years.  I
```

```
 1                    J. Fischman
 2   would say maybe like a dozen, two dozen.  Each of
 3   the companies that I supported may have
 4   encountered some level of litigation or claims
 5   against them and I would be happy to go through
 6   each and every one of them if you would like to.
 7   I can probably recall a lot of the facts and data
 8   about each of them because I was very thoroughly
 9   involved.
10        Q.    Have you ever represented MCHC in any
11   litigation?
12        A.    MCHC is a shell company that has a lot
13   of people working in both MCHC and its
14   subsidiaries.  So indirectly all of the companies
15   that I represent are MCHC.
16        Q.    I am just talking about the entity
17   itself not the personnel.  I'm just talking about
18   the entity.
19              Did you ever represent MCHC in
20   litigation?
21        A.    No.
22        Q.    Did you ever represent any affiliate
23   of MCHC or MCHA in litigation where another such
24   affiliate was also sued?
25        A.    Yes.
```

```
 1                    J. Fischman
 2        Q.    In any of those -- how many times?
 3        A.    Several.
 4        Q.    In any of those cases, did the
 5   claimant or plaintiff ever allege that one of
 6   those affiliates should be responsible or liable
 7   for the conduct of the other or others?
 8        A.    Possibly.
 9        Q.    When?
10        A.    There maybe, there may have been
11   allegations in that regard.
12        Q.    Tell me the allegations.  You said you
13   recall the litigations pretty well.
14              So what were the allegations?
15        A.    Some of the litigation that I managed
16   were for companies that were no longer in
17   existence.  So the company, the liability would be
18   managed by the parent company.
19        Q.    The parent company being MCHC?
20        A.    Being MCC, MCHC or MPI or a Pharma
21   company.
22        Q.    In any of those litigations, was there
23   an allegation by the claimant or plaintiff that
24   one of the entities should be responsible for the
25   conduct of the other?
```

```
 1                    J. Fischman
 2        A.    No.  It is a hard question to answer
 3   because it is not that clear, but I don't think
 4   so.
 5        Q.    You refer in your complaint to Bill
 6   Radlien.
 7              Who is he?
 8        A.    Bill Radlien will be, is the president
 9   of Mitsubishi Polyester Film.
10        Q.    Does he work or has he ever worked for
11   MCHA?
12        A.    No.
13        Q.    What discussions, if any, did you have
14   with Mr. Radlien about your appointment as acting
15   general counsel?
16        A.    I met with bill in April of 2015 in
17   Greer, South Carolina.  He picked me up at my
18   hotel, the Hyatt I was staying at.  We met for a
19   couple of drinks at the bar and then we went to
20   dinner and had a couple more drinks during dinner
21   and during the course of dinner we talked about my
22   appointment as acting rather than the full general
23   counsel position.
24        Q.    How did the subject come up?
25        A.    It was just a general.  This was only
```

1          J. Fischman
2   three weeks after it had been announced that I had
3   gotten this role.  So it was just a general
4   conversation.
5          Q.    Did he raise the subject or did you
6   raise the subject?
7          A.    I don't recall.  I think he did
8   probably.
9          Q.    What do you recall him saying?
10         A.    I recall him saying well, I heard that
11  Donna persuaded a whole lot of people in Japan to
12  let her be president, but that she didn't have the
13  political capital to get you through.  Those were
14  his words.
15         Q.    Get you through as?
16         A.    As GC.
17         Q.    But presumably she had the capital to
18  get you into the slot as acting general counsel?
19         A.    As a placeholder, sure.
20         Q.    Did Mr. Radlien tell you who he had
21  heard that from?
22         A.    Well, he had interaction with a lot of
23  executives in Japan in his role as president of
24  that company and I assumed it was Japanese
25  executives that he interacted with that told him

```
 1                  J. Fischman
 2    that.
 3         Q.    But he didn't tell you who he had
 4    heard it from?
 5         A.    No, he did not.
 6         Q.    It is common when people meet for
 7    drinks with colleagues, people in the same
 8    organization, for them to gossip a little bit; is
 9    that fair to say?
10         A.    It's possible.
11         Q.    It is even common you would say, is
12    that fair?
13         A.    It's quite possible.
14         Q.    And it is common for people to
15    speculate about the motives and plans of other
16    people in the company; is that fair?
17         A.    I don't know.
18         Q.    Is it possible that Mr. Radlien was
19    giving you his judgment, speculation about what
20    might have been going on?
21         A.    I didn't think that was possible
22    because I knew Bill pretty well and he had no
23    reason to speculate on such a matter when it was
24    my future that he was talking about.  So, and he
25    knew Donna pretty well and he knew the business
```

```
 1                     J. Fischman
 2   pretty well.  I did not believe that he was
 3   speculating.  I believe he had heard that from a
 4   Japanese executive and that he had learned about
 5   the various discussions or meetings that had taken
 6   place in Japan in order for Donna to be elevated
 7   into that position and he certainly made it seem
 8   like he was well briefed on the subject matter.
 9        Q.    When was the last time you spoke to
10   Mr. Radlien?
11        A.    Sometime in 2016 probably.
12        Q.    So you haven't spoken to him since
13   your termination?
14        A.    No.
15        Q.    How about indirectly, have you spoken
16   to him indirectly?
17        A.    No.
18        Q.    What did you say in response to Mr.
19   Radlien in the conversation you described?
20        A.    I did not respond very much because I
21   felt very, very upset by this statement that he
22   made because it reinforced what I was led to
23   believe in my communications with Donna in
24   December of 2014 and I had just started the
25   position and I really wanted the opportunity to
```

1                    J. Fischman

2    prove that I was going to stay in that position

3    and I was very, very sad to hear that no one in

4    Japan had the confidence to promote me based on

5    absolutely nothing other than what I believe was

6    my gender because they all were very appreciative

7    of all the work I had done over all the years I

8    had been there.

9          Q.    I think you had told us earlier you

10   already perceived that you were already unhappy

11   that you were given just the acting general

12   counsel title and already perceived that that was

13   a slight?

14         A.    Yes.

15         Q.    And that you were not being given the

16   role; right?

17         A.    Yes.

18         Q.    So why were you sad when Mr. Radlien

19   said effectively, what information, what new

20   information did Mr. Radlien add that changed your

21   perception of things?

22         A.    I don't think he changed my perception

23   of things.  I think that he just confirmed my

24   perception of things and that was disappointing

25   again.

```
 1                    J. Fischman
 2       Q.    You also said you spoke to Dennis
 3  Trice?
 4       A.    Mm-hmm.
 5       Q.    When was that?
 6       A.    The following day at lunch.
 7       Q.    Who is Dennis Trice?
 8       A.    Dennis was at the time the CEO of
 9  Mitsubishi Polyester Film.
10       Q.    Do you know whether he and Mr. Radlien
11  ever discussed you and your promotion?  Not you.
12  Do you know whether he and Mr. Radlien ever
13  discussed your promotion?
14       A.    No, I don't know.
15       Q.    When did you last speak to Mr. Trice?
16       A.    Sometime in 2017.  2016.
17       Q.    What was the setting for the
18  conversation between you and Mr. Trice that you
19  described in the complaint?
20       A.    It was his country club someplace in
21  South Carolina near the company.  We went to lunch
22  and again, this topic of acting general counsel
23  and Donna's promotion to president not acting
24  president but president and my position as acting
25  and that again he implied that it was a big deal
```

```
 1                    J. Fischman
 2   for her to become president.  That there was just
 3   no more room at the head of the table.
 4         Q.    You said implied.  I didn't mean to
 5   cut you off.  Go ahead.
 6         A.    That there was just not room for two
 7   women at the top of the ladder at Mitsubishi
 8   Chemical.
 9         Q.    And that was his judgment?
10         A.    Actually, that was Bill Radlien's
11   judgment and in conversation with Dennis Trice
12   without asking him directly we talked about it in
13   a more general sense and he confirmed that was the
14   case as well.
15               So I know what you are going to say
16   well, what specifically.  So Dennis was more
17   measured and is more measured.  Is a much more
18   measured speaker than Bill Radlien and in his
19   speech to me in our conversation I asked questions
20   like was it difficult for Donna to get promoted.
21   She's worked so hard kind of thing.  Yes, that was
22   a big leap for MCHC because there had never been a
23   woman president at any company.  And then we
24   probably discussed -- then we discussed my
25   becoming acting and of course I was very
```

1                    J. Fischman
2    complimentary of the work that Donna had always
3    done before me and I said it seems like she
4    couldn't have gotten me through at this time and
5    he sort of looked at me and nodded yeah.
6          Q.    Did he say anything more than just
7    nodding and saying yeah on the subject of your
8    being moved into the acting general counsel
9    position?
10         A.    Like I said, Dennis was much more
11   measured in his speech.  So it was more of an
12   innuendo.
13         Q.    And what did you infer?  Sorry.  What
14   was the basis of your inference about what his
15   saying yeah meant?
16         A.    I inferred, as I had previously
17   stated, that what Bill had confirmed to me the
18   evening before which was that there would not be
19   two women leading this New York based MCHA.  That
20   it was never going to be me.  That's what I
21   inferred.
22         Q.    When did you first anticipate you
23   would be demoted?
24         A.    That's an interesting question.  Since
25   I wasn't given the full job to begin with, I

```
 1                    J. Fischman
 2   suppose I thought it could be at any time during
 3   the course of 2015.
 4        Q.    I wasn't asking when you thought the
 5   demotion moment would be.
 6             I was asking when you first perceived
 7   that you were going to be demoted?
 8        A.    On the day that they gave me my -- the
 9   day they told me.  I didn't actually know that it
10   was coming.
11        Q.    The day that you were demoted you
12   didn't anticipate it before then?
13        A.    No, not really.
14        Q.    Despite the stresses and difficulties
15   that you described dating to July of that year?
16        A.    Yeah.  The tone of the office had
17   become more strained.  Donna really stopped
18   talking to me and even any interactions we had
19   were very strained.  So I was hoping to always
20   mend relationships.  Always hoping to not have
21   strained conversations.  I was always looking for
22   assistance from Pat to help with that, but no,
23   nobody said you are going to be demoted, no and I
24   didn't know until the day it happened.
25        Q.    What was the cause of those strains
```

1                    J. Fischman

2    you just mentioned?

3         A.    You will have to ask Donna, but she

4    has at some point along the way in July decided

5    that it was enough.  That she and they were going

6    to replace me and then she ended up creating

7    interactions with me that were difficult and I was

8    very busy and I was really trying my best and

9    really working hard and somewhere around the

10   beginning of August she walked into my office and

11   accused me of having a mental breakdown when I was

12   just sitting there working.  So it was from like

13   that point forward, maybe that was August 6th.  It

14   was from that point forward that every interaction

15   we had because I got upset with that because it

16   felt like why, where is this even coming from and

17   she was so visibly angry with me and I didn't know

18   why, and from that point forward there was

19   strained communications.

20        Q.    Did you ask her why she was angry at

21   you?

22        A.    No.

23        Q.    Did she explain in that conversation

24   why she was unhappy with you?

25        A.    She suggested that I was overworked

```
 1                    J. Fischman
 2   and that I was taking on too much responsibility
 3   and that the Brazil acquisition that she would
 4   just work with another person in the legal
 5   department which I said she should do and then she
 6   said she didn't want to do that, be responsible
 7   for that because she is no longer general counsel.
 8   And I tried to stay involved in that, but I pulled
 9   back a little bit, yeah.
10        Q.    What did she say in that conversation
11   about you having a mental breakdown?
12        A.    I said she walked into my office at
13   about 6 o'clock at night and accused me of having
14   a mental breakdown.
15        Q.    Did she elaborate on that at all?
16        A.    No.
17        Q.    How did you respond?
18        A.    I think I just said actually.  So if
19   you want we can just read back what I just
20   answered because I just went through the
21   conversation.
22        Q.    Nothing more than what you just said.
23              Were there any other incidents in
24   which you recall Ms. Costa expressing anger or
25   dissatisfaction with you during the period you
```

1                    J. Fischman

2     were functioning as acting general counsel?

3          A.    Not really, no.  I know now through

4     discovery that she from that moment forward

5     started sending e-mails to Japan wanting to

6     terminate me and asking for approval from Ken

7     Fujiwara, the head of legal at MCHC, and I know

8     now from those e-mails that she felt she couldn't

9     work with me, but there was nothing in our

10    day-to-day interactions or any e-mails between the

11    two of us that communicated that to me at all.

12              I continued to seek -- I continued to

13    do my job.  I continued to manage all the legal

14    department and the businesses but she never came

15    to me until there was a text she wrote me or a

16    short, I guess it is not a text but a quick e-mail

17    that she wrote that she somehow didn't know how to

18    talk to me during that period and I really found

19    that so curious because there had been no other

20    communication before that.  So it was like she was

21    building this case but I don't know where it was

22    coming from.  I had no problem having

23    conversations with her.  I had no problem doing

24    the work assigned to me.  I know problem training.

25    Steven Rose to come up as a first year inhouse

1                    J. Fischman

2    lawyer.  I had no problem sitting down with the

3    other lawyers and hearing about what they were

4    working on and giving them assistance or guidance.

5    So I really didn't know where this was coming

6    from.

7         Q.    Did she ever at any other time express

8    concern about your mental health or about you

9    having a mental breakdown or anything similar to

10   that?

11        A.    No.

12        Q.    Do you recall saying earlier in this

13   deposition the last day that Ms. Costa is a liar?

14             MR. BERMAN:  Object to form.

15        A.    Let me clarify what I said.  I believe

16   that the November 2015 mid-year performance review

17   is a complete fabrication of the actual events

18   that occurred during that time period that are

19   denoted in that paper.  Ms. Colwin asked me a

20   number of hypotheticals in order to elicit a

21   response.  In fact, testifying herself on the

22   record a number of times as to what Ms. Costa

23   might say or may not say in the course of her

24   testimony in which case she asked me if so and so

25   said such and such, would that be a lie and I said

1                    J. Fischman

2  yes, that would be a lie.  But let me clarify

3  that.   If Ms. Costa says something that I disagree

4  with, perhaps it is not a lie but a

5  misinterpretation of the events or

6  misunderstanding of the events that we both

7  experienced.

8          Q.    Did you perceive her to be lying to

9  you at any time up to the point of your

10 termination?

11         A.    I have noted a variety of fabricated

12 incidents.  So I think as of about November of

13 2015 I no longer trusted her to tell me any truth

14 whatsoever.

15         Q.    The fabricated documents that you

16 refer to like the review, did you see them prior

17 to discovery?

18         A.    Yes.  I saw the review when I sat in

19 the --

20         Q.    That was shown to you?

21         A.    -- in the meeting.  It was shown to

22 me.

23         Q.    Let's look at that document.

24                Let's mark as Exhibit 27 Defense 1714

25 is the Bates number.  It may have been marked

```
1                    J. Fischman
2    earlier as an exhibit the first day.  Why don't we
3    come back to that in the interest of moving things
4    along.
5         A.    Can we go off the record for a moment?
6         Q.    Sure.
7               THE VIDEOGRAPHER:  Going off the
8         record at 6:56.
9               (Recess taken.)
10              THE VIDEOGRAPHER:  Back on the record
11        at 7:15.
12              MR. FORTINSKY:  We have just had a
13        colloquy off the record in which the
14        witness' counsel has said that she is tired
15        and finished for the day and the plaintiff's
16        counsel wants to close the questioning for
17        this deposition here and I objected on
18        behalf of all defendants to the production
19        of documents by the plaintiffs late Friday
20        afternoon right before this deposition was
21        to begin Monday morning.  A whole set of
22        documents that we had not seen before and
23        have said it would be highly improper for
24        the plaintiffs, plaintiff's counsel to cut
25        off questioning here under those
```

1                    J. Fischman

2       circumstances and especially in light of the

3       e-mails between us on the subject matter, on

4       the subject of how long the deposition will

5       go.

6              Plaintiff's counsel, and he can

7       certainly add to this for himself, but

8       plaintiff's counsel has said that the

9       witness is tired and that they will leave

10      the deposition now.  I have proposed that

11      we -- I have said that they can't

12      unilaterally cut off the questions without

13      giving us the chance to ask about the

14      documents just produced.  They said -- I

15      offered to finish in 30 minutes and they

16      have said that they will collectively

17      consider that.  I have said that I will hold

18      off on going to the judge to get additional

19      time until I hear back from them as to their

20      intentions.

21             MR. BERMAN:  I think that's an

22      accurate representation of our conversation.

23             So anything further counselor?

24             MR. FORTINSKY:  Nothing further except

25      to say of course the deposition remains open

1                    J. Fischman

2         at this point.

3                MR. BERMAN:  And we object.  Thank

4         you.

5                THE VIDEOGRAPHER:  This concludes

6         today's deposition.  The time is 7:17 and we

7         are now off the record.

8                (Time Noted:  7:17 p.m.)

9

10

11                 JENNIFER FISCHMAN

12

13    Subscribed and sworn to before me

14    this      day of           , 2021.

15

16

17    (Notary Public)      My Commission Expires:

18

19

20

21

22

23

24

25

1

2                 C E R T I F I C A T E

3    STATE OF NEW YORK      )

                           : ss.

4    COUNTY OF NEW YORK    )

5                 I, LYNNE D. METZ, a Shorthand Reporter

6    and a Notary Public within and for the State of

7    New York, do hereby certify that the foregoing

8    deposition of JENNIFER FISCHMAN was taken before

9    me on the 28th day of June, 2021;

10                That the said witness was duly sworn

11   before the commencement of her testimony; that the

12   said testimony was taken stenographically by me

13   and then transcribed.

14                I further certify that I am not

15   related by blood or marriage to any of the parties

16   to this action or interested directly or

17   indirectly in the matter in controversy; nor am I

18   in the employ of any of the counsel in this

19   action.

20                IN WITNESS WHEREOF, I have hereunto

21   set my hand this 13th day of July, 2021.

22                      

23

24                      LYNNE D. METZ

25

1

2  June 28, 2021

3

4                        I N D E X

5  WITNESS                 EXAMINATION BY        PAGE

6  JENNIFER FISCHMAN      MS. COLWIN             275

7                         MR. FORTINSKY          346

8

9   ---------- INFORMATION REQUESTS ----------

10  DIRECTIONS (DI):      None

11  INSERT:               None

12  RULINGS (RL):         None

13  REQUESTS (RQ):        477, 489, 490, 493, 499, 500,

14                        501

15  CERTIFIED (CE):       None

16  MOTIONS (MO):         300, 302, 322, 325, 337, 341,

17                        351, 372, 392, 403, 428, 473

18

19

20                   E X H I B I T S

21  Fischman Exhibits                       For ID

22  Exhibit 1, a document Bates stamped 864  276

23  to 865

24  Exhibit 2, a document Bates stamped     279

25  1102 through 1103

```
 1

 2    Exhibit 3, a document Bates stamped 590    280

 3    to 599

 4    Exhibit 4, a document Bates stamped       294

 5    Exhibit 5, a document Bates stamped 876   294

 6    and 877

 7    Exhibit 6, a document Bates stamped       295

 8    1842 to 1847

 9    Exhibit 7, a document Bates stamped       299

10    1907 to 1908

11    Exhibit 8, a document Bates stamped       300

12    2301 through 2302

13    Exhibit 9, a document Bates stamped 882   301

14    to 883

15    Exhibit 10, a document Bates stamped      302

16    884 through 886

17    Exhibit 11, a document Bates stamped      307

18    2322

19    Exhibit 12, a document Bates stamped      310

20    2315 through 2316

21    Exhibit 13, a document Bates stamped      312

22    844 and 845

23    Exhibit 14, a document Bates stamped      318

24    842 to 843

25    Exhibit 15, a document Bates stamped      325
```

1

2    838 through 841

3    Exhibit 16, a document Bates stamped      338

4    806 to 807

5    Exhibit 17, the first amended complaint  359

6    Exhibit 18, a document Bates stamped      368

7    465 and 466

8    Exhibit 19, a document identified with    390

9    Bates numbers 1218 through 1229

10   Exhibit 20, a document previously         393

11   identified in this case by Bates

12   numbers Defendant 1208

13   Exhibit 21, a document produced with      395

14   Bates numbers Defendant 1066 through

15   1068

16   Exhibit 22, a document Bates stamped      400

17   1109 and 1110

18   Exhibit 23, a document Bates stamped      415

19   489 and 490

20   Exhibit 24, a copy of the EEOC            425

21   complaint Bates stamped Fischman 326

22   through 328

23   Exhibit 25, the amended initial           479

24   disclosures

25   Exhibit 26, a set of medical records      508

1

2   produced in this case

3   (Exhibits retained by the court reporter and attached.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| & |
|---|
| **&** 272:4 273:2 |

| 0 |
|---|
| **04** 494:5 |
| **08188** 270:7 274:9 |

| 1 |
|---|
| **1** 276:5,6 312:2 461:9 502:13 546:22 |
| **1-10** 270:14 |
| **1.05** 496:20 |
| **1/30/17** 339:24 |
| **10** 302:9,11 311:9 547:15 |
| **10/23/2016** 294:15 |
| **10001** 273:14 |
| **10004** 272:20 |
| **10022** 273:6 |
| **104** 366:3,5,7,8,23 |
| **1066** 395:11 548:14 |
| **1067** 395:9 399:10 |
| **1068** 395:9,12,15 548:15 |
| **108** 359:22 |
| **1099** 489:19 499:2 |
| **1099s** 490:17 497:24 498:17,20 |
| **10:09** 270:20 271:3 274:4 |
| **10:50** 310:17 |
| **10th** 312:2 317:7 327:7 |
| **11** 307:9,10 418:7 459:9 547:17 |
| **11,000** 501:13 |
| **11/13/2015** 512:2 519:7 |
| **11/5/2014** 393:11 |

**1102** 279:8,11,13 293:20 546:25
**1103** 279:8,11,13 293:20 546:25
**1109** 400:2,4 548:17
**1110** 400:2,4,8 406:4 548:17
**1135398** 272:23
**11530** 272:8
**11:15** 306:18
**11:29** 329:16
**11:44** 329:19
**12** 310:8,10 491:23 492:3,4,4,4,4,5,8 492:13,14 496:11 547:19
**120** 495:13
**120,000** 495:4,12
**1208** 393:2,5 548:12
**1218** 390:24 391:2 391:7 392:12 548:9
**1219** 391:6,9,14
**1223** 391:10
**1229** 390:24 391:3 548:9
**12:02** 344:23
**12:06** 345:2
**12:55** 379:19,20
**13** 312:8,9 547:21
**13th** 545:21
**14** 318:14,15 491:23 492:5 496:12,17 547:23
**1419** 293:24 294:3
**1421** 293:24 294:3
**15** 325:12,14 472:3 547:25

**16** 338:15,17 433:24 484:12 548:3
**17** 359:16,18 449:4 449:5 484:12 548:5
**170** 495:18
**170,000** 488:14 489:12 490:4
**1714** 541:24
**18** 270:7 274:9 368:2,4 375:9 463:2 548:6
**1842** 295:10,14 547:8
**1844** 296:11
**1847** 295:11,14 547:8
**19** 311:15 325:18 390:23,25 510:8 548:8
**1907** 299:18,22 300:7 547:10
**1908** 299:19,22 300:7 547:10
**1996** 469:11
**19th** 311:18,21 312:13 316:23 334:14
**1:50** 380:3
**1:51** 380:10
**1st** 282:9 283:9

| 2 |
|---|
| **2** 279:10,12 316:4 316:12,13 321:4 322:14,22 323:4 324:3 366:7 546:24 |
| **2.1** 496:19 |
| **2.2** 306:19 |

**2.2.** 306:21
**2.23** 494:8
**2.3** 306:21 310:19 312:18 313:16 316:19,25 317:15 320:13,16,17 321:13,22 322:10 326:5,8,10,12,24 328:2,11,19 340:19 341:9 342:19 343:2
**2.5** 301:10 320:8
**20** 351:16 392:24 393:3 398:17,18 456:20 459:9 463:2,22 466:10 471:15 501:2 523:3 548:10
**2007** 346:22 347:21 510:6
**2008** 347:11,22 348:22 358:15 459:15 474:12
**2011** 349:11 464:8
**2013** 380:14
**2014** 397:22 510:8 517:15,21 518:5,9 531:24
**2015** 281:5 283:13 348:12 368:11 397:3 402:5,23 414:13 418:7 423:14 445:25 458:6 511:19,23 511:24 512:11 514:7,10,15,20 515:15,15,21 518:8 521:9,10 528:16 536:3 540:16 541:13

**2016** 275:18 279:4
280:17,22 282:22
283:20 294:22
329:21 334:8,9
414:19 433:24
441:22 515:4,9,17
523:20 531:11
533:16
**2017** 302:25
303:14 304:2,24
305:8 306:2
307:14 308:20
309:15 310:17
311:16 325:18
334:10,19,23
337:18,23 338:10
338:23 348:12
425:11 435:24
461:10 483:22
484:8 485:5,6,13
486:9,10 487:18
488:10 500:20
501:13,14 511:18
511:19 515:5,6,11
522:13 533:16
**2018** 484:8,10,12
485:8 488:13,18
488:21 493:6
501:4
**2019** 481:20
482:13 488:16,18
488:21 492:23
493:5 500:2 501:4
**2020** 490:8 491:24
492:20 500:3,21
**2021** 270:19 271:2
274:3 286:2
490:23 491:20
493:18 499:6,17
499:18 544:14
545:9,21 546:2

**21** 395:8,10 496:17
496:18 548:13
**21st** 334:14
**22** 343:24 399:25
400:3 420:3
548:16
**220** 273:13
**23** 415:15,17 420:3
440:19 548:18
**2301** 299:25 300:4
300:7 547:12
**2302** 300:2,4,7
547:12
**2315** 310:8,11
547:20
**2316** 310:9,11
547:20
**2322** 307:8,11
547:18
**24** 280:21 425:13
425:15,19 482:13
548:20
**24th** 482:12
**25** 355:20 463:4
479:23,24 514:5
548:23
**26** 502:12 508:17
508:21 548:25
**27** 541:24
**275** 546:6
**276** 546:22
**279** 546:24
**28** 270:19 271:2
274:3 512:12
546:2
**280** 547:2
**28th** 272:19 545:9
**29** 512:12
**294** 547:4,5
**295** 547:7

**299** 547:9
**29th** 301:16 302:6
**2:12** 302:7

**3**

**3** 275:18 279:24
280:2 547:2
**3/7/2016** 522:16
**30** 280:17 310:19
320:13 337:8
338:10,23 348:12
348:12 435:24
497:18,19 512:14
543:15
**300** 546:16 547:11
**301** 547:13
**302** 546:16 547:15
**307** 547:17
**30th** 343:3 442:9
492:7
**31** 522:13
**310** 547:19
**312** 547:21
**318** 547:23
**31st** 442:10
**322** 546:16
**325** 546:16 547:25
**326** 425:14,16
548:21
**328** 425:17 548:22
**337** 546:16
**338** 548:3
**341** 546:16
**346** 546:7
**351** 546:17
**359** 548:5
**368** 548:6
**372** 546:17
**390** 548:8
**392** 546:17
**393** 548:10

**395** 548:13
**3:29** 444:13
**3:47** 444:16
**3:54** 447:25

**4**

**4** 293:25 294:2
448:4 547:4
**4/13/2014** 509:15
509:20
**400** 548:16
**401** 493:24
**403** 546:17
**415** 548:18
**425** 548:20
**428** 546:17
**4313** 545:23
**45** 486:17,19
**465** 368:3,5 548:7
**466** 368:3,5,17
548:7
**473** 546:17
**477** 546:13
**479** 548:23
**489** 415:18 546:13
548:19
**490** 415:16,16,18
415:22 546:13
548:19
**493** 546:13
**499** 546:13
**4th** 305:11

**5**

**5** 294:9,10 302:24
303:14 304:2,24
305:7 306:2
307:14 308:20
309:14 547:5
**50** 463:21
**50,000** 495:13

**50/50** 497:17
**500** 546:13
**501** 546:14
**508** 548:25
**51** 375:19,21
448:25
**519** 272:7
**52** 449:8
**54** 449:8
**55** 494:23
**56** 449:11
**58** 449:12
**59** 449:13
**590** 279:25 280:3,5
547:2
**592** 282:7
**594** 281:2
**595** 280:18
**599** 273:5 279:25
280:3,5 547:3
**5:19** 498:7
**5:32** 498:10
**5th** 305:11,12
306:16 327:6

**6**

**6** 278:15 295:12,13
310:17 538:13
547:7
**60** 449:13 494:24
**600** 272:6
**61** 449:14
**62** 449:14
**63** 449:14
**64** 449:14
**66** 449:14
**68** 449:15
**69** 449:15,17,22
**69,000** 402:22
**6:29** 308:20
**6:30** 308:24
309:14

**6:56** 542:8
**6th** 311:20 316:23
537:13

**7**

**7** 299:20,21 346:23
547:9
**70** 449:15,17,22
497:18
**71** 449:25
**72** 450:3
**76** 450:4
**77** 450:4
**78** 450:5
**79** 450:6
**7:14** 303:9,12
**7:15** 542:11
**7:17** 544:6,8
**7th** 315:4,16

**8**

**8** 299:25 300:3
346:22,23 547:11
**80** 450:7
**806** 338:15,18
548:4
**807** 338:16,18
548:4
**83** 450:9 487:9
**838** 325:12,15
548:2
**839** 325:17
**84** 450:10
**841** 325:13,15
548:2
**842** 318:14,16
547:24
**843** 318:14,16
328:18 547:24
**844** 312:6,10 314:2
547:22

**845** 312:6,10,12
547:22
**85** 302:18 450:10
**86** 450:10
**864** 276:3,7,11
277:12 546:22
**865** 276:4,7,11
277:25 546:23
**876** 294:8,11,16
547:5
**877** 294:8,11,16
547:6
**88** 450:13
**882** 301:3,6,8,22
547:13
**883** 301:4,6,9
547:14
**884** 302:9,12,19
311:8 547:16
**886** 302:10,12
547:16
**89** 359:17 450:14
**89,200** 493:25

**9**

**9** 301:3,5 547:13
**9/11** 349:7
**90** 450:14
**90,000** 493:19
**91** 450:14
**92** 450:14,16
**94** 450:17
**99** 525:8
**9th** 463:6

**a**

**a.m.** 270:20 271:3
306:18 339:25
**aback** 386:22
**ability** 366:20
382:2 416:5
502:24 524:24

525:2,4
**able** 296:17 344:4
386:2 438:7
440:21 461:17
494:20
**abraham** 476:8
**abroad** 296:16
389:7
**absence** 364:14
**absolute** 292:9
**absolutely** 284:12
376:11,14 502:15
532:5
**accept** 296:20
**accepting** 500:23
**accepts** 500:12
**accompanies**
487:12
**account** 444:22
**accounts** 501:18
501:19
**accumulated**
488:17
**accurate** 543:22
**accurately** 482:6
**accuse** 313:17,20
**accused** 537:11
538:13
**achieved** 375:8
**acosta** 273:23
274:21
**acquisition** 538:3
**acquisitions** 460:8
**acronym** 350:10
**act** 460:21
**acted** 461:23
**acting** 280:13
357:18 361:18
374:22 375:2,3,12
376:24 380:21,22
381:13,15,18

382:6,6,14,22
383:9,15,22 384:3
384:14 386:6
387:8,25 388:3,11
389:5 399:6
401:17 402:11
403:7,18 408:9
409:10,21,25
410:6,16 411:3,12
411:20 412:12
418:16 420:18
423:12,13 432:24
515:10 517:22
520:16,21 521:4
528:14,22 529:18
532:11 533:22,23
533:24 534:25
535:8 539:2
**action** 419:23
545:16,19
**actions** 418:14
431:15,20,22
444:23 447:18
**active** 292:10
**acts** 445:21 446:25
447:5
**actual** 429:13
520:13 540:17
**add** 362:10 366:22
532:20 543:7
**addition** 296:19
335:15
**additional** 448:8
448:11 449:23
472:12 473:6
543:18
**address** 426:6,8
**adjust** 362:7
**administrative**
356:20 374:20
506:15

**admit** 321:8
**admitted** 327:12
421:9 473:25
483:10 524:22
**adopt** 353:7
523:15
**adriana** 273:23
274:21
**advance** 321:7
322:16 475:18
**adverse** 444:23
447:17
**advertising** 489:6
489:7
**advice** 283:12
390:14,17,19
392:5,11,15,19,20
420:3 440:21
452:19 524:25
**advise** 335:2
**advisor** 524:12
**advocate** 376:20
**advocated** 376:16
376:17
**affect** 524:17,24
524:25
**affiliate** 369:19
387:17,23 403:5
452:14 460:12
526:22,24
**affiliates** 283:11
369:23 370:2
384:3 385:20
411:10 430:14
435:22 451:22
465:19 466:12
527:6
**afford** 360:21
**afoul** 454:5
**afraid** 378:13

**afternoon** 309:10
345:5 542:20
**age** 494:24
**agency** 426:10,12
**agent** 485:23
497:15,15,15,16
497:20 498:3
**agents** 486:2 496:8
497:14
**aggregate** 496:17
**aggressive** 417:2
**ago** 286:8 320:23
**agree** 407:10
472:23 473:12,14
490:21,22 495:9
507:10
**agreed** 306:22
327:20 459:12
**agreement** 364:15
369:11,14,17,22
370:6,10 464:15
**ahead** 309:16
321:5 447:12
510:7 534:5
**ahumada** 452:10
453:3 455:19
**ailment** 457:25
**air** 467:17
**airborne** 461:20
467:13
**aldila** 335:2,7,16
335:22
**alert** 353:24
**allegation** 406:18
447:4,9 527:23
**allegations** 366:22
435:7 439:18
445:13,15 527:11
527:12,14
**allege** 444:23
527:5

**alleged** 364:5
412:8 456:15
**allegedly** 285:9
**allow** 335:8
352:15 448:7
**allowed** 292:22
**allows** 426:12
**alluding** 277:13
**alternative** 516:9
**amazing** 524:11
**amber** 282:10,17
282:22 283:10,15
283:17,24 284:10
423:18 433:3
441:22
**ambien** 511:4
517:2
**ambiguous** 304:8
304:17
**amended** 359:16
359:19 448:25
479:20,24 502:12
548:5,23
**america** 270:8
272:16 274:7
**amex** 475:10
500:13
**amount** 321:4
323:12 361:24
365:11 460:19
481:23 493:24
495:18 504:13
**amounts** 414:11
502:3
**andrew** 404:2,4
**andy** 404:16,20
464:12,14
**angeles** 512:13
513:23
**anger** 504:13,14
538:24

**angry** 284:7 442:4
  442:4 504:17
  537:17,20
**anne** 329:24 332:8
  332:13 423:22
  433:8 442:12
**announced** 529:2
**answer** 281:22,23
  286:6 289:15
  291:21 292:24
  298:7 299:8,14
  303:21 305:3
  306:14 308:25
  311:4 322:4 333:7
  333:7 334:17
  336:8,10,16 342:6
  347:15 371:9
  378:11,13,20,20
  379:4,11,14 383:4
  388:16,18,20
  389:15 396:19
  399:7 407:19
  409:6 410:11,23
  419:17 422:23
  435:11 437:22
  438:8,24 439:4
  449:20 481:6,9,13
  497:7,8 502:23
  503:6,17,18
  506:13 507:15
  528:2
**answered** 299:16
  322:3 500:15
  538:20
**answering** 303:20
  303:23 309:7
  321:20 408:25
**answers** 307:18
  347:13 413:16,17
  435:13 524:14

**antianxiety**
  516:25
**anticipate** 535:22
  536:12
**anticipated** 383:7
  495:4
**antidepressant**
  505:10
**antitrust** 440:22
**anxiety** 503:8,11
  503:22 504:11
  511:10,17,21,23
  512:21 514:6,17
  514:19
**anybody** 377:4
  384:14 404:18
  455:2 459:21
  461:17 463:19
  465:16,18 466:24
  467:22,23 472:17
  479:8
**anytime** 329:7
**anyway** 323:15
  376:21
**apart** 441:9
  501:24
**apologized** 329:3
  422:19
**apologizing**
  325:10
**apparent** 484:17
**appear** 429:5
  509:8
**appears** 340:3
  396:4 495:8
**applications**
  477:15 484:3,6
**applied** 462:14
  468:3 472:21
  474:24 477:4

**apply** 468:11
**applying** 473:12
**appointed** 363:24
  373:10 403:18
**appointment**
  383:15 528:14,22
**appoints** 296:18
**appreciate** 325:19
  347:14
**appreciative** 532:6
**apprenticeship**
  426:10
**appropriate** 334:5
  468:22 494:18
**appropriately**
  499:22
**approval** 292:15
  292:17 309:23
  311:12 363:23,24
  372:17,20 373:9
  373:15 539:6
**approvals** 417:10
**approved** 314:15
  359:8 360:9
  361:22 362:7,13
  368:21,24 374:8
  385:25 432:17
**approximately**
  274:4 306:18
  475:5 488:20
  525:24
**april** 280:17
  387:23 389:9
  528:16
**arbitrary** 315:9,14
  315:20,20
**area** 470:4 483:15
  487:10 495:23
**argument's** 411:8
  508:2

**arithmetic** 497:3
**arm** 356:23
  374:13
**arrived** 289:19
  297:16 417:4
**aside** 457:11
**asked** 278:11,17
  281:23 320:9
  322:7 330:23
  340:23 341:14,16
  344:13 350:17
  364:10 368:11,18
  370:24 371:11,12
  371:23 372:20
  402:11 405:13
  406:25 419:15
  427:2 432:10,10
  443:9 445:6
  447:10 450:25
  459:22 460:13
  461:13 464:13,16
  466:5 467:15,17
  476:9,18,20,23
  477:21 494:24
  511:2,4,6 534:19
  540:19,24
**asking** 278:3
  281:25 286:24,25
  292:25 298:4,12
  301:13,20,23
  303:11 304:22
  306:14 310:3
  313:4 316:16,17
  317:19,23 319:18
  328:15 339:18
  345:25 346:2
  353:22 365:25
  370:19 375:14
  378:5,9 379:6,7
  383:19 394:7
  409:19,21 412:22

415:21 431:19
435:3,6 437:16
439:19,23 440:15
446:15,17 465:14
466:18 469:22
472:16 473:10,11
494:25 506:3
507:25 510:9,20
511:12 534:12
536:4,6 539:6
**asks** 426:15
**asleep** 511:15
**asserted** 439:6
**asserting** 501:23
502:14,18
**assigned** 330:2
539:24
**assist** 431:2
**assistance** 487:15
521:12 536:22
540:4
**assistant** 280:14
380:14 381:17,22
382:4,13 383:10
383:23 399:4
420:17 444:6,8
**associate** 463:13
513:2
**associated** 418:13
495:14 502:4
**associates** 463:10
**assume** 293:21
349:14 355:5
410:21 411:8
435:12 499:22
**assumed** 323:22
381:23 389:18
529:24
**assumes** 342:25
**assumption**
323:19

**assumptions** 381:7
**attached** 549:3
**attacks** 512:3,5
**attain** 382:2
**attend** 296:4,5,9
296:17 297:14
**attending** 433:21
**attention** 275:18
296:11 359:21
391:5 395:14
400:6,8 427:4
480:3
**attorney** 297:15
345:23 481:4,7,14
484:15 503:16,19
**attorneys** 272:5,15
273:3,12 346:7,8
346:17 462:9
470:21
**attract** 407:23
**attractive** 407:13
407:23 408:3
**attributed** 516:21
**audit** 500:24 501:2
**audited** 501:3,4
**august** 329:21
334:8 423:14
442:21 537:10,13
**authenticity**
293:23
**authority** 295:23
296:13,19 314:6,8
314:11,12,15
316:4,12 322:13
323:9 327:19
361:14 387:15
407:16 421:11
422:13 455:4,6,8
455:10
**authorization**
310:24 312:25

316:8,19 321:10
321:10 322:9
323:20 324:8
340:22
**authorize** 455:23
**authorized** 317:16
320:17 321:3
323:3 455:2 456:4
465:3,4
**authorizes** 328:11
**authorizing**
327:17 340:4,5
455:20
**autonomy** 352:16
**avail** 462:14
**available** 403:25
473:2
**avenue** 273:5,13
**average** 495:22
496:15,15
**avoid** 397:12
521:23
**aware** 289:19
290:18 294:5,7,13
294:17 295:6
296:7 298:18
322:15 323:13
331:12,16,23
344:2 351:19
363:23 368:23
380:18 389:12
394:23 522:19
523:10,25 524:2
**axiom** 462:10
468:21,25 469:4
470:15

**b**

**b** 546:20
**back** 277:22
283:13 285:12,13
291:11 306:22

315:7 318:23
323:15 325:23
328:24 329:18
332:11 349:18
356:16 358:9,14
365:19 370:20
380:9 383:7
387:21 393:23
399:4 408:14
412:24 413:20
414:7 418:21
422:22 423:11,13
427:17 431:24
441:14 444:15
445:10 448:3
465:9 475:21
482:19 489:17
494:6 497:25
498:9,12 519:4
538:9,19 542:3,10
543:19
**background**
468:23
**backpay** 494:14
**bad** 328:4 400:9
437:25 438:2
440:14
**badgering** 412:19
412:20
**badly** 479:19
**balance** 374:25
375:4,6,14,16
**bank** 501:18
**bar** 462:6 469:8,11
469:14,16 470:17
470:25 471:4,9,12
471:15,20 472:3,4
472:10,24 473:5
473:15,25 474:5,9
483:13 485:12
528:19

barbara 467:11
barely 294:23
base 413:10
  422:10
baseball 403:13
  440:5
based 276:22
  314:19 316:7,18
  383:20 386:3
  399:17 401:19
  408:25 413:23
  414:11 415:9
  423:25 425:6
  445:24 454:14
  465:20 466:3,7
  489:19,22 495:16
  496:20 504:20,21
  519:12 532:4
  535:19
basic 337:10
basically 291:2,8
  498:17
basing 409:3
basis 285:23
  291:11 292:9
  293:7 333:17
  351:11 360:6,11
  361:9 363:12
  364:4,18 365:7,8
  365:10,14,20
  366:11,18 368:25
  384:7,8 390:8
  400:22 406:18,23
  417:23 421:13
  422:9 423:2,5
  424:23 436:15
  437:3,7 438:2
  441:12,16,24
  442:24,25 443:23
  444:2 450:9 456:6
  456:8 490:4

493:24 494:13
  496:24,25 503:2
  535:14
bates 276:3,7,10
  279:10,13,24
  280:3 293:20
  294:3,11 295:14
  299:22,25 300:4
  301:3,6 302:9,12
  307:11 310:8,11
  311:8 312:10
  318:14,16 325:12
  325:15 338:15,18
  368:2,5 390:24
  391:2 393:2,4
  395:8,11 400:4
  415:18 425:16
  508:19,20 541:25
  546:22,24 547:2,4
  547:5,7,9,11,13,15
  547:17,19,21,23
  547:25 548:3,6,9
  548:11,14,16,18
  548:21
battery 271:7
  272:18
becoming 534:25
bed 457:17,17
bedroom 285:14
beer 403:14 440:4
began 447:16
  487:17 514:20,22
  518:8 519:25
  520:5 521:10
  522:6
beginning 346:23
  401:3 510:13
  517:16 537:10
begins 391:7 400:7
  441:24 522:14

behalf 439:13
  542:18
behavior 332:17
  332:21 417:2,20
  453:23
beholden 354:6
belief 333:17
  364:21 400:22
  406:23 432:4
beliefs 399:21,23
believe 283:8
  287:13 289:20
  290:11 291:24
  296:14 318:9
  324:19 326:3,6
  330:18 332:6
  333:20 334:15
  356:13,17 358:24
  360:7 362:12
  363:17 365:2,10
  365:12,16,18,20
  366:14,18,19
  372:13 377:20
  392:6,14 400:16
  400:17,19 403:22
  404:15,17,18
  406:21,25 408:17
  408:18 409:15
  410:11 414:23
  415:7 416:10,13
  418:12 419:25
  423:24 428:13
  432:4,6,9,13,16,25
  433:6,18 434:3
  445:3,22,25 447:5
  448:13,20 453:24
  454:11 456:14
  466:13,14,20,21
  473:4 476:20
  481:18 487:24
  489:18 490:17

494:16 502:7
  531:2,3,23 532:5
  540:15
believed 309:11
  313:21 315:25
  322:21 324:23
  417:6 428:25
  458:25 481:19
  518:2,8
belong 383:2
beneath 426:5,14
benefit 326:22
  379:12 448:11
benefits 360:23
  362:13,15 443:10
  443:22 482:19
  493:22 506:17
berman 272:9
  274:14,15 275:23
  281:11,15 285:3
  285:10,20 286:5
  286:13,16 287:12
  287:19 288:14
  290:9 291:4,10,18
  291:23 292:7
  296:6 297:9 298:2
  298:16,24 299:13
  301:11 304:7,11
  304:12,15,20
  307:13 308:16
  309:4,5,18,24
  310:14 311:2,9,23
  313:2,13 315:8,12
  315:18 316:9,20
  317:3,22 319:5,7
  319:13,14,16,20
  319:22 322:12
  323:21 324:25
  326:20 330:17
  332:10 340:9
  342:22 346:11

378:16 385:14
406:12 407:14,20
408:5,13 409:14
410:4,10 411:7,17
411:21 412:7,14
412:18,22 413:8
420:25 424:11
426:24 427:14,20
429:6 435:16
441:20 443:6,18
454:24 456:17
465:25 472:14
473:3,18 480:15
481:6 482:4
492:17,21 495:10
497:6,8 503:5,15
506:12 507:14
508:8 520:22
524:8 540:14
543:21 544:3
**best** 282:19 305:6
305:9,14,16,19,22
329:10 453:6
454:11 490:24
502:24 537:8
**betrayed** 328:25
**better** 419:20
436:25 437:18,21
438:9,18 460:20
490:9 500:8
518:17 520:20,23
521:4
**beyond** 415:12
475:19,19
**bidding** 491:9,11
**bienami** 288:8
**big** 533:25 534:22
**bigger** 422:8
**bill** 463:13 500:13
528:5,8,16 530:22
534:10,18 535:17

**birth** 509:14
**bit** 321:25 361:3
530:8 538:9
**blamed** 422:16
**blank** 426:14
429:4
**blatantly** 410:13
410:14,15
**bliss** 468:20 469:4
470:15 476:7
**blood** 545:15
**board** 353:2 385:4
**body** 427:25 516:9
**bonus** 414:14,17
**bonuses** 365:17
**book** 522:19
523:13
**booming** 491:2,6,7
491:9
**bored** 522:20
**boring** 523:7
**boss** 281:20
364:22 396:5,8
442:3 519:8,10
**bottom** 281:3
510:24
**boys** 512:14
**brazil** 392:17
538:3
**brazilian** 391:17
392:21
**breach** 291:9
421:14
**bread** 436:4 459:5
**break** 318:4
329:14 379:16
444:11,19
**breakdown**
537:11 538:11,14
540:9

**breakfast** 465:12
**brian** 386:17
**briefed** 531:8
**briefly** 276:10
279:18 519:11
**bring** 329:9 418:8
505:22
**brings** 523:16
**brittany** 272:22
274:20
**broad** 367:12
379:3,13
**broader** 353:22
**broke** 372:12
498:14
**broken** 374:19
**broker** 497:13
**brokerage** 497:21
497:21
**brought** 332:13
343:17 430:13
434:25 458:4
515:8,9,12 518:18
**bruce** 467:13
**budget** 360:15,20
361:4,6,6,10,20,25
362:6,7 363:11,14
364:6 365:15,17
370:11
**building** 349:9
539:21
**bullet** 493:15,23
**bullets** 481:16
494:10
**bunch** 284:24
**business** 288:22
296:15 327:15
331:14 334:12,22
335:10 336:22,23
357:16 372:18
373:8,22 374:2,4

398:2,7,8 403:10
404:6 432:19
441:8 460:6
465:10 470:20
483:8 485:16
486:12,23 488:9
488:13 489:9
500:5,19 501:7,10
530:25
**businesses** 327:22
336:2,6 337:8
375:12 389:11
430:2 432:20
539:14
**busy** 523:15 537:8
**buyer** 491:17
**buyer's** 497:15,15
497:20
**buyers** 491:13
**bylaws** 373:13

**c**

**c** 272:2 275:6
380:4 451:25
480:5,24 482:5
505:7 545:2,2
**calculating** 481:25
496:6
**calculation** 494:2
497:2
**calculations**
481:17
**calendar** 499:3
**california** 334:11
334:23 336:6
343:7,9 465:10
469:11 470:13
471:2,12,15,19,20
**calin** 451:25 452:8
452:21
**calin's** 453:16

**call** 295:20 318:3
324:24 325:3,6,22
328:23 461:25
476:3,19,21 477:9
487:3 489:24
490:2,12
**called** 295:21
306:22,23,23
338:10 350:6
467:2,22,23 505:9
**calls** 344:3 398:15
**calm** 440:7
**canada** 337:19,23
**canadian** 451:17
453:12,24 454:4,5
454:7
**cancelled** 294:24
**cancer** 510:6
**candid** 397:16,19
**candidate** 407:23
436:19,23 437:14
437:17 438:6,6,9
438:14
**candidates** 408:3
411:2 436:11
437:10 438:15
**capacities** 270:11
270:13,15
**capital** 529:13,17
**capsules** 451:15
**captures** 280:12
**car** 350:14 406:19
443:21 500:9
**carbon** 335:25
**card** 349:8,12,16
349:18
**cards** 489:9
**care** 393:24
471:18 505:6
**career** 350:15
375:9 456:20

463:2 483:4,20
484:21,23 485:2,3
485:4 502:2 524:6
524:9,17,20
**careful** 352:5
**carefully** 430:4
**carolina** 385:19
528:17 533:21
**carolyn** 358:25
**carolyn's** 359:2
**carry** 516:3
**case** 274:9 289:18
292:10 294:6
296:14 297:15,23
307:7 320:10
323:3,9 326:25
329:11 351:17
392:25 393:4
408:7 431:10
501:24 507:22
508:19,22 519:5
534:14 539:21
540:24 548:11
549:2
**cases** 527:4
**cause** 283:25
459:20 536:25
**caused** 341:25
342:8,15,18
503:12 508:15
**cautioned** 481:7
**cbre** 475:11
**ce** 546:15
**center** 360:16
374:16
**ceo** 372:7 452:15
452:17,18 533:8
**certain** 295:23
367:13 376:19
386:16 439:6,9
455:3 460:19

474:16 500:3
521:25
**certainly** 298:11
323:15 362:20
405:25 462:22
476:6 495:21
497:23 518:9
531:7 543:7
**certified** 546:15
**certify** 545:7,14
**cetera** 470:23
**chain** 466:11
**challenging** 281:5
**chance** 279:15
445:20 543:13
**change** 521:18,20
521:24 522:2,9,10
**changed** 284:13
420:10 482:16
532:20,22
**changing** 408:3
522:12
**characterize**
518:17
**charge** 425:22
426:25 428:11
455:9
**check** 300:24
**chemical** 270:8,9
272:15 273:3
274:7,24 291:20
350:7,11,13
351:23,25 353:25
534:8
**children** 462:16
470:4 504:12,22
505:17 523:22
**choice** 404:12
**choose** 438:5
**chose** 297:13,20
299:15 404:14

405:20,21 434:2
434:13 506:19
**chosen** 298:25
330:20 377:19
506:18
**circuit** 463:6
**circumstances**
286:9 367:15
379:6 400:24
409:17,19,20,24
410:5 543:2
**ciro** 452:10 455:14
**city** 272:8 347:23
349:11 513:24
**claim** 285:18
330:9,11 419:2,6
427:23 430:17
435:14 441:12,22
442:14,17,23
443:4,17,24 444:3
444:20 462:21
471:7
**claimant** 527:5,23
**claimed** 501:7
**claiming** 482:3
**claims** 334:4 439:6
439:9 448:14,18
451:3 482:16
526:4
**clarick** 273:11
275:3
**clarification**
347:14
**clarify** 304:17
444:18 445:3
540:15 541:2
**clarity** 445:17
**clear** 296:23
298:20 303:25
306:9,10 308:20
308:24 309:15,19

322:7 334:7 438:8
444:22 447:20
469:4 528:3
**clearer** 520:10
**clearly** 298:14
309:25 321:13,21
**clerk** 463:5
**client** 287:9
288:17 290:6,15
292:12 303:15
304:3 306:7 307:4
309:23 317:14
340:6 345:23
355:12 390:18
433:23 439:7,13
452:23,25 455:11
455:11 465:4
481:5,8,14 491:8
503:16,19
**clients** 306:2
355:14,15,22
369:7,15 370:2
466:11 491:10
525:5,11,18
**clock** 448:4
**close** 495:19,20
496:3 497:24
542:16
**closed** 491:22
496:11,16
**closely** 455:14
**closer** 401:5 419:3
419:5
**closes** 499:8
**closing** 283:16
496:8,15
**closings** 492:5
**club** 533:20
**coach** 304:14
**code** 337:3,9

**coincides** 398:7
517:15
**cokes** 360:22
361:2
**colleague** 274:25
**colleagues** 274:16
274:20 386:13
458:25 530:7
**collectively** 543:16
**college** 514:3
**colloquy** 542:13
**colwin** 272:21
274:18,18 275:10
276:3 279:9,23
286:14,19 293:24
294:8 295:10
299:3,18,24 301:2
301:20 302:8
304:10,13,19,21
307:8 310:7 312:7
318:7,10,12
321:19 324:9,12
324:14 325:11
329:13,20 336:9
338:14 340:15
344:12,20 445:6
450:25 469:24
540:19 546:6
**combat** 467:17
**combination**
494:9
**combined** 494:14
**come** 306:19 358:9
365:19 370:13
381:3 398:20
431:18 434:14,25
465:9 468:23
503:14 528:24
539:25 542:3
**comes** 278:25

**comfortable**
403:14
**coming** 512:15
536:10 537:16
539:22 540:5
**comitted** 522:3
**commencement**
545:11
**comments** 281:2,3
282:8 397:4
416:25 417:21
**commission**
544:17
**committee** 426:11
440:8,9
**common** 485:25
530:6,11,14
**communicate**
319:24 422:11,15
**communicated**
323:6,7 422:2
539:11
**communicating**
302:5 398:11
421:10 525:10
**communication**
282:13 296:24
300:8,12,16 301:9
305:25 308:3,9
310:13,16,22
311:10,21 312:14
318:18 319:9
320:15,23 321:9
321:12,15,23
324:15 326:17,24
328:23 364:23
433:5 442:8
464:25 539:20
**communications**
319:12,14,19,20
427:16 481:15

503:20 531:23
537:19
**companies** 292:3
331:11 335:11,12
335:25 343:25
350:14,21 351:24
352:20 371:17,20
373:19 384:12
385:25,25 402:25
403:5 408:2,6
420:4 440:19
443:13 451:14
468:11,22 470:14
475:7,22,23 476:2
476:11 526:3,14
527:16
**company** 278:12
283:13,14,16,18
283:18,23 284:3
286:22 289:10
290:20 297:19
307:5 332:14
335:16 349:13,15
351:21 352:25
353:3,5,10 354:3,6
354:6 363:23
369:19 373:10
374:11,13,14,16
374:18 384:9,25
385:12,22,24
386:13,22 387:4,9
387:23,23 393:17
396:6 402:21
404:24 405:20,21
405:23 407:8
408:8 409:10,25
410:6 411:19
418:8 419:19
424:4,8 425:5
427:23 428:15
432:17,19 433:10

441:23 451:17
458:24 459:14,16
459:19,21 460:4,5
460:11,12 461:3,7
461:12,23 462:4
462:13,21 464:16
477:20 494:4,7,17
515:12 526:12
527:17,18,19,21
529:24 530:16
533:21 534:23
**company's** 388:24
**comparable**
456:22
**compare** 405:13
**comparison**
443:25
**compensated**
488:23 489:2
**compensation**
407:12,12 408:3
501:23
**competitive** 491:5
**complained**
332:15,17,21
418:10 423:10
433:7,16,24
**complaining**
423:11,12,14,17
423:18,21 426:13
460:22
**complaint** 285:24
329:24 330:15,16
330:19 332:13
359:4,6,10,16,19
360:3 366:2
388:21 390:2
412:5,8 425:9,13
425:16,20 426:2,3
426:4 427:22,25
428:3,6,23 429:9

429:13 430:3
431:23,25 445:9
446:24 447:3,8,10
447:14,21 448:7
448:17,19 449:2
456:16 525:16
528:5 533:19
548:5,21
**complaints** 386:19
386:23 388:11
424:4,7 425:5
430:13,15,24
431:4,8 433:9
439:11 453:22
**complete** 379:13
417:24 540:17
**completely** 352:3
352:7,8 361:6
363:19 395:5,5
442:2 445:24
466:8
**compliance** 336:5
519:9
**complicated** 496:4
**complimentary**
535:2
**component** 370:5
**compromise**
296:20
**computation**
480:5,25
**concern** 353:6
418:8 540:8
**concerned** 279:20
351:22 377:15,23
**concerning** 453:15
**concerns** 293:14
294:6 297:22
298:14,19,22
299:11 399:18
400:12 418:15,18

**concerted** 397:2
**concluded** 437:11
437:12
**concludes** 497:3
544:5
**concluding** 510:14
**conclusion** 322:24
323:2 333:3 394:7
394:9 436:16
443:8
**conclusions** 277:8
**concrete** 307:18
308:25 355:8
**concurrent** 484:24
**condemn** 392:11
**condemning** 392:5
392:15,19
**condensed** 340:12
**conditions** 358:12
358:20,22 361:12
363:15 364:8
365:21,24 366:9
366:13,16 367:15
505:5 513:19
**conduct** 313:18,19
330:8 337:3,10
453:23 456:15
457:3 527:7,25
**conducted** 331:2
**conference** 295:18
295:20,23 296:18
297:8,14 298:21
299:10 312:5
387:22 433:21
**confidence** 381:25
387:3 532:4
**confidential**
393:19 394:8
**confidentiality**
393:13,18 394:3

**confirm** 367:4
460:17,18,19
**confirmation**
312:16,18 313:16
**confirmed** 385:20
461:5 532:23
534:13 535:17
**conflict** 283:25
**confronted** 328:22
**confused** 327:11
**confusion** 312:15
327:21,25
**connected** 499:21
501:25
**connecticut**
470:10
**connection** 421:5
452:20 486:24
513:18 514:18
516:19
**connections** 483:8
483:15
**consent** 370:16,25
371:12,23 372:4,9
373:6,22 374:5
**consequence**
466:17
**consequences**
378:14
**consider** 355:14
409:20,21 435:21
543:17
**consideration**
320:4
**considerations**
415:9
**considered** 330:25
352:6 404:15,18
404:20 405:24,25
**considering**
307:20 504:4

**consist** 382:13
**consisted** 433:21
  454:19
**consistent** 300:20
  316:2 322:22
  381:17 382:5,16
  383:6
**consortium** 504:9
**constant** 364:22
**constitute** 444:24
  445:20 446:10
  447:18
**constitutes** 446:25
  447:3
**consult** 325:7,9
**consulted** 380:18
  525:12
**cont'd** 275:9 380:7
**contact** 288:19
  328:17 357:6,24
  371:4,4,5 372:6
  389:17 452:23
  453:2 455:11
  468:9
**contemplate** 313:4
**contemplated**
  383:12
**contemplating**
  503:9
**content** 300:20
**context** 351:15
  359:12 395:18,19
  402:20 416:2,3
  419:20 431:19
  434:4 440:11
**continuance**
  454:20 456:5
**continuation**
  515:24
**continue** 275:15
  380:11 392:11

462:7 470:24
  516:23
**continued** 271:5
  516:22,24 518:11
  539:12,12,13
**continues** 457:10
  506:5
**continuing** 411:22
**contract** 291:9
  358:10 364:9,10
  364:11,14 462:10
  469:3 470:21,22
**contracted** 292:3
**contractor** 485:17
  485:20,21 486:8
  487:18 489:11
  500:6
**contractors**
  462:11 470:9
  486:2
**contracts** 344:6
  358:8 429:21
  440:23,24 467:14
**contribution**
  481:3
**control** 293:11
  352:3,8,24 364:6
  366:9,16 395:6
  428:15
**controlled** 359:7
  360:8,13,15,19,20
  360:24,25 361:4
  364:7,19 365:21
  366:12 428:19
**controversy** 285:6
  545:17
**convenient** 404:19
**conversation**
  276:23,24,25
  282:16,21 283:9
  284:7,17 287:17

305:20 306:17
  326:12 327:5,6
  335:6,22 340:13
  340:18 341:5,7
  351:7,9 383:17,21
  519:13,13 529:4
  531:19 533:18
  534:11,19 537:23
  538:10,21 543:22
**conversations**
  314:20 362:10
  374:7 389:12,20
  397:24 398:22
  469:3 479:5
  489:16 536:21
  539:23
**conveyed** 382:6
**conveys** 381:15
**copied** 318:21,24
  319:2,5,7,8
**copies** 429:11
**copy** 425:13,15
  548:20
**copying** 319:25
  325:22
**corinna** 452:8,21
**corp** 351:24,25
**corporate** 352:13
  523:8
**corporation**
  270:10 273:4
  274:24 436:8
  462:9 469:6
  471:25 474:3,17
**corporations**
  468:24
**correct** 280:22
  281:2,4 285:19
  287:25 288:15,20
  288:23 289:15
  291:3,17 292:13

293:15,20,22
  295:18,24 296:5,9
  296:10 297:3,25
  298:15,23 300:13
  300:17 301:15
  302:15,17 303:8
  303:17 304:6
  306:4 307:23
  308:6,15 310:20
  310:25 311:12,22
  312:25 313:12,23
  314:9 315:2,11,17
  315:19 317:2
  318:25 319:6,15
  319:21 320:10,17
  321:15 322:11
  323:24 324:18
  325:8 329:23
  330:12,16,22
  331:6,10,13,16
  332:3,4,17,21
  333:5 334:8,12,23
  334:24 335:4
  336:2,21 337:2
  338:25 339:7,13
  339:22 340:2
  341:14 346:25
  347:6 348:4,5,6,19
  354:23 355:3
  357:19 358:21
  368:19,20 369:23
  371:13 375:24
  381:14,20 388:18
  388:19,20 396:3
  405:6,21,22
  420:20,24 429:16
  435:12 443:5
  450:15 466:2,12
  472:13 478:8
  482:10,11 488:11
  499:3,4 517:13

518:16 525:19
**corrected** 442:20
**correctly** 371:10
**correspondence** 301:17
**corrina** 451:25
**cost** 362:16
**costa** 270:12
272:17 273:12,21
274:19 275:4
307:2 346:21,24
348:3,19 354:18
358:25 362:11,18
364:22 368:14
372:3,5,25 383:21
385:7 386:8
389:19,22 390:7
394:24 396:3,13
400:17 402:4
405:19 406:4
524:22 538:24
540:13,22 541:3
**counsel** 274:12
280:13,14 285:4,8
286:4,15 288:11
288:15 292:12
298:10 299:6,6
300:17 301:11
303:17 307:14
308:5,12 309:15
310:14 312:23
313:10,22 315:2
315:10,15 318:2
319:23 330:6,8
333:22 334:20
337:5 345:13,23
347:3 348:15
357:3,18 358:23
361:18 363:25
368:18 369:8
371:2 374:23

375:2,3 380:14,22
381:13,17,18,22
381:24 382:2,4,7
382:13,14 383:9
383:11,16,22,23
384:19 391:24
399:4,6 401:17
402:5,12 403:12
403:19 406:2,22
408:9,10,11
409:10,12,12,22
410:2,7,8,9,17
411:3,5,12,15,20
412:12,13 420:17
420:19 423:12
424:13,16 426:21
426:22 427:11,15
427:16 430:19,21
430:25 431:10
432:8,11,23
433:20,22,23
436:8 453:8,16,16
453:24 454:4,18
459:8,12 461:11
461:19,21 462:5,8
467:12 472:2
474:3 478:13
482:13 498:15
503:15 515:11
517:22 520:9,17
520:19,21,25
521:5 524:12
525:2,18 528:15
528:23 529:18
532:12 533:22
535:8 538:7 539:2
542:14,16,24
543:6,8 545:18
**counsel's** 357:10
404:22

**counselor** 524:12
543:23
**counsels** 444:7,8
**counter** 303:4
312:15
**counterparts** 363:8
**counterproposal** 303:17 304:4,25
**country** 272:6
463:4 533:20
**county** 545:4
**couple** 285:14
286:7 346:9
438:17 475:12
498:13 528:19,20
**course** 285:21
291:25 302:17
329:5 353:9 369:3
387:6 398:4,5
406:24 408:16
417:19 434:2,6
435:11,18 437:13
437:14 445:8
446:3 448:12
470:4 479:14
483:12,14 484:4
485:5 518:23
528:21 534:25
536:3 540:23
543:25
**court** 270:2 274:8
274:11 315:21,22
315:24 549:3
**cover** 445:19,20
**covered** 298:21
446:9
**covers** 487:13
**create** 401:6 406:9
406:10

**created** 327:25
400:23
**creating** 416:15,24
537:6
**credibility** 487:22
**credible** 506:19
**critically** 285:18
**criticism** 394:5,13
394:14,16
**criticisms** 281:9
**criticize** 390:13,19
417:13
**croen** 505:7
510:25 511:4,22
516:5,10,19,22
**crossover** 483:9
**culture** 297:19
434:2
**curious** 539:19
**current** 432:18
**customer** 284:2
**cut** 446:5,9 462:18
497:21 534:5
542:24 543:12
**cutting** 336:11
**cv** 270:7 274:9

**d**

**d** 271:9 545:5,24
546:4
**d.c.** 470:8,9
**damage** 503:13
**damaged** 456:23
456:25 457:4,5,13
457:14
**damages** 458:15
458:19 480:6,22
480:25 481:2,12
481:12,17 482:3,7
482:24 483:3
494:13 502:3,14
503:3 508:15

**damaging** 507:7
507:12
**dan** 283:12,13
423:19
**data** 344:5 526:7
**date** 275:19,21
276:8,23 279:14
280:4 294:4,12
295:15 299:23
300:5 301:7
302:13 307:12
310:12 312:11
314:24,25 318:17
325:16 337:21
338:19 359:20
368:6 391:4 393:6
395:13 400:5
415:19 425:18
480:2 481:20
508:23 509:14,14
**dated** 280:21
310:17 311:15,17
509:20 519:6
**dates** 460:20
**dating** 536:15
**day** 324:20 339:5
339:12 343:10
345:11,14 346:16
357:4 383:25
386:4 398:7,8
416:22 435:19,25
451:8 457:17
462:19 465:9
487:11,11 497:22
504:5 506:5 517:4
533:6 536:8,9,11
536:24 539:10,10
540:13 542:2,15
544:14 545:9,21
**days** 278:2 294:19
310:19 320:13

327:8 335:10
519:18 522:25
**deadline** 307:22
307:25 308:7,12
315:3,4,9,10,14,21
315:22,23,24
**deal** 291:19
357:14,25 372:14
496:3 497:14
515:23 519:8
533:25
**dealing** 430:23
505:23
**deals** 492:25 493:3
493:7 496:12,12
**dealt** 351:18
**dear** 296:12 400:7
**debate** 364:12
439:21
**debra** 332:2
**decade** 391:22
**december** 301:16
302:6 402:23
481:20 482:12,13
488:16 531:24
**decide** 307:15
400:12
**decided** 301:18
326:12 484:3,23
485:2,3 537:4
**decision** 293:3
296:8 309:20
320:25 348:21
349:2 363:20,21
365:3 370:16,21
370:25 371:12,24
372:4 373:6,11
380:17,19 384:18
384:23 385:6
389:16 402:14
403:20 414:16,21

414:24,25 415:4
433:19 437:4
506:15,16
**decisions** 352:16
353:4 363:19
367:6 385:22
**deck** 338:3,6,7
**deducted** 490:19
**deductible** 499:22
**deep** 360:3
**deeper** 278:19
**defendant** 273:3
273:12 274:23
393:2,5 395:11
399:10 548:12,14
**defendant's**
456:15
**defendants** 270:16
272:15 366:4
367:3 391:9
415:16 431:15
434:12,14,17
444:24 482:24
502:4 542:18
**defense** 395:9
400:2 443:10
482:13 541:24
**definitely** 276:17
277:17 343:8
366:15 372:20
504:23
**delegated** 314:15
316:3 322:13
**delivered** 312:17
313:15 337:4,7
339:24
**demanding** 519:2
**demote** 363:25
394:24 397:4
520:12

**demoted** 368:15
418:6,11 423:15
432:14 466:7
478:14 512:4
514:21 517:13
520:2,6,8 521:24
535:23 536:7,11
536:23
**demoting** 395:5
**demotion** 365:2
368:11 392:3
396:22 417:7
419:3 445:23
519:16 520:13
536:5
**denied** 364:11
459:7 461:6
**dennis** 533:2,7,8
534:11,16 535:10
**denoted** 540:19
**department** 290:5
327:23 329:25
333:23 346:22
351:22 356:7,8
364:24 370:2,11
372:10,12 374:14
374:20 385:3
389:10 404:3,25
405:3 420:7
422:12 424:18
425:8 429:24
451:20 464:6,25
464:25 478:15
538:5 539:14
**depend** 436:15
**depending** 303:12
**depends** 440:14
473:21 481:6
**deposed** 409:4
434:15,22

**deposition** 271:5
274:5 275:16
283:3 285:13
346:3,15 419:21
439:12 446:18
448:13 540:13
542:17,20 543:4
543:10,25 544:6
545:8
**depositions** 435:2
**depressed** 504:11
**depressing** 512:16
**depression** 503:7
503:23 504:2,3,24
512:7 513:20,22
**depth** 467:3
**describe** 336:19
**described** 363:10
388:4 420:10
455:21 490:6
498:21 501:21
521:8 531:19
533:19 536:15
**despite** 536:14
**destroyed** 457:2
**detail** 344:2
431:23 445:7
**detailed** 451:2
**details** 284:17
368:12,14
**determined** 361:5
361:11 365:11
416:6
**developed** 338:8
365:15
**developments**
292:6
**devoted** 458:24
484:16
**di** 546:10

**dictated** 359:7
360:8 363:16
**diego** 336:7
509:23
**diet** 360:22 361:2
**difference** 303:18
436:19 457:4
466:11
**differences** 398:25
**different** 286:10
292:20 293:6
331:14 335:11
344:5,6 355:20
374:10 411:10
414:10 420:3
426:22 431:18
433:11 440:22
446:3 454:7
458:12 462:20
464:7 478:15,16
481:24 502:2
506:21
**differently** 284:11
442:2
**difficult** 291:7,14
376:5,5 399:12
400:24 453:21
462:2 507:23
534:20 537:7
**difficulties** 536:14
**dig** 278:19
**digging** 506:3
**diligently** 329:9
**dinner** 345:19
346:12,14 528:20
528:20,21
**direct** 275:18
298:12 354:18,20
354:25,25 356:22
357:6,9,17 359:21
371:3,4 391:5

395:14 400:8
480:3 519:20
**directing** 400:6
**direction** 352:25
389:11 426:23
428:14 464:7
478:15,17
**directions** 546:10
**directly** 319:24
325:20 348:7,9
356:7 363:7
534:12 545:16
**director** 352:25
359:3 361:7
467:14
**directors** 363:6
385:24
**disadvantage**
397:11
**disagree** 472:24
473:4 490:22
541:3
**disappointed**
387:7 491:11
**disappointing**
532:24
**disappointment**
382:23
**disclose** 434:16
**disclosed** 393:19
434:12
**disclosures** 479:21
479:25 502:13
503:4 548:24
**discomfort** 294:14
**discovered** 326:23
**discovery** 539:4
541:17
**discriminated**
418:11 424:7
432:5,6,9,13,16,25

433:6,18
**discriminating**
441:24
**discrimination**
281:9 282:3
284:10 297:6,12
408:18 412:9
418:9,10 423:19
423:22 424:2,8
425:5,23 427:2
428:11 430:17
433:3,8 435:8,14
444:22 445:14,15
445:18,21 446:10
446:20 447:2,4,5,9
448:14,18 449:9
449:11,12,13,18
450:2,3,5,6,8,9,16
450:17 506:22,24
**discriminatory**
326:4,7 418:16
431:16,21 433:12
**discuss** 296:16
301:18 308:5
345:20 349:22
362:18 450:21,21
450:22,23
**discussed** 289:3,13
297:18 304:5
306:18 307:6
314:14,23 322:20
341:8 342:11
346:3,15 361:16
361:16 362:21
370:3 372:15
406:3 415:10
441:23 446:2,23
448:12 450:21,23
533:11,13 534:24
534:24

discussing   303:2
  498:14
discussion   282:10
  287:17,20,22,25
  288:3,5,6 305:15
  305:23 309:5
  317:8 347:17
  380:12 385:10
  443:15 444:22
discussions   345:22
  353:10,13 363:13
  366:25 372:24
  395:3 397:16,20
  452:24 460:16
  528:13 531:5
dismissal   282:10
disputing   308:21
  308:22
disrespectful
  283:5
dissatisfaction
  538:25
distinct   444:21
distinctions
  353:24
distracting   469:22
distress   457:20
  503:3
district   270:2,3
  274:8
divide   457:21
dividend   501:18
docket   359:17
doctor   505:7
  511:21 516:7,8,9
  516:12,24 519:4
  519:12
doctors   458:12
  505:4
doctrine   351:13

document   276:6
  276:10,19 279:6
  279:10,12,16,24
  280:2,6,8 281:12
  281:17,19,19
  282:3 285:8,17,18
  286:3 293:15,19
  293:21 294:2,11
  294:16 295:13
  296:3,7 299:21,25
  300:3,11 301:3,5
  302:9,11 306:6,11
  306:12,13 307:10
  308:19 309:25
  310:5,8,10 311:7
  312:9 313:5,7,24
  314:19 318:14,15
  325:12,14 326:21
  328:13,16 338:15
  338:17,21 342:12
  368:2,4,7 390:23
  390:25 392:22,25
  393:3 395:8,10,16
  396:21,21 400:3
  415:17,21 425:19
  427:8 428:8
  434:18 449:3
  470:22 480:4,13
  482:2,6 489:13
  495:3 499:5 500:7
  500:10 502:8,9,11
  509:17,19 510:9
  541:23 546:22,24
  547:2,4,5,7,9,11
  547:13,15,17,19
  547:21,23,25
  548:3,6,8,10,13,16
  548:18
documentation
  338:2 397:21
  434:20 443:9

445:10 454:12
  455:17 456:9
  493:21 500:12,16
  500:19 501:6
documented   500:2
documenting
  500:8
documents   284:25
  285:15 286:7
  287:8 297:22
  298:13,17 328:7
  344:14 364:2
  368:23 394:18
  395:2 434:24
  489:25 490:3,13
  494:6 498:17
  499:5,5,14 509:8
  541:15 542:19,22
  543:14
doing   275:20
  355:6 362:22
  376:23 394:11
  397:7 401:3
  406:10 419:24,24
  433:12 472:2,17
  473:23 487:17
  490:24 500:8
  539:23
dollar   321:14
  326:9,11,13,25
  328:11,19 340:20
  341:9 342:19
  343:2 440:24
  502:3
dollars   316:5,13
  316:14 321:4,22
  322:15 323:4
  324:4,5 490:14
  496:18,19 497:5
  497:10,23 503:4

donna   270:12
  272:17 273:12,21
  274:19 275:4
  307:2 346:21,24
  347:3,24 354:18
  357:6 358:25
  361:13 362:11,18
  364:22 366:25
  367:17 368:14
  372:3,5,25 382:19
  383:21 385:6
  386:8 388:15
  389:22 393:17
  394:24 396:2,13
  397:2,10,13,14,22
  398:16 399:8
  400:17 402:4,18
  406:4 455:13
  459:23 460:13
  461:10 464:8
  466:7 520:5
  524:22 529:11
  530:25 531:6,23
  534:20 535:2
  536:17 537:3
donna's   363:20
  399:3 402:15
  533:23
door   317:5
doubt   326:23
download   344:5
dozen   475:6
  476:11,16 526:2,2
dr   505:6,9,12
  509:23 511:22,22
  516:5,5,7,10,17,19
  516:22
drafted   320:23
draw   284:21
drinks   528:19,20
  530:7

**drive** 343:6,9
**drove** 336:6
**drug** 513:14
**due** 314:25 321:18
  378:21
**duly** 545:10
**duties** 412:2

**e**

**e** 272:2,2 275:6,6
  288:7,8 294:20
  300:8,25 301:16
  302:14,16,19,20
  302:20,24 303:2
  305:2,7,10,21,24
  306:2,7 307:2,17
  307:19 308:18
  309:21 310:13
  311:15,17 312:13
  313:18 318:18,22
  318:24 319:3,8
  325:19 327:8,13
  328:3 329:4,5
  363:5 369:2 380:2
  380:2,4,4 391:7,8
  391:15 393:7,10
  393:16,21,23
  396:2,10 398:13
  399:9 400:7,18
  403:2 406:3 440:6
  455:17 524:16
  539:5,8,10,16
  543:3 545:2,2
  546:4,20
**ear** 509:24
**earlier** 362:21
  415:10 418:25
  419:16 420:8,14
  449:3 471:16
  501:20 519:18
  520:15 532:9
  540:12 542:2

**earliest** 357:7
**early** 283:8,20
  305:12 363:17
  389:7 398:10
  402:5 433:19
  441:22 483:22,22
  484:8 487:22
  513:10,24 515:4
  522:25 523:6
**earn** 488:8
**earned** 377:19
  382:25 493:18
**earnest** 485:6
**easier** 399:5,8
**easiest** 448:15
**eastern** 470:2
**eating** 457:18
**economic** 457:22
  480:22,25 481:12
  481:17
**eeoc** 425:10,13,16
  425:19 429:9
  430:3,13,18,24
  431:4 548:20
**effect** 343:24
  478:12
**effectively** 374:12
  401:2 422:7
  525:10 532:19
**effort** 397:2
  469:13
**efforts** 482:24
**eight** 290:20 337:6
  338:9 341:17
  372:25 384:9
  402:24 403:10,10
  432:22 459:15
  510:22
**eighth** 509:12
**either** 287:13
  296:25 305:10

319:6 324:19
  331:12 336:25
  345:21 346:16
  354:11 355:3
  456:5 491:16
  513:18
**elaborate** 538:15
**elderly** 470:6
**electronic** 499:7
**element** 385:9
  412:16
**elevate** 399:5
**elevated** 401:17
  517:21 531:6
**elicit** 540:20
**elise** 476:8
**emotional** 440:7
  457:12,19,23
  469:13,15 471:10
  471:10 501:21
  502:5 503:3
  505:22 506:4
  508:15
**emotionally**
  456:23,25 457:5
  507:8,11 518:6
**emotions** 505:22
**employ** 545:18
**employed** 349:13
**employee** 280:25
  349:6 353:16
  354:3 363:18
  366:15 378:25
  413:6,6,23,25
  414:3,4 429:24
  506:14
**employees** 337:11
  337:11 402:22
  414:10 430:13
  453:22

**employer** 350:19
  350:25 351:13
  378:24 425:25
  426:2,7,15 428:12
  428:24 470:21
  476:18
**employer's** 429:5
**employers** 351:5
  352:6 427:13
**employment** 331:6
  331:7 348:19
  351:11,20 357:7
  358:10,13,16,20
  359:7 360:8
  361:12 363:16
  364:8,20 365:4,22
  365:24 366:9,13
  366:16 367:11,16
  415:2 416:7
  426:10 429:16,17
  429:18,20 430:19
  447:17 459:12
  461:18 462:19,24
  478:7
**encountered**
  516:15 526:4
**ended** 460:21
  537:6
**ends** 442:9
**ene** 294:24 295:2
  295:21 298:25
  316:6 433:23
**energy** 469:13
**engage** 390:7
  479:4 487:11
**enjoy** 523:13
**enjoyment** 457:16
**enormous** 465:6
**entails** 411:25
**enthusiastic** 377:8
  377:24

entire 321:17
360:20 433:15
460:3 500:13
entirely 437:19
entirety 372:11
entities 355:20
527:24
entity 526:16,18
enumerate 448:17
enumerated
431:17,23 445:8
enumerating
449:23
environment
277:18 278:19
environmental
429:21 440:23
epidemiological
518:19
episode 419:15
420:22 421:6
equal 436:14,18
438:5 442:22,25
443:24 444:3
equally 418:18
equivalent 412:2,3
escape 279:6
escobar 509:23
especially 429:25
543:2
esq 272:9,10,11,21
272:22 273:7,8,15
essential 292:5
385:9
essentially 291:16
320:6 455:11
establish 489:25
490:3
established 432:7
471:6

establishing
310:23 490:13
estate 483:7,12,12
483:20 484:4,16
485:2,16,23,25
486:12,15,16,24
488:9,9,13,13
490:7,25 492:20
496:7 501:10
estimate 495:16
503:12
estimating 503:2
et 470:22
ethical 336:4,23
342:12 421:14
ethics 335:12,13
336:5 337:7 342:2
342:8
europe 398:25
evasive 322:5,6
evening 535:18
event 344:15
events 393:22
424:16 441:17
540:17 541:5,6
eventually 381:9
everybody 379:17
387:15 401:8,10
417:9 455:18
469:22 479:15
490:25 514:3
evidence 281:8
282:3,4 287:16
297:5,11,18
348:25 367:3
384:22 401:22
402:3,7,8 435:18
446:10,19 447:18
449:10,12,13,15
449:18,25 450:3,4
450:5,6,7,8,10,16

ex 352:23 362:3
363:6
exactly 293:9
314:21 320:19
419:9 421:20
exaggerating
361:3
exam 469:14,16
examination 275:9
345:3 380:7 546:5
example 368:17
374:4 385:6
441:21 444:5
445:23 459:25
500:2 525:21
examples 449:23
exceptionally
489:7
exchange 310:18
excluded 388:23
389:2
exclusively 329:6
excursion 500:5
executive 337:16
356:10,14,17,21
402:22 439:25
452:13 531:4
executives 385:19
386:22 398:18
428:5 440:2
441:11 516:14
529:23,25
exhibit 276:5,6
279:10,12,24
280:2 293:25
294:2,9,10 295:11
295:13 299:19,21
299:25 300:3
301:3,5 302:9,11
307:9,10 310:8,10
311:9 312:8,9

318:13,15 325:12
325:14 338:15,17
359:15,18 368:2,4
390:23,25 392:24
393:3 395:8,10
399:10,25 400:3
415:15,17 425:12
425:15,19 427:5
449:4 479:23,24
508:17,17,21
541:24 542:2
546:22,24 547:2,4
547:5,7,9,11,13,15
547:17,19,21,23
547:25 548:3,5,6,8
548:10,13,16,18
548:20,23,25
exhibits 546:21
549:3
exist 317:20
393:21
existence 527:17
existential 513:25
exists 284:16
305:25
expect 327:11
495:17
expected 344:10
461:9
expecting 502:22
expects 514:3
expenses 489:4,5
489:10,13 490:5
490:15,19 495:15
498:20 499:9,19
499:20 500:9,10
500:11,20 501:7
expensive 489:8
experience 284:15
375:11 384:16
386:3 403:11

404:7 407:18,21
409:3 410:12
413:12,18 414:11
423:16 429:22,23
430:23 432:18,22
438:18,22 439:3
441:5,6,7 459:21
460:10 463:25
465:21 466:3
504:22 507:16
511:17 513:20
514:6,9,12,14,17
514:19 522:6
**experienced**
458:16 501:21
504:8 517:5,9,12
541:7
**experiences**
385:12
**experiencing**
503:21,25 508:5
**expert** 335:13
524:13,13
**expires** 544:17
**explain** 294:18
350:20 390:11
445:7 446:4
458:18 522:22
537:23
**explained** 335:21
336:3 361:21,22
366:14 391:20
393:16
**explanation**
292:23 295:4
298:8,10 305:4
317:25 328:17
333:6,10 335:9
446:6 478:19
**explanations**
445:5

**express** 340:25
353:6 540:7
**expressed** 294:14
340:10 498:4
**expressing** 538:24
**extensive** 372:24
**extent** 307:17
418:15 430:24
501:6
**externally** 353:23
**extra** 286:7
**extraordinary**
469:12
**extrapolate** 386:3
**extrapolating**
363:13 364:5
385:11
**extrapolation**
361:10
**extremely** 375:10
457:10

**f**

**f** 275:6,6 380:2,4,4
469:17 545:2
**fabricated** 445:24
466:8 541:11,15
**fabrication** 540:17
**face** 349:13
**faced** 436:11
**fact** 282:12 291:25
295:6 306:16
308:12 323:2
328:2 332:5,7
351:21 355:5
367:4,5 368:23
391:21 397:20
417:23 459:10
461:4 508:6
517:12 524:19,21
540:21

**factors** 420:9
437:25 482:20
**factory** 337:11
**facts** 410:23,25
434:8 435:3,4,6,9
435:13,17 439:15
443:17 445:4,18
446:7 448:8,11
449:8,10 450:19
451:3 526:7
**fail** 469:16
**failed** 327:13
427:12 469:17
**failure** 353:7
422:11,12,15
520:14,18
**fair** 499:23 521:7
530:9,12,16
**fairly** 337:4 482:2
**fairness** 412:15,16
**faith** 320:5
**fall** 283:13 378:7
511:15 517:14
**false** 416:15
**familiar** 302:14
338:20 339:21
350:15 431:6
**familiarity** 375:11
**family** 283:21
346:18 424:17
436:5 459:5
465:14 468:18
470:5 471:18,18
486:18 504:16,22
513:16
**far** 331:13,15,22
363:10 391:23
475:15 491:21
493:18
**farce** 433:15

**fashion** 329:12
**favor** 277:21
359:25
**february** 283:20
283:22 461:9
515:6
**fed** 462:17
**federal** 463:5
**feedback** 300:16
302:4,6
**feel** 329:6 392:4
403:14 469:14,19
503:18 505:15
517:18
**feeling** 277:14
418:11 522:20
523:23
**feelings** 374:24
375:4,14,15
376:25 377:11,14
377:24 378:12
379:2 396:18,20
**fees** 495:14
**feet** 499:24 517:7
518:16
**felt** 277:18 282:3
312:22 328:25
354:5 386:14
387:11,13 394:6
396:11,12 399:16
416:12 421:2
433:14 441:23
442:5,10,15 446:7
478:23 517:25
518:4,10 522:2
531:21 537:16
539:8
**fiber** 335:25
**fields** 524:13
**fifth** 273:13

fight 457:17 459:8
figure 295:8
  497:17 498:2
  513:11
figured 376:19
file 272:23 416:22
  424:19 443:11
  490:20
filed 274:8 412:8
  425:9,20 428:11
  430:17 480:14,16
  482:12 525:15
filing 351:18
  435:21
fill 426:17,18
filled 426:20,25
  427:3 429:7
film 528:9 533:9
final 354:19
  508:13
finance 353:2
  361:7 363:6
finances 363:11,14
financial 363:8
  370:5
find 283:5 397:9
  402:4 403:21,22
  407:25 464:9
  484:4,18,20,21
  485:14 494:20
  521:15 524:14
finding 483:5
  484:5 514:4,4
findings 333:5
fine 401:4 447:15
  448:24
finish 285:25
  305:17,17 318:7
  334:17 336:12
  543:15

finished 318:9
  542:15
finite 307:22 309:2
fire 283:25 343:10
  366:17,20 422:25
  465:13 506:18
fired 423:4,8
  459:17,19 507:6,8
  507:10,12,18
  508:11
firing 395:4
firm 345:7 432:21
  453:11,13 463:7,8
  513:2
firmly 307:15
first 275:17
  277:22 286:3
  293:7 320:24
  322:2 342:5
  345:11,14 346:16
  346:19 355:18
  359:16,18,24
  382:19 383:25
  385:15 386:4
  388:5,15 389:8
  394:8 399:6
  411:19 416:22
  435:19,21 446:4
  448:13,25 458:21
  463:11 468:15
  474:10,11 475:19
  483:17,19 484:10
  484:11 485:7,8
  486:6 494:10
  497:17 502:12
  505:9 511:5 512:2
  514:17,18 515:2
  515:14,18 519:21
  522:8,11 535:22
  536:6 539:25
  542:2 548:5

fiscal 281:5 442:9
  492:7
fischman 270:5
  271:6 274:5,6
  275:1,11 276:1,5,6
  276:9 277:1,3,20
  278:1 279:1,10,12
  279:24 280:1,2
  281:1,21 282:1
  283:1,3 284:1
  285:1,5,25 286:1
  286:25 287:1
  288:1 289:1,16,21
  290:1 291:1 292:1
  293:1,25 294:1,2,9
  294:10 295:1,11
  295:13 296:1
  297:1,21 298:1,9
  299:1,7,19,21,24
  300:1,3 301:1,2,5
  301:8 302:1,8,11
  303:1,14,21 304:1
  304:22 305:1,20
  306:1 307:1,9,10
  308:1,4,9 309:1,8
  309:13 310:1,7,10
  311:1 312:1,8,9
  313:1,17 314:1
  315:1 316:1,16
  317:1,13 318:1,13
  318:15,19 319:1
  320:1,22 321:1
  322:1 323:1,18
  324:1,6 325:1,4,11
  325:14 326:1,16
  327:1 328:1,21
  329:1,21 330:1
  331:1 332:1 333:1
  334:1 335:1 336:1
  336:13 337:1
  338:1,14,17,20

339:1 340:1,15
  341:1 342:1 343:1
  344:1,18 345:1,5
  346:1 347:1 348:1
  349:1 350:1 351:1
  352:1 353:1 354:1
  355:1 356:1 357:1
  358:1 359:1,15,18
  360:1 361:1 362:1
  363:1 364:1 365:1
  366:1 367:1,25
  368:1,4 369:1
  370:1 371:1 372:1
  373:1 374:1 375:1
  376:1 377:1 378:1
  379:1 380:1,12
  381:1 382:1 383:1
  384:1 385:1 386:1
  387:1 388:1 389:1
  390:1,23,25 391:1
  392:1,24 393:1,3
  394:1 395:1,7,10
  396:1 397:1 398:1
  399:1 400:1,3
  401:1 402:1 403:1
  404:1 405:1 406:1
  407:1 408:1 409:1
  410:1 411:1 412:1
  413:1 414:1 415:1
  415:15,17,20
  416:1 417:1 418:1
  419:1 420:1 421:1
  422:1 423:1 424:1
  425:1,15,16 426:1
  427:1 428:1 429:1
  430:1 431:1 432:1
  433:1 434:1 435:1
  436:1 437:1 438:1
  439:1 440:1 441:1
  442:1 443:1 444:1
  444:19 445:1

446:1 447:1 448:1
448:7 449:1 450:1
451:1 452:1 453:1
454:1 455:1 456:1
457:1 458:1 459:1
460:1 461:1 462:1
463:1 464:1 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1
475:1 476:1 477:1
478:1 479:1,24
480:1 481:1 482:1
483:1 484:1 485:1
486:1 487:1 488:1
489:1 490:1 491:1
492:1,15 493:1
494:1 495:1 496:1
497:1 498:1 499:1
500:1 501:1 502:1
503:1 504:1 505:1
506:1 507:1 508:1
508:21 509:1
510:1 511:1 512:1
513:1 514:1 515:1
516:1 517:1 518:1
519:1 520:1 521:1
522:1 523:1 524:1
525:1 526:1 527:1
528:1 529:1 530:1
531:1 532:1 533:1
534:1 535:1 536:1
537:1 538:1 539:1
540:1 541:1 542:1
543:1 544:1,11
545:8 546:6,21
548:21
**fit** 441:10
**five** 278:11 280:25
412:23 444:10
465:9 483:23

494:15,21 495:24
495:25 496:8,10
496:18,20 503:3
510:8 523:4
**fix** 397:13
**flashes** 492:12
**flight** 511:5
**flip** 508:25
**floor** 272:19
**florida** 470:8
**flow** 508:6
**flu** 301:18
**focus** 339:18
458:15
**folks** 491:12
**follow** 333:4,11
**followed** 352:18
352:19,22
**following** 395:21
533:6
**follows** 275:8
380:6
**followup** 479:8
**force** 286:12,21
287:3,7,11,14
335:2,7,18,23
**forcing** 459:8
**foregoing** 545:7
**foresaw** 381:21
**forget** 284:21
**forgot** 321:6 327:3
340:8,24 341:3,11
**form** 275:23
281:11,15 285:10
285:20 286:5,13
286:15 287:12,19
290:9 291:4,10,18
291:23 292:7
296:6 297:9 298:2
298:16,24 299:13
304:7,13,17

308:16 309:4,18
309:24 311:2,23
313:2,13 315:12
315:18 316:9,20
317:3,22 319:16
322:12 323:21
324:25 326:20
330:17 332:10
334:21 340:9
342:22 378:16
385:14 406:12
407:14,20 408:5
408:13 409:14
410:4,10 411:7,17
411:21 412:7,14
413:8 420:25
424:11 426:18,24
427:14,20 429:6
435:16 441:20
443:6,18 454:24
456:17 465:25
472:14 473:3,18
480:15,17 482:4
492:17,21 495:10
497:6 503:5
506:12 507:14
508:8 511:7
520:22 524:8
540:14
**formal** 308:11
321:9
**formalities** 352:13
352:14
**formally** 425:22
**formed** 372:13
374:11
**former** 292:3
383:5 385:4
**formerly** 362:3
**forth** 281:10 306:7
307:15 315:15

318:23 358:13,17
358:19
**fortinsky** 273:7
274:22,22 345:4,6
350:22 359:14
367:25 372:22
379:15 380:8
390:22 392:8,23
395:7 399:24
403:16 412:17,20
412:24 413:19
415:14 425:12
428:20 444:10,17
448:5 473:8 477:9
489:24 490:12
493:20 498:11
499:13 500:18
501:5 508:16
542:12 543:24
546:7
**forward** 317:9
327:21 376:22
482:14 537:13,14
537:18 539:4
**forwarding**
392:21
**found** 285:14,15
286:7 417:7,12
483:14 539:18
**foundation** 334:19
334:21
**founder** 454:2
**four** 278:10
292:10 320:23
335:10,10,12,14
336:5 404:19
417:18 418:5
458:2,7 462:24
481:16 494:5
504:8 505:24

**fourth** 463:12
**frame** 334:7
  482:14
**frank** 463:6
  524:20
**frankly** 451:7
  504:12
**free** 329:6 459:11
**frequently** 337:4
  372:6 398:23
  430:18 516:23
**friday** 345:19
  346:8 434:19
  542:19
**fried** 463:6 524:20
**friend** 513:16
**friendly** 460:12
**friends** 349:23
  353:20 424:17,20
  459:2 468:17
**friendship** 386:14
**friendships** 468:10
**from's** 391:6
**front** 280:15
  293:19 295:21
  297:24 298:13,17
  311:7 326:18,21
  359:12 366:3
  456:9 482:19
  492:2 494:15
  495:5
**fruitful** 479:4
**fruition** 493:7
**fujiwara** 356:19
  357:4 358:5
  364:23 366:15,19
  367:4 368:23
  385:3 388:25
  394:24 396:14
  398:17 399:16,18
  461:10 539:7

**full** 314:13 317:7
  317:24 333:9
  335:9 376:22
  381:24 382:2
  384:19 387:3,15
  403:11 408:10
  409:11 410:7,8
  411:5,13,14,16
  414:13,17 415:3
  416:18 420:2,5
  421:11 422:19
  432:8,11,23 465:2
  465:2,5 470:23
  472:6 479:6
  520:19 528:22
  535:25
**fuller** 292:22
  340:13
**fully** 421:9 445:6
  484:16 520:24
**fun** 387:16
**functioning**
  429:15,17 539:2
**fundamental**
  316:2 400:11
**funding** 365:16
  370:9
**further** 275:8
  320:3 333:6 380:6
  385:15 441:15
  470:15 477:25
  484:19 510:7
  543:23,24 545:14
**future** 290:7
  329:11 530:24

**g**

**gallup** 464:8
**game** 440:5
**games** 378:8
  403:13

**garden** 272:8
**gas** 489:10 500:10
  500:13,14
**gc** 389:5 395:22
  529:16
**gearing** 461:8
**gears** 288:10
**gender** 410:18,20
  410:22 412:5,9
  418:9 423:25
  441:10,25 506:10
  507:9,13,18 532:6
**general** 278:16
  280:13,14 288:11
  300:13 347:3
  348:15 357:18
  361:18 362:24
  363:25 374:22
  375:2,3 380:14,22
  381:13,18,22,24
  382:2,7,14 383:9
  383:15,22 384:19
  391:24 399:6
  401:17 402:5,12
  403:11,18 404:21
  406:2,21 408:9,10
  408:11,24 409:7,8
  409:10,12,12,21
  409:25 410:6,8,8
  410:16 411:3,5,12
  411:14,20 412:12
  412:13 420:17,18
  423:12 432:8,11
  432:23 436:7
  444:6,8 461:19
  467:12 473:11
  478:13 515:10,10
  515:11 516:24
  517:22 520:9,17
  520:19,21,25
  521:5 528:15,22

  528:25 529:3,18
  532:11 533:22
  534:13 535:8
  538:7 539:2
**generalist** 429:19
**generally** 276:24
  346:18 351:19
  366:24 385:23
  473:20 509:4,6
**generated** 499:2
**generating** 499:21
**generic** 511:7
**generous** 283:14
**genomatic** 290:24
**genomatica**
  288:10,12 291:2,6
  291:7,8,15,16,19
  294:15 298:15,23
  299:12 300:13
  304:25 306:4
  307:23 309:3,17
  311:20 312:18
  313:15,22 315:11
  315:16 316:25
  319:11 320:9
  321:8,15,23
  322:11,17 326:5,9
  326:11,13 327:2
  328:12 340:5,20
  340:22 341:10
  358:8 419:15
  420:22 421:5,17
  525:21
**gentlemen** 356:25
**getting** 401:5
  478:20 484:2
  488:24 499:24
**give** 283:19,23
  292:22 333:9
  344:5 352:16
  354:19 359:25

378:13 402:20
407:19 438:8
448:20 453:16
459:25 460:14,20
464:9,10,12
466:16,21,24
**given** 286:3
288:25 309:16
357:23 375:12
384:3 387:3,4
390:20 403:7,8,11
423:11 432:23
437:9 460:24
468:6 497:24
512:2 520:9
532:11,15 535:25
**gives** 497:21
**giving** 323:8
379:12 530:19
540:4 543:13
**glad** 458:14
**global** 290:16
**glowing** 464:3,3
**go** 277:16,22
289:23,24 298:25
306:20 309:16
316:4 320:3,12
323:10 340:6
341:13,22,23
344:20 349:18
370:20 372:17
373:22 387:21
389:7 393:23
402:18 403:13
431:24 440:4
441:14 447:7,12
447:13,16 448:16
448:16 455:16
461:3,15 468:13
470:15 475:21
483:16 485:8

492:13 494:6
497:25 498:5
504:4 505:18
511:25 514:3
519:4,14 526:5
534:5 542:5 543:5
**goal** 375:9
**goes** 342:24 352:3
378:22 418:21
466:23 480:9
**going** 274:2
275:15,17 277:14
277:22 283:23,24
284:4 289:24
290:14,16 291:11
291:22 292:19
296:4 299:7
300:12 302:18,18
303:21 306:8
307:3 311:5 315:7
317:9 318:5
323:14,22 325:21
329:15 334:20
335:8 340:15
341:16 343:10
344:20,22,25
356:18 357:16
359:14 361:23
362:5 368:12
374:22 378:7
382:20,24 389:6
400:10 401:5,7
409:5 410:13
413:15 415:23
418:8 423:10
433:14 434:25
438:23 442:5,11
442:15,17 444:12
445:10 447:22,24
461:10 464:9
465:12 466:6,7,16

466:20,21,23
479:14 483:25
484:23 489:14
493:22 498:6
502:17 505:21
506:3 508:24
511:3 516:12
520:12,12 530:20
532:2 534:15
535:20 536:7,23
537:5 542:7
543:18
**golf** 513:3
**good** 275:11,12,14
281:5 320:5 345:5
375:19 388:8
397:7 420:20,24
421:3 436:6,12,19
436:21,23 437:7,8
437:11,15,18,20
437:25 438:2,6,7
438:13,14,16,17
438:24 440:3,13
440:16,20,20,25
441:4,6,9,18
458:24 460:9,17
468:6 472:17
490:24 517:3
525:2
**gordon** 271:6
272:14
**gossip** 530:8
**gotten** 351:3 455:6
455:8,10 529:3
535:4
**government** 470:9
500:7,23
**graduated** 471:16
**grand** 459:9
**grant** 506:16

**grapmans** 460:2
**grateful** 376:15
**great** 290:14,21
291:19 357:14
372:14,20 376:9
376:10 383:2
418:7 431:23
441:7 459:10
463:9,9 466:19
482:25 492:13
495:18 516:15
518:23 524:9
**greenspan** 467:13
**greer** 385:18
528:17
**grew** 360:12
371:16 460:7
465:6
**gross** 489:15,18
493:19,19 499:11
**grossly** 506:9
**grough** 467:15
**grounds** 417:13
506:8
**group** 451:10,14
451:18 457:22
505:8,8,8 509:10
509:13 516:10
**grow** 409:23
**grown** 403:4
**guchisato** 367:5
**gueron** 273:11,15
275:2,2,3
**guess** 358:14
376:18 409:15
438:12 443:13
500:20 511:3
517:23 518:2
539:16
**guidance** 505:13
540:4

**gum** 417:2
**guy** 403:12 440:3
**guys** 349:19

**h**

**h** 275:6 363:5,6
  380:4 546:20
**half** 289:9 297:16
  458:7 462:15
  482:14 485:8
  496:16 505:24
**hand** 279:6 417:10
  545:21
**handed** 361:20
**handful** 431:5
  460:5 508:25
  525:25
**handle** 289:7
  324:17 433:11,14
  442:17
**handled** 343:20,20
  403:4 423:23
  442:13,15 466:4
**handling** 294:6,14
  297:23 298:15,23
  299:12 391:17
  392:18 430:15
**hands** 402:15
**handwritten**
  284:24
**hang** 321:6 403:13
**happen** 326:17
  373:20 382:21
  474:20
**happened** 327:4,9
  329:2 421:17
  441:18 454:22
  478:25 536:24
**happening** 366:25
  508:13
**happens** 421:20

**happiness** 522:19
  523:13
**happy** 329:8
  374:21,25 375:5
  375:16,18,21,23
  500:17 502:20,23
  526:5
**harassment**
  329:22 330:9,11
  442:14
**hard** 375:22 387:7
  387:10 460:23
  461:15,16 463:9
  463:18 466:22
  507:18 513:2
  523:4 528:2
  534:21 537:9
**harder** 399:8
  459:3 484:20
**harm** 317:11
  323:12 341:25
  342:8,14,18
  463:19
**haru** 279:3,17
  293:15
**hastings** 463:8
  524:20
**head** 307:5 313:3
  313:5 419:13
  440:8 454:15
  519:9 534:3 539:7
**health** 277:25
  278:6,8 462:18,20
  540:8
**hear** 279:19
  422:22 477:25
  532:3 543:19
**heard** 318:11
  351:13 384:10
  399:18 443:2,19
  529:10,21 530:4

  531:3
**hearing** 540:3
**heavy** 350:16
**held** 271:6 429:18
**help** 329:8 459:13
  505:12 536:22
**helped** 518:10
**helpful** 359:11
**hereunto** 545:20
**hi** 345:8
**high** 333:24
  337:15 372:6
  385:23 398:17
  402:24
**higher** 363:22
**highest** 384:25
**highly** 516:11
  524:18 542:23
**hire** 330:7 333:21
  348:21 361:23
  363:21 366:17,20
  377:22 378:11
  401:21 402:18
  407:10 430:18,25
  436:13,20,21
  437:2,13,14,20
  438:12,19,23
  441:3 459:8
  461:11 478:6
**hired** 348:18
  377:4,7,12 407:4,6
  411:9,11,14 431:9
  462:12 469:6,20
  484:7
**hiring** 395:4
  430:20 432:17
  436:10 478:3
**history** 384:2
**hitting** 319:4
**hmm** 280:16,23
  300:10 310:15

  318:20 320:14
  366:10 400:20
  406:7 423:3 533:4
**hold** 418:12
  543:17
**holder** 380:23
  401:20 405:25
**holdings** 270:8,9
  272:16 273:4
  274:7,24 351:23
**home** 278:2
  284:19 301:17
  306:25 309:9
  314:24 317:20
  321:17 324:20
  483:6 492:12,13
  492:15 495:22
  523:21,21
**honest** 378:9
**honestly** 396:11
  396:12 399:16
  413:14 416:11
  511:11
**hope** 409:23
**hoped** 284:21
**hopefully** 484:21
**hoping** 536:19,20
**horrible** 458:8
**hostile** 453:21
**hostility** 300:24
  453:22
**hotel** 528:18
**houlihan** 485:22
  486:7 487:18
  492:16
**hours** 346:9
  446:13 463:9,13
  504:5
**house** 462:17
  487:8,8,10 500:4

**houses** 487:12
488:24 489:9
491:20,24
**hr** 332:2 359:3
367:20 368:18
**huge** 420:7
**humiliated** 388:7
**humiliating**
387:18
**humiliation**
466:19
**hundred** 311:24
324:4 327:20
377:18,25 397:15
408:16 423:3
428:16 468:12
474:25 486:3
490:11,14 503:3
**hurt** 457:19
**husband** 284:2,11
441:25 501:4
504:10
**husband's** 462:20
**hyatt** 528:18
**hypothetical**
379:3,5,14 410:12
441:3
**hypotheticals**
378:21,22 413:16
413:17 438:20,25
439:20 540:20

**i**

**idea** 331:25 402:4
421:2 434:25
457:7,8 459:10
460:17 503:23
**ideas** 504:2 514:9
515:19 516:3,3
**ideation** 515:3
**identification**
276:8 279:14

280:4 294:4,12
295:15 299:23
300:5 301:7
302:13 307:12
310:12 312:11
318:17 325:16
338:19 359:20
368:6 391:3 393:6
395:12 400:5
415:19 425:17
480:2 508:23
**identified** 283:17
331:5 355:20
390:23 391:2
392:25 393:4
425:14 548:8,11
**identify** 349:12
350:13 354:3
426:2 448:8
**ignored** 291:2,8,16
**ignores** 291:24
**iguchi** 363:3
**illness** 321:18
**imagine** 379:6
408:6
**immediate** 424:14
504:22
**immediately**
284:13 329:3
**impediment**
478:19
**implications** 295:8
**implied** 278:12,12
533:25 534:4
**importance**
289:13,20 290:19
290:22,23
**important** 285:18
289:12 290:4
292:11 327:15
394:11 436:7

**impose** 315:23
**imposed** 315:10
**impression** 417:19
496:7
**improper** 412:15
542:23
**improved** 400:11
406:5
**improvement**
282:6,13 433:5
442:7
**inaccuracies**
276:21 277:4,6,21
**inappropriate**
284:4,9 453:23
**incident** 294:18
**incidents** 295:4
445:5,23 446:2
538:23 541:12
**include** 435:13
439:9
**included** 319:13
319:15 332:24
333:22 383:16
489:12
**including** 371:17
371:20 372:7,10
372:11 388:24
489:6
**inclusive** 457:9
490:5
**income** 436:5
470:24 472:6
484:5 485:9
486:10 488:8,12
488:18 490:7
492:19,24 493:4,6
493:7,10,11 495:7
497:4 498:15,18
498:19 499:6,21
501:10,14,15,17

505:15
**incorrect** 278:7,13
279:2 306:5
311:24,25
**increase** 358:15
376:12
**increased** 517:18
**increasing** 459:16
524:10
**incredible** 504:13
**incredibly** 458:23
**incur** 489:4
**independent**
485:17,19,21
486:2,8 487:17
489:11 500:6
**index** 270:6
**indicated** 391:6
**indirectly** 526:14
531:15,16 545:17
**individual** 270:11
270:12,14 293:13
332:2 364:8 498:3
500:13
**individuals** 293:2
293:4
**induced** 518:13
**industrial** 468:24
**industries** 350:16
**industry** 468:17
**infection** 518:20
**infer** 363:14
535:13
**inference** 402:13
535:14
**inferred** 535:16,21
**inferring** 364:4
**influential** 395:4
**information**
312:17 313:15
329:11 343:24

355:8 361:17
393:13,19 443:11
451:2 464:14,17
490:21 532:19,20
546:9
**informed** 338:23
339:5
**infrequently**
357:12
**inhouse** 369:8
462:5,8 463:23
472:2 474:3
525:18 539:25
**initial** 335:19
390:7 479:21,25
515:21 548:23
**initially** 372:12
518:25
**injured** 456:14
**injuries** 458:19
501:22,24 502:5
**injury** 458:21,22
501:3
**innuendo** 535:12
**input** 355:5,6
356:17 361:11
365:13,18 372:14
**insert** 546:11
**insist** 429:4
**insomnia** 514:14
**inspections** 487:13
**instance** 370:18,24
371:11,22 372:2
373:4 401:11
476:17 477:20
**instances** 372:15
374:3 417:12
418:5
**instant** 463:18,20
464:2

**instructed** 289:17
292:4
**instructions**
288:25 289:6
291:13
**insult** 501:3
**insurance** 362:12
362:14,16,22
459:7 461:5
462:18,18,20
495:15 501:12
**insurances** 374:11
**integrated** 352:7
**integration** 350:21
**intended** 446:16
**intention** 335:24
394:10 520:11,11
**intentions** 543:20
**interact** 389:9
390:3 416:23
525:4
**interacted** 371:19
388:2 529:25
**interaction** 357:5
358:4,6 371:15,16
529:22 537:14
**interactions** 356:5
357:2,9,13,14,15
357:15,17 388:23
389:3 417:21
517:16 519:10
520:5 536:18
537:7 539:10
**interest** 445:17
457:15 501:18
542:3
**interested** 463:21
473:23 545:16
**interesting** 438:20
523:14 535:24

**interim** 484:5
**intern** 273:22,23
393:25
**internal** 319:8
355:14 466:22
516:8,11
**internally** 296:16
304:5 308:6
**interpret** 310:5
**interrupt** 289:25
**interview** 347:5,16
347:17,19 433:13
461:16 462:25
475:9,11,16,19
476:19
**interviewed**
332:24 346:19
347:10 463:24,25
476:12 477:5
478:5
**interviews** 347:8
347:21 461:25
475:3,12,13,14
476:15 477:16
478:10 479:9
**intimidating**
469:18
**introduce** 274:12
**invading** 496:24
**inventory** 491:7
**inverse** 354:8
**invested** 441:8
**investigating**
333:25
**investigation**
329:23 330:6,8,11
330:21,23 331:10
333:4,14,19,22
334:3 423:23
433:8,15

**investigations**
331:3
**investment** 471:10
501:18
**invitation** 451:7
**involved** 329:22
331:9 363:19,20
367:5 371:2 403:9
430:20 437:24
455:18 460:16
504:25 526:9
538:8
**involvement**
279:20 293:14
333:19
**involving** 319:12
319:19
**ip** 429:22 440:23
**irs** 500:3,12
**irv** 467:15
**isaacs** 505:9,13
511:22 516:6,7,17
**isolating** 513:24
**issue** 278:14
307:20 324:17
331:23 433:2
462:21 465:7
515:22
**issues** 331:8 404:7
404:10 434:6
515:16
**itchiness** 517:5,20
**itching** 458:5,8
**itchy** 518:16

**j**

**j** 275:1,6 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1

| | | | |
|---|---|---|---|
| 292:1 293:1 294:1 | 414:1 415:1 416:1 | 537:1 538:1 539:1 | 529:24 531:4 |
| 295:1 296:1 297:1 | 417:1 418:1 419:1 | 540:1 541:1 542:1 | **jennifer** 270:5 |
| 298:1 299:1 300:1 | 420:1 421:1 422:1 | 543:1 544:1 | 271:6 274:5 |
| 301:1 302:1 303:1 | 423:1 424:1 425:1 | **january** 302:24 | 278:23 296:12 |
| 304:1 305:1 306:1 | 426:1 427:1 428:1 | 303:14 304:2,24 | 395:22 399:11 |
| 307:1 308:1 309:1 | 429:1 430:1 431:1 | 305:7,11,11,12 | 400:10 416:5 |
| 310:1 311:1 312:1 | 432:1 433:1 434:1 | 306:2,16 307:14 | 461:10 464:5 |
| 313:1 314:1 315:1 | 435:1 436:1 437:1 | 308:20 309:14 | 492:15 507:21 |
| 316:1 317:1 318:1 | 438:1 439:1 440:1 | 310:17 311:15,17 | 544:11 545:8 |
| 319:1 320:1 321:1 | 441:1 442:1 443:1 | 311:20,21 312:2 | 546:6 |
| 322:1 323:1 324:1 | 444:1 445:1 446:1 | 312:13 315:4,16 | **jerome** 273:7 |
| 325:1 326:1 327:1 | 447:1 448:1 449:1 | 316:23,23 317:7 | **jerry** 274:22 345:6 |
| 328:1 329:1 330:1 | 450:1 451:1 452:1 | 325:18 327:6,7 | 345:8 378:23 |
| 331:1 332:1 333:1 | 453:1 454:1 455:1 | 334:10,13,14,14 | **jersey** 404:5,23 |
| 334:1 335:1 336:1 | 456:1 457:1 458:1 | 334:19,23 337:18 | 470:10 |
| 337:1 338:1 339:1 | 459:1 460:1 461:1 | 337:23 338:10,23 | **job** 349:22 377:2 |
| 340:1 341:1 342:1 | 462:1 463:1 464:1 | 343:3 348:12 | 379:2 383:3 397:7 |
| 343:1 344:1 345:1 | 465:1 466:1 467:1 | 435:24 522:13 | 401:4 408:12,20 |
| 346:1 347:1 348:1 | 468:1 469:1 470:1 | **japan** 295:9 | 409:13 412:2 |
| 349:1 350:1 351:1 | 471:1 472:1 473:1 | 303:13,19 304:8 | 419:24 420:2 |
| 352:1 353:1 354:1 | 474:1 475:1 476:1 | 304:12 307:18 | 436:5 444:23 |
| 355:1 356:1 357:1 | 477:1 478:1 479:1 | 327:22 353:5 | 456:21 458:17 |
| 358:1 359:1 360:1 | 480:1 481:1 482:1 | 356:16 357:25 | 461:16,16 464:4 |
| 361:1 362:1 363:1 | 483:1 484:1 485:1 | 362:4,8,13,17 | 464:10 468:14,18 |
| 364:1 365:1 366:1 | 486:1 487:1 488:1 | 363:2,7 365:3 | 472:17 473:15 |
| 367:1 368:1 369:1 | 489:1 490:1 491:1 | 366:25 368:21 | 478:20 479:19 |
| 370:1 371:1 372:1 | 492:1 493:1 494:1 | 372:16 373:19 | 483:18 484:15,18 |
| 373:1 374:1 375:1 | 495:1 496:1 497:1 | 382:21 384:20 | 485:6,15,15,18 |
| 376:1 377:1 378:1 | 498:1 499:1 500:1 | 385:5,13,17 389:4 | 500:8 501:25 |
| 379:1 380:1,4 | 501:1 502:1 503:1 | 389:17 390:4 | 515:16 519:2 |
| 381:1 382:1 383:1 | 504:1 505:1 506:1 | 397:8,14,24 398:2 | 524:11 535:25 |
| 384:1 385:1 386:1 | 507:1 508:1 509:1 | 398:6,12,18,21,24 | 539:13 |
| 387:1 388:1 389:1 | 510:1 511:1 512:1 | 402:14,17 428:2 | **jobs** 471:24 |
| 390:1 391:1 392:1 | 513:1 514:1 515:1 | 433:20 465:2 | 474:25 521:19,20 |
| 393:1 394:1 395:1 | 516:1 517:1 518:1 | 529:11,23 531:6 | 521:24 522:2,9,10 |
| 396:1 397:1 398:1 | 519:1 520:1 521:1 | 532:4 539:5 | 522:12 |
| 399:1 400:1 401:1 | 522:1 523:1 524:1 | **japanese** 352:23 | **jog** 477:15 |
| 402:1 403:1 404:1 | 525:1 526:1 527:1 | 371:20 388:24 | **john** 270:13 |
| 405:1 406:1 407:1 | 528:1 529:1 530:1 | 393:25 398:7 | 469:17 |
| 408:1 409:1 410:1 | 531:1 532:1 533:1 | 425:7 428:5 | **joined** 274:15 |
| 411:1 412:1 413:1 | 534:1 535:1 536:1 | 439:25 440:2,8 | 289:9 |

| | | | |
|---|---|---|---|
| **joint** 320:25 351:5 351:11,13,20 352:6 | **k** | 377:10 384:23 385:6,21,22 387:9 387:15 394:2 | 463:10,11,16,18 467:21,22,23 468:5,8 472:16 |
| **jointly** 487:7 | **k** 363:5 493:24 | 406:19 427:21,22 | 483:10 484:19 |

**joint** 320:25 351:5
  351:11,13,20
  352:6
**jointly** 487:7
**joke** 387:25 388:2
  388:4,7
**jolly** 273:8 274:25
**josh** 288:14 295:7
  303:3 306:23,23
  309:5 312:17
  313:15 320:4
  321:2 326:18
  327:17
**jr** 274:17
**judge** 294:21,21
  294:25 295:5,21
  299:5 315:23
  433:22 463:5
  506:15,16 543:18
**judging** 495:6
**judgment** 436:6
  436:12,19,22,24
  437:7,8,11,15,18
  437:20,24,25,25
  438:2,3,6,7,13,15
  438:16,17,24
  440:3,13,14,16,20
  440:25 441:4,6,9
  530:19 534:9,11
**juggling** 440:24
**july** 397:3 401:3
  519:20,23 521:10
  521:11 522:7
  536:15 537:4
  545:21
**jumped** 394:7,9
**june** 270:19 271:2
  274:3 492:7 545:9
  546:2
**justified** 409:17

**k**

**k** 363:5 493:24
**kane** 272:4,11
  274:16 490:22
**keep** 292:12 298:4
  314:10 395:22
  413:15 467:16
  479:18 492:10
**kelli** 278:18,19
**ken** 356:19 357:4
  358:4 364:23
  366:14,19 385:3
  388:25 396:14
  398:16 399:18
  461:10 511:4
  539:6
**kennedy** 469:17
**kenneth** 510:25
**kept** 285:16 292:5
  300:24 394:8
**key** 359:6 360:7
**kidding** 504:6
**kind** 342:12 349:5
  356:24 357:11
  382:20 431:19
  469:21 472:5
  473:19,21,22
  478:24 513:5,13
  516:7 523:5
  525:16 534:21
**kinds** 372:25
  440:22
**kitchen** 360:22
  361:2
**knew** 290:22,23
  291:6 295:7
  323:10 326:10
  327:24 328:18
  343:7,9 357:5,15
  357:16 363:2,3,7
  364:21,25 366:24

377:10 384:23
385:6,21,22 387:9
387:15 394:2
406:19 427:21,22
428:18 459:18,20
460:10,17 461:2,6
461:12 462:4
465:12,20 466:22
505:20,21 516:15
524:14 530:22,25
530:25
**know** 278:14,15
  278:20,25 280:6,8
  282:5 283:6 286:6
  289:23 291:22
  294:20 295:5
  299:14 307:20
  309:10 310:4
  316:12 318:23
  325:2 327:23
  328:9 331:13,15
  331:22 343:22
  350:13 351:3
  355:4 357:13
  359:5 360:25
  361:15 363:3,25
  365:6,8 369:18
  372:17 373:12,19
  376:17 378:10
  382:16,17,18,18
  388:6 390:21
  396:15 398:21
  399:17 403:3
  405:23 413:14
  414:18,21,24,25
  415:3,5 419:12
  422:18 426:17
  431:18 437:10
  442:9 443:20
  451:10 452:10
  457:6 461:8,9,11

463:10,11,16,18
467:21,22,23
468:5,8 472:16
483:10 484:19
485:14 489:21
492:3,25 495:17
504:25 508:4,9
510:18 511:11
519:3 521:23
523:12,16 524:4
524:15,18 530:17
533:10,12,14
534:15 536:9,24
537:17 539:3,7,17
539:21,24 540:5
**knowing** 391:9
  395:22 411:24
**knowledge** 320:2
  332:18 375:11
  384:16 402:25
  432:3,19 441:8
  443:12 487:10
**known** 373:16
  386:6,7 466:14
  468:16 487:19
**knows** 421:20
**kobeoshi** 372:7
**kohei** 363:4,5

**l**

**l** 272:9,22 274:14
  451:25
**labeled** 425:22
**labor** 426:9
**lack** 504:9
**ladder** 534:7
**lapsed** 474:13,19
**laptop** 343:17
**large** 487:15
**larger** 374:17
**larry** 460:11,14,22

**larsen** 331:23
332:8,24 333:15
**larsen's** 332:17,21
**larson** 329:23
**lasted** 458:2,6
**late** 283:22 329:4
329:4 398:9
515:15 542:19
**law** 432:20,21
436:25 437:18,21
438:9,18,22
453:12 454:5,7,8
456:20 459:11
462:7 463:4,5,7,8
463:23 464:25
469:7 471:16,19
472:8 473:24
474:4,15 483:10
483:25 484:18
485:6 506:16
513:2 514:5
**lawrence** 485:22
486:7 487:18
492:16
**lawsuit** 290:19
291:12 351:18
367:3 418:9
435:22 482:8
505:2 525:13,15
**lawyer** 282:23
329:25 331:6
351:16 390:18
394:5,6 404:4
429:16,18,19,20
429:20,21,21,22
439:11 453:12
459:21 469:2,3
472:25 473:17,19
473:20,22 483:9
484:7 540:2

**lawyers** 336:20
391:17 392:18,21
435:4 459:10
463:9 524:18
525:4 540:3
**lead** 292:12
297:15 331:5
358:5 378:6,7
433:20 438:21
**leader** 288:23
327:15
**leadership** 335:13
335:14 388:24
**leading** 418:14
535:19
**leap** 534:22
**learn** 386:21 387:5
427:22 505:14
523:14
**learned** 294:23
302:16 368:22
374:21 486:17
531:4
**learning** 486:11
515:23 516:17
522:25 523:2
**leave** 283:18
293:12 345:24
363:4 420:7 472:7
543:9
**leaving** 278:11
501:11
**led** 365:2 514:5
531:22
**left** 283:14 374:19
460:23 461:13
478:17 494:17
505:8 509:24
**legal** 283:12
284:20 290:4
327:23 333:23

346:22 351:22
356:7,8,23 360:19
361:25 364:24
369:11,13,16,21
369:22,25 370:6
370:10,11 372:10
372:11 374:13,14
385:3 390:14,17
392:5,11,15,19,20
393:25 403:6
404:25 405:2
420:3 422:12
425:7 443:8
451:20,21 452:19
460:8 468:20
494:22 495:13
524:12,17,25
538:4 539:7,13
**legalities** 364:13
**legitimate** 441:19
**length** 361:17
**lesser** 413:7,24
414:4 432:20
**letter** 323:8
348:24 358:14,17
358:17,19,24
459:18 460:14,21
465:16 466:24,25
**letting** 294:20
295:5 307:19
**level** 282:6 295:23
327:14 334:5
337:15 358:23
363:18,22 371:14
372:6 384:13,13
384:13,24,25
385:23 390:4
398:18 413:12
421:10 422:11
462:10 526:4

**levels** 292:20
337:11 459:16
524:10
**lexington** 273:5
**liability** 439:10
527:17
**liable** 527:6
**liar** 540:13
**lie** 465:14 540:25
541:2,4
**life** 457:16 469:15
469:18 513:12
514:2 523:22
**life's** 523:22
**light** 543:2
**likelihood** 333:24
**limitations** 417:6
**limited** 353:23
357:20,22,24
358:5 384:15
491:7
**line** 278:6,10,15
318:7 326:19
337:11 359:24
392:10 395:20,24
395:25 399:10
400:9 404:17
411:22 416:4,11
424:2 493:25
519:21
**liner** 479:5
**lines** 278:23
**list** 355:19 467:18
475:8,22 476:9,15
476:19,24 477:2,3
477:8,10,11,13,13
477:14,15 489:9
492:11 510:10
**listed** 426:7,8
429:4

**listen** 289:22
352:6
**listener** 524:11
**listening** 339:2
**listing** 487:12
492:11
**literally** 416:24
**litigation** 289:2,4
289:7,8,12,14
290:4,25 291:25
292:6,19 294:15
302:17 320:7
322:14 327:16
336:25 351:11,12
369:3 394:19
395:19 397:12
416:2,3,21 417:15
422:14 440:23
461:8 479:22
482:3,17 525:19
526:4,11,20,23
527:15
**litigations** 358:8
527:13,22
**little** 321:25
441:14 501:14
530:8 538:9
**live** 486:16 488:3
**lives** 523:15
**llp** 271:7 272:14
**loan** 470:21
**located** 347:25
**location** 336:2
**loneliness** 512:22
513:23
**long** 283:15
342:25 346:6,7
398:19 416:14
424:2 451:8
461:14 485:8
512:18,23 543:4

**longer** 339:6 341:4
391:25 420:12
481:21,23 482:10
494:22 503:25
519:12 527:16
538:7 541:13
**look** 276:10,20
280:5,17 295:10
299:18 307:8
310:4 312:6 314:2
326:4,8 332:11
339:9 349:16,18
359:5 387:21
388:8 402:9 448:7
475:8 476:14,24
477:13 481:16
492:13 494:6
497:25 508:16
511:25 519:6
521:17 541:23
**looked** 354:12
362:21 462:13,14
462:14 463:20,21
468:15 469:21
470:2,6,7,8 493:16
510:23 522:10
535:5
**looking** 339:15
374:10 403:23
463:23 468:13
469:20 483:17
484:15 485:5
493:15,23 510:7
521:18,20 522:9
536:21
**looks** 426:9 509:22
510:24
**los** 512:13 513:23
**losing** 501:25
**lost** 416:5 456:20
457:15 505:14

**lot** 343:21,24
371:16 424:4
434:5 458:11
483:8,14 489:10
494:22 496:21
504:4,13,23 505:3
505:3,22 507:7
526:7,12 529:11
529:22
**loved** 497:9
**low** 327:14 371:14
422:11 462:10
503:12
**lower** 321:25
358:23 363:18
421:10 482:24
509:25
**lucky** 491:8,10
**lucrative** 498:2
**lump** 454:19 456:5
**lunch** 379:16
465:12 533:6,21
**luncheon** 379:20
**lying** 541:8
**lynne** 271:9
274:11 324:10
414:6 545:5,24

**m**

**m** 275:6 380:4
393:16
**mail** 294:20 300:8
300:25 301:16
302:14,16,19,20
302:20,24 303:2
305:2,7,10,21,24
306:2,7 307:2,17
307:19 308:18
309:21 310:13
311:15,17 312:13
313:18 318:18,22
318:24 319:3

325:19 327:8
329:4,5 391:7,8,15
393:7,10,21,23
396:2,10 399:9
400:7,18 403:2
406:3 440:6
539:16
**mails** 288:7,8
319:8 327:13
328:3 369:2
398:13 455:17
524:16 539:5,8,10
543:3
**main** 358:5 404:5
**maintain** 365:4
**major** 335:2 336:6
351:24 353:4
427:23 436:8
**making** 309:2
312:24 313:11
314:13 321:14,23
324:24 352:18
386:23 403:20
424:4,7 439:18
443:2,3,20 465:13
495:12,18 497:23
**male** 284:11 299:5
299:5,6 433:22,22
433:22,23 440:2
**man** 299:2 402:2,4
402:18 403:8,8,21
403:23 404:13
405:3,4,21 423:15
423:17 433:14
442:16,17 507:17
**manage** 431:10
440:21 539:13
**manageable**
521:13
**managed** 527:15
527:18

**management**
336:25 337:16
352:15,16 389:24
**manager** 453:21
**managers** 337:12
337:15
**managing** 391:22
**manner** 458:23
**mansukhani** 271:7
272:14
**manufacturing**
337:12 468:23
**march** 275:18
282:9,22 283:8,9
441:22 442:9,9
523:20
**mark** 276:5 279:9
279:23 293:25
294:8 295:11
299:19,24 301:2
302:8 307:9 310:7
312:7 318:13
325:11 338:14
359:15 367:25
390:22 392:24
395:7 399:25
415:15 425:12
479:22 508:17
541:24
**marked** 276:7
279:13 280:3
294:3,11 295:14
299:22 300:4,6
301:6 302:12
307:11 310:11
312:10 318:16
325:15 338:18
359:19 368:5
391:3 393:5
395:12 400:4
415:16,18 425:17

449:3 479:25
508:23 541:25
**market** 490:25
491:3,5
**marketing** 489:6
**marriage** 545:15
**married** 512:16
**maryland** 470:8,9
**masanori** 388:25
**mastercard**
475:17 477:22
478:2
**match** 494:4,7
**matching** 493:25
494:7
**materials** 362:25
**math** 496:11,21
**matter** 274:6
294:19 306:16
330:2 391:22
392:12,20 530:23
531:8 543:3
545:17
**matters** 344:5
361:14 363:9
372:9,21 391:17
392:18 429:24
438:23 440:22
**matthew** 272:9
274:14
**mca** 372:12
**mcc** 288:17,23
289:12 290:6,16
290:22 291:2,7,8
291:15,16 292:5,8
292:12,15 293:4
296:4,8,18,25
297:22 306:3
307:20 308:25
309:16 310:17,23
311:22 312:16,19

313:16 314:16
316:8 319:12,14
319:19,22,25
321:7,10,14,22
322:9,13 323:12
329:9 331:18,20
342:20 354:10
356:3 358:7
371:19 465:4
527:20
**mcc's** 311:12
314:8,11 316:2,18
322:22
**mcha** 274:18
287:18,24 288:5
296:18 312:5
331:6 338:25
339:7 346:20,22
348:4,17 350:9
354:10 355:13
356:6 358:21
360:14,15 366:4
367:8,23 369:19
369:22,25 374:8
391:16 415:2
420:11 426:4,6
427:21 428:13,17
429:16 430:14
435:22 451:19,22
465:18 466:11
472:8 478:11
501:11 526:23
528:11 535:19
**mcha's** 290:4
361:10 368:18
**mchc** 331:9,18,19
331:21,22 345:6
347:6,10,18,20
348:25 353:16
354:4,22,24 355:2
355:11,22,25

356:6,8,10,21,23
359:8 360:9,13,18
360:24 361:7,11
361:11 362:4
363:8,16,24 364:6
364:23,25 365:4
365:11,21 366:4
366:12,15 367:2
370:14,25 371:4,5
371:15,18,19,20
373:6,11 384:2
388:12,14 415:5
427:12,22,24
428:4,7,12,13,18
428:23 429:4
432:17 439:25
441:23 526:10,12
526:13,15,19,23
527:19,20 534:22
539:7
**mchc's** 370:16
371:12,23 372:3
373:15,22 374:5
**mchem** 272:23
**mchj** 288:19 292:8
296:5,9 297:2
303:16 319:25
327:14,23 328:17
330:5 337:5,6
346:24 354:10
356:8,20,23
421:11 422:12
**mcusa** 347:2,4,25
349:9 369:20,22
372:13
**mean** 298:4
304:12 315:25
316:11 338:7
351:3 356:11
357:21,23 362:14
368:20 380:21,24

382:18 386:7
389:2 401:25
424:12 434:16,23
437:5 445:22
452:7 482:22
488:17 494:23
497:24 514:23
518:15 519:3
534:4
**meaning** 341:15
381:15 407:18
513:14 514:2
**meaningful**
388:23 389:3,10
**means** 340:4 353:4
439:21 489:3
518:19 524:4
**meant** 278:11
364:7 380:13
381:2 383:10
451:6 493:17
535:15
**measure** 292:18
**measured** 534:17
534:17,18 535:11
**medical** 508:18,22
509:10,13 519:6
521:8,17 548:25
**medicating** 516:18
**medication** 503:10
503:10,22 505:14
510:2 516:18,25
517:2
**medications**
510:11
**medicine** 516:8,9
516:11
**medicines** 458:12
**meditate** 523:2
**meditation** 505:14
516:13,13,16,17

522:21,24,25
523:15
**meet** 299:5 345:8
345:9 346:6,10
505:12 530:6
**meeting** 275:22
276:14,15,17
312:3 335:16
338:11 340:11
345:21 347:17
362:19 365:2
368:14 382:19
385:16 387:22
388:15 390:7
394:2 416:22
446:4 512:14
541:21
**meetings** 343:22
417:25 440:10
531:5
**member** 404:24
405:2 462:6
470:16,25 471:4
473:14 474:5
483:13
**members** 346:21
353:2 367:2 372:7
385:5
**memory** 279:7
337:20 338:2
454:11 477:16
**men** 332:16,20,24
410:21
**mend** 536:20
**mental** 277:25
278:6,8 457:12,20
457:23 502:5
537:11 538:11,14
540:8,9
**mentality** 501:22

**mentally** 457:2,5
**mention** 427:24
428:4,5,7
**mentioned** 357:2,8
374:9 382:23
386:15,16,18
435:10 459:4
477:12 500:22
501:20 503:23
504:8 514:24
537:2
**mentor** 487:15
**mentors** 487:6
**mercedes** 272:21
274:18 275:12
282:23 303:24
316:22 317:18
355:19
**mercurio** 273:19
274:10
**merely** 392:21
**met** 275:19 307:4
311:25 317:6
366:25 384:10,13
385:19 468:16
509:22 528:16,18
**metropolitan**
470:4
**metz** 271:9 274:11
545:5,24
**mid** 283:22 294:22
401:3 445:25
540:16
**middle** 498:25
**mika** 393:15
**mike** 460:2,12,13
460:14
**miko** 393:25
**mileage** 500:2
**million** 306:20
310:19 316:4,12

316:14 317:16
321:4,13,22
322:10,15,23
323:4 324:3 326:5
326:9,11,12,24
328:11,19 340:20
341:9 342:19
343:2 440:24
494:8 495:24,25
496:16,18,18,19
496:20 497:4,10
497:23
**minami** 288:20
292:16 293:10
294:5,13 296:12
296:24 302:20,25
304:3 305:7,21
311:10 318:19
320:9,16 324:16
325:18 326:4,24
328:17,22
**minami's** 312:13
**mind** 278:25
347:12 391:12
446:19 447:21
460:2 516:9
**mine** 317:5 363:20
375:9
**minute** 319:3
329:2 444:11
448:6
**minutes** 523:3,4,4
543:15
**miscommunicati...**
327:25 328:4
421:8,13,23 422:4
422:8 425:7 465:6
**miscommunicati...**
417:8
**miserable** 395:23

**misinterpretation**
541:5
**misogynistic**
297:19 434:2
**misperceived**
421:16,19
**missed** 472:20
**mistake** 312:23
313:11 421:5,8,9
464:24
**mistaken** 452:15
**mistakenly** 319:2
**mistreatment**
423:19
**misunderstand**
278:24
**misunderstanding**
393:11 422:7
541:6
**mitigate** 483:2
**mitigation** 482:20
482:22,23 495:4,8
**mitsubishi** 270:8,9
272:15 273:3
274:7,24 291:20
338:9 350:6,7,11
350:12,14,16
351:23,24,25
352:2 353:21,24
367:22 425:3
431:4 432:19
440:17 461:22,25
466:3 474:23
476:22 501:16
503:12 504:19
506:17 522:3
528:9 533:9 534:7
**mixed** 357:11
374:24 375:4,13
375:15 376:25
377:10,14,24

378:12 379:2
**mkm** 391:15
392:16
**mm** 280:16,23
300:10 310:15
318:20 320:14
366:10 400:20
406:7 423:3 533:4
**mo** 299:3 301:20
321:19 324:9
336:9 340:15
350:22 372:22
392:8 403:16
428:20 473:8
546:16
**model** 470:20
**mold** 441:11
**moment** 277:23
341:8 376:22
403:23 433:25
442:5 457:11
489:22 536:5
539:4 542:5
**mommy** 504:24
**monday** 542:21
**money** 291:20
352:24 360:17
361:25 497:20,22
505:16
**month** 306:13
433:4 442:7
485:10 501:15
511:24
**months** 320:8
401:18 418:25
420:10 442:18,19
461:4 462:24
464:9 469:12
483:24 484:13,18
491:23 492:3,4,4,6
492:8 520:15

**mood** 504:23
**mora** 332:2,8
**morning** 275:11
275:12 303:10
305:12 344:3
398:10 542:21
**mortgage** 462:17
**mother** 486:15,23
487:19
**mother's** 487:25
492:19
**motions** 546:16
**motive** 282:14
**motives** 530:15
**move** 290:2
291:22 299:3,7
301:21 304:20
311:5 321:19
324:9,13 327:21
336:9,14 340:16
347:12 350:22
372:22 392:8
403:16 412:23
428:20 473:8
504:5
**moved** 324:12
349:10 420:17
463:4 474:11
535:8
**moving** 299:17
321:5 402:10
431:13 523:7
542:3
**mpi** 371:19 527:20
**multi** 440:24
**multiple** 372:6
374:7 398:22
440:21 469:3
475:12 492:11
524:13

**myama** 293:8

**n**

**n** 272:2 275:6,6,6
363:6 380:2,2,2,4
380:4,4 451:25
546:4
**name** 274:10
293:9 345:5
349:13 359:2
425:25 426:6,7,12
426:15 429:5
477:20 487:25
509:14
**named** 383:8
426:4 509:22
**names** 279:5 363:5
451:24 467:25
**narrative** 416:15
**nary** 403:2
**nasty** 458:23
**nathan** 464:8
**national** 432:21
463:7,8
**naturally** 439:12
**nature** 381:12
386:19 487:4
**near** 533:21
**nearby** 488:4
**necessarily** 371:3
**necessary** 329:10
359:5 448:22
469:19
**need** 278:20
282:24 304:14
306:20 310:4
317:4 344:16
400:12 462:16
466:25 472:3
487:14 503:22
514:13

**needed** 295:23
339:6 363:23,24
397:9 407:22
419:25 433:5
436:5 462:12
469:6 472:4
**needs** 282:5,12
442:7 462:17
**negative** 397:4
403:2 416:25
417:19,22 442:7
466:17 517:15,18
520:4
**negativity** 519:25
**negotiate** 407:11
407:22 408:2
**negotiation** 320:5
323:4 407:16
454:13 475:24
**negotiations**
421:18 452:20
453:9 454:10
**neither** 324:20
450:25
**net** 489:13 498:20
499:9
**never** 278:12
282:7 293:17,23
316:24 319:10
324:16 329:4
330:14,15 341:3
342:11 355:25
382:20 383:6
384:10,13 393:19
397:22 399:18
400:25,25 401:14
407:21 417:20
426:25 429:7,18
466:5 483:25
507:2 513:15
516:2 518:20,20

520:21 521:4
534:22 535:20
539:14
**new** 270:3 271:8,8
271:10 272:8,20
272:20 273:6,6,14
273:14 274:8
294:25 311:25
347:23,23 349:11
387:23,23 398:20
398:24 404:5,23
428:17 459:11
462:6,7 469:7,8
470:3,6,9,10,11
471:4,23,24 472:3
472:4,10,12,24
473:5,12,15,24,25
474:4,5,9,11
478:13 483:4,10
484:21,23 485:11
500:5 532:19
535:19 545:3,4,7
**news** 400:9
**nice** 345:8,9
**nick** 282:9 284:3
287:20 297:13,17
303:3 305:13,23
306:16 307:4
312:4 314:14
316:4 320:4,25
322:14 323:3,7
324:3 325:22
329:6 348:10,12
401:21,24 403:24
419:25 421:11
432:18 433:13,24
459:22 466:6
515:11
**nick's** 276:22
322:19 327:19

**nicolas** 270:10
272:16 273:20
274:19
**nicole** 273:15
275:2
**night** 284:19
303:12 305:10
329:4,5 345:19
346:13 398:10
465:11 538:13
**night's** 517:3
**nine** 327:7 341:18
370:20 459:14
461:19 465:8
467:19
**nippon** 387:20,20
**nodded** 535:5
**nodding** 535:7
**nonresponsive**
392:9
**nonsensical**
432:14
**norm** 486:4,5
**normal** 416:23
**notary** 271:10
430:9 544:17
545:6
**notation** 521:14
521:15 523:10
**note** 284:20
340:12 411:22
522:23 523:25
**notebook** 285:16
**noted** 541:11
544:8
**notes** 276:22
332:11 416:21
519:11,21
**notice** 271:8 459:4
464:9,14 474:16
494:18 499:7

**noticed** 479:3
**notified** 327:11
**notify** 327:10,13
**notwithstanding**
364:14
**november** 323:5
348:11 418:7
419:3 433:19,19
433:24 510:8
512:11 515:15,21
521:9 540:16
541:12
**nuance** 507:21
**number** 274:9
285:6 306:21,24
366:6,7,17 368:2
372:9 386:9 395:9
417:16 489:15,18
489:22 492:2
503:14 518:11
524:19 525:10
540:20,22 541:25
**numbered** 508:20
**numbers** 390:24
391:2 393:2,5
395:11 480:4
481:24 508:19
548:9,12,14

**o**

**o** 363:5 380:2,2,2
**o'clock** 538:13
**o'connors** 386:17
**oath** 282:11,20,24
283:6,7 309:13
325:4
**object** 275:23
281:11,15 285:10
285:20 286:5,13
287:12,19 290:9
291:4,10,18,23
292:7 296:6 297:9

298:2,16,24
299:13 304:7,19
308:16 309:4,18
309:24 311:2,23
313:2,13 315:12
315:18,19 316:9
316:20 317:3,22
319:16 322:12
323:21 324:25
326:20 330:17
332:10 334:20
340:9 342:22
378:16 385:14
386:10 387:8
406:12 407:14,20
408:5,13 409:14
410:4,10 411:7,17
411:21 412:7,14
413:8 420:25
424:11 426:24
427:11,14,20
429:6 435:16
441:20 443:6,18
454:24 456:17
465:25 472:14
473:3,18 480:15
482:4 492:17,21
495:10 497:6
503:5 506:12
507:14 508:8
520:22 524:8
540:14 544:3
**objected** 386:8
412:4 542:17
**objection** 286:14
304:13 386:5
411:22
**objections** 386:19
386:23 388:11
**objective** 334:2
399:3

**objectively** 440:13
**obligation** 340:7
340:21 482:23
**obligations** 454:6
**observe** 352:12
**obtain** 322:22
370:15,25 371:12
371:23 372:3
373:5,8
**obvious** 479:2
**obviously** 340:13
424:18
**occasionally**
430:22 525:6
**occasions** 346:4
386:9 389:13
413:22 476:21
**occur** 417:9
**occurred** 276:16
283:20 319:21
391:24 393:22
416:16 417:24
445:5 504:25
540:18
**october** 294:22
334:9 442:21
**offer** 301:10 302:4
303:2 306:3,8,19
307:6,23 308:5
309:2,16,23
310:24 311:11,13
311:20,22 312:15
312:24 313:9,11
313:22 314:14,20
314:23 315:5,16
316:5,13,25 317:8
317:10,15 320:9
322:10,10 323:19
326:5,9,11,13,18
326:25 327:18
328:2,3,7,11,19

340:20,22 341:9
342:19,21 343:2
348:19 358:14,17
358:17,19 407:22
416:25 421:12
455:4 462:23
465:3 478:6
**offered** 324:3
343:13 377:21
419:18 543:15
**offering** 323:12
328:16 377:17,18
**office** 277:18
284:14 285:14
297:18 301:19
306:17,22 307:3
312:2 317:5 349:8
354:20 356:18
357:3,10 360:21
361:5 367:24
404:5,6,22 433:25
517:17 522:14,15
536:16 537:10
538:12
**officer** 356:14,17
356:20,21 384:12
**officers** 356:10
**offices** 271:6
347:25
**officially** 389:9
**offset** 482:20
489:3
**oh** 388:6 436:2
438:22 457:25
492:13 507:20
**okay** 277:16,24
283:7 295:16
311:6 336:15
344:19 359:23
360:5 364:16
369:4,6 379:16

403:6 431:14
432:6 442:6 449:6
459:23 469:25
494:12 505:20
510:15 511:2
**old** 272:6 391:22
463:22 487:9
512:14
**oliva** 270:10
272:16 273:20
274:19 275:18
276:14 280:10
282:9,14,21
283:22 284:18
287:21,23 288:6
289:2,3,9 290:3
292:4 298:20,25
299:9 300:9,21
301:25 305:13,15
305:20,23 306:17
307:4 311:11
312:4,12,22
314:20 316:24
318:21 324:16
325:7 326:8,10,22
327:3 328:23
330:3,21 333:4,13
334:11,23 335:21
338:11,24 339:5
339:13 340:6,14
340:18 341:7,19
341:24 342:8,18
343:5,12,16,20
344:10 348:10,13
354:20 406:15
416:4,11 417:12
420:23 421:16
422:16 432:18
433:24 444:2
515:11

oliva's 300:15
301:12 340:2
olympic 440:8,9
once 349:10
430:16
ones 476:5
ongoing 362:22
online 468:21
ooh 341:3
open 460:21
543:25
opened 472:11,25
473:5
opens 473:15
operated 352:2
operations 283:17
352:8 428:19
opportunities
472:12,20,21,25
473:6,16
opportunity
290:14 376:9,10
389:7,14 417:25
483:7 494:17
531:25
opposed 441:17
opposing 299:5
300:13,17 303:17
308:4 310:14
315:2,10,15
433:22
opposite 308:13
option 462:12
order 373:22
462:6 469:6 531:6
540:20
organization
374:17 377:5
411:10 426:10
530:8

organization's
363:11,14
organizations
374:18
origin 326:5
original 315:5
originally 374:15
382:19
origins 326:8,10
ought 521:25
outcome 333:14
outlined 481:12
outside 288:15
299:6 301:11
307:13 308:12
309:15 312:23
313:10,21 319:23
330:7 333:22
334:3 430:18,21
431:10 433:23
453:8,16 454:18
461:21 518:22
outsourcing
460:24
overall 289:7
overlapping
483:15
overnight 511:15
overreact 523:22
524:3,7 525:9
overreacted
523:19
overreacting
522:20 523:10,17
overreactive 525:3
overtalker 479:2
overtly 507:20
overture 307:19
308:15
overview 431:20

overworked
537:25
owned 351:21
428:16
owner 452:5

**p**

p 272:2,2 339:19
p.m. 302:7 308:20
310:17 312:2
379:20 380:3
544:8
pack 435:23
package 283:15,19
283:24 341:14,15
341:17,20 407:12
408:4 453:15
454:16 455:5,23
460:24 461:13
pad 284:20
page 276:10
277:12,24 280:17
282:6 301:9
302:18 341:22
391:5,14 392:12
395:14 400:8
406:4 427:5,6
428:8 480:4,5,10
480:22,23,24
492:12,13,15
493:16,23 508:25
509:3,12,13,25
510:8,9,21,22,22
519:7 521:14,16
522:14 546:5
pages 510:8,23
paid 310:19
365:11 406:16
408:19 412:2
413:23 414:10
462:17 491:15
497:20

pain 505:25,25
509:24
painful 457:9,10
506:5,6 507:23
palpably 412:15
panic 512:3,5
paper 284:4 397:3
397:10 416:18
417:14 540:19
papering 416:14
paragraph 321:21
359:22 366:3,4,7,8
366:22 399:11
400:7,15 447:3
448:25 449:7
paragraphs
448:17,20,24
449:8 450:20,24
paraphrasing
471:11 522:5
parent 351:20
353:3,5 354:6
371:20 385:25,25
428:15 527:18,19
parenthetical
277:12 278:6,7,22
parents 470:6
park 271:7 272:18
parking 406:20
443:21
part 285:13
306:15 324:13
336:10 340:16
362:6 366:2
370:12,13 373:13
374:17 376:24
383:17 421:21
426:14 434:22
439:14 451:17
465:24 482:9
504:15

partially 353:3
participate 319:15
particular 290:5
290:15,25 294:17
296:23,25 316:17
337:14 341:8
369:19 446:16
487:7 499:12
515:7 521:16
parties 369:16
443:14 545:15
partly 502:16
partner 345:7
487:3
partnered 487:21
partnership
486:22 487:5
493:10
parts 276:25
party 334:3
passed 294:25
361:6
pat 362:3 367:11
367:19 368:10
386:16 435:23
536:22
path 401:13
438:21
pats 352:23 363:6
paul 463:8 524:20
pause 448:6
505:18
pausing 445:12
pay 360:19 361:25
362:5 368:17
369:9 408:9
409:10,25 410:2,6
411:19 412:12
413:5 414:3,16,22
442:22,25 443:24
444:3 482:19,19

489:8,9,10 494:15
495:5,13 505:16
paycheck 428:17
428:18
paying 362:6
455:9
payment 310:18
499:8
peace 523:16
penalty 430:6
pension 362:25
374:9
people 292:20
293:2,6 323:16
330:24 332:7
336:22 350:13
353:23 356:9,11
356:22,25 363:2
371:17,19 376:15
376:19 377:22
384:12 385:2,8
387:6 388:14
389:17 395:23
397:14 398:2,11
398:19 401:7
402:17 403:19
407:4 429:23
435:5 458:25
460:6 467:8
468:16,17,18,21
469:16 479:3,13
494:19 506:7
523:14 526:13
529:11 530:6,7,14
530:16
perceive 285:17
383:20 394:4,12
405:12 422:21
428:12,23 541:8
perceived 383:19
405:10 408:9,11

409:11,13 410:2,7
411:4,6,13,15
418:16 421:4
422:3,5 429:3
508:7 532:10,12
536:6
percent 311:24
327:20 375:19,21
377:18,25 397:15
408:16 423:3
428:16 486:3
494:5,5 496:8,10
496:18,19,20
497:18,19,19
525:8
percentage 488:24
491:15,18,19
496:2,5
perception 411:24
532:21,22,24
perfect 403:3
performance
377:25 394:5
401:19 402:25
403:3 404:7,10
406:11 420:19,23
421:3 440:18,18
442:8 507:6,11
508:7,11 540:16
performed 403:4
performing
420:13
period 289:22
295:3 332:12
336:14 357:3,10
357:18 362:25
389:8 398:21
420:16 474:16
512:17 538:25
539:18 540:18

perjury 430:7
perks 443:22
permission 361:14
459:22
permitted 390:3
402:9
person 296:13,15
307:5 327:14,15
337:7 352:15
368:19 377:10
387:9 402:9
403:24 405:18
411:3,5 421:10
422:11 437:20,20
438:12,24 440:13
440:14 441:5,7
473:23 478:23
506:18 538:4
person's 407:11
personal 363:15
364:20 384:15
408:23 413:17
443:11 502:17,23
personally 365:5
370:16 409:7
473:10
personnel 390:4
526:17
persuaded 394:24
529:11
pertaining 295:19
300:11 302:4
306:3 328:7
330:11 331:23
332:24
pertains 295:17
pharma 331:11
332:3,14 351:25
404:4,24 433:10
527:20

**pharmaceutical**
451:15
**phone** 324:24
325:3,6 398:15,22
427:3 475:13
**phonetic** 372:8
460:2 462:11
467:15
**phonetically** 293:8
367:5
**photography**
489:8
**physical** 324:21,23
457:23,25 458:9
501:22 502:5
**physically** 457:2
457:13,14,15,18
457:18 518:5
**physician** 505:6
509:9
**physicians** 525:12
**picked** 441:9
528:17
**pile** 297:25
**place** 347:22 399:6
401:20 405:25
441:18 463:7,9
531:6
**placed** 468:18
**placeholder**
529:19
**places** 468:3 470:7
477:4,5
**plains** 348:2
349:10
**plaintiff** 270:6
272:5 274:14
366:18 527:5,23
**plaintiff's** 366:9
502:12 542:15,24
543:6,8

**plaintiffs** 542:19
542:24
**plane** 511:15,16
**plans** 335:17
362:16 530:15
**plants** 337:12
**plastics** 352:2
**plate** 380:23
**played** 349:2
385:13 415:6,7
**playing** 378:8
**plaza** 271:8
272:18
**pleasantries**
465:13
**please** 274:12
276:4 279:9
282:25 293:24
299:24 302:8
304:17 306:14
310:7 312:7,11
313:14 318:13
324:10 325:11
338:14 392:10
408:14 411:21
412:23 413:20
414:7 427:18
435:12 447:12
481:10
**plenary** 422:13
**plotting** 397:17
**plus** 413:11
438:18 454:19
494:14
**point** 277:7,8,21
277:22 290:17,21
293:2,3 296:11
303:16 381:3
401:12 403:7
418:18 430:16
453:14 454:3

484:14,22,25
513:6,9 521:21
537:4,13,14,18
541:9 544:2
**pointed** 498:16
**points** 362:21
446:3
**policy** 337:10
**political** 529:13
**pollack** 467:11
**polyester** 528:9
533:9
**poor** 406:11 507:6
508:7,10
**poorly** 343:21
**portion** 280:25
339:10,12,16,19
**portions** 339:10
**posed** 305:4 439:2
**posing** 438:25
**position** 316:2
321:3 322:22
346:20 348:14
357:24 358:23
360:13 361:18
362:3,4 364:6
371:7 372:8
375:24 376:2,7,8
377:8,11,14,17,18
380:21 381:6,10
381:13,18,23
382:3,4,15,25
383:2,3,7 384:11
384:14,25 386:6
387:8,10 388:9,11
401:2,2,7,14,18
402:23 403:12
404:16 405:15
420:4,6,12,18,19
423:16 432:24
439:14,16,22,24

441:13 456:22
463:23 469:5
472:6 484:20
494:20 520:9
528:23 531:7,25
532:2 533:24
535:9
**positions** 371:16
470:23
**positive** 479:19
**possession** 287:9
349:19
**possibility** 323:23
351:20
**possible** 303:7
437:19 473:15
518:18,21,25
523:21 530:10,13
530:18,21
**possibly** 350:21
367:6 454:21
476:14 527:8
**post** 349:7
**potential** 335:17
**powerpoint** 338:8
**practice** 462:7
469:7 471:19
472:7,12 473:23
473:24 474:4
483:10,25 488:10
488:13 516:10
**practices** 336:23
**predecessor**
346:20 358:21
389:13
**predecessors**
346:25 348:4
**prefer** 395:22
**prepared** 310:18
338:3,6

**preparing** 285:12
481:11
**preposition**
476:10
**prequel** 286:16
**prescription**
513:15
**prescriptions**
513:14
**presence** 319:21
338:24 339:7
341:25
**present** 273:18
394:2
**presentation**
338:8
**presentations**
487:13
**presented** 509:23
**president** 335:6
352:25 356:15
362:2,2 373:9
384:11 385:4,7
387:17,19,20,24
393:17 396:6
402:11 433:10
452:5,6 467:12,16
528:8 529:12,23
533:23,24,24
534:2,23
**presidents** 373:18
**presses** 373:10
**pressure** 517:18
517:25 518:4
**pressures** 522:6
**presumably**
410:16 499:2
515:17 529:17
**pretend** 376:19,20
**pretending** 388:3

**pretext** 396:21,23
397:4
**pretextual** 326:15
425:6 432:14
434:4 445:24
450:9 464:22
466:8 508:10
**pretextually**
459:20
**pretty** 344:4 360:3
441:9 478:25
527:13 530:22,25
531:2
**previous** 381:6,10
459:12
**previously** 275:7
283:12 380:5
392:25 393:4
407:7 425:14
524:3 535:16
548:10
**price** 495:22
496:16,17
**primarily** 429:25
**primary** 334:25
335:9,11,15,20
336:3,18 337:7
436:4 459:5 505:6
509:9
**primavera** 272:22
274:20
**principle** 473:11
**prior** 312:16,18,24
313:16 321:14,23
322:10 324:15
327:5 329:5
350:15 351:18
362:25 397:21
459:20 461:18
511:17,19 513:9
514:6,10,15

541:16
**private** 330:6
**privilege** 345:23
**privileged** 427:16
481:14 503:19
**privileges** 481:8
503:16
**privy** 406:24
**pro** 488:6
**probably** 333:16
337:8 350:10
352:12,14 365:12
367:17 382:20
384:6 385:4
386:14,17 417:6
431:9 441:8
452:22 467:14,17
470:7 479:6
484:11 485:6
486:9 487:10
491:22 494:22
495:19,20 512:12
512:25 515:4
519:16 521:12,22
521:25 526:7
529:8 531:11
534:24
**problem** 325:20
325:21 328:5
518:16 519:22
525:9 539:22,23
539:24 540:2
**problems** 514:15
519:20
**proceed** 316:19
**process** 319:11
470:16 475:15,19
**produce** 443:13
477:6
**produced** 284:22
284:25 285:2,4,7,9

285:11 286:8
364:2 367:3 369:3
394:19 395:8,11
400:2 402:8
415:16 435:18
477:3 508:18,22
509:9 543:14
548:13 549:2
**production** 434:19
477:10 489:25
490:3,13 499:14
542:18
**profession** 494:22
**professional**
270:11,13,15
336:20 487:20
**proficiency** 282:6
**profit** 360:16
374:16
**program** 374:9
**prohibit** 390:5
**project** 279:3,5,17
279:21 293:15
**promote** 380:17
384:19 385:6
520:14,18 532:4
**promoted** 374:22
380:14 386:24,25
387:2,12,13
432:11 520:21,24
521:4 534:20
**promotion** 364:25
376:16,18,20,22
397:22 520:16
533:11,13,23
**prompted** 522:23
523:9
**pronounce** 293:9
**proper** 494:16
**properly** 499:25

**property** 499:8,12
**proposal** 303:4
  321:7,14,22
  322:16 323:17
  453:15 454:18,18
  454:25 455:20
  456:4
**proposals** 323:11
**propose** 379:15
**proposed** 543:10
**proposing** 300:17
**proposition** 409:8
**propriety** 496:5
  496:25
**prospective** 487:8
**proud** 375:7,8
**prove** 382:24
  532:2
**provide** 329:10
  335:12 336:4
  341:16 355:5,6
  358:2 369:22
  390:17 451:21
  452:19 453:14
  456:4 459:4
  467:25 476:18
  477:23 490:21
  500:17 516:25
  524:25
**provided** 286:16
  304:15 335:13
  354:15 365:16
  370:9 388:14
  392:20 393:13,20
  403:6 445:10
  464:17 479:21
  482:12 488:15
  490:17,18 494:5,7
  494:19
**provider** 469:2

**provides** 364:18
**providing** 420:3
  481:4
**psychiatrist**
  512:10,13,19
  513:5,9,10,13
**psychologist**
  512:19,20,23
  513:5,9
**public** 271:10
  392:12 544:17
  545:6
**pulled** 323:15
  538:8
**purchased** 454:3
**pure** 465:23
**purpose** 334:25
  335:9,11,15,20
  336:3,17,18 397:6
**purposes** 457:21
  500:11 525:13
**purse** 435:23
**pursuant** 271:8
  369:21 370:9
**pursue** 484:23
  485:2,3 502:2
  505:13
**pursuing** 483:19
  502:3
**put** 316:24 317:4
  370:23 398:13
  399:3 423:15
  426:6 427:12,21
  431:22 434:10,11
  434:13 446:8,20
  447:6 448:9 502:7
  505:9 507:24
**putting** 457:11
  480:21

## q

**qualicaps** 451:10
  452:6,14 454:3
  455:14
**qualification**
  436:7 438:4
**qualifications**
  403:9 405:8 413:7
  413:12,24,24
  414:5,12 423:16
**qualified** 387:9
  404:8,13,13 405:5
  405:9,11,15,17,21
  410:17,18 472:22
  473:7
**quantify** 458:18
**quarrel** 496:25
**quarter** 484:10,12
  485:7
**quarterly** 358:3
  390:8
**question** 275:17
  277:3 281:13,21
  281:23 286:17,18
  286:24,25 291:5
  291:24 298:8,12
  299:8,9,16 303:20
  303:21,23,25
  304:16,18,19,23
  305:3,18 306:10
  306:14 309:7
  310:3 321:20
  322:3,4 324:10
  327:19 328:15
  333:12 342:24
  353:22 363:12
  364:3,17 367:12
  368:16 370:23
  371:9,21 378:5,19
  379:13 382:3,9,10
  383:5 408:14,24

408:25 409:5,6
  410:24 412:23,25
  413:2,15,20
  415:23 418:21
  422:22 426:13
  427:18 437:3,6,22
  437:23 439:23
  440:15 447:22
  448:9 449:21,22
  463:14 472:23
  481:9,10 482:8
  490:15 496:23
  500:16 503:6
  507:15 515:20
  521:2,3 528:2
  535:24
**questioned** 442:12
  442:14
**questioning** 290:2
  318:8 411:23
  442:16 542:16,25
**questions** 275:16
  286:17 298:5
  322:7 344:16
  367:10,14 427:2
  439:4 451:7
  464:18 469:23
  472:16 479:8,11
  479:17 498:13
  502:17,23 505:21
  534:19 543:12
**quick** 329:13
  539:16
**quickly** 524:15,16
**quietly** 523:3
**quit** 277:15
**quite** 284:6,11
  285:6 437:12
  530:13
**quitting** 277:13

quotations 340:24
quote 278:6

**r**

r 272:2 275:6
380:2,4 545:2
race 507:9
radlien 528:6,8,14
529:20 530:18
531:10,19 532:18
532:20 533:10,12
534:18
radlien's 534:10
raise 322:5 334:4
367:7,10 414:19
414:22 529:5,6
raised 293:14
294:5 298:22
299:11 399:19
442:3
raising 433:2
471:17
ran 417:7
range 472:11,25
473:15
rationale 494:2
raytheon 350:15
461:20 467:5,8
524:21
reached 468:19
reaching 430:25
reacted 506:11,23
524:15,16
reactions 382:22
reactive 524:19,21
524:23
read 278:24
281:14 313:6
324:11 345:10
359:24 366:4
408:14,15 412:24
413:4,19,21 414:6

414:8 415:20
422:24 427:8,17
427:19 430:3
431:24 448:18,22
509:2 523:14
538:19
reader 349:12,17
349:18
readers 349:8
readiness 411:25
reading 314:10
339:3 522:18
reads 395:20
ready 283:18
303:3,16 304:4,25
327:21 408:10,12
408:20 409:11,13
409:22 410:2,7
411:4,6,13,15
461:11
real 378:19,20
483:7,11,12,20
484:4,16 485:2,16
485:23,25 486:11
486:15,16,24
488:9,9,12,13
490:7,25 492:20
496:7 501:10
522:19 523:13
reality 515:24,25
realize 447:2
realized 360:13
483:6
realizes 401:4
really 317:11
352:7 357:25
360:13 368:13
386:20,25 387:11
391:11 392:19
402:19 421:16
422:10 439:20

451:6 457:19
458:5 459:11
464:5 466:25
475:13 483:24
504:10 507:19
513:16 519:14
531:25 536:13,17
537:8,9 539:3,18
540:5
realtor 495:19
reason 278:17
281:25 326:15
393:24 396:16
399:20 400:16
408:19 410:17
412:4 416:10,13
425:6 441:19
502:16 506:18,19
506:21,24 515:14
530:23
reasonable 379:8
409:25 410:6
494:23,25
reasons 418:17,17
419:21,22 423:25
432:15 507:11
508:9
reassigned 381:6,9
381:16 382:12
383:10,23
reassignment
382:4
recall 275:21
277:14,17,24,25
278:21 279:3
288:2 306:23
327:9 332:22
333:2 344:11
349:9 350:4
352:18 355:21
359:9 370:7,17,18

370:19,24 371:10
371:21 372:2
373:4 384:5
390:21 391:23
406:15 446:15
452:9 454:23
455:16 460:22
475:9,22 488:20
488:22 489:22
526:7 527:13
529:7,9,10 538:24
540:12
receipts 500:14
receive 499:7
received 280:10
282:7,12 283:14
306:25 316:8
321:9 323:8 327:8
348:18 358:24
376:12 406:19
414:13 429:11
443:12 494:7
501:13
receiving 312:13
348:23
recess 329:17
344:24 379:20
444:14 448:2
498:8 542:9
recipients 504:23
reciprocity 470:12
recognize 368:7
391:8 393:7
451:24 509:4
recollection
276:13 279:16
282:20 305:6,9,14
305:16,19,22
452:4 453:5,6
455:22,24 456:10
456:12 460:15

**recommendation**
303:6 352:17
467:2
**recommendations**
352:22
**recommended**
353:8 505:12
516:12
**record** 274:3
281:14 282:20
284:5 318:6
324:11 327:12
329:16,19 334:7
344:21,23 345:2
379:19 380:10
397:3,11,20,23
406:9,10 408:15
413:4,21 414:8
416:14,18 417:14
422:24 427:19
431:25 434:10,11
434:13,14 444:13
444:16 446:8,18
446:20 447:6,13
447:16,25 448:4,9
448:19,23 485:14
498:5,7,10,12
504:6 505:19
519:6 521:8,17,17
522:15 540:22
542:5,8,10,13
544:7
**records** 365:5
393:22 498:15
508:18,22 509:5
548:25
**recruit** 408:2
**recruiter** 476:7,8
**recruiters** 468:16
476:7

**redacted** 391:10
**reduction** 286:11
286:20 287:2,6,11
287:14 335:2,7,17
335:23 458:12
**rees** 271:7 272:14
**refer** 350:11
353:15 528:5
541:16
**reference** 448:23
459:18,24 460:14
460:21 461:20
464:4,15 465:17
465:19 466:16,21
466:24,25 494:18
**references** 461:23
467:19 468:6
476:3,9,13,19,21
477:21,23
**referred** 354:7,9
362:10 457:12
502:6 505:7
**referring** 316:3
445:13 449:16,22
477:14 482:6
502:10,11 523:12
**refers** 366:8
522:22
**reflect** 399:21
416:11 498:17
509:18
**reflected** 294:16
305:2 361:10
396:10,20 399:15
498:20
**reflecting** 498:15
500:19 522:15
**reflects** 396:17
397:21
**refresh** 276:13
279:7,16 337:20

338:2 456:9
**refreshed** 454:12
**refresher** 275:24
**refreshes** 276:15
**refusing** 277:13
**regard** 326:14
409:7 431:16,20
527:11
**regarded** 516:11
**regarding** 282:17
282:21 286:9
287:25 288:6
294:14 296:13
301:10 332:8
335:7,22 341:9
**register** 388:10
474:8,10
**registered** 462:5,8
474:2,6,18
**registration**
474:13 485:11
**regular** 292:9
293:6
**reinforced** 531:22
**reisbaum** 273:11
275:3
**rejected** 323:11,23
**relate** 450:24
**related** 281:9
358:6,7 450:20
490:19 521:18
545:15
**relates** 501:6
**relationship**
291:15 292:2
451:19 453:25
460:9 486:7,23
487:16
**relationships**
398:19 536:20

**relatively** 419:7
**relevant** 448:21
**relieves** 511:10
**religion** 507:9
**remain** 400:12
418:20
**remains** 543:25
**remember** 276:17
276:24,25 284:23
293:8 353:12
358:25 361:19
446:12 447:19
453:18,19 454:9
454:15,16,17
455:19 476:17
**remind** 282:24
**reminded** 283:6
**removing** 423:13
**repeat** 281:13
**repeated** 304:16
**rephrase** 342:16
382:9
**replace** 401:21
537:6
**replaced** 423:17
**replacement**
361:23 385:8
510:6 515:10
**replied** 340:23
**report** 348:7,10
354:19,25 358:3
390:8
**reported** 348:3,12
356:7
**reporter** 271:9
274:11 359:15
392:24 399:25
415:14 479:22
545:5 549:3
**represent** 274:13
275:3 285:3 345:6

355:11 491:13
494:8 526:15,19
526:22
**representation**
543:22
**representative**
296:19 303:15
304:3
**represented**
355:23,25 526:10
**representing**
491:17,18
**request** 315:13
368:10 462:25
500:18 501:5
**requesting** 278:2
**requests** 546:9,13
**required** 370:15
372:3 474:15
**requires** 298:8
305:4 333:6
**research** 468:21
**reserve** 344:12
**resident** 367:24
**resource** 290:6,16
**resources** 471:11
**respect** 290:21,25
297:7 309:2
319:12 339:11
340:19 344:13
369:14 378:21
411:2 422:3 431:7
452:24 454:5
482:25
**respectful** 283:4
**respects** 388:22
**respond** 303:4
307:16 309:20
315:5,13,16
317:10 391:11
393:23 418:2

531:20 538:17
**responded** 308:8
**responding** 307:21
321:8 322:16
391:11
**response** 284:7
301:12 302:20
304:16 308:17
314:3,25 315:2
321:18 323:17
325:18 333:24
340:7 391:20
448:8 479:16
484:3 506:4
531:18 540:21
**responsibilities**
392:2 413:11
471:17
**responsibility**
314:13 336:21
391:21,25 422:20
439:10 459:16
524:10 538:2
**responsible** 307:5
331:7 362:23
385:2 404:6
429:25 440:19
446:12 527:6,24
538:6
**responsive** 350:23
372:23 403:17
428:21 473:9
**rest** 319:4
**restate** 481:10
**restaurant** 347:24
**restructured**
374:10
**result** 378:2
395:23 478:5
**resulted** 291:9

**resumed** 275:7
380:5
**retain** 330:6
**retained** 549:3
**retaliated** 333:18
333:20 423:9
424:3,6 433:2,7,16
434:3 441:17
442:5,11,16
508:12
**retaliating** 392:6
**retaliation** 282:5,8
425:4 435:10,14
441:14 444:20,25
447:18 449:15,16
449:24 450:4,7,10
450:11,13,14
**retaliatory** 282:13
423:25
**retired** 294:21,22
294:23 295:5
**returned** 283:7,22
343:10 381:22
398:21 465:13
**returns** 501:8
**reveal** 427:15
481:7 496:6
503:16
**revealing** 481:14
503:19
**reverence** 290:22
**review** 276:21
279:15 280:9
281:20 344:15,16
354:18,19,21,23
355:3 362:22,23
433:4 440:18,18
442:8 445:25
447:14 464:3
470:22 480:13,17
540:16 541:16,18

**reviewed** 328:13
328:16 354:12,16
394:18
**reviewing** 430:25
447:21
**reviews** 354:13,15
402:24
**rid** 376:23 397:9
397:17 401:13
416:15 417:4
418:23 507:20
520:12
**right** 280:10,13,24
281:6 298:20
306:21 323:13
326:21 331:24
335:3 336:25
337:5,13 338:5,6
339:14 341:15
359:2 370:3
376:24 378:11
380:15 381:3,10
384:16,20 386:25
387:3 389:23
394:16 398:4,13
404:12,14 405:3
414:14,19 417:17
420:14 421:23
424:5 425:23
426:16,19,23
430:7,10 431:2
435:15 438:11
440:15 451:3
452:16 454:14,22
455:12 456:2,11
457:7 458:5
460:14 461:9
464:23 465:24
466:5 471:14
472:8 474:25
482:17,18 485:16

488:10 490:21
491:6 495:9
505:24 506:2,2
509:21 510:21
514:5 517:10,22
520:3,7,17 523:7
532:16 542:20
**riley** 329:25
330:12,14,18
332:9,13 423:22
442:12
**riley's** 433:9
**rl** 546:12
**road** 272:6
**rob** 346:11,14
**robert** 272:10
274:16
**robust** 317:7
**rocco** 273:19
274:10
**role** 349:2 355:13
356:6 371:2
372:10 375:12
384:3 385:13
389:9 397:8,25
399:4 402:10
403:7,21 404:20
409:22,23 410:8
411:4,6,13,16
415:6,8 416:6
430:15 432:24
436:11 452:9
480:21 481:11
529:3,23 532:16
**roles** 384:12
413:11
**room** 312:5
354:24 387:22
393:15 405:18
426:5 506:6 534:3
534:6

**rose** 288:3 363:21
539:25
**rough** 496:11,21
**round** 355:18
**rpn** 476:7
**rq** 477:9 489:24
490:12 493:20
499:13 500:18
501:5 546:13
**rule** 502:12
**rules** 500:3
**rulings** 546:12
**run** 362:17 364:24
454:5
**running** 289:18
492:3,10

**s**

**s** 270:5 272:2
273:7 274:5 275:6
293:10 363:6
380:2,2,2,4 393:16
546:20
**sad** 532:3,18
**sadness** 505:3,3
**sakaguchi** 356:22
358:2 388:25
390:13,18 391:11
391:15,19 392:4
392:15 393:10
394:23
**sakaguchi's** 440:6
**sake** 411:8 508:2
**salaries** 365:17
**salary** 358:15
360:23 368:12,12
376:13 406:25
407:23,24 413:9
413:11 443:10
454:20 456:6
475:24

**sale** 486:24 488:24
491:15,18,19
496:17 499:12
**sales** 337:12 487:8
487:8 489:4
492:12
**sam** 273:8 274:25
**san** 293:12,12
296:14,17 311:25
317:7 323:8 327:7
327:15,24 336:7
356:13,15,22
363:3 391:11,15
391:19 393:10,16
400:8,18
**sara** 272:11
274:16 346:14
**sat** 465:10 541:18
**satisfaction** 500:7
**saunders** 338:11
338:24 339:7,20
341:25 367:11,19
368:10 386:16
**saw** 293:19,23
297:24 326:17
376:8 431:4,5
508:12 511:22
512:12 513:10,19
516:5 541:18
**saying** 277:11,17
277:24,25 278:21
307:2 308:12
310:4,6 315:9
317:15 325:5,5
344:11 354:2
360:6,11 368:25
402:15 406:15
438:22 441:2,16
442:24 444:5,9
464:19 493:24
529:9,10 535:7,15

540:12
**says** 278:3,5,5,17
278:18,18,19,20
278:22 296:12
300:25 301:22
307:15 308:9
309:25 310:17
311:13,14 314:22
316:17 321:21
322:8 339:19,24
340:4 366:2
391:15 392:10
399:11 400:9
406:4,4 480:25
495:3 497:2
509:13,23 510:2
511:12 518:9
519:7 521:17
522:8,18 523:25
541:3
**scared** 483:24,24
**scarsdale** 486:16
486:17 488:3
495:23 509:9,13
**scary** 462:22
**scenario** 385:21
**scene** 289:19
297:16
**scheduled** 295:2
**scheme** 368:24
**school** 372:18
373:8,23 374:2,4
432:20 436:25
437:18,21 438:10
438:18,22 463:4
463:23 470:5
471:16 514:5
**scope** 420:5
**scrambling** 295:8

scully 271:7
272:14
seaboard 470:3
searched 285:13
searching 456:21
second 301:9
341:22 343:5
360:2 378:25
384:24 388:5
426:14 429:4
463:12 494:10
seconder 468:20
secondly 283:2
section 280:25
480:5 482:5
sedative 511:8
see 275:19 276:21
280:14 296:3
301:15,25 302:2
302:15,22 311:14
312:20 325:17
333:5 340:23
359:12 360:2
366:7 378:22
391:14,18,19
392:10 395:20,24
395:25 399:10,13
400:13 406:6
416:4,8 417:21
426:5,14 427:5
439:17 447:10
475:21 476:25
480:7,9,11 486:21
493:25 494:11
505:6 508:19
509:2,25 510:10
511:21 512:4,18
512:23 513:4
516:19,22,23
519:7,22 521:15
522:4,6,18 541:16

seek 292:15
516:12 521:12
539:12
seeking 300:15
320:6 482:7,19
494:13
seen 293:21 367:2
395:2,15 415:24
416:20 417:15
429:9 440:7
441:11 505:4
507:22 512:10
513:8 542:22
segregated 477:8
select 297:2
selected 297:7
299:10
selection 364:7
self 340:14
sell 360:17 483:12
491:20
seller 491:19
497:19
seller's 497:14,16
sellers 487:13
491:13
send 300:12,17
303:6 304:25
319:4 321:7,22
322:16 329:4
474:15 484:6
sending 539:5
senior 384:11,13
384:24 385:19
390:3
sense 369:25
534:13
sensibly 437:12
sensitive 398:14
sent 305:21,23
319:3 321:13

393:11 396:13
464:24
separate 297:22
327:22 477:7,11
separated 338:25
separately 502:4
separation 472:8
478:10
seriousness 334:4
serve 402:5 403:21
408:10 409:11
436:7
served 344:14
369:8
service 341:17,18
369:9 492:11
services 339:6
360:19 369:11,14
369:17,21,23
370:6,10 451:21
serving 340:14
set 281:10 315:15
358:13,16,19
372:12 374:16
379:6 391:25
398:15 400:23
480:21 508:18,21
509:4 519:21
542:21 545:21
548:25
sets 306:7 307:15
setting 533:17
settle 295:24
296:14 308:15
310:18 320:10
322:14 323:3,9,14
326:25 420:4
422:13
settled 343:2,3
settlement 295:17
295:20,22 296:20

297:14 298:21
299:10 301:10,14
301:24 307:16
312:15,24 317:8
317:10 322:23
323:4 324:4,7
340:5 421:12,17
433:21 465:4
sever 453:25
severance 283:15
283:19,24 341:15
341:17 452:20
453:15 454:6,10
454:13,16,18,25
455:5,20,23 456:4
459:4 460:24
464:15
sexual 329:22
330:8 442:13
sezar 330:21 404:2
404:4,16,20
464:12
shaken 284:14
shared 293:18
417:20 522:19
shearman 273:2
274:23 345:7
463:10
sheila 488:2
shell 526:12
shifted 482:14
shifting 288:10
shin 363:4,4,5
shine 290:5,14
shoes 507:19,25
short 289:22 295:3
336:13 512:17
519:13 539:16
shorthand 271:9
545:5

shortly 307:21
334:13 337:23
show 320:5 479:20
499:6
showed 298:14
showing 300:6
301:8 487:11
shown 276:4
297:21 480:22
541:20,21
shows 395:3
sic 368:24
sick 301:17 306:25
309:9,12 314:24
321:17
side 457:22
sight 404:17
signature 280:19
339:20,21 340:2
427:5 510:24
545:23
signed 280:21
358:20,25 427:9
428:22 430:4,6,9
480:18
significant 335:23
492:8 503:7,8
signing 429:10
similar 337:17
540:9
simple 304:23
437:22,23
simply 308:4,14
309:22 325:19
508:5
single 344:2
371:22 405:18
440:17 445:7
446:12 462:23,25
509:3

sit 371:22 405:14
469:13,16 477:19
506:6
sitting 426:22
439:25 440:12
443:16 454:14
456:11 523:3
537:12 540:2
situated 390:4
situation 291:7
324:18 334:14
401:6 416:16
442:12 446:5
505:23 507:2
519:16
situational 521:18
situations 385:23
six 320:8 418:24
420:10 464:9
483:23 491:22
skills 483:15
skip 502:21
skyler 273:22
274:20
sleep 503:10,11,22
514:15 517:3
519:15
sleeplessness
512:21
slight 532:13
slot 529:18
small 294:18
312:5 460:5
464:23
smith 460:11
sold 486:15,16
solely 374:19
406:10
somebody 378:12
386:23 402:18
407:6,11 409:23

436:10 460:10
513:19
someplace 533:20
soon 303:7
sooner 418:4
419:23 436:3
sorry 280:7 329:5
339:2,16 348:11
358:18 366:6
375:7 378:23
382:8 409:4
410:12 413:15
414:6 439:3
445:12 449:19
450:15 458:15
469:21,24 473:13
494:11 504:5
507:17 514:13
535:13
sort 295:8 387:16
441:18 470:24
486:22 500:24
514:4 517:15
535:5
sought 516:2
sound 459:9
source 501:9
518:22
south 385:18
528:17 533:21
southern 270:3
274:8
space 324:21,23
461:19 467:12
spanish 452:13
speak 289:25
292:21 293:22,23
316:21 329:6
333:13 344:17
345:13 346:7
369:4 388:13

391:12 405:7
461:17 507:16
533:15
speaker 534:18
speaking 295:9
406:4 419:7 476:6
speaks 310:5
specific 289:5
347:13 353:12
365:23 370:22
372:2 373:4,7
477:20
specifically 303:15
304:2 327:9
335:25 352:21
366:20 374:5
390:6 441:21
442:10 534:16
speculate 385:12
530:15,23
speculating 531:3
speculation
465:23 530:19
speech 534:19
535:11
spend 505:16
spin 478:24 479:2
spinning 466:23
spins 417:24
split 375:19
488:21 497:18
spoke 287:24
292:8 293:6
364:25 386:13
387:24 442:6
455:15 468:20
531:9 533:2
spoken 300:21
305:13 333:15
461:7 468:19
531:12,15

**ss** 545:3
**stabber** 328:24
**stabbing** 325:23
**stage** 475:20
**stamped** 276:7,11
279:10,13,24
280:3 293:20
294:3,11 295:14
299:22,25 300:4
301:3,6 302:9,12
307:11 310:8,11
311:8 312:10
318:14,16 325:12
325:15 338:15,18
368:5 400:4
415:18 425:16
546:22,24 547:2,4
547:5,7,9,11,13,15
547:17,19,21,23
547:25 548:3,6,16
548:18,21
**stand** 275:8 380:6
507:19
**standing** 398:19
**stands** 364:17
479:6
**start** 481:24
483:17,19 503:9
506:3 518:3
522:11
**started** 351:10
447:19 458:5
464:19 483:4,21
484:21 493:8
517:17,21 518:21
531:24 539:5
**starting** 397:3
401:12 423:10
511:23 517:18
522:24

**starts** 281:2,4
293:9 301:9
325:17 401:8
480:9,24
**state** 271:10
276:16 282:20
283:7 287:6
309:22 320:24
321:2,12 328:10
414:23 424:18
428:17 462:7
469:7 473:24
474:4,9 482:2
483:11,12 485:12
545:3,6
**stated** 313:25
320:22 440:6
508:10 535:17
**statement** 282:11
286:18 316:17
322:21 364:19
366:12 384:7,8
447:20 488:15
531:21
**statements** 276:18
434:9 489:19
**states** 270:2
308:10 328:3
374:13,15 398:12
482:7
**station** 500:14
**statistically**
484:20
**statue** 417:6
**status** 382:5
**stay** 470:3 532:2
538:8
**stayed** 522:3
**staying** 483:6
528:18

**stellar** 402:24
**stems** 282:16
**stenographically**
545:12
**steps** 400:12
**sterling** 273:2
274:23 345:7
463:11
**stern** 273:22
274:21
**steven** 288:3
363:21 539:25
**stick** 347:11
**stiegler's** 307:16
**stipend** 406:19,20
**stock** 337:3,9
**stone** 488:2
**stood** 297:17
433:25
**stop** 324:24
**stopped** 457:18
484:15 486:20
536:17
**story** 306:15 479:7
479:9
**strained** 291:15
292:2 536:17,19
536:21 537:19
**strains** 536:25
**strategic** 292:18
293:3 389:12
**strategize** 324:17
**strategy** 300:20
307:7 317:9
327:20
**straw** 508:14
**strength** 469:13
469:15
**strengths** 483:9
**stress** 458:4,8,11
512:3 516:15

518:10,13,23
519:2 521:23
**stressed** 519:8,9
519:15
**stresses** 523:23
536:14
**strictly** 334:21
**strike** 299:3,8
301:21 321:11,19
324:9,12 336:9
340:16 350:22
372:22 392:8
403:16 428:20
473:8 504:5
**strong** 419:8,9
524:14
**stronger** 419:3
**strongly** 284:6
333:21 522:2
**structured** 374:15
**struggled** 463:3
**stuffed** 284:20
**subject** 284:13
286:11,22 287:2,6
287:10,14 431:13
528:24 529:5,6
531:8 535:7 543:3
543:4
**subjected** 286:20
**subjective** 333:24
413:10
**submitted** 281:20
**subordinates**
416:24
**subscribed** 544:13
**subsequent** 288:5
333:11 449:7
**subsidiaries** 352:4
352:9 360:18
526:14

subsidiary 351:21
428:16
substance 341:6
341:10 342:7,17
343:6,11,15,19
344:9 346:2
substantive 480:5
success 329:9
successfully 525:4
suddenly 401:4
442:7
sued 526:24
sufficiently 307:17
suggest 352:14
355:9 401:22
suggested 284:5
306:19 329:7
330:7 333:21
433:11 516:16
537:25
suggests 308:11
suicidal 504:2
514:9 515:2 516:3
suicide 503:9,24
504:4 515:19
suite 272:7
sum 341:6,10
342:7,17 343:6,11
343:15,19 344:9
454:19
summer 483:22
486:9
sums 456:5
supervise 366:8
supervised 365:21
366:12
supervisor 354:21
354:25 442:3
517:19
supervisors
337:15 371:5

supplement 485:4
supplemental
434:18
supplemented
472:5
support 284:13
364:18 366:11
370:10 402:3
434:9,20 435:7,13
443:17 445:18
448:14 460:25
464:10
supported 283:11
343:25 430:2
460:7 520:24
526:3
supporting 420:2
460:6
supports 366:22
384:22 439:18
suppose 451:23
476:10 508:2
536:2
supposed 401:14
429:5 475:9
sure 276:2 289:17
295:6 300:19,23
319:17 328:19
334:6 337:25
349:17,24 350:3,6
351:14,14 353:9
353:11 359:14
367:19 370:7,8
374:6 383:4
386:12,12 406:13
407:12 424:17
430:5,8 439:14
442:18 444:4,21
447:8 454:4
457:24 476:15
477:7 496:6

499:18 510:21
529:19 542:6
surface 505:24
506:2
surprise 279:19
386:2,21 387:5
407:25 461:12
surprised 387:6
surprising 389:6
swings 504:24
switching 451:5,9
sworn 275:7 380:5
544:13 545:10
sympathies 507:3
symptom 517:20
symptoms 503:23
504:7 508:5
514:19,23 516:20
518:12,15 521:8
synthroid 510:2,5
systems 461:20
467:13

t

t 293:10 380:2
545:2,2 546:20
table 465:11 534:3
take 276:9,20
280:5,17 292:19
295:10 299:18
307:8 312:6 318:4
329:13 339:9
347:22 360:4
361:25 379:16
401:18 408:20
415:20 419:23
444:10 459:10
464:6 469:5,8
471:13 478:4,14
478:16 483:11,14
484:4 489:16
499:19 503:10

510:5,16 511:5,14
516:2 517:2
taken 291:19
329:17 344:24
386:22 393:24
444:14,23 448:2,6
451:3 469:11
471:15 472:10
498:8 531:5 542:9
545:8,12
takibondo 293:7
takimoto 288:22
292:16 293:11,12
293:13 296:14,17
296:25 307:3
311:25 312:4
317:6 323:8 327:7
327:14,24 328:10
328:14,18 356:13
358:6
takimoto's 290:23
talk 365:24 389:10
389:11 424:9,15
428:2 440:10
467:3 479:3 487:6
488:5 512:22
539:18
talked 317:6
343:13 353:19
369:7 434:5
444:18 498:14
501:24 515:16
525:21 528:21
534:12
talking 275:25
287:22 289:21
291:13 318:11
331:19 338:7
351:10 408:22,23
444:20 473:22
499:20 509:19

526:16,17 530:24
536:18
**tanabe** 351:25
**tanzania** 511:3,13
**tax** 499:22 500:19
501:8
**taxes** 490:20
500:25
**team** 319:4
**teams** 335:14
**technophar**
337:22,25 451:16
452:7 454:2
**telephone** 344:3
**tell** 312:17 313:14
349:25 350:8,18
350:24 351:4
352:4,12 356:11
373:14,21 379:7
424:23 445:2
452:25 472:19
479:12 487:2
490:10 491:23
519:19 522:16
527:12 529:20
530:3 541:13
**telling** 308:3
309:11 378:10,14
378:17,18 401:8
401:10
**temp** 472:5
**temporary** 380:25
381:2,14,19 382:5
387:16 403:24
469:2,5
**ten** 432:21 446:13
496:19 523:3
**tendency** 524:2,7
**tenure** 357:13
391:24 431:3

**term** 380:20
381:15
**terminate** 394:25
415:2 417:8,23
418:3,22,24
419:10 459:3
465:7 474:19,21
539:6
**terminated** 349:5
418:19 419:19
423:24 424:10,22
425:3 434:4
458:21,22 460:11
460:25 464:8,13
466:15 468:15
506:8 508:6,11,14
517:10
**terminating**
326:15 420:6,6
**termination**
283:10 421:14
422:9 424:15,21
424:24 435:25
453:20 461:4
464:20 474:16,17
474:22 485:11
515:12 516:21
531:13 541:10
**terminations**
454:6
**terminology**
353:18,20 382:6
**terms** 281:4
296:20 320:10
358:12,16,20,22
359:6 360:8
361:11 363:15
364:7,9,19 368:17
369:13 381:18
382:13,17 383:6
383:14 408:24

409:7
**terrible** 401:9,9,11
**terrified** 484:2
**testified** 275:8
380:6 521:9
**testify** 412:17
456:3
**testifying** 304:10
353:7 412:18
413:3 472:18
540:21
**testimony** 282:14
335:5 340:17
345:11,14,20
346:2 355:19
383:25 384:5
386:5 388:22
403:19 404:11
411:18 434:20
435:19,20 445:9
446:14 448:12
540:24 545:11,12
**text** 307:2 316:11
539:15,16
**thank** 275:14
302:25 308:5,14
344:18,19 376:21
488:7 502:25
544:3
**thanking** 307:19
**thanks** 301:23
**theories** 439:10
**theory** 419:18
439:17
**therapist** 512:19
513:4,8
**therapy** 505:16
**thing** 388:6 446:12
466:9 478:24
493:17 534:21

**things** 282:23
373:2 374:7
391:23 397:23
398:13,14 400:9
400:24 423:9
436:13,18 438:5
446:17,22 447:2
464:5 478:12
487:14 505:17
522:20 523:11,17
523:19 532:21,23
532:24 542:3
**think** 275:24
278:16 286:22
298:8 306:20,21
310:3 326:7 327:3
328:3 340:12
345:22 349:7,8
350:14 351:2,6,8
351:17 354:7,8
359:2 365:7
368:22 372:5
374:3 379:12
381:21 383:14
388:21 389:4
394:14 396:10,13
396:16,23 397:13
397:16,18,19
399:15 400:19,21
400:22,23 405:14
406:8 408:8 409:9
412:10 413:5,9,10
413:22 414:9
416:20 417:3
418:3,6,7,22,24
419:6,21 420:9
421:4,7,12,15,16
421:19,20,25
422:2,5,6,16,25
423:4,8 428:25
429:11 431:17,22

434:11 436:6
439:24 443:7
445:19 446:10
448:15,22 452:5
453:25 458:6,20
468:12 472:19,20
473:21 474:25
477:8,11,19,22
478:18,25 481:13
482:5 489:21
490:18,20 494:9
494:23,24 495:11
500:15 501:13
504:16 506:6,23
507:6,17 509:11
511:4,6,11,13
512:20 513:22,25
518:4,12 520:23
522:10 524:6,17
525:3,7,8 528:3
529:7 530:21
532:9,22,23
538:18 541:12
543:21
**thinking** 522:11
**third** 334:3 399:11
400:6,15 427:4
463:12 493:15,22
510:9 518:22
521:16
**thirds** 403:5
505:15
**thoroughly** 526:8
**thought** 284:8,9
284:25 285:11
286:7 313:10
320:4 334:2,9
413:2 420:23
436:12 442:21
471:13 487:20
506:9 536:2,4

**thoughts** 378:25
395:21
**thousand** 324:5
463:14 490:14
503:4
**three** 278:10 292:9
298:10 324:4
332:18 351:24
357:13 372:16
417:18 418:4
462:24 463:14
469:12,17 494:14
524:15 529:2
**threshold** 512:15
**thyroid** 510:5,6
**tied** 402:15
**time** 280:12 286:3
289:22 295:3
303:13,13,18
304:8 305:5,7,9
308:21,22 311:19
311:21 323:14,16
329:16 332:12,15
334:6 336:14
344:12,13,18,23
347:2,3,7,9,9,16
348:4,14 349:3
353:10,14 354:4
359:3 360:4,12
362:25 364:22
369:9 371:14,18
371:18 383:13
384:9 387:14
388:2 392:7,14
393:15,17 396:7,8
398:6,20,25
402:10 404:3,22
404:24 405:24
411:9 414:2,10
415:20 416:12
419:5 426:21

428:10,10,22
430:12 432:7
434:7 440:25
441:8 443:9
444:13 446:16,18
446:19 447:25
454:3 455:13
458:6 460:3,15
461:14 469:12,15
469:18 470:23
471:10 472:6
474:16 481:24
482:13 484:9,22
484:25 485:8
488:15 489:14,23
493:9 495:11
498:7 511:4,5,12
512:2,17 514:21
515:16 517:2,3,19
523:8,24 525:8,19
525:19 531:9
533:8 535:4 536:2
540:7,18 541:9
543:19 544:6,8
**timely** 329:12
**times** 278:18
289:4 292:10
345:16,17 367:19
372:16 412:23
429:14 469:17
527:2 540:22
**tiny** 361:3
**tired** 505:11
542:14 543:9
**title** 382:7 532:12
**to's** 391:6
**today** 274:3,15
343:22 346:16
371:22 405:14
418:20 419:16
434:6 443:16

446:3 448:13
457:21 477:19
481:25 521:10
**today's** 435:19
544:6
**todd** 282:10,17,22
283:10,12,13,17
286:9,10,11,20
287:2,10 423:18
423:19 441:22,24
**todd's** 433:3
**told** 283:23 284:9
290:3 298:18
303:15 306:24
330:24 339:12,17
340:6 343:16
350:4 352:10
357:24 373:5,17
373:18,19 374:4
377:13 382:20
383:8 388:13
390:6 408:20
412:10 417:3
424:22 433:4
438:4 495:6
496:22 504:20
519:16 529:25
532:9 536:9
**tom** 329:23
**tomoji** 288:19
293:10 294:20
295:5 305:24
325:10 327:10,12
327:13,22 328:2
334:13
**tone** 300:19
321:25 536:16
**top** 280:15 301:12
301:22 462:4
509:12 521:16
534:7

**topic** 498:13
533:22
**topics** 451:5,9
**total** 494:14
501:14
**touch** 467:16
**touched** 447:8
**tough** 463:7,8
491:3
**toxic** 277:18,19
**train** 523:5
**training** 335:12,14
336:4,5,19,20,24
337:4,9,10,10,14
337:17,22,23
338:4 463:9 523:6
539:24
**trainings** 337:8
**transaction** 327:4
496:9
**transcribed**
545:13
**transcript** 345:10
**transition** 389:8
**transmit** 454:19
**trap** 439:19
**traveling** 324:19
511:13
**treated** 284:11
290:21 441:25
442:2 443:7 505:2
**treatment** 505:13
516:20
**trial** 387:4 432:24
**trice** 533:3,7,15,18
534:11
**tried** 446:4 462:3
462:13 479:18
483:16 538:8
**trip** 296:15 334:12
334:22,25 335:10

335:20 336:4
337:18 465:10
**trouble** 382:10
512:14
**true** 330:5,14
354:8 360:7
396:18,19 399:21
399:22 402:13
417:13 418:18,20
437:17 481:18,19
481:22 487:23
491:4 523:19
**truly** 395:22
**trust** 394:10,15
416:5 429:20
**trusted** 541:13
**truth** 464:23 465:2
465:3,5 541:13
**truthful** 478:23
**try** 439:14 484:4
497:25 516:16
**trying** 278:24
322:6 378:6 406:9
418:23 419:19
422:6 438:21
439:15,19,21
486:10 495:14
507:24 513:11
537:8
**tsmc** 387:21
**tuesday** 307:3
**turn** 285:8 367:16
399:9 509:11
**turned** 297:17
342:13
**turning** 427:4
**turns** 443:3
**twenties** 513:11,25
**two** 274:6 276:10
278:2,6,10,23
282:23 286:17

289:8 291:3,17
295:4 297:15,22
327:4,22 345:17
346:3 363:5 371:5
372:16 382:22
385:19 403:5
404:18 410:25
411:9 428:8 431:4
431:8 436:11
438:15 456:5
460:7 466:9 467:4
467:9 470:19
482:14 490:11,14
492:5 497:14
505:15 524:15
526:2 534:6
535:19 539:11
**type** 429:10
503:13
**types** 372:15 482:7
**typewriter** 426:18
**typewritten**
280:25 281:4
339:10,11,16
**typically** 350:11
350:20 353:5
354:17 398:13,15
407:15 479:2

**u**

**u** 293:10 393:16
**ultimate** 293:11
**ultimately** 342:2,9
342:20 343:3
385:9 422:18
**unable** 305:3
402:4 456:21
458:16 484:18
**unauthorized**
342:19
**unavailable**
473:16

**unaware** 293:17
**unbridled** 323:9
**undepressed**
505:11
**underestimate**
495:8
**underlying** 278:17
**undermined** 387:2
387:14 388:9
**underneath** 481:2
**understand**
296:21 309:14
349:21 371:10
375:13 380:20
381:25 383:9
404:11 419:20
421:25 436:17
438:11 439:12,13
439:15,16,22
440:11 441:13
482:21 488:10
**understanding**
332:12 362:23
382:10 405:8
420:5
**understands** 421:7
**understood**
290:24 291:2,14
292:11 295:22
296:2 302:3
327:16,18 381:19
393:12 507:5,8
**unemployed** 483:6
483:23
**unemployment**
424:19 459:7
461:5 495:15
501:12 506:17
**unfair** 394:5,12,14
408:8,17 409:9,16
409:18 410:13,14

410:15 411:19
412:12 413:5
506:9,20
**unfairly** 422:3,5
505:2
**unfortunately**
321:16
**unhappy** 375:5,10
375:17,18,21,23
376:3,4 391:16
392:17 523:23
532:10 537:24
**unified** 428:14
**unilaterally**
543:12
**unit** 288:22 404:6
428:14
**united** 270:2
374:13,14 398:12
**unreasonable**
378:24 379:8,9
414:3 495:2
**unsuccessful**
483:5
**untrue** 417:13
**updated** 292:5,13
**upset** 323:16
328:20 344:4
506:20 531:21
537:15
**usame** 393:15
**use** 275:24 315:19
350:10 353:20
422:6,9
**useful** 516:14
**usually** 350:12
352:24 413:10
**utsin** 293:8
**utterly** 395:6

**v**

**vacation** 283:8,21
511:3
**vacuum** 439:2,5
**vagnini** 272:4
**valli** 272:4,10
274:16 318:4,9,11
344:13 346:11
**variety** 541:11
**various** 331:2
369:23 523:23
531:5
**vast** 487:9 525:10
**verbal** 449:19
**verge** 503:8
**versa** 398:12
**versus** 274:6 296:9
497:18 500:13
**vice** 398:12 433:10
467:12,16
**vicious** 458:23
459:2 461:3
464:20 465:8,15
**victor** 451:24
452:5,21 453:20
**victor's** 453:19
**video** 274:4
**videographer**
273:19 274:2
318:5 329:15,18
344:22,25 379:18
380:9 444:12,15
447:24 448:3
498:6,9 542:7,10
544:5
**videotaped** 271:5
**view** 379:7 401:16
416:17,19 417:11
417:17 420:19
439:17

**views** 378:9
**violate** 394:10
**violated** 393:12,18
394:3
**violation** 342:2,9
342:12 442:25
**virginia** 359:3
**virtue** 383:21
**visibly** 537:17
**visit** 335:24
521:17 522:15,15
**visited** 335:10
**visiting** 387:17
**voice** 322:5
**void** 420:7
**volume** 274:5
**vp** 384:13

**w**

**wait** 321:5
**waiting** 417:9
**waive** 470:7,11
**wake** 424:14
**walked** 284:14
354:9 537:10
538:12
**wall** 508:13 522:5
**want** 284:8 292:23
299:4 306:15
307:16 320:19,21
339:9 341:22
347:15 357:25
360:2 375:20
377:7 378:11,12
397:8,10 401:7
402:17,18 409:6
436:21 439:13
441:13 442:22
444:18,20 447:13
464:2,6 479:20
498:19 500:16
504:10 505:18

507:3 538:6,19
**wanted** 300:19,23
308:25 330:5
343:12 374:12
376:10 397:23
400:25 402:19
403:24 418:12
433:13 447:19
461:12 470:3
471:24 476:3,10
478:14,16 479:19
513:12 531:25
**wanting** 539:5
**wants** 542:16
**war** 491:9
**warner** 359:2
**wars** 491:11
**watched** 463:2
504:21
**watching** 435:23
**way** 294:6 297:23
298:15,22 299:11
314:5 315:8 319:9
320:19,21,22
323:14 351:23
352:2 354:7
357:11 364:24
370:23 372:11
375:14 387:2
389:10 392:17
397:9 398:23
416:23 417:22
423:11,22 433:11
438:25 442:13,14
443:7 448:15
455:24 456:12
466:15,23 478:19
484:5 488:23
491:16 513:24
514:4 518:17
521:23 537:4

**ways** 391:16
400:11 406:5
432:4
**we've** 318:9
434:12 450:20
**weaker** 419:6
**website** 492:16
**week** 278:2 284:23
292:10 294:22,24
296:16 321:17
344:14 492:5
**weekend** 306:25
**weeks** 327:4
442:19 529:2
**weird** 458:5
**went** 283:21
284:19 285:12,13
306:22,25 309:9
318:23 324:16
332:8 342:3,9,20
342:25 356:16
372:16 373:8,19
374:2,8 385:18
436:25 437:18,21
438:9,18 463:3
478:9 486:11
500:4 511:13
518:20 528:19
533:21 538:20
**westchester**
487:20
**wet** 499:25
**whatsoever**
317:11 541:14
**whereof** 545:20
**white** 347:25
349:10
**wholly** 351:21
428:16
**widely** 373:16

**willing** 467:6
**win** 491:10
**winding** 283:16
**window** 327:14
421:10
**winner** 436:4
459:5
**wins** 491:9
**withdrawn** 287:15
319:10 334:16
335:19 355:12
358:18 369:15
401:23 410:3
422:21 430:12
443:24 465:17
471:8 483:18
508:3
**witness** 276:4
304:14 318:3
393:15 412:19,21
427:15 503:15
542:14 543:9
545:10,20 546:5
**witnessed** 339:19
**witnesses** 332:23
434:22
**woman** 283:10
299:4 333:23
389:23,24 402:22
404:12,14 408:21
425:4 440:3
463:22 507:21
534:23
**women** 332:14,16
332:19,25 403:15
433:13 440:5,7,9
534:7 535:19
**women's** 433:9
**word** 277:14
315:20 439:21
482:21

**worded** 284:6
**words** 290:11
316:21 364:9
386:11 404:9
443:24 529:14
**work** 278:2 281:10
343:21 355:6
356:9,12,18 377:4
377:22 394:13
403:6 407:4,6
420:11 453:8
458:24 460:9
462:10 463:10,16
463:17,17 467:3
470:22 471:25
472:5 483:5
485:19 486:2
487:7,18 488:25
493:3 497:11
517:25 518:5,10
519:8,15 521:18
522:7 528:10
532:7 535:2 538:4
539:9,24
**worked** 283:10,12
284:2 288:14
337:6 338:9 349:4
350:2,5,8,18,25
361:21 362:24
363:2,7 387:7,10
398:9,20 432:21
453:24 454:4
459:14 460:3,4,18
460:19 461:18,22
463:3,5,6,7,17,18
465:8 466:10,22
467:19 494:21
524:19 528:10
534:21
**working** 279:3
290:20 329:9

344:6 367:8
376:21 398:16
402:21 404:2,5,21
404:23 407:7
416:17 440:16
453:19 455:14,15
464:6 483:21
484:19 493:8
516:18 526:13
537:9,12 540:4
**works** 327:23
**world** 439:17
**worldwide** 389:25
**worse** 506:23
518:22
**worth** 471:13,21
**wow** 497:9
**wrapped** 457:19
**write** 302:25
316:10 321:6
322:18 323:10
325:17 429:8
500:4 519:17
523:17
**writes** 301:13
312:12,14 313:14
416:5 513:14
**writing** 281:24
282:2 284:16
287:5 288:4
307:14 316:24
317:5,14,14,17,19
324:15 325:8
428:18 508:12
522:5
**written** 281:19
301:10 306:6
339:10,19 355:3
495:12 519:12
**wrong** 284:12
323:19 422:25

**wrongful** 313:18
  313:19
**wrongfully** 508:14
**wrote** 284:19
  303:9 304:3
  310:23 325:25
  326:16 354:17
  355:2 391:19
  397:22 400:17
  417:22 461:10
  489:15 495:3
  506:15 539:15,17
**wyn** 272:11
  274:16

**x**

**x** 270:4,17 546:4
  546:20
**xanax** 516:25

**y**

**yeah** 284:23 344:4
  351:14 360:23
  367:24 372:19
  386:3,12 387:18
  395:25 400:14
  407:5 416:9 417:3
  420:12 422:18
  427:3 429:13
  436:2 450:12
  451:23 452:2
  458:13 467:18
  484:11,21 495:11
  501:2 502:19
  504:9 506:3 509:6
  513:15 514:25
  519:24,25 520:13
  521:25 535:5,7,15
  536:16 538:9
**year** 281:5,5
  283:15 286:8
  358:15 361:8

  372:16 375:9
  389:5 401:3,5
  403:8,25 416:14
  416:18 417:5,7,19
  418:12 420:2
  423:10 442:9
  445:25 456:21
  462:15 463:2,2,12
  463:12,12 482:14
  485:10 492:7
  495:4,7,7,20,21
  496:12 497:4,10
  498:25 499:3
  512:14,25 536:15
  539:25 540:16
**year's** 414:13
**years** 285:6 289:9
  289:18 290:20
  291:3,17 297:16
  320:23 337:6
  338:9 341:17,18
  351:16 370:20
  372:14,25 374:6
  375:10 384:10
  385:22 398:17,18
  402:24 403:10,10
  404:19,19 429:2
  429:12,14 432:22
  432:22 438:17
  440:16 456:20
  458:2,7,24 459:14
  459:15 460:6
  461:19,22 463:22
  463:22 465:9
  467:20 471:16
  472:3 482:15
  486:17,19 487:9
  494:14,15,21
  505:24 518:11
  525:25 532:7

**york** 270:3 271:8
  271:8,10 272:8,20
  272:20 273:6,6,14
  273:14 274:9
  312:2 347:23,23
  349:11 398:20,24
  428:17 459:11
  462:6,7 469:7,8
  470:3,6,10,11
  471:5,23,25 472:3
  472:4,11,12,24
  473:5,13,15,24,25
  474:4,5,9,11
  483:11 485:11
  535:19 545:3,4,7
**yoshisato** 356:15
  385:4 393:16
  400:7,18
**young** 504:25
  512:25
**younger** 463:24
**yuka** 278:14
**yvonne** 288:8

**z**

**zero** 492:22
**zillow** 489:7
**zithromax** 510:13
  510:19
**zolpidem** 510:14
  510:17,20 511:6,8

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

1

2   UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------X
JENNIFER S. FISCHMAN,

4

                         PLAINTIFF,

5

6        -against-      Civil Action No.:
                      18-CV-08188

7

8   MITSUBISHI CHEMICAL HOLDINGS AMERICA, INC.;
MITSUBISHI CHEMICAL HOLDINGS CORPORATION;

9   NICOLAS OLIVA, in his individual and
professional capacities; DONNA COSTA, in

10  her individual and professional capacities;
and JOHN DOES 1-10, in their individual and

11  professional capacities,

12                   DEFENDANTS.
------------------------------------------X

13

14             DATE:  July 26, 2021

15             TIME:  11:24 A.M.

16

17     CONTINUED VIDEOTAPED VIDEO CONFERENCE

18  DEPOSITION of the Plaintiff, JENNIFER STONE

19  FISCHMAN, s/h/a JENNIFER S. FISCHMAN, taken

20  by the respective parties, pursuant to

21  Agreement and to the Federal Rules of Civil

22  Procedure, held at the above-mentioned date

23  and time, before Frances Fitzpatrick, a

24  Notary Public of the State of New York.

25

1
2     A P P E A R A N C E S:
3     (Via Video Conference)
4
5     VALLI KANE & VAGNINI, LLP
          Attorneys for the Plaintiff
6          JENNIFER S. FISCHMAN
           600 Old Country Road, Suite 519
7          Garden City, New York  11530
           BY: MATTHEW L. BERMAN, ESQ.
8              ROBERT J. VALLI, JR., ESQ.
               SARA WYN KANE, ESQ.
9
10    GORDON REES SCULLY MANSUKHANI LLP
          Attorneys for the Defendants
11         MITSUBISHI CHEMICAL HOLDINGS AMERICA,
           INC., NICOLAS OLIVA and DONNA COSTA
12         One Battery Park Plaza, 28th Floor
           New York, New York  10004
13         BY: MERCEDES COLWIN, ESQ.
               BRITTANY L. PRIMAVERA, ESQ.
14             File # MCHEM-1135398
15
      SHEARMAN & STERLING LLP
16        Attorneys for the Defendant
          MITSUBISHI CHEMICAL HOLDINGS CORPORATION
17         599 Lexington Avenue
           New York, New York 10022
18         BY: JEROME S. FORTINSKY, ESQ.
               SAMUEL JOLLY, ESQ.
19
20    CLARICK GUERON REISBAUM LLP
          Attorneys for the Defendant
21         DONNA COSTA
           220 Fifth Avenue
22         New York, New York  10001
           BY: NICOLE GUERON, ESQ.
23
24
25

A P P E A R A N C E S:   (Continued)

A L S O    P R E S E N T:

          Legal Videographer - Carlos King

          Nicolas Oliva

                    *           *           *

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *    *    *    *

25

```
 1              JENNIFER STONE FISCHMAN
 2    J E N N I F E R    S T O N E
 3    F I S C H M A N,   called as a witness,
 4    having been first duly sworn by a Notary
 5    Public of the State of New York, was
 6    examined and testified as follows:
 7              THE REPORTER:  May I have your
 8         name and address?
 9              THE WITNESS:  Jennifer Stone
10         Fischman.
11              MR. BERMAN:  For her address,
12         you can put C/O Valli Kane & Vagnini,
13         600 Old Country Road, Suite 519,
14         Garden City, New York, 11530.
15              THE REPORTER:  Thank you.
16         Ready when you are.
17              MR. FORTINSKY:  Thank you,
18         Frances.  I'll just say as we begin
19         that we appreciate your being with us
20         by video even though you couldn't be
21         here in person, but, accordingly,
22         let's -- please don't hesitate if you
23         can't get something down if it's not
24         recorded properly because obviously
25         we rely on your for the transcript,
```

```
 1              JENNIFER STONE FISCHMAN
 2         so, don't hesitate to speak up.
 3              THE REPORTER:  Thank you.
 4    EXAMINATION BY
 5    MR. FORTINSKY:
 6         Q.    Good morning, Ms. Fischman.  As
 7    you know, I'm Jerry Fortinsky.  I'm with
 8    Shearman & Sterling, and I represent
 9    Mitsubishi Holdings Corporation.
10         A.    Nice to see you again.
11         Q.    You, too.
12               You recall testifying at a
13    deposition on June 15th and June 28th?
14         A.    Yes.
15         Q.    You understand that you're
16    still bound by the oath you gave at that
17    deposition to tell the truth?
18         A.    Of course.
19         Q.    Did you read the transcript of
20    either the first day or the second day of
21    your testimony?
22         A.    No.
23         Q.    Since the second day of your
24    deposition, have you discussed the
25    deposition with your attorneys?
```

1              JENNIFER STONE FISCHMAN

2         A.    Yes.

3         Q.    How many times?

4         A.    I couldn't say.  I mean, we

5    discussed it during the -- you know, we

6    discussed it -- I can't discuss what we

7    discussed; right?

8              MR. BERMAN:  He's asking you

9         how often.  You can answer.

10         A.    Oh.  I don't know.  Once or

11    twice.  I don't know.  Once or twice.

12         Q.    Okay.  Have you discussed the

13    deposition since June 28th with anybody

14    other than your attorneys?

15         A.    Just my husband.

16         Q.    Okay.  Let me start by putting

17    in front of you three Exhibits, which are

18    all documents that were produced after the

19    first day of your deposition.  The first

20    Exhibit is marked Fischman 788 through

21    Fischman 834, a collection of various

22    documents, which we'll talk about.  The

23    second Exhibit is marked Fischman 835, a

24    single page.  And the third Exhibit is

25    three pages marked Fischman 836 through

                    JENNIFER STONE FISCHMAN

1       Fischman 838.  And the first two of those

2       Exhibits were produced to us on June 25th,

3       2021, and the third was produced on July

4       16th, 2021.

5               MR. FORTINSKY:  Frances, how

6               are we proceeding with marking

7               Exhibits under the circumstances with

8               you not being present here?  Is there

9               a protocol that your firm generally

10              follows under these circumstances?

11              THE REPORTER:  You can just

12              deem them marked and describe what

13              they are on the record.

14              MR. FORTINSKY:  Okay.  I'm

15              going to mark them in ink.  Do you

16              know what Exhibit number we're up to?

17              Does anybody know what Exhibit number

18              we're up to?

19              MR. VALLI:  I want to say 28

20              because 27 is the last thing in my

21              notes.

22              MR. FORTINSKY:  Okay.  Well,

23              why don't I -- I'll mark them

24              Exhibits 30, 31 and 32.

1          JENNIFER STONE FISCHMAN

2                  (Whereupon, Fischman 788

3          through Fischman 834 was deemed

4          marked as Exhibit 30 for

5          Identification as of this date by the

6          Reporter; Fischman 835 was deemed

7          marked as Exhibit 31 for

8          Identification as of this date by the

9          Reporter; and Fischman 836 through

10         Fischman 838 was deemed marked as

11         Exhibit 32 for Identification.)

12         Q.    Miss Fischman, do you recognize

13    these three Exhibits to be the three sets

14    of documents produced by your counsel

15    subsequent to June 15th?

16         A.    Yes, I do.

17         Q.    These documents were not

18    previously produced in the litigation?

19         A.    No.

20         Q.    Do you know why they weren't

21    previously produced in the litigation?  And

22    if the answer is different for different

23    documents, feel free to say so.

24         A.    Okay.  Exhibit -- what we'll

25    talk about is 30 and 31 I had in my

```
 1              JENNIFER STONE FISCHMAN
 2   possession and didn't realize.  Thought I
 3   had provided everything to counsel.  I
 4   admit to being less than organized in my
 5   office.  And, specifically, the documents
 6   789 through 824 was a notebook that I had
 7   in -- I had it in a purse that was buried
 8   in my closet and didn't realize I had.
 9        Q.    How did you come to realize
10   that you had it?
11        A.    I went to use the purse and I
12   discovered it.
13        Q.    When did you go to use the
14   purse?
15        A.    Sometime in early spring this
16   year.
17        Q.    And what did you do then upon
18   discovering you had this notebook in your
19   purse?
20        A.    I did a more thorough review of
21   everything that I had in my possession and
22   in my home office and in my bags at home,
23   and I photocopied them and I sent them to
24   my counsel.
25        Q.    Tell me about that further
```

1                JENNIFER STONE FISCHMAN
2      review.  What did that consist of?
3           A.    I had a bunch of stacks of
4      papers in my bedroom, and I went through
5      all of the papers and asked if I had
6      already provided those to counsel, and he
7      said that he did not see them, so, I --
8      again, like I said, I went through the
9      different papers and I found a few
10     additional documents that I have not
11     previously produced.
12          Q.    And were pages 824 through 834
13     among those papers?  I'm referring to the
14     pages from Exhibit 30 marked --
15          A.    Yeah, yeah.  So, there were
16     just a few more things that I found that,
17     yeah, I had thought I had previously given
18     to counsel and I realized that I had not.
19     So, I was actually quite upset with the
20     fact that I had thought that all of this
21     was in an earlier production and realized
22     that it was not.  In fact, we -- I had
23     talked to my counsel as if he already had
24     it in possession.
25                MR. BERMAN:  I counsel the

1          JENNIFER STONE FISCHMAN
2          witness not to reveal any privileged
3          attorney-client communications, but
4          if you're asked nonsubstantive
5          questions, you may answer them.
6      Q.    Had you looked in your home
7   office when you initially did the review of
8   documents that led to the earlier document
9   productions in the case?
10     A.    In my earlier review, I was
11  focused on electronic documents, like all
12  of the job applications and things like
13  that, and, so, again, I admitted to not
14  being fully, you know, my home office not
15  being terribly well-organized, and, so,
16  there was a folder of documents that did
17  not get copied, you know, that is included
18  in that Exhibit 30 and 31.
19     Q.    Were any of the documents
20  produced by you prior to June 15th from
21  sources other than electronic data?
22     A.    I can't really recall, but I
23  think, yes, I had another file that was
24  photocopied that I personally photocopied
25  and that was produced.

1           JENNIFER STONE FISCHMAN
2       Q.     And where had that been kept?
3       A.     It had also been kept in my
4   home office in a stack of papers.
5       Q.     But was produced prior to June
6   15th, 2021?
7       A.     Yes.
8       Q.     So, why was -- if you searched
9   for documents in your home office prior to
10  June 15th, why then did you not discover
11  some documents but you did discover others?
12      A.     It was -- other than that
13  notebook, I knew about these documents and
14  I thought I had photocopied them and
15  provided them to counsel.  So, the fact
16  that one file was left uncopied by myself
17  was a surprise to me --
18      Q.     Okay.
19      A.     -- and it was inadvertent.
20      Q.     So, then, Exhibit 31, which is
21  produced separately from Exhibit 30, where
22  did you discover Exhibit 31 prior to
23  producing it?
24      A.     I'm sorry.  That would have
25  been produced at the same time.  It was in

1           JENNIFER STONE FISCHMAN

2     the same folder.

3           Q.    So, what you just testified to

4     applies also to Exhibit 31?

5           A.    Yeah.

6           Q.    Why was Exhibit 31 produced

7     separately from Exhibit 30?

8           A.    I couldn't say.  I didn't

9     produce it.

10          Q.    Okay.  Exhibit 32 -- you told

11    me that what you were just discussing

12    applied to Exhibits 30 and 31.  What about

13    Exhibit 32?  What prompted you to produce

14    this information in the past month?

15          A.    So, Exhibit 32 was your -- we

16    got into the expenses and my income for

17    2018, '19 and '20, and I explained to you

18    that as an independent contractor I incur a

19    great deal of expenses associated with the

20    generation of my income as a real estate

21    agent, and that they were not insubstantial

22    expenses, and you asked me to give you a

23    list.  So, I had this list at home that I

24    had given to my husband for tax purposes,

25    and it explains in great detail the types

1              JENNIFER STONE FISCHMAN

2    of expenses that I incurred in those years.

3         Q.    Okay.  We'll come back to that.

4         A.    Okay.

5         Q.    Turning now to Exhibit 31.

6         A.    Yes.

7         Q.    Can you identify this document?

8         A.    Yes.  This is the --

9              MR. BERMAN:  I object to form.

10        This is multiple documents.  Do you

11        want to specify pages?

12             MR. FORTINSKY:  No.  Exhibit 31

13        is a single page, page 35.

14        A.    This was the speech that Nick

15   Oliva said to me upon my termination at

16   approximately 9:30 in the morning on

17   January 30th, 2017.

18        Q.    So, presumably --

19        A.    It's a copy of the speech.

20        Q.    Okay.  And presumably you're

21   referring to the typewritten portion of

22   Exhibit 31?

23        A.    Yes.

24        Q.    Not the handwritten portion?

25        A.    The second paragraph, yes.

1          JENNIFER STONE FISCHMAN
2     Q.    Right.
3           How did you originally obtain a
4     copy of this document, this speech?
5     A.    So, I believe that I was given
6     this document shortly after my termination.
7     As I was leaving on the 30th of January
8     2017, I said to Pat Saunders, the H.R.
9     director, that I wanted a copy of my
10    personnel file, and it came via Fed Ex, I
11    believe, just a few days after my
12    termination, and I saw this document in
13    that it was included at that time, and I
14    jotted down these notes at that time within
15    a couple of days.
16    Q.    So, that would be in early
17    February 2017?
18    A.    Yeah.
19    Q.    Why did you ask for the
20    personnel file?
21    A.    I asked for the personnel file
22    because I knew that I had been an exemplary
23    employee and I was preparing to question my
24    termination.
25    Q.    How?

1                JENNIFER STONE FISCHMAN

2        A.     I wanted to get my personnel

3    file in my possession because I wanted to

4    get a copy of everything that had ever been

5    said to me, about me.

6        Q.     What do you mean when you say,

7    I was preparing to question my termination?

8        A.     Well, I believe that I was

9    wrongfully terminated on the basis of

10   gender discrimination and retaliation, so,

11   I wanted a copy of my personnel file in

12   case I decided to pursue legal action

13   against Mitsubishi.

14       Q.     What made you decide eventually

15   to pursue legal action?

16            MR. BERMAN:  Object to form.

17        You can answer.

18       A.     They -- what made me ultimately

19   decide?

20       Q.     I don't mean what were the

21   grounds.  We see the -- what your complaint

22   says, but, I mean, what was it that made

23   you -- that caused you to reach the

24   decision to sue rather than not sue as of

25   early February?

```
 1            JENNIFER STONE FISCHMAN
 2              MR. BERMAN:  I'll object to
 3         form on the grounds that it seems
 4         that your question calls for mental
 5         impressions of an attorney.  If you
 6         want to ask a factual question, I
 7         don't have any issue with that.
 8              MR. FORTINSKY:  I am intending
 9         for it just to be a factual question.
10      Q.    As of early February, had you
11   reached the decision to sue?
12      A.    No.
13      Q.    When did you reach the decision
14   to sue?
15      A.    I couldn't say when we sued.
16   When we got the -- when we filed the EEOC,
17   I guess.  I don't know.
18      Q.    So, what caused you to change
19   from not being certain about your intention
20   to sue as of February 2017 to becoming
21   later certain that you intended to sue?
22              MR. BERMAN:  Object to form.
23      A.    I couldn't recall exactly what
24   the steps were at that time, but I will
25   tell you it was a pretty dark time for me,
```

1          JENNIFER STONE FISCHMAN
2   and I was number one focused on getting
3   another job immediately.  I immediately
4   started working on my resume, and I
5   immediately contacted every recruiter that
6   I had contact with and I'm sure it was a
7   combination of timing, and, you know, and
8   the concern of, you know, I had been so
9   wronged that, yeah, I was going to sue.
10         Q.    Whose handwriting is on Exhibit
11  31?
12         A.    That's my handwriting.
13         Q.    All of it?
14         A.    All of it.
15         Q.    What does the word, never, on
16  the upper right refer to?
17         A.    That refers in direct response
18  to the sentence next to it where Nick Oliva
19  writes, I worked very hard to provide you
20  with guidance and feedback to assist you in
21  overcoming these deficiencies, and my
22  response was, he never did that and there
23  was never a need for it.
24         Q.    Are you saying that you never
25  got any guidance or feedback from Mr.

1          JENNIFER STONE FISCHMAN

2     Oliva?

3          A.    I will say that I never got

4     guidance and feedback from Mr. Oliva on

5     poor communications and lack of judgment

6     set forth in evaluations because there was

7     no such occurrence of lack of judgment or

8     poor communications.

9          Q.    Would you agree that you did

10    receive guidance and feedback from Mr.

11    Oliva during the period he was your

12    supervisor?

13         A.    I would say that during the

14    period that he was my supervisor we had

15    many, many collegial conversations that

16    were more of a dialogue than guidance, and,

17    so, I would say that given the fact that I

18    had eighteen years or nineteen years of

19    experience and nine years working with the

20    company, that most of our conversations

21    were eye-to-eye, if you will, eye-to-eye.

22         Q.    You didn't see those

23    conversations as being guidance from a

24    supervisor?

25         A.    I'd have to ask which specific

1          JENNIFER STONE FISCHMAN

2     conversation you're recalling because

3     you're asking very general questions.

4          Q.     I'm asking about whether there

5     was any conversation that you had with Mr.

6     Oliva when he was your supervisor in which

7     he gave you what you understood to be

8     guidance or feedback on your work.

9          A.     I can't recall ever having

10    guidance or feedback on my work.

11         Q.     Well, what about collegial

12    conversations with him?  Let's not call

13    them guidance or feedback.  Did you ever

14    have collegial conversations with him in

15    which he made suggestions to you as to how

16    best to handle your work?

17         A.     I can't really recall a

18    specific occasion.  He may have, but I

19    can't recall a specific occasion where he

20    gave me guidance on my work.  Like I said,

21    I think that we talked about strategy.  I

22    would update him frequently on a variety of

23    matters, but I can't recall that he gave me

24    guidance.

25         Q.     You viewed all your

1            JENNIFER STONE FISCHMAN
2    communications with him as collegial rather
3    than supervisor to employee?
4          A.    No.  I wouldn't say all.  I'm
5    just saying that, you know, if I reported
6    something to him, then I was reporting to
7    him as my supervisor.  I definitely viewed
8    him as my supervisor.  I mean, no doubt.
9    That's why I drove all over California when
10   we did our last trip right the day before
11   he fired me.  I rented the car out of
12   deference for him.  I drove him out of
13   deference.  He was my supervisor.  I didn't
14   ask him a lot of questions about things
15   that I wasn't involved in.  I had a lot of
16   deference for him.
17         Q.    Okay.  What was the purpose of
18   writing these notes on Exhibit 31?
19         A.    I just -- I wanted to get it
20   down at around the same time of exactly
21   what happened for my personal records.
22         Q.    Did anyone ask you to write
23   notes?
24         A.    No.
25         Q.    The next line beneath never, it

1           JENNIFER STONE FISCHMAN

2     says, no, and no A-U-T-H.  Looks like 4/5

3     meeting and 1/10 meeting J-T, can you --

4           A.    Can I clarify?  That is

5     actually --

6           Q.    Yeah.  That's my question.  If

7     you could tell --

8           A.    So, it's a little confusing

9     because it says, no, with a small N and a

10    small O, and then there is a line under it

11    --

12          Q.    Right.

13          A.    -- and then it says, N-O, which

14    is meant to be Nick Oliva.  Auth means,

15    A-U-T-H, he authorized 1/5 meeting, and

16    then under that it says, 1/10 meeting J-T,

17    and that is Johei Takimoto.  That was

18    referring to the meeting.

19          Q.    Okay.  And, just for the

20    record, who is Johei Takimoto?

21          A.    He was the business -- head of

22    the business for the Genomatica litigation

23    at Mitsubishi Chemical Corp.

24          Q.    What was the 1/5 meeting that

25    you referred to?

1          JENNIFER STONE FISCHMAN

2          A.      As I think I explained in an

3    earlier deposition on -- I had been out

4    sick the first week of January of 2017, and

5    I had asked to meet with Nick on the 3rd, I

6    believe it was, by e-mail.  I asked if Nick

7    wanted to have a phone call about the

8    Genomatica settlement offer that we had

9    received, and his response was, no, let's

10   just wait until you've come into the

11   office.  So, I returned to the office on

12   the morning of the 5th, and I recall that

13   specifically around 11:00, 11:15 on that

14   morning I stood in Nick's doorway and we

15   had a conversation about the settlement,

16   and we had a conversation because Josh, who

17   was our outside counsel, Josh Berman had

18   written an e-mail that I had forwarded when

19   I was home sick to Japan that, you know,

20   2.5 million in two installments would be

21   good, and I did not believe that that was a

22   good idea because that was about what we

23   were asking for in the litigation.  So, I

24   went to talk to Nick about it.  Nick's

25   response was, why don't we come down to

1        JENNIFER STONE FISCHMAN

2      2.2, and I said, I don't think we need to

3      come down that far.  Why don't we go with

4      2.3?  And he agreed.  And I then returned

5      to my office, and later that afternoon I

6      went home sick again.  I did not come to

7      the office again the next day because I was

8      sick, and sometime on the following day or

9      the morning after that I -- or sometime on

10     the 6th or 7th I spoke to Josh Berman, and

11     told him that we had authority to go ahead

12     with the 2.3.

13          Q.    Okay.  And your testimony is

14     that Mr. Oliva authorized that?

15          A.    My testimony is that Mr. Oliva,

16     my supervisor, who was authorized down to

17     $2,000,000 authorized it 100%.

18          Q.    Orally?

19          A.    100% orally.

20          Q.    Okay.  If that's the case, why

21     did you later apologize in a subsequent

22     e-mail?

23              MR. BERMAN:  Object to form.

24          A.    To whom?

25          Q.    To -- I think it was to one of

1                JENNIFER STONE FISCHMAN
2      the Japanese executives.
3           A.    No.  My apology, and I think
4      you should probably reference the actual
5      e-mail --
6           Q.    Let me just see if we can get
7      the e-mail to Mr. Timoji, I believe.
8           A.    Just for clarity, Timoji Minima
9      is -- was a low-level window person liaison
10     in Mitsubishi Chemical Holdings Japan.  He
11     was not the client.  Mitsubishi Chemical
12     Corporation was the client.  Johei Takimoto
13     was the client.  Johei Takimoto had
14     provided Nick Oliva plenary authority in
15     writing in November to settle this case.
16     Nick had participated in a settlement
17     conference in San Diego where he had
18     already offered down to $2,000,000.  So,
19     when I had the conversation in Nick's
20     office that we ought to offer 2.3 and he
21     agreed, I had no reason to question where
22     that authority was coming from because I
23     already knew he was authorized, so, I
24     believed that that was an authorized offer.
25     Three days later when Takimoto was visiting

1                JENNIFER STONE FISCHMAN
2    the New York office, Nick, Takimoto and
3    myself sat in the small conference room in
4    the New York office around a small round
5    table where we discussed at great length
6    the settlement offer, the strategy for
7    settlement, the need for depositions and
8    possibility of depositions, the need for
9    preservation of documents in Japan.  We had
10   a lengthy conversation, and, at the end,
11   Mr. Takimoto said, I agree 100% with your
12   strategy, Jennifer, and left.
13        Q.    My question is why you
14   apologized to Mr. Timoji.
15        A.    So, I apologized to Mr. Timoji
16   Minima because I had in my illness
17   forgotten to send a notice to this person
18   at MCHJ to communicate to the rest of the
19   team that we had gone forward with a 2.3
20   offer.  It was more of a status update
21   rather than seeking authority.
22        Q.    You'd represented many clients
23   at MCHA during your period there; right?
24        A.    Yes.
25        Q.    And you'd represented them in

1        JENNIFER STONE FISCHMAN

2   connection sometimes with various business

3   disputes; correct?

4        A.    Yes.

5        Q.    And sometimes you would settle

6   those disputes; right?

7        A.    Yes.  Certainly.

8        Q.    Okay.  Is it fair to say that

9   it was common before settling any dispute

10  to get authorization from your clients?

11       A.    I had authorization from the

12  client.

13       Q.    My question is, is it fair to

14  say that in settling disputes for your

15  clients during your tenure at MCHA that it

16  was standard to obtain authorization from

17  the client of the offer or settlement

18  proposal that you were going to make?

19       A.    I would say that each case was

20  completely different.

21       Q.    So, you'd say it was not

22  standard to obtain authorization from them?

23       A.    I would say that you could

24  often obtain authorization in advance up to

25  a certain number, and then within that

1                JENNIFER STONE FISCHMAN
2       range given the time difference in Japan
3       and the difficulty in communicating
4       sometimes by phone that you could have
5       authority down to a certain number to
6       settle, and, yes, I would have had that
7       authority to do so.
8            Q.   So, you would agree then that
9       it is standard to obtain authority from the
10      client before making a settlement proposal?
11           A.   I would say that it was
12      standard for us in the legal department to
13      obtain authority in order to proffer a
14      settlement agreement, a settlement amount.
15           Q.   And would you agree that it is
16      normal to obtain that authority in writing?
17           A.   Sometimes.
18           Q.   Well, would you say it was
19      normal to obtain the authority in writing?
20           A.   Yeah.  Okay.
21           Q.   Can you think of any instance
22      in which you did not obtain authority to
23      settle in writing before making a
24      settlement proposal?
25           A.   Well, in this case, we had the

1          JENNIFER STONE FISCHMAN

2    written authority of Johei Takimoto from

3    mid-November, so, there is your writing,

4    so, you know...

5          Q.    Let's put aside the Genomatica

6    case.  We know that's in the subject of

7    discussion, but let's put that to the side.

8          A.    Uh-hum.

9          Q.    Can you think of any other

10   instance in which you made a settlement

11   proposal on behalf one of your clients at

12   MCHA where you did not have written

13   authority?

14         A.    So, I think some of this might

15   be privileged kinds of communications with

16   those clients, but, in general, it would

17   have been my practice.

18         Q.    Let's turn now to Exhibit 32 --

19   I'm sorry -- no.  I want to stick with

20   Exhibit 30.  Let's just talk for the moment

21   about page 788.

22         A.    Okay.

23         Q.    Can you identify this page?

24         A.    Yes.

25         Q.    What is it?

1          JENNIFER STONE FISCHMAN

2          A.    This is a list of all of the

3    companies that I supported during my tenure

4    at -- well, actually, during my last year

5    at Mitsubishi.

6          Q.    Is all of the handwriting on

7    this page yours?

8          A.    Yes.

9          Q.    And why did you create this

10   document?

11         A.    Well, I created a similar

12   document, which would have included just my

13   columns for Nick when he first arrived to

14   show him the split of where -- what

15   everybody was responsible for, but I

16   probably created this, you know, just kind

17   of in my mind to like set out, you know,

18   who was responsible for what when I left.

19         Q.    When you left what position?

20         A.    Sorry.  When I -- my ultimate

21   responsibility upon my termination.

22         Q.    When did you create this

23   document?

24         A.    Probably early February of --

25   probably right after I left just to sort of

```
 1              JENNIFER STONE FISCHMAN
 2    see, like, how it all shook out.
 3         Q.    For what purpose did you create
 4    this document?
 5              MR. BERMAN:  Object to form.
 6          In the sense that this does not
 7          reveal mental impressions of an
 8          attorney in anticipation of
 9          litigation, you can answer.
10         A.    It's just a list of all of the
11    companies that I supported, the companies
12    that Catherine supported, and the companies
13    that Andy supported during 2016 and 2017.
14    It also shows that Nick was responsible for
15    Genex Brazil.  I don't recall the reason.
16         Q.    Do you recall Mr. Oliva ever
17    saying that after he became general counsel
18    that he wanted to move from a client model
19    to a practice group model within the
20    litigation group at MCHA?
21         A.    No, I don't recall that.
22         Q.    Do you know what I mean by a
23    client model to a practice group model?
24         A.    Why don't you tell me?
25         Q.    Let me ask the question a
```

1                    JENNIFER STONE FISCHMAN

2      different way.

3                    Do you recall Mr. Oliva ever

4      saying that instead of assigning

5      responsibilities within the legal group at

6      MCHA to different lawyers on the basis of

7      each lawyer representing certain affiliates

8      within the Mitsubishi Enterprise, that

9      instead he wanted to assign responsibility

10     to the various lawyers within the MCHA

11     legal group based on subject matter

12     expertise?

13          A.    I don't recall him ever saying

14     that, no.

15          Q.    You don't recall anything ever

16     like that?

17          A.    Not in 2016, no.

18          Q.    Or ever?

19          A.    But -- I don't recall his

20     plans, no.

21          Q.    Do you recall any discussions

22     with him about whether the responsibilities

23     for affiliates within the Mitsubishi

24     Enterprise should be distributed more

25     broadly rather than concentrated in a small

1              JENNIFER STONE FISCHMAN
2     number of attorneys?
3          A.    I don't recall ever having
4     conversations with Nick about his plans for
5     the group, no.
6          Q.    Do you ever recall any
7     conversations with Mr. Oliva about sharing
8     responsibility for any of the clients on
9     the list on the left side of Exhibit 30
10    under your name?
11         A.    Yeah.  I definitely had
12    conversations with him about moving some of
13    this business to Stephen Rose who was now a
14    year at the company and doing a terrific
15    job, and I had trained him, and there were
16    some of these business that he and I worked
17    with together on, and that eventually it
18    would have made sense to transition to him.
19         Q.    Tell me what you remember about
20    that conversation, what you said, what Mr.
21    Oliva said.
22         A.    For example, My Tech Mexico, we
23    were working on that together, but mostly
24    Stephen was fluent in Spanish, and, so, it
25    made sense for him to support them.  Same

1              JENNIFER STONE FISCHMAN
2      with Philtech, and, possibly, MCPP Brazil.
3      He probably would have transitioned to
4      more, you know, more broad -- take on more
5      responsibility as he grew in the role.
6              Q.    How many conversations of this
7      nature did you have with Mr. Oliva?
8              A.    Oh, I can't say.  No idea.
9      Maybe one.
10             Q.    And what was his message to you
11     in that conversation?
12             A.    I have no recollection of what
13     his message -- you have to be more
14     specific.
15             Q.    Did he ever encourage you to
16     give up your responsibility for any of the
17     clients that you had responsibility for?
18             A.    Encourage me to give up my
19     responsibilities?
20             Q.    In other words, to give up
21     responsibilities to Mr. Rose or anyone else
22     in the legal group.
23             A.    Most times people are looking
24     for people to take on more responsibilities
25     rather than less responsibilities.  So, you

```
1              JENNIFER STONE FISCHMAN
2    know, a lot of these companies I had been
3    providing support to for many, many years.
4    I had developed relationships with them and
5    their presidents.  There may have been --
6    yeah.  I can't recall him suggesting I give
7    up any of these companies.  Of course he
8    was in charge of the allocation of work,
9    so, if he didn't want me on one of these
10   companies, I imagine he would have
11   reassigned it.
12         Q.    What does 22 of 31 on the left
13   side mean?
14         A.    That I was responsible for 22
15   of the 31 operating companies.
16         Q.    All right.  Let's go now to a
17   different page, pages -- let's go to page
18   827 -- let's go to page 827.  Do you
19   recognize page 827?
20         A.    Yeah.
21         Q.    What is it?
22         A.    It was a notation -- some notes
23   I had taken after a call with a recruiter
24   about a potential position, so, just to
25   clarify, I found this on a notebook -- I'm
```

1          JENNIFER STONE FISCHMAN

2     sorry -- on a legal pad, and the next page,

3     as well, that I found on an old legal pad,

4     and I realized I had not submitted it with

5     my job search material, and, so, I

6     submitted it.

7          Q.    Okay.  So, these two pages

8     relate to your job search I take it?

9          A.    Yeah.  Uh-hum.

10         Q.    And this is all -- do these two

11    notes all relate to the same single

12    conversation with a recruiter?

13         A.    No, no, no, not at all.  I'm

14    not even sure they are from the same -- I'm

15    not even sure -- they're not from the same

16    pad even, so, no, and the first page, that

17    MLA, that would have been I think the name

18    of the recruiter, but I'm not sure, but

19    these would have related to jobs that I

20    would have put on the listing that I did

21    provide to you that I provided to New York

22    State Department of Labor of potential jobs

23    that I --

24         Q.    Do you recall when these notes

25    were made?

1              JENNIFER STONE FISCHMAN
2         A.    I believe these were made
3    around the spring of -- spring and summer
4    of 2017.
5         Q.    And is the same true for 828?
6         A.    Yes.
7         Q.    And these notes also relate to
8    your job search I take it?
9         A.    Yeah.
10        Q.    For this first -- what is MLA?
11        A.    That might have been the name
12   of this company for Morgan Applied, but I
13   can't recall.
14        Q.    Did you -- what happened with
15   your application?
16        A.    It didn't go anywhere on this
17   form.  I probably had a phone interview,
18   but I'd have to look back on -- I'd have to
19   look back on the listing I gave you from --
20        Q.    You had a phone interview with
21   Morgan Applied?
22        A.    I believe so.
23        Q.    Okay.  And then lower down it
24   says, Kathy Lueders.  Who is she?
25        A.    I can't recall at this time.

1          JENNIFER STONE FISCHMAN
2          Q.     Do the notes at the bottom of
3     the page beneath her name relate to the
4     same company as the notes at the top of the
5     page where it says, Morgan Applied?
6          A.     I don't believe that they're
7     the same company.  I believe this was two
8     separate discussions.
9          Q.     And what happened with this
10    application?
11         A.     I didn't -- I didn't get the
12    job.
13         Q.     Did you pursue it?
14         A.     I pursued everything.
15         Q.     Did you interview for that job?
16         A.     I did not interview in person
17    for that job.
18         Q.     Did you interview on the phone?
19         A.     I may have had a phone
20    interview.
21         Q.     How about CBRE, looking to the
22    next page?
23         A.     Yeah.  Yes.  I interviewed for
24    CBRE.
25         Q.     And what happened with that?

```
 1              JENNIFER STONE FISCHMAN
 2         A.    I did not get the job.
 3         Q.    Did you interview in person?
 4         A.    Yes.
 5         Q.    And then Nancy Westphal GC
 6    Global Workplace Solutions; is that a
 7    separate institution or --
 8         A.    No.
 9         Q.    -- does that relate to the same
10    --
11         A.    She's the GC at CBRE.
12         Q.    And Nora Davis, this whole page
13    relates to CBRE?
14         A.    Yes.
15         Q.    Were any of these three
16    positions outside of the New York area?
17         A.    I don't think so, no.  I think
18    that they may have included travel, but
19    they were all within the New York area.
20         Q.    Were you asked at any of these
21    interviews why you left MCHA?
22         A.    I was always asked why I left
23    MCHA.
24         Q.    Did you have a regular answer
25    to that question?
```

1              JENNIFER STONE FISCHMAN

2         A.    I did, and I explained it to

3    you earlier in our previous deposition.

4         Q.    Just to refresh me, what was

5    your answer to that?

6         A.    It was along the lines of there

7    was a new general counsel and he was taking

8    the group in a different direction and we

9    parted amicably, something to those --

10   along those lines.  I tried to spin it, but

11   it was challenging because, obviously, it

12   wasn't amicable and it wasn't a parting of

13   ways amicably.

14        Q.    Turning back to page 789.

15        A.    Okay.

16        Q.    I think you said that pages 789

17   through 824 all came from your notebook.

18        A.    Yes.

19        Q.    Were there any pages that were

20   in the notebook that were not produced, for

21   example, because of privileged concerns or

22   otherwise?

23        A.    No.  I think there is one page

24   at the end that I didn't copy because it

25   didn't seem to relate to anything involved

1                 JENNIFER STONE FISCHMAN
2      in this lawsuit.  It was just notes from a
3      meeting that I had in Japan just before my
4      demotion during that compliance trip, and
5      it related to their compliance materials
6      for something, so, I didn't copy it, but
7      everything else is here.
8           Q.    Was that page privileged?
9           A.    No.
10               MR. FORTINSKY:  We would call
11           for the production of that page.
12      *
13
14          A.    You can still see it when you
15      review.  I probably should have photocopied
16      that, too.
17          Q.    Okay.  Pages 789 through 824,
18      were these notes that you took during
19      conversations with people at MCHA?
20          A.    So, I had a practice of never
21      walking into a room for a meeting, or, you
22      know, I had a practice that I primarily
23      used which was I primarily took notes in
24      meetings on legal pads, legal pads which I
25      left in my office at Mitsubishi on the day

1                    JENNIFER STONE FISCHMAN

2       that I was locked out the door by Pat

3       Saunders.  Probably two stacks about a foot

4       tall each of my notes of conversations that

5       I had with a variety of people during my

6       tenure there, all of which we've asked for

7       and I haven't seen.  For the transition to

8       become acting general counsel, Donna

9       stressed to me that it was super secret and

10      no one could know about this between

11      December 3rd and mid-February when it was

12      going to be announced.  So, I went out and

13      I bought a small notebook with my own money

14      that would fit in my purse, and I would

15      keep it with me so that if I left a legal

16      pad on my desk that said, you know, that

17      I'm transitioning, nobody would see it

18      because it would be on my person and it

19      would be almost pocket size, almost a

20      little bigger than pocket size, like purse

21      size, and it had a cover, so, that's why

22      this notebook is different than the legal

23      pads that I traditionally left in my

24      office.  So, yeah, I bought this for those

25      conversations to have with Donna during

                JENNIFER STONE FISCHMAN

1   that transition period, and I primarily

2   used it during that transition period.

3        Q.    Are any of the conversations

4   recorded on pages 789 through 824 with

5   people other than Donna Costa?

6        A.    Yeah.  There might be some

7   notes from other meetings with other

8   people.  Like I think I have notes from a

9   meeting with Pat.  I think I have notes

10  from a meeting with Andrew Sazar.

11       Q.    Okay.  Well, we'll go through

12  it and then you can tell me as we go

13  through.

14       A.    And I didn't always date the

15  notes, so, it is what it is, what you're

16  seeing.

17       Q.    You referred to data dumps in

18  your testimony earlier.

19       A.    Yeah.

20       Q.    Were the meetings that these

21  notes reflect the data dumps that you were

22  earlier referring to?

23       A.    Yes.

24       Q.    In the upper left corner of

1                    JENNIFER STONE FISCHMAN

2    789, you see the word trust?

3         A.    Uh-hum.

4         Q.    What does that refer to?

5         A.    Building trust within the legal

6    department between -- I was going to be

7    taking on a new role, and it was important

8    to create trust between me and the other

9    attorneys working in the legal department

10   at MCHJ.

11        Q.    Why was that important?

12        A.    I think because I was being

13   elevated from a position of their colleague

14   to a position of supervisor, and that

15   establishing that trust early on with them

16   that I wasn't going to be changing things,

17   that their roles would be substantially the

18   same, that would keep them more

19   comfortable.

20        Q.    Okay.  The second bullet on 789

21   says, Donna deleting all communication, et

22   cetera.  Do you see that?

23        A.    Yeah.

24        Q.    Do you recall what that note

25   was intended to reflect?

1          JENNIFER STONE FISCHMAN
2          A.     Yeah.  Donna, one of the first
3     things she told me when I met with her on
4     that day was that she was wiping her
5     computer clean, which surprised me, but I
6     didn't -- I just wrote it down.  She's
7     deleting all her communication between her
8     and the legal department and herself
9     because she was taking on the role now as
10    president, and, therefore, she was no
11    longer holding onto those communications.
12         Q.     You see at the bottom of that
13    page it says, monthly update to Japan,
14    report activities of department by first of
15    each month?
16         A.     Yes.
17         Q.     What does that refer to?
18         A.     She had said that the -- that I
19    should provide four or five bulletpoints on
20    the general activities of our legal
21    department to Sakaguchi on a monthly basis.
22    This is like high level, you know, stuff of
23    what we're all working on.
24         Q.     And did you, in fact, do that?
25         A.     I'll have to look further

```
 1              JENNIFER STONE FISCHMAN
 2     because we had another conversation about
 3     those reports later on, and, so, I did
 4     report to Sakaguchi on a monthly and
 5     quarterly basis, I believe.
 6          Q.   So, you did have some
 7     communications with legal personnel in
 8     Japan; is that fair to say?
 9          A.   Yeah.  I mean, it was a report
10     of four to five bulletpoints in an e-mail.
11          Q.   Okay.
12          A.   Yeah.  I actually described it
13     on the next page.
14          Q.   And then on page 791 it says in
15     underline with an arrow next to it it says,
16     establish regular communication with
17     Sakaguchi.  Do you see that?
18          A.   Yeah.
19          Q.   Did you, in fact, establish
20     regular communication with Sakaguchi?
21          A.   Well, I think I may have
22     attempted to, because if you read on after
23     that it says, Donna's offered weekly,
24     monthly, oral, written and big issue
25     reports and he's rejected all of it.  So,
```

1                JENNIFER STONE FISCHMAN
2    he suggested I seek a way to communicate
3    with him, and, you know, I probably tried
4    to get in there with a monthly bullet
5    report, but it was clear, you know, nobody
6    was inviting me to Japan to get to know
7    each other better.
8         Q.    And then at the bottom of 791,
9    you see where it says, I-M-P-T, and the
10   language that follows?
11        A.    Yes.
12        Q.    Do you recall the conversation
13   that that refers to?
14        A.    Yeah.  During this conversation
15   where Donna said that she was going to
16   maintain all her relationships with Japan,
17   that they don't really want to interact
18   with me and just send the report.
19        Q.    Did she tell you why -- did she
20   tell you who didn't want to interact with
21   you?
22        A.    Well, I assumed it was Ken
23   Fujiwara and Sakaguchi who was the head of
24   all legal --
25        Q.    Did she tell you who it was

1          JENNIFER STONE FISCHMAN
2     that didn't want to interact with you?
3          A.    No.  She just said Japan.  And
4     that was -- we frequently referred to Japan
5     being, you know, MCHC, MCHJ, MCC, et
6     cetera.  I would have understood her to
7     mean, you know, Ken Sakaguchi, this other
8     high level executive that she had
9     interacted with, but that they did not want
10     to interact with me.
11          Q.    Did she tell you why they
12     didn't want to interact with you?
13          A.    No, she did not, and I wasn't
14     -- I wasn't really in the -- I didn't
15     question her.  I just accepted it.
16          Q.    Did you expect over time you
17     would grow into the new role of acting
18     general counsel or perhaps eventually
19     general counsel?
20          A.    Well, I was concerned that I
21     was chosen as acting right off the bat.
22     And I believe that I raised it in the very
23     first meeting and in multiple meetings
24     right up until my demotion that no one had
25     ever been acting of anything, and I felt

1          JENNIFER STONE FISCHMAN

2     really concerned that this was, you know,

3     some kind of placeholder position, or, you

4     know, it just felt like, you know, Japan

5     doesn't want to deal with me, which is

6     weird, and, you know, we had -- it just

7     felt like I should have been the full

8     general counsel from day one.  I had so

9     much experience.  I had so -- I had added

10    so much value to this company over nine

11    years, I mean, so much, and it felt like I

12    really -- I didn't know what they meant by,

13    grow into it, and, frankly, Donna never

14    said, if you grow into it.  In fact, she

15    just said the opposite to me.  Contrary to

16    what she has said or testified, she did not

17    -- she never said to me, you can grow into

18    it, here are the steps.  Never.  It was,

19    I'm not sure this is ever going to happen

20    for you.  Are you sure you want this job?

21    It was very -- and I believed in my soul

22    that I was going to see this job because I

23    had been working for it for nearly twenty

24    years.

25          Q.    Did it seem to you at the time

```
 1              JENNIFER STONE FISCHMAN
 2     of this conversation about who you would
 3     interact with that Japan, whatever that
 4     meant, wanted to interact with Donna Costa
 5     instead of you?
 6          A.    I couldn't say.  I don't know
 7     what the basis for why they didn't want to
 8     interact with me.  I had interactions with
 9     plenty of people in Japan up until this
10     point.  I met Sakaguchi's son a few times.
11     I had worked with Takimoto on multiple
12     projects.  I had worked for other direct
13     Japanese clients over many years.
14          Q.    Did the extent that they were
15     not going to get information from or
16     interact with you, where were they going to
17     get that information or who would they be
18     having those interactions with?
19          A.    I guess they were going to have
20     them with Donna.
21          Q.    Another woman?
22          A.    The only other woman ever in
23     the corporation worldwide.
24          Q.    Did you consider saying you
25     didn't want the job of acting general
```

```
 1              JENNIFER STONE FISCHMAN
 2    counsel?
 3         A.    No.  Never.
 4         Q.    Because you wanted it?
 5         A.    Yeah.  Well, let me rephrase
 6    that and clarify.  I wanted the job as
 7    general counsel.  That had been what I had
 8    had been working for for my entire career,
 9    and I had been working towards that at
10    Mitsubishi and I wanted that job, yeah.
11         Q.    But given the alternative of
12    taking the job of acting general counsel or
13    not taking the job of acting general
14    counsel, you preferred to take the job of
15    acting general counsel; right?
16         A.    Yes, because it was a
17    substantial raise over what I was making
18    and I wanted that position.
19         Q.    Okay.
20              MR. BERMAN:  Can I take a break
21         now, counsel?
22              MR. FORTINSKY:  If you want a
23         break, we can take a break.
24              THE WITNESS:  Okay.  I --
25              MR. BERMAN:  Is now a good
```

1          JENNIFER STONE FISCHMAN
2     time?
3               MR. FORTINSKY:  Yeah, it's a
4          fine time.
5               THE VIDEOGRAPHER:  The time is
6          12:30 P.M. and we are off the record.
7               (Whereupon, a short recess was
8          taken.)
9               THE VIDEOGRAPHER:  The time is
10         1:00 P.M. and we're back on the
11         record.
12         Q.    Okay.  We're back.  I want to
13    just follow-up on one thing we discussed
14    before the break, a while before the break.
15    You told me that you had -- when we looked
16    at Exhibit 31, which is the script with
17    your handwritten notes, you told me that
18    that was part of a personnel file that you
19    got from the company; right?
20         A.    (No response.)
21         Q.    What did you do with the
22    personnel file when you got it?
23         A.    Nothing.
24         Q.    Did you make copies of the
25    personnel file?

                    JENNIFER STONE FISCHMAN

1

2          A.     Yes.

3          Q.     When?

4          A.     Probably when I first met with

5     my original counsel.

6          Q.     When was that?

7          A.     I don't recall the date.  Early

8     -- that would have been in the spring of

9     2017, I believe.

10         Q.     Okay.  So, when you marked on

11    Exhibit 31 with your handwriting, was that

12    on the original version of the personnel

13    file, the original one that you received?

14         A.     It would have been on a copy

15    that I received from the company.

16         Q.     That's what I mean.  So, you

17    received a copy from the company.  Is that

18    the version that you recorded your

19    handwritten notes on?

20         A.     Yes.

21         Q.     And did you make copies after

22    or before you made the handwritten notes?

23         A.     I don't recall.

24         Q.     Well, you told me that you made

25    the handwritten notes within a few days of

```
 1              JENNIFER STONE FISCHMAN
 2    receiving it.  I think that's what you
 3    said; right?
 4         A.    Yes.
 5         Q.    And, so, when you made -- how
 6    long after that did you speak to your
 7    attorney from the unemployment matter?
 8         A.    I said I don't recall how early
 9    on I spoke with him.  Probably sometime in
10    February.
11         Q.    Did you keep a clean copy of
12    the personnel file?
13         A.    Yes.  I may have.  I don't
14    recall.
15         Q.    You don't recall?
16         A.    No.
17              MR. FORTINSKY:  Okay.  I'll now
18          mark as Exhibit 33 -- I think it's
19          33.  I'll now mark as Exhibit 33 a
20          four-page document beginning on the
21          letterhead of the first page of which
22          has the letterhead State of New York
23          Unemployment Insurance Appeal Board,
24          page number Fischman 411 through 414.
25          Let me just write on that.
```

1      JENNIFER STONE FISCHMAN

2           (Whereupon, Fischman 411

3        through 414 was deemed marked as

4        Exhibit 33 for Identification as of

5        this date by the Reporter.)

6      Q.    Turning to page -- well, do you

7   recognize the document, Ms. Fischman?

8      A.    This looks like a document that

9   I received or that was produced by the

10  Unemployment Insurance Appeal Board.

11     Q.    Okay.  And do you recognize the

12  document attached as Fischman 414?

13     A.    Yes.

14     Q.    Do you know how the

15  Unemployment Board obtained this document?

16     A.    Yes.  They must have received

17  it from the company directly.

18     Q.    And why do you say that?

19     A.    Because I don't believe I ever

20  provided any documents to them.

21     Q.    Okay.  All right.  Let's turn

22  now to page --

23     A.    Do you need a copy of this

24  back, or is this my copy?

25     Q.    Well, I guess that will be the

1                    JENNIFER STONE FISCHMAN

2        marked copy.

3              A.    You've marked it?

4              Q.    Yeah.  I did the same with the

5        other Exhibits.

6              A.    Okay.

7              Q.    That's in lieu of the Court

8        Reporter marking --

9              A.    Okay.

10             Q.    Now, let's turn to page 804 of

11       the notebook --

12             A.    Okay.

13             Q.    -- Fischman 804.  And this page

14       appears to be still part of your notes from

15       a meeting with Donna Costa --

16             A.    Uh-hum.

17             Q.    -- on -- let me see what the

18       date was.  I think it was from January 7th,

19       2015?

20             A.    I don't know.

21             Q.    But, in any event, this is from

22       your meeting with Donna Costa?

23             A.    Let's just agree it was from

24       some meeting with Donna Costa.  I couldn't

25       say when I wrote these notes.

```
 1              JENNIFER STONE FISCHMAN
 2         Q.     Okay.  That's fair.  Do you see
 3    near the bottom of the page it says, really
 4    I-M-P-T relationship?
 5         A.     Uh-hum.
 6         Q.     Do you know which relationship
 7    that was referring to?
 8         A.     It looked like there was a new
 9    president coming into MKIC.
10         Q.     And, for the record, what is
11    MKIC?
12         A.     Mitsubishi Kagaku Imaging Corp.
13    located in both Glendale, California and
14    Virginia.
15         Q.     And was that one of the clients
16    that MCHA served or the affiliates that
17    served that was one of MCHA's clients?
18         A.     Yes.
19         Q.     And then you see to the right
20    of the words we just looked at it says,
21    important relationship to build to create
22    trust and understanding?
23         A.     Uh-hum.
24         Q.     Was that -- do you have an
25    understanding as to what create trust and
```

1           JENNIFER STONE FISCHMAN
2    understanding refers to, that is, trust and
3    understanding between whom?
4         A.    Yeah.  I mean, this looks kind
5    of -- we use those words, create trust and
6    understanding, because the folks coming
7    over from Japan are not used to working
8    with Americans, and we used that
9    terminology very frequently to kind of
10   explain how we worked with them.  So, when
11   I would have a meeting with a Japanese
12   business person, I always spoke very
13   slowly, which is hard for a New Yorker to
14   do.  So, I tried to measure my tone and my
15   communications style to adjust to their
16   understanding of English, because it's a
17   very hard language, and often their English
18   wasn't very good, but they frequently
19   brought people with them because English
20   was better so that I would be speaking
21   maybe to the president, but also his
22   director of finance, and I would make sure
23   that I speak clearly and slowly in order to
24   develop a dialogue and impressed upon them
25   my understanding of their business.  So,

1              JENNIFER STONE FISCHMAN
2      MKIC, for example, was a business that made
3      toner products, and I had been supporting
4      the toner ink cartridges.  I had been
5      supporting them for many years through
6      their acquisition of Future Graphics and
7      beyond, and I was now going to support them
8      -- they had -- it was a tough business,
9      toner ink cartridges, and I was going to be
10     assisting them in their reduction in force.
11     And, so, if I was going to meet with the
12     new sales and marketing president, I would
13     make sure that I was empathetic to the new
14     position that he was in, which he was going
15     to come in and reduce the force, that's a
16     tough job to do, especially for people who
17     had been working there for more than twenty
18     or some odd years.  So, if I were going to
19     meet with him, I would make sure that I
20     explained I understood his situation, I
21     understood the business.  I've been to
22     their manufacturing sites many, many times.
23     I knew many of their employees, and I had
24     had been providing them support for many
25     years, and that I was there to help him

```
 1              JENNIFER STONE FISCHMAN
 2    through this process.
 3         Q.    Do you think that building
 4    trust with the legal department's clients
 5    is an important part of the general counsel
 6    role?
 7         A.    Yes.
 8         Q.    On page 807, you see where it
 9    says, first sit down reassuring status quo?
10         A.    Yeah.
11         Q.    This is part of Donna Costa's
12    guidance to you; is that correct?
13         A.    This was the first sit-down
14    with the other members of the legal
15    department.  She was suggesting how to
16    communicate with them to show stability and
17    focus on them.
18         Q.    And she thought it was
19    important to be reassuring, respectful,
20    calm and cool?
21         A.    Exactly.
22         Q.    Did you agree with that?
23         A.    Yes, of course I did.
24         Q.    Let's turn to 817.  You see --
25    is this still part of the meeting or some
```

1          JENNIFER STONE FISCHMAN

2     meeting between you and Donna Costa?

3          A.     Yeah.  This would have been

4     probably at a later time and date because

5     -- I don't know if there is a date.

6          Q.     Okay.  That's not important for

7     the moment.

8          A.     It's in different ink.  It's

9     probably at a different time.

10          Q.     You see where it says, yet to

11     be familiar with executive officers, board

12     members?

13          A.     Uh-hum.

14          Q.     So, was this part of Donna

15     Costa's advice to you?

16          A.     Yeah.  I remember she said

17     something to the extent of look on their

18     website and make sure you look at the name

19     of the board members.

20          Q.     And this is part of her

21     guidance to you as to how to be successful

22     in the role?

23          A.     This is her guidance of making

24     sure I knew the names of the executive

25     officers.

1                JENNIFER STONE FISCHMAN

2        Q.    So you could be successful in

3    the role; right?

4        A.    Yes.

5        Q.    On -- and just below that it

6    says, send Ken and Sakaguchi notes of their

7    promotions.  Do you know what that means?

8        A.    Yes.  I think we've even seen

9    those e-mails that I sent to Ken and

10   Sakaguchi when they were promoted in April

11   of 2015.  Donna suggested that I -- I

12   didn't know they were promoted because I

13   wasn't included in that announcement, even

14   though I was, you know, an officer at the

15   time, but she told me that they got

16   promoted, so, I sent them both

17   congratulatory notes.

18       Q.    Based on advice from Donna

19   Costa?

20       A.    Based on her knowing that they

21   actually got promoted and her advising me

22   that it would be a nice thing to send them

23   a note.

24       Q.    Because that would help you

25   succeed in the role?

1          JENNIFER STONE FISCHMAN

2          A.    I assume it was to help me

3     succeed, but yeah.

4          Q.    On page 818, you see it says,

5     as part of my learning, looking at things

6     more critically and quantitatively, do you

7     know what that means?

8          A.    Yeah.  I guess Jordan was a

9     member of the legal department and he had

10    mentioned to Donna that he was interested

11    in metrics and he was very interested in

12    measuring and quantifying work product.

13    So, I wrote down that I would also be

14    interested in being more critical and

15    looking at things more quantitatively than

16    we had in the past done so.  I thought

17    actually that was the direction that the

18    legal department was going in, legal

19    departments in general, and that had been

20    my experience actually at Raytheon in my

21    prior role that we measured things more --

22    our time spent on matters more

23    quantitatively, and, also, back at Raytheon

24    we had like a central database of all of

25    our matters and all of our documents, and

1          JENNIFER STONE FISCHMAN
2     at Mitsubishi we didn't have -- excuse me
3     -- at MCHA we didn't have any kind of
4     database or schedule, calendar that we put
5     matters on so that no one really knew what
6     anybody else was working on, and, also,
7     their documents were all on their own hard
8     drive of their computer, so, if their
9     computer failed we would lose a ton of
10    records.  So, during the time that I was
11    acting G.C., we were actually starting to
12    look at going into database or at least a
13    server base collection, and, in fact, we
14    transitioned to a very low budget product
15    called All Docs during that period of time.
16         Q.    So, this idea of looking at
17    things more critically and quantitatively,
18    was that your observation, or was that
19    Donna's advice or both?
20         A.    I think it was really Jordan
21    had raised it with Donna.  She didn't get
22    to it or didn't have interest in it.  I
23    said that -- I probably was more interested
24    in it, and that I probably asked her, you
25    know, how to speak to him about it in a way

1              JENNIFER STONE FISCHMAN
2     that made him feel like he, you know,
3     originated the idea.
4          Q.    On page 819, you see in the
5     middle of the line it says, keep reading
6     and reading our policies, try and remember
7     they're not self-evident to business
8     people?
9          A.    Yes.
10         Q.    What does that mean?
11         A.    So, over the years I had worked
12    with Donna, she and I had worked together
13    on all of our internal business -- I'm
14    sorry -- ethics and compliance policies,
15    and, you know, our code of conduct, and as
16    a part of becoming the chief compliance
17    officer she made it clear that I needed to
18    really own every one of those policies,
19    whether or not they were written ten years
20    earlier or even updated by me two years
21    earlier, that they were now all my
22    responsibility, not, you know, so, it was
23    keep reading and rereading those policies
24    and look at them with a different eye than
25    I had looked at them prior or look at them

1          JENNIFER STONE FISCHMAN
2     with a new -- just try to look at it from
3     different perspectives, you know, through,
4     you know, different lights.
5          Q.     Had Donna given you this advice
6     before you became assistant general counsel
7     -- sorry -- before you were named to be
8     acting general counsel?
9          A.     She might have been.  She might
10    have told me that earlier when we did the
11    last mark-up of the code of conduct.  It
12    was just a refresher I think.
13         Q.     And she gave you this advice
14    again now?
15         A.     Yeah.
16         Q.     And that was because she wanted
17    you to succeed in the role?
18              MR. BERMAN:  Object to form.
19         Q.     Is that right?
20         A.     I couldn't say why she -- you
21    know, you've asked me that a few times
22    because I think you're trying to establish
23    something here that she was so -- that she
24    was trying to help me succeed in the role.
25    Let me clarify my answers to you.  I can't

1       JENNIFER STONE FISCHMAN

2    say why Donna gave me these notes or

3    downloaded all of this data.  She would of

4    course want me to succeed in holding this

5    role together while she transitioned to a

6    big new job.  Okay.  Somebody had to do

7    this.  I was doing it.  I wanted to be

8    successful in this role.  Okay.  So, when

9    you say, did she give this to you because

10   she wanted you to be successful?  I don't

11   know.  I think I wanted to be successful in

12   this role.  I don't think she cared whether

13   I was successful or not in this role.

14       Q.    Okay.  Page 830 -- let's just

15   pause on page 826 first.  What were the

16   circumstances of -- first, do you recognize

17   page 826?

18       A.    Yeah.  It's actually 825 and

19   826.  825 being a copy of the envelope --

20       Q.    Yeah.

21       A.    -- and 826 being a copy of a

22   letter that I received from Marasasan, who

23   was the mother of Kanako who had worked in

24   our office for several years as a legal

25   assistant, and I had become good -- close

1        JENNIFER STONE FISCHMAN
2    with her, and Kanako developed cancer and
3    --
4        Q.    Sorry.
5        A.    -- and she passed away right
6    after she had a baby in 2016, and I was
7    really, really -- I can't believe I'm --
8    sorry -- emotionally --
9        Q.    It's okay.  Do you want to
10   pause?
11       A.    It's an emotionally charged
12   day.  I don't want to pause.  I'm fine.
13            But she just had a baby and she
14   had wanted to be married and wanted to have
15   a baby for so long, and it was just the
16   most heartbreaking situation that I had
17   ever, ever experienced to that date, and I
18   wrote to her mother to express my
19   condolences and sadness and connection
20   really to her beautiful daughter and wanted
21   her to know that halfway around the world
22   that I was still thinking about her, and I
23   still think of her often.  I'm sorry.
24       Q.    It's okay.  It's a tragedy.
25       A.    Yeah.

1          JENNIFER STONE FISCHMAN

2     Q.    On page 830, do you recognize

3    these notes?

4     A.    I do.

5     Q.    Page 830 and 831?

6     A.    Yes.

7     Q.    When were they created?

8     A.    On March 1st, 2016.

9     Q.    And what were the

10   circumstances?

11    A.    The circumstances were that I

12   had met with Nick earlier in the day after

13   returning from a vacation, and we had had a

14   discussion that I was very worried about,

15   and, so, for the first time in my life I

16   documented this discussion because it was

17   so far afield of the type of work that I'd

18   been asked to do prior that I wanted to

19   document it.

20    Q.    What do you mean by far afield?

21    A.    I felt that Nick was asking me

22   to create a false narrative to support a

23   company that was doing something wrong.

24    Q.    What did you think the company

25   was doing wrong?

1      JENNIFER STONE FISCHMAN

2          A.     They were terminating an

3      employee who had been with the company for

4      more than twenty years after she had

5      already given her resignation notice.

6      Remember when I talked to you earlier about

7      MKIC and them having a reduction in force?

8          Q.     Uh-hum.

9          A.     So, this is roughly a year

10     after those first notes were taken, right,

11     so, this is 2016 and those notes were taken

12     in early 2015.  So, there had been a couple

13     of waves of reduction in force, and my

14     understanding was that the employees were

15     told that if they would leave the company

16     voluntarily they would be provided with a

17     very good severance package based on your

18     years of service, and I helped prepare

19     those severance documents and those

20     agreements for the company, and Amber Todd

21     was an employee of MKIC, as was her

22     husband, Dan Todd, both of them long-term

23     employees who had moved to Glendale from

24     the Virginia manufacturing plant several

25     years earlier to help establish the

1          JENNIFER STONE FISCHMAN
2     California office.  Dan Todd left the
3     company in October of 2015 and received a
4     very nice -- well, he received the
5     severance package that had been offered at
6     that time for all employees.  Dan went to a
7     customer of MKIC, which helped create a
8     pipeline of product for MKIC, so, he was
9     actually now the customer, working for the
10    customer of the company, and he had been
11    working there for some time when Amber Todd
12    in, I believe, February, early February of
13    2016, Amber went to Yvonne Bienemi, the
14    H.R. manager at MKIC, and said that she was
15    interested in now taking her severance
16    package, staying as long as the company
17    needed her to stay to help train any
18    replacement or backfill, if necessary, but
19    that she was now ready to leave the
20    company, and Yvonne at the time contacted
21    me and told me that the company didn't want
22    to pay her a severance package as they had
23    done her husband and other employees, and I
24    said that you have to treat all employees
25    equally, and during the middle of this I

1                    JENNIFER STONE FISCHMAN
2      had told Yvonne that, no, it would be
3      inappropriate to treat her differently and
4      that was how I left it with her.  Then I
5      went away on vacation in February for
6      President's week, I suppose it was
7      President's week, and on or around March
8      1st, for sure it was March 1st, I came back
9      and Nick came into my office and told me
10     that while I was away he had had
11     discussions with Takayamasan and Donna and
12     that they had made a separate decision to
13     terminate Amber, and I was surprised, and I
14     said why would you -- why would they do
15     that when they have offered a severance
16     package, and they said, well, now there is
17     a conflict.  I said there is no conflict.
18     There's never been a conflict.  They're
19     manufacturing a reason to get rid of her
20     and treat her differently, and he said that
21     it was our job in the legal department to
22     help spin a narrative in order to protect
23     the company from any potential liability,
24     and I vehemently disagreed and told him
25     that that was discriminatory, and he

```
 1              JENNIFER STONE FISCHMAN
 2    immediately changed the subject and walked
 3    -- sort of stormed out of my office and
 4    refused to discuss it further.  So, I went
 5    home and I wrote this letter to myself
 6    because I had never been asked to do
 7    something like that.  It was antithetical
 8    to everything I believe.
 9         Q.    And what did you intend to do
10    with these notes when you wrote them?
11              MR. BERMAN:  Object to form.
12           To the extent that it doesn't call
13           for the mental impressions of an
14           attorney representing herself, you
15           can answer.
16         A.    I took these notes.  I folded
17    them up and I stuffed them in the back of
18    my desk hoping to never see them again.  It
19    was a cleansing for me, and that's where
20    they laid for the next several years.
21         Q.    The reduction in force at MKIC
22    in 2015 included both men and women; right?
23         A.    It had to because we did it
24    according to, you know, the EEOC
25    guidelines.
```

1       JENNIFER STONE FISCHMAN

2       Q.    And the people that were laid

3   off at the time received a severance

4   package; right?

5       A.    You know, you'd have to go back

6   and -- we'd have to go back and refresh

7   what exactly they received and what the

8   actual offers were.

9       Q.    Well, you testified just a

10  moment ago --

11      A.    Well, yes, my belief is that

12  they received severance packages based on

13  their years of service.

14      Q.    And both men and women received

15  those severance packages; right?

16      A.    I don't know the number of men

17  and women who received them, but I'm sure

18  that there were some women included.  There

19  were more men at the company than there

20  were women, so, it would have been the

21  majority men.

22      Q.    So, whatever was done with

23  Amber Todd was not based on the fact that

24  this benefit that was provided -- this

25  severance benefit that was provided was

1                    JENNIFER STONE FISCHMAN

2       being provided only to men and not to

3       women; correct?

4              A.    Well, actually, it's my belief

5       that it was provided to men right up until

6       she left, so, you'd have to ask MKIC if

7       they provided any other women with a

8       severance package during that time period.

9       My belief at the time that I wrote this was

10      that Amber was being treated differently

11      than other men who had left since that

12      reduction in force which was a rolling

13      occurrence.

14             Q.    But throughout 2015, both men

15      and women received severance packages when

16      they were asked to leave; correct?

17             A.    In 2015 I believe that there

18      were some women included in this severance

19      package distribution.

20             Q.    Okay.

21             A.    Because, as lawyers for the

22      company, we advised them to treat them

23      equally.

24             Q.    Right.

25                   So, when Dan Todd left, he left

```
 1              JENNIFER STONE FISCHMAN
 2   as part of a large scale reduction in
 3   force; correct?
 4              MR. BERMAN:  Object to form.
 5        A.    I'm not sure he left as a large
 6   scale reduction in force.  I'd have to go
 7   back to look at the timing.  I believe he
 8   left on his own somewhere after the large
 9   scale reduction in force.  Remember, the
10   reduction in force was primarily in
11   Virginia and he was separate.  He was over
12   in California.  So, if you could produce to
13   me the reduction in force numbers, I can
14   answer that more accurately.  My impression
15   was that he left and that she was being
16   treated differently.
17        Q.    He accepted an offer that was
18   made on a large scale to a significant
19   number of employees; correct?
20              MR. BERMAN:  Object to form.
21        A.    I believe that the entire
22   company was offered the same deal, same as
23   Amber, and I believe the understanding was
24   you could exercise that within any time
25   period.
```

                    JENNIFER STONE FISCHMAN
1
2        Q.    What's your basis for saying
3    that?
4        A.    I believe that that is what the
5    offer was.
6        Q.    Ad infinitum?  Forever?
7        A.    I believe that that was what
8    the offer was.
9        Q.    As you sit here today, are you
10   aware of any employee from MKIC that was
11   terminated pursuant to the reduction in
12   force on or after March 2016 other than
13   Amber Todd?
14       A.    No.
15       Q.    Did MKIC or the Mitsubishi
16   organization generally have a policy
17   concerning conflict of interest that was in
18   force in 2016?
19             MR. BERMAN:  Object to form.
20       A.    Not that I'm aware of, no.
21       Q.    Was there any policy concerning
22   doing business with relatives of the people
23   who worked for the company?
24       A.    Not that I'm aware of, no.
25       Q.    Let's look at page 833.

```
 1              JENNIFER STONE FISCHMAN
 2         Do you recognize this document?
 3    A.    Yes.
 4    Q.    Do you remember the
 5    circumstances that gave rise to this
 6    exchange of e-mails?
 7    A.    I do.
 8    Q.    What happened?
 9    A.    This is when -- we were trying
10    to -- so, when you do business in foreign
11    countries, you frequently need to have
12    documents authenticated either at the
13    consulate or the courts, and there are
14    companies that do that kind of work and
15    come to pick up the document from you and
16    then will take it to the consulate, have it
17    authenticated, stamped, bring it back to
18    you like a messenger service, it's a
19    specific type of messenger, and this
20    occasion was a situation where we had a
21    document that needed to be authenticated,
22    and I had asked Kelly Tricoli who was then
23    my assistant to set up the company to come
24    pick up the documents.  The gentleman who
25    is responsible for that, his name was
```

1          JENNIFER STONE FISCHMAN
2    Allen.  At this time I don't recall his
3    last name.  And I asked Kelly to set it up
4    so that he would come pick it up and then
5    get it authenticated and bring it back.  I
6    think that I had told Kelly in advance to
7    make sure that if she wasn't going to be in
8    the office, and I believe that it was a day
9    that she was intending not to be in the
10   office, that she arrange it in such a
11   manner that I didn't have to worry about
12   it.  And, instead, what she did is she set
13   it up and got him approved through the
14   security system in the lobby of the
15   building, but she didn't notify anybody
16   else about when he would be coming or that
17   he was coming, and I would have rather she
18   notified the other administrative
19   assistant/office manager because he
20   arrived, but I didn't get the phone call,
21   or I was in a meeting and nobody knew that
22   he was there, and somebody found him in the
23   lobby and brought -- and then I had to be
24   interrupted.  I was in a meeting with Donna
25   and Brian, and it was a little bit like an

1          JENNIFER STONE FISCHMAN

2    administrative fumble, that if you're not

3    going to be there, make arrangements for

4    somebody else to take care of this so that

5    the general counsel or acting general

6    counsel, who is busy, doesn't have to worry

7    about whether or not the guy has picked up

8    the documents or dropped off the documents.

9    We have other administrative assistants in

10   the office that could have been notified.

11   And, so, I was simply telling Kelly in here

12   that the guy showed up, that I was in a

13   meeting, Brian found him in the lobby, he

14   then came in and interrupted -- Brian then

15   interrupted my meeting with Donna to tell

16   me this guy was waiting in the lobby, and,

17   so, Yuka, who is Donna's administrative

18   assistant, I walked out of the meeting and

19   asked her if she could help manage this

20   situation, and all I said in this e-mail

21   was, if you're not going to be in the

22   office and something like this comes up,

23   that you could just speak to Yuka who is

24   just down the hall from you and arrange

25   that she manage it instead of having to

1          JENNIFER STONE FISCHMAN
2    interrupt a meeting or leave this guy in
3    the lobby without knowing who to call, that
4    kind of thing, and the response I got from
5    her I thought was a little flippant for an
6    assistant, and this was kind of the way
7    that she spoke to me all the time.  Her
8    response was, well, he was registered for
9    both days already, and I'm sorry an office
10   full of people can't handle a visitor in my
11   absence, and that just seemed to me like to
12   push it off on me that I had somehow asked
13   her to do too much by asking her to just
14   make an arrangement that somebody help
15   answer the door.  Like it's not that big a
16   deal, but it's not my job to make sure that
17   someone else answers the door.
18        Q.    Did you find Kelly a difficult
19   person?
20        A.    Yes.
21        Q.    Would you say you had a
22   difficult relationship with her?
23        A.    Yes.
24        Q.    Were there any other people in
25   the office that you would say you had a

1              JENNIFER STONE FISCHMAN
2     difficult relationship with?
3          A.    No.
4          Q.    834?
5          A.    Yes.
6          Q.    Can you tell me what this is
7     about?
8          A.    This is also off a notepad from
9     an interview I had with someone at
10    Oerlikon.
11         Q.    Another job interview?
12         A.    Yes.
13         Q.    And what happened with that?
14         A.    I didn't get the job.
15         Q.    Did you have an interview?
16         A.    On the phone.
17         Q.    Did you -- we looked at a few
18    examples of companies that you had notes
19    about that you interviewed with or pursued
20    applications for.  Did you have other notes
21    relating to other applications that you
22    submitted?
23         A.    I think now I have provided you
24    with all of the notes that I have in
25    writing, legal pads or note pads, and,

1           JENNIFER STONE FISCHMAN
2    primarily, I kept the notes electronically.
3           Q.    Okay.
4           A.    Some notes would have been when
5    I didn't have my computer nearby.
6           Q.    Got it.
7                 Turning now to Exhibit 32 --
8           A.    Sure.
9           Q.    -- documents -- pages 836
10   through 838.
11          A.    Uh-hum.
12          Q.    One page --
13          A.    Yeah.
14          Q.    -- it says 2018.
15          A.    Yeah.
16          Q.    The other one, the other two
17   pages look kind of different.
18          A.    Yeah.
19          Q.    Are these two different
20   documents, or three different documents or
21   one document --
22          A.    There's three different
23   documents.
24          Q.    Okay.  When was page 836
25   created?

1                    JENNIFER STONE FISCHMAN

2          A.    I believe sometime just after

3     the close of 2018.

4          Q.    Who created it?

5          A.    I did.

6          Q.    Was this submitted as an

7     attachment to your tax returns?

8          A.    It was used as a -- yes.  I

9     believe it was submitted possibly, but it

10    was used as a basis for a schedule on a tax

11    return.

12         Q.    And 837, when was this created?

13         A.    This was created probably after

14    the close of 2019, documenting my expenses

15    for 2019 in preparation of doing our taxes.

16         Q.    And this was used as a basis

17    also for preparing a schedule for 2019?

18         A.    Yes.

19         Q.    How come it includes at the

20    bottom two entries for 2020?

21         A.    I think it's a mistake.  Oh,

22    I'm sorry.  Okay.  Thank you for pointing

23    that out.  These two documents, the last

24    two, they are 837 and 838, were created

25    this year in response to inquiry from New

```
1            JENNIFER STONE FISCHMAN
2     York State Department of Taxation.  And
3     it's inadvertent that those two, 7/3/2020
4     and 7/27/2020, that those two charges were
5     included I think because Digital Tone gave
6     us an invoice that -- gave us a line
7     listing of all the invoices clumped
8     together and somebody mistakenly entered it
9     on here.
10          Q.    When did you receive the
11    inquiry from -- I think you said the New
12    York State Tax Authority?  Is that what you
13    said?
14          A.    Yeah.  New York State in -- I'd
15    have to ask my husband.  I really don't
16    know because I wasn't dealing with this.
17          Q.    And what did the inquiry
18    request of you?
19          A.    They requested us to provide
20    the -- we had all of the Amex receipts.
21    They wanted the actual receipts.
22          Q.    And you provided them?
23          A.    I provided what we had.
24          Q.    Was 838 prepared in response to
25    the same inquiry?
```

1          JENNIFER STONE FISCHMAN

2          A.     No.   This was prepared earlier

3    this year in preparation of doing our

4    taxes, so, prior to April.

5               MR. FORTINSKY:  I see.  Okay.

6          I want to just take a brief break

7          before we finish.

8               THE VIDEOGRAPHER:  The time is

9          1:46 P.M.  We're off the record.

10              (Whereupon, an off-the-record

11         discussion was held.)

12              THE VIDEOGRAPHER:  The time is

13         2:04 P.M. and we're back on the

14         record.

15         Q.     Ms. Fischman, a follow-up

16    question on a point we were discussing

17    before the break.

18              Remember we talked about the

19    lay-offs or the RIFS at MKIC and you were

20    concerned about how Amber Todd was treated?

21         A.     Yes.

22         Q.     Did you do anything else in

23    response to how she was treated besides

24    what you've already told us about?

25         A.     I communicated to the general

1           JENNIFER STONE FISCHMAN
2    counsel of the company that I thought what
3    he was doing was wrong.  I was, as I
4    mentioned, afraid of retaliation, and that
5    fear was confirmed some weeks later when I
6    received for the first time ever a needs
7    improvement for the first time in my legal
8    career, actually, in my performance review
9    generally called, needs improvement in
10   communication.  As I mentioned, there was
11   no one else to report this to other than to
12   general counsel, and he was the one who
13   wanted me to spin it.  So, no, I didn't do
14   anything further.
15         Q.    Did you ever discuss it with
16   Pat Saunders in H.R.?
17         A.    No, because Pat Saunders was
18   not the H.R. director for that business.
19   Pat Saunders only did H.R. for MCHA.
20         Q.    Who was the H.R. director for
21   that business?
22         A.    Yvonne Bienemy.
23         Q.    And did you go back to her
24   after your discussion with Mr. Oliva?
25         A.    Absolutely not.  I wasn't going

1                  JENNIFER STONE FISCHMAN

2       to undermine Nick's authority, and they'd

3       spoken.  I had no voice in this any

4       further.

5            Q.    How about raising the issue

6       with Donna Costa?

7            A.    As I mentioned, Donna Costa and

8       Nick Oliva had schemed up this spinning of

9       the story together.  It would have been

10      ineffective to raise it to Donna Costa

11      since it was probably her idea.

12           Q.    What's your basis for saying

13      that?

14           A.    Nick walked into my office and

15      said, Donna and I have discussed this with

16      Takayamasan and this is what we've come up

17      with.

18           Q.    What was your basis for

19      thinking that you might be retaliated

20      against?

21           A.    The way that Nick responded to

22      me when I told him that I was not in the

23      business of spinning stories.

24           Q.    And, specifically, what about

25      his response led you to believe that there

1          JENNIFER STONE FISCHMAN

2     might be some retaliation, if anything?

3          A.    He appeared angry with me, and

4     kind of shut down and left the office.

5          Q.    Did he say anything to suggest

6     he would retaliate?

7          A.    As I said, he immediately ended

8     the conversation and told me not to deal

9     with it and walked out of my office in a

10    way that was visibly angry, and it was

11    really the first time I had ever seen him

12    visibly angry, and, frankly, it was the

13    last time I ever saw him visibly angry.

14         Q.    So, it was essentially that you

15    saw that he was unhappy with something you

16    had said that led you to believe that he

17    might retaliate?  It wasn't anything he

18    said, it was just his, you know, what you

19    perceived to be his unhappiness; is that

20    fair?

21         A.    He was visibly angry, and I had

22    had not encountered that before.  I was

23    telling him that something he was doing or

24    was suggesting for me to do was unethical

25    and probably against the law.  He was angry

1              JENNIFER STONE FISCHMAN
2      that I was calling him out on it, and he
3      stormed out of the room.  Did I think he
4      was going to retaliate?  Yes, I did based
5      on his reaction to me, which, as you know,
6      his demeanor is very even.  This was a
7      departure from that even temperament, so, I
8      believed that he would retaliate, yes.
9          Q.    Sitting here today, do you
10     believe he did anything that was against
11     the law?
12         A.    He treated or he allowed the
13     company to treat this employee who was a
14     woman differently than other male employees
15     of the company, and, so, I do believe that
16     that was discrimination and against the
17     law.
18         Q.    So, you said it was differently
19     from how other male employees were treated,
20     but it was also differently from how other
21     female employees were treated who received
22     the same severance package; correct?
23              MR. BERMAN:  Object to form.
24         A.    So, I have no basis for what
25     other employees received at the time that

1           JENNIFER STONE FISCHMAN

2 Amber was leaving.  So, there were

3 different periods of time where people

4 received different things.  So, when we did

5 the formal RIF for -- the formal R-I-F,

6 reduction in force, back in September,

7 October time frame at Virginia and for

8 MKIC, there may have been a cross section

9 of employees both based on gender and age,

10 but people left after that point of time,

11 and my belief is that they all received

12 severance right up until Amber, and I don't

13 think any women left.  I think it was all

14 men.  So, my basis for my belief was that

15 she was being treated differently than the

16 other male counterparties that had left the

17 company and received severance.

18     Q.    When was the last male employee

19 that left prior to the discussion about

20 Amber Todd?

21     A.    I have no recollection at this

22 time.

23     Q.    Do you recall any other male

24 employee being given a severance package in

25 2016?

1          JENNIFER STONE FISCHMAN
2          A.    Well, this is early 2016, so, I
3     -- at the time that I wrote this I probably
4     did know that answer, but I don't have that
5     answer for you today.  I don't know how
6     many, but I'd be happy to learn that there
7     were others if you can produce that.
8          Q.    As you sit here today, are you
9     aware of any over employee that got a
10    severance package after Dan Todd in October
11    of 2015?
12         A.    I can't recall the name of
13    people, but I believe there were others.
14         Q.    And when were they?
15         A.    Sometime after September 2015.
16         Q.    Do you remember any in the
17    fourth quarter?
18         A.    I can't recall at this time.
19         Q.    Did you ever have a full list
20    of the employees who received severance
21    packages while you were working at the
22    company?
23         A.    I may not have, no.
24         Q.    So, there might have been
25    employees that had received severance

```
 1            JENNIFER STONE FISCHMAN
 2    packages that you were not aware of;
 3    correct?
 4         A.    To my knowledge, they were
 5    treating Amber differently because she was
 6    a woman.
 7         Q.    But there might have been
 8    employees that you were not aware of that
 9    were receiving severance packages; correct?
10         A.    I really couldn't say at this
11    time.  If you have that information, I'm
12    happy to go through that with you.
13         Q.    If Nick knew -- if Mr. Oliva
14    knew that there were women that had
15    received severance packages subsequent to
16    October 2016, then there would be no reason
17    for him to perceive that it was
18    discriminatory; correct?
19              MR. BERMAN:  Object to form.
20         A.    If Nick Oliva had in his
21    possession the information that she was not
22    being discriminated against, then I would
23    have appreciated if you've raised that with
24    me at the time that I raised my objection
25    to the way he was spinning it at that time.
```

1              JENNIFER STONE FISCHMAN
2     I don't believe he had that information
3     because that information did not exist.
4          Q.     And if he had that information
5     and he heard you accuse him of doing
6     something illegal, it would be pretty
7     natural for him to be angry; wouldn't it?
8              MR. BERMAN:  Object to form.
9          A.     No.  I think a rational person
10    would say, Jennifer, there's no
11    discrimination here.  We haven't provided
12    severance to any number of employees.  That
13    would have been the rational response.  I
14    didn't sit there and go, I'm accusing you
15    of -- you know, it wasn't that kind of
16    conversation.  I just said, look, I'm not
17    in the business of spinning narratives.
18    That's not my job.  I'm in the business of
19    preventing liability for the company, and
20    making sure that they treat all of their
21    employees with the same respect and dignity
22    that they should be treated and that's my
23    job.  So, I didn't say -- I didn't start
24    yelling at Nick saying, you know, your -- I
25    said, they're discriminating against her

```
 1              JENNIFER STONE FISCHMAN
 2   and I'm not going to be a part of it.
 3        Q.    Do you think it's natural for
 4   people to be angry when they are accused of
 5   something they didn't do?
 6              MR. BERMAN:  Object to form.
 7        A.    I can't say how -- I'm not a
 8   psychologist and I can't say how people
 9   react.  Different people react differently
10   to all kinds of circumstances, as you well
11   know.
12        Q.    Sure.
13              But you've been around in the
14   business world for -- well, forget the
15   business world.  You've lived in society
16   for more than thirty years, I'll say.
17        A.    Thank you.  That's kind.
18        Q.    You've noticed in that time, I
19   suppose, that people tend to get angry when
20   they're accused of things they haven't
21   done; right?
22              MR. BERMAN:  Object to form.
23        A.    I can say that it is sometimes
24   possible for a person who is accused of
25   doing something that they had not done to
```

1          JENNIFER STONE FISCHMAN
2    feel defensive and say that they didn't do
3    it.
4         Q.    Do you think it's justifiable
5    to be upset or angry if you're accused of
6    something you didn't do?
7              MR. BERMAN:  Object to form.
8         A.    Jerry, you're the king of
9    hypothetical questions.
10        Q.    It's not a hypothetical.  It's
11   a generalization.
12        A.    Generalization.  I'm sorry.  I
13   think that people react differently to all
14   kinds of situations.  So, generally, some
15   people may feel defensive and angry.  Other
16   people may absorb it and walk away.  Other
17   people may retaliate and get back against
18   somebody by throwing something into their
19   performance review that was fake.  There
20   are lots of reactions that people can have
21   to accusations.  Some people may sue when
22   they're accused of wrongdoing that they
23   didn't do.  There's lots of reactions I
24   think we can agree.
25        Q.    Right.

```
1              JENNIFER STONE FISCHMAN
2                 So, you sued when you were
3     unhappy with --
4          A.    When I was accused of doing
5     something I did not do --
6          Q.    Right.
7          A.    -- and was wrongfully
8     terminated on the basis of gender for this
9     pretextual nonsense that they accused me
10    of, yes.
11         Q.    Right.
12               And Mr. Oliva didn't sue you
13    for accusing him of anything he didn't do;
14    did he?
15               MR. BERMAN:  Object to form.
16         A.    I think you're
17    mischaracterizing my -- I'm sorry.  I cut
18    you off.
19               MR. BERMAN:  I just wanted to
20         get my objection on the record.  You
21         can answer.
22         A.    I think you're
23    mischaracterizing our conversation.  I told
24    him what the company was doing was
25    discriminatory, and that I didn't want to
```

1              JENNIFER STONE FISCHMAN
2    be a part of it, and I wasn't going to spin
3    it the way that he wanted it to be spun,
4    so, I think it was bad legal advice.  So,
5    let me re-clarify that I wasn't accusing
6    him of breaking the law.  I was accusing
7    him of enabling them to break the law, but
8    even during my conversation with him it
9    wasn't an accusation.  It was a, I'm not
10   going to be a part of that.  I'm not going
11   to do it.  So, but he got visibly angry
12   with me and walked out.
13              MR. FORTINSKY:  Thank you.  I
14         have nothing further.  Oh, wait.
15         Hold on.  I'm not closing the record
16         yet.  I do have another question.
17   MR. FORTINSKY:
18        Q.    In the course of your work, you
19   were aware of other people that were
20   terminated from the company; right?
21        A.    Yes.
22        Q.    Were you aware of anyone that
23   was terminated for complaining about some
24   issue?
25        A.    I don't know if --

1                    JENNIFER STONE FISCHMAN
2        Q.    Let me withdraw the question
3    and clarify it.
4              I'm referring to any affiliate
5    of MCHA, any Mitsubishi affiliate, are you
6    aware of anybody that was terminated
7    because the person complained about
8    anything at the company?
9        A.    You really have to be more
10   specific.  I handled many terminations over
11   the course of my tenure there where I
12   provided severance packages and wrote
13   severance agreements for people, and it is
14   possible that people were terminated for
15   making complaints or -- let me clarify.
16   Frequently, by the time the issue was
17   raised to the legal department, the H.R.
18   manager at a specific company might say, we
19   would like to terminate such-and-such
20   employee, and the question would be, on
21   what basis?  Well, they -- the answer might
22   include a combination of, we have a number
23   of bases for the termination, but they have
24   also complained about harassment, and, so,
25   we are worried, we don't want to come

1          JENNIFER STONE FISCHMAN

2    across as retaliation, so, as retaliating

3    against this employee, which, of course, is

4    not the basis for our termination, but that

5    does raise a concern.  H.R. professionals

6    know that if someone raises concerns that

7    that could be viewed as retaliation, right,

8    so, they'll -- they frequently would give

9    me, you know, as much information as they

10   could, and then I would help them -- the

11   legal department would help them either

12   terminate or not terminate as the case may

13   be depending on the level of risk to the

14   company.

15        Q.    As you sit here today, can you

16   think of any instance in which any

17   affiliate of MCHA terminated an employee

18   and one of the circumstances that you

19   recall is that the employee had complained

20   about something?

21        A.    If you could provide me with a

22   list of all of the terminations that I

23   handled over my nine years of providing

24   legal advice and employment advice to the

25   more than two dozen companies that I've

1          JENNIFER STONE FISCHMAN

2     recorded, I would be happy to go through

3     each one of them and tell you whether or

4     not I believe that they had complained

5     about a wrongdoing at the company and was

6     terminated anyway.

7          Q.     I appreciate the offer, but my

8     question really is just about what you

9     recall, what is in your head at the moment.

10               Do you, as you sit here now,

11    have any recollection of anybody being

12    terminated and in connection with that file

13    you saw some reference that the person had

14    complained about something at the company,

15    and, if so, tell us who that was?

16          A.     As I've stated, I worked with

17    more than a dozen or two dozen companies

18    over the nine years that I worked at

19    Mitsubishi Chemical Holdings America.  I

20    wrote dozens and dozens of termination

21    agreements and severance agreements.  I

22    definitely, definitely, as I sit here

23    today, can recall that some of them

24    included concerns raised by an employee,

25    and, yes, they were still terminated.  I

```
 1              JENNIFER STONE FISCHMAN
 2    cannot at this time recall the name of
 3    those people, but I would be happy to if
 4    you can send me the names of the people and
 5    the companies that they worked with and the
 6    e-mails that I exchanged with the H.R.
 7    professionals at the time, I'd be happy to
 8    work through those and find you some.
 9    Again, you guys are in possession of all of
10    my documents, all of my notes, all of my
11    records, and we received very little of
12    that, so, it's a little hard for me to
13    recall a name off the top of my head.
14         Q.    Okay.  Do you recall any
15    instance in which someone complained about
16    discrimination or sexual harassment --
17         A.    Yes.
18         Q.    -- and then was subsequently
19    terminated?
20         A.    Yes.  Actually, this just
21    occurred to me that we had three employees
22    involved in complaints about sexual
23    harassment at the pharma company in New
24    Jersey, which would have been MPDA, MP --
25    Mitsubishi -- MTPA, Mitsubishi Tanabe
```

1          JENNIFER STONE FISCHMAN

2    Pharma America, Mitsubishi Tanabe Pharma

3    Development Inc.  There was two or three

4    companies -- I can't recall at the time

5    right now -- that Andy Sazar managed and

6    provided legal services to where there were

7    complaints of sexual harassment, and the

8    complainants were terminated, and I believe

9    now I'm going to have to stop because there

10   was attorney-client -- I'm surprised nobody

11   here is objecting because this is all

12   attorney-client privileged, and I'm going

13   to stop there, but, yes, the answer is yes.

14            MR. FORTINSKY:  Okay.  Let me

15         just consult with MCHA counsel based

16         on that.  Hold on one second.  Off

17         the record a second.

18            THE VIDEOGRAPHER:  The time is

19         2:26 P.M. and we are off the record.

20            (Whereupon, an off-the-record

21         discussion was held.)

22            THE VIDEOGRAPHER:  The time is

23         2:27 P.M. and we are back on the

24         record.

25            MR. FORTINSKY:  Could I ask the

```
 1                JENNIFER STONE FISCHMAN
 2           Court Reporter to read back the last
 3            three questions and answers, please?
 4                THE REPORTER:  Sure.
 5                (Whereupon, the referred to
 6            testimony was read back by the
 7            Reporter.)
 8        Q.    In the examples you mentioned,
 9   were the accusations of sexual harassment
10   made before or after the termination of the
11   employees?
12        A.    My recollection is that they
13   were made prior to the termination.
14        Q.    And what happened in those
15   cases subsequently?
16        A.    Those cases were settled.
17   They were litigations that were settled.
18   Oh, it just occurred to me that this firm
19   may have been involved in those cases.
20        Q.    Which affiliates were involved
21   in those cases?
22                MR. BERMAN:  Object to form.
23        A.    I said that those were the
24   pharma companies in New Jersey.
25        Q.    Oh, the pharma -- sorry.
```

1              JENNIFER STONE FISCHMAN

2        A.    Yeah.

3        Q.    Are you aware of any instance

4   in which an employee of MCHA made an

5   accusation of sexual harassment or

6   discrimination of any kind and then was

7   subsequently terminated?

8              MR. BERMAN:  Object to form.

9        A.    Of MCHA?

10        Q.    Right.

11        A.    MCHA was a very small company

12   with, I don't know, maybe twenty-five

13   employees total, and was even smaller than

14   that in the New York office at least, and I

15   can think of one occasion, again, where

16   Gordon Rees represented Mitsubishi where

17   there was a complaint of -- where there

18   were complaints, but not until after the

19   termination.

20        Q.    So, again, as to MCHA, are you

21   aware of any MCHA employee that made an

22   accusation of discrimination or harassment

23   and then was subsequently terminated?

24        A.    I think as Donna -- as Donna

25   testified, I can only think of two

1          JENNIFER STONE FISCHMAN
2     terminations in the history of MCHA, mine
3     and another employee who also threatened
4     the company who the company settled with.
5          Q.   So, the answer I take it is,
6     no, you're not aware of any such example?
7          A.    No, but I'm not privy to
8     everything that occurred that may have
9     occurred for other people and their
10    severance from the company.  I may not have
11    been privy to their complaints, and it's
12    possible that they made complaints and then
13    the company severed the relationship.
14         Q.   So, as you sit here today,
15    you're not aware of any instance in which
16    an MCHA employee complained of harassment
17    or discrimination and then was subsequently
18    terminated; correct?
19              MR. BERMAN:  Object to form.
20         A.    It's a two-part question.  The
21    first part is, I am aware of people
22    complaining about harassment and/or
23    discrimination at the company, so, yes.
24    The answer to the first part of the
25    question is yes.  The answer to the second

1                    JENNIFER STONE FISCHMAN

2      part of the question is no.

3          Q.    So, again, there was no

4      instance -- are you aware of any instance

5      in which someone was terminated --

6          A.    Yes.  Myself.

7          Q.    -- after complaining of sexual

8      harassment or discrimination?

9          A.    Yes.  Once again, I'm sorry I

10     cut you off, Jerry.  The answer is, other

11     than myself, the answer is no.  The other

12     answer is, yes, me.

13         Q.    And when you say that, what

14     instance of complaining of discrimination

15     or harassment do you have in mind?

16              MR. BERMAN:  Object to form.

17        You can answer.

18         A.    The incidents of discrimination

19     as outlined in my complaint.

20         Q.    Now, let's talk about MCHC.

21     Are you aware of any instance in which any

22     MCHC employee was terminated after

23     complaining of harassment or discrimination

24     of any kind?

25         A.    I would not be privy to MCHA.

```
 1            JENNIFER STONE FISCHMAN
 2   MCHC, I wouldn't have been privy to that.
 3        Q.    And, therefore, the answer is
 4   no?
 5        A.    The answer is I am not privy to
 6   the internal workings of MCHC in Japan.
 7   While they were very much engaged in what
 8   was going on in the U.S., it was not a
 9   reciprocal conversation.
10        Q.    My question isn't about what
11   you were or not privy to.  My question is
12   about what you are or are not aware of.  My
13   question is whether you are aware of any
14   instance in which an MCHC employee was
15   terminated after discriminating or after
16   making allegations of discrimination or
17   harassment.
18        A.    I am not aware of any for MCHC
19   if that was handled in Japan, and I would
20   not have been notified of it.  It's not
21   going to be publicized in any American
22   affiliate.
23        Q.    And, therefore, you're not
24   aware of any such incidents?
25        A.    That's right.
```

1                    JENNIFER STONE FISCHMAN

2          Q.     I just want to clarify one

3     thing.

4          A.     Okay.

5          Q.     In your testimony a moment ago

6     you said when I asked you about instances

7     where MCHA employees have been terminated

8     after complaining about discrimination or

9     harassment, you made reference to your own

10    complaint in this case.  Where in the

11    complaint did you recite an instance where

12    you had complained about discrimination of

13    some kind?

14              MR. BERMAN:  Object to form.

15         A.     You can present the -- if you

16    want to give me the complaint and I'll go

17    through it.

18         Q.     Okay.

19              THE WITNESS:  We can object

20         because we've been here for

21         two-and-a-half hours.  I'm exhausted.

22              MR. BERMAN:  Jerry, you've

23         already walked through the entire

24         complaint allegation by allegation.

25              MR. FORTINSKY:  But I don't

1          JENNIFER STONE FISCHMAN
2          think she said at the time -- I think
3          those questions before were about
4          discrimination rather than complaints
5          about discrimination.
6               MR. BERMAN:  The pleading
7          identifies multiple instances of
8          alleged oppositional and complaining
9          activity.  You've already walked
10          through it on, I think, day 1.
11     Q.    So, let me just try to short
12   circuit that by asking you this, apart from
13   what's in the complaint, do you, as you sit
14   here now, have any recollection of any
15   complaint that you made, that is, any
16   instance of complaining by you of
17   discrimination or harassment?
18     A.    The instances are outlined in
19   the complaint.
20     Q.    And other than that, there is
21   nothing that you have in mind in your
22   answers to these questions?
23     A.    No.
24          MR. FORTINSKY:  Okay.  Nothing
25          further.  Thank you very much.

1                    JENNIFER STONE FISCHMAN
2                    MR. BERMAN:  Are you tendering
3           the witness back to us?
4                    MR. FORTINSKY:  Well, I guess
5           in principle MCHA could -- okay.
6           Yes.
7                    MR. BERMAN:  They've tendered
8           the witness back to us.  This is
9           Matthew Berman for Plaintiff.  We'd
10          like to ask a few questions of this
11          witness.
12   EXAMINATION BY
13   MR. BERMAN:
14       Q.    Ms. Fischman, I'll try to be
15   brief.
16               During the course of your
17   employment with MCHA, did you have a
18   company issued mobile phone?
19       A.    I did.
20       Q.    During your tenure at MCHA, did
21   you use that mobile phone to conduct
22   business?
23       A.    And my answer is yes, I did,
24   exclusively.
25       Q.    Did the business that you

1           JENNIFER STONE FISCHMAN

2    conducted using that mobile phone include

3    text communications?

4           A.     Yes, it did.

5           Q.     Did those text communications

6    include communications between you and Ms.

7    Costa?

8           A.     Yes.

9           Q.     Did they include communications

10   between you and Mr. Oliva?

11          A.     Yes.

12          Q.     Did that mobile phone have

13   access to e-mail?

14          A.     Yes.

15          Q.     Did it have access to your work

16   e-mail at MCHA?

17          A.     Yes.

18          Q.     Did your cell phone contain

19   e-mail communications between yourself and

20   Ms. Costa?

21          A.     Yes.

22          Q.     Did it contain communications

23   between you and Mr. Oliva?

24          A.     Yes.

25          Q.     On your last day of work, did

1          JENNIFER STONE FISCHMAN
2   you still have that mobile phone in your
3   possession?
4          A.    I did.
5          Q.    And in the course of your last
6   day of work, did you tender possession of
7   that phone back to an employee of MCHA?
8          A.    Yes.  I provided it to Pat
9   Saunders when she escorted me out of the
10  office.
11         Q.    You testified earlier today
12  concerning legal pads that you maintained
13  at MCHA.  Do you recall that testimony?
14         A.    Yes.
15         Q.    On your last day of employment
16  with MCHA, were those legal pads still in
17  your possession?
18         A.    Yes.
19         Q.    And on the last day of your
20  employment, did you take those legal pads
21  with you from the office?
22         A.    I did not.  I left probably two
23  dozen legal pads that I had written notes
24  on either in the bottom file drawer of my
25  credenza or in the bookcase opposite my

1              JENNIFER STONE FISCHMAN
2      credenza.
3          Q.    Okay.  Thank you.
4              Do you recall earlier on being
5      asked about meetings with Japanese
6      executives and the cultural formalities
7      concerning those meetings?
8          A.    Yes.
9          Q.    During your meetings with
10     clients from Asia during your tenure at
11     MCHA, were there any cultural issues that
12     you were particularly mindful of during
13     your meetings?
14         A.    Absolutely.
15         Q.    Can you please describe them?
16         A.    It was always very important
17     when we met with -- well, truthfully, I
18     have the same respect for all of my clients
19     whether they are Japanese nationals,
20     ex-pats or Americans, and I would treat
21     them equally with respect and dignity if I
22     was interacting with them.  Having said
23     that, I was also quite mindful of the
24     Japanese business etiquette because when I
25     first started at Mitsubishi back in 2008, I

1          JENNIFER STONE FISCHMAN

2    was unfamiliar with Japanese business

3    etiquette, and I received a book -- I

4    either bought it on Amazon or I had a book.

5    I don't remember where I got it from -- on

6    business etiquette in Japan, and I read

7    that book thoroughly because I wanted to

8    fit in with the culture of this new

9    company.  So, I knew that there were a few

10   things that were very important to Japanese

11   businessmen when they came to America, and,

12   also, when I visited in Japan and when I

13   interacted with them.  One of them was the

14   presentation of the business card.  The

15   presentation of the business card is not

16   like in the U.S. where we just hand over a

17   business card and say, here's my card.  The

18   presentation of a business card is a

19   two-handed clutching of the business card

20   and presented, and I'm doing this because

21   we're on video so you can see -- everybody

22   can see it -- is a two-handed presentation

23   and a two-handed reception from the person,

24   and it isn't just a thank you for your

25   business card.  It is a you want to look at

1          JENNIFER STONE FISCHMAN
2    the card very carefully, restate the
3    person's name, maybe admire the position
4    that they're in to show them that you
5    respect that they are in the position
6    they're in.  It's funny that I still kind
7    of use that practice today when I present
8    my business cards to anybody, but I have a
9    lot Asian clients in Scarsdale in real
10   estate, and I take that opportunity to
11   present my business card in such manner to
12   show them respect of culture -- sorry.  Do
13   you have another question?  I'm sorry.
14        Q.    Did you complete your response,
15   Ms. Fischman?
16        A.    No, not yet.
17        Q.    Okay.  Please continue.
18        A.    I'm sorry.  I was going to just
19   say the other thing that's important,
20   especially in Japan, but sometimes also in
21   the U.S., is the placement of people around
22   a table, and we did talk about this a
23   little bit in the first day of my
24   deposition.  There is a power seat.
25   Sometimes it's the head of the table.

1              JENNIFER STONE FISCHMAN
2      Sometimes it's the center of the table.
3      When Japanese guests arrive or any guests,
4      for that matter, you ask them to decide
5      where to sit.  You frequently don't sit
6      down until they sit down.  Having practiced
7      this over the course of many years, there
8      are certain clients that I had that we had
9      kind of gone through that dance before
10     where, no, you sit down, no, no, no, you
11     sit down, no, no, no, you take the big --
12     the important seat.  No, I'll take the
13     important seat.  If I were more familiar
14     with a client from Japan or visiting from
15     another business, I often would just sit
16     down and frequently they would say,
17     Jennifer, you sit down here.  So, I often
18     took their lead and there were other
19     business cultural things.  One involved
20     drinking beer after the business meeting.
21     We don't need to get into the details of
22     that.
23          Q.     Okay.  Thank you, Ms. Fischman.
24                 Now, you described some of your
25     practices with respect to visiting Japanese

1                    JENNIFER STONE FISCHMAN
2    business men; correct?
3         A.    Yes.
4         Q.    Were you ever visited by any
5    Japanese business women?
6         A.    In 2016 or late '15, and it may
7    have actually been in 2017, there was a
8    newly appointed outside director to the
9    MCHC Board.  She was the first business
10   executive that I had ever met that was a
11   woman from Japan.  There was another woman
12   that I once met maybe back in 2011 who was
13   in sales and marketing for one of the MCC
14   companies, but she was not a director
15   level, and then of course we had our
16   Japanese trainees who came to the office
17   who were, of course, low-level trainees,
18   so, we had two, Miko and Kanako during my
19   tenure.
20              MR. BERMAN:  Okay.  I'm going
21         to pass around an Exhibit now.  I'll
22         guess we'll deem this marked as 34.
23         If you can just take one and pass it
24         along.  And I will identify for the
25         record that the Exhibit deemed marked

1              JENNIFER STONE FISCHMAN

2         as Exhibit 34 is a three-page

3         document bearing Bate-stamped TEF

4         001714 through 1716.  I believe this

5         corresponds to an Exhibit that's been

6         previously presented in this

7         deposition, but because we don't have

8         the physical Exhibits here and we are

9         dealing with a remote Court Reporter,

10        I've had counsel for MCHA make copies

11        for you.

12             (Whereupon, TEF 001714 through

13        001716 was deemed marked as Exhibit

14        34 for Identification as of this date

15        by the Reporter.)

16   Q.    Ms. Fischman, I'm going to show

17   you, if you don't mind, please turn to the

18   very final page of this document, which

19   I'll represent to you is an excerpt of the

20   2015 performance review dated November

21   11th, 2015.  I'd like to turn your

22   attention to the first paragraph of this

23   document referencing the Comtrex

24   litigation.  Do you see that paragraph?

25   A.    Yes, I do.

1              JENNIFER STONE FISCHMAN
2         Q.    Can you tell me whether this
3    narrative concerning the Comtrex litigation
4    accurately reflects your work on that
5    project?
6         A.    No, it does not.
7         Q.    What is inaccurate about that
8    representation of the contract litigation?
9         A.    The paragraph starts out with,
10   first in the contract litigation you blamed
11   the head of an MCC division, the president
12   of the U.S. company, and a junior MCHJ
13   employee for your failure to communicate
14   effectively.  On -- this Comtrex litigation
15   occurred throughout the late 2014, early
16   2015 time frame, and, in fact, I never
17   blamed anyone about anything, and I was
18   responsible in supporting a U.S. company
19   called Mitsubishi Chemical Performance
20   Polymers, and this U.S. company had
21   purchased another U.S. company called
22   Comtrex.  Comtrex had hidden hazardous
23   waste on the site during the walk-throughs
24   of the business prior to purchase, and
25   during the course of post-acquisition there

1              JENNIFER STONE FISCHMAN
2      had been a flood due to torrential rain in
3      the Detroit area where it was located, and
4      those hazardous waste barrels were
5      inundated.  During that time it was
6      discovered that they were hazardous waste.
7      The president of the company asked me for
8      advice on how to deal with Comtrex who they
9      believed had committed fraud by hiding --
10              MS. COLWIN:  I just want to
11          note my objection.  This is
12          privileged information.  If we are
13          going to talk any privileged
14          information, we don't have the
15          ability to waive.
16              MS. FISCHMAN:  Okay.
17              MS. COLWIN:  I'm objecting on
18          the grounds of privilege.
19          A.    So, let me try and sum up
20      instead of getting into the details.  Let
21      me just try and sum up that throughout 2014
22      I had worked on the acquisition.  I had
23      supported this business for many years.  I
24      had communicated all the time with the U.S.
25      president of this business about this

```
 1              JENNIFER STONE FISCHMAN
 2    litigation.  I was in near constant
 3    communication with him about the strategy
 4    and work with outside counsel.  So, this
 5    statement completely and inaccurately
 6    alleges that I blamed somebody else at a
 7    different company for my failure to
 8    communicate effectively.  There was no
 9    failure to communicate effectively, and I
10    was in constant communication with the U.S.
11    president and the head of that MCC division
12    in Japan, and, actually, the MCHJ junior
13    employee that they're referring to here is
14    Kanako Murata, who I already established I
15    had a very, very strong relationship with.
16         Q.    And in connection with that
17    project, did you notify your superior at
18    MCHA concerning the status of the
19    litigation?
20         A.    Absolutely.  Donna was away on
21    a vacation for two weeks during the course
22    of which some questions were raised by the
23    MCC division manager, which was Takimoto,
24    who we have requested to participate and
25    sit for a deposition, but you refused to
```

1       JENNIFER STONE FISCHMAN

2   produce, and I communicated effectively

3   with him and asked him if there was any

4   questions that I can answer for him and

5   provided him with as much information as I

6   possibly could.

7       Q.    Ms. Fischmman, in turning next

8   to the Philtec matter referenced in this

9   document, does this paragraph, the second

10  paragraph there which begins, second, in

11  the Philtec matter, does that paragraph

12  accurately reflect your work on the Philtec

13  matter?

14      A.    No, it does not.

15      Q.    What is inaccurate about the

16  paragraph here?

17      A.    In the Philtec matter, which

18  came to light at the end of August of 2015,

19  this was an allegation of bribery at the

20  border by Philtec, an affiliate of MKIC,

21  and it was raised to Donna's attention and

22  she asked me to investigate.  As part of

23  that investigation, we hired Arnold &

24  Porter of Washington D.C., highly rated,

25  one of the best law firms in the country

```
 1              JENNIFER STONE FISCHMAN
 2    outside of, of course, Gordon Rees and
 3    Shearman & Sterling who are seated here
 4    today, and we asked them with
 5    Spanish-speaking attorneys to conduct an
 6    investigation.  I provided some preliminary
 7    information and data to Donna in September
 8    of what we believed would be the conclusion
 9    after the initial stages of the
10    investigation.  I made no conclusions of
11    law or fact at that time, but merely tried
12    to report the status of the investigation.
13    The investigation continued for another two
14    months, and a report was provided by Arnold
15    & Porter at the end of that investigation
16    in December of 2015, which made all the
17    conclusions of fact and all the conclusions
18    of law.
19         Q.    Thank you.
20               Turning to the next paragraph
21    where it says, third, you exhibited poor
22    judgment with respect to the 4010 filing?
23    Do you see that paragraph?
24         A.    Yes.
25         Q.    Does that paragraph accurately
```

1            JENNIFER STONE FISCHMAN

2    reflect your work on the 4010 filing?

3            A.    No, it absolutely doesn't

4    reflect it at all.

5            Q.    What is inaccurate about that

6    paragraph?

7            A.    So, with respect to the 4010

8    filing, I had been asked to participate in

9    a phone call where it was learned that the

10   actuaries who conduct an extensive study of

11   pension plans across all of our companies

12   to make sure that they fulfill the

13   requirements of the tax -- of the 4010 tax

14   requirement, and determined that they had

15   miscalculated two businesses who had been

16   recently joined into the pension plan, and

17   while on their own they both fulfilled all

18   of the requirements under the 4010

19   individually, in addition, when they were

20   added into the company pension plan, they

21   also fulfilled all the requirements of the

22   pension, but they had separately filed

23   them.  We had numerous conversations with

24   the actuaries.  We had numerous

25   conversations with Winston & Strawn who was

                    JENNIFER STONE FISCHMAN

1    outside counsel on the pension plan that

2    Donna Costa had hired.  I had not been

3    involved in the pension prior to me taking

4    over as acting general counsel, and this

5    was the first engagement that I had on that

6    matter, and Pat Saunders had asked me to

7    listen in on a conversation.  I listened in

8    and we determined that we needed to get

9    more information from Winston & Strawn and

10   more advice on how to move forward on that

11   matter, whether we needed to redo the

12   filing, which would have cost an enormous

13   amount of money because those filings --

14   the actuaries cost about $100,000 for each

15   of those, and nobody wanted to spend that.

16   So, we were trying to find a way to make

17   sure we didn't have to spend that, but

18   notify the IRS that everything complied.

19   Ultimately, we received advice from Winston

20   & Strawn that we followed, and that's all

21   I'll say about that to respect the

22   privilege.

23        Q.    Thank you, Ms. Fischman.

24             In connection with your

1           JENNIFER STONE FISCHMAN
2      providing any advice without revealing the
3      nature or substance thereof, were you
4      unwilling to seek advice from Donna Costa?
5           A.   I was perfectly willing to seek
6      advice from Donna Costa on all of these
7      matters, but she traveled a great deal, and
8      she also tried to avoid me.  And Pat, who
9      had been working with her for many years on
10     the IRS filings and the pension plan, had
11     been in conversation with Donna about this
12     matter, so, it was unnecessary for me to
13     have a separate conversation and waste her
14     time.  Pat had the conversation with her.
15     I then sat through another telephone call
16     and everything was resolved very easily and
17     amicably with no cost to any of the
18     companies.
19          Q.   Turning to the fourth paragraph
20     concerning your interactions with Kelly
21     Tricoli, that's been discussed at length
22     during the more than fourteen hours of
23     testimony today, so, I'm not going to go
24     into detail on that, but I would just ask
25     you whether you have engaged in any

1          JENNIFER STONE FISCHMAN
2     consistently retaliatory behavior against
3     Ms. Tricoli as a result of her complaint?
4          A.    Absolutely not.  I did
5     everything but that.  In fact, as has been
6     discussed prior to today in my testimony, I
7     sought the advice and counsel of a
8     well-respected labor attorney, and he
9     guided my action in every way in order to
10    avoid any liability whatsoever.
11         Q.    Okay.  Let me direct your
12    attention to the last sentence of that
13    paragraph.  It begins, you have refused to
14    cooperate in a manner of your own making
15    and have compromised the interest of the
16    company as a result.  Is that statement
17    accurate?
18         A.    No, it's not accurate at all.
19         Q.    And what is inaccurate about
20    that statement?
21         A.    As we have seen through the
22    documentation and the depositions that have
23    taken place to date, after Kelly Tricoli
24    made her formal complaint to Donna and Pat
25    about a conversation that I had had with

1          JENNIFER STONE FISCHMAN

2    Pat, Donna asked Pat to conduct an

3    investigation of her own conversation.  I

4    objected to the ridiculousness of that idea

5    because it was, how could a person

6    investigate their own conduct?  That was an

7    absolute conflict of interest.  And if we

8    were really going to treat this as a true

9    complaint, rather than her just complaining

10   because she wasn't Donna's assistant

11   anymore and didn't want to be mine, then

12   let's hire a third-party objective outside

13   counsel to interview me on the fact of what

14   actually took place.  And we know from the

15   e-mail that Donna was prohibited by Japan

16   from hiring anybody to investigate it and

17   the matter was subsequently dropped.

18        Q.    And turning to the next

19   paragraph after that that begins, finally,

20   the most recent example of your conduct in

21   the Project Genesis meeting during the

22   go/no go discussion.  Do you see in that

23   paragraph where it mentions you giving a

24   lengthy speech?

25        A.    Yeah.

1              JENNIFER STONE FISCHMAN

2         Q.     Did you give a lengthy speech

3    in connection with the go/no go meeting for

4    Project Genesis?

5         A.     No, I didn't give a lengthy

6    speech.  This was a situation where we were

7    seated around a conference table similar to

8    this one here, and we had had about two

9    days of discussions about the -- about the

10   project.  We had laid out the legal RIF

11   early on in those discussions, maybe the

12   first day of the discussions, and as we

13   were going around the table and when they

14   got to me as the acting general counsel and

15   lead -- I would say lead lawyer on the

16   deal, I actually stated I didn't think it

17   was for me in my role as lawyer to give a

18   go or no go decision because that's not the

19   job of the lawyer.  That's a business

20   decision.  So, I reiterated kind of listing

21   what I thought was a main RIF for everybody

22   to hear them one more time, and for

23   everyone to acknowledge and for me to say

24   to everybody else, listen, we know all of

25   these RIFS exist.  If you all are happy

1          JENNIFER STONE FISCHMAN
2    with the fact -- with your mitigation plans
3    for these RIFS, then you should plan to
4    move forward, that's a business decision,
5    and that is all I said, but this was
6    already when the demotion was already done
7    and this was late October, early November.
8          Q.    In connection with that
9    meeting, do you see in the paragraph where
10   it says, more importantly, you either
11   failed to notice the look of shock on
12   Ciro's face, Ciro, C-I-R-O, or you chose to
13   ignore it, as you kept on pushing your
14   point.  Do you know who Ciro is in
15   reference to?
16         A.    Yes.  I believe that's Ciro
17   Amaguta, the president of Polycap, Inc.
18         Q.    Okay.  And was he in attendance
19   during that meeting?
20         A.    He was.
21         Q.    And in connection with your
22   contributions to the meeting, did you
23   observe his response to your presentation?
24         A.    Yes, I did.  And I did not
25   notice any shock or disbelief.  I was doing

```
 1              JENNIFER STONE FISCHMAN
 2    my job.  I was the lawyer in the room, and
 3    I was brought in specifically to identify
 4    the RIF for the business people and make
 5    sure there were mitigation plans that they
 6    had adopted.
 7         Q.    Was this person you just
 8    mentioned, Ciro, also involved in the
 9    negotiations you had with Kaylin?
10         A.    He was.
11         Q.    And in connection with those
12    negotiations, did you work with Norton
13    Rose?
14         A.    Yes.
15         Q.    And have you seen any of those
16    communications in connection with the
17    filing of this lawsuit?
18         A.    I have.
19         Q.    And do you know whether we have
20    received the entire set of communications
21    concerning the Kaylin negotiation?
22         A.    We have not.
23              MR. BERMAN:  Okay.  I'm going
24         to reserve the right to recall the
25         witness based upon any subsequent
```

```
 1                JENNIFER STONE FISCHMAN
 2           productions for disclosures that are
 3           made.  Subject to that, we have no
 4           further questions at this time.
 5                MS. COLWIN:  I just have a
 6           couple of quick questions for you.
 7      EXAMINATION BY
 8      MS. COLWIN:
 9           Q.   Is it your testimony that you
10      texted messages on your MCHA device that is
11      pertinent to your case?
12           A.   It very well may be, yes.
13           Q.   Can you recall as you sit here
14      today any messages in particular that might
15      be pertinent to your case?
16           A.   I'm sure that I texted on
17      numerous occasions on all of the matters
18      that we have requested all communications
19      during discovery.
20           Q.   What is the nature of the
21      messages that you believe existed on your
22      MCHA device that's pertinent to your case?
23           A.   I frequently communicated with
24      Donna and Nick and other clients I text,
25      and, so, there very well may be
```

1    JENNIFER STONE FISCHMAN
2    discoverable information for my case, and
3    that is for you to review the text messages
4    and send us the ones that are responsive to
5    the document request that we've asked for.
6         Q.    But do you think the messages
7    pertain to cases that you worked on?
8         A.    I think the text messages would
9    pertain to lots of things that we've
10   discussed during the course of this
11   litigation.
12        Q.    I'm trying to determine what is
13   the nature.  List it for us, what you
14   believe the nature of the text messages.
15   If it's pertaining to cases, that's one.
16   Anything else?
17        A.    I think that it would pertain
18   to every matter that I worked on at
19   Mitsubishi.  It would pertain to
20   communications with Donna.  It would show a
21   number of communications with Ms. Tricoli.
22   It would show communications with lots of
23   people that have been put into issue with
24   this case.  We've asked for all this
25   information in our document request.  I

1              JENNIFER STONE FISCHMAN
2    don't think it's necessary to like go back
3    and rehash.  If you want to pull out the
4    document request, we can go through that.
5          Q.    No.  I'm fine.  I'll work it
6    out with your counsel.
7                I know that you mentioned legal
8    pads.  I'm just going to direct this to Mr.
9    Berman.
10                MS. COLWIN:  We have the legal
11          pads here.  Happy to do a D & I
12          whenever you would like.
13                MR. BERMAN:  I think we'll take
14          you up on that.
15                MS. COLWIN:  Sure.  They're
16          literally in Brittany's office.
17                MR. BERMAN:  Okay.
18                MS. COLWIN:  So, whenever you
19          want to do --
20                MR. BERMAN:  We'll discuss that
21          off the record.
22                MS. COLWIN:  Okay.
23                THE WITNESS:  Reserve your
24          right to question every witness --
25                MR. BERMAN:  I'll reserve the

1             JENNIFER STONE FISCHMAN

2     right to factor that into additional

3     questioning as appropriate.  We're

4     reserving our right to ask questions

5     of witnesses who have already been

6     deposed based upon the subsequent

7     disclosures, if appropriate.

8          MS. COLWIN:  We join in that,

9     as well.  If there is any other need

10    to bring witnesses back for the same

11    reason, we will.  We'll ask them.

12        Thank you, Ms. Fischman.  We're

13    set.

14        THE VIDEOGRAPHER:  We are going

15    off the record at 3:12 P.M., and this

16    concludes today's testimony given by

17    Ms. Jennifer S. Fischman.  The total

18    number of units used was one, and

19    will be retained by Veritext.

20        (Whereupon, at 3:12 P.M., the

21    Examination of this witness was

22    concluded.)

23

24        °      °      °      °

25

1

2                    D E C L A R A T I O N

3

4        I hereby certify that having been

5    first duly sworn to testify to the truth, I

6    gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9    transcript is a true and correct transcript

10   of the testimony given by me at the time

11   and place specified hereinbefore.

12

13

14

                 _____

15               JENNIFER STONE FISCHMAN

16

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20___.

20

21

     _____

22       NOTARY PUBLIC

23

24

25

1

2                  E X H I B I T S

3    EXHIBIT              EXHIBIT                     PAGE

4    NUMBER               DESCRIPTION

5    Exhibit 30           Fischman 788 through 834    559

6    Exhibit 31           Fischman 835                559

7    Exhibit 32           Fischman 836 through 838    559

8    Exhibit 33           Fischman 411 through 414    606

9    Exhibit 34           TEF 001714 through 1716     670

10         (Exhibits retained by Counsel.)

11

12                  I N D E X

13   EXAMINATION BY                      PAGE

14   MR. FORTINSKY                       556

15   MR. BERMAN                          662

16   MS. COLWIN                          684

17

18     INFORMATION AND/OR DOCUMENTS REQUESTED

19   INFORMATION AND/OR DOCUMENTS        PAGE

20   Provide page                        592

21

22        QUESTIONS MARKED FOR RULINGS

23   PAGE LINE QUESTION

24   (None)

25

1

2                C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

                              :  SS.:

5    COUNTY OF WESTCHESTER    )

6

7         I, FRANCES FITZPATRICK, a Notary

8    Public for and within the State of New

9    York, do hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 9th day of August, 2021.

21

22

23   _____

          FRANCES FITZPATRICK

24

25

1
2                    ERRATA SHEET
           VERITEXT/NEW YORK REPORTING, LLC
3
     CASE NAME:  Fischman v. Mitsubishi Chemical Holdings America
4    DATE OF DEPOSITION:  July 26, 2021
     WITNESS' NAME: Jennifer Stone Fischman
5
     PAGE/LINE(s)/    CHANGE              REASON
6    ____/_____/_____/_____
     ____/_____/_____/_____
7    ____/_____/_____/_____
     ____/_____/_____/_____
8    ____/_____/_____/_____
     ____/_____/_____/_____
9    ____/_____/_____/_____
     ____/_____/_____/_____
10   ____/_____/_____/_____
     ____/_____/_____/_____
11   ____/_____/_____/_____
     ____/_____/_____/_____
12   ____/_____/_____/_____
     ____/_____/_____/_____
13   ____/_____/_____/_____
     ____/_____/_____/_____
14   ____/_____/_____/_____
     ____/_____/_____/_____
15   ____/_____/_____/_____
     ____/_____/_____/_____
16   ____/_____/_____/_____
     ____/_____/_____/_____
17   ____/_____/_____/_____
     ____/_____/_____/_____
18   ____/_____/_____/_____
19
20                   _____
                     JENNIFER STONE FISCHMAN
21
     Subscribed and Sworn To
22   Before Me This_____Day
     of_____, 20  .
23
     _____
24      Notary Public
25   My Commission Expires_____

| & |
|---|
| **&** 552:5,15 554:17 555:12 556:8 674:23 675:3,15 676:25 677:10,21 686:11 |

| 0 |
|---|
| **001714** 670:4,12 689:9 |
| **001716** 670:13 |
| **08188** 551:6 |

| 1 |
|---|
| **1** 554:17 661:10 |
| **1-10** 551:10 |
| **1/10** 573:3,16 |
| **1/5** 573:15,24 |
| **100** 575:17,19 577:11 |
| **100,000** 677:15 |
| **10001** 552:22 |
| **10004** 552:12 |
| **10022** 552:17 |
| **1135398** 552:14 |
| **11530** 552:7 555:14 |
| **11:00** 574:13 |
| **11:15** 574:13 |
| **11:24** 551:15 |
| **11th** 670:21 |
| **12:30** 603:6 |
| **15** 669:6 |
| **15th** 556:13 559:15 562:20 563:6,10 |
| **16th** 558:5 |
| **1716** 670:4 689:9 |
| **18** 551:6 |
| **19** 564:17 |
| **1:00** 603:10 |

| **1:46** 637:9 |
| **1st** 620:8 623:8,8 |

| 2 |
|---|
| **2,000,000** 575:17 576:18 |
| **2.2** 575:2 |
| **2.3** 575:4 576:20 577:19 |
| **2.3.** 575:12 |
| **2.5** 574:20 |
| **20** 564:17 688:19 691:22 |
| **2008** 665:25 |
| **2011** 669:12 |
| **2014** 671:15 672:21 |
| **2015** 607:19 613:11 621:12 622:3 624:22 626:14,17 643:11 643:15 670:20,21 671:16 674:18 675:16 |
| **2016** 582:13 583:17 619:6 620:8 621:11 622:13 628:12,18 642:25 643:2 644:16 669:6 |
| **2017** 565:17 566:8 566:17 568:20 574:4 582:13 588:4 604:9 669:7 |
| **2018** 564:17 634:14 635:3 |
| **2019** 635:14,15,17 |
| **2020** 635:20 |
| **2021** 551:14 558:4 558:5 563:6 690:20 691:4 |

| **22** 586:12,14 |
| **220** 552:21 |
| **24524** 690:22 |
| **25th** 558:3 |
| **26** 551:14 691:4 |
| **27** 558:21 |
| **28** 558:20 |
| **28th** 552:12 556:13 557:13 |
| **2:04** 637:13 |
| **2:26** 654:19 |
| **2:27** 654:23 |

| 3 |
|---|
| **30** 554:16 558:25 559:4,25 561:14 562:18 563:21 564:7,12 580:20 584:9 689:5 |
| **30th** 565:17 566:7 |
| **31** 558:25 559:7,25 562:18 563:20,22 564:4,6,12 565:5 565:12,22 569:11 572:18 586:12,15 603:16 604:11 689:6 |
| **32** 558:25 559:11 564:10,13,15 580:18 634:7 689:7 |
| **33** 605:18,19,19 606:4 689:8 |
| **34** 669:22 670:2,14 689:9 |
| **35** 565:13 |
| **3:12** 687:15,20 |
| **3rd** 574:5 593:11 |

| 4 |
|---|
| **4/5** 573:2 |

| **4010** 675:22 676:2 676:7,13,18 |
| **411** 605:24 606:2 689:8 |
| **414** 605:24 606:3 606:12 689:8 |

| 5 |
|---|
| **519** 552:6 555:13 |
| **556** 689:14 |
| **559** 689:5,6,7 |
| **592** 689:20 |
| **599** 552:17 |
| **5th** 574:12 |

| 6 |
|---|
| **600** 552:6 555:13 |
| **606** 689:8 |
| **662** 689:15 |
| **670** 689:9 |
| **684** 689:16 |
| **6th** 575:10 |

| 7 |
|---|
| **7/27/2020** 636:4 |
| **7/3/2020** 636:3 |
| **788** 557:20 559:2 580:21 689:5 |
| **789** 560:6 591:14 591:16 592:17 594:5 595:2,20 |
| **791** 597:14 598:8 |
| **7th** 575:10 607:18 |

| 8 |
|---|
| **804** 607:10,13 |
| **807** 611:8 |
| **817** 611:24 |
| **818** 614:4 |
| **819** 616:4 |
| **824** 560:6 561:12 591:17 592:17 594:5 |

**825** 618:18,19
**826** 618:15,17,19
  618:21
**827** 586:18,18,19
**828** 588:5
**830** 618:14 620:2,5
**831** 620:5
**833** 628:25
**834** 557:21 559:3
  561:12 633:4
  689:5
**835** 557:23 559:6
  689:6
**836** 557:25 559:9
  634:9,24 689:7
**837** 635:12,24
**838** 558:2 559:10
  634:10 635:24
  636:24 689:7

**9**

**9:30** 565:16
**9th** 690:20

**a**

**a.m.** 551:15
**ability** 672:15
**absence** 632:11
**absolute** 680:7
**absolutely** 638:25
  665:14 673:20
  676:3 679:4
**absorb** 647:16
**accepted** 599:15
  627:17
**access** 663:13,15
**accurate** 679:17
  679:18
**accurately** 627:14
  671:4 674:12
  675:25

**accusation** 649:9
  656:5,22
**accusations**
  647:21 655:9
**accuse** 645:5
**accused** 646:4,20
  646:24 647:5,22
  648:4,9
**accusing** 645:14
  648:13 649:5,6
**acknowledge**
  681:23
**acquisition** 610:6
  671:25 672:22
**acting** 593:8
  599:17,21,25
  601:25 602:12,13
  602:15 615:11
  617:8 631:5 677:5
  681:14
**action** 551:6
  567:12,15 679:9
  690:16
**activities** 596:14
  596:20
**activity** 661:9
**actual** 576:4 625:8
  636:21
**actuaries** 676:10
  676:24 677:15
**ad** 628:6
**added** 600:9
  676:20
**addition** 676:19
**additional** 561:10
  687:2
**address** 555:8,11
**adjust** 609:15
**administer** 554:11
**administrative**
  630:18 631:2,9,17

**admire** 667:3
**admit** 560:4
**admitted** 562:13
**adopted** 683:6
**advance** 578:24
  630:6
**advice** 612:15
  613:18 615:19
  617:5,13 649:4
  651:24,24 672:8
  677:11,20 678:2,4
  678:6 679:7
**advised** 626:22
**advising** 613:21
**affiliate** 650:4,5
  651:17 659:22
  674:20
**affiliates** 583:7,23
  608:16 655:20
**afield** 620:17,20
**afraid** 638:4
**afternoon** 575:5
**age** 642:9
**agent** 564:21
**ago** 625:10 660:5
**agree** 570:9
  577:11 579:8,15
  607:23 611:22
  647:24
**agreed** 554:5,20
  575:4 576:21
**agreement** 551:21
  579:14
**agreements**
  621:20 650:13
  652:21,21
**ahead** 575:11
**allegation** 660:24
  660:24 674:19
**allegations** 659:16

**alleged** 661:8
**alleges** 673:6
**allen** 630:2
**allocation** 586:8
**allowed** 641:12
**alternative** 602:11
**amaguta** 682:17
**amazon** 666:4
**amber** 621:20
  622:11,13 623:13
  625:23 626:10
  627:23 628:13
  637:20 642:2,12
  642:20 644:5
**america** 551:8
  552:11 652:19
  654:2 666:11
  691:3
**american** 659:21
**americans** 609:8
  665:20
**amex** 636:20
**amicable** 591:12
**amicably** 591:9,13
  678:17
**amount** 579:14
  677:14
**andrew** 594:11
**andy** 582:13 654:5
**angry** 640:3,10,12
  640:13,21,25
  645:7 646:4,19
  647:5,15 649:11
**announced** 593:12
**announcement**
  613:13
**answer** 557:9
  559:22 562:5
  567:17 582:9
  590:24 591:5
  624:15 627:14

632:15 643:4,5
648:21 650:21
654:13 657:5,24
657:25 658:10,11
658:12,17 659:3,5
662:23 674:4
**answers** 617:25
632:17 655:3
661:22
**anticipation** 582:8
**antithetical** 624:7
**anybody** 557:13
558:18 615:6
630:15 650:6
652:11 667:8
680:16
**anymore** 680:11
**anyway** 652:6
**apart** 661:12
**apologize** 575:21
**apologized** 577:14
577:15
**apology** 576:3
**appeal** 605:23
606:10
**appeared** 640:3
**appears** 607:14
**application** 588:15
589:10
**applications**
562:12 633:20,21
**applied** 564:12
588:12,21 589:5
**applies** 564:4
**appointed** 669:8
**appreciate** 555:19
652:7
**appreciated**
644:23
**appropriate** 687:3
687:7

**approved** 630:13
**approximately**
565:16
**april** 613:10 637:4
**area** 590:16,19
672:3
**arnold** 674:23
675:14
**arrange** 630:10
631:24
**arrangement**
632:14
**arrangements**
631:3
**arrive** 668:3
**arrived** 581:13
630:20
**arrow** 597:15
**asia** 665:10
**asian** 667:9
**aside** 580:5
**asked** 561:5 562:4
564:22 566:21
574:5,6 590:20,22
593:6 615:24
617:21 620:18
624:6 626:16
629:22 630:3
631:19 632:12
660:6 665:5 672:7
674:3,22 675:4
676:8 677:7 680:2
685:5,24
**asking** 557:8
571:3,4 574:23
620:21 632:13
661:12
**assign** 583:9
**assigning** 583:4
**assist** 569:20

**assistant** 617:6
618:25 629:23
630:19 631:18
632:6 680:10
**assistants** 631:9
**assisting** 610:10
**associated** 564:19
**assume** 614:2
**assumed** 598:22
**attached** 606:12
**attachment** 635:7
**attempted** 597:22
**attendance** 682:18
**attention** 670:22
674:21 679:12
**attorney** 562:3
568:5 582:8 605:7
624:14 654:10,12
679:8
**attorneys** 552:5,10
552:16,20 556:25
557:14 584:2
595:9 675:5
**august** 674:18
690:20
**auth** 573:14
**authenticated**
629:12,17,21
630:5
**authority** 575:11
576:14,22 577:21
579:5,7,9,13,16,19
579:22 580:2,13
636:12 639:2
**authorization**
578:10,11,16,22
578:24
**authorized** 554:11
573:15 575:14,16
575:17 576:23,24

**avenue** 552:17,21
**avoid** 678:8
679:10
**aware** 628:10,20
628:24 643:9
644:2,8 649:19,22
650:6 656:3,21
657:6,15,21 658:4
658:21 659:12,13
659:18,24

## b

**b** 689:2
**baby** 619:6,13,15
**back** 565:3 588:18
588:19 591:14
603:10,12 606:24
614:23 623:8
624:17 625:5,6
627:7 629:17
630:5 637:13
638:23 642:6
647:17 654:23
655:2,6 662:3,8
664:7 665:25
669:12 686:2
687:10
**backfill** 622:18
**bad** 649:4
**bags** 560:22
**barrels** 672:4
**base** 615:13
**based** 583:11
613:18,20 621:17
625:12,23 641:4
642:9 654:15
683:25 687:6
**bases** 650:23
**basis** 567:9 583:6
596:21 597:5
601:7 628:2
635:10,16 639:12

639:18 641:24
642:14 648:8
650:21 651:4
**bat** 599:21
**bate** 670:3
**battery** 552:12
**bearing** 670:3
**beautiful** 619:20
**becoming** 568:20
616:16
**bedroom** 561:4
**beer** 668:20
**beginning** 605:20
**begins** 674:10
679:13 680:19
**behalf** 580:11
**behavior** 679:2
**belief** 625:11
626:4,9 642:11,14
**believe** 566:5,11
567:8 574:6,21
576:7 588:2,22
589:6,7 597:5
599:22 604:9
606:19 619:7
622:12 624:8
626:17 627:7,21
627:23 628:4,7
630:8 635:2,9
639:25 640:16
641:10,15 643:13
645:2 652:4 654:8
670:4 682:16
684:21 685:14
**believed** 576:24
600:21 641:8
672:9 675:8
**beneath** 572:25
589:3
**benefit** 625:24,25

**berman** 552:7
555:11 557:8
561:25 565:9
567:16 568:2,22
574:17 575:10,23
582:5 602:20,25
617:18 624:11
627:4,20 628:19
641:23 644:19
645:8 646:6,22
647:7 648:15,19
655:22 656:8
657:19 658:16
660:14,22 661:6
662:2,7,9,13
669:20 683:23
686:9,13,17,20,25
689:15
**best** 571:16 674:25
**better** 598:7
609:20
**beyond** 610:7
**bienemi** 622:13
**bienemy** 638:22
**big** 597:24 618:6
632:15 668:11
**bigger** 593:20
**bit** 630:25 667:23
**blamed** 671:10,17
673:6
**blood** 690:16
**board** 605:23
606:10,15 612:11
612:19 669:9
**book** 666:3,4,7
**bookcase** 664:25
**border** 674:20
**bottom** 589:2
596:12 598:8
608:3 635:20
664:24

**bought** 593:13,24
666:4
**bound** 556:16
**brazil** 582:15
585:2
**break** 602:20,23
602:23 603:14,14
637:6,17 649:7
**breaking** 649:6
**brian** 630:25
631:13,14
**bribery** 674:19
**brief** 637:6 662:15
**bring** 629:17
630:5 687:10
**brittany** 552:13
**brittany's** 686:16
**broad** 585:4
**broadly** 583:25
**brought** 609:19
630:23 683:3
**budget** 615:14
**build** 608:21
**building** 595:5
611:3 630:15
**bullet** 595:20
598:4
**bulletpoints**
596:19 597:10
**bunch** 561:3
**buried** 560:7
**business** 573:21
573:22 578:2
584:13,16 609:12
609:25 610:2,8,21
616:7,13 628:22
629:10 638:18,21
639:23 645:17,18
646:14,15 662:22
662:25 665:24
666:2,6,14,15,17

666:18,19,25
667:8,11 668:15
668:19,20 669:2,5
669:9 671:24
672:23,25 681:19
682:4 683:4
**businesses** 676:15
**businessmen**
666:11
**busy** 631:6

**c**

**c** 552:2 553:2
555:3,12 682:12
688:2 690:2,2
**calendar** 615:4
**california** 572:9
608:13 622:2
627:12
**call** 571:12 574:7
586:23 592:10
624:12 630:20
632:3 676:9
678:15
**called** 555:3
615:15 638:9
671:19,21
**calling** 641:2
**calls** 568:4
**calm** 611:20
**cancer** 619:2
**capacities** 551:9
551:10,11
**car** 572:11
**card** 666:14,15,17
666:17,18,19,25
667:2,11
**cards** 667:8
**care** 631:4
**cared** 618:12
**career** 602:8 638:8

carefully   667:2
carlos   553:7
cartridges   610:4,9
case   562:9 567:12
    575:20 576:15
    578:19 579:25
    580:6 651:12
    660:10 684:11,15
    684:22 685:2,24
    691:3
cases   655:15,16,19
    655:21 685:7,15
catherine   582:12
caused   567:23
    568:18
cbre   589:21,24
    590:11,13
cell   663:18
center   668:2
central   614:24
certain   568:19,21
    578:25 579:5
    583:7 668:8
certainly   578:7
certification   554:8
certify   688:4,8
    690:9,14
cetera   595:22
    599:6
challenging
    591:11
change   568:18
    691:5
changed   624:2
changing   595:16
charge   586:8
charged   619:11
charges   636:4
chemical   551:8,8
    552:11,16 573:23
    576:10,11 652:19

671:19 691:3
chief   616:16
chose   682:12
chosen   599:21
circuit   661:12
circumstances
    558:8,11 618:16
    620:10,11 629:5
    646:10 651:18
ciro   682:12,14,16
    683:8
ciro's   682:12
city   552:7 555:14
civil   551:6,21
clarick   552:20
clarify   573:4
    586:25 602:6
    617:25 649:5
    650:3,15 660:2
clarity   576:8
clean   596:5 605:11
cleansing   624:19
clear   598:5 616:17
clearly   609:23
client   562:3
    576:11,12,13
    578:12,17 579:10
    582:18,23 654:10
    654:12 668:14
clients   577:22
    578:10,15 580:11
    580:16 584:8
    585:17 601:13
    608:15,17 611:4
    665:10,18 667:9
    668:8 684:24
close   618:25 635:3
    635:14
closet   560:8
closing   649:15

clumped   636:7
clutching   666:19
code   616:15
    617:11
colleague   595:13
collection   557:21
    615:13
collegial   570:15
    571:11,14 572:2
columns   581:13
colwin   552:13
    672:10,17 684:5,8
    686:10,15,18,22
    687:8 689:16
combination
    569:7 650:22
come   560:9 565:3
    574:10,25 575:3,6
    610:15 629:15,23
    630:4 635:19
    639:16 650:25
comes   631:22
comfortable
    595:19
coming   576:22
    608:9 609:6
    630:16,17
commission
    691:25
committed   672:9
common   578:9
communicate
    577:18 598:2
    611:16 671:13
    673:8,9
communicated
    637:25 672:24
    674:2 684:23
communicating
    579:3

communication
    595:21 596:7
    597:16,20 638:10
    673:3,10
communications
    562:3 570:5,8
    572:2 580:15
    596:11 597:7
    609:15 663:3,5,6,9
    663:19,22 683:16
    683:20 684:18
    685:20,21,22
companies   581:3
    582:11,11,12
    586:2,7,10,15
    629:14 633:18
    651:25 652:17
    653:5 654:4
    655:24 669:14
    676:11 678:18
company   570:20
    584:14 588:12
    589:4,7 600:10
    603:19 604:15,17
    606:17 620:23,24
    621:3,15,20 622:3
    622:10,16,20,21
    623:23 625:19
    626:22 627:22
    628:23 629:23
    638:2 641:13,15
    642:17 643:22
    645:19 648:24
    649:20 650:8,18
    651:14 652:5,14
    653:23 656:11
    657:4,4,10,13,23
    662:18 666:9
    671:12,18,20,21
    672:7 673:7
    676:20 679:16

complainants
654:8
complained 650:7
650:24 651:19
652:4,14 653:15
657:16 660:12
complaining
649:23 657:22
658:7,14,23 660:8
661:8,16 680:9
complaint 567:21
656:17 658:19
660:10,11,16,24
661:13,15,19
679:3,24 680:9
complaints 650:15
653:22 654:7
656:18 657:11,12
661:4
complete 667:14
completely 578:20
673:5
compliance 592:4
592:5 616:14,16
complied 677:19
compromised
679:15
computer 596:5
615:8,9 634:5
comtrex 670:23
671:3,14,22,22
672:8
concentrated
583:25
concern 569:8
651:5
concerned 599:20
600:2 637:20
concerning 628:17
628:21 664:12
665:7 671:3

673:18 678:20
683:21
concerns 591:21
651:6 652:24
concluded 687:22
concludes 687:16
conclusion 675:8
conclusions
675:10,17,17
condolences
619:19
conduct 616:15
617:11 662:21
675:5 676:10
680:2,6,20
conducted 663:2
conference 551:17
552:3 576:17
577:3 681:7
confirmed 638:5
conflict 623:17,17
623:18 628:17
680:7
confusing 573:8
congratulatory
613:17
connection 578:2
619:19 652:12
673:16 677:25
681:3 682:8,21
683:11,16
consider 601:24
consist 561:2
consistently 679:2
constant 673:2,10
consulate 629:13
629:16
consult 654:15
contact 569:6
contacted 569:5
622:20

contain 663:18,22
continue 667:17
continued 551:17
553:2 675:13
contract 671:8,10
contractor 564:18
contrary 600:15
contributions
682:22
conversation
571:2,5 574:15,16
576:19 577:10
584:20 585:11
587:12 597:2
598:12,14 601:2
640:8 645:16
648:23 649:8
659:9 677:8
678:11,13,14
679:25 680:3
conversations
570:15,20,23
571:12,14 584:4,7
584:12 585:6
592:19 593:4,25
594:4 676:23,25
cool 611:20
cooperate 679:14
copied 562:17
copies 603:24
604:21 670:10
copy 554:14,17
565:19 566:4,9
567:4,11 591:24
592:6 604:14,17
605:11 606:23,24
607:2 618:19,21
corner 594:25
corp 573:23
608:12

corporation 551:8
552:16 556:9
576:12 601:23
correct 578:3
611:12 626:3,16
627:3,19 641:22
644:3,9,18 657:18
669:2 688:9
corresponds 670:5
cost 677:13,15
678:17
costa 551:9 552:11
552:21 594:6
601:4 607:15,22
607:24 612:2
613:19 639:6,7,10
663:7,20 677:3
678:4,6
costa's 611:11
612:15
counsel 554:6,17
559:14 560:3,24
561:6,18,23,25
563:15 574:17
582:17 591:7
593:8 599:18,19
600:8 602:2,7,12
602:14,15,21
604:5 611:5 617:6
617:8 631:5,6
638:2,12 654:15
670:10 673:4
677:2,5 679:7
680:13 681:14
686:6 689:10
counterparties
642:16
countries 629:11
country 552:6
555:13 674:25

county 690:5
couple 566:15
  621:12 684:6
course 556:18
  586:7 611:23
  618:4 649:18
  650:11 651:3
  662:16 664:5
  668:7 669:15,17
  671:25 673:21
  675:2 685:10
court 551:2
  554:13 607:7
  655:2 670:9
courts 629:13
cover 593:21
create 581:9,22
  582:3 595:8
  608:21,25 609:5
  620:22 622:7
created 581:11,16
  620:7 634:25
  635:4,12,13,24
credenza 664:25
  665:2
critical 614:14
critically 614:6
  615:17
cross 642:8
cultural 665:6,11
  668:19
culture 666:8
  667:12
customer 622:7,9
  622:10
cut 648:17 658:10
cv 551:6

**d**

d 554:2 686:11
  688:2 689:12

d.c. 674:24
dan 621:22 622:2
  622:6 626:25
  643:10
dance 668:9
dark 568:25
data 562:21
  594:18,22 618:3
  675:7
database 614:24
  615:4,12
date 551:14,22
  559:5,8 594:15
  604:7 606:5
  607:18 612:4,5
  619:17 670:14
  679:23 691:4
dated 670:20
daughter 619:20
davis 590:12
day 556:20,20,23
  557:19 572:10
  575:7,8 592:25
  596:4 600:8
  619:12 620:12
  630:8 661:10
  663:25 664:6,15
  664:19 667:23
  681:12 688:19
  690:20 691:22
days 554:16
  566:11,15 576:25
  604:25 632:9
  681:9
deal 564:19 600:5
  627:22 632:16
  640:8 672:8 678:7
  681:16
dealing 636:16
  670:9

december 593:11
  675:16
decide 567:14,19
  668:4
decided 567:12
decision 567:24
  568:11,13 623:12
  681:18,20 682:4
deem 558:13
  669:22
deemed 559:3,6,10
  606:3 669:25
  670:13
defendant 552:16
  552:20
defendants 551:12
  552:10
defensive 647:2,15
deference 572:12
  572:13,16
deficiencies
  569:21
definitely 572:7
  584:11 652:22,22
deleting 595:21
  596:7
demeanor 641:6
demotion 592:4
  599:24 682:6
department
  579:12 587:22
  595:6,9 596:8,14
  596:21 611:15
  614:9,18 623:21
  636:2 650:17
  651:11
department's
  611:4
departments
  614:19

departure 641:7
depending 651:13
deposed 687:6
deposition 551:18
  554:8,9,14 556:13
  556:17,24,25
  557:13,19 574:3
  591:3 667:24
  670:7 673:25
  691:4
depositions 577:7
  577:8 679:22
describe 558:13
  665:15
described 597:12
  668:24
description 689:4
desk 593:16
  624:18
detail 564:25
  678:24
details 668:21
  672:20
determine 685:12
determined
  676:14 677:9
detroit 672:3
develop 609:24
developed 586:4
  619:2
development
  654:3
device 684:10,22
dialogue 570:16
  609:24
diego 576:17
difference 579:2
different 559:22
  559:22 561:9
  578:20 583:2,6
  586:17 591:8

593:22 612:8,9
616:24 617:3,4
634:17,19,20,22
642:3,4 646:9
673:7
**differently** 623:3
623:20 626:10
627:16 641:14,18
641:20 642:15
644:5 646:9
647:13
**difficult** 632:18,22
633:2
**difficulty** 579:3
**digital** 636:5
**dignity** 645:21
665:21
**direct** 569:17
601:12 679:11
686:8
**direction** 591:8
614:17
**directly** 606:17
**director** 566:9
609:22 638:18,20
669:8,14
**disagreed** 623:24
**disbelief** 682:25
**disclosures** 684:2
687:7
**discover** 563:10
563:11,22
**discoverable**
685:2
**discovered** 560:12
672:6
**discovering**
560:18
**discovery** 684:19
**discriminated**
644:22

**discriminating**
645:25 659:15
**discrimination**
567:10 641:16
645:11 653:16
656:6,22 657:17
657:23 658:8,14
658:18,23 659:16
660:8,12 661:4,5
661:17
**discriminatory**
623:25 644:18
648:25
**discuss** 557:6
624:4 638:15
686:20
**discussed** 556:24
557:5,6,7,12 577:5
603:13 639:15
678:21 679:6
685:10
**discussing** 564:11
637:16
**discussion** 580:7
620:14,16 637:11
638:24 642:19
654:21 680:22
**discussions** 583:21
589:8 623:11
681:9,11,12
**dispute** 578:9
**disputes** 578:3,6
578:14
**distributed** 583:24
**distribution**
626:19
**district** 551:2,2
**division** 671:11
673:11,23
**docs** 615:15

**document** 562:8
565:7 566:4,6,12
581:10,12,23
582:4 605:20
606:7,8,12,15
620:19 629:2,15
629:21 634:21
670:3,18,23 674:9
685:5,25 686:4
**documentation**
679:22
**documented**
620:16
**documenting**
635:14
**documents** 557:18
557:22 559:14,17
559:23 560:5
561:10 562:8,11
562:16,19 563:9
563:11,13 565:10
577:9 606:20
614:25 615:7
621:19 629:12,24
631:8,8 634:9,20
634:20,23 635:23
653:10 689:18,19
**doing** 584:14
618:7 620:23,25
628:22 635:15
637:3 638:3
640:23 645:5
646:25 648:4,24
666:20 682:25
**donna** 551:9
552:11,21 593:8
593:25 594:6
595:21 596:2
598:15 600:13
601:4,20 607:15
607:22,24 611:11

612:2,14 613:11
613:18 614:10
615:21 616:12
617:5 618:2
623:11 630:24
631:15 639:6,7,10
639:15 656:24,24
673:20 675:7
677:3 678:4,6,11
679:24 680:2,15
684:24 685:20
**donna's** 597:23
615:19 631:17
674:21 680:10
**door** 593:2 632:15
632:17
**doorway** 574:14
**doubt** 572:8
**downloaded** 618:3
**dozen** 651:25
652:17,17 664:23
**dozens** 652:20,20
**drawer** 664:24
**drinking** 668:20
**drive** 615:8
**dropped** 631:8
680:17
**drove** 572:9,12
**due** 672:2
**duly** 555:4 688:5
690:11
**dumps** 594:18,22

| e |
| --- |

**e** 552:2,2 553:2,2,6
553:6 554:2,2
555:2,2,2 574:6,18
575:22 576:5,7
597:10 613:9
629:6 631:20
653:6 663:13,16
663:19 680:15

688:2 689:2,12
690:2,2
**earlier** 561:21
562:8,10 574:3
591:3 594:19,23
616:20,21 617:10
620:12 621:6,25
637:2 664:11
665:4
**early** 560:15
566:16 567:25
568:10 581:24
595:15 604:7
605:8 621:12
622:12 643:2
671:15 681:11
682:7
**easily** 678:16
**eeoc** 568:16
624:24
**effect** 554:12,15
**effectively** 671:14
673:8,9 674:2
**eighteen** 570:18
**either** 556:20
629:12 651:11
664:24 666:4
682:10
**electronic** 562:11
562:21
**electronically**
634:2
**elevated** 595:13
**emotionally** 619:8
619:11
**empathetic** 610:13
**employee** 566:23
572:3 621:3,21
628:10 641:13
642:18,24 643:9
650:20 651:3,17

651:19 652:24
656:4,21 657:3,16
658:22 659:14
664:7 671:13
673:13
**employees** 610:23
621:14,23 622:6
622:23,24 627:19
641:14,19,21,25
642:9 643:20,25
644:8 645:12,21
653:21 655:11
656:13 660:7
**employment**
651:24 662:17
664:15,20
**enabling** 649:7
**encountered**
640:22
**encourage** 585:15
585:18
**ended** 640:7
**engaged** 659:7
678:25
**engagement** 677:6
**english** 609:16,17
609:19
**enormous** 677:13
**entered** 636:8
**enterprise** 583:8
583:24
**entire** 602:8
627:21 660:23
683:20
**entries** 635:20
**envelope** 618:19
**equally** 622:25
626:23 665:21
**errata** 691:2
**escorted** 664:9

**especially** 610:16
667:20
**esq** 552:7,8,8,13
552:13,18,18,22
**essentially** 640:14
**establish** 597:16
597:19 617:22
621:25
**established** 673:14
**establishing**
595:15
**estate** 564:20
667:10
**et** 595:21 599:5
**ethics** 616:14
**etiquette** 665:24
666:3,6
**evaluations** 570:6
**event** 607:21
**eventually** 567:14
584:17 599:18
**everybody** 581:15
666:21 681:21,24
**evident** 616:7
**ex** 566:10 665:20
**exactly** 568:23
572:20 611:21
625:7
**examination** 556:4
662:12 684:7
687:21 689:13
690:10,12
**examined** 555:6
**example** 584:22
591:21 610:2
657:6 680:20
**examples** 633:18
655:8
**excerpt** 670:19
**exchange** 629:6

**exchanged** 653:6
**exclusively** 662:24
**excuse** 615:2
**executive** 599:8
612:11,24 669:10
**executives** 576:2
665:6
**exemplary** 566:22
**exercise** 627:24
**exhausted** 660:21
**exhibit** 557:20,23
557:24 558:17,18
559:4,7,11,24
561:14 562:18
563:20,21,22
564:4,6,7,10,13,15
565:5,12,22
569:10 572:18
580:18,20 584:9
603:16 604:11
605:18,19 606:4
634:7 669:21,25
670:2,5,13 689:3,3
689:5,6,7,8,9
**exhibited** 675:21
**exhibits** 557:17
558:3,8,25 559:13
564:12 607:5
670:8 689:10
**exist** 645:3 681:25
**existed** 684:21
**expect** 599:16
**expenses** 564:16
564:19,22 565:2
635:14
**experience** 570:19
600:9 614:20
**experienced**
619:17
**expertise** 583:12

expires 691:25
explain 609:10
explained 564:17
  574:2 591:2
  610:20
explains 564:25
express 619:18
extensive 676:10
extent 601:14
  612:17 624:12
eye 570:21,21,21
  570:21 616:24

**f**

f 554:2 555:2,3
  642:5 690:2
face 682:12
fact 561:20,22
  563:15 570:17
  596:24 597:19
  600:14 615:13
  625:23 671:16
  675:11,17 679:5
  680:13 682:2
factor 687:2
factual 568:6,9
failed 615:9
  682:11
failure 671:13
  673:7,9
fair 578:8,13
  597:8 608:2
  640:20
fake 647:19
false 620:22
familiar 612:11
  668:13
far 575:3 620:17
  620:20
fear 638:5
february 566:17
  567:25 568:10,20

581:24 593:11
  605:10 622:12,12
  623:5
fed 566:10
federal 551:21
feedback 569:20
  569:25 570:4,10
  571:8,10,13
feel 559:23 616:2
  647:2,15
felt 599:25 600:4,7
  600:11 620:21
female 641:21
fifth 552:21
file 552:14 562:23
  563:16 566:10,20
  566:21 567:3,11
  603:18,22,25
  604:13 605:12
  652:12 664:24
filed 568:16
  676:22
filing 554:7 675:22
  676:2,8 677:13
  683:17
filings 677:14
  678:10
final 670:18
finally 680:19
finance 609:22
find 632:18 653:8
  677:17
fine 603:4 619:12
  686:5
finish 637:7
fired 572:11
firm 558:10
  655:18
firms 674:25
first 555:4 556:20
  557:19,19 558:2

574:4 581:13
  587:16 588:10
  596:2,14 599:23
  604:4 605:21
  611:9,13 618:15
  618:16 620:15
  621:10 638:6,7
  640:11 657:21,24
  665:25 667:23
  669:9 670:22
  671:10 677:6
  681:12 688:5
fischman 551:3,19
  551:19 552:6
  555:1,10 556:1,6
  557:1,20,21,23,25
  558:1,2 559:1,2,3
  559:6,9,10,12
  560:1 561:1 562:1
  563:1 564:1 565:1
  566:1 567:1 568:1
  569:1 570:1 571:1
  572:1 573:1 574:1
  575:1 576:1 577:1
  578:1 579:1 580:1
  581:1 582:1 583:1
  584:1 585:1 586:1
  587:1 588:1 589:1
  590:1 591:1 592:1
  593:1 594:1 595:1
  596:1 597:1 598:1
  599:1 600:1 601:1
  602:1 603:1 604:1
  605:1,24 606:1,2,7
  606:12 607:1,13
  608:1 609:1 610:1
  611:1 612:1 613:1
  614:1 615:1 616:1
  617:1 618:1 619:1
  620:1 621:1 622:1
  623:1 624:1 625:1

626:1 627:1 628:1
  629:1 630:1 631:1
  632:1 633:1 634:1
  635:1 636:1 637:1
  637:15 638:1
  639:1 640:1 641:1
  642:1 643:1 644:1
  645:1 646:1 647:1
  648:1 649:1 650:1
  651:1 652:1 653:1
  654:1 655:1 656:1
  657:1 658:1 659:1
  660:1 661:1 662:1
  662:14 663:1
  664:1 665:1 666:1
  667:1,15 668:1,23
  669:1 670:1,16
  671:1 672:1,16
  673:1 674:1 675:1
  676:1 677:1,24
  678:1 679:1 680:1
  681:1 682:1 683:1
  684:1 685:1 686:1
  687:1,12,17
  688:15 689:5,6,7,8
  691:3,4,20
fischmman 674:7
fit 593:14 666:8
fitzpatrick 551:23
  690:7,23
five 596:19 597:10
  656:12
flippant 632:5
flood 672:2
floor 552:12
fluent 584:24
focus 611:17
focused 562:11
  569:2
folded 624:16

**folder** 562:16
564:2
**folks** 609:6
**follow** 603:13
637:15
**followed** 677:21
**following** 575:8
**follows** 555:6
558:11 598:10
**foot** 593:3
**force** 554:15
610:10,15 621:7
621:13 624:21
626:12 627:3,6,9
627:10,13 628:12
628:18 642:6
**foregoing** 688:8
**foreign** 629:10
**forever** 628:6
**forget** 646:14
**forgotten** 577:17
**form** 554:21 565:9
567:16 568:3,22
575:23 582:5
588:17 617:18
624:11 627:4,20
628:19 641:23
644:19 645:8
646:6,22 647:7
648:15 655:22
656:8 657:19
658:16 660:14
**formal** 642:5,5
679:24
**formalities** 665:6
**forth** 570:6 690:11
**fortinsky** 552:18
555:17 556:5,7
558:6,15,23
565:12 568:8
592:10 602:22

603:3 605:17
637:5 649:13,17
654:14,25 660:25
661:24 662:4
689:14
**forward** 577:19
677:11 682:4
**forwarded** 574:18
**found** 561:9,16
586:25 587:3
630:22 631:13
**four** 596:19
597:10 605:20
**fourteen** 678:22
**fourth** 643:17
678:19
**frame** 642:7
671:16
**frances** 551:23
555:18 558:6
690:7,23
**frankly** 600:13
640:12
**fraud** 672:9
**free** 559:23
**frequently** 571:22
599:4 609:9,18
629:11 650:16
651:8 668:5,16
684:23
**front** 557:17
**fujiwara** 598:23
**fulfill** 676:12
**fulfilled** 676:17,21
**full** 600:7 632:10
643:19
**fully** 562:14
**fumble** 631:2
**funny** 667:6
**further** 554:20
560:25 596:25

624:4 638:14
639:4 649:14
661:25 684:4
688:8 690:14
**future** 610:6

**g**

**g.c.** 615:11
**garden** 552:7
555:14
**gc** 590:5,11
**gender** 567:10
642:9 648:8
**general** 571:3
580:16 582:17
591:7 593:8
596:20 599:18,19
600:8 601:25
602:7,12,13,15
611:5 614:19
617:6,8 631:5,5
637:25 638:12
677:5 681:14
**generalization**
647:11,12
**generally** 558:10
628:16 638:9
647:14
**generation** 564:20
**genesis** 680:21
681:4
**genex** 582:15
**genomatica**
573:22 574:8
580:5
**gentleman** 629:24
**getting** 569:2
672:20
**give** 564:22 585:16
585:18,20 586:6
618:9 651:8
660:16 681:2,5,17

**given** 561:17
564:24 566:5
570:17 579:2
602:11 617:5
621:5 642:24
687:16 688:10
690:13
**giving** 680:23
**glendale** 608:13
621:23
**global** 590:6
**go** 560:13 575:3,11
586:16,17,18
588:16 594:12,13
625:5,6 627:6
638:23 644:12
645:14 652:2
660:16 678:23
680:22,22 681:3,3
681:18,18 686:2,4
**going** 558:16
569:9 578:18
593:12 595:6,16
598:15 600:19,22
601:15,16,19
610:7,9,11,14,18
614:18 615:12
630:7 631:3,21
638:25 641:4
646:2 649:2,10,10
654:9,12 659:8,21
667:18 669:20
670:16 672:13
678:23 680:8
681:13 683:23
686:8 687:14
**good** 556:6 574:21
574:22 602:25
609:18 618:25
621:17

gordon 552:10 656:16 675:2
graphics 610:6
great 564:19,25 577:5 678:7
grew 585:5
grounds 567:21 568:3 672:18
group 582:19,20 582:23 583:5,11 584:5 585:22 591:8
grow 599:17 600:13,14,17
gueron 552:20,22
guess 568:17 601:19 606:25 614:8 662:4 669:22
guests 668:3,3
guidance 569:20 569:25 570:4,10 570:16,23 571:8 571:10,13,20,24 611:12 612:21,23
guided 679:9
guidelines 624:25
guy 631:7,12,16 632:2
guys 653:9

**h**

h 551:19 555:3 573:2,15 689:2
h.r. 566:8 622:14 638:16,18,19,20 650:17 651:5 653:6
half 660:21
halfway 619:21
hall 631:24

hand 666:16 690:20
handed 666:19,22 666:23
handle 571:16 632:10
handled 650:10 651:23 659:19
handwriting 569:10,12 581:6 604:11
handwritten 565:24 603:17 604:19,22,25
happen 600:19
happened 572:21 588:14 589:9,25 629:8 633:13 655:14
happy 643:6 644:12 652:2 653:3,7 681:25 686:11
harassment 650:24 653:16,23 654:7 655:9 656:5 656:22 657:16,22 658:8,15,23 659:17 660:9 661:17
hard 569:19 609:13,17 615:7 653:12
hazardous 671:22 672:4,6
head 573:21 598:23 652:9 653:13 667:25 671:11 673:11
hear 681:22

heard 645:5
heartbreaking 619:16
held 551:22 637:11 654:21
help 610:25 613:24 614:2 617:24 621:25 622:17 623:22 631:19 632:14 651:10,11
helped 621:18 622:7
hereinbefore 688:11 690:11
hereunto 690:19
hesitate 555:22 556:2
hidden 671:22
hiding 672:9
high 596:22 599:8
highly 674:24
hire 680:12
hired 674:23 677:3
hiring 680:16
history 657:2
hold 649:15 654:16
holding 596:11 618:4
holdings 551:8,8 552:11,16 556:9 576:10 652:19 691:3
home 560:22,22 562:6,14 563:4,9 564:23 574:19 575:6 624:5
hoping 624:18

hours 660:21 678:22
hum 580:8 587:9 595:3 607:16 608:5,23 612:13 621:8 634:11
husband 557:15 564:24 621:22 622:23 636:15
hypothetical 647:9,10

**i**

idea 574:22 585:8 615:16 616:3 639:11 680:4
identification 559:5,8,11 606:4 670:14
identifies 661:7
identify 565:7 580:23 669:24 683:3
ignore 682:13
illegal 645:6
illness 577:16
imagine 586:10
imaging 608:12
immediately 569:3 569:3,5 624:2 640:7
important 595:7 595:11 608:21 611:5,19 612:6 665:16 666:10 667:19 668:12,13
importantly 682:10
impressed 609:24
impression 627:14
impressions 568:5 582:7 624:13

improvement 638:7,9

inaccurate 671:7 674:15 676:5 679:19

inaccurately 673:5

inadvertent 563:19 636:3

inappropriate 623:3

incidents 658:18 659:24

include 650:22 663:2,6,9

included 562:17 566:13 581:12 590:18 613:13 624:22 625:18 626:18 636:5 652:24

includes 635:19

income 564:16,20

incur 564:18

incurred 565:2

independent 564:18

individual 551:9 551:10,10

individually 676:19

ineffective 639:10

infinitum 628:6

information 564:14 601:15,17 644:11,21 645:2,3 645:4 651:9 672:12,14 674:5 675:7 677:10 685:2,25 689:18 689:19

initial 675:9

initially 562:7

ink 558:16 610:4,9 612:8

inquiry 635:25 636:11,17,25

installments 574:20

instance 579:21 580:10 651:16 653:15 656:3 657:15 658:4,4,14 658:21 659:14 660:11 661:16

instances 660:6 661:7,18

institution 590:7

insubstantial 564:21

insurance 605:23 606:10

intend 624:9

intended 568:21 595:25

intending 568:8 630:9

intention 568:19

interact 598:17,20 599:2,10,12 601:3 601:4,8,16

interacted 599:9 666:13

interacting 665:22

interactions 601:8 601:18 678:20

interest 615:22 628:17 679:15 680:7

interested 614:10 614:11,14 615:23 622:15 690:17

internal 616:13 659:6

interrupt 632:2

interrupted 630:24 631:14,15

interview 588:17 588:20 589:15,16 589:18,20 590:3 633:9,11,15 680:13

interviewed 589:23 633:19

interviews 590:21

inundated 672:5

investigate 674:22 680:6,16

investigation 674:23 675:6,10 675:12,13,15 680:3

inviting 598:6

invoice 636:6

invoices 636:7

involved 572:15 591:25 653:22 655:19,20 668:19 677:4 683:8

irs 677:19 678:10

issue 568:7 597:24 639:5 649:24 650:16 685:23

issued 662:18

issues 665:11

**j**

j 552:8 555:2 573:3,16

january 565:17 566:7 574:4 607:18

japan 574:19 576:10 577:9

579:2 592:3 596:13 597:8 598:6,16 599:3,4 600:4 601:3,9 609:7 659:6,19 666:6,12 667:20 668:14 669:11 673:12 680:15

japanese 576:2 601:13 609:11 665:5,19,24 666:2 666:10 668:3,25 669:5,16

jennifer 551:3,18 551:19 552:6 555:1,9 556:1 557:1 558:1 559:1 560:1 561:1 562:1 563:1 564:1 565:1 566:1 567:1 568:1 569:1 570:1 571:1 572:1 573:1 574:1 575:1 576:1 577:1 577:12 578:1 579:1 580:1 581:1 582:1 583:1 584:1 585:1 586:1 587:1 588:1 589:1 590:1 591:1 592:1 593:1 594:1 595:1 596:1 597:1 598:1 599:1 600:1 601:1 602:1 603:1 604:1 605:1 606:1 607:1 608:1 609:1 610:1 611:1 612:1 613:1 614:1 615:1 616:1 617:1 618:1 619:1 620:1 621:1 622:1 623:1 624:1 625:1 626:1 627:1 628:1 629:1

630:1 631:1 632:1
633:1 634:1 635:1
636:1 637:1 638:1
639:1 640:1 641:1
642:1 643:1 644:1
645:1,10 646:1
647:1 648:1 649:1
650:1 651:1 652:1
653:1 654:1 655:1
656:1 657:1 658:1
659:1 660:1 661:1
662:1 663:1 664:1
665:1 666:1 667:1
668:1,17 669:1
670:1 671:1 672:1
673:1 674:1 675:1
676:1 677:1 678:1
679:1 680:1 681:1
682:1 683:1 684:1
685:1 686:1 687:1
687:17 688:15
691:4,20
**jerome** 552:18
**jerry** 556:7 647:8
658:10 660:22
**jersey** 653:24
655:24
**job** 562:12 569:3
584:15 587:5,8
588:8 589:12,15
589:17 590:2
600:20,22 601:25
602:6,10,12,13,14
610:16 618:6
623:21 632:16
633:11,14 645:18
645:23 681:19
683:2
**jobs** 587:19,22
**johei** 573:17,20
576:12,13 580:2

**john** 551:10
**join** 687:8
**joined** 676:16
**jolly** 552:18
**jordan** 614:8
615:20
**josh** 574:16,17
575:10
**jotted** 566:14
**jr** 552:8
**judge** 554:13
**judgment** 570:5,7
675:22
**july** 551:14 558:4
691:4
**june** 556:13,13
557:13 558:3
559:15 562:20
563:5,10
**junior** 671:12
673:12
**justifiable** 647:4

**k**

**kagaku** 608:12
**kanako** 618:23
619:2 669:18
673:14
**kane** 552:5,8
555:12
**kathy** 588:24
**kaylin** 683:9,21
**keep** 593:15
595:18 605:11
616:5,23
**kelly** 629:22 630:3
630:6 631:11
632:18 678:20
679:23
**ken** 598:22 599:7
613:6,9

**kept** 563:2,3 634:2
682:13
**kind** 581:16 600:3
609:4,9 615:3
629:14 632:4,6
634:17 640:4
645:15 646:17
656:6 658:24
660:13 667:6
668:9 681:20
**kinds** 580:15
646:10 647:14
**king** 553:7 647:8
**knew** 563:13
566:22 576:23
610:23 612:24
615:5 630:21
644:13,14 666:9
**know** 556:7 557:5
557:10,11 558:17
558:18 559:20
562:14,17 568:17
569:7,8 572:5
574:19 580:4,6
581:16,17 582:22
585:4 586:2
592:22 593:10,16
596:22 598:3,5,6
599:5,7 600:2,4,4
600:6,12 601:6
606:14 607:20
608:6 612:5 613:7
613:12,14 614:7
615:25 616:2,15
616:22 617:3,4,21
618:11 619:21
624:24 625:5,16
636:16 640:18
641:5 643:4,5
645:15,24 646:11
649:25 651:6,9

656:12 680:14
681:24 682:14
683:19 686:7
**knowing** 613:20
632:3
**knowledge** 644:4

**l**

**l** 552:7,13 553:6
554:2,2 688:2
**labor** 587:22
679:8
**lack** 570:5,7
**laid** 624:20 625:2
681:10
**language** 598:10
609:17
**large** 627:2,5,8,18
**late** 669:6 671:15
682:7
**law** 640:25 641:11
641:17 649:6,7
674:25 675:11,18
**lawsuit** 592:2
683:17
**lawyer** 583:7
681:15,17,19
683:2
**lawyers** 583:6,10
626:21
**lay** 637:19
**lead** 668:18
681:15,15
**learn** 643:6
**learned** 676:9
**learning** 614:5
**leave** 621:15
622:19 626:16
632:2
**leaving** 566:7
642:2

**led** 562:8 639:25
640:16
**left** 563:16 577:12
581:18,19,25
584:9 586:12
590:21,22 592:25
593:15,23 594:25
622:2 623:4 626:6
626:11,25,25
627:5,8,15 640:4
642:10,13,16,19
664:22
**legal** 553:7 567:12
567:15 579:12
583:5,11 585:22
587:2,3 592:24,24
593:15,22 595:5,9
596:8,20 597:7
598:24 611:4,14
614:9,18,18
618:24 623:21
633:25 638:7
649:4 650:17
651:11,24 654:6
664:12,16,20,23
681:10 686:7,10
**length** 577:5
678:21
**lengthy** 577:10
680:24 681:2,5
**letter** 618:22
624:5
**letterhead** 605:21
605:22
**level** 576:9 596:22
599:8 651:13
669:15,17
**lexington** 552:17
**liability** 623:23
645:19 679:10

**liaison** 576:9
**lieu** 607:7
**life** 620:15
**light** 674:18
**lights** 617:4
**line** 572:25 573:10
616:5 636:6
689:23 691:5
**lines** 591:6,10
**list** 564:23,23
581:2 582:10
584:9 643:19
651:22 685:13
**listen** 677:8
681:24
**listened** 677:8
**listing** 587:20
588:19 636:7
681:20
**literally** 686:16
**litigation** 559:18
559:21 573:22
574:23 582:9,20
670:24 671:3,8,10
671:14 673:2,19
685:11
**litigations** 655:17
**little** 573:8 593:20
630:25 632:5
653:11,12 667:23
**lived** 646:15
**llc** 691:2
**llp** 552:5,10,15,20
**lobby** 630:14,23
631:13,16 632:3
**located** 608:13
672:3
**locked** 593:2
**long** 605:6 619:15
621:22 622:16

**longer** 596:11
**look** 588:18,19
596:25 612:17,18
615:12 616:24,25
617:2 627:7
628:25 634:17
645:16 666:25
682:11
**looked** 562:6
603:15 608:8,20
616:25 633:17
**looking** 585:23
589:21 614:5,15
615:16
**looks** 573:2 606:8
609:4
**lose** 615:9
**lot** 572:14,15
586:2 667:9
**lots** 647:20,23
685:9,22
**low** 576:9 615:14
669:17
**lower** 588:23
**lueders** 588:24

**m**

**m** 555:3 598:9
608:4
**mail** 574:6,18
575:22 576:5,7
597:10 631:20
663:13,16,19
680:15
**mails** 613:9 629:6
653:6
**main** 681:21
**maintain** 598:16
**maintained**
664:12
**majority** 625:21

**making** 579:10,23
602:17 612:23
645:20 650:15
659:16 679:14
**male** 641:14,19
642:16,18,23
**manage** 631:19,25
**managed** 654:5
**manager** 622:14
630:19 650:18
673:23
**manner** 630:11
667:11 679:14
**mansukhani**
552:10
**manufacturing**
610:22 621:24
623:19
**marasasan** 618:22
**march** 620:8
623:7,8 628:12
**mark** 558:16,24
605:18,19 617:11
**marked** 557:20,23
557:25 558:13
559:4,7,10 561:14
604:10 606:3
607:2,3 669:22,25
670:13 689:22
**marketing** 610:12
669:13
**marking** 558:7
607:8
**marriage** 690:16
**married** 619:14
**material** 587:5
**materials** 592:5
**matter** 583:11
605:7 668:4 674:8
674:11,13,17
677:7,12 678:12

680:17 685:18
690:18
**matters** 571:23
614:22,25 615:5
678:7 684:17
**matthew** 552:7
662:9
**mcc** 599:5 669:13
671:11 673:11,23
**mcha** 577:23
578:15 580:12
582:20 583:6,10
590:21,23 592:19
608:16 615:3
638:19 650:5
651:17 654:15
656:4,9,11,20,21
657:2,16 658:25
660:7 662:5,17,20
663:16 664:7,13
664:16 665:11
670:10 673:18
684:10,22
**mcha's** 608:17
**mchc** 599:5
658:20,22 659:2,6
659:14,18 669:9
**mchem** 552:14
**mchj** 577:18
595:10 599:5
671:12 673:12
**mcpp** 585:2
**mean** 557:4 567:6
567:20,22 572:8
582:22 586:13
597:9 599:7
600:11 604:16
609:4 616:10
620:20
**means** 573:14
613:7 614:7

**meant** 573:14
600:12 601:4
**measure** 609:14
**measured** 614:21
**measuring** 614:12
**meet** 574:5 610:11
610:19
**meeting** 573:3,3
573:15,16,18,24
592:3,21 594:10
594:11 599:23
607:15,22,24
609:11 611:25
612:2 630:21,24
631:13,15,18
632:2 668:20
680:21 681:3
682:9,19,22
**meetings** 592:24
594:8,21 599:23
665:5,7,9,13
**member** 614:9
**members** 611:14
612:12,19
**men** 624:22
625:14,16,19,21
626:2,5,11,14
642:14 669:2
**mental** 568:4
582:7 624:13
**mentioned** 551:22
614:10 638:4,10
639:7 655:8 683:8
686:7
**mentions** 680:23
**mercedes** 552:13
**merely** 675:11
**message** 585:10,13
**messages** 684:10
684:14,21 685:3,6
685:8,14

**messenger** 629:18
629:19
**met** 596:3 601:10
604:4 620:12
665:17 669:10,12
**metrics** 614:11
**mexico** 584:22
**mid** 580:3 593:11
**middle** 616:5
622:25
**miko** 669:18
**million** 574:20
**mind** 581:17
658:15 661:21
670:17
**mindful** 665:12,23
**mine** 657:2 680:11
**minima** 576:8
577:16
**miscalculated** 
676:15
**mischaracterizing** 
648:17,23
**mistake** 635:21
**mistakenly** 636:8
**mitigation** 682:2
683:5
**mitsubishi** 551:8,8
552:11,16 556:9
567:13 573:23
576:10,11 581:5
583:8,23 592:25
602:10 608:12
615:2 628:15
650:5 652:19
653:25,25 654:2
656:16 665:25
671:19 685:19
691:3
**mkic** 608:9,11
610:2 621:7,21

622:7,8,14 624:21
626:6 628:10,15
637:19 642:8
674:20
**mla** 587:17 588:10
**mobile** 662:18,21
663:2,12 664:2
**model** 582:18,19
582:23,23
**moment** 580:20
612:7 625:10
652:9 660:5
**money** 593:13
677:14
**month** 564:14
596:15
**monthly** 596:13
596:21 597:4,24
598:4
**months** 675:14
**morgan** 588:12,21
589:5
**morning** 556:6
565:16 574:12,14
575:9
**mother** 618:23
619:18
**move** 582:18
677:11 682:4
**moved** 621:23
**moving** 584:12
**mp** 653:24
**mpda** 653:24
**mtpa** 653:25
**multiple** 565:10
599:23 601:11
661:7
**murata** 673:14

| **n** | **never** 569:15,22 | **nineteen** 570:18 | 682:7 |
|---|---|---|---|
| **n** 552:2 553:2,6 | 569:23,24 570:3 | **nonsense** 648:9 | **number** 558:17,18 |

**n**

**n** 552:2 553:2,6
554:2 555:2,2,2,3
573:9,13 688:2
689:12
**name** 555:8
584:10 587:17
588:11 589:3
612:18 629:25
630:3 643:12
653:2,13 667:3
691:3,4
**named** 617:7
**names** 612:24
653:4
**nancy** 590:5
**narrative** 620:22
623:22 671:3
**narratives** 645:17
**nationals** 665:19
**natural** 645:7
646:3
**nature** 585:7
678:3 684:20
685:13,14
**near** 608:3 673:2
**nearby** 634:5
**nearly** 600:23
**necessary** 622:18
686:2
**need** 569:23 575:2
577:7,8 606:23
629:11 668:21
687:9
**needed** 616:17
622:17 629:21
677:9,12
**needs** 638:6,9
**negotiation** 683:21
**negotiations** 683:9
683:12

**never** 569:15,22
569:23,24 570:3
572:25 592:20
600:13,17,18
602:3 623:18
624:6,18 671:16
**new** 551:2,24
552:7,12,12,17,17
552:22,22 555:5
555:14 577:2,4
587:21 590:16,19
591:7 595:7
599:17 605:22
608:8 609:13
610:12,13 617:2
618:6 635:25
636:11,14 653:23
655:24 656:14
666:8 690:4,8
691:2
**newly** 669:8
**nice** 556:10 613:22
622:4
**nick** 565:14
569:18 573:14
574:5,6,24 576:14
576:16 577:2
581:13 582:14
584:4 620:12,21
623:9 639:8,14,21
644:13,20 645:24
684:24
**nick's** 574:14,24
576:19 639:2
**nicolas** 551:9
552:11 553:8
**nicole** 552:22
**nine** 570:19
600:10 651:23
652:18

**nineteen** 570:18
**nonsense** 648:9
**nonsubstantive**
562:4
**nora** 590:12
**normal** 579:16,19
**norton** 683:12
**notary** 551:24
555:4 688:22
690:7 691:24
**notation** 586:22
**note** 595:24
613:23 633:25
672:11
**notebook** 560:6,18
563:13 586:25
591:17,20 593:13
593:22 607:11
**notepad** 633:8
**notes** 558:22
566:14 572:18,23
586:22 587:11,24
588:7 589:2,4
592:2,18,23 593:4
594:8,9,10,16,22
603:17 604:19,22
604:25 607:14,25
613:6,17 618:2
620:3 621:10,11
624:10,16 633:18
633:20,24 634:2,4
653:10 664:23
**notice** 577:17
621:5 682:11,25
**noticed** 646:18
**notified** 630:18
631:10 659:20
**notify** 630:15
673:17 677:19
**november** 576:15
580:3 670:20

682:7
**number** 558:17,18
569:2 578:25
579:5 584:2
605:24 625:16
627:19 645:12
650:22 685:21
687:18 689:4
**numbers** 627:13
**numerous** 676:23
676:24 684:17

**o**

**o** 553:6 554:2
555:2,12 573:10
573:13 682:12
688:2
**oath** 554:12
556:16
**object** 565:9
567:16 568:2,22
575:23 582:5
617:18 624:11
627:4,20 628:19
641:23 644:19
645:8 646:6,22
647:7 648:15
655:22 656:8
657:19 658:16
660:14,19
**objected** 680:4
**objecting** 654:11
672:17
**objection** 644:24
648:20 672:11
**objections** 554:21
**objective** 680:12
**observation**
615:18
**observe** 682:23
**obtain** 566:3
578:16,22,24

579:9,13,16,19,22
**obtained** 606:15
**obviously** 555:24
591:11
**occasion** 571:18
571:19 629:20
656:15
**occasions** 684:17
**occurred** 653:21
655:18 657:8,9
671:15
**occurrence** 570:7
626:13
**october** 622:3
642:7 643:10
644:16 682:7
**odd** 610:18
**oerlikon** 633:10
**offer** 574:8 576:20
576:24 577:6,20
578:17 627:17
628:5,8 652:7
**offered** 576:18
597:23 622:5
623:15 627:22
**offers** 625:8
**office** 560:5,22
562:7,14 563:4,9
574:11,11 575:5,7
576:20 577:2,4
592:25 593:24
618:24 622:2
623:9 624:3 630:8
630:10,19 631:10
631:22 632:9,25
639:14 640:4,9
656:14 664:10,21
669:16 686:16
**officer** 613:14
616:17

**officers** 612:11,25
**offs** 637:19
**oh** 557:10 585:8
635:21 649:14
655:18,25
**okay** 557:12,16
558:15,23 559:24
563:18 564:10
565:3,4,20 572:17
573:19 575:13,20
578:8 579:20
580:22 587:7
588:23 591:15
592:17 594:12
595:20 597:11
602:19,24 603:12
604:10 605:17
606:11,21 607:6,9
607:12 608:2
612:6 618:6,8,14
619:9,24 626:20
634:3,24 635:22
637:5 653:14
654:14 660:4,18
661:24 662:5
665:3 667:17
668:23 669:20
672:16 679:11
682:18 683:23
686:17,22
**old** 552:6 555:13
587:3
**oliva** 551:9 552:11
553:8 565:15
569:18 570:2,4,11
571:6 573:14
575:14,15 576:14
582:16 583:3
584:7,21 585:7
638:24 639:8
644:13,20 648:12

663:10,23
**once** 557:10,11
658:9 669:12
**ones** 685:4
**operating** 586:15
**opportunity**
667:10
**opposite** 600:15
664:25
**oppositional** 661:8
**oral** 597:24
**orally** 575:18,19
**order** 579:13
609:23 623:22
679:9
**organization**
628:16
**organized** 560:4
562:15
**original** 554:9,17
604:5,12,13
**originally** 566:3
**originated** 616:3
**ought** 576:20
**outcome** 690:17
**outlined** 658:19
661:18
**outside** 574:17
590:16 669:8
673:4 675:2 677:2
680:12
**overcoming**
569:21

**p**

**p** 552:2,2 553:2,2
553:6 554:2 598:9
608:4
**p.m.** 603:6,10
637:9,13 654:19
654:23 687:15,20

**package** 621:17
622:5,16,22
623:16 625:4
626:8,19 641:22
642:24 643:10
**packages** 625:12
625:15 626:15
643:21 644:2,9,15
650:12
**pad** 587:2,3,16
593:16
**pads** 592:24,24
593:23 633:25,25
664:12,16,20,23
686:8,11
**page** 557:24
565:13,13 580:21
580:23 581:7
586:17,17,18,19
587:2,16 589:3,5
589:22 590:12
591:14,23 592:8
592:11 596:13
597:13,14 605:20
605:21,24 606:6
606:22 607:10,13
608:3 611:8 614:4
616:4 618:14,15
618:17 620:2,5
628:25 634:12,24
670:2,18 689:3,13
689:19,20,23
691:5
**pages** 557:25
561:12,14 565:11
586:17 587:7
591:16,19 592:17
594:5 634:9,17
**papers** 561:4,5,9
561:13 563:4

**paragraph** 565:25
670:22,24 671:9
674:9,10,11,16
675:20,23,25
676:6 678:19
679:13 680:19,23
682:9
**park** 552:12
**part** 603:18
607:14 611:5,11
611:25 612:14,20
614:5 616:16
627:2 646:2 649:2
649:10 657:20,21
657:24 658:2
674:22
**parted** 591:9
**participate** 673:24
676:8
**participated**
576:16
**particular** 684:14
**particularly**
665:12
**parties** 551:20
554:7 690:15
**parting** 591:12
**party** 680:12
**pass** 669:21,23
**passed** 619:5
**pat** 566:8 593:2
594:10 638:16,17
638:19 664:8
677:7 678:8,14
679:24 680:2,2
**pats** 665:20
**pause** 618:15
619:10,12
**pay** 622:22
**pension** 676:11,16
676:20,22 677:2,4

678:10
**people** 585:23,24
592:19 593:5
594:6,9 601:9
609:19 610:16
616:8 625:2
628:22 632:10,24
642:3,10 643:13
646:4,8,9,19
647:13,15,16,17
647:20,21 649:19
650:13,14 653:3,4
657:9,21 667:21
683:4 685:23
**perceive** 644:17
**perceived** 640:19
**perfectly** 678:5
**performance**
638:8 647:19
670:20 671:19
**period** 570:11,14
577:23 594:2,3
615:15 626:8
627:25
**periods** 642:3
**person** 555:21
576:9 577:17
589:16 590:3
593:18 609:12
632:19 645:9
646:24 650:7
652:13 666:23
680:5 683:7
**person's** 667:3
**personal** 572:21
**personally** 562:24
**personnel** 566:10
566:20,21 567:2
567:11 597:7
603:18,22,25
604:12 605:12

**perspectives** 617:3
**pertain** 685:7,9,17
685:19
**pertaining** 685:15
**pertinent** 684:11
684:15,22
**pharma** 653:23
654:2,2 655:24,25
**philtec** 674:8,11
674:12,17,20
**philtech** 585:2
**phone** 574:7 579:4
588:17,20 589:18
589:19 630:20
633:16 662:18,21
663:2,12,18 664:2
664:7 676:9
**photocopied**
560:23 562:24,24
563:14 592:15
**physical** 670:8
**pick** 629:15,24
630:4
**picked** 631:7
**pipeline** 622:8
**place** 679:23
680:14 688:11
**placeholder** 600:3
**placement** 667:21
**plaintiff** 551:4,18
552:5 662:9
**plan** 676:16,20
677:2 678:10
682:3
**plans** 583:20
584:4 676:11
682:2 683:5
**plant** 621:24
**plaza** 552:12
**pleading** 661:6

**please** 555:22
655:3 665:15
667:17 670:17
**plenary** 576:14
**plenty** 601:9
**pocket** 593:19,20
**point** 601:10
637:16 642:10
682:14
**pointing** 635:22
**policies** 616:6,14
616:18,23
**policy** 628:16,21
**polycap** 682:17
**polymers** 671:20
**poor** 570:5,8
675:21
**porter** 674:24
675:15
**portion** 565:21,24
**position** 581:19
586:24 595:13,14
600:3 602:18
610:14 667:3,5
**positions** 590:16
**possession** 560:2
560:21 561:24
567:3 644:21
653:9 664:3,6,17
**possibility** 577:8
**possible** 646:24
650:14 657:12
**possibly** 585:2
635:9 674:6
**post** 671:25
**potential** 586:24
587:22 623:23
**power** 667:24
**practice** 580:17
582:19,23 592:20
592:22 667:7

practiced 668:6
practices 668:25
preferred 602:14
preliminary 675:6
preparation
  635:15 637:3
prepare 621:18
prepared 636:24
  637:2
preparing 566:23
  567:7 635:17
present 558:9
  660:15 667:7,11
presentation
  666:14,15,18,22
  682:23
presented 666:20
  670:6
preservation
  577:9
president 596:10
  608:9 609:21
  610:12 671:11
  672:7,25 673:11
  682:17
president's 623:6
  623:7
presidents 586:5
presumably
  565:18,20
pretextual 648:9
pretty 568:25
  645:6
preventing 645:19
previous 591:3
previously 559:18
  559:21 561:11,17
  670:6
primarily 592:22
  592:23 594:2
  627:10 634:2

primavera 552:13
principle 662:5
prior 562:20 563:5
  563:9,22 614:21
  616:25 620:18
  637:4 642:19
  655:13 671:24
  677:4 679:6
privilege 672:18
  677:23
privileged 562:2
  580:15 591:21
  592:8 654:12
  672:12,13
privy 657:7,11
  658:25 659:2,5,11
probably 576:4
  581:16,24,25
  585:3 588:17
  592:15 593:3
  598:3 604:4 605:9
  612:4,9 615:23,24
  635:13 639:11
  640:25 643:3
  664:22
procedure 551:22
proceeding 558:7
process 611:2
produce 564:9,13
  627:12 643:7
  674:2
produced 557:18
  558:3,4 559:14,18
  559:21 561:11
  562:20,25 563:5
  563:21,25 564:6
  591:20 606:9
producing 563:23
product 614:12
  615:14 622:8

production 561:21
  592:11
productions 562:9
  684:2
products 610:3
professional 551:9
  551:10,11
professionals
  651:5 653:7
proffer 579:13
prohibited 680:15
project 671:5
  673:17 680:21
  681:4,10
projects 601:12
promoted 613:10
  613:12,16,21
promotions 613:7
prompted 564:13
properly 555:24
proposal 578:18
  579:10,24 580:11
protect 623:22
protocol 558:10
provide 569:19
  587:21 596:19
  636:19 651:21
  689:20
provided 560:3
  561:6 563:15
  576:14 587:21
  606:20 621:16
  625:24,25 626:2,5
  626:7 633:23
  636:22,23 645:11
  650:12 654:6
  664:8 674:5 675:6
  675:14
providing 586:3
  610:24 651:23
  678:2

psychologist 646:8
public 551:24
  555:5 688:22
  690:8 691:24
publicized 659:21
pull 686:3
purchase 671:24
purchased 671:21
purpose 572:17
  582:3
purposes 564:24
purse 560:7,11,14
  560:19 593:14,20
pursuant 551:20
  628:11
pursue 567:12,15
  589:13
pursued 589:14
  633:19
push 632:12
pushing 682:13
put 555:12 580:5,7
  587:20 615:4
  685:23
putting 557:16

**q**

quantifying
  614:12
quantitatively
  614:6,15,23
  615:17
quarter 643:17
quarterly 597:5
question 566:23
  567:7 568:4,6,9
  573:6 576:21
  577:13 578:13
  582:25 590:25
  599:15 637:16
  649:16 650:2,20
  652:8 657:20,25

658:2 659:10,11
659:13 667:13
686:24 689:23
**questioning** 687:3
**questions** 562:5
571:3 572:14
647:9 655:3 661:3
661:22 662:10
673:22 674:4
684:4,6 687:4
689:22
**quick** 684:6
**quite** 561:19
665:23
**quo** 611:9

**r**

**r** 552:2 553:2,6
554:2 555:2 642:5
682:12 688:2
690:2
**rain** 672:2
**raise** 602:17
639:10 651:5
**raised** 599:22
615:21 644:23,24
650:17 652:24
673:22 674:21
**raises** 651:6
**raising** 639:5
**range** 579:2
**rated** 674:24
**rational** 645:9,13
**raytheon** 614:20
614:23
**reach** 567:23
568:13
**reached** 568:11
**react** 646:9,9
647:13
**reaction** 641:5

**reactions** 647:20
647:23
**read** 556:19
597:22 655:2,6
666:6
**reading** 616:5,6,23
**ready** 555:16
622:19
**real** 564:20 667:9
**realize** 560:2,8,9
**realized** 561:18,21
587:4
**really** 562:22
571:17 598:17
599:14 600:2,12
608:3 615:5,20
616:18 619:7,7,20
636:15 640:11
644:10 650:9
652:8 680:8
**reason** 576:21
582:15 623:19
644:16 687:11
691:5
**reassigned** 586:11
**reassuring** 611:9
611:19
**recall** 556:12
562:22 568:23
571:9,17,19,23
574:12 582:15,16
582:21 583:3,13
583:15,19,21
584:3,6 586:6
587:24 588:13,25
595:24 598:12
604:7,23 605:8,14
605:15 630:2
642:23 643:12,18
651:19 652:9,23
653:2,13,14 654:4

664:13 665:4
683:24 684:13
**recalling** 571:2
**receipts** 636:20,21
**receive** 570:10
636:10
**received** 574:9
604:13,15,17
606:9,16 618:22
622:3,4 625:3,7,12
625:14,17 626:15
638:6 641:21,25
642:4,11,17
643:20,25 644:15
653:11 666:3
677:20 683:20
**receiving** 605:2
644:9
**reception** 666:23
**recess** 603:7
**reciprocal** 659:9
**recite** 660:11
**recognize** 559:12
586:19 606:7,11
618:16 620:2
629:2
**recollection**
585:12 642:21
652:11 655:12
661:14
**record** 558:14
573:20 603:6,11
608:10 637:9,10
637:14 648:20
649:15 654:17,19
654:20,24 669:25
686:21 687:15
690:12
**recorded** 555:24
594:5 604:18
652:2

**records** 572:21
615:10 653:11
**recruiter** 569:5
586:23 587:12,18
**redo** 677:12
**reduce** 610:15
**reduction** 610:10
621:7,13 624:21
626:12 627:2,6,9
627:10,13 628:11
642:6
**rees** 552:10 656:16
675:2
**refer** 569:16 595:4
596:17
**reference** 576:4
652:13 660:9
682:15
**referenced** 674:8
**referencing**
670:23
**referred** 573:25
594:18 599:4
655:5
**referring** 561:13
565:21 573:18
594:23 608:7
650:4 673:13
**refers** 569:17
598:13 609:2
**reflect** 594:22
595:25 674:12
676:2,4
**reflects** 671:4
**refresh** 591:4
625:6
**refresher** 617:12
**refused** 624:4
673:25 679:13
**registered** 632:8

**regular** 590:24
597:16,20
**rehash** 686:3
**reisbaum** 552:20
**reiterated** 681:20
**rejected** 597:25
**relate** 587:8,11
588:7 589:3 590:9
591:25
**related** 587:19
592:5 690:15
**relates** 590:13
**relating** 633:21
**relationship** 608:4
608:6,21 632:22
633:2 657:13
673:15
**relationships**
586:4 598:16
**relatives** 628:22
**rely** 555:25
**remember** 584:19
612:16 616:6
621:6 627:9 629:4
637:18 643:16
666:5
**remote** 670:9
**rented** 572:11
**rephrase** 602:5
**replacement**
622:18
**report** 596:14
597:4,9 598:5,18
638:11 675:12,14
**reported** 572:5
**reporter** 555:7,15
556:3 558:12
559:6,9 606:5
607:8 655:2,4,7
670:9,15

**reporting** 572:6
691:2
**reports** 597:3,25
**represent** 556:8
670:19
**representation**
671:8
**represented**
577:22,25 656:16
**representing**
583:7 624:14
**request** 636:18
685:5,25 686:4
**requested** 636:19
673:24 684:18
689:18
**requirement**
676:14
**requirements**
676:13,18,21
**rereading** 616:23
**reserve** 683:24
686:23,25
**reserved** 554:22
**reserving** 687:4
**resignation** 621:5
**resolved** 678:16
**respect** 645:21
665:18,21 667:5
667:12 668:25
675:22 676:7
677:22
**respected** 679:8
**respectful** 611:19
**respective** 551:20
554:6
**responded** 639:21
**response** 569:17
569:22 574:9,25
603:20 632:4,8
635:25 636:24

637:23 639:25
645:13 667:14
682:23
**responsibilities**
583:5,22 585:19
585:21,24,25
**responsibility**
581:21 583:9
584:8 585:5,16,17
616:22
**responsible**
581:15,18 582:14
586:14 629:25
671:18
**responsive** 685:4
**rest** 577:18
**restate** 667:2
**result** 679:3,16
**resume** 569:4
**retained** 687:19
689:10
**retaliate** 640:6,17
641:4,8 647:17
**retaliated** 639:19
**retaliating** 651:2
**retaliation** 567:10
638:4 640:2 651:2
651:7
**retaliatory** 679:2
**return** 635:11
**returned** 574:11
575:4
**returning** 620:13
**returns** 635:7
**reveal** 562:2 582:7
**revealing** 678:2
**review** 560:20
561:2 562:7,10
592:15 638:8
647:19 670:20
685:3

**rid** 623:19
**ridiculousness**
680:4
**rif** 642:5 681:10
681:21 683:4
**rifs** 637:19 681:25
682:3
**right** 557:7 566:2
569:16 572:10
573:12 577:23
578:6 581:25
586:16 599:21,24
602:15 603:19
605:3 606:21
608:19 613:3
617:19 619:5
621:10 624:22
625:4,15 626:5,24
642:12 646:21
647:25 648:6,11
649:20 651:7
654:5 656:10
659:25 683:24
686:24 687:2,4
**rise** 629:5
**risk** 651:13
**road** 552:6 555:13
**robert** 552:8
**role** 585:5 595:7
596:9 599:17
611:6 612:22
613:3,25 614:21
617:17,24 618:5,8
618:12,13 681:17
**roles** 595:17
**rolling** 626:12
**room** 577:3
592:21 641:3
683:2
**rose** 584:13
585:21 683:13

**roughly** 621:9
**round** 577:4
**rules** 551:21
**rulings** 689:22

**s**

**s** 551:3,19,19
552:2,6,18 553:2,6
553:6 554:2,2
555:2,3 687:17
689:2 691:5
**sadness** 619:19
**sakaguchi** 596:21
597:4,17,20
598:23 599:7
613:6,10
**sakaguchi's**
601:10
**sales** 610:12
669:13
**samuel** 552:18
**san** 576:17
**sara** 552:8
**sat** 577:3 678:15
**saunders** 566:8
593:3 638:16,17
638:19 664:9
677:7
**saw** 566:12 640:13
640:15 652:13
**saying** 569:24
572:5 582:17
583:4,13 601:24
628:2 639:12
645:24
**says** 567:22 573:2
573:9,13,16
588:24 589:5
595:21 596:13
597:14,15,23
598:9 608:3,20
611:9 612:10

613:6 614:4 616:5
634:14 675:21
682:10
**sazar** 594:11
654:5
**scale** 627:2,6,9,18
**scarsdale** 667:9
**schedule** 615:4
635:10,17
**schemed** 639:8
**script** 603:16
**scully** 552:10
**sealing** 554:7
**search** 587:5,8
588:8
**searched** 563:8
**seat** 667:24 668:12
668:13
**seated** 675:3 681:7
**second** 556:20,23
557:23 565:25
595:20 654:16,17
657:25 674:9,10
**secret** 593:9
**section** 642:8
**security** 630:14
**see** 556:10 561:7
567:21 570:22
576:6 582:2
592:14 593:17
595:2,22 596:12
597:17 598:9
600:22 607:17
608:2,19 611:8,24
612:10 614:4
616:4 624:18
637:5 666:21,22
670:24 675:23
680:22 682:9
**seeing** 594:17

**seek** 598:2 678:4,5
**seeking** 577:21
**seen** 593:7 613:8
640:11 679:21
683:15
**self** 616:7
**send** 577:17
598:18 613:6,22
653:4 685:4
**sense** 582:6 584:18
584:25
**sent** 560:23 613:9
613:16
**sentence** 569:18
679:12
**separate** 589:8
590:7 623:12
627:11 678:13
**separately** 563:21
564:7 676:22
**september** 642:6
643:15 675:7
**served** 608:16,17
**server** 615:13
**service** 554:16
621:18 625:13
629:18
**services** 654:6
**set** 570:6 581:17
629:23 630:3,12
683:20 687:13
690:11,20
**sets** 559:13
**settle** 576:15 578:5
579:6,23
**settled** 655:16,17
657:4
**settlement** 574:8
574:15 576:16
577:6,7 578:17
579:10,14,14,24

580:10
**settling** 578:9,14
**severance** 621:17
621:19 622:5,15
622:22 623:15
625:3,12,15,25
626:8,15,18
641:22 642:12,17
642:24 643:10,20
643:25 644:9,15
645:12 650:12,13
652:21 657:10
**severed** 657:13
**sexual** 653:16,22
654:7 655:9 656:5
658:7
**sharing** 584:7
**shearman** 552:15
556:8 675:3
**sheet** 691:2
**shock** 682:11,25
**shook** 582:2
**short** 603:7 661:11
**shortly** 566:6
**show** 581:14
611:16 667:4,12
670:16 685:20,22
**showed** 631:12
**shows** 582:14
**shut** 640:4
**sick** 574:4,19
575:6,8
**side** 580:7 584:9
586:13
**signature** 690:22
**signed** 554:10,12
554:15
**significant** 627:18
**similar** 581:11
681:7

**simply** 631:11
**single** 557:24
  565:13 587:11
**sit** 611:9,13 628:9
  643:8 645:14
  651:15 652:10,22
  657:14 661:13
  668:5,5,6,10,11,15
  668:17 673:25
  684:13
**site** 671:23
**sites** 610:22
**sitting** 641:9
**situation** 610:20
  619:16 629:20
  631:20 681:6
**situations** 647:14
**size** 593:19,20,21
**slowly** 609:13,23
**small** 573:9,10
  577:3,4 583:25
  593:13 656:11
**smaller** 656:13
**society** 646:15
**solutions** 590:6
**somebody** 618:6
  630:22 631:4
  632:14 636:8
  647:18 673:6
**son** 601:10
**sorry** 563:24
  580:19 581:20
  587:2 616:14
  617:7 619:4,8,23
  632:9 635:22
  647:12 648:17
  655:25 658:9
  667:12,13,18
**sort** 581:25 624:3
**sought** 679:7

**soul** 600:21
**sources** 562:21
**southern** 551:2
**spanish** 584:24
  675:5
**speak** 556:2 605:6
  609:23 615:25
  631:23
**speaking** 609:20
  675:5
**specific** 570:25
  571:18,19 585:14
  629:19 650:10,18
**specifically** 560:5
  574:13 639:24
  683:3
**specified** 688:11
**specify** 565:11
**speech** 565:14,19
  566:4 680:24
  681:2,6
**spend** 677:16,18
**spent** 614:22
**spin** 591:10
  623:22 638:13
  649:2
**spinning** 639:8,23
  644:25 645:17
**split** 581:14
**spoke** 575:10
  605:9 609:12
  632:7
**spoken** 639:3
**spring** 560:15
  588:3,3 604:8
**spun** 649:3
**ss** 690:4
**stability** 611:16
**stack** 563:4
**stacks** 561:3 593:3

**stages** 675:9
**stamped** 629:17
  670:3
**standard** 578:16
  578:22 579:9,12
**start** 557:16
  645:23
**started** 569:4
  665:25
**starting** 615:11
**starts** 671:9
**state** 551:24 555:5
  587:22 605:22
  636:2,12,14 690:4
  690:8
**stated** 652:16
  681:16
**statement** 673:5
  679:16,20
**states** 551:2
**status** 577:20
  611:9 673:18
  675:12
**stay** 622:17
**staying** 622:16
**stephen** 584:13,24
**steps** 568:24
  600:18
**sterling** 552:15
  556:8 675:3
**stick** 580:19
**stipulated** 554:5
  554:20
**stone** 551:18 555:1
  555:9 556:1 557:1
  558:1 559:1 560:1
  561:1 562:1 563:1
  564:1 565:1 566:1
  567:1 568:1 569:1
  570:1 571:1 572:1
  573:1 574:1 575:1

576:1 577:1 578:1
579:1 580:1 581:1
582:1 583:1 584:1
585:1 586:1 587:1
588:1 589:1 590:1
591:1 592:1 593:1
594:1 595:1 596:1
597:1 598:1 599:1
600:1 601:1 602:1
603:1 604:1 605:1
606:1 607:1 608:1
609:1 610:1 611:1
612:1 613:1 614:1
615:1 616:1 617:1
618:1 619:1 620:1
621:1 622:1 623:1
624:1 625:1 626:1
627:1 628:1 629:1
630:1 631:1 632:1
633:1 634:1 635:1
636:1 637:1 638:1
639:1 640:1 641:1
642:1 643:1 644:1
645:1 646:1 647:1
648:1 649:1 650:1
651:1 652:1 653:1
654:1 655:1 656:1
657:1 658:1 659:1
660:1 661:1 662:1
663:1 664:1 665:1
666:1 667:1 668:1
669:1 670:1 671:1
672:1 673:1 674:1
675:1 676:1 677:1
678:1 679:1 680:1
681:1 682:1 683:1
684:1 685:1 686:1
687:1 688:15
691:4,20
**stood** 574:14

**stop** 654:9,13
**stories** 639:23
**stormed** 624:3
  641:3
**story** 639:9
**strategy** 571:21
  577:6,12 673:3
**strawn** 676:25
  677:10,21
**stressed** 593:9
**strong** 673:15
**study** 676:10
**stuff** 596:22
**stuffed** 624:17
**style** 609:15
**subject** 580:6
  583:11 624:2
  684:3
**submitted** 587:4,6
  633:22 635:6,9
**subscribed** 688:18
  691:21
**subsequent** 559:15
  575:21 644:15
  683:25 687:6
**subsequently**
  653:18 655:15
  656:7,23 657:17
  680:17
**substance** 678:3
**substantial** 602:17
**substantially**
  595:17
**succeed** 613:25
  614:3 617:17,24
  618:4
**successful** 612:21
  613:2 618:8,10,11
  618:13
**sue** 567:24,24
  568:11,14,20,21

569:9 647:21
  648:12
**sued** 568:15 648:2
**suggest** 640:5
**suggested** 598:2
  613:11
**suggesting** 586:6
  611:15 640:24
**suggestions**
  571:15
**suite** 552:6 555:13
**sum** 672:19,21
**summer** 588:3
**super** 593:9
**superior** 673:17
**supervisor** 570:12
  570:14,24 571:6
  572:3,7,8,13
  575:16 595:14
**support** 584:25
  586:3 610:7,24
  620:22
**supported** 581:3
  582:11,12,13
  672:23
**supporting** 610:3
  610:5 671:18
**suppose** 623:6
  646:19
**sure** 569:6 587:14
  587:15,18 600:19
  600:20 609:22
  610:13,19 612:18
  612:24 623:8
  625:17 627:5
  630:7 632:16
  634:8 645:20
  646:12 655:4
  676:12 677:18
  683:5 684:16
  686:15

**surprise** 563:17
**surprised** 596:5
  623:13 654:10
**sworn** 554:10
  555:4 688:5,18
  690:11 691:21
**system** 630:14

## t

**t** 553:6 554:2,2
  555:2 573:2,3,15
  573:16 598:9
  608:4 688:2 689:2
  690:2,2
**table** 577:5 667:22
  667:25 668:2
  681:7,13
**takayamasan**
  623:11 639:16
**take** 585:4,24
  587:8 588:8
  602:14,20,23
  629:16 631:4
  637:6 657:5
  664:20 667:10
  668:11,12 669:23
  686:13
**taken** 551:19
  586:23 603:8
  621:10,11 679:23
**takimoto** 573:17
  573:20 576:12,13
  576:25 577:2,11
  580:2 601:11
  673:23
**talk** 557:22 559:25
  574:24 580:20
  658:20 667:22
  672:13
**talked** 561:23
  571:21 621:6
  637:18

**tall** 593:4
**tanabe** 653:25
  654:2
**tax** 564:24 635:7
  635:10 636:12
  676:13,13
**taxation** 636:2
**taxes** 635:15 637:4
**team** 577:19
**tech** 584:22
**tef** 670:3,12 689:9
**telephone** 678:15
**tell** 556:17 560:25
  568:25 573:7
  582:24 584:19
  594:13 598:19,20
  598:25 599:11
  631:15 633:6
  652:3,15 671:2
**telling** 631:11
  640:23
**temperament**
  641:7
**ten** 616:19
**tend** 646:19
**tender** 664:6
**tendered** 662:7
**tendering** 662:2
**tenure** 578:15
  581:3 593:6
  650:11 662:20
  665:10 669:19
**term** 621:22
**terminate** 623:13
  650:19 651:12,12
**terminated** 567:9
  628:11 648:8
  649:20,23 650:6
  650:14 651:17
  652:6,12,25
  653:19 654:8

656:7,23 657:18
658:5,22 659:15
660:7
**terminating** 621:2
**termination**
565:15 566:6,12
566:24 567:7
581:21 650:23
651:4 652:20
655:10,13 656:19
**terminations**
650:10 651:22
657:2
**terminology** 609:9
**terribly** 562:15
**terrific** 584:14
**testified** 555:6
564:3 600:16
625:9 656:25
664:11
**testify** 688:5
**testifying** 556:12
**testimony** 556:21
575:13,15 594:19
655:6 660:5
664:13 678:23
679:6 684:9
687:16 688:6,10
690:13
**text** 663:3,5
684:24 685:3,8,14
**texted** 684:10,16
**thank** 555:15,17
556:3 635:22
646:17 649:13
661:25 665:3
666:24 668:23
675:19 677:24
687:12
**thereof** 678:3

**thing** 558:21
603:13 613:22
632:4 660:3
667:19
**things** 561:16
562:12 572:14
595:16 596:3
614:5,15,21
615:17 642:4
646:20 666:10
668:19 685:9
**think** 562:23
571:21 574:2
575:2,25 576:3
579:21 580:9,14
587:17 590:17,17
591:16,23 594:9
594:10 595:12
597:21 605:2,18
607:18 611:3
613:8 615:20
617:12,22 618:11
618:12 619:23
620:24 630:6
633:23 635:21
636:5,11 641:3
642:13,13 645:9
646:3 647:4,13,24
648:16,22 649:4
651:16 656:15,24
656:25 661:2,2,10
681:16 685:6,8,17
686:2,13
**thinking** 619:22
639:19
**third** 557:24 558:4
675:21 680:12
**thirty** 646:16
**thorough** 560:20
**thoroughly** 666:7

**thought** 560:2
561:17,20 563:14
611:18 614:16
632:5 638:2
681:21
**threatened** 657:3
**three** 557:17,25
559:13,13 576:25
590:15 634:20,22
653:21 654:3
655:3 670:2
**throughs** 671:23
**throwing** 647:18
**time** 551:15,23
554:22 563:25
566:13,14 568:24
568:25 572:20
579:2 588:25
599:16 600:25
603:2,4,5,9 612:4
612:9 613:15
614:22 615:10,15
620:15 622:6,11
622:20 625:3
626:8,9 627:24
630:2 632:7 637:8
637:12 638:6,7
640:11,13 641:25
642:3,7,10,22
643:3,18 644:11
644:24,25 646:18
650:16 653:2,7
654:4,18,22 661:2
671:16 672:5,24
675:11 678:14
681:22 684:4
688:10
**times** 557:3
585:23 601:10
610:22 617:21

**timing** 569:7
627:7
**timoji** 576:7,8
577:14,15
**today** 628:9 641:9
643:5,8 651:15
652:23 657:14
664:11 667:7
675:4 678:23
679:6 684:14
**today's** 687:16
**todd** 621:20,22
622:2,11 625:23
626:25 628:13
637:20 642:20
643:10
**told** 564:10 575:11
596:3 603:15,17
604:24 613:15
617:10 621:15
622:21 623:2,9,24
630:6 637:24
639:22 640:8
648:23
**ton** 615:9
**tone** 609:14 636:5
**toner** 610:3,4,9
**top** 589:4 653:13
**torrential** 672:2
**total** 656:13
687:17
**tough** 610:8,16
**traditionally**
593:23
**tragedy** 619:24
**train** 622:17
**trained** 584:15
**trainees** 669:16,17
**transcript** 555:25
556:19 688:9,9

**transition** 584:18 593:7 594:2,3
**transitioned** 585:3 615:14 618:5
**transitioning** 593:17
**travel** 590:18
**traveled** 678:7
**treat** 622:24 623:3 623:20 626:22 641:13 645:20 665:20 680:8
**treated** 626:10 627:16 637:20,23 641:12,19,21 642:15 645:22
**treating** 644:5
**trial** 554:22
**tricoli** 629:22 678:21 679:3,23 685:21
**tried** 591:10 598:3 609:14 675:11 678:8
**trip** 572:10 592:4
**true** 588:5 680:8 688:9 690:12
**trust** 595:2,5,8,15 608:22,25 609:2,5 611:4
**truth** 556:17 688:5
**truthfully** 665:17
**try** 616:6 617:2 661:11 662:14 672:19,21
**trying** 617:22,24 629:9 677:17 685:12
**turn** 580:18 606:21 607:10 611:24 670:17,21

**turning** 565:5 591:14 606:6 634:7 674:7 675:20 678:19 680:18
**twenty** 600:23 610:17 621:4 656:12
**twice** 557:11,11
**two** 558:2 574:20 587:7,10 589:7 593:3 616:20 634:16,19 635:20 635:23,24 636:3,4 651:25 652:17 654:3 656:25 657:20 660:21 664:22 666:19,22 666:23 669:18 673:21 675:13 676:15 681:8
**type** 620:17 629:19
**types** 564:25
**typewritten** 565:21

**u**

**u** 554:2 573:2,15
**u.s.** 659:8 666:16 667:21 671:12,18 671:20,21 672:24 673:10
**uh** 580:8 587:9 595:3 607:16 608:5,23 612:13 621:8 634:11
**ultimate** 581:20
**ultimately** 567:18 677:20
**uncopied** 563:16

**underline** 597:15
**undermine** 639:2
**understand** 556:15
**understanding** 608:22,25 609:2,3 609:6,16,25 621:14 627:23
**understood** 571:7 599:6 610:20,21
**unemployment** 605:7,23 606:10 606:15
**unethical** 640:24
**unfamiliar** 666:2
**unhappiness** 640:19
**unhappy** 640:15 648:3
**united** 551:2
**units** 687:18
**unnecessary** 678:12
**unsigned** 554:14
**unwilling** 678:4
**update** 571:22 577:20 596:13
**updated** 616:20
**upper** 569:16 594:25
**upset** 561:19 647:5
**use** 560:11,13 609:5 662:21 667:7

**v**

**v** 691:3
**vacation** 620:13 623:5 673:21
**vagnini** 552:5 555:12

**valli** 552:5,8 555:12 558:20
**value** 600:10
**variety** 571:22 593:5
**various** 557:21 578:2 583:10
**vehemently** 623:24
**veritext** 687:19 691:2
**version** 604:12,18
**video** 551:17 552:3 555:20 666:21
**videographer** 553:7 603:5,9 637:8,12 654:18 654:22 687:14
**videotaped** 551:17
**viewed** 571:25 572:7 651:7
**virginia** 608:14 621:24 627:11 642:7
**visibly** 640:10,12 640:13,21 649:11
**visited** 666:12 669:4
**visiting** 576:25 668:14,25
**visitor** 632:10
**voice** 639:3
**voluntarily** 621:16

**w**

**wait** 574:10 649:14
**waiting** 631:16
**waive** 672:15
**waived** 554:9

**walk** 647:16
671:23
**walked** 624:2
631:18 639:14
640:9 649:12
660:23 661:9
**walking** 592:21
**want** 558:20
565:11 568:6
580:19 586:9
598:17,20 599:2,9
599:12 600:5,20
601:7,25 602:22
603:12 618:4
619:9,12 622:21
637:6 648:25
650:25 660:2,16
666:25 672:10
680:11 686:3,19
**wanted** 566:9
567:2,3,11 572:19
574:7 582:18
583:9 601:4 602:4
602:6,10,18
617:16 618:7,10
618:11 619:14,14
619:20 620:18
636:21 638:13
648:19 649:3
666:7 677:16
**washington**
674:24
**waste** 671:23
672:4,6 678:13
**waves** 621:13
**way** 583:2 598:2
615:25 632:6
639:21 640:10
644:25 649:3
677:17 679:9
690:17

**ways** 591:13
**we've** 593:6 613:8
639:16 660:20
685:5,9,24
**website** 612:18
**week** 574:4 623:6
623:7
**weekly** 597:23
**weeks** 638:5
673:21
**weird** 600:6
**went** 560:11 561:4
561:8 574:24
575:6 593:12
622:6,13 623:5
624:4
**westchester** 690:5
**westphal** 590:5
**whatsoever**
679:10
**whereof** 690:19
**willing** 678:5
**window** 576:9
**winston** 676:25
677:10,20
**wiping** 596:4
**withdraw** 650:2
**witness** 554:10,16
554:18 555:3,9
562:2 602:24
660:19 662:3,8,11
683:25 686:23,24
687:21 690:10,13
690:19 691:4
**witnesses** 687:5,10
**woman** 601:21,22
641:14 644:6
669:11,11
**women** 624:22
625:14,17,18,20
626:3,7,15,18

642:13 644:14
669:5
**word** 569:15 595:2
**words** 585:20
608:20 609:5
**work** 571:8,10,16
571:20 586:8
614:12 620:17
629:14 649:18
653:8 663:15,25
664:6 671:4 673:4
674:12 676:2
683:12 686:5
**worked** 569:19
584:16 601:11,12
609:10 616:11,12
618:23 628:23
652:16,18 653:5
672:22 685:7,18
**working** 569:4
570:19 584:23
595:9 596:23
600:23 602:8,9
609:7 610:17
615:6 622:9,11
643:21 678:9
**workings** 659:6
**workplace** 590:6
**world** 619:21
646:14,15
**worldwide** 601:23
**worried** 620:14
650:25
**worry** 630:11
631:6
**write** 572:22
605:25
**writes** 569:19
**writing** 572:18
576:15 579:16,19
579:23 580:3

633:25
**written** 574:18
580:2,12 597:24
616:19 664:23
**wrong** 620:23,25
638:3
**wrongdoing**
647:22 652:5
**wronged** 569:9
**wrongfully** 567:9
648:7
**wrote** 596:6
607:25 614:13
619:18 624:5,10
626:9 643:3
650:12 652:20
**wyn** 552:8

| x |
| --- |

**x** 551:3,12 689:2
689:12

| y |
| --- |

**yeah** 561:15,15,17
564:5 566:18
569:9 573:6
579:20 584:11
586:6,20 587:9
588:9 589:23
593:24 594:7,20
595:23 596:2
597:9,12,18
598:14 602:5,10
603:3 607:4 609:4
611:10 612:3,16
614:3,8 617:15
618:18,20 619:25
634:13,15,18
636:14 656:2
680:25
**year** 560:16 581:4
584:14 621:9

635:25 637:3
**years** 565:2
  570:18,18,19
  586:3 600:11,24
  601:13 610:5,18
  610:25 616:11,19
  616:20 618:24
  621:4,18,25
  624:20 625:13
  646:16 651:23
  652:18 668:7
  672:23 678:9
**yelling** 645:24
**york** 551:2,24
  552:7,12,12,17,17
  552:22,22 555:5
  555:14 577:2,4
  587:21 590:16,19
  605:22 636:2,12
  636:14 656:14
  690:4,9 691:2
**yorker** 609:13
**yuka** 631:17,23
**yvonne** 622:13,20
  623:2 638:22

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.