# EXHIBIT MMMM

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
JENNIFER S. FISCHMAN,

                        Plaintiff,

        -against-
MITSUBISHI CHEMICAL HOLDINGS AMERICA,
INC.; MITSUBISHI CHEMICAL HOLDINGS
CORPORATION; NICOLAS OLIVA, in his
individual and professional capacities;
DONNA COSTA, in her individual and
professional capacities; and JOHN DOES
1-10, in their individual and professional
capacities,

                        Defendants.
- - - - - - - - - - - - - - - - - - - -x
                    VIRTUAL ZOOM DEPOSITION

                    December 15, 2020
                    10:00 a.m.

    VIRTUAL VIDEO ZOOM DEPOSITION of
JOSHUA BERMAN, in the above-entitled
action, held at the above time and place,
taken before Jeremy Richman, a Shorthand
Reporter and Notary Public of the State of
New York, pursuant to the Federal Rules of
Civil Procedure, and stipulations between
Counsel.

                *      *      *

Page 2

```
 1
 2    APPEARANCES:
 3
         VALLI KANE & VAGNINI LLP
 4            Attorneys for Plaintiff
              600 Old Country Road, Suite 519
 5            Garden City, New York 11530
         BY:   MATTHEW BERMAN, ESQ.
 6
 7
         CLARICK GUERON REISBAUM, LLP
 8            Attorneys for Donna Costa
              220 Fifth Avenue, 14th Floor
 9            New York, New York 10001
         BY:   NICOLE GUERON, ESQ.
10
11       SHEARMAN & STERLING, LLP
              Attorneys for Mitsubishi
12            401 9th Street, Suite 800
              Washington, D.C. 20004
13       BY:   GEORGE E. ANHANG, ESQ.
14
         WHITE & CASE LLP
15            Attorneys for the witness,
              Joshua Berman
16            1221 Avenue of the Americas
              New York, New York 10020
17       BY:   AMY DONEHOWER, ESQ.
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   APPEARANCES (Cont'd):
 3      GORDON REES SCULLY MANSUKHANI, LLP
                 Attorneys for Donna Costa,
 4                Nicolas Oliva
              One Battery Park Plaza
 5                28th Floor
              New York, New York 10004
 6      BY:   MERCEDES COLWIN, ESQ.
              LAUREN MECABE, ESQ.
 7
 8
 9   PRESENT:
     DONNA COSTA
10   NICOLAS OLIVIA
     MARCO SOZIO, Videographer
11
12                *      *      *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1

2                    **STIPULATIONS**

3       IT IS HEREBY STIPULATED AND AGREED, by

4    and among counsel for the respective

5    parties hereto, that the filing, sealing

6    and certification of the within deposition

7    shall be and the same are hereby waived;

8       IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to form of

10   the question, shall be reserved to the

11   time of the trial;

12      IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be signed

14   before any Notary Public with the same

15   force and effect as if signed and sworn to

16   before the Court.

17                 *      *  *

18

19

20

21

22

23

24

25

1                    J. BERMAN

2              THE VIDEOGRAPHER:   Good

3        morning, we are going on the record

4        at 10:19 a.m. on December 15, 2020.

5        Please note that the microphones

6        are sensitive, and may pick up

7        whispering, private conversations

8        and cellular interference.  Please

9        turn off all cell phones, or place

10       them away from the microphones, as

11       they can interfere with the

12       deposition audio.  Audio and video

13       recording will continue to take

14       place unless all parties agree to

15       go off the record.  This is media

16       unit one of the video recorded

17       deposition of Joshua Berman, taken

18       by counsel for the defendant in the

19       matter of Jennifer S. Fischman

20       versus Mitsubishi Chemical Holdings

21       America, Incorporated, Mitsubishi

22       Chemical Holdings Corporation,

23       Nicolas Oliva in his individual and

24       professional capacities, Donna

25       Costa in her individual and

Page 6

```
 1                    J. BERMAN
 2        professional capacities, and John
 3        Does 1 through 10 in the individual
 4        and professional capacities, filed
 5        in the United States District
 6        Court, Southern District of New
 7        York, civil action number
 8        18-CV-08188 (JMF.)
 9             The deposition is being held
10        remote virtual Zoom located in
11        Scarsdale, New York 10583.  My name
12        is Marco Sozio from the firm
13        Veritext New York, and I'm the
14        videographer.  The court reporter
15        is Jeremy Richman, from the firm
16        Veritext New York.
17             I am not authorized to
18        administer an oath, I am not
19        related to any party in this
20        action, nor am I financially
21        interested in the outcome.  Counsel
22        and all present in the room and
23        everyone attending remotely will
24        now state their appearances and
25        affiliations for the record.  If
```

```
 1                    J. BERMAN
 2        there are any objections to the
 3        proceeding, please state them at
 4        the time of your appearance,
 5        beginning with the noticing
 6        attorney.
 7              MS. COLWIN:  Good morning,
 8        all.  Mercedes Colwin from the Law
 9        Offices of Gordon Rees.  I am
10        present defending Nicolas Oliva,
11        Donna Costa and Mitsubishi Chemical
12        Holdings America.  With me are my
13        colleagues Brittany Primavera and
14        Peter Siachos.
15              MR. ANHANG:  My name is
16        George Anhang.  Anhang is spelled
17        A-N-H-A-N-G.  I'm with the law firm
18        of Shearman and Sterling.  There
19        are two entities represented by
20        Shearman and Sterling in connection
21        with this matter.  The first is
22        Mitsubishi Chemical Corporation,
23        the second is Mitsubishi Chemical
24        Holdings Corporation.  My
25        appearance today is without waiver
```

Page 8

```
 1                   J. BERMAN
 2        of, and we expressly reserve all
 3        rights with respect to all defenses
 4        of our clients, including the
 5        defense that the court in this
 6        matter is without personal
 7        jurisdiction over Mitsubishi
 8        Chemical Holdings Corporation.
 9        That defense is the subject of a
10        pending motion to dismiss by
11        Mitsubishi Chemical Holdings
12        Corporation.
13              MS. GUERON:  Nicole Gueron,
14        Clarick Gueron Reisbaum.  I
15        represent Donna Costa.
16              MS. DONEHOWER:  Amy
17        Donehower, White & Case, LLP.  I'm
18        here for the deponent, Josh Berman.
19              MR. BERMAN:  This is Matthew
20        Berman, here for the plaintiff
21        Jennifer Fischman.
22              THE VIDEOGRAPHER:  Is that
23        everyone?
24              MS. COSTA:  Donna Costa,
25        defendant.
```

```
 1                    J. BERMAN
 2            MR. OLIVA:  Nicolas Oliva,
 3       defendant, and as general counsel
 4       of Mitsubishi Chemical Holdings
 5       America.
 6            THE VIDEOGRAPHER:  Will the
 7       court reporter please swear in the
 8       witness.
 9            JOSHUA BERMAN, having been
10       called as a witness, having first
11       been duly sworn by a Notary Public
12       (Jeremy Richman) of the State of
13       New York, was examined and
14       testified as follows:
15            THE VIDEOGRAPHER:  Thank you,
16       we may proceed.
17            EXAMINATION BY
18            MS. COLWIN:
19        Q.    Good morning, Mr. Berman.  As
20    you know from my introductory remarks,
21    I'm the defense counsel here
22    representing Donna Costa, Nicolas Oliva
23    and Mitsubishi Chemical Holdings
24    America.  You are present pursuant to a
25    subpoena that was issued by my office;
```

```
 1                    J. BERMAN
 2    is that correct?
 3         A.    Yes.
 4         Q.    Now, I understand that you
 5    received an attorney, so I'm not going
 6    to go into the particulars about that
 7    you are -- you understand the rules of
 8    engagement in a deposition; is that
 9    correct?
10         A.    Yes.
11         Q.    I want to flag some critical
12    parts of the process.  One is that you
13    are sworn to tell the truth, correct?
14         A.    Yes.
15         Q.    And let us have an agreement.
16    I ask a question, you respond.  It's
17    agreed between the two of us that you
18    understood the question, that you are
19    testifying to the best of your
20    recollection as you sit here today, and
21    that you're testifying truthfully; is
22    that understood?
23         A.    I understand.
24         Q.    Let's begin.  Is there --
25    have you taken anything that could
```

```
 1                    J. BERMAN
 2    affect your ability to recollect
 3    events?
 4         A.    No.
 5         Q.    Have you taken anything that
 6    can affect your judgment in any way?
 7         A.    No.
 8         Q.    Have you taken anything that
 9    could affect your ability to tell the
10    truth during this proceeding?
11         A.    No.
12         Q.    Have you taken -- withdrawn.
13              Were you required to take
14    medication today that you have not
15    taken?
16         A.    No.
17         Q.    Okay.  And as you know,
18    Mr. Berman, if you need to take a break
19    at any time, then please let us know,
20    and we can take that break, but all I
21    ask is that you not take a break during
22    the pendency of a question.  Is that
23    understood?
24         A.    It's understood.
25         Q.    All right.  Mr. Berman, what
```

```
                                    Page 12
 1                  J. BERMAN
 2   is your full legal name?
 3        A.    Joshua A. Berman.
 4        Q.    Have you been known by any
 5   other legal name?
 6        A.    No.
 7        Q.    You are currently employed by
 8   White & Case, are you not?
 9        A.    I am.
10        Q.    And how long have you been
11   employed by White & Case?
12        A.    Nearly four years.
13        Q.    And you're a partner,
14   correct?
15        A.    Correct.
16        Q.    Prior to White & Case, where
17   were you practicing?
18        A.    Troutman Sanders, LLP.
19        Q.    Do you have a specialization
20   in your current position as partner at
21   White & Case?
22        A.    Litigation and disputes.
23        Q.    And in your prior
24   partnership, what was your -- were you
25   a partner as well?
```

Page 13

1                    J. BERMAN

2          A.     I was.

3          Q.     And at Troutman, what was

4    your specialization, if anything?

5          A.     The same.

6          Q.     How long did you work there?

7          A.     Four years, give or take.

8          Q.     And under what circumstances

9    did your employment with the firm end?

10         A.     I got an offer to join White

11   & Case, which was very attractive to

12   me, and I accepted that offer and made

13   the move.

14         Q.     Have you spoken to Jennifer

15   -- withdrawn.

16                You know Jennifer Fischman,

17   do you not?

18         A.     I do.

19         Q.     You consider her a friend,

20   correct?

21         A.     Certainly friendly.

22         Q.     Your children socialize with

23   hers?

24         A.     They know one another, you

25   know, the high school is a big high

```
 1                    J. BERMAN
 2    school.  So they're not in the same
 3    friend group, but they know who one
 4    another is, for sure.
 5          Q.    Have you spoken to
 6    Ms. Fischman about this deposition?
 7          A.    No.
 8          Q.    Have you ever spoken to her
 9    about the complaint that's at issue
10    here?
11          A.    In very broad strokes, I'm
12    aware that she is maintaining a
13    lawsuit.  Not specifically about the
14    complaint, no.
15          Q.    Did you ever have any
16    substantive discussion with
17    Ms. Fischman about your deposition?  I
18    understand that you may not have spoken
19    to her specifically, but the substance
20    of your testimony today, have you ever
21    had a discussion with Ms. Fischman?
22          A.    Why don't you ask me that at
23    the end?  I think the answer is no.
24          Q.    Have you had -- what did you
25    do in preparation -- withdrawn.
```

Page 15

```
 1                    J. BERMAN
 2              You spoke to your counsel,
 3    that's Amy Donehower, correct?
 4         A.    That's correct.
 5         Q.    When did you first meet
 6    Jennifer Fischman?
 7         A.    Oh, boy.  Let me just do some
 8    math in my head.  If Zach is 15, I
 9    would say five to seven years ago.
10         Q.    You mentioned your son, so
11    you met through your children; is that
12    correct?
13         A.    Our children attended Hebrew
14    school together, and there were monthly
15    parent sessions, and Jennifer and I sat
16    next to one another during some Sunday
17    morning religious school services and
18    became friendly, you know, we would
19    just chat during those.
20         Q.    Have you socialized with
21    Ms. Fischman outside of what you just
22    described?
23         A.    A few times over this period
24    of five years, maybe three or four.
25    And certainly not in the past while.
```

```
 1                J. BERMAN
 2   My wife Lisa and I had dinner with
 3   Jennifer and her husband, Lee.
 4        Q.    Is that recent, when was the
 5   last time you socialized with Jennifer
 6   and her husband -- Ms. Fischman and her
 7   husband, rather?
 8        A.    I would guess more than a
 9   year ago.  But I would have to look at
10   the -- I think I would have to ask Lisa
11   to look at her calendar.
12        Q.    You both -- do you live near
13   Ms. Fischman?  We understand from your
14   testimony that your children had
15   attended Hebrew school together.
16        A.    We both live in Scarsdale,
17   but we live in different neighborhoods,
18   if you will, of Scarsdale.  So I think
19   it's probably a 15-minute drive, or
20   12-minute drive from my house to hers.
21        Q.    Have you gone to her home?
22        A.    Once for a barbecue years
23   ago.
24        Q.    Now, did you ever have a
25   discussion with Ms. Fischman about her
```

```
                                    Page 17
 1                    J. BERMAN
 2    decision to return to New York after
 3    being in California for a period of
 4    time?
 5         A.    I believe so.
 6         Q.    Did you know Ms. Fischman at
 7    the time that you had made the
 8    decision, or was this discussion after
 9    she had returned to New York?
10         A.    After the fact.
11         Q.    When did you last speak to
12    Ms. Fischman?
13         A.    I'm trying to think.  Quite a
14    while ago, before the summer.
15         Q.    Now, there came a time when
16    Ms. Fischman hired you to work on
17    matters for Mitsubishi; is that right?
18         A.    Yes.
19         Q.    When was the first time that
20    you worked with Ms. Fischman?
21         A.    It would have been around,
22    just flipping through, yeah, it would
23    have been, I think in the fourth
24    quarter of 2016, probably late in the
25    third quarter.
```

```
 1                    J. BERMAN
 2        Q.     Now, we just want to note for
 3   the record that you were looking at
 4   documents.  What document in particular
 5   were you looking at to respond to this
 6   question?
 7        A.     Yeah, literally tab two of
 8   the exhibits you sent.  I just wanted
 9   to see -- I just wanted to make sure I
10   was getting the year correct.  In the
11   months leading up to Labor Day, so the
12   summer, I just wanted to make sure it
13   was 2016, rather than 2017.
14        Q.     So that in the document that
15   you're looking at refers to the
16   Genomatica litigation, correct?
17        A.     Correct.
18             MR. BERMAN:  Hey, Counsel, is
19        the witness looking at exhibits
20        that were provided?  Because I have
21        not received any exhibits.
22             MS. COLWIN:  Let's introduce
23        Exhibit 1.
24             MR. BERMAN:  Are these
25        materials that have been provided
```

```
                                            Page 19

 1                      J. BERMAN

 2        to the deponent?

 3              MS. COLWIN:  Yes, they were

 4        provided in hardcopy, in a sealed

 5        envelope.

 6              THE WITNESS:  They were just

 7        a courtesy copy for me, I believe.

 8        Sorry, I should let counsel say

 9        that.

10              MR. BERMAN:  Okay, I just

11        wanted to make sure that any

12        materials provided to the deponent

13        have been disclosed to us,

14        regardless of whether they're

15        ultimately introduced into evidence

16        or not.

17              MS. COLWIN:  All the

18        documents that have been provided

19        to counsel -- to Mr. Berman are

20        going to be introduced.  So we're

21        going to introduce Exhibit 1, which

22        is the document that Mr. Berman was

23        just referring to.

24              MR. BERMAN:  Okay, I just

25        want to note for the record my
```

```
                                      Page 20
 1                    J. BERMAN
 2        request that all such documents
 3        provided to the deponent be
 4        disclosed to us, regardless of
 5        whether they end up being
 6        introduced today, or if you should
 7        decide within your discretion not
 8        to introduce an exhibit, we would
 9        still like to make sure we receive
10        a copy disclosed to us, thank you.
11             MS. COLWIN:  Could I just
12        ask, right now my screen is the
13        exhibits.  Could I just ask for the
14        identity of the individual who was
15        just speaking?
16             MR. BERMAN:  That's Matthew
17        Berman for plaintiff.
18             MS. COLWIN:  Thank you, Matt.
19         A.    I'm afraid I opened a can of
20   worms.  Had I given it a more careful
21   think, I could have told you that it
22   was around summer of 2016 without
23   glancing at the document, just my
24   nature to be extra sure.
25             MS. COLWIN:  While we're
```

1                    J. BERMAN
2         waiting for the exhibit to come up,
3         and Matt, just so that you know,
4         Exhibit 1 is the complaint at
5         issue, Exhibit 2 is an email
6         communication, all of which, all of
7         the exhibits that we are referring
8         to today have been previously
9         marked, and I will identify them as
10        marked and disclosed during the
11        course of discovery.  So I'll make
12        sure that with each exhibit, that
13        the Bates stamp is identified as
14        well, so there are no surprises
15        here for anyone.
16              MR. BERMAN:  Perfect, I
17        appreciate that.  Thank you,
18        Counsel.
19         Q.    While we are waiting for the
20    exhibits to upload, Mr. Berman, I just
21    want to go back.  So is the Genomatica
22    litigation the first time that you had
23    learned of Mitsubishi?
24         A.    No, I mean, I know of
25    Mitsubishi Chemical Corporation just

Page 22

```
 1                    J. BERMAN
 2    from experience in the business world,
 3    as an important multinational
 4    Japan-based conglomerate, but it's the
 5    first time that I ever did work for
 6    them.
 7         Q.    Okay.  Was it the first time
 8    that your firm had ever done work for
 9    Mitsubishi?
10              MS. DONEHOWER:  I want to
11         jump in here -- Mr. Berman's answer
12         may implicate some privileged or
13         confidential information.  I want
14         to make sure we are taking
15         direction from defendants about
16         whether or not he's permitted to
17         answer that question, to the extent
18         he knows.
19              MR. ANHANG:  I'm happy to
20         clarify.  For the record, this is
21         George Anhang, and on behalf of
22         Mitsubishi Chemical Corporation, I
23         instruct the witness, in answering
24         the present question and other
25         questions today, not to reveal any
```

Page 23

```
 1                    J. BERMAN
 2        confidential client communications
 3        or work product with respect to his
 4        representation of Mitsubishi
 5        Chemical Corporation, except that
 6        the witness today may, in his
 7        answer to the present question and
 8        other questions, refer to client
 9        communications regarding the
10        settlement of the Genomatica action
11        that is the subject of this action.
12            A.    Ms. Colwin, are you referring
13    to Troutman Sanders or White & Case, or
14    both?
15            Q.    We're just reflecting your
16    time at Troutman Sanders at the present
17    moment.  We'll get back to whether or
18    not you have a continuing relationship
19    with Mitsubishi towards the end.
20            A.    I don't know if Troutman
21    Sanders had ever done work for
22    Mitsubishi Chemical Corporation prior
23    to my working on the Genomatica matter.
24            Q.    In your current role as
25    partner in White & Case, do you
```

```
 1                    J. BERMAN
 2   continue to have a working relationship
 3   with Mitsubishi?
 4         A.    I do.
 5         Q.    And there are matters that
 6   you are handling for them currently?
 7         A.    I have two matters for
 8   Mitsubishi Chemical Composites America,
 9   and as luck would have it, there are a
10   few kind of tail-end cleanup items
11   still pertaining to the Genomatica
12   lawsuit that come up once every six
13   months, and relate only to the clerical
14   act --
15              MS. DONEHOWER:  Mr. Berman,
16         let's not get into the details of
17         what it states without MCC's
18         direction.
19         A.    Very, very limited clerical
20   issues that are ongoing from the
21   settlement of Genomatica.
22         Q.    Okay.  We are having the --
23   we're waiting for the exhibits to
24   populate.  While they are, I just want
25   to focus for a moment, before we get to
```

Page 25

```
 1                   J. BERMAN
 2   the -- to Exhibit 2, which is what you
 3   had referred to in answering the
 4   question as to when you were hired for
 5   Genomatica.  Let me just focus for a
 6   moment on the complaint that
 7   Ms. Fischman has brought against the
 8   entities that are involved in today's
 9   proceeding.
10               (Exhibit 1, marked for
11          identification, First amended
12          complaint jury trial demand.)
13       Q.    When did you first learn
14   about this lawsuit that's at issue
15   today?
16       A.    When Jennifer told me about
17   if.
18       Q.    Do you remember when that
19   was?
20       A.    Like I said, I believe to the
21   best of my recollection, I would say Q3
22   or early Q4 of 2016.
23       Q.    Okay.  We are now going to --
24   I would ask you to take a look at the
25   second exhibit you have in front of
```

Page 26

```
 1                    J. BERMAN
 2   you.  It's the first amendment
 3   complaint.  We're going to populate it
 4   for everyone at the deposition at this
 5   very moment.
 6        A.    The first amended complaint
 7   is the first exhibit I have, it's tab
 8   1.
 9        Q.    Had you ever seen this
10   complaint prior to today?
11        A.    No.  Well, yesterday, when I
12   got the packet of documents, I
13   literally physically saw it, but I
14   didn't read it.
15        Q.    Okay.  Have you ever
16   discussed any particulars with
17   Ms. Fischman?  I understand you didn't
18   read the complaint, but had you
19   discussed any of the particulars of the
20   complaint with Ms. Fischman at any
21   point prior to today?
22        A.    I can't discuss that without
23   reading the complaint, because I don't
24   know what's in there.
25        Q.    Did you discuss any of the
```

```
                                          Page 27
 1                   J. BERMAN
 2   allegations that you believed
 3   existed -- exist in the amended
 4   complaint in your discussions with
 5   Ms. Fischman?
 6        A.    I'm really hesitant to
 7   speculate as to what's in the complaint
 8   without having read it.  Go ahead, I'm
 9   sorry.
10        Q.    I was going to ask a question
11   related to the same, but to see, were
12   there any conversations that you had
13   with Ms. Fischman pertaining to
14   allegations that may or may not be
15   existing in the complaint, but
16   allegations in general against
17   Mitsubishi Holdings America, Donna
18   Costa and Nick Oliva?
19        A.    Yes.
20        Q.    And what were those
21   discussions?
22        A.    Just at a very high level of
23   generality, that she was seeking
24   redress for being terminated by -- I
25   didn't know which defendants were on
```

Page 28

```
 1                    J. BERMAN
 2    the caption, so I'll just refer to it
 3    as Mitsubishi.  She was seeking legal
 4    redress for being terminated by
 5    Mitsubishi.  I'm not sure, again, which
 6    entity, but that was really it.
 7         Q.    Was it a single conversation,
 8    or were there multiple conversations
 9    that Ms. Fischman disclosed the general
10    nature of her allegations against
11    Mitsubishi, et al.?
12         A.    I'm just not sure.
13         Q.    Was it more than once that
14    you had a conversation with her?
15         A.    Probably, but I don't want to
16    be misleading and say, like, we had a
17    conversation centered around that.  It
18    would have been -- first of all, I'm
19    not sure if it was more than one.
20    Second of all, it would have been,
21    like, at a restaurant with our
22    respective spouses, and not a main
23    topic of conversation, just in passing
24    like, Yeah, I'm pursuing legal action.
25    I said, You know, it's a sort of a
```

```
 1                    J. BERMAN
 2     bummer of a situation and I'm sorry to
 3     hear about these matters.  But we've
 4     never gotten into the nitty-gritty of
 5     this.
 6          Q.    Did you ever disclose to
 7     Ms. Fischman that you had an ongoing
 8     and continuing relationship with
 9     Mitsubishi?
10          A.    I think she knew without me
11     having to disclose that.
12          Q.    And what is the basis for
13     your belief that that's so?
14          A.    One of the ongoing matters,
15     and I'll be careful with privilege
16     here, for a U.S.-based Mitsubishi
17     company, Jennifer discussed with me
18     briefly prior to the events, I guess,
19     in question, relative to her
20     termination, and then that matter
21     turned into a litigation matter.
22          Q.    Okay.  We've mentioned
23     Mr. Oliva's name a couple of times
24     during your testimony today.  You know
25     Mr. Oliva, do you not?
```

Page 30

1                    J. BERMAN

2        A.    I do know him.

3        Q.    And how did you first meet

4   Mr. Oliva?

5        A.    Through the Genomatica matter

6   as well, and in particular, Mr. Oliva

7   and I attended an early neutral

8   mediation session in San Diego,

9   California together before a federal

10   magistrate judge, and we spent a day in

11   preparation, went to dinner together,

12   and then we attended the mediation.

13        Q.    Was that the first time you

14   met Mr. Oliva, was through the

15   Genomatica litigation?

16        A.    Yes.  Let me just clarify, I

17   may have had a telephone conversation

18   before that.  I believe that was the

19   first time I met Mr. Oliva in person.

20        Q.    Has Ms. Fischman ever

21   discussed Mr. Oliva with you?

22        A.    Yes.

23        Q.    And what did she say about

24   him?

25        A.    That he had been at Bristol

Page 31

1                  J. BERMAN
2    Myers, that he was brought into -- she
3    had been acting general counsel at
4    MCHA, and that Nick was brought in to
5    take over the full-time general counsel
6    role.  And that he was a good boss.
7         Q.    Okay.  Has Mr. Oliva ever
8    spoken to you about Ms. Fischman in
9    terms of her separation from the
10   company?
11        A.    Only at a very high level,
12   and I believe saying that he wanted to
13   be careful not to put me into an
14   uncomfortable position.  No.  Sorry,
15   I'm trying to remember, these are a
16   number of years ago, and I know how
17   frustrating that is sitting at your end
18   of the table.  To the best of my
19   recollection, I never had a detailed
20   discussion with Mr. Oliva about these
21   matters.  Just at a very high level,
22   this happened -- oh, know what, sorry,
23   I talked myself into remembering.
24             When Ms. Fischman was
25   terminated, Mr. Oliva called me and

```
                                              Page 32
 1                    J. BERMAN
 2    said, I just want to let you know this
 3    is happening and, you know, so you're
 4    not surprised, you know, you and I will
 5    be working together on the, I guess
 6    conclusion of Genomatica.
 7          Q.    Okay.
 8          A.    But that was it.  He
 9    certainly didn't get into his various
10    reasons and anything of that nature, to
11    the best of my recollection.
12          Q.    In your interactions with
13    Mitsubishi employees, has anyone ever
14    complained to you about Mr. Oliva?
15          A.    No.
16          Q.    In your discussions with
17    Ms. Fischman, did she ever say to you
18    that she felt she had been punished at
19    Mitsubishi at any point?
20          A.    I don't believe so.  You're
21    asking if she told me she was
22    specifically punished, I don't believe
23    so.
24          Q.    Did Ms. Fischman ever discuss
25    with you about Mr. Oliva's abilities as
```

```
                                          Page 33
 1                    J. BERMAN
 2   an attorney?
 3         A.     I think she regarded him
 4   highly, but I can't point you to a
 5   special date or conversation.
 6         Q.     Okay.  I'm going to call your
 7   attention to the Genomatica litigation.
 8         A.     Okay.
 9         Q.     Were you the primary outside
10   counsel at Troutman Sanders responsible
11   for Genomatica?
12         A.     Yes.
13         Q.     Was there anyone else
14   involved in the litigation with you
15   from your firm?
16         A.     My associate and current
17   colleague, Suzie Grace.
18         Q.     Who interfaced with
19   Ms. Fischman?
20         A.     I would say I did, and Suzie
21   may have had a few conversations or
22   emails with Ms. Fischman, I just don't
23   know.  But I would have been, by far,
24   the primary point of contact.
25         Q.     In terms of communications
```

```
 1                    J. BERMAN
 2   with opposing counsel, were you the
 3   primary partner that was responsible
 4   for that in the Genomatica litigation?
 5        A.    I was the only partner
 6   responsible for that.
 7        Q.    Who did you represent?
 8        A.    Mitsubishi Chemical
 9   Corporation.
10        Q.    And who was the client
11   contact in the Genomatica litigation?
12        A.    Jen.
13        Q.    When you say Jen, you mean
14   Jennifer Fischman?
15        A.    Sorry, Jennifer Fischman, but
16   we did speak with Mr. Minami Tomoji,
17   and Masaru Utsunomiya, who we referred
18   to as Utsunomiya-san.
19        Q.    Could you tell us the general
20   nature of the Genomatica litigation?
21        A.    Yes.  At a high level,
22   Mitsubishi Chemical Corporation entered
23   into a venture, I don't know if it was
24   formally captioned a joint venture with
25   Genomatica, which was, in essence, a
```

```
                                         Page 35
  1                      J. BERMAN
  2     green energy type company, and
  3     Mitsubishi had paid a sum of money in
  4     advance to Genomatica.  And the
  5     contract between the two parties, that
  6     is Genomatica on the one hand and
  7     Mitsubishi Chemical Corporation on the
  8     other hand, called for the return of a
  9     portion of Mitsubishi's cash payment if
 10     Genomatica failed to meet certain, I
 11     believe, business and scientific
 12     milestones by a date certain.
 13     Genomatica failed to meet those
 14     deadlines.  The contract, to the best
 15     of my recollection, was clear and
 16     unambiguous on its face, and Mitsubishi
 17     business folks in Japan had tried in
 18     good faith for months, if not a year,
 19     to successfully obtain the return of
 20     Mitsubishi's money from Genomatica, but
 21     Genomatica was exceptionally evasive,
 22     and they weren't returning Mitsubishi's
 23     money, in violation of the party's
 24     contract.
 25          Q.    Mr. Berman, who was your
```

```
                                    Page 36
 1                  J. BERMAN
 2   contact at Mitsubishi Chemical Holdings
 3   America, was that just Ms. Fischman?
 4        A.    Yes.   Subsequently Mr. Oliva,
 5   but Ms. Fischman initially.
 6        Q.    And was it your understanding
 7   that Ms. Fischman was managing the
 8   litigation for MCC?  We're going to use
 9   the acronym.
10        A.    I think that's a fair
11   assessment, yes.
12        Q.    How would you describe it in
13   your own words, what Ms. Fischman's
14   role was in the Genomatica litigation?
15        A.    She was in-house counsel,
16   that's how I looked at it.  I'm aware
17   there are different entities, but
18   contemporaneously, my understanding
19   was, she was, you know, based in the
20   U.S., I think still is, and was serving
21   as in-house counsel from whom I took
22   direction and talked about the case,
23   and not unlike any of the other, you
24   know, in-house litigators or in-house
25   general counsels with whom I work, I
```

Page 37

```
 1                    J. BERMAN
 2    wasn't focused on the fact that
 3    Ms. Fischman was technically an
 4    employee of X entity or Y entity.
 5         Q.    You mentioned moments ago
 6    under oath that Mr. Oliva also had a
 7    role in the Genomatica litigation, and
 8    at one point pursuant to your
 9    testimony, he was the primary contact
10    for you at MCHA regarding Genomatica.
11              What was Nick's involvement
12    in the Genomatica litigation?  And if
13    it changes over time, and obviously,
14    from your testimony, it will, describe
15    that for us?
16              MS. DONEHOWER:  I just want
17         to jump in and say, Josh, be
18         careful that we are only talking
19         about client communications
20         regarding the settlement, as per
21         Mr. Anhang's direction.
22         A.    I understand.  So broadly,
23    when Jennifer and I kind of kicked off
24    the litigation, I was aware that Nick
25    was the general counsel, and so that's
```

```
 1                    J. BERMAN
 2     the highest you can get within an
 3     organization's legal function.  So I'm
 4     not sure whether I assumed or whether
 5     it was explicitly communicated, but I
 6     knew that Nick, you know, sort of sat
 7     on top of the pyramid in the litigation
 8     function, and was aware of the
 9     litigation and so forth.  But Jennifer
10     was responsible for the day-to-day in
11     terms of the in-house counsel roles,
12     and I assume that's because Nick had,
13     you know, a ton on his plate, and had
14     various deputies who were either
15     responsible for litigation or M&A or
16     tax matters or employment, and so I
17     dealt with Jennifer knowing that Nick
18     was the general counsel.
19               Subsequently, I believe it
20     was in or around November of 2017 --
21     no, it was, I'm sorry, it would have
22     been earlier than that.  At any rate,
23     shortly after I joined White & Case,
24     which was in February of 2017, when
25     these events transpired as between
```

```
 1              J. BERMAN
 2   Ms. Fischman and the company, Nick
 3   really took over the day-to-day in
 4   place of Ms. Fischman.  And so he
 5   functioned as both the general counsel,
 6   and I know that he had other
 7   responsibilities, but he sort of, if
 8   you will, rolled his sleeves up and got
 9   involved with this particular case and
10   our efforts to get a good result.
11        Q.    So Mr. Berman, just to orient
12   your memory, because I would like to
13   have a specific date of the November
14   time frame you just testified about,
15   the offer made to Genomatica was on
16   January 6, 2017.
17              Now, going back to your
18   testimony, you have identified November
19   as a time in which Mr. Oliva had become
20   more involved in the Genomatica
21   litigation.  If I'm phrasing your
22   testimony incorrectly, please say so
23   and just --
24        A.    No, you're -- sorry, go
25   ahead.  You're phrasing it correctly.
```

Page 40

```
 1              J. BERMAN
 2   I must have my dates wrong, because
 3   Nick didn't become involved day-to-day
 4   until the early neutral mediation, or
 5   it could have been before that.  But he
 6   didn't become day-to-day until
 7   Ms. Fischman was let go, and I don't
 8   know when that was.  But if we go
 9   through these documents, I'm sure it
10   will refresh my recollection.
11        Q.    We will bookmark that and
12   come back to it.
13        A.    Okay.
14        Q.    Did you ever communicate
15   directly with MCC?
16        A.    I did, but only with
17   Ms. Fischman on the phone.
18        Q.    Did you ever communicate
19   directly with MCHC?
20        A.    I don't know, because I don't
21   know who wore what hats, and I have
22   only a dim understanding of what MCHC
23   is, to begin with.
24        Q.    Did you ever have a
25   conversation with any Mitsubishi -- I'm
```

```
                                    Page 41

 1                    J. BERMAN
 2    just focusing your attention on
 3    Genomatica.  Did you ever have any
 4    discussion with anyone outside of
 5    Ms. Fischman at Genomatica during the
 6    pendency of the Genomatica litigation
 7    other than Ms. Fischman, and you
 8    already identified Mr. Oliva.  Other
 9    than those two, were there any other
10    conversations you had with individuals
11    pertaining to Genomatica?
12          A.    At MCA or MCC?
13          Q.    We can start with MCC.
14          A.    Well, I think I said earlier
15    that I spoke, together with
16    Ms. Fischman, on a number of occasions,
17    with Tomoji and Utsunomiya-san.  I
18    don't believe I ever spoke to
19    Takimoto-san or Sakiguchi-san, but I
20    was aware they were stakeholders, if
21    you will, in the outcome.  And
22    subsequently, I spoke to Nick about
23    this, but I think that's it.
24          Q.    Was there ever a time that
25    you had a conversation during the
```

```
                                        Page 42
 1                    J. BERMAN
 2    pendency of the Genomatica litigation
 3    where you had conversations with anyone
 4    at MCC without the presence of Jennifer
 5    Fischman?
 6         A.    To the best of my
 7    recollection, no.
 8         Q.    Was there ever a time that
 9    you had a conversation with individuals
10    from MCC pertaining to the Genomatica
11    litigation outside the presence of
12    Mr. Oliva?
13         A.    Yes, I mean, the
14    conversations that I had with Jennifer
15    and the folks back in Japan did not
16    include Mr. Oliva.  But subsequent to
17    Nick taking the reins, if you will, we
18    spoke then, either he spoke to MCC or
19    we together spoke to MCC.
20         Q.    I just want to make sure the
21    record is clear.  Was there ever an
22    occasion where you spoke to MCC, it
23    went -- following separation, the
24    Fischman separation from MCHA, where
25    then Mr. Oliva was not present?
```

Page 43

```
 1              J. BERMAN
 2      A.    Not to the best of my
 3   recollection, no.
 4      Q.    Did Mr. Oliva ever provide
 5   you with any direction during the
 6   pendency of the Genomatica litigation?
 7      A.    Sure, I mean, Nick is a
 8   really sharp lawyer, and so we worked
 9   together to, you know, do all that we
10   could to obtain a successful outcome
11   for MCC.  So for example, at the early
12   neutral mediation, there was shuttle
13   diplomacy, if I call.  The magistrate
14   split up the sides as we were
15   negotiating, and Nick has a very steady
16   demeanor, and we would have
17   conversations about whether to respond
18   to X or Y offer, and I have a general
19   recollection, without being able to
20   quote specific sentences, that Nick's
21   guidance was, let's essentially try to
22   hold firm.  And then it was Nick's
23   call, I guess together with the folks
24   in Japan, when we ultimately reached --
25   agreed to a deal.  But maybe that's
```

Page 44

```
 1                    J. BERMAN
 2    more detail than you want.
 3              Did Nick ever provide me
 4    guidance, yes.
 5         Q.    What instructions did you
 6    receive from Ms. Fischman during the --
 7              MR. BERMAN:  Ms. Colwin, I'm
 8         informed that Ms. Fischman is
 9         trying to participate in the call
10         unsuccessfully.  Could we maybe
11         pause momentarily and see if we can
12         get Veritext to help her join in?
13         A.    May I, without going off the
14    record, go fill my coffee cup?
15              THE VIDEOGRAPHER:  I need to
16         take us off the record, stand by.
17         Off the record at 11:01 a.m.
18              (Recess.)
19              THE VIDEOGRAPHER:  We are now
20         on the record.  The time is
21         11:08 a.m.
22         Q.    Mr. Berman, you received
23    instructions from Ms. Fischman
24    pertaining to the Genomatica
25    litigation, correct?
```

Page 45

```
 1                    J. BERMAN
 2        A.    Yes.
 3        Q.    What were those instructions,
 4   to the best of your recollection, and
 5   how you were to handle that litigation?
 6              MS. DONEHOWER:  I would like
 7        to take direction from Mr. Anhang,
 8        thank you.
 9              MR. ANHANG:  Thanks, Amy.
10        I'm just going to repeat what I
11        said before.  I'm not going to do
12        that throughout the deposition
13        today, but let me just once again
14        say on behalf of Mitsubishi
15        Chemical Corporation, that I
16        instruct the witness, in answering
17        the present question and all other
18        questions today, not to reveal
19        confidential client communications
20        or work product with respect to his
21        representation of Mitsubishi
22        Chemical Corporation, except that
23        the witness may, in answering the
24        present question and other
25        questions today, refer to client
```

Page 46

```
 1                    J. BERMAN
 2        communications regarding the
 3        settlement of the Genomatica action
 4        that is the subject of the present
 5        litigation.
 6          A.    So Ms. Colwin, this is
 7     difficult to answer, because obviously
 8     the settlement conversations didn't
 9     commence instantly.  The first
10     conversations I had with Ms. Fischman
11     relative to the lawsuit were connected
12     to the contract and the substance of
13     the dispute and the objectives in
14     potentially initiating litigation.  So
15     I think I've been -- if I understand
16     the privilege issues, even at a
17     rudimentary level, I think I've been
18     instructed not to answer that.
19              MS. DONEHOWER:  You can
20        answer the directions that
21        Ms. Fischman gave you with respect
22        to the settlement of the Genomatica
23        matter, to the extent that's the
24        question.
25          Q.    I'm going to rephrase my
```

Page 47

```
 1                    J. BERMAN
 2   question in consideration of what
 3   co-counsel has raised.
 4            When talking about the
 5   general tone and direction of the
 6   litigation that you were involved in,
 7   protecting the interests of MCC, were
 8   you given instructions by Ms. Fischman?
 9   I'm not talking about the specifics,
10   I'm not asking for --
11        A.    Yes.
12        Q.    What were those instructions?
13        A.    Well, one thing is that
14   Ms. Fischman was careful to note that
15   there's a certain business culture in
16   Japan of unfailing courtesy, which is
17   something I was familiar with
18   independently.  And there was very
19   important -- Tony Stiegler, my
20   adversary --
21            MS. DONEHOWER:  Mr. Berman,
22        is this limited to the settlement
23        communications?
24            THE WITNESS:  I think so, I
25        believe so.  It was important, even
```

Page 48

1                    J. BERMAN

2        in negotiating a potential deal,

3        and even if Mr. Stiegler can be

4        quite provocative in the tone of

5        his emails, not to respond in kind,

6        but rather to maintain courtesy and

7        equanimity in my communications.

8        That was one instruction.  And then

9        it's difficult for me to answer

10        beyond that, unless you ask me more

11        specific questions.  That was at a

12        high level.

13        Q.     I will.

14        A.     Okay.

15        Q.     And did you receive

16   instructions from Mr. Oliva about the

17   manner in which to conduct yourself

18   during the course of the Genomatica

19   litigation with respect to tone and

20   strategy?

21        A.     Limiting my answer to

22   settlement, there are two high-level

23   instructions that I recall receiving

24   from Mr. Oliva.  One was to the same

25   effect, making sure that we comported

Page 49

```
 1                  J. BERMAN
 2   ourselves in a way that was consistent
 3   with Mitsubishi standards at all times,
 4   even if opposing counsel was, as I
 5   said, provocative, and had more of an
 6   American streetfighter kind of
 7   demeanor.  And then Mr. Oliva and I had
 8   conversations about sort of staying the
 9   course and believing in the rightness
10   of our position, and so in the context
11   of settlement, holding firm until
12   Genomatica and counsel came, brought
13   their offer up to a level that was
14   acceptable to MCC and to Mr. Oliva
15   based on their objectives.
16         Q.    Were you aware of any
17   conversations that Ms. Fischman had
18   with MCC without your attendance during
19   the pendency of the Genomatica
20   litigation?
21         A.    Am I aware that they
22   occurred, or am I aware of what was
23   said?
24         Q.    Both.  Were you -- well, one
25   bleeds into the other.  Were you aware
```

```
                                              Page 50
 1                      J. BERMAN
 2    that there were communications between
 3    Ms. Fischman and MCC where you were not
 4    in attendance?
 5          A.     I can't say with certainty,
 6    but I certainly believe that
 7    Ms. Fischman was in contact with the
 8    individuals at MCC who had a stake in
 9    the matter, and I believe so.  I
10    believe I was aware of that.  I just
11    want to not testify with certainty to
12    something that I'm not a hundred
13    percent certain about.
14          Q.     Did you, in conversations
15    with Ms. Fischman, understand that she
16    was having conversations with MCC
17    without your attendance, and relaying
18    information to you thereafter?
19              MS. DONEHOWER:  Limited, per
20          Mr. Anhang, to settlement
21          discussions.
22          A.     I'm just not sure of the
23    answer relative to settlement
24    discussions.  Being very careful to
25    limit my answer to that topic.  Again,
```

Page 51

```
 1                    J. BERMAN
 2     I believe so, but I can't testify with
 3     absolute certainty.
 4          Q.    What was your understanding
 5     as to the general strategy that you
 6     were to take with respect to
 7     Genomatica?
 8               MS. DONEHOWER:  Limiting your
 9          answer to settlement discussions.
10          A.    I don't know that it was --
11     one, we wanted to get as high a number
12     -- high amount of cash back as
13     possible.  Two, we wanted to make sure
14     that settlement negotiations didn't
15     tank as a consequence of any perceived
16     discourtesy on our part from the other
17     side.  So obviously, we didn't have a
18     magic wand and we couldn't force
19     Genomatica to pay or make a settlement
20     of X dollars, but there was, we wanted
21     to be very careful that if settlement
22     negotiations did not succeed, that
23     wouldn't be a consequence of sort of
24     our slighting Genomatica or its
25     counsel.  And they were, you know,
```

Page 52

```
 1                    J. BERMAN
 2   obviously the initial offers made by
 3   Genomatica were what we would all refer
 4   to in vernacular as low-ball, and so
 5   they were sort of nonstarters, and
 6   there came a point in time in which
 7   Genomatica, through its counsel, began
 8   to make more serious offers.  And the
 9   objective was to get the best deal we
10   could while minimizing, you know, the
11   legal spend associated with litigation.
12        Q.   Is that consistent with your
13   understanding as to what the client
14   MCC's goal was in the Genomatica
15   litigation?
16        A.   I believe that the client
17   hoped that the pressure exerted by
18   litigation activity would drive --
19   would be a settlement driver.  And so
20   the hope was to resolve the matter
21   amicably, but the understanding, again,
22   I believe -- this is all to the best of
23   my recollection, it's been some
24   years -- was that the hope was to avoid
25   protractive litigation that would
```

```
                                         Page 53
 1                     J. BERMAN
 2      become expensive.
 3          Q.    Were you aware at some point
 4      during the course of the Genomatica
 5      litigation that Minami Tomoji had
 6      raised concerns about the handling of
 7      the case, specifically at or around
 8      September of 2019?
 9              MS. DONEHOWER:  Mr. Anhang,
10          can you please give us direction on
11          whether Mr. Berman can answer that
12          question?
13              MR. ANHANG:  He can.
14          A.    Not until I got your packet
15      of documents.
16              MR. BERMAN:  Please note my
17          objection to the form of the
18          question, thank you.
19          Q.    Let me -- we're going to
20      share exhibit -- we're just uploading
21      it to share with the rest of the group,
22      just be a moment.
23              (Exhibit 2, marked for
24          identification, Bates stamped Def
25          001419.)
```

Page 54

```
 1              J. BERMAN
 2      Q.    Mr. Berman, I ask you, I know
 3   you have hardcopies.  If you could just
 4   take a moment and review the exhibit,
 5   which is Exhibit 2 for identification,
 6   I want to note for the record that
 7   Exhibit 2 is Bates stamped Def 1419 to
 8   Def 1421.
 9      A.    Okay, and just to confirm,
10   what I see on the screen is what I have
11   before me in hardcopy.  Do you want me
12   to review the entirety of the email
13   string?
14      Q.    Yes, just Exhibit 2, which
15   would be 1419 to 1421.
16      A.    Okay, I understand, give me a
17   second, please.
18      Q.    Sure.
19      A.    Sorry, my phone beeped.  I'm
20   shutting it off.
21      Q.    Mr. Berman, let us know when
22   you've completed your review.
23      A.    It's a little hard, because
24   there's portions of sentences redacted,
25   so I'm trying to -- okay, I read it
```

                                                    Page 55

1                        J. BERMAN

2    now.

3          Q.    Thank you, Mr. Berman.  Were

4    you aware that Takimoto-san had issues

5    with the way the Genomatica issue was

6    being handled by you and Ms. Fischman?

7          A.    Not at the time.

8                MR. BERMAN:  Note my

9        objection to the form of the

10       question.

11         Q.    Did you -- at what point in

12   time did you become aware that there

13   were concerns in the matter in which

14   the Genomatica litigation was being

15   handled?

16         A.    I guess when I received this

17   document.

18         Q.    Is it your testimony that at

19   no point during the Genomatica

20   litigation you were made aware that

21   there were concerns from individuals at

22   MCC on how the litigation was being

23   handled?

24         A.    I knew that the folks at MCC

25   hoped for a quick settlement, and that

Page 56

```
 1              J. BERMAN
 2   offer from Genomatica, and that didn't
 3   materialize.  I think we were all
 4   surprised that a litigant in
 5   Genomatica's position fought somewhat
 6   desperately, but ultimately fecklessly
 7   and ineffectively, when in the face of
 8   a contract that was so clear in
 9   misconduct and wrongdoing, I should
10   say, on Genomatica's part of the
11   evidence, I didn't have specific
12   knowledge that Takimoto-san was
13   skeptical of me or Jennifer personally,
14   and our strategy or legal work.
15        Q.   I'm going to show you exhibit
16   -- I'm going to populate and share with
17   the rest of the group Exhibit 3, just
18   take a moment, Mr. Berman.  So while we
19   wait and do that for the rest of the
20   group, I ask that you take a look at
21   it, since you have a hardcopy.
22        A.   Okay.
23        Q.   I just want to note for the
24   record that Exhibit 3 is Bates stamped
25   Def 876 to Def 877.
```

```
                                            Page 57
 1                    J. BERMAN
 2              (Exhibit 3, marked for
 3         identification, Bates stamped Def
 4         000876.)
 5         Q.    Mr. Berman, let us know when
 6    you've completed your review of
 7    Exhibit 3.
 8         A.    I've completed it.
 9         Q.    Were you aware that Minami
10    Tomoji had expressed discomfort
11    regarding the handling of the
12    Genomatica litigation prior to your
13    review of this Exhibit 3?
14              MS. DONEHOWER:  Mr. Anhang,
15         may we answer that question?
16              MR. ANHANG:  Yes, as long as
17         the answer --
18              MR. BERMAN:  I'm going to
19         object to the form of the question
20         as well.
21              MR. ANHANG:  I'm sorry, I
22         didn't mean to speak over you,
23         Matthew.
24              MR. BERMAN:  Vice-versa, I
25         apologize.
```

1                    J. BERMAN

2              MR. ANHANG:   No problem at

3        all.   I don't believe there's a

4        problem with the witness answering

5        the question, insofar as the

6        question doesn't require the

7        witness to reveal the substance of

8        any request for legal advice or the

9        substance of the provision of any

10       legal advice by the people involved

11       here.   So to that extent, I don't

12       see a problem with the witness

13       answering the question.

14        A.     To the best of my

15    recollection, Ms. Colwin, I wasn't

16    aware of that until reading the

17    document just now.   And I'm not sure

18    how to understand -- I'm not sure how I

19    would characterize Tomoji's email.   I

20    leave that to others.

21        Q.     I just want to make sure the

22    record is clear, that prior to your

23    review of these emails, you were not

24    made aware of the concerns that Tomoji

25    had raised about the handling of the

```
 1                    J. BERMAN
 2    Genomatica litigation, correct?
 3              MR. BERMAN:  Object to form.
 4        A.      Not specifically, no.  Again,
 5    I knew that the client, MCC, and all of
 6    the stakeholders really wanted this
 7    thing to be wrapped up, and really
 8    wanted it to be wrapped up
 9    successfully.  And sometimes that takes
10    time in U.S. court, and this document
11    has also refreshed my recollection
12    that, I had forgotten it, but either
13    the district judge or the original
14    magistrate had retired, which, and we
15    had -- we were moving along at a good
16    clip, and were scheduled to go for a
17    mediation, and then one of the judges
18    retired.  And, you know, I remember
19    feeling like this is quite frustrating,
20    given that the client would like to see
21    a response in a, you know, as short a
22    time frame, a resolution in as short a
23    time frame as possible.
24              But I wasn't aware of
25    anything else.  I just, I think I
```

```
                                   Page 60
 1                    J. BERMAN
 2    shared in the frustration of the -- of
 3    my client.
 4          Q.    So Mr. Berman, if I am to
 5    interpret your testimony correctly, and
 6    please state so if I'm not, is it your
 7    testimony that there was a disconnect
 8    between the expectations MCC had with
 9    respect to the Genomatica litigation
10    and the proffers of the litigation, and
11    what you and Ms. Fischman were able to
12    deliver?
13              MR. BERMAN:   Object to form.
14          A.    I wouldn't go that far,
15    Ms. Colwin.   I think we hit some choppy
16    waters, and we were all surprised that
17    a litigant under so explicit a
18    contractual obligation was taking
19    frivolous and unsupportable positions
20    rather than coming to the settlement
21    table immediately and in good faith,
22    more immediately, which they ultimately
23    did.   And I was aware that this wasn't
24    great.   That my client, and I'm now
25    thinking of the folks in Japan had
```

Page 61

```
 1                    J. BERMAN
 2    wanted, on an ongoing basis, for this
 3    matter to be resolved as quickly as
 4    possible.  And contemporaneously, my
 5    thinking was it's difficult to imagine,
 6    from thousands of miles away, that
 7    sometimes the litigation process in the
 8    United States courts, even in federal
 9    courts, can feel a bit glacial, and
10    then we were hit with this retirement.
11              And so I definitely
12    understood, and this is often the case
13    with businesspersons, but I definitely
14    understood that this wasn't great news
15    for the client.  I wouldn't think of it
16    as a disconnect, though.
17         Q.    But Mr. Berman, you're a
18    seasoned litigator, and you have --
19    obviously a very sophisticated one.
20    You have a lot of business
21    relationships, and you have represented
22    clients in matters for a number of
23    years.  If there is any discomfort to
24    characterize what was happening at
25    Genomatica as hitting choppy waters,
```

1                    J. BERMAN
2    you agree, do you not, that the client
3    at issue here, MCC, had full discretion
4    to change the manner in which the
5    litigation was being handled, do you
6    not?
7         A.    Sure, although I would say
8    that most of my clients, or longtime
9    clients, are many, and we would discuss
10   this, rather than me being ordered to
11   kind of change tack.  At any rate, the
12   strategy was correct.  It just took
13   more time to play out than we all
14   hoped.  We had to sort of tenderize
15   Genomatica a little bit with litigation
16   activity, and ultimately we had this
17   delay that was occasioned by nobody,
18   other than the happenstance of a judge
19   retiring.  And this is, I guess, the
20   November time frame that must have
21   leapt to my mind earlier.
22        Q.    I was about to start in that
23   time frame.  Does this part of your
24   testimony refresh your recollection as
25   to the time frame in which Mr. Oliva,

```
                                        Page 63
 1                   J. BERMAN
 2   as you had testified earlier, became
 3   move involved in the Genomatica
 4   litigation?
 5        A.    I think so.  Unless -- it
 6   must be, because this is around the
 7   time of the ENE.  And then that is when
 8   Nick -- it would have been, I guess, in
 9   the lead-up to this time frame, or
10   around this time frame that Nick got
11   involved, yes, on a day-to-day basis.
12        Q.    Okay.  Let me just share with
13   the rest, and I would ask you,
14   Mr. Berman, to take a look at Exhibit
15   4.  The document is loading on our end,
16   just a moment.  But Mr. Berman, if you
17   could take a look at Exhibit 5 -- four,
18   rather, it's Bates stamped Def 1422 and
19   Def 1423.
20        A.    I just read it.
21        Q.    Okay.  I want to wait for the
22   rest of the group to have it, so just
23   wait one second.
24             (Exhibit 4, marked for
25        identification, Bates stamped Def
```

Page 64

```
 1                    J. BERMAN
 2        1422 and Def 1423.)
 3        Q.    Mr. Berman, when was the
 4   first time you've seen this document,
 5   which is Exhibit 4?
 6        A.    When your envelope arrived at
 7   my home.
 8        Q.    Okay.  Had you ever discussed
 9   this information -- well, I should say
10   what's set forth in Exhibit 4, with
11   Mr. Oliva or Ms. Fischman?
12        A.    To the best of my
13   recollection, no.  I was just notified
14   that Nick would be participating in the
15   early neutral mediation, and that's
16   what happened.
17        Q.    And that brings us to, that
18   would have been the November 2016
19   settlement conference, correct?
20        A.    I guess that's right.
21        Q.    And who was it that informed
22   you that Mr. Oliva would have a more
23   significant role during that process?
24        A.    It wasn't that he would have
25   a more significant role, it was that he
```

Page 65

1                    J. BERMAN
2    would be the client designee with
3    settlement authority who would be
4    accompanying me to California.  I
5    believe it may have been Ms. Fischman
6    in the first instance who said MCC has
7    designated Mr. Oliva to go with you to
8    the ENE, to the mediation or settlement
9    conference, as you call it.
10               You recall, Ms. Colwin, with
11   most of these court-ordered mediation
12   programs, each party is required to
13   bring a client representative to the
14   settlement party, and Nick Oliva was
15   that person.
16        Q.    Okay.  So you derived the
17   understanding that Mr. Oliva would be
18   the designee for the November 26th
19   settlement conference through your
20   conversation with Ms. Fischman,
21   correct?
22        A.    And of course, subsequently
23   with Mr. Oliva.
24        Q.    But your initial
25   understanding was derived from your

Page 66

```
1                    J. BERMAN
2    conversation with Ms. Fischman,
3    correct?
4         A.    Correct.
5         Q.    Did you have more than one
6    conversation with Ms. Fischman about
7    Mr. Oliva's role in the November 2016
8    mediation?
9         A.    I just don't remember.
10        Q.    Is there anything that exists
11   that would refresh your recollection as
12   you sit here today?
13        A.    Like, I don't know how to
14   answer that question.  You would have
15   to show it to me and ask me if it
16   reflects -- I don't know if there's
17   anything in the world that might
18   refresh my recollection.  I guess if I
19   saw time records or emails, sure.  That
20   could help.  I just don't know if there
21   was one conversation or more than one.
22        Q.    Put up the next email, and I
23   would ask, Mr. Berman, if you could
24   take a look at Exhibit 5, and I'm just
25   going to state for the record.
```

```
 1                    J. BERMAN
 2        A.    Okay, let me just read it,
 3   okay?
 4        Q.    Sure, and while we're doing
 5   that, I just want to note for the
 6   record that Exhibit 5 is Def 872 and
 7   873.  There are two parts of this
 8   exhibit, Mr. Berman.  I would also ask
 9   you to take a look at Exhibit 6.  And
10   so both Exhibit 5 will encompass -- now
11   we're populating Exhibit 6.
12              (Exhibit 5, marked for
13        identification, Bates stamped Def
14        872 and 873.)
15        A.    Exhibit 6 is long.  Do you
16   want me to read the whole thing?
17        Q.    If you could, Mr. Berman.
18        A.    Okay, just a second.
19        Q.    I'd just like to note for the
20   record that Exhibit 6 is Bates stamped
21   Def 1842 to Def 1847.
22              (Exhibit 6, marked for
23        identification, Bates stamped Def
24        1842 to Def 1847.)
25        A.    Okay, I believe I read them
```

Page 68

```
 1                    J. BERMAN
 2   both.
 3        Q.    Mr. Berman, I'm going to ask
 4   you to take a look at Exhibit 5, and
 5   the Bates stamp number 873 would be the
 6   second page of Exhibit 5.
 7        A.    I see it.
 8        Q.    And do you see the copy of
 9   the email on the bottom half of that
10   page?
11        A.    I do.
12        Q.    That is your email at your
13   former firm, is it not --
14        A.    Yeah --
15        Q.    Joshua.Berman -- .com,
16   correct?
17        A.    -- yeah, I mean, it appears
18   that my testimony earlier was not
19   correct.  I was copied on this email
20   from Minami-san, and I -- that must
21   have been how I learned that Mr. Oliva
22   was going to be the designee for the
23   early neutral evaluation.  So I just
24   correct myself and remind everybody
25   that it's been some time, and I'm doing
```

Page 69

```
 1                    J. BERMAN
 2    my best.
 3         Q.    Sure, no, absolutely, and we
 4    appreciate it, Mr. Berman, thank you.
 5    November 16, 2016, you attended the
 6    mediation with Mr. Oliva; is that
 7    right?
 8         A.    Correct.
 9         Q.    Did you receive any
10    instructions from Mr. Oliva at the
11    time, at that very moment in time,
12    about the tone and approach the two of
13    you were to take during the mediation
14    on November 16, 2016?
15         A.    That's a hard question, only
16    in the sense that Nick and I were
17    collaborating with, obviously, Nick
18    being the client, and giving the
19    guidance, but Nick and I were
20    collaborating on a sort of
21    moment-to-moment basis.  So I received
22    lots of guidance, and I hoped that Nick
23    believed he received guidance or
24    appropriate and thoughtful reactions in
25    return.
```

Page 70

1                    J. BERMAN
2              So like, you have to imagine,
3     we were in the magistrate chambers.
4     Both sides were sitting there.  If
5     memory serves, I made a presentation
6     first.  Mr. Stiegler, my opposing
7     counsel, then made a presentation.  And
8     then the judge split us up and was kind
9     of going back and forth between rooms
10    and conducting negotiations.  And so
11    Nick and I were very much working, you
12    know, arm in arm to achieve a
13    settlement, if that was possible.  So
14    at every moment we were in close
15    communication.
16         Q.    Did you receive instructions
17    from Mr. Oliva about the tone and the
18    presentation at the mediation at
19    November '16?
20         A.    I did.
21         Q.    What were those instructions?
22         A.    Again, to take special
23    caution not to respond to anything put
24    forth or stated by Mr. Stiegler that
25    might be provocative, and to maintain a

Page 71

1                    J. BERMAN
2    courtesy disposition and equanimity at
3    all times.  You know, in keeping with
4    the cultural norms and values of our
5    Japanese client.
6          Q.    What was the outcome of the
7    settlement conference?
8          A.    I don't remember if we
9    reached a settlement there, or if it
10   was somewhat thereafter, but we
11   achieved a successful settlement of the
12   matter.  I don't remember the exact
13   number, but my broadly -- did we have
14   to go to a second one?  I remember
15   Tomoji Utsunomiya-san being in the U.S.
16   Look, I don't know when the outcome
17   came about exactly.  I'm sure the
18   documents will refresh my recollection,
19   but we ultimately were able to achieve
20   a successful outcome.
21         Q.    So let me just make sure that
22   the record is clear.  Is it your best
23   recollection that that successful
24   outcome did not come on that day of
25   November 16, 2016?

```
 1                      J. BERMAN
 2        A.    I don't know why I have that
 3    idea in my head, but it could just be,
 4    it could be incorrect -- I just, I'm
 5    frustrated with my own lack of
 6    recollection, but I'm just not sure.
 7        Q.    Mr. Berman, I think the next
 8    exhibit will probably help you, so I
 9    ask you to take a look at Exhibit 7
10    while we populate it for the rest of
11    the group.  And Exhibit 7 is Bates
12    stamped Def 1907 to 1908.
13               (Exhibit 7, marked for
14         identification, Bates stamped Def
15         1907 to 1908.)
16        A.    Okay, I guess we didn't
17    resolve it on the day of the ENE.
18        Q.    I thought this might be
19    fruitful for your recollection.
20        A.    Yep.  Yeah, you can see when
21    I forwarded this to Jen for review.  I
22    can't see what I wrote, because it was
23    blocked out, but Stiegler was a very
24    aggressive and sometimes discourteous
25    opponent, and I wanted to be sure that
```

Page 73

```
 1                    J. BERMAN
 2    my responses sort of held to the
 3    guidance, so you can see that I asked
 4    Jennifer, who then, I guess, forwarded
 5    it to Nick, and I wanted to make sure
 6    that the language I was using with
 7    Stiegler was not too strong.
 8         Q.    Prior to today, had you seen
 9    -- so let me just make sure that the
10    record is clear, I'm going to take a
11    look, 1908, Mr. Stiegler is
12    Genomatica's counsel, and that is
13    redacted, preserving the
14    attorney/client privilege, and the Def
15    1908 was Mr. Oliva's response to
16    Ms. Fischman pertaining to that
17    particular message you proposed to send
18    to Stiegler.  Had you seen Mr. Oliva's
19    response prior to today?
20         A.    I don't see Mr. Oliva's
21    response in the exhibit, I only see
22    Ms. Fischman's email to Jen saying, I
23    don't want to send this out without
24    your green light, if you will.
25         Q.    Did you ever receive any
```

Page 74

```
 1                    J. BERMAN
 2    feedback from Ms. Fischman about
 3    Mr. Oliva's response?
 4         A.    You're speaking specifically
 5    with respect to that email?
 6         Q.    Yes.
 7         A.    I don't recall.  And I just
 8    want to ask you, am I missing something
 9    on the page here?
10         Q.    No.
11         A.    Okay, I'm not seeing Nick's
12    answer to Jennifer.
13         Q.    We're going to populate the
14    screen again.
15         A.    Should I be reading
16    Exhibit 8, or no?
17         Q.    No, take a look -- yes, we're
18    just calling it up.  So it would be
19    Exhibit 9, and it is Def 2301 and 2302.
20         A.    I see it, I read it.
21         Q.    And do you see the -- oh, you
22    read it, okay.
23              (Exhibit 8, marked for
24         identification, Bates stamped Def
25         2301 and 2302.)
```

Page 75

```
 1                  J. BERMAN
 2        Q.     Had you discussed with
 3   Ms. Fischman any of the feedback that
 4   she had received from Mr. Oliva about
 5   the manner in which the litigation
 6   should -- Genomatica should be handled?
 7   And specifically Def 2301, where
 8   Mr. Oliva states, We should stay the
 9   course with integrity?
10        A.     I don't recall about the
11   attribution, or if Ms. Fischman
12   attributed this guidance to Nick
13   specifically, but she did communicate
14   that we would have to adapt our
15   litigation style to the courtesy norms,
16   if will you, of the client, in spite of
17   the fact that opposing counsel is
18   writing in a way that is more
19   consistent with a bit antagonistic,
20   U.S. litigation counsel.  But I don't
21   know that she said this is guidance
22   specifically from Nick.
23        Q.     Let's take a look at, I'm
24   going to ask you to take a look at a
25   series of emails.  Let's begin with
```

```
 1                    J. BERMAN
 2   Exhibit 9 in your package that is Bates
 3   stamped Def 882 and Def 883.
 4         A.    Okay, just a second.
 5         Q.    I want to note for the
 6   record, it is redacted heavily to
 7   ensure that attorney/client privilege
 8   is maintained.
 9              (Exhibit 9, marked for
10         identification, Bates stamped Def
11         882 and Def 883.)
12         A.    I see it.
13         Q.    All right.  I'm going to ask
14   you to identify what this email is, but
15   just hold on one moment, because we are
16   about to populate it for the group.
17   Mr. Berman, I'm showing you what's
18   Exhibit 9 for identification.  What is
19   it?
20         A.    So if you scroll down on your
21   screen, I found the answer on text.
22         Q.    Sure.
23         A.    Even further, all the way tow
24   the bottom.  So this, I somewhat recall
25   this.  At or around this time period,
```

Page 77

1                    J. BERMAN
2    Stiegler had started to make settlement
3    offers that were not just completely
4    silly.  Like, they had started at
5    $135,000, and I think the contract
6    amount that was owed was 2.5 million.
7    So what I was forwarding here to
8    Ms. Fischman, oh, and Mr. Oliva,
9    because I guess this would have been
10   after the ENE.
11        Q.    Yes.
12        A.    So I had spoken to both of
13   them.  My recommendation for how we
14   might respond to Stiegler's or
15   Genomatica's settlement offer, and some
16   editorial, as you can see, about what I
17   thought our litigation activity was
18   accomplishing in terms of sort of
19   shaking up Genomatica and its counsel.
20              Yeah, right, and I recall
21   that I -- I recall thinking, why don't
22   we offer -- maybe we just give them a
23   little bit of a time runway to pay the
24   2.5 million that was owed, and show
25   kind of good faith in that way, or

Page 78

```
 1                    J. BERMAN
 2   compromise a bit in that way, or ask
 3   for a smaller amount of money in
 4   settlement of the matter full and
 5   final, but payable immediately.  Those
 6   were my thoughts on how we might
 7   respond to Tony Stiegler.
 8        Q.    Above, Mr. Berman, I'm going
 9   to ask you to take a look at the top
10   half of 883.  Ms. Fischman makes a
11   reference to having spoken to you about
12   this communication, and with respect
13   specifically to the offering that was
14   being proposed.
15              Do you recall having a
16   conversation with her at this time
17   period?
18        A.    I mean, we spoke, as lawyers
19   and counsel do, with some regularity.
20   I can't say that I remember this
21   specific conversation that's referenced
22   in the email dated December 29, 2016.
23   Yeah, it would have been obviously,
24   during that week between Christmas and
25   New Year's.  I don't remember the
```

```
 1                    J. BERMAN
 2   specific conversation.  I just don't
 3   remember it.
 4        Q.    Okay.  Take a look at 882,
 5   Mr. Oliva's response to Ms. Fischman,
 6   and this is her proposal to Mr. Oliva,
 7   the one that's reflected in the top
 8   half of 883.
 9        A.    I see it.  She's saying, I
10   want to counter with 2.5 up front, and
11   a royalty license, and Nick said, Isn't
12   that just asking for a win -- I see the
13   colloquy.
14        Q.    Was that discussed with you?
15        A.    I don't recall.
16        Q.    Did you have a conversation
17   with Mr. Oliva pertaining to his
18   conclusion as to what Ms. Fischman had
19   proposed, which is reflected in the top
20   half of 883?
21        A.    For some reason, I think Nick
22   and I went back out to San Diego.  I
23   don't know why I can't shake that, but
24   I know that -- I don't recall a
25   specific conversation about this email
```

```
                                    Page 80
 1                  J. BERMAN
 2    chain.  Nick and I certainly discussed
 3    settlement subsequent to this date, and
 4    we -- our offer was not 2.5 plus
 5    royalties.  It was more of a compromise
 6    position.
 7         Q.    Okay.  I ask you to take a
 8    look at Exhibit 10, which is going to
 9    be populated to the rest of the group,
10    but if you could take a look at the
11    hardcopy you have, and just let us know
12    when you have reviewed it, and I would
13    like the record to reflect that
14    Exhibit 10 is Def 884 to Def 886.
15              THE VIDEOGRAPHER:  Excuse me,
16         Counselor.
17              MS. COLWIN:  Yes?
18              THE VIDEOGRAPHER:  Sorry to
19         interrupt, but I need to change
20         this media unit.
21              MS. COLWIN:  Let's go off the
22         record, and we can do it.
23              THE VIDEOGRAPHER:  It will
24         take me one minute.  Stand by.
25              THE WITNESS:  Can I ask for
```

                                    Page 81

1                    J. BERMAN

2       five minutes?

3               THE VIDEOGRAPHER:  Let me

4       take us off the record.

5               MS. COLWIN:  Go ahead,

6       Mr. Berman.

7               THE VIDEOGRAPHER:  This is

8       media unit one, we are now off the

9       record at 11:58 a.m.

10              (Recess.)

11              (Ms. Gueron has left the

12      deposition.)

13              THE VIDEOGRAPHER:  This is

14      the beginning of media unit number

15      two.  We are now on the record at

16      12:09 p.m., back from break.

17       Q.    Great.  Mr. Berman, you've

18  had an opportunity to take a look at

19  Exhibit 10, have you not?

20       A.    Yes.

21       Q.    That was Bates stamped 884 to

22  886, correct?

23              (Exhibit 10, marked for

24      identification, Bates stamped Def

25      884 to 886.)

Page 82

```
 1                   J. BERMAN
 2        A.     Correct, correct.
 3        Q.     So let's start with the back
 4   and go forward.  It will be the last
 5   page right there.
 6        A.     Yes, this is the same email
 7   we looked at in the previous exhibit,
 8   and you can see there's a forward.
 9        Q.     Right.  When did you become
10   aware of these communications?
11        A.     Well, I obviously was aware
12   of the communication when I wrote it.
13   The subsequent email from Tomoji to
14   Jennifer copying Utsunomiya-san,
15   Takimoto-san and numerous others, I
16   don't know if I was aware of that
17   specific email until this process.
18        Q.     Okay.  Let's take a look at
19   the very first -- so I'm looking at
20   886.
21        A.     Okay, just a moment, please.
22   I'm there.
23        Q.     All right.  This is the
24   counter that you were communicating
25   with in the prior exhibit, which is
```

```
                                        Page 83
 1                    J. BERMAN
 2   Exhibit 9, the 2.5.
 3        A.    Just to be clear, I was
 4   suggesting options for how we might
 5   counter.  I wasn't --
 6        Q.    Sure.
 7        A.    Yeah.
 8        Q.    So these -- so Ms. Fischman
 9   is communicating with Minami Tomoji
10   about the settlement -- the settlement
11   options, correct?
12        A.    It appears that way from the
13   document.
14        Q.    And that communication is
15   dated 12/30/2016, correct?
16        A.    Oh, I see.  I'm sorry.  This
17   is Jennifer forwarding my email to
18   Minami-san.  I now see what is going on
19   here.
20              Yes, on December 30th of
21   2016, it appears from looking at the
22   document that Ms. Fischman forwarded my
23   suggestion to Tomoji.
24        Q.    Exactly.  Now, there was a
25   response, so I'm going to ask you to
```

Page 84

```
 1                   J. BERMAN
 2   take a look at 885.  That's for --
 3        A.    I see it.
 4        Q.    And that is dated January 3,
 5   2017, there is a redaction reflecting
 6   attorney/client privilege.  But above
 7   that were the instructions given from
 8   MCC, correct?
 9        A.    I see that.
10        Q.    Was this communicated to you
11   by Ms. Fischman, to the best of your
12   recollection?
13        A.    I'm sorry, but I just don't
14   know if this particular step in the
15   process was communicated to me or not.
16        Q.    Okay.  Then there is a
17   further communication.
18        A.    I see that.
19        Q.    That is dated now January 5,
20   2017; is that right?
21        A.    Right.
22        Q.    And that communication is
23   from Ms. Fischman back to MCC; is that
24   right?
25        A.    I do see that, yes.
```

Page 85

```
 1                   J. BERMAN
 2       Q.     And just take a moment.  It
 3   says, Dear Tomoji, thank you for your
 4   email.  We are still discussing the
 5   offer among Josh, Nick and myself, and
 6   we're not ready to respond with a
 7   counterproposal.  We will send you our
 8   recommendation as soon as possible.
 9              So do you understand that as
10   of January 5, 2017, there had not been
11   a specific understanding as to what the
12   offer should be back to Genomatica?
13       A.     Do I understand -- gauging
14   from the email, it appears that
15   Ms. Fischman was saying, Hold on,
16   before we definitively say 2.5 split
17   into two payments over the period of
18   six months, let me and Nick and Josh
19   consider this a little further and kind
20   of update, or respond -- recommend a
21   definitive course.
22       Q.     Mr. Berman, you're not aware
23   of any written communication from MCC
24   with a specific authorization directing
25   you and Ms. Fischman to take a specific
```

```
 1                    J. BERMAN
 2    offer to the Genomatica matter; is that
 3    right?
 4         A.    I believe that's true, and
 5    you can see that in the email of
 6    January 3rd at 11:22 p.m., where Tomoji
 7    did make the statement, Our
 8    counterproposal should be 2.5 payable
 9    in two installments over six months, as
10    suggested by Josh, I don't believe I'm
11    copied on that.  So I can't tell you
12    from memory -- to the best of my
13    recollection, I didn't get a separate
14    email from Tomoji or from
15    Utsunomiya-san or anyone else saying,
16    Do X.
17         Q.    I'm going to ask you to take
18    a look at the next exhibit.
19         A.    The next exhibit, or the
20    first page of the exhibit that we
21    have --
22         Q.    No, the next exhibit.
23         A.    Okay.
24         Q.    Which is the --
25         A.    The next exhibit is 11, but
```

Page 87

```
 1                 J. BERMAN
 2   it's just the stuff that I have to
 3   hand.  Do you want me to go to 12?
 4                 (Exhibit 11, marked for
 5        identification, Bates stamped Def
 6        885.)
 7        Q.    We're going to populate it.
 8        A.    In the meantime, what are you
 9   asking me to look at?
10        Q.    It will be 12 in your
11   package, Bates Def 2322.
12        A.    Okay, I'm there, thank you.
13                 (Exhibit 12, marked for
14        identification, Bates stamped Def
15        2322.)
16        A.    I've read it.
17        Q.    Okay.  This is a
18   communication to Ms. Fischman
19   pertaining to the settlement, correct?
20        A.    That's correct.  Well, among
21   other things.
22        Q.    Is it your understanding as
23   of January 5, 2017, at the time of this
24   email at 6:29 p.m., there was no
25   specific written communication from MCC
```

Page 88

```
 1                    J. BERMAN
 2    with specific instructions as to what
 3    offer should be made in the Genomatica
 4    matter, correct?
 5          A.    Yeah, it must have been,
 6    because I'm saying let's also decide
 7    firmly how we want to respond to the
 8    settlement email.
 9          Q.    And in this specific email,
10    it says, We don't have sufficiently
11    concrete answers from Japan yet.  What
12    did you mean by that?
13          A.    What it sounds like, which
14    is, you know, whether we want to say
15    2.5 over six months or something
16    different, I think -- if memory serves,
17    I didn't want to let Stiegler's
18    proposal just kind of sit without a
19    response.  That seemed
20    counterproductive, and maybe
21    discourteous.  And so you can see, that
22    I suggest, you know, to the extent that
23    we don't have a kind of a specific
24    marching order or a precise strategy
25    down to the number, maybe I just send
```

Page 89

```
 1                    J. BERMAN
 2    him a note saying, Thank you for kind
 3    of reopening conversations, and we'll
 4    be back to you shortly.
 5         Q.    I just want to make sure the
 6    record is correct and reflects your
 7    testimony accurately, Mr. Berman.  Is
 8    it your testimony that as of the
 9    evening of January 5, 2017, you were
10    not aware of any specific instructions
11    from MCC as to the specific amount to
12    offer in the Genomatica litigation,
13    correct?
14         A.    To the best of my
15    recollection, that's correct.
16         Q.    And is it your testimony that
17    -- withdrawn.
18              Did you have any
19    conversations with anyone from MCC
20    between January 5, 2017, at 6:29 p.m.
21    and the time of the offer that was made
22    on January 6, 2017, in the Genomatica
23    litigation?
24         A.    I don't believe so.  That
25    would have entailed a call to Japan.  I
```

```
                                      Page 90
 1                   J. BERMAN
 2    don't believe I had such a
 3    communication, though.
 4         Q.    Okay.  And your
 5    understanding, just to make sure that
 6    we have a full record of your
 7    recollection, your understanding of the
 8    offer you made on January 6, 2017, was
 9    based upon communications with
10    Ms. Fischman; is that right?
11         A.    Yeah, just for my own -- oh,
12    I see, is it okay that I look at 13?
13         Q.    Yes, we're going to populate
14    that for the rest of the group.  I ask
15    you to take a look at Exhibit 13, and
16    I'll ask you what that document is, but
17    in the interim, while we have that put
18    up on the screen for the rest of the
19    group, it is Bates stamped Def 2315 to
20    2316.  Let me know when you've had a
21    moment to take a look at it.
22              (Exhibit 13, marked for
23         identification, Bates stamped Def
24         2315 to 2316.)
25           A.    I read it.
```

1                    J. BERMAN

2       Q.    Okay.  Could you identify for

3    the record what Exhibit 13 is?

4       A.    Yes, it's a response pursuant

5    to Federal Rule of Evidence 408, which

6    is, pertains to the settlement

7    privilege, to Tony Stiegler's offer on

8    behalf of Genomatica, which was dated

9    December 28, 2016.  And this is our

10   counteroffer.  Jen offered 1.5 in four

11   equal installments, and I am here

12   countering with 2.3 million to be paid

13   within 30 days.  So this is my

14   counteroffer.

15      Q.    Mr. Berman, do you believe at

16   the time you made that offer on

17   January 6th, that you were authorized

18   to make that communication known to

19   opposing counsel in the Genomatica

20   litigation, based upon your

21   conversations with Ms. Fischman and

22   Ms. Fischman alone; is that right?

23      A.    To the best of my

24   recollection, yes.

25      Q.    And is it your recollection

```
                                          Page 92

 1                      J. BERMAN
 2    -- withdrawn.
 3              Is it your recollection that
 4    the directive given to you by
 5    Ms. Fischman to make this offer was
 6    relayed to you by telephone or some
 7    other method?
 8         A.    Well, you can see here that I
 9    write to Mr. Stiegler, I have spoken to
10    my client, and that is consistent with
11    my best recollection, which could be
12    faulty, but it's consistent with my
13    best recollection that Ms. Fischman and
14    I spoke, and this was the result of
15    that communication.  What I don't
16    remember is the specific words uttered
17    in my call with Jen.  But obviously, it
18    led me to write this.
19         Q.    Okay.  I ask you to take a
20    look at Exhibit 14, and while we
21    populate that for the rest of the
22    group, it is Bates stamped 878 and 879.
23              (Exhibit 14, marked for
24         identification, Bates stamped Def
25         878 and 879.)
```

Page 93

1                    J. BERMAN
2         A.    Okay, give me a second to
3    read it.  It's slowed by all the
4    redactions.
5         Q.    Sure.
6         A.    Okay, I see it.
7         Q.    Okay, Mr. Berman, I will give
8    you, then, a moment to take a look at
9    this communication, and I'm going to
10   direct your attention to Def 878.  You
11   understand that this communication from
12   MCC to Mr. Oliva, and with a copy to
13   Ken Fujiwara, do you know who Ken
14   Fujiwara is?
15        A.    No idea.
16        Q.    That the offer that you had
17   made on January 6th was not authorized
18   by MCC, correct?
19        A.    I see that Tomoji is saying
20   he was surprised to hear that the offer
21   is made.  So I have no independent
22   knowledge, but merely looking at the
23   document, I understand why you're
24   framing it that way.
25        Q.    And you understand that MCC

Page 94

```
1                    J. BERMAN
2    is setting forth their concerns about
3    an offer made that they had not been
4    made aware of prior to the offer being
5    made, correct?
6              MR. BERMAN:  Objection to
7       form.
8         A.    I see the sentence that
9    reads, Some MCC members are a little
10   upset by the fact that Josh made it
11   without advising us of the offer.  Bit
12   of a funny sentence, because I never
13   would have called anyone in Japan
14   without either Mr. Oliva or
15   Ms. Fischman on the phone.  That would
16   have been, I believe, tactless and out
17   of place for me to do that.
18        Q.    So I just want to make sure
19   that the record is clear.  You already
20   stated under oath in your testimony
21   that you had no communications with
22   anyone from MCC between January 5 and
23   the time you made the offer on January
24   6; is that accurate?
25        A.    To the best of my
```

```
                                        Page 95
 1                    J. BERMAN
 2    recollection, that is correct.
 3         Q.     If you take a look at Exhibit
 4    15, which is Bates stamped 844 and 845.
 5                 (Exhibit 15, marked for
 6          identification, Bates stamped Def
 7          844 and 845.)
 8         A.     These are the communications
 9    between Mr. Oliva and Ms. Fischman?
10         Q.     Yes.
11         A.     Okay.
12         Q.     Prior to this proceeding --
13         A.     Hold on, hold on, let me just
14    read it.
15         Q.     I'm sorry, Mr. Berman, I
16    thought you had completed your review.
17         A.     Okay, I see it.
18         Q.     Had you seen these email
19    exchanges prior to today?
20         A.     Not to the best of my
21    recollection, no.
22         Q.     And I'm going to ask you to
23    take a look at 845, when Mr. Oliva
24    states to Ms. Fischman that it's his
25    understanding that you had delivered
```

Page 96

```
 1                    J. BERMAN
 2    information to Genomatica pertaining to
 3    the $2.3 million offer prior to
 4    confirmation from MCC, do you see that?
 5         A.    I do see it.
 6         Q.    And in Ms. Fischman's
 7    response on 844, she states that it was
 8    done by her authority.  Did you ever
 9    have a conversation with Ms. Fischman
10    about this exchange between herself and
11    Mr. Oliva?
12         A.    To the best of my
13    recollection, no.
14         Q.    I'm going to ask, if we take
15    a moment, I need a five-minute break.
16    I think I'm done, but let me take a
17    five-minute break to confirm.
18         A.    Are there others besides you
19    who intend to ask questions?
20         Q.    I would ask counsel present
21    if any questions are going to be asked
22    of Mr. Berman.
23              MR. BERMAN:  This is Matthew
24         Berman speaking on behalf of
25         plaintiff, and the answer is likely
```

```
                                        Page 97
 1                    J. BERMAN
 2         yes, there may be some
 3         cross-examination questions limited
 4         to what you've already been asked
 5         today.
 6                THE WITNESS:  Okay, great.
 7                THE VIDEOGRAPHER:  Let me
 8         take us off the record.
 9                MR. BERMAN:  Before you take
10         us off the record, I would also
11         like to note that we are reserving
12         the right to call this witness as a
13         deponent at some future point in
14         time.
15                THE VIDEOGRAPHER:  Stand by
16         to go off the record.  We are now
17         off the record, the time is
18         12:30 p.m.
19                (Recess.)
20                THE VIDEOGRAPHER:  We are now
21         on the record, the time is
22         12:44 p.m., back from break.
23      Q.    Mr. Berman, after January 6,
24    2017, do you recall having a
25    conversation with Mr. Oliva pertaining
```

Page 98

```
 1                    J. BERMAN
 2   to the $3.5 million offer you had made
 3   on Genomatica on January 6, 2017?
 4        A.    I don't recall a specific
 5   conversation.  There certainly could
 6   have been one, but sitting here today,
 7   can't recall if we had such a
 8   conversation or not.
 9        Q.    In any conversation after
10   January -- do you recall any
11   conversations pertaining to the offer
12   that you had made on January 6, 2017,
13   pertaining to the Genomatica matter?
14        A.    I don't remember if Mr. Oliva
15   and I specifically addressed the
16   $2.3 million counteroffer.  I do,
17   obviously, recall working closely with
18   Mr. Oliva to achieve the settlement
19   that we achieved.
20        Q.    Does it make logical sense to
21   you that you would have a conversation
22   with Mr. Oliva about the $2.3 million
23   offer made on January 6, 2017?
24        A.    It's very possible.  Nick was
25   incredibly scrupulous, just sort of
```

```
 1                J. BERMAN
 2    generally, I guess, about observing the
 3    -- I don't mean the formalities, to
 4    diminish them, but I mean about
 5    observing protocols, and obviously -- I
 6    mean, it's certainly possible, and Nick
 7    was really clear about other
 8    relationship matters and making sure we
 9    always maintained composure no matter
10    what the other side did, and that sort
11    of thing, so it wouldn't surprise me at
12    all.  I just can't recall if we had a
13    specific conversation on this narrow
14    topic or not.
15         Q.    And just following the logic
16    that you just expressed, in any
17    conversation that you believe you may
18    have had with Mr. Oliva pertaining to
19    the $2.3 million offer made on
20    January 6th, you would have identified
21    that offer was made pursuant to
22    Ms. Fischman's authorization, correct?
23         A.    If anyone would have asked
24    me, I would have told the truth,
25    including Nick.
```

```
 1                    J. BERMAN
 2              MR. BERMAN:  Object to the
 3         form of the question.  It takes me
 4         a moment to unmute.  I don't mean
 5         to speak over the witness.
 6         A.    I'm speculating a little bit,
 7    but if you were to ask me what
 8    happened, I would -- if anybody, I
 9    would have told the truth, which is
10    what we discussed today.  So if that
11    conversation did occur, and it's
12    possible that other people's
13    recollection is sharper than mine on
14    this particular point, because I
15    haven't been living this in the context
16    of litigation the way you all have, I'd
17    have no reason to doubt that.
18         Q.    Okay.
19              MS. COLWIN:  I have nothing
20         further at the moment.  I know that
21         Matt Berman may have some questions
22         for you, so I reserve my time to
23         come back and ask you some further
24         questions, if necessary.  But I
25         thank you, Mr. Berman.
```

```
                                    Page 101
 1                    J. BERMAN
 2              THE WITNESS:  Sure.
 3              MS. COLWIN:  Matt.
 4              MR. BERMAN:  Sure, I just
 5         have some questions to ask you
 6         about your interaction with
 7         Ms. Fischman.
 8              MS. DONEHOWER:  Mr. Berman,
 9         if I may, before you start, we've
10         made Mr. Berman available today as
11         a nonparty witness.  I know you
12         reserved your right to call him
13         back, but we would ask, given that
14         he has made himself available today
15         and that you have the opportunity
16         to ask him questions, that you ask
17         him as much as possible, so that he
18         won't have to reappear.
19              MR. BERMAN:  I understand
20         that concern, and we're going to do
21         our best not to recall the witness
22         unless it's absolutely necessary,
23         but we do need to reserve the right
24         to do so if it should become
25         necessary.
```

```
 1                    J. BERMAN
 2               EXAMINATION BY
 3               MR. BERMAN:
 4        Q.    When did you begin working
 5   with Ms. Fischman?
 6        A.    As I believe I testified
 7   earlier, and I may be off by a month or
 8   two, in or around the area of 2016.
 9        Q.    Can you repeat the month,
10   please, if you know?
11        A.    I don't have a specific month
12   without a document.
13        Q.    Okay.  What role was
14   Ms. Fischman in when you first began
15   interacting with her?
16        A.    I can't remember if
17   Ms. Fischman was still acting general
18   counsel, or if Nick had already arrived
19   at MCHA.  I can't remember if that
20   happened before I was retained or
21   shortly after I was retained.
22        Q.    Okay.  Did you ever interact
23   with Ms. Fischman while she was in any
24   other title at the company?
25        A.    It's possible, like I said.
```

```
 1                    J. BERMAN
 2    It's possible -- well, the facts are
 3    what they are.  My recollection is that
 4    I'm not, I don't recall when I was
 5    first retained, whether Ms. Fischman
 6    was still acting GC or whether she had
 7    taken on the new title, and Mr. Oliva
 8    had assumed the general counsel role.
 9    It's possible it occurred before she
10    retained me or shortly after she
11    retained me.  I'm afraid I just don't
12    remember.
13         Q.    Did you ever interact in a
14    role with her prior to her becoming
15    general counsel?
16         A.    No, not professionally.  I
17    don't know when she got that role, but
18    as I testified earlier, we would -- we
19    often sat next to each other in Hebrew
20    school, and would chat socially.
21         Q.    Okay.  Did you work with her
22    on a number of matters?
23         A.    No.
24         Q.    Only Genomatica?
25         A.    Genomatica, and Ms. Fischman
```

1                    J. BERMAN
2    previewed a litigation matter that is
3    still ongoing as something that may
4    become an issue that required outside
5    counsel.
6         Q.    Okay.  I'm not going to ask
7    you the details of any other legal
8    matters other than Genomatica, okay?
9    Have you had the opportunity to work
10   with any other acting general counsel
11   or general counsel in your professional
12   capacity?
13        A.    Sure.
14        Q.    And generally speaking, did
15   you form an opinion of Ms. Fischman's
16   competency as an attorney?
17        A.    Yes.
18        Q.    And what was your impression
19   of Ms. Fischman's competency as an
20   attorney?
21        A.    I held her in high regard.
22        Q.    Okay.
23        A.    She was very engaged, and in
24   particular at one point in time I
25   remember I had drafted a motion.  It

```
 1                  J. BERMAN
 2   was very late at night, and I got it
 3   back from her with quite a lot of red
 4   lines, which I took in good spirits,
 5   and we worked together to refine
 6   whatever motion I was writing to
 7   improve it.
 8        Q.     And in comparison with other
 9   attorneys that you've worked with in
10   either an acting general counsel or
11   general counsel role, would you say she
12   was on the same level as those other
13   professional relationships?
14        A.     Too hard a question to
15   answer, Mr. Berman.
16        Q.     Okay, that's fair.  Did you
17   form any impression of her ethics as an
18   attorney?
19             MS. COLWIN:  Objection.
20        A.     I don't think I formed a
21   specific impression, but not because I
22   saw anything wrong, it's just that I
23   have the default assumption that my GCs
24   out of litigation are ethical, and
25   unless I see something that would
```

```
 1                    J. BERMAN
 2   really startle me, I -- I wouldn't
 3   focus on that one way or the other.
 4        Q.    Okay.  Did anything in your
 5   interaction with Ms. Fischman give you
 6   cause to question her ethics as an
 7   attorney?
 8        A.    To the best of my
 9   recollection, no.
10        Q.    Did you form an opinion as to
11   the depth of her legal knowledge in the
12   matters that you interacted with her
13   on?
14        A.    I'm not sure what you mean by
15   legal knowledge, but Jen, like Nick
16   after her, rolled up her sleeves and
17   was an active participant in the case.
18   She wasn't hands-off.  Some general
19   counsels just hand you litigation, and
20   you check in with them every few
21   months, and that was not our -- that
22   was not Ms. Fischman's style.
23        Q.    Okay.  Did you observe her to
24   have an appropriate level of legal
25   knowledge for the position that she was
```

```
 1                  J. BERMAN
 2   in?
 3        A.    I'm not -- I'm not really
 4   qualified to opine on that.
 5        Q.    Okay.
 6        A.    But I -- she seemed to be a
 7   skilled attorney.
 8        Q.    Okay.  And in communication
 9   with Ms. Fischman, did you have any --
10   withdrawn.
11              Did you form any opinion as
12   to the communication skills that
13   Ms. Fischman had through your
14   interaction with her?
15              MS. COLWIN:  Objection.
16        A.    Yeah, I'm not, I don't know,
17   I'm not sure how to answer that.
18        Q.    Okay.  Did you observe any
19   gaps in her communication ability as
20   you interacted with her?
21              MS. COLWIN:  Objection.
22        A.    I'm still, without trying to
23   be in any way difficult or not respond,
24   I'm not entirely sure what you mean.
25        Q.    Were your communications that
```

```
 1                    J. BERMAN
 2    you received from Ms. Fischman clear?
 3         A.    I see, yes, I think, and she
 4    was responsive.
 5         Q.    Okay.
 6         A.    If I had a question, she
 7    would respond quickly and so forth.
 8         Q.    And her written
 9    communications to you -- withdrawn.
10              Did you have any opportunity
11    to observe Ms. Fischman's communication
12    with her clients?
13         A.    By her clients, do you mean
14    Tomoji and Utsunomiya-san?
15         Q.    Yes, we can call them the
16    stakeholders, if that works for you.
17         A.    Yeah, we had a number of
18    phone calls together with those two
19    individuals in particular.
20    Utsunomiya-san is a scientist, and to
21    the best of my recollection, Minami-san
22    is an attorney, Japanese qualified
23    attorney.
24         Q.    Okay.  And did you observe
25    that her communications with those
```

Page 109

1                    J. BERMAN
2    individuals were clear?
3         A.    There's a caveat to the
4    answer, which is that we had calls at
5    like 11 at night or ten at night, and
6    there were topics that were really
7    complicated that we were discussing.
8    So we -- for instance, there was a
9    concern throughout that Genomatica
10   could simply file for bankruptcy, and
11   there was a material question as to
12   what would happen to our claim, and in
13   particular to intellectual property
14   owned or held in some form by MCC if
15   there were to be a bankruptcy.  And
16   then if you layer on top of that a
17   language barrier, my recollection is
18   that Jen and I did our best to provide
19   very detailed, and kind of all the pros
20   and cons and lay out all the situations
21   for Utsunomiya-san and Minami-san, but,
22   you know, those are hard things to
23   explain to anybody at a very high level
24   in detail, let alone to folks for whom
25   English is a second language and, you

```
 1                    J. BERMAN
 2   know, with such a time, yeah.
 3        Q.    Moving on to the Genomatica
 4   matter, did you work with anyone other
 5   than Ms. Fischman and Mr. Oliva on that
 6   matter from the Mitsubishi side?
 7                MR. ANHANG:  Excuse me, I'm
 8        going to --
 9                MR. BERMAN:  I'm going to
10        withdraw the question.
11        Q.    On the Genomatica matter, did
12   you work with Ms. Fischman?
13        A.    Yeah.
14        Q.    Did you work with Mr. Oliva?
15        A.    Yes.
16        Q.    Did you work with any other
17   in-house attorneys on that matter?
18        A.    To the best of my
19   recollection, no.
20        Q.    And you already described the
21   type of manner of litigation, but can
22   you tell us who is the plaintiff party
23   in that matter?
24        A.    Mitsubishi Chemical
25   Corporation.
```

1                    J. BERMAN
2        Q.    So when it came to settlement
3    of that matter, do you recall -- do you
4    recall attending, or I think you called
5    it an INE, right --
6        A.    It's an ENE.
7        Q.    An ENE?
8        A.    And that's just southern
9    district of Cal parlance.  Different
10   courts call it different things.  But
11   SD Cal calls it an early neutral
12   evaluation.
13       Q.    Right, so ENN -- or ENE,
14   right?
15       A.    ENE, that's right.
16       Q.    Okay.  And do you recall
17   whether the matter -- you were asked
18   about this earlier, but do you recall
19   testifying concerning whether the
20   matter settled at the first neutral
21   mediation?
22       A.    Yeah, I now realize it
23   couldn't have, because we went out
24   there in November, didn't settle, and I
25   remember going to dinner with Nick and

```
 1                  J. BERMAN
 2   Tomoji and Utsunomiya-san.  We were all
 3   exhausted, particularly the two
 4   gentlemen from Japan.  After we
 5   successfully resolved the matter, this
 6   was in san Diego, so there must have
 7   been a second ENE that we attended or a
 8   further settlement conference of some
 9   kind.
10         Q.    Do you know whether that was
11   on or around February of 2017?
12         A.    Yeah, that's right.  Because
13   I had moved to White & Case by that
14   point, and right after I joined White &
15   Case I went back -- you have refreshed
16   my recollection.  There were two ENEs.
17   Right after I moved to White & Case, I
18   went back out to San Diego, and I
19   stayed at that hotel right across from
20   the ballpark.  And that's when
21   Mr. Oliva and I were able to obtain a
22   satisfactory settlement offer from
23   Genomatica.
24         Q.    Okay.  Turning your attention
25   back to the first ENE, I'll just call
```

```
                                       Page 113
 1                    J. BERMAN
 2    it an ENE, does that work?
 3         A.     Yeah.
 4         Q.     Okay.  So turning your
 5    attention back to the first ENE, did
 6    you have express settlement authority
 7    at a fixed sum for that first ENE?
 8         A.     Well, Nick was with me, and
 9    Nick was the designee of Mitsubishi
10    Chemical Corporation who had settlement
11    -- I didn't have anything.  I had my
12    boss and my client with me.
13         Q.     Understood.  Do you know
14    whether Nick had expressed settlement
15    authority at a fixed sum?
16         A.     I don't know whether there
17    was a fixed sum, but MCC had designated
18    Nick in accordance with the rules as
19    the person to participate in the ENE
20    with settlement authority.  So I would
21    imagine either we had settlement
22    authority, or there was some protocol
23    put in place whereby if we got it and
24    we were close, Nick would just pick up
25    the phone and have a conversation with
```

```
 1              J. BERMAN
 2    the folks in Japan and make a, you
 3    know, decision on how to proceed.
 4         Q.    You'd done other ENEs prior
 5    to that one, correct?
 6         A.    I think that was my only
 7    technical ENE in the southern district
 8    of California, but I've certainly done
 9    many mediations over the course of my
10    career, or settlement conferences,
11    sure.
12         Q.    Normally when you have a
13    mediation or a settlement conference
14    when you're representing a party, do
15    you usually have settlement authority
16    that is specified to you ahead of time?
17              MS. COLWIN:  Objection.
18         A.    With respect, I can't answer
19    that question in the form it's asked.
20         Q.    Okay.  Did you have any
21    discussions with Mr. Oliva about the
22    amount of settlement authority that
23    your team was bringing to the ENE?
24              MS. COLWIN:  Objection.
25         A.    I'm sure we did.  But the
```

Page 115

```
 1              J. BERMAN
 2    fixation, not just by you, Mr. Berman,
 3    but by everyone, with me knowing a
 4    specific number as discussed between
 5    either Mr. Oliva and the folks in Japan
 6    or Ms. Fischman and the folks in Japan,
 7    sort of misapprehends the nature of the
 8    situation.  If and -- when Nick and I
 9    were sitting there negotiating our
10    hearts out and doing the best we could
11    for the client to obtain the prevailing
12    results, you know, we live in an age of
13    smart phones and ongoing communication,
14    and so I don't know that I ever said,
15    you know, Nick, do we have a hard stop
16    at X number or, you know, it was more
17    realtime, you know, two colleagues or
18    lawyer and client, but given that Nick
19    and I were both attorneys, it was much
20    more like two colleagues working in
21    good faith to get to the best result we
22    could.  That's the best I could tell
23    you.
24         Q.   Thank you for explaining
25    that.  With respect to that first ENE,
```

```
 1                    J. BERMAN
 2    when you describe interactions in
 3    realtime, are you referring to your
 4    interactions with, Nick who attended
 5    with you, or are you referring to
 6    interactions with stakeholders who
 7    might be in Japan?
 8         A.    Well, the stakeholders in
 9    Japan were obviously in Japan.  But
10    with both Jen and Nick, they were a
11    phone call away, and cared about the
12    result, clearly.  And so I guess I was
13    referring to my interactions with Nick,
14    and the way that we -- I don't know the
15    precise word.  It felt like we were a
16    team, and we were there to obtain the
17    best result that we could.
18         Q.    Did you understand, when you
19    attended the first ENE, that it would
20    be necessary to communicate with people
21    in Japan?
22         A.    I don't have an understanding
23    one way or the other.
24         Q.    So it was your understanding
25    that the settlement authority at the
```

```
 1                    J. BERMAN
 2   ENE would derive through Nick, correct?
 3        A.    Not exactly.  What I said is
 4   that Nick was designated as the
 5   representative of MCC for the purposes
 6   of the ENE.  I didn't have a fully
 7   formed, if you will, view one way or
 8   the other on an issue that appears on
 9   the outside to be central to the
10   litigation, which is from when
11   authority, you know, originated as to
12   every single point.  But I viewed Nick
13   as, from my perspective, what Nick said
14   was what we were going to do.
15        Q.    Okay.  Did you -- normally --
16   do you have an understanding of what it
17   means to designate somebody as the
18   representative for an ENE?
19             MS. COLWIN:  Objection.
20        A.    Yeah, I think so.
21        Q.    Okay.  Does that person who
22   is designated have to come to the ENE
23   in possession of some level of
24   settlement authority?
25             MS. COLWIN:  Objection.
```

```
 1                    J. BERMAN
 2        A.    I think that's probably
 3    right.  But very often in practice,
 4    stakeholders, so like, I don't know
 5    what precise settlement authority
 6    conversations he had with Japan or
 7    didn't have with Japan, I wasn't privy
 8    to those.  But my belief was that
 9    everybody on our side was acting in the
10    best of faith to comply with the court
11    rules, and more than that, achieve a
12    result for our client.
13        Q.    Did you make any provisions
14    for making sure you would have realtime
15    access to stakeholders in Japan during
16    the ENE?
17        A.    I don't -- I don't recall,
18    you know, there's the time difference,
19    and as I said, I don't recall, either,
20    if Mr. Oliva had received specific
21    directives from Japan as to a bottom
22    line number.  I just don't recall.
23    It's very possible that they
24    communicated to me at the first ENE,
25    this is the bottom line as stated from
```

```
 1                    J. BERMAN
 2   Japan.  But I can't recall the
 3   conversation.  Certainly could have
 4   happened.  I just, you know --
 5        Q.    So did you yourself make any
 6   provision to be able to contact the
 7   individuals in Japan during the ENE?
 8        A.    No.  At least I don't believe
 9   so.  If I just sent an email that
10   said -- I don't believe so.  I mean, I
11   think Nick was the designee.
12        Q.    Did you have any discussion
13   with Ms. Fischman leading up to the ENE
14   about having $2 million of settlement
15   authority to settle the matter?
16             MS. COLWIN:  Can we have the
17        question repeated, please.
18             MR. BERMAN:  Read that back,
19        please.
20             (Requested portion of the
21        record was read back.)
22        A.    It's entirely possible that I
23   did, but sitting here today four years
24   later, more than four years later, I
25   just can't remember a specific
```

1                     J. BERMAN
2    conversation to that effect, yes or no.
3         Q.    Okay.  Did you have any
4    conversation with Mr. Oliva about
5    having $2 million of settlement
6    authority for the ENE?
7         A.    Same answer, Mr. Berman, I
8    absolutely may have had that
9    conversation, but four years after the
10   fact it's very hard to recall specific
11   conversations one way or the other,
12   whether we had it or not.
13        Q.    So whatever settlement
14   authority was possessed at the ENE, you
15   could have made any demand higher than
16   that number, correct, during the ENE?
17             MS. COLWIN:  Objection.
18        A.    Not necessarily.  I mean, you
19   know, we were under a clear directive
20   not to antagonize the other side, and
21   in so doing, to impair the progress of
22   settlement discussions.  So I'm pretty
23   sure Nick would have been displeased
24   if, in the middle of the, ENE I turned
25   to Stiegler and said, You know what,

```
                                           Page 121
 1                     J. BERMAN
 2     you're being difficult and you have no
 3     basis for any of this, and now we want
 4     ten million.  That was not --
 5          Q.    Let's try it again with the
 6     proviso that we're not talking about a
 7     situation where you're being
 8     antagonistic or something.  I'm asking
 9     about the mechanics of settlement
10     authority on behalf of a plaintiff.
11     When a plaintiff makes a settlement --
12     withdrawn.
13               When you go into settlement
14     on behalf of a plaintiff, and you're
15     granted an express amount of settlement
16     authority --
17          A.    I need to close my blinds,
18     because the sun is shining at a very
19     acute angle.
20          Q.    Let me try asking the
21     question.
22          A.    It's very dark, is that okay
23     for the --
24               THE VIDEOGRAPHER:  We need
25         more light -- there we go.
```

                        J. BERMAN
1
2        Q.    I'm asking how the demand
3   works and settlement authority works,
4   and I want to make sure I understand
5   correctly that where a client
6   authorizes you with settlement
7   authority on behalf of a plaintiff
8   party, if their authority is X, that --
9   if your authority to settle the matter
10  is X, then you're implicitly or
11  expressly authorized to make any
12  request for settlement above X; is that
13  correct?
14              MS. COLWIN:  Objection.
15       A.    It really depends on the
16  client.  I have some clients who really
17  are hands-off in terms of -- and they
18  really kind of leave it to me to go
19  negotiate however I see fit, and I have
20  other clients who are much more -- who
21  have much more specific instructions.
22       Q.    Okay, that's --
23       A.    I've been to mediations where
24  they say, you know, or settlement
25  conversations where they say, if you

```
 1                    J. BERMAN
 2    can get me to at least X, good, and how
 3    you get there is up to you.
 4         Q.    Mm-hmm.
 5         A.    And I have other clients who
 6    are more -- who have a more articulated
 7    route and methodology that I am to
 8    follow.
 9         Q.    Okay.  Absent a limiting
10    instruction of the kind that you just
11    identified, the mechanics of settlement
12    is what I'm asking about.  If a client
13    provides you with a sum certain in
14    terms of your settlement authority,
15    aren't you then authorized to settle
16    that amount for anything above the sum
17    certain in the case --
18              MS. COLWIN:  Objection.
19         A.    Are you asking me if someone
20    says, get me ten million bucks, and the
21    other side offers me 15, do I believe
22    I'm authorized to take it?  Yes.
23         Q.    Yes, okay, thank you.
24         A.    And I ask for a bonus.
25         Q.    And you will have earned it.
```

```
 1                    J. BERMAN
 2    Did you have any discussion with
 3    Mr. Oliva concerning who was providing
 4    him with his settlement authority?
 5         A.    I mean, no, I knew that
 6    Mr. Oliva was in regular contact with
 7    the stakeholders in Japan, but he may
 8    have, in fact, just come back from
 9    Japan.  At some point he took a trip
10    either right before or after our ENE,
11    first ENE.  But I don't think I
12    specifically said to the general
13    counsel, Hey, you know, who gave you
14    your settlement authority, that would
15    be a little bit out of place for me to
16    ask that kind of question.
17         Q.    Okay.  Did you have any other
18    source of independent knowledge
19    concerning where his settlement
20    authority came from?
21         A.    I don't believe so.  If I
22    understand your question correctly, I
23    don't believe so.
24         Q.    Did you have any discussions
25    concerning who should be designated as
```

Page 125

```
 1                    J. BERMAN
 2    the representative to attend the ENE,
 3    the initial one?
 4          A.     Not my call.
 5          Q.     Did you have any discussions
 6    over that topic, though?
 7          A.     Briefly.  I mean, I was
 8    somewhat surprised that -- I had
 9    assumed it would be Ms. Fischman,
10    because she's the person I was working
11    with day-to-day, day in, day out.  So
12    we had sort of, I think Jen and I had a
13    conversation where we were both like,
14    okay, wow.  It designated Nick.  And,
15    you know, my attention turned pretty
16    quickly -- it wasn't a derisive
17    conversation, it was just surprise on
18    my part, at least, and my attention
19    turned pretty quickly to wanting to
20    make sure that I could get Nick up to
21    speed and get him any information that
22    he needed --
23          Q.     Okay.
24          A.     -- and wanted to know about.
25          Q.     And up until that point, you
```

```
 1              J. BERMAN
 2   had been interacting with Jennifer
 3   Fischman as your primary contact on the
 4   matter?
 5        A.    Correct.
 6        Q.    Did you have any discussions
 7   with Ms. Fischman concerning the amount
 8   of settlement authority that was being
 9   brought to the ENE?
10        A.    It's totally possible that I
11   did, but sitting here today I can't
12   remember one way or the other.
13        Q.    Would you have had any
14   conversations with anyone else
15   concerning the amount of settlement
16   authority that was being brought to the
17   ENE?
18        A.    Either Mr. Oliva or
19   Ms. Fischman would have been the two
20   people I spoke to about that topic.
21   Well, I suppose it's possible, I would
22   have to see my phone records.  It's
23   possible that Nick and I had a call
24   with Japan prior to the first ENE, and
25   we had representatives from Japan at
```

```
                                    Page 127
 1                    J. BERMAN
 2    the second ENE.  I just don't remember.
 3    So when you say, did you have such a
 4    call, I don't want to say definitively
 5    no.  The correct answer is I don't
 6    remember.
 7         Q.    Would your attorney records
 8    reflect any such conversations?
 9         A.    Probably.
10         Q.    Do you know if they still
11    exist?
12         A.    I have no idea.
13         Q.    Okay.  Would those have been
14    at your prior firm or your current
15    firm?
16         A.    Considering we're talking
17    about the time period of the first ENE,
18    which is in 2016, they would be at my
19    prior firm.
20         Q.    Did there come a time when
21    the Genomatica matter was settled?
22         A.    There did.
23         Q.    And do you know whether any
24    of the settlement terms reflected a
25    payment over some period of time?
```

```
                                            Page 128
 1                    J. BERMAN
 2       A.    I do believe there were
 3    payments over time, yeah.
 4       Q.    Do you know what the length
 5    of the time period is?
 6              MS. DONEHOWER:  Mr. Anhang
 7         and Ms. Colwin, can you let us know
 8         if Mr. Berman is able to answer
 9         these questions?
10              MS. COLWIN:  It's going to be
11         Mr. Anhang.
12              MR. ANHANG:  So far, yes,
13         I'll jump in to caution and direct
14         the witness, but Josh, go ahead.
15              THE WITNESS:  Did you say go
16         ahead?
17              MR. ANHANG:  Yes.
18       A.    I'm sorry, can you ask the
19    question again?  I lost it.
20              MR. BERMAN:  Can you read it
21         back, please?
22              (Requested portion of the
23         record was read back.)
24       A.    I'm sorry, forgive me.  I'm a
25    little lost.
```

```
 1                    J. BERMAN
 2        Q.     Just asking if you know what
 3    the payment term was.
 4        A.     I would have to look at the
 5    settlement agreement.
 6        Q.     Okay.  Is the settlement
 7    confidential?
 8        A.     Probably.
 9        Q.     Okay.  I won't ask you any
10    further questions on the details, then.
11             MR. BERMAN:  Mr. Anhang?
12             MR. ANHANG:  Yes.
13             MR. BERMAN:  Okay, do you
14        have any objection to me asking him
15        the amount of the final
16        settlements?
17             MS. COLWIN:  I'm going to
18        raise an objection.
19             MR. BERMAN:  Whose objection
20        is that?
21             MS. COLWIN:  Mercedes Colwin.
22        I'm just reserving it.  Relevance
23        is what I would say, but...
24             MR. BERMAN:  Maybe can I ask
25        it a different way, and we can see
```

```
                                    Page 130
 1                    J. BERMAN
 2       if there's a problem with that.
 3          Q.    Do you know if the matter
 4   ultimately settled for more than
 5   2.3 million?
 6          A.    I don't think it did.
 7          Q.    Okay.
 8          A.    Except that I would say,
 9   sorry, there were some IP -- there was
10   some -- let me rephrase.  There was
11   some nonmonetary components of the
12   settlement, and I don't know how to
13   value those.
14          Q.    Do you know whether the
15   monetary component of the settlement
16   ended up being more than $2.3 million?
17          A.    I don't believe it was.
18          MS. COLWIN:  Objection.
19          Q.    Do you know whether it was
20   more than $2 million?
21          A.    I feel like it was right
22   around there.  I really would have to
23   go back and look.
24          Q.    Did you work with Jennifer
25   Smith on the Genomatica matter in the
```

```
 1                   J. BERMAN
 2   first week of January of 2017?
 3        A.    With Jennifer Smith?
 4        Q.    I'm sorry, Jennifer Fischman,
 5   excuse me.
 6        A.    Did I work on the Genomatica
 7   matter with Jen in the first week of
 8   January 2016?
 9        Q.    2017, yeah.
10        A.    2017.
11        Q.    Mm-hmm.
12        A.    I think so, yeah, that's when
13   we had the call with -- I think so.
14        Q.    Do you recall being asked
15   questions about exhibits relating to
16   the first week of January --
17        A.    Yeah, yeah, I think that's
18   right, I think so.
19        Q.    And do you recall one of the
20   emails that we reviewed today
21   mentioning that Jennifer was out sick
22   for the week?
23        A.    I do, I'm -- I do recall
24   seeing that.
25        Q.    Okay.  And do you recall
```

```
 1                    J. BERMAN
 2   Ms. Fischman being out sick for a week
 3   in the beginning of January of 2017?
 4        A.    I don't have an independent
 5   recollection of that, but I have no
 6   reason to doubt it.
 7        Q.    Did you have any discussions
 8   with Ms. Fischman concerning the amount
 9   of an appropriate settlement after the
10   first ENE completed?
11        A.    We must have, right?  I mean,
12   the first ENE was in November.
13        Q.    Mm-hmm.
14        A.    And the emails we looked at
15   were from a time period subsequent to
16   that.  So yes, Ms. Fischman and I
17   continued to work together after the
18   first ENE.
19        Q.    On or about the beginning of
20   January of 2017, did you have a
21   conversation with Ms. Fischman
22   concerning a discussion she related to
23   you between her and Mr. Oliva
24   concerning the settlement amount?
25        A.    On or about what date?
```

```
 1                    J. BERMAN
 2        Q.    In the first week of
 3   January 2017.
 4        A.    Did Jen have a conversation
 5   with me about a conversation she had
 6   with Nick?
 7        Q.    Yes.
 8        A.    It's possible, but I just
 9   don't remember.
10        Q.    Okay.  Did Ms. Fischman
11   suggest to you that Nick wanted to make
12   a settlement demand of $2.2 million?
13        A.    I'm sorry, I feel -- wish I
14   had a more precise recollection of
15   these daily events, but it's possible
16   she did, but I just don't have a
17   specific recollection one way or the
18   other.
19        Q.    Did you have any conversation
20   with Ms. Fischman concerning the
21   $2.3 million settlement demands?
22        A.    Must have, because I wouldn't
23   have written to Anthony Stiegler, I
24   have been authorized to come in at 2.3,
25   unless I had been authorized to come in
```

```
 1                    J. BERMAN
 2    at 2.3.
 3         Q.    Okay.  Did you have any --
 4    did Ms. Fischman relate to you that she
 5    was authorized by Mr. Oliva to make
 6    that demand?
 7         A.    I just can't remember.  I
 8    mean, for what it's worth, Mr. Berman,
 9    I wouldn't in the ordinary course have
10    questioned Jen on one of her marching
11    orders.  She was, you know, I answered
12    to her, as I did with Mr. Oliva, and
13    she was conscientious and up to date,
14    to the best of my discernment, and
15    like, I would never have said to her,
16    you know, Hey, person who hired me,
17    prove to me that you're actually
18    authorized to give me this, it's just
19    not a question I would have asked.
20         Q.    Okay.  So you understood at
21    the time that the 2.3 million that
22    Ms. Fischman conveyed to you, that she
23    was authorized to do that, correct?
24              MS. COLWIN:  Objection.
25         A.    I would say I assumed that.
```

```
 1                    J. BERMAN
 2        Q.    Okay, but you --
 3        A.    You know, I -- that's the
 4   best way I know how to answer the
 5   question, I assumed that.
 6        Q.    Okay.  And do you recall her
 7   being sick at the time?
 8        A.    I saw the email, we talked
 9   about it.
10             MS. COLWIN:  Objection.
11        A.    And so she totally may have
12   well been sick at the time, I just
13   don't have a recollection of whether
14   she was or wasn't.
15        Q.    So after this $2.3 million
16   demand was made, do you know whether
17   the demand was accepted?
18        A.    I do know.
19        Q.    Was it accepted?
20        A.    No.
21        Q.    Okay.  Was it withdrawn?
22        A.    That's a little weird.  I
23   don't know if we were going to a second
24   ENE pretty quickly after that, or
25   Stiegler reached out to me again.  I
```

```
 1                    J. BERMAN
 2   don't recall -- he might have
 3   countered, I really don't recall.  But
 4   I don't think, I don't think that I
 5   called him up and said, I just want you
 6   to know this is wrong.
 7        Q.    Did anyone at Mitsubishi
 8   instruct you to withdraw the
 9   $2.3 million demand after it was
10   articulated?
11            MR. ANHANG:  I'm going to
12        object to that on the grounds,
13        among other things, that it's vague
14        with regard to the use of the term
15        Mitsubishi.  Not at all clear to me
16        who is being referenced by the use
17        of the term Mitsubishi.
18            MR. BERMAN:  That's fair.
19        Q.    Let's clarify.  Did Mr. Oliva
20   instruct you to withdraw the demand
21   after it was articulated?
22        A.    Not to the best of my
23   recollection.
24        Q.    Okay.  Did any of his
25   colleagues instruct you to withdraw the
```

```
 1                J. BERMAN
 2    demand?
 3         A.    I only ever spoke to
 4    Mr. Oliva and to Ms. Fischman about
 5    this matter.
 6         Q.    Okay.  So nobody instructed
 7    you to withdraw the demand?
 8         A.    Again, it's possible that
 9    someone did.  But to the best of my
10    recollection, sitting here today, I
11    can't remember a communication to that
12    effect.
13         Q.    Okay.  When you went to the
14    second ENE, did you have any express
15    settlement authority that you were
16    aware of?
17         A.    Well, at the second ENE,
18    Utsunomiya-san and Minami-san were
19    together with us, so we had, if you
20    will, the litigant itself right there.
21    So I understood at a remove that, you
22    know, they had to, they ultimately
23    answer to Takimoto-san and other --
24    maybe Sakaguchi-san and other very
25    senior people -- or I can just give a
```

```
 1                    J. BERMAN
 2   clearer answer, which is at the second
 3   ENE, we had representatives from Japan
 4   with us.  So it was, you know, the
 5   litigant itself, the captioned litigant
 6   was sitting in the room physically.
 7         Q.    Okay.  Do you know whether
 8   after making the $2.3 million demand,
 9   was any demand for a higher dollar
10   value ever articulated?
11         A.    It's not impossible, but I
12   doubt it.
13         Q.    Okay.  Did you ever have a
14   discussion with Ms. Fischman where she
15   informed you that she just came from
16   Nick Oliva's office to discuss the
17   settlement?
18         A.    It's totally possible.  I
19   can't dispute it or confirm it.  I'm
20   sorry about all of you for my evidently
21   deficient recollection of these events.
22         Q.    That's fine, you know what
23   you know and you remember what you
24   remember, we appreciate --
25         A.    I have been on the other side
```

Page 139

```
 1                    J. BERMAN
 2    of this conversation so many times and
 3    wondered, how can you not remember
 4    these things.
 5           Q.    I understand.  Did
 6    Ms. Fischman ever discuss with you any
 7    disagreement with Mr. Oliva concerning
 8    whether to demand a number of 2.2 or
 9    $2.3 million?
10           A.    I don't recall that.
11           Q.    Okay.  Did there come a time
12    when Ms. Fischman was terminated?
13           A.    To the best of my
14    understanding, yes.
15           Q.    Okay.  How did that come to
16    your attention?
17           A.    Nick called me, and in a very
18    modulated way, said, I want you to hear
19    this from me.  We had to -- words to
20    the effect of -- I'm not purporting to
21    quote him -- we've had to separate from
22    Ms. Fischman.  I recall Nick being
23    careful to say, we don't want to
24    involve you, and this is not, we don't
25    feel that you've done anything, you,
```

```
 1                    J. BERMAN
 2   Josh, have done anything improper or
 3   unwarranted.  And this is between, sort
 4   of between us on our side of the table,
 5   and we kind of left it at that.  I
 6   mean, it seemed that if Nick wanted to
 7   tell me more, he could have told me
 8   more, but he was, you know, being
 9   discreet.
10        Q.    Okay.  What was your reaction
11   to learning that Ms. Fischman had been
12   terminated?
13        A.    I was surprised.
14              MS. COLWIN:  Objection.
15        Q.    Why were you surprised?
16        A.    I had no knowledge -- well,
17   two reasons.  I told you that I had a
18   good opinion of Jen as a conscientious
19   attorney and as devoted and, you know,
20   to the case and our work.  And two, I
21   had no knowledge that there's any
22   friction behind the scenes that might
23   lead to something, but -- like that.
24   But of course, and this is very
25   important for me to say, I don't know
```

```
 1                    J. BERMAN
 2    what I don't know.  Whatever things
 3    took place outside of my presence took
 4    place outside of my presence, and I
 5    can't express an opinion one way or the
 6    other, and don't want to be understood
 7    as expressing an opinion one way or the
 8    other as to what's right and what's
 9    wrong here relative to the claim at
10    issue.
11         Q.    I understand.
12         A.    I have no knowledge of that.
13         Q.    Okay, I'm just interested in
14    what you've observed in the preceptory
15    sense way.  Okay.
16              Did Ms. Fischman ever call
17    you after she was terminated?
18         A.    We spoke at some point.  Like
19    I said earlier, we went to dinner with
20    Lee and Lisa at a Colombian restaurant
21    in Portchester.  I can't remember if
22    the barbecue at Ms. Fischman's house --
23    I think that was before her
24    termination.
25         Q.    After her termination, did
```

```
 1                    J. BERMAN
 2   she call you to inform you that she had
 3   been terminated?  So right around the
 4   time you had spoken to Mr. Oliva.
 5        A.     Probably.  Probably, but I'm
 6   not positive, actually.
 7        Q.     All right.  Do you recall any
 8   of the elements of that discussion?
 9   What did she say to you, what you say
10   to her?
11        A.     I think there was something
12   around, to the best of my recollection,
13   there was something about Ms. Fischman
14   having just conducted an ethics
15   seminar.
16        Q.     Okay.
17        A.     And her being shocked,
18   essentially, that after that she would
19   be -- she was terminated.
20        Q.     Okay.  Did you have any
21   discussion with her about the
22   $2.3 million settlement demand after
23   she was terminated?
24        A.     I don't believe so, but I
25   can't -- I just can't say definitively.
```

Page 143

```
 1              J. BERMAN
 2    I mean, at this point, just so everyone
 3    knows, I was like, Oh, boy, you know,
 4    this is a very uncomfortable position,
 5    a few people I respect and like.  I
 6    hope not to be in the middle of this.
 7    And everyone has largely honored that,
 8    for which I'm grateful.  It's possible
 9    that the subject of the 2.3 was brought
10    up in a conversation with Jen.  I'm
11    sorry that I can't give you more
12    detail.
13         Q.    Okay, I appreciate that.  So
14    as between these two phone calls, do
15    you know sequentially the order of
16    them, did one happen before the other?
17         A.    First of all, I'm not sure
18    there were two.
19         Q.    Okay.
20         A.    Second of all, I'm also
21    trying to separate out, like, a social
22    call, which could have gone to my
23    wife -- by the way, we also played
24    doubles tennis once.  At any rate, I'm
25    sorry, I don't have greater detail than
```

```
 1                    J.  BERMAN
 2    that.
 3         Q.    Okay.  Was there any
 4    discussion over whether the
 5    $2.3 million demand was authorized
 6    after she was terminated, Ms. Fischman?
 7         A.    Totally possible that when
 8    Jen called to let me know she was
 9    terminated, totally possible the issue
10    you're describing came up, but I can't
11    attest to it one way or the other.
12         Q.    Do you know where the
13    $2.3 million figure came from?
14         A.    I mean, I had a view -- the
15    answer is no, but I have a view, which
16    was that I proposed 2.5 split over six
17    months, and it didn't seem in any way
18    bizarre to say, Well, let's knock the
19    number down a little bit, but
20    illuminate the chronological runway.
21              I don't have a specific
22    knowledge of the derivation of the
23    figure, but it didn't strike me in the
24    moment as, like, a -- it seemed
25    perfectly logical.
```

```
 1                  J. BERMAN
 2        Q.     Okay.  Did Ms. Fischman
 3   inform you that there is an allegation
 4   that she had breached her attorney's
 5   ethics?
 6        A.     I want to say that rings a
 7   bell, Mr. Berman, because I think
 8   that's why the ethics seminar or ELE or
 9   whatever it might have been must have
10   come up.
11        Q.     Do you know the general
12   nature of the accusation?
13        A.     I mean, I've got the
14   complaint in front of me.
15        Q.     I'm just interested in your
16   independent knowledge.
17        A.     At a very high level, very
18   high level, there was some
19   miscommunication between Jen and Japan
20   that either was or wasn't wrongful,
21   depending on who you ask, and -- sorry
22   for the noise -- the claim revolved
23   around that, I believe.  And, you know,
24   there's obviously a formal wrongful
25   termination suit.
```

```
 1                  J. BERMAN
 2       Q.    Okay.  Do you know whether
 3   the $2.3 million demand was higher than
 4   any previously disclosed settlement
 5   authority that either Nick Oliva or Jen
 6   Fischman had?
 7             MS. COLWIN:  Objection.
 8       Q.    Do you understand the
 9   question?
10       A.    Not really.
11       Q.    Okay.  So do you know whether
12   the $2.3 million settlement demand was
13   higher than any settlement authority
14   previously revealed to you?
15             MS. COLWIN:  Objection.
16       Q.    Do you understand the
17   question?
18             MR. ANHANG:  I'm going to
19        join in that objection, and indeed,
20        I'm joining all objections made by
21        MCHA's counsel.
22       A.    I don't -- I don't know.  I
23   just don't recall, sorry.  It's
24   possible that at a certain point we
25   made -- and I'm not sure if it was a
```

```
 1                    J. BERMAN
 2    settlement, we certainly set it up in
 3    the complaint, plus that's what you're
 4    interested in, other relief.  I just
 5    don't remember if that was communicated
 6    in the settlement conversation.
 7         Q.    Okay.  Prior to the
 8    $2.3 million settlement demand, were
 9    you ever made aware of any express
10    settlement authority at a specific
11    amount or higher?
12              MS. COLWIN:  Objection.
13         A.    I don't recall.
14         Q.    Did you ever participate in
15    any telephone calls or other verbal
16    communications where you were on with
17    both Ms. Fischman and Mr. Oliva at the
18    same time?
19         A.    What's another verbal
20    communication besides a telephone call?
21         Q.    Could have been face to face.
22         A.    I don't believe I ever saw
23    them in a face-to-face.
24         Q.    Okay.
25         A.    I don't believe I've ever
```

```
 1                    J. BERMAN
 2   spoken to them at the same time on the
 3   phone, but I can't rule that out.
 4           MR. BERMAN:  Just checking my
 5       notes, I think we might be done.
 6           MR. ANHANG:  Matthew, while
 7       you're referring to your notes, let
 8       me just say something at this
 9       point.  This may go to any further
10       questions you have, but I know it
11       goes to some questions you already
12       asked.  There have obviously been
13       some references that have been put
14       on the record today with regard to
15       the ultimate actual settlement
16       agreement between MCC and
17       Genomatica, and I want to designate
18       those references as confidential.
19       They should be treated as
20       confidential by all counsel here,
21       and others, and anyone who wants to
22       make a disclosure of any of those
23       references, I would insist that
24       they contact me first to discuss
25       them.
```

Page 149

1               J. BERMAN

2          REPORTER:  Should I mark the

3     transcript confidential?

4          MS. COLWIN:  Yes, please.

5          MR. ANHANG:  Matthew, any

6     objection to what I just said?

7          MR. BERMAN:  To requesting

8     your authorization prior to

9     disclosure of any confidential

10    portions of the transcript; is that

11    what it was?

12         MR. ANHANG:  Also designating

13    --

14         MR. BERMAN:  I have no

15    objection to designating any

16    portion of the transcript relating

17    to the settlement amount or the

18    settlement terms as confidential,

19    and my understanding is that

20    there's a confidentiality agreement

21    or order in the case, but counsel

22    can correct me if I'm

23    misremembering.

24         MS. COLWIN:  There is, I was

25    about to state on the record that

Page 150

```
 1                    J. BERMAN
 2        there is a stipulation of
 3        protective order so ordered by
 4        SCNY, and we're going to abide by
 5        the protocols in place.
 6               MR. BERMAN:  We will abide by
 7        the protocols as well, obviously.
 8        Q.    You referred to an individual
 9   earlier named Takimoto-san, correct?
10        A.    I think so.
11        Q.    Was Takimoto-san involved in
12   the first ENE?
13        A.    I think Takimoto-san was the
14   boss of the whole kit and caboodle.  He
15   might have been extremely high-ranking.
16   So no, at least not directly.
17        Q.    Going into the first ENE, did
18   you have a sense of what you can
19   actually settle the matter for?
20        A.    Sorry, I don't recall.
21        Q.    Okay.  And did you have any
22   written authorization of your
23   settlement amount with Nick going into
24   that ENE?
25        A.    Did I have any written
```

Page 151

```
 1                    J. BERMAN
 2   authorization?  No, Nick was with me.
 3        Q.    I mean, was there any written
 4   record leading into the ENE that set
 5   forth what the likely settlement range
 6   was, or what your actual authority to
 7   settle was?
 8             MS. COLWIN:  Objection,
 9        there's been two ENEs.  Can we just
10        get a clarification which one?
11             MR. BERMAN:  I'm only asking
12        about the first ENE.
13             MS. COLWIN:  November 16,
14        2016?
15             MR. BERMAN:  Right.
16        A.    I just don't know the answer
17   to that.
18        Q.    Okay.
19             MR. BERMAN:  I have no --
20        A.    It's also possible I wasn't
21   copied on it.
22             MR. BERMAN:  I have no
23        further questions for the deponent
24        at this time, thank you.
25             MS. COLWIN:  I need to take a
```

Page 152

```
 1                      J. BERMAN
 2        two-minute break.
 3                 THE VIDEOGRAPHER:  Stand by,
 4        I'm going to change out this media
 5        unit.  This is the end of media
 6        unit number two, we are now off the
 7        record at 1:46 p.m.
 8                 (Recess.)
 9                 THE VIDEOGRAPHER:  This is
10        the beginning of media unit number
11        three, we are now on the record at
12        1:54 p.m.
13          Q.    Mr. Berman, you had testified
14     earlier that you had worked with
15     Ms. Fischman on two matters;
16     Genomatica, which we have talked to
17     extensively today, but also another
18     matter, Mitsubishi Chemical Composites;
19     is that right?
20          A.    Yeah, but we didn't really
21     work together in the second one.  She
22     just sort of previewed that it may be
23     something that was coming down the
24     pike.
25          Q.    I just wanted to make sure
```

Page 153

```
 1                    J. BERMAN
 2    the record is clear, your knowledge of
 3    Jennifer's work is really limited to
 4    your interactions with Ms. Fischman in
 5    the Genomatica matter then, correct?
 6         A.    That's right.
 7              MS. COLWIN:  Mr. Berman, I so
 8         appreciate your time.  Thank you
 9         for obliging with the subpoena that
10         was issued.  We appreciate it.  I
11         know that you have many other
12         things on your plate, and spending
13         time with us may not be the first
14         thing you thought of today, so we
15         do appreciate the time you spent
16         with us.  I have nothing further.
17              MR. BERMAN:  Thank you,
18         nothing further at this time.
19              MR. ANHANG:  Nothing further
20         on my end.
21              MS. COLWIN:  Thank you all
22         very much.
23              THE VIDEOGRAPHER:  Counselor,
24         I'm sorry, we are concluded,
25         correct?
```

Page 154

```
 1              J. BERMAN
 2          MS. COLWIN:  We are
 3      concluded.
 4          THE VIDEOGRAPHER:  We are off
 5      the record at 1:55 p.m., and this
 6      concludes today's testimony given
 7      by Joshua Berman.  The total number
 8      of media units used was three, and
 9      will be retained by Veritext New
10      York.
11          (Time noted:  1:56 p.m.)
12
13
14      _____
15              JOSHUA BERMAN
16
17
18
19      _____
20      Subscribed and sworn to
21      before me this _____
22      day of _____, 2020.
23
24      _____
25              Notary Public
```

Page 155

```
1
2                    I N D E X
3
4
5   WITNESS        EXAMINATION BY          PAGE
6
    BERMAN         MS. COLWIN              9
7
                   MR. BERMAN             101
8
9
10
                        E X H I B I T S
11
    EXHIBIT           DESCRIPTION          PAGE
12   Exh 1     First amended complaint     25
13            jury trial demand
14   Exh 2     Bates stamped Def           53
15            001419.
16   Exh 3     Bates stamped Def           57
17            000876
18   Exh 4     Bates stamped Def 1422      63
19            and Def 1423
20   Exh 5     Bates stamped Def 872       67
21            and 873
22   Exh 6     Bates stamped Def 1842      67
23            to Def 1847
24   Exh 7     Bates stamped Def 1907      72
25            to 1908
```

Page 156

```
 1
 2   Exh 8        Bates stamped Def 2301        74
 3                and 2302
 4   Exh 9        Bates stamped Def 882         76
 5                and Def 883
 6   Exh 10       Bates stamped Def 884         81
 7                to 886
 8   Exh 11       Bates stamped Def 885         87
 9   Exh 12       Bates stamped Def 2322        87
10   Exh 13       Bates stamped Def 2315        90
11                to 2316
12   Exh 14       Bates stamped Def 878         92
13                and 879
14   Exh 15       Bates stamped Def 844         95
15                and 845
16
17
18
19
20
21
22
23
24
25
```

Page 157

1

2                    CERTIFICATION

3

4

5      I, JEREMY RICHMAN, a Notary Public for

6   and within the State of New York, do

7   hereby certify:

8      That the witness whose testimony as

9   herein set forth, was duly sworn by me;

10  and that the within transcript is a true

11  record of the testimony given by said

12  witness.

13     I further certify that I am not

14  related to any of the parties to this

15  action by blood or marriage, and that I am

16  in no way interested in the outcome of

17  this matter.

18     IN WITNESS WHEREOF, I have hereunto

19  set my hand this 29th day of December,

20  2020.

21

22  _____

23  JEREMY RICHMAN

24                *     *     *

25

```
                                             Page 158
 1
 2                  ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
 3
     CASE NAME: FISCHMAN v MITSUBISHI
 4   DATE OF DEPOSITION: December 15, 2020
     WITNESS' NAME: JOSHUA BERMAN
 5
     PAGE/LINE(S)/     CHANGE          REASON
 6   ____/_____/_____/_____
     ____/_____/_____/_____
 7   ____/_____/_____/_____
     ____/_____/_____/_____
 8   ____/_____/_____/_____
     ____/_____/_____/_____
 9   ____/_____/_____/_____
     ____/_____/_____/_____
10   ____/_____/_____/_____
     ____/_____/_____/_____
11   ____/_____/_____/_____
     ____/_____/_____/_____
12   ____/_____/_____/_____
     ____/_____/_____/_____
13   ____/_____/_____/_____
     ____/_____/_____/_____
14   ____/_____/_____/_____
     ____/_____/_____/_____
15   ____/_____/_____/_____
     ____/_____/_____/_____
16   ____/_____/_____/_____
     ____/_____/_____/_____
17   ____/_____/_____/_____
     ____/_____/_____/_____
18   ____/_____/_____/_____
     ____/_____/_____/_____
19   ____/_____/_____/_____
20
              _____
21                 JOSHUA BERMAN
22   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS_____DAY
23   OF_____, 20   .
24   _____
          NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____
```

[& - 6:29]                                                                                    Page 1

**&**

**&**   2:3,11,14 8:17
  12:8,11,16,21
  13:11 23:13,25
  38:23 112:13,14
  112:17

**0**

**000876**   57:4
  155:17
**001419**   53:25
  155:15
**08188**   6:8

**1**

**1**   6:3 18:23 19:21
  21:4 25:10 26:8
  155:12
**1-10**   1:9
**1.5**   91:10
**10**   6:3 80:8,14
  81:19,23 156:6
**10001**   2:9
**10004**   3:5
**10020**   2:16
**101**   155:7
**10583**   6:11
**10:00**   1:14
**10:19**   5:4
**11**   86:25 87:4
  109:5 156:8
**11530**   2:5
**11:01**   44:17
**11:08**   44:21
**11:22**   86:6
**11:58**   81:9
**12**   16:20 87:3,10
  87:13 156:9
**12/30/2016**   83:15
**1221**   2:16
**12:09**   81:16

**12:30**   97:18
**12:44**   97:22
**13**   90:12,15,22
  91:3 156:10
**135,000**   77:5
**14**   92:20,23 156:12
**1419**   54:7,15
**1421**   54:8,15
**1422**   63:18 64:2
  155:18
**1423**   63:19 64:2
  155:19
**14th**   2:8
**15**   1:13 5:4 15:8
  16:19 95:4,5
  123:21 156:14
  158:4
**16**   69:5,14 70:19
  71:25 151:13
**16780**   157:21
**18**   6:8
**1842**   67:21,24
  155:22
**1847**   67:21,24
  155:23
**1907**   72:12,15
  155:24
**1908**   72:12,15
  73:11,15 155:25
**1:46**   152:7
**1:54**   152:12
**1:55**   154:5
**1:56**   154:11

**2**

**2**   21:5 25:2 53:23
  54:5,7,14 119:14
  120:5 130:20
  155:14
**2.2**   133:12 139:8
**2.3**   91:12 96:3
  98:16,22 99:19

130:5,16 133:21
133:24 134:21
135:15 136:9
138:8 139:9
142:22 143:9
144:5,13 146:3,12
147:8
**2.3.**   134:2
**2.5**   77:6,24 79:10
  80:4 85:16 86:8
  88:15 144:16
**2.5.**   83:2
**20**   158:23
**20004**   2:12
**2016**   17:24 18:13
  20:22 25:22 64:18
  66:7 69:5,14
  71:25 78:22 83:21
  91:9 102:8 127:18
  131:8 151:14
**2017**   18:13 38:20
  38:24 39:16 84:5
  84:20 85:10 87:23
  89:9,20,22 90:8
  97:24 98:3,12,23
  112:11 131:2,9,10
  132:3,20 133:3
**2019**   53:8
**2020**   1:13 5:4
  154:22 157:20
  158:4
**220**   2:8
**2301**   74:19,25 75:7
  156:2
**2302**   74:19,25
  156:3
**2315**   90:19,24
  156:10
**2316**   90:20,24
  156:11

**2322**   87:11,15
  156:9
**25**   155:12
**26th**   65:18
**28**   91:9
**28th**   3:5
**29**   78:22
**29th**   157:19

**3**

**3**   56:17,24 57:2,7
  57:13 84:4 155:16
**3.5**   98:2
**30**   91:13
**30th**   83:20
**3rd**   86:6

**4**

**4**   63:15,24 64:5,10
  155:18
**401**   2:12
**408**   91:5

**5**

**5**   63:17 66:24 67:6
  67:10,12 68:4,6
  84:19 85:10 87:23
  89:9,20 94:22
  155:20
**519**   2:4
**53**   155:14
**57**   155:16

**6**

**6**   39:16 67:9,11,15
  67:20,22 89:22
  90:8 94:24 97:23
  98:3,12,23 155:22
**600**   2:4
**63**   155:18
**67**   155:20,22
**6:29**   87:24 89:20

**6th** 91:17 93:17
99:20

**7**

**7** 72:9,11,13
155:24
**72** 155:24
**74** 156:2
**76** 156:4

**8**

**8** 74:16,23 156:2
**800** 2:12
**81** 156:6
**844** 95:4,7 96:7
156:14
**845** 95:4,7,23
156:15
**87** 156:8,9
**872** 67:6,14 155:20
**873** 67:7,14 68:5
155:21
**876** 56:25
**877** 56:25
**878** 92:22,25 93:10
156:12
**879** 92:22,25
156:13
**882** 76:3,11 79:4
156:4
**883** 76:3,11 78:10
79:8,20 156:5
**884** 80:14 81:21,25
156:6
**885** 84:2 87:6
156:8
**886** 80:14 81:22,25
82:20 156:7

**9**

**9** 74:19 76:2,9,18
83:2 155:6 156:4

**90** 156:10
**92** 156:12
**95** 156:14
**9th** 2:12

**a**

**a.m.** 1:14 5:4
44:17,21 81:9
**abide** 150:4,6
**abilities** 32:25
**ability** 11:2,9
107:19
**able** 43:19 60:11
71:19 112:21
119:6 128:8
**absent** 123:9
**absolute** 51:3
**absolutely** 69:3
101:22 120:8
**acceptable** 49:14
**accepted** 13:12
135:17,19
**access** 118:15
**accompanying**
65:4
**accomplishing**
77:18
**accurate** 94:24
**accurately** 89:7
**accusation** 145:12
**achieve** 70:12
71:19 98:18
118:11
**achieved** 71:11
98:19
**acronym** 36:9
**act** 24:14
**acting** 31:3 102:17
103:6 104:10
105:10 118:9
**action** 1:18 6:7,20
23:10,11 28:24

46:3 157:15
**active** 106:17
**activity** 52:18
62:16 77:17
**actual** 148:15
151:6
**acute** 121:19
**adapt** 75:14
**addressed** 98:15
**administer** 6:18
**advance** 35:4
**adversary** 47:20
**advice** 58:8,10
**advising** 94:11
**affect** 11:2,6,9
**affiliations** 6:25
**afraid** 20:19
103:11
**age** 115:12
**aggressive** 72:24
**ago** 15:9 16:9,23
17:14 31:16 37:5
**agree** 5:14 62:2
**agreed** 4:3,8,12
10:17 43:25
**agreement** 10:15
129:5 148:16
149:20
**ahead** 27:8 39:25
81:5 114:16
128:14,16
**al** 28:11
**allegation** 145:3
**allegations** 27:2
27:14,16 28:10
**amended** 25:11
26:6 27:3 155:12
**amendment** 26:2
**america** 1:6 5:21
7:12 9:5,24 24:8
27:17 36:3

**american** 49:6
**americas** 2:16
**amicably** 52:21
**amount** 51:12
77:6 78:3 89:11
114:22 121:15
123:16 126:7,15
129:15 132:8,24
147:11 149:17
150:23
**amy** 2:17 8:16
15:3 45:9
**angle** 121:19
**anhang** 2:13 7:15
7:16,16 22:19,21
45:7,9 50:20 53:9
53:13 57:14,16,21
58:2 110:7 128:6
128:11,12,17
129:11,12 136:11
146:18 148:6
149:5,12 153:19
**anhang's** 37:21
**answer** 14:23
22:11,17 23:7
46:7,18,20 48:9,21
50:23,25 51:9
53:11 57:15,17
66:14 74:12 76:21
96:25 105:15
107:17 109:4
114:18 120:7
127:5 128:8 135:4
137:23 138:2
144:15 151:16
**answered** 134:11
**answering** 22:23
25:3 45:16,23
58:4,13
**answers** 88:11

**antagonistic** 75:19
121:8
**antagonize** 120:20
**anthony** 133:23
**anybody** 100:8
109:23
**apologize** 57:25
**appearance** 7:4,25
**appearances** 2:2
3:2 6:24
**appears** 68:17
83:12,21 85:14
117:8
**appreciate** 21:17
69:4 138:24
143:13 153:8,10
153:15
**approach** 69:12
**appropriate** 69:24
106:24 132:9
**area** 102:8
**arm** 70:12,12
**arrived** 64:6
102:18
**articulated** 123:6
136:10,21 138:10
**asked** 73:3 96:21
97:4 99:23 111:17
114:19 131:14
134:19 148:12
**asking** 32:21
47:10 79:12 87:9
121:8,20 122:2
123:12,19 129:2
129:14 151:11
**assessment** 36:11
**associate** 33:16
**associated** 52:11
**assume** 38:12
**assumed** 38:4
103:8 125:9

134:25 135:5
**assumption**
105:23
**attend** 125:2
**attendance** 49:18
50:4,17
**attended** 15:13
16:15 30:7,12
69:5 112:7 116:4
116:19
**attending** 6:23
111:4
**attention** 33:7
41:2 93:10 112:24
113:5 125:15,18
139:16
**attest** 144:11
**attorney** 7:6 10:5
33:2 73:14 76:7
84:6 104:16,20
105:18 106:7
107:7 108:22,23
127:7 140:19
**attorney's** 145:4
**attorneys** 2:4,8,11
2:15 3:3 105:9
110:17 115:19
**attractive** 13:11
**attributed** 75:12
**attribution** 75:11
**audio** 5:12,12
**authority** 65:3
96:8 113:6,15,20
113:22 114:15,22
116:25 117:11,24
118:5 119:15
120:6,14 121:16
121:16 122:3,7,8,9
123:14 124:4,14
124:20 126:8,16
137:15 146:5,13

147:10 151:6
**authorization**
85:24 99:22 149:8
150:22 151:2
**authorized** 6:17
91:17 93:17
122:11 123:15,22
133:24,25 134:5
134:18,23 144:5
**authorizes** 122:6
**available** 101:10
101:14
**avenue** 2:8,16
**avoid** 52:24
**aware** 14:12 36:16
37:24 38:8 41:20
49:16,21,22,25
50:10 53:3 55:4
55:12,20 57:9
58:16,24 59:24
60:23 82:10,11,16
85:22 89:10 94:4
137:16 147:9

**b**

**b** 155:10
**back** 21:21 23:17
39:17 40:12 42:15
51:12 70:9 79:22
81:16 82:3 84:23
85:12 89:4 97:22
100:23 101:13
105:3 112:15,18
112:25 113:5
119:18,21 124:8
128:21,23 130:23
**ball** 52:4
**ballpark** 112:20
**bankruptcy**
109:10,15
**barbecue** 16:22
141:22

**barrier** 109:17
**based** 22:4 29:16
36:19 49:15 90:9
91:20
**basis** 29:12 61:2
63:11 69:21 121:3
**bates** 21:13 53:24
54:7 56:24 57:3
63:18,25 67:13,20
67:23 68:5 72:11
72:14 74:24 76:2
76:10 81:21,24
87:5,11,14 90:19
90:23 92:22,24
95:4,6 155:14,16
155:18,20,22,24
156:2,4,6,8,9,10
156:12,14
**battery** 3:4
**becoming** 103:14
**beeped** 54:19
**began** 52:7 102:14
**beginning** 7:5
81:14 132:3,19
152:10
**behalf** 22:21 45:14
91:8 96:24 121:10
121:14 122:7
**belief** 29:13 118:8
**believe** 17:5 19:7
25:20 30:18 31:12
32:20,22 35:11
38:19 41:18 47:25
50:6,9,10 51:2
52:16,22 58:3
65:5 67:25 86:4
86:10 89:24 90:2
91:15 94:16 99:17
102:6 119:8,10
123:21 124:21,23
128:2 130:17

142:24 145:23 147:22,25
**believed** 27:2 69:23
**believing** 49:9
**bell** 145:7
**berman** 1:17 2:5 2:15 5:1,17 6:1 7:1 8:1,18,19,20 9:1,9,19 10:1 11:1 11:18,25 12:1,3 13:1 14:1 15:1 16:1 17:1 18:1,18 18:24 19:1,10,19 19:22,24 20:1,16 20:17 21:1,16,20 22:1 23:1 24:1,15 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1,25 36:1 37:1 38:1 39:1,11 40:1 41:1 42:1 43:1 44:1,7,22 45:1 46:1 47:1,21 48:1 49:1 50:1 51:1 52:1 53:1,11 53:16 54:1,2,21 55:1,3,8 56:1,18 57:1,5,18,24 58:1 59:1,3 60:1,4,13 61:1,17 62:1 63:1 63:14,16 64:1,3 65:1 66:1,23 67:1 67:8,17 68:1,3 69:1,4 70:1 71:1 72:1,7 73:1 74:1 75:1 76:1,17 77:1 78:1,8 79:1 80:1 81:1,6,17 82:1 83:1 84:1 85:1,22

86:1 87:1 88:1 89:1,7 90:1 91:1 91:15 92:1 93:1,7 94:1,6 95:1,15 96:1,22,23,24 97:1 97:9,23 98:1 99:1 100:1,2,21,25 101:1,4,8,10,19 102:1,3 103:1 104:1 105:1,15 106:1 107:1 108:1 109:1 110:1,9 111:1 112:1 113:1 114:1 115:1,2 116:1 117:1 118:1 119:1,18 120:1,7 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1,8,20 129:1,11,13,19,24 130:1 131:1 132:1 133:1 134:1,8 135:1 136:1,18 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 145:7 146:1 147:1 148:1,4 149:1,7,14 150:1,6 151:1,11 151:15,19,22 152:1,13 153:1,7 153:17 154:1,7,15 155:6,7 158:4,21
**berman's** 22:11
**best** 10:19 25:21 31:18 32:11 35:14 42:6 43:2 45:4 52:9,22 58:14 64:12 69:2 71:22 84:11 86:12 89:14 91:23 92:11,13

94:25 95:20 96:12 101:21 106:8 108:21 109:18 110:18 115:10,21 115:22 116:17 118:10 134:14 135:4 136:22 137:9 139:13 142:12
**beyond** 48:10
**big** 13:25
**bit** 61:9 62:15 75:19 77:23 78:2 94:11 100:6 124:15 144:19
**bizarre** 144:18
**bleeds** 49:25
**blinds** 121:17
**blocked** 72:23
**blood** 157:15
**bonus** 123:24
**bookmark** 40:11
**boss** 31:6 113:12 150:14
**bottom** 68:9 76:24 118:21,25
**boy** 15:7 143:3
**breached** 145:4
**break** 11:18,20,21 81:16 96:15,17 97:22 152:2
**briefly** 29:18 125:7
**bring** 65:13
**bringing** 114:23
**brings** 64:17
**bristol** 30:25
**brittany** 7:13
**broad** 14:11
**broadly** 37:22 71:13

**brought** 25:7 31:2 31:4 49:12 126:9 126:16 143:9
**bucks** 123:20
**bummer** 29:2
**business** 22:2 35:11,17 47:15 61:20
**businesspersons** 61:13

**c**

**caboodle** 150:14
**cal** 111:9,11
**calendar** 16:11
**california** 17:3 30:9 65:4 114:8
**call** 33:6 43:13,23 44:9 65:9 89:25 92:17 97:12 101:12 108:15 111:10 112:25 116:11 125:4 126:23 127:4 131:13 141:16 142:2 143:22 147:20
**called** 9:10 31:25 35:8 94:13 111:4 136:5 139:17 144:8
**calling** 74:18
**calls** 108:18 109:4 111:11 143:14 147:15
**capacities** 1:8,9,10 5:24 6:2,4
**capacity** 104:12
**caption** 28:2
**captioned** 34:24 138:5

cared  116:11
career  114:10
careful  20:20
  29:15 31:13 37:18
  47:14 50:24 51:21
  139:23
case  2:14 8:17
  12:8,11,16,21
  13:11 23:13,25
  36:22 38:23 39:9
  53:7 61:12 106:17
  112:13,15,17
  123:17 140:20
  149:21 158:3
cash  35:9 51:12
cause  106:6
caution  70:23
  128:13
caveat  109:3
cell  5:9
cellular  5:8
centered  28:17
central  117:9
certain  35:10,12
  47:15 50:13
  123:13,17 146:24
certainly  13:21
  15:25 32:9 50:6
  80:2 98:5 99:6
  114:8 119:3 147:2
certainty  50:5,11
  51:3
certification  4:6
  157:2
certify  157:7,13
chain  80:2
chambers  70:3
change  62:4,11
  80:19 152:4 158:5
changes  37:13

characterize  58:19
  61:24
chat  15:19 103:20
check  106:20
checking  148:4
chemical  1:6,7
  5:20,22 7:11,22,23
  8:8,11 9:4,23
  21:25 22:22 23:5
  23:22 24:8 34:8
  34:22 35:7 36:2
  45:15,22 110:24
  113:10 152:18
children  13:22
  15:11,13 16:14
choppy  60:15
  61:25
christmas  78:24
chronological
  144:20
circumstances
  13:8
city  2:5
civil  1:22 6:7
claim  109:12
  141:9 145:22
clarick  2:7 8:14
clarification
  151:10
clarify  22:20
  30:16 136:19
cleanup  24:10
clear  35:15 42:21
  56:8 58:22 71:22
  73:10 83:3 94:19
  99:7 108:2 109:2
  120:19 136:15
  153:2
clearer  138:2
clearly  116:12

clerical  24:13,19
client  23:2,8 34:10
  37:19 45:19,25
  52:13,16 59:5,20
  60:3,24 61:15
  62:2 65:2,13
  69:18 71:5 73:14
  75:16 76:7 84:6
  92:10 113:12
  115:11,18 118:12
  122:5,16 123:12
clients  8:4 61:22
  62:8,9 108:12,13
  122:16,20 123:5
clip  59:16
close  70:14 113:24
  121:17
closely  98:17
coffee  44:14
collaborating
  69:17,20
colleague  33:17
colleagues  7:13
  115:17,20 136:25
colloquy  79:13
colombian  141:20
colwin  3:6 7:7,8
  9:18 18:22 19:3
  19:17 20:11,18,25
  23:12 44:7 46:6
  58:15 60:15 65:10
  80:17,21 81:5
  100:19 101:3
  105:19 107:15,21
  114:17,24 117:19
  117:25 119:16
  120:17 122:14
  123:18 128:7,10
  129:17,21,21
  130:18 134:24
  135:10 140:14

146:7,15 147:12
  149:4,24 151:8,13
  151:25 153:7,21
  154:2 155:6
com  68:15
come  21:2 24:12
  40:12 71:24
  100:23 117:22
  124:8 127:20
  133:24,25 139:11
  139:15 145:10
coming  60:20
  152:23
commence  46:9
commission
  158:25
communicate
  40:14,18 75:13
  116:20
communicated
  38:5 84:10,15
  118:24 147:5
communicating
  82:24 83:9
communication
  21:6 70:15 78:12
  82:12 83:14 84:17
  84:22 85:23 87:18
  87:25 90:3 91:18
  92:15 93:9,11
  107:8,12,19
  108:11 115:13
  137:11 147:20
communications
  23:2,9 33:25
  37:19 45:19 46:2
  47:23 48:7 50:2
  82:10 90:9 94:21
  95:8 107:25 108:9
  108:25 147:16

**company** 29:17 31:10 35:2 39:2 102:24
**comparison** 105:8
**competency** 104:16,19
**complained** 32:14
**complaint** 14:9,14 21:4 25:6,12 26:3 26:6,10,18,20,23 27:4,7,15 145:14 147:3 155:12
**completed** 54:22 57:6,8 95:16 132:10
**completely** 77:3
**complicated** 109:7
**comply** 118:10
**component** 130:15
**components** 130:11
**comported** 48:25
**composites** 24:8 152:18
**composure** 99:9
**compromise** 78:2 80:5
**concern** 101:20 109:9
**concerning** 111:19 124:3,19,25 126:7 126:15 132:8,22 132:24 133:20 139:7
**concerns** 53:6 55:13,21 58:24 94:2
**concluded** 153:24 154:3
**concludes** 154:6

**conclusion** 32:6 79:18
**concrete** 88:11
**conduct** 48:17
**conducted** 142:14
**conducting** 70:10
**conference** 64:19 65:9,19 71:7 112:8 114:13
**conferences** 114:10
**confidential** 22:13 23:2 45:19 129:7 148:18,20 149:3,9 149:18
**confidentiality** 149:20
**confirm** 54:9 96:17 138:19
**confirmation** 96:4
**conglomerate** 22:4
**connected** 46:11
**connection** 7:20
**cons** 109:20
**conscientious** 134:13 140:18
**consequence** 51:15,23
**consider** 13:19 85:19
**consideration** 47:2
**considering** 127:16
**consistent** 49:2 52:12 75:19 92:10 92:12
**cont'd** 3:2
**contact** 33:24 34:11 36:2 37:9 50:7 119:6 124:6 126:3 148:24

**contemporaneou...** 36:18 61:4
**context** 49:10 100:15
**continue** 5:13 24:2
**continued** 132:17
**continuing** 23:18 29:8
**contract** 35:5,14 35:24 46:12 56:8 77:5
**contractual** 60:18
**conversation** 28:7 28:14,17,23 30:17 33:5 40:25 41:25 42:9 65:20 66:2,6 66:21 78:16,21 79:2,16,25 96:9 97:25 98:5,8,9,21 99:13,17 100:11 113:25 119:3 120:2,4,9 125:13 125:17 132:21 133:4,5,19 139:2 143:10 147:6
**conversations** 5:7 27:12 28:8 33:21 41:10 42:3,14 43:17 46:8,10 49:8,17 50:14,16 89:3,19 91:21 98:11 118:6 120:11 122:25 126:14 127:8
**conveyed** 134:22
**copied** 68:19 86:11 151:21
**copy** 19:7 20:10 68:8 93:12
**copying** 82:14

**corporation** 1:7 5:22 7:22,24 8:8 8:12 21:25 22:22 23:5,22 34:9,22 35:7 45:15,22 110:25 113:10
**correct** 10:2,9,13 12:14,15 13:20 15:3,4,12 18:10,16 18:17 44:25 59:2 62:12 64:19 65:21 66:3,4 68:16,19,24 69:8 81:22 82:2,2 83:11,15 84:8 87:19,20 88:4 89:6,13,15 93:18 94:5 95:2 99:22 114:5 117:2 120:16 122:13 126:5 127:5 134:23 149:22 150:9 153:5,25
**correctly** 39:25 60:5 122:5 124:22
**costa** 1:8 2:8 3:3,9 5:25 7:11 8:15,24 8:24 9:22 27:18
**counsel** 1:23 4:4 5:18 6:21 9:3,21 15:2 18:18 19:8 19:19 21:18 31:3 31:5 33:10 34:2 36:15,21 37:25 38:11,18 39:5 47:3 49:4,12 51:25 52:7 70:7 73:12 75:17,20 77:19 78:19 91:19 96:20 102:18 103:8,15 104:5,10 104:11 105:10,11

124:13 146:21
148:20 149:21
**counselor** 80:16
153:23
**counsels** 36:25
106:19
**counter** 79:10
82:24 83:5
**countered** 136:3
**countering** 91:12
**counteroffer**
91:10,14 98:16
**counterproductive**
88:20
**counterproposal**
85:7 86:8
**country** 2:4
**couple** 29:23
**course** 21:11
48:18 49:9 53:4
65:22 75:9 85:21
114:9 134:9
140:24
**court** 1:2 4:16 6:6
6:14 8:5 9:7 59:10
65:11 118:10
**courtesy** 19:7
47:16 48:6 71:2
75:15
**courts** 61:8,9
111:10
**critical** 10:11
**cross** 97:3
**cultural** 71:4
**culture** 47:15
**cup** 44:14
**current** 12:20
23:24 33:16
127:14
**currently** 12:7
24:6

**cv** 6:8

**d**

**d** 155:2
**d.c.** 2:12
**daily** 133:15
**dark** 121:22
**date** 33:5 35:12
39:13 80:3 132:25
134:13 158:4
**dated** 78:22 83:15
84:4,19 91:8
**dates** 40:2
**day** 18:11 30:10
38:10,10 39:3,3
40:3,3,6,6 63:11
63:11 71:24 72:17
125:11,11,11,11
154:22 157:19
158:22
**days** 91:13
**deadlines** 35:14
**deal** 43:25 48:2
52:9
**dealt** 38:17
**dear** 85:3
**december** 1:13 5:4
78:22 83:20 91:9
157:19 158:4
**decide** 20:7 88:6
**decision** 17:2,8
114:3
**def** 53:24 54:7,8
56:25,25 57:3
63:18,19,25 64:2
67:6,13,21,21,23
67:24 72:12,14
73:14 74:19,24
75:7 76:3,3,10,11
80:14,14 81:24
87:5,11,14 90:19
90:23 92:24 93:10

95:6 155:14,16,18
155:19,20,22,23
155:24 156:2,4,5,6
156:8,9,10,12,14
**default** 105:23
**defendant** 5:18
8:25 9:3
**defendants** 1:10
22:15 27:25
**defending** 7:10
**defense** 8:5,9 9:21
**defenses** 8:3
**deficient** 138:21
**definitely** 61:11,13
**definitive** 85:21
**definitively** 85:16
127:4 142:25
**delay** 62:17
**deliver** 60:12
**delivered** 95:25
**demand** 25:12
120:15 122:2
133:12 134:6
135:16,17 136:9
136:20 137:2,7
138:8,9 139:8
142:22 144:5
146:3,12 147:8
155:13
**demands** 133:21
**demeanor** 43:16
49:7
**depending** 145:21
**depends** 122:15
**deponent** 8:18
19:2,12 20:3
97:13 151:23
**deposition** 1:12,16
4:6,13 5:12,17 6:9
10:8 14:6,17 26:4
45:12 81:12 158:4

**depth** 106:11
**deputies** 38:14
**derisive** 125:16
**derivation** 144:22
**derive** 117:2
**derived** 65:16,25
**describe** 36:12
37:14 116:2
**described** 15:22
110:20
**describing** 144:10
**description** 155:11
**designate** 117:17
148:17
**designated** 65:7
113:17 117:4,22
124:25 125:14
**designating**
149:12,15
**designee** 65:2,18
68:22 113:9
119:11
**desperately** 56:6
**detail** 44:2 109:24
143:12,25
**detailed** 31:19
109:19
**details** 24:16
104:7 129:10
**devoted** 140:19
**diego** 30:8 79:22
112:6,18
**difference** 118:18
**different** 16:17
36:17 88:16 111:9
111:10 129:25
**difficult** 46:7 48:9
61:5 107:23 121:2
**dim** 40:22
**diminish** 99:4

[dinner - english]                                                 Page 8

**dinner**  16:2 30:11
 111:25 141:19
**diplomacy**  43:13
**direct**  93:10
 128:13
**directing**  85:24
**direction**  22:15
 24:18 36:22 37:21
 43:5 45:7 47:5
 53:10
**directions**  46:20
**directive**  92:4
 120:19
**directives**  118:21
**directly**  40:15,19
 150:16
**disagreement**
 139:7
**discernment**
 134:14
**disclose**  29:6,11
**disclosed**  19:13
 20:4,10 21:10
 28:9 146:4
**disclosure**  148:22
 149:9
**discomfort**  57:10
 61:23
**disconnect**  60:7
 61:16
**discourteous**
 72:24 88:21
**discourtesy**  51:16
**discovery**  21:11
**discreet**  140:9
**discretion**  20:7
 62:3
**discuss**  26:22,25
 32:24 62:9 138:16
 139:6 148:24

**discussed**  26:16,19
 29:17 30:21 64:8
 75:2 79:14 80:2
 100:10 115:4
**discussing**  85:4
 109:7
**discussion**  14:16
 14:21 16:25 17:8
 31:20 41:4 119:12
 124:2 132:22
 138:14 142:8,21
 144:4
**discussions**  27:4
 27:21 32:16 50:21
 50:24 51:9 114:21
 120:22 124:24
 125:5 126:6 132:7
**dismiss**  8:10
**displeased**  120:23
**disposition**  71:2
**dispute**  46:13
 138:19
**disputes**  12:22
**district**  1:2,3 6:5,6
 59:13 111:9 114:7
**document**  18:4,14
 19:22 20:23 55:17
 58:17 59:10 63:15
 64:4 83:13,22
 90:16 93:23
 102:12
**documents**  18:4
 19:18 20:2 26:12
 40:9 53:15 71:18
**doing**  67:4 68:25
 115:10 120:21
**dollar**  138:9
**dollars**  51:20
**donehower**  2:17
 8:16,17 15:3
 22:10 24:15 37:16

45:6 46:19 47:21
 50:19 51:8 53:9
 57:14 101:8 128:6
**donna**  1:8 2:8 3:3
 3:9 5:24 7:11 8:15
 8:24 9:22 27:17
**doubles**  143:24
**doubt**  100:17
 132:6 138:12
**drafted**  104:25
**drive**  16:19,20
 52:18
**driver**  52:19
**duly**  9:11 157:9

**e**

**e**  2:13 155:2,10
**earlier**  38:22
 41:14 62:21 63:2
 68:18 102:7
 103:18 111:18
 141:19 150:9
 152:14
**early**  25:22 30:7
 40:4 43:11 64:15
 68:23 111:11
**earned**  123:25
**editorial**  77:16
**effect**  4:15 48:25
 120:2 137:12
 139:20
**efforts**  39:10
**either**  38:14 42:18
 59:12 94:14
 105:10 113:21
 115:5 118:19
 124:10 126:18
 145:20 146:5
**ele**  145:8
**elements**  142:8
**email**  21:5 54:12
 58:19 66:22 68:9

68:12,19 73:22
 74:5 76:14 78:22
 79:25 82:6,13,17
 83:17 85:4,14
 86:5,14 87:24
 88:8,9 95:18
 119:9 135:8
**emails**  33:22 48:5
 58:23 66:19 75:25
 131:20 132:14
**employed**  12:7,11
**employee**  37:4
**employees**  32:13
**employment**  13:9
 38:16
**encompass**  67:10
**ended**  130:16
**ene**  63:7 65:8
 72:17 77:10 111:6
 111:7,13,15 112:7
 112:25 113:2,5,7
 113:19 114:7,23
 115:25 116:19
 117:2,6,18,22
 118:16,24 119:7
 119:13 120:6,14
 120:16,24 124:10
 124:11 125:2
 126:9,17,24 127:2
 127:17 132:10,12
 132:18 135:24
 137:14,17 138:3
 150:12,17,24
 151:4,12
**energy**  35:2
**enes**  112:16 114:4
 151:9
**engaged**  104:23
**engagement**  10:8
**english**  109:25

enn  111:13
ensure  76:7
entailed  89:25
entered  34:22
entirely  107:24
  119:22
entirety  54:12
entities  7:19 25:8
  36:17
entitled  1:17
entity  28:6 37:4,4
envelope  19:5 64:6
equal  91:11
equanimity  48:7
  71:2
errata  158:2
esq  2:5,9,13,17 3:6
  3:6
essence  34:25
essentially  43:21
  142:18
et  28:11
ethical  105:24
ethics  105:17
  106:6 142:14
  145:5,8
evaluation  68:23
  111:12
evasive  35:21
evening  89:9
events  11:3 29:18
  38:25 133:15
  138:21
everybody  68:24
  118:9
evidence  19:15
  56:11 91:5
evidently  138:20
exact  71:12
exactly  71:17
  83:24 117:3

examination  9:17
  97:3 102:2 155:5
examined  9:13
example  43:11
exceptionally
  35:21
exchange  96:10
exchanges  95:19
excuse  80:15
  110:7 131:5
exerted  52:17
exh  155:12,14,16
  155:18,20,22,24
  156:2,4,6,8,9,10
  156:12,14
exhausted  112:3
exhibit  18:23
  19:21 20:8 21:2,4
  21:5,12 25:2,10,25
  26:7 53:20,23
  54:4,5,7,14 56:15
  56:17,24 57:2,7,13
  63:14,17,24 64:5
  64:10 66:24 67:6
  67:8,9,10,11,12,15
  67:20,22 68:4,6
  72:8,9,11,13 73:21
  74:16,19,23 76:2,9
  76:18 80:8,14
  81:19,23 82:7,25
  83:2 86:18,19,20
  86:22,25 87:4,13
  90:15,22 91:3
  92:20,23 95:3,5
  155:11
exhibits  18:8,19
  18:21 20:13 21:7
  21:20 24:23
  131:15
exist  27:3 127:11

existed  27:3
existing  27:15
exists  66:10
expectations  60:8
expensive  53:2
experience  22:2
expires  158:25
explain  109:23
explaining  115:24
explicit  60:17
explicitly  38:5
express  113:6
  121:15 137:14
  141:5 147:9
expressed  57:10
  99:16 113:14
expressing  141:7
expressly  8:2
  122:11
extensively  152:17
extent  22:17 46:23
  58:11 88:22
extra  20:24
extremely  150:15

**f**

face  35:16 56:7
  147:21,21,23,23
fact  17:10 37:2
  75:17 94:10
  120:10 124:8
facts  103:2
failed  35:10,13
fair  36:10 105:16
  136:18
faith  35:18 60:21
  77:25 115:21
  118:10
familiar  47:17
far  33:23 60:14
  128:12

faulty  92:12
february  38:24
  112:11
fecklessly  56:6
federal  1:21 30:9
  61:8 91:5
feedback  74:2
  75:3
feel  61:9 130:21
  133:13 139:25
feeling  59:19
felt  32:18 116:15
fifth  2:8
figure  144:13,23
file  109:10
filed  6:4
filing  4:5
fill  44:14
final  78:5 129:15
financially  6:20
fine  138:22
firm  6:12,15 7:17
  13:9 22:8 33:15
  43:22 49:11 68:13
  127:14,15,19
firmly  88:7
first  7:21 9:10
  15:5 17:19 21:22
  22:5,7 25:11,13
  26:2,6,7 28:18
  30:3,13,19 46:9
  64:4 65:6 70:6
  82:19 86:20
  102:14 103:5
  111:20 112:25
  113:5,7 115:25
  116:19 118:24
  124:11 126:24
  127:17 131:2,7,16
  132:10,12,18
  133:2 143:17

148:24 150:12,17
151:12 153:13
155:12
**fischman** 1:5 5:19
8:21 13:16 14:6
14:17,21 15:6,21
16:6,13,25 17:6,12
17:16,20 25:7
26:17,20 27:5,13
28:9 29:7 30:20
31:8,24 32:17,24
33:19,22 34:14,15
36:3,5,7 37:3 39:2
39:4 40:7,17 41:5
41:7,16 42:5,24
44:6,8,23 46:10,21
47:8,14 49:17
50:3,7,15 55:6
60:11 64:11 65:5
65:20 66:2,6
73:16 74:2 75:3
75:11 77:8 78:10
79:5,18 83:8,22
84:11,23 85:15,25
87:18 90:10 91:21
91:22 92:5,13
94:15 95:9,24
96:9 101:7 102:5
102:14,17,23
103:5,25 106:5
107:9,13 108:2
110:5,12 115:6
119:13 125:9
126:3,7,19 131:4
132:2,8,16,21
133:10,20 134:4
134:22 137:4
138:14 139:6,12
139:22 140:11
141:16 142:13
144:6 145:2 146:6

147:17 152:15
153:4 158:3
**fischman's** 36:13
73:22 96:6 99:22
104:15,19 106:22
108:11 141:22
**fit** 122:19
**five** 15:9,24 81:2
96:15,17
**fixation** 115:2
**fixed** 113:7,15,17
**flag** 10:11
**flipping** 17:22
**floor** 2:8 3:5
**focus** 24:25 25:5
106:3
**focused** 37:2
**focusing** 41:2
**folks** 35:17 42:15
43:23 55:24 60:25
109:24 114:2
115:5,6
**follow** 123:8
**following** 42:23
99:15
**follows** 9:14
**force** 4:15 51:18
**forgive** 128:24
**forgotten** 59:12
**form** 4:9 53:17
55:9 57:19 59:3
60:13 94:7 100:3
104:15 105:17
106:10 107:11
109:14 114:19
**formal** 145:24
**formalities** 99:3
**formally** 34:24
**formed** 105:20
117:7

**former** 68:13
**forth** 38:9 64:10
70:9,24 94:2
108:7 151:5 157:9
**forward** 82:4,8
**forwarded** 72:21
73:4 83:22
**forwarding** 77:7
83:17
**fought** 56:5
**found** 76:21
**four** 12:12 13:7
15:24 63:17 91:10
119:23,24 120:9
**fourth** 17:23
**frame** 39:14 59:22
59:23 62:20,23,25
63:9,10
**framing** 93:24
**friction** 140:22
**friend** 13:19 14:3
**friendly** 13:21
15:18
**frivolous** 60:19
**front** 25:25 79:10
145:14
**fruitful** 72:19
**frustrated** 72:5
**frustrating** 31:17
59:19
**frustration** 60:2
**fujiwara** 93:13,14
**full** 12:2 31:5 62:3
78:4 90:6
**fully** 117:6
**function** 38:3,8
**functioned** 39:5
**funny** 94:12
**further** 4:8,12
76:23 84:17 85:19
100:20,23 112:8

129:10 148:9
151:23 153:16,18
153:19 157:13
**future** 97:13

## g

**g** 7:17
**gaps** 107:19
**garden** 2:5
**gauging** 85:13
**gc** 103:6
**gcs** 105:23
**general** 9:3 27:16
28:9 31:3,5 34:19
36:25 37:25 38:18
39:5 43:18 47:5
51:5 102:17 103:8
103:15 104:10,11
105:10,11 106:18
124:12 145:11
**generality** 27:23
**generally** 99:2
104:14
**genomatica** 18:16
21:21 23:10,23
24:11,21 25:5
30:5,15 32:6 33:7
33:11 34:4,11,20
34:25 35:4,6,10,13
35:20,21 36:14
37:7,10,12 39:15
39:20 41:3,5,6,11
42:2,10 43:6
44:24 46:3,22
48:18 49:12,19
51:7,19,24 52:3,7
52:14 53:4 55:5
55:14,19 56:2
57:12 59:2 60:9
61:25 62:15 63:3
75:6 77:19 85:12
86:2 88:3 89:12

89:22 91:8,19
96:2 98:3,13
103:24,25 104:8
109:9 110:3,11
112:23 127:21
130:25 131:6
148:17 152:16
153:5
**genomatica's** 56:5
56:10 73:12 77:15
**gentlemen** 112:4
**george** 2:13 7:16
22:21
**getting** 18:10
**give** 13:7 53:10
54:16 77:22 93:2
93:7 106:5 134:18
137:25 143:11
**given** 20:20 47:8
59:20 84:7 92:4
101:13 115:18
154:6 157:11
**giving** 69:18
**glacial** 61:9
**glancing** 20:23
**go** 5:15 10:6 21:21
27:8 39:24 40:7,8
44:14 59:16 60:14
65:7 71:14 80:21
81:5 82:4 87:3
97:16 121:13,25
122:18 128:14,15
130:23 148:9
**goal** 52:14
**goes** 148:11
**going** 5:3 10:5
19:20,21 25:23
26:3 27:10 33:6
36:8 39:17 44:13
45:10,11 46:25
53:19 56:15,16

57:18 66:25 68:3
68:22 70:9 73:10
74:13 75:24 76:13
78:8 80:8 83:18
83:25 86:17 87:7
90:13 93:9 95:22
96:14,21 101:20
104:6 110:8,9
111:25 117:14
128:10 129:17
135:23 136:11
146:18 150:4,17
150:23 152:4
**good** 5:2 7:7 9:19
31:6 35:18 39:10
59:15 60:21 77:25
105:4 115:21
123:2 140:18
**gordon** 3:3 7:9
**gotten** 29:4
**grace** 33:17
**granted** 121:15
**grateful** 143:8
**great** 60:24 61:14
81:17 97:6
**greater** 143:25
**green** 35:2 73:24
**gritty** 29:4
**grounds** 136:12
**group** 14:3 53:21
56:17,20 63:22
72:11 76:16 80:9
90:14,19 92:22
**gueron** 2:7,9 8:13
8:13,14 81:11
**guess** 16:8 29:18
32:5 43:23 55:16
62:19 63:8 64:20
66:18 72:16 73:4
77:9 99:2 116:12

**guidance** 43:21
44:4 69:19,22,23
73:3 75:12,21

**h**

**h** 7:17 155:10
**half** 68:9 78:10
79:8,20
**hand** 35:6,8 87:3
106:19 157:19
**handle** 45:5
**handled** 55:6,15
55:23 62:5 75:6
**handling** 24:6
53:6 57:11 58:25
**hands** 106:18
122:17
**happen** 109:12
143:16
**happened** 31:22
64:16 100:8
102:20 119:4
**happening** 32:3
61:24
**happenstance**
62:18
**happy** 22:19
**hard** 54:23 69:15
105:14 109:22
115:15 120:10
**hardcopies** 54:3
**hardcopy** 19:4
54:11 56:21 80:11
**hats** 40:21
**head** 15:8 72:3
**hear** 29:3 93:20
139:18
**hearts** 115:10
**heavily** 76:6
**hebrew** 15:13
16:15 103:19

**held** 1:18 6:9 73:2
104:21 109:14
**help** 44:12 66:20
72:8
**hereto** 4:5
**hereunto** 157:18
**hesitant** 27:6
**hey** 18:18 124:13
134:16
**high** 13:25,25
27:22 31:11,21
34:21 48:12,22
51:11,12 104:21
109:23 145:17,18
150:15
**higher** 120:15
138:9 146:3,13
147:11
**highest** 38:2
**highly** 33:4
**hired** 17:16 25:4
134:16
**hit** 60:15 61:10
**hitting** 61:25
**hmm** 123:4 131:11
132:13
**hold** 43:22 76:15
85:15 95:13,13
**holding** 49:11
**holdings** 1:6,7
5:20,22 7:12,24
8:8,11 9:4,23
27:17 36:2
**home** 16:21 64:7
**honored** 143:7
**hope** 52:20,24
143:6
**hoped** 52:17 55:25
62:14 69:22
**hotel** 112:19

**house** 16:20 36:15
  36:21,24,24 38:11
  110:17 141:22
**hundred** 50:12
**husband** 16:3,6,7

**i**

**idea** 72:3 93:15
  127:12
**identification**
  25:11 53:24 54:5
  57:3 63:25 67:13
  67:23 72:14 74:24
  76:10,18 81:24
  87:5,14 90:23
  92:24 95:6
**identified** 21:13
  39:18 41:8 99:20
  123:11
**identify** 21:9
  76:14 91:2
**identity** 20:14
**illuminate** 144:20
**imagine** 61:5 70:2
  113:21
**immediately** 60:21
  60:22 78:5
**impair** 120:21
**implicate** 22:12
**implicitly** 122:10
**important** 22:3
  47:19,25 140:25
**impossible** 138:11
**impression** 104:18
  105:17,21
**improper** 140:2
**improve** 105:7
**include** 42:16
**including** 8:4
  99:25
**incorporated** 5:21

**incorrect** 72:4
**incorrectly** 39:22
**incredibly** 98:25
**independent** 93:21
  124:18 132:4
  145:16
**independently**
  47:18
**individual** 1:8,8,9
  5:23,25 6:3 20:14
  150:8
**individuals** 41:10
  42:9 50:8 55:21
  108:19 109:2
  119:7
**ine** 111:5
**ineffectively** 56:7
**inform** 142:2
  145:3
**information** 22:13
  50:18 64:9 96:2
  125:21
**informed** 44:8
  64:21 138:15
**initial** 52:2 65:24
  125:3
**initially** 36:5
**initiating** 46:14
**insist** 148:23
**insofar** 58:5
**installments** 86:9
  91:11
**instance** 65:6
  109:8
**instantly** 46:9
**instruct** 22:23
  45:16 136:8,20,25
**instructed** 46:18
  137:6
**instruction** 48:8
  123:10

**instructions** 44:5
  44:23 45:3 47:8
  47:12 48:16,23
  69:10 70:16,21
  84:7 88:2 89:10
  122:21
**integrity** 75:9
**intellectual** 109:13
**intend** 96:19
**interact** 102:22
  103:13
**interacted** 106:12
  107:20
**interacting** 102:15
  126:2
**interaction** 101:6
  106:5 107:14
**interactions** 32:12
  116:2,4,6,13 153:4
**interested** 6:21
  141:13 145:15
  147:4 157:16
**interests** 47:7
**interfaced** 33:18
**interfere** 5:11
**interference** 5:8
**interim** 90:17
**interpret** 60:5
**interrupt** 80:19
**introduce** 18:22
  19:21 20:8
**introduced** 19:15
  19:20 20:6
**introductory** 9:20
**involve** 139:24
**involved** 25:8
  33:14 39:9,20
  40:3 47:6 58:10
  63:3,11 150:11
**involvement** 37:11

**ip** 130:9
**issue** 14:9 21:5
  25:14 55:5 62:3
  104:4 117:8
  141:10 144:9
**issued** 9:25 153:10
**issues** 24:20 46:16
  55:4
**items** 24:10

**j**

**j** 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1
  88:1 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1

100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1
**january**  39:16
84:4,19 85:10
86:6 87:23 89:9
89:20,22 90:8
91:17 93:17 94:22
94:23 97:23 98:3
98:10,12,23 99:20
131:2,8,16 132:3
132:20 133:3
**japan**  22:4 35:17
42:15 43:24 47:16
60:25 88:11 89:25
94:13 112:4 114:2
115:5,6 116:7,9,9
116:21 118:6,7,15
118:21 119:2,7
124:7,9 126:24,25
138:3 145:19
**japanese**  71:5
108:22
**jen**  34:12,13 72:21
73:22 91:10 92:17

106:15 109:18
116:10 125:12
131:7 133:4
134:10 140:18
143:10 144:8
145:19 146:5
**jennifer**  1:5 5:19
8:21 13:14,16
15:6,15 16:3,5
25:16 29:17 34:14
34:15 37:23 38:9
38:17 42:4,14
56:13 73:4 74:12
82:14 83:17 126:2
130:24 131:3,4,21
**jennifer's**  153:3
**jeremy**  1:19 6:15
9:12 157:5,23
**jmf**  6:8
**john**  1:9 6:2
**join**  13:10 44:12
146:19
**joined**  38:23
112:14
**joining**  146:20
**joint**  34:24
**josh**  8:18 37:17
85:5,18 86:10
94:10 128:14
140:2
**joshua**  1:17 2:15
5:17 9:9 12:3
154:7,15 158:4,21
**joshua.berman**
68:15
**judge**  30:10 59:13
62:18 70:8
**judges**  59:17
**judgment**  11:6
**jump**  22:11 37:17
128:13

**jurisdiction**  8:7
**jury**  25:12 155:13

**k**

**kane**  2:3
**keeping**  71:3
**ken**  93:13,13
**kicked**  37:23
**kind**  24:10 37:23
48:5 49:6 62:11
70:8 77:25 85:19
88:18,23 89:2
109:19 112:9
122:18 123:10
124:16 140:5
**kit**  150:14
**knew**  29:10 38:6
55:24 59:5 124:5
**knock**  144:18
**know**  9:20 11:17
11:19 13:16,24,25
14:3 15:18 17:6
21:3,24 23:20
26:24 27:25 28:25
29:24 30:2 31:16
31:22 32:2,3,4
33:23 34:23 36:19
36:24 38:6,13
39:6 40:8,20,21
43:9 51:10,25
52:10 54:2,21
57:5 59:18,21
66:13,16,20 70:12
71:3,16 72:2
75:21 79:23,24
80:11 82:16 84:14
88:14,22 90:20
93:13 100:20
101:11 102:10
103:17 107:16
109:22 110:2
112:10 113:13,16

114:3 115:12,14
115:15,16,17
116:14 117:11
118:4,18 119:4
120:19,25 122:24
124:13 125:15,24
127:10,23 128:4,7
129:2 130:3,12,14
130:19 134:11,16
135:3,4,16,18,23
136:6 137:22
138:4,7,22,23
140:8,19,25 141:2
143:3,15 144:8,12
145:11,23 146:2
146:11,22 148:10
151:16 153:11
**knowing**  38:17
115:3
**knowledge**  56:12
93:22 106:11,15
106:25 124:18
140:16,21 141:12
144:22 145:16
153:2
**known**  12:4 91:18
**knows**  22:18 143:3

**l**

**labor**  18:11
**lack**  72:5
**language**  73:6
109:17,25
**largely**  143:7
**late**  17:24 105:2
**lauren**  3:6
**law**  7:8,17
**lawsuit**  14:13
24:12 25:14 46:11
**lawyer**  43:8
115:18

**lawyers** 78:18
**lay** 109:20
**layer** 109:16
**lead** 63:9 140:23
**leading** 18:11
  119:13 151:4
**leapt** 62:21
**learn** 25:13
**learned** 21:23
  68:21
**learning** 140:11
**leave** 58:20 122:18
**led** 92:18
**lee** 16:3 141:20
**left** 81:11 140:5
**legal** 12:2,5 28:3
  28:24 38:3 52:11
  56:14 58:8,10
  104:7 106:11,15
  106:24
**length** 128:4
**level** 27:22 31:11
  31:21 34:21 46:17
  48:12,22 49:13
  105:12 106:24
  109:23 117:23
  145:17,18
**license** 79:11
**light** 73:24 121:25
**limit** 50:25
**limited** 24:19
  47:22 50:19 97:3
  153:3
**limiting** 48:21
  51:8 123:9
**line** 118:22,25
  158:5
**lines** 105:4
**lisa** 16:2,10 141:20
**literally** 18:7
  26:13

**litigant** 56:4 60:17
  137:20 138:5,5
**litigation** 12:22
  18:16 21:22 29:21
  30:15 33:7,14
  34:4,11,20 36:8,14
  37:7,12,24 38:7,9
  38:15 39:21 41:6
  42:2,11 43:6
  44:25 45:5 46:5
  46:14 47:6 48:19
  49:20 52:11,15,18
  52:25 53:5 55:14
  55:20,22 57:12
  59:2 60:9,10 61:7
  62:5,15 63:4 75:5
  75:15,20 77:17
  89:12,23 91:20
  100:16 104:2
  105:24 106:19
  110:21 117:10
**litigator** 61:18
**litigators** 36:24
**little** 54:23 62:15
  77:23 85:19 94:9
  100:6 124:15
  128:25 135:22
  144:19
**live** 16:12,16,17
  115:12
**living** 100:15
**llc** 158:2
**llp** 2:3,7,11,14 3:3
  8:17 12:18
**loading** 63:15
**located** 6:10
**logic** 99:15
**logical** 98:20
  144:25
**long** 12:10 13:6
  57:16 67:15

**longtime** 62:8
**look** 16:9,11 25:24
  56:20 63:14,17
  66:24 67:9 68:4
  71:16 72:9 73:11
  74:17 75:23,24
  78:9 79:4 80:8,10
  81:18 82:18 84:2
  86:18 87:9 90:12
  90:15,21 92:20
  93:8 95:3,23
  129:4 130:23
**looked** 36:16 82:7
  132:14
**looking** 18:3,5,15
  18:19 82:19 83:21
  93:22
**lost** 128:19,25
**lot** 61:20 105:3
**lots** 69:22
**low** 52:4
**luck** 24:9

**m**

**m&a** 38:15
**magic** 51:18
**magistrate** 30:10
  43:13 59:14 70:3
**main** 28:22
**maintain** 48:6
  70:25
**maintained** 76:8
  99:9
**maintaining** 14:12
**making** 48:25 99:8
  118:14 138:8
**managing** 36:7
**manner** 48:17
  62:4 75:5 110:21
**mansukhani** 3:3
**marching** 88:24
  134:10

**marco** 3:10 6:12
**mark** 149:2
**marked** 21:9,10
  25:10 53:23 57:2
  63:24 67:12,22
  72:13 74:23 76:9
  81:23 87:4,13
  90:22 92:23 95:5
**marriage** 157:15
**masaru** 34:17
**material** 109:11
**materialize** 56:3
**materials** 18:25
  19:12
**math** 15:8
**matt** 20:18 21:3
  100:21 101:3
**matter** 5:19 7:21
  8:6 23:23 29:20
  29:21 30:5 46:23
  50:9 52:20 55:13
  61:3 71:12 78:4
  86:2 88:4 98:13
  99:9 104:2 110:4
  110:6,11,17,23
  111:3,17,20 112:5
  119:15 122:9
  126:4 127:21
  130:3,25 131:7
  137:5 150:19
  152:18 153:5
  157:17
**matters** 17:17
  24:5,7 29:3,14
  31:21 38:16 61:22
  99:8 103:22 104:8
  106:12 152:15
**matthew** 2:5 8:19
  20:16 57:23 96:23
  148:6 149:5

mca 41:12
mcc 36:8 40:15
41:12,13 42:4,10
42:18,19,22 43:11
47:7 49:14,18
50:3,8,16 55:22,24
59:5 60:8 62:3
65:6 84:8,23
85:23 87:25 89:11
89:19 93:12,18,25
94:9,22 96:4
109:14 113:17
117:5 148:16
mcc's 24:17 52:14
mcha 31:4 37:10
42:24 102:19
mcha's 146:21
mchc 40:19,22
mean 21:24 34:13
42:13 43:7 57:22
68:17 78:18 88:12
99:3,4,6 100:4
106:14 107:24
108:13 119:10
120:18 124:5
125:7 132:11
134:8 140:6 143:2
144:14 145:13
151:3
means 117:17
mecabe 3:6
mechanics 121:9
123:11
media 5:15 80:20
81:8,14 152:4,5,10
154:8
mediation 30:8,12
40:4 43:12 59:17
64:15 65:8,11
66:8 69:6,13
70:18 111:21

114:13
mediations 114:9
122:23
medication 11:14
meet 15:5 30:3
35:10,13
members 94:9
memory 39:12
70:5 86:12 88:16
mentioned 15:10
29:22 37:5
mentioning
131:21
mercedes 3:6 7:8
129:21
merely 93:22
message 73:17
met 15:11 30:14
30:19
method 92:7
methodology
123:7
microphones 5:5
5:10
middle 120:24
143:6
miles 61:6
milestones 35:12
million 77:6,24
91:12 96:3 98:2
98:16,22 99:19
119:14 120:5
121:4 123:20
130:5,16,20
133:12,21 134:21
135:15 136:9
138:8 139:9
142:22 144:5,13
146:3,12 147:8
minami 34:16
53:5 57:9 68:20

83:9,18 108:21
109:21 137:18
mind 62:21
mine 100:13
minimizing 52:10
minute 16:19,20
80:24 96:15,17
152:2
minutes 81:2
misapprehends
115:7
miscommunicati...
145:19
misconduct 56:9
misleading 28:16
misremembering
149:23
missing 74:8
mitsubishi 1:6,7
2:11 5:20,21 7:11
7:22,23 8:7,11 9:4
9:23 17:17 21:23
21:25 22:9,22
23:4,19,22 24:3,8
27:17 28:3,5,11
29:9,16 32:13,19
34:8,22 35:3,7,16
36:2 40:25 45:14
45:21 49:3 110:6
110:24 113:9
136:7,15,17
152:18 158:3
mitsubishi's 35:9
35:20,22
mm 123:4 131:11
132:13
modulated 139:18
moment 23:17
24:25 25:6 26:5
53:22 54:4 56:18
63:16 69:11,21,21

70:14 76:15 82:21
85:2 90:21 93:8
96:15 100:4,20
144:24
momentarily
44:11
moments 37:5
monetary 130:15
money 35:3,20,23
78:3
month 102:7,9,11
monthly 15:14
months 18:11
24:13 35:18 85:18
86:9 88:15 106:21
144:17
morning 5:3 7:7
9:19 15:17
motion 8:10
104:25 105:6
move 13:13 63:3
moved 112:13,17
moving 59:15
110:3
multinational 22:3
multiple 28:8
myers 31:2

**n**

n 7:17,17 155:2
name 6:11 7:15
12:2,5 29:23
158:3,4
named 150:9
narrow 99:13
nature 20:24
28:10 32:10 34:20
115:7 145:12
near 16:12
nearly 12:12
necessarily 120:18

**necessary** 100:24 101:22,25 116:20
**need** 11:18 44:15 80:19 96:15 101:23 121:17,24 151:25
**needed** 125:22
**negotiate** 122:19
**negotiating** 43:15 48:2 115:9
**negotiations** 51:14 51:22 70:10
**neighborhoods** 16:17
**neutral** 30:7 40:4 43:12 64:15 68:23 111:11,20
**never** 29:4 31:19 94:12 134:15
**new** 1:3,21 2:5,9,9 2:16,16 3:5,5 6:6 6:11,13,16 9:13 17:2,9 78:25 103:7 154:9 157:6 158:2
**news** 61:14
**nick** 27:18 31:4 37:24 38:6,12,17 39:2 40:3 41:22 42:17 43:7,15 44:3 63:8,10 64:14 65:14 69:16 69:17,19,22 70:11 73:5 75:12,22 79:11,21 80:2 85:5,18 98:24 99:6,25 102:18 106:15 111:25 113:8,9,14,18,24 115:8,15,18 116:4 116:10,13 117:2,4

117:12,13 119:11 120:23 125:14,20 126:23 133:6,11 138:16 139:17,22 140:6 146:5 150:23 151:2
**nick's** 37:11 43:20 43:22 74:11
**nicolas** 1:7 3:4,10 5:23 7:10 9:2,22
**nicole** 2:9 8:13
**night** 105:2 109:5 109:5
**nitty** 29:4
**noise** 145:22
**nonmonetary** 130:11
**nonparty** 101:11
**nonstarters** 52:5
**normally** 114:12 117:15
**norms** 71:4 75:15
**notary** 1:20 4:14 9:11 154:25 157:5 158:24
**note** 5:5 18:2 19:25 47:14 53:16 54:6 55:8 56:23 67:5,19 76:5 89:2 97:11
**noted** 154:11
**notes** 148:5,7
**noticing** 7:5
**notified** 64:13
**november** 38:20 39:13,18 62:20 64:18 65:18 66:7 69:5,14 70:19 71:25 111:24 132:12 151:13

**number** 6:7 31:16 41:16 51:11 61:22 68:5 71:13 81:14 88:25 103:22 108:17 115:4,16 118:22 120:16 139:8 144:19 152:6,10 154:7
**numerous** 82:15

**o**

**oath** 6:18 37:6 94:20
**object** 57:19 59:3 60:13 100:2 136:12
**objection** 53:17 55:9 94:6 105:19 107:15,21 114:17 114:24 117:19,25 120:17 122:14 123:18 129:14,18 129:19 130:18 134:24 135:10 140:14 146:7,15 146:19 147:12 149:6,15 151:8
**objections** 4:9 7:2 146:20
**objective** 52:9
**objectives** 46:13 49:15
**obligation** 60:18
**obliging** 153:9
**observe** 106:23 107:18 108:11,24
**observed** 141:14
**observing** 99:2,5
**obtain** 35:19 43:10 112:21 115:11 116:16

**obviously** 37:13 46:7 51:17 52:2 61:19 69:17 78:23 82:11 92:17 98:17 99:5 116:9 145:24 148:12 150:7
**occasion** 42:22
**occasioned** 62:17
**occasions** 41:16
**occur** 100:11
**occurred** 49:22 103:9
**offer** 13:10,12 39:15 43:18 49:13 56:2 77:15,22 80:4 85:5,12 86:2 88:3 89:12,21 90:8 91:7,16 92:5 93:16,20 94:3,4,11 94:23 96:3 98:2 98:11,23 99:19,21 112:22
**offered** 91:10
**offering** 78:13
**offers** 52:2,8 77:3 123:21
**office** 9:25 138:16
**offices** 7:9
**oh** 15:7 31:22 74:21 77:8 83:16 90:11 143:3
**okay** 11:17 19:10 19:24 22:7 24:22 25:23 26:15 29:22 31:7 32:7 33:6,8 40:13 48:14 54:9 54:16,25 56:22 63:12,21 64:8 65:16 67:2,3,18,25 72:16 74:11,22 76:4 79:4 80:7

82:18,21 84:16
86:23 87:12,17
90:4,12 91:2
92:19 93:2,6,7
95:11,17 97:6
100:18 102:13,22
103:21 104:6,8,22
105:16 106:4,23
107:5,8,18 108:5
108:24 111:16
112:24 113:4
114:20 117:15,21
120:3 121:22
122:22 123:9,23
124:17 125:14,23
127:13 129:6,9,13
130:7 131:25
133:10 134:3,20
135:2,6,21 136:24
137:6,13 138:7,13
139:11,15 140:10
141:13,15 142:16
142:20 143:13,19
144:3 145:2 146:2
146:11 147:7,24
150:21 151:18
old  2:4
oliva  1:7 3:4 5:23
7:10 9:2,2,22
27:18 29:25 30:4
30:6,14,19,21 31:7
31:20,25 32:14
36:4 37:6 39:19
41:8 42:12,16,25
43:4 48:16,24
49:7,14 62:25
64:11,22 65:7,14
65:17,23 68:21
69:6,10 70:17
75:4,8 77:8 79:6
79:17 93:12 94:14

95:9,23 96:11
97:25 98:14,18,22
99:18 103:7 110:5
110:14 112:21
114:21 115:5
118:20 120:4
124:3,6 126:18
132:23 134:5,12
136:19 137:4
139:7 142:4 146:5
147:17
oliva's  29:23 32:25
66:7 73:15,18,20
74:3 79:5 138:16
olivia  3:10
once  16:22 24:12
28:13 45:13
143:24
ongoing  24:20
29:7,14 61:2
104:3 115:13
opened  20:19
opine  107:4
opinion  104:15
106:10 107:11
140:18 141:5,7
opponent  72:25
opportunity  81:18
101:15 104:9
108:10
opposing  34:2
49:4 70:6 75:17
91:19
options  83:4,11
order  88:24
143:15 149:21
150:3
ordered  62:10
65:11 150:3
orders  134:11

ordinary  134:9
organization's
38:3
orient  39:11
original  59:13
originated  117:11
outcome  6:21
41:21 43:10 71:6
71:16,20,24
157:16
outside  15:21 33:9
41:4 42:11 104:4
117:9 141:3,4
owed  77:6,24
owned  109:14

**p**

p.m.  81:16 86:6
87:24 89:20 97:18
97:22 152:7,12
154:5,11
package  76:2
87:11
packet  26:12
53:14
page  68:6,10 74:9
82:5 86:20 155:5
155:11 158:5
paid  35:3 91:12
parent  15:15
park  3:4
parlance  111:9
part  51:16 56:10
62:23 125:18
participant  106:17
participate  44:9
113:19 147:14
participating
64:14
particular  18:4
30:6 39:9 73:17
84:14 100:14

104:24 108:19
109:13
particularly  112:3
particulars  10:6
26:16,19
parties  4:5 5:14
35:5 157:14
partner  12:13,20
12:25 23:25 34:3
34:5
partnership  12:24
parts  10:12 67:7
party  6:19 65:12
65:14 110:22
114:14 122:8
party's  35:23
passing  28:23
pause  44:11
pay  51:19 77:23
payable  78:5 86:8
payment  35:9
127:25 129:3
payments  85:17
128:3
pendency  11:22
41:6 42:2 43:6
49:19
pending  8:10
people  58:10
116:20 126:20
137:25 143:5
people's  100:12
perceived  51:15
percent  50:13
perfect  21:16
perfectly  144:25
period  15:23 17:3
76:25 78:17 85:17
127:17,25 128:5
132:15

permitted 22:16
person 30:19
  65:15 113:19
  117:21 125:10
  134:16
personal 8:6
personally 56:13
perspective
  117:13
pertaining 24:11
  27:13 41:11 42:10
  44:24 73:16 79:17
  87:19 96:2 97:25
  98:11,13 99:18
pertains 91:6
peter 7:14
phone 40:17 54:19
  94:15 108:18
  113:25 116:11
  126:22 143:14
  148:3
phones 5:9 115:13
phrasing 39:21,25
physically 26:13
  138:6
pick 5:6 113:24
pike 152:24
place 1:18 5:9,14
  39:4 94:17 113:23
  124:15 141:3,4
  150:5
plaintiff 1:5 2:4
  8:20 20:17 96:25
  110:22 121:10,11
  121:14 122:7
plate 38:13 153:12
play 62:13
played 143:23
plaza 3:4
please 5:5,8 7:3
  9:7 11:19 39:22

53:10,16 54:17
60:6 82:21 102:10
119:17,19 128:21
149:4
plus 80:4 147:3
point 26:21 32:19
  33:4,24 37:8 52:6
  53:3 55:11,19
  97:13 100:14
  104:24 112:14
  117:12 124:9
  125:25 141:18
  143:2 146:24
  148:9
populate 24:24
  26:3 56:16 72:10
  74:13 76:16 87:7
  90:13 92:21
populated 80:9
populating 67:11
portchester
  141:21
portion 35:9
  119:20 128:22
  149:16
portions 54:24
  149:10
position 12:20
  31:14 49:10 56:5
  80:6 106:25 143:4
positions 60:19
positive 142:6
possessed 120:14
possession 117:23
possible 51:13
  59:23 61:4 70:13
  85:8 98:24 99:6
  100:12 101:17
  102:25 103:2,9
  118:23 119:22
  126:10,21,23

133:8,15 137:8
138:18 143:8
144:7,9 146:24
151:20
potential 48:2
potentially 46:14
practice 118:3
practicing 12:17
preceptory 141:14
precise 88:24
  116:15 118:5
  133:14
preparation 14:25
  30:11
presence 42:4,11
  141:3,4
present 3:9 6:22
  7:10 9:24 22:24
  23:7,16 42:25
  45:17,24 46:4
  96:20
presentation 70:5
  70:7,18
preserving 73:13
pressure 52:17
pretty 120:22
  125:15,19 135:24
prevailing 115:11
previewed 104:2
  152:22
previous 82:7
previously 21:8
  146:4,14
primary 33:9,24
  34:3 37:9 126:3
primavera 7:13
prior 12:16,23
  23:22 26:10,21
  29:18 57:12 58:22
  73:8,19 82:25
  94:4 95:12,19

96:3 103:14 114:4
126:24 127:14,19
147:7 149:8
private 5:7
privilege 29:15
  46:16 73:14 76:7
  84:6 91:7
privileged 22:12
privy 118:7
probably 16:19
  17:24 28:15 72:8
  118:2 127:9 129:8
  142:5,5
problem 58:2,4,12
  130:2
procedure 1:22
proceed 9:16
  114:3
proceeding 7:3
  11:10 25:9 95:12
process 10:12 61:7
  64:23 82:17 84:15
product 23:3
  45:20
professional 1:8,9
  1:9 5:24 6:2,4
  104:11 105:13
professionally
  103:16
proffers 60:10
programs 65:12
progress 120:21
property 109:13
proposal 79:6
  88:18
proposed 73:17
  78:14 79:19
  144:16
pros 109:19
protecting 47:7

**protective** 150:3
**protocol** 113:22
**protocols** 99:5
  150:5,7
**protractive** 52:25
**prove** 134:17
**provide** 43:4 44:3
  109:18
**provided** 18:20,25
  19:4,12,18 20:3
**provides** 123:13
**providing** 124:3
**provision** 58:9
  119:6
**provisions** 118:13
**proviso** 121:6
**provocative** 48:4
  49:5 70:25
**public** 1:20 4:14
  9:11 154:25 157:5
  158:24
**punished** 32:18,22
**purporting** 139:20
**purposes** 117:5
**pursuant** 1:21
  9:24 37:8 91:4
  99:21
**pursuing** 28:24
**put** 31:13 66:22
  70:23 90:17
  113:23 148:13
**pyramid** 38:7

**q**

**q3** 25:21
**q4** 25:22
**qualified** 107:4
  108:22
**quarter** 17:24,25
**question** 4:10
  10:16,18 11:22
  18:6 22:17,24

23:7 25:4 27:10
  29:19 45:17,24
  46:24 47:2 53:12
  53:18 55:10 57:15
  57:19 58:5,6,13
  66:14 69:15 100:3
  105:14 106:6
  108:6 109:11
  110:10 114:19
  119:17 121:21
  124:16,22 128:19
  134:19 135:5
  146:9,17
**questioned** 134:10
**questions** 22:25
  23:8 45:18,25
  48:11 96:19,21
  97:3 100:21,24
  101:5,16 128:9
  129:10 131:15
  148:10,11 151:23
**quick** 55:25
**quickly** 61:3 108:7
  125:16,19 135:24
**quite** 17:13 48:4
  59:19 105:3
**quote** 43:20
  139:21

**r**

**raise** 129:18
**raised** 47:3 53:6
  58:25
**range** 151:5
**ranking** 150:15
**rate** 38:22 62:11
  143:24
**reached** 43:24
  71:9 135:25
**reaction** 140:10
**reactions** 69:24

**read** 26:14,18 27:8
  54:25 63:20 67:2
  67:16,25 74:20,22
  87:16 90:25 93:3
  95:14 119:18,21
  128:20,23
**reading** 26:23
  58:16 74:15
**reads** 94:9
**ready** 85:6
**realize** 111:22
**really** 27:6 28:6
  39:3 43:8 59:6,7
  99:7 106:2 107:3
  109:6 122:15,16
  122:18 130:22
  136:3 146:10
  152:20 153:3
**realtime** 115:17
  116:3 118:14
**reappear** 101:18
**reason** 79:21
  100:17 132:6
  158:5
**reasons** 32:10
  140:17
**recall** 48:23 65:10
  74:7 75:10 76:24
  77:20,21 78:15
  79:15,24 97:24
  98:4,7,10,17 99:12
  101:21 103:4
  111:3,4,16,18
  118:17,19,22
  119:2 120:10
  131:14,19,23,25
  135:6 136:2,3
  139:10,22 142:7
  146:23 147:13
  150:20

**receive** 20:9 44:6
  48:15 69:9 70:16
  73:25
**received** 10:5
  18:21 44:22 55:16
  69:21,23 75:4
  108:2 118:20
**receiving** 48:23
**recess** 44:18 81:10
  97:19 152:8
**recollect** 11:2
**recollection** 10:20
  25:21 31:19 32:11
  35:15 40:10 42:7
  43:3,19 45:4
  52:23 58:15 59:11
  62:24 64:13 66:11
  66:18 71:18,23
  72:6,19 84:12
  86:13 89:15 90:7
  91:24,25 92:3,11
  92:13 95:2,21
  96:13 100:13
  103:3 106:9
  108:21 109:17
  110:19 112:16
  132:5 133:14,17
  135:13 136:23
  137:10 138:21
  142:12
**recommend** 85:20
**recommendation**
  77:13 85:8
**record** 5:3,15 6:25
  18:3 19:25 22:20
  42:21 44:14,16,17
  44:20 54:6 56:24
  58:22 66:25 67:6
  67:20 71:22 73:10
  76:6 80:13,22
  81:4,9,15 89:6

90:6 91:3 94:19
97:8,10,16,17,21
119:21 128:23
148:14 149:25
151:4 152:7,11
153:2 154:5
157:11
**recorded** 5:16
**recording** 5:13
**records** 66:19
126:22 127:7
**red** 105:3
**redacted** 54:24
73:13 76:6
**redaction** 84:5
**redactions** 93:4
**redress** 27:24 28:4
**rees** 3:3 7:9
**refer** 23:8 28:2
45:25 52:3
**reference** 78:11
**referenced** 78:21
136:16
**references** 148:13
148:18,23
**referred** 25:3
34:17 150:8
**referring** 19:23
21:7 23:12 116:3
116:5,13 148:7
**refers** 18:15
**refine** 105:5
**reflect** 80:13 127:8
**reflected** 79:7,19
127:24
**reflecting** 23:15
84:5
**reflects** 66:16 89:6
**refresh** 40:10
62:24 66:11,18
71:18

**refreshed** 59:11
112:15
**regard** 104:21
136:14 148:14
**regarded** 33:3
**regarding** 23:9
37:10,20 46:2
57:11
**regardless** 19:14
20:4
**regular** 124:6
**regularity** 78:19
**reins** 42:17
**reisbaum** 2:7 8:14
**relate** 24:13 134:4
**related** 6:19 27:11
132:22 157:14
**relating** 131:15
149:16
**relationship** 23:18
24:2 29:8 99:8
**relationships**
61:21 105:13
**relative** 29:19
46:11 50:23 141:9
**relayed** 92:6
**relaying** 50:17
**relevance** 129:22
**relief** 147:4
**religious** 15:17
**remarks** 9:20
**remember** 25:18
31:15 59:18 66:9
71:8,12,14 78:20
78:25 79:3 92:16
98:14 102:16,19
103:12 104:25
111:25 119:25
126:12 127:2,6
133:9 134:7
137:11 138:23,24

139:3 141:21
147:5
**remembering**
31:23
**remind** 68:24
**remote** 6:10
**remotely** 6:23
**remove** 137:21
**reopening** 89:3
**repeat** 45:10 102:9
**repeated** 119:17
**rephrase** 46:25
130:10
**reporter** 1:20 6:14
9:7 149:2
**reporting** 158:2
**represent** 8:15
34:7
**representation**
23:4 45:21
**representative**
65:13 117:5,18
125:2
**representatives**
126:25 138:3
**represented** 7:19
61:21
**representing** 9:22
114:14
**request** 20:2 58:8
122:12
**requested** 119:20
128:22
**requesting** 149:7
**require** 58:6
**required** 11:13
65:12 104:4
**reserve** 8:2 100:22
101:23
**reserved** 4:10
101:12

**reserving** 97:11
129:22
**resolution** 59:22
**resolve** 52:20
72:17
**resolved** 61:3
112:5
**respect** 8:3 23:3
45:20 46:21 48:19
51:6 60:9 74:5
78:12 114:18
115:25 143:5
**respective** 4:4
28:22
**respond** 10:16
18:5 43:17 48:5
70:23 77:14 78:7
85:6,20 88:7
107:23 108:7
**response** 59:21
73:15,19,21 74:3
79:5 83:25 88:19
91:4 96:7
**responses** 73:2
**responsibilities**
39:7
**responsible** 33:10
34:3,6 38:10,15
**responsive** 108:4
**rest** 53:21 56:17
56:19 63:13,22
72:10 80:9 90:14
90:18 92:21
**restaurant** 28:21
141:20
**result** 39:10 92:14
115:21 116:12,17
118:12
**results** 115:12
**retained** 102:20
102:21 103:5,10

103:11 154:9
**retired** 59:14,18
**retirement** 61:10
**retiring** 62:19
**return** 17:2 35:8
35:19 69:25
**returned** 17:9
**returning** 35:22
**reveal** 22:25 45:18
58:7
**revealed** 146:14
**review** 54:4,12,22
57:6,13 58:23
72:21 95:16
**reviewed** 80:12
131:20
**revolved** 145:22
**richman** 1:19 6:15
9:12 157:5,23
**right** 11:25 17:17
20:12 64:20 69:7
76:13 77:20 82:5
82:9,23 84:20,21
84:24 86:3 90:10
91:22 97:12
101:12,23 111:5
111:13,14,15
112:12,14,17,19
118:3 124:10
130:21 131:18
132:11 137:20
141:8 142:3,7
151:15 152:19
153:6
**rightness** 49:9
**rights** 8:3
**rings** 145:6
**road** 2:4
**role** 23:24 31:6
36:14 37:7 64:23
64:25 66:7 102:13

103:8,14,17
105:11
**roles** 38:11
**rolled** 39:8 106:16
**room** 6:22 138:6
**rooms** 70:9
**route** 123:7
**royalties** 80:5
**royalty** 79:11
**rudimentary**
46:17
**rule** 91:5 148:3
**rules** 1:21 10:7
113:18 118:11
**runway** 77:23
144:20

**s**

**s** 1:5 5:19 155:10
158:5
**sakaguchi** 137:24
**sakiguchi** 41:19
**san** 30:8 34:18
41:17,19,19 55:4
56:12 68:20 71:15
79:22 82:14,15
83:18 86:15
108:14,20,21
109:21,21 112:2,6
112:18 137:18,18
137:23,24 150:9
150:11,13
**sanders** 12:18
23:13,16,21 33:10
**sat** 15:15 38:6
103:19
**satisfactory**
112:22
**saw** 26:13 66:19
105:22 135:8
147:22

**saying** 31:12 73:22
79:9 85:15 86:15
88:6 89:2 93:19
**says** 85:3 88:10
123:20
**scarsdale** 6:11
16:16,18
**scenes** 140:22
**scheduled** 59:16
**school** 13:25 14:2
15:14,17 16:15
103:20
**scientific** 35:11
**scientist** 108:20
**scny** 150:4
**screen** 20:12 54:10
74:14 76:21 90:18
**scroll** 76:20
**scrupulous** 98:25
**scully** 3:3
**sd** 111:11
**sealed** 19:4
**sealing** 4:5
**seasoned** 61:18
**second** 7:23 25:25
28:20 54:17 63:23
67:18 68:6 71:14
76:4 93:2 109:25
112:7 127:2
135:23 137:14,17
138:2 143:20
152:21
**see** 18:9 27:11
44:11 54:10 58:12
59:20 68:7,8
72:20,22 73:3,20
73:21 74:20,21
76:12 77:16 79:9
79:12 82:8 83:16
83:18 84:3,9,18,25
86:5 88:21 90:12

92:8 93:6,19 94:8
95:17 96:4,5
105:25 108:3
122:19 126:22
129:25
**seeing** 74:11
131:24
**seeking** 27:23 28:3
**seen** 26:9 64:4
73:8,18 95:18
**seminar** 142:15
145:8
**send** 73:17,23 85:7
88:25
**senior** 137:25
**sense** 69:16 98:20
141:15 150:18
**sensitive** 5:6
**sent** 18:8 119:9
**sentence** 94:8,12
**sentences** 43:20
54:24
**separate** 86:13
139:21 143:21
**separation** 31:9
42:23,24
**september** 53:8
**sequentially**
143:15
**series** 75:25
**serious** 52:8
**serves** 70:5 88:16
**services** 15:17
**serving** 36:20
**session** 30:8
**sessions** 15:15
**set** 64:10 147:2
151:4 157:9,19
**setting** 94:2
**settle** 111:24
119:15 122:9

123:15 150:19
151:7
**settled** 111:20
127:21 130:4
**settlement** 23:10
24:21 37:20 46:3
46:8,22 47:22
48:22 49:11 50:20
50:23 51:9,14,19
51:21 52:19 55:25
60:20 64:19 65:3
65:8,14,19 70:13
71:7,9,11 77:2,15
78:4 80:3 83:10
83:10 87:19 88:8
91:6 98:18 111:2
112:8,22 113:6,10
113:14,20,21
114:10,13,15,22
116:25 117:24
118:5 119:14
120:5,13,22 121:9
121:11,13,15
122:3,6,12,24
123:11,14 124:4
124:14,19 126:8
126:15 127:24
129:5,6 130:12,15
132:9,24 133:12
133:21 137:15
138:17 142:22
146:4,12,13 147:2
147:6,8,10 148:15
149:17,18 150:23
151:5
**settlements** 129:16
**seven** 15:9
**shake** 79:23
**shaking** 77:19
**share** 53:20,21
56:16 63:12

**shared** 60:2
**sharp** 43:8
**sharper** 100:13
**shearman** 2:11
7:18,20
**sheet** 158:2
**shining** 121:18
**shocked** 142:17
**short** 59:21,22
**shorthand** 1:19
**shortly** 38:23 89:4
102:21 103:10
**show** 56:15 66:15
77:24
**showing** 76:17
**shutting** 54:20
**shuttle** 43:12
**siachos** 7:14
**sick** 131:21 132:2
135:7,12
**side** 51:17 99:10
110:6 118:9
120:20 123:21
138:25 140:4
**sides** 43:14 70:4
**signature** 157:21
**signed** 4:13,15
**significant** 64:23
64:25
**silly** 77:4
**simply** 109:10
**single** 28:7 117:12
**sit** 10:20 66:12
88:18
**sitting** 31:17 70:4
98:6 115:9 119:23
126:11 137:10
138:6
**situation** 29:2
115:8 121:7

**situations** 109:20
**six** 24:12 85:18
86:9 88:15 144:16
**skeptical** 56:13
**skilled** 107:7
**skills** 107:12
**sleeves** 39:8
106:16
**slighting** 51:24
**slowed** 93:3
**smaller** 78:3
**smart** 115:13
**smith** 130:25
131:3
**social** 143:21
**socialize** 13:22
**socialized** 15:20
16:5
**socially** 103:20
**somebody** 117:17
**somewhat** 56:5
71:10 76:24 125:8
**son** 15:10
**soon** 85:8
**sophisticated**
61:19
**sorry** 19:8 27:9
29:2 31:14,22
34:15 38:21 39:24
54:19 57:21 80:18
83:16 84:13 95:15
128:18,24 130:9
131:4 133:13
138:20 143:11,25
145:21 146:23
150:20 153:24
**sort** 28:25 38:6
39:7 49:8 51:23
52:5 62:14 69:20
73:2 77:18 98:25
99:10 115:7

125:12 140:3
152:22
**sounds** 88:13
**source** 124:18
**southern** 1:3 6:6
111:8 114:7
**sozio** 3:10 6:12
**speak** 17:11 34:16
57:22 100:5
**speaking** 20:15
74:4 96:24 104:14
**special** 33:5 70:22
**specialization**
12:19 13:4
**specific** 39:13
43:20 48:11 56:11
78:21 79:2,25
82:17 85:11,24,25
87:25 88:2,9,23
89:10,11 92:16
98:4 99:13 102:11
105:21 115:4
118:20 119:25
120:10 122:21
133:17 144:21
147:10
**specifically** 14:13
14:19 32:22 53:7
59:4 74:4 75:7,13
75:22 78:13 98:15
124:12
**specifics** 47:9
**specified** 114:16
**speculate** 27:7
**speculating** 100:6
**speed** 125:21
**spelled** 7:16
**spend** 52:11
**spending** 153:12
**spent** 30:10
153:15

**spirits** 105:4
**spite** 75:16
**split** 43:14 70:8
 85:16 144:16
**spoke** 15:2 41:15
 41:18,22 42:18,18
 42:19,22 78:18
 92:14 126:20
 137:3 141:18
**spoken** 13:14 14:5
 14:8,18 31:8
 77:12 78:11 92:9
 142:4 148:2
**spouses** 28:22
**stake** 50:8
**stakeholders**
 41:20 59:6 108:16
 116:6,8 118:4,15
 124:7
**stamp** 21:13 68:5
**stamped** 53:24
 54:7 56:24 57:3
 63:18,25 67:13,20
 67:23 72:12,14
 74:24 76:3,10
 81:21,24 87:5,14
 90:19,23 92:22,24
 95:4,6 155:14,16
 155:18,20,22,24
 156:2,4,6,8,9,10
 156:12,14
**stand** 44:16 80:24
 97:15 152:3
**standards** 49:3
**start** 41:13 62:22
 82:3 101:9
**started** 77:2,4
**startle** 106:2
**state** 1:20 6:24 7:3
 9:12 60:6 66:25
 149:25 157:6

**stated** 70:24 94:20
 118:25
**statement** 86:7
**states** 1:2 6:5
 24:17 61:8 75:8
 95:24 96:7
**stay** 75:8
**stayed** 112:19
**staying** 49:8
**steady** 43:15
**step** 84:14
**sterling** 2:11 7:18
 7:20
**stiegler** 47:19 48:3
 70:6,24 72:23
 73:7,11,18 77:2
 78:7 92:9 120:25
 133:23 135:25
**stiegler's** 77:14
 88:17 91:7
**stipulated** 4:3,8,12
**stipulation** 150:2
**stipulations** 1:22
 4:2
**stop** 115:15
**strategy** 48:20
 51:5 56:14 62:12
 88:24
**street** 2:12
**streetfighter** 49:6
**strike** 144:23
**string** 54:13
**strokes** 14:11
**strong** 73:7
**stuff** 87:2
**style** 75:15 106:22
**subject** 8:9 23:11
 46:4 143:9
**subpoena** 9:25
 153:9

**subscribed** 154:20
 158:22
**subsequent** 42:16
 80:3 82:13 132:15
**subsequently** 36:4
 38:19 41:22 65:22
**substance** 14:19
 46:12 58:7,9
**substantive** 14:16
**succeed** 51:22
**successful** 43:10
 71:11,20,23
**successfully** 35:19
 59:9 112:5
**sufficiently** 88:10
**suggest** 88:22
 133:11
**suggested** 86:10
**suggesting** 83:4
**suggestion** 83:23
**suit** 145:25
**suite** 2:4,12
**sum** 35:3 113:7,15
 113:17 123:13,16
**summer** 17:14
 18:12 20:22
**sun** 121:18
**sunday** 15:16
**suppose** 126:21
**sure** 14:4 18:9,12
 19:11 20:9,24
 21:12 22:14 28:5
 28:12,19 38:4
 40:9 42:20 43:7
 48:25 50:22 51:13
 54:18 58:17,18,21
 62:7 66:19 67:4
 69:3 71:17,21
 72:6,25 73:5,9
 76:22 83:6 89:5
 90:5 93:5 94:18

 99:8 101:2,4
 104:13 106:14
 107:17,24 114:11
 114:25 118:14
 120:23 122:4
 125:20 143:17
 146:25 152:25
**surprise** 99:11
 125:17
**surprised** 32:4
 56:4 60:16 93:20
 125:8 140:13,15
**surprises** 21:14
**suzie** 33:17,20
**swear** 9:7
**sworn** 4:15 9:11
 10:13 154:20
 157:9 158:22

**t**

**t** 155:10
**tab** 18:7 26:7
**table** 31:18 60:21
 140:4
**tack** 62:11
**tactless** 94:16
**tail** 24:10
**take** 5:13 11:13,18
 11:20,21 13:7
 25:24 31:5 44:16
 45:7 51:6 54:4
 56:18,20 63:14,17
 66:24 67:9 68:4
 69:13 70:22 72:9
 73:10 74:17 75:23
 75:24 78:9 79:4
 80:7,10,24 81:4,18
 82:18 84:2 85:2
 85:25 86:17 90:15
 90:21 92:19 93:8
 95:3,23 96:14,16
 97:8,9 123:22

151:25

**taken**   1:19 5:17
10:25 11:5,8,12,15
103:7

**takes**   59:9 100:3

**takimoto**   41:19
55:4 56:12 82:15
137:23 150:9,11
150:13

**talked**   31:23 36:22
135:8 152:16

**talking**   37:18 47:4
47:9 121:6 127:16

**tank**   51:15

**tax**   38:16

**team**   114:23
116:16

**technical**   114:7

**technically**   37:3

**telephone**   30:17
92:6 147:15,20

**tell**   10:13 11:9
34:19 86:11
110:22 115:22
140:7

**ten**   109:5 121:4
123:20

**tenderize**   62:14

**tennis**   143:24

**term**   129:3 136:14
136:17

**terminated**   27:24
28:4 31:25 139:12
140:12 141:17
142:3,19,23 144:6
144:9

**termination**   29:20
141:24,25 145:25

**terms**   31:9 33:25
38:11 77:18
122:17 123:14

127:24 149:18

**testified**   9:14
39:14 63:2 102:6
103:18 152:13

**testify**   50:11 51:2

**testifying**   10:19,21
111:19

**testimony**   14:20
16:14 29:24 37:9
37:14 39:18,22
55:18 60:5,7
62:24 68:18 89:7
89:8,16 94:20
154:6 157:8,11

**text**   76:21

**thank**   9:15 20:10
20:18 21:17 45:8
53:18 55:3 69:4
85:3 87:12 89:2
100:25 115:24
123:23 151:24
153:8,17,21

**thanks**   45:9

**thing**   47:13 59:7
67:16 99:11
153:14

**things**   87:21
109:22 111:10
136:13 139:4
141:2 153:12

**think**   14:23 16:10
16:18 17:13,23
20:21 29:10 33:3
36:10,20 41:14,23
46:15,17 47:24
56:3 59:25 60:15
61:15 63:5 72:7
77:5 79:21 88:16
96:16 105:20
108:3 111:4 114:6
117:20 118:2

119:11 124:11
125:12 130:6
131:12,13,17,18
136:4,4 141:23
142:11 145:7
148:5 150:10,13

**thinking**   60:25
61:5 77:21

**third**   17:25

**thought**   72:18
77:17 95:16
153:14

**thoughtful**   69:24

**thoughts**   78:6

**thousands**   61:6

**three**   15:24 152:11
154:8

**time**   1:18 4:11 7:4
11:19 16:5 17:4,7
17:15,19 21:22
22:5,7 23:16
30:13,19 31:5
37:13 39:14,19
41:24 42:8 44:20
52:6 55:7,12
59:10,22,23 62:13
62:20,23,25 63:7,9
63:10 64:4 66:19
68:25 69:11,11
76:25 77:23 78:16
87:23 89:21 91:16
94:23 97:14,17,21
100:22 104:24
110:2 114:16
118:18 127:17,20
127:25 128:3,5
132:15 134:21
135:7,12 139:11
142:4 147:18
148:2 151:24
153:8,13,15,18

154:11

**times**   15:23 29:23
49:3 71:3 139:2

**title**   102:24 103:7

**today**   7:25 10:20
11:14 14:20 20:6
21:8 22:25 23:6
25:15 26:10,21
29:24 45:13,18,25
66:12 73:8,19
95:19 97:5 98:6
100:10 101:10,14
119:23 126:11
131:20 137:10
148:14 152:17
153:14

**today's**   25:8 154:6

**told**   20:21 25:16
32:21 99:24 100:9
140:7,17

**tomoji**   34:16
41:17 53:5 57:10
58:24 71:15 82:13
83:9,23 85:3 86:6
86:14 93:19
108:14 112:2

**tomoji's**   58:19

**ton**   38:13

**tone**   47:5 48:4,19
69:12 70:17

**tony**   47:19 78:7
91:7

**top**   38:7 78:9 79:7
79:19 109:16

**topic**   28:23 50:25
99:14 125:6
126:20

**topics**   109:6

**total**   154:7

**totally**   126:10
135:11 138:18

144:7,9
tow 76:23
transcript 149:3
149:10,16 157:10
transpired 38:25
treated 148:19
trial 4:11 25:12
155:13
tried 35:17
trip 124:9
troutman 12:18
13:3 23:13,16,20
33:10
true 86:4 157:10
truth 10:13 11:10
99:24 100:9
truthfully 10:21
try 43:21 121:5,20
trying 17:13 31:15
44:9 54:25 107:22
143:21
turn 5:9
turned 29:21
120:24 125:15,19
turning 112:24
113:4
two 7:19 10:17
18:7 24:7 35:5
41:9 48:22 51:13
67:7 69:12 81:15
85:17 86:9 102:8
108:18 112:3,16
115:17,20 126:19
140:17,20 143:14
143:18 151:9
152:2,6,15
type 35:2 110:21

**u**

u.s. 29:16 36:20
59:10 71:15 75:20

ultimate 148:15
ultimately 19:15
43:24 56:6 60:22
62:16 71:19 130:4
137:22
unambiguous
35:16
uncomfortable
31:14 143:4
understand 10:4,7
10:23 14:18 16:13
26:17 37:22 46:15
50:15 54:16 58:18
85:9,13 93:11,23
93:25 101:19
116:18 122:4
124:22 139:5
141:11 146:8,16
understanding
36:6,18 40:22
51:4 52:13,21
65:17,25 85:11
87:22 90:5,7
95:25 116:22,24
117:16 139:14
149:19
understood 10:18
10:22 11:23,24
61:12,14 113:13
134:20 137:21
141:6
unfailing 47:16
unit 5:16 80:20
81:8,14 152:5,6,10
united 1:2 6:5 61:8
units 154:8
unmute 100:4
unsuccessfully
44:10
unsupportable
60:19

unwarranted
140:3
update 85:20
upload 21:20
uploading 53:20
upset 94:10
use 36:8 136:14,16
usually 114:15
utsunomiya 34:17
34:18 41:17 71:15
82:14 86:15
108:14,20 109:21
112:2 137:18
uttered 92:16

**v**

v 158:3
vagnini 2:3
vague 136:13
valli 2:3
value 130:13
138:10
values 71:4
various 32:9 38:14
venture 34:23,24
verbal 147:15,19
veritext 6:13,16
44:12 154:9 158:2
vernacular 52:4
versa 57:24
versus 5:20
vice 57:24
video 1:16 5:12,16
videographer 3:10
5:2 6:14 8:22 9:6
9:15 44:15,19
80:15,18,23 81:3,7
81:13 97:7,15,20
121:24 152:3,9
153:23 154:4
view 117:7 144:14
144:15

viewed 117:12
violation 35:23
virtual 1:12,16
6:10

**w**

wait 56:19 63:21
63:23
waiting 21:2,19
24:23
waived 4:7
waiver 7:25
wand 51:18
want 10:11 18:2
19:25 21:21 22:10
22:13 24:24 28:15
32:2 37:16 42:20
44:2 50:11 54:6
54:11 56:23 58:21
63:21 67:5,16
73:23 74:8 76:5
79:10 87:3 88:7
88:14,17 89:5
94:18 121:3 122:4
127:4 136:5
139:18,23 141:6
145:6 148:17
wanted 18:8,9,12
19:11 31:12 51:11
51:13,20 59:6,8
61:2 72:25 73:5
125:24 133:11
140:6 152:25
wanting 125:19
wants 148:21
washington 2:12
waters 60:16
61:25
way 11:6 49:2
55:5 75:18 76:23
77:25 78:2 83:12
93:24 100:16

**[way - zoom]**                                                                 Page 26

106:3 107:23
116:14,23 117:7
120:11 126:12
129:25 133:17
135:4 139:18
141:5,7,15 143:23
144:11,17 157:16
**we've**  29:3,22
101:9 139:21
**week**  78:24 131:2
131:7,16,22 132:2
133:2
**weird**  135:22
**went**  30:11 42:23
79:22 111:23
112:15,18 137:13
141:19
**whereof**  157:18
**whispering**  5:7
**white**  2:14 8:17
12:8,11,16,21
13:10 23:13,25
38:23 112:13,14
112:17
**wife**  16:2 143:23
**win**  79:12
**wish**  133:13
**withdraw**  110:10
136:8,20,25 137:7
**withdrawn**  11:12
13:15 14:25 89:17
92:2 107:10 108:9
121:12 135:21
**witness**  2:15 9:8
9:10 18:19 19:6
22:23 23:6 45:16
45:23 47:24 58:4
58:7,12 80:25
97:6,12 100:5
101:2,11,21
128:14,15 155:5

157:8,12,18 158:4
**wondered**  139:3
**word**  116:15
**words**  36:13 92:16
139:19
**wore**  40:21
**work**  13:6 17:16
22:5,8 23:3,21
36:25 45:20 56:14
103:21 104:9
110:4,12,14,16
113:2 130:24
131:6 132:17
140:20 152:21
153:3
**worked**  17:20 43:8
105:5,9 152:14
**working**  23:23
24:2 32:5 70:11
98:17 102:4
115:20 125:10
**works**  108:16
122:3,3
**world**  22:2 66:17
**worms**  20:20
**worth**  134:8
**wow**  125:14
**wrapped**  59:7,8
**write**  92:9,18
**writing**  75:18
105:6
**written**  85:23
87:25 108:8
133:23 150:22,25
151:3
**wrong**  40:2 105:22
136:6 141:9
**wrongdoing**  56:9
**wrongful**  145:20
145:24

**wrote**  72:22 82:12

**x**

**x**  1:4,11 37:4
43:18 51:20 86:16
115:16 122:8,10
122:12 123:2
155:2,10

**y**

**y**  37:4 43:18
**yeah**  17:22 18:7
28:24 68:14,17
72:20 77:20 78:23
83:7 88:5 90:11
107:16 108:17
110:2,13 111:22
112:12 113:3
117:20 128:3
131:9,12,17,17
152:20
**year**  16:9 18:10
35:18
**year's**  78:25
**years**  12:12 13:7
15:9,24 16:22
31:16 52:24 61:23
119:23,24 120:9
**yep**  72:20
**yesterday**  26:11
**york**  1:3,21 2:5,9
2:9,16,16 3:5,5
6:7,11,13,16 9:13
17:2,9 154:10
157:6 158:2

**z**

**zach**  15:8
**zoom**  1:12,16 6:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.