UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER S. FISCHMAN,

                              Plaintiff,

        -against-

                                                    Index No.: 18-cv-08188 (JMF)

MITSUBISHI CHEMICAL HOLDINGS AMERICA,
INC.; MITSUBISHI CHEMICAL CORPORATION;
MITSUBISHI CHEMICAL HOLDINGS
CORPORATION; NICHOLAS OLIVA, in his
individual and professional capacities; DONNA
COSTA, in her individual and professional capacities;
And JOHN DOES 1-10, in their individual and
professional capacities,

                              Defendants.

# DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE
## THE TESTIMONY OF CHAD L. STALLER AND RONA WEXLER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND .............................................................................................. 1

LEGAL STANDARD ........................................................................................ 4

ARGUMENT ................................................................................................... 5

    I.      Mr. Staller and Ms. Wexler Are Both Qualified .................................... 6

    II.     Mr. Staller and Ms. Wexler Reliably Applied Reliable Principles and Methods ... 8

          A.      Mr. Staller's Methods Are Reliable and Were Reliably Applied ............... 8

          B.      Ms. Wexler's Methods Are Reliable and Were Reliably Applied ........... 11

          C.      Mr. Staller's and Ms. Wexler's Use of Methodologies Other Than Industrial Organizational Psychology Does Not Render the Expert Testimony Unreliable or Otherwise Inadmissible ................................... 13

    III.    Plaintiff's Other Arguments Are Also Meritless ................................... 14

          A.      Mr. Staller's Opinions Do Not Improperly Reach an Ultimate Issue ....... 14

          B.      The Expert Testimony Does Not Simply Address Lay Matters ............... 15

          C.      Plaintiff's Lack of a New York Law License Does Not Mean That She Could Not Get a Suitable Job in New York ............................................... 15

          D.      Plaintiff's Disagreements with or Hypothetical Scenarios Concerning the Expert Testimony Are Insufficient ......................................................... 16

CONCLUSION ............................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alves v. Affiliated Care of Putnam, Inc.*,
  No. 16-cv-1593, 2022 WL 1002817 (S.D.N.Y. Mar. 30, 2022) ................................................ 7

*Bacardi & Co. v. N.Y. Lighter Co.*,
  No. 97-CV-07140, 2000 WL 298915 (E.D.N.Y. Mar. 15, 2000) ............................................ 5

*Cohalan v. Genie Indus., Inc.*,
  No. 10-CV-02415, 2013 WL 829150 (S.D.N.Y. Mar. 1, 2013) ............................................. 5

*Dailey v. Société Générale*,
  108 F.3d 451 (2d Cir. 1997) .............................................................................................. 6

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................ 1, 4, 5, 6, 15

*Ford Motor Co. v. EEOC*,
  458 U.S. 219 (1982) ........................................................................................................... 6

*Ge Dandong v. Pinnacle Performance Ltd.*,
  No. 10-CV-08086, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ....................................... 15

*Greenway v. Buffalo Hilton Hotel*,
  143 F.3d 47 (2d Cir. 1998) ................................................................................................ 6

*In re Gen. Motors LLC Ignition Switch Litig.*,
  No. 14-MD-02543, 2016 WL 4077117 (S.D.N.Y. Aug. 1, 2016) ...................................... 5

*New York City Transit Auth. v. Express Scripts, Inc.*,
  588 F. Supp. 3d 424 (S.D.N.Y. 2022) .............................................................................. 5

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005 ............................................................................................... 4

*Palmieri v. Defaria*,
  88 F.3d 136 (2d Cir. 1996) ............................................................................................... 5

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) ............................................................................................. 4

*Roniger v. McCall*,
  No. 97-cv-08009, 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000) ..................................... 9

*SEC v. Lek Securities Corporation*,
370 F. Supp.3d 384 (S.D.N.Y. 2019) ................................................ 13

*SEC v. Revelation Capital Management*,
215 F. Supp. 3d 267 (S.D.N.Y. 2016) ................................................. 6

*Speights v. Arsens Home Care Inc.*,
2020 WL 6343263 (E.D. Pa. Oct. 28, 2020) .................................. 9, 10

*United States v. Feliciano*,
223 F.3d 102 (2d Cir. 2000) ............................................................. 14

**Rules**

Fed. R. Evid. 401 ................................................................................ 5

Fed. R. Evid. 402 ................................................................................ 5

Fed. R. Evid. 403 ................................................................................ 4

Fed. R. Evid. 702 ............................................................................ 4, 6

Fed. R. Evid. 704(a) .......................................................................... 14

## PRELIMINARY STATEMENT

Having chosen not to retain rebuttal experts, Plaintiff Jennifer S. Fischman ("Plaintiff") instead brings a meritless motion to exclude the expert testimony of Chad L. Staller ("Staller Testimony") and Rona Wexler ("Wexler Testimony) (collectively the "Expert Testimony"). Plaintiff's motion offers no basis to exclude the Expert Testimony.

In any civil litigation, facts relating to the calculation of damages are critical. The opinions of Mr. Staller and Ms. Wexler, both highly qualified experts, provide the necessary context for the Court or jury to understand those facts in full. The Expert Testimony concludes that Plaintiff failed to conduct a reasonable job search after her termination. Neither Plaintiff's dissatisfaction with this conclusion, nor her choice not to retain a rebuttal expert, is a sufficient basis to exclude the Expert Testimony.

Indeed, all of the *Daubert* factors weigh heavily in favor of admitting the Expert Testimony, and nothing in the Federal Rules of Evidence supports exclusion. Accordingly, the Court should admit the testimony and reports of Mr. Staller and Ms. Wexler.

## BACKGROUND

On November 12, 2020, Mr. Staller submitted his expert report concerning Plaintiff's mitigation efforts (the "Staller Report"), detailing his opinions as well as the extensive bases for those opinions. Mr. Staller considered many documents in evaluating Plaintiff's mitigation efforts, including the pleadings, Plaintiff's interrogatory responses, a large volume of documents produced by Plaintiff, personnel documents, and Plaintiff's resume. (Staller Report at 1.)

Mr. Staller also analyzed Plaintiff's job search activities subsequent to her employment with Mitsubishi Chemical Holdings America, Inc. ("MCHA"). (*Id.* at 3.) He then compared Plaintiff's efforts to the minimum standard set by the New York Department of Labor ("DOL") for job search activities while unemployed, as no other quantitative standard for minimum job

search requirements exists. (*Id.* at 4; Declaration of Chad L. Staller ("Staller Declaration") ¶ 30.) In analyzing Plaintiff's job opportunities, Mr. Staller refined his analysis by date range, occupation title, and geographic area. (Staller Report at 5.) Mr. Staller then further refined the results by keyword to eliminate inapplicable or duplicate job opportunities and positions requiring specialized experience, among other limiting factors. (*Id.* at 6.) Mr. Staller's detailed search demonstrated that 6,409 broadly classified, and 551 refined, potential employment opportunities existed for Plaintiff during the relevant time period. (*Id.* at 8.)

Based on his review of Plaintiff's job search efforts as compared to the potential job opportunities available to her and the relevant labor market data, Mr. Staller concluded that Plaintiff did not conduct a reasonable job search. (Staller Report at 9.)

On January 28, 2021, Ms. Wexler provided her expert report containing a vocational evaluation and earning capacity analysis for Plaintiff (the "Wexler Report"). Ms. Wexler, a certified American Board of Vocational Experts Diplomate, has been qualified and testified as an employability expert in employment matters since 2004. (Declaration of Rona Wexler ("Wexler Declaration") ¶¶ 6, 8.) In that capacity, she has offered expert opinions regarding employability, compensation, earning capacity, job search diligence, and labor market analyses. (*Id.* ¶ 8.) In her report, Ms. Wexler analyzed Plaintiff's employment capabilities and her efforts to search for employment since her separation from MCHA. (Wexler Report at 4.) Ms. Wexler based her evaluation on information provided by Plaintiff, including her education, past employment, earnings history, and job search activities, along with an analysis of employment opportunities available to her based upon her local labor market. (*Id.*)

Ms. Wexler employed the Vocational and Rehabilitation Assessment Model ("VRA Model"), an empirically derived structural model of vocational and rehabilitation assessment in a

legal forensic setting, to conduct her analysis. (*Id.* at 5; Wexler Declaration ¶ 17.) Using this model, Ms. Wexler reviewed documents connected with this litigation, identified Plaintiff's proficiencies and skills, performed a transferable skills analysis of Plaintiff, performed an employability analysis including labor market research, and analyzed Plaintiff's job search efforts. (Wexler Report at 5-6.)

In determining the relevant labor market, Ms. Wexler narrowed the parameters of the available job data pool established by the Forensic JobStats, which identified the most relevant employment opportunities from the Gartner Talent Neuron database, both well-established labor market databases. (*Id.* at 21-22.) Ms. Wexler's refinement included job title key words (such as "chief Compliance Officer," "General Counsel," "Corporate Counsel," and "Assistant General Counsel") and geographic region. (*Id.* at 22.) The results were further refined to ensure that the identified jobs were applicable to Plaintiff's qualifications. (*Id.*) After such refinement, the search yielded nearly 700 job opportunities for which Plaintiff was qualified to apply during the relevant time period. (*Id.*) Even during the time in which Plaintiff was applying to positions, albeit a shorter time than the full relevant time period, she only applied to 100 jobs, whereas Ms. Wexler identified 201 potential positions during this same period of time. (*Id.*)

Ms. Wexler, in analyzing Plaintiff's job search efforts in light of available opportunities during the same time period, concluded that Plaintiff failed to meet the minimal standards of time, effort, record keeping or decision making required for a diligent and effective job search. (*Id.* at 23.) Ms. Wexler also concluded that if Plaintiff were not hired into an in-house role similar to the one she held at MCHA, she would be a competitive job applicant for law firm roles. (*Id.* at 24.)

# <u>LEGAL STANDARD</u>[1]

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to the expert's opinion if:

> (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ." *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005). Rule 702's first requirement—that the "evidence or testimony will assist the trier of fact to understand the evidence or to determine a fact in issue"— "goes primarily to relevance." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Factors that may bear on reliability include: (1) the theory's testability; (2) whether the expert's theory has been subjected to review; (3) the existence of standards concerning the expert's methodology, and reliance on those standards; (4) the known or potential rate of error in the expert's technique or theory; and (5) whether the technique or theory utilized by the expert has been generally accepted in the scientific community. *Restivo v. Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017). "[N]o single factor is necessarily dispositive of the reliability of a particular expert's testimony . . . ." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

---

[1] Although Plaintiff's brief references Rule 403 in its legal standard section, Plaintiff does not make any Rule 403 argument or even suggest that the admission of the Expert Testimony would pose any of the dangers identified in Rule 403.

"Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Cohalan v. Genie Indus., Inc.*, No. 10-CV-02415, 2013 WL 829150, at *5 (S.D.N.Y. Mar. 1, 2013) (Furman, J.) (*quoting Bacardi & Co. v. N.Y. Lighter Co.*, No. 97-CV-07140, 2000 WL 298915, at *2 (E.D.N.Y. Mar. 15, 2000)). "[E]xclusion [of expert testimony] remains the exception rather than the rule." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-02543, 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (Furman, J.). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *New York City Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 445 (S.D.N.Y. 2022) (Furman, J.) (*quoting Daubert*, 509 U.S. at 596).

## **ARGUMENT**

*First*, rather than "enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence," Plaintiff improperly addresses the weight of Mr. Staller and Ms. Wexler's findings. *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). To the extent Plaintiff seeks to challenge the opinions or any of the findings in the Expert Testimony, she may cross-examine each expert at trial. *See Express Scripts*, 588 F. Supp. 3d at 445.

*Second*, Plaintiff begins her argument by citing to Rules 401 and 402 of the FRE and essentially recites the FRE's definition and requirement for relevance as it relates to the admissibility of evidence. (*See* Plaintiff's Memorandum of Law in Support of Plaintiff's Motions *In Limine* to Exclude the Testimony of Chad L. Staller and Rona Wexler ("Pl.'s Mem.") at 3.) However, Plaintiff does not make any substantive argument pertaining to the relevance of the

Expert Testimony. The Expert Testimony is undoubtedly relevant here. An employee purportedly subject to discriminatory discharge must mitigate her damages. *See, e.g.*, *Dailey v. Société Générale*, 108 F.3d 451, 455 (2d Cir. 1997). The duty to mitigate requires the discharged employees to "'use reasonable diligence in finding other suitable employment,' which need not be comparable to their previous positions." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998) (*quoting Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982)). The expert opinions of Mr. Staller and Ms. Wexler both bear directly on whether or not Plaintiff demonstrated reasonable diligence in working to mitigate her damages, and are therefore relevant.

Instead, Plaintiff focuses on questioning the reliability of the Expert Testimony. Plaintiff baselessly challenges Ms. Wexler's qualifications as an expert to provide her opinion. (Pl.'s Mem. at 23-25.) However, as set forth herein, Mr. Staller and Ms. Wexler are each indisputably qualified, and each used established methodologies in reaching their respective conclusions that Plaintiff did not conduct a reasonable job search and that if she had, she would have been expected to find employment within six to nine months. Plaintiff fails to make any valid argument as to why the Expert Testimony should be excluded. Rather, for the reasons set forth below, the Expert Testimony satisfies Rule 702 and each *Daubert* factor.

## I.      Mr. Staller and Ms. Wexler Are Both Qualified

Plaintiff does not dispute that Mr. Staller is qualified to offer his testimony (*see* Pl.'s Mem. at 8-22), and Plaintiff's argument that Ms. Wexler is unqualified is meritless.

In evaluating an expert's qualifications, courts consider the totality of the expert's background, including education and training. *SEC v. Revelation Capital Management*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016). Courts then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Id.* (citations omitted). "Courts within the Second Circuit liberally construe the expert

qualification requirement." *Alves v. Affiliated Care of Putnam, Inc.*, No. 16-cv-1593, 2022 WL 1002817, at *6 (S.D.N.Y. Mar. 30, 2022).

Ms. Wexler is the President and Founder of Wexler Vocational and Career Consulting LLC, and has spent two decades as a vocational evaluator, career advisor, and employability expert. (Wexler Report at 3.) She is a Diplomate of the American Board of Vocational Experts ("ABVE"), the only professional credentialing board in North America for vocational experts. (*Id.*) Ms. Wexler also has prior experience as an expert, including testifying in this District. (*Id.*) Further, Ms. Wexler's credentials as a vocational and employability expert align with the findings regarding Plaintiff's employability, earning capacity, job search diligence, and labor market analysis she sets forth in her report.

Plaintiff's arguments about Ms. Wexler's background and experience *before* her twenty years as a vocational expert say nothing about the qualifications she *does* have to offer her opinions. (Pl.'s Mem. at 23-24.) Plaintiff also challenges Ms. Wexler's ABVE Diplomate designation, but states nothing other than that it is not clear to Plaintiff how she obtained her title as, according to Plaintiff, she does not possess the requisite skills. (*See* Pl.'s Mem. at 23-24.) Plaintiff does not explain her reasoning to support such a conclusion.

Contrary to Plaintiff's unsupported conclusion regarding Ms. Wexler's qualifications, she in fact received the extensive training required to receive an ABVE Diplomate designation. (Wexler Declaration ¶¶ 7-12.) Ms. Wexler was required to have specific training and experience in assessment, vocational rehabilitation and evaluation, psychological testing, job analysis and placement, labor market surveys, and job site analysis. (*Id.* ¶ 9.) She was also required to have experience providing testimony in one of those areas. (*Id.*) Furthermore, prior to receiving her ABVE Diplomate designation, Ms. Wexler was required to demonstrate her knowledge and

expertise through peer review of a forensic work product. (*Id.* ¶ 10.) All Diplomates, including Ms. Wexler, must pass the ABVE examination and show seven years of documented experience as a vocational expert to receive the ABVE Diplomate designation. (*Id.* ¶ 11.) Ms. Wexler met all of these requirements. (*Id.* ¶ 12.)

After an extensive peer review process, the ABVE determined that Ms. Wexler satisfied the requirements to attain the title of ABVE Diplomate. (*Id.*) Plaintiff's challenge to that status, and further as a vocational expert, is devoid of any substantive support. Accordingly, Ms. Wexler is qualified.

## II.  Mr. Staller and Ms. Wexler Reliably Applied Reliable Principles and Methods

### A.  Mr. Staller's Methods Are Reliable and Were Reliably Applied

Mr. Staller used two data sources when analyzing relevant data and formulating his expert opinion, namely the Bureau of Labor Statistics ("BLS"), and Forensic JobStats. (Staller Declaration ¶ 18.) Mr. Staller also relies on certain job-search requirements set by the DOL. (*Id.* ¶ 30.) Each of these sources has been recognized as accurate and reliable within the field of labor economics. (*Id.* ¶ 18.) Plaintiff attempts to undermine Mr. Staller's use of these sources by misrepresenting their use.

First, the DOL job search requirements used in the Staller Report were included only to establish the minimum level of effort for an employment search set by the state government. (*See* Staller Declaration ¶ 30.) The DOL provides the only quantitative standard for minimum job search requirements in New York. (*Id.*) This standard was not used, as Plaintiff seems to argue, to suggest that Plaintiff should have applied for jobs far below her qualification range. Plaintiff's arguments that the DOL requirements analyzed by Mr. Staller are irrelevant and that Defendants are collaterally estopped from arguing that Plaintiff failed to meet these requirements due to a previous finding that she was eligible for unemployment benefits are unconvincing, as Plaintiff's eligibility

for unemployment benefits is not contested or relied upon in the Expert Testimony. Furthermore, Defendants do not advance any argument as to Plaintiff's eligibility for unemployment. Instead, Mr. Staller uses the DOL requirements as an objective standard against which to compare Plaintiff's job search efforts.

Second, Plaintiff attempts to discredit underlying categories used by Mr. Staller in his analysis of BLS data, comparing it to the data used by Mr. Staller's colleague, Charles L. Sodikoff, in *Roniger v. McCall*, No. 97-cv-08009, 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000). However, in *Roniger*, Mr. Sodikoff incorporated data points that were too broad, including those on all workers over the age of 25, instead of those related more specifically to the plaintiff. *Id.* at *3. Mr. Staller, by contrast, did appropriately limit the data points, narrowing them by Plaintiff's gender, age, occupational group, and industry group. (Staller Report at 5; Staller Declaration ¶ 26.) The BLS provides reliable government data.

Lastly, Plaintiff attempts to discredit the Forensic JobStats database. (Pl.'s Mem. at 16.) Plaintiff relies most heavily on *Speights v. Arsens Home Care Inc.*, wherein a portion of an expert report was struck as unreliable in part because the experts, one of whom was Mr. Staller, did not explain the use of the data in reaching their ultimate conclusion. 2020 WL 6343263, *6 (E.D. Pa. Oct. 28, 2020). The court in *Speights* found the data to be unreliable because there was no explanation of "how this database was created or from where the information in the database is drawn." *Id.*

In contrast, here, the Staller Declaration provides that the listings obtained from Forensic JobStats are compiled from the Gartner TalentNeuron database. (Staller Declaration ¶ 23.) Gartner, a global research and advisory firm, provides data and consulting services to thousands of clients worldwide. (*Id.* ¶ 24.) The Gartner database covers over ten years of advertisements from

over 15,000 sources, and includes job title, occupation, employer, geographic location, industry, source, publication date, and full text of the advertisements. (*Id.*) Furthermore, each listing contains a URL with the source of the advertisement, confirming that the listing was available to be viewed by potential job seekers at the time it was recorded. (*Id.*) Mr. Staller has performed this type of confirmation and cross-checking in previous matters he has worked on, ensuring the jobs posted on Forensic JobStats were actually posted to accept applications. (Staller Declaration ¶ 25; Staller Dep. 133:7-134:24.)

The court in *Speights* did not reject expert testimony based on any inherent flaw in the Forensic JobStats database, nor did it find the database unreliable on a fundamental level. Instead, the court was not provided the information necessary to assess the reliability of the database. The necessary information provided here concerning the source of the underlying information renders Forensic JobStats a reliable source of information.

Furthermore, Mr. Staller submitted here a detailed analysis explaining his application of the DOL, BLS, and Forensic JobStats data to Plaintiff's documented job search efforts, and formulated his expert findings based upon his experience as a labor economist. (Staller Report at 8-9; Staller Declaration ¶¶ 41-42.) As discussed above, both the BLS and Forensic JobStats data sources used are reliable sources within the field of labor economics. Mr. Staller's application of those data sources remains consistent with economic theory and principles. (Staller Declaration ¶ 19.) Mr. Staller provides a collective analysis of the minimum quantitative standard of job search effort as required by the DOL, the duration of unemployment for similar individuals to Plaintiff as tabulated by the BLS, and the systematic search of potential employment opportunities from Forensic JobStats to provide a benchmark analysis. (Staller Declaration ¶¶ 41-42.) Mr. Staller's comparison of Plaintiff's performance in her job search efforts against the standard set by the DOL

is a common practice in labor economics. (Staller Declaration at 8 n.19.)

Mr. Staller used his experience and knowledge as a labor economist to apply standard principles to widely accepted sets of data. Specifically, Mr. Staller used BLS data to establish the number of individuals employed as lawyers in Plaintiff's geographic area, then searched for the duration of unemployment experienced by those with characteristics similar to Plaintiff (women; age 45 to 54; management, professional and related occupations; and manufacturing). (Staller Report at 5.) These criteria allowed Mr. Staller to establish the mean period of unemployment for individuals similar to Plaintiff. (*Id.*)

Mr. Staller also used the Forensic Jobstats data to gather potential employment opportunities that existed for Plaintiff. He set parameters based on date range, occupation, title, and geographic area, further filtering results to ensure an accurate pool of potential positions. (*Id.* at 5-7.) Mr. Staller then used these data points as points of comparison for Plaintiff's established job search activities. (*Id.* at 8.) The use of these data points in combination with each other, as compared to Plaintiff's job search efforts, constitutes a benchmark analysis, which is common practice in the field of economics. (*Id.* at 8; Staller Declaration at 8 n. 19.)

To be sure, despite Plaintiff's representations, experts applying Mr. Staller's methodology have testified in many matters at the federal court level. (Staller Declaration ¶¶ 13-15.) Based on Mr. Staller's extensive and detailed explanation of the statistical databases used, and the analysis he performed to reach his conclusions, it cannot be argued that his methodology is not reliable.

**B.  Ms. Wexler's Methods Are Reliable and Were Reliably Applied**

The VRA Model and its underlying methods have been well established and widely recognized. (Wexler Report at 6 n. 7-9.) Plaintiff does not directly contend otherwise, at most noting that the VRA Model was "originally developed for determining whether injured or disabled workers could find jobs in new field . . . ." (Pl.'s Memo of Law, p. 24 (*citing* Wexler Dep. Tr.

85:10-86:5).) This alone is insufficient to support any assertion that the use of the VRA Model is not generally accepted.

As articulated in the Wexler Report, the VRA Model is a standardized, systematic vocational evaluation method. (Wexler Report at 5.) The original peer-reviewed publication of the VRA Model established its core domains through empirical analysis of existing forensic assessment models. (Wexler Declaration ¶ 34.) The authors of that publication made clear that the objective of developing the VRA Model was for application in forensic settings. (*Id.*) It is well established that the VRA Model assesses a wide scope of information to form a forensic opinion about an individual's capacity to participate in the labor market. (*Id.*) Certain domains that are inapplicable to any given analysis, such as injury-related restrictions in the present case, are simply not considered. *Id.*

In conducting her evaluation of Plaintiff, Ms. Wexler reviewed litigation documents, identified Plaintiff's proficiencies and skills, performed a transferable skills analysis, performed an employability analysis to include labor market research, and analyzed Plaintiff's job search efforts. (Wexler Report at 5-6.) The VRA Model has been recognized as one of the most widely referenced vocational rehabilitation models, has been widely published in peer-reviewed literature, and is generally accepted by the professional community. (Wexler Report at 6.) The use and acceptance of the VRA Model dates back over thirty years, further illustrating its reliability.

As the VRA Model is undoubtedly reliable and generally accepted, Plaintiff attempts to discredit Ms. Wexler's use of the methodology in her analysis of Plaintiff's job search, arguing that Ms. Wexler did not use each of the steps provided in the VRA Model. (Pl.'s Mem at 26.) Even if this argument had merit—and it does not—it would speak to the weight of Ms. Wexler's testimony rather than its admissibility. To be sure, "a slight modification of an otherwise reliable

method does not itself require exclusion." *SEC v. Lek Securities Corporation*, 370 F. Supp.3d 384, 404 (S.D.N.Y. 2019). Instead, Plaintiff will have the opportunity at trial to cross-examine Ms. Wexler as to the methods she used and any supposed deviation from the VRA Model. *See id.* (noting that the adversary system provides the proper forum for challenging expert testimony that is reliable, but debatable).

In any event, Ms. Wexler had good reason to include only five of the fourteen steps required by the VRA Model. That is, only the five steps conducted were necessary to form her opinion regarding Plaintiff's job search efforts. (Wexler Declaration ¶¶ 16-18.) Plaintiff, lacking expertise in the VRA Model, confounds its three distinct operational modules. (*Id.* ¶ 18.) It is also well established that not every data domain will apply in every case, and those found not to apply are intentionally left out of the analysis. (*Id.* ¶ 18.) Plaintiff's disagreement with how Ms. Wexler used an established method for vocational analysis is not grounds to exclude admissible evidence.

**C. Mr. Staller's and Ms. Wexler's Use of Methodologies Other Than Industrial Organizational Psychology Does Not Render the Expert Testimony Unreliable or Otherwise Inadmissible**

In another attempt to obfuscate the expert testimony analysis, Plaintiff writes at length about Industrial Organizational ("I-O") psychology. (Pl.'s Mem. at 19-20, 24, 30.) I-O psychology is another method of job analysis, and the method seemingly preferred by Plaintiff. However, despite every opportunity to produce her own expert to conduct her preferred job analysis, Plaintiff failed to do so. To now argue that the established methodologies used by Mr. Staller and Ms. Wexler to develop the Expert Testimony here are somehow less reliable, simply because another method for performing the analysis exists, is grossly insufficient. Any methodology other than those used by Mr. Staller and Ms. Wexler are irrelevant for purposes of deciding whether their testimony is admissible.

## III.    Plaintiff's Other Arguments Are Also Meritless

Plaintiff's hodgepodge of additional arguments seeking to exclude portions of the Expert Testimony should also be rejected.

### A.    Mr. Staller's Opinions Do Not Improperly Reach an Ultimate Issue[2]

Plaintiff's arguments that Mr. Staller's first, third, and fourth opinions should be excluded because they improperly reach ultimate issues are meritless. (*See* Pl.'s Mem. at 11 (first and fourth opinions), 22 (third opinion).)[3] The Federal Rules of Evidence provide that "[a]n opinion is *not* objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a) (*emphasis added*). Indeed, experts may testify as to ultimate issues so long as they do not state legal conclusions. *See United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000).

As to Mr. Staller's first and fourth opinions, Plaintiff admits that they address "fact" rather than legal questions. (*See* Pl.'s Mem. at 11 (arguing that Mr. Staller's first and fourth opinions should be excluded because they "improperly reach[ ] one of the ultimate *fact* questions to be resolved at trial" (*emphasis added*)).) These opinions are admissible.

Finally, although Plaintiff labels Mr. Staller's third opinion as a "legal conclusion," it plainly addresses factual rather than legal issues. (Pl.'s Mem. at 22.) Whether Plaintiff experienced "an ongoing or permanent loss of earnings or earning capacity" and was able to "function as an attorney in the labor market" after her termination are factual issues, and Plaintiff concedes as much by arguing that these conclusions are "flatly *contradicted* by the undisputed facts of this case." (Pl.'s Mem. at 21 (*emphasis in origina*l).)

---

[2] Plaintiff does not even attempt to argue that Ms. Wexler's report and testimony reaches an ultimate issue, but the arguments detailed in this subsection would apply to Ms. Wexler as well.

[3] Plaintiff makes no such argument regarding Mr. Staller's second opinion.  (*See* Pl.'s Mem. at 15-20.)

**B.     The Expert Testimony Does Not Simply Address Lay Matters**

Plaintiff's argument that the Expert Testimony should be excluded because it addresses only lay matters is incorrect. (*See* Pl.'s Mem. at 12, 25-26.) Plaintiff argues that "courts or juries do not need an expert explaining counts and percentages to them." (*Id* at 12.) However, the Expert Testimony here is more than mere counts and percentages. Mr. Staller provides context on the labor market that existed for Plaintiff, as compared to the job search exercised by Plaintiff. (Staller Declaration ¶ 22.) Ms. Wexler likewise uses a vocational assessment model not known to the general public to assess Plaintiff's job search efforts and earnings potential; just because certain components of the process may be less complex than in other circumstances, does not mean that the expert provides no value to the jury. (Wexler Declaration ¶¶ 13-15; Staller Declaration ¶¶ 22, 41.)

**C.     Plaintiff's Lack of a New York Law License Does Not Mean That She Could Not Get a Suitable Job in New York**

Plaintiff argues that both Mr. Staller's and Ms. Wexler's testimony should be excluded because they "fail[] to consider" that Plaintiff was not licensed to practice law in New York at the time of her termination but rather, was only temporarily licensed as in-house counsel. (Pl.'s Mem. at 2, 21, 27.) Plaintiff argues that no jobs in the New York or New Jersey area should have been considered as job prospects since she was not licensed in those states. Even if this argument had any merit, and it does not, it would go to the weight of the Expert Testimony rather than its admissibility. *See, e.g.*, *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-08086, 2013 WL 5658790, at *14 (S.D.N.Y. Oct. 17, 2013) (Furman, J.) (rejecting *Daubert* motion "principal[ly] objecti[ng]" that an expert "failed to account for" a factor because those objections went "more to weight than to admissibility"). Moreover, this argument has the very obvious flaw that she obtained employment with MCHA while not officially licensed to practice law in New York. Just

as Plaintiff qualified for an in-house counsel license many years ago, she is even more qualified to be granted such a license now. Furthermore, nothing prevented Plaintiff from pursuing admission to the New York or New Jersey bars, and law firms frequently give new hires (*e.g.* recent law school graduates) the opportunity to seek admission to the bar during their initial period of employment. It is only logical that such firms would have been more willing to do so for Plaintiff given her extensive legal experience. Additionally, Plaintiff focused her own job search on New York opportunities. To now argue that additional opportunities in the same geographic location where she planned to reside are not legitimate job prospects, defies logic. Both the Staller Report and the Wexler Report appropriately considered sufficiently narrowed job opportunities in the New York region.

### D. Plaintiff's Disagreements with or Hypothetical Scenarios Concerning the Expert Testimony Are Insufficient

It should be noted that throughout Plaintiff's motion, she invokes a plethora of hypothetical scenarios that serve only to confuse the key considerations. First, these hypotheticals are plainly irrelevant. Mr. Staller and Ms. Wexler analyzed the information and job search efforts Plaintiff claimed to have done. Any hypothetical regarding information outside of the analyzed set of data, if proper at all, would be more appropriate during cross-examination. Such hypotheticals do not undermine the reliability of either report, as the information contained in the many hypotheticals Plaintiff poses could not have been incorporated into the reports themselves. This would include Plaintiff's argument that Ms. Wexler failed to consider Plaintiff's testimony in her report. (Pl.'s Mem. at 28). To be clear, the Wexler Report was submitted prior to Plaintiff's deposition, so any testimony provided by Plaintiff that expanded upon the job search efforts detailed in her discovery responses could not have been incorporated. (Wexler Declaration ¶ 31.) Critically, after reviewing the testimony cited by Plaintiff that she alleges should have been considered, Ms. Wexler's expert

opinion regarding the diligence of Plaintiff's job search remains unchanged.  (*Id.*)

Similarly, Plaintiff's disagreement about what parameters or job search criteria should have been used in the Expert Testimony can be addressed on cross-examination.  The Expert Testimony, and the foundational methods, are no less reliable simply because Plaintiff disagrees with them.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny in its entirety Plaintiff's motion to exclude the report and testimony of Mr. Staller and Ms. Wexler.  To the extent the Court determines any statements in Mr. Staller's or in Ms. Wexler's report are inadmissible, Defendants respectfully request that the Court permit the entry in evidence of the remainder of the Expert Testimony.

Dated: New York, New York
December 2, 2022

Respectfully submitted,

GORDON REES SCULLY MANSUKHANI, LLP

/s/ *Mercedes Colwin*
Mercedes Colwin
Brittany L. Primavera
1 Battery Park Plaza, 28th Floor
New York, New York 10004
Telephone: (212) 269-5500
mcolwin@grsm.com
bprimavera@grsm.com

*Attorneys for Defendants Mitsubishi
Chemical Holdings America, Inc., now
known as Mitsubishi Chemical
America, Inc., Donna Costa, and Nicholas
Oliva*

SHEARMAN & STERLING LLP

/s/ *Jerome S. Fortinsky*
Jerome S. Fortinsky
Nikolai Krylov
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
jfortinsky@shearman.com
nik.krylov@shearman.com

George Anhang
401 9th Street, N.W.
Suite 800
Washington, DC  20004
Telephone: (202) 508-8000
george.anhang@shearman.com

*Attorneys for Defendant Mitsubishi
Chemical Holdings Corporation, now
known as Mitsubishi Chemical Group
Corporation*


CLARICK GUERON REISBAUM LLP

/s/ *Nicole L. Gueron*
Nicole L. Gueron
220 Fifth Avenue
New York, New York  10001
Telephone: (212) 633-4310
ngueron@cgr-law.com

*Attorneys for Defendant Donna Costa*