**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JENNIFER S. FISCHMAN,

                    Plaintiff,

    v.

MITSUBISHI CHEMICAL HOLDINGS
AMERICA, INC., MITSUBISHI CHEMICAL
HOLDINGS CORP., DONNA COSTA, and
NICHOLAS OLIVA,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No.: 18-CV-08188 (JMF)


## <u>MEMORANDUM OF LAW IN OPPOSITION TO<br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>


**VALLI KANE & VAGNINI LLP**

Robert J. Valli, Jr.
rvalli@vkvlawyers.com
Sara Wyn Kane
skane@vkvlawyers.com
Matthew L. Berman
mberman@vkvlawyers.com
600 Old Country Road
Garden City, New York 11530
Tel: (516) 203-7180
Fax: (516) 706-0248
*Attorneys for Plaintiff*

# <u>Table of Authorities</u>

Cases

*Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992) ..................................... 22

*Conahan v. MedQuest Ltd.*, 2022 WL 16748585, at *6 (S.D.N.Y. Nov. 7, 2022)........................ 5

*Corning Glass Works v. Brennan*, 417 U.S. 188, 207 (1974)....................................................... 23

*E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d, 816, 832 (S.D.N.Y. 2013)....................................... 4

*Fenner v. News Corp.*, No. 09 Civ. 09832, 2013 WL 6244156 at *18 (S.D.N.Y. Dec. 2, 2013)  11

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ....................................... 18

*Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ........................................................ 5

*Halkitis v. New York City Department of Education*, 2022 WL 392911 , at *5 (S.D.N.Y. Feb. 9,
     2022) ........................................................................................................................................ 13

*Hamburg v. NYU Sch. of Medicine,* 155 A.D.3d 66, 72-73 (1ˢᵗ Dep't 2017) ............................. 11

*Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) ......................................................... 4

*Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 512 (S.D.N.Y. 2014) ............................... 4

*Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014).......................................... 18

*Lavin-McEleny v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001)......................................... 21

*Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019) .......................................................... 24

*Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) ....................................................... 18

*Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)................................................... 8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................................................ 4

*McHenry v. Fox News Network, LLC*, 510 F.Supp.3d 51, 68 (S.D.N.Y. 2020) .......................... 25

*Mirna Martinez Santiago v. ACACIA Network, Inc.,* 2022 WL 6775835 *7 (S.D.N.Y. Oct. 10,
     2022) ........................................................................................................................................ 21

*Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) ................................................ 15

*Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n. 2 (2d Cir.2010) .................... 4

Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 n. 2 (2d Cir.2010)), ................ 11

*Williams v. Regus Mgmt. Grp., LLC,* 836 F. Supp. 2d 159, at 170-171 (S.D.N.Y. 2011)............. 5

*Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013)........................................ 18

Statutes

29 U.S.C. § 206(d)(1)(iii) ............................................................................................................. 22

*Husser v. NYC DOE*, 137 F.Supp.3d 253, 269 (E.D.N.Y. 2015) ............................................... 22

N.Y. Exec. Law § 296(6) ............................................................................................................. 25

N.Y.C Admin. Code § 8-107(6)................................................................................................... 25

Treatises

Deborah Thompson Eisenberg, *Shattering the Equal Pay Act's Glass Ceiling*, 63 SMU L. Rev.
     17................................................................................................................................................ 23

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 1

SUMMARY JUDGMENT STANDARD ....................................................................................... 4

I.    Genuine Issues Of Material Fact Preclude Summary Judgment on Plaintiff's Gender Discrimination Claims Under Title VII, the NYSHRL, and the NYCHRL ................................... 4

  A   Legal Standard For Discrimination Claims Under *McDonnell Douglas* ............................ 4

  B   Plaintiff's *Prima Facie* Case ................................................................................. 5

     1   Plaintiff was Qualified for the GC Position .................................................... 5

     2   Plaintiff has Presented Evidence of Circumstances Giving Rise to an Inference of Discrimination ................................................................................................. 7

  C   Defendants' Proffered Legitimate Business Reasons are Pretextual ................................. 11

     1   Failure to Promote Plaintiff to GC .............................................................. 11

     2   Demotion of Plaintiff to Assistant GC .......................................................... 12

     3   Termination of Plaintiff's Employment ......................................................... 15

II.   Genuine Issues Of Fact Preclude Summary Judgment on Plaintiff's Retaliation Claims .... 17

  A   Legal Standard ............................................................................................... 17

  B   Plaintiff's Investigation Into Yoshisato ................................................................. 18

  C   Plaintiff's Complaints Regarding Discriminatory Severance Practices ........................... 20

  D   Plaintiff's Complaints Regarding Her Own Disparate Treatment ................................... 20

  E   Admissible Evidence Demonstrates a Causal Connection Between Plaintiffs' Protected Activity and the Adverse Employment Actions She Sustained ............................................... 21

III.  Defendants' Affirmative Defenses to Compensation Discrimination Must Fail .............. 21

  A   Legal Standards Applicable to Plaintiff's Federal and State EPA Claims ........................ 21

  B   Application of These Legal Standards for EPA Claims .................................................. 22

  C   Defendants' "Factor Other Than Sex" Defense Fails ....................................................... 22

  D   Legal Standards Applicable to Title VII, NYSHRL, and NYCHRL Pay Discrimination Claims ......................................................................................................... 24

IV.  Plaintiff's Aiding and Abetting Claims Against Ms. Costa and Mr. Oliva Under The NYSHRL And The NYCHRL Should Not Be Dismissed ........................................................ 25

CONCLUSION ................................................................................................................. 26

## PRELIMINARY STATEMENT

In her First Amended Complaint ("FAC," Dkt No. 89), Plaintiff Jennifer S. Fischman ("Plaintiff") alleges that Mitsubishi Chemical Holdings America, Inc. ("MCHA), Mitsubishi Chemical Holdings Corporation ("MCHC"), Donna Costa ("Costa"), and Nicholas Oliva ("Oliva") (collectively, "Defendants") discriminated against her because of her gender. Specifically, Plaintiff alleges that Defendants failed to promote her to General Counsel and Chief Compliance Officer ("GC") of MCHA and instead named her the "Acting" GC, demoted her in favor of a man, Oliva, and then wrongfully terminated her. Plaintiff also alleges that Defendants engaged in pay discrimination by paying her less than Oliva. Plaintiff further alleges that Defendants retaliated against her for her participation in a sexual harassment investigation and her complaints about gender discrimination within MCHA and MCHC.

For the reasons set forth in this memorandum of law, the court should dismiss Defendants' motion for summary judgment in its entirety. Plaintiff has provided evidence, both documentary and testimonial, to support each of her claims. Contrary to Defendants' arguments, the material facts in this case are hotly in dispute. Ultimately, much of this case boils down to "he said, she said." Thus, a jury should be allowed to decide the facts at issue.

## STATEMENT OF FACTS

Plaintiff graduated from Boston University School of Law, a top-25 law school, and then began her legal career clerking for a federal judge. Ex. 1;[1] Ex. J,[2] 84:13-15. She then worked as a corporate and litigation attorney at the law firms Fried, Frank, Harris, Shriver & Jacobson LLP, Paul Hastings LLP, and Jeffer Mangels Butler & Mitchel LLP. Ex. 1. For the next seven years, she

---

[1] Numbered exhibits refer to exhibits attached to the Declaration of Matthew Berman filed herewith.
[2] Lettered exhibits refer to exhibits attached to the Declaration of Mercedes Colwin, ECF Dkt. 138.

worked in-house as Legal Counsel at Raytheon Company. *Id.* Finally, in 2008, MCHA hired Plaintiff to the "Corporate Counsel" position. *Id.*

Plaintiff earned stellar performance reviews at MCHA. From 2009 through 2014, Costa, then MCHA's GC, gave Plaintiff overall ratings of "Exceeds Expectations." Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. EE. Plaintiff earned a promotion to Assistant GC in 2013, based in part on the "level of trust and respect she has earned both inside and outside MCHA." Ex. 5. In the 2014 review, dated April 29, 2015, Costa praised Plaintiff's communication skills, her ability to handle various complex matters, her "excellent judgment," and her ethics. Ex. EE.

In December 2014, Costa informed Plaintiff that Costa was being promoted from GC to President of MCHA, Ex. A, and that Plaintiff would be elevated to the position of Acting GC effective April 1, 2015. Ex. J, 76:9-22. Further, Costa made it clear that Plaintiff would not be elevated to the full GC position. Ex. J, 600:13-24. Instead, Costa implied that she did not have the "political capital" to promote Plaintiff – a woman – to GC. *Id.* 245:2-5. This was confirmed when, in April 2015, Plaintiff spoke with Bill Radlien and Dennis Trice, of Mitsubishi Polyester Film, who each (separately) stated that Ms. Costa had "expended all of her political capital" on her own promotion and that there was "no way" Defendants "were going to let two women run that business." *Id.* 245:6-14; 248:9-19. Plaintiff objected to not being given the full "GC" title and complained to Pat Saunders ("Saunders"), of HR, that this was unlawful gender discrimination. Ex. J, 386:4-20; 423:9-11. Defendants had not promoted anyone to an "acting" position before. Ex. 7 64:24-65:6. Nevertheless, Defendants insisted upon putting Plaintiff into an "acting" position, despite her qualifications.

Sometime in the Fall of 2014, before Plaintiff was named Acting GC, Plaintiff investigated sexual harassment complaints against Yoshisato, MCHA's president at the time. This investigation

involved asking him extremely personal questions. She testified that he did not later support her promotion to GC out of retaliation for her participation in the investigation. Ex. J, 95:8-19.

On November 30, 2015, Plaintiff was demoted to *Assistant* GC and replaced with a man, Oliva, who was named GC. Ex. 8. In a November 2015 mid-year evaluation of Plaintiff that ostensibly explained the demotion, and in stark contrast to her 2014 review, Costa criticized Plaintiff's inter-personal skills and falsely accused Plaintiff of being unwilling to work with Costa. Ex. 8. On the contrary, Plaintiff regularly reached out to Costa for advice on the job but felt that Costa had no interest in speaking with Plaintiff. *See* Ex. 9, 10, 11; Ex. J, 678:5-8. Costa's review listed five alleged incidents which purportedly justified the demotion. Ex. 8. Plaintiff testified at length describing the factual inaccuracies underlying each incident. *See generally* Ex. J, 671-82.

Meanwhile, Oliva, a male selected to replace Plaintiff as GC, was objectively less qualified than she was. He went to a less prestigious law school, had fewer years of experience both at MCHA and as an attorney, and never clerked or worked in private practice. Ex. 12. Further, unlike Plaintiff, Oliva lacked litigation and transactional experience, which were requirements for the GC position. Ex. CC; Ex. F, 90:22-91:6, 104:24-105:7, 106:3-4, 229:18-230:3; Ex.1. Defendants paid Oliva more for his work as GC than they paid Plaintiff for her work as Acting GC. *Compare* Ex. F, 69:11-15 (noting Oliva's $325,000 base salary) *with* Ex. G, 131:13-23 (noting Plaintiff's $300,000 base salary).

In March 2016, Plaintiff reported to Oliva her belief that MKIC, an MCHC subsidiary, was discriminating against a former female employee, Amber Todd ("Ms. Todd"). Ex. J, 442:6-8. She described how MCHC had provided Ms. Todd's husband, also a MCHC employee, a severance but refused to give one to Ms. Todd. *Id.* Oliva became "very angry" with Plaintiff after her complaint, and, "within the month," Oliva gave plaintiff a "Needs Improvement" rating for her

"communication skills" in a performance review. *Id.* Plaintiff had never received a "Needs Improvement" rating on a performance review before. Ex. J, 282:4-10, 638:3-8.

On January 30, 2017, Oliva fired Plaintiff. Ex. J, 565:14-17. Oliva accused Plaintiff of making an unauthorized $2.3 million settlement demand in the Genomatica litigation on behalf of the client, Mitsubishi Chemical Corporation ("MCC"). However, as Plaintiff testified, Oliva authorized Plaintiff to make the demand. Ex. J, 576-77.

### SUMMARY JUDGMENT STANDARD

The standards applicable to motions for summary judgment are well settled and need not be restated here. However, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Johnson v. IAC/Interactive Corp.,* 2 F. Supp. 3d 504, 512 (S.D.N.Y. 2014). Direct evidence of discriminatory intent will "rarely be available," and thus the "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (internal quotations omitted).

I.  **Genuine Issues Of Material Fact Preclude Summary Judgment on Plaintiff's Gender Discrimination Claims Under Title VII, the NYSHRL, and the NYCHRL**

A  Legal Standard For Discrimination Claims Under *McDonnell Douglas*

Familiarity with the three-stage framework for analyzing employment discrimination cases under Title VII and the NYSHRL[3], established under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), is presumed (plaintiff must establish a *prima facie* case, defendant may rebut it with a legitimate business reason, which plaintiff may rebut with evidence of pretext).

---

[3] "[C]laims asserted under Title VII and the NYSHRL are analyzed pursuant to the same standard; therefore, analysis of identical claims brought by an individual under both of these laws can be performed in tandem." *E.E.O.C. v. Bloomberg L.P.,* 967 F.Supp.2d, 816, 832 (S.D.N.Y. 2013) (citing *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n. 2 (2d Cir.2010)).

Claims asserted under the NYCHRL are assessed under a similar standard, but must be construed more broadly in favor of plaintiffs, as explained in *Conahan v. MedQuest Ltd.*, 2022 WL 16748585, at *6 (S.D.N.Y. Nov. 7, 2022) (Courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'") (internal citations omitted). While "claims under the NYCHRL are more liberally construed than claims under Title VII ..., the NYCHRL does not alter the kind, quality, or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Williams v. Regus Mgmt. Grp., LLC,* 836 F. Supp. 2d 159, at 170-171 (S.D.N.Y. 2011).

B    Plaintiff's *Prima Facie* Case

Only the second and fourth elements of Plaintiff's *prima facie* gender discrimination claims (that she was qualified, and that her circumstances raise the inference of discrimination) are in dispute, because Defendants do not contest the first and third elements.[4] Thus, Plaintiff's claims withstand summary judgment if she can demonstrate that there are genuine disputes of material fact such that a jury can find in her favor concerning the second and fourth elements of her gender discrimination claims: *i.e.* that she was qualified for the full GC position and that she was passed over and demoted from the Acting GC position under circumstances raising the inference of discrimination. The fourth element can be established by showing less favorable treatment compared to similarly situated persons outside of plaintiff's protected class. *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000).

1    Plaintiff was Qualified for the GC Position

---

[4] Plaintiff is a member of a protected class (female); she was denied a promotion (to the full GC position) and was demoted (from Acting GC back to Assistant GC); she was paid less than Oliva; and she was terminated. Def. Mot. 4, 8, 21, 24-25. Note that Defendants do not use the term"demotion," but instead claim that Plaintiff was "returned" to the Assistant General Counsel position. Def. Mot. 8. The practical effect was the same as a demotion.

Defendants argue that Plaintiff was not qualified for the GC position. Def. Mot. 18. To the contrary, Plaintiff has presented significant evidence detailing her qualifications for the position. From 2009 through 2014, Costa gave Plaintiff an overall rating of "exceeds expectations" on her annual performance reviews. Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. EE. Plaintiff's 2014 review ranked her as "Outstanding" in the "Job Knowledge" and "Compliance and Ethics" categories. Ex. EE. In that review, given on April 29, 2015, Costa wrote that Plaintiff "consistently demonstrates excellent judgment in providing advice." *Id.* Further, Plaintiff "provides meaningful communication to and is supportive of her clients, her colleagues and the department." *Id.* Costa also wrote that Plaintiff "has demonstrated an ability to handle complex matters at once." *Id.*

Not only did Plaintiff receive years of *glowing* performance reviews, but she also had seven years of experience working for Defendant MCHA at the time of her promotion to Acting GC. Ex. J, 14:15-16:5; Ex. 1. This included five years of experience as "Corporate Counsel" and two years of experience as "Assistant GC." *Id.* Further, in many ways, Plaintiff had more relevant experience at the time of her promotion to Acting GC than Costa had when she had been named GC. For instance, before joining MCHA, Costa did not have any transactional experience. Ex. E, 56:5-9. Nor had she done any patent work. *Id.* 57:25. In contrast, Plaintiff had extensive transactional and patent experience as a corporate associate from her time in private practice, Ex. 1, and from her time at MCHA as corporate counsel and assistant GC. *See* Exs. 2, 3, 4, 5. Costa also did not have any compliance experience, Ex. E, 55:11-20, whereas Plaintiff did. *Id.* 240:18-24.

Before working for Defendant MCHA, Plaintiff had about twelve years of experience as an attorney. This included seven years of in-house experience at Raytheon Company, approximately four years of corporate and litigation experience at large prestigious law firms, and

nearly a year of clerkship experience for a federal judge. *See* Ex.1. Plaintiff also attended a top-25 tier law school, Boston University School of Law. Ex. J, 84:13-15.

Defendants point to Kelli Troccoli's ("Troccoli") criticisms of Plaintiff as evidence that Plaintiff was not qualified for the GC role. Def. Mot. 18-19. Notably, Troccoli is not an attorney. She was a legal assistant about whom Plaintiff had complained to HR, and who Plaintiff felt was bullying and undermining her. Def. Mot. 18; Ex. G, 171:10-18, 176:13-16; Ex. TT; Ex. J, 203:23-204:22. Thus, Troccoli was not in a position to evaluate Plaintiff's performance. At best, her analysis should be afforded little to no weight, and it is a credibility call for the jury to make. Further, the evidence suggests that Costa intentionally solicited negative performance feedback from Troccoli concerning Plaintiff to justify demoting Plaintiff. *See* Ex. PP; Ex. J, 203:22. Notably, none of Plaintiff's colleagues or clients supplied negative feedback concerning her performance during the seven years leading up to Costa's decision to not promote Plaintiff to GC. Defendants throughout their papers suggest that many people complained about or had issues with Plaintiff's performance as Acting GC, yet each example provided refers to Troccoli. *See* Def. Mot 4-6, 18-19. A jury might reasonably conclude that Troccoli's criticisms are tainted, that Costa sought to "paper Plaintiff's file" to justify her preferred and pre-determined decisions, and that Costa played upon Troccoli's animosity toward Plaintiff to accomplish her goals.

Despite Plaintiff's extensive experience at MCHA and elsewhere and her glowing performance reviews, Defendants still maintain that she was undisputedly unqualified. At the very least, Plaintiff's qualification for the GC position is an issue for a jury to decide, and thus summary judgment is inappropriate.

2     Plaintiff has Presented Evidence of Circumstances Giving Rise to an Inference of Discrimination

i     *Oliva was Similarly Situated to Plaintiff*

To raise an inference of discrimination, the plaintiff may show that the employer treated her "less favorably than a similarly situated employee outside [her] protected group." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). The plaintiff must show that she was "similarly situated in all **material** respects" to the comparator. *Id.* (emphasis added). "Ordinarily, the question of whether two employees are similarly situated is a question of fact for the jury." *Id.*

It is undisputed that Oliva (a man) was hired into the full GC position. Nevertheless, Defendants argue that Oliva was not "similarly situated" to Plaintiff, and therefore she cannot point to a male comparator to establish an inference of discrimination. Def. Mot. 16-17. Defendants argue that "[w]hereas Oliva was hired to serve as GC, MCHA promoted Plaintiff only to Acting GC." *Id.* at 16. However, *in the very next paragraph*, Defendants state that Plaintiff "was assigned all of the responsibilities" of the GC role, and that the only aspect of the job she did not enjoy was the "formal title." *Id.* at 17. Thus, Defendants effectively admit that Oliva and Plaintiff were similarly situated in all "material respects." *Mandell*, 316 F.3d at 379. Plaintiff and Oliva performed the same job with the same duties and responsibilities. The only difference between their positions was the formal title (and compensation). Accordingly, a jury could reasonably conclude that Oliva and Plaintiff were "similarly situated" and that Plaintiff was treated less favorably because of her gender, as set forth below. Thus, Defendants' motion for summary judgment should be denied on this point.

ii       *Plaintiff was Treated Less Favorably than Oliva*

Defendants' decision to promote Oliva, an objectively less qualified male candidate, demonstrates that Plaintiff was treated less favorably because of her gender. Unlike Plaintiff, Oliva has never clerked or worked for a private law firm. Ex. 12. When MCHA hired Oliva as GC, he

had not worked at MCHA for several years. When he had worked at the company it was as an *intern* and then as a Corporate Counsel (MCHA's most junior attorney position). *Id.* In contrast, when MCHA named Plaintiff as Acting GC, she already had seven years of experience at MCHA as both Corporate Counsel and Assistant GC. Ex. J, 14:15-16:5. Plaintiff also had worked for two prestigious law firms practicing litigation and corporate law, clerked for a federal judge, and worked at a multinational defense company. Ex. J, 84:13-15, 255:7-19.

The job duties of the GC role supposedly required a minimum of 15 years of legal experience. Ex. CC. Yet at the time of their respective promotions to GC and Acting GC, Oliva only had 11 years of experience, in contrast to Plaintiff's 19 years. Ex. 12; Ex. 1; Ex. J, 14:15-16:5. Further, the job duties of the GC position list "Evaluating pre-litigation issues…overseeing litigation; advising management on litigation strategy." Ex. CC. Oliva testified that he did not have prior experience being primarily responsible for litigation matters. Ex. F, 229:18-230:3. Plaintiff, in contrast, had years of litigation experience. Ex. 1. In the employment realm, Oliva had never supervised an employment law litigation. Ex. F, 90:22-91:6. In contrast, Oliva himself testified that Plaintiff "handled the most employment-related matters" for MCHA and that she had a "significant amount of experience in employment work." Ex. F, 104:24-105:7, 106:3-4. The GC job also required "playing a key role in the review and negotiation of corporate transactions." Ex. CC. Costa identified M&A as a gap in Oliva's background. Ex. F, 56:14-20. In contrast, Plaintiff was "heavy on transactional work" for MCHA, as Oliva testified. Ex. F, 104:24-105:7.

Accordingly, Plaintiff had more overall experience than Oliva, more breadth of experience, and more specific experience dealing with MCHA's internal clients and their needs. In sum, Plaintiff has presented substantial evidence to show that she was *more* qualified than Oliva for the GC position. At the very least, this is a question for a jury to decide.

Defendants rely on the "same actor" defense to claim that Plaintiff cannot establish an inference of discrimination. Def. Mot. 14-16. Defendants claim that because Costa played a "critical" role in employment decisions, including hiring Plaintiff, she cannot have discriminated against Plaintiff with respect to promotion, demotion, or termination of Plaintiff's employment. Def. Mot. 14. Although Costa certainly played a role in some of the employment actions at issue, Defendants overstate their case. Various emails reveal that Costa was *not* responsible for hiring Plaintiff. Instead, Costa made *suggestions* that were subject to approval from MCHC, the real decision maker. For example, in an August 7, 2015, email from Costa to Saunders, Costa provided an email draft she had prepared to send to Ken Fujiwara ("Fujiwara") of MCHC. Ex. NN. In the draft, Costa wrote "MCHC directed MCHA to promote Jennifer" and asked Fujiwara, "How would you like me to proceed?" *Id.* In a September 1, 2015, email from Costa to Fujiwara, Costa asked him for his "thoughts" regarding whether to demote Plaintiff and replace her with Oliva. Ex. 13. *See also* Ex. 14 (September 11, 2015, email from Fujiwara to Costa, in which he approves of Costa's proposal to strip Plaintiff of the CCO title); Ex. 15 (Costa telling Fujiwara that she hopes he is "prepared to approve the proposal" to demote Plaintiff); Ex. HHH (discussion between Costa and Fujiwara regarding how MCHC (as opposed to MCHA) will pay for Plaintiff's replacement); Ex. 16 (Costa asking Fujiwara for advice on when to inform Plaintiff about her demotion). MCHA's interrogatory responses also name Fujiwara as a relevant individual regarding Plaintiff's termination. *See* Ex. 17. Finally, Plaintiff confirmed in her deposition that MCHA's (and thus Costa's) decisions were subject to MCHC's approval. Ex. J, 37:2-5.

Defendants' "same-actor" defense also fails because of Oliva's central involvement in Plaintiff's termination. Oliva repeatedly testified that it was he – not Costa – who told MCHC that Plaintiff's employment would be terminated. *See* Ex. F, 250:12-13 (describing how he had

"determined to terminate" Plaintiff); Ex. F, 251:21-22 ("And I turned to Donna and said, I think I have to fire Jennifer"); Ex. F, 259:14-16 ("So I reached the conclusion that she couldn't stay here anymore, that she was terminated for cause[.]"). Further, Costa testified that she did not make the decision to terminate Plaintiff. *See* Ex. E,  261:24-262:4.

Finally, Defendants claim that it "strains credulity" that Ms. Costa, a woman, discriminated against Plaintiff, also a woman. Def. Mot. 15.  But it is well-settled that a reasonable jury may permissibly find that a woman has discriminated against another woman. *See Castaneda v Partida*, 430 U.S. 482, 499 (1977) ("[I]t would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.").

### C     Defendants' Proffered Legitimate Business Reasons are Pretextual

As set forth below, the admissible evidence demonstrates that Defendants purported legitimate business reasons for their decisions are pretextual.  *See Fenner v. News Corp.,* No. 09 Civ. 09832, 2013 WL 6244156 at *18 (S.D.N.Y. Dec. 2, 2013) (It is the plaintiff's burden to show pretext by demonstrating that defendant's proffered reasons "were false, and that more likely than not [discrimination] was the real reason for the adverse employment action.").[5]

### 1     Failure to Promote Plaintiff to GC

Defendants justify the failure to promote Plaintiff to the full GC role because of Costa's supposed "concern that Plaintiff could not manage the responsibilities of MCHA's GC." Def. Mot. 19-20. Yet Plaintiff was, as a practical matter, *already* performing the role of GC during the

---

[5] While Plaintiff's claims under Title VII and the NYSHRL are analyzed pursuant to the same legal standard (*see Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 117 n. 2 (2d Cir.2010)), Plaintiff's NYCHRL claims are analyzed under the more lenient "mixed motive" framework. *Hamburg v. NYU Sch. of Medicine,* 155 A.D.3d 66, 72-73 (1st Dep't 2017). Accordingly, a plaintiff may defeat a summary judgment motion by showing pretext, as in the Title VII context, or by providing evidence that "discrimination was one of the motivating factors for the defendant's conduct." *Id.* The evidence discussed below demonstrates that Defendants' proffered reasons are pretextual, or, at the very least, that discrimination was a motivating factor. Defendants failed entirely to address Plaintiff's mixed motive NYCHRL claim.

substantial period when Costa was earning her MBA. *See* Ex. E, , 247:11 – 19 (Costa was pursuing an MBA abroad). Moreover, upon Costa's promotion to Director, Plaintiff was given *all* of the responsibilities of the GC position. Indeed, Defendants admit in their Motion that "Plaintiff was assigned all of the responsibilities" of the GC position. Def. Mot. 17. Therefore, a jury might reasonably discredit Costa's claimed "concern" about Plaintiff's readiness. Further, Defendants had never given anyone an "acting" position before. Ex. 7 64:24-65:6; Ex. J, 30:8-9. When MCHA hired Oliva to GC, for example, "[t]here was no discussion" about him joining on an "acting" basis. Ex. F, 123:17-124:5; *see also* Ex. G, 208-09. Therefore, a jury could infer that Plaintiff was effectively on probation only because she was female, since the male was not required to complete any probationary period.

### 2     <u>Demotion of Plaintiff to Assistant GC</u>

Defendants refer to Costa's November 2015 mid-year evaluation of Plaintiff to justify her demotion to Assistant GC. Plaintiff has produced evidence sufficient to dispute each of the underlying points raised in that evaluation and establish pretext. For instance, Costa wrote that Plaintiff "seemed unable or unwilling to work with [her] as [her] supervisor." Ex. 8. However, various emails between Plaintiff and Costa show the opposite is true. *See* Ex.9 (Plaintiff asking Ms. Costa for advice); Ex. 10 (same); Ex. 11 (Costa responding to Plaintiff's request for advice with "There's no need for me to weigh in"). Further, Plaintiff testified that she was "perfectly willing to seek advice from [Costa] … but she traveled a great deal, and she also tried to avoid me." Ex. J, 678:5-8.

The evaluation lists five examples of events that Costa deemed to reflect Plaintiff's poor judgment. Ex. 8. However, Plaintiff testified at length describing the factual inaccuracies

underlying each of the five examples.[6] *See generally* Ex. J, 671-82. As to the first example, the "Comtrex litigation," Costa accused Plaintiff of blaming others for her "failure to communicate effectively" and failing to update Costa about the case. Ex. 8. However, Plaintiff testified that she was in "near constant communication" with the client and that she never blamed anyone regarding her communications because "there was no failure to communicate effectively." Ex. J, 673:2-9. Further, Plaintiff testified that she "absolutely" updated Costa about the case. *Id.* 673:20. To the extent Plaintiff did not speak to Costa about the case, it was during the two weeks that Costa was on vacation. *Id.* 673:20-21.

In the second example, the "Filtec" matter, Costa accused Plaintiff of providing her advice that was wrong on the facts and the law. Ex. 8. However, Plaintiff testified that she "made no conclusions of law or fact" in her discussion with Costa, but "merely tried to report the status of the investigation." Ex. J, 675:10-12.

In the third example, the "4010 filing," Costa accused Plaintiff of failing to "adequately consider less costly or risky alternatives" for a pension plan filing. Ex. 8. However, Plaintiff testified in detail about her "numerous conversations" with actuaries and outside counsel that informed the ultimate decision, evidencing that she did in fact consider a plethora of other potentially less costly or risky alternatives. Ex. J, 676:23-25.

In the fourth example, Costa accused Plaintiff of retaliating against Troccoli. Ex. 8. Plaintiff testified, however, that she did not. Ex. J, 679:4. Instead, Plaintiff sought counsel from a

---

[6] Defendants claim that "Plaintiff's disagreement with others' assessment of her performance is insufficient to establish discriminatory intent, largely because 'disagreements do not, as a matter of law or logic, mean that present performance reviews are unfounded.'" Def. Mot. 21 (citing *Halkitis v. New York City Department of Education*, 2022 WL 392911, at *5 (S.D.N.Y. Feb. 9, 2022) (Furman, J)). However, Plaintiff does not merely "disagree" with Costa's opinions in the 2015 mid-year evaluation. She disputes the underlying *facts* that form the basis for the evaluation. *See* Ex. J, 540:15-19 ("[T]he November 2015 mid-year performance review is a complete fabrication of the actual events that occurred during that time period that are denoted in that paper"). Which version of the underlying facts is accurate is a question for a jury.

"well-respected labor attorney" who "guided [her] action in every way" regarding Troccoli "to avoid any liability whatsoever." *Id.* at 679:7-10.[7]  Moreover, at this point in Plaintiff's employment, Plaintiff contends that Defendants sought to fabricate reasons for their adverse employment actions. Ex. J, 397:2-12. Whether Defendants fabricated these reasons is a credibility determination for the jury to decide.

In the fifth example, the "Project Genesis" meeting, Costa accused Plaintiff of making an inappropriately "lengthy speech." Ex. 8. Plaintiff testified that she did not make a "lengthy speech," but instead, simply reiterated the risk factors involved in the project for the decision-makers in the room. Ex. J, 681:5-682:7. Plaintiff was simply "doing her job." *Id.* at 682:25-683:2. As "the lawyer in the room," she was "brought in specifically to identify" risks for the "businesspeople" and to "make sure there were mitigation plans." *Id.* at 683:2-6.

The 2015 mid-year evaluation further lacks credibility because of how starkly it stands in contrast to the overwhelmingly positive 2014 and prior reviews. Costa delivered the 2015 mid-year evaluation on November 11, 2015. Ex. 8. This was less than seven months after she delivered the 2014 evaluation, dated April 29, 2015. Ex. EE. While the 2015 mid-year criticizes Plaintiff's communication and inter-personal skills, just months earlier, Costa wrote that Plaintiff "provides meaningful communication to and is supportive of her clients, her colleagues, and the department." Ex. EE. In the 2015 mid-year, Costa claimed that she "d[oes] not trust [Plaintiff's] judgment." Ex. 8. In the 2014 evaluation, however, Costa wrote that Plaintiff "has good instincts," "consistently

---

[7] Again, Defendants refer to Troccoli's issues with Plaintiff to justify the demotion. According to Defendants, Troccoli "conclud[ed] that Plaintiff was struggling as Acting General Counsel." Def. Mot. 20. As noted above, a jury might reasonably give little weight to the opinion of a legal assistant regarding how the highest attorney at MCHA was performing her job. Defendants' reference to Troccoli's "formal complaint" against Plaintiff also carries little weight. Def. Mot. 20. For one thing, Plaintiff denied ever discriminating against Troccoli. Ex. J, 679:4. Further, Plaintiff felt that Troccoli was bullying her. Ex. G, 171:10-18; 176:13-16. A jury might reasonably believe Plaintiff was the victim, and that Troccoli was the instigator of their personal issues.

demonstrates excellent judgment," and that her "confidence in [Plaintiff's] ability to manage matters on her own continues to grow." Ex. EE.[8]

These disputed accounts of plaintiff's performance create a classic "he said, she said" situation that cannot be adjudicated at the summary judgment stage:

> Where the evidence presents "a question of 'he said, she said'" the court "cannot ... take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

*Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019).

In sum, the evidence shows that the mid-year review providing the purported basis for Defendants' decision-making is riddled with factual inaccuracies or, at least, that there is a genuine dispute of material fact that must be resolved by the factfinder at trial. Contrasted against Plaintiff's history of glowing performance reviews over many years, without exception up until her demotion, a jury might reasonably conclude that the 2015 mid-year evaluation proffered by Defendants was mere pretext for a discriminatory employment decision.

### 3    Termination of Plaintiff's Employment

Defendants justify Plaintiff's termination by claiming that she made a settlement demand without approval from her client, MCC, in the Genomatica litigation. Def. Mot. 21. Defendants further claim that Plaintiff "admitted" to making an unauthorized settlement demand. *Id.* Plaintiff

---

[8] Costa did not want to promote a woman to GC. Ex. J at 245:2-5

did no such thing. The only thing Plaintiff "admitted" to was failing to notify Tomoji Minami a "low level" employee at MCHJ, that a counterproposal to Genomatica's offer had been made in accordance with the previously agreed-upon settlement negotiation strategy.  Ex. J, 327:12-14. Plaintiff did *not*, however, admit to making any *unauthorized* demand.

Plaintiff testified that: (i) Oliva had received  authority from MCC to make any settlement demand of $2.0 million or more; (ii) Plaintiff was fully aware of the extent of the settlement authority that Oliva had received; (iii) Oliva exercised that authority by approving Plaintiff's request to convey the $2.3 million settlement demand on behalf of MCC, and (iv) Johei Takimoto ("Takimoto"), of MCC, approved of the plan to make a settlement demand over $2.0 million and was supportive of the $2.3 million demand that had been made. Ex. J, 576-77; *see also id*. 575:15-17 ("My testimony is that Mr. Oliva, my supervisor, who was authorized down to $2,000,000 authorized [the $2.3M offer] 100%."); *Id*. at 324:7-8 (the demand was "well within the settlement authorization" given by MCC to Oliva); *Id*. at 326:10-15 (Oliva "knew the origins of the [$2.3M] offer" because "he was in the conversation who decided" on that offer); *Id*. at 574:23-575:19 (describing how Oliva orally agreed to the $2.3M demand). Further, in Plaintiff's September 7, 2017, unemployment hearing, which was much closer in time to the events at issue than Oliva's July 15, 2021 deposition, Oliva admitted that he spoke with Plaintiff about how the $2.3M demand was an appropriate settlement amount. Ex. 18; Ex. F, 225:6-10 (admitting that he has no reason to believe the unemployment transcript is inaccurate).

Circumstances surrounding Defendants' decision to terminate Plaintiff further suggest that their justification was pretextual. After Defendants decided to terminate Plaintiff, ostensibly for an ethical breach, Oliva astoundingly had Plaintiff travel with him in California for a week to

deliver a compliance training program that dealt with "doing business with integrity." Ex. F, 248:3-9, 249:6; Ex. 19.

Furthermore, in Saunders' notebook, in an entry dated January 26, 2017, she described a conversation she had with Costa regarding the pros and cons of terminating Plaintiff for cause or without cause. Ex. 20. The entry reads, "we can lose our ability to collect from insurance if we offer [severance]. Options – we offer [severance] and on hook for all money or [terminate] for cause and offer nothing. Decision from [Donna Costa] → no severance." *Id.*; Ex. G, 222:12-16. The notebook entry clearly implies that Defendants' decision to terminate Plaintiff was motivated by a bad faith desire to procure insurance coverage where none would otherwise be available, rather than by a legitimate business reason related to Plaintiff's actual job performance.

Ultimately, Defendants suggest that Plaintiff – an attorney of nearly two decades, who consistently received "outstanding" ratings for "Compliance and Ethics" on her performance reviews and who they themselves held out as an ethics authority – suddenly decided to disregard her ethical duties to her client and make an unauthorized settlement demand. *See* Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. EE. Defendants offer no motive that would supposedly explain this deviation from Plaintiff's long history of positive and ethical performance as an officer of the Court. *See* Ex. F, 258:13-18 (Q. Are you aware of any benefit that would [inure] to [Plaintiff] in making an unauthorized settlement offer or settlement demand? A. No). Considering the evidence above, a reasonable jury could conclude that Defendants' justification for Plaintiff's termination was pretextual.

## II.     Genuine Issues Of Fact Preclude Summary Judgment on Plaintiff's Retaliation Claims

### A     Legal Standard

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that "(1) she was engaged in protected activity, (2) the employer was aware of that activity; (3) the employee suffered a materially adverse [employment] action; and (4) there was a causal connection between the protected activity and that adverse [employment] action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). A plaintiff may establish causation through temporal proximity between the protected activity and the adverse action. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). There is no "bright line" rule for temporal proximity. *Id.* However, even "five months is not too long to find the causal relationship." *Id.* After the *prima facie* case, the burden shifts to the employer to give a "legitimate, non-discriminatory reason for its actions." *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). If the employer does so, the plaintiff has the burden to show that adverse action "would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

Here, Plaintiff engaged in protected activity by: (i) participating in the sexual harassment investigation of Yoshisato; (ii) complaining about disparate treatment of female employees with respect to severance compensation; and (iii) complaining about being passed over for promotion to GC in favor of a less qualified male employee (Oliva). Each of these protected activities are causally tied to Defendants' retaliatory actions with admissible evidence, as set forth below.

B       Plaintiff's Investigation Into Yoshisato

It is undisputed that Plaintiff investigated Yoshisato because of sexual harassment complaints brought against him. Ex. J, 95:8-19. Defendants do not dispute that the failure to promote Plaintiff to the full GC position constituted an adverse employment action. Def. Mot. 23. Finally, Plaintiff can establish a causation because although Plaintiff was the most senior lawyer in line for promotion, *see* Ex. E,   172:13-17 (noting that there were three Assistant GCs at the time, and Plaintiff was the "only one qualified of those three" for promotion to GC), and although

the Company had never named anyone to an "acting" position before, Ex. 7 64:24-65:6, Ex. J, 30:8-9, mere months after her participation in the investigation, Yoshisato suggested naming Plaintiff as *Acting* (not full) GC. Pl. Depo. Ex. 30. Plaintiff also testified that Yoshisato did not support her promotion to GC because she had "just completed" the investigation against him. Ex. J, 95:8-19.

Defendants argue that Costa's concerns that Plaintiff was "unsuited" for the full GC role justify not promoting her. Def. Mot. 23. The evidence demonstrates that this is pretextual. Costa's testimony shows that even she was not fully "ready" for her promotion to GC. Costa had never performed compliance work before becoming GC, even though the position involved supervising MCHA's compliance work. Ex. E, 55:10-20; Ex. CC. Costa learned how to perform those duties *after* she started as GC. Ex. E, 240:7-14. In contrast, Plaintiff had extensive compliance experience *before* being named Acting GC. *Id.* 240:18-24. Further, the GC position requires transactional experience, *see* Ex. CC, but Costa had none before becoming GC. Ex. E, 56:5-9. Costa worked on her first M&A transaction in her first year as GC. *Id.* 54:3-11. Plaintiff, on the other hand, had extensive transactional experience both at MCHA and in private practice. Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5. The role also involved pharmaceutical and life science work. Ex. E, 51:5-6. Again, Costa had no prior experience in these areas before becoming GC. *Id.* 58:8-9, 58:23-25. If Costa was "ready" for the position, given her deficiencies described above, it strains credulity to suggest that Plaintiff was not.[9] More likely than not, this justification was pretextual. At the very least, a jury should decide this factual dispute.

---

[9] Similarly, as discussed in I.B.2.ii, Plaintiff was objectively more qualified for the General Counsel role than Oliva. If Oliva was "ready" for the position, given his lack of qualifications relative to Plaintiff, it strains credulity to suggest that Plaintiff was not.

Finally, Plaintiff testified that although she was "perfectly willing" to seek advice from Costa regarding her Acting GC duties, Costa "tried to avoid [her]." Ex. J, 678:5-8. Costa's unwillingness to work with Plaintiff casts further doubt upon Costa's claim that Plaintiff was unsuited for the GC role. A jury might reasonably conclude that this justification was pretextual.

C      Plaintiff's Complaints Regarding Discriminatory Severance Practices

Plaintiff testified that in early March 2016, she reported to Oliva her belief that MKIC, a MCHC subsidiary, was discriminating against Ms. Todd based on her gender because the company had not offered her any severance upon her termination but did offer her husband severance. Ex. J, 283-84; *Id.* at 442:6-8. Defendants do not dispute that such a complaint constitutes protected activity. Def. Mot. 23. Only *weeks* later, Oliva gave Plaintiff a "Needs Improvement" rating for communication in her April 2016 performance review. Ex. J, 282:4-10; Ex. 22. Plaintiff had never received a "Needs Improvement" rating before, nor had there been any verbal counseling or any other advance indication that a low rating was being contemplated. Ex. J, 442:6-8, 638:3-8. Such a short timespan between a plaintiff engaging in protected activity and an adverse employment action is sufficient to establish the presumption of causation.

Defendants' Motion fails to address the negative evaluation entirely. Def. Mot. 23. Instead, Defendants note that Oliva testified that Plaintiff did not complain about the negative evaluation and attempt to dismiss Plaintiff's testimony as "her own say-so." Def. Mot. 23. However, Plaintiff's "say-so" is her sworn testimony, and it establishes a genuine issue of material fact regarding her protected activity. A jury should decide this factual dispute.

D      Plaintiff's Complaints Regarding Her Own Disparate Treatment

Plaintiff testified that she complained about the disparate treatment she suffered at MCHA based on her gender, *see* Ex. G, 215:25-216:4; Ex. J, 423:8-17, and that Defendants terminated

her in retaliation for these complaints. Ex. J, 423:8-12. Defendants fail to address this claim entirely, and therefore summary judgment is inappropriate. Def. Mot. 23.

      E      <u>Admissible Evidence Demonstrates a Causal Connection Between Plaintiffs' Protected Activity and the Adverse Employment Actions She Sustained</u>

As set forth above, Defendants do not appear to deny that Plaintiff engaged in any of these activities, that they were aware of the activities, and that Defendants actions (failure to promote, demotion, and termination) are adverse employment actions. Instead, they contend only in conclusory fashion that there is no causal connection between Plaintiff's protected activity and the adverse employment actions. Accordingly, they have failed to meet their burden on summary judgment and these issues should be heard and decided by a jury.

## III.    Defendants' Affirmative Defenses to Compensation Discrimination Must Fail

Plaintiff asserts five different causes of action for disparate treatment in compensation based on gender, including under the federal EPA (*see* FAC, Third Cause of Action), the New York Equal Pay Act (*id*., Sixth Cause of Action), Title VII (*id.*, First Cause of Action), the NYSHRL (*id*., Fourth Cause of Action) and the NYCHRL (*id.*, Fifth Cause of Action). As set forth below, Defendants affirmative defenses to Plaintiff's pay discrimination claims must fail.

      A      <u>Legal Standards Applicable to Plaintiff's Federal and State EPA Claims</u>

To establish a *prima facie* EPA[10] claim, the plaintiff must demonstrate that "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Lavin-McEleny v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001). Then, the burden shifts to the employer to justify the disparity based on a statutory affirmative defense,

---

[10] Equal pay claims under the New York State Equal Pay Act "are governed by the same framework as claims under the [federal] EPA." *Mirna Martinez Santiago v. ACACIA Network, Inc.,* 2022 WL 6775835 *7 (S.D.N.Y. Oct. 10, 2022).

including "a differential based on any other factor other than sex." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992); 29 U.S.C. § 206(d)(1)(iii). The employer "bears the burden of proving that a bona fide business-related reason exists" to use the "factor other than sex" defense. *Aldrich*, 963 F.2d at 526; *Husser v. NYC DOE*, 137 F.Supp.3d 253, 269 (E.D.N.Y. 2015) (defendants "must establish that the pay difference at issue is the result of a gender-neutral system adopted for a genuine business reason"). Where the employer meets that burden, the plaintiff can "counter the defendant's affirmative defense by offering evidence showing that the reasons sought to be proved are a pretext for sex discrimination." *Aldrich*, 963 F.2d at 526.

B  Application of These Legal Standards for EPA Claims

Here, Defendants all but concede the elements of Plaintiff's prima facie EPA claim. It is undisputed that Defendants paid Plaintiff less than they paid Oliva, satisfying the first *prima facie* element. Ex. F, 69:11-15; Ex. G, 131:13-23. Defendants also admit "Plaintiff was assigned all of the responsibilities" of the GC position, *see* Def. Mot. 17, and that Plaintiff performed the same job duties as Oliva. *See* Def. Mot. 15-16. These admissions satisfy the second and third *prima facie elements* of Plaintiff's EPA claim. Accordingly, Plaintiff has established a *prima facie* case with respect to all of the elements of her EPA claim.

C  Defendants' "Factor Other Than Sex" Defense Fails

Instead of contesting Plaintiff's *prima facie* case, Defendants assert a putative "factor other than sex" defense. Def. Mot. 24-25. Defendants' argument fails because their justifications for the pay disparity between Plaintiff and Oliva are unrelated to any "bona fide business-related reason." *Aldrich*, 963 F.2d at 526. Defendants assert two market-related defenses that purport to justify paying Oliva more. First, they claim that Oliva needed to be "lured away from another employer" and therefore he had "significant leverage that Plaintiff did not." Def. Mot. 24-25. This is not a *bona fide* business reason to justify the pay disparity. Oliva's prior employment and his relative

"leverage" compared to Plaintiff *have nothing to do with Defendants' own business or the job of GC*, and therefore cannot justify pay discrimination.

Second, Defendants argue that Oliva "negotiated an additional $25,000 in salary" because of his "prior work experience in the pharmaceutical industry." Def. Mot. 25. Again, this is not a *bona fide* business justification for the pay disparity. Oliva's negotiation skills are entirely unrelated to Defendants' business or the GC position. Regarding Oliva's qualifications, as discussed in section I.B.2.ii, Plaintiff was more qualified for the GC position in a variety of ways, and a jury could reasonably conclude that Defendants' argument here is pretextual.

Moreover, these market-based arguments must be rejected for an additional reason: the failure of the competitive market to compensate women fairly compared to men is the precise reason why Congress enacted the EPA in the first place. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 207 (1974) ("The whole purpose of the Act was to require that these depressed wages [of women] be raised, in part as a matter of simple justice to the employees themselves, but also as a matter of market economics, since Congress recognized as well that discrimination in wages on the basis of sex 'constitutes an unfair method of competition'"); *see also* Deborah Thompson Eisenberg, *Shattering the Equal Pay Act's Glass Ceiling*, 63 SMU L. Rev. 17, at 54 ("First, the very purpose of the EPA is to overcome the discriminatory market forces that caused wage inequality . . . . The market itself perpetuates and exacerbates discriminatory pay rates. Under the EPA, the abstract notion of 'the market' does not trump the promise of equal pay.") (internal citations omitted).

Finally, Defendants argue that "MCHA determined that Oliva's salary was equivalent to what Plaintiff would have earned if she had been promoted to the full [GC] position." Def. Mot. 25. Defendants do not cite to any evidence in the record to support this argument. Nor is it relevant

because this is not one of the enumerated affirmative defenses to an EPA claim. Instead, under the EPA, a plaintiff does not need to show that her job is "identical to a higher paid position, but only show that the two positions are 'substantially equal' in skill, effort, and responsibility." *Lavin-McEleney,* 239 F.3d at 480. Here, Defendants admit that Plaintiff performed the *same job duties* in her role of Acting GC as Oliva performed as GC. Thus, under the EPA, Defendants were required to pay Plaintiff equally to Oliva – regardless of whether they labelled her "Acting" or not – because her position was "substantially equal in skill, effort, and responsibility" to Oliva's. *Id.* Defendants failed to do so. Finally, this (irrelevant) claim of equivalency is belied by Defendant's justification that the extra money was due to market conditions.

Accordingly, Defendants have failed to establish any *bona fide* "factor other than sex" defense. Summary judgment should therefore not be granted in their favor.

D      <u>Legal Standards Applicable to Title VII, NYSHRL, and NYCHRL Pay Discrimination Claims</u>

Because Defendants fail to address Plaintiff's Title VII, NYSHRL, and NYCHRL claims for compensation discrimination (Def. Mot. 24-25), summary judgment on those claims is inappropriate. Moreover, Defendants putative affirmative defenses to Plaintiff's federal EPA and New York state EPA claims are inapplicable to her disparate treatment (Title VII, NYSHRL, and NYCHRL) compensation discrimination claims. Title VII pay discrimination claims are <u>not</u> analyzed under the EPA's "unequal pay for equal work" standard. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019). Rather, "all Title VII requires a plaintiff to prove is that her employer discriminated against her with respect to her compensation…because of her…sex." *Id.* (internal

quotations omitted). NYSHRL and Title VII claims are analyzed under the same standard. *Hyek v. Field Support Servs., Inc.,* 461 F. App'x 59. 60 (2d Cir. 2012).[11]

Here, the circumstances give rise to an inference of pay discrimination because Plaintiff was arguably more qualified than Oliva, *see section* I.B.2(ii) *supra*, and yet she received less pay. Further, Defendants had never placed anyone in an "acting" position before Plaintiff, *see* Ex. 7 64:24-65:6, and never considered giving Oliva an "acting" title. Ex. F, 123:17-124:5; Ex. G, 208-09. Again, Defendants' failure to address this claim precludes summary judgment.

## IV.    Plaintiff's Aiding and Abetting Claims Against Ms. Costa and Mr. Oliva Under The NYSHRL And The NYCHRL Should Not Be Dismissed

Both the NYSHRL and the NYCHRL prohibit "aid[ing], abet[ting], incit[ing], compel[ing] or coerc[ing] the doing" of any unlawful acts of discrimination under either statute. N.Y. Exec. Law § 296(6); N.Y.C Admin. Code § 8-107(6); *McHenry v. Fox News Network, LLC*, 510 F.Supp.3d 51, 68 (S.D.N.Y. 2020). To prevail on a claim under either statute,[12] a plaintiff must establish that the defendant "actually participated" in the unlawful conduct by the employer. *McHenry*, 510 F.Supp.3d at 68.

Defendants argue that "Plaintiff has not established that MCHA or MCHC retaliated or discriminated against her." Def. Mot. 25. For the reasons discussed in this brief, Plaintiff has established that a jury should be able to consider the discrimination and retaliation violations alleged in this action. Since Defendants do not dispute either Oliva's or Costa's participation in the alleged discrimination and/or retaliation, the court should not grant summary judgment as to these claims.

---

[11] As noted in section I.A, claims asserted under the NYCHRL are assessed under a similar standard as Title VII and NYSHRL but must be construed more broadly in favor of plaintiffs. *Conahan, supra* at *6:

[12] The same standard governs aiding and abetting claims under the NYSHRL and NYCHRL "because the language of the two laws is virtually identical." *McHenry*, 510 F.Supp.3d at 68.

**<u>CONCLUSION</u>**

For the above reasons, Plaintiff respectfully requests that this Court deny Defendants' motion for summary judgment in its entirety.

Dated: Garden City, New York
December 2, 2022

**VALLI KANE & VAGNINI LLP**

By: <u>/s/ *Robert J. Valli, Jr.*</u>
Robert J. Valli, Jr., Esq.
<u>RValli@vkvlawyers.com</u>

<u>Sara Wyn Kane, Esq.</u>
<u>SKane@vkvlawyers.com</u>

Matthew L. Berman, Esq.
<u>MBerman@vkvlawyers.com</u>

600 Old Country Road
Garden City, New York 11530
Tel: (516) 203-7180
Fax: (516) 706-0248

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2022 a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was served via electronic email on all counsel of record.

Date:   December 2, 2022

*/s/ Matthew L. Berman*
Matthew L. Berman, Esq.