**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JENNIFER S. FISCHMAN

            Plaintiff,

    v.

MITSUBISHI CHEMICAL HOLDINGS
AMERICA, INC., MITSUBISHI
CHEMICAL HOLDINGS CORP.,
DONNA COSTA, and NICHOLAS
OLIVA

         Defendants

18-cv-08188 (JMF)

## PLAINTIFFS' RESPONSES TO DEFENDANTS' RULE 56.1 STATEMENT OF FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

### Responses to Defendants' Statement of Facts

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, the above-captioned plaintiff ("Plaintiff"), by her undersigned attorneys, responds as set forth below to the factual assertions made by Defendants Mitsubishi Chemical Holdings America, Inc. ("MCHA"), Mitsubishi Chemical Holdings Corporation ("MCHC"), Donna Costa, and Nicholas Oliva in their Rule 56.1 Statement (ECF Dkt 137).

I.     **BACKGROUND**

1.     Plaintiff was hired as Corporate Counsel of MCHA in 2008, promoted to Assistant General Counsel of MCHA in 2013, promoted to Acting General Counsel and Chief Compliance Officer on April 1, 2015, returned to her position as Assistant General Counsel on November 30, 2015, and terminated on January 30, 2017. (Defendant MCHA Document Production ("MCHA

Doc. Pr.") at 633-35 (Exhibit "A"), MCHA Doc. Pr. at 641 (Exhibit "B"), MCHA Doc. Pr. at 665 (Exhibit "C"), MCHA Doc. Pr. at 806-07 (Exhibit "D").)

**Disputed in part.** Plaintiff disputes that she was "returned" to her position as Assistant General Counsel. Instead, she was demoted to that position. (Plaintiff Jennifer Fischman Deposition Transcript (Exhibit "J"[1]) at 152:9-16; 245:19-249:13; 363:10-364:2; 368:7-17; 394:23-397:5; 418:3-14; 423:7-424:2; 466:5-9; 478:9-17; 511:21-512:4; 514:17-21; 517:12-19; 519:19 – 522:3; 535:22 – 536:24).

2.      Donna Costa served as MCHA's General Counsel from February 1996 through March 31, 2015 and as MCHA's President from April 1, 2015 through March 31, 2018. (Exhibit A; Defendant Donna Costa Deposition Transcript (Exhibit "E") at 11:23-12:18; 34:25-35:10; 88:9-11.)

**Undisputed.**

3.      Nicholas Oliva, a former Counsel at MCHA, has served as General Counsel and Chief Compliance Officer of MCHA since November 30, 2015. (Defendant Nicholas Oliva Deposition Transcript (Exhibit "F") at 11:12-21; 21:13-18.)

**Undisputed.**

4.      Patricia Saunders at all relevant times served as the Director of Human Resources of MCHA. (Patricia Saunders Deposition Transcript (Exhibit "G") at 12:12-14.)

**Undisputed.**

5.      Kelli Troccoli at all relevant times served as a Legal Assistant and Compliance Coordinator at MCHA. (MCHA Doc. Pr. at 866 (Exhibit "H").)

**Undisputed.**

---

[1] Citations to Exhibits with lettering refer to the Exhibits attached to the Declaration of Mercedes Colwin, ECF Dkt. 137.

6. Shoji Yoshisato served as President of MCHA from April 2011 through March 31, 2015. (Exhibit A.)

**Undisputed.**

7. Masanori Sakaguchi served as General Counsel of Mitsubishi Rayon Co., Ltd., and later as a member of the legal group at Mitsubishi Chemical Corporation ("MCC"), and MCHC. (Exhibit E, at 24:16-25:6.)

**Undisputed.**

8. Ken Fujiwara served as Executive Officer of MCHC from April 2015 through March 2017, Executive Officer of MCC from April 2017 through March 2018, and Managing Corporate Executive Officer of MCHC beginning in April 2018. (Defendant MCHC Document Production ("MCHC Doc. Pr.") at 9399 p. 36 (Exhibit "I").)

**Undisputed.**

9. During a significant portion of the relevant time period, and at the time of Plaintiff's promotion to Assistant General Counsel by Ms. Costa, MCHA's legal department consisted of four women and one man. (Exhibit J at 67:6-68:13.)

**Undisputed.**

10. During Ms. Costa's tenure, there were a number of women named to various executive positions. (Exhibit E, at 87:11-16.)

**Disputed.** At the time Ms. Costa became president of MCHA, there was only one female executive, and she worked for a European entity. (Exhibit E at 87:23-25.)

## II. PROCEDURAL HISTORY/NATURE OF THE ACTION

11. Plaintiff Jennifer S. Fischman ("Plaintiff" or "Fischman") submitted a Charge of Discrimination to the United States Equal Employment Opportunity Commission ("EEOC"), and

the EEOC issued a Notice of Right to Sue letter on June 14, 2018. (First Amended Complaint (Exhibit "K") ¶ 9.)

**Undisputed.**

12.    Plaintiff commenced this action on September 7, 2018, by filing a complaint in this Court. (Complaint filed on September 7, 2018 (Exhibit "L").)

**Undisputed.**

13.    On April 4, 2020, Plaintiff filed a First Amended Complaint, which is now the operative pleading. (Exhibit K.)

**Undisputed.**

14.    Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the New York State Human Rights Law, and the Administrative Code of the City of New York, alleging that Defendants engaged in unlawful employment discrimination against Plaintiff on the basis of her gender and retaliated against her for opposing Defendants' allegedly unlawful employment practices. (Exhibit K, ¶ 1.)

**Undisputed.**

## III.    <u>PLAINTIFF'S EMPLOYMENT</u>

### A.  <u>The Start of Plaintiff's Employment</u>

15.    Plaintiff applied for the Corporate Counsel position at MCHA's predecessor company, Mitsubishi Chemical USA (referred to hereinafter as "MCHA"). (Exhibit J, at 14:15-14:23.)

**Undisputed.**

16.    At that time, she served as Legal Counsel, General Law – Space and Airborne Systems for Raytheon Company. (MCHA Doc. Pr. at 7 (Exhibit "M").)

**Undisputed.**

17.     In late 2007 and January 2008, Donna Costa, who at the time was MCHA's Vice President and General Counsel, and other members of MCHA's legal department interviewed Plaintiff. (Exhibit J, at 346:19-23.)

**Undisputed.**

18.     When Plaintiff was being interviewed in late 2007 and January 2008 for her first position with MCHA, no one from MCHC interviewed her. (Exhibit J, at 346:19-23, 347:5-20.)

**Undisputed.**

19.     On January 17, 2008, Ms. Costa offered Plaintiff the position of Corporate Counsel with MCHA. (Exhibit C.)

**Undisputed.**

20.     MCHA's January 17, 2008 offer letter to Plaintiff set March 3, 2008 as her start date at MCHA. (*Id.*)

**Undisputed.**

21.     On January 23, 2008, Plaintiff accepted Ms. Costa's offer of employment as Corporate Counsel with MCHA. (*Id.*)

**Undisputed.**

22.     At the time she was hired, Plaintiff's salary was $165,000, with a $10,000 signing bonus, among other benefits. (*Id.*)

**Undisputed.**

23.     Ms. Costa hired Plaintiff to fill a position left vacant by a male employee. (MCHA Doc. Pr. at 666 (Exhibit "N").)

**Undisputed.**

24.     In March 2008, Plaintiff started working for MCHA. (Exhibit J, at 14:15-23; Exhibit M.)

**Undisputed.**

25.     During Plaintiff's employment with MCHA, MCHA was the only company that paid her salary. (Exhibit J, at 14:24-15:2.)

**Disputed.**   MCHA may have tendered Plaintiff's compensation to Plaintiff, but MCHA obtained the funds tendered from MCHC, which established the budget for MCHA. (Exhibit J, at 59:4 – 60:24; 360:6 – 365:18; 369:7 – 370:14.)

26.     When Plaintiff started at MCHA, her supervisor was Ms. Costa. (MCHA Doc. Pr. at 664 (Exhibit "O")); Exhibit J, at 14:15-14:23.)

**Undisputed.**

**B.   Plaintiff's Performance in the Corporate Counsel Position and Subsequent Promotion**

27.     During her time as Corporate Counsel, Ms. Costa approved yearly salary increases for Plaintiff. (MCHA Doc. Pr. at 753-54 (Exhibit "P").)

**Undisputed.**

28.     Ms. Costa approved an annual salary of $201,699.16 for Plaintiff for 2012. (Exhibit P.)

**Undisputed.**

29.     Ms. Costa noted in Plaintiff's 2012 performance evaluation that Plaintiff "should focus on increasing her sensitivity to Japanese culture and Mitsubishi culture and politics." (MCHA Doc. Pr. at 616 (Exhibit "Q").)

**Undisputed.**

30.     Ms. Costa promoted Plaintiff to Assistant General Counsel in 2013.  (Exhibit B; Exhibit J, at 16:2-17.)

**Disputed in part.** Ms. Costa's decision to name Plaintiff Acting General Counsel was subject to MCHC's input and approval. (Exhibit NN).

31.     Ms. Costa made the decision to promote Plaintiff.  (Exhibit J, at 36:8-37:7; Exhibit B.)

**Disputed in part.** Ms. Costa's decision to name Plaintiff Acting General Counsel was subject to MCHC's input and approval. (Exhibit NN).

32.     Upon Plaintiff's promotion to Assistant General Counsel, Ms. Costa approved an increase in Plaintiff's salary to $211,785.08.  (Exhibit P.)

**Disputed.** Ms. Costa's decision to name Plaintiff Acting General Counsel was subject to MCHC's input and approval. (Exhibit NN). Additionally, Plaintiff's salary was set pursuant to budgeting controlled and authorized by MCHC.  (Exhibit J, at 59:4 – 60:24; 360:6 – 365:18; 369:7 – 370:14.)

33.     In the five years leading up to Plaintiff's promotion to Assistant General Counsel, Ms. Costa provided Plaintiff training, development opportunities, and increasing responsibilities. (MCHA Doc. Pr. at 614-31 (Exhibit "R").)

**Undisputed.**

34.     Ms. Costa gave Plaintiff positive performance reviews and approved yearly salary increases for her. (Exhibit R; Exhibit P.)

**Disputed in part.**  Plaintiff's compensation was set subject to MCHC's input and approval. (Exhibit NN).  Additionally, Plaintiff's salary was set pursuant to budgeting controlled and authorized by MCHC.  (Exhibit J, at 59:4 – 60:24; 360:6 – 365:18; 369:7 – 370:14.)

35.     At the time of Plaintiff's promotion to Assistant General Counsel by Ms. Costa, there was no reason for Plaintiff to believe she was subject to discrimination. (Exhibit J, at 62:2-7.)

**Undisputed.**

C. **Plaintiff's Performance in the Assistant General Counsel Position and Subsequent Promotion**

36.     In 2014, Ms. Costa assigned Plaintiff to investigate sexual harassment claims against Shoji Yoshisato, then MCHC's executive officer. (Exhibit J, at 95:8-12.)

**Undisputed.**

37.     On March 12, 2014, Plaintiff received her 2013 performance evaluation, conducted by Ms. Costa. (MCHA Doc. Pr. at 609-613 (Exhibit "S").) Although the evaluation described Plaintiff's overall performance as "exceeds expectations" (Exhibit S), it noted that Plaintiff (1) "should increase her objectivity and focus on the whole picture in order to more effectively serve her clients' needs and the needs of the group" and (2) "improve her communication skills, with special attention given to Japanese culture and Mitsubishi culture and politics." (*Id.*)

**Undisputed.**

38.     In her 2013 performance evaluation, Plaintiff received a "performs acceptably" designation for "Leadership/ Development of Others," the second lowest level of proficiency possible. (*Id.*)

**Disputed in part.** Plaintiff does not dispute the rating but disputes its characterization as the "second lowest level" possible because there were three levels of proficiency available, "performs acceptably" was the middle rating and, accordingly, was also the second *highest* level of proficiency available. (Exhibit S).

39.     During 2014, Ms. Costa approved two additional salary increases for Plaintiff, bringing her total salary to $222,161.94. (Exhibit P.)

> **Disputed in part.** Plaintiff's salary was set pursuant to budgeting controlled and authorized by MCHC. (Exhibit J, at 59:4 – 60:24; 360:6 – 365:18; 369:7 – 370:14.)

40.     On November 5, 2014, Masanori Sakaguchi, then General Counsel of Mitsubishi Rayon Co., Ltd. ("MRC"), stated that Plaintiff's treatment of certain confidential information led to a "very uncomfortable email and complaint" from an MRC executive. (MCHA Doc. Pr., at 1208 (Exhibit "T").)

> **Disputed.** Mika Usame, a legal intern at the time, was present for the conversation at issue. She later explained to Mr. Yoshisato and to Ms. Costa that Plaintiff "had not violated any confidentiality and [she] had never disclosed any confidential information." (Exhibit J, at 393:10-20).

41.     On November 20, 2014, Plaintiff received a mid-year evaluation for the first half of 2014, conducted by Ms. Costa. (MCHA Doc. Pr. at 1362-67 (Exhibit "U"); Exhibit J, at 21:18-23.)

> **Undisputed.**

42.     In late 2014, MCHC promoted Ms. Costa to President of MCHA, to replace Mr. Yoshisato, who planned to return to Japan (Exhibit A.)

> **Undisputed.**

43.     Ms. Costa expressed her desire to hire an external candidate to fill the position of General Counsel because she felt that none of MCHA's three Assistant General Counsels—two of whom, including Plaintiff, were female—were qualified for the position. (Exhibit E, at 179:15-180:13.)

**Disputed.** Ms. Costa sought an external candidate because she preferred a male for the General Counsel role. (Exhibit J, at 243:12). As Plaintiff testified, Ms. Costa preferred a man because it would make her dealings with Japan easier and she had already expended all of her political capital to get the job as MCHA president. (*Id.* 244:19-245:14).

44.     Mr. Yoshisato made clear to Ms. Costa that it was his preference to promote an internal candidate into the General Counsel position instead of hiring an outside individual. (Exhibit E, at 174:2-19).

**Undisputed.**

45.     On December 10, 2014, Ms. Costa and Patricia Saunders, then MCHA's Director of Human Resources, put together a "pros and cons" list addressing Plaintiff's ability to handle the General Counsel position, citing several concerns:

  a.  "Still feels needs to limit amount of her work because she can only deal with a limited amount at one time   Things tend to fall through cracks";

  b.  "She is selective in what she cares about"; and

  c.  "Has preconceived judgments—has to learn to manage this emotional [reaction].  She complains to peers in department.  Can't do that when you are the boss.  Will need to learn to manage frustrations."

 (MCHA Doc. Pr. at 891 (Exhibit "V"); Exhibit G, at 134:3-138:20).

**Undisputed.**

46.     In a December 10, 2014 email, Ms. Costa informed Ken Fujiwara, then head of MCHC's legal department, that MCHA's president had decided to promote Plaintiff to Acting General Counsel:  "I received the message from Yoshisato-san that MCHA wants to make Jennifer Acting-General Counsel for 12 months in the hope that she will grow into the job. I am

working on a plan to communicate to her, which I will discuss with Yoshisato-san and later present to Jennifer." (MCHA Doc. Pr. at 4 (Exhibit "W").)

**Undisputed.**

47.     Ms. Costa offered Plaintiff the Acting General Counsel position over two other potential internal hires, one of whom was male. (Exhibit E, at 172:12-17, 173:5-8.)

**Undisputed.**

48.     On December 14, 2014, Ms. Costa emailed Mr. Fujiwara to say that she spoke to Plaintiff about accepting the Acting General Counsel position and received a positive initial response. (MCHA Doc. Pr. at 2 (Exhibit "X").)

**Disputed.** Plaintiff had "mixed feelings" about being named Acting General Counsel and was "extremely unhappy that after all [her] years of experience, knowledge, familiarity with the businesses" she had been "given an acting role" as opposed to the full General Counsel role. (Exhibit J, at 374:24-375:12).

49.     In advance of Plaintiff assuming the Acting General Counsel position, Ms. Costa and Ms. Saunders began preparing Plaintiff for the position through daily sessions to convey their knowledge of relevant law, programs, businesses and people, as well as intensive coaching on communication, emotional intelligence, and cultural awareness and sensitivity. (Exhibit E, at 191:8-21, 233:25-234:6.)

**Disputed.** Plaintiff had "multiple, probably weekly, several hour conversations" with Ms. Costa "where she provided [Plaintiff] with a data dump." (Exhibit J, at 113:24-114:3. Plaintiff testified, "I do not have a specific recollection of quote 'training and coaching'." *Id*. 166:23-24).

50.     On February 26, 2015, Plaintiff emailed Ms. Costa to outline her upcoming job duties as Acting General Counsel and Chief Compliance Officer. (MCHA Doc. Pr. at 5 (Exhibit "Y").)

**Undisputed.**

51.     On March 3, 2015, Plaintiff emailed Mr. Fujiwara to congratulate him on his promotion to Executive Officer of MCHC.  (MCHA Doc. Pr. at 1209 (Exhibit "Z").)  She also thanked him for supporting her promotion to Acting General Counsel of MCHA:  "I also wanted to thank you for all your support in my promotion, which I am sure could not have happened without you." (*Id.*)

**Undisputed.**

52.     On March 17, 2015, Plaintiff wrote to Mr. Sakaguchi to congratulate him on his promotion.  Mr. Sakaguchi replied that he was "anxious to work and collaborate with" Plaintiff. (MCHA Doc. Pr. at 1217 (Exhibit "AA").)

**Undisputed.**

53.     On March 18, 2015, before Plaintiff assumed the position of Acting General Counsel, Ms. Costa attempted to explain the decision to name her as "acting" General Counsel, but Plaintiff declined to discuss the topic with Ms. Costa.  (MCHA Doc. Pr. at 13 (Exhibit "BB").)

**Disputed.** Plaintiff complained to Ms. Costa about being named "acting" General Counsel. (Exhibit J, at 423:8-17).

54.     Ms. Costa promoted Plaintiff to the position of Acting General Counsel and Chief Compliance Officer effective April 1, 2015.  (Exhibit A.)

**Disputed in part.** Ms. Costa's decision to name Plaintiff Acting General Counsel was subject to MCHC's input and approval. (Exhibit NN).

55. Effective the same day as Plaintiff's promotion, Ms. Costa was promoted to President of MCHA. (*Id.*)

**Undisputed.**

56. Ms. Costa approved a salary increase to $300,000 for Plaintiff in her new position as Acting General Counsel and Chief Compliance Officer. (*Id.*)

**Undisputed.**

57. MCHA maintained a detailed written "position profile" of the General Counsel and Chief Compliance Officer position, including its key responsibilities. (MCHA Doc. Pr. at 821-22 (Exhibit "CC").)

**Undisputed.**

D. **Plaintiff's Performance in the Acting General Counsel and Chief Compliance Officer Position**

58. On April 17, 2015, Kelli Troccoli, then a Legal Assistant and Compliance Coordinator at MCHA, emailed Plaintiff and Ms. Costa to tell them that she "ha[d] been diagnosed with a serious illness" for which she would need medical treatment. (MCHA Doc. Pr. at 35 (Exhibit "DD").)

**Undisputed.**

59. On April 29, 2015, Plaintiff received her 2014 performance evaluation, conducted by Ms. Costa, indicating "performs acceptably" grades in "Communication Skills" and "Leadership/ Development of Others," the second lowest proficiency grade available. (MCHA Doc. Pr. at 64-76 (Exhibit "EE").)

**Disputed in part.** Because there were three levels of proficiency available, "performs acceptably" was also the second highest level available. (Exhibit EE).

60.     On June 26, 2015, Ms. Saunders took notes of a conversation she had with Ms. Costa about shortcomings in Plaintiff's work. Ms. Costa informed Ms. Saunders that she needed Plaintiff to "stop being defensive," that Plaintiff needed to learn to say "yes" or "I agree," and that Plaintiff needed to cease "sloppy" behavior, such as "respond[ing] to email w/o reading thoroughly." (MCHA Doc. Pr. at 892 (Exhibit "FF").)

**Disputed.** Plaintiff has no recollection of Ms. Costa informing her of these issues. (Exhibit J, at 194:3-195:2).

61.     Prior to and at the beginning of Plaintiff's new position of Acting General Counsel and Chief Compliance Officer, Ms. Costa and Ms. Saunders continually coached Plaintiff on how to be effective in her new position. (MCHA Doc. Pr. at 1040-44 (Exhibit "GG"); MCHA Doc. Pr. at 1179-80 (Exhibit "HH"); MCHA Doc. Pr. at 1206 (Exhibit "II"); Exhibit E, at 191:8-21, 233:25-234:6.)

**Disputed.** As noted in number 49, the "data dumps" that Ms. Costa provided were not equivalent to coaching or training. (Exhibit J, at 113:24-114:3, 166:23-24).

62.     On July 10, 2015, Plaintiff corresponded directly with Mr. Sakaguchi regarding new projects recently undertaken by MCHA. (MCHA Doc. Pr. at 1212 (Exhibit "JJ").)

**Disputed in part.** In this email, Plaintiff refers to only one project, "Project Genesis." (Exhibit JJ).

63.     On July 21, 2015, Ms. Costa emailed Plaintiff to offer her help in dealing with MCHA's legal department's increasing workload: "I think we're going to be getting busier (!) overall, so we need to be sure we stay on top of things now. Let me know if you want any support in getting the most out of Jordon and Stephen. We will need everyone focused." (MCHA Doc. Pr. at 123 (Exhibit "KK").)

**Undisputed.**

64.    Later that day, Plaintiff responded to Ms. Costa's email: "Thank you for your offer to help me make the most of the guys. I would love to discuss with you next week. I think they are both up to the challenges but I can use whatever support you can offer." (MCHA Doc. Pr. at 133 (Exhibit "LL").)

**Undisputed.**

65.    On July 26, 2015, Ms. Costa informed Plaintiff of her shortcomings on a recent project, which led to "some misses with respect to the process of identifying a financial advisor." (MCHA Doc. Pr. at 1026-28 (Exhibit "MM").)

> **Disputed in part.** In the same email, Ms. Costa also praised Plaintiff's work on the project (Project Genesis). Ms. Costa said, "You said and did a lot of things in the last two weeks that made feel confident that you understand the needs of the project." (Exhibit MM). Ms. Costa also said, "You have done a great job moving this project forward during the last couple of weeks." (*Id.*). In response to the "misses" that Ms. Costa identified, Plaintiff responded, "thank you very much for the feedback," and promised to "work hard" to improve. (*Id.*).

66.    On August 7, 2015, Ms. Costa wrote to Ms. Saunders to ask for her feedback on a draft email to Mr. Fujiwara explaining why Ms. Costa wanted to "replace [Plaintiff] as General Counsel":

> When I learned last fall that I was going to be promoted, Yoshisato- san, Pat Saunders and I discussed my successor. As you know, we decided that the best course was to hire someone from outside. Although Jennifer is smart, the breadth and depth of her legal expertise were limited, she had no management experience, and she often behaved in a way that was incompatible with the position. (I had received many complaints about her style and attitude that impacted both her credibility and effectiveness.) Nevertheless, after discussions regarding the cost of

hiring a General Counsel, MCHC directed MCHA to promote Jennifer, and I was asked to do my best to make it work. . . .

It has now been over eight months since she was told of her promotion, and more than seven months since it was announced. I have no reason to believe that the barriers to her success will disappear. In fact, my experience with her last week confirms that they will not. . . .

In sum, I am afraid we have reached our limit. Her style results in a lack of trust, which is unacceptable for someone in her role. Personally, I am growing exhausted from our discussions, which often leave me drained and frustrated. I need someone I can be honest with, rely on and depend on, without being worried that she will fall apart. I also need to be confidant [sic] that members of MCHA and our affiliates feel comfortable speaking to her and seeking her advice. The current situation is not healthy or productive, and it is not sustainable. . . .

(MCHA Doc. Pr. at 186-87 (Exhibit "NN").)

**Undisputed.**

67.     On August 9, 2015, Ms. Saunders replied to Ms. Costa's August 7 email, writing:

"I think this is a very good summary of the situation and covers the key issues." (MCHA Doc. Pr.

at 185 (Exhibit "OO").)

**Undisputed.**

68.     On August 12, 2015, Ms. Troccoli sent Ms. Costa an email listing deficiencies in

Plaintiff's performance as Acting General Counsel:

- "Potential for things to fall through the cracks because they are not being relayed (ie. MCPP IP transfer, MFA New Line, etc) and thats just on my end not sure about the bigger picture";

- "A few instances where things had to be explained to her by Jordon (she was stating wrong information)";

- "She is completely micro managing to the point where it is detrimental (ie. the rental car situation that I gave to Stephen)";

- "Long delay in response time to questions that should take a minute to answer (ie. language for merger doc's that I asked you about and you said to let her handle took a week

to get a response that said 'this is fine'[)]";

- "May sound petty but she constantly eats in meetings (ie dept. or even when someone is in her office and not always legal dept. member)";

- "Her method of communication is often inappropriate (ie the words she chooses, the tone, etc. and this also is with everyone not just our office)";

- "She answers emails before reading the entire email in an effort to appear to respond quickly which then results in a multi email chain to correct the advice she's given";

- "She doesn't appear to fully grasp the job responsibilities (I think compliance is overwhelming her. I think she would have been better off not taking that on) (also relates to first bullet item I believe)";

- "legal dept meetings (there have been 2) have been very unorganized!";

- "She continues to try but ultimately struggle with her personality issues as it relates to dealing with others"; and

- "I've had people in our office and other companies make comments about her personality and ability to do the job."

(MCHA Doc. Pr. at 194 (Exhibit "PP").)

**Undisputed.**

69.     On August 14, 2015, Ms. Troccoli emailed Ms. Costa to ask her about an assignment Plaintiff had given Ms. Troccoli. (MCHA Doc. Pr. at 1169-70 (Exhibit "QQ").) Ms. Costa responded by directing Ms. Troccoli to "follow up with Jen directly" and noting: "You can tell her that I raised the question." (*Id.*) In a reply email to Ms. Costa, Ms. Troccoli described Plaintiff's reaction to Ms. Troccoli's question: "FYI she got defensive and nasty with me…….it's hard to work with someone who loses her shit every time you mention Donna :( ." (*Id.*)

**Undisputed.**

70. That same day, Plaintiff forwarded to Ms. Saunders her email correspondence with Ms. Troccoli about the assignment and asked to discuss the exchange with her. (MCHA Doc. Pr. at 981-86 (Exhibit "RR").)

**Undisputed.**

71. On August 16, 2015, Ms. Costa emailed Mr. Fujiwara stating that MCHA may terminate Plaintiff's employment:

> I am writing to let you know that it is not going well with Jennifer and that there is a good chance that I will want to terminate her. I am committed to one more month of trying to make it work, but if things do not improve I will need to start considering other options. I will keep you posted - in the mean time I would be grateful for your thoughts. As you know, she will be in Japan in October, however I will need to make a decision before then.

(MCHA Doc. Pr. at 1052 (Exhibit "SS").)

**Disputed in part.** Ms. Costa's inclination to terminate Plaintiff was subject to MCHC's input and approval. (Exhibit NN).

72. On August 17, 2015, Plaintiff met with Ms. Saunders to complain about Ms. Troccoli's absences and threatened to quit if Ms. Troccoli was not fired. Plaintiff stated, "[i]t's [Troccoli] or me." (MCHA Doc. Pr. at 896 (Exhibit "TT").)

**Disputed.** Plaintiff testified that there was "no chance that we were ever going to terminate [Ms. Troccoli]" and that this was not a serious threat. (Exhibit J, at 213:19-25). She further testified that she did not demand that Ms. Troccoli be terminated, nor did she say she would quit if Ms. Troccoli was not fired. (*Id.* 210:15-23).

73. During this meeting, Ms. Saunders told Plaintiff that she needed to be very careful about complaining about Ms. Troccoli's absences taken for medical reasons, as such complaints could be seen as a violation of the Americans with Disabilities Act. (MCHA Doc. Pr. at 281-82 (Exhibit "UU").)

**Disputed.** Plaintiff testified that Ms. Saunders did *not* tell Plaintiff to be careful about complaining about Ms. Troccoli's absences. (Exhibit J, at 224:13). Rather, Plaintiff "was the one who was telling [Ms. Saunders] that we needed to be very careful because we don't want to violate the Americans with Disabilities Act." (*Id.* 224:16-19). As Plaintiff noted, "Why would [Ms. Saunders], the human resources person, be advising the acting general counsel on legal advice… I was the lawyer." (*Id.* 224:14-20).

74.     In an August 19, 2015, Mr. Fujiwara replied to Ms. Costa:

I thought you had been feeling well with her and she had been trying her best to assume her new position or assignment. I know there is some claim or allegation to her, but it is too sudden for me to agree or disagree, because not a small number of people in Japan like her and have been appreciative for her contribution.

MCHA Doc. Pr. at 1024-25 (Exhibit "VV").)

**Undisputed.**

75.     On August 28, 2015, Ms. Costa emailed Mr. Fujiwara and Mr. Sakaguchi "to notify [them] that Kelli Troccoli (a member of the Legal Department for 13 years) made a formal complaint to Pat Saunders (Director of HR) about" what she perceived as a "threat [by Plaintiff] to terminate her employment in retaliation for her taking time off to address her medical condition." (Exhibit UU.)

**Undisputed.**

76.     Later that day, Ms. Costa sent another email to Mr. Fujiwara and Mr. Sakaguchi to say that Ms. Troccoli's complaint against Plaintiff was "a clear example of what prompted [Ms. Costa] to send [her] email of August 16 stating that [she] ha[d] serious concerns about keeping Jennifer in the position of General Counsel and Chief Compliance Officer." (MCHA Doc. Pr. at 951-52 (Exhibit "WW").)

**Undisputed.**

77.     On August 28, 2015, Plaintiff informed Ms. Saunders that she consulted outside counsel regarding Ms. Troccoli's absences, without first notifying either Ms. Costa or Ms. Saunders. (MCHA Doc. Pr. at 1122-24 (Exhibit "XX").)

> **Disputed but immaterial.** Plaintiff testified that she "had the authority" to seek outside counsel on this issue. (Exhibit J, at 219:4). Further, Steve Moss, the attorney plaintiff consulted, never billed MCHA for his time. *Id.* 219:15.

78.     On September 1, 2015, Ms. Costa emailed Plaintiff to schedule an in-person meeting to discuss their relationship and communication, as well as Plaintiff's relationship with Ms. Troccoli, stating "I am at a loss as to how to work with you and communicate with you." (MHCA Doc. Pr. at 1047-48 (Exhibit "YY").)

> **Undisputed.**

79.     Also on September 1, 2015, Ms. Costa emailed Mr. Fujiwara and Mr. Sakaguchi to recommend hiring outside counsel to conduct the investigation into Ms. Troccoli's complaint against Plaintiff in light of Plaintiff's failure to cooperate. (MCHA Doc. Pr. at 943-44 (Exhibit "ZZ").)

> **Disputed in part.** It is not disputed that Ms. Costa sent the email; however, Plaintiff objected to Ms. Saunders investigating Ms. Troccoli's complaint because Ms. Saunders was the "primary witness to the conversation" that formed the basis of Ms. Troccoli's complaint. (Exhibit J, at 222:16-25). Accordingly, the putative "investigation" was a "farce." (*Id.* 222:19).

80.     Mr. Sakaguchi responded to Ms. Costa's email by stating that this issue should be resolved internally, without the use of outside counsel. (Exhibit ZZ.)

**Undisputed.**

81.     Mr. Sakaguchi also emailed Plaintiff directly and asked that she "try to resolve the problem internally by discussing the issues in good faith with Donna and HR Manager," noting that he was "neutral." (MCHA Doc. Pr. at 973-74 (Exhibit "AAA").)

**Undisputed.**

82.     Ms. Costa informed Mr. Sakaguchi that his email "made [Plaintiff] angry." (MCHA Doc. Pr. at 957-58 (Exhibit "BBB").)

**Undisputed.**

83.     In August 2015, Ms. Costa and Mr. Oliva met for lunch, during which Ms. Costa mentioned that there were some difficulties in the MCHA legal department. Mr. Oliva indicated he might be interested in returning to MCHA if he were offered the General Counsel position. (Exhibit F, at 49:11-50:12; Exhibit B, at 177:2-17.)

**Undisputed.**

84.     Ms. Costa did not offer Mr. Oliva the General Counsel position during the August 2015 dinner. (Exhibit E, at 176:12.)

**Undisputed.**

85.     In a September 1, 2015, email to Mr. Fujiwara, Ms. Costa suggested that MCHA hire Nicholas Oliva, a former MCHA counsel, to replace Plaintiff:

> I would like your thoughts on the following: would you truly prefer to keep Jennifer as GC knowing all the people who are miserable as a result, or would you prefer to have Nick Oliva as GC (or someone like him)? Nick took me for a belated birthday dinner and to thank him for a favor I did for him a few months ago -- he is not happy in his current job....

(MCHA Doc. Pr. at 278 (Exhibit "CCC"); MCHA Doc. Pr. at 292-94 (Exhibit "DDD").)

**Undisputed.**

86. Mr. Fujiwara responded to Ms. Costa's email later that day:

> About Nick, I like him a lot more than Jennifer. To be frank, Jennifer has been sometimes difficult for us, while, based on my experience, Nick had tried to understand our culture and to be nice with people from Japan. If he is interested in coming back to us, I know many people, including me, welcome him.

(Exhibit CCC; Exhibit DDD.)

**Undisputed.**

87. Later on September 1, 2015, Ms. Costa replied to Mr. Fujiwara's email with an email restating her reasons for wanting to terminate Plaintiff, concluding:

> What we have all seen in the last couple of months is that Jennifer's personality is not something separate from her capabilities and professionalism - her personality negatively impacts the quality of her work and her ability to manage, and creates risk for the businesses being supported by MCHA. I can give you many actual examples, but I will stop for now. I am going to speak to Nick and see if he is interested. It would be great to have Nick back again.

(*Id.*)

**Undisputed.**

88. On September 11, 2015, Ms. Costa forwarded to Ms. Saunders the response she received from Mr. Fujiwara, wherein he agreed to remove the title of Chief Compliance Officer from Plaintiff and discussed further actions. (MCHA Doc. Pr. at 1175 (Exhibit "EEE").)

**Undisputed.**

89. On September 25, 2015, Ms. Costa wrote to Mr. Sakaguchi, then general manager of MCHC's legal department, and Mr. Fujiwara to say that she accepted Mr. Sakaguchi's request that MCHA offer Plaintiff her prior position instead of terminating her employment:

> I have considered Sakaguchi-san's request further, and have concluded that I am willing to offer Jennifer to return to her prior position rather than terminating her. If she does not accept, we will give her a severance package. If she does accept, we will return her to her former title and compensation package and we will do our best to make it work.

(MCHA Doc. Pr. at 1020 (Exhibit "FFF"); MCHA Doc. Pr. at 1022-23 (Exhibit "GGG").)

**Undisputed.**

90.     In a September 26, 2015 email to Mr. Fujiwara and Mr. Sakaguchi, Ms. Costa outlined her expected timeline for interviewing and hiring Mr. Oliva.  (Exhibit FFF; Exhibit GGG.)

**Undisputed.**

91.     In a September 28, 2015 email to Ms. Costa, Mr. Fujiwara expressed concern that moving Plaintiff back to her previous position while hiring a new General Counsel would increase MCHA's operating budget:

> As you recall, the reason of us in Japan having not agreed to the idea of hiring new GC after your taking the president's position was because of the anticipated increase in the costs at the legal department or MCHA.  If [Plaintiff] accepts the idea, it will result in the same situation as before. . . .  I think we need to know the impact in the operating costs associated with this whole thing in relation to the 2015 budget . . . .

(MCHA Doc. Pr. at 346-47 (Exhibit "HHH").)

**Undisputed.**

92.     On October 1, 2015, Plaintiff provided Ms. Costa with Plaintiff's mid-year self-assessment for 2015.  (MCHA Doc. Pr. at 375-83 (Exhibit "III").)

**Undisputed.**

93.     On October 12, 2015, Ms. Troccoli sent an email to Ms. Saunders notifying her that Plaintiff had not been informing the Human Resources department of employee absences in the legal department.  (MCHA Doc. Pr. at 1120-21 (Exhibit "JJJ").)

**Disputed.**  Plaintiff testified that "everybody did know" that Miko, a legal department employee at the time, was sick and in the hospital. (Exhibit J, at 226:20-24).

94.     On October 13, 2015, Ms. Costa requested that Plaintiff keep her "fully posted by email" about a project.  (MCHA Doc. Pr. at 412 (Exhibit "KKK").)

**Disputed.** The document labelled Exhibit "KKK" is a January 6, 2017, email.

95.     On October 20, 2015, Ms. Saunders met with Ms. Troccoli to discuss Ms. Troccoli's complaints that Plaintiff had been excluding Ms. Troccoli from matters falling within her job description. (MCHA Doc. Pr. at 903 (Exhibit "LLL").)

**Undisputed.**

96.     On November 11, 2015, Plaintiff received a mid-year evaluation for 2015, conducted by Ms. Costa that was significantly more negative than Plaintiff's mid-year self-evaluation. (MCHA Doc. Pr. at 600-602 (Exhibit "MMM"); Exhibit E, at 193:20-195:9.)

**Undisputed.**

97.     In the 2015 mid-year evaluation, Ms. Costa informed Plaintiff that she would not be promoted from Acting General Counsel to General Counsel and that, instead, a new General Counsel and Chief Compliance Officer would join MCHA on November 30, 2015, at which time Plaintiff would return to her former position of Assistant General Counsel. (Exhibit MMM.)

**Undisputed.**

98.     Ms. Costa explained that, after receiving "the input of many individuals" and based on her personal dealings with Plaintiff, she concluded "that additional time w[ould] not remedy [Plaintiff's] failure to satisfy the core competencies required of the General Counsel and CCO." (Exhibit MMM; *see also* Exhibit E, at 229:14-233:4.)

> **Disputed.** Plaintiff testified that "each and every reason that [Ms. Costa] listed" in the mid-year review is a "fabrication of the true events that took place." (Exhibit J, at 236:21-23).

99.     Ms. Costa further wrote that Plaintiff "seem[ed] unable or unwilling to work with [Ms. Costa] as [Plaintiff's] supervisor" and "d[id] not proactively communicate with [Ms. Costa] on routine or substantive matters." (Exhibit MMM.)

**Disputed.** Plaintiff testified that this is incorrect. (Exhibit J, at 236:12). On the contrary, Plaintiff regularly reached out to Ms. Costa for advice on the job but felt that it was Ms. Costa who tried to avoid Plaintiff. (*See* Exhibit 9,[2] Exhibit 10, Exhibit 11; Exhibit J, at 678:5-8).

100.     Most critically, Ms. Costa said that she could no longer trust Plaintiff's judgment in her current position. She listed five examples of Plaintiff's poor judgment: (1) the Comtrex litigation, in which Plaintiff failed to notify Ms. Costa of what was happening in the case throughout the litigation; (2) the Filtec matter, where Plaintiff disregarded Ms. Costa's instructions and made incorrect, premature conclusions; (3) a 4010 filing, with regard to which Plaintiff exhibited poor judgment and failed to consult Ms. Costa; (4) Plaintiff's dealings with Ms. Troccoli, which compromised MCHA's interests; and (5) the Project Genesis "go/ no-go" discussion, during which Plaintiff made "an emphatic soapbox statement [that] was entirely inappropriate," demonstrating her inability to tactfully adjust her approach to the circumstances, and therefore to inspire confidence in the way essential to effectively function as General Counsel. (*Id.*)

**Disputed.** Plaintiff testified at length (*see generally* Exhibit J, at 671-82) describing the factual inaccuracies underlying each of the five examples:

101.     **(1)** As to the Comtrex litigation, Plaintiff "absolutely" updated Ms. Costa about the matter. *Id.* 674:20. To the extent that Ms. Costa did not receive any updates, it was because Ms. Costa was "away on a vacation for two weeks." (*Id.* 674:20-21).

         **(2)** As to the Filtec matter, Plaintiff "made no conclusions of law or fact" in her discussion with Ms. Costa, but "merely tried to report the status of the investigation." (*Id.* 675:10-12).

---

[2] Numerically labelled exhibits refer to exhibits attached to the Declaration of Matthew L. Berman, submitted herewith.

**(3)** As to the 4010 filing, Plaintiff testified to the "numerous conversations" with actuaries and outside counsel that informed the ultimate decision, reflecting her good judgment. (*Id.* 676:23-25).

**(4)** As to Plaintiff's dealings with Ms. Troccoli, Plaintiff sought counsel from a "well-respected labor attorney" who "guided [her] action in every way" regarding Ms. Troccoli "to avoid any liability whatsoever." (*Id.* 679:7-10).

**(5)** As to Project Genesis, Plaintiff did not make any "lengthy speech," but instead, simply reiterated the risk factors involved in the project for the decision-makers in the room. *Id.* 681:5-682:7. Plaintiff was simply "doing her job." (*Id.* at 682:25-683:2). As "the lawyer in the room," Plaintiff was "brought in specifically to identify" risks for the "businesspeople" and to "make sure there were mitigation plans." *Id.* at 683:2-6. Regarding the above matters, Plaintiff was "perfectly willing to seek advice from [Ms. Costa], but she traveled a great deal, and she also tried to avoid [Plaintiff]." *Id.* 678:5-8.

102.   Ms. Costa further stated that she had "discussed [her] concerns with [Plaintiff] repeatedly, in one form or another, without results" but made clear that Plaintiff was being returned to her former position of Assistant General Counsel rather than being terminated. (*Id.*)

**Disputed.** Ms. Costa testified that as president she never disciplined Plaintiff, nor did she ever issue a written warning or inform Plaintiff that she had violated any company policy. (Exhibit E, at 223:6-24).

103.   On November 12, 2015, Ms. Costa emailed Mr. Fujiwara and Mr. Sakaguchi to inform them that she had notified Plaintiff that Plaintiff would be returning to her former position effective November 30, 2015, and that Plaintiff had agreed to the change. (MCHA Doc. Pr. at 1072-75 (Exhibit "NNN").)

**Undisputed.**

104.     On November 20, 2015, Ms. Costa emailed Ms. Saunders to inquire how things were going with Plaintiff since Ms. Costa had informed Plaintiff that she would be returning to her position as Assistant General Counsel.  (MCHA Doc. Pr. at 461 (Exhibit "OOO").)

**Undisputed.**

### E.  Nicholas Oliva Is Hired as General Counsel and Chief Compliance Officer

105.     Mr. Oliva worked for MCHA as a paralegal during his time in law school and continued to work there after graduating.  (Exhibit F, at 19:11-20:6.)

**Undisputed.**

106.     Upon passing the bar exam, Mr. Oliva served as Counsel for MCHA.  (*Id*., at 20:19-21:9.)

**Undisputed.**

107.     Mr. Oliva worked for MCHA from July 2001 until April 2007.  (*Id*., at 22:9-10.)

**Undisputed.**

108.     Mr. Oliva departed from MCHA in April 2007 to pursue work in the pharmaceutical industry. (*Id.*, at 39:20-59:4.)

**Undisputed.**

109.     In his time away from MCHA, Mr. Oliva developed significant experience with mergers and acquisitions, antitrust, and compliance, especially in the pharmaceutical industry. (*Id.*, at 56:17-40:13, 42:5-10.)

**Disputed.** Ms. Costa identified antitrust and mergers and acquisitions as gaps in Mr. Oliva's experience and "two major areas of concern." (Exhibit F, at 56:14-20).

110. Plaintiff did not have the same pharmaceutical experience as Mr. Oliva or experience managing a global team. (Exhibit J, at 257:24-258:10.)

**Undisputed.**

111. In addition to Ms. Costa, Mr. Oliva was interviewed by Ms. Saunders and a female Assistant General Counsel. (Exhibit F, at 70:21-25.)

**Undisputed.**

112. MCHA ultimately offered Mr. Oliva the position of General Counsel and Chief Compliance Officer with a starting salary of $300,000, the same salary that Plaintiff was earning in the Acting General Counsel position. (Exhibit F, at 68:5-13; Exhibit A.)

**Undisputed.**

113. Mr. Oliva negotiated with MCHA over his compensation package, removing a car from the package, securing a signing bonus for the purposes of paying back the signing bonus from his previous employer, and a base salary of $325,000 based upon his work experience. (Exhibit F, at 68:14-69:20, 72:14-73:9.)

**Undisputed.**

114. In order to hire Mr. Oliva, MCHA needed to lure him away from his current employer. (*Id.*, at 69:12-20.)

**Undisputed but immaterial.**

115. On October 19, 2015, Mr. Oliva received an offer letter for the General Counsel and Chief Compliance Officer of MCHA (MCHA Doc. Pr. at 2360-61 (Exhibit "PPP")), and commenced his duties on November 30, 2015. (Exhibit F, at 11:12-21.)

**Undisputed.**

116.     On December 1, 2015, Plaintiff requested that Ms. Saunders confirm the details of Plaintiff's pay increase and pro rata bonus target.  (MCHA Doc. Pr. at 465-66 (Exhibit "QQQ").)

**Undisputed.**

117.     On December 9, 2015, during a discussion between Mr. Oliva and Plaintiff, Plaintiff questioned whether Mr. Oliva had the necessary experience to handle a new project for a client.  (MCHA Doc. Pr. at 854-56 (Exhibit "RRR").)

**Undisputed.**

118.     According to notes that Mr. Oliva sent himself on the morning of December 16, 2015, the previous day Plaintiff again questioned his experience and capabilities, stating "she doesn't know [his] skill/experience and therefore, she cannot tell what can move to [him]." (Exhibit RRR.)

> **Disputed.** Exhibit RRR is an email Mr. Oliva sent himself on December 11, 2015, and therefore does not refer to any meeting on December 15, 2015.

119.     In those notes, Mr. Oliva also recorded that during a December 15, 2015 staff meeting, Plaintiff confronted another attorney about an issue that the attorney had raised before conceding that Plaintiff herself "must have worked through [the issue] but her memory fails."  (*Id.*)

> **Disputed.** *See* explanation in ¶ 118.

120.     On December 17, 2015, Ms. Saunders made a note that Plaintiff refused to tell Mr. Oliva what projects she was working on.  (MCHA Doc. Pr. at 905 (Exhibit "SSS").)

> **Disputed.** Plaintiff has no recollection of either the meeting or making such a statement. (Exhibit J, at 260:10-22).

121.    On November 25, 2015, Mr. Sakaguchi informed Plaintiff that MCHA's clients were "very unhappy with the ways in which [Plaintiff] (or MCHA)" was handling the representation. (MCHA Doc. Pr. at 1219 (Exhibit "TTT").)

**Undisputed.**

122.    On November 26, 2015, Plaintiff responded to Mr. Sakaguchi's November 25 email:

> I took over this case only a few months ago and it is over a decade old. If you do not like the way it was handled then please direct your comments to Donna [Costa] who managed it and [that client relationship] for the last 10 years. You asked for an explanation of the fees and an expectation for the coming years. This is what I gave you. Please do not continue to condemn my legal advice in such a public manner. It is unprofessional and nasty.

(MCHA Doc. Pr. at 1218 (Exhibit "UUU").)

**Undisputed.**

123.    On February 12, 2016, Mr. Oliva sent himself an email recording that he had coached Plaintiff that day on a trade secret issue, but Plaintiff responded to him in a "condescending" tone, even though "her legal reasoning/identification of the core issue was wrong." (MCHA Doc. Pr. at 861 (Exhibit "VVV").)

**Disputed.** Mr. Oliva never gave Plaintiff any formal warnings. (Exhibit F, at 258:9-22). Nor did Mr. Oliva provide guidance or feedback to Plaintiff regarding communications or judgment. (Exhibit J, at 570:3-8).

124.    Plaintiff alleges that, on March 1, 2016, she memorialized a conversation with Mr. Oliva that day concerning disparate treatment of another employee and Plaintiff's fear of retaliation. (Exhibit J, at 283:5-285:2; *see* Plaintiff Jennifer Fischman's Document Production (Exhibit "WWW") at 830-31.)

**Undisputed.**

125.    Plaintiff has testified that this note was "critically important," and that "[it] is the basis for which I used for the complaint." (Exhibit J, at 285:17-24.)

**Undisputed.**

126.    Defendants retained the expert services of Gerald M. LaPorte, a forensic chemist and document dating specialist, who determined that the note was not created in March 2016, but rather that it was created within two years of when he performed his testing, or sometime after July 31, 2019. (Expert Report of Gerald M. LaPorte (Exhibit "XXX"), at 7.)

**Undisputed.**

127.    Mr. Oliva testified that Plaintiff never complained of disparate treatment with respect to lesser severance packages being offered to female employees. (Exhibit F, at 145:16-19.)

**Disputed.** Plaintiff testified that she did complain about disparate treatment regarding severance packages. (Exhibit J, at 283-84).

128.    On March 3, 2016, Mr. Oliva met with Plaintiff to discuss her request to work from home two days a week, problems with colleagues, and job dissatisfaction. (MCHA Doc. Pr. at 864-65 (Exhibit "YYY").)

**Undisputed.**

129.    On March 7, 2016, Mike Gragtmans, president of Mitsubishi Chemical Performance Polymers, Inc., wrote to Ms. Costa that Jouhei Takimoto, one of the general managers at MCC, did not want Plaintiff to lead the legal effort on Project Haru, an acquisition of a multi-national company:

> I am currently in Japan and just met with the Project Haru team. The team is asking who our lead counsel will be for the project?
>
> I know you told me that Jennifer would be the person that was assigned to the project and I think that is fine for the US portion of the deal. However, I don't think she can be lead counsel for the project if it does take off. The reason I say this is because Takimoto- san is not supportive of her as lead counsel since the target

company operates in multiple regions. I think Takimoto-san will want a more experienced person who can handle a multi-national company acquisition.

Could you tell me who you recommend be lead counsel for this project if it does take-off? I assume it is Nick, but I wanted to confirm. . . .

PS I am truly disappointed that Jennifer seems to have lost a great deal of credibility with PPD [the Performance Polymers Division]. I wish I knew how to help her overcome it

(MCHA Doc. Pr. at 1102-03 (Exhibit "ZZZ").)

**Undisputed.**

130.    On April 22, 2016, Plaintiff wrote to Mr. Oliva that she had always been "exceeds [expectations]" on her performance evaluations in the past, and thought that she should receive the same assessment in her next evaluation.  (MCHA Doc. Pr. at 1306-09 (Exhibit "AAAA").)

**Undisputed.**

131.    On April 30, 2016, Plaintiff received her year-end evaluation for 2015, conducted by Mr. Oliva, and based upon the fourth quarter of 2015 only.  (MCHA Doc. Pr. at 590-99 (Exhibit "BBBB").)

**Undisputed.**

132.    Plaintiff received "meets competency performance standards" for contributing to team success, the second lowest possible proficiency grade, and "needs improvement" for communication, the lowest possible proficiency grade.  (Exhibit BBBB.)

**Disputed in part.** There were three proficiency grades available, so "meets competency performance standards" was also the second highest possible grade. (Exhibit BBBB)

133.    Mr. Oliva stated in the evaluation that Plaintiff should invest more time in ensuring that the department functioned as a team, and that she had room for improvement in communicating in a respectful tone and manner, and being aware of verbal and non-verbal communication styles.  (*Id.*)

**Disputed.** Plaintiff had never received a "needs improvement" grade before. (Exhibit J, at 282:7). She testified that Mr. Oliva gave her this grade in retaliation for her early March 2016 complaint about discrimination against Amber Todd. *Id.* 282:11-18.

134.    On May 24, 2016, Ms. Saunders provided Mr. Oliva with the new base salary and bonus information for members of the legal department. (MCHA Doc. Pr. at 1831-32 (Exhibit "CCCC").)

**Undisputed.**

135.    The salaries reflected in Ms. Saunders's email were to be reflected in the June 10 pay period, and demonstrate that Plaintiff earned more than anyone else in the legal department except for Mr. Oliva, the General Counsel. (Exhibit CCCC.)

**Undisputed.**

### F.  The Genomatica Matter

136.    In June 2016, MCC filed a breach of contract suit against Genomatica, Inc. (*See* No. 3:2016-cv-01414-RBB-MJL (S.D. Cal.).)

**Undisputed.**

137.    Plaintiff was the lead MCHA attorney on this matter, supervising Joshua Berman as outside counsel. (Exhibit J, at 288:11-16; Exhibit F, at 166:21-167:2.)

**Undisputed.**

138.    On September 7, 2016, Tomoji Minami, a manager in MCHS's legal department, emailed Mr. Oliva to request that Mr. Oliva join future conference calls on the Genomatica matter in addition to Plaintiff and Joshua Berman, because high-level decisions needed to be made. (MCHA Doc. Pr. at 1422-23 (Exhibit "DDDD").)

**Disputed in part.** Tomoji Minami ("Mr. Minami") was a "low level window person" who worked for MCHJ. (Exhibit J, at 327:14).

139.    On September 29, 2016, Mr. Minami expressed concerns to Mr. Oliva regarding Plaintiff's handling of the Genomatica litigation, and again sought Mr. Oliva's advice. (MCHA Doc. Pr. at 1419-1421 (Exhibit "EEEE").)

**Disputed in part.** Mr. Minami's concerns about the Genomatica matter overwhelmingly related to Josh Berman ("Mr. Berman"), the outside counsel. (Exhibit EEEE).

140.    On October 23, 2016, Mr. Minami wrote to Mr. Oliva to express further concern, especially on the part of Mr. Takimoto, about Plaintiff's failure to provide them with regular litigation updates. (MCHA Doc. Pr. at 876-77 (Exhibit "FFFF").)

**Disputed in part.** In this email, Mr. Minami states, "I believe that [Plaintiff] did not do any bad thing and I know she is doing the best for us. Please stand up for her if necessary." (Exhibit FFFF).

141.    Furthermore, on October 23, 2016, Mr. Minami informed Plaintiff and Mr. Oliva that Mr. Takimoto wanted Mr. Oliva to attend the upcoming conference as MCC's authorized representative with authority to settle, and requested that Plaintiff provide updates regarding the general status of the litigation. (MCHA Doc. Pr. at 872-73 (Exhibit "GGGG").)

**Undisputed.**

142.    On December 29, 2016, Plaintiff communicated Genomatica's new settlement offer to Mr. Oliva and stated that she did not want to counter with anything less than $2.5 million payable up front and a royalty-free license for the assigned patents. (MCHA Doc. Pr. at 882-83 (Exhibit "HHHH").)

**Undisputed.**

143.    On December 30, 2016, Plaintiff and Mr. Berman proposed to Mr. Minami that they respond to Genomatica's settlement offer with a demand of $2.5 million payable in two installments over six months, or $2 million payable immediately.  (MCHA Doc. Pr. at 885-86 (Exhibit "IIII").)

**Undisputed.**

144.    On January 3, 2017, Mr. Minami responded to advise Plaintiff that the counterproposal should be $2.5 million, payable in two installments over 6 months.  (Exhibit IIII.)

**Undisputed.**

145.    On January 5, 2017, Plaintiff informed Mr. Minami, that she, Mr. Oliva, and Mr. Berman were not ready to respond with a counterproposal, but that she would send him their recommendation as soon as possible.  (*Id.*)

**Undisputed.**

146.    Also on January 5, 2017, Mr. Berman emailed Plaintiff confirming they did not yet have Japan's approval for a settlement counterproposal.  (MCHA Doc. Pr. at 2322 (Exhibit "JJJJ").)

**Disputed.** The email reads, "Let's also decide firmly how we want to respond to Stiegler's settlement email (which to the extent we don't have sufficiently concrete answers from Japan yet, could be with an email thanking him for the overture and letting him know that MCC is considering the issue and will be responding shortly.)" (Exhibit JJJJ). As Plaintiff testified, the email does *not* make it clear that MCC had failed to provide approval for a settlement counterproposal. (Exhibit J, at 309:19-22). Instead, it simply shows that "we hadn't made a decision how to respond" to opposing counsel's email. *Id.*

147. On January 6, 2017, Plaintiff directed Mr. Berman to make a settlement counterproposal of $2.3 million, to be paid within 30 days, unbeknownst to the client, MCC, and without its approval. (MCHA Doc. Pr. at 2315 (Exhibit "KKKK"); MCHA Doc. Pr. at 878-79 (Exhibit "LLLL").)

**Disputed.** Plaintiff did not instruct Mr. Berman to make an unauthorized settlement counterproposal. She testified that that: (i) Mr. Oliva had received authority from MCC to make any settlement demand of $2.0 million or more; (ii) Plaintiff was fully aware of the extent of the settlement authority that Mr. Oliva had received; (iii) that Mr. Oliva exercised that authority by approving Ms. Fischman's request to convey the $2.3 million settlement demand on behalf of MCC, and (iv) that Mr. Johei Takimoto ("Mr. Takimoto"), of MCC, approved of the plan to make a settlement demand over $2.0 million and was supportive of the $2.3 million demand that had been made:

Mitsubishi Chemical Corporation was the client. Johei Takimoto was the client. Johei Takimoto had provided Nick Oliva plenary authority in writing in November to settle this case. Nick had participated in a settlement conference in San Diego where he had already offered down to $2,000,000. So, when I had the conversation in Nick's office that we ought to offer 2.3 and he agreed, I had no reason to question where that authority was coming from because I already knew he was authorized, so, I believed that that was an authorized offer. Three days later when Takimoto was visiting the New York office, Nick, Takimoto and myself sat in the small conference room in the New York office around a small round table where we discussed at great length the settlement offer, the strategy for settlement, the need for depositions and possibility of depositions, the need for preservation of documents in Japan. We had a lengthy conversation, and, at the end, Mr. Takimoto said, I agree 100% with your strategy, Jennifer, and left.

(Exhibit J at 576-77) 575:15-17 ("My testimony is that Mr. Oliva, my supervisor, who was authorized down to $2,000,000 authorized [the $2.3M offer] 100%."); 324:7-8 (the demand was "well within the settlement authorization" given by MCC to Mr. Oliva); 326:10-15 (Mr. Oliva "knew the origins of the [$2.3M] offer" because "he was in the conversation

36

who decided" on that offer); 574:23-575:19 (describing how Mr. Oliva orally agreed to the $2.3M demand)).

148.   Mr. Berman made the settlement counterproposal because he was authorized to do so by Plaintiff. (Joshua Berman Deposition Transcript (Exhibit "MMMM") at 91:15-24.)

**Undisputed.**

149.   On January 19, 2017, Mr. Minami wrote to Mr. Oliva that, earlier that day, Plaintiff and Mr. Berman informed him on call that they had made a settlement counterproposal on January 7, 2017, of $2.3 million, unbeknownst to Mr. Minami. (Exhibit LLLL.)

**Undisputed but immaterial.** Plaintiff admitted that she failed to notify Mr. Minami that an offer had been made. (Exhibit J at 327:12-13). However, Mr. Minami was a "low level window person at MCHJ." (*Id.* at 327:14). In contrast, Mr. Takimoto, of MCC, approved of the plan to make a settlement demand over $2.0 million and was supportive of the $2.3 million demand that had been made:

"Takimoto San, the business leader and person most important to this litigation understood what we had done, what I had done in authorizing Josh to make that offer. He also understood that it was within Nick's authority. He didn't question that. He agreed one hundred percent with our strategy and was ready to move forward. The confusion was that two separate businesses in Japan. Tomoji, who works in the legal department of MCHJ, didn't know what Mr. Takimoto San knew and so that's what created the confusion and the miscommunication but no one was against the 2.3 offer. In fact, Tomoji states in his e-mails we don't think the offer is so bad. It is the miscommunication that is a problem.

(*Id*. at 327:3-328:5). As Mr. Minami notes in his email, the issue boiled down to a "miscommunication," and not an unauthorized counterproposal. (Exhibit LLLL).

150.   Mr. Mvinami further stated that they had been waiting for the recommendation from Plaintiff pursuant to her January 5 email, and that some individuals were upset that a settlement counterproposal was made without advising them first. (*Id*.)

**Undisputed but immaterial.** As noted in paragraph 148, Mr. Minami was concerned about the "miscommunication," in that he did not know an offer had been made. (Exhibit LLLL). Nowhere in the email does he state that the offer was made without authorization; instead, he notes that the offer was "not so bad." *Id.*

151.     Mr. Oliva did not know this counterproposal was made, and promised Mr. Minami to investigate what had happened. (MCHA Doc. Pr. at 1836 (Exhibit "NNNN").)

**Disputed.** *See* ¶ 147 (describing how Mr. Oliva was well aware of the $2.3 million offer because he authorized it).

152.     Mr. Oliva wrote to Plaintiff to ask whether Mr. Berman had made a settlement demand without prior client approval. (MCHA Doc. Pr. at 880-81 (Exhibit "OOOO").)

**Disputed in part.** In the email, Mr. Oliva asked Plaintiff if Mr. Berman had made the settlement demand "prior to confirmation from MCC." (Exhibit OOOO).

153.     On January 19, 2017, Plaintiff admitted to Mr. Oliva that the $2.3 million settlement counterproposal was made by Mr. Berman on Plaintiff's authority alone and without prior confirmation from MCC, because she believed the counterproposal was consistent with MCC's fundamental position.  (MCHA Doc. Pr. at 844-45 (Exhibit "PPPP"); Exhibit F, at 262:11-14.)

**Disputed.** *See* ¶¶ 146, 148 (describing how Mr. Oliva had authorized the $2.3 million offer and how MCC was supportive of the offer). Further, in the email itself, Plaintiff noted that "[Mr. Oliva] and [Plaintiff] had discussed that [$2.3 million] offer." (Exhibit OOOO).

154.     Mr. Oliva first thought to fire Mr. Berman, before learning that Plaintiff authorized the settlement demand. (Exhibit F, at 251:12-20.)

**Undisputed.**

155. On January 19, 2017, Plaintiff sent a "*mea culpa*" email to Mr. Minami admitting that she authorized Mr. Berman to make the $2.3 million settlement demand before getting approval from MCC. Plaintiff then emailed Mr. Oliva directing him to the apology email she sent to Mr. Minami. (MCHA Doc. Pr. at 842-43 (Exhibit "QQQQ"); Exhibit F, at 243:19-244:4.)

> **Disputed in part.** *See* ¶¶ 146, 148 (describing how MCC was supportive of the $2.3 million demand). It is undisputed that Plaintiff sent the email to Mr. Minami on January 19, 2017.

156. On January 20, 2017, Plaintiff wrote to Mr. Minami accusing him of "back-stabbing" her. (MCHA Doc. Pr. at 838-39 (Exhibit "RRRR").)

> **Undisputed.**

## IV. PLAINTIFF'S TERMINATION

157. On January 20, 2017, Mr. Oliva emailed Ms. Costa and Ms. Saunders stating that he had not changed his thinking and still wanted to terminate her employment. (MCHA Doc. Pr. at 1107-08 (Exhibit "SSSS").) Ms. Costa reaffirmed her full support for his decision. (*Id.*)

> **Undisputed.**

158. Mr. Oliva felt [he] could no longer trust Plaintiff to do her job or to advance the legal department of MCHA. (Exhibit F, at 258:23-259:18, 266:6-20.)

> **Undisputed.**

159. Mr. Oliva would not have made the decision to terminate Plaintiff's employment without Ms. Costa's approval. (Exhibit F, at 251:12-252:5.)

> **Disputed.** The cited portions here do not discuss Ms. Costa at all. Ms. Costa may have agreed to the termination, but it was ultimately Mr. Oliva's decision. (*See* Exhibit F, at 250:12-13 (describing how he had "determined to terminate" Plaintiff); *id.* 251:21-22

("And I turned to Donna and said, I think I have to fire Jennifer"); *id.* 259:14-16 ("So I reached the conclusion that she couldn't stay here anymore, that she was terminated for cause[.]"); (Exhibit E, at 261:24-262:4 ("I cannot speak to what were the grounds for [Mr. Oliva] choosing to terminate her"); Exhibit TTTT (cited by Defendants in their ¶ 161) (Ms. Costa confirming that she "fully support[ed] **Nick's decision**" to terminate Plaintiff) (emphasis added)).

160.     On January 22, 2017, Mr. Oliva wrote to Mr. Fujiwara, copying Ms. Costa and Ms. Saunders, to inform him that MCHA was terminating Plaintiff:

> Given that I had communicated with Jennifer (and outside counsel) about the critical nature of trust in managing this litigation, and the serious lapse in judgment and attorney responsibility in this matter which causes me to question everything I know about Jennifer's performance and behaviors, I have lost the ability to trust Jennifer in her role and have determined to end her employment. . .
>
> I plan to deliver the news of termination on Monday, January 30.

(MCHA Doc. Pr. at 489-90 (Exhibit "TTTT").)

**Undisputed.**

161.     Ms. Costa approved Plaintiff's termination. (Exhibit F, at 251:12-252:5; Exhibit E, at 261:24-262:4.)

**Disputed.** Ms. Costa may have agreed to the termination, but it was ultimately Mr. Oliva's decision. (*See* Exhibit F, at 250:12-13 (describing how he had "determined to terminate" Plaintiff); *id.* 251:21-22 ("And I turned to Donna and said, I think I have to fire Jennifer"); *id.* 259:14-16 ("So I reached the conclusion that she couldn't stay here anymore, that she was terminated for cause[.]"); Exhibit E, at 261:24-262:4 ("I cannot speak to what were the grounds for [Mr. Oliva] choosing to terminate her"); Exhibit TTTT (cited by

Defendants in their ¶ 161) (Ms. Costa confirming that she "fully support[ed] **Nick's decision**" to terminate Plaintiff) (emphasis added)).

162.    Later that day, Ms. Costa wrote to Mr. Fujiwara to say that she "fully support[ed]" Mr. Oliva's decision to terminate Plaintiff.  (Exhibit TTTT.)

**Undisputed.**

163.    On January 23, 2017, Mr. Fujiwara responded to Mr. Oliva, writing that he had "no objection to Mr. Oliva's decision on the termination." (MCHA Doc. Pr. at 999-1001 (Exhibit "UUUU").) Mr. Fujiwara noted:  "I do not clearly remember nor I know if you were aware, though, there had been a very difficult situation with Jennifer before you returned to our team, when she was very close to be terminated.  In my way of counting things, this seems the second misconduct on her part and now it should be appropriate to give her a red-card." (*Id.*)

**Undisputed.**

164.    On January 30, 2017, Mr. Oliva and Ms. Saunders met with Plaintiff to terminate her employment, during which Mr. Oliva read from a prepared script.  (Exhibit D.)

**Undisputed.**

165.    Plaintiff, in response to her termination, stated that she "ha[d] a lot of work that [Mr. Oliva] did not even know about."  (*Id.*)

> **Undisputed but immaterial.** As Plaintiff testified, she supported 22 companies and "he could not have been aware of every single detail of even who [she] was having telephone calls with[.]" (Exhibit J at 343:24-344:3).

## PLAINTIFF'S STATEMENT OF
## ADDITIONAL UNDISPUTED MATERIAL FACTS

166.    Plaintiff graduated from Boston University School of Law, a top-25 law school, and then began her legal career by clerking for a federal judge in California. (Exhibit 1; Exhibit J,

at 84:13-15. Mr. Oliva went to a less prestigious law school and never clerked for a federal judge. Exhibit 12).

167.    Plaintiff worked in private practice as a corporate and litigation attorney at the law firms Fried, Frank, Harris, Shriver & Jacobson LLP, Paul Hastings LLP, and Jeffer Mangels Butler & Mitchel LLP. (Exhibit 1). Mr. Oliva never worked for a private firm. (Exhibit 12).

168.    Unlike Plaintiff, Mr. Oliva lacked litigation and transactional experience, both requirements for the General Counsel position. (Exhibit CC; Exhibit F, at 90:22-91:6, 104:24-105:7, 106:3-4, 229:18-230:3; Exhibit 1).

169.    At the time of her promotion to Acting General Counsel, Plaintiff had seven years of experience working for MCHA. (Exhibit 1). This was more than Mr. Oliva had at the time of his hiring as General Counsel. (Exhibit 12).

170.    The General Counsel role required a minimum of 15 years of legal experience. (Exhibit CC). At the time of their respective promotions to General Counsel and Acting General Counsel, Mr. Oliva only had 14 years of experience, in contrast to Plaintiff's 19 years. (Exhibit 12; Exhibit 1; Exhibit J at 14:15-16:5).

171.    The General Counsel job duties included "Evaluating pre-litigation issues… overseeing litigation; advising management on litigation strategy." (Exhibit CC). Mr. Oliva did not have prior experience being primarily responsible for litigation matters. (Exhibit F, at 229:18-230:3). Plaintiff, in contrast, had years of litigation experience, including private practice work. (Exhibit 1).

172.    Mr. Oliva had never supervised an employment law litigation before becoming General Counsel. (Exhibit F, at 90:22-91:6). In contrast, Plaintiff handled most employment-related matters for MCHA. (*Id.* 104:24-105:7, 106:3-4).

173.     From 2009 through 2014, Ms. Costa gave Plaintiff overall ratings of "Exceeds Expectations." (Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit EE). Each of these reviews also ranked Plaintiff as "outstanding" for "Compliance and Ethics." *Id.*

174.     At the time of Plaintiff's promotion to Acting General Counsel, she was the most qualified of the three assistant general counsels who could have been promoted to the position. (Exhibit E, at 172:13-17).

175.     The General Counsel role required "playing a key role in the review and negotiation of corporate transactions." (Exhibit CC). Whereas Mr. Oliva lacked experience with M&A, Plaintiff did not. (Exhibit F, at 56:14-20, 104:24-105:7).  Likewise, Ms. Costa had no transactional experience before becoming General Counsel, and only worked on her first M&A transaction *after* becoming General Counsel. (Exhibit E, at 54:3-11; 56:5-9).

176.     The General Counsel role involved pharmaceutical and life science work. (Exhibit E, at 51:5-6). Ms. Costa had no prior experience in these areas before becoming General Counsel. (Exhibit E, at 58:8-9, 58:23-25).

177.     Ms. Costa had never performed compliance work before becoming General Counsel, even though the position involved supervising MCHA's compliance work. (Exhibit E, at 55:10-20; Exhibit CC). Ms. Costa learned how to perform those duties after she started as General Counsel. (Exhibit E, at 240:7-14). In contrast, Plaintiff had extensive compliance experience before being named Acting General Counsel. (*Id*. 240:18-24).

178.     When Ms. Costa was General Counsel, she had three Assistant General Counsels to support her; when Plaintiff became Acting General Counsel, she only had two Assistant General Counsels to support her. (Exhibit G, at 178:19-179:7).

179.    In Plaintiff's 2014 review, dated April 29, 2015, Ms. Costa praised Plaintiff's communication skills, her ability to handle various complex matters, her "excellent judgment," and her ethics. (Exhibit EE). The review also ranked her as "Outstanding" in the "Job Knowledge" and "Compliance and Ethics" categories. *Id.* Ms. Costa wrote that Plaintiff "has good instincts and consistently demonstrates excellent judgment in providing advice." *Id.* Further, Plaintiff "provides meaningful communication to and is supportive of her clients, her colleagues and the department." *Id.* Ms. Costa also wrote that Plaintiff "has demonstrated an ability to handle complex matters at once" and that her "confidence in [Plaintiff's] ability to manage matters on her own continues to grow." *Id.*

180.    Plaintiff complained to Ms. Saunders that Ms. Troccoli had been bullying her. (Exhibit G, at 171:10-18; *see also id.* 176:13-16; Exhibit TT). Plaintiff felt that Ms. Troccoli was undermining her. (Exhibit J, at 203:23-204:22 (noting that Ms. Troccoli was "very upset" that Plaintiff had been named Acting General Counsel and that she "didn't like [Plaintiff]" and "didn't have any interest in supporting [Plaintiff]")).

181.    Ms. Costa intentionally sought out negative feedback about Plaintiff from Ms. Troccoli. (Exhibit PP (August 12, 2015, email from Ms. Troccoli to Ms. Costa, in which Ms. Troccoli provided the "information [Ms. Costa] requested," consisting of a list of Plaintiff's alleged shortcomings)). The negative feedback that Ms. Troccoli subsequently provided was inaccurate. (Exhibit J at 203:22).

182.    MCHC was heavily involved in the employment decisions at issue, and various documents show Ms. Costa making suggestions subject to MCHC's approval or asking for MCHC's advice. (Exhibit NN; Exhibit 13; Exhibit 14; Exhibit 15; Exhibit HHH; Exhibit 16).

183.    MCHA had never named anyone to an "acting" position before Plaintiff. Trice Tr. 64:24-65:6; Exhibit J at 30:8-9.

184.    Neither Mr. Oliva nor Ms. Costa were hired into an "acting" General Counsel role. (Exhibit F, at 123:17-124:5; *see also* Exhibit G, at208-09; Exhibit E, at 12:16-18).

185.    Ms. Costa preferred a man for the General Counsel role. (Exhibit J at 243:12).

186.    At Plaintiff's unemployment hearing, Mr. Oliva admitted that that he spoke with Plaintiff about how the $2.3M demand was an appropriate settlement amount. (Exhibit 18; Exhibit F, at 225:6-10).

187.    After Defendants had decided to terminate Plaintiff, ostensibly for an ethical breach, Mr. Oliva had Plaintiff travel with him throughout the West for over a week to deliver a compliance training program that dealt with "doing business with integrity." (Exhibit F, at 248:3-9, 249:6).

188.    "There was no investigation" into Plaintiff's handling of the Genomatica matter. (Exhibit G, at217:12-13; *see also* Exhibit E, at 260:3-16, 285:19-286:10).

189.    In Plaintiff's Fourth Quarter of 2015 Performance Review, dated April 30, 2016, Mr. Oliva wrote, "[Plaintiff] maintains a high ethical standard and communicates directly with regard to any potential ethical concern." (Exhibit 22).

190.    In Patricia Saunders' ("Ms. Saunders") notebook, on an entry dated January 26, 2017, Ms. Saunders described a conversation she had with Ms. Costa regarding the pros and cons of terminating Plaintiff for cause or without cause. (Exhibit 20). The entry reads,

> "**[W]e can lose our ability to collect from insurance if we offer [severance]**. Options – **we offer [severance] and on hook for all money** or [terminate] for cause and offer nothing. Decision from [Donna Costa] → no severance."

(*Id*.; Exhibit G, at 222:12-16) (emphasis added).

191.     Plaintiff investigated Mr. Yoshisato because of sexual harassment complaints brought against him. (Exhibit J, at 95:8-19).

192.     Mr. Yoshisato did not support Plaintiff's promotion to the full General Counsel position because she had participated in the sexual harassment investigation against him. (Exhibit J, at 95:8-19).

193.     Plaintiff complained about the disparate treatment she suffered at MCHA on the basis of gender. (Exhibit G, at 215:25-216:4; Exhibit J at 423:8-17).

194.     As General Counsel, Mr. Oliva was paid $325,000; as Acting General Counsel, Plaintiff was paid $300,000. (Exhibit F, at 69:11-15; Exhibit G, at131:13-23).

195.     Mike Gragtmans ("Mr. Gragtmans") made favorable comments about Plaintiff's work in representing MCPP and "respect[ed] [Plaintiff] and appreciate[ed] the services she provided." (Exhibit E, at 202:20-203:3).

196.     Plaintiff received "positive feedback from clients of MCHA about [Plaintiff's] performance." (Exhibit E, at 203:5-12).

197.     On August 19, 2015, Mr. Fujiwara said to Ms. Costa, "not a small number of people like [Plaintiff] and have been appreciative for her contribution." (Exhibit 23).

Dated: Garden City, New York
        December 2, 2022

**VALLI KANE & VAGNINI LLP**

By: /s/ *Robert J. Valli, Jr.*

Robert J. Valli, Jr., Esq.
RValli@vkvlawyers.com

Sara Wyn Kane, Esq.
SKane@vkvlawyers.com

Matthew L. Berman, Esq.
MBerman@vkvlawyers.com

600 Old Country Road
Garden City, New York 11530
Tel: (516) 203-7180
Fax: (516) 706-0248

*Attorneys for Plaintiffs*