UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                 :

JENNIFER S. FISCHMAN,                :

                           :

               Plaintiff,         :

                           :            **18-CV-8188 (JMF)**

      -v-                   :

                           :          <u>OPINION AND ORDER</u>

MITSUBISHI CHEMICAL HOLDINGS AMERICA, :
INC. et al.,                 :

                           :

             Defendants.      :

                           :

------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiff Jennifer Fischman, who worked as in-house counsel for Defendant Mitsubishi Chemical Holdings America, Inc. ("MCHA"), brings claims of sex discrimination and retaliation against MCHA, related entities, and two of her former supervisors.  In particular, Fischman alleges that she was passed over for a promotion in favor of a less qualified male comparator; paid less than the male comparator; demoted; and finally terminated due to sex discrimination and retaliation.  She brings employment discrimination, retaliation, and equal pay claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. ("NYCHRL"), the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and New York Labor Law ("NYLL") § 194 *et seq*.  Defendants now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment. For the reasons that follow, Defendants' motion is GRANTED.

## BACKGROUND

The relevant facts are drawn from the admissible materials submitted by the parties in connection with Defendants' motion and are either undisputed or described in the light most favorable to Fischman.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

MCHA, which is apparently now known as Mitsubishi Chemical America, Inc., is a Delaware corporation with its principal place of business in New York.  *See* ECF No. 89 ("Am. Compl."), ¶ 11; ECF No. 136 ("Defs.' Mem."), at 1.  It is a wholly owned subsidiary of Mitsubishi Chemical Holdings Corporation ("MCHC"), which is now apparently known as Mitsubishi Chemical Group Corporation, a Japanese corporation with its principal place of business in Japan.  Am. Compl. ¶ 12; Defs.' Mem. 1.  In 2008, Defendant Donna Costa, who was then the General Counsel of MCHA, hired Fischman as a Corporate Counsel of MCHA with a salary of $165,000 and a $10,000 signing bonus.  *See* ECF No. 151 ("SOF"), ¶¶ 1, 19, 22.  In 2012, Costa approved a raise for Fishman to $201,699.16 per year.  *Id.* ¶ 28.  The following year, Costa promoted Fischman to Assistant General Counsel of MCHA.  *Id.* ¶ 30.  During this time — that is, from about 2009 to about 2014 — Costa consistently gave Fischman ratings of "Exceeds Expectations" during her performance reviews.  *Id.* ¶ 173.  In 2014, Fischman's salary was raised again, to $222,161.94.  *Id.* ¶ 39.

In 2014, Costa directed Fischman to investigate sexual harassment claims against Shoji Yoshisato, an MCHC executive officer.  *Id.* ¶ 36.  Later that same year, MCHA promoted Costa from General Counsel to President.  *Id.* ¶ 42.  Costa and others then discussed who should fill the vacated position of General Counsel.  Yoshisato told Costa that his preference was to promote an internal candidate.  *Id.* ¶ 44.  Costa, however, had some concerns about promoting Fischman — the most experienced of the three possible internal candidates.  *Id.* ¶ 45.  As she wrote in a list of

"pros and cons," Fischman "[s]till feels needs [sic] to limit amount of her work because she can only deal with a limited amount at one time" and, thus, "[t]hings tend to fall through cracks"; "is selective in what she cares about"; has "preconceived judgments"; and "complains to peers in [the] department" instead of appropriately managing her frustrations.  *Id.*

Despite these concerns, on December 10, 2014, Costa informed Ken Fujiwara, then head of MCHC's legal department, that "MCHA wants . . . to make Jennifer [Fischman] Acting-General Counsel for 12 months in the hope that she will grow into the job."  *Id.* ¶ 46.  On April 1, 2015, Fischman was officially promoted to the position of Acting General Counsel and Chief Compliance Officer.  *Id.* ¶ 54.  Costa approved an increase in Fischman's salary, to $300,000, for her new role.  *Id.* ¶ 56.  Plaintiff had "mixed feelings" about being named General Counsel in only an acting capacity and was "extremely unhappy that after all [her] years of experience, knowledge, familiarity with the businesses," she had been "given an acting role" instead of the full General Counsel role.  *See* ECF No. 138-10 ("Pl.'s Depo."), at 375.

On April 29, 2015, several weeks after Fischman had assumed her new position, Costa completed her performance evaluation for 2014.  SOF ¶ 59.  Costa gave her a "performs acceptably" in "Communication Skills" and "Leadership/Development of Others," the middle of the three grades available.  *Id.*  Things went only downhill from there.  In June 2015, for example, Costa told Patricia Saunders, then MCHA's human resources director, that Fischman needed to "stop being defensive," learn to say "yes" or "I agree," "listen more" and "talk less," and be less "sloppy."  *Id.* ¶ 60; ECF No. 139-15.  In August 2015, Kelly Troccoli, a Legal Assistant and Compliance Coordinator at MCHA, submitted a formal complaint to Saunders alleging that Fischman had discriminated against her based on her disability.  SOF ¶ 75.  Additionally, Troccoli complained to Costa about what she perceived to be Fischman's many

deficiencies, including that there was "[p]otential for things to fall through the cracks because they are not being relayed"; that Fischman was "completely micro managing to the point where it is detrimental"; that Fischman's "method of communication" was "often inappropriate"; that Fischman did not "appear to fully grasp the job responsibilities"; and that Fischman continued to "struggle with her personality issues as it relates to dealing with others." *Id.* ¶ 68. That same month, Costa wrote to a colleague for feedback on a draft email to Fujiwara explaining why Costa wanted to replace Fischman as General Counsel. *Id.* ¶ 66. She wrote that "[i]t has now been over eight months since she was told of her promotion, and more than seven months since it was announced. I have no reason to believe that the barriers to her success will disappear. In fact, my experience with her last week confirms that they will not. . . . Her style results in a lack of trust, which is unacceptable for someone in her role. Personally, I am growing exhausted from our discussions, which often leave me drained and frustrated." *Id.*

On August 16, 2015, Costa emailed Fujiwara to let him know "that it is not going well with Jennifer and that there is a good chance that I will want to terminate her. I am committed to one more month of trying to make it work, but if things do not improve I will need to start considering other options. I will keep you posted — in the mean time [sic] I would be grateful for your thoughts. As you know, she will be in Japan in October, however I will need to make a decision before then." *Id.* ¶ 71. A couple weeks later, Costa emailed Fujiwara and another executive to inform them that Troccoli, "a member of the Legal Department for 13 years," had "made a formal complaint" that Fischman had threatened "to terminate her employment in retaliation for her taking time off to address her medical condition." *Id.* ¶ 75. In a follow-up email, Costa explained that this was a "clear example" of why she had concerns about keeping Fischman in the role of Acting General Counsel. *Id.* ¶ 76.

Around the same time in August 2015, Costa met with Nick Oliva, a former MCHA counsel, and shared with him there were issues in the MCHA legal department.  *Id.* ¶ 83.  Oliva indicated he might be interested in returning to MCHA if he was offered the General Counsel position.  *Id.*  On September 1, 2015, Costa emailed Fischman to schedule a meeting to discuss their relationship, and Fischman's relationship with Troccoli, noting: "I am at a loss as to how to work with you and communicate with you."  *Id.* ¶ 78.  That same day, Costa emailed Fujiwara to ask for his "thoughts on the following: would you truly prefer to keep Jennifer as GC knowing all the people who are miserable as a result, or would you prefer to have Nick Oliva as GC (or someone like him)?"  *Id.* ¶ 85.  Fujiwara responded that he "like[d Nick] a lot more than Jennifer.  To be frank, Jennifer has been sometimes difficult for us."  *Id.* ¶ 86.  Fujiwara wrote that "many people," including him, would welcome Oliva back.  *Id.*

Costa moved ahead with recruiting Oliva.  But she received pushback on the prospect of firing Fischman from Masanori Sakaguchi, then the general manager of MCHC's legal department.  *Id.* ¶ 89.  In the end, Costa wrote to Fujiwara and stated that she had "considered Sakaguchi-san's request further, and have concluded that I am willing to offer Jennifer to return to her prior position rather than terminating her.  If she does not accept, we will give her a severance package.  If she does accept, we will return her to her former title and compensation package and we will do our best to make it work."  *Id.*  On November 11, 2015, Costa conducted a mid-year evaluation for Fischman that was significantly more negative than Fischman's own mid-year self-evaluation.  *Id.* ¶ 96.  During the evaluation, Costa informed Fischman that the company had hired a new General Counsel and Chief Compliance Officer and that Fischman would "return" to her former position of Assistant General Counsel.  *Id.* ¶ 97.

On November 30, 2015, Oliva became MCHA's General Counsel.  MCHA initially

offered him a $300,000 salary — the same amount that Fischman had been paid for her Acting

General Counsel role.  *Id.* ¶ 112.  Oliva, however, successfully negotiated for a salary of

$325,000 (plus a signing bonus that would enable him to pay back the signing bonus he had

received from his previous employer).  *Id.* ¶ 113.  Oliva had worked for MCHA from 2001 until

2007, after which he had worked in the pharmaceutical sector.  *Id.* ¶¶ 105-108.  Fischman did not

have the same pharmaceutical experience as Oliva or experience managing a global team, *id.*

¶ 110, but she had other experience that Oliva lacked.  As Fischman states, she "graduated from

Boston University School of Law, a top-25 law school, and then began her legal career by

clerking for a federal judge in California," while "Oliva went to a less prestigious law school and

never clerked for a federal judge."  *Id.* ¶ 166.  In addition, Fischman worked in private practice,

while Oliva never worked at a firm.  *Id.* ¶ 167.  In total, Fischman had nineteen years of

experience to Oliva's fourteen years.  *Id.* ¶ 170.  According to MCHA, the General Counsel was

required to have "a minimum of 15 years of legal experience in-house and/or in an international

law firm."  ECF No. 139-12, at 1.

After MCHA notified Fischman about her demotion, friction with her mounted.  On

November 25, 2015, for example, Sakaguchi told Fischman that MCHA's clients were "very

unhappy" with MCHA's representation.  SOF ¶ 121.  Fischman responded: "I took over this case

only a few months ago and it is over a decade old.  If you do not like the way it was handled then

please direct your comments to [Costa] who managed it and [that client relationship] for the last

10 years.  You asked for an explanation of the fees and an expectation for the coming years.

This is what I gave you.  Please do not continue to condemn my legal advice in such a public

manner.  It is unprofessional and nasty."  *Id.* ¶ 122.  Additionally, in exchanges over the next few

weeks, Fischman openly questioned whether Oliva had the necessary experience to handle

certain matters.  *Id.* ¶¶ 117-18.  On March 1, 2016, Fischman allegedly wrote a note (the "Note")

in which she memorialized a conversation with Oliva about disparate treatment of another

employee.  *Id.* ¶¶ 124-25.  Defendants maintain, as they have throughout this litigation, that the

Note is a forgery, likely created after this litigation began.  *Id.* ¶ 126.

  Most significantly, Oliva concluded that Fischman had mishandled settlement

negotiations in litigation between Genomatica, Inc., and Mitsubishi Chemical Corporation

("MCC"), one of Fischman's clients.  On December 30, 2016, Fischman and Josh Berman —

outside counsel on the matter — proposed to MCC that they respond to a settlement offer by

Genomatica with a $2.5 million demand payable over six months or $2 million immediately.  *Id.*

¶ 143.  MCC's representative advised that the demand should be for $2.5 million over six

months.  *Id.* ¶ 144.  On January 5, 2017, Fischman wrote to Tomoji Minami, a representative of

her client, that she, Oliva, and Berman were "still discussing the offer" and were "not ready to

respond with a counter proposal" but would "send you our recommendation as soon as possible."

*See* ECF No 143-6 at 3.  On January 6, 2017, however, Fischman directed Berman to make a

settlement counterproposal of $2.3 million payable within thirty days.  SOF ¶ 147.  Berman did

so.  *Id.* ¶ 148.  Upon learning about the counterproposal, Minami emailed Oliva to say that he

"was surprised to hear" about the counterproposal.  ECF No 143-6 at 2.  Attaching Fischman's

email of January 5, 2017, Mimani continued: "As you see the below email dated January 5,

Jennifer mentioned that she was discussing with you and Josh about the counter proposal and she

would send us a recommendation as soon as possible.  So, we have been waiting for the

recommendation from Jennifer[.]  Personally, I believe that $2.3MM offer is not so bad.  But

some MCC members are a little upset by the fact that Josh made it without advising us of the

offer."  ECF No 143-6 at 2.  Minami acknowledged that the issue might have been a

"miscommunication," but he asked Oliva to "kindly supervise Jennifer (and Josh) if the process

was not appropriate" because the client did "not want that this kind of thing happen again in the

future."  *Id*.

On January 19, 2017, Fischman sent Minami an email, which she also forwarded to

Oliva, describing it a "mea culpa email to clarify what happened."  ECF No. 143-11, at 2.  The

email to Minami stated that Fischman "forgot to send MCC this proposal in advance of our

responding to [Genomatica].  When it was time to respond, I authorized Josh to make the

proposal because I believed it was consistent with MCC's position to obtain at least $2M in

settlement.  We knew that both proposals would be rejected by [Genomatica], so I believed that

there would be no harm to MCC by offering this amount.  If we believed that we were actually

close to settling this lawsuit, we would never make a proposal without MCC's approval.  In the

future, as we progress toward settlement (hopefully), we will not make proposals or agreements

of this nature without MCC's approval."  *Id.* at 3.  That same day, Minami replied to Fischman,

stating: "I trust you and I know that you do not do anything harmful to MCC.  But please

understand there are many people who have negative feeling against that something happens in

unknown situation.  I hope you know what I mean."  ECF No. 143-12, at 3.  Fischman responded

the next day: "I would appreciate it also if you simply ask me directly if you have a problem or if

someone else has a problem, instead of going above me to Nick [Oliva] without copying me.  It

is what we call in the US, 'back-stabbing.'"  *Id.* at 2.

Later on January 20, 2017, Oliva and Costa discussed firing Fischman.  Oliva felt he

could not trust Fischman, particulary in light of the Genomatica incident.  SOF ¶¶ 157-162.  On

January 23, 2027, Oliva wrote to Fujiwara, stating that Fischman had "acted without

authorization from MCC in authorizing a settlement offer in the Genomatica litigation" and

further explaining that she had "also replied to the team in Japan apologizing and explaining the

admitted action but did not ask me to review nor did she consult with me about how to respond.

In fact, she did not copy me on the communication, but only sent it to me separately afterward."

ECF No. 143-15 at 3-4.  Fujiwara wrote back that he had "no objection to your decision on the

termination," noting that "there had been a very difficult situation with Jennifer before [Oliva]

returned to our team, when she was very close to be terminated.  In my way of counting things,

this seems the second misconduct on her part and now it should be appropriate to give her a red-

card."  *Id.* at 2.  Fischman was terminated on January 30, 2017.  SOF ¶ 164.

### APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings

demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.

2012) (per curiam).  Such a dispute qualifies as genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving

party bears the initial burden of demonstrating the absence of a genuine issue of material fact.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment

against a party who will bear the ultimate burden of proof at trial, the movant's burden will be

satisfied if he can point to an absence of evidence to support an essential element of the

nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18

(2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315

F.3d 101, 105 (2d Cir. 2002) (per curiam).  Critically, however, all evidence must be viewed "in

the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on "personal knowledge," must "set out facts that would be admissible in evidence," and must "show that the affiant or declarant is competent to testify on the matters stated." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)). Notably, the Second Circuit has cautioned that courts should be "especially chary in handing out summary judgment in discrimination cases," as the intent of the employer is often disputed. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *accord Jamilik v. Yale Univ.*, 362 F. App'x 148, 149 (2d Cir. 2009) (summary order) (internal quotation marks omitted). Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Indeed, just as in the non-discrimination context, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts. She must

come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (cleaned up). That is, a "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (cleaned up).

## DISCUSSION

As noted, Fischman brings sex discrimination, retaliation, and equal pay claims pursuant to two federal laws — Title VII and the EPA — as well as state and local law. The Court will begin with her claims under federal law, taking them in turn.

## A.  Discrimination

Discrimination claims under Title VII are subject to the familiar three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See DeMuth v. U.S. Small Bus. Admin.*, 819 F. App'x 23, 25 (2d Cir. 2020) (summary order); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). Under that framework, a plaintiff must first establish "a *prima facie* case of discrimination." *DeMuth*, 819 F. App'x at 25. To do so, she must show that (1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See, e.g.*, *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *accord Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). If the plaintiff does so, "the burden then shifts to the employer to articulate a legitimate, non-discriminatory . . . reason for the adverse action." *DeMuth*, 819 F. App'x at 25. "If the employer satisfies its burden, the plaintiff must then show

that the reasons presented were a pretext for discrimination . . . ." *Id.* (internal quotation marks omitted).  Notably, if the employer articulates a legitimate, non-discriminatory reason, the "plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of [prohibited] discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).

Measured against these standards, Fischman's sex discrimination claim plainly falls short.  Indeed, she arguably fails to establish even a *prima facie* case of discrimination.  But assuming she could meet that threshold, her claims would fail at the third *McDonnell Douglas* step because Defendants have proffered legitimate, non-discriminatory reasons for the allegedly adverse employment actions (the decision to make her *Acting* General Counsel, her demotion to Assistant General Counsel, and her termination) — namely, Costa's and then Oliva's significant doubts about her abilities and growing dissatisfaction with her performance — and the record is devoid of evidence that they were in fact the result of sex discrimination.  For starters, there is no admissible evidence of comments or incidents that provide even circumstantial evidence of sex discrimination — by Costa or anyone else.  Fischman does allege that Bill Radlien and Dennis Trice, employees of Mitsubishi Polyester Film, "each (separately) stated that Ms. Costa had 'expended all of her political capital' on her own promotion and that there was 'no way' Defendants 'were going to let two women run that business.'"  ECF No. 150 ("Pl.'s Opp'n"), at 2 (quoting Pl.'s Depo. 245, 248).  But putting aside whether the subjective opinions of Radlien and Trice would even suffice, Fischman's testimony about their alleged statements is rank

hearsay and, thus, cannot be considered.  *See, e.g.*, *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005).[1]

Instead, Fischman's case rests almost entirely on the fact that MCHA hired a man (Nick Oliva) to replace her and gave him the title of General Counsel when, at least in her view, her qualifications were stronger than his.  It is true that "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), *superseded in other part by* Fed. R. Civ. P. 37(e) (2015).  "At the same time," courts "must respect" employers' "unfettered discretion to choose among qualified candidates."  *Id.* (internal quotation marks omitted).  Thus, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination.  In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Id.* (internal quotation marks omitted).  Fischman does not come close to meeting that standard.  Yes, some of Fischman's credentials were arguably stronger than Oliva's; but he had some advantages over her, most notably, his experience in the pharmaceutical industry.  *See*

---

[1]     Fischman contends that her testimony about Radlien's and Trice's statements is admissible pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence, which provides that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." But that Rule does not apply because Radlien and Trice were employees of a separate entity and Fischman fails to establish (despite an invitation to do so through supplemental briefing) that an agency relationship existed.  *See* ECF Nos. 156-57.

Defs.' Mem. 7.  And in any event, Fischman's credentials were not "so superior" to Oliva's "that no reasonable person, in the exercise of impartial judgment, could have chosen" him over her. *Byrnie*, 243 F.3d at 103.  It is not the Court's place to second-guess MCHA's business judgment. *See, e.g.*, *Bunk v. Gen. Servs. Admin.*, 408 F. Supp. 2d 153, 159 (W.D.N.Y. 2006) ("Employers should be free to choose the person that they honestly (even if erroneously) consider the better-qualified candidate without being subjected to liability merely because the candidates are of a different [sex].").

One additional fact puts a final nail in the coffin of Fischman's Title VII sex discrimination claim: Costa — who was heavily involved in, if not responsible for, all three of the adverse employment actions against Fischman — was the same person who hired Fischman, provided her with several substantial salary increases and training opportunities, gave her positive reviews, and promoted her to Acting General Counsel (over a man who held the same title, no less).  SOF ¶¶ 19, 28, 30-35, 47.  When, as here, "the person who made the decision to [impose an adverse employment action] was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *accord Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137-38 (2d Cir. 2000); *Villetti v. Guidepoint Glob. LLC*, No. 21-2059-CV, 2022 WL 2525662, at *4 (2d Cir. July 7, 2022) (summary order); *Gilani v. Teneo, Inc.*, No. 20-CV-1785 (CS), 2021 WL 3501330, at *13 (S.D.N.Y. Aug. 4, 2021); *Downey v. Adloox Inc.*, No. 16-CV-1689 (JMF), 2018 WL 5266875, at *7 (S.D.N.Y. Oct. 23, 2018).  To be sure, this "so-called 'same-actor' inference has been the subject of [academic] criticism." *Downey*, 2018 WL 5266875, at *7 (citing Victor D. Quintanilla & Cheryl R. Kaiser, *The Same-*

*Actor Inference of Nondiscrimination: Moral Credentialing and the Psychological and Legal Licensing of Bias*, 104 Calif. L. Rev. 1 (2016)).  But it remains the law of the Circuit.

Fischman does not make — and thus has forfeited — any argument that the same-actor inference does not apply to Title VII claims.  Instead, her main, if not only, substantive response to Defendants' argument that the same-actor inference applies is that Costa was not the real decisionmaker, both because all decisions were "subject to approval from MCHC, the real decision maker," and because Oliva was in charge of the termination decision.  Pl.'s Opp'n 10.  But that response is based on a misunderstanding of the applicable legal standard.  For the "same-actor" inference to apply, "the decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions."  *Gilani*, 2021 WL 3501330, at *13 (cleaned up).  Here, whatever involvement others may have had in the adverse employment actions at issue, there is — and could be — no dispute that Costa played "significant roles" in all of them.  *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 250 (S.D.N.Y. 2000).  She was intimately involved in all discussions about whether to name Fischman General Counsel and in the ultimate decision to give her the role on an acting basis; played a central role in both recruiting Oliva and deciding to demote Fischman back to her earlier position; and was consulted by Oliva in connection with the decision to fire Fischman.

Indeed, at least with respect to the decisions to elevate Fischman to Acting General Counsel and to demote her, the facts do not even support Fischman's argument.  If anything, to the extent that the record reveals any divergence between Costa and MCHC on these decisions, it actually bolsters the same-actor inference.  Fischman relies upon a series of conversations between Fujiwara and Costa in which the latter revealed concerns about Fischman and the former supported her.  *See* Pl.'s Opp'n 10.  These include the email from Costa in which she

stated "I received the message from Yoshisato-san that MCHA wants us to make Jennifer Acting-General Counsel for 12 months in the hope that she will grow into the job," ECF No. 139-6; testimony from Costa about discussions in which Fujiwara preferred an internal candidate (such as Fischman), *see* ECF No. 138-5, at 175; and the email from Costa to Fujiwara and Sakaguchi in which Costa stated "I have considered Sakaguchi-san's request further, and have concluded that I am willing to offer Jennifer to return to her prior position rather than terminating her. . . . I hope that with this compromise you are prepared to approve the proposal next week." ECF No. 141-4, at 5. Every piece of this evidence indicates that the primary decisionmaker was Costa. To the extent that others at MCHA or MCHC exercised influence or control, it was in support of Fischman. Instead, it was Costa who spearheaded the decision to name Fischman *Acting* General Counsel and to demote her in favor of Oliva.

Costa arguably took a back-seat role to Oliva with respect to Fischman's firing. *See* SOF ¶¶ 157-164. But that is no matter. As discussed, there is no evidence that that decision was motivated by Fischman's sex. In fact, the evidence is overwhelming that the reason for Fischman's firing was her mishandling of the Genomatica matter — or, at a minimum, Oliva's good-faith belief that she had mishandled it and his consequent loss of confidence in her. The undisputed record demonstrates that, on January 19, 2023, Fischman wrote that she "forgot to send MCC this proposal in advance of our responding to [Genomatica]. . . . We knew that both proposals would be rejected by [Genomatica], so I believed that there would be no harm to MCC by offering this amount. If we believed that we were actually close to settling this lawsuit, we would never make a proposal without MCC's approval. In the future, as we progress toward settlement (hopefully), we will not make proposals or agreements of this nature without MCC's approval." ECF No. 143-11. Fischman now argues that she did, in fact, have actual authority

from MCC to make the settlement counterproposal to Genomatica.  *See* Pl.'s Opp'n 16.  But that is belied by her own "mea culpa" email.  And, in any event, it is immaterial because there is no dispute that, rightly or wrongly, Oliva *believed* in good faith, based in substantial part on Fischman's own email about the incident, that she had demonstrated poor judgment and poor communication skills in handling the matter and that, as a result, Oliva felt that he could no longer trust Fischman to do her job or to advance the legal team at MCHA.  SOF ¶ 158.  That this was not pretext for sex discrimination is bolstered by the fact that the critical events — including the settlement demand, Fischman's mea culpa email, Oliva's discussions with his superiors, and Fischman's termination — all occurred in a matter of days.

In short, it is doubtful that Fischman establishes a *prima facie* case of sex discrimination, but even if she could, her Title VII discrimination claim fails because no reasonable jury could find that Defendants' legitimate, non-discriminatory reasons for the challenged adverse employment actions were pretext for discrimination.  Accordingly, Defendants' motion for summary judgment with respect to Fischman's Title VII discrimination claim is GRANTED.

## B.  Retaliation

Fischman's Title VII retaliation claim is also subject to the *McDonnell Douglas* framework.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) she engaged in a protected activity of which the defendants were aware; (2) she was subjected to an adverse employment action; and (3) a causal connection existed between the adverse employment action and her protected activity.  *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391 (2d Cir. 2020).  If the plaintiff makes out a *prima facie* case of retaliation and the employer proffers a legitimate, non-retaliatory reason for the action, the burden then shifts back to the plaintiff to show that

retaliation was a "but-for" cause of the employer's alleged adverse employment action.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2d Cir. 2015).  Significantly, a plaintiff seeking to avoid summary judgment must provide more than speculation to support her burden at the third step.  *See, e.g.*, *Bucek v. Gallagher Bassett Servs., Inc.*, No. 16-CV-1344 (KMK), 2018 WL 1609334, at *18 n.31 (S.D.N.Y. Mar. 29, 2018) (citing cases).

Fischman fails to establish even a *prima facie* case of retaliation and, even if she did, her claim would plainly fail at the third *McDonnell Douglas* step for largely the same reasons as discussed above in reference to her discrimination claim.  In fact, one of Fischman's two claims of retaliation is not even supported by the record.  She alleges that, in retaliation for her role in investigating the sexual harassment claims against him, Yoshisato did not support her promotion to General Counsel.  Pl.'s Opp'n 18-19.  But the only relevant evidence in the record suggests, if not proves, otherwise.  *See* ECF No. 139-6 (email from Costa stating that she had "received the message from Yoshisato-san that MCHA wants us to make Jennifer Acting-General Counsel for 12 months in the hope that she will grow into the job").[2]  There are also reasons to doubt the basis for Fischman's second claim of retaliation, which revolve around her alleged report in early March 2016 to Oliva that a MCHC subsidiary was discriminating against someone based on gender, given Defendants' expert report showing that critical evidence of Fischman making that report may have been forged.  *See* Defs.' Mem. 23; Pl.'s Opp'n 20.  But even if Fischman did make the report, there is no basis to her claim that it led to retaliation.  She does not even try to connect that report to her termination, as the nine-month interval between the two would prevent her from establishing causation.  *See, e.g.*, *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457-58

---

[2]     To rebut this evidence, Fischman offers nothing more than her own speculation that this email was fabricated.  *See* ECF No. 138-10, at 51-52.

(S.D.N.Y. 2012) (collecting cases for the proposition that a gap of six months or more

undermines causation).  And while she attempts to tie the report to the fact that she received a

"Needs Improvement" rating for communication in her April 2016 performance review, *see* Pl.'s

Opp'n 20, a "negative performance review, without any showing of a negative ramification,

cannot constitute an adverse employment action."  *Natofsky v. City of New York*, 921 F.3d 337,

352 (2d Cir. 2019).[3]

 In short, Defendants are also entitled to summary judgment on Fischman's Title VII

retaliation claim.

## C.  Equal Pay

 Fischman's final federal claim is for discrimination in violation of the EPA.  To establish

a *prima facie* case of pay discrimination under the EPA, a plaintiff must show that "(i) the

employer pays different wages to employees of the opposite sex; (ii) the employees perform

equal work on jobs requiring equal skill, effort, and responsibility; and (iii) the jobs are

performed under similar working conditions."  *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476,

480 (2d Cir. 2001) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999), *abrogated

on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)).  Once a

plaintiff establishes a *prima facie* case, an employer may establish that the alleged wage disparity

is justified by showing that it is due to "(i) a seniority system; (ii) a merit system; (iii) a system

---

[3] In addition to these two claims of retaliation, Fischman asserts that she "testified that she complained about the disparate treatment she suffered at MCHA based on her gender, and that Defendants terminated her in retaliation for these complaints.  Defendants fail to address this claim entirely, and therefore summary judgment is inappropriate."  Pl.'s Opp'n 20-21 (citations omitted).  Nowhere in Fischman's deposition or elsewhere, however, does she make clear what specific disparate treatment she complained about.  Nor does she provide the timeframe for such complaints or establish a causal connection between the complaints and her termination.  Such generalized assertions, especially at summary judgment, are not sufficient to maintain a retaliation claim.

which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). A plaintiff may "counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Flaherty v. Massapequa Public Sch.*, 752 F. Supp. 2d 286, 299 (E.D.N.Y. 2010) (quoting *Belfi*, 191 F.3d at 136).

Measured against these standards, Fischman's claim falls short because she offers no evidence to suggest that the relatively modest pay disparity between her and Oliva was due to anything other than Defendants' legitimate basis for the differential. Defendants argue that the pay differential was due to Oliva's pharmaceutical experience and the need to lure him from another job, *see* Defs.' Mem. 24-25, and — in part for the reasons discussed above — Fischman offers no evidence that these explanations were pretext for sex discrimination.[4] Indeed, Costa testified that an internal candidate was preferred in part because of the reduced cost of an in-person candidate, *see* ECF No. 138-5 at 175, and Fischman does not dispute that an employer may have a legitimate reason to pay an experienced candidate more to lure him or her from an another employer. An internal hire, in contrast, may need less incentive because they do not face the various risks of accepting a job at a different company. In addition, although Fischman

---

[4]     Defendants also cite as a legitimate reason for the pay differential Oliva's superior negotiating skills. *See* Defs.' Mem. 25. Whether that is a legitimate reason has divided courts. *Compare, e.g.*, *Dreves v. Hudson Grp. (HG) Retail, LLC*, No. 11-CV-4, 2013 WL 2634429, at *8 (D. Vt. June 12, 2013) ("[T]here is simply no basis for the proposition that a male comparator's ability to negotiate a higher salary is a legitimate business-related justification to pay a woman less. To hold otherwise would eviscerate . . . equal pay provisions. It. . . is essentially indistinguishable from the repudiated argument that employers are justified in paying men more than women because men command higher salaries in the marketplace."), *with E.E.O.C. v. Hunter-Tannersville Cent. Sch. Dist.,* No. 21-CV-352, 2021 WL 5711995, at *2-3 (N.D.N.Y. Dec. 2, 2021) (accepting defendant's argument that salary negotiations could be a job-related factor other than sex under the EPA in part because "at least two circuit courts and multiple federal district courts that have specifically held that negotiation is a valid defense"). The Court need not and does not reach the issue here.

argues that Oliva did not have other relevant experience, she does not dispute that Oliva had

greater pharmaceutical experience.  Nor does she provide any reason, let alone evidence, to

believe Defendants' reliance upon that experience was pretextual.

**D.  State and Local Claims**

Having dismissed all three of Fischman's federal claims, the Court must decide whether

to exercise supplemental jurisdiction over her claims under state and local law.  Pursuant to 28

U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over [a

pendent state law claim] if . . . the district court has dismissed all claims over which it has

original jurisdiction."  The statute does not create "a mandatory rule to be applied inflexibly in

all cases."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Nevertheless, "in the

usual case in which all federal-law claims are eliminated before trial," as here, "the balance of

factors to be considered under the pendent jurisdiction doctrine — judicial economy,

convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the

remaining state-law claims."  *Id.*; *see also Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 123

(2d Cir. 2006) (reversing a district court decision to retain supplemental jurisdiction over state-

law claims after dismissal of the federal claim, citing "the absence of a clearly articulated federal

interest"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal

claims are dismissed before trial, the state claims should be dismissed as well."); *Anderson v.

Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the

Second Circuit instructs that absent exceptional circumstances, where federal claims can be

disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from

exercising pendent jurisdiction." (citing cases) (internal quotation marks omitted)).

Applying these standards, the Court concludes that summary judgment should be granted with respect to Fischman's NYSHRL and NYLL claims, which are governed by the same standards as the corresponding federal claims.  *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (NYSHRL and Title VII standards are the same for pre-2019 claims); *Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x. 28, 30 n.2 (2d Cir. 2015) (summary order) (NYLL and federal standards are also the same).[5]  By contrast, the Court declines to exercise supplemental jurisdiction over Fischman's claims under the NYCHRL, as they are subject to a different standard and must be analyzed separately.  *See, e.g.*, *Downey*, 2018 WL 5266875, at \*9; *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that NYCHRL claims "require[] an independent analysis").  In light of that, Fischman's NYCHRL claims present questions "best left to the courts of the state of New York."  *Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x 88, 92-93 (2d Cir. 2011) (summary order) (affirming dismissal of the plaintiff's federal claims and declining to decide his claims under state and city law on the ground that they were "arguably governed by different legal standards" and the relevant law of New York was "still developing"); *Giordano v. City of New York*, 274 F.3d 740, 754-55 (2d Cir. 2001) (declining to reach the question of whether the plaintiff had a valid claim under the NYCHRL after dismissing his federal claim).

---

[5]     In 2019, the NYSHRL was amended to be more like the NYCHRL, but the amendment "does not have retroactive effect."  *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68-69 (S.D.N.Y. 2020).  Thus, Fischman's claims — which concern employment actions taken before the effective date of the amendment — are governed by the pre-2019 standard.  *See id.*

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment must be and is GRANTED — in the case of Fischman's NYCHRL claims, without prejudice to refiling them in state court. Fischman's motions *in limine*, *see* ECF No. 132, are denied as moot.

One final housekeeping matter remains. The Court previously deferred judgment on Defendants' motion for attorney's fees as a sanction for the allegedly forged Note produced by Fischman "until after summary judgment or trial, when the record is likely to be better developed on whether the Note is a forgery and the significance, if any, of that fact." *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188 (JMF), 2022 WL 3646205, at *2 (S.D.N.Y. Aug. 24, 2022). Based on its review of the record, the Court certainly harbors doubts about the authenticity of the Note. But the Court also harbors doubts about whether any sanction would be appropriate. As the Court previously noted, "[a]t most, Defendants allege that Fischman fabricated a single document and lied about doing so in her deposition. Moreover, the document is far from 'the linchpin' of Fischman's case." *Id.* (citation omitted). This Opinion and Order has confirmed that the Note is far from the linchpin of Fischman's case. Indeed, the Court was able to grant summary judgment without resolving whether the Note was authentic. That said, if Defendants wish to move for sanctions, the parties shall confer and propose an appropriate briefing schedule **within two weeks of the date of this Opinion and Order**.

The Clerk of Court is directed to terminate ECF Nos. 132 and 135, to enter judgment in Defendants' favor consistent with ECF No. 35 and this Opinion and Order, and to close the case.

SO ORDERED.

Dated: July 26, 2023
　　　　New York, New York

　　　　　　　　　　　　　　　　JESSE M. FURMAN
　　　　　　　　　　　　　　　　United States District Judge